```
 1              IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF HAWAII

 3

 4   GRAHAM T. CHELIUS, M.D., et al.,  )  CIVIL NO. 17-000493-JAO-RT
                                       )
 5                    Plaintiffs,      )  Honolulu, Hawaii
                                       )
 6        vs.                          )  June 15, 2023
                                       )
 7   UNITED STATES FOOD AND DRUG       )  VIDEO TELECONFERENCE RE:
     ADMINISTRATION, et al.,           )  [171] DEFENDANTS' MOTION
 8                                      )  TO STAY PROCEEDINGS
                      Defendants.      )
 9   _____)

10
                      TRANSCRIPT OF PROCEEDINGS
11              BEFORE THE HONORABLE JILL A. OTAKE
                UNITED STATES DISTRICT COURT JUDGE
12
     APPEARANCES:
13
     For the Plaintiffs:    JULIA KAYE, ESQ.
14                          American Civil Liberties Union Foundation
                            125 Broad Street, 18th Floor
15                          New York, New York 10004

16                          JONGWOOK PHILIP KIM, ESQ.
                            ACLU of Hawaii
17                          P.O. Box 3410
                            Honolulu, Hawaii 96801
18
     For the Government:    ISAAC C. BELFER, ESQ.
19                          Consumer Protection Branch
                            Civil Division
20                          U.S. Department of Justice
                            P.O. Box 386
21                          Washington, D.C. 20044-0386

22
     Official Court         Ann B. Matsumoto, RPR
23   Reporter:              United States District Court
                            300 Ala Moana Boulevard, Room C-338
24                          Honolulu, Hawaii 96850 --

25   Proceedings recorded by machine shorthand.  Transcript produced
     with computer-aided transcription (CAT).
```

1   THURSDAY, JUNE 15, 2023                    9:01 O'CLOCK A.M.

2           COURTROOM MANAGER:  The United States District Court

3   for the District of Hawaii, with the Honorable Jill Otake

4   presiding, is now in session.

5           Civil Number 17-00493 JAO-RT, Graham T. Chelius,

6   M.D., on behalf of himself and his patients, et al. versus

7   United States Food and Drug Administration, et al.

8           This case has been called for a hearing on

9   defendants' motion to stay proceedings, which is being

10  conducted by video teleconference.

11          Counsel, please make your appearances for the record,

12  starting with the plaintiff.

13          DR. CHELIUS:  Hello.  I'm Dr. Graham Chelius,

14  plaintiff for the case.

15          THE COURT:  Hello, Dr. Chelius.

16          Ms. Kaye, you can introduce yourself if you wish.

17          MS. KAYE:  Thank you.  Good morning, Your Honor.

18  Julia Kaye, counsel for plaintiffs.

19          THE COURT:  Good morning.

20          Mr. Kim.

21          MR. KIM:  Wookie Kim also on behalf of plaintiffs.

22  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          And I also note that Dr. Raul Ayala is also here, one

25  of the -- representing one of the plaintiffs.

 1              DR. AYALA:  Yes, Your Honor.  Dr. Raul Ayala,

 2    president of CAFP, plaintiff.

 3              THE COURT:  Good morning.  Mr. Belfer --

 4              DR. AYALA:  Good morning.

 5              THE COURT:  -- if you could introduce yourself.

 6              MR. BELFER:  Good morning.  Isaac Belfer for the

 7    government.

 8              THE COURT:  All right.  Thank you, everyone, for

 9    being here on time and so promptly.

10              If I'm turning to my right, I want you to know that

11    that's because I'm looking at a live transcript to make sure

12    that we're catching everything.  And so I don't want you to

13    think I'm being distracted by something else.

14              I have read everything very carefully.  I don't

15    intend to limit your time this morning.  I will, however, let

16    you know if you're covering things that I feel I know

17    comfortably and don't need more argument on.

18              So with that, as this is the government's motion,

19    let's hear from you first, Mr. Belfer.

20              MR. BELFER:  Sure, Your Honor.  And I know that the

21    Court provided some questions on the docket.  So if you'd like

22    me to address those first, I'm happy to do that.

23              THE COURT:  Well, maybe, why don't I start with a

24    different question and then we'll get to those.  And, you know,

25    one of things that's not clear to me is if this Court were to

1  await the decision in the Texas case, how is it that the stay

2  that you're requesting would be short or at least of a

3  reasonable duration?  I mean do you have any estimate,

4  realistic estimate as to when that case would be resolved and

5  why that would amount to a reasonable duration?

6          MR. BELFER:  Well, Your Honor, we cannot predict

7  exactly how long it will take the Fifth Circuit to decide

8  Alliance, and, you know, we don't know how -- if or when it

9  will go to the Supreme Court.  What I can say is that if the

10  Fifth Circuit decides the case and no one seeks cert., then the

11  appellate proceedings could be resolved and the stay would be

12  lifted as soon as this fall.  If, on the other hand, one party

13  seeks cert. and it goes to the Supreme Court, the Supreme Court

14  grants cert., then the stay might be a bit longer.  It might

15  last, you know, for instance, until, you know, the end of next

16  term.  But in that case --

17          THE COURT:  And isn't that precisely the problem,

18  Mr. Belfer, is that there are a lot of ifs here?  In other

19  words, that the stay would necessary, at least if it were to be

20  entered now, would be of indeterminate length, and we basically

21  send this case into the ether?

