Exhibit B-2

**ACOG Petition References 36-52**

# TABLE OF CONTENTS

| Petition Reference No. | Reference | Page No. |
|---|---|---|
| 1 | Prescription drug products; certain combined oral contraceptives for use as postcoital emergency contraception, 62 Fed. Reg. 8610 (proposed February 25, 1997) | Pet. Ref. 1 |
| 2 | U.S. Food & Drug Admin., *FDA Is Temporarily Exercising Enforcement Discretion with Respect to Certain Clozapine REMS Program Requirements to Ensure Continuity of Care of Patients Taking Clozapine* (last updated Nov. 2, 2022) | Pet. Ref. 4 |
| 3 | Letter from Janet Woodcock, M.D., Acting Comm'r, U.S. Food & Drug Admin., to Maureen Phipps, M.D., M.P.H., FACOG, Chief Exec. Off., Am. Coll. of Obstetricians & Gynecologists, and William Grobman, M.D., M.B.A., Pres., Society for Maternal-Fetal Medicine (Apr. 12, 2021) | Pet. Ref. 16 |
| 4 | U.S. Dep't of Health & Hum. Servs., *Remarks by Secretary Xavier Becerra at the Press Conference in Response to President Biden's Directive Following Overturning of Roe v. Wade* (June 28, 2022) | Pet. Ref. 18 |
| 5 | Am. Coll. of Obstetricians & Gynecologists, Practice Bulletin No. 200: Early Pregnancy Loss, Interim Update (2021) | Pet. Ref. 22 |
| 6 | U.S. Ctrs. for Disease Control & Prevention, *Pregnancy and Infant Loss* (last reviewed Sept. 2022) | Pet. Ref. 49 |
| 7 | Siobhan Quenby et al., *Miscarriage Matters: The Epidemiological, Physical, Psychological, and* | Pet. Ref. 51 |

| | *Economic Costs of Early Pregnancy Loss*, 397 Lancet 1658 (May 2021) | |
| --- | --- | --- |
| 8 | Xiaobin Wang et al., *Conception, Early Pregnancy Loss, and Time to Clinical Pregnancy: A Population-Based Prospective Study*, 79 Fertil. & Steril. 577 (Mar. 2003) | Pet. Ref. 61 |
| 9 | Christopher W. Tessum et al., *PM2. 5 Polluters Disproportionately and Systemically Affect People of Color in the United States*, 7 Sci. Advances eabf4491 (Apr. 2021) | Pet. Ref. 69 |
| 10 | Kaiser Family Foundation, *State Health Facts: Poverty Rate by Race/Ethnicity* (2022) | Pet. Ref. 76 |
| 11 | Jade M. Shorter et al., *Racial Disparities in Mental Health Outcomes Among Women with Early Pregnancy Loss*, 137 Obstet. Gynecol. 156 (Jan. 2021) | Pet. Ref. 89 |
| 12 | Linda Layne, *"True Gifts from God": Paradoxes of Motherhood, Sacrifice, and Enrichment*, *in* Motherhood Lost: A Feminist Account of Pregnancy Loss in America 145–72 (Routledge ed. 2002) | Pet. Ref. 97 |
| 13 | Robin R. Wallace et al., *Counseling Women with Early Pregnancy Failure: Utilizing Evidence, Preserving Preference*, 81 Patient Educ. & Couns. 454 (2010) | Pet. Ref. 125 |
| 14 | Alisa B. Goldberg et al., *Pregnancy Loss*, in Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care 264-279 (Maureen Paul et al., eds., 2009) | Pet. Ref. 133 |
| 15 | J. Trinder et al., *Management of Miscarriage: Expectant, Medical, or Surgical? Results of* | Pet. Ref. 149 |

| | | |
|---|---|---|
| | *Randomised Controlled Trial (Miscarriage Treatment (MIST) Trial)*, 332 BMJ 1235 (May 2006) | |
| 16 | F. Blohm et al., *A Randomized Double Blind Trial Comparing Misoprostol or Placebo in the Management of Early Miscarriage*, 112 BJOG 1090 (Aug. 2005) | Pet. Ref. 155 |
| 17 | Jun Zhang et al., *A Comparison of Medical Management with Misoprostol and Surgical Management for Early Pregnancy Failure*, 353 N. Engl. J. Med. 761 (Aug. 2005) | Pet. Ref. 161 |
| 18 | Margreet Wieringa-de Waard et al., *Patient Preferences for Expectant Management vs. Surgical Evacuation in First-Trimester Uncomplicated Miscarriage*, 57 J. Clin. Epidemiol. 167 (Feb. 2004) | Pet. Ref. 170 |
| 19 | Robin Wallace et al., *"Every Person's Just Different": Women's Experiences with Counseling for Early Pregnancy Loss Management*, 27 Women's Health Issues 456 (2017) | Pet. Ref. 177 |
| 20 | Pak Chung Ho, *Women's Perceptions on Medical Abortion*, 74 Contraception 11 (July 2006) | Pet. Ref. 184 |
| 21 | William F. Rayburn, *Distribution of American Congress of Obstetricians and Gynecologists Fellows and Junior Fellows in Practice in the United States*, 119 Obstetrics & Gynecology 1017 (May 2012) | Pet. Ref. 189 |
| 22 | Agency for Healthcare Res. & Quality., Primary Care Workforce Facts and Stats Number 3, AHRQ Pub. No. 12-P001-4-EF (Jan. 2012) | Pet. Ref. 195 |

| 23 | Courtney A. Schreiber et al., *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, 378 N. Engl. J. Med. 2161 (2018) | Pet. Ref. 196 |
|----|-----------------------------------|-------------|
| 24 | Justin J. Chu et al., *Mifepristone and Misoprostol Versus Misoprostol Alone for the Management of Missed Miscarriage (MifeMiso): A Randomised, Double-Blind, Placebo-Controlled Trial*, 396 Lancet 770 (Sept. 2020) | Pet. Ref. 206 |
| 25 | JP Neilson et al., *Medical Treatment for Early Fetal Death (Less than 24 Weeks)*, 3 Cochrane Database of Sys. Rev. CD002253 (2006) | Pet. Ref. 215 |
| 26 | C Kim et al., *Medical Treatments for Incomplete Miscarriage*, 1 Cochrane Database Sys. Rev. CD007223 (2017) | Pet. Ref. 304 |
| 27 | Jessica Beaman et al., *Medication to Manage Abortion and Miscarriage*, 35 J. Gen. Intern. Med. 2398 (May 2020) | Pet. Ref. 472 |
| 28 | J Ghosh et al., *Methods for Managing Miscarriage: A Network Meta-Analysis*, 6 Cochrane Database Sys. Rev. CD012602 (2021) | Pet. Ref. 480 |
| 29 | Sam Neill et al., *Medication Management of Early Pregnancy Loss: The Impact of the U.S. Food and Drug Administration Risk Evaluation and Mitigation Strategy [A289]*, 139 Obstetrics & Gynecology 83S (May 2022) | Pet. Ref. 718 |
| 30 | Alabama Chemical Abortion Prohibition Act, H.B. 261, Reg. Sess. (Ala. 2022) | Pet. Ref. 719 |
| 31 | Unlawful Abortion Medication, H.B. 2811, Reg. Sess. (Ariz. 2022) | Pet. Ref. 726 |

| 32 | Pam Belluck, *They Had Miscarriages, and New Abortion Laws Obstructed Treatment*, N.Y. Times, July 20, 2022 | Pet. Ref. 727 |
|---|---|---|
| 33 | Tom Murphy, *CVS Seeks Verification on Drugs with Possible Abortion Use*, AP News (July 21, 2022) | Pet. Ref. 732 |
| 34 | Frances Stead Sellers & Fenit Nirappil, *Confusion Post-Roe Spurs Delays, Denials for Some Lifesaving Pregnancy Care*, Washington Post (July 16, 2022) | Pet. Ref. 734 |
| 35 | Jen Christensen, *Women with Chronic Conditions Struggle to Find Medications After Abortion Laws Limit Access*, CNN (July 22, 2022) | Pet. Ref. 740 |
| 36 | U.S. Dep't of Health & Human Servs., Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care Services (July 13, 2022) | Pet. Ref. 747 |
| 37 | U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., Risk Assessment and Risk Mitigation Review(s); Application Number 020687Orig1s020 (Mar. 29, 2016) | Pet. Ref. 754 |
| 38 | Alison Norris et al., *Abortion Stigma: A Reconceptualization of Constituents, Causes, and Consequences*, 21-3S Women's Health Issues S49 (2011) | Pet. Ref. 791 |
| 39 | Alisa B. Goldberg et al., *Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location*, 139 Obstetrics & Gynecology 771 (May 2022) | Pet. Ref. 797 |

| 40 | Soc. of Teachers of Fam. Med., *Core Outcomes, Competencies, Subcompetencies, and Milestones* (accessed Nov. 28, 2023) | Pet. Ref. 807 |
|---|---|---|
| 41 | Accreditation Council for Graduate Med. Educ., *Obstetrics & Gynecology Milestones* (2d Rev. 2021) | Pet. Ref. 810 |
| 42 | Greer Donley, *Medication Abortion Exceptionalism*, 107 Cornell L. Rev. 627 (2022) | Pet. Ref. 848 |
| 43 | David S. Cohen & Krysten Connon, *Living in the Crosshairs: The Untold Stories of Anti-Abortion Terrorism* (Oxford University Press 2015) (*Introduction only, based on public online accessibility) | Pet. Ref. 926 |
| 44 | Danielle Calloway et al., *Mifepristone Restrictions and Primary Care: Breaking the Cycle of Stigma Through a Learning Collaborative Model in the United States*, 104 Contraception 24 (July 2021) | Pet. Ref. 963 |
| 45 | Mugdha Mokashi et al., *"There's Only One Use For It": Stigma as a Barrier to Mifepristone Use for Early Pregnancy Loss in Alabama [A31]*, 139 Obstetrics & Gynecology 9S (May 2022) | Pet. Ref. 968 |
| 46 | Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into U.S. Family Medicine Primary Care Clinics*, 109 Contraception 19 (May 2022) | Pet. Ref. 970 |
| 47 | Jonathan M. Bearak et al., *Disparities and Change over Time in Distance Women Would Need to Travel to Have an Abortion in the USA: A Spatial Analysis* 2 Lancet Public Health e493 (2017) | Pet. Ref. 983 |

| 48 | Am. Coll. of Obstetricians & Gynecologists Committee on Health Care for Underserved Women, Committee Opinion No. 586: *Health Disparities in Rural Women*, 123 Obstetrics & Gynecology 384 (Feb. 2014) | Pet. Ref. 991 |
|---|---|---|
| 49 | Daniel Grossman et al., *Medication Abortion with Pharmacist Dispensing of Mifepristone*, 137 Obstetrics & Gynecology 613 (2021) | Pet. Ref. 996 |
| 50 | Saida Mamedova et al., U.S. Dep't of Education, *A Description of U.S. Adults Who Are Not Digitally Literate*, NCES 2018-161 (May 2018) | Pet. Ref. 1006 |
| 51 | Health Canada, *Regulatory decision summary: Mifegymiso* (July 29, 2015) | Pet. Ref. 1039 |
| 52 | Laura Schummers et al., *Abortion Safety and Use with Normally Prescribed Mifepristone in Canada*, 386 N. Engl. J. Med. 57 (Jan. 2022) | Pet. Ref. 1043 |

11/28/23, 3:38 PM    Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT    Document 198-3    Filed 11/30/23    Page 9 of 315    PageID.5150



🇺🇸 An official website of the United States government

**U.S. Department of**
**Health and Human Services**
Enhancing the health and well-being of all Americans

HHS </> > Civil Rights Home </civil-rights/index.html> > For Individuals </civil-rights/for-individu…

**Navigate to:**

T+  🖨  f  𝕏  ✉

# Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Health Care at Pharmacies

*Revised guidance: On September 29, 2023, OCR revised this guidance to clarify that the guidance does not require pharmacies to fill prescriptions for medication for the purpose of abortion.*

Pharmacies—and the pharmacists they employ—play a critical role in the American health care system. This has never been more apparent than the efforts taken to administer vaccines during the COVID-19 pandemic, for which your continued partnership has been crucial.[1]  The purpose of this guidance is to remind the roughly 60,000 retail pharmacies in the United States[2] of the unique role pharmacies play in ensuring nondiscriminatory access to health care services and supporting persons with disabilities, women experiencing miscarriages and early pregnancy loss, and those seeking access to contraceptives and fertility treatments. This guidance covers the nondiscrimination obligations of pharmacies under federal civil rights laws.

Pet. Ref. 747

11/28/23, 3:38 PM          Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT    Document 198-3    Filed 11/30/23    Page 10 of 315    PageID.5151

This guidance supersedes and revises OCR guidance entitled "Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Access to Comprehensive Reproductive Health Care" issued on July 13, 2022, to clarify that the guidance does not require pharmacies to fill prescriptions for medication for the purpose of abortion; nor does the guidance suggest or imply an obligation of pharmacies to fill prescriptions for medication in violation of State laws, including those banning or restricting abortion.

Under Section 1557 of the Affordable Care Act (Section 1557), 42 U.S.C. § 18116, and its implementing regulation, 45 C.F.R. part 92, recipients of federal financial assistance are prohibited from excluding an individual from participation in, denying them the benefits of, or otherwise subjecting them to discrimination on the basis of sex and disability, among other bases, in their health programs and activities.[3] Under Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. 794, recipients of federal financial assistance are prohibited from discriminating in all programs and activities on the basis of disability.  While pharmacies regularly dispense medications, make determinations regarding the suitability of a prescribed medication for a patient, and advise patients about medications and how to take them, pharmacies that receive federal financial assistance may not discriminate against pharmacy customers on the bases prohibited by Section 1557 and Section 504 when they do so.

The United States has the highest maternal mortality rate among developed nations; though most maternal deaths in the United States are preventable, they have been rising over the last two decades.[4] Maternal deaths are especially high among Black women and Native American women—regardless of their income or education levels.[5] Further, the early loss of pregnancy (before 13 completed weeks) is extremely common, experienced by about 10 percent of those who know they are pregnant.[6]  The Department is committed to improving maternal health—including for individuals who experience miscarriages—and vigorous enforcement of our civil rights laws is one way in which we plan to do so.

Pharmacies are often the most accessible health care provider for millions of Americans, with most Americans living within five miles of a pharmacy.[7] It is estimated that more than 131 million people (66 percent of adults) in the United States use prescription medication,[8] and therefore come into contact with pharmacies. Of the 7.6 billion retail prescription drugs filled by pharmacies in 2019, 44 percent were paid for either by

Pet. Ref. 748

11/28/23, 3:38 PM          Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 11 of 315   PageID.5152

Medicare or Medicaid health coverage.[9] As recipients of federal financial assistance, including Medicare and Medicaid payments, pharmacies are prohibited from discriminating on the basis of race, color, national origin, sex, age, and disability in their programs and activities under a range of federal civil rights laws.

Among its civil rights enforcement responsibilities, the Department of Health and Human Services' (HHS or Department) Office for Civil Rights (OCR) is responsible for protecting the rights of women and pregnant people in their ability to access care that is free from discrimination. This includes their ability to access lawfully prescribed medication from their pharmacy free from discrimination. A recent study by the Centers for Disease Control and Prevention showed that nearly 25 percent of women aged 15–49 in the United States who use contraception use some form of prescribed method (e.g., oral contraception pill, contraceptive ring).[10]

Furthermore, discrimination against pregnant people on the basis of their pregnancy or related conditions (examples below) is a form of sex discrimination. Such discrimination can have significant health consequences. Denying lawfully prescribed medication to customers can have negative health impacts and may violate civil rights laws.

**Examples:**

- An individual experiences an early pregnancy loss (first-trimester miscarriage) and their health care provider prescribes medication to assist with the passing of the miscarriage.[11] If a pharmacy refuses to fill the individual's prescription—which is prescribed to manage a miscarriage or complications from pregnancy loss, because this medication can also be used to terminate a pregnancy—the pharmacy may be discriminating on the basis of sex.

- An individual experiences severe and chronic stomach ulcers, such that their condition meets the definition of a disability under civil rights laws. Their gastroenterologist prescribes misoprostol to decrease risk of serious complications associated with ulcers. If the pharmacy refuses to fill the individual's prescription or does not stock misoprostol because of its alternate uses, it may be discriminating on the basis of disability.

Pet. Ref. 749

11/28/23, 3:38 PM    Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 12 of 315  PageID.5153

- An individual presents to a hospital emergency department with chills, fever, and vaginal bleeding. The treating physician diagnoses a miscarriage complicated by a uterine infection (known medically as a septic abortion) and orders an antibiotic. If the hospital pharmacy refuses to provide the antibiotic required for treatment because of concern that subsequent care may include uterine evacuation (via medical or surgical abortion), the pharmacy may be discriminating on the basis of sex.

- An individual who has been undergoing fertility treatments receives a positive pregnancy test. After the individual expresses concern with symptoms associated with an ectopic pregnancy,[12] their medical provider performs an ultrasound to determine where the pregnancy is developing. The ultrasound indicates the fertilized egg is growing in a fallopian tube. The medical provider orders methotrexate to halt the ectopic pregnancy. If a pharmacy refuses to fill the prescription because it will halt the growing of cells and end the ectopic pregnancy, it may be discriminating on the basis of sex.

- An individual with rheumatoid arthritis, such that their condition meets the definition of a disability under civil rights laws, is prescribed methotrexate by their physician's assistant as a standard immunosuppressive treatment. If the pharmacy refuses to fill the individual's prescription or does not stock methotrexate because of its alternate uses, it may be discriminating on the basis of disability.

- An individual presents a prescription for an emergency contraceptive at their local pharmacy after a sexual assault to prevent pregnancy. If the pharmacy otherwise provides contraceptives (e.g., external and internal condoms) but refuses to fill the emergency contraceptive prescription because it can prevent ovulation or block fertilization, the pharmacy may be discriminating of the basis of sex.

- An individual's health care provider sends the individual's legally valid prescription for hormonal contraception (e.g., oral contraceptive pill, emergency contraception, a patch placed on the skin, a contraceptive ring, or any other FDA-approved contraceptive product) to a pharmacy. If the pharmacy otherwise provides contraceptives (e.g., external and internal condoms) but refuses to fill a certain type of contraceptive because it may prevent a pregnancy, the pharmacy may be discriminating on the basis of sex.

Pet. Ref. 750

11/28/23, 3:38 PM     Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 13 of 315   PageID.5154

In addition to the aforementioned civil rights laws, OCR also enforces Federal religious freedom and conscience statutes including the Church Amendments, codified at 42 U.S.C. § 300a-7, and complies with the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, et seq. This guidance does not address how RFRA or the Church Amendments would apply in a given case. OCR will evaluate and apply these statutory protections on a case-by-case basis. To learn more about OCR's enforcement of the Church Amendments, see HHS's *Guidance on Nondiscrimination Protections under the Church Amendments* </conscience/conscience-protections/guidance-church-amendments-protections/index.html>.

For additional information, contact the Office for Civil Rights at (800) 368-1019 or OCRMail@hhs.gov. If you believe that your or another person's civil rights, conscience rights, or health information privacy rights have been violated, visit the OCR complaint portal to file a complaint online at: https://www.hhs.gov/ocr/complaints/index.html <https://www.hhs.gov/ocr/complaints/index.html>.

To obtain this information in an alternate format, contact the HHS Office for Civil Rights at (800) 368-1019, TDD toll-free: (800) 537-7697, or by emailing OCRMail@hhs.gov. Language assistance services for OCR matters are available and provided free of charge.

DISCLAIMER: The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or the Departments' policies.

---

# Endnotess

[1] *See, e.g.*, *The Federal Retail Pharmacy Program for COVID-19 Vaccination*, U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention (last updated July 25, 2023), https://www.cdc.gov/vaccines/covid-19/retail-pharmacy-program/index.html <https://www.cdc.gov/vaccines/covid-19/retail-pharmacy-program/index.html>.

[2] IQVIA, *U.S. National Pharmacy Market Summary 2021: Market Insights Report* (2021), https://www.onekeydata.com/downloads/reports/2021_US_Pharmacy_Market_Report.pdf - PDF <https://www.onekeydata.com/downloads/reports/2021_us_pharmacy_market_report.pdf> ↗ </disclaimer.html>.

Pet. Ref. 751

11/28/23, 3:38 PM    Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 14 of 315   PageID.5155

[3] Covered entities should also note that Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq*., prohibits discrimination on the basis of sex in education programs and activities of recipients of federal financial assistance. Pharmacies that are affiliated with a covered education program or activity are also subject to Title IX nondiscrimination requirements. *See also* 45 C.F.R. part 86 (HHS Title IX implementing regulations).

[4] Roosa Tikkanen et al., *Issue Brief: Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, Commonwealth Fund (Nov. 18, 2020),

[5] Emily Petersen et al., *Racial/Ethnic Disparities in Pregnancy-Related Deaths — United States, 2007–2016*, 68 Morbidity & Mortality Wkly. Rep. 762 (2019), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6835a3-H.pdf - PDF <https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6835a3-h.pdf>.

[6] *FAQs: Early Pregnancy Loss*, Am. Coll. of Obstetricians & Gynecologists (last updated Jan. 2022), https://www.acog.org/womens-health/faqs/early-pregnancy-loss <https://www.acog.org/womens-health/faqs/early-pregnancy-loss> </disclaimer.html>.

[7] *Federal Retail Pharmacy Program*, U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention (last updated June 24, 2022), https://www.cdc.gov/vaccines/covid-19/retail-pharmacy-program/index.html <https://www.cdc.gov/vaccines/covid-19/retail-pharmacy-program/index.html>.

[8] *Prescription Drugs,* Georgetown Univ., Health Pol'y Inst., https://hpi.georgetown.edu/rxdrugs <https://hpi.georgetown.edu/rxdrugs> </disclaimer.html> (last visited June 29, 2022).

[9] *Number of Retail Prescription Drugs Filled at Pharmacies by Payer*, Kaiser Fam. Found., https://www.kff.org/health-costs/state-indicator/total-retail-rx-drugs/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D </disclaimer.html> (last visited June 29, 2022).

[10] Kimberly Daniels & Joyce C. Abma, U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Health Stats., *Data Brief: Current Contraceptive Status Among Women Aged 15-49: United States, 2015-2017* (2018),

Pet. Ref. 752

11/28/23, 3:38 PM    Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights Laws to Ensure Nondiscriminatory Access to Hea…

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 15 of 315   PageID.5156

https://www.cdc.gov/nchs/data/databriefs/db327-h.pdf - PDF

<https://www.cdc.gov/nchs/data/databriefs/db327-h.pdf>.

[11] Am. Coll. of Obstetricians and Gynecologists, *Practice Bulletin: Pregnancy Loss* (2018), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/11/early-pregnancy-loss <https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/11/early-pregnancy-loss> ↗ </disclaimer.html>.

[12] An ectopic pregnancy is a pregnancy that occurs when fertilized egg grows outside of the uterus. *FAQs: Ectopic Pregnancy,* Am. Coll. of Obstetricians and Gynecologists (last updated Feb. 2018), https://www.acog.org/womens-health/faqs/ectopic-pregnancy <https://www.acog.org/womens-health/faqs/ectopic-pregnancy> ↗ </disclaimer.html>.

---

Content created by Office for Civil Rights (OCR)
Content last reviewed September 29, 2023

Pet. Ref. 753

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

# 020687Orig1s020

# RISK ASSESSMENT and RISK MITIGATION REVIEW(S)



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
10903 New Hampshire Avenue
Building #51
Silver Spring, MD 20993

DATE:     March 28, 2016

FROM:     Janet Woodcock, MD
          Director, Center for Drug Evaluation and Research

THRU:     (b)(6)

TO:       (b)(6)

RE:  NDA 020687, Supp 20

The currently approved REMS for Mifeprex contains a Patient Agreement Form required to be signed by both the patient and the prescriber. During the review of the REMS in connection with supplement 20 to NDA 020687 submitted by the sponsor, (b)(6) found that the information contained in the Patient Agreement Form is generally duplicative of information in the Medication Guide and of information and counseling provided to patients under standard informed consent practices for medical care and under professional practice guidelines. For the reasons further described in their reviews, the reviewers recommended that the Patient Agreement Form be removed from the REMS.

After being briefed on the planned changes to the NDA that the Center was considering, the Commissioner concluded that continuing the REMS requirement for a signed Patient Agreement Form would not interfere with access and would provide additional assurance that the patient is aware of the nature of the procedure, its risks, and the need for appropriate follow-up care. He requested that the Patient Agreement Form be retained as an element of the REMS.

Therefore, I have asked (b)(6) and (b)(6) to continue to include a Patient Agreement Form in the REMS for Mifeprex.

Pet. Ref. 755

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

---------------------------------------------------

(b) (6)

03/29/2016

adding to for the record

Pet. Ref. 756

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

(b) (6)

Date: March 29, 2016

(b) (6)

(b) (6)    (    (b) (6)

| | |
|---|---|
| Subject: | (b)(6)  Assessment Review of the Year 4 risk evaluation and mitigation strategy (REMS) assessment report |
| Drug Name(s): | Mifeprex® (mifepristone) |
| Therapeutic class: | Progesterone-receptor modulator |
| Dosage forms: | 200 mg tablets |
| (b) (6) Review Division: | (b) (6) |
| Application Type/Number: | NDA 020687, Supp 20 |
| Applicant/sponsor: | Danco Laboratories |

1

This memo is to address specific statements made in the          (b) (6)
(   (b) (6) Review of the Year 4 Risk Evaluation and Mitigation Strategy (REMS) assessment report that relate to an unapproved dosing regimen for Mifeprex.[1]

Mifeprex (NDA 20-687) is currently approved for the medical termination of intrauterine pregnancy through 49 days (7 weeks) gestation in a regimen with misoprostol. The currently approved dose of Mifeprex is 600 mg (three 200 mg) oral tablets which are to be taken under the supervision of a physician, followed two days later by two 200 mcg tablets (400 mcg) of misoprostol orally.

Danco Laboratories, LLC (Danco) submitted the 4 year REMS assessment report on June 2, 2015. The   (b) (6) REMS assessment reviewer had noted that there was use of the unapproved dosing regimen of Mifeprex 200 mg orally on day 1; followed by misoprostol 800 mcg, administered vaginally or buccally on day 3 or 4 for medical termination of intrauterine pregnancy up to 63 days gestation. The reviewer's comments included that it was unknown whether this unapproved regimen may have contributed to certain observed adverse events.

On May 29, 2015, Danco submitted a prior approval efficacy supplement-020 (PAS-020) seeking approval of certain changes to the approved indication, dosing regimen, and labeling for Mifeprex. Danco proposed to change the dosing regimen to: 200 mg orally x 1, instead of 600 mg orally x 1; followed 24-48 hours later by misoprostol 800 mcg, administered buccally; and an extension of gestational age from 49 to        (b) (4) 70 days). This supplement was under review at the time the October 2015   (b) (6) REMS Assessment review was conducted.

The                (b) (6)     (b) (6) is reviewing Danco's efficacy prior approval supplement-020 (PAS-020) to determine whether the supplement can be approved. Because    (b) (6) review encompasses all of the data and information submitted in the supplement,   (b) (6) defers to   (b) (6) with respect to the safety and efficacy of the dose and dosing regimen proposed by Danco.

---

[1]       (b) (6) (   (b) (6) Review of Year 4 Risk Evaluation and Mitigation Strategy (REMS) Assessment Report, dated October 13, 2015

2

Pet. Ref. 758

------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

------------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------

(b) (6)

03/29/2016

memo to the assessment review

Pet. Ref. 759

### Risk Evaluation and Mitigation Strategy (REMS) Memorandum
### REMS Modification

**U.S. FOOD AND DRUG ADMINISTRATION**
**CENTER FOR DRUG EVALUATION AND RESEARCH**
(b) (6)

**NDA:**         020687
**PRODUCT:**     Mifeprex (mifepristone) oral tablets
**APPLICANT:**   Danco Laboratories (Danco)
**FROM:**        (b) (6)
**DATE:**        March 29, 2016

This memorandum provides the (b) (6) ( (b) (6) review of the proposed modifications to the Mifeprex Risk Evaluation and Mitigation Strategy (REMS) addressed in the (b) (6) ( (b) (6) REMS Modification Review and Addendum to REMS Modification Review. A REMS for Mifeprex was approved on June 8, 2011, to ensure the benefits of the drug outweighed the risks of serious complications. The Mifeprex REMS consists of a Medication Guide, elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments of the REMS.

Mifeprex was approved for the medical termination of an intrauterine pregnancy through 49 days of gestation on September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (Subpart H). It was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the 2007 Food and Drug Administration Amendments Act. A formal REMS proposal was submitted by Danco and approved on June 8, 2011. The goals and elements of the approved Mifeprex REMS are briefly summarized in Table 1 below.

**Table 1. Summary of Mifeprex REMS[1]**

| | |
|---|---|
| **REMS Goals** | To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug. |
| | To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. |
| **REMS Elements** | Medication Guide |
| | ETASU A – Special certification of healthcare providers (HCPs) who prescribe Mifeprex: Completion of Prescriber's Agreement form and enrollment in the REMS program. |
| | ETASU C – Mifeprex is dispensed only in certain healthcare settings: It is only available to be dispensed in clinics, medical offices or hospitals, under the supervision of a specially certified prescriber. Mifeprex will not be distributed to or dispensed through retail pharmacies. |
| | ETASU D – Safe-use conditions: Patients must complete and sign the Patient Agreement form that is to be placed in the patient's medical record. A copy of the Patient Agreement form and Medication Guide must be provided to the patient. |
| **Implementation System** | Distributors of Mifeprex must be certified and agree to ship Mifeprex only to locations identified by certified prescribers. Distributors must agree to maintain secure and confidential records, as well as, follow all distribution guidelines concerning storage, shipments and controlled returns. |

---

[1] Source: The (b) (6) REMS Modification Review (NDA 20867/S-020, dated March 29, 2016), Table 1.

Pet. Ref. 760

On May 29, 2015, Danco submitted an efficacy supplement (S-020) that proposed modifications to the Mifeprex Prescribing Information and REMS.  In the S-020 submission, Danco seeks the following major changes (among others):

- (b) (4) dosing regimen of Mifeprex and misoprostol
- Extension of maximum gestational age from 49 days to 70 days
- Replacement of the term "licensed physician" with " (b) (4) in the REMS Prescriber's Agreement form
- Removal of the phrase "Under Federal Law" from the REMS Prescriber's Agreement form
- Revisions to the Patient Agreement form reflecting changes to the Prescribing Information

The proposed changes in the efficacy supplement prompted revisions to the Mifeprex REMS materials and also updating of the REMS materials to current format.  During review of this efficacy supplement, we also evaluated the current REMS program to determine whether each Mifeprex REMS element remains necessary to ensure the drug benefits outweigh the risks.  The Agency considered the recent (b) (6) REMS Assessment review completed October 13, 2015, safety data gathered since drug approval in 2000, and experience from current clinical practice to support additional modifications to the Mifeprex REMS.

After consultations between the (b) (6) and (b) (6) and considering the (b) (6) REMS Modification Review and Addendum to the REMS Modification Review, (b) (6) has determined that the approved REMS for Mifeprex should be modified as follows:

1. Revisions to the Prescriber's Agreement form in addition to those proposed by the Applicant
2. Removal of the Medication Guide as a REMS element
3. Removal of the Patient Agreement form as a Documentation of Safe Use Condition  (ETASU D)
4. Updating of REMS goals to reflect the above changes

We concur with (b) (6) recommendation that the Prescriber's Agreement form should include other modifications to reflect current REMS standards and materials and also to reflect changes to align with approval of the efficacy supplement S-020, such as the dose and dose regimen and upper limit of gestational age.

In addition, we agree with Danco's proposed removal of the phrase "Under Federal Law," because of the lack of precedent for requiring such text and clinical rationale for its inclusion.  As approvals and REMS are governed by Federal law, the phrase "Under Federal law" is unnecessary.  Regarding Danco's proposal to replace "licensed physician," we have determined that the replacement term should be "licensed healthcare providers who prescribe," to include other practitioners who prescribe; in addition, this phrase is consistent with language in the statute.

We concur with (b) (6) recommendation that the Medication Guide is no longer necessary as an element of the REMS to ensure the benefits of Mifeprex outweigh its risks. The Medication Guide will continue to be part of the approved labeling that must be provided to a patient in accordance with 21 CFR part 208.  Like other labeling, Medication Guides are subject to the safety labeling change provisions of section 505(o)(4) of the FDCA.

In addition, we concur with (b) (6) recommendation that the signed Patient Agreement form is no longer necessary and should be removed as a condition of safe use (ETASU D).  Recent professional guidelines for women seeking surgical and medical abortion services emphasize comprehensive counseling, education about the risks of different treatments, and obtaining and documenting informed consent.[2,3]  The National Abortion

---

[2] ACOG. Medical management of first trimester abortion. ACOG Practice Bulletin #143. Obstetrics and Gynecology 2014; 123(3):676-692

Pet. Ref. 761

Federation (NAF) clinical practice guidelines include a standard stating that documentation must show that the patient affirms that she understands the procedure and its alternatives, the potential risks and benefits, and that her decision is voluntary.[4]   Approximately (b)(4)% of the use of Mifeprex in the U.S. is through Planned Parenthood Federation of America (PPFA)- and NAF-affiliated members, where patient counseling and informed consent is standard of care.  The practice of treating women with Mifeprex is well-established by these organizations and their associated providers who choose to provide this care to women.  In addition, the Medication Guide, which must be provided to the patient under 21 CFR part 208, contains the same risk information contained in the Patient Agreement form.

The safety profile of Mifeprex is well-characterized and its risks well-understood after more than 15 years of marketing.  Serious adverse events are rare and the safety profile of Mifeprex has not substantially changed.[5]  The removal of the Medication Guide as a REMS element and of the Patient Agreement form is not expected to adversely impact the ability of the REMS to ensure that the drug benefits outweigh its risks.  The benefit-risk balance of Mifeprex remains favorable in the presence of the following:

- **Retention of ETASUs A and C in the Mifeprex REMS**: The Prescriber's Agreement form required for prescriber certification under ETASU A will continue to require that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them."  The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals by or under the supervision of a certified prescriber.  This ensures that Mifeprex can only be dispensed by or under the direct supervision of a certified prescriber.

- **Communication of risks through patient labeling**: The Medication Guide, which will be retained as part of labeling, contains the same risk information covered under the Patient Agreement form.  Under 21CFR 208.24, prescribers who dispense Mifeprex are required to provide the Medication Guide to patients.  The Prescriber's Agreement form also reminds the prescriber to provide the Medication Guide to the patient.

- **Information from published articles on established clinical practices**: This information, including clinical guidelines and publications, indicates that comprehensive patient counseling and informed consent prior to medical or surgical abortion treatment is standard of care when using Mifeprex.

We have also determined that the information in the efficacy supplement supports changes to the goals of the Mifeprex REMS. We concur with (b)(6) recommendation that the REMS goals should be modified from:

A. To provide information to patients about the benefits  and risks of Mifeprex before they make a decision whether to take the drug.
B. To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications.

to:

The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:

a) Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.

---

[3] National Abortion Federation Membership information accessed on the internet at http://prochoice.org/health-care-professionals/naf-membership/ on March 11, 2016
[4] National Abortion Federation Clinical Policy Guidelines (for abortion care). Revised 2015 edition, 56 pages, accessed on the internet at http://prochoice.org/wp-content/uploads/2015_NAF_CPGs.pdf on March 11, 2016.
[5] (b)(6) Mifeprex Post-marketing Safety Review, dated August 20, 2015.

3

b)  Ensuring that Mifeprex is only dispensed in certain health care settings under the supervision of a certified prescriber.

The above REMS modifications and changes in goals were discussed with the ███████████ **(b) (6)** and concurrence with these changes was obtained.

The modified Mifeprex REMS should consist of ETASU A, in which healthcare providers who prescribe Mifeprex will be certified, and ETASU C, in which Mifeprex will be dispensed only in certain health care settings (specially clinics, medical offices, and hospitals) by or under the supervision of a certified prescriber. The Mifeprex REMS will also include an implementation system, and a timetable for continued submission of assessments of the REMS.

Addendum:

On March 28, 2016, Dr. Janet Woodcock, the Director, Center for Drug Evaluation and Research, asked **(b) (6)** ███████████ and ██████ **(b) (6)** to continue to include a Patient Agreement form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through ███████████ **(b) (4)**, ██████ **(b) (6)** the Director, OSE, and ███████ **(b) (6)**, to the Directors of **(b) (6)** and **(b) (6)** Therefore, the Patient Agreement form will be retained and other changes will be made in the REMS to reflect that it is being retained, as described in the ██████ **(b) (6)** Addendum to REMS Modification Review.

4

-------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------

/s/

---------------------------------------------------

(b) (6)

03/29/2016

Signing for (b) (6) , (b) (6)

(b) (6)

Pet. Ref. 764

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

(b) (6)

## ADDENDUM TO REMS MODIFICATION REVIEW

Date:                          March 29, 2016

Reviewer:

(b) (6)

(b) (6)

Subject:                       Proposed REMS Modifications

Drug Name(s):                  Mifeprex® (mifepristone)

Therapeutic class:             Progesterone-receptor modulator

Dosage forms:                  200 mg tablets

(b) (6) Review Division:

Application Type/Number:       NDA 020687, Supp 20

Applicant/sponsor:             Danco Laboratories

(b) (6)   (b) (6) #:          2015-1719

**1.**

**INTRODUCTION**

This review is an addendum to the [redacted] ([redacted] March 29, 2016, REMS Modification Review regarding modifications to the risk evaluation and mitigation strategy (REMS) for Mifeprex, as proposed by Danco Laboratories in the amendment to the prior approval efficacy supplement 020 (PAS-20).  See the March 29, 2016, REMS Modification Review for a description of the original submission and the existing REMS, and the materials informing our review.

In addition to those materials, we considered additional communications with the sponsor which included proposed changes to the REMS and REMS materials on March 21, 25, 27, 28 and 29th. We also considered a memorandum dated March 28, 2016 from Dr. Janet Woodcock, Director, Center for Drug Evaluation and Research, requesting that [redacted] and [redacted] [redacted] continue to include a Patient Agreement Form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through [redacted] [redacted]  This review addresses the sponsor's proposed changes as well as the changes that are needed in the REMS to reflect the fact that the Patient Agreement Form will be retained as part of the REMS.

This addendum will only describe changes that were recommended and that were not covered in the original REMS Modification Review.  The changes we have agreed to were proposed to the sponsor and were accepted.

As with the original REMS modification review, all of the modifications discussed in this review were discussed with [redacted] and they are in agreement.

## 2.   [redacted] AND SPONSOR PROPOSED MODIFICATIONS AND RATIONALE

### 2.1.  REMS ELEMENTS

#### 2.1.1.  DOCUMENTATION OF SAFE USE CONDITIONS - ETASU D

##### 2.1.1.1.   PATIENT AGREEMENT FORM

As discussed above, it has been determined that the Mifeprex REMS should continue to include a Patient Agreement Form as ETASU D in the REMS.  Therefore, the *Patient Agreement Form* is being revised as part of this modification.

The content has been modified to reflect the changes to the Prescribing Information that are being approved as part of the approval of PAS 020. These changes include changing the dosing regimen, updating the percentage of patients for which the treatment will not be effective, revising where Mifeprex or misoprostol should be taken and revising the patient follow-up recommendations after taking Mifeprex.

The requirement for a patient to read the MG has been removed since we are recommending that the MG be removed as an element of the REMS.[1]  However, the MG will remain part of labeling

---

[1]   [redacted] REMS Modification Review for Mifeprex, dated March 29, 2016.

Pet. Ref. 766

and will still be required to be distributed to the patient as per 21 CFR part 208. In addition, certified HCPs will have agreed to provide a MG to the patient before providing Mifeprex.

Additionally, the reference to birth defects should be removed because the effects of Mifeprex on an ongoing pregnancy are unknown. Lastly, the attestation that the patient believes she is no more than a certain number of weeks pregnant should be removed. The Prescriber is responsible for accurately dating the pregnancy. Therefore, the patient should not be relied upon to date her own pregnancy.

## 2.2. REMS DOCUMENT

### 2.2.1. GOALS

As discussed in the REMS Modification Review dated March 29, 2016, the Mifeprex REMS goals should be modified. As discussed above, it has been determined that the Mifeprex REMS should continue to include the Patient Agreement Form, which is an ETASU D (documentation of safe use) requirement (see Section 4.1.1). Therefore, the goal of the REMS also should include objective c) below in underlined text.

> The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:
> a) Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.
> b) Ensuring that Mifeprex is only dispensed in certain health care settings under the supervision of a certified prescriber.
> c) <u>Informing patients about the risk of serious complications associated with Mifeprex</u>

(b) (4)

The REMS goal should include the risks to be mitigated by the REMS. The phrase "risk of serious complications" was taken from the previously approved REMS document and continues to be applicable. (b) (6) recommends keeping the risks in the goal.

### 2.2.2. CERTIFICATION OF PRESCRIBERS - ETASU A

As discussed above, it has been determined that the Mifeprex REMS should continue to include the Patient Agreement Form. Therefore, ETASU A in the REMS document needs to be revised to reinsert information regarding this requirement. First, as was the case in the previously approved REMS document, certified prescribers must agree to review the Patient Agreement Form with the patient and answer any of her questions. Additionally, the prescriber must agree to sign the Patient Agreement Form and obtain the patient's signature on the form. Finally, the prescriber must agree to provide the patient with a copy of the Patient Agreement Form and insert a copy in the patient's chart. See redlined, attached REMS document.

In its March 21, 2016, submission, the Sponsor disagrees with changing the name of the *Prescriber's Agreement* to the *Prescriber Enrollment Form* because "enrollment" may be misconstrued by prescribers to mean they are being placed on a list or database. (b) (6) agrees

with the Sponsor's concern about using the term "Enrollment" in the title and proposes to change the name of the *Prescriber's Agreement* to the *Prescriber Agreement Form*. This has been reflected in the REMS document and the *Prescriber Agreement Form.*

The second proposed revision by the Sponsor applies to the qualifications of a certified prescriber.  The REMS document currently states that prescribers must have the "ability to assess the duration of pregnancy accurately."  Danco is proposing _____ (b) (4) have concluded that not all practitioners are able to accurately assess gestational age.  This ability is necessary for the safe use of Mifeprex.

In its March 21, 2016, submission, the Sponsor additionally proposed to insert "a non-identifiable reference" into the following statement in the REMS document and the *Prescriber Agreement Form* because it would increase the Sponsor's ability to track these adverse events.  In addition, they stated that it is current practice for certified HCPs to provide this information. Danco also proposed removing "solely" from the statement, as shown below:

> Report any deaths to Danco Laboratories, identifying the patient ~~solely~~ by a non-identifiable reference and the serial number from each package of Mifeprex.

(b) (6) agreed with the above revisions.  Lastly, the Sponsor proposed the following revised language in the REMS document and the Prescriber Agreement Form:

> …explain the risks _____ (b) (4) of the ~~procedure, its effects, and the risks associated with~~ Mifeprex treatment regimen.

(b) (6) rejected the addition of _____ (b) (4) to the REMS document and Prescriber Agreement Form. A REMS should only focus on the risks of a drug. Therefore, (b) (6) proposed that the final language be as follows:

> …explain the risks of the Mifeprex treatment regimen.

Additional minor edits and revisions were suggested for this section of the REMS document and corresponding language within the *Prescriber Agreement Form*. These changes were not intended to be substantive.

### 2.2.3.  DOCUMENTATION OF SAFE USE CONDITIONS -ETASU D

As discussed above, it has been determined that the Mifeprex REMS should retain the Patient Agreement Form.  Therefore, (b) (6) has proposed to insert the following text into the Mifeprex REMS document:

> 3. Mifeprex must be dispensed to patients with evidence or other documentation of safe use conditions.
>> a.  The patient must sign a *Patient Agreement Form* indicating that she has:
>>> i.   Received, read and been provided a copy of the *Patient Agreement Form.*
>>> ii.  Received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

Pet. Ref. 768

### 2.2.4. IMPLEMENTATION SYSTEM

In its March 21, 2016, submission, the Sponsor proposed to 



a.  Ship Mifeprex only to clinics, medical offices, and hospitals identified by certified prescribers in the signed *Prescriber Agreement Form*.

b.  Complete the healthcare provider certification process upon receipt of the *Prescriber Enrollment Form*.

c.  Notify healthcare providers when they have been certified by the Mifeprex REMS Program.

(b) (6)                                    (b) (4). These are separate actions the distributor undertakes. Therefore, they should be described in the REMS document. Furthermore, it is not guaranteed that when a healthcare provider submits the *Prescriber Agreement Form*, they are ordering Mifeprex. In this situation, it is important that HCPs be notified when they are certified and, therefore, able to order Mifeprex in the future.

Lastly, (b) (6) proposed to move the adverse event reporting requirements from the assessment to the implementation system of the REMS and to remove the requirement to report certain specifically enumerated adverse events such as all hospitalizations due to complications and women requiring transfusions, but retain the requirement to report all deaths. The following language was inserted:

"Danco Laboratories must report to FDA any death associated with Mifeprex whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the applicant. This requirement does not affect the applicant's other reporting and follow-up requirements under the FDA regulations."

### 3. CONCLUSION

The review team and Sponsor have proposed additional modifications that continue to ensure that the benefit outweighs the risk for Mifeprex. This addendum addresses modifications to the REMS including those proposed by the sponsor in its March 21, 25, 27, 28 and 29, 2016, submissions, and additional changes recommended by (b) (6) The additional changes include the following: reinsertion of the Prescriber Agreement Form (ETASU D) with certain changes to other documents to reflect this, and modification of the REMS goal, REMS document and appended materials provided to the Sponsor on March 17, 2016.

As discussed above, several changes to the language in the REMS document were proposed by Danco. The (b) (4) were rejected by (b) (6) The Sponsor additionally expressed their desire to not change the name of the *Prescriber's Agreement* to the *Prescriber Enrollment Form,* as suggested by the review team. In consideration of this, (b) (6) proposes to change the title to the *Prescriber Agreement Form*.

The above changes to the REMS document and materials are appropriate modifications to the Mifeprex REMS.  They are necessary to ensure that that the risks of serious complications will be mitigated and that the benefits of Mifeprex will continue to outweigh the risks.

## 4.  RECOMMENDATIONS

The proposed amended modification submitted by Danco on March 29, 2016 is acceptable and (b) (6)  recommends approval of the REMS.

## Appendix

1.  Prescriber Enrollment Form, clean
2.  Patient Agreement Form, clean
3.  REMS Document, clean

Pet. Ref. 770

Initial REMS approval:  06/2011

Most recent modification:  03/2016

NDA 020687 MIFEPREX® (mifepristone) Tablets, 200 mg

Antiprogestational Synthetic Steroid

Danco Laboratories, LLC
PO Box 4816
New York, NY 10185

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

## I.  GOAL

The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:

a)  Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.

b)  Ensuring that Mifeprex is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber.

c)  Informing patients about the risk of serious complications associated with Mifeprex

## II.   REMS ELEMENTS

### A. Elements to Assure Safe Use

1.   Healthcare providers who prescribe Mifeprex must be specially certified.

   a.  To become specially certified to prescribe Mifeprex, healthcare providers must:

   i.   Review the Prescribing Information for Mifeprex.

   ii.  Complete the *Prescriber Agreement Form*. By signing the *Prescriber Agreement Form*, prescribers agree that:

   1)  They have the following qualifications:

   a)  Ability to assess the duration of pregnancy accurately

Pet. Ref. 771

b) Ability to diagnose ectopic pregnancies

c) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

2) They will follow the guidelines for use of Mifeprex (see b.i-v below).

b.   As a condition of certification, healthcare providers must follow the guidelines for use of Mifeprex described below:

i.    Review the *Patient Agreement Form* with the patient and fully explain the risks of the Mifeprex treatment regimen. Answer any questions the patient may have prior to receiving Mifeprex.

ii.   Sign the *Patient Agreement Form* and obtain the Patient's signature on the *Form*

iii.  Provide the patient with a copy of the *Patient Agreement Form* and Medication Guide.

iv.   Place the signed *Patient Agreement Form* in the patient's medical record.

v.    Record the serial number from each package of Mifeprex in each patient's record.

vi.   Report any deaths to Danco Laboratories, identifying the patient by a non-identifiable reference and the serial number from each package of Mifeprex.

c. Danco Laboratories must:

i.    Ensure that healthcare providers who prescribe Mifeprex are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements

ii.   Provide the Prescribing Information and *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

The following materials are part of the REMS and are appended:
- *Prescriber Agreement Form*
- *Patient Agreement Form*

2. Mifeprex must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

a.    Danco Laboratories must:

i.    Ensure that Mifeprex is available to be dispensed to patients only in clinics, medical offices and hospitals by or under the supervision of a certified prescriber.

Pet. Ref. 772

  ii. Ensure that Mifeprex is not distributed to or dispensed through retail pharmacies or other settings not described above.

3. Mifeprex must be dispensed to patients with evidence or other documentation of safe use conditions.

  a. The patient must sign a *Patient Agreement Form* indicating that she has:

   i. Received, read and been provided a copy of the *Patient Agreement Form*.

   ii. Received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

## B.  Implementation System

1. Danco Laboratories must ensure that Mifeprex is only distributed to clinics, medical offices and hospitals by or under the supervision of a certified prescriber by:

  a. Ensuring that distributors who distribute Mifeprex comply with the program requirements for distributors.  The distributors must:

   i. Put processes and procedures in place to:

    a. Complete the healthcare provider certification process upon receipt of the *Prescriber Agreement Form*.

    b. Notify healthcare providers when they have been certified by the Mifeprex REMS Program.

    c. Ship Mifeprex only to clinics, medical offices, and hospitals identified by certified prescribers in the signed *Prescriber Agreement Form*.

    d. Not ship Mifeprex to prescribers who become de-certified from the Mifeprex Program.

    e. Provide the Prescribing Information and *Prescriber Agreement Form* to healthcare providers who (1) attempt to order Mifeprex and are not yet certified, or (2) inquire about how to become certified.

   ii. Put processes and procedures in place to maintain a distribution system that is secure, confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, proof of delivery and controlled returns of Mifeprex.

   iii. Train all relevant staff on the Mifeprex REMS Program requirements.

   iv. Comply with audits by Danco Laboratories, FDA or a third party acting on behalf of Danco Laboratories or FDA to ensure that all processes and procedures are in place and are being followed for the Mifeprex REMS Program.  In addition, distributors must maintain appropriate documentation and make it available for audits.

  b. Ensuring that distributors maintain secure and confidential distribution records of all shipments of Mifeprex.

Pet. Ref. 773

2.  Danco Laboratories must monitor distribution data to ensure compliance with the REMS Program.

3.  Danco Laboratories must audit new distributors within 90 calendar days after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifeprex REMS Program. Danco Laboratories will take steps to address distributor compliance if noncompliance is identified.

4.  Danco Laboratories must take reasonable steps to improve implementation of and compliance with the requirements of the Mifeprex REMS Program based on monitoring and assessment of the Mifeprex REMS Program.

5.  Danco Laboratories must report to FDA any death associated with Mifeprex whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the applicant.  This requirement does not affect the applicant's other reporting and follow-up requirements under FDA regulations.

**C.  Timetable for Submission of Assessments**

Danco Laboratories must submit REMS assessments to FDA one year from the date of the initial approval of the REMS (06/08/2011) and every three years thereafter.  To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment.  Danco Laboratories must submit each assessment so that it will be received by the FDA on or before the due date.

APPEARS THIS WAY ON ORIGINAL

Pet. Ref. 774

PRESCRIBER AGREEMENT FORM



Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

*To set up your account to receive Mifeprex, you must:*
1. complete, 2. sign, and 3. fax page 2 of this form to the distributor.

If you will be ordering for more than one facility, you will need to list each facility on your order form before the first order will be shipped to the facility.

**Prescriber Agreement:** By signing page 2 of this form, you agree that you meet the qualifications below and will follow the guidelines for use. You also understand that if you do not follow the guidelines, the distributor may stop shipping Mifeprex to you.

*Mifeprex must be provided by or under the supervision of a healthcare provider who prescribes and meets the following qualifications:*

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of Mifeprex. The Prescribing Information is available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, www.earlyoptionpill.com.

*In addition to meeting these qualifications, you also agree to follow these guidelines for use:*

- Review the Patient Agreement Form with the patient and fully explain the risks of the Mifeprex treatment regimen. Answer any questions the patient may have prior to receiving Mifeprex.

- Sign and obtain the patient's signature on the Patient Agreement Form.

- Provide the patient with a copy of the Patient Agreement Form and the Medication Guide.

- Place the signed Patient Agreement Form in the patient's medical record.

- Record the serial number from each package of Mifeprex in each patient's record.

- Report deaths to Danco Laboratories, identifying the patient by a non-identifiable patient reference and the serial number from each package of Mifeprex.



Danco Laboratories, LLC • P.O. Box 4816 • New York, NY 10185
1-877-4 Early Option (1-877-432-7596) • www.earlyoptionpill.com
*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

03/2016

Pet. Ref. 775

Reference ID: 3909588

## ACCOUNT SETUP MIFEPREX® (Mifepristone) Tablets, 200 mg; NDC 64875-001-01

**TO SET UP YOUR ACCOUNT:**

**❶**
Read the Prescriber Agreement on page 1 of this form.

**❷**
Complete and sign this form.

**❸**
Fax this page to the Danco distributor at 1-866-227-3343. Your account information will be kept strictly confidential.

**❹**
The distributor will call to finalize your account setup and take your initial order.

**❺**
Subsequent orders may be phoned or faxed and are usually shipped within 24 hours.

*Mifeprex*
(Mifepristone) Tablets, 200 mg

THE ORIGINAL EARLY OPTION PILL

### BILLING INFORMATION

Bill to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### SHIPPING INFORMATION ☐ *Check if same as above*

Ship to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### ADDITIONAL SITE LOCATIONS *I will also be prescribing Mifeprex\* at these additional locations:*

Name _____ Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Name _____ Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

*(Any additional sites may be listed on an attached sheet of paper.)*

### REQUEST ADDITIONAL MATERIALS

☐ Medication Guides   ☐ State Abortion Guides   ☐ Patient Brochures   ☐ Patient Agreement Form

### ESTABLISHING YOUR ACCOUNT *(required only with first order)*

Each facility purchasing Mifeprex must be included on this form (*see additional site locations box above*) before the distributor can ship the product to the facility.

**By signing below, you agree that you meet the qualifications and that you will follow the guidelines for use on page 1 of the Prescriber Agreement.**

Print Name _____ Signature _____

Medical License # _____ Date _____

**FAX THIS COMPLETED FORM TO THE AUTHORIZED DISTRIBUTOR. FAX: 1-866-227-3343**

Please fax any questions to the above number or call 1-800-848-6142.

Pet. Ref. 776

*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

PATIENT AGREEMENT FORM



**Healthcare Providers:** *Counsel the patient on the risks of Mifeprex*. Both you and the patient must sign this form.*

**Patient Agreement:**

1. I have decided to take Mifeprex and misoprostol to end my pregnancy and will follow my provider's advice about when to take each drug and what to do in an emergency.

2. I understand:
   a. I will take Mifeprex on Day 1.
   b. My provider will either give me or prescribe for me the misoprostol tablets which I will take 24 to 48 hours after I take Mifeprex.

3. My healthcare provider has talked with me about the risks including:
   • heavy bleeding
   • infection
   • ectopic pregnancy (a pregnancy outside the womb)

4. I will contact the clinic/office right away if in the days after treatment I have:
   • a fever of 100.4°F or higher that lasts for more than four hours
   • severe stomach area (abdominal) pain
   • heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
   • stomach pain or discomfort, or I am "feeling sick",  including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol

5. My healthcare provider has told me that these symptoms could require emergency care. If I cannot reach the clinic or office right away my healthcare provider has told me who to call and what to do.

6. I should follow up with my healthcare provider about 7 to 14 days after I take Mifeprex to be sure that my pregnancy has ended and that I am well.

7. I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

8. If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

9. I have the MEDICATION GUIDE for Mifeprex. I will take it with me if I visit an emergency room or a healthcare provider who did not give me Mifeprex so that they will understand that I am having a medical abortion with Mifeprex.

10. My healthcare provider has answered all my questions.

Patient Signature: _____ Patient Name (print):_____ Date: _____

*The patient signed the PATIENT AGREEMENT in my presence after I counseled her and answered all her questions. I have given her the MEDICATION GUIDE for Mifeprex.*

Provider's Signature: _____ Name of Provider (print): _____ Date: _____

*After the patient and the provider sign this PATIENT AGREEMENT, give 1 copy to the patient before she leaves the office and put 1 copy in her medical record.*

03/2016

Pet. Ref. 777

*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

--------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------
/s/

---------------------------------------------------

(b) (6)

03/29/2016

(b) (6)

03/29/2016

Concur

Reference ID: 3909588

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

(b) (6)

# REMS MODIFICATION REVIEW

Date:                              March 29, 2016
Reviewer:                          (b) (4)

                                   (b) (6)

(b) (6)                            (b) (6)

                                   (b) (6)

(b) (6)                            (b) (6)

                                   (b) (6)

Subject:                           Proposed REMS Modifications
Drug Name(s):                      Mifeprex® (mifepristone)
Therapeutic class:                 Progesterone-receptor modulator
Dosage forms:                      200 mg tablets
(b) (6) Review Division:           (b) (6)
Application Type/Number:           NDA 020687, Supp 20
Applicant/sponsor:                 Danco Laboratories
(b) (6)  (b) (6) #:                2015-1719

1

## Table of Contents

1.      INTRODUCTION ................................................................................................. 3

1.1     BACKGROUND .................................................................................................... 3

1.2     BRIEF SUMMARY OF KEY REGULATORY HISTORY ........................................ 4

2.      MATERIALS REVIEWED ................................................................................... 4

3.      OVERVIEW OF RATIONALE FOR proposed REMS MODIFICATIONS ................. 5

4.      Sponsor proposed modifications and Rationale .................................................. 5

4.1.    REMS ELEMENTS ............................................................................................. 5

4.1.1.  Certification of Prescribers - ETASU A ........................................................... 5

4.1.1.1.  Prescriber's Agreement ............................................................................... 5

5.            (b) (6) Proposed Modifications and Rationale ...................................... 6

5.1.    REMS ELEMENTS ............................................................................................. 6

5.1.1.  Medication Guide ............................................................................................. 6

5.1.2.  Certification of Prescribers - ETASU A ........................................................... 6

5.1.2.1.  Prescriber's Agreement ............................................................................... 6

5.1.3.  Drug dispensed only in certain health care settings - ETASU C ...................... 7

5.1.4.  Documentation of Safe Use Conditions - ETASU D ......................................... 7

5.1.4.1.  Patient Agreement ....................................................................................... 7

5.2.    REMS DOCUMENT ........................................................................................... 8

5.2.1.  GOALS ............................................................................................................ 8

5.2.2.  Medication Guide ............................................................................................. 9

5.2.3.  Certification of Prescribers - ETASU A ........................................................... 9

5.2.4.  Drug dispensed only in certain health care settings - ETASU C ...................... 9

5.2.5.  Documentation of Safe Use Conditions -ETASU D ......................................... 9

5.2.6.  Implementation System ................................................................................... 9

5.2.7.  Timetable for Submission of Assessments ...................................................... 9

5.3.    Assessment Plan ............................................................................................... 9

6.      CONCLUSION ................................................................................................. 10

7.      RECOMMENDATIONS ................................................................................... 11

8.      Appendix ......................................................................................................... 11

Reference ID: 3909587

## 1. INTRODUCTION

This review provides the ⬛⬛⬛⬛⬛⬛⬛ (b) (6) ⬛⬛ (b) (6) evaluation of the modifications to the risk evaluation and mitigation strategy (REMS) for Mifeprex proposed in the efficacy supplement submitted by Danco Laboratories (Danco) on May 29, 2015, and provides ⬛⬛ (b) (6) recommendations to the ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛ (b) (6)     The approved REMS consists of a Medication Guide (MG), elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments.  The evaluation of modifications to the approved REMS utilized input received from the ⬛⬛⬛⬛⬛⬛⬛⬛⬛ (b) (6) ⬛ (b) (6) 1, REMS assessment data, and a postmarketing summary report by the ⬛⬛⬛⬛⬛⬛⬛⬛ (b) (6) ⬛ (b) (6)

### 1.1 BACKGROUND

Mifeprex is a synthetic steroid with antiprogestational effects.  The currently approved dose is three 200 mg oral tablets which are to be taken under the supervision of a physician for the medical termination of intrauterine pregnancy through 49 days gestation.  Mifeprex was approved September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (Subpart H).[2]  Mifeprex was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007.  A formal REMS proposal was submitted by Danco and approved on June 8, 2011 with a MG, ETASU, an implementation system and a timetable for submission of assessments. The goals and elements of the REMS are briefly summarized in Table 1 below.

Table 1. Summary of Currently Approved Mifeprex REMS

| REMS Goals | To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug. |
| --- | --- |

---

[1] ⬛⬛⬛⬛ (b) (6) ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

[2] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

Pet. Ref. 781

| | To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. |
|---|---|
| REMS Elements | Medication Guide |
| | ETASU A – Special certification of healthcare providers (HCPs) who prescribe Mifeprex: Completion of Prescriber's Agreement form and enrollment in the REMS program. |
| | ETASU C – Mifeprex dispensed only in certain healthcare settings: It is only available to be dispensed in clinics, medical offices or hospitals, by or under the supervision of a specially certified prescriber. Mifeprex will not be distributed to or dispensed through retail pharmacies. |
| | ETASU D – Safe-use conditions: Patients must complete and sign the Patient's Agreement form that is to be placed in the patient's medical record. A copy of the Patient's Agreement form and MG must be provided to the patient. |
| Implementation System | Distributors of Mifeprex must be certified and agree to ship Mifeprex only to locations identified by certified prescribers. Distributors must agree to maintain secure and confidential records, as well as, follow all distribution guidelines concerning storage, shipments and controlled returns. |

## 1.2 BRIEF SUMMARY OF KEY REGULATORY HISTORY

A brief summary of the key regulatory history relevant to the Mifeprex REMS is listed below:

**September 28, 2000:** Mifeprex is approved with restricted distribution and postmarketing commitments under 21 CFR 314.520 (Subpart H).

**September 27, 2007:** FDAAA enacted and Mifeprex is deemed to have a REMS.

**June 8, 2011:** Mifeprex REMS is approved, NDA 020687/S-014

**June 1, 2012:** REMS Assessment Report, Year 1

**June 2, 2015:** REMS Assessment Report, Years 2-4

**May 29, 2015:** Danco submitted PAS- 020 efficacy supplement

**January 15, 2016:** A (b) (6) meeting was held to discuss proposed revisions to the REMS which included revising the REMS goal and removal of the MG and Patient Agreement form as elements of the REMS.

## 2. MATERIALS REVIEWED

## 2.1 SUBMISSIONS

- Danco Laboratories, Prior Approval Efficacy Supplement and REMS Modification, PAS-020, received May 29, 2015 (paper submission)

## 2.2 OTHER MATERIALS INFORMING OUR REVIEW

- Mifeprex approval letter, dated September 28, 2000
- (b) (6) Mifeprex PAS-014 approval letter, dated June 8, 2011
- (b) (6) Final deemed REMS Review for Mifeprex:, dated June 3, 2011
- (b) (6) Review of Year 1 REMS Assessment Report: dated August 1, 2012
- (b) (6) Review of Year 4 REMS Assessment Report: dated October 13, 2015

4

Pet. Ref. 782

- [(b) (6)]   Mifeprex Post-marketing Safety Review: dated August 20, 2015
- Addendum to [(b) (6)] Review of Year 4 REMS Assessment Report: dated March 29, 2016
- [(b) (6)] draft Clinical Review for Mifeprex, NDA 020687, PAS 20: dated March 29, 2016.

## 3. OVERVIEW OF RATIONALE FOR PROPOSED REMS MODIFICATIONS

On May 29, 2015, Danco submitted an efficacy prior approval supplement-020 (PAS-020) and REMS modification.  In PAS-020, Danco is seeking approval of certain changes, including:

- Dosing of 200 mg orally x 1, instead of 600 mg orally x 1
- Extension of maximum gestational age
- Inclusion of misoprostol in the indication statement
- Inclusion of information regarding Pediatric Research Equity Act (PREA) data
- Replacement of the term "physician" with "[(b) (4)]  in the PI and the REMS Prescriber's Agreement
- Removal of the phrase "Under Federal Law" from the REMS Prescriber's Agreement
- Revisions to the Patient Agreement Form to reflect proposed changes in the PI

The Sponsor's proposed changes in the efficacy supplement prompted revisions to the Mifeprex REMS materials. During review of the efficacy supplement and proposed REMS Modifications, [(b) (6)] evaluated the current REMS program to determine whether other changes were appropriate.  As part of this evaluation, the review team took into consideration the recent [(b) (6)] review of the Mifeprex REMS Assessment completed on October 13, 2015, the addendum to the October 13, 2015 review completed on March 29, 2016, safety data gathered over the past 16 years since approval, and information regarding current clinical practice.[5,6,8,9]

Based on the available data and information, [(b) (6)] continues to believe that a REMS is necessary to ensure the benefits outweigh the risks; however, we recommend that some elements be modified or removed.  All of the modifications in this review were discussed with [(b) (6)]  The recommended modifications and supporting rationale for each are further described in Sections 4 and 5 below.

## 4. SPONSOR PROPOSED MODIFICATIONS AND RATIONALE

### 4.1. REMS ELEMENTS

#### 4.1.1. CERTIFICATION OF PRESCRIBERS - ETASU A

##### 4.1.1.1. PRESCRIBER'S AGREEMENT

Danco is proposing two modifications to the Prescriber's Agreement form.  The first proposal is to remove the phrase "Under Federal law" from the document.  This phrase appears twice in the Prescriber's Agreement:

(1) *Under Federal law*, Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…
(2) *Under Federal law*, each patient must be provided with a Medication Guide.

5

Pet. Ref. 783

The Sponsor is proposing that the phrase be deleted from the beginning of the above sentences to be consistent with current REMS language.

*Reviewer Comment: The review team agrees with this revision. The review team has determined that there is no precedent in other REMS for using the phrase, nor is there any clinical rationale for including it. As approvals are governed by Federal law, the review team concludes that the phrase "Under Federal law" is unnecessary in the Prescriber's Agreement.*

The second proposed modification from Danco is to replace the word "physician" with "                    " (b) (4)   The Prescriber's Agreement currently reads: "Under Federal law, Mifeprex must be provided by or under the supervision of a *physician* who meets the following qualifications…"   The Sponsor is proposing that the agreement read:  "Mifeprex must be provided by or under the supervision of a                    (b) (4) who meets the following qualifications…"

*Reviewer Comment: The review team agrees that the term "physician" should be replaced, but with the phrase "healthcare provider who prescribes." '*                    (b) (4) *. Mifeprex is a prescription medication and "healthcare providers who prescribe" accurately describes not only physicians but other healthcare providers, for example, nurse practitioners, certified nurse midwives and physician assistants, who may prescribe medications. Additionally, the phrase "healthcare provider who prescribes" is consistent with the language that is included in the statute.*[3]

## 5.   (b) (6)   PROPOSED MODIFICATIONS AND RATIONALE

### 5.1. REMS ELEMENTS

#### 5.1.1. MEDICATION GUIDE

FDA has generally been maintaining MGs as FDA-approved labeling but removing them from REMS when inclusion in REMS is not necessary to ensure that the benefits of a drug outweigh the risks.  The Mifeprex MG, though an important tool for patient education that will continue to be distributed to patients, does not need to be an element of the REMS to ensure the benefits outweigh the risks for Mifeprex. The MG will remain part of labeling and will still be required to be distributed to the patient as per 21 CFR part 208. This approach is consistent with ongoing efforts to streamline REMS by allowing for changes to a MG without the need for a REMS modification.

#### 5.1.2. CERTIFICATION OF PRESCRIBERS - ETASU A

#### 5.1.2.1. PRESCRIBER'S AGREEMENT

Per the current Mifeprex REMS, a Prescriber's Agreement is required to be completed, signed and faxed to the distributor to complete enrollment.  The review team is recommending

---

[3] FDCA 505-1(f)(3)(A).

6

Pet. Ref. 784

changing the name of the form from "Prescriber's Agreement" to "Prescriber Agreement Form" to be consistent with the terminology used in other similar REMS Programs.  The term *"physician"* should be replaced, as proposed by the Sponsor.  However the review team recommends the phrase "*healthcare provider who prescribes*" in lieu of the Sponsor proposed "⬛⬛⬛⬛⬛⬛⬛⬛ (b) (4) to more closely reflect the statutory provision, and to align with this revision in the Mifeprex Prescribing Information (PI), which was based on information in the supplement.[4]  Additional changes are intended to improve the flow of the document. See the appended, redlined document for further details.

Consistent with the labeling revisions in the efficacy supplement, the language in the Prescriber Enrollment Form about the gestational age should be changed to match the labeling being approved.

### 5.1.3.  DRUG DISPENSED ONLY IN CERTAIN HEALTH CARE SETTINGS - ETASU C

No changes to ETASU C are proposed.

### 5.1.4.  DOCUMENTATION OF SAFE USE CONDITIONS - ETASU D

### 5.1.4.1.  PATIENT AGREEMENT

Per the Mifeprex REMS, a Patient Agreement form is required to be signed and placed in the patient's medical record as documentation of safe use conditions for Mifeprex. The review team recommends removal of the Patient Agreement form from the Mifeprex REMS.  This recommendation is based in part on the fact that the current Patient Agreement is duplicative of the informed consent and counseling processes that take place in the US, consistent with medical standard of care and current clinical practice guidelines for abortion providers.[5,6,7]  For example, the National Abortion Federation (NAF) clinical practice guidelines state that "obtaining informed consent and assessing that the decision to have an abortion is made freely by the patient are essential parts of the abortion process."  The NAF guidelines also include a standard stating that documentation must show that the patient affirms that she understands the procedure and its alternatives, the potential risks and benefits, and that her decision is voluntary.[6] The NAF is a professional association; a condition of membership requires periodic quality assurance site visits, and members must agree to adhere to the Clinical Policy Guidelines published by the NAF.[7] When healthcare providers at NAF affiliated facilities were surveyed, between 96 and 99% of healthcare providers indicated they provided patient counseling and obtained and documented informed consent.[8,9] The review team is aware that

---

[4] ⬛⬛⬛ (b) (6) draft Clinical Review for Mifeprex (NDA 020687) PAS 20. Dated:  March 29, 2016

[5] ACOG. Medical management of first trimester abortion. ACOG Practice Bulletin #143. Obstetrics and Gynecology 2014; 123(3):676-692

[6] National Abortion Federation Clinical Policy Guidelines (for abortion care). Revised 2015 edition, 56 pages, accessed on the internet at http://prochoice.org/wp-content/uploads/2015_NAF_CPGs.pdf on March 9, 2016.

[7] National Abortion Federation Membership information accessed on the internet at http://prochoice.org/health-care-professionals/naf-membership/ on March 9, 2016

[8] Gould H, Perrucci A, Barar R, Sinkford D, Foster D. Patient Education and Emotional Support Practices in Abortion Care Facilities in the United States. Women's Health Issues 2012; 22-4; 359-364

Pet. Ref. 785

Planned Parenthood of America has informed consent forms describing the risks associated with medical abortions. The NAF affiliated members and Planned Parenthood of America facilities account for [(b)(4)]% of Mifeprex use.

The information in the Mifeprex REMS Patient Agreement form is duplicative of the informed consent process that is followed and documented by these providers, who also provide abortion counseling and education about adverse events.  Additionally, the MG, which is required to be provided under 21 CFR 208, contains the same risk information addressed in the Patient Agreement form and will be provided at the time the medication is dispensed to the patient. Based on this information, the Patient Agreement form is not necessary to ensure the benefits outweigh the risks of Mifeprex.

Finally, the U.S. marketing history of Mifeprex spans over fifteen years.  During this period of surveillance, the safety profile of Mifeprex has been well-characterized, and serious adverse events have rarely occurred. [10,11,12]

## 5.2. REMS DOCUMENT

The REMS document is being revised to reflect the changes described above as well as to reflect the Agency's current thinking on the language and flow in REMS documents. The changes to the different sections of the REMS document are described further below.  For additional details, see the redlined and clean REMS document appended to this review.

### 5.2.1.  GOALS

The review team is recommending modification of the Mifeprex REMS goals.  Currently the goals are (A) to provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug and (B) to minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications.  Since [(b)(6)] is recommending removal of the Patient Agreement from the REMS, [(b)(6)] recommends revising the REMS goals to reflect this change. The revised goal is to ensure that prescribers are aware of the risks of serious complications associated with the use of Mifeprex and that it can only be dispensed in certain health care settings. The goal would be modified to read:

---

[9] O'Connell K, Jones HE, Simon M, Saporta V, Paul M, Lichtenberg ES. First trimester surgical abortion practices: a survey of National Abortion Federation members. Contraception 2009; 79:385-392

[10] [(b)(6)] ( [(b)(6)] Mifeprex Post-marketing Safety Review: [(b)(6)], dated August 20, 2015

[11] ACOG. Medical management of first trimester abortion. ACOG Practice Bulletin #143. Obstetrics and Gynecology 2014; 123(3):676-692

[12] National Abortion Federation Clinical Policy Guidelines (for abortion care). Revised 2015 edition, 56 pages, accessed on the internet at http://prochoice.org/wp-content/uploads/2015_NAF_CPGs.pdf

Pet. Ref. 786

"The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:

    a) Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.

    b) Ensuring that Mifeprex is only dispensed in certain health care settings under the supervision of a certified prescriber."

### 5.2.2.  MEDICATION GUIDE

(b) (6) recommends this element be removed from the REMS document. See Section 5.1.1 for rationale.

### 5.2.3.  CERTIFICATION OF PRESCRIBERS - ETASU A

The language in the REMS document stating that certified prescribers must obtain a completed Patient Agreement form from the patient is recommended to be removed (see Section 5.1.2.1 for rationale). In addition, edits to align the REMS document with language in the revised PI are being made. Finally, we recommend that this section of the REMS document be revised and edited to reflect the Agency's current thinking on the most appropriate language and flow of REMS documents. However, the requirement for Prescriber Certification remains and the qualifications of a healthcare provider who prescribes Mifeprex have not changed and continue to be necessary to ensure the benefits outweigh the risks.

### 5.2.4.  DRUG DISPENSED ONLY IN CERTAIN HEALTH CARE SETTINGS - ETASU C

This section of the REMS was edited to provide clarification on where Mifeprex will not be dispensed.

In addition, the REMS document was revised and edited to reflect (b) (6) current thinking on the language and flow of REMS documents.  These changes are not intended to be substantive.

### 5.2.5.  DOCUMENTATION OF SAFE USE CONDITIONS -ETASU D

This element is being recommended for removal from the REMS document. See section 5.1.4.1 for rationale.

### 5.2.6.  IMPLEMENTATION SYSTEM

This section of the REMS document is proposed to be revised and edited to reflect the Agency's current thinking on the language and flow of REMS documents.

### 5.2.7.  TIMETABLE FOR SUBMISSION OF ASSESSMENTS

This section of the REMS document is proposed to be revised and edited to reflect the Agency's current thinking on the language and flow of REMS documents.

### 5.3. ASSESSMENT PLAN

9

Pet. Ref. 787

Currently, the REMS Assessment Plan requires Danco to submit the following adverse event information as part of the periodic REMS Assessment Report:

6.  Copies of MedWatch forms for each of the following adverse events during the assessment period; and for each of the following adverse events, the cumulative number from the date of approval of Mifeprex up to the approval date of the REMS, the number for each reporting period, and the cumulative number since the approval date of Mifeprex:
    a.  On-going pregnancies not terminated subsequent to the conclusion of the treatment procedure
    b.  Women hospitalized due to complications
    c.  Women requiring transfusion(s) of two or more units of packed cells or whole blood, or having a hemoglobin of 6 gm/dL or less or a hematocrit of 18% or less
    d.  Serious infection, sepsis
    e.  Death
    f.  Other serious and unexpected adverse events

7.  Per section 505-1(g)(3)(B) and (C), information on the status of any postapproval study or clinical trial required under section 505(o) or otherwise undertaken to investigate a safety issue.

This information is being submitted to the Agency through other pathways including spontaneous adverse event reporting and the annual report. Therefore, ⁽ᵇ⁾ ⁽⁶⁾ is recommending it be removed from the Assessment Plan.

The revised Assessment Plan is as follows:

**REMS Assessment Plan**
1.  Number of prescribers enrolled (cumulative)
2.  Number of new prescribers enrolled during reporting period
3.  Number of prescribers ordering Mifeprex during reporting period
4.  Number of healthcare providers who attempted to order Mifeprex who were not enrolled; describe actions taken (during reporting period and cumulative)
5.  Number of women exposed to Mifeprex (during reporting period and cumulative)
6.  Summary and analysis of any program deviations and corrective action taken
7.  Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed

## 6.  CONCLUSION

A REMS for Mifeprex is necessary to ensure that the benefits outweigh the risks.  The review team and Sponsor have proposed modifications that continue to ensure that the benefit outweighs the risk, while updating the REMS in light of current medical practice and to provide clarifying language in the REMS documents.

The modifications to the Mifeprex REMS include the sponsor's proposed modifications and additional changes recommended by the review team and include the following: revision of the REMS goals, removal of the MG (it will remain as part of labeling) and the Patient Agreement; and changes to the Prescriber Enrollment Form.

10

Pet. Ref. 788

## 7.  RECOMMENDATIONS

(b) (6) recommends the changes in the attached, redlined REMS document and materials, which represent (b) (6) proposed changes to the REMS as a result of this REMS Modification Review.

## 8.  APPENDIX

1.  Prescriber Enrollment Form, redlined
2.  Prescriber Enrollment Form, clean
3.  REMS Document, redlined
4.  REMS Document, clean

20 Page(s) has been Withheld in Full as b4 (CCI/TS) immediately following this page

11

----------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

----------------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------

(b) (6)

03/29/2016

(b) (6)

03/29/2016

Concur

Pet. Ref. 790

Women's Health Issues 21-3S (2011) S49–S54





www.whijournal.com

Invited paper

# Abortion Stigma: A Reconceptualization of Constituents, Causes, and Consequences

Alison Norris, MD, PhD [a,*], Danielle Bessett, PhD [b], Julia R. Steinberg, PhD [c],
Megan L. Kavanaugh, DrPH [d], Silvia De Zordo, PhD [e], Davida Becker, PhD [f]

[a] Department of Population Family and Reproductive Health, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland
[b] Department of Sociology, University of Cincinnati, Cincinnati, Ohio
[c] Department of Psychiatry, University of California, San Francisco, San Francisco, California
[d] Guttmacher Institute, New York, New York
[e] Goldsmiths College, University of London, Department of Anthropology, New Cross, London, United Kingdom
[f] Center for the Study of Women, University of California, Los Angeles, Los Angeles, California

Article history: Received 23 October 2010; Received in revised form 25 January 2011; Accepted 12 February 2011

A B S T R A C T

Stigmatization is a deeply contextual, dynamic social process; stigma from abortion is the discrediting of individuals as a result of their association with abortion. Abortion stigma is under-researched and under-theorized, and the few existing studies focus only on women who have had abortions. We build on this work, drawing from the social science literature to describe three groups whom we posit are affected by abortion stigma: Women who have had abortions, individuals who work in facilities that provide abortion, and supporters of women who have had abortions, including partners, family, and friends, as well as abortion researchers and advocates. Although these groups are not homogeneous, some common experiences within the groups—and differences between the groups—help to illuminate how people manage abortion stigma and begin to reveal the roots of this stigma itself. We discuss five reasons why abortion is stigmatized, beginning with the rationale identified by Kumar, Hessini, and Mitchell: The violation of female ideals of sexuality and motherhood. We then suggest additional causes of abortion stigma, including attributing personhood to the fetus, legal restrictions, the idea that abortion is dirty or unhealthy, and the use of stigma as a tool for anti-abortion efforts. Although not exhaustive, these causes of abortion stigma illustrate how it is made manifest for affected groups. Understanding abortion stigma will inform strategies to reduce it, which has direct implications for improving access to care and better health for those whom stigma affects.

Copyright © 2011 by the Jacobs Institute of Women's Health. Published by Elsevier Inc.

## Introduction

Abortion stigma, an important phenomenon for individuals who have had abortions or are otherwise connected to abortion, is under-researched and under-theorized. The few existing studies focus only on women who have had abortions, which in the United States represents about one third of women by age 45 (Henshaw, 1998). Kumar, Hessini, and Mitchell (2009) recently theorized that women who seek abortions challenge localized cultural norms about the "essential nature" of women. We posit that that stigma may also apply to medical professionals who provide abortions, friends and family who support abortion patients, and perhaps even to prochoice advocates. Does abortion stigma affecting these groups stem from the same root? Do they experience this stigma in the same way? We build on Kumar et al.'s work by exploring how different groups experience abortion stigma and what this tells us about why abortion is stigmatized.

Stigmatization is a deeply contextual, dynamic social process; it is related to the disgrace of an individual through a particular attribute he or she holds in violation of social expectations. Goffman (1963, p. 3) described stigma as "an attribute that is deeply discrediting," reducing the possessor "from a whole and usual person to a tainted, discounted one." Many have built on Goffman's definition over the past 45 years,[1] but two components of stigmatization consistently appear across disciplines:

* Correspondence to: Alison Norris, MD, PhD, Department of Population, Family and Reproductive Health, Johns Hopkins Bloomberg School of Public Health , 615 N. Wolfe Street, Room 4035, Baltimore, MD 21205.
E-mail address: anorris@jhsph.edu (A. Norris).

[1] The growing field of abortion research relies, necessarily, on other fields in which examination and measurement of stigma is more developed.

1049-3867/$ - see front matter Copyright © 2011 by the Jacobs Institute of Women's Health. Published by Elsevier Inc.
doi:10.1016/j.whi.2011.02.010

Pet. Ref. 791

The perception of negative characteristics and the global devaluation of the possessor. Kumar et al. (2009) define abortion stigma as "a negative attribute ascribed *to women* who seek to terminate a pregnancy that marks them, internally or externally, as inferior to ideals of womanhood" (p. 628, emphasis added). Like Kumar et al. (2009), we dispute any "universality" of abortion stigma. We retain their useful multilevel conceptualization, understanding stigma as created across all levels of human interaction: Between individuals, in communities, in institutions, in law and government structures, and in framing discourses (Kumar et al., 2009).

Abortion stigma is usually considered a "concealable" stigma: It is unknown to others unless disclosed (Quinn & Chaudior, 2009). Secrecy and disclosure of abortion often pertain to women who have had abortions, but may also apply to other groups—including abortion providers, partners of women who have had abortions, and others—who must also manage information about their relationship to abortion. As with women who have had abortions, none are fully in control of whether their status is revealed by—and to—others. Consequently, those stigmatized by abortion cope not only with the stigma once revealed, but also with managing whether or not the stigma will be revealed (Quinn & Chaudior, 2009). Researchers have theorized that concealing abortion is part of a vicious cycle that reinforces the perpetuation of stigma (Kumar et al., 2009; Major & Gramzow, 1999).

We examine how abortion stigma, created across levels of human interaction, is made manifest for different individuals within groups and across groups. Abortion stigma can affect all women. Here, we focus on how different groups—women who have had abortions, abortion providers (e.g., doctors, nurses, counselors, clinic staff), and others who are supporters of women who have had abortions (e.g., husbands, boyfriends, family members, close friends, as well as advocates and researchers)— although not homogeneous, are positioned differently with regard to abortion. Intergroup differences illuminate how people manage abortion stigma and begin to reveal the roots of abortion stigma itself. Understanding abortion stigma will inform strategies to reduce it, which has direct implications for improving access to care and better health for those stigmatized. We limit our focus here to the United States; a thorough analysis of abortion stigma in other settings is beyond the scope of this paper and deserves attention in its own right.

## Groups Affected by Abortion Stigma

### Women Who Have Had Abortions

Women in the United States voice complex emotions after abortion, and not all women feel stigmatized by it. Many, however, follow the "implicit rule of secrecy": Women are expected to keep quiet about abortion (Ellison, 2003). Recent research indicates that two out of three women having abortions anticipate stigma if others were to learn about it; 58% felt they needed to keep their abortion secret from friends and family (Shellenberg, 2010). The experience of stigma varies by individual characteristics, such as religious beliefs, cultural values, and economic status (Kumar et al., 2009). Major and Gramzow (1999) examined effects of individual-level abortion stigma, finding that the more a woman perceived others were looking down on her for having an abortion, the more she felt a need to keep the abortion secret. More than two thirds of women talked about their abortions "only a little bit" or "not at all." This secret

keeping in turn led to more thought suppression regarding the abortion, which hampered postabortion psychological adjustment. That is, the more women experienced stigma, the more likely they were to have adverse emotional outcomes (Major & Gramzow, 1999). Women may believe they will cope poorly with having an abortion because of misinformation they have received about its physical and psychological risks (Major et al., 2009; Russo & Denious, 2005).

Social support that women receive from their immediate social networks, particularly their partners, mitigates the effects of abortion stigma (Kumar et al., 2009). Women who perceive community support for the right to terminate a pregnancy are less likely to feel guilt and shame than those who do not (Kumar et al., 2009). Conversely, stigma surrounding abortion may keep women from seeking or receiving social support. Stigma may also have economic costs for women who feel they must conceal their abortions. Jones, Finer, and Singh (2010) found that, among the 30% of abortion patients covered by private insurance, nearly two thirds paid for abortion care out of pocket, which they attribute in part to stigma. Finally, the persistence of self-induced abortion in the United States may be another indicator of how stigma affects women's actions (Grossman et al., 2010): Self-induced abortion is one way that women can keep their terminations secret.

The experience of abortion stigma can be transitory or episodic for some abortion patients. Abortion may not become a salient part of their self-concept and may re-emerge only at key moments. For example, a woman who rarely thinks of the abortion she had 20 years ago may find herself face-to-face with abortion stigma when her new father-in-law loudly asserts anti-abortion rhetoric at a holiday dinner or she may re-experience it when she is asked about her reproductive history by her obstetrician. Thus, we caution against reification of individually experienced abortion stigma as something that one always "has" or is always salient.

Women who have had abortions are a heterogeneous group (Jones et al., 2010). Their reasons for terminating their pregnancies also vary (Finer, Frohwirth, Dauphinee, Singh, & Moore, 2005). In public discourse and from the perspective of women having abortions, however, the idea that there are "good abortions" and "bad abortions" stemming from "good" and "bad" reasons for having them, is prevalent. Stigma experienced by women who have had abortions may be mitigated or exacerbated by whether their abortions fall into one category or the other. "Good abortions" are those judged to be more socially acceptable, characterized by one or more of the following: A fetus with major malformations, a pregnancy that occurred despite a reliable method of contraception, a first-time abortion, an abortion in the case of rape or incest, a very young woman, or a contrite woman who is in a monogamous relationship. "Bad abortions," in contrast, occur at later gestational ages and are had by "selfish" women who have had multiple previous abortions without using contraception (Furedi, 2001). Women who have had abortions may be both the stigmatizer and the stigmatized, believing they had "good abortions" and distancing themselves from others who had "bad abortions" (Rapp, 2000). These moral distinctions may be drawn by any woman having an abortion, whether anti-abortion or prochoice (Arthur, 2000).

### Individuals Who Work in Abortion Provision

Most abortions in the United States are provided in free-standing clinics (Jones & Kooistra, 2011). These separate clinics

were originally conceived of by women's movement activists to ensure sensitive, women-controlled care. Today, however, this separateness isolates abortion from mainstream health care and marginalizes both abortion and those who provide it. Although abortion is one of the most common medical procedures among women in the United States (Owings & Kozack, 1998), 87% of U.S. counties lack an abortion provider (Jones & Kooistra, 2011). This inconsistency between supply and demand indicates that a small number of providers supply women with a large proportion of abortion care. In essence, many doctors and staff are channeled by structural forces into becoming "abortion specialists" (Joffe, 1995).

Physicians who are trained to but do not provide abortions describe explicit and subtle practice restrictions and fear of repercussions from colleagues (Freedman, Landy, Darney, & Steinauer, 2010). Consequently, some providers opt to perform abortions only under "extraordinary" circumstances. The climate of harassment and violence at abortion clinics—exacerbated by the murder of abortion provider Dr. George Tiller—also contributes to providers' experience of stigma (Joffe, 2003; Freedman et al., 2010; Joffe, 2009). Stigma may also depend on the types of abortions physicians perform, with second-trimester abortion more stigmatized than first-trimester abortion (Harris, 2008; Yanow, 2009).

The experience of abortion stigma is different for providers than it is for women who have had abortions. Abortion stigma is close at hand for providers (Harris, 2008). Their work identity is connected to abortion, and exposure to stigmatizing behaviors may be continual. The concentration of the abortion load on a relatively small number of providers suggests that abortion and its associated stigma may be consistently integrated into the identities of abortion clinic doctors and staff.

The consequences of abortion stigma for the well-being of abortion providers have not been well studied, but hypothesized effects include stress, professional difficulties with anti-abortion colleagues, fears about disclosing one's work in social settings, and burnout. Some efforts are currently underway to help abortion providers cope with the stresses and stigma of their work (Harris, 2008). Providers counter the negative effects of abortion stigma with positive beliefs that their work is valuable and that it contributes to patients' well-being in a profound way. Many abortion providers actively support each other.

### Supporters of Women Who Have Had Abortions

Supporters of women who have had abortions, including partners, family, and friends, as well as abortion researchers and advocates, may experience a "courtesy stigma" that arises from being associated with women who have had abortions or with providers (Goffman, 1963). Research about male partners of women obtaining abortions has found that they often experience complex emotions similar to those reported by women: Ambivalence, guilt, sadness, anxiety, and powerlessness (Shostak, Koppel, & Perkins, 2006), yet whether they also experience stigma has yet to be studied. Research is needed to understand whether abortion stigma affects male partners and other family members.

Information about stigma experienced by prochoice advocates and researchers who study abortion is also limited. Based on our own experiences, we believe that researchers may experience difficulty securing funding for studies on abortion or may encounter pressure to study "less controversial" topics. We would be interested to see an investigation of how this stigma

influences scholars' research funding, publication patterns, and overall career paths.

### Why Is Abortion Stigmatized?

*Abortion Is Stigmatized Because It Violates "Feminine Ideals" of Womanhood*

As Kumar et al. (2009) deftly demonstrate, abortion violates two fundamental ideals of womanhood: Nurturing motherhood and sexual purity. The desire to be a mother is central to being a "good woman" (Russo, 1976), and notions that women should have sex only if they intend to procreate reinforce the idea that sex for pleasure is illicit for women (although it is acceptable for men). Abortion, therefore, is stigmatized because it is evidence that a woman has had "nonprocreative" sex and is seeking to exert control over her own reproduction and sexuality, both of which threaten existing gender norms (Kumar et al., 2009).

The stigmatization women experience may not be rooted in the act of aborting a fetus; stigma may instead be associated with having conceived an unwanted pregnancy, of which abortion is a marker. Stigma may be associated with feelings of shame about sexual practices, failure to contracept effectively, or misplaced faith in a partner who disappoints. Abortion can be seen here as one of several "bad choices" about sex, contraception, or partner (Furedi, 2001).

*Abortion Is Stigmatized by Attributing Personhood to the Fetus*

Technological changes during the past three decades—fetal photography, ultrasound, advances in care for preterm infants, fetal surgery—have facilitated personification of the fetus and challenged previous constructions of boundaries between fetus and infant. Prochoice groups have debated appropriate gestational age limits (Furedi, 2010). Anti-abortion forces have helped to shape this debate by using fetal images (many of which were not alive or in utero as implied by the photos) and interpreting them in ways that suggest abortion is equivalent to murder (Morgan & Michaels, 1999). These images have effectively erased pregnant women from view, decontextualizing the fetus and overstating its independence from the woman who carries it and the social circumstances of her life (Taylor, 2008). Abortion stigma is affected both by legislative initiatives that establish fetal personhood and gestational age limits and by discourses that influence cultural values. By constructing the fetus as a person and abortion as murder, anti-abortion forces argue that women or providers—or both— should be seen as murderers.

Abortion stigma via personification of the fetus affects individuals differently. Women who have had abortions may find ready justifications for a one-time action. Providers, in contrast, have to cope with an ongoing relationship to abortion, sometimes as they themselves become pregnant or parents (Harris, 2008).

*Abortion Is Stigmatized Because of Legal Restrictions*

We see an important intertwining of law, morality, and stigma. Legal restrictions (e.g., parental consent requirements, gestational limits, waiting periods, and mandated ultrasound viewing) in the United States make it more difficult for women to obtain abortions and reinforce the notion that abortion is morally wrong. Stigma is a barrier to changing abortion law. This is of particular concern because severe legal restrictions are

*A. Norris et al. / Women's Health Issues 21-3S (2011) S49–S54*

correlated with unsafe abortion, which contributes to morbidity and mortality (Singh, Wulf, Hussain, Bankole, & Sedgh, 2009).

Changes in the legal situation do not necessarily diminish stigma in social discourse. The stigma of abortion did not go away when it was legalized in the United States. In fact, lowering the legal barriers revealed an enduring cultural stigma (Joffe, 1995).

*Abortion Is Stigmatized Because It Is Viewed as Dirty or Unhealthy*

The legacy of "back alley" abortionists has left a perception in the United States that abortion is dirty, illicit, and harmful to women. Unfortunately, abortion is still marred by unsafe practices in some places, usually where it is illegal. Occasionally abortion is unsafe in places where, although legal, stigma flourishes, including some instances in the United States. Drawing on this deep historical stigma, anti-abortionists in the United States have championed a new argument that "abortion hurts women." This argument, which positions women as victims of a profiteering abortion machine and the ostensible objects of pity, reduces providers to cruel and callous manipulators and women to "damaged goods." Unsubstantiated links between abortion, breast cancer, and impaired fertility have been used to frame a "women-centered" anti-abortion strategy (Littman, Zarcadoolas, & Jacobs, 2009; Siegel, 2008). In contrast with other examples, in which abortion reveals or symbolizes flaws in women's character, here women become flawed because of the experience of having an abortion, and the abortion provider is further tainted, now harming both fetus and woman.

Seven states have integrated groundless claims about the psychological effects of abortion (such as so-called post-abortion syndrome) into regulations. These institutional practices deny the normalcy of abortion as technique and as medical care and reinforce stigmatizing ideas that abortion is unhealthy.

The clinic, itself a stigmatized place, can reinforce stigma for women: Set off from other medical practices and beset by picketers, the institutional arrangements of abortion provision may validate abortion stigma. Abortion providers themselves are not always free of stigmatizing attitudes, and women may internalize abortion stigma so deeply that they feel judged even by those who support their decisions. Abortion stigma may cause women to feel less empowered to ask questions about the procedure and its health consequences. Research is needed to understand whether women are less likely to challenge poor treatment, or to tell others if they receive low-quality care, or if they feel that they "got what they deserved" if treated disrespectfully. When male partners accompany women to abortion visits, they are generally not allowed to stay with their partners during the procedure and rarely receive information or counseling from the staff (Shostak et al., 2006). The experience of being in the clinic does not have to be stigmatizing; however, it can be a powerful source of comfort and destigmatization for women having abortions, their supporters, and the individuals who work there (Littman et al., 2009). Women's experiences at the clinic may be strongly influenced by their expectations as well as by what happens there, and research is needed to clarify the role of the clinic in abortion stigma.

*Abortion Is Stigmatized Because Anti-Abortion Forces Have Found Stigma a Powerful Tool*

The anti-abortion movement increasingly seeks both to erect overt barriers to abortion and to change cultural values,

beliefs, and norms about abortion so that women will seek abortion less frequently regardless of its legal status. From photographing women entering clinics to distributing flyers to the neighbors of providers, the anti-abortion movement foments abortion stigma as a deliberate tactic, not just as a byproduct of its legislative initiatives. Eroding public support for the idea of abortion is seen as an underpinning of future institutional limits (Joffe, 2009).

**Conclusion**

One pernicious effect of abortion stigma may be that physicians are unable to receive training in abortion procedures, decline to be trained, or, if trained, face barriers to providing abortions. Future studies should investigate whether abortion stigma leads some physicians to refuse to provide legal abortions. Conscientious objection on religious grounds, by challenging the morality of abortion, may lead both to lack of training opportunities and to trainees refusing to be trained, further enhancing abortion stigma. Another concern warranting study is that abortion stigma may cause some women to carry their pregnancies to term, to assume a disproportionate economic burden for care, or to seek abortion care clandestinely. It may be that the most vulnerable groups of women are unable to get abortions because of this social barrier. We propose the following recommendations to counter abortion stigma.

*Normalize Abortion Within Public Discourse*

Silence is an important mechanism for individuals coping with abortion stigma; people hope that if no one knows about their relationship to abortion, they cannot be stigmatized. Nevertheless, even a concealed stigma may lead to an internal experience of stigma and health consequences (Quinn & Chaudoir, 2009). We recognize the importance of advocacy and programs that aim to normalize abortion and allow people to speak, such as Baumgardner's "I had an abortion" T-shirt campaign and Exhale's "pro-voice" services, among others. Abortion providers, like women who have had abortions and those who support them, may need targeted supports and outlets. We should engage popular media, including popular entertainment, in the effort to remind people that abortion is common and usual. We need to continue to work with policy makers so that health care and other reforms do not further marginalize and stigmatize abortion services (Weitz, 2010). Empirical research would help to assess the effectiveness of these initiatives and their potential for decreasing abortion stigma. We see a need for work comparing abortion with other social phenomena that have become less stigmatized, such as cancer and homosexuality, to understand better the processes of destigmatization.

*Be Aware of Language Used Within Community of Abortion Supporters*

The prochoice community, researchers, and advocates need to avoid language that endorses "good" versus "bad" reasons for abortions. Prochoice people should not distance themselves from abortion, invoking "safe, legal, and rare" language, which perpetuates the stigma (Weitz, 2010). Considering the controversies, political advocacy, and social discourse around abortion

may illuminate the ways in which particular conflicts have increased or reduced abortion stigma.

### Maintain and Strengthen Training Initiatives

The growing movement to make abortion training more research based has helped to improve its standing and to integrate abortion care within academic medicine. The Family Planning Fellowship provides advanced abortion training to board-certified obstetrician/gynecologists and family medicine physicians in 21 universities across the United States. The Society of Family Planning and the National Abortion Federation support ongoing training and research by providing cutting-edge curricula and institutional support for clinical researchers and providers. Physicians for Reproductive Choice and Health has created prizes for abortion providers at the American College of Obstetrics and Gynecology and the New York Academy of Medicine specifically to counter stigma and push medicine to claim abortion as a legitimate procedure. As social scientists who have benefitted tremendously from the Charlotte Ellertson Social Science Postdoctoral Fellowship in Abortion and Reproductive Health, we advocate for the resumption of this program, which filled an important gap in training.

### Conduct Research Into Experiences of Stigma Within and Among Groups

Measuring abortion stigma is not easy. We eagerly anticipate new work from Kumar on program design and evaluation for measuring abortion stigma as well as a validated stigma scale for women having abortions being developed by Cockrill and others at Advancing New Standards in Reproductive Health, a program of the University of California at San Francisco's Bixby Center for Global Reproductive Health. We look forward as well to the contributions of Harris and colleagues about the stigma of abortion work. We acknowledge the concern of some prochoice advocates that a renewed focus on abortion stigma may inadvertently heighten that stigma. We argue, however, that abortion stigma is worthy of attention specifically because the evidence is so limited. Refining our understanding of how stigma operates within and between groups and why abortion is stigmatized will benefit not only the groups identified, but also society in general.

### Acknowledgments

An earlier version of this paper was presented at the Social Science Networking Meeting at the National Abortion Federation meeting in April 2010. We are grateful for the many helpful comments we received at that time from participants and panelists, as well as the suggestions of two anonymous reviewers. We also gratefully acknowledge the funding and support of the Charlotte Ellertson Social Science Postdoctoral Fellowship in Abortion and Reproductive Health.

### References

Arthur, J. (2000). "The only moral abortion is my abortion:" When the anti-choice choose. Available: http://mypage.direct.ca/w/writer/anti-tales.html.

Ellison, M. A. (2003). Authoritative knowledge and single women's unintentional pregnancies, abortions, adoption, and single motherhood: Social stigma and structural violence. Medical Anthropology Quarterly, 17, 322–347.

Finer, L. B., Frohwirth, L. F., Dauphinee, L. A., Singh, S., & Moore, A. M. (2005). Reasons U.S. women have abortions: Quantitative and qualitative perspectives. Perspectives on Sexual and Reproductive Health, 37, 110–118.

Freedman, L., Landy, U., Darney, P., & Steinauer, J. (2010). Obstacles to the integration of abortion into obstetrics and gynecology practice. Perspectives in Sexual and Reproductive Health, 42, 146–151.

Furedi, A. (2001). Issues for service providers: A response to points raised. Journal of Medical Ethics, 27(Suppl.), ii28–ii32.

Goffman, E. (1963). Stigma: Notes on the management of spoiled identity. New York: Prentice-Hall.

Grossman, D., Holt, K., Peña, M., Lara, D., Veatch, M., Córdova, D., et al. (2010). Self-induction of abortion among women in the United States. Reproductive Health Matters, 18, 136–146.

Harris, L. H. (2008). Second trimester abortion provision: Breaking the silence and changing the discourse. Reproductive Health Matters, 16(Suppl. 31), 74–81.

Henshaw, S. K. (1998). Unintended pregnancy in the United States. Family Planning Perspectives, 30(1), 24–29 & 46.

Joffe, C. (1995). Doctors of conscience: The struggle to provide abortions before and after Roe v. Wade. Boston: Beacon Press.

Joffe, C. (2003). Roe v. Wade at 30: What are the prospects for abortion provision? Perspectives on Sexual and Reproductive Health, 35, 29–33.

Joffe, C. (2009). Dispatches from the abortion wars: The costs of fanaticism to doctors, patients, and the rest of us. Boston: Beacon Press.

Jones, R. K., Finer, L. B., & Singh, S. (2010). Characteristics of U.S. abortion patients, 2008. New York: Guttmacher Institute.

Jones, R. K., & Kooistra, K. (2011). Abortion incidence and access to abortion services in the United States, 2008. Perspectives on Sexual and Reproductive Health, 43, 41–50.

Kumar, A., Hessini, L., & Mitchell, E. M. (2009). Conceptualising abortion stigma. Culture, Health & Sexuality, 11, 625–639.

Littman, L. L., Zarcadoolas, C., & Jacobs, A. R. (2009). Introducing abortion patients to a culture of support: A pilot study. Journal of Women's Mental Health, 12, 419–431.

Major, B., Appelbaum, M., Beckman, L., Dutton, M. A., Russo, N. F., & West, C. (2009). Abortion and mental health: Evaluating the evidence. American Psychologist, 64, 863–890.

Major, B., & Gramzow, R. H. (1999). Abortion as stigma: Cognitive and emotional implications of concealment. Journal of Personality and Social Psychology, 77, 735–745.

Morgan, L., & Michaels, M. (1999). Fetal subjects; Feminist positions. Philadelphia: University of Pennsylvania Press.

Owings, M. F., & Kozak, L. J. (1998). Ambulatory and inpatient procedures in the United States. Vital and Health Statistics, 13, 139.

Quinn, D. M., & Chaudior, S. R. (2009). Living with a concealable stigmatized identity: The impact of anticipated stigma, centrality, salience, and cultural stigma on psychological distress and health. Journal of Personality and Social Psychology, 97, 634–651.

Rapp, R. (2000). Testing women, testing the fetus: The social impact of amniocentesis in America. New York: Routledge.

Russo, N. F. (1976). The motherhood mandate. Journal of Social Issues, 32, 143–153.

Russo, N. F., & Denious, J. E. (2005). Controlling birth: Science, politics, and public policy. Journal of Social Issues, 61, 181–191.

Shellenberg, K. M. (2010). Abortion stigma in the United States: Quantitative and qualitative perspectives from women seeking an abortion (Doctoral Dissertation). Baltimore, Maryland: The Johns Hopkins University.

Shostak, A. B., Koppel, R., & Perkins, J. (2006). Abortion clinics and waiting room men: Sociological Insights. Available: http://www.menandabortion.com/articles.html.

Siegel, R. B. (2008). The right's reasons: Constitutional conflict and the spread of woman-protective antiabortion argument. Duke Law Journal, 57, 1641–1692.

Singh, S., Wulf, D., Hussain, R., Bankole, A., & Sedgh, G. (2009). Abortion worldwide: A decade of uneven progress. New York: Guttmacher Institute.

Taylor, J. (2008). The public life of the fetal sonogram. New Brunswick, NJ: Rutgers University Press.

Weitz, T. A. (2010). Rethinking the mantra that abortion should be "safe, legal, and rare". Journal of Women's History, 22, 161–172.

Yanow, S. (2009). Confronting our ambivalence: The need for second-trimester abortion advocacy. Conscience. Available: http://www.catholicsforchoice.org.

### Author Descriptions

The six authors were Ellertson Fellows from 2008–2010.

Alison Norris, MD, PhD, is a Postdoctoral Fellow the Johns Hopkins Bloomberg School of Public Health in Baltimore, MD. She pursues multi-method research on sexual and reproductive health in under-served women and men.

Danielle Bessett, PhD, is an Assistant Professor of Sociology at the University of Cincinnati, Cincinnati, OH. Her research interests are in medical and family sociology, focusing on sexual and reproductive health issues and inequality.

Julia R. Steinberg, PhD, is an Assistant Professor of Health Psychology in the Department of Psychiatry at UCSF. Her research interests are at the intersection of psychology and reproductive health.

Megan L. Kavanaugh, DrPH, is a Senior Research Associate at the Guttmacher Institute, New York, NY. Her research portfolio has focused on unintended pregnancy, contraceptive use, post-abortion contraception and attitudes about abortion.

Silvia De Zordo, PhD, is a Visiting Researcher at Goldsmiths College-University of London. Her research interests are in social and medical anthropology, focusing on sexual and reproductive health issues and inequality.

Davida Becker, PhD, is a Research Scholar at the Center for the Study of Women at the University of California, Los Angeles. Her research focuses on the accessibility and quality of reproductive health services and disparities in reproductive health outcomes.

Pet. Ref. 796

*Original Research*

OPEN

# Mifepristone and Misoprostol for Undesired Pregnancy of Unknown Location

*Alisa B. Goldberg, MD, MPH, Isabel R. Fulcher, PhD, Jennifer Fortin, MPH, Rebecca K. Hofer, MD, Alex Cottrill, BA, Divya Dethier, MD, Allison Gilbert, MD, MPH, Elizabeth Janiak, ScD, and Danielle Roncari, MD, MPH*

**OBJECTIVE:** To compare immediate initiation with delayed initiation of medication abortion among patients with an undesired pregnancy of unknown location.

**METHODS:** This retrospective cohort study used electronic medical record data from the Planned Parenthood League of Massachusetts (2014–2019) for patients who requested medication abortion with a last menstrual period (LMP) of 42 days or less and pregnancy of unknown location (no

From the Division of Family Planning, Department of Obstetrics, Gynecology, and Reproductive Biology, Brigham & Women's Hospital, the Planned Parenthood League of Massachusetts, Harvard Medical School, the Department of Global Health and Social Medicine, Harvard Medical School, and Tufts Medical Center Boston, Massachusetts.

This work was supported by the Society of Family Planning Research Fund [SFPRF12-MA7].

Presented at the National Abortion Federation Annual Meeting, held virtually, May 11–12, 2021.

The authors thank Julia Max, Katharine White, and Talcott Camp for their advice on study concept and design.

The findings and conclusions expressed in this article are those of the authors and do not necessarily reflect the views of Planned Parenthood Federation of America, Inc., or the Society of Family Planning Research Fund.

Each author has confirmed compliance with the journal's requirements for authorship.

Corresponding author: Alisa B. Goldberg, MD, MPH, Division of Family Planning, Department of Obstetrics, Gynecology, and Reproductive Biology, Brigham & Women's Hospital, Boston, MA; email: agoldberg@bwh.harvard.edu.

*Financial Disclosure*
Alisa B. Goldberg was supported by the Society of Family Planning Research Fund [SFPRF12-MA7], which was awarded to the Planned Parenthood League of Massachusetts. She received royalties from UpToDate and was a consultant for Sanofi/Genzyme from 2018 to 2019. Danielle Roncari reports receiving payment from Organon as a Nexplanon trainer. The following authors are or were employed by Planned Parenthood League of Massachusetts during the study: Jennifer Fortin, Rebecca Hofer, and Alex Cottrill. The other authors did not report any potential conflicts of interest.

© 2022 The Author(s). Published by Wolters Kluwer Health, Inc. This is an open access article distributed under the terms of the Creative Commons Attribution-Non Commercial-No Derivatives License 4.0 (CCBY-NC-ND), where it is permissible to download and share the work provided it is properly cited. The work cannot be changed in any way or used commercially without permission from the journal.

ISSN: 0029-7844/22

gestational sac) on initial ultrasonogram. Clinicians could initiate medication abortion with mifepristone followed by misoprostol while simultaneously excluding ectopic pregnancy with serial serum human chorionic gonadotropin (hCG) testing (same-day-start group) or establish a diagnosis with serial hCG tests and repeat ultrasonogram before initiating treatment (delay-for-diagnosis group). We compared primary safety outcomes (time to diagnosis of pregnancy location [rule out ectopic], emergency department visits, adverse events, and nonadherence with follow-up) between groups. We also reported secondary efficacy outcomes: time to complete abortion, successful medication abortion (no uterine aspiration), and ongoing pregnancy.

**RESULTS:** Of 5,619 medication abortion visits for patients with an LMP of 42 days or less, 452 patients had pregnancy of unknown location (8.0%). Three patients underwent immediate uterine aspiration, 55 had same-day start, and 394 had delay for diagnosis. Thirty-one patients (7.9%), all in the delay-for-diagnosis group, were treated for ectopic pregnancy, including four that were ruptured. Among patients with no major ectopic pregnancy risk factors (n=432), same-day start had shorter time to diagnosis (median 5.0 days vs 9.0 days; *P*=.005), with no significant difference in emergency department visits (adjusted odds ratio [aOR] 0.90, 95% CI 0.43–1.88) or nonadherence with follow-up (aOR 0.92, 95% CI 0.39–2.15). Among patients who proceeded with abortion (n=270), same-day start had shorter time to complete abortion (median 5.0 days vs 19.0 days; *P*<.001). Of those who had medication abortion with known outcome (n=170), the rate of successful medication abortion was lower (85.4% vs 96.7%; *P*=.013) and the rate of ongoing pregnancy was higher (10.4% vs 2.5%; *P*=.041) among patients in the same-day-start group.

**CONCLUSION:** In patients with undesired pregnancy of unknown location, immediate initiation of medication abortion is associated with more rapid exclusion of ectopic pregnancy and pregnancy termination but lower abortion efficacy.

(Obstet Gynecol 2022;139:771–80)
DOI: 10.1097/AOG.0000000000004756

Pet. Ref. 797

Patients present for abortion at increasingly earlier gestational ages, with 40% presenting at 6 weeks of gestation or less in the United States.[1] Early presentation increases the likelihood that health care professionals will not visualize an intrauterine gestational sac on ultrasonogram and diagnose a pregnancy of unknown location.[2] Patients with pregnancy of unknown location may eventually be diagnosed with intrauterine pregnancy, early pregnancy loss, or ectopic pregnancy.[2] Because mifepristone and misoprostol are highly effective treatments for early abortion[3–5] and early pregnancy loss,[6] the most serious risk of initiating medication abortion in the setting of undesired pregnancy of unknown location is delaying the diagnosis and treatment of ectopic pregnancy, which can result in significant morbidity and mortality. Several studies also suggest an increased risk of ongoing pregnancy among those who initiate medication abortion with pregnancy of unknown location compared with those with a visualized intrauterine gestational sac.[7,8]

The benefit of immediate initiation of mifepristone and misoprostol for undesired pregnancy of unknown location is pregnancy termination without delay. Additionally, just as uterine aspiration can help distinguish an intrauterine pregnancy from an ectopic pregnancy, it is plausible that uterine emptying with medications may also facilitate diagnosis of pregnancy location more rapidly than expectant management with serial human chorionic gonadotropin (hCG) testing and ultrasonography. Furthermore, many patients prefer medical management over aspiration.[9]

Although current mifepristone labeling lists ectopic pregnancy as a contraindication, several national organizations allow immediate medication abortion for undesired pregnancy of unknown location when combined with serial hCG follow-up to exclude ectopic pregnancy ("same-day-start").[10–12] This retrospective cohort study compares the safety and efficacy of same-day start with the common practice of first confirming intrauterine pregnancy and then initiating treatment ("delay for diagnosis").

## METHODS

We performed a retrospective cohort study of all patients who presented to the Planned Parenthood League of Massachusetts, Boston, Worcester, or Springfield, from 2014 to 2019 requesting medication abortion with a reported gestational age by last menstrual period (LMP) of 42 days or less. We defined this population as the *very early gestation, medication abortion–seeking population.* Our primary interest was in the subpopulation of these patients who were found to have pregnancy of unknown location (no gestational sac) on initial ultrasonogram.

We identified patients using the current and previous Planned Parenthood League of Massachusetts electronic health record (EHR) systems (NextGen and Athenahealth). We used practice-management software to identify all patients who scheduled a medication abortion appointment and reported an LMP of 42 days or less at the time of scheduling. Of these patients, we then identified those diagnosed with pregnancy of unknown location on initial ultrasonogram.

Ultrasonographic images are uploaded into the EHR and undergo clinician interpretation of the ultrasonogram, including: 1) definite intrauterine pregnancy (gestational sac with yolk sac or fetal pole), 2) probable intrauterine pregnancy (small gestational sac with no yolk sac),[2] 3) pregnancy of unknown location (no intrauterine gestational sac and no evidence of ectopic pregnancy),[2] 4) early pregnancy loss,[13] or 5) ectopic pregnancy. Ultrasonographic images for all those diagnosed with pregnancy of unknown location by their care-providing clinician were reviewed by one of our research physicians (D.D., A.G.) to confirm the interpretation and diagnosis. Any discrepancies in ultrasonogram interpretation were reviewed by the principal investigator (A.B.G.), who determined the final diagnosis. Demographic data were exported directly from the relevant EHR system to the research database. Detailed clinical data were manually extracted from the EHR onto a data-collection form for all patients with pregnancies of unknown location. Data from the written forms were then entered twice into the research database. All information was merged into a single database created for this study. This study was approved by the Partners Institutional Review Board.

The primary goal of the study was to compare outcomes between two management groups (same-start and delay for diagnosis) for patients seeking medication abortion with pregnancy of unknown location on ultrasonogram who were very early in gestation by LMP. Patients in the delay-for-diagnosis group were followed with serial hCG testing and repeat ultrasonograms to confirm intrauterine pregnancy before initiating medication abortion. Patients in the same-day-start group initiated medication abortion by taking mifepristone on the day of presentation with pregnancy of unknown location while simultaneously initiating serial hCG testing to exclude ectopic pregnancy. In April 2014, we began offering same-day-start medication abortion for patients found to have pregnancy of unknown location, a positive

Pet. Ref. 798

urine hCG test result, no ectopic pregnancy symptoms, and no major ectopic pregnancy risk factors (intrauterine device in situ, prior tubal surgery, prior ectopic pregnancy). Initially, to be eligible for same-day start, patients had to have a certain LMP of 35 days or less. During the 5-year study period, eligibility expanded to include patients with a known LMP of 42 days or less. Patients who were managed with same-day start followed a standard protocol (Box 1). Importantly, decision making about whether to initiate medication abortion while simultaneously ruling out ectopic pregnancy compared with first confirming intrauterine pregnancy was left to the discretion of the physician or nurse practitioner. All patients with pregnancies of unknown location, whether managed with same-day start or delay for diagnosis, had a baseline serum hCG drawn on the day of presentation (day 1). Patients managed with same-day start took misoprostol 24–48 hours after mifepristone (day 2–3) and had a follow-up hCG drawn 48–72 hours after misoprostol (day 4–5); those managed with delay for diagnosis had a follow-up hCG drawn 48–72 hours after baseline (day 3–4). Regardless of group, management of patients with baseline hCG levels greater than 2,000 followed the same standard protocol described in Box 1. Those in the delay-for-diagnosis group with an initial hCG level less than 2,000, a doubling of their hCG level in 48–72 hours, and no ectopic pregnancy symptoms or major risk factors were presumed to have a normal intrauterine pregnancy and were scheduled for a repeat ultrasonogram and abortion when their hCG level was expected to be greater than 2,000. Those whose hCG level did not rise as expected or who were symptomatic or at high risk were managed on a case-by-case basis.

The primary outcomes focused on evaluating the safety of same-day-start mifepristone with pregnancy of unknown location and included 1) time to diagnosis, 2) significant adverse events, and 3) nonadherence with follow-up. Time to diagnosis was measured as the number of days between the initial diagnosis of pregnancy of unknown location and the final diagnosis of pregnancy location, meaning that ectopic pregnancy was excluded or diagnosed and treated. For patients in the delay-for-diagnosis group, the pregnancy location diagnosis was usually made by confirming pregnancy location on ultrasonogram; for patients in the same-day-start group, the diagnosis of pregnancy location was usually made by diagnosing a completed abortion by decline in serial hCG levels. According to Planned Parenthood League of Massachusetts protocols, a decline in serum hCG level of 50% within 48–72 hours after misoprostol or 80%

> **Box 1. Planned Parenthood League of Massachusetts Clinical Management Protocol for Patients Initiating Medication Abortion While Simultaneously Determining Pregnancy Location**
>
> Day 1: Mifepristone 200 mg administered orally
>   • Serum hCG must be sent on the day of mifepristone (day 1). Management based on initial serum hCG level (results are obtained after mifepristone has already been administered and patient has left clinic).
>   • hCG of less than 2,000, the abortion can proceed as planned.
>   • hCG between 2,000 and 2,999, a diagnostic ultrasonogram must be performed on the day hCG results are obtained. If a diagnostic ultrasonogram cannot be performed that day or if the patient is symptomatic, the patient must be referred to an ED for ectopic pregnancy evaluation.
>   • hCG of more than 3,000 or if diagnostic ultrasonogram does not confirm IUP, the patient must be referred to an ED for ectopic pregnancy evaluation.
> Day 2–3: Misoprostol 800 micrograms self-administered buccally
> Day 4–5: Serum hCG testing (48–72 h after misoprostol)
>   • Serum hCG decline required to diagnose complete abortion.
>       50% decline 48–72 h after misoprostol (day 4–5 after mifepristone).
>       80% decline by 1 week after mifepristone.[12]
>
> hCG, human chorionic gonadotropin; ED, emergency department; IUP, intrauterine pregnancy.

within 1 week of taking mifepristone was used to diagnose complete abortion.[14] *Nonadherence with follow-up* was defined as 30 days without clinical contact and without a definitive diagnosis. Patients could be coded as "adherent" if they complied with some follow-up, even if a definitive diagnosis was never achieved. Significant adverse events included ruptured ectopic pregnancy, hemorrhage (estimated blood loss 500 mL or more), blood transfusion, hospital admission, and abdominal surgical procedures (laparoscopy or laparotomy) occurring within 3 months of initial presentation.

We also considered secondary outcomes focused on efficacy among patients who received mifepristone and misoprostol, including 1) time to complete abortion (measured in days), 2) overall rate of successful medication abortion, and 3) frequency of ongoing pregnancy after a single dose of mifepristone and misoprostol. For time to complete abortion, patients with slowly declining hCG levels after mifepristone and misoprostol that eventually resolved without uterine aspiration were diagnosed as having completed abortions. *Successful medication abortion* was

Pet. Ref. 799

defined as a completed abortion with no uterine aspiration procedure, even if those individuals took additional doses of misoprostol or retook mifepristone and misoprostol. *Ongoing pregnancy* was defined as an ongoing pregnancy after a single dose of mifepristone and misoprostol, regardless of whether the patient then chose uterine aspiration or a repeat dose of mifepristone and misoprostol.

In addition, we identified and report the proportion of early pregnancies that presented as pregnancy of unknown location and were ultimately diagnosed as ectopic pregnancies. A diagnosis of *ectopic pregnancy* was defined as either a definitive or presumed ectopic pregnancy treated with either methotrexate or surgery. We included treated ectopic pregnancies that were diagnosed on initial presentation and those that were initially diagnosed as pregnancy of unknown location and later diagnosed as ectopic pregnancy. We did not review ultrasonographic images or abstract additional clinical data for patients diagnosed with intrauterine pregnancy, probable intrauterine pregnancy, or early pregnancy loss on initial ultrasonogram. For the patients who initially presented with pregnancy of unknown location and were later treated for ectopic pregnancy, we also describe ectopic pregnancy outcomes, ectopic pregnancy symptoms, and major risk factors.

Patient demographic and health characteristics were also collected, including ethnicity and race, insurance type, parity, gestational age by LMP (days), uncertain LMP, major ectopic pregnancy risk factors, and ectopic pregnancy symptoms. Race and Hispanic or Latinx ethnicity were self-reported by patients from a list of predefined options, including an "other" category (reported in this article as "none of the above"). A variable was created for Hispanic ethnicity and race, with the following categories: Hispanic, Asian (non-Hispanic), Black (non-Hispanic), White (non-Hispanic), none of the above (non-Hispanic), and declined or unknown. We considered race and ethnicity to be a potential confounder of the treatment group–clinical outcome relationships, because health care professional conscious and unconscious bias are conceptually plausible causal drivers of treatment-group allocation and could also be associated with loss to follow-up. Insurance type included private (includes group policy), public, and self-pay or other.

For our primary outcome, we estimated that, with 200 patients, we would have more than 99% power to detect a 5-day difference in time to diagnosis with various sample size allocations in each management group (1:1, 2:1, or 3:1). To detect a difference in successful abortion rates of 5% (93% vs 98%) with 80%

power, we would require 400 patients. To complete adjusted analyses and maximize identification of ectopic pregnancies, we sought to identify at least 400 patients who were seeking medication abortion with no gestational sac visualized on initial ultrasonogram.

We compared the distribution of patient demographic and health characteristics by management group in the pregnancy of unknown location population using the Fisher exact test for categorical variables and Wilcoxon rank sum tests for continuous variables. Similarly, for the primary and secondary outcomes, we used bivariate analyses to describe the associations between the management groups and the outcome of interest. For the time-to-event outcomes (time to diagnosis and time to complete abortion), we created Kaplan-Meier survival curves for the probability of each outcome by days and formally compared curves using the Tarone-Ware test. For the remaining binary outcomes, we used $\chi^2$ tests to compare outcomes between management groups. Because patients with major ectopic pregnancy risk factors were not eligible for same-day start according to Planned Parenthood League of Massachusetts clinical protocols during the dates of this study, the 17 individuals with major ectopic pregnancy risk factors were excluded from all primary analyses.

Finally, we conducted adjusted analyses to estimate the relationship between management group and the primary outcomes of interest. For time to diagnosis, we used an adjusted accelerated failure time model with log-logistic distribution to estimate and compare the odds of being diagnosed before day "t" in the same-day-start and delay-for-diagnosis groups. Note that, in a log-logistic model, the odds ratio (OR) is assumed to be fixed for all days after the first day of follow-up (ie, $t \in [1, \infty]$). For the binary safety outcomes, we used logistic regression models to estimate the OR for each outcome, comparing same-day start with delay for diagnosis. All models adjusted for the following covariates: Hispanic ethnicity and race, insurance type, gestational age by LMP, uncertain LMP, and presence of any ectopic pregnancy symptoms. Because there was missingness in the covariates (ranging from 0% to 17%), we used the mice R package to create 50 imputed data sets using multiple imputation by chained equations based on patient demographic and health characteristics, management group membership, and primary outcomes. The log-logistic and logistic regression models described above were fit on each imputed data set, and results were then combined according to Rubin's rules.[15] All analyses were completed in R 3.6.0.

Pet. Ref. 800

## RESULTS

Of the 5,619 patients seeking medication abortion with an LMP of 42 days or less, four were diagnosed with ectopic pregnancy on the initial ultrasonogram (0.07%) (Fig. 1). Of the 452 patients with confirmed pregnancy of unknown location, 31 were eventually diagnosed with ectopic pregnancy, resulting in an overall incidence of ectopic pregnancy of 35 of 5,619 (0.6%, 95% CI 0.4–0.9%) and an ectopic pregnancy incidence among pregnancies of unknown location of 31 of 452 (6.9%, 95% CI 4.7–9.6%). We do not know whether there were additional ectopic pregnancies among those initially diagnosed with probable intrauterine pregnancy.

Eighty percent (n=25) of the patients with pregnancies of unknown location who had an eventual ectopic pregnancy (Table 1) reported ectopic pregnancy symptoms on their initial evaluation, including abdominal pain or vaginal bleeding, compared with 49.6% (n=209) of those with pregnancy of unknown location never treated for ectopic pregnancy (P<.001). Major ectopic pregnancy risk factors (prior ectopic pregnancy, tubal surgery, intrauterine device in place) were infrequent but also more common among those eventually diagnosed with ectopic pregnancy, compared with those without ectopic pregnancy (12.9% [n=4] vs 3.3% [n=14], P=.028).

Three of the patients with pregnancies of unknown location switched to surgical abortion on the day of presentation and were excluded from the remaining analyses (n=449). Three hundred ninety-four (87.8%) patients were in the delay-for-diagnosis group, and 55 (12.2%) were in the same-day-start group. The median age of study participants was 27 years, with no difference in age distribution between the management groups (Table 2). There were no significant differences in the distribution of those of Hispanic ethnicity and race or an individual's insurance status between the management groups (Table 2). Individuals in the delay-for-diagnosis group were slightly further along in gestation by LMP (median 37 days in the delay-for-diagnosis group vs 34 days in same-day-start group; P<.001), more likely to have an uncertain LMP (43.9% vs 30.9%; P=.03), and more likely to exhibit symptoms of ectopic pregnancy (55.3% vs 29.1%; P<.001). All 31 ectopic pregnancies were in the delay-for-diagnosis group (7.9% vs 0%; P=.023).

In the delay-for-diagnosis group, 161 (40.9%) patients eventually proceeded with mifepristone and misoprostol and 62 (15.7%) switched to uterine

aspiration. Overall, a total of 233 (52.0%) patients in the delay-for-diagnosis group never took mifepristone owing to spontaneous pregnancy loss, treatment for ectopic pregnancy, switch to uterine aspiration, or unknown reasons (Fig. 1).

Figure 2 presents our primary outcome, *time to diagnosis*, defined as the probability of identifying the pregnancy's location by days since initial diagnosis of pregnancy of unknown location, for the 432 patients with pregnancy of unknown location and no major ectopic pregnancy risk factors. The median time to diagnosis of pregnancy location was 5.0 days in the same-day-start group and 9.0 days in the delay-for-diagnosis group (P=.005). Eighty-eight (20.4%) individuals were censored at their dates of last clinical contact because they did not have a final diagnosis documented in the EHR.

Table 3 details the remaining primary safety outcomes. Nine (2.4%) patients in the delay-for-diagnosis group had a serious adverse event documented; no patients in the same-day-start group had an adverse event (P=.611). The adverse events included a combination of ruptured ectopic pregnancy (n=4), hospitalization (n=4), hemorrhage (n=2), and unplanned major surgery (n=8). Emergency department visits were slightly higher in the delay-for-diagnosis group, but the difference was not statistically significant (32.4% vs 23.6% respectively; P=.216). There was no difference in nonadherence with follow-up between the groups (15.9% delay for diagnosis vs 16.4% same-day start; P=1.000).

The Kaplan-Meier curve for time to complete abortion includes only those individuals with no major ectopic pregnancy risk factors who we know proceeded with uterine evacuation either by mifepristone and misoprostol or suction curettage (n=270), thereby including the entire same-day-start group but excluding delay-for-diagnosis patients with a spontaneous completed miscarriage, a diagnosis of ectopic pregnancy, or a diagnosis of an intrauterine pregnancy with unknown pregnancy outcome. Figure 3 presents the probability of complete abortion by days since initial diagnosis with pregnancy of unknown location and shows a significantly shorter time to complete abortion in the same-day-start group (P<.001). Forty-four (16.3%) individuals were censored because they did not have a known time to complete abortion. Excluding censored individuals, the median time to complete abortion was 5.0 days in same-day-start and 19.0 days in delay for diagnosis.

Table 3 details the remaining efficacy outcomes for success of medication abortion. By definition, this

Pet. Ref. 801



**Fig. 1.** Flowchart of participants. IUP, intrauterine pregnancy.
*Goldberg. Undesired Pregnancy of Unknown Location. Obstet Gynecol 2022.*

analysis includes only those individuals who received mifepristone (n=209), thereby including the entire same-day-start group but excluding the delay-for-diagnosis patients who never took mifepristone. We further excluded 39 (20.8% delay for diagnosis and 12.7% same-day start) patients with unknown abortion out-come (n=170). In this population, those in the same-day-start group had a lower rate of successful medication abortion (85.4% vs 96.7%; *P*=.013) and higher ongoing pregnancy rates (10.4% vs 2.5%; *P*=.041).

The odds of being diagnosed before day t (for any arbitrary day t) among those in the same-day-

Pet. Ref. 802

**Table 1.** Prevalence of Symptoms and Major Risk Factors by Ectopic Pregnancy* Status Among Patients With Initial Diagnosis of Pregnancy of Unknown Location (N=452)

| | No Ectopic Pregnancy (n=421) | Ectopic Pregnancy (n=31) | P |
|---|---|---|---|
| Ectopic pregnancy symptom: any[†] | 209 (49.6) | 25 (80.6) | <.001[‡] |
|   Abdominal pain | 167 (39.7) | 18 (58.1) | .052[‡] |
|   Vaginal bleeding | 97 (23.0) | 17 (54.8) | <.001[‡] |
| Major risk factor: any[§] | 14 (3.3) | 4 (12.9) | .028 |
|   Ectopic pregnancy history | 13 (3.1) | 2 (6.5) | .275 |
|   Tubal surgery | 4 (0.9) | 1 (3.2) | .300 |
|   IUD in place | 1 (0.2) | 2 (6.5) | .013 |

IUD, intrauterine device.
Data are n (%) unless otherwise specified.
* Ectopic pregnancy was defined as receiving treatment for ectopic pregnancy (methotrexate or surgery).
† There were 24 individuals missing information on ectopic pregnancy symptoms.
‡ Excludes individuals with missing values from statistical testing.
§ No individuals were missing information on major risk factors.

start group is 1.72 (95% CI 1.35–2.19; $P$<.001) times higher than for those in the delay-for-diagnosis group, adjusting for Hispanic ethnicity and race, insurance type, gestational age by LMP, uncertain LMP, and presence of any ectopic pregnancy symptoms. There was no difference in the adjusted odds of emergency department visit (OR 0.90, 95% CI 0.43– 1.88; $P$=.784) or nonadherence (OR 0.92, 95% CI 0.39–2.15; $P$=.847) between patients in the same-day-start and delay-for-diagnosis groups. We did not fit an adjusted model for incidence of ectopic pregnancy or significant adverse events, because there were no ectopic pregnancies and no adverse events in the same-day-start group.

**Table 2.** Description of Patient Characteristics for Patients With Pregnancy of Unknown Location Managed With Delay for Diagnosis Compared with Same-Day Start (n=449*)

| Characteristic | Delay for Diagnosis (n=394) | Same-Day Start (n=55) | P |
|---|---|---|---|
| Age (y) | 27 (23–33) | 26 (23–32) | .316 |
| Hispanic ethnicity and race category | | | .124[†] |
|   Asian, non-Hispanic | 28 (7.1) | 0 (0) | |
|   Black, non-Hispanic | 42 (10.7) | 9 (16.4) | |
|   Hispanic | 69 (17.5) | 7 (12.7) | |
|   White, non-Hispanic | 193 (49.0) | 30 (54.5) | |
|   None of the above, non-Hispanic | 19 (4.8) | 3 (5.5) | |
|   Declined or unknown | 43 (10.9) | 6 (10.9) | |
| Insurance type | | | .646 |
|   Private or group policy | 219 (55.6) | 33 (60.0) | |
|   Public | 88 (22.3) | 13 (23.6) | |
|   Self-pay or other | 87 (22.1) | 9 (16.4) | |
| Parity | 0 (0–2) | 1 (0–2) | .220[†] |
|   Missing | 19 (4.8) | 3 (5.5) | |
| Gestational age by LMP (d) | 37 (36–39) | 34 (31–35) | <.001[†] |
|   Missing | 1 (0.3) | 0 (0) | |
| Uncertain LMP | 173 (43.9) | 17 (30.9) | .030[†] |
|   Missing | 69 (17.5) | 8 (14.5) | |
| Any ectopic pregnancy symptoms | 218 (55.3) | 16 (29.1) | <.001[†] |
|   Missing | 21 (5.3) | 3 (5.5) | |
| Any major ectopic pregnancy risk factor | 17 (4.3) | 0 (0) | .246[†] |
|   Missing | 0 (0) | 0 (0) | |
| Diagnosed with ectopic pregnancy | 31 (7.9) | 0 (0) | .023 |

LMP, last menstrual period.
Data are median (interquartile range) or n (%) unless otherwise specified.
* Excludes three individuals with pregnancy of unknown location who chose immediate uterine aspiration.
† Excludes individuals with missing values from statistical testing.

Pet. Ref. 803



**Fig. 2.** Time to diagnosis for patients with pregnancy of unknown location, managed with same-day start vs delay for diagnosis (n=432). The median time to diagnosis was 5.0 days (same-day start) vs 9.0 days (delay for diagnosis). Excludes 17 people with major ectopic pregnancy risk factors. Tarone-Ware test, $P$=.005.

*Goldberg. Undesired Pregnancy of Unknown Location. Obstet Gynecol 2022.*

## DISCUSSION

For patients with undesired pregnancies who have pregnancy of unknown location on initial ultrasonogram, we found that initiating medication abortion with mifepristone on the day of presentation, with simultaneous close serial hCG follow-up (same-day-start), was associated with: 1) shorter time to rule out ectopic pregnancy, 2) shorter time to completed abortion, and 3) a lower rate of successful medication abortion and a higher rate of ongoing pregnancy when compared with delay for diagnosis. Additionally, in the same-day-start group, we found no evidence of an increase in the rates of serious adverse events, emergency department visits,

or nonadherence with follow-up. However, we were underpowered to detect smaller yet meaningful differences for these safety outcomes.

Although the most obvious benefit of immediate initiation of medication abortion is to meet patient demand for a timely abortion, we are unaware of other studies that have identified a diagnostic benefit to immediate initiation of mifepristone and misoprostol in the setting of pregnancy of unknown location. Although uterine aspiration with inspection of the aspirate may still be the fastest and most definitive way to both terminate an intrauterine pregnancy and rule out ectopic pregnancy, health care professionals

**Table 3.** Safety and Efficacy Outcomes for Patients With Pregnancy of Unknown Location Managed With Same-Day Start Compared With Delay for Diagnosis

| Safety Outcomes (n=432)* | Delay for Diagnosis (n=377) | Same-Day Start (n=55) | Unadjusted OR (95% CI) | P |
|---|---|---|---|---|
| Individuals with any serious adverse event | 9 (2.4) | 0 (0) | 0.12 (0–2.42)[†] | .611 |
| ED visit | 122 (32.4) | 13 (23.6) | 0.65 (0.31–1.29) | .216 |
| Nonadherence with follow-up[‡] | 60 (15.9) | 9 (16.4) | 1.03 (0.42–2.29) | >.99 |
| Efficacy outcomes (n=170)[§] | (n=122) | (n=48) | | |
|     Successful medication abortion | 118 (96.7) | 41 (85.4) | 0.20 (0.04–0.84) | .013 |
|     Ongoing pregnancy | 3 (2.5) | 5 (10.4) | 4.47 (1.06–22.75) | .041 |

OR, odds ratio; ED, emergency department.
Data are n (%) unless otherwise specified.
\* Safety outcomes excluded those with major ectopic pregnancy risk factors (n=17), not eligible for same-day start.
[†] Used modified Gart and Nam (1988) OR for zero-frequency cells.
[‡] Nonadherence with follow-up was defined as more than 30 days with a pregnancy of unknown location and no definitive diagnosis. Patients could still be coded as "adherent" if they complied with some follow-up, even if definitive diagnosis was never achieved.
[§] Efficacy outcomes excluded individuals with major ectopic pregnancy risk factors (n=17), those who did not take mifepristone (n=223, all in the delay-for-diagnosis group), and those with unknown abortion outcome (n=39).

Pet. Ref. 804



**Fig. 3.** Time to complete abortion for patients with pregnancy of unknown location managed with same-day start vs delay for diagnosis (n=270). The median time to complete abortion was 5.0 days (same-day start) vs 19.0 days (delay for diagnosis). Excludes 17 people with major ectopic pregnancy risk factors and those in the delay-for-diagnosis group with a spontaneous completed miscarriage, a diagnosis of ectopic pregnancy, or a diagnosis of an intrauterine pregnancy with unknown pregnancy outcome. Tarone-Ware test, *P*<.001.

*Goldberg. Undesired Pregnancy of Unknown Location. Obstet Gynecol 2022.*

| At risk (n) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Delay for diagnosis | 215 | 201 | 155 | 114 | 81 | 39 | 21 | 8 | 3 |
| Same-day start | 55 | 24 | 10 | 6 | 5 | 4 | 3 | 1 | 1 |

may now consider using mifepristone and misoprostol in a similar diagnostic and therapeutic way.

Interestingly, we observed no ectopic pregnancies in our same-day-start group compared with 31 (7.9%) in the delay-for-diagnosis group. If ectopic pregnancy rates were similar between groups, we would have anticipated four ectopic pregnancies in the same-day-start group. The difference in the ectopic pregnancy rate between management groups may be due to confounding, where certain observed (ie, bleeding or pain) and unobserved patient characteristics influenced a clinician's decision to manage expectantly, and were also associated with ectopic pregnancy. Unfortunately, the fact that there were no ectopic pregnancies in the same-day-start group precluded us from an adjusted analysis. However, it also may be possible that administering mifepristone and misoprostol in the setting of very early (nonvisualized) ectopic pregnancy increases the likelihood of self-resolving tubal pregnancy. Two randomized trials from China collectively provided 1,021 patients with no visible gestational sac on ultrasonogram mifepristone and misoprostol for abortion.[16,17] These studies had 98% follow-up and three suspected (but never confirmed or treated) ectopic pregnancies (0.3%).[16,17] These suspected ectopic pregnancies may have been self-resolving tubal pregnancies. It is also possible that patients with ectopic pregnancy in our same-day-start group were more likely to be lost to follow-up and not have their ectopic pregnancies captured in our database. However, this is unlikely given that we observed similar rates of nonadherence with follow-up in both groups.

Although we observed numerous benefits to same-day-start medication abortion in the setting of pregnancy of unknown location, there are also risks. Similar to other authors,[7,8] we found that initiating medication abortion in the setting of pregnancy of unknown location was associated with an increased risk of ongoing pregnancy compared with initiating medication abortion with a gestational sac visualized on ultrasonogram. It is unclear why this occurs, although perhaps with extremely early gestations progesterone levels are not yet high enough for the effects of mifepristone to be fully realized. Nonetheless, it is important that patients with pregnancy of unknown location who take mifepristone and misoprostol have close follow-up to identify and manage ongoing pregnancies in a timely fashion.

Additionally, some patients who present with undesired pregnancies of unknown location may never require an abortion. We found that 18% of patients in the delay-for-diagnosis group were eventually diagnosed with early pregnancy loss and 8% with ectopic pregnancy; thus, collectively, 26% did not require abortion. In the United States, patients may have health insurance that covers care for early pregnancy loss and ectopic pregnancy but does not cover abortion; thus, delaying treatment to determine a diagnosis may enable these patients to avoid the out-of-pocket expenses of abortion care.

Recently, a randomized trial compared expectant with active management of persistent pregnancy of unknown location. Active management included either uterine aspiration followed by methotrexate as needed or empiric methotrexate. The authors found

Pet. Ref. 805

that active management, with either treatment, was associated with a greater likelihood of successful pregnancy resolution and lower risk of unscheduled surgeries. They found randomization challenging because patients had strong management preferences.[18]

Patients seeking abortion have similarly strong preferences,[19] and our data, generalizable to those with an LMP of 42 days or less with no major ectopic pregnancy risk factors, suggest that there is no reason to mandate that these patients with pregnancies of unknown location delay initiating abortion to first obtain a definitive diagnosis. In contrast, there is diagnostic and therapeutic benefit to administering mifepristone and misoprostol in the setting of undesired pregnancy of unknown location. Given that both management strategies are reasonably safe and effective, and that each carries benefits and risks, our data inform shared decision making and enable choices heavily weighted toward patient priorities and preferences.

## REFERENCES

1. Kortsmit K, Jatlaoui TC, Mandel MG, Reeves JA, Oduyebo T, Petersen E, et al. Abortion surveillance - United States, 2018. MMWR Surveill Summ 2020;69:1–29. doi: 10.15585/mmwr.ss6907a1

2. Barnhart K, van Mello NM, Bourne T, Kirk E, Van Calster B, Bottomley C, et al. Pregnancy of unknown location: a consensus statement of nomenclature, definitions, and outcome. Fertil Steril 2011;95:857–66. doi: 10.1016/j.fertnstert.2010.09.006

3. Kapp N, Baldwin MK, Rodriguez MI. Efficacy of medication abortion prior to 6 gestational weeks: a systematic review. Contraception 2018;97:90–9. doi: 10.1016/j.contraception.2017.09.006

4. Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol 2015;126:12–21. doi: 10.1097/AOG.0000000000000897

5. Heller R, Cameron S. Termination of pregnancy at very early gestation without visible yolk sac on ultrasound. J Fam Plann Reprod Health Care 2015;41:90–5. doi: 10.1136/jfprhc-2014-100924

6. Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161–70. doi: 10.1056/NEJMoa1715726

7. Goldstone P, Michelson J, Williamson E. Effectiveness of early medical abortion using low-dose mifepristone and buccal misoprostol in women with no defined intrauterine gestational sac. Contraception 2013;87:855–8. doi: 10.1016/j.contraception.2012.10.013

8. Bizjak I, Fiala C, Berggren L, Hognert H, Sääv I, Bring J, et al. Efficacy and safety of very early medical termination of pregnancy: a cohort study. BJOG 2017;124:1993–9. doi: 10.1111/1471-0528.14904

9. Jones RK, Witwer E, Jerman J. Abortion incidence and service availability the United States, 2017. Accessed January 18, 2022. https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017

10. National Abortion Federation. Management of pregnancy of uncertain location. In: 2020 clinical policy guidelines for abortion care. National Abortion Federation; 2020.

11. Planned Parenthood Federation of America. Medical standards & guidelines. Planned Parenthood Federation of America; 2016.

12. Reid S, Condous G. Is there a need to definitively diagnose the location of a pregnancy of unknown location? The case for "no". Fertil Steril 2012;98:1085–90. doi: 10.1016/j.fertnstert.2012.09.032

13. Doubilet PM, Benson CB, Bourne T, Blaivas M; Society of Radiologists in Ultrasound Multispecialty Panel on Early First Trimester Diagnosis of Miscarriage and Exclusion of a Viable Intrauterine Pregnancy, Barnhart KT, et al. Diagnostic criteria for nonviable pregnancy early in the first trimester. N Engl J Med 2013;369:1443–51. doi: 10.1056/NEJMra1302417

14. Fiala C, Safar P, Bygdeman M, Gemzell-Danielsson K. Verifying the effectiveness of medical abortion; ultrasound versus hCG testing. Eur J Obstet Gynecol Reprod Biol 2003;109:190–5. doi: 10.1016/s0301-2115(03)00012-5

15. Rubin DB. Multiple imputation for nonresponse in surveys. John Wiley and Sons, Inc; 2004.

16. Li CL, Song LP, Tang SY, Zhou LJGY, He H, Mo XT, et al. Efficacy, safety, and acceptability of low-dose mifepristone and self-administered misoprostol for ultra-early medication abortion: a randomized controlled trial. Reprod Sci 2017;24:731–7. doi: 10.1177/1933719116669055

17. Li CL, Chen DJ, Song LP, Wang Y, Zhang ZF, Liu MX, et al. Effectiveness and safety of lower doses of mifepristone combined with misoprostol for the termination of ultra-early pregnancy: a dose-ranging randomized controlled trial. Reprod Sci 2015;22:706–11. doi: 10.1177/1933719114557897

18. Barnhart KT, Hansen KR, Stephenson MD, Usadi R, Steiner AZ, Cedars MI, et al. Effect of an active vs expectant management strategy on successful resolution of pregnancy among patients with a persisting pregnancy of unknown location: the ACT or NOT randomized clinical trial. JAMA 2021;326:390–400. doi: 10.1001/jama.2021.10767

19. Rørbye C, Nørgaard M, Nilas L. Medical versus surgical abortion: comparing satisfaction and potential confounders in a partly randomized study. Hum Reprod 2005;20:834–8. doi: 10.1093/humrep/deh643

## PEER REVIEW HISTORY

Received December 13, 2021. Received in revised form February 1, 2022. Accepted February 10, 2022. Peer reviews and author correspondence are available at http://links.lww.com/AOG/C678.

Pet. Ref. 806

RESOURCES

## Core Outcomes, Competencies, Subcompetencies, and Milestones

Under the ACGME accreditation system, all residents are evaluated using a competency-based assessment model. The ACGME's assessment model includes six domains of clinical competence: patient care, medical knowledge, systems-based practice, interpersonal and communications skills, and practice-based learning and improvement. These general competencies apply to all specialties. The subcompetencies and the Milestones, which further divide the general clinical competencies into meaningful components, provide key observable behaviors and are specialty-specific.

# Core Outcomes of Family Medicine Education

The ACGME Family Medicine Review Committee (FM-RC) and the ABFM established the "core outcomes" of family medicine residency education, building on the family medicine EPAs. The core outcomes represent observable behaviors that can be improved with deliberate practice.

"The ACGME Family Medicine Review Committee, the American Board of Family Medicine, and family medicine residency programs and faculty across the country commit to the patients and communities they serve that residents who complete ACGME-accredited training in family medicine will be able to:

1. Develop effective communication and constructive relationships with patients, clinical teams, and consultants
2. Practice as personal physicians, providing first-contact access, comprehensive, and continuity medical care for people of all ages in multiple settings and coordinate care by helping patients navigate a complex health care system
3. Provide preventive care that improves wellness, modifies risk factors for illness and injury, and detects illness in early, treatable stages for people of all ages while supporting patients' values and preferences
4. Evaluate, diagnose, and manage patients with undifferentiated symptoms, chronic medical conditions, and multiple comorbidities
5. Diagnose and manage common mental health conditions in people of all ages
6. Diagnose and manage acute illness and injury for people of all ages in the emergency room or hospital
7. Perform the procedures most frequently needed by patients in continuity and hospital practices
8. Care for low-risk patients in prenatal care, labor and delivery, and post-partum settings
9. Effectively lead, manage, and participate in teams that provide care and improve outcomes for the diverse populations and communities they serve
10. Model lifelong learning and engage in self-reflection
11. Assess priorities of care for individual patients across the continuum of care—in-office visits, emergency, hospital, and other settings, balancing the preferences of patients, medical priorities, and the setting of care
12. Model professionalism and be trustworthy for patients, peers, and communities"[a]

Beginning in June 2024, the American Board of Family Medicine will require program directors to attest "both that each resident has finished their residency and is competent in all the core outcomes, "with an additional focus on robust continuity of care, the care of children and more specific aspects of the care of pregnant women." The attestation requirement will be rolled out over 3 years, with the following schedule.[b]

June 2024 program directors will attest that each graduating resident is competent to:

- "Practice as personal physicians, providing first contact, comprehensive and continuity care, to include excellent doctor-patient relationships, excellent care of chronic disease and routine preventive care and effective practice management.
- Diagnose and manage acute illness and injury for people of all ages in the emergency room or hospital.
- Provide comprehensive care of children, including diagnosis and management of the acutely ill child and routine preventive care.
- Develop effective communication and constructive relationships with patients, clinical teams, and consultants
- Model Professionalism and be trustworthy for patients, peers, and communities.

June 2025, program directors will attest that each graduating resident is competent in the above and to:

- "Practice as personal physicians, to include care of women, the elderly, and patients at the end of life, with excellent rate of continuity and appropriate referrals.
- Provide care for low-risk patients who are pregnant, to include management of early pregnancy, medical problems during pregnancy, prenatal care, postpartum care and breastfeeding, with or without competence in labor and delivery.
- Diagnose and manage of common mental health problems in people of all ages.
- Perform the procedures most frequently needed by patients in continuity and hospital practices.
- Model lifelong learning and engage in self-reflection."

In June 2026, program directors will attest that each graduating resident is competent in the above and to:

- "Practice as personal physicians, to include musculoskeletal health, appropriate medication use and coordination of care by helping patients navigate a complex health system.

Pet. Ref. 807

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 70 of 315   PageID.5211

- Provide preventive care that improves wellness, modifies risk factors for illness and injury, and detects illness in early, treatable stages for people of all ages while supporting patients' values and preferences.
- Assess priorities of care for individual patients across the continuum of care—in-office visits, emergency, hospital, and other settings, balancing the preferences of patients and medical priorities.
- Evaluate, diagnose, and manage patients with undifferentiated symptoms, chronic medical conditions, and multiple comorbidities.
- Effectively lead, manage, and participate in teams that provide care and improve outcomes for the diverse populations and communities they serve.[2]

1. Newton W, Cagno CK, Hoekzema GS, Edje L. Core Outcomes of Residency Training 2022 (Provisional). Ann Fam Med. 2023 Mar–Apr;21(2):191–194. doi: 10.1370/afm.2977. Epub 2023 Mar 2. PMID: 36863777; PMCID: PMC10042560.

2. Newton W, Magill M, Barr W, Hoekzema GS, Karuppiah S, Stutzman K. Implementing Competency Based ABFM Board Eligibility. The Journal of the American Board of Family Medicine Aug 2023, 36 (4) 703–707; DOI: 10.3122/jabfm.2023.230201R0

[ CBME TOOLKIT HOME PAGE ]

## CONTACT US



11400 Tomahawk Creek Parkway
Leawood, KS 66211
(800) 274-7928
stfmoffice@stfm.org

    

## EVENTS

November 27, 2023, 12:30 PM CT: The Road to Becoming a Point of Care Ultrasound (POCUS) Champion
December 8, 2023, 12 PM CT: Webinar: What You Need to Know About ACGME and ABFM Expectations for a Shift to Competency-Based Medical Education
January 10, 2024, 12 PM CT: Webinar: Best Practices for Creating Individualized Learning Plans
February 8-11, 2024: 2024 STFM Conference on Medical Student Education
February 14, 2024, 12 PM CT: Webinar: Let's Talk About Entrustment
April 10, 2024, 12 PM CT: Webinar: Assessment Tools for CBME and the Core Outcomes
May 4-8, 2024: 2024 STFM Annual Spring Conference
May 15, 2024, 12 PM CT: Webinar: Building CBME Into Faculty Development
June 12, 2024, 12 PM CT: Webinar: Advisors and Coaches: The Evolving Role of Faculty and Resident Relationships
July 10, 2024, 12 PM CT: Webinar: How to Have Reflective Feedback Conversations and Develop a Culture of Effective Feedback
August 14, 2024, 12 PM CT: Webinar: Fostering Master Adaptive Learning and a Growth Mindset in Your Program
September 18, 2024, 12 PM CT: Webinar: How to Effectively Use Electives to Help Residents Attain Competency in the Core Outcomes
September 15-18, 2024: 2024 STFM Conference on Practice & Quality Improvement
October 9, 2024, 12 PM CT: Webinar: The Role of Resident Portfolios in Competency-Based Assessment
November 13, 2024, 12 PM CT: Webinar: Managing Assessment Burden in CBME

## DEADLINES

November 30, 2023: Behavioral Science Family Systems Educator Fellowship Applications Due
November 30, 2023: STFM Education Column Co-Editor Applications Due
November 30, 2023: Behavioral Science Family Systems Educator Fellowship Applications Due
November 30, 2023: Emerging Leaders Fellowship Applications Due
January 8, 2024: Last Day to Receive Early-Bird Pricing for the 2024 STFM Conference on Medical Student Education
February 23, 2024: Family Medicine POCUS Educator's Certificate Program Applications Due

Pet. Ref. 808

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 71 of 315   PageID.5212

March 1, 2024: Representative to Annals of Family Medicine Board of Directors Applications Due

**USEFUL LINKS**

Join or Renew Your Membership >

Advocacy >

MemberDirectory >

STFM CONNECT >

Collaboratives/Special Project Teams >

Donate to the STFM Foundation >

Refund Policy >

Privacy Policy >

STFM Ethics and Conduct Policy >

2023 © All Rights Reserved. Society of Teachers of Family Medicine **Privacy Policy**

Pet. Ref. 809

# Obstetrics and Gynecology Milestones

The Accreditation Council for Graduate Medical Education



A C G M E

Implementation: July 2022
Second Revision: August 2021
First Revision: September 2013

Pet. Ref. 810

# Obstetrics and Gynecology Milestones

The Milestones are designed only for use in evaluation of residents in the context of their participation in ACGME-accredited residency programs. The Milestones provide a framework for the assessment of the development of the resident in key dimensions of the elements of physician competence in a specialty or subspecialty. They neither represent the entirety of the dimensions of the six domains of physician competency, nor are they designed to be relevant in any other context.

Pet. Ref. 811

**Obstetrics and Gynecology Milestones**

**Work Group**

Wade Barton, MD, PharmD

Jennifer Domingo-Mihalko, MD

Laura Edgar, EdD, CAE

David Jaspan, DO

Kim Kenton, MD

Kurt A. Ludwig, DO

Katherine McDaniel, PhD

Arthur Ollendorff, MD

Sarah Page-Ramsey, MD

Stephanie Ros, MD, MACI

Kylie Steenbergh, MD

**The ACGME would like to thank the following organizations for their continued support in the development of the Milestones:**

American Board of Obstetrics and Gynecology

American College of Osteopathic Obstetricians and Gynecologists

Review Committee for Obstetrics and Gynecology

Pet. Ref. 812

**Understanding Milestone Levels and Reporting**

This document presents the Milestones, which programs use in a semi-annual review of resident performance, and then report to the ACGME. Milestones are knowledge, skills, attitudes, and other attributes for each of the ACGME Competencies organized in a developmental framework. The narrative descriptions are targets for resident performance throughout their educational program.

Milestones are arranged into levels. Tracking from Level 1 to Level 5 is synonymous with moving from novice to expert resident in the specialty or subspecialty. For each reporting period, the Clinical Competency Committee will review the completed evaluations to select the milestone levels that best describe each learner's current performance, abilities, and attributes for each subcompetency.

These levels *do not* correspond with post-graduate year of education. Depending on previous experience, a junior resident may achieve higher levels early in their educational program just as a senior resident may be at a lower level later in their educational program. There is no predetermined timing for a resident to attain any particular level. Residents may also regress in achievement of their milestones. This may happen for many reasons, such as over scoring in a previous review, a disjointed experience in a particular procedure, or a significant act by the resident.

Selection of a level implies the resident substantially demonstrates the milestones in that level, as well as those in lower levels (see the diagram on page vi).

Pet. Ref. 813

**Additional Notes**

Level 4 is designed as a graduation *goal* but *does not* represent a graduation *requirement*. Making decisions about readiness for graduation and unsupervised practice is the purview of the program director. Furthermore, Milestones 2.0 include revisions and changes that preclude using Milestones as a sole assessment in high-stakes decisions (i.e., determination of eligibility for certification or credentialing). Level 5 is designed to represent an expert resident whose achievements in a subcompetency are greater than the expectation. Milestones are primarily designed for formative, developmental purposes to support continuous quality improvement for individual learners, education programs, and the specialty. The ACGME and its partners will continue to evaluate and perform research on the Milestones to assess their impact and value.

Examples are provided for some milestones within this document. Please note: the examples are not the required element or outcome; they are provided as a way to share the intent of the element.

Some milestone descriptions include statements about performing independently. These activities must occur in conformity to ACGME supervision guidelines as described in the Program Requirements, as well as to institutional and program policies. For example, a resident who performs a procedure independently must, at a minimum, be supervised through oversight.

A Supplemental Guide is also available to provide the intent of each subcompetency, examples for each level, assessment methods or tools, and other available resources. The Supplemental Guide, like examples contained within the Milestones, is designed only to assist the program director and Clinical Competency Committee, and is not meant to demonstrate any required element or outcome.

Supplemental Guides and other resources are available on the Milestones page of each specialty section of the ACGME website. On www.acgme.org, choose the applicable specialty under the "Specialties" menu, then select the "Milestones" link in the lower navigation bar.

Pet. Ref. 814

The diagram below presents an example set of milestones for one sub-competency in the same format as the ACGME Report Worksheet. For each reporting period, a resident's performance on the milestones for each sub-competency will be indicated by selecting the level of milestones that best describes that resident's performance in relation to those milestones.

| Practice-Based Learning and Improvement 2: Reflective Practice and Commitment to Personal Growth | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates an openness to performance data (feedback and other input) | Demonstrates an openness to performance data and uses it to develop personal and professional goals | Seeks and accepts performance data for developing personal and professional goals | Using performance data, continually improves and measures the effectiveness of one's personal and professional goals | Acts as a role model for the development of personal and professional goals |
| | Identifies the factors that contribute to the gap(s) between expectations and actual performance | Analyzes and reflects upon the factors that contribute to gap(s) between expectations and actual performance | Analyzes, reflects on, and institutes behavioral change(s) to narrow the gap(s) between expectations and actual performance | Coaches others on reflective practice |

Comments:

Not Yet Completed Level 1 ☐

Selecting a response box in the middle of a level implies that milestones in that level and in lower levels have been substantially demonstrated.

Selecting a response box on the line in between levels indicates that milestones in lower levels have been substantially demonstrated as well as **some** milestones in the higher level(s).

Pet. Ref. 815

| **Patient Care 1: Antepartum Care and Complications of Pregnancy** | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic knowledge of normal obstetrical care and common medical complications seen in pregnancy | Provides complete antepartum care for women with uncomplicated pregnancies<br><br>Recognizes basic risk factors, symptoms, and signs of common medical and obstetrical complications | Provides complete antepartum care for women with complicated pregnancies<br><br>Manages common medical and obstetrical complications | Effectively supervises and educates lower-level residents in antepartum care<br><br>Recognizes atypical presentations of medical and obstetrical complications; identifies indications for referral and/or transfer of care for patients with medical and obstetrical complications | Manages patients with complex and atypical medical and obstetrical complications and implements treatment plans based on emerging evidence |

Comments:

Not Yet Completed Level 1
Not Yet Assessable

Pet. Ref. 816

| Patient Care 2: First-Trimester Bleeding | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Formulates a differential diagnosis for patients with first-trimester bleeding | Counsels patients regarding natural history, and diagnostic and treatment options | Uses non-surgical and surgical methods to manage patients with first-trimester bleeding | Manages patients with complications of first-trimester bleeding | Implements treatment plans for complex or atypical first-trimester bleeding |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | |
| Comments: | | | | |

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 817

| Patient Care 3: Care of Patients in the Intrapartum Period | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic knowledge of routine/uncomplicated intrapartum obstetrical care, including conduct of normal labor<br><br>Performs basic obstetric skills (e.g., identification of fetal lie, interpretation of fetal heart rate monitoring, and tocodynamometry) | Manages normal labor<br><br>Recognizes common intrapartum complications | Effectively supervises and educates lower-level residents in intrapartum care for women with uncomplicated pregnancies<br><br>Manages common labor and intrapartum complications | Provides care for women with complex intrapartum complications and conditions<br><br>Identifies indications for referral and/or transfer of care for patients with intrapartum complications | Applies innovative approaches to complex and atypical intrapartum conditions and implements treatment plans based on emerging evidence |

Comments:

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 818

| Patient Care 4: Care of Patients in the Postpartum and Interconception Period | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Provides postpartum and interconception care for women with uncomplicated pregnancies | Recognizes basic risk factors, symptoms, and signs of common postpartum and interconception complications | Manages common postpartum complications and counsels patients about associated risk in future pregnancies | Manages patients with complex postpartum complications and identifies indications for referral and/or transfer of care in the postpartum or interconception period | Applies innovative approaches to complex and atypical postpartum and interconception conditions and implements treatment plans based on emerging evidence |

Comments:

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 819

| Patient Care 5: Obstetric Technical Skills | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic surgical principles, including use of universal precautions and aseptic technique | Demonstrates basic obstetrical skills | Performs advanced obstetrical procedures | Performs complex obstetrical procedures | Applies innovative and complex approaches obstetrical care and implements treatment plans based on emerging evidence |

Comments:

Not Yet Completed Level 1

Not Yet Assessable

Pet. Ref. 820

| Patient Care 6: Critically Ill Obstetric Patients and Obstetric Emergencies | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Recognizes risk factors that can lead to critical illness in an obstetric patient | Formulates an initial differential diagnosis, recognizes initial signs/symptoms of a critically ill patient (vital signs, lab abnormalities, etc.) and asks for assistance in a timely fashion | Manages and initiates treatment for a critically ill obstetric patient, including recognizing when transfer to the intensive care unit (ICU) or another service is most appropriate | Collaborates with other health care teams to facilitate care for critically ill obstetric patients | Debriefs with the members of the health care team, the patient, and the family members of a critically ill obstetric patients |
| Recognizes risk factors for obstetric emergencies | Recognizes obstetric emergencies and asks for assistance in a timely fashion | Manages and treats obstetric emergencies | Leads the multidisciplinary health care team in caring for patients with obstetric emergencies | Debriefs with the members of the health care team, the patient, and the patient's family members after an obstetric emergency |

Comments:

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 821

| Patient Care 7: Peri-Procedural Care | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Identifies alterations in normal physiology and anatomy | Accurately and reliably gathers and reports clinical information pertaining to common peri-procedural risks and complications | Independently identifies and manages common peri-procedural risks and complications | Independently identifies and manages complex peri-procedural risks and complications | Implements measures to prevent or mitigate complications, applying effective interdisciplinary team management skills to manage multiple scenarios simultaneously |

Comments:

Not Yet Completed Level 1 ☐

Not Yet Assessable ☐

Pet. Ref. 822

| Patient Care 8: Endoscopic Procedures (Hysteroscopy and Cystoscopy) | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Prepares patient and equipment for endoscopic procedures (e.g., lithotomy positioning, assemble endoscope) | Performs diagnostic hysteroscopy and cystoscopy | Independently performs simple operative hysteroscopic procedures | Independently performs complex operative hysteroscopic procedures | Independently performs complex hysteroscopic procedures in altered anatomy |

Comments:

Not Yet Completed Level 1 ☐

Not Yet Assessable ☐

Pet. Ref. 823

| Patient Care 9:  Laparoscopic Procedures | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic skills (e.g., positioning, draping, docking, undocking) | Assists during laparoscopic procedures (e.g., port placement, bedside assistant) | Independently performs simple laparoscopic procedures | Independently performs advanced laparoscopic procedures | Independently performs uncommon complex laparoscopic procedures |
| ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ |

**Comments:**

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 824

| Patient Care 10: Vulvar-Vaginal Procedures | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic skills (e.g., positioning, knot tying, suturing) | Performs simple vulvar-vaginal procedures | Performs pelvic entry for vaginal procedures and simple procedures for incontinence and prolapse | Independently performs vaginal hysterectomy and complex vulvar-vaginal procedures | Independently performs uncommon complex vulvar-vaginal procedures |

Comments:

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 825

| Patient Care 11: Open Surgical Procedures (excludes Cesarean section) | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic skills (e.g., positioning, knot tying, suturing) | Opens and closes abdominal incisions | Independently performs simple open surgical procedures | Independently performs complex open surgical procedures | Independently performs uncommon complex open surgical procedures |
| □ | □ □ | □ □ | □ □ | □ |

Comments:

Not Yet Completed Level 1  □
Not Yet Assessable  □

Pet. Ref. 826

| Patient Care 12: Family Planning | | | | |
|---|---|---|---|---|
| **Level 1** | **Level 2** | **Level 3** | **Level 4** | **Level 5** |
| Demonstrates ability to find reputable, evidence-based information on contraception choices | Counsels patients on the effectiveness, risks, benefits, and contraindications of available forms of family planning | Implements comprehensive contraception management plans for patients and manages common side effects | Implements comprehensive management plans for patients with medical conditions complicating their use of contraceptive methods | Applies innovative and complex approaches to medical contraception and pregnancy termination, and implements treatment plans based on emerging evidence |
| | Performs medical uterine evacuation | Performs routine surgical uterine evacuation and manages complications | Performs surgical uterine evacuation on patients with complex comorbidities and manages complications | |

Comments:

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 827

| Patient Care 13: Ambulatory Gynecology and Office-Based Procedures | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Takes a focused patient history for common ambulatory gynecologic problems | Performs the initial assessment, formulates a differential diagnosis, and initiates treatment, including performance of basic procedures for common ambulatory gynecologic problems | Formulates management plans and initiates treatment, including relevant procedures for complex ambulatory gynecologic problems | Effectively cares for patients with complex presentations and uses a multidisciplinary approach when caring for patients with complex problems | Applies innovative approaches to complex and atypical ambulatory gynecology and implements treatment plans based on emerging evidence |
| ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ |

**Comments:**

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 828

| Patient Care 14: Consultations | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Performs consultation, with guidance | Triages consult requests | Manages consultations (including coordination of care) requiring intervention, including procedural options | Supervises lower-level residents in managing consultations (including coordination of care) requiring intervention, including procedural options | Oversees the consultation process and manages interdisciplinary systems issues affecting patient care |

Comments:

Not Yet Completed Level 1 ☐
Not Yet Assessable ☐

Pet. Ref. 829

| Medical Knowledge 1: Anatomy and Pathophysiology of Female Reproduction | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Identifies normal anatomy relevant to physical examination, imaging, and surgery<br><br>Demonstrates knowledge of physiology of reproduction | Identifies pathologic anatomic variants as applied to physical examination and imaging<br><br>Demonstrates basic knowledge of pathophysiology and clinical findings for common diseases of the reproductive system | Identifies common pathologic anatomic variants during surgery<br><br>Demonstrates advanced knowledge of pathophysiology and clinical findings for common diseases of the reproductive system | Identifies complex pathologic anatomic variants during surgery<br><br>Demonstrates comprehensive knowledge of the varying patterns of disease presentation, natural history, and patient outcomes | Contributes to peer-reviewed literature on the varying patterns of disease presentation, and natural history |
| ☐ | ☐ | ☐ | ☐ | ☐ |
| **Comments:** | | | | |

Not Yet Completed Level 1  ☐
Not Yet Assessable  ☐

Pet. Ref. 830

| Medical Knowledge 2: Differential Diagnosis | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Generates a basic differential diagnosis based on patient symptoms and history | Generates a comprehensive differential diagnosis based on patient symptoms and history and interpretation of results of common diagnostic tests | Generates a prioritized differential diagnosis and selects additional testing for confirmation | Independently and efficiently synthesizes information to develop prioritized differential diagnoses in complex patient presentations and incorporates subtle, unusual, or conflicting findings | Coaches peers to develop prioritized differential diagnoses in atypical patient presentations |
| ▢ | ▢ | ▢ | ▢ | ▢ | ▢ | ▢ | ▢ | ▢ |

**Comments:**

Not Yet Completed Level 1 ▢
Not Yet Assessable ▢

Pet. Ref. 831

| Systems-Based Practice 1: Patient Safety | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates knowledge of common patient safety events | Identifies system factors that lead to patient safety events | Participates in analysis of patient safety events (simulated or actual) | Conducts analysis of patient safety events and offers error prevention strategies (simulated or actual) | Actively engages teams and processes to modify systems to prevent patient safety events |
| Demonstrates knowledge of how to report patient safety events | Reports patient safety events through institutional reporting systems (simulated or actual) | Participates in disclosure of patient safety events to patients and their families (simulated or actual) | Discloses patient safety events to patients and their families (simulated or actual) | Role models or mentors others in the disclosure of patient safety events |

☐   ☐   ☐   ☐   ☐   ☐   ☐   ☐   ☐

**Comments:**

Not Yet Completed Level 1   ☐

Pet. Ref. 832

| Systems-Based Practice 2: Quality Improvement | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates knowledge of basic quality improvement methodologies and metrics | Describes local quality improvement initiatives (e.g., cancer screening rate, surgical site infection, smoking cessation) | Participates in local quality improvement initiatives | Demonstrates the skills required to identify, develop, implement, and analyze a quality improvement project | Creates, implements, and assesses quality improvement initiatives at the institutional or community level |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Comments:

Not Yet Completed Level 1 ☐

Pet. Ref. 833

| Systems-Based Practice 3: System Navigation for Patient-Centered Care - Coordination of Care | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates knowledge of care coordination | Coordinates care of patients in routine clinical situations effectively using the roles of interprofessional team members | Coordinates care of patients in complex clinical situations effectively using the roles of interprofessional team members | Identifies concerns with current systems and identifies opportunities for improvement | Analyzes the process of care coordination and leads in the design and implementation of improvements |
| ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ | ☐ ☐ |

Comments:

Not Yet Completed Level 1   ☐

Pet. Ref. 834

| Systems-Based Practice 4: System Navigation for Patient-Centered Care – Transitions of Care | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Identifies key elements for safe and effective transitions of care and hand-offs | Performs safe and effective transitions of care/hand-offs in routine clinical situations | Performs safe and effective transitions of care/hand-offs in complex clinical situations | Role models and advocates for safe and effective transitions of care/hand-offs within and across health care delivery systems, including in outpatient settings | Improves quality of transitions of care within and across health care delivery systems to optimize patient outcomes |

Comments:

Not Yet Completed Level 1 ☐

Pet. Ref. 835

| **Systems-Based Practice 5: Community and Population Health** | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates knowledge of community and population health needs and inequities | Identifies specific population and community health needs and inequities for the local population, taking into account social and structural determinants of health | Uses local resources effectively to meet the needs of a patient population and community | Participates in changing and adapting practice to provide for the needs of specific populations | Leads innovations and advocates for populations and communities with health care inequities |

Comments:

Not Yet Completed Level 1

Pet. Ref. 836

| Systems-Based Practice 6: Physician Role in Health Care Systems | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Identifies key components of the complex health care system (e.g., hospital, skilled nursing facility, finance, personnel, technology) | Describes how components of a complex health care system are interrelated and how this impacts patient care | Discusses how individual practice affects the broader system (e.g., length of stay, readmission rates, clinical efficiency) | Manages various components of the complex health care system to provide efficient and effective patient care and transitions of care | Advocates for or leads systems change that enhances high-value, efficient, and effective patient care and transitions of care |

Comments:

Not Yet Completed Level 1 ☐

Pet. Ref. 837

| **Practice-Based Learning and Improvement 1: Evidence-Based and Informed Practice** | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates how to access and use available evidence and incorporate patient preferences and values to the care of a routine patient | Articulates clinical questions and elicits patient preferences and values to guide evidence-based care, with guidance from other health care team members | Locates and applies the best available evidence, integrated with patient preferences, to the care of complex patients, with minimal guidance | Critically appraises and applies evidence, even in the face of uncertainty and conflicting evidence, to guide care tailored to the individual patient | Coaches others to critically appraise and apply evidence for complex patients and/or participates in the development of guidelines |

Comments:

Not Yet Completed Level 1 ☐

Pet. Ref. 838

| Practice-Based Learning and Improvement 2: Reflective Practice and Commitment to Personal Growth | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Identifies gap(s) between expectations and actual performance | Analyzes and reflects on the factors that contribute to gap(s) between expectations and actual performance | Institutes behavioral change(s) to narrow the gap(s) between expectations and actual performance | Continuously reflects on remaining gaps and institutes behavioral adjustments to narrow them | Coaches others on reflective practice |
| Establishes goals for personal and professional development | Identifies opportunities for performance improvement; designs a learning plan | Integrates practice data and feedback with humility to implement a learning plan | Uses performance data to measure the effectiveness of the learning plan and adapts when necessary | Coaches others in the design and implementation of learning plans |

Comments:

Not Yet Completed Level 1  ☐

Pet. Ref. 839

| Professionalism 1: Professional Behavior | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Identifies and describes potential triggers for professionalism lapses and how to appropriately report professionalism lapses | Demonstrates insight into professional behavior in routine situations and takes responsibility for one's own professionalism lapses | Demonstrates professional behavior in complex or stressful situations | Recognizes situations that may trigger professionalism lapses and intervenes to prevent lapses in oneself and others | Coaches others when their behavior fails to meet professional expectations |

Comments:

Not Yet Completed Level 1 ☐

Pet. Ref. 840

| Professionalism 2: Ethical Principles | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates knowledge of ethical principles | Analyzes straightforward situations using ethical principles | Recognizes the need to seek help in managing and resolving complex ethical situations | Recognizes and uses appropriate resources for managing and resolving ethical dilemmas as needed and identifies system-level issues that induce or exacerbate ethical problems | Seeks to address system-level factors that induce or exacerbate ethical problems or impede their resolution |
| ☐   ☐   ☐ | ☐   ☐ | ☐   ☐ | ☐   ☐ | ☐ |

**Comments:**

Not Yet Completed Level 1   ☐

Pet. Ref. 841

| Professionalism 3: Accountability/Conscientiousness | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Takes responsibility for failure to complete tasks and responsibilities, identifies potential contributing factors, and describes strategies for ensuring timely task completion in the future | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in routine situations | Performs tasks and responsibilities in a timely manner with appropriate attention to detail in complex or stressful situations | Recognizes situations that may impact others' ability to complete tasks and responsibilities in a timely manner | Recognizes one's own role in leading the care of all patients on the service while mentoring/coaching other team members to ensure the best possible care of patients, including prioritizing tasks and mitigating burnout |
| Responds promptly to requests or reminders to complete tasks and responsibilities | Recognizes situations that may impact one's own ability to complete tasks and responsibilities in a timely manner | Proactively implements strategies to ensure that the needs of patients, teams, and systems are met | | |

☐   ☐   ☐   ☐   ☐   ☐   ☐   ☐

Comments:

Not Yet Completed Level 1   ☐

Pet. Ref. 842

| Professionalism 4: Well-Being | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Recognizes status of personal and professional well-being, with assistance | Independently recognizes status of personal and professional well-being | With assistance, proposes a plan to optimize personal and professional well-being | Independently develops a plan to optimize personal and professional well-being | Coaches others when emotional responses or limitations in knowledge/skills do not meet professional expectations |

Comments:

Not Yet Completed Level 1 ☐

*This subcompetency is not intended to evaluate a resident's well-being. Rather, the intent is to ensure that each resident has the fundamental knowledge of factors that impact well-being, the mechanism by which those factors impact well-being, and available resources and tools to improve well-being.

Pet. Ref. 843

| **Interpersonal and Communication Skills 1: Patient- and Family-Centered Communication** | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates respect and establishes rapport with patients and patients' families (e.g., situational awareness of language, disability, health literacy level, cultural differences) | Establishes a therapeutic relationship in straightforward encounters | Establishes a therapeutic relationship in challenging encounters (e.g., shared decision-making) | Facilitates difficult discussions specific to conferences with patients and patients' families (e.g., end-of-life, explaining complications, therapeutic uncertainty) | Mentors others in situational awareness and critical self-reflection |
| Communicates with patients and their families in an understandable and respectful manner | Identifies barriers to effective communication (e.g., health literacy, cultural differences) | When prompted, reflects on personal biases while attempting to minimize communication barriers | Independently recognizes personal biases while attempting to proactively minimize communication barriers | Coaches others in the facilitation of crucial conversations |
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

Comments:

Not Yet Completed Level 1  ☐

Pet. Ref. 844

| **Interpersonal and Communication Skills 2: Patient Counseling and Shared Decision-Making** | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Demonstrates basic understanding of the informed consent process | Answers questions about the treatment plan and seeks guidance when appropriate | Counsels patients through the decision-making process, including responding to questions, for simple clinical problems | Counsels patients through the decision-making process, including responding to questions, for complex clinical problems | Counsels patients through the decision-making process, including responding to questions, for uncommon clinical problems |

Comments:

Not Yet Completed Level 1

Pet. Ref. 845

| Interpersonal and Communication Skills 3: Interprofessional and Team Communication | | | | |
|---|---|---|---|---|
| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
| Understands and respects the role and function of interprofessional team members | Solicits insights from and uses language that values all interprofessional team members | Integrates contributions from interprofessional team members into the care plan | Prevents and mediates conflict and distress among interprofessional team members | Fosters a culture of open communication and effective teamwork within the interprofessional team |
| Understands and respects the role and function of other health care team members | Solicits insights from other health care team members using language that values all members | Integrates contributions from other health care team members into the care plan | Addresses conflict and distress among other health care team members in complex patient situations | Attends to individual and team distress and promotes resilience among other health care teams |

Comments:

Not Yet Completed Level 1 ☐

Pet. Ref. 846

**Interpersonal and Communication Skills 4: Communication within Health Care Systems**

| Level 1 | Level 2 | Level 3 | Level 4 | Level 5 |
|---|---|---|---|---|
| Accurately records information in the patient record | Demonstrates organized diagnostic and therapeutic reasoning through notes in the patient record | Concisely reports diagnostic and therapeutic reasoning in the patient record in an efficient manner | Communicates clearly, concisely, on time, and in an organized written form, including providing anticipatory guidance | Models feedback to improve others' written communication |
| Safeguards patient personal health information | Documents required data in formats specified by institutional policy | Appropriately selects direct (e.g., telephone, in-person) and indirect (e.g., progress notes, text messages) forms of communication based on context | Produces written or verbal communication (e.g., patient notes, emails) that serves as an example for others to follow | Guides departmental or institutional communication around policies and procedures |

☐    ☐    ☐    ☐    ☐    ☐    ☐    ☐

**Comments:**

Not Yet Completed Level 1   ☐

Pet. Ref. 847

# MEDICATION ABORTION EXCEPTIONALISM

*Greer Donley†*

*Though state laws dominate the abortion debate, there is a federal abortion policy that significantly curtails access to early abortion in all fifty states. The policy, known as a Risk Evaluation and Mitigation Strategy (REMS), limits the distribution of mifepristone, the only drug approved to terminate a pregnancy so long as it is within the first ten weeks. Unlike most drugs, which can be prescribed by licensed healthcare providers and picked up at most pharmacies, the Food and Drug Administration only allows certified providers to prescribe mifepristone, and until December 2021, only allowed those providers to distribute the drug to patients directly, in person, not through pharmacies. This policy has segregated abortion care outside of the traditional healthcare setting and into abortion clinics, which provide ninety-five percent of abortions. This paper is the first to examine the burdens, benefits, and impacts of the mifepristone REMS. It argues that mifepristone fails to meet the statutory criteria for a REMS, and that the FDA's improper regulation of mifepristone is a part of a larger history of biased decision-making over sexual and reproductive health. It concludes by exploring impending modifications to the mifepristone REMS, what they mean for the future of early abortion care, and how the FDA can go further to remove unnecessary barriers to medication abortion.*

---

†   Greer Donley is an Assistant Professor at the University of Pittsburgh Law School. Donley's research for this Article earned her a 2020 Health Law Scholar Award by Saint Louis University and the American Society of Law, Medicine & Ethics. As part of this award, Donley was invited to workshop a draft of her paper to a large group of interdisciplinary scholars. She would particularly like to thank Saint Louis University School of Law, which organized the event, and Seema Mohapatra, Fred Rottnek, Robert Gatter, Jesse Goldner, Elizabeth Chiarello, Leslie Francis, Nathan Cortez, Sidney Watson, Elizabeth Pendo, Ruqaiijah Yearby, Stacey Tovino, Ana Santos Rutschman, Anya Prince, Jennifer D. Oliva, and Gabriel Scheffler for their valuable feedback at the workshop. She is also very grateful to Mary Ziegler, Yvonne (Yvette) Lindgren, David S. Cohen, Rebecca S. Eisenberg, W. Nicholson Price II, Patricia J. Zettler, Govind Persad, Myrisha S. Lewis, Amy J. Wildermuth, Deborah L. Brake, Sonya Borerro, Beatrice A. Chen, Susan Fritsche, Joshua Galperin, Grant MacIntyre, Andrele Brutus St. Val, and Jabeen Adawi for their helpful comments on earlier drafts of this Article.

627

Pet. Ref. 848

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 628
  I.  THE STIFLED PROMISE OF MEDICATION ABORTION . . . . . . 633
      A.  Creation of the Drug . . . . . . . . . . . . . . . . . . . . . . . . . 636
      B.  Federal Regulation in the United States . . . . . . . 637
      C.  How the Mifepristone REMS Affects Abortion
          Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 643
          1.  *Segregating Abortion Care Outside of the
              Traditional Healthcare Setting* . . . . . . . . . . . . . 643
          2.  *Prohibiting Telemedicine for Abortion* . . . . . . . 648
  II.  THE MIFEPRISTONE REMS IS UNNECESSARY, HARMFUL,
     AND IMPROPER UNDER THE STATUTE . . . . . . . . . . . . . . . . . 651
      A.  The Benefits of the Mifepristone REMS are
          Negligible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 651
      B.  The Harms of the Mifepristone REMS
          are Large . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 655
      C.  Mifepristone Fails to Meet the Statutory
          Standard for a REMS . . . . . . . . . . . . . . . . . . . . . . . . 663
 III.  THE FDA'S TROUBLING PATTERN OF DEVALUING
     WOMEN'S HEALTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 667
      A.  Plan B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 667
      B.  Importation of Mifepristone for Personal Use . . 670
      C.  Female Sex Drugs . . . . . . . . . . . . . . . . . . . . . . . . . . . . 673
      D.  Medical Research in Women and Female
          Animals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 675
      E.  Labeling Regulations in Pregnancy . . . . . . . . . . . 678
  IV.  REMOVAL OF THE REMS WILL TRANSFORM ABORTION
     CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681
      A.  Paths Toward Removing the Mifepristone
          REMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 681
          1.  *Constitutional Challenge* . . . . . . . . . . . . . . . . . . . . 681
          2.  *Arbitrary and Capricious Challenge* . . . . . . . . 684
          3.  *Reconsideration Within the Agency* . . . . . . . . . 686
      B.  The Future of Abortion Care Without the
          Mifepristone REMS . . . . . . . . . . . . . . . . . . . . . . . . . . 689
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 703

## INTRODUCTION

State abortion laws have received an enormous amount of attention in the national discourse and legal scholarship. But less known is a federal policy that dramatically limits access to abortion throughout the United States. The policy, created by the Food and Drug Administration (FDA), has burdened access to the medication used to induce abortion in the first ten weeks of pregnancy, mifepristone, through what is known as a Risk

Pet. Ref. 849

Evaluation and Mitigation Strategy (REMS).[1]  A REMS subjects a drug to additional controls that theoretically improve the drug's safety profile at the expense of accessibility.[2]  The mifepristone REMS has historically been quite stringent—it dramatically limited access to medication abortion and effectively isolated abortion care outside of traditional medical settings.[3]  Though the FDA is only supposed to institute a REMS when it concludes that additional regulation is needed to ensure that a drug's health benefits outweigh its safety risks, every medical organization to consider mifepristone's risk profile has found that the REMS is unnecessary to protect patient safety.[4]  In light of this growing criticism, in December 2021, the FDA removed one of its most onerous restrictions; nevertheless, the agency maintained the mifepristone REMS and added a new restriction, continuing its exceptional treatment of the drug.

After the 2020 election, abortion rights activists have been concerned about the future of their mission.  Justice Barrett was confirmed to fill Justice Ginsburg's seat only eight days before the election—a replacement that threatened most of the rights Justice Ginsburg had championed, perhaps most acutely, abortion rights.  The future of abortion rights has only become more uncertain since then, with Texas enacting the harshest abortion ban since before *Roe v. Wade* and the Supreme Court reconsidering the right to abortion this term in *Dobbs v. Jackson Women's Health Organization*.[5]  Nevertheless, the Biden administration has the ability and opportunity to remove or further loosen the mifepristone REMS, expanding abortion access throughout much of the country.  This Article explores the rationale for removing the mifepristone REMS and what impact that decision could have for abortion rights generally.

Most people have an unchallenged background assumption that abortion occurs outside of the traditional healthcare setting, typically at an abortion or family planning clinic.  That

---

1   *Risk Evaluation and Mitigation Strategy (REMS) Single Shared System for Mifepristone 200MG*, U.S. FOOD & DRUG ADMIN., https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf [https://perma.cc/C5UE-UV9Q] (last updated Apr. 2019) [hereinafter *REMS*].

2   *Risk Evaluation and Mitigation Strategies (REMS)*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems [https://perma.cc/C45E-6U7Y] (last updated Aug. 8, 2019).

3   *See infra* Part I.

4   *See infra* Part II.

5   *See* Whole Woman's Health v. Jackson, 141 S. Ct. 2494, 2495 (2021).

is because 95% of abortions—including abortions that are completed with a simple medication regimen—have historically been provided by those clinics.[6]  There is no reason, however, for medication abortion to be limited to any physical space.  So long as abortion patients are within the first ten weeks of their pregnancies, they should simply be able to make an appointment with a general practitioner or OBGYN, obtain a prescription for medication abortion, pick up the medications at their regular pharmacy, and end their pregnancy in the privacy of their home.  The primary obstacle blocking this scenario from coming to fruition in more than half the country is the FDA's REMS.[7]

The mifepristone REMS created distribution limitations that, in effect, isolated early abortion care to clinics.  Until December 2021, the REMS barred pharmacies from distributing mifepristone and required patients to pick up the drug in person from a "certified prescriber" at a clinic, medical office, or hospital.[8]  The logistical burdens associated with certification and distribution ensured that the vast majority of providers who became certified were abortion providers working at abortion and family planning clinics.[9]  And given that clinics are few and far between in most southern and midwestern states, the REMS effectively required women to travel far distances—sometimes hundreds of miles—to simply pick up a prescription.[10]  It also prevented women from obtaining the prescription through telehealth, which became an urgent necessity in the COVID-19 pandemic.

Quickly after taking office, the Biden administration used its discretion to suspend the in-person dispensing requirement associated with the mifepristone REMS[11]—an action the

---

6   RACHEL K. JONES, ELIZABETH WITWER & JENNA JERMAN, ABORTION INCIDENCE AND SERVICE AVAILABILITY IN THE UNITED STATES, 2017, at 16 (2019), https://www.guttmacher.org/sites/default/files/report_pdf/abortion-incidence-service-availability-us-2017.pdf [https://perma.cc/Z6CM-BMCD].  As discussed in the final section of the Article, the COVID-19 pandemic, and the temporary suspension of the mifepristone REMS that resulted from it, has radically disrupted the provision of abortion care and moved abortion access increasingly online.

7   Some states have their own laws that would limit the distribution of mifepristone even if the REMS were lifted.  *See infra* subpart IV.B.

8   *REMS, supra* note 1.

9   *See infra* Part I.

10   *See* JONES, WITWER & JERMAN, *supra* note 6, at 3.

11   Letter from FDA to Maureen G. Phipps, MD, MPH & FACOG, CEO of Am. Coll. of Obstetricians and Gynecologists, and William Grobman, MD & MBA, President of Soc'y for Maternal-Fetal Med. (Apr. 12, 2021) (on file with the ACLU), https://www.aclu.org/letter/fda-response-acog-april-2021 [https://perma.cc/3JZM-XD2R].

Pet. Ref. 851

Trump administration refused to take, and the Supreme Court found was not legally required.[12] In the months after the suspension took effect, abortion care started to change dramatically in many states, including the creation of virtual clinics, which provide medication abortions entirely through telehealth.[13] Remote abortion care is cheaper, more convenient, and allows patients to avoid the harassment associated with clinics. On December 16, 2021, the FDA permanently removed the in-person dispensing requirement, ensuring that these important changes could become permanent.[14] But the agency stopped short of removing the REMS entirely, keeping the certified provider requirement and patient agreement form, and adding a requirement that any pharmacy dispensing the drug also become certified.[15]

This Article starts with background on medication abortion, including its risks and benefits, the FDA's history regulating it, and the negative impact of that regulation on abortion access. Part II then examines whether the burdens associated with the REMS are offset by any health benefit, as the statute requires. It concludes, as has every major medical organization to examine the issue, that there are no demonstrated medical benefits to the REMS. Medication abortion is both safe and effective without limits on distribution. Though there are real risks to mifepristone—as there are for every drug—there is no reason that a physician or pharmacist could not ensure that patients are informed of the risks and how to manage them. As a result, the Part concludes that mifepristone failed to meet the statutory criteria for a REMS.

In Part III, the Article describes how the FDA's mifepristone REMS is a part of a larger pattern of gender bias in the FDA's decision making. The Part traces a series of agency failures to protect women's health, especially reproductive and sexual health, over the course of decades. This Part concludes that the FDA has a history of placing political concerns over its scientific mission when it comes to issues concerning female sexuality and reproduction.

Finally, Part IV explores legal and political avenues for invalidating, removing, or loosening the mifepristone REMS, as

---

12   FDA v. ACOG, 141 S. Ct. 578, 578 (2021).

13   *See infra* subpart IV.B.

14   Letter to Donna Harrison from the Food & Drug Admin. (Dec. 16, 2021) at 6–7, https://www.regulations.gov/document/FDA-2019-P-1534-0016 [https://perma.cc/ED3T-SUJM] [hereinafter FDA Letter].

  *Id.*

the medical evidence supports. The Part then pivots to a discussion of how a removal of the REMS could reshape early abortion care in the United States, integrating it into the traditional healthcare system and making it more accessible than ever before. But perhaps the largest impact of loosening the REMS would be to accelerate the polarization in abortion access across state lines. Nineteen states have their own laws limiting the distribution of medication abortion, and more states might erect similar barriers.[16] In these states, the innovations in early abortion care, like virtual abortion clinics, would remain unavailable. If *Roe v. Wade* is further limited or overturned in the coming years, this disparity will grow again.[17] Women living in liberal states will continue to experience the benefits of remote abortion access, while women in conservative states could lose legal access to in-state abortion care altogether. Since SB 8 took effect in Texas—a law that has, in effect, ended legal abortion starting roughly two weeks after a woman's missed period—this polarization is already on display.[18] Nevertheless, Texas also proves that modifications to the REMS will facilitate abortion access in these antiabortion states by making it easier for women to get medication abortion from neighboring states.[19]

---

[16]   *Medication Abortion*, GUTTMACHER INST., https://www.guttmacher.org/state-policy/explore/medication-abortion [https://perma.cc/4JRF-NNT5] (last updated Nov. 1, 2021).

[17]   410 U.S. 113 (1973).

[18]   *See* Greer Donley, David S. Cohen & Rachel Rebouché, *The Messy Post-*Roe *Legal Future Awaiting America*, ATLANTIC (Sept. 27, 2021), https://www.theatlantic.com/ideas/archive/2021/09/after-roe-legal-mess-future-abortion-rights/620134/ [https://perma.cc/U53S-7X8P].

[19]   Already, in Texas, virtual clinics are working to serve Texas women in neighboring states where remote abortion is legal, like Colorado and Nevada. Carey Goldberg & Catarina Saraiva, *Texas Ban May Spur Tele-Abortions: Virtual Visits, Then Pills*, BLOOMBERG (Sept. 4, 2021), https://www.bloomberg.com/news/articles/2021-09-04/texas-ban-may-spur-tele-abortions-virtual-visits-then-pills [https://perma.cc/8BYS-K62V]. This will help patients obtain remote abortion care by simply crossing the border, instead of also needing to travel to an abortion clinic in that state. It will also help reduce pressure on the providers doing surgical abortion procedures, who have seen an influx of Texan patients. As argued in subpart IV.B, experts also expect to see an increase in illegal self-managed abortion for women who cannot travel, which appears to be already happening in Texas as well. Tanya Basu, *Activists Are Helping Texans Get Access to Abortion Pills Online*, MIT TECH. REV. (Sept. 15, 2021), https://www.technologyreview.com/2021/09/15/1035790/abortion-pills-online-texas-sb8/ [https://perma.cc/4VV9-C785].

Pet. Ref. 853

I

THE STIFLED PROMISE OF MEDICATION ABORTION

Mifepristone is a drug that, when used in combination with misoprostol, terminates a pregnancy. Mifepristone was originally sold exclusively under the brand name Mifeprex, but the FDA also approved a generic version of the drug in 2019.[20] Mifepristone works by blocking the hormone progesterone, which is necessary for a pregnancy to continue.[21] In particular, when progesterone is blocked during pregnancy, it alters the lining of the uterus and causes disruption to the decidua (which later becomes the placenta).[22] By thinning the uterine lining, mifepristone detaches the gestational sac from the uterus and stops its growth.[23] It can also cause the cervix to soften and dilate, which can help express the pregnancy.[24]

Mifepristone, however, is not always sufficient to end a pregnancy on its own, which is why it is used in combination with a second drug, misoprostol. Misoprostol causes contractions that help expel the pregnancy.[25] It is typically taken 24–48 hours after mifepristone.[26] Unlike mifepristone, which is the only drug approved as an abortifacient, misoprostol was originally approved to prevent stomach ulcers after the use of certain anti-inflammatory drugs.[27] However, it has been used off label[28] for a variety of obstetric uses—including to induce labor or evacuate a pregnancy after an incomplete or missed

---

[20] This Article uses the term "mifepristone" to refer to both the generic and brand name drug. *Questions and Answers on Mifeprex*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex [https://perma.cc/F46V-34CP] (last updated Apr. 13, 2021). The agency consolidated both products under a single REMS, but otherwise made no substantive changes to the REMS protocol. *Id.*

[21] Irving M. Spitz & C.W. Bardin, *Mifepristone (RU 486I) – A Modulator of Progestin and Glucocorticoid Action*, 329 NEW ENG. J. MED. 404, 405 (1993).

[22] *Id.*

[23] *Medical Abortion*, MAYO CLINIC (May 14, 2020), https://www.mayoclinic.org/tests-procedures/medical-abortion/about/pac-20394687 [https://perma.cc/Z284-2M7H].

[24] Spitz & Bardin, *supra* note 21, at 405.

[25] *Medical Abortion*, *supra* note 23.

[26] *The Availability and Use of Medication Abortion*, KAISER FAM. FOUND. (June 16, 2021), https://www.kff.org/womens-health-policy/fact-sheet/the-availability-and-use-of-medication-abortion/ [https://perma.cc/NN8S-R4DV].

[27] Rebecca Allen & Barbara M. O'Brien, *Uses of Misoprostol in Obstetrics and Gynecology*, 2 REVS. OBSTETRICS & GYNECOLOGY 159, 159 (2009).

[28] Off-label use refers to when a physician prescribes medication for a use that was not approved by the FDA. *Understanding Unapproved Use of Approved Drugs "Off Label,"* U.S. FOOD & DRUG ADMIN., https://www.fda.gov/patients/learn-about-expanded-access-and-other-treatment-options/understanding-un-approved-use-approved-drugs-label [https://perma.cc/DL5G-ZMWV] (last updated Feb. 5, 2018).

Pet. Ref. 854

miscarriage.[29]  Perhaps due to its variety of other uses outside of the abortion context, misoprostol has not been subject to the same controversy or regulatory limitations on its distribution despite similar side effects and risks.  As a result, women can obtain misoprostol as any other drug, with a prescription from their pharmacy.[30]

Though there are other drug regimens that can effectively terminate a pregnancy, 97% of medication abortions in the United States use the FDA-approved combination of mifepristone and misoprostol.[31]  With more than twenty years of safety data, there is ample evidence that mifepristone is both safe and effective.  In 2018, the Government Accountability Office (GAO) published a report on mifepristone; it found that from September 2000 to June 2017, 3.2-million women used mifepristone to end a pregnancy.[32]  Of those women, only 4,200 reported adverse events, including twenty deaths—some of which were later found to be unrelated to the medication.[33]  The fatality rate was calculated at 0.0006%.[34]  "In contrast, the background risk of pregnancy-related death among pregnant women in the United States who do not have abortions and instead proceed to live birth is approximately 0.009%, which is 14 times higher."[35]  The rates of serious adverse events like infection requiring hospitalization are also low, ranging from 0.01 to 0.7%, and are almost always treatable without long-term issues.[36]  As for efficacy, the drug's current label reports

---

29   Allen & O'Brien, *supra* note 27, at 164.  Studies have recently shown that a combination of mifepristone and misoprostol would be more effective at treating an incomplete miscarriage, but the regulatory limits on mifepristone have made that protocol more difficult to implement.  Courtney A. Schreiber et al., *Mifepristone Pretreatment for the Medical Management of Early Pregnancy Loss*, 378 NEW ENG. J. MED. 2161, 2161 (2018).

30   Pharmacists can, however, invoke conscience laws to avoid dispensing misoprostol.

31   Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 PERSPS. ON SEXUAL & REPROD. HEALTH 1, 6 (2017), https://www.guttmacher.org/sites/default/files/article_files/abortion-incidence-us.pdf [https://perma.cc/6XZL-X8NL].

32   GOV'T ACCOUNTABILITY OFF., GAO-18-292, FOOD AND DRUG ADMINISTRATION: INFORMATION OF MIFEPREX LABELING CHANGES AND ONGOING MONITORING EFFORTS 21 (2018), https://www.gao.gov/assets/700/690914.pdf [https://perma.cc/9MTN-EDK7] [hereinafter GAO-18-292].

33   *Id.*

34   *Id.*

35   Mifeprex REMS Study Grp., *Sixteen Years of Overregulation: Time to Unburden Mifeprex*, 376 NEW ENG. J. MED. 790, 791 (2017) [hereinafter *Mifeprex REMS Study Group*].

*Id.*

Pet. Ref. 855

that it is over 96% effective at ending a pregnancy.[37]  For the remaining cases, an additional dose of misoprostol will frequently expel the remaining tissue.[38]  In roughly 1% of cases, a surgical procedure is required.[39]

The possibility of abortion by medication was enormously controversial from the moment it first entered the public debate: "[a]lmost no pharmaceutical product has captured the public imagination with the force of mifepristone."[40]

> Initially, predictions were both dire and ecstatic: women would run rampant, having more abortions than ever, boyfriends would slip mifepristone into their girlfriends' tea, abortion would become simple and easy, women would have access to abortion without any medical interface and the politics of abortion would soften.[41]

Thus far, none of these predictions have come to pass, including the drug's promise to dramatically increase the accessibility of abortion in the United States (though that might be changing).[42]  In 2017, roughly forty percent of U.S. abortions are now completed with medication,[43] but accessing the drugs has not been easy.[44]  Some have decried that mifepristone is, and must remain, "the moral property of women," but the potential for any woman[45] or pregnant person in America to access the medication at her local pharmacy with a prescription from her regular provider—as they do with other medications—is not yet a reality in the United States.[46]  As explained below, this is largely due to an FDA policy that limits the distribution of mifepristone.

---

37   Mifeprex Label, 13, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf [https://perma.cc/PZ9U-NN6B]; Older studies using an outdated dosing regimen demonstrated a lower efficacy.  *See* GAO-18-292, *supra* note 32, at 13.

38   GAO-18-292, *supra* note 32, at 14.

39   Mifeprex Label, *supra* note 37, at 13.

40   Beverly Winikoff & Carolyn Westhoff, *Fifteen Years: Looking Back and Looking Forward*, 92 Contraception 177, 178 (2015).

41   *Id.*

42   *See The Availability and Use of Medication Abortion*, *supra* note 26, at 8.

43   *Id.* As noted below, medication abortion for the first time became the majority of all abortions in 2020 (54%).

44   *See infra* subpart I.C.

45   Not every person capable of becoming pregnant identifies as a woman.  As a result, I attempt to primarily use gender neutral language.  There are times, however, where I use gendered language because gender is relevant, or the language is less clunky.  But in those instances, the arguments apply with equal force to all people with uteruses, however they identify.

46   Winikoff & Westhoff, *supra* note 40, at 178 (quoting Claude Evin, the then-French Minister of Health).

Pet. Ref. 856

A.   Creation of the Drug

Researchers conceived of the idea for mifepristone after studies of hormone-based contraception; once scientists understood the role that progesterone plays in pregnancy, they began to theorize that anti-progestins could also interrupt an embryo's implantation in the uterus.[47]  The pharmaceutical company, Roussel Uclaf, eventually created mifepristone and named it RU-486.[48]

In 1982, the first clinical trial for mifepristone began in Geneva.[49]  Nine out of the eleven women who participated in the study successfully terminated their pregnancies.[50]  Additional studies were conducted to expand this research, including the first U.S. study in 1983 involving 300 research subjects in California.[51]  In 1988, after many successful clinical trials in France,[52] the French government approved mifepristone (still then known as RU-486) for use as an abortifacient.[53]  The decision was highly controversial, and Roussel Uclaf even stopped selling the drug for a few days after anti-abortion organizations threatened the company.[54]  Nevertheless, the drug reentered the market after the French government successfully intervened.[55]  China also approved mifepristone as an abortifacient in 1988.[56]  Britain and Sweden followed within a few years,[57] and the entire EU had access by 1999.[58]

Roussel Uclaf was hesitant to apply for new drug approval in the United States, fearing boycotts and lawsuits.[59]  The risks were especially undesirable in the Bush administration, which

---

[47]   Randall K. O'Bannon, *The Introduction and Use of the Abortifacient Mifepristone (RU-486) in the United States*, 24 ASS'N FOR INTERDISC. RSCH. IN VALUES AND SOCIAL CHANGES: RSCH. BULLETIN (2012).

[48]   Carolina J. Abboud, *The Development of Mifepristone for Use in Medication Abortions*, EMBRYO PROJECT (Aug. 7, 2017), https://embryo.asu.edu/pages/development-mifepristone-use-medication-abortions  [https://perma.cc/7DHD-JHG3].

[49]   *Id.* at 1.

[50]   *Id.*

[51]   *See* THE CASE FOR ANTIPROGESTINS: A REPORT OF THE REPRODUCTIVE HEALTH TECHNOLOGIES PROJECT, REPROD. HEALTH TECH. PROJECT 5–6 (1992).

[52]   Rebecca K. Kramnick, *RU 486 and the Politics of Drug Regulation in the United States and France*, 25 CORNELL INT'L L.J. 677, 686 (1992).

[53]   THE CASE FOR ANTIPROGESTINS, *supra* note 51, at 7.

[54]   JUDITH A. JOHNSON, CONGRESSIONAL RESEARCH SERVICE, ABORTION: TERMINATION OF EARLY PREGNANCY WITH RU-486 (MIFEPRISTONE) 1 (2001).

[55]   *Id.* at 1–2.

[56]   *Id.* at 1.

[57]   Winikoff & Westhoff, *supra* note 40, at 177.

[58]   *Id.*

[59]   Lars Noah, *A Miscarriage in the Drug Approval Process?: Mifepristone Embroils the FDA in Abortion Politics*, 36 WAKE FOREST L. REV. 571, 579 (2001).

had already tried to ban the importation of mifepristone for personal use, as described in Part III below.[60]  But once President Clinton entered office, his administration took the unusual step of actively recruiting the company to seek FDA approval, even helping the reluctant sponsor to negotiate licenses so that its brand would not be affected in the United States.[61]  In 1994, "after lengthy negotiations" with the Clinton administration,[62] Roussel Uclaf "donated the rights to sell mifepristone in the United States to the Population Council, a large nonprofit group in New York City that conducts international research on reproductive health."[63]  The Population Council searched for large pharmaceutical companies to develop the drug, but was unsuccessful; it eventually licensed the rights to produce and distribute mifepristone, sold under the brand name Mifeprex, to Danco Laboratories, LLC ("Danco") in 1997.[64]

## B.   Federal Regulation in the United States

In the United States, drug regulation is largely governed by the Food and Drug Administration (FDA).  Drugs cannot be sold or distributed through interstate commerce unless they receive new drug approval from the FDA.[65]  In 1996, mifepristone's sponsor, Danco, submitted a new drug application (NDA) for FDA approval.[66]  Later that year, the FDA sent a letter to Danco indicating that although the available evidence from abroad suggested that the drug was safe and effective, it could not approve the drug until it had final data from a clinical trial in the United States.[67]  The FDA also requested that the sponsor submit a plan on how to restrict the drug's distribution.[68]

---

60   *See infra* Part III; Benten v. Kessler, 799 F. Supp. 281, 285–86 (E.D.N.Y. 1992).

61   Noah, *supra* note 59, at 578–79.

62   *Id.* at 579.

63   Melody Petersen, *Abortion Pill Distributor Energized by New Mission*, N.Y. TIMES (Sept. 30, 2000), https://www.nytimes.com/2000/09/30/us/abortion-pill-distributor-energized-by-new-mission.html [https://perma.cc/MB6W-RGPL].

64   *Id.*

65   Greer Donley, *Regulation of Encapsulated Placenta*, 86 TENN. L. REV. 225, 242 (2019).

66   The original NDA was submitted by the Population Council; but Danco took over during the NDA process, and for ease of reference, this Article refers to Danco as the sponsor.  U.S. GOV'T ACCOUNTABILITY OFF., GAO-08-751, APPROVAL AND OVERSIGHT OF THE DRUG MIFEPREX 4 n.12 (2008), https://www.gao.gov/assets/280/279424.pdf [https://perma.cc/3MMJ-ESDD] [hereinafter GAO-08-751].

67   *Id.* at 5–6.

68   *Id.*

Pet. Ref. 858

Three years later, in 1999, Danco responded to the FDA's letter and included data from a U.S. clinical trial showing that the drug was safe and effective.[69] By this time, the Clinton administration's previous enthusiasm to approve mifepristone had faded as President Clinton sought to rehabilitate his image after his cheating scandal.[70] And as Republicans now had control of the Senate, they were able to hold up the confirmation of a new FDA Commissioner for two years, only confirming Jane Henney "after receiving assurances that Dr. Henney would not actively facilitate final approval of mifepristone."[71] Nevertheless, after reviewing the new information Danco submitted, the FDA agreed that the drug was safe and effective, but "suggested a variety of unusual distribution restrictions such as making the drug available only through physicians who performed surgical abortions [who] would agree to register with the manufacturer."[72] The FDA finally approved mifepristone in 2000 after reaching an agreement with the sponsor on the limited distribution plan, labeling, and manufacturing processes.[73]

The FDA's initial approval of mifepristone was through the first forty-nine days of pregnancy.[74] It used the agency's Subpart H authority to restrict mifepristone's distribution; Subpart H allows distribution restrictions for drugs treating serious or life-threatening illnesses.[75] The sponsor objected to this classification, but the "FDA concluded that termination of an unwanted pregnancy is a serious condition and that the drug can allow patients to avoid a surgical procedure."[76] The FDA's primary restrictions were to prohibit pharmacies from distributing the drug—only qualified physicians could do so.[77] A physician was qualified only if she could "assess the duration of pregnancy accurately," "diagnose ectopic pregnancies," "provide surgical intervention" or had "plans to provide such care

---

69   *Id.* at 19.
70   Noah, *supra* note 59, at 583.
71   *Id.*
72   *Id.* at 584; GAO-08-751, *supra* note 66, at 5.
73   GAO-08-751, *supra* note 66, at 5.
74   Memorandum entitled NDA 20-687 Mifeprex (mifepristone) Population Council, at 1 (Sept. 28, 2000), http://wayback.archive-it.org/7993/20170113112743/http://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111366.pdf [https://perma.cc/FZ2Q-8S6R] [hereinafter Mifepristone Memorandum].
75   *Id.* at 6, 8.
76   GAO-08-751, *supra* note 66, at 6. The GAO reviewed this determination in 2008 and found it appropriate. *Id.* at 25–28.
77   Mifepristone Memorandum, *supra* note 74, at 6. The initial restrictions included many other provisions related to informed consent, shipping controls, and additional research. *Id.* at 3–8.

Pet. Ref. 859

through other qualified physicians" in the case of complications.[78]

At the time, physicians could only distribute mifepristone in person and were required to supervise the administration of the drug—i.e., the patient was not allowed to take the drug at home.[79] Patients were also required to return to the office a few days later to take the second drug in the regimen, misoprostol, in person.[80] Finally, the drug also was given a black box warning—the most aggressive warning the FDA can require.[81] Black box warnings are typically reserved for drugs that can cause serious injury or death.[82]

The FDA's distribution restrictions were seen as problematic from the outset. In 2001, FDA law scholar, Lars Noah, wrote:

> This degree of oversight resembles some of the restrictions imposed on Schedule II controlled substances such as methadone, but no one has suggested that mifepristone qualifies as a narcotic subject to the Controlled Substances Act, and nothing in the FDA's enabling statute explicitly authorized the imposition of such controls on access to the drug.[83]

Nevertheless, the restrictions persisted and were recrafted into a REMS once Congress passed the Food and Drug Administration Amendments Act, which created the REMS program in 2007.[84] This statute created the REMS system, which it described as "a drug safety program that the [FDA] can require for certain medications with serious safety concerns."[85] The statute requires the FDA to issue a REMS if it "determines that [it] is necessary to ensure that the benefits of the drug outweigh

---

78   *Id.* at 6.

79   *Id.* at 8.

80   *Id.* at 2–3.

81   A GUIDE TO DRUG SAFETY TERMS AT FDA, FOOD & DRUG ADMIN. (2012), https://www.fda.gov/media/74382/download#:~:text=this%20type%20of%20warning%20is,serious%20or%20life%2Dthreatening%20risks.&text=NOVEMBER%202012-,cause%20disability%2C%20are%20life%2Dthreatening%2C%20result%20in%20hospitalization%20or,death%2C%20or%20are%20birth%20defects [https://perma.cc/7HDN-5NB7].

82   The current black box warning notes, among other things, that "[s]erious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions." HIGHLIGHTS OF PRESCRIBING INFORMATION, FOOD & DRUG ADMIN. 1 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf [https://perma.cc/FCD5-CXGG].

83   Noah, *supra* note 59, at 584 (citations omitted).

84   FDA's REMS authority was a part of the Food and Drug Administration Amendments Act, which was passed in 2007. 21 U.S.C. § 355-1.

85   *Risk Evaluation and Mitigation Strategies (REMS)*, *supra* note 2.

Pet. Ref. 860

the risks of the drug."[86]  The statute also allows the FDA to use its deeming authority to institute a REMS for a previously approved drug if the drug was already on the market with distribution limitations.[87]  Given the restrictions that the FDA had already placed on mifepristone, the FDA used its deeming authority to require a REMS on the drug in 2008.[88]

A REMS does not always create limitations on drug distribution; it could simply involve a communication plan, including a medication guide for patients or risk disclosures from the manufacturer to the provider.[89]  When the FDA concludes that those basic REMS requirements are insufficient to protect patient safety, it can issue what is known as Elements to Assure Safe Use (ETASU)—a more stringent REMS[90] that may include limits on distribution, including restrictions on who can prescribe the drug and under what conditions.[91]  The FDA's mifepristone REMS includes ETASU.[92]  Though there are only sixty-one REMS programs[93] covering less than 5% of all FDA-approved drugs,[94] the vast majority (90%) also include ETASU.[95]

---

86   21 U.S.C. § 355-1(a)(1).

87   *See Questions and Answers on the Federal Register Notice on Drugs and Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies*, U.S. Food & Drug Admin., https://www.fda.gov/regulatory-information/food-and-drug-administration-amendments-act-fdaaa-2007/questions-and-answers-federal-register-notice-drugs-and-biological-products-deemed-have-risk [https://perma.cc/2KXT-HJBK] (last updated March 28, 2018).

88   Notice, 73 Fed. Reg. 16313, 16313 (Mar. 27, 2008), https://www.federalregister.gov/documents/2008/03/27/E8-6201/identification-of-drug-and-biological-products-deemed-to-have-risk-evaluation-and-mitigation [https://perma.cc/W9DP-ZHWW].  In response, Danco submitted a supplemental new drug application (sNDA) proposing a REMS that would satisfy the agency, which the FDA accepted.  Letter from Dep't of Health & Hum. Servs. to Danco Laboratories, LLC (June 8, 2011), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/020687s014ltr.pdf [https://perma.cc/WL94-QVBR].

89   *What's in a REMS?*, U.S. Food & Drug Admin., https://www.fda.gov/drugs/risk-evaluation-and-mitigation-strategies-rems/whats-rems [https://perma.cc/U4SE-ESPQ] (last updated Jan. 26, 2018).

90   *The Availability and Use of Medication Abortion*, *supra* note 26.

91   Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823.

92   Mifeprex REMS Study Group, *supra* note 35, at 790.

93   *Approved Risk Evaluation and Mitigation Strategies (REMS)*, U.S. Food & Drug Admin., https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsData.page [https://perma.cc/4JZ5-6X7W] (last visited May 30, 2021).

94   *See* Mifeprex REMS Study Group, *supra* note 35, at 790 (identifying that there were "1750 prescription drug and therapeutic biologic active ingredients that [had] been approved by FDA and marketed in the United States" as of February 2017).

95   *Approved Risk Evaluation and Mitigation Strategies (REMS)*, *supra* note 93.

Pet. Ref. 861

In May 2015, mifepristone's sponsor submitted a Supplemental New Drug Application (sNDA), which proposed several changes to the administration of the drug.[96]  These proposals included, among other things, "changing the dosing regimen, increasing the gestational age limit up to which [mifepristone] can be taken, and eliminating the requirement that the dose of misoprostol be administered in a medical facility."[97]  In the course of its review, the FDA also received multiple letters from academics and professional organizations requesting that the REMS be modified or eliminated.[98]  In its review of the sNDA, the FDA concluded that "no new safety concerns have arisen in recent years, and that the known serious risks occur rarely."[99]  It also found that "[g]iven that the numbers of . . . adverse events appear to be stable or decreased over time, it is likely that . . . serious adverse events will remain acceptably low."[100]

As a result, in 2016, the agency approved the sNDA.[101]  The modified approval updated the drug's labeling and REMS in the following ways:

- It extended the gestational age for which the medication was approved for use (from 49 days to 70 days since a woman's last missed period);
- It modified the dose regimen for mifepristone and misoprostol based on research showing improved safety and efficacy with an altered dose;
- It allowed providers who are not physicians to become certified to prescribe mifepristone; and
- It removed language requiring the drug to be taken (not just dispensed) in a healthcare facility.[102]  The last requirement allowed women to only travel to a clinic once, where they could pick up the entire medication regimen and take it at home instead of traveling to the clinic multiple times and taking the drugs at the facility.[103]

Nevertheless, the mifepristone REMS and ETASU still required that (1) only certified healthcare providers[104] prescribe the

---

96   GAO-18-292, *supra* note 32, at 1.

97   *Id.* at 2.

98   Joint Stipulation of Facts at 11–12, Chelius v. Azar, No. 1:17-cv-00493-JAO-RT (D. Haw. Nov. 27, 2019).

99   CTR. FOR DRUG EVALUATION & RSCH., FDA, MEDICAL REVIEW 8 (2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf [https://perma.cc/XT3Q-P6KB].

100   *Id.* at 47.

101   GAO-18-292, *supra* note 32, at 6.

102   *Id.* at 7–8.

103   *Id.*

104   Only providers that can (a) "assess the duration of pregnancy accurately" (b) "diagnose ectopic pregnancies" and (c) "provide surgical intervention" or "have

drug, (2) the drug be dispensed in certain healthcare settings, and (3) patients receive additional counseling and sign a Patient Agreement Form.[105]

In December 2021, as this Article was coming to press, the FDA announced an additional change to the mifepristone REMS, the details of which will be ironed out over the coming months with the drug's sponsor.[106] The FDA removed the requirement that mifepristone be dispensed in person at a healthcare facility (known as the in-person dispensing requirement) and allowed pharmacies to prescribe it for the first time.[107] This decision was in response to the mounting evidence that medication abortion can be safely and effectively prescribed without in-person care—data that surged during the COVID-19 pandemic when the in-person dispensing requirement was temporarily suspended by court order.[108] As described below, this temporary suspension transformed abortion care in the thirty-one states that did not have their own laws requiring in-person dispensation. Though the FDA decided to make these changes permanent in December, it otherwise maintained the REMS requirements that providers become certified to prescribe the drug and that patients be given extra informed consent; it also *added* a new requirement—that pharmacies dispensing mifepristone become certified.[109] As explored throughout this Article, these burdens are unnecessary and continue to impede access to early abortion care.

The following section describes how the FDA's history in regulating mifepristone has significantly reduced access to medication abortion and isolated abortion care outside of the traditional healthcare setting, perpetuating abortion stigma. Though some of these effects may start to change with the FDA's most recent modification of the REMS, its continued over-regulation of the drug perpetuates abortion exceptionalism.

---

made plans to provide such care through others" are eligible for certification. REMS, *supra* note 1.

[105]   *Id.*

[106]   Mifeprex (mifepristone) Information, Food & Drug Admin., (last updated Dec. 16, 2021), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information [https://perma.cc/SH6R-SP66] ("The revised REMS document and materials will be available within one day after approval on the FDA website," which has not yet occurred).

[107]   *Id.*

[108]   *See* FDA Letter, supra note 14, at 25-38.

[109]   *Id.* at 6-7.

C. How the FDA's Regulation of Mifepristone has Harmed Abortion Access

The mifepristone REMS has serious implications for abortion access. First, the certified provider requirement makes it difficult for abortion to occur in traditional healthcare settings—within the purview of any Primary Care Physician (PCP) or Gynecologist—and has instead kept it segregated to abortion and family planning clinics. Isolating abortion care to clinics creates unnecessary stigma and logistical barriers. These barriers were especially pronounced in the era of the in-person dispensing requirement, where abortion patients were required to travel to clinics to pick up their prescription, even though clinics are few and far between in many states. The FDA's new pharmacy certification requirement similarly prevents medication abortion from being treated like regular healthcare. Second, until very recently, the REMS prevented a pure model of telemedicine abortion from coming to fruition. In fact, it was only due to the efforts of researchers during the COVID-19 pandemic, who meticulously documented the safety and efficacy of remote abortion provision when a court temporarily suspended the in-person dispensing requirement, that the FDA decided to lift it.[110] Though the mifepristone REMS is not the only factor limiting early abortion access—state abortion laws also play an important role—the REMS is a major barrier that must be addressed in order to see significant improvements in access.

1. *Segregating Abortion Care Outside of the Traditional Healthcare Setting*

The REMS keeps abortion separate from traditional healthcare by making it difficult or impossible for patients to obtain mifepristone through their regular pharmacy after an appointment with their regular provider.[111] It is true that OBGYNs and PCPs could apply for certification to dispense mifepristone,[112]

---

[110] The FDA refused to suspend the mifepristone REMS during the pandemic, as it has done for other medications. *See* U.S. DEP'T OF HEALTH & HUM. SERVS., FOOD & DRUG ADMIN., CTR. FOR DRUG EVALUATION & RSCH., CTR. FOR BIOLOGICS EVALUATION & RSCH., POLICY FOR CERTAIN REMS REQUIREMENTS DURING THE COVID-19 PUBLIC HEALTH EMERGENCY: GUIDANCE FOR INDUSTRY AND HEALTH CARE PROFESSIONALS 7 n.13 (2020), https://www.fda.gov/media/136317/download [https://perma.cc/3JUP-T3AV] (suspending multiple REMS for public health reasons, but leaving in-person dispending requirements in place); FDA v. ACOG, 141 S.Ct. 578, 579 (2021) (Sotomayor, J., dissenting) (noting that mifepristone was subject to disparate treatment by the agency).

[111] *See* REMS, *supra* note 1.

[112] Almost all physicians are qualified to seek certification. *See id.*

Pet. Ref. 864

and would likely obtain certification if they tried, but the practical barriers may be as effective as a prohibition.[113] Unlike most drugs, where physicians are granted the power to prescribe noncontrolled substances through their medical license, doctors must affirmatively seek certification to prescribe mifepristone, a noncontrolled substance.[114] Research from other settings confirms the psychological reality that simply requiring an affirmative opt-in can discourage behavior.[115] This makes sense: opting in requires providers to commit their time and energy to filling out the certification paperwork.

But opting into prescribing *mifepristone* also comes with unique risks to providers that make it even less likely they would choose to commit the time and resources in applying for certification. Abortion providers have long faced stigma, harassment, and violence. In 2019, ninety-two abortion providers experienced death threats; 1,507 experienced trespassing; and 3,123 experienced hate mail or harassing phone calls.[116] There have also been eleven murders and six attempted murders of abortion providers since 1977.[117] Certification creates a list of providers who offer abortion care. And though the drug manufacturers presumably work hard to keep that list confidential, doctors reasonably worry that their certification as a mifepristone prescriber could get leaked, subjecting them to this harassment or violence.[118] Some doctors might be willing to provide abortions, but are hesitant to affirmatively identify as an abortion provider given the risks that come with that designation. For this reason, becoming certified to prescribe mifepristone is categorically different than seeking certification to prescribe less stigmatized drugs that are subjected to a simi-

---

[113]  *See* Jones & Jerman, *supra* note, at 6 (noting the lack of physician offices that provide abortion care).

[114]  *See* REMS, *supra* note 1.

[115]  *The Opt-Out Option*, Ass'n for Psych. Sci. (Sept. 13, 2013), https://www.psychologicalscience.org/news/minds-business/the-opt-out-option.html [https://perma.cc/S4DX-RUGK]; Alpha's Path, *Opt-in vs. Opt-out Psychology*, Medium (Apr. 25, 2019), https://medium.com/@alphaspath/opt-in-vs-opt-out-psychology-61b974e39ee2 [https://perma.cc/CQD8-SW8N].

[116]  NAF Releases 2019 Violence & Disruption Statistics, Nat. Abortion Fed., (July 30, 2020), https://prochoice.org/naf-releases-2019-violence-disruption-statistics/ [https://perma.cc/L5ZX-GXH2].

[117]  *Id.*

[118]  Mifeprex REMS Study Group, *supra* note 35, at 792 ("[T]he expense and hassle of maintaining drug inventories as well as reluctance to be included on a list of certified abortion providers—understandable, given the long history of harassment and violence—may discourage some otherwise willing clinicians from offering medical abortion at all.").

lar ETASU—that certification process would be less discouraging because it does not also come with these unique risks.[119]

Moreover, before December 16, 2021, the burdens of certification were perpetuated by the in-person dispensing requirement, which forced providers to also dispense the drug themselves instead of relying on pharmacies. This created logistical barriers that were difficult to overcome even if providers were willing to face the hassle and anxieties associated with certification:

> Physicians lack the setup, time and training to manage drug inventory, including maintaining stock and ensuring that expired medicines are not released. Few doctors are likely to be willing to stock this expensive medication, reported by the manufacturer to cost $300 per dose.[120] Physicians' offices are not usually engaged in retail sales and may not have the infrastructure to sell a medication, if sales are needed to dispense it.[121]

In other words, because most physicians did not have the capability or infrastructure to sell and dispense medication, even if they became certified, they would not be able to dispense it themselves, as the REMS required.[122]

Forcing certified providers to dispense the medication themselves also imposed financial risks—physicians would have to buy the medication themselves and then eat the cost if the drug expired before a woman requested it.[123] Predicting demand would be especially difficult given that many providers may not feel comfortable advertising that they offer this service, so even if they were certified to prescribe mifepristone and had

---

[119]   For instance, thalidomide—a drug used to treat multiple myeloma and leprosy—requires certification to prescribe because it can cause fatal birth defects James H. Kim & Anthony R. Scialli, *Thalidomide: The Tragedy of Birth Defects and the Effective Treatment of Disease*, 122 TOXICOLOGICAL SCIS. 1, 1–2 (2011). But because it treats multiple myeloma and leprosy, stigma is not an additional barrier. *Thalomid REMS*, FDA, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Thalomid_2017-06-27_REMS_Document.pdf [https://perma.cc/G9HL-YYCV].

[120]   Note: the cost of mifepristone has recently decreased after the introduction of a generic. *See* Anna North, *America's First Generic Abortion Pill, Explained*, VOX (Aug. 20, 2019), https://www.vox.com/identities/2019/8/20/20750226/abortion-pill-mifepristone-pregnancy-genbiopro-mifeprex-generic [https://perma.cc/P2Q2-UQLQ] (noting that the producer of the generic version of Mifeprex expected that the introduction of the generic to the market would lead prices to decrease).

[121]   Wendy V. Norman & Judith A. Soon, *Requiring Physicians to Dispense Mifepristone: An Unnecessary Limit on Safety and Access to Medical Abortion*, 188 CANADIAN MED. ASS'N J. E429, E429 (2016).

[122]   *Id.*

[123]   DAVID S. COHEN & CAROLE JOFFE, OBSTACLE COURSE: THE EVERYDAY STRUGGLE TO GET AN ABORTION IN AMERICA 223 (2020).

the capacity to dispense it, their patients may not request it frequently enough to justify having it in stock. It would have been entirely reasonable for doctors to decide they either did not want, or could not handle, these extra administrative burdens.[124] Studies show that more physicians would be willing to become certified to prescribe mifepristone if the drug could be distributed as almost all other drugs—through a pharmacy.[125]

The fact that the FDA recently removed the in-person dispensing requirement and allowed pharmacies to dispense mifepristone is an important step forward. But its decision to impose a certification requirement on pharmacies will only duplicate the harmful effects associated with the provider certification requirement, making it unlikely that the average pharmacy will opt into carrying the drug. Similar to the concerns of providers, pharmacies with physical storefronts might worry about vandalism, arson, or threats to their employees if their certification status becomes known.[126] The fact that pharmacies are business entities creates additional considerations. The antiabortion movement is known to stage boycotts, which could harm pharmacies' business interests.[127] And unlike individual providers, who might be willing to face some of the risks of certification due to a deep moral conviction about the necessity of abortion, pharmacies will only endure these risks if they are outweighed by financial benefits. Certainly, some pharmacies, especially mail-order pharmacies, will be incentivized to participate and take advantage of this new business, but it is less likely that the big corporate chains most Americans rely on[128] will opt in. Indeed, as this Article was

---

[124]   By simply allowing mifepristone to be distributed by a pharmacy, it is estimated that "the number of medication abortion providers among ob-gyns in the United States would likely increase from less than one-quarter of these physicians to 31 percent." *Id.*

[125]   *Id.* In a recent study, forty-three percent of internal medicine primary care providers believed medication abortion was within their scope of practice and were interested in offering it. Tierney Wolgemuth et al., *Perspectives of Internal Medicine Physicians Regarding Medication Abortion Provision in the Primary Care Setting*, 104 CONTRACEPTION 420, 421 (2021).

[126]   NAF Releases 2019 Violence & Disruption Statistics, *supra* note 116.

[127]   *See* Cynthia Greenlee, A Short History of Abortion-Related Boycotts, Rewire News Group (May 23, 2019), https://rewirenewsgroup.com/article/2019/05/23/a-short-history-of-abortion-related-boycotts/ [https://perma.cc/L6EY-HYW2].

[128]   Cory Stern, CVS and Walgreens are completely dominating the US drugstore industry, Yahoo (July 29, 2015), https://www.yahoo.com/entertainment/s/cvs-walgreens-completely-dominating-us-211840229.html [https://perma.cc/A5CS-ZRUS].

coming to press, Walgreens announced that it would not seek certification.[129]

Though these rules are technical, they have a big impact on access to early abortion. First, because the mifepristone REMS makes it difficult for average healthcare providers to prescribe medication abortion, there are fewer providers to provide abortion care. Thus, it can be more difficult for people to find a provider and more difficult for the small number of providers to meet the demand.[130] As discussed in more depth in Section IV, this is an especially important concern as we face the potential end of *Roe v. Wade*, where states with abortion-friendly policies may need to dramatically increase their number of abortion providers to meet the increase in demand from out-of-state patients.

Second, the certification requirements effectively isolate abortion care into clinics outside of the traditional healthcare system because the REMS disincentivizes regular providers from offering this care. And as a result, the vast majority of certified providers are those that already have an abortion practice at abortion and family-planning clinics.[131] As of 2017, it was estimated that only 261 physician offices in the United States offered abortion services (providing only 1% of abortions[132]), while abortion and family planning clinics provide 95% of abortions.[133] The remainder of abortions occur in hospitals.[134] The removal of the in-person dispensing requirement will likely lead to more physician offices providing abortions, but eliminating the REMS entirely would certainly lead to more. Though we have yet to see the effects of the pharmacy certification requirement, we can expect that the certification process will similarly disincentivize traditional pharmacies from dispensing abortion medication—again, isolating abortion care outside of traditional healthcare settings.

This isolation of abortion care was particularly problematic when patients were required to pick up the medication in per-

---

129   Cynthia Koons, *The Abortion Pill Is Safer Than Tylenol and Almost Impossible to Get*, BLOOMBERG (Feb. 17, 2022), https://www.bloomberg.com/news/features/2022-02-17/abortion-pill-mifepristone-is-safer-than-tylenol-and-almost-impossible-to-get.

130   *See* David S. Cohen & Krysten Connon, Living in the Crosshairs: the Untold Stories of Anti-Abortion Terrorism ix–x (2015) (noting that "partly because abortion providers are not safe, there are very few abortion providers in the United States").

131   *See* Jones & Jerman, *supra* note 6, at 6.

132   Jones & Jerman, *supra* note 6, at 16.

133   *Id.* at 9.

134   *Id.* at 16.

son, meaning they needed to travel to a clinic.[135]  Some states have only a handful of clinics left—five states (as of 2017) only had one[136]—meaning that women in those states would often need to travel long distances to get their medication.  Long travel often required women to pay extra travel costs, find childcare, and miss work, in addition to facing harassment from protesters.[137]  Given that three quarters of abortion patients are low income, these costs made abortion much more difficult to access.[138]  This physical separation from the rest of the healthcare system also contributes to abortion stigma.[139]

The REMS is not the only barrier that might prevent interested providers from prescribing mifepristone.  Physicians would also need to become acquainted with the state laws governing abortion, which apply to medication abortion.  For instance, they must abide by state mandated waiting periods and disclosures.[140]  These barriers, however, can be fixed with physician outreach and education, while the REMS and similar state laws impose logistical challenges that are more difficult to combat.  The stigma associated with providing abortion might be more difficult to overcome, but allowing providers to prescribe mifepristone as any other drug—i.e., without becoming certified and with dispensing from traditional pharmacies—would certainly help assuage fears of harassment.

## 2. *Prohibiting Telemedicine for Abortion*

Another significant barrier associated with the mifepristone REMS is that until very recently, it prevented a pure model

---

135   *See* Elizabeth Raymond et al., *TelAbortion: Evaluation of a Direct to Patient Telemedicine Abortion Service in the United States*, 100 CONTRACEPTION 173, 174 (2019).

136   Jones & Jerman, *supra* note 6, at 17.

137   Raymond et al., *supra* note 135, at 174.

138   *Abortion Patients Are Disproportionately Poor And Low Income*, GUTTMACHER INST. (May 9, 2016), https://www.guttmacher.org/infographic/2016/abortion-patients-are-disproportionately-poor-and-low-income [https://perma.cc/9KJQ-MUL3].

139   CAROL SANGER, ABOUT ABORTION: TERMINATING PREGNANCY IN TWENTY-FIRST-CENTURY AMERICA 22–23 (2017) ("A network of rules whose purpose is to persuade pregnant women that what they are doing is wrong can make securing an abortion feel abnormal and crime-like.  Clinics are isolated from the regular medical facilities that provide most other forms of health care.").

140   *See generally, An Overview of Abortion Laws*, GUTTMACHER INST. (May 1, 2021), https://www.guttmacher.org/state-policy/explore/overview-abortion-laws?gclid=EAIaIQobChMIvY6L66u-6gIVIfC1Ch06UAHoEAAYA SAAEgJ6UPD_BwE# [https://perma.cc/P2JU-KBEY] (giving an overview of abortion laws in the United States).

Pet. Ref. 869

of telemedicine from coming to fruition.[141] As discussed in more depth in Section IV, abortion will become remarkably more accessible when abortion patients can meet with a provider remotely from home and receive the abortion medication by mail.[142]

Over the course of the COVID-19 pandemic, telemedicine for abortion care quickly changed from a future dream to an urgent necessity.[143] Not only might women delay an abortion to avoid an infection risk in a clinic, but for a while, some women were entirely unable to access clinic-based care.[144] The pandemic made travel much more difficult, especially for those dependent on public transportation.[145] And many clinics closed temporarily, either due to state orders or because providers could not come in; others dramatically reduced capacity to try to reduce infection risk, leading to long wait times that caused woman to pass the ten-week mark entirely.[146] Despite these hardships, the REMS demanded in-person pickup.

Women of color, rural women, and low-income women are always disproportionately harmed by disruptions to abortion care, but this was especially pronounced in the pandemic.[147] Not only were these women less able to afford the expense and hurdles of long-distance travel to an abortion clinic, but they were at much greater risk of contracting and dying of COVID-19 to do so: "[T]hree-quarters of abortion patients have low incomes, making them more likely to rely on public transporta-

---

[141]   Megan K. Donovan, *Improving Access to Abortion Via Telehealth*, 22 GUTTMACHER POL'Y REV. 23, 26 (2019). The REMS allowed abortion providers to use a limited telemedicine model, where patients who are physically present at a clinic can visit with a doctor who is not physically present via videoconference. Julia E. Kohn et al., *Medication Abortion Provided Through Telemedicine in Four U.S. States*, 143 OBSTETRICS & GYNECOLOGY 343, 344 (2019); Donovan, *supra* note 141, at 24 (noting that this model exists in at least ten states).

[142]   *See* COHEN & JOFFE, *supra* note 123, at 222.

[143]   *See* Laurie Sobel, Amrutha Ramaswamy, Brittni Frederiksen & Alina Salganicoff, *State Action to Limit Abortion Access During the COVID-19 Pandemic*, KAISER FAM. FOUND. (Aug. 10, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/state-action-to-limit-abortion-access-during-the-covid-19-pandemic/ [https://perma.cc/6QWV-JTZ7] ("[A]ccess is further challenged by difficulties traveling when a stay at home order is in effect, additional costs related to waiting periods and other delays, the loss of jobs, the risk of exposure to the coronavirus, and the uncertain future of the COVID-19 outbreak.").

[144]   *See id.*

[145]   Greer Donley, Beatrice A. Chen & Sonya Borrero, *The Legal and Medical Necessity of Abortion Care Amid the COVID-19 Pandemic*, 7 J.L. & BIOSCIENCES 1, 13 (2020).

[146]   *Id.* at 2, 11.

[147]   *Id.* at 13; Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction at 28, ACOG v. FDA, 472 F. Supp. 3d (D. Md. 2020) (No. 8:20-cv-01320-TDC).

Pet. Ref. 870

tion to get to a clinic to pick up their medication. Such patients must bear further risk of exposure while they travel, sometimes for several hours each way, to clinics often located far from their homes."[148] Given that "COVID-19's mortality rate is three times higher for Black and Hispanic individuals than non-Hispanic White individuals," this additional and unnecessary exposure had life-threatening consequences.[149]

Telemedicine created an obvious solution to this problem—after all, there is no medical justification for making patients pick up their prescription in person. For these reasons, the U.K. started allowing the remote administration of abortion medication during the pandemic,[150] as other countries, like Australia, had implemented even before the pandemic began.[151] When the FDA under the Trump administration temporarily suspended the in-person requirements of other medications' REMS, including opioids, but refused to do the same for mifepristone,[152] a medical organization sued the FDA and won a preliminary injunction. That injunction meant that for the first time, many Americans began to receive fully remote abortion care.[153] Though the Supreme Court eventually reinstated the in-person dispensing requirement,[154] in the meantime, researchers collected data demonstrating that there was no increased incidence of adverse events when the in-person dispensing requirement was suspended. As a result, the Biden administration decided to temporarily, and then permanently, remove the in-person dispensing requirement.[155]

The imposition of a REMS is a dramatic tool to ensure risky drugs are prescribed and dispensed in the safest manner possible. The next section explores whether mifepristone is risky enough to warrant a REMS, and if not, whether the harms of the REMS outweigh any benefits. It concludes that mifepristone fails to meet the statutory criteria for a REMS because the

---

[148]   FDA v. ACOG, 141 S.Ct. 578, 582 (2021) (Sotomayor, J., dissenting).

[149]   *Id.*

[150]   Elizabeth C. Romanis, Jordan A. Parsons, & Nathan Hodson, *COVID-19 and Reproductive Justice in Great Britain and the United States: Ensuring Access to Abortion Care During a Global Pandemic*, 7 J.L. & BIOSCIENCES 1, 8 (2020).

[151]   Paul Hyland, Elizabeth G. Raymond & Erica Chong, *A Direct-to-Patient Telemedicine Abortion Service in Australia: Retrospective Analysis of the First 18 Months*, 58 AUSTL. & N.Z. J. OBSTETRICS & GYNECOLOGY 335, 336 (2018).

[152]   *See* POLICY FOR CERTAIN REMS REQUIREMENTS DURING THE COVID-19 PUBLIC HEALTH EMERGENCY, *supra* note 110, at 7 n.13; *ACOG*, 141 S. Ct. at 579 (Sotomayor, J., dissenting) (noting that the FDA subjected mifepristone to disparate treatment).

[153]   *See* infra Section IV.

[154]   *ACOG*, 141 S. Ct. at 578.

[155]   *See* FDA Letter, *supra* note 14, at 25-38.

Pet. Ref. 871

benefits of the drug outweigh the risks even without any distribution limitations.

## II
### THE MIFEPRISTONE REMS IS UNNECESSARY, HARMFUL, AND IMPROPER UNDER THE STATUTE

The mifepristone REMS has come under increasing attack in recent years.  Many physician organizations, including the American Medical Association, the American College of Obstetricians and Gynecologists (ACOG), and the American Academy of Family Physicians, have issued statements concluding that the REMS serves no medical purpose.[156]  Below, I argue that these negligible benefits are outweighed by significant harms.  Not only does the REMS reduce access to abortion throughout the United States—which can cause physical, mental, and emotional harms—and increase abortion stigma, it may also increase a reliance on self-managed abortion, where women buy the drug online without the assistance of a doctor.  The REMS is also impacting other aspects of reproductive healthcare.  Women suffering from a missed or incomplete miscarriage, for instance, have less access to the drug because of the REMS,[157] even though a combination of mifepristone and misoprostol is more effective at managing these miscarriages than misoprostol alone.[158]

### A.   The Benefits of the Mifepristone REMS are Negligible

As highlighted above, the safety data on mifepristone is extensive.  The FDA has been tracking adverse events closely since the drug was approved in 2000.  According to the drug's label, which was last modified in 2016, 0.03-0.5% of women

---

[156]   *Improving Access to Mifepristone for Reproductive Health Indications*, ACOG (June 2018), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications [https://perma.cc/VJ53-X8YJ]; Letter to the FDA, AAFP (Mar. 25, 2020), https://www.aafp.org/dam/AAFP/documents/advocacy/legal/administrative/LT-FDA-REMSFlexibility-032520.pdf [https://perma.cc/6GCF-GB9J]; *Mifepristone*, AMA POL'Y (2018), https://policysearch.ama-assn.org/policyfinder/detail/mifepristone?uri=%2FAMADoc%2FHOD.xml-H-100.948.xml [https://perma.cc/XF9A-JQNN].

[157]   *See* Amanda Allen & Cari Sietstra, *Miscarriages Are Awful, and Abortion Politics Make Them Worse*, N.Y. TIMES (June 22, 2021), https://www.nytimes.com/2021/06/22/opinion/miscarriage-abortion.html [https://perma.cc/N79Y-3L3X].

[158]   Divyah Nagendra et. al., *Cost-effectiveness of Mifepristone Pretreatment for the Medical Management of Nonviable Early Pregnancy: Secondary Analysis of a Randomized Trial*, JAMA NETWORK OPEN 1, 7 (2020).

Pet. Ref. 872

who took mifepristone needed a blood transfusion, 0.2% of women experienced sepsis, and 0.04-0.6% of women needed hospitalization.[159]  The risk that someone who had taken mifepristone would make a visit to the ER was slightly higher, at 2.9-4.6%.[160]  These adverse events are all treatable without any permanent issues.[161]  FDA's website notes that "[a]s of December 31, 2018, there were reports of 24 deaths of women associated with Mifeprex since the product was approved in September 2000"[162] compared to 3.7 million women who had taken the drug.[163]  However, these "adverse events cannot with certainty be causally attributed to mifepristone."[164]  There is some reason, for instance, to believe that at least eleven of the deaths were unrelated to the drug.[165]  But even assuming mifepristone caused all twenty-four deaths, the risk of death from the drug would be 0.65 deaths per 100,000 (or 0.00065%).[166]

The adverse events listed above are serious and should not be minimized, but all drugs have some risk of serious adverse events, and the vast majority of them are not subject to a REMS.  For instance, phosphodiesterase type-5 inhibitors, which include Viagra, have a fatality rate of four deaths per 100,000, which is roughly six times higher than mifepristone, yet it is not subject to a REMS.[167]  Penicillin's fatality rate is two deaths per 100,000, roughly three times higher than mifepristone, but again, it is not subject to a REMS.[168]  And drugs with similar risks, like anti-coagulants, are available at all pharmacies without a REMS.[169]  Finally, the background risk associated with the alternative—carrying the pregnancy to term—is also much higher: "the pregnancy related mortality

---

159   *Label for Mifeprex (mifepristone) tablets*, FDA 8, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf [https://perma.cc/Z53F-2SYL].

160   *Id.*

161   Mifeprex REMS Study Group, *supra* note 6, at 791.

162   *Questions and Answers on Mifeprex, supra* note 20.

163   *Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018*, FDA, https://www.fda.gov/media/112118/download [https://perma.cc/X5UD-B246].

164   *Questions and Answers on Mifeprex, supra* note 20.

165   *Analysis of Medication Abortion Risk and the FDA report, "Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018"*, ADVANCING NEW STANDARDS IN REPROD. HEALTH (April 2019), https://www.ansirh.org/sites/default/files/publications/files/mifepristone_safety_4-23-2019.pdf [https://perma.cc/65WV-YRM4].

166   *Id.*

167   *Id.*

168   *Id.*

169   Mifeprex REMS Study Group, *supra* note 6, at 792.

Pet. Ref. 873

ratio is eighteen deaths per 100,000 live births, and it is even higher for Black women—forty deaths per 100,000 live births."[170]

Moreover, it is worth noting that the FDA approved mifepristone without a REMS under the brand name Korlym when used to treat Cushing's Syndrome, a condition related to exposure to excessive amounts of the hormone cortisol.[171] Though the agency's risk-benefit calculus will inevitably differ when the same drug is used to treat a different condition, the risks are larger when mifepristone is used for Cushing's Syndrome. "Korlym is taken in higher doses, in a chronic, daily fashion unlike the single 200 mg dose of Mifeprex" that is used for abortion; as a result, "the rate of adverse events with Mifeprex is much lower."[172] Nevertheless, patients can buy Korlym through a specialty pharmacy and have it delivered directly to their home.[173]

One could always speculate that mifepristone's safety record is so good *because of* the REMS, and therefore, the REMS is necessary. But at least with the in-person dispensing requirement, data has proved the opposite. For instance, in 2019, a team of researchers published a study in American women showing that medication abortion was safe and effective with telehealth.[174] A similar study was conducted on over 1,000 women in Australia with similar results: the medication was effective at ending the pregnancy in 96% of the patients, 3% needed a procedure to finish the abortion, and 3% were admitted to a hospital.[175] This data supports the experiences in other countries, like Mexico, Australia, and parts of Canada, where mifepristone is safely filled by pharmacists without an in-person appointment.[176] And most recently, data collected when the in-person dispensing requirement was temporarily suspended demonstrated that there were no increases in adverse events.[177]

---

[170] *Analysis of Medication Abortion Risk and the FDA report, supra* note 165.

[171] *Improving Access to Mifepristone for Reproductive Health Indications, supra* note 156; CTR. FOR DRUG EVALUATION & RSCH., *supra* note 99, at 10.

[172] CTR. FOR DRUG EVALUATION & RES., *supra* note 99, at 10.

[173] *Id.*

[174] *See* Raymond et al., *supra* note 135, at 175.

[175] Hyland, Raymond, & Chong, *supra* note 151, at 337–38.

[176] Daniel Grossman & Philip Goldstone, *Mifepristone by Prescription: A Dream in the United States but Reality in Australia*, 92 CONTRACEPTION 186, 186 (2015); Sarah Raifman, Megan Orlando, Sally Rafie, & Daniel Grossman, *Medication Abortion: Potential for Improved Patient Access Through Pharmacies*, 58 J. AM. PHARMACIST ASS'N 377, 379–80 (2018).

[177] *See* FDA Letter, *supra* note 14.

These results are not surprising given that the REMS is not actually correlated with any of mifepristone's safety risks. First, the requirement (now removed) that a woman obtain the drug from a medical facility does nothing to reduce her risk of hemorrhage, infection, or incomplete abortion, all of which would all take place at home.[178]  It is worth noting that the FDA only subjects sixteen other drugs (of roughly 20,000 FDA-regulated drugs) to an ETASU that requires a patient to obtain a medication in a clinic.[179]  Of those sixteen drugs, all must be taken in the presence of a doctor because the drug requires intravenous administration, could cause an immediate adverse reaction that a physician must monitor, or is highly addictive.[180]  None of those three justifications would apply to mifepristone, which is a single-use drug, administered by the patient, that does not cause immediate adverse events.  It is for this reason that ACOG concluded that the in-person dispensing requirement is "medically unnecessary and illogical on its face: it requires patients to obtain a pill only in clinical settings, even when they are not receiving any clinical services at that time and will take the medicine at home without clinical supervision."[181]

Second, because almost any provider could become certified to prescribe mifepristone, the certified provider requirement is largely "an empty formality,"[182] aimed largely at discouraging mifepristone's provision than credentialling providers.  Conservative states have often pointed to the fact that any healthcare provider can become certified to prescribe mifepristone as evidence that additional credentialing is necessary when passing state abortion laws.  For instance, in a recent abortion case before the Supreme Court, *June Medical*, Louisiana criticized the abortion clinic for hiring an ophthalmologist and radiologist to provide medication abortion.[183]

---

178   *See* Mifeprex REMS Study Group, *supra* note 35, at 792.

179   Plaintiffs' Motion for Summary Judgement at 12–13, 29, Chelius v. Becerra sub nom. Chelius v. Azar, No. 1:17-cv-00493-JAO-RT 11–12 (Nov. 27, 2019); FDA v. ACOG, 141 S. Ct. 578, 579 (2021) (Sotomayor, J., dissenting).

180   Plaintiffs' Motion for Summary Judgement, at 12–13.

181   Plaintiff's Memorandum of Law in Support of Motion for Preliminary Injunction at 25, ACOG v. FDA, 472 F. Supp. 3d (D. Md. 2020) (No. 8:20-cv-01320-TDC).  The ACOG continued, "[t]here is no other drug that the FDA treats in this manner . . . and for evident reason: it plainly serves no medical interest to dictate where a patient is standing when handed a pill she will put in her pocket to swallow later." *Id.* at 26.

182   Mifeprex REMS Study Group, *supra* note 35, at 793.

183   June Med. Servs. L.L.C. v. Russo, 140 S. Ct. 2103, 2172 (2020) (Gorsuch, J., dissenting) ("Clinics have even hired physicians whose specialties were unrelated to abortion—including a radiologist and an ophthalmologist.").

Pet. Ref. 875

This is not to suggest these providers cannot adequately provide medication abortion—the opposite—but to note that any healthcare provider can meet the certified provider requirement and safely provide these services. The requirement therefore provides no independent credentialing function outside of a license to practice and a plan for dealing with emergencies, accomplishing nothing more than limiting the number of providers offering early abortion care. Though we do not yet know what the pharmacy certification requirement will contain, one can suspect that it will be subject to the same criticism.

The final component of the mifepristone REMS—that patients must sign a Patient Agreement Form—is also unnecessary given that medical ethics requires providers to counsel patients on the risks and benefits of all medications, and tort law provides recourse when they fail to do so. Even the FDA's own scientists recommended removing the Patient Agreement Form in 2016 because it was duplicative of informed consent.[184] Though this requirement has a much less significant impact on abortion access, it is still exceptional and redundant. Taken together, the mifepristone REMS confers marginal, if any, benefits to patients. If the REMS did not create significant harms, it may not matter that the REMS is unnecessary, but as discussed below, the harms are substantial.

## B.   The Harms of the Mifepristone REMS are Large

The most significant harm associated with the mifepristone REMS is the reduced access to early and safe abortion. Such reduced access leads to delays in seeking care, which can force patients to receive a more expensive and risky surgical abortion procedure, increase their reliance on self-managed abortion, and even risk the possibility of being timed out of receiving abortion care altogether by exceeding the gestational age limits of state abortion bans. Women who are unable to get an abortion must experience the much greater risks of childbirth and are more likely to have mental and physical health issues over time. These harms disproportionately fall on poor women, rural women, and women of color.

As noted in Section I.C, the certification and in-person dispensing requirements made it undesirable for physicians who do not typically provide abortions to prescribe and dispense mifepristone. The result was that only 261 physician offices

---

[184]   Joint Stipulation of Facts at 13–14, Chelius v. Azar, No. 1:17-cv-00493-JAO-RT (D. Haw. Nov. 27, 2019).

Pet. Ref. 876

provided medication abortion in 2017, providing only 1% of abortions in the United States.[185] The only providers with an incentive to jump through the hoops of the mifepristone REMS are those at abortion and family planning clinics, which provide 95% of abortions in this country.[186] Thus, the REMS has contributed to the segregation of abortion care outside of traditional healthcare settings.

This reality meant that the overwhelming majority of women obtained an abortion at a clinic. But the number of clinics is steadily dropping, and six states only have one abortion provider left.[187] From 2011 to 2014, there were six percent fewer clinics in the United States; the numbers are starker in the South and Midwest, where the number of clinics had decreased thirteen and twenty-three percent respectively.[188] "In 2017, 95% and 94% of counties in the Midwest and the South, respectively, did not have a facility that provided abortion care."[189] As a result, many people do not live within 100 miles of a clinic.[190] When the in-person dispensing requirement was in effect, these long distances made abortion care even more expensive as patients needed to take time off work, procure childcare, and pay for travel costs.[191] "Given that 75% of abortion patients were poor or low-income in 2014, any additional barriers to abortion care—including travel and its associated costs, such as lost wages and expenses for child care, transportation and accommodations—may be significant for many women."[192] And "[e]ven people who live near a clinic may have difficulty attending in person due to scheduling conflicts, long wait times for appointments, the high cost of travel, child care, and lost wages, concerns about confidentiality, and anticipated harassment at clinics."[193]

---

[185]   Jones, Witwer & Jerman, *supra* note 6, at 16.

[186]   *Id.* at 14.

[187]   *Id.* at 3; Holly Yan, *These Six States Have Only One Abortion Clinic Left. Missouri Could Become the First with Zero*, CNN (June 21, 2019), https://www.cnn.com/2019/05/29/health/six-states-with-1-abortion-clinic-map-trnd/index.html [https://perma.cc/BXH5-DLZA].

[188]   Jones, Witwer & Jerman, *supra* note 6, at 3.

[189]   Erica Chong et al., *Expansion of a Direct-To-Patient Telemedicine Abortion Service in the United States and Experience During the COVID-19 Pandemic*, 104 CONTRACEPTION 43, 44 (2021).

[190]   Raymond et al., *supra* note 135, at 174.

[191]   *Id.*

[192]   Jenna Jerman, Lori Frohwirth, Megan L. Kavanaugh & Nakeisha Blades, *Barriers to Abortion Care and Their Consequences for Patients Traveling for Services: Qualitative Findings from Two States*, 49 PERSPS. IN SEXUAL AND REPROD. HEALTH 95, 95 (2017).

[193]   Raymond et al., *supra* note 135, at 174.

For these reasons, the REMS's effect of funneling abortion care into clinics—and until very recently, requiring patients to show up in person—caused some patients to delay abortion care, leading to a more complicated, risky procedure.[194] Each week an abortion is delayed increases the risk of death from the procedure by 38%.[195] Patients who must travel more than fifty miles to a clinic are more likely to seek an abortion in the second trimester, and those who must travel more than three hours to a clinic are more likely to need an abortion at or after twenty weeks.[196] Delayed abortions can also be more expensive and difficult to find: "If a first-trimester abortion is delayed until the second trimester, this would result in increased and perhaps prohibitive cost and access barriers, as second trimester abortions are more expensive, require more time (2-3 days), and have fewer providers able to perform them."[197] Consequently, "delays may ultimately impede women from having an abortion procedure entirely."[198] "For example, among a group of women denied an abortion because of gestational age limits, 85% reported procedure and travel costs as the primary reason for not obtaining an abortion elsewhere."[199]

When women are denied access to an abortion, it comes at a cost to their health. In the landmark Turnaway Study, researchers compared women who had been denied abortions from those able to obtain them. They found:

> Compared to women who received abortions, those who were denied abortion were more likely to experience financial distress that was sustained for years following the intended abortion. Women denied abortion also had higher rates of anxiety and stress, and lower self-esteem and life satisfaction in the short term, and were more likely to experience potentially life-threatening conditions associated with pregnancy such as preeclampsia and postpartum hemorrhage. These women were also more likely to report worse long-term physical health.[200]

---

194   THE NAT'L ACADS. SCIS., ENG'G, AND MED., THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES 10 (2018).

195   Linda A. Bartlett et al., *Risk Factors for Legal Induced Abortion–Related Mortality in the United States*, 103 OBSTETRICS & GYNECOLOGY 729, 731 (2004).

196   Rachel K. Jones & Jenna Jerman, *Characteristics and Circumstances of U.S. Women Who Obtain Very Early and Second-Trimester Abortions*, 12 PLOS ONE 1, 12 (2017); Diana Greene Foster & Katrina Kimport, *Who Seeks Abortions at or after 20 Weeks?*, 45 PERSPS. SEXUAL & REPROD. HEALTH 210, 212 (2013).

197   Donley, Chen & Borerro, *supra* note 145, at 11.

198   *Id.*

199   Jerman, Frohwirth, Kavanaugh & Blades, *supra* note 192, at 95.

200   Donley, Chen & Borerro, *supra* note 145, at 11 (describing results from the Turnaway study).

Pet. Ref. 878

And of course, the risks associated with pregnancy and birth are higher than abortion, so any woman denied an abortion increases her health risks, even if she doesn't suffer acute pregnancy-related conditions like pre-eclampsia.[201] This is especially true for Black women who experience maternal mortality rates three to four times higher than those of white women.[202]

By contrast, if mifepristone could be dispensed by average pharmacies, which are much more prevalent throughout the United States than clinics, patients could more easily access early abortion without delays. For instance, when the government in Australia started allowing pharmacies to dispense mifepristone, early abortion access increased, especially in rural areas.[203] Early research in the United States has shown that more OBGYNs would prescribe mifepristone if it could be filled at a pharmacy.[204] Though the FDA has decided to allow certified pharmacies to prescribe it, its addition of a pharmacy certification requirement makes it unlikely that the pharmacies most Americans rely on (Walgreens and CVS) will choose to participate, reducing its positive impact.[205] Nevertheless, telemedicine and medication-by-mail, which were also recently allowed, dramatically improve access to medication abortion, reducing delays in care.

Another underreported consequence associated with difficulties accessing abortion is that women will turn to self-managed abortion.[206] "[C]onsequences of encountering barriers to abortion care" include women "consider[ing] ending the pregnancy on their own, either with medications (misoprostol, herbs or home remedies) or by blunt-force physical trauma."[207] Self-managed abortion occurs when "when a person ends a pregnancy outside the medical care setting, typically by ordering abortion pills online."[208] Though recent data, discussed in greater detail in Section IV, suggests that self-managed medi-

---

201   For instance, the risk of death is approximately fourteen times higher for birth than abortion. Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 OBSTETRICS & GYNECOLOGY 215, 215 (2012).

202   *Black Women's Maternal Health: A Multifaceted Approach to Addressing Persistent and Dire Health Disparities*, NAT'L P'SHIP FOR WOMEN & FAMS. (2018), https://www.nationalpartnership.org/our-work/health/reports/black-womens-maternal-health.html [https://perma.cc/7N3Z-FJU3].

203   Grossman & Goldstone, *supra* note 176, at 187.

204   COHEN & JOFFE, *supra* note 123, at 222–23.

205   *See* discussion accompanying notes 130-32.

206   Jones & Jerman, *supra* note 31, at 2.

207   Jerman, Frohwirth, Kavanaugh & Blades, *supra* note 192, at 98.

208   *The Availability and Use of Medication Abortion*, *supra* note 26.

cation abortion is safe in most contexts,[209] abortion care through a healthcare provider is still the gold standard and self-management can come with legal risks.

The rate of self-managed abortion has been increasing in recent years; though it is difficult to estimate the true number of these abortions, in 2017, eighteen percent of clinics "reported that they had seen one or more patients for a missed or failed abortion due to self-induction . . . , up from 12% in 2014."[210] "The majority of these facilities (54%) had seen only one or two such patients, but four facilities (all high-volume) reported 50 or more."[211] Unsurprisingly, self-managed abortion is more common in areas with fewer clinics and greater abortion restrictions: "Reports of self-managed abortion were highest in the South (25%) and the West (21%), compared with 10% in the Midwest and 14% in the Northeast."[212] The relationship between strict abortion laws and self-managed care is also supported by "a media analysis," which "found that interest in self-induced abortion—as measured via Google searches—was higher in states with restrictive abortion laws than in states without them."[213] Indeed, organizations that help women self-manage their abortions have reported a significant increase in requests from Texans since SB8 went into effect.[214]213

Self-managed abortion is not legal in the United States. The only legal way to obtain the FDA-approved medication abortion regimen is through the REMS protocol.[215] Even if the REMS were removed, legal use of mifepristone and misoprostol would still require the prescription of a provider unless the FDA approved them for over-the-counter use, which is not currently being considered and is a distant goal.[216]

---

209  *See infra* subpart IV.B.
210  Jones, Witwer & Jerman, *supra* note 6, at 8.
211  *Id.*
212  *Id.*
213  Jones & Jerman, *supra* note 31, at 2.
214  Tanya Basu, *Activists are helping Texans get access to abortion pills online*, MIT TECH. R. (Sept. 15, 2021), https://www.technologyreview.com/2021/09/15/1035790/abortion-pills-online-texas-sb8/ [https://perma.cc/4VV9-C785].
215  Catherine Shaffer, *REMS Violations Fines*, 27 NATURE BIOTECH. 1068, 1068 (2009). Abortions can be completed without mifepristone by simply using misoprostol, which is not subject to a REMS on its own. This is generally considered less effective and its legal use still requires a physician prescription. Nguyen Thi Nhu Ngoc et al., *Comparing Two Early Medical Abortion Regimens: Mifepristone+Misoprostol vs. Misoprostol Alone*, 83 CONTRACEPTION 410, 410 (2011).
216  Megan K. Donovan, *Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care*, 21 GUTTMACHER POL'Y REV. 41, 44 (2018) [hereinafter *Self-Managed Medication Abortion*].

Nevertheless, pregnant people have found ways to order these drugs online from international sources. In 2018, an international organization, Aid Access, began helping Americans access medication abortion through international pharmacies by mail with the assistance of a doctor.[217] A person who contacts Aid Access has an online consultation with a doctor abroad; if the physician decides the patient meets the criteria for medication abortion, the drugs will be prescribed, filled by a pharmacy in India, and mailed to the patient.[218] In 2018, over 11,000 U.S. women requested Aid Access's help, and the organization filled 2,500 of those requests.[219] The following year, 21,000 U.S. women requested care from Aid Access, and more than a third were provided medication.[220] On March 8, 2019, the FDA issued a warning letter to Aid Access that its actions violated the Food, Drug & Cosmetic Act.[221] Nevertheless, the organization has refused to stop offering its services to American women.[222]

Though self-managed medication abortion appears to be safe in most circumstances,[223] the FDA has in other contexts loosened regulations when those regulations caused consumers to seek care outside of the traditional healthcare system, presumably with greater health risks. For instance, when onerous FDA regulations created a risk that patients might attempt fecal transplants on their own outside of the medical setting, the FDA relaxed its regulations.[224]

There are some notable cases that highlight possible legal and medical risks when the medication is obtained without any physician involvement. For instance, in 2013, Purvi Patel purchased medication abortion online through a pharmacy in Hong Kong without any medical consultation.[225] Because

---

217   Jones, Witwer & Jerman, *supra* note 6, at 10.
218   Letter from Aid Access, to Thomas Christl, Director, Food & Drug Admin., 2 (May 16, 2019), https://aidaccess.org/en/media/inline/2019/5/16/19_05_16_gomperts_letter_and_exhibit_a.pdf [https://perma.cc/H536-Y9YD].
219   Jones, Witwer & Jerman, *supra* note 6, at 10; *Who Are We*, AID ACCESS, https://aidaccess.org/en/page/561 [https://perma.cc/QR3E-ELGT].
220   COHEN & JOFFE, *supra* note 123, at 226.
221   Warning Letter from Food & Drug Admin., to Aid Access (March 8, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/aidaccessorg-575658-03082019 [https://perma.cc/5L4N-AUZG].
222   Letter from Aid Access, *supra* note 218; *Who Are We, supra* note 219.
223   *See infra* subpart IV.B; Letter from Aid Access, *supra* note 218 (noting that Aid Access is not aware of any serious adverse event); Donovan, *Self-Managed Medication Abortion, supra* note 216.
224   *Id.*
225   Patel v. State, 60 N.E.3d 1041, 1043 (Ind. Ct. App. 2016).

Patel had underestimated the length of her pregnancy, the medication caused her to deliver a live baby at home, who died shortly after birth, and Patel needed urgent medical attention at the hospital.[226] Rare reports of similar cases have also emerged in recent years.[227] Some studies have suggested that patients' underestimation of a pregnancy's length is uncommon; for instance, only 1% of medication abortion patients who were certain that their last missed period had started less than seventy-eight days ago were proven wrong on ultrasound.[228] But still, the FDA would nonetheless prefer abortion to occur under the guidance of a U.S. doctor, and "there is widespread agreement that those attempting an abortion on their own should have access to a trusted provider if questions arise."[229] There is also the risk that the medication women are buying online could be fake or impure,[230] although this risk seems low.[231] Self-management as an option for abortion, therefore, should encourage the FDA to remove the REMS and make it easier for patients to access abortion from their regular providers.

Moreover, even if the health risks of self-managed abortion are small, there are serious legal risks. Purvi Patel was prosecuted in Indiana and sentenced to thirty years in prison for feticide and felony neglect of a minor.[232] She served two of those years before an appellate court invalidated part of her conviction and sentenced her to time served.[233] Jennie McCormack and Kenlissia Jones similarly used medication abortion to terminate pregnancies outside the ten-week window and were also prosecuted when they delivered a much older fetus.[234] And Jennifer Whalen was sentenced to eighteen months in jail after purchasing abortion medication for her

---

226    *Id.* at 1046–47.
227    *See Woman Who Took Abortion Pill Charged in Death of Fetus*, CBS NEWS (June 9, 2015), http://www.cbsnews.com/news/woman-who-took-abortion-pill-charged-in-death-of-fetus/ [https://perma.cc/28TE-ULB3].
228    Raymond, et al., *supra* note 135, at 363.
229    COHEN & JOFFE, *supra* note 123, at 228.
230    *See Warning, fake abortion pills for sale online!!*, WOMEN ON WAVES (last visited Nov. 7, 2021), https://www.womenonwaves.org/en/page/974/warning-fake-abortion-pills-for-sale-online [https://perma.cc/UR9K-Y4VM].
231    *See* Chloe Murtagh, Elisa Wells, Elizabeth G. Raymond, Francine Coeytaus & Beverly Winikoff, *Exploring the feasibility of obtaining mifepristone and misoprostol from the internet*, 97 CONTRACEPTION 287, 291 (2018) (finding no evidence that mifepristone and misoprostol products sold online were dangerous or ineffective).
232    *Patel*, 60 N.E.3d at 1044.
233    *Id.* at 1062.
234    *Woman Who Took Abortion Pill Charged in Death of Fetus*, *supra* note 227.

sixteen-year-old daughter online.[235] Of course, the legal risks associated with illegal use of medication abortion almost always impact poor women and women of color disproportionately.[236]

Finally, the REMS burdens not only abortion access, but also access to the best protocol for miscarriage management. A miscarriage occurs when a fetus or embryo dies independently in the womb.[237] Though the pregnant person's body typically expels the dead fetus or embryo, it can take time for the body to register the death, and thousands of women every year learn on ultrasound that their pregnancy has ended before having any symptoms of miscarriage.[238] In those cases, patients can choose whether they want to expedite the miscarriage with medical intervention or to wait for the miscarriage to end naturally, which can take weeks or longer.[239] Many patients understandably do not want to prolong their suffering or grief and opt for medical intervention.[240] Miscarriage management can occur surgically or with medication.[241] When patients choose medication, they are typically only given misoprostol, even though recent research suggests that the combination of mifepristone and misoprostol is more effective.[242] But because the REMS requires certification to prescribe mifepristone—and most OBGYNs are not certified—it is impossible for this regimen to be adopted into regular clinical care, harming people experiencing miscarriage as well as those who need abortion.[243] Part IV further explores the impact that using mifepristone for miscarriage could have on destigmatizing abortion care.

---

235   Emily Bazelon, *A Mother in Jail for Helping Her Daughter Have an Abortion*, N.Y. TIMES (Sept. 22, 2014), https://www.nytimes.com/2014/09/22/magazine/a-mother-in-jail-for-helping-her-daughter-have-an-abortion.html [https://perma.cc/SF67-ELUN].

236   Ushma D. Upadhyay, Nicole E. Johns, Alice F. Cartwright, & Tanya E. Franklin, *Sociodemographic Characteristics of Women Able to Obtain Medication Abortion Before and After Ohio's Law Requiring Use of the Food and Drug Administration Protocol*, 2.1 HEALTH EQUITY 122, 124 (2018).

237   *Missed or Incomplete Miscarriage*, MISCARRIAGE ASSN., https://www.miscarriageassociation.org.uk/information/information-on-coronavirus-covid-19/missed-or-incomplete-miscarriage-information-for-you/ [https://perma.cc/DG42-VBR3].

238   *Id.*

239   *Id.*

240   *Id.*

241   *Id.*

242   Schreiber et al., *supra* note 29, at 2162.

243   *Id.*; Allen & Sietstra, *supra* note 157.

Though the benefits of the mifepristone REMS are marginal at best, the risks are significant. As explored below, this suggests that mifepristone does not meet the statutory standard for imposing a REMS because the benefits of mifepristone outweigh the risks without one. And because the REMS is particularly burdensome on patients in rural or underserved areas and is not commensurate with how the agency treats similar drugs, it is especially unwarranted.

C.   Mifepristone Fails to Meet the Statutory Standard for a REMS

The FDA may demand a REMS only if it "determine[s] that . . . a [REMS] is necessary to ensure that the benefits of the drug outweigh the risks of the drug."[244] When the FDA issues a REMS with an ETASU as it has done with mifepristone, the standard is higher and requires the agency to determine that the drug "is associated with a serious adverse drug experience" and that the ETASU is necessary "to mitigate a specific serious risk listed in the labeling of the drug."[245] Furthermore, the statute requires that the ETASU be "commensurate with the specific serious risk listed in the labeling of the drug," "not be unduly burdensome on patient access to the drug, considering in particular . . . patients who have difficulty accessing health care (such as patients in rural or medically underserved areas)," and "conform with elements to assure safe use for other drugs with similar, serious risks."[246]

Given the safety and efficacy of mifepristone, it would be difficult for the FDA to conclude that mifepristone should be subject to any REMS—as demonstrated above, the REMS does not reduce the risks of the drug, so by definition, it cannot be necessary to "ensure that the benefits of the drug outweigh the risks."[247] The certification requirement serves no credentialing function, the patient agreement form is duplicative of informed consent, and the (recently removed) in-person dispensing requirement does nothing to prevent the risks of the drug that would occur at home.[248] Moreover, the benefits of mifepristone are larger than the risks even without a REMS. Mifepristone benefits women by helping them avoid the greater medical

---

[244]   21 U.S.C. § 355–1(a)(2).

[245]   *Id.* § 355–1(f)(1).

[246]   *Id.* § 355–1(f)(2).

[247]   *Id.* § 355–1(a)(2); *see* Raymond et al., *supra* note 135, at 176.

[248]   *See* Section II.A.

risks associated with pregnancy and childbirth.[249] This alone would ensure that the benefits of the drug outweigh the drug's much smaller risks and was the basis for the FDA's original approval. But even beyond those therapeutic benefits, mifepristone also helps women exercise their constitutional and human right to control the number and spacing of their children[250]—the deprivation of which leads to physical, mental, and financial challenges.[251] It therefore serves important secondary benefits, which the FDA may also be able to consider in its risk-benefit calculus.[252]

But even assuming a REMS could be appropriate, the FDA would surely fail to meet the statutory requirements of an ETASU. First, the restrictions are not "commensurate with the specific serious risks listed in the labeling of the drug."[253] As just described, the REMS requirements are divorced from the drug's risks.[254] Second, the ETASU for mifepristone does not "conform with [ETASU] for other drugs with similar, serious risks."[255] Other drugs with similar, serious risks, like misoprostol, are not subject to any REMS. Drugs that are riskier, like Viagra and penicillin, also do not have a REMS.[256] And much riskier drugs, like opioids, are subject to more lenient REMS.[257] Even though opioids are highly addictive and have caused tens of thousands of fatalities *per year* from overdoses, the opioid REMS only requires that opioid manufacturers offer

---

[249]   Mifeprex REMS Study Group, *supra* note 6, at 791.

[250]   Roe v. Wade, 410 U.S. 113 (1973); *see Reproductive Rights*, United Nations, https://www.un.org/en/development/desa/population/theme/rights/index.asp [https://perma.cc/G9PD-US7R].

[251]   *See* The Harms of Denying a Woman a Wanted Abortion Findings from the Turnaway Study, ANSRH, https://www.ansirh.org/sites/default/files/publications/files/the_harms_of_denying_a_woman_a_wanted_abortion_4-16-2020.pdf [https://perma.cc/JDN4-4AUP] (describing the findings from the Turnaway Study).

[252]   Though the FDA typically focuses on therapeutic benefits, Patricia Zettler has documented the FDA's recent trend of considering non-therapeutic benefits as well, including public health and cosmetic benefits. *See* Patricia J. Zettler, Margaret Foster Riley & Aaron S. Kesselheim, *Implementing a Public Health Perspective in FDA Drug Regulation*, 73 Food & Drug L.J. 221 (2018); Patricia J. Zettler, *The FDA's Power Over Non-Therapeutic Uses of Drugs and Devices*, 78 Wash. & Lee L. Rev. 379 (2021).

[253]   21 U.S.C. § 355–1(f)(2).

[254]   *See supra* Part II.

[255]   21 U.S.C. § 355–1(f)(2).

[256]   *See supra* Part II.

[257]   *Risk Evaluation and Mitigation Strategy (REMS) Document, Opioid Analgesic REMS Program*, U.S. Food & Drug Admin. (Sept. 2018), https://www.accessdata.fda.gov/drugsatfda_docs/rems/Opioid_Analgesic_2019_11_14_REMS_Document.pdf [https://perma.cc/8NY9-PMAC].

training to healthcare providers that prescribe opioids.[258]  The FDA acknowledges that "[t]here is no mandatory federal requirement that prescribers or other HCPs take the training and no precondition to prescribing or dispensing opioid analgesics to patients."[259]

But most importantly, the mifepristone REMS is "unduly burdensome on patient access to the drug," especially for "patients in rural or medically underserved areas."[260]  "Poor and low-income women and those who live in rural areas are often hit hardest by state restrictions that exacerbate long-standing inequalities in abortion access . . . ."[261]  Because clinics exist in urban areas, funneling abortion care through clinics creates extra burdens for rural women.  These burdens were especially pronounced with the in-person dispensing requirement, which forced rural women to travel long distances to pick up mifepristone; it also disproportionately harmed poor women, who struggled the most to afford the additional costs associated with travel and in-person care.[262]  It is well documented that travel time to an abortion or family planning clinic delays care and reduces access to abortion.[263]

Furthermore, the FDA's record for explaining the need for the REMS is thin.  The agency at has never provided a detailed explanation for how mifepristone meets the statutory definition for a REMS—i.e., how a REMS is necessary to ensure the benefits of the drug outweigh the harms.[264]  This might be an accident of history: the restrictions were first approved under a different statute before the REMS program existed, and then converted to a REMS in 2011.[265]  But ever since the REMS has been in place, the agency has required others to prove the requirements are unnecessary before removing them.  Though the burden is originally on the FDA to justify the imposition of a

---

[258]   *Id.*
[259]   *Opioid Analgesic Risk Evaluation and Mitigation Strategy (REMS)*, U.S. FOOD & DRUG ADMIN. (Sept. 2018), https://www.fda.gov/drugs/information-drug-class/opioid-analgesic-risk-evaluation-and-mitigation-strategy-rems [https://perma.cc/B6ZU-CSBY].
[260]   21 U.S.C. § 355–1(f)(2).
[261]   *Although Many U.S. Women of Reproductive Age Live Close to an Abortion Clinic, A Substantial Minority Would Need to Travel Far to Access Services*, GUTTMACHER INST. (Oct. 3, 2017), https://www.guttmacher.org/news-release/2017/although-many-us-women-reproductive-age-live-close-abortion-clinic-substantial [https://perma.cc/MB8U-99CC].
[262]   *Id.*
[263]   *See supra* subpart I.C.
[264]   *See* Joint Stipulation of Facts at 13–14, Chelius v. Azar, No. 1:17-cv-00493-JAO-RT (D. Haw. Nov. 27, 2019).
[265]   *See infra* Section I.

Pet. Ref. 886

REMS, once issued, the drug's sponsor and others bear the burden of proving there is an "adequate rationale" to modify the REMS.[266]  In 2021, when the agency concluded its reconsideration of the mifepristone REMS, it explained that it was retaining the certification and patient agreement form requirements because no new research has demonstrated that they could be removed safely.[267]  Similarly, the agency imposed a new pharmacy certification requirement because there was not sufficient evidence that retail pharmacies could safely dispense it.[268]  This burden shifting is problematic in the absence of an original justification that mifepristone's benefits can only outweigh its risks with a REMS.

This Section argued that the mifepristone REMS is improper, has few benefits, and contains significant harms.  It also demonstrated that the statutory basis for issuing a REMS, much less an ETASU, is not met.  So why would the FDA have required it?  Abortion exceptionalism.  Abortion exceptionalism is a term that first appeared in legal scholarship around 2012 and describes the phenomenon "in which abortion is singled out for more restrictive government regulation as compared to other, similar procedures."[269]  Linda Greenhouse and Reva Siegel have noted that abortion exceptionalism also involves "the notion that there is a special moral valence to abortion that, because it concerns the unborn, warrants special forms of health regulation not imposed on procedures of comparable risk."[270]  Abortion exceptionalism is not new, but it is underexplored in the context of the FDA.  I argue below that the FDA's

---

266   RISK EVALUATION AND MITIGATION STRATEGIES: MODIFICATIONS AND REVISIONS, GUIDANCE FOR INDUSTRY, FOOD & DRUG ADMIN. 12 (June 2020), https://www.fda.gov/media/128651/download [https://perma.cc/3NP7-D8XL].  The rationale may include, but is not limited to, the reason(s) why the proposed modification is necessary; the potential effect of the proposed modification on how the REMS addresses the serious risk(s) for which the REMS was required, on patient access to the drug, and/or on the burden on the health care delivery system; and other appropriate evidence or data to support the proposed change.  *Id.* The sponsor could also submit a modification request based on a new use of the drug—for instance, mifepristone's use in miscarriage management in addition to abortion. *Id.* at 12–13.

267   FDA Letter, *supra* note 14, at 22-24.

268   *Id.* at 34-35.

269   Ian Vandewalker, *Abortion and Informed Consent: How Biased Counseling Laws Mandate Violations of Medical Ethics*, 19 MICH. J. GENDER & L. 1, 3 (2012); *see also* Caitlin E. Borgmann, *Abortion Exceptionalism and Undue Burden Preemption*, 71 WASH. & LEE L. REV. 1047, 1048 (2014) ("'Abortion exceptionalism' is a term that has been used to describe the tendency of legislatures and courts to subject abortion to unique, and uniquely burdensome, rules.").

270   Linda Greenhouse & Reva B. Siegel, *Casey and the Clinic Closings: When "Protecting Health" Obstructs Choice*, 125 YALE L.J. 1428, 1448 (2016).

decision to institute the mifepristone REMS is a part of a larger pattern of bias from the agency that has harmed women's health. Though abortion is political, the FDA should not be. Rather, the agency should act according to its scientific mission and neutrally administer the statute to which it is bound.

III

THE FDA'S TROUBLING PATTERN OF DEVALUING WOMEN'S HEALTH

Though the mifepristone REMS may seem like an outlier, the FDA has a troubling history of implicit bias that harms women's sexual and reproductive health.

> [T]he FDA has shown particular vulnerability to sociopolitical influences on matters of women's health. The agency displays a number of biases that distort scientific analysis, from normative judgments about women's sexuality to a patronizing sense that women require heightened protection against the risks posed by otherwise effective drugs.[271]

Below, I highlight many instances in which the FDA has acted unusually with regard to women's sexual and reproductive health. Some of these instances were overturned by court order or statute; others were resolved only after public pressure mounted. In almost all cases, advocates attacked the FDA's decisions by showing the agency's unusual treatment compared to other products. Such comparisons can help uncover biases that may be hidden when any one decision is viewed in isolation.

A.   Plan B

The most famous instance of reproductive health bias at the FDA occurred in its regulation of Plan B. The FDA approved Plan B as emergency contraception in 1999.[272] Two years later, a group of sixty-six organizations petitioned the FDA to approve the drug for over-the-counter use.[273] Obtaining over-the-counter approval was vital for a time-sensitive drug like Plan B—without it, women and girls could only access Plan B after a doctor's appointment that resulted in a prescription. This extra step easily caused days of delays, threatening

---

271   Mara Sanders, *Sex, Drugs, and Advisory Committees: An Analysis of Pharmaceutical Industry Manipulation of FDA Vulnerability to Sociopolitical Influences on Matters of Women's Health*, 48 COLUM. HUM. RTS. L. REV. 149, 150 (2017).
272   Tummino v. Torti, 603 F. Supp. 2d 519, 522 (E.D.N.Y. 2009).
273   The Plan B sponsor also submitted a formal SNDA seeking the same over-the-counter approval. *Id.* at 526–27.

the efficacy of the medication.  Plan B is most effective when people take the drug within twenty-four hours (or, at most, three days) of unprotected sex.[274]

The FDA rejected the switch to over-the-counter, even though its experts recommended approval; this led to a Government Accountability Office (GAO) investigation, which found that the FDA's decision was atypical.[275]  In 2006, the FDA agreed to allow over-the-counter sale of Plan B but limited its approval to adult women "despite nearly uniform agreement among FDA scientific review staff that women of all ages could use Plan B without a prescription safely and effectively."[276] The manufacturer objected to the restriction that prevented women under eighteen from purchasing Plan B over-the-counter and sued the agency under the Administrative Procedures Act.

The first time this case made it to court, the Eastern District of New York found that the agency's decision with regard to Plan B was contaminated with "political considerations, delays, and implausible justifications."[277]  The court also determined that "the FDA's course of conduct regarding Plan B departed in significant ways from the agency's normal procedures regarding similar applications to switch a drug product from prescription to non-prescription use."[278]  In particular, the court was alarmed that the FDA disregarded an expert panel and its own staff, who had determined Plan B would be safe for women and girls of all ages over the counter.[279]  As a result, the court held that the FDA had acted arbitrarily and capriciously.[280]  The court remanded back to the agency to reconsider its decision regarding access to Plan B, noting that because the new Obama administration had replaced the FDA Commissioner, it expected that the new leadership would ensure that fair scientific review would occur.[281]

Three years later, the FDA agreed to approve Plan B for over-the-counter use for all ages.  The agency concluded that:

---

[274]   *Id.* at 522.

[275]   U.S. GOV'T ACCOUNTABILITY OFF., GAO-06-109, FOOD AND DRUG ADMINISTRATION: DECISION PROCESS TO DENY INITIAL APPLICATION FOR OVER-THE-COUNTER MARKETING OF THE EMERGENCY CONTRACEPTIVE DRUG PLAN B WAS UNUSUAL 5–6 (2005).

[276]   *Tummino,* 603 F. Supp. 2d at 523.

[277]   *Id.*

[278]   *Id.*

[279]   *Id.* at 545–46.

[280]   *Id.* at 545.

[281]   *Id.* at 549.

> [T]he product was safe and effective in adolescent females, that adolescent females understood the product was not for routine use, and that the product would not protect them against sexually transmitted diseases. Additionally, the data supported a finding that adolescent females could use Plan B One–Step properly without the intervention of a healthcare provider.[282]

Though this would have ordinarily put the matter to rest, the Secretary of the Department of Health & Human Services (HHS), which oversees the FDA, overruled the Commissioner's decision.[283] The Secretary ordered the Commissioner to deny the manufacturer's request on the grounds that "the data submitted for this product do not establish that prescription dispensing requirements should be eliminated for all ages."[284] The Secretary's main objection was that the data did not adequately take into account the "significant cognitive and behavioral differences between older adolescent girls and the youngest girls of reproductive age."[285] President Obama agreed.[286]

The petitioners sued again, and the court for a second time held that an agency—this time, HHS—acted arbitrarily and capriciously.[287] The court again relied on the unusual political involvement in what should have been a scientific decision.[288] The court noted that it was the first time the Secretary had overruled the Commissioner on a drug approval matter[289] and concluded that the Secretary's rationale was "so unpersuasive as to call into question her good faith."[290] The court relied on the fact that less safe drugs were available over-the-counter with no age restrictions: "levonorgestrel-based contraceptives would be probably among the safest drugs approved for over-the-counter sale for the pediatric population."[291] The New England Journal of Medicine published an opinion, cited by the court, which argued the agency's denial "cannot be based on issues of safety, since a 12-year-old can purchase a lethal dose

---

282   Tummino v. Hamburg, 936 F. Supp. 2d 162, 166–67 (E.D.N.Y. 2013).
283   *Id.* at 167.
284   *Id.* (quoting Memorandum from Kathleen Sebelius, Sec'y Health & Human Servs., to Margaret Hamburg, Comm'r Food & Drugs (Dec. 7, 2011), Case No. 05-cv-366, Doc. No. 339-1).
285   *Id.*
286   *Id.* at 167–68.
287   *Id.* at 197.
288   *Id.* at 170.
289   *Id.*
290   *Id.* at 171.
291   *Id.* at 173–74.

of acetaminophen in any pharmacy for about $11, no questions asked. The only documented adverse effects of a $50 dose of levonorgestrel are nausea and delay of menses by several days."[292] The court also described the evidence that the prescription requirement for adolescents would delay and even prevent young women and girls from "accessing the drug within the short time frame during which it will be effective, thereby exposing them to increased risk of unwanted pregnancy and making the product's limited [over-the-counter] status useless."[293]

As a result, the court remanded to the agency, ordering it to allow the over-the-counter sale of Plan B to women and girls of all ages.[294] Though the court acknowledged the political reasons why Plan B was controversial, it noted that the agency's role was quite simple: "the issue in this case involves the interpretation of a general statutory and regulatory scheme relating to the approval of drugs for over-the-counter sale. The standards are the same for aspirin and for contraceptives."[295] The Obama administration decided not to appeal the decision and instead complied with the order. But the lengthy Plan B drama lost the FDA and HHS a great deal of credibility.[296] "Plan B is an excellent example of what happens when the public health standard is replaced by a public morality standard that has not been determined by a democratic process through the appropriate government institutions."[297]

B.   Importation of Mifepristone for Personal Use

Long before mifepristone was approved as an abortifacient and subject to a REMS, the FDA had treated it unusually. In the decade or so where the drug was approved in European countries, but not the United States, some American women attempted to import mifepristone under the personal use ex-

---

[292]   *Id.* at 171.

[293]   *Id.* at 168 (quoting Wilkinson Decl. ¶ 7, Case No. 12-cv-763, Doc. No. 6).

[294]   *Id.* at 197.

[295]   *Id.* at 169.

[296]   For instance, medical journals declared that the government was prioritizing politics over science. *See e.g.,* Alastair J.J. Wood, M.D., Jeffrey M. Drazen, M.D., & Michael F. Greene, M.D., *The Politics of Emergency Contraception,* 366 NEW ENG. J. MED. 101, 102 (2012) ("Thus, we once again have a situation in which political considerations are forming the basis of public health policy—resulting in another sad day for women.").

[297]   John H. Fielder, Ph.D., *Ethics and FDA,* 61 FOOD & DRUG L.J. 809, 810 (2006).

Pet. Ref. 891

emption.[298]  Though the FDA bans the sale of unapproved drugs, the personal use exemption allows individuals to import small quantities of drugs for personal use under the supervision of a physician if the drug was used to treat conditions that were life-threatening, serious, or less serious conditions where the product "is not known to represent a significant health risk."[299]  The exemption was created in 1989 in response to the HIV/AIDS crisis, during which time the FDA was heavily criticized for not acting quickly enough to approve life-saving drugs; the exception helped patients access treatments not approved in the United States without sacrificing the agency's rigorous drug approval process.[300]  Quickly thereafter, members of Congress complained to the FDA that mifepristone—then known as RU 486—could be permitted under this exemption.  The FDA under the Bush administration then issued Import Alert 66-47, which stated that RU-486 was subject to automatic detention because it "could pose a risk to the safety of the user."[301]

In 1992, Leona Benten traveled abroad and returned to the United States with a small amount of mifepristone, which had been prescribed by her doctor to end an early pregnancy.[302]  She was detained and the drug was seized.[303]  She sued under the Administrative Procedures Act.[304]  The district court granted her motion for preliminary injunction on the grounds that the agency failed to follow the required notice and comment procedures in issuing the import alert.[305]  Though not central to the court's analysis, the court noted that the agency's determination was politically motivated and inconsistent with its treatment of other drugs: "it appears much more likely from the history outlined above that the decision to ban the drug was based not from any bonafide concern for the safety of users of the drug, but on political considerations having no place in FDA decisions on health and safety."[306]  It or-

---

[298]  *See* Elizabeth A. Silverberg, *Looking Beyond Judicial Deference to Agency Discretion: A Fundamental Right of Access to RU 486?*, 59 BROOK. L. REV. 1551, 1551 (1994).

[299]  Benten v. Kessler, 799 F. Supp. 281, 285 (E.D.N.Y. 1992) (quoting U.S. FOOD & DRUG ADMIN. REGUL. PROCS. MANUAL 9-71-30(C)).

[300]  *Id.*

[301]  *Id.* at 286 (quoting U.S. FOOD & DRUG ADMIN. IMPORT ALERT 66–47).

[302]  Silverberg, *supra* note 298, at 1551.

[303]  *Id.*

[304]  *Benten*, 799 F. Supp. at 283.

[305]  *Id.* at 289.

[306]  *Id.* at 286.

Pet. Ref. 892

dered the FDA to "immediately release the impounded dosage of RU486 to [the] plaintiff."[307]

On appeal, the Second Circuit stayed the injunction. Benten filed an application to vacate the stay, which the Supreme Court denied in a per curium opinion with no analysis.[308] Scholars have suggested that the FDA's decision was as politically motivated as its decision over Plan B: "What RU-486 and Plan B have in common . . . is that both were very controversial FDA decisions because of their connection (or perceived connection, in the case of Plan B) to abortion. In addition, the FDA appears to have deviated from its standard procedures in regard to both."[309] "[T]he FDA appears to have responded to political pressure rather than a public health mandate when it issued its import alert on RU-486."[310]

On November 19, 1990, the House of Representatives called a hearing to consider the appropriateness of the FDA's decision.[311] There, many scientists testified that they believed the FDA's decision was politically motivated.[312] For instance, a representative from the American Public Health Association testified: "The FDA should be making their decisions based on scientific fact, pure and simple. If you allow the FDA to become politicized as it seems to be in this case, then their credibility and the credibility of our Government and country suffers dramatically, and the American people will end up suffering."[313]

On President Clinton's third day in office, he ordered the FDA to reconsider the policy, noting that "RU-486 has been held hostage to politics."[314] His order stated that "the FDA appears to have based its decision on factors other than an assessment of the possible health and safety risks of the drug."[315] "[I]f the FDA concludes that RU-486 meets the crite-

---

[307]   *Id.* at 291.

[308]   Benten v. Kessler, 505 U.S. 1084, 1085 (1992).

[309]   Gillian E. Metzger, *Abortion, Equality, and Administrative Regulation*, 56 EMORY L.J. 865, 878 (2007).

[310]   Peter S. Reichertz & Melinda S. Friend, *Hiding Behind Agency Discretion: The Food and Drug Administration's Personal Use Drug Importation Policy*, 9 CORNELL J. L. & PUB. POL'Y 493, 520 (2000).

[311]   *RU 486: The Import Ban and its Effect on Medical Research: Hearing Before the Subcomm. on Regul., Bus. Opportunities, and Energy of the H. Comm. on Small Bus.*, 101st Cong., 2d Sess. (1990).

[312]   *Id.* at 31.

[313]   *Id.* at 33.

[314]   Noah, *supra* note 59, at 578 (quoting President Clinton).

[315]   Importation of RU-486, Memorandum for the Secretary of Health and Human Services, 58 Fed. Reg. 7459 (Jan. 22, 1993).

ria for the personal use importation exemption, I direct that you immediately take steps to rescind Import Alert 66–47."[316]

## C.   Female Sex Drugs

The FDA was again accused of bias—this time with regard to women's sexual health—when it refused to approve the female sex drug, flibanserin, which is used to treat hypoactive sexual desire disorder in women.[317]  Flibanserin was touted as the "pink pill," which could help women increase their sexual interest.[318]  In 2010, the FDA first declined to approve the drug.[319]  The agency concluded that the eligibility criteria for the clinical trials were too restrictive, and therefore, the study results were not generalizable to the broader female population; it found that more data was needed to demonstrate the product was effective and safe.[320]  The agency also required more data on the drug's interactions with other substances, including alcohol.[321]  After the failed FDA review, the pharmaceutical company sponsoring the NDA decided to abandon the drug instead of investing in more clinical trials.[322]

Instead, a small pharmaceutical company, Sprout, bought the rights to the drug and decided to invest in it.[323]  The company conducted fourteen new clinical trials, composed of over 3,000 women (in addition to the 8,000 women who had participated in the initial clinical trials).[324]  The results were modest, but positive—"[o]n average, women on the drug had 0.5 to 1 additional sexually satisfying events per month (from a 2 to 3 'event' baseline) compare[d] to those on a placebo."[325]  Sprout resubmitted its NDA in 2013, but the FDA again found that more data was needed.[326]  This time, the FDA expressed concerns about the marginal benefit of the drug and the drug's safety, especially if used with alcohol.[327]

---

[316]   *Id.*
[317]   Jessica Leber, *The "Female Viagra" Is Here: The Story of How It Almost Never Happened*, FASTCOMPANY (Aug. 18, 2015), https://www.fastcompany.com/3049926/the-female-viagra-is-coming-the-story-of-how-it-almost-never-happened [https://perma.cc/SU6X-UXET].
[318]   *Id.*
[319]   *Id.*
[320]   Sanders, *supra* note 271, at 190.
[321]   *Id.*
[322]   Leber, *supra* note 317.
[323]   *Id.*
[324]   *Id.*
[325]   *Id.*
[326]   *Id.*
[327]   Sanders, *supra* note 271, at 190–91.

Pet. Ref. 894

At that point, Sprout helped launch a public interest campaign, called Even the Score, which was run by members of Congress and a dozen women's advocacy groups.[328] The goal was to demonstrate that the FDA's decision reflected bias—the group frequently noted that Viagra was associated with much more serious health risks but was approved much more quickly.[329] "I think there's been some unconscious bias at the FDA and an overly protective mentality about the risks women are allowed to undertake when it comes to sexual health, especially compared to men."[330] The FDA rejected claims that gender bias influenced its decision.[331]

Sprout eventually applied for approval a third time, and an advisory committee met in 2015 to review the drug again.[332] Sprout relied on the same efficacy data from the previous trials but submitted additional data related to the drug's safety with alcohol. At that meeting, the FDA heard testimony from individuals who supported the approval of the drug, including individuals affected by the disorder and women's rights advocates generally.[333]

> These speakers often spoke in the language of the women's reproductive rights movement, stressing a woman's right to sexual autonomy and implying that a rejection of flibanserin would be an intolerable imposition of patronizing sexual norms in a treatment decision that should be made privately between a patient and her doctor.[334]

The testimony also "implied both that the FDA had patronizingly over-assessed risks that women were capable of evaluating with their doctors, and also undervalued the problem of female sexual dysfunction."[335] Two women's health advocates, however, also testified against approval of the drug, arguing that the drug's risks were not worth its modest benefits.[336] These speakers accused Even the Score of "an unprecedented misinformation campaign that hijacked the feminist movement to pressure the FDA to approve a risky drug for a diagnosis of dubious legitimacy."[337]

---

[328]   Leber, *supra* note 317.
[329]   *Id.*
[330]   *Id.*
[331]   Sanders, *supra* note 271, at 177.
[332]   *Id.* at 173.
[333]   *Id.* at 177–78.
[334]   *Id.* at 184.
[335]   *Id.* at 186.
[336]   *Id.* at 187, 189.
[337]   *Id.* at 189.

Pet. Ref. 895

This time, the advisory committee voted to approve the drug. Though the advisory committee found the benefits marginal, the benefits were statistically significant and clinically meaningful.[338] However, the FDA remained concerned about the drug's interaction with alcohol.[339] Though Sprout had conducted a study on the interaction of the drug with alcohol, it surprisingly included almost all men.[340] As a result, the committee recommended a REMS.[341] The initial REMS only allowed certified providers to prescribe the drug, but after negotiations with the agency in the years following approval, the ETASU was removed; now, the REMS only includes a medication guide that informs women of the drug's risks, especially with regard to alcohol.[342] More recent data appears to suggest, however, that the drug is both effective and safe to use with alcohol.[343]

### D.  Medical Research in Women and Female Animals

In addition to bias in approving products, the FDA has been heavily criticized for its role in excluding women from medical research. Historically, medical research was conducted primarily in men, after which the results were considered generalizable to both sexes.[344] This approach has been condemned over the past seventy-five years as research mounted that "women are not just smaller men: male and female bodies differ down to a cellular level."[345] Women and men are afflicted by different diseases, respond to different treatments, and experience different side effects in response to drugs.[346] The exclusion of women from medical trials has therefore led to a dearth of research on how to treat women most effectively.[347]

---

[338]  *Id.* at 193.
[339]  *Id.*
[340]  *Id.*
[341]  *Id.* at 195.
[342]  *Flibanserin REMS*, U.S. FOOD & DRUG ADMIN., https://www.access data.fda.gov/scripts/cder/rems/index.cfm?event=indvRemsDe-tails.page&REMS=350 [https://perma.cc/NS66-4LTN] (last updated Oct. 2019).
[343]  James A. Simon, Anita H. Clayton, Sharon J. Parish, Stuart C. Apfel, & Leah Millheiser, *Effects of Alcohol Administered with Flibanserin in Healthy Premenopausal Women: A Randomized, Double-Blind, Single-Dose Crossover Study*, 17 J. SEXUAL MED. 83, 89–90 (2020).
[344]  CAROLINE CRIADO PEREZ, INVISIBLE WOMEN: DATA BIAS IN A WORLD DESIGNED FOR MEN 201 (2019).
[345]  *Id.* at 199; R. Alta Charo, *Protecting Us to Death: Women, Pregnancy, and Clinical Research Trials*, 38 ST. LOUIS U. L.J. 135, 140 (1993).
[346]  CRIADO PEREZ, *supra* note 344, at 198–99.
[347]  *Id.* at 200–01.

Pet. Ref. 896

Women were historically excluded from medical research on the grounds that their menstrual cycles introduced too much variability into the data.[348] Of course, this very difference demonstrates the need to study all sexes; if women's bodies are that different from men's bodies, then their drug response could be too.[349] It also led to the unfortunate reality that diseases affecting women were hardly ever studied.[350] In the wake of *Roe v. Wade*, the FDA decided to explicitly exclude all women of childbearing potential from participation in early-phase medical research.[351] "The vocal pro-life community, galvanized in the wake of the U.S. Supreme Court's 1973 *Roe v. Wade* decision, expressed concern for unborn fetuses by pushing for stringent limits on women's research participation."[352] The FDA's overinclusive and ultimately harmful decision bowed to political pressure and codified the presumption of the male norm in medical research.[353]

In the late 1980s and early 1990s, "a coalition of women's health advocates, biomedical researchers, and lawmakers came up with a strategy to put this knowledge gap on the public's radar."[354] In 1992, the Government Accountability Office (GAO) issued a report, titled "Women's Health: FDA Needs to Ensure More Study of Gender Differences in Prescription Drug Testing," which found that more than 60% of drugs did not enroll a representative sample of women in their clinical trials.[355] In 1993, President Clinton signed the NIH Revitalization Act, which required all NIH-funded studies to include wo-

---

[348]   *Id.* at 202.

[349]   MAYA DUSENBERY, DOING HARM: THE TRUTH ABOUT HOW BAD MEDICINE AND LAZY SCIENCE LEAVE WOMEN DISMISSED, MISDIAGNOSED, AND SICK 32 (2018).

[350]   CRIADO PEREZ, *supra* note 344, at 198.

[351]   FDA was also likely motivated to ban women of childbearing age from research after the thalidomide scandal, where a drug that was initially thought of as safe ended up causing over 10,000 birth defects. CRIADO PEREZ, *supra* note 344, at 201.

[352]   Christine Grady & Colleen Denny, *Research Involving Women*, *in* THE OXFORD TEXTBOOK OF CLINICAL RESEARCH ETHICS 407, 409 (Ezekiel J. Emanuel et al. eds., 2008); *see also* Charles R. McCarthy, *Historical Background of Clinical Trials Involving Women and Minorities*, 69 ACAD. MED. 695, 696 (1994) ("The highly emotional abortion debate, including its political connotations, had a chilling effect on research involving women of childbearing potential and human fetuses.").

[353]   Grady & Denny, *supra* note 352, at 416.

[354]   DUSENBERY, *supra* note 349, at 24.

[355]   U.S. GOV'T ACCOUNTABILITY OFF., GAO-93-17, WOMEN'S HEALTH: FDA NEEDS TO ENSURE MORE STUDY OF GENDER DIFFERENCES IN PRESCRIPTION DRUG TESTING 2–3 (1992), https://www.gao.gov/assets/220/216966.pdf [https://perma.cc/446X-Y4EY].

Pet. Ref. 897

men and minorities.[356]  Thereafter, the FDA abandoned its policy excluding women of child-bearing age from research and started to encourage drug companies to include a representative sample of women in all clinical trials.[357]  In the FDA's mea culpa, it admitted that its previous policy had been "rigid and paternalistic" and may have led to "a paucity of information about the effects of drugs in women."[358]

By 2001, GAO issued another report, which found significant improvement, but also areas of concern.[359]  For instance, GAO noted that the FDA lacked any system to track the inclusion of women in research and did not evaluate sex differences in its review process.[360]  The lack of analysis into sex differences means that the inclusion of women is not leading to the information that matters: "it's been twenty-five years and we now have a lot of research that includes women but women are still invisible."[361]  "[I]nclusion is one thing, analysis is something else[,] [a]nd that's not there yet."[362]  After a request from Congress in 2012, the FDA acknowledged this lack of analysis remained a problem, and in 2014, released a twenty-seven-point action plan to "enhance the collection and availability of demographic subgroup data" for underrepresented populations, including women.[363]

These policy changes have unfortunately not translated to serious gains.  In 2015, the director of the women's health research center at Yale Medical School noted that "progress has been painfully slow—stalling for long periods or sometimes reversing direction—and, consequently, not nearly enough progress has been made."[364]  The FDA has been criticized for doing nothing to improve women's participation in clinical trials "apart from dropping the policy that actively excluded them."[365]  Beyond women, the FDA still does not require pre-

---

356   DUSENBERY, *supra* note 349, at 33.
357   *Id.*
358   *Id.*; Guideline for the Study and Evaluation of Gender Differences in the Clinical Evaluation of Drugs, 51 Fed. Reg. 39406, 39406 (1993).
359   U.S. GOV'T ACCOUNTABILITY OFF., *supra* note 355, at 3–4.
360   *Id.* at 5.
361   DUSENBERY, *supra* note 349, at 36 (quoting Dr. Jan Werbinski, executive director of the Sex and Gender Women's Health Collaborative); Charo, *supra* note 345, at 151.
362   *Id.* at 37 (quoting Phyllis Greenberger, the former president of the Society for Women's Health Research).
363   *Id*; FOOD & DRUG ADMIN., FDA ACTION PLAN TO ENHANCE THE COLLECTION AND AVAILABILITY OF DEMOGRAPHIC SUBGROUP DATA (2014), https://www.fda.gov/media/89307/download [https://perma.cc/WL4X-DJC2].
364   DUSENBERY, *supra* note 349, at 33.
365   *Id.* at 34.

clinical studies to include female animals or cell lines,[366] and many researchers still use exclusively male animals and cell lines in their research.[367] This is despite the fact that sex differences in female animals and cells can also lead to different outcomes in research.[368] As a result, some have questioned: "how many treatments have women missed out on because they had no effect on the male cells on which they were exclusively tested?"[369] Researchers who focus exclusively on male cells and male animals are missing possible medical breakthroughs for women's health.

E.   Labeling Regulations in Pregnancy

Another area where the FDA has shown bias is in its regulations governing the labeling of drugs for use in pregnancy. Medical research in pregnant women has been almost nonexistent, creating a dearth of information about how pregnant women metabolize drugs.[370] Pregnant women are not just women with bigger bellies: "Pregnancy-related changes in the gastrointestinal tract, the cardiovascular system, the kidneys, and other organs may profoundly alter the ways that drugs are processed by the body (pharmacokinetics) or the ways that drugs act on the body (pharmacodynamics)."[371] For instance, a pregnant woman's blood volume increases by 50% during pregnancy, which can have a huge impact on how her body metabolizes drugs.[372]

The FDA's involvement here is related to its labeling regulations, where the agency has historically warned pregnant women about drug risks to their detriment.[373] Before 2015, the FDA required all drugs to be categorized as either A, B, C, D, or

---

366   *See Guidance for Industry: M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals*, FOOD & DRUG ADMIN. (Oct. 17, 2019) https://www.fda.gov/regulatory-information/search-fda-guidance-documents/m3r2-nonclinical-safety-studies-conduct-human-clinical-trials-and-marketing-authorization [https://perma.cc/A4WU-HKZP].

367   CRIADO PEREZ, *supra* note 344, at 206.

368   *Id.*

369   *Id.* at 207.

370   Greer Donley, *Encouraging Maternal Sacrifice: How Regulations Governing the Consumption of Pharmaceuticals During Pregnancy Prioritize Fetal Safety Over Maternal Health and Autonomy*, 39 N.Y.U. R. L. & SOC. CHANGE 45, 55 (2015).

371   Anne Drapkin Lyerly, Margaret Olivia Little & Ruth Faden, *The Second Wave: Toward Responsible Inclusion of Pregnant Women in Research*, 1 INT'L J. FEMINIST APPROACHES TO BIOETHICS 5, 8 (2008).

372   Frank Hytten, *Blood Volume Changes in Normal Pregnancy*, 14 CLINICS HAEMATOLOGY 601, 601 (1985).

373   *See* Donley, *supra* note 370.

Pet. Ref. 899

X, which was supposed to help pregnant women understand a drug's safety during pregnancy.[374]  Category A was the safest; a drug only received Category A status if there were clinical trials *in pregnant women* that failed to show additional risks.[375]  Because it was so hard to conduct clinical trials in pregnant women, very few drugs were able to meet this standard.  But "[e]ven if a drug [was] able to gain Class A status—a status only 0.7% of drugs hold—the drug label [was required to] contain a warning against taking the drug unless doing so is clearly needed."[376]  This warning was exclusively required in the pregnancy context; even though the FDA can never rule out drug risks for any population, it does not recommend any other population avoid pharmaceuticals that were shown to be safe in clinical trials.[377]  Not only was a similar warning never used for drugs in the general adult population, it was also not required for pediatric use.  Pediatric labeling does not contain a similar warning even when there is no available pediatric data showing that the drug is safe for use in kids and even when known risks in that population exist.  Thus, "the FDA permit[ed] drugs that are known to be risky to children [ ] contain less precautious labeling than drugs tested in pregnant women without any demonstration of risk."[378]

The pregnancy labeling regulations also "focused exclusively on fetal (as opposed to maternal) risks from drug consumption."[379]  This focus led to the result that "[w]arnings for fetuses are much more protective than those for children; yet pregnant women, who are also susceptible to increased drug risks, received no warnings for their own safety."[380]  By ignoring maternal harms, the FDA sent the clear message that fetal risks were more important than maternal risks, and that "only legitimate factors in drug consumption are fetal risk and benefit."[381]

And though pregnancy labeling was always required to recommend that pregnant women avoid drugs during pregnancy—which as noted, was an unnecessary, unusual, and paternalistic requirement—the labeling "failed to present infor-

---

[374]  *Id.* at 69–70.
[375]  *Id.*
[376]  *Id.* at 70 (citation omitted).
[377]  *Id.* at 70–71.
[378]  *Id.* at 71–72.
[379]  *Id.* at 73.
[380]  *Id.* (citation omitted).
[381]  *Id.* at 81.

Pet. Ref. 900

mation on the risks associated with drug avoidance."[382]  This is a problem because women and fetuses can experience serious complications when women avoid needed drugs in pregnancy.[383]  For instance, the recommendation to avoid anti-depressants in pregnancy can lead to premature birth, fetal growth restriction, and increased drug and substance abuse in pregnancy, among other complications, in addition to the harmful effects for the women's mental health.[384]  Thus, pregnant women were not given the information to evaluate the fetal risks of avoiding drug use or the maternal risks associated with either taking drugs or avoiding drugs.  Finally, the pregnancy regulations were the only instance that the FDA required the labeling to display animal data, which can be highly unreliable, even when data in pregnant women existed.[385]

After great criticism and decades of consideration, the FDA finalized a rule that updated its labeling requirements for use in pregnancy, which were phased in from 2015-2020.[386]  The new regulations were an improvement:  they eliminated the drug categories, required the disclosure of risks affecting both the pregnant woman and her fetus, required the risks of untreated medical conditions to be displayed, and removed the blanket statement encouraging women to avoid drug use.[387]  Nevertheless, the modified regulations continue to rely on animal data over objections from toxicologists, even low-quality animal data.[388]

\* \* \*

In each of the cases described above, the FDA showed bias and exceptionalism that harmed women's health.  Though each one might seem like an isolated incident, their aggregate demonstrates that the agency has a blind spot when it comes to women's reproductive and sexual health.  The agency has allowed the politics of contraception and abortion to override its scientific mission.  The mifepristone REMS is another instance where FDA is failing to follow its own mandate in the context of women's reproductive health.  As a result, it should be removed.

---

[382]   Donley, *supra* note 370, at 73.
[383]   *Id.* at 57.
[384]   *Id.*
[385]   *Id.* at 73–75.
[386]   *Id.* at 49.
[387]   *Id.* at 76–78.
[388]   *Id.* at 78–80.

Pet. Ref. 901

## IV
### REMOVAL OF THE REMS WILL TRANSFORM ABORTION CARE

The mifepristone REMS is unnecessary, harmful, and not supported by the statute. It reflects a history of bias at the FDA related to women's sexual and reproductive health. This Section first describes the effort to remove the REMS, which started as a legal challenge under the Trump administration but evolved into a direct request to the FDA under the Biden administration. As this Article was coming to press, the FDA announced that it will maintain the REMS, but remove the in-person dispensing requirement, suggesting that litigation may still be necessary to fully dismantle the REMS. This Section then explores how early abortion care is already being transformed by the removal of the in-person dispensing requirement, and how it can be further improved if the rest of the REMS were also relinquished.

### A.  Paths Toward Removing the Mifepristone REMS

Under the Trump administration, the only path to remove the REMS was through litigation. In 2017, the ACLU launched the first challenge attempting to invalidate the REMS. The case, *Chelius v. Azar*,[389] is ongoing—though currently stayed—in the District of Hawaii. It is based on two separate legal theories: first, that the mifepristone REMS creates an undue burden in violation of the Fourteenth Amendment, and second, that the agency acted arbitrarily and capriciously in instituting the REMS, violating the Administrative Procedures Act. I briefly explain the merits and weaknesses of these theories below. I then explore how the Biden administration could remove the mifepristone REMS on its own.

#### 1.  *Constitutional Challenge*

Historically, the most common challenge to abortion laws was under the Due Process Clause—specifically, litigants argue that the law constitutes an undue burden under *Planned Parenthood v. Casey*.[390] An abortion law is unconstitutional under this standard when it has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an

---

[389]   Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment at 11–12, Chelius v. Azar, No. 17-cv-493 (D. Haw. Nov. 27, 2019).

[390]   505 U.S. 833, 836–38 (1992).

Pet. Ref. 902

abortion of a nonviable fetus."[391]  In *Whole Woman's Health v. Hellerstedt*, the Court strengthened the undue burden standard by requiring that the law's benefits outweigh its burdens.[392]  Thus, if the law has no benefits for women's health, then it would be unconstitutional because any burdens would outweigh the nonexistent benefits.  Relying on *Whole Woman's Health* or similar balancing tests, some lower courts have found that laws similar to the REMS create an undue burden.  For instance, the Iowa Supreme Court in 2015 found a state regulation requiring physicians to perform a physical exam and be physically present when dispensing abortion medication unconstitutional under the state constitution, using a balancing test.[393]  And the year before, the Ninth Circuit granted a preliminary injunction that prevented Arizona from requiring that mifepristone be prescribed only according to its label, even though off-label use is permitted and common for other drugs,[394] relying on a balancing test.[395]

But in *June Medical v. Russo*—the first abortion case after Justice Kennedy retired—a majority of the Court did not sign onto the balancing test from *Whole Woman's Health*.  Chief Justice Roberts cast the fifth vote to overturn a restrictive Louisiana abortion regulation, but penned a separate concurrence that effectively overruled the balancing test.[396]  He argued that the balancing test was inconsistent with *Planned Parenthood v. Casey* and that he would instead utilize a less rigorous version of the undue burden standard in future cases.[397]  In his view, the proper undue burden standard only looks to the law's burdens and questions whether they are undue—not the law's benefits.[398]  In this view, it is irrelevant if the law benefits women's health.  Because Justice Roberts's vote is now necessary

---

[391]   *Id.* at 877.

[392]   136 S. Ct. 2292, 2309 (2016).

[393]   Planned Parenthood of the Heartland, Inc. v. Iowa Bd. of Med., 865 N.W.2d 252, 254 (Iowa 2015).

[394]   "Laws prohibiting the 'off-label' use of abortion-inducing medication offer a paradigm case of abortion exceptionalism." Greenhouse & Siegel, *supra* note 270, at 1447.

[395]   Planned Parenthood Arizona v. Humble, 753 F.3d 905 (9th Cir. 2014). Though *Humble* was decided before *Whole Woman's Health*, the Ninth Circuit had already adopted a balancing test like the one relied on *Whole Woman's Health. Id.* In the Western District of Texas, a similar law was not invalidated because the court did not use a balancing test.  *See* Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott, 951 F. Supp. 2d 891, 905 (W.D. Tex. 2013).

[396]   June Med. Servs. v. Russo, 140 S. Ct. 2103, 2133-2142 (2020) (C.J. Roberts, concurring).

[397]   *Id.*

[398]   *Id.*

to invalidate any abortion restriction, the reasoning in these earlier cases, which relied on a balancing test, is inconsistent with how a majority of the Supreme Court understands its abortion precedent.

Since *June Medical*, the composition of the Supreme Court has changed again. Justice Barrett replaced Justice Ginsburg, moving the Court even further to the right. The impact of this change was on display in *ACOG v. FDA*—a case concerning the FDA's failure to temporarily suspend the in-person dispensing requirements of the mifepristone REMS during the COVID-19 pandemic. *ACOG v. FDA* was the first abortion case with Justice Barrett and was largely thought to signal the Court's receptivity to both the *Chelius* case and abortion rights generally. Before *ACOG v. FDA* reached the Supreme Court, the District of Maryland had temporarily invalidated the in-person dispensing requirements associated with the mifepristone REMS.[399] The district court, relying on *Whole Woman's Health*'s balancing test, before *June Medical* had been decided, found that:

> Forcing a patient to travel in person to a hospital, clinic, or medical office to pick up a pill she will swallow unsupervised at home offers no medical benefit. And, in the present circumstances, any conceivable benefit is far outweighed by the burdens it imposes on patients seeking care: needless exposure to the severe risks of illness and death associated with COVID-19.[400]

Thus, the court found the in-person dispensing requirement to create an unconstitutional undue burden.

The Supreme Court reversed this preliminary injunction.[401] The majority did not issue reasoning; rather, the short order only contained a brief concurrence by Chief Justice Roberts and a dissent by Justice Sotomayor that Justice Kagen joined.[402] In light of this outcome in *ACOG v. FDA*, it is hard to imagine the Court reaching a different result in the *Chelius* case, where the urgency of the pandemic is not at issue. "[B]y allowing the FDA to enforce in-person requirements for mifepristone during the pandemic, the Court heavy-handedly insinuates that these same requirements would be acceptable

---

[399] Order for Preliminary Injunction, ACOG v. FDA, No. 8:20-cv-01320-TDC 80 (D. Md. Jul. 13, 2020).

[400] *Id.* at 25.

[401] FDA v. ACOG, 141 S. Ct. 578 (2021). Justice Roberts relied on deference to the agency, finding that the case did not concern the undue burden standard. *Id.* (Roberts, C.J., concurring).

[402] *Id.*

Pet. Ref. 904

in a non-pandemic world."[403]  Perhaps more importantly, at a time where the Supreme Court is expected to overturn or significantly limit the constitutional right to abortion in the near future, a strategy that relies on this doctrine is not likely to be successful, at least not before the Supreme Court.

### 2.  *Arbitrary and Capricious Challenge*

Given the current Supreme Court and the expected hostility it will have to future constitutional challenges to abortion regulation, administrative law may be a more promising route. As Gillian Metzger noted in 2007, "[a]dministrative law does not offer the permanent protections of constitutional law and can be quite deferential to administrative determinations.  Nonetheless, administrative law's requirements of explanation and reasoned decisionmaking [sic] may in the end offer the greatest protection against regulations that single out abortion for disfavored treatment."[404]

There is solid evidence that the FDA has acted arbitrarily and capriciously in subjecting mifepristone to a REMS.  An agency's decision is generally considered arbitrary and capricious under the Administrative Procedures Act when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[405]  Similarly, an agency acts illegally when "it announces and follows—by rule or by settled course of adjudication—a general policy" and then commits "an irrational departure from that policy (as opposed to an avowed alteration of it)."[406]  In other words, the agency must follow its own standards and fairly assess the evidence in applying those standards.

In the Plan B litigation described above, the court invalidated the agency's refusal to grant over-the-counter status to Plan B for minor girls because it was treating Plan B exception-

---

[403]   Jareb A. Gleckel & Sheryl L. Wulkan, *Abortion and Telemedicine: Beyond COVID-19 and the Shadow Docket*, 55 UC DAVIS L. REV. ONLINE (forthcoming 2021),   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3801124& dgcid=EJournal_htmlemail_women,:gender:the:law:ejournal_abstractlink [https://perma.cc/JLV2-LYZJ].

[404]   Metzger, *supra* note 309, at 869.

[405]   *Id.* at 899 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

[406]   INS v. Yang, 519 U.S. 26, 32 (1996).

ally and not following its typical practices.[407] The FDA's history of bias and political involvement in reproductive health decisions should increase the skepticism regarding its decision here. "[W]here the agency has demonstrated undue bias towards particular [ ] interests," "[m]ore exacting scrutiny" under the APA is "particularly useful."[408] As Metzger noted, "[o]ften what triggers greater scrutiny is judicial perceptions of perceived agency arbitrariness, expansion of power, or improper influences."[409] She continues: "Inconsistent agency actions in addressing abortion or reproduction issues similarly may trigger greater judicial scrutiny. Such inconsistency not only raises the impression of arbitrary administrative action, but it also suggests that the agency's stated rationale is not what is actually motivating its actions."[410]

This Article highlights the evidence that the FDA irrationally departed from its standards when it issued the mifepristone REMS.[411] There is a strong case to be made, therefore, that the agency acted arbitrarily and capriciously. But there is nevertheless reason to doubt that this line of attack would ultimately prove successful, at least in the Supreme Court.

The outcome of any abortion case is likely to be influenced by the values and ideologies of the judges hearing the case. Though the *ACOG v. FDA* case did not involve an arbitrary and capricious challenge, it is still unlikely that the Court would affirm the agency's decision to limit distribution during a pandemic but overrule the same decision under non-exigent circumstances. Second, overruling agency action can be a tall task. Courts can highlight ample precedent that supports deference for agencies, especially for decisions that depend on an interpretation of scientific data.[412] In fact, Chief Justice Roberts's concurrence in *ACOG v. FDA* used this reasoning to find "that courts owe significant deference to the politically accountable entities with the 'background, competence, and expertise to assess public health.'"[413] This position may not be

---

[407]   Tummino v. Hamburg, 936 F. Supp. 2d 162, 197–98 (E.D.N.Y. 2013).

[408]   Nat'l Res. Defense Council, Inc. v. SEC, 606 F.2d 1031, 1049 n.23 (D.C. Cir. 1979).

[409]   Metzger, *supra* note 309, at 900.

[410]   *Id.*

[411]   *See supra* Part II.

[412]   Metzger, *supra* note 309, at 903–04 ("It is important not to oversell the potential of administrative law as a constraint on abortion restrictions. While offering a basis for searching scrutiny, administrative law also puts strong emphasis on deferring to agency expertise and policy choices, an emphasis reflected (among other ways) in ostensibly deferential standards of review.").

[413]   FDA v. ACOG, 141 S. Ct. 578 (2021) (Roberts, C.J., concurring).

popular with the rest of the conservative wing of the Court, which has spent years attempting to weaken deference to administrative agencies,[414] but it could nevertheless provide an easy justification to allow the Court to maintain the mifepristone REMS while simultaneously appearing politically neutral.

Nevertheless, as explored below, this presumptive deference to the FDA would also make it difficult for a future anti-abortion litigant to successfully challenge the Biden administration's decision to release or significantly weaken the mifepristone REMS after a reasoned decision.

### 3. *Reconsideration Within the Agency*

Under the Trump Administration, litigation was the best hope for invalidating the mifepristone REMS—there was no chance that a Trump-appointed FDA Commissioner would have allowed the agency to loosen an abortion restriction. Indeed, we saw the agency fight to keep the REMS in place during the middle of a deadly pandemic when it was otherwise temporarily suspending REMS requirements for other medications.[415] But with Biden's 2020 victory, activists shifted their approach to working directly with the agency to reevaluate the REMS.

The president has historically only been able to affect abortion rights indirectly, but "mifepristone offer[s] the federal government a direct and significant occasion for affecting the availability of abortion and, with it, the balance of power between pro-choice and pro-life forces."[416] By modifying the mifepristone REMS, President Biden can give the progressive women's groups who supported his candidacy a win while also promoting "science and truth" as he has promised.[417] Moreover, first-trimester abortion is supported by a majority of Americans (sixty percent), and he could reasonably argue that

---

[414]   Joshua Matz, *The Imminent Demise of Chevron Deference?*, TAKE CARE (June 21, 2018), https://takecareblog.com/blog/the-imminent-demise-of-chevron-deference [https://perma.cc/7BSH-XZKM].

[415]   POLICY FOR CERTAIN REMS REQUIREMENTS DURING THE COVID-19 PUBLIC HEALTH EMERGENCY, *supra* note 110, at 7 n.13.

[416]   Noah, *supra* note 59, at 573.

[417]   Bill Barrow & Seth Borenstein, *Biden Says His Advisers Will Lead With 'Science and Truth'*, ABC NEWS (Jan. 18, 2021), https://abcnews.go.com/Technology/wireStory/correction-biden-science-story-75329323 [https://perma.cc/X6FG-8KXT].

Pet. Ref. 907

loosening the mifepristone REMS will reduce reliance on the less popular second-trimester abortion.[418]

The Biden administration clearly had some of this in mind when it announced on December 16, 2021 that it would permanently remove the in-person dispensing requirement. Though the announcement on the website was bare bones,[419] the agency sent a letter to the American Association of Pro-Life Obstetricians and Gynecologists outlining the reasons for its decision.[420] (That group had asked the agency to strengthen the mifepristone REMS and make medication abortion more difficult to access.) As noted above, the agency justified its decision by relying on recent evidence and published data clearly establishing the safety and efficacy of remote provision of medication abortion.[421] With that safety established, the agency concluded that it *must* remove the requirement because doing so "will render the REMS less burdensome to healthcare providers and patients, and . . . the REMS will continue to ensure that the benefits of mifepristone for medical abortion outweigh the risks."[422] Nevertheless, the agency refused to remove the provider certification requirement or the patient agreement form because no new data proved they were unnecessary;[423] it similarly added a pharmacy certification requirement because it concluded that there was insufficient data to suggest its safety and efficacy at retail pharmacies.[424]

Though the FDA's decision to remove the in-person dispensing requirement was a step in the right direction, advocates should continue to put pressure on the agency to remove the other REMS requirements. They can do this in a few ways: First, reproductive health scholars can conduct research demonstrating that the other REMS requirements are unnecessary for safety and efficacy and then ask the FDA to modify the REMS based on that research. Though certainly worth the investment, this research is time consuming and expensive, meaning that this approach will likely take years. Second, ad-

---

[418]   Lydia Saad, *Trimesters Still Key to U.S. Abortion Views*, GALLUP (June 13, 2018), https://news.gallup.com/poll/235469/trimesters-key-abortion-views.aspx [https://perma.cc/DFG8-RDYW].

[419]   Mifeprex (mifepristone) Information, Food & Drug Admin (last updated Dec. 16, 2021), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information [https://perma.cc/2VK8-5Z64].

[420]   FDA Letter, *supra* note 14.

[421]   *Id.* at 6-7.

[422]   *Id.* at 35.

[423]   *Id.* at 23-24.

[424]   *Id.* at 34-35.

Pet. Ref. 908

vocates can also continue the *Chelius* lawsuit and argue that mifepristone does not meet the statutory criteria of a REMS. If advocates win at the district court or circuit court level, the FDA may decide not to appeal the decision and simply remove the REMS in compliance with the lower court's order, thereby never asking the Supreme Court to weigh in.

It's important to note that if the FDA does conclude that the evidence supports removing the mifepristone REMS, it would be difficult for anti-abortion activists to successfully challenge that decision in litigation. Without a doubt, these activists will sue the agency to try to get the decision over-turned on administrative law grounds. But their lawsuit will be unlikely to succeed. The FDA's decision would be realigning mifepristone with its treatment of similar drugs, ending the kind of special treatment that gave rise to a strong arbitrary and capricious challenge in *Chelius*. If the FDA is following the proper procedures for releasing or modifying the REMS, and its scientists conclude based on the best scientific evidence that the release or modification of the REMS is justified, then it would be difficult to argue that the scientific agency acted im-properly by listening to scientists. Due to the high-profile na-ture of the decision, it will be vital for the FDA to ensure that its decision follows the proper procedures perfectly and docu-ments the scientific evidence. Any procedural misstep will likely be used to invalidate the decision.

This is not to say it would be impossible for a motivated court to find fault with the FDA's decision to remove the mifepristone REMS. Anti-abortion activists have argued since the FDA approved mifepristone in 2000 that the drug is dan-gerous and should not only be restricted, but entirely removed from the market.[425] They have also suggested that the Clinton administration acted politically and unusually by seeking out a sponsor to support a New Drug Application for mifepristone.[426] These arguments will likely get recycled in litigation about the mifepristone REMS.[427]

---

[425]  *See* Response to Opposition Comments filed by The Population Council, Inc. and Danco Laboratories (Oct. 10, 2003), https://www.aaplog.org/wp-con-tent/uploads/2002/08/ResponseToDanco10-03reRU-486.pdf [https://perma.cc/U6J7-CAKY]; Letter from Ted Cruz, Senator, and Nineteen Other Sena-tors to Stephen Hahn, Commissioner, FDA (Sept. 1 2020), https://www.cruz.senate.gov/files/documents/Letters/2020.09.01%20--%20Pro-Life%20Mifeprex%20Letter%20to%20FDA%20-%20FSV.pdf [https://perma.cc/L6Q9-87K6].

[426]  Letter to FDA Commissioner, *supra* note 425, at 2–3.

[427]  The arguments were made again in 2020 when Ted Cruz tried to get the FDA to remove mifepristone from the market. *Id.*

Pet. Ref. 909

But just as precedent on judicial deference to administrative agencies would harm abortion rights activists in the *Chelius* lawsuit, it would similarly harm anti-abortion activists in a lawsuit challenging the removal or modification of the REMS.[428] It is not the role of the courts to review scientific evidence and decide whether a drug's risks can only outweigh its benefits without a REMS—even a conservative judge would recognize that such a scientific judgment should be made by the agency to which it was delegated. Rather, the courts' role is to consider whether the agency's decision was arbitrary and capricious. It is particularly noteworthy that Chief Justice Roberts relied on deference to the FDA in his concurrence overturning the preliminary injunction in *ACOG v. FDA*.[429] This could signal how he might be inclined to vote if the opposite case reached the Supreme Court. And importantly, even if a court were to find a procedural flaw that warranted a reversal of the agency's decision, the agency would be free to reissue the decision, correcting the flaws identified by the court.

B.   The Future of Abortion Care Without the Mifepristone REMS

Removing the mifepristone REMS has the power to transform early abortion care. Already, the removal of the in-person dispensing requirement has created possibilities that were unimaginable five years ago—namely, an early abortion through telehealth without ever leaving one's home. And these innovations led to medication abortion becoming, for the first time, the majority (54%) of all abortions in 2020.[430] But these benefits will not be felt everywhere. Some states have their own laws that will continue to burden medication abortion provision even if the federal policy disappears. Nineteen states, for instance, either require medication abortion to be distributed in the presence of a physician or ban the use of telemedicine for

---

[428]   It is true that the Supreme Court in *Gonzales v. Carhart* showed a willingness to ignore the bulk of scientific evidence about when an abortion procedure could be medically necessary because a minority view contradicted it. *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) ("The Court has given state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty."). But that precedent relied on the Court deferring to the fact-finding of conservative states, which relied on that minority view, not overriding a fact-finder—in this case the agency—with its own judgment on the science.

[429]   141 S. Ct. 578, 578–79 (2021) (Roberts, C.J., concurring).

[430]   Rachel K. Jones et al., *Medication Abortion Now Accounts for More Than Half of All US Abortions* (Feb. 2022), https://www.guttmacher.org/article/2022/02/medication-abortion-now-accounts-more-half-all-us-abortions.

abortion.[431] More states are likely to pass similar laws in the next few years.[432] As a result, the FDA's removal of the in-person dispensing requirement will not help patients in these states.

In the remaining thirty-one states, however, removing the in-person dispensing requirement will lead to an enormous expansion of access. Many of these changes have already begun.[433] The COVID-19 pandemic transformed remote abortion care from a distant dream to a current reality.[434] After the District of Maryland temporarily suspended the in-person dispensing requirement, a variety of start-ups launched, including Abortion on Demand, Hey Jane, Choix, and Just the Pill, which created "virtual clinics" that provide remote abortion care.[435] Some of these organizations are innovating abortion care, like sending the abortion medication in a care package that includes herbal tea and anti-nausea medication, and most have significantly cut the cost of early abortion by hundreds of dollars.[436] More traditional abortion clinics also began mailing abortion medication after meeting with patients via telemedicine.[437] As a result, telemedicine is quickly becoming

---

[431] *Medication Abortion*, GUTTMACHER INST. (May 1, 2021), https://www.guttmacher.org/state-policy/explore/medication-abortion [https://perma.cc/4JRF-NNT5].

[432] *See* Alice Miranda Ollstein & Darius Tahir, *Will At-Home Abortions Make Roe V. Wade Obsolete?*, POLITICO (updated March 21, 2021), https://www.politico.com/news/2021/03/20/abortion-pills-telemedicine-477234 [https://perma.cc/6QJX-GPQV].

[433] *See* Chong et al., *supra* note 189, at 2 (noting that demand for the Gynuity trial tripled during the pandemic); Ruth Reader, *The Pandemic Sparked The Rise of Tele-Abortion. Is it Here to Stay?*, FAST COMPANY (Oct. 2, 2020), https://www.fastcompany.com/90550536/telehealth-abortion-pill-supreme-court-ruling [https://perma.cc/WE8K-G74W]; Carrie N. Baker, *How Telemedicine Startups Are Revolutionizing Abortion Health Care in the U.S.*, MS. MAG. (Nov. 16, 2020), https://msmagazine.com/2020/11/16/just-the-pill-choix-carafem-honeybee-health-how-telemedicine-startups-are-revolutionizing-abortion-health-care-in-the-u-s/ [https://perma.cc/ZGE8-8L5Q].

[434] *See* Reader, *supra* note 433 (noting that these start-ups started offering remote abortions after the District of Maryland suspended the in-person dispensing requirements); Baker, *supra* note 433.

[435] Reader, *supra* note 433.

[436] Susan Rinkunas, *A Bitter Pill*, MARIE CLAIRE (Jan. 13, 2021), https://www.marieclaire.com/politics/a35203155/pandemic-abortion-telemedicine/ [https://perma.cc/MXZ6-T9XW].

[437] *See id.* (noting that Whole Woman's Health is offering remote appointments); *see also PPMW Now Offering Medication Abortion At-Home Services*, PLANNEDPARENTHOOD.ORG. (Sept. 10, 2021), https://www.plannedparenthood.org/planned-parenthood-metropolitan-washington-dc/press-room/ppmw-now-offering-medication-abortion-at-home-services [https://perma.cc/3NQT-5T38] (noting that Planned Parenthood of Metropolitan Washington, DC started offering telemedicine).

the norm for early abortion care in states that allow it.[438] This trend is unlikely to change once the pandemic ends: "[t]he genie's out of the bottle. And once the genie is out of the bottle, it's really hard to get it back in."[439]

Telemedicine for early abortion care means that patients would no longer need to travel to clinics to end a pregnancy in the first ten weeks.[440] As noted in subpart I.C, this would immediately improve access by reducing the cost and logistical burdens associated with travel, especially for those who live hundreds of miles from the nearest clinic.[441] This will especially benefit rural women, who must travel the farthest, and poor women, who are least able to afford the costs associated with travel.[442] Perhaps even more importantly, remote abortion care itself is also less expensive—almost half the price of clinic-based care.[443] Given that most patients pay for abortion out of pocket[444] and half of those needing an abortion live in poverty,[445] this benefit will be very impactful for all abortion patients.

Another huge advantage of telemedicine is that patients would no longer need to endure the stigma and violence associated with abortion clinics.

> Encountering protestors who intimidate, shame, harass, and harangue people who are doing nothing more than entering a medical clinic is normal around the country for patients trying to get an abortion. In no other areas of medicine are patients subjected to this kind of harassment just for walking into a doctor's office.[446]

---

[438] Baker, *supra* note 433 (describing remote abortion as the new standard of care).

[439] Rinkunas, *supra* note 436.

[440] Mounting evidence suggests that medication abortion is safe and effective through twelve weeks, and the mifepristone label may eventually be changed to extend the timing of its use. Nathalie Kapp et al., *Medical Abortion in the Late First Trimester: A Systematic Review*, 99 CONTRACEPTION 77, 77 (2019); *What Will Happen If You Do An Abortion With Pills After The First 12 Weeks?*, WOMENONWEB, https://www.womenonweb.org/en/page/573/what-will-happen-if-you-do-an-abortion-with-pills-after-the-first-12 [https://perma.cc/FG6F-4EWV] (last visited Mar. 23, 2021).

[441] *See supra* subpart I.C.

[442] *See supra* subpart II.B.

[443] Rinkunas, *supra* note 436.

[444] *How do Women Pay for Abortions*, GUTTMACHER INST. (2013),https://www.guttmacher.org/sites/default/files/graphics/infographics/HowDoWomenPay-740.pdf [https://perma.cc/EP7F-9LBF].

[445] Sabrina Tavernise, *Why Women Getting Abortions Now Are More Likely to Be Poor*, N.Y. TIMES (July 9, 2019), https://www.nytimes.com/2019/07/09/us/abortion-access-inequality.html [https://perma.cc/4273-Q5GQ].

[446] COHEN & JOFFE, *supra* note 123, at 114.

Pet. Ref. 912

There is a recent rise of picketing and obstructing abortion facilities: "the National Abortion Federation's 2019 annual report on violence and disruption statistics documented 3,387 incidents of obstructing facilities (up from 3,038 in 2018), and 123,228 incidents of picketing (up from 99,409 in 2018)."[447]  In addition to traditional harassment, protestors have recently started posing as clinic staff to try to trick patients into giving them their names so that they can publicly disclose their abortions and shame them online; protesters have also started recording women walking into clinics, often streaming them on Facebook Live, to further shame them on social media.[448]  Women using telemedicine can avoid this stressor entirely and end their pregnancy in the privacy of their homes.[449]  This shift could radically reduce the public stigma associated with abortion care.

Furthermore, the less abortion is tied to physical locations, the harder it will become for extremists to target and attack providers and clinics.  Abortion providers have been murdered, threatened, and physically attacked simply for providing abortion, and their clinics have been bombed, broken into, and defaced.[450]  Concentrating all abortion care in certain locations like clinics makes it easy for protesters and extremists to target providers and patients.  For instance, hospitals that provide abortions experience almost no protests or violence—abortions are only a tiny fraction of the care hospitals provide, and it would be practically impossible for the protesters to determine which patients and providers at the hospital were there for abortions.[451]  If early abortion occurred online through telemedicine or moved to physician offices, it would be similarly difficult to target doctors and offices providing that care.  And by making it safer and less stigmatizing for providers to offer early abortion care, more physicians would likely be willing to provide it.[452]

---

[447]  Chong et al., *supra* note 189, at 2.

[448]  COHEN & JOFFE, *supra* note 123, at 119.

[449]  *See* Yvonne Lindgren, *The Doctor Requirement:* Griswold, *Privacy, and At-Home Reproductive Care*, 32 CONST. COMMENT. 341, 358–64 (2017) (describing the privacy benefits associated with abortion at home); *see also infra* Part IV (describing how telehealth can improve abortion access and the abortion experience).

[450]  *Anti-Abortion Violence*, NARAL PRO-CHOICE AM., https://www.prochoiceamerica.org/issue/anti-abortion-violence/ [https://perma.cc/XT6Q-32ET].

[451]  COHEN & JOFFE, *supra* note 123, at 114–15.

[452]  *See* Cohen & Connon, *supra* note 130, at ix–x (noting that "partly because abortion providers are not safe, there are very few abortion providers in the United States").

Though this de-linking of early abortion from physical spaces has many positive implications for early abortion care, clinics would still be necessary for surgical abortions after ten weeks.[453] Given that these later abortions tend to be more controversial, one potential consequence could be that violence at abortion clinics actually increases—all of a sudden, the majority of clinic-based abortion care could flip from first-trimester abortions to second-trimester abortions.[454] Thus, while patients and providers involved with early abortion care could see a real improvement in their safety and wellbeing, those needing and providing later abortions might feel even more threatened. Clinics are also expected to struggle financially if new, virtual clinics reduce demand for their services, which could lead to more clinic closures, even in states with abortion friendly laws.[455] This is a serious concern given that it is already difficult for women to find a clinic that offers second-trimester abortion care.[456] In other words, the removal of the REMS will improve the experience and availability of early abortion but could have the opposite effect on abortion after ten weeks.

The move away from clinic-based care will also make it harder to regulate abortion spaces. Clinics not only attract violence and harassment but also legislative attention. "Abortion opponents have taken aim at stand-alone clinics, describing them as 'abortion mills' and seeking to undermine the legitimacy of abortion providers."[457] This perspective ignores the reality that abortion is segregated into clinics because of laws like the mifepristone REMS that have isolated abortion outside of traditional healthcare. Nevertheless, states have historically attempted to regulate the physical space within abortion clinics to the extent that compliance is difficult or

---

453    Rinkunas, *supra* note 436.

454    Given that the majority of abortions occur in the first trimester, see *Second-Trimester Abortion*, ACOG (June 2013), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2013/06/second-trimester-abortion [https://perma.cc/M62M-UK9R], when all abortion care occurred in clinics, the majority of clinic-based care was in the first trimester. However, this would change if telemedicine "skim[s] off all of the early abortions" from clinics. Rinkunas, *supra* note 436.

455    Rinkunas, *supra* note 436.

456    *See Later Abortion*, Guttmacher Inst. (Nov. 13, 2019), https://www.guttmacher.org/evidence-you-can-use/later-abortion [https://perma.cc/JPR6-4YTP].

457    Lindgren, *supra* note 449.

impossible.[458]  For instance, "9 states specify the size of the procedure rooms," "8 states specify corridor width," and "8 states require abortion facilities to be within a set distance from a hospital."[459]  When abortion is happening entirely online and in the privacy of one's home, there are no physical spaces to regulate.[460]  This is not to say that antiabortion legislatures will be unable to regulate abortion provided online—or simply ban it as many states have done—but it does undercut one of their common strategies over the past few decades.

Unfortunately, the states with the fewest brick-and-mortar clinics are also those most likely to have laws that prevent telemedicine for abortion.  Thus, in the states where remote abortion access could be the most beneficial because there are the fewest clinics and greatest harassment at those clinics, it will likely be prohibited.  As a result, removing the mifepristone REMS will accelerate the existing polarization of abortion access across state lines.  States in the South and Midwest already limit abortion access as much as possible and won't see much change in their legal abortion model after the REMS is removed; northern and coastal states, on the other hand, which have recently sought to codify and expand abortion protections, will see dramatic improvement in early abortion access without the in-person dispensing requirements.[461]

The Supreme Court's upcoming abortion decisions are expected to further intensify polarization by allowing conservative states to decrease (and perhaps eliminate) abortion access.  In May 2021, the Court announced that it would hear a case that is a direct challenge to the viability standard in *Casey*.[462]  The case, *Dobbs v. Jackson Women's Health Organization*, concerns

---

[458]    *See Targeted Regulation of Abortion Providers*, GUTTMACHER INST. (May 1, 2021), https://www.guttmacher.org/state-policy/explore/targeted-regulation-abortion-providers# [https://perma.cc/D3SK-XLG6].

[459]    *Id.*

[460]    *See* Lindgren, *supra* note 449, at 358–64 (describing the privacy benefits associated with medication abortion in the home).

[461]    *See* Elizabeth Nash, *Unprecedented Wave of Abortion Bans is an Urgent Call to Action*, GUTTMACHER INST., https://www.guttmacher.org/article/2019/05/unprecedented-wave-abortion-bans-urgent-call-action [https://perma.cc/GS5Q-R38V] (updated May 31, 2019); Elizabeth Nash et al., *State Policy Trends 2019: A Wave of Abortion Bans, But Some States Are Fighting Back*, GUTTMACHER INST. (Dec. 12, 2019), https://www.guttmacher.org/article/2019/12/state-policy-trends-2019-wave-abortion-bans-some-states-are-fighting-back [https://perma.cc/JS43-LK4D].

[462]    Mary Ziegler, *This Could Be the Case That Takes Down Roe v. Wade*, CNN (May 18, 2021), https://www.cnn.com/2021/05/17/opinions/abortion-mississippi-supreme-court-dobbs-v-jackson-womens-health-ziegler/index.html [https://perma.cc/688L-PRSS].

Pet. Ref. 915

whether a state can ban abortion starting at fifteen weeks, long before a fetus is viable.[463] With Justices Barrett and Kavanaugh replacing Justices Ginsburg and Kennedy, there is a genuine fear that the constitutional right to abortion may become a relic of a different era.[464] If the Supreme Court does move to further limit or overturn *Roe*, states will have even more power to determine their own abortion regulations, and nearly half are expected to ban all or most abortions.[465] These bans would disproportionately and significantly harm poor women, rural women, and women of color living in antiabortion states, who would struggle to afford the high cost of interstate travel to access care.[466] Nevertheless, women living in the remaining states will continue to enjoy all the benefits of expanded access to early abortion that came from removing the in-person dispensing requirement. As a result, the removal of the mifepristone REMS has the power to transform and improve abortion access in parts of the country even if the constitutional right to abortion falls.

The states that have their own limits on medication abortion—or, if *Dobbs* allows, even ban abortion completely—will still see ripple effects associated with greater abortion access in other parts of the country. One of these effects is an increase in illegal, self-managed abortion everywhere. Though illegal abortion conjures up images of the back-alley abortions from generations ago, self-managed abortion in today's world is very different. It essentially involves women taking the same FDA-approved medications, but purchased outside of the traditional healthcare setting, and often without the help of a physician.[467]

Many abortion rights activists believe self-managed abortion will become the future of abortion care, especially if *Roe* is overturned or dramatically weakened.[468] Already, self-man-

---

463   *Id.*

464   *Id.*

465   Elizabeth Nash & Lauren Cross, *26 States Are Certain or Likely to Ban Abortion Without Roe: Here's Which Ones and Why*, GUTTMACHER INST. (Oct. 2021), https://www.guttmacher.org/article/2021/10/26-states-are-certain-or-likely-ban-abortion-without-roe-heres-which-ones-and-why [https://perma.cc/YAV6-P9EX].

466   Megan K. Donovan, *In Real Life: Federal Restrictions on Abortion Coverage and the Women They Impact*, 20 GUTTMACHER POL. REV. 1, 5–6 (2017).

467   *See Donovan*, *supra* note 466, at 44.

468   *See, e.g.*, *How Activists Can Prepare for a Post-Roe World*, REPROACTION (Sept. 21, 2018), https://reproaction.org/resource/how-activists-can-prepare-for-a-post-roe-world/ [https://perma.cc/785J-2Y5L] (describing how medication abortion has been used in other countries where abortion is criminalized). In

aged abortion has grown as abortion became increasingly diffi-
cult to access in parts of the country,[469] with a greater
incidence in states with harsher abortion restrictions.[470] But
as mifepristone becomes easier to access in a majority of states
because the FDA has loosened its unnecessary restrictions,
women in conservative states will likely be able to obtain the
drug more easily, albeit, illegally, from other states (instead of
relying on international pharmacies, as they do now). Women
in these restrictive states could meet with an out-of-state pro-
vider by telemedicine who mails them the medication directly
or calls the prescription into an out-of-state, mail-in pharmacy
that ships them the drug. Not only would this practice be
almost impossible to police because the abortion would occur
in a private setting, but it might also be legally difficult to
restrict.[471]

Even if abortion providers continued to only ship abortion
medication to addresses within their state, where doing so was
legal, one could easily imagine a world in which a patient in a
restrictive state lies about their location and gives the provider
an address of a friend, family member, or ally within that pro-
vider's state lines, who would then ship the out-of-state patient
the drug once it arrives.[472] Plan C, an organization that helps
women find abortion medication, has detailed instructions on
its website for creating a temporary address in a state that
allows remote abortion access so that a patient in an abortion-
restricting state could visit a virtual clinic, provide that tempo-
rary address, and then have the pills forwarded to their home
address without ever leaving their house.[473] Furthermore, re-
mote abortion care makes traveling out of state for abortion

---

2021, the Supreme Court agreed to hear a case that would directly challenge *Roe
v. Wade*. *See* Ziegler, *supra* note 462.

[469]   Abigail R. A. Aiken et al., *Demand for Self-Managed Medication Abortion
Through an Online Telemedicine Service in the United States*, 110 AM. J. PUB.
HEALTH 90, 90 (2020).

[470]   *Id.* at 92, 94.

[471]   *See* David S. Cohen, Greer Donley, & Rachel Rebouche, *The New Abortion
Battleground* (draft manuscript on file with author) (describing the complex legal
issues that will challenge state enforcement of abortions laws related to out-of-
state conduct); Rachel Rebouche, *The Public Health Turn in Reproductive Rights*,
78 WASH. & LEE L. REV. 1355, 1400, n.220 (2021) (noting, and citing scholarship
for the proposition, that in the context of interstate travel for an abortion at a
clinic, "there are mixed views about whether states could limit residents from
seeking abortion outside of state lines").

[472]   Rebouche, *supra* note 471, at 40; Gleckel & Wulkan, *supra* note 403, at
15–16.

[473]   The Plan C Guide to Abortion Pills, Plan C (last visited Nov. 7, 2021),
https://www.plancpills.org/guide-how-to-get-abortion-pills#find-pills [https://
perma.cc/FXR2-RZRG].

Pet. Ref. 917

easier because women can have the medication mailed to a post office near the state line instead of needing to travel to a clinic within that state.[474]

Though a healthcare provider's involvement is still the gold standard for abortion care, self-managed abortion can be done safely. According to the World Health Organization, there are three components to self-managed abortion without the involvement of a provider (sometimes referred to as self-sourced abortion): "[1] self-assessing eligibility; [2] managing the mifepristone and misoprostol medication without direct supervision of a health care provider; and [3] self-assessing completeness of the abortion process using pregnancy tests and checklists."[475] Evidence endorsed by the WHO suggests that the latter two components can be done safely.[476] Even under the REMS, most women already take the abortion medication drugs at home and assess the abortion's completion on their own with pregnancy tests; as a result, it makes sense that women do not need a doctor's direct involvement during those phases of the abortion, so long as they have "a source of accurate information and access to a health-care provider should they need or want it at any stage of the process."[477]

However, until very recently, researchers have had questions about the safety of the first component—i.e., how accurately women can assess their own eligibility. This self-assessment primarily relies on a woman's ability to accurately assess the gestational age of her pregnancy, which evidence suggests that most women can accurately do.[478] As mentioned above, only 1% of medication abortion patients who were certain that their last missed period had started less than seventy-eight days ago were proven wrong on ultrasound.[479] Many abortion patients, however, will not be certain of their last missed period, and for them, self-assessment will be more challenging. As noted, there have been incidences of self-managed abortion well into the second trimester that led to medical emergencies.[480] Furthermore, there are other eligibility questions related to risk factors, like whether a woman could have a rare ectopic pregnancy, which is contraindicated for mifepristone, or a negative blood type, which might require an addi-

---

[474]   *Id.*

[475]   *Self-Managed Medication Abortion, supra* note 216, at 44.

[476]   *Id.*

[477]   *Id.*

[478]   *Id.*

[479]   Raymond et al., *supra* note 135, at 363.

[480]   *See* the notes and discussion, *supra* notes 256-58 and 261-64.

tional medication to protect her future fertility.[481]  Fewer women know their blood type and only an ultrasound can diagnose an ectopic pregnancy.[482]

The traditional medication abortion model based on clinic care eliminated these risks by recommending that all women get blood work and an ultrasound before receiving the medication abortion.[483]  The ultrasound could rule out ectopic pregnancy and verify the length of pregnancy, and the blood work could identify women who are Rh negative and might need additional medication.  But the pandemic catalyzed a paradigm shift that is altering the early abortion model that had been used for decades.[484]  The zeitgeist now prefers "no touch abortions," where most women can obtain abortion care without any in-person testing, unless it is medically indicated.[485]  Not only does this model remove even more logistical burdens associated with care, but it also reduces the cost of the abortion, making abortion even more accessible.[486]

More recent data suggests that these extra tests are unnecessary.  For instance, recent studies have shown that for women who are Rh negative, antibodies may not develop to a pregnancy in the first ten weeks and therefore the additional medication would not be necessary.[487]  And because ectopic pregnancy often comes with symptoms like bleeding or pain, ultrasound could be reserved for women experiencing those symptoms.[488]  The virtual clinics described above are already offering no-touch abortions, and even traditional clinics are

---

[481]   *See* Raymond et al., *supra* note 135, at 363.

[482]   *Id.* at 364.

[483]   *Id.* at 361.

[484]   *Id.* ("Across all fields of medicine, changes in practice models are occurring rapidly.  For patients seeking abortion, urgent modifications of current protocols are needed to ensure that patients can continue to obtain this time sensitive treatment while limiting transmission of infection by maintaining distance between and among patients and providers."); Chong et al., *supra* note 189, at 2, 4 (noting that "[e]xperts have advocated for adoption of no-test medication abortion," but that "[i]ndividuals were required to obtain a pre-abortion ultrasound or pelvic exam" to participate in the study, even though 52% of sites did not enforce the requirement).

[485]   *See Telehealth Care for Medication Abortion Protocol,* REPROD. ACCESS (May 2021), https://www.reproductiveaccess.org/wp-content/uploads/2020/03/03-2020-no-touch-MAB.pdf [https://perma.cc/X5W6-CA38].

[486]   Baker, *supra* note 433; *see* Chong et al., *supra* note 189, at 4 (noting that "[m]onths with high enrollment were also months in which large percentages of abortions occurred without screening ultrasounds").

[487]   Alice Mark et al., *Foregoing Rh testing and anti-D immunoglobulin for women presenting for early abortion: a recommendation from the National Abortion Federation's Clinical Policies Committee,* 99 CONTRACEPTION 265, 266 (2019).

[488]   Raymond et al., *supra* note 135, at 363–34.

Pet. Ref. 919

moving in this direction by altering their protocols so that wo-men never need to set foot in a healthcare facility to receive an abortion.[489] Two very recent studies, one in England[490] and one in the United States,[491] show that no touch medication abortions are safe and effective. As a result, it appears that even when it comes to self-assessment of eligibility, a physician's involvement may not be required except when women are unsure of their last period or experiencing symptoms of ectopic pregnancy. Scholars have similarly started criticizing as paternalistic the doctrinal link that has woven physician involvement into the right to abortion.[492]

Nevertheless, as described in Part II, there will still be serious legal risks associated with self-management given the fact that many states have enforced a variety of laws against pregnant women who self-induce an abortion.[493]

> [T]here are 7 states with laws directly criminalizing self-induced abortions, 10 states with laws criminalizing harm to fetuses that lack adequate exemptions for the pregnant person, and 15 states with criminal abortion laws that have been and could be misapplied to people who self-induce. There are also a variety of laws that have been used when other grounds are unavailable, including those governing the disposal of human remains and concealment of a birth.[494]

Motivated prosecutors have found a variety of arcane legal avenues to criminalize those who self-manage, and if abortion becomes illegal in certain states, prosecuting abortion will become easier. Though it has historically been politically undesirable to prosecute *patients* for abortions, and laws typically prefer to criminalize providers, this might change if providers

---

489   Baker, *supra* note 433 (describing remote abortion as the new standard of care); Carrie N. Baker, *No-Test Medication Abortion Increases Safety and Access During COVID-19*, Ms. Mag. (May 13, 2020), https://msmagazine.com/2020/05/13/no-test-medication-abortion-increases-safety-and-access-during-covid-19/ [https://perma.cc/9N7Q-EHDY] (interviewing a provider who is already using the new protocol).

490   A.R.A. Aiken, P.A. Lohr, J. Lord, N. Ghosh & J Starling, *Effectiveness, Safety and Acceptability of No-Test Medical Abortion (Termination of pregnancy) Provided via Telemedicine: A National Cohort Study*, 128 Int'l J. Obstet. & Gynaecol. 1464, 1470 (2021).

491   Ushma D. Upadhyay et al., *Outcomes and Safety of History-Based Screening for Medication Abortion A Retrospective Multicenter Cohort Study*, JAMA Internal Medicine (March 2022), file:///Users/DONLEY/Downloads/jamainternal_upadhyay_2022_oi_220007_1647267379.10073.pdf.

492   *See* Lindgren, *supra* note 457, at 3.

493   *See supra* Part II.

494   *Self-Managed Medication Abortion*, *supra* note 216, at 45.

Pet. Ref. 920

are out of state and harder to control.[495]  On the other hand, as self-management becomes more commonplace and organized, women can be counseled about how to avoid detection, even when experiencing side-effects and risks that require medical care.[496]  Because there is no discernable difference between an abortion by medication and miscarriage, women who need medical care can simply show up to a hospital claiming to be experiencing natural fetal loss.[497]

Though self-managed abortion is likely to increase in antiabortion states, removing the in-person dispensing requirement will likely reduce self-management in abortion-supportive states.  Self-management will become less desirable when it is easy to access medication abortion from a U.S. provider while still ending the pregnancy in the privacy of one's home, avoiding the harassment, travel, and obstacles associated with clinic-based care, and the legal risks associated with self-management.[498]  And as argued above, the very possibility of self-management with abortion care should encourage the FDA to release the REMS in its entirety to encourage women to obtain care through a doctor given that self-management is already an option for American women.[499]  And the FDA may be worried about the fact that many women attempt to self-

---

[495]   *See* Cohen, Donley & Rebouche, *supra* note 471.  Georgia's recent abortion law would start subjecting women who get illegal abortions to criminal prosecution, including life imprisonment and the death penalty.  Mark Joseph Stern, *Georgia Just Criminalized Abortion. Women Who Terminate Their Pregnancies Would Receive Life in Prison*, SLATE (May 7, 2019), https://slate.com/news-and-politics/2019/05/hb-481-georgia-law-criminalizes-abortion-subjects-women-to-life-in-prison.html [https://perma.cc/PSK2-PJ86].

[496]   So long as the abortion is in the first trimester, women should be able to seek medical care by indicating that they were suffering from a miscarriage, not an abortion.  Reader, *supra* note 433.

[497]   Though this pretense will protect many women, it is becoming more common for zealous prosecutors to prosecute women experiencing pregnancy loss due to the perception that the woman was attempting to terminate the pregnancy.  *See, e.g.*, The Editorial Board, *When Prosecutors Jail a Mother for a Miscarriage*, N.Y. TIMES (Dec. 28, 2018), https://www.nytimes.com/interactive/2018/12/28/opinion/abortion-pregnancy-pro-life.html [https://perma.cc/TY69-LHJA].  I suspect these instances will continue to grow as illegal abortion becomes more common, harming women—especially poor women and women of color—experiencing abortion, miscarriage, and stillbirth.

[498]   *See* Aiken et al., *supra* note 469, at 93 (describing the various reasons women sought self-managed abortion, including the desire for privacy and the burdens associated with clinics); *A Roadmap for Research on Self-Managed Abortion in the United States*, GYNUITY HEALTH 1 (Aug. 2018), https://ibisreproductivehealth.org/sites/default/files/files/publications/US%20research%20roadmap%20self%20managed%20abortion.pdf [https://perma.cc/G6S3-8L4U]; Daniel Grossman, et al., *Self-Induction of Abortion Among Women in the United States*, 18 REPROD. HEALTH MATTERS 136, 144 (2010).

[499]   *See supra* Part II.

Pet. Ref. 921

manage in less safe ways—with physical trauma or ineffective supplements and herbs.[500]

Beyond the in-person dispensing requirement, if the FDA removed the rest of the REMS, the agency's abortion exceptionalism would cease, and patients would see additional benefits in accessing early abortion. Patients in states without their own prohibitions could obtain a prescription for medication abortion from any willing doctor and pick up the medication in any pharmacy.[501] Doctors in these states would still need to be educated about, and act in compliance with, local abortion laws before prescribing mifepristone, and some providers and pharmacists would refuse to prescribe or dispense mifepristone based on conscience,[502] but abortion would immediately become less siloed. And the more integrated abortion becomes in traditional healthcare, the more normal and less stigmatized it will be.

Primarily, removing the provider certification requirement will lead to an increase in physicians offering medication abortion.[503] No longer would providers need to opt into a prescribing system or identify as an abortion provider—they would simply provide early abortions to their patients when they need them. This would reduce the fear that the certified provider list could be leaked after a data breach, exposing all the providers on the list to harassment and violence.[504] Similarly, now that physicians can provide early abortion care from their home offices or via telemedicine (i.e., not always at clinics), they might similarly feel safer.[505] And if all pharmacies could similarly dispense the drug without certification, providers would no longer need to deal with the logistical burdens associated with dispensing the drug in house or establishing a relationship with a "certified pharmacy."[506] Given that 87% of counties in the United States lack an abortion provider, and 34% of women of reproductive age live in a county without an abortion

---

500   Ushma D Upadhyay, Alice F. Cartwright, Daniel Grossman, *Barriers to abortion care and incidence of attempted self-managed abortion among individuals searching Google for abortion care: A national prospective study*, 106 Contraception, 49, 49 (2022).

501   *Medication Abortion, supra* note 431.

502   *Self-Managed Medication Abortion, supra* note 216, at 43–44.

503   COHEN & JOFFE, *supra* note 123, at 223.

504   Mifeprex REMS Study Group, *supra* note 35, at 792.

505   *See* Cohen & Connon, *supra* note 130, at ix–x (noting that "partly because abortion providers are not safe, there are very few abortion providers in the United States").

506   *Self-Managed Medication Abortion, supra* note 216, at 43; Mifeprex REMS Study Group, *supra* note 35, at 792.

Pet. Ref. 922

provider,[507] increasing the number of providers could reduce the burden on existing abortion providers and improve access to abortion generally.

If the Supreme Court overrules *Roe v. Wade*, and roughly half the states ban abortion, increasing the number of abortion providers in abortion-supportive states will be urgently important.[508] In this scenario, abortion providers in half the country will be responsible for providing all U.S. abortions. Already, SB8—a Texas law that essentially bans abortions after six weeks in our country's second most populous state—have pushed providers to the brink of their capacity, even in distant states like Minnesota.[509] If half the country bans abortion, the entire system will experience immense strain, delaying care for everyone. To the extent the remaining states can increase the number of providers offering early abortion care, it will free up surgical abortion providers to focus their expertise on those needing abortions past ten weeks.

Removing the mifepristone REMS will also have an impact on miscarriage management. As mentioned above, recent research has suggested that the same combination of medications used for abortion (mifepristone and misoprostol) is more effective at treating a missed or incomplete miscarriage than the current protocol, which only involves misoprostol.[510] Without the mifepristone REMS, any provider could start prescribing the same protocol for missed or incomplete miscarriage as they do for abortion.[511] Not only does this benefit women who are experiencing a missed or incomplete miscarriage, but it would also help to reduce mifepristone's stigma. Pharmacists, for instance, would not know whether women picking up a prescription for mifepristone were using it for an abortion or for a miscarriage, making it more difficult for them to object to filling the prescription based on their conscience. This benefit would exist across the country—even in abortion-restrictive

---

[507]  *Data Center*, GUTTMACHER INST., https://data.guttmacher.org/states/table?state=US&topics=71+72+73&dataset=data [https://perma.cc/HV8J-JFJT].

[508]  Nash & Cross, *supra* note 465.

[509]  Ashely Hacket, After Texas' abortion ban, some groups have seen increased demand for abortions in Minnesota, Minn Post (Nov. 19, 2021), https://www.minnpost.com/health/2021/11/texas-abortion-ban-has-increased-demand-for-legal-abortions-in-minnesota-and-it-might-just-be-the-beginning/ [https://perma.cc/2EW8-GCMQ]("'However,' Rierson said, 'We're overwhelmed now. And if Roe falls, the combination of state level restrictions [in other states] and the lack of providers here means that we're not going to be able to meet the need if it's federally overturned.")

[510]  Schreiber et al., *supra* note 29, at 2161.

[511]  *Id.*

Pet. Ref. 923

states—as state laws limiting the provision of mifepristone are often tied to abortion, not mifepristone specifically. As a result, state laws would not limit mifepristone's use outside of the abortion context.

Removing the mifepristone REMS would radically change abortion care in parts of the United States. Already, the FDA's decision to remove the in-person dispensing requirement means that patients will no longer need to travel long distances to clinics for early abortion, nor will they need to deal with the harassment of protesters. Patients will be able to terminate an early pregnancy at home, entirely through telemedicine. If the FDA removed the rest of the unnecessary and burdensome requirements, more providers would offer early abortion care, and there will be less of an incentive for patients to rely on self-managed abortion to end a pregnancy. Mifepristone could be used for a variety of obstetric uses, making it harder to politicize. However, in other parts of the country, access to legal abortion will not improve; instead, state legislatures will continue to chip away at abortion rights—banning it completely if the Supreme Court allows. Self-managed, illegal abortion will likely become the norm in those states, which will be difficult to regulate and police. Though the best evidence suggests that self-managed abortion is safe, there are legal risks, and many women would likely prefer to have a doctor oversee their abortion.

CONCLUSION

Medication abortion is an effective and safe way to end a pregnancy in the first ten weeks. Nevertheless, the FDA has dramatically limited its distribution by imposing a REMS—a tool intended to protect the public from particularly risky drugs. The REMS has segregated medication abortion outside of traditional healthcare settings and into abortion and family planning clinics. Before December 2021, the REMS also banned remote abortion through telehealth, dramatically reducing access to abortion across the country.

Removing the REMS could represent the largest increase in abortion access in decades, at least in the states that have not passed state laws that limit access to medication abortion. Patients in those states will be able to receive abortion care entirely from the comfort of their own homes at lower cost through telemedicine, never having to face the harassment associated with abortion clinics. More providers will be able to provide early abortion care—and do so anonymously without

Pet. Ref. 924

threats of harassment and violence. None of these benefits will be felt by those in states that continue to limit medication abortion, and as a result, the FDA's decision to remove or modify the mifepristone REMS, as it began to do in December, will accelerate the trend toward polarization in abortion regulations across the United States. This trend will only increase if *Roe v. Wade* is limited or overturned as some states will outlaw abortion entirely, while patients in the remaining states will continue to experience the benefits associated with easier access to medication abortion.

Pet. Ref. 925



# LIVING

in the

# CROSSHAIRS

The

## UNTOLD STORIES

of

## ANTI-ABORTION TERRORISM

**David S. Cohen & Krysten Connon**

Pet. Ref. 926

Electronic copy available at: https://ssrn.com/abstract=2577010

# LIVING
## IN THE
# CROSSHAIRS

———◦◦◦———

Pet. Ref. 927

Electronic copy available at: https://ssrn.com/abstract=2577010

Pet. Ref. 928

Electronic copy available at: https://ssrn.com/abstract=2577010

# LIVING
## IN THE
# CROSSHAIRS

*THE UNTOLD STORIES OF*
*ANTI-ABORTION TERRORISM*

DAVID S. COHEN
AND
KRYSTEN CONNON



Pet. Ref. 929

Electronic copy available at: https://ssrn.com/abstract=2577010

## OXFORD
### UNIVERSITY PRESS

Oxford University Press is a department of the University of
Oxford. It furthers the University's objective of excellence in research,
scholarship, and education by publishing worldwide.

Oxford    New York

Auckland   Cape Town   Dar es Salaam   Hong Kong   Karachi
Kuala Lumpur   Madrid   Melbourne   Mexico City   Nairobi
New Delhi   Shanghai   Taipei   Toronto

With offices in

Argentina   Austria   Brazil   Chile   Czech Republic   France   Greece
Guatemala   Hungary   Italy   Japan   Poland   Portugal   Singapore
South Korea   Switzerland   Thailand   Turkey   Ukraine   Vietnam

Oxford is a registered trademark of Oxford University Press
in the UK and certain other countries.

Published in the United States of America by
Oxford University Press
198 Madison Avenue, New York, NY 10016

© Oxford University Press 2015

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the prior
permission in writing of Oxford University Press, or as expressly permitted by law,
by license, or under terms agreed with the appropriate reproduction rights organization.
Inquiries concerning reproduction outside the scope of the above should be sent to the
Rights Department, Oxford University Press, at the address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

Library of Congress Cataloging-in-Publication Data
ISBN 978–0–19–937755–8

1 3 5 7 9 8 6 4 2
Printed in the United States of America
on acid-free paper

Pet. Ref. 930

Electronic copy available at: https://ssrn.com/abstract=2577010

*To Jennifer Boulanger*

Pet. Ref. 931

Electronic copy available at: https://ssrn.com/abstract=2577010

Pet. Ref. 932

Electronic copy available at: https://ssrn.com/abstract=2577010

# CONTENTS

Preface   ix

Introduction   1

1.   Seven Stories of Targeted Harassment   21

2.   Where Targeted Harassment Occurs   57

3.   Tactics of Targeted Harassment   75

4.   Secondary Targets   109

5.   Providers' Reactions to Targeted Harassment   123

6.   Prevention and Protection   147

7.   Six Stories of Law and Targeted Harassment   173

8.   Legal Responses to Targeted Harassment   205

9.   Legal Reform   235

10.   Why Abortion Providers Continue   269

Notes   285

Acknowledgments   309

Provider Index   315

Index   319

Pet. Ref. 933

Electronic copy available at: https://ssrn.com/abstract=2577010

Pet. Ref. 934

Electronic copy available at: https://ssrn.com/abstract=2577010

# PREFACE

⸺

Abortion is one of the most common medical procedures in the United States, as three in ten women will have the procedure in their lifetime. Every year, over one million women have an abortion. Since the US Supreme Court decided *Roe v. Wade* in 1973 and decriminalized abortion, there have been over fifty million abortions performed in the United States. Although there is variation, women of all ages, religions, races, socioeconomic groups, and family statuses have abortions.[1]

Not only is abortion one of the most common medical procedures, but it is also an incredibly safe procedure in the United States. In fact, abortion is much safer than childbirth. From 1998 to 2005, sixty-four women died from a legal abortion out of over ten million abortions performed; in contrast, over 2,800 women died from childbirth out of thirty-two million pregnancies that resulted in live birth. The rate of death of women undergoing legal abortion is fourteen times lower than the rate of death from childbirth. Moreover, every significant complication associated with pregnancy is more common with childbirth than with abortion.[2]

However, despite abortion being such a common and safe medical procedure, individuals who provide abortion care cannot count on their own personal safety, and partly because abortion providers are not safe,

Pet. Ref. 935

Electronic copy available at: https://ssrn.com/abstract=2577010

there are very few abortion providers in the United States. Because of their work, abortion providers have been murdered, shot, kidnapped, assaulted, stalked, and subjected to death threats. Their clinics have been bombed, attacked with noxious chemicals, invaded, vandalized, burglarized, and set ablaze. Individual abortion providers have been picketed at home and have received harassing mail and phone calls. Their family members have been followed where they work, their children have been protested at school, and their neighbors' privacy has been invaded. Partly as a result of this terrorism, medical facilities providing abortion services have decreased by almost 40% since 1982, 89% of counties in the United States have no abortion provider, and only 14% of obstetrician-gynecologists perform the procedure.[3]

This book tells the stories of abortion providers targeted by anti-abortion harassment in these extreme ways, explores how this harassment seriously affects their lives, and offers suggestions as to what the legal system can do about it.

Pet. Ref. 936

Electronic copy available at: https://ssrn.com/abstract=2577010

# Introduction

ON SUNDAY, MAY 31, 2009, in Wichita, Kansas, anti-abortion extremist Scott Roeder assassinated Dr. George Tiller. That morning, Dr. Tiller was in his church foyer awaiting the beginning of services, having completed his duties as an usher. As the pastor began the music signaling the start of services, Roeder, who had been sitting in the adjacent sanctuary waiting for Dr. Tiller, walked through the doors into the foyer. He walked straight to Dr. Tiller, pulled a gun from his pocket, pressed the barrel against Dr. Tiller's forehead just above his right eye, and pulled the trigger. Dr. Tiller dropped to the floor, dead from the single gunshot.[1]

George Tiller was not the victim of a random act of violence; instead, he was murdered because he had become one of the most prominent abortion providers in the country. His medical practice started in 1970 when he took over his father's family medicine clinic. Over the years, Dr. Tiller's practice grew to include abortion care, and he eventually converted the general family medicine practice into a clinic that provided only abortion care.[2]

Dr. Tiller was at the center of the national controversy over abortion because of the particular nature of his clinic. As a result of both Kansas law and Dr. Tiller's compassion for patients in difficult situations, Dr. Tiller became an expert in late abortion. Like doctors in other clinics, Dr. Tiller performed routine and less controversial abortions in the first and second trimesters of pregnancy; however, unlike most other physicians, Dr. Tiller was both willing and able to perform

1

Pet. Ref. 937

Electronic copy available at: https://ssrn.com/abstract=2577010

abortions later in pregnancy. Women came to Dr. Tiller from around the country for abortions because of extreme fetal anomalies and severe maternal health complications that developed after the sixth month of pregnancy. For these women, Dr. Tiller was both a compassionate physician and one of their only options.[3]

However, to those who opposed abortion, Dr. Tiller became a national symbol of everything wrong with a country that permitted abortion. For instance, in the years preceding Dr. Tiller's murder, Bill O'Reilly, the nationally syndicated talk show personality and *Fox News* prime-time host, railed against Dr. Tiller. O'Reilly mentioned Dr. Tiller on his program twenty-nine times between 2005 and the month before Dr. Tiller's murder, repeatedly referring to Dr. Tiller as "Tiller the Baby Killer." O'Reilly accused Dr. Tiller of "operating a death mill," "executing babies about to be born," and "destroy[ing] fetuses for just about any reason right up until the birth date." In one particularly noteworthy rant, O'Reilly proclaimed, "If I could get my hands on Tiller—well, you know. Can't be vigilantes. Can't do that. It's just a figure of speech. But despicable? Oh, my God. Oh, it doesn't get worse. Does it get worse? No."[4]

As Dr. Tiller's abortion practice gained prominence, both Dr. Tiller and his clinic were the victims of many serious attacks and threats at the hands of anti-abortion[5] protesters. In 1986, Dr. Tiller's clinic was bombed, affecting two-thirds of the clinic structure and causing $100,000 in damage. In the summer of 1991, Operation Rescue, a New York–based anti-abortion group launched in 1986,[6] descended on Dr. Tiller's clinic and staged its largest protest ever. For six weeks, in what Operation Rescue called its "Summer of Mercy," hundreds of protesters repeatedly blocked the entrance to Dr. Tiller's clinic. The massive demonstration resulted in 2,700 arrests and culminated in a gathering of 25,000 anti-abortion activists at the Wichita State University football stadium.[7]

After the "Summer of Mercy," the attacks on Dr. Tiller became even more extreme. In 1993, Dr. Tiller was shot at point-blank range in both arms while leaving his clinic for the evening. In 1998, Dr. Tiller's clinic received a letter warning that it would be the target of an anthrax attack.[8] In 2006, Operation Rescue used an obscure provision of Kansas law to convene a citizen grand jury and investigate Dr. Tiller for the death of

Pet. Ref. 938

Electronic copy available at: https://ssrn.com/abstract=2577010

one of his patients; the grand jury investigation was short-lived and did not issue an indictment against Dr. Tiller. Throughout the early 2000s, avowedly anti-abortion Kansas Attorney General Phill Kline led multiple investigations into Dr. Tiller, his patients, and his clinic, none of which resulted in any legal action against Dr. Tiller.[9] Kline's successor, Paul Morrison, filed nineteen misdemeanor charges against Dr. Tiller in 2007, alleging that Dr. Tiller sought legally mandated second opinions from a physician with whom he had a financial relationship. After a widely publicized trial in early 2009, Dr. Tiller was acquitted of all wrongdoing.[10]

Dr. Tiller also experienced attacks and threats that, although they garnered less attention, nonetheless affected his day-to-day life. He was the subject of repeated death threats, as were members of his family and clinic staff. Old West–style "Wanted" posters with Dr. Tiller's name, picture, and personal information appeared throughout Wichita. The signs offered a vague "reward" for Dr. Tiller. Anti-abortion demonstrators picketed Dr. Tiller's home and stalked his wife. They also repeatedly showed up at Dr. Tiller's church, harassing the congregants and interrupting services.[11]

Dr. Tiller significantly altered his life to deal with the constant harassment and threats. He outfitted his vehicles with armored protection, hired lawyers to protect him, and bought expensive bulletproof glass and security systems. As a result of the threats, Dr. Tiller lived with US Marshal protection at various times in his life. In addition, Dr. Tiller wore a bulletproof vest to work, strategically took different routes on his way to the clinic, and usually drove in the right-hand lane because a security expert had told him this technique gave potential attackers fewer angles of approach.[12]

Dr. Tiller's experiences with these constant threats, harassment, and attacks took place against a backdrop of increasing violence against abortion providers in the United States. Starting in the 1970s and escalating through the 1980s, abortion clinics regularly suffered bombings, arsons, and chemical weapon attacks committed by anti-abortion protesters. Protesters also developed intricate methods to physically blockade entrances to clinics, including chaining themselves underneath cars and placing their heads in cement blocks deposited in front of clinic doorways. Throughout the 1980s, anti-abortion protesters also targeted

Pet. Ref. 939

Electronic copy available at: https://ssrn.com/abstract=2577010

4     LIVING IN THE CROSSHAIRS

individual abortion providers by, for example, making death threats against doctors and clinic workers.[13]

In the early 1990s, anti-abortion harassment escalated. In 1993, Dr. David Gunn became the first abortion provider to be murdered by an anti-abortion extremist. Dr. Gunn provided abortions in Pensacola, Florida, and was murdered after anti-abortion protestors hanged an effigy of him and posted "Wanted" flyers of him around town. In mid-1994, Dr. John Britton and retired Air Force Lieutenant Colonel James Barrett, who worked as a volunteer escort for the clinic where Dr. Britton performed abortions, were murdered in front of the same clinic in Pensacola where Dr. Gunn was murdered. At the end of 1994, two receptionists at different clinics in the Boston area, Shannon Lowney and Leanne Nichols, were shot and killed in an attack that concluded with the murderer driving to Norfolk, Virginia, and firing shots at a clinic there. In 1998, a clinic in Birmingham, Alabama, was bombed, killing Robert Sanderson, the clinic's part-time security guard. Later in 1998, a sniper murdered Dr. Barnett Slepian by shooting him through his kitchen window while he was preparing dinner. With Dr. Tiller's murder in 2009, the total number of confirmed abortion-related murders in the United States now stands at eight.[14]

These murders have not been the only incidents of violence against individual abortion providers. Other providers have been kidnapped, shot, bombed, and attacked. Scott Roeder existed on the fringes of this violent anti-abortion movement in the years before he ultimately killed Dr. Tiller. After flirting with the militia movement in the early 1990s, Roeder began on his path of anti-abortion violence.[15] In the mid-1990s, he associated with several prominent violent anti-abortion activists and threatened a Kansas City abortion doctor at his clinic. In 1996, police found bomb-making materials in Roeder's car, which Roeder admitted he intended to use against an abortion clinic. He was convicted and sentenced to twenty-four months of probation for using explosives, but the Kansas Court of Appeals ultimately overturned the conviction.[16]

Roeder became more involved in the anti-abortion movement after this incident. He began associating with Operation Rescue and posting his thoughts about Dr. Tiller on various websites. In 2009, he was in the courtroom during the trial over Dr. Tiller's alleged relationship with a consulting physician and reacted angrily when Dr. Tiller was acquitted.

Pet. Ref. 940

Electronic copy available at: https://ssrn.com/abstract=2577010

Roeder picketed Dr. Tiller's clinic in Wichita and demonstrated outside of Dr. Tiller's church on Sundays. In the weeks preceding Dr. Tiller's murder, Roeder twice vandalized a clinic in Kansas City, something he had done multiple times before.[17]

After shooting and killing Dr. Tiller on May 31, 2009, Roeder was quickly apprehended and brought to trial. At his trial, he attempted to use a "necessity" defense, claiming that murdering Dr. Tiller was necessary to save the thousands of babies that he believed Dr. Tiller murdered with his abortion practice. The judge rejected this defense, and the jury ultimately convicted Roeder of first-degree murder. Roeder was sentenced to life in prison with the possibility of parole after fifty years. A federal grand jury investigated whether Roeder conspired with any individual or group to kill Dr. Tiller, but there is no public information about the results of that investigation.[18]

Dr. Tiller's murder is the most high-profile act of anti-abortion violence to occur since Dr. Slepian's murder in 1998. As of the writing of this book, there have been no subsequent murders of abortion providers. However, anti-abortion violence and extremism continue. According to the most recent statistics available from the National Abortion Federation, from 2010 to 2013 there were 9 attempted or successful bombings and arsons; 66 acts of vandalism; 425 incidents of trespassing; 8 clinic invasions; 2 anthrax/bioterrorism threats; 14 incidents of assault and battery; 12 death threats; 18 bomb threats; 26 acts of burglary; and 34 incidents of stalking.[19]

### Targeted Harassment of Abortion Providers

Extreme forms of violence and aggression against individuals involved in abortion care, like Dr. Tiller's assassination, make local, if not national, headlines when they occur. But these extreme examples hardly represent the full extent of the ways in which abortion opponents terrorize providers. Other forms of harassment occur much more frequently but go almost completely unnoticed in national headlines. While a media outlet will occasionally feature an in-depth story about a particular provider and her day-to-day struggles dealing with harassment from abortion opponents, this type of harassment usually flies under the radar of the national consciousness and discourse surrounding abortion. Based

Pet. Ref. 941

Electronic copy available at: https://ssrn.com/abstract=2577010

6    LIVING IN THE CROSSHAIRS

on interviews with abortion providers from around the country, this book rectifies this missing element in the national story about abortion by telling and analyzing providers' stories of the targeted harassment they face.

To the extent that people are aware of anti-abortion protest and harassment beyond the high-profile attacks and murders, they are most likely familiar with what this book calls *general clinic protest*. General clinic protest can take many forms, but the most common type occurs when abortion opponents protest in front of a clinic. They do so for many reasons, including to express their opposition to abortion to both clinic employees and passersby, to try to change the minds of women entering the clinic so they do not obtain an abortion, to "bear witness" to what they believe is a mass slaughter, and to participate in the national movement to end abortion.[20]

General clinic protest has serious effects on women seeking abortion, people providing abortion, the clinics and offices where abortion occurs, and the national debate about the issue. These effects have been well documented.[21]

This book is about something different, what we call *targeted harassment of abortion providers*. This term refers to acts of anti-abortion protest that are or are perceived to be specifically focused on individual abortion providers. Two parts of this definition require explanation.

First, since targeted harassment of abortion providers is or is perceived to be directed toward individuals, this type of protest differs from general clinic protest, which is focused on the clinic, the clinic's patients, or the larger issue of abortion, not the specific individuals who work inside the clinic. Targeted harassment of abortion providers also differs from anti-abortion rallies or political events that are focused on the general issue of abortion. These categories are not hermetically sealed as general clinic protest and political rallies can also target individuals, but the distinction is important.

According to data from the Feminist Majority Foundation, individualized targeting has been on the rise. In 2014, the organization surveyed abortion clinics in the United States and found that there are "significantly higher levels of threats and targeted intimidation of doctors and staff than in prior years." Moreover, "the overall percentage of clinics impacted by these types of threats and targeted intimidation

Pet. Ref. 942

Electronic copy available at: https://ssrn.com/abstract=2577010

tactics increased dramatically since 2010, from 26.6% of clinics to 51.9% of clinics."[22]

This increase is possibly explained by the fact that, as political scientist Alesha Doan has described, the people who work inside clinics are an effective target for anti-abortion protesters. Harassing them "is relatively cheap to implement, generates publicity, and introduces costs to clinic employees." It can also produce "more immediate" results than "long-term legislation aimed at incrementally restricting services." Moreover, abortion providers are nongovernmental actors who often do not have the resources or political pull to effectively curb harassment and are vulnerable because "they must contend with it on a regular basis."[23]

Second, the targeted harassment that is the focus of this book includes harassment against anyone who works in providing abortion care. Some people within the world of abortion use the term "abortion provider" to mean only doctors who perform the procedure. However, we use the term more broadly to encompass the many people who work to provide women a safe, caring, and medically-skilled environment in which to have an abortion. This includes not only the doctors who perform abortions but also referring physicians, nurses, physician assistants, administrative staff, counselors, clinic owners, security guards, and volunteer escorts and supporters. All of these people have been the subject of individualized targeted harassment by anti-abortion protesters. After all, in the brief account of abortion violence provided earlier, four of the eight murder victims were not doctors. These four—a volunteer escort in Pensacola, two clinic receptionists in the Boston area, and a clinic security officer in Birmingham—were all murdered because of their role in providing safe and competent abortion care. Their deaths, along with the targeted harassment experiences of providers who are not physicians, are no less important in understanding the ways in which the lives of individuals involved with abortion provision are affected by anti-abortion protest.[24]

Based on interviews with abortion providers from around the country, this book seeks to show that targeted harassment of abortion providers has been and continues to be a serious issue. It exists in a wide variety of forms all over the country and can profoundly affect the daily lives of abortion providers everywhere. Contrary to some commonly held assumptions, this harassment is not a relic of some distant past, is

Pet. Ref. 943

Electronic copy available at: https://ssrn.com/abstract=2577010

8    LIVING IN THE CROSSHAIRS

not directed solely against high-profile doctors like Dr. George Tiller, and is not limited to only the most conservative parts of this country. Rather, it is a severe, ongoing, and nationwide problem that needs to be addressed.[25]

### Legal Response

In addition to highlighting abortion providers' experiences with targeted harassment, this book explores various legal responses to targeted harassment of abortion providers and ways to improve the law. Providers interact with the law in various ways. In a country like the United States in which federal, state, and local governments often tackle the same problems, the legal response to the targeted harassment of abortion providers invokes a patchwork of laws and people enforcing those laws. Even though law alone cannot stop the targeted harassment and violence that providers face, law can improve so that more abortion providers can perform this legal and common medical procedure free of fear and harassment.

Law can address targeted harassment in many ways. Basic criminal laws in every jurisdiction, such as laws that criminalize murder, arson, burglary, assault, and trespassing, can be an effective response to targeted harassment of abortion providers when that harassment constitutes a crime and when the person responsible for the crime can be identified. However, targeted harassment involving crime does not always end in a conviction. For a variety of reasons, many crimes against abortion providers remain unresolved—the suspect is unknown, the police refuse to take sides when the anti-abortion protester says one thing and the abortion provider says another, or the police have an attitude that pursuing such crimes is not worth their time or that abortion providers should expect to deal with anti-abortion crime specifically because they work in abortion care.

Beyond run-of-the-mill criminal law, there are other ways that law addresses targeted harassment of abortion providers. Perhaps the most important law relating to anti-abortion protest is the Freedom of Access to Clinic Entrances Act (FACE). Signed into law in 1994, FACE is a federal law that prohibits using force, threat of force, or physical obstruction to injure, intimidate, or interfere with anyone trying to provide or access reproductive health services. FACE violations can result in criminal

Pet. Ref. 944

Electronic copy available at: https://ssrn.com/abstract=2577010

penalties or a civil lawsuit.[26] In some circumstances, federal law also provides protection for abortion providers from the US Marshals Service.

State and local laws also address targeted harassment of abortion providers. Some laws regulate how close protesters can stand in relation to an abortion clinic, its patients, or its workers. Other laws address protesting in a residential neighborhood, with some prohibiting it altogether and others regulating it, such as requiring protesters to keep moving or to be there only during certain hours. Still other laws give providers the option to sue protesters for violating their privacy or harming them in other ways. Sometimes providers can also obtain injunctions from courts to prevent these harms from happening again.

This mix of legal response is subject to the usual vagaries of the legal system. Individuals within the legal system, from police officers to district attorneys to judges to politicians, are often constrained by time and resources. Moreover, they may have their own prejudices about abortion that influence how they respond to any situation. Lawyers usually cost significant amounts of money, which means it can be difficult for an abortion provider to access help in navigating the legal system. And all of this occurs against the backdrop of the First Amendment guarantee of freedom of speech, which protects abortion opponents in certain expressions of anti-abortion speech.

This description of the legal responses and issues related to targeted harassment of abortion providers just scratches the surface of the complexities that will be addressed throughout this book. Collectively, the abortion providers that we interviewed have experiences with almost every avenue of legal redress for the harassment they face. Their stories help inform the analysis in the second half of this book, which looks at how the legal system's different approaches work for abortion providers and then shows that these systems can improve.

## Current Significance

The two overarching messages of this book—that targeted harassment of abortion providers continues to be a serious problem and that the legal system's response can improve—are important for several reasons. First, targeted harassment of abortion providers left unaddressed by the legal system can drastically hinder abortion access. Many of

Pet. Ref. 945

Electronic copy available at: https://ssrn.com/abstract=2577010

the providers we interviewed told stories of colleagues they knew who would not work in abortion care because they feared the possibility of harassment.

A recent study by sociologist Lori Freedman bears this out. She looked at the reasons why doctors who were trained in abortion in their residency did or did not perform abortions in their practice. Freedman came across several doctors who voiced concerns about targeted harassment. One doctor who had previously provided abortions stopped doing so "because of the violence of the anti-abortion movement, which she felt could put her family at risk." Another doctor started a job in a new medical practice soon after Dr. Slepian was murdered and said, "[A]fter that experience . . . it wasn't worth it. [It's a] small town, and I didn't want to have to worry about all of that—you know, get a [bulletproof] vest and all that." Freedman concluded that, although fear of violence and harassment was not the most prominent reason doctors did not provide abortion, it was a serious concern for some doctors, particularly those in rural areas. Even though targeted harassment of abortion providers does not deter all providers, it does deter some, contributing to the decreasing accessibility of abortion.[27]

Second, people providing basic medical services should not be harassed for doing so, and law and society should understand the nature of this harassment and respond by protecting providers. At its most basic level, abortion is a medical procedure that more than 50 million women have obtained safely and legally since *Roe v. Wade*.[28] It is one of the most common procedures in the United States. Physicians and others who provide abortion should not suffer threats, harassment, intimidation, and violence for providing a basic and common medical service. The politicization and stigmatization surrounding abortion do not justify terrorizing the lives of the people providing this legal procedure. Moreover, harassment reaches beyond just the providers. Providers' neighbors and families, including young children and elderly parents, often feel the brunt of the targeted harassment as abortion opponents target them in an effort to coerce the provider. Very few notions of justice would countenance this type of harassment in the context of lawful medical care; yet despite the extent that anti-abortion harassment permeates providers' daily lives, few people and legal actors understand the true nature of life as an abortion provider.[29]

Pet. Ref. 946

Electronic copy available at: https://ssrn.com/abstract=2577010

Third, in the midst of the current "war on women," it is important to understand yet another way that women's rights are threatened and how law plays a role. Women's issues have dominated the political landscape in the early 2010s, from issues of pay equity to insurance coverage for contraception to the definition of "rape" to whether immigrants and lesbian-gay-bisexual-transgender people should receive benefits under the Violence Against Women Act. Perhaps most prominent, though, have been issues of reproductive rights. Attacks on abortion have become commonplace in state legislatures. In fact, by a large margin, states enacted more legislation restricting abortion in each of 2011, 2012, and 2013 than in any previous year (92 laws in 2011, 43 in 2012, and 70 in 2013 compared with the previous high of 34 in 2005).[30]

The current political climate places this book's two messages in tension. On the one hand, understanding targeted harassment of abortion providers is undeniably important so that people are exposed to all aspects of this larger war on women. On the other hand, the argument that legal responses can improve to address targeted harassment is a difficult pill to swallow in an environment in which law is also being used to restrict women's rights, particularly around abortion and other reproductive health issues. If the political system is currently using law to restrict access to abortion, then how can we seriously hope that law can be used to help abortion providers and, by extension, help the women who need access to abortion care? There are two main responses to this conundrum.[31]

First, people providing medical care should never have to worry about individual safety and security because of their work, even in an environment seemingly opposed to abortion rights. Second, educating the general public about the ways that abortion providers are harassed, threatened, and terrorized could shift public opinion and encourage legal responses that better protect abortion providers, thus improving abortion access more generally. In other words, if people understood the truly unsettling extent of the methods of attack in this war on women, the entire war might not be so appealing.

### This Interview-Based Study

This book delivers its two messages by presenting and analyzing original research drawn from interviews with abortion providers across the

Electronic copy available at: https://ssrn.com/abstract=2577010

country. From the middle of 2011 through the beginning of 2014,[32] we interviewed eighty-seven abortion providers about their experiences with anti-abortion protest and harassment. All but five of those interviewed detailed experiences with targeted harassment. Of the eighty-two who spoke about their experiences as targets, seventy-five described experiences that occurred within ten years of the interview.

For a variety of reasons, including the privacy and safety concerns at the heart of this book, we were not able to interview a random representative sample of abortion providers from around the country; nonetheless, we culled a diverse cross section of abortion providers in the United States,[33] including physicians, other medical professionals, staff, executive directors, and volunteers. We interviewed people who were new to the field of abortion and those who had been working in abortion for more than half a century. We interviewed people who were young, old, and everywhere in between. We interviewed men and women of various races, religions, ethnicities, and sexual orientations.

The providers in this study have worked in the field of abortion in thirty-four states. Some have worked in the same state for their entire career, while others have worked in multiple states over the course of their time as an abortion provider, often working in more than one state at the same time. All of the providers worked in urban or suburban areas of various population sizes, which is consistent with the fact that abortion clinics are concentrated in only 11% of the counties in the United States.[34] Nonetheless, the providers live in every type of locale—from dense urban centers to suburban areas to rural farmland.

The providers also work or worked in a variety of abortion-care settings. For many reasons that have been documented extensively, abortion provision in the United States has moved away from the hospital setting and into separate clinics that specialize in abortion and reproductive healthcare.[35] Some doctors continue to provide abortions in hospitals or their own private practices, but most abortions occur in specialty clinics. These clinics can be divided into roughly two different types—those that are affiliated with Planned Parenthood and those that are independently owned and operated. The people we interviewed have provided abortions in all of these settings—hospitals, Planned Parenthood health centers, independent clinics, and private medical practices.

Pet. Ref. 948

Electronic copy available at: https://ssrn.com/abstract=2577010

The interviews were structured, but open-ended. All but fifteen of the interviews were conducted in person and at the provider's preferred location, mostly in providers' places of business but also in their homes or convenient public spaces. We approached each interview with general topics to address but did not use a rigid format to be followed regardless of the responses. Rather, the interview subjects responded and told their stories as they saw fit, and we then asked follow-up questions as necessary to make sure we covered all of the topics. The basic topics we covered were providers' experiences with protest generally and targeted harassment in particular; their reactions to the harassment they have experienced; interactions with law, if any; and the providers' thoughts about their interactions with law. Given the nature of the topic, the subjects' varying approaches to being interviewed, and their different depths of experience with the topic, the interviews ranged from fifteen minutes to over two hours and revealed many unexpected aspects of life as an abortion provider.

Also, given the nature of targeted harassment, we offered the participating providers confidentiality and anonymity. Because we did not want this research to put any provider at risk, almost all of the names in this book are fictional and almost all of the descriptions of the providers are generalized and nonspecific.[36] To the extent that providers' stories have details that could possibly identify them, such information has been changed without any indication in the text that we have done so. We have not altered the nature of the stories told here, only identifying details.[37]

Participating in a study like this is risky for providers. A book detailing the ways that anti-abortion protesters harass abortion providers and then analyzing the effect of that harassment could inspire other protesters to pursue new avenues of harassment. This is not a risk that we take lightly, so we discussed it in detail with all of the people we interviewed. Not a single person declined to continue the interview after discussing this as everyone felt that the benefit of telling these stories and thinking about how law can better respond to this harassment was of utmost importance. The providers felt strongly that their stories needed to be shared with the public.

Before each of the interviews, we discussed another major risk with the providers. We warned the providers that talking about their experiences

Electronic copy available at: https://ssrn.com/abstract=2577010

with targeted harassment could be emotionally difficult. For many people we talked with, it was just that. They opened up to us about some of the most difficult moments in their lives. They told us stories that they had told very few others. They cried about personal memories and became angry about the way they are treated. They trusted us with details of moments in their lives when they felt vulnerable. They welcomed us into their homes and offices, two places many providers vigilantly guard precisely because of the targeted harassment they face. Without any compensation in return, they were generous with their time and hospitality in ways we never could have imagined. And all this openness, trust, and generosity came to us even though we had not met most of the providers in person before the interview and had only corresponded with them for a short time by phone or e-mail. The providers participated in this manner because they trusted us to listen to their stories and use what we learned from the interviews to improve their lives. We hope this book does their trust justice.

## Key Findings

This book has several key findings. These findings are explained in detail throughout the book but summarized here to frame what will come in the following chapters.

First, targeted harassment of abortion providers takes an incredible variety of forms, from high-profile incidents like the murders described earlier in this introduction to more routine and private events like picketing at someone's home or church. The variety of harassment tactics detailed in the interviews is staggering. In almost every interview, a different type of targeted anti-abortion harassment emerged. Many tactics are repeated around the country, but many others are unique to particular individuals or locations.

Second, targeted harassment of abortion providers is ongoing and can happen to anyone associated with abortion provision. This finding calls into question many common misperceptions about abortion-related harassment. Many people believe that targeted harassment is a relic of a past when federal law was silent on the issue, Operation Rescue was more active, and doctors were more frequently being murdered.[38] These interviews show that this is not true; rather, targeted harassment

Pet. Ref. 950

Electronic copy available at: https://ssrn.com/abstract=2577010

continues today and can be a major aspect of abortion providers' daily lives. While some of the stories in this book are from decades past, the majority of the experiences told throughout these chapters are much more current.

Moreover, many people believe that targeted harassment is a problem only for doctors and occurs only in the most conservative states or locations in the country. In fact, many of the people we interviewed expressed these beliefs. However, the stories in this book reveal that this is not true. Doctors do experience a great deal of the targeted harassment that occurs, but so do nurses, counselors, administrative staff, executive directors, volunteers, and others associated with abortion provision. Targeted harassment is aimed at every type of provider all around the United States, from populous liberal urban areas to remote conservative rural areas.

The previously described murders illustrate these points. Of the eight murders that are directly attributable to anti-abortion violence, four have been of doctors and four have been of others who work at clinics. With respect to political leanings and geography, five occurred in Kansas, Alabama, and Florida, states generally considered more conservative, but three occurred in Massachusetts and New York, states generally considered more liberal. The stories in this book are likewise not tied to the general political leanings of a particular location.

Third, targeted harassment affects abortion providers' lives in serious ways and invokes a variety of reactions. Many providers report giving the harassment very little thought and just accepting its effects and the risks it poses as a normal part of life, like the everyday risk of being in a traffic accident. Others report a variety of negative emotions, such as being annoyed, angered, or frustrated by the harassment. Still others report much more serious emotions in response, such as living in fear or feeling terrorized.

Regardless of their specific emotional reactions to the targeted harassment, abortion providers report that it often substantially interferes with their lives. Because of targeted harassment, directed at both them and others in their profession, some abortion providers are hypervigilant, alter their routes to and from work and home, hide their identities, refrain from discussing their work publicly, and take other measures to increase their sense of personal safety. The harassment

Pet. Ref. 951

Electronic copy available at: https://ssrn.com/abstract=2577010

affects providers' personal relationships and home lives, affects their non-abortion-related businesses, and threatens their long-term emotional health. Fearing the worst, some providers wear bulletproof vests and carry concealed weapons.

Despite these negative effects, targeted harassment often strengthens providers' resolve as well as their commitment to providing abortion care. Many providers remain motivated to stay in the field despite the harassment because of their memories of a pre–*Roe v. Wade* era when women were injured or even died from illegal, unsafe abortions. Only a small number report thinking about leaving the work or actually leaving because of targeted harassment.

Fourth, law sometimes adequately addresses targeted harassment, but it can further improve. Many abortion providers told stories of law and law enforcement responding to targeted harassment in ways that significantly helped their lives. Positive responses and interactions occurred all over the country, not only in communities generally perceived as more supportive of abortion rights. The reverse was also true. Providers had negative interactions with law and law enforcement all over the country, not just in communities generally perceived as politically opposed to abortion.

Drawing from these stories, we ultimately propose several reforms. We recognize that these reforms alone are not likely to end targeted harassment, as legal reform cannot accomplish that by itself. But certain reforms can help, such as improving policing, adopting legislation that protects providers and punishes violations more severely, improving providers' access to and reception within the judicial system, and labeling targeted harassment of abortion providers as what it is—terrorism.

Ultimately, the last of these suggestions may be the most important. Though many abortion-rights advocates and some anti-abortion protesters have long used the term "terrorism" to describe the activities documented and analyzed in this book, it has not been universally adopted. In fact, in many contexts, it has been actively resisted. For instance, in March and April 2009, the Department of Homeland Security released two documents that included "anti-abortion extremism" within a larger discussion of domestic terrorism. As a result, the department faced intense backlash. Because of the public pressure, the

Pet. Ref. 952

Electronic copy available at: https://ssrn.com/abstract=2577010

department pulled both reports in May 2009[39]—just weeks before Dr. Tiller was murdered by anti-abortion terrorist Scott Roeder.

In light of the providers' lived experiences that are analyzed throughout this book, the department was wrong to backtrack on this point. Although there is no universally accepted understanding of terrorism, one leading definition that most relevantly captures the concept is "the deliberate creation and exploitation of fear through violence or the threat of violence in the pursuit of political change." Terrorist acts are so unsettling because they have "far-reaching psychological repercussions beyond the immediate victim or target."[40]

Scott Roeder's murder of Dr. Tiller is an excellent example of how terrorism works. Roeder shot and killed Dr. Tiller in the name of anti-abortion activism. Through this single and deliberate terrorist act, Roeder not only killed Dr. Tiller but also instilled fear throughout almost an entire field of medical professionals and volunteers. Anti-abortion protesters exploit providers' fear of extreme violence, a rational fear based on past violent acts, such as Dr. Tiller's murder, by following providers home from work, screaming at them with their private personal information, picketing their houses, or engaging in almost any of the activities documented in this book. Although a particular action by an anti-abortion protester may not itself be violent, its effectiveness is derived from the threat that it could escalate into the violence to that other abortion providers have faced. As other scholars have demonstrated, there are many objectives and motivations behind the actions of anti-abortion protesters,[41] but one of the central goals is the political and social change of ending abortion. Deliberate creation of fear to enact change: simply put, this is a form of domestic terrorism.

If these interviews and this book could help to influence people in government, media, classrooms, and everywhere else to call targeted harassment of abortion providers "terrorism" rather than "protest," the societal approbation that comes with such a term could influence some people to stop engaging in this behavior. In the meantime, while we are under no illusion that the reforms discussed in this book will put a complete end to abortion-related terrorism, we do hope that these suggestions help diminish it while also helping to make abortion providers feel safer and more comfortable providing lawful medical care.

Pet. Ref. 953

Electronic copy available at: https://ssrn.com/abstract=2577010

## Roadmap

The structure of this book follows its two main messages—that targeted harassment of abortion providers continues to be a serious problem and that the legal system can do a better job of addressing it.

The first half of this book describes and analyzes targeted harassment of abortion providers and the effect that it has on them, starting with Chapter 1, which has seven stories of abortion providers and their experiences with targeted harassment. Chapters 2, 3, and 4 then categorically break down the different types of targeted harassment abortion providers have experienced by examining where it happens, how it occurs, and against whom it is directed. These chapters present a comprehensive look at targeted harassment, answering the question, "What is the targeted harassment that abortion providers experience?" Chapters 5 and 6 finish this portion of the book by looking at providers' various responses to targeted harassment. Chapter 5 illustrates the range of their emotional responses, while Chapter 6 details the ways that abortion providers change their lives in response to targeted harassment. These two chapters answer the question, "How does targeted harassment affect abortion providers?"

The second half of the book focuses on abortion providers' experiences with the legal system. Chapter 7 starts by providing six stories of abortion providers and their experience with the law, and then Chapter 8 breaks down providers' different interactions with the legal system. These stories are supplemented by publicly available resources, such as cases and legislative responses to targeted harassment. Chapter 9 draws on the providers' reactions and thoughts with respect to the legal response to their targeted harassment and suggests reforms based on the providers' experiences.

The conclusion in Chapter 10 looks at reasons why abortion providers continue to provide abortions despite the terrorism they encounter. Though some providers knew of people who had stopped providing abortions because of targeted harassment and one of the providers we interviewed permanently left the field as a direct result of the harassment she endured,[42] everyone else explained why they stayed in this profession: their commitment to their patients, their commitment to women's

Pet. Ref. 954

Electronic copy available at: https://ssrn.com/abstract=2577010

rights, their refusal to return to the days when women were injured or died from illegal abortion, their refusal to let the terrorists win.

Easing this burden on these dedicated health care providers' lives is the reason we have written this book. No one should have to face this terrorism and exhibit such extraordinary resolve just to provide women with legal, safe, and basic medical care.

Pet. Ref. 955

Electronic copy available at: https://ssrn.com/abstract=2577010

# NOTES

## Preface

1. The Guttmacher Institute publishes some of the most widely used and respected data about abortion in the United States. See Rachel K. Jones and Jenna Jerman, "Abortion Incidence and Service Availability in the United States, 2011," *Perspectives on Sexual and Reproductive Health* 46 (2014): 3–14.

2. Elizabeth G. Raymond and David A. Grimes, "The Comparative Safety of Legal Induced Abortion and Childbirth in the United States," *Obstetrics & Gynecology* 119 (2012): 215–19. On abortion safety generally, see Ushma D. Upadhyay et al., "Incidence of Emergency Department Visits and Complications After Abortion," *Obstetrics & Gynecology* 125 (2015): 175–183; Elizabeth G. Raymond and Daniel Grossman, "Mortality of Induced Abortion, Other Outpatient Surgical Procedures and Common Activities in the United States," *Contraception* 90 (2014): 476–79.

3. Jones and Jerman, "Abortion Incidence," supra note 1; Debra Stulberg et al., "Abortion Provision Among Practicing Obstetrician-Gynecologists," *Obstetrics & Gynecology* 118 (2011): 609–14.

## Introduction

1. Stephen Singular, *The Wichita Divide: The Murder of Dr. George Tiller and the Battle over Abortion* (New York: St. Martin's Press, 2011), 207–14.

2. Ibid., 13–17.

3. Ibid., 28–36.

Pet. Ref. 956

Electronic copy available at: https://ssrn.com/abstract=2577010

286    NOTES TO PAGES 2–4

4. Ibid., 105–6; Gabriel Winant, "O'Reilly's Campaign against Murdered Doctor," Salon (May 31, 2009), http://www.salon.com/2009/05/31/tiller_2/; "O'Reilly 2006 Anti-Tiller Rant," Media Matters for America (June 1, 2009), http://mediamatters.org/video/2009/06/01/oreilly-2006-anti-tiller-rant-if-i-could-get-my/150722.

5. We use the term "anti-abortion" throughout the book rather than other terminology sometimes associated with the same position, such as "pro-life." As sociologist Dallas Blanchard has written, the term "pro-life" can incorporate other political concerns, such as the death penalty and war. Moreover, abortion providers often believe that providing abortion care furthers life by protecting women's lives. Therefore, because this book focuses on the single issue of opposition to abortion, it uses a term that clearly conveys that. See Dallas Blanchard, *The Anti-Abortion Movement and the Rise of the Religious Right: From Polite to Fiery Protest* (New York: Twayne Publishers, 1994), 1–2.

6. Operation Rescue continues to exist, though it split into Operation Save America (based in Dallas, Texas) and Operation Rescue (based in Wichita, Kansas), which previously operated as Operation Rescue West. "History," Operation Rescue, http://www.operationrescue.org/about-us/history/; "Operation Rescue," Montana Human Rights Network, http://www.mhrn.org/publications/fact%20sheets%20and%20adivsories/OperationRescue.pdf.

7. Singular, *The Wichita Divide*, supra note 1, at 37–57.

8. Ibid., 71–77; W. Seth Carus, *Bioterrorism and Biocrimes: The Illicit Use of Biological Agents Since 1900* (Amsterdam, The Netherlands: Fredonia Books, 2002), 144–46.

9. The Kansas Supreme Court ultimately disbarred Kline for his unprofessional actions in relentlessly pursuing Dr. Tiller. In re *Kline*, 311 P.3d 321 (Kan. 2013).

10. Singular, *The Wichita Divide*, supra note 1, at 99–173.

11. "The Assassination of Dr. Tiller," Crime and Courts, NBCNews.com (broadcast October 25, 2010), http://www.nbcnews.com/id/39826191/ns/us_news-crime_and_courts/t/assassination-dr-tiller.

12. Singular, *The Wichita Divide*, supra note 1, at 37–39, 93–98.

13. A comprehensive compilation of the acts of violence around abortion through 2000 appears in Patricia Baird-Windle and Eleanor J. Bader, *Targets of Hatred: Anti-Abortion Terrorism* (New York: Palgrave, 2001).

14. For a retelling of the events of Dr. David Gunn's murder, see ibid., 206–8; for the murder of Dr. John Britton and James Barrett, see ibid., 231–35; for the murders of Shannon Lowney and Leanne Nichols, see ibid., 244–50; for the murder of Robert Sanderson, see ibid., 298–302; for the murder of Dr. Barnett Slepian, see Eyal Press, *Absolute Convictions: My Father, a City, and the Conflict that Divided America* (New York: Henry Holt, 2006); and for the murder of Dr. George Tiller, see Singular, *The Wichita Divide*,

Pet. Ref. 957

Electronic copy available at: https://ssrn.com/abstract=2577010

supra note 1. A great summary of the most extreme acts of violence can be found at "Anti-Choice Violence and Intimidation," NARAL Pro-Choice America Foundation, http://www.prochoiceamerica.org/assets/files/abortion-access-to-abortion-violence.pdf.

15. Scott Roeder is not alone as there are links between the militia movement and the anti-abortion movement. See, e.g., Carol Mason, *Killing for Life: The Apocalyptic Narrative of Pro-Life Violence* (Ithaca, NY: Cornell University Press, 2002), 9–45; Sandi DuBowski, "Storming Wombs and Waco: How the Anti-Abortion and Militia Movements Converge," *Front Lines Research* 2 (October 1996).

16. Singular, *The Wichita Divide*, supra note 1, at 46–70.

17. Ibid., 78–81, 112–16, 151–61, 194–200.

18. Ibid., 201–344; Judy L. Thomas, "Grand Jury Weighs Evidence of Conspiracy in Tiller Murder," *Kansas City Star* (December 26, 2010). Scott Roeder appealed his conviction to the Kansas Supreme Court and lost, though the case was remanded to a lower court to correct a sentencing error. *Kansas v. Roeder*, 336 P.3d 831 (Kan. 2014).

19. The National Abortion Federation (NAF) is a North American professional association of abortion providers. Its members provide over half the abortions in North America. One of the services NAF provides for its members and the public is a compilation of clinic violence and disruption statistics. The most recent report is available at "NAF Violence and Disruption Statistics," http://prochoice.org/wp-content/uploads/Stats_Table2.pdf. This information does not reflect the actual number of incidents, which "is likely to be significantly higher, because not all providers report to NAF and not all incidents are reported." *Brief of National Abortion Federation et al. as Amici Curiae in Support of Respondents and Affirmance in McCullen v. Coakley*, 134 S. Ct. 2518 (2014), at 8 n. 3.

20. Joshua C. Wilson, *The Street Politics of Abortion: Speech, Violence, and America's Culture Wars* (Stanford, CA: Stanford University Press, 2013).

21. There is voluminous literature in this area. See, e.g., Catherine Cozzarelli and Brenda Major, "The Impact of Antiabortion Activities on Women Seeking Abortions," in *The New Civil War: The Psychology, Culture, and Politics of Abortion*, ed. Linda J. Beckman and S. Marie Harvey (Washington, DC: American Psychological Association, 1998), 81–104; Alesha E. Doan, *Opposition & Intimidation: The Abortion Wars and Strategies of Political Harassment* (Ann Arbor: University of Michigan Press, 2007); Diana Greene Foster et al., "Effect of Abortion Protesters on Women's Emotional Response to Abortion," *Contraception* 87 (2013): 81–87; Mireille Jacobson and Heather Royer, "Aftershocks: The Impact of Clinic Violence on Abortion Services," *American Economic Journal: Applied Economics* 3 (2011): 189–223.

22. Feminist Majority Foundation, "2014 National Clinic Violence Survey" (November 2014), 2.

Pet. Ref. 958

Electronic copy available at: https://ssrn.com/abstract=2577010

23.   Doan, *Opposition & Intimidation*, supra note 21, at 36.

24.   Other authors have similarly called for such an expansive view of the term
      "abortion provider." Notably, sociologist and reproductive health scholar
      Carole Joffe favors a broad definition of the term because all of the types
      of people featured in this book are "important combatants in the abortion
      wars." Carole Joffe, *Dispatches from the Abortion Wars: The Costs of Fanaticism
      to Doctors, Patients, and the Rest of Us* (Boston: Beacon Press, 2011), xv.
      Carol Mason, an American studies professor who has researched the rise
      of right-wing movements, has also lamented that others who have studied
      abortion providers have ignored the "experience of those clinic workers who
      must daily withstand death threats or harassment," Mason, *Killing for Life*,
      supra note 15, at 71. This is far from a universal position however. Some even
      take issue with the term "provider" itself, as one of our interview subjects
      strenuously did. To him, the word conjures the image of people who provide
      services or goods, not doctors who perform a medical procedure. While we
      respect that position, we use "provider" because it is the convention of the
      field, and we use the word expansively for the reasons indicated in the text.

25.   Though targeted harassment of abortion providers is a serious, current,
      and widespread issue, very little is known or written about it as a distinct
      form of anti-abortion activity. The media does not pay close attention to
      abortion providers' everyday lived experiences, and others who have studied
      anti-abortion violence and harassment tend to combine targeted harassment
      with general clinic protest or political activism around abortion. See generally
      Baird-Windle and Bader, *Targets of Hatred*, supra note 13, at 13; Dallas A.
      Blanchard and Terry J. Prewitt, *Religious Violence and Abortion: The Gideon
      Project* (Gainesville: University Press of Florida, 1993); Lori Freedman, *Willing
      and Unable: Doctors' Constraints in Abortion Care* (Nashville, TN: Vanderbilt
      University Press, 2010); Joffe, *Dispatches from the Abortion Wars*, supra note 24,
      at 23; James Risen and Judy L. Thomas, *Wrath of Angels: The American
      Abortion War* (New York: Basic Books, 1998); Center for Reproductive Rights,
      "Defending Human Rights: Abortion Providers Facing Threats, Restrictions,
      and Harassment" (2009). Several authors have written about particular
      incidents of targeted harassment. Jack Fainman, *They Shoot Doctors Don't
      They?: A Memoir*, with Roland Penner (Winnipeg, Canada: Great Plains
      Publications, 2011); Emily Lyons and Jeff Lyons, *Life's Been a Blast* (Homewood,
      AL: I Em Books, 2005); Press, *Absolute Convictions*, supra note 14; Singular,
      *The Wichita Divide*, supra note 1; Bruce S. Steir, *Jailhouse Journal of an OB/
      GYN* (Bloomington, IN: AuthorHouse, 2008); Susan Wicklund, *This Common
      Secret: My Journey as an Abortion Doctor* (New York: PublicAffairs, 2008).
      These sources are all important works about abortion protest and politics, but
      none has developed a comprehensive understanding of targeted harassment of
      abortion providers and how law may improve providers' lives.

26.   18 U.S.C. § 248. As a result of FACE, clinics have experienced fewer
      blockades, an anti-abortion protest tactic common in the 1980s and early

Pet. Ref. 959

Electronic copy available at: https://ssrn.com/abstract=2577010

1990s in which protesters blocked the entrance to abortion clinics with their bodies and other items, rendering the clinic inaccessible and forcing the clinic to close or never even open for the day. FACE has also been used to address targeted harassment of abortion providers. See generally US General Accountability Office, *Abortion Clinics: Information on the Effectiveness of the Freedom of Access to Clinic Entrances Act* (Washington, DC, November 1988).

27. Freedman, *Willing and Unable*, supra note 25, at 48–49. Political scientist Alesha Doan also studied the effects of harassment on abortion providers and concluded that "[h]arassment has been an important tool used by the direct action groups of the pro-life movement. It has been an effective way of contributing to the reduction in the number of abortion providers and has had an impact on women (evidenced in the abortion rate)." Doan, *Opposition & Intimidation*, supra note 21, at 154; see also Martin Donohue, "Increase in Obstacles to Abortion: The American Perspective in 2004," *Journal of the American Medical Women's Association* 60 (2005): 16–25.

28. 410 U.S. 113 (1973).

29. For example, the Supreme Court has demonstrated its lack of awareness around these issues, as evidenced by its 2014 decision in *McCullen v. Coakley*. In that case, the Court reviewed a Massachusetts law that kept protesters from the immediate vicinity of abortion clinics. In finding the law to be an unconstitutional infringement on anti-abortion demonstrators' speech, the Court refused to label the abortion opponents as "protesters," instead portraying these individuals as docile people wanting to calmly talk with and care for the women entering the abortion clinic. Without any reference to the harassment and intimidation tactics that abortion opponents regularly engage in at clinics as well as off-site, as described throughout this book, the Court struck down the law as unconstitutional. *McCullen*, 134 S. Ct. 2518 (2014). In light of *McCullen*, providers' experiences with targeted harassment emerge as an untold story that is important for shaping law and policy in the immediate future.

30. Guttmacher Institute, "More State Abortion Restrictions Were Enacted in 2011–2013 Than in the Entire Previous Decade" (January 2, 2014), http://www.guttmacher.org/media/inthenews/2014/01/02/index.html.

31. Joshua Wilson has noted this tension in his study of abortion-rights activists and anti-abortion protesters and their understanding of the law. Both sides of the debate have reason to distrust law and the state, but nonetheless both see law and the state as important to their position. Joshua C. Wilson, "Sustaining the State: Legal Consciousness and the Construction of Legality in Competing Abortion Activists' Narratives," *Law & Social Inquiry* 36 (2011): 455–83.

32. Most of the interviews took place in 2011. A handful of new interviews took place in 2012 and 2013, and we conducted a small number of follow-up interviews in those years and in 2014.

Pet. Ref. 960

Electronic copy available at: https://ssrn.com/abstract=2577010

33. In order to find the people we interviewed, we engaged in a complex process of working through existing contacts and the sources they provided us. From over one hundred providers interested in participating, we narrowed the list based on our goal of obtaining a diverse group of providers along the different characteristics mentioned in the text. In the academic language of qualitative empirical research, we used a snowball approach to arrive at a statistically nonrepresentative stratified sample. See Jan E. Trost, "Statistically Nonrepresentative Stratified Sampling: A Sampling Technique for Qualitative Studies," *Qualitative Sociology* 9 (1986): 54–57.

34. Rachel K. Jones and Jenna Jerman, "Abortion Incidence and Service Availability in the United States, 2011," *Perspectives on Sexual and Reproductive Health* 46 (2014): 3–14.

35. Lori Freedman, Carole Joffe, and other scholars have detailed this professional marginalization of abortion care and the resulting push of abortion care out of the mainstream hospital setting and into freestanding clinics, the lack of abortion care facilities, and, importantly, the lack of abortion providers. See Freedman, *Willing and Unable*, supra note 25; Joffe, *Dispatches from the Abortion Wars*, supra note 24.

36. Providers in the book are identified with a name generated from an Internet website that creates fake names. We use these pseudonyms consistently throughout the book, so the provider identified as Kristina Romero in Chapter 1 (the first provider profiled in that chapter) is identified as Kristina Romero throughout the book. When we first describe a particular provider, we give basic employment information and the region of the country where the provider has worked. Regions are based on the US Census Bureau regions, see "Census Regions and Divisions of the United States," US Census Bureau, http://www.census.gov/geo/maps-data/maps/pdfs/reference/us_regdiv.pdf, though because it is a more familiar term, we use "Midwest" instead of "North Central." All of the providers have agreed to how we refer to them and have reviewed their references in the book for accuracy. Anytime we do not conform a provider's description to the general practice described here, we have done so because the provider requested a greater degree of generality or, in just a few cases, more specificity. For ease of reference, we provide an index at the end of the book of references to individual abortion providers.

37. We have also very lightly edited the quotes for readability.

38. Even Troy Newman, the president of Operation Rescue, conveyed this sentiment. See Janet Reitman, "The Stealth War on Abortion," *Rolling Stone* (January 15, 2014) (noting that Newman believes that the "overt harassment" of twenty years ago is a thing of the past).

39. Audrey Hudson, "Report Citing Veteran Extremism Is Pulled," *Washington Times* (May 14, 2009). The details of the controversy are explained in full at the end of Chapter 9.

Pet. Ref. 961

Electronic copy available at: https://ssrn.com/abstract=2577010

40. Bruce Hoffman, *Inside Terrorism*, 40–41 (New York: Columbia University Press, 2006).

41. For excellent and varied analyses of the motivations behind anti-abortion protest and extremism, see Mason, *Killing for Life*, supra note 15; Faye D. Ginsburg, *Contested Lives: The Abortion Debate in an American Community* (Berkeley and Los Angeles: University of California Press, 1989); Blanchard, *The Anti-Abortion Movement*, supra note 5; Blanchard and Prewitt, *Religious Violence and Abortion*, supra note 25; Risen and Thomas, *Wrath of Angels*, supra note 25; Celeste Michelle Condit, *Decoding Abortion Rhetoric: Communicating Social Change* (Champaign: University of Illinois Press, 1990); Jessica Stern, *Terror in the Name of God: Why Religious Militants Kill* (New York: HarperCollins, 2003); Jennifer Jefferis, *Armed for Life: The Army of God and Anti-Abortion Terror in the United States* (Santa Barbara, CA: Praeger, 2011); Faye Ginsburg, "Rescuing the Nation: Operation Rescue and the Rise of Anti-Abortion Militance," in *Abortion Wars: A Half Century of Struggle, 1950–2000*, ed. Rickie Solinger (Berkeley and Los Angeles: University of California Press, 1998), 227–50; Doan, *Opposition & Intimidation*, supra note 21; Marian Faux, *Crusaders: Voices from the Abortion Front* (New York: Birch Lane Press, 1990); Kerry N. Jacoby, *Souls, Bodies, Spirits: The Drive to Abolish Abortion since 1973* (Westport, CT: Praeger, 1998); Frederick S. Jaffe, *Abortion Politics: Private Morality and Public Policy* (New York: McGraw-Hill, 1980); Carol J. C. Maxwell, *Pro-Life Activists in America: Meaning, Motivation, and Direct Action* (Cambridge and New York: Cambridge University Press, 2002).

42. According to the Feminist Majority Foundation, in 2010, 2.2% of staff resignations at clinics were the result of anti-abortion violence and harassment. Feminist Majority Foundation, "2010 National Clinic Violence Survey," 7.

Electronic copy available at: https://ssrn.com/abstract=2577010

Contraception 104 (2021) 24–28



Contents lists available at ScienceDirect

## Contraception

journal homepage: www.elsevier.com/locate/contraception



# Mifepristone restrictions and primary care: Breaking the cycle of stigma through a learning collaborative model in the United States



Danielle Calloway [a], Debra B. Stulberg [a], Elizabeth Janiak [b,c,d,*]

[a] Department of Family Medicine, University of Chicago, Chicago, IL, United States
[b] Department of Obstetrics and Gynecology, Brigham and Women's Hospital, Boston, MA, United States
[c] Department of Obstetrics, Gynecology, and Reproductive Biology, Harvard Medical School, Boston, MA, United States
[d] Planned Parenthood League of Massachusetts, Boston, MA, United States

## ARTICLE INFO

*Article history:*
Received 5 February 2021
Received in revised form 31 March 2021
Accepted 4 April 2021

*Keywords:*
Abortion access
Abortion stigma
Mifepristone
Primary care

## ABSTRACT

Despite its safety record, mifepristone is subject to a highly restrictive set of regulatory measures through the Risk Evaluation and Mitigation Strategy (REMS) by the US Food and Drug Administration. We argue that these restrictions both reflect and perpetuate a cycle of abortion stigma, creating particular barriers to mifepristone use in primary care settings where communities that historically experience barriers to care can most easily access reproductive health services. Through qualitative interviews with Illinois primary care clinicians, we discovered how the REMS heightens institutional anxiety over implementation of mifepristone use. To address this, we created *ExPAND Mifepristone*, a learning collaborative targeting institutional anxiety and logistical barriers to mifepristone use. The learning collaborative model holds high potential to mitigate institutional barriers to mifepristone use by increasing providers' self-efficacy to identify, address, and overcome institutional fears. Until the REMS is fully repealed, learning collaboratives constitute a promising tool to combat the practical and psychological barriers to mifepristone use that these restrictions currently pose.

© 2021 Elsevier Inc. All rights reserved.

## Introduction

Abortion with mifepristone is safe and effective [1–4]. This treatment falls well within the scope of primary care in the United States, as it involves patient assessment and health education for which primary care providers are extensively trained [5–8]. Nonetheless, many clinicians trained to provide medication abortion do not currently do so, and only an estimated 1% of medication abortions occur in primary care offices [9,10]. The potential for primary care providers to help improve abortion access is particularly high in the Midwest, which experienced the largest regional decline in abortion clinics over the past decade [11]. Given this context, our team set out to develop an evidence-based intervention to support mifepristone use in primary care in Illinois, resulting in the learning collaborative *Excellence in Providing Access to New Directions in Mifepristone Use* (*ExPAND Mifepristone*). This commentary describes how *ExPAND Mifepristone* seeks to disrupt a cycle of abortion stigmatization in primary care that is anchored by the US Food and Drug Administration's inclusion of mifepristone in the Risk Evaluation and Mitigation Strategy (REMS) program. We

argue that the REMS serves as the linchpin of a cycle of medication abortion stigmatization in primary care, encouraging institutional anxiety over abortion provision which leads to logistical barriers to mifepristone use. This cycle successfully excludes mifepristone from many primary care settings, reinforcing the perception that abortion is a tainted and undesirable service that should remain marginalized in specialty settings. The learning collaborative model serves as a potentially valuable framework for primary care physicians to address, understand, and overcome the institutional fears that the REMS program encourages.

## 1. The mifepristone REMS and the ripple effect of logistical barriers

*The fascinating thing is, there are a lot of other things I've managed to implement [since joining this primary care practice], and when the perception is that your organization does not care, or prioritize providing abortion care, the barriers can be great, and other [services] the organization does prioritize, the resources, the people, the organization gets behind them. So it's very frustrating to me that abortion care again occupies this separate space. – Illinois primary care provider*

The REMS for mifepristone requires that (1) the drug be dispensed in healthcare settings by or under the supervision of a cer-

* Corresponding author.
*E-mail address:* ejaniak@bwh.harvard.edu (E. Janiak).

https://doi.org/10.1016/j.contraception.2021.04.002
0010-7824/© 2021 Elsevier Inc. All rights reserved.

D. Calloway, D.B. Stulberg and E. Janiak

Contraception 104 (2021) 24–28



**Fig. 1.** Taxonomy of barriers to medication abortion care in primary care settings.

tified prescriber; (2) dispensing clinicians register with the drug manufacturer; and (3) patients sign a specific form stating the drug will be used for a medication abortion, despite the evidence base that it is also effective for both early pregnancy loss treatment and cervical ripening for dilation and evacuation procedures [12–14]. While the REMS program aims to reduce risks from drugs with high potential of serious adverse health effects [15], mifepristone has been shown to have an excellent safety profile [16]. As a result, mifepristone access has expanded globally through evidence-based deregulation. Mifepristone is fully incorporated in abortion services in Canada, as the federal regulatory system permits dispensing through a pharmacy with a prescription from a clinician and no longer requires an ultrasound prior to prescribing [17,18]. Mifepristone distribution via postal mail following a telemedicine appointment is also approved in the United Kingdom [19]. In light of these regulatory frameworks, the REMS stands out as exceptionally restrictive.

To gain a more comprehensive understanding of the institutional barriers primary care providers face to evidence-based mifepristone use, we conducted a qualitative study of providers in Illinois and assessed their opinions of the REMS restrictions and other barriers to medication abortion provision. As part of this larger study on barriers to abortion provision in primary care, 19 primary care providers and clinical administrators participated in semi-structured interviews exploring barriers to and facilitators of mifepristone use at the individual, institutional, and policy levels. We sampled clinicians based on their current abortion provision status (providing in primary care or not), type of health care facility (community health center, hospital, group or private practice), and geographic location (within vs. outside of Chicago). For full study methodology, see Rasmussen and colleagues, this issue.

Overall, interviewees expressed widespread support of removal of the mifepristone REMS and reported that removing the REMS would help them or their colleagues integrate medication abortion into primary care. We noted that providers named two types of barriers posed by the REMS: direct infrastructure requirements for dispensing mifepristone; and requirements self-imposed in response to the REMS (Fig. 1). On a practical level, some clinicians expressed that if the REMS was eliminated and they could prescribe mifepristone through a pharmacy, that would remove logistical barriers around medication stocking [20]. Participants also expressed that the REMS impedes mifepristone use in primary care by perpetuating fear and mystery around the drug that is not supported by clinical evidence of its risks, resulting in the desire for excessive clinical training, unnecessary bureaucratic infrastructure-building, and fear of extremely rare complications with mifepristone use. The resulting institutional anxiety around abortion provision drives a process of stigmatization of which the REMS forms an integral part.

## 2. Logistical barriers within a cycle of stigmatization

*Interviewer: Your practice has implemented quite a few new services. How do you feel implementing these services is analogous or different to implementing abortion?*

*Clinician: I want to say it's just the stigma that surrounds it is the only real difference. When there's money…and operations stand behind it, it's much easier, but then we are also now faced with the…stigma of it. – Illinois primary care provider*

The REMS program imposes medically unnecessary restrictions on mifepristone access, and these restrictions create specific logistical hurdles, as well as generating an impression that provision of mifepristone is difficult and requires extensive training, ultimately creating a hesitancy among primary care clinicians to administer it. As illustrated in Figure 2, the REMS are the linchpin of a cycle of stigmatization that continues to keep mifepristone out of primary care practice and other non-specialty settings over time. Similarly to stigma among abortion patients and providers, institutional stigma around abortion care functions as a cycle [21,22]. Because regulations such as the REMS are imposed, institutions perceive abortion care to be excessively complex, and fear abortion provision. Out of fear, leadership blocks qualified clinicians from integrating abortion into their primary care practice. Thus, abortion remains siloed from mainstream medicine, reinforcing the perception that it is a tainted medical practice [23].

We heard this hesitancy in our interviews, as clinicians expressed concern over their own competency to administer mifepristone to their patients. When asked about their personal barriers to administering medication abortion, one clinician responded: "I totally believe that it can be done, but I also feel like I didn't have that preparation… But I've heard that some people do it in primary care settings…I'm like, 'How do I do this? Can I do it?'" Other clinicians expressed feeling a sense of hypervigilance when it came to providing medication abortion services because of the seemingly specialized nature of mifepristone protocols. One clinician noted their heightened sense of alertness stems from their desire to distribute mifepristone perfectly. They commented: "I think there's a piece of perfectionism…it may lead us to stumble across smaller roadblocks, because we're looking for a perfect outcome, rather than a safe and acceptable outcome." As a result of the perceived need for extensive training in medication abortion provision, primary care institutions lean towards not administering mifepristone in fear of incorrectly distributing the medication or not knowing how to proceed with potential adverse side effects. While primary care institutions see training as necessary to overcome institutional anxiety about abortion provision, this anxiety can also prevent individuals from accessing additional training: "Even just talking about wanting abortion training or having that be a conversation that felt normal was a barrier because of the stigma around abortions."

Pet. Ref. 964

D. Calloway, D.B. Stulberg and E. Janiak

Contraception 104 (2021) 24–28



**Fig. 2.** Cycle of abortion stigmatization in primary care.

This institutional anxiety directly feeds into implementation challenges, as some interview participants expressed a desire to implement medication abortion in their clinics but an unwillingness among institutional leadership to allow this service. One respondent commented, "We've been unable to get… even though there are pathways for doing medication abortion…sadly, our board…doesn't feel comfortable. They're afraid." Many interviewees named budget constraints as a main reason for not providing medication abortion services, as clinicians working in federally qualified health centers (FQHCs) have very limited funding that they cannot afford to waste. Because the REMS requires onsite drug stocking rather than pharmacy prescription, providers expressed that clinical leadership hesitated to invest funds in the medication given their very limited resources. One clinician commented: "So it's kind of, yeah, we want to, but is that a necessary thing to do to take time and money and resources away from the rest of…what the FQHC is doing." These implementation barriers, combined with institutional anxiety, create a cycle of abortion stigmatization that isolates medication abortion from mainstream medicine. Removal of the REMS would disrupt this cycle significantly by alleviating the need for infrastructure-building within clinics and signaling leadership that the drug is safe enough to be prescribed without excessive training. However, in the current context of having the REMS in place, we identified a structured, multi-institutional learning collaborative as a promising strategy to disrupt the stigma cycle and help clinics overcome both the logistical and the psychological barriers at play.

## 3. Opportunity for action within the learning collaborative model

*I wish that [abortion implementation] would have been the same way that I participated in other quality collaboratives, whether it's to improve depression care, hypertension care, implement new screening, protocols…A big part of my career now has become working in quality improvement. There are best practices out there for how to do this, for how to help organizations across the country, who are trying to do the same thing. -Illinois primary care clinician*

In our formative research, clinicians described how mifepristone distribution is seen as a complex process that requires extensive training and experience to dispense. These findings highlight the need for evidence-based interventions in primary care, leading us to create *ExPAND Mifepristone*, a learning collaborative geared towards disrupting the stigma around mifepristone use for both abortion and miscarriage management in primary care settings. *ExPAND Mifepristone* launched in spring 2020 and aims to demystify mifepristone use in clinical care by building self-efficacy and knowledge not only around clinical applications of the drug, but also regarding billing, stocking, scheduling, and other logistical barriers. This program is largely based on the learning collaborative model developed by the Institute for Healthcare Improvement's Breakthrough Series. The learning collaborative model is defined as a 6-to-15-month intervention that provides a structure for organizations to learn from each other in multidisciplinary teams on a certain issue [24]. In addition to creating collaborative teams within organizations, learning collaboratives generally include highly skilled experts to educate and train the teams to incorporate changes within their settings. This training is then followed by an action period where the teams implement the changes and report back to the learning collaborative, allowing experts to weigh in on their progress and for other teams to learn from each other. The learning collaborative approach is proven to be successful in fostering implementation of evidence-based practices across a wide range of clinical settings serving both children and adults [25,26]. In the field of reproductive health care in particular, the learning collaborative model has improved care and ed-

Pet. Ref. 965

D. Calloway, D.B. Stulberg and E. Janiak

Contraception 104 (2021) 24–28



**Fig. 3.** Cycle of stigmatization of abortion in primary care—Hypothesized impact of a learning collaborative intervention.

ucation for individuals with preeclampsia and for individuals with postpartum gestational diabetes [27,28].

Drawing on the literature of best practices for learning collaboratives more broadly, we designed the *ExPAND Mifepristone* collaborative specifically to target the cycle of stigma while helping clinics build infrastructure for full-spectrum evidence-based mifepristone use (Fig. 3). The program is designed to provide clinicians with concrete tools to incorporate mifepristone in primary care settings in Illinois through monthly group meetings, on-site and distance consultation, self-assessment, and tailored evaluation. The *Expand Mifepristone* learning collaborative includes expert coaches who advise physicians and administrators on how to combat institutional hurdles and competing priorities to incorporate mifepristone in their clinics. Trainings in our pilot year shared new evidence-based guidelines for early pregnancy loss and no-test medication abortion [29,30] and provided guidance on how primary care clinicians can bill for mifepristone. Illinois law provides for public and private insurance coverage of abortion [31,32], and the collaborative clarified the funding component of abortion provision through trainings on Medicaid reimbursement policies and procedures. The collaborative also provided expert, step-by-step support in understanding and navigating the process of registering with the manufacturer(s) to dispense mifepristone, as well as understanding how to use required patient consent forms and how to enable in-office dispensing of mifepristone. This implementation-based training was designed to debunk the misconceptions associated with mifepristone.

Based on our conceptual model of how abortion stigma inhibits abortion provision in primary care (Fig. 2), we hypothesize that by the end of the program, clinicians should be equipped with enhanced self-efficacy around mifepristone use, as well as the concrete logistical tools needed to provide mifepristone for abortion and miscarriage management in primary care. We are testing these hypotheses through a mixed-methods evaluation with qualitative interviews and review of electronic medical record data from *Ex-*

*PAND Mifepristone*'s pilot clinics. We will apply an implementation science framework to our analyses, to refine the program's design for future cohorts.

## 4. Moving forward: Deregulate, educate, and empower primary care clinicians

The *ExPAND Mifepristone* learning collaborative constitutes a potential model for mitigating medication abortion stigma specifically and mifepristone stigma more broadly in primary care settings by addressing both logistical and psychological barriers. The existence of the REMS diffuses stigma within primary care settings and encourages hesitation and fear amongst clinicians and administrators to provide abortion. While the learning collaborative model addresses the stigmatization that is driven by the REMS, removal of mifepristone from the REMS program would likely have a far greater impact on abortion stigma. Nonetheless, as stigma operates at multiple levels across medical training, institutions, and the broader social context, even in the absence of the REMS, additional work will be needed to normalize abortion in primary care [21–23,32–35].

*ExPAND Mifepristone* represents just one potential approach to supporting clinical champions of mifepristone use in primary care in taking on institutional barriers to evidence-based use. To complement the existing robust infrastructure to train primary care providers in pregnancy diagnosis and management, including abortion care [8,36–37], additional programs to support implementation of medication abortion in primary care should be created and evaluated over time. As the largest and most geographically well distributed provider group in the United States, primary care providers hold immense untapped potential to expand abortion access. Unless and until the US health care system joins the global trend of mifepristone deregulation, learning collaboratives and other systems of practical support can empower clinicians

Pet. Ref. 966

*D. Calloway, D.B. Stulberg and E. Janiak*

*Contraception 104 (2021) 24–28*

to overcome logistical barriers to providing the holistic, patient-centered pregnancy care their patients deserve.

## Declaration of competing interest

None.

## Funding

Our qualitative research was supported by the Irving Harris Foundation. The learning collaborative is supported by grants from the Irving Harris Foundation, the Collaborative for Gender + Reproductive Equity, and the Argosy Foundation. Ms. Calloway's time devoted to this topic was supported by Cambridge Reproductive Health Consultants. The findings and conclusions in this article are those of the authors and do not necessarily reflect the views of Planned Parenthood Federation of America, Inc.

## Acknowledgments

The authors thank Noel Leon for introducing us to the phrase "institutional anxiety." We also thank Alischer Cottrill, Ashley McHugh, and Ellen McCammon for their roles in the formative research that inspired *ExPAND Mifepristone*. We are grateful to our *ExPAND* expert consultants Kristie Monast, Susan Rubin, and Julie Gonen, and to the clinics participating in the program's pilot year.

## References

[1] Gatter M, Cleand K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015;91(4):269–73.

[2] Fjerstad M, Sivin I, Lichtenberg ES, Trussell J, Cleland K, Cullins V. Effectiveness of medical abortion with mifepristone and buccal misoprostol through 59 gestational days. Contraception 2009;80(3):282–6.

[3] Schaff EA, Fielding SL, Eisinger SH, Stadalius LS, Fuller L. Low-dose mifepristone followed by vaginal misoprostol at 48 hours for abortion up to 63 days. Contraception 2000;61(1):41–6.

[4] Dzuba IG, Chong E, Hannum C, Lichtenberg ES, Lugo Hernández EM, Ngoc NTN, et al. A non-inferiority study of outpatient mifepristone-misoprostol medical abortion at 64-70 days and 71-77 days of gestation. Contraception 2020;101(5):302–8.

[5] Reproductive Decisions, Promoting access to medication and first trimester aspiration terminations by supporting skilled providers [Internet]. AAFP Home, 2019. Accessed January 5, 2021. Available at: https://www.aafp.org/about/policies/all/reproductive-decisions-promoting-access.html

[6] Beaman J, Schillinger D. Responding to evolving abortion regulations—the critical role of primary care. N Engl J Med 2019;380(18):e30.

[7] Prine LW, Lesnewski R. Medication abortion and family physicians' scope of practice. J Am Board Fam Pract 2005;18(4):304–6.

[8] Beaman J, Prifti C, Schwarz EB, Sobota M. Medication to manage abortion and miscarriage. J Gen Intern Med 2020;35(8):2398–405.

[9] Stulberg DB, Monast K, Dahlquist IH, Palmer K. Provision of abortion and other reproductive health services among former Midwest Access Project trainees. Contraception 2018;97(4):341–5.

[10] Srinivasulu S, Maldonado L, Prine L, Rubin SE. Intention to provide abortion upon completing family medicine residency and subsequent abortion provision: a 5-year follow-up survey. Contraception 2019;100(3):188–92.

[11] Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2014. Perspect Sex Reprod Health 2017;49(1):17–27.

[12] Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378(23):2161–70.

[13] Chu JJ, Devall AJ, Beeson LE, Hardy P, Cheed V, Sun Y, et al. Mifepristone and misoprostol versus misoprostol alone for the management of missed miscarriage (MifeMiso): a randomised, double-blind, placebo-controlled trial. Lancet 2020;396(10253):770–8.

[14] Shaw KA, Lerma K, Shaw JG, Scrivner K, Hugin M, Hopkins FW, et al. Preoperative effects of mifepristone for dilation and evacuation after 19 weeks of gestation: a randomised controlled trial. BJOG 2017;124(13):1973–81.

[15] Center for Drug Evaluation and Research. FAQs about REMS [Internet]. U.S. Food and Drug Administration, 2018. Accessed January 5, 2021. Available at: https://www.fda.gov/drugs/risk-evaluation-and-mitigation-strategies-rems/frequently-asked-questions-faqs-about-rems

[16] Henderson JT, Hwang AC, Harper CC, Stewart FH. Safety of mifepristone abortions in clinical use. Contraception 2005;72(3):175–8.

[17] Yalahow A, Doctoroff J, Mark A, Foster AM. Trends in medication abortion provision before and after the introduction of mifepristone: a study of the National Abortion Federation's Canadian member services. Contraception 2020;102(2):119–21.

[18] Government of Canada HC. Health Canada approves updates to Mifegymiso prescribing information: ultrasound no longer mandatory [Internet]. Recalls and Safety Alerts, 2019. Accessed January 5, 2021. Available at: https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2019/69620a-eng.php

[19] Aiken ARA, Starling JE, Gomperts R, Scott JG, Aiken CE. Demand for self-managed online telemedicine abortion in eight European countries during the COVID-19 pandemic: a regression discontinuity analysis. BMJ Sex Reprod Health 2021. doi:10.1136/bmjsrh-2020-200880. Online ahead of print.

[20] Rasmussen K, Janiak E, Cottrill A, Stulberg D. Expanding access expanding access to medication abortion through pharmacy dispensing of mifepristone: primary care perspective through Illinois [Internet]. National American Primary Care Research Group; 2020. Accessed February 4, 2021Available at: https://www.napcrg.org/conferences/annual/na20-poster-hall/studentresidentfellowsposteronresearchinprogress/2335/.

[21] Kumar A, Hessini L, Mitchell EM. Conceptualising abortion stigma. Cult Health Sex 2009;11(6):625–39.

[22] Harris LH, Debbink M, Martin L, Hassinger J. Dynamics of stigma in abortion work: findings from a pilot study of the Providers Share Workshop. Soc Sci Med 2011;73(7):1062–70.

[23] O'Donnell J, Weitz TA, Freedman LR. Resistance and vulnerability to stigmatization in abortion work. Soc Sci Med 2011;73(9):1357–64.

[24] Institute for Healthcare ImprovementThe breakthrough series: IHI's collaborative model for achieving breakthrough improvement. Diabetes Spectr 2004;17(2):97–101.

[25] Lang JM, Franks RP, Epstein C, Stover C, Olver JA. Statewide dissemination of an evidence-based practice using Breakthrough Series Collaboratives. Children Youth Serv Rev 2015;55:201–9.

[26] Ebert L, Malte C, Hamlett-Berry K, Beckham J, McFall M, Saxon A. Use of a learning collaborative to support implementation of integrated care for smoking cessation for veterans with posttraumatic stress disorder. Am J Public Health 2014;104(10):1935–42.

[27] Morton CH, Peterson. Improving outcomes of preeclampsia in California: from review of maternal death to quality care collaboratives. J Obstetr Gynecol Neonatal Nurs 2014;43:S74–5.

[28] Shellhaas C, Conrey E, Crane D, Lorenz A, Wapner A, Oza-Frank R, et al. The Ohio Gestational Diabetes Postpartum Care Learning Collaborative: development of a quality improvement initiative to improve systems of care for women. Matern Child Health J 2016;20(suppl 1):71–80.

[29] Raymond EG, Grossman D, Mark A, Upadhyay UD, Dean G, Creinin MD, et al. Commentary: no-test medication abortion: a sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101(6):361–6.

[30] State funding of abortion under Medicaid Guttmacher Institute [Internet.]. Guttmacher Institute, 2021. Accessed January 19, 2021. Available at: https://www.guttmacher.org/state-policy/explore/state-funding-abortion-under-medicaid

[31] Regulating insurance coverage of abortion Guttmacher Institute [Internet]. Guttmacher Institute, 2021. Accessed January 19, 2021. Available at: https://www.guttmacher.org/state-policy/explore/regulating-insurance-coverage-abortion

[32] Norris A, Bessett D, Steinberg JR, Kavanaugh ML, De Zordo S, Becker D. Abortion stigma: a reconceptualization of constituents, causes, and consequences. Womens Health Issues 2011;21(3 suppl):S49–54.

[33] Hanschmidt F, Linde K, Hilbert A, Riedel-Heller SG, Kersting A. Abortion stigma: a systematic review. Perspect Sex Reprod Health 2016;48(4):169–77.

[34] Janiak E, Goldberg AB. Eliminating the phrase "elective abortion": why language matters. Contraception 2016;93(2):89–92.

[35] Kumar A. Disgust, stigma, and the politics of abortion. Fem Psychol 2018;28(4):530–8.

[36] Summit AK, Gold M. The effects of abortion training on family medicine residents' clinical experience. Fam Med 2017;49(1):22–7.

[37] Training in early abortion for comprehensive healthcare Guttmacher Institute [Internet]. TEACH. Accessed February 4, 2021. Available at: https://www.teachtraining.org/

Pet. Ref. 967

Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC4/OAVpDDa8KKGKV0Ymy+78= on 11/28/2023

contraception until the postpartum visit, women choosing contraceptive methods other than immediate postpartum LARC also had a higher rate of SIP (12.6%) when compared with the LARC group (4.0%, $P$=0.003). After adjustment for potential confounders including nulliparity, young maternal age, and married status, SIP was lower with immediate postpartum LARC [AOR 0.27 (95% CI 0.18, 0.64), $P$=.003] and higher by married status [AOR 1.89 (95% CI 1.26, 2.84), $P$=.002].

**CONCLUSION:** Implementation of an immediate postpartum LARC program decreased SIP rates. Improved counseling about the impact of immediate LARC placement for family planning is encouraged.

*Financial Disclosure: The authors did not report any potential conflicts of interest.*

---

## The Effect of Immediate Postpartum Implant Use on Breastfeeding or Breast Milk Supply [A28]

*Erin Fleurant, MD*
 University of Connecticut, Farmington, CT
*David O'Sullivan, PhD, Kathleen Hazel, CNM, Mary Marshall Crim, FNP, Joan Kuhnly, and Amy Johnson, MD*

**INTRODUCTION:** Lactogenesis is triggered by withdrawal of circulating progesterone after birth, thus leading to theoretical concern that progesterone-containing contraception may decrease breast milk production. While current studies show no adverse effects of implant placement on milk supply, there has not yet been a study to evaluate the effects with immediate postpartum implant use.

**METHODS:** We performed a prospective cohort study from June 2019 through April 2021. Inclusion criteria were breastfeeding females ages 18 years and older. Exclusion criteria were use of other hormonal contraception, contraindications to breastfeeding, or inability to breastfeed due to neonatal circumstances. Participants were enrolled prior to discharge and assigned to an implant (progesterone-containing contraceptive) or control group. Follow-up data were collected at the 6-week visit or via telephone. Statistics included Student's t-test and chi square, and were performed using an alpha level of 0.05.

**RESULTS:** A total of 151 participants were enrolled. There was no significant difference between breastfeeding rates at 6 weeks postpartum (implant 65.0% vs control 70.5%, $P$=.537). Cohorts differed in marital status ($P$<.001) and age ($P$=.017), with implant users more likely to be younger and single.

**CONCLUSION:** Interim analysis indicates that immediate implant use does not have a significant effect on postpartum breastfeeding rates. Due to interruptions during a global pandemic, the study did not reach goal participation of implant users to adequately power the primary outcome. Despite younger age, potential lack of partner support, and a trend toward first-time mothers, immediate postpartum implant use did not appear to affect breastfeeding.

*Financial Disclosure: The authors did not report any potential conflicts of interest.*

---

## Understanding of Lactational Amenorrhea Among US Pregnant Women [A29]

*Melissa J. Chen, MD*
 University of California, Davis, Sacramento, CA
*Caidon Iwuagwu, Adrienne E. Hoyt-Austin, DO, Margaret Fix, MPH, Laura R. Kair, MD, and Eleanor Bimla Schwarz, MD*

**INTRODUCTION:** Lactational amenorrhea method (LAM) is a temporary postpartum contraceptive method that is typically more effective than use of condoms or birth control pills. However, this method may be underutilized due to incomplete knowledge.

**METHODS:** To assess perceptions of the effectiveness of LAM compared to other postpartum contraceptives in 2021, we used social media to recruit US-born nulliparous pregnant women carrying a singleton pregnancy of 28+ weeks' gestation. Participants were compensated a $20 gift card for completing an online survey. Institutional review board (IRB) approval was obtained.

**RESULTS:** Of 152 respondents, 76% were college-educated, 90% wanted to breastfeed, and 7% indicated they planned to rely on LAM as their sole method of contraception in the first 6 months postpartum. However, less than half (48%) were aware that breastfeeding would delay the return of menses after the baby is born, and only 47% believed exclusive breastfeeding reduces the chance of pregnancy within 6 months of delivery. Only 9% (95% CI 5%-14%) knew breastfeeding prevents pregnancy when their infant is exclusively breastfed, while 27% (95% CI 20%-35%) knew breastfeeding only protects mothers from pregnancy until menstrual periods have returned. No respondents indicated that exclusive breastfeeding is typically more effective than condoms and only 2% (0%-6%) indicated that exclusive breastfeeding is typically more effective than birth control pills.

**CONCLUSION:** Few US pregnant women are aware of LAM criteria or the effectiveness of LAM compared with other postpartum contraceptive options, suggesting that patients may be receiving incomplete counseling from their health care providers regarding their options for postpartum contraception.

*Financial Disclosure: Melissa J. Chen: Mayne Pharma (Speaker). The other authors did not report any potential conflicts of interest.*

---

## Awareness of the Maternal Health Benefits of Lactation Among US Pregnant Women [A30]

*Caidon Iwuagwu*
 UC Davis, Davis, CA
*Melissa J. Chen, MD, Adrienne E. Hoyt-Austin, DO, Laura R. Kair, MD, Margaret Fix, MPH, and Eleanor Bimla Schwarz, MD*

**INTRODUCTION:** Rates of breastfeeding in the US remain suboptimal. Public health campaigns encouraging breastfeeding have focused on health benefits for infants, despite over 60 years of data demonstrating breastfeeding reduces maternal risk of breast cancer with more recent data indicating breastfeeding lowers maternal risk of ovarian cancer, diabetes, hypertension and heart disease.

**METHODS:** To assess awareness of the effects of lactation on maternal health, we used social media to recruit a prospective cohort of US-born nulliparous women carrying a singleton pregnancy of 28+ weeks' gestation in 2021. Participants were compensated a $20 gift card for completing an online survey. Institutional review board (IRB) approval was obtained.

**RESULTS:** Of 152 respondents, a family history of breast cancer (9%), diabetes (23%), hypertension (26%), and heart disease (9%) was reported by some; fewer (5%) were diagnosed with gestational diabetes or a hypertensive disorder of pregnancy (2%), and 76% were college educated. Most respondents were aware that breastfeeding benefits infant health; 23% strongly (and 42% somewhat) felt that breastfed babies are healthier than formula fed babies. Most (91%) believed breastfeeding will save their family money. Most strongly (67%) or somewhat (23%) agreed that breastfeeding their baby was important. However, fewer than half were aware that breastfeeding lowers maternal risk of breast cancer (47%), ovarian cancer (32%), diabetes (25%), and hypertension or heart disease (28%).

**CONCLUSION:** Few US pregnant women are aware of the maternal health benefits of breastfeeding. Counseling pregnant women about the beneficial effects of lactation on maternal, in addition to infant, health may help increase breastfeeding rates.

*Financial Disclosure: Melissa J. Chen: Mayne Pharma (Speaker). The other authors did not report any potential conflicts of interest.*

---

## "There's only one use for it": Stigma as a Barrier to Mifepristone Use for Early Pregnancy Loss [A31]

*Mugdha Mokashi, MPH*
 Harvard Medical School, Boston, MA
*Christina M. Boulineaux, BS, Elizabeth Janiak, ScD, Margaret Boozer, MD, and Sara Neill, MD*

© 2022 by the American College of Obstetricians
and Gynecologists. Published by Wolters Kluwer Health, Inc.
Unauthorized reproduction of this article is prohibited.

Pet. Ref. 968



Downloaded from http://journals.lww.com/greenjournal by BfDMf5sePHKav1zEcum1QN4a+kIJrEZqbsHoeXhM0hCywtCx1AWtnYQp/IIDrH03i3DD0IRy/TtSfHKd3tVCA/OAVpdDda8hKGKGKYovhy/my+Te= on 11/28/2023

**INTRODUCTION:** Mifepristone combined with misoprostol has superior efficacy for early pregnancy loss (EPL) treatment compared to misoprostol alone. Mifepristone access is restricted by the U.S. Food and Drug Administration (FDA) Risk Evaluation and Mitigation Strategy program, and its use may be further limited by logistical and interpersonal barriers due to its association with abortion, especially in states with restrictive policies. Understanding barriers to incorporation of mifepristone in EPL care is key for developing interventions to improve care quality.

**METHODS:** We conducted semi-structured interviews with 19 obstetrican-gynecologists in Alabama who manage EPL. Interviews explored participants' knowledge of and experience with mifepristone use for EPL and abortion, along with barriers to and facilitators of clinical mifepristone use. Interviews were coded by multiple study staff using inductive and deductive thematic coding. This study was deemed exempt by the Harvard Medical School Institutional Review Board.

**RESULTS:** Nearly all interviewees identified abortion-related stigma as a barrier to mifepristone use. Interviewees often attributed stigma to a lack of knowledge about the clinical use of mifepristone for EPL. Stigmatization of mifepristone due to its association with abortion was related to religious and politic objections. Many also described stigma associated with misoprostol use. Although providers believe mifepristone use for abortion would not be accepted in their practice, most felt that mifepristone could be successfully used for EPL after practice-wide education on its use.

**CONCLUSION:** Mifepristone is strongly associated with abortion stigma, which is a barrier to its use for EPL. Interventions to increase clinical knowledge of mifepristone use and decrease stigma are needed to optimize EPL care.

*Financial Disclosure:* The authors did not report any potential conflicts of interest.

---

## Continuation Rates of the Etonogestrel Implant and Factors Associated With Early Discontinuation [A32]

*Genesis V. Hines, MD*
 Lehigh Valley Health Network, Allentown, PA
*Joanne N. Quinones, MD, Treasure N. Walker, MD,*
*and Andrea Waxman, MD*

**INTRODUCTION:** The etonogestrel implant is a highly effective, 3-year, long acting reversible contraceptive (LARC) device. Studies report a 1-year continuation rate of 80%, with 10% of patients reporting abnormal uterine bleeding (AUB) leading to discontinuation. Our primary objective was to describe the continuation rates of the implant in our population. Secondarily, we aimed to identify factors associated with early discontinuation.

**METHODS:** Single center retrospective cohort study of women with placement of the etonogestrel implant at Lehigh Valley Health Network Obstetrics and Gynecology department between January 1, 2015 and December 31, 2017. Institutional review board (IRB) approval was obtained. A sample size calculation was performed to guide a subanalysis of the implant side effect profile.

**RESULTS:** From 2015-2017, 774 women had the etonogestrel implant inserted. The 1-year continuation rate was significantly less than the literature reported value (62% vs 80%, $P<.001$). A subanalysis of 216 women revealed that 82% reported side effects (n=177) and 73% discontinued use due to side effects. Side effects were more common in women who discontinued use at 1 year compared to women who continued use (93% vs 71%, $P<.001$). The most common side effect, AUB (n=115), was not associated with early discontinuation. Neurologic and psychiatric complaints were reported by 16.7% of patients (n=18), and associated with early discontinuation ($P=.02$).

**CONCLUSION:** The 1-year continuation rate of the etonogestrel implant may be significantly lower than that reported in the literature. Side effects are common, and patients with psychiatric or neurologic side effects are more likely to discontinue. Future studies should examine this relationship.

---

*Financial Disclosure:* The authors did not report any potential conflicts of interest.

---

## Patterns and Determinants of Postpartum Long Acting Reversible Contraception Utilization and Sterilization Utilization in Michigan [A33]

*Michelle Moniz, MD*
 University of Michigan, Ann Arbor, MI
*Alex F. Peahl, MD, Dawn Zinsser, BS, Giselle Kolenic, MA, Molly Stout, BS, and Daniel Morgan, BS*

**INTRODUCTION:** We aimed to evaluate patterns and determinants of utilization of postpartum long acting reversible contraception (LARC) and sterilization to guide future quality improvement interventions.

**METHODS:** This institutional review board (IRB)-approved retrospective cohort analysis used administrative claims data from a statewide collaborative quality initiative to identify childbirth episodes from 1/2016-12/2019. Outcomes included LARC utilization and sterilization utilization by 60 days postpartum. Multivariable logistic regression using hospital fixed effects evaluated associations between outcomes and patient characteristics, including neighborhood social vulnerability index (a composite measure of socioeconomic status, household composition, minority status, and housing/transportation).

**RESULTS:** The cohort included 140,380 delivery episodes among 130,174 women (44% publicly insured). By 60 days postpartum, adjusted hospital-specific rates of LARC utilization ranged from 0.5% to 20.4%; sterilization utilization ranged from 0.0% to 13.2%. In multivariable models, women living in neighborhoods with the highest quintile of socioeconomic vulnerability and racial/ethnic vulnerability were more likely to use LARC, as were those with younger age, chronic conditions, public insurance, and birth year later in the study period. Sterilization utilization was less likely among women in neighborhoods with highest socioeconomic and racial/ethnic vulnerability and more likely among women in neighborhoods with highest housing/transportation vulnerability, and those with older age, chronic conditions, public insurance, and later birth years.

**CONCLUSION:** Wide variation in postpartum contraceptive use calls for quality improvement efforts in Michigan. Observed associations with social vulnerability identify the pressing need to understand how potential community factors (e.g., transportation, housing, racism) shape postpartum contraceptive decision-making and utilization.

*Financial Disclosure:* The authors did not report any potential conflicts of interest.

---

## The Effects of the Etonogestrel Subdermal Implant on Weight Gain in Obese Women [A34]

*Cherise Hatch, DO*
 Geisinger, Danville, PA
*Amanda Young, MS, Celia M. Gray, BS, Michael J. Paglia, MD, and Denise Howard, MD*

**INTRODUCTION:** To evaluate weight change after insertion of the etonogestrel subdermal implant (EI) in normal/underweight, overweight, and obese women.

**METHODS:** This is a retrospective cohort study in a large health system which examined the weight changes in women using the EI from January 1, 2010–December 31, 2019. Data were obtained using the system's electronic health records. Subjects were grouped by body mass index (BMI) class with weights (kg) obtained at regular intervals until removal. A test of trend analysis was completed to evaluate for significant weight changes as BMI class increased.

**RESULTS:** The cohort included 3,497 women, of whom 34% were normal/underweight, 24% were overweight, and 42% were obese. The median time from insertion of the EI to removal was 1.7 years and there was no significant difference between time to removal for any BMI class. At the time of removal, there was no significant trend in

*OBSTETRICS & GYNECOLOGY*

© 2022 by the American College of Obstetricians
and Gynecologists. Published by Wolters Kluwer Health, Inc.
Unauthorized reproduction of this article is prohibited.

Pet. Ref. 969

## HHS Public Access
Author manuscript
*Contraception.* Author manuscript; available in PMC 2022 May 01.

Published in final edited form as:
*Contraception.* 2022 May ; 109 : 19–24. doi:10.1016/j.contraception.2022.01.017.

# Exploring the impact of mifepristone's risk evaluation and mitigation strategy (REMS) on the integration of medication abortion into US family medicine primary care clinics*

**Na'amah Razon**[a,*], **Sarah Wulf**[b], **Citlali Perez**[b], **Sarah McNeil**[c], **Lisa Maldonado**[d], **Alison Byrne Fields**[e], **Diana Carvajal**[f], **Rachel Logan**[b], **Christine Dehlendorf**[b]

[a]Department of Family and Community Medicine, University of California, Davis, CA, United States

[b]Person-Centered Reproductive Health Program, Department of Family and Community Medicine, University of California, San Francisco, CA, United States

[c]Departments of Family Medicine and Ob/Gyn, Contra Costa Regional Medical Center, Medical Director, Training in Early Abortion for Comprehensive Healthcare, Martinez, CA, United States

[d]Reproductive Health Access Project, New York, NY, United States

[e]Aggregate, Seattle, WA, United States

[f]Department of Family and Community Medicine, University of Maryland, Director of DEIA and Strategic Planning, National RHEDI Program, Baltimore, MD, United States

## Abstract

**Objectives:** In 2000, the United States' Food and Drug Administration (FDA) approved mifepristone for medication abortion. In this article, we explore how the Risk Evaluation and Mitigation Strategy (REMS) criteria for mifepristone specifically impede family physicians' ability to provide medication abortion in primary care settings.

**Study design:** We conducted 56 qualitative interviews with a national sample of family physicians across the US who were not opposed to abortion. We examined how the REMS criteria for mifepristone impact family physicians' ability to provide medication abortion.

**Results:** Of the 56 interviews conducted, 23 participants (41%) raised the REMS criteria as a barrier to providing medication abortion in primary care. These participants reported the REMS added a layer of bureaucratic complexity that made it difficult for family physicians to navigate, even when trained, to provide abortion care. These family physicians described 2 predominant ways the REMS impede their ability to provide medication abortion: (1) The REMS require substantial involvement of clinic administration, who can be unsupportive; (2) The complexity of navigating the REMS results in physicians and clinic administration in primary care viewing

---

✩ *Declaration of competing interest.* The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/)

*Corresponding author. nrazon@ucdavis.edu (N. Razon).

medication abortion as not worth the effort, since it is only a small component of services offered in primary care.

**Conclusion:** Removing the REMS could simplify integration of medication abortion into primary care, which could meet patient preferences, improve access, and reduce abortion stigma. The FDA's revised REMS criteria may ease administrative burden but will likely maintain key barriers to integrating medication abortion into family physicians' practice.

**Implications:** Our study highlights that the REMS criteria are barriers to family physicians' ability to integrate medication abortion into their primary care practices. The FDA's removal of in person dispensing criteria may provide some impetus for trained family physicians to integrate medication abortion into their scope of practice but the revised REMS criteria maintain key barriers to broader adoption.

**Keywords**

Family medicine; Medication abortion; Mifepristone; Primary care; REMS

## 1.  Introduction

In 2000, the United States Food and Drug Administration (FDA) approved mifepristone for medication abortion. A growing proportion of patients in the United States choose medication abortion instead of an in-office instrumentation procedure: in 2018, medication abortion made up 39% of abortions, up from 23% in 2014 [1–3]. Since only 11% of counties in the United States have a clinician who provides abortion care, many advocates hoped that the availability of mifepristone would allow primary care clinicians to integrate abortion services into their practices [4,5]. Unfortunately, this expansion into primary care has not occurred: more than twenty years later most abortions still take place in specialized abortion clinics, with only 1% of abortions taking place in a physician's office [5].

Family physicians are primary care physicians who provide broad scope of care across the life course, including reproductive health services. Provision of medication abortions by family physicians presents a unique opportunity to enhance access to patient-centered medication abortion care [6]. Further, having family physicians integrate medication abortion into their practice has the potential to destigmatize abortion for patients and providers by normalizing it as a routine part of full-spectrum care [4, 7]. Family physicians make up the majority of primary care physicians in the United States and provide care in many counties where there is no access to other health care services [8, 9]. Medication abortion care aligns with family medicine values related to meeting patients' needs for comprehensive care [4, 6, 10, 11]. Prior research demonstrates that family physicians who provide abortion services have low complication rates and that some patients prefer to have an abortion with their primary care provider [12–16].

While substantial efforts to expand abortion training for family physicians have been implemented, this has not resulted in substantial numbers of abortions being provided in primary care settings [17–19]. Several studies have outlined barriers that limit the integration of abortion into primary care, even among trained clinicians. These include

Pet. Ref. 971

state laws, health system restrictions, and liability insurance [10, 17, 18, 20, 21]. An additional consideration for family physicians wishing to provide mifepristone to their patients is the FDA's stringent Risk Evaluation and Mitigation Strategies (REMS) [22, 23]. The REMS criteria for mifepristone includes a formal certification process, which determines that a provider can accurately date a pregnancy, diagnose an ectopic pregnancy, and provide surgical intervention or referral for any complication. Furthermore, the REMS require that each patient sign a Patient Agreement Form. While in December 2021, the FDA announced a critical decision to remove the REMS in person dispensing requirement, the FDA maintained 2 key provisions of the REMS: (1) Providers (and now pharmacies) must receive certification from the manufacturer of mifepristone to prescribe and dispense mifepristone, and (2) patients still must sign a Patient Agreement Form for mifepristone use [24].

Drawing on a national set of qualitative interviews with family physicians, in this article we examine how the REMS for mifepristone specifically impede family physicians' ability to provide medication abortion in primary care settings.

## 2. Methods

This study draws on interviews with family physicians performed with the primary goal of exploring how family medicine values can be leveraged to encourage family physicians to integrate medication abortion into primary care settings to improve abortion access. Given the geographic variation in abortion access across the United States, we focused on recruiting participants from diverse geographies and with a broad range of experiences. We used a multipronged recruitment approach that included recruiting participants from national conferences and from national listservs. In addition, we (CD, SM, LM, SR) used professional networks to purposively sample family physicians from states with more hostile abortion policies, as well as to identify family physicians who had successfully integrated abortion services into primary care or had experience in leadership in family medicine.

Inclusion criteria for this study included being either a new career family physician or a family medicine thought leader. These criteria were based on the desire to focus on the perspectives of those with insights into the ongoing evolution of family medicine practice patterns. We defined new career family physicians as those who completed a family medicine residency in the United States within the previous 10 years. Thought leaders included experts in the field of family medicine with experience motivating other family physicians to expand their scope, or family physicians specifically with experience related to abortion integration into family medicine. The study team directly asked thought leaders to participate in the study.

The study team screened participants in the primary study for eligibility over the phone or in person with an initial eligibility survey, and excluded individuals who self-identified as opposing abortion, based on their responses to: "Are you personally opposed to people getting abortions?" The research team met regularly to review transcripts and discuss findings. During the recruitment process, we also used purposive sampling to speak to individuals who successfully integrated medication abortion into primary care. Once the

Pet. Ref. 972

team established that the themes related to the initial research question and aims reached saturation, by noting similar themes and responses during interviews, recruitment for the primary study ended.

## 2.1. Data collection

We developed an interview guide for the primary study with input from the research team including family physicians, educators, advocates, a social and behavioral scientist, and a communications specialist. Interview questions covered key components of the Theory of Planned Behavior, a well-described and frequently used approach to understanding influences on behavior change with attention to social norms, attitudes, perceived control, and intentions [25]. The research team iterated the interview guide based on participant feedback and themes that arose from interviews. Data for this analysis primarily came from responses to the following interview questions: "What factors do you think most contribute to you not providing medication abortion?" (asked only of those not providing medication abortion in a primary care setting) and, "What do you think are the main reasons why more family physicians don't provide medication abortion?"

Research staff (CD, EF, SW) obtained oral informed consent and participants completed surveys with questions about demographics, training, and clinical experience ahead of the interviews. Three team members (CD, EF, SW), trained in qualitative interview methods and with experience working in reproductive health, conducted the interviews. Two UCSF research staff (EF, SW) conducted most of the interviews with new career family physicians and all interviews with thought leaders. Both self-identify as white women who led projects within the Person-Centered Reproductive Health Program. They are not family physicians or clinicians and therefore studying up in this setting based on clinical hierarchy. CD, a UCSF faculty member and practicing family physician, conducted 4 new career family physician interviews. CD identifies as a white woman. While CD brings extensive research expertise on reproductive health and family medicine, she did not know any of the providers interviewed and related to them as a peer.

Interviews took place either in person or virtually over video conferencing software and lasted 60 to 75 minutes. We audio-recorded all interviews. We compensated participants for their time with $100 gift cards. The UCSF Institutional Review Board approved this study.

## 2.2. Analysis

We used a HIPAA-compliant professional transcription service to transcribe verbatim and de-identify all transcripts. A team member (RK, CP, IS, SW) reviewed transcripts to ensure accuracy. Research team members (KH, IS, SW) read transcripts, discussed impressions with the entire study team, and developed a preliminary codebook based on components of the Theory of Planned Behavior.

Two researchers (IS, SW) double coded an initial set of transcripts using NVivo 12 to assess inter-coder agreement, clarify codes, and resolve disagreements. Through this iterative process the research team revised the codebook. Three members of the study team (CP, NR, SW) coded approximately equal number of transcripts and met regularly to achieve consensus on coding and resolve any discrepancies.

Author Manuscript

We took a deductive-inductive content analysis approach and used memos to identify broad themes [26]. After coding a transcript, the study team drafted a memo to document and describe impressions of the interview. Over the course of the coding process, memos became more structured to highlight key domains. The team regularly met to discuss memos and major themes derived from the transcripts. Based on these analyses, researchers clarified the central attitudes and factors shaping family physicians' perspectives on providing medication abortion. Participants independently raised REMS as a topic that influenced their ability to provide medication abortion or integrate medication abortion into primary care. This paper focuses on a secondary analysis of family physicians' experience and knowledge of the REMS.

## 3.  Results

We interviewed 56 family physicians (see Table 1). A plurality of participants received abortion training ($n = 37$, 66%) but most did not currently provide medication abortions ($n = 39$, 70%). Sixteen interviewees (29%) did not receive abortion training and did not provide abortions. Of the physicians that provided abortions 7 offered abortions in the primary care setting where they have a continuity practice with patients, with the remaining providing abortions in specialized reproductive health settings.

Of the 56 family physicians interviewed, 23 (41%) either named or described the REMS criteria as a barrier to providing medication abortion. Participants who mentioned the REMS represented all regions of the country and worked in states with abortion policies that ranged from supportive to hostile. Both thought leaders and new career family physicians raised the REMS criteria as a barrier. Most family physicians who mentioned the REMS criteria received abortion training ($n = 20$, 87%).

Family physicians who raised the REMS criteria described 2 predominant ways the REMS impede their ability to provide medication abortion within primary care: (1) The REMS require substantial involvement of clinic administration, who can be unsupportive; (2) The complexity of navigating the REMS results in physicians and clinic administration in primary care viewing medication abortion as not worth the effort, since it is only a small component of services offered in primary care.

### 3.1.  Administrative interference

Participants discussed the REMS criteria as transforming the decision to provide mifepristone from being one between a physician and patient, to involving multiple levels of administration. Participants described to us how dispensing mifepristone requires that their clinics register, install a lockbox on site to stock medication, and have specific systems in place for ordering. These requirements meant that clinic administration must approve the process. As 1 participant who provided medication abortion only at a reproductive health clinic explained, "The only other huge hurdle, which would be wonderful if it could get overturned, it would be the REMS... You just have to sign some papers and have it on-site, but it does, you know, add another level of bureaucracy that we need to overcome to be able to stock the pill in our office" (Early career, northeast, abortion provider). As this participant

Pet. Ref. 974

went on to explain, the REMS criteria not only require providers' training but specifically their clinic's backing.

You really do need [the] support of your administration before you could do it, especially with all the regulations that are required. It's the fact that mifepristone has the REMS criteria, and it's not easy to - you can't just prescribe it. Um, it has to be given to the person in person, so you have to stock it in your clinic, and there's just - those hurdles kind of keep a lot of providers from doing it (Early career, northeast, abortion provider).

The need to navigate regulations and logistics as a result of the REMs meant participants with unsupportive clinic leadership were unable to provide, even if there were no religious or other formal limitations on abortion provision. As another participant explained to us, "You're at the whim of the place that you practice and if the person in charge of your clinic doesn't feel like providing or purchasing mifepristone is important or profitable, then you just don't do it" (Early career, west, abortion provider). Another participant echoed this sentiment: "If you don't have a local champion, you don't have someone who's willing to put the time and effort into it, it's hard to do, right. It's easy for me to prescribe like antibiotics, but it's not so easy for me to prescribe mifepristone 'cause of all the stuff around it" (Early career, northeast, abortion provider).

Because of the restrictions around mifepristone, some participants characterized the REMS criteria as "a stop sign" (Early career, south, not abortion provider) and "the absolute biggest barrier" (Early career, south, not abortion provider) to providing medication abortion. One family physician trained in medication abortion felt unable to provide specifically because of the REMS. "Unfortunately, there's just so much more red tape… I would be doing it in a heartbeat if I could prescribe mifepristone, and my patient could pick it up at a commercial pharmacy, but she can't because of the way it's regulated by the FDA" (Early career, south, not abortion provider).

Even among family physicians who do provide abortions, several felt that the complexity required to implement medication abortion steered their colleagues away from adopting it into their scope of practice.

I think number 1 is the restrictions on mifepristone. That's a huge 1 because - because there are so many restrictions, it scares people into thinking that they can't do medication abortions. So even though you may - there may be a lot of physicians out there who agree with medication abortion and would, you know, in theory would do it, there's so many restrictions and barriers to doing it, I think it really turns people off (Early career, midwest, abortion provider).

One of the thought leaders we interviewed who provides medication abortion emphasized the barrier the REMS criteria pose for most family physicians.

I think the REMS is a huge factor. It's because the access to the medication is restricted and you have to order it and stock it in your health center. You have to get a lot of other people's approval before - you know, you can't just write a prescription… So, you know, you have to go to a pharmacy and therapeutics committee or the Director of Nursing has to approve it or

the CEO has to approve it or the Medical Director has to approve it, or all of those people have to approve it. And there's bound to be somebody in there who doesn't like the idea (Though leader, northeast, abortion provider).

### 3.2.   Medication abortion as only a small part of primary healthcare

The REMS criteria impose the same restrictions on all clinical practices and prescribers, regardless of abortion volume. A number of participants mentioned that because a family medicine clinic might only care for patients choosing a medication abortion a few times a month (or even year), this low volume served as justification for leadership as to why they should not pursue approval to dispense mifepristone. In short, clinic leadership, and at times participants themselves, felt that the effort required to stock and dispense mifepristone outweigh the benefits of providing the service. As 1 participant explained, "Many primary care clinics think, oh, if our volume is low, like why bother going through all of this headache to be able to provide the service when, you know, we have maybe like 4 a week or something like that" (Early career south, not abortion provider).

Multiple participants highlighted how the REMS' disproportionately impacts clinics with low abortion volume. One participant we spoke with received training in medication abortion during residency, but she did not provide in her current practice. The REMS criteria determined where medication abortion took place in her organization as a mifepristone lockbox was only provided to the ob/gyn department. She explained, [F] or Mifeprex specifically, there's a multitude of restrictions that make it logistically incredibly challenging, depending on how many patients actually need it... The really irritating thing about it is they got exactly what they wanted by passing that, right? Which is that... you make a logistical barrier so high that providers who completely support it ideologically just don't feel that it's worth the time... While I wholly support it [mifepristone] being available, I can also see how, in terms of the use of time, like me like training and signing off every provider. And like making sure this med is stocked. And making sure there's lockboxes. And like all of this stuff. Uh, is an enormous burden relative to the number of patients whose lives it would improve (Early career, west, not abortion provider).

## 4.   Discussion

In a United States sample of family physicians, we found that the REMS on mifepristone creates a barrier to some family physicians' ability to provide medication abortion in their primary care clinics, with many interviewees sharing without prompting that the REMS prevented them from providing medication abortion. While these criteria are not the only barriers family physicians hoping to provide medication abortion encounter [27], the REMS do pose specific challenges for family physicians. Furthermore, given mifepristone's safety record, the need for the REMS (even in its revised form) has been questioned [22, 28, 29]. Our findings add to growing research documenting the negative impact of the REMS on primary care practitioners' ability to provide medication abortions [23, 30]. In this study of primary care physicians and administrators in Illinois, Calloway and colleagues characterize the REMS as the "linchpin of a cycle of stigmatization that continues to keep mifepristone out of primary care practice" [30]. As family physicians make up the majority of primary

Pet. Ref. 976

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

care physicians in the United States, our study adds to this literature by characterizing how this key group of physicians experience the REMS criteria and suggests that fully removing the REMS from mifepristone would be an important facilitator of efforts to broaden medication abortion access.

While our study took place prior to the FDA's decision to partially revise the REMS, our research provides insights into how this decision may impact United States family physicians' ability to provide medication abortion. The FDA's removal of the in person dispensing provision may encourage family physicians whose clinical site previously did not support the provision of medication abortion to provide medication abortion. This group of family physicians, who made up the majority of our sample, could now prescribe mifepristone directly to a certified pharmacy. The removal of the in person dispensing means that much of the administrative and clinic barriers and complexity that study participants described may be more easily overcome.

Nonetheless, the physicians we interviewed still encountered a range of barriers to provide medication abortions that the revised REMS will not alleviate. For example, the certification requirement for providers, and now pharmacies, may continue to serve as a gatekeeper for some providers. The ongoing requirement for patients to sign a Patient Agreement Form may also limit the ability of family physicians to provide medication abortion, especially since having this form on site and incorporating it into medical records requires the involvement of clinical administrators. To our knowledge, there is no existing evidence that supports maintaining this requirement or how this form impacts clinicians' ability to integrate or provide medication abortion. Beyond the REMS restrictions, family physicians will continue to experience additional barriers, including the restriction on provision of abortion in Federally Qualified Health Centers because of the Hyde Amendment and state-level restrictions on telemedicine for abortion care.

The experience of the Canadian health care system with mifepristone expansion into primary care provides useful insights into the potential impacts of fully removing the REMS criteria [33]. In 2015, mifepristone was approved by Health Canada for medication abortion. The initial Risk Management Plan, similar to the FDA's REMS, instituted by Health Canada limited the availability and accessibility to medication abortion by limiting gestational age at the time of abortion to 7 weeks, requiring an ultrasound prior to dispensing, requiring providers to register with the manufacturer, and only allowing providers to dispense medications [34]. However, through the efforts of advocacy groups and regional professional organizations, Canada decreased regulations, including eliminating the ultrasound requirement and allowing pharmacists to directly dispense to patients. A study in Ottawa documented that after these changes, participants experienced shorter wait times and an increase in medication abortion access [35]. It is important to note, however, that these decreased regulations occurred alongside other influences on medication abortion access and provision, including government financing of abortion care and trainings conducted by the Canadian Academy of Family Physicians and the National Abortion Federation Canada.

In the United States, models such as *ExPAND Mifepristone* demonstrate that learning collaborations that provide evidence-based knowledge on the clinical use of mifepristone

and expertise on best practices to navigate the administrative logistics are important aspects of reducing logistical and psychological barriers to abortion provision in primary settings [30]. In addition, recent models of online provision of medication abortion by family physicians provide encouraging direction for expanding care [31,32]. These broad efforts will likely be necessary, alongside the full elimination of the REMS, to reduce stigma and optimize provision of medication abortion in primary care settings.

Because abortion restrictions vary across the United States, 1 of the strengths of our study is our geographically diverse sample of family physicians working in different practice settings. Our interview methodology allowed physicians to share in depth experiences with abortion provision that may not be captured in survey data. Nonetheless, our study does have limitations that are important for consideration when interpreting our findings. First, as with all qualitative studies, the small and not inherently representative sample limits the generalizability of our findings. While we did not necessarily seek to recruit abortion trained physicians who are not providing abortion care, our sample did have more individuals who received abortion training, which does not reflect the broader family medicine community. In addition, our study design was not aimed to explore REMS specifically or the role of REMS in relationship to other barriers. As a result, we may not have fully elucidated experiences related to REMs from our participants, and our ability to compare barriers or explore the role of REMS for participants who did not bring up this topic is limited. Nonetheless we believe that the emphasis many participants placed on the impacts of the REMS criteria on their practice highlights its role in shaping abortion provision.

Mifepristone's approval in 2000 did not significantly improve abortion access through integration into primary care, and our interviews demonstrate the role that the REMS criteria played in this failure. The FDA's decision to revise the REMS on mifepristone has been long overdue, yet it does not go far enough. By keeping key components of the REMS in place, the FDA maintains an exceptionality to abortion services and may continue to keep abortion outside the scope of routine medical care. By permanently, and fully, removing the REMS on mifepristone family physicians and other primary care providers could more easily incorporate medication abortion into their scope of practice and integrate medication abortion into primary care settings. Such changes can better honor patient preferences for where abortion services are offered, reduce abortion stigma for providers and patients, and finally improve abortion access for millions across the United States.

## Acknowledgments

The authors would like to thank Shelly Rodrigues, Edith Fox, Ilana Silverstein, Kelsey Holt, and Rassidatou Konate for their input into the parent study on which the data for this analysis was drawn. Also, would like to thanks to the many physicians who spoke with us and shared their time, insights, and persistence.

**Funding:**

The research reported in this publication was funded through the Society of Family Planning Research Fund (grant award number SFPRF12-MA9).

## Abbreviations:

| REMS | Risk Evaluation and Mitigation Strategies |
|------|-------------------------------------------|

Pet. Ref. 978

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

| FDA | Food and Drug Administration |
|-----|------------------------------|

# References

[1]. Newhall EP, Winikoff B. Abortion with mifepristone and misoprostol: Regimens, efficacy, acceptability and future directions. Am J Obstetr Gynecol 2000;183:S44–53. doi: 10.1067/mob.2000.107950.

[2]. Pazol K, Creanga AA, Burley KD, Jamieson DJ. Abortion surveillance - United States, 2011. MMWR Surveill Summ 2014;63:1–41. doi: 10.15585/mmwr.ss6811a1.

[3]. Kortsmit K, Jatlaoui TC, Mandel MG, Reeves JA, Oduyebo T, Petersen E, et al. Abortion surveillance — United States, 2018. MMWR Surveill Summ 2020;69:1–30. doi: 10.15585/MMWR.SS6907A1.

[4]. Yanow S It is time to integrate abortion into primary care. Am J Public Health 2013;103:14–16. doi: 10.2105/AJPH.2012.301119. [PubMed: 23153160]

[5]. Jones RK, Witwer E, Jerman J. Abortion Incidence and Service Availability the United States, 2017. New York: 2019. https://doi.org/Abortion Incidence and Service Availability in the United States, 2017.

[6]. Amico JR, Godfrey EM. Providing abortion services in the primary care setting. Prim Care 2018;45:599–613. doi: 10.1016/j.pop.2018.07.010. [PubMed: 30401344]

[7]. Dianat S, Silverstein IA, Holt K, Steinauer J, Dehlendorf C. Breaking the silence in the primary care office: patients' attitudes toward discussing abortion during contraceptive counseling. Contraception X 2020;16(2):100029. doi: 10.1016/j.conx.2020.100029.

[8]. Petterson S, McNellis R, Klink K, Meyers D, Bazemore A. The state of primary care in the United States: a chartbook of facts and statistics. Washington, DC: Robert Graham Center; 2018.

[9]. The United States relies on family physicians unlike any other specialty. Am Fam Physician 2001;63:1669. [PubMed: 11352277]

[10]. Block A, Dehlendorf C, Biggs MA, McNeil S, Goodman S. Postgraduate experiences with an advanced reproductive health and abortion training and leadership program. Fam Med 2017;49:706–13. [PubMed: 29045988]

[11]. Nothnagle M, Prine L, Goodman S. Benefits of comprehensive reproductive health education in family medicine residency. Fam Med 2008;40:204–7. [PubMed: 18320400]

[12]. Herbitter C, Bennett A, Schubert FD, Bennett IM, Gold M. Management of early pregnancy failure and induced abortion by family medicine educators. J Am Board Fam Med 2013;26:751–8. doi: 10.3122/jabfm.2013.06.120248. [PubMed: 24204072]

[13]. Rubin SE, Godfrey E, Gold M. Patient attitudes toward early abortion services in the family medicine clinic. J Am Board Fam Med 2008;21:162–4. doi: 10.3122/jabfm.2008.02.070158. [PubMed: 18343866]

[14]. Paul M, Nobel K, Goodman S, Lossy P, Moschella JE, Hammer H. Abortion training in three family medicine programs: resident and patient outcomes. Fam Med 2007;39:184–9. [PubMed: 17323209]

[15]. Bennett I, Baylson M, Kalkstein K, Gillespie G, Bellamy S, Fleischman J. Early abortion in family medicine: clinical outcomes. Ann Fam Med 2009;527–33. doi: 10.1370/afm.1051. [PubMed: 19901312]

[16]. Logsdon MB, Handler A, Godfrey EM. Women's preferences for the location of abortion services: a pilot study in two Chicago clinics. Matern Child Health J 2012;16:212–16. doi: 10.1007/s10995-010-0722-4. [PubMed: 21107760]

[17]. Greenberg M Barriers and enablers to becoming abortion providers. Fam Med 2017;44:493–500.

[18]. Goodman S, Shih G, Hawkins M, Feierabend S, Lossy P, Waxman NJ, et al. A long-term evaluation of a required reproductive health training rotation with opt-out provisions for family medicine residents. Fam Med 2013;45:180–6. [PubMed: 23463431]

[19]. Srinivasulu S, Maldonado L, Prine L, Rubin S. Intention to provide abortion upon completing family medicine residency and subsequent abortion provision: a 5-year follow-up survey. Contraception 2019;100:188–92. [PubMed: 31150603]

Pet. Ref. 979

[20]. Dehlendorf C, Brahmi D, Engel D, Grumbach K, Joffe C, Gold M. Integrating abortion training into family medicine residency programs. Fam Med 2007;39:337–42. [PubMed: 17476607]

[21]. Dehlendorf CE, Grumbach K. Medical liability insurance as a barrier to the provision of abortion services in family medicine. Am J Public Health 2008;98:1770–4. doi: 10.2105/ AJPH.2008.136325. [PubMed: 18703433]

[22]. Raymond EIG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of overregulation: time to unburden mifeprex. N Engl J Med 2017;376:790–4. doi: 10.1056/ NEJMsb1612526. [PubMed: 28225670]

[23]. Srinivasulu S, Yavari R, Brubaker L, Prine L, Riker L, Prine L, et al. US clinicians' perspectives on how mifepristone regulations affect access to medication abortion and early pregnancy loss care in primary care. Contraception 2021;104:92–7. [PubMed: 33910031]

[24]. U.S Food and Drug Administration. "Mifeprex (mifepristone) Information." Accessed: December 17, 2021. Available: https://www.fda.gov/drugs/postmarket-drug-safety-information- patients-and-providers/mifeprex-mifepristone-information.

[25]. Ajzen I The theory of planned behavior. Organ Behav Hum Decis Process 1991;50:179–211. doi: 10.1016/0749-5978(91)90020-T.

[26]. Hsieh H-F, Shannon SE. Three approaches to qualitative content analysis. 2005. 10.1177/1049732305276687.

[27]. Razon N, Wulf S, Perez C, McNeil S, Maldonado S, Byrne Fields A, et al. A qualitative analysis of family physicians' barriers and facilitators to incorporating medication abortion into primary care Na'amah Razona, Sarah Wulf, Citlali Perez, Sarah McNeil, Lisa Maldonado, Alison Byrne Fields, Kelsey Holt, Edith Fox, Ilana Silverstein, Christine Dehlendorf. J Am Board Fam Med 2022 In Press.

[28]. Cleland K, Smith N. Aligning mifepristone regulation with evidence: Driving policy change using 15 years of excellent safety data. Contraception 2015;92:179–81. doi: 10.1016/ j.contraception.2015.06.016. [PubMed: 26093188]

[29]. Kaye J, Reeves R, Chaiten L. The mifepristone REMS: a needless and unlawful barrier to care. Contraception 2021;104:12–15. [PubMed: 33930383]

[30]. Calloway D, Stulberg D, Janiak E. Mifepristone restrictions and primary care: breaking the cycle of stigma through a learning collaborative model in the United States. Contraception 2021;104:24–8. [PubMed: 33891965]

[31]. Godfrey E, Thayer E, Fiastro A, Aiken A, Gomperts R. Family medicine provision of online medication abortion in three US states during COVID-19. Contraception 2021;104:54–60. [PubMed: 33939985]

[32]. Upadhyay UD, Koenig LR, Meckstroth KR. Safety and efficacy of telehealth medication abortions in the US during the COVID-19 pandemic. JAMA Netw Open 2021;4(8):e2122320. doi: 10.1001/jamanetworkopen.2021.22320. [PubMed: 34427682]

[33]. Munro S, Guilbert E, Wagner MS, Wilcox ES, Devane C, Dunn S, et al. Perspectives among Canadian physicians on factors influencing implementation of mifepristone medical abortion: a national qualitative study. Ann Fam Med 2020;18:413–21. doi: 10.1370/afm.2562. [PubMed: 32928757]

[34]. Yalahow A, Doctoroff J, Mark A, Foster AM. Trends in medication abortion provision before and after the introduction of mifepristone: a study of the National Abortion Federation's Canadian member services. Contraception 2020;102:119–21. doi: 10.1016/j.contraception.2020.04.012. [PubMed: 32325077]

[35]. LaRoche KJ, Labeca-Gordon IN, Foster AM. How did the introduction of mifepristone impact the availability of abortion care in Ottawa? a qualitative study with abortion patients. Facets 2020;5:559–70. doi: 10.1139/FACETS-2020-0019.

Pet. Ref. 980

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**Table 1**

Participants' demographics and abortion training and provision

| | Total participants $N = 56$ (%) | Mentioned REMS $N = 23$ (%) |
|---|---|---|
| **Gender** | | |
| Female | 43 (77) | 19 (83) |
| Male | 12 (21) | 4 (17) |
| Non-binary/third gender | 1 (2) | 0 |
| **Race** | | |
| American Indian/Alaska Native | 0 | 0 |
| Asian | 9 (16) | 2 (9) |
| Black or African American | 5 (9) | 1 (4) |
| Native Hawaiian/Pacific Islander | 1 (2) | 0 |
| White | 35 (63) | 18 (78) |
| Other | 6 (11) | 2 (9) |
| **Ethnicity** | | |
| Hispanic or Latino/a/x | 3 (5) | 0 |
| Non-Hispanic or Latino/a/x | 53 (95) | 23 (100) |
| **Age (years)** | | |
| ≤30 | 1 (2) | 0 |
| 31–40 | 45 (80) | 18 (78) |
| 41–50 | 5 (9) | 1 (4) |
| 51–60 | 4 (7) | 3 (13) |
| > 60 | 1 (2) | 1 (4) |
| **Regions of the U.S.[a]** | | |
| West | 23 (41) | 8 (35) |
| South | 13 (23) | 5 (22) |
| Midwest | 6 (11) | 2 (9) |
| Northeast | 14 (25) | 8 (35) |
| **State Abortion Policy Landscape[b]** | | |
| Hostile | 20 (36) | 7 (30) |
| Neutral | 4 (7) | 3 (13) |
| Supportive | 30 (54) | 11 (48) |

| Gender | Total participants $N = 56$ (%) | Mentioned REMS $N = 23$ (%) |
|---|---|---|
| N/A | 2 (4) | 2 (9) |
| Approximate distance between provider's clinical setting and nearest abortion clinic[c] (miles) | | |
| < 5 | 32 (57) | 19 (83) |
| 5–25 | 15 (27) | 2 (9) |
| 26–50 | 4 (7) | 1 (4) |
| > 50 | 4 (7) | 1 (4) |
| Unknown | 1 (2) | 0 |
| Abortion Training | | |
| Aspiration and medication abortion | 35 (63) | 19 (83) |
| Only aspiration abortion | 3 (5) | 1 (4) |
| Only medication abortion | 2 (4) | 0 |
| Neither aspiration or medication abortion | 16 (29) | 3 (13) |
| Abortion services provided since graduating residency | | |
| Aspiration and medication abortion | 16 (29) | 12 (52) |
| Only aspiration abortion | 0 | 0 |
| Only medication abortion | 5 (9) | 3 (13) |
| Neither aspiration or medication abortion | 35 (63) | 8 (35) |
| Current medication abortion provision | | |
| Currently provides medication abortion | 17 (30) | 14 (61) |
| Does not currently provide medication abortion | 39 (70) | 9 (39) |
| Setting of current abortion provision | | |
| Primary care | 5 (9) | 3 (13) |
| Reproductive health clinic | 10 (18) | 9 (39) |
| Primary care and reproductive health clinic | 2 (4) | 2 (9) |
| N/A (Does not provide abortion care) | 39 (70) | 9 (39) |

[a] U.S. Census Bureau, Census Regions and Divisions of the United States, 2013.

[b] Nash E, State Abortion Policy Landscape: From Hostile to Supportive, Guttmacher Institute, 2019. *State categories were based on laws in effect as of July 1, 2020. N/A refers to areas where a state policy landscape was not available.* https://www.guttmacher.org/article/2019/08/state-abortion-policy-landscape-hostile-supportive

[c] ANSIRH, Abortion Facility Database, University of California, San Francisco, 2019. *Distance was calculated using the zip code of the clinic where the provider works and the address of the closest clinic that offers abortion care in the ANSIRH Facility Database. If a provider works at multiple sites, the zip code of the furthest clinic from an abortion clinic was used.* https://www.ansirh.org/abortion-facility-database

Author Manuscript        Author Manuscript        Author Manuscript        Author Manuscript

Pet. Ref. 982

# Articles

# Disparities and change over time in distance women would need to travel to have an abortion in the USA: a spatial analysis



*Jonathan M Bearak, Kristen Lagasse Burke, Rachel K Jones*



## Summary

**Background** Abortion can help women to control their fertility and is an important component of health care for women. Although women in the USA who live further from an abortion clinic are less likely to obtain an abortion than women who live closer to an abortion clinic, no national study has examined inequality in access to abortion and whether inequality has increased as the number of abortion clinics has declined.

**Methods** For this analysis, we obtained data on abortion clinics for 2000, 2011, and 2014 from the Guttmacher Institute's Abortion Provider Census. Block groups and the percentage of women aged 15–44 years by census tract were obtained from the US Census Bureau. Distance to the nearest clinic was calculated for the population-weighted centroid of every block group. We calculated the median distance to an abortion clinic for women in each county and the median and 80th percentile distances for each state by weighting block groups by the number of women of reproductive age (15–44 years).

**Findings** In 2014, women in the USA would have had to travel a median distance of 10·79 miles (17·36 km) to reach the nearest abortion clinic, although 20% of women would have had to travel 42·54 miles (68·46 km) or more. We found substantially greater variation within than between states because, even in mostly rural states, women and clinics were concentrated in urban areas. We identified spatial disparities in abortion access, which were broadly unchanged, at least as far back as 2000.

**Interpretation** We showed substantial and persistent spatial disparities in access to abortion in the USA. These results contribute to an emerging literature documenting similar disparities in other high-income countries.

**Funding** An anonymous grant to the Guttmacher Institute.

**Copyright** © The Author(s). Published by Elsevier Ltd. This is an Open Access article under the CC BY-NC-ND 4.0 license.

## Introduction

Induced abortion allows women to control their fertility, and ensuring that all women in the USA have access to abortion is a public health goal.[1,2] In 2011, 2·8 million (45%) of the 6·1 million pregnancies in the USA were unintended, and 42% of unintended pregnancies ended in abortion.[3] However, abortion is not always easy to access in the USA, and issues such as stigma, restrictive laws, and financial constraints can pose barriers to access. One key measure of access is how far women have to travel to reach an abortion clinic. Previous research[4–7] found that the further a woman lives from a provider, the less likely she is to obtain an abortion. Most patients seeking an abortion have limited financial resources, so having to cover the cost of travel (which can include overnight stays and time off work) might prevent them from having an abortion.[8]

Spatial inequality—unequal access to resources and services based on location—affects access to abortion in many countries where it is legal.[9] Studies[10–13] in Australia, New Zealand, Canada, and the USA have

found that, among women who have abortions, those who live in rural areas typically travel greater distances than those who live in urban areas, at least in part because of subnational variation in restrictive laws.[13]

At least 20 US states have adopted one or more abortion restrictions since 2011 (appendix), making analysis of spatial inequality in that country particularly timely and relevant.[14] In 2008, patients in the USA travelled a median distance of 15 miles (24 km) to have an abortion.[15] Although the median distance travelled was reasonably low, a substantial minority of women (17%) travelled 50 miles (80 km) or more, and 31% of women living in rural areas travelled 100 miles (161 km) or more to have an abortion. A 2016 study[16] examined the change in how far women travelled for an abortion in the state of Texas after implementation of a restrictive law, which resulted in the closure of 22 (54%) of 41 abortion providers in the state. Similar to women nationally, patients in Texas in 2013 travelled a mean distance of 15 miles (24 km) to reach an abortion facility. The mean distance increased by 20 miles (32 km), to 35 miles (56 km), in 2014 after the law came into effect,

*Lancet Public Health* 2017; **2**: e493–500

Published Online October 3, 2017 http://dx.doi.org/10.1016/ S2468-2667(17)30158-5

See **Comment** page e484

Guttmacher Institute, New York, NY, USA (J M Bearak PhD, K L Burke BA, R K Jones PhD)

Correspondence to: Dr Jonathan M Bearak, Guttmacher Institute, New York, NY 10038, USA jbearak@guttmacher.org

Pet. Ref. 983

Research in context

**Evidence before this study**
Between Feb 1, 2017, and April 1, 2017, we searched Google Scholar for studies about spatial inequality in abortion access using the search terms "abortion and distance", "abortion access", and "spatial inequality". We reviewed the reference lists and reverse citations of relevant articles. Studies of high-income countries in which abortion is legal have identified spatial disparities in access to abortion facilities. Within the USA, studies using data from individual states have shown an inverse association between distance to nearest abortion provider and county abortion incidence. Meanwhile, many areas of the USA are implementing restrictive policies aimed at curtailing abortion. However, no national study has examined spatial inequality in access to abortion in the USA.

**Added value of this study**
We present the first national estimates of spatial disparities in distance to the nearest abortion provider in the USA. This study is also the first to take into account the geographical distribution of women. This approach allowed estimation of the median distance that a woman would have to travel to an abortion provider in each county and state and the 80th percentile distance that 20% of women in each state live from the nearest clinic. We characterised spatial disparities within and across states, and the stability of these disparities over a 15 year period, from 2000 to 2014.

**Implications of all the available evidence**
We showed persistant spatial disparities in women's access to abortion in the USA that might be applicable to women in other high-income countries.

and the number of patients who travelled more than 50 miles (80 km) increased from 10% to 44%.[16]

A limitation of those analyses was that they examined users of abortion services and did not capture women who wanted abortions but did not make it to the clinic because of distance; thus, they did not fully capture spatial inequality in access to abortions.[4–7] Two studies[4,7] found that the number of abortions in a county in Texas decreased as the distance to the nearest abortion facility increased between 2012 and 2014. Previous studies[5,6] that used abortion data for the states of New York and Georgia in the 1970s also found that the further women lived from a county or state where abortion care was provided, the lower the abortion incidence. These studies suggest that distance has been a persistent barrier to abortion.

Between 2011 and 2014, abortion incidence in the USA decreased by 14% to 14·6 abortions per 1000 women (15–44 years) each year.[17] During the same period, the number of clinics providing abortions decreased by 6%, from 839 to 788, compared with a 1% decline across the preceding 3 year period.[17] The decline in clinics was greatest in the midwest (22%) and southern (13%) regions, which also had the highest number of abortion restrictions enacted over this period.[17] As abortion clinics closed and service availability shifted, women might have had to travel further to have an abortion.

Using abortion-clinic data for 2014, 2011, and 2000, we examined spatial disparities in distance to the nearest abortion clinic by state and county. Because a decline in the number of abortion clinics might have increased the distance women had to travel to reach a provider,[17] we also examined state-specific and county-specific changes in distance to abortion clinics between 2011 and 2014. In a supplementary analysis to assess the long-term stability of access to abortion, we also analysed change since 2000.

## Methods

### Study design

We obtained the location of all abortion clinics in the USA from the Guttmacher Institute's Abortion Provider Census (APC). Since 1973, the Guttmacher Institute has regularly surveyed all known abortion-providing facilities to collect information about number of abortions and other aspects of service provision. The APC provides the most accurate counts of abortion available in the USA.[18] In the most recent APC, information was collected for 2014.[17] We also used data for 2011 and 2000 in this analysis. Approval for the study was obtained through expedited review by the Guttmacher Institute's federally registered institutional review board.

To identify clinics providing abortion services to the public, we limited the analysis to facilities that had caseloads of 400 abortions or more per year and those affiliated with Planned Parenthood that did at least one abortion in the period of interest. We included Planned Parenthood facilities that provided fewer than 400 abortions in a year because of name recognition and because their websites indicated whether they provided abortion services. These providers did 95% of all abortions in 2014; of the remainder, 2·1% occurred in hospitals, 1·4% in private physicians' offices, and 1·5% in health clinics.

Not all locations where abortions are done are accessible and discoverable to a woman seeking abortion care. Abortion providers in the USA have been targets of domestic terrorism, and doctors might be unable to maintain a practice if they are known to be willing to do abortions. Our data collection efforts showed that facilities doing small numbers of abortions seldom advertise their services. Thus, it is possible for a woman to live near to an abortion provider without knowing of that physician or that the physician provides abortions. Such a provider would not constitute a public point of access, and these were excluded from our analysis.

Pet. Ref. 984

**Articles**

Moreover, confidentiality concerns did not allow us to reveal the locations of low-volume providers because doing so would threaten their safety.

### Statistical analysis

To measure the distance between women and abortion providers, we first needed to specify the location of both. For women, we used the smallest publicly available geographical units, census block groups, which are geographical subdivisions of census tracts.[19] For their coordinates, we used population-weighted centroids.[20] For abortion providers, we geocoded (ie, determined the latitude and longitude of) each provider using Maptitude 2016, and linked each census block group to the nearest provider. Some women obtain abortions outside their state of residence; as such, in our analysis the nearest provider could be in another county or state. We used Open Source Routing Machine 4.9 to compute driving distance.[21]

| | 2011 | | 2014 | | Change in distance, 2011–14 | |
|---|---|---|---|---|---|---|
| | Median | 80th percentile | Median | 80th percentile | Median | 80th percentile |
| USA | 10·59 (17·04) | 40·26 (64·80) | 10·79 (17·36) | 42·54 (68·46) | 0·20 (0·32) | 2·28 (3·66) |
| **Northeast** | | | | | | |
| Connecticut | 5·74 (9·24) | 10·65 (17·13) | 5·17 (8·32) | 9·70 (15·60) | −0·57 (−0·92) | −0·95 (−1·53) |
| Maine | 46·12 (74·22) | 129·73 (208·77) | 25·31 (40·73) | 40·36 (64·95) | −20·81 (−33·49) | −89·37 (−143·82) |
| Massachusetts | 9·67 (15·56) | 21·64 (34·82) | 9·77 (15·72) | 21·52 (34·63) | 0·10 (0·16) | −0·12 (−0·19) |
| New Hampshire | 15·08 (24·27) | 24·28 (39·07) | 14·98 (24·10) | 24·14 (38·84) | −0·10 (−0·16) | −0·14 (−0·23) |
| New Jersey | 6·70 (10·78) | 14·37 (23·12) | 5·43 (8·74) | 11·65 (18·75) | −1·27 (−2·04) | −2·72 (−4·37) |
| New York | 3·19 (5·14) | 9·66 (15·55) | 3·17 (5·10) | 9·12 (14·67) | 0·03 (−0·04) | −0·54 (−0·87) |
| Pennsylvania | 12·96 (20·86) | 51·92 (83·55) | 13·00 (20·91) | 50·92 (81·95) | 0·04 (0·06) | −0·99 (−1·60) |
| Rhode Island | 7·07 (11·38) | 18·90 (30·41) | 7·07 (11·38) | 18·83 (30·31) | 0·00 (0·00) | −0·07 (−0·11) |
| Vermont | 18·86 (30·36) | 34·98 (56·29) | 15·78 (25·40) | 34·08 (54·84) | −3·08 (−4·96) | −0·90 (−1·45) |
| **Midwest** | | | | | | |
| Illinois | 9·96 (16·03) | 29·56 (47·57) | 10·41 (16·75) | 32·67 (52·58) | 0·45 (0·72) | 3·11 (5·01) |
| Indiana | 21·34 (34·34) | 60·51 (97·37) | 21·32 (34·31) | 60·30 (97·04) | −0·02 (−0·03) | −0·21 (−0·34) |
| Iowa | 17·61 (28·33) | 47·76 (76·87) | 12·16 (19·57) | 47·92 (77·12) | −5·45 (−8·77) | 0·16 (0·25) |
| Kansas | 105·58 (169·92) | 188·93 (304·05) | 32·04 (51·57) | 100·50 (161·74) | −73·54 (−118·35) | −88·43 (−142·31) |
| Michigan | 10·92 (17·57) | 35·35 (56·89) | 12·63 (20·33) | 42·85 (68·96) | 1·71 (2·76) | 7·50 (12·07) |
| Minnesota | 16·47 (26·50) | 60·43 (97·25) | 17·77 (28·59) | 60·55 (97·44) | 1·30 (2·09) | 0·12 (0·20) |
| Missouri | 29·54 (47·54) | 97·62 (157·10) | 36·99 (59·53) | 124·38 (200·17) | 7·45 (11·99) | 26·76 (43·07) |
| Nebraska | 9·21 (14·82) | 97·16 (156·36) | 9·36 (15·06) | 98·13 (157·92) | 0·15 (0·24) | 0·97 (1·56) |
| North Dakota | 137·13 (220·68) | 284·23 (457·42) | 151·58 (243·94) | 286·78 (461·52) | 14·46 (23·27) | 2·55 (4·11) |
| Ohio | 16·43 (26·44) | 45·26 (72·83) | 15·01 (24·80) | 45·58 (73·36) | −1·42 (−1·64) | 0·33 (0·53) |
| South Dakota | 95·87 (154·29) | 327·33 (526·79) | 92·06 (148·16) | 329·85 (530·83) | −3·81 (−6·14) | 2·51 (4·04) |
| Wisconsin | 29·18 (46·96) | 66·82 (107·53) | 29·53 (47·53) | 64·78 (104·25) | 0·35 (0·56) | −2·04 (−3·28) |
| **South** | | | | | | |
| Alabama | 26·59 (42·80) | 60·91 (98·03) | 26·20 (42·16) | 60·01 (96·58) | −0·40 (−0·64) | −0·90 (−1·45) |
| Arkansas | 49·29 (79·32) | 82·10 (132·13) | 48·35 (77·81) | 81·63 (131·36) | −0·94 (−1·51) | −0·47 (−0·76) |
| Delaware | 6·65 (10·71) | 19·36 (31·15) | 6·68 (10·75) | 19·39 (31·20) | 0·03 (0·04) | 0·03 (0·05) |
| Florida | 8·34 (13·42) | 22·58 (36·33) | 7·84 (12·62) | 20·74 (33·38) | −0·50 (−0·80) | −1·84 (−2·95) |
| Georgia | 20·11 (32·37) | 63·05 (101·47) | 17·95 (28·89) | 59·94 (96·46) | −2·16 (−3·48) | −3·11 (−5·01) |
| Kentucky | 38·88 (62·57) | 91·24 (146·83) | 38·18 (61·45) | 90·51 (145·66) | −0·70 (−1·13) | −0·73 (−1·17) |
| Louisiana | 34·39 (55·34) | 75·34 (121·24) | 35·06 (56·42) | 84·81 (136·48) | 0·67 (1·07) | 9·47 (15·24) |
| Maryland | 5·86 (9·42) | 15·53 (24·99) | 6·20 (9·97) | 16·61 (26·73) | 0·34 (0·55) | 1·08 (1·74) |
| Mississippi | 68·31 (109·94) | 95·30 (153·37) | 68·80 (110·72) | 94·92 (152·76) | 0·49 (0·78) | −0·38 (−0·61) |
| North Carolina | 19·07 (30·69) | 46·41 (74·68) | 18·34 (29·52) | 45·68 (73·52) | −0·73 (−1·17) | −0·72 (−1·16) |
| Oklahoma | 21·47 (34·55) | 75·59 (121·65) | 20·79 (33·46) | 75·09 (120·84) | −0·68 (−1·09) | −0·50 (−0·81) |
| South Carolina | 24·24 (39·01) | 52·05 (83·76) | 23·98 (38·59) | 51·71 (83·23) | −0·26 (−0·42) | −0·33 (−0·54) |
| Tennessee | 26·99 (43·43) | 68·50 (110·23) | 26·91 (43·31) | 68·54 (110·30) | −0·08 (−0·12) | 0·04 (0·06) |
| Texas | 14·01 (22·55) | 32·86 (52·88) | 17·23 (27·72) | 89·36 (143·81) | 3·22 (5·18) | 56·50 (90·93) |
| Virginia | 10·91 (17·56) | 40·22 (64·73) | 11·25 (18·10) | 39·67 (63·85) | 0·34 (0·54) | −0·55 (−0·88) |
| West Virginia | 59·94 (96·46) | 91·46 (147·18) | 59·81 (96·25) | 91·44 (147·15) | −0·13 (−0·21) | −0·02 (0·04) |
| | | | | | | (Table continues on next page) |

Pet. Ref. 985

**Articles**

| | 2011 | | 2014 | | Change in distance, 2011–14 | |
|---|---|---|---|---|---|---|
| | Median | 80th percentile | Median | 80th percentile | Median | 80th percentile |
| (Continued from previous page) | | | | | | |
| **West** | | | | | | |
| Alaska | 9·31 (14·99) | 156·24 (251·45) | 9·31 (14·99) | 154·25 (248·26) | 0·00 (0·00) | –1·99 (–3·20) |
| Arizona | 8·13 (13·08) | 20·94 (33·69) | 11·71 (18·84) | 31·80 (51·18) | 3·58 (5·76) | 10·87 (17·49) |
| California | 4·51 (7·26) | 10·85 (17·47) | 4·50 (7·24) | 10·95 (17·63) | –0·01 (–0·02) | 0·10 (0·16) |
| Colorado | 10·26 (16·51) | 25·73 (41·41) | 9·73 (15·66) | 20·08 (32·32) | –0·53 (–0·85) | –5·65 (–9·09) |
| Hawaii | 14·00 (22·54) | 29·97 (48·24) | 14·00 (22·54) | 30·20 (48·61) | 0·00 (0·00) | 0·23 (0·37) |
| Idaho | 26·79 (43·12) | 118·29 (190·37) | 24·65 (39·67) | 115·81 (186·37) | –2·14 (–3·45) | –2·48 (–4·00) |
| Montana | 27·82 (44·76) | 113·39 (182·48) | 74·02 (119·13) | 123·83 (199·29) | 46·21 (74·37) | 10·45 (16·81) |
| Nevada | 7·22 (11·62) | 13·26 (21·33) | 7·10 (11·43) | 12·06 (19·41) | –0·12 (–0·19) | –1·19 (–1·92) |
| New Mexico | 27·27 (43·89) | 102·09 (164·29) | 26·52 (42·67) | 112·45 (180·96) | –0·75 (–1·21) | 10·36 (16·67) |
| Oregon | 8·07 (12·99) | 36·05 (58·02) | 8·16 (13·12) | 35·77 (57·56) | 0·08 (0·13) | –0·29 (–0·46) |
| Utah | 29·51 (47·49) | 53·62 (86·29) | 29·35 (47·23) | 50·97 (82·03) | –0·16 (–0·26) | –2·65 (–4·26) |
| Washington | 6·11 (9·84) | 16·53 (26·61) | 6·36 (10·24) | 15·25 (24·55) | 0·25 (0·40) | –1·28 (–2·06) |
| Wyoming | 168·36 (270·95) | 273·04 (439·42) | 168·49 (271·16) | 275·01 (442·59) | 0·13 (0·21) | 1·97 (3·17) |

Data are miles (km).

*Table:* Median and 80th percentile distances to nearest abortion clinic for women aged 15–44 years in 2011–14, by state

To estimate mean and percentile distances for each state and county, we weighted each block group by the approximate number of women of reproductive age (15–44 years). We obtained population data for 2000 and 2010 from the Decennial Census.[22,23] The smallest geographical area for which age and sex distributions were available was census tract; therefore, we multiplied each block group's population by the proportion of the census tract that was made up of women aged 15–44 years. To account for population growth after 2010, the last year a census was done, we scaled each block group's population using the Census Bureau's 2011 and 2014 county population estimates.[24]

Mean distances were right skewed by the small proportion of women who lived several 100 miles from the nearest provider. For this reason, we used median distance or the value for which half of women in a county lived from the nearest provider. In our state-level analyses, we also examined 80th percentile distances.

We analysed whether distance to provider varied by the National Center for Health Statistics' urban-rural classification scheme, an extension of the Office of Management and Budget metropolitan statistical area (MSA) classification.[25]

No smooth gradient was seen in the number of abortions done by providers; of the providers excluded from the analysis in 2014, 631 (62%) did fewer than 25 abortions, whereas 38 (4%) did 300–399 abortions. A concern was that a small number of abortions might have placed a provider above or below 400 abortions so as to substantively affect our results. To address this possibility, we did a sensitivity analysis that included all providers who did at least 200 abortions.

Another concern was that rural areas might have been served by providers who did very few abortions. However, although 43% of counties were rural, less than 1% of the excluded providers were in rural areas. All of these were either hospitals or physicians' offices, except for one clinic, which did not advertise abortion services on its website.

We excluded the District of Columbia from the tables and discussion of the findings (but not from the overall analysis) because it is not a state. In both 2011 and 2014, the District of Columbia had four or more abortion clinics,[17,26] and residents would have had to travel a median distance of 2 miles to reach the nearest clinic (shorter than the median distance in any state).

### Role of the funding source

The funding source did not have any role in the study design, data collection, data analysis, writing of the manuscript, or in the decision to submit the paper for publication. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

## Results

Nationally, half of all women of reproductive age in 2014 lived within 10·79 miles (17·36 km) of an abortion clinic (table). The median distance a woman would have had to travel to reach the nearest abortion clinic in 2014 was less than 15 miles (24 km) in 23 (46%) states (figure 1 and table). These states were located in all four geographical regions. Because we considered the concentration of residents in census block groups, many women in states with large rural populations would not have had to travel far to reach a clinic. For example, although a third of residents in Alaska live in rural areas,[27] we found that half

**Articles**

of all women in this state lived within 9·31 miles (14·98 km) of the nearest abortion clinic.

The median distance to the nearest clinic providing abortion services in 2014 was 15–29 miles (24–47 km) in 16 (32%) states and 30–89 miles (48–143 km) in eight (16%) states. At least half of all women in three (6%) states, including Wyoming (168·49 miles [271·16 km]), North Dakota (151·58 miles [243·94 km]), and South Dakota (92·06 miles [148·16 km]), would have had to travel more than 90 miles (145 km) to reach the nearest clinic.

The median state distances concealed sizable minorities of women who would have had to travel substantial distances to reach an abortion provider. For example, compared with the median distance of 9·31 miles (14·98 km) in Alaska, the 80th percentile distance showed that 20% of women in Alaska would have had to travel at least 154·26 miles (248·26 km) to reach the nearest abortion clinic in 2014 (table). In 26 (52%) states, at least 20% of women would have had to travel more than 50 miles (80 km) to reach the nearest facility providing abortion care.

Examining distance to the nearest clinic by county provided a more complex picture (figure 2). Substantially more variation was seen between counties than between states, and women in many counties had to travel considerably further than their state median distance. However, even in states such as Texas, in which most of the landmass was far from an abortion clinic, most women lived reasonably close to an abortion clinic because of the concentration of both women and clinics in urban areas (appendix).

Counties where women would have had to travel 180 miles (290 km) or more to reach the nearest clinic were concentrated in the middle of the country, covering large portions of Montana, Wyoming, North Dakota, South Dakota, Nebraska, Kansas, and Texas. There were also areas with large travel distances in some states bordering Canada (Minnesota and Michigan), as well as pockets in California, Nevada, Utah, Idaho, and Missouri. Although geographically sizable, most of these areas were not densely populated and were generally rural (appendix). However, several of them were located in or near to medium or small metropolitan areas, the largest of which were located in Texas: Corpus Christi (324 000 residents), Lubbock (246 000), Amarillo (199 000), and Brownsville (183 000).

Between 2011 and 2014, the median distance a woman would have had to travel to reach an abortion clinic decreased in nine [18%] states; remained stable, changing no more than 1 mile (1·6 km) in 34 (68%) states; and increased in seven [14%] states (table). Most of the changes in distance to the nearest clinic were 5 miles (8 km) or less. The exceptions were Kansas (73·54 miles [118·35 km]) and Maine (20·81 miles [33·49 km]), where the median distance decreased, and Montana (46·21 miles [74·37 km]), North Dakota (14·46 miles [23·27 km]), and



**Figure 1:** Median distance to the nearest abortion provider by state, 2014
Alaska and Hawaii are inset in the bottom-left corner.



**Figure 2:** Median distance to the nearest abortion provider by county, 2014
Alaska and Hawaii are inset in the bottom-left corner.

Missouri (7·45 miles [11·99 km]), where the median distance increased.

Similarly, little to no change was seen in the median distance to the nearest clinic in most counties (figure 3). Counties where the median distance to the nearest provider increased by 30 miles (48 km) or more were especially prominent in Texas, Iowa, Montana, and Missouri, and were present only outside large metropolitan areas (appendix). Texas and Missouri also had the largest increases in the 80th percentile distance that 20% of women would have had to travel to reach a clinic (56·50 miles [90·93 km] for Texas and 26·76 miles

See Online for appendix

Pet. Ref. 987

e497



***Figure 3:*** Change in median distance to the nearest abortion provider by county, 2011–14
Alaska and Hawaii are inset in the bottom-left corner.

Legend:
- ≥30 miles (48 km) further
- 15–29 miles (24–47 km) further
- 1–14 miles (2–23 km) further
- <1 mile (2 km)
- 1–14 miles (2–23 km) nearer
- 15–29 miles (24–47 km) nearer
- ≥30 miles (48 km) nearer

[43·07 km] for Missouri). Conversely, the 80th percentile distance increased by less than 1 mile in Iowa, and the median distance actually decreased by 5·45 miles (8·77 km) in this state (table). Although counties where the median distance to the nearest provider increased by 30 miles (48 km) or more were located in all four geographical regions, New Jersey was the only state in the northeast to show this degree of change. Counties where the median distance to a clinic increased by 15–29 miles (24–47 km) were more sparse than those where the median distance to the nearest provider increased by 30 miles (48 km) or more, although they too were not found in large metropolitan areas (appendix). These counties were also scattered across all four regions, although only one state in the northeast, Virginia, experienced this level of decline in access.

Counties where the median distance to the nearest clinic decreased by more than 30 miles (48 km) were most commonly in the midwest, occurring in Illinois, Iowa, Kansas, Missouri, Nebraska, and Wisconsin. Distance to the nearest clinic also decreased by 30 miles (48 km) or more in counties in California and Colorado (in the west) and in Maine and upstate New York (in the northeast).

Our findings showed spatial disparities that were broadly unchanged in the period of 2011–14, despite several abortion restrictions being enacted during this period. We confirmed the consistency of the spatial disparities in our supplemental analysis of data from 2000. These spatial disparities have persisted for at least 15 years (appendix).

To assess the robustness of our results, we did a sensitivity analysis with inclusion of providers who did

200–399 abortions each year. State distances in 2014 were almost identical to those from the original primary analysis, with one exception: in Texas, the 80th percentile distance increased by 30 miles (48 km) because of a restrictive law that forced clinic closures (appendix).

## Discussion

To our knowledge, this study is the first to provide national estimates of spatial disparity in distance to the nearest abortion clinic for all women aged 15–44 years in the USA. Research has shown that living far from a provider can make abortion inaccessible.[4–6] Travelling long distances can impose a substantial burden on women with respect to transportation costs, travel duration, time off work, and arrangement of childcare, particularly for women who are economically disadvantaged. However, distance can be contextualised within several factors that can affect access to abortion care. The presence of one nearby clinic does not necessarily show that the clinic meets the needs of all prospective patients, that it is open daily, or that it has the capacity to meet demand.[28] Numerous barriers to access can have compounding effects on a woman's ability to access care. For example, in 2014, 11 US states (an increase from nine states in 2011) required that a woman have in-person counselling, followed by waiting for 24–72 h, before obtaining an abortion (appendix). For these women, even seemingly short distances of 30 miles (48 km) can pose a substantial barrier to care because they would have to travel to and from the clinic twice (120 miles [193 km] in total).

Almost all patients who have an abortion in the USA are economically disadvantaged, and many either do not have health insurance or are unable to use insurance to pay for the procedure.[8] These women might be able to travel to an abortion clinic, but they will be unable to access the service if they cannot afford to pay for the procedure. Distance might compound these cost barriers.

Most women would not have to travel considerable distances to reach an abortion clinic because almost all women and providers in the USA are in metropolitan areas. However, a sizable minority of women would have to travel 90 miles or more, and variation between counties is greater than between states. For example, in Alaska in 2014, half of all women lived 9·31 miles (14·98 km) or less from an abortion clinic, but a fifth of women lived 154·26 miles (248·26 km) or even further from a clinic; similar examples included Idaho, Montana, Nebraska, New Mexico, and Texas. Although half of all woman in the USA would have had to travel no more than 10·79 miles (17·36 km) to reach the nearest abortion clinic, 20% of women would have had to travel 42·54 miles (68·46 km) or more. Although policies are implemented at the state level, the consequences of restrictive legislation might not be felt equally across counties within a state; women in rural counties are likely to be most adversely affected by clinic closures.

Pet. Ref. 988

Increases in distance in excess of 30 miles (48 km) between 2011 and 2014 were particularly evident in numerous counties in Texas, Missouri, Iowa, and Montana. All of these states, except for Iowa, adopted abortion restrictions during this period (appendix). These states were among those that had the largest proportionate decline in clinics.[17] A hostile environment might have contributed to clinic closures, meaning that more women would have had to travel further to access care in 2014 than in 2011. By contrast, Iowa enacted no major restrictions during the study period and was not considered hostile to abortion rights, although it had five fewer clinics in 2014 than in 2011 (appendix). Research has suggested that efforts to increase access to long-acting contraceptive methods in Iowa might have contributed to reductions in the number of abortions.[29] Reduced need for abortion services might have contributed to the decline in clinics and, in turn, the increase in distance that some women in some counties would have to travel for an abortion. The median distance to a clinic decreased by about 5 miles (8 km) for Iowa during the study period, suggesting that abortion services were redistributed and that women, particularly those living in metropolitan areas, would not have had to travel quite as far.

Texas was an outlier in that the distance that 20% of women would have had to travel increased by about 56 miles (90 km). This finding was probably due to an abortion restriction enacted in 2013 requiring that physicians who provide abortion care have admitting privileges at nearby hospitals. This law resulted in the closure of more than half of the abortion care facilities in the state between 2013 and 2014.[30] Our estimates of distance to nearest provider for women in Texas in 2014 are probably too low because they were calculated with inclusion of facilities that provided at least 400 abortions in 2014, several of which were closed at some point that year.[31] Although some of the more onerous restrictions were struck down by the Supreme Court in June, 2016, most clinics have not yet reopened,[4] and the distance to the nearest provider has probably not improved.

The median distance to the nearest provider decreased by more than 20 miles (32 km) in Kansas and Maine. A new clinic opened in Kansas, and two clinics in Maine had increased caseloads so that they provided 400 or more abortions in 2014. These findings suggested that abortion might have become more accessible for women in these states.

This study had several limitations. First, there are numerous barriers to abortion access in the USA, and distance is not the only obstacle. Abortion restrictions, stigma, and financial constraints could prevent a woman from having an abortion, regardless of distance. Second, our estimates might be conservative because they do not capture the effect of mandated counselling and waiting periods, which might force women to make multiple trips to an abortion clinic. Third, a woman might not visit the closest abortion provider to her home; for example, the closest provider might not offer the necessary or desired services. Fourth, our analysis did not capture women's qualitative experiences. Fifth, the inclusion criteria might have affected the measured distances, but modifying these criteria would have led to inclusion of locations that were not public points of access. Finally, although we documented spatial disparities, it was beyond the scope of our analysis to fully address their causal determinants (eg, reduced demand for services might have affected a clinic's ability to support itself).

In conclusion, abortion is an important component of reproductive health, and restricting access to abortions can lead to them being done later or under potentially unsafe conditions. Our analysis showed substantial and persistent spatial disparities in access to abortion. Enacting restrictions at the state level is a stated priority of many policy makers.[32] Such efforts, if successful, could not only reduce access to abortion, especially for economically disadvantaged women who might not have the resources to overcome obstacles posed by travel, but could potentially exacerbate existing spatial inequality.

**Contributors**
JMB led the conceptualisation of the research and analysis of data. RKJ led the Abortion Provider Censuses and contributed to conceptualisation of the research. KLB contributed to data collection, geocoded the data, and co-led the analysis, under the supervision of JMB and RKJ. All authors contributed to interpretation of the results and writing of this report.

**Declaration of interests**
We declare no competing interests.

**Acknowledgments**
This study was funded by an anonymous grant to the Guttmacher Institute. We thank Lawrence Finer, Kathryn Kost, Rachel Gold, Elizabeth Nash, Megan Donovan, and Adam Sonfield for reviewing drafts of this report and Liza Fuentes for her insight during peer review.

**References**
1   Committee on Health Care for Underserved Women. ACOG Committee opinion no. 613: increasing access to abortion. *Obstet Gynecol* 2014; **124:** 1060–65.
2   American Public Health Association. Restricted access to abortion violates human rights, precludes reproductive justice, and demands public health intervention. Policy number 20152. 2015. https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2016/01/04/11/24/restricted-access-to-abortion-violates-human-rights (accessed Dec 13, 2016).
3   Finer LB, Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *N Engl J Med* 2016; **374:** 843–52.
4   Grossman D, White K, Hopkins K, Potter JE. Change in distance to nearest facility and abortion in Texas, 2012 to 2014. *JAMA* 2017; **317:** 437–39.
5   Shelton JD, Brann EA, Schulz KF. Abortion utilization: does travel distance matter? *Fam Plann Perspect* 1976; **8:** 260–62.
6   Joyce TJ, Tan R, Zhang Y. Back to the future? Abortion before & after Roe. Cambridge, MA: National Bureau of Economic Research, 2012.
7   Cunningham S, Lindo JM, Myers C, Schlosser A. How far is too far? New evidence on abortion clinic closures, access, and abortions. Cambridge, MA: National Bureau of Economic Research, 2017.
8   Jerman J, Jones RK, Onda T. Characteristics of US abortion patients in 2014 and changes since 2008. New York, NY: Guttmacher Institute, 2016.

Pet. Ref. 989

9      Doran F, Nancarrow S. Barriers and facilitators of access to first-trimester abortion services for women in the developed world: a systematic review. *J Fam Plann Reprod Health Care* 2015; **41**: 170–80.

10     Sethna C, Doull M. Spatial disparities and travel to freestanding abortion clinics in Canada. *Womens Stud Int Forum* 2013; **38**: 52–62.

11     Silva M, McNeill R. Geographical access to termination of pregnancy services in New Zealand. *Aust NZ J Public Health* 2008; **32**: 519–21.

12     Nickson C, Smith AMA, Shelley JM. Travel undertaken by women accessing private Victorian pregnancy termination services. *Aust NZ J Public Health* 2006; **30**: 329–33.

13     Nickson C, Shelley J, Smith A. Use of interstate services for the termination of pregnancy in Australia. *Aust NZ J Public Health* 2002; **26**: 421–25.

14     Nash E, Gold RB, Ansari-Thomas Z, Cappello O, Mohammed L. Policy trends in the states: 2016. New York, NY: Guttmacher Institute, 2017.

15     Jones RK, Jerman J. How far did US women travel for abortion services in 2008? *J Womens Health* 2013; **22**: 706–13.

16     Gerdts C, Fuentes L, Grossman D, et al. Impact of clinic closures on women obtaining abortion services after implementation of a restrictive law in Texas. *Am J Public Health* 2016; **106**: 857–64.

17     Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2014. *Perspect Sex Reprod Health* 2017; **49**: 17–27.

18     Jatlaoui TC, Ewing A, Mandel MG, et al. Abortion surveillance—United States, 2013. *MMWR Surveill Summ* 2016; **65**: 1–44.

19     US Census Bureau. Geographic terms and concepts—block groups. 2010. https://www.census.gov/geo/reference/gtc/gtc_bg.html (accessed June 15, 2017).

20     US Census Bureau. Centers of population. http://www.census.gov/geo/reference/centersofpop.html (accessed June 14, 2016).

21     Huber S, Rust C. Calculate travel time and distance with OpenStreetMap data using the Open Source Routing Machine (OSRM). *Stata J* 2016; **16**: 416–23.

22     US Census Bureau/American FactFinder. P12: sex by age. 2000 Census. US Census Bureau, 2000.

23     US Census Bureau/American FactFinder. P12: sex by age. 2010 Census. US Census Bureau, 2010.

24     US Census Bureau. County population totals tables: 2010–2016. https://www.census.gov/data/tables/2016/demo/popest/counties-total.html (accessed June 26, 2017).

25     Ingram DD, Franco SJ. 2013 NCHS urban-rural classification scheme for counties. Hyattsville, MD: National Center for Health Statistics, 2014.

26     Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2011. *Perspect Sex Reprod Health* 2014; **46**: 3–14.

27     Iowa Community Indicators Program. Urban percentage of the population for states, historical. http://www.icip.iastate.edu/tables/population/urban-pct-states (accessed Feb 21, 2017)

28     Texas Policy Evaluation Project. Abortion wait times in Texas: the shrinking capacity of facilities and the potential impact of closing non-ASC clinics. 2015. http://sites.utexas.edu/txpep/files/2016/01/Abortion_Wait_Time_Brief.pdf (accessed July 25, 2016)

29     Biggs MA, Rocca CH, Brindis CD, Hirsch H, Grossman D. Did increasing use of highly effective contraception contribute to declining abortions in Iowa? *Contraception* 2015; **91**: 167–73.

30     Grossman D, Baum S, Fuentes L, et al. Change in abortion services after implementation of a restrictive law in Texas. *Contraception* 2014; **90**: 496–501.

31     Fuentes L, Lebenkoff S, White K, et al. Women's experiences seeking abortion care shortly after the closure of clinics due to a restrictive law in Texas. *Contraception* 2016; **93**: 292–97.

32     Gold RB, Starrs AM. US reproductive health and rights: beyond the global gag rule. *Lancet Public Health* 2017; **2**: e122–23.

Pet. Ref. 990

The American College of
Obstetricians and Gynecologists
WOMEN'S HEALTH CARE PHYSICIANS

# COMMITTEE OPINION

Number 586 • February 2014        (Reaffirmed 2016. Replaces Committee Opinion Number 429, March 2009)

**Committee on Health Care for Underserved Women**

*This information should not be construed as dictating an exclusive course of treatment or procedure to be followed.*

## Health Disparities in Rural Women

**ABSTRACT:** Rural women experience poorer health outcomes and have less access to health care than urban women. Many rural areas have limited numbers of health care providers, especially women's health providers. Rural America is heterogeneous where problems vary depending on the region and state. Health care professionals should be aware of this issue and advocate for reducing health disparities in rural women.

Significant health disparities exist between rural and urban women. Various definitions of "rural" are used to study and report population data, and to determine eligibility and reimbursement levels for federal and state programs. In this document, because of the complexities of definitions, the term "rural" will be used interchangeably with "nonmetropolitan" and the term "urban" will be used interchangeably with "metropolitan."

Rural America represents 75% of the national landmass and is home to 22.8% of U.S. women aged 18 years and older (1, 2). Rural communities are heterogeneous, with substantial regional differences in ethnic and racial composition (3, 4). Whereas 83.5% of nonmetropolitan residents are non-Hispanic white, Hispanics and Asians are the fastest growing rural subgroups (2).

### Rural Health Disparities

Although national data on women's health and outcomes according to residence are limited, disparities in rural women are apparent. General health conditions and behavior that U.S. rural women experience at higher rates than their urban counterparts include, self-reported fair or poor health status, unintentional injury and motor vehicle-related deaths, cerebrovascular disease deaths, suicide, cigarette smoking, obesity, difficulty with basic actions or limitation of complex activities (4, 5), and incidence of cervical cancer (6). Other comparisons show that death rates from ischemic heart disease in rural women exceed that for all U.S. women. In some regions of the country, women in nonmetropolitan areas have higher rates of heavy alcohol consumption (4). Proportionately fewer rural women receive recommended preventive screening services for breast and cervical cancer. Rural

African American, Hispanic, Asian, and white women are less likely to have cervical cancer screening. African American, Hispanic, and white women are less likely than their urban counterparts to have mammograms (7). Comparisons of female patients in whom invasive breast cancer was diagnosed in Georgia from 2000 to 2009 indicate that women living in small rural and isolated areas were 30% more likely to have surgery and 17% less likely to receive radiotherapy as first-course treatment than their urban counterparts. Also, within these rural areas, African American patients were 57% less likely to have surgery than white patients (8).

### Obstetric and Reproductive Health Outcomes

National level data show relatively little difference between metropolitan and nonmetropolitan women for a number of obstetric outcomes (9). In contrast, risks vary by levels of rurality in many parts of the country. Prenatal care initiation in the first trimester was lower for mothers in more rural areas compared with suburban areas (10). Relative to women living in large fringe metropolitan and medium to small metropolitan areas, rural women experienced slightly higher rates of hospitalizations with complications during pregnancy in 2008 (11).

With respect to adverse birth outcomes, a 2002 study in Pennsylvania found that women residing in the two most rural types of communities experienced risks of low birth weight (LBW) and preterm birth similar to those identified for women living in urban areas, even after controlling for pertinent maternal variables (12). Calculations of 5-year average (2000–2004) infant mortality rates for the United States and its counties indicated

a rate of 6.9 deaths per 1,000 live births. There were 1,041 nonmetropolitan counties (51%) with rates that exceeded the U.S. rate, and a subset of 128 nonmetropolitan counties (6.2%) with rates more than twice the national rate (3).

Receipt of reproductive health services by sexually active women, aged 15–44 years, within the past year, was less likely for women living in nonmetropolitan areas (13); rural women relied on female sterilization (35%) to a greater extent than women living in central metropolitan (24%) or fringe metropolitan (25%) areas (14). A 2006 survey of women aged 18–44 years in Colorado found that women in small towns or rural areas indicated that they plan for contraceptive use less and were more likely to have had an unintended pregnancy than women in more urban areas (15).

## Health Services Access

Access to health care for rural residents is complicated by patient factors as well as those related to the delivery of care. Rural residents are more likely to be poor, lack health insurance, or rely substantially on Medicaid and Medicare; they also travel longer distances to receive care or to access a range of medical, dental, and mental health specialty services (16). Less than one half of rural women live within a 30-minute drive to the nearest hospital offering perinatal services. Within a 60-minute drive, the proportion increases to 87.6% in rural towns and 78.7% in the most isolated areas (17, 18). During 2008–2010, rural women aged 18–64 years reported the highest rates of delayed care or no medical care due to cost (18.6%) and no health insurance coverage (23.1%), both rates increased since 2002–2004 (5). According to 2006 birth certificate data, home births were higher in counties with a population size less than 100,000 (0.87%) than in counties with a population size of 100,000 or more (0.50%) (19).

Regional organization of perinatal services is an important strategy to improve outcomes for underserved women and their infants in rural communities. One outcome indicator is the percentage of very LBW (less than 1,500 g) deliveries that take place in subspecialty hospitals. Based on this indicator, 9 of the 12 lowest ranked states have rural populations that exceed one third of the state population (20, 21). Some studies that examined deliveries of very LBW infants suggest that residing in more distant areas from a subspecialty facility, as well as inadequate prenatal care, increases the likelihood of delivery in a lower level facility (22–24).

## Obstetric–Gynecologic Workforce in Rural Areas

In 2008, only 6.4% of obstetrician–gynecologists practiced in rural settings (25). By 2010, 49% of the 3,143 U.S. counties (home to 10.1 million women or 8.2% of all women), lacked an obstetrician–gynecologist. These predominantly rural counties exist in all states, but are particularly prevalent in the central and mountain west states. The ratio of obstetrician–gynecologists per 10,000 women is highest in metropolitan areas, and decreases in less populated and rural counties (18, 26). In some rural areas, family physicians provide 100% of obstetric care. Even so, practice data show that obstetric services provided by family physicians is decreasing, with only 19.2% providing routine deliveries (27, 28). At the same time, an increasing proportion of women are entering obstetrics and family practice; however, substantially fewer females compared with males in both specialties choose to practice in rural areas (26, 29, 30). These trends could contribute to a potential decrease in the rural workforce.

## Availability of Specialty Women's Health Services

Obstetric and gynecologic health services, including family planning, are limited in many nonmetropolitan areas. Substantial decreases in the availability of vaginal birth after cesarean delivery (VBAC) services from 1999 through 2005 reported for hospitals in Colorado, Montana, Oregon, and Wisconsin disproportionately affected smaller and more isolated or rural hospitals (31). Local availability of abortion services also is a concern. Eighty-seven percent of U.S. counties, in which 35% of reproductive-aged women lived, had no abortion provider in 2008. Obstetrician–gynecologists with rural mailing addresses were significantly less likely to perform abortions (6.5%) than their urban counterparts (17.0 %) (32). Rural women seeking abortions in 2008 traveled substantially greater distances than nonrural women. Thirty-one percent traveled more than 100 miles and an additional 42.9% traveled between 50 miles and 100 miles, compared with 3.8% and 7%, respectively, for nonrural women (33).

Among the 14 states ranked the highest on percentage of women aged 13–44 years in need of publicly funded contraceptive services and supplies, nine have rural populations exceeding 33% of the state population (20, 34). Only 46% of the agencies providing publicly funded family planning services reported that their clinic sites are located in mostly rural locations, the majority of which are health departments and Federally Qualified Health Centers (35). In Colorado, where almost three-quarters of the counties are considered rural, substantial numbers of reproductive-aged women live in counties where there is no identified pharmacy or health clinic that either prescribes or fills prescriptions for contraceptives (36). Despite concern about access to emergency contraception, data on current over-the-counter availability of emergency contraception in U.S. rural pharmacies are lacking.

## Current Initiatives to Improve Services for Rural Women

A variety of initiatives have been established to address the difficulties in providing care to rural women, funded

Pet. Ref. 992

by a range of state and federal programs and medical school department budgets. Examples of recent or current approaches include:

- Wyoming, a state with no tertiary care centers for pregnant women or infants and few pediatric specialists, approves out-of-state health care providers and facilities as state Medicaid providers, allowing the state to reimburse transport to and care and delivery in an out-of-state subspecialty hospital when medically necessary (37).

- The University of Texas Medical Branch in Galveston's Department of Obstetrics and Gynecology developed its Regional Maternal & Child Health Program to serve geographically underserved women in multiple off-site clinics. The program addresses culturally relevant services and transportation needs, and uses electronic medical records to facilitate continuity of care. It also provides housing in its Regional Perinatal Residence for high-risk women (and family members) living in distant locations to facilitate their access to regional center care when hospitalization is not necessary (38).

- The Arkansas Medicaid Program and the University of Arkansas for Medical Sciences are collaborating with the state's medical community to enhance primary obstetric care in rural Arkansas and increase risk-appropriate referrals to maternal–fetal medicine subspecialists. The system uses telemedicine and clinic networks to facilitate access to maternal–fetal medicine consultation services, and to provide continuing education for practitioners (39).

- Oregon enacted legislation to offer financial incentives, such as a state income tax credit for rural practitioners and assistance with medical liability insurance, for obstetricians practicing in rural areas. An evaluation of the program 2 years after full implementation found that the subsidy had not halted the overall decrease in rural clinicians who performed deliveries in that time frame. Clinicians receiving the subsidy, however, indicated that it was an important reason that they were able to continue maternity care (40).

- Twenty-four family medicine residency programs have incorporated a rural training track. Graduates of these programs are two to three times more likely to practice in rural areas than graduates of family medicine residencies overall. The majority of those physicians initially selecting rural sites remained in rural locations 2 years after graduation (30).

## Recommendations

Obstetricians and gynecologists in every region of the United States can work to reduce rural health disparities. The diversity of rural communities necessitates local solutions to local problems. The American College of Obstetricians and Gynecologists encourages obstetrician–gynecologists to do the following:

- Collaborate with maternal–child and rural health agencies in their state to identify the health needs of rural women and barriers to health care.

- Share professional expertise as a member of an advisory committee or task force focused on improving the health of rural women.

- Partner with family physicians and other women's primary care providers to ensure that appropriate consultation and training are available for practitioners in rural areas.

- Promote state initiatives offering financial incentives to rural health care practitioners and providers of rural obstetric care and reproductive health services.

- Encourage graduates of obstetric–gynecologic residency programs to participate in loan repayment programs that require practicing in rural locations for a specific length of time.

- Reinvigorate the implementation of regionalized perinatal care in underserved, rural areas.

- Share and network resources as well as clinical expertise.

- Foster and participate in efforts to utilize effective telemedicine technologies (in accordance with state regulations) to expand and improve services for rural women.

- Advocate for comprehensive professional liability reform to facilitate the practice of health care providers in rural areas.

- Monitor the availability of obstetric and gynecologic services in rural and underserved areas.

- Promote research to determine factors and conditions that support the retention of obstetrician–gynecologists in rural communities.

- Conduct further research to understand acceptable conditions for performance of VBAC in rural areas and to study the effect of VBAC policies on access to care for rural women.

- Advocate for increased access for rural women to con-traceptive methods and emergency contraception.

- Advocate for the availability of safe and accessible abortion services.

- Include place of residence in the collection of data for health-related databases and their analyses to ensure improved understanding of rural–urban health disparities among women.

- Encourage research on the education, employment, and poverty disparities that affect the health of rural

women.

## References

1. Department of Agriculture, Economic Research Service. Population and migration: overview. Available at: http://www.ers.usda.gov/topics/rural-economy-population/population-migration.aspx. Retrieved October 30, 2013. ⤶

2. Department of Health and Human Services, Health Resources and Services Administration Maternal and Child Health Bureau. Women's health USA 2011. Rockville (MD): DHHS; 2011. Available at: http://mchb.hrsa.gov/whusa11. Retrieved October 30, 2013. ⤶

3. Rural Policy Research Institute. Demographic and economic profile: nonmetropolitan America. Columbia (MO): RUPRI; 2009. Available at: http://www.rupri.org/Forms/Nonmetro2.pdf. Retrieved October 30, 2013. ⤶

4. National Center for Health Statistics. Health, United States, 2012: with special feature on emergency care. Hyattsville (MD): NCHS; 2013. Available at: http://www.cdc.gov/nchs/data/hus/hus12.pdf. Retrieved October 30, 2013. ⤶

5. National Center for Health Statistics. Health, United States, 2011: with special feature on socioeconomic status and health. Hyattsville (MD): NCHS; 2012. Available at: http://www.cdc.gov/nchs/data/hus/hus11.pdf. Retrieved October 25, 2013. ⤶

6. Benard VB, Coughlin SS, Thompson T, Richardson LC. Cervical cancer incidence in the United States by area of residence, 1998–2001. Obstet Gynecol 2007;110:681–6. [PubMed] [Obstetis & Gynecology] ⤶

7. Bennett KJ, Olatosi B, Probst JC. Health disparities: a rural-urban chartbook. Columbia (SC): South Carolina Rural Health Research Center; 2008. Available at: http://rhr.sph.sc.edu/report/(7-3)%20Health%20Disparities%20A%20Rural%20Urban%20Chartbook%20-%20Distribution%20Copy.pdf. Retrieved October 30, 2013. ⤶

8. Markossian TW, Hines RB, Bayakly R. Geographic and racial disparities in breast cancer-related outcomes in Georgia. Health Serv Res 2013; doi: 10.1111/1475-6773.12096. [PubMed] [Full Text] ⤶

9. National Center for Health Statistics. Health indicators warehouse. Available at: http://healthindicators.gov/Indicators. Retrieved October 30, 2013. ⤶

10. Agency for Healthcare Research and Quality. 2012 national healthcare disparities report. AHRQ Publication No. 13-0003. Rockville (MD): AHRQ; 2013. Available at: http://www.ahrq.gov/research/findings/nhqrdr/nhdr12/nhdr12_prov.pdf. Retrieved October 30, 2013. ⤶

11. Elixhauser A, Wier LM. Complicating conditions of pregnancy and childbirth, 2008. Statistical Brief #113. Healthcare Cost and Utilization Project (HCUP). Rockville (MD): Agency for Healthcare Research and Quality; 2011. Available at: http://www.hcup-us.ahrq.gov/reports/statbriefs/sb113.pdf. Retrieved October 25, 2013. ⤶

12. Hillemeier MM, Weisman CS, Chase GA, Dyer AM. Individual and community predictors of preterm birth and low birthweight along the rural-urban continuum in central Pennsylvania. J Rural Health 2007;23:42–8. [PubMed] ⤶

13. National Center for Health Statistics. Reproductive health services receipt: sexually active females (percent). Available at: http://healthindicators.gov/Indicators/Sexually-active-females-who-received-reproductive-health-services-percent_786/Profile/Data. Retrieved October 30, 2013. ⤶

14. Jones J, Mosher W, Daniels K. Current contraceptive use in the United States, 2006–2010, and changes in patterns of use since 1995. Natl Health Stat Rep 2012;(60):1–25. ⤶

15. Prevention First Colorado. Telephone study executive summary. Available at: http://www.preventionfirstcolorado.org/uploads/How%20She%20Does%20It.pdf. Retrieved October 30, 2013. ⤶

16. Hart LG, Larson EH, Lishner DM. Rural definitions for health policy and research. Am J Public Health 2005;95:1149–55. [PubMed] [Full Text] ⤶

17. Rayburn WF, Richards ME, Elwell EC. Drive times to hospitals with perinatal care in the United States. Obstet Gynecol 2012;119:611–6. [PubMed] [Obstetrics & Gynecology] ⤶

18. American Congress of Obstetricians and Gynecologists. The obstetrician-gynecologist distribution atlas. Washington, DC: ACOG; 2013. ⤶

19. MacDorman MF, Menacker F, Declercq E. Trends and characteristics of home and other out-of-hospital births in the United States, 1990–2006. Natl Vital Stat Rep 2010;58:1–14, 16. [PubMed] ⤶

20. U.S. Census Bureau. Table P2: urban and rural. Washington, DC: U.S. Census Bureau; 2010. ⤶

21. Health Resources and Services Administration, Maternal and Child Health Bureau. Title V information system. National performance measures: most recent year available. Available at: https://mchdata.hrsa.gov/tvisreports/MeasurementData/StandardNationalMeasureIndicatorSearch.aspx?MeasureType=Performance&YearType=MostRecent.Retrieved December 18, 2013. ⤶

22. Samuelson JL, Buehler JW, Norris D, Sadek R. Maternal characteristics associated with place of delivery and neonatal mortality rates among very-low-birthweight infants, Georgia. Paediatr Perinat Epidemiol 2002;16:305–13. [PubMed] ⤶

23. Gould JB, Sarnoff R, Liu H, Bell DR, Chavez G. Very low birth weight births at non-NICU hospitals: the role of sociodemographic, perinatal, and geographic factors. J Perinatol 1999;19:197–205. [PubMed] ⤶

24. Indiana State Department of Health. Hospital level and delivery volume and neonatal mortality among very low birth weight infants: Indiana, 2000–2005 birth cohort. Indianapolis (IN): Indiana State Department of Health; 2008. Available at: http://www.in.gov/isdh/files/VLBW_Hosp_Report_2000_2005.pdf. Retrieved October 30, 2013. ⤶

25. American College of Obstetricians and Gynecologists. 2008 socioeconomic survey of ACOG fellows. Available at: http://www.acog.org/About_ACOG/ACOG_Departments/Practice_Management_and_Managed_Care/2008_Socioeconomic_Survey_of_ACOG_Fellows. Retrieved October 30, 2013. ⤶

26. Rayburn WF, Klagholz JC, Murray-Krezan C, Dowell LE, Strunk AL. Distribution of American Congress of

Pet. Ref. 994

Obstetricians and Gynecologists fellows and junior fellows in practice in the United States. Obstet Gynecol 2012; 119:1017–22. [PubMed] [Obstetrics & Gynecology] ⇐

27. American Academy of Family Physicians. Cesarean delivery in family medicine. Position paper. Leawood (KS): AAFP; 2010. Available at: http://www.aafp.org/about/policies/all/cesarean-delivery.html. Retrieved October 30, 2013. ⇐

28. American Academy of Family Physicians. Table 18: number of babies delivered in 2009 by family physicians (as of April 2011). Available at: http://www.aafp.org/about/the-aafp/family-medicine-facts/table-18.html. Retrieved October 30, 2013. ⇐

29. Emmons SL, Nichols M, Schulkin J, James KE, Cain JM. The influence of physician gender on practice satisfaction among obstetrician gynecologists. Am J Obstet Gynecol 2006;194:1728–38; discussion 1739. [PubMed] [Full Text] ⇐

30. WWAMI Rural Health Research Center. Rural residency training for family medicine physicians: graduate early-career outcomes. Policy Brief. Seattle (WA): RHRC; 2012. Available at: http://depts.washington.edu/uwrhrc/uploads/RTT_Grad_Outcomes_PB.pdf. Retrieved October 30, 2013. ⇐

31. Roberts RG, Deutchman M, King VJ, Fryer GE, Miyoshi TJ. Changing policies on vaginal birth after cesarean: impact on access. Birth 2007;34:316–22. [PubMed] ⇐

32. Stulberg DB, Dude AM, Dahlquist I, Curlin FA. Abortion provision among practicing obstetrician-gynecologists. Obstet Gynecol 2011;118:609–14. [PubMed] [Obstetrics & Gynecology] ⇐

33. Jones RK, Jerman J. How far did US women travel for abortion services in 2008? J Womens Health 2013;22:706–13. [PubMed] [Full Text] ⇐

34. Gold RB, Sonfield A, Richards CL, Frost JJ. Next steps for America's family planning program: leveraging the potential of Medicaid and Title X in an evolving health care system. New York (NY): Guttmacher Institute; 2009. Available at: http://www.guttmacher.org/pubs/NextSteps.pdf. Retrieved October 30, 2013. ⇐

35. Frost JJ, Jerman J, Sonfield A. Health information technology and publicly funded family planning agencies: readiness, use and challenges. New York (NY): Guttmacher Institute; 2012. Available at: http://www.guttmacher.org/pubs/Health-IT.pdf. Retrieved October 30, 2013. ⇐

36. Prevention First Colorado. Allow advanced practice nurses with prescriptive authority to distribute and administer prescription contraceptives. In: Planning, protection, prevention: reducing unintended pregnancy in Colorado. Denver (CO): PFC; 2009. p. 45–51. Available at: http://www.preventionfirstcolorado.org/uploads/PPP-Rec.7.AdvancedPracticesNurses.pdf. Retrieved October 30, 2013. ⇐

37. Wyoming Department of Health. State narrative for Wyoming: application for 2014 annual report for 2012. Maternal and Child Health Services Title V Block Grant. Cheyenne (WY): Wyoming Department of Health; 2013. Available at: http://www.health.wyo.gov/Media.aspx?mediaId=13622. Retrieved October 30, 2013. ⇐

38. Anderson GD, Nelson-Becker C, Hannigan EV, Berenson AB, Hankins GD. A patient-centered health care delivery system by a university obstetrics and gynecology department. Obstet Gynecol 2005;105:205–10. [PubMed] [Obstetrics & Gynecology] ⇐

39. Lowery C, Bronstein J, McGhee J, Ott R, Reece EA, Mays GP. ANGELS and University of Arkansas for Medical Sciences paradigm for distant obstetrical care delivery. Am J Obstet Gynecol 2007;196:534.e1–534.e9. [PubMed] [Full Text] ⇐

40. Smits AK, King VJ, Rdesinski RE, Dodson LG, Saultz JW. Change in Oregon maternity care workforce after malpractice premium subsidy implementation. Health Serv Res 2009;44:1253–70. [PubMed] [Full Text] ⇐

Copyright February 2014 by the American College of Obstetricians and Gynecologists, 409 12th Street, SW, PO Box 96920, Washington, DC 20090-6920. All rights reserved.

ISSN 1074-861X

Health disparities in rural women. Committee Opinion No. 586. American College of Obstetricians and Gynecologists. Obstet Gynecol 2014;123:384–8.

Pet. Ref. 995

*Original Research*



# Medication Abortion With Pharmacist Dispensing of Mifepristone

*Daniel Grossman, MD, C. Finley Baba, MPH, Shelly Kaller, MPH, M. Antonia Biggs, PhD, Sarah Raifman, MSc, Tanvi Gurazada, Sally Rafie, PharmD, BCPS, Sarah Averbach, MD, MAS, Karen R. Meckstroth, MD, MPH, Elizabeth A. Micks, MD, MPH, Erin Berry, MD, MPH, Tina R. Raine-Bennett, MD, MPH, and Mitchell D. Creinin, MD*

**OBJECTIVE:** To estimate effectiveness and acceptability of medication abortion with mifepristone dispensed by pharmacists.

**METHODS:** We conducted a prospective cohort study at eight clinical sites and pharmacies in California and

*From Advancing New Standards in Reproductive Health (ANSIRH), Bixby Center for Global Reproductive Health, and the Department of Obstetrics, Gynecology and Reproductive Sciences, University of California, San Francisco, Oakland; the Department of Pharmacy, University of California San Diego Health; the Department of Obstetrics, Gynecology and Reproductive Sciences, University of California, San Diego; the Department of Obstetrics and Gynecology, University of Washington; Planned Parenthood of the Great Northwest and Hawaiian Islands, Seattle, Washington; the Division of Research, Kaiser Permanente Northern California, Oakland; and the Department of Obstetrics and Gynecology, University of California, Davis, California.*

*Presented in part as an oral abstract at the Society of Family Planning's Annual Meeting, October 19–21, 2019, Los Angeles, California.*

*Funded by a grant from Fidelity Charitable.*

*The authors thank the research staff who assisted with data collection, as well as the pharmacists at the study sites and patients who volunteered to be study participants. The findings and conclusions in this article are those of the authors and do not necessarily reflect the views of Planned Parenthood Federation of America, Inc., or Kaiser Permanente Northern California.*

*Each author has confirmed compliance with the journal's requirements for authorship.*

*Corresponding author: Daniel Grossman, ANSIRH, Bixby Center for Global Reproductive Health, Department of Obstetrics, Gynecology and Reproductive Sciences, University of California, San Francisco, Oakland, CA; email: Daniel.Grossman@UCSF.edu.*

**Financial Disclosure:**
*Dr. Grossman has served as a consultant to Planned Parenthood Federation of America and the Center for Reproductive Rights. Dr. Creinin and Dr. Meckstroth are consultants for Danco, Inc., the manufacturer of Mifeprex (mifepristone 200 mg). Dr. Rafie is a consultant for GenBioPro, the manufacturer of generic mifepristone. The other authors did not report any potential conflicts of interest.*

*© 2021 The Author(s). Published by Wolters Kluwer Health, Inc. This is an open-access article distributed under the terms of the Creative Commons Attribution-Non Commercial-No Derivatives License 4.0 (CCBY-NC-ND), where it is permissible to download and share the work provided it is properly cited. The work cannot be changed in any way or used commercially without permission from the journal.*

ISSN: 0029-7844/21

Washington State from July 2018 to March 2020. Pharmacists at participating pharmacies underwent a 1-hour training on medication abortion. We approached patients who had already been evaluated, counseled, and consented for medication abortion per standard of care. Patients interested in study participation gave consent, and the clinician electronically sent a prescription to the pharmacy for mifepristone 200 mg orally, followed 24–48 hours later by misoprostol 800 micrograms buccally. Participants were sent web-based surveys about their experience and outcomes on days 2 and 14 after enrollment and had routine follow-up with study sites. We extracted demographic and clinical data, including abortion outcome and adverse events, from medical records. We performed multivariable logistic regression to assess the association of pharmacy experience and other covariates with satisfaction.

**RESULTS:** We enrolled 266 participants and obtained clinical outcome information for 262 (98.5%), of whom two reported not taking either medication. Of the 260 participants with abortion outcome information, 252 (96.9%) and 237 (91.2%) completed day 2 and 14 surveys, respectively. Complete medication abortion (primary outcome) occurred for 243 participants (93.5%, 95% CI 89.7–96.1%). Four participants (1.5%, 95% CI 0.4–3.9%) had an adverse event, none of which was serious or related to pharmacist dispensing. In the day 2 survey, 91.3% (95% CI 87.1–94.4%) of participants reported satisfaction with the pharmacy experience. In the day 14 survey, 84.4% (95% CI 79.1–88.8%) reported satisfaction with the medication abortion experience. Those reporting being very satisfied with the pharmacy experience had higher odds of reporting overall satisfaction with medication abortion (adjusted odds ratio 2.96, 95% CI 1.38–6.32).

**CONCLUSION:** Pharmacist dispensing of mifepristone for medication abortion is effective and acceptable to patients, with a low prevalence of adverse events.

Pet. Ref. 996

CLINICAL TRIAL REGISTRATION: ClinicalTrials.gov, NCT03320057.

*(Obstet Gynecol 2021;137:613–22)*

*DOI: 10.1097/AOG.0000000000004312*

Medication abortion with mifepristone and misoprostol is approved by the U.S. Food and Drug Administration (FDA) for use through 70 days of gestation. Extensive research has documented the safety and effectiveness of medication abortion, as well as high levels of patient satisfaction.[1] Since mifepristone's approval in 2000, the FDA has required that the drug only be dispensed in clinics, medical offices, or hospitals, a restriction that is codified in the mifepristone Risk Evaluation and Mitigation Strategy.[2] The FDA instituted these restrictions likely because of the limited experience with medication abortion in the United States in 2000. However, there is no evidence that in-person dispensing improves safety, and medications associated with more risks to the patient do not have similar restrictions.[3]

Twenty years later, such evidence is still lacking, and countries such as Australia and Canada have approved mifepristone without dispensing restrictions.[4,5] The mifepristone Risk Evaluation and Mitigation Strategy may be a barrier to access; a national survey of obstetrician–gynecologists found that the number who would provide medication abortion might double if this dispensing restriction were removed.[6] The American College of Obstetricians and Gynecologists advocates the removal of the mifepristone Risk Evaluation and Mitigation Strategy.[7]

Pharmacists dispense medications and controlled substances for all types of indications, including sensitive health issues such as sexually transmitted infections and erectile dysfunction. Currently, 12 states permit pharmacists to prescribe hormonal contraception[8]; a recent national survey found that 65% of all pharmacists were interested in such prescribing.[9]

We performed this study under an FDA Investigational New Drug application to document clinical outcomes with and the acceptability of medication abortion when mifepristone is prescribed by clinicians and dispensed by pharmacists. We also sought to identify factors associated with satisfaction with the pharmacist-dispensing model, as well as to explore whether satisfaction with the pharmacy experience was associated with overall satisfaction with medication abortion.

## METHODS

We performed a multicenter prospective cohort study of patients undergoing medication abortion who agreed to obtain pharmacist-dispensed mifepristone. The Institutional Review Boards (IRBs) of the University of California San Francisco (UCSF), Kaiser Permanente Northern California, and the University of Washington approved the study, with reliance on the University of California San Francisco IRB granted by the IRBs of the University of California, Davis, and the University of California, San Diego.

From July 2018 through March 2020, we enrolled patients at eight study sites in California and Washington State, each of which was paired with a nearby pharmacy that agreed to dispense mifepristone. Each of the clinical sites provided medication abortion before the study with clinic dispensing of mifepristone; patients obtained other prescribed medications at pharmacies. Six of the eight clinics partnered with an affiliated pharmacy in the same or adjacent building (n=5) or 1.5 miles away (n=1). Two clinics partnered with independent pharmacies, one of which was located in an adjacent building, and the other was located 1.5 miles away. Study investigators trained participating pharmacists on medication abortion and mifepristone dispensing using a standardized 1-hour presentation at the beginning of the study and as needed when new participating pharmacists were hired. At all study pharmacies, leadership permitted pharmacists to participate in the study if interested, including undergoing training, and committed to having coverage during study recruitment times by a pharmacist who could dispense mifepristone. Of note, three chain pharmacies near potential clinic sites declined to participate. Each clinical site principal investigator completed the mifepristone Prescriber Agreement Form.

Clinicians included physicians, physician assistants, and nurse practitioners. Research staff provided study details, including study coverage of clinical costs (see below) to patients only after the clinician had completed all medically necessary requirements for medication abortion. All patients approached for the study had already been fully evaluated for medication abortion medical eligibility according to the FDA-approved mifepristone labeling and local standard of care, signed the mifepristone Patient Agreement Form and any clinic-specific consent form, and received mifepristone use and follow-up instructions. Clinical follow-up options were site-specific and included returning for an in-clinic ultrasonography examination approximately 1–2 weeks later, obtaining serum human chorionic gonadotropin measurements on the day of taking mifepristone and 1–2 weeks later, or performing telephone follow-up 1 week later with a home urine pregnancy test 4 weeks after mifepristone.

Pet. Ref. 997

Participants were eligible for the study if they spoke English or Spanish, were age 15 years or older (18 years or older at two study sites), had been fully evaluated and consented for medication abortion with a gestational age of 70 days or less confirmed by ultrasonography, and were willing to go to the study pharmacy to obtain mifepristone and to use misoprostol buccally per the FDA-approved mifepristone label. Participants also had to be willing and able to be contacted by email, telephone, or text message to complete survey data collection. Eligible and interested participants provided written study informed consent, including Health Insurance Portability and Accountability Act authorization to allow clinical data abstraction from their medical record.

A clinician then electronically prescribed mifepristone 200 mg and misoprostol 800 micrograms, along with analgesics, antibiotics, antiemetics, or contraceptives, as needed. The prescribing clinician instructed participants to use the mifepristone at an agreed-on time and take the misoprostol buccally 24–48 hours after swallowing the mifepristone, consistent with the FDA-approved labeling.[10] Participants went to the pharmacy to obtain the prescribed medications. A trained pharmacist dispensed the mifepristone and other prescribed medications, maintained a study log and provided brief counseling, unless declined by the patient.

On the day after enrollment, the University of California San Francisco study team emailed participants a link to a web-based survey (day 2 survey) in Qualtrics to collect sociodemographic information, including self-described race and ethnicity. Given the evidence of negative health care experiences during pregnancy among people of color due to racism,[11] we believed it was important to collect race and ethnicity information to explore associations with satisfaction outcomes. Participants also confirmed whether they obtained the medications at the pharmacy, and if and when they took or planned to take the medications. If they had taken the misoprostol, we asked the route of administration. If a participant obtained the medications and decided not to take them, we asked what they did or planned to do with the medications; if a participant reported they still had the medications, a survey prompt instructed them to return the medications to the pharmacy or the clinic. Participants were asked whether they thought the pregnancy had already been expelled and whether they had had a medical problem that required them to go to a hospital, emergency department, or doctor's office since starting the medication abortion, and, if so, we asked participants to provide details.

In addition, the day 2 survey assessed participant experiences obtaining mifepristone at the pharmacy with multiple choice questions as well as open-response fields for those who reported dissatisfaction to explain their responses. We asked whether the wait time at the pharmacy was "reasonable" or "too long." All participants were asked, "Did you feel that you got enough information from the pharmacist about how to use the medications?" with response options of "Yes," "No, I would have liked more information from the pharmacist," and "No, but I got all the information I needed from the doctor or nurse in clinic." We asked participants who reported having had a prior medication abortion, "How would you compare your experience of getting the abortion pill this time in the pharmacy compared with last time in the clinic?" with response options of "This time was better," "Last time was better," "They were both the same," or "Not sure."

Two weeks after enrollment, we sent participants an email link to the day 14 survey, which had similar questions about taking the medications, medical problems for which they sought care, follow-up with the clinic, use of additional misoprostol, and whether they thought the abortion was complete and reasons why they thought it was complete. If a participant reported being unsure whether the abortion was complete, a survey prompt instructed the participant to contact the clinical site and asked permission to follow-up with them again after the visit.

The day 14 survey also included questions about the patient's experience with the overall medication abortion experience and whether they would recommend medication abortion to a friend in a similar situation who decided to have an abortion. We also asked whether they would recommend that the friend "get the abortion pill at the pharmacy like you did." Finally, we asked, "If you have another medication abortion in the future, how would you feel about the way you get the service?" Responses options were "I would prefer to have medication abortion be available through many primary care providers and providers of women's health care (doctors and nurses) and I would like to pick up my abortion pill at the pharmacy," "I would prefer to have medication abortion available only in select clinics where the abortion pill can be given to me directly in clinic," "Either way is fine," or "Unsure." The day 14 survey also included open-response questions that allowed participants to elaborate on their responses.

Participants who did not complete the surveys were sent reminders by text, email, or phone, depending on their contact preferences. Those who had not

yet completed the day 2 survey received a longer day 14 survey, including the day 2 survey items. The surveys remained open for 1 month.

Six or more weeks after participants enrolled, site investigators abstracted data from patient charts and entered the de-identified data into an electronic REDCap form. Abstracted data included demographics, clinical information from the initial visit, and information about any follow-up visits or contacts with the patient related to the medication abortion, including whether the abortion was complete, additional treatments given, and adverse events. Adverse events were also identified from the patient surveys. Adverse events were captured up to 6 weeks after participants were recruited into the study, and any ongoing adverse events were followed until resolution. Adverse events were defined as serious using the FDA criteria and included death, hospitalization, blood transfusion, and surgery.[12,13]

Study participants received a $25 electronic gift card for completing each survey. Participants that had to travel from the clinic to the pharmacy also received a small stipend to cover travel expenses. The study covered the cost of mifepristone, misoprostol, and pharmacy dispensing fees, as well as the cost of other medications and clinical care related to the medication abortion provided during the initial and follow-up visits at some sites, depending on whether the site was able to bill for the service in the usual fashion or not.

We aimed to recruit a minimum of 300 and up to 350 patients for this study, which we thought was feasible during the study period. With a sample size of 300, if the proportion of patients with a complete abortion is 95%, the 95% CI of that proportion is ±3.1%; with a sample of 350, the interval is ±2.7%.

We examined four outcomes related to clinical experience and satisfaction with the pharmacist-dispensing model. These included two clinical outcomes: 1) effectiveness of medication abortion (primary outcome) and 2) adverse events, as well as two patient satisfaction outcomes that we examined in multivariate mixed-effects logistic regression analyses: 3) satisfaction with the pharmacy experience at day 2 and 4) satisfaction with the overall medication abortion experience at day 14. Effectiveness of medication abortion was defined as the proportion of participants who had a complete abortion with medications alone and did not undergo vacuum aspiration. Given the accuracy of patient self-assessment of abortion completion,[14,15] we used self-reported survey data to document abortion outcome if the participant did not have follow-up contact with the clinic. Satisfaction

outcomes were based on participants' ratings on a Likert scale. On the day 2 survey, we asked participants "Overall, how satisfied were you with your experience at the pharmacy when you got the abortion pill?" with response options "Very satisfied," "Somewhat satisfied, "Somewhat dissatisfied," and "Very dissatisfied." On the day 14 survey we asked, "Looking back on your experience overall, how satisfied were you with the abortion pill?" with the same response options. We dichotomized responses to the two questions by those who were very satisfied compared with all other responses. We calculated 95% CIs using the binomial method.

We performed multivariable mixed-effects logistic regression analyses to explore associations between participant and pregnancy characteristics and our two patient satisfaction outcomes (satisfaction with pharmacy experience and satisfaction with overall medication abortion experience). We used mixed-effects regression with random intercepts for recruitment site to account for clustering. Independent variables included the following demographic and pregnancy characteristics, selected a priori based on our hypotheses and previous literature[16]: age, race and ethnicity, highest completed level of education, relationship status, parity, gestational age in days at the initial clinic visit, and prior abortion experience (none, previous medication abortion, or previous procedural abortion only). We also adjusted for whether the participant reported receiving adequate information from the pharmacist about medication abortion and pharmacy wait time (reasonable or too long). We included a dichotomized measure of satisfaction with treatment by pharmacy staff as an independent variable in the analysis of satisfaction with the pharmacy experience outcome. To assess whether the pharmacy experience contributed to overall satisfaction with the medication abortion experience, we also included satisfaction with the pharmacy experience as an independent variable to model this outcome.

To account for missing covariate data, we conducted multiple imputation then deletion methods, using chained equations.[17] We excluded participants with missing outcome data after performing multiple imputation. All demographic variables and pharmacy experience responses were collected from patient surveys except gestational age at the clinic visit, which came from clinical charts. Missing survey data for age, race and ethnicity, and parity were obtained from patients' clinical chart data when available.

We conducted all analyses using Stata 15 and reported significance at $P<.05$. Open-ended survey responses were sorted by relevance to study intervention and organized under unifying themes.

Pet. Ref. 999



**Fig. 1.** Medication abortion study flow of patients who received mifepristone from pharmacists. PI, principal investigator.

*Grossman. Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021.*

## RESULTS

Study recruitment began in July 2018 and was halted before reaching our desired sample size in March 2020 owing to the coronavirus disease 2019 (COVID-19) pandemic, which limited the ability to have research staff in clinical facilities and lengthen patient visits for the purposes of research consent. Research staff assessed 499 patients for eligibility, of whom 233 were ineligible (n=163) or declined to participate (n=70) (Fig. 1). We enrolled 266 participants, all of whom received the study medications from the pharmacy. The median number of participants recruited at the eight sites was 27 (range 8–74). Medication abortion and study outcome information was available for 262 participants (98.5%); the other four were lost to follow-up. In addition, one participant opted not to have a medication abortion and returned the medications to the study site, and one reported flushing the medications down the toilet after having a spontaneous pregnancy loss. The characteristics of the 260 participants (97.7%) who took the medications and have abortion outcome data are presented in Table 1. The median gestational age was 46 days at the time of initial clinic visit. Two hundred forty-six participants (94.6%) reported the date they took mifepristone; all had a gestational age of 70 days or less on that date.

Pet. Ref. 1000

**Table 1.** Characteristics of Study Participants Having Medication Abortion and Receiving Mifepristone at a Pharmacy (n=260)

| Characteristic | Value |
| --- | --- |
| Age (y) | 28 (16–44) |
| 16–20 | 22 (8.5) |
| 21–24 | 45 (17.3) |
| 25–29 | 78 (30.0) |
| 30–34 | 69 (26.5) |
| 35–44 | 46 (17.7) |
| Race and ethnicity | |
| Non-Hispanic White | 99 (38.1) |
| Non-Hispanic Black | 29 (11.2) |
| Hispanic | 65 (25.0) |
| Asian or Pacific Islander | 45 (17.3) |
| Alaska Native or Native American | 2 (0.8) |
| Other* and mixed race and ethnicity | 19 (7.3) |
| Missing | 1 (0.4) |
| Education | |
| High school or less | 39 (15.0) |
| Some college or professional school | 93 (35.8) |
| College degree | 90 (34.6) |
| Advanced degree | 28 (10.8) |
| Missing | 10 (3.8) |
| Relationship status | |
| Neither married nor in a relationship | 84 (32.3) |
| Married | 54 (20.8) |
| Committed relationship | 110 (42.3) |
| Missing | 12 (4.6) |
| Parity | |
| Nulliparous | 171 (65.8) |
| Parous | 89 (34.2) |
| History of abortion | |
| None | 165 (63.5) |
| Previous medication abortion | 48 (18.5) |
| Previous procedural abortion only | 40 (15.4) |
| Missing | 7 (2.7) |
| Gestational age at initial clinic visit (d) | 46 (30–70) |
| 49 or less | 176 (67.7) |
| 50–56 | 43 (16.5) |
| 57–63 | 32 (12.3) |
| 64–70 | 9 (3.5) |

Data are median (range) or n (%).
* Four participants selected "other" race and did not give additional information.

**Table 2.** Acceptability and Satisfaction at Day 2 Survey Among Women Having Medication Abortion and Receiving Mifepristone at a Pharmacy (n=252)

| | n (%) |
| --- | --- |
| Satisfaction with pharmacy experience | |
| Very satisfied | 173 (68.7) |
| Somewhat satisfied | 57 (22.6) |
| Somewhat dissatisfied | 18 (7.1) |
| Very dissatisfied | 4 (1.6) |
| Satisfaction with treatment by pharmacy staff | |
| Very satisfied | 201 (79.8) |
| Somewhat satisfied | 43 (17.1) |
| Somewhat dissatisfied | 5 (2.0) |
| Very dissatisfied | 3 (1.2) |
| Wait time at pharmacy | |
| Reasonable | 200 (79.4) |
| Too long | 51 (20.2) |
| Missing | 1 (0.4) |
| Adequate information received from pharmacist | |
| No, I would have liked more information | 4 (1.6) |
| No, but I got all the information I needed from the doctor or nurse | 96 (38.1) |
| Yes | 151 (59.9) |
| Missing | 1 (0.4) |
| Current vs previous experience among those who had previous medication abortion (n=48) | |
| This time better | 17 (35) |
| Last time better | 1 (2) |
| Same | 22 (46) |
| Not sure | 8 (17) |

We obtained abortion outcomes for most participants (n=235, 90.4%) based on completed clinical follow-up, with the remainder based on survey responses. Follow-up assessments are detailed in online Appendix 1, available online at http://links.lww.com/AOG/C227. Complete abortion occurred for 243 participants (93.5%, 95% CI 89.7–96.1%) with medication alone. Twenty-seven participants received a second dose of misoprostol, including 18 who ultimately had a complete abortion. Seventeen participants were diagnosed with incomplete abortion based on symptoms and ultrasonography findings, all of whom underwent vacuum aspiration. No participant had an ongoing pregnancy. Outcomes by gestational age are presented in Appendix 2, available online at http://links.lww.com/AOG/C227.

Four participants (1.5%, 95% CI 0.4–3.9%) had an adverse event possibly related to the abortion. Three participants went to an emergency department: one received intravenous fluids for dehydration, one reported heavy bleeding and was treated with pain medication, and one was diagnosed with pelvic inflammatory disease after an aspiration for incomplete abortion. None were hospitalized. In addition, one participant reported at a follow-up visit that she had transient pain and swelling in her cheeks after taking the misoprostol buccally, which had resolved and was thought to be a possible allergic reaction. After review by the site principal investigators, no adverse event was thought to be related to pharmacist dispensing. No participant reported a serious adverse event, and none were identified in chart abstraction.

Pet. Ref. 1001

For survey data, we excluded 8 of 260 (3.1%) participants missing pharmacy satisfaction data and 23 of 260 (8.8%) participants missing overall medication abortion satisfaction data. Participants completed the day 2 survey a median of 2 days after enrollment (interquartile range 1–4 days) and completed the day 14 survey a median of 16 days after enrollment (interquartile range 14–21 days). Table 2 shows participants' satisfaction as reported in the day 2 survey (n=252). Among survey respondents, 91.3% (95% CI 87.1–94.4%) reported being very (68.7%) or somewhat (22.6%) satisfied with their experience at the pharmacy, and 96.8% (95% CI 93.8–98.6%) reported being very (79.8%) or somewhat (17.1%) satisfied with their treatment by pharmacy staff. Four-fifths (79.4%) of participants said the wait time in the pharmacy was reasonable.

Participants who were less than very satisfied with the pharmacy experience (n=76) or treatment by pharmacy staff (n=42) gave open-ended responses describing their dissatisfaction. Common themes cited included complaints about long wait times (n=38), confusion on the part of pharmacists or staff regarding dispensing (n=27), perceived negative pharmacist attitudes (n=10), inadequate pharmacist knowledge about the medications (n=8), initially not receiving all prescribed medications (n=8), and privacy not adequately maintained (n=4), among others. Some participants pointed to more than one factor that contributed to their dissatisfaction.

In the day 2 survey, most participants reported they received adequate information from the pharmacist (59.9%) or reported they did not receive enough information from the pharmacist but received all the information they needed from the clinician they had seen previously (38.1%). Only four participants (1.6%) reported that they would have liked more information about how to use the medications from the pharmacist.

Among the 48 participants who reported a prior medication abortion, most said the current experience was the same (n=22, 46%) or better (n=17, 35%) as receiving the medications in the clinic. Eight (17%) were unsure and one (2%) reported the experience as worse. In an open-response field, participants wrote they appreciated the ability to schedule when they would take the medications, which improved convenience and allowed them to have more control over when the abortion would take place. Although some participants saw this model of care as allowing more privacy and social support, a few thought the model was less private and felt less supported by the pharmacy staff compared with the clinic staff.

**Table 3.** Acceptability and Satisfaction at Day 14 Survey Among Women Having Medication Abortion and Receiving Mifepristone at a Pharmacy (n=237)

|  | n (%) |
|---|---|
| Overall satisfaction with medication abortion |  |
|   Very satisfied | 155 (65.4) |
|   Somewhat satisfied | 45 (19.0) |
|   Neither satisfied nor dissatisfied | 23 (9.7) |
|   Somewhat dissatisfied | 12 (5.1) |
|   Very dissatisfied | 2 (0.8) |
| Would recommend medication abortion to friend |  |
|   Yes | 161 (67.9) |
|   No | 14 (5.9) |
|   Depends | 53 (22.4) |
|   Unsure | 8 (3.4) |
|   Missing | 1 (0.4) |
| Would recommend pharmacy dispensing |  |
|   Yes | 176 (74.3) |
|   No | 10 (4.2) |
|   Depends | 42 (17.7) |
|   Unsure | 9 (3.8) |
| Future model preference reported |  |
|   Prefer to have medication abortion available through primary care and pick up at pharmacy | 147 (62.0) |
|   Prefer to have medication abortion available only in select clinics where pill is given directly in clinic | 13 (5.5) |
|   Either way | 68 (28.7) |
|   Unsure | 7 (3.0) |
|   Missing | 2 (0.8) |

Table 3 shows measures of satisfaction collected from the 237 (91.2%) women who completed the day 14 survey. Overall, 84.4% (95% CI 79.1–88.8%) reported being very (65.4%) or somewhat (19.0%) satisfied with their medication abortion experience. The majority said they would recommend medication abortion (67.9%) and pharmacist dispensing (74.3%) to a friend in a similar situation. When asked how they would prefer to obtain medication abortion in the future, if needed, the majority (62.0%) said they would prefer to have medication abortion available through prescriptions from primary care clinics with medications dispensed in pharmacies. Only 5.5% said they would prefer to have the service only available in select clinics where the medications are dispensed directly to patients in clinic. About one quarter (28.7%) said either way was fine, and 3.0% were unsure.

Table 4 shows the results of multivariable mixed-effects logistic regression analyses exploring factors associated with patient satisfaction with the pharmacy and medication abortion experience. Those reporting

Pet. Ref. 1002

**Table 4.** Multivariable Adjusted Odds Ratios for Reporting Satisfaction With the Pharmacy Experience and Overall Abortion Experience Among Women Having Medication Abortion and Receiving Mifepristone at a Pharmacy

| Participant Characteristics | Very Satisfied With Pharmacy Experience at Day 2 Survey (n=252) | | Very Satisfied With Medication Abortion Experience Overall at Day 14 Survey (n=237) | |
|---|---|---|---|---|
| | aOR (95% CI) | % | aOR (95% CI) | % |
| Received adequate information from pharmacist | | | | |
| No or No, but received the info from clinician | Ref | 64.0 | Ref | 55.2 |
| Received adequate info from the pharmacy | 1.86 (0.82–4.26) | 71.5 | 1.86 (0.99–3.51) | 72.1 |
| Wait time at pharmacy | | | | |
| Reasonable wait time | Ref | 81.0 | Ref | 68.5 |
| Too long wait time | 0.04* (0.01–0.13) | 21.6 | 0.87 (0.37–2.09) | 55.1 |
| Satisfaction with treatment by pharmacy staff | | | | |
| Dissatisfied or somewhat satisfied | Ref | 21.6 | | |
| Very satisfied | 16.79* (6.00–46.98) | 80.6 | | |
| Satisfaction with the pharmacy experience | | | | |
| Dissatisfied or somewhat satisfied | | | Ref | 47.4 |
| Very satisfied | | | 2.96* (1.38–6.32) | 73.9 |

aOR, adjusted odds ratio; Ref, referent group.
Mixed-effects logistic regression analyses controlled for age, race and ethnicity, education, relationship status, parity, gestational age at initial visit, and prior abortion experience and accounted for clustering by clinical site.
* $P<.05$.

excessively long wait times had lower odds of satisfaction with pharmacy dispensing (adjusted odds ratio [aOR] 0.04, 95% CI 0.01–0.13), and those who reported being very satisfied with the treatment by pharmacy staff had higher odds of satisfaction with pharmacy dispensing (aOR 16.79, 95% CI 6.00–46.98). Those who reported that they were very satisfied with the pharmacy experience had higher odds of being very satisfied with their medication abortion overall compared with those who were somewhat satisfied or dissatisfied with the pharmacy experience (aOR 2.96, 95% CI 1.38–6.32).

## DISCUSSION

In this study, medication abortion provision with pharmacist dispensing of mifepristone was effective and acceptable to patients. Among participants with follow-up data, 93% had a complete abortion, and none had an ongoing pregnancy. These outcome proportions are similar to those reported in the literature when the medications are dispensed by a clinician.[18,19] Few patients (1.5%) had adverse events, and none were related to pharmacist dispensing.

We also found that the vast majority of patients were satisfied with the model of care, and overall satisfaction was similar to other studies of medication abortion with clinician-dispensed mifepristone, which have found that 87–88% were satisfied with the method.[19,20] Satisfaction with the pharmacy and treat-

ment by pharmacy staff, reported on the day 2 survey, were somewhat higher than overall satisfaction with medication abortion reported later. This is not surprising given that overall method satisfaction is correlated with symptoms and outcomes of the medication abortion,[21] which might not yet have been apparent by the day 2 survey. The vast majority reported they received adequate information—either from the clinician or pharmacist—and more than 90% indicated their support for pharmacist dispensing of mifepristone in the future.

Although satisfaction with this model was high, the open-ended responses point to areas for improvement that could be addressed through additional training of pharmacists and pharmacy staff. The finding that elements of the pharmacy experience, such as wait time and treatment by the pharmacy staff, were associated with satisfaction with the pharmacy experience, which in turn was associated with overall abortion satisfaction, is similar to research on other pharmacy services.[22]

It is a reassuring finding that one-third of participants who had had a prior medication abortion reported that the current experience of getting the medications at the pharmacy was better. The open-ended responses suggest that patients appreciated the convenience of being able to schedule when to take the medications. Since the FDA approved updated labeling for mifepristone in 2016, patients are no

Pet. Ref. 1003

longer required to take the pill in the facility after it is dispensed,[10] although some state laws still require this. It is also notable that two participants did not proceed with the medication abortion after completing their clinic visit and filling the prescription. Other studies that allow patients to take the mifepristone at home after receiving it in the clinic or that mail the medications patients have also reported that a very small number of patients choose not to proceed with the abortion.[23,24]

One concern that has been raised with allowing clinicians to issue prescriptions for mifepristone is that some pharmacists may refuse to fill the prescription, limiting the feasibility of this model.[25] In our study, the participating pharmacies were required to have a pharmacist on duty during clinic hours who had been trained in the study protocol and was willing to dispense mifepristone. As a result, all participants were able to fill their prescriptions when they went to the pharmacy. We also collected survey and interview data with the pharmacists at the study pharmacies to evaluate their perceptions of the model, which will be reported separately. Although we did not have challenges with individual pharmacists refusing to dispense mifepristone, we did have difficulty obtaining study approval at chain pharmacies. If the dispensing requirement for mifepristone is eliminated, some pharmacies may refuse to stock the medication, as has been reported for ulipristal acetate emergency contraception,[26] highlighting a potential role for mail-order pharmacies once the Risk Evaluation and Mitigation Strategy is removed.

This study has several strengths, including low loss to follow-up and standardized pharmacist training. It also has several limitations. We had to stop recruitment early because of the COVID-19 pandemic, reaching 89% of our planned minimum sample size. However, the effect of the reduced sample size on the precision of our estimates was small. The sample size is similar to the only other published report on providing medication abortion in the United States without in-clinic dispensing (n=190 with abortion outcome data).[24] In addition, our findings may have limited generalizability given that no chain pharmacy participated; patient experiences at chain pharmacies theoretically may be different. Finally, satisfaction with the pharmacy experience may increase over an extended time as pharmacy staff become more accustomed to dispensing mifepristone.

This study, together with another report of a direct-to-patient telemedicine service in which patients received the medications by mail,[24] demonstrate that medication abortion may be offered with a high level of effectiveness and satisfaction and low prevalence of adverse events without requiring mifepristone to be dispensed in the clinic or medical office. These data further support eliminating the dispensing requirement for mifepristone and allowing pharmacies to dispense the medication.

## REFERENCES

1. Medication abortion up to 70 days of gestation. ACOG Practice Bulletin No. 225. American College of Obstetricians and Gynecologists. Obstet Gynecol 2020;136:e31–47. doi: 10.1097/AOG.0000000000004082

2. U.S. Food and Drug Administration. Risk evaluation and mitigation strategy (REMS) single shared system for mifepristone 200MG. Accessed August 23, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf

3. Mifeprex REMS Study Group, Raymond EG, Blanchard K, Blumenthal P, Cleland K, Foster AM, et al. Sixteen years of overregulation: time to unburden Mifeprex. N Engl J Med 2017;376:790–4. doi: 10.1056/NEJMsb1612526

4. Grossman D, Goldstone P. Mifepristone by prescription: a dream in the United States but reality in Australia. Contraception 2015;92:186–9. doi: 10.1016/j.contraception.2015.06.014

5. Government of Canada. MIFEGYMISO (mifepristone and misoprostol tablets) - Canadian distribution and administration program. Accessed August 23, 2020. https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2017/63330a-eng.php

6. Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician–gynecologists. Obstet Gynecol 2019;133:477–83. doi: 10.1097/AOG.0000000000003110

7. American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. Accessed August 23, 2020. https://www.acog.org/en/Clinical Information/Policy and Position Statements/Position Statements/2018/Improving Access to Mifepristone for Reproductive Health Indications

8. Birth Control Pharmacist. Policies: pharmacist prescribing of hormonal contraception. Accessed September 13, 2020. https://birthcontrolpharmacist.com/policies/

9. Rafie S, Cieri-Hutcherson NE, Frame TR, Griffin B, Harris JB, Horlen C, et al. Pharmacists' perspectives on prescribing and expanding access to hormonal contraception in pharmacies in the United States. J Pharm Pract 2019 Aug 7 [Epub ahead of print]. doi: 10.1177/0897190019867601

10. U.S. Food and Drug Administration. Mifeprex (mifepristone) tablets label. Accessed August 23, 2020. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

11. Altman MR, McLemore MR, Oseguera T, Lyndon A, Franck LS. Listening to women: recommendations from women of color to improve experiences in pregnancy and birth care. J Midwifery Womens Health 2020;65:466–73. doi: 10.1111/jmwh.13102

12. U.S. Food and Drug Administration. What is a serious adverse event? Accessed September 12, 2020. https://www.fda.gov/safety/reporting-serious-problems-fda/what-is-a-serious-adverse-event

Pet. Ref. 1004

13. Upadhyay UD, Desai S, Zlidar V, Weitz TA, Grossman D, Anderson P, et al. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125: 175–83. doi: 10.1097/AOG.0000000000000603

14. Perriera LK, Reeves MF, Chen BA, Hohmann HL, Hayes J, Creinin MD. Feasibility of telephone follow-up after medical abortion. Contraception 2010;81:143–9. doi: 10.1016/j.contraception.2009.08.008

15. Chen MJ, Rounds KM, Creinin MD, Cansino C, Hou MY. Comparing office and telephone follow-up after medical abortion. Contraception 2016;94:122–6. doi: 10.1016/j.contraception.2016.04.007

16. Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectiveness and acceptability of medical abortion provided through telemedicine. Obstet Gynecol 2011;118:296–303. doi: 10.1097/AOG.0b013e318224d110

17. von Hippel PT. Regression with missing Ys: an improved strategy for analyzing multiply imputed data. Sociological Methodol 2007;37:83–117. doi: 10.1111/j.1467-9531.2007.00180.x

18. Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol 2015;126:12–21. doi: 10.1097/AOG.0000000000000897

19. Winikoff B, Dzuba IG, Chong E, Goldberg AB, Lichtenberg ES, Ball C, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120: 1070–6. doi: 10.1097/AOG.0b013e31826c315f

20. Winikoff B, Ellertson C, Elul B, Sivin I. For the mifepristone clinical trials group. Acceptability and feasibility of early pregnancy termination by mifepristone-misoprostol: results of a large multicenter trial in the United States. Arch Fam Med 1998;7:360–6. doi: 10.1001/archfami.7.4.360

21. Teal SB, Dempsey-Fanning A, Westhoff C. Predictors of acceptability of medication abortion. Contraception 2007;75: 224–9. doi: 10.1016/j.contraception.2006.10.008

22. Patel PM, Vaidya V, Osundina F, Comoe DA. Determining patient preferences of community pharmacy attributes: a systematic review. J Am Pharm Assoc 2020;60:397–404. doi: 10.1016/j.japh.2019.10.008

23. Chong E, Frye LJ, Castle J, Dean G, Kuehl L, Winikoff B. A prospective, non-randomized study of home use of mifepristone

24. Raymond E, Chong E, Winikoff B, Patais I, Mary M, Lotarevich T, et al. TelAbortion: evaluation of a direct to patient telemedicine abortion service in the United States. Contraception 2019;100:173–7. doi: 10.1016/j.contraception.2019.05.013

25. Raifman S, Orlando M, Rafie S, Grossman D. Medication abortion: potential for improved patient access through pharmacies. J Am Pharm Assoc (2003) 2018;58:377–81. doi: 10.1016/j.japh.2018.04.011

26. Shigesato M, Elia J, Tschann M, Bullock H, Hurwitz E, Wu YY, et al. Pharmacy access to ulipristal acetate in major cities throughout the United States. Contraception 2018;97:264–9. doi: 10.1016/j.contraception.2017.10.009

for medical abortion in the U.S. Contraception 2015;92:215–9. doi: 10.1016/j.contraception.2015.06.026

## Authors' Data Sharing Statement

Will individual participant data be available (including data dictionaries)? *No.*

What data in particular will be shared? *No data beyond what is presented in the manuscript will be shared.*

What other documents will be available? *Study protocol and data collection forms will be available.*

When will data be available (start and end dates)? *Study documents will be available from the date of publication for a period of 5 years.*

By what access criteria will data be shared (including with whom, for what types of analyses, and by what mechanism)? *Individuals interested in obtaining study documents should email the corresponding author.*

## PEER REVIEW HISTORY

Received October 9, 2020. Received in revised form December 15, 2020. Accepted December 22, 2020. Peer reviews and author correspondence are available at http://links.lww.com/AOG/C228.

Pet. Ref. 1005

# STATS IN BRIEF

**U.S. DEPARTMENT OF EDUCATION**         **MAY 2018**         **NCES 2018-161**

# A Description of U.S. Adults Who Are Not Digitally Literate

**AUTHORS**
**Saida Mamedova**
**Emily Pawlowski**
American Institutes for Research

**PROJECT OFFICER**
**Lisa Hudson**
National Center for Education Statistics

**Statistics in Brief** publications present descriptive data in tabular formats to provide useful information to a broad audience, including members of the general public. They address simple and topical issues and questions. They do not investigate more complex hypotheses, account for inter-relationships among variables, or support causal inferences. We encourage readers who are interested in more complex questions and in-depth analysis to explore other NCES resources, including publications, online data tools, and public- and restricted-use datasets. See nces.ed.gov and references noted in the body of this document for more information.

## In the United States

and internationally, digital technologies are pervasive both at home and at work. For many adults, it is hard to imagine not going online for everything from finding recipes to trading stocks. To understand how equipped adults are for successful participation in 21st-century society and the global economy, the Organization for Economic Cooperation and Development (OECD; see exhibit 1) developed the Program for the International Assessment of Adult Competencies (PIAAC). PIAAC measures the key cognitive and workplace skills of reading literacy, numeracy (the ability to understand and work with numbers), and—for the first time in an international study— adults' ability to solve problems using computer technologies. The OECD refers to this third skill as "problem solving in a technology rich environment." This Brief uses the simpler term "digital problem solving." PIAAC assesses digital problem solving by simulating tasks commonly performed in computer-based settings, such as e-mailing, interacting with websites, and using spreadsheets, to solve real-world problems such as purchasing goods or services, finding health information, and managing personal information and business finances. For example, PIAAC asked adults to sort e-mails into appropriate folders based on their content and to determine how to return a lamp purchased from an online store.[1]

---

[1] The framework for the development of the PIAAC assessment and examples of assessment items are available in OECD (2012); example items are also available in Goodman et al. (2013).

This Statistics in Brief was prepared for the National Center for Education Statistics under Contract No. ED-IES-12-D-002/006 with American Institutes for Research. Mention of trade names, commercial products, or organizations does not imply endorsement by the U.S. Government.



# EXHIBIT 1.

## The Organization for Economic Cooperation and Development (OECD)

The OECD has its roots in the Organization for European Economic Cooperation (OEEC), which began in 1948 to help implement the post-World War II Marshall Plan and to encourage cooperative economic development among European countries. The success of the OEEC led to its expansion outside of Europe. In 1961, Canada and the United States joined, and the OEEC became the Organization for Economic Cooperation and Development (OECD). Since then, the OECD has expanded to 35 countries, which work together to "identify problems [that hinder economic growth and stability], discuss and analyze them, and promote policies to solve them" (retrieved August 10, 2016, from http://www.oecd.org/about/history/). As part of its goal to foster prosperity among member states, the OECD maintains a core focus on economic issues, but also examines other issues related to economic success, such as health and education and, more broadly, environmental and social well-being.

In the area of education, the OECD sponsors four data collections in which the United States participates: the Teaching and Learning International Survey (TALIS), a study of teaching and learning environments; the Progress in International Reading Literacy Study (PIRLS), an assessment of reading literacy among fourth-graders; the Program for International Student Assessment (PISA), an assessment of 15-year-olds' reading, mathematics, and science literacy; and the Program for the International Assessment of Adult Competencies, described in this Brief. More information about the OECD is available at http://www.oecd.org/about/.

## DIGITAL LITERACY

The premise of the PIAAC digital problem-solving assessment is that in order to operate effectively in today's digital environment, one needs to master foundational computer skills, including (a) skills associated with manipulating input and output devices (e.g., the mouse, the keyboard, and digital displays), (b) awareness of concepts and knowledge of how the digital environment is structured (e.g., files, folders, scrollbars, hyperlinks, and different types of menus and buttons), and (c) the ability to interact effectively with digital information (e.g., how to use commands such as Save, Delete, Open, Close, Move, Highlight, Submit, and Send). Such interaction involves familiarity with electronic texts, images, graphics, and numerical data, as well as the ability to locate, evaluate, and critically judge the validity, accuracy, and appropriateness of accessed information. These skills constitute the core aspects of the digital problem-solving assessment; adults who have at least some fluency with these skills are termed "digitally literate" in this Statistics in Brief. But the focus of this Brief is on adults who do not have these basic computer skills—and could thus not participate in the digital problem-solving assessment—that is, on adults who are not digitally literate. (Readers interested in performance on the digital problem-solving assessment are referred to past OECD reports [OECD 2013, 2015, and 2016] and a recent U.S. report [Rampey et al. 2016]).

Adults were defined as "not digitally literate" using the requirements that PIAAC established for determining basic computer competence: (1) prior computer use, (2) willingness to take the assessment on the computer, and (3) passing a basic computer test (by successfully completing four of six simple tasks, such as using a mouse and highlighting text on the screen). Adults who met all three of these requirements participated in the digital problem-solving assessment; these adults are classified as digitally literate in this Brief. Adults who did not meet any one of these requirements—who reported no computer use, who were unwilling to take the assessment on the computer, or who failed the basic computer test—did not take the digital problem-solving assessment; these adults are classified as not digitally literate in this Brief.

Findings from the OECD analysis of the 2012 PIAAC show that 16 percent of U.S. adults were not digitally

Pet. Ref. 1007

literate (OECD 2013) (figure 1). Five percent of U.S. adults reported they had no computer experience, 7 percent reported some computer experience but were unwilling to take the assessment on the computer, and 4 percent reported computer experience and were willing to take the assessment on the computer, but failed the basic computer test. The national estimate of 16 percent of adults who are not digitally literate translates into 31.8 million Americans who do not have sufficient comfort or competence with technology to use a computer— these 31.8 million adults are the focus of this Brief.[2]

## FIGURE 1.



**DIGITAL LITERACY RATES**
**Percentage distribution of digital literacy status among U.S. adults ages 16–65: 2012**

Not digitally literate, 16

- No computer experience
- Opted out of computer-based assessment
- Failed basic computer test
- Digitally literate

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

## PREVIOUS RESEARCH

Initial results from PIAAC studies show that, among adults who are digitally literate, adults with the strongest digital problem-solving skills are typically young, are frequent users of information and communication technology, hold a postsecondary degree, and have a parent with a postsecondary degree (OECD 2015, 2013). Digital problem-solving skills are also associated with higher labor force participation rates and higher wages (OECD 2015). Across OECD countries, on average, there is a weak relationship between gender and digital problem solving and no significant correlation between immigrant status and digital problem solving; however, these relationships vary by country (OECD 2015). In the United States, Blacks, Hispanics, the foreign born, and females all have lower levels of digital problem-solving skills than those who are White, U.S. born, or male, even after controlling for age, education, and employment status (Reder 2015).

While previous studies examined adults who are digitally literate, little is known about those who are not digitally literate. As our economy and society become increasingly reliant on technology, it is important to understand who does not have digital literacy skills. A report from the Council of Economic Advisers (2015) notes that although the United States is a world leader of advanced Internet services and technology, the benefits of these technologies do not reach all Americans and a "digital divide" remains, particularly among older, less educated, and less affluent populations, as well as in rural parts of the country.

## DATA AND METHODS

The analyses in this Brief use data from the first administration of PIAAC, conducted in 2011–12 in the United States and 23 other OECD and partner countries. The digital problem-solving assessment was administered in 19 out of the 24 participating countries,[3] including the United States. Each country administered PIAAC to a nationally representative sample of adults ages 16 to 65. In the United States, a nationally representative sample of about 5,000 adults between

---

[2] PIAAC was administered on study-provided laptops. Specifications called for use of a Windows operating system, although Macintosh or Linux operating systems were allowed upon country request; see OECD (2014) for more detail on computer specifications. All respondents were asked to complete PIAAC using the laptops. It is possible that some adults who refused to take the assessment via computer (i.e., adults who "opted out" of the computer-based assessment) may have been digitally literate. However, because it is not possible to distinguish other reasons for not taking the computer-based assessment from digital literacy reasons, in this brief, all respondents who opted out of the computer-based assessment are classified as not digitally literate.

[3] The 19 countries that participated in the digital problem-solving assessment are listed in figures 12–14 later in this Brief. The five PIAAC-participating countries that did not administer this assessment are Cyprus, France, Italy, Spain, and the Russian Federation.

Pet. Ref. 1008

the ages of 16 and 65 took part. The international averages reported later in the Brief were estimated based on the 19 countries that administered the digital problem-solving assessment.[4]

Findings on digital literacy in the United States are examined for adults from a variety of socio-demographic backgrounds. The Brief looks first at the percentage of each socio-demographic group that is not digitally literate (e.g., percentage of native-born versus non-native-born adults who are not digitally literate). Second, the Brief examines the socio-demographic characteristics of adults who are not digitally literate, focusing on where (in which socio-demographic group) the majority of adults who are not digitally literate are found. For example, although non-native-born adults could be more likely than native-born adults to lack digital literacy skills, native-born adults could nonetheless make up a relatively large proportion of the adults who lack these skills.

The findings reported in this Brief are statistically significant at the $p < .05$ level. No adjustments were made for multiple comparisons. For additional information about the data and methods used in this study, see the Technical Notes at the end of the Brief. Appendix A contains the detailed data tables with standard errors.

---

[4]  The international averages weight each country equally.

Pet. Ref. 1009

# STUDY QUESTIONS

**1** How do different groups of adults in the United States compare on digital literacy?

**2** How does the United States compare to other developed countries on digital literacy?

**3** How does the United States compare to other developed countries on computer use at work and in everyday life?

## KEY FINDINGS

- Adults who are not digitally literate are, on average, less educated, older, and more likely to be Black, Hispanic, or foreign born, compared to digitally literate adults. Compared to digitally literate adults, adults who are not digitally literate have a lower rate of labor force participation and tend to work in lower skilled jobs.

- Compared to adults internationally (i.e., in other OECD countries), a smaller proportion of U.S. adults are not digitally literate. About 16 percent of U.S. adults are not digitally literate, compared to 23 percent of adults internationally. The percentage of U.S. adults who are not digitally literate is not measurably different from the percentages in England/Northern Ireland (UK), Flanders (Belgium), Canada, and Germany. The Netherlands and several Nordic countries (Sweden, Norway, and Denmark) have some of the lowest percentages of adults who are not digitally literate, ranging from 11 to 14 percent.

- Across the countries studied, 71 percent of adults use a computer at work and 83 percent of adults use a computer in everyday life. In comparison, 74 percent of U.S. adults use a computer at work, 3 percentage points higher than the international average, and 81 percent of U.S. adults use a computer in everyday life, 3 percentage points lower than the international average.

Pet. Ref. 1010



# 1 How do different groups of adults in the United States compare on digital literacy?

This Brief takes two approaches to examine the characteristics of adults who are not digitally literate. First, the Brief examines the *rate* of digital literacy among groups of adults with selected education, demographic, and employment characteristics; this is the percentage of adults within each group who are not digitally literate. Second, the Brief examines the *distribution* of selected education, demographic, and employment characteristics among adults who are not digitally literate; these distributions show which groups make up the largest proportions of adults who are not digitally literate. The two analyses

are complementary and tell a similar story: Adults who are not digitally literate are less educated, older, and disproportionately Black, Hispanic, and foreign born, compared to digitally literate adults. In addition, adults who are not digitally literate have lower rates of labor force participation and work in lower skilled jobs than those who are digitally literate.

**Educational attainment.** Digital literacy among U.S. adults generally increases with educational attainment (figure 2). About two-fifths (41 percent) of U.S. adults without a high school diploma are not digitally literate,

compared with 17 percent of adults who have a high school diploma but no college degree, and 5 percent of adults who have a college degree.[5]

The disparities in digital literacy by educational attainment mean that a relatively high percentage of adults who are not digitally literate have low educational attainment—37 percent of adults who are not digitally literate do not have a high school diploma, compared to 10 percent of digitally literate adults (figure 3). Nonetheless, the most common educational attainment level among adults who are not digitally literate is a high school diploma—53 percent of adults who are not digitally literate have this level of attainment.

**Gender.** There is no measurable difference in digital literacy rates by gender. Overall, 18 percent of males and 15 percent of females are not digitally literate (figure 4). The population of not-digitally-literate adults is 52 percent male and 48 percent female (figure 5).

**Nativity.** Although more than twice as many foreign-born adults are not digitally literate compared to native-born adults (36 versus 13 percent, respectively; figure 4), native-born

## FIGURE 2.



**DIGITAL LITERACY RATES**
**Rate of digital literacy among U.S. adults ages 16–65, by educational attainment: 2012**

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

[5] It is important to note that PIAAC includes young adults (ages 16 to 25), many of whom could still be in high school or college. Thus, findings by educational attainment should not be viewed as a proxy for socioeconomic status; they are better viewed as an indicator of the adult's current level of formal skill development.

Pet. Ref. 1011

adults represent the majority (68 percent) of adults who are not digitally literate (figure 5).

**Age.** Among adults ages 16–65, the average age of adults who are not digitally literate is 46, which is 8 years higher than the average age for digitally literate adults (not in tables or figures).[6]

This average age difference reflects the higher rates of digital nonliteracy among older adults (ages 45–65) compared to younger adults (ages 16–34). Because of the higher rate at which older adults are not digitally literate (figure 6), the two oldest groups of adults (ages 45–54 and 55–65) are overrepresented among adults who are not digitally literate. For example, 34 percent of adults who are not digitally literate are ages 55–65, while only 17 percent of adults who are digitally literate are in this age group (figure 7).

# FIGURE 3.

**DISTRIBUTION OF EDUCATIONAL ATTAINMENT**
**Percentage distribution of educational attainment among U.S. adults ages 16–65, by digital literacy status: 2012**



NOTE: Detail may not sum to 100 because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

# FIGURE 4.

**DIGITAL LITERACY BY GENDER AND NATIVITY**
**Rate of digital literacy among U.S. adults ages 16–65, by gender and by nativity status: 2012**



SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

[6]  The average age of adults who were not digitally literate was 46.3, with a standard error of 0.54. The average age of adults who were digitally literate was 38.7, with a standard error of 0.14.

Pet. Ref. 1012

## FIGURE 5.



**DISTRIBUTIONS OF GENDER AND NATIVITY**
**Percentage distributions of gender and nativity status among U.S. adults ages 16–65, by digital literacy status: 2012**

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

**Race/ethnicity.** The percentage of Black adults who are not digitally literate is about twice the percentage of White adults (22 versus 11 percent) (figure 6), and the percentage of Hispanic adults who are not digitally literate is about three times the percentage of White adults (35 versus 11 percent). Nonetheless, White adults make up about half (46 percent) of adults who are not digitally literate (figure 7).

**Labor force experience.** In this Brief, adults are classified according to their labor force status as employed, unemployed (not working and looking for work), and "not in the labor force" (not working and not looking for work). In addition, adults' labor force experiences are examined using labor force participation rate, employment rate, and occupation skill level. The labor force participation rate is the percentage of adults who are in the labor force—that is, either employed

or not employed but looking for work (unemployed). The employment rate is the percentage of adults in the labor force who are employed. Occupation skill level is based on an OECD measure that classifies occupations into four broad skill levels: (1) skilled occupations (e.g., legislators, senior officials and managers, professionals, technicians, and associate professionals), (2) semiskilled white-collar occupations (e.g., clerks, service workers, and shop and market sales workers),

Pet. Ref. 1013

# FIGURE 6.



**DIGITAL LITERACY BY AGE AND RACE/ETHNICITY**
**Rate of digital literacy among U.S. adults ages 16–65, by age and by race/ethnicity: 2012**

NOTE: *Other race* includes Asian, American Indian or Alaska Native, Hawaiian or other Pacific Islander, and persons of Two or more races. Race categories exclude persons of Hispanic ethnicity. Detail may not sum to 100 because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

(3) semiskilled blue-collar occupations (e.g., skilled agricultural and fishery workers, craft and related trades workers, and plant and machine operators and assemblers), and (4) unskilled occupations (e.g., laborers) (OECD 2013).

The rate of digital nonliteracy is not measurably different among employed (13 percent) and unemployed adults (14 percent), but is higher for adults who are not in the labor force (30 percent) (figure 8). Likewise,

digitally literate adults have a higher rate of labor force participation than do adults who are not digitally literate (84 percent and 66 percent, respectively, figure 9). And among adults who participate in the labor force, both digitally literate and nonliterate adults have employment rates of 90 percent.

In addition, digitally literate and nonliterate adults tend to work in different types of jobs. Generally, as the skill level of a job decreases, the proportion of adults who are not

digitally literate increases (figure 10). Thus, compared to digitally literate adults, adults who are not digitally literate are more often found in unskilled or semiskilled blue-collar jobs (figure 11). For example, 22 percent of adults who are not digitally literate work in unskilled occupations, compared to 7 percent of digitally literate adults. However, adults who are not digitally literate are more often found in semiskilled occupations than in skilled or unskilled occupations.

Pet. Ref. 1014

## FIGURE 7.

**DISTRIBUTIONS OF AGE AND RACE/ETHNICITY**
**Percentage distributions of age and race/ethnicity among U.S. adults ages 16–65, by digital literacy status: 2012**



NOTE: *Other race* includes Asian, American Indian or Alaska Native, Hawaiian or other Pacific Islander, and persons of Two or more races. Race categories exclude persons of Hispanic ethnicity. Detail may not sum to 100 because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1015

# FIGURE 8.



**DIGITAL LITERACY BY EMPLOYMENT AND LABOR FORCE STATUS**
**Rate of digital literacy among U.S. adults ages 16–65, by employment and labor force status: 2012**

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

# FIGURE 9.

**RATES OF LABOR FORCE PARTICIPATION AND EMPLOYMENT**
**Labor force participation rate and employment rate among U.S. adults ages 16–65, by digital literacy status: 2012**



NOTE: The labor force participation rate is the percentage of adults who are in the labor force—that is, either employed or not employed but looking for work (unemployed). The employment rate is the percentage of adults in the labor force who are employed.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1016

# FIGURE 10.

**DIGITAL LITERACY BY OCCUPATION SKILL-LEVEL**
**Rate of digital literacy among U.S. workers ages 16–65, by occupation skill-level: 2012**



NOTE: Estimates for occupation skill-levels are based on adults ages 16–65 who worked in the last 12 months. Occupation skill-level is based on an OECD measure that classifies occupations into four broad skill-levels: (1) skilled occupations (e.g. legislators, senior officials and managers, professionals, technicians and associate professionals); (2) semi-skilled white-collar occupations (e.g. clerks, service workers, and shop and market sales workers); (3) semi-skilled blue-collar occupations (e.g. skilled agricultural and fishery workers, craft and related trades workers, plant and machine operators and assemblers); and (4) unskilled occupations (e.g. laborers) (OECD 2013).
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

# FIGURE 11.

**DISTRIBUTION OF OCCUPATION SKILL-LEVEL**
**Percentage distribution of occupation skill-level of U.S. workers ages 16–65, by digital literacy status: 2012**



NOTE: Estimates for occupation skill-levels are based on adults ages 16–65 who worked in the last 12 months. Occupation skill-level is based on an OECD measure that classifies occupations into four broad skill-levels: (1) skilled occupations (e.g. legislators, senior officials and managers, professionals, technicians and associate professionals); (2) semi-skilled white-collar occupations (e.g. clerks, service workers, and shop and market sales workers); (3) semi-skilled blue-collar occupations (e.g. skilled agricultural and fishery workers, craft and related trades workers, plant and machine operators and assemblers); and (4) unskilled occupations (e.g. laborers) (OECD 2013).
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1017

# 2 How does the United States compare to other developed countries on digital literacy?

The rate of digital literacy among adults ages 16–65 is higher in the United States than the average of the 19 participating PIAAC countries. About 84 percent of U.S. adults are digitally literate compared to the international average of 77 percent. Conversely, 16 percent of U.S. adults are not digitally literate compared to the international average of 23 percent (figure 12).

The proportion of U.S. adults who are not digitally literate is not measurably different from the proportions in England/Northern Ireland (UK), Flanders (Belgium), Canada, and Germany. The Netherlands and several Nordic countries[7] (Sweden, Norway, and Denmark) have the smallest proportions of adults who are not digitally literate.[8] In contrast, the Slovak Republic, Japan, and Poland have the highest proportions of adults who are not digitally literate.

Although the United States has a relatively high proportion of adults who are digitally literate, those digitally literate adults scored relatively low on the PIAAC digital problem-solving assessment. U.S. adults had an average score of 277 on that assessment, compared to the international average of 283; overall, 14 of the 19 participating countries scored measurably higher than the United States (Goodman et al. 2013).[9] More information about performance on the digital problem-solving assessment is available in Goodman et al. (2013), Reder (2015), and OECD (2013).



## FIGURE 12.



**DIGITAL LITERACY BY COUNTRY**
**Percentage of adults ages 16–65 who are not digitally literate, by country: 2012**

| Country | Percent |
|---|---|
| Netherlands | 11 |
| Sweden | 12 |
| Norway | 14 |
| Denmark | 14 |
| England/N. Ireland (UK) | 15 |
| United States | 16 |
| Flanders (Belgium) | 16 |
| Canada | 17 |
| Germany | 18 |
| Finland | 18 |
| Australia | 22 |
| International Average | 23 |
| Czech Republic | 25 |
| Austria | 25 |
| Estonia | 29 |
| Korea | 30 |
| Ireland | 32 |
| Slovak Republic | 36 |
| Japan | 37 |
| Poland | 50 |

NOTE: Countries are listed in descending order based on unrounded percentage estimates. Shaded countries have a percentage estimate that is not measurably different from that of the United States.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

---

[7] The Nordic countries that participated in PIAAC are Denmark, Finland, Norway, and Sweden. (Iceland is the one Nordic country that did not participate.)

[8] There are two exceptions: The percentages of adults who are not digitally literate in Denmark and Norway are not measurably different from those of England/Northern Ireland.

[9] Scores ranged from 0 to 500; see exhibit 2.

Pet. Ref. 1018



# 3 How does the United States compare to other developed countries on computer use at work and in everyday life?

The PIAAC background questionnaire that was administered along with the PIAAC assessment asked working adults if they use a computer at work and also asked all adults if they use a computer in everyday life outside of work. The prevalence of digital technologies is evident in the rates of reported computer usage both at work and in everyday life. Internationally, 71 percent of workers in the 19 participating OECD countries use a computer at work, and 83 percent of adults use a computer in everyday life (figures 13 and 14).

A larger portion of U.S. workers use computers at work compared to workers internationally, but a smaller proportion of U.S. adults use computers in everyday life compared to adults internationally. Some 74 percent of U.S. workers use computers at work, 3 percentage points higher than the international average. Meanwhile, 81 percent of U.S. adults use computers in everyday life, 3 percentage points lower than the international average (based on unrounded estimates).

Poland, Ireland, Korea, the Czech Republic, and the Slovak Republic have some of the smallest proportions of adults using computers at work and in everyday life; these countries also have some of the largest proportions of adults who are not digitally literate.

## FIGURE 13.

**COMPUTER USE AT WORK, BY COUNTRY**
**Percentage of working adults ages 16–65 who use computers at work, by country: 2012**



| Country | Percent |
|---|---|
| Norway | 83 |
| Sweden | 82 |
| Netherlands | 80 |
| Finland | 80 |
| Denmark | 79 |
| Australia | 77 |
| England/Northern Ireland (UK) | 75 |
| Flanders (Belgium) | 74 |
| Canada | 74 |
| United States | 74 |
| International Average | 71 |
| Austria | 71 |
| Japan | 71 |
| Germany | 69 |
| Ireland | 65 |
| Czech Republic | 65 |
| Estonia | 64 |
| Korea | 63 |
| Slovak Republic | 56 |
| Poland | 54 |

NOTE: Estimates are based on adults who worked in the last 12 months. Countries are listed in descending order based on unrounded percentage estimates. Shaded countries have a percentage estimate that is not measurably different from that of the United States.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1019

Finland, Sweden, Denmark, Norway, and the Netherlands have the largest proportions of adults using computers at work and in everyday life; with the exception of Finland, these countries have the smallest proportions of adults who are not digitally literate.[10,11]



## FIGURE 14.

**COMPUTER USE IN EVERYDAY LIFE, BY COUNTRY**
**Percentage of adults ages 16–65 who use computers in everyday life, by country: 2012**

NOTE: Countries are listed in descending order based on unrounded percentage estimates. Shaded countries have a percentage estimate that is not measurably different from that of the United States.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

---

[10] Finland's proportion of adults who are not digitally literate is below the international average, but is still larger than the proportion in eight other countries.

[11] Although digital literacy and computer usage are related concepts, they are not exactly the same. For example, someone could currently not use a computer, but still have the ability to use one, based on past experience. Or persons could report that they do use a computer, but might use it in such a rudimentary manner that they are essentially not digitally literate.

Pet. Ref. 1020

## FIND OUT MORE

**For questions about content, to download this Statistics in Brief, or view this report online, go to:**

**http://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2018161**

To access and explore PIAAC data, visit the PIAAC International Data Explorer at:
http://nces.ed.gov/surveys/international/ide/

In addition, the PIAAC Gateway provides a clearinghouse of PIAAC news and analyses:
http://piaacgateway.com

Pet. Ref. 1021

## TECHNICAL NOTES

This section describes the assessment design, sampling and weighting, and statistical testing procedures used for the 2012 Program for the International Assessment of Adult Competencies (PIAAC). The PIAAC was a household data collection, conducted from August 2011 through April 2012, in 24 countries including the United States. In the United States, PIAAC was collected under the auspices of the National Center for Education Statistics (NCES).

The PIAAC collection included a detailed background questionnaire, administered as a computer-assisted personal interview, and an assessment covering four competency domains: literacy, numeracy, reading components, and problem solving in technology-rich environments. The assessment was administered via computer, whenever the respondent was able and willing to do so; otherwise, a paper-and-pencil assessment was used for the literacy, numeracy, and reading components domains, and the "problem solving in technology rich environments" domain was not assessed.

The "problem solving in technology-rich environments" competency domain is most relevant to this Statistics in Brief (where it was previously referred to as "digital problem solving"), and is described below.

### Problem Solving in Technology-Rich Environments

PIAAC's problem solving in technology-rich environments (PS-TRE) assessment is an innovative addition to adult literacy and large-scale assessments—an addition that reflects the recent growth in digital technologies that has revolutionized access to information. In the PIAAC PS-TRE framework, PS-TRE is defined as "using digital technology, communication tools, and networks to acquire and evaluate information, communicate with others, and perform practical tasks" (OECD 2012). Specifically, PS-TRE assesses the cognitive processes of problem solving—goal setting, planning, selecting, evaluating, organizing, and communicating results—within the digital environment.

PS-TRE items present tasks of varying difficulty to be performed in simulated software applications using commands and functions commonly found in the digital environments of e-mail, web pages, and spreadsheets. These tasks range from purchasing particular goods or services online and finding interactive health information to managing personal information and business finances. Descriptions of PS-TRE tasks that are associated with PIAAC scores and achievement levels are noted in exhibit 2, and examples of PS-TRE items are available online at http://nces.ed.gov/surveys/piaac/sample-pstre.asp and in exhibit B-6 of Goodman et al. (2013).

As seen in exhibit 2, three groups of adults were excluded from the PS-TRE competency domain because of their lack of computer skill. These three groups—adults who reported no computer experience, who failed the basic computer test, or who opted out of taking the computer-based assessment—are defined in this Statistics in Brief as "not digitally literate." As previously mentioned, 16 percent of the U.S. sample fell into this not-digitally-literate category.

More information on the 2012 PIAAC is available in the U.S. PIAAC technical report (Hogan et al. 2014), in Goodman et al. (2013), and at http://nces.ed.gov/surveys/piaac/admin.asp.

### United States Sampling

As in all PIAAC participating countries, the target population for the 2012 PIAAC assessment in the United States was adults ages 16 to 65, living in households, with a country sample size goal of 5,000 adults. The U.S. sample started with a nationally representative probability sample of 9,468 households. This household sample was selected on the basis of a four-stage, stratified area sample: (1) primary sampling units consisting of counties or groups of contiguous counties, (2) secondary sampling units consisting of area blocks, (3) housing units containing households, and (4) eligible persons within households (up to two adults per household could be selected). Person-level data were collected through a screener, a background questionnaire, and

the assessment. The screener instrument was administered first, using a computer-assisted personal interviewing system. The screener collected basic demographic information on all household members; it was used to determine household members' eligibility for the study and to select the sample person(s). Of the 9,468 sampled households, 1,285 were either vacant or not a dwelling unit, resulting in a sample of 8,183 eligible households. In the sample of eligible households, 1,267 households did not have an eligible adult ages 16 to 65. A total of 5,686 of the 6,916 households with eligible adults completed the screener. The weighted screener response rate was 86.5 percent.

At the screener stage, 6,100 adults ages 16 to 65 were selected to complete the next stage, the PIAAC background questionnaire; a total of 4,898 adults actually completed the background questionnaire. Of the 1,202 respondents who did not complete the background questionnaire, 112 were unable to do so because of a literacy-related barrier—either the inability to communicate in English or Spanish (the two languages in which the background questionnaire was administered) or a mental disability. Twenty others were unable to complete the questionnaire due to technical problems. The final weighted response rate for the background questionnaire—which included adults who completed it and adults who were unable to complete it because

of a language problem or mental disability—was 82.2 percent.

Of the 4,898 adults who completed the background questionnaire, 4,820 completed the assessment. An additional 22 were unable to complete the assessment for literacy-related reasons. Another 11 were unable to do so due to technical problems. The weighted response rate for the overall assessment—which included adults who answered at least one question in each domain and the 22 adults who were unable to do so because of a language problem, mental disability, or technical problem—was 99.0 percent. The overall weighted response rate for the U.S. PIAAC sample, which is the product of response rates on the screener (86.5 percent), background questionnaire (82.2 percent), and assessment (99.0 percent), was 70.3 percent.

For adults who did not complete any tasks in any of the assessment domains, no information is available about their performance. Omitting these individuals from the data would have resulted in unknown biases in estimates of the cognitive skills of the national population because refusals cannot be assumed to have occurred randomly. Thus, for adults who answered the background questionnaire but refused to complete the assessment for reasons that were not literacy related (that is, for reasons other than language issues or a mental disability), proficiency values were imputed based on the

covariance information from those who completed the assessment.

The final PIAAC reporting sample (those with a final weight for analysis, including the imputed cases) consisted of 5,010 respondents. These 5,010 respondents are the 4,898 respondents who completed the background questionnaire, plus the 112 respondents who were unable to complete the background questionnaire for literacy-related reasons.

The PIAAC sample was subject to unit nonresponse from the screener, background questionnaire, and assessment. Although the screener and assessment had unit response rates above 85 percent, the background questionnaire had a unit response rate below 85 percent and thus, based on NCES statistical standards, required an analysis of the potential for nonresponse bias.

### Nonresponse Bias

A nonresponse bias analysis of respondents to the background questionnaire revealed differences in the characteristics of respondents compared with those who did not respond. The following variables were identified as those that contributed most to differential response rates: education level, gender, age, race/ethnicity, employment status, household size, whether children under 16 live in the household, whether the house is owner occupied, and region of the country. Weighting adjustments were applied to adjust for these

Pet. Ref. 1023

# EXHIBIT 2.

**PIAAC proficiency levels for problem solving in technology-rich environments (PS-TRE) and groups that did not participate in the PS-TRE competency domain**

| Achievement level and PS-TRE score range | Task descriptions |
| --- | --- |
| No computer experience<br>No PS-TRE score | Adults in this category reported having no prior computer experience; therefore, they did not take part in the computer-based assessment but took the paper-based version of the assessment, which does not include the problem solving in technology-rich environments domain. |
| Failed basic computer test (information and communication technology [ICT] core)<br>No PS-TRE score | Adults in this category had prior computer experience but failed the ICT core test, which assesses basic computer skills, such as the ability to use a mouse or scroll through a web page, needed to take the computer-based assessment. Therefore, they did not take part in the computer-based assessment, but took the paper-based version of the assessment, which does not include the problem solving in technology-rich environments domain. |
| "Opted out" of taking computer-based assessment<br>No PS-TRE score | Adults in this category opted to take the paper-based assessment without first taking the ICT core assessment, even if they reported some prior experience with computers. They also did not take part in the computer-based assessment, but took the paper-based version of the assessment, which does not include the problem solving in technology-rich environments domain. |
| Below Level 1<br>Score of 0–240 | At this level, tasks are based on well-defined problems involving the use of only one function within a generic interface to meet one explicit criterion without any categorical or inferential reasoning or transforming of information. Few steps are required and no subgoal has to be generated. |
| Level 1<br>Score of 241–290 | At this level, tasks typically require the use of widely available and familiar technology applications, such as e-mail software or a web browser. There is little or no navigation required to access the information or commands required to solve the problem. The problem may be solved regardless of the respondent's awareness and use of specific tools and functions (e.g., a sort function). The tasks involve few steps and a minimal number of operators. At the cognitive level, the respondent can readily infer the goal from the task statement; problem resolution requires the respondent to apply explicit criteria, and there are few monitoring demands (e.g., the respondent does not have to check whether he or she has used the appropriate procedure or made progress toward the solution). Identifying content and operators can be done through a simple match. Only simple forms of reasoning, such as assigning items to categories, are required; there is no need to contrast or integrate information. |
| Level 2<br>Score of 291–340 | At this level, tasks typically require the use of both generic and more specific technology applications. For instance, the respondent may have to use a novel online form. Some navigation across pages and applications is required to solve the problem. The use of tools (e.g., a sort function) can facilitate the resolution of the problem. The task may involve multiple steps and operators. The goal of the problem may have to be defined by the respondent, though the criteria to be met are explicit. There are higher monitoring demands. Some unexpected outcomes or impasses may appear. The task may require evaluating the relevance of a set of items in order to discard distractors. Some integration and inferential reasoning may be needed. |
| Level 3<br>Score of 341–500 | At this level, tasks typically require the use of both generic and more specific technology applications. Some navigation across pages and applications is required to solve the problem. The use of tools (e.g., a sort function) is required to make progress toward the solution. The task may involve multiple steps and operators. The goal of the problem may have to be defined by the respondent, and the criteria to be met may or may not be explicit. There are typically high monitoring demands. Unexpected outcomes and impasses are likely to occur. The task may require evaluating the relevance and reliability of information in order to discard distractors. Integration and inferential reasoning may be needed to a large extent. |

NOTE: Information about the procedures used to set the achievement levels is available in PIAAC Technical Standards and Guidelines (OECD 2014).

SOURCE: Organization for Economic Cooperation and Development (OECD), 2013. OECD Skills Outlook 2013: First Results From the Survey of Adult Skills, table 2.4.

Pet. Ref. 1024

response rate differences and were found to be highly effective in reducing nonresponse bias. The potential nonresponse bias attributable to unit nonresponse on the background questionnaire, after adjustment, was negligible.

### Weighting and Variance Estimation

The PIAAC sample was selected using a complex sample design. Sampling weights were used to account for the fact that in a complex sampling design the probabilities of selection are not identical for all respondents. The sampling weights were further adjusted for nonresponse to the screener and background questionnaire, extreme weights were trimmed, and weights for all respondents were calibrated to the U.S. Census Bureau's 2010 American Community Survey population totals for those ages 16 to 65.

Because the statistics presented in this report are estimates based on a sample of respondents, it is important to have measures of the degree of uncertainty of the estimates. Accordingly, in addition to providing estimates of percentages, this Brief provides information about the uncertainty of each statistic in the form of standard errors (see appendix A). Because PIAAC used clustered sampling, conventional formulas for estimating standard errors (which assume simple random sampling and hence independence of observations)

are inappropriate. For this reason, the PIAAC uses a paired jackknife replication approach (Rust and Rao 1996) to estimate standard errors.

### Statistical Testing

The statistical comparisons in this report were based on the $t$ statistic. Statistical significance was determined by calculating a $t$ value for the difference between a pair of means or proportions and comparing this value with published tables of values at a certain level of significance, called the alpha level. The alpha level is an a priori statement of the probability of inferring that a difference exists when, in fact, it does not. In this Brief, findings from $t$ tests are reported based on a statistical significance (or alpha level) set at .05. Student's $t$ values were computed to test differences between independent estimates using the following formula:

$$ t = \frac{E_1 - E_2}{\sqrt{se_1^2 + se_2^2}} $$

where $E_1$ and $E_2$ are the estimates to be compared and $se_1$ and $se_2$ are their corresponding standard errors. In instances where comparisons were made on dependent samples, the test statistic calculation was adjusted for the shared variance in the dependent groups. No adjustments were made for multiple comparisons.

There are some potential hazards in interpreting the results of statistical

tests. First, the magnitude of the $t$ statistic depends not only on observed differences between means or percentages but also on the number of respondents. A small difference found in a comparison across a large number of respondents would still produce a large and possibly statistically significant $t$ statistic.

A second hazard stems from reliance on a sample, rather than an entire population: one can conclude that a difference found in the sample is real when there is no true difference in the population. Statistical tests are designed to limit the risk of this Type 1, or "false positive," error by setting a significance level, or alpha. The alpha level of .05 used in this report ensures that the probability of finding a false positive result is no more than 1 in 20 (.05) occurrences. However, failing to meet the significance level of .05 does not mean that there is no real difference between two quantities, only that the likelihood is less.

It is important to note that many of the variables examined in this report may be related to one another and to other variables not included in the analysis. The complex interactions and relationships among the variables were not explored. Furthermore, the variables examined in this report are just a few of those that could be examined. Thus, readers are cautioned not to draw causal inferences based on the results presented here.

Pet. Ref. 1025

# REFERENCES

Council of Economic Advisers. (2015). *Mapping the Digital Divide*. Issue Brief. Washington, DC: Executive Office of the President of the United States. Retrieved July 19, 2017, from https://obamawhitehouse.archives.gov/sites/default/files/wh_digital_divide_issue_brief.pdf.

Goodman, M., Finnegan, R., Mohadjer, L., Krenzke, T., and Hogan, J. (2013). *Literacy, Numeracy, and Problem Solving in Technology-Rich Environments Among U.S. Adults: Results From the Program for the International Assessment of Adult Competencies 2012* (NCES 2014-008). U.S. Department of Education. Washington, DC: National Center for Education Statistics, Institute of Education Sciences. Retrieved March 22, 2018, from https://nces.ed.gov/pubsearch.

Hogan, J., Montalvan, P., Diaz-Hoffman, L., Dohrmann, S., Krenzke, T., Lemay, M., Mohadjer, L., and Thornton, N. (2014). *Program for the International Assessment of Adult Competencies (PIAAC): 2012: U.S. Main Study Technical Report* (NCES 2014-047). U.S. Department of Education. Washington, DC: National Center for Education Statistics, Institute of Education Sciences. Retrieved March 22, 2018, from https://nces.ed.gov/pubsearch.

OECD. (2012). *Literacy, Numeracy and Problem Solving in Technology-Rich Environments: Framework for the OECD Survey of Adult Skills.* Paris: OECD Publishing. Retrieved March 22, 2018, from http://dx.doi.org/10.1787/9789264128859-en.

OECD. (2013). OECD *Skills Outlook 2013: First Results From the Survey of Adult Skills.* Paris: OECD Publishing. Retrieved July 19, 2017, from http://dx.doi.org/10.1787/9789264204256-en.

OECD. (2014). *PIAAC Technical Standards and Guidelines.* Paris: OECD Publishing. Retrieved July 19, 2017, from http://www.oecd.org/skills/piaac/PIAAC-NPM(2014_06)PIAAC_Technical_Standards_and_Guidelines.pdf.

OECD. (2015). *Adults, Computers and Problem Solving: What's the Problem?* Paris: OECD Publishing. Retrieved July 19, 2017, from http://dx.doi.org/10.1787/9789264236844-en.

OECD. (2016). *Skills Matter: Further Results From the Survey of Adult Skills.* Paris: OECD Publishing. Retrieved July 19, 2017, from http://dx.doi.org/10.1787/9789264258051-en.

Rampey, B.D., Finnegan, R., Goodman, M., Mohadjer, L., Krenzke, T., Hogan, J., and Provasnik, S. (2016). *Skills of U.S. Unemployed, Young, and Older Adults in Sharper Focus: Results From the Program for the International Assessment of Adult Competencies (PIAAC) 2012/2014: First Look* (NCES 2016-039rev). U.S. Department of Education. Washington, DC: National Center for Education Statistics. Retrieved March 22, 2018, from https://nces.ed.gov/pubsearch.

Reder, S. (2015). *Digital Inclusion and Digital Literacy in the United States: A Portrait From PIAAC's Survey of Adult Skills.* Paper presented at the "Taking the Next Step With PIAAC: A Research-to-Action" Conference, Arlington, VA. Retrieved October 19, 2015, from http://piaacgateway.com/us-piaac-conference-2014/.

Rust, K.F., and Rao, J.N.K. (1996). Replication Methods for Analyzing Complex Survey Data. *Statistical Methods in Medical Research: Special Issue on the Analysis of Complex Surveys, 5*: 283–310.

Pet. Ref. 1026

# APPENDIX A: DATA TABLES

**Table A-1. Percentage distribution of digital literacy status among U.S. adults ages 16 to 65, by demographic characteristic: 2012**

| | Total, all adults | Not digitally literate | | | | Digitally literate[1] | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| **All adults** | **100.0** | **16.3** | **5.5** | **4.2** | **6.6** | **83.7** | **51.1** | **32.6** |
| Educational attainment | | | | | | | | |
| Less than high school | 100.0 | 41.1 | 21.5 | 7.7 | 11.9 | 58.9 | 45.3 | 13.6 |
| High school diploma | 100.0 | 17.2 | 4.1 | 5.0 | 8.2 | 82.8 | 58.0 | 24.7 |
| Associate's or higher degree | 100.0 | 4.7 | 0.8 | 1.7 | 2.2 | 95.3 | 43.8 | 51.4 |
| Gender | | | | | | | | |
| Male | 100.0 | 17.6 | 6.1 | 4.9 | 6.6 | 82.5 | 48.0 | 34.4 |
| Female | 100.0 | 15.2 | 4.9 | 3.7 | 6.6 | 84.8 | 54.1 | 30.8 |
| Nativity status | | | | | | | | |
| Born in U.S. | 100.0 | 12.9 | 3.5 | 3.3 | 6.2 | 87.1 | 51.5 | 35.6 |
| Born outside of U.S. | 100.0 | 35.9 | 17.1 | 9.8 | 9.1 | 64.1 | 48.9 | 15.2 |
| Age | | | | | | | | |
| 16–24 | 100.0 | 7.7 | 0.9 ! | 3.7 | 3.1 | 92.3 | 52.4 | 39.9 |
| 25–34 | 100.0 | 10.7 | 2.0 ! | 3.8 | 4.9 | 89.3 | 48.9 | 40.4 |
| 35–44 | 100.0 | 13.8 | 5.1 | 3.5 | 5.2 | 86.2 | 50.1 | 36.0 |
| 45–54 | 100.0 | 20.5 | 7.8 | 5.4 | 7.3 | 79.5 | 53.0 | 26.6 |
| 55–65 | 100.0 | 28.4 | 11.2 | 4.7 | 12.5 | 71.7 | 51.1 | 20.5 |
| Race/ethnicity[2] | | | | | | | | |
| White | 100.0 | 11.5 | 2.8 | 2.6 | 6.1 | 88.6 | 48.4 | 40.1 |
| Black | 100.0 | 22.4 | 6.6 | 7.8 | 8.0 | 77.6 | 64.4 | 13.2 |
| Hispanic | 100.0 | 35.0 | 17.8 | 8.7 | 8.6 | 65.0 | 50.2 | 14.7 |
| Other race | 100.0 | 13.2 | 3.7 ! | 4.5 | 5.0 | 86.8 | 54.2 | 32.6 |

! Interpret data with caution. The coefficient of variation (CV) for this estimate is between 30 and 50 percent.
[1] See exhibit 2 for definitions of digital literacy levels.
[2] Other race includes Asian, American Indian or Alaska Native, Hawaiian or other Pacific Islander, and persons of Two or more races. Race categories exclude persons of Hispanic ethnicity.
NOTE: Detail may not sum to totals because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1027

**Table A-2. Percentage distribution of each demographic characteristic among U.S. adults ages 16 to 65, by digital literacy status: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate[1] | | |
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
|---|---|---|---|---|---|---|---|---|
| **Educational attainment** | | | | | | | | |
| Less than high school | **14.8** | 37.1 | 57.8 | 26.9 | 26.5 | 10.4 | 13.1 | 6.2 |
| High school diploma | **49.8** | 52.6 | 37.1 | 58.7 | 61.5 | 49.2 | 56.5 | 37.8 |
| Associate's or higher degree | **35.5** | 10.3 | 5.1 | 14.4 | 11.9 | 40.4 | 30.4 | 56.0 |
| **Gender** | | | | | | | | |
| Male | **48.8** | 52.5 | 54.2 | 56.0 | 48.7 | 48.1 | 45.9 | 51.7 |
| Female | **51.2** | 47.5 | 45.8 | 44.0 | 51.3 | 51.9 | 54.2 | 48.4 |
| **Nativity** | | | | | | | | |
| Native-born | **85.3** | 67.6 | 54.2 | 66.0 | 79.8 | 88.7 | 85.9 | 93.1 |
| Foreign-born | **14.7** | 32.4 | 45.8 | 34.0 | 20.2 | 11.3 | 14.1 | 6.9 |
| **Age** | | | | | | | | |
| 16–24 | **18.4** | 8.7 | 2.9 ! | 15.9 | 8.7 | 20.3 | 18.8 | 22.5 |
| 25–34 | **20.4** | 13.3 | 7.5 ! | 18.3 | 15.0 | 21.8 | 19.5 | 25.3 |
| 35–44 | **20.0** | 16.9 | 18.7 | 16.4 | 15.7 | 20.5 | 19.6 | 22.1 |
| 45–54 | **22.0** | 27.6 | 31.4 | 28.2 | 24.1 | 20.9 | 22.8 | 17.9 |
| 55–65 | **19.3** | 33.5 | 39.5 | 21.2 | 36.5 | 16.6 | 19.3 | 12.2 |
| **Race/ethnicity[2]** | | | | | | | | |
| White | **65.5** | 45.9 | 33.4 | 39.5 | 60.4 | 69.3 | 62.0 | 80.8 |
| Black | **12.7** | 17.4 | 15.2 | 23.3 | 15.3 | 11.7 | 15.9 | 5.1 |
| Hispanic | **14.2** | 30.5 | 46.2 | 29.1 | 18.5 | 11.1 | 14.0 | 6.5 |
| Other race | **7.7** | 6.2 | 5.2 ! | 8.1 | 5.8 | 8.0 | 8.1 | 7.7 |

! Interpret data with caution. The coefficient of variation (CV) for this estimate is between 30 and 50 percent.
[1] See exhibit 2 for definitions of digital literacy levels.
[2] Other race includes Asian, American Indian or Alaska Native, Hawaiian or other Pacific Islander, and persons of Two or more races. Race categories exclude persons of Hispanic ethnicity.
NOTE: Detail may not sum to totals because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1028

**Table A-3. Percentage distribution of digital literacy status among U.S. adults ages 16 to 65, by employment characteristic: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate[1] | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| **All adults** | **100.0** | **16.3** | **5.5** | **4.2** | **6.6** | **83.7** | **51.1** | **32.6** |
| Employment and labor force status | | | | | | | | |
| Employed | **100.0** | 13.1 | 4.1 | 3.6 | 5.4 | 86.9 | 51.5 | 35.4 |
| Unemployed | **100.0** | 13.6 | 1.6 | 4.4 | 7.6 | 86.4 | 58.5 | 27.9 |
| Not in the labor force | **100.0** | 29.9 | 12.4 | 6.4 | 11.1 | 70.1 | 46.5 | 23.6 |
| Occupation skill level (among the employed)[2] | | | | | | | | |
| Skilled occupations | **100.0** | 5.8 | 0.6 ! | 1.9 | 3.4 | 94.2 | 46.2 | 48.0 |
| Semi-skilled white-collar occupations | **100.0** | 13.5 | 3.0 | 4.7 | 5.8 | 86.5 | 57.4 | 29.2 |
| Semi-skilled blue-collar occupations | **100.0** | 26.3 | 10.7 | 6.2 | 9.4 | 73.7 | 56.5 | 17.2 |
| Unskilled occupations | **100.0** | 32.9 | 13.6 | 7.9 | 11.4 | 67.1 | 50.3 | 16.8 |

! Interpret data with caution. The coefficient of variation (CV) for this estimate is between 30 and 50 percent.
[1] See exhibit 2 for definitions of digital literacy levels.
[2] Occupation skill level classifies occupations into four broad levels: (1) skilled occupations (e.g. legislators, senior officials and managers, professionals, technicians and associate professionals); (2) semi-skilled white-collar occupations (e.g. clerks, service workers, and shop and market sales workers); (3) semi-skilled blue-collar occupations (e.g. skilled agricultural and fishery workers, craft and related trades workers, plant and machine operators and assemblers); and (4) unskilled occupations (e.g. laborers).
NOTE: Detail may not sum to totals because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1029

**Table A-4. Percentage distribution of each employment characteristic among U.S. adults ages 16 to 65, by digital literacy status: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate[1] | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| Labor force status | | | | | | | | |
| In the labor force | **81.3** | 65.7 | 57.6 | 71.5 | 68.7 | 84.3 | 83.0 | 86.4 |
| Not in the labor force | **18.7** | 34.3 | 42.4 | 28.6 | 31.3 | 15.7 | 17.0 | 13.6 |
| Employment status (among those in the labor force) | | | | | | | | |
| Employed | **90.3** | 89.9 | 95.9 | 88.5 | 86.7 | 90.3 | 89.1 | 92.2 |
| Unemployed | **9.8** | 10.1 | 4.1 ! | 11.5 | 13.3 | 9.7 | 10.9 | 7.9 |
| Occupation (among the employed)[2] | | | | | | | | |
| Skilled occupations | **43.7** | 18.2 | 5.8 ! | 20.4 | 25.4 | 47.9 | 39.1 | 61.1 |
| Semi-skilled white-collar occupations | **31.1** | 30.1 | 22.8 | 36.4 | 30.9 | 31.3 | 34.5 | 26.4 |
| Semi-skilled blue-collar occupations | **16.0** | 30.2 | 41.4 | 25.0 | 25.8 | 13.7 | 17.5 | 8.0 |
| Unskilled occupations | **9.2** | 21.6 | 30.0 | 18.2 | 17.9 | 7.1 | 8.9 | 4.5 |

! Interpret data with caution. The coefficient of variation (CV) for this estimate is between 30 and 50 percent.
[1] See exhibit 2 for definitions of digital literacy levels.
[2] Occupation skill level classifies occupations into four broad levels: (1) skilled occupations (e.g. legislators, senior officials and managers, professionals, technicians and associate professionals); (2) semi-skilled white-collar occupations (e.g. clerks, service workers, and shop and market sales workers); (3) semi-skilled blue-collar occupations (e.g. skilled agricultural and fishery workers, craft and related trades workers, plant and machine operators and assemblers); and (4) unskilled occupations (e.g. laborers).
NOTE: Detail may not sum to totals because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1030

**Table A-5. Percentage distribution of digital literacy status among adults ages 16 to 65, by country: 2012**

| Country | Total, all adults | Not digitally literate | | | | Digitally literate[1] | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| **International Average** | **100.0** | **23.1** | **8.1** | **5.0** | **10.0** | **76.9** | **42.3** | **34.5** |
| Canada | 100.0 | 17.1 | 4.6 | 6.0 | 6.5 | 82.9 | 45.7 | 37.1 |
| Czech Republic | 100.0 | 24.7 | 10.4 | 2.2 | 12.1 | 75.3 | 41.9 | 33.4 |
| Denmark | 100.0 | 14.2 | 2.5 | 5.4 | 6.4 | 85.8 | 47.0 | 38.8 |
| England/Northern Ireland (UK) | 100.0 | 14.9 | 4.4 | 5.9 | 4.6 | 85.1 | 49.8 | 35.4 |
| Estonia | 100.0 | 29.3 | 10.0 | 3.4 | 15.9 | 70.7 | 43.0 | 27.7 |
| Finland | 100.0 | 18.5 | 3.5 | 5.2 | 9.7 | 81.6 | 39.9 | 41.6 |
| Germany | 100.0 | 17.9 | 8.1 | 3.7 | 6.2 | 82.1 | 45.5 | 36.5 |
| Australia | 100.0 | 21.8 | 4.1 | 3.6 | 14.1 | 78.2 | 39.2 | 39.0 |
| Ireland | 100.0 | 32.3 | 10.1 | 4.7 | 17.5 | 67.7 | 42.2 | 25.4 |
| Japan | 100.0 | 37.3 | 10.3 | 10.9 | 16.1 | 62.7 | 27.7 | 35.0 |
| Austria | 100.0 | 25.4 | 9.8 | 4.1 | 11.5 | 74.6 | 41.5 | 33.1 |
| Korea | 100.0 | 30.1 | 15.6 | 9.1 | 5.4 | 70.0 | 39.5 | 30.5 |
| Netherlands | 100.0 | 11.4 | 3.1 | 3.8 | 4.6 | 88.6 | 46.1 | 42.5 |
| Flanders (Belgium) | 100.0 | 16.5 | 7.8 | 3.7 | 5.0 | 83.6 | 47.2 | 36.4 |
| Norway | 100.0 | 13.8 | 1.7 | 5.3 | 6.8 | 86.2 | 44.3 | 41.9 |
| Poland | 100.0 | 49.8 | 19.5 | 6.5 | 23.8 | 50.2 | 31.0 | 19.2 |
| Slovak Republic | 100.0 | 36.5 | 22.1 | 2.2 | 12.2 | 63.5 | 37.8 | 25.7 |
| Sweden | 100.0 | 12.0 | 1.6 | 4.8 | 5.7 | 88.0 | 44.0 | 44.0 |
| United States | 100.0 | 16.3 | 5.5 | 4.2 | 6.6 | 83.7 | 51.1 | 32.6 |

[1] See exhibit 2 for definitions of digital literacy levels.
NOTE: Detail may not sum to totals because of rounding.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1031

**Table A-6. Percentage of workers ages 16 to 65 in each country who use computers at work and who use computers in everyday life: 2012**

| Country | Percent of workers who use computers at work | Percent of adults who use computers in everyday life |
|---|---|---|
| **International Average** | **71.4** | **83.3** |
| Canada | 74.3 | 86.3 |
| Czech Republic | 65.0 | 77.9 |
| Denmark | 79.2 | 93.1 |
| England/Northern Ireland (UK) | 74.9 | 85.8 |
| Estonia | 63.7 | 82.7 |
| Finland | 79.8 | 91.2 |
| Germany | 69.1 | 84.9 |
| Australia | 76.6 | 84.2 |
| Ireland | 65.3 | 75.3 |
| Japan | 70.9 | 75.1 |
| Austria | 71.1 | 81.4 |
| Korea | 63.0 | 78.2 |
| Netherlands | 79.8 | 93.6 |
| Flanders (Belgium) | 74.4 | 87.2 |
| Norway | 82.9 | 94.3 |
| Poland | 53.7 | 69.5 |
| Slovak Republic | 56.0 | 68.4 |
| Sweden | 82.0 | 92.2 |
| United States | 74.3 | 80.7 |

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012

Pet. Ref. 1032

# APPENDIX B: STANDARD ERROR TABLES

**Table B-1. Standard errrors for Table A-1: Percentage distribution of digital literacy status among U.S. adults ages 16 to 65, by demographic characteristic: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| **All adults** | † | **0.81** | **0.43** | **0.38** | **0.59** | **0.81** | **1.13** | **1.11** |
| Educational attainment | | | | | | | | |
| Less than high school | † | 1.80 | 1.76 | 1.11 | 1.36 | 1.80 | 2.11 | 1.52 |
| High school diploma | † | 1.18 | 0.37 | 0.54 | 1.00 | 1.18 | 1.49 | 1.34 |
| Associate's or higher degree | † | 0.58 | 0.20 | 0.37 | 0.37 | 0.58 | 1.64 | 1.68 |
| Gender | | | | | | | | |
| Male | † | 1.04 | 0.48 | 0.56 | 0.80 | 1.04 | 1.46 | 1.39 |
| Female | † | 0.88 | 0.60 | 0.41 | 0.59 | 0.88 | 1.36 | 1.35 |
| Nativity status | | | | | | | | |
| Born in U.S. | † | 0.73 | 0.28 | 0.37 | 0.69 | 0.73 | 1.23 | 1.26 |
| Born outside of U.S. | † | 2.54 | 2.46 | 1.24 | 0.95 | 2.54 | 2.64 | 1.63 |
| Age | | | | | | | | |
| 16–24 | † | 1.03 | 0.30 | 0.85 | 0.80 | 1.03 | 2.71 | 2.67 |
| 25–34 | † | 1.31 | 0.73 | 0.65 | 0.95 | 1.31 | 2.34 | 2.24 |
| 35–44 | † | 1.32 | 0.80 | 0.67 | 0.77 | 1.32 | 2.25 | 2.05 |
| 45–54 | † | 1.36 | 0.84 | 0.87 | 0.90 | 1.36 | 1.98 | 1.83 |
| 55–65 | † | 1.71 | 0.98 | 0.57 | 1.30 | 1.71 | 2.44 | 1.98 |
| Race/ethnicity | | | | | | | | |
| White | † | 0.83 | 0.33 | 0.34 | 0.73 | 0.83 | 1.42 | 1.45 |
| Black | † | 1.84 | 1.10 | 1.43 | 1.40 | 1.84 | 2.63 | 1.97 |
| Hispanic | † | 3.08 | 2.61 | 1.43 | 1.16 | 3.08 | 3.33 | 2.19 |
| Other race | † | 2.15 | 1.16 | 1.27 | 1.34 | 2.15 | 3.85 | 3.90 |

† Not applicable.

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1033

**Table B-2. Standard errors for Table A-2: Percentage distribution of each demographic characteristic among U.S. adults ages 16 to 65, by digital literacy status: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate | | |
|---|---|---|---|---|---|---|---|---|
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| Educational attainment | | | | | | | | |
| Less than high school | 0.28 | 1.55 | 2.35 | 3.11 | 3.02 | 0.33 | 0.61 | 0.64 |
| High school diploma | 0.48 | 1.82 | 2.40 | 3.53 | 3.21 | 0.60 | 0.97 | 1.33 |
| Associate's or higher degree | 0.42 | 1.10 | 1.09 | 2.89 | 1.66 | 0.56 | 0.89 | 1.42 |
| Gender | | | | | | | | |
| Male | 0.22 | 1.58 | 3.22 | 3.39 | 2.80 | 0.37 | 0.87 | 1.24 |
| Female | 0.22 | 1.58 | 3.22 | 3.39 | 2.80 | 0.37 | 0.87 | 1.24 |
| Nativity | | | | | | | | |
| Native-born | 0.50 | 2.30 | 4.94 | 3.56 | 2.58 | 0.43 | 0.70 | 0.76 |
| Foreign-born | 0.50 | 2.30 | 4.94 | 3.56 | 2.58 | 0.43 | 0.70 | 0.76 |
| Age | | | | | | | | |
| 16–24 | 0.38 | 1.16 | 0.95 | 3.32 | 2.20 | 0.48 | 0.99 | 1.29 |
| 25–34 | 0.37 | 1.32 | 2.28 | 2.74 | 2.24 | 0.42 | 0.91 | 1.08 |
| 35–44 | 0.31 | 1.19 | 2.45 | 2.66 | 1.69 | 0.35 | 0.80 | 1.10 |
| 45–54 | 0.37 | 1.77 | 2.75 | 3.71 | 2.39 | 0.41 | 0.82 | 1.11 |
| 55–65 | 0.24 | 1.54 | 3.30 | 2.40 | 2.53 | 0.38 | 0.88 | 1.08 |
| Race/ethnicity | | | | | | | | |
| White | 0.91 | 2.42 | 3.89 | 3.75 | 3.51 | 1.00 | 1.40 | 1.65 |
| Black | 0.10 | 1.66 | 2.92 | 3.31 | 2.78 | 0.29 | 0.65 | 0.74 |
| Hispanic | 0.42 | 2.23 | 4.94 | 4.32 | 1.88 | 0.43 | 0.88 | 0.92 |
| Other race | 0.79 | 1.14 | 1.88 | 2.08 | 1.56 | 0.87 | 1.13 | 1.00 |

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1034

**Table B-3. Standard errors for Table A-3: Percentage distribution of digital literacy status among U.S. adults ages 16 to 65, by employment characteristic: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
| **All adults** | † | **0.81** | **0.43** | **0.38** | **0.59** | **0.81** | **1.13** | **1.11** |
| Employment and labor force status | | | | | | | | |
| Employed | † | 0.86 | 0.45 | 0.40 | 0.61 | 0.86 | 1.32 | 1.27 |
| Unemployed | † | 1.58 | 0.47 | 0.71 | 1.51 | 1.58 | 3.38 | 3.30 |
| Not in the labor force | † | 1.56 | 1.04 | 0.94 | 1.09 | 1.56 | 1.96 | 1.86 |
| Occupation skill level (among the employed) | | | | | | | | |
| Skilled occupations | † | 0.63 | 0.18 | 0.38 | 0.52 | 0.63 | 1.54 | 1.60 |
| Semi-skilled white-collar occupations | † | 1.38 | 0.69 | 0.52 | 1.03 | 1.38 | 1.92 | 1.64 |
| Semi-skilled blue-collar occupations | † | 2.08 | 1.27 | 0.96 | 1.47 | 2.08 | 2.43 | 1.92 |
| Unskilled occupations | † | 3.02 | 2.44 | 1.65 | 1.67 | 3.02 | 3.54 | 2.87 |

† Not applicable.

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1035

**Table B-4. Standard errors for Table A-4: Percentage distribution of each employment characteristic among U.S. adults ages 16 to 65, by digital literacy status: 2012**

| Characteristic | Total, all adults | Not digitally literate | | | | Digitally literate | | |
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
|---|---|---|---|---|---|---|---|---|
| Labor force status | | | | | | | | |
| In the labor force | **0.70** | 1.76 | 3.04 | 3.42 | 2.55 | 0.69 | 1.04 | 1.03 |
| Not in the labor force | **0.70** | 1.76 | 3.04 | 3.42 | 2.55 | 0.69 | 1.04 | 1.03 |
| Employment status (among those in the labor force) | | | | | | | | |
| Employed | **0.47** | 1.25 | 1.29 | 1.71 | 2.58 | 0.49 | 0.83 | 0.87 |
| Unemployed | **0.47** | 1.25 | 1.29 | 1.71 | 2.58 | 0.49 | 0.83 | 0.87 |
| Occupation (among the employed) | | | | | | | | |
| Skilled occupations | **0.77** | 1.46 | 1.96 | 3.32 | 2.51 | 0.88 | 1.19 | 1.62 |
| Semi-skilled white-collar occupations | **0.68** | 2.16 | 3.84 | 3.59 | 3.55 | 0.79 | 1.09 | 1.22 |
| Semi-skilled blue-collar occupations | **0.67** | 2.19 | 4.08 | 3.05 | 3.35 | 0.72 | 0.90 | 0.97 |
| Unskilled occupations | **0.47** | 1.59 | 4.31 | 3.48 | 2.86 | 0.51 | 0.72 | 0.81 |

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1036

**Table B-5. Standard errors for Table A-5: Percentage distribution of digital literacy status among adults ages 16 to 65, by country: 2012**

| Country | Total, all adults | Not digitally literate | | | | Digitally literate | | |
| | | Total | No computer experience | Failed basic computer test | Opted out of computer-based assessment | Total | Level 1 or below | Level 2 or 3 |
|---|---|---|---|---|---|---|---|---|
| **International Average** | † | **0.14** | **0.09** | **0.08** | **0.12** | **0.14** | **0.21** | **0.19** |
| Canada | † | 0.39 | 0.18 | 0.25 | 0.27 | 0.39 | 0.58 | 0.56 |
| Czech Republic | † | 0.93 | 0.50 | 0.28 | 0.85 | 0.93 | 1.22 | 1.14 |
| Denmark | † | 0.34 | 0.18 | 0.23 | 0.28 | 0.34 | 0.76 | 0.72 |
| England/Northern Ireland (UK) | † | 0.58 | 0.30 | 0.35 | 0.40 | 0.58 | 0.97 | 0.88 |
| Estonia | † | 0.44 | 0.31 | 0.25 | 0.44 | 0.44 | 0.83 | 0.76 |
| Finland | † | 0.47 | 0.27 | 0.29 | 0.41 | 0.47 | 0.81 | 0.74 |
| Germany | † | 0.65 | 0.54 | 0.36 | 0.49 | 0.65 | 1.02 | 0.84 |
| Australia | † | 0.69 | 0.28 | 0.30 | 0.61 | 0.69 | 1.05 | 1.05 |
| Ireland | † | 0.75 | 0.38 | 0.37 | 0.69 | 0.75 | 1.03 | 0.83 |
| Japan | † | 0.99 | 0.46 | 0.67 | 0.91 | 0.99 | 0.91 | 0.84 |
| Austria | † | 0.64 | 0.45 | 0.33 | 0.50 | 0.64 | 0.90 | 0.80 |
| Korea | † | 0.55 | 0.41 | 0.40 | 0.32 | 0.55 | 0.85 | 0.82 |
| Netherlands | † | 0.46 | 0.24 | 0.28 | 0.29 | 0.46 | 0.81 | 0.78 |
| Flanders (Belgium) | † | 0.48 | 0.35 | 0.27 | 0.32 | 0.48 | 0.80 | 0.82 |
| Norway | † | 0.46 | 0.18 | 0.30 | 0.36 | 0.46 | 0.83 | 0.77 |
| Poland | † | 0.64 | 0.52 | 0.37 | 0.66 | 0.64 | 0.84 | 0.76 |
| Slovak Republic | † | 0.73 | 0.66 | 0.21 | 0.44 | 0.73 | 0.89 | 0.76 |
| Sweden | † | 0.52 | 0.23 | 0.35 | 0.35 | 0.52 | 0.81 | 0.74 |
| United States | † | 0.81 | 0.43 | 0.38 | 0.59 | 0.81 | 1.13 | 1.11 |

† Not applicable.
SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012.

Pet. Ref. 1037

**Table B-6. Standard errors for Table A-6: Percentage of workers ages 16 to 65 in each country who use computers at work and who use computers in everyday life: 2012**

| Country | Percent of workers who use computers at work | Percent of adults who use computers in everyday life |
|---|---|---|
| **International Average** | **0.17** | **0.12** |
| Canada | 0.50 | 0.30 |
| Czech Republic | 1.22 | 1.06 |
| Denmark | 0.58 | 0.24 |
| England/Northern Ireland (UK) | 0.77 | 0.53 |
| Estonia | 0.75 | 0.38 |
| Finland | 0.59 | 0.36 |
| Germany | 0.84 | 0.59 |
| Australia | 0.65 | 0.57 |
| Ireland | 0.83 | 0.52 |
| Japan | 0.67 | 0.63 |
| Austria | 0.85 | 0.57 |
| Korea | 0.76 | 0.53 |
| Netherlands | 0.51 | 0.33 |
| Flanders (Belgium) | 0.78 | 0.48 |
| Norway | 0.50 | 0.36 |
| Poland | 0.80 | 0.52 |
| Slovak Republic | 1.03 | 0.61 |
| Sweden | 0.68 | 0.44 |
| United States | 0.74 | 0.68 |

SOURCE: U.S. Department of Education, National Center for Education Statistics, Organization for Economic Cooperation and Development (OECD), Program for the International Assessment of Adult Competencies (PIAAC), 2012

Pet. Ref. 1038

Skip to main content

Standard version

 **Government of Canada** **Gouvernement du Canada**

Search Canada.ca

🔍

| Jobs | Immigration | Travel | Business | Benefits | Health | Taxes | More services |

Home ➔ All Services ➔ Health ➔ Drugs, health & consumer products ➔ Review Decisions

# Regulatory Decision Summary - Mifegymiso - Health Canada

Drugs    Natural Health Products    Medical Devices    **Review Decisions** ▾

Submit a report ▾

Prescription Drug List    About ▾

## Regulatory Decision Summary for MIFEGYMISO

**Medicinal ingredient(s):**

Mifepristone and misoprostol

**Therapeutic area:**

Progesterone Receptor Modulators and Prostaglandin

**Type of submission:**

Supplement to a New Drug Submission

**Control number:**

200856

Pet. Ref. 1039

Case 1:17-cv-00493-JAO-RT    Document 198-3    Filed 11/30/23    Page 302 of 315    PageID.5443

What was the purpose of this submission?

The purpose of the present submission was to extend the indication of Mifegymiso from a gestational age limit of 49 days to 63 days of gestation and to modify the Distribution Plan.

Why was the decision issued?

To support the increase of gestational age limit to 63 days, data from three pivotal trials were reviewed. All three trials used a regimen of 200 mg oral mifepristone administered at the clinic followed by 800 mcg buccal misoprostol administered at home. Termination of pregnancy was induced in 94.2 to 96.4% of the 714 women with a gestational age of 50 to 63 days. This regimens efficacy was also supported by the systematic literature review and by post-marketing studies that reported the outcome of 1,773 and 7,577 patients, respectively. Supportive studies also confirmed that the current conditions of use (doses and routes of administration) of mifepristone and misoprostol for pregnancies in this new gestational age group were appropriate. Clinical efficacy was slightly lower in this gestational age group compared to the previously approved patient population with 49 days or less of gestation, although it remained within an acceptable range. Efficacy remained robust in most subpopulations studied in the 50 to 63 days of gestation group, including patients of less than 18 years of age. Patients who have had 4 or more previous pregnancies appeared to have a 2-fold higher risk of treatment failures, which required additional labelling in the Product Monograph.

Mifegymiso efficacy in patients of gestational age of 63 days or less and less than 18 years of age (N = 67 patients) was similar to the adult population, although not as well tolerated, due to more frequent vomiting and more frequent reporting of "pain and bleeding is more than expected". An acceptable treatment failure rate was also noted for an additional 259 patients of less than 18 years of age in post-market safety trials. There are insufficient data in patients less than 15 years old to establish efficacy and safety. Modifications to the product monograph were performed to provide the available data on this patient population.

The risks associated with Mifegymiso in patients with a gestational age of 50 to 63 days were similar to those previously identified. Patients taking Mifegymiso reported frequently experiencing abdominal pain, diarrhea, nausea, vomiting, fever/chills, headache, dizziness and weakness, some of which can be severe and may require oral medication. Rates of occurrence of frequent adverse events and serious adverse events were similar in women with a gestational age of 50 to 63 days compared to lower gestational age groups. Mifegymiso administration induces a significant amount of vaginal bleeding in all women, which may be serious in some and may require intravenous hydration or blood transfusion. A 1-day increase in bleeding duration was noted in the 50-63 days of gestation group compared to 49 days or less. Patients taking Mifegymiso have experienced pelvic

Pet. Ref. 1040

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 303 of 315   PageID.5444

infections (endometritis, salpingitis) and may require oral or intravenous antibiotic administration. Some infections may be serious and become life-threatening if not promptly treated.

To support changes to the distribution plan, the sponsor provided post marketing data from Australia where the proposed distribution through retail pharmacies has been in place since 2015. While limited data on direct to patient dispensing was provided, the sponsor reported that no safety concern has been raised with the distribution through retail pharmacies after over a year of marketing. In addition, the efficacy and safety of Mifegymiso was also investigated in 9 studies involving 1,486 patients that were given mifepristone to take at home. In those studies, patients received Mifegymiso from a physician and self-administered mifepristone and misoprostol at home with clear instructions and emergency contact information in case of complications. Although the studies had limitations, the efficacy results were within an acceptable range and no unexpected safety concerns were noted. The risk of harm due to the delay between Mifegymiso prescription and administration is mitigated by safeguards that were implemented in the supporting trials and that are proposed on the Canadian market by Linepharma. Those safeguards include adequate prescriber knowledge of the procedure, adequate information for patients at the time of prescription, adequate documentation given to the patient on the procedure and its side effects and contact information for patients in case they need information after drug product dispensing.

The Risk Management Plan was further modified to better support the practice of medicine and pharmacy determined by each provincial and territorial jurisdiction. Changes included recommending rather than requiring physician training and modifying the requirement to obtain the patients written consent to obtaining an informed consent. In addition, the product monographs Dosage and Administration section was clarified to indicate that copies of the Mifegymiso Patient Medication Information and Patient Medication Card should be completed and provided to the patient.

In summary, labelling was changed to indicate that health professionals should have sufficient knowledge of medical abortion to prescribe Mifegymiso and/or should complete a Mifegymiso education program. An overall product monograph update was also performed to present efficacy and safety data for the patient population with a gestational age of 63 days or less. The term "Doctors" was replaced by "health professionals" throughout the Mifegymiso product monograph as practice of medicine, including who can prescribe Mifegymiso, varies by province. The requirement for patients written consent was modified to informed consent. Previous requirements for the prescribing health professional were maintained, such as screening for gestational age and exclusion of ectopic pregnancy by ultrasound, counselling patients on the Mifegymiso abortion process and its possible complications, scheduling a follow-up appointment, providing all Mifegymiso completed documentation, including contact information for inquiries and for emergency situations.

Pet. Ref. 1041

Case 1:17-cv-00493-JAO-RT   Document 198-3   Filed 11/30/23   Page 304 of 315   PageID.5445

Decision issued

**Date of decision:**

2017-11-07

**Manufacturer:**

Linepharma International Limited

**Drug Identification Numbers issued:**

02444038

**Prescription status:**

Mifegymiso is available by prescription only.

**Date filed:**

2016-12-05

**Contact:**

tpd-general-dpt-general@hc-sc.gc.ca

**Date modified:**
2021-07-14

# Government of Canada activities and initiatives

Access Government of Canada activities and initiatives



Pet. Ref. 1042

*The* NEW ENGLAND JOURNAL *of* MEDICINE

---

SPECIAL ARTICLE

---

# Abortion Safety and Use with Normally Prescribed Mifepristone in Canada

Laura Schummers, Sc.D., Elizabeth K. Darling, Ph.D., Sheila Dunn, M.D.,
Kimberlyn McGrail, Ph.D., Anastasia Gayowsky, M.Sc., Michael R. Law, Ph.D.,
Tracey-Lea Laba, Ph.D., Janusz Kaczorowski, Ph.D.,
and Wendy V. Norman, M.D., M.H.Sc.

---

ABSTRACT

---

**BACKGROUND**

In the United States, mifepristone is available for medical abortion (for use with misoprostol) only with Risk Evaluation and Mitigation Strategy (REMS) restrictions, despite an absence of evidence to support such restrictions. Mifepristone has been available in Canada with a normal prescription since November 2017.

**METHODS**

Using population-based administrative data from Ontario, Canada, we examined abortion use, safety, and effectiveness using an interrupted time-series analysis comparing trends in incidence before mifepristone was available (January 2012 through December 2016) with trends after its availability without restrictions (November 7, 2017, through March 15, 2020).

**RESULTS**

A total of 195,183 abortions were performed before mifepristone was available and 84,032 after its availability without restrictions. After the availability of mifepristone with a normal prescription, the abortion rate continued to decline, although more slowly than was expected on the basis of trends before mifepristone had been available (adjusted risk difference in time-series analysis, 1.2 per 1000 female residents between 15 and 49 years of age; 95% confidence interval [CI], 1.1 to 1.4), whereas the percentage of abortions provided as medical procedures increased from 2.2% to 31.4% (adjusted risk difference, 28.8 percentage points; 95% CI, 28.0 to 29.7). There were no material changes between the period before mifepristone was available and the nonrestricted period in the incidence of severe adverse events (0.03% vs. 0.04%; adjusted risk difference, 0.01 percentage points; 95% CI, −0.06 to 0.03), complications (0.74% vs. 0.69%; adjusted risk difference, 0.06 percentage points; 95% CI, −0.07 to 0.18), or ectopic pregnancy detected after abortion (0.15% vs. 0.22%; adjusted risk difference, −0.03 percentage points; 95% CI, −0.19 to 0.09). There was a small increase in ongoing intrauterine pregnancy continuing to delivery (adjusted risk difference, 0.08 percentage points; 95% CI, 0.04 to 0.10).

**CONCLUSIONS**

After mifepristone became available as a normal prescription, the abortion rate remained relatively stable, the proportion of abortions provided by medication increased rapidly, and adverse events and complications remained stable, as compared with the period when mifepristone was unavailable. (Funded by the Canadian Institutes of Health Research and the Women's Health Research Institute.)

From the Department of Family Practice (L.S., W.V.N.) and the Centre for Health Services and Policy Research, School of Population and Public Health (K.M., M.R.L.), University of British Columbia, Vancouver, ICES (L.S., E.K.D., A.G.) and the Department of Obstetrics and Gynecology (E.K.D.), McMaster University, Hamilton, ON, the Department of Family and Community Medicine, University of Toronto, and the Women's College Research Institute, Women's College Hospital, Toronto (S.D.), and the Department of Family and Emergency Medicine, University of Montreal, Montreal (J.K.) — all in Canada; the Centre for Health Economics Research and Evaluation, University of Technology, Sydney (T.-L.L.); and the Department of Public Health, Environments, and Society, Faculty of Public Health and Policy, London School of Hygiene and Tropical Medicine, London (W.V.N.). Dr. Norman can be contacted at wendy.norman@ubc.ca or at the Department of Family Practice, University of British Columbia, 5950 University Blvd., Vancouver, BC, V6T 1Z3, Canada.

This article was published on December 8, 2021, and updated on January 6, 2022, at NEJM.org.

N Engl J Med 2022;386:57-67.
DOI: 10.1056/NEJMsa2109779
*Copyright © 2021 Massachusetts Medical Society.*

57

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1043

The NEW ENGLAND JOURNAL of MEDICINE

Access to safe abortion is a human right and a key component of reproductive health, yet inadequate access remains a global concern.[1] A medical abortion regimen of mifepristone and misoprostol has been shown to be safe.[2-4] Mifepristone is approved for use in the United States with Risk Evaluation and Mitigation Strategy (REMS) restrictions[5] (including mandatory prescriber certification, observed dosing, dispensing by the prescriber or medical facility with the exclusion of pharmacies, and submission of a prespecified patient consent form) and elsewhere with similar restricted approvals.[6,7] Professional organizations have called for the removal of REMS restrictions because they impede access to abortion services without improving safety.[8] However, high-quality data with respect to abortion safety and effectiveness when mifepristone is available without REMS-like restrictions are lacking.[9]

Mifepristone was first marketed in Canada in January 2017 as a 200-mg tablet combined with 800 $\mu$g of misoprostol.[10] Approval came more than 15 years after approval in the United States and more than 25 years after similar rulings in France, Sweden, and the United Kingdom.[11] Initially, regulatory restrictions in Canada were similar to REMS restrictions.[12] By November 7, 2017, Canadian regulators had removed these restrictions so that mifepristone could be prescribed and dispensed as a normal prescription medication and had expanded approved use from 49 to 63 days after the patient's last menstrual period.[13] This action resulted in a globally unprecedented practice of permitting any physician or nurse practitioner to prescribe, any pharmacist to dispense, and patients to independently administer mifepristone when, where, and if they chose.[14] Before 2017, medically induced abortions made up only 4% of all abortions in Canada and used off-label regimens of misoprostol with or without methotrexate. These regimens have reduced effectiveness (84 to 97%) and a high risk of teratogenicity if the abortion fails.[4,15]

We compared abortion use, safety, and effectiveness during the period after mifepristone had become available without REMS-like restrictions with the period before mifepristone had become available in Ontario, Canada (representing nearly 40% of the Canadian population).

## METHODS

### DATA SET

In Canada, universal single-payer health care — including coverage for abortion services and management of its complications — is provided by each province or territory. We used linked administrative health data[16] to create a population-based cohort of all female Ontario residents between the ages of 12 and 49 years who had received abortion services from January 1, 2012, to March 15, 2020. We linked records from practitioner visits, all hospital visits, and outpatient prescriptions using a secure data platform at ICES (formerly known as the Institute for Clinical Evaluative Sciences) at McMaster University.[16,17] We excluded events that had occurred within 6 weeks before or after a missed abortion (pregnancy loss without expulsion) or spontaneous abortion (pregnancy loss with expulsion) and those occurring within 6 weeks after delivery at 25 weeks or more of gestation to avoid including procedures that could have been misclassified as abortions. Details regarding the data set are provided in Figure S1 and Table S1 in the Supplementary Appendix, available with the full text of this article at NEJM.org. Ethics approval for the study was granted by the University of British Columbia.

### EXPOSURE AND OUTCOMES

The exposure we examined was the regulatory change that made mifepristone available as a normal prescription. Outcomes included measures of abortion use, safety, and effectiveness.

We evaluated outcomes regarding abortion use that included the abortion rate, which was calculated according to the international standard as the annual number of abortions among female residents between 15 and 49 years of age per 1000 female residents in that age group,[18] the percentage of all abortions that were medically induced, and the percentage of all abortions that were provided at 14 weeks or more of gestation (second-trimester abortion). (In the calculation of the abortion rate, the lower age for female residents was 15 years, as compared with a lower age of 12 years that was used for all other calculations in our study cohort.) Abortion safety outcomes within 6 weeks after abortion were severe adverse

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1044

events, including any blood transfusion, abdominal surgery (laparotomy, laparoscopy, or hysterectomy), admission to an intensive care unit, or sepsis that occurred during a hospitalization associated with an abortion-complication code. Complications of abortion included genital tract or pelvic infection, hemorrhage (delayed or excessive bleeding that complicated complete or incomplete abortion), embolism, shock, renal failure, damage to pelvic organs or tissues (including uterine perforation), venous complications, and other or unspecified complications. Outcomes regarding abortion effectiveness were the incidence of subsequent uterine evacuation (aspiration after medical abortion, reaspiration after surgical abortion, or subsequent abortion procedure), ongoing intrauterine pregnancy continuing until delivery, and ectopic pregnancy diagnosed within 6 weeks after the abortion date. Detailed outcome definitions are provided in Table S1.

### STATISTICAL ANALYSIS

We tabulated the incidence of each outcome according to the mifepristone regulatory period. We then conducted interrupted time-series analysis using segmented generalized mixed-effects regression to compare the expected incidence and trend for each outcome based on the period before mifepristone had become available with the observed level and trend after the availability of mifepristone with a normal prescription. We used log binomial regression to model incidence outcomes and Poisson regression with population offset to calculate the abortion rate; models were adjusted for outcome trends before the approval of mifepristone and accounted for autocorrelation and correlated residuals (File 1 in the Supplementary Appendix).[19,20] We used 6-month moving averages to smooth the resulting estimates. We examined the period from January 1, 2017, through November 6, 2017, descriptively but excluded this period from our models because it included rapid, incremental regulatory changes.[13]

We graphed the observed and expected monthly outcome incidence (quarterly for outcomes with <6 events in any month) following best practices.[21] We estimated risk differences and risk ratios for each outcome by comparing the observed with expected values for September 2019, a time

point selected a priori to balance model stability (greatest in the middle of the study period) and integration of mifepristone into practice (greatest at the end of the study period). We used bootstrapping with 200 samples drawn with replacement to estimate 95% confidence intervals[22] without adjustment for multiple comparisons. All analyses were conducted with the use of SAS software, version 7.51, and R software (code in File 2 in the Supplementary Appendix).

To examine the robustness of our findings to modeling specification, we conducted sensitivity analyses using segmented generalized least-squares regression, with autocorrelation terms selected on the basis of the Durbin–Watson test[23-25] and visual examination of autocorrelation function and partial autocorrelation function residuals.[25] We conducted subgroup analyses that were restricted to first-trimester abortions and then further restricted to first-trimester medical abortions.

## RESULTS

### CHARACTERISTICS OF THE STUDY POPULATION

Of the 314,859 induced abortions in Ontario, Canada, from January 1, 2012, through March 15, 2020, the majority (89.3%) were surgical (with 94.6% performed by means of suction aspiration), approximately 10% were medical abortions, and less than 0.1% were unclassified. Table 1 shows cohort characteristics according to the regulatory period for mifepristone.

### DESCRIPTIVE ANALYSES OF ABORTION OUTCOMES

The abortion rate per 1000 female residents of reproductive age and the incidence of all other outcomes are presented descriptively according to the regulatory period in Table 2. (Components of the composite outcomes are shown in Table S2.) The abortion rate decreased from 11.9 abortions per 1000 female residents between the ages of 15 and 49 years of age before mifepristone had become available to 11.3 per 1000 female residents after mifepristone had become available with a normal prescription. The percentage of all abortions that were provided medically increased from 2.2% before mifepristone had become available to 8.3% while mifepristone was restricted and then to 31.4% after mifepristone had become avail-

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1045

*The* NEW ENGLAND JOURNAL *of* MEDICINE

**Table 1.** Characteristics of Patients Undergoing Medical or Surgical Abortion, According to Period of Availability of Mifepristone.

| Characteristic | Mifepristone Not Available (N = 195,183) | Mifepristone Available with Restrictions (N = 35,644) | Mifepristone Available without Restrictions (N = 84,032) |
|---|---|---|---|
| | January 2012– December 2016 | January 1, 2017– November 6, 2017 | November 7, 2017– March 15, 2020 |
| | *number of patients (percent)* | | |
| Age — yr* | | | |
| <20 | 20,034 (10.3) | 2,969 (8.3) | 6,643 (7.9) |
| 20–24 | 54,346 (27.8) | 9,208 (25.8) | 20,247 (24.1) |
| 25–29 | 47,598 (24.4) | 8,909 (25.0) | 21,717 (25.8) |
| 30–34 | 36,640 (18.8) | 7,369 (20.7) | 17,838 (21.2) |
| ≥35 | 36,565 (18.7) | 7,189 (20.2) | 17,587 (20.9) |
| Nulliparous | 104,824 (53.7) | 19,030 (53.4) | 45,902 (54.6) |
| Neighborhood income† | | | |
| Lowest quintile | 55,076 (28.2) | 9,737 (27.3) | 22,360 (26.6) |
| Highest quintile | 24,852 (12.7) | 4,603 (12.9) | 11,075 (13.2) |
| Neighborhood ethnic concentration‡ | | | |
| Highest quintile | 82,143 (42.1) | 14,627 (41.0) | 33,600 (40.0) |
| Lowest quintile | 19,424 (10.0) | 3,552 (10.0) | 8,451 (10.1) |
| Rural residence§ | 11,709 (6.0) | 2,174 (6.1) | 5,195 (6.2) |

* Trends regarding the patient's age at which abortion was performed in Ontario continued a historic gradual and steady increase over the study period, which was consistent with an increase in age in the population-based trends during this period.
† The neighborhood income quintile was drawn from the Registered Persons Database file from the Institute for Clinical Evaluative Sciences and was defined on the basis of the Nearest Census-Based Neighborhood Income Quintile from Census Canada.
‡ The neighborhood ethnic concentration, which is part of the Ontario Marginalization Index,[26] refers to high area-level percentages of recent immigrants and persons belonging to a "visible minority" group, which was defined by Statistics Canada as "persons, other than aboriginal peoples, who are non-Caucasian in race or non-white in color." The highest concentration of such residents is the top quintile, and the lowest concentration is the lowest quintile.
§ Rural residence is defined as all territory lying outside population centers.

able with a normal prescription. The rate of second-trimester abortions declined from 5.5% of all abortions to 5.1% after the availability of mifepristone with a normal prescription.

Abortion safety outcomes remained stable during the period before mifepristone had become available and during the period after its availability with a normal prescription (severe adverse events, 0.03% and 0.04%, respectively; and abortion complications, 0.67% and 0.74%, respectively). Subsequent uterine evacuation increased from 1.0% to 2.2%, and ongoing intrauterine pregnancy continuing until delivery increased from 0.03% to 0.08%. Ectopic pregnancy that was detected after abortion increased from 0.15% to 0.22%.

TIME-SERIES ANALYSES OF ABORTION OUTCOMES

Interrupted time-series graphs of abortion-use outcomes are presented in Figure 1, abortion safety outcomes in Figure 2, and abortion-effectiveness outcomes in Figure 3. Adjusted risk differences and risk ratios from these models comparing the period before mifepristone had become available with the nonrestricted period are presented in Table 2.

During the study period, the abortion rate continued an absolute decline, although as compared with the trend before the approval of mifepristone, we noted an increase of 1.2 abortions per 1000 female residents (95% confidence interval [CI], 1.1 to 1.4) over the predicted rate.

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1046

**Table 2. Safety and Effectiveness of 314,859 Abortions Provided during the Study Period.***

| Outcome | Mifepristone Not Available (N=195,183) January 2012–December 2016 | Mifepristone Available with Restrictions (N=35,644) January 1, 2017–November 6, 2017 | Mifepristone Available without Restrictions (N=84,032) November 7, 2017–March 15, 2020 | Adjusted Risk Difference (95% CI)† | Adjusted Risk Ratio (95% CI) |
|---|---|---|---|---|---|
| Abortions provided | | | | | |
| No. of female residents in age cohort | 3,268,428 | 3,272,448 | 3,312,061 | | |
| Annual rate of abortion per 1000 female residents in age cohort‡ | 11.9 | 10.9 | 11.3 | 1.2 (1.1 to 1.4) | 1.1 (1.1 to 1.2) |
| Type of abortion — no. (%) | | | | | |
| Medical abortion | 4,307 (2.2) | 2,962 (8.3) | 26,434 (31.4) | 28.8 (28.0 to 29.7) | 5.3 (4.7 to 5.9) |
| Second-trimester abortion at ≥14 wk of gestation | 10,830 (5.5) | 2,072 (5.8) | 4,300 (5.1) | −0.22 (−0.63 to 0.19) | 0.96 (0.88 to 1.04) |
| Abortion safety — no. (%) | | | | | |
| Severe adverse events§ | 53 (0.03) | 9 (0.03) | 29 (0.04) | 0.01 (−0.06 to 0.03) | 1.2 (0.4 to 3.4) |
| Complications¶ | 1,434 (0.74) | 239 (0.67) | 578 (0.69) | 0.06 (−0.07 to 0.18) | 1.1 (0.9 to 1.3) |
| Ongoing pregnancy — no. (%) | | | | | |
| Subsequent uterine evacuation‖ | 2,029 (1.0) | 518 (1.5) | 1,882 (2.2) | 1.1 (0.9 to 1.3) | 2.0 (1.7 to 2.3) |
| Ongoing pregnancy continuing until delivery | 51 (0.03) | 15 (0.04) | 70 (0.08) | 0.08 (0.04 to 0.10) | 7.8 (2.2 to 33.6) |
| Ectopic pregnancy detected after abortion | 289 (0.15) | 57 (0.16) | 182 (0.22) | −0.03 (−0.19 to 0.09) | 0.88 (0.54 to 1.40) |

* Adjusted risk differences and risk ratios are for the period after mifepristone was available without restrictions as compared with the period before mifepristone was available. The calculations were performed by means of interrupted time-series segmented regression analyses among all surgical and medical abortions after adjustment for outcome trends during the period before mifepristone had been available. CI denotes confidence interval.
† The adjusted risk difference is shown in percentage points for all categories except for the abortion rate per 1000 female residents.
‡ The annual abortion rate was calculated as the number of abortions provided among female residents between the ages of 15 and 49 years per 1000 female residents in the same age cohort in the population per year.
§ Severe adverse events included blood transfusion, abdominal surgery (laparotomy, laparoscopy, and hysterectomy), admission to an intensive care unit, or sepsis, all concurrent with an abortion complication. A detailed definition is provided in Table S1 in the Supplementary Appendix.
¶ Abortion complications included incomplete or complete abortion complicated by infection, hemorrhage, embolism, damage to pelvic organs, venous complications, or other complications after an induced abortion.
‖ Subsequent uterine evacuation included aspiration, reaspiration, or subsequent abortion procedure in the same pregnancy.

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1047

*The* NEW ENGLAND JOURNAL *of* MEDICINE



**Figure 1. Changes in the Percentages of Medical and Second-Trimester Abortions among All Abortions and in Abortion Rates.**

Shown are the results of interrupted time-series analyses of the level and trend of abortion outcomes in Ontario, Canada, among all surgical and medical abortions that were provided before the introduction of mifepristone in the province (2012 through 2016), after the introduction but with Risk Evaluation and Mitigation Strategy (REMS)–like restrictions (January 1, 2017, through November 6, 2017), and after a regulatory change to remove restrictions, which made mifepristone available by normal prescription (November 7, 2017, through March 15, 2020). Panel A shows the percentage of all abortions that were performed medically at any gestational age. Panel B shows the annual abortion rate among female residents between the ages of 15 and 49 years per 1000 female residents in the same age group in the population. Panel C shows the percentage of second-trimester abortions (≥14 weeks of gestation) among all abortions. In Panels B and C, the insets show the same data on an expanded y axis; shading indicates 95% confidence intervals. The expected outcomes if mifepristone had not been available were estimated from segmented mixed-effects models (log binomial regression in Panels A and C and Poisson regression with population offset in Panel B) and smoothed with the use of a 6-month moving-average function.

The proportion of all abortions that were medical increased by an adjusted risk difference of 28.8 percentage points (95% CI, 28.0 to 29.7). The rate of second-trimester abortions showed a stable, continuous decline (adjusted risk difference, −0.22 percentage points; 95% CI, −0.63 to 0.19). Abortion safety outcomes were materially stable, with an adjusted risk difference of 0.01 percentage points (95% CI, −0.06 to 0.03) for severe adverse events and 0.06 percentage points (95% CI, −0.07 to 0.18) for complications. The rate of subsequent uterine evacuation increased modestly, with an adjusted risk difference of 1.1 percentage points (95% CI, 0.91 to 1.3), and the rate of ongoing intrauterine pregnancy that continued until delivery increased by 0.08 percentage points (95% CI, 0.04 to 0.10). The rate of ectopic pregnancy that was detected after abortion was materially stable, with an adjusted risk difference of −0.03 percentage points (95% CI, −0.19 to 0.09).

Interrupted time-series graphs from generalized least-squares regression with the use of

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1048

aggregated monthly data showed the robustness of the findings to modeling specification (Figs. S2, S3, and S4). Changes in outcome incidences and trends after mifepristone availability with a normal prescription were consistent for all outcomes except for the percentage of second-trimester abortions, for which aggregated models indicated a slight reduction (−0.92 percentage points; 95% CI, −1.40 to −0.48).

### OUTCOMES AFTER FIRST-TRIMESTER ABORTION

Outcome incidences among all first-trimester abortions are presented in Tables S3 and S4 and Figures S5, S6, and S7; outcomes among first-trimester medical abortions are provided in Tables S5 and S6. The percentage of first-trimester abortions that were performed medically increased from 1.6% before mifepristone was available to 32.4% after mifepristone was available without restrictions. Severe adverse events were rare among first-trimester medical abortions (<6 events per 25,744 abortions [too infrequent to report exact incidence]), the incidence of abortion complications was 0.76%, and the incidence of subsequent uterine evacuation was 4.5%. Similarly, ongoing intrauterine pregnancy was uncommon, with 0.13% continuing to delivery. Ectopic pregnancy detected after abortion that occurred with any severe adverse event was also rare (<6 per 314,859 abortions).

---

### DISCUSSION

We comprehensively examined changes in abortion use, safety, and effectiveness during the period when mifepristone had become available without REMS-like restrictions in a population-based cohort of abortion service users in Ontario, Canada. We found that after mifepristone had become available with a normal prescription dispensed by pharmacists and taken at user discretion, abortion rates were materially stable, medical abortion uptake was rapid, and abortion-related adverse events and ectopic pregnancy remained rare, as compared with before mifepristone had been available.

The modestly slower decline in the abortion rate, relative to the expected decline based on the trend before mifepristone had become avail-





**Figure 2. Changes in Abortion Safety Outcomes.**

Shown are the results of interrupted time-series analyses of the level and trend of abortion safety in Ontario, Canada, among all surgical and medical abortions provided during the study period. Panel A shows the incidence of severe adverse events, which included any blood transfusion, abdominal surgery (laparotomy, laparoscopy, or hysterectomy), admission to an intensive care unit, or sepsis that occurred during a hospitalization associated with an abortion-complication code. Panel B shows abortion complications, which included genital tract or pelvic infection, hemorrhage, embolism, shock, renal failure, damage to pelvic organs or tissues, venous complications, and other or unspecified abortion complications. In Panel A, the inset shows the same data on an expanded y axis; shading indicates 95% confidence intervals.

able, may be due in part to the provision of abortion earlier in pregnancy. Since 4 to 7% of pregnancies per week in the first trimester[27] end in

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1049

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 3. Abortion Effectiveness and Ongoing Pregnancy Outcomes.**

Shown are the results of interrupted time-series analyses of the level and trend of ongoing pregnancy outcomes among all surgical and medical abortions provided during the study period. These outcomes include the incidences of uterine evacuation after abortion (Panel A), ongoing intrauterine pregnancy continuing until delivery (Panel B), and ectopic pregnancy detected after abortion (Panel C). Shading indicates 95% confidence intervals.

spontaneous abortion, the availability of abortion at earlier gestational ages would increase the abortion rate by enabling termination of pregnancy before the occurrence of miscarriage, even in the absence of a true increase in demand for abortion. The availability of mifepristone without restrictions may have slowed the decline in the abortion rate through improved abortion access, a hypothesis that is consistent with findings that restrictive policies regarding the prescription of mifepristone worsen access to abortion[28] and that abortion rates increase when access improves.[29] Because we did not measure pregnancy intention in our study, we cannot differentiate trend changes in unintended pregnancy from changes in the fraction of pregnancies that were terminated. Our findings indicate that improved abortion access was not associated with a material increase in the abortion rate.

The uptake of mifepristone for medical abortion under Canada's unrestricted regulations was faster than reported in settings with restrictive regulations. Although more than one third of abortions in Ontario were medically induced 2 years after mifepristone had been available as a normal prescription, 5.2% of abortions in the United States were medically induced 2 years after mifepristone availability, with the percentage slowly increasing to 39.0% 17 years after availability.[2] Similarly slower uptake has been reported in European settings that have mifepristone restrictions, even among those where mifepristone had been introduced long after best practice guidelines had been established.[30]

Our findings indicate that abortion remained safe and ongoing pregnancy remained infrequent after unrestricted access to mifepristone.

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1050

Without observed administration, some patients with a prescription for mifepristone may have never used it.[9] However, the infrequent occurrence of ongoing intrauterine pregnancy indicates that patients who received mifepristone most often correctly used the medication without supervision.[31] Our abortion safety and effectiveness findings are consistent with the results of recent studies examining patient-reported outcomes during the coronavirus disease 2019 pandemic, when REMS-like restrictions were temporarily removed in some settings.[9,32,33] A study involving 52,142 patients in the United Kingdom showed no material differences in success rates or serious adverse events between abortions provided under REMS-like restrictions and a telemedicine-hybrid model with investigations such as ultrasonography performed only when indicated.[33]

The small increase in the incidence of ectopic pregnancy that was detected after unrestricted access to mifepristone was consistent with the increasing trend before the availability of mifepristone, which indicated no increase over the expected incidence. A 2012 cross-sectional survey of abortion providers in the United States and Canada showed that more than 90% of providers routinely performed ultrasonography before abortion,[34] even though the value of such imaging in the absence of known ectopic risks or symptoms had not been shown.[2,35] Ectopic pregnancy is more likely to be detected after abortion that is provided at earlier stages of gestation before a clinical or ultrasonographic diagnosis. Because undiagnosed ectopic pregnancy can lead to tubal rupture and death,[36] identifying ectopic pregnancy before the onset of complications with the use of clear clinical protocols[2,4] is essential, although such procedures do not need to be performed before the initiation of medical abortion.[33]

Our safety and ongoing pregnancy findings among first-trimester medical abortions during the period after unrestricted access to mifepristone were consistent with reports from other settings with restricted access.[2,4] In settings with REMS-like restrictions, first-trimester medical abortions resulted in major adverse events in 0.3 to 0.5% of women[2,4,31] and blood transfusion in 0.04 to 0.10%.[4,31] Among medical abortions performed up to 63 days after the last menstrual period, subsequent uterine evacuation occurred in 2.0 to 4.8% of patients and ongoing intrauterine pregnancy in 0.5 to 2.0%.[2,4] In our study among first-trimester abortions, severe adverse events were too infrequent to report an incidence value, 0.04% of the patients underwent blood transfusion, 4.5% underwent uterine evacuation, and 0.13% had an ongoing pregnancy continuing to delivery. Although the incidence of uterine evacuation was increasing before mifepristone had become available, the expected incidence trend after the availability of mifepristone leveled off because of the more rapid increase in the number of abortions (the denominator). Because subsequent uterine evacuation is substantially more frequent after medical abortion than after surgical procedures (<3.0%),[4,37] a practice shift to more medical abortions is expected to increase the incidence of this outcome.

Our study has several potential limitations. The fundamental assumption underlying the validity of interrupted time-series analysis is that outcome trends before the exposure of interest would have continued if the exposure had not occurred. This assumption does not hold if other policy, practice, or contextual changes that may have an effect on outcome incidence occur concurrent to the exposure of interest.[20] However, this analytic approach is robust with respect to changes in the individual-level characteristics of patients or provider practices that accrue gradually over the study period, since such changes are accounted for in trend regression terms during the period before mifepristone had become available. Careful review of policies, academic literature, practice guidelines, and media output that are related to abortion during the study period identified no concurrent changes that would have invalidated our analytic approach. Practitioner fees, training programs, administrative data codes, and cost coverage for the drug were stable during the study period. Surveys and interviews among practitioners indicate that initial mifepristone restrictions were barriers to broad adoption of this practice.[13,38] The short period during which mifepristone was available in Canada with REMS-like restrictions (January 1 to November 6, 2017) precludes a formal analysis of mifepristone

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1051

*The* NEW ENGLAND JOURNAL *of* MEDICINE

availability with restrictions as compared with such availability without restrictions. The unrestricted availability of mifepristone appears to be the fundamental factor associated with changes in our study outcomes.

Our prescription database universally captured mifepristone prescriptions that were dispensed after August 10, 2017 (when a universal no-cost subsidy was introduced) but only captured mifepristone prescriptions from January to August 9, 2017, among patients with income-based prescription subsidies and those under 25 years of age. These factors may have contributed to an underestimation of early mifepristone uptake. However, this limitation was mitigated by our identification of medical abortions using data regarding practitioner payments, procedures, and prescriptions, along with our exclusion of these months from our time-series analysis. Our population-based data comprehensively captured all abortions among Ontario residents, as well as all subsequent hospital or health service events, even if such services were not provided by the same provider or facility that provided the initial care. Therefore, loss to follow-up was minimal since it involved only patients who had moved out of the province within 6 weeks after the abortion or during the current pregnancy. However, since linkages across databases are possible only for residents who are eligible for provincial health insurance, we excluded the 397 abortions (0.1%) that were provided to nonresidents. Because of lags in availability of cause-of-death data, we

could not report the incidence of abortion-related deaths. However, surveillance by the U.S. Centers for Disease Control and Prevention indicates that death is a very rare outcome (2 deaths among 609,095 abortions in 2018).[39] Although minimal data were missing for gestational trimester, we did not have data regarding specific gestational ages in weeks, which prevented an evaluation of changes to abortion timing within trimesters.

When mifepristone became available as a normally prescribed medication in Canada, the frequency of medical abortion rose substantially as compared with the frequency during the period before mifepristone became available, even though the rate of abortion remained materially stable. The incidences of serious adverse events and complications remained materially unchanged, and uterine evacuation and ongoing pregnancy remained infrequent.

Parts of this material are based on data and information compiled and provided by the Ontario Ministry of Health and the Canadian Institute for Health Information. The analyses, conclusions, opinions, and statements expressed in this article are solely those of the authors and do not reflect those of the funding or data sources.

Supported by a grant (PJT-168964) from the Canadian Institutes of Health Research and by a grant from the Women's Health Research Institute of the Provincial Health Services Authority of British Columbia.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

We thank staff members at ICES, which is supported by the Government of Ontario Ministry of Health and the Ministry of Long-Term Care, for their assistance with data management; staff members at IQVIA Solutions Canada for use of their Drug Information File; and our fellow members of the Canadian Contraception and Abortion Research Team for their contributions to the study.

### REFERENCES

**1.** United Nations High Commissioner for Human Rights. Information series on sexual and reproductive health and rights: abortion. 2020 (https://www.ohchr.org/Documents/Issues/Women/WRGS/SexualHealth/INFO_Abortion_WEB.pdf). **2.** Creinin MD, Grossman DA. Medication abortion up to 70 days of gestation: ACOG practice bulletin, number 225. Obstet Gynecol 2020;136(4):e31-e47. **3.** Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev 2011;11: CD002855. **4.** Costescu D, Guilbert E, Bernardin J, et al. Medical abortion. J Obstet Gynaecol Can 2016;38:366-89. **5.** Mifeprex REMS Study Group. Sixteen years of overregulation: time to unburden mifeprex. N Engl J Med 2017;376:790-4.

**6.** Gissler M, Fronteira I, Jahn A, et al. Terminations of pregnancy in the European Union. BJOG 2012;119:324-32. **7.** Baird B. Medical abortion in Australia: a short history. Reprod Health Matters 2015;23:169-76. **8.** American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. June 2018 (https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications). **9.** Gambir K, Garnsey C, Necastro KA, Ngo TD. Effectiveness, safety and acceptability of medical abortion at home versus in the clinic: a systematic review and meta-analysis in response to COVID-19. BMJ Glob Health 2020;5(12):e003934. **10.** Grant K. Long-awaited abortion pill

Mifegymiso makes Canadian debut. Globe and Mail. January 20, 2017 (https://beta.theglobeandmail.com/news/national/long-awaited-abortion-pill-mifegymiso-rolls-out-in-canada/article33695167/?ref=http://www.theglobeandmail.com&). **11.** Gynuity Health Projects. Map of mifepristone approvals. June 2017 (http://gynuity.org/resources/info/map-of-mifepristone-approvals/). **12.** Health Canada. Regulatory decision summary: Mifegymiso. 2015 (https://cart-grac.ubc.ca/np-mifepristone-study/regulatory-decision-summary-sbd_-mifegymiso-2015-health-canada/?login). **13.** Munro S, Guilbert E, Wagner M-S, et al. Perspectives among Canadian physicians on factors influencing implementation of mifepristone medical abortion: a national qualitative study. Ann Fam Med 2020;18: 413-21.

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1052

**14.** Health Canada. Regulatory decision summary — Mifegumiso — Health Canada. November 7, 2017 (https://hpr-rps.hres.ca/reg-content/regulatory-decision-summary-detail.php?lang=en&linkID=RDS00294).

**15.** Guilbert ER, Hayden AS, Jones HE, et al. First-trimester medical abortion practices in Canada: National survey. Can Fam Physician 2016;62(4):e201-e208.

**16.** ICES. Mission, vision & values (https://www.ices.on.ca/About-ICES/Mission-vision-and-values).

**17.** Samiedaluie S, Peterson S, Brant R, Kaczorowski J, Norman WV. Validating abortion procedure coding in Canadian administrative databases. BMC Health Serv Res 2016;16:255.

**18.** World Health Organization. Women of reproductive age (15-49) population (thousands). April 12, 2021 (https://www.who.int/data/maternal-newborn-child-adolescent-ageing/indicator-explorer-new/mca/women-of-reproductive-age-(15-49-years)-population-(thousands)).

**19.** Saeed S, Moodie EEM, Strumpf EC, Klein MB. Segmented generalized mixed effect models to evaluate health outcomes. Int J Public Health 2018;63:547-51.

**20.** Bernal JL, Cummins S, Gasparrini A. Interrupted time series regression for the evaluation of public health interventions: a tutorial. Int J Epidemiol 2017;46:348-55.

**21.** Turner SL, Karahalios A, Forbes AB, et al. Creating effective interrupted time series graphs: review and recommendations. Res Synth Methods 2021;12:106-17.

**22.** Haukoos JSLR, Lewis RJ. Advanced statistics: bootstrapping confidence intervals for statistics with "difficult" distributions. Acad Emerg Med 2005;12:360-5.

**23.** Hategeka C, Ruton H, Karamouzian M, Lynd LD, Law MR. Use of interrupted time series methods in the evaluation of health system quality improvement interventions: a methodological systematic review. BMJ Glob Health 2020;5(10):e003567.

**24.** Nelson BK. Statistical methodology. V. Time series analysis using autoregressive integrated moving average (ARIMA) models. Acad Emerg Med 1998;5:739-44.

**25.** Wagner AK, Soumerai SB, Zhang F, Ross-Degnan D. Segmented regression analysis of interrupted time series studies in medication use research. J Clin Pharm Ther 2002;27:299-309.

**26.** Matheson FI, van Ingen T. 2011 Ontario marginalization index: technical document. Toronto: St. Michael's Hospital, November 2017 (https://www.publichealthontario.ca/-/media/documents/on-marg-technical.pdf?la=en).

**27.** Ammon Avalos L, Galindo C, Li D-K. A systematic review to calculate background miscarriage rates using life table analysis. Birth Defects Res A Clin Mol Teratol 2012;94:417-23.

**28.** Brown BP, Hebert LE, Gilliam M, Kaestner R. Association of highly restrictive state abortion policies with abortion rates, 2000–2014. JAMA Netw Open 2020;3(11):e2024610.

**29.** Ferris LE, McMain-Klein M. Small-area variations in utilization of abortion services in Ontario from 1985 to 1992. CMAJ 1995;152:1801-7.

**30.** Berard V, Fiala C, Cameron S, Bombas T, Parachini M, Gemzell-Danielsson K. Instability of misoprostol tablets stored outside the blister: a potential serious concern for clinical outcome in medical abortion. PLoS One 2014;9(12):e112401.

**31.** Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. Obstet Gynecol 2013;121:166-71.

**32.** Chong E, Shochet T, Raymond E, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-8.

**33.** Aiken A, Lohr PA, Lord J, Ghosh N, Starling J. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464-74.

**34.** Jones HE, O'Connell White K, Norman WV, Guilbert E, Lichtenberg ES, Paul M. First trimester medication abortion practice in the United States and Canada. PLoS One 2017;12(10):e0186487.

**35.** Kulier R, Kapp N. Comprehensive analysis of the use of pre-procedure ultrasound for first- and second-trimester abortion. Contraception 2011;83:30-3.

**36.** Grimes DA. Estimation of pregnancy-related mortality risk by pregnancy outcome, United States, 1991 to 1999. Am J Obstet Gynecol 2006;194:92-4.

**37.** Costescu D, Guilbert É. No. 360 — induced abortion: surgical abortion and second trimester medical methods. J Obstet Gynaecol Can 2018;40:750-83.

**38.** Devane C, Renner RM, Munro S, et al. Implementation of mifepristone medical abortion in Canada: pilot and feasibility testing of a survey to assess facilitators and barriers. Pilot Feasibility Stud 2019;5:126.

**39.** Kortsmit K, Jatlaoui TC, Mandel MG, et al. Abortion surveillance — United States, 2018. MMWR Surveill Summ 2020;69(7):1-29.

*Copyright © 2021 Massachusetts Medical Society.*

67

The New England Journal of Medicine
Downloaded from nejm.org on November 28, 2023. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Pet. Ref. 1053