# Exhibit 12



**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | 020687 and 91178 |
| **Reviewer Names** | |
| **Review Completion Date** | December 16, 2021 |

# Exhibit 12

1

| | |
|---|---|
| **Subject** | REMS Modification Rationale Review |
| **Established Name** | Mifepristone REMS |
| **Name of Applicants** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablets |

Reference ID: 4905882

## Table of Contents

EXECUTIVE SUMMARY .................................................................................................. 4

1.   Introduction .............................................................................................................. 5

2.   Background ............................................................................................................... 5

2.1.   PRODUCT AND REMS INFORMATION ...................................................................... 5

2.2.   REGULATORY HISTORY AND EVENTS RELEVANT TO THIS REMS MODIFICATION RATIONALE
REVIEW .............................................................................................................................. 7

3.   Rationale for Proposed REMS Modification ............................................................ 9

3.1.   CURRENT REQUIREMENTS FOR THE APPROVED REMS ........................................ 10

3.2.   EVALUATION OF THE EVIDENCE ............................................................................. 10

3.2.1.   Evaluation of the requirement for healthcare providers who prescribe the drug to be
specially certified (ETASU A) ........................................................................................... 12

3.2.2.   Evaluation of the requirement for the drug to be dispensed with evidence or other
documentation of safe-use conditions (ETASU D) ........................................................... 14

3.2.3.   Evaluation of the requirement for drug to be dispensed only in certain healthcare settings
(ETASU C) ........................................................................................................................ 19

4.   Discussion ............................................................................................................... 36

5.   Conclusions and Recommendations ....................................................................... 41

6.   References .............................................................................................................. 42

7.    Appendix ................................................................................................................ 45

3

Reference ID: 4905882

## EXECUTIVE SUMMARY

This review provides the _____ (b) (6) ( (b) (6) and _____ (b) (6) _____ ( (b) (6) rationale and conclusions regarding modifications to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (Mifepristone REMS Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA) 91178.

ANDA 91178 was approved with the approval of the Mifepristone REMS Program on April 11, 2019 to mitigate the risk of serious complications associated with mifepristone 200 mg. The most recent REMS modification was approved on May 14, 2021. The REMS consists of elements to assure safe use (ETASU) under ETASU A, C and D, an implementation system, and a timetable for submission of assessments. To determine whether a modification to the REMS was warranted, FDA undertook a comprehensive review of the published literature; safety information collected during the COVID-19 public health emergency (PHE); the one-year REMS assessment report of the Mifepristone REMS Program; adverse event data; and information provided by advocacy groups, individuals and the Applicants. Our review also included an examination of literature references provided by plaintiffs in the *Chelius v. Becerra* litigation discussed below.

The modifications to the REMS will consist of:

- Removing the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to here as the "in-person dispensing requirement" for brevity)

- Adding a requirement under ETASU B that pharmacies that dispense the drug be specially certified

A REMS Modification Notification letter will be sent to both Applicants in the Single Shared System.

4

2023 SUPP 001364

## 1.  Introduction

In connection with the *Chelius v. Becerra* litigation, FDA agreed to undertake a full review of the Mifepristone REMS Program, in accordance with the REMS assessment provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act).[a] This review provides the analysis of the [ (b) (6) ] ( (b) (6) and the [ (b) (6) ] ( (b) (6) regarding whether any changes are warranted to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone (hereafter referred to as the Mifepristone REMS Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA) 91178. The Mifeprex REMS was initially approved in 2011; the single, shared system REMS for mifepristone 200 mg, known as the Mifepristone REMS Program, was approved in 2019.

The last time the existing REMS elements to assure safe use (under ETASU A, C and D) were reviewed was in the context of our review of supplement S-020 to NDA 20687; these ETASU were updated following review and approval of supplement S-020 on March 29, 2016. The key changes approved in 2016 are summarized below.

Changes to labeling included:
- Changing the dosing of Mifeprex to 200 mg orally x 1
- Extension of maximum gestational age through 70 days
- Inclusion of misoprostol in the indication statement
- Replacing the term "physician" with "licensed healthcare provider"
- Removal of the phrase "Under Federal Law"

The Mifeprex REMS and REMS materials were updated to reflect the changes above, and additional changes were made including:
- Removing the Medication Guide as part of the REMS but retaining it as part of labeling.

## 2.  Background

### 2.1. PRODUCT AND REMS INFORMATION

---

[a] Section 505-1(g)(2) of the FD&C Act (21 U.S.C. § 355-1(g)(2)).

5

Reference ID: 4905882

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifepristone is available as 200 mg tablets for oral use.

Mifeprex (mifepristone) was approved on September 28, 2000 with a restricted distribution program under 21 CFR 314.520 (subpart H)[b] to ensure that the benefits of the drug outweighed the risk of serious complications associated with mifepristone when used for medical abortion. Mifeprex was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007, and the Mifeprex REMS was approved on June 8, 2011. On March 29, 2016, as noted above, a supplemental application and REMS modification was approved for Mifeprex. On April 11, 2019, ANDA 091178 was approved, and the Mifepristone REMS Program was approved. The Mifepristone REMS Program is a single, shared system REMS that includes NDA 020687 and ANDA 91178.

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a. Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program (under ETASU A).
b. Ensuring that mifepristone is only dispensed in certain healthcare settings,  by or under the supervision of a certified prescriber (under ETASU C).
c. Informing patients about the risk of serious complications associated with mifepristone (under ETASU D).

Under ETASU A, to become specially certified to prescribe mifepristone, a healthcare provider must review the prescribing information, complete and sign the *Prescriber Agreement Form,* and follow the guidelines for use of mifepristone. Under ETASU C, mifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. Under ETASU D, mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (i.e., the patient must sign a *Patient Agreement Form*). The Mifepristone REMS Program also includes an implementation system, and a timetable for assessments (one year from the date of the initial approval of the REMS on April 11, 2019, and every three years thereafter).

---

[b] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

Reference ID: 4905882

## 2.2. REGULATORY HISTORY AND EVENTS RELEVANT TO THIS REMS MODIFICATION RATIONALE REVIEW

The following is a summary of significant regulatory history since approval of the REMS modification on March 29, 2016:

- 03/29/2016: FDA approved an efficacy supplement (S-020) that, among other things, provided a new dosing regimen (200 mg mifepristone, followed in 24 to 48 hours by 800 mcg buccal misoprostol), increased the gestational age (GA) to which mifepristone may be used (through 70 days gestation), and modified the REMS.

- 03/29/2019: A Citizen Petition was received requesting that FDA revise the product labeling to reflect pre-2016 provisions (including limiting GA to 49 days and requiring patients to make 3 office visits) and that FDA maintain the REMS.

- 04/11/2019: ANDA 91178 was approved along with the Single Shared System REMS for Mifepristone 200 mg (Mifepristone REMS Program) for NDA 20687 and ANDA 91178.

- 01/31/2020: the COVID-19 public health emergency (PHE) was declared by the Secretary of Health and Human Services (HHS) as having existed since January 27, 2020.[c]

- 7/13/2020: The United States (US) District Court of Maryland granted a preliminary injunction in the *ACOG v. FDA* litigation to temporarily bar enforcement of the Mifepristone REMS Program in-person dispensing requirement during the COVID-19 PHE.

- 1/12/2021: US Supreme Court granted a stay of that injunction.

- 04/12/2021: FDA issued a General Advice Letter to both the NDA and ANDA Applicants, stating that provided that all other requirements of the Mifepristone REMS Program are met, and given that in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare

---

[c] *See* Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued January 31, 2020, and subsequently renewed), available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx

7

Reference ID: 4905882

personnel because it may involve a clinical visit solely for this purpose, FDA intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement in the Mifepristone REMS Program, including any in-person requirements that may be related to the *Patient Agreement Form.* FDA further stated that to the extent all of the other requirements of the Mifepristone REMS Program are met, FDA intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

- 05/07/2021: FDA stated that it would be reviewing the elements of the Mifepristone REMS Program in accordance with the REMS assessment provisions of section 505-1 of the FD&C Act.

- 05/14/2021: A modification was approved for the Mifepristone REMS Program. This modification was to revise the *Patient Agreement Form* to include gender-neutral language.

- 06/30/2021: An Information Request (IR) was sent to the Applicants for additional information on shipments and any program deviations, adverse events, or noncompliance with the REMS that occurred during the period from April 1, 2021 through September 30, 2021.

- 7/15/2021: An IR was sent to the Applicants to provide the total number of shipments during the period from April 1, 2021 to September 30, 2021 and details on whether any of those shipments were involved in any program deviation or non-compliance.

- 8/5/2021: An IR was sent to the Applicants for additional clinical and other information (e.g., adverse events and units of mifepristone shipped) for the period of March 29, 2016 through June 30, 2021, to be provided by August 31, 2021. This IR also requested information covering the period of July 1, 2021 through September 30, 2021 and an

8

Reference ID: 4905882

aggregate summary (for the period of March 29, 2016 through September 30, 2021), to be provided by October 12, 2021.[d]

- 8/26/2021: The ANDA Applicant submitted a response to the IR issued on 8/5/2021.

- 08/27/2021: The NDA Applicant submitted a response to the IR issued on 8/5/2021.

- 10/08/2021:  The NDA Applicant submitted a response to the June 30 and July 15, 2021 IRs as well as an aggregate summary for the period March 29, 2016 through September 30, 2021 in response to the August 5, 2021 IR. The NDA Applicant also included a follow-up to their initial response provided on August 27, 2021 to the August 5, 2021 IR.

- 10/12/2021: The ANDA Applicant submitted a response to the June 30 and July 15, 2021 IRs as well as an aggregate summary for the period March 29, 2016 through September 30, 2021 in response to the August 5, 2021 IR.

- 10/16/2021: The ANDA Applicant revised their Oct 12, 2012 response to provide a correction to the number of mifepristone tablets.

- 

- 11/02/2021: A ⬜⬜⬜ (b) (6) ( ⬜⬜ (b) (6) meeting was convened to obtain CDER concurrence on the removal of the in-person dispensing requirement and the addition of a certification requirement for pharmacies. The ⬜⬜ (b) (6) ⬜⬜ (b) (6) and senior CDER leadership concurred with removing the in-person dispensing and adding pharmacy certification.


## 3.  Rationale for Proposed REMS Modification

---

[d] Multiple Information Requests were issued to obtain additional information on drug shipments, any program deviations or noncompliance, and use of alternative methods for drug distribution during the COVID-19 PHE. These IRs are referenced as appropriate in this document and the one-year REMS Assessment Review of the Mifepristone REMS Program, December 16, 2021.

9

### 3.1. CURRENT REQUIREMENTS FOR THE APPROVED REMS

The Mifepristone REMS Program includes elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments. Elements to assure safe use in the current REMS include a prescriber certification requirement (ETASU A), a requirement that mifepristone be dispensed only in certain healthcare settings by or under the supervision of a certified prescriber (ETASU C), and a requirement that mifepristone be dispensed only with documentation of safe use conditions (ETASU D). Documentation of safe use conditions under ETASU D consists of a *Patient Agreement Form* between the prescriber and the patient indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with mifepristone 200 mg for medical termination of early pregnancy.

