# Exhibit 18

**Response to Consult Request from** ▓ **CDER**

To: ▓

From: ▓

Through: ▓

Date:     December 16, 2021

Subject:  **Mifeprex Citizen Petition: (Docket No. FDA-2019-P-1534)**

**Introduction:**

The ▓ requested that the ▓ provide a consult on a Citizen Petition submitted on March 29, 2019, to the Food and Drug Administration (FDA or the Agency) by the American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) and the American College of Pediatricians (ACPeds). The Petitioners request that FDA: (1) restore and strengthen elements of the Mifeprex regimen and prescriber requirements approved in 2000, and (2) retain the Mifeprex Risk Evaluation and Mitigation Strategy (REMS) and continue limiting the dispensing of Mifeprex to patients in clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

**Background:**

On September 28, 2000, Mifeprex 600 mg, followed in two days by 400 mcg oral misoprostol, was approved for medical termination of pregnancy through 49 days' gestation under Subpart H (21 CFR 314.520).[1] Mifeprex was approved with a restricted distribution plan that included a requirement that Mifeprex be provided only by or under the supervision of a physician who met certain qualifications, including the ability to date pregnancy, to identify an ectopic pregnancy, and to provide (directly or through other qualified physicians) surgical intervention in cases of incomplete abortion or severe bleeding. In 2007, with the passage of the FDA Amendment Act, Mifeprex was included among the products deemed to have in effect an approved Risk Evaluation and Mitigation Strategy (REMS) under Section 505-1 of the Federal Food, Drug, and Cosmetic Act. A formal REMS proposal was submitted and the REMS with Elements to Assure Safe Use (ETASU), along with an implementation system and Medication Guide, was approved on June 8, 2011 under Supplement-014. The goals and elements of the REMS are summarized in Table 1 below.

---

[1] NDA approval letter, Mifeprex (NDA 020687, dated September 28, 2000).

1



**Exhibit 18**

2019 CP 000599

**Table 1. Summary of Mifeprex REMS Approved in 2011[2]**

| | |
|---|---|
| REMS Goals | To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug. |
| | To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. |
| REMS Elements | Medication Guide |
| | ETASU A – Special certification of healthcare providers (HPCs) who prescribe Mifeprex: Completion of Prescriber's Agreement form and enrollment in the REMS program. |
| | ETASU C – Mifeprex is dispensed only in certain healthcare settings: It is only available to be dispensed in clinics, medical offices or hospitals, under the supervision of a specially certified prescriber. Mifeprex will not be distributed to or dispensed through retail pharmacies. |
| | ETASU D – Safe-use conditions: Patients must complete and sign the Patient Agreement form that is to be placed in the patient's medical record. A copy of the Patient Agreement form and Medical Guide must be provided to the patient. |
| Implementation System | Distributors of Mifeprex must be certified and agree to ship Mifeprex only to locations identified by certified prescribers. Distributors must agree to maintain secure and confidential records, as well as, follow all distribution guidelines concerning storage, shipments and controlled returns. |

On March 29, 2016, Supplement-020 (S-020) was approved, providing for labeling changes, including but are not limited to the following:

- Extended the maximum gestational age eligible for medical termination from 49 to 70 days' gestation;
- Revised the dosing and dosing regimen: from 600 mg Mifeprex (Day 1, single oral dose)/400 mcg misoprostol (Day 3, single oral dose) to 200 mg Mifeprex (Day 1, single oral dose)/800 mcg misoprostol (Day 2 or 3, by buccal route, 24-48 hours after taking Mifeprex);
- Reduced the required office visits by the patient from three to one (post-treatment assessment Day 7 to 14) to confirm complete termination pregnancy and to evaluate the degree of bleeding.

The consult request from [(b)(6)/PPI] included 17 questions overall. Among these, [(b)(6)/PPI] seeks input from [(b)(6)/PPI] on Questions 1 (parts a and b), 2, 3, 4, 5 (parts a through h), 6, 10, 11, 12, 13 (a, b, and c), 14 (parts a and b), 15, 16, and 17. [(b)(6)/PPI] responses to [(b)(6)/PPI] follow in the sections below.

---

[2] Source: The [(b)(6)/PPI] REMS Modification Review (NDA 02867/S-020, dated March 29, 2016), Table 1.

Reference ID: 4906306

On April 11, 2019, we approved GenBioPro, Inc.'s generic version of Mifeprex, Mifepristone Tablets, 200 mg (abbreviated new drug application (ANDA) 091178). This action took place after this Petition was submitted to the Agency. As required by 21 CFR 314.94(a)(8), GenBioPro's approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, has the same labeling (with certain permissible differences) as the brand product it references, Mifeprex. Accordingly, although we refer to the Mifeprex labeling in several sections of this document, our discussions in this document apply equally to both the NDA and the generic product labeling, unless otherwise specifically noted.

GenBioPro's generic version of Mifeprex is subject to the same ETASU as its listed drug (21 U.S.C. 355-1(i)). At the time we approved GenBioPro's generic version of Mifeprex, that ANDA product was required to use a single, shared system for the ETASU with the brand drug product, Mifeprex, unless the requirement was waived by FDA (21 U.S.C. 355-1(i)). FDA did not waive this requirement. Accordingly, at the same time that FDA approved GenBioPro's generic version of Mifeprex in 2019, FDA approved a supplemental new drug application (sNDA) for Mifeprex, approving modifications to the existing, approved REMS for Mifeprex to establish a single, shared system REMS for mifepristone products for the medical termination of intrauterine pregnancy through 70 days gestation (referred to as the Mifepristone REMS Program). In establishing the single, shared system REMS in 2019, no substantive changes were made to the ETASU in the March 2016 Mifeprex REMS. References to the REMS in this document refer to the Mifepristone REMS Program established in 2019, unless otherwise noted.

## 1. Mifeprex Regimen and Prescriber Requirements

### A. Indications and Usage:

(b)(6)/PPI  **Question 1.** Citing a 2011 study and a statement by the American College of Obstetricians and Gynecologists (ACOG), Petitioners state that drug-induced abortion regimens demonstrate an increase in complications, including serious risks of failure, hemorrhage, infection and ongoing pregnancy after 49 days gestation (Petition at 3-4). Do you agree? Please explain why or why not.

> (b)(6)/PPI  **Response to** (b)(6)/PPI **Question 1:**

No, we do not agree. The Petitioners' reference of these two publications appears misleading; by quoting sentences from the publications out of context.

The Mentula publication reported old data (2003-2006); we conducted an extensive review of more recent data for our 2016 review of S-020. The Petitioners cite Mentula, et al.,[3] a register-based, retrospective cohort study that included 18,248 women in Finland who

---

[3] Mentula MJ, Niinimake M, Suhonen S, et al. Immediate Adverse Events After Second Trimester Medical Termination of Pregnancy: Results of a nationwide registry study, Human Reproduction. 2011;26(4):927-932.

Reference ID: 4906306

underwent medical abortion[4] between January 1, 2003 and December 31, 2006. In Finland, medical abortion is permitted up to 20 weeks of gestation or up to 24 weeks of gestation in cases of a confirmed medical condition in the fetus. Mentula et al. was primarily designed to compare immediate adverse events following medical abortion in second trimester (13 to 24 weeks as defined by the authors) to first trimester (up to 12 gestational weeks as defined by the authors). This study was not designed to compare rates of complications, such as serious risks of failure, hemorrhage, infection and ongoing pregnancy, following medical abortion regimens taken before and after 49 days of gestation. The Mentula publication presents the percentages of surgical evacuation following medical abortion and of infection following medical abortion from 2003 to 2006,[5] based on weekly gestational age, from ≥ 5 weeks to ≤ 20 weeks gestation in two figures (Figure 2, and Figure 3, respectively). Although the point estimates for the surgical evacuation rate appear to be increasing for gestational ages weeks 7 to 10, we cannot conclude that the actual surgical evacuation rate at each gestational age (from weeks 7 to 10) differ because the associated 95% confidence intervals for the surgical evaluation rate at each gestational age (weeks 7 to 10) are overlapping. For the same reason, although the point estimates for the infection rate appear to increase for gestational ages 7 to 10, we cannot conclude that the actual infection rate at each gestational age from weeks 7 to 10 differ. Therefore, it is problematic to rely on the rates of complications as reported in the publication to determine whether complications increased by week in pregnancies < 10 weeks. In the Agency's 2016 review of the S-020 efficacy supplement, we reviewed more recent data,[6] and concluded that, Mifeprex, in a regimen with misoprostol, is safe and effective for medical termination of intrauterine pregnancy through 70 days gestation. Regardless, serious adverse events through 70 days GA are infrequent per current Mifeprex labeling (Table 2: transfusion 0-0.1%, sepsis < 0.01%, hospitalization related to medical abortion 0-0.7%, hemorrhage 0.1%).

