**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN*
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
lchaiten@aclu.org


*admitted pro hac vice*


*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE*
JENNIFER DALVEN*
JOHANNA ZACARIAS*
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
jdalven@aclu.org
jzacarias@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN*
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| HEIDI PURCELL, M.D., FACOG, *et al.*<br><br>          Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*,<br><br>          Defendants. | CIVIL ACTION<br>Case No. 1:17-cv-00493-JAO-RT<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Jill A. Otake<br>Hearing Date: Vacated per Dkt. 107<br>Trial Date: Vacated per Dkt. 82 |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

I.  INTRODUCTION ..................................................................1

II. UNDISPUTED FACTS ...........................................................5

   A. New Drug Approvals .....................................................5

   B. REMS Statute ..............................................................5

   C. Mifepristone Regimen and Safety................................7

   D. FDA Regulation of Mifepristone .................................8

      1. Initial Mifepristone Regulations (2000-2020) ...................8

      2. COVID-19 Public Health Emergency .................12

      3. 2023 REMS Reauthorization .............................13

   E. FDA Regulation of Other Drugs ................................20

      1. Drugs without a REMS ....................................20

      2. Drugs with a REMS ........................................21

   F. Harms Imposed by the REMS ....................................21

III. STANDARD OF REVIEW ....................................................25

IV. ARGUMENT ........................................................................25

   A. FDA's Decision Was Arbitrary and Capricious ........25

      1. FDA Failed to Consider Relevant Data .............26

2. FDA Failed to Provide a Reasoned Explanation for Its 2023
REMS Decision. ..................................................................30

    a. FDA Failed to Apply Statutory Standards....................................31

    b. FDA Failed to Respond to Commentary and Evidence
Contrary to Its Decision.................................................33

    c. FDA Failed to Address Its Inconsistent Regulation .....................34

    d. FDA's Rationales are Unreasonable and Unsupported ................35

        i. Patient Agreement ...................................................36

        ii. Prescriber Certification............................................39

        iii. Pharmacy Certification ............................................42

B. The 2023 REMS Exceeds FDA's Statutory Authority ...........................44

V. CONCLUSION ........................................................46

CERTIFICATE OF COMPLIANCE ..................................................48

# TABLE OF AUTHORITIES

## Cases

*ACOG v. FDA,*
  472 F. Supp. 3d 183 (D. Md. 2020) ................................................................12, 13

*Am. Tel. & Tel. Co. v. FCC,*
  974 F.2d 1351 (D.C. Cir. 1992) ...........................................................................30

*Chemehuevi Indian Tribe v. Jewell,*
  767 F.3d 900 (9th Cir. 2014)................................................................................25

*Cook v. FDA,*
  733 F.3d 1 (D.C. Cir. 2013) .................................................................................44

*Dist. Hosp. Partners, L.P. v. Burwell,*
  786 F.3d 46 (D.C. Cir. 2015) ...............................................................................26

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) .............................................................................................36

*Env't Health Tr. v. FCC,*
  9 F.4th 893 (D.C. Cir. 2021) ..........................................................................33, 34

*Genuine Parts Co. v. EPA,*
  890 F.3d 304 (D.C. Cir. 2018) .............................................................................42

*Grayscale Invs., LLC v. SEC,*
  82 F.4th 1239 (D.C. Cir. 2023) ................................................................4, 34, 35

*In re NTE Conn., LLC,*
  26 F.4th 980 (D.C. Cir. 2022) ..............................................................................33

*Int'l Dark-Sky Ass'n, Inc. v. FCC,*
  106 F.4th 1206 (D.C. Cir. 2024) ..........................................................................26

*Los Padres ForestWatch v. U.S. Forest Serv.,*
  25 F.4th 649 (9th Cir. 2022)..................................................................32, 35, 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .........................................................................25, 28, 31, 33

*Nat. Res. Def. Council v. Daley,*
  209 F.3d 747 (D.C. Cir. 2000) .............................................................................25

*Nat. Res. Def. Council v. EPA,*
   38 F.4th 34 (9th Cir. 2022)..................................................................30, 37

*Nat'l Lifeline Ass'n v. FCC,*
   921 F.3d 1102 (D.C. Cir. 2019) ....................................................................41

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.,*
   374 F.3d 1209 (D.C. Cir. 2004) ......................................................31, 41, 43

*SEC v. Sloan,*
   436 U.S. 103 (1978) ......................................................................................46

*Sorenson Commc'ns Inc. v. FCC,*
   755 F.3d 702 (D.C. Cir. 2014) ........................................................31, 37, 40

*Washington v. FDA,*
   668 F. Supp. 3d 1125 (E.D. Wash. 2023) .......................................................6

**Statutes**

21 U.S.C. §355-1 ...................................................................................................5

21 U.S.C. §355-1(a).................................................................................... *passim*

21 U.S.C. §355-1(f).................................................................................... *passim*

21 U.S.C. §355-1(g).................................................................................... *passim*

5 U.S.C. §706(2)(A) .............................................................................................25

5 U.S.C. § 706(2)(C) ............................................................................................25

**Regulations**

21 C.F.R. §201.56.................................................................................................5

21 C.F.R. §201.57.................................................................................................5

21 C.F.R. §208.20.............................................................................................9, 38

iv

## I.   INTRODUCTION

Mifepristone is a prescription medication used to end an early pregnancy by initiating a process similar to miscarriage.[1] As the U.S. Food and Drug Administration ("FDA" or "the Agency") observed in 2016, mifepristone "has been increasingly used as its efficacy and safety have become well-established by both research and experience and serious complications have proven to be extremely rare." Pls.' Concise Statement of Facts ("PCSF") ¶12. Indeed, data from the millions of U.S. patients who have used mifepristone over the past quarter-century confirm that it is safer than common medications like Tylenol and Viagra.

Yet FDA regulates mifepristone more stringently than nearly all other drugs—even fentanyl. Ever since first approving mifepristone in 2000, FDA has subjected it to special restrictions far beyond the normal protections for all prescription drugs. Mifepristone is among the 3% of prescription medications for which FDA imposes a Risk Evaluation and Mitigation Strategy, or "REMS." For years, medical authorities like the American College of Obstetricians and Gynecologists ("ACOG"), the American Medical Association ("AMA"), and Plaintiff Society of Family Planning ("SFP") have urged FDA to lift these "outdated" restrictions because they are "inconsistent with" FDA's regulation of "other medications with

---

[1] Plaintiffs use "mifepristone" to refer to the brand-name drug, Mifeprex®, and its generic, mifepristone, which are subject to identical regulations. PCSF ¶43.

1

similar or greater risks," "confer[] no benefit in terms of [the] safety, efficacy, or acceptability" of mifepristone, and "substantially limit access to this safe, effective medication." PCSF ¶20.

FDA's restrictions on mifepristone are not only unjustified—they defy the strict limits Congress imposed on the Agency's authority to obstruct access to approved medications. Congress permits FDA to require a REMS *only* when "necessary to ensure that the benefits of the drug outweigh [its] risks," based on certain statutorily mandated factors. 21 U.S.C. §355-1(a)(1); *accord id.* at (g)(4)(B)(i). Congress further limited FDA's authority to impose Elements to Assure Safe Use ("ETASU")—the most onerous kinds of REMS, and those at issue here. ETASU are permitted only where so essential for safety that the medication's approval "would be withdrawn" absent the ETASU; must, "to the extent practicable," "conform with" ETASU for other drugs carrying similar risks; and, even then, may not be "unduly burdensome on patient access." *Id.* §355-1(f)(1)(A), (f)(2)(C)-D); *see also id.* §355-1(g)(4)(B). The mifepristone REMS and its ETASU do not come close to meeting these extraordinary statutory standards.

In 2021-22, this litigation spurred FDA to review the mifepristone REMS, and in 2023, the Agency released an updated REMS ("**2023 REMS Decision**"). It permanently eliminated a prior ETASU requiring that mifepristone be dispensed in person in a clinical setting, which had been paused during the COVID-19

pandemic—first by court order, and then by FDA after real-world experience proved the Agency's safety protestations unfounded. However, FDA (1) retained the ETASU requiring patients to sign a redundant counseling form ("**Patient Agreement**") that FDA does not require for over 99.3% of prescription drugs, and which FDA's own scientific review team attempted to remove in 2016 because it "does not add to safe use conditions," and "is a burden for patients," PCSF ¶¶40, 70; (2) retained the ETASU barring clinicians from prescribing mifepristone unless they first self-certify that they are qualified to do so ("**Prescriber Certification**"), even though FDA concedes *all* clinicians licensed to write prescriptions are qualified to discern whether they have the necessary skills to safely prescribe a drug—and, thus, over 99.5% of prescription drugs have no such self-certification requirement, PCSF ¶69; and (3) added a new "**Pharmacy Certification**" ETASU, largely as a means of enforcing the superfluous Prescriber Certification requirement.

