**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN*
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
lchaiten@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN*
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

**American Civil Liberties Union
Foundation**
JULIA KAYE*
JENNIFER DALVEN*
WHITNEY WHITE*
JOHANNA ZACARIAS
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
jdalven@aclu.org
wwhite@aclu.org
jzacarias@aclu.org

**American Civil Liberties Union
Foundation**
RACHEL REEVES*
915 15th Street NW
Washington, DC 20005
T: (212) 549-2633
F: (212) 549-2650
rreeves@aclu.org

*admitted pro hac vice*

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAIʻI

HEIDI PURCELL, M.D., FACOG,
*et al.*

                    Plaintiffs,

v.

DORIS FINK, J.D., *in her
official capacity as* ACTING
SECRETARY,
U.S. D.H.H.S., *et al.*,

                    Defendants.

CIVIL ACTION
Case No. 1:17-cv-00493-JAO-RT

**PLS.' LR56.1(E) COMBINED
OPPOSING AND SUPPLEMENTAL
CONCISE STATEMENT OF FACTS**

Judge: Hon. Jill A. Otake
Hearing Date: Vacated per ECF 107
Trial Date: Vacated per ECF 82

# I. Plaintiffs' Concise Statement in Opposition to Defendants' Concise Statement of Facts (ECF 229)[1]

| Defendants' Statement of Fact | Plaintiffs' Response |
|---|---|
| 1. In 2000, FDA approved mifepristone (under the brand name Mifeprex) in a regimen with misoprostol for medical termination of intrauterine pregnancy through 49 days gestation. 2021 REMS 001566; FDA 0003-5; FDA 0009. | Undisputed. |
| 2. At the time of approval, to assure mifepristone's safe use, FDA placed restrictions under Subpart H on the distribution and use of the drug product. 2021 REMS 001566; FDA 0003-5. | Disputed in part.<br><br>Undisputed that FDA imposed restrictions on mifepristone under Subpart H.<br><br>Disputed that the restrictions were "needed to assure safe use" and "commensurate with the specific safety concerns presented," 21 C.F.R. §314.520(a)-(b) (1999); FDA1-2; *see also, e.g.*, FDA574; FDA535; FDA354; 2021ED195; 2022CP99-109; Pls.' Concise Statement of Facts ¶¶1-2, 10-20, 64-68, ECF 222 [hereinafter "PCSF"]; *infra* Supp. ¶24. |
| 3. The restrictions imposed at the time of approval in 2000 included requirements that (1) prescribers certify that (among other things) they have the ability to accurately date pregnancies and diagnose ectopic pregnancies, and will either provide surgical intervention or arrange for others to provide it if necessary; (2) the drug be dispensed | Undisputed. |

---

[1] All record citations are attached as Ex. C.

| | |
|---|---|
| only in certain healthcare settings, by or under the supervision of a specially certified prescriber (the in-person dispensing requirement); and (3) patients sign a Patient Agreement Form. 2021 REMS 001566; FDA 0004. | |
| 4. FDA concluded based on a review of clinical trials and other scientific evidence that, under those conditions, mifepristone was safe and effective, in a regimen with misoprostol, to terminate early pregnancy. 2021 REMS 001566; FDA 0003. | Disputed in part. *Supra* ¶2. |
| 5. Because these restrictions under Subpart H were in place when the Food and Drug Administration Amendments Act of 2007 took effect, Mifeprex was "deemed to have in effect an approved [REMS]" that continued these restrictions as "elements to assure safe use." Pub. L. No. 110-85, § 909(b)(1); 2021 REMS 001566; FDA 1281; PCSF ¶ 27. | Undisputed. |
| 6. In 2011, in response to a supplemental application submitted by the sponsor, FDA approved the Mifeprex REMS after determining that restrictions remained necessary to ensure the benefits of mifepristone outweigh the risks. FDA 1281; 2021 REMS 001565, 1566. | Disputed in part.

Undisputed that FDA stated in 2011 that it "determined that a REMS is necessary" to ensure mifepristone's benefits outweigh its risks. FDA 1281.

