# Exhibit C

Excerpts from Administrative Record

**Index of Excerpts from Administrative Record in Support of
Plaintiffs' LR 56.1(e) Combined Opposing and Supplemental
Concise Statement of Facts**
*Purcell, et al. v. Fink, et al.,*
**No. 1:17-cv-00493-JAO-RT (D. Haw.)**

| Exhibit Page No. | Document Name | Date | Excerpted AR Pages |
|---|---|---|---|
| 1-2 | Danco Group letter to FDA re: Mifeprex NDA 20-687, distribution plan (FDA1-2) | Jan. 21, 2000 | Entire Range |
| 3-8 | FDA, Final Deemed REMS Review (Mifeprex) (FDA231-57) | June 3, 2011 | FDA231-36 |
| 9-10 | FDA, REMS Review(s) (Korlym) (FDA292-306) | Jan. 27, 2012 | FDA292, FDA303 |
| 11-12 | FDA, Final REMS Review (Mifeprex) (FDA342-60) | dated Oct. 10, 2013; signed Oct. 17, 2013 | FDA 342, FDA354 |
| 13-14 | FDA, Summary Review (Mifeprex) (FDA412-39) | Mar. 29, 2016 | FDA412, FDA437 |
| 15-17 | FDA, Clinical Review (Mifeprex) (FDA528-634) | Mar. 29, 2016 | FDA 0528, FDA535, FDA574 |
| 18-19 | FDA, REMS Review & Supporting Materials (Mifeprex) (FDA673-709) | Mar. 29, 2016 | FDA673-74 |
| 20-24 | Letter from Kelly Blanchard, President, Ibis Reproductive Health et al., to FDA (FDA1245-53) | Nov. 3, 2015 | FDA1245, FDA1247, FDA1249-51 |

| 25-26 | Letter from Hal C. Lawrence, III, Exec. VP & CEO, Am. Coll. of Obstetricians & Gynecologists ("ACOG"), to FDA (FDA1263-64) | Nov. 4, 2015 | FDA 1263-64 |
| 27 | FDA Supplement Approval letter (Mifeprex) (FDA1281-84) | June 8, 2011 | FDA1281 |
| 28-30 | Nat'l Acads. of Scis., Eng'g & Med., The Safety & Quality of Abortion Care in the United States (2021ED126-348) | 2018 | 2021ED126, 2021ED195, 2021ED240 |
| 31-43 | REMS Modification Rationale Review (Mifepristone) (2021REMS1561-1609) | Dec. 16, 2021 | 2021REMS1561, 2021REMS1565, 2021REMS1571-73, 2021REMS1575-77, 2021REMS1604-08 |
| 44-45 | Citizen Petition from ACOG et al. to FDA (2022CP71-98) | Oct. 4, 2022 | 2022CP71, 2022CP82 |
| 46-56 | Laura Schummers et al., *Abortion Safety and Use with Normally Prescribed Mifepristone in Canada,* 386 New Eng. J. Med. 57-67 (2022CP99-109) | Jan. 6, 2022 | Entire range |
| 57-58 | Citizen Petition Response Letter from FDA to ACOG (2022CP110-113) | Jan. 3, 2023 | 2022CP110, 2022CP112 |
| | Letter from Maureen G. Phipps, CEO, ACOG & | June 21, 2022 | 2023SUPP32, 2023SUPP34 |

| | | | |
|---|---|---|---|
| 59-60 | James L. Madara, CEO, AMA, to FDA re: actions related to mifepristone (2023SUPP32-37) | | |
| 62 | Sponsors' Resp. To FDA's Information Request (Mifepristone REMS) (2023SUPP460-78) | Aug. 26, 2022 | 2023SUPP460, 2023SUPP477 |
| 63-66 | Memorandum to File: Referenced Publications (2023SUPP1077-80) | Dec. 30, 2022 | Entire Range |
| 67 | Joint Summary Review (Mifepristone REMS) (2023SUPP1112-50) | Jan. 3, 2023 | 2023SUPP1112 |
| 68-70 | Memorandum to File: Referenced Publication (2023SUPP1259-61) | Jan. 3, 2023 | Entire Range |
| 71-74 | Mifepristone Tablets, 200mg, Single Shared System REMS (2023SUPP1466-70) | Jan. 2023 | 2023SUPP1466-69 |
| 75-76 | Mifeprex 2023 Labeling and Medication Guide (2023SUPP1471-89) | Jan. 2023 | 2023SUPP1471, 2023SUPP1486 |

## The Danco Group

January 21, 2000

Division of Reproductive and
  Urologic Drug Products (HFD-580)
Attention:  Document Control Room 17B-20
Office of Drug Evaluation II
Center for Drug Evaluation and Research
Food and Drug Administration
5600 Fishers Lane
Rockville, MD  20857

Re:    **NDA 20-687, Mifepristone 200mg Oral Tablets**
       •      Amendment 039    -    Mifeprex® – Distribution Plan

Dear Dr          ⅃

As previously agreed, we are submitting Danco Laboratories, Inc.'s Distribution Plan for
Mifeprex®. This is a comprehensive distribution plan that emphasizes control of
mifepristone at all points in the supply chain, from manufacturers through to individual
patients. This plan has been prepared in light of the unique situation surrounding
abortion provision in the United States and not out of any medical safety concerns.
However, in preparation of this plan, we have taken into account advice from the FDA
that it is considering approving the NDA under "Subpart H—Accelerated Approval of
New Drugs for Serious or Life-Threatening Illnesses, Sec. 314.520--Approval with
restrictions to assure safe use."

Our position is that we are willing to agree with the FDA on appropriate distribution
controls for mifepristone but that the application of Sec. 314.520 under Subpart H
seems unnecessary, in light of our voluntary acceptance of some appropriate
distribution controls.

Specifically, Sec. 314.520(a) states that the FDA can apply post-marketing restrictions if
it "concludes that a drug product shown to be effective can be safely used *only* if
distribution or use is restricted" (emphasis added). Regardless of the distribution
system for mifepristone, the medical safety of this drug is well documented in our IND
application and in the label and, thus, we believe that Sec. 314.520 does not apply.

This document constitutes trade secret and confidential commercial information exempt from public
disclosure under 21 C.F.R.  20.61.  Should FDA tentatively determine that any portion of this document is
disclosable in response to a request under the Freedom of Information Act, Danco Laboratories, Inc.
requests immediate notification and an opportunity for consultation in accordance with 21 C.F.R.  20.45.
Contact telephone number is (⌐          ⅃

On the contrary, scientific evidence demonstrates that mifepristone is an exceptionally safe drug. Mifepristone when taken by a woman whose pregnancy is $\leq$ 49 days LMP is associated with several relatively minor and predictable side effects. More serious adverse events are quite rare and are related to the entire treatment (not mifepristone *per se*), almost always following the use of the prostaglandin. There has never been a death related to the use of mifepristone in combination with misoprostol for medical termination of pregnancy. These details have been discussed and reported in our label and various submissions to the FDA.

In addition to concerns about patient safety, the possibility of teratogenic effects has previously triggered the application of section 314.520, as in the case of Thalomid (Thalidomide). These concerns relate to the inadvertent use of a known teratogen at the early stages of a pregnancy that was not scheduled for termination. In contrast, all women who will receive mifepristone will be known to be in early pregnancy and have elected to terminate that pregnancy. Of course, in the case of a successful application of mifepristone, concerns about teratogenicity are rendered moot as the woman will no longer be pregnant. Similarly, in the case of a failed medical abortion, women should have a surgical intervention to terminate the pregnancy and are counseled to do so before taking mifepristone and misoprostol. To date, there is no compelling evidence to suggest that either mifepristone or misoprostol produces teratogenic effects.

Based on the above reasons, we firmly believe that the NDA for mifepristone should not be approved under Sec. 314.520. In addition, applying Sec. 314.520 might draw increased and unwarranted attention to the product, the FDA, and to Danco and its manufacturers, in particular evoking queries about the product's safety. Nonetheless, given the contentious political climate surrounding *all* abortion provision in the United States, we feel that the distribution of mifepristone should be carefully monitored and controlled. Therefore, we have developed and are implementing a controlled distribution strategy and are submitting the details of this strategy in the enclosed Distribution Plan for your review and comment.

Sincerely.



Enclosure

cc:
Sandra P. Arnold – Population Council
Frederick H. Schmidt – Population Council

52 pages have been withheld as b4 (CCI) immediately following this page

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

**FINAL deemed REMS REVIEW**

| | |
|---|---|
| **Date:** | June 3, 2011 |
| **To:** | (b) (6) |
| **Through:** | (b) (6) |
| **From:** | (b) (6) |
| **Subject:** | Review of Risk Evaluation and Mitigation Strategy |
| **Drug Name:** | mifepristone (Mifeprex) |
| **Application Type/Number:** | NDA 20-687 |
| **Applicant:** | Danco Laboratories, LLC |
| (b) (6) **#:** | 2008-1841 |
| (b) (6) | 257 |

# 1  INTRODUCTION

This is the ████████████████ (b) (6)  final review of the Risk Evaluation and Mitigation Strategy (REMS) for Mifeprex (mifepristone).

Mifeprex was approved for the medical termination of intrauterine pregnancy through 49 days' pregnancy on September 28, 2000 under 21 CFR 314 Subpart H.

Since approval, mifepristone has been available only through a restricted distribution program that requires prescribers to be enrolled to be able to order Mifeprex and it can only be dispensed in a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber. Mifeprex is not distributed to or dispensed through retail pharmacies.  Finally, before dispensing Mifeprex, patients must sign an agreement form.

Mifepristone was included on the list of products deemed to have in effect an approved risk evaluation and mitigation strategy (REMS) under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007. The spnsors of such listed products were required to submit a REMS propoal by September 21, 2008. The sponsor (Danco) submitted a proposal on September 16, 2008. The final proposal submitted May 27, 2011 incorported the elements from the approved risk management program.

# 2  MATERIALS REVIEWED

We reviewed the following submissions:

- Proposed REMS and REMS Supporting Document, submissions of September 16, 2008, December 9, 2008, November 8, 2010, May 19, 2011, May 27, 2011

# 3  RESULTS OF REVIEW – Risk Evaluation and Mitigation Strategy (REMS)

## 3.1  Goal

The goals of the REMS are to:

- To provide information to patients about the benefits and risks of MIFEPREX before they make a decision whether to take the drug.

- To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe MIFEPREX and are able to assure patient access to appropriate medical facilities to manage any complications.

## 3.2  REMS Elements

### 3.2.1  Medication Guide

A Medication Guide will be dispensed with each MIFEPREX prescription in accordance with 21 CFR 208.24.

### 3.2.1    Communication Plan

The Mifeprex REMS does not include a Communication Plan

### 3.2.2    Elements to Assure Safe Use

1. **Healthcare providers who prescribe MIFEPREX will be specially certified.**

   Danco will ensure that healthcare providers who prescribe MIFEPREX are specially certified.

   a. To become specially certified, each prescriber must complete and fax to the MIFEPREX distributor the one-time Prescriber's Agreement, agreeing that they meet the qualifications and will follow the guidelines outlined in the Prescriber's Agreement.

   b. The following materials are part of the REMS and are appended:

      - Prescriber's Agreement
      - Patient Agreement

2. **MIFEPREX will be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals.**

   Danco will ensure that MIFEPREX will only be available to be dispensed in a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber.  MIFEPREX will not be distributed to or dispensed through retail pharmacies.

3. **MIFEPREX will only be dispensed to patients with documentation of safe use conditions.**

   Danco will ensure that MIFEPREX will only be dispensed to patients with documentation of the following safe use conditions:

      a. The patient has completed and signed the Patient Agreement, and the Patient Agreement has been placed in the patient's medical record.

      b. The patient has been provided copies of the signed Patient Agreement and the Medication Guide.

### 3.2.3    Implementation System

The Implementation System will include the following:

1. Distributors who distribute MIFEPREX will be certified.  To become certified, distributors must agree to:

    a. Ship drug only to site locations identified by specially certified prescribers in signed Prescriber's Agreements, and maintain secure and confidential records of shipments.

    b. Follow all distribution guidelines, including those for storage, tracking package serial numbers, proof of delivery, and controlled returns.

2. Danco will assess the performance of the certified distributors with regard to the following:

    a. Whether a secure, confidential and controlled distribution system is being maintained with regard to storage, handling, shipping, and return of MIFEPREX.

    b. Whether MIFEPREX is being shipped only to site locations identified by specially certified prescribers in the signed Prescriber's Agreement and only available to be dispensed to patients in a clinic, medical office, or hospital by or under the supervision of a specially certified prescriber.

3. If Danco determines the distributors are not complying with these requirements, Danco will take steps to improve their compliance.

### 3.2.4    Timetable for Submission of Assessments

Danco will submit REMS assessments to the FDA one year from the date of the approval of the REMS and every three years thereafter.  To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the assessment reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment.  Danco will submit each assessment so that it will be received by the FDA on or before the due date.

## 3.3    REMS Assessment Plan

The REMS assessment reports will include the following:

1. Number of prescribers enrolled (cumulative)

2. Number of new prescribers enrolled during reporting period

3. Number of prescribers ordering MIFEPREX during reporting period

4.  Number of healthcare providers who attempted to order MIFEPREX who were not enrolled. Describe actions taken (during reporting period and cumulative)

5.  Number of women exposed to MIFEPREX (during reporting period and cumulative)

6.  Copies of MedWatch forms for each of the following adverse events during the assessment period; and for each of the following adverse events, the cumulative number from the date of approval of Mifeprex up to the approval date of the REMS, the number for each reporting period, and the cumulative number since the approval date of Mifeprex:

    - On-going pregnancies not terminated subsequent to the conclusion of the treatment procedure

    - Women hospitalized due to complications

    - Women requiring transfusion(s) of two or more units of packed cells or whole blood, or having a hemoglobin of 6 gm/dL or less or a hematocrit of 18% or less

    - Serious infection, sepsis

    - Death

    - Other serious and unexpected adverse events

7.  Summary and analysis of any program deviations and corrective action taken

8.  Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed

9.  Per section 505-1(g)(3)(B) and (C), information on the status of any postapproval study or clinical trial required under section 505(o) or otherwise undertaken to investigate a safety issue. With respect to any such postapproval study, you must include the status of such study, including whether any difficulties completing the study have been encountered. With respect to any such postapproval clinical trial, you must include the status of such clinical trial, including whether enrollment has begun, the number of participants enrolled, the expected completion date, whether any difficulties completing the clinical trial have been encountered, and registration information with respect to requirements under subsections (i) and (j) of section 402 of the Public Health Service Act. You can satisfy these requirements in your REMS assessments by referring to relevant information included in the most recent annual report required under section 506B and 21 CFR 314.81(b)(2)(vii) and including any updates to the status information since the annual report was prepared. Failure to comply

with the REMS assessments provisions in section 505-1(g) could result in enforcement action.

**4    DISCUSSION/CONCLUSION**

During a face-to-face meeting with Danco on April 28, 2011, FDA and Danco agreed on the REMS and REMS assessment parameters as outlined above and attached (see Attachment A).

**5    RECOMMENDATION**

 The REMS submitted May 27, 2011 is acceptable. The REMS should be approved.

**ATTACHMENTS**
- Mifeprex REMS
- Mifeprex Prescriber's Agreement
- Mifeprex Patient Agreement
- Interim Review #1 dated February 11, 2010
- Interim Review #2/             <sup>(b) (6)</sup> Background Document
  dated December 6, 2010

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
## 202107Orig1s000

# <u>RISK ASSESSMENT and RISK MITIGATION REVIEW(S)</u>

This approach is also consistent with misoprostol and methotrexate, both of which are known abortifacents and do not have a REMS to address that risk. This approach is used to prevent misuse of the growth hormone products.

2. REMS with ETASU – dispensing through certified specialty pharmacies

This REMS option may minimize diversion and subsequent misuse by minimizing the number of pharmacies stocking and dispensing Korlym for outpatient use. In addition, Corcept would be required to provide FDA an assessment of how the REMS is achieving its goals.

This option does not address intended termination of pregnancy with Korlym.

3. REMS with ETASU – prescriber certification (agreement not to use for termination of pregnancy) and distribution through certified specialty pharmacies that are willing to track inventory

This REMS option would minimize diversion and subsequent misuse as described above. In addition, certified pharmacies (for outpatient dispensing, not inpatient hospital pharmacies) would verify that prescribers were certified. Prescriber certification would consist of agreement not use Korlym for pregnancy termination. The addition of prescriber certification would address the risk of intended termination of pregnancy with Korlym.

These options assume that the safety labeling is maximized to address Korlym use in pregnancy.

## 6    DISCUSSION

The issue of how to address intended termination of pregnancy was discussed at the REMS Oversight Committee meeting on September 29, 2011 and at a Center Director Briefing on November 3, 2011.

