## Index of Joint Appendix Documents
### *Purcell, et al. v. Kennedy, et al.,*
### No. 1:17-cv-00493-JAO-RT (D. Haw.)

| VOLUME A | | | |
|---|---|---|---|
| **Administrative Record** | | | |
| **AR Range** | **Document Name** | **Date** | **Location in Pls.' Exhibits** |
| FDA1-2 | Danco Group Letter to FDA re: NDA 20-687, Distribution Plan | Jan. 21, 2000 | Doc. 231-3, Ex. C at 1 |
| FDA3-5 | Letter from FDA to Sandra P. Arnold, Population Council re: Approval | Sept. 28, 2000 | N/A |
| FDA6-17 | Approved Labeling Text | Sept. 28, 2000 | N/A |
| FDA223-30 | Summary Review | Sept. 28, 2000 | Doc. 222-2, Ex. Vol. A at PCSF1 |
| FDA231-43 | Final Deemed REMS Review | June 3, 2011 | Doc. 222-2, Ex. Vol. A at PCSF9 |
| FDA269-91 | Approved Labeling Text (Korlym) | Feb. 2012 | Doc. 222-2, Ex. Vol. A at PCSF22 |

| FDA292-306 | Risk Assessment and Risk Mitigation Review(s) (Korlym) | Jan. 27, 2012 | Doc. 222-2, Ex. Vol. A at PCSF45 |
|---|---|---|---|
| FDA307-30 | Summary Review (Korlym) | Feb. 17, 2012 | Doc. 222-2, Ex. Vol. A at PCSF50 |
| FDA342-60 | Final REMS Review | dated Oct. 10, 2013; signed Oct. 17, 2013 | Doc. 222-2, Ex. Vol. A at PCSF53 |
| FDA371-81 | Approval Package Index and Approval Letter | Mar. 29, 2016 | N/A |
| FDA403-11 | Mifeprex REMS | Mar. 29, 2016 | Doc. 222-2, Ex. Vol. A at PCSF72 |
| FDA412-39 | Summary Review | Mar. 29, 2016 | Doc. 222-2, Ex. Vol. A at PCSF81 |
| FDA440-41, 465 | Cross-Discipline Team Leader Review | Mar. 29, 2016 | Doc. 222-2, Ex. Vol. A at PCSF89 |
| FDA528-634 | Clinical Review | Mar. 29, 2016 | Doc. 222-2, Ex. Vol. A at PCSF92 |
| FDA673-709 | REMS Review & Supporting Materials | Mar. 29, 2016 | Doc. 222-3, Ex. Vol. B at PCSF98 |

## The Danco Group

January 21, 2000

Division of Reproductive and
  Urologic Drug Products (HFD-580)
Attention:  Document Control Room 17B-20
Office of Drug Evaluation II
Center for Drug Evaluation and Research
Food and Drug Administration
5600 Fishers Lane
Rockville, MD  20857

Re:    **NDA 20-687, Mifepristone 200mg Oral Tablets**
         •         Amendment 039      -    Mifeprex® – Distribution Plan

Dear Dr

As previously agreed, we are submitting Danco Laboratories, Inc.'s Distribution Plan for
Mifeprex®.  This is a comprehensive distribution plan that emphasizes control of
mifepristone at all points in the supply chain, from manufacturers through to individual
patients.  This plan has been prepared in light of the unique situation surrounding
abortion provision in the United States and not out of any medical safety concerns.
However, in preparation of this plan, we have taken into account advice from the FDA
that it is considering approving the NDA under "Subpart H—Accelerated Approval of
New Drugs for Serious or Life-Threatening Illnesses, Sec. 314.520--Approval with
restrictions to assure safe use."

Our position is that we are willing to agree with the FDA on appropriate distribution
controls for mifepristone but that the application of Sec. 314.520 under Subpart H
seems unnecessary, in light of our voluntary acceptance of some appropriate
distribution controls.

Specifically, Sec. 314.520(a) states that the FDA can apply post-marketing restrictions if
it "concludes that a drug product shown to be effective can be safely used *only* if
distribution or use is restricted" (emphasis added).  Regardless of the distribution
system for mifepristone, the medical safety of this drug is well documented in our IND
application and in the label and, thus, we believe that Sec. 314.520 does not apply.

This document constitutes trade secret and confidential commercial information exempt from public
disclosure under  21 C.F.R.  20.61.  Should FDA tentatively determine that any portion of this document is
disclosable in response to a request under the Freedom of Information Act, Danco Laboratories, Inc.
requests immediate notification and an opportunity for consultation in accordance with 21 C.F.R.  20.45.
Contact telephone number is

On the contrary, scientific evidence demonstrates that mifepristone is an exceptionally safe drug. Mifepristone when taken by a woman whose pregnancy is ≤ 49 days LMP is associated with several relatively minor and predictable side effects. More serious adverse events are quite rare and are related to the entire treatment (not mifepristone *per se*), almost always following the use of the prostaglandin. There has never been a death related to the use of mifepristone in combination with misoprostol for medical termination of pregnancy. These details have been discussed and reported in our label and various submissions to the FDA.

In addition to concerns about patient safety, the possibility of teratogenic effects has previously triggered the application of section 314.520, as in the case of Thalomid (Thalidomide). These concerns relate to the inadvertent use of a known teratogen at the early stages of a pregnancy that was not scheduled for termination. In contrast, all women who will receive mifepristone will be known to be in early pregnancy and have elected to terminate that pregnancy. Of course, in the case of a successful application of mifepristone, concerns about teratogenicity are rendered moot as the woman will no longer be pregnant. Similarly, in the case of a failed medical abortion, women should have a surgical intervention to terminate the pregnancy and are counseled to do so before taking mifepristone and misoprostol. To date, there is no compelling evidence to suggest that either mifepristone or misoprostol produces teratogenic effects.

Based on the above reasons, we firmly believe that the NDA for mifepristone should not be approved under Sec. 314.520. In addition, applying Sec. 314.520 might draw increased and unwarranted attention to the product, the FDA, and to Danco and its manufacturers, in particular evoking queries about the product's safety. Nonetheless, given the contentious political climate surrounding *all* abortion provision in the United States, we feel that the distribution of mifepristone should be carefully monitored and controlled. Therefore, we have developed and are implementing a controlled distribution strategy and are submitting the details of this strategy in the enclosed Distribution Plan for your review and comment.

Sincerely,



Enclosure

cc:
Sandra P. Arnold – Population Council
Frederick H. Schmidt – Population Council

52 pages have been withheld as b4 (CCI) immediately following this page

NDA 20-687

SEP 2 8 2000

Population Council
Attention:  Sandra P. Arnold
Vice President, Corporate Affairs
1230 York Avenue
New York, NY 10021

Dear Ms. Arnold:

Please refer to your new drug application (NDA) dated March 14, 1996, received March 18, 1996,
submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for MIFEPREX™
(mifepristone) Tablets, 200 mg.

We acknowledge receipt of your submissions dated April 19, June 20, July 25, August 15 and September
16 and 26, 1996; January 30, March 31, July 28, August 5, September 24, November 26, 1997; January
30 (2), February 19, April 27, June 25, October 26, December 8, 1998; February 8 and 22, March 31,
April 28, May 10 and 20, June 3 (2), 15, 23, 25, and 30, July 14 (2) and 22, August 3, 13, 18 and 30,
September 3, 8, 13 and 30, October 5, 26 and 28, November 16 and 29 (2), December 6, 7 and 23, 1999;
and January 11, 21 and 28 (2), February 16 and 24, March 3, 6, 9, 10, 30 and 31 (2), April 20, May 3, 11
and 17, June 22 and 23, July 11, 13, 25 and 27, August 18, 21 and 24, September 8, 12, 15 (2), 19 (2), 20,
21, 22, 26 (2), and 27 (2), 2000.  Your submission of March 30, 2000 constituted a complete response to
our February 18, 2000 action letter.

This new drug application provides for the use of Mifeprex™ for the medical termination of intrauterine
pregnancy through 49 days' pregnancy.

We have completed the review of this application, as amended, and have concluded that adequate
information has been presented to approve Mifeprex™ (mifepristone) Tablets, 200 mg, for use as
recommended in the agreed upon labeling text.  The application is approved under 21 CFR 314 Subpart
H.  Approval is effective on the date of this letter.  Marketing of this drug product and related activities
are to be in accordance with the substance and procedures of the referenced regulations.

The final printed labeling (FPL) [including the professional labeling (Package Insert), the Medication
Guide required for this product under 21 CFR Part 208, the Patient Agreement Form, and the Prescriber's
Agreement Form] must be identical to the submitted draft labeling (Package Insert, Medication Guide,
Patient Agreement Form, and the Prescriber's Agreement Form submitted September 27, 2000; and the
immediate container and carton labels submitted July 25, 2000).  Marketing the product with FPL that is
not identical to the approved labeling text may render the product misbranded and an unapproved new
drug.

Please submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is
printed.  Please individually mount ten of the copies on heavy-weight paper or similar material.
Alternatively, you may submit the FPL electronically according to the guidance for industry titled
*Providing Regulatory Submissions in Electronic Format - NDAs* (January 1999).  For administrative

purposes, this submission should be designated "FPL for approved NDA 20-687." Approval of this submission by FDA is not required before the labeling is used.

Under 21 CFR 314.520, distribution of the drug is restricted as follows:

Mifeprex™ must be provided by or under the supervision of a physician who meets the following qualifications:

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the prescribing information of Mifeprex™.

- Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, give her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement and must sign it as well.

- Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an ongoing pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure.

- Must report any hospitalization, transfusion or other serious events to the sponsor or its designate.

- Must record the Mifeprex™ package serial number in each patient's record.

With respect to the aspects of distribution other than physician qualifications described above, the following applies:

- Distribution will be in accordance with the system described in the March 30, 2000 submission. This plan assures the physical security of the drug product and provides specific requirements imposed by and on the distributor including procedures for storage, dosage tracking, damaged product returns, and other matters.

We also note the following Phase 4 commitments, specified in your submission dated September 15, 2000. These commitments replace all previous commitments cited in the September 18, 1996 and the February 18, 2000 approvable letters. These Phase 4 commitments are:

1. A cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention. Previous study questions related to age, smoking, and follow-up on day 14 (compliance with return visit) will be incorporated into this cohort study, as well as an audit of signed Patient Agreement forms.

FDA 0004

2.  A surveillance study on outcomes of ongoing pregnancies.

You have agreed to provide the final Phase 4 protocols for these studies within six months.

Protocols, data, and final reports should be submitted to your IND for this product and a copy of the cover letter sent to this NDA. If an IND is not required to meet your Phase 4 commitments, please submit protocols, data and final reports to this NDA as correspondence. In addition, under 21 CFR 314.81(b)(2)(vii), we request that you include a status summary of each commitment in your annual report to this NDA. The status summary should include the number of patients entered in each study, expected completion and submission dates, and any changes in plans since the last annual report. For administrative purposes, all submissions, including labeling supplements, relating to these Phase 4 commitments must be clearly designated "Phase 4 Commitments."

We also remind you that, under 21 CFR 314.550, after the initial 120 day period following this approval, you must submit all promotional materials, including promotional labeling as well as advertisements, at least 30 days prior to the intended time of initial dissemination of the labeling or initial publication of the advertisement.

Be advised that, as of April 1, 1999, all applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred (63 *FR* 66632). We are waiving the pediatric study requirement for this action on this application.

Please submit one market package of the drug product when it is available.

We remind you that you must comply with the requirements for an approved NDA set forth under 21 CFR 314.80 and 314.81.

If you have any questions, call

Sincerely,

/S/

Center for Drug Evaluation and Research

APPEARS THIS WAY
ON ORIGINAL

## MIFEPREX™ (mifepristone) Tablets, 200 mg For Oral Administration Only

If Mifeprex* results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance whether they will provide such care themselves or through other providers. Prescribers should also give patients clear instructions on whom to call and what to do in the event of an emergency following administration of Mifeprex.

Prescribers should make sure that patients receive and have an opportunity to discuss the Medication Guide and the PATIENT AGREEMENT.

### DESCRIPTION

Mifeprex tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical and biconvex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11β-[p-(Dimethylamino)phenyl]-17β-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:

The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 191-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

* Mifeprex is a trademark of Danco Laboratories, LLC.

### CLINICAL PHARMACOLOGY

**Pharmacodynamic Activity**

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit and monkey), the compound inhibits the activity of endogenous or exogenous progesterone. The termination of pregnancy results.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women. During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity of prostaglandins.

Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity. The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

**Pharmacokinetics and Metabolism**

*Absorption*

Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 mg/l occurring approximately 90 minutes after ingestion. The absolute bioavailability of a 20 mg oral dose is 69%.

FDA 0006

## Distribution

Mifepristone is 98% bound to plasma proteins, albumin and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance. Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

## Metabolism

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11β; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

## Excretion

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum levels are undetectable by 11 days.

## Special Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.

## Clinical Studies

Safety and efficacy data from the U.S. clinical trials and from two French trials of mifepristone are reported below. The U.S. trials provide safety data on 837 women and efficacy data on 827 women with gestation durations of 49 days or less (dated from the first day of the last menstrual period). In the two French clinical trials, safety evaluable data are available for 1800 women, while efficacy information is available for 1681 of these women. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure, for the U.S. and French studies appear in Table 1.

In the U.S. trials, 92.1% of the 827 subjects had a complete medical abortion, as shown in Table 1. In 52 women (6.3%) expulsion occurred within two days, and resulted from the action of mifepristone (600 mg) alone, unaided by misoprostol, an analog of prostaglandin $E_2$. All other women without an apparent expulsion took a 400 μg dose of misoprostol two days after taking mifepristone. Many women (44.1%) in the U.S. trials expelled the products of conception within four hours after taking misoprostol and 62.8% experienced expulsion within 24 hours after the misoprostol administration. There were 65 women (7.9%) who received surgical interventions: 13 (1.6%) were medically indicated interventions during the study period, mostly for excessive bleeding; five (0.6%) interventions occurred at the patient's request; 39 women (4.7%) had incomplete abortions at the end of the study protocol; and eight (1.0%) had ongoing pregnancies at the end of the study protocol.

Women who participated in the U.S. trials reflect the racial and ethnic composition of American women. The majority of women (71.4%) were Caucasian, while 11.3% were African American, 10.9% were East Asian, 4.7% were Hispanic. A small percentage (1.7%) belonged to other racial or ethnic groups. Women aged 18 to 45 were enrolled in the trials. Nearly two-thirds (66.0%) of the women were under 30 years old with a mean age of 27 years.

In the French trials, complete medical abortion occurred in 95.5% of the 1681 subjects, as shown in Table 1. In 89 women (5.3%), complete abortion occurred within two days of taking mifepristone (600 mg). About half of the women (50.3%) in the French trials expelled the products of conception during the first four hours immediately following administration of misoprostol and 72.3% experienced expulsion within 24 hours after taking misoprostol. In 1.0% of women in the French trials ultimately received surgical intervention for excessive bleeding, incomplete abortions, or ongoing pregnancies at the end of the protocol.

FDA-0497

**Table 1**

**Outcome Following**

**Treatment with Mifepristone and Misoprostol in the U.S. and French Trials**

| | U.S. Trials | | French Trials | |
|---|---|---|---|---|
| | N | % | N | % |
| **Complete medical abortion** | **762** | **92.1** | **1605** | **95.5** |
| Timing of expulsion | | | | |
| Before second visit | 52 | (6.3) | 89 | (5.3) |
| During second visit | | | | |
| • less than 4 hrs after misoprostol | 365 | (44.1) | 846 | (50.3) |
| After second visit | | | | |
| • greater than 4 hrs but less than 24 hrs after misoprostol | 155 | (18.7) | 370 | (22.0) |
| • greater than 24 hrs after misoprostol | 68 | (8.2) | 145 | (8.6) |
| Time of expulsion unknown | 122 | (14.8) | 155 | (9.2) |
| **Surgical intervention** | **65** | **7.9** | **76** | **4.5** |

FDA 0008

Reason for surgery

| | | | | |
|---|---|---|---|---|
| Medically necessary interventions during the study period | 13 | (1.6) | NA | (NA) |
| Patient request | 5 | (0.6) | NA | (NA) |
| Treatment of bleeding during study | NA | (NA) | 6 | (0.3) |
| Incomplete expulsion at study end | 39 | (4.7) | 48 | (2.9) |
| Ongoing pregnancy at study end | 8 | (1.0) | 22 | (1.3) |
| **Total** | **827** | **100** | **1681** | **100** |

*Note: Mifepristone 600 mg oral was administered on Day 1, misoprostol 400 µg oral was given on Day 3 (second visit).*

## INDICATION AND USAGE

Mifeprex is indicated for the medical termination of intrauterine pregnancy through 49 days' pregnancy. For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period in a presumed 28 day cycle with ovulation occurring at mid-cycle. The duration of pregnancy may be determined from menstrual history and by clinical examination. Ultrasonographic scan should be used if the duration of pregnancy is uncertain, or if ectopic pregnancy is suspected.

Any intrauterine device ("IUD") should be removed before treatment with Mifeprex begins.

Patients taking Mifeprex must take 400 µg of misoprostol two days after taking mifepristone unless a complete abortion has already been confirmed before that time (see DOSAGE AND ADMINISTRATION).

Pregnancy termination by surgery is recommended in cases when Mifeprex and misoprostol fail to cause termination of intrauterine pregnancy (see PRECAUTIONS).

## CONTRAINDICATIONS

Administration of Mifeprex and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any one of the following conditions:

- Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy);

- IUD in place (see INDICATION AND USAGE);

- Chronic adrenal failure;

- Concurrent long-term corticosteroid therapy;

- History of allergy to mifepristone, misoprostol or other prostaglandin;

• Hemorrhagic disorders or concurrent anticoagulant therapy;
• Inherited porphyrias.

Because it is important to have access to appropriate medical care if an emergency develops, the treatment procedure is contraindicated if a patient does not have adequate access to medical facilities equipped to provide emergency treatment of incomplete abortion, blood transfusions, and emergency resuscitation during the period from the first visit until discharged by the administering physician.

Mifeprex also should not be used by any patient who may be unable to understand the effects of the treatment procedure or to comply with its regimen. Patients should be instructed to review the Medication Guide and the PATIENT AGREEMENT provided with Mifeprex carefully and should be given a copy of the product label for their review. Patients should discuss their understanding of these materials with their health care providers, and retain the Medication Guide for later reference (see PRECAUTIONS).

**WARNINGS**

(see CONTRAINDICATIONS)

**1. Bleeding**

Vaginal bleeding occurs in almost all patients during the treatment procedure. According to data from the U.S. and French trials, women should expect to experience bleeding or spotting for an average of nine to 16 days, while up to 8% of all subjects may experience some type of bleeding for 30 days or more. Bleeding was reported to last for 69 days in one patient in the French trials. In general the duration of bleeding and spotting increased as the duration of the pregnancy increased.

In some cases, excessive bleeding may require treatment by vasoconstrictor drugs, curettage, administration of saline infusions, and/or blood transfusions. In the U.S. trials, 4.8% of subjects received administration of uterotonic medications and nine women (1.0%) received intravenous fluids. Vasoconstrictor drugs were used in 4.3% of all subjects in the French trials, and in 5.5% of women there was a decrease in hemoglobin of more than 2 g/dL. Blood transfusions were administered in one of 859 subjects in the U.S. trials and in two of 1800 subjects in the French trials. Since heavy bleeding requiring curettage occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

**2. Confirmation of Pregnancy Termination**

Patients should be scheduled for and return for a follow-up visit at approximately 14 days after administration of mifepristone to confirm that the pregnancy is completely terminated and to assess the degree of bleeding. Vaginal bleeding is not evidence of the termination of pregnancy. Termination can be confirmed by clinical examination or ultrasonographic scan. Lack of bleeding following treatment, however, usually indicates failure. Medical abortion failures should be managed with surgical termination.

FDA 0010

# PRECAUTIONS

## General

Mifeprex is available only in single dose packaging. Administration must be under the supervision of a qualified physician (see DOSAGE AND ADMINISTRATION).

The use of Mifeprex is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

There are no data on the safety and efficacy of mifepristone in women with chronic medical conditions such as cardiovascular, hypertensive, hepatic, respiratory or renal disease; insulin-dependent diabetes mellitus; severe anemia or heavy smoking. Women who are more than 35 years of age and who also smoke 10 or more cigarettes per day should be treated with caution because such patients were generally excluded from clinical trials of mifepristone.

Although there is no clinical evidence, the effectiveness of Mifeprex may be lower if misoprostol is administered more than two days after mifepristone administration.

## Information for Patients

Patients should be fully advised of the treatment procedure and its effects. Patients should be given a copy of the Medication Guide and the PATIENT AGREEMENT. (Additional copies of the Medication Guide and the PATIENT AGREEMENT are available by contacting Danco Laboratories at 1-877-4 Early Option) (1-877-432-7596). Patients should be advised to review both the Medication Guide and the PATIENT AGREEMENT, and should be given the opportunity to discuss them and obtain answers to any questions they may have. Each patient must understand:

- the necessity of completing the treatment schedule, including a follow-up visit approximately 14 days after taking Mifeprex;

- that vaginal bleeding and uterine cramping probably will occur;

- that prolonged or heavy vaginal bleeding is not proof of a complete expulsion;

- that if the treatment fails, there is a risk of fetal malformation;

- that medical abortion treatment failures are managed by surgical termination; and

- the steps to take in an emergency situation, including precise instructions and a telephone number that she can call if she has any problems or concerns.

Another pregnancy can occur following termination of pregnancy and before resumption of normal menses. Contraception can be initiated as soon as the termination of the pregnancy has been confirmed, or before the woman resumes sexual intercourse.

Patient information is included with each package of Mifeprex (see Medication Guide).

## Laboratory Tests

Clinical examination is necessary to confirm the complete termination of pregnancy after the treatment procedure. Changes in quantitative human Chorionic Gonadotropin (hCG) levels will not be decisive until at least 10 days after the administration of Mifeprex. A continuing pregnancy can be confirmed by ultrasonographic scan.

FDA 0011

The existence of debris in the uterus following the treatment procedure will not necessarily require surgery for its removal.

Decreases in hemoglobin concentration, hematocrit and red blood cell count occur in some women who bleed heavily. Hemoglobin decreases of more than 2 g/dL occurred in 5.5% of subjects during the French clinical trials of mifepristone and misoprostol.

Clinically significant changes in serum enzyme (serum glutamic oxaloacetic transaminase (SGOT), serum glutamic pyruvic transaminase (SGPT), alkaline phosphatase, gamma-glutamyltransferase (GT) activities were rarely reported.

**Drug Interactions**

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum levels of mifepristone). Furthermore, rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum levels of mifepristone).

Based on in vitro inhibition information, coadministration of mifepristone may lead to an increase in serum levels of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range, including some agents used during general anesthesia.

**Carcinogenesis, Mutagenesis, Impairment of Fertility**

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed. Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

The pharmacological activity of mifepristone disrupts the estrus cycle of animals, precluding studies designed to assess effects on fertility during drug administration. Three studies have been performed in rats to determine whether there were residual effects on reproductive function after termination of the drug exposure.

In rats, administration of the lowest oral dose of 0.3 mg/kg/day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effect on reproductive performance was observed. In a neonatal exposure study in rats, the administration of a subcutaneous dose of mifepristone up to 100 mg/kg on the first day after birth had no adverse effect on future reproductive function in males or females. The onset of puberty was observed to be slightly premature in female rats neonatally exposed to mifepristone. In a separate study in rats, oviduct and ovary malformations in female rats, delayed male puberty, deficient male sexual behavior, reduced testicular size, and lowered ejaculation frequency were noted after exposure to mifepristone (1 mg every other day) as neonates.

**Pregnancy**

Mifepristone is indicated for use in the termination of pregnancy (through 49 days' pregnancy) and has no other approved indication for use during pregnancy

*Teratogenic Effects*

Human Data

FDA 0012

Over 620,000 women in Europe have taken mifepristone in combination with a prostaglandin to terminate pregnancy. Among these 620,000 women, about 415,000 have received mifepristone together with misoprostol. As of May 2000 a total of 82 cases have been reported in which women with on-going pregnancies after using mifepristone alone or mifepristone followed by misoprostol declined to have a surgical procedure at that time. These cases are summarized in Table 2.

**Table 2**

**Reported Cases (as of May 2000) of On-going Pregnancies Not Terminated by Surgical Abortion at the End of Treatment with Mifepristone Alone or with Mifepristone-Misoprostol**

| | Mifepristone Alone | Mifepristone Misoprostol | Total |
|---|---|---|---|
| **Subsequently had surgical abortion** | 3 | 7 | 10 |
| *No abnormalities detected* | 2 | 7 | 9 |
| *Abnormalities detected (sirenomelia, cleft palate)* | 1 | 0 | 1 |
| **Subsequently resulted in live birth** | 13 | 13 | 26 |
| *No abnormalities detected at birth* | 13 | 13 | 26 |
| *Abnormalities detected at birth* | 0 | 0 | 0 |
| **Other/Unknown** | 26 | 20 | 46 |
| **Total** | 42 | 40 | 82 |

**Several reports in the literature indicate that prostaglandins, including misoprostol, may have teratogenic effects in human beings. Skull defects, cranial nerve palsies, delayed growth and psychomotor development, facial malformation and limb defects have all been reported after exposure during the first trimester.**

**Animal Data**

**Teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure level based on body surface area) were carried out. Because of the antiprogestational activity of mifepristone, fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from decreased progesterone levels.**

*Nonteratogenic Effects*

**The indication for use of Mifeprex in conjunction with misoprostol is for the termination of pregnancy through 49 days' duration of pregnancy (as dated from the first day of the last menstrual period). These drugs together disrupt pregnancy by causing decidual necrosis, myometrial contractions and cervical softening, leading to the expulsion of the products of conception.**

**Nursing Mothers**

**It is not known whether mifepristone is excreted in human milk. Many hormones with a similar chemical structure, however, are excreted in breast milk. Since the effects of mifepristone on infants are unknown, breast-feeding women should consult with their health care provider to decide if they should**

FDA 0013

discard their breast milk for a few days following administration of the medications.

**Pediatric Use**

**Safety and effectiveness in pediatric patients have not been established.**

**ADVERSE REACTIONS**

**The treatment procedure is designed to induce the vaginal bleeding and uterine cramping necessary to produce an abortion. Nearly all of the women who receive Mifeprex and misoprostol will report adverse reactions, and many can be expected to report more than one such reaction. About 90% of patients report adverse reactions following administration of misoprostol on day three of the treatment procedure. Those adverse events that occurred with a frequency greater than 1% in the U.S. and French trials are shown in Table 3.**

**Bleeding and cramping are expected consequences of the action of Mifeprex as used in the treatment procedure. Following administration of mifepristone and misoprostol in the French clinical studies, 80 to 90% of women reported bleeding more heavily than they do during a heavy menstrual period (see WARNINGS, Bleeding for additional information). Women also typically experience abdominal pain, including uterine cramping. Other commonly reported side effects were nausea, vomiting and diarrhea. Pelvic pain, fainting, headache, dizziness, and asthenia occurred rarely. Some adverse reactions reported during the four hours following administration of misoprostol were judged by women as being more severe than others; the percentage of women who considered any particular adverse event as severe ranged from 2 to 35% in the U.S. and French trials. After the third day of the treatment procedure, the number of reports of adverse reactions declined progressively in the French trials, so that by day 14, reports were rare except for reports of bleeding and spotting.**

**Table 3**

**Type of Reported Adverse Events Following Administration of**

**Mifepristone and Misoprostol in the U.S. and French Trials\* (percentages)**

|                            | U.S. Trials | French Trials |
|----------------------------|-------------|---------------|
| Abdominal Pain (cramping)  | 96          | NA            |
| Uterine cramping           | NA          | 83            |
| Nausea                     | 61          | 43            |
| Headache                   | 31          | 2             |
| Vomiting                   | 26          | 18            |
| Diarrhea                   | 20          | 12            |

FDA 0014

FDA 0015

| Adverse Reaction | | |
|---|---|---|
| Dizziness | 12 | 1 |
| Fatigue | 10 | NA |
| Back pain | 9 | NA |
| Uterine hemorrhage | 5 | NA |
| Fever | 4 | NA |
| Viral infections | 4 | NA |
| Vaginitis | 3 | NA |
| Rigors (chills/shaking) | 3 | NA |
| Dyspepsia | 3 | NA |
| Insomnia | 3 | NA |
| Asthenia | 2 | 1 |
| Leg pain | 2 | NA |
| Anxiety | 2 | NA |
| Anemia | 2 | NA |
| Leukorrhea | 2 | NA |
| Sinusitis | 2 | NA |
| Syncope | 1 | NA |
| Decrease in hemoglobin greater than 2 g/dL | NA | 6 |
| Pelvic pain | NA | 2 |
| Fainting | NA | 2 |

* Only adverse reactions with incidence >1% are included.

## OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than threefold that recommended for termination of pregnancy. If a patient ingests a massive overdose, she should be observed closely for signs of adrenal failure.

The oral acute lethal dose of mifepristone in the mouse, rat and dog is greater than 1000 mg/kg (about 100 times the human dose recommended for termination of pregnancy).

## DOSAGE AND ADMINISTRATION

Treatment with Mifeprex and misoprostol for the termination of pregnancy requires three office visits by the patient. Mifeprex should be prescribed only by physicians who have read and understood the prescribing information. Mifeprex may be administered only in a clinic, medical office, or hospital, by or under the supervision of a physician, able to assess the gestational age of an embryo and to diagnose ectopic pregnancies. Physicians must also be able to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

**Day One: Mifeprex Administration**

Patients must read the Medication Guide and read and sign the PATIENT AGREEMENT before Mifeprex is administered.

Three 200 mg tablets (600 mg) of Mifeprex are taken in a single oral dose.

**Day Three: Misoprostol Administration**

The patient returns to the healthcare provider two days after ingesting Mifeprex. Unless abortion has occurred and has been confirmed by clinical examination or ultrasonographic scan, the patient takes two 200 µg tablets (400 µg) of misoprostol orally.

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms (see ADVERSE REACTIONS). The patient should be given instructions on what to do if significant discomfort, excessive bleeding or other adverse reactions occur and should be given a phone number to call if she has questions following the administration of the misoprostol. In addition, the name and phone number of the physician who will be handling emergencies should be provided to the patient.

**Day 14: Post-Treatment Examination**

Patients will return for a follow-up visit approximately 14 days after the administration of Mifeprex. This visit is very important to confirm by clinical examination or ultrasonographic scan that a complete termination of pregnancy has occurred.

According to data from the U.S. and French studies, women should expect to experience bleeding or spotting for an average of nine to 16 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at this visit, however, could indicate an incomplete abortion.

Patients who have an ongoing pregnancy at this visit have a risk of fetal malformation resulting from the treatment. Surgical termination is recommended to manage medical abortion treatment failures (see PRECAUTIONS, Pregnancy).

Adverse events, such as hospitalization, blood transfusion, ongoing pregnancy, or other major complications following the use of Mifeprex and misoprostol must be reported to Danco Laboratories. Please provide a brief clinical and administrative synopsis of any such adverse events in writing to:

FDA-0016

**Medical Director**
**Danco Laboratories, LLC**
**P.O. Box 4816**
**New York, NY 10185**
**1-877-4-Early Option (1-877-432-7596)**

**For immediate consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

**HOW SUPPLIED**

**Mifeprex will be supplied only to licensed physicians who sign and return a Prescriber's Agreement. Distribution of Mifeprex will be subject to specific requirements imposed by the distributor, including procedures for storage, dosage tracking, damaged product returns and other matters. Mifeprex is a prescription drug, although it will not be available to the public through licensed pharmacies.**

**Mifeprex is supplied as light yellow, cylindrical, bi-convex tablets imprinted on one side with ''MF.'' Each tablet contains 200 mg of mifepristone. Tablets are packaged in single dose blister packets containing three tablets and are supplied in individual cartons (National Drug Code 6487500103).**

**Store at $25^0$C ($77^0$F); excursions permitted to 15-30$^0$C (59-86$^0$F) [see USP Controlled Room Temperature].**

**Manufactured for:**

**Danco Laboratories, LLC**
**P.O. Box 4816**
**New York, NY 10185**
**1-877-4 Early Option (1-877-432-7596)**

**www.earlyoptionpill.com**

FDA 0017

Case 1:17-cv-00493-JRD-RD Document 224 Filed 07/02/25 Page 1 of 317 PageID.7764
PageID.7764

**MEMORANDUM**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FOOD AND DRUG ADMINISTRATION
CENTER FOR DRUG EVALUATION AND RESEARCH

DATE:       September 28, 2000

FROM:                                           /S/                  SEP 2 8 2000

SUBJECT:                       Memo

TO:         NDA 20-687 MIFEPREX (mifepristone) Population Council

This memo documents the approval action concerning the Population Council's NDA for mifepristone for the medical termination of intrauterine pregnancy through 49 days' pregnancy. The application was initially submitted to the Food and Drug Administration (FDA) on March 14, 1996. The Reproductive Health Drugs Advisory Committee met on July 19, 1996 and voted that benefits exceeded risk for this drug product with 6-yes, 0-no, and 2 abstentions. An approvable action letter was issued September 18, 1996 citing deficiencies in areas of Clinical (distribution system), Chemistry/Manufacturing and Controls, Biopharmaceutics, and Labeling. A complete response was received August 18, 1999. The last action by the Office was on February 18, 2000. That approvable action letter listed application deficiencies consisting of Chemistry/Manufacturing and Controls, Labeling, and the Distribution System issues. The Population Council submitted a complete response on March 30, 2000. After a brief summary of effectiveness and safety, this memo addresses those outstanding issues listed in the last action letter, Phase 4 commitments, and other issues.

Summary of Effectiveness and Safety

Effectiveness and safety data were derived from one U.S. clinical trial and two French trials. Effectiveness was defined as the complete expulsion of products of conception without the need for surgical intervention.

The U.S. trial consisted of 859 women providing safety data and 827 women providing effectiveness data for gestations of 49 days or less, dated from the last menstrual period. Demographic data showed racial composition of the U.S. trial was similar to the overall U.S. general population. Medical abortion was complete in 92.1% of 827 subjects. Surgical intervention was performed in 7.9% of subjects: 1.6% had medically indicated interventions (1.2% for heavy bleeding), 4.7% had incomplete abortions, 1.0% had ongoing pregnancies, and 0.6% had intervention at the patient's request. One of the 859 patients received a blood transfusion.

The two French trials enrolled a total of 1,681 women providing effectiveness outcomes and 1,800 women providing safety information. Medical abortion was complete in 95.5% of the 1681 subjects. Surgical intervention was performed in 4.5% of subjects: 0.3% for bleeding, 2.9% for incomplete abortions, and 1.3% for ongoing pregnancies. Of the 1,800 women, 2 patients received blood transfusions.

The Advisory Committee reviewed the French data in 1996 and voted 6-yes and 2-no for data supporting efficacy, 7-yes and 1-abstention for data supporting safety. As stated above, the overall vote for benefits exceeding risk was 6-yes, 0-no, and 2-abstentions. During the second review cycle in 1999, the committee received a copy of the U.S. study report, as they requested, to provide FDA with comments. None were received. The U.S. trial data confirms the effectiveness and safety of the product.

**APPEARS THIS WAY
ON ORIGINAL**

#### Chemistry/Manufacturing

In May, 2000 the Population Council informed the Division of Reproductive and Urologic Drug Products that the bulk drug substance maker had changed manufacturing processes last summer. New analytic, physical, and stability data were received and reviewed and found to be adequate to ensure the quality of the drug manufacturing was preserved.

An inspection of the bulk drug substance maker was performed on July 24-28, 2000. Deficiencies were cited and the manufacturer corrected these. These corrections were found acceptable.

Because the drug is being distributed directly to qualified physicians, there is minimal chance for drug name confusion and I agree with the name, Mifeprex.

#### Labeling

Labeling is important to educate prescribers and patients about the safe and effective use of the drug and to inform health professionals about adverse event risks. The 1996 Advisory Committee strongly supported education of users of mifepristone. By coupling professional labeling with other educational interventions such as the Medication Guide, Patient Agreement, and Prescriber's Agreement, along with having physician qualification requirements of abilities to date pregnancies accurately and diagnose ectopic pregancies (and other requirements), goals of safe and appropriate use may be achieved. The drug's labeling is now part of a total risk management program that will be summarized below. The professional labeling, Medication Guide, Patient Agreement, and Prescriber's Agreement will together constitute the approved product labeling to ensure any future generic drug manufacturers will have the same risk management program.

The labeling for mifepristone has been revised to provide information about how to report adverse events. FDA and the Population Council agree that a black box will highlight special items related to the drug. In addition, FDA has determined that a Medication Guide for this drug will help ensure dispensers provide important information to patients to enhance compliance with the regimen for safety and efficacy. Furthermore, a patient agreement fosters active patient education and participation in this regimen. The Population Council will provide these educational materials (the professional labeling, the Medication Guide, the patient agreement form, and the Prescriber's Agreement form). The professional labeling, Medication Guide, Patient Agreement, and Prescriber's Agreement must be read, understood, and attested to by physicians who meet prescribing qualifications (discussed below).

##### Black Box

21 CFR 201.57(e) permits FDA to require a black box warning for special problems, particularly those that may lead to death or serious injury. The Population Council agreed in its July 5, 2000 submission to a black box warning. It was agreed that the box would contain the following:

> "If Mifeprex results in incomplete abortion, surgical intervention may be necessary. Prescribers should determine in advance whether they will provide such care themselves or through other providers. Prescribers should also give patients clear instructions of whom to call and what to do in the event of an emergency following administration of Mifeprex.
>
> Prescribers should make sure the patients receive and have an opportunity to discuss the Medication Guide and Patient Agreement."

##### Misoprostol Administration

The approvable letter issued by FDA on 2/18/2000 agreed to the Population Council's statement that women could have the option of taking misoprostol on Day 3 either at home or at the prescriber's office. However, data provided by the Population Council supporting home use was re-reviewed and found not to provide substantial evidence for safety and efficacy. The data were anecdotal off-label experience with

2

a vaginal misoprostol regimen, an observational study about home use in Guadeloupe, and a U.S. clinical study of home use of a different regimen with different drug doses. The only study that commented on whether home use led to correct use was the Guadeloupe study reporting that 4% of patients who took misoprostol at home did it incorrectly. Returning to the health care provider on Day 3 for misoprostol, as in the U.S. clinical trial, assures that the misoprostol is correctly administered. This requirement has the additional advantage of contact between the patient and health care provider to provide ongoing care and to reinforce the need to return on Day 14 to confirm that expulsion has occurred.

Early in drug development, a mandatory observation period of 3-4 hours was instituted in clinical trials worldwide when a prostaglandin analogue, sulprostone, was used with mifepristone and felt to have some cardiovascular risk. This drug is no longer being used with mifepristone and is not a marketed drug in the U.S.; therefore, the rationale for an observation period is moot. There is no more likelihood of an adverse event occurring in the few hours after misoprostol administration than during the entire study period.

Therefore, as a consequence of this re-evaluation, the labeling currently reads that the patient returns on Day 3 for misoprostol and is given instructions about adverse events and whom to contact for questions and emergencies.

### Access to Health Care and Emergency Services

FDA agreed with the Population Council that access to health care and emergency services is critical for the safe and effective use of the drug. The clinical trials ensured access to services. The labeling has a black box highlighting the possible need for surgical intervention and either the provision of access to these services by the prescriber or through referral. The labeling has a contraindication if there is no access to medical facilities for emergency services. The Patient Agreement emphasizes the need to know what to do in the case of an emergency.

### Patient Agreement Form

Patients should be informed about the indication of the drug and how it is given. They must understand the type of regimen they are about to commit to and its risks and benefits. The signed agreement form will be given to the patient for her reference and another kept in the medical record. The Population Council has committed to auditing prescribers to ascertain whether they have obtained signed copies of the Patient Agreement forms.

### Biopharmaceutics

This review cycle, the clinical biopharmaceutical reviewers evaluated new data in the published literature regarding the metabolism of mifepristone by the P450 3A4 system. Mifepristone is a substrate and this may inhibit drug metabolism of certain drugs and induce metabolism of others. This information was placed in the professional labeling and patients are instructed in the Medication Guide that use of other drugs may interfere with actions of mifepristone and misoprostol.

### Pharmacology-Toxicology

Current literature on the effects of human fetal exposure to mifepristone and misoprostol or mifepristone alone was reviewed to ensure risk information was current. Many of the case reports of malformation concern the unsuccessful use of misoprostol for abortion, resulting in limb, facial, cranial, and other abnormalities. Many reports were retrospective in nature, subject to reporting and recall bias. Nevertheless, the risk of malformation is very important to address. This drug's indication is for pregnancy termination. The labeling, Medication Guide, process of obtaining patient agreement on medical abortion, and the commitment of the physicians through their signed Prescriber's Agreement are all meant to ensure women are completely informed about the process and make a commitment to follow through.

**APPEARS THIS WAY
ON ORIGINAL**

3

The labeling for Mifeprex states that it is used with misoprostol for termination of pregnancy of 49 days or less. Human data on mifepristone and misoprostol used in this timeframe is available. Safety Update Report #3 submitted on March 31, 2000 contains Exelgyn Laboratories Periodic Safety Update Report #9 for the period of September 1, 1998 to November 30, 1999. It lists 38 on-going pregnancies with mifepristone plus misoprostol. The Lancet published a letter in July 1998 from Exelgyn in which they mention that they had reviewed 71 cases of continuing pregnancies after failed early termination of pregnancy occurring from 1987 to 1998 and found no reported cases of malformation associated with use of mifepristone and misoprostol. There was one report of sirenomelia and cleft palate in a patient who had a therapeutic termination at week 7 gestation associated with mifepristone use alone. On July 6, 1999 the European Summary of Product Characteristics contains a statement for mifepristone that in humans, the reported cases do not allow a causality assessment for mifepristone alone or used with a prostaglandin. On August 21, 2000 the sponsor provided Exelgyn's 12/1/99 to 5/31/00 Periodic Safety Update on pregnancy outcomes following early pregnancy exposure. The current labeling has these new data on 82 pregnancies exposed to mifepristone only (40) and mifepristone used with misoprostol (42). FDA agrees that no conclusion can be made from the data at this time. Information on the possibility of a risk of malformation, including the above information as well as the anecdotal reports, is nevertheless included in the professional labeling, Medication Guide, and Patient Agreement. The Population Council has committed to continuing ongoing surveillance of human malformation risk.

### Medication Guide

This product will be approved with a Medication Guide which dispensers must provide with the drug. It is important for patients to be fully informed about the drug, as well as the need for follow up, especially on Day 14 to confirm expulsion. A Medication Guide was determined to be necessary to patients' safe and effective use of the drug. The drug product is important to the health of women and the Medication Guide will encourage patient adherence to directions for use. Patient adherence to directions for use and visits is critical to the drug's effectiveness and safety.

### Distribution System

Since 1996, FDA and the Population Council have agreed, as publicly discussed with the Reproductive Drug Products Advisory Committee, that once approved, the drug will be distributed directly to physicians. It will not be available from pharmacies. There were also discussions about the qualifications of the physicians receiving mifepristone for dispensing. The Committee also stated it was important that women have access to medical abortion as this new therapeutic option may offer women avoidance of a surgical procedure.

In January 2000, the Population Council provided its initial plan for drug distribution. This plan was resubmitted in its complete response of March 30, 2000. This plan had acceptably addressed the issue of physical security of the drug. The distribution system plan stated specific requirements imposed on and by distributors of the drug, including procedures for storage, dosage tracking, damaged product returns, and other matters. See Subpart H of this memo for more details. Other aspects of the distribution system are addressed below.

### Physician Qualifications

Physician qualifications were discussed within CDER, the Agency, and with the Population Council. FDA also discussed physician qualifications with a special government employee with expertise in early pregnancy. The Population Council proposed that the drug be directly distributed to qualified physicians, as opposed to other types of health care professionals (midwives, physician's assistants, nurse practitioners, etc.). This restriction was supported by the discussions of the 1996 Advisory Committee. In fact, the clinical trial data was derived from the experience of physicians using this drug. Thus, physicians remain the initial population who will receive this drug for dispensing. This does not preclude another type of health care provider, acting under the supervision of a qualified physician, from

APPEARS THIS WAY
ON ORIGINAL

4

dispensing the drug to patients, provided state laws permit this. Should data be provided to amend the restriction to physicians, FDA will consider them.

The types of skills physicians had in the U.S. clinical trial were: 1) the ability to use ultrasound and clinical examination to date pregnancies and diagnose ectopic pregnancies, 2) the ability to perform surgical procedures, including dilation and curettage, vacuum suction, and/or surgical abortions, for bleeding or incomplete abortion, and, 3) they had privileges at medical facilities to provide emergency resuscitation, transfusion, hospitalization, etc. Physicians were trained to use the drug per protocol. Fourteen of the seventeen physicians in the U.S. clinical trial were obstetricians/gynecologists. All patients were within one hour of emergency facilities or the facilities of the principle investigator.

The role of ultrasound was carefully considered. In the clinical trial, ultrasound was performed to ensure proper data collection on gestational age. In practice, dating pregnancies occurs through using other clinical methods, as well as through using ultrasound. Ultrasound information can be provided to the prescribing physicians to guide treatment, but this information can be obtained through consultation referral from an ultrasound provider and does not necessarily need to be obtained by the prescriber him/herself. The labeling recommends ultrasound evaluation as needed, leaving it to the medical judgement of the physician.

The Population Council proposed that any physician who could date pregnancies and diagnose ectopic pregnancies should be able to receive the drug from the distributor. These two qualifications alone limit the number of physicians who will be eligible to receive mifepristone from the Population Council's distributor(s) to those physicians who are very familiar with managing early pregnancies. These two qualifications also are performance-based standards and do not limit providers of mifepristone to specific medical subspecialties. Education about the use of the drug is described above in the Labeling section of this memo. Because qualified physicians will be using this drug, there is no need for special certification programs. The current labeling and distribution system states physician need not have skills for handling surgical interventions, but could provide referral to services for incomplete abortion and emergency care. The Population Council stated that current medical practice is structured on referral of patients who need surgery (for example, women with a spontaneous incomplete abortion or a cardiologist's patient who needs by-pass grafts) to a physician possessing the skills to address the problem. Moreover, within the U.S. clinical trial, 11 patients out of roughly 850 patients needed surgical intervention to handle bleeding, the most important urgent adverse event associated with this drug, and 3 of these patients were handled by non-principal investigators such as the emergency room and non-study gynecologist. This suggests that patients will get the needed surgical intervention by either their physician or another physician with the needed skills. Referral to a hospital for emergency services does not mean having admitting privileges, but having the ability and the responsibility to direct patients to hospitals, if needed. The professional labeling and the Medication Guide highlight that surgery may be needed and patients need to know if the provider of mifepristone will furnish surgical intervention or if the patient will be referred. If the latter, the treating health care provider must give the patient the name, address, and phone number of this referred provider. To ensure that the quality of care is not different for patients who are treated by physicians who have the skill for surgical intervention (as in the clinical trials) compared to those treated by physicians who must refer patients for surgical intervention, FDA has proposed and the Population Council has agreed to structure a Phase 4 monitoring study. This monitoring study incorporates study questions of four of the original six Phase 4 commitments. See Phase 4 Commitments for additional information.

Finally, the one hour travel distance restriction in the clinical trial was intended to ensure access by patients to emergency or health care services. This concern has been dealt with through the labeling, which makes it clear that if there isn't adequate access to emergency services, the medication is contraindicated.

**APPEARS THIS WAY
ON ORIGINAL**

5

### Subpart H

In the February 18, 2000 approvable letter, FDA stated that the eventual approval of this drug would be under Subpart H. (21 CFR 314.500-314.560). This subpart applies to certain new drugs that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments. FDA has determined that the termination of an unwanted pregnancy is a serious condition within the scope of Subpart H. The meaningful therapeutic benefit over existing surgical abortion is the avoidance of a surgical procedure. Subpart H applies when FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, such as to certain physicians with special skills or experience. In the case of mifepristone, the Population Council proposed and FDA agreed that this drug will be directly distributed via an approved plan that ensures the physical security of the drug to physicians who meet specific qualifications. Under 21 CFR 314.520, distribution of mifepristone is restricted as described below.

- Mifepristone must be provided by or under the supervision of a physician who meets the following qualifications:
  - Ability to assess the duration of pregnancy accurately
  - Ability to diagnose ectopic pregnancies
  - Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through other qualified physicians, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary
  - Has read and understood the prescribing information of Mifeprex
  - Must provide each patient with a Medication Guide and must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, given her an opportunity to read and discuss both the Medication Guide and the Patient Agreement, obtain her signature on the Patient Agreement and must sign it as well
  - Must notify the sponsor or its designate in writing as discussed in the Package Insert under the heading DOSEAGE AND ADMINISTRATION in the event of an on-going pregnancy, which is not terminated subsequent to the conclusion of the treatment procedure
  - Must report any hospitalization, transfusion or other serious events to the sponsor or its designate
  - Must record the Mifeprex package serial number in each patient's record

- With respect to the aspects of distribution other than physician qualifications described above, distribution of Mifeprex will be in accordance with the system described in the Population Council's submission of March 30, 2000, which includes the following:
  - Secure manufacturing, receiving, and holding areas for the drug
  - Secure shipping procedures, including tamper-proof seals
  - Controlled returns procedures
  - Tracking system ability to trace individual packages to the patient level, while maintaining patient confidentiality
  - Use of authorized distributors and agents with necessary expertise to handle distribution requirements for the drug
  - Provision of drug through a direct, confidential physician distribution system that ensures only qualified physicians will receive the drug for patient dispensing

The Population Council agreed to approval under Subpart H in their letter of September 15, 2000.

**APPEARS THIS WAY
ON ORIGINAL**

6

Phase 4 Commitments

In 1996, the Population Council committed to 6 post-marketing studies: 1) to monitor the adequacy of the distribution and credentialing system; 2) to follow up on the outcome of a representative sample of mifepristone treated women who have surgical abortion because of method failure; 3) to assess the long term effects of multiple use of the regimen; 4) to ascertain frequency with which women follow the complete treatment regimen and the outcome of those who do not; 5) to study the safety and efficacy of the regimen in women under age 18, over age 35, and who smoke; 6) to ascertain the effect of the regimen on children born after treatment failure.

During this review cycle, items 1, 2, 4 and 5 were revised and integrated into a monitoring study to ensure providers who did not have surgical intervention skills and referred patients for surgery had similar patient outcomes as those patients under the care of physicians who possessed surgical skills (such as those in the clinical trial). This study specifically addresses adequacy of qualifications (#1). FDA reviewed the protocols from the Population Council submitted on September 7, 2000 and provided a revised protocol on September 13, 2000 in which the investigators collect data on safety outcomes (#2), return for their follow up visits (#4), and include all ages (#5) and collect smoking status (#5). Commitment #2 was defined by the Advisory Committee discussions of 1996 surrounding the question of whether certain physician specialties would have higher rates of problems encountered with medical abortion. This study specifically will investigate the performance of specialties with surgical skills compared to those that refer for surgical interventions with respect to incidence of medical abortion failures.

The Population Council agrees to study ongoing pregnancies and their outcomes through a surveillance, reporting, and tracking system (#6). This protocol summary and a summary for the monitoring system was received on September 19, 2000 and both were found to be adequate.

The Population Council asked that Commitment #3 (to assess the long term effects of multiple use of the regimen) be waived because it would not be feasible to identify and enroll sufficient numbers of repeat users of the drug, especially given privacy issues. In addition, the pharmacology of mifepristone does not suggest any carry over effect after one-time administration. The Agency agrees with this assessment.

As a note, this cycle the Population Council provided new data concerning Commitment #5 (to study the safety and efficacy of the regimen in women under age 18, over age 35, and who smoke), from Spitz et al. This study had 106 women ages 35 years or older as well as 51 subjects under age 20, all of whom were 49 days or less since their last menstrual period. The data on the older women is informative and of meaningful sample size. FDA agrees there is no biological reason to expect menstruating females under age 18 to have a different physiological outcome with the regimen. The Sptiz data actually suggests a trend towards increased success of medical abortion with younger patients. However, as these age groups were not part of the NDA indication and the data on safety and effectiveness were only reviewed for the indication's age group (18-35 years of age), the trials excluded patients younger than 18 years old, and the raw data from Sptiz have not been submitted for review, the labeling states the safety and efficacy in these groups have not been studied. The Population Council will collect outcomes in their Phase 4 studies of women of all ages to further study this issue. With respect to smokers, the Population Council will study smokers of various ages to collect safety information. In sum, the changes in postmarketing commitments reflect current postmarketing questions given establishment of final labeling, Medication Guide, and distribution system, along with availability of additional clinical data with the drug since 1996.

The postmarketing audit of signed Patient Agreement forms was discussed above.

**APPEARS THIS WAY
ON ORIGINAL**

7

Public Comments Considered

The Food and Drug Administration received over 1,000 letters or emails from the public about mifepristone. Most comments objected to various restrictions of the drug's distribution. For example, many letters opposed press reports of an alleged FDA public registry of doctors who dispense mifepristone. Other letters focused on the research uses of mifepristone for neurologic and oncologic diseases and the concern that restricting distribution after approval would constrain off-label uses. Still other letters expressed misunderstanding that experimental indications that are subject to INDs would be limited by an approval of mifepristone with distribution restrictions. These comments were reviewed and considered.

Risk Management Program

Risk management for a drug has the goal of optimizing the use of a product by maximizing its benefits and minimizing its risks. Interventions to manage risk include education to physicians, patients, and the public, labeling (including warnings, precautions, contraindications, dosage and administration, and Medication Guide), restriction of product use or supply, and packaging changes. This drug is being approved under Subpart H (restrictions on distribution) as part of the risk management program. The Population Council and FDA have identified the areas below, among others, that contribute to drug safety and effectiveness:

1. Proper selection of patients via physicians who are qualified to do so by dating pregnancies and diagnosing ectopics.
2. Qualified physicians to administer or supervise the administration of the medication
3. Compliance with the regimen by physicians and patients through education and monitoring
4. Safety and effectiveness information that fully informs patients and physicians about the risks and benefits of the treatment
5. Evaluation of physician qualifications through Phase 4 studies has been discussed in above sections.
6. Physical packaging in unit of dosing to ensure proper dose and provision of Medication Guide with each dose
7. Active patient participation in the treatment through the Patient Agreement and Medication Guide with an audit of signed Patient Agreement to ensure compliance
8. Active programs to get physicians to report adverse events and ongoing pregnancies to provide accurate risk information
9. Commitment to review and revise the risk management program for improved public health

All components of this risk management program have been discussed above, including the Medication Guide, the labeling that includes the Prescriber's and Patient Agreement forms, approval under Subpart H, and Phase 4 studies to evaluate risk management interventions and to gather data on risks.

In summary, all approval issues related to the NDA have been addressed adequately.

APPEARS THIS WAY
ON ORIGINAL

8

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

**FINAL deemed REMS REVIEW**

| | |
|---|---|
| **Date:** | June 3, 2011 |
| **To:** | (b) (6) |
| **Through:** | (b) (6) |
| **From:** | (b) (6) |

| | |
|---|---|
| **Subject:** | Review of Risk Evaluation and Mitigation Strategy |
| **Drug Name:** | mifepristone (Mifeprex) |
| **Application Type/Number:** | NDA 20-687 |
| **Applicant:** | Danco Laboratories, LLC |
| (b) (6) **#:** | 2008-1841 |
| (b) (6) | 257 |

# 1 INTRODUCTION

This is the [blank] (b) (6) final review of the Risk Evaluation and Mitigation Strategy (REMS) for Mifeprex (mifepristone).

Mifeprex was approved for the medical termination of intrauterine pregnancy through 49 days' pregnancy on September 28, 2000 under 21 CFR 314 Subpart H.

Since approval, mifepristone has been available only through a restricted distribution program that requires prescribers to be enrolled to be able to order Mifeprex and it can only be dispensed in a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber. Mifeprex is not distributed to or dispensed through retail pharmacies. Finally, before dispensing Mifeprex, patients must sign an agreement form.

Mifepristone was included on the list of products deemed to have in effect an approved risk evaluation and mitigation strategy (REMS) under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007. The spnsors of such listed products were required to submit a REMS propoal by September 21, 2008. The sponsor (Danco) submitted a proposal on September 16, 2008. The final proposal submitted May 27, 2011 incorported the elements from the approved risk management program.

# 2 MATERIALS REVIEWED

We reviewed the following submissions:

- Proposed REMS and REMS Supporting Document, submissions of September 16, 2008, December 9, 2008, November 8, 2010, May 19, 2011, May 27, 2011

# 3 RESULTS OF REVIEW – Risk Evaluation and Mitigation Strategy (REMS)

## 3.1 Goal

The goals of the REMS are to:

- To provide information to patients about the benefits and risks of MIFEPREX before they make a decision whether to take the drug.

- To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe MIFEPREX and are able to assure patient access to appropriate medical facilities to manage any complications.

## 3.2 REMS Elements

### 3.2.1 Medication Guide

Reference ID: 2956361

Supp.PCSF4

FDA 0232

A Medication Guide will be dispensed with each MIFEPREX prescription in accordance with 21 CFR 208.24.

### 3.2.1 Communication Plan

The Mifeprex REMS does not include a Communication Plan

### 3.2.2 Elements to Assure Safe Use

1. **Healthcare providers who prescribe MIFEPREX will be specially certified**.

   Danco will ensure that healthcare providers who prescribe MIFEPREX are specially certified.

   a. To become specially certified, each prescriber must complete and fax to the MIFEPREX distributor the one-time Prescriber's Agreement, agreeing that they meet the qualifications and will follow the guidelines outlined in the Prescriber's Agreement.

   b. The following materials are part of the REMS and are appended:

      - Prescriber's Agreement
      - Patient Agreement

2. **MIFEPREX will be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals.**

   Danco will ensure that MIFEPREX will only be available to be dispensed in a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber.  MIFEPREX will not be distributed to or dispensed through retail pharmacies.

3. **MIFEPREX will only be dispensed to patients with documentation of safe use conditions.**

   Danco will ensure that MIFEPREX will only be dispensed to patients with documentation of the following safe use conditions:

   a. The patient has completed and signed the Patient Agreement, and the Patient Agreement has been placed in the patient's medical record.

   b. The patient has been provided copies of the signed Patient Agreement and the Medication Guide.

Reference ID: 2956361

Supp.PCSF5                                                              FDA 0233

### 3.2.3      Implementation System

The Implementation System will include the following:

1. Distributors who distribute MIFEPREX will be certified.  To become certified, distributors must agree to:

    a. Ship drug only to site locations identified by specially certified prescribers in signed Prescriber's Agreements, and maintain secure and confidential records of shipments.

    b. Follow all distribution guidelines, including those for storage, tracking package serial numbers, proof of delivery, and controlled returns.

2. Danco will assess the performance of the certified distributors with regard to the following:

    a. Whether a secure, confidential and controlled distribution system is being maintained with regard to storage, handling, shipping, and return of MIFEPREX.

    b. Whether MIFEPREX is being shipped only to site locations identified by specially certified prescribers in the signed Prescriber's Agreement and only available to be dispensed to patients in a clinic, medical office, or hospital by or under the supervision of a specially certified prescriber.

3. If Danco determines the distributors are not complying with these requirements, Danco will take steps to improve their compliance.

### 3.2.4      Timetable for Submission of Assessments

Danco will submit REMS assessments to the FDA one year from the date of the approval of the REMS and every three years thereafter.  To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the assessment reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment.  Danco will submit each assessment so that it will be received by the FDA on or before the due date.

## 3.3      REMS Assessment Plan

The REMS assessment reports will include the following:

1. Number of prescribers enrolled (cumulative)

2. Number of new prescribers enrolled during reporting period

3. Number of prescribers ordering MIFEPREX during reporting period

Reference ID: 2956361

4. Number of healthcare providers who attempted to order MIFEPREX who were not enrolled. Describe actions taken (during reporting period and cumulative)

5. Number of women exposed to MIFEPREX (during reporting period and cumulative)

6. Copies of MedWatch forms for each of the following adverse events during the assessment period; and for each of the following adverse events, the cumulative number from the date of approval of Mifeprex up to the approval date of the REMS, the number for each reporting period, and the cumulative number since the approval date of Mifeprex:

   ▪ On-going pregnancies not terminated subsequent to the conclusion of the treatment procedure

   ▪ Women hospitalized due to complications

   ▪ Women requiring transfusion(s) of two or more units of packed cells or whole blood, or having a hemoglobin of 6 gm/dL or less or a hematocrit of 18% or less

   ▪ Serious infection, sepsis

   ▪ Death

   ▪ Other serious and unexpected adverse events

7. Summary and analysis of any program deviations and corrective action taken

8. Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed

9. Per section 505-1(g)(3)(B) and (C), information on the status of any postapproval study or clinical trial required under section 505(o) or otherwise undertaken to investigate a safety issue. With respect to any such postapproval study, you must include the status of such study, including whether any difficulties completing the study have been encountered. With respect to any such postapproval clinical trial, you must include the status of such clinical trial, including whether enrollment has begun, the number of participants enrolled, the expected completion date, whether any difficulties completing the clinical trial have been encountered, and registration information with respect to requirements under subsections (i) and (j) of section 402 of the Public Health Service Act. You can satisfy these requirements in your REMS assessments by referring to relevant information included in the most recent annual report required under section 506B and 21 CFR 314.81(b)(2)(vii) and including any updates to the status information since the annual report was prepared. Failure to comply

with the REMS assessments provisions in section 505-1(g) could result in enforcement action.

## 4   DISCUSSION/CONCLUSION

During a face-to-face meeting with Danco on April 28, 2011, FDA and Danco agreed on the REMS and REMS assessment parameters as outlined above and attached (see Attachment A).

## 5   RECOMMENDATION

The REMS submitted May 27, 2011 is acceptable. The REMS should be approved.

**ATTACHMENTS**
- Mifeprex REMS
- Mifeprex Prescriber's Agreement
- Mifeprex Patient Agreement
- Interim Review #1 dated February 11, 2010
- Interim Review #2/                (b) (6) Background Document dated December 6, 2010

6

NDA 20-687 MIFEPREX (mifepristone) Tablets, 200 mg

Danco Laboratories, LLC
PO Box 4816
New York, NY 10185

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

## I.   GOALS

A.   To provide information to patients about the benefits and risks of MIFEPREX before they make a decision whether to take the drug.

B.   To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe MIFEPREX and are able to assure patient access to appropriate medical facilities to manage any complications.

## II.   REMS ELEMENTS

A.   <u>Medication Guide</u>

1.   A Medication Guide will be dispensed with each MIFEPREX prescription in accordance with 21 CFR 208.24.

2.   Please see the appended Medication Guide.

B.   <u>Elements to Assure Safe Use</u>

1.   Healthcare providers who prescribe MIFEPREX will be specially certified.

Danco will ensure that healthcare providers who prescribe MIFEPREX are specially certified.

a.   To become specially certified, each prescriber must complete and fax to the MIFEPREX distributor the one-time Prescriber's Agreement, agreeing that they meet the qualifications and will follow the guidelines outlined in the Prescriber's Agreement.

b.   The following materials are part of the REMS and are appended:

i.   Prescriber's Agreement.

ii.   Patient Agreement.

(b) (6);
(b) (4) 038268/000001 - 3250409 v1

2. MIFEPREX will be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals.

Danco will ensure that MIFEPREX will only be available to be dispensed in a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber. MIFEPREX will not be distributed to or dispensed through retail pharmacies.

3. MIFEPREX will only be dispensed to patients with documentation of safe use conditions.

Danco will ensure that MIFEPREX will only be dispensed to patients with documentation of the following safe use conditions:

a. The patient has completed and signed the Patient Agreement, and the Patient Agreement has been placed in the patient's medical record.

b. The patient has been provided copies of the signed Patient Agreement and the Medication Guide.

C. <u>Implementation System</u>

The Implementation System will include the following:

1. Distributors who distribute MIFEPREX will be certified. To become certified, distributors must agree to:

a. Ship drug only to site locations identified by specially certified prescribers in signed Prescriber's Agreements, and maintain secure and confidential records of shipments.

b. Follow all distribution guidelines, including those for storage, tracking package serial numbers, proof of delivery, and controlled returns.

2. Danco will assess the performance of the certified distributors with regard to the following:

a. Whether a secure, confidential and controlled distribution system is being maintained with regard to storage, handling, shipping, and return of MIFEPREX.

b. Whether MIFEPREX is being shipped only to site locations identified by specially certified prescribers in the signed Prescriber's Agreement and only available to be dispensed to patients in a clinic, medical office, or hospital by or under the supervision of a specially certified prescriber.

2

(b) (6),
(b) (4) 038268/000001 - 3250409 v1

3. If Danco determines the distributors are not complying with these requirements, Danco will take steps to improve their compliance.

D. <u>Timetable for Submission of Assessments</u>

Danco will submit REMS assessments to the FDA one year from the date of the approval of the REMS and every three years thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the assessment reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment. Danco will submit each assessment so that it will be received by the FDA on or before the due date.

038268/000001 - 3250409 v1

Reference ID: 2956361



# ACCOUNT SETUP FORM
**MIFEPREX™ (Mifepristone) Tablets, 200 mg; NDC 64875-001-03**

## To set up your account:

**1**

Read the Prescriber's Agreement on the back of this Account Setup Form.

**2**

Complete and sign this form.

**3**

Fax the completed Account Setup Form to the Danco distributor at 1-866-227-3343. Your account information will be kept strictly confidential.

**4**

The distributor will call to finalize your account setup and take your initial order.

**5**

Subsequent orders may be phoned in and are usually shipped within 24 hours.

**6**

Unopened, unused product may be returned for a refund or exchange up to a year after the expiration date.

### Billing information

Bill to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### Shipping information (☐ Check if same as above)

Ship to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### Additional site locations

I will also be prescribing Mifeprex* at these additional locations:

| Name _____ | Address _____ |
|---|---|
| City _____ | State _____ ZIP _____ |
| Phone _____ | Fax _____ |

| Name _____ | Address _____ |
|---|---|
| City _____ | State _____ ZIP _____ |
| Phone _____ | Fax _____ |

(Any additional sites may be listed on an attached sheet of paper.)

### Request additional materials

☐ Medication Guides     ☐ Patient Agreements

☐ State Abortion Guidelines     ☐ Patient Brochures

### Establishing your account (required only with first order)

Each facility purchasing Mifeprex must be included on this form (see additional site locations box above) before the distributor can ship the product. Please read the Prescriber's Agreement on the reverse of this form and sign below.

**By signing below, you acknowledge receipt of the Prescriber's Agreement and agree that you meet these qualifications and that you will follow these guidelines for use.**

Print Name _____ Signature _____

Medical License # _____ Date _____

### Fax this completed Account Setup Form to the authorized distributor. Fax: 1-866-227-3343

Please fax any questions to the above number or call 1-800-848-6142.

*Mifeprex is a trademark of Danco Laboratories, LLC.

Reference ID: 2956361

**MIFEPREX™**
(Mifepristone) Tablets, 200 mg

PCSF18          FDA 0240

OWEB

M I F E P R E X ™
(Mifepristone) Tablets, 200 mg
**PRESCRIBER'S AGREEMENT**

We are pleased that you wish to become a provider of Mifeprex* (Mifepristone) Tablets, 200 mg, which is indicated for the medical termination of intrauterine pregnancy through 49 days from the first day of the patient's last menstrual period (see full prescribing information). Prescribing Information, Mifeprex Medication Guides and PATIENT AGREEMENT forms will be provided together with your order of Mifeprex.

Prior to establishing your account and receiving your first order, you must sign and return this letter to the distributor, indicating that you have met the qualifications outlined below and will observe the guidelines outlined below. If you oversee more than one office facility, you will need to list each facility on your order form prior to shipping the first order.

By signing the reverse side, you acknowledge receipt of the PRESCRIBER'S AGREEMENT and agree that you meet these qualifications and that you will follow these guidelines for use. You also understand that if you do not follow these guidelines, the distributor may discontinue distribution of the drug to you.

Under Federal law, Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications:

• Ability to assess the duration of pregnancy accurately.

• Ability to diagnose ectopic pregnancies.

• Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

• Has read and understood the prescribing information of Mifeprex. The prescribing information is attached to this letter, and is also available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, www.earlyoptionpill.com.

In addition to these qualifications, you must provide Mifeprex in a manner consistent with the following guidelines.

• Under Federal law, each patient must be provided with a Medication Guide. You must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and PATIENT AGREEMENT, give her an opportunity to read and discuss them, obtain her signature on the PATIENT AGREEMENT, and sign it yourself.

• The patient's follow-up visit at approximately 14 days is very important to confirm that a complete termination of pregnancy has occurred and that there have been no complications. You must notify Danco Laboratories in writing as discussed in the Package Insert under the heading DOSAGE AND ADMINISTRATION in the event of an on-going pregnancy which is not terminated subsequent to the conclusion of the treatment procedure.

• While serious adverse events associated with the use of Mifeprex are rare, you must report any hospitalization, transfusion or other serious event to Danco Laboratories, identifying the patient solely by package serial number to ensure patient confidentiality.

• Each package of Mifeprex has a serial number. As part of maintaining complete records for each patient, you must record this identification number in each patient's record.

Danco Laboratories, LLC
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

*MIFEPREX is a trademark of Danco Laboratories, LLC.

PCSF19                                    FDA 0241

Mifeprex® (Mifepristone) Tablets, 200 mg

## PATIENT AGREEMENT
Mifeprex* (mifepristone) Tablets

1. I have read the attached MEDICATION GUIDE for using Mifeprex and misoprostol to end my pregnancy.
2. I discussed the information with my health care provider (provider).
3. My provider answered all my questions and told me about the risks and benefits of using Mifeprex and misoprostol to end my pregnancy.
4. I believe I am no more than 49 days (7 weeks) pregnant.
5. I understand that I will take Mifeprex in my provider's office (Day 1).
6. I understand that I will take misoprostol in my provider's office two days after I take Mifeprex (Day 3).
7. My provider gave me advice on what to do if I develop heavy bleeding or need emergency care due to the treatment.
8. Bleeding and cramping do not mean that my pregnancy has ended. Therefore, I must return to my provider's office in about 2 weeks (about Day 14) after I take Mifeprex to be sure that my pregnancy has ended and that I am well.
9. I know that, in some cases, the treatment will not work. This happens in about 5 to 8 women out of 100 who use this treatment.
10. I understand that if my pregnancy continues after any part of the treatment, there is a chance that there may be birth defects. If my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about my choices, which may include a surgical procedure to end my pregnancy.
11. I understand that if the medicines I take do not end my pregnancy and I decide to have a surgical procedure to end my pregnancy, or if I need a surgical procedure to stop bleeding, my provider will do the procedure or refer me to another provider who will. I have that provider's name, address and phone number.
12. I have my provider's name, address and phone number and know that I can call if I have any questions or concerns.
13. I have decided to take Mifeprex and misoprostol to end my pregnancy and will follow my provider's advice about when to take each drug and what to do in an emergency.
14. I will do the following:
   - contact my provider right away if in the days after treatment I have a fever of 100.4°F or higher that lasts for more than 4 hours or severe abdominal pain.
   - contact my provider right away if I have heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours).
   - contact my provider right away if I have abdominal pain or discomfort, or I am "feeling sick", including weakness, nausea, vomiting or diarrhea, more than 24 hours after taking misoprostol.
   - take the MEDICATION GUIDE with me when I visit an emergency room or a provider who did not give me Mifeprex, so that they will understand that I am having a medical abortion with Mifeprex.
   - return to my provider's office in 2 days (Day 3) to check if my pregnancy has ended. My provider will give me misoprostol if I am still pregnant.
   - return to my provider's office about 14 days after beginning treatment to be sure that my pregnancy has ended and that I am well.


Patient Signature: _____

Patient Name (print): _____

Date: _____

The patient signed the PATIENT AGREEMENT in my presence after I counseled her and answered all her questions. I have given her the MEDICATION GUIDE for mifepristone.

Provider's Signature: _____

Name of Provider (print): _____

Reference ID: 2956361

Date: _____

After the patient and the provider sign this PATIENT AGREEMENT, give 1 copy to the patient before she leaves the office and put 1 copy in her medical record.  Give a copy of the MEDICATION GUIDE to the patient.


Rev 2: 7/19/05
*Mifeprex is a registered trademark of Danco Laboratories, LLC.

Reference ID: 2956361

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use Korlym™ safely and effectively. See full prescribing information for Korlym.**

**Korlym™ (mifepristone) 300 mg Tablets**

**Initial U.S Approval 2000**

---

**WARNING:  TERMINATION OF PREGNANCY**

*See full prescribing information for complete boxed warning.*

**Mifepristone has potent antiprogestational effects and will result in the termination of pregnancy. Pregnancy must therefore be excluded before the initiation of treatment with Korlym, or if treatment is interrupted for more than 14 days in females of reproductive potential.**

---

--------------------INDICATIONS AND USAGE--------------------
Korlym (mifepristone) is a cortisol receptor blocker indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.

**Important Limitations of Use (1.1)**
- Do not use for the treatment of type 2 diabetes mellitus unrelated to endogenous Cushing's syndrome.

---------------DOSAGE AND ADMINISTRATION--------------
- Administer once daily orally with a meal (2).
- The recommended starting dose is 300 mg once daily (2).
- Renal impairment:  do not exceed 600 mg once daily.
- Mild-to-moderate hepatic impairment:  do not exceed 600 mg once daily.  Do not use in severe hepatic impairment.

Based on clinical response and tolerability, the dose may be increased in 300 mg increments to a maximum of 1200 mg once daily. Do not exceed 20 mg/kg per day (2).

---------------DOSAGE FORMS AND STRENGTHS------------
• 300 mg tablet

------------------------CONTRAINDICATIONS--------------------
- Pregnancy (4.1, 8.1)
- Use of simvastatin or lovastatin and CYP 3A substrates with narrow therapeutic range (4.2)
- Concurrent long-term corticosteroid use (4.3)

- Women with  history of unexplained vaginal bleeding (4.4)
- Women with endometrial hyperplasia with atypia or endometrial carcinoma (4.4)

---------------WARNINGS AND PRECAUTIONS--------------
- *Adrenal insufficiency*: Patients should be closely monitored for signs and symptoms of adrenal insufficiency (5.1).
- *Hypokalemia*: Hypokalemia should be corrected prior to treatment and monitored for during treatment (5.2).
- *Vaginal bleeding and endometrial changes*: Women may experience endometrial thickening or unexpected vaginal bleeding. Use with caution if patient also has a hemorrhagic disorder or is on anti-coagulant therapy (5.3).
- *QT interval prolongation*: Avoid use with QT interval-prolonging drugs, or in patients with potassium channel variants resulting in a long QT interval (5.4).
- *Use of Strong CYP3A Inhibitors*  Concomitant use can increase mifepristone plasma levels significantly. Use only when necessary and limit mifepristone dose to 300 mg (5.6).

---------------------ADVERSE REACTIONS----------------------
Most common adverse reactions in Cushing's syndrome ($\geq$ 20%): nausea, fatigue, headache, decreased blood potassium, arthralgia, vomiting, peripheral edema, hypertension, dizziness, decreased appetite, endometrial hypertrophy

**To report suspected adverse reactions, contact Corcept Therapeutics at 1-855-844-3270 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

---------------------DRUG INTERACTIONS---------------------
• Drugs metabolized by CYP3A: Administer drugs that are metabolized by CYP3A at the lowest dose when used with Korlym (7.1).
• CYP3A inhibitors: Caution should be used when Korlym is used with strong CYP3A inhibitors.  Limit mifepristone dose to 300 mg per day when used with strong CYP3A inhibitors (5.6, 7.2).
• CYP3A inducers: Do not use Korlym with CYP3A inducers (7.3).
• Drugs metabolized by CYP2C8/2C9: Use the lowest dose of CYP2C8/2C9 substrates when used with Korlym (7.4).
• Drugs metabolized by CYP2B6: Use of Korlym should be done with caution with bupropion and efavirenz (7.5).
• Hormonal contraceptives: Do not use with Korlym (7.6).

---------------USE IN SPECIFIC POPULATIONS-------------
- Nursing mothers: Discontinue drug or discontinue nursing (8.3).

**See Section 17 for PATIENT COUNSELING INFORMATION and FDA-approved Medication Guide**

Reference ID: 3089791

FDA 0269

**FULL PRESCRIBING INFORMATION:  Contents\***

**1  INDICATIONS AND USAGE**
LIMITATIONS OF USE:
**2  DOSAGE AND ADMINISTRATION**
2.1  Adult Dosage
2.2  Dosing in Renal Impairment
2.3  Dosing in Hepatic Impairment
**3  DOSAGE FORMS AND STRENGTHS**
**4  CONTRAINDICATIONS**
4.1  Pregnancy
4.2  Drugs Metabolized by CYP3A
4.3  Corticosteroid Therapy Required for
Lifesaving Purposes
4.4  Women with Risk of Vaginal Bleeding or
Endometrial Changes
4.5  Known Hypersensitivity to Mifepristone
**5  WARNINGS AND PRECAUTIONS**
5.1  Adrenal Insufficiency
5.2  Hypokalemia
5.3  Vaginal Bleeding and Endometrial
Changes
5.4  QT Interval Prolongation
5.5  Exacerbation/Deterioration of Conditions
Treated with Corticosteroids
5.6  Use of Strong CYP3A Inhibitors
5.7  *Pneumocystis jiroveci* Infection
5.8 Potential Effects of Hypercortisolemia
**6  ADVERSE REACTIONS**
6.1  Clinical Trials Experience
6.2  Laboratory Tests
6.3  Vaginal Bleeding and Endometrial
Changes
6.4  Additional Data from Clinical Trials

6.4.1  Adrenal Insufficiency
6.4.2  Rash
**7  DRUG INTERACTIONS**
7.1  Drugs Metabolized by CYP3A
7.2  CYP3A Inhibitors
7.3  CYP3A Inducers
7.4  Drugs Metabolized by CYP2C8/2C9
7.5  Drugs Metabolized by CYP2B6
7.6  Use of Hormonal Contraceptives
**8  USE IN SPECIFIC POPULATIONS**
8.1  Pregnancy
8.3  Nursing Mothers
8.4  Pediatric Use
8.5  Geriatric Use
8.6  Renal Impairment
8.7  Hepatic Impairment
8.8  Females of Reproductive Potential
**10  OVERDOSAGE**
**11  DESCRIPTION**
**12  CLINICAL PHARMACOLOGY**
12.1  Mechanism of Action
12.2  Pharmacodynamics
12.3  Pharmacokinetics
**13  NONCLINICAL TOXICOLOGY**
13.1  Carcinogenesis, Mutagenesis,
Impairment of Fertility
**14  CLINICAL STUDIES**
14.1  Cushing's Syndrome
**16  HOW SUPPLIED/STORAGE AND
HANDLING**
**17  PATIENT COUNSELING
INFORMATION**
17.1  Importance of Preventing Pregnancy

\*Sections or subsections omitted from the full prescribing information are not listed

Reference ID: 3089791                                                                    FDA 0270

**Korlym**[TM] **(mifepristone) 300 mg tablets for oral use**

**FULL PRESCRIBING INFORMATION**

---

**WARNING:  TERMINATION OF PREGNANCY**

**Mifepristone is a potent antagonist of progesterone and cortisol via the progesterone and glucocorticoid (GR-II) receptors, respectively.  The antiprogestational effects will result in the termination of pregnancy. Pregnancy must therefore be excluded before the initiation of treatment with Korlym and prevented during treatment and for one month after stopping treatment by the use of a non-hormonal medically acceptable method of contraception unless the patient has had a surgical sterilization, in which case no additional contraception is needed. Pregnancy must also be excluded if treatment is interrupted for more than 14 days in females of reproductive potential.**

---

## 1  INDICATIONS AND USAGE

Korlym (mifepristone) is a cortisol receptor blocker indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.

LIMITATIONS OF USE:
- Korlym should not be used in the treatment of patients with type 2 diabetes unless it is secondary to Cushing's syndrome.

## 2  DOSAGE AND ADMINISTRATION

### 2.1  Adult Dosage

The recommended starting dose is 300 mg orally once daily. Korlym must be given as a single daily dose. Korlym should always be taken with a meal. Patients should swallow the tablet whole. Do not split, crush, or chew tablets.

*Dosing and titration*

The daily dose of Korlym may be increased in 300 mg increments. The dose of Korlym may be increased to a maximum of 1200 mg once daily but should not exceed 20 mg/kg per day. Increases in dose should not occur more frequently than once every 2-4 weeks. Decisions about dose increases should be based on a clinical assessment of tolerability and degree of improvement in Cushing's syndrome manifestations. Changes in glucose control, anti-diabetic medication requirements, insulin levels, and psychiatric symptoms may provide an early assessment of response (within 6 weeks) and may help guide early dose titration. Improvements in cushingoid appearance, acne, hirsutism, striae, and body weight occur over a longer period of time and, along with measures of glucose control, may be used to determine dose changes beyond the first 2 months of therapy. Careful and gradual titration of Korlym accompanied by monitoring for recognized adverse reactions (*See Warnings and Precautions 5.1 and 5.2*) may reduce the risk of severe adverse reactions. Dose reduction or even dose discontinuation may be needed in some

Reference ID: 3089791

FDA 0271

clinical situations. If Korlym treatment is interrupted, it should be reinitiated at the lowest dose (300 mg). If treatment was interrupted because of adverse reactions, the titration should aim for a dose lower than the one that resulted in treatment interruption.

## 2.2  Dosing in Renal Impairment

No change in initial dose of Korlym is required in renal impairment. The maximum dose should be limited to 600 mg. *[See Renal Impairment (8.6) and Clinical Pharmacology (12.3)]*

## 2.3  Dosing in Hepatic Impairment

No change in the initial dose of Korlym is required in mild to moderate hepatic impairment. The maximum dose should be limited to 600 mg. Korlym should not be used in severe hepatic impairment. *[See Hepatic Impairment (8.7) and Clinical Pharmacology (12.3)]*

## 3  DOSAGE FORMS AND STRENGTHS

Korlym is supplied as a light yellow to yellow oval-shaped tablet debossed with "Corcept" on one side and "300" on the other. Each tablet contains 300 mg of mifepristone. The tablets are not scored.

## 4  CONTRAINDICATIONS

### 4.1  Pregnancy

Korlym is contraindicated in women who are pregnant. Pregnancy must be excluded before the initiation of treatment with Korlym or if treatment is interrupted for more than 14 days in females of reproductive potential.  Nonhormonal contraceptives should be used during and one month after stopping treatment in all women of reproductive potential. *[See Use in Specific Populations 8.8]*

### 4.2  Drugs Metabolized by CYP3A

Korlym is contraindicated in patients taking simvastatin, lovastatin, and CYP3A substrates with narrow therapeutic ranges, such as cyclosporine, dihydroergotamine, ergotamine, fentanyl, pimozide, quinidine, sirolimus, and tacrolimus, due to an increased risk of adverse events. *[See Drug Interactions (7.1) and Clinical Pharmacology (12.3)]*

### 4.3  Corticosteroid Therapy Required for Lifesaving Purposes

Korlym is contraindicated in patients who require concomitant treatment with systemic corticosteroids for serious medical conditions or illnesses (e.g., immunosuppression after organ transplantation) because Korlym antagonizes the effect of glucocorticoids.

### 4.4  Women with Risk of Vaginal Bleeding or Endometrial Changes

Korlym is contraindicated in the following:

- Women with a history of unexplained vaginal bleeding
- Women with endometrial hyperplasia with atypia or endometrial carcinoma

### 4.5  Known Hypersensitivity to Mifepristone

Korlym is contraindicated in patients with prior hypersensitivity reactions to mifepristone or to any of the product components.

Reference ID: 3089791                                                    FDA 0272

# 5  WARNINGS AND PRECAUTIONS

## 5.1  Adrenal Insufficiency

Patients receiving mifepristone may experience adrenal insufficiency. Because serum cortisol levels remain elevated and may even increase during treatment with Korlym, serum cortisol levels do not provide an accurate assessment of hypoadrenalism in patients receiving Korlym. Patients should be closely monitored for signs and symptoms of adrenal insufficiency, including weakness, nausea, increased fatigue, hypotension, and hypoglycemia. If adrenal insufficiency is suspected, discontinue treatment with Korlym immediately and administer glucocorticoids without delay. High doses of supplemental glucocorticoids may be needed to overcome the glucocorticoid receptor blockade produced by mifepristone. Factors considered in deciding on the duration of glucocorticoid treatment should include the long half-life of mifepristone (85 hours).

Treatment with Korlym at a lower dose can be resumed after resolution of adrenal insufficiency. Patients should also be evaluated for precipitating causes of hypoadrenalism (infection, trauma, etc.).

## 5.2  Hypokalemia

In a study of patients with Cushing's syndrome, hypokalemia was observed in 44% of subjects during treatment with Korlym. Hypokalemia should be corrected prior to initiating Korlym. During Korlym administration, serum potassium should be measured 1 to 2 weeks after starting or increasing the dose of Korlym and periodically thereafter. Hypokalemia can occur at any time during Korlym treatment. Mifepristone-induced hypokalemia should be treated with intravenous or oral potassium supplementation based on event severity. If hypokalemia persists in spite of potassium supplementation, consider adding mineralocorticoid antagonists.

## 5.3  Vaginal Bleeding and Endometrial Changes

Being an antagonist of the progesterone receptor, mifepristone promotes unopposed endometrial proliferation that may result in endometrium thickening, cystic dilatation of endometrial glands, and vaginal bleeding. Korlym should be used with caution in women who have hemorrhagic disorders or are receiving concurrent anticoagulant therapy. Women who experience vaginal bleeding during Korlym treatment should be referred to a gynecologist for further evaluation.

## 5.4  QT Interval Prolongation

Mifepristone and its metabolites block IKr. Korlym prolongs the QTc interval in a dose-related manner. There is little or no experience with high exposure, concomitant dosing with other QT-prolonging drugs, or potassium channel variants resulting in a long QT interval. *[See Warnings & Precautions (5.6)]* To minimize risk, the lowest effective dose should always be used.

## 5.5  Exacerbation/Deterioration of Conditions Treated with Corticosteroids

Use of Korlym in patients who receive corticosteroids for other conditions (e.g., autoimmune disorders) may lead to exacerbation or deterioration of such conditions, as Korlym antagonizes the desired effects of glucocorticoid in these clinical settings. For medical conditions in which chronic corticosteroid therapy is life-saving (e.g., immunosuppression in organ transplantation), Korlym is contraindicated. *[See Contraindications (4.3)]*

Reference ID: 3089791                                                    FDA 0273

**5.6  Use of Strong CYP3A Inhibitors**

Korlym should be used with extreme caution in patients taking ketoconazole and other strong inhibitors of CYP3A, such as itraconazole, nefazodone, ritonavir, nelfinavir, indinavir, atazanavir, amprenavir, fosamprenavir, boceprevir, clarithromycin, conivaptan, lopinavir, nefazodone, posaconazole, ritonavir, saquinavir, telaprevir, telithromycin, or voriconazole, as these could substantially increase the concentration of mifepristone in the blood. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. Mifepristone should be used in combination with strong CYP3A inhibitors only when necessary, and in such cases the dose should be limited to 300 mg per day. *[See Warnings & Precautions (5.4), Drug Interactions (7.2), and Clinical Pharmacology (12.3)]*

**5.7 *Pneumocystis jiroveci* Infection**

Patients with endogenous Cushing's syndrome are at risk for opportunistic infections such as *Pneumocystis jiroveci* pneumonia during Korlym treatment. Patients may present with respiratory distress shortly after initiation of Korlym. Appropriate diagnostic tests should be undertaken and treatment for *Pneumocystis jiroveci* should be considered.

**5.8 Potential Effects of Hypercortisolemia**

Korlym does not reduce serum cortisol levels. Elevated cortisol levels may activate mineralcorticoid receptors which are also expressed in cardiac tissues.   Caution should be used in patients with underlying heart conditions including heart failure and coronary vascular disease.

**6  ADVERSE REACTIONS**

**6.1  Clinical Trials Experience**

Because clinical trials are conducted under widely varying conditions, the adverse reaction rates observed cannot be directly compared to rates in other clinical trials and may not reflect the rates observed in clinical practice.

Safety data on the use of Korlym are available from 50 patients with Cushing's syndrome enrolled in an uncontrolled, open-label, multi-center trial (Study 400). Forty-three patients had Cushing's disease and all except one had previously undergone pituitary surgery. Four patients had ectopic ACTH secretion, and three had adrenal carcinoma. Patients were treated for up to 24 weeks. A dose of 300 mg per day was administered for the initial 14 days; thereafter, the dose could be escalated in increments of 300 mg per day based on assessments of tolerability and clinical response. Doses were escalated up to 900 mg per day for patients <60 kg, or 1200 mg per day for patients >60 kg.

The most frequently reported adverse reactions (reported in ≥20% of patients, regardless of relationship to Korlym) were nausea, fatigue, headache, decreased blood potassium, arthralgia, vomiting, peripheral edema, hypertension, dizziness, decreased appetite, and endometrial hypertrophy. Drug-related adverse events resulted in dose interruption or reduction in study drug in 40% of patients.

The adverse reactions that occurred in ≥10% of the Cushing's syndrome patients receiving Korlym, regardless of relationship to Korlym, are shown in Table 1.

6

FDA 0274

**Table 1.  Treatment Emergent Adverse Events Occurring in ≥10% of Cushing's Syndrome Patients Receiving Korlym**

| Body System/Adverse Reaction | Percent (%) of Patients Reporting Event (n = 50) |
|---|---|
| **Gastrointestinal disorders** | |
| Nausea | 48 |
| Vomiting | 26 |
| Dry mouth | 18 |
| Diarrhea | 12 |
| Constipation | 10 |
| **General disorders and administration/site conditions** | |
| Fatigue | 48 |
| Edema peripheral | 26 |
| Pain | 14 |
| **Nervous system disorders** | |
| Headache | 44 |
| Dizziness | 22 |
| Somnolence | 10 |
| **Musculoskeletal and connective tissue disorders** | |
| Arthralgia | 30 |
| Back pain | 16 |
| Myalgia | 14 |
| Pain in extremity | 12 |
| **Investigations** | |
| Blood potassium decreased | 34 |
| Thyroid function test abnormal | 18 |
| **Infections and infestations** | |
| Sinusitis | 14 |
| Nasopharyngitis | 12 |
| **Metabolism and nutrition disorders** | |
| Decreased appetite | 20 |
| Anorexia | 10 |
| **Vascular disorders** | |
| Hypertension | 24 |
| **Reproductive system and breast disorders** | |
| Endometrial hypertrophy | 38* |
| **Respiratory, thoracic, and mediastinal disorders** | |
| Dyspnea | 16 |
| **Psychiatric disorders** | |
| Anxiety | 10 |

*The denominator was 26 females who had baseline and end-of-trial transvaginal ultrasound

7

FDA 0275

**6.2  Laboratory Tests**

Reductions in high density lipoprotein-cholesterol (HDL-C) levels have been observed following treatment with Korlym. In study subjects that experienced declines in HDL-C, levels returned to baseline following discontinuation of drug. The clinical significance of the treatment-related reduction in HDL-C levels in patients with Cushing's syndrome is not known.

In a study of patients with Cushing's syndrome, hypokalemia was observed in 44% of subjects during treatment with Korlym. In these cases, hypokalemia responded to treatment with potassium supplementation and/or mineralocorticoid antagonist therapy (e.g., spironolactone or eplerenone). Hypokalemia should be corrected prior to initiating Korlym. *[See Warnings and Precautions (5.2)]*

Elevations of thyroid-stimulating hormone (TSH) were seen in subjects treated with Korlym. Of the 42 subjects with detectable TSH at baseline, eight (19%) had increases in TSH above the normal range, while remaining asymptomatic. The TSH levels returned to normal in most patients without intervention when Korlym was discontinued at the end of the study.

**6.3  Vaginal Bleeding and Endometrial Changes**

In Study 400, the thickness of the endometrium increased from a mean of 6.14 mm at baseline (n=23) to 15.7 mm at end-of-trial (n=18) in premenopausal women; in postmenopausal women the increase was from 2.75 mm (n=6) to 7.35 mm (n=8). Endometrial thickness above the upper limit of normal was reported in 10/26 females who had baseline and end-of-trial transvaginal ultrasound (38%). The endometrial thickness returned to the normal range in 3 out of 10 patients 6 weeks after treatment cessation at the end of the study. Vaginal bleeding occurred in 5 out of 35 females (14%). Two of five subjects with vaginal bleeding had normal endometrial thickness. Endometrial biopsies were performed in six patients; five of these patients had endometrial thickening. No endometrial carcinoma was detected in the sampled cases.

**6.4  Additional Data from Clinical Trials**

The following are adverse events that were reported in Study 400 at frequencies of ≥ 5% to 10%, and may be related to Korlym's mechanism of action:

*Gastrointestinal disorders:* gastroesophageal reflux, abdominal pain

*General disorders and administration site conditions:* asthenia, malaise, edema, pitting edema, thirst

*Investigations:* blood triglycerides increased

*Metabolism and nutrition disorders:* hypoglycemia

*Musculoskeletal and connective tissue disorders:* muscular weakness, flank pain, musculoskeletal chest pain

*Psychiatric disorders:* insomnia

*Reproductive system and breast disorders:* vaginal hemorrhage, metrorrhagia *[See Warnings and Precautions (5.3)]*

**6.4.1  Adrenal Insufficiency**

Adrenal insufficiency was reported in two subjects (4%) in Study 400. The most typical symptoms of adrenal insufficiency were nausea and decreased appetite. No hypotension or hypoglycemia was reported

FDA 0276

during the events. Adrenal insufficiency resolved in both cases with Korlym interruption and /or dexamethasone administration.

### 6.4.2 Rash

Generalized, maculo-papular rash was reported in 2 subjects (4%) in Study 400. Two additional subjects developed pruritus (4%). None resulted in discontinuation of Korlym, and all the events resolved by the end of the study.

## 7 DRUG INTERACTIONS

Based on the long terminal half-life of mifepristone after reaching steady state, at least 2 weeks should elapse after cessation of Korlym before initiating or increasing the dose of any interacting concomitant medication.

### 7.1 Drugs Metabolized by CYP3A

Because Korlym is an inhibitor of CYP3A, concurrent use of Korlym with a drug whose metabolism is largely or solely mediated by CYP3A is likely to result in increased plasma concentrations of the drug. Discontinuation or dose reduction of such medications may be necessary with Korlym co-administration.

Korlym increased the exposure to simvastatin and simvastatin acid significantly in healthy subjects. Concomitant use of simvastatin or lovastatin is contraindicated because of the increased risk of myopathy and rhabdomyolysis. *[See Contraindications (4.2), Clinical Pharmacology 12.3]*

The exposure of other substrates of CYP3A with narrow therapeutic ranges, such as cyclosporine, dihydroergotamine, ergotamine, fentanyl, pimozide, quinidine, sirolimus, and tacrolimus, may be increased by concomitant administration with Korlym. Therefore, the concomitant use of such CYP3A substrates with Korlym is contraindicated. *[See Contraindications (4.2)]*

Other drugs with similar high first pass metabolism in which CYP3A is the primary route of metabolism should be used with extreme caution if co-administered with Korlym. The lowest possible dose and/or a decreased frequency of dosing must be used with therapeutic drug monitoring when possible. Use of alternative drugs without these metabolic characteristics is advised when possible with concomitant Korlym.

If drugs that undergo low first pass metabolism by CYP3A or drugs in which CYP3A is not the major metabolic route are co-administered with Korlym, use the lowest dose of concomitant medication necessary, with appropriate monitoring and follow-up. *[See Clinical Pharmacology (12.3)]*

### 7.2 CYP3A Inhibitors

Medications that inhibit CYP3A could increase plasma mifepristone concentrations and dose reduction of Korlym may be required.

Ketoconazole and other strong inhibitors of CYP3A, such as itraconazole, nefazodone, ritonavir, nelfinavir, indinavir, atazanavir, amprenavir and fosamprenavir, boceprevir, clarithromycin, conivaptan, lopinavir, mibefradil, nefazodone, posaconazole, ritonavir, saquinavir, telaprevir, telithromycin, or voriconazole may increase exposure to mifepristone significantly. The clinical impact of this interaction has not been studied. Therefore, extreme caution should be used when these drugs are prescribed in

Reference ID: 3089791

FDA 0277

combination with Korlym. The benefit of concomitant use of these agents should be carefully weighed against the potential risks. The dose of Korlym should be limited to 300 mg and used only when necessary. *[See Warnings & Precautions (5.6)]*

Moderate inhibitors of CYP3A, such as amprenavir, aprepitant, atazanavir, ciprofloxacin, darunavir/ritonavir, diltiazem, erythromycin, fluconazole, fosamprenavir, grapefruit juice, imatinib, or verapamil, should be used with caution when administered in combination with Korlym.

### 7.3  CYP3A Inducers

No medications that induce CYP3A have been studied when co-administered with Korlym. Avoid co-administration of Korlym and CYP3A inducers such as rifampin, rifabutin, rifapentin, phenobarbital, phenytoin, carbamazepine, and St. John's wort.

### 7.4  Drugs Metabolized by CYP2C8/2C9

Because Korlym is an inhibitor of CYP2C8/2C9, concurrent use of Korlym with a drug whose metabolism is largely or solely mediated by CYP2C8/2C9 is likely to result in increased plasma concentrations of the drug.

Korlym significantly increased exposure of fluvastatin, a typical CYP2C8/2C9 substrate, in healthy subjects. When given concomitantly with Korlym, drugs that are substrates of CYP2C8/2C9 (including non-steroidal anti-inflammatory drugs, warfarin, and repaglinide) should be used at the smallest recommended doses, and patients should be closely monitored for adverse effects. *[See Clinical Pharmacology (12.3)]*

### 7.5  Drugs Metabolized by CYP2B6

Mifepristone is an inhibitor of CYP2B6 and may cause significant increases in exposure of drugs that are metabolized by CYP2B6 such as bupropion and efavirenz. Since no study has been conducted to evaluate the effect of mifepristone on substrates of CYP2B6, the concomitant use of bupropion and efavirenz should be undertaken with caution. *[See Clinical Pharmacology (12.3)]*

### 7.6  Use of Hormonal Contraceptives

Mifepristone is a progesterone-receptor antagonist and will interfere with the effectiveness of hormonal contraceptives. Therefore, non-hormonal contraceptive methods should be used.

### 8  USE IN SPECIFIC POPULATIONS

### 8.1  Pregnancy

Category X

Korlym is contraindicated in pregnancy. Korlym can cause fetal harm when administered to a pregnant woman because the use of Korlym results in pregnancy loss. The inhibition of both endogenous and exogenous progesterone by mifepristone at the progesterone receptor results in pregnancy loss. If Korlym is used during pregnancy or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus. *[See Contraindications (4.1)]*

10

FDA 0278

*Human Data*

In a report of thirteen live births after single dose mifepristone exposure, no fetal abnormalities were noted.

*Animal Data*

Teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than human exposure at the maximum clinical dose, based on body surface area) were carried out. Because of the anti-progestational activity of mifepristone, fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at less than human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from antagonism of the progesterone receptor.

## 8.3  Nursing Mothers

Mifepristone is present in human milk of women taking the drug. Because of the potential for serious adverse reactions in nursing infants from Korlym, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

## 8.4  Pediatric Use

Safety and effectiveness of Korlym in pediatric patients have not been established.

## 8.5  Geriatric Use

Clinical studies with Korlym did not include sufficient numbers of patients aged 65 and over to determine whether they respond differently than younger people.

## 8.6  Renal Impairment

The maximum dose should not exceed 600 mg per day in renally impaired patients. *[See Clinical Pharmacology (12.3)]*

## 8.7  Hepatic Impairment

In patients with mild to moderate hepatic impairment, the maximum dose should not exceed 600 mg per day.  The pharmacokinetics of mifepristone in patients with severe hepatic impairment has not been studied, and Korlym should not be used in these patients. *[See Clinical Pharmacology (12.3)]*

## 8.8  Females of Reproductive Potential

Due to its anti-progestational activity, Korlym causes pregnancy loss. Exclude pregnancy before the initiation of treatment with Korlym or if treatment is interrupted for more than 14 days in females of reproductive potential. Recommend contraception for the duration of treatment and for one month after stopping treatment using a non-hormonal medically acceptable method of contraception. If the patient has had surgical sterilization, no additional contraception is needed.

## 10  OVERDOSAGE

There is no experience with overdosage of Korlym.

FDA 0279

## 11  DESCRIPTION

Korlym (mifepristone) is a cortisol receptor blocker for oral administration. The chemical name of mifepristone is 11β-(4-dimethylaminophenyl)-17β-hydroxy-17α-(1-propynyl)-estra-4, 9-dien-3-one. The chemical formula is $C_{29}H_{35}NO_2$; the molecular weight is 429.60; and the structural formula is:



Mifepristone demonstrates a pH-related solubility profile. The greatest solubility is achieved in acidic media (~ 25 mg/mL at pH 1.5) and solubility declines rapidly as the pH is increased. At pH values above 2.5 the solubility of mifepristone is less than 1 mg/mL.

Each Korlym tablet for oral use contains 300 mg of mifepristone. The inactive ingredients of Korlym tablets are silicified microcrystalline cellulose, sodium starch glycolate, hydroxypropylcellulose, sodium lauryl sulfate, magnesium stearate, hypromellose, titanium dioxide, triacetin, D&C yellow 10 aluminum lake, polysorbate 80, and FD&C yellow 6 aluminum lake.

## 12  CLINICAL PHARMACOLOGY

### 12.1  Mechanism of Action

Mifepristone is a selective antagonist of the progesterone receptor at low doses and blocks the glucocorticoid receptor (GR-II) at higher doses. Mifepristone has high affinity for the GR-II receptor but little affinity for the GR-I (MR, mineralocorticoid) receptor. In addition, mifepristone appears to have little or no affinity for estrogen, muscarinic, histaminic, or monoamine receptors.

### 12.2  Pharmacodynamics

Because mifepristone acts at the receptor level to block the effects of cortisol, its antagonistic actions affect the hypothalamic-pituitary-adrenal (HPA) axis in such a way as to further increase circulating cortisol levels while, at the same time, blocking their effects.

Mifepristone and the three active metabolites have greater affinity for the glucocorticoid receptor (100%, 61%, 48%, and 45%, respectively) than either dexamethasone (23%) or cortisol (9%).

### 12.3  Pharmacokinetics

*Absorption*

Following oral administration, time to peak plasma concentrations of mifepristone occurred between 1 and 2 hours following single dose, and between 1 and 4 hours following multiple doses of 600 mg of

12

FDA 0280

Korlym in healthy volunteers. Mean plasma concentrations of three active metabolites of mifepristone peak between 2 and 8 hours after multiple doses of 600 mg/day, and the combined concentrations of the metabolites exceed that of the parent mifepristone. Exposure to mifepristone is substantially less than dose proportional. Time to steady state is within 2 weeks, and the mean (SD) half-life of the parent mifepristone was 85 (61) hours following multiple doses of 600 mg/day of Korlym.

Studies evaluating the effects of food on the pharmacokinetics of Korlym demonstrate a significant increase in plasma levels of mifepristone when dosed with food. To achieve consistent plasma drug concentrations, patients should be instructed to always take their medication with meals.

*Distribution*
Mifepristone is highly bound to alpha-1-acid glycoprotein (AAG) and approaches saturation at doses of 100 mg (2.5 μM) or more. Mifepristone and its metabolites also bind to albumin and are distributed to other tissues, including the central nervous system (CNS). As determined in vitro by equilibrium dialysis, binding of mifepristone and its three active metabolites to human plasma proteins was concentration-dependent. Binding was approximately 99.2% for mifepristone, and ranged from 96.1 to 98.9% for the three active metabolites at clinically relevant concentrations.

*Metabolism*
Cytochrome P450 3A4 (CYP3A4) has been shown to be involved in mifepristone metabolism in human liver microsomes. Two of the known active metabolites are the product of demethylation (one monodemethylated and one di-demethylated), while a third active metabolite results from hydroxylation (monohydroxylated).

*Elimination and Excretion*
Excretion is primarily (approximately 90%) via the fecal route.

**Specific Populations**
*Renal Impairment*
The pharmacokinetics of mifepristone in subjects with severe renal impairment (creatinine clearance [CrCL] < 30 mL/min, but not on dialysis) was evaluated following multiple doses of 1200 mg Korlym for 7 days. Mean exposure to mifepristone increased 31%, with similar or smaller increases in metabolite exposure as compared to subjects with normal renal function (CrCL ≥ 90 mL/min). There was large variability in the exposure of mifepristone and its metabolites in subjects with severe renal impairment as compared to subjects with normal renal function (geometric least square mean ratio [CI] for AUC of mifepristone: 1.21 [0.71-2.06]; metabolite 1: 1.43 [0.84-2.44]; metabolite 2: 1.18 [0.64-2.17] and metabolite 3: 1.19 [0.71-1.99]). No change in the initial dose of Korlym is needed for renal impairment; the maximum dose should not exceed 600 mg per day.

*Hepatic Impairment*
The pharmacokinetics of mifepristone in subjects with moderate hepatic impairment (Child-Pugh Class B) was evaluated in a single- and multiple-dose study (600 mg for 7 days). The pharmacokinetics in subjects with moderate hepatic impairment was similar to those with normal hepatic function. There was large variability in the exposure of mifepristone and its metabolites in subjects with moderate hepatic impairment as compared to subjects with normal hepatic function (geometric least square mean ratio [CI] for AUC of mifepristone: 1.02 [0.59-1.76]; metabolite 1: 0.95 [0.52-1.71]; metabolite 2: 1.37 [0.71-2.62] and metabolite 3: 0.62 [0.33-1.16]).  Due to limited information on safety in patients with mild-to-

13

FDA 0281

moderate hepatic impairment, the maximum dose should not exceed 600 mg per day. The pharmacokinetics of mifepristone in patients with severe hepatic disease has not been studied. Korlym is not recommended in patients with severe hepatic disease.

**Drug-Drug Interactions**

*In Vitro Assessment of Drug Interactions*

In vitro studies indicate a potential for CYP-mediated drug interactions by mifepristone and/or its metabolites with substrates of CYP2A6, CYP2C8/2C9, CYP2C19, CYP3A4, CYP1A2, CYP2B6, CYP2D6, and CYP2E1. In vitro studies also indicated an interaction potential for drug transport mediated by P-glycoprotein (P-gp) and breast cancer resistance protein (BCRP). In vitro studies indicate mifepristone metabolism is mediated by CYP3A, and that mifepristone also inhibits and induces CYP3A.

*In Vivo Assessment of Drug Interactions (see Table 2)*

**Table 2.  Summary Table of Korlym Drug-Drug Interaction Effects**

| Dosing of Mifepristone | Coadministered Drug | Dosing of Coadministered Drug | Geometric Mean Ratio (analyte ratio with/without drug coadministration) | | |
|---|---|---|---|---|---|
| | | | **Analyte** | **AUC** | **Cmax** |
| **Effect of Korlym on Coadministered Drug** | | | | | |
| **Contraindicated with mifepristone** *[See Contraindications (4)]* | | | | | |
| 1200 mg once daily for 10 days | simvastatin[1] | 80 mg single dose | simvastatin acid | 15.70 | 18.20 |
| | | | simvastatin | 10.40 | 7.02 |
| **Use lowest dose of coadministered drug,** based on clinical  experience and/or use of therapeutic drug monitoring | | | | | |
| 1200 mg once daily for 10 days | alprazolam[2] | 1 mg single dose | alprazolam 4-hydroxy-alprazolam | 1.80 0.76 | 0.81 0.39 |
| 1200 mg once daily for 7 days | fluvastatin[3] | 40 mg single dose | fluvastatin | 3.57 | 1.76 |
| 1200 mg once daily for 10 days | digoxin[4] | 0.125 mg once daily | digoxin | 1.40 | 1.64 |
| **Effect of Coadministered Drug on Korlym** | | | | | |
| **No dosing adjustment required** | | | | | |
| 300 mg once daily for 14 days | cimetidine[5] | 800 mg once daily | mifepristone | 0.85* | 0.75 |

*No effect = 90% CI within range 0.80 – 1.25

[1] Simvastatin 40 mg dose used as reference for the comparison.  Result could be representative of other oral drugs with CYP3A metabolism and high first pass effect: cyclosporine, midazolam, triazolam, pimozide, sildenafil, sirolimus, and tacrolimus.
[2] Result could be representative of other oral drugs with CYP3A metabolism and low first pass effect. Clinical significance of any interaction will depend on the therapeutic margin of the drug.
[3] Result could be representative of other oral drugs with CYP2C8/C9 metabolism
[4] Plasma digoxin concentration should be measured after 1 to 2 weeks of concomitant use and following usual clinical practice at appropriate intervals thereafter.
[5] Result could be representative of other mild inhibitors of CYP3A

14

FDA 0282

## 13  NONCLINICAL TOXICOLOGY

### 13.1  Carcinogenesis, Mutagenesis, Impairment of Fertility

Mifepristone was evaluated for carcinogenicity potential in rats and mice. Rats were dosed for up to two years at doses of 5, 25, and 125 mg/kg of mifepristone. The high dose was the maximum tolerated dose, but exposure at all doses was below exposure at the maximum clinical dose based on AUC comparison. Female rats had a statistically significant increase in follicular cell adenomas/carcinomas and liver adenomas. It is plausible that these tumors are due to drug-induced enzyme metabolism, a mechanism not considered clinically relevant, but studies confirming this mechanism were not conducted with mifepristone. Mice were also tested for up to 2 years at mifepristone doses up to the maximum tolerated dose of 125 mg/kg, which provided exposure below the maximum clinical dose based on AUC. No drug-related tumors were seen in mice.

Mifepristone was not genotoxic in a battery of bacterial, yeast, and mammalian in vitro assays, and an in vivo micronucleus study in mice.

The pharmacological activity of mifepristone disrupts the estrus cycle of adult rats at a dose of 0.3 mg/kg (less than human exposure at the maximum clinical dose, based on body surface area). However, following withdrawal of treatment and subsequent resumption of the estrus cycle, there was no effect on reproductive function when mated.

A single subcutaneous dose of mifepristone (up to 100 mg/kg) to rats on the first day after birth did not adversely affect future reproductive function in males or females, although the onset of puberty was slightly premature in dosed females. Repeated doses of mifepristone (1 mg every other day) to neonatal rats resulted in potentially adverse fertility effects, including oviduct and ovary malformations in females, delayed male puberty, deficient male sexual behavior, reduced testicular size, and lowered ejaculation frequency.

## 14  CLINICAL STUDIES

### 14.1  Cushing's Syndrome

An uncontrolled, open-label, 24-week, multicenter clinical study was conducted to evaluate the safety and efficacy of Korlym in the treatment of endogenous Cushing's syndrome. The study enrolled 50 subjects with clinical and biochemical evidence of hypercortisolemia despite prior surgical treatment and radiotherapy. The reasons for medical treatment were failed surgery, recurrence of disease, and poor medical candidate for surgery. Forty-three patients (86%) had Cushing's disease, four patients (8%) had ectopic ACTH secretion, and three (6%) had adrenal carcinoma. Baseline characteristics included: mean age of 45 years (range 26 to 71), mean BMI of 36 kg/m$^2$ (range 24 to 66), mean weight 100 kg (range 61 to 199), and mean waist circumference was 119 cm (range 89 to 178); 70% were female; 84% were white and 16% were black or African American. Baseline mean urinary free cortisol level was 365 μg per 24 hr.

Patients belonged to one of two cohorts: a "diabetes" cohort (29 patients, 26 with type 2 diabetes and 3 with glucose intolerance), and a "hypertension" cohort (21 patients). Efficacy was evaluated separately in the two cohorts. Korlym treatment was started in all patients at a dose of 300 mg once a day. The study protocol allowed an increase in dose to 600 mg after 2 weeks, and then by additional 300 mg increments

15

FDA 0283

every 4 weeks to a maximum of 900 mg per day for patients <60 kg, or 1200 mg per day for patients >60 kg, based on clinical tolerance and clinical response.

*Results in the diabetes cohort*

Patients in the diabetes cohort underwent standard oral glucose tolerance tests at baseline and periodically during the clinical study. Anti-diabetic medications were allowed but had to be kept stable during the trial and patients had to be on stable anti-diabetic regimens prior to enrollment. The primary efficacy analysis for the diabetes cohort was an analysis of responders. A responder was defined as a patient who had a $\geq$ 25% reduction from baseline in glucose AUC. The primary efficacy analysis was conducted in the modified intent-to-treat- population (n=25) defined as all patients who received a minimum of 30 days on Korlym. Fifteen of 25 patients (60%) were treatment responders (95% CI: 39%,78%).

Mean HbA1C was 7.4% in the 24 patients with HbA1c values at baseline and Week 24. For these 24 patients mean reduction in HbA1c was 1.1% (95% CI -1.6, -0.7) from baseline to the end of the trial. Fourteen of 24 patients had above normal HbA1c levels at baseline, ranging between 6.7% and 10.4%; all of these patients had reductions in HbA1c by the end of the study (range -0.4 to -4.4%) and eight of 14 patients (57%) normalized HbA1c levels at trial end. Antidiabetic medications were reduced in 7 of the 15 DM subjects taking antidiabetic medication and remained constant in the others.

*Results in the hypertension cohort*

There were no changes in mean systolic and diastolic blood pressures at the end of the trial relative to baseline in the modified intent-to-treat population (n=21).

*Signs and symptoms of Cushing's syndrome in both cohorts*

Individual patients showed varying degrees of improvement in Cushing's syndrome manifestations such as cushingoid appearance, acne, hirsutism, striae, psychiatric symptoms, and excess total body weight. Because of the variability in clinical presentation and variability of response in this open label trial, it is uncertain whether these changes could be ascribed to the effects of Korlym.

## 16  HOW SUPPLIED/STORAGE AND HANDLING

Korlym is supplied as a light yellow to yellow, film-coated, oval-shaped tablet debossed with "Corcept" on one side and "300" on the other. Each tablet contains 300 mg of mifepristone. Korlym tablets are available in bottles of 28 tablets (NDC 76346-073-01) and bottles of 280 tablets (NDC 76346-073-02).

Store at controlled room temperature, 25 °C (77 °F); excursions permitted to 15 to 30 ° C (59 – 86 °F).
*[See USP Controlled Room Temperature]*

## 17  PATIENT COUNSELING INFORMATION

As a part of patient counseling, doctors must review the Korlym Medication Guide with every patient.
*[See FDA-Approved Medication Guide (17.3)]*

### 17.1  Importance of Preventing Pregnancy

- Advise patients that Korlym will cause termination of pregnancy.  Korlym is contraindicated in pregnant patients.

16

- Counsel females of reproductive potential regarding pregnancy prevention and planning with a non-hormonal contraceptive prior to use of Korlym and up to one month after the end of treatment.
- Instruct patients to contact their physician immediately if they suspect or confirm they are pregnant.

17

FDA 0285

**Medication Guide**
**Korlym™ (KOR-lim)**
**(mifepristone)**
**tablets**

Read this Medication Guide before you start taking Korlym and each time you get a refill. There may be new information.  This information does not take the place of talking with your doctor about your medical condition or treatment.

**What is the most important information I should know about Korlym?**

**Korlym can cause serious side effects, including:**

- **Loss of a pregnancy.**  Women who can become pregnant must:

    - have a negative pregnancy test before starting Korlym

    - have a negative pregnancy test before restarting Korlym if you stop taking it for more than 14 days

    - use a non-hormonal form of birth control while taking Korlym and for 1 month after stopping Korlym.  Talk to your doctor about how to prevent pregnancy.  Tell your doctor right away if you think you may be pregnant.

**What is Korlym?**

Korlym is a prescription medicine used to treat high blood sugar (hyperglycemia) caused by high cortisol levels in the blood (hypercortisolism) in adults with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or cannot have surgery.

Korlym is not for people who have type 2 diabetes mellitus not caused by Cushing's syndrome.

It is not known if Korlym is safe and effective in children.

**Who should not take Korlym?**

**Do not take Korlym if you:**

- **are pregnant.**  See "What is the most important information I should know about Korlym?"

- **are taking:**
    - simvastatin (Zocor®, Vytorin®, Juvisync®, Simcor®)
    - lovastatin (Mevacor®, Altoprev®, Advicor®)
    - cyclosporine (Gengraf®, Neoral®, Restais®, Sandimmune®)
    - dihydroergotamine (Migranal®)
    - ergotamine (Ergomar®, Migerot®)
    - fentanyl (Abstral®, Actiq®, Duragesic®, Fentora®, Lazanda®, Onsolis®, Sublimaze Preservative Free®, Sunsys®)
    - pimozide (Orap®)

1

FDA 0286

- quinidine (Neudexta®)
- sirolimum (Rapamune®, Torisel®)
- tacrolimus (Prograf®, Protopic®)

- must take corticosteroid medicines for other serious medical problems

- are a woman who still has her uterus (womb) **and** have:
  - unexplained bleeding from your vagina
  - changes in the cells lining your uterus (endometrial hyperplasia) or cancer of the lining of your uterus (endometrial cancer)

- are allergic to mifepristone or any of the ingredients in Korlym. See the end of this Medication Guide for a complete list of ingredients in Korlym.

Talk to your doctor before taking Korlym if you have any of these conditions.

**What should I tell my doctor before taking Korlym?**
Before taking Korlym, tell your doctor if you:

- have low potassium in your blood (hypokalemia)
- have or have had a bleeding problem or are taking medicines to thin your blood
- have or have had heart problems
- have had an organ transplant
- have been taking medicines called corticosteroids (cortisone, dexamethasone, methylprednisolone, prednisolone, prednisone)
- are breastfeeding or plan to breastfeed. Korlym passes into your breast milk and may harm your baby. You and your doctor should decide if you will take Korlym or breastfeed. You should not do both.

**Tell your doctor about all of the medicines you take,** including prescription and nonprescription medicines, vitamins and herbal supplements.

Using Korlym with certain other medicines can affect each other. Using Korlym with other medicines can cause serious side effects.

Especially tell your doctor if you take:
- medicines to treat:
  - fungal infections (such as ketoconazole)
  - depression
  - HIV infection
  - Hepatitis C infection
  - certain bacterial infections
- steroid medicines such as prednisone
- thyroid hormones

Ask your doctor or pharmacist for a list of these medicines if you are not sure.

Reference ID: 3089791

FDA 0287

Know the medicines you take. Keep a list of them to show to your doctor and pharmacist.

## How should I take Korlym?

- Take Korlym exactly as your doctor tells you.
- Your doctor may change your dose if needed.
- Korlym is usually taken 1 time each day.
- Take Korlym with food.
- Swallow Korlym whole. **Do not** split, crush or chew Korlym tablets.  If you cannot swallow Korlym tablets whole, tell your doctor.

## What should I avoid while taking Korlym?

You should not drink grapefruit juice while you take Korlym.  Grapefruit juice may increase the amount of Korlym in your blood and increase your chance of having side effects.

## What are the possible side effects of Korlym?

**Korlym can cause serious side effects including:**

- **See "What is the most important information I should know about Korlym?"**

- **reduced effects of adrenal hormones (adrenal insufficiency)**. Korlym stops an adrenal hormone in your body called cortisol from working.  Tell your doctor right away if you have any symptoms of adrenal insufficiency.  Symptoms may include:
  - unusual tiredness or weakness
  - nausea
  - fatigue
  - low blood pressure (hypotension)
  - low blood sugar (hypoglycemia)

- **low blood potassium (hypokalemia)**.  Your doctor should check the level of potassium in your blood before you start taking Korlym and while you take it.  Tell your doctor if you have any signs of low potassium.  Signs may include:
  - muscle weakness, aches, or cramps
  - abnormal or irregular heartbeats (palpitations)

- **bleeding from the vagina.**  Korlym may cause the lining of your uterus to become thick and may cause your uterus to bleed.  Tell your doctor right away about any bleeding from your vagina that is not normal for you.

- **problems with the electrical system of your heart (QT interval prolongation).**

- **worsening of symptoms of other medical problems that are treated with corticosteroids when you take corticosteroids and Korlym at the same time.**

3

FDA 0288

The most common side effects of Korlym include:
- nausea
- fatigue
- headache
- low potassium in your blood
- pain in your arms and legs (arthralgia)
- vomiting
- swelling of your arms and legs (peripheral edema)
- high blood pressure
- dizziness
- decreased appetite
- thickening of the lining of the uterus (endometrial hypertrophy)

Tell your doctor if you have any side effect that bothers you or that does not go away.

These are not all the possible side effects of Korlym. For more information, ask your doctor or pharmacist.

Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**How should I store Korlym?**

Store Korlym at room temperature, between 68°F to 77°F (20°C to 25°C).

**Keep Korlym and all medicines out of the reach of children.**

**General information about the safe and effective use of Korlym**

Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide.

Do not use Korlym for a condition for which it was not prescribed. Do not give Korlym to other people, even if they have the same symptoms you have. It may harm them.

This Medication Guide summarizes the most important information about Korlym. If you would like more information, talk with your doctor. You can ask your doctor or pharmacist for information about Korlym that is written for healthcare professionals.

For more information, call 1-855-4Korlym (1-855-456-7596) or visit www.korlym.com or www.corcept.com.

**What are the ingredients in Korlym?**

**Active ingredient**: mifepristone

**Inactive ingredients**: silicified microcrystalline cellulose, sodium starch glycolate, hydroxypropylcellulose, sodium lauryl sulfate, magnesium stearate, hypromellose, titanium dioxide, triacetin, D&C yellow 10 aluminum lake, polysorbate 80, and FD&C yellow 6 aluminum lake.

4

FDA 0289

This Medication Guide has been approved by the US Food and Drug Administration.

Distributed by:
Corcept Therapeutics Incorporated
149 Commonwealth Avenue
Menlo Park, CA 94025
Issued: 02/2012

Reference ID: 3089791

FDA 0290

FDA 0291



Lot No:
Exp.

Manufactured for:
Corcept Therapeutics
Menlo Park, CA 94025

NDC 76346-073-01    **Rx only**
28 Tablets

**Korlym®**
mifepristone

**300 mg Tablets**

**Take tablets whole. Do not split, crush or chew.**

**ATTENTION PHARMACIST:** Dispense attached Medication Guide to each patient.

Each yellow oval-shaped tablet contains 300 mg of mifepristone.

**Usual Dosage:** For indications, dosage, precautions, etc., see accompanying package insert.

Store at 25°C (77°F); excursions permitted to 15° to 30°C (59° to 86°F) [see USP Controlled Room Temperature].
Dispense in tight container (USP)

**KEEP THIS AND ALL DRUGS OUT OF THE REACH OF CHILDREN**

BAR CODE

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*
## 202107Orig1s000

# <u>RISK ASSESSMENT and RISK MITIGATION REVIEW(S)</u>

FDA 0292

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**
**Office of Surveillance and Epidemiology**
**Office of Medication Error Prevention and Risk Management**

**RISK MANAGEMENT REVIEW**

Date:                          January 27, 2012

Risk Management Analyst:       Suzanne Robottom, Pharm.D.
                               Division of Risk Management (DRISK)

Team Leader:                   Cynthia LaCivita, Pharm.D., DRISK

Division Director:             Claudia Karwoski, Pharm.D., DRISK

Drug Name:                     Korlym (mifepristone)

Dosage and Route:              300 mg tablets; by mouth

Application Type/Number:       NDA 202-107

Applicant/sponsor:             Corcept

OSE RCM #:                     2011-2351

**EXECUTIVE SUMMARY**

The purpose of this review is to document DRISK's determination that a risk evaluation and mitigation strategy (REMS) with elements to assure safe use (ETASU) is not necessary for the approval of mifepristone for the treatment of the signs and symptoms of endogenous Cushing's syndrome.

Corcept submitted a 505(b)(2) application for approval of Korlym (mifepristone) for the treatment of the signs and symptoms of endogenous Cushing's syndrome. Mifepristone (Mifeprex) is currently approved for pregnancy termination with a REMS with ETASU. Based on FDA feedback provided at the September 14, 2010 pre-NDA meeting, Corcept proposed a REMS with ETASU with their NDA submission.

After extensive research and multiple discussions with the review team, DRISK and the Division of Metabolism and Endocrinology Products (DMEP) determined that:

- A REMS with ETASU is not necessary to ensure that the benefits outweigh the risks of Korlym *in the Cushing's population*.

- A REMS with ETASU for Korlym would not improve the benefit/risk balance for the intended use (Cushing's) population and would add burden.

- Use of Korlym outside of Cushing's syndrome cannot be prospectively quantified.

The REMS Oversight Committee and the Center Director provided additional guidance and affirmed that although a REMS is required for Mifeprex, a REMS for Korlym is not necessary to ensure that the benefits of the drug outweigh its risks at this time. Korlym's safety and drug utilization should use be monitored through post marketing requirements (PMR). If data indicate that the current approach compromises the integrity of the Mifeprex REMS and results in serious adverse events, or additional serious safety signals arise, further regulatory action must be considered.

# 1   INTRODUCTION

The purpose of this review is to document DRISK's determination that a REMS with ETASU is not necessary for the approval of mifepristone for the treatment of the signs and symptoms of endogenous Cushing's syndrome.

## 1.1   BACKGROUND

Corcept submitted a 505(b)(2) application on April 15, 2011 for approval of Korlym (mifepristone) to treat the clinical and metabolic effects of hypercortisolism in adult patients ($\geq$ 18 years of age) with endogenous Cushing's syndrome including:

- Patients with Cushing's disease who have not adequately responded to or relapsed after surgery

- Patients with Cushing's disease who are not candidates for surgery

(b) (4)

Korlym is manufactured as 300 mg tablets. The proposed dosing for the aforementioned indication is 300 to 1200 mg daily by mouth.

## 1.2 REGULATORY HISTORY

Mifepristone if currently marketed as Mifeprex and approved on September 28, 2000 under 21 CFR 314 Subpart H for the medical termination of intrauterine pregnancy through 49 days' pregnancy. The approved dosing is 600[1] mg (three (3), 200 mg tablets) followed by misoprostol on Day 4. Since approval, mifepristone is available only through a restricted distribution program that requires prescribers to be enrolled to be able to order Mifeprex and should only be distributed to/through a clinic, medical office, or hospital, by or under the supervision of a specially certified prescriber. Mifeprex is not distributed to or dispensed through retail pharmacies. The restricted distribution program was approved as a REMS on June 8, 2011.[2]

In 2007, Corcept initiated a clinical development program to evaluate the clinical benefit of mifepristone in patients with Cushing's syndrome and received orphan drug designation on July 5, 2007.

A pre-NDA meeting with Corcept was held on September 14, 2010. Corcept informed the FDA that they intended to submit a REMS and requested comments on the draft REMS. The FDA informed Corcept that for this NDA/indication, a REMS with restricted distribution would be necessary to address the risk of termination of pregnancy. The proposed REMS must be sufficient to maintain the integrity of the current Mifeprex restricted distribution program. The sponsor was instructed that a complete review of the proposed REMS, and REMS materials would be done in conjunction with the full clinical review after the NDA is submitted.

On April 15, 2011 Corcept submitted NDA 202107 for review with a proposed REMS.

## 2     MATERIALS REVIEWED

The following materials were reviewed:

- Weber J. Pre-NDA Meeting Preliminary Comments for September 14, 2010. Signed under IND 76480 on September 9, 2010 by Weber J.
- NDA 202107 submitted on April 15, 2011 and received on April 18, 2011 with a proposed REMS with ETASU.
- Bhatnagar U. Maternal Health Team review for Mifepristone. Signed September 15, 2011 by Bhatnagar U, Feibus K, and Mathis L.
- Greene P. Drug use review of Mifeprex. Signed September 19, 2011 by Greene P, Chai G, and Governale L.

---

[1] Standard practice is to dispense a single, 200 mg tablet of mifepristone, not 600 mg. In addition, the standard misoprostol dose is 800µg (4 tablets), not 400 µg.
[2] Mifepristone was included on the list of products deemed to have in effect an approved risk evaluation and mitigation strategy (REMS) under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007.

FDA 0295

Reference ID: 3078677

- November 3, 2011 Center Director Briefing on Mifepristone for Cushing's syndrome. Signed into DAARTS for NDA 202107 on November 15, 2011 by Egan A.
- (b) (6) Division of Reproductive and Urology Products consult response. Signed November 18, 2011 by (b) (6).

## 3    RISK BENEFIT CHARACTERIZATION

### 3.1    CUSHING'S SYNDROME AND TREATMENT OPTIONS

Cushing's syndrome is a serious, multisystem disorder that results from overproduction of cortisol by the adrenal glands. For those not cured by surgery, it is a chronic and debilitating condition.[4] If left untreated, Cushing's syndrome limits survival to 4 to 5 years following initial diagnosis.[3]

Surgical resection of the offending tumor remains first line treatment, and initial cure or remission is obtained in 65-85% of patients with Cushing's disease.[4] In cases that surgery only partially or temporarily controls glucocorticoid hypersecretion (or for patients who are not candidates for surgery),[5] radiation and/or pharmacologic treatment is used for disease control. A two to three fold increase in mortality is observed in most studies and this excess mortality seems confined to patients in whom initial cure was *not* obtained (the indicated population for mifepristone). [4]

There is an unmet medical need for additional drug treatment options for Cushing's syndrome. The following table lists the drug treatment options, none of which are approved for Cushing's syndrome:[2,6]

| Steriodogenic inhibition | Adrenolytic | Neuromodulators of ACTH release | Glucocorticoid receptor antagonism |
|---|---|---|---|
| <ul><li>Metyrapone (not available in US)</li><li>Aminoglutethimide (discontinued)^</li><li>Ketoconazole</li></ul> | <ul><li>Mitotane^^</li><li>Etomidate</li></ul> | <ul><li>Cyproheptidine*</li><li>Bromocriptine*</li><li>Valproic acid*</li><li>Octreotide*</li></ul> | <ul><li>Mifepristone</li></ul> |
| ^Aminogluthethimide was approved in 1980 and indicated "for the the suppression of adrenal function in selected patients with Cushing's syndrome." <br>^^Mitotane was approved in 1970 and indicated for "the treatment of inoperable adrenal cortical carcinoma of both functional and nonfunctional types." <br>*Agent has not demonstrated consistent clinical efficacy.[3] | | | |

---

[3] Gums JG, Smith JD. Adrenal Gland Disorders. Pharmacotherapy: A pathophysiologic approach. 4th ed. Ed Dipiro JT. Stamford, Appleton & Lange, 1999. Print.
[4] Steffensen C, Bak AM, Rubeck KZ, Jorgensen JO. Epidemiology of Cushing's syndrome. Neuroendocrinology 2010;92(supp 1):1-5.
[5] Johanssen S. Allolio B. Mifepristone (RU 486) in Cushing's syndrome. Euro J Endocrin (2007)156; 561-569.
[6] Heyn J, et al. Medical suppression of hypercortisolemia in Cushing's syndrome with particular consideration for etomidate. Pituitary (online May 10, 2011).

Reference ID: 3078677

### 3.1.1    Size of Population

Cushing's syndrome is a rare disorder with incidence ranging from 0.7 to 2.4 per 1 million persons per year.[7] Ninety percent of all cases of Cushing's syndrome occur during adulthood; the incidence of Cushing's syndrome in children is estimated at approximately 0.2 cases per 1 million persons per year.

It is estimated that at any given time there are approximately 20,000 patients with Cushing's syndrome in the U.S. The peak incidence of Cushing's syndrome due to an adrenal or pituitary tumor occurs in persons 25-40 years of age; females are 8 times more likely than males to develop hypercortisolemia from a pituitary tumor and 3 times more likely to develop a cortisol-secreting adrenal tumor.

In the US, it is estimated that approximately 5,000 patients would be considered candidates for treatment with Korlym.

### 3.2    EXPECTED DRUG BENEFIT

Mifepristone works by binding to glucocorticoid receptors, preventing cortisol from binding, and thereby blocking cortisol's activity and effects. It does not decrease the amount of circulating cortisol. It has a rapid onset of action (~90 minutes for peak plasma concentrations).

According to the sponsor in Study 400 (open label, 24 week prospective trial), 60% of the diabetes patients met the primary endpont of at least a 25% reduction in $AUC_{glucose}$, and antidiabetic medication use was reduced in half of the patients. The Data Review Board determined that 72% of patients met the secondary endpoint of a change in signs and symptoms at week 24.

Mifepristone may be used as an adjunct to radiation, palliative treatment, or when rapid onset of anti-glucocorticoid effect is required (e.g., psychosis).

### 3.3    DURATION OF TREATMENT

Cushing's syndrome that is not cured by surgery is a chronic condition. Patients may be treated indefinitely (weeks, months, years/decades) with mifepristone.

### 3.4    SEVERITY OF THE RISK

The observed risks (adverse events documented in the safety database; adrenal insufficiency, hyopkalemia, and endometrial hyperplasia) in patients with Cushing's syndrome were considered. After discussion with DMEP, we agree that these risks can be adequately addressed through labeling.

---

[7] Newell-Price J, Bertagna X, Grossman AB, Nieman LK. Cushing's syndrome. Lancet. 2006 May 13;367 (9522):1605-17.

FDA 0297

Reference ID: 3078677

Two risks were identified that are anticipated to occur in the post-marketing setting. These risks were the focus of the risk management discussion.

### 3.4.1    Fetal Loss (unintended pregnancy termination)

#### 3.4.1.1    Cushing's Syndrome Patients

Mifepristone blocks progesterone receptors at lower doses than necessary for glucocorticoid receptor inhibition. Therefore, the lowest treatment dose studied for the treatment of Cushing's syndrome is effective for terminating pregnancy. However, mifepristone alone is less effective for pregnancy termination when compared to the combined regimen mifepristone/prostaglandin.[8]

Women with Cushing's syndrome are not at substantial risk for fetal loss because they are unlikely to be pregnant. The review by the Maternal Health Team (MHT) states that amenorrhea and ovulatory disturbances are associated with untreated Cushing's syndrome and therefore pregnancy occurs "rarely" in this population. Pregnancy may occur in a small subset of patients with Cushing's syndrome who are of childbearing age. MHT recommends that this possibility be noted in labeling.[9]

At the time treatment is initated with mifepristone, a woman has a low likelihood of conception due to her underlying disease. During treatment, if she is not compliant with mifepristone treatment, she would be amenorrheic due to worsened disease condition. If she is compliant with medication, mifepristone would prevent a sustained pregnancy. Therefore, the risk of fetal loss before and during treatment in the intended patient population appears low.

Pregnancy tests were performed in Study 400 as part of enrollment and repeated after any significant interruption of treatment. No pregnancies were reported.

#### 3.4.1.2    Non-Cushing's Syndrome Patients

There are a variety of uses for mifepristone ⬛⬛⬛ (b) (4). It has been studied to treat the following:



---

[8]    (b) (6)  Division of Reproductive and Urology Products consult response. Signed November 18, 2011 by ⬛ (b) (6) ⬛.

[9] Bhatnagar U. Maternal Health Team review for Mifepristone. Signed September 15, 2011 by Bhatnagar U, Feibus K, and Mathis L.

Reference ID: 3078677

At present, mifepristone is only commercially available in blister packages (3 pills per carton) that are sold through the Mifeprex REMS. If Korlym is approved without restrictions (e.g. REMS), mifepristone will be more readily available to treat females of child bearing potential with other chronic conditions. The extent of off-label use of mifepristone, for the above conditions, in the post-marketing setting is unknown.

### 3.4.2  Intended Termination of Pregnancy with Korlym

If Korlym is approved without a REMS with restricted distribution, there will be increased access to mifepristone. This could lead to 1) prescribers prescribing Korlym for the termination of pregnancy without following the safeguards that are in place for Mifeprex and/or 2) misuse, pilfering, and diversion of Korlym for the termination of pregnancy not under the supervision of a healthcare provider.

The risk <u>mitigation</u> tools for the Mifeprex REMS are physician certification and controlled access to assure safe use. A Mifeprex prescriber must agree that he/she meets the required qualifications to assure the drug is used safey and appropriately. Compliance with the REMS requirements is not enforced beyond a one-time completion of the enrollment form (e.g., signed Patient Agreements are not collected). The certification requirement is the tool that provides controlled access for Mifeprex. Without restricted distribution, a prescriber using Korlym for pregnancy termination would <u>not</u> have to attest to having certain skills, agree to document certain information/activities, or report adverse events. The patient would not receive a Patient Agreement or Mifeprex Medication Guide that would provide the most relevant and important information to her for pregnancy termination. The current REMS does not prevent use beyond 49 days gestation, termination of an ectopic pregnancy, bleeding, incomplete abortion, and infection.

In considering if there is increased potential for pilfering and misuse with Korlym, we note that Mifeprex is distributed only to medical facilities and dispensed to the patient in small quantities (a single tablet) by certified prescribers. Korlym will be distributed directly to patients, in larger quantities and each Korlym tablet is an effective dose for pregnancy termination. Moreover, Korlym is proposed to be packaged in bottles of 28 and 280, making diversion and pilfering presumably easier relative to the Mifeprex packaging. Similar to Korlym, there is potential for Mifeprex to be pilfered or diverted from a distribution facility, during shipping, or at the place of dispensing. Mifeprex has processes in place to prevent drug loss during distribution and shipping that can be done outside a REMS for Korlym. It is not known if clinics keep careful stock and dispensing records of Mifeprex.

### 3.5    RISK IN CONTEXT OF DRUGS IN CLASS AND AMONG OTHER DRUGS USED TO TREAT THE DISEASE

There are no other glucocorticoid receptor antagonists approved in the U.S. for comparison.

Ketoconazole, metapyrone (not approved in U.S.), mitotane, etomidate are anti-corticolic drugs that are used for the treatment of Cushing's syndrome. Because these drugs have a

different mechanism of action, they are not associated with the same potential risks as mifepristone. These drugs are associated with serious risk(s) although none of these drugs have a REMS.

### 3.6  HOW THE RISK(S) ARE MANAGED ACROSS OTHER PRODUCTS AND/OR DISEASES

#### 3.6.1  Fetal Loss

Other drug products are associated with fetal loss (e.g., methotrexate, misoprostol; see Attachment 1). At present, this risk is addressed through labeling for these drugs. There are no REMS approved that address only fetal loss without also the accompanying risk of birth defect.

#### 3.6.2  Intended Termination of Pregnancy with Korlym

We identified two drugs, misoprostol and methotrexate, that are associated with a risk of pregnancy termination and are approved for other uses. See the table in Attachment 1. The extent to which misoprostol and methotrexate are used off-label to terminate pregnancy is unknown. With each drug, the risk of termination of pregnancy is managed through labeling (Contraindication, Boxed Warning) and neither product has a REMS.

#### 3.6.3  Misuse

Misuse has been addressed in different ways as follows:

*Voluntary Restricted Distribution:*

- *Example: Egrifta/growth hormone*: Growth hormones are at risk for misuse and abuse. None of the growth hormone products have a REMS. However, the sponsor has voluntarily decided to distribute this product through a non-REMS restricted distribution system which allows tracking "of each box of Egrifta to determine the volume of product dispensed and evaluate if the projected number of boxes dispensed correlates with prescription use in the intended population."[10] Egrifta was approved in 2010 with no REMS and no PMR for monitoring drug use.

*Required Restricted Distribution Program*

- *Example: Xyrem[11]*
  - At the time Xyrem was initially approved in 2002, the Sponsor agreed as a condition of approval to distribute and dispense Xyrem through a primary and exclusive central pharmacy, implement a program to educate physicians and patients about the risks and benefits of Xyrem, fill the initial prescription only after the prescriber and patient received and read the educational materials, and maintain patient and prescribing physician registries.[12]

---

[10] LaCivita C. Review of REMS for Egrifta. Signed September 3, 2010.

[11] Xyrem was included on the list of products deemed to have in effect an approved risk evaluation and mitigation strategy (REMS) under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007.

[12] Choudhry Y. REMS Interim Comment Set #1. Signed August 1, 2011 by Choudhry Y and Worthy K.

Reference ID: 3078677

### 3.6.4    Same Active Ingredient, Different Indication and Different Risk Management Approaches

The agency evaluates an active ingredient based on the risk benefit profile for the intended population. To date, the Agency has not required a REMS for a product based only on the fact that the active ingredient already has a REMS for one population. For example, denosumab was originally approved under two tradenames for different indications. Prolia was initially approved for the treatment for post-menopausal osteoporosis (PMO). At that time, a REMS for Prolia was required and approved consisting of a Medication Guide and communication plan to "inform healthcare providers about the risks of serious infections, dermatologic adverse reactions, and suppression of bone turnover, including osteonecrosis of the jaw." Under the tradename Xgeva, denosumab was approved for prevention of skeletal-related events in patients with bone metastases from solid tumors. A REMS was not required given the resulting differences in the risk benefit profile when considering the patient populations (post-menopausal women vs cancer patients with bone metastases) and prescribing populations (internists vs oncologists).

### 3.7    PRODUCTS AFFECTED

Mifeprex (and pending generics) are potentially affected because they are or will only be available under a restrictive REMS.

## 4    RISK MANAGEMENT CONSIDERATIONS

The following factors are important to consider:

- Burden to the intended population

  It is important to ensure that the intended treatment population can receive Korlym in a timely, dependable manner in the least burdensome way. Any restrictions will impede access with little to no benefit to Cushing's syndrome population.

- Confidentiality/Privacy

  Confidentiality and patient privacy is a significant issue with Mifeprex. To what extent do stakeholders who make, distribute, dispense, prescribe, and use Korlym need protection from a confidentiality perspective?

  The purpose of a REMS is to ensure the benefits of the drug outweigh its risks. Confidentiality and concern regarding the safety of the prescribers, pharmacists, and patients does not meet criteria. Confidentiality can be maintained without a REMS. Privacy may be better maintained if there are no systems in place to track formally prescribers and patients. Risk to pharmacies that stock the drug should be considered but it is outside the purview of a REMS.

- Reproductive potential for various possible Korlym off-label use populations

Reference ID: 3078677

As stated in section 3.4.1.2. above, there are a variety of uses for mifepristone
 (b) (4). The therapeutic areas included below are more likely to
include females of reproductive potential than other uses                    (b) (4)). A formal
epidemiologic review was not conducted to estimate of the proportion of females of
reproductive potential for each use. However, the following observations and/or
assumptions were made:

(b) (4)

The degree to which Korlym will be used off label for the above uses is unknown.

- Extent of current off-label use

  Current Mifeprex drug utilization information is not informative in predicting broader
  uses for Korlym. In the September 19, 2011 mifepristone drug use review using
  commercial databases was conducted, off-label use was described as "uncommon"
  based on information obtained through a *sample* of medical offices and outpatient
  clinics. Sales distribution data was not available. The lack of findings are not
  surprising given the design of the Mifeprex REMS.

## 5   RISK MANAGEMENT OPTIONS

DRISK analyzed more than six risk management options to address intended termination
of pregnancy by:

- HCPs outside of Mifeprex REMS

- women who seek to terminate a pregnancy and are not under the care of an HCP

Ultimately, three options were considered.

1. No REMS and voluntary restricted distribution through specialty
   pharmacies/distributors

   This REMS option may minimize diversion and subsequent misuse by
   minimizing the number of pharmacies stocking and dispensing Korlym for
   outpatient use. This option is in alignment with DMEP and DRISK's assessment
   that a REMS is not necessary to assure the safe use of mifepristone for treating
   patients with Cushing's syndrome because we believe the likelihood that a
   Cushing's patient experiences "serious complications" relating to pregnancy
   termination are low.

Reference ID: 3078677

This approach is also consistent with misoprostol and methotrexate, both of which are known abortifacents and do not have a REMS to address that risk. This approach is used to prevent misuse of the growth hormone products.

2. REMS with ETASU – dispensing through certified specialty pharmacies

This REMS option may minimize diversion and subsequent misuse by minimizing the number of pharmacies stocking and dispensing Korlym for outpatient use. In addition, Corcept would be required to provide FDA an assessment of how the REMS is achieving its goals.

This option does not address intended termination of pregnancy with Korlym.

3. REMS with ETASU – prescriber certification (agreement not to use for termination of pregnancy) and distribution through certified specialty pharmacies that are willing to track inventory

This REMS option would minimize diversion and subsequent misuse as described above. In addition, certified pharmacies (for outpatient dispensing, not inpatient hospital pharmacies) would verify that prescribers were certified. Prescriber certification would consist of agreement not use Korlym for pregnancy termination. The addition of prescriber certification would address the risk of intended termination of pregnancy with Korlym.

These options assume that the safety labeling is maximized to address Korlym use in pregnancy.

## 6    DISCUSSION

The issue of how to address intended termination of pregnancy was discussed at the REMS Oversight Committee meeting on September 29, 2011 and at a Center Director Briefing on November 3, 2011.

DMEP and DRISK presented at both meetings that women with Cushing's syndrome are unlikely to be or become pregnant given the effects of their disease on the reproductive system and the effects of daily mifepristone treatment. Therefore, addressing the risk of fetal loss associated with Korlym was not discussed because 1) pregnancy is not a likely event in the intended population and; 2) the use of Korlym for "off-label" uses (in women more likely to be pregnant) is unknown and available data do not indicate that mifepristone would be first line treatment for any diseases or conditions at this time. For these reasons, there was general agreement that fetal loss can be adequately addressed through labeling and is not necessary to require additional safe use measures through a REMS at this time.

The team stated that for any risk management approach, it is important to ensure that the intended treatment population can receive Korlym in a timely, dependable manner in the least burdensome way. Any restrictions could impede access without benefit to the intended population.

The primary focus shifted to whether or not a REMS is necessary for Korlym to maintain the integrity of the Mifeprex REMS. While the absence of any restrictions on Korlym could undermine the safe use conditions required by the Mifeprex REMS, a number of other factors are important considerations including:

- The burden (reduced access, treatment delays) of a restrictive REMS to the Cushing's population without any benefit from the REMS for this population.
- Overall drug exposure and subsequent access is anticipated to be small given the small size of the intended use population and lack of a signal for substantially broader use.
- The sponsor's plan to distribute Korlym through a specialty pharmacy regardless of the REMS. If necessary, this provides the sponsor the ability to monitor use more closely.
- The cost - If the cost of this orphan product is substanial, it may be expensive to obtain and deter use for pregnancy termination as well as other off label uses. In addition, third party payors/reimbursement may play a substantial role in influencing prescribing behavior. It is unknown how much Korlym will cost and how cost will impact prescribing behavior.[13]

The need for some monitoring of use was discussed. Commercial drug use databases will not provide FDA with adequate estimates of Korlym use because Korlym will be dispensed through a specialty pharmacy. As noted above, using a single specialty pharmacy does allow the sponsor the ability to monitor use more closely through its business contract with the specialty pharmacy. Similarly, commercial drug use databases are not able to provide an accurate estimate of Mifeprex use due to how it is distributed and dispensed. The first REMS assessment for Mifeprex is due June 2012 which we anticipate will provide a baseline to quantify current Mifeprex use. Given these considerations and the discussion with the Center Director, we agree that a post-marketing requirement (PMR) study to obtain Korlym use data (age, gender, dose, duration of treatment) "to better characterize the incidence rates of adverse events with Korlym" is prudent. Monitoring drug use data for both Mifeprex and Korlym, in conjunction with reports of serious adverse events resulting from pregnancy terminations outside of the Mifeprex REMS, will be important factors in future regulatory action to address any compromise to the Mifeprex REMS.

## 7    CONCLUSION

A REMS for Korlym is not necessary to ensure that the benefits of the drug outweigh its risks at this time. We agree that it is prudent to monitor use through a PMR. If data indicate that this approach compromises the integrity of the Mifeprex REMS and results in serious adverse events, or additional serious safety signals arise, further regulatory action must be considered.

## ATTACHMENTS

---

[13] Planned parenthood charges $300-800 for a medical abortion (includes diagnostic testing, mifepristone, and misoprostol).

Reference ID: 3078677

ATTACHMENT 1: Drugs with a risk associated with an off-label use

| Drug | Abortifacient Efficacy | Indication | Off-label use* | Contraindication | Boxed Warning |
|------|----------------------|-----------|----------------|-----------------|---------------|
| Misoprostol (Cytotec) | When used alone – variable (~40-60%); used in combination with MTX or MFP efficacy is higher<br><br>(Source - Micromedex) | NSAID-induced gastric ulcers | • Postpartum hemorrhage<br>• Cervical ripening, labor induction<br>• Pregnancy termination | "Cytotec should not be taken by pregnant women to reduce the risk of ulcers induced by NSAIDs " | "Cytotec administration to women who are pregnant can cause abortion … Cytotec should not be taken by pregnant women to reduce the risk of ulcers induced by NSAIDs… Patients must be advised of the abortifacient property and warned not to give the drug to others  … " |
| Methotrexate (MTX) | When used alone – (IM injxn – variable); in combination with misoprostol efficacy is higher (80-90%; small Ns)<br><br>(Source - Micromedex) | • Cancer<br>• Psoriasis<br>• Rheumatoid arthritis including juvenile | • Other Autoimmune diseases<br>• More cancer<br>• Pregnancy termination | "MTX can cause fetal death or teratogenic effects when administered to a pregnant woman  MTX is contraindicated in pregnant women with psoriasis or rheumatoid arthritis and should be used in the treatment of neoplastic diseases only when the potential benefit outweighs the risk to the fetus  Women of childbearing potential should not be started on MTX until pregnancy is excluded and should be fully counseled on the serious risk to the fetus should they become pregnant while undergoing treatment " | "MTX has been reported to cause fetal death and/or congenital anomalies  Therefore, it is not recommended for women of childbearing potential unless there is clear medical evidence that the benefits can be expected to outweigh the considered risks  Pregnant women with psoriasis or rheumatoid arthritis should not receive MTX " |

*The off-label uses are general and based on tertiary sources; not on a formal drug use analysis.

13

FDA 0305

--------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------

SUZANNE C BERKMAN ROBOTTOM
01/27/2012

CLAUDIA B KARWOSKI
01/27/2012
concur

FDA 0306

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 202107Orig1s000

# <u>SUMMARY REVIEW</u>

# Summary Review for Regulatory Action

| | |
|---|---|
| **Date** | February 17, 2012 |
| **From** | Mary H. Parks, M.D. |
| **Subject** | Division Director Summary Review |
| **NDA/BLA #** | 202107 |
| **Supplement #** | (cross reference IND 76480) |
| **Applicant Name** | Corcept Therapeutics, Inc. |
| **Date of Submission** | April 18, 2011 |
| **PDUFA Goal Date** | February 17, 2012 |
| **Proprietary Name / Established (USAN) Name** | Korlym (mifepristone immediate-release tablet) |
| **Dosage Forms / Strength** | 300-mg tablets |
| **Proposed Indication(s)** | To control hyperglycemia in adult patients with endogenous Cushing's syndrome with T2DM or glucose intolerance who have failed surgery or are not candidates for surgery |
| **Action/Recommended Action for NME:** | Approval |

# 1. Introduction

Corcept Therapeutics has submitted this new drug application (NDA) under Section 505(b)(2) of the Federal Food, Drug and Cosmetic Act (FDCA) for the use of Korlym® (mifepristone) in the treatment of patients with endogenous Cushing's syndrome who have failed surgery or are not candidates for surgery.

Cushing's syndrome is due to hypercortisolism and its clinical and metabolic consequences. It is broadly separated into exogenous and endogenous forms, the former due to exogenous glucocorticoid administration for varied medical conditions and the latter due to the body's over production of cortisol. Endogenous Cushing's syndrome is further divided into ACTH-dependent and ACTH-independent forms to distinguish between an extra-adrenal or intra-adrenal pathology. [1] As this application is only for the treatment of underlined endogenous Cushing's syndrome, the remainder of this memo will refer to Cushing's syndrome with an understanding that it is specific to only the endogenous forms of this condition.

Approximately 80-85% of Cushing's syndrome are ACTH-dependent with 80% of these due to a pituitary tumor (Cushing's disease) and 20% due to ectopic ACTH secretion from a non-pituitary tumor with the most prevalent ones being bronchial carcinoid and small cell lung

---

[1] Pivonello R et al. Cushing's Syndrome, *Endocrinology and Metabolism Clinics of North America.* 2008; 37(1): 135-149.

Reference ID: 3089695

FDA 0308

cancer although any tumor of neuroendocrine origin may produce ACTH.[2] Of the approximate 15-20% of ACTH-independent Cushing's syndrome, the majority are due to an adrenal tumor. Cushing's syndrome is a rare disease with an incidence of 0.7 to 2.4 per million population per year. This application received orphan designation on July 5, 2007.

The diagnosis of Cushing's syndrome requires a multitude of laboratory and radiologic tests whose discussion extends beyond the scope of this memo. The objective of the laboratory tests is to demonstrate inappropriate and sustained hypercortisolism to distinguish these patients from conditions such as pseudo-Cushings, severe depression, or cyclical Cushing's. Reliance on just clinical presentations is not possible or acceptable as patients' presentations are highly variable and span a wide spectrum that includes textbook descriptions of buffalo hump, violaceous striae, hirsutism and facial plethora to more subtle signs of just diabetes and depression. The etiology of the syndrome may also influence the clinical presentation. For example, the age range of patients with ectopic ACTH syndromes is generally a decade older than those with Cushing's disease with a lower female to male ratio. Patients with ectopic ACTH syndrome or adrenal cancers may also present with more severe signs and symptoms of hypercortisolism, and due to the underlying malignant nature of the tumor, these patients often have greater morbidity.

Regardless of the etiology of Cushing's syndrome, the treatment goal is the same and in all cases, if the underlying tumor can be located, surgical resection is the preferred initial therapy. Medical therapy may be initiated prior to surgery to control the hypermetabolic state and is often relied upon afterwards if surgery is unsuccessful or the tumor recurs. In some patients, radiation therapy and/or bilateral adrenalectomy are considered. The available medical therapies are limited and unapproved for Cushing's syndrome.[3] Their use has been based on the knowledge of their effects at inhibiting certain enzymes in the adrenal steroidogenesis pathway (e.g., ketoconazole or metyrapone) or limited inhibition of ACTH (e.g., somatostatin). Mifepristone employs a different strategy in treating Cushing's syndrome: blockade of the glucocorticoid II receptor (GR) to inhibit the actions downstream from this receptor. It also blocks the progesterone and androgen receptor, the former activity being the basis for its use in termination of pregnancy.

## 2. Background

There were two main challenges in the review of this application. The first was a scientific matter and the second was a regulatory/legal one.

On the scientific note, the trial design to establish safety and effectiveness of Korlym for this indication was limited by 1) the underlying medical condition and 2) the pharmacologic action of the drug. Given the rarity and progressive nature of the condition with limited medical options, the type of trial design would have to be an uncontrolled and open-label design in a limited number of patients. Such a trial design in a small sample of patients complicates

---

[2] Alexandraki K and Grossman A. The ectopic ACTH syndrome. *Rev Endocr Metab Disord.* 2010; 11: 117-126.
[3] Mitotane is an exception but it has a limited indication in only patients with adrenal carcinomas

Reference ID: 3089695

attribution of effect and safety to drug.  The mechanism of action of the drug presented another complexity as to the appropriate endpoint to evaluate effectiveness of Korlym.  Just as the diagnosis of Cushing's syndrome requires evidence of elevated cortisol levels, the treatment of these patients relies on a demonstration of reduced cortisol levels as a measure of response and/or success.  Since the drug's selective antagonism of the GR does not result in reduced cortisol levels, this biomarker was not of any utility for establishing efficacy and could not be employed as a measure for dose titration.  Sections 6.0 and 7.0 of my memo delve further into the trial design and how the reviewers considered multiple lines of evidence to make a determination of safety and effectiveness.

The regulatory and legal challenge of this application is because of the more controversial use of this active ingredient for medical termination of pregnancy in the approved formulation, Mifeprex®.  Given as one-time lower doses than proposed in Cushing's syndrome, mifepristone binds to the progesterone receptor (PR) to achieve pregnancy termination.  Mifeprex, manufactured by Danco, was approved on September 28, 2000 under 21 CFR Subpart H and is available only through a restricted distribution program.  With passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007, a Risk Evaluation and Mitigation Strategy (REMS) with Elements to Assure Safe Use (ETASU) was applied to Mifeprex on June 8, 2011.  Mifeprex is not distributed to or dispensed through retail pharmacies but is limited to specialty clinics and prescribed by physicians who have enrolled in a certification program.  (Please see DRISK review for a full description of the Mifeprex REMS with ETASU).

Prior to the submission of Korlym and throughout the NDA review, multiple internal meetings and discussions were held to determine if Korlym and its proposed indication met the regulatory requirements for a REMS with ETASU or if one would be necessary to maintain the integrity of Mifeprex's REMS with ETASU.

Dr. Dragos Roman in his cross-discipline team leader (CDTL) memo has clearly outlined these discussions and the reader is also referred to memos written by DRISK reviewers, Drs. Robottom, LaCivita, and Karwoski, and meeting minutes prepared by Dr. Amy Egan for  a meeting involving CDER Center Director and senior managers in OND, OSE, and ORP.  On November 3, 2011, a CDER recommendation was made that given the rarity and seriousness of Cushing's syndrome and the unique situation in which it would be used, a REMS with ETASU was not warranted.  However, the applicant has agreed to establish a voluntary limited distribution system and a drug utilization study will be required postmarketing.  Please see Section 13.0 for further discussions of the PMR for this application.

## 3. CMC/Device

CMC has recommended approval without any additional testing or studies required.  Please see reviews of Drs. Ysern and Al-Hakim dated January 12, 2012.

# 4. Nonclinical Pharmacology/Toxicology

The applicant conducted several nonclinical studies to support the chronic use of mifepristone. These included safety pharmacology studies to evaluate potential of mifepristone to inhibit Ki channels, pharmacokinetic/ADME/and toxicokinetic studies, repeat-dose toxicity studies, in vitro genetic toxicology studies, and carcinogenicity studies. Published literature and studies conducted under approved NDA 20687 for use of mifepristone in pregnancy termination were also relied upon by the applicant as permitted under 505(b)(2). The three major metabolites of RU486 identified in humans were also present in mice, rats, dogs, and monkeys and were therefore adequately evaluated in the nonclinical program.

Please see Dr. Patricia Brundage's review dated January 19, 2012, for details of the nonclinical program supporting approval of this NDA. She and pharmacology/toxicology supervisor, Dr. Todd Bourcier, deem data acceptable in support of approval of mifepristone for Cushing's syndrome provided labeling accurately reflects the nonclinical findings and their recommendations on use of the product. Dr. Bourcier's memo dated February 7, 2012, also outlines the sufficient bridging data to Mifeprex® supporting reliance on FDA's finding of safety and effectiveness for some aspects of this application. No postmarketing trials are being proposed by this discipline.

Several of the safety findings identified reflect the pharmacology of mifepristone as an anti-glucocorticoid and anti-progesterogenic drug. The first of these effects is the basis for evaluating the use of mifepristone in the treatment of Cushing's syndrome. Antagonism at the progesterone receptor is also included in the label and discussed in other sections of this memo with regard to the effect on fertility and pregnancy.

Two hERG channel studies were performed of which one showed a concentration-related inhibition of potassium selective IKr current with mifepristone and its metabolites. A 12-month toxicity study in dogs also revealed a slight QTc prolongation in higher-dosed animals. These findings alongside the clinical tQT study support information on the potential QT prolongation effect of mifepristone in labeling with caution to be applied when used with drugs which might increase mifepristone drug exposures.

# 5.   Clinical Pharmacology/Biopharmaceutics

Please see review of Drs. Jee Eun Lee and Jayabharathi Vaidyanathn dated January 13, 2012. Thirteen clinical pharmacology studies have been conducted by applicant and submitted to this NDA.

Drug-drug interaction studies (DDI) were conducted with digoxin (P-gp substrate), alprazolam and simvastatin (CYP3A substrate), fluvastatin (insensitive CYP2C8/9 substrate), and cimetidine (mild CYP3A inhibitor). No DDI studies were conducted to address the effect of strong CYP3A4 inhibitors. The results from these studies are illustrated in the following figure:

# Effects of Mifepristone on Other Drugs



| Parameter | Analyte | Ratio [ 90% CI ] |
|---|---|---|
| Cmax | Digoxin | 1.64 [ 1.50 , 1.84 ] |
| AUC |  | 1.40 [ 1.33 , 1.47 ] |
| Cmax | Alprazolam | 0.81 [ 0.67 , 0.99 ] |
| AUC |  | 1.81 [ 1.52 , 2.15 ] |
| Cmax | 4-OH Alprazolam | 0.39 [ 0.32 , 0.47 ] |
| AUC |  | 0.76 [ 0.64 , 0.90 ] |
| Cmax | Simvastatin | 7.02 [ 5.27 , 9.34 ] |
| AUC |  | 10.40 [ 8.11 , 13.21 ] |
| Cmax | Simvastatin acid | 18.20 [ 12.85 , 25.79 ] |
| AUC |  | 15.70 [ 11.29 , 21.70 ] |
| Cmax | Fluvastatin | 1.76 [ 1.31 , 2.36 ] |
| AUC |  | 3.57 [ 2.74 , 4.65 ] |

*Simvastatin dose in multiple dosing regimen is 80 mg while 40 mg in single dosing regimen
(Exposure was not normalized by dose)

**Figure 10. Forest plot for DDI with mifepristone**

Given the significant increase in sensitive CYP3A substrate simvastatin, contraindications are proposed for simvastatin and lovastatin plus other CYP3A4 substrate drugs with narrow therapeutic indices.

The applicant was asked to conduct a DDI with a potent CYP3A4 inhibitor. This was not done and the applicant instead provided 2 randomly-timed concentrations of mifepristone from one patient who was on concomitant ketoconazole therapy during his participation in Study 400. This was not deemed acceptable. (b) (4)



(b) (4)

(b) (4)

After further discussion it was decided that potential DDI with potent CYP3A4 inhibitors would be more appropriately discussed in Warnings and Precautions recommending against their use with mifepristone unless medically necessary. In addition the label will recommend limiting the dose of mifepristone to 300 mg daily if a strong CYP3A4 inhibitor must be used concomitantly. A DDI study with ketoconazole will be required. Depending on the results of this study, updates to labeling may occur.

**Thorough QT Study**
A tQT study was conducted; please see the IRT review dated October 20, 2011. This study was a 14-day, multiple-dose, parallel treatment design enrolling 180 healthy male subjects but due to adverse events resulting in high discontinuation rates, data are limited out to Day 14. Mifepristone doses of 600 and 1800 mg were employed, the latter providing supratherapeutic exposures. A single oral dose of moxifloxacin 400 mg was used as a positive control.

Overall, the study results were inconclusive because assay sensitivity was not established. The largest lower bound of the 2-sided 90% CI for the pbo-adjusted, baseline-corrected QTcI for moxifloxacin was < 5 ms; therefore, small changes in QTc interval cannot be excluded. Despite this shortcoming, the largest upper bounds of the 2-sided 90% CI for the mean difference between mifepristone 1800 mg and placebo did exceed 10 ms at several time points. No such finding was observed in the 600 mg dose group. This finding along with the one positive hERG channel study suggests a potential for QT prolongation associated with mifepristone use with increasing exposures.

The proposed label will note that mifepristone and its metabolites block IKr, based on nonclinical data, and that Korlym prolongs QTc interval in a dose-related manner. More cautionary language is proposed with regard to using lowest effective dose. Since a DDI study has not been conducted with a potent CYP3A4 inhibitor, we will recommend limiting dose of Korlym to 300 mg if combined use with a potent inhibitor is necessary. The applicant will be required to conduct this DDI study with ketoconazole. Depending on the results, labeling may be revised accordingly.

# 6. Clinical Microbiology

Not applicable.

# 7. Clinical/Statistical-Efficacy

**Limitations of Clinical Development Program to be Considered**
One pivotal efficacy and safety trial was conducted by the applicant in support of this NDA. Published studies of mifepristone in Cushing's syndrome were also submitted and summarized in Dr. Zemskova's review but none of these studies was relied upon for the demonstration of efficacy of Korlym and are therefore not discussed in this memo.

C1073-400 or Study 400 was a 24-week, open-label, uncontrolled trial that enrolled a total of 50 patients with endogenous Cushing's Syndrome. The stated objectives of the trial were to evaluate the safety and efficacy of mifepristone in the treatment of the signs and symptoms of endogenous Cushing's syndrome. These are very broad objectives and in reality, only two endpoints were identified and patients were selected specifically to evaluate these endpoints: glycemic control and blood pressure.

Before presenting the trial results, a discussion on several aspects of the trial design, endpoints, and patient population, and how they impact data interpretability will be necessary.

Trial Design (Open-label and Uncontrolled)
The open-label and uncontrolled nature of a trial can introduce confounders, biases, and limitations that are often mitigated through the conduct of a randomized, double-blind, and controlled trial. For this condition, a placebo control arm could not be employed because the progressive and serious nature of the condition would make it unethical to randomize any patient to placebo.

An active-controlled trial to currently available therapies was not considered for several reasons. With exception for mitotane, which is approved for the treatment of inoperable adrenal cortical carcinoma of both functional and nonfunctional types, all medical therapies employed in practice for the treatment of Cushing's syndrome are used off-label. The treatment regimens and efficacy of these other medical therapies have not been adequately assessed beyond case reports and anecdotal experience. In addition, these other drugs target a reduction in cortisol levels which cannot be achieved with Korlym by virtue of mifepristone's mechanism of action. Selecting an appropriate and easily quantifiable endpoint that can compare the effects of the off-label therapies and Korlym could not be identified for a well-designed, active-controlled trial. Similarly, radiotherapy, which is also a treatment option in Cushing's syndrome, would not be an appropriate active control given its variable success rate and time to demonstration of efficacy measured over the course of years.

Untreated hypercortisolism in Cushing's syndrome is progressive with little to no expectation of spontaneous improvement (e.g. the very rare instance of pituitary apoplexy in Cushing's disease). For this reason, an uncontrolled trial of Korlym that could assess a clinically relevant efficacy endpoint might produce results which can be reasonably attributed to the drug. However, this limitation of the trial design must still be considered in the evaluation and conclusions made of the study results.

Efficacy Endpoints
As stated in the Introduction and Background sections of this memo, the mechanism of action of Korlym is antagonism of the GR preventing the downstream effects of cortisol on its receptor. Unlike other interventions targeting a reduction in cortisol levels, Korlym does not reduce serum cortisol and in some cases cortisol levels may increase. Furthermore, despite biochemical hypercortisolism, patients can become adrenally insufficient as a result of absent post-receptor activation.

Reference ID: 3089695

During the IND stage, FDA agreed with the applicant that demonstration of an effect on some other biochemical parameter will be accepted.  The original protocol submission included very broad assessments of a composite clinical endpoint which was ultimately modified (with FDA input) to a demonstration on improvements in glycemic control and/or blood pressure defined as:

1. The change in the area under the concentration-time curve for glucose (AUCglu) in the 2-hr oral glucose tolerance test (oGTT) from baseline to Week 24
2. A change from baseline to Week 24 in mean diastolic blood pressure (DBP)

Secondary endpoints included a blinded assessment of selected signs and symptoms of Cushing's syndrome as well as laboratory findings by a Data Review Board, body weight, use of concomitant medications for diabetes and hypertension, levels of HbA1c, systolic blood pressure, and photographs.  There were exploratory efficacy variables assessed which will not be discussed in this memo.  It should be noted that no hierarchical sequence for analysis was applied in the analysis of secondary endpoints.  Although FDA did not object to this, FDA did note that control of Type 1 error for secondary endpoints would be important for consideration of labeling.

The trial selected patients but did not randomize them into subgroups which would be evaluated specifically for one of the two primary endpoints.  These subgroups are referred to as the Diabetes Mellitus (DM) and the Hypertension (HTN) cohorts.

FDA has well-established efficacy criteria for therapies intended for the treatment of hyperglycemia in diabetes mellitus.  The primary efficacy endpoint in both T1 and T2DM trials has been HbA1c which is a reliable measure of glycemic control and a surrogate for clinical benefits (e.g., microvascular complications).  HbA1c was not selected as a primary efficacy endpoint in the Cushing Syndrome population because the clinical presentation of diabetes is variable in this condition and adjustments in anti-diabetic therapies are expected which would hinder the interpretation of results, especially in an uncontrolled study.  As the DM cohort also included a few patients with glucose intolerance, a change in HbA1c from baseline might not be as reliable of a measure in these patients as they would have normal values at baseline.  Reliance on a change in AUCglu during a 2-hr oGTT is a reasonable alternative assessment of glycemic response as it is under a controlled setting (unlike self-blood-glucose monitoring); is administered via a protocol; and is an objective laboratory measure.  Nonetheless, results can be influenced by certain patient behaviors.  Furthermore, unlike HbA1c, the clinical relevance of a reduction in AUCglu during an oGTT is unknown.  Hence, the effect of Korlym on glycemic control will focus on both this primary efficacy measure supported by changes in HbA1c and anti-diabetic medications.

Anti-hypertensive therapies have been approved based on mean changes in systolic and/or diastolic blood pressure.  Hence, the endpoint of change in DBP is not unprecedented for drug approval.  However, the effect of Korlym on blood pressure proved to be more difficult to demonstrate than anticipated and the results were obfuscated by the inclusion criteria, protocol violations, and use of certain anti-hypertensive medications.  In retrospect, establishing efficacy of Korlym in Cushing's syndrome based on blood pressure reduction should not have

Reference ID: 3089695

been considered a primary endpoint because the increased cortisol levels resulting from the drug's mechanism of action may actually exacerbate hypertension secondary to mineralocorticoid receptor activation. Nonetheless, this memo will highlight these results from both an efficacy and safety perspective.

Patient Population
Given the rarity of this condition, the sample size in the pivotal trial was only 50 which is a limitation for evaluating efficacy and safety for chronic use but not unexpected for orphan indications. FDA has approved other therapies for rare disease with similar sample sizes (NDA for Increlex included 71 pediatric patients with severe Primary IGF-1 deficiency).

It should be noted that despite the limited patient numbers in the pivotal trial, other clinical data of mifepristone in Cushing's patients from published literature served as supportive evidence for efficacy and informed us in the design of the Phase 3 trial. None of these studies, which are summarized under Section 6.1.10, 7.7.2, and 9.1 of Dr. Zemskova's review, will be included in labeling.

**Efficacy in Diabetes (DM) Cohort**
There were 29 out of 50 patients enrolled in Study 400 who were evaluated under the DM Cohort. Twenty-four (83%) had Cushing's disease; 3 had ectopic ACTH and 2 had adrenal carcinoma. Twelve of the 24 patients with Cushing's disease had prior radiation therapy whose data were reviewed separately by Dr. Zemskova to determine whether this previous treatment could account for any observed efficacy associated with Korlym. In her review, she pointed out that ACTH levels remained elevated in these patients despite radiation therapy. This would be evidence that radiation therapy was not successful and unlikely contributory to any efficacy observed in Study 400.

Patients in this cohort underwent a 75-g oGTT at screening, on Day 1, Wks 6, 10, 16, and 24 or on early termination visits. A patient was considered a responder if he/she had a 25% or more decrease in AUCglu at Wk 24 or early termination visit from baseline. A statistically significant reduction in AUCglu was defined by a responder analysis in which the lower bound of the 95% CI of this response rate had to exceed 20%. Approximately 60% of patients were responders and the lower bound of the 95% CI was 42%. From the cumulative distribution function curve provided by the applicant it is evident that the majority of patients had a reduction in AUCglu from baseline. The following table from Dr. Zemskova's review summarizes the individual response for the 24 patients included in this analysis.

Table 19. Cumulative Distribution Function for Percent Reduction in $AUC_{glucose}$ at Week 24/ET in C-DM Subjects (mITT population)

| % Reduction from Baseline | Cumulative Distribution of Change, n (%) | Improved/ Worsened |
|---|---|---|
| -68.7 | 1 (4.17) | Improved |
| -60.6 | 2 (8.33) | Improved |
| -50.7 | 3 (12.50) | Improved |
| -48.2 | 4 (16.67) | Improved |
| -47.0 | 5 (20.83) | Improved |
| -46.5 | 6 (25.00) | Improved |
| -45.3 | 7 (29.17) | Improved |
| -43.9 | 8 (33.33) | Improved |
| -42.4 | 9 (37.50) | Improved |
| -41.2 | 10 (41.67) | Improved |
| -37.1 | 11 (45.83) | Improved |
| -36.9 | 12 (50.00) | Improved |
| -35.3 | 13 (54.17) | Improved |
| -28.0 | 14 (58.33) | Improved |
| -25.0 | 15 (62.50) | Improved |
| -24.2 | 16 (66.67) | Improved |
| -19.8 | 17 (70.83) | Improved |
| -4.4 | 18 (75.00) | Improved |
| -3.8 | 19 (79.17) | Improved |
| -3.5 | 20 (83.33) | Improved |
| -0.8 | 21 (87.50) | Improved |
| 4.7 | 22 (91.67) | Worsened |
| 26.5 | 23 (95.83) | Worsened |
| 33.2 | 24^ (100.00) | Worsened |

Source: Sponsor's table 15, Module 5, Vol 31, p. 73;
^One subject was excluded from mITT analysis (#20-022), because he did not have $AUC_{glucose}$ values post-baseline.

In those patients who responded to treatment, a reduction in AUCglu was observed by Week 6 in most patients and was sustained for the duration of treatment out to Week 24 (see Figure 3 in Dr. Zemskova's review).

As stated above, AUCglu is not a standard efficacy endpoint for anti-diabetic medications and was accepted only for the unusual circumstances of evaluating glycemic control in Cushing's patients treated with Korlym. However, the applicant also provided data on HbA1c reduction in 21 patients who had baseline and post-baseline values. The mean reduction from baseline in these patients was 1.14% (2-sided 95% CI: -1.56, -0.65; p=0.0001). This magnitude of reduction has been observed in currently approved anti-diabetic applications and considered to be clinically relevant. Dr. Zemskova further evaluated those patients with HbA1c levels above normal at baseline (6.5% - recall that trial enrolled patients with glucose intolerance or could have enrolled a diabetic patient with adequate control). In 14 patients with elevated HbA1c levels at baseline, all had a reduction from baseline including some with robust reductions of 2 to 4% accompanied by reductions in anti-diabetic medications or doses.

In conclusion, while this trial employed an untraditional measure of glycemic control and was uncontrolled, a correlation of AUCglu to clinically meaningful endpoints such as HbA1c reduction and dose reduction of antidiabetic medications could be established including several very robust effects (e.g., reduction from 10.4 to 6.0% in HbA1c level in one patient or

Reference ID: 3089695

~ 50% reduction in insulin requirements). These data constituted substantial evidence that Korlym would treat hyperglycemia associated with diabetes or glucose intolerance in Cushing's syndrome. However, the observed effects should not be extrapolated beyond this patient population and it would be inappropriate to consider the use of Korlym in the management of diabetes unrelated to hypercortisolism due to Cushing's syndrome. Labeling should indicate this as a Limitation of Use.

**Efficacy in Hypertension (HTN) Cohort**
Unlike the effect observed in the DM-cohort, the response rate in the HTN cohort was equivocal. Drs. Zemskova and Roman discuss some of the design flaws which might have contributed to the difficulty in establishing a robust effect and I will not reiterate them here. I believe that some aspect of the results reflect the pharmacologic effect of mifepristone. Hypertension in Cushing's syndrome is partly due to high circulating levels of cortisol which can bind to the mineralocorticoid receptor. Acting like aldosterone, patients can present with hypokalemia and hypertension. Since mifepristone blocks the glucocorticoid receptor but does not cause a reduction in circulating cortisol levels, these patients are still prone to mineralocorticoid effects of hypercortisolism.

**Effects on Clinical Signs and Symptoms of Cushing's Syndrome in Overall Cohort**
It should be noted that no plan was submitted to FDA for review by the Study Endpoints and Labeling of Drugs (SEALD) review team with respect to patient reported outcome measures. FDA reviewers have determined that while these endpoints should be evaluated in a clinical trial, the limitations of the assessments in an open-label, uncontrolled trial should preclude any quantitative statements in labeling.

A Data Review Board (DRB) comprised of 3 experts on Cushing's syndrome performed a review of 8 categories of clinical parameters to evaluate whether a patient's signs and symptoms of Cushing's had changed. These categories included:

1. assessment of glucose homeostasis
2. assessment of blood pressure
3. assessment of lipids
4. changes in weight and body composition
5. clinical scoring and appearance (e.g., acne, hirsutism (in women only), Cushingoid appearance)
6. strength assessments
7. psychiatric and quality of life assessments
8. metabolic bone assessments

The DRB reviewed adverse events, concomitant medication data, and all efficacy assessments obtained at baseline, Weeks 6, 10, 16 and 24 or end of treatment, and at the follow-up visit. Baseline and follow-up evaluations were identified, but data from other visits were reviewed in a blinded fashion with respect to visit. The DRB did not know the dose of drug or the sequence in which the visit occurred. It should be noted that while the DRB reviewers are blinded to the sequence of visits, some of the assessments at each visit were evaluated by a

clinical investigator who was NOT blinded. After reviewing the data, each DRB member assigned an overall score for each visit as follows:

    -1: worse than baseline
     0: unchanged from baseline
    +1: clinically significant improvement

The median of the 3 scores was calculated and a score of +1 was considered evidence of clinical improvement. A responder was defined as a subject whose median score was +1 at any visit after the baseline visit. Based on the applicant's definition of responders, they report that 87% of patients (40/46) in the mITT population had a clinical improvement at any point in time and deemed the findings statistically significant based on a calculated 95% CI yielding a lower bound of > 30%, an arbitrary cut point considered by applicant as adequate to account for variability in response.

Drs. Zemskova and Choudury appropriately point out the limitations of this endpoint assessment. The open-label nature of the trial is always problematic in evaluating subjective measures such as quality of life where patient reports may be perceptions based on expectations of clinical improvements or side effects based on knowledge that he/she is receiving an investigational agent. This is further compounded by the absence of a control group for comparison of response for the less subjective measures. In addition, declaring a patient as a responder at any visit also allows the applicant many opportunities for concluding success on this endpoint.

Finally, it is not clear how the reviewers ranked the clinical relevance of the 8 clinical parameters in their scoring. The form for this scoring is provided below.



**Data Review Board Evaluation**

**Corcept Therapeutics**

Study: C1073-400

BEST AVAILABLE COPY

| BLINDED REVIEW RESULTS |
|---|

**Subject ID:** | | | | | | |

**REVIEWER NAME:** _____
*Printed Name*

Scoring:
- -1 = Worse than Baseline
- 0 = Unchanged from Baseline
- +1 = Clinically significant improvement from Baseline

| VISIT | RESULT *(Please check one (and only one) box per visit)* | | | |
|---|---|---|---|---|
| VISIT A | ☐ -1 | ☐ 0 | ☐ +1 | ☐ N/A- No data |
| VISIT B | ☐ -1 | ☐ 0 | ☐ +1 | ☐ N/A- No data |
| VISIT C | ☐ -1 | ☐ 0 | ☐ +1 | ☐ N/A- No data |
| VISIT D | ☐ -1 | ☐ 0 | ☐ +1 | ☐ N/A- No data |

| Reviewer Signature: | |
|---|---|
| Review Date: | \|__\|__\| \|__\|__\| \|__\|__\| <br> day    month    year |

There is no breakdown of how response in categories such as blood pressure or metabolic parameters might have contributed to the scores or if there was worsening in one and improvement in another, how these components were weighted in the overall score of -1, 0 or 1. To add further to the subjectivity of this assessment, it is not clear how some of these parameters which had their own scoring system were translated to the -1, 0, or 1 categories. For example, acne was rated using a Global Acne Scoring System (CAGS) by the clinical investigator not the DRB reviewer which is described under Section 18.3.3.1 of the applicant's Clinical Study Report. Different locations of the body are assessed and given a Grade of 0-4 which contributed to a Local Score. The sum of the Local Scores is called the Global Score for acne and can be: 0 None; 1-18 Mild; 19-30 Moderate; 31-38 Moderately Severe; or > 39 Severe. Did a Global Score of 40 on one visit and 38 on another get rated as 0 or +1 by the blinded DRB reviewer?

Reference ID: 3089695

FDA 0320

Despite the inability to rely on these assessments, review of patient narratives does point to individual responses on some endpoints. Care for these patients by several on the FDA review team has given us an appreciation that for many of these patients who have limited options, some of these clinical responses are meaningful, even if other signs or symptoms show worsening. While the label will not state that Korlym is indicated for improving clinical signs and symptoms of Cushing's syndrome, a statement under the Clinical Studies section describing the variable responses to treatment, including some patients reporting improvement, was considered appropriate by the review team provided that no statistical significance be applied to any of these findings.

# 8. Safety

In contrast to the review of efficacy which relied on one trial, safety of Korlym was based on Study 400, its ongoing extension (Study 415), and several Phase 1 , 2 and 3 studies, including studies conducted by the applicant using Korlym for the treatment of other medical conditions. For purposes of labeling, only some of these studies were relied upon. Please see Dr. Zemskova's review for a thorough assessment of safety based on all studies submitted or referenced. Given the variable patient population and study designs, safety data across studies were not pooled.

Just as it was the case in evaluating efficacy, the absence of a control group in Study 400 and 415 is a limitation in assessing a causal relation to drug treatment in the assessment of safety. Furthermore, the co-morbidities associated with Cushing's syndrome often result in serious complications. This is evident in Dr. Zemskova's review of several nonfatal serious adverse events in which she ascribed certain events to drug or as being exacerbated by drug only after careful consideration of the clinical presentation. Despite the lack of a control group, adverse events related to the mechanism of action of mifepristone should be anticipated. Please see section 7.3.5 of Dr. Zemskova's review and Dr. Roman's CDTL memo for a discussion of events of adrenal insufficiency, endometrial hyperplasia/vaginal bleeding and mineralocorticoid excess resulting in severe hypokalemia. Specific sections under Contraindications and Warnings and Precautions will convey these safety concerns.

There were 5 deaths in Studies 400 and 415: four occurred during Study 400 and one during Study 415. The narratives for these deaths are summarized in Section 7.3 of Dr. Zemskova's review who considered the deaths related to progression of disease. Three patients who died in Study 400 had metastatic adrenal carcinoma and the 4th patient had ectopic ACTH-secreting neuroendocrine carcinoma with metastases. The 5th patient in Study 415 had Cushing's disease. The patient was noted to have markedly elevated alkaline phosphatase and bilirubin at the onset of Study 415. Further work-up included a liver biopsy revealing amyloidosis, and a bone marrow aspirate revealing multiple myeloma. The patient's condition deteriorated rapidly thereafter with development of renal failure, hypotension and disseminated intravascular coagulation prior to death.

FDA 0321

As noted in the Introduction, mifepristone's antagonism of the progesterone receptor is used in combination with misoprostol for medical termination of pregnancy. The higher doses of mifepristone used in the treatment of Cushing's syndrome are expected to have a similar effect in a pregnant woman. However, differences in this patient population lend themselves to a lower likelihood of unplanned pregnancy and termination. The hypercortisolemic state often renders a patient amenorrheic from secondary hypogonadism. Furthermore, the high doses of mifepristone used for glucocorticoid antagonism is also a contraceptive. Nevertheless, all female patients had to have negative pregnancy screening prior to initiation of therapy and women of childbearing potential had to use an acceptable non-hormonal form of contraception with regular counseling against becoming pregnant. No pregnancies were reported in this program.

Other safety concerns which will be discussed in labeling include immunosuppression, increased TSH levels and rash. Of note, immunosuppression should be discussed with the following in mind:

*Immunosuppression – predisposition to infections*
Patients with Cushing's syndrome are immunocompromised due to the hypercortisolemic state. In addition, these patients have other co-morbidities (e.g., diabetes) which increase the risk of infections in this patient population. Several infections were reported by Dr. Zemskova but one should be discussed only as it has been reported in the literature as related to the effective control of hypercortisolemia.

A 41 yo male with ectopic Cushing's syndrome secondary to metastatic thymic carcinoid was diagnosed with pneumonia about one month after initiation of Korlym. The patient was treated for presumed Pneumocystis jirovecii (formerly carinii). This case is described on page 118 of the clinical review.

Pneumocystis jirovecii is known to occur in severely immunocompromised patients and several reports of this form of pneumonia occurring in Cushing's syndrome have been reported in published literature.[4,5,6] In some reports, the pneumonia was diagnosed shortly after treatment for Cushing's was initiated. The authors of these reports suspect a subclinical picture of pneumocystis in patients with Cushing's syndrome due to their immunocompromised state which is kept at bay by high circulating cortisol levels. With a reduction in cortisol levels or a blockade of cortisol activity, this suppression of an acute immune response to the infection is disrupted resulting in severe pulmonary distress and compromise. Supporting this notion is the recognition in the 1990s that addition of high dose glucocorticoids to antibiotic treatment of pneumocystis in AIDS patients resulted in improved clinical outcomes.

---

[4] Arlt A et al. Fatal pneumocystis jirovecii pneumonia in a case of ectopic cushing's syndrome due to neuroendocrine carcinoma of the kidney. *Exp Clin Endocrinol Diabetes*. 2008 Oct; 116(9):515-9.
[5] Oosterhuis JK et al. Life-threatening pneumocystis jiroveci pneumonia following treatment of severe Cushing's syndrome. *Neth J Med*. 2007 Jun;65(6):215-7.
[6] Kim DS et al. Pneumocystis carinii pneumonia associated with a rapid reduction of cortisol level in a patient with ectopic ACTH syndrome treated by octreotide and ketoconazole. *Exp Clin Endocrinol Diabetes*. 2001;108(2):146-50.

FDA 0322

*Immunosuppresion – treatment with exogenous glucocorticoids*
Dr. Zemskova described six adverse events related to exacerbation of an autoimmune disorder. This may be treatment-related in that mifepristone will block the immunosuppressive effects from exogenous steroid use. [(b) (4)]

[                                        ] during negotiations, the label was modified to contraindicate the use of Korlym in serious medical conditions in which steroids would be required (e.g., post-organ transplant). There may be certain medical conditions in which Korlym dose may be reduced or held for short courses of glucocorticoid therapy.

*Other concerns of hypercortisolemia*
The clinical and metabolic effects of Cushing's syndrome results for elevated cortisol levels which is not eliminated with Korlym. The effects of cortisol extend beyond that of glucose metabolism and include, but are not limited to, wound healing, bone differentiation and metabolism, lipid metabolism, and mineralocorticoid effects. These concerns could not be adequately assessed in this program given the trial design and size of the patient population but one effect of hypercortisolemia that was apparent in this program can be attributed to the binding of cortisol to the mineralocorticoid receptor. This effect was manifested as hypokalemia although the increased blood pressure might also be a consequence of hypercortisolemia although there was poor correlation of cortisol levels with HTN in this program. Another potential effect of cortisol on the mineralocorticoid receptor would relate to effects on myocardial tissues as the mineralocorticoid receptor is also expressed in cardiac myocytes and its activation has been associated with tissue damage in heart failure and post-MI patients.[7] One patient in Study 400 developed worsening cardiomyopathy during treatment and had another episode after drug discontinuation. One other patient in Study 415 had developed mild heart failure responsive to diuretic therapy. Again, a causal association can not be established based on these two reports in this uncontrolled clinical trial. It should also be noted that improvement in heart failure was reported with mifepristone in the published literature and summarized in Dr. Zemskova's review.[8] However, published literature also supports the potential role of glucocorticoid and RU486 on expansion of infarct area in rodent studies that is ameliorated by spironolactone.[9] Although this clinical development can not provide any adequate CV risk assessment of Korlym or hypercortisolemia, it would be appropriate to include under the Warnings and Precautions section to use caution in patients with underlying heart disease including heart failure.

# 9. Advisory Committee Meeting

Korlym is not a new molecular entity requiring discussion before an advisory committee. However, it was acknowledged early in the review process that if approved, this would be a novel medical therapy for Cushing's syndrome and there may be concerns about expanded availability of mifepristone which is currently only available as Mifeprex under a restricted distribution program for medical termination of early term pregnancy.

---

[7] Funder JW. Reconsidering the roles of the mineralocorticoid receptor. *Hypertension.* 2009; 53: 286-290.
[8] Chu et al. Successful long-term treatment of refractory Cushing's disease with high-dose mifepristone. *J Clin Endocrinol Metab.* 2001; 86:3568-3573.
[9] Mihailidou et al. Glucocorticoids activate cardiac mineralocorticoid receptors during experimental myocardial infarction. *Hypertension.* 2009; 54:1306-1312.

FDA 0323

An advisory committee was not considered necessary to discuss the clinical development program as it was felt that the scope of the program for an orphan disease was not out of the ordinary. The selected efficacy endpoints were clinically relevant to the disease and scientifically sound based on the drug's mechanism of action. Similarly, the safety concerns predicted with the drug were also based on knowledge of the pharmacologic action. Review of the clinical studies did not yield any different conclusion.

The need for a restricted drug distribution plan is discussed under Section 13.

## 10.    Pediatrics

Korlym was granted orphan drug status. Pediatric studies are therefore waived under PREA.

## 11.    Other Relevant Regulatory Issues

(b) (4)



1 Page has been witthheld in full as B4
(CCI/TS) immediately following this page.



(b) (4). FDA has already negotiated a more limited patient population with Korlym than was originally proposed by the applicant. The fact that cortisol levels cannot be relied on for the monitoring of clinical response and drug toxicity was known during the IND stage (b) (4). Given the limited availability of medical therapies, which themselves are used off-label with their own toxicities, I still conclude that with careful monitoring and cautious titration of Korlym by physicians experienced in the care of patients with Cushing's syndrome, a reasonable balance of benefit to risk can be achieved.

## 12.    Labeling

One of the objectives of the prescriber and patient labeling is to convey that Korlym will cause pregnancy termination and that it is NOT to be used in a pregnant patient. To achieve this, multiple sections of labeling reiterate this as summarized below:

Prescriber labeling will include a BOXED WARNING

> **WARNING: TERMINATION OF PREGNANCY**
>
> *See full prescribing information for complete boxed warning.*
>
> **Mifepristone has potent antiprogestational effects and will result in the termination of pregnancy. Pregnancy must therefore be excluded before the initiation of treatment with Korlym.**

Under CONTRAINDICATIONS Section 4.1 the label will state:

### 4.1  Pregnancy

Korlym is contraindicated in women who are pregnant. Pregnancy must be excluded before the initiation of treatment with Korlym.  Nonhormonal contraceptives should be used during and one month after stopping treatment in all women of childbearing potential. *[See Use in Specific Populations 8.8]*

Under USE IN SPECIFIC POPULATIONS 8.1 Pregnancy:

### 8.1  Pregnancy

Category X

Korlym is contraindicated in pregnancy.  Korlym can cause fetal harm when administered to a pregnant woman because the use of Korlym results in pregnancy loss.  The inhibition of both endogenous and exogenous progesterone by mifepristone at the progesterone-receptor results in pregnancy loss. If Korlym is used during pregnancy or if the patient becomes pregnant while taking this drug, the patient should be apprised of the potential hazard to a fetus. *[See Contraindications (4.1)]*

Under PATIENT COUNSELING INFORMATION

### 17.1  Importance of Preventing Pregnancy

- Advise patients that Korlym will cause termination of pregnancy.  Korlym is contraindicated in pregnant women.
- Counsel females of reproductive potential regarding pregnancy prevention and planning with a non-hormonal contraceptive prior to use of Korlym and up to one month after the end of treatment.
- Instruct patients to contact their physician immediately if they suspect or confirm they are pregnant.

And the first item in the Medication Guide, What is the most important information I should know about Korlym is:

Korlym can cause serious side effects.

1. **Loss of a pregnancy**
   For women who can become pregnant, you must:
   - Have a negative pregnancy test:
     o before starting Korlym
     o before restarting Korlym if you stop taking it for more than 14 days
   - Use a non-hormonal form of birth control during treatment with Korlym and for 1 month after stopping treatment. Talk to your doctor to find out how to prevent pregnancy. Tell your doctor right away if you think you may be pregnant.

FDA has also limited the indication to the smaller subset of patients with Cushing's syndrome as follows:

Korlym (mifepristone) is a cortisol receptor blocker indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have diabetes mellitus type 2 or glucose intolerance and have failed surgery or are not candidates for surgery.

Please see the approved label accompanying the action letter as there are many other important risks and benefit information conveyed beyond pregnancy termination.

# 13.     Decision/Action/Risk Benefit Assessment

- Regulatory Action

Approval

- Risk Benefit Assessment

When prescribed to the selected population of Cushing's syndrome who have diabetes or glucose intolerance AND have failed surgery or are not candidates for surgery, a benefit of Korlym therapy can be ascribed to the observed improvements in glucose control. In addition to a reduction in AUCglu after an oral glucose challenge, a reduction in HbA1c was also observed and several patients had reductions in anti-diabetic medication requirements. The long-term benefits of glucose control in this population are not known but expectation of such a demonstration for this indication is neither feasible nor reasonable given that the population indicated is circumscribed to those who have limited options. In most patients, the shortened life expectancy makes the concern of long-term benefits of glycemic control less paramount.

Korlym is not without risks, some being very serious due to the mechanism of action of the drug. Given that these risks are predictable, appropriate labeling and use of Korlym by specialists well-versed in the care of patients with Cushing's syndrome should allow safe and effective use for the indicated population.

Reference ID: 3089695

FDA 0327

- Recommendation for Postmarketing Risk Evaluation and Mitigation Strategies

The serious safety concerns associated with Korlym use for the treatment of adults with endogenous Cushing's syndrome who have type 2 diabetes or glucose intolerance include adrenal insufficiency, hypokalemia, vaginal bleeding, potential for QT prolongation, and drug-drug interactions. These safety concerns and others identified in the product label can be managed effectively through prescriber labeling and a Medication Guide.

The safety concern in a pregnant woman is termination of her pregnancy. The likelihood that patients in the intended population will fall into this category is low. The hypercortisolemic state of these patients often results in amenorrhea and infertility through secondary hypogonadism. Chronic therapy of mifepristone at the doses necessary to control hypercortisolemia is also an effective contraceptive. For both these reasons, the probability that a Cushing's patient will become pregnant while on Korlym is very low. Regardless, the label will include a boxed warning and a contraindication for its use in pregnant women (Please see section 12 of memo). A contraindication is the most stringent safety warning in an FDA-approved labeling as under 21 CFR 201.57 it means that the risk from use of Korlym clearly outweighs any possible therapeutic benefit in the pregnant patient. The label will also recommend use of a nonhormonal contraceptive in women of childbearing potential during and for at least one month after stopping treatment with Korlym.

The concern that Korlym may be used intentionally by women seeking an abortion (off-label use) was also considered in the approval of this application and whether it would require a REMS with ETASU (restricted distribution) to prevent off-label use. Given that the safety concerns associated with Korlym in its intended population does not support a REMS with ETASU and that the patients are severely ill with limited options, it was determined that establishing a REMS with ETASU to prevent off-label use established an unnecessary hurdle for a patient population with a serious and life-threatening disease.

With the NDA submission, the applicant proposed to establish a distribution program through a central pharmacy under the Support Program for Access and Reimbursement for Korlym (SPARK). Physicians can submit their prescriptions through this central pharmacy to have Korlym delivered directly to the patient. Distribution through a central pharmacy not only ensures timely access to treatment because it is unlikely that many pharmacies will keep Korlym stocked for the few patients eligible for treatment (~5000) but it will also limit its availability for potential off-label use.

- Recommendation for other Postmarketing Requirements and Commitments

The applicant will have two PMRs:
1. conduct a DDI study between ketoconazole and mifepristone to characterize the effect of a potent CYP3A4 inhibitor on mifepristone exposures.
2. conduct a drug utilization study to better characterize reporting rates for adverse events of interest associated with chronic Korlym use.

FDA 0328

Division Director Review

The drug utilization study will provide a denominator for adverse events reported with the use of Korlym, thus allowing an estimate of reporting rates which can be assessed in the context of the known background incidence rates of these adverse events in the Cushing's population. The reports of these adverse events of interest (endometrial hyperplasia and/or vaginal bleeding, retinopathy, and major adverse cardiovascular events) will be gathered through enhanced pharmacovigilance (15-day expedited reporting). Additional information such as gender and age of patient, dose and duration of use, and prescriber specialty can also be obtained through the drug utilization study which will provide some insight on whether the population prescribed Korlym reflects the indicated use of the product. But in addition to the measures established to ensure access to Korlym to patients with Cushing's syndrome who have limited options, FDA will need to communicate to the public that this drug is contraindicated in pregnant patients. Those seeking to use the same active ingredient for pregnancy termination must obtain it through a different program designated by FDA to ensure the safe and effective use of Mifeprex for early medical termination of pregnancy.

FDA 0329

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

----------------------------------------------------

MARY H PARKS
02/17/2012

**Department of Health and Human Services**
**Public Health Service**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

**Final Risk Evaluation and Mitigation Strategy (REMS) Review**

Date:                          October 10, 2013

Drug Name(s):                  Mifeprex (mifepristone) 200 mg tablets

Therapeutic Class:             progesterone-receptor modulator

Dosage and Route:              Mifepristone 600 mg as a single oral dose followed by
                               misoprostol 400 micrograms on Day 3

Application Type/Number:       NDA 020687/Danco Laboratories

(b) (4)

(b) (6)  #:                    2012-1287

*** This document contains proprietary and confidential information that should not be
released to the public. ***

# CONTENTS

INTRODUCTION .................................................................................................. 2

1   Background & Regulatory History of Mifeprex REMS .............................. 2

2   Safety Profile of Mifeprex ........................................................................ 4

   2.1   Background ........................................................................................ 4

   **2.2   Serious Complications Assessed Through the REMS** ................... 5

3   Mifepristone Use ...................................................................................... 7

   3.1   Mifeprex (mifepristone 200mg tablets) Utilization ............................ 7

   3.2   Factors Affecting Safe Use of Mifeprex ............................................ 9

4   Considerations Regarding the need for a REMS ...................................... 11

   4.1   Safety Considerations ....................................................................... 11

   4.2   Monitoring Considerations ................................................................ 12

   4.3   Distribution Considerations ............................................................... 12

   4.4   Confidentiality/Privacy ...................................................................... 12

5   Impact of REMS Elements and Their Removal ........................................ 13

   5.1   Prescriber Certification ...................................................................... 13

   5.2   Restricted to Certain Healthcare Settings ......................................... 13

   5.3   Documentation of Safe Use Conditions ............................................ 14

6   Discussion ................................................................................................ 14

7   Recommendation and Conclusion ............................................................ 15

FDA 0343

**EXECUTIVE SUMMARY**

This review evaluates if the risk evaluation and mitigation strategy (REMS) for Mifeprex (mifepristone 200 mg tablets) continues to be necessary to ensure the benefits of the product outweigh its risks.

Mifeprex was approved on September 28, 2000 with a restricted distribution program requiring prescribers attest that they are knowledgeable about the safe and appropriate use of Mifeprex. The program was approved as a REMS on June 8, 2011. The goals of the REMS are:

- To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug.

- To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications.

Since the approval of Mifeprex, safety concerns have been reported by certified prescribers, including serious infection and hemorrhage sometimes leading to the need for transfusions, hospitalization, and death. We reviewed the current Mifeprex safety data and researched what factors may affect its safe use for patients. Our key findings include that:

- The overall safety profile of Mifeprex has not changed over the last 6-7 years and is consistent with current product labeling.
- There have been a small number of serious complications associated with Mifeprex reported and this is likely reflective of the use of Mifeprex within a system of knowledgeable healthcare providers, safe use protocols, and proper patient counseling.
  - Planned Parenthood and other family planning clinics account for the majority of Mifeprex use. Planned Parenthood implements the REMS requirements                    (b) (4).

Accurate gestation dating, patient education, dispensing Mifeprex directly to the patient during the office visit, and timely access to medical care remain important components to ensure the safe use of Mifeprex in order to maintain the current safety profile. Medical abortion accounts for the minority of abortions in the U.S. Similarly, training opportunities in medical abortion appear limited and are less available than surgical abortion experience. Given this relative lack of familiarity and experience with medical abortion, a restricted distribution program that reinforces the necessary skills and appropriate care (i.e., counseling and follow-up) is necessary to assuring safe use of Mifeprex. It is not likely that the essential safe use conditions will be maintained to a similar extent if a REMS is no longer required and, as a consequence, we would expect a negative impact on the types, incidence, and severity of adverse events. For these reasons, we believe the Mifeprex REMS provides the foundation to ensure the implementation of these safe use conditions with Mifeprex use.

(b) (6)      therefore recommends that the existing elements of the REMS be maintained. Specifically, prescriber certification and dispensing limited to certain healthcare settings provide a framework to ensure that the benefits of Mifeprex outweigh its risks in an appropriate patient population.

## INTRODUCTION

This review evaluates if the risk evaluation and mitigation strategy (REMS) continues to be necessary to ensure the benefits outweigh the risks for Mifeprex (mifepristone 200 mg tablets).

(b) (4)

During a _____ (b) (6) meeting on October 4, 2012[2], the Center Director requested that the REMS for Mifeprex be re-evaluated to determine if a REMS continues to be necessary to ensure that the benefits outweigh the risks, (b) (4)

The merits of _____ (b) (4) for mifepristone 200 mg is addressed in a separate memorandum.

## 1    BACKGROUND & REGULATORY HISTORY OF MIFEPREX REMS

On September 28, 2000, Mifeprex was approved for the medical termination of intrauterine pregnancy through 49 days' gestation under 21 CFR 314.520 Subpart H.[3] According to the September 28, 2000 _____ (b) (6) review, "the success of medical termination of pregnancy decreased with advancing gestational age and incidence of adverse events increased with advancing gestational age." In addition, the review states that timely access to medical care to manage serious complications is necessary. The _____ (b) (6)'s approval memo states, "[t]he 1996 advisory committee strongly supported education of users of mifepristone. By coupling professional labeling with other educational interventions such as the Medication Guide, Patient Agreement, and Prescriber's Agreement, along with having physician qualification requirements of abilities to date pregnancies accurately and diagnose ectopic pregnancies (and other requirements), goals of safe and appropriate use may be achieved."[4]

As a result, FDA concluded Mifeprex must be available only through a restricted distribution program and required the program under Subpart H.



[1] (b) (4) (b) (4)

[2] (b) (4), (b) (6)

[3] Mifeprex Approval Letter signed September 28, 2000.

[4] (b) (6) _____ (b) (6) Memo. Signed September 28, 2000.

2

In 2007, Congress amended the FD&C Act to give FDA the authority to require a REMS when necessary to ensure that the benefits of a drug outweigh its risks.[5]  Mifeprex was included on the list of products deemed to have in effect an approved REMS.[6]

The Mifeprex restricted distribution program was approved as a REMS on June 8, 2011 and contains the following elements:[7, 8]

    A.  Goals

- To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug.

- To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications.

    B.  Medication Guide

    C.  Elements to Assure Safe Use, including:

        a.  Healthcare providers who prescribe Mifeprex will be specially certified by agreeing or attesting to the conditions set forth in the Prescriber Agreement.

        b.  Mifeprex will be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals.

        c.  Mifeprex will only be dispensed to patients with documentation of safe use conditions.

    D.  An Implementation System that requires Danco to:

        a.  Certify distributors. To become certified, distributors must agree to:

            i.  Ship drug only to site locations identified by specially certified prescribers in signed Prescriber's Agreements, and maintain secure and confidential records of shipments.

           ii.  Follow all distribution guidelines, including those for storage, tracking package serial numbers, proof of delivery, and controlled returns.

        b.  Assess the performance of the certified distributors with regard to the following:

            i.  Whether a secure, confidential and controlled distribution system is being maintained with regard to storage, handling, shipping, and return of MIFEPREX.

---

[5] Food and Drug Administration Amendments Act (FDAAA) of 2007, Pub. L. No. 110-85, Title IX, Subtitle A, Section 901, 121 Stat. 823 (2007).

[6] See Identification of Drugs and Biological Products Deemed to Have Risk Evaluation and Mitigation Strategies (REMS) for Purposes of the Food and Drug Administration Amendments Act of 2007, 73 Fed. Reg. 16313 (Mar. 27, 2008).

[7] Memorandum of meeting minutes for April 28, 2011 meeting between Danco and FDA. Signed by    (b) (6)   on June 3, 2011.

[8] Mifeprex REMS Approval Letter. Signed by    (b) (6)   on June 8, 2011.

3

Reference ID: 3392205

ii. Whether MIFEPREX is being shipped only to site locations identified by specially certified prescribers in the signed Prescriber's Agreement and only available to be dispensed to patients in a clinic, medical office, or hospital by or under the supervision of a specially certified prescriber.

c. If Danco determines the distributors are not complying with these requirements, Danco will take steps to improve their compliance.

E. A Timetable for Submission of Assessments that requires Danco to submit REMS assessments to FDA one year from the date of approval of the REMS and every three years after.

The next REMS assessment is due June 2015.

## 2    SAFETY PROFILE OF MIFEPREX

### 2.1    BACKGROUND

Abortion is one of the most common procedures undergone by women of reproductive age in the United States.[9] Since 1969, the Centers for Disease Control and Prevention (CDC) has conducted abortion surveillance to document the number and characteristics of women obtaining legal, induced abortions. The 2009 data is the most recent year available. The CDC requests data from 52 reporting areas (i.e., 50 states, District of Columbia, and New York City). The areas provide information voluntarily; 45 areas reported data every year from 2000 – 2009. In most states, collection of abortion data is facilitated by the legal requirements for hospitals, facilities, and physicians to report abortions to a central health agency. These health agencies in turn voluntarily provide aggregate data to the CDC. For medical abortions, the CDC abortion surveillance summary does not include specific information on what medications and dosages are used.

A total of 784,507 abortions were reported to the CDC for 2009. Approximately 17% (16.2% $\leq$ 8 weeks' gestation, 0.9% >8 weeks' gestation) of abortions were reported as medical.[10,11] This is a slight increase from 2008 data (14.1% $\leq$ 8 weeks' gestation, 0.7% >8 weeks' gestation).[12]

In 2009, most (64.0%) abortions were performed at $\leq$8 weeks' gestation, and 91.7% were performed at $\leq$13 weeks' gestation. Among areas that reported data every year during 2000 – 2009, the percentage of abortions performed at $\leq$ 8 weeks' gestation increased 12% from 2008 to 2009.

---

[9] Jones K et al. Abortion in the United States: Incidence and access to services, 2005. Perspect Sex Reprod Health 2008;41(1): 6-16.

[10] "the administration of medication or medications to include an abortion; at $\leq$8 weeks' gestation, typically involves the use of mifepristone and misoprostol; at >8 weeks' gestation, typically involves the use of vaginal prostaglandins". CDC does not report on specific medications  and dosages used.

[11] Pazol K et al. Abortion Surveillance – United States, 2009. MMWR Surveillance Summaries 2012;61:1-44. Available at http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6108a1_htm?s_cid=ss6108a1_w#Tab24.

[12] Pazol K et al. Abortion Surveillance – United States, 2008. MMWR Surveillance Summaries 2011;60:1-40. Available at http://www.cdc.gov/mmwr/preview/mmwrhtml/ss6015a1_htm?s_cid=ss6015a1_w.

4

**2.2   SERIOUS COMPLICATIONS ASSESSED THROUGH THE REMS**

Serious complications[13] assessed through the Mifeprex REMS include:

1. Hospitalizations

2. Transfusions of 2 or more units of packed cells or whole blood or having a hemoglobin of 6 gm/dL or less or a hematocrit of 18% or less

3. Serious infection, sepsis

4. Death

5. Other serious and unexpected adverse events

As of October 31, 2012, approximately 1.88 million women in the U.S. have been treated with Mifeprex for termination of pregnancy with 2,740 adverse events reported cumulatively (14 deaths, 768 hospitalizations, 66 ectopic pregnancies, 416 reports of blood loss requiring transfusion, and 308 infections [57 severe]). The overall estimate of a hospitalization over time is 1 in 2,448 patients. The following tables provide an analysis of the reporting rates of these adverse events over time.

Table 1 provides US Mifeprex use and adverse reporting rates per 100,000 uses in 2-year time intervals over the past 6 years (October 2006 through October 2012).

---

[13] Although ongoing pregnancies (confirmed and unconfirmed) are assessed in REMS assessment reports, ongoing pregnancy is not considered a serious complication because it usually reflects an incomplete abortion which is sometimes part of the medical abortion process.

5

FDA 0348

**Table 1: US Reporting Rates for Serious Adverse Events with Mifeprex per 100,000 uses from October 2006 through October 2012**

| Time Period | Use | Adverse events | Deaths | Hospital-izations | Trans-fusions | Ectopic Pregnancies | Infection | Severe[14] Infection |
|---|---|---|---|---|---|---|---|---|
| 10/06 to 10/08 | (b) (4) K* | 357 | 1 | 105 | 63 | 9 | 48 | 8 |
| Rate per 100 K | NA | | | | | | | (b) (4) |
| 10/08 to 10/10 | (b) (4) K | 600 | 4 | 187 | 103 | 18 | 71 | 10 |
| Rate per 100 K | NA | | | | | | | (b) (4) |
| 10/10 to 10/12 | (b) (4) K | 704 | 0 | 213 | 115 | 11 | 67 | 17 |
| Rate per 100 K | NA | | | | | | | (b) (4) |

NA= not applicable
*K = 1,000; for example, (b) (4) K = (b) (4).  All rates are per 100,000 uses of the drug.
Source: the data here is extracted directly from the quarterly FDA reports using the same categories.

Table 2 provides an adverse event analysis for the most recent 18 months of available data from April 30, 2011 through October 31, 2012.

---

[14] This category includes endometritis (involving the lining of the womb), pelvic inflammatory disease (involving the nearby reproductive organs such as the fallopian tubes or ovaries), and pelvic infections with sepsis (a serious systemic infection that has spread beyond the reproductive organs). Not included are women with reported sexually transmitted infections such as Chlamydia infections and gonorrhea, cystitis and women with toxic shock syndrome not associated with a pelvic infection.

6

FDA 0349

**Table 2: Adverse Event Analysis - per** (b) (6) **US Postmarketing Adverse Event Summary from April 30, 2011 through October 31, 2012.**

| Time Period | ~ # Women* | AEs reported | Deaths | Hospitalizations | Transfusions | Infections (severe) | Hospitalization Rate per women |
|---|---|---|---|---|---|---|---|
| 4/30/11-10/31/11 | (b) (4) | 178 | 0 | 66 | 27 | 13 (5) | 1 hospitalized per (b) (4) women |
| 10/31/11 - 4/30/12 | | 185 | 0 | 52 | 26 | 14 (3) | 1 hospitalized per (b) (4) women |
| 4/30/12-10/31/12 | | 170 | 0 | 38 | 24 | 15 (1) | 1 hospitalized per (b) (4) women |

*Estimate based on above table showing (b) (4) U.S. women per month being treated with Mifeprex for termination of pregnancy from Feb 2011 through Oct 2012.

## DEATHS

An overview of each of the US reports with a fatal outcome following mifepristone use for termination of pregnancy from approval in 2000 through January 9, 2013 is provided in Appendix A. Fourteen deaths in US women have been reported since approval. The last reported death occurred in March 2010. In half of the reported deaths, the cause of death was related to infection/sepsis. Two deaths were related to a ruptured ectopic pregnancy. Mifeprex is neither indicated for nor effective for terminating ectopic pregnancy.[15]

## 3    MIFEPRISTONE USE

### 3.1    MIFEPREX (MIFEPRISTONE 200MG TABLETS) UTILIZATION

Drug use information is not available to FDA through commercial databases for drugs distributed through closed distribution systems. Sales distribution data for Mifeprex is only available from the sponsor (Danco). Danco provides an estimate of the number of women who have used mifepristone in the US for termination of pregnancy on a periodic basis and as part of the REMS assessment. The (b) (6) has summarized the use data along with adverse event reporting information on a quarterly to semi-annual basis. A version of this document is available on FDA.gov (last report posted - April 2011).[16] The table below is based on the use data provided by Danco and documented in the (b) (6) summaries.

---

[15] "Mifeprex is contraindicated in patients with a confirmed or suspected ectopic pregnancy since Mifeprex is not effective for terminating these pregnancies." Mifeprex [package insert] New York, NY. Danco Laboratories, LLC;2005.

[16] Available at
http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111323 htm 222. Accessed January 27, 2013.

7

FDA 0350

**Table 3: Estimate of the number of women who have used mifepristone in the US for termination of pregnancy per month**

| End of Month/Year | Cumulative number of women from approval | Change | Number of Months | N/month |
|---|---|---|---|---|
| Mar 2006 | 575,000 | | | |
| June 2006 | 612,000 | 37,000 | 3 | 12,300 |
| May 2007 | 750,000 | 138,000 | 11 | 12,500 |
| Jan 2008 | 855,000 | 105,000 | 8 | 13,100 |
| Sept 2008 | 979,000 | 124,000 | 8 | 15,500 |
| May 2009 | 1,100,000 | 121,000 | 8 | 15,100 |
| Dec 2009 | 1,230,000 | 130,000 | 7 | 18,600 |
| July 2010 | 1,350,000 | 120,000 | 7 | 17,100 |
| Jan 2011 | 1,460,000 | 110,000 | 6 | 18,300 |
| April 2011 | 1,520,000 | 60,000 | 3 | 20,000 |
| Aug 2011 | 1,600,000 | 80,000 | 4 | 20,000 |
| Dec 2011 | 1,680,000 | 80,000 | 4 | 20,000 |
| Oct 2012 | 1,880,000 | 200,000 | 10 | 20,000 |

Danco states that the majority of drug/use ( (b)(4)%) is distributed to/by Planned Parenthood and other family planning clinics. The remainder is distributed through hospitals and private practices. An independent study published in 2009 found 88% of Mifeprex for abortions was dispensed through clinics.[17]

### 3.1.1   Korlym (mifepristone 300mg tablets)

Korlym was approved without a REMS by FDA on February 17, 2012 for the treatment of Cushing's syndrome. However, the sponsor distributes Korlym through a single specialty pharmacy and agreed to provide use data as part of a PMR "to better characterize the incidence rates of adverse events with Korlym." Preliminary data from the first 6 months of marketing of Korlym indicated that   (b)(4) patients under the care of (b)(4) prescribers received Korlym. Most of the use ( (b)(4) of (b)(4) patients) was for the treatment of Cushing's syndrome.                                          (b)(4)

---

[17] Finer L, Wei J. Mifepristone and abortion access in the U.S. Obstet Gynecol 2009;114:623-40.

8

FDA 0351

(b) (4)  Additional information on the

(b) (4)  code is pending.

## 3.2   FACTORS AFFECTING SAFE USE OF MIFEPREX

### 3.2.1   REMS

As described in Section 1.1, in order to obtain Mifeprex, healthcare providers must be willing to enroll in the REMS program by attesting to have the necessary skills and agreeing to comply with the program requirements. Based on the May 30, 2012 REMS Assessment submission, the following prescriber data were provided by Danco:

- Cumulative number of prescribers enrolled
- Number of new prescribers enrolled during reporting period
- Number of prescribers ordering Mifeprex during reporting period

According to a study published in 2009 by Finer and Wei, between November 2000 and May 2007, among physicians who had ever provided mifepristone, 67% were obstetrician-gynecologists and 13% were family practice physicians.[17] Danco does not collect practice specialty information.

### 3.2.2   Planned Parenthood

Planned Parenthood and other family planning clinics account for the majority (e.g., (b) (4) ) of Mifeprex use. Planned Parenthood has implemented (b) (4)



---

[18] Fjerstad M, et al. Rates of Serious Infection after Changes in Regimens for Medical Abortion. NEJM. 2009;361-145-51.

Reference ID: 3392205

FDA 0352

Fjerstad et al performed a retrospective analysis assessing the rates of serious infection in the US after medical abortion. The rate of serious infection after medical abortion declined by 93% after these changes were implemented (from 0.93 per 1000 to 0.06 per 1000).[18]

In 2007, FDA stated that there was not "sufficient information to recommend the use of prophylactic antibiotics for women having a medical abortion." The current American College of Obstetricians and Gynecologists Practice Bulletin on medical abortion states that "no data exist to support the routine use of preventative antibiotics for medical abortion." The Practice Bulletin recommends oral or vaginal administration of misoprostol.[19]

The current Mifeprex professional labeling does not include information on antibiotic prophylaxis and does recommend oral (as opposed to vaginal) administration of misoprostol (in a dose different from current standard practice outlined in the ACOG Practice Bulletin and Planned Parenthood protocol).

### 3.2.3    Physician Training in Induced Abortion[20,21,22]

In 1996, in response to data indicating that the (1) age of practicing obstetricians who provided the majority of pregnancy terminations was rising (older than 65 years) and (2) the majority of counties in the U.S. lack of abortion providers, the Accreditation Council for Graduate Medical Education (ACGME) required obstetrics and gynecology residency programs to provide training *opportunities* in induced abortion.

In 1998 and 2004, a survey was mailed to all obstetrics and gynecology residency program directors in an effort to characterize the availability of abortion training. In 1998, 46% of respondents reported routine[23] training. In 2004, 51% of directors reported routine training, 39% reported optional training, and 10% reported no training. Of those programs with routine training, 50% reported training in termination practices -- the most common were first-trimester surgical abortion (85%), followed by medical abortion (59%), second trimester induction (51%), and dilation and extraction (36%).[20]

A survey[22] conducted in 2007 of final year obstetrics and gynecology residents sought to determine which abortion procedures residency graduates had received training. Respondents reported higher routine, on-site participation in training on surgical abortion procedures (range 65.6% - 85.2%) compared to mifepristone (52.3%). Routine participation in off-site mifepristone training was higher (72.7%). Ten percent of respondents reported that no training was available on mifepristone use, which is consistent with the 2004 study of residency program directors.

---

[19] ACOG Practice Bulletin: *Compared with the FDA-approved regimen, mifepristone–misoprostol regimens using 200 mg of mifepristone orally and 800 μg of misoprostol vaginally are associated with a decreased rate of continuing pregnancies, decreased time to expulsion, fewer side effects, improved complete abortion rates, and lower cost for women with pregnancies up to 63 days of gestation based on LMP.*

[20] Eastwood KL, et al. Abortion training in United States obstetrics and gynecology residency programs. Obstet Gynecol 2006;108;303-8.

[21] Greenberg M. et al. Barriers and enablers to becoming abortion providers: the reproductive health program. Fam Med 2011;44(7):493-500.

[22] Jackson CB, Foster AM. Ob/Gyn training in abortion care: results from a national survey. Contraception 2012;86:407-417.

[23] Routine training was defined as "required training unless residents express moral objections."

10

The ACGME requirements for family medicine residents do not include training in medical abortion but residents must be "trained to competency" in "options counseling for unintended pregnancy." A similar survey to characterize the availability of abortion training in family medicine residencies reported 49% provide some type of abortion training.

From 1999 through 2005, the Department of Family Medicine at the University of Rochester Medical Center operated the Reproductive Health Program (RHP), a national elective abortion training program aimed to address a gap in training to all US medical students, residents, advanced practice clinicians, and physicians in practice. A study published in 2012 interviewed RHP trained providers in 2008-2009. A total of 58.8% of respondents reported providing abortions since training, with most occurring in high-volume abortion clinic settings. Of those who had provided abortions, most had performed more than 50 surgical or medical abortions. More than 90% of abortion providers reported having liability insurance that covers abortion, colleague support, ease of obtaining medications and/or equipment, reimbursement, and administrative and/or staff support at the site where they provide abortions. Relative to providers, the greatest barriers to providing an abortion reported by non-providers were lack of skills, concerns about liability, and difficulty obtaining supplies.[21] Although these data were limited to RHP trainees, data are consistent with data from other sources and provides additional insight into what facilitates abortion care and barriers.

# 4    CONSIDERATIONS REGARDING THE NEED FOR A REMS

## 4.1    SAFETY CONSIDERATIONS

In general, the intended patient population for Mifeprex is healthy. Medical abortion, similar to surgical abortion, is associated with potentially serious adverse events. Since the approval of Mifeprex, safety concerns have been identified through enhanced surveillance and reporting by certified prescribers. Use of Mifeprex is associated rarely with serious infection and hemorrhage sometimes resulting in transfusions, hospitalization, and death. Serious infections and deaths resulted in labeling changes in 2004 and 2005. There have been no new safety concerns identified with Mifeprex since that time and the serious complications being reported now are consistent with labeling. Moreover, these complications with Mifeprex are consistent with what one can expect with spontaneous abortion and surgical abortions.[24,25] The serious complications that arise can be managed if recognized in a timely manner.

(b) (6) believes that the current safety profile is reflective of an effective system in place with knowledgeable prescribers primarily using Mifeprex within that system guided by standard protocols. It is not likely that the current safe use conditions will persist to a similar extent if a REMS is no longer required and, as a consequence, we would expect a negative impact on the types, incidence, and severity of adverse events if the REMS was eliminated. Because Mifeprex prescribing occurs in a limited number of healthcare settings and training is not uniformly provided in physician residencies, there is no data

---

[24] Mifeprex [package insert] New York, NY. Danco Laboratories, LLC;2005.

[25] Grimes, DA and Raymond, EG. Medical Abortion in Adolescents, *BJM* 2011;342:d2185.

11

indicating that the appropriate use of Mifeprex has become an ingrained part of "standard medical practice". The "standard" is for Mifeprex to be prescribed within these family planning clinics or by qualified physicians in a private setting. However, if the REMS is eliminated, use would no longer be restricted to these practice settings with knowledgeable prescribers, and use outside the current effective "standard practice " setting could occur.

If the REMS for Mifeprex is eliminated, there would be no restrictions for dispensing and Mifeprex (or any generics that may be approved in the future) could be made available (depending on the manufacturer's business decisions) in the same manner as any prescription drug product. Such a change could result in 1) treatment delays which are problematic given the importance of gestational timing on the safe and effective use or 2) inappropriate prescribing (e.g., ectopic pregnancy) by less experienced practitioners.

## 4.2    MONITORING CONSIDERATIONS

It is not known how adverse event reporting will change if a REMS is eliminated. Planned Parenthood and the manufacturers would not be required to continue the same level of reporting of serious complications. Data on deaths from infection after Mifeprex use would be available through the CDC. The CDC conducts regular surveillance for maternal mortality and morbidity associated with pregnancy and abortion, including deaths from infection following a medical abortion or any pregnancy event. We note the abortion surveillance summaries published by CDC can have a lag time of up to four years.

Reporting may not be important if it was determined that the risks no longer warrant additional safe use requirements. However, given the public interest this medication generates, it is likely information inquiries will continue. If the REMS is eliminated, FDA will be less informed of adverse events that occur with Mifeprex or its generics.

## 4.3    DISTRIBUTION CONSIDERATIONS

The                                                              (b) (6)) believes that Danco would continue some sort of restricted distribution even if FDA no longer requires it. It is not known how new generic sponsors/manufacturers would choose to distribute mifepristone if no restrictions were required by FDA. Even if not required and both innovator and generic manufacturers choose to continue to dispense mifepristone through clinics and medical offices, this would be based on the various manufacturers business decisions and subject to change at their discretion.

Without a REMS, prescriber and patient usage information may be more complex to obtain and less precise than the current data. Furthermore, if the sponsor(s) chose to maintain a closed distribution system, it would be difficult for FDA to track use data in the absence of being provided data directly from the sponsor(s).

## 4.4    CONFIDENTIALITY/PRIVACY

Confidentiality and patient privacy are significant issues with Mifeprex, but not generally a factor when determining the need for a REMS. The availability of Mifeprex through retail pharmacies could reduce patient/prescriber confidentiality by adding the need to write and fill a prescription. Concerns regarding protests or targeting may deter retail pharmacies from stocking Mifeprex.

FDA 0355

The purpose of a REMS is to ensure the benefits of the drug outweigh its risks. While we remain concerned about confidentiality and concerned regarding the personal safety of the prescribers, pharmacists, and patients, it does not meet the criteria for requiring a REMS. Moreover, manufacturers could decide to protect prescriber and patient confidentiality without a REMS.

## 5    IMPACT OF REMS ELEMENTS AND THEIR REMOVAL

The risk mitigation tools that are part of the Mifeprex REMS are physician certification and controlled access (or restricted distribution). A Mifeprex prescriber must agree that he/she meets the required qualifications to assure the drug is used safely and appropriately. A prescriber self-certifies by completing a one-time enrollment form. This enrollment or certification requirement is the tool that provides controlled access to Mifeprex. Without restricted distribution, a prescriber using Mifeprex would not have to attest to having certain skills, agree to provide counseling on how to handle adverse events, provide Mifeprex during the office visit, document certain information/activities, or report serious complications.

### 5.1    PRESCRIBER CERTIFICATION

This Prescriber Agreement is a one-time event with limited burden. Prescriber certification probably has the most influence of the three ETASUs in addressing safe use and limiting access to Mifeprex because this element requires physicians to attest to having certain skills, agree to abide by the program requirements including reporting of serious adverse events, and complete an additional step (e.g., the enrollment form) in the usual drug procurement process.

Eliminating this element opens access to any prescriber. Therefore, it is possible that physicians and advanced practice healthcare providers (e.g., physician assistants, nurse practitioners) who are not familiar with Mifeprex and/or practice outside of facilities with established protocols may prescribe Mifeprex; a factor that could contribute to an increase in serious complications.

### 5.2    RESTRICTED TO CERTAIN HEALTHCARE SETTINGS

This element limits distribution by preventing the distribution of Mifeprex through retail (including mail order and internet) pharmacies. If this restriction was removed, any pharmacy could stock the drug and prescribers would no longer have to stock Mifeprex. In a "worst case" scenario, the following *could* occur:

- patients are not properly counseled about the serious complications and what to do in the event that they experience an adverse event,
- patients may not pick-up the prescription – failing to initiate the abortion in a timely manner resulting in ineffective or inappropriate use of the drug or potentially an increased incidence of complications,
- patients have difficulty finding a pharmacy that stocks the drug because not all pharmacies may choose to stock the drug, resulting in treatment delay

Although not safety concerns, confidentiality and personal safety are significant concerns with Mifeprex. Distribution through retail pharmacies could compromise patient and

13

FDA 0356

prescriber confidentiality with adding a new stakeholder to the treatment process, and pharmacies could be targeted by individuals or groups opposed to abortions.

Restriction of mifepristone to certain healthcare settings is probably the most critical element for maintaining confidentiality and privacy for both patients and prescribers. This element also contributes to the patient's safe use of Mifeprex by making the prescriber responsible for giving the drug directly to the patient and counseling the patient at the time of dispensing. It is safer for the patient - providing the opportunity for direct observed therapy (although this is not a REMS program requirement) to initiate the time-sensitive abortion process, and ensures the patient leaves the healthcare facility with the medications that are necessary for completing a medical abortion to maximize efficacy and minimize risk.

### 5.3    DOCUMENTATION OF SAFE USE CONDITIONS

The REMS requires that prescribers review and complete a Patient Agreement with each patient before treatment is initiated. The signed Agreement is placed in the patient's medical record; however it is not collected by Danco. There is no data available on how often the Agreement is utilized.

Family planning clinics generally utilize consent forms and in this type of practice setting the Patient Agreement may be redundant. Therefore, it is not known if removing this element would increase the risk that a patient is not properly informed and counseled about complications and what to do when a complication occurs.

## 6    DISCUSSION

(b) (6) and (b) (6) considered two options – maintain the REMS or eliminate the REMS with the following possible rationale for each option.

- Eliminate the REMS: No new safety concerns have been identified in 6 - 7 years. The serious complications being reported now have been consistent with labeling and the reporting rate has been stable over the last several years. These complications are consistent with what one would expect with a surgical abortion and are not necessarily unique to a medical abortion with Mifeprex. Use of Mifeprex has been primarily in Planned Parenthood and other family planning clinics where there are protocols and familiarity with assessing the duration of pregnancy, diagnosing an ectopic pregnancy, performing surgical interventions in cases of incomplete abortion, and caring for patients that experience serious complications. Some of the safe use practices surrounding Mifeprex may therefore already be embedded in these practice sites that already dispensing Mifeprex and would likely be maintained even if the REMS were eliminated.

- Maintain the REMS:  There have been a small number of reported serious complications associated with Mifeprex and this is likely reflective of the use of Mifeprex within a system of knowledgeable healthcare providers, safe use protocols, proper patient counseling, and follow-up procedures.

  Medical abortion accounts for the minority of abortions in the U.S. Similarly, training opportunities in medical abortion appear limited and are less available than surgical abortion experience. Given this relative lack of familiarity and

14

experience with medical abortion. A restricted distribution program that reinforces the necessary skills and appropriate care (i.e., counseling and follow-up) is necessary to assuring safe use of Mifeprex.

The Mifeprex REMS provides the foundation to ensure the implementation of safe use conditions with Mifeprex use. Accurate gestation dating, patient education, dispensing Mifeprex directly to the patient during the office visit, and timely access to medical care remain important to maintaining the current safety profile of Mifeprex. It is not likely that the essential safe use conditions will be maintained to a similar extent if a REMS is no longer required and, as a consequence, we would expect a negative impact on the types, incidence, and severity of adverse events.

## 7    RECOMMENDATION AND CONCLUSION

(b) (6) recommends that the existing elements of the REMS should be maintained. Specifically, prescriber certification and dispensing limited to certain healthcare settings provide a framework to ensure that the benefits of Mifeprex outweigh its risks in an appropriate patient population.

On January 30, 2013, (b) (6) and (b) (6) presented this recommendation to the Center Director and senior level management from (b) (6) There was general consensus that a REMS is necessary to ensure that the benefits outweigh its risks.

15

**Appendix A: <u>Overview of US Mifeprex Cases with Fatal Outcomes</u>**

| State | Date of Death | Patient Age | Cause of Death | Culture if Available |
|-------|---------------|-------------|----------------|----------------------|
| | (b) (6) | 38 | Hemorrhage from ruptured ectopic pregnancy | N/A |
| | | 18 | Septic shock | CDC positively identified *C. sordellii* in uterine tissue |
| | | 21 | Presumed infection | CDC positively identified *C. sordellii* in uterine tissue |
| | | 22 | Sepsis | CDC positively identified *C. sordellii* in uterine tissue |
| | | 34 | Sepsis | CDC positively identified *C. sordellii* in uterine cavity |
| | | 32 | Not specified^ (autopsy declined) | Uterine cavity culture positive for Prevotella and Peptostreptococcus |
| | | 23 | Probably methadone overdose | N/A |
| | | 24 | Septic shock | Probably *C. perfringens* |
| | | 22 | Suspected homicide | N/A |
| | | 23 | Cocaine and Fentanyl poisoning | N/A |
| | | 18 | Septic shock & cardiac arrest | *C. sordellii* confirmed in uterine samples |
| | | 29 | Complications due to acute endometritis & myometritis | CDC positively identified *C. sordellii* in uterine tissue |
| | | 21 | Not specified, but presumed *C. sordellii* infection | CDC positively identified *C. sordellii* |
| | | 27 | Ruptured ectopic pregnancy | N/A |

^The (b) (6) death occurred on (b) (6) (Day 33) after an initial failed surgical and medical abortion on (b) (6) (Day 1) in a woman with a large uterine fibroid. A repeat <u>surgical</u> abortion was done on (b) (6) (Day 22). We do not believe the death was related to the attempted medical abortion on (b) (6).

16

Reference ID: 3392205

------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

------------------------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

10/17/2013

(b) (6)

10/17/2013

Received concurrence from _____ (b) (6)

FDA 0360

# CENTER FOR DRUG EVALUATION AND RESEARCH

## **Approval Package for:**

### *APPLICATION NUMBER:*

020687Orig1s020

*Trade Name:*     Mifeprex Tablets

*Generic Name:*     mifepristone

*Sponsor:*     Danco Laboratories, LLC

*Approval Date:*     March 29, 2016

*Indication:*     For use through 70 days gestation, revise the labeled dose and dosing regimen and modify the REMS

# CENTER FOR DRUG EVALUATION AND RESEARCH

# 020687Orig1s020

## CONTENTS

| Reviews / Information Included in this NDA Review. | |
|---|---|
| Approval Letter | X |
| Other Action Letters | |
| Labeling | X |
| REMS | X |
| Summary Review | X |
| Officer/Employee List | |
| Office Director Memo | |
| Cross Discipline Team Leader Review | X |
| Medical Review(s) | X |
| Chemistry Review(s) | X |
| Environmental Assessment | |
| Pharmacology Review(s) | X |
| Statistical Review(s) | X |
| Microbiology / Virology Review(s) | |
| Clinical Pharmacology/Biopharmaceutics Review(s) | X |
| Other Reviews | X |
| Risk Assessment and Risk Mitigation Review(s) | X |
| Proprietary Name Review(s) | |
| Administrative/Correspondence Document(s) | X |

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

## 020687Orig1s020

## <u>APPROVAL LETTER</u>

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Silver Spring MD 20993

NDA 020687/S-020

**SUPPLEMENT APPROVAL**

Danco Laboratories, LLC
(b) (6)

P.O. Box 4816
New York, NY 10185

Dear        (b) (6)    :

Please refer to your Supplemental New Drug Application (sNDA) dated May 28, 2015, received
May 29, 2015, submitted pursuant to section 505(b)(2) of the Federal Food, Drug, and Cosmetic
Act (FDCA) for Mifeprex (mifepristone) Tablets.

We acknowledge receipt of your risk evaluation and mitigation strategy (REMS) assessment
dated July 17, 2015.

This "Prior Approval" supplemental new drug application proposes to provide for use through 70
days gestation, revise the labeled dose and dosing regimen and modify the REMS.

**APPROVAL & LABELING**

We have completed our review of this supplemental application, as amended. It is approved,
effective on the date of this letter, for use as recommended in the enclosed, agreed-upon labeling
text.

**CONTENT OF LABELING**

As soon as possible, but no later than 14 days from the date of this letter, submit the content of
labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using the FDA
automated drug registration and listing system (eLIST), as described at
http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm. Content
of labeling must be identical to the enclosed labeling (text for the package insert, text for the
patient package insert, Medication Guide), with the addition of any labeling changes in pending
"Changes Being Effected" (CBE) supplements, as well as annual reportable changes not
included in the enclosed labeling.

Information on submitting SPL files using eList may be found in the guidance for industry titled
"SPL Standard for Content of Labeling Technical Qs and As at
http://www.fda.gov/downloads/DrugsGuidanceComplianceRegulatoryInformation/Guidances/U
CM072392.pdf

FDA 0374

The SPL will be accessible from publicly available labeling repositories.

Also within 14 days, amend all pending supplemental applications that includes labeling changes for this NDA, including CBE supplements for which FDA has not yet issued an action letter, with the content of labeling [21 CFR 314.50(l)(1)(i)] in MS Word format, that includes the changes approved in this supplemental application, as well as annual reportable changes and annotate each change. To facilitate review of your submission, provide a highlighted or marked-up copy that shows all changes, as well as a clean Microsoft Word version. The marked-up copy should provide appropriate annotations, including supplement number(s) and annual report date(s).

We request that the labeling approved today be available on your website within 10 days of receipt of this letter.

## REQUIRED PEDIATRIC ASSESSMENTS

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients, new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We are waiving the pediatric study requirement for pre-menarcheal patients because the use of this product before menarche is not indicated, and we have determined that you have fulfilled the pediatric study requirement for post-menarcheal patients.

## RISK EVALUATION AND MITIGATION STRATEGY REQUIREMENTS

The REMS for Mifeprex (mifepristone) Tablets was originally approved on June 8, 2011. The REMS consisted of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS. Your proposed modifications to the REMS included revisions to both the prescriber and patient agreement forms.

Other changes proposed in the efficacy supplement prompted additional revisions to the Mifeprex REMS materials. During review of this efficacy supplement, we also assessed the current REMS program to determine whether each Mifeprex REMS element remains necessary to ensure that the drug's benefits outweigh the risks.

After consultations between the  (b) (6) and the (b) (6) we have determined that the approved REMS for Mifeprex should be modified to continue to ensure that the benefits of Mifeprex outweigh its risks and to minimize the burden on the healthcare delivery system of complying with the REMS. The REMS modifications submitted by you on March 29, 2016 are approved.

We have determined that it is no longer necessary to include the Medication Guide as an element of the approved REMS to ensure that the benefits of Mifeprex outweigh its risks. The

NDA 020687/S-020
Page 3

Medication Guide will continue to be part of the approved labeling in accordance with 21 CFR 208. Like other labeling, Medication Guides are subject to the safety labeling change provisions of section 505(o)(4) of the FDCA.

Your proposed modified REMS, submitted on July 17, 2015, and appended to this letter, is approved as amended. The modified REMS consists of elements to assure safe use (A, C and D), an implementation system, and a timetable for submission of assessments of the REMS.

The timetable for submission of assessments of the REMS remains the same as that approved on June 8, 2011.

The REMS assessment plan will include the information submitted to FDA on March 29, 2016.

The revised REMS assessment plan must include, but is not limited to, the following:

**REMS Assessment Plan**
1. Number of prescribers enrolled (cumulative)
2. Number of new prescribers enrolled during reporting period
3. Number of prescribers ordering Mifeprex during reporting period
4. Number of healthcare providers who attempted to order Mifeprex who were not enrolled; describe actions taken (during reporting period and cumulative).
5. Number of women exposed to Mifeprex (during reporting period and cumulative)
6. Summary and analysis of any program deviations and corrective action taken
7. Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether 1 or more such goals or such elements should be modified.

We remind you that in addition to the REMS assessments submitted according to the timetable in the approved REMS, you must include an adequate rationale to support any proposed REMS modification for the addition, modification, or removal of any of goal or element of the REMS, as described in section 505-1(g)(4) of the FDCA.

We also remind you that you must submit a REMS assessment when you submit any future supplemental application for a new indication for use  as described in section 505-1(g)(2)(A) of the FDCA.  This assessment should include:

a) An evaluation of how the benefit-risk profile will or will not change with the new indication;

b) A determination of the implications of a change in the benefit-risk profile for the current REMS;

FDA 0376

NDA 020687/S-020
Page 4

c) *If the new indication for use introduces unexpected risks*: A description of those risks and an evaluation of whether those risks can be appropriately managed with the currently approved REMS.

d) *If a REMS assessment was submitted in the 18 months prior to submission of the supplemental application for a new indication for use:*  A statement about whether the REMS was meeting its goals at the time of that the last assessment and if any modifications of the REMS have been proposed since that assessment.

e) *If a REMS assessment has not been submitted in the 18 months prior to submission of the supplemental application for a new indication for use:*  Provision of as many of the currently listed assessment plan items as is feasible.

f) *If you propose a REMS modification based on a change in the benefit-risk profile or because of the new indication of use, submit an adequate rationale to support the modification, including*: Provision of the reason(s) why the proposed REMS modification is necessary, the potential effect on the serious risk(s) for which the REMS was required, on patient access to the drug, and/or on the burden on the health care delivery system; and other appropriate evidence or data to support the proposed change. Additionally, include any changes to the assessment plan necessary to assess the proposed modified REMS. *If you are not proposing REMS modifications*, provide a rationale for why the REMS does not need to be modified.

If the assessment instruments and methodology for your REMS assessments are not included in the REMS supporting document, or if you propose changes to the submitted assessment instruments or methodology, you should update the REMS supporting document to include specific assessment instrument and methodology information at least 90 days before the assessments will be conducted.  Updates to the REMS supporting document may be included in a new document that references previous REMS supporting document submission(s) for unchanged portions. Alternatively, updates may be made by modifying the complete previous REMS supporting document, with all changes marked and highlighted.  Prominently identify the submission containing the assessment instruments and methodology with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687 REMS CORRESPONDENCE
(insert concise description of content in bold capital letters, e.g.,
UPDATE TO REMS SUPPORTING DOCUMENT - ASSESSMENT
METHODOLOGY**

An authorized generic drug under this NDA must have an approved REMS prior to marketing. Should you decide to market, sell, or distribute an authorized generic drug under this NDA, contact us to discuss what will be required in the authorized generic drug REMS submission.

We remind you that section 505-1(f)(8) of FDCA prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j).  A violation of this provision in 505-1(f) could result in enforcement action.

FDA 0377

NDA 020687/S-020
Page 5

Prominently identify any submission containing the REMS assessments or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**NDA 020687 REMS ASSESSMENT**

**NEW SUPPLEMENT FOR NDA 020687/S-000**
**CHANGES BEING EFFECTED IN 30 DAYS**
**PROPOSED MINOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000**
**PRIOR APPROVAL SUPPLEMENT**
    **PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABEL CHANGES**
    **SUBMITTED IN SUPPLEMENT XXX**

*or*

**NEW SUPPLEMENT (NEW INDICATION FOR USE)**
    **FOR NDA 020687/S-000**
        **REMS ASSESSMENT**
        **PROPOSED REMS MODIFICATION (if included)**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

**REMS REVISIONS FOR NDA 020687**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

If you do not submit electronically, please send 5 copies of REMS-related submissions.

FDA 0378

NDA 020687/S-020
Page 6

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling. To do so, submit the following, in triplicate: (1) a cover letter requesting advisory comments, (2) the proposed materials in draft or mock-up form with annotated references, and (3) the package insert(s) to:

> OPDP Regulatory Project Manager
> Food and Drug Administration
> Center for Drug Evaluation and Research
> Office of Prescription Drug Promotion (OPDP)
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

Alternatively, you may submit a request for advisory comments electronically in eCTD format. For more information about submitting promotional materials in eCTD format, see the draft Guidance for Industry (available at: http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM443702.pdf ).

You must submit final promotional materials and package insert(s), accompanied by a Form FDA 2253, at the time of initial dissemination or publication [21 CFR 314.81(b)(3)(i)].  Form FDA 2253 is available at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf. Information and Instructions for completing the form can be found at http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf.  For more information about submission of promotional materials to the Office of Prescription Drug Promotion (OPDP), see http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm090142.htm.

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call                                                                      (b) (6)
                     .

Sincerely,

*{See appended electronic signature page}*

                                                                                                      (b) (6)

Center for Drug Evaluation and Research

NDA 020687/S-020
Page 7


ENCLOSURES:
   Content of Labeling
   REMS

FDA 0380

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

03/29/2016

FDA 0381

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 020687Orig1s020

# <u>REMS</u>

                    FDA 0403

Initial REMS approval:  06/2011
Most recent modification:  03/2016


NDA 020687 MIFEPREX® (mifepristone) Tablets, 200 mg

Antiprogestational Synthetic Steroid

Danco Laboratories, LLC
PO Box 4816
New York, NY 10185

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

**I.  GOAL**

The goal of the Mifeprex REMS is to mitigate the risk of serious complications
associated with Mifeprex by:

    a)  Requiring healthcare providers who prescribe Mifeprex to be certified in the
    Mifeprex REMS Program.

    b)  Ensuring that Mifeprex is only dispensed in certain healthcare settings by or under
    the supervision of a certified prescriber.

    c)  Informing patients about the risk of serious complications associated with Mifeprex


**II.  REMS ELEMENTS**

**A. Elements to Assure Safe Use**

1.  Healthcare providers who prescribe Mifeprex must be specially certified.

    a.  To become specially certified to prescribe Mifeprex, healthcare providers must:

        i.  Review the Prescribing Information for Mifeprex.

        ii.  Complete the *Prescriber Agreement Form*. By signing the *Prescriber
        Agreement Form*, prescribers agree that:

            1)  They have the following qualifications:

                a)  Ability to assess the duration of pregnancy accurately

      b) Ability to diagnose ectopic pregnancies

      c) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

    2) They will follow the guidelines for use of Mifeprex (see b.i-v below).

b.   As a condition of certification, healthcare providers must follow the guidelines for use of Mifeprex described below:

    i.   Review the *Patient Agreement Form* with the patient and fully explain the risks of the Mifeprex treatment regimen. Answer any questions the patient may have prior to receiving Mifeprex.

    ii.   Sign the *Patient Agreement Form* and obtain the Patient's signature on the *Form*

    iii.   Provide the patient with a copy of the *Patient Agreement Form* and Medication Guide.

    iv.   Place the signed *Patient Agreement Form* in the patient's medical record.

    v.   Record the serial number from each package of Mifeprex in each patient's record.

    vi.   Report any deaths to Danco Laboratories, identifying the patient by a non-identifiable reference and the serial number from each package of Mifeprex.

c. Danco Laboratories must:

    i.   Ensure that healthcare providers who prescribe Mifeprex are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements

    ii.   Provide the Prescribing Information and *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

The following materials are part of the REMS and are appended:
- *Prescriber Agreement Form*
- *Patient Agreement Form*

2. Mifeprex must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

    a.     Danco Laboratories must:

    i.   Ensure that Mifeprex is available to be dispensed to patients only in clinics, medical offices and hospitals by or under the supervision of a certified prescriber.

        ii.  Ensure that Mifeprex is not distributed to or dispensed through retail pharmacies or other settings not described above.

3.  Mifeprex must be dispensed to patients with evidence or other documentation of safe use conditions.

    a.  The patient must sign a *Patient Agreement Form* indicating that she has:

        i.  Received, read and been provided a copy of the *Patient Agreement Form*.

        ii.  Received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

## B. Implementation System

1.  Danco Laboratories must ensure that Mifeprex is only distributed to clinics, medical offices and hospitals by or under the supervision of a certified prescriber by:

    a.  Ensuring that distributors who distribute Mifeprex comply with the program requirements for distributors. The distributors must:

        i.  Put processes and procedures in place to:

            a.  Complete the healthcare provider certification process upon receipt of the *Prescriber Agreement Form.*

            b.  Notify healthcare providers when they have been certified by the Mifeprex REMS Program.

            c.  Ship Mifeprex only to clinics, medical offices, and hospitals identified by certified prescribers in the signed *Prescriber Agreement Form*.

            d.  Not ship Mifeprex to prescribers who become de-certified from the Mifeprex Program.

            e.  Provide the Prescribing Information and *Prescriber Agreement Form* to healthcare providers who (1) attempt to order Mifeprex and are not yet certified, or (2) inquire about how to become certified.

        ii.  Put processes and procedures in place to maintain a distribution system that is secure, confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, proof of delivery and controlled returns of Mifeprex.

        iii.  Train all relevant staff on the Mifeprex REMS Program requirements.

        iv.  Comply with audits by Danco Laboratories, FDA or a third party acting on behalf of Danco Laboratories or FDA to ensure that all processes and procedures are in place and are being followed for the Mifeprex REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

    b.  Ensuring that distributors maintain secure and confidential distribution records of all shipments of Mifeprex.

2. Danco Laboratories must monitor distribution data to ensure compliance with the REMS Program.

3. Danco Laboratories must audit new distributors within 90 calendar days after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifeprex REMS Program. Danco Laboratories will take steps to address distributor compliance if noncompliance is identified.

4. Danco Laboratories must take reasonable steps to improve implementation of and compliance with the requirements of the Mifeprex REMS Program based on monitoring and assessment of the Mifeprex REMS Program.

5. Danco Laboratories must report to FDA any death associated with Mifeprex whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the applicant. This requirement does not affect the applicant's other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

Danco Laboratories must submit REMS assessments to FDA one year from the date of the initial approval of the REMS (06/08/2011) and every three years thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment. Danco Laboratories must submit each assessment so that it will be received by the FDA on or before the due date.

PRESCRIBER AGREEMENT FORM

*Mifeprex®* (Mifepristone)
Tablets, 200 mg

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

*To set up your account to receive Mifeprex, you must:*
1. complete, 2. sign, and 3. fax page 2 of this form to the distributor.

If you will be ordering for more than one facility, you will need to list each facility on your order form before the first order will be shipped to the facility.

**Prescriber Agreement:** By signing page 2 of this form, you agree that you meet the qualifications below and will follow the guidelines for use. You also understand that if you do not follow the guidelines, the distributor may stop shipping Mifeprex to you.

*Mifeprex must be provided by or under the supervision of a healthcare provider who prescribes and meets the following qualifications:*

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of Mifeprex. The Prescribing Information is available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, www.earlyoptionpill.com.

*In addition to meeting these qualifications, you also agree to follow these guidelines for use:*

- Review the Patient Agreement Form with the patient and fully explain the risks of the Mifeprex treatment regimen. Answer any questions the patient may have prior to receiving Mifeprex.

- Sign and obtain the patient's signature on the Patient Agreement Form.

- Provide the patient with a copy of the Patient Agreement Form and the Medication Guide.

- Place the signed Patient Agreement Form in the patient's medical record.

- Record the serial number from each package of Mifeprex in each patient's record.

- Report deaths to Danco Laboratories, identifying the patient by a non-identifiable patient reference and the serial number from each package of Mifeprex.



Danco Laboratories, LLC • P.O. Box 4816 • New York, NY 10185
1-877-4 Early Option (1-877-432-7596) • www.earlyoptionpill.com
*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

03/2016

PCSF77

FDA 0408

# ACCOUNT SETUP

MIFEPREX® (Mifepristone) Tablets, 200 mg; NDC 64875-001-01

## TO SET UP YOUR ACCOUNT:

**❶**
Read the Prescriber Agreement on page 1 of this form.

**❷**
Complete and sign this form.

**❸**
Fax this page to the Danco distributor at 1-866-227-3343. Your account information will be kept strictly confidential.

**❹**
The distributor will call to finalize your account setup and take your initial order.

**❺**
Subsequent orders may be phoned or faxed and are usually shipped within 24 hours.

*Mifeprex*
(Mifepristone) Tablets, 200 mg
THE ORIGINAL EARLY OPTION PILL

### BILLING INFORMATION

Bill to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### SHIPPING INFORMATION ☐ *Check if same as above*

Ship to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### ADDITIONAL SITE LOCATIONS *I will also be prescribing Mifeprex\* at these additional locations:*

Name _____ Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Name _____ Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

*(Any additional sites may be listed on an attached sheet of paper.)*

### REQUEST ADDITIONAL MATERIALS

☐ **Medication Guides**  ☐ **State Abortion Guides**  ☐ **Patient Brochures**  ☐ **Patient Agreement Form**

### ESTABLISHING YOUR ACCOUNT *(required only with first order)*

Each facility purchasing Mifeprex must be included on this form (*see additional site locations box above*) before the distributor can ship the product to the facility.

**By signing below, you agree that you meet the qualifications and that you will follow the guidelines for use on page 1 of the Prescriber Agreement.**

Print Name _____ Signature _____

Medical License # _____ Date _____

### FAX THIS COMPLETED FORM TO THE AUTHORIZED DISTRIBUTOR. FAX: 1-866-227-3343

Please fax any questions to the above number or call 1-800-848-6142.

PCSF78

FDA 0409

*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

PATIENT AGREEMENT FORM

*Mifeprex®* (Mifepristone)

Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of Mifeprex\*. Both you and the patient must sign this form.*

**Patient Agreement:**

**1.** I have decided to take Mifeprex and misoprostol to end my pregnancy and will follow my provider's advice about when to take each drug and what to do in an emergency.

**2.** I understand:
   **a.** I will take Mifeprex on Day 1.
   **b.** My provider will either give me or prescribe for me the misoprostol tablets which I will take 24 to 48 hours after I take Mifeprex.

**3.** My healthcare provider has talked with me about the risks including:
   • heavy bleeding
   • infection
   • ectopic pregnancy (a pregnancy outside the womb)

**4.** I will contact the clinic/office right away if in the days after treatment I have:
   • a fever of 100.4°F or higher that lasts for more than four hours
   • severe stomach area (abdominal) pain
   • heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
   • stomach pain or discomfort, or I am "feeling sick",  including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol

**5.** My healthcare provider has told me that these symptoms could require emergency care. If I cannot reach the clinic or office right away my healthcare provider has told me who to call and what to do.

**6.** I should follow up with my healthcare provider about 7 to 14 days after I take Mifeprex to be sure that my pregnancy has ended and that I am well.

**7.** I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**8.** If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**9.** I have the MEDICATION GUIDE for Mifeprex. I will take it with me if I visit an emergency room or a healthcare provider who did not give me Mifeprex so that they will understand that I am having a medical abortion with Mifeprex.

**10.** My healthcare provider has answered all my questions.

Patient Signature: _____ Patient Name (print):_____ Date: _____

*The patient signed the PATIENT AGREEMENT in my presence after I counseled her and answered all her questions. I have given her the MEDICATION GUIDE for Mifeprex.*

Provider's Signature:_____ Name of Provider (print): _____ Date: _____

*After the patient and the provider sign this PATIENT AGREEMENT, give 1 copy to the patient before she leaves the office and put 1 copy in her medical record.*

03/2016

PCSF79

FDA_0410

\*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

DANCO

--------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

03/29/2016

FDA 0411

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 020687Orig1s020

# <u>SUMMARY REVIEW</u>

FDA 0412

Summary Review for Regulatory Action

| | |
|---|---|
| Date | March 29, 2016 |
| Subject | Summary Review |
| NDA #/Supplement # | 20687/S-020 |
| Applicant name | Danco Laboratories, LLC |
| Date of submission | May 28, 2015 |
| Date of submission receipt | May 29, 2015 |
| PDUFA goal date | March 29, 2016 |
| Proprietary name/established name | Mifeprex/mifepristone |
| Dosage form/strength | Oral tablet/200 mg |
| Dosage regimen | Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol |
| Proposed indication | Mifeprex is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation |
| Action | Approval |

1

FDA 0413

1. **Introduction**
2. **Background**
3. **CMC**
4. **Nonclinical Pharmacology/Toxicology**
5. **Clinical Pharmacology**
6. **Clinical Microbiology**
7. **Efficacy/Statistics**
8. **Safety**
9. **Advisory Committee Meeting**
10. **Pediatrics**
11. **Other Relevant Regulatory Issues**
12. **Labeling**
13. **Decision/Action/Risk Benefit Assessment**

1. **Introduction**

Danco Laboratories, LLC, referred to hereafter as the Applicant, submitted an efficacy supplement (S-020) to NDA 20687 for Mifeprex (mifepristone). The Applicant sought the following changes to its approved application:

1. ▓▓▓▓▓▓▓ (b) (4)   Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally; see below:
   - Day One: Mifeprex Administration (oral)
     One 200 mg tablet of Mifeprex is taken in a single oral dose
   - After a 24-48 hour interval: Misoprostol Administration (buccal)(minimum 24-hour interval between Mifeprex and misoprostol)
     Four 200 mcg tablets (total dose: 800 mcg) of misoprostol are taken by the buccal route

2. Removal of the instruction that administration of misoprostol must be done in-clinic, to allow for administration at home or other location convenient for the woman
3. Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex
4. Follow-up, although still needed, not restricted to in clinic at 14 days after Mifeprex
5. Increase in the maximum gestational age from 49 days to 70 days
6. Change of the labeled time for expected expulsion of pregnancy from 4-24 hours to 2-24 hours post misoprostol administration
7. Addition that a repeat 800 mcg buccal dose of misoprostol may be used if needed
8. Change of "physician" to "healthcare provider" in the label and Risk Evaluation and Mitigation Strategies (REMS) document
9. Change in the indication statement to add reference to use of misoprostol: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of pregnancy through 70 days gestation."
10. Removal of references to "under Federal law" from the Prescriber's Agreement under the REMS

FDA 0414

11. Labeling changes addressing the pediatric requirements under the Pediatric
Research Equity Act

This efficacy supplement submission includes information from published studies, review
articles and additional information from the authors of some of the publications. These
published studies evaluated reproductive age women in the U.S. and outside the U.S. who
had early medical termination with mifepristone, in a regimen with misoprostol,
including women up through 70 days of gestation.

This memorandum serves as the Division's decisional memorandum for the efficacy
supplement.

## 2. Background

The active ingredient of Mifeprex, mifepristone, is a progestin antagonist. Mifeprex, in a
regimen with misoprostol, is approved for the medical termination of pregnancy up
through 49 days' gestation. The approved dosing regimen is currently labeled as follows:

- Day 1: The patient takes three 200 mg tablets of Mifeprex in a single oral dose in
  the clinic, medical office, or hospital.
- Day 3: The patient returns to the clinic, medical office, or hospital and takes two
  200 mcg tablets of misoprostol orally.
- Day 14: The patient returns for a follow-up visit to confirm that a complete
  termination has occurred.

At the time of the September, 2000 approval, FDA restricted distribution of Mifeprex
under 21 CFR 314.520, requiring that Mifeprex be dispensed only by or under the
supervision of a physician who meets certain qualifications. With the passage of
FDAAA in 2007, Mifeprex was deemed to have in effect an approved REMS. The
Applicant submitted a formal REMS, which was approved on June 8, 2011 and consisted
of the following: a Medication Guide, elements to assure safe use (ETASU A [special
certification of healthcare providers who prescribe Mifeprex], ETASU C [dispensing
only in certain healthcare settings], and ETASU D [safe use condition of a signed Patient
Agreement]), an implementation system and a timetable for assessments. The goals of the
REMS were 1) To provide information to patients about the benefits and risks of
Mifeprex before they make a decision whether to take the drug and 2) To minimize the
risk of serious complications by requiring prescribers to certify that they are qualified to
prescribe Mifeprex and are able to assure patient access to appropriate medical facilities
to manage any complications. The REMS for Mifeprex incorporated the restrictions
under which the drug was originally approved.

Since 2011, the Applicant has submitted two REMS assessment reports. The Agency
review of these reports determined that the REMS goals were being met and that no
modifications were required to the REMS at that time.

3

FDA 0415

FDA held a pre-NDA meeting with the Applicant on January 29, 2015, to discuss proposed labeling and REMS changes to be submitted in this efficacy supplement. These changes were submitted with the efficacy supplement.

The Applicant submitted published literature and supportive information to support changes to the dose, dosing regimen, gestational age, revisions to labeling, modifications to the REMS document, and to address PREA requirements. The Agency accepts the use of peer reviewed literature as primary data for an application under the framework of a 505(b)(2) application.

### 3.  CMC

No new CMC information was submitted with this efficacy supplement. The CMC team determined no additional review or inspections were required. The CMC team completed a review of the labeling and found the CMC sections of labeling (sections 3, 11 and 16) acceptable (See review dated March 29, 2016). The CMC review team recommends approval of the efficacy supplement; refer also to the CMC review of the separate supplement proposing a single tablet blister pack for Mifeprex, dated January 11, 2016. There are no outstanding CMC issues or postmarketing commitments or requirements.

*Comment: On March 10, 2016, a separate CMC supplement was approved that allowed the packaging of individual 200 mg tablets of mifepristone; previously packaging consisted of three 200 mg tablets per blister pack (a total of 600 mg Mifeprex as administered under the originally approved dosing regimen).*

### 4.  Nonclinical Pharmacology/Toxicology

No new nonclinical information was submitted in this supplement. The Pharmacology/Toxicology team revised labeling to conform to the Pregnancy and Lactation Labeling Rule. There are no outstanding nonclinical issues. The Pharmacology/Toxicology review team recommends approval of the efficacy supplement; refer to the Pharmacology/Toxicology review dated March 4, 2016.

### 5.  Clinical Pharmacology

The Applicant did not conduct any new clinical pharmacology studies pertaining to the proposed ⬛⬛⬛ (b) (4) regimen, but provided information on pharmacokinetics (PK) of misoprostol following various routes of administration. The PK of the 200 mg Mifeprex tablet has not been characterized in women, but data are available in men and were submitted in the original NDA. The Clinical Pharmacology review team determined that the PK data were appropriate for inclusion in labeling. Review of the labeling pertinent to the Clinical Pharmacology sections is complete and labeling relevant to pharmacokinetics and pharmacodynamics is acceptable. There are no outstanding Clinical Pharmacology issues or postmarketing commitments or requirements. The clinical pharmacology review team recommends approval of the efficacy supplement; refer to the Clinical Pharmacology review dated March 29, 2016.

4

**6.  Clinical Microbiology**

Not applicable.

**7.  Efficacy/Statistics**

The Applicant submitted published literature as the primary evidence to support the efficacy (and safety) of the proposed dosing regimen (refer to the Clinical Review dated March 29, 2016, Section 9.5 for a list of submitted references).  Most published articles submitted by the Applicant and reviewed by the clinical review team reported the primary efficacy endpoint as complete termination of pregnancy without further medical or surgical intervention; the Division considers this to be a clinically relevant endpoint.

The majority of the publications included a statement that the study was conducted under institutional review board (IRB) or Ethical Review Committee approval and the women gave informed consent.  The clinical review team concluded that the published literature was adequate as the primary information source to support the changes proposed in the efficacy supplement.  During the course of the review, the team also requested and received more detailed information from select publications from their authors via communication with the Applicant.

Although there were slight demographic differences among the published studies from the database, these differences were not expected to alter the efficacy or safety of Mifeprex. Therefore, for the majority of the proposed efficacy changes, the clinical team assessed efficacy information from a subset of publications that evaluated a given proposed change. An independent statistical review was not needed for this review of published literature.

The clinical review team identified several major proposed clinical changes in the efficacy supplement.  As these major changes are interrelated, in some cases data from a given study were relied on to provide evidence to support multiple changes. These  major changes as considered by the clinical team included:
1. A proposed dosing regimen consisting of mifepristone 200 mg orally followed by the buccal administration of 800 mcg misoprostol including:
   a. Use of a revised interval between mifepristone and misoprostol from 48 hours to 24-48 hours
   b. Allowing home administration of misoprostol
   c. Use of an additional dose of misoprostol
2. Support for extending the gestation age through 70 days
3. Flexibility in follow-up visit: follow-up is needed in the range of 7-14 days after Mifeprex administration; the specific nature and exact timing of the follow-up to be agreed upon by the healthcare provider and patient.
4. Change in who can provide Mifeprex from physician to healthcare provider who prescribes

Reference ID: 3909594

The following section summarizes the clinical review team's evaluations that supported the above proposed changes:

1. *Support for the proposed dose and dosing regimen of 200 mg of Mifeprex orally and 800 mcg of misoprostol buccally 24-48 hours after Mifeprex administration:* The clinical review team reviewed the submission and identified studies and review articles that evaluated over 35,000 women who were treated with efficacy in the 91-98% range. For additional details on the efficacy from these studies, please refer to Section 6 of the Clinical Review.

2. *Support for extending the gestational age to 70 days:* The Applicant submitted a number of published articles and systematic reviews that supported the proposed dose and dosing regimen. Four studies and one systematic review evaluated the exact proposed dosing regimen through 70 days gestation. These include three prospective observational studies (Winikoff et al 2012[1], Boersma et al[2], Sanhueza Smith et al[3]) and one randomized controlled trial (RCT) (Olavarrieta et al[4]) that had a primary objective of evaluating medical abortion provision by non-physicians. The systematic review by Chen and Creinin[5] covered 20 studies including over 30,000 women; all but one of the studies used the proposed regimen in gestations through 70 days (the remaining study used 400 mcg of buccal misoprostol). For those publications that provided overall success rates, these were in the range of 97-98%. Other relevant publications include the systematic review by Raymond[6] of 87 studies, which covered a variety of misoprostol doses and routes of administration used with 200 mg of mifepristone. Assessing the efficacy by misoprostol dose, the paper noted that doses ≥ 800 mcg had a success rate of 96.8%, with an ongoing pregnancy rate of 0.7%.

---

[1] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6

[2] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6

[3] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015; 22: 75-82

[4] Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015; 93: 249-258

[5] Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol: a Systematic Review. Obstet Gynecol 2015; 126(1): 12-21

[6] Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9

FDA 0418

Reference ID: 3909594

The original dosing regimen specifies taking misoprostol 2 days after Mifeprex. This efficacy supplement proposes a more flexible time frame of 24 to 48 hours between Mifeprex and misoprostol administration. Data from a review article by Wedisinghe et al[7] evaluated different time intervals using administration of misoprostol after Mifeprex. A meta-analysis of all five studies found a non-significant odds ratio for failure for shorter vs. longer dosing intervals, but a trend for lower success if a dosing interval < 8 hours is used. Chen & Creinin's systematic review[8] of 20 studies including over 33,000 women, all but one using the proposed regimen, compared the success of dosing intervals of 24 hours with intervals ranging from 24-48 hours. The success rate in six studies that used a 24-hour interval through 63 days gestation was 94.2%, compared to the rate of 96.8% in 14 studies that used a 24-48 hour interval, and this difference was statistically significant. The clinical team concluded that the efficacy of the revised dosing regimen was not compromised by revising the dosing interval to 24-48 hours. In addition, they noted that the overall rate of ongoing pregnancies did not differ significantly by dosing interval.

3. *Administration of misoprostol after Mifeprex administration at home:* Currently, the dosing regimen specifies that misoprostol is taken in the clinic setting following Mifeprex administration. No specific publication evaluated treatment outcomes with use of misoprostol at home compared to in-clinic dosing. However, one large literature review (Raymond et al[9]) evaluated a variety of mifepristone treatment regimens with different misoprostol doses, routes of administration and dosing intervals used in gestations through 63 days. Roughly half of the studies included in this review did not require women to take misoprostol in-clinic. Rates of treatment failure and of ongoing pregnancy were very similar regardless of whether misoprostol was taken in-clinic or at another location. The clinical review team concluded that the review provided sufficient data to support labeling that misoprostol does not need to be restricted to in-clinic administration.

4. *Use of a repeat misoprostol dose, if necessary:* The Applicant submitted several published studies that supported use of a repeat misoprostol dose, when complete uterine expulsion did not occur after the initial misoprostol dose following Mifeprex. In clinical practice, the usual treatment for incomplete expulsion (retained products of conception) may include either a repeat dose of misoprostol, expectant management or a surgical procedure (suction aspiration or a dilation and curettage). Studies that specifically report the success rate of a repeat dose of misoprostol are:

---

[7] Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010; 81(4): 269-74. doi: 10.1016/j.contraception.2009.09.007. Epub Oct 29, 2009

[8] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859

[9] Raymond EG & Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012; 119: 215-9

Reference ID: 3909594

FDA 0419

- Winikoff et al[10] – studied the proposed regimen through 70 days gestation; of the few women who received a second dose for an incomplete abortion at follow-up, the success rate was 91% at 57-63 days and 67% at 64-70 days.
- Chen and Creinin [11] – a systematic review of 20 studies, all but one of which used the proposed regimen up through 70 days; success of a second dose ranged from 91-100%
- Boersma et al[12] – included pregnancies through 70 days treated with the proposed regimen; five of 330 women took a second dose due to absence of bleeding 48 hours after first dose; the success rate was 80%
- Louie et al[13] – studied the proposed regimen to 63 days; in 16 women (of 863) who took a second dose of misoprostol, the success rate was 100%
- Chong et al[14] – compared the proposed regimen to a lower dose of misoprostol; the success of a second dose of misoprostol was 92% overall, but the number of women in each dose arm getting a second dose was not specified.
- Winikoff et al[15] – 14 women in the proposed regimen took a second dose of misoprostol with a success rate of 92.9%.

Using the information from the above studies and other supportive data, the clinical team concluded that the available data support the efficacy of a repeat dose of misoprostol if complete expulsion has not occurred. The relatively high complete pregnancy termination rates indicate that this option is likely to reduce the need for a surgical intervention.

5. *Requirements regarding follow-up care:* Current labeling states that women will return to the clinic 14 days after Mifeprex administration for follow-up. This provision was based on the follow up regimen in the U.S. phase 3 trial that supported the initial approval in 2000. Although the Applicant submitted several studies that evaluated flexibility in the time of follow-up, the key publication identified by the review team that addressed this issue was a 2013 article by

---

[10] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6

[11] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004; 103: 851-859

[12] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011; 16: 61-6

[13] Louie KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014; 19(6): 457-464

[14] Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012; 86: 251-256

[15] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310

8

FDA 0420

Raymond[16]. The impact of the timing of follow-up was assessed in Raymond's
systematic review of studies using various treatment regimens. While some have
posited that earlier follow-up may result in a higher rate of surgical intervention
(for women who would have had complete expulsion had they been given a bit
more time), Raymond's analyses found no difference in failure rates for women
followed less than one week after mifepristone as compared to a week or more
after mifepristone. As follow-up was anticipated to not alter the efficacy of the
proposing dosing regimen, this change is also discussed below in Section 7.

6.  *Allowing qualified healthcare providers to use Mifeprex.*

The Applicant provided data on the efficacy of medical abortion provided by non-
physician healthcare providers, including four studies with 3,200 women in
randomized controlled clinical trials and 596 women in prospective cohorts.
These studies included a study by Warriner et al[17] that showed efficacy of 97.4%
with nurses versus 96.3% by physicians.

Conclusions: I concur with the clinical review team's assessments and conclusions and
these conclusions will be reflected in labeling. The data and information reviewed
constitute substantial evidence of efficacy to support the proposed dosing regimen for
Mifeprex for pregnancy termination through 70 days gestation. Other proposed changes
to the Mifeprex labeling, including the time interval between Mifeprex and misoprostol
dosing, and use of a repeat dose, were also adequately supported by evidence. Finally, I
concur with the clinical review team that the information from the published literature
also supported efficacious use of Mifeprex by non-physician providers.

**Comment:** Discussion was held as to whether the original dosing regimen approved in
2000 (i.e., Mifeprex 600 mg and misoprostol 400 mcg up to 49 days gestation) should
remain in labeling.                                                      (b) (4)

                                                              the clinical review
team and I concur with their          (b) (4) request to remove the current regimen from the
labeling. Removal of the original dosing regimen simplifies labeling, and avoids any
confusion regarding instructions. Therefore, the revised labeling, and REMS materials
accompanying the approval of this efficacy supplement, will include only the proposed
dosing regimen and instructions. It should be noted that there are no safety or efficacy
concerns about the originally approved dosing regimen that led to removing it from the
labeling.

---

[16]Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a
systematic review. Contraception 2013;87(1):26-37.
[17] Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al.  Can midlevel health-care
providers administer early medical abortion as safely and effectively as doctors?  A randomized controlled
equivalence trial in Nepal. Lancet 2011; 377: 1155-61.

Reference ID: 3909594                                        FDA 0421

## 8. Safety

The safety of the proposed dosing regimen for Mifeprex was supported by the evidence from submitted published literature and postmarketing experience. The focus of the safety analysis was on published studies that evaluated the proposed dosing regimen (Mifeprex 200 mg followed by 800 mcg misoprostol buccally 24-48 hours later), with comparison to the known safety profile of the currently approved dosing regimen.

*Exposure*: Per the Applicant's submission, the clinical review concluded that there have been approximately 2.5 million uses of Mifeprex by U.S. women since the drug's approval in 2000. The clinical review team estimated that exposure to the proposed dosing regimen for their safety analysis was based on approximately 30,000 patients (refer to Table 11 for a list of references used to evaluate safety). Such exposure volume is sufficient to characterize the safety profile of the proposed dosing regimen and other proposed changes in this efficacy supplement.

*Deaths:* Deaths with medical abortion rarely occur and causality can be difficult to determine. Most of the publications did not specifically report any deaths with medical abortion with Mifeprex. Among the seven U.S. studies submitted to support the safety profile of Mifeprex and misoprostol, only one (Grossman, et al[18]) explicitly addressed deaths and noted that there were no deaths among 578 subjects evaluated in the study. Only one observational study (Goldstone, et al[19]) from Australia contained a report of a death after a mifepristone and misoprostol dosing regimen. In this retrospective review of 13,345 pregnancy terminations, the authors identified one death from sepsis. The article stated that the death was in an individual who failed to follow-up with her healthcare provider despite showing signs of illness. Based on this information, deaths in association with abortion are extremely rare.

Deaths reported from the postmarketing experience of Mifeprex are summarized below in the Postmarketing Experience section.

*Nonfatal serious adverse events*: The clinical review team identified key nonfatal serious adverse events (SAEs) associated with the proposed dosing regimen for Mifeprex. These SAEs include: hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. Section 7 of the clinical review dated March 29, 2016, provides a detailed discussion of reported rates of hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. The latter is not an adverse reaction because an ectopic pregnancy would exist prior to the Mifeprex regimen; it represents instead a failure to diagnose an ectopic pregnancy. Overall rates identified by the clinical review team from the published literature are as follows:
- Hospitalization: 0.04-0.6% in U.S. studies of over 14,000 women; 0-0.7% in international studies of over 1,200 women

---

[18]Grossman D, Grindlay K, Buckacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.
[19]Goldstone P, Michelson J, Williamson E. Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012; 197: 282-6.

Reference ID: 3909594

- Serious infection/sepsis: 0-0.2% in U.S. and international studies of over 12,000 women
- Transfusion:  0.03-0.5% in U.S. studies of over 17,000 women; 0-0.1% in international studies of over 12,000 women

A study by Upadhyay et al[20] reported a 0.31% rate of major complications (including incomplete or failed abortion, hemorrhage, infection or uterine perforation that required hospitalization, surgery or transfusion) for medical abortions (dosing regimen unspecified) through 63 days; this was about double the rate reported for first trimester aspiration abortions and statistically significantly higher.  However, these rates were driven by higher rates of incomplete/failed abortion; rates of hemorrhage (0.14%) and infection (0.23%) did not differ from those associated with aspirations.

Only one submitted study reported an ectopic pregnancy. This study (Winikoff et al[21]) reported one ectopic among 847 women (0.12%).

*Comment:* The proposed dosing regimen has been studied extensively in the literature using U.S. and global sites. Serious adverse events including deaths, hospitalization, serious infections, bleeding requiring transfusion and ectopic pregnancy are rarely reported. The rates of these serious adverse events are well below 1% and do not suggest a safety profile different from the original approved Mifeprex dosing regimen. Although there is less serious adverse event data on women who received Mifeprex and misoprostol between 64-70 days of gestation, the data from a U.S. study of 379 women (Winikoff et al)[22] in that gestational age is reassuring that the rates of these serious adverse events are not clinically different from that of other gestational age ranges.

In summary, based on the published literature, nonfatal serious adverse events occur with Mifeprex and misoprostol use with rates generally less than 1%.  Increased gestational age (64-70 weeks) was not associated with an increased incidence of nonfatal SAEs. Other submission- specific safety issues that were evaluated including uterine rupture and angioedema/anaphylaxis are discussed in the Postmarketing Experience section below.

*Loss to follow-up:* The studies included in this safety review revealed a wide range of loss to follow-up, from 0.6% loss to follow-up in the study with telephone follow-up (Ngoc et al[23]) to 22% in the Grossman et al[24] study using telemedicine to deliver medical

---

[20]Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.

[21]Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310.

[22]Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070-6.

[23] Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam:  A randomized controlled trial. Obstet Gynecol 2014;123:88-95.

[24] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

Reference ID: 3909594

FDA 0423

abortion services.

*Comment*: Based on these data reviewed by the clinical review team, there is no literature that suggests that follow-up modality alters safety. Therefore, labeling will not be directive regarding follow-up; that will be a decision left to the patient and provider.

*Common adverse events:* The clinical review team evaluated common adverse reaction data and compared U.S. and global study locations. The comparison revealed that there were differences in the frequency of common adverse reactions, with the reporting rates considerably higher among the U.S. studies. There is no reason to anticipate regional differences in the safety profile for the same treatment regimen, so these differences likely reflect lower ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data in labeling would not be appropriate, as it is unlikely to be informative to the U.S. population of users. The data to be reported in labeling is outlined in Table 1 below:

**Table 1: Common Adverse Events (≥ 15%) in U.S. Studies of the Proposed Dosing Regimen**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

Source: Data from Middleton[25], Winikoff[26] and Winikoff[27] as outlined in Table 2 of the CDTL review dated March 29, 2016.

One concerning adverse event is severe vaginal bleeding. Severe vaginal bleeding can result in interventions such as hospitalization and transfusion and may be associated with infection. The overall rate of bleeding across publications varied between 0.5% and 4.2%. Two publications (Sanhueza Smith et al[28] and Gatter et al[29]) evaluated clinically significant bleeding by gestational age. Although the publications reported slightly different rates, there was no trend of increased bleeding requiring intervention with Mifeprex and misoprostol use with increasing gestational age.

---

[25] Middleton T, et al. Randomized trial of mifepristone and buccal or vaginal misoprostol for abortion through 56 days of last menstrual period. Contraception 2005; 72: 328-32
[26] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012; 120: 1070-6
[27] Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008; 112(6): 1303-1310
[28] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;22:75-82.
[29] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.

FDA 0424

*Comment:* While not all of the studies reported common adverse events, those that reported did not have unexpected rates of common adverse events. These common adverse events are included in labeling in section 6.1 (Clinical Trial Experience) in the ADVERSE REACTIONS section.

*Postmarketing experience – Spontaneous reports:*

The safety profile for Mifeprex includes over 15 years of postmarketing safety data available on Mifeprex due to the reporting requirements under the REMS. The Year 3 REMS Assessment report was submitted by the Applicant in June, 2015. The ⟨(b) (6)⟩ ⟨(b) (6)⟩ provided a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015. Findings include:

- No Clostridial septic deaths reported in the U.S. since 2009, and none worldwide since 2010.
- The postmarketing rates of hospitalization, severe infection, blood loss requiring transfusion and ectopic pregnancy reported from publications and remain stable and relatively low.

*Submission-specific safety issues:*
- <u>Anaphylaxis/angioedema:</u> The ⟨(b) (6)⟩ ( ⟨(b) (6)⟩ identified a safety signal of anaphylaxis and angioedema with mifepristone administration. This signal was based on a comprehensive review of adverse event reports submitted from 2000 through November 17, 2015. A FAERS search retrieved one case of anaphylaxis and six cases of angioedema with mifepristone administration. Six of the seven cases were seen in women using mifepristone for termination of pregnancy. Six of the seven cases noted some type of medical intervention, such as treatment with an antihistamine, a histamine H2 antagonist, a corticosteroid, or a combination of various medications. Hospitalization was noted in three of the seven total cases; all three hospitalization cases occurred in patients who experienced angioedema. There were no additional cases of anaphylaxis or angioedema identified in the literature.

  *Comment:* ⟨(b) (6)⟩ and the clinical review team recommended that anaphylaxis and angioedema be described in the Contraindications and Adverse Reactions sections of labeling. These labeling sections were discussed with the Applicant and labeling was revised for those sections to describe these serious adverse events.

- <u>Uterine rupture:</u> As discussed in the clinical review, the potential risk of uterine rupture was considered because the current labeling for misoprostol includes a Boxed Warning against the use of misoprostol for gestations more than 8 weeks due to the risk of uterine rupture. Although misoprostol is used alone for various obstetric indications, including induction of labor at term, it was important to consider whether labeling about this potential risk is warranted for Mifeprex. Both the clinical reviewer and the ⟨(b) (6)⟩ ( ⟨(b) (6)⟩ reviewed the literature and ⟨(b) (6)⟩ searched FAERS for adverse event reports.

13

FDA 0425

Published literature reported three case reports[30,31,32] of uterine rupture with
mifepristone/misoprostol treatment in the first trimester. Of these three reports,
two patients had a risk factor for uterine rupture (prior uterine surgery). The third
case was in a patient who received more than two doses of misoprostol. After
consideration, the clinical review team decided that labeling should include
information about this event. The FAERS search did not identify any reports of
uterine rupture with use of mifepristone alone.  Of 80 reports, 77 cited use of
misoprostol alone, and three of mifepristone and misoprostol.  Only two reports of
uterine rupture in the first trimester were identified, both using misoprostol alone;
one entailed an unspecified dose and route of misoprostol at 5 weeks gestation,
and one involved vaginal administration of 800 mcg misoprostol at 8 weeks
gestation for cervical preparation prior to a surgical abortion in a woman with a
prior uterine scar.

Based on the available safety reports of uterine rupture, the review team from
(b) (6) and clinical review team concluded that these data demonstrated that
uterine rupture with Mifeprex and misoprostol in the first ten weeks (70 days) of
gestation is exceedingly uncommon, and occurs most often in the face of a risk
factor (previous uterine surgery).

***Comment:*** I agree with the clinical review team and the (b) (6) team that the risk
of uterine rupture with first trimester use of mifepristone and misoprostol appears
to be extremely rare, and most often associated with a prior uterine scar, a known
risk factor for uterine rupture.  Labeling of these reports is included in section 2.3
of the  DOSAGE AND ADMINISTRATION and section 6.2 of the ADVERSE
REACTIONS of labeling to provide additional information to healthcare
providers, but no restriction of use is needed based upon this extremely rare
adverse reaction.

The clinical review team also evaluated the safety for each of the following major
changes proposed in this efficacy supplement:
1. Changing the dosing interval between Mifeprex and misoprostol from 48 hours to
   24-48 hours
2. Home administration of misoprostol
3. Use of a repeat dose of misoprostol
4. Change in the follow-up timeframe and method of follow-up
5. Allowing providers other than physicians to provide Mifeprex

---

[30] Khan S et al. Uterine rupture at 8 weeks' gestation following 600 µg of oral misoprostol for management
of delayed miscarriage. Journal of Obstet Gynaecol 2007; 27: 869-870
[31] Bika O, Huned D, Jha S, Selby K Uterine rupture following termination of pregnancy in a scarred uterus
J Obstet Gynaecol 2014; 34(2): 198-9. doi: 10.3109/01443615.2013.841132
[32] Willmott F, et al. Rupture of uterus in the first trimester during medical termination of pregnancy for
exomphalos using mifepristone/misoprostol. BJOG 2008;15:575-77

14

FDA 0426

To evaluate each of these changes, the reviewers evaluated the adverse event information regarding:

- *Changing the timing interval between Mifeprex and misoprostol and change in the gestational age to 70 days:* Support for the 24-48 hour interval and use up through 70 days was primarily based on a large systematic review by Shaw et al[33]. This review evaluated studies looking at different follow-up modalities and demonstrated that there are a variety of acceptable alternatives to in-clinic follow-up that can identify cases in which there is need for additional intervention. In addition, the systematic review did not identify any significant difference in adverse events with different time intervals.  Based on these findings, labeling will not be directive regarding specific details of how follow-up should be performed; this will be a decision between the patient and her healthcare provider.

- *Home administration of misoprostol:* The Applicant supplied several published studies that supported this change including Gatter et al[34] and Ireland et al[35]. These studies reported on large numbers of women in the U.S. who took misoprostol at home. The authors showed that home administration of misoprostol, as part of the proposed regimen, is associated with exceedingly low rates of serious adverse events, and with rates of common adverse events comparable to those in the studies of clinic administration of misoprostol that supported the initial approval in 2000. Given that information is available on approximately 45,000 women from the published literature, half of which incorporated home use of misoprostol, there is no clinical reason to restrict the location in which misoprostol may be taken.  Given the fact that the onset of cramping and bleeding occurs rapidly (i.e., generally within 2 hours) after misoprostol dosing, allowing dosing at home increases the chance that the woman will be in an appropriate and safe location when the process begins.

- *Use of a repeat dose of misoprostol:*  Safety reporting from studies that evaluated a repeat dose of misoprostol did not specifically assess the subset of women who received a second dose, but no unexpected findings were identified. One randomized controlled trial (Coyaji et al[36]) conducted in 300 women seeking medical abortion in India looked at a single misoprostol dose as compared to two misoprostol doses. Although there was no difference in the complete pregnancy termination rate in women who received a second misoprostol dose compared to those who did not, the repeat misoprostol dose reduced the need for surgical intervention. This study was reassuring in that  there was no significant difference in the adverse events observed—similar percentages of women experienced

---

[33] Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.
[34] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[35] Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8.
[36] Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278.

FDA 0427

cramping (87% in the single dose group, 89% in the repeat dose group), nausea (both groups 1%), vomiting (both groups 0%), and diarrhea (0% in the single dose group versus 2% in the repeat dose group). A supportive systematic review by Gallo et al[37] also provided safety information on subjects who received repeat misoprostol. In this review, the only side effects discussed in the trials were diarrhea, which was more common on those groups receiving misoprostol orally than in those receiving it exclusively vaginally (26-27% versus 9%). Rash was reported <1%. Based on these findings, labeling will be changed because the misoprostol dose does not need to be restricted to in clinic administration to assure safe pregnancy termination using the proposed dosing regimen. Given the onset of bleeding and cramping after misoprostol, allowing home administration increases the likelihood that a woman will be in an appropriate and safe location when the pregnancy termination process begins.

- *Change in the follow-up timeframe and method of follow-up:* The Applicant submitted several articles that described different methodologies in follow-up including phone calls and standardized instructions. The clinical reviewers evaluated a study in Scotland by Cameron et al[38] that evaluated self-assessment as compared to standard follow-up methodologies (clinic visit or phone call). Most of the women chose self-assessment over an in-clinic visit or phone call, and there were no significant differences in adverse outcomes between women who underwent self-assessment of health compared to those who had a clinic visit or phone call. Among women with an ongoing pregnancy after Mifeprex and misoprostol, the majority self-identified and presented within two-weeks for care. Based on this information and the other data from the Raymond systematic article[39] that did not identify a difference in failure rate for earlier (less than one week) as compared to one week or greater of follow-up, sufficient support was provided to use a broadened window of 7 to 14 days for follow-up. This revised follow-up time frame will be included in labeling.

- *Allowing providers other than physicians to provide Mifeprex*: The current Prescriber's Agreement in the REMS specifies that "…Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…" In addition, current labeling states that Mifeprex will be supplied only to licensed physicians who sign and return a Prescriber's Agreement. However, labeling states that other healthcare providers, acting under the supervision of a qualified physician, may also provide Mifeprex to patients. Several published studies submitted by the Applicant indicate that health care providers such as nurse practitioners, nurse midwives, and physician assistants are

---

[37] Gallo MF, Cahill S, Castelman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41.
[38] Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11.
[39] Raymond EG & Grimes DA.  The comparative safety of legal induced abortion and childbirth in the United States.  Obstet Gynecol 2012; 119: 215-9

16

currently providing abortion services. One of these studies (Kopp Kallner et al[40]) was a randomized controlled trial of 1,068 women in Sweden who were randomized to receive medical abortion care from two nurse midwives experienced in medical terminations and trained in early pregnancy ultrasound versus a group of 34 physicians with varying training and experience. Success rates were ≥ 96% regardless of gestational age. The nurse midwife group had few complications, though this was not statistically significant (4.1% for nurse midwives, versus 6.1% for doctors, p=0.14). No serious complications were reported and no blood transfusions were administered in the study. Based on this and other supportive studies, the information supports the efficacy and safety of allowing healthcare providers other than physicians can effectively and safely provide abortion services, provided that they meet the requirements for certification described in the REMS. The clinical team also felt that the term "healthcare provider who prescribes" would be the appropriate terminology as prescribing ability is a critical factor in dispensing Mifeprex.

The clinical review team concluded that the evidence demonstrated acceptable safety for each of the above proposed changes, and I concur with their conclusion.  The proposed dosing regimen has a similar safety profile as the original regimen approved in 2000. Adverse outcomes of interest, such as deaths, serious infection, transfusions, ectopic pregnancies and uterine rupture, remain rare, and are not necessarily attributable to Mifeprex use.  Overall, the rate of deaths and nonfatal serious adverse events are acceptably low, and data for the proposed regimen do not suggest a safety profile that deviates from that of the originally approved regimen  No association between adverse outcomes and increasing gestational age was identified. Finally, the available information supports the safety of the other proposed changes, including increasing the flexibility of the time interval between Mifeprex and misoprostol, at home use of misoprostol, use of a repeat dose of misoprostol, change in the follow-up timeframe and allowing health care providers other than physicians to prescribe and dispense Mifeprex were acceptable.

## 9.  Advisory Committee Meeting

Mifeprex is not a new molecular entity requiring discussion before an advisory committee. In addition, an advisory committee was not necessary as the application did not raise complex scientific or other issues that would warrant holding an AC before approval.

## 10. Pediatrics

This efficacy supplement triggered requirements under the Pediatric Research Equity Act (PREA).  The Agency granted a partial PREA waiver for pre-menarcheal females ages birth to 12 years because it would be impossible to conduct studies in this pediatric population, as pregnancy does not exist in premenarcheal females.

---

[40] Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

Reference ID: 3909594          FDA 0429

The Applicant fulfilled the remaining PREA requirement in postmenarcheal females by submitting published studies of Mifeprex for pregnancy termination in postmenarcheal females less than 17 years old. Efficacy and safety information in these adolescents was based on a U.S. study in 322 postmenarcheal adolescents (Gatter et al[41]). Of the 322 adolescents, 106 of these adolescents were under 16; see Table 2 below:

**Table 2: Age and Number of Adolescents Undergoing Medical Abortion (Gatter et al[42])**

| Age of Subject | Number of Subjects evaluated |
|:---:|:---:|
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 20 |
| 15 | 82 |
| 16 | 216 |

Source: Refer to Table 17 of the Medical Officer's review dated March 29, 2016

The Gatter et al[43] study reported that postmenarchal females less than 18 years old had a 98.7% pregnancy termination rate as compared to females aged 18-24, who had a rate of 98.1%. This article reported that loss to follow-up was slightly higher in those less than 18 years old, however, age did not adversely impact efficacy outcomes.

One issue was whether adolescents would comply with at home use of misoprostol. The Gatter[44] et al study incorporated at home use of misoprostol into the Mifeprex dose regimen given to all females, including postmenarchal females less than 18 years old. The overall efficacy in adolescents was similar to that of all older women. This information supports at home administration of misoprostol in postmenarchal females under 17.

Two other published studies provided additional efficacy on Mifeprex use by adolescents for pregnancy termination:

- Phelps et al[45] evaluated data from 28 adolescents aged 14 to 17, at ≤ 56 days gestation, using Mifeprex 200 mg followed 48 hours later by misoprostol 800 mcg vaginally. In this study, 100% of subjects had a complete pregnancy termination, with five not requiring misoprostol.

---

[41]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[42] Ibid.
[43]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[44]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[45]Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343.

Reference ID: 3909594

FDA 0430

- Niinimaki et al[46] used data from a Finnish Registry from 2000-2006. An analysis of efficacy between adolescents under age 18 compared to the women ≥ age 18 indicated that the adolescent group had a lower rate of incomplete abortions as compared to adults. And efficacy outcomes in adolescents were similar to those of adult women.

The safety of Mifeprex in postmenarcheal adolescents was primarily supported by adverse event information from the Gatter et al[47] study.                                    (b) (6), (b) (4)

                                                                              Supportive data from a Finnish registry (Niinimaki et al  ) from 3024 adolescent females under 18 years of age reported that, compared to adult women, the risks of hemorrhage (adjusted odds ratio 0.87 [95% confidence interval: 0.77 to 0.99]), incomplete abortion (0.69, [95% confidence interval: 0.59 to 0.82]), and surgical evacuation (0.78, [95% confidence interval: 0.67 to 0.90]) were lower in the adolescent cohort. In the Finnish registry study, a majority of adolescents and adults received both Mifeprex and misoprostol. Safety findings from the Gatter et al and Niinimaki et al studies are reassuring and indicate that the safety profile of Mifeprex is similar between postmenarcheal adolescents and adult women.

Additional details from this article and other published data on Mifeprex use in adolescents (females under 17) are described in the clinical review (Refer to the Medical Officer's review dated March 29, 2016).

                                            (b) (6)  concurred that the efficacy and safety data in postmenarcheal adolescents less than 17 years old was sufficient to support the use of Mifeprex in this pediatric population and to fulfill the PREA pediatric study requirement. The revised Mifeprex labeling will state that that efficacy and safety are similar to adult women  in the Pediatric Use section (8.4).

## 11. Other Relevant Regulatory Issues

                                                                  (b) (6)

             reviewed the Medication Guide in conjunction with the                    (b) (6)
(        (b) (6)  Both      (b) (6)  and      (b) (6)  found the Medication Guide to be acceptable with recommended changes (See review dated March 29, 2016). The Division considered all of the recommendations from       (b) (6)  in revising and updating the text in

---

[46]Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.
[47]Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.
[48]Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.

19

FDA 0431

the Medication Guide and incorporated appropriate changes into the final agreed upon
Medication Guide.



reviewed the Prescribing Information (PI) in addition to the joint review with
of the Medication Guide in conjunction with After review,
provided recommended changes (See review dated March 29, 2016). The Division
considered all of the recommendations from in revising and updating the text in
the PI and incorporated appropriate changes into the final label.



in the
) reviewed the proposed modifications to the REMS. The
review reflected agreement with the Applicant's proposed REMS changes which include:

- Removal of the term "under Federal law" from the Prescriber's Agreement.
- Replacement of the word "physician" with a broader term to describe appropriate
  healthcare professionals who may order, prescribe and administer Mifeprex.
  believes that the Applicant's proposed terminology of "
  is too broad and that a more appropriate description is
  "healthcare provider who prescribes," which limits acceptable healthcare
  providers to those who are licensed in their state to prescribe medications.
- Removal of the Medication Guide from the REMS. The Medication Guide
  remains an important education tool for patients. It will still be dispensed to
  each patient in accordance with 21 CFR part 208. As described in the
  Medication Guide Guidance, a Medication Guide is not necessary to ensure
  that the benefits outweigh the risks of Mifeprex.
- Modification of Element to Assure Safe Use (ETASU) A, the Prescriber's
  Agreement. recommends changing the name of the document to the
  Prescriber's Agreement Form to be consistent with other REMS programs.
  References to "physician" should be changed to "healthcare provider who
  prescribes."
- recommends removing the Patient Agreement from the REMS for a
  number of reasons:
  1. The established safety profile over 15 years of experience with Mifeprex is
     well-characterized, stable, and known serious risks occur rarely
  2. The Medication Guide contains the same risk information addressed in the
     Patient Agreement, and will still be provided to patients under 21 CFR part
     208
  3. The Prescriber's Agreement Form will continue to require providers to
     explain the treatment, its effects and risks associated with Mifeprex and to
     answer any questions that a patient may have
  4. Established clinical practice provides for counseling, informing the patient
     about follow-up, when to contact the provider/clinic, answering questions and
     obtaining signed informed consent before treatment. FDA has removed REMS

Reference ID: 3909594
PCSF82
FDA 0432

requirements in other programs based on the integration of the REMS safe use condition into clinical practice.

Other revisions to the REMS document will be made for consistency with changes described above and to reflect current FDA thinking and practice regarding format, language and flow in REMS documents. These changes include modification of the Mifeprex REMS goal, changes in requirements to certify prescribers (removal of the requirement to obtain a Patient Agreement) and other minor edits.

In summary, the overall (b) (6) recommendation for the REMS modification for this efficacy supplement was approval (Refer to (b) (6) review dated March 29, 2016).

## 12. Labeling

Carton and container labeling was reviewed by the (b) (6) ( (b) (6) the (b) (6) ( (b) (6) and the (b) (6) ( (b) (b) (b) (6) Their comments were conveyed to the Applicant as appropriate.

The label was submitted in the format prescribed by the PLR. Although the supplement was submitted prior to when it would otherwise have been required to comply with the PLLR requirements, the review team believed it would be of value to harmonize with this labeling standard to the extent possible.

Specific issues discussed during labeling negotiations included the selection of studies for inclusion in Section 6.1 (Clinical Trial Experience in the ADVERSE REACTIONS section) and 14 (CLINICAL STUDIES section). Only studies that evaluated the specific proposed regimen were included in these sections. For the Adverse Reactions section, examination of the common adverse reaction data by U.S. compared to non-U.S. study location revealed that there were large differences in the frequency of common adverse reactions, with the reporting rate considerably higher among the U.S. studies. This may reflect differences in ascertainment or subject reporting of adverse reactions in non-U.S. studies. Regardless, inclusion of this non-U.S. data would not be appropriate, as it is unlikely to be informative to the U.S. population of users. In the case of serious adverse reactions, the reported frequency was quite similar regardless of study location; for this reason, serious adverse reaction information from global studies is reported. Agreement on labeling was reached on March 29, 2016.

FDA 0433

<u>Post-Marketing Requirement/Commitment and Risk Evaluation and Mitigation Strategies
(REMS)</u>:

*Postmarketing Requirements/Postmarketing Commitments*: None.

*Risk Evaluation and Mitigation Strategies (REMS)*: The Applicant proposed a REMS
modification for the Mifeprex REMS program with the submission of this efficacy
supplement. The review teams from the (b) (6) evaluated the current Mifeprex REMS
program and the proposed REMS modifications to determine whether each Mifeprex
REMS element remains necessary to ensure that the benefits of Mifeprex outweigh the
risks. Factors that impacted the decision included findings from two REMS assessments
(the more recent REMS assessment review was completed in October 2015), an
unchanged safety profile, and published literature that documented adequate safeguards
in clinical practice with the use of Mifeprex in a regimen with misoprostol.

The teams determined that the following REMS modifications were warranted:

1. Revisions to the Prescriber Agreement Form to reflect the new dosing regimen
   and to reflect current REMS formatting and language standards
2. Removal of the Medication Guide as a REMS element, as distribution of the
   Medication Guide is required under 21 CFR 208
3. Removal of the Patient Agreement as a Documentation of Safe Use Condition
   (ETASU D)
4. Updating of the REMS goals to reflect the above 3 changes.
5. Removal of the phrase "Under Federal law" from the Prescriber's Agreement
6. Replacing the term "licensed physician" with "healthcare provider who
   prescribes"

The above modifications to the Mifeprex REMS program were discussed with the (b) (6)
(b) (6) on January 15, 2016, as per                                     (b) (6)
.

The (b) (6) concurred with conforming changes to the Prescriber's Agreement to reflect
the new dosing regimen, and with removal of the Medication Guide from the REMS.
The Medication Guide would remain a part of labeling to inform patients about the risks
associated with Mifeprex use. The (b) (6) also concurred with revisions to the REMS
goals to reflect these changes.

The (b) (6) concurred with the removal of the term "under Federal law". A rationale for
the original inclusion of the phrase "Under Federal law" cannot be discerned from
available historical documents, nor is it consistent with REMS materials for other
products. All the conditions of approval, including the REMS materials, are under
Federal law; therefore, the phrase is unnecessary and it was decided that the phrase be
removed from the Prescriber's Agreement.

PCSF84                                                                    FDA 0434

The [(b) (6)] concurred with use of the term "healthcare providers who prescribe." To support a change in the REMS that would allow qualified healthcare providers other than physicians to prescribe Mifeprex through the Mifeprex REMS program, the Applicant provided information from over 3,200 women in randomized controlled trials and 596 women in prospective cohort studies comparing medical abortion care by physicians versus other providers (nurses or nurse midwives). These studies were conducted in a variety of settings (international, urban, rural, and low-resource). No differences in serious adverse events, ongoing pregnancy or incomplete abortion were identified between the groups. Given that providers other than physicians are providing family planning and abortion care under supervision and that the approved labeling and REMS program stipulate that prescribers must be able to refer patients for additional care, including surgical management, allowing these prescribers to participate in the Mifeprex REMS program is acceptable.

The [(b) (6)] also concurred with the teams' recommendation to remove the Patient Agreement (ETASU D) from the REMS although some [(b) (6)] members commented that additional support for the review team's rationale for this modification was needed. The review team's rationale for this change was:

APPEARS THIS WAY ON ORIGINAL

FDA 0435

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and Informed Consent, and, more specifically with Mifeprex, includes counseling on all options for termination of pregnancy, access to pain management and emergency services if needed.
- Medical abortion with Mifeprex is provided by a well-established group of organizations and their associated providers who are knowledgeable in this area of women's health. Their documents and guidelines cover all the safety information that also appears in the Patient Agreement.
- ETASUs A and C remain in place: The Prescriber's Agreement under ETASU A requires that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them." The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals. This ensures that Mifeprex can only be dispensed under the direct supervision of a certified prescriber.
- Labeling mitigates risk: The Medication Guide, which will remain a part of labeling, contains the same risk information covered under the Patient Agreement.

The Mifeprex REMS program will have a modified ETASU REMS that will continue to ensure that Mifeprex can only be prescribed by certified prescribers and be dispensed to patients in certain healthcare settings, specifically, clinics, medical offices and hospitals. The Medication Guide will continue to be distributed to patients required under 21 CFR part 208. As required for all ETASU REMS, ongoing assessments of the Mifeprex REMS program will continue to ensure that the modified Mifeprex REMS program is meeting its goals.

### 13. Decision/Action/Risk Benefit Assessment

Decision:

All regulatory and scientific requirements have been adequately addressed in this efficacy supplement. Review teams involved in this supplement have recommended approval of the supplement from their disciplines' perspective. The submitted efficacy and safety information supported approval of the proposed dosing regimen through 70 days gestation, and other changes discussed in this summary memo. This supplement will receive an Approval action.

Benefit Risk Assessment:

This efficacy supplement provided substantial evidence of efficacy for the proposed dosing regimen through 70 days gestation. The efficacy findings were similar to those that led to the approval of the original dosing regimen in 2000. In addition, the submitted published literature supported other changes sought in this efficacy supplement that will

FDA 0436

be reflected in labeling: 1) a more flexible time interval of 24 to 48 hours between Mifeprex and misoprostol administration, 2) the option of at home administration of misoprostol, 3) the option of repeat misoprostol dosing, if clinically indicated, 4) flexibility in the follow–up time frame of 7 to 14 days, and 5) permitting qualified healthcare providers other than physicians to prescribe Mifeprex.

The safety findings of the proposed dosing regimen were acceptable and were similar to those seen with the original dosing regimen approved in 2000.

After review of the REMS modifications proposed by the Sponsor, I concur with the clinical team and _____ (b) (6) _____ recommendations that:

1.    The Medication Guide can be removed from the Mifeprex REMS program. The Medication Guide requirements under 21 CFR part 208 require the Medication Guide to be distributed to patients. Mifeprex will only be dispensed by a healthcare professional who will be knowledgeable and able to provide the patient instructions on appropriate use of the drug, including what potential side effects may occur or follow-up that may be required as appropriate, and who will answer any questions the patient may have. In that setting, the Medication Guide will already be a required available tool for counseling. Therefore, given the existing requirements under 21 CFR part 208, I concur that there is no reason for the Medication Guide to specifically be a part of the REMS.

2.    The Prescriber Agreement Form (ETASU A) as revised reflects current FDA format and content to conform to current REMS programs and reflect the labeling changes that will be approved in this supplement. I concur that the changes are acceptable.

3.    Revision of the Mifeprex REMS goals (ETASU C) will adequately mitigate the risk of serious complications by requiring certification of healthcare providers who prescribe and ensuring the Mifeprex is dispensed only in certain healthcare settings by or under the supervision of a certified prescriber.

4.    Removal of the Patient Agreement Form (ETASU D): I concur with the clinical review team that the Patient Agreement Form, which requires a patient's signature, does not add to safe use conditions for the patient for this REMS and is a burden for patients. It is standard of care for patients undergoing pregnancy termination to undergo extensive counseling and informed consent. The Patient Agreement Form contains duplicative information already provided by each healthcare provider or clinic. I believe that it is much more critical for the healthcare provider who orders or prescribes Mifeprex to provide and discuss informed consent derived from their own practice so that care can be individualized for the patient.

Reference ID: 3909594

FDA 0437

I support that the Mifeprex REMS with ETASUs A and C remain in place to support conditions critical to the use of the drug. Therefore, the implementation system and timetable for assessments should continue.

I also agree with the clinical review team that the reporting requirements should only be required for deaths. It is important that the Agency be informed of any deaths with Mifeprex to monitor new safety signals or trends. However, after 15 years of reporting serious adverse events, the safety profile for Mifeprex is essentially unchanged. Therefore, I agree that reporting of labeled serious adverse events other than deaths can be collected in the periodic safety update reports and annual reports to the Agency.

In summary, I believe that the benefit-risk profile for Mifeprex continues to be favorable and with the agreed-to labeling changes and REMS modifications, the Mifeprex REMS program will continue to assure safe use. Therefore, I support approval of this efficacy supplement and REMS modifications.

Addendum:

On March 28, 2016, Dr. Janet Woodcock, the Director, Center for Drug Evaluation and Research, asked [redacted] (b)(6) and the [redacted] (b)(6) [redacted] to continue to include a Patient Agreement Form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through the [redacted] (b)(6) [redacted] (6)

Therefore, the Patient Agreement Form will be retained and other changes will be made in the REMS to reflect that it is being retained.

Reference ID: 3909594

PCSF88

FDA 0438

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

----------------------------------------------------

(b) (6)

03/29/2016

Reference ID: 3909594

FDA 0439

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 020687Orig1s020

# CROSS DISCIPLINE TEAM LEADER REVIEW

# Cross-Discipline Team Leader Review

| Date | March 29, 2016 |
|---|---|
| From | (b) (6) |
| Subject | Cross-Discipline Team Leader Review |
| NDA/BLA # | 20-687 |
| Applicant | Danco Laboratories, LLC |
| Date of Submission | May 28, 2015 |
| PDUFA Goal Date | March 29, 2016 |
| Proprietary Name / Established (USAN) names | Mifeprex Mifepristone |
| Dosage forms / Strength | 200 mg oral tablet |
| Proposed Indication(s) | "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation." |
| Recommended: | *Approval* |

## 1. Introduction

Mifeprex was approved for medical termination of pregnancy through 49 days' gestation on September 28, 2000, under Subpart H (21 CFR 314.520). This subpart provides for approval with restrictions that are needed to assure the safe use of a drug product shown to be safe and effective in treating a serious or life-threatening condition. The approved dosing regimen was 600 mg Mifeprex taken orally followed in two days by 400 mcg misoprostol taken orally. Mifeprex was approved with a restricted distribution plan that included a requirement that Mifeprex be provided only by or under the supervision of a physician who met certain qualifications, including the ability to date pregnancy, to identify an ectopic pregnancy, and to provide (directly or through other qualified physicians) surgical intervention in cases of incomplete abortion or severe bleeding.

The approved regimen and various alternative regimens have been studied widely, and for some years, actual US clinical practice has relied upon different doses of Mifeprex and misoprostol – i.e., 200 mg Mifeprex followed by 800 mcg misoprostol. For a time, misoprostol was primarily administered by the <u>vaginal</u> route; however, the occurrence of rare but lethal infections with *Clostridium sordellii* led to a change to <u>buccal</u> administration of misoprostol (major providers, like the Planned Parenthood Foundation of America [PPFA] also began screening for sexually transmitted infections and providing routine antibiotic prophylaxis before medical abortion). FDA has no evidence that the vaginal use of misoprostol causes infection, and no causal association has been identified between the cases of sepsis and vaginal administration of misoprostol. While labeling was revised to recommend that providers have a high index of suspicion in order to rule out serious infection and sepsis, the Agency did not consider there was sufficient evidence to justify recommending prophylactic antibiotics.

This application seeks revisions to specify use of different dose and a revised dosing regimen (200 mg Mifeprex, followed in 24-48 hours by 800 mcg buccal misoprostol), and to increase the gestational age to which Mifeprex may be used to 70 days. These and other changes

PCSF90       FDA 0441

for various elements of the current REMS, ☐ (b) (6) recommended and the Division agreed to the following, for reasons that are discussed in Section 6.1:

- Removal of the phrase "under Federal law" from the Prescriber's Agreement (Prescriber's Agreement Form) (see further discussion of this change in Section 7.7.2)

- Replacement of references to "physician" with "healthcare provider who prescribes" (see further discussion of this change in Section 7.5)

- Removal of the Medication Guide from the REMS – ☐ (b) (6) agrees that distribution of the Medication Guide as part of patient labeling will ensure that patients receive this educational tool, and that requiring provision of the Medication Guide under the REMS is not necessary

- Revision of the Prescriber's Agreement (now called the Prescriber's Agreement Form) – the requirement for certification remains, and the criteria that a provider must meet to become a certified prescriber have not changed.  The provider reporting requirement has been changed to mandate reporting only of deaths (currently reporting of ongoing pregnancies, hospitalizations, transfusions or other serious adverse events is required).  Reference to the Patient Agreement should be removed.

- Removal of the Patient Agreement form – ☐ (b) (6) concurs with the recommendation for removal of the Patient Agreement from the REMS, for the reasons outlined in the ☐ (b) (6) review.  In addition, the Prescriber's Agreement Form will continue to require providers to explain the treatment, its effects and risks associated with Mifeprex and to answer any questions that a patient may have.  FDA has removed REMS requirements in other programs based on the integration of the REMS safe use condition into clinical practice.

- Revision of the REMS goals to state that the goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by a) requiring healthcare providers who prescribe to be certified in the Mifeprex REMS program, and b) ensuring that Mifeprex is only dispensed in certain healthcare settings under the supervision of a certified prescriber

### 8.6.2   Advocacy Group Communications

The Agency received three letters from representatives from academia and various professional organizations, including the American Congress of Obstetricians and Gynecologists, the American Public Health Association (APHA), the National Abortion Federation (NAF), Ibis Reproductive Health and Gynuity.  In general, these advocates requested FDA to revise labeling in a manner that would reflect current clinical practice, including the new dose regimen submitted by the Sponsor, and proposing to extend the gestational age through 70 days.  Other requests were that the labeling not require that the drug-taking location for both Mifeprex and misoprostol be restricted to the clinic, and that labeling not specify that an in-person follow-up visit is required.  The advocates also requested that any licensed healthcare provider be able to prescribe Mifeprex and that the REMS be modified or eliminated, to remove the Patient Agreement and eliminate the prescriber certification, while allowing Mifeprex to be dispensed through retail pharmacies. The letters cited articles that were also submitted by the Applicant and are reviewed above.

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

# 020687Orig1s020

# <u>MEDICAL REVIEW(S)</u>

Clinical Review:
⬛ (b) (6) and ⬛ (b) (6)
NDA 020687/S-020-  Mifeprex

# CLINICAL REVIEW

| | |
|---|---|
| Application Type | SE-2 Efficacy Supplement |
| Application Number(s) | NDA 020687/S-020 |
| Priority or Standard | Standard |
| | |
| Submit Date(s) | May 28, 2015 |
| Received Date(s) | May 29, 2015 |
| PDUFA Goal Date | March 29, 2016 |
| Division / Office | ⬛ (b) (6) |
| | |
| Reviewer Name(s) | ⬛ (b) (6) and ⬛ (b) (6) |
| Review Completion Date | March 29, 2016 |
| | |
| Established Name | Mifepristone |
| (Proposed) Trade Name | Mifeprex |
| Therapeutic Class | Progestin antagonist |
| Applicant | Danco Laboratories, LLC |
| | |
| Formulation(s) | Oral Tablet |
| Dosing Regimen | For pregnancies through 70 days gestation: Mifeprex 200 mg tablet orally followed in 24-48 hours by 800 mcg buccal misoprostol. |
| Indication(s) | Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. |
| Intended Population(s) | Pregnant women who desire a medical termination through 70 days gestation. |

1

FDA 0528

Clinical Review:
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

# Table of Contents

1   RECOMMENDATIONS/RISK BENEFIT ASSESSMENT ........................................ 5

1.1   Recommendation on Regulatory Action ........................................ 5
1.2   Risk Benefit Assessment ........................................ 6
1.3   Recommendations for Postmarket Risk Evaluation and Mitigation Strategies ... 7
1.4   Recommendations for Postmarket Requirements and Commitments ............... 8

2   INTRODUCTION AND REGULATORY BACKGROUND ........................................ 9

2.1   Product Regulatory Information ........................................ 9
2.2   Tables of Currently Available Treatments for Proposed Indications ................. 9
2.3   Availability of Proposed Active Ingredient in the United States ...................... 10
2.4   Important Safety Issues with Consideration to Related Drugs......................... 10
2.5   Summary of Presubmission Regulatory Activity Related to Submission .......... 11
2.6   Other Relevant Background Information ........................................ 11

3   ETHICS AND GOOD CLINICAL PRACTICES........................................ 13

3.1   Submission Quality and Integrity ........................................ 13
3.2   Compliance with Good Clinical Practices ........................................ 13
3.3   Financial Disclosures ........................................ 13

4   SIGNIFICANT EFFICACY/SAFETY ISSUES RELATED TO OTHER REVIEW
    DISCIPLINES ........................................ 14

4.1   Chemistry Manufacturing and Controls (CMC) ........................................ 14
4.2   Clinical Microbiology........................................ 14
4.3   Preclinical Pharmacology/Toxicology ........................................ 14
4.4   Clinical Pharmacology ........................................ 15
    4.4.1   Mechanism of Action ........................................ 15
    4.4.2   Pharmacodynamics ........................................ 15
    4.4.3   Pharmacokinetics ........................................ 15

5   SOURCES OF CLINICAL DATA........................................ 17

5.1   Tables of Studies/Clinical Trials ........................................ 17
    5.1.1   Submissions during the Review Process ........................................ 19
5.2   Review Strategy ........................................ 20
    5.2.1   Discussion of Individual Studies/Clinical Trials ........................................ 21

6   REVIEW OF EFFICACY ........................................ 21

Efficacy Summary ........................................ 21
6.1   Indication ........................................ 22
    6.1.1   Methods ........................................ 23
    6.1.2   Demographics ........................................ 23
    6.1.3   Subject Disposition ........................................ 23
    6.1.4   Analysis of Primary Endpoint(s) ........................................ 23

2

Case 1:17-cv-00493-JAO-RT    Document 240-1    Filed 05/27/25    Page 176 of 317
PageID.7920
Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

6.1.5    Analysis of Secondary Endpoints(s)...........................................................24
6.1.6    Proposal for a New Dosing Regimen .........................................................24
6.1.7    Increase in gestational age from 49 days to 70 days ...............................32
6.1.8    At-home Administration of Misoprostol.....................................................38
6.1.9    Use of a Repeat Dose of Misoprostol if Needed ......................................41
6.1.10   Physician v Other Healthcare Provider Treatment ....................................43
6.1.11   Follow-up Timing and Method....................................................................44
6.1.12   Subpopulations .........................................................................................44
6.1.13   Analysis of Clinical Information Relevant to Dosing Recommendations ....46
6.1.14   Discussion of Persistence of Efficacy and/or Tolerance Effects................47
6.1.15   Additional Efficacy Issues/Analyses .........................................................47

7    REVIEW OF SAFETY...........................................................................................47
Safety Summary ............................................................................................................47
7.1    Methods.........................................................................................................49
7.1.1    Studies/Clinical Trials Used to Evaluate Safety .......................................49
7.1.2    Categorization of Adverse Events.............................................................50
7.1.3    Pooling of Data Across Studies/Clinical Trials to Estimate and Compare
            Incidence...................................................................................................50
7.2    Adequacy of Safety Assessments .................................................................50
7.2.1    Overall Exposure at Appropriate Doses/Durations and Demographics of
            Target Populations....................................................................................50
7.2.2    Explorations for Dose Response...............................................................51
7.2.3    Special Animal and/or In Vitro Testing .....................................................51
7.2.4    Routine Clinical Testing ............................................................................51
7.2.5    Metabolic, Clearance, and Interaction Workup ........................................51
7.2.6    Evaluation for Potential Adverse Events for Similar Drugs in Drug Class ..51
7.3    Major Safety Results .....................................................................................51
7.3.1    Deaths.......................................................................................................51
7.3.2    Nonfatal Serious Adverse Events .............................................................51
7.3.3    Dropouts and/or Discontinuations ............................................................57
7.4    Significant Adverse Events ............................................................................57
7.4.1    Submission-Specific Primary Safety Concerns .........................................60
7.5    Supportive Safety Results .............................................................................67
7.5.1    Common Adverse Events ..........................................................................67
7.5.2    Laboratory Findings ..................................................................................71
7.5.3    Vital Signs.................................................................................................71
7.5.4    Electrocardiograms (ECGs) ......................................................................71
7.5.5    Special Safety Studies/Clinical Trials .......................................................71
7.5.6    Immunogenicity .........................................................................................71
7.6    Other Safety Explorations ..............................................................................71
7.6.1    Additional Safety Evaluations....................................................................72
7.6.2    Human Carcinogenicity .............................................................................72
7.6.3    Human Reproduction and Pregnancy Data................................................72
7.6.4    Pediatrics and Assessment of Effects on Growth .....................................74

3

(b) (6) and                                        (b) (6)
NDA 020687/S-020-  Mifeprex

7.6.5   Overdose, Drug Abuse Potential, Withdrawal and Rebound...................... 76
7.7   Additional Submissions / Issues ........................................................... 76

**8   POSTMARKET EXPERIENCE...........................................................82**

**9   APPENDICES ................................................................................85**

9.1   Literature Review/References ............................................................ 85
9.2   Labeling Recommendations............................................................... 86
9.3   Advisory Committee Meeting.............................................................. 86
9.4   (b) (6)                                        (b) (6) Meeting ................... 86
9.4   Abbreviations.................................................................................. 90
9.5   List of References............................................................................ 91
9.6   Mifepristone Approvals Globally ........................................................ 99

# Table of Tables

Table 1: List of Major Studies Reviewed ........................................................ 18
Table 2 Clinical Submissions during the Course of the Review ................................ 20
Table 3: Efficacy- Mifepristone 200 mg with Buccal Misoprostol 800 mcg 24-48 Hours
    Later - US Studies.............................................................................. 29
Table 4: Efficacy- Mifepristone 200 mg with Buccal Misoprostol 800 mcg 24-48 Hours
    Later- Non- US Studies........................................................................ 30
Table 5: Original NDA Efficacy Results .......................................................... 32
Table 6: MAB Efficacy Outcome 57-63 Days Gestation .................................. 35
Table 7: MAB Efficacy Outcome 64-70 Days Gestation .................................. 37
Table 8: Misoprostol Self-administration at Home ............................................... 40
Table 9: Success with a Repeat Dose of Misoprostol - Incomplete MAB ..................... 42
Table 10: MAB Success by Age Group .......................................................... 46
Table 11: Studies Used to Evaluate Safety ..................................................... 50
Table 12: Hospitalizations by Gestational Age ................................................. 53
Table 13: Serious Infection by Gestational Age ................................................ 54
Table 14: Transfusion by Gestational Age ...................................................... 55
Table 15: Uterine Rupture with Misoprostol Case Reports.................................... 59
Table 16: Bleeding and Cramping in Literature ................................................. 68
Table 17: Common Adverse Events in Literature ............................................... 70
Table 18: Age of Adolescents Undergoing Medical Abortion ................................ 74
Table 19: Serious Adverse Events in Adolescents vs. Adults ............................... 74
Table 20: Adherence to Follow-Up Among Adolescents vs. Adults............................ 76
Table 21: US Postmarketing AEs- Mifepristone for Medical Abortion ........................ 83
Table 22: US Postmarketing Ectopic Cases- Mifepristone for Medical Abortion .......... 84

FDA 0531

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

# 1  Recommendations/Risk Benefit Assessment

This NDA supplement from the Applicant, Danco Laboratories, LLC (called Danco or the Applicant throughout this clinical review), requested the following changes to the NDA for Mifeprex, approved 15 years ago in September 2000.

Changes proposed by the Applicant:

1. Change the dosing regimen:  Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally
2. Remove the statement in labeling that administration of misoprostol must be done in-clinic, to allow for administration at home or other location convenient for the woman.
3. Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex
4. Follow-up needed, but not restricted to in-clinic at 14 days after Mifeprex
5. Increase the gestational age from 49 days to 70 days
6. Change the labeled time for expulsion of the products of conception from 4-24 hours to 2-24 hours post misoprostol administration
7. Add that a repeat 800 mcg buccal dose of misoprostol may be used if needed
8. Change "physician" to "                                   (b) (4) in the label and Risk Evaluation and Mitigation Strategies (REMS) document
9. Change indication to add reference to use of misoprostol: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of pregnancy through 70 days gestation."
10. Remove references to "under Federal law" from the Prescriber's Agreement
11. Address the Pediatric Research Equity Act (PREA) requirement for pediatric studies

Each of these 11 items will be discussed in the appropriate section of this review, generally under Section 6: Review of Efficacy and Section 7: Review of Safety.  Four of the items, namely Number 8-11, are primarily regulatory and/or legal.  They are discussed in Sections 1.3 and 9.4 (REMS recommendations and Prescriber's Agreement), 7.6.4 (PREA), and 9.2 (Labeling recommendation).  Additional information is found in Section 7.7 (2) on the change to "                              (b) (4) Section 7.7 (3) on "under Federal law", and Section 7.7 (4) on the reference to use of misoprostol.

## 1.1  Recommendation on Regulatory Action

The clinical reviewers recommend an approval action for this efficacy supplement.

5

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

## 1.2  Risk Benefit Assessment

1. Decrease mifepristone dose from 600 to 200 mg, followed by misoprostol at a dose increased from 400 mcg to 800 mcg, administered buccally instead of orally.

   The Applicant has submitted sufficient evidence from the published medical literature to demonstrate that decreasing the dose of Mifeprex from 600 mg to 200 mg while increasing the dose of misoprostol from 400 to 800 mcg is safe and efficacious for termination of pregnancy through 70 days gestation. The risk/benefit balance favors approval.

   There is sufficient evidence that a dosing regimen with buccal administration of 800 mcg misoprostol is safe and effective. This change in the dosing regimen should be approved.

2. Allow administration of misoprostol outside of the clinic:

   Based on the evidence submitted by the Applicant, a dosing regimen that includes administration of misoprostol outside of the clinic is safe and effective for termination of pregnancy through 70 days gestation; labeling should be revised to remove the requirement for in-clinic dosing of misoprostol

3. Administration of misoprostol at 24-48 hours instead of 48 hours after Mifeprex:

   The available evidence supports that a dosing regimen that provides for administration of misoprostol 24-48 hours after administration of Mifeprex is safe and effective. The risk/benefit assessment demonstrates that this change in the dosing regimen should be approved.

4. Follow-up needed, but not restricted to in-clinic at 14 days after Mifeprex:

   Based on the evidence submitted by the Applicant supporting this change, flexibility in timing and method of follow-up after medical abortion is safe. Labeling should be revised to remove the requirement for in-clinic follow-up at 14 days.

5. Increase the gestational age from 49 days to 70 days:

   As detailed in the following review, the Applicant has submitted sufficient evidence for the safety and efficacy of medical abortion with Mifeprex, in a regimen with misoprostol, through 70 days gestation. The risk/benefit assessment supports the approval of the new dosing regimen up through 70 days gestation.

6. Change the labeled time for expulsion of the products of conception from 4-24 hours to 2-24 hours post misoprostol administration:

   The Applicant has submitted sufficient data from the published medical literature to support approval of a change in the label to note time to expulsion ranges from 2-24 hours.

7. Add that a repeat 800 mcg buccal dose of misoprostol may be used if needed:

6

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020- Mifeprex

The Applicant has submitted sufficient evidence to support that a repeat dose of misoprostol may be used through 70 days gestation to complete expulsion of the products of conception if needed. The risk/benefit assessment supports approval of this change. There have been rare reports of uterine rupture with use of misoprostol in women with prior uterine scar(s). This information should be added to the Mifeprex label.

8. Change "physician" to " (b) (4) in the labeling and Risk Evaluation and Mitigation Strategies (REMS) document:

The Applicant has submitted sufficient data to support that Mifeprex is safe and effective when prescribed by midlevel practitioners as well as by physicians. Therefore, the term "licensed physician" was changed in the label and REMS materials to "healthcare provider who prescribes." This broader category of providers will still have to meet the certification criteria specified in the Prescriber Agreement Form.

9. Change the approved indication to add reference to use of misoprostol: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation." Based on current Agency labeling practice regarding drugs used together in a treatment regimen, the addition of misoprostol to the Indication Statement for Mifeprex should be approved.

10. Remove references to "under Federal law" from the Prescriber Agreement:

The Agency has determined that there is no precedent for using this phrase in other REMS, nor is there any clinical rationale for including it; therefore, it is acceptable to remove "under Federal law" from the Prescriber Agreement Form.

11. Address the Pediatric Research Equity Act (PREA) requirement for pediatric studies:

The Applicant has submitted sufficient evidence from the published medical literature to address the PREA requirement for this supplemental application. The Applicant has demonstrated that Mifeprex is safe and effective in postmenarchal females, including those under 17 years of age. (b) (6) concurred with granting a partial waiver under PREA in patients ages birth to 12 years of age who are premenarche.

## 1.3 Recommendations for Postmarket Risk Evaluation and Mitigation Strategies

Changes proposed in this efficacy supplement entailed a number of modifications to the current Risk Evaluation and Mitigation Strategy (REMS) for Mifeprex. See Section 9.4 for full details. The (b) (6) ( (b) (6) concurs with the (b) (6) ( (b) (6) evaluation of the REMS modifications, which include:

7

FDA 0534

Clinical Review
(b) (6)  and  (b) (6)
NDA 020687/S-020-  Mifeprex

- Removal of "under Federal law" from the Prescriber Agreement Form is acceptable (see discussion in Additional Submissions / Issues).
- The term "healthcare providers who prescribe" is preferable to the Applicant's proposed "                    (b) (4) (see discussion in Additional Submissions / Issues).

- It is appropriate to modify the current adverse event reporting requirements under the REMS, which are currently outlined in the Prescriber's Agreement to include "hospitalization, transfusion or other serious event."  Under these requirements, healthcare providers report certain adverse events to the Applicant, which then is required to report the adverse events to FDA.  FDA has received such reports for 15 years, and it has determined that the safety profile of Mifeprex is well-characterized, that no new safety concerns have arisen in recent years, and that the known serious risks occur rarely.  For this reason, ongoing reporting by certified healthcare  providers to the Applicant of all of the specified adverse events is no longer warranted.  .  It should be noted that the Applicant will still be required by law, as is every NDA holder, to report serious, unexpected adverse events as 15-day safety reports, and to submit non-expedited individual case safety reports, and periodic adverse drug experience reports.


(b) (6) concurs with the following modifications recommended by       (b) (6)

- Removal of the Medication Guide (MG) from the REMS.  The MG will remain a required part of labeling and will be required to be provided to patients consistent with the requirements in 21 CFR part 208. FDA has been maintaining MGs as labeling but removing them from REMS when, as here, inclusion in REMS is not necessary to ensure that the benefits of a drug outweigh the risks, such as when the MG is redundant and not providing additional use or information to the patient about the risk(s) the REMS is intended to mitigate. This is consistent with ongoing efforts to streamline REMS by allowing for updates to the MG without need for a REMS modification.
- Removal of the Patient Agreement form (ETASU D). This decision was based on the well-established safety profile of Mifeprex, as well as the fact that the small numbers of practitioners who provide abortion care in the US use informed consent practices that are duplicated of the current Patient Agreement and thus the Patient Agreement is no longer necessary to ensure that the benefits of the drug outweigh the risks.
- Revision of the Prescriber Agreement Form to reflect changes to labeling revisions pursuant to the proposed efficacy supplement, and to improve the flow of the document.
- Revision of the REMS goals to reflect the above changes

## 1.4  Recommendations for Postmarket Requirements and Commitments

There are no recommendations for postmarket requirements or commitments for this efficacy supplement.

8

FDA 0535

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

# 2  Introduction and Regulatory Background

## 2.1  Product Regulatory Information

On September 28, 2000, FDA approved Mifeprex for the medical termination of intrauterine pregnancy through 49 days' (7 weeks) pregnancy (NDA 20-687).  The application was approved under 21 CFR part 314, subpart H, "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" (subpart H).  This subpart applies to certain new drug products that have been studied for their safety and effectiveness in treating serious or life-threatening illnesses and that provide meaningful therapeutic benefit to patients over existing treatments."  Specifically, § 314.520 of subpart H provides for approval with restrictions that are needed to assure the safe use of the drug product.  In accordance with § 314.520, FDA restricted the distribution of Mifeprex as specified in the approval letter, including a requirement that Mifeprex be provided by or under the supervision of a physician who meets certain qualifications specified in the letter.

The September 28, 2000, approval letter also listed two Phase 4 commitments that the then-applicant of the Mifeprex NDA (i.e., the Population Council) agreed to meet:

1. A cohort-based study of safety outcomes of patients having medical abortion under the care of physicians with surgical intervention skills compared to physicians who refer their patients for surgical intervention.  Previous study questions related to age, smoking, and follow-up on Day 14 (compliance with return visit) were incorporated into this cohort study, as well as an audit of signed Patient Agreement forms.
2. A surveillance study on outcomes of ongoing pregnancies.

In addition, the 2000 approval letter stated that FDA was waiving the pediatric study requirement in 21 CFR 314.55.

Effective October 31, 2002, the Population Council transferred ownership of the Mifeprex NDA to Danco Laboratories, LLC (Danco).

## 2.2  Tables of Currently Available Treatments for Proposed Indications

In the US there are no other approved products for the medical termination of first trimester pregnancy.  Misoprostol alone or in combination with methotrexate has been used for early medical abortion (MAB), with much lower success than Mifeprex.[1]

---

[1] American College of Obstetricians and Gynecologists. Practice bulletin No. 143: medical management of first-trimester abortion. Obstet Gynecol 2014;123(3):676-92. doi:10.1097/01.AOG.0000444454.67279.7d.

9

FDA 0536

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

## 2.3   Availability of Proposed Active Ingredient in the United States

<u>Mifepristone</u>:  The only other FDA approval for mifepristone is the product Korlym, approved under NDA 202107 on February 17, 2012 for the control of hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.

## 2.4   Important Safety Issues with Consideration to Related Drugs

Korlym (mifepristone) is indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery. Korlym is taken in oral doses of 300 mg to 1200 mg daily. It is contraindicated in pregnancy, patients taking simvastatin, lovastatin and CYP3A substrates with narrow therapeutic ranges,  patients on corticosteroids for lifesaving purposes, and women with unexplained vaginal bleeding or endometrial hyperplasia with atypia or endometrial carcinoma.  The label[2] provides warnings and precautions regarding adrenal insufficiency, hypokalemia, vaginal bleeding and endometrial changes, QT prolongation, exacerbation or deterioration of conditions treated with corticosteroids, use of strong CYP3A inhibitors, and opportunistic infections with *Pneumocystis jiroveci* pneumonia in patients with Cushing's.  Adverse reactions noted in $\geq$20% of patients in clinical trials with Korlym included nausea, fatigue, headache, hypokalemia, arthralgia, vomiting, peripheral edema, hypertension, dizziness, decreased appetite and endometrial hypertrophy.

**<u>Reviewer comment</u>:**
**Some of the adverse events noted with Korlym are also seen with Mifeprex, such as nausea and vomiting.  However, Korlym is taken in higher doses, in a chronic, daily fashion unlike the single 200 mg dose of Mifeprex that is the subject of this supplement; the rate of  adverse events with Mifeprex is much lower.**

Ella (ulipristal acetate) is a progesterone agonist/antagonist emergency contraceptive indicated for prevention of pregnancy following unprotected intercourse or a known or suspected contraceptive failure.  The **ella** label[3] notes that in clinical trials, the most common adverse reactions ($\geq$ 10%) in women receiving **ella** were headache (18% overall) and nausea (12% overall) and abdominal and upper abdominal pain (12% overall).

Due to **ella's** high affinity binding to the progesterone receptor, use of **ella** may reduce the contraceptive action of regular hormonal contraceptive methods.  The label notes that after **ella** intake, menses sometimes occur earlier or later than expected by a few

---

[2] http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/202107s000lbl.pdf

[3]  https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf

10

FDA 0537

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

days. In clinical trials, cycle length was increased by a mean of 2.5 days but returned to normal in the subsequent cycle.  Seven percent of subjects reported menses occurring more than 7 days earlier than expected, and 19% reported a delay of more than 7 days. The label recommends that women rule out pregnancy if the expected menses is delayed by more than one week.  Nine percent of women studied reported intermenstrual bleeding after use of **ella**.

**Reviewer comment:**

**Ella is for occasional use and is not to be used as a regular contraceptive method.  As such, the drug is not recommended for repeated use in the same menstrual cycle.  The safety and efficacy of repeat use within the same cycle has not been evaluated. A single dose of ella does not appear to result in serious adverse events.**

## 2.5   Summary of Presubmission Regulatory Activity Related to Submission

A pre-NDA meeting was held with the Applicant on January 29, 2015. The following items, among others, were discussed:
- New dosing regimen
- Proposal to have                              (b) (4)
- Use up to (b)(4) days' gestation
- Change in the interval between Mifeprex and misoprostol administration to 24-48 hours
- Revision of the labeled time to expulsion after misoprostol is administered
- Use of the term "                              (b) (4) in the approval and label to describe who may obtain and dispense Mifeprex
- Deletion of "under Federal law" in the Prescriber's Agreement
- PREA requirements
- Regulatory pathway for approval

## 2.6   Other Relevant Background Information

Since the approval in France and China in 1988, mifepristone for MAB is currently approved in 62 countries globally[4]; see the list and dates of approval in Appendix 9.7.

Prior to the Mifeprex approval by the FDA, mifepristone had also been approved in the UK in 1991.  In the UK, the current therapeutic indications include:
- Medical alternative to surgical termination of intrauterine pregnancy up to 63 days gestation based on the first day of the last menstrual period
- Softening and dilatation of the cervix uteri prior to mechanical cervical dilatation for pregnancy termination during the first trimester

[4] Gynuity website, www.gynuity.org, Medical Abortion in Developing Countries- List of Mifepristone Approvals.

Clinical Review
(b) (6)　and　(b) (6)
NDA 020687/S-020-  Mifeprex

- For use with prostaglandin analogues for termination of pregnancy for medical reasons beyond the first trimester
- Labour induction in foetal death in utero[5]

The estimated cumulative use of Mifeprex in the US since the 2000 approval is 2.5 million uses.  Estimated global occurence of MAB and SAB combined was 43.8 million abortionsin 2008 (Guttmacher Institute data)[6].  MAB has been increasingly used as its efficacy and safety have become well-established by both research and experience, and serious complications have proven to be extremely rare.[7]  Medical abortion comprises 16.5% of all abortions in the US, 25.2% of all abortions at or before 9 weeks of gestation[1], and based on data from 40 reporting areas sending data to the CDC, 30.8% of all abortions at or before 8 weeks gestation (2012 data).[8]  In 2011, approximately 239,400 medical abortions were performed, which was a 20% increase from 2008 data.[9]  Data show that in the most recently reported 12 months (September 29, 2014-September 28, 2015), (b) (4) Mifeprex tablets were distributed in the US (NDA 20687 SD # 650, Annual Report-15, submitted October 09, 2015).  Further, the vast majority of practitioners in the US who provide medical abortion services use a regimen other than the FDA-approved one.  In 2008, Wiegerinck et al published a survey of members of the National Abortion Federation which showed that only 4% of facilities were using the current FDA-approved regimen.[10]

It is noteworthy that ten years ago, the combination of mifepristone and misoprostol for medical abortion was included on the World Health Organization (WHO) Model list of Essential Medicines for termination of pregnancy where legal and acceptable, up to 9 weeks of gestation.[11]  Several other national and international organizations have also endorsed the safe use of medical abortion up to 9 and 10 weeks of gestation.  This topic will be discussed thoroughly in the Efficacy and Safety Sections.

---

[5] Mifegyne Summary of Product Characteristics. Exelgyn Laboratories- June 2013. *https://www.medicines.org.uk/emc/medicine/617*

[6] Sedgh G et al., Induced abortion: incidence and trends worldwide from 1995 to 2008. Lancet, 2012;379:625-32.

[7] Cleland K, Smith N. Aligning mifepristone regulation with evidence: driving policy change using 15 years of excellent safety data. Contraception 2015;92:179-81.

[8] Pazol K, Creanga AA, Zane SB, Burley KD, Jamieson DJ. Abortion surveillance--United States, Centers for Disease Control and Prevention (CDC). MMWR Surveill Summ 2012;61(SS-8):1–44 and Surveillance Summaries Nov 27, 2015; 64(SS10);1-40.

[9] Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2011. Perspectives on Sexual and Reproductive Health 2014;46(1):3-14.doi10.1363/46e0414.

[10] Wiegerinck MMJ, Jones HE, O'Connell, K, Lichtenberg ES, Paul M, Westhoff CL. Medical abortion practices: a survey of National Abortion Federation members in the United States. Contraception 2008;78:486-491.

[11] World Health Organization April 2015 Model Lists of Essential Medicines Available  online at http://www.who.int/medicines/publications/essentialmedicines/en/.

12

FDA 0539

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

MAB is a choice that women have available in many areas, especially urban, in the US, although it should be noted that some geographical areas in the US have very limited availability of both the surgical and medical options or even one option for early pregnancy termination.

The primary advantages of having a MAB compared to a surgical abortion (SAB) are the following:

- Limited or no anesthesia
- Limited likelihood of any surgical intervention

**Reviewer's Comment**:
**A very small number of physicians currently provide early medical terminations. In the most recent REMS update from the Applicant (stamp date June 3, 2015), the cumulative number of certified prescribers since 2000 is only** (b) (4) **. Between May 1, 2012 and April 30, 2015, the number of new prescribers was** (b) (4) **and the number of prescribers ordering Mifeprex was** (b) (4) **during this 3-year period. The number of healthcare providers that are performing early SAB is not documented.**

# 3  Ethics and Good Clinical Practices

## 3.1  Submission Quality and Integrity

Because this submission did not rely on datasets from any of the clinical trials, no FDA inspections were performed at clinical sites.  The authors of the numerous articles, however, have published widely in peer-reviewed medical journals.

## 3.2  Compliance with Good Clinical Practices

This submission relies on findings from the published medical literature.  The majority of the publications included a statement that the study was conducted under institutional review board (IRB) or Ethical Review Committee approval and the women gave informed consent.

## 3.3  Financial Disclosures

None were submitted or required.

13

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

# 4  Significant Efficacy/Safety Issues Related to Other Review Disciplines

## 4.1  Chemistry Manufacturing and Controls (CMC)

On March 10, 2016, a separate supplement approved the packaging of a single 200 mg tablet of mifepristone compared to the current 3 tablets in a blister pack.  Each packet will have an individual barcode.

**Reviewer comment:**
**The approval of single tablet packaging should make recording the barcode of the mifepristone tablet in the patient record (as provided in the REMS) easier as the new proposed dosing regimen uses only one 200 mg mifepristone tablet compared to the previously approved regimen of three tablets.**

_____ (b) (6), reviewed the PLR conversion of the label.  Her review, dated January 11, 2016 states the following:

> "No changes have been made in the approved chemistry, manufacturing and controls. The approved 200 mg tablet will be used.  This review evaluates the PLR conversion of the labeling.  Sections 3, 11, and 16 of the PLR labeling, and the Highlights of Prescribing Information, have been evaluated from a chemistry perspective.
>
> **Overall Evaluation**: Acceptable. The labeling provided in Section 3, Section 11, and Section 16, and the Highlights of Prescribing Information, is identical in content to the approved information.  The PLR conversion labeling, therefore, is acceptable from a chemistry perspective.  The PLR label also corresponds to the content and format required in 21 CFR 201.57.

**Reviewer comment:**
**We agree with the conclusions in the CMC review of the PLR conversion of the label.**

## 4.2  Clinical Microbiology

The chemistry (CMC) reviewers determined that a microbiology review was not needed for this efficacy supplement.

## 4.3  Preclinical Pharmacology/Toxicology

Please refer to the Pharmacology/Toxicology review by _____ (b) (6), dated March 2, 2016. No preclinical data were submitted for this efficacy supplement.The reviewer's only recommendations were labeling changes. His comments were conveyed to the Sponsor.

14

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

Per (b) (6) review, the supplement is approvable from a Pharmacology/Toxicology standpoint.

## 4.4  Clinical Pharmacology

The Clinical Pharmacology review by (b) (6) concluded with the following recommendation:

> "(b) (6), (b) (6) has reviewed the available clinical pharmacology information in relation to the newly proposed regimen for Mifeprex®. We find the application to be acceptable from a Clinical Pharmacology perspective, provided that an agreement on the language in the package insert is reached between the Sponsor and the Division."

> No postmarketing commitments or requirement are recommended.

### 4.4.1  Mechanism of Action

The original approved label states:

> "The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone. The termination of pregnancy results.
>
> …..During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity of prostaglandins."

### 4.4.2  Pharmacodynamics

No new studies were submitted with this Application.  See the original approved label.

### 4.4.3  Pharmacokinetics

(b) (6) review states the following:

The pharmacokinetics (PK) of 200 mg mifepristone tablet has not been characterized in women.  However, the PK data of 200 mg mifepristone tablet in men are available (1996 study): the mean maximum concentration ($C_{max}$) (± standard error) = 1.77 (±0.23) mg/L, the mean time to reach $C_{max}$ ($T_{max}$) = 0.81 (±0.16) hour, and the mean area-under-the curve (AUC) = 25.8 (±2.2) mg·h/L.  While the effects of sex on the disposition of mifepristone have not been evaluated using Mifeprex®, no sex differences in PK of mifepristone were seen with 300 mg mifepristone in a different NDA review (Korlym™, NDA 202107, Clinical Pharmacology review).  Therefore, Section 12.3 of the proposed label in a PLR format should include the available PK data of mifepristone 200 mg tablet.

Cytochrome P450 3A4 (CYP3A4) plays an important role in the metabolism of mifepristone.  Therefore, concomitant intake of CYP3A4 inducers with mifepristone

15

FDA 0542

(b) (6)  and  (b) (6)
NDA 020687/S-020-  Mifeprex

is anticipated to have a significant effect on the disposition of mifepristone. However, the Sponsor did not conduct any *in vivo* studies to evaluate the effect of CYP3A4 inducers on the PK of Mifeprex®.  Although the lowest effective therapeutic margin of mifepristone for termination of pregnancy has been not characterized clearly, the use of misoprostol in the regimen for Mifeprex® contributes to efficacy for inducing termination of pregnancy.  In addition, concomitant intake of CYP3A4 inducers does not appear to affect the systemic exposure of misoprostol.  In the proposed new regimen, another dose of misoprostol can be administered following day 7 to 14 of post-treatment of mifepristone if termination of pregnancy does not occur.

In summary, the contribution of misoprostol in termination of pregnancy and additional dosing option of misoprostol may compensate the possibly diminished efficacy of Mifeprex® in the users of CYP3A4 inducers.  However, the labeling information should include the practical clinical guidance for the subject who has been exposed to CYP3A4 inducers.

**Reviewers comments**:

- **We agree with the Clinical Pharmacology conclusions and recommendations made by** (b) (6) **.**

- **Within the last 10 years, administration of oral mifepristone followed by buccal misoprostol for early medical abortion has become the standard of care for MAB in many countries, including the US.  This is based on 1) the PK profile of different doses and routes of administration for misoprostol, and 2) many clinical trials comparing the efficacy and safety of different dosing regimens.**

**From Chen and Creinin (2015)[12]:**
**"With buccal administration, misoprostol is held in the buccal pouch between the teeth and gums for 30 minutes before swallowing any remaining tablets.  Buccal misoprostol is slowly absorbed, unlike oral misoprostol, which is rapidly absorbed and undergoes extensive first-pass metabolism.  After a dose of oral misoprostol, plasma misoprostol acid levels peak quickly at 30 minutes and decrease rapidly by 120 minutes.  In contrast, after buccal administration, plasma misoprostol acid levels rise gradually to peak concentration after a median time of 75 minutes and fall slowly over several hours."**

---

[12] Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol: a Systematic Review. Obstet Gynecol 2015;126(1):12-21.

FDA 0543

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**The PK profile of vaginal misoprostol is very similar to that of buccal misoprostol.  These pharmacological differences between vaginal and buccal misoprostol do not  have a clinically meaningful effect on the efficacy at different gestational weeks and the adverse event profile for the combination of mifepristone and misoprostol for early medical abortion.  Those routes with rapid and significant absorption (e.g., sublingual) also have high efficacy (ACOG Bulletin[1]).  This review, however, focuses primarily on the new dosing regimen proposed by the Applicant with some supportive data from studies that used vaginal and sublingual misoprostol.**

# 5  Sources of Clinical Data

## 5.1  Tables of Studies/Clinical Trials

There were many studies that provided data for this NDA review.  The original US trial that was reviewed for the Mifeprex approval in 2000 was performed over 20 years ago in 1994-95.  Subsequently, there has been 20 years of experience with MAB, guidelines from professional organizations here and abroad, and clinical trials that have been published in the peer-reviewed medical literature.  This review focuses on the information submitted by the Applicant for the change in the dosing regimen and follow-up.

For a complete list of all sources of information, see the extensive list of references in Appendix 9.6 at the end of this review.

17

FDA 0544

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

## Table 1: List of Major Studies Reviewed

| USA | International |
|-----|--------------|
| Gatter 2015[13], retrospective | Louie 2014[14,] Azerbaijan, prospective |
| Ireland 2015[15], retrospective | Ngoc 2014[16,] Vietnam, prospective |
| Chong, 2015[17], prospective single-arm | Raymond 2013[18], International, including US, retrospective |
| Winikoff 2012[19], prospective | Goldstone 2012[20], Australia, retrospective |
| Perriera 2010[21], prospective | Boersma 2011[22], Curacao, prospective |
| Winikoff 2008[23], RCT* | Middleton 2005[24,] prospective |
| Creinin 2007[25,] prospective | Spitz 1998[26], single arm trial |

---

[13] Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015; 91:269-273.

[14] Louie  KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014;19(6):457-464.

[15] Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8.

[16] Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam: A randomized controlled trial. Obstet Gynecol 2014;123:88-95.

[17] Chong E, Frye LJ, Castle J, Dean G, Kuehl L, Winikoff B. A prospective, non-randomized study of home use of mifepristone for medical abortion in the US. Contraception 2015;92:215-291.

[18] Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87(1):26-37.

[19] Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070-6.

[20] Goldstone P, Michelson J, Williamson E.  Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012; 197: 282-6.

[21] Perriera LK, Reeves MF, Chen BA, Hohmann HL, Hayes J, Creinin MD. Feasibility of telephone follow-up after medical abortion. Contraception 2010;81:143-149.

[22] Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011;16:61-6.

[23]Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310.

[24] Middleton T, et al.  Randomized trial of  mifepristone and buccal or vaginal misoprostol for abortion through 56 days of last menstrual period.  Contraception 2005;72:328-32.

[25] Creinin MD, Schreiber CA, Bednarek P, Lintu H, Wagner MS, Meyn LA. Medical Abortion at the Same

18

Reference ID: 3909590

Clinical Review
(b) (6)  and                                      (b) (6)
NDA 020687/S-020-  Mifeprex

Source: compiled by clinical reviewers.  *Randomized controlled trial.

**Reviewer's comment**:

Table 1 **above lists the major studies and review articles covering over 45,000 women who had an early MAB through 70 days gestation.  Both retrospective and prospective studies were found to be valuable for this review.  There are additional studies submitted by the Applicant that are not quoted or reviewed primarily because they did not use a dosing regimen relevant to that proposed by the Applicant or did not contain information pertinent to the other requested changes (e.g., less restrictive follow-up requirements or gestations through 70 days) in the NDA supplement.  In some cases, studies that used variants of the proposed regimen were considered because PK, PD and clinical data indicate the relevance of data on vaginally-administered misoprostol, and because lower doses and certain other routes of administration of misoprostol are expected to have lower or similar levels of effectiveness.**

## 5.1.1 Submissions during the Review Process

During the course of the review, the Applicant submitted additional supportive articles from the peer-reviewed medical literature, and provided more detailed data from previously submitted articles based on direct communication with the authors.  Further, the Applicant submitted  changes to some of the original proposals.  Below in Table 2 is a list of the clinical submissions to the NDA after the initial submission dated May 18, 2015.

---

Time (MAST Study Trial Group). Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion a randomized controlled trial. Obstet Gynecol 2007;109:885-894.

[26] Spitz IM, et al. Early Pregnancy Termination with Mifepristone and Misoprostol in the United States. NEJM 1998;338(18):1241-47.

19

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 2 Clinical Submissions during the Course of the Review**

| Item | Submission Type, Date |
|---|---|
| Additional supportive articles<br>More detailed data from previously submitted articles | Amendment # 3, dated 9/23/2015<br>Amendment # 4, dated 10/13/2015<br>Amendment # 5, dated 11/16/2015<br>Amendment # 6, dated 12/8/2015 |
| Additional supportive documents on patient counseling | Follow-up to 1/27/2016 teleconference, dated 2/2/2016 |
| Additional supportive articles | Amendment # 8, dated 2/25/2016 |
| **Proposed Additional Changes** | |
| REMS amendment, Revised REMS Supporting Document<br>Additional supportive articles | Amendment # 2, dated 7/16/2015 |
| REMS modification | Dated 11/4/2015 |
| Labeling: (b) (4) Indication Statement | Amendment # 4, dated 10/13/2015 |
| Labeling changes: (b) (4) the proposed new dosage regimen (b) (4) | Follow-up to 1/27/2016 teleconference, dated 2/15/2016, Also in Amendment # 9, dated 2/25/2016 |
| Labeling: changes to Sections 2.4, 5.2, 6.1, 7, 8.1, 8.2, 8.6, 12.3, 14 | Amendment # 7, dated 2/23/2016 |
| Labeling changes: revise indication statement to state "through 70 days gestation | Amendment # 9, dated 2/25/2016 |
| Labeling: changes to Sections 2.3, 6.1 and 14 | Amendment # 10, dated 3/17/2016 |
| REMS documents | Amendment #11, dated 3/21/2016 |

Source: Reviewer table.

## 5.2   Review Strategy

This is a joint review by two medical officers: _____ (b) (6) reviewed the efficacy data and _____ (b) (6) reviewed safety data and related issues. Other sections are jointly completed.

Within the last 10 years, use of buccal misoprostol with mifepristone for MAB has become commonplace.  However, the published literature did not contain abundant information about medical abortion outcomes with buccal misoprostol at the time of the

20

FDA 0547

Clinical Review
(b) (6)   and   (b) (6)
NDA 020687/S-020-  Mifeprex

original NDA review.  In this review, we summarize clinical outcomes and adverse effects of medical abortion regimens consisting of oral mifepristone 200 mg followed in 24-48 hours by buccal misoprostol 800 mcg in pregnancies through 70 days of gestation.

## 5.2.1  Discussion of Individual Studies/Clinical Trials

Information and findings from individual clinical trials and reviews in the published medical literature, websites, the Applicant and other sources are discussed in different sections throughout this review.  As acknowledged during pre-submission discussions between the Applicant and         (b) (6)  and as is typical for literature-based submissions, original datasets from the trials that are cited were not available for submission in this supplement.

# 6  Review of Efficacy

## *Efficacy Summary*

**This summary lists the final conclusions based on review of the data.  Not all of the conclusions, regarding covariates such as ethnicity, parity, previous abortion, are specifically addressed in labeling, but the reviewers believe that it is important to show that we evaluated many different aspects and potential risk factors for safe and effective MAB:**

- Medical termination of pregnancies through 70 days gestation is safe and effective and should be approved using the new proposed regimen.

- The original approved dosing regimen remains safe and effective but the new proposed dosing regimen is effective and should be approved for use in gestations through 70 days (10 weeks) gestation.

- 2015 Chen-Creinin review[12] of over 33,800 MABs concluded that regimens with a 24-hour time interval between mifepristone and buccal misoprostol administration are slightly less effective (94.2% success) compared to those with a 24-48-hour interval (96.8% success).

- 2013 Raymond review[18] of over 45,500 MABs using <u>oral</u> mifepristone 200 mg and various misoprostol doses concluded that the effectiveness decreases when:
  - misoprostol is taken orally compared to the three other routes of administration (buccal, sublingual, or vaginal)
  - the gestational age increases
  - the mifepristone-misoprostol interval is less than 24 hours
  - the total misoprostol dose is 400 mcg or less

- Efficacy in the adolescent population is the same or slightly better compared to non-adolescent women.

21

FDA 0548

Clinical Review
(b) (6) and                                    (b) (6)
NDA 020687/S-020-  Mifeprex

- Efficacy outcomes do not appear to be related to other baseline characteristics including age, race, body weight, gravidity and previous spontaneous abortions. (Spitz data[26] and many subsequent studies)

- Data from the original US trial (1994-95; Spitz 1998[26]) showed lower efficacy rates with the originally approved Mifeprex dosing than is reported in a large number of subsequent trials using different mifepristone-misoprostol dosing regimens for early MAB.  There does not appear to be any change in the safety profile.

- Raymond (2013 systematic review[18]) found no significant association between abortion failure rates and the timing of the follow-up evaluation.

- Over 30% of women will completely expel the products of conception within 4-5 hours of taking the misoprostol for MAB with gestations of 57-70 days (Winikoff 2012[19]); this finding supports the proposal to allow women to choose the timing of (within the labeled range) and where to take the misoprostol.

  o  Data from the original NDA review showed occurrence of a successful (complete) MAB occurred in ≤ 4 hours after misoprostol administration in 45-46% of women up to 56 days gestation and 34.9% of women at 57-63 days gestation.

- Home administration of misoprostol is efficacious, practical, and safe (see Safety Section)

**Reviewer's overall comment:**
**Compared to the current Mifeprex approved label and regimen, the Applicant has requested less restrictive measures for location and timing of misoprostol administration and follow-up measures for early MAB.  We believe that a regimen that includes these less restrictive measures is equally safe and effective, while offering women greater convenience and providing a less burdensome procedure for patients and providers.**

## 6.1  Indication

In the initial submission of this efficacy supplement, the proposed new indication was the following: "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy                                        (b) (4)"  In Amendment # 9, submitted on February 25, 2016, the Applicant proposed          (b) (4) the gestational age through 70 days.

The proposed new modified regimen uses buccal (not oral) misoprostol administered 24-48 hours after taking a lower dose, 200 mg instead of 600mg, of oral mifepristone. The labeled dose of misoprostol is increased compared to the current approved regimen, from 400 mcg to 800 mcg.                    (b) (4)

, the

22

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

(b) (4)

.

These requests were thoroughly reviewed by the Agency and we believe the product is safe and effective for the indication, which reads:

> "Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation."

### 6.1.1  Methods

There were numerous articles from the peer-reviewed medical literature that were submitted by the Applicant.  Articles were also cited in three letters sent to CDER Center Director Janet Woodcock, MD from 1) ACOG, 2) a group of academic professionals and women's health non-profit organizations, and 3) thirty professional and academic organizations, all of which requested changes to the Mifeprex labeling and REMS.  All relevant publications cited in those three letters were also submitted by the Applicant for our review.  The articles and sources of data used for this review are listed in the Reference List in Appendix 9.6 at the end of this review.

The various studies noted in the articles had slightly different designs, inclusion criteria, dosing regimens and endpoints for safety and efficacy.  The review focus is on clinical trials and follow-up methods for early medical abortion, including gestations through 70 days (10 weeks).

### 6.1.2  Demographics

Many of the trials were randomized and some were blinded to the actual dose of the two drugs that were administered.  The route of misoprostol administration could not be easily blinded.  Although there may have been some small differences in the demographic data for the different arms, it is doubtful that demographic differences such as race or ethnicity are clinically meaningful in relation to the safety and efficacy of medical abortion.

### 6.1.3  Subject Disposition

Most of the studies noted the number of women who were lost to follow-up and did not count them in the efficacy analysis.  All women with any available safety data were included in the safety analyses.  See Safety Section for further discussion.

### 6.1.4  Analysis of Primary Endpoint(s)

The studies analyzed for data used in this NDA review almost universally defined their primary efficacy endpoint as expulsion of the pregnancy from the uterus without need for any surgical evacuation or procedure for any reason (including patient request).

23

Clinical Review

(b) (6) and                                    (b) (6)

NDA 020687/S-020-  Mifeprex

## 6.1.5  Analysis of Secondary Endpoints(s)

In addition to the final outcome of MAB success or lack of success (i.e., surgical or medical intervention needed), there are intermediate outcomes:

- Incomplete abortion: pregnancy no longer ongoing, but only partial or non-expulsion of the products of conception has occurred
- Ongoing pregnancy based on fetal heartbeat and/or growth

In the case of incomplete expulsion but where the pregnancy is no longer ongoing, there are in the US several safe options available to the healthcare provider and the patient:

- Expectant management (in many cases, complete expulsion will occur spontaneously given additional time)
- Additional dose of misoprostol
- Minor surgical procedure such as a vacuum aspiration in the clinic/office
- Surgical procedure under anesthesia such as a dilation and curettage (D&C)

For ongoing pregnancies following the initial MAB procedure, typically one of the surgical procedures is performed.

In addition to these two intermediate outcomes, there are other cases in which a surgical intervention might be performed:

- Intervention because of bleeding or other aspect of the patient's condition: the healthcare provider judges that surgical intervention is indicated
- Patient request: the patient requests surgical intervention for any reason

## 6.1.6  Proposal for a New Dosing Regimen

There are five major changes proposed by the Applicant in this supplement for which efficacy data will be discussed.  The changes are interrelated and, in general, the same studies usually provide evidence to support multiple changes, although data from a given study may be more or less pertinent to a specific change (e.g., extending the approved gestational age, home administration of buccal misoprostol, etc.).

**Summary of changes to dosing regimen, indication, and follow-up initially requested by the Applicant in the NDA Supplement:**

1. **Addition of a new dosing regimen of Mifeprex 200 mg orally followed by the buccal administration of 800 mcg misoprostol at 24-48 hours instead of 48 hours**

2. **Increase in gestational age from**                     (b) (4)

3. **Option to administer misoprostol outside of the clinic**

24

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

4.   **Option that a repeat dose of misoprostol may be used if needed for women using the new proposed dosing regimen**

5.   **Follow-up timing and methods: follow-up is needed at 7-14 days after Mifeprex administration; the specific nature and timing of the follow-up to be agreed upon by the** (b) (4) **and patient. The current approved label states: "Patients will return for a follow-up visit approximately 14 days after the administration of Mifeprex."**

Discussion and analysis of the data supporting the five changes follows in five individual sections.

1.   **Proposal of a new dosing regimen that:**
     **1) decreases the oral dose of Mifeprex from 600 mg to 200 mg orally,**
     **2) increases the misoprostol dose from 400 mcg orally to 800 mcg misoprostol administered buccally, and**
     **3) revises the interval between Mifeprex and misoprostol dosing from 48 hours to "24-48 hours."**

(b) (4)

.

Background on some dosing data and US practices:

There is ample medical evidence that the currently approved dose regimen (oral mifepristone 600 mg followed 2 days later with oral misoprostol 400 mcg) is safe and efficacious up to 49 days gestation.  It was approved in September 2000 based on the US clinical trial of 1994-95 and two French trials.  After 1995, however, more studies gradually became available using lower doses of mifepristone and different doses and routes of administration for misoprostol.  These newer data were not submitted to or considered in the original NDA review.  Studies also showed that with lower doses (< 600 mg) of oral mifepristone followed by oral misoprostol 400 mcg, the treatment success rate is greater than 95% up to 49 days gestation.

It is difficult to tell how many MABs in the US actually used the FDA-approved dosing regimen following the 2000 approval.  It is clear that many clinics and individual practitioners did not.  For example, from 2001 to March 2006, Planned Parenthood Federation of America (PPFA) health centers throughout the United States provided medical abortions principally using a regimen of oral mifepristone 200 mg, followed 24–48 hours later by 800 mcg misoprostol administered vaginally at home.[27]  Of note, PPFA has been and continues to be the largest provider of MAB services in the US.

---

[27] Fjerstad M, Sivin I, Lichtenberg ES, Trussell J, Cleland K, Cullins V. Effectiveness of medical abortion

25

FDA 0552

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Reviewer's comment:**
**The 2009 Fjerstad article[28] states that PPFA was a federation of 97 independent local affiliates operating 880 health centers throughout the US; roughly 300 of those centers provided medical abortion.  So, within one year of the FDA Mifeprex approval, PPFA was using a dosing regimen (actual doses and routes of administration) very similar to that proposed in this efficacy supplement.**

Meanwhile, from September 2003 to June 2005, there were four fatalities in the US and one in August 2001 in a Canadian clinical trial, all due to a sudden and rapid sepsis secondary to the bacteria *Clostridium sordellii*.  The five cases were with early MAB (all around 7 weeks gestation) in women who had used 800 mcg vaginal misoprostol.  By late March 2006, consideration of these fatal uterine infections led PPFA to 1) change the route of administration of the 800 mcg misoprostol from vaginal to buccal (or, much less commonly, oral) and 2) employ additional measures (sexually transmitted infection [STI] testing and treatment if positive, or use of prophylactic antibiotics) to minimize the risk of subsequent serious uterine infections.  In July 2007, PPFA began requiring routine treatment with antibiotics for all medical abortions at their health centers.[28]

**Reviewer's comment:**
**As stated in currently approved labeling "No causal relationship between the use of Mifeprex and misoprostol and these events [serious and sometimes fatal infections and bleeding] has been established."  There is no clear evidence that the vaginal use of misoprostol causes infection, and no causal association has been identified between the cases of sepsis and vaginal administration of misoprostol.  While labeling was revised in November 2004 and July 2005 to recommend that providers have a high index of suspicion in order to rule out serious infection and sepsis, the Agency did not consider there was sufficient evidence to justify recommending prophylactic antibiotics.**

A 2006 article showed that in pregnancies greater than 49 days gestation, compared to oral administration of misoprostol, the bioavailability and efficacy with use of misoprostol is increased by vaginal, sublingual and buccal administration, avoiding first-pass metabolism by the liver.[29]  Furthermore, a 2009 review of MAB[30] noted that:

> "Consistent with other kinetic studies, clinical trials have demonstrated no change in efficacy when mifepristone doses are reduced from 600 to 200 mg.  Multiple

---

with mifepristone and buccal misoprostol through 59 gestational days. Contraception 2009;80:282-6.

[28] Fjerstad M, Trussell J, et al. Rates of serious infection after changes in regimens for medical abortion. NEJM 2009;361:145-51.

[29] Fiala C, Gemzell-Danielsson K. Review of medical abortion using mifepristone in combination with prostaglandin analogue. Contraception 2006;74:66-86.

[30] Bartz B, Goldberg A. Medical Abortion. Clin Obstet and Gyn 2009; 52:140-50.

26

FDA 0553

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

> clinical studies, including a 2004 Cochrane meta-analysis, reported that a
> regimen of 200 mg of oral mifepristone followed 24 to 48 hours later by 800 mcg
> of vaginal misoprostol results in complete abortion in 96% of cases at gestations
> of up to 63 days and that increasing the mifepristone dose to 600 mg does not
> improve efficacy."

In a 2010 review article covering 25 years of the clinical development of mifepristone
followed by a prostaglandin for MAB, Spitz[31] noted similar conclusions:

> "In the US, most investigators administer 200 mg rather than 600 mg
> mifepristone as many trials have shown equivalent results with these two dose
> schedules.  A recent meta-analysis of four randomized controlled trials compared
> the two dose regimens.  Endpoints were complete abortion, continuing
> pregnancy and side effects.  The two doses *[600 v. 200 mg mifepristone]* result in
> similar rates of complete abortion with no difference in adverse events."

Another change in clinical practice was related to the labeling stipulation that women
return to the clinic/office two days after Mifeprex was administered to take the
misoprostol dose.  Many experts involved with termination of early pregnancies also
advocated misoprostol self-administration at home to mitigate the time, travel and
inconvenience of this additional visit.

In the US, the American College of Obstetricians and Gynecologists (ACOG), National
Abortion Federation[32], and PPFA currently all endorse the lower oral dose of
mifepristone followed in 24-48 hours with misoprostol.  According to the 2014 ACOG
Practice Bulletin, the misoprostol route of administration may be oral, buccal, sublingual
or vaginal; sublingual administration, however, has a more rapid absorption resulting in
a higher incidence of adverse side effects.[1]

European practice:

In December 2011, the International Federation of Obstetrics and Gynaecology (FIGO)
published revised guidelines for the use of mifepristone and misoprostol for MAB up to
63 days, 64-84 days, and after 84 days (12 weeks) gestation.[33]  The FIGO
recommended regimens using 200 mg of oral mifepristone followed by 800 mcg of
misoprostol administered vaginally, buccally, or sublingually.  Up to 57-63 days
gestational age, misoprostol is taken 24-48 hours after mifepristone.  Per the review of
data available to them, FIGO decided additional doses of 400 mcg misoprostol may be

---

[31] Spitz IM. Mifepristone: where do we come from and where are we going? Clinical development over a
quarter of a century. Contraception 2010;82:442–52.

[32] National Abortion Federation Guidelines 2015.

[33] Faundes A. The combination of mifepristone and misoprostol for the termination of pregnancy. *Int J
Gynecol Obstet* 2011;115:1-4.

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

safely used depending on gestational age, and these combinations result in a complete termination in more than 95% of cases.

Similar guidelines using either vaginal, buccal, or sublingual misoprostol are endorsed by the World Health Organization (WHO), the United Kingdom Royal College of Obstetricians and Gynecologists[34], and a recent Cochrane Review (2011, Issue11).[35]

**Reviewer's Comment:**

**From the above discussion, it is clear that the standard of care in the US for early MAB has deviated from the FDA-approved dosing regimen. PPFA provides the largest number of medical abortions each year in the US and as early as 2001, was already using the regimen of 200 mg oral mifepristone followed 24-48 hours later by 800 mcg vaginal misoprostol.**

There are a large number of studies and reviews that support the efficacy of the proposed new dose regimen through 63-70 days gestation. Efficacy was defined in these studies as a complete expulsion of the pregnancy without need for surgical intervention for any reason during the follow up period. The 2015 review by Chen and Creinin summarized clinical outcomes and adverse effects from 20 MAB studies including a total of 33,846 women using regimens consisting of 200 mg oral mifepristone followed by buccal misoprostol through 70 days gestation. All studies except two used 800 mcg misoprostol. Two studies (827 women) used 400 mcg buccal misoprostol. Six studies used a 24-hour time interval between mifepristone and buccal misoprostol administration and 14 used a 24-48 hour window for the dosing interval. The table below lists the 15 studies using the proposed doses (200 mg plus 800 mcg) with a 24-48 hour dosing interval.

---

[34] Royal College of Obstetricians and Gynaecologists. The care of women requesting induced abortion: evidence-based clinical guideline Number 7. 3rd ed. London (UK):RCOG Press 2011.

[35] Kulier R, Kapp N, et al. Medical methods for first trimester abortion (Review). The Cochrane Library 2011, Issue 11:1-126.

FDA 0555

Reference ID: 3909590

Clinical Review

(b) (6) and (b) (6)
NDA 020687/S-020- Mifeprex

## Table 3: Efficacy- Mifepristone 200 mg with Buccal Misoprostol 800 mcg 24-48 Hours Later - US Studies

| Study &Year | Design, Location | Gestation (maximum days) | M-M Interval (hrs) | Evaluable Subjects (N) | Success - no intervention (%) |
|---|---|---|---|---|---|
| **Middleton 2005[24] US** | **Prospective** | 56 | 24-48 | 216 | 94.9 |
| **Winikoff 2008[23] US** | **Prospective** | 63 | 24-36 | 421 | 96.2 |
| **Fjerstad 2009[27] US** | **Retrospective** | 59 | 24-48 | 1,349 | 98.3 |
| **Grossman 2011[36] US - Clinic Mife v. Tele-med** | **Prospective** | 63 | 24-48 | 449 | Clinic: 96.9% Telemed: 98.7% |
| **Winikoff 2012[19]     US** | **Prospective** | 57-70 | 24-48 | 629 | 93.2 |
| **Gatter 2015[13] US** | **Retrospective** | 63 | 24-48 | 13,373 | 97.7 |
| **Chong 2015[17]     US** | **Prospective** | 63 | 24-48 | 357 | 96.7 |
| **TOTALS** | **7 Studies** | **56-70 days** | **24-48 hr** | **16,794** | **97.4** |

**Source: Modified from Table 3, page 14-15, Chen-Creinin 2015 Review and submitted articles. All subjects had 200 mg oral mifepristone followed by 800 mcg buccal misoprostol.**

**Success percentages calculated by clinical reviewer.**

---

[36] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

29

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

## Table 4: Efficacy- Mifepristone 200 mg with Buccal Misoprostol 800 mcg 24-48 Hours Later- Non- US Studies

| Study &Year/Country | Design, Location | Gestation (maximum) | M-M Interval (hrs) | Evaluable Subjects (N) | Success - no intervention (%) |
|---|---|---|---|---|---|
| Alam 2013[37] Bangladesh | Prospective | 63 | 24 | 629 | 92.7 |
| Blum 2012[70] | Prospective | 63 | 24 | 210 | 92.9 |
| Boersma 2011[22] Curacao | Prospective | 70 | 24-48 | 307 | 97.7 |
| Chai 2013[38] Hong Kong | Prospective | 63 | 48 | 45 | 95.6 |
| Dahiya 2012[39] India | Prospective | 50 | 24 | 50 | 92 |
| Chong 2012[40] Georgia, Vietnam | Prospective | 63 | 36-48 | 560 | 96.4 |
| Giri 2011[41]    Nepal | Prospective | 63 | 24 | 95 | 93.6 |
| Goldstone 2012[20] Australia | Retrospective | 63 | 24-48 | 11,155 | 96.5 |
| Louie 2014[14] Azerbaijan | Prospective | 63 | 24-48 | 863 | 97.3 |
| Ngo 2012[42]    China | Retrospective | 63 | 36-48 | 167 | 91.0 |
| Ngoc 2011[43]    Vietnam | Prospective | 63 | 24 | 201 | 96.5 |
| Ngoc 2014[16]    Vietnam | Prospective | 63 | 24-48 | 1,371 | 94.7 |
| Olavarietta 2015[85] Mexico | Prospective | 70 | 24 | 884 | 98.2 |
| Pena 2014[44]    Mexico | Prospective | 70 | 24-48 | 971 | 97.3 |

---

[37] Alam A, Bracken H et al. Acceptability and Feasibility of Mifepristone-Misoprostol for Menstrual Regulation in Bangladesh. Intnational Persp on Sexual and Reprod Health 2013;39(2):79-87.

[38] Chai J, Wong CY, Ho PC. A randomized clinical trial comparing the short-term side effects of sublingual and buccal routes of misoprostol administration for medical abortions up to 63 days' gestation. Contraception 2013;87:480-5.

[39] Dahiya K, Ahuja K, Dhingra A et al.  Efficacy and safety of mifepristone and buccal misoprostol versus buccal misoprostol alone for medical abortion.  Arch Gynecol Obstet 2012; 285: 1055-8

[40] Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012;86:251-6.

[41] Giri A, Tuladhar H et al. Prospective study of medical abortion in Nepal Medical College- a one year experience. Nepal Medical Coll J 2011;13(3):213-15.

[42] Ngo TD, Park MH, Xiao Y. Comparing the WHO versus China recommended protocol for first trimester medical abortion: a retrospective analysis. Int J Womens Health 2012;4:123-7.

[43] Ngoc NTN, et al. Comparing two early medical abortion regimens: mifepristone+misoprostol  vs. misoprostol alone. Contraception 2011;83:410-17.

[44] Pena M, Dzuba IG, Smith PS, et al. Efficacy and acceptability of a mifepristone-misoprostol combined

30

FDA 0557

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

| Sanhueza 2015[48] Mexico | Prospective | 70 | 24-48 | 896 | 93.3 |
|---|---|---|---|---|---|
| TOTALS | 15 Studies | 56-70 days | 24-48 hrs | 18,425 | 96.1% |

Source: Modified from Table 3, page 14-15, Chen-Creinin 2015 Review and submitted articles.  All subjects had 200 mg oral mifepristone followed by 800 mcg buccal misoprostol.

Success percentages calculated by clinical reviewer.

**Reviewer's comments:**

**The data above in Table 3 and Table 4 from ~16,800 US women and ~18,400 non-US women in clinical studies of MAB through 70 days gestation with success rates of 97.4% (US) and 96.1% (non-US) strongly support the proposed new dosing regimen and the extension of the acceptable gestational age.  The number of US and non-US studies, the number of evaluable women, and the overall complete abortion rates (termination with no surgical intervention) will be described in the efficacy table in Section 14 CLINICAL STUDIES in the new approved label.  Additional discussion on increasing the gestational age through 70 days follows in the next major section.**

Precise timing of the administration of misoprostol has not been shown to result in a higher success rate which is why the majority of the above studies allowed a range of hours between the mifepristone dose and misoprostol dose rather than one set time between the two drugs.  The 2013 Raymond systematic review[18] of 87 studies that exclusively used a mifepristone 200 mg oral dose in over 45,000 women, followed by varying doses and routes of administration of misoprostol, concluded that if the mifepristone-misoprostol interval is < 24 hours, the procedure is less effective compared to an interval of 24-48 hours.

Another study[45] also looked at the question of the mifepristone-misoprostol interval.  The authors conducted a systematic review of randomized controlled trials published from 1999 to 2008 to assess the evidence for a shorter mifepristone and misoprostol administration interval for first trimester medical termination.  Searching strategy included MEDLINE, EMBASE, CLINAHL and Cochrane Library.  The primary outcome measure was complete abortion without the need for a surgical procedure.  "Five randomized controlled trials (RCTs) compared the efficacy of mifepristone-misoprostol administration intervals between 0 and 72 hours in 5,139 participants.  The complete abortion rates varied between 90% and 98%.  Although the meta-analysis of pooled data of all five RCTs showed no statistically significant difference in efficacy between

---

regimen for early induced abortion among women in Mexico City. Int J Gynaecol Obstet 2014;127:82-5.

[45] Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010;81(4):269-74. doi: 10.1016/ j.contraception.2009.09.007. Epub Oct 29, 2009.

31

Reference ID: 3909590

Clinical Review

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

the shorter and longer dosing intervals, there was a trend toward slightly <u>lower</u> success rates with administration intervals < 8 hours." This study supports the finding that the proposed regimen is effective with the 24-48 hour flexible interval.  Labeling will indicate that the regimen may not work as well if the misoprostol is taken earlier than 24 hours after Mifeprex.


<u>Reviewer's Final Recommendation</u>:
**The new proposed regimen of 200 mg oral mifepristone followed in 24-48 hours with 800 mcg buccal misoprostol should be approved; there are sufficient data from the medical literature with over 35,000 women supporting the regimen's efficacy (termination without any additional surgical intervention) as being in the 91-98% range.**

## 6.1.7  Increase in gestational age from 49 days to 70 days

**Original NDA review:**

The US clinical trial[31] was conducted from September 1994 to September 1995 and treated 2,121 women.  A total of 2,015 women (95%) returned at the 14-day follow-up visit.  The trial categorized women into three groups based on gestational age at the time of procedure, and evaluated the rates of "Success" (a complete pregnancy termination without use of any additional doses of misoprostol or surgical intervention), and the rates of "Failure" (with four sub-categories of incomplete abortion, ongoing pregnancy, intervention for medical reason, and intervention solely because of patient request).  The success and failure data are shown in Table 5.


**Table 5: Original NDA Efficacy Results**

| OUTCOME | ≤ 49 Days N= 827 (%) | 50-56 Days N= 678 (%) | 57-63 Days N= 510 (%) |
|---|---|---|---|
| **Success (mifepristone + misoprostol)** | **762  (92)** | **563  (83)** | **395  (77)\*†** |
| Failure (any surgical intervention for any reason)  N (%) | | | |
| **Total failures** | **8%** | **17%** | **23%\*†** |
| Incomplete abortion | 39 (5) | 51 (8)‡ | 36 (7) |
| Ongoing pregnancy | 8 (1) | 25 (4)\* | 46 (9)\* § |
| Medical indication  for intervention | 13 (2) | 26 (4)‡ | 21 (4)‡ |
| Patient's request  for intervention | 5 (0.6) | 13 (2) | 12 (2)‡ |

**\*P<0.001 for the comparison with the ≤ 49-days group.**

**†P= 0.02 for the comparison with the 50 to 56-days group.**

**‡ 0.001 ≤ P<0.03 for the comparison with the ≤ 49-days group.**

**§ P<0.001 for the comparison with the 50 to 56-days group.**

**Source: Modified from Table 1, pg 1243 in the Spitz NEJM article (1998).**

32

FDA 0559

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

**Reviewer's comments:**

**Looking at the results in the table above, it is reasonable that the approved use was only for women in the first 49 days' gestation, given the 8% "failure rate" in this subgroup, compared to 17% and 23% failure rates for the longer gestations. It is important to note that failure was defined as any case requiring surgical intervention for any of the following reasons:**

- **incomplete abortion (incomplete expulsion)**
- **documented ongoing pregnancy**
- **medical reasons (usually heavy vaginal bleeding with or without retained products of conception)**
- **patient request (usually for bleeding)**

**As has been pointed out, since the US trial data used for the FDA approval of Mifeprex, given the experience and data gained in the last 20 years from millions of women in the US and abroad, the success rates and overall outcomes are very different.  Currently, when a "failure" occurs, using the original definition, options that are now commonly available include the following:**

- **expectant management (wait and see) in the case of an incomplete abortion (i.e., pregnancy terminated but not fully expelled)\***
- **medical treatment for bleeding, pain and other common symptoms**
- **clinical evaluation with the use of 1) office ultrasound and/or 2) hCG data determined by rapid, sensitive urine and/or serum testing\***
- **additional doses of misoprostol for an incomplete abortion\***
- **less invasive surgical intervention (vacuum aspiration) in the clinic/office instead of a D&C under anesthesia in an operating room**
- **continuing the pregnancy (although the medical recommendation is to proceed to a surgical abortion in such a case, we acknowledge that a woman could potentially decide to continue the pregnancy)**

    **\* per protocol, these options were NOT available in the original US trial**

**It is also evident that the proposed new dosing regimen is considerably more effective for all gestations through 70 days [see data and discussion that follows for 57-63 and 64-70 days gestation], especially when compared to the original data using the FDA-approved regimen which had "success" rates of only 83% and 77% at 50-56 and 57-63 days gestation, respectively.**

**Current evidence for increasing the gestational age to 70 days**

Current evidence demonstrates that the new proposed medical abortion regimen is effective for women in the range of 57-63 days and 64-70 days of gestation.  A 2015

33

Reference ID: 3909590

Clinical Review

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

systematic review identified six published studies that recorded data on outcomes of medical abortions performed during gestational Days 64-70.[46]

The published studies were conducted in the United States, UK, Mexico, Curaçao, Vietnam, and the Republic of Georgia.  All subjects were treated as outpatients between 2007 and 2015.  The older UK study evaluated 127 women who were at 64-70 days gestation and treated with 200 mg oral mifepristone followed by 800 mcg vaginal misoprostol.[47]

**Reviewer comment:**

**We evaluated the data separately for 57-63 and 64-70 days of gestation.  The following two tables show the efficacy data for 57-63 and 64-70 days gestation (also known as Week 9 and Week 10).**

---

[46] Abbas D, Chong E, Raymond EG. Outpatient medical abortion is safe and effective through 70days gestation. Contraception 2015;92:197-9.

[47] Gouk EV, et al. Medical termination of pregnancy at 63-83 days gestation. British J Obstet Gyn 1999;106:535-539.

34

Reference ID: 3909590

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

## Table 6: MAB Efficacy Outcome 57-63 Days Gestation

| Study | Enrolled N | Followed N | Success N (%) | Ongoing Pregnancy N (%) | Lost to Follow up % | Comment |
|---|---|---|---|---|---|---|
| Winikoff [23] 2008 US- | 132 | 115 | 109 (94.8) | 2 (1.7) | 13.0% | * Proposed Dosing |
| Winikoff [19] 2012    US | 379 | 325 | 304 (93.5) | 10 (3.1) | 14.2% | * Proposed Dosing |
| Gatter[13] 2015    US | 1527 | 1286 | 1228 (95.5) | 21 (1.6) | 15.8% | * Proposed Dosing |
| Sanhueza[48] 2015 Mexico City | 196 | 190 | 171 (90.0) | 6 (3.2) | 3.1% | * Proposed dosing |
| Boersma[22] 2011** Curacao | 105 | 95 | 91 (95.8) | 2 (2.1) | 9.5% | *Proposed dosing @ 24-36 hr @ home |
| Pena[44] 2014 Mexico City | 177 | 171 | 164 (95.9) | 2 (1.2) | 3.4% | * Proposed dosing |
| Chong[40] 2012 Viet Nam, Georgia | 86 | 85 | 79 (92.9) | 2 (2.4) | 1.2% | *Proposed dosing 36-48 hr |
|  | 81 | 81 | 77 (95.1) | 2 (2.5) | 0% | 400 mcg buccal @ 36-48 hr |
| Bracken[49] 2014 4 countries- | 389 | 382 | 362 (94.8) | 7 (1.8) | 1.3% (2 women withdrew) | 400 mcg sublingual @ 24-48 hr |
| TOTAL | 3,072 | 2,730 | 2,585 (94.7) | 54 (2.0%) | 11.1% |  |

**Mifepristone oral 200 mg followed in 24-48 hour range with misoprostol buccal 800 mcg.**

****Boersma study reported the interval from 50-63 days without further breakdown.**

**Source: Data from published studies.**

[48] Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015;22:75-82.

[49] Bracken H ,Dabash R, Tsertsvadze G et al. A two-pill sublingual misoprostol outpatient regimen following mifepristone for medical abortion through 70 days' LMP: a prospective comparative open-label trial. Contraception 2014;89(3):181-6.

35

FDA 0562

Clinical Review

(b) (6)  and                                      (b) (6)
NDA 020687/S-020-  Mifeprex

**Reviewer comments**:

**Although the Chong and Bracken studies do not use the exact proposed dosing regimen, it is felt that their efficacy results are relevant because both used a lower dose of misoprostol, which, if anything, would have been expected to provide lower efficacy.**

**After careful review of the above eight studies, we find the following results.  A combined total of 3,072 women were treated at 57-63 days of gestation, with 2,730 (88.9%) providing outcome data.  Of these women, 2,585 (94.7%) had a complete medical abortion (pregnancy termination without any surgical intervention), and 54 (2.0%) had ongoing pregnancies.  This successful treatment rate is better (94.7% compared to 92.1%) than the rate in the data on which the 2000 FDA Mifeprex approval was based.  The data are sufficient and acceptable for extending the approval of Mifeprex up to at least 63 days gestation.**

**The numbers here do not exactly match the results shown in the efficacy table for 57-63 gestational days that are in Section 14 CLINICAL STUDIES in the new approved label, which is limited to studies using the identical dosing regimen to that proposed in this supplement.  The number of evaluable women here is higher because the Chong and Bracken data are included, as noted above in the comment.  The label, however, states the same conclusion of a 94.7% complete medical abortion rate and a 2% ongoing pregnancy rate.**

**Data for 64-70 days gestation are found in the next table.**

Reference ID: 3909590

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

**Table 7: MAB Efficacy Outcome 64-70 Days Gestation**

| Study | Enrolled N | Followed N | Success N (%) | Ongoing Pregnancy N (%) | Lost to Follow up % | Comment |
|---|---|---|---|---|---|---|
| Winikoff[19] 2012 | 350 | 304 | 282 (92.8) | 9 (3.0) | 13.1 | *Proposed dosing |
| Sanhueza[48] 2015 | 150 | 147 | 134 (91.2) | 5 (3.4) | 2.0 | * Proposed dosing |
| Boersma[22] 2011† | 26 | 26 | 25 (96.2) | 1 (3.8) | 0 | Proposed dosing @ 24-36 hr @ home |
| Pena[44] 2014 | 2 | 2 | 2 (100) | 0 (0) | 0 | * Proposed dosing |
| Chong[40] 2012 RCT | 1 | 1 | 1 (100) | 0 (0) | 0 | * Proposed dosing @ 36-48 hr |
|  | 6 | 6 | 6 (100) | 0 (0) | 0 | 400 mcg buccal |
| [Y]Gouk[47] 1999 UK- misoprostol in hospital | 127 | 127 | 120 (94.5) | 7 (5.5) | 0 | 800 mcg vaginal @ 36-48 hr |
| Bracken[49] 2014 | 325 | 321 | 295 (91.9) | 7 (2.2) | 1.2 | 400 mcg sublingual @ 24-48 hr |
| TOTAL | 987 | 934 | 865 (92.6) | 29/934 (3.1) | 53/987 (5.4) | |

*Mifepristone oral 200 mg followed in 24-48 hour range with misoprostol buccal 800 mcg.

[Y]The Gouk study in 1996-97 included 253 women at 63-83 days gestation (Weeks 10-12).

Source: Table modified with data from published studies.  See Abbas D et al. Contraception [MAB through 70 days gestation] 92 (2015):197-199.

**Reviewer comments**:

Use of the Chong and Bracken data is discussed above.  Although the Gouk regimen used a different route of administration for misoprostol, the effectiveness of the vaginal route appears to be similar to that of the buccal route; therefore, these data are considered relevant.  Data on sublingual administration of misoprostol may be less generalizable due to the different pharmacokinetic (PK) profile and higher AE frequency compared to buccal

37

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

administration.  Also, see Section 4.4.3 Pharmacokinetics and the Cross Discipline Team Leader review.

The abortion success rates shown above from seven studies are comparable to (and in several studies, greater than) the success rates for medical abortion in the initial 2000 decision for Mifeprex up to 49 days gestation.  The proportion of subjects with complete success without any medical or surgical intervention in the US pivotal trial that supported the original approval was 92.1%, as shown in Table 5, in 827 women encompassing all gestational weeks up to 49 days.  The data in the above two tables include 3,072 women treated at 57-63 days gestation and 987 women at 64-70 days gestation.  We believe that this comprises a sufficient number of women in each gestational week upon which to make a clinical decision, and that the overall 94.7% and 92.6% success rates are acceptable for approval.

The data here clearly establish the efficacy of medical abortion with mifepristone and misoprostol through 70 days gestation.  At least two Gynuity Health studies of outpatient medical abortion through 70 days are ongoing, so more information from clinical studies will be available in the future.

It is also worth noting that in November 2015, the National Medical Committee of PPFA approved medical abortion through 70 days, so this is currently their standard of care.

**Reviewer's Final Recommendation:**
The new proposed regimen of 200 mg oral mifepristone followed in 24-48 hours with 800 mcg buccal misoprostol should be approved for use through 70 days gestation (10 weeks from the first day of the LMP).

## 6.1.8  At-home Administration of Misoprostol

For the majority of women, the most significant cramping and bleeding will occur within 2-24 hours after taking misoprostol.  Requiring women to take misoprostol in the office necessitates another visit and can interfere with the woman's ability to make reasonable plans for the expected bleeding and cramping.  With the option to take misoprostol at home the woman can:

- **Plan to experience cramping and bleeding at a safe and convenient time when support is available**
- **Minimize loss of income (for childcare or missed days of work)**
- **Experience improved comfort, satisfaction and privacy**

Data (graph below) from Winikoff (2012)[19] shows the time in hours to complete expulsion of the pregnancy after misoprostol administration for gestations at 57-63 and 64-70 days.  Within about 5 hours after misoprostol dosing, 50-60% of the MABs are complete.

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex



Many studies have recorded data on home use in the US and elsewhere and "demonstrated that 87-97% of women find home use of misoprostol acceptable. Home use of misoprostol is now standard in the US."[50]  The 2009-10 Swica comparative study focused on the option to take both mifepristone and misoprostol at home after being counseled at the office/clinic.  There was no significant difference in either efficacy or safety for the 139 women (46%) who took <u>both medications</u> at home compared to 161 women who took mifepristone in the office and misoprostol at home.

Table 8 that follows is a list of studies where data are available on home use of misoprostol and the specific efficacy findings.

---

[50] Swica Y, et al. Acceptability of home use of mifepristone for medical abortion. Contraception 2013;88:122-127.

Reference ID: 3909590

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 8: Misoprostol Self-administration at Home**

| Study | Evaluable N | Misoprostol at home | Success | Comment |
|---|---|---|---|---|
| **US Studies** | | | | |
| Gatter 2015[13] US | **13,373** | **All subjects** at 24-48 hr | 97.7% | Through 63 days; buccal miso 800 mcg |
| Winikoff 2008[23] US | 421 | **All subjects** at 24-36 hr | 96.2% | Through 63 days; buccal miso 800 mcg |
| Winikoff 2012[19] US | 629 | **All subjects** at 24-48 hr | 93.5% (Wk 9) 92.8% (Wk 10) | **Week 9 v Week 10;** buccal miso 800 mcg |
| Swica 2013[50] US | 301 | **All subjects** at 6-48 hr | 96.7 %- home mife 95.6%- clinic mife | Through 63 days; 800 mcg miso |
| **Foreign Studies** | | | | |
| Louie 2014[14] Azerbaijan | 863 | 794 (92%) at home at 24-48 hr | 97% | Through 63 days; buccal miso 800 mcg |
| Pena 2014[44] Mexico | **1,000** | **All subjects** at 24-48 hr | 97.3% | Through 63 days; buccal miso 800 mcg |
| Bracken 2014[49] 4 countries | 703 (382 v 321) | 543 (**77%**) took miso at 24-48 hr | 94.8% (Wk 9) v 91.9% (Wk 10) | **Week* 9 v Week 10** 400 mcg sublingual miso used |
| Boersma 2011[22] Curacao | 307 | **All subjects** at 24-36 hr | 97.7% | Through **70 days  (Wk 10); GP care**; buccal miso 800 mcg; |
| Chong 2012[40] 400 v 800 buccal | 1115 (559 v 563 were enrolled) | 851 (**76%**) at 36-48 hr | 96.8% with <u>home</u> miso; 95.1% with clinic miso | Through 63 days; *DB, RCT in Vietnam and Georgia |
| Goldstone 2012[20] Australia: | **11,155** | **All subjects** at 24-48 hr | 96.5% | Through 63 days; **buccal miso 800 mcg** |
| Sanhueza 2015[48] | **896** | **All subjects** at 24-48 hr | 93.3 | **Through 70 days  (Wk 10)** |
| **TOTAL** | **30,763** | **30,210 (98.2%)** | **92%-97.7%** | **Different gestations, and regimens** |

**\*DB, RCT: double-blind, randomized clinical trial.**

**Source: FDA clinical reviewer table.**

<u>**Reviewer comments**</u>:

**The above table with data for home administration of misoprostol for 30,763 women in the US and other countries shows a success rate ranging from 91.9 to**

40

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

97.7%.  The two largest studies (Gatter and Goldstone) pooled showed 97% success using the new proposed dosing regimen with home use of buccal misoprostol.  The lowest success rate above of 91.9% in the Bracken study is still supportive for approval and does not differ significantly from results with misoprostol taken in the clinic/office.

Of note is that 4 of the above studies provided data on home use of misoprostol through 70 days gestation.

Home use of misoprostol has been evaluated as part of the proposed protocol in studies including well over 30,000 patients, as well as in studies of home use of both mifepristone and misoprostol.  The Raymond (2013) review[18] of early MAB with mifepristone 200 mg and misoprostol (different doses and routes of administration), analyzed 87 trials with 47,283 treated women up to 63 days gestation.  The article concludes: "We found no evidence that allowing women to take the misoprostol at home increased the rate of abortion failure or serious complications."  It is also notable that the NAF and ACOG guidances encourage home administration of misoprostol and it has been standard protocol for most PPFA clinics for since 2005.

While we do not have age-specific efficacy data for adolescents who took misoprostol at home, it is evident that many adolescents did take buccal misoprostol at home.  In the Goldstone 2012 study, there were eight 14 year olds and 931 women ages 15-19 who took misoprostol at home.  In the Gatter 2015 study, there were 24 adolescents age 11-14, 82 age 15, 216 age 16, and 435 age 17 who took misoprostol at home.  The overall efficacy in these two large studies was excellent, as previously noted.

<u>Reviewer's Final Recommendation</u>:
There is no medical rationale against permitting the woman to be given the misoprostol on the day of the initial clinic/office visit and self-administer it at a convenient time in the next 24-48 hours at home.  This would avoid another visit and the time, transportation, loss of work, inconvenience, etc. that such a visit would involve.  Furthermore, given the fact that 22-38% of women abort within 3 hours and 50-60% within 5 hours of buccal misoprostol[19], it is preferable for the woman to be in a convenient, safe place (home or at a support person's location) for the expected uterine cramping and vaginal bleeding to occur.  The new proposed regimen of 200 mg oral mifepristone followed in 24-48 hours with 800 mcg buccal misoprostol shows acceptable efficacy when misoprostol is self-administered at home.

## 6.1.9  Use of a Repeat Dose of Misoprostol if Needed

Several studies using buccal misoprostol allowed the option of repeat misoprostol at follow-up one week after mifepristone for persistent gestational sac; however, only a few

41

FDA 0568

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

studies report specific outcomes.  The Chen and Creinin 2015 review[12] of mifepristone with buccal misoprostol for MAB reported on four studies.  Chong (2012)[40] provided additional information from 1,122 women.  In the study protocols, women with an ongoing pregnancy at follow-up were recommended to undergo uterine suction curettage, whereas women who had retained products of conception were given the options of expectant management, suction curettage/aspiration, or a second dose of misoprostol.  Limited additional data were provided by Gatter (2015)[13]: data on the use of a repeat dose of misoprostol were available from a subset of 7,335 women, of whom 87 (1.2%) received a repeat dose.  Efficacy results, however, are not stated in the Gatter article, so this study is not included in Table 9, which highlights success rates after a repeat dose of misoprostol in seven published articles that included this specific outcome.

**Table 9: Success with a Repeat Dose of Misoprostol - Incomplete MAB**

| Study/Country | Total N | Mife-Miso Interval (hrs) | Took 2nd Dose | Success with 2nd dose N (%) | Comment |
|---|---|---|---|---|---|
| *Raghavan 2010[51] Moldova | 277 | 24 | 2 | 2 (100) | Buccal Miso 400 |
| *Winikoff 2008[23] US | 421 | 24-36 | 14 | 13 (93) | Buccal Miso 800 |
| *Winikoff 2012[19] US | 629 | 24-48 | [Y]20 | [Y]Wk 9- 11 (91) Wk 10: 9 (67) | Week 9 v. Week 10: Buccal Miso 800 |
| *Louie 2014[14] Azerbaijan | 863 | 24-48 | 16 | 16 (100) | Buccal Miso 800 |
| Chong 2012[40] Georgia, Vietnam | 1122 | 36-48 | 47 | 43 (92) | Buccal Miso 400 and 800 mcg |
| Boersma  2011[22] Curacao | 307 | 24-36 hr | 5 | 4 (80) | GP care; Buccal Miso 800 at home |
| Bracken 2014[49] 4 countries | 703 | 24-48 hr | 33 | 29 (88) | Sublingual Miso 400 |
| **TOTALS** | **4,018** | **--** | **137 (3.4%)** | **123 (90%)** | |

*These 4 studies are in Table 4 of the Chen and Creinin 2015 review article.
[Y]These data are directly from the Winikoff article; the Chen and Creinin review had incorrect data.
Source: table modified by FDA reviewer from Chen and Creinin 2015 article and 3 other studies.

---

[51] Raghavan S, et al. Comparison of 400 mcg buccal and 400 mcg sublingual misoprostol after mifepristone medical abortion through 63 days' LMP: a randomized controlled trial.  Contraception 2010; 82:513-9.

Reference ID: 3909590

FDA 0569

Clinical Review
(b) (6)   and   (b) (6)

NDA 020687/S-020-  Mifeprex

**Reviewer's comment:**

**The completion success rates shown above are high.  While only 3.4% of the women took a second misoprostol dose, 90% of these women  avoided a surgical procedure to complete their termination.  We believe the option of a repeat dose of misoprostol is acceptable and safe in the case that complete expulsion has not occurred after initial dosing (provided that the pregnancy is not still ongoing): it offers a choice for the healthcare provider and the patient on how to manage an incomplete expulsion (retained products of conception) following the initial treatment.  As noted above, the other options are expectant management, suction aspiration in the office, or a surgical D&C in the operating room.  It is also of note that it is standard protocol in many US clinics to offer the choice of a repeat misoprostol dose, especially for women with an incomplete termination (retained tissue/clots or a documented non-viable pregnancy).  A second dose of misoprostol is generally not offered in the case of a documented ongoing pregnancy following use of mifepristone and misoprostol.**

**Reviewer's Final Recommendation:**

**Use of a repeat dose of misoprostol may be offered when using the new dosing regimen if the pregnancy has ended, but the expulsion is incomplete.**

## 6.1.10  Physician v Other Healthcare Provider Treatment

The Applicant provided data on the efficacy of medical abortion provided by non-physician healthcare providers, including four studies with 3,200 women in randomized controlled clinical trials and 596 women in prospective cohorts. These studies took place in varying settings (urban, rural, international, low resource).  The efficacy results are as follows:

- Olavarietta[85] demonstrated efficacy of 97.9% when the MAB was provided by nurses as compared with 98.4% with physicians
- Kopp Kallner[84] showed efficacy of 99% with certified nurse midwives versus 97.4% with physicians
- Warriner[52] demonstrated efficacy of 97.4% with nurses versus 96.3% with physicians
- Puri[83] showed efficacy of 96.8% compared with 97.4% in the "standard care" group

**Reviewer comment:**

**The above findings for MAB efficacy from 5 studies clearly demonstrates that efficacy is the same with non-physician providers compared to physicians or the**

---

[52] Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al.  Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors?  A randomized controlled equivalence trial in Nepal.  Lancet 2011; 377: 1155-61.

FDA 0570

Reference ID: 3909590

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

"standard care" treatment.


## 6.1.11  Follow-up Timing and Method

Concerning follow-up timing and method, follow-up within the 7-14 day interval after mifepristone administration is universally recommended; however, follow-up does not necessarily need to be done as currently labeled "in the clinic or healthcare provider's office 14 days after Mifeprex administration."

One strong argument for flexibility in follow-up timing, location and method after the administration of Mifeprex and misoprostol is to avoid placing an undue burden on either the provider or the patient, while maintaining the ability to identify incomplete terminations.  The currently approved labeling specifies three visits (two for dosing, one for follow-up) at fairly rigid times that are often not practical, convenient or necessary.

Several articles were submitted by the Applicant to support flexible follow-up.  The most noteworthy article is the 2013 Raymond review[18] of over 45,000 MABs using 200 mg oral mifepristone that concluded: "we observed no significant association between abortion failure rates and the timing of the follow-up evaluation."  This topic is discussed thoroughly in the Section Submission-Specific Primary Safety Concerns.

**Reviewer comment:**
**Follow-up during the 7-14 day window after the administration of mifepristone is necessary to determine that the termination was successful and the woman is in good health.  If for some reason the follow-up contact is not made (the woman is "lost to follow-up"), the clinical guidelines of NAF state that "all attempts to contact the patient (phone calls and letters) must be documented in the patient's medical record."  This guideline emphasizes the importance of follow-up but accepts the fact that women are sometimes lost to follow-up and there is no mechanism that can guarantee 100% follow-up in the normal clinical setting.**

**Reviewer's Final Recommendation:**
**Follow-up after taking Mifeprex and misoprostol is necessary.  The exact timing and method should be flexible and determined jointly by the healthcare provider and the individual woman being treated, and should follow the standard guidelines for the office/clinic where the Mifeprex is being dispensed. Fortunately, there are several choices/methods of follow-up that can be used and it appears that no single option is superior to the others.  The woman should always have the option to be seen at the office/clinic.**


## 6.1.12  Subpopulations

**Parity**

The Raymond (2013) review article[18] had 74 trials with parity data for ~ 32,000 women. In 34 trials whose study populations comprised > 50% nulliparous women, the MAB success rate was 96.4%; in 40 trials with ≤ 50% nulliparous women, the success rate was 94.9%.  This suggests that women who have not had a previous term pregnancy

44

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020- Mifeprex

delivery have a slightly higher early MAB success rate. These data are not definitive, however, because such factors as the dosing regimen, route of administration, and gestational age could also influence the success rates.

### Previous abortion

One study[26] found that success rates are slightly better in women who have <u>not</u> had a previous abortion. Prior abortion, however, did not appear to be an important risk factor for abortion failure or success (Raymond[18]).

### Race

There does not appear to be any efficacy difference based on race. Results are reported in studies enrolling a large number of women. Gatter (2015)[13] had five racial/ethnicity groups among over 13,000 women at the PPFA centers in the Los Angeles area; the success rates ranged from a low of 97.2% (African-American) to a high of 97.8% (White, Asian and Other), which is not clinically or statistically significant.

### Adolescents v. Older Women

There are at least three articles that support the efficacy of MAB in adolescents; each study used the same definition of success as the need for no further medical or surgical intervention:

- Phelps et al. 2001[53] conducted a pilot study in 28 adolescents aged 14-17, at ≤ 56 days gestation, using Mifeprex 200 mg followed 48 hours later by misoprostol 800 mcg vaginally. All 28 had complete medical terminations without complications or surgical intervention. Five adolescents did not require any misoprostol.

- Niinimaki et al. April 2011:[54] Finnish Registry from 2000-06 comparing rates of AEs in adolescents and adult women with MAB at ≤ 20 weeks gestation, which included 3,024 women < age 18 and 24,006 women age 18 or older. By gestational age, 2,424 adolescents were < 64 days gestation and 139 were within 64-84 days gestation. The specific dose regimens are not stated and may have varied according to the gestational ages. The odds ratio for an incomplete abortion for adolescents under age 18 compared to the women ≥ age 18 was 0.69, meaning that the younger women had a lower rate of incomplete abortions.

- Gatter, Cleland and Nucatola (2015):[13] US data using the proposed regimen of mifepristone 200 mg and misoprostol 800 mcg buccally through 63 days included 283 women aged 17 years and 322 under age 17 (see Table 10). The 605 women under age 18 had a 98.7% success rate while the 6,674 18-24 year olds had a 98.1% success rate. The four older age groups had success rates that ranged from 96.5 to 97.5% without any need for a surgical procedure and additional treatment. In

---

[53] Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343.

[54] Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.

45

FDA 0572

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

the pediatric population, there were no cases requiring transfusion, hospitalization or treatment for severe infection.

The table below shows the age distribution from the Gatter study.  There were 24 adolescents between ages 11-14, 82 adolescents age 15, and 216 age 16 totaling 322 adolescents.  As noted, 283 adolescents were age 17.

**Table 10: MAB Success by Age Group**

| Age Group (years) | Total N Success (%) | Comment |
|---|---|---|
| **< 18** | **605 (98.7)** | **322 were age 11-16** <br> **283 were age 17** |
| 18-24 | 6684 (98.1) | The age distribution here is representative of other US data on MAB - largest group is age 18-24 followed by age 25-29 |
| 25-29 | 3317 (97.5) | |
| 30-34 | 1613 (96.5) | |
| 35-39 | 855 (97.0) | |
| 40+ | 299 (97.3) | |
| **TOTAL** | **13,373** <br> **97.7% overall success** | |

Source: Data from Gatter 2015 review.

**Reviewer comments:**

**Data from 3,657 adolescents under age 18 in the above three studies shows a MAB success rate that is consistently equal to or higher than that found in the women older than age 17.  It is interesting that five (18%) of the adolescents in the Phelps study did not even need misoprostol.  The percentage of women not needing any misoprostol is generally much lower, perhaps 1-3%, in other early MAB studies.  From the articles reviewed, efficacy of early MAB in the adolescent population is not a concern.**

**Additional adolescent data were reported in the Goldstone 2012 study[20], where there were eight 14 year olds and 931 women ages 15-19 who took misoprostol at home for a MAB up to 63 days gestation.  Efficacy and safety data by age groups were not reported in the article.**

## 6.1.13  Analysis of Clinical Information Relevant to Dosing Recommendations

As noted in some of the reviewer comments and tables, there is evidence that lower doses of misoprostol (400 mcg), other ROAs (vaginal and sublingual), inclusion of more advanced gestational ages, and different dosing intervals between mifepristone and misoprostol have shown acceptable efficacy and safety results.  However, for the purposes of this NDA review, our final recommendations are focused on the dosing regimen and other requests specifically made by the Applicant.

46

FDA 0573

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

## 6.1.14  Discussion of Persistence of Efficacy and/or Tolerance Effects

There is no evidence that repeated medical or surgical abortion is unsafe or that there is a tolerance effect.  Return to fertility is well-documented: in the Patient Counseling Information section, the labeling states "inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses" and "inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before she resumes sexual intercourse."

## 6.1.15  Additional Efficacy Issues/Analyses

The Applicant has requested that revised labeling provide only for the new proposed regimen and that the original approved regimen be deleted.

**Reviewer Final Recommendation:**

**While there are no safety or efficacy reasons that would lead us to withdraw approval of the currently labeled dosing regimen, we concur that it may be deleted from labeling because very few providers currently use it, and inclusion of two options for dosing could be confusing.  Of note, PPFA and NAF guidelines have used mifepristone 200 mg oral and misoprostol 800 mcg (initially given vaginally and now buccally) since 2001.**

# 7  Review of Safety

## *Safety Summary*

- Medical abortion with the new proposed regimen of Mifeprex 200 mg followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation is safe. Major adverse events including death, hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy with the proposed regimen are reported rarely in the literature on over 30,000 patients.  The rates, when noted, are exceedingly rare, generally far below 0.1% for any individual adverse event. The number of postmarketing deaths associated with Mifeprex pharmacovigilance is very low.  Non-vaginal routes of administration of misoprostol have increased and since  the *C. sordellii* deaths associated with vaginal misoprostol, there have been no *C. sordellii* deaths. Given that the numbers of these adverse events appear to be stable or decreased over time, it is likely that these serious adverse events will remain acceptably low.

- Common adverse events associated with medical abortion occur at varying but acceptable rates.

- There are scarce cases of uterine rupture associated with early medical abortion. Medical abortion using mifepristone with or without misoprostol in the first trimester is safe from this perspective.

47

Clinical Review
(b) (6)  and  (b) (6)
NDA 020687/S-020-  Mifeprex

- There does appear to be an association between angioedema and mifepristone administration. The risks of anaphylaxis and angioedema should be included in the labeling for Mifeprex and there should be continued pharmacovigilance for anaphylaxis.

- Home use of misoprostol has been evaluated as part of the proposed dosing regimen in studies including well over 30,000 patients, demonstrating an acceptable safety profile, with rates of adverse events equal to or lower than those with the approved regimen requiring in-office dispensing of misoprostol. Home use of misoprostol can increase patient convenience, autonomy and privacy without increased burden on the healthcare system.

- In the articles about repeat misoprostol after mifepristone administration, there is little information provided about safety. The need for a second dose is a relatively uncommon occurrence. In studies of medical abortion using misoprostol alone, using two or more doses as compared to one dose of misoprostol does increase the risk of the common adverse event of diarrhea. There are a very few reports of uterine rupture with multiple doses of misoprostol, in almost all cases in women with prior uterine surgery, such as a cesarean section.

- The Applicant demonstrates that alternatives to in-clinic follow-up, including standardized questions, telephone follow-up, and use of low and high sensitivity urine pregnancy tests, serum pregnancy tests, and ultrasound are effective and safe. Loss-to-follow-up rates do not exceed those of in-clinic follow-up. This option can increase flexibility and accessibility of medical abortion for women.

- Medical abortion in adolescents appears to be at least as safe, if not safer, as in adult women. These data support the safety of Mifeprex in adolescents and satisfy requirements for PREA. No information on safety or efficacy if used in premenarchal girls is required, as the medication is not indicated in that subset of the pediatric population.

- Midlevel providers in the United States, such as  nurse practitioners, nurse midwives and physician assistants currently provide family planning services and abortion care, including medical abortion care, under the supervision of physicians.  In light of the REMS requirements, midlevel providers who are currently practicing abortion care are doing so under the supervision of physicians.  Therefore, facilities that employ midlevel providers already have an infrastructure in place for consultation and referral if, as required under the REMS, a prescriber is unable to provide additional care, including surgical management if needed.

- It is appropriate to modify the current adverse event reporting requirements under the REMS, which are currently outlined in the Prescriber's Agreement  to include "hospitalization, transfusion or other serious event."  FDA has received

48

(b) (6) and                          (b) (6)
NDA 020687/S-020-  Mifeprex

such reports for 15 years, and it has determined that the safety profile of Mifeprex is well-characterized, that no new safety concerns have arisen in recent years, and that the known serious risks occur rarely.  For this reason, FDA does not believe ongoing reporting of all of the specified adverse events is warranted. The proposed Prescriber's Agreement Form (to replace the Prescriber's Agreement) will continue to require that qualified healthcare providers report any deaths.  The Applicant will still be required by law, as is every NDA holder, to report serious, unexpected adverse events as 15-day safety reports, and to submit non-expedited individual case safety reports, and periodic adverse drug experience.

- Upon review of historical documents and of current guidelines for REMS materials, the phrase "under Federal law" can be removed from the Prescribers' Agreement.  We concur with        (b) (6)  review of the REMS document.

- The revised Indication Statement should read:

"Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation." Safe use of Mifeprex would be enhanced when other information necessary to describe appropriate use (i.e., the need to use Mifeprex in a combined regimen with misoprostol and the gestational age for use) is included in the Indication Statement.  This would be consistent with current FDA thinking (e.g., the internal Label Review Tool) which states that the indication and use statement should include "Information if drug is to be used only in conjunction with another therapy."

## 7.1   Methods

The assessment of the clinical safety of Mifeprex through 70 days gestation is based on the Applicant's submission of numerous articles from the peer-reviewed medical literature. The various studies have different designs, inclusion criteria, dosing regimens and endpoints for safety and efficacy.  For the evaluation of safety, this reviewer focused on the studies that evaluated the proposed dosing regimen .  All the articles used for this review can be found in the extensive list of references in Section 9.6 at the end of this review.

### 7.1.1  Studies/Clinical Trials Used to Evaluate Safety

The reviewer evaluated safety based on the studies that focused on the proposed dosing regimen, specifically Mifeprex 200 mg followed by misoprostol 800 mcg buccally 24-48 hours later, as listed in Table 11 below. Supportive data from studies that have less specific numerical data or studies that included other regimens, specifically with different routes of administration of misoprostol (vaginal, oral, sublingual) are not included in this portion of the review, but are discussed in Sections Major Safety Results and Supportive Safety Results. Table 11 lists the studies referenced in these discussions.

Reference ID: 3909590

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

**Table 11: Studies Used to Evaluate Safety**

| Study | |
|---|---|
| **USA** | **International** |
| Gatter 2015[13], retrospective | Ngoc 2014[16], Vietnam, prospective |
| Ireland 2015[15], retrospective | Goldstone 2012[20], Australia, retrospective |
| Chong 2015[17], prospective single-arm | Boersma 2011[22], Curacao, prospective |
| Winikoff 2012[19], prospective | |
| Grossman 2011[36], prospective | |
| Winikoff 2008[23], prospective RCT | |
| Creinin 2007[25], prospective | |
| Middleton 2005[24], prospective | |

**Source: NDA clinical reviewer table.**

## 7.1.2 Categorization of Adverse Events

For the purposes of this review, adverse events categorized as serious include death; hospitalization; infection, including severe infection requiring hospitalization; bleeding requiring transfusion; and ectopic pregnancy. Other non-serious adverse events include: nausea, vomiting, diarrhea, fever, bleeding and cramping.

## 7.1.3 Pooling of Data Across Studies/Clinical Trials to Estimate and Compare Incidence

The data are not pooled across studies as the study designs are quite different. The incidence of individual adverse events is noted for each study, and can be used to provide an estimated range.

## 7.2 Adequacy of Safety Assessments

## 7.2.1 Overall Exposure at Appropriate Doses/Durations and Demographics of Target Populations

Per the Applicant, there have been approximately 2.5 million US uses of Mifeprex by US women since its approval in 2000.  If evaluation is limited to the studies listed in Table 11 focusing specifically on the proposed new dosing regimen, exposure for this safety analysis is based on well over 30,000 patients. The exact number cannot be determined because two retrospective studies (Gatter[13] and Ireland[15]) are likely based on overlapping cohorts of patients from Planned Parenthood clinics in Los Angeles. There are likely some differences in the demographic data for the different studies; therefore, the descriptions are separated into US and international data. However, it is doubtful

50

Clinical Review

(b) (6)  and                                                              (b) (6)

NDA 020687/S-020-  Mifeprex

that demographic differences such as race or ethnicity are clinically meaningful in relation to the safety and efficacy of medical abortion. The data do include adolescents exposed to Mifeprex; information on safety in this population is discussed in Section 7.4.5.

### 7.2.2  Explorations for Dose Response

NA for this review.

### 7.2.3  Special Animal and/or In Vitro Testing

NA for  this review.

### 7.2.4  Routine Clinical Testing

From this reviewer's assessment of the literature, no routine clinical testing is needed to evaluate the proposed changes to the Mifeprex labeling.

### 7.2.5  Metabolic, Clearance, and Interaction Workup

NA for this review.

### 7.2.6  Evaluation for Potential Adverse Events for Similar Drugs in Drug Class

Please see Important Safety Issues with Consideration to Related Drugs for discussion of potential adverse events for drugs in this class.

## 7.3   Major Safety Results

### 7.3.1  Deaths

Deaths are rare with medical abortion. Most of the articles provided did not specifically report on deaths with medical abortion. Among the seven US studies, only one reported on deaths (Grossman, 2011[36]) and noted zero deaths among 578 subjects.  Among the three international studies, only one[20] reported on deaths.  In this retrospective review of 13,345 medical abortions with the proposed regimen, the authors reported only one death, yielding a rate of 0.007%.  More information on deaths associated with medical abortion is found in Section 8 Postmarket Experience.

### 7.3.2  Nonfatal Serious Adverse Events

The nonfatal serious adverse events typically discussed in the literature are hospitalization, serious infection, bleeding requiring transfusion and ectopic pregnancy. See narratives below and Table 12, Table 13, and Table 14 for details.

Hospitalization data:

Most articles do not report hospitalization data.  In the US studies, 19 patients were reported as being hospitalized out of a total of 16,696 subjects. The overall  rates range

51

FDA 0578

Clinical Review

(b) (6) and                                    (b) (6)
NDA 020687/S-020-  Mifeprex

from 0.003-1.1%.  Only three articles separated out hospitalizations by gestational age. In Gatter 2015[13], there were 3/8495 hospitalizations among women ≤ 49 days, 3/3142 among women at 50-56 days gestation and none among women at 57-63 days.  In Winikoff 2012[19], there were only two hospitalizations, both among women at 57-63 days, and none in the 64-70 days gestation group.  In Creinin[25] two of six total hospitalizations were in the 50-56 days group and two in the 57-63 days group.  The two remaining hospitalizations in that study were unrelated to study drug and gestational age information was not provided for these two cases. There were none among women at 64-70 days gestation. See Table 12 below.

Among the international studies, only 3 of 15,109 women were hospitalized, with rates from 0.07-0.6%. These rates were not separated out by gestational age.  See Table 12.

APPEARS THIS WAY ON ORIGINAL

52

Clinical Review

(b) (6)    and    (b) (6)

NDA 020687/S-020-  Mifeprex

## Table 12: Hospitalizations by Gestational Age

| Study | Design | Subjects (N) | Hospitalizations by gestational age [Total N in subgroup, rate (%)] | | | | |
|-------|--------|-------------|------|------|------|------|------|
| | | | All Gestational Ages (Overall/not specified) | ≤ 49 days | 50-56 days | 57-63 days | 64-70 days |
| **USA** | | | | | | | |
| **Gatter 2015**[13] | retrospective | 13,373 | 6‡ (0.04%) | N=8945 3/8945 (0.03%) | N=3142 (0.1%) | N=1286 0 | N/A |
| **Chong 2015**[17] | prospective | 400 | 2 (0.5%) | NR* | NR | NR | N/A |
| **Winikoff 2012**[19] | prospective | 729 | 2 (0.27%) | N/A | N/A | N=325 2 (0.61%)^ | N= 304 0% |
| **Grossman 2011**[36] | prospective | 578 | 0 | N=283 0% | N=103 0% | N=63 0% | N/A |
| **Winikoff 2008**[23] | prospective | 421 | 3(0.71%) | N=213 NR | N=93 NR | N= 115 NR | N/A |
| **Creinin 2007**[25] | prospective | 546 | 6 (1.1%)§ | N=229 0% | N=172 2 (1.16%)§ | N=145 2 (1.38%)§ | NA |
| **Middleton 2005**[24] | prospective | 223 | NR | NR | NR | N/A | N/A |
| **International** | | | | | | | |
| **Ngoc 2014**[16] **Vietnam** | prospective | 1433 | 1 (0.07%) | NR | NR | NR | N/A |
| **Goldstone 2012**[20] **Australia** | retrospective | 13,345 | NR | N=11,855 NR | N= 1441 NR | N=49 NR | N/A |
| **Boersma 2011**[22] **Curacao** | prospective | 331 | 2/331 (0.6%) | N=199 NR | N=105 (50-63 d) NR | NR | N=26 NR |

\* NR= not reported

‡numbers of hospitalizations for Gatter study includes those for bleeding and infection in subsequent tables.

^ includes woman with sepsis noted in Table 13, and one woman with chronic pancreatitis, recurrent.

§includes subjects receiving transfusions noted in Table 14.

**Source: NDA clinical reviewer table.**

Serious infection:

Infections requiring hospitalization or IV antibiotics were rare in the studies.  Only three US studies captured this information, with rates ranging from 0-0.015%. Two studies separated this information out by gestational age.  In Gatter 2015[13], the two serious infections were in women ≤ 49 days gestation. There were no serious infections in

53

FDA 0580

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

women at 50-56 or 57-63 days gestation. In Winikoff 2012[19], there was one serious infection in a woman at 57-63 days and none in women at 64-70 days.  See Table 13.

Among the international studies, there were five women hospitalized with rates from 0.03-0.07%. This information was not broken down by gestational age. See Table 13.

**Table 13: Serious Infection by Gestational Age**

| Study | Design | Subjects (N) | Serious Infection by gestational age {Total N in subgroup, rate (%)] | | | | |
|---|---|---|---|---|---|---|---|
| | | | All Gestational Ages (Overall/ not specified) | ≤ 49 days | 50-56 days | 57-63 days | 64-70 days |
| **USA** | | | | | | | |
| **Gatter 2015**[13] | retrospective | 13,373 | 2 (0.015%) | N= 8945 2 (0.022%) | N= 3142 0% | N=1286 0% | N/A |
| **Chong 2015**[17] | prospective | 400 | NR* | NR | NR | NR | N/A |
| **Winikoff 2012**[19] | prospective | 729 | 1 (0.014%) | N/A | N/A | N=325 1 (0.31%) | N=304 0% |
| **Grossman 2011**[36] | prospective | 578 | NR | N=283 NR | N=103 NR | N=63 NR | N/A |
| **Winikoff 2008**[23] | prospective | 421 | NR | N=213 NR | N=93 NR | N=115 NR | N/A |
| **Creinin 2007**[25] | prospective | 546 | 0 | N=229 0% | N=172 0% | N=145 0% | N/A |
| **Middleton 2005**[24] | prospective | 223 | NR | NR | NR | N/A | N/A |
| **International** | | | | | | | |
| **Ngoc 2014**[16] Vietnam | prospective | 1433 | 1 (0.07%) | NR | NR | NR | N/A |
| **Goldstone 2012**[20] Australia | retrospective | 13,345 | 4 (0.03%) | N=11,855 NR | N=1441 NR | N=49 NR | N/A |
| **Boersma 2011**[22] Curacao | prospective | 331 | NR | N=199 NR | N=105 (50-63 d) NR | NR | N=26 NR |

* NR= not reported
Source: NDA clinical reviewer table.

Transfusion data:

With regard to bleeding requiring transfusion, five of the seven US studies included this information as shown in Table 14. The rates of transfusion range from 0.03-0.7%. Three of the studies provided a breakdown by gestational age.  In Gatter 2015[13], there were the following: one woman in the ≤ 49 days group, three in the 50-56 days and zero in the 57-63 days group.  In Winikoff 2012[19], there were: two in the 57-63 days group

54

(b) (6)  and                                          (b) (6)
NDA 020687/S-020-  Mifeprex

and 1 in the 64-70 days group. In Creinin 2007[25], there were two women transfused each in the 50-56 days and 57-63 days. Only one international study[20] (Goldstone 2012) reported on transfusions and 11/13,345 women or 0.08% required transfusion.

**Table 14: Transfusion by Gestational Age**

| Study | Design | Subjects (N) | Bleeding Requiring Blood Transfusion by gestational age [Total N in subgroup, rate (%)] | | | | |
|---|---|---|---|---|---|---|---|
| | | | All Gestational Ages (Overall/not specified) | ≤ 49 days | 50-56 days | 57-63 days | 64-70 days |
| USA | | | | | | | |
| Gatter 2015[13] | retrospective | 13,373 | 4 (0.03%) | N=8945 1 (0.01%) | N=3142 3 (0.1%) | N=1286 0 | N/A |
| Chong 2015[17] | prospective | 400 | NR | NR | NR | NR | N/A |
| Winikoff 2012[19] | prospective | 729 | 3 (0.41%) | N/A | N/A | N=325 2 (0.53%) | N=304 1 (0.29%) |
| Grossman 2011[36] | prospective | 578 | 1 (0.17%) | N=283 NR | N=103 NR | N=63 NR | N/A |
| Winikoff 2008[23] | prospective | 421 | NR | N=213 NR | N=93 NR | N=115 NR | N/A |
| Creinin 2007[25] | prospective | 546 | 4(0.7%) | N=229 0 | N=172 2 (0.36%) | N=145 2 (0.36%) | N/A |
| Middleton 2005[24] | prospective | 223 | 1 (0.45%) | NR | NR | N/A | N/A |
| International | | | | | | | |
| Ngoc 2014[16] Vietnam | prospective | 1433 | NR | NR | NR | NR | N/A |
| Goldstone 2012[20] Australia | retrospective | 13,345 | 11 (0.08%) | N=11,855 NR | N=1441 NR | N=49 NR | N/A |
| Boersma 2011[22] Curacao | prospective | 331 | NR | N=199 NR | N=105 (50-63 d) NR | NR | N=26 NR |

*NR= not reported
Source: NDA clinical reviewer table.

Ectopic pregnancy:

Ectopic pregnancies were rarely reported in the supporting literature submitted with this efficacy supplement. Only one ectopic pregnancy was reported among 847 patients (0.12%) in Winikoff 2008[23].

Several studies also included less detailed, though still useful, information on adverse events. Ireland et al[15] conducted a retrospective review of 30,146 women undergoing

55

Clinical Review
(b) (6)         and                          (b) (6)
NDA 020687/S-020-  Mifeprex

medical or surgical abortion at ≤ 63 days gestation at Planned Parenthood clinics in Los
Angeles between November 1, 2010 and August 31, 2013. The authors reported that 29
women of 13,221 (0.1%) undergoing medical abortion experienced a major
complication, which was defined as including: emergency department presentation,
hospitalization, infection, perforation and hemorrhage requiring transfusion. The article
did not specify the rate of each event.  No deaths or ectopic pregnancies were reported
in this study.  In 2011, Grossman[36] reported on a study of medical abortion provided
through telemedicine, in which 578 women seeking abortion services at Planned
Parenthood of the Heartland clinics in Iowa were offered in-person services or
telemedicine services. The serious adverse event outcomes are reported in Table 12,
Table 13 and Table 14 above, but in addition, he reported on adverse events among all
medical abortion patients from July 1, 2008 through October 31, 2009 (a wider time
frame than the study itself). Four of 1,172 telemedicine patients (0.3%) required a blood
transfusion compared to 0.1% of 2,384 in-person patients. These figures were reported
in the paper to support study findings of low rates of serious adverse events, including
transfusion.  Pena (2014)[44] reported on 1,000 women in Mexico who had a medical
abortion up to 63 days gestation. Their paper reported that "there were no serious
complications as defined by any occurrence that was unexpected, serious, and related
to the induced abortion."  Upadhyay et al[55] used 2009 through 2010 patient-level billing
data from Medi-Cal, California's state Medicaid program, to evaluate the incidence of
complications after abortion, including medical abortion.  Major complications were
defined as those which required hospitalization, surgery or blood transfusion. There
were 11,319 medical abortions, with 35 women (0.31%) having a major complication.

Winikoff (2012)[19] provides data on other serious adverse events through 70 days.
Regarding hospitalization, there were zero hospitalizations among 350 women receiving
medical abortion at 64-70 days compared with 2/379 women at 57-63 days (0.5% rate).
There were no serious infections in the 64-70 day group, compared with 1/379 (0.3%
rate) in the 57-63 day group. There was one transfusion (1/350=0.3% rate) in the 64-70
day group, compared with 2/379 (0.5% rate) in the 57-63 day group.


**Reviewer comments:**

                                                                              (b) (4)

**. Serious adverse events including
death, hospitalization, serious infection, bleeding requiring transfusion and
ectopic pregnancy with the proposed regimen are rarely reported in the literature.
The rates, when noted are exceedingly rare, with rates generally far below 1.0%
for any individual adverse event. This indicates that medical abortion with the
proposed regimen up through 63 days is safe.**

---

[55] Upadhyay UD, Desai S, Lidar V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of
emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.

FDA 0583

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Serious fatal or nonfatal adverse events in the 64-70 days gestation group, were evaluated in one US study (Winikoff 2012)[19].  This study with 379 women in the 64-70 day range is reassuring in that the rates of hospitalization, serious infection and transfusion are no higher than in the lower gestational age ranges.  Based on the available safety data on medical abortion in totality, it appears that serious fatal or nonfatal adverse events are very rare through 70 days as well.  This regimen should be approved for use through 70 days gestation.**

**Reviewer's Final Recommendation:**

**The regimen of mifepristone 200 mg followed by misoprostol 800 mcg buccally in 24-48 hours is safe to approve for use through 70 days gestation.**

## 7.3.3  Dropouts and/or Discontinuations

The studies included in this safety review revealed a wide range of loss to follow-up, from 0.6% loss to follow-up in the study with telephone follow-up (Ngoc 2014[16]) to 22% in the Grossman[36] study using telemedicine to deliver medical abortion services. One study noted no differences in demographics between the subjects on whom follow-up was available, compared with those on whom no follow-up information was available. Only two studies evaluated other subgroups of  women lost to follow-up. Gatter et al 2015[13] found a higher odds of loss to follow-up with age <18 and with income at or below the federal poverty level.  Additionally they noted increased odds of loss to follow-up with increasing gestational age.  As compared with women 43-49 days gestation, the Odds Ratio (OR) for loss to follow-up at 50-56 days was 1.17 (95% CI 1.05-1.31) and at 57-63 days was 1.28 (95% CI 1.10-1.48). The Boersma study[22] had a 7% loss to follow-up rate. The rate of loss to follow-up was 6.5% at ≤ 49 days, 7.6% at 50-63 days and 7.7% at 64-70 days. No tests for significance were applied to these numbers.  Only one study reported on withdrawals: Winikoff 2012[19] reported that 0.27% of patients withdrew and noted this was similar to rates previously reported in the literature.

**Reviewer comment:**

**There is a wide range of loss to follow-up in the studies submitted with the efficacy supplement. The loss to follow-up rate cannot be reliably linked to method of follow-up, though it is notable that the lowest rate of loss-to-follow-up occurred in the Ngoc trial with telephone follow-up (0.6%) and the highest with abortion services provided via telemedicine (22%). The range of loss to follow-up is well-within the range documented in literature covering real-world abortion practice.[1]**

## 7.4  Significant Adverse Events

The label for misoprostol currently includes a boxed warning against the use past 8 weeks gestation, due to the risk of uterine rupture. The (b) (6) safety reviewer and

57

Reference ID: 3909590

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

(b) (6) conducted separate literature searches on this topic. Chen et al 2008[56] evaluated 488 women with a mean gestational age of 7.8 weeks who received 800 mcg misoprostol as part of a randomized study of misoprostol vs. curettage for early pregnancy failure. They found that 78 (16%) of women in the misoprostol group had previous uterine surgery (>1 C-section or myomectomy). There were no uterine ruptures in that study. Gautam et al[57] reported in 2003 on 66 women up to 60 days' gestation and with previous Caesarean section scar, who received misoprostol 800 mcg for termination and found no uterine ruptures. The literature search also revealed five case reports of uterine rupture.[58, 59, 60 , 61, 62] Of these five cases, three occurred with combined mifepristone/misoprostol dosing.  Four women had uterine scars, most commonly from at least one prior cesarean section, and one of them had had a prior uterine rupture in labor. Only one woman had no prior uterine scar (Willmott). In these case reports and studies, women received varying doses of misoprostol ranging from 400 mcg to 600 mcg to 800 mcg, and in two, the women received multiple doses of misoprostol (4 and 5 doses in the Wilmot and Bika reports respectively). The women required surgery to repair the uterus or hysterectomy and transfusion. See Table 15.

APPEARS THIS WAY ON ORIGINAL

---

[56] Chen BA, Reeves MF, Creinin MD, Gilles JM, Barnhart K, Westhoff C, Zhang J. National Institute of Child Health and Human Development Management of Early Pregnancy Failure Trial. Am J Obstet Gynecol 2008;198(6):626. d1-5 doi: 10.1016/j.ajog.2007.11.045. Epub Feb 15, 2008.

[57] Gautam R, Agrawal V. Early medical termination pregnancy with methotrexate and misoprostol in lower segment cesarean section cases. J Obstet Gynaecol Res 2003; 29(4):251-256.

[58] Khan S, et al. Uterine rupture at 8 weeks' gestation following 600 µg of oral misoprostol for management of delayed miscarriage. J Obstet Gynaecol 2007;27(8):869-870.

[59] Kim JO, et al. Oral misoprostol and uterine rupture in the first trimester of pregnancy: A case report. Reproductive Toxicology 2005;20:575–577.

[60] Jwarah E, Greenhalf JO. Rupture of the uterus after 800 micrograms misoprostol given vaginally for termination of pregnancy. BJOG 2000;107:807.

[61] Bika O, Huned D, Jha S, Selby K. Uterine rupture following termination of pregnancy in a scarred uterus J Obstet Gynaecol 2014;34(2):198-9. doi: 10.3109/01443615.2013.841132.

[62] Willmott F, et al. Rupture of uterus in the first trimester during medical termination of pregnancy for exomphalos using mifepristone/misoprostol. BJOG 2008;115:1575-1577.

FDA 0585

Reference ID: 3909590

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 15: Uterine Rupture with Misoprostol Case Reports**

| Study | GA (weeks) | Mifepristone used? | Dose of Misoprostol | Number of doses of misoprostol | Risk Factor for Rupture |
|---|---|---|---|---|---|
| Khan[58] | 8 | Yes; dose not specified | 600 mcg | 1 | 1 prior C-section, 1 prior uterine rupture at 32 weeks |
| Kim[59] | 8 | No | 400 mcg | 1 | 1 prior C-section |
| Jwarah[60] | 8 2/7 | No | 800 mcg | 1 | 1 prior C-section |
| Bika[61] | 10 2/7 | Yes; 200 mg | 800 mcg x 2 doses then 400 mcg x 2 doses | 4 | 2 prior C-sections |
| Willmott[62] | 12 3/7 | Yes; 200 mg | 400 mcg | 5 | none |

Source: NDA clinical reviewer table.

(b) (6) also conducted a review of FAERS cases from January 1,1965 through October 15, 2015 for reports of uterine rupture with mifepristone alone, misoprostol alone, or a combined regimen, with special interest in cases occurring in women ≤ 10 weeks pregnant (≤ 70 days). The FAERS search retrieved 80 cases of uterine rupture, with 77 citing misoprostol use alone and 3 citing both mifepristone and misoprostol use. No cases of uterine rupture were reported with mifepristone use alone. Vaginal administration of misoprostol was documented in the majority of the cases. The majority of the FAERS cases either occurred in the 3rd trimester of pregnancy, or did not report gestational age. In the cases where the gestational age was not reported, it is likely that most of these cases occurred during the 2nd or 3rd trimester, as many noted the induction of labor as the reason for misoprostol use. The majority of cases also noted at least one additional potential risk factor, with a history of at least one previous c-section, or the use of additional uterotonic drugs (e.g., oxytocin or dinoprostone) being the most commonly reported. The use of misoprostol during the 3rd trimester for the induction of labor, cervical ripening, or both, in women that had at least one previous c-section, was also documented in many cases.

There were only two cases (2.5% of all reports) that reported uterine rupture within the first 10 weeks of pregnancy.  In both cases, misoprostol alone was utilized for termination of pregnancy.  The first case provided minimal information other than documentation of a 5 week gestation, and an ultrasound noting "an important uterine separation" during an unspecified time after misoprostol (route not specified) administration.  The remaining case was also a published case report in which uterine rupture was documented as occurring approximately 2.5 hours after 800 mcg of misoprostol was administered vaginally for cervical preparation prior to surgical termination of pregnancy.  The patient was 8 weeks and 2 days pregnant, had a history of a prior c-section, and was of advanced maternal age.  (b) (6) concluded that uterine

59

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

rupture associated with the use of mifepristone alone, misoprostol alone, or both, is likely a rare event in the 1st trimester.

**Reviewer comment:**

**Based on the scarcity of reported cases in the first trimester of pregnancy, uterine rupture associated with early medical abortion using mifepristone with or without misoprostol is likely rare. There are a three reports of uterine rupture with mifepristone and misoprostol in the first trimester, most of which occurred in women with prior uterine surgery (e.g., a cesarean section).**

## 7.4.1 Submission-Specific Primary Safety Concerns

**Summary of requested dosing changes in the NDA Supplement that could affect safety:**

1. **Proposing a new dosing regimen that uses mifepristone 200 mg oral and the buccal administration of 800 mcg misoprostol at 24-48 hours after Mifeprex and increasing the gestational age from 49 days to 70 days**

   The Applicant submitted several articles in support of the proposed dosing regimen as well as increasing the gestational age through 70 days using the proposed regimen, including the 24-48 hour interval.  See Section 7.3 Major Safety Results for fatal and nonfatal serious adverse events reported with the proposed regimen and gestational age. The data submitted show these events to be exceedingly rare, indicating that the new dosing regimen and increasing the gestational age to 70 days is safe.  Please see Section 7.3 Major Safety Results on Nonfatal Serious Adverse Events for a review of this information.

   In further support of changing the dosing interval for misoprostol to 24-48 hours after mifepristone is taken, the Applicant also provided a systematic review by Shaw et al.[63]  In this study the authors searched Medline, ClinicalTrials.gov, Popline and the Cochrane Controlled Trials Register and included 20 randomized controlled trials and 9 observational studies.  The majority of the studies used the proposed 200 mg dose of mifepristone, but three RCTs and two observational studies used 600 mg of mifepristone.  The doses and route of misoprostol administration varied, including doses of 400 mcg, 600 mcg, and 800 mcg, some with repeat doses, and included vaginal, buccal, oral and sublingual routes.  There was wide variation in time to administration of the misoprostol, ranging from <24 hours, 24-48 hours, 36-48 hours.  Adverse events were not reported consistently.  There was no statistically significant difference in nausea, vomiting or diarrhea.

---

[63] Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.

FDA 0587

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Reviewer comment:**

**Unlike the efficacy data, which is based on studies that look specifically at individual changes proposed by the Applicant, the adverse event data typically come from studies or reviews that include multiple changes (e.g., dose of each drug, dosing interval, gestational age) simultaneously.  Therefore, it is not possible to provide safety data specific to each individual change.**

**The changing of the dosing interval to 24-48 hours does not appear to increase the risk of serious fatal or nonfatal adverse events or to increase the risk of common adverse events associated with medical abortion.**

**Reviewer's Final Recommendation:**

**Based on the available evidence, changing the dosing interval between mifepristone and misoprostol to 24-48 hours is safe to approve, including for use in gestations up through 70 days.**

2.  **Home administration of misoprostol**

Currently, the Dosage and Administration section of labeling for Mifeprex requires that patients return to the healthcare provider on Day 3 (two days after ingesting Mifeprex) for misoprostol. The Applicant proposes that the label be changed to allow for home administration of the misoprostol. The Applicant reasons that all published US trials after the initial trial by Spitz et al[26], as well as numerous international trials, included distribution of misoprostol for self-administration at home with evidence of safe and effective medical abortion. The Applicant also emphasizes that women usually start having bleeding within two hours of administration of the misoprostol and home administration gives the opportunity for more privacy in the process.

The Applicant submitted many articles to support this change.  See Table 8 for US and foreign studies that enrolled over 30,000 women who administered misoprostol at home.  None of the studies directly compare home versus clinic/office administration of misoprostol.  Most of the studies include protocols where all of the subjects take misoprostol at home. Gatter[13] and Ireland[15] reported separately on large numbers of clients of Planned Parenthood Los Angeles (13,373 and 13,221 clients respectively, though likely with some overlap, in 2010-2011), while Winikoff (2012[19] and 2008[23]), Grossman[36], Creinin[25] and Middleton[24] reported on smaller numbers of US subjects. Internationally, Goldstone[20] reported on 13,345 medical abortions, while Kopp Kallner[64], Løkeland[65], Chong (2012)[40], Bracken[49], Pena[44],

---

[64] Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

[65] Løkeland M, Iversen OE, Engeland A, Økland I. Medical abortion with mifepristone and home administration of misoprostol up to 63 days' gestation. Acta Obstet Gynecol Scand 2014;93:647-653.

FDA 0588

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

Ngoc[16], Louie[14],  Sanhueza Smith[48], Boersma[22] and Lynd[66] report on smaller numbers of subjects.  All of these studies have been reviewed above in Sections Deaths, Nonfatal Serious Adverse Events and Common Adverse Events. This information shows that home administration of misoprostol, as part of the proposed regimen, is associated with exceedingly low rates of serious adverse events, and with rates of common adverse events comparable to those in the original studies of clinic administration of misoprostol.

Swica et al[50] similarly conducted a non-randomized trial with 301 US women, 139 of whom chose home use of mifepristone and misoprostol and 162 of whom chose clinic administration of mifepristone followed by home use of misoprostol.  The majority of women (74%) who chose home use took the mifepristone at the appointed 6-48 hour window; for those who took it at a different time than that planned with their provider, the median interval was 25 hours. Over 90% of women in both groups took the misoprostol at the scheduled time, and none waited past 72 hours to take the misoprostol.  There were no significant differences in the mean number of days of work or school missed or dependent care needed.  Most women made no additional calls (85% for home use group and 90% for office use group) or unscheduled visits to the doctor's office (96% for home use group and 99% for office use group).

The Applicant also submitted a commentary by Gold and Chong[67], in which they discuss benefits of home administration of Mifeprex and misoprostol.  They cite the convenience of scheduling for women, the possibility of greater autonomy and privacy, the lack of burden on staff, and the safety.

**Reviewer comment:**

**Home use of misoprostol has been evaluated as part of the proposed protocol in studies including well over 30,000 patients, as well as in dedicated studies of home use of mifepristone and misoprostol. The studies demonstrate that women take the misoprostol at the recommended time. The safety profile is acceptable, with rates of adverse events equal to or lower than those with the approved regimen requiring in-office dispensing of misoprostol. The studies, including those of home use of mifepristone and misoprostol, show increased convenience, autonomy and privacy for the woman, a smaller impact on their lifestyles, and no increased burden on the healthcare system. The safety data on the home use of misoprostol are adequate to support revision of labeling.**

---

[66] Lynd K, Blum J, Ngoc NTN, Shochet T, Blumenthal PD, Winikoff B. Simplified medical abortion using a semi-quantitative pregnancy test for home-based follow-up. Int J Gynecol Obstet 2013;121:144-148.

[67] Gold M, Chong E. If we can do it for misoprostol, why not for mifepristone? The case for taking mifepristone out of the office in medical abortion. Contraception 2015;92:194-196.

62

Reference ID: 3909590

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Reviewer's Final Recommendation:**
**Based on the available data, home use of misoprostol is safe to approve.**

3.  **Repeat dose of misoprostol if needed.**

The Applicant reasoned that studies include an option for a repeat dose of misoprostol to allow women to avoid a surgical procedure if possible and that this is a safe way to treat an incomplete medical abortion.  The Applicant submitted two articles on the repeat use of misoprostol, one randomized trial and one systematic review, that were relevant to this safety review (other articles[12, 17, 22] did not present safety data stratified by number of misoprostol doses).  Only one randomized trial reviewed the safety of repeat misoprostol.  Coyaji et al[68] conducted a randomized controlled trial of 300 women seeking medical abortion in India.  After taking mifepristone, women in one group took 400 mcg misoprostol followed by placebo 3 hours later, while women in the other group took two doses of 400 mcg misoprostol 3 hours apart.  As discussed in the efficacy portion of this review, there was no significant difference in the complete abortion rate between the groups; however, the repeat misoprostol reduced need for surgical intervention.  Before discharge home, there was no significant difference in the adverse effects observed—similar percentages of women experienced cramping (87% in the single dose group, 89% in the repeat dose group), nausea (both groups 1%), vomiting (both groups 0%), and diarrhea (0% in the single dose group versus 2% in the repeat dose group).  More women in the repeat dose arm experienced moderate to severe cramping than women in the single dose arm on Day 4 (24% versus 15%, p=0.032) and on Day 7 (10% versus 4%, p=0.006).

Gallo[69] performed a systematic review of data relating to the safety and efficacy of more than one dose of misoprostol after mifepristone for medical abortion.  The search yielded three randomized controlled trials that studied medical abortion ≤ 63 days.  The studies included doses of mifepristone ranging from 200 mg to 600 mg followed by misoprostol 6 to 48 hours later, in doses ranging from 400 mcg to 800 mcg via the oral, sublingual or vaginal routes. In two trials, all subjects received repeat misoprostol—in one, three hours later, while in the other study subjects received misoprostol twice a day for days 4-10.  In the third trial, subjects only received repeat misoprostol if there was still a gestational sac present.  The only side effects discussed in the trials were diarrhea, which was more common in those groups receiving misoprostol orally than in those receiving it exclusively vaginally (26-27% versus 9%).  Rash was reported <1%.

There is a good deal of literature on the use of misoprostol alone for medical abortion and in those regimens, doses of up to 800 mcg repeated in three hours have been

---

[68] Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278.

[69] Gallo MF, Cahill S, Castleman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41.

FDA 0590

(b) (6)  and                                    (b) (6)

NDA 020687/S-020-  Mifeprex

used.  In a study by Blum et al[70], misoprostol only, given as two doses of 800 mcg three hours apart, was compared to mifepristone-misoprostol medical abortion where only one dose of 800 mcg misoprostol was administered.  The two groups had similar rates of nausea, vomiting, fever and chills. Subjects in the repeat misoprostol group had more diarrhea than in the mifepristone-misoprostol group (83.9% vs. 61.2%, p<0.001). Please see Section 7.4 Significant Adverse Events for additional discussion on safety concerns with repeat doses of misoprostol.

**Reviewer comment**:

**There are few articles concerning the safety of repeat misoprostol after mifepristone administration. Generally, the success of mifepristone-misoprostol medical abortion renders the need for a second dose of misoprostol to be relatively uncommon. In studies of misoprostol alone given using a single repeat dose, there is an increased risk of the common adverse event of diarrhea. There have been rare reports of uterine rupture in women with a prior uterine scar who receive repeated doses of misoprostol.**

**Reviewer's Final Recommendation**:

**Based on the available data, the option for repeat misoprostol in women whose pregnancy has been terminated, but who have not completely expelled the pregnancy is safe and should be approved.  For women whose pregnancy is ongoing at follow-up, surgical intervention is recommended, rather than repeated misoprostol.  The rare reports of uterine rupture in women with a prior uterine scar who receive repeated doses of misoprostol is discussed in labeling.**

4.  **Follow-up timing and method: follow-up is needed, but not necessarily in the clinic or licensed healthcare provider's office at 14 days after mifepristone administration**

The Dosage and Administration section of the current approved label for Mifeprex stipulates that patients will return for a follow-up visit approximately 14 days after the administration of Mifeprex to confirm by clinical examination or ultrasonographic scan that a complete termination of pregnancy has occurred. The Applicant acknowledges that follow-up is important to diagnose and treat complications, and to ensure complete abortion or identify ongoing pregnancies.  However, the Applicant proposes to change the labeling to state that the provider should perform an assessment at 1-2 weeks, in order to broaden the timeframe and method used, to give patients and providers more flexibility and reduce loss to follow-up rates.  Use of ultrasound, serum and urine pregnancy testing (semi-quantitative, and quantitative) and telephone calls have all been evaluated in the literature as options for follow-up of patients after medical

---

[70] Blum J, Raghavan S, Dabash R, Ngoc NTN, Chelli H, Hajri S, Conkling K, Winikoff B. comparison of misoprostol-only and combined mifepristone-misoprostol regimens for home-based early medical abortion in Tunisia and Vietnam. Int J Gynecol Obstet 2012;118:166-171.

Reference ID: 3909590

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

abortion. Grossman and Grindlay[71] conducted a systematic review of the literature on alternatives to ultrasound for medical abortion follow-up.  They identified eight studies, but found that outcomes of interest (ongoing pregnancy) were rare with medical abortion and not consistently defined across studies.  Nonetheless, they found that serum hCG, a low sensitivity urine pregnancy test combined with a standardized assessment with multiple questions about women's symptoms, or standardized telephone follow-up, perhaps followed by high-sensitivity urine pregnancy test, all had sensitivities ≥90% and negative predictive values (NPVs) ≥99% and they resulted in a proportion of "screen positives (or women who had a self-assessment of ongoing pregnancy and had an unscheduled visit) ≤33%."

This reviewer analyzed relevant studies that were submitted by the Applicant and referenced in the Grossman and Grindlay assessment.[71]  Perriera et al[21] conducted a prospective cohort study of 139 US women with ≤63 days gestation undergoing medical abortion at one center.  Up to three attempts were made to phone subjects 7 days after taking mifepristone. The subjects were asked to confirm when they took misoprostol and generally to describe their experience. They were then asked a series of five standardized questions to assess for expulsion, including:

1  Did you have cramping and bleeding heavier than a period?
2  Did you pass clots or tissue?
3  What was the highest number of pads you soaked per hour?
4  Do you still feel pregnant now?
5  Do you think you passed the pregnancy?

If the clinician or the subject did not think the pregnancy had passed, the subject was asked to return to the center for an ultrasound within 7 days.  If there was an ongoing pregnancy, women were offered additional misoprostol or a D&C. If the clinician and subject believed the pregnancy had passed, she was instructed to begin birth control or schedule a visit for injectable, implantable or intrauterine contraception.  On Day 30, the subject was to perform a urine pregnancy test.  Follow-up was obtained for 97.1% of subjects.  Four subjects did not complete follow-up (2.9%)—one was never reached by phone, three were and two of them had positive pregnancy tests while one had an inconclusive test.  These three never returned for an in-person visit and outcomes are not available on them.  The sensitivity for correctly predicting an expelled pregnancy (completed abortion) was 95.9%, specificity was 50%, positive predictive value 97.5% and negative predictive value 37.5%.  This study suggests that clinicians and subjects are almost always correct when they believe a pregnancy has passed.  The loss to follow-up rate was not higher than for standard medical abortion follow-up.

Fiala et al[72] compared hCG with ultrasound for verification of completed abortion in 217 women ≤49 days with intrauterine pregnancy in Scotland. Successful expulsions were

---

[71] Grossman D, Grindlay K. Alternatives to ultrasound for follow-up after medication abortion: a systematic review. Contraception 2011;83:504-510.
[72] Fiala C, Safar P, Bygdeman M, Gemzell-Danielsson K. Verifying the effectiveness of medical abortion;

65

Reference ID: 3909590

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

consistent with a marked decline in hCG values at follow-up. Using 20% of the initial value as cut-off at follow-up gave a high sensitivity.  It allowed correct diagnosis in 98.5% of the patients with successful expulsion.  When 20% of the initial hCG value was used as cut-off, a positive predictive value for successful expulsion was 99.5%.  If the reduction of the hCG level was less than 80%, the negative predictive value was 50% and further evaluation was warranted.  By contrast, the reliability of ultrasound examination in diagnosing successful expulsion was 89.8%.

Lynd et al[66] studied 300 women at ≤ 63 days gestation who underwent medical abortion in Vietnam. Women were given mifepristone and sent home with misoprostol and a semi-quantitative urine pregnancy test, a urine cup, instructions and a questionnaire. They were to take the urine test, record their impression of the results and complete the questionnaire on the morning of an in-person follow-up visit 2 weeks after mifepristone administration. Fifty-four women (18.5%) still felt pregnant at the follow-up visit, but only 11 of the semiquantitative urine tests indicated ongoing pregnancies. All 11 correctly identified ongoing pregnancies, with 100% sensitivity and 89.7% specificity. Ten of the 11 women with an ongoing pregnancy understood in-person follow-up was necessary.

Similarly, Cameron et al[73] reported on 1791 women undergoing medical abortion in Scotland, 1,726 (96%) of whom chose self-assessment with a low-sensitivity urine pregnancy test, instructions on how to interpret it, and signs/symptoms of ongoing pregnancy. The rest of the women chose in-clinic follow-up with an ultrasound or a phone call. Eight women in the self-assessment group had ongoing pregnancies, but only four of them had a positive low-sensitivity pregnancy test at the appointed time— within 4 weeks. Of the four who did not follow up in 4 weeks, two had a positive or invalid pregnancy test within two weeks after the medical abortion and should have presented for care, and two reported their pregnancy test was negative and did not present for care. All has successful termination either with repeat medical dosing or surgical aspiration. Most women presented within four weeks, but two women presented only after two missed menses. The delayed follow-up was not different from that for an in-person visit or an ultrasound.

**Reviewer comments**:

**While the number of articles is not extensive, they include almost 2,400 subjects. The Applicant demonstrates that alternatives to in-clinic follow-up are effective and safe, detecting most of the ongoing pregnancies so that women can get needed treatment.  It appears that, using standardized questionnaires or instructions or a telephone call along with a low or high sensitivity pregnancy test, ongoing pregnancies can be detected allowing for further treatment.  There is some loss-to-follow-up, but the rates do not appear to exceed those associated**

ultrasound versus hCG testing. Eur J Obstet Gynecol Reprod Biol 2003;109;190-195.
[73] Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11.

66

FDA 0593

Clinical Review

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

with a planned in-clinic follow-up.  Women should be allowed to have an in-person visit if desired, but also allowed the flexibility of other options if desired.

It is important to note that since 2005, Planned Parenthood Federation of America has waived the follow-up visit if it poses undue hardships owing to distances from abortion facilities or other reasons, and women manage their follow-up with serial hCG testing.[74]  From the clinical reviewers' perspective, this is safe and acceptable.  We further note that the NAF 2015 guidelines (page 23) state the following:

> "Success of the medical abortion must be assessed by ultrasonography, hCG testing, or by clinical means in the office or by telephone.  If the patient has failed to follow-up as planned, clinic staff must document attempts to reach the patient.  All attempts to contact the patient (phone calls and letters) must be documented in the patient's medical record."

The ACOG 2014 Practice Bulletin[1] on management of early MAB states "Follow-up after receiving mifepristone and misoprostol for medical abortion is important, although an in-clinic evaluation is not always necessary."  Several options for follow up without an office/clinic visit are discussed and no specific method or algorithm is definitely recommended (i.e., it is left to the discretion of the provider and patient).

<u>Reviewer's Final Recommendation</u>:
Based on the available evidence, flexibility in the timing and method of follow-up is safe to approve.

## 7.5  Supportive Safety Results

## 7.5.1 Common Adverse Events

According to the currently approved Mifeprex label,[75] common adverse events include the following:

- Vaginal bleeding up to 16 days, with 8% of women experiencing bleeding up to 30 days. 4.8% of women in the original US trials and 4.3% in the original French trials required administration of uterotonic agents to control the bleeding. Only 1% of women required intravenous fluids and 1% required curettage.  In the original French trials, 5.5% of women had a drop in hemoglobin of more than 2 g/dL.
- Abdominal pain in 96% of US women
- Uterine cramping in 83% of French women
- Nausea in 43-61%, vomiting in 18-26%

---

[74] Fjerstad M. Figuring out follow-up. Mife Matters. Planned Parenthood Federation of America/Coalition of Abortion Providers 2006;13:2–3.

[75] http://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.htm

FDA 0594

Clinical Review

(b) (6)  and                                      (b) (6)
NDA 020687/S-020-  Mifeprex

- Diarrhea in 12-20%
- Headache in 2-31%
- Dizziness in 1-12%

A review of the literature submitted in the efficacy supplement, which includes Mifeprex at the proposed dose but also includes misoprostol administered buccally, vaginally or orally, reveals the following. Table 16 addresses bleeding that did not require transfusion (which is covered inTable 14: Transfusion by Gestational Age above), but was still significant in terms of requiring another intervention or in terms of a decrease in measured hemoglobin.  Most of the studies include subjects up to 63 days' gestation, with the exception of Middleton 2005[24], which includes subject to 56 days, and Sanhueza Smith 2015[48] and Winikoff 2012[19], which include subjects through 70 days.

**Table 16: Bleeding and Cramping in Literature**

| Study | N | Maximal Gestational Age | Route of misoprostol administration | Adverse Event Rate (%) | | |
|---|---|---|---|---|---|---|
| | | | | Bleeding requiring intervention* | Bleeding with drop in hemoglobin > 2g/dL | Cramping/pain |
| Middleton 2005[24] | 216 | 56 d | buccal | 4.2 | NR | NR |
| Coyaji 2007[68] | | | | | NR | 87-89 |
| Løkeland 2014[65] | | | | 4.9 | NR | 96.6 |
| Kopp Kallner 2010[64] | 395 | 63 d | vaginal | 0.5 | NR | NR |
| Pena 2014[44] | 971 | 63 d | Buccal | 1.7 | NR* | NR |
| Ngoc 2014[16] | 1433 | 63 d | buccal | 0.07 | NR | NR |
| Gatter 2015[13] | 13,373 | 63 d | buccal | 1.8 | NR | NR |
| Ireland 2015[15] | 13,221 | 63 d. | buccal | 1.8 | NR | NR |
| Winikoff 2012[19] | 729 | 70 d | buccal | 1.1 | NR | NR |
| Sanhueza Smith 2015[48] | 960 | 70 d | buccal | 1.7 | NR | NR |

*Intervention includes aspiration or uterine evacuation, use of uterotonics, intravenous fluids
*NR=not reported
Source: NDA clinical reviewer table.

**Reviewer Comments:**

**Given that Mifeprex and misoprostol are taken to terminate an intrauterine pregnancy, vaginal bleeding and cramping or abdominal pain are an expected**

68

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**and necessary part of the process; therefore, these should only be considered adverse events if the amount of bleeding or pain exceeds what would be expected for such a process. The rate of bleeding requiring intervention is low and ranges from 0.5% to 4.2%, with the rates in the largest studies being around 1.8%.  Two articles parsed the bleeding requiring intervention by gestational age. In Sanhueza Smith et al.[48] the rate was 1.1% (7/622)  among women ≤ 56 days, 4.2% (8/190) in women 57-63 days and 1.4% (2/148) in women 64-70 days. In Gatter 2015[13], the rate  was 0.65-1.43%  up to 49 days, 2.04% in women 50-56 days, and 2.49% in women 57-63 days. These differing numbers from the two studies do not reveal a trend toward bleeding requiring intervention with increasing gestational age, specifically even through 70 days.**

**No articles submitted discussed a drop in hemoglobin of > 2 g/dL, most likely because routine laboratory studies are not obtained in medical abortion unless anemia or a medical illness is reported or suspected.  Also not surprisingly, pain and cramping are an expected part of the medical abortion process, so most studies do not comment on the percentage of women who experience this.**

APPEARS THIS WAY ON ORIGINAL

69

FDA 0596

Clinical Review

NDA 020687/S-020- (b)(6) and (b)(6) Mifeprex

## Table 17: Common Adverse Events in Literature

| Study | N | Maximal GA (days) | Route of Misoprostol | Adverse Event Rate (%) | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | nausea | vomiting | diarrhea | fever | chills | headache | dizziness | weakness |
| Middleton 2005[24] | 216 | 56 d | Buccal | 70 | 37 | 36 | 42 | NR | 44 | 41 | 51 |
| Blum 2012[70] | | | buccal | 45.9 | 37.8 | 61.2 | 28.2 | 30.6 | | | NR |
| Coyaji 2007[68] | | | | 1 | 0-2 | NR* | NR | NR | | | NR |
| Kopp Kallner 2010[64] | 395 | 63 d | vaginal | 87.1 | 57.3 | 6.3 | 26.3 | NR | 4.1 | 3.6 | 2-3.1 |
| Louie 2014[14] | 860 | 63 d | buccal | 38-53 | 13-25 | 1-3 | 15-23† | | | | NR |
| Pena 2014[44] | 971 | 63 d | buccal | NR | NR | 7.8 | 8.9† | † | NR | NR | 14.3 |
| Creinin 2007[25] | 544 | 63 d | vaginal | 9.4 | 5.7 | 4.8 | 10.3† | † | 6.6 | 6.8 | NR |
| Chong 2012[10] | 563 | 63 d | buccal | 47 | 22 | NR | 33† | † | 33 | 24 | 42 |
| Winikoff 2012[19] | 618 | 70 d | buccal | 50.8 | 40.6 | 17.6 | 11.2 | 23.5 | NR | NR | NR |
| Sanhueza Smith 2015[8] | 960 | 70 d | buccal | 27 | 23 | 44.6 | 46† | † | 14.3 | 9.7 | 21 |

GA = gestational age; *NR= not reported.  † includes fever and chills, which were grouped together

Source: NDA clinical reviewer table.

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

**Reviewer comment:**

**The range of reported percentages for each adverse event is wide, with some studies reporting virtually no patients experiencing nausea, vomiting or diarrhea, while others report at least half of subjects suffering these side effects. Only the Winikoff 2012[19] article parses out these side effects by gestational age (57-63 days versus 64-70 days). There is no statistically significant difference in the rates of any side effect between gestational age group except for vomiting, where 35.8% of women 57-63 days had vomiting and 45.7% of women 64-70 days did (p=0.008).  It is hard to determine a value that could be used in labeling based on these wide variations, but the adverse events are common, expected and well-known with the medical abortion regimen and the ranges should be reported in labeling.**

## 7.5.2  Laboratory Findings

Mifepristone with misoprostol is a well-established regimen for termination of pregnancy.  Few laboratory tests are necessary before use of the regimen. Those that are commonly performed include confirmation of pregnancy (urine or serum pregnancy testing) as well as Rh testing (unless it has been previously documented), such that RhD immunoglobulin can be administered as indicated. Pre-medical abortion assessment of hemoglobin or hematocrit is indicated when anemia is suspected. Routine follow-up laboratory testing is also not indicated unless dictated by the patient's clinical condition, for example, heavy bleeding or signs of infection.  Lab results are not typically reported in the literature, except for when studies look at decreases in hemoglobin related to bleeding.

## 7.5.3  Vital Signs

Vital signs are not typically reported in the literature on medical abortion.

## 7.5.4  Electrocardiograms (ECGs)

Mifepristone used with a prostaglandin analogue has been approved for medical termination of pregnancy since 1988 in France and subsequently in many countries around the globe.  It has been well-established that doing an ECG prior to MAB is not standard procedure.  It can be done if individual circumstances warrant its use. Literature does not typically report on ECGs.

## 7.5.5  Special Safety Studies/Clinical Trials

The pediatric studies are addressed in Section 7.6.3.

## 7.5.6  Immunogenicity

NA to this review

## 7.6  Other Safety Explorations

This section is not relevant to this application.

71

FDA 0598

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

## 7.6.1  Additional Safety Evaluations

## 7.6.2  Human Carcinogenicity

The Applicant submitted no new data on human carcinogenicity.

## 7.6.3  Human Reproduction and Pregnancy Data

As noted in the efficacy portion of this review, some women who use Mifeprex do have ongoing pregnancies.  Most of these are treated with an aspiration or a surgical evacuation of the uterus; there is little information on outcomes of ongoing pregnancies not terminated by another method. At the time of approval of the drug, the Applicant agreed to two postmarketing commitments, including one to conduct a surveillance study of the outcomes of ongoing pregnancies. On January 11, 2008, the Applicant was released from this commitment due to the lack of an adequate number of women enrolled.  The Applicant explained that the small number was due, in part, to the requirement that the patients consent to participation *[in the surveillance study]* after seeking a pregnancy termination.

A review of all of the articles submitted by the Applicant for outcomes of ongoing pregnancies after mifepristone administration yielded minimal information.  There is one article reporting a case of a  fetus with sirenomelia, a cleft palate and lip, micrognathia, and hygroma; this infant was born to a woman who had received mifepristone as RU 486 at 18 weeks and was reported to Roussel-Uclef in France in 1989.[76] A prospective observational study[77] from fifteen French pharmacovigilance centers followed women exposed to mifepristone in the first trimester between1997 and 2010. The study included pregnant women who sought counseling on mifepristone exposure from a pharmacovigilance center or Paris Teratology Information Service (TIS).  A total of 105 pregnancies were exposed to mifepristone in the first trimester; 46 to mifepristone alone, and 59 to mifepristone and misoprostol. The mean gestational age at exposure was 7.9 weeks; 81% were exposed between weeks 5 and 9 of gestation. About 40% of patients received 200 mg of mifepristone while about 50% received 600 mg. Of the patients who received both mifepristone and misoprostol, 48 received repeat misoprostol with four receiving 1200–2000 mcg of misoprostol, a significantly higher dose than recommended. Among all exposed women, there were 94 live births (90.4%),10 (9.6%) miscarriages (including one with a major malformation of major hydrocephalus associated with adductus thumb and a normal karyotype) and one patient had an elective termination of pregnancy for the subsequent diagnosis of trisomy 21.  Eight of the ten miscarriages occurred in the mifepristone-only group; however, after potential confounding factors such as maternal age, gestational age at inclusion,

---

[76]  Pons JC, Papiernik E. Mifepristone teratogenicity. Lancet 1991;338(8778):1332-3.

[77]  Bernard N, Elefant E, Carlier P.Tebacher M, Barjhoux CE, Bos-Thompson MA, Amar E, Descotes J, Vial T. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG 2013;120:568–575.

72

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

drug exposure, and mifepristone dose were controlled for by logistic regression, the rate of miscarriage did not differ across mifepristone only versus mifepristone-misoprostol groups (p= 0.08).  Among the live births, the mean gestational age at delivery was 39.5 weeks and there was no difference in birth weights between groups. The overall rate of major congenital malformations among the 95 examinable cases was 4.2% (95% CI 1.2–10.4%), with two cases among 38 patients exposed to mifepristone alone, and two cases among 57 patients exposed to both mifepristone and misoprostol. Three of the four major congenital malformations occurred with exposure to 600 mg of mifepristone, while one occurred in exposure to 400 mg of mifepristone. The malformations included:

- Claude Bernard–Horner syndrome with stridor
- Hydrocephalus with triventricular dilatation and adductus thumb (miscarriage patient noted above)
- Möbius syndrome
- Retrognathism, slight cleft palate, trismus, swallowing disorder, club foot with four toes, incomplete genital development and mild hypoplasia of the cerebellar vermis

The authors posit that the cases of major malformations in patients exposed to mifepristone alone could be explained by associated medical conditions, for example, the case of congenital Claude Bernard Horner syndrome could have been related to traumatic vaginal delivery of a high birth weight newborn, a well-recognized cause of this syndrome, while the spontaneously aborted hydrocephalic fetus may have been caused by streptococcus B chorioamnionitis, which was subsequently confirmed on pathological examination, or be an X-linked hydrocephalus. The authors also note that the two cases of major malformations in patients exposed to both mifepristone and misoprostol were consistent with malformations described after exposure to misoprostol alone. The authors concluded that major malformations after first-trimester exposure to mifepristone is only slightly higher than the expected 2–3% rate in the general population, which was reassuring regarding the risk evaluation for continuation of pregnancy after mifepristone exposure.

There are reports that misoprostol can result in congenital anomalies when used during the first trimester, including defects in the frontal or temporal bones, limb abnormalities with or without Mobius syndrome.[1] The Korlym label notes in Important Safety Issues with Consideration to Related Drugs: "In a report of thirteen live births after single dose mifepristone exposure, no fetal abnormalities were noted."

**Reviewer Comment**:

**There are anomalies associated with the use of misoprostol in the first trimester. The risk of teratogenic effects with a continued pregnancy after a failed pregnancy termination with Mifeprex in a regimen with misoprostol is unknown. Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with Mifeprex in a regimen with misoprostol, but it is not clear if this just represents the usual background rate of birth defects.**

FDA 0600
Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**As discussed above, FDA requested at the time of initial approval that the Applicant conduct a surveillance study of the outcomes of ongoing pregnancies. The Applicant was subsequently released from this commitment because it had been unable to enroll a sufficient number of women with ongoing pregnancies after an attempted medical abortion in the surveillance study.**

## 7.6.4 Pediatrics and Assessment of Effects on Growth

The Applicant submitted no new data on assessment of effects on growth in pediatric patients.  The Applicant did submit data on efficacy and safety of medical abortion in adolescents, using the proposed regimen of 200 mg oral Mifeprex followed by 800 mcg buccal misoprostol 24-48 hours later at home, in order to satisfy requirements for PREA.  Gatter et al (2015)[13] included data on 322 adolescents. (b) (6), (b) (4)

(b) (6), (b) (4)          The adolescent efficacy was similar to that of all older women; this implies that compliance in taking the misoprostol dose properly at home was also acceptable.  The study included adolescents aged 11-16 per Table 18 below:

**Table 18: Age of Adolescents Undergoing Medical Abortion**

| Age | # Subjects |
|-----|-----------|
| 11 | 1 |
| 12 | 1 |
| 13 | 2 |
| 14 | 20 |
| 15 | 82 |
| 16 | 216 |

Source: (b) (6), (b) (4) NDA 20687s20

(b) (4), (b) (6) As is evident in the table, no adolescents had a hospitalization, severe infection or hemorrhage which required a transfusion.

**Table 19: Serious Adverse Events in Adolescents vs. Adults**

|  | Under 17 | 17+ | All |
|--|----------|-----|-----|
| Transfusion | 0.00% (0/251) | 0.03% (4/13,122) | 0.03% (4/13,373) |
| Hospitalization | 0.00% (0/251) | 0.05% (7/13,122) | 0.05% (7/13,373) |
| Infection | 0.00% (0/251) | 0.02% (2/13,122) | 0.01% (2/13,373) |

Source: (b) (6), (b) (4) NDA 20687s20

In 2011, Niinimäki et al[54] published a retrospective cohort study of the Finnish abortion registry from 2000-2006, in which they evaluated the rates of adverse events in 3,024

74



NDA 020687/S-020-  Mifeprex

adolescents and 24,006 adult women undergoing medical abortion (regimen unspecified). The study population included women ≤ 20 week's gestation; 84.6% of the adolescents were ≤ 12 weeks, while 86.6% of the adults were ≤ 12 weeks.  Adolescents ranged in age from 13-17, with a mean age of 16.1 years.  The study showed that after adjustment for parity, previous abortion, marital status, types of residence, duration of gestation and year of abortion, in adolescents, the adjusted ORs were significantly lower for hemorrhage (0.87, 95% CI 0.77 to 0.99), incomplete abortion (0.69, 95% CI 0.59 to 0.82) and surgical evacuation (0.78, 95% CI 0.67 to 0.90) compared to adults. There was no significant difference in the OR for infection (0.97, 95% CI 0.73 to 1.30).

Phelps[53] had previously conducted a pilot study in 28 adolescents aged 14-17, at ≤ 56 days gestation, using Mifeprex 200  mg followed 48 hours later by misoprostol 800 mcg vaginally.  As reported in Section Subpopulations, 100% of study subjects had a complete abortion, with five not requiring misoprostol. There were no serious adverse events.  Subjects noted common expected adverse events including bleeding (100%), cramping (95%), nausea (62%), and vomiting (43%).

It is also important to consider adherence to the proposed regimen (including taking misoprostol at a location other than the clinic) and adherence to follow-up among adolescents versus adults.

There are no data specifically comparing adherence to the regimen among adolescents <17 with women ≥17 years old. The Gatter[13] study clearly demonstrates the efficacy and safety is the same for both age groups, suggesting that there is no clinically significant difference in adherence to the regimen between age groups. The Goldstone[20] article included 8 subjects aged 14 and 931 subjects aged 15-19. The efficacy and safety are not separated out by age; however, all subjects did take the proposed regimen and overall efficacy and safety is reassuring, indicating that adolescents and adults alike likely did adhere to the mifepristone and misoprostol regimen in a safe and effective way.

Regarding adherence to follow-up, four articles included 346 subjects <17 years old. Ngoc[16] is based in Vietnam and Cameron[73] is based in Scotland, while  Gatter[13] and Horning[78], are US-based studies. _____ (b) (4), (b) (6) _____. The difference in the follow-up rate for the combined data is 6.5%.  The Gatter study accounts for 85% of all patients being compared. The difference in follow-up adherence is not clinically relevant as there is no difference in efficacy between the two age groups.

FDA 0602

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

**Table 20: Adherence to Follow-Up Among Adolescents vs. Adults**

| | <17 years old | | | ≥17 years old | | |
|---|---|---|---|---|---|---|
| | N | # Adherent | Adherence % | N | # Adherent | Adherence % |
| Gatter[13] | 322 | 251 | 78.0% | 15,517 | 13,122 | 84.6% |
| Cameron[71] | 5 | 4 | 80.0% | 607 | 516 | 85.0% |
| Ngoc[16] | 1 | 1 | 100.0% | 1,406 | 1,345 | 95.7% |
| Horning[78] | 18 | 16 | 88.9% | 846 | 648 | 76.6% |
| TOTAL | 346 | 272 | 78.6% | 18,376 | 15,631 | 85.1% |

**Reviewer Comment:**
**Medical abortion in adolescents appears to be at least as safe, if not safer, as in adult women. Adolescents appear able to comply with the regimen, including use of misoprostol outside of the clinic setting, as well as with alternative follow-up methods. These data support the safety of Mifeprex in adolescents and satisfy requirements for PREA.  No information on safety and efficacy of use in premenarchal girls is required, as the medication is not indicated in that subset of the pediatric population.**

**Reviewer's Final Recommendation:**
**The available evidence supports that Mifeprex and the new proposed dosing regimen are safe to use in adolescents.**

## 7.6.5  Overdose, Drug Abuse Potential, Withdrawal and Rebound

The Applicant submitted no new data on overdose, drug abuse potential withdrawal and rebound.

## 7.7   Additional Submissions / Issues

Summary of additional changes in labeling that may affect safety of Mifeprex

**1.  Change in labeled time for expulsion from 4-24 hours to 2-24 hours**

The Applicant proposes to change the time to expulsion described in the labeling from 4-24 hours to 2-24 hours post misoprostol to more accurately reflect the data and real-life experiences with the drug. The Applicant reasons that in the large US trial upon

---

[78] Horning EL, Chen BA, Meyn LA, Creinin MD. Comparison of medical abortion follow-up with serum human chorionic gonadotropin testing and in-office assessment. Contraception 2012;85:402-407.

FDA 0603

(b) (6) and (b) (6)

NDA 020687/S-020- Mifeprex

which labeling is based (Spitz, 1998[26]), the median time to expulsion was 4 hours. Indeed, in that study, women were observed for several hours after misoprostol administration, and during the four hours of observation, 49% of the women expelled the products of conception, and 60% had by the fifth hour. Several studies are provided to corroborate this. Only one uses buccal misoprostol; however, the misoprostol was administered within 5 minutes of the Mifeprex, not at the 24-48 hour interval as proposed in this supplement.  Nonetheless, in this trial, Lohr[79] found the median time to onset of cramping to be 2 hours (range 10 minutes to 13 hours) and bleeding to be 3 hours (range 9 minutes to 11 hours). This shorter duration to expulsion is also seen in several other pilot studies submitted where subjects took vaginal misoprostol immediately or within 6-8 hours of mifepristone. If the focus is shifted to the randomized controlled studies that report times to onset of bleeding and cramping and include vaginal misoprostol, we find data confirming the timing of expulsion in the 2-24 hour window proposed by the Applicant.  Creinin[25] noted a median time to onset of cramping of 1.7 hours and to onset of bleeding of 2 hours after misoprostol (administered 24 hours after Mifeprex).  In a similar study[80] comparing misoprostol administered 24 vs. 6-8 hours after Mifeprex, the median time to onset of cramping was 1.5  hours and to bleeding was 2 hours in women with misoprostol given 24 hours after Mifeprex.

**Reviewer comment:**
**The data from vaginal and buccal administration of misoprostol around 24 hours after mifepristone support the assertion that bleeding and cramping begin before the 4 hour mark that is currently labeled. Therefore the label should be revised to make this clearer.  Median times seem to be around 1.5 to 2 hours.  It is reasonable to label the time to expulsion 2-24 hours, but it could be labeled as beginning even earlier. A clearer label will help providers better counsel patients and patients can better select an appropriate time frame within the 24-48 hour window to take their misoprostol and can be prepared when the expulsion starts.**

**Reviewer's Final Recommendation:**
**Based on the available evidence, it is acceptable to revise the label so that it notes that the time to expulsion after misoprostol dosing is 2-24 hours.**

**2.  Use of the term "** (b) (4)

The Applicant proposes to use the term " (b) (4) in place of all other terms in labeling and in the REMS materials, for consistency and (b) (4)
(b) (4)                      The Applicant

---

[79] Lohr PA, Reeves MF, Hayes JL, Harwood B, Creinin MD. Oral mifepristone and buccal misoprostol administered simultaneously for abortion: a pilot study. Contraception 2007;76:215-220.

[80] Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004;103:851-859.

FDA 0604

Reference ID: 3909590

Clinical Review

(b) (6)    and    (b) (6)

NDA 020687/S-020-  Mifeprex

submitted an article demonstrating that nurse practitioners, certified nurse midwives and physician assistants can safely provide <u>aspiration</u> abortion.[81] The Division asked the Applicant to provide articles specifically addressing the provision of <u>medical</u> abortion services by non-physician practitioners, since that is the issue at hand.

The Applicant provided data on the efficacy of medical abortion provided by non-physician healthcare providers, including four studies with 3,200 women in randomized controlled clinical trials and 596 women in prospective cohorts. These studies took place in varying settings (urban, rural, international, low resource). The efficacy results are discussed in Section 6.1.10.

Regarding the safety of medical abortion provided by non-physician health care providers, a systematic review by Renner[82] identified five studies with a total of 8,908 subjects. A RCT in Nepal included 1,104 of those subjects, comparing  medical abortions by nurses or auxiliary nurse midwives with those offered by physicians. Outcome data on 1,077 women showed no serious complications (hemorrhage requiring transfusion or condition necessitating hospitalization) and the rate of ongoing pregnancy or incomplete abortion did not vary by physician versus midlevel provider. Also in Nepal, Puri et al[83] described training female community health volunteers to provide education, and training auxiliary nurse midwives to provide medical abortion in intervention districts, and compared knowledge and medical abortion outcomes with those in neighboring districts where there were no interventions. Medical abortions were performed on 307 women in the intervention areas and 289 women in the comparison areas. There were five incomplete abortions (1.6%) in the intervention areas, treated with manual vacuum aspiration by the auxiliary nurse midwives, and 7 (2.4%) incomplete abortions in the comparison areas.  The difference was not statistically significant.  Kopp Kallner[84] conducted a randomized controlled equivalence trial of 1,068 women in Sweden who were randomized to receive medical abortion care from two nurse midwives experienced in medical terminations and trained in early pregnancy ultrasound versus a group of 34 physicians with varying training and experience. The trial showed fewer complications for the nurse midwife group, though this was not statistically significant (4.1% for nurse midwives, versus 6.1% for doctors, p=0.14).

---

[81] Weitz TA, Taylor D, Desai S, Upadhyay UD, Waldman J, Battistelli MF, Drey EA. Safety of aspiration abortion performed by nurse practitioners, certified nurse midwives, and physician assistants under a California legal waiver. Am J Public Health 2013;103:454-461.

[82] Renner R-M, Brahmi D, Kapp N. Who can provide effective and safe termination of pregnancy care: a systematic review. BJOG 2013;10:23-31.

[83] Puri M, Tamang A, Shrestha P, Joshi D. The role of auxiliary nurse-midwives and community health volunteers in expanding access to medical abortion in rural Nepal. Reproductive Health Matters 2015;Suppl(44):94-103.

[84] Kopp Kallner H, Gomperts R, Salomonsson E, Johansson M, Marions L, Gemzell-Danielsson K. The efficacy, safety and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse-midwives: a randomized controlled equivalence trial. BJOG 2015;122:510-517.

78

FDA 0605

Clinical Review
(b) (6)    and    (b) (6)
NDA 020687/S-020-  Mifeprex

There were no serious complications and no blood transfusions in the study. There was no difference in unscheduled visits.  Nurse midwives did call for more second opinions (26%) versus doctors (4%). Olavarrieta[85] conducted a randomized controlled non-inferiority trial in Mexico City abortion clinics. Eight physicians and seven nurses who had not previously independently provided medical abortion care received 1.5 weeks of training. A total of 1,088 women were randomized to two groups of providers. Nurses were not found to be inferior to physicians in the provision of abortion care. There was only  one serious adverse event in the physician group, a woman requiring admission and surgical aspiration for heavy bleeding. Nurses requested consultation with an experienced obstetrician in 9 cases, whereas physicians requested consultation only twice.

**Reviewer Comments**:
**The Applicant provided data from over 3,200 women in randomized controlled trials and data on 596 women in prospective cohorts comparing medical abortion care by physicians versus nurses or nurse midwives.  The studies were conducted in varying settings (international, urban, rural, low-resource) and found no differences in efficacy, serious adverse events, ongoing pregnancy or incomplete abortion between the groups.  Two studies did show that nurses or nurse midwives called for more second opinions than physicians, but these numbers were a small portion of the total subjects included.**

**Midlevel providers in the United States, such as  nurse practitioners, nurse midwives and physician assistants currently provide family planning services and abortion care, including medical abortion care, under the supervision of physicians. The data here demonstrate that it would be safe to allow healthcare providers who are licensed to prescribe medications and who meet the criteria in the REMS to become certified to provide medical abortion care with Mifeprex and misoprostol. Midlevel providers are already practicing abortion care under the supervision of physicians, and the approved labeling and the REMS Prescriber's Agreement already stipulate that prescribers must be able to refer patients for additional care, including surgical management if needed.  Therefore, facilities that employ midlevel prescribers already have an infrastructure in place for consultation and referral.**

**Reviewer's Final Recommendation**:
**Based on the available evidence, it is safe for midlevel providers to administer medical abortion.  The term in the revised Prescriber Agreement Form will be "a healthcare provider who prescribes."  Per the review by the** (b) (6) **(** (b) (6) **dated March 29, 2016, this term provides an accurate**

---

[85] Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015;93:249-258.

FDA 0606

(b) (6)  and                                              (b) (6)

NDA 020687/S-020-  Mifeprex

representation of the varied practitioners who are prescribers, while at the same time using language that is consistent with statute.  We concur with the (b) (6) review.

### 3. Removal of references to "Under Federal Law" from the Prescriber's Agreement

The Applicant requests removal of the phrase "under Federal law" from the Prescriber's Agreement portion of the REMS materials. The phrase appears in two places:

- "Under Federal law, Mifeprex must be provided by or under the supervision of a licensed physician who meets the following qualifications:
  - Ability to assess the duration of pregnancy accurately.
  - Ability to diagnose ectopic pregnancies.
  - Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and are able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary."
- "Under Federal law, each patient must be provided with a Medication Guide. You must fully explain the procedure to each patient, provide her with a copy of the Medication Guide and Patient Agreement, give her an opportunity to read and discuss them, obtain her signature on the Patient Agreement, and sign it yourself."

The Applicant rationalizes that all of the conditions of Mifeprex approval, including the REMS,  are under Federal law and that the statement is redundant and are no more subject to Federal law than the other conditions of approval.

**Reviewer comment:**
**A rationale for the original inclusion of the phrase "Under Federal law" cannot be discerned from available historical documents, nor is it consistent with REMS materials for other products.  All the conditions of approval, including the REMS materials, are under Federal law; therefore, the phrase is unnecessary and can be removed from the Prescriber's Agreement.**

**Reviewer's Final Recommendation:**
**The term "under Federal law" can be removed from the Prescriber's Agreement.**

### 4. Addition of misoprostol to the indication statement

The Indication and Usage section of the currently approved labeling is as follows:

"Mifeprex is indicated for the medical termination of intrauterine pregnancy through 49 days' pregnancy. For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period in a presumed 28 day cycle with ovulation

80

Clinical Review
(b) (6)  and _____ (b) (6)
NDA 020687/S-020-  Mifeprex

occurring at mid-cycle. The duration of pregnancy may be determined from menstrual history and by clinical examination.

Ultrasonographic scan should be used if the duration of pregnancy is uncertain, or if ectopic pregnancy is suspected.

Any intrauterine device ("IUD") should be removed before treatment with Mifeprex begins.

Patients taking Mifeprex must take 400 mcg of misoprostol two days after taking mifepristone unless a complete abortion has already been confirmed before that time (see DOSAGE AND ADMINISTRATION).

Pregnancy termination by surgery is recommended in cases when Mifeprex and misoprostol fail to cause termination of intrauterine pregnancy (see PRECAUTIONS)."

The Applicant proposed two alternative indication statements, both of which include reference to misoprostol:

(b) (4)

Or

(b) (4)

The Applicant provides the rationale that:
- the two drugs are used in combination and placing misoprostol in the indication statement early on in labeling gives it greater prominence and highlights the importance of completing the full treatment regimen

81

Reference ID: 3909590

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

- the mention of misoprostol enhances the goal of labeling, which is to give healthcare providers information necessary for safe and effective use of Mifeprex.

Subsequently on February 25, 2016, the Applicant proposed (b) (4)   (b) (4) gestational age through 70 days, based on the literature already submitted.

**Reviewer comment:**

**We recommend that the Indication Statement read:**

 **"Mifeprex is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation."**

**The rationale for this is that:**

- **All supporting data are based on the combined regimen**
- **Inclusion of misoprostol in the Indication Statement would be consistent with the rest of Mifeprex labeling and with current medical practice**
- **It would be consistent with current FDA thinking (e.g., the internal Label Review Tool) which states that the indication and use statement should include "Information if drug is to be used only in conjunction with another therapy."**

**Reviewer's Final Recommendation:**

**Misoprostol should be included in the Indication Statement for Mifeprex.**

# 8  Postmarket Experience

A comprehensive review of the adverse events associated with Mifeprex from September 28, 2000 through November 17, 2015, performed by (b) (6) (b) (6), yielded the following information on reported deaths. Regarding the US cases, there were 17 reported deaths. Deaths were associated with sepsis in eight of the 17 (seven cases tested positive for *Clostridium sordellii,* one case tested positive for *Clostridium perfringens).* Seven of the eight fatal sepsis cases reported vaginal misoprostol use; one case reported buccal misoprostol use. Seven of the nine remaining U.S. deaths involved two cases of ruptured ectopic pregnancy and one case each of the following: substance abuse/drug overdose; methadone overdose; suspected homicide; suicide; and a case of delayed onset toxic shock-like syndrome. In the eighth case, the cause of death could not be established despite performance of an autopsy; tissue samples were negative for *C. sordellii*. The autopsy report on the ninth death became available to the Agency and was reviewed on December 2, 2015.  It showed the woman died of pulmonary emphysema.

There were 11 additional deaths in women in foreign countries who used mifepristone for medical termination of pregnancy. These fatal cases were associated with the

82

FDA 0609

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

following: sepsis (*Clostridium sordellii* identified in tissue samples) in a foreign clinical trial; sepsis (Group A *Streptococcus pyogenes*); a ruptured gastric ulcer; severe hemorrhage; severe hemorrhage and possible sepsis; "multivisceral failure;" thrombotic thrombocytopenic purpura leading to intracranial hemorrhage; toxic shock syndrome (*Clostridium sordellii* was identified through uterine biopsy cultures); asthma attack with cardiac arrest; respiratory decompensation with secondary pulmonary infection 30 days after mifepristone in a patient on the lung transplant list with diabetes, a jejunostomy feeding tube, and severe cystic fibrosis; and a case of *Clostridium sordellii* sepsis (from a published literature report).

**Reviewer Comments:**

**While an exact rate of death with use of mifepristone cannot be calculated from this information, given that there have been over 2.5 million uses of Mifeprex by US women since its marketing in 2000, the number of deaths is very low. Moreover, half of the deaths were associated with *C. sordellii* sepsis. Seven out of 8 of these cases occurred in women who used misoprostol via the vaginal route while one used buccal misoprostol. Since at least 2006, PPFA (comprising the majority of US medical abortion providers) switched its national guidelines to avoid vaginal administration of misoprostol (even though the data did not find a causal relationship).[23] Although the possibility that Mifeprex might increase the likelihood of infection by adversely affecting immune system function has been raised, the overall event rate of serious infections does not support this.**

**Since 2009, there have been no *C. sordellii* deaths associated with medical abortion in the US. This reviewer finds that the postmarketing data on deaths associated with medical abortion demonstrate low numbers and an improved safety profile with the buccal route of misoprostol administration as compared with the vaginal route.**

**The review by** (b) (6)  (b) (6) **also yielded the following**

Table 21 summarizing hospitalizations, blood loss requiring transfusions, and severe infections.

**Table 21: US Postmarketing AEs- Mifepristone for Medical Abortion**

| Date ranges of reports received | 09/28/00[†]-10/31/12 | 11/1/12 - 04/30/14[‡] |
|---|---|---|
| Cases with any adverse event | 2740 | 504 |
| Hospitalized, excluding deaths | 768 | 110 |
| *Experienced blood loss requiring transfusions[§] | 416 | 66 |
| Infections[‖] (*Severe infections[¶]) | 308 (57) | 37 (5) |

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

† U.S. approval date.
‡ FDA implemented FAERS on September 10, 2012, and migrated all of the data from the previous reporting system (AERS) to FAERS.  Differences may exist when comparing case counts in AERS and FAERS.  FDA validated and recoded product information as the AERS reports were migrated to FAERS.  As a result of this change, it is not recommended to calculate a cumulative number when reviewing the data provided in Table 5.
* The majority of these women are included in the hospitalized category in Table 5.
§ As stated in the approved Mifeprex (mifepristone) labeling, bleeding or spotting can be expected for an average of 9-16 days, and may last for up to 30 days.  Excessive vaginal bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, curettage, administration of saline infusions, and/or blood transfusions.
‖ This category includes endometritis (inflammation resulting from an infection involving the lining of the womb), pelvic inflammatory disease (involving the nearby reproductive organs such as the fallopian tubes or ovaries), and pelvic infections with sepsis (a serious systemic infection that has spread beyond the reproductive organs).  Not included are women with reported sexually transmitted infections such as chlamydia and gonorrhea, cystitis, and toxic shock syndrome not associated with a pelvic infection.
¶ This subset of infections includes cases that were determined to be severe based on medical review of the available case details.  Severe infections generally result in death or hospitalization for at least 2-3 days, require intravenous antibiotics for at least 24 hours and total antibiotic usage for at least 3 days, or have other physical or clinical findings, laboratory data, or surgery that suggest a severe infection.

**Source: Review by** (b) (6) (b) (6) (b) (6) **dated 08/27/2015.**

The (b) (6) review also describes ectopic pregnancies:

## Table 22: US Postmarketing Ectopic Cases- Mifepristone for Medical Abortion

| Date Range of Cumulative Reports | 9/28/2000-10/31/14* | 11/1/14-4/30/2015 |
|---|---|---|
| Ectopic Pregnancies† | 79 | 10 |

* U.S. approval date

† Administration of mifepristone and misoprostol is contraindicated in patients with confirmed or suspected ectopic pregnancy (a pregnancy outside the uterus).

**Source:** (b) (6) (b) (6) (b) (6) **Mifepristone U.S. Post-marketing Adverse Events 6 month Update Summary through 04/30/2015, dated 08/20/2015.**

**Reviewer comment:**

**While exact rates cannot be calculated, as these reports are spontaneously generated, a few conclusions can be drawn from the information provided:**

- **Given that there have been over 2.5 million uses of Mifeprex by US women since its marketing in 2000, including the use of the proposed dosing regimen and extended gestational age at many clinic/office sites, the numbers of hospitalizations, severe infections,  blood loss requiring transfusion and ectopic pregnancy will likely remain acceptably low.**
- **The numbers of each of these adverse events appears to have remained steady over time, with a possible decrease in severe infections.**

A discussion of a (b) (6) review of uterine rupture is found in the Section Significant Adverse Events.

84

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

(b) (6) identified another safety signal in a review dated January 27, 2016. A FAERS search retrieved one case of anaphylaxis and six cases of angioedema with mifepristone administration.  A literature search did not reveal any case reports of either adverse event with mifepristone.  Six of the seven cases were seen in women using mifepristone for termination of pregnancy.  Six of the seven cases noted some type of medical intervention, such as treatment with an antihistamine, a histamine H2 antagonist, a corticosteroid, or a combination of the various medications. Hospitalization was noted in three of the seven total cases; all three hospitalization cases occurred in patients who experienced angioedema.

In the case of anaphylaxis, it was reported that the patient experienced an anaphylactic reaction three hours after mifepristone administration; however, co-administration of doxycycline was also documented.  Because both mifepristone and doxycycline were discontinued simultaneously, the exact cause of the anaphylactic reaction cannot be determined.

Regarding angioedema, five of the six cases noted a time-to-onset within 24 hours of mifepristone administration for the termination of pregnancy, with no additional suspect medications reported.  The remaining case of angioedema with mifepristone reported a time-to-onset of approximately one week in a Cushing's syndrome patient with a complex medical history and multiple concomitant medications; however, this case noted both a positive dechallenge and rechallenge upon sole re-introduction of mifepristone therapy.  Evaluation of these FAERS cases provides supportive evidence of a drug-event association between angioedema and mifepristone. The (b) (6) reviewer recommends the inclusion of anaphylaxis and angioedema within the Mifeprex labeling, specifically to the Contraindications and Adverse Reactions Postmarketing Experience sections.

**Reviewer Comment:**

**There does appear to be an association with angioedema and mifepristone administration.  The reviewers agree with inclusion of anaphylaxis and angioedema in the labeling for Mifeprex and with continued pharmacovigilance for anaphylaxis.**

# 9  Appendices

## 9.1  Literature Review/References

This NDA review obviously involved an extensive review of resources and the peer-reviewed medical literature that was pertinent to the requested changes of the Applicant.  Such sources are noted throughout the review in footnotes.  A detailed Reference List is found in Appendix 9.6.

85

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

## 9.2   Labeling Recommendations

The package insert (PI) for this product was submitted in the Physician Labeling Rule (PLR) format.  Although not required for this supplement, Section 8 was revised in accord with the Pregnancy and Lactation Labeling Rule (PLLR).  Section 17 Patient Counseling Information was also revised to be compatible with the new dosing regimen and follow-up.  Major changes were made that updated the labeling with new safety and efficacy information, especially in two areas:

1)  6.1 Clinical Trials Experience in the section 6 Adverse Reactions
2)  14 Clinical Studies

Changes were also made in the patient package insert (PPI) and Medication Guide for the product.  These format and content updates marked a significant improvement in the label.  Agreement on the Final Approved label was reached with the Applicant on March 29, 2016.

**Reviewer comment:**
**The new dosing regimen was based on the extensive number of articles submitted by the Applicant from the peer reviewed medical literature.  The revised label used the new PLR format which is a complete change from the previous style.  This meant that the newly approved label was extensively rewritten and much improved from the old format.**

## 9.3   Advisory Committee Meeting

An Advisory Committee met in 1996 to discuss the approval of mifepristone plus misoprostol for medical termination of early pregnancy.  There has been extensive US (15+ years with over 2.5 million uses) and global use (27+ years) of mifepristone and misoprostol for the medical termination of early pregnancy.  No special external consultations were requested by the review Divisions.  The FDA determined that the efficacy supplement did not raise complex scientific or other issues that would warrant holding an advisory committee meeting before approval of the supplement.

## 9.4   (b) (6) (                    (b) (6)   Meeting

As noted in Product Regulatory Information, Mifeprex was originally approved under 21 CFR part 314, subpart H, "Accelerated Approval of New Drugs for Serious or Life-Threatening Illnesses" (subpart H).  Specifically, in accordance with § 314.520 of subpart H, FDA restricted the distribution of Mifeprex and required that Mifeprex be provided by or under the supervision of a physician who met certain qualifications.  Further, practitioners had to complete a Prescriber's Agreement, provide patients with a Medication Guide and have patients sign a Patient Agreement.  Mifeprex was included on the list of products deemed to have in effect an approved REMS[86] under section

---

86 Federal Register / Vol. 73, No. 60 | Issued: March 27, 2008

86

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of FDA Amendments Act (FDAAA) of 2007.  A formal REMS proposal was submitted by Danco and approved on June 8, 2011, with the essential elements unchanged.  The REMS included:

- Medication Guide
- Elements to Assure Safe Use (ETASU):
  - Prescribed only by certified prescribers (ETASU A; includes a Prescriber's Agreement)
  - Dispensed only in certain healthcare settings (ETASU C)
  - Dispensed with documentation of safe use conditions (ETASU D; includes a Patient Agreement)
- Implementation System
  - Distributed only by certified distributors

Following this approval, two REMS assessment reports were completed. The Year 1 assessment was completed on June 1, 2012 and the Years 2-4 assessment was completed on June 2, 2015.  Agency review of these reports determined that the REMS goals were being met and that no modifications were required to the REMS at that time.

On July 16, 2015, the Applicant submitted a revised REMS as part of the efficacy supplement.  The proposed modifications included:

- Prescriber's Agreement Form
  - Remove "Under Federal law"
  - Replace "physician" with " (b) (4)

The Agency determined that broader review of the REMS was warranted concurrently with the efficacy supplement because some proposed changes in labeling dovetail with proposed changes to the REMS, and the documents should remain consistent with each other. Further, extensive review of the postmarketing experience based on the literature submitted to support the efficacy supplement, and pharmacovigilance, suggested that certain components of the REMS may no longer be necessary to assure safe use of Mifeprex.

In light of the efficacy review, upon assessment of the proposed modifications, (b) (6) concurs with (b) (6) recommendations that:

- Removal of "under Federal law" from the Prescribers' Agreement was acceptable (see discussion in Additional Submissions / Issues)
- The term "healthcare providers who prescribe" is preferable to (b) (4) (see discussion in Additional Submissions / Issues)

(b) (6) and (b) (6) also proposed the following modifications:

- Removal of the Medication Guide from the REMS (will remain a part of labeling and must be distributed by the prescriber as required under 21 CFR part 208)
- Removal of the Patient Agreement form - Documentation of Safe Use (ETASU D)

87

[(b) (6)] and [(b) (6)]
NDA 020687/S-020-  Mifeprex

- Revision of the Prescriber's Agreement form
- Revision of the REMS goal to reflect above changes

FDA considered the need for the current adverse event reporting requirements under the REMS, which are currently outlined in the Prescriber's Agreement to include "hospitalization, transfusion or other serious event."   FDA has received such reports for 15 years; the safety profile of Mifeprex is well-characterized, no new safety concerns have arisen in recent years, and the known serious risks occur rarely.  For this reason, the reviewers do not believe ongoing reporting of all of the specified adverse events is warranted.  The Applicant will still be required by law, as is every NDA holder, to report serious, unexpected adverse events as 15-day safety reports, and to submit non-expedited individual case safety reports, and periodic adverse drug experience.

[(b) (6)] and [(b) (6)] met with the [(b) (6)] ( [(b) (6)] on January 15, 2015, to discuss the proposed modifications. The [(b) (6)] concurred with the removal of the term "under Federal law" and with use of the term "healthcare providers who prescribe." The [(b) (6)] also concurred with the removal of the Medication Guide (MG) from the REMS, though the document would remain a part of labeling. FDA has been maintaining MGs as labeling but removing them from REMS when, as here, inclusion in REMS is not necessary to ensure that the benefits of a drug outweigh the risks, such as when the MG is redundant and not providing additional use or information to the patient about the risk(s) the REMS is intended to mitigate. This is consistent with ongoing efforts to streamline REMS by allowing for updates to the MG without need for a REMS modification. [(b) (6)] and the [(b) (6)] had subsequent interactions and on February 23, 2016, the [(b) (6)] concurred with the decision to remove the Patient Agreement (ETASU D) from the REMS. This decision was based on the following rationale:

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance

- Established clinical practice includes patient counseling and documentation of Informed Consent, and, more specifically with Mifeprex, includes counseling an all options for termination of pregnancy, access to pain management and emergency services if needed. The National Abortion Federation (NAF) provides clinical practice guidelines**Error! Bookmark not defined.** and evidence shows that practitioners are providing appropriate patient counseling and education; a survey published in 2009 demonstrated that 99% of facilities surveyed provided pre-abortion counseling with patient education.[87]  This indicates that the Patient Agreement form is duplicative and no longer necessary to ensure that the benefits of the drug outweigh the risks.

APPEARS THIS WAY ON ORIGINAL

---

[87] O'Connell K, Jones HE, Simon M, Saporta V, Paul M, Lichtenberg ES. First-trimester surgical abortion practices: a survey of National Abortion Federation members. Contraception 2009; 79: 385–392.

88

Clinical Review
(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

- Medical abortion with Mifeprex is provided by a small group of organizations and their associated providers. Their documents and guidelines cover the safety information that is duplicated in the Patient Agreement.

- ETASUs A and C remain in place: The Prescriber's Agreement under ETASU A requires that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them."  The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals.  This ensures that Mifeprex can only be dispensed under the supervision of a certified prescriber at the time the patient receives treatment with Mifeprex.

- Labeling mitigates risk: The Medication Guide, which will remain a part of labeling, contains the same risk information covered under the Patient Agreement.

APPEARS THIS WAY ON ORIGINAL

89

Clinical Review

(b) (6) and (b) (6)

NDA 020687/S-020- Mifeprex

## 9.4  Abbreviations

## List of Abbreviations

| Abbreviation | Term |
|---|---|
| ACOG | American College of Obstetrics and Gynecology |
| APHA | American Public Health Association |
| CDER | Center for Drug Evaluable and Research |
| CDRH | Center for Devices and Radiological Health |
| (b) (6) | (b) (6) |
| FU | follow up |
| GA | gestational age |
| IRB | Institutional Review Board |
| LFU | lost to follow up |
| LMP | last menstrual period |
| MAB | medical abortion |
| MG | Medication Guide |
| Miso | misoprostol |
| NA | not applicable |
| NAF | National Abortion Federation |
| NDA | New drug application |
| NR | not reported |
| NSAID | non-steroidal anti-inflammatory drug |
| PPFA | Planned Parenthood Federation of America |
| PREA | Pediatric Research Equity Act |
| REMS | Risk Evaluation and Mitigation Strategies |
| ROA | route of administration |
| (b) (6) | (b) (6) |
| SAB | surgical abortion |
| WHO | World Health Organization |

FDA 0617

Reference ID: 3909590

(b) (6) and (b) (6)
NDA 020687/S-020-  Mifeprex

## 9.5   List of References

Abbas D, Chong E, Raymond EG. Outpatient medical abortion is safe and effective through 70 days gestation. Contraception 2015;92:197-9.

Alam A, Bracken H, et al. Acceptability and Feasibility of Mifepristone-Misoprostol for Menstrual Regulation in Bangladesh. International Persp on Sexual and Reprod Health 2013;39(2):79-87.

American College of Obstetricians and Gynecologists. Practice bulletin No. 143: medical management of first-trimester abortion. Obstet Gynecol 2014;123(3):676-92. doi:10.1097/01.AOG.0000444454.67279.7d.

Bartz B and Goldberg A. Medical Abortion. Clin Obstet and Gyn 2009;52:140-50.

Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos-Thompson MA, Amar E, Descotes J, Vial T. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG 2013;120:568–575.

Bika O, Huned D, Jha S, Selby K Uterine rupture following termination of pregnancy in a scarred uterus J Obstet Gynaecol 2014;34(2):198-9. doi: 10.3109/01443615.2013.841132.

Blum J, Raghavan S, Dabash R, Ngoc NTN, Chelli H, Hajri S, Conkling K, Winikoff B. comparison of misoprostol-only and combined mifepristone-misoprostol regimens for home-based early medical abortion in Tunisia and Vietnam. Int J Gynecol Obstet 2012;118:166-171.

Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care 2011;16:61-6.

Bracken H ,Dabash R, Tsertsvadze G, et al. A two-pill sublingual misoprostol outpatient regimen following mifepristone for medical abortion through 70 days' LMP: a prospective comparative open-label trial. Contraception 2014;89(3):181-6.

Cameron ST, Glasier A, Dewarta H, Johnstone A, Burnside A. Telephone follow-up and self-performed urine pregnancy testing after early medical abortion: a service evaluation. Contraception 2012;86:67-73.

Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception 2015;91:6-11.

Reference ID: 3909590

Clinical Review

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

Chai J, Wong CY, Ho PC. A randomized clinical trial comparing the short-term side effects of sublingual and buccal routes of misoprostol administration for medical abortions up to 63 days' gestation. Contraception 2013;87:480-5.

Chen BA, Reeves MF, Creinin MD, Gilles JM, Barnhart K, Westhoff C, Zhang J. National Institute of Child Health and Human Development Management of Early Pregnancy Failure Trial. Am J Obstet Gynecol 2008;198(6):626.d1-5 doi: 10.1016/j.ajog.2007.11.045. Epub 2008 Feb 15.

Chen MJ, Creinin MD. Mifepristone with Buccal Misoprostol for Medical Abortion Obstet Gynecol: a Systematic Review. Obstet Gynecol 2015;126(1):12-21.

Chong E, Tsereteli T, Nguyen NN, Winikoff B. A randomized controlled trial of different buccal misoprostol doses in mifepristone medical abortion. Contraception 2012;86:251-256.

Chong E, Frye LJ, Castle J, Dean G, Kuehl L, Winikoff B. A prospective, non-randomized study of home use of mifepristone for medical abortion in the US. Contraception 2015;92:215-291.

Cleland K, Smith N. Aligning mifepristone regulation with evidence: driving policy change using 15 years of excellent safety data. Contraception 2015;92:179-81.

Coyaji K, Krishna U, Ambardekar S, Bracken H, Raote V, Mandlekar A, Winikoff B. Are two doses of misoprostol after mifepristone for early abortion better than one? BJOG 2007;114:271-278.

Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. MOD Study Trial Group: A randomized comparison of misoprostol 6-8 hours versus 24 hours after mifepristone for abortion. Obstet Gynecol 2004;103:851-859.

Creinin MD, Schreiber CA, Bednarek P, Lintu H, Wagner MS, Meyn LA. Medical Abortion at the Same Time (MAST Study Trial Group). Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion a randomized controlled trial. Obstet Gynecol 2007;109:885-894.

Dahiya K, Ahuja K, Dhingra A, et al.  Efficacy and safety of mifepristone and buccal misoprostol versus buccal misoprostol alone for medical abortion.  Arch Gynecol Obstet 2012;285:1055-8.

Dehlendorf CE, et al. Medication abortion failure in women with and without previus cesarean section. Contraception 2015 92:463-68.

Reference ID: 3909590

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

Faundes A. The combination of mifepristone and misoprostol for the termination of pregnancy. *Int J Gynecol Obstet* 2011;115:1-4.

FDA label for ella:
https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022474s000lbl.pdf

FDA Label for Korlym:
http://www.accessdata.fda.gov/drugsatfda_docs/label/2012/202107s000lbl.pdf

FDA label for MIfeprex:
http://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.htm

Fiala C, Safar P, Bygdeman M, Gemzell-Danielsson K. Verifying the effectiveness of medical abortion; ultrasound versus hCG testing. Eur J Obstet Gynecol Reprod Biol 2003;109:190-195.

Fiala C, Gemzell-Danielsson K. Review of medical abortion using mifepristone in combination with prostaglandin analogue. Contraception 2006;74:66-86.

Fjerstad M. Figuring out follow-up. Mife Matters. Planned Parenthood Federation of America/Coalition of Abortion Providers 2006;13:2–3.

Fjerstad M, Sivin I, Lichtenberg ES, Trussell J, Cleland K, Cullins V. Effectiveness of medical abortion with mifepristone and buccal misoprostol through 59 gestational days. Contraception 2009;80:282–6.

Fjerstad M, Trussell J, et al. Rates of serious infection after changes in regimens for medical abortion. NEJM 2009;361:145-51.

Gallo MF, Cahill S, Castelman L, Mitchell EMH. A systematic review of more than one dose of misoprostol after mifepristone for abortion up to 10 weeks gestation. Contraception 2006;74:36-41.

Gatter M, Cleland K, Nucatola DL. Efficacy and safety of medical abortion using mifepristone and buccal misoprostol through 63 days. Contraception 2015;91:269-273.

Gautam R, Agrawal V. Early medical termination pregnancy with methotrexate and misoprostol in lower segment cesarean section cases. J Obetet Gynaecol Res. 2003; 29(4):251-256.

Giri A, Tuladhar H, et al. Prospective study of medical abortion in Nepal Medical College- a one year experience. Nepal Medical Coll J 2011;13(3):213-15.

Reference ID: 3909590

(b) (6) and                                      (b) (6)

NDA 020687/S-020-  Mifeprex

Gold M, Chong E. If we can do it for misoprostol, why not for mifepristone? The case for taking mifepristone out of the office in medical abortion. Contraception 2015;92:194-196.

Goldstone P, Michelson J, Williamson E.  Early medical abortion using low-dose mifepristone followed by buccal misoprostol: A large Australian observational study. Med J Austral 2012;197:282-6.

Gouk EV, et al. Medical termination of pregnancy at 63-83 days gestation. British J Obstet Gyn 1999;106:535-539.

Grossman D, Grindlay K. Alternatives to ultrasound for follow-up after medication abortion: a systematic review. Contraception 2011;83:504-510.

Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectivenesss and acceptability of medical abortion provided thorugh telemedicine. Obstet Gynecol 2011;118:296-303.

Gynuity website, www.gynuity.org, Medical Abortion in Developing Countries- List of Approvals.

Harrison P. Medicine Control Agency background communication to the FDA. June 14, 2001.

Horning EL, Chen BA, Meyn LA, Creinin MD. Comparison of medical abortion follow-up with serum human chorionic gonadotropin testing and in-office assessment. Contraception 2012;85:402-407.

Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol 2015;126:22-8.

Jwarah E, Greenhalf JO. Rupture of the uterus after 800 micrograms misoprostol given vaginally for termination of pregnancy. BJOG 2000;107:807.

Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2011. Perspectives on Sexual and Reproductive Health 2014;46(1):3-14.doi10.1363/46e0414.

Khan S et al. Uterine rupture at 8 weeks' gestation following 600 µg of oral misoprostol for management of delayed miscarriageJournal of Obstet Gynaecol 2007;27:869-870.

Kim JO, et al. Oral misoprostol and uterine rupture in the first trimester of pregnancy: A case report. Reproductive Toxicology 2005;20:575–577.

94

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

Kopp Kallner H, Fiala C, Stephansson O, Gemzell-Danielsson K. Home self-administration of vaginal misoprostol for medical abortion at 50-63 days compared with gestation of below 50 days. Human Reprod 2010;25(5):1153-1157.

Kopp Kallner H, Gomperts R, Salomonsson E, Johansson M, Marions L, Gemzell-Danielsson K. The efficacy, safety and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse-midwives: a randomized controlled equivalence trial. BJOG 2015;122:510-517.

Kulier R, Kapp N, et al. Medical methods for first trimester abortion (Review). The Cochrane Library 2011, Issue 11:1-126.

Løkeland M, Iversen OE, Engeland A, Økland I. Medical abortion with mifepristone and home administration of misoprostol up to 63 days' gestation. Acta Obstet Gynecol Scand 2014;93:647-653.

Lohr PA, Reeves MF, Hayes JL, Harwood B, Creinin MD. Oral mifepristone and buccal misoprostol administered simultaneously for abortion: a pilot study. Contraception 2007;76:215-220.

Louie  KS, Tsereteli T, Chong E, Ailyeva F, Rzayeva G, Winikoff B. Acceptability and feasibility of mifepristone medical abortion in the early first trimester in Azerbaijan. Eur J Contracept Reprod Health Care 2014;19(6):457-464.

Lynd K, Blum J, Ngoc NTN, Shochet T, Blumenthal PD, Winikoff B. Simplified medical abortion using a semi-quantitative pregnancy test for home-based follow-up. Int J Gynecol Obstet 2013;121:144-148.

Middleton T, et al.  Randomized trial of  mifepristone and buccal or vaginal misoprostol for abortion through 56 days of last menstrual period.  Contraception 2005; 72: 328-32.

Mifegyne Summary of Product Characteristics. Exelgyn Laboratories- June 2013. https://www.medicines.org.uk/emc/medicine/617

National Abortion Federation Guidelines 2015. http://prochoice.org/resources/clinical-policy-guidelines/

Ngo TD, Park MH, Xiao Y. Comparing the WHO versus China recommended protocol for first trimester medical abortion: a retrospective analysis. Int J Womens Health 2012;4:123-7.

Ngoc NTN, et al. Comparing two early medical abortion regimens: mifepristone+misoprostol  vs. misoprostol alone. Contraception 2011;83:410-17.

95

FDA 0622

(b) (6) and (b) (6)

NDA 020687/S-020-  Mifeprex

Ngoc NTN, et al. Acceptability and feasibility of phone follow-up after early medical abortion in Vietnam: A randomized controlled trial. Obstet Gynecol 2014;123:88-95.

Niinimaki M, et al. Comparison of rates of adverse events in adolescent and adult women undergoing medical abortion: population register based study. BJM 2011;342: d2111.

O'Connell K, Jones HE, Simon M, Saporta V, Paul M, Lichtenberg ES. First-trimester surgical abortion practices: a survey of National Abortion Federation members. Contraception 2009;79:385-392.

Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, Garcia SG, Pérez M, Bousieguez M, Sanhueza P. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ 2015;93:249-258.

Pazol K, Creanga AA, Burley KD, Jamieson DJ. Abortion surveillance - United States, 2011. MMWR Surveill Summ 2014;63:1-41.

Pazol K, Creanga AA, Zane SB, Burley KD, Jamieson DJ. Abortion surveillance--United States, Centers for Disease Control and Prevention (CDC). MMWR Surveill Summ 2012;61(SS-8):1–44 and Surveillance Summaries Nov 27, 2015;64(SS10);1-40.

Pena M, Dzuba IG, Smith PS, et al. Efficacy and acceptability of a mifepristone-misoprostol combined regimen for early induced abortion among women in Mexico City. Int J Gynaecol Obstet 2014;127:82-5.

Perriera LK, Reeves MF, Chen BA, Hohmann HL, Hayes J, Creinin MD. Feasibility of telephone follow-up after medical abortion. Contraception 2010;81:143-149.

Phelps RH, et al. Mifepristone abortion in minors. Contraception 2001;64:339-343.

Pons JC, Papiernik E. Mifepristone teratogenicity. Lancet 1991;338(8778):1332-3.

Puri M, Tamang A, Shrestha P, Joshi D. The role of auxiliary nurse-midwives and community health volunteers in expanding access to medical abortion in rural Nepal. Reproductive Health Matters 2015;Suppl(44):94-103.

Raghavan S, et al.  Comparison of 400 mcg buccal and 400 mcg sublingual misoprostol after mifepristone medical abortion through 63 days' LMP: a randomized controlled trial. Contraception 2010;82:513-9.

Raymond EG, et al. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87:26-37.

FDA 0623

(b) (6)  and  (b) (6)

NDA 020687/S-020-  Mifeprex

Renner R-M, Brahmi D, Kapp N. Who can provide effective and safe termination of pregnancy care/ A systematic review. BJOG 2013;10:23-31.

Royal College of Obstetricians and Gynaecologists. The care of women requesting induced abortion: evidence-based clinical guideline number 7. 3rd ed. London (UK): RCOG Press; 2011.

Sanhueza Smith P, Pena M, Dzuba IG, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters 2015; 22:75-82.

Sedgh G, et al. Induced abortion: incidence and trends worldwide from 1995 to 2008. Lancet, 2012;379:625-32.

Shaw KA, Topp NJ, Shaw JG, Blumenthal PB. Mifepristone-misoprostol dosing interval and effect on induction abortion times. Obstet Gynecol 2013;121(6):1335-1347.

Spitz IM, et al. Early Pregnancy Termination with Mifepristone and Misoprostol in the United States. NEJM 1998;338(18):1241-47.

Spitz IM. Mifepristone: where do we come from and where are we going? Clinical development over a quarter of a century. Contraception 2010;82:442–52.

Swica Y, et al. Acceptability of home use of mifepristone for medical abortion. Contraception 2013;88:122-127.

Upadhyay UD, Desai S, LIDAR V, Waits TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-183.

Warriner IK, Wang D, Huong NTM, Thapa K, Tamang A, Shah I et al.  Can midlevel health-care providers administer early medical abortion as safely and effectively as doctors?  A randomized controlled equivalence trial in Nepal.  Lancet 2011;377:1155-61.

Wedisinghe L and Elsandabesee D. Flexible mifepristone and misoprostol administration interval for first-trimester medical termination. Contraception 2010;81(4):269-74. doi: 10.1016/ j.contraception.2009.09.007. Epub Oct 29, 2009.

Weitz TA, Taylor D, Desai S, Upadhyay UD, Waldman J, Battistelli MF, Drey EA. Safety of aspiration abortion performed by nurse practitioners, certified nurse midwives, and physician assistants under a California legal waiver. Am J Public Health 2013;103:454-461.

97

(b) (6)  and                                              (b) (6)

NDA 020687/S-020-  Mifeprex

Wiegerinck MMJ, Jones HE, O'Connell, K, Lichtenberg ES, Paul M, Westhoff CL. Medical abortion practices: a survey of National Abortion Federation members in the United States. Contraception 2008;78:486-491.

Willmott F, et al. Rupture of uterus in the first trimester during medical termination of pregnancy for exomphalos using mifepristone/misoprostol. BJOG 2008;115:1575-77.

Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Goldberg AB, Gonzales J, Howe M, Moskowitz J, Prine L, Shannon CS. Two distinct oral routes of misoprostol in mifepristone medical abortion: a randomized controlled trial. Obstet Gynecol 2008;112(6):1303-1310.

Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070-6.

World Health Organization April 2015 Model Lists of Essential Medicines Available online at http://www.who.int/medicines/publications/essentialmedicines/en/

APPEARS THIS WAY ON ORIGINAL

98

Clinical Review

(b) (6) and    (b) (6)

NDA 020687/S-020-  Mifeprex

## 9.6  Mifepristone Approvals Globally

**1988**
- [ ] China
- [ ] France

**1991-**
- [ ] UK

**1992**
- [ ] Sweden

**1999**
- [ ] Austria
- [ ] Belgium
- [ ] Denmark
- [ ] Finland
- [ ] Germany
- [ ] Greece
- [ ] Iceland
- [ ] Israel
- [ ] Luxembourg
- [ ] Netherlands
- [ ] Russia
- [ ] Spain
- [ ] Switzerland

**2000**
- [ ] Norway
- [ ] Taiwan
- [ ] Tunisia
- [ ] US

**2001**
- [ ] New Zealand
- [ ] South Africa
- [ ] Ukraine

**2002**
- [ ] Belarus
- [ ] Georgia
- [ ] India
- [ ] Latvia
- [ ] Serbia
- [ ] Vietnam

**2003**
- [ ] Estonia

**2004**
- [ ] Guyana
- [ ] Moldova

**2005**
- [ ] Albania
- [ ] Hungary
- [ ] Mongolia
- [ ] Uzbekistan

**2006**
- [ ] Kazakhstan

**2007**
- [ ] Armenia
- [ ] Kyrgyzstan
- [ ] Portugal
- [ ] Tajikistan

**2008**
- [ ] Nepal
- [ ] Romania

**2009**
- [ ] Cambodia
- [ ] Italy

**2010**
- [ ] Zambia

**2011**
- [ ] Ghana
- [ ] Mexico
- [ ] Mozambique

**2012**
- [ ] Australia
- [ ] Bangladesh
- [ ] Ethiopia
- [ ] Kenya

**2013**
- [ ] Azerbaijan
- [ ] Bulgaria
- [ ] Czech Republic
- [ ] Slovenia
- [ ] Uganda
- [ ] Uruguay

**2014**
- [ ] Thailand

**2015**
- [ ] Canada

99

FDA 0626

100

FDA 0627

Clinical Review

(b) (6) and

NDA 020687/S-020- Mifeprex

(b) (6)

APPEARS THIS WAY ON ORIGINAL

Reference ID: 3909590

-------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------------------

/s/

----------------------------------------------------

(b) (6)

03/29/2016

(b) (6)

03/29/2016

(b) (6)

03/29/2016

I concur with _____ (b) (6) conclusions and recommendations for approval of this efficacy supplement.

# CLINICAL FILING CHECKLIST FOR NDA/BLA or Supplement

**NDA/BLA Number: 020687**     **Applicant: Danco Labs**     **Stamp Date: May 29, 2015**

**Drug Name: Mifeprex (Mifepristone)**     **NDA/BLA Type: supplement #020**

On initial overview of the NDA/BLA application for filing:

| | Content Parameter | Yes | No | NA | Comment |
|---|---|---|---|---|---|
| | **FORMAT/ORGANIZATION/LEGIBILITY** | | | | |
| 1. | Identify the general format that has been used for this application, e.g. electronic CTD. | x | | | Paper submission. |
| 2. | On its face, is the clinical section organized in a manner to allow substantive review to begin? | x | | | |
| 3. | Is the clinical section indexed (using a table of contents) and paginated in a manner to allow substantive review to begin? | x | | | |
| 4. | For an electronic submission, is it possible to navigate the application in order to allow a substantive review to begin (*e.g.*, are the bookmarks adequate)? | | | x | |
| 5. | Are all documents submitted in English or are English translations provided when necessary? | x | | | |
| 6. | Is the clinical section legible so that substantive review can begin? | x | | | |
| | **LABELING** | | | | |
| 7. | Has the applicant submitted the design of the development package and draft labeling in electronic format consistent with current regulation, divisional, and Center policies? | x | | | |
| | **SUMMARIES** | | | | |
| 8. | Has the applicant submitted all the required discipline summaries (*i.e.*, Module 2 summaries)? | | x | | The applicant has not provided module 2 summaries as this is an NDA based on published literature. The applicant has provided a justification summarizing the evidence of safety and efficacy for the proposed changes. |
| 9. | Has the applicant submitted the integrated summary of safety (ISS)? | | x | | See comment for 8. |
| 10. | Has the applicant submitted the integrated summary of efficacy (ISE)? | | x | | See comment for 8. |
| 11. | Has the applicant submitted a benefit-risk analysis for the product? | x | | | Scientific justification-30 pg document |
| 12. | Indicate if the Application is a 505(b)(1) or a 505(b)(2). | x | | | (b) (2) |
| | **505(b)(2) Applications** | | | | |
| 13. | If appropriate, what is the reference drug? | | | X | |
| 14. | Did the applicant provide a scientific bridge demonstrating the relationship between the proposed product and the referenced product(s)/published literature? | x | | | The sponsor provides a bridge from the approved product to the proposed changes, with literature based |

File name: 5_Clinical Filing Checklist for NDA_BLA or Supplement 010908

1

FDA 0629

# CLINICAL FILING CHECKLIST FOR NDA/BLA or Supplement

| | | Content Parameter | Yes | No | NA | Comment |
|---|---|---|---|---|---|---|
| | | | | | | on both the approved product and the proposed regimen. |
| 15. | | Describe the scientific bridge (e.g., BA/BE studies) | x | | | See #14. |
| **DOSE** | | | | | | |
| 16. | | If needed, has the applicant made an appropriate attempt to determine the correct dosage and schedule for this product (*i.e.*, appropriately designed dose-ranging studies)? Study Number: Many articles from the published medical literature.    Study Title:    Sample Size:              Arms: Location in submission: | x | | | |
| **EFFICACY** | | | | | | |
| 17. | | Do there appear to be the requisite number of adequate and well-controlled studies in the application? Pivotal Study #1                 Indication: Pivotal Study #2                 Indication: | x | | | The applicant provides 54 articles total, with 32 specifically on efficacy of the proposed regimen. These include controlled trials, meta-analyses, observational and retrospective studies. |
| 18. | | Do all pivotal efficacy studies appear to be adequate and well-controlled within current divisional policies (or to the extent agreed to previously with the applicant by the Division) for approvability of this product based on proposed draft labeling? | x | | | |
| 19. | | Do the endpoints in the pivotal studies conform to previous Agency commitments/agreements?  Indicate if there were not previous Agency agreements regarding primary/secondary endpoints. | x | | | |
| 20. | | Has the application submitted a rationale for assuming the applicability of foreign data to U.S. population/practice of medicine in the submission? | | | x | The applicant provides 54 articles total. 46 are studies (trials, retrospective, observational studies) and of these 17 are foreign. There are also 3 metanalyses which include foreign studies. |
| **SAFETY** | | | | | | |
| 21. | | Has the applicant presented the safety data in a manner consistent with Center guidelines and/or in a manner previously requested by the Division? | x | | | The applicant provides 21 articles with information on safety, specifically on the serious adverse events of interest (hospitalization, |

File name: 5_Clinical Filing Checklist for NDA_BLA or Supplement 010908

Reference ID: 3793577

FDA 0630

# CLINICAL FILING CHECKLIST FOR NDA/BLA or Supplement

| | Content Parameter | Yes | No | NA | Comment |
|---|---|---|---|---|---|
| | | | | | transfusion, infection requiring IV antibiotics, death). There is another 5 articles with limited safety information and 6 articles with safety information, but using different dosing regimens (e.g. not the approved or proposed new regimen). |
| 22. | Has the applicant submitted adequate information to assess the arythmogenic potential of the product (*e.g.*, QT interval studies, if needed)? | | | x | |
| 23. | Has the applicant presented a safety assessment based on all current worldwide knowledge regarding this product? | x | | | |
| 24. | For chronically administered drugs, have an adequate number of patients (based on ICH guidelines for exposure[1]) been exposed at the dose (or dose range) believed to be efficacious? | | | x | |
| 25. | For drugs not chronically administered (intermittent or short course), have the requisite number of patients been exposed as requested by the Division? | x | | | |
| 26. | Has the applicant submitted the coding dictionary[2] used for mapping investigator verbatim terms to preferred terms? | | | x | There is no mapping of investigator terms to preferred terms. AE's were variably ascertained; 21 studies include data on SAE's of interest, 7 have limited safety information, 6 have safety information on the approved dosing regimen. Some 7 studies report no safety information. |
| 27. | Has the applicant adequately evaluated the safety issues that are known to occur with the drugs in the class to which the new drug belongs? | x | | | |
| 28. | Have narrative summaries been submitted for all deaths and adverse dropouts (and serious adverse events if requested by the Division)? | | | x | As of 7/16/15, there is one reported death; a complete report will be forthcoming. This |

[1] For chronically administered drugs, the ICH guidelines recommend 1500 patients overall, 300-600 patients for six months, and 100 patients for one year. These exposures MUST occur at the dose or dose range believed to be efficacious.

[2] The "coding dictionary" consists of a list of all investigator verbatim terms and the preferred terms to which they are mapped. It is most helpful if this comes in as a SAS transport file so that it can be sorted as needed; however, if it is submitted as a PDF document, it should be submitted in both directions (verbatim -> preferred and preferred -> verbatim).

File name: 5_Clinical Filing Checklist for NDA_BLA or Supplement 010908

Reference ID: 3793577

FDA 0631

## CLINICAL FILING CHECKLIST FOR NDA/BLA or Supplement

| | Content Parameter | Yes | No | NA | Comment |
|---|---|---|---|---|---|
| | | | | | is not part of the presently submitted application. |
| **OTHER STUDIES** | | | | | |
| 29. | Has the applicant submitted all special studies/data requested by the Division during pre-submission discussions? | | | x | |
| 30. | For Rx-to-OTC switch and direct-to-OTC applications, are the necessary consumer behavioral studies included (*e.g.*, label comprehension, self selection and/or actual use)? | | | x | |
| **PEDIATRIC USE** | | | | | |
| 31. | Has the applicant submitted the pediatric assessment, or provided documentation for a waiver and/or deferral? | x | | | The applicant requested a partial waiver for patients <12 and a waiver for patients 12-17, based on data from one study which included 322 subjects <17 years old. |
| **ABUSE LIABILITY** | | | | | |
| 32. | If relevant, has the applicant submitted information to assess the abuse liability of the product? | | | x | |
| **FOREIGN STUDIES** | | | | | |
| 33. | Has the applicant submitted a rationale for assuming the applicability of foreign data in the submission to the U.S. population? | | | X | 29/46 studies are US data, 17 are based on foreign data. |
| **DATASETS** | | | | | |
| 34. | Has the applicant submitted datasets in a format to allow reasonable review of the patient data? | | | x | NDA relies upon published studies; datasets were not provided. |
| 35. | Has the applicant submitted datasets in the format agreed to previously by the Division? | | | x | |
| 36. | Are all datasets for pivotal efficacy studies available and complete for all indications requested? | | | x | |
| 37. | Are all datasets to support the critical safety analyses available and complete? | | | x | |
| 38. | For the major derived or composite endpoints, are all of the raw data needed to derive these endpoints included? | | | x | |
| **CASE REPORT FORMS** | | | | | |
| 39. | Has the applicant submitted all required Case Report Forms in a legible format (deaths, serious adverse events, and adverse dropouts)? | | | x | NDA relies upon published studies; CRFs were not provided. |
| 40. | Has the applicant submitted all additional Case Report Forms (beyond deaths, serious adverse events, and adverse drop-outs) as previously requested by the Division? | | | x | |
| **FINANCIAL DISCLOSURE** | | | | | |
| 41. | Has the applicant submitted the required Financial Disclosure information? | | | X | |
| **GOOD CLINICAL PRACTICE** | | | | | |
| 42. | Is there a statement of Good Clinical Practice; that all clinical studies were conducted under the supervision of an | | | x | |

File name: 5_Clinical Filing Checklist for NDA_BLA or Supplement 010908

4

FDA 0632

# CLINICAL FILING CHECKLIST FOR NDA/BLA or Supplement

| Content Parameter | Yes | No | NA | Comment |
|---|---|---|---|---|
| IRB and with adequate informed consent procedures? | | | | |

**IS THE CLINICAL SECTION OF THE APPLICATION FILEABLE?  ___yes_____**

If the Application is not fileable from the clinical perspective, state the reasons and provide comments to be sent to the Applicant.

Please identify and list any potential review issues to be forwarded to the Applicant for the 74-day letter.

> There is one review issue which will need to be addressed.
> The proposed label contains information from the original studies and not from the studies supporting the new dosing regimen and the other proposed changes (e.g., including healthcare providers prescribing Mifeprex and home use of misoprostol). The Sponsor will need to update the proposed label.

(b) (6)                                                        7/16/15

Reviewing Medical Officers                              Date

(b) (6)                                                        7/16/15

                                                        Date

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

07/16/2015


(b) (6)

07/17/2015


(b) (6)

07/17/2015

FDA 0634

# CENTER FOR DRUG EVALUATION AND RESEARCH

## *APPLICATION NUMBER:*

## **020687Orig1s020**

## <u>**RISK ASSESSMENT and RISK MITIGATION REVIEW(S)**</u>

FDA 0673



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Food and Drug Administration
10903 New Hampshire Avenue
Building #51
Silver Spring, MD 20993

DATE:       March 28, 2016

FROM:       Janet Woodcock, MD
            Director, Center for Drug Evaluation and Research

THRU:

                                                                    (b) (6)

TO:

                                                                    (b) (6)

RE:  NDA 020687, Supp 20

The currently approved REMS for Mifeprex contains a Patient Agreement Form required to be
signed by both the patient and the prescriber.  During the review of the REMS in connection with
supplement 20 to NDA 020687 submitted by the sponsor.                          (b) (6)
                                                                found that the
information contained in the Patient Agreement Form is generally duplicative of information in
the Medication Guide and of information and counseling provided to patients under standard
informed consent practices for medical care and under professional practice guidelines.  For the
reasons further described in their reviews, the reviewers recommended that the Patient
Agreement Form be removed from the REMS.

After being briefed on the planned changes to the NDA that the Center was considering, the
Commissioner concluded that continuing the REMS requirement for a signed Patient Agreement
Form would not interfere with access and would provide additional assurance that the patient is
aware of the nature of the procedure, its risks, and the need for appropriate follow-up care.  He
requested that the Patient Agreement Form be retained as an element of the REMS.

Therefore, I have asked                          (b) (6)  and                      (b) (6)
                   to continue to include a Patient Agreement Form in the REMS for Mifeprex.

FDA 0674

-------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

03/29/2016

adding to for the record

**Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b) (6)

(b) (6)

Date:                    March 29, 2016

(b) (6)

(b) (6)  (        (b) (6)

Subject:                   Assessment Review of the Year 4 risk evaluation and mitigation strategy (REMS) assessment report

Drug Name(s):        Mifeprex® (mifepristone)

Therapeutic class:   Progesterone-receptor modulator

Dosage forms:        200 mg tablets

(b) (6) Review Division:                       (b) (6)

Application Type/Number:   NDA 020687, Supp 20

Applicant/sponsor:   Danco Laboratories

I

FDA 0676

This memo is to address specific statements made in the ⬛ (b) (6)
( ⬛ (b) (6) Review of the Year 4 Risk Evaluation and Mitigation Strategy (REMS) assessment report that relate to an unapproved dosing regimen for Mifeprex.[1]

Mifeprex (NDA 20-687) is currently approved for the medical termination of intrauterine pregnancy through 49 days (7 weeks) gestation in a regimen with misoprostol. The currently approved dose of Mifeprex is 600 mg (three 200 mg) oral tablets which are to be taken under the supervision of a physician, followed two days later by two 200 mcg tablets (400 mcg) of misoprostol orally.

Danco Laboratories, LLC (Danco) submitted the 4 year REMS assessment report on June 2, 2015. The ⬛ (b) (6) REMS assessment reviewer had noted that there was use of the unapproved dosing regimen of Mifeprex 200 mg orally on day 1; followed by misoprostol 800 mcg, administered vaginally or buccally on day 3 or 4 for medical termination of intrauterine pregnancy up to 63 days gestation. The reviewer's comments included that it was unknown whether this unapproved regimen may have contributed to certain observed adverse events.

On May 29, 2015, Danco submitted a prior approval efficacy supplement-020 (PAS-020) seeking approval of certain changes to the approved indication, dosing regimen, and labeling for Mifeprex. Danco proposed to change the dosing regimen to: 200 mg orally x 1, instead of 600 mg orally x 1; followed 24-48 hours later by misoprostol 800 mcg, administered buccally; and an extension of gestational age from 49 to ⬛ (b) (4) 70 days). This supplement was under review at the time the October 2015 ⬛ (b) (6) REMS Assessment review was conducted.

The ⬛ (b) (6) ( ⬛ (b) (6) is reviewing Danco's efficacy prior approval supplement-020 (PAS-020) to determine whether the supplement can be approved. Because ⬛ (b) (6) review encompasses all of the data and information submitted in the supplement, ⬛ (b) (6) defers to ⬛ (b) (6) with respect to the safety and efficacy of the dose and dosing regimen proposed by Danco.

---

[1] ⬛ (b) (6) ( ⬛ (b) (6) Review of Year 4 Risk Evaluation and Mitigation Strategy (REMS) Assessment Report, dated October 13, 2015

2

FDA 0677

-------------------------------------------------------------------------------------------

This is a representation of an electronic record that was signed
electronically and this page is the manifestation of the electronic
signature.

-------------------------------------------------------------------------------------------

/s/

----------------------------------------------------

(b) (6)

03/29/2016

memo to the assessment review

FDA 0678

## Risk Evaluation and Mitigation Strategy (REMS) Memorandum
## REMS Modification

### U.S. FOOD AND DRUG ADMINISTRATION
### CENTER FOR DRUG EVALUATION AND RESEARCH

**NDA:** 020687
**PRODUCT:** Mifeprex (mifepristone) oral tablets
**APPLICANT:** Danco Laboratories (Danco)
**FROM:**
**DATE:** March 29, 2016

This memorandum provides the _____ ( _____ review of the proposed modifications to the Mifeprex Risk Evaluation and Mitigation Strategy (REMS) addressed in the _____ ( _____ REMS Modification Review and Addendum to REMS Modification Review.  A REMS for Mifeprex was approved on June 8, 2011, to ensure the benefits of the drug outweighed the risks of serious complications.  The Mifeprex REMS consists of a Medication Guide, elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments of the REMS.

Mifeprex was approved for the medical termination of an intrauterine pregnancy through 49 days of gestation on September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (Subpart H).  It was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the 2007 Food and Drug Administration Amendments Act.  A formal REMS proposal was submitted by Danco and approved on June 8, 2011.  The goals and elements of the approved Mifeprex REMS are briefly summarized in Table 1 below.

### Table 1. Summary of Mifeprex REMS[1]

| | |
|---|---|
| **REMS Goals** | To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug. |
| | To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. |
| **REMS Elements** | Medication Guide |
| | ETASU A – Special certification of healthcare providers (HCPs) who prescribe Mifeprex: Completion of Prescriber's Agreement form and enrollment in the REMS program. |
| | ETASU C – Mifeprex is dispensed only in certain healthcare settings: It is only available to be dispensed in clinics, medical offices or hospitals, under the supervision of a specially certified prescriber. Mifeprex will not be distributed to or dispensed through retail pharmacies. |
| | ETASU D – Safe-use conditions: Patients must complete and sign the Patient Agreement form that is to be placed in the patient's medical record.  A copy of the Patient Agreement form and Medication Guide must be provided to the patient. |
| **Implementation System** | Distributors of Mifeprex must be certified and agree to ship Mifeprex only to locations identified by certified prescribers.  Distributors must agree to maintain secure and confidential records, as well as, follow all distribution guidelines concerning storage, shipments and controlled returns. |

---

[1] Source: The _____ REMS Modification Review (NDA 20867/S-020, dated March 29, 2016), Table 1.

FDA 0679

On May 29, 2015, Danco submitted an efficacy supplement (S-020) that proposed modifications to the Mifeprex Prescribing Information and REMS. In the S-020 submission, Danco seeks the following major changes (among others):

- [(b) (4)] dosing regimen of Mifeprex and misoprostol
- Extension of maximum gestational age from 49 days to 70 days
- Replacement of the term "licensed physician" with "[(b) (4)]" in the REMS Prescriber's Agreement form
- Removal of the phrase "Under Federal Law" from the REMS Prescriber's Agreement form
- Revisions to the Patient Agreement form reflecting changes to the Prescribing Information

The proposed changes in the efficacy supplement prompted revisions to the Mifeprex REMS materials and also updating of the REMS materials to current format. During review of this efficacy supplement, we also evaluated the current REMS program to determine whether each Mifeprex REMS element remains necessary to ensure the drug benefits outweigh the risks. The Agency considered the recent [(b) (6)] REMS Assessment review completed October 13, 2015, safety data gathered since drug approval in 2000, and experience from current clinical practice to support additional modifications to the Mifeprex REMS.

After consultations between the [(b) (6)] and [(b) (6)] and considering the [(b) (6)] REMS Modification Review and Addendum to the REMS Modification Review, [(b) (6)] has determined that the approved REMS for Mifeprex should be modified as follows:

1. Revisions to the Prescriber's Agreement form in addition to those proposed by the Applicant
2. Removal of the Medication Guide as a REMS element
3. Removal of the Patient Agreement form as a Documentation of Safe Use Condition (ETASU D)
4. Updating of REMS goals to reflect the above changes

We concur with [(b) (6)] recommendation that the Prescriber's Agreement form should include other modifications to reflect current REMS standards and materials and also to reflect changes to align with approval of the efficacy supplement S-020, such as the dose and dose regimen and upper limit of gestational age.

In addition, we agree with Danco's proposed removal of the phrase "Under Federal Law," because of the lack of precedent for requiring such text and clinical rationale for its inclusion. As approvals and REMS are governed by Federal law, the phrase "Under Federal law" is unnecessary. Regarding Danco's proposal to replace "licensed physician," we have determined that the replacement term should be "licensed healthcare providers who prescribe," to include other practitioners who prescribe; in addition, this phrase is consistent with language in the statute.

We concur with [(b) (6)] recommendation that the Medication Guide is no longer necessary as an element of the REMS to ensure the benefits of Mifeprex outweigh its risks. The Medication Guide will continue to be part of the approved labeling that must be provided to a patient in accordance with 21 CFR part 208. Like other labeling, Medication Guides are subject to the safety labeling change provisions of section 505(o)(4) of the FDCA.

In addition, we concur with [(b) (6)] recommendation that the signed Patient Agreement form is no longer necessary and should be removed as a condition of safe use (ETASU D). Recent professional guidelines for women seeking surgical and medical abortion services emphasize comprehensive counseling, education about the risks of different treatments, and obtaining and documenting informed consent.[2,3] The National Abortion

---

[2] ACOG. Medical management of first trimester abortion. ACOG Practice Bulletin #143. Obstetrics and Gynecology 2014; 123(3):676-692

2

Federation (NAF) clinical practice guidelines include a standard stating that documentation must show that the patient affirms that she understands the procedure and its alternatives, the potential risks and benefits, and that her decision is voluntary.[4]  Approximately (b)(4)% of the use of Mifeprex in the U.S. is through Planned Parenthood Federation of America (PPFA)- and NAF-affiliated members, where patient counseling and informed consent is standard of care.  The practice of treating women with Mifeprex is well-established by these organizations and their associated providers who choose to provide this care to women.  In addition, the Medication Guide, which must be provided to the patient under 21 CFR part 208, contains the same risk information contained in the Patient Agreement form.

The safety profile of Mifeprex is well-characterized and its risks well-understood after more than 15 years of marketing.  Serious adverse events are rare and the safety profile of Mifeprex has not substantially changed.[5] The removal of the Medication Guide as a REMS element and of the Patient Agreement form is not expected to adversely impact the ability of the REMS to ensure that the drug benefits outweigh its risks.  The benefit-risk balance of Mifeprex remains favorable in the presence of the following:

- Retention of ETASUs A and C in the Mifeprex REMS: The Prescriber's Agreement form required for prescriber certification under ETASU A will continue to require that providers "explain the procedure, follow-up, and risks to each patient and give her an opportunity to discuss them."  The REMS will continue to require that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals by or under the supervision of a certified prescriber.  This ensures that Mifeprex can only be dispensed by or under the direct supervision of a certified prescriber.

- Communication of risks through patient labeling: The Medication Guide, which will be retained as part of labeling, contains the same risk information covered under the Patient Agreement form.  Under 21CFR 208.24, prescribers who dispense Mifeprex are required to provide the Medication Guide to patients.  The Prescriber's Agreement form also reminds the prescriber to provide the Medication Guide to the patient.

- Information from published articles on established clinical practices: This information, including clinical guidelines and publications, indicates that comprehensive patient counseling and informed consent prior to medical or surgical abortion treatment is standard of care when using Mifeprex.

We have also determined that the information in the efficacy supplement supports changes to the goals of the Mifeprex REMS. We concur with (b)(6) recommendation that the REMS goals should be modified from:

A.  To provide information to patients about the benefits  and risks of Mifeprex before they make a decision whether to take the drug.
B.  To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications.

to:

The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:

a)  Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.

---

[3] National Abortion Federation Membership information accessed on the internet at http://prochoice.org/health-care-professionals/naf-membership/ on March 11, 2016
[4] National Abortion Federation Clinical Policy Guidelines (for abortion care). Revised 2015 edition, 56 pages, accessed on the internet at http://prochoice.org/wp-content/uploads/2015_NAF_CPGs.pdf on March 11, 2016.
[5] (b)(6) Mifeprex Post-marketing Safety Review, dated August 20, 2015.

3

   b) Ensuring that Mifeprex is only dispensed in certain health care settings under the supervision of a certified prescriber.

The above REMS modifications and changes in goals were discussed with the ████████████ (b) (6)
and concurrence with these changes was obtained.

The modified Mifeprex REMS should consist of ETASU A, in which healthcare providers who prescribe Mifeprex will be certified, and ETASU C, in which Mifeprex will be dispensed only in certain health care settings (specially clinics, medical offices, and hospitals) by or under the supervision of a certified prescriber. The Mifeprex REMS will also include an implementation system, and a timetable for continued submission of assessments of the REMS.

<u>Addendum:</u>

On March 28, 2016, Dr. Janet Woodcock, the Director, Center for Drug Evaluation and Research, asked (b)(6) ████████████ and ████████████ (b) (6) to continue to include a Patient Agreement form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through ████████████ (b) (4) , ████████████ (b) (6) the Director, OSE, and ████████████ (b) (6) , to the Directors of ███ (b)(6) and ███ (b)(6) Therefore, the Patient Agreement form will be retained and other changes will be made in the REMS to reflect that it is being retained, as described in the ███ (b) (6) Addendum to REMS Modification Review.

4

--------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

--------------------------------------------------------------------------------

/s/

----------------------------------------------------

(b) (6)

03/29/2016

Signing for                                    (b) (6)                    (b) (6)

FDA 0683

**Department of Health and Human Services**

**Food and Drug Administration**

**Center for Drug Evaluation and Research**

(b) (6)

(b) (6)

## ADDENDUM TO REMS MODIFICATION REVIEW

| | |
|---|---|
| Date: | March 29, 2016 |
| Reviewer: | (b) (6) |
| | (b) (6) |
| (b) (6) | (b) (6) |
| | (b) (6) |
| (b) (6) | (b) (6) |
| | (b) (6) |
| Subject: | Proposed REMS Modifications |
| Drug Name(s): | Mifeprex® (mifepristone) |
| Therapeutic class: | Progesterone-receptor modulator |
| Dosage forms: | 200 mg tablets |
| (b) (6) Review Division: | (b) (6) |
| Application Type/Number: | NDA 020687, Supp 20 |
| Applicant/sponsor: | Danco Laboratories |
| (b) (6)   (b) (6) #: | 2015-1719 |

1.

FDA 0684

**INTRODUCTION**

This review is an addendum to the ███████████ ( ████ March 29, 2016, REMS Modification Review regarding modifications to the risk evaluation and mitigation strategy (REMS) for Mifeprex, as proposed by Danco Laboratories in the amendment to the prior approval efficacy supplement 020 (PAS-20)  See the March 29, 2016, REMS Modification Review for a description of the original submission and the existing REMS, and the materials informing our review.

In addition to those materials, we considered additional communications with the sponsor which included proposed changes to the REMS and REMS materials on March 21, 25, 27, 28 and 29th. We also considered a memorandum dated March 28, 2016 from Dr. Janet Woodcock, Director, Center for Drug Evaluation and Research, requesting that ████████ and ██ ████████████ continue to include a Patient Agreement Form in the REMS for Mifeprex (see March 28, 2016 Memorandum from Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, through ████ ████████████████████████ This review addresses the sponsor's proposed changes as well as the changes that are needed in the REMS to reflect the fact that the Patient Agreement Form will be retained as part of the REMS.

This addendum will only describe changes that were recommended and that were not covered in the original REMS Modification Review.  The changes we have agreed to were proposed to the sponsor and were accepted.

As with the original REMS modification review, all of the modifications discussed in this review were discussed with ████ and they are in agreement.

## 2.  ████ AND SPONSOR PROPOSED MODIFICATIONS AND RATIONALE

### 2.1. REMS ELEMENTS

#### 2.1.1. DOCUMENTATION OF SAFE USE CONDITIONS - ETASU D

##### 2.1.1.1.  PATIENT AGREEMENT FORM

As discussed above, it has been determined that the Mifeprex REMS should continue to include a Patient Agreement Form as ETASU D in the REMS.  Therefore, the *Patient Agreement Form* is being revised as part of this modification.

The content has been modified to reflect the changes to the Prescribing Information that are being approved as part of the approval of PAS 020. These changes include changing the dosing regimen, updating the percentage of patients for which the treatment will not be effective, revising where Mifeprex or misoprostol should be taken and revising the patient follow-up recommendations after taking Mifeprex.

The requirement for a patient to read the MG has been removed since we are recommending that the MG be removed as an element of the REMS.[1]  However, the MG will remain part of labeling

---

[1]  ████ REMS Modification Review for Mifeprex, dated March 29, 2016.

and will still be required to be distributed to the patient as per 21 CFR part 208. In addition, certified HCPs will have agreed to provide a MG to the patient before providing Mifeprex.

Additionally, the reference to birth defects should be removed because the effects of Mifeprex on an ongoing pregnancy are unknown. Lastly, the attestation that the patient believes she is no more than a certain number of weeks pregnant should be removed. The Prescriber is responsible for accurately dating the pregnancy. Therefore, the patient should not be relied upon to date her own pregnancy.

## 2.2. REMS DOCUMENT

### 2.2.1. GOALS

As discussed in the REMS Modification Review dated March 29, 2016, the Mifeprex REMS goals should be modified. As discussed above, it has been determined that the Mifeprex REMS should continue to include the Patient Agreement Form, which is an ETASU D (documentation of safe use) requirement (see Section 4.1.1). Therefore, the goal of the REMS also should include objective c) below in underlined text.

> The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:
> a) Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.
> b) Ensuring that Mifeprex is only dispensed in certain health care settings under the supervision of a certified prescriber.
> c) <u>Informing patients about the risk of serious complications associated with Mifeprex</u>

(b) (4)

The REMS goal should include the risks to be mitigated by the REMS. The phrase "risk of serious complications" was taken from the previously approved REMS document and continues to be applicable. (b) (6) recommends keeping the risks in the goal.

### 2.2.2. CERTIFICATION OF PRESCRIBERS - ETASU A

As discussed above, it has been determined that the Mifeprex REMS should continue to include the Patient Agreement Form. Therefore, ETASU A in the REMS document needs to be revised to reinsert information regarding this requirement. First, as was the case in the previously approved REMS document, certified prescribers must agree to review the Patient Agreement Form with the patient and answer any of her questions. Additionally, the prescriber must agree to sign the Patient Agreement Form and obtain the patient's signature on the form. Finally, the prescriber must agree to provide the patient with a copy of the Patient Agreement Form and insert a copy in the patient's chart. See redlined, attached REMS document.

In its March 21, 2016, submission, the Sponsor disagrees with changing the name of the *Prescriber's Agreement* to the *Prescriber Enrollment Form* because "enrollment" may be misconstrued by prescribers to mean they are being placed on a list or database. (b) (6) agrees

with the Sponsor's concern about using the term "Enrollment" in the title and proposes to change the name of the *Prescriber's Agreement* to the *Prescriber Agreement Form*. This has been reflected in the REMS document and the *Prescriber Agreement Form*.

The second proposed revision by the Sponsor applies to the qualifications of a certified prescriber. The REMS document currently states that prescribers must have the "ability to assess the duration of pregnancy accurately." Danco is proposing ███████ (b) (4) ██████ have concluded that not all practitioners are able to accurately assess gestational age. This ability is necessary for the safe use of Mifeprex.

In its March 21, 2016, submission, the Sponsor additionally proposed to insert "a non-identifiable reference" into the following statement in the REMS document and the *Prescriber Agreement Form* because it would increase the Sponsor's ability to track these adverse events. In addition, they stated that it is current practice for certified HCPs to provide this information. Danco also proposed removing "solely" from the statement, as shown below:

> Report any deaths to Danco Laboratories, identifying the patient ~~solely~~ by <u>a non-identifiable reference and</u> the serial number from each package of Mifeprex.

███ (b) (6) agreed with the above revisions. Lastly, the Sponsor proposed the following revised language in the REMS document and the Prescriber Agreement Form:

> …explain the <u>risks</u> ████ (b) (4) of the ~~procedure, its effects, and the risks associated with~~ Mifeprex <u>treatment regimen</u>.

███ (b) (6) rejected the addition of ███████ (b) (4) to the REMS document and Prescriber Agreement Form. A REMS should only focus on the risks of a drug. Therefore, ████ (b) (6) proposed that the final language be as follows:

> …explain <u>the risks</u> of the Mifeprex treatment regimen.

Additional minor edits and revisions were suggested for this section of the REMS document and corresponding language within the *Prescriber Agreement Form*. These changes were not intended to be substantive.

### 2.2.3. DOCUMENTATION OF SAFE USE CONDITIONS -ETASU D

As discussed above, it has been determined that the Mifeprex REMS should retain the Patient Agreement Form. Therefore, ████ (b) (6) has proposed to insert the following text into the Mifeprex REMS document:

3. Mifeprex must be dispensed to patients with evidence or other documentation of safe use conditions.

    a. The patient must sign a *Patient Agreement Form* indicating that she has:

        i. Received, read and been provided a copy of the *Patient Agreement Form*.

        ii. Received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

### 2.2.4. IMPLEMENTATION SYSTEM

In its March 21, 2016, submission, the Sponsor proposed to 

   a. Ship Mifeprex only to clinics, medical offices, and hospitals identified by certified prescribers in the signed *Prescriber Agreement Form*.

   b. Complete the healthcare provider certification process upon receipt of the *Prescriber Enrollment Form*.

   c. Notify healthcare providers when they have been certified by the Mifeprex REMS Program.

(b) (6)                                               (b) (4). These are separate actions the distributor undertakes. Therefore, they should be described in the REMS document. Furthermore, it is not guaranteed that when a healthcare provider submits the *Prescriber Agreement Form*, they are ordering Mifeprex. In this situation, it is important that HCPs be notified when they are certified and, therefore, able to order Mifeprex in the future.

Lastly, (b) (6) proposed to move the adverse event reporting requirements from the assessment to the implementation system of the REMS and to remove the requirement to report certain specifically enumerated adverse events such as all hospitalizations due to complications and women requiring transfusions, but retain the requirement to report all deaths. The following language was inserted:

"Danco Laboratories must report to FDA any death associated with Mifeprex whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the applicant. This requirement does not affect the applicant's other reporting and follow-up requirements under the FDA regulations."

## 3. CONCLUSION

The review team and Sponsor have proposed additional modifications that continue to ensure that the benefit outweighs the risk for Mifeprex. This addendum addresses modifications to the REMS including those proposed by the sponsor in its March 21, 25, 27, 28 and 29, 2016, submissions, and additional changes recommended by (b) (6) The additional changes include the following: reinsertion of the Prescriber Agreement Form (ETASU D) with certain changes to other documents to reflect this, and modification of the REMS goal, REMS document and appended materials provided to the Sponsor on March 17, 2016.

As discussed above, several changes to the language in the REMS document were proposed by Danco. The (b) (4) were rejected by (b) (6) The Sponsor additionally expressed their desire to not change the name of the *Prescriber's Agreement* to the *Prescriber Enrollment Form*, as suggested by the review team. In consideration of this, (b) (6) proposes to change the title to the *Prescriber Agreement Form*.

The above changes to the REMS document and materials are appropriate modifications to the Mifeprex REMS.  They are necessary to ensure that that the risks of serious complications will be mitigated and that the benefits of Mifeprex will continue to outweigh the risks.

## 4.  RECOMMENDATIONS

The proposed amended modification submitted by Danco on March 29, 2016 is acceptable and <sup>(b) (6)</sup> recommends approval of the REMS.

## Appendix

    1.  Prescriber Enrollment Form, clean
    2.  Patient Agreement Form, clean
    3.  REMS Document, clean

FDA 0689

Initial REMS approval: 06/2011

Most recent modification: 03/2016

NDA 020687 MIFEPREX® (mifepristone) Tablets, 200 mg

Antiprogestational Synthetic Steroid

Danco Laboratories, LLC
PO Box 4816
New York, NY 10185

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

## I.  GOAL

The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:

    a)  Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.

    b)  Ensuring that Mifeprex is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber.

    c)  Informing patients about the risk of serious complications associated with Mifeprex

## II.  REMS ELEMENTS

### A. Elements to Assure Safe Use

1.  Healthcare providers who prescribe Mifeprex must be specially certified.

    a.  To become specially certified to prescribe Mifeprex, healthcare providers must:

        i.  Review the Prescribing Information for Mifeprex.

        ii.  Complete the *Prescriber Agreement Form*. By signing the *Prescriber Agreement Form*, prescribers agree that:

            1)  They have the following qualifications:

                a)  Ability to assess the duration of pregnancy accurately

FDA 0690

      b) Ability to diagnose ectopic pregnancies

      c) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

    2) They will follow the guidelines for use of Mifeprex (see b.i-v below).

b.   As a condition of certification, healthcare providers must follow the guidelines for use of Mifeprex described below:

    i.   Review the *Patient Agreement Form* with the patient and fully explain the risks of the Mifeprex treatment regimen. Answer any questions the patient may have prior to receiving Mifeprex.

    ii.   Sign the *Patient Agreement Form* and obtain the Patient's signature on the *Form*

    iii.   Provide the patient with a copy of the *Patient Agreement Form* and Medication Guide.

    iv.   Place the signed *Patient Agreement Form* in the patient's medical record.

    v.   Record the serial number from each package of Mifeprex in each patient's record.

    vi.   Report any deaths to Danco Laboratories, identifying the patient by a non-identifiable reference and the serial number from each package of Mifeprex.

c. Danco Laboratories must:

    i.   Ensure that healthcare providers who prescribe Mifeprex are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements

    ii.   Provide the Prescribing Information and *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

The following materials are part of the REMS and are appended:
- *Prescriber Agreement Form*
- *Patient Agreement Form*

2. Mifeprex must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.

    a.   Danco Laboratories must:

    i.   Ensure that Mifeprex is available to be dispensed to patients only in clinics, medical offices and hospitals by or under the supervision of a certified prescriber.

      ii.  Ensure that Mifeprex is not distributed to or dispensed through retail pharmacies or other settings not described above.

3. Mifeprex must be dispensed to patients with evidence or other documentation of safe use conditions.

    a.  The patient must sign a *Patient Agreement Form* indicating that she has:

      i.  Received, read and been provided a copy of the *Patient Agreement Form*.

      ii.  Received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

## B. Implementation System

1. Danco Laboratories must ensure that Mifeprex is only distributed to clinics, medical offices and hospitals by or under the supervision of a certified prescriber by:

    a.  Ensuring that distributors who distribute Mifeprex comply with the program requirements for distributors. The distributors must:

      i.  Put processes and procedures in place to:

        a.  Complete the healthcare provider certification process upon receipt of the *Prescriber Agreement Form.*

        b.  Notify healthcare providers when they have been certified by the Mifeprex REMS Program.

        c.  Ship Mifeprex only to clinics, medical offices, and hospitals identified by certified prescribers in the signed *Prescriber Agreement Form*.

        d.  Not ship Mifeprex to prescribers who become de-certified from the Mifeprex Program.

        e.  Provide the Prescribing Information and *Prescriber Agreement Form* to healthcare providers who (1) attempt to order Mifeprex and are not yet certified, or (2) inquire about how to become certified.

      ii.  Put processes and procedures in place to maintain a distribution system that is secure, confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, proof of delivery and controlled returns of Mifeprex.

      iii.  Train all relevant staff on the Mifeprex REMS Program requirements.

      iv.  Comply with audits by Danco Laboratories, FDA or a third party acting on behalf of Danco Laboratories or FDA to ensure that all processes and procedures are in place and are being followed for the Mifeprex REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

    b.  Ensuring that distributors maintain secure and confidential distribution records of all shipments of Mifeprex.

FDA 0692

2. Danco Laboratories must monitor distribution data to ensure compliance with the REMS Program.

3. Danco Laboratories must audit new distributors within 90 calendar days after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifeprex REMS Program. Danco Laboratories will take steps to address distributor compliance if noncompliance is identified.

4. Danco Laboratories must take reasonable steps to improve implementation of and compliance with the requirements of the Mifeprex REMS Program based on monitoring and assessment of the Mifeprex REMS Program.

5. Danco Laboratories must report to FDA any death associated with Mifeprex whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the applicant.  This requirement does not affect the applicant's other reporting and follow-up requirements under FDA regulations.

**C.  Timetable for Submission of Assessments**

Danco Laboratories must submit REMS assessments to FDA one year from the date of the initial approval of the REMS (06/08/2011) and every three years thereafter.  To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 60 days before the submission date for that assessment.  Danco Laboratories must submit each assessment so that it will be received by the FDA on or before the due date.

APPEARS THIS WAY ON ORIGINAL

PRESCRIBER AGREEMENT FORM

*Mifeprex®* (Mifepristone)
Tablets, 200 mg

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

*To set up your account to receive Mifeprex, you must:*
1. complete, 2. sign, and 3. fax page 2 of this form to the distributor.

If you will be ordering for more than one facility, you will need to list each facility on your order form before the first order will be shipped to the facility.

**Prescriber Agreement:** By signing page 2 of this form, you agree that you meet the qualifications below and will follow the guidelines for use. You also understand that if you do not follow the guidelines, the distributor may stop shipping Mifeprex to you.

*Mifeprex must be provided by or under the supervision of a healthcare provider who prescribes and meets the following qualifications:*

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of Mifeprex. The Prescribing Information is available by calling our toll free number, 1-877-4 Early Option (1-877-432-7596), or logging on to our website, www.earlyoptionpill.com.

*In addition to meeting these qualifications, you also agree to follow these guidelines for use:*

- Review the Patient Agreement Form with the patient and fully explain the risks of the Mifeprex treatment regimen. Answer any questions the patient may have prior to receiving Mifeprex.

- Sign and obtain the patient's signature on the Patient Agreement Form.

- Provide the patient with a copy of the Patient Agreement Form and the Medication Guide.

- Place the signed Patient Agreement Form in the patient's medical record.

- Record the serial number from each package of Mifeprex in each patient's record.

- Report deaths to Danco Laboratories, identifying the patient by a non-identifiable patient reference and the serial number from each package of Mifeprex.



Danco Laboratories, LLC • P.O. Box 4816 • New York, NY 10185
1-877-4 Early Option (1-877-432-7596) • www.earlyoptionpill.com
*MIFEPREX is a registered trademark of Danco Laboratories, LLC.

03/2016

FDA 0694

# ACCOUNT SETUP FORM ID 6947

MIFEPREX* (Mifepristone) Tablets, 200 mg; NDC 64875-001-01

## TO SET UP YOUR ACCOUNT:

❶ Read the Prescriber Agreement on page 1 of this form.

❷ Complete and sign this form.

❸ Fax this page to the Danco distributor at 1-866-227-3343. Your account information will be kept strictly confidential.

❹ The distributor will call to finalize your account setup and take your initial order.

❺ Subsequent orders may be phoned or faxed and are usually shipped within 24 hours.

**Mifeprex**
(Mifepristone) Tablets, 200 mg
THE ORIGINAL EARLY OPTION PILL

### BILLING INFORMATION

Bill to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### SHIPPING INFORMATION  ☐ *Check if same as above*

Ship to Name _____

Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Attention _____

### ADDITIONAL SITE LOCATIONS *I will also be prescribing Mifeprex* at these additional locations:*

Name _____ Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

Name _____ Address _____

City _____ State _____ ZIP _____

Phone _____ Fax _____

*(Any additional sites may be listed on an attached sheet of paper.)*

### REQUEST ADDITIONAL MATERIALS

☐ Medication Guides   ☐ State Abortion Guides   ☐ Patient Brochures   ☐ Patient Agreement Form

### ESTABLISHING YOUR ACCOUNT *(required only with first order)*

Each facility purchasing Mifeprex must be included on this form (*see additional site locations box above*) before the distributor can ship the product to the facility.
**By signing below, you agree that you meet the qualifications and that you will follow the guidelines for use on page 1 of the Prescriber Agreement.**

Print Name _____ Signature _____

Medical License # _____ Date _____

### FAX THIS COMPLETED FORM TO THE AUTHORIZED DISTRIBUTOR. FAX: 1-866-227-3343

Please fax any questions to the above number or call 1-800-848-6142.

FDA 0695

Reference ID: 3909588                    *MIFEPREX is a registered trademark of Danco Laboratories, LLC.

PATIENT AGREEMENT FORM



**Healthcare Providers:** *Counsel the patient on the risks of Mifeprex\*. Both you and the patient must sign this form.*

**Patient Agreement:**

**1.** I have decided to take Mifeprex and misoprostol to end my pregnancy and will follow my provider's advice about when to take each drug and what to do in an emergency.

**2.** I understand:
   **a.** I will take Mifeprex on Day 1.
   **b.** My provider will either give me or prescribe for me the misoprostol tablets which I will take 24 to 48 hours after I take Mifeprex.

**3.** My healthcare provider has talked with me about the risks including:
   • heavy bleeding
   • infection
   • ectopic pregnancy (a pregnancy outside the womb)

**4.** I will contact the clinic/office right away if in the days after treatment I have:
   • a fever of 100.4°F or higher that lasts for more than four hours
   • severe stomach area (abdominal) pain
   • heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
   • stomach pain or discomfort, or I am "feeling sick", including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol

**5.** My healthcare provider has told me that these symptoms could require emergency care. If I cannot reach the clinic or office right away my healthcare provider has told me who to call and what to do.

**6.** I should follow up with my healthcare provider about 7 to 14 days after I take Mifeprex to be sure that my pregnancy has ended and that I am well.

**7.** I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**8.** If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**9.** I have the MEDICATION GUIDE for Mifeprex. I will take it with me if I visit an emergency room or a healthcare provider who did not give me Mifeprex so that they will understand that I am having a medical abortion with Mifeprex.

**10.** My healthcare provider has answered all my questions.


**Patient Signature:** _____ **Patient Name (print):** _____ **Date:** _____

*The patient signed the PATIENT AGREEMENT in my presence after I counseled her and answered all her questions. I have given her the MEDICATION GUIDE for Mifeprex.*


**Provider's Signature:** _____ **Name of Provider (print):** _____ **Date:** _____

*After the patient and the provider sign this PATIENT AGREEMENT, give 1 copy to the patient before she leaves the office and put 1 copy in her medical record.*

03/2016

FDA 0696

*MIFEPREX is a registered trademark of Danco Laboratories, LLC.    **D** DANCO

-----------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-----------------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

03/29/2016

(b) (6)

03/29/2016

Concur

FDA 0697

**Department of Health and Human Services**

**Food and Drug Administration**

**Center for Drug Evaluation and Research**



## REMS MODIFICATION REVIEW

Date:    March 29, 2016

Reviewer:



Subject:    Proposed REMS Modifications

Drug Name(s):    Mifeprex® (mifepristone)

Therapeutic class:    Progesterone-receptor modulator

Dosage forms:    200 mg tablets

(b) (6) Review Division:

Application Type/Number:    NDA 020687, Supp 20

Applicant/sponsor:    Danco Laboratories

(b) (6) (b) (6) #:    2015-1719

1

FDA 0698

## Table of Contents

1.      INTRODUCTION ........................................................................................................ 3
1.1    BACKGROUND ........................................................................................................... 3
1.2    BRIEF SUMMARY OF KEY REGULATORY HISTORY ..................................................... 4
2.      MATERIALS REVIEWED ......................................................................................... 4
3.      OVERVIEW OF RATIONALE FOR proposed REMS MODIFICATIONS ................. 5
4.      Sponsor proposed modifications and Rationale ............................................................ 5
4.1.    REMS ELEMENTS .................................................................................................. 5
4.1.1.  Certification of Prescribers - ETASU A ................................................................... 5
4.1.1.1.  Prescriber's Agreement .......................................................................................... 5
5.      (b) (6) Proposed Modifications and Rationale ............................................ 6
5.1.    REMS ELEMENTS .................................................................................................. 6
5.1.1.  Medication Guide.................................................................................................... 6
5.1.2.  Certification of Prescribers - ETASU A ................................................................... 6
5.1.2.1.  Prescriber's Agreement .......................................................................................... 6
5.1.3.  Drug dispensed only in certain health care settings - ETASU C ............................... 7
5.1.4.  Documentation of Safe Use Conditions - ETASU D ................................................ 7
5.1.4.1.  Patient Agreement .................................................................................................. 7
5.2.    REMS DOCUMENT ................................................................................................ 8
5.2.1.  GOALS .................................................................................................................. 8
5.2.2.  Medication Guide.................................................................................................... 9
5.2.3.  Certification of Prescribers - ETASU A ................................................................... 9
5.2.4.  Drug dispensed only in certain health care settings - ETASU C ............................... 9
5.2.5.  Documentation of Safe Use Conditions -ETASU D ................................................. 9
5.2.6.  Implementation System .......................................................................................... 9
5.2.7.  Timetable for Submission of Assessments ............................................................... 9
5.3.    Assessment Plan..................................................................................................... 9
6.      CONCLUSION ........................................................................................................ 10
7.      RECOMMENDATIONS ........................................................................................... 11
8.      Appendix ................................................................................................................ 11

Reference ID: 3909587                                                                                       FDA 0699

# 1.  INTRODUCTION

This review provides the ▓▓▓▓ (b) (6) ▓▓ (b) (6) evaluation of the modifications to the risk evaluation and mitigation strategy (REMS) for Mifeprex proposed in the efficacy supplement submitted by Danco Laboratories (Danco) on May 29, 2015, and provides ▓▓ (b) (6) recommendations to the ▓▓▓▓ (b) (6) ▓▓ ( ▓▓ (b) (6) ▓▓  The approved REMS consists of a Medication Guide (MG), elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments.  The evaluation of modifications to the approved REMS utilized input received from the ▓▓▓▓ (b) (6) ( ▓ (b) (6) 1, REMS assessment data, and a postmarketing summary report by the ▓▓▓ (b) (6) ▓▓ ( ▓▓ (b) (6) ▓

## 1.1 BACKGROUND

Mifeprex is a synthetic steroid with antiprogestational effects.  The currently approved dose is three 200 mg oral tablets which are to be taken under the supervision of a physician for the medical termination of intrauterine pregnancy through 49 days gestation.  Mifeprex was approved September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (Subpart H).[2]  Mifeprex was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007.  A formal REMS proposal was submitted by Danco and approved on June 8, 2011 with a MG, ETASU, an implementation system and a timetable for submission of assessments. The goals and elements of the REMS are briefly summarized in Table 1 below.

Table 1. Summary of Currently Approved Mifeprex REMS

| REMS Goals | To provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug. |
| --- | --- |



[1] ▓▓ (b) (6) ▓▓

[2] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

FDA 0700

| | |
|---|---|
| | To minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. |
| REMS Elements | Medication Guide |
| | ETASU A – Special certification of healthcare providers (HCPs) who prescribe Mifeprex: Completion of Prescriber's Agreement form and enrollment in the REMS program. |
| | ETASU C – Mifeprex dispensed only in certain healthcare settings: It is only available to be dispensed in clinics, medical offices or hospitals, by or under the supervision of a specially certified prescriber. Mifeprex will not be distributed to or dispensed through retail pharmacies. |
| | ETASU D – Safe-use conditions: Patients must complete and sign the Patient's Agreement form that is to be placed in the patient's medical record. A copy of the Patient's Agreement form and MG must be provided to the patient. |
| Implementation System | Distributors of Mifeprex must be certified and agree to ship Mifeprex only to locations identified by certified prescribers. Distributors must agree to maintain secure and confidential records, as well as, follow all distribution guidelines concerning storage, shipments and controlled returns. |

## 1.2 BRIEF SUMMARY OF KEY REGULATORY HISTORY

A brief summary of the key regulatory history relevant to the Mifeprex REMS is listed below:

**September 28, 2000:** Mifeprex is approved with restricted distribution and postmarketing commitments under 21 CFR 314.520 (Subpart H).

**September 27, 2007:** FDAAA enacted and Mifeprex is deemed to have a REMS.

**June 8, 2011:** Mifeprex REMS is approved, NDA 020687/S-014

**June 1, 2012:** REMS Assessment Report, Year 1

**June 2, 2015:** REMS Assessment Report, Years 2-4

**May 29, 2015:** Danco submitted PAS- 020 efficacy supplement

**January 15, 2016:** A (b) (6) meeting was held to discuss proposed revisions to the REMS which included revising the REMS goal and removal of the MG and Patient Agreement form as elements of the REMS.

## 2. MATERIALS REVIEWED

## 2.1 SUBMISSIONS

- Danco Laboratories, Prior Approval Efficacy Supplement and REMS Modification, PAS-020, received May 29, 2015 (paper submission)

## 2.2 OTHER MATERIALS INFORMING OUR REVIEW

- Mifeprex approval letter, dated September 28, 2000
- (b) (6) Mifeprex PAS-014 approval letter, dated June 8, 2011
- (b) (6) Final deemed REMS Review for Mifeprex:, dated June 3, 2011
- (b) (6) Review of Year 1 REMS Assessment Report: dated August 1, 2012
- (b) (6) Review of Year 4 REMS Assessment Report: dated October 13, 2015

4

FDA 0701

- (b) (6)  Mifeprex Post-marketing Safety Review: dated August 20, 2015
- Addendum to         (b) (6)  Review of Year 4 REMS Assessment Report: dated March 29, 2016
- (b) (6)  draft Clinical Review for Mifeprex, NDA 020687, PAS 20: dated March 29, 2016.

## 3. OVERVIEW OF RATIONALE FOR PROPOSED REMS MODIFICATIONS

On May 29, 2015, Danco submitted an efficacy prior approval supplement-020 (PAS-020) and REMS modification. In PAS-020, Danco is seeking approval of certain changes, including:

- Dosing of 200 mg orally x 1, instead of 600 mg orally x 1
- Extension of maximum gestational age
- Inclusion of misoprostol in the indication statement
- Inclusion of information regarding Pediatric Research Equity Act (PREA) data
- Replacement of the term "physician" with "                    (b) (4)  in the PI and the REMS Prescriber's Agreement
- Removal of the phrase "Under Federal Law" from the REMS Prescriber's Agreement
- Revisions to the Patient Agreement Form to reflect proposed changes in the PI

The Sponsor's proposed changes in the efficacy supplement prompted revisions to the Mifeprex REMS materials. During review of the efficacy supplement and proposed REMS Modifications, (b) (6)  evaluated the current REMS program to determine whether other changes were appropriate. As part of this evaluation, the review team took into consideration the recent (b) (6)  review of the Mifeprex REMS Assessment completed on October 13, 2015, the addendum to the October 13, 2015 review completed on March 29, 2016, safety data gathered over the past 16 years since approval, and information regarding current clinical practice.[5,6,8,9]

Based on the available data and information, (b) (6)  continues to believe that a REMS is necessary to ensure the benefits outweigh the risks; however, we recommend that some elements be modified or removed. All of the modifications in this review were discussed with (b) (6)  The recommended modifications and supporting rationale for each are further described in Sections 4 and 5 below.

## 4. SPONSOR PROPOSED MODIFICATIONS AND RATIONALE

### 4.1. REMS ELEMENTS

### 4.1.1. CERTIFICATION OF PRESCRIBERS - ETASU A

### 4.1.1.1. PRESCRIBER'S AGREEMENT

Danco is proposing two modifications to the Prescriber's Agreement form. The first proposal is to remove the phrase "Under Federal law" from the document. This phrase appears twice in the Prescriber's Agreement:

(1) *Under Federal law*, Mifeprex must be provided by or under the supervision of a physician who meets the following qualifications…
(2) *Under Federal law*, each patient must be provided with a Medication Guide.

5

The Sponsor is proposing that the phrase be deleted from the beginning of the above sentences to be consistent with current REMS language.

*Reviewer Comment: The review team agrees with this revision. The review team has determined that there is no precedent in other REMS for using the phrase, nor is there any clinical rationale for including it. As approvals are governed by Federal law, the review team concludes that the phrase "Under Federal law" is unnecessary in the Prescriber's Agreement.*

The second proposed modification from Danco is to replace the word "physician" with "⬛⬛⬛" (b)(4)  The Prescriber's Agreement currently reads: "Under Federal law, Mifeprex must be provided by or under the supervision of a *physician* who meets the following qualifications…"   The Sponsor is proposing that the agreement read:  "Mifeprex must be provided by or under the supervision of a ⬛⬛⬛ (b)(4) who meets the following qualifications…"

*Reviewer Comment: The review team agrees that the term "physician" should be replaced, but with the phrase "healthcare provider who prescribes." ⬛⬛⬛ (b)(4)*
⬛⬛⬛. *Mifeprex is a prescription medication and "healthcare providers who prescribe" accurately describes not only physicians but other healthcare providers, for example, nurse practitioners, certified nurse midwives and physician assistants, who may prescribe medications. Additionally, the phrase "healthcare provider who prescribes" is consistent with the language that is included in the statute.[3]*

## 5.    ⬛ (b)(6) PROPOSED MODIFICATIONS AND RATIONALE

### 5.1. REMS ELEMENTS

### 5.1.1. MEDICATION GUIDE

FDA has generally been maintaining MGs as FDA-approved labeling but removing them from REMS when inclusion in REMS is not necessary to ensure that the benefits of a drug outweigh the risks.  The Mifeprex MG, though an important tool for patient education that will continue to be distributed to patients, does not need to be an element of the REMS to ensure the benefits outweigh the risks for Mifeprex. ==The MG will remain part of labeling and will still be required to be distributed to the patient as per 21 CFR part 208. This== approach is consistent with ongoing efforts to streamline REMS by allowing for changes to a MG without the need for a REMS modification.

### 5.1.2. CERTIFICATION OF PRESCRIBERS - ETASU A

### 5.1.2.1. PRESCRIBER'S AGREEMENT

Per the current Mifeprex REMS, a Prescriber's Agreement is required to be completed, signed and faxed to the distributor to complete enrollment.  The review team is recommending

---

[3] FDCA 505-1(f)(3)(A).

6

changing the name of the form from "Prescriber's Agreement" to "Prescriber Agreement Form" to be consistent with the terminology used in other similar REMS Programs. The term *"physician"* should be replaced, as proposed by the Sponsor. However the review team recommends the phrase *"healthcare provider who prescribes"* in lieu of the Sponsor proposed "                    (b) (4) to more closely reflect the statutory provision, and to align with this revision in the Mifeprex Prescribing Information (PI), which was based on information in the supplement.[4] Additional changes are intended to improve the flow of the document. See the appended, redlined document for further details.

Consistent with the labeling revisions in the efficacy supplement, the language in the Prescriber Enrollment Form about the gestational age should be changed to match the labeling being approved.

### 5.1.3. DRUG DISPENSED ONLY IN CERTAIN HEALTH CARE SETTINGS - ETASU C

No changes to ETASU C are proposed.

### 5.1.4. DOCUMENTATION OF SAFE USE CONDITIONS - ETASU D

### 5.1.4.1. PATIENT AGREEMENT

Per the Mifeprex REMS, a Patient Agreement form is required to be signed and placed in the patient's medical record as documentation of safe use conditions for Mifeprex. The review team recommends removal of the Patient Agreement form from the Mifeprex REMS. This recommendation is based in part on the fact that the current Patient Agreement is duplicative of the informed consent and counseling processes that take place in the US, consistent with medical standard of care and current clinical practice guidelines for abortion providers.[5,6,7] For example, the National Abortion Federation (NAF) clinical practice guidelines state that "obtaining informed consent and assessing that the decision to have an abortion is made freely by the patient are essential parts of the abortion process." The NAF guidelines also include a standard stating that documentation must show that the patient affirms that she understands the procedure and its alternatives, the potential risks and benefits, and that her decision is voluntary.[6] The NAF is a professional association; a condition of membership requires periodic quality assurance site visits, and members must agree to adhere to the Clinical Policy Guidelines published by the NAF.[7] When healthcare providers at NAF affiliated facilities were surveyed, between 96 and 99% of healthcare providers indicated they provided patient counseling and obtained and documented informed consent.[8,9] The review team is aware that

---

[4]        (b) (6) draft Clinical Review for Mifeprex (NDA 020687) PAS 20. Dated:  March 29, 2016

[5] ACOG. Medical management of first trimester abortion. ACOG Practice Bulletin #143. Obstetrics and Gynecology 2014; 123(3):676-692

[6] National Abortion Federation Clinical Policy Guidelines (for abortion care). Revised 2015 edition, 56 pages, accessed on the internet at http://prochoice.org/wp-content/uploads/2015_NAF_CPGs.pdf on March 9, 2016.

[7] National Abortion Federation Membership information accessed on the internet at http://prochoice.org/health-care-professionals/naf-membership/ on March 9, 2016

[8] Gould H, Perrucci A, Barar R, Sinkford D, Foster D. Patient Education and Emotional Support Practices in Abortion Care Facilities in the United States. Women's Health Issues 2012; 22-4; 359-364

Reference ID: 3909587

Planned Parenthood of America has informed consent forms describing the risks associated with medical abortions. The NAF affiliated members and Planned Parenthood of America facilities account for (b)(4)% of Mifeprex use.

The information in the Mifeprex REMS Patient Agreement form is duplicative of the informed consent process that is followed and documented by these providers, who also provide abortion counseling and education about adverse events. Additionally, the MG, which is required to be provided under 21 CFR 208, contains the same risk information addressed in the Patient Agreement form and will be provided at the time the medication is dispensed to the patient. Based on this information, the Patient Agreement form is not necessary to ensure the benefits outweigh the risks of Mifeprex.

Finally, the U.S. marketing history of Mifeprex spans over fifteen years. During this period of surveillance, the safety profile of Mifeprex has been well-characterized, and serious adverse events have rarely occurred.[10,11,12]

## 5.2. REMS DOCUMENT

The REMS document is being revised to reflect the changes described above as well as to reflect the Agency's current thinking on the language and flow in REMS documents. The changes to the different sections of the REMS document are described further below. For additional details, see the redlined and clean REMS document appended to this review.

### 5.2.1. GOALS

The review team is recommending modification of the Mifeprex REMS goals. Currently the goals are (A) to provide information to patients about the benefits and risks of Mifeprex before they make a decision whether to take the drug and (B) to minimize the risk of serious complications by requiring prescribers to certify that they are qualified to prescribe Mifeprex and are able to assure patient access to appropriate medical facilities to manage any complications. Since (b)(6) is recommending removal of the Patient Agreement from the REMS, (b)(6) recommends revising the REMS goals to reflect this change. The revised goal is to ensure that prescribers are aware of the risks of serious complications associated with the use of Mifeprex and that it can only be dispensed in certain health care settings. The goal would be modified to read:

---

[9] O'Connell K, Jones HE, Simon M, Saporta V, Paul M, Lichtenberg ES. First trimester surgical abortion practices: a survey of National Abortion Federation members. Contraception 2009; 79:385-392

[10] (b)(6) ((b)(6) Mifeprex Post-marketing Safety Review: (b)(6), dated August 20, 2015

[11] ACOG. Medical management of first trimester abortion. ACOG Practice Bulletin #143. Obstetrics and Gynecology 2014; 123(3):676-692

[12] National Abortion Federation Clinical Policy Guidelines (for abortion care). Revised 2015 edition, 56 pages, accessed on the internet at http://prochoice.org/wp-content/uploads/2015_NAF_CPGs.pdf

Reference ID: 3909587

FDA 0705

"The goal of the Mifeprex REMS is to mitigate the risk of serious complications associated with Mifeprex by:

    a) Requiring healthcare providers who prescribe Mifeprex to be certified in the Mifeprex REMS Program.

    b) Ensuring that Mifeprex is only dispensed in certain health care settings under the supervision of a certified prescriber."

### 5.2.2. MEDICATION GUIDE

(b) (6) recommends this element be removed from the REMS document. See Section 5.1.1 for rationale.

### 5.2.3. CERTIFICATION OF PRESCRIBERS - ETASU A

The language in the REMS document stating that certified prescribers must obtain a completed Patient Agreement form from the patient is recommended to be removed (see Section 5.1.2.1 for rationale). In addition, edits to align the REMS document with language in the revised PI are being made. Finally, we recommend that this section of the REMS document be revised and edited to reflect the Agency's current thinking on the most appropriate language and flow of REMS documents. However, the requirement for Prescriber Certification remains and the qualifications of a healthcare provider who prescribes Mifeprex have not changed and continue to be necessary to ensure the benefits outweigh the risks.

### 5.2.4. DRUG DISPENSED ONLY IN CERTAIN HEALTH CARE SETTINGS - ETASU C

This section of the REMS was edited to provide clarification on where Mifeprex will not be dispensed.

In addition, the REMS document was revised and edited to reflect (b) (6) current thinking on the language and flow of REMS documents. These changes are not intended to be substantive.

### 5.2.5. DOCUMENTATION OF SAFE USE CONDITIONS -ETASU D

This element is being recommended for removal from the REMS document. See section 5.1.4.1 for rationale.

### 5.2.6. IMPLEMENTATION SYSTEM

This section of the REMS document is proposed to be revised and edited to reflect the Agency's current thinking on the language and flow of REMS documents.

### 5.2.7. TIMETABLE FOR SUBMISSION OF ASSESSMENTS

This section of the REMS document is proposed to be revised and edited to reflect the Agency's current thinking on the language and flow of REMS documents.

### 5.3. ASSESSMENT PLAN

9

FDA 0706

Currently, the REMS Assessment Plan requires Danco to submit the following adverse event information as part of the periodic REMS Assessment Report:

> 6.  Copies of MedWatch forms for each of the following adverse events during the assessment period; and for each of the following adverse events, the cumulative number from the date of approval of Mifeprex up to the approval date of the REMS, the number for each reporting period, and the cumulative number since the approval date of Mifeprex:
> > a.  On-going pregnancies not terminated subsequent to the conclusion of the treatment procedure
> > b.  Women hospitalized due to complications
> > c.  Women requiring transfusion(s) of two or more units of packed cells or whole blood, or having a hemoglobin of 6 gm/dL or less or a hematocrit of 18% or less
> > d.  Serious infection, sepsis
> > e.  Death
> > f.  Other serious and unexpected adverse events
>
> 7.  Per section 505-1(g)(3)(B) and (C), information on the status of any postapproval study or clinical trial required under section 505(o) or otherwise undertaken to investigate a safety issue.

This information is being submitted to the Agency through other pathways including spontaneous adverse event reporting and the annual report. Therefore, (b) (6) is recommending it be removed from the Assessment Plan.

The revised Assessment Plan is as follows:

**REMS Assessment Plan**
1.  Number of prescribers enrolled (cumulative)
2.  Number of new prescribers enrolled during reporting period
3.  Number of prescribers ordering Mifeprex during reporting period
4.  Number of healthcare providers who attempted to order Mifeprex who were not enrolled; describe actions taken (during reporting period and cumulative)
5.  Number of women exposed to Mifeprex (during reporting period and cumulative)
6.  Summary and analysis of any program deviations and corrective action taken
7.  Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed

## 6.  CONCLUSION

A REMS for Mifeprex is necessary to ensure that the benefits outweigh the risks.  The review team and Sponsor have proposed modifications that continue to ensure that the benefit outweighs the risk, while updating the REMS in light of current medical practice and to provide clarifying language in the REMS documents.

The modifications to the Mifeprex REMS include the sponsor's proposed modifications and additional changes recommended by the review team and include the following: revision of the REMS goals, removal of the MG (it will remain as part of labeling) and the Patient Agreement; and changes to the Prescriber Enrollment Form.

Reference ID: 3909587

## 7. RECOMMENDATIONS

[(b) (6)] recommends the changes in the attached, redlined REMS document and materials, which represent [(b) (6)] proposed changes to the REMS as a result of this REMS Modification Review.

## 8. APPENDIX

1. Prescriber Enrollment Form, redlined
2. Prescriber Enrollment Form, clean
3. REMS Document, redlined
4. REMS Document, clean

20 Page(s) has been Withheld in Full as b4 (CCI/TS) immediately following this page

11

-------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**

-------------------------------------------------------------------------------

/s/

--------------------------------------------------

(b) (6)

03/29/2016

(b) (6)

03/29/2016
Concur