22          MS. BELFER:  So, you know, I would direct Your Honor

23  to the Ramachadran case from the Northern District of

24  California, which explained that when the Court grants a stay

25  pending the completion of proceedings in another case, that's

1    not really indefinite, because it speaks to the completion of

2    proceedings, you know, in another case.  And there, proceedings

3    in this other case were pending in the trial court, and the

4    court recognized there could still be an appeal.  But even --

5    nonetheless, the court granted a stay pending the resolution of

6    the trial court proceedings and the appellate proceedings, and

7    explained that wasn't really indefinite.  And with regard to,

8    you know, why it would be reasonable in this context, you know,

9    I think if this goes to the Supreme Court, this would be -- you

10   know, and if the Supreme Court decides the merits, this would

11   be the first time that the Supreme Court has addressed a REMS

12   on the merits.  And so the Supreme Court would have an

13   opportunity for the first time to explain the standard by which

14   to evaluate FDA's actions in approving a REMS.  And so that

15   would be very relevant as to this Court's decision-making.

16          Now, to the extent that the Court is concerned about

17   timing, and we acknowledge there is some uncertainty, one

18   option the Court could take would be to enter deadlines

19   consistent with the Washington court and then hold off on

20   deciding the stay motion until after we produce the

21   administrative record in September, because I think, you know,

22   by September, hopefully, or September or after then, hopefully

23   we'll have more clarity on how Alliance is proceeding, and

24   we'll be better able to understand the potential length of a

25   stay and able to judge the various stay factors.

1          One thing I -- I would like to note --

2          THE COURT:  As -- I'm sorry.  Go ahead.

3          MS. BELFER:  Thank you, Your Honor.

4          So I just want to give the Court an update regarding

5    the status of the Washington schedule.

6          So the -- in Washington, the parties have agreed that

7    the government will produce the administrative record, the

8    complete record by September 1st.  And we have agreed to

9    produce the record on a rolling basis between now and

10   September 1st, with the first production to occur tomorrow.

11   And we are happy to do that in this case as well.

12         With regard to the answer, the original schedule had

13   our answer due on June 23rd.  The parties have recently agreed

14   to defer the answer deadline until after the conclusion of

15   summary judgment proceedings, and the parties intend to file

16   something with the Washington court to that effect.  You know,

17   here, you know, we think it would be reasonable to follow the

18   Washington proceedings and also defer the answer till summary

19   judgment.  If the plaintiffs would like an answer sooner, we

20   would propose an answer deadline of September 1st, the same

21   time when we complete production of the administrative record.

22   We think that would give the government ample time to prepare

23   the answer and would also not prejudice the plaintiffs,

24   because, you know, summary judgment proceedings will not begin

25   until after the record is fully produced and plaintiffs had

1    time to review it.

2           And so, you know, we think a September 1st answer

3    deadline, if the Court wants to set a -- a date certain for the

4    answer, we think September 1st would be a reasonable deadline

5    and would not prejudice the plaintiffs.

6           THE COURT:  Let me -- I will get back to the

7    Washington case in a moment, Mr. Belfer.  But let's go back to

8    the Texas case.

9           And isn't there a real possibility that the Supreme

10   Court could -- assuming it makes it all the way to the Supreme

11   Court, could decide that case in a manner that has really no

12   bearing on this case?  I mean, couldn't they address Alliance

13   on standing alone, for example?

14          MR. BELFER:  It certainly is possible.  We can't

15   predict on what grounds the Supreme Court will resolve

16   Alliance, assuming it gets to the Supreme Court.  But, you

17   know, I think it also is possible that the Court will reach the

18   merits, the parties to brief the merits, and the Court could

19   resolve it on any grounds presented.  So we think it is very

20   possible that the Supreme Court will resolve the Alliance case

21   on the merits.  And if it does so, again, that will be the

22   first time the Supreme Court has -- has evaluated a REMS and

23   FDA's decision in approving a REMS on the merits, and so that

24   would be helpful to this Court in evaluating the REMS.

25          THE COURT:  But wouldn't -- couldn't, if they decide

1   that the FDA's decision to eliminate some of the ETASU, if

2   that's how folks pronounce that acronym -- that's how I've been

3   pronouncing it -- the ETASUs imposed pre-2023 were not

4   arbitrary and capricious, if they came to that conclusion and

5   they basically uphold the FDA's decrease in the mifepristone

6   safeguards, wouldn't that holding -- why does that holding

7   necessarily shed light on the question here about whether or

8   not those safeguards are going too far?

9           MS. BELFER:  Well, you know, I think even though the

10  specific arguments that are made in Alliance and in this case

11  are somewhat different, nonetheless I think it would be helpful

12  for this Court to see how the Supreme Court evaluates the REMS,

13  because, you know, I think how -- the standard by which the

14  Court evaluates FDA's decision in approving a REMS I think is

15  helpful.  And in particular, the mifepristone REMS.  And so,

16  you know, again, even though the particular arguments are

17  different, I think seeing how the Supreme Court goes about

18  evaluating the -- the REMS, I think that analysis will be

19  helpful in this Court's analysis.

20          THE COURT:  But you would agree that if we even get

21  that far, to the Supreme Court, that decision itself might not

22  come out until 2024, 2025?

23          MS. BELFER:  I cannot predict how long --

24          THE COURT:  Right.  You keep saying that, Mr. Belfer.

25  And I agree with you.  None of us can do that.  We're on the

1    same page there.  But doesn't that weigh against this stay?

2            MS. BELFER:  So I think in -- in the -- the Leyva

3    case, the Ninth Circuit explained that when you are considering

4    how long a stay lasts, you don't just look at the amount of

5    time in the abstract; you look at the amount -- the

6    reasonableness of the amount of time relative to the -- the

7    urgency of the matter.  You look at the interest of the

8    parties, and that can determine the reasonableness.

9            So here, I think, you know, as we've explained in our

10   briefs, a stay would not harm the plaintiffs, but it would

11   avoid harm to the defendants.  And so I think that in light of

12   the -- the interest of the parties, a stay, for instance, that

13   lasted, you know, for a year, would be reasonable.  And I would

14   also note that, you know, to the extent that the Court is

15   concerned that the stay might be long, one approach to take

16   would be to hold off on resolving the stay question until after

17   we produce the administrative record in September, because

18   hopefully by later this year we will have more clarity on

19   whether the Fifth Circuit has decided the case, whether the

20   case will be decided by the Supreme Court, and the timing of

21   all of those decisions.