### 3.2. EVALUATION OF THE EVIDENCE

We reviewed multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Applicants. Our review also included an examination of literature references provided by plaintiffs in the *Chelius v. Becerra* litigation. Below is an overview of how information relevant to the current Mifepristone REMS Program was retrieved, analyzed, and applied to each of the individual ETASUs to determine if further changes should be considered.

<u>Methods for the literature search</u>

(b) (6) conducted a literature search in PubMed and Embase to retrieve publications relevant to this review. The time period used for this literature search was between March 29, 2016 (when the Mifeprex labeling and REMS were last substantially revised) through July 26, 2021. The search terms used were "medical abortion" and "mifepristone" and "pregnancy termination and mifepristone."

The search retrieved 306 publications from PubMed and 613 from Embase, respectively; the search yielded 646 unique publications after eliminating duplications between the two databases. The result of our literature search was also supplemented by an examination of literature references provided by advocacy groups, individuals, plaintiffs in the *Chelius* litigation, and the Applicants, as well as letters from healthcare providers and researchers.

10

Reference ID: 4905882

References included in these letters were considered for inclusion in this review using identical selection criteria to the [(b) (6)] literature search (outlined below).

For this review of the REMS, [(b) (6)] focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS ETASUs. We excluded systematic reviews and meta-analyses because these publications did not include original safety data related to the outcomes of medical abortion. The following are examples of materials that were excluded from our literature search:

- Information from survey studies or qualitative studies that evaluated perspectives on and/or satisfaction with medical abortion procedures from patients, pharmacists, clinic staff, or providers, even if the study assessed REMS ETASUs. These surveys or qualitative studies did not include objective safety data related to outcomes of medical abortion.

- Opinions, commentaries, or policy/advocacy statements. These publications did not include objective safety data related to outcomes of medical abortion.

- Safety data related to mifepristone use for second trimester medical abortion. These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data related to mifepristone use for spontaneous first trimester abortion (i.e., miscarriages). These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data that pertained only to surgical abortion or did not separate out medical abortion from surgical abortion.

- Other safety information unrelated to the REMS elements (e.g., articles limited to case reports or those discussing unrelated gynecologic or medical issues)

- Publications for which it was not possible to conduct a full review of the methods or results, i.e., the references were limited to an abstract of the study methods and results.

- Publications that provided only general statistics on abortion care in the United States.

Reference ID: 4905882

- Information pertinent to molecular or other basic science aspects of mifepristone.

- Data on the logistics of accessing abortion care in general, such as time to appointment or the distance traveled to obtain care.

- Publications that provided data not related specifically to abortion care or the REMS (e.g., references focused on federal poverty guidelines, poverty data, or the financial impact of the COVID-19 pandemic).

One exception to the above literature search criteria was the inclusion in Section 3.2.2 of this review, which discusses the *Patient Agreement Form*, of publications that discussed changes in provider volume. The data discussed in relation to provider volume was obtained from surveys. This data was included because changes in provider volume could only be obtained from well-conducted survey studies.

Regarding medical/scientific references submitted with letters from the plaintiffs in the *Chelius* litigation, we applied the same criteria as for the literature search, as described above.

Letters from the plaintiffs in the *Chelius* litigation included several references that preceded our 2016 review of the REMS. Two of those pre-2016 studies were not captured in our 2016 literature search. These two studies were assessed as part of our current review; their results are consistent with the existing safety profile of the approved medical abortion regimen, and therefore, support our current conclusions regarding the REMS. See Appendix A.

### 3.2.1. Evaluation of the requirement for healthcare providers who prescribe the drug to be specially certified (ETASU A)

In order to become specially certified, prescribers must: 1) review the prescribing information for mifepristone and 2) complete the *Prescriber Agreement Form*. In signing the *Prescriber Agreement Form*, prescribers agree they meet the qualifications listed below:

- Ability to assess the duration of pregnancy accurately
- Ability to diagnose ectopic pregnancies
- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to

12

Reference ID: 4905882

ensure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of mifepristone (which the provider can access by phone or online).

In addition to meeting these qualifications, as a condition of certification the healthcare provider also agrees to follow the guidelines for use below:

- Review the *Patient Agreement Form* with the patient and fully explain the risks of the mifepristone treatment regimen. Answer any questions the patient may have prior to receiving mifepristone.
- Sign and obtain the patient's signature on the *Patient Agreement Form*.
- Provide the patient with a copy of the *Patient Agreement Form* and the Medication Guide.
- Place the signed *Patient Agreement Form* in the patient's medical record.
- Record the serial number from each package of mifepristone in each patient's record.
- Report deaths to the Applicant, identifying the patient by a non-identifiable patient reference and the serial number from each package of mifepristone.

The literature review was the primary source of information that contributed to our reassessment of ETASU A.

We continue to be concerned that absent these provider qualifications, serious and potentially fatal complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed. Our review of the literature did not identify any studies comparing providers who met these qualifications with providers who did not. In the absence of such studies, there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention or arrange for such care through others if needed, is necessary to mitigate the serious risks associated with the use of mifepristone in a regimen with misoprostol. Therefore, our review continues to support the conclusion that a healthcare provider who prescribes mifepristone should meet the above qualifications.   We conclude it is reasonable to maintain the requirement for a one-time prescriber certification where prescribers attest to having the ability to diagnose an intrauterine

13

Reference ID: 4905882

pregnancy, to diagnose an ectopic pregnancy,[e]  and to either manage serious complications themselves or arrange for other providers to provide the needed care in a timely manner.

In addition, in signing the *Prescriber Agreement Form* and placing it in the patient's medical record, the prescribers acknowledge the requirement to report patient deaths associated with mifepristone to the manufacturer. Such a requirement ensures that the manufacturer receives all reports of patient deaths and, in turn, fulfills its regulatory obligations to report those deaths to the FDA.

As discussed in Section 3.2.2 below, there is a potential for doubling of the number of prescribers of mifepristone if the in-person dispensing requirement in ETASU C is removed from the Mifepristone REMS Program. Given the potential addition of new prescribers, in addition to the considerations described above, we conclude that we should maintain the requirement for prescriber certification, to ensure that providers meet the necessary qualifications and adhere to the guidelines for use.  Our literature review supports that these requirements are still necessary, and the potential increase in new prescribers under the REMS is a further reason to maintain prescriber certification.  Healthcare provider certification continues to be a necessary component of the REMS to ensure the benefits of mifepristone for medical abortion outweigh the risks. The burden of prescriber certification has been minimized to the extent possible by requiring prescribers to certify only one time for each applicant.

### 3.2.2.  Evaluation of the requirement for the drug to be dispensed with evidence or other documentation of safe-use conditions (ETASU D)

In order to receive mifepristone for medical termination of pregnancy through 70 days gestation, the patient must sign a *Patient Agreement Form* indicating that the patient has received, read, and been provided a copy of the *Patient Agreement Form* and received counseling from the prescriber regarding the risk of serious complications associated with mifepristone for this indication. The *Patient Agreement Form* ensures that patients are informed of the risks of serious complications associated with mifepristone for this indication.

---

[e] American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin Number 191, February 2018. Tubal Ectopic Pregnancy. https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/03/tubal-ectopic-pregnancy. Mifepristone is not effective for terminating ectopic pregnancy. Some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. A missed ectopic pregnancy that ruptures is a medical emergency that requires immediate surgical intervention.

2023 SUPP 001374

Reference ID: 4905882

In a number of approved REMS, *Patient Agreement Forms* or *Patient Enrollment Forms* ensure that patients are counseled about the risks of the product and/or informed of appropriate safe use conditions.[f]

As a condition of certification under the Mifepristone REMS Program, healthcare providers must follow the guidelines for use of mifepristone, including reviewing the *Patient Agreement Form* with the patient, fully explaining the risks of the treatment regimen, and answering any questions the patient may have before receiving the medication. With this form, the patient acknowledges that they have received and read the form, and that they have received the counseling regarding when to take mifepristone, the risk of serious complications associated with mifepristone and what to do if they experience adverse events (e.g., fever, heavy bleeding). Both the healthcare provider and patient must sign the document and the patient must receive a copy of the signed form. In addition to the counseling described in the *Patient Agreement Form*, patients also receive a copy of the Medication Guide for mifepristone. Ultimately, the *Patient Agreement Form* serves as an important counseling component, and documentation that the safe use conditions of the Mifepristone REMS Program have been satisfied, as the prescriber is required to place the signed *Patient Agreement Form* in the patient's medical record.

Prior to the March 29, 2016 approval of the S-020 efficacy supplement for Mifeprex, FDA undertook a review of all elements of the REMS. At that time, the (b) (6)



( (b) (6) ), along with the (b) (6) ( (b) (6) ), recommended removal of the *Patient Agreement Form* (ETASU D). This recommendation received concurrence from the (b) (6) on February 23, 2016. The rationale for this recommendation in the 2016 (b) (6) review[g] is summarized here as follows:

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and documentation of informed consent and evidence shows that practitioners are providing appropriate patient

---

[f] REMS@FDA, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm, Accessed November 15, 2021.
[g] (b) (6) Clinical Review, NDA 020687/S20, dated March 29, 2016. https://darrts.fda.gov/darrts/faces/ViewDocument?documentId=090140af803dc7bd&_afrRedirect=38617557320374 5

2023 SUPP 001375

Reference ID: 4905882

counseling and education; the *Patient Agreement Form* is duplicative of these established practices.

- Medical abortion with Mifeprex is provided by a small group of organizations and their associated providers. Their documents and guidelines are duplicated in the *Patient Agreement Form*.

- ETASUs A and C remain in place: The *Prescriber Agreement Form* and the requirement that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals under the supervision of a certified prescriber, remain in place.

In light of a memorandum from the Director of the Center for Drug Evaluation and Research, an addendum to the [REDACTED] (b) (6) March 29, 2016 review and a memorandum from the signatory authority in [REDACTED] (b) (6) indicated that the *Patient Agreement Form* would be retained in the REMS.[h,i]

The current review of literature from March 29, 2016 to July 26, 2021, is relevant to our assessment of the necessity of the *Patient Agreement Form* as part of the REMS. While our literature search yielded no publications which directly addressed this element of the REMS, we identified the following literature that focused on the informed consent process. These studies were reviewed for their potential relevance on this topic, though the articles do not directly assess the need for the *Patient Agreement Form* as a condition necessary to assure safe use of Mifepristone under ETASU D.

- Two studies[1,2] (both authored by Dr. Grossman in 2021) used the *Patient Agreement Form* and additional clinic-specific written informed consent forms as part of the study methodology. One study evaluated medical abortion with pharmacist dispensing of mifepristone and another evaluated mail-order pharmacy dispensing. Safety and efficacy outcomes were not assessed regarding the element of consent in isolation or the *Patient Agreement Form*.

- Several studies included use of electronic or verbal consent. Two studies were conducted using signed electronic consent (Chong[3], Kerestes[4]). Aiken[5] reported that patients had the option of providing consent verbally and the discussion had to be recorded in the notes. Rocca[6] described obtaining verbal informed consent from patients seeking medical abortion provided in pharmacies or government-certified

---

h [REDACTED] (b) (6) Review of proposed REMS modifications to Mifeprex. March 29, 2106.
i [REDACTED] (b) (6) Summary of Regulatory Action for Mifeprex. March 29, 2016.