The Petitioners also cite ACOG Practice Bulletin No. 143, which states: "the risk of clinically significant bleeding and transfusion may be lower in women who undergo medical abortion of gestations up to 49 days compared with those who undergo medical abortion of gestations of more than 49 days."[7,8] This statement is based on a 1998 publication which evaluated women undergoing medical abortion with mifepristone 600 mg and oral

---

[4] In this response, the terms "medical abortion" and "medication abortion" both refer to the use of mifepristone, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy.

[5] Surgical intervention after medical abortion and infection after medical abortion are two distinct adverse events. The calculation of completion abortion rates accounts for the need for surgical intervention. In clinical studies we reviewed, success of medical abortion was defined as "the complete expulsion of the products of conception without the need for surgical intervention."

[6] Cross-Discipline Team Leader Review (b)(6)/PPI ) for NDA 20687 S-020, dated March 29, 2016. Table 4: Summary Table of Studies Supporting NDA 20-687 S-020 in Appendix (p 36 of 60).

[7] Medical Management of First-Trimester Abortion. ACOG Practice Bulletin No. 143. March 2014 (Reaffirmed 2016). The quote appears on page 680.

[8] Medication Abortion Up to 70 Days of Gestation. ACOG Practice Bulletin No. 225. October 2020. We note that ACOG Practice Bulletin No. 225 has replaced Practice Bulletin No. 143.

Reference ID: 4906306

misoprostol 400 mcg two days later.[9] The regimen studied in this 1998 publication is not the currently approved regimen in the United States.  We note that ACOG Practice Bulletin No. 143 has been replaced by Practice Bulletin No. 225; the statement quoted by the Petitioners does not appear in ACOG Practice Bulletin No. 225.

(b)(6)/PPI **Question 1a.** Citing a 2015 meta-analysis, Petitioners state that the failure rate of the buccal misoprostol regimen increased as the gestational age increased, especially at gestational ages greater than 49 days (Petition at 3-4). Do you agree? Please explain why or why not.

**Response to** (b)(6)/PPI **Question 1a:**

We agree that failure rate of medical abortion regimens, including the buccal misoprostol regimen, generally increases with increasing GA. However, the increase in failure rate with each incremental week described in approved mifepristone labeling and in the 2015 meta-analysis discussed below is small and that the benefit/risk profile for medical termination of intrauterine pregnancies between 49 days and 70 days' gestation remains acceptable.

The Petitioners cite a 2015 meta-analysis by Chen and Creinin,[10] which included 20 studies with a total of 33,846 women undergoing medical abortion through 70 days of gestation using the buccal misoprostol regimen. The authors report efficacy (i.e., complete medical abortion rates) of the buccal misoprostol regimen by GA as shown in table below: 98.1% for ≤ 49 days, 96.7% for 50-56 days, 95.2% for 57-63 days, and 93.1% for 64-70 days. These completion rates are consistent with the outcome by GA described in the approved labeling.

| | Successful Abortion | | | Ongoing Pregnancy | | |
|---|---|---|---|---|---|---|
| | No. in Analysis | No. Successful | % (95% CI) | No. in Analysis | No. of Ongoing Pregnancies | % (95% CI) |
| Overall | | | | | | |
| Through 63 d of gestation | 33,514 | 32,394 | 96.7 (96.5–96.8) | 32,479 | 252 | 0.8 (0.7–0.9) |
| Through 70 d of gestation | 33,846 | 32,703 | 96.6 (96.4–96.8) | 32,785 | 261 | 0.8 (0.7–0.9) |
| By gestational age (d)* | | | | | | |
| 49 or less | 12,555 | 12,318 | 98.1 (97.9–98.3) | 10,781 | 40 | 0.4 (0.3–0.5) |
| 50–56 | 4,161 | 4,024 | 96.7 (96.1–97.2) | 4,008 | 34 | 0.8 (0.6–1.2) |
| 57–63 | 2,202 | 2,096 | 95.2 (94.2–96.0) | 2,119 | 39 | 1.8 (1.3–2.5) |
| 64–70 | 332 | 309 | 93.1 (89.6–95.5) | 306 | 9 | 2.9 (1.4–5.7) |

CI, confidence interval.
All outcomes are based on patients for whom outcome was determined (patients without follow-up are not included).
* Not all studies reported outcome within each specific gestational age range; outcomes are calculated using only those studies with outcome data presented by gestational age.

Source: Table 1, Chen and Creinin 2015.

---

[9] Spitz I, Bardin CW, Benton L, Robbins A. Early pregnancy termination with mifepristone and misoprostol in the United Sates, NEJM. 1998;338 (18):1241-1247.
[10] Chen MJ and Creinin MD. Mifepristone with buccal misoprostol for medical abortion. Obstet Gynecol. 2015;126(1):12-21.

2019 CP 000603

Reference ID: 4906306

**Question 1b.** Petitioners state that the gestational limit for the Mifeprex regimen should not have been increased (Petition at 4). Do you agree? Please explain why or why not.

**Response to** (b)(6)/PPI **Question 1b:**

No, we do not agree. The (b)(6) review of S-020 concluded that Mifeprex, in a regimen with misoprostol, is safe and effective for medical termination of intrauterine pregnancies through 70 days' gestation.[11]

With respect to efficacy, complete medical abortion rates from the pivotal clinical trials relied on for the initial approval of original Mifeprex (mifepristone followed by oral misoprostol regimen through 49 days of gestation) were 92.1 and 95.5% in the US and French trials, respectively. The studies reviewed in support of the 2016 approval (with an indication for medical termination of intrauterine pregnancy through 70 days gestation) showed comparable efficacy. The 2016 clinical review summarized clinical outcomes and adverse effects from 22 studies (7 in the United States and 15 from outside the United States) through 70 days gestation using the now-approved regimen.[11] The ranges of complete medical abortion rates calculated by the clinical reviewer were: 93.2 to 98.7% in the US studies and 92 to 98.2% in the non-US studies. The Division's 2016 action to extend the GA limit for Mifeprex did not compromise on efficacy.

As discussed above, the rate of serious adverse events through 70 days GA are rare. The benefit/risk assessment supported the Division's 2016 approval.

**B. Dosage and Administration:**

**Question 2.** Do you agree with Petitioners' statement that FDA should limit the ability to prescribe and dispense Mifeprex to qualified, licensed physicians, rather than healthcare providers, because of the regimen's serious risks and because physicians are better trained to diagnose patients who have contraindications to Mifeprex and to verify gestational age (Petition at 3)? Please explain why or why not.

**Response to** (b)(6)/PPI **Question 2:**

No, we do not agree. Prior to approval of S-20, the Prescriber's Agreement in the REMS specified that "…Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…" However, the labeling also stated that other healthcare providers (HCPs), acting under the supervision of a qualified physician, may also dispense/administer Mifeprex to patients. Therefore, the provisions of the labeling (including REMS) approved in 2016 that relate to provider training and admitting privileges are substantially similar to the labeling provisions approved in 2000. Under currently approved labeling, HCPs who administer Mifeprex must be licensed to prescribe, and must have the ability to date pregnancies accurately and to diagnose ectopic pregnancies. These HCPs must

---

[11] 2016 Medical Review, Table 3 (U.S. studies) and Table 4 (international studies), page 29 and 30 of 100. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

Reference ID: 4906306

also (1) be able to provide any necessary surgical intervention, or  have made arrangements for others to provide for such care; or (2) be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

As we determined, in conjunction with the ▓▓▓▓▓(b)(6)/PPI▓▓▓▓▓ during the review of S-020, the safety and efficacy of allowing non-physician HCPs to order, dispense, and administer Mifeprex are supported by available data. ▓▓(b)(6)/PPI▓▓ 2016 review[12] included three randomized clinical trials and one comparative study that evaluated safety and efficacy of medical abortion when performed by non-physician HCPs. Two trials evaluated the Mifeprex and buccal misoprostol regimen (Olavarrieta and Kopp Kallner),[13,14] one trial studied the regimen using vaginal misoprostol (Warriner),[15] and the fourth study did not specify the route of misoprostol administered (Puri).[16] Olavarrieta reported completion rate of 97.9% when medical abortion was provided by nurses as compared with 98.4% with physicians. Kopp Kallner reported completion rate of 99% with certified nurse midwives vs. 97.4% with physicians. Warriner reported abortion complete rate of 97.4% with nurses as compared with 96.3% with physicians. Puri reported abortion completion rate of 96.8% when the service was provided by nurse-midwives as compared with 97.4% in the "standard care" group. Our 2016 clinical review also included a systemic review of six controlled clinical studies by Renner;[17] the authors concluded that the evidence "indicates that trained mid-level providers may effectively and safely provide first trimester surgical and medical termination of pregnancy services." Additionally, Barnard et al., in a Cochrane systematic review, assessed the safety and effectiveness of abortion procedures administered by mid-level providers (nurse practitioners, midwives, other non-physician healthcare providers) compared to doctors.[18] This Cochrane review concluded that there was no statistically significant difference in the risk of failure for medical abortions performed by mid-level providers compared with doctors; this conclusion was based in part on the same studies that FDA reviewed in 2016.[19]

---

[12] Cross-Discipline Team Leader memorandum, S-020.