In addition to lacking a reasoned explanation for its 2023 REMS Decision, there were flagrant flaws in FDA's process. For instance, FDA ignored a peer-reviewed study showing no safety reduction after Canada removed its REMS-like restrictions on mifepristone. It refused to address statements by leading medical societies explaining why a REMS is inappropriate for mifepristone. It categorically excluded qualitative studies and provider testimonials detailing how the ETASU impede access and undermine informed consent, and said nothing about the evidence

that Prescriber Certification deters nearly 1 in 10 obstetrician-gynecologists ("OBGYNs") from prescribing mifepristone.

Perhaps most glaringly, FDA offered no "reasonable and coherent explanation"—indeed, no acknowledgment at all—for its "inconsistent treatment" of mifepristone relative to comparably or less safe drugs. *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023). For instance, FDA's website bemoans that opioids "claim[] lives at [such] a staggering rate" that they are "reducing life expectancy in the United States," PCSF ¶71, yet FDA's Opioid Analgesics REMS (covering, *e.g.*, fentanyl and OxyContin) has *no* prescriber certification, pharmacy certification, or patient agreement ETASU. Jeuveau—which is FDA-approved for the purely cosmetic purpose of reducing facial lines, and carries a black-box warning for "life threatening" "[s]wallowing and breathing difficulties"—has no REMS at all. PCSF ¶64.

At bottom, FDA's decision rests on implausible speculation that restrictions imposed decades ago, when mifepristone was still novel and the REMS statute did not exist, are necessary for safety and aligned with the statutory mandate today. Plaintiffs respectfully ask the Court to declare that FDA's 2023 REMS Decision violated the Administrative Procedure Act ("APA") and remand to FDA to reconsider the mifepristone REMS and its ETASU.

4

## II.     UNDISPUTED FACTS

### A. <u>New Drug Approvals</u>

All drugs have risks; for all but a tiny fraction, FDA manages those risks through "labeling"—the FDA-approved prescribing information provided with the medication. PCSF ¶¶21-24. Labeling includes, *inter alia*, "a summary of the essential scientific information needed for the safe and effective use of the drug," warnings, and potential adverse reactions. 21 C.F.R. §§201.56-57. Under narrow circumstances, FDA may also condition approval on restrictions that circumscribe access, known as a REMS. 21 U.S.C. §355-1.

### B. <u>REMS Statute</u>

Under the REMS statute, FDA has authority to impose a REMS *only* if "necessary to ensure that the benefits of [a] drug outweigh [its] risks…." *Id.* §355-1(a)(1). Congress identified six factors that must be considered as part of this risk/benefit analysis: (1) "estimated size of the [patient] population," (2) "seriousness of the disease or condition," (3) "expected benefit," (4) "expected or actual duration of treatment," (5) "seriousness of any known or potential adverse events" and "the background incidence of such events in the population likely to use the drug," and (6) "[w]hether the drug is a new molecular entity." *Id.*

Consistent with this strict standard, FDA rarely imposes REMS programs. Only 3% of the more than 20,000 FDA-regulated prescription drugs have a REMS,

and two-thirds of those are opioids. PCSF ¶¶23-25.

FDA may impose ETASU—the most restrictive type of REMS—only where "necessary to assure safe use of the drug, because of its inherent toxicity or potential harmfulness," and only where "required as part of [a] strategy to mitigate a specific serious risk listed in the labeling of the drug." 21 U.S.C. §355-1(f)(1). And Congress imposed further guardrails: ETASU may be imposed only when so essential that FDA would "*withdraw*[]" drug approval without them, and must be "*commensurate* with the specific serious risk[s] listed in the labeling." *Id.* §355-1(f)(1)(A), (2)(A) (emphases added). In addition, ETASU must, "to the extent practicable," "*conform* with [ETASU] for other drugs with similar, serious risks," and may "not be *unduly burdensome* on patient access," "considering in particular … patients who have difficulty accessing health care (such as patients in rural or medically underserved areas)." *Id.* §355-1(f)(2)(C)-(D) (emphases added).

The same considerations apply when FDA evaluates whether to lift or modify an approved REMS. 21 U.S.C. §355-1(g)(4)(B) (directing agency to consider whether restrictions "ensure the benefits of the drug outweigh [its] risks," and how to "minimize the burden on the health care delivery system"); *see also Washington v. FDA*, 668 F. Supp. 3d 1125, 1140-41 (E.D. Wash. 2023) ("Implicit in this assessment is whether the drug's risks require REMS and/or ETASU … based on criteria under 21 U.S.C. § 355-1(a)(1), (f)(1).").

### C. **Mifepristone Regimen and Safety**

There are two methods of ending an early pregnancy: procedural abortion, performed in a clinical setting, or medication abortion, using prescription drugs to induce a process similar to miscarriage. PCSF ¶1.

Nearly a quarter-century ago, FDA approved mifepristone (under the brand name Mifeprex) as part of a two-drug regimen for medication abortion. PCSF ¶26. In that regimen, which now is FDA-approved through ten weeks of pregnancy, mifepristone blocks a hormone necessary to sustain pregnancy, and misoprostol causes contractions and bleeding that empty the uterus. PCSF ¶¶3, 5. More than five and a half million U.S. patients have used this regimen, which is also the most effective medication regimen to manage early miscarriages. PCSF ¶¶4, 8.

While all abortion is very safe, FDA acknowledges that medication abortion with mifepristone provides a "meaningful therapeutic benefit" to some patients by avoiding an invasive procedure, and may be "preferable and safer in [a patient's] particular situation." PCSF ¶¶2, 10; *see also* PCSF ¶¶9, 11.

Like all drugs, mifepristone's FDA-approved labeling warns of its risks. PCSF ¶¶21-22. For mifepristone, the labeling lists: "serious and sometimes fatal infections or bleeding," both of which FDA described in 2016 as "exceedingly rare, generally far below 0.1% for any individual adverse event," PCSF ¶¶13-14. As the labeling makes plain, these risks are not inherent to mifepristone, but arise whenever

7

the pregnant uterus is emptied by *any* means. PCSF ¶15 ("[R]arely, serious and potentially life-threatening bleeding, infections, or other problems can occur *following a miscarriage, surgical abortion, medical abortion, or childbirth*." (emphasis added)). The labeling confirms: "[n]o causal relationship between the use of Mifepristone tablets 200mg and misoprostol and [serious infections and bleeding] has been established." PCSF ¶16. Indeed, FDA concluded in 2016 that the "critical risk factor" for certain rare serious infections following mifepristone use "[wa]s pregnancy itself," not the medication, PCSF ¶17. As FDA admits, the risk of death is approximately 14 times higher with childbirth than with abortion. PCSF ¶2.

A small fraction of mifepristone users will have a follow-up procedure, typically for reasons FDA acknowledges are *not* adverse events but failed treatment (ongoing pregnancy or incomplete expulsion of pregnancy tissue). PCSF ¶18. The procedure is identical to that used in procedural abortion or to treat an incomplete miscarriage. PCSF ¶19.

### D. **FDA Regulation of Mifepristone**

#### *1. Initial Mifepristone Regulations (2000-2020)*

Since approving mifepristone in 2000, FDA has subjected it to restrictions beyond its labeling. PCSF ¶¶26-28, 31-32, 49-50. Until the most recent REMS reauthorization, FDA imposed three principal requirements: (1) Prescriber Certification, requiring would-be prescribers to self-certify that they are qualified to

8

prescribe mifepristone and will adhere to FDA's special requirements; (2) a Patient Agreement counseling form; and (3) In-Person Dispensing, requiring that mifepristone be dispensed in clinical settings by or under the supervision of a certified prescriber, not at pharmacies or by mail. PCSF ¶¶31-32.[2]

FDA maintained these restrictions across multiple decision points. After enactment of the REMS statute in 2007, FDA identified mifepristone as a drug "deemed" to have in effect an approved REMS based on the restrictions imposed since 2000. PCSF ¶27. In 2011, FDA formally adopted a REMS encompassing the same three restrictions, now classified as ETASU under 21 U.S.C. §355-1(f), without providing any rationale. PCSF ¶28.