Disputed that FDA engaged in any substantive analysis to support this "determin[ation]," *see* FDA231-36, and disputed that the evidence supported such a conclusion, *e.g.*, *supra* ¶2. |
| 7. In 2016, FDA approved modifications to the conditions of | Undisputed that FDA approved changes to mifepristone's labeling |

| | |
|---|---|
| approval (including the REMS) for Mifeprex, to lower the dose of mifepristone, increase the gestational age limit from 49 to 70 days, reduce the number of required in-person clinic visits from three to one, remove the requirement that mifepristone be taken at a clinic, and to allow mifepristone to be prescribed by non-physician healthcare providers licensed under state law to prescribe drugs. 2021 REMS 001565; FDA 0371-381. | indications including, but not limited to, dose, gestational age, and number of in-person visits.  Further undisputed that FDA modified REMS requirements including replacing the term "physician" with "licensed healthcare provider" and "removing the Medication Guide as part of the REMS but retaining it as part of the labeling." 2021REMS1565. |
| 8. When FDA approved a generic version of the drug in 2019, it approved a single, shared system REMS, known as the Mifepristone REMS Program, for both Mifeprex and the generic version. 2021 REMS 001565; PCSF ¶43. | Undisputed. |
| 9. On May 7, 2021, FDA announced that it would review the elements of the Mifepristone REMS Program to determine whether those elements should be modified. 2021 REMS 001565, 1568; 2021 REMS 000643-650. | Undisputed that, in May 2021, "[i]n connection with the *Chelius v. Becerra* litigation, FDA agreed to undertake a full review of the Mifepristone REMS program." 2021REMS1565; *see* 21 U.S.C. §355-1(g)(4)(B) (modification review encompasses whether REMS elements should be added, modified, *or removed*" (emphasis added)). |
| 10. FDA's 2021 REMS review encompassed "multiple different sources of information," including "published literature," "safety information," adverse event reports, a "REMS assessment report" submitted by the sponsors, "information provided by advocacy groups, individuals, and the [sponsors]," and "an examination of literature references provided by plaintiffs in the | Disputed in part.<br><br>Undisputed that the cited document identifies these categories of materials as part of FDA's review.<br><br>Disputed that FDA's review encompassed all relevant record evidence within these categories: FDA expressly "excluded," *inter alia*, "survey studies or qualitative studies…, |

| | |
|---|---|
| *Chelius v. Becerra* litigation." 2021 REMS 001570. | even if the study assessed REMS ETASUs," "[o]pinions, commentaries, or policy/advocacy statements," and "[d]ata on the logistics of accessing abortion care," and failed to address many objections raised even in those materials it reviewed. 2021REMS1571-72; 2021REMS1604-08; *see also, e.g.*, PCSF ¶¶52, 56-60. |
| 11. The agency's 2021 literature review covered material published between March 29, 2016 (the date of an earlier REMS modification) and July 26, 2021, and included publications found on PubMed and Embase as well as those provided by "advocacy groups, individuals, plaintiffs in [*Chelius v. Becerra*, No. 1:17-493-JAO-RT (D. Haw.)]," the sponsors, and "healthcare providers and researchers." 2021 REMS 001570. | Disputed in part. *Supra* ¶10. |
| 12. FDA "focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from [FDA's] literature search and from the references proved to [FDA] relevant to the REMS ETASUs." 2021 REMS 001571. | Disputed in part. *Supra* ¶10.<br><br>Further disputed that FDA considered all publications containing objective safety data. *E.g.*, PCSF ¶57 (disregarding Canadian safety data). |
| 13. "Appendix A" to FDA's 2021 REMS review memo, entitled "References Cited in Letters from Plaintiffs," contains a chart that lists the references that FDA "excluded" from the review, describes the contents of the listed references, and briefly notes the reason that FDA did not give the item | Disputed. Appendix A lists publications FDA received from Plaintiffs and divides them into two sections: "References included in the REMS review," and "References excluded from the REMS review," with a second column listing "Rationale for Exclusion." Reasons for exclusion include, *inter alia*: "Policy/advocacy |