DMEP and DRISK presented at both meetings that women with Cushing's syndrome are unlikely to be or become pregnant given the effects of their disease on the reproductive system and the effects of daily mifepristone treatment. Therefore, addressing the risk of fetal loss associated with Korlym was not discussed because 1) pregnancy is not a likely event in the intended population and; 2) the use of Korlym for "off-label" uses (in women more likely to be pregnant) is unknown and available data do not indicate that mifepristone would be first line treatment for any diseases or conditions at this time. For these reasons, there was general agreement that fetal loss can be adequately addressed through labeling and is not necessary to require additional safe use measures through a REMS at this time.

The team stated that for any risk management approach, it is important to ensure that the intended treatment population can receive Korlym in a timely, dependable manner in the least burdensome way. Any restrictions could impede access without benefit to the intended population.

**Department of Health and Human Services**
**Public Health Service**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

**Final Risk Evaluation and Mitigation Strategy (REMS) Review**

Date:                            October 10, 2013

Drug Name(s):                    Mifeprex (mifepristone) 200 mg tablets

Therapeutic Class:               progesterone-receptor modulator

Dosage and Route:                Mifepristone 600 mg as a single oral dose followed by
                                 misoprostol 400 micrograms on Day 3

Application Type/Number:         NDA 020687/Danco Laboratories

(b) (4)

(b) (6) #:                       2012-1287

*** This document contains proprietary and confidential information that should not be
released to the public. ***

The ACGME requirements for family medicine residents do not include training in medical abortion but residents must be "trained to competency" in "options counseling for unintended pregnancy." A similar survey to characterize the availability of abortion training in family medicine residencies reported 49% provide some type of abortion training.

From 1999 through 2005, the Department of Family Medicine at the University of Rochester Medical Center operated the Reproductive Health Program (RHP), a national elective abortion training program aimed to address a gap in training to all US medical students, residents, advanced practice clinicians, and physicians in practice. A study published in 2012 interviewed RHP trained providers in 2008-2009. A total of 58.8% of respondents reported providing abortions since training, with most occurring in high-volume abortion clinic settings. Of those who had provided abortions, most had performed more than 50 surgical or medical abortions. More than 90% of abortion providers reported having liability insurance that covers abortion, colleague support, ease of obtaining medications and/or equipment, reimbursement, and administrative and/or staff support at the site where they provide abortions. Relative to providers, the greatest barriers to providing an abortion reported by non-providers were lack of skills, concerns about liability, and difficulty obtaining supplies.[21] Although these data were limited to RHP trainees, data are consistent with data from other sources and provides additional insight into what facilitates abortion care and barriers.

## 4    CONSIDERATIONS REGARDING THE NEED FOR A REMS

### 4.1    SAFETY CONSIDERATIONS

In general, the intended patient population for Mifeprex is healthy. Medical abortion, similar to surgical abortion, is associated with potentially serious adverse events. Since the approval of Mifeprex, safety concerns have been identified through enhanced surveillance and reporting by certified prescribers. Use of Mifeprex is associated rarely with serious infection and hemorrhage sometimes resulting in transfusions, hospitalization, and death. Serious infections and deaths resulted in labeling changes in 2004 and 2005. There have been no new safety concerns identified with Mifeprex since that time and the serious complications being reported now are consistent with labeling. Moreover, these complications with Mifeprex are consistent with what one can expect with spontaneous abortion and surgical abortions.[24,25] The serious complications that arise can be managed if recognized in a timely manner.

(b) (6) believes that the current safety profile is reflective of an effective system in place with knowledgeable prescribers primarily using Mifeprex within that system guided by standard protocols. It is not likely that the current safe use conditions will persist to a similar extent if a REMS is no longer required and, as a consequence, we would expect a negative impact on the types, incidence, and severity of adverse events if the REMS was eliminated. Because Mifeprex prescribing occurs in a limited number of healthcare settings and training is not uniformly provided in physician residencies, there is no data

---

[24] Mifeprex [package insert] New York, NY. Danco Laboratories, LLC;2005.

[25] Grimes, DA and Raymond, EG. Medical Abortion in Adolescents, *BJM* 2011;342:d2185.

11

# CENTER FOR DRUG EVALUATION AND RESEARCH

## APPLICATION NUMBER:

# 020687Orig1s020

# SUMMARY REVIEW

be reflected in labeling: 1) a more flexible time interval of 24 to 48 hours between Mifeprex and misoprostol administration, 2) the option of at home administration of misoprostol, 3) the option of repeat misoprostol dosing, if clinically indicated, 4) flexibility in the follow–up time frame of 7 to 14 days, and 5) permitting qualified healthcare providers other than physicians to prescribe Mifeprex.

The safety findings of the proposed dosing regimen were acceptable and were similar to those seen with the original dosing regimen approved in 2000.

After review of the REMS modifications proposed by the Sponsor, I concur with the clinical team and [(b) (6)] recommendations that:

1.      The Medication Guide can be removed from the Mifeprex REMS program. The Medication Guide requirements under 21 CFR part 208 require the Medication Guide to be distributed to patients. Mifeprex will only be dispensed by a healthcare professional who will be knowledgeable and able to provide the patient instructions on appropriate use of the drug, including what potential side effects may occur or follow-up that may be required as appropriate, and who will answer any questions the patient may have. In that setting, the Medication Guide will already be a required available tool for counseling. Therefore, given the existing requirements under 21 CFR part 208, I concur that there is no reason for the Medication Guide to specifically be a part of the REMS.

2.      The Prescriber Agreement Form (ETASU A) as revised reflects current FDA format and content to conform to current REMS programs and reflect the labeling changes that will be approved in this supplement. I concur that the changes are acceptable.

3.      Revision of the Mifeprex REMS goals (ETASU C) will adequately mitigate the risk of serious complications by requiring certification of healthcare providers who prescribe and ensuring the Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber.

4.      Removal of the Patient Agreement Form (ETASU D): I concur with the clinical review team that the Patient Agreement Form, which requires a patient's signature, does not add to safe use conditions for the patient for this REMS and is a burden for patients. It is standard of care for patients undergoing pregnancy termination to undergo extensive counseling and informed consent. The Patient Agreement Form contains duplicative information already provided by each healthcare provider or clinic. I believe that it is much more critical for the healthcare provider who orders or prescribes Mifeprex to provide and discuss informed consent derived from their own practice so that care can be individualized for the patient.

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

# CLINICAL REVIEW

| | |
|---|---|
| Application Type | SE-2 Efficacy Supplement |
| Application Number(s) | NDA 020687/S-020 |
| Priority or Standard | Standard |
| | |
| Submit Date(s) | May 28, 2015 |
| Received Date(s) | May 29, 2015 |
| PDUFA Goal Date | March 29, 2016 |
| Division / Office | (b) (6) |
| | |
| Reviewer Name(s) | (b) (6) and (b) (6) |
| Review Completion Date | March 29, 2016 |
| | |
| Established Name | Mifepristone |
| (Proposed) Trade Name | Mifeprex |
| Therapeutic Class | Progestin antagonist |
| Applicant | Danco Laboratories, LLC |
| | |
| Formulation(s) | Oral Tablet |
| Dosing Regimen | For pregnancies through 70 days gestation: Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol. |
| Indication(s) | Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. |
| Intended Population(s) | Pregnant women who desire a medical termination through 70 days gestation. |

1

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

- Removal of "under Federal law" from the Prescriber Agreement Form is acceptable (see discussion in Additional Submissions / Issues).
- The term "healthcare providers who prescribe" is preferable to the Applicant's proposed " (b) (4) (see discussion in Additional Submissions / Issues).

- It is appropriate to modify the current adverse event reporting requirements under the REMS, which are currently outlined in the Prescriber's Agreement to include "hospitalization, transfusion or other serious event."  Under these requirements, healthcare providers report certain adverse events to the Applicant, which then is required to report the adverse events to FDA.  FDA has received such reports for 15 years, and it has determined that the safety profile of Mifeprex is well-characterized, that no new safety concerns have arisen in recent years, and that the known serious risks occur rarely.  For this reason, ongoing reporting by certified healthcare  providers to the Applicant of all of the specified adverse events is no longer warranted.  .  It should be noted that the Applicant will still be required by law, as is every NDA holder, to report serious, unexpected adverse events as 15-day safety reports, and to submit non-expedited individual case safety reports, and periodic adverse drug experience reports.

(b) (6) concurs with the following modifications recommended by (b) (6)

- Removal of the Medication Guide (MG) from the REMS.  The MG will remain a required part of labeling and will be required to be provided to patients consistent with the requirements in 21 CFR part 208. FDA has been maintaining MGs as labeling but removing them from REMS when, as here, inclusion in REMS is not necessary to ensure that the benefits of a drug outweigh the risks, such as when the MG is redundant and not providing additional use or information to the patient about the risk(s) the REMS is intended to mitigate. This is consistent with ongoing efforts to streamline REMS by allowing for updates to the MG without need for a REMS modification.
- Removal of the Patient Agreement form (ETASU D). This decision was based on the well-established safety profile of Mifeprex, as well as the fact that the small numbers of practitioners who provide abortion care in the US use informed consent practices that are duplicated of the current Patient Agreement and thus the Patient Agreement is no longer necessary to ensure that the benefits of the drug outweigh the risks.
- Revision of the Prescriber Agreement Form to reflect changes to labeling revisions pursuant to the proposed efficacy supplement, and to improve the flow of the document.
- Revision of the REMS goals to reflect the above changes

## 1.4  Recommendations for Postmarket Requirements and Commitments

There are no recommendations for postmarket requirements or commitments for this efficacy supplement.

8

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

## 6.1.14  Discussion of Persistence of Efficacy and/or Tolerance Effects

There is no evidence that repeated medical or surgical abortion is unsafe or that there is a tolerance effect.  Return to fertility is well-documented: in the Patient Counseling Information section, the labeling states "inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses" and "inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before she resumes sexual intercourse."

## 6.1.15  Additional Efficacy Issues/Analyses

The Applicant has requested that revised labeling provide only for the new proposed regimen and that the original approved regimen be deleted.

**Reviewer Final Recommendation:**
**While there are no safety or efficacy reasons that would lead us to withdraw approval of the currently labeled dosing regimen, we concur that it may be deleted from labeling because very few providers currently use it, and inclusion of two options for dosing could be confusing.  Of note, PPFA and NAF guidelines have used mifepristone 200 mg oral and misoprostol 800 mcg (initially given vaginally and now buccally) since 2001.**

# 7  Review of Safety

## *Safety Summary*

- Medical abortion with the new proposed regimen of Mifeprex 200 mg followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation is safe. Major adverse events including death, hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy with the proposed regimen are reported rarely in the literature on over 30,000 patients.  The rates, when noted, are exceedingly rare, generally far below 0.1% for any individual adverse event. The number of postmarketing deaths associated with Mifeprex pharmacovigilance is very low.  Non-vaginal routes of administration of misoprostol have increased and since  the *C. sordellii* deaths associated with vaginal misoprostol, there have been no *C. sordellii* deaths. Given that the numbers of these adverse events appear to be stable or decreased over time, it is likely that these serious adverse events will remain acceptably low.

- Common adverse events associated with medical abortion occur at varying but acceptable rates.

- There are scarce cases of uterine rupture associated with early medical abortion. Medical abortion using mifepristone with or without misoprostol in the first trimester is safe from this perspective.

47

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 020687Orig1s020

# RISK ASSESSMENT and RISK MITIGATION REVIEW(S)



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
10903 New Hampshire Avenue
Building #51
Silver Spring, MD 20993

DATE: March 28, 2016

FROM: Janet Woodcock, MD
Director, Center for Drug Evaluation and Research

THRU: (b) (6)

TO: (b) (6)

RE: NDA 020687, Supp 20

The currently approved REMS for Mifeprex contains a Patient Agreement Form required to be signed by both the patient and the prescriber. During the review of the REMS in connection with supplement 20 to NDA 020687 submitted by the sponsor. (b) (6) found that the information contained in the Patient Agreement Form is generally duplicative of information in the Medication Guide and of information and counseling provided to patients under standard informed consent practices for medical care and under professional practice guidelines. For the reasons further described in their reviews, the reviewers recommended that the Patient Agreement Form be removed from the REMS.

After being briefed on the planned changes to the NDA that the Center was considering, the Commissioner concluded that continuing the REMS requirement for a signed Patient Agreement Form would not interfere with access and would provide additional assurance that the patient is aware of the nature of the procedure, its risks, and the need for appropriate follow-up care. He requested that the Patient Agreement Form be retained as an element of the REMS.

Therefore, I have asked (b) (6) and (b) (6) to continue to include a Patient Agreement Form in the REMS for Mifeprex.

# CONFIDENTIAL

November 3, 2015

Robert M. Califf, MD, Deputy Commissioner for Medical Products and Tobacco
Janet Woodcock, MD, Director of the Center for Drug Evaluation and Research
Food and Drug Administration
10902 New Hampshire Avenue
Silver Spring, MD 20993

Dear Drs. Califf and Woodcock,

The US Food and Drug Administration approved mifepristone for use in medical abortions on September 28, 2000. Now, 15 years and over 2.5 million uses later, the safety and effectiveness of the drug have been well established by both research and experience, and serious complications have proven to be extremely rare.[1]

We the undersigned are researchers and providers of medical abortion. The organizations we represent include many of the practitioners of medical abortion in the United States. We are writing to present evidence demonstrating that some of the restrictions placed on mifepristone at its initial approval are no longer necessary for the safe and effective use of the drug. We encourage you to exercise your authority to change the label in order to improve both the use of the drug for medical abortion and access to it for this use.

We fully support the following changes to the label:

- The drug should be indicated for use in medical abortions beyond 49 days of gestation.
- The recommended dose regimen should be mifepristone 200 mg followed 24-48 hours later by misoprostol 800 mcg administered buccally.
- The location where the patient should take these drugs should not be restricted.
- An in-person visit should not be mandated for follow-up assessment.
- Any licensed healthcare provider – not just physicians – should be able to prescribe the drug.

All of these provisions are supported by overwhelming evidence and experience, and they reflect current practice in the United States. We hope and expect that you will agree.

We would like to focus here on two additional amendments to the current regulation of mifepristone:

A. Elimination or substantial modification of the Risk Evaluation and Mitigation Strategy (REMS), and
B. Extension of the gestational age limit for medical abortion to 70 days.

Below we discuss the rationale for each of these amendments. Because the elimination or modification of the REMS would have the greatest positive impact on the greatest number of women, we address it first.

A. Elimination or modification of the REMS

When the FDA first approved mifepristone in 2000, experience with its use in non-research settings was minimal, and the decision to impose specific conditions to minimize risk to users was therefore understandable. But over the past 15 years, the safety of the drug has been well established by both research and experience, and serious complications have proven to be extremely rare.[1] Thus, reassessment of the REMS and the Elements To Assure Safe Use (ETASU) which are included in the

# CONFIDENTIAL

2. <u>Provider certification</u>. The ETASU require that to prescribe mifepristone, a provider must obtain certification by submitting a form attesting that he or she:

- is able to assess the duration of pregnancy accurately;
- is able to diagnose ectopic pregnancies;
- is able to provide surgical intervention in cases of incomplete abortion or severe bleeding, or has made plans to provide such care through others, and is able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary; and
- has read and understood the prescribing information.

Fulfilling these criteria requires no specialized medical expertise. Although many clinicians use history and/or clinical examination to assess the duration and location of a pregnancy, any provider who is not comfortable with these approaches can order an ultrasound. Similarly, any provider can appropriately plan to provide care for emergencies by referring patients to an emergency room if needed. No licensed healthcare professional would be unable to read or understand the prescribing information. A standard clinical license should be sufficient to assure that a provider meets these qualifications; an exceptional certification for mifepristone is unnecessary.

Provider certification for mifepristone is also inconsistent with the requirements for prescribing other drugs that require careful patient screening to ensure safety. For example, clinicians are not required to certify their ability to diagnose heart disease before prescribing powerful cardiovascular drugs, to diagnose infections before prescribing antibiotics, or to assess schizophrenia before prescribing antipsychotics. Evaluating a patient for each of these conditions is much more complicated than assessing the duration or location of a pregnancy. Singling out mifepristone for certification is inappropriate.

Furthermore, the certification process inhibits access to mifepristone. Most immediately, because the certification process must be completed in advance of the patient encounter, it prevents qualified clinicians who have not completed the certification from providing the service to patients who present for care unexpectedly. More broadly, the process of obtaining certification may discourage some providers from offering the service to any patients. Given the history of harassment and violence against abortion providers in this country and the demonstrated difficulty in maintaining confidentiality in the current environment, some clinicians are understandably reluctant to allow their names to be included in a list of abortion providers.

Finally, the certification requirement should be eliminated because it would be incompatible with standard distribution of mifepristone in pharmacies. Setting up and maintaining a system whereby pharmacies could check the certification status of prescribers would be impractical.

3. <u>Patient Agreement.</u> The requirement that each patient should sign an FDA-approved agreement before receiving mifepristone should also be eliminated. Like the other parts of the ETASU, this requirement is inconsistent with requirements for other drugs with similar or greater risks. Medical abortion is a treatment, not a procedure, and it is highly unusual to require patients to sign agreements for other safe treatments – for example, treatment of a sexually transmitted infection, or a nebulizer treatment for asthma. In addition, in places where off-label use of mifepristone is permitted, the content of any FDA-approved agreement may be inconsistent with the care provided by the individual clinician. The requirement that a patient sign an agreement to a treatment plan that differs from the one offered by her provider is both inappropriate and confusing.