22           And I think, you know, come this fall, when we

23   hopefully have more clarity on the timing of all the decisions,

24   the Court will be better placed to know how long a stay will

25   last and to evaluate the various stay factors.

```
 1              THE COURT:  You mentioned harm a moment ago, which
 2    reminds me I forgot to ask this question about you say that the
 3    plaintiffs aren't pharmacies and that they therefore can't be
 4    harmed by the pharmacy certification requirement.  Haven't they
 5    already alleged how they would be harmed and by the pharm --
 6    and are being harmed by the pharmacy certification requirement?
 7              MS. BELFER:  Well, so my -- my recollection is that
 8    they -- they have allegations about how patients might be
 9    harmed by the pharmacy certification requirements.  We -- we do
10    not concede that -- that plaintiffs can properly assert the
11    interests of their patients.  I think our argument is that
12    plaintiff themselves, the, you know, Dr. Chelius and the
13    organizational plaintiffs, they are not being directly harmed
14    by the pharmacy certification requirement.
15              And then I think, you know, another important point
16    is that, you know, with regard to the pharmacy certification
17    requirement and the January 2023 REMS modification, that
18    actually loosens restrictions on the availability of
19    mifepristone.  It made mifepristone kind of more available,
20    loosened restrictions.  And so plaintiffs simply cannot show
21    any harm from the pharmacy certification requirements.
22              THE COURT:  All right.  Let's turn next to the
23    Washington case.
24              And correct me if I'm wrong, Mr. Belfer, that you are
25    still asking me at this point to, you know, if I decline or
```

1    deny your motion, you do want me to impose a stay of scheduling

2    as Judge Rice has in the Washington case?

3              MS. BELFER:  That's correct.  So in particular --

4              THE COURT:  Thank you.

5              MS. BELFER:  -- with regard to the administrative

6    record deadline, we would ask for the September 1st

7    administrative record deadline as in Washington.  And then

8    regarding the answer, the -- the parties have agreed to defer

9    the answer until after summary judgment.  So we think that will

10   be reasonable here.  If the Court wanted to impose a stay

11   certain, then we would suggest September 1st, the same date

12   that we filed the administrative record, because we think that

13   that would give us ample time to prepare the answer and would

14   also not prejudice plaintiffs.

15             THE COURT:  Okay.  Let's turn to the EO question

16   then, the question I asked in the entry order.  So if you could

17   answer that now, and then I have a couple more questions about

18   the Washington case.

19             MS. BELFER:  Sure.  So the language of the Washington

20   preliminary injunction prohibits FDA from taking any action to

21   change the status quo and rights as it relates to the

22   availability of mifepristone under the REMS in the states of

23   the plaintiffs in that case, which include Hawaii.  The

24   preliminary injunction does not operate on this Court.  So the

25   injunction itself would not prevent the Court from entering an

1    order that altered the status quo.

2           The government believes any such action by this Court

3    would not be warranted as it believes FDA acted within its

4    authority when it approved the REMS.  If this Court ordered FDA

5    to take an action that would change the status quo in any of

6    the Washington plaintiff states, there would be a strong

7    possibility of a conflict between this Court's order and the

8    Washington order.  FDA would consider both orders to determine

9    the extent to which they conflict and then evaluate whether and

10   to what extent the agency might seek relief from one or both

11   orders.

12          THE COURT:  I guess that's why I'm a little confused

13   as to why you're asking me to set a -- kind of schedule of

14   things kind of on par with Judge Rice.  I mean, I understand

15   that you're not necessarily asking me to set the same motions

16   deadlines, but you're asking me to set other things on par with

17   him.

18          Am I right that I should be nervous about the risk of

19   inconsistent results here, especially on a matter that affects

20   the entire state of Hawaii and arguably other states across the

21   country?

22          MS. BELFER:  Well, I think, you know, as -- you know,

23   as we've discussed, I think you, know, certainly it is -- the

24   relief that plaintiffs asked for does raise the risks of an

25   inconsistent judgment.  And so I think there -- there is a --

1    there is a possible risk of that.

2            So, you know, I think -- I think again, in terms

3    of -- of the appropriate steps to take, I think -- I think a

4    stay, as we've discussed, would avoid -- avoid that issue.

5            THE COURT:  A stay with -- a stay awaiting the

6    outcome of the Washington case as an alternative?  Is that what

7    you're endorsing?

8            MS. BELFER:  Well, also, you know, what we've asked

9    for is a stay pending the resolution of appellate --

10           THE COURT:  Right.  Right.  I understand that.

11           (The record was read as follows:  "THE COURT:  A stay

12   awaiting the outcome of the Washington case as an alternative?

13   Is that want you're endorsing?")

14           MR. BELFER:  We are not asking for a stay pending the

15   outcome in Washington.  We're asking for a stay pending the

16   resolution of appellate proceedings in Alliance.

17           THE COURT:  Right.  I understand that.

18           MS. BELFER:  So --

19           THE COURT:  But help me understand why you're not

20   asking for a stay pending the outcome of Washington.

21           MS. BELFER:  The reason for a stay is that the

22   Supreme -- if the Supreme Court resolves Alliance on the

23   merits, the Supreme Court's decision could provide helpful

24   guidelines or binding authority --

25           THE COURT:  Mr. Belfer --

1        MS. BELFER:  -- with regard to (indiscernible).

2        THE COURT:  -- I understand why you're asking for a

3   stay in -- with regard to the Texas case.  What I don't

4   understand is why you're not asking for a stay with regard to

5   the Washington case.