16

Reference ID: 4905882

public health facilities by auxiliary nurse midwives (ANMs) in Nepal. Outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

- A retrospective chart review (Wiebe[7]) was conducted in Canada. This study included telemedicine abortions between January 31, 2017 and January 31, 2019 and a similar group of controls seen in the clinic during the same time frame, matched by date of initial appointment. As part of the telemedicine process, patients read a consent form (not specified whether they could view an electronic version) and gave verbal consent "witnessed by the counselor". Again, outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

After review, we conclude that there are no outcome data from these studies that address the need for the *Patient Agreement Form* as a condition necessary to assure safe use of mifepristone. Nor do any of these studies provide evidence of whether the patient's informed consent has been adequately documented under the process set out in the study protocol. Therefore, these studies do not provide evidence that would support removing ETASU D.

Although ⬚⬚ (b) (6) agrees that informed consent in medicine is an established practice, the National Abortion Federation's 2020 Clinical Policy Guidelines for Abortion Care[8] continue to include a detailed section on patient education, counseling, and informed consent. The guidelines state that these steps are essential parts of the abortion process; that they should be conducted by appropriate personnel, with accurate information, including about alternatives and potential risks and benefits; and that the patients must have an opportunity to have any questions answered to their satisfaction prior to any intervention. Under these guidelines, documentation must show that the patient affirms that they understand all the information provided and that the decision to undergo an abortion is voluntary. The guidelines specifically list the risks that must be addressed at a minimum, including those pertinent to medical abortion: hemorrhage, infection, continuing pregnancy, and death. Additionally, Practice Bulletins from ACOG[9] and the Society of Family Planning also support detailed patient counseling.

In addition, trends in US clinical practice are developing which could negatively impact adequate patient counseling about the risks of medical abortion. One survey by Jones 2017[10] of abortion providers in the United States and Canada prior to the COVID-19 pandemic did reveal strong adherence to evidence-based guidelines. However, this same survey noted continued increasing uptake of medical abortion by US providers. Grossman[11] conducted a US survey in

17

Reference ID: 4905882

2019 which suggested that the number of obstetrician/gynecologists providing medical abortion care may be increasing and that uptake might increase if mifepristone were dispensed by pharmacies instead of being dispensed in-person. A subsequent survey of US obstetricians/ gynecologists by Daniel in 2021[12] evaluated a subsample (n = 868) from a prior national survey of providers and found that 164 (19%) reported providing medical abortion in the previous year. Of those obstetrician/gynecologists not providing medical abortion, 171 (24%) said they would offer the method to their patients if the in-person dispensing requirement for mifepristone were removed. This indicates a potential doubling of providers (+ 104%, 95% confidence interval (CI): 97% −112%). There were geographical variations, with the largest potential increases being in the Midwest (+ 189%, 95% CI: 172% −207%) and the South (+ 118%, 95% CI: 103% −134%).

Based on the articles discussed above, removal of the in-person dispensing requirement from the Mifepristone REMS Program (as discussed below in section 3.2.3) could significantly increase the number of providers to a larger group of practitioners. The *Patient Agreement Form* is an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients, and also provides the information in a brief and understandable format for patients. The requirement to counsel the patient, to provide the patient with the *Patient Agreement Form*, and to have the healthcare provider and patient sign the *Patient Agreement Form*, ensures that each provider, including new providers, informs each patient of the appropriate use of mifepristone, risks associated with treatment, and what to do if the patient experiences symptoms that may require emergency care. The single-page *Patient Agreement Form* is in line with other elements of this REMS, in that it supports the requirement that certified prescribers be able to accurately assess a patient, counsel a patient appropriately and recognize and manage potential complications. The form is placed in the patient's medical record to document the patient's acknowledgment of receiving the information from the prescriber and a copy is provided to the patient. We determined, consistent with section 505-1(f)(2) of the FD&C Act, that this does not impose an unreasonable burden on providers or patients, and that the *Patient Agreement Form* remains necessary to assure the safe use of Mifepristone.

After considering potential burden on healthcare providers and patients and considering the available data discussed above, including the potential for increased prescribing of mifepristone if in-patient dispensing is removed from the REMS, we conclude that the *Patient Agreement Form* should remain a safe use condition in the REMS.

2023 SUPP 001378

Reference ID: 4905882

### 3.2.3. Evaluation of the requirement for drug to be dispensed only in certain healthcare settings (ETASU C)

Mifepristone applicants must ensure that mifepristone is available to be dispensed to patients only in clinics, medical offices, and hospitals by or under the supervision of a certified prescriber. This creates what we refer to in this document as an in-person dispensing requirement under the REMS; i.e., the patient must be present in person in the clinic, medical office or hospital when the drug is dispensed.  The mifepristone REMS document states that mifepristone may not be distributed to or dispensed through retail pharmacies or settings other than these.

The following information contributed to our analysis of this requirement: Mifepristone REMS Program year-one assessment data, postmarketing safety information and literature review.

**REMS Assessment Data**
_Reporting period for the Mifepristone REMS Program - April 11, 2019 through February 29, 2020_

We evaluated information included in the one-year (1st)[j] REMS assessment reports for the Mifepristone REMS Program, which included healthcare provider certification data, program utilization data, compliance data, audit results and patient exposure data.[13] The assessment reports were submitted on April 10, 2020 by the NDA Applicant and April 15, 2020 by the ANDA Applicant and cover a reporting period from April 11, 2019 through February 29, 2020. During this reporting period, the NDA Applicant reported (b) (4) newly certified healthcare providers, and the ANDA Applicant reported (b) (4) newly certified healthcare providers in the Mifepristone REMS Program. The NDA Applicant reported a total of (b) (4) certified healthcare providers (includes new and previously certified) ordered mifepristone during the assessment reporting period, and the ANDA Applicant reported a total of (b) (4) certified healthcare providers ordered mifepristone during the assessment reporting period. The NDA Applicant estimated that a total of (b) (4) patients were exposed to mifepristone during the assessment reporting period. The ANDA Applicant reported an estimated total of (b) (4) patients were exposed to mifepristone during the reporting period.

During the reporting period, a small number of non-compliance events were reported. The authorized distributor for the NDA applicant reported to the NDA Applicant that they experienced deviations with scanning of the product serial numbers which were confirmed during the February 2020 audit. The authorized distributor conducted a root cause analysis and developed a corrective and preventive action (CAPA) on February 12, 2020. The CAPA was

---

[j] This REMS assessment report was the first to be submitted following the approval of the single, shared system REMS for mifepristone.

19

Reference ID: 4905882

validated and deployed with monitoring of the system through April 10, 2020. The corrective action will prevent similar events from occurring in the future.

*January 27, 2020 through September 30, 2021*

During the timeframe from January 27, 2020 through September 30, 2021, there were periods when the in-person dispensing requirement was not being enforced.

- On July 13, 2020, the United States District Court for the District of Maryland granted a preliminary injunction in the *ACOG* case to temporarily bar enforcement of the in-person dispensing requirement during the COVID-19 PHE.
- On January 12, 2021, the United States Supreme Court issued a stay of the injunction.
- On April 12, 2021, the FDA issued a General Advice Letter informing the applicants of the Agency's intent to exercise enforcement discretion during the COVID-19 public health emergency regarding the in-person dispensing requirement in the Mifepristone REMS Program.[k,l]

To better understand whether there was any impact on safety or noncompliance during the periods when the in-person dispensing requirement was not being enforced, we requested additional information from the Applicants to provide for more comprehensive assessment of the REMS for the time period from January 27, 2020 (the effective date of the COVID-19 PHE) to September 30, 2021. We requested the Applicants provide a summary and analysis of any program deviation or noncompliance events from the REMS requirements and any adverse events that occurred during this time period that had not already been submitted to FDA. As part of an additional request for information for the REMS assessment report, the Applicants were also asked to submit the adverse events to FAERS and to notify FDA that the reports were submitted.

Between January 27, 2020 and September 30, 2021, the NDA Applicant distributed [(b) (4)] shipments representing [(b) (4)] tablets. The NDA Applicant reported that there were [(b) (4)] shipments representing a total of [(b) (4)] tablets sent to [(b) (4)] non-certified healthcare providers.[m,n] [(b) (4)] of these healthcare providers subsequently became certified while [(b) (4)] did not. Of the healthcare providers who were not subsequently certified, [(b) (4)] returned a total of 12 of the 13

---

[k] FDA General Advice Letter for NDA 20687, April 12, 2021.
[l] FDA General Advice Letter for ANDA 091178, April 12, 2021.

[m] NDA 020687 September 9, 2021 response to the FDA's September 2, 2021 Information Request.
[n] NDA 020687 October 8, 2021 response to the FDA's June 30, 2021 Information Request.

Reference ID: 4905882

Mifeprex tablets to the distributor. (b) (4) non-certified healthcare provider dispensed one tablet to a patient; no adverse events were reported. The NDA Applicant attributed the non-compliance observed to the authorized distributor's transition to a new platform. The NDA Applicant implemented a corrective and preventative action to address this issue, which we found to be acceptable.

The ANDA Applicant distributed (b) (4) shipments representing (b) (4) tablets of mifepristone from January 27, 2020 to September 30, 2021 and reported no instances of shipments to non-certified healthcare providers during this timeframe.

The NDA and the ANDA applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021. These eight cases were also identified in the FAERS database and are described in the section below.

The number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use for medical termination of pregnancy is small, and the data provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these reported adverse events. Further analysis of the adverse events is included below in the section on Pharmacovigilance Data.

**Pharmacovigilance Data**

The (b) (6) ( (b) (6) conducted a search of the FAERS database and the published medical literature to identify U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 through September 30, 2021 with mifepristone use for medical termination of pregnancy.[o,p]

The data for this time period were then further divided into date ranges when the in-person dispensing requirement was being enforced per the REMS (January 27, 2020 - July 12, 2020 & January 13, 2021 - April 12, 2021) versus when the in-person dispensing requirement was not being enforced (July 13, 2020 - January 12, 2021 (in-person dispensing requirement was temporarily enjoined) & April 13, 2021 - September 30, 2021 (in-person dispensing requirement was not being enforced because of the COVID-19 PHE)).

---

o (b) (6) . Pharmacovigilance Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. (b) (6) # 2007-525. Finalized April 12, 2021.

p (b) (6) . Pharmacovigilance Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. (b) (6) # 2007-525. Finalized December 16, 2021.