[13] Olavarrieta CD, Ganatra B, Sorhaindo A, et al. Nurse versus Physician-provision of Early Medical Abortion in Mexico: A Randomized Controlled Non-Inferiority Trial. Bull World Health Organ. 2015;93:249-258.

[14] Kopp Kallner H, Gomperts R, Salomonsson E, et al. The efficacy, safety and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse-midwives: a randomized controlled equivalence trial. BJOG. 2015; 122: 510-517.

[15] Warriner IK, Wang D, et al. Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors? A randomized controlled equivalence trial in rural Nepal. Lancet. 2011; 377: 1155-61.

[16] Puri M, Tamang, A, Shrestha P, et al. The role of auxiliary nurse-midwives and community health volunteers in expanding access to medical abortion in rural Nepal. Reproductive Health Matters. 2015; 22(44) 94-103.

[17] Renner RM, Brahmi D, Kapp N. Who can provide effective and safe termination of pregnancy care? A systematic review. BJOG 2013 Jan;120(1):23-31.

[18] Barnard S, Kim C, Park MN, Ngo TD. Doctors or mid-level providers for abortion (Review). Cochran Database of Systematic Reviews. 2015, Issue 7.

[19] Of the medical abortion studies reviewed by Barnard et al., two were reviewed by the Agency as part of the review of the S-020 supplement in 2016. See Warriner et al. and Kopp Kallner et al. The third study used a different

7

2019 CP 000605

Reference ID: 4906306

With respect to identification of patients with contraindications to using Mifeprex, [(b)(6)/PPI] finds that this evaluation can be done by mid-level HCPs as well as physicians. Mifepristone in a regimen with misoprostol for medical termination of pregnancy through 70 days gestation is contraindicated in patients with any of the following conditions:

- Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass
- An intrauterine device in place
- Chronic adrenal failure
- Concurrent long-term corticosteroid therapy
- History of allergy to mifepristone, misoprostol, or other prostaglandins
- Hemorrhagic disorder or concurrent anticoagulant therapy
- Inherited prophyrias

The contraindications can be assessed by trained HCP who prescribe mifepristone by obtaining a medical history, from medical records, and/or from physical examination or ultrasound if appropriate. [(b)(6)/PPI] maintains that HCPs who prescribe possess the clinical and counseling skills necessary to provide medical abortion. Allowing trained advanced practice clinicians to provide medical abortion is supported by ACOG.[20] Furthermore, if necessary, ultrasound training and certification is available to nurse practitioners, physician assistants, as well as physicians (American Institute of Ultrasound in Medicine)[21].

**Question 3.** Do you agree with Petitioners' statement that FDA should strengthen the requirement that providers accurately assess the duration of the pregnancy by mandating that gestational age be assessed by ultrasound (Petition at 5)? Please explain why or why not.

**Response to [(b)(6)/PPI] Question 3:**

No, we do not agree. We refer to FDA's 2016 Denial Response to the citizen petition submitted to Docket No. FDA-2002-P-0364 (hereafter referred to as the 2016 CP denial response), where FDA stated that the determination of gestational age does not always require an ultrasound.[22] In the 2016 CP denial response, FDA "determined that it was inappropriate for us to mandate how providers clinically assess women for duration of

---

dose of misoprostol than the currently approved regimen. (See Jejeebhoy SJ, et al. Feasibility of expanding the medication abortion provider based in India to include ayurvedic physicians and nurses. International Perspectives on Sexual and Reproductive Health 2012;38(3)133-42).

[20] ACOG Practice Bulletin No. 225. Medication Abortion Up to 70 Days of Gestation. Obstetrics and Gynecology 2020; 136(4); e31 to e47.

[21] American Institute of Ultrasound in Medicine. Accessed November 26, 2021.
https://www.aium.org/officialStatements/70

[22] FDA's citizen petition denial response dated March 29, 2016, to the citizen petition submitted by the American Association of Pro-Life Obstetricians and Gynecologists on August 20, 2002, Docket No. FDA-2002-P-0364.

2019 CP 000606

Reference ID: 4906306

pregnancy and for ectopic pregnancy. These decisions should be left to the professional judgment of each provider, as no method (including TVS [transvaginal ultrasound]) provides complete accuracy. The approved labeling for Mifeprex recommended ultrasound evaluation as needed, leaving this decision to the judgment of the provider."

(b)(6)/ PPI **Question 4.** Referencing the Provider Agreement Form and the requirements that a provider: (1) accurately assess the duration of the pregnancy; (2) diagnose ectopic pregnancies; and (3) provide surgical intervention if needed, Petitioners state that FDA should require certified prescribers to be physically present, rather than consulting with the patient over the Internet, when Mifeprex is dispensed so that they can appropriately examine patients and rule out contraindications to the use of Mifeprex (Petition at 4)? Do you agree? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/ PPI **Question 4:**

No, we do not agree. The certified prescriber does not have to be physically present as long as he/she has evaluated the patient's data which confirm a patient's gestational age and intrauterine pregnancy and rule out contraindications as listed and discussed in our response to Question 2 above. As noted above, in the 2016 CP denial response, FDA "determined that it was inappropriate for us to mandate how providers clinically assess women for duration of pregnancy and for ectopic pregnancy."[23] A certified prescriber can also review the Patient Agreement Form[24] with the patient, fully explain the risk of the Mifeprex treatment regimen, and answer any questions, as with any consent process, without physical proximity. To address requirement (3), the certified prescriber must provide or arrange to provide emergency intervention through others and to assure patient access to appropriate medical facilities. It is common practice for HCPs to provide emergency care coverage for other HCPs' patients and in many places, hospitals employ "hospitalists" to provide care to all patients. We also note ACOG's statement that if women need access to emergency surgical intervention, "it is medically appropriate to provide referral to another HCP if needed."[25]

(b)(6)/ PPI **Question 5.** Do you agree with Petitioners' statement that the use of Mifeprex and misoprostol should require three office visits by the patient (Petition at 7)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/ PPI **Question 5:**

No, we do not agree. See also our response to (b)(6)/ PPI Question 4.

The safe use of Mifeprex for medical abortion is not contingent on a specific number of office visits made by the patient undergoing medical abortion. We concluded, upon

---

[23] Id.
[24] Mifeprex REMS https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf
[25] ACOG Practice Bulletin No. 225. Mediation Abortion Up to 70 Days of Gestation. Obstetrics and Gynecology 2020; 136(4); e31 to e47.

2019 CP 000607

Reference ID: 4906306

reviewing the data in S-020, that the elements necessary to assure the safe use of Mifeprex could be scaled back to offset the burden on the patients.[26] These elements include:

- Requiring that healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS program;
- Ensuring that Mifeprex is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber;
- Informing patients about the risk of serious complications associated with Mifeprex.

We do not consider three office visits are necessary to satisfy these elements. The previously required Day 3 visit, mandating administration of misoprostol in clinic, was especially burdensome, considering that most patients will expel the pregnancy within 2 to 24 hours of taking misoprostol.

**(b)(6)/PPI** **Question 5a.** Do you agree with Petitioner's statement that providers may now "confirm" that a patient's drug-induced abortion was successful without a clinic visit (Petition at 7)? Please explain why or why not?

**Response to (b)(6)/PPI Question 5a:**

The 2016 Mifeprex labeling states that complete pregnancy termination "can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasound scan." Not all these modalities require an in-clinic assessment. The 2016 labeling change regarding post-treatment assessment (from specifying an in-office assessment on Day 14 to advising that patients should follow-up with their HCP approximately 7-14 days after taking Mifeprex and not specifying what assessment should be performed) was based on evidence reviewed in S-020. FDA's review concluded that "available data support … that there are a variety of follow-up modalities that can adequately identify the need for additional intervention."[27] These findings are also consistent with ACOG guidelines, which state that "an in-clinic evaluation is not always necessary" and recommends several methods for post-treatment follow-up, as appropriate, including serial serum hCG testing alone or telephone follow-up at 1 week after treatment followed by urine pregnancy testing at 4 weeks after treatment.[7] Because there is more than one effective option to detect an on-going pregnancy, we conclude that how post-treatment follow-up is performed may be determined by the HCP and the patient.