In 2013, FDA evaluated "if a [REMS] continues to be necessary." *Id.* (at FDA345). FDA's "*possible* rationale" for maintaining the restrictions was speculation that the "small number" of serious complications "*is likely* reflective" of mifepristone's use "within a system of knowledgeable healthcare providers, safe use protocols, proper patient counseling, and follow-up procedures," and FDA's assumption that the REMS is the reason for those safety conditions rather than the laws and professional standards that ensure safe care for the 97% of prescription

---

[2] FDA also requires mifepristone prescribers to give patients a "Medication Guide" providing risk-management information in accessible language. 21 C.F.R. §208.20(a)(1). Originally part of the REMS, since 2016, this has been included in the labeling that comes with each mifepristone package. PCSF ¶32.

drugs with no REMS. PCSF ¶¶23-24, 28-29 (at FDA357; *accord* FDA344) (emphases added). FDA declared it "possible" that clinicians "who are not familiar with [mifepristone] … *may* prescribe [mifepristone]," which "*could* contribute" to a hypothetical increase in complications, justifying Prescriber Certification. PCSF ¶29 (at FDA356) (emphases added). And despite conceding that "it is not known if removing [the Patient Agreement] would increase the risk that a patient is not properly informed and counseled," FDA retained it nonetheless. *Id.* (at FDA357).

In 2015-16, the Agency reviewed the REMS again. PCSF ¶30. During that review, FDA received letters opposing the REMS from signatories including Plaintiff SFP, ACOG, the American Public Health Association, and expert OBGYNs and researchers. PCSF ¶33. The letters explained, *inter alia*, that Prescriber Certification is medically unnecessary because clinicians "are already subject to many laws, policies, and ordinary standards of practice that ensure they can accurately and safely understand and prescribe" mifepristone, PCSF ¶34, and a "standard clinical license" is "sufficient to ensure that a practitioner meets qualifications for prescribing mifepristone," PCSF ¶35. They also warned that this ETASU deters clinicians from prescribing mifepristone because "clinicians may be understandably reluctant to add their names to a centralized database of mifepristone providers" given "escalating harassment and violence against known abortion providers." PCSF ¶76. And they urged FDA to remove the Patient Agreement

10

because it is "medically unnecessary and interferes with the clinician-patient relationship." PCSF ¶34.

Following its review, FDA's scientific review team recommended eliminating the Patient Agreement because it "does not add to safe use conditions." PCSF ¶40. They concluded that it was "duplicative of information in the Medication Guide"[3] given with prescriptions "and of information and counseling provided to patients under standard informed consent practices and under professional practice guidelines." *Id.* Moreover, it was "a burden for patients." *Id.*

In 2016, FDA reauthorized the REMS. PCSF ¶31. Acknowledging that mifepristone's "efficacy and safety have become well-established by both research and experience," "serious complications have proven to be extremely rare," and "no new safety concerns have arisen" in years, PCSF ¶12, FDA removed a requirement to report serious adverse events associated with mifepristone other than death, and made the Medication Guide part of the labeling rather than REMS. PCSF ¶32.

Nevertheless, FDA retained all three then-existing ETASU. PCSF ¶31. It did so without weighing the six risk/benefit factors identified by Congress, or explaining how the statutory constraints on ETASU were satisfied. PCSF ¶61 (at FDA673-709). FDA's single-sentence justification for Prescriber Certification was that "the qualifications of a health care provider who prescribes [mifepristone] have not

---

[3] *See supra* note 2.

11

changed and continue to be necessary to ensure the benefits outweigh the risks."
PCSF ¶42. FDA retained even the Patient Agreement after FDA's Commissioner, a
political appointee, overruled the scientific review team with the single-sentence
assertion that this ETASU "would not interfere with access and would provide
additional assurance" that patients are properly counseled. PCSF ¶41 (at FDA674).

Nowhere in its 2011, 2013, or 2016 reviews did FDA state that it would need
to withdraw approval for mifepristone absent the ETASU, nor address any other
statutory limitations under 21 U.S.C. §355-1(f)(1)-(2) beyond the bare assertion that
the ETASU do not burden access. PCSF ¶¶61-62 (at FDA356, FDA674).

### 2. COVID-19 Public Health Emergency

In 2020, a coalition of medical experts led by ACOG challenged the In-Person
Dispensing ETASU, arguing that it was medically unnecessary and exposed patients
to needless burdens and risks during the COVID-19 pandemic. *ACOG v. FDA*, 472
F. Supp. 3d 183, 196-97 (D. Md. 2020). The district court preliminarily enjoined this
ETASU, enabling patients to obtain mifepristone from a mail-order pharmacy; the
injunction remained in place for six months. *Id.* at 233, *order clarified*, No. CV TDC-
20-1320, 2020 WL 8167535 (D. Md. Aug. 19, 2020), *stay granted*, 141 S. Ct. 578,
578 (2021) (mem.); PCSF ¶44.

In April 2021, FDA announced that it would exercise enforcement discretion
regarding In-Person Dispensing throughout the COVID-19 public health emergency.

PCSF ¶45. After arguing that In-Person Dispensing was "necessary … to protect patients' safety," *ACOG*, 472 F. Supp. 3d at 228, FDA conceded that there was *no* increase in adverse events when mifepristone was available through mail-order pharmacies under the injunction, PCSF ¶46.

In May 2021, Plaintiffs moved for summary judgment in this case. Shortly before its brief was due, FDA notified Plaintiffs that it was undertaking a new REMS review. On the condition that FDA would "review any relevant data and evidence submitted by the Plaintiffs," Joint Mot. Stay 2 (May 7, 2021), Dkt. 148, the parties jointly moved for, and this Court granted, a stay.

### 3. 2023 REMS Reauthorization

FDA undertook a REMS review process in 2021-2022. PCSF ¶47. During that review, Plaintiffs submitted letters explaining why the mifepristone REMS is medically unjustified and burdensome. PCSF ¶48. Plaintiffs cited, *inter alia*:

- statements opposing the REMS by preeminent medical organizations, including AMA, ACOG, and the American Academy of Family Physicians ("AAFP");

- data showing that, after Canada eliminated its REMS-like restrictions on mifepristone in 2017, medication abortion remained extremely safe, with a major complication rate of only 0.33%;

- specific examples of medications posing greater or comparable risks that are not subject to a REMS; and

- sworn testimony from clinicians and other experts detailing how FDA's restrictions are medically unnecessary, undermine the provider-patient relationship, and burden access.

*Id*. In addition to the policy statements referenced in Plaintiffs' letters, medical societies including ACOG and AAFP submitted their own letters and petitions opposing the REMS, arguing that it is medically unjustified and inconsistent with FDA's treatment of comparably or less safe drugs. PCSF ¶20 (at 2021REMS2051-52, 2022CP71-98, 2023SUPP32-37).

In January 2023, FDA reauthorized the mifepristone REMS. PCSF ¶49. While permanently eliminating In-Person Dispensing, FDA retained the Prescriber Certification and Patient Agreement ETASUs. *Id.* It also added a *new* ETASU requiring pharmacies to become "certified" before they can dispense mifepristone, *id.*, notwithstanding that pharmacies dispensed mifepristone during the pandemic with no certification and no increase in adverse events, PCSF ¶46.

The three current ETASU are:

- **<u>Prescriber Certification</u>**, requiring would-be prescribers to fax a form to the drug distributor attesting that they can date a pregnancy and diagnose an ectopic pregnancy; can ensure patient access to a uterine evacuation

14

procedure in cases of incomplete abortion or severe bleeding and to medical facilities equipped to provide blood transfusions and resuscitation if necessary; and have read and understood the prescribing information. Clinicians also agree to review the Patient Agreement with the patient, answer questions, obtain a signature, retain the signed form, and provide the patient a copy; and to report any patient deaths to the drug sponsor. As of 2023, this ETASU also requires clinicians to fulfill certain obligations if a pharmacy will dispense the mifepristone, including providing the pharmacy with their signed Prescriber Certification form and working with the pharmacy to determine an appropriate course of action if the pharmacy cannot ensure delivery within four calendar days.

- **<u>Pharmacy Certification</u>**, requiring pharmacies to, *inter alia*, agree to verify that mifepristone is only prescribed by certified prescribers by confirming receipt and keeping records of completed Prescriber Certification forms; ensure delivery of mifepristone to the patient within four days of receiving the prescription, track and verify each shipment, and contact the prescriber if the drug will not be delivered within that timeframe; record in each patient's record the National Drug Code and lot number for the mifepristone package; not transfer mifepristone to another pharmacy except other locations of the same pharmacy; ensure

15

confidentiality of patient and prescriber identities; report any patient deaths
to the prescriber and drug sponsor; designate an authorized representative
to carry out the certification process; and be specially audited.