| | |
|---|---|
| weight in making its determination. 2021 REMS 001604-1608. | statement," "Focused on the logistics of accessing abortion care," "Survey on clinician perspectives on access to mifepristone." 2021REMS1604-08. Nowhere in Appendix A or any other source does FDA say it considered but did not give weight to these materials; FDA states only that they were "excluded." *E.g.*, 2021REMS1571-72; 2021REMS1604-08. |
| 14. In assessing whether to maintain the Patient Agreement Form, FDA considered the National Abortion Federation's 2020 Clinical Policy Guidelines for Abortion Care, as well as Practice Bulletins from the American College of Obstetricians and Gynecologists and the Society of Family Planning, and data relating to an increase in new providers for this care obtained from well-conducted surveys. 2021 REMS 001572, 1577. | Undisputed that FDA mentioned these materials and stated that, as an "exception" to its literature review criteria, it reviewed survey data "in relation to provider volume" in considering the Patient Agreement ETASU. 2021REMS1572. |
| 15. Laure Schummers et al., Abortion Safety and Use with Normally Prescribed Mifepristone in Canada, 386 New Eng. J. Med. 57-67 (2022) ("the Canadian study") was published in 2022, after FDA completed its 2021 REMS review and directed the sponsors to propose a modified REMS. 2022 CP 000099-109. | Disputed in part.<br><br>Undisputed that this study was published in January 2022, 21 days after FDA completed its 2021 REMS Review. 2022CP99; 2021REMS1561.<br><br>Disputed that the completion date of FDA's 2021 REMS Review is relevant when FDA did not release the updated REMS until January 3, 2023, after completing an additional "Review of proposed Major REMS Modification." 2023SUPP1112; *see also* Order on Pls.' Mot. To Complete the Record, ECF 207, at 4, 6, 12-14. |

| | |
|---|---|
| | Plaintiffs further note that the study abstract was before FDA by August 2021, four months before FDA completed its 2021 REMS Review. 2021REMS1604; 2021REMS1607. |
| 16. The Canadian study was cited to FDA in a 2022 citizen petition asking FDA to request that the sponsor of Mifeprex submit a supplemental new drug application proposing to (1) add miscarriage management as an approved indication and (2) eliminate or modify the REMS so that it would not be unduly burdensome for that use. 2022 CP 000071-98. | Undisputed that the cited document makes these requests and further "request[s] that FDA immediately exercise enforcement discretion with respect to the use and distribution of mifepristone for miscarriage management without complying with the REMS." 2022CP71.<br><br>As this Court found, the petition also addressed why the REMS is medically unnecessary and burdensome for abortion care. *See* ECF 207, at 5-6, 9-12. |
| 17. FDA denied the citizen petition because it is up to the sponsor to decide whether to seek approval for a new indication. | Defendants' response violates Fed. R. Civ. P. 56(c)(1) because it lacks a citation to admissible record evidence.<br><br>Otherwise, disputed in part.<br><br>Undisputed that this was one basis FDA gave for its petition denial. 2022CP112; *infra* ¶19.<br><br>Disputed that FDA lacked the ability to seek modifications to mifepristone's REMS in response to the petition. *E.g.*, 21 U.S.C. §355-1(g)(4)(B). |
| 18. The 2022 citizen petition also urged FDA to exercise enforcement discretion with respect to the REMS requirements as they pertain to miscarriage management, while such a | Undisputed. |