Drs. Califf and Woodcock
November 3, 2015

# CONFIDENTIAL

over the past several years, about half of Planned Parenthood affiliates have indicated their intentions to offer services to women up to 70 days, and have provided services to hundreds of women at 64-70 days of gestation (Deborah VanDerhei, National Director, CAPS, Planned Parenthood Federation of America, personal communication June 10, 2015).

Considering the current evidence, we submit that medical abortion is safe and effective through at least 70 days since last menstrual period (LMP) and that a label specifying a maximum gestational age less than that is unnecessarily and arbitrarily conservative. Women who present for abortion in the 10th gestational week currently constitute about 7% of all abortion patients nationally.[13] This is a significant proportion and limitations to access to medical abortion would have significant negative consequences for those women.

 Although off-label use of drugs is generally accepted in the United States, many clinicians see FDA labels as guides to appropriate and legally defensible clinical practice. A gestational limit lower than 70 days on the mifepristone label may discourage some clinicians from offering medical abortion to this subgroup of patients. In addition, in states where off-label use of mifepristone is prohibited by law, women at a later gestational age would be entirely prevented from accessing medical abortion. Because of these state laws demanding strict compliance with the label, it is important for the FDA to include on the label all situations where medical abortion is safe and effective. And as a growing number of non-hospital abortion providers offer medical abortion but not surgical abortion,[14,15] these women will need to travel farther and at greater cost to access abortion services at all.

The data presented here are sufficient to establish the efficacy and safety of outpatient medical abortion with mifepristone and misoprostol through 70 days LMP. Including this information on the mifepristone label would be consistent with the FDA's mission to promote public health through the effective and safe use of drugs. Furthermore additional studies of outpatient medical abortion through 70 days LMP are ongoing and we would be happy to forward more information as it becomes available.

We would be happy to provide further details regarding the data we have presented. We appreciate your consideration of the requests that we have made in this letter.

Respectfully yours,

**Kelly Blanchard, MSc**
President, Ibis Reproductive Health

**Paul Blumenthal, MD, MPH**
Professor, Department of Obstetrics and Gynecology
Director, Stanford Gynecology Service
Director, Stanford Division of Family Planning Services and Research
Stanford University School of Medicine

**Eve Espey, MD, MPH**
Professor and Chair, Department of Obstetrics and Gynecology
Director, Family Planning Fellowship
University of New Mexico School of Medicine

*Signatures continue on following page*

Drs. Califf and Woodcock
November 3, 2015

# CONFIDENTIAL

**Angel M. Foster, DPhil, MD, AM**
Chair of the Population, Reproductive, and Sexual Health Section
American Public Health Association
Endowed Chair of Women's Health Research
Institute of Population Health
University of Ottawa



**Marji Gold, MD**
Professor, Family and Social Medicine
Director, Family Planning Fellowship
Director, Center for Reproductive Health Education in Family Medicine
Albert Einstein College of Medicine/Montefiore Medical Center



**David A. Grimes, MD**
Clinical Professor, Department of Obstetrics and Gynecology
University of North Carolina School of Medicine



**Daniel Grossman, MD**
Director, Advancing New Standards in Reproductive Health
Professor, Department of Obstetrics, Gynecology and Reproductive Sciences
University of California San Francisco
Senior Advisor, Ibis Reproductive Health

**Elizabeth Raymond, MD, MPH**
Senior Medical Associate, Gynuity Health Projects

**Matthew Reeves, MD, MPH**
Medical Director, National Abortion Federation

**James Trussell, PhD, B.Phil**
Professor of Economics and Public Affairs, Emeritus
Senior Research Demographer, Office of Population Research
Princeton University

**Carolyn Westhoff MD, MSc**
Sarah Billinghurst Solomon Professor of Reproductive Health
Columbia University Medical Center

**Beverly Winikoff, MD, MPH**
President, Gynuity Health Projects
Professor, Clinical Population and Family Health
Mailman School of Public Health, Columbia University

*Signatures continue on following page*

Supp.PCSF23

FDA 1250

Drs. Califf and Woodcock
November 3, 2015

# CONFIDENTIAL

***Organizational Signatories***

**American Public Health Association,** Population, Reproductive, and Sexual Health Section

**National Abortion Federation**

**Ibis Reproductive Health**

**Gynuity Health Projects**

Supp.PCSF24

FDA 1251

**ACOG**
THE AMERICAN CONGRESS
OF OBSTETRICIANS
AND GYNECOLOGISTS

**Executive Vice President &
Chief Executive Officer**

Hal C. Lawrence, III, MD, FACOG
Office: (202) 863-2500
Facsimile: (202) 863-1643

November 4, 2015

Robert M. Califf, MD, Deputy Commissioner for Medical Products and Tobacco
Janet Woodcock, MD, Director of the Center for Drug Evaluation and Research
Food and Drug Administration
10902 New Hampshire Avenue
Silver Spring, MD 20993

Dear Drs. Califf and Woodcock:

On behalf of the American Congress of Obstetricians and Gynecologists (ACOG), an organization representing 58,000 physicians and partners in women's health, I would like to present our recommendations regarding the safety, effectiveness, and use of mifepristone. We hope this information will be useful to FDA in any future deliberations regarding revisions to the drug label, Risk Evaluation and Mitigation Strategy (REMS), and Elements To Assure Safe Use (ETASU).

Since FDA approval in 2000, mifepristone has been used by women over 2.5 million times as a safe, effective method of pregnancy termination. As outlined in the enclosed Committee Opinion #613, ACOG supports access to safe, legal abortion services as a necessary component of women's health care, supports the availability of high-quality reproductive health services for all women, and is committed to improving access to abortion. As our knowledge regarding mifepristone advances, we believe its labeling, REMS, and ETASU have become outdated and have limited women's access to safe, effective abortion care.

ACOG supports evidence-based regimens for provision of medication abortion services, as outlined in the enclosed Practice Bulletin #143. These evidence-based regimens have improved medication abortion in terms of expense, safety, speed, and adverse effects. Based on efficacy and the adverse effect profile, evidence-based protocols for medication abortion are superior to the FDA-approved regimen.

Regimens that use low doses of mifepristone (200 mg) have similar efficacy and lower costs compared with those that use mifepristone at 600 mg. Vaginal, buccal, and sublingual routes of misoprostol administration increase efficacy, decrease continuing pregnancy rates, and increase the gestational age range for use as compared with the FDA-approved regimen. ACOG supports efforts to align FDA labeling for mifepristone with evidence-based regimens.

In addition, ACOG would fully support the following changes to the current label, consistent with ACOG recommendations outlined in Practice Bulletin #143:

1.  The drug should be indicated for use in medical abortions up to 70 days of gestation

    Although the method is most commonly used up to 63 days of gestation, the treatment is also effective after 63 days gestation[i].

2.  The location where the patient should take these drugs should not be restricted

    There is no clinical justification for restrictions or regulations regarding the location of mifepristone or misoprostol ingestion or administration.

---

3. An in-person visit should not be mandated for follow-up assessment

Follow-up after medication abortion is important, although an in-clinic evaluation is not always necessary.

4. Any licensed healthcare provider should be able to prescribe the drug, not just physicians

Medication abortion can be provided safely and effectively by nonphysician clinicians.

In addition to the above recommendations, ACOG finds evidence regarding the safety of the drug over the past 15 years of use in the United States to be a compelling argument for the removal or substantial modification of the Risk Evaluation and Mitigation Strategy (REMS) and Elements to Assure Safe Use (ETASU) for mifepristone[ii]. These requirements are inconsistent with requirements for other drugs with similar or greater risks and serve as barriers to access without demonstrated improvements to patient safety or outcomes. Prescription access to medication abortion has been shown to improve access to care, and could also facilitate expansion of telemedicine models of provision that have been shown to increase access, particularly for women in rural areas.[iii] [iv] [v]

ACOG opposes regulations or restrictions that are inappropriately unique to the provision of abortion and that mandate procedures and care that are not evidence-based. The safety record of this drug does not warrant restrictions such as provider certification, dispensing of the drug in specific locations, or specified patient consent. A standard clinical license should be sufficient to ensure that a practitioner meets qualifications for prescribing mifepristone. Mandating the location where the drug is to be dispensed has no bearing on risk. The requirement that patients sign an FDA-approved agreement before receiving mifepristone is inconsistent with requirements for other drugs with similar or greater risks. In line with its safety record and to improve access, we recommend that mifepristone be made available in retail pharmacies like other prescription drugs, without unique provider certification or patient consent requirements.

Thank you for your consideration. We are available to answer any questions you may have regarding these issues.

Sincerely,

*Hal C. Lawrence MD*

Hal C. Lawrence, III, MD, FACOG
Executive Vice President and CEO

---

[i] Abbas D, Chong E, Raymond EG. Outpatient medical abortion is safe and effective through 70 days gestation. Contraception 2015;92:197-9.
[ii] Cleland K, Smith N. Aligning mifepristone regulation with evidence: driving policy change using 15 years of excellent safety data. Contraception 2015;92:179-181.
[iii] Grossman D, Goldstone P. Mifepristone by prescription: a dream in the United States but reality in Australia. Contraception 2015; 92:186–189.
[iv] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectiveness and acceptability of medical abortion provided through telemedicine. Obstet Gynecol 2011; 118:296–303.
[v] Grossman DA, Grindlay K, Buchacker T, Potter JE, Schmertmann CP. Changes in service delivery patterns after introduction of telemedicine provision of medical abortion in Iowa. Am J Public Health 2013; 103:73–8.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**
**Silver Spring  MD  20993**

NDA 020687/S-014

**SUPPLEMENT APPROVAL**

Danco Laboratories, LLC

(b) (6)

P.O. Box 4816
New York, NY 10185

Dear _____ (b) (6) :

Please refer to your Supplemental New Drug Application (sNDA) dated September 16, 2008, received September 17, 2008, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for MIFEPREX® (mifepristone) Tablets.  We note that NDA 020687 is approved under the provisions of 21 CFR 314.520 (Subpart H).

This supplemental application provides for a proposed risk evaluation and mitigation strategy (REMS) for MIFEPREX (mifepristone) and was submitted in accordance with section 909(b)(1) of the Food and Drug Administration Amendments Act of 2007 (FDAAA).  Under section 909(b)(1) of FDAAA, we identified MIFEPREX (mifepristone) as a product deemed to have in effect an approved REMS because there were in effect on the effective date of FDAAA, March 25, 2008, elements to assure safe use required under 21 CFR 314.520.

We acknowledge receipt of your amendments dated December 9, 2008, November 8, 2010, and May 19 and 27, 2011.

In accordance with section 505-1 of the FDCA, we have determined that a REMS is necessary for MIFEPREX (mifepristone) to ensure the benefits of the drug outweigh the risks of serious complications by requiring prescribers to certify that they are qualified to prescribe MIFEPREX (mifepristone) and are able to assure patient access to appropriate medical facilities to manage any complications.

Your proposed REMS, as amended and appended to this letter, is approved.  The REMS consists of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

We remind you that section 505-1(f)(8) of FDCA prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j).  A violation of this provision in 505-1(f) could result in enforcement action.

**NATIONAL**
**ACADEMIES**

Sciences
Engineering
Medicine

NATIONAL
ACADEMIES
PRESS
Washington, DC

This PDF is available at http://nap.nationalacademies.org/24950

  





BUY THIS BOOK

FIND RELATED TITLES

# The Safety and Quality of Abortion Care in the United States (2018)

## DETAILS

222 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-46818-3 | DOI 10.17226/24950

## CONTRIBUTORS

Committee on Reproductive Health Services: Assessing the Safety and Quality of Abortion Care in the U.S.; Board on Population Health and Public Health Practice; Board on Health Care Services; Health and Medicine Division; National Academies of Sciences, Engineering, and Medicine

## SUGGESTED CITATION

National Academies of Sciences, Engineering, and Medicine. 2018. *The Safety and Quality of Abortion Care in the United States.* Washington, DC: The National Academies Press. https://doi.org/10.17226/24950.

Visit the National Academies Press at nap.edu and login or register to get:

– Access to free PDF downloads of thousands of publications
– 10% off the price of print publications
– Email or social media notifications of new titles related to your interests
– Special offers and discounts



All downloadable National Academies titles are free to be used for personal and/or non-commercial academic use. Users may also freely post links to our titles on this website; non-commercial academic users are encouraged to link to the version on this website rather than distribute a downloaded PDF to ensure that all users are accessing the latest authoritative version of the work. All other uses require written permission. (Request Permission)

This PDF is protected by copyright and owned by the National Academy of Sciences; unless otherwise indicated, the National Academy of Sciences retains copyright to all materials in this PDF with all rights reserved.

*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*     55

*Complications*

Complications after medication abortion, such as hemorrhage, hospitalization, persistent pain, infection, or prolonged heavy bleeding, are rare—occurring in no more than a fraction of a percent of patients (Chen and Creinin, 2015; FDA, 2016a; Ireland et al., 2015; Kulier et al., 2011; Woodcock, 2016). Obesity (i.e., a body mass index [BMI] of 30 or greater) has not been found to increase the risk for adverse outcomes after medication abortion (Strafford et al., 2009). The Society of Family Planning suggests that medication abortion may be preferable to aspiration abortion when patients, including those with extreme obesity, are at risk of procedural and anesthetic complications (SFP, 2012).

**Hemorrhage**   Prolonged heavy bleeding is rare but may indicate an incomplete abortion[5] or other complications. Hemorrhage requiring assessment or treatment following medication abortion is also rare. The FDA advises that women contact a health care provider immediately if bleeding after a medication abortion soaks through two thick full-size sanitary pads per hour for two consecutive hours (FDA, 2016a). In a study of 11,319 medication abortions performed in California between 2009 and 2010, hemorrhage occurred in 16 cases (0.14 percent) (Upadhyay et al., 2015).

The need for a blood transfusion—an uncommon occurrence—is an indication of clinically significant hemorrhage. In a study of more than 1,000 women receiving medication abortion in Norway, 1 patient required a transfusion (0.1 percent) and 32 required an aspiration procedure because of continued bleeding (3.0 percent) (Løkeland et al., 2014). In Chen and Creinin's (2015) systematic review of 20 studies and 33,846 women (described above), 0.03 to 0.6 percent of women required a blood transfusion after a medication abortion.

**Infection**   Serious infection occurs rarely after medication abortion; reports of fatal sepsis are exceedingly rare (<1 in 100,000) (FDA, 2011; Woodcock, 2016). Signs and symptoms of serious infection are fever of 100.4°F or higher lasting more than 4 hours, tachycardia, severe abdominal pain, pelvic tenderness, or general malaise with or without fever occurring more than 24 hours after administration of misoprostol (ACOG and SFP, 2014; FDA, 2016a). There is no evidence of a causal relationship between use of mifepristone and misoprostol and an increased risk of infection or death (FDA, 2016a; Woodcock, 2016). The incidence of infection in recent studies ranges from 0.01 to 0.5 percent (Chen and Creinin, 2015; Cleland et

---

[5]An "incomplete abortion" occurs when parts of the products of conception are retained in the uterus.

Copyright National Academy of Sciences. All rights reserved.

*100 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

abortion, patients should receive the contraceptive method of their choice or be referred elsewhere if the preferred method is unavailable (NAF, 2017; RCOG, 2015; WHO, 2012). The Centers for Disease Control and Prevention and the U.S. Office of Population Affairs recommend the following for providers offering contraceptive services, including contraceptive counseling and education (Gavin et al., 2014):

- Establish and maintain rapport with the client.
- Obtain clinical and social information from the client (medical history, pregnancy intention, and contraceptive experiences and preferences).
- Work with the client interactively to select the most effective and appropriate contraceptive method (providers should ensure that patients understand the various methods' effectiveness, correct use, noncontraceptive benefits, side effects, and potential barriers to their use).
- Conduct a physical assessment related to contraceptive use, when warranted.
- Provide the selected contraceptive method along with instructions for its correct and consistent use, help the client develop a plan for using the selected method and for follow-up, and confirm the client's understanding of this information.

### Competencies Required for Abortion Methods

*Medication Abortion*

Medication abortion is a method commonly used to terminate a pregnancy up to 70 days' (or 10 weeks') gestation with a combination of medications—mifepristone followed by misoprostol. The skill set required for early medication abortion has been outlined by several organizations and is similar to the management of spontaneous loss of a pregnancy with medications (Goodman et al., 2016). The skills include the essential competencies outlined in the section above, plus the knowledge of medication abortion protocols, associated health effects, and contraindications. Prescribing medication abortion is no different from prescribing other medications—providers must be able to recognize who is clinically eligible; counsel the patient regarding medication risks, benefits, and side effects; and instruct the patient on how to take the medication correctly and when to seek follow-up or emergency care. Chapter 2 describes the U.S. Food and Drug Administration's (FDA's) Risk Evaluation and Mitigation Strategy (REMS) for Mifeprex, the brand name for mifepristone, the first drug administered during a medication

Copyright National Academy of Sciences. All rights reserved.