6        MS. BELFER:  I understand, Your Honor.

7        So we do not believe that, you know, the plaintiffs

8   are entitled to the relief they request.  And so, you know,

9   we -- we think that, you know, the -- if -- if and when the

10  Court decides this case on the merits, we think the Court

11  should deny plaintiffs' request for relief and rule for the

12  government.

13       And so, you know, in terms of why we requested the

14  stay that we requested, you know, I think we -- we focused on

15  the efficiencies that would be gained from waiting for the

16  Supreme Court's decision in Alliance, and that -- that was our

17  focus.

18       THE COURT:  And but -- and you've mentioned obviously

19  in your briefing that you haven't asked for a stay in the

20  Washington case.

21       MS. BELFER:  The government believes that a stay

22  in -- in Washington as in this case would be appropriate.  But

23  as a -- a compromise, the parties agreed on a schedule which

24  the Court then entered.  And so I think, you know, in

25  Washington as in this case, we do believe that a stay would be

1   appropriate.  In Washington, the parties agreed on a

2   compromise.  Here, we offered the same Washington schedule to

3   plaintiffs, and plaintiffs did not agree to that.

4           And so that's why here we are requesting a stay or,

5   on the alternative, to follow the deadlines set in Washington.

6           THE COURT:  All right.  Thank you, Mr. Belfer.  I

7   don't have any questions.  But if you have any further

8   argument, I'm happy to hear it.

9           MS. BELFER:  Sure, Your Honor.  I guess one more

10  thing I would note with regard to Washington is that the -- the

11  preliminary injunction that Judge Rice entered is not going to

12  be the ultimate relief in Washington.  So we don't know what

13  the ultimate relief in Washington will be.  And so I think that

14  played into our decision not to request a stay pending the

15  outcome in Washington.  Instead, we focused on the efficiencies

16  to be gained by a stay pending the resolution of appellate

17  proceedings in Alliance.

18          So I think if that answers Your Honor's questions, I

19  think that is -- that is all we have for now.

20          THE COURT:  All right.  Thank you.

21          Ms. Kaye?

22          MS. KAYE:  Thank you, Your Honor.

23          As the Court's earlier questions acknowledged and as

24  both sides here agree, defendants are seeking to stay this 2017

25  case by, at minimum, more than one year, in order to await what

1    may be an entirely inapposite ruling in Alliance that touches

2    none of the issues in Chelius.

3         But even if Alliance might shed some light on this

4    case, defendants still cannot meet their burden to justify a

5    stay, because their motion fails on two other factors that are

6    dispositive under Landis and Lockyer.

7         First, if there's even a fair possibility that the

8    stay will cause harm to others, the moving party must make out

9    a clear case of hardship or inequity, which defendants cannot

10   do as a matter of law.  And second, as Your Honor's questions

11   addressed earlier, even if that showing of hardship could be

12   made, the length of the stay must be reasonable, which is not

13   the case here.

14        Now, I'd like to briefly expand on those various

15   points and then turn to Washington thereafter unless the Court

16   would prefer a different order.

17        THE COURT:  Let's -- why don't we talk about

18   Washington first, just because I think, as you can probably

19   guess, that's the case that's I think a harder row to hoe.  So

20   what is your position on whether and how Judge Rice's

21   preliminary injunction precludes the relief that you seek here?

22        MS. KAYE:  The Washington preliminary injunction does

23   not prevent this Court from expanding the availability of

24   mifepristone via changes to the REMS.  And there are three

25   points I'd like to briefly make on that.

1     First, as Judge Rice expressly recognized, no less

2     than five times in the PI order, on pages 2, 7, 9, 25, and 27,

3     the Washington plaintiffs' PI motion sought to prevent FDA

4     from, quote, "changing the status quo to make mifepristone less

5     available."

6     So that is all that Judge Rice's order can be

7     understood to do, prevent FDA from making the mifepristone less

8     available.  And that is also the only reading that makes sense,

9     given that Judge Rice found numerous legal defects with the

10    REMS as part of the court's likelihood of success on the merits

11    analysis, including that FDA's actions with respect to

12    mifepristone are likely arbitrary and likely contrary to law.

13    So the first big-picture response, the most important

14    response is that there is no conflict between that PI order and

15    a potential order here eliminating some or all of the REMS from

16    mifepristone.

17    The second point, Your Honor, is that even if there

18    were some ambiguity in the Washington order, that District

19    Court has no authority to prevent this Court from granting

20    appropriate final relief in the case before it.  And if that

21    happened, that comes to pass and at that time defendants

22    believe that they are subject to conflicting orders, they are

23    free to do what the federal government regularly may have to

24    do, which is seek clarification from either the District Courts

25    or, if necessary, the Ninth Circuit.  That is the proper course

1    of action if there is potentially some tension down the road

2    between the orders.  Although, again, we do not view there to

3    be any conflict at all.

4           Now, defendants argue that the Washington PI order is

5    a basis to sideline the Chelius plaintiffs for years while both

6    the Alliance and Washington cases move forward.  Both of those

7    cases were filed within the last seven months.  Well, of

8    course, Chelius has been pending for nearly six years.  But as

9    the Supreme Court underscored in Landis, only in rare

10   circumstances will a litigant in one cause be compelled to

11   stand aside while a litigant in another settles the rule of law

12   that will define the rights of both.

13          This Court can and respectfully should proceed to

14   final judgment, because if there were any hypothetical tension

15   between those orders, that could be resolved at that time by

16   seeking clarification from Judge Rice or the Ninth Circuit.

17   And then final --

18          THE COURT:  My question, though, is:  How does that

19   offer any clarity on anything?  I mean in the sense that let's

20   say we -- I do adopt a schedule similar to Judge Rice.  He and

21   I have hearings at approximately the same time.  We're sitting

22   here 2,000 miles or more away from each other, waiting for each

23   other to rule so that we can see -- gain some insight perhaps

24   from each other's work.  I mean, I don't understand how it's

25   beneficial to anybody for us to have these two concurrent

1   litigations asking basically the exact same question of two

2   separate judges in the same circuit.