A total of eight cases that met the search criteria were identified in FAERS and no additional case reports were identified in the medical literature. Two of the eight cases reported adverse events that occurred when the in-person dispensing requirement in the REMS was being enforced (i.e., January 27, 2020 - July 12, 2020 & January 13, 2021 - April 12, 2021). These two cases reported the occurrence of uterine/vaginal bleeding (case 1) and uterine/vaginal bleeding and sepsis (case 2). Of note, uterine/vaginal bleeding and sepsis are labeled adverse events. Five of the eight cases reported adverse events that occurred when the in-person dispensing requirement was not being enforced (i.e., July 13, 2020 - January 12, 2021 & April 13, 2021 - September 30, 2021). These five cases reported the occurrence of ongoing pregnancy (case 3), drug intoxication and death approximately 5 months after ingestion of mifepristone (case 4), death [cause of death is currently unknown] (case 5), sepsis and death (case 6), and pulmonary embolism (case 7). Although these adverse events occurred during the period when the in-person dispensing requirement was not being enforced, the narratives provided in the FAERS reports for cases 5, 6, and 7 explicitly stated that mifepristone was dispensed in-person. Of note, ongoing pregnancy, and sepsis, including the possibility of fatal septic shock, are labeled adverse events. The remaining case from July 2021 reported the occurrence of oral pain/soreness (case 8) but did not provide sufficient information to determine the exact date of the adverse event. Based upon the U.S. postmarketing data reviewed, no new safety concerns were identified by ___(b) (6)___

In addition to the FAERS data provided above, ___(b) (6)___ routinely monitors adverse events reported to FAERS and published in the medical literature for mifepristone for medical termination of pregnancy. ___(b) (6)___ has not identified any new safety concerns with the use of mifepristone for medical termination of pregnancy.

To enable additional review of adverse events, the Applicants were requested[q] to provide a summary and analysis of adverse events reported with incomplete medical abortion requiring surgical intervention to complete abortion, blood transfusion following heavy bleeding or hemorrhage, ectopic pregnancies, sepsis, infection without sepsis, hospitalization related to medical abortion, and emergency department (ED)/urgent care encounter related to medical abortion. The Applicant for Mifeprex provided a summary of postmarketing safety information from March 29, 2016, when S-020 was approved, through September 30, 2021, on August 27 and October 8, 2021. During the time period in question, ___(b) (4)___ tablets were shipped, and

---

[q] On August 5, 2021, an IR was sent to the Applicants requesting a summary and analysis of adverse events from March 29, 2016 through June 30, 2021 and from July 1, 2021 through September 30, 2021.

2023 SUPP 001382

Reference ID: 4905882

48 adverse events were received. The 48 adverse events included 4 deaths (one of which occurred in 2010 but was reported in 2017), 25 incomplete abortions requiring surgical intervention, 17 blood transfusions following heavy vaginal bleeding, 2 ectopic pregnancies, 7 infections (1 sepsis and 6 infection without sepsis), 13 hospitalizations, and 43 ED or urgent care visits related to medical abortion. For the period between January 27, 2020 and September 30, 2021, a time frame that includes the entire period when the COVID-19 public health emergency (PHE) has been in effect, there were three adverse events reported corresponding to the above cases from FAERS identified by (b) (6) case 1 (uterine/vaginal bleeding), case 2 (uterine/vaginal bleeding and sepsis), and case 4 (drug intoxication and death).

The ANDA Applicant provided a summary of postmarketing safety information from April 11, 2019 (date of ANDA approval) through September 30, 2021. On August 26, 2021, the Applicant provided distribution and adverse event information from April 11, 2019 through June 30, 2021. During this time period, a total of (b) (4) tablets were shipped. There were 7 adverse events including 3 deaths (1 from sepsis, 1 from bilateral pulmonary artery thromboemboli, 1 in a patient who complained of not being able to breathe), 1 ongoing pregnancy treated with uterine aspiration, 2 blood transfusions, 1 sepsis (with death), 1 hospitalization, and 3 ED or urgent care visits related to medical abortion. On October 12, 2021 the Applicant provided information from July 1, 2021 to September 30, 2021; there were no additional adverse events. For the period between January 27, 2020 and September 30, 2021, there were four adverse events reported corresponding to the above cases from FAERS identified by (b) (6) case 3 (ongoing pregnancy), case 5 (death unknown cause), case 6 (sepsis and death), and case 7 (pulmonary embolism).[r]

The postmarketing data from FAERS were analyzed by (b) (6) to determine if there was a difference in adverse events between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced. Based on this review, we conclude that there does not appear to be a difference in adverse events between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced. This suggests that mifepristone may be safely used without an in-person dispensing requirement.

---

[r] The eighth FAERS case, oral pain/soreness, was not within the scope of the August 5, 2021 IR and was not considered for this review of postmarketing safety information submitted by the Applicants in response to the IRs.

23

Reference ID: 4905882

[b) (6)] review of the Applicants' IR responses, which included the same cases identified by [b) (6)] from FAERS, did not change our conclusion.[5]

**Literature Review**

Published studies have described alternatives in location and method for dispensing mifepristone by a certified prescriber (or an equivalent healthcare provider in countries other than the US). Some studies have examined replacing in-person dispensing in certain health care settings with dispensing at retail pharmacies (Grossman[2], Wiebe[7], Rocca[6]) and dispensing mifepristone from pharmacies by mail (Grossman[1], Upadhyay[14], Hyland[15]). Other studies have evaluated two modes of dispensing by prescribers: (1) prescribers mailing the medications to women (Gynuity study [Raymond[16], Chong[3], Anger[17], Kerestes[4], Aiken[5] (2021)) and (2) prescribers using couriered delivery of medications (Reynolds-Wright[18]). Other studies have evaluated dispensing mifepristone by mail by an entity described as "a partner organization" (Aiken[19] (2017), Norton[20], Endler[21]). For ease of review, in the sections below that describe these studies, we have separated relevant references by the methodology used to dispense mifepristone.

Retail pharmacy dispensing

Three studies report medical abortion outcomes for retail pharmacy dispensing of mifepristone after clinical evaluation. Grossman[2] conducted a US-based study in which mifepristone and misoprostol were dispensed from a pharmacy partnered with the clinic where the participant had an evaluation by ultrasound and counseling. Of the 266 participants enrolled, 260 had known abortion outcomes. Complete abortion without additional procedure occurred in 243 participants (93.5% of those with known outcomes). Seventeen participants (6.5% of those with known outcomes) were diagnosed with incomplete abortion and underwent uterine aspiration. The reported proportion of complete abortion is within the range described in the approved mifepristone labeling. However, the finding represents a lower-than-expected efficacy based on the cohort's GA (84% of participants were at ≤ 56 days GA, a cohort for which the labeled success rate is 96.8%). No participants experienced a serious adverse event, were hospitalized, or required transfusion. Three participants had ED visits with treatment (intravenous hydration, pain medication, pelvic infection after uterine aspiration for incomplete abortion). The study's

---

[5] The reporting period of [b) (6)] assessment of the adverse events in FAERS is not identical to the time period for summaries of adverse events in the IRs to the Applicants. Therefore, the numbers of cases and adverse events summarized in [b) (6)] assessment may differ from the numbers of cases and adverse events summarized by the Applicants in their responses to IRs (note that each case report may include more than one adverse event).

24

Reference ID: 4905882

safety and efficacy outcomes are consistent with labeled frequencies. The majority of participants (65%) were very satisfied with the experience. There were some complaints from participants about not receiving all prescribed medications at the initial pharmacy visit, privacy not being adequately maintained, and perceived negative pharmacist attitude.

Overall, we conclude that this study has limited generalizability because it was conducted in two US states and involved partnered pharmacies, some of which were in the same building as the clinic. Additionally, all participating pharmacies in this study were required to have a pharmacist on duty during clinic hours who had been trained in the study protocol and was willing to dispense mifepristone. The study conditions may not be generalizable to US retail pharmacies; there is insufficient information to assess this. Rocca[6] conducted an observational study evaluating 605 participants at ≤63 days GA who obtained medical abortions in Nepal by comparing the provision of medical abortion service by newly trained nurse midwives in pharmacies to medical abortion provided in government-certified clinics. Participants who presented to pharmacy study sites underwent clinical screening including a pelvic exam by trained nurse midwives at the pharmacy (which was equipped with an examination room) and if eligible for medical abortion, were dispensed mifepristone and misoprostol in the pharmacy at the time of their visit. Participants who presented to public health facilities underwent clinical screening including pelvic examination by abortion providers including trained nurse midwives and if eligible for medical abortion were dispensed mifepristone and misoprostol in the clinic at the time of their visit. The authors reported that, with respect to complete abortion (>97%) and complications (no hospitalizations or transfusions), evaluation and dispensing in pharmacy was non-inferior to in-clinic evaluation and dispensing.

Wiebe,[7] in a retrospective, chart review study conducted in Canada, compared abortion outcomes of 182 women at ≤ 70 days GA who underwent medical abortion with telemedicine consult, and either received medications by courier or picked them up at a local pharmacy, with outcomes of a matched control cohort of 199 women who received the medications at a pharmacy after an in-clinic visit. The groups had similar documented complete medical abortion outcomes (90%, calculated maintaining subjects with unknown outcomes in the denominator; ≥ 95% calculated with known outcomes only). The telemedicine group had one case of hemorrhage (0.5%) and one case of infection requiring antibiotics (0.5%) compared with no cases of hemorrhage or infection requiring antibiotics in the in-clinic cohort. The telemedicine group had more ED visits (3.3% compared to 1.5% in-clinic cohort). Both models of dispensing mifepristone resulted in efficacy and safety outcomes within labeled frequency.

25

Reference ID: 4905882

None of the three studies described above allow a determination regarding differences in safety between in-person dispensing by a certified prescriber in a health care setting and dispensing through a retail pharmacy, due to limitations on the generalizability of the studies to the current retail pharmacy environment in the US. The outcome findings from the one US study (Grossman[2]), in which the pharmacies were partnered with prescribers, may not be generalizable to much of the US as they do not reflect typical prescription medication availability with use of retail pharmacy dispensing. Although retail pharmacy dispensing of mifepristone and misoprostol in Canada has been described in the literature, there are important differences in healthcare systems between Canada and the US that render the findings from studies in Canada (Wiebe[7]) not generalizable to the US. In the Wiebe study, timely provision of medication from the retail pharmacy was accomplished by either courier to the woman or faxed prescription to the woman's pharmacy. It is unknown whether conditions that allow timely access to medications for medical abortion would occur in retail pharmacies throughout the US. Canada's federal government has reaffirmed that abortion is an essential health service[t] which may have implications affecting access to medical abortion from retail pharmacies in Canada. The Rocca[6] study evaluated medical abortion provided in Nepali pharmacies and essentially moved the abortion provider and clinical examination into the pharmacy, a scenario that is not, at this time, applicable to the US retail setting.

<u>Mail order pharmacy</u>

Grossman[1] published an interim analysis of an ongoing prospective cohort study evaluating medical abortion with mifepristone and misoprostol dispensed by mail-order pharmacy after in-person clinical assessment. All participants were evaluated for eligibility during a clinic visit with GA up to 63 days confirmed with either an ultrasound or examination; instead of receiving medication at the clinic visit, participants received medications from a mail-order pharmacy. A total of 240 participants have been enrolled; three participants did not take either medication. A total of 227 (94.6%) provided some outcome information, of whom 224 provided abortion outcome information. Complete abortion without additional procedures occurred in 217 participants (96.9% of those with known outcomes). Two (0.9%) participants experienced serious adverse events (SAE); one received a blood transfusion, and one was hospitalized overnight. Nine (4%) participants attended 10 ED visits. In this interim analysis, the outcomes are consistent with labeled frequencies. With respect to the time interval between a

---

[t] As noted in Mark[23] and Martin[24], most provincial and federal health insurance programs in Canada cover medical abortion, and covered services are free at the point of care.