---

[26] 2016 Clinical Review. supra n. 44 and 64-67.
[27] 2016 Cross Discipline Team Leader Review
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020CrossR.pdf. p17/60

2019 CP 000608

Reference ID: 4906306

(b)(6)/PPI **Question 5b**. Do you agree with Petitioners' statement that a patient may take misoprostol before the prescribed minimum 24-hour period after taking Mifeprex and that home administration of misoprostol does not permit the health providers to control when women take the misoprostol (Petition at 7)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 5b:**
During our review S-020, the evaluation of home use of misoprostol included over 30,000 women. The data showed that Mifeprex, in a regimen with misoprostol administered at home, was safe and effective.[28] Therefore, incorrect administration, if it occurred, was infrequent and did not significantly affect the safety and efficacy of medical abortion. Additionally, because the process of expelling the pregnancy may begin as soon as 2 hours after taking misoprostol, there is a benefit in allowing patients to choose when and where to start this process to maximize the possibility of their being at a safe place at a convenient time to experience cramping and bleeding.

(b)(6)/PPI **Question 5c.** Do you agree with Petitioners' statement that: (1) the use of buccal misoprostol sooner than 24 hours of administering mifepristone leads to significantly increased failure rates; (2) oral administration of misoprostol is not as effective in ending the pregnancy; (3) taking misoprostol earlier than 48 hours after Mifeprex is more likely to "fail the regimen (Petition at 7)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 5c:**
Incorrect self-administration of medication has not been shown to adversely affect efficacy and safety (see (b)(6)/PPI response to (b)(6)/PPI Question 5b above).

The Petitioners state the use of buccal misoprostol sooner than 24 hours of administering mifepristone leads to a significantly increased failure rate and cites a pilot study by Lohr et al.[29]  Lohr et al. assessed the complete abortion rate using <u>simultaneous</u> oral mifepristone and buccal misoprostol in three gestational age groupings (≤ 49 days, 50-56 days, 57-63 days) and compared the rates with those published in previous pilot investigations[30,31] using <u>simultaneous</u> oral mifepristone and vaginal misoprostol in the same three gestational age groupings.  The complete abortion rates at 24 hours reported by Lohr for oral mifepristone and buccal misoprostol were 72.5%, 69.2%, and 72.5%,

---

[28] 2016 Clinical review. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf. page 41.
[29] Lohr PA, Reeves MF, Hayes JL, et al., 2007, Oral Mifepristone and Buccal Misoprostol Administered Simultaneously for Abortion: A Pilot Study, Contraception, 76:215-220.
[30] Schreiber CA, Creinin MD, Harwood B, Murthy AS. A pilot study of mifepristone and misoprostol administered at the same time for abortion in women with gestation from 50 to 63 days. Contraception 2005;71:447–50.
[31] Murthy AS, Creinin MD, Harwood B, Schreiber C. A pilot study of mifepristone and misoprostol administered at the same time for abortion up to 49 days gestation. Contraception 2005;71:333–6.

2019 CP 000609

Reference ID: 4906306

respectively, for the three gestational age groupings. The complete abortion rates at 2 weeks reported by Lohr for oral mifepristone and buccal misoprostol were 97.5%, 100%, and 94.9%, respectively. The published complete abortion rates at 24 hours for oral mifepristone and vaginal misoprostol were 90%, 88%, and 83%, respectively, for gestational age groupings and the complete abortion rates at 2 weeks for oral mifepristone and vaginal misoprostol were 98%, 93%, 90% respectively.[32,33] As recommended in Section 2.3 of approved labeling, follow-up at the 7-14 day after administration of mifepristone is more appropriate to evaluate efficacy. Based on the data presented in Lohr, the use of buccal misoprostol at the same time as oral mifepristone does not adversely affect efficacy, although expulsion may be delayed. In Section 2.1 Dosing Regimen in labeling, we advise women to take misoprostol within 24 to 48 hours after taking mifepristone. While we acknowledge that the effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours after mifepristone administration, we do not agree that doing so would result in a significantly increased failure rate.

The Petitioners are concerned that self-administration of misoprostol may result in swallowing rather than buccal administration with resultant decreased efficacy. Winikoff et al. specifically studied the use of oral vs buccal misoprostol 24-36 hours after mifepristone 200 mg in women with pregnancies up to 63 days with overall medical abortion success rates of 91.3% vs 96.2%.[34] Although the study showed decreased efficacy with oral vs. buccal misoprostol in 57-63 days gestational age (85.1% versus 94.8%), there were no statistical differences in other gestational age groupings. Assuming there is a small proportion of women who are 57-63 days gestational age and use oral administration of misoprostol (rather than buccal as labeled), a small decrease in the reported efficacy in that population would not justify requiring a clinic visit for all women undergoing medical abortion. As we note above in our response to Question 1b, our 2016 review included 22 studies which assessed mifepristone 200 mg followed in 24 to 48 hours by buccal misoprostol in pregnancies through 70 days gestation. As stated above, the ranges of complete medical abortion rates reported were: 93.2 to 98.7% in the US studies and 92 to 98.2% in the non-US studies.

The Petitioners cite the 2015 systematic review by Chen and Creinin. The Petitioners state that the review found "women taking misoprostol earlier than 48 hours after Mifeprex are more likely to fail the regimen." Chen and Creinin included studies in which the intervals between mifepristone and buccal misoprostol were 24 hours or 24-48 hours and stated that "based on the available literature, the overall efficacy of regimens

---

[32] Id.
[33] Schreiber CA, supra n. 31
[34] Winikoff B, Dzuba, IG, Creinin MD, et al, 2008, Two Distinct Oral Routes of Misoprostol in Mifepristone Medical Abortion, Obstet Gynecol 112(6):1303-1310.

2019 CP 000610

Reference ID: 4906306

with a 24-hour interval between mifepristone and buccal misoprostol is significantly lower than those with a 24- to 48-hour interval (94.2% compared with compared with 96.8%)."[7]  The differences in efficacy rates were statistically significant but both regimens are more effective than the 92% efficacy rate of the original FDA-approved regimen. In the 2016 clinical review, we stated that "[p]recise timing of the administration of misoprostol has not been shown to result in a higher success rate which is why the majority of the [22 studies reviewed] allowed a range of hours between the mifepristone dose and misoprostol dose rather than one set time between [mifepristone and misoprostol]."[35] Our 2016 review also referenced a 2013 systematic review by Raymond, which concluded that "if mifepristone-misoprostol interval is < 24 hours, the procedure is less effective compared to an interval of 24-48 hours."[36] Therefore, under Section 2 Dosing Regimen, the labeling approved in 2016 recommends a "<u>minimum</u> 24-hour interval between" mifepristone and misoprostol (underline emphasis included in the labeling).

(b)(6)/PPI  **Question 5d**. In support of Petitioners' assertion that more healthcare oversight is needed, the Petitioners cite the World Health Organization's finding that up to 90% of women will abort with 4-6 hours after taking misoprostol and under the 2000 regimen patients were permitted to remain in the clinic during this time-period (Petition at 8). The Petitioners also cite a 2018 study to support the Petitioners' statement that abortion complications are more frequent when women aborted at home (Petition at 8). Do you agree? Please explain why or why not.

**Response to** (b)(6)/PPI **Question 5d:**

No, we do not agree. The Petitioners appear to cite the WHO guidance document out of context. In stating that up to 90% of women will expel the products of conception (i.e., abort) within 4-6 hours after taking misoprostol, the WHO guidance states so in the context of recommending adequate pain management because most women are likely to require medication for cramping pain during this time period.[37] The WHO guidance takes no position in whether women should return to and remain in the clinic during a follow-up visit for purposes of taking misoprostol. In fact, the WHO guidance explicitly recognizes that post-abortion care may not require a follow-up visit if the patient is adequately counseled.[38]  In the U.S., and as reflected in the approved labeling, medical abortion usually involves women terminating the pregnancy at home, with appropriate follow-up that may not include a return visit.

---

[35] 2106 Medical Review, supra n. 11, at 31
[36] Id.
[37] World Health Organization, Safe Abortion: technical and policy guidance for health systems – 2nd edition. 2012. Page 45 and Section 2.2.2.1 Medication for pain.
[38] Id. at Section 2.3 Post-abortion care and follow-up, page 52.