- **<u>Patient Agreement</u>**, requiring the patient to sign an FDA-approved form
  stating that they are taking mifepristone because they have "decided ... to
  end [their] pregnancy," will follow a particular clinical protocol, and
  understand when and how to seek follow-up or emergency care.

PCSF ¶50.

FDA issued two memoranda, in 2021 and 2023, explaining its rationale for
the 2023 REMS. PCSF ¶51. Despite "agree[ing] to undertake a full review of the
Mifepristone REMS Program," PCSF ¶47, FDA nowhere addressed whether
mifepristone fits the statutory requirements for a REMS or ETASU in the first place,
PCSF ¶¶51-58, 62-63; it only looked at "the individual ETASUs to determine if
further changes should be considered," PCSF ¶51 (at 2021REMS1570). FDA did
not address the evidence of mifepristone's safety beyond finding two pre-2016
studies "consistent with [mifepristone's] existing safety profile" and, therefore,
"support[ive]" of maintaining a REMS. PCSF ¶52.

FDA retained the Patient Agreement despite the scientific review team's 2016
conclusion that it was "duplicative" and "burden[some]," PCSF ¶40, and despite
acknowledging that "informed consent in medicine is an established practice" with

16

"strong adherence to evidence-based guidelines" among U.S. abortion providers, PCSF ¶35. FDA reasoned that this ETASU would ensure that "each provider, including new providers," would "inform[] each patient of the appropriate use of mifepristone, risks associated with the treatment, and what to do if the patient experiences symptoms that may require emergency care," PCSF ¶55, nowhere acknowledging the absence of any comparable requirement for over 99.3% of prescription drugs, PCSF ¶70. On burden, FDA stated only that it "determined, consistent with [the REMS statute], that [the Patient Agreement] does not impose an unreasonable burden on providers or patients." PCSF ¶61 (at 2021REMS1578).

FDA reasoned that its literature review found "no evidence to contradict our previous finding" that prescribers should have the skillset reflected in the Prescriber Certification and "therefore … conclude[d] it [wa]s reasonable to maintain the requirement." PCSF ¶53 (at 2021REMS1573-74). FDA again cited "the potential addition of new prescribers," without analyzing whether unqualified providers would attempt to prescribe mifepristone without a self-certification form, *id.* (at 2021REMS1574)—a form FDA does not require for 99.5% of prescription drugs, PCSF ¶69.

FDA stated that Pharmacy Certification was necessary to "ensure[] that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers" and that the other REMS requirements are met, while acknowledging

17

that this ETASU "will likely limit the types of pharmacies that will choose to certify" in the REMS. PCSF ¶¶54, 81.

Nowhere in its 2023 REMS Decision did FDA explain how the factors Congress identified as integral to a risk/benefit determination justify a REMS for mifepristone. 21 U.S.C. §355-1(a)(1), (g)(4)(B); PCSF ¶¶51-58, 61-62. Nor did FDA explain how the mifepristone ETASU "conform with [ETASU] for other drugs with similar, serious risks" and are "commensurate with" mifepristone's risks, or meaningfully address whether the ETASU are "unduly burdensome." 21 U.S.C. §355-1(f)(2)(A), (C)-(D); *see also id.* §355-1 (g)(4)(B)(ii); PCSF ¶¶56, 61. In fact, throughout mifepristone's regulatory history, FDA has *never* explained how the mifepristone ETASU satisfy the strict statutory criteria, PCSF ¶61, including that mifepristone's risks be so great that FDA would withdraw approval absent the ETASU. 21 U.S.C. §355-1(f)(1)(A); PCSF ¶62.

FDA's 2021-23 review also never grappled with facts critical to the statutory standards—including its admissions that mifepristone is a well-known medication with an extremely strong and stable risk profile; that continuing a pregnancy is far more dangerous than using mifepristone and misoprostol to end it; and that the risks identified in mifepristone's labeling have never been shown to be caused by mifepristone but are inherent to *all* pregnancy outcomes. PCSF ¶56.

FDA did not acknowledge that, when Canada eliminated its REMS-like

18

restrictions, there was no safety reduction. PCSF ¶57; *see also* PCSF ¶48. And FDA ignored additional evidence that the ETASU are unnecessary, including that ethical and professional standards already require clinicians to only prescribe drugs they are qualified to prescribe, assess patient eligibility before issuing a prescription, and obtain informed consent; that there is "strong adherence to evidence-based guidelines" among abortion providers; that other drugs for which patient screening is the standard of care are not subject to a REMS; and that pharmacies safely dispensed mifepristone for over a year during the pandemic without the special requirements FDA is now demanding. PCSF ¶56.

Moreover, FDA categorically excluded highly relevant evidence from its review. PCSF ¶58. For instance, despite routinely relying on such stakeholder input for other drugs, PCSF ¶¶59-60, FDA refused to examine "survey studies and qualitative studies" reflecting prescriber experiences with mifepristone, "*even if the study assessed REMS ETASUs*," PCSF ¶58 (emphasis added), or "[o]pinions, commentaries, or policy/advocacy statements" by leading medical associations like ACOG and AMA, *id.* (emphasis added) (at 2021REMS1571). FDA also ignored evidence regarding the difficulties patients face in accessing abortion care, including "distance traveled to obtain care," and how the mifepristone ETASU contribute to the dearth of U.S. abortion providers. *Id.* (at 2021REMS1572).

E.  **FDA Regulation of Other Drugs**

*1. Drugs without a REMS*

As medical experts underscored to FDA, many comparably or less safe drugs do not have a REMS, including:

**Korlym:** The identical chemical compound, mifepristone, is available under the brand name Korlym to treat Cushing's syndrome. PCSF ¶65. Whereas abortion patients take a one-time 200mg tablet, Korlym patients take up to four 300mg tablets daily. PCSF ¶¶6-7, 65 (at FDA269). Although FDA acknowledges that "the rate of adverse events with Mifeprex is much lower," PCSF ¶66, Korlym is not subject to a REMS in part because FDA worried such restrictions would "reduce[] access" and cause "treatment delays." PCSF ¶¶65, 67. In its 2012 Korlym review, FDA explained that "the challenge of this application is because of the more controversial use of this active ingredient for medical termination of pregnancy." PCSF ¶67.

**Jeuveau**: Jeuveau is used for a purely cosmetic purpose—temporarily reducing facial lines—and carries a black-box warning for "[s]wallowing and breathing difficulties" that "can be life threatening," with "reports of death," but is not subject to a REMS. PCSF ¶64.

**Anticoagulants ("Blood Thinners")**: Common anticoagulants like Coumadin are associated with "major or fatal bleeding," as their FDA-approved labeling warns, but are not subject to a REMS. *Id.*

20

**Misoprostol**: Misoprostol alone is also an evidence-based protocol for abortion and miscarriage care, and carries the same rare risks associated with mifepristone or any process that empties the uterus (abortion, childbirth, or miscarriage). PCSF ¶68. Misoprostol has no REMS. *Id.*

**Other common medications**: Mifepristone is as safe or safer than many common medications—Viagra's fatality rate is *six times* that of mifepristone; penicillin's is *three times higher* than mifepristone; and many antibiotics and over-the-counter medications like Tylenol and aspirin have either higher or comparable risks to mifepristone, PCSF ¶64. Yet none is subject to a REMS. *Id.*

### 2. Drugs with a REMS

Only 3% of FDA-regulated drugs are subject to a REMS, two-thirds of which are opioids. PCSF ¶¶23-25. And even though, unlike mifepristone, opioids are highly addictive and "claim[] lives at a staggering rate," FDA's shared-system REMS for opioid analgesics like fentanyl is *less restrictive* than the mifepristone REMS. PCSF ¶¶71-73 (at 2021REMS1813-14). Indeed, that program involves only optional education; neither opioid prescribers nor pharmacies that dispense the hundreds of opioids subject to that REMS program are subject to *any* certification process, nor must opioid patients sign a patient agreement. PCSF ¶72.

### F.  Harms Imposed by the REMS

*First*, Prescriber Certification deters clinicians from providing mifepristone,

thus contributing to the very limited number of U.S. abortion providers. *See* PCSF ¶¶75-76, 78, 84-85. Many would-be prescribers fear their certification forms could become public, exposing them to anti-abortion hostility. PCSF ¶76. FDA's own actions reinforce this concern: it redacted from the administrative record the names and offices of every employee who has worked on mifepristone, fearing that, "[i]n light of the violence and harassment surrounding the provision of abortion," releasing this information—even subject to a protective order—"could expose those employees to threats, intimidation, harassment and/or violence." PCSF ¶77.