| | |
|---|---|
| supplemental new drug application was being considered. 2022 CP 000110-113. | |
| 19. FDA denied this request because the management of miscarriage is not a currently approved indication for mifepristone, and it would be premature for FDA to consider the impact that the addition of this indication would have, if any, on the REMS so that it is not unduly burdensome for that use. 2022 CP 000110-113. | Disputed in part.<br><br>Undisputed that FDA identified these as reasons to deny the request.<br><br>Disputed that FDA lacked the ability to seek modifications to mifepristone's REMS in response to the petition. *E.g.*, 21 U.S.C. §355-1(g)(4)(B). |
| 20. On December 16, 2021, FDA announced its conclusion that "mifepristone will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met, and pharmacy certification is added." 2021 REMS 001599; *see also* 2021 REMS 001601. | Disputed in part.<br><br>Undisputed that the cited document includes the quoted language and that the evidence supported removal of in-person dispensing.<br><br>Disputed that the retained and/or new ETASU are necessary to assure safe use or otherwise satisfy the statutory requirements. *E.g.*, *supra* ¶2; *infra* ¶¶21-22, 24, 27-28, 37. |
| 21. FDA found that the prescriber certification and Patient Agreement Form requirements continued to be necessary components of the REMS to mitigate risks related to heavy bleeding, missed ectopic pregnancy, and other issues. 2021 REMS 001572-1578, 1596-1597. | Disputed in part.<br><br>Undisputed that FDA attributed its decisions to retain the Prescriber Certification and Patient Agreement ETASU to "concern[s]" about these risks. 2021REMS1573.<br><br>Disputed that they are necessary to assure safe use or commensurate with those identified risks. *E.g.*, *supra* ¶2; Defs. Opp'n Resp. 8 (Jan. 10, 2020), Dkt. 101; FDA1264; 2021ED240; 2022CP82; 2021REMS1575-76; PCSF ¶¶34-41, 48. |

| | |
|---|---|
| 22. FDA explained that the evidence was insufficient to show that the benefits of mifepristone would continue to outweigh its risks if the prescriber certification requirement was removed. 2021 REMS 001573-1574, 1597. | Disputed in part.<br><br>Undisputed that FDA stated that "there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention or arrange for such care through others if needed, is necessary to mitigate the serious risks associated with the use of mifepristone." 2021REMS1573.<br><br>Disputed that the evidence supports such a conclusion where, *inter alia*, FDA admits that "clinicians with state-licensed prescribing authority are qualitied to understand any prescribing information sufficiently to discern whether they are qualified to prescribe or administer a particular drug," Defs.' Opp'n Resp. 8, Dkt. 101, and where FDA requires no such self-certification for 99.5% of regulated drugs, PCSF ¶69 *see also e.g.*, *supra* ¶21. |
| 23. FDA's 2021 literature review did not identify any studies comparing providers who met these qualifications with providers who did not, and thus found "no evidence to contradict [its] previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention or arrange for such care through others if needed, is necessary to mitigate the serious risks associated with" the drug. 2021 REMS 001573. | Disputed in part.<br><br>Undisputed that the cited document includes the quoted language.<br><br>Otherwise, disputed. *Supra* ¶22. |

| | |
|---|---|
| 24. FDA found that by requiring prescribers to acknowledge that they "must report patient deaths associated with mifepristone to the manufacturer," the prescriber certification requirement "ensures that the manufacturer receives all reports of patient deaths and, in turn, fulfills its regulatory obligations to report those deaths to the FDA." 2021 REMS 001574. | Disputed in part.<br><br>Undisputed that the cited document includes the quoted language.<br><br>Disputed that this ETASU meets the statutory standard, *e.g.*, 21 U.S.C. §355-1(f)(2), where, *inter alia*, deaths associated with mifepristone are infinitesimally rare and have never been shown to be caused by mifepristone, and where FDA imposes no such requirement for drugs posing similar or greater risks. *E.g.*, *infra* Supp. ¶24; 2023SUPP1486; PCSF ¶¶14-17, 64-74. |
| 25. FDA anticipated a "potential for doubling" the number of prescribers due to the agency's removal of the in-person dispensing requirement and, in view of that potential, determined that it was important to retain the prescriber certification to ensure that providers meet the necessary qualifications and adhere to the guidelines for use. 2021 REMS 001574; *see also* 2021 REMS 001597. | Disputed in part.<br><br>Undisputed that the cited document includes the quoted language and that a study FDA discussed found the potential for such an increase.<br><br>Otherwise, disputed. *Supra* ¶22. |
| 26. FDA concluded that prescriber certification "continues to be a necessary component of the REMS to ensure the benefits of mifepristone for medical abortion outweigh the risks." 2021 REMS 001574; *see also* 2021 REMS 001597. | Disputed in part.<br><br>Undisputed that the cited document includes the quoted language.<br><br>Otherwise, disputed. *Supra* ¶22. |
| 27. FDA found that "[t]he burden of prescriber certification has been minimized to the extent possible" because each provider need only provide one certification to each of the two drug | Disputed in part.<br><br>Undisputed that the cited document contains the quoted language. |