**Center for Drug Evaluation and Research (CDER)**



| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | 020687 and 91178 |
| **Reviewer Names** | |
| **Review Completion Date** | December 16, 2021 |

1

## 1. Introduction

In connection with the *Chelius v. Becerra* litigation, FDA agreed to undertake a full review of the Mifepristone REMS Program, in accordance with the REMS assessment provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act).[a] This review provides the analysis of the (b) (6) ( (b) (6) and the (b) (6)

( (b) (6) regarding whether any changes are warranted to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone (hereafter referred to as the Mifepristone REMS Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA) 91178. The Mifeprex REMS was initially approved in 2011; the single, shared system REMS for mifepristone 200 mg, known as the Mifepristone REMS Program, was approved in 2019.

The last time the existing REMS elements to assure safe use (under ETASU A, C and D) were reviewed was in the context of our review of supplement S-020 to NDA 20687; these ETASU were updated following review and approval of supplement S-020 on March 29, 2016. The key changes approved in 2016 are summarized below.

Changes to labeling included:
- Changing the dosing of Mifeprex to 200 mg orally x 1
- Extension of maximum gestational age through 70 days
- Inclusion of misoprostol in the indication statement
- Replacing the term "physician" with "licensed healthcare provider"
- Removal of the phrase "Under Federal Law"

The Mifeprex REMS and REMS materials were updated to reflect the changes above, and additional changes were made including:
- Removing the Medication Guide as part of the REMS but retaining it as part of labeling.

## 2. Background

### 2.1. PRODUCT AND REMS INFORMATION

---

[a] Section 505-1(g)(2) of the FD&C Act (21 U.S.C. § 355-1(g)(2)).

5

Reference ID: 4905882

References included in these letters were considered for inclusion in this review using identical selection criteria to the [(b) (6)] literature search (outlined below).

For this review of the REMS, [(b) (6)] focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS ETASUs. We excluded systematic reviews and meta-analyses because these publications did not include original safety data related to the outcomes of medical abortion. The following are examples of materials that were excluded from our literature search:

- Information from survey studies or qualitative studies that evaluated perspectives on and/or satisfaction with medical abortion procedures from patients, pharmacists, clinic staff, or providers, even if the study assessed REMS ETASUs. These surveys or qualitative studies did not include objective safety data related to outcomes of medical abortion.

- Opinions, commentaries, or policy/advocacy statements. These publications did not include objective safety data related to outcomes of medical abortion.

- Safety data related to mifepristone use for second trimester medical abortion. These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data related to mifepristone use for spontaneous first trimester abortion (i.e., miscarriages). These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data that pertained only to surgical abortion or did not separate out medical abortion from surgical abortion.

- Other safety information unrelated to the REMS elements (e.g., articles limited to case reports or those discussing unrelated gynecologic or medical issues)

- Publications for which it was not possible to conduct a full review of the methods or results, i.e., the references were limited to an abstract of the study methods and results.

- Publications that provided only general statistics on abortion care in the United States.

11

Reference ID: 4905882

- Information pertinent to molecular or other basic science aspects of mifepristone.

- Data on the logistics of accessing abortion care in general, such as time to appointment or the distance traveled to obtain care.

- Publications that provided data not related specifically to abortion care or the REMS (e.g., references focused on federal poverty guidelines, poverty data, or the financial impact of the COVID-19 pandemic).

One exception to the above literature search criteria was the inclusion in Section 3.2.2 of this review, which discusses the *Patient Agreement Form*, of publications that discussed changes in provider volume. The data discussed in relation to provider volume was obtained from surveys. This data was included because changes in provider volume could only be obtained from well-conducted survey studies.

Regarding medical/scientific references submitted with letters from the plaintiffs in the *Chelius* litigation, we applied the same criteria as for the literature search, as described above.

Letters from the plaintiffs in the *Chelius* litigation included several references that preceded our 2016 review of the REMS. Two of those pre-2016 studies were not captured in our 2016 literature search. These two studies were assessed as part of our current review; their results are consistent with the existing safety profile of the approved medical abortion regimen, and therefore, support our current conclusions regarding the REMS. See Appendix A.

### 3.2.1. Evaluation of the requirement for healthcare providers who prescribe the drug to be specially certified (ETASU A)

In order to become specially certified, prescribers must: 1) review the prescribing information for mifepristone and 2) complete the *Prescriber Agreement Form*. In signing the *Prescriber Agreement Form*, prescribers agree they meet the qualifications listed below:

- Ability to assess the duration of pregnancy accurately
- Ability to diagnose ectopic pregnancies
- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to

12

Reference ID: 4905882

ensure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of mifepristone (which the provider can access by phone or online).

In addition to meeting these qualifications, as a condition of certification the healthcare provider also agrees to follow the guidelines for use below:

- Review the *Patient Agreement Form* with the patient and fully explain the risks of the mifepristone treatment regimen. Answer any questions the patient may have prior to receiving mifepristone.
- Sign and obtain the patient's signature on the *Patient Agreement Form*.
- Provide the patient with a copy of the *Patient Agreement Form* and the Medication Guide.
- Place the signed *Patient Agreement Form* in the patient's medical record.
- Record the serial number from each package of mifepristone in each patient's record.
- Report deaths to the Applicant, identifying the patient by a non-identifiable patient reference and the serial number from each package of mifepristone.

The literature review was the primary source of information that contributed to our reassessment of ETASU A.

We continue to be concerned that absent these provider qualifications, serious and potentially fatal complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed. Our review of the literature did not identify any studies comparing providers who met these qualifications with providers who did not. In the absence of such studies, there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention or arrange for such care through others if needed, is necessary to mitigate the serious risks associated with the use of mifepristone in a regimen with misoprostol. Therefore, our review continues to support the conclusion that a healthcare provider who prescribes mifepristone should meet the above qualifications.  We conclude it is reasonable to maintain the requirement for a one-time prescriber certification where prescribers attest to having the ability to diagnose an intrauterine

13

In a number of approved REMS, *Patient Agreement Forms* or *Patient Enrollment Forms* ensure that patients are counseled about the risks of the product and/or informed of appropriate safe use conditions.[f]

As a condition of certification under the Mifepristone REMS Program, healthcare providers must follow the guidelines for use of mifepristone, including reviewing the *Patient Agreement Form* with the patient, fully explaining the risks of the treatment regimen, and answering any questions the patient may have before receiving the medication. With this form, the patient acknowledges that they have received and read the form, and that they have received the counseling regarding when to take mifepristone, the risk of serious complications associated with mifepristone and what to do if they experience adverse events (e.g., fever, heavy bleeding). Both the healthcare provider and patient must sign the document and the patient must receive a copy of the signed form. In addition to the counseling described in the *Patient Agreement Form*, patients also receive a copy of the Medication Guide for mifepristone. Ultimately, the *Patient Agreement Form* serves as an important counseling component, and documentation that the safe use conditions of the Mifepristone REMS Program have been satisfied, as the prescriber is required to place the signed *Patient Agreement Form* in the patient's medical record.

Prior to the March 29, 2016 approval of the S-020 efficacy supplement for Mifeprex, FDA undertook a review of all elements of the REMS. At that time, the (b) (6) (                         (b) (6)     ), along with the (b) (6) (             (b) (6)       ), recommended removal of the *Patient Agreement Form* (ETASU D). This recommendation received concurrence from the (b) (6) on February 23, 2016. The rationale for this recommendation in the 2016 (b) (6) review[g] is summarized here as follows:

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and documentation of informed consent and evidence shows that practitioners are providing appropriate patient

---

[f] REMS@FDA, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm, Accessed November 15, 2021.
[g] (b) (6) Clinical Review, NDA 020687/S20, dated March 29, 2016. https://darrts.fda.gov/darrts/faces/ViewDocument?documentId=090140af803dc7bd&_afrRedirect=38617557320374 5

15

Reference ID: 4905882

counseling and education; the *Patient Agreement Form* is duplicative of these established practices.

- Medical abortion with Mifeprex is provided by a small group of organizations and their associated providers. Their documents and guidelines are duplicated in the *Patient Agreement Form*.

- ETASUs A and C remain in place: The *Prescriber Agreement Form* and the requirement that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals under the supervision of a certified prescriber, remain in place.

In light of a memorandum from the Director of the Center for Drug Evaluation and Research, an addendum to the [REDACTED (b) (6)] March 29, 2016 review and a memorandum from the signatory authority in [REDACTED (b) (6)] indicated that the *Patient Agreement Form* would be retained in the REMS.[h,i]

The current review of literature from March 29, 2016 to July 26, 2021, is relevant to our assessment of the necessity of the *Patient Agreement Form* as part of the REMS. While our literature search yielded no publications which directly addressed this element of the REMS, we identified the following literature that focused on the informed consent process. These studies were reviewed for their potential relevance on this topic, though the articles do not directly assess the need for the *Patient Agreement Form* as a condition necessary to assure safe use of Mifepristone under ETASU D.

- Two studies[1,2] (both authored by Dr. Grossman in 2021) used the *Patient Agreement Form* and additional clinic-specific written informed consent forms as part of the study methodology. One study evaluated medical abortion with pharmacist dispensing of mifepristone and another evaluated mail-order pharmacy dispensing. Safety and efficacy outcomes were not assessed regarding the element of consent in isolation or the *Patient Agreement Form*.

- Several studies included use of electronic or verbal consent. Two studies were conducted using signed electronic consent (Chong[3], Kerestes[4]). Aiken[5] reported that patients had the option of providing consent verbally and the discussion had to be recorded in the notes. Rocca[6] described obtaining verbal informed consent from patients seeking medical abortion provided in pharmacies or government-certified

---

h [REDACTED (b) (6)] Review of proposed REMS modifications to Mifeprex. March 29, 2106.
i [REDACTED (b) (6)] Summary of Regulatory Action for Mifeprex. March 29, 2016.

16

Reference ID: 4905882

public health facilities by auxiliary nurse midwives (ANMs) in Nepal. Outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

- A retrospective chart review (Wiebe[7]) was conducted in Canada. This study included telemedicine abortions between January 31, 2017 and January 31, 2019 and a similar group of controls seen in the clinic during the same time frame, matched by date of initial appointment. As part of the telemedicine process, patients read a consent form (not specified whether they could view an electronic version) and gave verbal consent "witnessed by the counselor". Again, outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

After review, we conclude that there are no outcome data from these studies that address the need for the *Patient Agreement Form* as a condition necessary to assure safe use of mifepristone. Nor do any of these studies provide evidence of whether the patient's informed consent has been adequately documented under the process set out in the study protocol. Therefore, these studies do not provide evidence that would support removing ETASU D.

Although            (b) (6)      agrees that informed consent in medicine is an established practice, the National Abortion Federation's 2020 Clinical Policy Guidelines for Abortion Care[8] continue to include a detailed section on patient education, counseling, and informed consent. The guidelines state that these steps are essential parts of the abortion process; that they should be conducted by appropriate personnel, with accurate information, including about alternatives and potential risks and benefits; and that the patients must have an opportunity to have any questions answered to their satisfaction prior to any intervention. Under these guidelines, documentation must show that the patient affirms that they understand all the information provided and that the decision to undergo an abortion is voluntary. The guidelines specifically list the risks that must be addressed at a minimum, including those pertinent to medical abortion: hemorrhage, infection, continuing pregnancy, and death. Additionally, Practice Bulletins from ACOG[9] and the Society of Family Planning also support detailed patient counseling.

In addition, trends in US clinical practice are developing which could negatively impact adequate patient counseling about the risks of medical abortion. One survey by Jones 2017[10] of abortion providers in the United States and Canada prior to the COVID-19 pandemic did reveal strong adherence to evidence-based guidelines. However, this same survey noted continued increasing uptake of medical abortion by US providers. Grossman[11] conducted a US survey in

17

Reference ID: 4905882

## 7. Appendix A

References Cited in Letters from Plaintiffs

| References cited in letter from *Chelius v. Becerra* Plaintiffs (September 29, 2021) | |
|---|---|
| **References included in the REMS review** | |
| Aiken A et al. BJOG 2021: 128 (9): 1464-1474 | |
| Chong, et al. Contraception 2021; 104(1) 43-48 | |
| Daniel S. et al. Contraception 2021; 104(1): 73-76 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Am. Coll. of Obstetricians & Gynecologists, *Position Statement: Improving Access to Mifepristone for Reproductive Health Indications* (June 2018), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications | Policy/advocacy statement |
| House of Delegates, Am. Med. Ass'n., *Memorial Resolutions Adopted Unanimously No. 504 (2018)* https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a18-resolutions.pdf | Policy/advocacy statement |
| Cong. Of Delegates, Am. Acad. Of Fam. Physicians, *Resolution No. 506 (CoSponsored C) Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization of Mifepristone* (May 24, 2018) https://www.reproductiveaccess.org/wp-content/uploads/2019/02/Resolution-No.-506-REMS.pdf | Policy/advocacy statement |
| Schummers L et al, Contraception 2020; 102(4): 273 | Abstract |
| Upadhyay UD et al.) Obstet & Gynecol 2015; 125: 175 | Published prior to March 29, 2016- July 26, 2021 timeframe for current literature review. We note that the extensive literature review conducted as part of the 2016 review, which was consistent with the division's standard approach for reviewing an efficacy supplement |

Reference ID: 4905882

| | and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
|---|---|
| Kapp N et al. Best Pract Clin Obstet Gynaecol. 2020;63:37-44 | Abstract. Also outside the scope of first trimester medical abortion. |
| Fuentes L et al. J Women's Health 2019; 28 (12): 1623,  1625<br><br>Bearak JM, Lancet Pub Health 2017 Nov;2(11): e493, e495-96<br><br>Cartwright A et al 20 J Med Internet Res 2018  20(5):e10235<br><br>Barr-Walker J, et al PLoS One 2019;14(4): e0209991<br><br>Grossman et al  JAMA Network 2017;317(4):437, 437-438<br><br>Dobie S et al 31 Fam Plan Persp 1999; 31(5): 241-244<br><br>Shelton JD 8 Fam Plan Persp 1976; 8(6):260, 260-262<br><br>Norris AH et al Am J Pub Health 2020; 110 (8): 1228,1232<br><br>Upadhyay UD et al Am J Pub Health 2014; 104(9):1687, 1689 | Focused on the logistics of accessing abortion care. |
| CDC MMWR Abortion Surveillance – United States, 2018<br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T5_down | Contains primarily general statistics on abortion care  by state. |

| References cited in appendix from *Chelius v. Becerra* Plaintiffs (September 29, 2021) |
|---|
| References included in the REMS review |
| None |

| References excluded from the REMS review | Rationale for Exclusion |
|---|---|
| Jones RK et al Guttmacher Institute Abortion Incidence and Service Availability in the United States, 2017 (2019)<br><br>Guttmacher Inst, Induced Abortion in the United States (2019) | Contains primarily general statistics on abortion care and logistics of accessing abortion care. |
| University of Minnesota Healthy Youth Dev. Prevention Rsch Ctr, 2019 Minnesota Adolescent Sexual Health Report 3 (2019) | Not related specifically to abortion care. |
| Jerman J et al Guttmacher Inst, Characteristics of U.S. Abortion Patients in 2014 and Changes since 2008 (2016) | Contains figures on patient characteristics from 2008-2014. |
| Roberts CM et al  Women's Health Issues 2014; 24:e211, e215 | Focused on cost of abortion. |
| CDC MMWR Abortion Surveillance 2018<br><br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T7 down (last updated Nov. 7, 2020) | Contains primarily statistics on number of abortions in the US. |
| Jones RK  Persp on Sexual & Reprod Health 2017; 49:17, 20 | Focused on abortion incidence and service availability. |
| Fuentes L et al (as above)<br><br>Bearak JM et al (as above)<br><br>Cartwright A et al (as above)<br><br>Johns NE et al. BMC Health Serv Res 2017; 17: 287, 294 | Focused on logistics of accessing abortion care. |

| References cited in letter from Society of Family Planning (August 11, 2021) |
|---|
| References included in the REMS review |
| Grossman D. Obstet Gynecol 2019;133 (3): 477-483 |