3           Isn't it more efficient and also wouldn't it, you

4   know, not impact judicial resources if this were addressed in

5   one case with the second judge, you know, following up or

6   perhaps consolidation or something, so that there wouldn't be

7   two separate cases; there can be one clear answer that is --

8   one clear case that is the prevailing case and that case goes

9   to the Ninth Circuit, rather than having to go through these

10  all -- additional other steps of trying to figure out what the

11  FDA's going to do with conflicting orders, what the courts are

12  going to do with the conflicting orders, what the Ninth

13  Circuit's going to do with conflicting orders?  Isn't it more

14  efficient to just have one order that everybody's operating off

15  of that addresses the same issues that's raised in both cases?

16          MS. KAYE:  Your Honor, to the extent that the Court

17  views it as beneficial for there to be only one District Court

18  proceeding moving forward, it should be this one.  Not only

19  because the Chelius plaintiffs have been seeking relief for

20  nearly six years, whereas the Washington litigation was filed

21  only four months ago, but also because there is a richer record

22  in this case, including a dialogue between the Chelius

23  plaintiffs and the FDA in -- during the FDA's process of

24  reevaluating the mifepristone REMS during the 2021 and 2022

25  time period.

1          So to the extent that there is any -- if Your Honor

2    feels that there must be only one District Court proceeding

3    moving forward, this is the one that makes sense.  The counsel

4    here --

5          THE COURT:  But am I right, though, Ms. Kaye, that

6    that case is further along procedurally with regard to the

7    operative complaints?

8          MS. KAYE:  Well, I don't believe that's true.  There

9    was a PI motion filed in this case, which is now up on

10   appeal -- or actually, it is not up on appeal.  Forgive me.  A

11   motion to deny intervention is up on appeal, but the PI order

12   has not been appealed.

13         THE COURT:  Right.

14         MS. KAYE:  So that is sort of a non-issue.

15         But with respect to -- you know, they have a

16   complaint on file; we have an amended complaint on file.

17   You've just heard from Mr. Belfer that they have agreed with

18   the parties in Washington not to provide an answer until

19   September 1st.

20         So with respect to litigation focused on the 2023

21   REMS, the two cases are in exactly the same posture.  The

22   difference is that in our litigation here we have the benefit

23   of multiple years preceding this moment that captures the

24   evolution of the FDA's actions with respect to mifepristone,

25   including, again, the submission by the Chelius plaintiffs of

1   particular data and evidence with respect to the REMS, which

2   the defendants had committed to review as a condition of the

3   parties' jointly moving for a stay pending that REMS review in

4   2021.  And we now have the FDA's response as part of its review

5   memoranda to the Chelius plaintiffs' submission.

6            So again, there is a richness to the record here that

7   is not present in Washington, layered on top of the fact that

8   the counsel and plaintiffs here have been working on the REMS

9   issue for six years, in contrast to the much, much more recent

10  filing in Washington.

11           Now, the other point that I wanted to highlight is

12  that there is a benefit to having multiple District Court cases

13  addressing similar factual and legal questions progressing at

14  the same time.  Now, I just wanted to pull up a quotation here.

15           I will circle back around to this.  It should take me

16  a moment to pull it up.

17           But the bottom line is that the Ninth Circuit and the

18  Supreme Court have repeatedly held that the appellate courts

19  benefit from having both factual and legal questions percolate

20  in the lower courts to have the value of multiple perspectives

21  on the same questions before the appellate courts weigh in.

22  And this is very common practice when it comes to litigation

23  against the federal government.  It is frequently the case that

24  there are similar challenges pending in multiple jurisdictions

25  simultaneously, even within the same circuit.

1          So, you know, while I certainly understand the

2    Court's point about judicial resources, there is also a benefit

3    for the court system to have the perspective of different

4    judges with different focuses of the litigation.  Now,

5    certainly there's a lot of overlap between the complaint in --

6    the amended complaint in Chelius and the complaint in

7    Washington.

8          But the Washington case is very much focused on harm

9    to the state itself.  It's focused in particular on the public

10   hospital system at the University of Washington.  We have a

11   different perspective.  We have a national membership

12   organization, the Society of Family Planning --

13          THE COURT:  But --

14          MS. KAYE:  -- as one of our plaintiffs.  Yes.

15          THE COURT:  -- don't the plaintiffs in both that case

16   and this case assert that they are bringing the claims on

17   behalf of patients?

18          MS. KAYE:  I believe that is correct, but there is

19   still a different factual record that's being represented,

20   including because of the geographic distinctions.

21          So the Washington case is focused on the -- the harm

22   in the 17 plaintiff states and the District of Columbia;

23   whereas here we have among our plaintiffs the Society of Family

24   Planning, which is a nationwide membership organization which

25   has members in -- across the country, including in a number of

1   states that are not encompassed by the Washington injunction.

2   So California, where, of course, all of plaintiff California

3   Academy of Family Physicians members practice, that is not

4   encompassed by the Washington litigation.  Nor is New York or

5   Massachusetts or many other states where FSP has members who

6   provide mifepristone or seek to provide mifepristone and are

7   harmed by the REMS.

8          And to the broader point about judicial economy and

9   having the benefit of different courts addressing similar

10  issues, just one recent example that I would cite is the

11  litigation under the Trump Administration relating to the

12  Title X family planning program, where there was litigation all

13  across the country challenging a new set of regulations that

14  the Trump Administration had adopted with respect to the

15  Title X program, and different circuits reached different

16  rulings there.  So that was a case where the Ninth Circuit

17  sitting en banc upheld the Trump Administration's regulations,

18  and just a few months later the Fourth Circuit sitting en banc

19  affirmed a Maryland court's permanent injunction of those

20  regulations just with respect to the state of Maryland.  So

21  that was a case where, you know, as often -- often arises with

22  the federal government, there were multiple court systems

23  evaluating similar identical factual and legal questions.