Reference ID: 4905882

participant's clinic visit and receipt of medications, of the 224 participants with known abortion outcomes, 184 (82.1%) received medication within 3 days. However, 17% received between 4-7 days and one participant waited over 7 days for receipt. Seven of 216 (3.2%) participants who completed the day-3 survey reported compromised confidentiality (e.g., someone found their medication, privacy concerns).

Upadhyay[14] reports findings from a retrospective cohort study of 141 women undergoing medical abortion in the US without a consultation or visit. Eligibility was assessed based on a participant-completed online form collecting pregnancy and medical history. Participants who were considered eligible received medication delivered by a mail-order pharmacy. Three interactions via text, messaging or telephone occurred to confirm medication administration, assessment of expulsion and pregnancy symptoms, and results of a 4-week home pregnancy test. Abortion outcome was determined by either the day 3 assessment or the 4-week pregnancy test. The investigators reported a complete abortion rate without additional procedures of 95% (105 participants out of 110 for whom outcomes were known) and stated that no participants had any major adverse events. The proportion of abortion outcomes assessed at 3 days versus 4 weeks is not reported. Regardless, determining outcomes at 3 days is insufficient to determine outcome rates or safety findings because a 3-day follow-up period is too short. Additionally, a substantial number of participants (31) provided no outcomes information. Among the 141 participants enrolled, 128 had any follow-up contact with the study staff, and 110 provided outcomes information. Excluding outcomes of 22% of the cohort is a limitation of this study. This study used a model with numerous deviations from standard provision of medical abortion in the US, such as no synchronous interaction with the prescriber during informed consent or prior to prescribing medication, no confirmation of self-reported medical, surgical, and menstrual history. Further, follow-up information based on a 3-day period is insufficient to determine outcome rates or safety findings. These deviations, limited follow-up information, and small sample size limit the usefulness of this study.

Hyland[15] describes findings from a cohort study in Australia evaluating medical abortion outcomes utilizing telemedicine and a central mail order pharmacy. All participants obtained screening tests including ultrasound confirmation of GA. A total of 1010 participants completed the screening process and were provided mifepristone and misoprostol. Abortion outcomes were determined for 754 (75%) of the 1010. Outcomes for the remaining 256 participants (25%) were not included because 31 provided no relevant information after shipment, 14 reported not taking misoprostol, and 211 did not have "full follow-up" (i.e., known outcome of either complete medical abortion, uterine evacuation, or ongoing pregnancy with plan to continue).

27

Reference ID: 4905882

Complete abortions without additional procedures occurred in 727 participants (96% of those with definitively documented outcomes) and is consistent with labeled efficacy. Of the 754 participants included in the analysis 717 (95%) had no face-to-face clinical encounters after medications were mailed while 21 (3%) were admitted to the hospital and 16 (2%) had an outpatient encounter. One participant who was hospitalized and underwent a surgical uterine evacuation received a transfusion. Not included in the findings are 7 hospitalizations occurring in 7 participants who did not have "full follow up". The authors do not report any other adverse events and conclude use of the telemedicine medical abortion service is safe. The reasons for hospitalization are not discussed by the authors; therefore, it is unknown why the patients were hospitalized. Although the reported number of hospitalizations (3%) is higher than the less than 1% in the FDA-approved mifepristone labeling, conclusions regarding the safety findings in this study cannot be made in the absence of information about the reasons for hospitalization. Other limitations of this study include incomplete information about outcomes with face-to-face encounters, and not reporting outcomes of 25% of the enrolled cohort.

Overall, the three studies evaluating mail order pharmacy dispensing suggest that the efficacy of medical abortion is maintained with mail order pharmacy dispensing. In the Grossman[1] study, the interim analysis, although small, does not raise serious safety concerns. We note that 18% of participants did not receive medications within 3 days; the potential for delay in receiving medication by mail could limit the GA eligible for medical abortion through mail order pharmacy dispensing, because women at GA closer to 70 days might not receive medication in time. A small proportion (3%) of participants raised concerns regarding the issues of confidentiality and privacy. Safety findings from the Hyland[15] study are difficult to interpret. Although only one transfusion is reported, and the authors state the findings demonstrate safety, the higher hospitalization rates, and lack of information on the reasons for hospitalization do not allow any conclusions about safety findings. Lastly, the Upadhyay[14] study had no reported adverse events, but the findings are less useful because of the limited follow-up, and because medical abortions were provided using a model with numerous deviations from standard provision of medical abortion in the US.

<u>Clinic dispensing by mail</u>

A total of five studies evaluated clinic dispensing by mail.[3,4,5,16, 17] Gynuity Health Projects conducted a prospective cohort study (the "TelAbortion" study) evaluating use of telemedicine for remote visits and mifepristone being dispensed from clinics via overnight or regular tracked mail. Three publications reviewed have reported outcomes for the Gynuity population

28

Reference ID: 4905882

exclusively: Raymond[16] from May 2016 to December 2018, Chong[3] from May 2016 to September 2020 and Anger[17] from March 2020 to September 2020. Due to the pandemic, the Gynuity study deviated from the protocol requirement of confirmation of GA by examination or ultrasound for many participants treated from March 2020 onward (although none of the three publications reported on the single element of dispensing mifepristone from the healthcare setting by mail). A fourth study, Kerestes,[4] reports outcomes of medical abortion at the University of Hawai'i from April 2020 to November 2020: seventy-five (of whom 71 were enrolled in the Gynuity study) of the 334 participants in Kerestes were dispensed mifepristone by mail after a telemedicine consult. The section below discusses these four studies from the US as well as a large UK study by Aiken[5] (2021).

Raymond [16] (2019) reported outcomes from the Gynuity study prior to the pandemic. In the TelAbortion study, participants were not required to have an in-person clinic visit; rather, they obtained screening tests at laboratories and radiology offices and then communicated with the abortion provider by videoconference. If the participant was eligible for treatment, the provider dispensed the medications by mail. Of 433 women screened, 165 (38%) either declined to schedule the videoconference or did not keep the videoconference appointment. Among the 268 participants evaluated via videoconference, medication packages were sent to 248. Abortion outcomes were determined for 190 (77%) of the 248; outcomes for 58 (23%) participants were unknown. Complete abortion without additional procedures occurred in 177 participants (93% of those with known outcomes). The investigators obtained follow-up information from 217 participants after package shipment; there were two hospitalizations (one received a transfusion for severe anemia despite having had a complete abortion), and 16 other participants (7%) had clinical encounters in ED and urgent care centers. The reported outcomes in Raymond[16] (2019) are similar to outcomes described in approved labeling except the combined ED/urgent care center encounters (7%) exceeded the ED visits in approved labeling (2.9-4.6%). The authors note that half of the ED/urgent care visits did not entail any medical treatment and opine that the increased number of visits may have been due to the study participants living farther from the abortion providers.[16] All participants received medications within 8 days.

Chong[3] updated the findings from the Gynuity study described in Raymond[16] and reported on 1157 medical abortion outcomes, of which approximately 50% occurred during the period of the COVID-19 PHE. Although a screening ultrasound was required per the protocol, sites determined in 52% (346/669) of abortions that occurred during the period of the COVID-19 PHE that, in order to avoid potential exposure to COVID-19 at a health care facility, those

Reference ID: 4905882

participants were not required to obtain a screening ultrasound. Use of urine pregnancy test to confirm abortion completion also increased from 67% (144/214) in the 6 months prior to the pandemic to 90% (602/669) in the 6 months during the pandemic. Of the 1390 participants to whom medicine packages (containing both mifepristone and misoprostol) were mailed, 1157 (83.2%) had known abortion outcomes. Complete abortion without a procedure occurred in 1103 participants (95% of the those with a known outcome). Ten women experienced an SAE (5 transfusions (0.4%) and 7 hospitalizations (0.7%)) and 70 (6%) participants had unplanned clinical encounters in ED/urgent care. Surgical interventions were required in 47 participants (4.1% of 1390) to complete abortion. The reported outcomes in this study are similar to outcomes described in approved labeling, except that the combined ED/urgent care center encounters (6%) exceeded the ED visits in approved labeling (2.9-4.6%).

Anger[17] compared outcomes among participants enrolled in the Gynuity study who did versus did not have confirmation of GA/intrauterine location with an examination or ultrasound from 10 jurisdictions across the US. These participants were screened for enrollment from March 25 through September 15, 2020. All participants had a telemedicine consultation and received mifepristone and misoprostol by mail from the healthcare facility. Determination of which participants did not require confirmation of GA by examination or ultrasound to be eligible depended on the study clinician's assessment of eligibility for "no-test medication abortion"[u] based on a sample protocol published by Raymond[22] (2020). There were two key differences between the two groups. Participants for whom the study clinician determined a pre-abortion ultrasound was required were more likely than the participants who had no ultrasound or examination to live further than 150 miles from the clinic (51.2% vs. 31.7%) and were more likely to have a GA above 63 days (12.0% vs. 1.7%). The study sites shipped 503 medication packages during the analysis period; 344 packages went to the "no test" group while 159 went to the "test" medical abortion cohort (see figure below). However, because the two cohorts were not randomized in this study, they had different baseline characteristics. Consequently, findings based on the comparisons between the two cohorts should be interpreted carefully.

---

[u] "No-test medication abortion" refers to medical abortion provided without a pretreatment ultrasound, pelvic examination, or laboratory tests when, in the judgment of the provider, doing so is medically appropriate (appropriateness based on history and symptoms); "no-test medication abortion" does include post-abortion follow up. A sample protocol is described by Raymond et al.[22]

2023 SUPP 001390

Reference ID: 4905882



Source: Figure 1 in this publication. MA= medical abortion.

The investigators' analyses excluded 91 (18% of 503; 57 in the no-test group and 34 in the test group) participants because they did not provide a date of the last menstrual period (LMP), did not take mifepristone, or did not have a recorded abortion outcome. Overall, 410 participants (81.5% of 503) provided outcomes data. There were no reported ectopic pregnancies in either group. The number of ED/urgent care visits and the proportion of unplanned clinical encounters that led to medical treatment were not reported. In the no-test group, complete medical abortion was confirmed in 271 participants who took medications (94% among those with known outcome). In the no-test cohort, two participants were "hospitalized and/or blood transfusion," and 36 (12.5%) had an unplanned clinical encounter (participant sought in-person medical care related to abortion and the visit was not planned prior to abortion).

In the test medical abortion group, complete abortion was confirmed in 123 participants (of 125 with known outcomes); the completion rate was 98% among those with known outcomes. In the test medical abortion group, one participant was "hospitalized and/or blood transfusion," and 10 (8.0%) had an unplanned clinical encounter. The authors concluded that, compared to participants who had an ultrasound prior to medical abortion, those without an examination prior to medical abortion were more likely to require procedural interventions and had more unplanned clinical encounters.