2019 CP 000611

Reference ID: 4906306

The Petitioners also cite Carlsson, et al., a study that evaluated complications following all medical and abortions (both less than 12 weeks and more than 12 weeks) as well as surgical abortions performed at one hospital in Sweden between 2008 and 2015.[39] For the years 2008 to 2010, data were collected retrospectively; for the years 2011 to 2015, data were collected prospectively. In this study, medical abortions after 12 gestational weeks all occurred at the hospital. The authors report that, among medical abortions less than 12 weeks, the complication frequency increased from 5.4 percent (2008 to 2010) to 8.2 percent (2015). However, the authors also compared the complications related to medical abortions that occurred less than 12 gestational weeks between "at home" abortions (managed as an outpatient) and "at the hospital" abortions, in 2015 and found no statistically significant difference (8.2 percent at home versus 8.0 percent at the hospital). For pregnancies less than or equal to 9 gestational weeks, the rates appear similar for the "at home" group (10.0 percent) and the "at the hospital" group (9.3 percent).

Notably, our 2016 clinical review assessed serious adverse events by gestational age, including hospitalizations, serious infection requiring hospitalization or intravenous antibiotics, bleeding requiring transfusion, and ectopic pregnancy as reported in the literature submitted by the Applicant. We concluded that these "serious adverse events with the [regimen approved in 2016] are rarely reported and that the regimen of mifepristone 200 mg followed by buccal misoprostol 800 mcg in 24-48 hours is safe to approve for use through 70 days gestation.[40]

In summary, the totality of data on the safety and efficacy of medical abortion less than 70 days gestation derived from numerous studies has characterized the complications and rates of complications for completing medical abortion at home with the findings showing medical abortion at home is both safe and effective.

(b)(6)/PPI **Question 5e.** Do you agree with Petitioners' statement that a follow-up examination is particularly critical for Rh-negative patients and without the follow-up, women will not receive Rhogam after the abortion, increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies (Petition at 9)? Please explain why or why not.

**Response to** (b)(6)/PPI **Question 5e:**
No, we do not agree. The Petitioners suggest that a clinic visit after the administration of Mifeprex is important for Rh-negative women to receive Rhogam and that removing the required follow-up visit puts Rh-negative women at risk for isoimmunization. Rh testing is standard of care in the U.S. and RhD immunoglobulin (such as Rhogam) should be

---

[39] Carlsson I, Breding K, Larsson PG, 2018, Complications Related to Induced Abortion: A Combined Retrospective and Longitudinal Follow-up Study, BMC Women's Health 18:158.
[40] 2016 Medical Review, pages 51 to 57 of 100.
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

2019 CP 000612

Reference ID: 4906306

administered if indicated. Further, administration of RhD immunoglobulin should be given within 72 hours of a sensitizing event (e.g., medical abortion).[41] However, at what facility (clinic, hospital, laboratory) the Rhogam injection occurs is not critical. A shift from medical clinics to hospitals for administration of Rhogam injections has occurred over the years due to shortages of RhD immunoglobulin and poor reimbursement for RhD immunoglobulin injection from third-party payers.[42] This has resulted in pregnant women obtaining the routine 28-week Rhogam injection at hospitals/laboratories with a prescription provided by their HCPs. This same process of obtaining RhD immunoglobulin via prescription is available to women after medical abortion and does not require a follow-up clinic visit.

**Question 5f.** Do you agree with Petitioners' representation of the cited studies regarding the reduction of required visits (Petition at 9-10)? Please explain why or why not.

**Response to** [b(6)/PPI] **Question 5f:**

Yes, we agree. The three studies referenced[43,44,45] evaluate the effectiveness of semiquantitative urine pregnancy tests (multi-level pregnancy tests, MLPT) and low sensitivity urine pregnancy tests (LSPT) to rule out on-going pregnancies after medical abortion and the ability of women to self-administer and interpret the test results. The studies overall conclude that in the majority of women, it is feasible to use a simplified test to determine whether further follow-up is necessary. We acknowledge that urine pregnancy tests are used for post medical abortion follow up. A recent systematic review and meta-analysis by Baiju assessed the effectiveness and safety of self-assessment of the outcome of medical abortion using a low sensitivity or semiquantitative urine pregnancy test with or without symptom check list completed at home. At home self-assessment compared with routine clinic follow up after medical abortion was not inferior to routine clinic follow up.[46] Recent ACOG recommendations indicate that "follow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility."[47] Nonetheless, the FDA-approved label for mifepristone states patients should follow up

---

[41] ACOG Practice Bulletin No. 181. Prevention of Rh D Alloimmunization. August 2017.

[42] https://www.mdedge.com/obgyn/article/61083/practice-management/rhogam-injections-payment-levels-vary-among-insurers

[43] Lynd K, Blum J, Thi Nhu Ngoc N, et al., 2013, Simplified Medical Abortion Using A Semi-Quantitative Pregnancy Test for Home-Based Follow-Up, Internal Journal of Gynecology and Obstetrics, 121:144-148.

[44] Raymond E, Tan, Y, Grant, M, et al., 2018, Self-Assessment of Medical Abortion Outcome Using Symptoms and Home Pregnancy Testing, Contraception 97:324-328.

[45] Raymond E, Shochet T, Bracken, H, 2018, Low-Sensitivity Urine Pregnancy Testing to Assess Medical Abortion Outcome: A Systematic Review, Contraception 98:30-35.

[46] Baiju, N, Acharya, G, D'Antonio, F, et al. 2019. Effectiveness, safety and acceptability of self-assessment of the outcome of first-trimester medical abortion: a systematic review and meta-analysis. BJOG; 126:1536-1544.

[47] ACOG Practice Bulletin Number 225, Medication Abortion Up to 70 Days of Gestation. Obstetrics Gynecol 2020;136(4): e31-e47.

Reference ID: 4906306

with their healthcare provider approximately 7-14 days after administration of misoprostol to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding. Termination can be confirmed by medical history, clinical examination, hCG testing or ultrasonographic scan.

The Petitioners note in one study[48], 26% of participants provided no follow up information. We also note that this level of lack of follow up information is not uncommon in similar studies.

(b)(6)/PPI **Question 5g**. Do you agree with Petitioners' statement that ACOG acknowledges that drug-induced abortion is contraindicated for patients who are not available for follow-up contact or evaluation (Petition at 10)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 5g:**

No, we do not agree. As discussed in our response to (b)(6)/PPI Question 5a, post-medical abortion follow-up may be accomplished in many ways and not all require an in-clinic visit. ACOG states that "Women are not good candidates for medical abortion if they …are not available for follow-up contact or evaluation…" and notes that medical abortion requires follow-up to ensure completion of abortion.[4] Neither of these statements contraindicates medical abortion in women who are not available for an in-clinic follow-up visit. Rather, ACOG's statements may be considered by the women and their HPCs in the consultation and consent process to determine the best abortion option for each woman.

(b)(6)/PPI **Question 5h**. Do you agree with Petitioners' statement that drug-induced abortion is a longer process that requires more attention and care from HCPs (Petition at 10)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 5h:**

We agree that medical abortion can be a longer process than surgical abortion[49] but we disagree that medical abortion always requires in-person follow-up with a healthcare provider. None of the complications associated with medical abortion necessarily requires more intensive management from HCPs during a follow-up visit. The question of whether to include an in-person follow-up visit should be discussed by the healthcare provider and the patient. We have concluded that medical abortions are safe and effective for women who are appropriate candidates. Contrary to what the Petitioners claim,

---

[48] Raymond, supra n.44
[49] See ACOG Practice Bulletin Number 225, supra n. 26.

2019 CP 000614

Reference ID: 4906306

reducing the number of clinic visits does not compromise patient safety and is not done for the "convenience" of healthcare providers or patients.

## C. Contraindications:

(b)(6)/PPI **Question 6**. Petitioners note that critical language contraindicating Mifeprex for patients without access to appropriate medical care was excluded from the 2016 Mifeprex label and cite a study and ACOG statements indicating that Mifeprex abortions have greater risks and more need for emergency reoperation than a surgical abortion. Petitioners focus on this point particularly for patients in rural areas with limited access to emergency medical care (Petition at 11). Do you agree? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 6:**

No, we do not agree. The 2016 labeling is consistent with the 2006 Physician Labeling Rule (PLR) format, which includes a Boxed Warning and lists the Mifeprex REMS program which was established after the 2000 approval.