***Second***, the REMS imposes considerable administrative burdens on prescribers and pharmacies that would not otherwise exist. For example, the Prescriber Certification and Patient Agreement ETASU require health centers to develop special systems to track and update certifications and securely store signed patient forms. PCSF ¶75. These burdens—which may necessitate the involvement of multiple colleagues, such as administrators and information-technology staff—prevent some clinicians from providing mifepristone at all. PCSF ¶¶75, 78.

Pharmacy Certification likewise imposes significant burdens, including requiring pharmacies to develop special systems for verifying, tracking, and confidentially maintaining prescriber certifications. PCSF ¶79. The requirement that pharmacies ensure delivery to patients within four calendar days necessitates two-day or next-day shipping, and mandates that pharmacies contact the prescriber in the

22

event of delay. PCSF ¶80. While standard pharmacy practice requires timely delivery of medications, *id.*, this strict four-day mandate strips pharmacies and patients of the flexibility to account for practical realities and clinical needs—for example, the ability to choose a less expensive shipping option if a patient knows that, given the length of their pregnancy, receiving the medication in slightly more than four days would be perfectly fine. Like Prescriber Certification, these burdens have a deterrent effect—as FDA admitted, PCSF ¶81—especially on community pharmacies with fewer resources, *see* PCSF ¶88.

**Third**, FDA sends a false message about mifepristone's safety by continuing to classify it among the tiny fraction of drugs for which REMS restrictions are necessary—on par with deadly, addictive opioids. PCSF ¶¶24, 71, 82. This exacerbates abortion-related stigma, further complicating, delaying, and derailing providers' efforts to integrate mifepristone into their practices. PCSF ¶83.

**Fourth,** taken together, the REMS considerably decreases access for and increases burdens on patients seeking medication abortion, compounding the profound access issues that already exist in the U.S., and making it difficult and sometimes impossible for patients to access abortion care at all, PCSF ¶¶84-85; *see also* PCSF ¶86 (being denied a wanted abortion harms patients' health, financial security, safety, and families). These burdens disproportionately impact patients who already face difficulties accessing healthcare, such as low-income populations,

communities of color, and those living in rural areas. PCSF ¶¶87-88. Robust research shows that forcing patients to travel even slightly further (*e.g.*, 10 miles) imposes considerable costs in transportation, lost wages, and childcare that can delay or block patients from accessing desired abortions. PCSF ¶85; *see also* PCSF ¶87 (75% of abortion patients are low-income, 60% are people of color, 60% are parents). The REMS compounds these burdens by reducing the pool of mifepristone providers and pharmacies and heightening obstacles for, *inter alia*, low-income patients less able to bear added travel costs; people in abusive households for whom travel can be dangerous; and homeless populations without reliable addresses for mail-order pharmacies. PCSF ¶¶85, 87-90.

  ***Finally***, the REMS undermines informed consent and causes confusion by requiring patients to sign a form containing fossilized science that may conflict with their individual clinical circumstances. PCSF ¶89. For example, the Patient Agreement states that the patient will take misoprostol 24 to 48 hours after taking mifepristone, PCSF ¶6, but some clinicians instruct patients to use a different evidence-based protocol in which misoprostol is taken in less than 24 hours if most appropriate given the patient's individual needs, PCSF ¶89. For miscarriage patients, the requirement that a patient sign a form attesting that they "have decided … to end [their] pregnancy" can cause not just confusion but distress. PCSF ¶90.

## III.   STANDARD OF REVIEW

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Chemehuevi Indian Tribe v. Jewell*, 767 F.3d 900, 903 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).

## IV.   ARGUMENT

Under the APA, agency action is unlawful where it is, *inter alia*, (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or (2) "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §706(2)(A), (C). FDA's 2023 REMS decision violates the APA in both ways.

### A.  FDA's Decision Was Arbitrary and Capricious

While deferential in some circumstances, the arbitrary and capricious standard is no "rubber stamp." *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 755-56 (D.C. Cir. 2000) (cleaned up). It demands that an agency both "examine the relevant data" and "supply a reasoned analysis" for its decision. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). If the agency's explanation for its decision "entirely fail[s] to consider an important aspect of the problem, … runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," it is invalid. *Id.* at 43.

25

### 1. *FDA Failed to Consider Relevant Data*

It was arbitrary and capricious for FDA to exclude from its review multiple categories of evidence squarely relevant to whether a REMS is "necessary to ensure that the benefits of [mifepristone] outweigh the risks," whether the ETASU "conform with" those for other drugs carrying similar risks, and whether the mifepristone ETASU are "unduly burdensome on patient access." 21 U.S.C. §355-1(a)(1), (f)(2)(A), (C), (g)(4)(B)(i)-(ii). "If an agency fails to examine the relevant data … it has failed to comply with the APA." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015); *see also, e.g.*, *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1213 (D.C. Cir. 2024). Here, the Agency expressly refused to consider statements by the nation's leading medical groups opposing the REMS; failed to consider safety outcomes from mifepristone use in Canada, even though "objective safety data" was ostensibly the focus of its review; and categorically excluded qualitative studies and stakeholder narratives addressing why the ETASU are unnecessary and burdensome, as well as data on the difficulties mifepristone patients face in accessing care. PCSF ¶¶57-58. In each of these ways, FDA acted arbitrarily and capriciously.

***First***, FDA excluded statements by preeminent medical societies urging elimination of the mifepristone REMS. PCSF ¶¶20, 48, 56, 58. For years, these groups have told FDA that its mifepristone restrictions are "not based on scientific

evidence and cause significant barriers to accessing abortion care." PCSF ¶20 (AAFP); *accord id.* (ACOG: "outdated and substantially limit access"). They also emphasized that the restrictions are "inconsistent with" FDA's regulation of "other medications with similar or greater risks." *Id.* (ACOG, at 2021ED11); PCSF ¶64 (AAFP: "acetaminophen" and "aspirin" have "higher complication rates").

The Agency reviewed none of this evidence, explicitly declining to consider publications from ACOG, AMA, AAFP, and other medical associations that FDA deemed "opinions, commentaries, or policy/advocacy statements." PCSF ¶58 (at 2021REMS1571, 2021REMS1604). FDA's sole explanation was that the medical societies' positions did not constitute "objective safety data," *id.* (at 2021REMS1571), but that is an arbitrary line: FDA's own guidance states that, in determining whether a REMS meets the statutory criteria, FDA may consider input from "professional societies," PCSF ¶59 (at Factors Guidance 4-5). There is no credible argument that the uniform conclusion of the nation's leading medical associations that a REMS is inappropriate for mifepristone was not relevant evidence that the APA required FDA to examine.

***Second***, despite declaring that the linchpin of its inquiry was publications "includ[ing] objective safety data related to outcomes of medical abortion," PCSF ¶58 (2021REMS1571)—and excluding the medical groups' positions on that basis— FDA ignored the data showing that when Canada began regulating mifepristone like

other drugs, there was no decline in safety, PCSF ¶¶48, 56-57. FDA first refused to consider the abstract of a study by Schummers et al. that examined the impact when Canada removed its REMS-like restrictions and concluded that the change was not associated with increased complications. PCSF ¶¶48, 56-57. FDA then declined to consider a complete, peer-reviewed study by the same authors, even though it was released a full year before the 2023 REMS decision, PCSF ¶57, offers precisely the "objective safety data" FDA claimed was its focus, PCSF ¶58, and is directly relevant to whether a REMS is necessary for mifepristone, 21 U.S.C. §355-1(a)(1), (g)(4)(B)(i); *see also* PCSF ¶58 (at 2021REMS1607) (refusing to examine 2018 report by the National Academies of Science, Engineering, and Medicine ("National Academies") on "the Safety and Quality of Abortion Care" as allegedly "not provid[ing] safety data relevant to the … REMS"). FDA's refusal to examine data that were indisputably relevant under the statute and FDA's own selection criteria is dispositive under *State Farm*. *See* 463 U.S. at 43.