| | |
|---|---|
| sponsors for mifepristone. 2021 REMS 001574; *see also* 2021 REMS 001597. | Otherwise, disputed. This ETASU imposes ongoing administrative burdens on mifepristone prescribers. *See* 2023SUPP1466-67; *infra*, Supp. ¶¶3-7, 11. This ETASU also burdens prescribers who fear anti-abortion violence or harassment if their certification were ever leaked. *E.g.*, PCSF ¶¶76-78. |
| 28. FDA concluded that the single-page Patient Agreement Form, which "ensures that patients are informed of the risks of serious complications associated with" use of mifepristone for this indication, "does not impose an unreasonable burden on providers or patients" and "remains necessary to assure the safe use of Mifepristone." 2021 REMS 001574, 1578; *see also* 2021 REMS 001597. | Disputed in part.<br><br>Undisputed that the cited document contains the quoted language.<br><br>Disputed that this ETASU is necessary to assure safe use or informed consent where, *inter alia*, FDA admits that "informed consent in medicine is an established practice" and that studies have found "strong adherence to evidence-based guidelines by abortion providers," 2021REMS1577; *see also e.g.*, PCSF ¶¶34-35, 38, 40, and where 99.3% of FDA-regulated drugs have no Patient Agreement ETASU, PCSF ¶70. This ETASU also burdens patients and providers, as the record reflects and as FDA's own scientific review team concluded in 2016. *E.g.*, PCSF ¶¶40, 89-90; *infra* Supp. ¶¶3, 9-11. |
| 29. FDA explained that "literature that focused on the informed consent process" "d[id] not provide evidence that would support removing" the Patient Agreement Form requirement. 2021 REMS 001576, 1577; *see also* 2021 REMS 001597. | Disputed in part.<br><br>Undisputed that the cited document contains the quoted language.<br><br>Disputed that there was no relevant record evidence to support removing this ETASU. *E.g.*, *supra* ¶28. |

| | |
|---|---|
| 30. FDA found "no publications which directly addressed" the Patient Agreement Form. 2021 REMS 001576. | Disputed in part. *Supra* ¶29. |
| 31. FDA found that seven studies focusing on the informed consent process contained "no outcome data" or "other evidence demonstrating that informed consent made the Patient Agreement Form unnecessary." 2021 REMS 001576-1577. | Disputed in part. *Supra* ¶29. |
| 32. The Patient Agreement Form may be signed electronically. 2023 SUPP 001122. | Undisputed. |
| 33. As with prescriber certification, FDA found that the "potential doubling of medical abortion providers" weighed in favor of retaining the Patient Agreement Form. 2021 REMS 001597; see also 2021 REMS 001578. | Disputed in part.<br><br>Undisputed that the cited document contains the quoted language and that a study FDA considered showed the potential for such an increase.<br><br>Disputed that any such finding justifies retaining the Patient Agreement. *Supra* ¶28. |
| 34. The agency noted the "continued need to ensure that patients are consistently provided patient education under the mifepristone REMS Program regarding the use and risks of mifepristone," a need the Patient Agreement Form fulfills by "standardizing the medication information that prescribers communicate to their patients, including new prescribers." 2021 REMS 001597; see also 2021 REMS 001575, 1578. | Disputed in part. *Supra* ¶28. |