Reference ID: 4905882

| | |
|---|---|
| Grossman D et al. Obstet Gynecol 2021; 137 (4): 613-622. | |
| Winikoff B et al. Obstet Gynecol 2012; 120: 1070-1076 reviewed in 2016 clinical memo | |
| Chen MJ et al. Obstet Gynecol 2015;126(1):12-21 reviewed in 2016 memo | |
| Chong et al. Contraception 2021;104(1): 43-48 | |
| Aiken A et al. BJOG 2021; 128 (9): 1464 -1474 | |
| Hyland 2018 et al. Aust New Zeal J Obstet Gynaecol 2018; 58 (3): 335-340 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Schummers L et al. BMJ Sex Reprod Heal 2021;47(e1) | Abstract |
| Kapp et al. 2020 (as above) | Abstract |
| Upadhyay et al. 2015 (as above) | (See rationale above) |
| Srinivasulu et al. Contraception 2021; 104(1):92-97 | Survey on clinician perspectives on access to mifepristone. |
| Calloway D et al. Contraception 2021; 104(1): 24-28 | Primarily addresses provider stigma around abortion care. |
| Rasmussen et al. Contraception; 104(1): 98-103 | Opinion/commentary |
| Cleland et al. Obstet Gynecol 2013;121(1):166-171 | Published prior to March 29, 2016 - July 26, 2021 timeframe for current literature review. We note that the extensive literature search conducted as part of the 2016 clinical review, which was consistent with the division's standard approach for reviewing an efficacy supplement and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
| National Academy of Sciences, Engineering, and Medicine. Safety and Quality of Abortion Care in the US 2018 | General information about abortion care in the US. Did not provide safety data relevant to the elements of the REMS |
| Raymond EG. Obstet Gynecol 2012: 119(2): 215-219 | Does not separate out medical and surgical abortion. |

48

Reference ID: 4905882

| Bartlett LA et al. Obstet Gynecol 2004; 103(4): 729-737 | Focused on surgical abortion. |
|---|---|
| Jones RK, Jerman J. Time to appointment and delays in accessing care among U.S. abortion patients, Guttmacher 2016 | Focused on logistics of accessing abortion care. |
| Foster DG et al. Perspect Sex Reprod Health 2013; 45(4):210-218 | Focused on second trimester abortion. |
| Ely G et al. Heal Soc Work 2019;44(1):13-21 | Focused on logistics of accessing abortion care. |
| Munro S et al. Ann Fam Med 2020; 18(5):413-421. | Survey on physician perspectives on implementing medical abortion with mifepristone. |

49

Reference ID: 4905882

October 4, 2022

TO:

Lauren Roth
Associate Commissioner for Policy
The US Food & Drug Administration
10903 New Hampshire Ave
Silver Spring, MD 20903

<u>CITIZEN PETITION</u>

The American College of Obstetricians and Gynecologists submits this petition on behalf of itself and 48 other organizations listed below pursuant to 21 C.F.R. § 10.30 to request that the Food & Drug Administration (FDA) ask Danco Laboratories, LLC ("Danco") – the holder of the approved new drug application for Mifeprex (mifepristone)—to submit a Supplemental New Drug Application (sNDA) that seeks to add miscarriage management as an indication to the drug's label and to eliminate or modify mifepristone's Risk Evaluation and Mitigation Strategy (REMS) so that it is not unduly burdensome for that use.[1] In the meantime, Petitioners also request that FDA immediately exercise enforcement discretion with respect to the use and distribution of mifepristone for miscarriage management without complying with the REMS.[2]

---

[1] There is precedent for such a request. In 1997, the FDA issued a notice encouraging the manufacturers of certain contraceptives to submit a New Drug Application that would modify the dose and use of its product for postcoital emergency contraception (1). The FDA found that this use was safe and effective, that postcoital emergency contraception was important for public health, and that manufacturers should make this product available. In this case, we are asking the FDA to request the manufacturer to submit an sNDA, as opposed to an NDA, because it is more efficient and the medication abortion drug dosages are identical to the miscarriage management protocol, which was not true in the emergency contraception example.

[2] There also is precedent for FDA to exercise enforcement discretion with respect to REMS requirements when they are seriously affecting patient access to important drugs, as it did last year, for example, with respect to the Clozapine REMS (2). Of course, FDA also exercised enforcement discretion with respect to part of the mifepristone REMS itself in order to facilitate patient access during the COVID-19 public health emergency (3).

1

miscarriage management protocol, making it harder for patients, especially poor and rural patients, to access it. Accordingly, a REMS with ETASU is inappropriate for a miscarriage management indication for mifepristone and should therefore be eliminated.

### A. The Patient Agreement Form is Not Necessary for the Benefits of Mifepristone to Outweigh the Risks and Unduly Burdens Access to the Drug

We recommend that the Patient Agreement Form be removed entirely because it is medically unnecessary and repetitive of informed consent, as a previous review conducted by CDER determined in 2016.[9] As a result, the Form does nothing to ensure the benefits of the drug outweigh the risks. Moreover, for miscarriage management, there is an additional concern: the medical alternative (misoprostol alone) does not require patients to sign any form, and therefore the mandated Patient Agreement Form adds an administrative and logistical burden that disincentivizes the most effective protocol for medically managing miscarriage at the health systems level. It should therefore be removed for that reason.

If the Patient Agreement Form is retained, however, it at least minimally needs to be amended to reflect the new indication or separate forms should be used for the separate indications. The current Form makes people attest that they are ending a pregnancy, which is not accurate for the indication of miscarriage, in which the loss of the pregnancy has already occurred or is already in process. Asking a miscarriage patient to attest to having an abortion will confuse patients at best, but due to the prevalence of abortion stigma, it might also add emotional harm to their miscarriage experience (38).

---

[9] These recommendations were ultimately rejected by Dr. Janet Woodcock, who decided to retain this element of the REMS (37).

12

THE NEW ENGLAND JOURNAL of MEDICINE

---

SPECIAL ARTICLE

---

# Abortion Safety and Use with Normally Prescribed Mifepristone in Canada

Laura Schummers, Sc.D., Elizabeth K. Darling, Ph.D., Sheila Dunn, M.D.,
Kimberlyn McGrail, Ph.D., Anastasia Gayowsky, M.Sc., Michael R. Law, Ph.D.,
Tracey-Lea Laba, Ph.D., Janusz Kaczorowski, Ph.D.,
and Wendy V. Norman, M.D., M.H.Sc.

---

ABSTRACT

---

**BACKGROUND**

In the United States, mifepristone is available for medical abortion (for use with misoprostol) only with Risk Evaluation and Mitigation Strategy (REMS) restrictions, despite an absence of evidence to support such restrictions. Mifepristone has been available in Canada with a normal prescription since November 2017.

**METHODS**

Using population-based administrative data from Ontario, Canada, we examined abortion use, safety, and effectiveness using an interrupted time-series analysis comparing trends in incidence before mifepristone was available (January 2012 through December 2016) with trends after its availability without restrictions (November 7, 2017, through March 15, 2020).

**RESULTS**

A total of 195,183 abortions were performed before mifepristone was available and 84,032 after its availability without restrictions. After the availability of mifepristone with a normal prescription, the abortion rate continued to decline, although more slowly than was expected on the basis of trends before mifepristone had been available (adjusted risk difference in time-series analysis, 1.2 per 1000 female residents between 15 and 49 years of age; 95% confidence interval [CI], 1.1 to 1.4), whereas the percentage of abortions provided as medical procedures increased from 2.2% to 31.4% (adjusted risk difference, 28.8 percentage points; 95% CI, 28.0 to 29.7). There were no material changes between the period before mifepristone was available and the nonrestricted period in the incidence of severe adverse events (0.03% vs. 0.04%; adjusted risk difference, 0.01 percentage point; 95% CI, −0.06 to 0.03), complications (0.74% vs. 0.69%; adjusted risk difference, 0.06 percentage points; 95% CI, −0.07 to 0.18), or ectopic pregnancy detected after abortion (0.15% vs. 0.22%; adjusted risk difference, −0.03 percentage points; 95% CI, −0.19 to 0.09). There was a small increase in ongoing intrauterine pregnancy continuing to delivery (adjusted risk difference, 0.08 percentage points; 95% CI, 0.04 to 0.10).

**CONCLUSIONS**

After mifepristone became available as a normal prescription, the abortion rate remained relatively stable, the proportion of abortions provided by medication increased rapidly, and adverse events and complications remained stable, as compared with the period when mifepristone was unavailable. (Funded by the Canadian Institutes of Health Research and the Women's Health Research Institute.)

From the Department of Family Practice (L.S., W.V.N.) and the Centre for Health Services and Policy Research, School of Population and Public Health (K.M., M.R.L.), University of British Columbia, Vancouver, ICES (L.S., E.K.D., A.G.) and the Department of Obstetrics and Gynecology (E.K.D.), McMaster University, Hamilton, ON, the Department of Family and Community Medicine, University of Toronto, and the Women's College Research Institute, Women's College Hospital, Toronto (S.D.), and the Department of Family and Emergency Medicine, University of Montreal, Montreal (J.K.) — all in Canada; the Centre for Health Economics Research and Evaluation, University of Technology, Sydney (T.-L.L.); and the Department of Public Health, Environments, and Society, Faculty of Public Health and Policy, London School of Hygiene and Tropical Medicine, London (W.V.N.). Dr. Norman can be contacted at wendy.norman@ubc.ca or at the Department of Family Practice, University of British Columbia, 5950 University Blvd., Vancouver, BC, V6T 1Z3, Canada.

This article was published on December 8, 2021, and updated on January 6, 2022, at NEJM.org.

N Engl J Med 2022;386:57-67.
DOI: 10.1056/NEJMsa2109779
Copyright © 2021 Massachusetts Medical Society.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 9, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp. PCSF46

2022 CP 000099

The NEW ENGLAND JOURNAL of MEDICINE

ACCESS TO SAFE ABORTION IS A HUMAN right and a key component of reproductive health, yet inadequate access remains a global concern.[1] A medical abortion regimen of mifepristone and misoprostol has been shown to be safe.[2-4] Mifepristone is approved for use in the United States with Risk Evaluation and Mitigation Strategy (REMS) restrictions[5] (including mandatory prescriber certification, observed dosing, dispensing by the prescriber or medical facility with the exclusion of pharmacies, and submission of a prespecified patient consent form) and elsewhere with similar restricted approvals.[6,7] Professional organizations have called for the removal of REMS restrictions because they impede access to abortion services without improving safety.[8] However, high-quality data with respect to abortion safety and effectiveness when mifepristone is available without REMS-like restrictions are lacking.[9]

Mifepristone was first marketed in Canada in January 2017 as a 200-mg tablet combined with 800 μg of misoprostol.[10] Approval came more than 15 years after approval in the United States and more than 25 years after similar rulings in France, Sweden, and the United Kingdom.[11] Initially, regulatory restrictions in Canada were similar to REMS restrictions.[12] By November 7, 2017, Canadian regulators had removed these restrictions so that mifepristone could be prescribed and dispensed as a normal prescription medication and had expanded approved use from 49 to 63 days after the patient's last menstrual period.[13] This action resulted in a globally unprecedented practice of permitting any physician or nurse practitioner to prescribe, any pharmacist to dispense, and patients to independently administer mifepristone when, where, and if they chose.[14] Before 2017, medically induced abortions made up only 4% of all abortions in Canada and used off-label regimens of misoprostol with or without methotrexate. These regimens have reduced effectiveness (84 to 97%) and a high risk of teratogenicity if the abortion fails.[4,15]

We compared abortion use, safety, and effectiveness during the period after mifepristone had become available without REMS-like restrictions with the period before mifepristone had been available in Ontario, Canada (representing nearly 40% of the Canadian population).

## METHODS

### DATA SET

In Canada, universal single-payer health care — including coverage for abortion services and management of its complications — is provided by each province or territory. We used linked administrative health data[16] to create a population-based cohort of all female Ontario residents between the ages of 12 and 49 years who had received abortion services from January 1, 2012, to March 15, 2020. We linked records from practitioner visits, all hospital visits, and outpatient prescriptions using a secure data platform at ICES (formerly known as the Institute for Clinical Evaluative Sciences) at McMaster University.[16,17] We excluded events that had occurred within 6 weeks before or after a missed abortion (pregnancy loss without expulsion) or spontaneous abortion (pregnancy loss with expulsion) and those occurring within 6 weeks after delivery at 25 weeks or more of gestation to avoid including procedures that could have been misclassified as abortions. Details regarding the data set are provided in Figure S1 and Table S1 in the Supplementary Appendix, available with the full text of this article at NEJM.org. Ethics approval for the study was granted by the University of British Columbia.

### EXPOSURE AND OUTCOMES

The exposure we examined was the regulatory change that made mifepristone available as a normal prescription. Outcomes included measures of abortion use, safety, and effectiveness.

We evaluated outcomes regarding abortion use that included the abortion rate, which was calculated according to the international standard as the annual number of abortions among female residents between 15 and 49 years of age per 1000 female residents in that age group,[18] the percentage of all abortions that were medically induced, and the percentage of all abortions that were provided at 14 weeks or more of gestation (second-trimester abortion). (In the calculation of the abortion rate, the lower age for female residents was 15 years, as compared with a lower age of 12 years that was used for all other calculations in our study cohort.) Abortion safety outcomes within 6 weeks after abortion were severe adverse

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 9, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp.PCSF47

2022 CP 000100

events, including any blood transfusion, abdominal surgery (laparotomy, laparoscopy, or hysterectomy), admission to an intensive care unit, or sepsis that occurred during a hospitalization associated with an abortion-complication code. Complications of abortion included genital tract or pelvic infection, hemorrhage (delayed or excessive bleeding that complicated complete or incomplete abortion), embolism, shock, renal failure, damage to pelvic organs or tissues (including uterine perforation), venous complications, and other or unspecified complications. Outcomes regarding abortion effectiveness were the incidence of subsequent uterine evacuation (aspiration after medical abortion, reaspiration after surgical abortion, or subsequent abortion procedure), ongoing intrauterine pregnancy continuing until delivery, and ectopic pregnancy diagnosed within 6 weeks after the abortion date. Detailed outcome definitions are provided in Table S1.

### STATISTICAL ANALYSIS

We tabulated the incidence of each outcome according to the mifepristone regulatory period. We then conducted interrupted time-series analysis using segmented generalized mixed-effects regression to compare the expected incidence and trend for each outcome based on the period before mifepristone had become available with the observed level and trend after the availability of mifepristone with a normal prescription. We used log binomial regression to model incidence outcomes and Poisson regression with population offset to calculate the abortion rate; models were adjusted for outcome trends before the approval of mifepristone and accounted for autocorrelation and correlated residuals (File 1 in the Supplementary Appendix).[19,20] We used 6-month moving averages to smooth the resulting estimates. We examined outcomes from January 1, 2017, through November 6, 2017, descriptively but excluded this period from our models because it included rapid, incremental regulatory changes.[13]

We graphed the observed and expected monthly outcome incidence (quarterly for outcomes with <6 events in any month) following best practices.[21] We estimated risk differences and risk ratios for each outcome by comparing the observed with expected values for September 2019, a time

point selected a priori to balance model stability (greatest in the middle of the study period) and integration of mifepristone into practice (greatest at the end of the study period). We used bootstrapping with 200 samples drawn with replacement to estimate 95% confidence intervals[22] without adjustment for multiple comparisons. All analyses were conducted with the use of SAS software, version 7.51, and R software (code in File 2 in the Supplementary Appendix).

To examine the robustness of our findings to modeling specification, we conducted sensitivity analyses using segmented generalized least-squares regression, with autocorrelation terms selected on the basis of the Durbin–Watson test[23-25] and visual examination of autocorrelation function and partial autocorrelation function residuals.[25] We conducted subgroup analyses that were restricted to first-trimester abortions and then further restricted to first-trimester medical abortions.

## RESULTS

### CHARACTERISTICS OF THE STUDY POPULATION

Of the 314,859 induced abortions in Ontario, Canada, from January 1, 2012, through March 15, 2020, the majority (89.3%) were surgical (with 94.6% performed by means of suction aspiration), approximately 10% were medical abortions, and less than 0.1% were unclassified. Table 1 shows cohort characteristics according to the regulatory period for mifepristone.

### DESCRIPTIVE ANALYSES OF ABORTION OUTCOMES

The abortion rate per 1000 female residents of reproductive age and the incidence of all other outcomes are presented descriptively according to the regulatory period in Table 2. (Components of the composite outcomes are shown in Table S2.) The abortion rate decreased from 11.9 abortions per 1000 female residents between the ages of 15 and 49 years of age before mifepristone had become available to 11.3 per 1000 female residents after mifepristone had become available with a normal prescription. The percentage of all abortions that were provided medically increased from 2.2% before mifepristone had become available to 8.3% while mifepristone was restricted and then to 31.4% after mifepristone had become avail-

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 1, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp.PCSF48

2022 CP 000101

The New England Journal of Medicine

**Table 1.** Characteristics of Patients Undergoing Medical or Surgical Abortion, According to Period of Availability of Mifepristone.

| Characteristic | Mifepristone Not Available (N = 195,183) | Mifepristone Available with Restrictions (N = 35,644) | Mifepristone Available without Restrictions (N = 84,032) |
|---|---|---|---|
| | January 2012–December 2016 | January 1, 2017–November 6, 2017 | November 7, 2017–March 15, 2020 |
| | *number of patients (percent)* | | |
| Age — yr* | | | |
| <20 | 20,034 (10.3) | 2,969 (8.3) | 6,643 (7.9) |
| 20–24 | 54,346 (27.8) | 9,208 (25.8) | 20,247 (24.1) |
| 25–29 | 47,598 (24.4) | 8,909 (25.0) | 21,717 (25.8) |
| 30–34 | 36,640 (18.8) | 7,369 (20.7) | 17,838 (21.2) |
| ≥35 | 36,565 (18.7) | 7,189 (20.2) | 17,587 (20.9) |
| Nulliparous | 104,824 (53.7) | 19,030 (53.4) | 45,902 (54.6) |
| Neighborhood income† | | | |
| Lowest quintile | 55,076 (28.2) | 9,737 (27.3) | 22,360 (26.6) |
| Highest quintile | 24,852 (12.7) | 4,603 (12.9) | 11,075 (13.2) |
| Neighborhood ethnic concentration‡ | | | |
| Highest quintile | 82,143 (42.1) | 14,627 (41.0) | 33,600 (40.0) |
| Lowest quintile | 19,424 (10.0) | 3,552 (10.0) | 8,451 (10.1) |
| Rural residence§ | 11,709 (6.0) | 2,174 (6.1) | 5,195 (6.2) |

* Trends regarding the patient's age at which abortion was performed in Ontario continued a historic gradual and steady increase over the study period, which was consistent with an increase in age in the population-based trends during this period.
† The neighborhood income quintile was drawn from the Registered Persons Database file from the Institute for Clinical Evaluative Sciences and was defined on the basis of the Nearest Census-Based Neighborhood Income Quintile from Census Canada.
‡ The neighborhood ethnic concentration, which is part of the Ontario Marginalization Index,[26] refers to high area-level percentages of recent immigrants and persons belonging to a "visible minority" group, which was defined by Statistics Canada as "persons, other than aboriginal peoples, who are non-Caucasian in race or non-white in color." The highest concentration of such residents is the top quintile, and the lowest concentration is the lowest quintile.
§ Rural residence is defined as all territory lying outside population centers.

able with a normal prescription. The rate of second-trimester abortions declined from 5.5% of all abortions to 5.1% after the availability of mifepristone with a normal prescription.