24          THE COURT:  Let me ask you about Landis, because

25  doesn't Landis itself suggest that it's reasonable for District

1    Courts to await another District Court's ruling, where that

2    could clarify or simplify the questions of fact in law?

3              MS. KAYE:  Yes.  Certainly that is one of the

4    considerations that's part of the balancing test.  But what is

5    key about Landis is that in Landis the -- it was much more

6    clear that the resolution of the other matter was going to be

7    highly relevant to the resolution of the case that had been

8    stayed.  It's much more clear there than it is here.

9              THE COURT:  How is the resolution in Washington not

10   going to be as relevant here?

11             MS. KAYE:  Oh, I apologize.  I thought you were

12   referring to the Alliance litigation.

13             Yes.  What's -- the same -- the same principle

14   applies.  In Landis there were virtually identical proceedings

15   relating to the same statute, moving forward in multiple courts

16   simultaneously.  And the government sought to stay all of those

17   other matters, claiming that having to litigate on so many

18   different fronts would clog the courts and overtax the

19   government's facilities, and emphasized that the resolution of

20   those other cases was likely to settle many, if not all, of the

21   legal and factual questions at issue in the case that had been

22   stayed.

23             So that was the landscape in which the Supreme Court

24   decided Landis.

25             But nevertheless, the Supreme Court vacated the stay.

1    Even though a -- the stay pending the other litigation would

2    have settled many of the questions in the instant case, the

3    Supreme Court said that is not enough, because the stay would

4    not be of reasonable duration.  And that is exactly the same

5    situation here.

6            THE COURT:  I don't have any other further questions

7    for you, Ms. Kaye, but I'm happy to hear additional argument if

8    you have any.

9            MS. KAYE:  Sure, Your Honor.

10           I'd like to focus in particular on the requirement

11   that where there is a fair possibility that a stay will cause

12   harm, that the government must make out a clear case of

13   hardship or inequity, because that is dispositive of the motion

14   that the government had made here, of a potential stay pending

15   Alliance, but that would also be dispositive to the extent that

16   the Court is considering a stay pending resolution of the

17   proceedings in Washington.

18           Now, defendants have argued that it would be hardship

19   to have to litigate on two fronts.  But as I was just

20   highlighting in Landis, that was exactly the circumstance.  The

21   government was saying we've got all of these different cases

22   going on simultaneously, why can't we just resolve it cleanly

23   in this one case in New York, because it's going to overtax us

24   if we have to litigate simultaneously.  And the Court rejected

25   that argument, finding that's not adequate -- that's not an

1    adequate showing of hardship.

2            And again, the defendants are the federal government

3    here.  DOJ is frequently in the position of having to litigate

4    multiple cases relating to the same statute or regs

5    simultaneously.

6            Defendants' citation for the point that having to

7    litigate on two fronts would be hardship is to a California

8    District Court case, where the defendant there was a private

9    company that had submitted evidence that having to defend both

10   cases simultaneously would be (gestures) crippling.  So that is

11   certainly not the case here, if the -- the government were in

12   the position of having to litigate this matter, the Washington

13   case, and the Alliance case simultaneously.

14           And the only other showing of hardship that the

15   government has purported to make is with respect to the threat

16   of having to produce the administrative record before

17   September 1st.  As you heard, they said that they are only

18   bringing this stay motion here, despite consenting to

19   litigation moving forward in Washington, because the parties

20   couldn't voluntarily agree to a scheduling order.

21           But if defendants are concerned with the scheduling,

22   that should be resolved at a scheduling conference, not on a

23   stay motion.  Just because plaintiffs don't believe that it's

24   appropriate for the government to need nine months from when we

25   first asked them to supplement the administrative record, one

1  day after the final agency action, just because we don't think

2  nine months is reasonable to accomplish that, you know, the

3  Court, of course, could reach a different decision.  Filing a

4  stay motion for an indefinite period of time of one to two

5  years is not how one resolves a scheduling conflict and -- and

6  as a matter of law does not constitute hardship under Lockyer,

7  where the Ninth Circuit said that having to proceed toward

8  trial does not constitute a clear case of hardship or inequity.

9          So defendants have the burden here to justify a stay,

10  either, you know, whatever -- whatever other proceeding that

11  stay would be contingent on, and they cannot as a matter of law

12  meet that burden.

13          THE COURT:  All right.  Thank you, Ms. Kaye.

14          MS. KAYE:  Your Honor, there's just one final --

15          THE COURT:  Yes.

16          MS. KAYE:  -- point that I could make.

17          I would just like to underscore the benefit that

18  there would be of this Court's considered ruling, certainly

19  with respect to the Washington proceeding --

20          THE COURT:  I'm sorry.

21          MS. KAYE:  -- highlighted the deeper record here,

22  including the dialogue --

23          THE COURT:  I'm sorry.  Ms. Kaye, I missed the start

24  of that last sentence.  So if you could start that sentence

25  over, please.

 1              MS. KAYE:  Sure.  Of course.

 2              I wanted to underscore the benefit of having this

 3   Court's considered ruling in the context of this case.  I have

 4   already highlighted why it makes more sense, if there were to

 5   be only one case moving forward in a REMS challenge, why it

 6   would make more sense for it to be this case, because of the

 7   rich record, including the dialogue between the Chelius

 8   plaintiffs and the FDA's failure to consider evidence submitted

 9   by the Chelius plaintiffs as part of the FDA's REMS analysis in

10   2021 and 2022.

11              THE COURT:  But --

12              MS. KAYE:  But I've already --

13              THE COURT:  Ms. Kaye, isn't that part of the record

14   in Washington as well, though?  I mean, Judge Rice's order

15   refers to it.