Kerestes[4] was the only publication that linked outcomes of medical abortion with different delivery models. Participants included in the report had GA up to 77 days and received

31

Reference ID: 4905882

medications in Hawaii between April 2020 and January 2020. A total of 334 medication packages (to 330 unique participants) were dispensed containing mifepristone and misoprostol; three different delivery models were used concurrently: 110 (32.9%) had traditional in-person visits, 149 (44.6%) had telemedicine consultation with in-person pick-up of medications, and 75 (22.5%) were sent medications by mail (71 of these were enrolled through Gynuity's TelAbortion study). Seven participants of the 330 participants who received 334 medication packages reported that they did not take them and were excluded from analysis of the outcomes. Among participants with follow-up data, the rates of successful medical abortion without surgery were 93.6%, 96.8%, and 97.1% in the in-clinic group, telemedicine + in-person pickup group, and telemedicine + mail group, respectively; these were consistent with outcomes in approved labeling. Blood transfusion was given to two participants (both in the telemedicine + in-person pickup group). Eleven participants went to an ED. Although ED visits occurred the most frequently in the telemedicine + mail group (four participants or 5.8%) and the least in the in-person group (two participants or 2.1%), the study reported no increases in other serious adverse events.

Taken together, the three Gynuity study reports[3,16,17] and Kerestes[4] support dispensing mifepristone and misoprostol by mail after a telemedicine visit. Efficacy was maintained in all four studies. All of the studies reported SAEs frequencies comparable to labeled rates, except two of the Gynuity study reports (Raymond[16], Chong[3]) and Kerestes[4] report a higher frequency of ED/urgent care visits than the labeled frequency of ED visits. We do not know whether the reporting of combined ED and urgent care visits represents an increased rate of ED visits compared to the labeled rate of ED visits (2.9-4.6%). Other labeled SAEs (e.g., transfusion) occur infrequently (< 1%).

Aiken[5] (2021) reports outcomes of medical abortion up to 70 days GA in the UK before and during the pandemic in a retrospective cohort study. In the UK, prior to the COVID-19 pandemic, all patients attended an in-clinic visit where they received an ultrasound, were administered mifepristone in the clinic, and given misoprostol in-clinic for use at home (traditional model). During the pandemic, medical abortion consultations were performed remotely by telephone or video. Based on the consultation and questionnaire (including date of last menstrual period; menstrual, contraceptive and medical history; symptoms; risk for ectopic pregnancy), an assessment of eligibility for treatment via telemedicine was made. If eligible, medications were delivered to participants via mail or were made available for collection from the clinic for use at home. If the participant was assessed to be ineligible for treatment via

32

Reference ID: 4905882

telemedicine, an in-person assessment with ultrasound was performed and medications were provided from the clinic for home use (hybrid model).

The study compared the two cohorts: 22,158 obtained medical abortion before the pandemic and had in-person visits and dispensing (traditional model) and 29,984 obtained medical abortion during the pandemic with either in-person visit and in-person dispensing, or a telemedicine visit and dispensing by mail or picked up from the clinic (hybrid model). Outcomes were obtained from electronic records and incident databases. Outcomes of all hospitalizations related to abortion, ED visits, infection without sepsis, and hemorrhage without transfusion were not reported. The investigators' analysis for non-inferiority determined the efficacy and safety were comparable between both cohorts. Complete abortion occurred in > 98% in both cohorts. Hemorrhage requiring transfusion was reported in 0.04% and 0.02% of the traditional and hybrid cohorts, respectively; this is lower than the labeled 0.5% transfusion rate. There were no severe infections requiring hospitalization, major surgery or deaths reported.

A secondary analysis of the hybrid cohort was reported. Within the 29,984-person hybrid model cohort, 11,549 (39%) abortions were conducted in-person (in-person assessment with ultrasound was performed and medications provided from the clinic for home use) and 18,435 (61%) abortions were provided by telemedicine visit, without tests or confirmation of GA/intrauterine position by ultrasound, and medications either mailed or picked up from the clinic. Outcomes stratified by type of mifepristone dispensing were not reported. The rate of complete abortion was slightly higher in the telemedicine group (99.2%) than that in the in-person group (98.1%). There were no significant differences in the rates of reported SAEs. Adjustments for clinical and demographic characteristics were made because the two groups differed in baseline characteristics, including a higher proportion of pregnancies with GA over 6 weeks in the in-person group (68.2% compared with 55.1%). The authors conclude a hybrid model for medical abortion that includes no-test medical abortion[u] (no ultrasound, no pelvic exam, no pregnancy test) is effective and safe.

We conclude that although the Aiken[5] (2021) study has a large sample size and includes 85% of all medical abortions performed in England and Wales during the study period, the study has limitations. The authors acknowledge the main limitation of their study was that analysis was based on deidentified information in the NHS database and the investigators were unable to verify the outcomes extracted. Other limitations included that their search only captured

33

Reference ID: 4905882

outcomes in electronic records and incident databases that met the authors' defined threshold for SAE reporting, and that the labeled abortion outcomes considered serious, such as hospitalizations related to abortion, infection without sepsis, hemorrhage without transfusion, or ED/urgent care visits, were not all included in the authors' definition of serious adverse event.

Data from the mail order dispensing studies with telemedicine visits from Gynuity (Raymond, Chong and Anger),[3,16,17] Kerestes[4], and Aiken[5] (2021) support that efficacy of medical abortion was maintained. The Aiken[5] study appears to be of sufficient sample size to determine whether safety outcomes with mail dispensing differ from in-person dispensing; however, the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings. Study reports of Raymond[16] Chong[3], and Kerestes[4] all suggest there may be an increase in ED/urgent care visits with telemedicine visits and dispensing by mail without increases in other adverse events. Anger's[17] comparative analysis suggests a pre-abortion examination may decrease the occurrence of procedural intervention and decrease the number of unplanned visits for postabortion care. Overall, despite the limitations noted, these studies support that dispensing by mail is safe and effective. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other SAEs related to mifepristone use. One reason for the increase in frequent ED/urgent care visits in the Raymond[16] publication, according to its authors, may have been that a substantial proportion of participants lived significant distances from their providers and increased distances have been associated with higher use of ED following treatment. Raymond[16] reported that half of the participants who had an ED/urgent care visit did not require medical treatment.

Clinic dispensing by courier

Reynolds-Wright[18] reported findings from a prospective cohort study of 663 women at less than 12 weeks' GA in Scotland undergoing medical abortion at home with use of telemedicine during the pandemic (from April 1 to July 9, 2020). The majority of medical abortions (78.7%) used telemedicine visits, eliminated pre-abortion ultrasound, and provided mifepristone for pick up at the service or by couriered delivery to woman's home. The number of couriered deliveries was not reported; thus, this study does not provide abortion outcomes separately for couriered delivery of mifepristone and misoprostol. With access to NHS regional hospital databases, the investigators were able to verify pregnancy outcomes and complications. Of the 663 participants, 642 (98.2%) were under 10 weeks GA, 21 (1.8%) were between 10 and 12 weeks

34

Reference ID: 4905882

GA, and one participant was never pregnant. A total of 650 participants had complete abortion without requiring surgical intervention (98%), 5 (0.8%) an ongoing pregnancy and 4 (0.6%) an incomplete abortion. The outcomes from this study in Scotland are consistent with labeled mifepristone outcomes. The study shares the same limitations as the Aiken[5] (2021) study.

<u>Partner organization dispensing by mail</u>

Women on Web (WoW), an internet group, connects patients and providers outside of the US and provides medical abortion globally, dispensing mifepristone through "a partner organization" by mail.[v] Medical abortion eligibility is determined using an online questionnaire with asynchronous physician review. If eligible, medications are mailed to the women. WoW provides help and support by email or instant messaging.

Aiken[19] (2017) conducted a population-based study analyzing findings from 1,636 women in the Republic of Ireland and Northern Ireland who were sent medications between 2010 and 2012. Receipt of medications was confirmed for 1,181 women, among whom 1,023 confirmed use of mifepristone and misoprostol; outcome information was available for 1,000 (61% of women sent medications). Of the 1,000 women, the majority (781, 78%) were less than 7 weeks GA and 219 (22%) were at 7-9 weeks. Complete abortion without surgical intervention occurred in 947 (94.7% of 1,000 with known outcome); 7 (0.7%) women received a blood transfusion, 26 (2.6%) received antibiotics (route of administration undetermined) and 87 (8.7%) sought medical care at a hospital or clinic for symptoms related to medical abortion. Hospitalizations related to abortion were not reported. The reported proportion of complete abortion is within the range labeled for medical abortion up to 70 days (92.7-98.1%). However, the finding of 94.7% complete abortion represents a lower-than-expected efficacy based on the cohort's GA (almost 80% less than 7 weeks, labeled success for medical abortion ≤ 49 days is 98.1%). This study has limitations, including outcomes based on self-report without validation of completed abortion by examination or laboratory testing, and no known outcomes for 39% of study cohort. Additionally, the authors noted medical abortion was provided in a legally-restrictive setting, where the law provided a maximum penalty of life imprisonment for the woman undergoing the abortion, which may affect participants' self-reporting.

---

[v] In March 2019, FDA sent a WL to Aidaccess.org, a group affiliated with WoW. Aidaccess.org received this WL because it was introducing misbranded and unapproved new drugs into the U.S. In the context of this REMS review, studies involving WoW are included solely for purposes of evaluating of data regarding the methods of dispensing mifepristone.

35

Reference ID: 4905882

Endler[21] and Norten[20] have reported outcomes from WoW cohorts but do not provide relevant information on mifepristone dispensing by mail, because neither provide meaningful outcomes data for consideration.  Endler[21] compared the outcomes of self-reported heavy bleeding and clinical visits occurring during the "first or second day of abortion" that occurred in women undergoing medical abortion at 9 weeks GA or less, with outcomes from women at more than 9 weeks GA. Outcome data from day 1 or 2 is of limited usefulness. Norten[20] describes findings from a survey of women who were sent medical abortion medication through WoW and provided self-reported outcomes. Results were based on surveys returned from only 37% of participants, a return rate that is too low for the study to be considered valid.

WoW uses a model with numerous deviations from the standard provision of medical abortion in the US. For example, this model has no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history or confirmed pregnancy testing. Further, although Aiken[19] (2017) is a large cohort study, the outcomes are self-reported with no verification of complete abortion by laboratory or clinical evaluation and 39% of outcomes are unaccounted for. These limitations in the Aiken study result in the data being insufficient to determine the safety of dispensing mifepristone by mail through a partner organization.

## 4. Discussion

After review of the published literature, safety information collected during the COVID-19 PHE, postmarketing data, information from the first Mifepristone REMS Program assessment report, responses to information requests to the Applicants, and information provided by advocacy groups, individuals and the plaintiffs in the *Chelius v. Becerra* litigation, we conclude that the REMS can be modified to reduce burden without compromising patient safety.

**Prescriber Certification**

None of the publications we reviewed would support a conclusion that a healthcare provider who prescribes mifepristone does not need to meet the qualifications included in the Mifepristone REMS Program as described above in section 3.2.1. Absent these provider qualifications, serious complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed.