Although inadequate access to medical facilities for appropriate care was removed from the list of contraindications in Section 4 of the approved labeling, the 2016 labeling continue to include appropriate instructions for providers regarding patient access to appropriate medical care in the designated sections of Mifeprex labeling as seen below:[50] (underline added)

- Boxed Warning: Before prescribing MIFEPREX, inform the patient about the risk of these serious events. <u>Ensure that the patient knows whom to call and what to do,</u> including going to an Emergency Room if none of the provided contacts are reachable, if she experiences sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if she experiences abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting or diarrhea) for more than 24 hours after taking misoprostol.
- 2.2 Patient Management Following Misoprostol Administration
  Give the patient:… <u>The name and phone number of the healthcare provider who will be handling emergencies.</u>
- 17 Patient Counseling Information
  Provider Contacts and Actions in Case of Complications
  <u>Ensure that the patient knows whom to call and what to do,</u> including going to an Emergency Room if none of the provided contacts are reachable, or if she experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever [see Boxed Warning].

---

[50] Mifeprex labeling, approved 2016.
https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf

2019 CP 000615

Reference ID: 4906306

Additionally, one of the required qualifications listed in the Prescriber Agreement Form is "Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary."[51]

The Petitioners cite information in Box 1, Features of Medical and Surgical Abortion (page 3) in the ACOG Practice Bulletin No. 143.[4]  We note that Practice Bulletin No. 143 is no longer in effect and has been replaced by ACOG Practice Bulletin No. 225, which does not have language contrasting the features of medical and surgical abortion.

### D. Adverse Event Reporting:

**Question 7.** Do you agree with Petitioners' statement that collecting accurate and complete adverse event information for Mifeprex is highly difficult and that many prescribers violate FDA protocol and instruct their patients to lie to emergency medical personnel (Petition at 12)? Please explain why or why not.

**Response to Question 7:**

No, we do not agree. The safety profile of Mifeprex with misoprostol for medical abortion is well-established based on clinical studies performed over several years. Since the approval in 2000, no new safety concerns have arisen and the known serious risks occur infrequently (< 0.7%). FDA routinely reviews the safety information provided by the Applicants in the Annual Reports. As with all other application holders, the Applicant is required to report serious, unexpected adverse events as 15-day safety reports, and to submit non-expedited individual case safety reports, and periodic adverse drug experience. In addition to this requirement for the NDA holder(s), certified physicians are required to report any deaths.

We cannot address the Petitioners' accusation that many Mifeprex prescribers instruct their patient to lie to emergency medical personnel because we have no documentation that U.S. prescribers instruct their patients to lie. The Petitioners cite instructions from the organization Aid Access to patients that they could tell emergency room staff that they had a miscarriage. We note that Aid Access facilitates the sale of unapproved mifepristone and misoprostol to U.S. consumers and that FDA has sent Aid Access a letter asking it to promptly cease causing the sale of unapproved and misbranded drugs to U.S. consumers.[52]



We recommend that      also seeks input from the      and the      in the

---

[51] Mifeprex REMS, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RemsR.pdf. Prescriber Agreement starts on page 6.
[52] US FDA Warning Letter to Aid Access.org, dated March 8, 2019. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/aidaccessorg-575658-03082019

2019 CP 000616

Reference ID: 4906306

(b)(6)/PPI **Question 10**. Do you agree with Petitioners' statement that FDA should provide guidance to emergency healthcare providers and physicians so they know how to distinguish complications following drug-induced abortion from complications following spontaneous miscarriage (Petition at 13)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 10:**

No, we do not agree. The FDA has worked with the NDA holder to issue several communications to HCPs and emergency department providers advising an "elevated index of suspicion" for serious adverse events such infection and sepsis following medical abortion. These communications can be located on the webpage Historical Information on Mifepristone (marketed as Mifeprex) and include, but not limited to, the following:

- November 15, 2004: Dear Health Professional Letter and Dear Emergency Room Director Letter
- July 19, 2005: Healthcare Professional Sheet, Public Health Advisory, and revised labeling
- March 17, 2006: Public Health Advisory
- February 24, 2010: Mifeprex Questions and Answers

Since the issuance of these communications, we have not identified a change in the safety profile of mifepristone.[53]  Our assessment is also supported by ACOG's Committee Opinion Number 427, which discusses complications to abortion (spontaneous or induced) and states postabortion care "refers to a specific set of services for women experiencing problems for all types of spontaneous or induced abortions."[54] The care "involves management of incomplete abortion, and complications include retained tissue, hemorrhage, and infection." Because there does not appear to be any specific complications that occur solely in medical abortion, there is no guidance at this time to provide emergency HCPs. Finally, if we become aware of safety information that merits further communications, or that warrants revisions to the approved labeling, we will act as appropriate.

## 2. Mifeprex REMS

### A. Request to Retain Mifeprex REMS:

(b)(6)/PPI **Question 11**. Do you agree with Petitioners that the Mifeprex REMS should require a formal study for at-risk populations, including: patients under the age of 18; patients with repeat

---

[53] Postmarketing safety reviews (done every six months) by the (b)(6)/PPI dated September 24, 2021, April 12, 2021, October 6, 2020, etc.
[54] Misoprostol for Postabortion Care. ACOG Committee Opinion Number 427. February 2009.

2019 CP 000617

Reference ID: 4906306

Mifeprex abortions; patients with limited access to emergency room services; and patients who self-administer misoprostol (Petition at 13)? Please explain why or why not.

**Response to (b)(6)/PPI Question 11:**

No, we do not agree that an additional study is needed. These at-risk populations have been included in clinical trials evaluating medical abortion; they have been found to be appropriate populations for Mifeprex use.

- The Petitioners state that Mifeprex was approved for use in the pediatric population after the requirement for studies in the pediatric population were waived. During the 2016 review for S-20, a partial waiver was granted for pediatric studies in premenarchal females under because pregnancy does not occur in premenarchal females. Additionally, in conjunction with the Agency's (b)(6)/PPI, (b)(6)/PPI concluded that the Applicant had provided adequate information to support efficacy and safety in adolescents aged 12 to 16 years. The totality of this information includes data extrapolated from adults and information in literature.[55] Over 1,000 adolescents aged 12 to 17 years used Mifeprex and misoprostol for medical abortion in the trials evaluated by (b)(6)/PPI Review of these findings found the efficacy and safety in this population to be similar to the efficacy and safety in the adult population.

- Published data concerning adverse reproductive health outcomes in US women who undergo repeat medical abortions with Mifeprex are limited. Our 2016 clinical review stated that "there is no evidence that repeated medical or surgical abortion is unsafe or that there is a tolerance effect." The review also noted that return to fertility is well-documented: in the Patient Counseling Information section, the labeling states "inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses" and "inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before she resumes sexual intercourse." The Medication Guide also conveys the same information, stating: "You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again." Although the Petitioners state that more than one out of every three abortion in the US is a repeat abortion,[56] (b)(6)/PPI is not aware of reports suggesting greater safety concerns in repeat abortion than first-time abortion. The Petitioners also cite a published study, using a mouse model of repeated medical termination of pregnancy that showed repeat medical abortion impaired the reproductive function of female mice.[57] However, these data from a single nonclinical study in mice are not persuasive, given that return to fertility after medical abortion is known clinically;

---

[55] Primary Clinical Review for S-20, dated March 29, 2016.
[56] Jones R, Jerman J, Ingerick M. Which abortion patients have had a prior abortion? Findings from the 2014 U.S. Abortion Patient Survey. J Womens Health
[57] Lv F, Xu X, Zhang S, et al. Repeated abortion affects subsequent pregnancy outcomes in BALB/c mice. PLoS One. 2012;7(10):e48384.

2019 CP 000618

Reference ID: 4906306

please see our 2016 clinical review. Therefore, we do not agree that a study is necessary in this population.

- The Petitioners request a formal study of mifepristone for medical abortion in women without access to emergency care. However, certified prescribers must attest that they have the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and the ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary. Therefore, mifepristone is prescribed only to women who are assured access to emergent care if needed. We do not agree that a study as suggested by the Petitioners is needed.

- In the 2016 review for S-20, (b)(6)/PPI conducted a literature review of self-administration of misoprostol at home. In the clinical trials reviewed, over 30,000 women (including over 13,000 US women) had home use of misoprostol (Table 8 in the clinical review for S-20).[7] (b)(6)/PPI found no efficacy or safety concerns with home self-administration of misoprostol.