***Third***, FDA excluded qualitative studies and ignored physician narratives, even when—by FDA's admission—they specifically "assessed REMS ETASUs," PCSF ¶58, and even though the statute requires assessing burdens on patients and the health care system, 21 U.S.C. §355-1(f)(2)(C)(ii), (f)(2)(D), (g)(4)(B)(ii). For instance, FDA excluded a study that surveyed clinicians about how the regulations affect patients' access to medication abortion and miscarriage care, concluding that

"removing the mifepristone REMS is a crucial evidence-based step to increase access." PCSF ¶58; *accord id.* (at 2021REMS993-98); *see also id.* (at 2021REMS984-92). FDA also did not examine the physician narratives Plaintiffs submitted discussing how the ETASU, *inter alia*, are duplicative of legal and ethical guidelines governing medical care; burden patient access, especially in rural areas; undermine informed consent; and are inconsistent with how FDA regulates less safe drugs that these physicians prescribe. *See* PCSF ¶¶35, 48, 75-76, 82-85, 87-90.

There is no genuine dispute that this evidence was relevant. FDA routinely relies on "key stakeholders" for input on the impact of a REMS, "including prescribers, pharmacists, other healthcare professionals, and patients." PCSF ¶59 (at Assessment Guidance 12). This includes "surveys, focus groups, and interviews" to "inform the applicant and the Agency about the impact of the program on the healthcare delivery system and on patient access to the drug, as well as opportunities for program improvement." *Id.* (at Assessment Guidance 12). FDA specifically encourages the use of "complementary data sources that provide a combination *of qualitative* and quantitative information about the REMS." *Id.* (at Assessment Guidance 7) (emphasis added). FDA purportedly excluded such stakeholder input here because it did not contain "objective safety data," PCSF ¶58, but Congress required FDA to assess evidence of burden, not just safety considerations, 21 U.S.C. §355-1(f)(2)(C)(ii), (f)(2)(D), (g)(4)(B)(ii). And FDA's reliance on prescriber input

in REMS reviews for *other* drugs, PCSF ¶60 (citing examples), makes its refusal to take prescriber perspectives into account in its mifepristone review all the more arbitrary. *See Nat. Res. Def. Council v. EPA*, 38 F.4th 34, 51 (9th Cir. 2022) ("arbitrary" of agency to "abandon its own guidance without a discernable rationale" (cleaned up)).

**Lastly**, FDA excluded "[d]ata on the logistics of accessing abortion care," including studies addressing the distance patients must travel to access care. PCSF ¶58 (at 2021REMS1572). But Congress directed FDA to ensure that ETASU are not "unduly burdensome on patient access …, *considering in particular* … patients who have difficulty accessing health care (such as *patients in rural or medically underserved areas*)." 21 U.S.C. §355-1(f)(2)(C)(ii) (emphases added); *see also id.* §355-1(g)(4)(B)(ii). Against this statutory backdrop, such data were patently relevant.

In short, FDA arbitrarily constrained the scope of its review in violation of the APA, excluding relevant evidence in ways that contradict the statute, FDA's own guidance, and its approach to REMS reviews for other drugs.

### 2. FDA Failed to Provide a Reasoned Explanation for Its 2023 REMS Decision

Courts may "not uphold an agency's action where it has failed to offer a reasoned explanation that is supported by the record." *Am. Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992). The 2023 REMS Decision fails that test on

multiple independent grounds: (1) FDA ignored statutory factors; (2) FDA ignored key arguments and evidence contrary to its decision; (3) FDA failed to acknowledge, much less explain, its inconsistent regulation of mifepristone relative to comparably and less safe drugs; and (4) FDA's rationales for its ETASU rest on "sheer speculation," *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014), and are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43.

### a.  FDA Failed to Apply Statutory Standards

***First***, the 2023 REMS Decision entirely ignored critical aspects of the organic statute. 21 U.S.C. §355-1(a)(1), (f)(1)-(2), (g)(4)(B). That is dispositive under arbitrary and capricious review: "a statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216-17 (D.C. Cir. 2004) (cleaned up).

As an initial matter, FDA assumed a REMS is necessary to ensure that the benefits of mifepristone outweigh its risks without weighing the factors Congress identified as essential to that inquiry. 21 U.S.C. §355-1(a)(1), (g)(4)(B)(i); *supra* at 16-18. Had FDA applied the factors enumerated by Congress, it would have been clear mifepristone does not meet the statutory bar: (1) mifepristone is used by millions, PCSF ¶8; (2) it treats unintended pregnancy, which carries severe medical risks, PCSF ¶2; (3) unlike non-REMS drugs that carry life-threatening risks while

serving a purely cosmetic purpose, PCSF ¶64, mifepristone "provides a meaningful therapeutic benefit" over the two alternatives: procedural abortion or childbirth, PCSF ¶10; (4) it is single use and, unlike opioids, poses no risk of dependency, PCSF ¶¶7, 71, 73; (5) FDA admits mifepristone is associated with "exceedingly rare" adverse events, and that the same risks are inherent to all pregnancy outcomes, PCSF ¶¶13-17; and (6) mifepristone has been marketed in the U.S. for decades with no new safety concerns since 2005, PCSF ¶¶12, 26.

Similarly, as discussed more fully below, FDA did not apply the threshold standard that ETASU be so essential that drug approval would be withdrawn without it. 21 U.S.C. §355-1(f)(1)(A). FDA never claimed that the mifepristone ETASU meet that high bar, and the Agency's implausible, speculative rationales plainly fall short. *See infra* 35-45. FDA also nowhere analyzed whether its ETASU "conform with" the ETASU (or lack thereof) for other drugs with similar or greater risk profiles, 21 U.S.C. §355-1(f)(2)(D)(i); to the contrary, FDA entirely ignored its disparate treatment of mifepristone relative to other drugs. *See infra* 34-35, 45. And FDA failed to weigh the extensive evidence that its ETASU burden patients and providers, 21 U.S.C. §355-1(f)(2)(C), (g)(4)(B)(ii), while providing "generic statements" that they do not, *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) (cleaned up); *see, e.g.*, PCSF ¶61 (at 2021REMS1578) (FDA baldly asserting that it had "determined, consistent with [the REMS statute],

32

that this [ETASU] does not impose an unreasonable burden on providers or patients"); *see infra* 38-39, 41-43.

        b.   <u>FDA Failed to Respond to Commentary and Evidence Contrary to Its Decision</u>

**Second**, FDA "completely failed even to acknowledge, let alone respond to," the objections by key stakeholders that the mifepristone REMS and ETASU do not fit the statutory profile and are unnecessary and burdensome. *Env't Health Tr. v. FCC*, 9 F.4th 893, 907, 909 (D.C. Cir. 2021) (arbitrary and capricious where agency ignored comments, including by American Academy of Pediatrics, challenging "fundamental premise" of agency decision); PCSF ¶¶20, 34, 48; *see supra* 26-30. This suffices alone to render the 2023 REMS Decision unlawful: "An agency's failure to respond meaningfully to objections raised by a party renders its decision arbitrary and capricious. We have stressed that unless the agency answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *In re NTE Conn., LLC*, 26 F.4th 980, 989 (D.C. Cir. 2022) (citation omitted).

    The medical associations specifically highlighted the Canadian data confirming mifepristone's safety when prescribed like other drugs. PCSF ¶57 (ACOG, AAFP, SFP, et al.); *accord* PCSF ¶48 (SFP, at 2021REMS951). Yet the Agency nowhere addressed the peer-reviewed study or the abstract that came before it. *See supra* 27-28. FDA's conclusion that a REMS is necessary to ensure that mifepristone's benefits outweigh its risks ran "counter to the evidence before the

agency," and was therefore arbitrary and capricious. *State Farm*, 463 U.S. at 43. And FDA's "utter lack of response" to the Canadian findings "does not meet the [Agency's] obligation to provide a reasoned explanation," *Env't Health*, 9 F.4th at 909, compounding the APA violation.

### c. FDA Failed to Address Its Inconsistent Regulation

***Third***, FDA never addressed its disparate regulation of mifepristone relative to drugs posing comparable or greater risks. As the D.C. Circuit recently explained, the APA requires agencies to "justify different results reached on similar facts 'to lend predictability and intelligibility' to agency actions, 'promote fair treatment, and facilitate judicial review.'" *Grayscale Invs., LLC*, 82 F.4th at 1245 (citation omitted). FDA's obligation to justify its inconsistencies was even greater here: Congress expressly required the Agency to consider whether ETASU "conform with" those of "other drugs with similar, serious risks," 21 U.S.C. §355-1(f)(2)(D)(i), and endeavor to bring them into line.