| | |
|---|---|
| 35. FDA found that the Patient Agreement Form provides that information in a "brief and understandable format," thus minimizing the burden of this requirement. 2021 REMS 001578. | Disputed in part.<br><br>Undisputed that the cited document contains the quoted language and that the Patient Agreement Form uses brief, understandable language.<br><br>Disputed that this ETASU is not "unduly burdensome." 21 U.S.C. §355-1(f)(2)(C); *e.g.*, *supra* ¶28. |
| 36. FDA determined that the REMS "must be modified" to remove the requirement that mifepristone be dispensed only in certain healthcare settings because this requirement is "no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug." 2021 REMS 1803-1807; 1808-1811. | Undisputed. |
| 37. FDA determined that because the in-person dispensing requirement was being removed, it was necessary to add a new requirement that pharmacies that dispense the drug be certified. 2021 REMS 001600-1601. | Disputed in part.<br><br>Undisputed that FDA concluded that eliminating in-person dispensing necessitated adding a pharmacy certification ETASU.<br><br>Disputed that this ETASU is necessary to assure safe use or otherwise in compliance with the statutory requirements. *E.g.*, *infra* Supp. ¶¶3-8, 11-16; PCSF ¶¶79-81, 2023SUPP34; FDA1247. |
| 38. The pharmacy certification requirement permits pharmacies to dispense mifepristone upon prescription by a certified prescriber if the pharmacies | Undisputed. |

13

| | |
|---|---|
| become certified. 2021 REMS 001600-1601. | |
| 39. FDA reasoned that "[a]dding the pharmacy certification requirement incorporates pharmacies into the REMS, ensures that pharmacies are aware of and agree to follow applicable REMS requirements, and ensures that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers." 2021 REMS 001600. | Disputed in part.<br><br>Undisputed that the cited document contains the quoted language.<br><br>Otherwise, disputed. *Supra* ¶37. |
| 40. FDA acknowledged prescriber (and patient) confidentiality concerns, and emphasized those concerns as part of the basis for requiring pharmacy certification in light of the elimination of the in-person dispensing requirement. 2023 SUPP 1124-1125. | Disputed in part.<br><br>Undisputed that the cited documents mention confidentiality concerns.<br><br>Otherwise, disputed. FDA did not acknowledge the evidence that prescribers fear that even forms held confidentially could be leaked, exposing them to anti-abortion hostility, or that requiring prescribers to send certification forms to every pharmacy to which they may send mifepristone prescriptions increases these risks. *E.g.*, *supra* ¶27. FDA redacted the names of employees involved in mifepristone decisions because of safety concerns, even if names were released subject to a protective order. PCSF ¶77. |
| 41. In light of the labeled indication and gestational age, pharmacies must ensure delivery within four days of receiving a prescription or make contact with the prescriber who can agree to another timeline. 2023 SUPP 1122. | Disputed in part.<br><br>Undisputed that pharmacies are subject to a four-day delivery requirement. 2023SUPP1468. |

| | Disputed that this requirement is necessary to ensure timely delivery or otherwise meets the statutory requirements. *E.g.*, *supra* ¶37. |
|---|---|
| 42. FDA directed the mifepristone sponsors to submit supplemental applications proposing these modifications to the REMS. 2021 REMS 001803-1807, 1808-1811. | Undisputed. |
| 43. The sponsors submitted their supplemental applications in 2022, and FDA approved them on January 3, 2023. 2023 SUPP 000257-350, 351-439; 2023 SUPP 001448-1460, 1461-1465. | Undisputed. |
| 44. FDA found that Korlym does not require a REMS to assure safe use of the drug to treat Cushing's syndrome, including that women with Cushing's syndrome are "unlikely to be pregnant" due to the underlying disease and the sponsor voluntarily distributes Korlym exclusively through specialty pharmacies. FDA 298, 304; see generally FDA 292-306. | Undisputed that the cited document includes the quoted language, and that these were among the reasons FDA determined not to impose a REMS for Korlym, in addition to concerns that a REMS would "reduce[] access" and cause "treatment delays," PCSF ¶67; *see also* FDA303 ("Any restrictions could impede access…"). |

## II. Plaintiffs' Concise Statement of Supplemental Facts

1.      Honor MacNaughton and Jessica Nouhavandi are members of the Society of Family Planning ("SFP"). Decl. of Honor MacNaughton ("MacNaughton Decl.") ¶4, attached hereto as Ex. A; Decl. of Jessica Nouhavandi, Pharm.D. ("Nouhavandi Decl.") ¶2, attached hereto as Ex. B.