Abortion safety outcomes remained stable during the period before mifepristone had become available and during the period after its availability with a normal prescription (severe adverse events, 0.03% and 0.04%, respectively; and abortion complications, 0.67% and 0.74%, respectively). Subsequent uterine evacuation increased from 1.0% to 2.2%, and ongoing intrauterine pregnancy continuing until delivery increased from 0.03% to 0.08%. Ectopic pregnancy that was detected after abortion increased from 0.15% to 0.22%.

### TIME-SERIES ANALYSES OF ABORTION OUTCOMES

Interrupted time-series graphs of abortion-use outcomes are presented in Figure 1, abortion safety outcomes in Figure 2, and abortion-effectiveness outcomes in Figure 3. Adjusted risk differences and risk ratios from these models comparing the period before mifepristone had become available with the nonrestricted period are presented in Table 2.

During the study period, the abortion rate continued an absolute decline, although as compared with the trend before the approval of mifepristone, we noted an increase of 1.2 abortions per 1000 female residents (95% confidence interval [CI], 1.1 to 1.4) over the predicted rate.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 7, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp.PCSF49

2022 CP 000102

**Table 2. Safety and Effectiveness of 314,859 Abortions Provided during the Study Period.***

| Outcome | Mifepristone Not Available (N=195,183) January 2012–December 2016 | Mifepristone Available with Restrictions (N=35,644) January 1, 2017–November 6, 2017 | Mifepristone Available without Restrictions (N=84,032) November 7, 2017–March 15, 2020 | Adjusted Risk Difference (95% CI)† | Adjusted Risk Ratio (95% CI) |
|---|---|---|---|---|---|
| Abortions provided | | | | | |
| No. of female residents in age cohort | 3,268,428 | 3,272,448 | 3,312,061 | | |
| Annual rate of abortion per 1000 female residents in age cohort‡ | 11.9 | 10.9 | 11.3 | | |
| Type of abortion — no. (%) | | | | | |
| Medical abortion | 4,307 (2.2) | 2,962 (8.3) | 26,434 (31.4) | 28.8 (28.0 to 29.7) | 5.3 (4.7 to 5.9) |
| Second-trimester abortion at ≥14 wk of gestation | 10,830 (5.5) | 2,072 (5.8) | 4,300 (5.1) | −0.22 (−0.63 to 0.19) | 0.96 (0.88 to 1.04) |
| Abortion safety — no. (%) | | | | | |
| Severe adverse events§ | 53 (0.03) | 9 (0.03) | 29 (0.04) | 0.01 (−0.06 to 0.03) | 1.2 (0.4 to 3.4) |
| Complications¶ | 1,434 (0.74) | 239 (0.67) | 578 (0.69) | 0.06 (−0.07 to 0.18) | 1.1 (0.9 to 1.3) |
| Ongoing pregnancy — no. (%) | | | | | |
| Subsequent uterine evacuation‖ | 2,029 (1.0) | 518 (1.5) | 1,882 (2.2) | 1.1 (0.9 to 1.3) | 2.0 (1.7 to 2.3) |
| Ongoing pregnancy continuing until delivery | 51 (0.03) | 15 (0.04) | 70 (0.08) | 0.08 (0.04 to 0.10) | 7.8 (2.2 to 33.6) |
| Ectopic pregnancy detected after abortion | 289 (0.15) | 57 (0.16) | 182 (0.22) | −0.03 (−0.19 to 0.09) | 0.88 (0.54 to 1.40) |

\* Adjusted risk differences and risk ratios are for the period after mifepristone was available without restrictions as compared with the period before mifepristone was available. The calculations were performed by means of interrupted time-series segmented regression analyses among all surgical and medical abortions after adjustment for outcome trends during the period before mifepristone had been available. CI denotes confidence interval.

† The adjusted risk difference is shown in percentage points for all categories except for the abortion rate per 1000 female residents.

‡ The annual abortion rate was calculated as the number of abortions provided among female residents between the ages of 15 and 49 years per 1000 female residents in the same age cohort in the population per year.

§ Severe adverse events included blood transfusion, abdominal surgery (laparotomy, laparoscopy, and hysterectomy), admission to an intensive care unit, or sepsis, all concurrent with an abortion complication. A detailed definition is provided in Table S1 in the Supplementary Appendix.

¶ Abortion complications included complete abortion complicated by infection, hemorrhage, embolism, damage to pelvic organs, venous complications, or other complications after an induced abortion.

‖ Subsequent uterine evacuation included aspiration, respiration, or subsequent abortion procedure in the same pregnancy.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 9, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp PCSF50

2022 CP 000103



**Figure 1. Changes in the Percentages of Medical and Second-Trimester Abortions among All Abortions and in Abortion Rates.**

Shown are the results of interrupted time-series analyses of the level and trend of abortion outcomes in Ontario, Canada, among all surgical and medical abortions that were provided before the introduction of mifepristone in the province (2012 through 2016), after the introduction but with Risk Evaluation and Mitigation Strategy (REMS)–like restrictions (January 1, 2017, through November 6, 2017), and after a regulatory change to remove restrictions, which made mifepristone available by normal prescription (November 7, 2017, through March 15, 2020). Panel A shows the percentage of all abortions that were performed medically at any gestational age. Panel B shows the annual abortion rate among female residents between the ages of 15 and 49 years per 1000 female residents in the same age group in the population. Panel C shows the percentage of second-trimester abortions (≥14 weeks of gestation) among all abortions. In Panels B and C, the insets show the same data on an expanded y axis; shading indicates 95% confidence intervals. The expected outcomes if mifepristone had not been available were estimated from segmented mixed-effects models (log binomial regression in Panels A and C and Poisson regression with population offset in Panel B) and smoothed with the use of a 6-month moving-average function.

The proportion of all abortions that were medical increased by an adjusted risk difference of 28.8 percentage points (95% CI, 28.0 to 29.7). The rate of second-trimester abortions showed a stable, continuous decline (adjusted risk difference, −0.22 percentage points; 95% CI, −0.63 to 0.19). Abortion safety outcomes were materially stable, with an adjusted risk difference of 0.01 percentage points (95% CI, −0.06 to 0.03) for severe adverse events and 0.06 percentage points (95% CI, −0.07 to 0.18) for complications. The rate of subsequent uterine evacuation increased modestly, with an adjusted risk difference of 1.1 percentage points (95% CI, 0.91 to 1.3), and the rate of ongoing intrauterine pregnancy that continued until delivery increased by 0.08 percentage points (95% CI, 0.04 to 0.10). The rate of ectopic pregnancy that was detected after abortion was materially stable, with an adjusted risk difference of −0.03 percentage points (95% CI, −0.19 to 0.09).

Interrupted time-series graphs from generalized least-squares regression with the use of

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp. PCSF51

2022 CP 000104

aggregated monthly data showed the robustness of the findings to modeling specification (Figs. S2, S3, and S4). Changes in outcome incidences and trends after mifepristone availability with a normal prescription were consistent for all outcomes except for the percentage of second-trimester abortions, for which aggregated models indicated a slight reduction (–0.92 percentage points; 95% CI, –1.40 to –0.48).

#### OUTCOMES AFTER FIRST-TRIMESTER ABORTION

Outcome incidences among all first-trimester abortions are presented in Tables S3 and S4 and Figures S5, S6, and S7; outcomes among first-trimester medical abortions are provided in Tables S5 and S6. The percentage of first-trimester abortions that were performed medically increased from 1.6% before mifepristone was available to 32.4% after mifepristone was available without restrictions. Severe adverse events were rare among first-trimester medical abortions (<6 events per 25,744 abortions [too infrequent to report exact incidence]), the incidence of abortion complications was 0.76%, and the incidence of subsequent uterine evacuation was 4.5%. Similarly, ongoing intrauterine pregnancy was uncommon, with 0.13% continuing to delivery. Ectopic pregnancy detected after abortion that occurred with any severe adverse event was also rare (<6 per 314,859 abortions).

---

### DISCUSSION

We comprehensively examined changes in abortion use, safety, and effectiveness during the period when mifepristone had become available without REMS-like restrictions in a population-based cohort of abortion service users in Ontario, Canada. We found that after mifepristone had become available with a normal prescription dispensed by pharmacists and taken at user discretion, abortion rates were materially stable, medical abortion uptake was rapid, and abortion-related adverse events and ectopic pregnancy remained rare, as compared with before mifepristone had been available.

The modestly slower decline in the abortion rate, relative to the expected decline based on the trend before mifepristone had become avail-





**Figure 2. Changes in Abortion Safety Outcomes.**

Shown are the results of interrupted time-series analyses of the level and trend of abortion safety in Ontario, Canada, among all surgical and medical abortions provided during the study period. Panel A shows the incidence of severe adverse events, which included any blood transfusion, abdominal surgery (laparotomy, laparoscopy, or hysterectomy), admission to an intensive care unit, or sepsis that occurred during a hospitalization associated with an abortion-complication code. Panel B shows abortion complications, which included genital tract or pelvic infection, hemorrhage, embolism, shock, renal failure, damage to pelvic organs or tissues, venous complications, and other or unspecified abortion complications. In Panel A, the inset shows the same data on an expanded y axis; shading indicates 95% confidence intervals.

able, may be due in part to the provision of abortion earlier in pregnancy. Since 4 to 7% of pregnancies per week in the first trimester[27] end in

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp.FCSF52                                    2022 CP 000105



**A Subsequent Uterine Evacuation**

Introduction of mifepristone with restrictions | Removal of mifepristone restrictions

**B Subsequent Delivery**

Introduction of mifepristone with restrictions | Removal of mifepristone restrictions



**C Ectopic Pregnancy Detected after Abortion**

Introduction of mifepristone with restrictions | Removal of mifepristone restrictions



—— Observed model   - - - - Expected trend before mifepristone approval

**Figure 3. Abortion Effectiveness and Ongoing Pregnancy Outcomes.**

Shown are the results of interrupted time-series analyses of the level and trend of ongoing pregnancy outcomes among all surgical and medical abortions provided during the study period. These outcomes include the incidences of uterine evacuation after abortion (Panel A), ongoing intrauterine pregnancy continuing until delivery (Panel B), and ectopic pregnancy detected after abortion (Panel C). Shading indicates 95% confidence intervals.

spontaneous abortion, the availability of abortion at earlier gestational ages would increase the abortion rate by enabling termination of pregnancy before the occurrence of miscarriage, even in the absence of a true increase in demand for abortion. The availability of mifepristone without restrictions may have slowed the decline in the abortion rate through improved abortion access, a hypothesis that is consistent with findings that restrictive policies regarding the prescription of mifepristone worsen access to abortion[28] and that abortion rates increase when access improves.[29] Because we did not measure pregnancy intention in our study, we cannot differentiate trend changes in unintended pregnancy from changes in the fraction of pregnancies that were terminated. Our findings indicate that improved abortion access was not associated with a material increase in the abortion rate.

The uptake of mifepristone for medical abortion under Canada's unrestricted regulations was faster than reported in settings with restrictive regulations. Although more than one third of abortions in Ontario were medically induced 2 years after mifepristone had been available as a normal prescription, 5.2% of abortions in the United States were medically induced 2 years after mifepristone availability, with the percentage slowly increasing to 39.0% 17 years after availability.[2] Similarly slower uptake has been reported in European settings that have mifepristone restrictions, even among those where mifepristone had been introduced long after best practice guidelines had been established.[30]

Our findings indicate that abortion remained safe and ongoing pregnancy remained infrequent after unrestricted access to mifepristone.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp PCSF53

2022 CP 000106

Without observed administration, some patients with a prescription for mifepristone may have never used it.[9] However, the infrequent occurrence of ongoing intrauterine pregnancy indicates that patients who received mifepristone most often correctly used the medication without supervision.[31] Our abortion safety and effectiveness findings are consistent with the results of recent studies examining patient-reported outcomes during the coronavirus disease 2019 pandemic, when REMS-like restrictions were temporarily removed in some settings.[9,32,33] A study involving 52,142 patients in the United Kingdom showed no material differences in success rates or serious adverse events between abortions provided under REMS-like restrictions and a telemedicine-hybrid model with investigations such as ultrasonography performed only when indicated.[33]

The small increase in the incidence of ectopic pregnancy that was detected after unrestricted access to mifepristone was consistent with the increasing trend before the availability of mifepristone, which indicated no increase over the expected incidence. A 2012 cross-sectional survey of abortion providers in the United States and Canada showed that more than 90% of providers routinely performed ultrasonography before abortion,[34] even though the value of such imaging in the absence of known ectopic risks or symptoms had not been shown.[2,35] Ectopic pregnancy is more likely to be detected after abortion that is provided at earlier stages of gestation before a clinical or ultrasonographic diagnosis. Because undiagnosed ectopic pregnancy can lead to tubal rupture and death,[36] identifying ectopic pregnancy before the onset of complications with the use of clear clinical protocols[2,4] is essential, although such procedures do not need to be performed before the initiation of medical abortion.[33]

Our safety and ongoing pregnancy findings among first-trimester medical abortions during the period after unrestricted access to mifepristone were consistent with reports from other settings with restricted access.[2,4] In settings with REMS-like restrictions, first-trimester medical abortions resulted in major adverse events in 0.3 to 0.5% of women[2,4,31] and blood transfusion in 0.04 to 0.10%.[4,31] Among medical abortions performed up to 63 days after the last menstrual period, subsequent uterine evacuation occurred in 2.0 to 4.8% of patients and ongoing intrauterine pregnancy in 0.5 to 2.0%.[2,4] In our study among first-trimester abortions, severe adverse events were too infrequent to report an incidence value, 0.04% of the patients underwent blood transfusion, 4.5% underwent uterine evacuation, and 0.13% had an ongoing pregnancy continuing to delivery. Although the incidence of uterine evacuation was increasing before mifepristone had become available, the expected incidence trend after the availability of mifepristone leveled off because of the more rapid increase in the number of abortions (the denominator). Because subsequent uterine evacuation is substantially more frequent after medical abortion than after surgical procedures (<3.0%),[4,37] a practice shift to more medical abortions is expected to increase the incidence of this outcome.

Our study has several potential limitations. The fundamental assumption underlying the validity of interrupted time-series analysis is that outcome trends before the exposure of interest would have continued if the exposure had not occurred. This assumption does not hold if other policy, practice, or contextual changes that may have an effect on outcome incidence occur concurrent to the exposure of interest.[20] However, this analytic approach is robust with respect to changes in the individual-level characteristics of patients or provider practices that accrue gradually over the study period, since such changes are accounted for in trend regression terms during the period before mifepristone had become available. Careful review of policies, academic literature, practice guidelines, and media output that are related to abortion during the study period identified no concurrent changes that would have invalidated our analytic approach. Practitioner fees, training programs, administrative data codes, and cost coverage for the drug were stable during the study period. Surveys and interviews among practitioners indicate that initial mifepristone restrictions were barriers to broad adoption of this practice.[13,38] The short period during which mifepristone was available in Canada with REMS-like restrictions (January 1 to November 6, 2017) precludes a formal analysis of mifepristone

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 9, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp PCSF54                                                    2022 CP 000107

THE NEW ENGLAND JOURNAL OF MEDICINE

availability with restrictions as compared with such availability without restrictions. The unrestricted availability of mifepristone appears to be the fundamental factor associated with changes in our study outcomes.