16              MS. KAYE:  Your Honor, it is part of the record in

17   the sense that, yes, those materials were before the FDA.  You

18   have the FDA's response to it.  Yes, technically that is part

19   of the administrative record.

20              But it would be -- I would have to return to the

21   Landis point that it is a very rare case where a litigant in

22   one cause should be compelled to stand aside while a litigant

23   in another cause resolves their rights.  And this would be a

24   paradigmatic example of that problem.  It would be deeply

25   troubling and unjust for the Chelius plaintiffs here, who have

 1   been fighting against the REMS for nearly six years, who have

 2   made all of the submissions in this case, including multiple

 3   declarations attached to two rounds of summary judgment

 4   briefing that were subsequently vacated, you know, after

 5   declarations already being submitted, who then made multiple

 6   evidentiary submissions to the FDA, for all of that to merely

 7   become part of the record that these Chelius plaintiffs have no

 8   say in the -- in the resolution of, that would be gravely

 9   unjust.  That is exactly what the Supreme Court counseled

10   against in Landis, because it would be so unfair to the

11   litigants.

12           And the -- the very final point I wanted to just

13   highlight is that to the extent that, you know, the stay motion

14   that we are grappling with here is one that would be pending

15   the Alliance resolution, we just want to highlight the value

16   for the U.S. Supreme Court of having the benefit of this

17   Court's ruling at the time that it eventually considers the

18   Alliance case.

19           That case, of course -- in that case, of course, the

20   plaintiffs are arguing that mifepristone is dangerous and that

21   the FDA has therefore been overly permissive of mifepristone.

22   But as Your Honor's earlier questions acknowledged, here, it's

23   really the inverse; the record here reflects that mifepristone

24   is incredibly safe and that actually, FDA has been overly

25   restrictive of this safe and effective medication for abortion

1    and miscarriage here.

2           So for the Supreme Court to have that as part of the

3    background context at the time that it considers the Alliance

4    litigation would be enormously valuable and is part of why the

5    Supreme Court generally prefers to have a policy of having

6    factual and legal questions percolating in the lower court so

7    as to have that broader advantage point of the -- the factual

8    legal landscape.

9           THE COURT:  Thank you, Ms. Kaye.

10          Mr. Belfer, time for rebuttal.

11          MS. BELFER:  Thank you, Your Honor.

12          Just a few points.  I'd like to first make a few

13   points regarding the stay analysis and then turn to the

14   Washington case.

15          So when the Court considers whether the length of a

16   stay is reasonable, it should consider the reasonableness of

17   the stay in light of the urgency of the matter, in light of the

18   interests at stake.  And here, with regard to judicial economy,

19   we have explained how the Supreme Court's potential decision on

20   the merits in Alliance would provide helpful guidance or by a

21   new precedent for this Court when it addresses the merits in

22   this case.

23          With regard to the percolation issue, you know, there

24   are already two different cases, two different decisions that

25   have been made.  We have the Alliance decision and the

1   Washington decision going in a different direction.  So we

2   already have several different District Courts taking different

3   approaches here.  To have kind of an additional court weigh in

4   and potentially issue an injunction which was in tension with,

5   you know, other courts would, you know, not meaningfully add to

6   the kind of percolation concern, but it would harm the

7   government to have an additional third injunction and

8   potentially conflicted with other injunctions.

9           And then, you know, with regard to balancing of the

10  harms, you know, plaintiffs argued that if you have a

11  possibility of harm to the plaintiffs, then we need to show,

12  you know, harm to the defendants that would be avoided by a

13  stay.  But, you know, importantly, we only need to show harm to

14  defendants that would be avoided by a stay if plaintiffs have

15  shown that they would be harmed by a stay.  And for the reasons

16  we discussed in our brief, plaintiffs have not shown that they

17  would be harmed by a stay.  You know, for example, the delay

18  that they had in, you know, challenging the (indiscernible) --

19          THE COURT:  If you could slow down, Mr. Belfer,

20  please.  If you could restate your last sentence.

21          MS. BELFER:  Sure.  So as we've discussed, plaintiffs

22  have not showed that they would be harmed by a stay, in light

23  of their delay in challenging or -- in challenging the

24  prescriber certification requirement and the patient agreement

25  form requirement and the fact that the pharmacy certification

1    requirement actually loosened restrictions on the availability

2    of mifepristone.

3            And with regards to, you know, plaintiffs' argument

4    that simply having to litigate is not a sufficient harm.  You

5    know, what Landis said is that, you know, simply having to

6    litigate a case is not sufficient on its own to show harm to

7    the party requesting a stay.  But it is a relevant factor.  And

8    when you take the harm of having to prepare summary judgment

9    briefs that might become -- that might have to be redone

10   following Alliance, combine that with having to litigate on

11   multiple fronts and being potentially subject to multiple

12   inconsistent orders, there certainly is harm to defendants that

13   would be avoided by a stay.

14           THE COURT:  That means, given the amount of time that

15   Alliance will take, isn't it entirely possible that there would

16   be a summary judgment ruling issued in this case before the

17   Supreme Court rules on Alliance?

18           MS. BELFER:  Yeah, we -- we -- I can't speculate as

19   to when the Supreme Court will rule.  But, you know, I think to

20   the extent that the Supreme Court grants cert. in Alliance,

21   then there will be a significant benefit to this Court and

22   efficiencies to be gained by waiting for the Supreme Court to

23   issue its decision and getting guidance from the Supreme Court

24   on the standards to apply in evaluating the mifepristone REMS.

25           So again, even if we do have to wait, you know, up to

1    a year, say, for the Supreme Court to decide Alliance, that

2    will be worth it because the Court would gain significant

3    efficiencies in seeing how the Supreme Court evaluates the

4    mifepristone REMS.