Reference ID: 4905882

We conclude that prescriber certification (ETASU A) should be maintained. The current process requires the prescriber to agree to the requirements of the Mifepristone REMS Program and to attest that they meet the qualifications described in section 3.2.1 above. The REMS has been structured to minimize burden to prescribers by requiring only a one-time certification by the prescriber for each Applicant. We have determined that healthcare provider certification continues to be necessary to ensure the benefits outweigh the risks, especially considering that, if the in-person dispensing requirement is removed from the Mifepristone REMS Program, the number of new providers may increase (see discussion in section 3.2.2 above).

**Drug to be dispensed with evidence or other documentation of safe use conditions**

The requirement to counsel the patient and provide them with the *Patient Agreement Form* ensures that each patient is informed of the appropriate use of mifepristone, the risks associated with treatment, and what to do if they experience symptoms that may require emergency care.

In 2016, we initially recommended eliminating the *Patient Agreement Form* (see section 3.2.2), though the form was ultimately maintained as part of the REMS. As discussed above, our current literature review has indicated that there is no basis to remove the *Patient Agreement Form* from the REMS. In addition, surveys we reviewed suggest that if the in-person dispensing requirement for mifepristone is removed, there could be a potential doubling of medical abortion providers. This potential doubling of medical abortion providers supports the continued need to ensure that patients are consistently provided patient education under the Mifepristone REMS Program regarding the use and risks of mifepristone. The *Patient Agreement Form* is an important part of standardizing the medication information that prescribers communicate to their patients, including new prescribers, and also provides the information in a brief and understandable format to patients. We determined, in accordance with section 505-1(f)(2) of the FD&C Act, that this does not impose an unreasonable burden on providers or patients.[w]

Given the likelihood of a potential increase in new prescribers if the in-person dispensing requirement is removed from the Mifepristone REMS Program, we conclude that maintaining the *Patient Agreement Form* remains necessary to assure safe use at this time.

---

[w] *The Patient Agreement Form* can be signed in person or through other means.

37

Reference ID: 4905882

**Drug to be dispensed only in certain healthcare settings**

As discussed above in section 3.2.3, our evaluation of information submitted by the applicants in the one-year (1st) REMS assessment report for the Mifepristone REMS Program and in response to follow-up requests from the Agency indicates that the number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use is small, and the data provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these adverse events. We further conclude, based our review of the postmarketing safety data from FAERS during the COVID-19 PHE and information submitted by the applicants for the timeframe of January 27, 2020 through September 30, 2021, that there does not appear to be a difference in adverse events between periods during the COVID-19 PHE when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced; nor have we identified any new safety concerns with the use of mifepristone for medical termination of early pregnancy.

Alternatives to in-person dispensing of mifepristone have been investigated in several studies and countries. The literature review identified 15 publications[x] that assessed safety outcomes from various medication delivery models (US, UK, Canada, Ireland, Australia, Nepal), including dispensing by retail and mail order pharmacies, prescribers mailing medications or using couriered service to deliver medications, and dispensing by "partner organizations". The ability to generalize the results of these studies to the US population is hampered by differences in pre-abortion care (e.g., telemedicine versus in-person, testing), and the usefulness of the studies is limited in some instances by small sample sizes and lack of follow-up information on outcomes with regard to both safety and efficacy.

In addition, there are factors which complicate the analysis of the dispensing element alone. Some of these factors are: (1) only a few studies have evaluated alternatives for in-person dispensing of mifepristone in isolation; for example, most studies on mail dispensing of mifepristone also include telemedicine consultation, and (2) because most SAEs with medical abortion are infrequent, though they can be life threatening, further evaluation of changes in dispensing would require studies with larger numbers of participants. We did not find any large clinical studies that were designed to collect safety outcomes in healthcare systems similar to the US.

---

[x] The 15 publications correspond to endnote numbers: 1-7, 14-21.

2023 SUPP 001398

Reference ID: 4905882

Based on the literature identified by our review, dispensing mifepristone by mail from the clinic or from a mail order pharmacy does not appear to jeopardize the efficacy of medical abortion. The studies we reviewed are not adequate on their own to establish the safety of the model of dispensing mifepristone by mail, although the safety and efficacy outcomes reported in these studies remain within the ranges described in mifepristone labeling except for increased numbers of ED/urgent care visits and hospitalizations.

Four publications (Raymond[16], Chong[3], Anger[17] and Kerestes[4]), describe a relevant US cohort where dispensing mifepristone from the clinic by mail was paired with telemedicine visits. These studies showed that efficacy was maintained and there was no increased frequency of SAEs except for higher ED/urgent care visits. The increased ED/urgent care visits were not associated with increases of other SAEs, and in the view of one study's authors (Raymond[16]), may be associated with participants being located significant distances from their providers. The Aiken[5] (2021) study of a large UK cohort where the clinics mailed mifepristone report small (lower than labeled) occurrences of transfusion and no significant infections requiring hospitalization. In Grossman[1] and Hyland[15], where the pharmacies mailed mifepristone after prescribers confirmed GA, efficacy is maintained. Grossman's[1] interim analysis found no increases in SAEs. Hyland[15] reported higher numbers of hospitalizations but did not report increases of other SAEs. Overall, while the studies assessing mifepristone dispensing by mail suggest more frequent encounters with healthcare providers, they generally support a conclusion that dispensing by mail is safe. Despite the limitations of the studies we reviewed, we conclude that overall, the outcomes of these studies are not inconsistent with our conclusion that, based on the 1st year REMS assessment report and postmarketing safety data, mifepristone will remain safe, and efficacy will be maintained if the in-person dispensing requirement is removed from the Mifepristone REMS Program.

Based on the REMS assessment data, FAERS data from the time period when the in-person dispensing requirement was not being enforced, our review of the literature, and information provided by advocacy groups, individuals, the Applicants, and the plaintiffs in the *Chelius v. Becerra* litigation, we conclude that mifepristone will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met, and pharmacy certification is added as described below.

Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to

39

Reference ID: 4905882

ensure that the benefits of mifepristone for medical abortion outweigh the risks. Therefore, to reduce the burden imposed by the REMS, the Mifepristone REMS Program should be modified to  remove the in-person dispensing requirement, which would allow, for example, dispensing of mifepristone by mail via certified prescribers or pharmacies, in addition to in-person dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C.

**New requirement to be added for pharmacy certification**

The current distribution model requires the certified prescriber to dispense mifepristone directly to the patient in a clinic, medical office, or hospital. During the periods when the in-person dispensing requirement was not being enforced, both applicants used mail order pharmacies to receive and hold mifepristone on behalf of the certified healthcare providers who had purchased the product.[j,y,z]  Pursuant to a prescription for mifepristone, the mail order pharmacy would ship the product to a named patient.

The Mifepristone REMS Program continues to require that mifepristone be prescribed only by certified prescribers. With the removal of the in-person dispensing requirement, however, the drug is no longer required to be dispensed only in a clinic, medical office or hospital. Under the REMS as modified, mifepristone can be dispensed through a pharmacy, provided the product is prescribed by a certified prescriber and all other requirements of the REMS are met. Given this modification to the dispensing requirements in the REMS, it is necessary to add a requirement for certification of pharmacies under ETASU B. Adding the pharmacy certification requirement incorporates pharmacies into the REMS, ensures that pharmacies are aware of and agree to follow applicable REMS requirements, and ensures that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers. Without pharmacy certification, a pharmacy might dispense product that was not prescribed by a certified prescriber. Adding pharmacy certification ensures that ETASU A is met prior to dispensing the product to a patient; certified prescribers, in turn, have agreed to meet all the conditions of the REMS, including ensuring that the *Patient Agreement Form* (ETASU D) is completed. In addition, wholesalers and distributors can only ship to certified pharmacies. Based on our review of the safety data and our consideration of the distribution model implemented by the Applicants during the periods

---

y ANDA 091178: September 23, 2021 response to the September 15, 2021 information request;  October 11 and 16, 2021  responses to the June 30, 2021 and July 15, 2021 information requests; October 26, 2021 response to the October 22, 2021 information request; October 29, 2021 response to the October 27 information request.
z NDA 020687: September 20, 2021 response to the September 15, 2021 information request; October 26, 2021 response to the October 22 information request.

2023 SUPP 001400

Reference ID: 4905882

when the in-person dispensing requirement was not being enforced, as well as REMS assessment data and published literature, we conclude that provided all other requirements of the REMS are met, the REMS program, with the removal of the in-person dispensing requirement and the addition of a requirement for pharmacy certification, will continue to ensure the benefits of mifepristone for medical abortion outweigh the risks while minimizing the burden imposed by the REMS on healthcare providers and patients.  As modified, the REMS would allow, for example, dispensing by mail order or specialty pharmacies, similar to the distribution model used by applicants during the periods when the in-person dispensing requirement was not being enforced.[aa]

The above recommendations were discussed with the ⬛⬛ (b) (6)   ( ⬛ (b) (6) and senior leadership from CDER on November 2, 2021. The ⬛ (b) (6)  ⬛ (b) (6) along with senior CDER leadership, concurred with removing the in-person dispensing requirement provided that all of the remaining REMS requirements are met, including but not limited to prescriber certification where prescribers need to attest to having certain qualifications, and maintaining the *Patient Agreement Form*. The ⬛ (b) (6)  ⬛ (b) (6) and senior leadership from CDER were also in favor of adding pharmacy certification to assure the safe use of mifepristone.

## 5.  Conclusions and Recommendations

Based on the results of REMS assessments; our review of safety data collected during the PHE as well as data from FAERS; our literature search; and information provided by advocacy groups, individuals, the Applicants, and the plaintiffs in the *Chelius v. Becerra* litigation, ⬛ (b) (6) and ⬛ (b) (6) have concluded that a REMS modification is necessary and should include the following changes:

- Removing the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.
- Adding a requirement under ETASU B that pharmacies that dispense the drug be specially certified.

---

[aa] Our current conclusion that the REMS would allow dispensing by mail order or specialty pharmacies is based on data received from Applicants relating to the periods when the in-person dispensing requirement was not enforced and mail-order pharmacies were used to dispense the product, as well as our analysis of postmarketing safety data and available literature.  At this time we do not have data (from the Applicants or from other sources) to assess the certification of retail pharmacies under the REMS. We have not yet determined the details of pharmacy certification requirements, including whether any limitations on the types of pharmacies that may dispense the product are necessary.

41

(b) (6)  and  (b) (6)  recommend the Applicants be issued a REMS Modification Notification Letter that requests submission within 120 days from the date of the letter.

## 6. References

[1] Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2021; In press. doi:https://doi.org/10.1016/j.contraception.2021.09.008

[2] Grossman D, Baba CF, Kaller S, et al. Medication Abortion With Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021;137:613–22.

[3] Chong E, Shochet T, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-48.

[4] Kerestes C, Murayama S, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 Jul;104(1):49-53. doi:10.1016/j.contraception.2021.03.025. Epub 2021 Mar 28.

[5] Aiken ARA, Lohr PA, et al. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464–1474.

[6] Rocca CH, Puri M, et al. Effectiveness and safety of early medication abortion provided in pharmacies by auxiliary nurse-midwives: A non-inferiority study in Nepal. PLoS ONE 2018 13(1): e0191174. https://doi.org/10.1371/journal.pone.019117

[7] Wiebe ER, Campbell M, et al. Comparing telemedicine to in-clinic medication abortions induced with mifepristone and misoprostol. Contracept X. 2020; 2: 100023.