(b)(6)/PPI **Question 12**. Citing the Council for International Organizations of Medical Sciences' (CIOMS) definitions[58] of "rare" and a 2018 Swedish study, Petitioners state that because "about 1 out of 100 women" using Mifeprex/misoprostol require surgery, serious complications are common, not rare,[29] and medical abortions carry greater risks than surgical abortions (Petition at 15-16). Do you agree? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 12:**

No; we do not agree. The Petitioners reference definitions and frequencies of adverse drug reactions from CIOMS[59] and reference two sentences in the Medication Guide that refer to different events. Petitioners state that the Medication Guide improperly downplays the risks of the use of Mifeprex in a regimen with misoprostol and cite the Medication Guide as stating "'*rarely*, serious and potentially life-threatening bleeding, infections, and other problems can occur following . . . medical abortion.' Specifically, 'in about 1 out of 100 women [administered Mifeprex and misoprostol] bleeding can be so heavy that it requires a surgical procedure." Using these two separate statements in the Medication Guide, the Petitioners argue that the CIOMS's definition of rare ("1 out of 1000") means that if 1 out of 100 women using Mifeprex in a regimen with misoprostol require surgery, serious complications are common, not rare. However, the Petitioners' reference to these two statements conflate two different clinical scenarios: (1) the adverse events of serious and potentially life-threatening bleeding, and (2) treatment failure. The first sentence (under section What symptoms should I be concerned with) states: "Although cramping and

---

[58] https://www.who.int/medicines/areas/quality_safety/safety_efficacy/trainingcourses/definitions.pdf
[59] Council for international Organizations of Medical Sciences. Guidelines for Preparing Core Clinical Safety Information on Drugs Second Edition. 1999. https://cioms.ch/wp-content/uploads/2018/03/Guidelines-for-Preparing-Core-Clinical-Safety-Info-Drugs-Report-of-CIOMS-Working-Group-III-and-V.pdf.  Accessed December 13, 2021.

2019 CP 000619

Reference ID: 4906306

bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth." This statement refers to life-threatening problems that can occur during expulsion of a pregnancy regardless of gestational age or mode of delivery (e.g., vaginal delivery or cesarean section). During the 2016 Mifeprex review, the reported rate of death in the submitted studies reviewed by the FDA, based on one death, was 0.007% (very rare by CIOMS), the rate of infections requiring hospitalization or intravenous antibiotics was < 0.1% (rare by CIOMS), and the rate of transfusion were 0.03-0.7% (rare to uncommon by CIOMS).[60]  Therefore, "rarely" accurately refers to the frequency of the adverse events referenced in this statement. The second sentence (under section Be sure to contact your healthcare provider promptly if you have any of the following; subsection Heavy Bleeding): "In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C)." This statement refers to the rate of surgical procedures for bleeding that occurred in women following treatment with mifepristone. Heavy bleeding or hemorrhage after medical abortion is a small subset of bleeding and can require a surgical procedure due to ongoing pregnancy or incomplete expulsion; these are considered failed treatment rather than adverse events and are not characterized using the CIOMS definitions. Even if heavy, bleeding after medical abortion may not be considered a serious adverse event unless clinically diagnosed as hemorrhage or requiring a transfusion. Furthermore, in the vast majority of medical abortions, surgical intervention is not necessary.

The Petitioners cite a Niinimaki, et al.[61] study reporting overall incidences of immediate adverse events (up to 42 days) in medical and surgical abortions performed in women undergoing induced abortion from 2000-2006 based on data from the Finnish national registries. The overall incidence of adverse events for medical abortion was fourfold higher when compared with surgical abortion (20.0% vs. 5.6%). Specifically, hemorrhage (15.6% vs. 2.1%), incomplete abortion (6.7% vs. 1.6%), and surgical (re)evacuation (5.9% vs. 1.8%) were higher for medical abortion compared with surgical abortion. However, injuries requiring operative treatment or operative complications were higher in the surgical abortion group (0.6% vs. 0.03%). No differences were noted in the incidence of infections, thromboembolic disease, psychiatric morbidity, or death. The authors acknowledged weaknesses in registry data, including variable reliability of diagnoses and severity of diagnoses. They stated that there was a high rate of consultation for the diagnosis of hemorrhage, which was not surprising because medical abortion is associated with uterine bleeding lasting approximately two weeks and specifically noted that uterine bleeding requiring surgical evacuation probably better reflects the severity of bleeding after

---

[60] These rates are reported in Section 6 (Adverse Reactions) of the approved mifepristone labeling.
[61] Niinimaki M, Pouta A, Bloigu A, et al. Immediate complications after medical compared with surgical termination of pregnancy. Obstet Gynecol. 2009;114(4):795-804.

Reference ID: 4906306

termination of pregnancy. The incidence of such bleeding was relatively low, but it was more common in the medical abortion group (2.9% vs. 0.9%). The authors concluded that both methods are generally safe; they recommend discussing the adverse event profiles of different methods when counseling women seeking pregnancy termination. Ireland, et al.[62] reported findings from a more recent retrospective cohort study of 30,146 US women undergoing pregnancy termination before 64 days of gestation from November 2010 to August 2013. Efficacy of pregnancy termination was 99.6% and 99.8% for medical and surgical abortion, respectively, which represented a fourfold higher risk of abortion failure in those undergoing medical abortion. Unanticipated aspiration for persistent pain, bleeding or both were 1.8% and 0.4% for medical and surgical abortion respectively. These findings are compatible with the Niinimaki study findings. There was no difference in major adverse events (emergency department visit, hospitalization, uterine perforation, infection, hemorrhage requiring transfusion) between the groups. The authors conclude medical and surgical abortion before 64 days of gestation are both highly effective with low complication rates.

We acknowledge that medical abortion is known to have more days of bleeding and increased rates of incomplete abortion compared to surgical evacuation, but without increases in major adverse events (e.g., death, hospitalization, uterine perforation, infection, hemorrhage requiring transfusion). However, in a vast majority of medical abortions, surgical intervention can be avoided. Thus, medical abortion and surgical abortion are two options; both have benefits, side effects, and potential complications. It should be up to women and their HCPs to decide which method is preferable and safer according to each woman's unique situation.

(b)(6)/PPI **Question 13.** Do you agree with Petitioners' representation of the cited studies on the use of mifepristone for management of early miscarriages (Petition at 16-17)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 13:**

The use of mifepristone for the management of early miscarriages is investigational and outside the scope of the Mifepristone REMS Program.

(b)(6)/PPI **Question 13a:** Do you agree with Petitioners' statement that the Mifeprex + misoprostol arm raises concerns about the need for further study of adverse events, especially hemorrhage (Petition at 17)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 13a:**

---

[62] Ireland LD, Gatter, M, Chen, A. 2015. Medical Compared with Surgical Abortion for Effective Pregnancy Termination in the Frist Trimester. Obstetrics & Gynecology 126;22-28.

23

Reference ID: 4906306

Please see our response to (b)(6)/PPI Question 13. The use of mifepristone for the management of early miscarriages is investigational and outside the scope of the Mifepristone REMS Program.

(b)(6)/PPI **Question 13b:** Do you agree with Petitioners' statements that use of mifepristone to manage spontaneous miscarriages ignores: (1) clear methodological errors, including a failure to accurately diagnose fetal death according to accepted criteria as well as a lack of adherence to the stated inclusion criteria, and (2) the absence of power to evaluate safety (Petition at 18)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 13b:**

Please see response to (b)(6)/PPI Question 13.

(b)(6)/PPI **Question 13c.** Do you agree with Petitioners' statement that a change in spontaneous miscarriage management using mifepristone should require a new drug application with two randomized controlled trials comparing the arms of mifepristone and misoprostol, misoprostol alone, surgical management and expectant management (Petition at 18)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 13c:**

Whether the clinical programs pursuing the management of miscarriage indication are adequate is outside the scope of the Mifepristone REMS Program.

**B. Request to Continue Dispensing Limitations of Mifeprex:**

(b)(6)/PPI **Question 14.** Do you agree with Petitioners' statement that eliminating or relaxing the REMS to facilitate Internet or telephone prescriptions would be dangerous to women and adolescent girls and that healthcare providers prescribing abortion-inducing drugs over the Internet or phone or before a patient is even pregnant cannot adequately evaluate patients for contraindications to the drugs (Petition at 18-19)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 14:**

The current mifepristone labeling states that mifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices and hospitals by or under the supervision of a certified prescribers. We do not agree that eliminating the REMS requirement for the dispensing of mifepristone in certain healthcare settings will be dangerous to patients, nor do we agree that doing so will affect the ability of HCPs to evaluate women for contraindications to mifepristone in a regimen with misoprostol for medical termination of intrauterine pregnancy through 70 days gestation. Evaluation, consent, development of a follow-up plan, and contact for emergency care can occur in many types of healthcare settings. The evaluation of women for contraindications to medical

24

Reference ID: 4906306

abortion includes assessment of medical history and clinical examination (e.g., physical examination or ultrasound examination); these do not necessarily require physical contact with a certified prescriber (see response to [(b)(6)/PPI] Question 2).[15]

Patients who are not pregnant at the time of evaluation would not be appropriate candidates for Mifepristone dispensation because they do not fulfill the indication of having an intrauterine pregnancy through 70 days gestation.