Instead, FDA entirely ignored the numerous commenters—including medical experts—highlighting that mifepristone is as safe or safer than, *inter alia*, Tylenol, Viagra, aspirin, penicillin, blood thinners, antibiotics, insulin, and multiple drugs used for purely cosmetic purposes, none of which are subject to a REMS. PCSF ¶64. Such "dissimilar treatment of evidently identical cases" is "the quintessence of arbitrariness and caprice." *Grayscale Invs., LLC*, 82 F.4th at 1245 (citation omitted);

34

*see also Los Padres ForestWatch*, 25 F.4th at 658 (failure to explain conflicting determinations in "similar" circumstances was arbitrary and capricious).

Indeed, despite FDA's admissions that the serious complications associated with mifepristone are "extremely rare," inherent to pregnancy, and never proven to be caused by mifepristone, PCSF ¶¶12-17, FDA regulates mifepristone more strictly than the vast majority of opioid products, PCSF ¶72. While FDA bars clinicians and pharmacies from prescribing or dispensing mifepristone without first being certified, there is no such precondition to prescribing or dispensing *fentanyl*: the Opioid Analgesic REMS merely makes optional educational materials available. PCSF ¶72. Nor is there a patient agreement ETASU. *Id.*

FDA could not possibly justify this disparate treatment, and hasn't even tried. The APA requires agencies to "offer[] a reasonable and coherent explanation" for "inconsistent treatment under the same rule or standard." *Grayscale Invs., LLC*, 82 F.4th at 1245. FDA's failure to do so is dispositive.

d. <u>FDA's Rationales are Unreasonable and Unsupported</u>

**Fourth**, FDA cannot provide a reasoned, evidence-based explanation why each ETASU is necessary "to ensure [mifepristone's] … benefits … outweigh [its] risks" and so essential for safety that FDA would need to "withdraw[]" approval for mifepristone without it, nor show that they are "commensurate" with mifepristone's risks, "conform with" the ETASU for other similar drugs, and are not "unduly

35

burdensome" on patients and the health care system. 21 U.S.C. §355-1(g)(4)(B), (f)(1)(A), (2)(A). To the contrary, FDA's rationales are implausible, speculative, incomplete, and contradicted by the record.

### i. Patient Agreement

The lack of reasoned basis for this ETASU has long been apparent. In overruling the scientific review team's 2016 determination that this ETASU "does not add to safe use conditions," PCSF ¶40, FDA's Commissioner offered a single-sentence rationale: he "concluded that continuing the REMS requirement for a signed Patient Agreement Form would not interfere with access and would provide additional assurance that the patient is aware of the nature of the procedure, its risks, and the need for appropriate follow-up care." PCSF ¶41 (at FDA674). Such "conclusory statements do not suffice to explain" an agency decision, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016); *see also Los Padres ForestWatch*, 25 F. 4th at 657 ("a bare assertion[] with no supporting analysis" does not satisfy APA)—and "additional assurance" is far from being so essential that FDA would withdraw approval without the ETASU, 21 U.S.C. §355-1(f)(1)(A).

FDA's 2023 justification was no more valid. It conceded again that "informed consent in medicine is an established practice," and specifically confirmed that informed consent is embedded in the professional guidelines governing abortion care. PCSF ¶35. This alignment is unsurprising: as the National Academies

36

explained in a 2018 report on abortion safety that FDA refused to consider, PCSF ¶58 (at 2021REMS1607), "[p]rescribing medication abortion is no different from prescribing other medication" in that, for instance, providers must "counsel the patient regarding medication risks, benefits, and side effects." PCSF ¶38.

That is exactly what abortion providers do, as FDA admits. The Agency conceded that a study "revealed strong adherence to evidence-based guidelines" among abortion providers. PCSF ¶35. Nevertheless, FDA retained this ETASU to ensure that "new providers" will likewise obtain informed consent, PCSF ¶55—even though FDA has "removed REMS requirements in other programs based on the integration of the REMS safe use condition into clinical practice," PCSF ¶63.

The Agency's theory that new mifepristone prescribers might shirk this fundamental professional imperative was not supported by a shred of evidence— only "sheer speculation," *Sorenson Commc'ns Inc.*, 755 F.3d at 708. And FDA's "new providers" rationale is utterly implausible to justify a Patient Agreement ETASU for mifepristone, which has been used in the U.S. for decades, PCSF ¶8, when FDA routinely approves *entirely new drugs* without a patient agreement requirement even though *every* prescriber will be unfamiliar with that novel medication. Inconsistent reasoning "is, absent explanation, 'the hallmark of arbitrary action.'" *Nat. Res. Def. Council*, 38 F.4th at 51 (citation omitted).

FDA also ignored its 2016 review team's conclusion that the Patient Agreement is "duplicative" of the Medication Guide and should be eliminated for that reason. *Compare* PCSF ¶40, *with* PSCF ¶51 (at 2021REMS1575-76) ("summariz[ing]" 2016 review team's rationale without mentioning Medication Guide). The Agency purported to justify this ETASU as "provid[ing] the [counseling] information in a brief and understandable format," PCSF ¶51 (at 2021REMS1578), but the Medication Guide already provides the same information in "nontechnical, understandable" language, 21 C.F.R. §208.20(a)(1); PCSF ¶61 (at FDA681) (FDA: "same risk information" in Medication Guide). FDA did not explain how this ETASU—which FDA's own scientists view as redundant—could possibly be so essential that approval would be withdrawn without it.

Nor did FDA explain how the Patient Agreement is "commensurate with" mifepristone's risks when those risks are both "exceedingly rare" and the very same ones the patient would face regardless of whether the pregnancy ends through childbirth, miscarriage, or procedural or medication abortion. 21 U.S.C. §355-1(f)(2)(A); PCSF ¶¶13-16.

Finally, FDA failed to offer any reasoned explanation on burdens. FDA acknowledged neither its 2016 admission that this ETASU "burden[s]" patients, PCSF ¶40; nor the evidence that this ETASU undermines informed consent by forcing patients to sign a counseling form that may contradict their individual

38

circumstances and the evolving scientific evidence, PCSF ¶¶89-90; nor the evidence that it contributes to administrative complexities that prevent doctors from integrating mifepristone into their practices at all, PCSF ¶75.

*ii.    Prescriber Certification*

The Prescriber Certification ETASU also cannot withstand scrutiny. FDA's central justification was that it did not find "any studies comparing providers who met" the qualifications set out in the prescriber certification form "with providers who did not," and thus the Agency found "no evidence to contradict [its] previous finding" that "a healthcare provider who prescribes mifepristone should meet th[ose] … qualifications." PCSF ¶53 (at 2021REMS1573).

This rationale rests on a gravely flawed premise. FDA has conceded that all clinicians licensed to write prescriptions are qualified to read a medication's labeling and determine whether they have the necessary abilities to safely prescribe that drug. PCSF ¶36. Thus, for 99.5% of the over 20,000 prescription drugs it regulates, FDA does not impose a prescriber certification ETASU. PCSF ¶69. This holds true even for drugs that, unlike mifepristone, require diagnostic tests or special screening before they can be safely prescribed. PCSF ¶74. Yet FDA theorizes, contrary to the evidence, that mifepristone prescribers might defy the laws and ethical and professional guidelines that constrain them to provide care only when qualified to do so. There is nothing in the record supporting FDA's implausible assumption that

39

new mifepristone prescribers would not exercise the same "sound medical judgment," PCSF ¶35 (AMA), that current prescribers exercise—and that their license and ethics require—without a self-certification form. *See id.* (FDA: "strong adherence to evidence-based guidelines" by abortion providers). It is, again, "sheer speculation." *Sorenson Commc'ns Inc.*, 755 F.3d at 708.

In any event, the qualifications in the certification form are readily met by clinicians caring for pregnant patients. FDA admits that any provider who is not comfortable using patient medical history or a clinical examination to assess the duration and location of a pregnancy can obtain that information by ordering an ultrasound. PCSF ¶37. As with any other drug, all clinicians can refer patients to the nearest emergency department if necessary, ensuring access to surgery, blood transfusions, or resuscitation in the extremely rare event they are needed. PCSF ¶39; *see id.* (FDA's Viagra labeling: "Patients should seek emergency treatment if an erection lasts >4 hours."). Moreover, any specific referral plans a prescriber makes will be irrelevant if the patient does not live nearby; as ACOG has explained, "should a rare medical emergency arise, patients should be advised to seek care at the closest emergency facility" regardless of where their provider intended to refer them. *Id.* And FDA's reasoning that certification ensures providers will complete the Patient Agreement form, PCSF ¶51 (at 2023SUPP1124), cannot justify this ETASU when the Patient Agreement itself "does not add to safe use conditions," PCSF ¶40. The

40

absence of specialized qualifications only underscores the lack of justification for singling out mifepristone prescribers. *See* PCSF ¶38.