2.      SFP is a medical society focused on family planning and just and equitable access to abortion. MacNaughton Decl. ¶4.

3.      As a certified prescriber and the individual within her large, safety-net health system with administrative responsibility for overseeing mifepristone REMS compliance, Dr. MacNaughton faces ongoing burdens caused directly by the REMS—including ensuring that, before prescribing mifepristone, every clinician complete and transmit the Prescriber Certification form to the certified pharmacies they use to fill mifepristone prescriptions, and integrating information on Prescriber Certification and Patient Agreement into internal intranet and onboarding procedures. *E.g.*, MacNaughton Decl. ¶¶7-10, 21-24, 30; 2023SUPP1466-68.

4.      Dr. MacNaughton is aware of colleagues in her health system who want to prescribe mifepristone but do not currently because of administrative burdens imposed by the REMS. MacNaughton Decl. ¶¶21, 24.

5.      Dr. MacNaughton has spent many hours over approximately six months coordinating system-wide REMS implementation and the work is ongoing. MacNaughton Decl. ¶21.

6.      Because of the REMS, Dr. MacNaughton and her colleagues are only able to (1) directly dispense mifepristone at certain outpatient clinics that stock it; (2) send mifepristone prescriptions to the four REMS-certified commercial

16

pharmacies associated with their health system; or (3) arrange for courier delivery of mifepristone to patients. MacNaughton Decl. ¶¶11-12.

7.    Dr. MacNaughton and her colleagues do not utilize any unaffiliated pharmacies for mifepristone prescriptions because of the substantial administrative burdens imposed by the REMS, including (1) individually identifying whether hundreds of pharmacies their patients use are certified and (2) ensuring that every clinician in their health system submits a completed Prescriber Certification form to every pharmacy they use for mifepristone. MacNaughton Decl. ¶¶12-15; 2023SUPP1467-68.

8.    Having to travel to a clinic location that stocks mifepristone, travel to a system-affiliated pharmacy, or be available to receive a courier delivery presents a hardship for Dr. MacNaughton's primarily low-income patients and can cause delays. MacNaughton Decl. ¶¶16-20, 31.

9.    The Patient Agreement ETASU imposes direct administrative burdens on Dr. MacNaughton beyond what is required for informed consent. MacNaughton Decl. ¶¶25-27.

10.    The Patient Agreement form conflicts with evidence-based counseling for some of Dr. MacNaughton's patients, causing them confusion and sometimes distress and impeding Dr. MacNaughton's ability to practice her profession consistent with her medical judgment. MacNaughton Decl. ¶¶28-29.

11.    Because of the non-clinical tasks the REMS requires (e.g., reviewing and signing completing the Patient Agreement and discussing the atypical options for receiving the medication), appointments involving mifepristone prescriptions are *double* the length of other routine primary-care appointments in Dr. MacNaughton's health system, reducing the number of mifepristone patients they can see. MacNaughton Decl. ¶¶25-27, 31-32.

12.    Dr. Nouhavandi is the owner, co-founder, and Pharmacist-in-Charge at Honeybee Health, a REMS-certified mail-order pharmacy licensed in all 50 states. Nouhavandi Decl. ¶¶2, 5, 14.

13.    The REMS requirement that Honeybee collect, verify, and store Prescriber Certification forms before dispensing mifepristone does not exist for any other medication they dispense, and directly burdens Honeybee's staff and resources. Nouhavandi Decl. ¶15.

14.    The Pharmacy Certification's four-day-delivery requirement costs Honeybee thousands of dollars each month in extra shipping costs that Honeybee would not otherwise bear. Nouhavandi Decl. ¶¶16-17.

15.    When Honeybee was dispensing mifepristone before FDA imposed the Pharmacy Certification ETASU, patients received their mifepristone within 36 hours on average of Honeybee receiving the prescription. Nouhavandi Decl. ¶¶8-12, 16.

16.    Many time-sensitive medications are filled through pharmacies without an ETASU requiring four-day delivery. MacNaughton Decl. ¶14; *see* PCSF ¶24 (97% of FDA-regulated drugs have no REMS).