Our prescription database universally captured mifepristone prescriptions that were dispensed after August 10, 2017 (when a universal no-cost subsidy was introduced) but only captured mifepristone prescriptions from January to August 9, 2017, among patients with income-based prescription subsidies and those under 25 years of age. These factors may have contributed to an underestimation of early mifepristone uptake. However, this limitation was mitigated by our identification of medical abortions using data regarding practitioner payments, procedures, and prescriptions, along with our exclusion of these months from our time-series analysis. Our population-based data comprehensively captured all abortions among Ontario residents, as well as all subsequent hospital or health service events, even if such services were not provided by the same provider or facility that provided the initial care. Therefore, loss to follow-up was minimal since it involved only patients who had moved out of the province within 6 weeks after the abortion or during the current pregnancy. However, since linkages across databases are possible only for residents who are eligible for provincial health insurance, we excluded the 397 abortions (0.1%) that were provided to nonresidents. Because of lags in availability of cause-of-death data, we could not report the incidence of abortion-related deaths. However, surveillance by the U.S. Centers for Disease Control and Prevention indicates that death is a very rare outcome (2 deaths among 609,095 abortions in 2018).[39] Although minimal data were missing for gestational trimester, we did not have data regarding specific gestational ages in weeks, which prevented an evaluation of changes to abortion timing within trimesters.

When mifepristone became available as a normally prescribed medication in Canada, the frequency of medical abortion rose substantially as compared with the frequency during the period before mifepristone became available, even though the rate of abortion remained materially stable. The incidences of serious adverse events and complications remained materially unchanged, and uterine evacuation and ongoing pregnancy remained infrequent.

Parts of this material are based on data and information compiled and provided by the Ontario Ministry of Health and the Canadian Institute for Health Information. The analyses, conclusions, opinions, and statements expressed in this article are solely those of the authors and do not reflect those of the funding or data sources.

Supported by a grant (PJT-168964) from the Canadian Institutes of Health Research and by a grant from the Women's Health Research Institute of the Provincial Health Services Authority of British Columbia.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

We thank staff members at ICES, which is supported by the Government of Ontario Ministry of Health and the Ministry of Long-Term Care, for their assistance with data management; staff members at IQVIA Solutions Canada for use of their Drug Information File; and our fellow members of the Canadian Contraception and Abortion Research Team for their contributions to the study.

## REFERENCES

1. United Nations High Commissioner for Human Rights. Information series on sexual and reproductive health and rights: abortion. 2020 (https://www.ohchr.org/Documents/Issues/Women/WRGS/SexualHealth/INFO_Abortion_WEB.pdf).

2. Creinin MD, Grossman DA. Medication abortion up to 70 days of gestation: ACOG practice bulletin, number 225. Obstet Gynecol 2020;136(4):e31-e47.

3. Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev 2011;11: CD002855.

4. Costescu D, Guilbert E, Bernardin J, et al. Medical abortion. J Obstet Gynaecol Can 2016;38:366-89.

5. Mifeprex REMS Study Group. Sixteen years of overregulation: time to unburden mifeprex. N Engl J Med 2017;376:790-4.

6. Gissler M, Fronteira I, Jahn A, et al. Terminations of pregnancy in the European Union. BJOG 2012;119:324-32.

7. Baird B. Medical abortion in Australia: a short history. Reprod Health Matters 2015;23:169-76.

8. American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. June 2018 (https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications).

9. Gambir K, Garnsey C, Necastro KA, Ngo TD. Effectiveness, safety and acceptability of medical abortion at home versus in the clinic: a systematic review and meta-analysis in response to COVID-19. BMJ Glob Health 2020;5(12):e003934.

10. Grant K. Long-awaited abortion pill Mifegymiso makes Canadian debut. Globe and Mail. January 20, 2017 (https://beta.theglobeandmail.com/news/national/long-awaited-abortion-pill-mifegymiso-rolls-out-in-canada/article33695167/?ref=http://www.theglobeandmail.com&).

11. Gynuity Health Projects. Map of mifepristone approvals. June 2017 (http://gynuity.org/resources/info/map-of-mifepristone-approvals/).

12. Health Canada. Regulatory decision summary: Mifegymiso. 2015 (https://cart-grac.ubc.ca/np-mifepristone-study/regulatory-decision-summary-sbd_-mifegymiso-2015-health-canada/?login).

13. Munro S, Guilbert E, Wagner M-S, et al. Perspectives among Canadian physicians on factors influencing implementation of mifepristone medical abortion: a national qualitative study. Ann Fam Med 2020;18: 413-21.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 9, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

Supp. PCSF55

2022 CP 000108

The New England Journal of Medicine

Downloaded from nejm.org at FDA Library on January 7, 2024. For personal use only. No other uses without permission.

Copyright © 2022 Massachusetts Medical Society. All rights reserved.

**14.** Health Canada. Regulatory decision summary — Mifegymiso — Health Canada. November 7, 2017 (https://hpr-rps .hres.ca/reg-content/regulatory-decision -summary-detail.php?lang=en&linkID= RDS00294).

**15.** Guilbert ER, Hayden AS, Jones HE, et al. First-trimester medical abortion practices in Canada: National survey. Can Fam Physician 2016;62(4):e201-e208.

**16.** ICES. Mission, vision & values (https:// www.ices.on.ca/About-ICES/Mission-vision -and-values).

**17.** Samiedaluie S, Peterson S, Brant R, Kaczorowski J, Norman WV. Validating abortion procedure coding in Canadian administrative databases. BMC Health Serv Res 2016;16:255.

**18.** World Health Organization. Women of reproductive age (15-49) population (thousands). April 12, 2021 (https://www .who.int/data/maternal-newborn-child -adolescent-ageing/indicator-explorer -new/mca/women-of-reproductive-age -(15-49-years)-population-(thousands)).

**19.** Saeed S, Moodie EEM, Strumpf EC, Klein MB. Segmented generalized mixed effect models to evaluate health outcomes. Int J Public Health 2018;63:547-51.

**20.** Bernal JL, Cummins S, Gasparrini A. Interrupted time series regression for the evaluation of public health interventions: a tutorial. Int J Epidemiol 2017;46:348-55.

**21.** Turner SL, Karahalios A, Forbes AB, et al. Creating effective interrupted time series graphs: review and recommendations. Res Synth Methods 2021;12:106-17.

**22.** Haukoos JSLR, Lewis RJ. Advanced statistics: bootstrapping confidence intervals for statistics with "difficult" distributions. Acad Emerg Med 2005;12:360-5.

**23.** Hategeka C, Ruton H, Karamouzian M, Lynd LD, Law MR. Use of interrupted time series methods in the evaluation of health system quality improvement interventions: a methodological systematic review. BMJ Glob Health 2020;5(10):e003567.

**24.** Nelson BK. Statistical methodology. V. Time series analysis using autoregressive integrated moving average (ARIMA) models. Acad Emerg Med 1998;5:739-44.

**25.** Wagner AK, Soumerai SB, Zhang F, Ross-Degnan D. Segmented regression analysis of interrupted time series studies in medication use research. J Clin Pharm Ther 2002;27:299-309.

**26.** Matheson FI, van Ingen T. 2011 Ontario marginalization index: technical document. Toronto: St. Michael's Hospital, November 2017 (https://www .publichealthontario.ca/-/media/ documents/on-marg-technical.pdf?la=en).

**27.** Ammon Avalos L, Galindo C, Li D-K. A systematic review to calculate background miscarriage rates using life table analysis. Birth Defects Res A Clin Mol Teratol 2012;94:417-23.

**28.** Brown BP, Hebert LE, Gilliam M, Kaestner R. Association of highly restrictive state abortion policies with abortion rates, 2000–2014. JAMA Netw Open 2020; 3(11):e2024610.

**29.** Ferris LE, McMain-Klein M. Small-area variations in utilization of abortion services in Ontario from 1985 to 1992. CMAJ 1995;152:1801-7.

**30.** Berard V, Fiala C, Cameron S, Bombas T, Parachini M, Gemzell-Danielsson K. Instability of misoprostol tablets stored outside the blister: a potential serious concern for clinical outcome in medical abortion. PLoS One 2014;9(12):e112401.

**31.** Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. Obstet Gynecol 2013;121:166-71.

**32.** Chong E, Shochet T, Raymond E, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-8.

**33.** Aiken A, Lohr PA, Lord J, Ghosh N, Starling J. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464-74.

**34.** Jones HE, O'Connell White K, Norman WV, Guilbert E, Lichtenberg ES, Paul M. First trimester medication abortion practice in the United States and Canada. PLoS One 2017;12(10):e0186487.

**35.** Kulier R, Kapp N. Comprehensive analysis of the use of pre-procedure ultrasound for first- and second-trimester abortion. Contraception 2011;83:30-3.

**36.** Grimes DA. Estimation of pregnancy-related mortality risk by pregnancy outcome, United States, 1991 to 1999. Am J Obstet Gynecol 2006;194:92-4.

**37.** Costescu D, Guilbert É. No. 360 — induced abortion: surgical abortion and second trimester medical methods. J Obstet Gynaecol Can 2018;40:750-83.

**38.** Devane C, Renner RM, Munro S, et al. Implementation of mifepristone medical abortion in Canada: pilot and feasibility testing of a survey to assess facilitators and barriers. Pilot Feasibility Stud 2019;5: 126.

**39.** Kortsmit K, Jatlaoui TC, Mandel MG, et al. Abortion surveillance — United States, 2018. MMWR Surveill Summ 2020; 69(7):1-29.

*Copyright © 2021 Massachusetts Medical Society.*

Supp PCSF56

2022 CP 000109



Maureen G. Phipps, MD, MPH, FACOG
American College of Obstetricians and Gynecologists
409 12th Street SW
Washington, DC 20024

January 3, 2023

Re:  Docket No. FDA-2022-P-2425

Dear Dr. Phipps:

This letter responds to your citizen petition submitted to the Food and Drug Administration (FDA or
Agency) on October 4, 2022, on behalf of the American College of Obstetricians and Gynecologists and
48 other organizations (Petition).  In the Petition, you request that FDA:

(1) Ask Danco Laboratories, LLC, the holder of the approved new drug application (NDA) for
    Mifeprex (mifepristone) (NDA holder), to submit a supplemental new drug application
    (sNDA) that seeks to add miscarriage management as an indication to the drug's labeling,
    and to eliminate or modify mifepristone's risk evaluation and mitigation strategy (REMS) so
    that it is not unduly burdensome for that use

(2) Immediately exercise enforcement discretion with respect to the use and distribution of
    mifepristone for miscarriage management without complying with the REMS

We have carefully considered the Petition and other information available to us. For the reasons stated
below, the Petition is denied.

## I.     BACKGROUND

On September 28, 2000, FDA approved Mifeprex for the medical termination of intrauterine pregnancy
through 49 days' pregnancy (NDA 020687). The application was approved under part 314, subpart H
(21 CFR part 314, subpart H); specifically, § 314.520 of subpart H provides for approval with
restrictions that are needed to assure the safe use of the drug product.  In accordance with § 314.520,
FDA restricted the distribution of Mifeprex as specified in the September 2000 approval letter.[1]

Subsequently, Mifeprex was identified as one of the products that was deemed to have in effect an
approved REMS under the Food and Drug Administration Amendments Act of 2007 (FDAAA) because
on the effective date of Title IX, subtitle A of FDAAA (March 28, 2008), Mifeprex had in effect

---

[1] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

Docket No. FDA-2022-P-2425

The Federal Food, Drug, and Cosmetic Act (FD&C Act) and FDA regulations require that a person seeking to market a new drug, including a new indication for an approved drug, submit an application to FDA for review.[5] To support the addition of a new indication to a drug product's FDA-approved labeling, the holder of the NDA for the drug product would submit a supplemental application requesting a new indication.[6] FDA would approve a supplemental application only if the Agency finds that the drug product is safe and effective for the proposed indication.[7]

Only the holder of an approved application may submit a supplement to an application.[8] Therefore, if the person seeking a new indication for an approved drug product is not the application holder for the drug, that person would need to submit a separate, original application for approval of a new drug with the new indication.[9]

To support a finding of safety and effectiveness for a new indication, FDA would require, among other information, that an applicant provide adequate data and information to support the new indication.  The applicant must establish effectiveness of the drug for the proposed indication and the application (whether an original application or a supplemental application) generally would contain data and information adequate to support a determination that the drug is safe and effective under the conditions of use specified in the labeling.

If the NDA holder for Mifeprex chooses to submit an sNDA to add an indication for miscarriage management to the Mifeprex labeling, the Agency will review such application consistent with the FD&C Act, FDA regulations, and our standard process for sNDAs.  In addition, any person may submit an original new drug application requesting approval of mifepristone for miscarriage management.[10]  As with all products, FDA is open to meeting with interested parties to discuss the potential submission of an application. In addition, it is our understanding that the NDA holder for Mifeprex is aware of your Petition, including the request to add miscarriage management as an indication to the drug's labeling.[11]

For these reasons, we deny your request that we ask the NDA holder for Mifeprex to submit an sNDA that seeks to add miscarriage management as an indication to the drug's labeling.

---

Advisory Committee for Reproductive Health Drugs in addition to specific findings by FDA based on literature and experience with approved combined oral contraceptive products – do not exist here.
[5] Section 505(a) of the FD&C Act (21 U.S.C. 355(a)) and 21 CFR part 314.
[6] §§ 314.71(b) and 314.50(d)(5).  See also FDA final guidance, *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004), at 6. We update guidances periodically.  For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/regulatory-information/search-fda-guidance-documents.
[7] See section 505(d) of the FD&C Act.
[8] § 314.71(a).
[9] An application submitted under section 505(b)(1) of the FD&C Act, also called a "stand-alone NDA," requires that the application contain, among other information, "full reports of investigations" to show that the drug is safe and effective for its intended use.
[10] See section 505(b)(1) and (2) of the FD&C Act.
[11] See https://www.reuters.com/business/healthcare-pharmaceuticals/doctors-urge-us-fda-add-miscarriage-management-abortion-pill-label-2022-10-04/.

 

June 21, 2022

Robert Califf, MD
Commissioner
U.S. Food and Drug Administration
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

*Re: U.S. Food and Drug Administration actions related to mifepristone*

Dear Dr. Califf:

On behalf of the American College of Obstetricians and Gynecologists (ACOG), representing more than 60,000 physicians and partners dedicated to advancing women's health and individuals seeking obstetric and gynecologic care, and the American Medical Association, we write to express our appreciation for the support demonstrated by the U.S. Food and Drug Administration (FDA) in response to the needs of individuals seeking reproductive care. Respectfully, we request that additional actions are taken to improve access to quality women's health care. In anticipation of the crisis to abortion access that is expected to follow the United States Supreme Court's decision in the *Dobbs v. Jackson Women's Health Organization* case, we strongly urge you to prioritize the following evidence-based decisions that will increase access to mifepristone:

- Reconsider the implementation of the Risk Evaluation and Mitigation Strategies (REMS) and Elements to Assure Safe Use (ETASU) requirements for mifepristone and ensure the process does not add unnecessary and unmitigated burdens for physicians, patients, and pharmacies; and
- Explicitly preempt state laws relating to mifepristone that are not evidence-based, that interfere with the medically necessary and appropriate use of a safe and effective drug, and that frustrate the FDA's regulatory decisions relating to mifepristone, and that have inconsistent policies and laws restricting access to mifepristone.

trimester medical abortion.[23] Currently, strong evidence supports the use of the mifepristone regimen through 77 days gestation, and multi-center study published in 2022 found that many physicians offer mifepristone up to 77 days.[24,25]

Experts, including ACOG, and the growing body of scientific evidence, demonstrate that the FDA regulations should preempt those state laws and prevent state lawmakers from imposing restrictions that are not evidence-based, that interfere with the medically necessary and appropriate use of a safe and effective drug, that frustrate access to necessary care and are inconsistent with the FDA's regulatory decisions relating to mifepristone.

**Revisit or Remove the Risk Evaluation and Mitigation Strategies (REMS) and Elements to Assure Safe Use (ETASU) Requirements for Mifepristone**

Recognizing the accomplishments of the FDA in modifying the REMS for mifepristone, we continue to urge the FDA to remove or make further changes to the REMS and ETASU requirements to allow obstetrician–gynecologists and other physicians to deliver the highest quality care for their patients. While the FDA updated the REMS for mifepristone in December 2021, the REMS for mifepristone still requires use of a provider agreement form, a patient agreement form and dispensing from a pharmacy certified by the drug distributors. The agency and manufacturers have not yet defined the pharmacy certification process; however, we are concerned that this unnecessary hurdle could serve as a deterrent to pharmacies' decisions to stock and dispense mifepristone. To increase access to mifepristone, we ask that, at a minimum, the FDA simplify the pharmacy certification process, eliminate the requirement for patients to sign a form to get the drug, lift the requirement that prescribers acquire a certification from the manufacturer, and evaluate adding protections for availability of mifepristone via telehealth.