5          And I'd like to just say a few points about the

6    Washington case.

7          So, you know, plaintiffs said that the Washington

8    injunction does not prevent courts from expanding access and

9    from changing the REMS to -- to basically make them less

10   restrictive.

11         You know, plaintiffs' characterization is not

12   consistent with the -- the plain text of the order.  I think if

13   the Court looks at the text of the order, that requires FDA to

14   maintain the status quo.

15         With regard to the record, you know, I think it's

16   important to note that the record in this case would be the

17   same as the record in Washington.  We (indiscernible) the same

18   administrative record.

19         And with regard to the Court's questions about

20   whether it would make sense to stay this case pending the

21   resolution of Washington, you know, if the Court would like, we

22   would be happy to kind of -- I would be happy to confer with my

23   client and then submit a supplemental brief or letter on that

24   question.

25         And then the final thing I would note is, you know,

1  so for the reasons we discussed, we think a stay is warranted.

2  If the Court would instead prefer to enter the deadlines in

3  Washington and then potentially revisit the question of the

4  stay later this year where we have more clarity, you know, we

5  think that a September 1st administrative record deadline would

6  be appropriate; and, you know, as I said, we plan to do rolling

7  production of the administrative record between now and

8  September 1st, with the first production tomorrow.  And with

9  regard to the answer, you know, we think September 1st would be

10 an appropriate deadline.

11        At the very least we would like, you know, some more

12 time to work on the answer, and so we would at least like, you

13 know, several weeks, a month or two, but we would like at least

14 some more time to work on the answer.

15        And so I think that's -- I think that's everything.

16 And I think in summation, I think the Court should stay this

17 case or alternatively enter the deadlines in Washington.

18        THE COURT:  Let me ask you, Mr. Belfer, to respond to

19 Ms. Kaye's last argument with regard to the fairness of, you

20 know, basically wresting from the plaintiffs here the power and

21 control to raise their arguments in a case that they have been

22 fighting for a number of years.

23        I mean, maybe procedurally there is disagreement

24 between Ms. Kaye and I as to where -- which case is further

25 along procedurally with regard to the operative complaint.  But

1   she raises a good argument I think by saying, look, Judge,

2   there's something inherently unfair by taking away from my

3   clients the ability to argue their case, have their day in

4   court and surrendering their day in court to other plaintiffs

5   over whom they have no control and with whom they may not be

6   even strategizing.  So how do you respond to that argument?

7            MS. BELFER:  Well, Your Honor, I think with regard to

8   kind of the considerations that would arise from a stay of this

9   case pending the outcome in Washington, I think we would need

10  to -- to make a further submission to the Court, because we

11  haven't so far taken a position on that, on that question.  So

12  I think to the extent that the Court is interested in whether

13  it should stay this case pending Washington, we would be happy

14  to make a supplemental submission in addressing that question.

15           THE COURT:  All right.  Okay.  Thank you.

16           Ms. Kaye, let me ask you your position on whether or

17  not you would want to file any supplemental submissions with

18  regard to a potential stay pending the outcome in the

19  Washington case.

20           MS. KAYE:  Yes, Your Honor.  I think we will likely

21  be documenting many of the arguments I've already made, but

22  certainly if that is something that Your Honor is considering,

23  we would be grateful for the opportunity to weigh in in

24  writing.

25           One additional point that I can make right now on

1   that is that there is no schedule in Washington beyond

2   production of the administrative record as -- as Mr. Belfer has

3   underscored.  We actually have no idea when the Washington

4   matter would move forward towards summary judgment.  And were

5   this matter stayed pending the resolution -- the resolution of

6   the Washington proceeding, our plaintiffs, in addition to

7   having no substantive ability to participate, would also have

8   no ability to influence the scheduling there in Washington.

9            So if the Washington case ends up not moving towards

10  summary judgment until, say, early 2024, our plaintiffs would

11  have no say in that at all.

12           And in the event that both cases, here and

13  Washington, are moving forward simultaneously in summary

14  judgment, there really would be no -- or hardly any extra

15  burden on the government, because they would be making the same

16  defenses or largely the same defenses in both cases.

17           So from that perspective as well, there would be no

18  hardship to the government, no cognizable hardship under the

19  precedent to having to defend both cases simultaneously.  But

20  the Ninth Circuit would have the benefit of two different

21  District Courts' considered judgment of the record before them.

22           We are eager to move forward to summary judgment.

23  Before we knew that the government intended to move for a stay

24  in this proceeding, we had proposed jointly proposing to the

25  Court a schedule in which plaintiffs' opening motion and brief

1    would be due this month, in June.  That was the schedule that

2    we were envisioning.  Obviously that is not possible now, but

3    what we are respectfully urging the Court to do here is to both

4    deny the stay motion and move this case forward to summary

5    judgment briefing in the fall.

6             We don't think September 1st is a reasonable date for

7    the administrative record production, but we are not going to

8    die on that hill.  What we mostly care about is a path forward

9    for this case that has been pending for nearly six years to

10   finally reach a -- a ruling on the merits that these plaintiffs

11   have been seeking for so long.

12            THE COURT:  All right.  Okay, thank you, Ms. Kaye.

13            Thank you, Mr. Belfer.

14            I very much appreciate the argument this morning.  It

15   was helpful.  I found the briefs enlightening as well.  I will

16   endeavor to issue a ruling in a reasonable time frame.  You

17   will hear from me sooner rather than later on the matter of

18   whether or not I would seek additional briefing on the

19   potential requests for a stay and pending the Washington

20   outcome.

21            Okay.  Thank you, counsel.  Have a nice weekend.  We

22   are adjourned.

23            (The proceedings concluded at 9:54 a.m., June 15,

24   2023.)

25

1                    COURT REPORTER'S CERTIFICATE

2              I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9              DATED at Honolulu, Hawaii, June 30, 2023.

10

11

12
                         */s/ Ann B. Matsumoto*
13                       ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25