[8] National Abortion Federation 2020 Clinical Policy Guidelines for Abortion Care, available at https://5aa1b2xfmfh2e2mk03kk8rsx-wpengine.netdna-ssl.com/wp-content/uploads/2020_CPGs.pdf

[9] American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Gynecology and the Society of Family Planning. Simultaneously published as ACOG Bulletin

2023 SUPP 001402

Reference ID: 4905882

Number 225: Medication abortion up to 70 days of gestation. Obstet Gynecol 2020;136(4): e31-e47 and in Contraception 2020; 102:225-236.

[10] Jones HE, O'Connell White K, Norman WV, Guilbert E, Lichtenberg ES, Paul M. First trimester medication abortion practice in the United States and Canada. PLoS ONE 2017; 12(10): e0186487. https://doi.org/10.1371/journal.pone.0186487

[11] Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. Obstet Gynecol 2019;133:477-483.

[12] Daniel S, Schulkin J, Grossman D. Obstetrician-gynecologist willingness to provide medication abortion with removal of the in-person dispensing requirement for mifepristone. Contraception. 2021;104:73-76

[13] (b) (6) Review of the one-year REMS assessment report for the Mifepristone REMS Program, December 16, 2021.

[14] Upadhyay UD, Koenig LR, Meckstroth KR. Safety and Efficacy of Telehealth Medication Abortion in the US During the COVID-19 Pandemic. JAMA Network Open. 2021;4(8):e2122320. doi:10.1001/jamanetworkopen.2021.22320

[15] Hyland P, Raymond EG, Chong E. A direct-to-patient telemedicine abortion service in Australia: Retrospective analysis of the first 18 months. Aust N Z J Obstet Gynaecol 2018;58: 335-340.

[16] Raymond E, Chong E, et al. TelAbortion: evaluation of a direct to patient telemedicine abortion service in the United States. Contraception 2019;100:173-177

[17] Anger HA, Raymond EG, et al. Clinical and service delivery implications of omitting ultrasound before medication abortion provided via direct-to-patient telemedicine and mail. Contraception 2021 Jul 28;S0010-7824(21)00342-5. doi: 10.1016/j.contraception.2021.07.108. Published online.

[18] Reynolds-Wright JJ, Johnstone A, McCabe K, et al. Telemedicine medical abortion at home under 12 weeks' gestation: a prospective observational cohort study during the COVID-19 pandemic. BMJ Sex Reprod Health 2021;0:1–6. doi:10.1136/bmjsrh-2020-200976

Reference ID: 4905882

[19] Aiken AR, Digon I, Trussell J, et al. Self reported outcomes and adverse events after medical abortion through online telemedicine: population based study in the Republic of Ireland and Northern Ireland. BMJ 2017;357:j2011.

[20] Norten H, Ilozumba O, Wilkinson J, et.al. 10-year evaluation of the use of medical abortion through telemedicine: a retrospective cohort study. BJOG 2021; https://doi.org/10.1111/1471-0528.16765.

[21] Endler M, Beets L, Gemzell Danielsson K, Gomperts R. Safety and acceptability of medical abortion through telemedicine after 9 weeks of gestation: a population-based cohort study. BJOG 2019;126:609–618.

[22] Raymond EG, Grossman D, Mark A, et.al. Commentary: No-test medication abortion: A sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361-366

[23] Mark A, Foster A, Perritt J. The future of abortion is now: Mifepristone by mail and in-clinic abortion access in the United States. Contraception 2021;104:38-42

[24] Martin D, Miller A, Quesnel-Vallee, A, et al. Canada's global leadership on health 1. Canada's universal health care system: achieving its potential. Lancet 2018; 391:1718-35

2023 SUPP 001404

Reference ID: 4905882

---

## 7. Appendix A

References Cited in Letters from Plaintiffs

| References cited in letter from *Chelius v. Becerra* Plaintiffs (September 29, 2021) | |
|---|---|
| **References included in the REMS review** | |
| Aiken A et al. BJOG 2021: 128 (9): 1464-1474 | |
| Chong, et al. Contraception 2021; 104(1) 43-48 | |
| Daniel S. et al. Contraception 2021; 104(1): 73-76 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Am. Coll. of Obstetricians & Gynecologists, *Position Statement: Improving Access to Mifepristone for Reproductive Health Indications* (June 2018), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications | Policy/advocacy statement |
| House of Delegates, Am. Med. Ass'n., *Memorial Resolutions Adopted Unanimously No. 504 (2018)* https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a18-resolutions.pdf | Policy/advocacy statement |
| Cong. Of Delegates, Am. Acad. Of Fam. Physicians, *Resolution No. 506 (CoSponsored C) Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization of Mifepristone* (May 24, 2018) https://www.reproductiveaccess.org/wp-content/uploads/2019/02/Resolution-No.-506-REMS.pdf | Policy/advocacy statement |
| Schummers L et al, Contraception 2020; 102(4): 273 | Abstract |
| Upadhyay UD et al.) Obstet & Gynecol 2015; 125: 175 | Published prior to March 29, 2016-July 26, 2021 timeframe for current literature review. We note that the extensive literature review conducted as part of the 2016 review, which was consistent with the division's standard approach for reviewing an efficacy supplement |

2023 SUPP 001405

Reference ID: 4905882

| | and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
|---|---|
| Kapp N et al. Best Pract Clin Obstet Gynaecol. 2020;63:37-44 | Abstract. Also outside the scope of first trimester medical abortion. |
| Fuentes L et al. J Women's Health 2019; 28 (12): 1623,  1625<br><br>Bearak JM, Lancet Pub Health 2017 Nov;2(11): e493, e495-96<br><br>Cartwright A et al 20 J Med Internet Res 2018  20(5):e10235<br><br>Barr-Walker J, et al PLoS One 2019;14(4): e0209991<br><br>Grossman et al  JAMA Network 2017;317(4):437, 437-438<br><br>Dobie S et al 31 Fam Plan Persp 1999; 31(5): 241-244<br><br>Shelton JD 8 Fam Plan Persp 1976; 8(6):260, 260-262<br><br>Norris AH et al Am J Pub Health 2020; 110 (8): 1228,1232<br><br>Upadhyay UD et al Am J Pub Health 2014; 104(9):1687, 1689 | Focused on the logistics of accessing abortion care. |
| CDC MMWR Abortion Surveillance – United States, 2018<br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T5_down | Contains primarily general statistics on abortion care  by state. |

| References cited in appendix from *Chelius v. Becerra* Plaintiffs (September 29, 2021) |
|---|
| References included in the REMS review |
| None |

2023 SUPP 001406

Reference ID: 4905882

| References excluded from the REMS review | Rationale for Exclusion |
|---|---|
| Jones RK et al Guttmacher Institute Abortion Incidence and Service Availability in the United States, 2017 (2019)<br><br>Guttmacher Inst, Induced Abortion in the United States (2019) | Contains primarily general statistics on abortion care and logistics of accessing abortion care. |
| University of Minnesota Healthy Youth Dev. Prevention Rsch Ctr, 2019 Minnesota Adolescent Sexual Health Report 3 (2019) | Not related specifically to abortion care. |
| Jerman J et al Guttmacher Inst, Characteristics of U.S. Abortion Patients in 2014 and Changes since 2008 (2016) | Contains figures on patient characteristics from 2008-2014. |
| Roberts CM et al  Women's Health Issues 2014; 24:e211, e215 | Focused on cost of abortion. |
| CDC MMWR Abortion Surveillance 2018<br><br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T7 down (last updated Nov. 7, 2020) | Contains primarily statistics on number of abortions in the US. |
| Jones RK  Persp on Sexual & Reprod Health 2017; 49:17, 20 | Focused on abortion incidence and service availability. |
| Fuentes L et al (as above)<br><br>Bearak JM et al (as above)<br><br>Cartwright A et al (as above)<br><br>Johns NE et al. BMC Health Serv Res 2017; 17: 287, 294 | Focused on logistics of accessing abortion care. |

| References cited in letter from Society of Family Planning (August 11, 2021) |
|---|
| References included in the REMS review |
| Grossman D. Obstet Gynecol 2019;133 (3): 477-483 |

47

2023 SUPP 001407

Reference ID: 4905882

| | |
|---|---|
| Grossman D et al. Obstet Gynecol 2021; 137 (4): 613-622. | |
| Winikoff B et al. Obstet Gynecol 2012; 120: 1070-1076 reviewed in 2016 clinical memo | |
| Chen MJ et al. Obstet Gynecol 2015;126(1):12-21 reviewed in 2016 memo | |
| Chong et al. Contraception 2021;104(1): 43-48 | |
| Aiken A et al. BJOG 2021; 128 (9): 1464 -1474 | |
| Hyland 2018 et al. Aust New Zeal J Obstet Gynaecol 2018; 58 (3): 335-340 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Schummers L et al. BMJ Sex Reprod Heal 2021;47(e1) | Abstract |
| Kapp et al. 2020 (as above) | Abstract |
| Upadhyay et al. 2015 (as above) | (See rationale above) |
| Srinivasulu et al. Contraception 2021; 104(1):92-97 | Survey on clinician perspectives on access to mifepristone. |
| Calloway D et al. Contraception 2021; 104(1): 24-28 | Primarily addresses provider stigma around abortion care. |
| Rasmussen et al. Contraception; 104(1): 98-103 | Opinion/commentary |
| Cleland et al. Obstet Gynecol 2013;121(1):166-171 | Published prior to March 29, 2016 - July 26, 2021 timeframe for current literature review. We note that the extensive literature search conducted as part of the 2016 clinical review, which was consistent with the division's standard approach for reviewing an efficacy supplement and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
| National Academy of Sciences, Engineering, and Medicine. Safety and Quality of Abortion Care in the US 2018 | General information about abortion care in the US. Did not provide safety data relevant to the elements of the REMS |
| Raymond EG. Obstet Gynecol 2012: 119(2): 215-219 | Does not separate out medical and surgical abortion. |

48

Reference ID: 4905882

| | |
|---|---|
| Bartlett LA et al. Obstet Gynecol 2004; 103(4): 729-737 | Focused on surgical abortion. |
| Jones RK, Jerman J. Time to appointment and delays in accessing care among U.S. abortion patients, Guttmacher 2016 | Focused on logistics of accessing abortion care. |
| Foster DG et al. Perspect Sex Reprod Health 2013; 45(4):210-218 | Focused on second trimester abortion. |
| Ely G et al. Heal Soc Work 2019;44(1):13-21 | Focused on logistics of accessing abortion care. |
| Munro S et al. Ann Fam Med 2020; 18(5):413-421. | Survey on physician perspectives on implementing medical abortion with mifepristone. |

49

Reference ID: 4905882

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

12/16/2021 10:22:50 AM

(b) (6)

12/16/2021 10:25:34 AM

(b) (6)

12/16/2021 10:30:08 AM

(b) (6)

12/16/2021 10:35:53 AM

(b) (6)

12/16/2021 10:49:46 AM

(b) (6)

12/16/2021 10:59:01 AM

(b) (6)

12/16/2021 11:08:07 AM

2023 SUPP 001410

Reference ID: 4905882