See also REMS Modification Rationale Review Memorandum dated December 16, 2021, which provides the [(b)(6)/PPI] and the [(b)(6)/PPI] rationale and recommendations for modifications to the Mifepristone REMS Program for NDA 020687 and ANDA 091178.[63]

[(b)(6)/PPI] **Question 14a.** Do you agree with Petitioners' statement that without direct patient contact, Rh-negative patients will not receive the Rhogam after their abortion, greatly increasing their risk of subsequent Rh isoimmunization, which can endanger future pregnancies (Petition at 19)? Please explain why or why not.

> [(b)(6)/PPI] **Response to [(b)(6)/PPI] Question 14a:**
>
> No, we do not agree; see our response to Question 5e. "Direct patient contact" with a certified prescriber is not necessary for the administration of Rhogam in Rh-negative women. Further, many women must obtain Rhogam injections from local hospitals with an HCP prescription due to Rhogam shortages and reimbursement from third-party payers.

[(b)(6)/PPI] **Question 14b.** Do you agree with Petitioners' statement that telemedicine abortion absolves abortion providers of responsibility for the well-being of their patients (Petition at 19)? Please explain why or why not.

> [(b)(6)/PPI] **Response to [(b)(6)/PPI] Question 14b:**
>
> No, we do not agree. HCPs who prescribe Mifepristone for medical abortion are responsible for the well-being of their patients regardless of mode of evaluation or dispensing of medication. The Agency agrees with the AMA that a physician-patient relationship is entered when the "physician serves a patient's medical needs"[64] and continues until resolution of the pregnancy or transfer of care to another HCP. Further, the following excerpts are taken from the American Medical Association (AMA) Ethical Practice in Telemedicine:

---

[63] REMS Modification Rationale Review Memorandum dated December 16, 2021 https://darrts_fda.gov/darrts/faces/ViewDocument?documentId=090140af80633d74&_afrRedirect=23032383998405 20
[64] www.ama-assn.org/delivering-care/ethics/patient-physician-relationships

2019 CP 000623

Reference ID: 4906306

- "Physicians who provide clinical services through telehealth/telemedicine must uphold the standards of professionalism expected in in-person interactions, follow appropriate ethical guidelines of relevant specialty societies and adhere to applicable law governing the practice of telemedicine."

- "Physicians must ensure that they have the information they need to make well-grounded clinical recommendations when they cannot personally conduct a physical examination, such as by having another health care professional at the patient's site conduct the exam or obtaining vital information through remote technologies."

- "When the physician would otherwise be expected to obtain informed consent, tailor the informed consent process to provide information patients (or their surrogates) need about the distinctive features of telehealth/ telemedicine, in addition to information about medical issues and treatment options. Patients and surrogates should have a basic understanding of how telemedicine technologies will be used in care, the limitations of those technologies, the credentials of health care professionals involved, and what will be expected of patients for using these technologies."

- "As in any patient-physician interaction, take steps to promote continuity of care, giving consideration to how information can be preserved and accessible for future episodes of care in keeping with patients' preferences (or the decisions of their surrogates) and how follow-up care can be provided when needed. Physicians should assure themselves how information will be conveyed to the patient's primary care physician when the patient has a primary care physician and to other physicians currently caring for the patient."[65]

**(b)(6)/PPI** **Question 15.** Do you agree with Petitioners' representations of a 2018 study, the 2018 Grossman op-ed, and the Guttmacher Institute's 2018 Policy Review, discussing alternative models of providing abortion medications and advocating for the lifting of the REMS on mifepristone (Petitioner at 23-24)? Please explain why or why not.

**Response to (b)(6)/PPI Question 15:**

Yes. We agree that the overarching message in the publications referenced appears to be advocating self-management of medical abortion. The references, Biggs, et al,[66] Grossman,[67] and a Guttmacher Institute's Policy Review,[68] examine expanding access to medical

---

[65] https://www.ama-assn.org/delivering-care/ethics/ethical-practice-telemedicine
[66] Biggs MA, Ralph L, Raifman S, et al. Support for and interest in alternative models of medication abortion provision among a national probability sample of U.S. women. Contraception. 2019:99:118-124.
[67] Grossman D, November 2, 2018, Op-Ed: American Women Should Have Access to Abortion Pills Before They Need Them, https://www.latimes.com/opinion/op-ed/la-oe-grossman-abortion-pills-20181121-story.html
[68] Donovan MK, 2018, Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care, Guttmacher Policy Review, Vol. 21. https://www.guttmacher.org/gpr/2018/10/self-managed-medication-abortion-expanding-available-options-us-abortion-care

2019 CP 000624

Reference ID: 4906306

abortion. All three discuss removal of the REMS and access to Mifeprex and misoprostol without a prescription. Biggs and the Guttmacher Institute's Policy Review also discuss obstacles to access other than the REMS and the need for a prescription.

Biggs et al presents findings from a survey of a "representative U.S. sample of women" on interest and support and perceived advantages and disadvantages of alternative models of medical abortion.[40] The three alternative models of medical abortion are described with a preface that medical abortion is safe and effective and does not include information on known adverse reactions. Interestingly, perceived disadvantages (incorrect administration, absence of clinician visit, concerns with safety) of the alternative methods were higher than perceived advantages (privacy, convenience, earlier access) in most categories tabulated.

Grossman's op-ed advocates for alternative methods of medical abortion and states the FDA restrictions are medically unnecessary and not consistent with the findings of the Biggs survey. Grossman further opines that advanced provision of drug products for emergency contraception helped in the eventual approval for an over-the-counter switch and suggests a similar pathway could be used for an over-the-counter switch of Mifeprex and misoprostol for medical abortion.

The Guttmacher Institute's Policy Review (entitled Self-Managed Medication Abortion: Expanding the Available Options for U.S. Abortion Care) discusses obstacles to providing a full range of safe and effective options for abortion care, including access to a provider if needed or wanted at any stage of the abortion, state restrictions on medical abortions, federal laws allowing physicians and pharmacists to refuse to provide care, stigma and criminalization of self-abortion, and affordability. The Policy Review does note that these obstacles would not be eliminated with the removal of the REMS.

(b)(6)/PPI **Question 16.** Do you agree with Petitioners' statement that Mifeprex prescribers should continue to be certified as qualified (Petition at 25)? Please explain why or why not.

(b)(6)/PPI **Response to** (b)(6)/PPI **Question 16:**

Yes. We agree that only qualified HCPs should prescribe or supervise HCP who prescribe Mifeprex. The Mifepristone REMS Program states that prescribers of Mifepristone should have or be under the supervision of a certified HCP who has the ability to assess pregnancy duration accurately, diagnose ectopic pregnancy, provide surgical intervention if needed or have made plans to provide such care through others, and have the ability to assure access to medical facilities equipped to provide blood transfusions and resuscitation, if needed and explain the risks of the Mifepristone treatment regimen including answering any questions. In other words, prescribers of Mifepristone should be able to accurately access eligibility for medical abortion, provide informed consent, and provide follow-up care including treatment of adverse events related to medical abortion.

Please see also response to (b)(6)/PPI Question 17.

27

Reference ID: 4906306

(b)(6)/PPI  **Question 17.**  Do you agree with Petitioners' request that FDA retain the Mifeprex REMS (Petition at 14)? Please explain why or why not.

(b)(6)/PPI  **Response to** (b)(6)/PPI  **Question 17:**

In 2021, FDA undertook a full review of the Mifepristone REMS Program, in accordance with the REMS assessment provisions of section 505 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 355-1(g)(2)). We agree that FDA should retain the Mifepristone REMS Program. See REMS Modification Rationale Review Memorandum dated December 16, 2021, which provides the (b)(6)/PPI and the (b)(6)/PPI rationale and recommendations for modifications to the Mifepristone REMS Program for NDA 020687 and ANDA 091178.

2019 CP 000626

Reference ID: 4906306

--------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

12/16/2021 02:42:15 PM

(b)(6)/PPI

12/16/2021 02:43:17 PM

(b)(6)/PPI

12/16/2021 02:44:43 PM

2019 CP 000627