Moreover, FDA provided no reasoned response to the extensive evidence that this ETASU burdens patients and providers in violation of 21 U.S.C. §355-1(f)(2)(C)(ii) and (g)(4)(B)(ii), including by deterring would-be prescribers who fear their registrations could become public and expose them to anti-abortion hostility. PCSF ¶76. The Agency concluded that no burden exists as long as pharmacies are required to confidentially maintain prescriber and patient information, while ignoring that these fears predated the existence of pharmacy dispensing. PCSF ¶61 (at 2023SUPP1124-25). Indeed, even as the same fear drove FDA to redact all employee information from the record *even subject to a protective order*, PCSF ¶77—a parallel Plaintiffs pointed out in 2021, *see* PCSF ¶48 (at 2021REMS1163)— the Agency never addressed how a certification requirement inherently deters prescribers and reduces access. That is fatal under the APA. *See Pub. Citizen*, 374 F.3d at 1216 (agency violated APA where it "failed to consider the impact of the rules on the health of drivers, a factor the agency must consider under its organic statute"); *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1112-13 (D.C. Cir. 2019) (APA violation where agency did not consider providers' unwillingness to offer telecommunications services to low-income people or impact on those consumers). Indeed, to justify retaining the Patient Agreement, FDA relied on a survey showing

that eliminating In-Person Dispensing would lead to new mifepristone prescribers,

PCSF ¶55—yet wholly ignored that study's finding that Prescriber Certification

prevents *nearly 1 in 10* OBGYNs from prescribing mifepristone, PCSF ¶¶61, 78; *see*

*Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018) (arbitrary and

capricious "to rely on portions of studies in the record that support [agency's]

position, while ignoring [information] in those studies that do not").

### iii.   Pharmacy Certification

Nor did FDA consider how the burdens of Prescriber Certification are

compounded by the Pharmacy Certification ETASU—which FDA principally

justified based on the need to verify certification forms. PCSF ¶54. Commenters

warned the Agency that "the extra administrative burden" posed by this ETASU

would "disincentivize" pharmacies from dispensing mifepristone, PCSF ¶81, and

FDA conceded as much, *id.* (acknowledging requirement would "likely limit"

"pharmacies choosing to certify"). FDA was also told that whether patients can

access mifepristone at their "neighborhood retail pharmacies" matters, particularly

for "rural residents" and individuals who "are not digitally literate." PCSF ¶88.

Former plaintiff Dr. Chelius underscored that patients on Kaua'i who are homeless

do not "have a physical address to which a package can be securely and

confidentially mailed," so must find a facility dispensing mifepristone onsite. *Id.*

Any faithful application of the requirement that ETASU not be "unduly burdensome

on patient access," in particular, for "patients who have difficulty accessing health care (such as patients in rural or medically underserved areas)," 21 U.S.C. §355-1(f)(2)(C)(ii), would have grappled with these facts. Yet FDA engaged in no such analysis, in violation of the APA. *See Pub. Citizen*, 374 F.3d at 1216.

The record also does not justify FDA's decision to increase the burdens of this ETASU by mandating that pharmacies ensure delivery within four days of receiving the prescription or make contact with the prescriber to confirm that another timeline is sufficient. The drug sponsors noted that this means a default of "two-day or next day shipping," flagging concerns about the "affordability of shipping services." PCSF ¶80. While Plaintiffs are plainly in favor of timely access to health care, FDA nowhere explained why mifepristone is different from the countless other time-sensitive medications dispensed through pharmacies without a certification ETASU. *See* PCSF ¶¶64, 69. As the sponsors made clear, "the professional practice of pharmacy requires that pharmacies promptly dispense products to patients upon receiving the prescription or swiftly communicate with the patient and prescriber if that is not possible within the appropriate clinical window." PCSF ¶80. And FDA found *no* increase in adverse events when mail-order pharmacies dispensed mifepristone during the pandemic with no delivery-date mandate. PCSF ¶46.

In short, FDA failed to address statutory factors; ignored overwhelming evidence contradicting its decision; offered implausible rationales; and did not even

try to justify its uniquely stringent regulation of mifepristone. For each of these reasons independently, the 2023 REMS Decision was arbitrary and capricious.

**B.  The 2023 REMS Exceeds FDA's Statutory Authority**

"If [an] agency has violated Congress's precise instructions … that is the end of the matter": the *ultra vires* action cannot stand. *Cook v. FDA*, 733 F.3d 1, 5, 10-11 (D.C. Cir. 2013) (cleaned up) (invalidating FDA action). Just so here. As detailed *supra*, FDA did not assess the statutory criteria and violated the statutory mandate that access to an approved drug be impeded through a REMS and ETASU only when strictly necessary and in the least restrictive way possible.

FDA's 2023 REMS Decision blew past the guardrails established by Congress. The statute requires that a REMS determination balance enumerated statutory factors, but FDA did not weigh those factors before reauthorizing the REMS. *See supra* 31-33. And Congress permits a REMS only where "necessary to ensure that the benefits of [a] drug outweigh [its] risks, 21 U.S.C. §355-1(a)(1), (g)(4)(B)(i), yet Canada saw no safety reduction when it eliminated its REMS-like restrictions—critical evidence that FDA ignored. *See supra* 26-28.

The statute also requires that any ETASU be so essential that FDA would withdraw drug-approval without it, yet FDA nowhere suggested that these ETASU rise to that level. To the contrary, FDA retained the Patient Agreement in 2016 as mere "additional assurance" of informed consent practices, *see supra* 36; retained

44

the Prescriber Certification despite admitting that "[c]linicians with state licensed prescribing authority are qualified to understand any prescribing information sufficiently to discern whether they are qualified to prescribe or administer a particular drug," PCSF ¶36; and added a burdensome Pharmacy Certification ETASU primarily to enforce the Prescriber Certification requirement that 99.5% of prescription drugs do not have, *see supra* 39.

The mifepristone ETASU are also "unduly burdensome" on patients and the health care system, 21 U.S.C. §355-1(f)(2)(C)(ii); *accord id.* §355-1(g)(4)(B)(ii), as key stakeholders—including individual physicians and the leading professional societies for U.S. clinicians, PCSF ¶20 (*e.g.*, ACOG representing more than 60,000 OBGYNs)—repeatedly told FDA. Prescriber Certification alone prevents nearly one in ten OBGYNs from offering this "meaningful therapeutic" option to their patients. PCSF ¶¶10, 78; *see supra* 42.

Congress also required that ETASU be "commensurate" with the drug's serious risks, but mifepristone's risks are the same as those arising any time a pregnancy concludes and have never been proven to be caused by mifepristone. PCSF ¶¶15-16. And ETASU must "conform with [ETASU] for other drugs with similar, serious risks," 21 U.S.C. §355-1(f)(2)—yet FDA does not impose a REMS *at all* for drugs with similar risks like misoprostol and anticoagulants, and imposes much less restrictive ETASU for drugs as deadly as opioids. *See supra* 34-35.

45

When an agency action is "inconsistent with the statutory mandate," it is the Court's "clear duty … to reject" it. *SEC v. Sloan*, 436 U.S. 103, 118-19 (1978). FDA defied Congress's instructions in multiple ways and the 2023 REMS is invalid.

## V.   CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs summary judgment under the APA.

DATED: Honolulu, Hawaiʻi, October 2, 2024.

/s/ Jongwook "Wookie" Kim
JONGWOOK "WOOKIE" KIM
11020
**ACLU of Hawaii Foundation**
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

LORIE CHAITEN*
**American Civil Liberties Union
Foundation**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
lchaiten@aclu.org


*admitted pro hac vice


*Attorneys for Plaintiffs*

JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE*
JENNIFER DALVEN*
JOHANNA ZACARIAS*
**American Civil Liberties Union
Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
jdalven@aclu.org
jzacarias@aclu.org

JOHN A. FREEDMAN*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word count limits set by the Court in Dkt. 82, 211, because, excluding the parts of the document exempted by Local Rule 7.4(d), it contains 9,999 words. In compliance with Local Rules 7.4(e) and 10.2(a), I further certify that this document has been prepared using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: October 2, 2024

/s/ Jongwook "Wookie" Kim
JONGWOOK "WOOKIE" KIM
ACLU of Hawaii Foundation
*Attorney for Plaintiffs*

48