17.    Honeybee incurs ongoing financial costs to maintain a special "dashboard" it built to streamline compliance with atypical REMS requirements to relay information about mifepristone to prescribers. Nouhavandi Decl. ¶¶9-11, 18.

18.    The REMS requires Honeybee to undergo annual compliance audits that pose ongoing burdens in time, labor, resources, and paperwork. Nouhavandi Decl. ¶19.

19.    Honeybee has an employees whose principal job is to facilitate compliance with the mifepristone REMS. Nouhavandi Decl. ¶20.

20.    Healthcare providers and pharmacies that fail to comply with REMS requirements must be "de-certified," losing the ability to prescribe or dispense mifepristone and impacting the practice of their professions. 2023SUPP1467; 2023SUPP1469; MacNaughton Decl. ¶32.

21.    As part of its 2023 REMS Review, FDA wrote memos-to-file on December 30, 2022, and January 3, 2023, considering studies published after FDA's July 2021 literature review cut-off date, including one published on January 3, 2023. 2023SUPP1077-80; 2023SUPP1259-61.

22.    The Consolidated Appropriations Act, enacted December 2022, created a new training requirement for opioid prescribers that did not previously exist. Letter from Thomas W. Prevoznik, U.S. Dep't of Justice, Drug Enforcement Admin., to DEA-Registered         Practitioners        (Mar.        27,        2023), https://deadiversion.usdoj.gov/pubs/docs/MATE_Training_Letter_Final.pdf [https://perma.cc/QT6C-USW8].[2]

23.    FDA approved the current Opioid Analgesic REMS in 2018. *Opioid Analgesic Risk Evaluation and Mitigation Strategy (REMS)*, U.S. Food and Drug Admin. (Oct. 31, 2024), https://www.fda.gov/drugs/information-drug-class/opioid-analgesic-risk-evaluation-and-mitigation-strategy-rems    [https://perma.cc/WE7F-3LDB].

24.    According to FDA, between September 2000 and December 31, 2024, there were 36 fatalities following mifepristone use out of approximately 7.5 million uses, none found to be *caused* by mifepristone and many self-evidently unrelated to it (e.g., homicide). U.S. Food & Drug Admin., Mifepristone U.S. Post-Marketing Adverse    Events    Summary    through    12/31/2024,    at    1, https://www.fda.gov/media/185245/download?attachment [https://perma.cc/D9N6-D24T].

---

[2] Plaintiffs respectfully request judicial notice of the government sources cited in Supp. ¶¶22-24. *See* PCSF 5, n.2.

DATED: Honolulu, Hawaiʻi, January 31, 2025

/s/ Jongwook "Wookie" Kim
JONGWOOK "WOOKIE" KIM
11020
**ACLU of Hawaii Foundation**
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

LORIE CHAITEN*
**American Civil Liberties Union Foundation**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
lchaiten@aclu.org

**American Civil Liberties Union Foundation**
RACHEL REEVES*
915 15th Street NW
Washington, DC 20005
T: (212) 549-2633
F: (212) 549-2650
rreeves@aclu.org

JULIA KAYE*
WHITNEY WHITE*
JENNIFER DALVEN*
JOHANNA ZACARIAS*
**American Civil Liberties Union Foundation**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
wwhite@aclu.org
jdalven@aclu.org
jzacarias@aclu.org

JOHN A. FREEDMAN*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

*admitted pro hac vice*

*Attorneys for Plaintiffs*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word count limits set by the Court in Dkt. 82, 211, because, excluding the parts of the document exempted by Local Rule 7.4(d) and the restatement of Defendants' Concise Statement of Fact in Section I (recopied herein for the Court's convenience), it contains 2,493 words. In compliance with Local Rules 7.4(e) and 10.2(a), I further certify that this document has been prepared using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: January 31, 2025

/s/ Jongwook "Wookie" Kim
JONGWOOK "WOOKIE" KIM
ACLU of Hawaii Foundation
*Attorney for Plaintiffs*