**Failure to Improve Access to Mifepristone Will Threaten to Exacerbate the Maternal Mortality Crisis**

The United States leads the developed world in rates of maternal mortality. In 2020, the most recent year for which data is available, there were 23.8 deaths per 100,000 live births, up from 20.1 in 2019.[26] Alarmingly, the maternal mortality rate for Black women was 55.3 deaths per 100,000 live births, 2.9 times the rate for White women, and rates significantly increased for both Black and Hispanic women.[27] The rising maternal mortality rates and persistent racial disparities in maternal outcomes are unacceptable. However, without sufficient access to abortion care, including mifepristone, these figures are certain to climb.

Current data support an association between restricted access to safe and legal abortion and higher rates of maternal morbidity and mortality, with already vulnerable populations experiencing the greatest burden.[28,29,30] At just 0.3 deaths per 100,000 abortions performed at or before 8 weeks, the mortality rate associated with abortion is significantly lower than the mortality rate associated with childbirth.[31] A lack of access to mifepristone will result in more pregnancies, including high-risk pregnancies, which is associated with the much higher maternal mortality rates described above. A recent study estimated a total, nationwide abortion ban would increase pregnancy-related deaths by 7% in the first year and 21% in subsequent years, including a 33% increase for Black people.[32]

**Mifepristone SSS REMS**

**Sponsors' August 26, 2022 Response to FDA's Information Request**

**Dated July 22, 2022**

Mifepristone Shared REMS                                                                17
NDA 20687, Information Request
Received: July 22, 2022
Submitted: August 26, 2022

The Sponsors anticipate that certified pharmacies will either publicize their certification status or reveal their status upon inquiry from a HCP or have an existing relationship with that certified HCP or their patient based on routinely filling their other prescriptions (e.g., pharmacies that fill prescriptions of misoprostol and other drugs for a clinic that does not dispense those drugs to their medical abortion patients). HCPs and their patients will be able to readily identify the former pharmacies from public sources and confirm certification status of the latter pharmacies directly with such pharmacies. Over time, we expect that HCPs will gain institutional knowledge about which pharmacies maintain certification. Based on input from stakeholders, if the REMS mandates disclosure of certified pharmacies that do not want to be publicly identified they will not enter into a pharmacy certification agreement to purchase and dispense mifepristone.

11. *How will you ensure that pharmacies are able to dispense in a timely manner? Delays in use of this product could adversely impact patient safety as the risk of serious adverse events such as bleeding that requires transfusion, although rare, increase with increasing gestation. Further, the approved indication reflects a window of use up to 70 days gestation. Explain whether there will be differences between the types of certified pharmacies in ensuring compliance with certification and decertification and how you will ensure patients receive the product within this window.*

**Response:** First, the professional practice of pharmacy requires that pharmacies promptly dispense products to patients upon receiving the prescription or swiftly communicate with the patient and prescriber if that is not possible within the appropriate clinical window. Second, pharmacies and individual pharmacists are accustomed to complying with substantial product-specific requirements and prescriber instructions when dispensing products to patients (either in person or by mail) to ensure safe and effective use., As noted in response to Questions 2 and 12 , we do not anticipate differences in certification or decertification based on pharmacy type.

12. *Describe the criteria for pharmacy decertification and how this would be communicated to other stakeholders, such as distributors, prescribers, and patients.*

**Response:** The standard for pharmacy decertification is intentional and/or repeated failure to comply with the REMS after efforts to ensure compliance. This same standard applies to decertification of HCPs. If a Sponsor determines

## Center for Drug Evaluation and Research (CDER)

(b)(6)/PPI

Memorandum to File

| NDA | 020687 |
|---|---|
| Reviewer Names | (b)(6)/PPI |
| | |
| (b)(6)/PPI | |
| | |
| | |
| | |
| Date of Memorandum | December 30, 2022 |
| Subject | Referenced Publications |

On December 16, 2021, FDA sent REMS Modification Notification letters to Danco Laboratories, LLC (Danco) and GenBioPro, Inc. (GBP) (collectively the Applicants) regarding the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program), which was approved on April 11, 2019 and last modified on May 14, 2021. The December 16, 2021 letters explained that, in accordance with section 505-1(g)(4)(8) of the Federal Food, Drug, and Cosmetic Act (FDCA), FDA had determined that the approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The letters also noted that the determination was based on a review of published literature, safety information collected during the COVID-19 Public Health Emergency (PHE), FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

FDA is reviewing Danco's supplemental new drug application (sNDA) and GBP's supplemental abbreviated new drug application (sANDA), which were submitted on June 22, 2022, in response to the December 16, 2021 letters. The REMS modification supplemental applications propose revisions to the Mifepristone REMS Program that, consistent with the December 16, 2021 REMS Modification Notification letters, 1) remove the REMS requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber (known as the "in-person dispensing requirement") and 2) add a new REMS requirement for pharmacy certification. The supplemental applications also include proposed changes

1

Reference ID: 5102531

to, among other things, the REMS document and REMS materials, to align with the removal of the in-person dispensing requirement and the addition of pharmacy certification.

(b)(6)/PPI was notified that the publications listed below were attached to the Complaint recently filed in a lawsuit (Alliance for Hippocratic Medicine v. U.S. Food and Drug Administration, No. 2:22-cv-00223-Z (N.D. Tex.)):

1. Studnicki et al., 2021: "A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015"[1]

2. Studnicki et al., 2022: "A Post Hoc Exploratory Analysis: Induced Abortion Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization"[2]

3. Rafferty et al., 2020: "#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives"[3]

4. Aultman et al., 2019: "Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019"[4]

5. Cirucci et al., 2021: "Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act"[5]

(b)(6)/PPI has reviewed these five publications for the limited purpose of determining whether they contain information relevant to our review of the REMS modifications proposed in the pending sNDA and sANDA, applying the same approach described on pages 11-12 of the December 16, 2021 REMS Modification Rationale Review prepared jointly by (b)(6)/PPI

As described on pages 11-12 of the REMS Modification Rationale Review, (b)(6)/PPI approach to the literature review for the Agency's December 16, 2021 REMS modification determination focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS elements to assure safe use (ETASUs). We excluded systematic reviews and meta-analyses because these publications did not include original safety data related to the outcomes of medical abortion.

We applied the same approach that was used for the literature search for the December 16, 2021 review to these five articles, which were not studies focused on in-person dispensing or pharmacy certification. We conclude that the five publications listed above do not include safety data relevant to

---

[1] Studnicki J, Harrison DJ, Longbons T, et al. A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015. Health Services Research and Managerial Epidemiology. 2021;8. doi:10.1177/23333928211053965.

[2] Studnicki J, Longbons T, Harrison DJ, et al. A Post Hoc Exploratory Analysis: Induced Abortion Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization. Health Services Research and Managerial Epidemiology. 2022;9. doi:10.1177/23333928221103107.

[3] KA Rafferty and T Longbons. #AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives. Health Communication 2020; 36:12, 1485-1494.

[4] Aultman K, Cirucci CA, Harrison DJ, et al. Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019. Issues Law Med. 2021;36(1):3-26.

[5] Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act. Health Serv Res Manag Epidemiol. 2021 Dec 21;8:23333928211068919. doi: 10.1177/23333928211068919. eCollection 2021 Jan-Dec.

2

Reference ID: 5102531

the Applicants' proposed modifications to the REMS ETASUs (i.e., removal of the "in-person dispensing requirement" or the addition of a new requirement for pharmacy certification).

Supp.PCSF65                    2023 SUPP 001079

Reference ID: 5102531

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b)(6)/PPI

12/30/2022 09:21:40 AM

(b)(6)/PPI

12/30/2022 09:23:55 AM

(b)(6)/PPI

12/30/2022 09:26:21 AM

(b)(6)/PPI

12/30/2022 09:27:53 AM

(b)(6)/PPI

12/30/2022 10:14:26 AM

(b)(6)/PPI

(b)(6)/PPI

12/30/2022 10:49:21 AM



**(b) (6)** and

**Center for Drug Evaluation and Research (CDER)**

---

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 091178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequences 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively), November 30, 2022 (sequences 24 and 92 respectively), December 9, 2022 (sequences 25 and 93 respectively) and December 16, 2022 (sequences 26 and 95 respectively). This supplement is on a 180-Day clock. |
| **Targeted Action Date** | December 19, 2022 |
| **(b) (6)** # | 2022-1169 |
| **Reviewer Names** |  |
| |  |
| |  |
| **Review Completion Date** | January 3, 2023 |
| **Subject** | Review of proposed Major REMS Modification |
| **Established Name** | Mifepristone REMS |
| **Name of Sponsor** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

1

Reference ID: 5103819

## Center for Drug Evaluation and Research (CDER)



(b)(6)/PPI

**Memorandum to File**

| NDA | 020687 |
|---|---|
| Reviewer, (b)(6)/PPI | (b)(6)/PPI |
| Date of Memorandum | January 3, 2023 |
| Subject | Referenced Publication |

On December 16, 2021, FDA sent REMS Modification Notification letters to Danco Laboratories, LLC (Danco) and GenBioPro, Inc. (GBP) (collectively the Applicants) regarding the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program), which was approved on April 11, 2019 and last modified on May 14, 2021. The December 16, 2021 letters explained that, in accordance with section 505-1(g)(4)(B) of the Federal Food, Drug, and Cosmetic Act (FDCA), FDA had determined that the approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The letters also noted that the determination was based on a review of published literature, safety information collected during the COVID-19 Public Health Emergency (PHE), FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

FDA is reviewing Danco's supplemental new drug application (sNDA) and GBP's supplemental abbreviated new drug application (sANDA), which were submitted on June 22, 2022, in response to the December 16, 2021 letters. The REMS modification supplemental applications propose revisions to the Mifepristone REMS Program that, consistent with the December 16, 2021 REMS Modification Notification letters, 1) remove the REMS requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber (known as the "in-person dispensing requirement") and 2) add a new REMS requirement for pharmacy certification. The supplemental applications also include proposed changes to, among other things, the REMS document and REMS materials, to align with the removal of the in-person dispensing requirement and the addition of pharmacy certification.

(b)(6)/PPI received notification through a weekly email listing the table of contents for the Annals of Internal Medicine that a large clinical study, Liu N, Ray JG., 2023 "Short-term Adverse Outcomes After

Reference ID: 5103795

Mifepristone–Misoprostol Versus Procedural Induced Abortion," was published in Annals of Internal Medicine on January 3, 2023.[1]

(b)(6)/PPI have reviewed this publication for the limited purpose of determining whether it contains information relevant to our review of the REMS modifications proposed in the pending sNDA and sANDA, applying the same approach described on pages 11-12 of the December 16, 2021 REMS Modification Rationale Review prepared jointly by (b)(6)/PPI As described on pages 11-12 of the REMS Modification Rationale Review, (b)(6)/PPI approach to the literature review for the Agency's December 16, 2021 REMS modification determination focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS elements to assure safe use (ETASUs).

We applied the same approach that was used for the literature search for the December 16, 2021 review to this article. We conclude that the findings are not relevant to the Applicants' proposal to remove the "in-person dispensing requirement" or to add a new requirement for pharmacy certification because the study did not evaluate and compare outcomes when the drug is dispensed in person versus a manner other than in person.

---

[1] Liu N, Ray JG. Short-term Adverse Outcomes After Mifepristone–Misoprostol Versus Procedural Induced Abortion. A population-based propensity-weighted study. Ann Intern Med. 3 January 2023. [Epub ahead of print]. doi:10.7326/M22-2568.

Reference ID: 5103795

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

01/03/2023 04:51:52 PM

(b)(6)/PPI

01/03/2023 04:53:44 PM

(b)(6)/PPI

01/03/2023 04:57:10 PM

(b)(6)/PPI

01/03/2023 04:58:21 PM

(b)(6)/PPI

01/03/2023 04:59:37 PM

Initial Shared System REMS approval: 04/2019
Most Recent Modification: 01/2023

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

## I.   GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c) Informing patients about the risk of serious complications associated with mifepristone.

## II.   REMS ELEMENTS

### A.  Elements to Assure Safe Use

1. Healthcare providers who prescribe mifepristone must be specially certified.

   a. To become specially certified to prescribe mifepristone, healthcare providers must:

      i. Review the Prescribing Information for mifepristone.

      ii. Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

         1) They have the following qualifications:

            a) Ability to assess the duration of pregnancy accurately

            b) Ability to diagnose ectopic pregnancies

            c) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

         2) They will follow the guidelines for use of mifepristone (see b.i-vii below).

   b. As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

      i. Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

      ii. Ensure that the healthcare provider and patient sign the *Patient Agreement Form.*

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

Reference ID: 5103833

 iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

 iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

 v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

 vi. If mifepristone will be dispensed by a certified pharmacy:

  1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

  2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

  3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

 vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

  1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

  2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

  3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

 i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

 ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

  1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

  2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

 iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

 iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

 v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

Reference ID: 5103833

2.  Pharmacies that dispense mifepristone must be specially certified

    a.  To become specially certified to dispense mifepristone, pharmacies must:

        i.  Be able to receive *Prescriber Agreement Forms* by email and fax.

        ii.  Be able to ship mifepristone using a shipping service that provides tracking information.

        iii.  Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

        iv.  Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

            1)  Review the Prescribing Information for mifepristone.

            2)  Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

                a)  Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

                b)  Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

                c)  Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

                d)  Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

                e)  Track and verify receipt of each shipment of mifepristone.

                f)  Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

                g)  Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

                h)  Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

                i)  Maintain records of *Prescriber Agreement Forms*.

                j)  Maintain records of dispensing and shipping.

                k)  Maintain records of all processes and procedures including compliance with those processes and procedures.

                l)  Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

                m)  Train all relevant staff on the Mifepristone REMS Program requirements.

Reference ID: 5103833

    n)  Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b.  Mifepristone Sponsors must:

    i.  Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

    ii.  Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

    i.  Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.  Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

  a.  The patient must sign a *Patient Agreement Form* indicating that the patient has:

    i.  Received, read and been provided a copy of the *Patient Agreement Form*.

    ii.  Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

**B. Implementation System**

1.  Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

  a.  Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

    i.  The distributors must put processes and procedures in place to:

      1)  Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

      2)  Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

      3)  Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

      4)  Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

      5)  Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

    ii.  Put processes and procedures in place to maintain a distribution system that is secure,

Reference ID: 5103833

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use **MIFEPREX** safely and effectively. See full prescribing information for **MIFEPREX.**

**MIFEPREX®** (mifepristone) tablets, for oral use
Initial U.S. Approval: 2000

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

*See full prescribing information for complete boxed warning.*
Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.

- **Atypical Presentation of Infection. Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)**
- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)**

**MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).**
**Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.**

---

**----------------------------INDICATIONS AND USAGE----------------------------**
MIFEPREX is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

**--------------------DOSAGE AND ADMINISTRATION--------------------**
- 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
- Instruct the patient what to do if significant adverse reactions occur. (2.2)
- Follow-up is needed to confirm complete termination of pregnancy. (2.3)

**---------------DOSAGE FORMS AND STRENGTHS---------------**
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

**--------------------------------CONTRAINDICATIONS--------------------------------**
- Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
- Chronic adrenal failure (4)
- Concurrent long-term corticosteroid therapy (4)
- History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
- Hemorrhagic disorders or concurrent anticoagulant therapy (4)
- Inherited porphyria (4)
- Intrauterine device (IUD) in place (4)

**----------------------WARNINGS AND PRECAUTIONS----------------------**
- Ectopic pregnancy: Exclude before treatment. (5.4)
- Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

**----------------------------ADVERSE REACTIONS----------------------------**
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch.***

**----------------------------DRUG INTERACTIONS----------------------------**
- CYP3A4 inducers can lower mifepristone concentrations. (7.1)
- CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
- CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

**----------------------------USE IN SPECIFIC POPULATIONS----------------------------**
- Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.**

**Revised: 01/2023**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

1    INDICATIONS AND USAGE
2    DOSAGE AND ADMINISTRATION
     2.1  Dosing Regimen
     2.2  Patient Management Following Misoprostol Administration
     2.3  Post-treatment Assessment: Day 7 to 14
     2.4  Contact for Consultation
3    DOSAGE FORMS AND STRENGTHS
4    CONTRAINDICATIONS
5    WARNINGS AND PRECAUTIONS
     5.1  Infections and Sepsis
     5.2  Uterine Bleeding
     5.3  Mifepristone REMS Program
     5.4  Ectopic Pregnancy
     5.5  Rhesus Immunization
6    ADVERSE REACTIONS
     6.1  Clinical Trials Experience
     6.2  Postmarketing Experience
7    DRUG INTERACTIONS
     7.1  Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)
     7.2  Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)
     7.3  Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)
8    USE IN SPECIFIC POPULATIONS
     8.1  Pregnancy
     8.2  Lactation
     8.4  Pediatric Use
10   OVERDOSAGE
11   DESCRIPTION
12   CLINICAL PHARMACOLOGY
     12.1  Mechanism of Action
     12.2  Pharmacodynamics
     12.3  Pharmacokinetics
13   NONCLINICAL TOXICOLOGY
     13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility
14   CLINICAL STUDIES
16   HOW SUPPLIED/STORAGE AND HANDLING
17   PATIENT COUNSELING INFORMATION

*Sections or subsections omitted from the full prescribing information are not listed.

---

---

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone tablets, for oral use

---

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

---

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

Reference ID: 5103833