# Index of Joint Appendix Documents
## *Purcell, et al. v. Kennedy, et al.,*
## No. 1:17-cv-00493-JAO-RT (D. Haw.)

| VOLUME C | | | |
|---|---|---|---|
| **Administrative Record** | | | |
| **AR Range** | **Document Name** | **Date** | **Location in Pls.' Exhibits** |
| 2021ED11-13 | ACOG, *Position Statement: Improving Access to Mifepristone for Reproductive Health Indications* | approved June 2018, reaffirmed Mar. 2021 | Doc. 222-4, Ex. Vol. C at PCSF246 |
| 2021ED126-348 | Nat'l Acads. of Scis., Eng'g & Med., The Safety & Quality of Abortion Care in the United States | 2018 | Doc. 222-4, Ex. Vol. C at PCSF249 |
| 2021ED512-14 | General Advice Letter (ANDA 91178) re: COVID-19 Public Health Emergency | Apr. 12, 2021 | Doc. 222-4, Ex. Vol. C at PCSF256 |
| 2021ED515-17 | General Advice Letter (NDA 20687) re: COVID-19 Public Health Emergency | Apr. 12, 2021 | Doc. 222-4, Ex. Vol. C at PCSF259 |
| 2021REMS84-85 | Advancing New Standards in Reproductive Health, | Apr. 2019 | Doc. 222-4, Ex. Vol. C at PCSF262 |

| | *Analysis of Medication Abortion Risk and the FDA Report "Mifepristone US. Post-Marketing Adverse Events Summary through 12/31/2018* | | |
|---|---|---|---|
| 2021REMS86-156 | AMA House of Delegates, *Memorial Resolutions:#504 Ending the Risk Evaluation and Mitigation Strategy (REMS) policy on mifepristone (Mifeprex)* | 2018 | Doc. 222-4, Ex. Vol. C at PCSF264 |
| 2021REMS168-69 | Sarah Raifman et al., *Medication Abortion: Potential for Improved Patient Access Through Pharmacies*, 58 J. Am. Pharmacists Ass'n 377-81 | 2018 | Doc. 222-4, Ex. Vol. C at PCSF266 |
| 2021REMS643-50 | Joint Motion and Order to Stay Case Pending Agency Review, *Chelius v. Becerra*, 17-cv-0493 (D. Haw. May 7, 2021), ECF Nos. 148, 149 | May 7, 2021 | N/A |

| 2021REMS668, 678-79 | Letter from Gillian Dean, Planned Parenthood, to FDA re: Review of Mifepristone | July 28, 2021 | Doc. 222-4, Ex. Vol. C at PCSF268 |
|---|---|---|---|
| 2021REMS695-99 | Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215-19 | Feb. 2012 | Doc. 222-4, Ex. Vol. C at PCSF271 |
| 2021REMS748-64 | ACOG & SFP, *Practice Bulletin No. 225, Medication Abortion Up to 70 Days of Gestation*, 136 Obstetrics & Gynecology e31-e47 | Oct. 2020 | Doc. 222-4, Ex. Vol. C at PCSF276 |
| 2021REMS782-845 | Nat'l Abortion Fed'n, 2020 Clinical Policy Guidelines for Abortion Care | 2020 | Doc. 222-4, Ex. Vol. C at PCSF293 |



# Improving Access to Mifepristone for Reproductive Health Indications

Position Statement

The American College of Obstetricians and Gynecologists (ACOG) supports efforts to improve access to quality women's health care and opposes regulations, restrictions, or mandates that impede access to evidence-based care. Recent evidence highlighting the potential for mifepristone to significantly improve the safe and effective medical management of early pregnancy loss, such as a missed abortion, provides incentive to facilitate improved access to mifepristone.[1,2] Early pregnancy loss is common, occurring in 10% of all clinically recognized pregnancies and affecting approximately 1 million women in the U.S. annually.[3,4] The current U.S. Food and Drug Administration (FDA) Risk Evaluation and Mitigation Strategy (REMS) and Elements to Assure Safe Use (ETASU) requirements for Mifeprex® (mifepristone, 200 mg) are outdated and substantially limit access to this safe, effective medication. Therefore, ACOG urges the removal of the REMS and ETASU for Mifeprex®.

The ETASU for Mifeprex® require that the medication be dispensed in a clinic, medical office, or hospital (precluding its availability in retail pharmacies), that clinicians obtain certification prior to prescribing the medication, and that patients sign an FDA-approved agreement before receiving the medication.

2021 ED 000011

Evidence regarding the safety of mifepristone for medication-induced abortion, used by over 3 million women in the U.S. since FDA approval in 2000, supports the removal of the REMS and ETASU.[5,6] These requirements are inconsistent with those for other medications with similar or greater risks, including a 300-mg formulation of mifepristone used in treatment of Cushing's syndrome, and serve as barriers to access without supporting demonstrated improvements to patient safety or outcomes. In addition, ACOG opposes regulations or restrictions that are inappropriately unique to the provision of abortion. In line with its safety record and to improve access, ACOG recommends that mifepristone for reproductive health indications be made available in retail pharmacies like other prescription drugs and without unique provider certification or patient consent requirements.

Restricting access to mifepristone interferes with the ability of obstetrician–gynecologists and other women's health care providers to deliver the highest quality care for their patients. Removing the REMS and ETASU on Mifeprex® would allow more women the option of medical management for early pregnancy loss, and improve access for first trimester medication-induced abortion.

# References

1.  Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161-70. Available at: https://www.nejm.org/doi/full/10.1056/NEJMoa1715726. Retrieved July 9, 2018.

2.  Westhoff CL. A Better medical regimen for the management of miscarriage. N Engl J Med 2018;378:2232-3. Available at: https://www.nejm.org/doi/full/10.1056/NEJMe1803491. Retrieved July 9, 2018.

3.  Early pregnancy loss. Practice Bulletin No. 150. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:1258-67. Available at: https://journals.lww.com/greenjournal/fulltext/2015/05000/Practice_Bulletin_No__150___Early_Pregnancy_Loss.46.aspx. Retrieved July 9, 2018.

4.  Ventura SJ, Curtin SC, Abma JC, Henshaw SK. Estimated pregnancy rates and rates of pregnancy outcomes for the United States, 1990-2008. Natl Vital Stat Rep 2012;60(7):1-21. Available at: https://www.cdc.gov/nchs/data/nvsr/nvsr60/nvsr60_07.pdf. Retrieved July 9, 2018.

2021 ED 000012

5. Raymond EG, Blanchard K, Blumenthal PD, Grimes DA, Foster AM, Gold M, et al. Sixteen years of overregulation: time to unburden mifeprex. Mifeprex REMS Study Group. N Engl J Med 2017;376:790-4. Available at: https://www.nejm.org/doi/full/10.1056/NEJMsb1612526. Retrieved July 9, 2018.

6. Cleland K, Smith N. Aligning mifepristone regulation with evidence: driving policy change using 15 years of excellent safety data. Contraception 2015;92:179-81. Available at: https://www.sciencedirect.com/science/article/pii/S0010782415002541. Retrieved July 9, 2018.

*Approved by the Executive Board: June 2018*
*Reaffirmed: March 2021*

American College of Obstetricians and Gynecologists
409 12th Street SW, Washington, DC 20024-2188

Copyright 2023  All rights reserved
tement  |  Terms and C

2021 ED 000013

**NATIONAL ACADEMIES** *Sciences*
*Engineering*
*Medicine*

NATIONAL
ACADEMIES
PRESS
Washington, DC

This PDF is available at http://nap.nationalacademies.org/24950

 



# The Safety and Quality of Abortion Care in the United States (2018)

## DETAILS

222 pages | 6 x 9 | PAPERBACK
ISBN 978-0-309-46818-3 | DOI 10.17226/24950

## CONTRIBUTORS

Committee on Reproductive Health Services: Assessing the Safety and Quality of Abortion Care in the U.S.; Board on Population Health and Public Health Practice; Board on Health Care Services; Health and Medicine Division; National Academies of Sciences, Engineering, and Medicine



**BUY THIS BOOK**

**FIND RELATED TITLES**

## SUGGESTED CITATION

National Academies of Sciences, Engineering, and Medicine. 2018. *The Safety and Quality of Abortion Care in the United States.* Washington, DC: The National Academies Press. https://doi.org/10.17226/24950.

Visit the National Academies Press at nap.edu and login or register to get:

– Access to free PDF downloads of thousands of publications
– 10% off the price of print publications
– Email or social media notifications of new titles related to your interests
– Special offers and discounts



All downloadable National Academies titles are free to be used for personal and/or non-commercial academic use. Users may also freely post links to our titles on this website; non-commercial academic users are encouraged to link to the version on this website rather than distribute a downloaded PDF to ensure that all users are accessing the latest authoritative version of the work. All other uses require written permission. (Request Permission)

This PDF is protected by copyright and owned by the National Academy of Sciences; unless otherwise indicated, the National Academy of Sciences retains copyright to all materials in this PDF with all rights reserved.

2021 ED 000126

# THE SAFETY AND QUALITY OF
# ABORTION CARE
# IN THE UNITED STATES

Committee on Reproductive Health Services:
Assessing the Safety and Quality of Abortion Care in the U.S.

Board on Population Health and Public Health Practice

Board on Health Care Services

Health and Medicine Division

A Consensus Study Report of

*The National Academies of*
SCIENCES · ENGINEERING · MEDICINE

THE NATIONAL ACADEMIES PRESS
*Washington, DC*
**www.nap.edu**

2021 ED 000127

Copyright National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS**   500 Fifth Street, NW   Washington, DC 20001

This activity was supported by contracts between the National Academy of Sciences and The David and Lucile Packard Foundation, The Grove Foundation, The JPB Foundation, The Susan Thompson Buffett Foundation, Tara Health Foundation, and William and Flora Hewlett Foundation. Any opinions, findings, conclusions, or recommendations expressed in this publication do not necessarily reflect the views of any organization or agency that provided support for the project.

International Standard Book Number-13:   978-0-309-46818-3
International Standard Book Number-10:   0-309-46818-3
Digital Object Identifier:   https://doi.org/10.17226/24950
Library of Congress Control Number:   2018939630

Additional copies of this publication are available for sale from the National Academies Press, 500 Fifth Street, NW, Keck 360, Washington, DC 20001; (800) 624-6242 or (202) 334-3313; http://www.nap.edu.

Copyright 2018 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Suggested citation: National Academies of Sciences, Engineering, and Medicine. 2018. *The safety and quality of abortion care in the United States*. Washington, DC: The National Academies Press. doi: https://doi.org/10.17226/24950.

2021 ED 000128
Copyright National Academy of Sciences. All rights reserved.

*The National Academies of*
SCIENCES · ENGINEERING · MEDICINE

The **National Academy of Sciences** was established in 1863 by an Act of Congress, signed by President Lincoln, as a private, nongovernmental institution to advise the nation on issues related to science and technology. Members are elected by their peers for outstanding contributions to research. Dr. Marcia McNutt is president.

The **National Academy of Engineering** was established in 1964 under the charter of the National Academy of Sciences to bring the practices of engineering to advising the nation. Members are elected by their peers for extraordinary contributions to engineering. Dr. C. D. Mote, Jr., is president.

The **National Academy of Medicine** (formerly the Institute of Medicine) was established in 1970 under the charter of the National Academy of Sciences to advise the nation on medical and health issues. Members are elected by their peers for distinguished contributions to medicine and health. Dr. Victor J. Dzau is president.

The three Academies work together as the **National Academies of Sciences, Engineering, and Medicine** to provide independent, objective analysis and advice to the nation and conduct other activities to solve complex problems and inform public policy decisions. The National Academies also encourage education and research, recognize outstanding contributions to knowledge, and increase public understanding in matters of science, engineering, and medicine.

Learn more about the National Academies of Sciences, Engineering, and Medicine at www.nationalacademies.org.

2021 ED 000129

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

*The National Academies of*
# SCIENCES · ENGINEERING · MEDICINE

**Consensus Study Reports** published by the National Academies of Sciences, Engineering, and Medicine document the evidence-based consensus on the study's statement of task by an authoring committee of experts. Reports typically include findings, conclusions, and recommendations based on information gathered by the committee and the committee's deliberations. Each report has been subjected to a rigorous and independent peer-review process and it represents the position of the National Academies on the statement of task.

**Proceedings** published by the National Academies of Sciences, Engineering, and Medicine chronicle the presentations and discussions at a workshop, symposium, or other event convened by the National Academies. The statements and opinions contained in proceedings are those of the participants and are not endorsed by other participants, the planning committee, or the National Academies.

For information about other products and activities of the National Academies, please visit www.nationalacademies.org/about/whatwedo.

2021 ED 000130
Copyright National Academy of Sciences. All rights reserved.

## COMMITTEE ON REPRODUCTIVE HEALTH SERVICES:
### ASSESSING THE SAFETY AND QUALITY
### OF ABORTION CARE IN THE U.S.

**B. NED CALONGE** (*Co-Chair*), University of Colorado
**HELENE D. GAYLE** (*Co-Chair*), Chicago Community Trust
**WENDY R. BREWSTER,** University of North Carolina at Chapel Hill School of Medicine
**LEE A. FLEISHER,** University of Pennsylvania Perelman School of Medicine
**CAROL J. ROWLAND HOGUE,** Emory University Rollins School of Public Health
**JODY RAE LORI,** University of Michigan School of Nursing
**JEANNE MIRANDA,** University of California, Los Angeles
**RUTH MURPHEY PARKER,** Emory University School of Medicine
**DEBORAH E. POWELL,** University of Minnesota Medical School
**EVA K. PRESSMAN,** University of Rochester Medical Center
**ALINA SALGANICOFF,** Kaiser Family Foundation
**PAUL G. SHEKELLE,** The RAND Corporation
**SUSAN M. WOLF,** University of Minnesota

*Study Staff*

**JILL EDEN,** Study Director
**KATYE MAGEE,** Research Associate
**MATTHEW MASIELLO,** Research Assistant
**ANNA MARTIN,** Senior Program Assistant
**ROSE MARIE MARTINEZ,** Senior Director, Board on Population Health and Public Health Practice
**SHARYL NASS,** Director, Board on Health Care Services
**HOPE HARE,** Administrative Assistant
**PATRICK BURKE,** Senior Financial Officer
**MISRAK DABI,** Financial Associate (*from June 2017*)

*v*

2021 ED 000131

Copyright National Academy of Sciences. All rights reserved.

2021 ED 000132

Copyright National Academy of Sciences. All rights reserved.

# Reviewers

This Consensus Study Report was reviewed in draft form by individuals chosen for their diverse perspectives and technical expertise. The purpose of this independent review is to provide candid and critical comments that will assist the National Academies of Sciences, Engineering, and Medicine in making each published report as sound as possible and to ensure that it meets the institutional standards for quality, objectivity, evidence, and responsiveness to the study charge. The review comments and draft manuscript remain confidential to protect the integrity of the deliberative process.

We thank the following individuals for their review of this report:

**REBECCA H. ALLEN,** Brown University
**DONALD M. BERWICK,** Institute for Healthcare Improvement
**CLAIRE BRINDIS,** University of California, San Francisco
**PONJOLA CONEY,** Virginia Commonwealth University
**VANESSA K. DALTON,** University of Michigan
**C. NEILL EPPERSON,** University of Pennsylvania Perelman School of Medicine
**DANIEL GROSSMAN,** University of California, San Francisco
**AMY LEVI,** University of New Mexico College of Nursing
**HEIDI D. NELSON,** Oregon Health & Science University
**WILLIE J. PARKER,** Physicians for Reproductive Health
**ROBERT L. PHILLIPS, JR.,** American Board of Family Medicine
**SARA ROSENBAUM,** The George Washington University Milken Institute School of Public Health

*vii*

2021 ED 000133

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

**MICHAEL W. VARNER,** University of Utah School of Medicine
**GAIL R. WILENSKY,** Project HOPE
**SUSAN F. WOOD,** The George Washington University

Although the reviewers listed above provided many constructive comments and suggestions, they were not asked to endorse the conclusions or recommendations of this report, nor did they see the final draft before its release. The review of this report was overseen by **ALFRED O. BERG,** University of Washington, and **ENRIQUETA C. BOND,** Burroughs Wellcome Fund. They were responsible for making certain that an independent examination of this report was carried out in accordance with the standards of the National Academies and that all review comments were carefully considered. Responsibility for the final content rests entirely with the authoring committee and the National Academies.

Copyright National Academy of Sciences. All rights reserved.

# Acknowledgments

The committee and staff are indebted to a number of individuals and organizations for their contributions to this report. We extend special thanks to all the individuals who were essential sources of information, generously giving their time and knowledge to further the committee's efforts. Thank you to Elizabeth Brown, Sidney Callahan, Olivia Cappello, Nancy Chescheir, Mitch Creinin, Carrie Cwiak, Ann Davis, Diana Greene Foster, Marji Gold, Alisa Goldberg, Kristy Goodman, Jane Henney, Susan Higginbotham, Elizabeth Janiak, Tara Jatlaoui, Rachel Jones, Uta Landy, Amy Levi, Steve Lichtenberg, Abigail Long, Ana McKee, Michael Raggio, Matthew Reeves, Debra Stulberg, Diana Taylor, Stephanie Teal, Ushma Upadhyay, Carl Weiner, Kari White, Beverly Winikoff, and Susan Wood.

Thank you as well to the following individuals, who provided testimony to the committee:

**BONNIE SCOTT JONES,** Senior Policy Advisor, Advancing New Standards in Reproductive Health (ANSIRH), University of California, San Francisco;

**SARAH ROBERTS,** Associate Professor, ANSIRH, Department of Obstetrics, Gynecology, and Reproductive Sciences, University of California, San Francisco; and

**JULIET ROGERS,** Assistant Professor, Health Management and Policy, University of Michigan.

*ix*

2021 ED 000135
Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

Funding for this study was provided by The David and Lucile Packard Foundation, The Grove Foundation, The JPB Foundation, The Susan Thompson Buffett Foundation, Tara Health Foundation, and William and Flora Hewlett Foundation. The committee appreciates the opportunity and support extended by the sponsors for the development of this report.

Many within the Health and Medicine Division (HMD) of the National Academies of Sciences, Engineering, and Medicine were helpful to the study staff. The committee would like to thank Rebecca Morgan and the National Academies Research Center staff for their assistance in the committee's research efforts. We would also like to thank Patrick Burke and Misrak Dabi (HMD Offices of Finance and Administration); Chelsea Frakes, Lauren Shern, and Taryn Young (HMD Executive Office); and Greta Gorman, Nicole Joy, and Bettina Ritter (HMD Office of Communications).

Copyright National Academy of Sciences. All rights reserved.

# Contents

**SUMMARY** 1

**1  INTRODUCTION** 17
Abortion Care Today, 19
Study Approach, 33
Organization of the Report, 39
References, 39

**2  THE SAFETY AND QUALITY OF CURRENT ABORTION
METHODS** 45
Preabortion Care, 46
Initial Clinical Assessment, 50
Safety and Effectiveness of Current Abortion Methods, 51
Postabortion Care, 68
Use of Analgesia, Sedation, and Anesthesia in Abortion Care, 68
Mortality, 74
State Regulation of Abortion Care, 76
Summary, 77
References, 80

**3  ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION
PROVIDERS** 95
Required Clinical Competencies, 96
Which Providers Have the Clinical Skills to Perform Abortions?, 102

*xi*

2021 ED 000137

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

Training of Physicians and Advanced Practice Clinicians, 105
Availability of Trained Clinicians, 114
Summary, 118
References, 119

**4   LONG-TERM HEALTH EFFECTS**                                    **129**
Limitations of the Literature, 130
Future Childbearing and Pregnancy Outcomes, 133
Risk of Breast Cancer, 148
Mental Health Disorders, 149
Premature Death, 152
Summary, 152
References, 153

**5   CONCLUSIONS**                                                 **159**

**APPENDIXES**

**A**   Biographical Sketches of Committee Members                  **169**
**B**   Acronyms and Glossary                                       **177**
**C**   Public Meeting Agenda                                       **185**
**D**   Literature Search Strategy                                  **187**

2021 ED 000138

Copyright National Academy of Sciences. All rights reserved.

# Boxes, Figures, and Tables

## BOXES

S-1  Charge to the Committee on Reproductive Health Services:
     Assessing the Safety and Quality of Abortion Care in the U.S., 2
S-2  The Six Dimensions of Health Care Quality, 3

1-1  Charge to the Committee on Reproductive Health Services:
     Assessing the Safety and Quality of Abortion Care in the U.S., 18
1-2  Current Abortion Methods, 20
1-3  The Six Dimensions of Health Care Quality, 36
1-4  Types of Research Reviewed for This Study, 38

2-1  FDA Risk Evaluation and Mitigation Strategy (REMS) Program for
     Mifeprex, 52

## FIGURES

S-1  Analytic framework for assessing the quality of abortion care, 4

1-1  Continuum of abortion care, 21
1-2  Abortion rate, United States, 1973–2014, 27
1-3  Percentage and cumulative percentage of outpatient abortions by
     weeks' gestation, 2014–2015, 27
1-4  Percentage of abortion-providing facilities accounted for by each
     facility type and percentage of abortions performed in each type of
     facility, 2014 (n = 1,671), 32

*xiii*

2021 ED 000139

Copyright National Academy of Sciences. All rights reserved.

1-5  Median distance to the nearest abortion-providing facility by county, 2014, 33

1-6  The committee's analytic framework for assessing the quality of abortion care, 34

3-1  Selected residencies and fellowships offering abortion training in the United States, 109

3-2  Regulations defining the level of provider credentialing required to provide abortions, by state and abortion method, 117

## TABLES

S-1  Does Abortion Care in the United States Meet the Six Attributes of Quality Health Care?, 11

1-1  Overview of State Abortion-Specific Regulations That May Impact Safety and Quality, as of September 1, 2017, 23

1-2  Characteristics of Women Who Had an Abortion in an Outpatient Setting in 2014, by Percent, 30

2-1  Selected Organizations That Issue Clinical Guidelines on Abortion Care, 47

2-2  Levels and Effects of Analgesia, Sedation, and Anesthesia, 70

2-3  Minimum Facility Requirements Related to Level of Sedation for Medication, Aspiration, and Dilation and Evacuation (D&E) Abortions, 71

2-4  Comparison of Mortality Rates for Abortion, Childbirth, Colonoscopy, Dental Procedures, Plastic Surgery, and Tonsillectomy, United States,  75

3-1  Required Competencies by Type of Abortion Procedure, 97

4-1  Studies Assessing the Association Between Abortion and Subsequent Pregnancy Complications Using Record-Linkage Methods, 136

4-2  Studies Assessing the Association Between Abortion and Preterm Birth (PTB), Low Birthweight (LBW), and Small for Gestational Age (SGA) Using Record-Linkage Methods, 140

5-1  Does Abortion Care in the United States Meet the Six Attributes of Quality Health Care?, 163

D-1  Literature Searches, 188

2021 ED 000140

Copyright National Academy of Sciences. All rights reserved.

# Summary[1]

When the Institute of Medicine (IOM)[2] issued its 1975 report on the public health impact of legalized abortion, the scientific evidence on the safety and health effects of legal abortion services was limited. It had been only 2 years since the landmark *Roe v. Wade* decision had legalized abortion throughout the United States, and nationwide data collection was just under way. Today, the available evidence on abortion's health effects is quite robust. There is a great deal of related scientific research, including well-designed randomized controlled trials, systematic reviews, and epidemiological studies examining the relative safety of abortion methods and the appropriateness of methods for different clinical circumstances. With this growing body of research, medical and surgical abortion methods have been refined or discontinued, and new techniques have been developed.

In 2016, six private foundations came together to ask the Health and Medicine Division of the National Academies of Sciences, Engineering, and Medicine to conduct a comprehensive review of the state of the science on the safety and quality of legal abortion services in the United States. The sponsors—The David and Lucile Packard Foundation, The Grove Foundation, The JPB Foundation, The Susan Thompson Buffett Foundation, Tara Health Foundation, and William and Flora Hewlett Foundation—asked

---

[1]This summary does not include references. Relevant citations appear in subsequent chapters.

[2]In March 2016, the division of the National Academies of Sciences, Engineering, and Medicine that focuses on health and medicine, previously known as the Institute of Medicine (IOM), was renamed the Health and Medicine Division.

*1*

2021 ED 000141

Copyright National Academy of Sciences. All rights reserved.

that the review focus on the eight research questions listed in Box S-1. The Committee on Reproductive Health Services: Assessing the Safety and Quality of Abortion Care in the U.S. was appointed in December 2016 to conduct the study and prepare this report.

---

**BOX S-1**
**Charge to the Committee on Reproductive Health Services: Assessing the Safety and Quality of Abortion Care in the U.S.**

In 1975, the Inst tute of Med c ne (IOM) ssued the report *Legalized Abortion and the Public Health: Report of a Study*. The report conta ned a comprehens ve ana ys s of the then ava ab e sc ent fic ev dence on the mpact of abort on on the hea th of the pub c. S nce 1975, there have been substant a changes n the U.S. hea th care de very system and n med ca sc ence. In add t on, pract ces for abort on care have changed, nc ud ng the ntroduct on of new techn ques and techno og es. An updated systemat c and ndependent ana ys s of today's ava - ab e ev dence has not been conducted. An ad hoc consensus comm ttee of the Hea th and Med c ne D v s on, wh ch as of March 2016 cont nues the consensus stud es and conven ng act v t es prev ous y carr ed out by the IOM, w produce a comprehens ve report on the current state of the sc ence re ated to the prov s on of safe, h gh-qua ty abort on serv ces n the Un ted States.

The comm ttee w cons der the fo ow ng quest ons and offer find ngs and recommendat ons:

1. What types of ega abort on serv ces are ava ab e n the Un ted States? What s the ev dence regard ng wh ch serv ces are appropr ate under d ffer- ent c n ca c rcumstances (e.g., based on pat ent med ca cond t ons such as prev ous cesarean sect on, obes ty, gestat ona age)?
2. What s the ev dence on the phys ca and menta hea th r sks of these d f- ferent abort on ntervent ons?
3. What s the ev dence on the safety and qua ty of med ca and surg ca abor- t on care?
4. What s the ev dence on the m n mum character st cs of c n ca fac t es necessary to effect ve y and safe y prov de the d fferent types of abort on ntervent ons?
5. What s the ev dence on what c n ca sk s are necessary for hea th care prov ders to safe y perform the var ous components of abort on care, n- c ud ng pregnancy determ nat on, counse ng, gestat ona age assessment, med cat on d spens ng, procedure performance, pat ent mon tor ng, and fo ow-up assessment and care?
6. What safeguards are necessary to manage med ca emergenc es ar s ng from abort on ntervent ons?
7. What s the ev dence on the safe prov s on of pa n management for abort on care?
8. What are the research gaps assoc ated w th the prov s on of safe, h gh- qua ty care from pre- to postabort on?

---

2021 ED 000142

Copyright National Academy of Sciences. All rights reserved.

## CONTEXT FOR THIS REPORT

### What Is Quality Abortion Care?

The committee agreed that two fundamental principles would guide its work: first, that women should expect that the abortion care they receive meets well-established clinical standards for objectivity, transparency, and scientific rigor; and second, that the quality of abortion care should be assessed using the six dimensions of health care quality first described in the 2001 IOM report *Crossing the Quality Chasm: A New Health System for the 21st Century* (see Box S-2). These dimensions—safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity—have guided public and private efforts to improve U.S. health care delivery at the local, state, and national levels for more than 15 years. Donabedian's structure-process-outcome framework was also foundational for this report. Figure S-1 illustrates the committee's adaptation of these concepts for assessing abortion care.

---

**BOX S-2**
**The Six Dimensions of Health Care Quality**

*Crossing the Quality Chasm: A New Health System for the 21st Century*

1. Safety—avo d ng njur es to pat ents from the care that s ntended to he p them.

2. Effect veness—prov d ng serv ces based on sc ent fic know edge to a  who cou d benefit and refra n ng from prov d ng serv ces to those not  ke y to benefit (avo d ng underuse and overuse, respect ve y).

3. Pat ent-centeredness—prov d ng care that  s respectfu  of and respons ve to  nd v dua  pat ent preferences, needs, and va ues and ensur ng that pat ent va ues gu de a  c n ca  dec s ons.

4. T me ness—reduc ng wa ts and somet mes harmfu  de ays for both those who rece ve and those who g ve care.

5. Effic ency—avo d ng waste,  nc ud ng waste of equ pment, supp es,  deas, and energy.

6. Equ ty—prov d ng care that does not vary  n qua ty because of persona  char-acter st cs such as gender, ethn c ty, geograph c  ocat on, and soc oeconom c status.

---

2021 ED 000143

Copyright National Academy of Sciences. All rights reserved.



**FIGURE S-1** Analytic framework for assessing the quality of abortion care.
NOTE: OB/GYN = obstetrician/gynecologist.

2021 ED 000144
Copyright National Academy of Sciences. All rights reserved.

**Trends**

In the immediate years after national legalization, legal abortions increased steadily until peaking in the 1980s. Since then, there has been a steady decline in both the annual number and rate of abortions. Between 1980 and 2014, the abortion rate among U.S. women fell by more than half, from 29.3 to 14.6 per 1,000 women. In 2014, the aggregate number of abortions reached a low of 926,190. The reason for these declines is not fully understood, but they have been attributed to the increasing use of contraceptives, especially long-acting methods (e.g., intrauterine devices [IUDs] and implants), historic declines in the rate of unintended pregnancy, and increasing numbers of state regulations that limit the availability of otherwise legal abortion services.

Since national legalization, most abortions in the United States (91.6 percent) have been performed in early pregnancy (i.e., ≤13 weeks). With advances in technology such as highly sensitive pregnancy tests and the availability of medication abortion, abortions are being performed at increasingly earlier gestation. According to the Centers for Disease Control and Prevention, the percentage of early abortions performed at ≤6 weeks' gestation increased by 16 percent from 2004 to 2013. In 2013, 38 percent of early abortions occurred at ≤6 weeks' gestation. The proportion of early-gestation abortions occurring at ≤6 weeks is expected to increase even further as the use of medication abortion becomes more common.

*Abortion Methods*

Abortion methods have evolved and improved in the decades since national legalization. Four legal abortion methods—medication,[3] aspiration, dilation and evacuation (D&E), and induction—are used in the United States. Today, aspiration is the most common abortion method used in the United States, accounting for almost 68 percent of abortions performed overall in 2013. Its use, however, is likely to decline as the use of medication abortion increases. The percentage of total abortions by the medication method rose from 10.6 to 22.3 percent between 2004 and 2013. In 2014, approximately 45 percent of abortions up to 9 weeks' gestation were medication abortions, up from 36 percent in 2011. Fewer than 9 percent of abortions are performed after 13 weeks' gestation—typically by D&E. In 2013, approximately 2 percent of U.S. abortions at 14 weeks' gestation or later were induction procedures.

---

[3]The terms "medication abortion" and "medical abortion" are used interchangeably in the literature. This report uses "medication abortion" to describe the U.S. Food and Drug Administration (FDA)-approved prescription drug regimen used up to 10 weeks' gestation.

2021 ED 000145

Copyright National Academy of Sciences. All rights reserved.

*Clinical Settings*

In 2014, the vast majority of abortions were performed in nonhospital settings: either an abortion clinic (59 percent) or a clinic offering a variety of medical services (36 percent). Fewer than 5 percent of abortions were provided in hospitals.

The overall number of facilities providing abortions—especially specialty abortion clinics—is declining. The greatest proportional decline is in states that have enacted abortion-specific regulations. In 2014, there were 272 abortion clinics in the United States—17 percent fewer than in 2011— and 39 percent of women of reproductive age resided in a county without an abortion provider. Twenty-five states have five or fewer abortion clinics; five states have only one abortion clinic. An estimated 17 percent of women travel more than 50 miles to obtain an abortion.

*Women Who Have Abortions*

Most women who have abortions are under age 30 (72 percent), are unmarried (86 percent), and are poor or low income (75 percent). Women who have abortions are also more likely to be women of color[4] (61.0 percent); half of all women who have abortions are black (24.8 percent) or Hispanic (24.5 percent). This distribution is similar to the racial and ethnic distribution of women with household incomes below 200 percent of the federal poverty level (FPL). Poor women and women of color are also more likely than others to experience an unintended pregnancy.

## Unique Regulatory Environment

Abortion is among the most regulated medical procedures in the nation. While a comprehensive legal analysis of abortion regulation is beyond the scope of this report, the committee agreed that it should consider how abortion's unique regulatory environment relates to the safety and quality of abortion care. Federal restrictions on the distribution of mifepristone (one of the drugs used in medication abortion) also merit attention given its increasing use and the extensive body of research demonstrating its safety and effectiveness.

### State Regulations

States play an essential role in ensuring the safety of health care services, especially through their licensure of clinicians and health care facilities. In

---

[4]Includes all nonwhite races and ethnicities.

2021 ED 000146

Copyright National Academy of Sciences. All rights reserved.

every state, clinicians and inpatient facilities (e.g., hospitals, rehabilitation centers) must be licensed by a state board or agency to provide health care services legally. When states regulate specific office-based health care procedures, the requirements are usually triggered by the level of sedation that the facility offers. Abortion services are an exception. A wide variety of state regulations affect abortion care, including the type of clinician permitted to perform an abortion, independently of the relevant scope of practice laws (e.g., qualified advanced practice clinicians [APCs] or physicians without hospital privileges may be barred from performing abortions); health insurance coverage (e.g., Medicaid or private insurance plans may be prohibited from paying for abortions); how the informed consent process is conducted (e.g., providers may be required to inform women that abortion increases their risk of breast cancer or mental illness, despite the absence of valid scientific evidence); the abortion method that is used (e.g., D&Es may be banned); the timing and scheduling of procedures (e.g., women may have to wait 18 to 72 hours after a counseling appointment); and the physical attributes of the clinical setting (e.g., procedure room size, corridor width). In most states, the regulations apply to all abortion methods regardless of weeks' gestation, the use of sedation, or the invasiveness of the procedure.

### U.S. Food and Drug Administration's (FDA's) Risk Evaluation and Mitigation Strategy (REMS) Program

The distribution and use of mifepristone has been restricted under the requirements of the FDA's REMS program since 2011. The FDA-approved protocol for medication abortion was updated in 2016 based on extensive clinical research demonstrating the safety of the revised regimen. The revised REMS continues to limit the distribution of Mifeprex (the brand name for mifepristone) to patients in clinics, hospitals, or medical offices under the supervision of a certified prescriber and cannot be sold in retail pharmacies. The committee could not find evidence on how this restriction impacts the safety or quality of abortions.

### CONCLUSIONS

This report provides a comprehensive review of the state of the science on the safety and quality of abortion services in the United States. As noted earlier (see Box S-1), the committee was charged with answering eight specific research questions. The committee's conclusions regarding each question appear below. The committee was also asked to offer recommendations regarding the eight questions. However, the committee decided that its conclusions regarding the safety and quality of U.S. abortion care responded comprehensively to the scope of this study. Therefore,

2021 ED 000147

Copyright National Academy of Sciences. All rights reserved.

the committee does not offer recommendations for specific actions to be taken by policy makers, health care providers, and others.

## The Research Questions

1. *What types of legal abortion services are available in the United States? What is the evidence regarding which services are appropriate under different clinical circumstances (e.g., based on patient medical conditions such as previous cesarean section, obesity, gestational age)?*

As noted above, four legal abortion methods—medication, aspiration, D&E, and induction—are used in the United States. Length of gestation—measured as the amount of time since the first day of the last menstrual period—is the primary factor in deciding which abortion procedure is the most appropriate. Both medication and aspiration abortions are used up to 10 weeks' gestation. Aspiration procedures may be used up to 14 to 16 weeks' gestation.

Mifepristone, which, as noted above, is sold under the brand name Mifeprex, is the only medication specifically approved by the FDA for use in medication abortion. As discussed earlier, the drug's distribution has been restricted under the requirements of the FDA REMS program since 2011—it may be dispensed only to patients in clinics, hospitals, or medical offices under the supervision of a certified prescriber. To become a certified prescriber, eligible clinicians must register with the drug's distributor, Danco Laboratories, and meet certain requirements. Retail pharmacies are prohibited from distributing the drug.

When abortion by aspiration is no longer feasible, D&E and induction methods are used. D&E is the superior method; in comparison, inductions are more painful for women, take significantly more time, and are more costly. However, D&Es are not always available to women. The procedure is illegal in Mississippi and West Virginia.[5] Elsewhere, access to the procedure is limited because many obstetrician/gynecologists (OB/GYNs) and other physicians lack the requisite training to perform D&Es. Physicians' access to D&E training is very limited or nonexistent in many areas of the country.

Few women are medically ineligible for abortion. There are, however, specific contraindications to using mifepristone for a medication abortion or induction. The drug should not be used for women with confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass; an IUD in place; chronic adrenal failure; concurrent long-term systemic corticosteroid

---

[5]Both states allow exceptions in cases of life endangerment or severe physical health risk to the woman.

2021 ED 000148

Copyright National Academy of Sciences. All rights reserved.

therapy; hemorrhagic disorders or concurrent anticoagulant therapy; allergy to mifepristone, misoprostol, or other prostaglandins; or inherited porphyrias.

Obesity is not a risk factor for women who undergo medication or aspiration abortions (including with the use of moderate intravenous sedation). Research on the association between obesity and complications during a D&E abortion is less certain—particularly for women with Class III obesity (body mass index ≥40) after 14 weeks' gestation.

A history of a prior cesarean delivery is not a risk factor for women undergoing medication or aspiration abortions, but it may be associated with an increased risk of complications during D&E abortions, particularly for women with multiple cesarean deliveries. Because induction abortions are so rare, it is difficult to determine definitively whether a prior cesarean delivery increases the risk of complications. The available research suggests no association.

### 2. *What is the evidence on the physical and mental health risks of these different abortion interventions?*

Abortion has been investigated for its potential long-term effects on future childbearing and pregnancy outcomes, risk of breast cancer, mental health disorders, and premature death. The committee found that much of the published literature on these topics does not meet scientific standards for rigorous, unbiased research. Reliable research uses documented records of a prior abortion, analyzes comparable study and control groups, and controls for confounding variables shown to affect the outcome of interest.

**Physical health effects**   The committee identified high-quality research on numerous outcomes of interest and concludes that having an abortion does not increase a woman's risk of secondary infertility, pregnancy-related hypertensive disorders, abnormal placentation (after a D&E abortion), preterm birth, or breast cancer. Although rare, the risk of very preterm birth (<28 weeks' gestation) in a woman's first birth was found to be associated with having two or more prior aspiration abortions compared with first births among women with no abortion history; the risk appears to be associated with the number of prior abortions. Preterm birth is associated with pregnancy spacing after an abortion: it is more likely if the interval between abortion and conception is less than 6 months (this is also true of pregnancy spacing in general). The committee did not find well-designed research on abortion's association with future ectopic pregnancy, miscarriage or stillbirth, or long-term mortality. Findings on hemorrhage during a subsequent pregnancy are inconclusive.

2021 ED 000149

Copyright National Academy of Sciences. All rights reserved.

*10     THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**Mental health effects**   The committee identified a wide array of research on whether abortion increases women's risk of depression, anxiety, and/or posttraumatic stress disorder and concludes that having an abortion does not increase a woman's risk of these mental health disorders.

### 3.   *What is the evidence on the safety and quality of medical and surgical abortion care?*

**Safety**   The clinical evidence clearly shows that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective. Serious complications are rare. But the risk of a serious complication increases with weeks' gestation. As the number of weeks increases, the invasiveness of the required procedure and the need for deeper levels of sedation also increase.

**Quality**   Health care quality is a multidimensional concept. As noted above, six attributes of health care quality—safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity—were central to the committee's review of the quality of abortion care. Table S-1 details the committee's conclusions regarding each of these quality attributes. Overall, the committee concludes that the quality of abortion care depends to a great extent on where women live. In many parts of the country, state regulations have created barriers to optimizing each dimension of quality care. The quality of care is optimal when the care is based on current evidence and when trained clinicians are available to provide abortion services.

### 4.   *What is the evidence on the minimum characteristics of clinical facilities necessary to effectively and safely provide the different types of abortion interventions?*

Most abortions can be provided safely in office-based settings. No special equipment or emergency arrangements are required for medication abortions. For other abortion methods, the minimum facility characteristics depend on the level of sedation that is used. Aspiration abortions are performed safely in office and clinic settings. If moderate sedation is used, the facility should have emergency resuscitation equipment and an emergency transfer plan, as well as equipment to monitor oxygen saturation, heart rate, and blood pressure. For D&Es that involve deep sedation or general anesthesia, the facility should be similarly equipped and also have equipment to provide general anesthesia and monitor ventilation.

Women with severe systemic disease require special measures if they desire or need deep sedation or general anesthesia. These women require

2021 ED 000150

Copyright National Academy of Sciences. All rights reserved.

**TABLE S-1** Does Abortion Care in the United States Meet the Six Attributes of Quality Health Care?

| Quality Attribute[a] | Definition | Committee's Conclusions |
|---|---|---|
| Safety | Avoiding injuries to patients from the care that is intended to help them. | Legal abortions—whether by medication, aspiration, D&E, or induction—are safe. Serious complications are rare and occur far less frequently than during childbirth. Safety is enhanced when the abortion is performed as early in pregnancy as possible. |
| Effectiveness[b] | Providing services based on scientific knowledge to all who could benefit and refraining from providing services to those not likely to benefit (avoiding underuse and overuse, respectively). | Legal abortions—whether by medication, aspiration, D&E, or induction—are effective. The likelihood that women will receive the type of abortion services that best meet their needs varies considerably depending on where they live. In many parts of the country, abortion-specific regulations on the site and nature of care, provider type, provider training, and public funding diminish this dimension of quality care. The regulations may limit the number of available providers, misinform women of the risks of the procedures they are considering, overrule women's and clinician's medical decision making, or require medically unnecessary services and delays in care. These include policies that<br>• require office-based settings to meet the structural standards of higher-intensity clinical facilities (e.g., ambulatory surgery centers or hospitals) even for the least invasive abortion methods (medication and aspiration);<br>• prohibit the abortion method that is most effective for a particular clinical circumstance (e.g., D&E);<br>• delay care unnecessarily from a clinical standpoint (e.g., mandatory waiting periods);<br>• prohibit qualified clinicians (family medicine physicians, certified nurse-midwives, nurse practitioners, and physician assistants) from performing abortions;<br>• require the informed consent process to include inaccurate information on abortion's long-term physical and mental health effects;<br>• require individual clinicians to have hospital privileges;<br>• bar publicly funded clinics from providing abortion care to low-income women; or<br>• mandate clinically unnecessary services (e.g., preabortion ultrasound, in-person counseling visit). |

*continued*

2021 ED 000151

Copyright National Academy of Sciences. All rights reserved.

*12    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**TABLE S-1** Continued

| Quality Attribute[a] | Definition | Committee's Conclusions |
|---|---|---|
| Patient-Centeredness | Providing care that is respectful of and responsive to individual patient preferences, needs, and values and ensuring that patient values guide all clinical decisions. | Patients' personal circumstances and individual preferences (including preferred abortion method), needs, and values may be disregarded depending on where they live (as noted above). The high state-to-state variability regarding the specifics of abortion care may be difficult for patients to understand and navigate. Patients' ability to be adequately informed in order to make sound medical decisions is impeded when state regulations require that<br>• women be provided inaccurate or misleading information about abortion's potential harms; and<br>• women's preferences for whether they want individualized counseling not be taken into consideration. |
| Timeliness | Reducing waits and sometimes harmful delays for both those who receive and those who give care. | The timeliness of an abortion depends on a variety of local factors, such as the availability of care, affordability, distance from the provider, and state requirements for an in-person counseling appointment and waiting periods (18 to 72 hours) between counseling and the abortion.<br>• There is some evidence that the logistical challenges of arranging and getting to a second appointment can result in delaying the abortion procedure beyond the mandatory waiting period.<br>• Delays put the patient at greater risk of an adverse event. |
| Efficiency | Avoiding waste, including waste of equipment, supplies, ideas, and energy. | An extensive body of clinical research has led to important refinements and improvements in the procedures, techniques, and methods for performing abortions. The extent to which abortion care is delivered efficiently depends, in part, on the alignment of state regulations with current evidence on best practices. Regulations that require medically unnecessary equipment, services, and/or additional patient visits increase cost, and thus decrease efficiency. |

2021 ED 000152

Copyright National Academy of Sciences. All rights reserved.

**TABLE S-1** Continued

| Quality Attribute[a] | Definition | Committee's Conclusions |
|---|---|---|
| Equity | Providing care that does not vary in quality because of personal characteristics such as gender, ethnicity, geographic location, and socioeconomic status. | State-level abortion regulations are likely to affect women differently based on their geographic location and socioeconomic status. Barriers (lack of insurance coverage, waiting periods, limits on qualified providers, and requirements for multiple appointments) are more burdensome for women who reside far from providers and/or have limited resources.<br>• Women who undergo abortions are disproportionately lower-income compared with other women of similar age: family incomes of 49 percent of them are below the federal poverty level (FPL), and family incomes of 26 percent are 100 to 200 percent of the FPL; 61 percent are women of color.<br>• Seventeen percent of women travel more than 50 miles to obtain an abortion. |

[a]These attributes of quality health care were first proposed by the Institute of Medicine's Committee on Quality of Health Care in America in the 2001 report *Crossing the Quality Chasm: A New Health System for the 21st Century.*

[b]Elsewhere in this report, effectiveness refers to the successful completion of the abortion without the need for a follow-up aspiration.

further clinical assessment and should have their abortion in either an accredited ambulatory surgery center or hospital.

5.  *What is the evidence on what clinical skills are necessary for health care providers to safely perform the various components of abortion care, including pregnancy determination, counseling, gestational age assessment, medication dispensing, procedure performance, patient monitoring, and follow-up assessment and care?*

**Required skills**  All abortion procedures require competent providers skilled in patient preparation (education, counseling, and informed consent); clinical assessment (confirming intrauterine pregnancy, determining gestation, taking a relevant medical history, and physical examination); pain management; identification and management of expected side effects and serious complications; and contraceptive counseling and provision. To provide medication abortions, the clinician should be skilled in all these areas. To provide aspiration abortions, the clinician should also be skilled in the technical aspects of an aspiration procedure. To provide D&E abortions,

2021 ED 000153

Copyright National Academy of Sciences. All rights reserved.

*14    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

the clinician needs the relevant surgical expertise and sufficient caseload to maintain the requisite surgical skills. To provide induction abortions, the clinician requires the skills needed for managing labor and delivery.

**Clinicians that have the necessary competencies**   Both trained physicians (OB/GYNs, family medicine physicians, and other physicians) and APCs (physician assistants, certified nurse-midwives, and nurse practitioners) can provide medication and aspiration abortions safely and effectively. OB/GYNs, family medicine physicians, and other physicians with appropriate training and experience can provide D&E abortions. Induction abortions can be provided by clinicians (OB/GYNs, family medicine physicians, and certified nurse-midwives) with training in managing labor and delivery.

The extensive body of research documenting the safety of abortion care in the United States reflects the outcomes of abortions provided by thousands of individual clinicians. The use of sedation and anesthesia may require special expertise. If moderate sedation is used, it is essential to have a nurse or other qualified clinical staff—in addition to the person performing the abortion—available to monitor the patient, as is the case for any other medical procedure. Deep sedation and general anesthesia require the expertise of an anesthesiologist or certified registered nurse anesthetist to ensure patient safety.

### 6.   *What safeguards are necessary to manage medical emergencies arising from abortion interventions?*

The key safeguards—for abortions and all outpatient procedures—are whether the facility has the appropriate equipment, personnel, and emergency transfer plan to address any complications that might occur. No special equipment or emergency arrangements are required for medication abortions; however, clinics should provide a 24-hour clinician-staffed telephone line and have a plan to provide emergency care to patients after hours. If moderate sedation is used during an aspiration abortion, the facility should have emergency resuscitation equipment and an emergency transfer plan, as well as equipment to monitor oxygen saturation, heart rate, and blood pressure. D&Es that involve deep sedation or general anesthesia should be provided in similarly equipped facilities that also have equipment to monitor ventilation.

The committee found no evidence indicating that clinicians that perform abortions require hospital privileges to ensure a safe outcome for the patient. Providers should, however, be able to provide or arrange for patient access or transfer to medical facilities equipped to provide blood transfusions, surgical intervention, and resuscitation, if necessary.

2021 ED 000154

Copyright National Academy of Sciences. All rights reserved.

7. *What is the evidence on the safe provision of pain management for abortion care?*

Nonsteroidal anti-inflammatory drugs (NSAIDs) are recommended to reduce the discomfort of pain and cramping during a medication abortion. Some women still report high levels of pain, and researchers are exploring new ways to provide prophylactic pain management for medication abortion. The pharmaceutical options for pain management during aspiration, D&E, and induction abortions range from local anesthesia, to minimal sedation/anxiolysis, to moderate sedation/analgesia, to deep sedation/analgesia, to general anesthesia. Along this continuum, the physiological effects of sedation have increasing clinical implications and, depending on the depth of sedation, may require special equipment and personnel to ensure the patient's safety. The greatest risk of using sedative agents is respiratory depression. The vast majority of abortion patients are healthy and medically eligible for all levels of sedation in office-based settings. As noted above (see Questions 4 and 6), if sedation is used, the facility should be appropriately equipped and staffed.

8. *What are the research gaps associated with the provision of safe, high-quality care from pre- to postabortion?*

The committee's overarching task was to assess the safety and quality of abortion care in the United States. The committee decided that its findings and conclusions fully respond to this charge. The committee concludes that legal abortions are safe and effective. Safety and quality are optimized when the abortion is performed as early in pregnancy as possible. Quality requires that care be respectful of individual patient preferences, needs, and values so that patient values guide all clinical decisions.

The committee did not identify gaps in research that raise concerns about these conclusions and does not offer recommendations for specific actions to be taken by policy makers, health care providers, and others.

The following are the committee's observations about questions that merit further investigation.

**Limitation of Mifepristone distribution**    Mifepristone (Mifeprex) is the only medication approved by the FDA for use in medication abortion. Extensive clinical research has demonstrated its safety and effectiveness using the FDA-recommended regimen. Furthermore, few women have contraindications to medication abortion. Nevertheless, as noted earlier, the FDA REMS restricts the distribution of mifepristone. Research is needed on how the limited distribution of mifepristone under the REMS process impacts dimensions of quality, including timeliness, patient-centeredness,

2021 ED 000155

Copyright National Academy of Sciences. All rights reserved.

and equity. In addition, little is known about pharmacist and patient perspectives on pharmacy dispensing of mifepristone and the potential for direct-to-patient models through telemedicine.

**Pain management**    There is insufficient evidence to identify the optimal approach to minimizing the pain women experience during an aspiration procedure without sedation. Paracervical blocks are effective in decreasing procedural pain, but the administration of the block itself is painful, and even with the block, women report experiencing moderate to significant pain. More research is needed to learn how best to reduce the pain women experience during abortion procedures.

Research on prophylactic pain management for women undergoing medication abortions is also needed. Although NSAIDs reduce the pain of cramping, women still report high levels of pain.

**Availability of providers**    APCs can provide medication and aspiration abortions safely and effectively, but the committee did not find research assessing whether APCs can also be trained to perform D&Es.

**Addressing the needs of women of lower income**    Women who have abortions are disproportionately poor and at risk for interpersonal and other types of violence. Yet little is known about the extent to which they receive needed social and psychological supports when seeking abortion care or how best to meet those needs. More research is needed to assess the need for support services and to define best clinical practice for providing those services.

2021 ED 000156

Copyright National Academy of Sciences. All rights reserved.

# 1

# Introduction

When the Institute of Medicine (IOM)[1] issued its 1975 report on the public health impact of legalized abortion, the scientific evidence on the safety and health effects of legal abortion services was limited (IOM, 1975). It had been only 2 years since the landmark *Roe v. Wade* decision had legalized abortion throughout the United States and nationwide data collection was just under way (Cates et al., 2000; Kahn et al., 1971). Today, the available scientific evidence on abortion's health effects is quite robust.

In 2016, six private foundations came together to ask the Health and Medicine Division of the National Academies of Sciences, Engineering, and Medicine to conduct a comprehensive review of the state of the science on the safety and quality of legal abortion services in the United States. The sponsors—The David and Lucile Packard Foundation, The Grove Foundation, The JPB Foundation, The Susan Thompson Buffett Foundation, Tara Health Foundation, and William and Flora Hewlett Foundation—asked that the review focus on the eight research questions listed in Box 1-1.

The Committee on Reproductive Health Services: Assessing the Safety and Quality of Abortion Care in the U.S. was appointed in December 2016 to conduct the study and prepare this report. The committee included 13 individuals[2] with research or clinical experience in anesthesiology,

---

[1]In March 2016, the IOM, the division of the National Academies of Sciences, Engineering, and Medicine focused on health and medicine, was renamed the Health and Medicine Division.

[2]A 14th committee member participated for just the first 4 months of the study.

*17*

2021 ED 000157

Copyright National Academy of Sciences. All rights reserved.

**BOX 1-1**
**Charge to the Committee on Reproductive Health Services:**
**Assessing the Safety and Quality of Abortion Care in the U.S.**

In 1975, the Inst tute of Med c ne (IOM)  ssued the report *Legalized Abortion and the Public Health: Report of a Study*. The report conta ned a comprehens ve ana ys s of the then ava ab e sc ent fic ev dence on the  mpact of abort on on the hea th of the pub c. S nce 1975, there have been substant a  changes  n the U.S. hea th care de very system and  n med ca  sc ence. In add t on, pract ces for abort on care have changed,  nc ud ng the  ntroduct on of new techn ques and techno og es. An updated systemat c and  ndependent ana ys s of today's ava - ab e ev dence has not been conducted. An ad hoc consensus comm ttee of the Hea th and Med c ne D v s on, wh ch as of March 2016 cont nues the consensus stud es and conven ng act v t es prev ous y carr ed out by the IOM, w   produce a comprehens ve report on the current state of the sc ence re ated to the prov s on of safe, h gh-qua ty abort on serv ces  n the Un ted States.

The comm ttee w   cons der the fo ow ng quest ons and offer find ngs and recommendat ons:

1. What types of  ega  abort on serv ces are ava ab e  n the Un ted States? What  s the ev dence regard ng wh ch serv ces are appropr ate under d ffer- ent c n ca  c rcumstances (e.g., based on pat ent med ca  cond t ons such as prev ous cesarean sect on, obes ty, gestat ona  age)?
2. What  s the ev dence on the phys ca  and menta  hea th r sks of these d f- ferent abort on  ntervent ons?
3. What  s the ev dence on the safety and qua ty of med ca  and surg ca  abor- t on care?
4. What  s the ev dence on the m n mum character st cs of c n ca  fac  t es necessary to effect ve y and safe y prov de the d fferent types of abort on  ntervent ons?
5. What  s the ev dence on what c n ca  sk  s are necessary for hea th care prov ders to safe y perform the var ous components of abort on care,  n- c ud ng pregnancy determ nat on, counse ng, gestat ona  age assessment, med cat on d spens ng, procedure performance, pat ent mon tor ng, and fo  ow-up assessment and care?
6. What safeguards are necessary to manage med ca  emergenc es ar s ng from abort on  ntervent ons?
7. What  s the ev dence on the safe prov s on of pa n management for abort on care?
8. What are the research gaps assoc ated w th the prov s on of safe, h gh- qua ty care from pre- to postabort on?

obstetrics and gynecology, nursing and midwifery, primary care, epide-miology of reproductive health, mental health, health care disparities, health care delivery and management, health law, health professional education and training, public health, quality assurance and assessment,

2021 ED 000158

Copyright National Academy of Sciences. All rights reserved.

statistics and research methods, and women's health policy. Brief biographies of committee members are provided in Appendix A.

This chapter describes the context for the study and the scope of the inquiry. It also presents the committee's conceptual framework for conducting its review.

## ABORTION CARE TODAY

Since the IOM first reviewed the health implications of national legalized abortion in 1975, there has been a plethora of related scientific research, including well-designed randomized controlled trials (RCTs), systematic reviews, and epidemiological studies examining abortion care. This research has focused on examining the relative safety of abortion methods and the appropriateness of methods for different clinical circumstances (Ashok et al., 2004; Autry et al., 2002; Bartlett et al., 2004; Borgatta, 2011; Borkowski et al., 2015; Bryant et al., 2011; Cates et al., 1982; Chen and Creinin, 2015; Cleland et al., 2013; Frick et al., 2010; Gary and Harrison, 2006; Grimes et al., 2004; Grossman et al., 2008, 2011; Ireland et al., 2015; Kelly et al., 2010; Kulier et al., 2011; Lohr et al., 2008; Low et al., 2012; Mauelshagen et al., 2009; Ngoc et al., 2011; Ohannessian et al., 2016; Peterson et al., 1983; Raymond et al., 2013; Roblin, 2014; Sonalkar et al., 2017; Upadhyay et al., 2015; White et al., 2015; Wildschut et al., 2011; Woodcock, 2016; Zane et al., 2015). With this growing body of research, earlier abortion methods have been refined, discontinued, and new approaches have been developed (Chen and Creinin, 2015; Jatlaoui et al., 2016; Lichtenberg and Paul, 2013). For example, the use of dilation and sharp curettage is now considered obsolete in most cases because safer alternatives, such as aspiration methods, have been developed (Edelman et al, 1974; Lean et al, 1976; RCOG, 2015). The use of abortion medications in the United States began in 2000 with the approval by the U.S. Food and Drug Administration (FDA) of the drug mifepristone. In 2016, the FDA, citing extensive clinical research, updated the indications for mifepristone for medication abortion[3] up to 10 weeks' (70 days') gestation (FDA, 2016; Woodcock, 2016).

Box 1-2 describes the abortion methods currently recommended by U.S. and international medical, nursing, and other health organizations that set professional standards for reproductive health care, including the American College of Obstetricians and Gynecologists (ACOG), the Society of Family Planning, the American College of Nurse-Midwifes, the National Abortion Federation (NAF), the Royal College of Obstetricians and Gynaecologists (RCOG) (in the United Kingdom), and the World

---

[3]The terms "medication abortion" and "medical abortion" are used interchangeably in the literature.

2021 ED 000159

Copyright National Academy of Sciences. All rights reserved.

---

**BOX 1-2**
**Current Abortion Methods**

Most abort ons n the Un ted States are performed n the first 13 weeks of pregnancy us ng e ther med cat on or asp rat on methods. These and other ega abort on methods are descr bed be ow. See Chapter 2 for a deta ed rev ew of the sc ent fic ev dence on the safety of each method.

- ***Medication abortion*** (or "med ca " abort on) nvo ves the use of med cat ons to nduce uter ne contract ons that expe the products of concept on. The reg men, approved by the FDA for up to 70 days' (10 weeks') gesta-t on, uses 200 mg of m fepr stone fo owed by 800 mcg of m soprosto 24 to 48 hours ater.
- ***Aspiration abortion*** (a so referred to as surg ca abort on or suct on curet-tage) s used up to 14 to 16 weeks' gestat on. A ho ow curette (tube) s nserted nto the uterus. At the other end of the curette, a hand-he d syr nge or an e ectr c dev ce s app ed to create suct on and empty the uterus.
- ***Dilation and evacuation (D&E) abortion*** s usua y performed start ng at 14 weeks' gestat on. The procedure nvo ves cerv ca preparat on w th osmot c d ators and/or med cat ons, fo owed by suct on and/or forceps extract on to empty the uterus. U trasound gu dance s often used.
- ***Induction abortion*** (a so referred to as "med ca " abort on) nvo ves the use of med cat ons to nduce abor and de very of the fetus. The most effect ve reg mens use a comb nat on of m fepr stone and m soprosto .

NOTE Gestation is counted from the first day of the last menstrual period
SOURCES Jones and Jerman 2017a; NAF 2017; RCOG 2011; WHO 2012

---

Health Organization (ACNM, 2011, 2016; ACOG, 2013, 2014; Costescu et al., 2016; Lichtenberg and Paul, 2013; NAF, 2017; RCOG, 2011; WHO, 2014).

### A Continuum of Care

The committee views abortion care as a continuum of services, as illustrated in Figure 1-1. For purposes of this study, it begins when a woman, who has decided to terminate a pregnancy, contacts or visits a provider seeking an abortion. The first, preabortion phase of care includes an initial clinical assessment of the woman's overall health (e.g., physical examination, pregnancy determination, weeks of gestation, and laboratory and other testing as needed); communication of information on the risks and benefits of alternative abortion procedures and pain management options; discussion of the patient's preferences based on desired anesthesia and weeks of gestation; discussion of postabortion contraceptive options if desired; counseling

Copyright National Academy of Sciences. All rights reserved.



FIGURE 1-1 Continuum of abortion care.

and referral to services (if needed); and final decision making and informed consent. The next phases in the continuum are the abortion procedure itself and postabortion care, including appropriate follow-up care and provision of contraceptives (for women who opt for them).

### A Note on Terminology

Important clinical terms that describe pregnancy and abortion lack consistent definition. The committee tried to be as precise as possible to avoid misinterpreting or miscommunicating the research evidence, clinical practice guidelines, and other relevant sources of information with potentially significant clinical implications. Note that this report follows Grimes and Stuart's (2010) recommendation that weeks' gestation be quantified using cardinal numbers (1, 2, 3…) rather than ordinal numbers (1st, 2nd, 3rd…). It is important to note, however, that these two numbering conventions are sometimes used interchangeably in the research literature despite having different meanings. For example, a woman who is 6 weeks pregnant has *completed* 6 weeks of pregnancy: she is in her 7th (not 6th) week of pregnancy.

This report also avoids using the term "trimester" where possible because completed weeks' or days' gestation is a more precise designation, and the clinical appropriateness of abortion methods does not align with specific trimesters.

Although the literature typically classifies the method of abortion as either "medical" or "surgical" abortion, the committee decided to specify methods more precisely by using the terminology defined in Box 1-2. The term "surgical abortion" is often used by others as a catchall category that includes a variety of procedures, ranging from an aspiration to a dilation and evacuation (D&E) procedure involving sharp surgical and other instrumentation as well as deeper levels of sedation. This report avoids describing abortion procedures as "surgical" so as to characterize a method more accurately as either an aspiration or D&E. As noted in Box 1-2, the term "induction abortion" is used to distinguish later abortions that use a

Copyright National Academy of Sciences. All rights reserved.

medication regimen from medication abortions performed before 10 weeks' gestation.

See Appendix B for a glossary of the technical terms used in this report.

### Regulation of Abortion Services

Abortion is among the most regulated medical procedures in the nation (Jones et al., 2010; Nash et al., 2017). While a comprehensive legal analysis of abortion regulation is beyond the scope of this report, the committee agreed that it should consider how abortion's unique regulatory environment relates to the safety and quality of abortion care.

In addition to the federal, state, and local rules and policies governing all medical services, numerous abortion-specific federal[4] and state laws and regulations affect the delivery of abortion services. Table 1-1 lists the abortion-specific regulations by state. The regulations range from prescribing information to be provided to women when they are counseled and setting mandatory waiting periods between counseling and the abortion procedure to those that define the clinical qualifications of abortion providers, the types of procedures they are permitted to perform, and detailed facility standards for abortion services. In addition, many states place limitations on the circumstances under which private health insurance and Medicaid can be used to pay for abortions, limiting coverage to pregnancies resulting from rape or incest or posing a medical threat to the pregnant woman's life. Other policies prevent facilities that receive state funds from providing abortion services[5] or place restrictions on the availability of services based on the gestation of the fetus that are narrower than those established under federal law (Guttmacher Institute, 2017h).

### Trends and Demographics

National- and state-level abortion statistics come from two primary sources: the Centers for Disease Control and Prevention's (CDC's) Abortion

---

[4]Hyde Amendment (P.L. 94-439, 1976); Department of Defense Appropriations Act (P.L. 95-457, 1978); Peace Corps Provision and Foreign Assistance and Related Programs Appropriations Act (P.L. 95-481, 1978); Pregnancy Discrimination Act (P.L. 95-555, 1977); Department of the Treasury and Postal Service Appropriations Act (P.L. 98-151, 1983); FY1987 Continuing Resolution (P.L. 99-591, 1986); Dornan Amendment (P.L. 100-462, 1988); Partial-Birth Abortion Ban (P.L. 108-105, 2003); Weldon Amendment (P.L. 108-199, 2004); Patient Protection and Affordable Care Act (P.L. 111-148 as amended by P.L. 111-152, 2010).

[5]Personal communication, O. Cappello, Guttmacher Institute, August 4, 2017: AZ § 15-1630, GA § 20-2-773; KS § 65-6733 and § 76-3308; KY § 311.800; LA RS § 40:1299 and RS § 4 0.1061; MO § 188.210 and § 188.215; MS § 41-41-91; ND § 14-02.3-04; OH § 5101.57; OK 63 § 1-741.1; PA 18 § 3215; TX § 285.202.

2021 ED 000162

Copyright National Academy of Sciences. All rights reserved.

**TABLE 1-1** Overview of State Abortion-Specific Regulations That May Impact Safety and Quality, as of September 1, 2017

| Type of Regulation[a] | States | Number of States |
|---|---|---|
| An ultrasound must be performed before all abortions, regardless of method | AL, AZ, FL, IA, IN, KS, LA, MS, NC, OH, OK, TX, VA, WI | 14 |
| Clinicians providing medication abortions must be in the physical presence of the patient when she takes the medication | AL, AR, AZ, IN, KS, LA, MI, MO, MS, NC, ND, NE, OK, SC, SD, TN, TX, WI, WV | 19 |
| Women must receive counseling before an abortion is performed | AL, AK, AR, AZ, CA,[b] CT,[b] FL, GA, IA, ID, IN, KS, KY, LA, ME,[b] MI, MN, MO, MS, NC, ND, NE, NV,[b] OH, OK, PA, RI,[b] SC, SD, TN, TX, UT, VA, WI, WV | 35 |
| Abortion patients are offered or given inaccurate or misleading information (verbally or in writing) on[c] | | |
| • Reversing medication abortion | AR, SD, UT | 3 |
| • Risks to future fertility | AZ, KS, NC, NE, SD, TX | 6 |
| • Possible link to breast cancer | AK, KS, MS, OK, TX | 5 |
| • Long-term mental health consequences | ID, KS, LA, MI, NC, ND, NE, OK, SD, TX, UT, WV | 12 |
| All methods of abortion are subject to a mandatory waiting period between counseling and procedure | | |
| • 18 hours | IN | 1 |
| • 24 hours | AZ, GA, ID, KS, KY, MI, MN, MS, ND, NE, OH, PA, SC, TX, VA, WI, WV | 17 |
| • 48 hours | AL, AR, TN | 3 |
| • 72 hours | MO, NC, OK, SD, UT | 5 |
| Preabortion counseling must be in person, necessitating two visits to the facility | AR, AZ, IN, KY, LA, MO, MS, OH, SD, TN, TX,[d] UT,[e] VA, WI | 14 |

*continued*

2021 ED 000163

Copyright National Academy of Sciences. All rights reserved.

**TABLE 1-1** Continued

| Type of Regulation[a] | States | Number of States |
|---|---|---|
| All abortions, regardless of method, must be performed by a licensed physician | AL, AK, AR, AZ, DE, FL, GA, IA, ID, IN, KS, KY, LA, MD, ME, MI, MN, MO, MS, NC, ND, NE, NV, OH, OK, PA, SC, SD, TN, TX, UT, VA, WI, WY | 34 |
| Clinicians performing any type of abortion procedures must have hospital admitting privileges or an agreement with a local hospital to transfer patients if needed | AL, AZ, IN, LA, MS, ND, OK, SC, TX, UT | 10 |
| Abortion facilities must have an agreement with a local hospital to transfer patients if needed | FL, KY, MI, NC, OH, PA, TN, WI | 8 |
| All abortions, regardless of method, must be performed in a facility that meets the structural standards typical of ambulatory surgical centers | AL, AR, AZ, IN, KY, LA, MI, MO, MS, NC, OH, OK, PA, RI, SC, SD, UT | 17 |
| Procedure room size, corridor width, or maximum distance to a hospital is specified | AL, AR, AZ,[f] FL, IN, LA, MI, MS, ND, NE, OH, OK, PA, SC, SD, UT | 16 |
| Public funding of abortions is limited to pregnancies resulting from rape or incest or when the woman's life is endangered[g] | AL, AR, CO, DC, DE, FL, GA, IA, ID, IN, KS, KY, LA, ME, MI, MO, MS, NC, ND, NE, NH, NV, OH, OK, PA, RI, SC, SD, TN, TX, UT, VA, WI, WY | 34 |
| Insurance coverage of abortion is restricted in all private insurance plans written in the state, including those offered through health insurance exchanges established under the federal health care reform law[h] | ID, IN, KS, KY, MI, MO, ND, NE, OK, TX, UT | 11 |
| Insurance coverage of abortion is restricted in plans offered through a health insurance exchange[h] | AL, AR, AZ, FL, GA, ID, IN, KS, KY, LA, MI, MO, MS, NC, ND, NE, OH, OK, PA, SC, SD, TN, TX, UT, VA, WI | 26 |

2021 ED 000164

Copyright National Academy of Sciences. All rights reserved.

**TABLE 1-1** Continued

| Type of Regulation[a] | States | Number of States |
|---|---|---|
| No abortions may be performed after a specified number of weeks' gestation unless the woman's life or health is endangered | | |
| • Not after 20–22 weeks | AL, AR, GA, IA, IN, KS, KY, LA, MS, NC, ND, NE, OH, OK, SC, SD, TX, WI, WV | 19 |
| • Not at 24 weeks and after | FL, MA, NV, NY, PA, RI, VA | 7 |
| Dilation and evacuation (D&E) abortions are banned except in cases of life endangerment or severe physical health risk | MS, WV | 2 |
| Abortions cannot be performed in publicly funded facilities | AZ, GA, KS, KY, LA, MO, MS, ND, OH, OK, PA, TX | 12 |

[a]Excludes laws or regulations permanently or temporarily enjoined pending a court decision.

[b]States have abortion-specific requirements generally following the established principles of informed consent.

[c]The content of informed consent materials is specified in state law or developed by the state department of health.

[d]In-person counseling is not required for women who live more than 100 miles from an abortion provider.

[e]Counseling requirement is waived if the pregnancy is the result of rape or incest or the patient is younger than 15.

[f]Maximum distance requirement does not apply to medication abortions.

[g]Some states also exempt women whose physical health is at severe risk and/or in cases of fetal impairment.

[h]Some states have exceptions for pregnancies resulting from rape or incest, pregnancies that severely threaten women's physical health or endanger their life, and/or in cases of fetal impairment.

SOURCES: Guttmacher Institute, 2017b,c,d,e,f,g,h,i, 2018b.

2021 ED 000165

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 47 of 40
PageID.8225
26    *THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

Surveillance System and the Guttmacher Institute's Abortion Provider Census (Jatlaoui et al., 2016; Jerman et al., 2016; Jones and Kavanaugh, 2011; Pazol et al., 2015). Both of these sources provide estimates of the number and rate of abortions, the use of different abortion methods, the characteristics of women who have abortions, and other related statistics. However, both sources have limitations.

The CDC system is a voluntary, state-reported system;[6,7] three states (California, Maryland, and New Hampshire) do not provide information (CDC, 2017). The Guttmacher census, also voluntary, solicits information from all known abortion providers throughout the United States, including in the states that do not submit information to the CDC surveillance system. For 2014, the latest year reported by Guttmacher,[8] information was obtained directly from 58 percent of abortion providers, and data for nonrespondents were imputed (Jones and Jerman, 2017a). The CDC's latest report, for abortions in 2013, includes approximately 70 percent of the abortions reported by the Guttmacher Institute for that year (Jatlaoui et al., 2016).

Both data collection systems report descriptive statistics on women who have abortions and the types of abortion provided, although they define demographic variables and procedure types differently. Nevertheless, in the aggregate, the trends in abortion utilization reported by the CDC and Guttmacher closely mirror each other—indicating decreasing rates of abortion, an increasing proportion of medication abortions, and the vast majority of abortions (90 percent) occurring by 13 weeks' gestation (see Figures 1-2 and 1-3) (Jatlaoui et al., 2016; Jones and Jerman, 2017a).[9] Both data sources are used in this chapter's brief review of trends in abortions and throughout the report.

*Trends in the Number and Rate of Abortions*

The number and rate of abortions have changed considerably during the decades following national legalization in 1973. In the immediate years after

---

[6]In most states, hospitals, facilities, and physicians are required by law to report abortion data to a central health agency. These agencies submit the aggregate utilization data to the CDC (Guttmacher Institute, 2018a).

[7]New York City and the District of Columbia also report data to the CDC.

[8]Guttmacher researchers estimate that the census undercounts the number of abortions performed in the United States by about 5 percent (i.e., 51,725 abortions provided by 2,069 obstetrician/gynecologist [OB/GYN] physicians). The estimate is based on a survey of a random sample of OB/GYN physicians. The survey did not include other physician specialties and other types of clinicians.

[9]A full-term pregnancy is 40 weeks.

2021 ED 000166

Copyright National Academy of Sciences. All rights reserved.



**FIGURE 1-2** Abortion rate, United States, 1973–2014.
SOURCE: Guttmacher Institute, 2017a. Used with permission.



**FIGURE 1-3** Percentage and cumulative percentage of outpatient abortions by weeks' gestation, 2014–2015.
NOTE: n = 8,105.
SOURCE: Adapted from Jones and Jerman, 2017b.

national legalization, both the number and rate[10] of legal abortions steadily increased (Bracken et al., 1982; Guttmacher Institute, 2017a; Pazol et al., 2015; Strauss et al., 2007) (see Figure 1-2). The abortion rate peaked in the

---

[10]Reported abortion rates are for females aged 15 to 44.

2021 ED 000167

Copyright National Academy of Sciences. All rights reserved.

1980s, and the trend then reversed, a decline that has continued for more than three decades (Guttmacher Institute, 2017a; Jones and Kavanaugh, 2011; Pazol et al., 2015; Strauss et al., 2007). Between 1980 and 2014, the abortion rate among U.S. women fell by more than half, from 29.3 to 14.6 per 1,000 women (Finer and Henshaw, 2003; Guttmacher Institute, 2017a; Jones and Jerman, 2017a) (see Figure 1-2). In 2014, the most recent year for which data are available, the aggregate number of abortions reached a low of 926,190 after peaking at nearly 1.6 million in 1990 (Finer and Henshaw, 2003; Jones and Jerman, 2017a). The reason for the decline is not fully understood but has been attributed to several factors, including the increasing use of contraceptives, especially long-acting methods (e.g., intrauterine devices and implants); historic declines in the rate of unintended pregnancy; and increasing numbers of state regulations resulting in limited access to abortion services (Finer and Zolna, 2016; Jerman et al., 2017; Jones and Jerman, 2017a; Kost, 2015; Strauss et al., 2007).

*Weeks' Gestation*

Length of gestation—measured as the amount of time since the first day of the last menstrual period—is the primary factor in deciding what abortion procedure is most appropriate (ACOG, 2014). Since national legalization, most abortions in the United States have been performed in early pregnancy (≤13 weeks) (Cates et al., 2000; CDC, 1983; Elam-Evans et al., 2003; Jatlaoui et al., 2016; Jones and Jerman, 2017a; Koonin and Smith, 1993; Lawson et al., 1989; Pazol et al., 2015; Strauss et al., 2007). CDC surveillance reports indicate that since at least 1992 (when detailed data on early abortions were first collected), the vast majority of abortions in the United States were early-gestation procedures (Jatlaoui et al., 2016; Strauss et al., 2007); this was the case for approximately 92 percent of all abortions in 2013 (Jatlaoui et al., 2016). With such technological advances as highly sensitive pregnancy tests and medication abortion, procedures are being performed at increasingly earlier gestational stages. According to the CDC, the percentage of early abortions performed ≤6 weeks' gestation increased by 16 percent from 2004 to 2013 (Jatlaoui et al., 2016); in 2013, 38 percent of early abortions occurred ≤6 weeks (Jatlaoui et al., 2016). The proportion of early-gestation abortions occurring ≤6 weeks is expected to increase even further as the use of medication abortions becomes more widespread (Jones and Boonstra, 2016; Pazol et al., 2012).

Figure 1-3 shows the proportion of abortions in nonhospital settings by weeks' gestation in 2014 (Jones and Jerman, 2017a).

2021 ED 000168

Copyright National Academy of Sciences. All rights reserved.

*Abortion Methods*

Aspiration is the abortion method most commonly used in the United States, accounting for almost 68 percent of all abortions performed in 2013 (Jatlaoui et al., 2016).[11] Its use, however, is likely to decline as the use of medication abortion increases. The percentage of abortions performed by the medication method rose an estimated 110 percent between 2004 and 2013, from 10.6 to 22.3 percent (Jatlaoui et al., 2016). In 2014, approximately 45 percent of abortions performed up to 9 weeks' gestation were medication abortions, up from 36 percent in 2011 (Jones and Jerman, 2017a).

Fewer than 9 percent of abortions are performed after 13 weeks' gestation; most of these are D&E procedures (Jatlaoui et al., 2016). Induction abortion is the most infrequently used of all abortion methods, accounting for approximately 2 percent of all abortions at 14 weeks' gestation or later in 2013 (Jatlaoui et al., 2016).

*Characteristics of Women Who Have Abortions*

The most detailed sociodemographic statistics on women who have had an abortion in the United States are provided by the Guttmacher Institute's Abortion Patient Survey. Respondents to the 2014/2015 survey included more than 8,000 women who had had an abortion in 1 of 87 outpatient (nonhospital) facilities across the United States in 2014 (Jerman et al., 2016; Jones and Jerman, 2017b).[12] Table 1-2 provides selected findings from this survey. Although women who had an abortion in a hospital setting are excluded from these statistics, the data represent an estimated 95 percent of all abortions provided (see Figure 1-3).

The Guttmacher survey found that most women who had had an abortion were under age 30 (72 percent) and were unmarried (86 percent) (Jones and Jerman, 2017b). Women seeking an abortion were far more likely to be poor or low-income: the household income of 49 percent was below the federal poverty level (FPL), and that of 26 percent was 100 to 199 percent of the FPL (Jerman et al., 2016). In comparison, the

---

[11]CDC surveillance reports use the catchall category of "curettage" to refer to nonmedical abortion methods. The committee assumed that the CDC's curettage estimates before 13 weeks' gestation refer to aspiration procedures and that its curettage estimates after 13 weeks' gestation referred to D&E procedures.

[12]Participating facilities were randomly selected and excluded hospitals. All other types of facilities were included if they had provided at least 30 abortions in 2011 (Jerman et al., 2016). Jerman and colleagues report that logistical challenges precluded including hospital patients in the survey. The researchers believe that the exclusion of hospitals did not bias the survey sample, noting that hospitals accounted for only 4 percent of all abortions in 2011.

2021 ED 000169

Copyright National Academy of Sciences. All rights reserved.

**TABLE 1-2** Characteristics of Women Who Had an Abortion in an Outpatient Setting in 2014, by Percent

| Characteristic | Percent |
|---|---|
| Age (a) | |
| <15–17 | 3.6 |
| 18–19 | 8.2 |
| 20–24 | 33.6 |
| 25–29 | 26.3 |
| 30–34 | 16.0 |
| 35+ | 12.2 |
| Race/Ethnicity (a) | |
| Asian/Pacific Islander | 4.7 |
| Black | 24.8 |
| Hispanic | 24.5 |
| Multiracial | 4.5 |
| Other | 2.5 |
| White | 39.0 |
| Prior Pregnancies (a) | |
| No prior pregnancies | 29.2 |
| Prior birth only | 26.0 |
| Prior abortion only | 11.7 |
| Prior birth and abortion | 33.1 |
| Prior Births (b) | |
| None | 40.7 |
| 1 | 26.2 |
| 2+ | 33.1 |
| Education (a) | |
| Not a high school graduate | 12.2 |
| High school graduate or GED | 29.0 |
| Some college or associates degree | 39.2 |
| College graduate | 19.7 |
| Family Income as a Percentage of Federal Poverty Level (b) | |
| <100 | 49.3 |
| 100–199 | 25.7 |
| ≥200 | 25.0 |
| Payment Method (a) | |
| Private insurance | 14.1 |
| Medicaid | 21.9 |
| Financial assistance | 13.2 |
| Out of pocket | 45.4 |
| Other/unknown | 5.4 |

NOTE: Percentages may not sum to 100 because of rounding.
SOURCES: (a) Jones and Jerman, 2017b (n = 8,098); (b) Jerman et al., 2016 (n = 8,380).

2021 ED 000170

Copyright National Academy of Sciences. All rights reserved.

corresponding percentages among all women aged 15 to 49 are 16 and 18 percent.[13] Women who had had an abortion were also more likely to be women of color[14] (61.0 percent); overall, half of women who had had an abortion were either black (24.8 percent) or Hispanic (24.5 percent) (Jones and Jerman, 2017b). This distribution is similar to the racial and ethnic distribution of women with household income below 200 percent of the FPL, 49 percent of whom are either black (20 percent) or Hispanic (29 percent).[15] Poor women and women of color are also more likely than others to experience an unintended pregnancy (Finer and Henshaw, 2006; Finer et al., 2006; Jones and Kavanaugh, 2011).

Many women who have an abortion have previously experienced pregnancy or childbirth. Among respondents to the Guttmacher survey, 59.3 percent had given birth at least once, and 44.8 percent had had a prior abortion (Jerman et al., 2016; Jones and Jerman, 2017b).

While precise estimates of health insurance coverage of abortion are not available, numerous regulations limit coverage. As noted in Table 1-1, 33 states prohibit public payers from paying for abortions and other states have laws that either prohibit health insurance exchange plans (25 states) or private insurance plans (11 states) sold in the state from covering or paying for abortions, with few exceptions.[16] In the Guttmacher survey, only 14 percent of respondents had paid for the procedure using private insurance coverage, and despite the disproportionately high rate of poverty and low income among those who had had an abortion, only 22 percent reported that Medicaid was the method of payment for their abortion. In 2015, 39 percent of the 25 million women lived in households that earned less than 200 percent of the FPL in the United States were enrolled in Medicaid, and 36 percent had private insurance (Ranji et al., 2017).

*Number of Clinics Providing Abortion Care*

As noted earlier, the vast majority of abortions are performed in non-hospital settings—either an abortion clinic (59 percent) or a clinic offering a variety of medical services (36 percent) (Jones and Jerman, 2017a) (see Figure 1-4). Although hospitals account for almost 40 percent of facilities offering abortion care, they provide less than 5 percent of abortions overall.

---

[13]Calculation by the committee based on estimates from *Annual Social and Economic Supplement (ASEC) to the Current Population Survey (CPS)*.

[14]Includes all nonwhite race and ethnicity categories in Table 1-2. Data were collected via self-administered questionnaire (Jones and Jerman, 2017b).

[15]Calculation by the committee based on estimates from *Annual Social and Economic Supplement (ASEC) to the Current Population Survey (CPS)*.

[16]Some states have exceptions for pregnancies resulting from rape or incest, pregnancies that endanger the woman's life or severely threaten her health, and in cases of fetal impairment.

2021 ED 000171

Copyright National Academy of Sciences. All rights reserved.



**FIGURE 1-4** Percentage of abortion-providing facilities accounted for by each facility type and percentage of abortions performed in each type of facility, 2014 (n = 1,671).
NOTE: Abortion clinics are nonhospital facilities in which 50 percent or more of patient visits are for abortion services. Nonspecialized clinics are nonhospital facilities in which fewer than 50 percent of patient visits are for abortion services.
SOURCE: Jones and Jerman, 2017a.

The overall number of nonhospital facilities providing abortions—especially specialty abortion clinics—is declining. The greatest proportional decline is in states that have enacted abortion-specific regulations (Jones and Jerman, 2017a). In 2014, there were 272 abortion clinics in the United States, 17 percent fewer than in 2011. The greatest decline (26 percent) was among large clinics with annual caseloads of 1,000–4,999 patients and clinics in the Midwest (22 percent) and the South (13 percent). In 2014, approximately 39 percent of U.S. women aged 15 to 44 resided in a U.S. county without an abortion provider (90 percent of counties overall) (Jones and Jerman, 2017a). Twenty-five states have five or fewer abortion clinics; five states have one abortion clinic (Jones and Jerman, 2017a). A recent analysis[17] by Guttmacher evaluated geographic disparities in access to abortion by calculating the distance between women of reproductive age (15 to 44) and the nearest abortion-providing facility in 2014 (Bearak et al., 2017). Figure 1-5 highlights the median distance to the nearest facility by county.

---

[17]The analysis was limited to facilities that provided at least 400 abortions per year and those affiliated with Planned Parenthood that performed at least 1 abortion during the period of analysis.

2021 ED 000172

Copyright National Academy of Sciences. All rights reserved.



FIGURE 1-5 Median distance to the nearest abortion-providing facility by county, 2014.
NOTE: Analysis is limited to facilities that had caseloads of 400 abortions or more per year and those affiliated with Planned Parenthood that performed at least 1 abortion in the period of analysis.
SOURCE: Bearak et al., 2017.

The majority of facilities offer early medication and aspiration abortions. In 2014, 87 percent of nonhospital facilities provided early medication abortions; 23 percent of all nonhospital facilities offered this type of abortion (Jones and Jerman, 2017a). Fewer facilities offer later-gestation procedures, and availability decreases as gestation increases. In 2012, 95 percent of all abortion facilities offered abortions at 8 weeks' gestation, 72 percent at 12 weeks' gestation, 34 percent at 20 weeks' gestation, and 16 percent at 24 weeks' gestation (Jerman and Jones, 2014).

## STUDY APPROACH

### Conceptual Framework

The committee's approach to this study built on two foundational developments in the understanding and evaluation of the quality of health

2021 ED 000173
Copyright National Academy of Sciences. All rights reserved.



**FIGURE 1-6** The committee's analytic framework for assessing the quality of abortion care.
NOTE: OB/GYN = obstetrician/gynecologist.

2021 ED 000174

Copyright National Academy of Sciences. All rights reserved.

care services: Donabedian's (1980) structure-process-outcome framework and the IOM's (2001) six dimensions of quality health care. Figure 1-6 illustrates the committee's adaptation of these concepts for this study's assessment of abortion care in the United States.

### *Structure-Process-Outcome Framework*

In seminal work published almost 40 years ago, Donabedian (1980) proposed that the quality of health care be assessed by examining its structure, process, and outcomes (Donabedian, 1980):

- *Structure* refers to organizational factors that may create the potential for good quality. In abortion care, such structural factors as the availability of trained staff and the characteristics of the clinical setting may ensure—or inhibit—the capacity for quality.
- *Process* refers to what is done to and for the patient. Its assessment assumes that the services patients receive should be evidence based and correlated with patients' desired outcomes—for example, an early and complete abortion for women who wish to terminate an unintended pregnancy.
- *Outcomes* are the end results of care—the effects of the intervention on the health and well-being of the patient. Does the procedure achieve its objective? Does it lead to serious health risks in the short or long term?

### *Six Dimensions of Health Care Quality*

The landmark IOM report *Crossing the Quality Chasm: A New Health System for the 21st Century* (IOM, 2001) identifies six dimensions of health care quality—safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity. The articulation of these six dimensions has guided public and private efforts to improve U.S. health care delivery at the local, state, and national levels since that report was published (AHRQ, 2016).

In addition, as with other health care services, women should expect that the abortion care they receive meets well-established standards for objectivity, transparency, and scientific rigor (IOM, 2011a,b).

Two of the IOM's six dimensions—safety and effectiveness—are particularly salient to the present study. Assessing both involves making relative judgments. There are no universally agreed-upon thresholds for defining care as "safe" versus "unsafe" or "effective" versus "not effective," and decisions about safety and effectiveness have a great deal to do with the context of the clinical scenario. Thus, the committee's frame of reference for evaluating safety, effectiveness, and other quality domains is of necessity a

2021 ED 000175

Copyright National Academy of Sciences. All rights reserved.

relative one—one that entails not only comparing the alternative abortion methods but also comparing these methods with other health care services and with risks associated with not achieving the desired outcome.

Safety—avoiding injury to patients—is often assessed by measuring the incidence and severity of complications and other adverse events associated with receiving a specific procedure. If infrequent, a complication may be characterized as "rare"—a term that lacks consistent definition. In this report, "rare" is used to describe outcomes that affect fewer than 1 percent of patients. Complications are considered "serious" if they result in a blood transfusion, surgery, or hospitalization.

Note also that the term "effectiveness" is used differently in this report depending on the context. As noted in Box 1-3, effectiveness as an attribute of quality refers to providing services based on scientific knowledge to all who could benefit and refraining from providing services to those not likely to benefit (avoiding underuse and overuse, respectively). Elsewhere in this report, effectiveness denotes the clinical effectiveness of a procedure, that

---

**BOX 1-3**
**The Six Dimensions of Health Care Quality**

*Crossing the Quality Chasm: A New Health System for the 21st Century*

1. Safety—avoiding injuries to patients from the care that is intended to help them.

2. Effectiveness—providing services based on scientific knowledge to all who could benefit and refraining from providing services to those not likely to benefit (avoiding underuse and overuse, respectively).

3. Patient-centeredness—providing care that is respectful of and responsive to individual patient preferences, needs, and values and ensuring that patient values guide all clinical decisions.

4. Timeliness—reducing waits and sometimes harmful delays for both those who receive and those who give care.

5. Efficiency—avoiding waste, including waste of equipment, supplies, ideas, and energy.

6. Equity—providing care that does not vary in quality because of personal characteristics such as gender, ethnicity, geographic location, and socioeconomic status.

SOURCE: Excerpted from IOM, 2001, p. 6

---

2021 ED 000176

Copyright National Academy of Sciences. All rights reserved.

is, the successful completion of an abortion without the need for a follow-up aspiration.

### Finding and Assessing the Evidence

The committee deliberated during four in-person meetings and numerous teleconferences between January 2017 and December 2017. On March 24, 2017, the committee hosted a public workshop at the Keck Center of the National Academies of Sciences, Engineering, and Medicine in Washington, DC. The workshop included presentations from three speakers on topics related to facility standards and the safety of outpatient procedures. Appendix C contains the workshop agenda.

Several committee workgroups were formed to find and assess the quality of the available evidence and to draft summary materials for the full committee's review. The workgroups conducted in-depth reviews of the epidemiology of abortions, including rates of complications and mortality, the safety and effectiveness of alternative abortion methods, professional standards and methods for performing all aspects of abortion care (as described in Figure 1-1), the short- and long-term physical and mental health effects of having an abortion; and the safety and quality implications of abortion-specific regulations on abortion.

The committee focused on finding reliable, scientific information reflecting contemporary U.S. abortion practices. An extensive body of research on abortion has been conducted outside the United States. A substantial proportion of this literature concerns the delivery of abortion care in countries where socioeconomic conditions, culture, population health, health care resources, and/or the health care system are markedly different from their U.S. counterparts. Studies from other countries were excluded from this review if the committee judged those factors to be relevant to the health outcomes being assessed.

The committee considered evidence from randomized controlled trials comparing two or more approaches to abortion care; systematic reviews; meta-analyses; retrospective cohort studies, case control studies, and other types of observational studies; and patient and provider surveys (see Box 1-4).

An extensive literature documents the biases common in published research on the effectiveness of health care services (Altman et al., 2001; Glasziou et al., 2008; Hopewell et al., 2008; Ioannidis et al., 2004; IOM, 2011a,b; Plint et al., 2006; Sackett, 1979; von Elm et al., 2007). Thus, the committee prioritized the available research according to conventional principles of evidence-based medicine intended to reduce the risk of bias in a study's conclusions, such as how subjects were allocated to different types of abortion care, the comparability of study populations, controls

2021 ED 000177

Copyright National Academy of Sciences. All rights reserved.

**BOX 1-4**
**Types of Research Reviewed for This Study**

The fo ow ng types of exper menta and observat ona research on the out-
comes of abort on care were rev ewed for th s study.

**Experimental Studies**

- **Controlled trials** are exper menta stud es n wh ch an exper menta group
  rece ves the ntervent on of nterest wh e one or more compar son groups
  rece ve an act ve comparator, a p acebo, no ntervent on, or the usua stan-
  dard of care, and the outcomes are compared. In a random zed contro ed
  tr a (RCT), the part c pants are random y a ocated to the exper menta
  group or the compar son group(s).
- **Systematic reviews** are sc ent fic nvest gat ons focused on a spec fic
  quest on and use exp c t, p anned sc ent fic methods to dent fy, se ect, as-
  sess, and summar ze the find ngs of s m ar but separate stud es. They may
  or may not nc ude a quant tat ve synthes s (meta-ana ys s) of the resu ts
  from separate stud es.
- A **meta-analysis** s a systemat c rev ew that uses stat st ca methods to
  comb ne quant tat ve y the resu ts of s m ar stud es n an attempt to a ow
  nferences to be drawn from the samp e of stud es and app ed to the popu-
  at on of nterest.

**Observational Studies**

- In **cohort studies**, groups of exposed nd v dua s (e.g., women hav ng had
  an abort on n the r first pregnancy) and groups of unexposed nd v dua s
  (e.g., women whose first pregnancy was a de very) are mon tored over t me
  and compared w th respect to an outcome of nterest (e.g., future fert ty).
  Cohort stud es can be e ther prospect ve or retrospect ve.
- **Case control studies** compare one group of persons w th a certa n d s-
  ease, chron c cond t on, or type of njury (case pat ents) and another group
  of persons w thout that hea th prob em (contro subjects) to dent fy d ffer-
  ences n exposures, behav ors, and other character st cs for the purpose of
  determ n ng and quant fy ng assoc at ons, test ng hypotheses, and under-
  stand ng causes.

SOURCE OM 2011b

for confounding factors, how outcome assessments were conducted, the
completeness of outcome reporting, the representativeness of the study
population compared with the general U.S. population, and the degree to
which statistical analyses helped reduce bias (IOM, 2011b). Applying these
principles is particularly important with respect to understanding abortion's

Copyright National Academy of Sciences. All rights reserved.

long-term health effects, an area in which the relevant literature is vulnerable to bias (as discussed in Chapter 4).

The committee's literature search strategy is described in Appendix D.

## ORGANIZATION OF THE REPORT

Chapter 2 of this report describes the continuum of abortion care including current abortion methods (question 1 in the committee's statement of task [Box 1-1]); reviews the evidence on factors affecting their safety and quality, including expected side effects and possible complications (questions 2 and 3), necessary safeguards to manage medical emergencies (question 6), and provision of pain management (question 7); and presents the evidence on the types of facilities or facility factors necessary to provide safe and effective abortion care (question 4).

Chapter 3 summarizes the clinical skills that are integral to safe and high-quality abortion care according to the recommendations of leading national professional organizations and abortion training curricula (question 5).

Chapter 4 reviews research examining the long-term health effects of undergoing an abortion (question 2).

Finally, Chapter 5 presents the committee's conclusions regarding the findings presented in the previous chapters, responding to each of the questions posed in the statement of task. Findings are statements of scientific evidence. The report's conclusions are the committee's inferences, interpretations, or generalizations drawn from the evidence.

## REFERENCES

ACNM (American College of Nurse-Midwives). 2011. *Position statement: Reproductive health choices*. http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILE NAME/000000000087/Reproductive_Choices.pdf (accessed August 1, 2017).

ACNM. 2016. *Position statement: Access to comprehensive sexual and reproductive health care services*. http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILE NAME/000000000087/Access-to-Comprehensive-Sexual-and-Reproductive-Health-Care-Services-FINAL-04-12-17.pdf (accessed August 1, 2017).

ACOG (American College of Obstetricians and Gynecologists). 2013. Practice Bulletin No. 135: Second-trimester abortion. *Obstetrics & Gynecology* 121(6):1394–1406.

ACOG. 2014. Practice Bulletin No. 143: Medical management of first-trimester abortion (reaffirmed). *Obstetrics & Gynecology* 123(3):676–692.

AHRQ (Agency for Healthcare Research and Quality). 2016. *The six domains of health care quality*. https://www.ahrq.gov/professionals/quality-patient-safety/talkingquality/create/sixdomains.html (accessed May 3, 2017).

Altman, D. G., K. F. Schulz, D. Moher, M. Egger, F. Davidoff, D. Elbourne, P. C. Gøtzsche, and T. Lang. 2001. The revised CONSORT statement for reporting randomized trials: Explanation and elaboration. *Annals of Internal Medicine* 134(8):663–694.

2021 ED 000179

Copyright National Academy of Sciences. All rights reserved.

Ashok, P. W., A. Templeton, P. T. Wagaarachchi, and G. M. Flett. 2004. Midtrimester medical termination of pregnancy: A review of 1002 consecutive cases. *Contraception* 69(1):51–58.

Autry, A. M., E. C. Hayes, G. F. Jacobson, and R. S. Kirby. 2002. A comparison of medical induction and dilation and evacuation for second-trimester abortion. *American Journal of Obstetrics and Gynecology* 187(2):393–397.

Bartlett, L. A., C. J. Berg, H. B. Shulman, S. B. Zane, C. A. Green, S. Whitehead, and H. K. Atrash. 2004. Risk factors for legal induced abortion-related mortality in the United States. *Obstetrics & Gynecology* 103(4):729–737.

Bearak, J. M., K. L. Burke, and R. K. Jones. 2017. Disparities and change over time in distance women would need to travel to have an abortion in the USA: A spatial analysis. *The Lancet Public Health* 2(11):e493–e500.

Borgatta, L. 2011. *Labor induction termination of pregnancy. Global library for women's medicine.* https://www.glowm.com/section_view/heading/Labor%20Induction%20 Termination%20of%20Pregnancy/item/443 (accessed September 13, 2017).

Borkowski, L., J. Strasser, A. Allina, and S. Wood. 2015. *Medication abortion. Overview of research & policy in the United States.* http://publichealth.gwu.edu/sites/default/files/ Medication_Abortion_white_paper.pdf (accessed January 25, 2017).

Bracken, M. B., D. H. Freeman, Jr., and K. Hellenbrand. 1982. Hospitalization for medical-legal and other abortions in the United States 1970–1977. *American Journal of Public Health* 72(1):30–37.

Bryant, A. G., D. A. Grimes, J. M. Garrett, and G. S. Stuart. 2011. Second-trimester abortion for fetal anomalies or fetal death: Labor induction compared with dilation and evacuation. *Obstetrics & Gynecology* 117(4):788–792.

Cates, Jr., W., K. F. Schulz, D. A. Grimes, A. J. Horowitz, F. A. Lyon, F. H. Kravitz, and M. J. Frisch. 1982. Dilatation and evacuation procedures and second-trimester abortions. The role of physician skill and hospital setting. *Journal of the American medical Association* 248(5):559–563.

Cates, Jr., W., D. A. Grimes, and K. F. Schulz. 2000. Abortion surveillance at CDC: Creating public health light out of political heat. *American Journal of Preventive Medicine* 19(1, Suppl. 1):12–17.

CDC (Centers for Disease Control and Prevention). 1983. Surveillance summary abortion surveillance: Preliminary analysis, 1979–1980—United States. *MMWR Weekly* 32(5): 62–64. https://www.cdc.gov/mmwr/preview/mmwrhtml/00001243.htm (accessed September 18, 2017).

CDC. 2017. *CDC's abortion surveillance system FAQs.* https://www.cdc.gov/reproductivehealth/ data_stats/abortion.htm (accessed June 22, 2017).

Chen, M. J., and M. D. Creinin. 2015. Mifepristone with buccal misoprostol for medical abortion: A systematic review. *Obstetrics & Gynecology* 126(1):12–21.

Cleland, K., M. D. Creinin, D. Nucatola, M. Nshom, and J. Trussell. 2013. Significant adverse events and outcomes after medical abortion. *Obstetrics & Gynecology* 121(1):166–171.

Costescu, D., E. Guilbert, J. Bernardin, A. Black, S. Dunn, B. Fitzsimmons, W. V. Norman, H. Pymar, J. Soon, K. Trouton, M. S. Wagner, and E. Wiebe. 2016. Medical abortion. *Journal of Obstetrics and Gynaecology Canada* 38(4):366–389.

Donabedian, A. 1980. The definition of quality and approaches to its assessment. In *Explorations in quality assessment and monitoring.* Vol. 1. Ann Arbor, MI: Health Administration Press.

Edelman, D. A., W. E. Brenner, and G. S. Berger. 1974. The effectiveness and complications of abortion by dilatation and vacuum aspiration versus dilatation and rigid metal curettage. *American Journal of Obstetrics and Gynecology* 119(4):473–480.

2021 ED 000180

Copyright National Academy of Sciences. All rights reserved.

Elam-Evans, L. D., L. T. Strauss, J. Herndon, W. Y. Parker, S. V. Bowens, S. Zane, and C. J. Berg. 2003. Abortion surveillance—United States, 2000. *MMWR Surveillance Summaries* 52(SS-12):1–32. https://www.cdc.gov/mmwr/preview/mmwrhtml/ss5212a1.htm (accessed September 18, 2017).

FDA (U.S. Food and Drug Administration). 2016. *MIFEPREX®: Highligh*ts of prescribing information. https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf (accessed September 11, 2017).

Finer, L. B., and S. K. Henshaw. 2003. Abortion incidence and services in the United States in 2000. *Perspectives on Sexual and Reproductive Health* 35(1):6–15.

Finer, L. B., and S. K. Henshaw. 2006. Disparities in rates of unintended pregnancy in the United States, 1994 and 2001. *Perspectives on Sexual and Reproductive Health* 38(2):90–96.

Finer, L. B., and M. R. Zolna. 2016. Declines in unintended pregnancy in the United States, 2008–2011. *New England Journal of Medicine* 374(9):843–852.

Finer, L. B., L. F. Frohwirth, L. A. Dauphinee, S. Singh, and A. M. Moore. 2006. Timing of steps and reasons for delays in obtaining abortions in the United States. *Contraception* 74(4):334–344.

Frick, A. C., E. A. Drey, J. T. Diedrich, and J. E. Steinauer. 2010. Effect of prior cesarean delivery on risk of second-trimester surgical abortion complications. *Obstetrics & Gynecology* 115(4):760–764.

Gary, M. M., and D. J. Harrison. 2006. Analysis of severe adverse events related to the use of mifepristone as an abortifacient. *Annals of Pharmacotherapy* 40(2):191–197.

Glasziou, P., E. Meats, C. Heneghan, and S. Shepperd. 2008. What is missing from descriptions of treatment in trials and reviews? *British Medical Journal* 336(7659):1472–1474.

Grimes, D. A., and G. Stuart. 2010. Abortion jabberwocky: The need for better terminology. *Contraception* 81(2):93–96.

Grimes, D. A., S. M. Smith, and A. D. Witham. 2004. Mifepristone and misoprostol versus dilation and evacuation for midtrimester abortion: A pilot randomised controlled trial. *British Journal of Obstetrics & Gynaecology* 111(2):148–153.

Grossman, D., K. Blanchard, and P. Blumenthal. 2008. Complications after second trimester surgical and medical abortion. *Reproductive Health Matters* 16(31 Suppl.):173–182.

Grossman, D., K. Grindlay, T. Buchacker, K. Lane, and K. Blanchard. 2011. Effectiveness and acceptability of medical abortion provided through telemedicine. *Obstetrics & Gynecology* 118(2 Pt. 1):296–303.

Guttmacher Institute. 2017a. *Fact sheet: Induced abortion in the United States.* https://www.guttmacher.org/fact-sheet/induced-abortion-united-states (accessed November 10, 2017).

Guttmacher Institute. 2017b. *Bans on specific abortion methods used after the first trimester.* https://www.guttmacher.org/state-policy/explore/bans-specific-abortion-methods-used-after-first-trimester (accessed September 12, 2017).

Guttmacher Institute. 2017c. *Counseling and waiting periods for abortion.* https://www.guttmacher.org/state-policy/explore/counseling-and-waiting-periods-abortion (accessed September 12, 2017).

Guttmacher Institute. 2017d. *Medication abortion.* https://www.guttmacher.org/state-policy/explore/medication-abortion (accessed September 12, 2017).

Guttmacher Institute. 2017e. *An overview of abortion laws.* https://www.guttmacher.org/state-policy/explore/overview-abortion-laws (accessed September 12, 2017).

Guttmacher Institute. 2017f. *Requirements for ultrasound.* https://www.guttmacher.org/state-policy/explore/requirements-ultrasound (accessed September 12, 2017).

Guttmacher Institute. 2017g. *State funding of abortion under Medicaid.* https://www.guttmacher.org/state-policy/explore/state-funding-abortion-under-medicaid (accessed September 12, 2017).

2021 ED 000181

Copyright National Academy of Sciences. All rights reserved.

Guttmacher Institute. 2017h. *State policies on later abortions.* https://www.guttmacher.org/state-policy/explore/state-policies-later-abortions (accessed September 12, 2017).

Guttmacher Institute. 2017i. *Targeted regulation of abortion providers.* https://www.guttmacher.org/state-policy/explore/targeted-regulation-abortion-providers (accessed September 12, 2017).

Guttmacher Institute. 2018a. *Abortion reporting requirements.* https://www.guttmacher.org/state-policy/explore/abortion-reporting-requirements (accessed January 22, 2018).

Guttmacher Institute. 2018b. *Restricting insurance coverage of abortion.* https://www.guttmacher.org/state-policy/explore/restricting-insurance-coverage-abortion (accessed January 24, 2018).

Hopewell, S., M. Clarke, D. Moher, E. Wager, P. Middleton, D. G. Altman, K. F. Schulz, and the CONSORT Group. 2008. CONSORT for reporting randomized controlled trials in journal and conference abstracts: Explanation and elaboration. *PLoS Medicine* 5(1):e20.

Ioannidis, J. P., S. J. Evans, P. C. Gøtzsche, R. T. O'Neill, D. G. Altman, K. Schulz, D. Moher, and the CONSORT Group. 2004. Better reporting of harms in randomized trials: An extension of the CONSORT statement. *Annals of Internal Medicine* 141(10):781–788.

IOM (Institute of Medicine). 1975. *Legalized abortion and the public health.* Washington, DC: National Academy Press.

IOM. 2001. *Crossing the quality chasm: A new health system for the 21st century.* Washington, DC: National Academy Press.

IOM. 2011a. *Clinical practice guidelines we can trust.* Washington, DC: The National Academies Press.

IOM. 2011b. *Finding what works in health care: Standards for systematic reviews.* Washington, DC: The National Academies Press.

Ireland, L. D., M. Gatter, and A. Y. Chen. 2015. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. *Obstetrics & Gynecology* 126(1):22–28.

Jatlaoui, T. C., A. Ewing, M. G. Mandel, K. B. Simmons, D. B. Suchdev, D. J. Jamieson, and K. Pazol. 2016. Abortion surveillance—United States, 2013. *MMWR Surveillance Summaries* 65(No. SS-12):1–44.

Jerman, J., and R. K. Jones. 2014. Secondary measures of access to abortion services in the United States, 2011 and 2012: Gestational age limits, cost, and harassment. *Women's Health Issues* 24(4): e419–e424.

Jerman J., R. K. Jones, and T. Onda. 2016. *Characteristics of U.S. abortion patients in 2014 and changes since 2008.* https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf (accessed October 17, 2016).

Jerman, J., L. Frohwirth, M. L. Kavanaugh, and N. Blades. 2017. Barriers to abortion care and their consequences for patients traveling for services: Qualitative findings from two states. *Perspectives on Sexual and Reproductive Health* 49(2):95–102.

Jones, R. K., and H. D. Boonstra. 2016. *The public health implications of the FDA update to the medication abortion label.* New York: Guttmacher Institute. https://www.guttmacher.org/article/2016/06/public-health-implications-fda-update-medication-abortion-label (accessed October 27, 2017).

Jones, R. K., and J. Jerman. 2017a. Abortion incidence and service availability in the United States, 2014. *Perspectives on Sexual and Reproductive Health* 49(1):1–11.

Jones, R. K., and J. Jerman. 2017b. Characteristics and circumstances of U.S. women who obtain very early and second trimester abortions. *PLoS One* 12(1):e0169969.

Jones, R. K., and M. L. Kavanaugh. 2011. Changes in abortion rates between 2000 and 2008 and lifetime incidence of abortion. *Obstetrics & Gynecology* 117(6):1358–1366.

Jones, R. K., L. B. Finer, and S. Singh. 2010. *Characteristics of U.S. abortion patients, 2008.* New York: Guttmacher Institute.

2021 ED 000182

Copyright National Academy of Sciences. All rights reserved.

Kahn, J. B., J. P. Bourne, J. D. Asher, and C. W. Tyler. 1971. Technical reports: Surveillance of abortions in hospitals in the United States, 1970. *HSMHA Health Reports* 86(5):423–430.

Kelly, T., J. Suddes, D. Howel, J. Hewison, and S. Robson. 2010. Comparing medical versus surgical termination of pregnancy at 13–20 weeks of gestation: A randomised controlled trial. *British Journal of Obstetrics & Gynaecology* 117(12): 1512–1520.

Koonin, L. M., and J. C. Smith. 1993. Abortion surveillance—United States, 1990. *MMWR Surveillance Summaries* 42(SS-6):29–57. https://www.cdc.gov/mmwr/preview/mmwrhtml/00031585.htm (accessed September 18, 2017).

Kost, K. 2015. *Unintended pregnancy rates at the state level: Estimates for 2010 and trends since 2002.* New York: Guttmacher Institute.

Kulier, R., N. Kapp, A. M. Gulmezoglu, G. J. Hofmeyr, L. Cheng, and A. Campana. 2011. Medical methods for first trimester abortion. *The Cochrane Database of Systematic Reviews* (11):CD002855.

Lawson, H. W., H. K. Atrash, A. F. Saftlas, L. M. Koonin, M. Ramick, and J. C. Smith. 1989. Abortion surveillance, United States, 1984–1985. *MMWR Surveillance Summaries* 38(SS-2):11–15. https://www.cdc.gov/Mmwr/preview/mmwrhtml/00001467.htm (accessed September 18, 2017).

Lean, T. H., D. Vengadasalam, S. Pachauri, and E. R. Miller. 1976. A comparison of D & C and vacuum aspiration for performing first trimester abortion. *International Journal of Gynecology and Obstetrics* 14(6):481–486.

Lichtenberg, E. S., and M. Paul. 2013. Surgical abortion prior to 7 weeks of gestation. *Contraception* 88(1):7–17.

Lohr, A. P., J. L. Hayes, and K. Gemzell Danielsson. 2008. Surgical versus medical methods for second trimester induced abortion. *Cochrane Database of Systematic Reviews* (1):CD006714.

Low, N., M. Mueller, H. A. Van Vliet, and N. Kapp. 2012. Perioperative antibiotics to prevent infection after first-trimester abortion. *Cochrane Database of Systematic Reviews* (3):CD005217.

Mauelshagen, A., L. C. Sadler, H. Roberts, M. Harilall, and C. M. Farquhar. 2009. Audit of short term outcomes of surgical and medical second trimester termination of pregnancy. *Reproductive Health* 6(1):16.

NAF (National Abortion Federation). 2017. *2017 Clinical policy guidelines for abortion care.* Washington, DC: NAF.

Nash, E., R. B. Gold, L. Mohammed, O. Cappello, and Z. Ansari-Thomas. 2017. *Laws affecting reproductive health and rights: State policy trends at midyear, 2017.* Washington, DC: Guttmacher Institute. https://www.guttmacher.org/article/2017/07/laws-affecting-reproductive-health-and-rights-state-policy-trends-midyear-2017 (accessed September 21, 2017).

Ngoc, N. T., T. Shochet, S. Raghavan, J. Blum, N. T. Nga, N. T. Minh, V. Q. Phan, B. Winikoff. 2011. Mifepristone and misoprostol compared with misoprostol alone for second-trimester abortion: A randomized controlled trial. *Obstetrics & Gynecology* 118(3):601–608.

Ohannessian, A., K. Baumstarck, J. Maruani, E. Cohen-Solal, P. Auquier, and A. Agostini. 2016. Mifepristone and misoprostol for cervical ripening in surgical abortion between 12 and 14 weeks of gestation: A randomized controlled trial. *European Journal of Obstetrics & Gynecology and Reproductive Biology* 201:151–155.

Pazol, K., A. A. Creanga, and S. B. Zane. 2012. Trends in use of medical abortion in the United States: Reanalysis of surveillance data from the Centers for Disease Control and Prevention, 2001–2008. *Contraception* 86(6):746–751.

Pazol, K., A. A. Creanga, and D. J. Jamieson. 2015. Abortion surveillance—United States, 2012. *Morbidity and Mortality Weekly Report* 64(SS-10):1–40.

2021 ED 000183

Copyright National Academy of Sciences. All rights reserved.

Peterson, W. F., F. N. Berry, M. R. Grace, and C. L. Gulbranson. 1983. Second-trimester abortion by dilatation and evacuation: An analysis of 11,747 cases. *Obstetrics & Gynecology* 62(2):185–190.

Plint, A. C., D. Moher, A. Morrison, K. Schulz, D. G. Altman, C. Hill, and I. Gaboury. 2006. Does the CONSORT checklist improve the quality of reports of randomised controlled trials? A systematic review. *Medical Journal of Australia* 185(5):263–267.

Ranji, U., A. Salganicoff, L. Sobel, C. Rosenzweig, and I. Gomez. 2017. *Financing family planning services for low-income women: The role of public programs.* https://www.kff.org/womens-health-policy/issue-brief/financing-family-planning-services-for-low-income-women-the-role-of-public-programs (accessed September 9, 2017).

Raymond, E. G., C. Shannon, M. A. Weaver, and B. Winikoff. 2013. First-trimester medical abortion with mifepristone 200 mg and misoprostol: A systematic review. *Contraception* 87(1):26–37.

RCOG (Royal College of Obstetricians and Gynaecologists). 2011. The care of women requesting induced abortion (Evidence-based clinical guideline number 7). London, UK: RCOG Press. https://www.rcog.org.uk/globalassets/documents/guidelines/abortion-guideline_web_1.pdf (accessed July 27, 2017).

RCOG. 2015. Best practice in comprehensive abortion care (Best practice paper no. 2). London, UK: RCOG Press. https://www.rcog.org.uk/globalassets/documents/guidelines/best-practice-papers/best-practice-paper-2.pdf (accessed September 11, 2017).

Roblin, P. 2014. Vacuum aspiration. In *Abortion care,* edited by S. Rowlands. Cambridge, UK: Cambridge University Press.

Sackett, D. L. 1979. Bias in analytic research. *Journal of Chronic Diseases* 32(1–2):51–63.

Sonalkar, S., S. N. Ogden, L. K. Tran, and A. Y. Chen. 2017. Comparison of complications associated with induction by misoprostol versus dilation and evacuation for second-trimester abortion. *International Journal of Gynaecology & Obstetrics* 138(3):272–275.

Strauss, L. T., S. B. Gamble, W. Y. Parker, D. A. Cook, S. B. Zane, and S. Hamdan. 2007. Abortion surveillance—United States, 2004. *MMWR Surveillance Summaries* 56 (SS-12):1–33.

Upadhyay, U. D., S. Desai, V. Zlidar, T. A. Weitz, D. Grossman, P. Anderson, and D. Taylor. 2015. Incidence of emergency department visits and complications after abortion. *Obstetrics & Gynecology* 125(1):175–183.

von Elm, E., D. G. Altman, M. Egger, S. J. Pocock, P. C. Gøtzsche, and J. P. Vandenbrouke. 2007. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: Guidelines for reporting observational studies. *PLoS Medicine* 4(10):e296.

White, K., E. Carroll, and D. Grossman. 2015. Complications from first-trimester aspiration abortion: A systematic review of the literature. *Contraception* 92(5):422–438.

WHO (World Health Organization). 2012. *Safe abortion: Technical and policy guidance for health systems* (Second edition). http://apps.who.int/iris/bitstream/10665/70914/1/9789241548434_eng.pdf (accessed September 12, 2017).

WHO. 2014. *Clinical practice handbook for safe abortion.* Geneva, Switzerland: WHO Press. http://apps.who.int/iris/bitstream/10665/97415/1/9789241548717_eng.pdf?ua=1&ua=1 (accessed November 15, 2016).

Wildschut, H., M. I. Both, S. Medema, E. Thomee, M. F. Wildhagen, and N. Kapp. 2011. Medical methods for mid-trimester termination of pregnancy. *The Cochrane Database of Systematic Reviews* (1):Cd005216.

Woodcock, J. 2016. Letter from the director of the FDA Center for Drug Evaluation and Research to Donna Harrison, Gene Rudd, and Penny Young Nance. *Re: Docket No. FDA-2002-P-0364.* Silver Spring, MD: FDA.

Zane, S., A. A. Creanga, C. J. Berg, K. Pazol, D. B. Suchdev, D. J. Jamieson, and W. M. Callaghan. 2015. Abortion-related mortality in the United States: 1998–2010. *Obstetrics & Gynecology* 126(2):258–265.

2021 ED 000184

Copyright National Academy of Sciences. All rights reserved.

2

# The Safety and Quality of
# Current Abortion Methods

In the more than 40 years since national legalization of abortion, investigators have conducted randomized controlled trials (RCTs), large retrospective cohort studies, patient and provider surveys, systematic reviews, and other types of research on abortion care and its health effects on women, resulting in an extensive literature. The objective of this chapter is to examine this literature, focusing on the safety and effectiveness of current abortion methods and the extent to which these methods could expose women to the risk of such serious complications as the need for blood transfusion, surgery, or hospitalization. The chapter also examines whether the type of facility or method of sedation or anesthesia affects the risk of adverse outcomes. The chapter is organized as follows:

- The first section describes the clinical assessment, informed consent, patient education, and counseling that precede the abortion procedure.
- The second section addresses the initial clinical assessment.
- The next section describes current abortion methods and, for each method, reviews what is known about the procedure's effectiveness, expected side effects, and risk of complications. Note that, for the purposes of this review, efficacy or effectiveness refers to the successful completion of the abortion without the need for a follow-up aspiration.
- The fourth section turns to postabortion care.

*45*

2021 ED 000185

Copyright National Academy of Sciences. All rights reserved.

- The fifth section examines the evidence on the use of analgesia, sedation, and anesthesia in abortion care, including its safety and implications for the site of care.
- The following section compares the mortality rates for abortion and other common outpatient procedures.
- The next section presents a brief discussion of state regulation of abortion care.
- The final, summary section reviews state regulation of abortion safety in light of the clinical evidence presented earlier in the chapter.

The committee's review emphasizes contemporary approaches to abortion care because abortion methods have been refined in response to new evidence. Some research conducted before 2000 is unlikely to reflect the outcomes of how abortions are typically performed in the United States today. As discussed below, for example, the U.S. Food and Drug Administration (FDA)-approved protocol for medication abortion was updated in 2016 based on extensive research showing improved outcomes with a revised regimen (CDER, 2016). Techniques used in aspiration procedures are also safer and more effective than in the past. Sharp metal curettes, once commonly used, are considered obsolete by many professional groups, and their use is no longer recommended for abortion because of the increased (albeit rare) risk of injury (NAF, 2017a; RCOG, 2011, 2015; Roblin, 2014; SFP, 2013; WHO, 2012). New approaches to cervical preparation and the use of ultrasound guidance have also improved abortion safety (Darney and Sweet, 1989; SFP, 2013).

This chapter draws primarily on the scientific literature but also includes the recommendations (i.e., clinical practice guidelines and best practices) of professional groups that provide obstetrical and gynecological care or are concerned with the quality of abortion services. Appendix D summarizes the literature search strategies the committee used to identify the relevant evidence, while Table 2-1 describes the sources of the clinical guidelines cited throughout this report.

## PREABORTION CARE

When women seek an abortion, they present with a variety of experiences and needs (Moore et al., 2011; Zurek et al., 2015). Patient-centeredness—a fundamental attribute of quality health care—means "providing care that is respectful of and responsive to individual patient preferences, needs, and values and ensuring that patient values guide all clinical decisions" (IOM, 2001, p. 6). Thus, when women seek an abortion, they should have the opportunity to discuss their questions and concerns and receive support in their decision making. They should also

2021 ED 000186

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 68 of 40
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*    PageID.8246    *47*

**TABLE 2-1** Selected Organizations That Issue Clinical Guidelines on Abortion Care

| | |
|---|---|
| American College of Obstetricians and Gynecologists (ACOG) | A professional membership organization of obstetricians and gynecologists. ACOG produces clinical guidelines and other educational materials for its members and patients. |
| National Abortion Federation (NAF) | A standards-based membership organization of abortion facilities (clinics, physicians' offices, and hospitals). To qualify for and maintain NAF membership, providers must meet NAF clinical and safety standards. The standards are revised annually to reflect current evidence and are the basis for members' certification. |
| Royal College of Obstetricians and Gynaecologists (RCOG) | A global reproductive health professional society based in the United Kingdom. Its more than 14,000 members include individuals involved in obstetrics or gynecology worldwide. RCOG's mission is to improve the standard of care and to advance the science and practice of obstetrics and gynecology. |
| Society of Family Planning (SFP) | A professional membership organization for qualified individuals who have an interest in family planning demonstrated through training, clinical or laboratory practice, or academic publication. SFP develops clinical guidelines and supports research on contraception and abortion. |
| World Health Organization (WHO) | The international public health organization of the United Nations, based in Geneva, Switzerland. WHO develops clinical guidelines on reproductive health care with the stated objective of improving health outcomes. |

SOURCES: ACOG, 2017a; NAF, 2017b; RCOG, 2017; SFP, 2017; WHO, 2017.

be provided evidence-based information on their procedure options so they can make an informed and independent decision.

There is little evidence on how preabortion care is typically provided, but there is consensus among professional guidelines that the preabortion encounter includes the following elements (Baker and Beresford, 2009; NAF, 2017a; RCOG, 2015; WHO, 2014):

- individualized, sensitive, and respectful communication;
- cultural sensitivity;
- review of the risks and benefits of the available abortion procedures that is based on evidence and is easy to understand;
- options for pain management, including nonpharmaceutical approaches, analgesia, sedation, and anesthesia;
- support for emotional and other needs as they arise;
- confirmation that the abortion decision is voluntary (not coerced);

2021 ED 000187

Copyright National Academy of Sciences. All rights reserved.

- explanation of what will be done before, during, and after the procedure, including the preabortion evaluation;
- description of what the patient is likely to experience, clear instruction on aftercare, and how to recognize potential complications requiring emergency care;
- whom to call and where to go for services for both routine and follow-up care; and
- information and counseling on future prevention of unintended pregnancy and contraceptive options, including the option to obtain contraception immediately following the procedure.

Patient education, counseling, and informed consent are overlapping components of preabortion care. Patient education refers to the information women should receive regarding the available treatment options and the risks and benefits of these options (Baker and Beresford, 2009). It is also integral to the informed consent process—a legal and ethical obligation to all patients defined by state and federal law, malpractice standards, and professional standards (ACOG, 2015; AMA, 2016; Joint Commission Resources, 2016; Kinnersley et al., 2013). Counseling involves addressing the patient's emotions, expectations, and beliefs about abortion care (Baker and Beresford, 2009).

Health care providers are legally required to obtain patients' informed consent before performing a medical procedure. Specific definitions of informed consent may vary from state to state, but the goal of the informed consent process is well established: to ensure that patients understand the nature and risks of the procedure they are considering and that their decision to undergo it is voluntary (AAAHC, 2016; AMA, 2016; HHS, 2017a; Joint Commission, 2016). The discussion should also include options for analgesia, sedation, or anesthesia, including their associated risks and benefits (AANA, 2016; ASA Committee on Ethics, 2016).

Not every woman wants or needs psychological counseling in addition to patient education before an abortion (Baker and Beresford, 2009; Baron et al., 2015; Brown, 2013; Moore et al., 2011). Some women may wish to discuss the emotional aspects of the abortion with a counselor (Moore et al., 2011), and individualized counseling may be helpful for women having difficulty with their decision (Baker and Beresford, 2009). Women should also be referred to and have access to additional counseling and social services if needed (e.g., for counseling on intimate partner violence, sexual abuse care, rape crisis counseling, mental health services, substance abuse services, and postabortion counseling) (Goodman et al., 2016). As noted in Chapter 1, most women who undergo abortions are poor or low-income. Three-quarters of abortion patients have family incomes below 200 percent of the federal poverty level (Jerman et al., 2016) and thus may benefit

2021 ED 000188

Copyright National Academy of Sciences. All rights reserved.

from social support services. In addition, although the evidence is drawn largely from non-U.S. data (Australia, Canada, China, New Zealand, and the United Kingdom), epidemiological studies have shown that women who have abortions are disproportionately at risk of interpersonal and other types of violence (Bourassa and Berube, 2007; Evins and Chescheir, 1996; Fanslow et al., 2008; Fisher et al., 2005; Glander et al., 1998; Janssen et al., 2003; Keeling et al., 2004; Leung et al., 2002; Russo and Denious, 2001; Saftlas et al., 2010; Steinberg and Russo, 2008; Taft and Watson, 2007; Taft et al., 2004). Little is known about the extent to which abortion patients receive the follow-up social and psychological supports they need. A study of Finnish registry data provides some evidence that monitoring for mental health status in a follow-up visit after abortion may help reduce the consequences of serious mental health disorders (Gissler et al., 2015).

Providing evidence-based information on how to prevent a future unintended pregnancy—including the option to obtain contraception contemporaneously with the procedure—is a standard component of abortion care (Goodman et al., 2016; NAF, 2017a; RCOG, 2015; WHO, 2014). Contraception discussions should be patient-centered, based on principles of informed consent using evidence-based information on the contraceptive alternatives, and guided by the patient's preferences (Goodman et al., 2016; RCOG, 2015). Most contraceptive methods can be administered safely immediately after an abortion (Fox et al., 2011; Goodman et al., 2016; Grimes et al., 2010; Okusanya et al., 2014; Patil et al., 2016; Sääv et al., 2012; WHO, 2014). Recent studies suggest improved contraceptive use with the placement of implants or the initiation of other contraceptive methods at the time of the abortion or when mifepristone is administered for an early medication abortion (Hognert et al., 2016; Raymond et al., 2016a; Whaley and Burke, 2015).

While numerous options for contraception are available, long-acting reversible contraception (LARC) methods are the most effective for pregnancy prevention (ACOG, 2017b; Winner et al., 2012). Further, they are associated with higher rates of continuation, even for adolescents and young women, and fewer repeat abortions compared with other forms of contraception (ACOG, 2017b; Ames and Norman, 2012; Diedrich et al., 2015; Goodman et al., 2008; Goyal et al., 2017; Kilander et al., 2016; Rose and Lawton, 2012; Rosenstock et al., 2012; Winner et al., 2012). A prospective cohort study of women of reproductive age in the St. Louis area—the Contraceptive CHOICE project—assessed the impact of an educational intervention designed to increase awareness of LARC among women who wanted to avoid pregnancy for at least 1 year. The 10,000 women who enrolled in the project had the opportunity to obtain the contraceptive method of their choice at no cost in a variety of clinical settings where they received family planning, obstetrical, gynecological, and primary care (including two facilities

2021 ED 000189

Copyright National Academy of Sciences. All rights reserved.

providing abortion care) (McNicholas et al., 2014; Secura et al., 2010). The study found that offering LARC at the time of enrollment was well received; 75 percent of the 9,256 participants opted for intrauterine devices (IUDs) or implants. LARC users were more likely than non-LARC users to continue using contraception at 12 and 24 months (86 percent versus 55 percent at 12 months, 77 percent versus 41 percent at 24 months). The generalizability of these findings, however, is uncertain given that the contraceptives were free, and the study population included only women who wanted to avoid pregnancy. The CHOICE study also evaluated a structured approach to contraceptive counseling and found that counseling could be provided effectively by trained personnel without a medical background (Madden et al., 2013).

## INITIAL CLINICAL ASSESSMENT

Abortion care should always begin with a clinical evaluation, including a pertinent medical history and clinical assessment to assess the presence of comorbidities or contraindications relevant to the procedure. The primary aim of the evaluation is to confirm an intrauterine pregnancy and determine gestation. The physical exam may involve laboratory tests and ultrasonography to confirm an intrauterine pregnancy; assess gestation; screen for sexually transmitted infections (STIs) and cervical infections; document Rh status; or evaluate uterine size, position, and possible anomalies (ACOG and SFP, 2014; Goldstein and Reeves, 2009; Goodman et al., 2016; NAF, 2017a; RCOG, 2015; WHO, 2014). Women whose Rh status is unknown should be offered Rh testing and, if Rh negative, offered Rh immune globulin (ACOG and SFP, 2014, NAF, 2017a; RCOG, 2015). No evidence, however, indicates that Rh immune globulin is needed in pregnancies under 8 weeks' gestation (NAF, 2017a). While it should not delay the abortion procedure, screening for STIs may be appropriate if available (NAF, 2017a; RCOG, 2015). The contraindications and other circumstances affecting the appropriateness of each abortion method are discussed later in the chapter.

Pregnancy is dated from the first day of the last menstrual period (LMP) and is commonly measured by days' or weeks' gestation (Goldstein and Reeves, 2009). Either clinical evaluation or ultrasound examination can be used to establish gestation (ACOG and SFP, 2014; WHO, 2014). Ultrasound is not required, however, and there is no direct evidence that it improves the safety or effectiveness of the abortion (Kaneshiro et al., 2011; NAF, 2017a; Raymond et al., 2015; RCOG, 2015). In a study of nearly 4,500 medication abortion patients aimed at assessing the feasibility and efficacy of foregoing routine use of ultrasound, Bracken and colleagues (2011) found that LMP date combined with physical examination was

2021 ED 000190

Copyright National Academy of Sciences. All rights reserved.

highly effective at determining eligibility for medication abortion—patients accurately assessed their eligibility (Bracken et al., 2011).

## SAFETY AND EFFECTIVENESS OF CURRENT ABORTION METHODS

Several methods—medication, aspiration, dilation and evacuation (D&E), and induction—are used to perform an abortion depending on weeks' gestation, patient preference, provider skill, need and desire for sedation, costs, clinical setting, and state policies and regulations.

### Medication Abortion

Medication abortion in early pregnancy is accomplished using mifepristone, a progesterone receptor antagonist that competitively interacts with progesterone at the progesterone receptor site, thereby inhibiting the activity of endogenous or exogenous progesterone. This process initiates the breakdown of the endometrium and implanted embryo (Borkowski et al., 2015). Mifepristone, sold under the brand name Mifeprex,[1] is the only medication specifically approved by the FDA for use in medication abortion (Woodcock, 2016). Taken orally, it has been shown to increase sensitivity to prostaglandins and is most commonly used in conjunction with misoprostol, a prostaglandin E1 analogue. Misoprostol causes uterine contractions as well as cervical ripening and can be administered orally, sublingually, buccally, or vaginally.[2] Since mifepristone's initial FDA approval in 2000, an extensive body of research has led to improvements in the drug's protocol, including a lower recommended dosage, an increased period of eligibility from 49 days' to 70 days' (10 weeks') gestation, and a recommendation that the misoprostol be taken buccally rather than sublingually or orally to minimize side effects (Borkowski et al., 2015; Chai et al., 2013). The World Health Organization (WHO) has included mifepristone and misoprostol on its Model List of Essential Medicines since 2005 (WHO, 2015).[3]

Few women have contraindications to medication abortion (ACOG and SFP, 2014). The FDA-approved Mifeprex label states that the drug should not be used for women with confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass; an IUD in place; chronic adrenal

---

[1]Mifeprex is manufactured and distributed by Danco Laboratories. Danco is the only distributer of Mifeprex in the United States.

[2]A sublingual medication is dissolved under the tongue. Buccal medications are placed between the gums and the cheek.

[3]Where permitted under national law and where culturally acceptable (WHO, 2015).

2021 ED 000191

Copyright National Academy of Sciences. All rights reserved.

---

**BOX 2-1**
**FDA Risk Evaluation and Mitigation Strategy (REMS)**
**Program for Mifeprex**

The FDA REMS program restr cts the cha n of supp y of certa n drug products to ensure that the drugs are d str buted on y by author zed prescr bers or pharma-c es under spec fied cond t ons. The FDA cons ders the fo ow ng when determ n ng the necess ty of a REMS:

- est mated s ze of the popu at on ke y to use the drug nvo ved;
- ser ousness of the d sease or cond t on that s to be treated w th the drug;
- expected benefit of the drug w th respect to such d sease or cond t on;
- expected or actua  durat on of treatment w th the drug;
- ser ousness of any known or potent a  adverse events that may be re ated to the drug and the background nc dence of such events n the popu at on ke y to use the drug; and
- whether the drug s a new mo ecu ar ent ty.

As of March 2017, there were 77 approved REMS programs, nc ud ng that of M feprex. A drug requ r ng a REMS must have at east one of the fo ow ng:

- a Med cat on Gu de for consumers;
- a commun cat on p an for hea th care prov ders; and
- one of s x "e ements to assure safe use" of the med cat on (e.g., spec -ficat ons for prescr bers, p aces and cond t ons where the drug can be d spensed, and pat ent mon tor ng).

The FDA first estab shed a REMS program for M feprex n 2011 and re-v sed t n March 2016 a ong w th an update to the drug's abe . The rev sed

---

failure; concurrent long-term systemic corticosteroid therapy; hemorrhagic disorders or concurrent anticoagulant therapy; allergy to mifepristone, misoprostol, or other prostaglandins; or inherited porphyrias (FDA, 2016a).

Since 2011, the distribution and use of Mifeprex has been restricted under the requirements of the FDA Risk Evaluation and Mitigation Strategy (REMS) program (see Box 2-1). (See Chapter 3 for additional details on REMS requirements for clinicians who prescribe Mifeprex.) Despite the restriction, use of the medication method is increasing, especially in early pregnancy. As noted in Chapter 1, the percentage of all abortions by medication rose by 110 percent between 2004 and 2013 and is expected to increase further (Jatlaoui et al., 2016). In 2014, medication abortions accounted for approximately 45 percent of all U.S. abortions performed <9 weeks' gestation (Jones and Jerman, 2017).

2021 ED 000192

Copyright National Academy of Sciences. All rights reserved.

REMS requirements do not differ substantially from the original. They include the following:

- Mifeprex may be dispensed only to patients in clinics, hospitals, or medical offices under the supervision of a certified prescriber. It cannot be dispensed through retail pharmacies.
- To be certified, health care providers must submit a Prescriber Agreement to the drug's distributor, Danco Laboratories, attesting to their ability to assess duration of pregnancy and to diagnose ectopic pregnancy. They must be able to provide or arrange for surgical intervention as well as access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary. Nonphysicians, such as certified nurse-midwives and other advanced practice clinicians, may prescribe Mifeprex if they have prescription authority under state law.
- Before patients receive the drug, the prescriber must provide the patient the FDA-approved Medication Guide, fully explain the potential risks related to the treatment regimen, and review and complete the Patient Agreement form with the patient.

The revised label

- lowered the recommended Mifeprex dosage to 200 mg;
- extended the gestation period appropriate for its use from 49 days' to 70 days' (10 weeks) gestation;
- eliminated the requirement for an in-person follow-up visit; and
- eliminated mandatory reporting of nonfatal adverse events.

SOURCES: Borkowski et al., 2015; Dabrowska, 2017; FDA, 2016a,b,c; Gassman et al., 2017; Woodcock, 2016

*Effectiveness of the Current Medication Regimen*

The current FDA-approved regimen for medication abortion is 200 mg of mifepristone taken orally, followed by 800 mcg of misoprostol taken buccally 24 to 48 hours later (FDA, 2016a). A recent systematic review of this regimen—including 33,846 medication abortions—found an overall effectiveness rate of 96.7 percent for gestations up to 63 days (9 weeks) (Chen and Creinin, 2015).[4]

_____

[4]The review also included 332 abortions that were performed between 64 and 70 days' gestation; the efficacy rate for these procedures was 93.1 percent.

2021 ED 000193

Copyright National Academy of Sciences. All rights reserved.

*Reversal of Medication Abortion*

There has recently been media attention to claims that medication abortions can be "reversed" by taking progesterone after the mifepristone but before taking the misoprostol (Graham, 2017). The claims are based on a case series report of seven patients who did not receive standardized doses or formulations of the medications (i.e., mifepristone or progesterone) (Delgado and Davenport, 2012). Case series are descriptive reports that are considered very low-quality evidence for drawing conclusions about a treatment's effects (Guyatt et al., 2011). In a related subsequent systematic review, Grossman and colleagues (2015) assessed the likelihood of a pregnancy continuing if the abortion medication regimen is not completed (i.e., the mifepristone dosage is not followed by misoprostol). However, the review found that there were insufficient data to conclude that the progesterone treatment is more likely to lead to continued pregnancy compared with expectant management after mifepristone alone.

*Expected Side Effects*

It is common for medical procedures to result in side effects in addition to the intended outcome. Medication abortions involve cramping, pain, and bleeding, similar to the symptoms of a miscarriage (ACOG and SFP, 2014; Borkowski et al., 2015; FDA, 2016a). Vaginal bleeding is expected during and after an abortion and occurs in almost all patients during a medication abortion (FDA, 2016a). Bleeding generally starts as the tissue begins to separate from the endometrium and continues for several days after the abortion is complete. The heaviest bleeding occurs during and immediately following the passage of the gestational sac and lasts 1 to 2 days. Some bleeding and spotting may occur up to 9–16 days.

Like bleeding, uterine pain and cramping are an expected and normal consequence of medication abortion (FDA, 2016a). Cramping can last from a half-day to 3 days (Ngo et al., 2011). Nonsteroidal anti-inflammatory drugs (NSAIDs) are typically recommended to manage the pain. Ibuprofen—after the onset of cramping—has been shown to reduce both pain and later analgesia use (Jackson and Kapp, 2011; Livshits et al., 2009). However, some women still report high levels of pain, and pain is commonly reported as the worst feature of the method. Prophylactic regimens for pain management are an area of active research (Dragoman et al., 2016).

Other side effects reported by women who undergo medication abortion include nausea, vomiting, weakness, diarrhea, headache, dizziness, fever, and chills (Chen and Creinin, 2015; FDA, 2016a). About 85 percent of patients report at least one of these side effects, and many patients are expected to report more than one (FDA, 2016a).

2021 ED 000194

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 76 of 40
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*    PageID.8254    *55*

*Complications*

Complications after medication abortion, such as hemorrhage, hospitalization, persistent pain, infection, or prolonged heavy bleeding, are rare—occurring in no more than a fraction of a percent of patients (Chen and Creinin, 2015; FDA, 2016a; Ireland et al., 2015; Kulier et al., 2011; Woodcock, 2016). Obesity (i.e., a body mass index [BMI] of 30 or greater) has not been found to increase the risk for adverse outcomes after medication abortion (Strafford et al., 2009). The Society of Family Planning suggests that medication abortion may be preferable to aspiration abortion when patients, including those with extreme obesity, are at risk of procedural and anesthetic complications (SFP, 2012).

**Hemorrhage**    Prolonged heavy bleeding is rare but may indicate an incomplete abortion[5] or other complications. Hemorrhage requiring assessment or treatment following medication abortion is also rare. The FDA advises that women contact a health care provider immediately if bleeding after a medication abortion soaks through two thick full-size sanitary pads per hour for two consecutive hours (FDA, 2016a). In a study of 11,319 medication abortions performed in California between 2009 and 2010, hemorrhage occurred in 16 cases (0.14 percent) (Upadhyay et al., 2015).

The need for a blood transfusion—an uncommon occurrence—is an indication of clinically significant hemorrhage. In a study of more than 1,000 women receiving medication abortion in Norway, 1 patient required a transfusion (0.1 percent) and 32 required an aspiration procedure because of continued bleeding (3.0 percent) (Løkeland et al., 2014). In Chen and Creinin's (2015) systematic review of 20 studies and 33,846 women (described above), 0.03 to 0.6 percent of women required a blood transfusion after a medication abortion.

**Infection**    Serious infection occurs rarely after medication abortion; reports of fatal sepsis are exceedingly rare (<1 in 100,000) (FDA, 2011; Woodcock, 2016). Signs and symptoms of serious infection are fever of 100.4°F or higher lasting more than 4 hours, tachycardia, severe abdominal pain, pelvic tenderness, or general malaise with or without fever occurring more than 24 hours after administration of misoprostol (ACOG and SFP, 2014; FDA, 2016a). There is no evidence of a causal relationship between use of mifepristone and misoprostol and an increased risk of infection or death (FDA, 2016a; Woodcock, 2016). The incidence of infection in recent studies ranges from 0.01 to 0.5 percent (Chen and Creinin, 2015; Cleland et

---

[5]An "incomplete abortion" occurs when parts of the products of conception are retained in the uterus.

2021 ED 000195

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 77 of 40
PageID.8255
*56   THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

al., 2013; Upadhyay et al., 2015). According to the FDA's Adverse Event Reporting System, there were nine reports of severe bacterial infections following medication abortion from November 1, 2012, through April 30, 2015 (Woodcock, 2016). The FDA has concluded that the available evidence does not support the use of prophylactic antibiotics for medication abortion (CDER, 2016).

**Need for uterine aspiration**   Some women require a uterine aspiration after medication abortion because of retained products of conception, persistent pain or bleeding, or ongoing pregnancy (Chen and Creinin, 2015; Cleland et al., 2013; Ireland et al., 2015; Raymond et al., 2013; Upadhyay et al., 2015). Ireland and colleagues (2015) analyzed more than 13,000 electronic medical records documenting the outcomes of medication abortions (up to 9 weeks' gestation) performed in private Los Angeles clinics from November 2010 to August 2013. Of these, 2.1 percent required an unanticipated uterine aspiration either because of an ongoing pregnancy (0.4 percent) or for persistent pain, bleeding, or both (1.8 percent). Other recent estimates of the need for an unanticipated uterine aspiration range from 1.8 to 4.2 percent (Chen and Creinin, 2015). Rates vary in part because of differences in study populations (including weeks' gestation) and in treatment regimens (Cleland et al., 2013; Raymond et al., 2013; Upadhyay et al., 2015).

### Impact of Clinical Setting on the Safety and Effectiveness of Medication Abortion

There is no direct evidence suggesting that specific types of facilities (e.g., ambulatory surgery centers or hospitals) or facility factors (e.g., size of procedure room or corridor width) are needed to ensure the safety of medication abortion. Indeed, most women in the United States return home after taking mifepristone and take the misoprostol 28 to 48 hours later. As a result, medication abortions occur largely in nonclinical settings. Moreover, as described above, a body of research including systematic reviews (Chen and Creinin, 2015; Kulier et al., 2011; Raymond et al., 2013) and large cohort studies (Cleland et al., 2013; Ireland et al., 2015; Upadhyay et al., 2015) demonstrates that complications such as infection, hemorrhage requiring transfusion, or hospitalization occur in fewer than 1.0 percent of patients.

Some research has focused specifically on medication abortion outside the hospital or clinic setting. A variety of studies, for example, have assessed the self-administration of misoprostol after receiving mifepristone in a clinic. This largely observational research shows that home use of misoprostol produces outcomes similar to those of the clinic-supervised method (Clark

2021 ED 000196

Copyright National Academy of Sciences. All rights reserved.

et al., 2005; Fiala et al., 2004; Guengant et al., 1999; Løkeland et al., 2014; Ngoc et al., 2004; Shannon et al., 2005; Shrestha and Sedhai, 2014).

Other research has assessed the safety and effectiveness of home use of both mifepristone and misoprostol (Chong et al., 2015; Conkling et al., 2015; Platais et al., 2016). In one U.S. prospective nonrandomized study, 400 women with pregnancies up to 63 days' gestation were offered the choice of either clinic-supervised or home use of mifepristone. Of these women, 128 chose home administration, and 272 chose clinic administration; the women did not differ significantly in terms of gravidity, gestation, or other measured characteristics. The women choosing home use were slightly older (27.8 versus 26.0 years) and more likely to be doing paid work (78.9 versus 68.0 percent). Success rates did not differ between the groups (96.3 versus 96.9 percent), and the 2 patients who required hospitalization were in the clinic-supervised group. One patient was diagnosed with an incomplete abortion and underwent a follow-up dilation and curettage procedure, and the other was treated for severe nausea and vomiting (Chong et al., 2015). A related study found that among 301 women offered the choice of home use, the factor most cited by women who chose this option was flexibility in scheduling (Swica et al., 2013).

*Telemedicine*

Telemedicine is the use of telecommunications and information technology to provide access to health assessment, diagnosis, intervention, consultation, supervision, and information across distance (HHS, 2017b). For medication abortion, the process involves a health care provider's reviewing the relevant medical information and having a discussion with the patient via teleconference. If clinical criteria are met, the health care provider remotely dispenses or issues a prescription for the medication abortion regimen (Aiken et al., 2018; Grossman et al., 2011a). Grossman and colleagues (2011a) investigated the effectiveness and acceptability of telemedicine for medication abortion (mean days' gestation was 47 days) compared with face-to-face physician visits in Iowa. Roughly half of the 578 patients were enrolled in the telemedicine option. The success rates for the two options were similar: 98.7 percent for the telemedicine patients and 96.9 percent for the clinic patients. No patient in either group required hospitalization, and there was no significant difference in the occurrence of adverse events. One of the 223 patients in the telemedicine group received a blood transfusion. In a recent 7-year retrospective cohort study in Iowa, researchers compared the rate of clinically significant adverse events (hospital admission, surgery, blood transfusion, emergency department treatment, or death) after medication abortion for 8,765 telemedicine patients and 10,405 in-person patients (Grossman and Grindlay, 2017). The overall rate of adverse events

Copyright National Academy of Sciences. All rights reserved.

was less than 0.3 percent. The difference between the telemedicine patients (0.18 percent) and in-person patients (0.32 percent) was not statistically significant and was within the authors' margin of noninferiority. This finding indicates that telemedicine provision of medication abortion was not associated with a significantly higher prevalence of adverse events compared with in-person provision.

These reported risks are both low and similar in magnitude to the reported risks of serious adverse effects of commonly used prescription and over-the-counter medications. For example, it has been estimated that the use of NSAIDs is responsible for 3,500 hospitalizations and 400 deaths per year in UK residents aged 60 or older, a risk rate of 0.23 and 0.03 percent, respectively (Hawkey and Langman, 2003). The NSAID-related risk of hospitalization in elderly Medicaid patients in the United States has been estimated to be even higher—1.25 percent in one study (Smalley et al., 1995). The risk of diarrhea with many common antibiotics is as high as 39 percent (McFarland, 1998), and the risk of hospitalization due to the more serious *Clostridium difficile* infection may be as high as 0.02 percent with some antibiotic combinations (Hirschhorn et al., 1994). Taken together, these findings provide additional indirect evidence that no facility-specific factors are needed to ensure the safety of medication abortion, as there is no perceived need for facility-specific factors to ensure the safety of these other common pharmaceuticals. These safety data accord with professional guidelines or best practices according to which routine early medication abortion does not require sophisticated settings and can be safely performed in settings typical for the delivery of women's health care and family planning services (ACOG and SFP, 2014; NAF, 2017a; RCOG, 2015; WHO, 2014).

In their analysis of the Iowa study described above, Grossman and colleagues (2013) conducted a geographic analysis to assess the effect of the telemedicine model on access to medication abortion for women in different areas of the state. They found that the proportion of all Iowa abortions that were medication abortions had increased, from 33.4 to 45.3 percent (p <.001), in the 2-year periods before and after telemedicine was introduced. The increase was especially notable among women living in more remote areas. Women who lived more than 50 miles from an abortion clinic that provided only surgical abortions were 16 percent more likely to have a medication abortion (adjusted odds ratio [aOR] = 1.16; 95% confidence interval [CI] = 1.05, 1.28). The proportion of medication abortions at the study sites had also increased from 46 to 54 percent after telemedicine was introduced (p <.001). Overall, women in Iowa had a 46 percent greater likelihood of having an earlier abortion (<14 weeks' gestation) (aOR = 1.46; 95% CI = 1.22, 1.75).

2021 ED 000198

Copyright National Academy of Sciences. All rights reserved.

## Aspiration Abortion

Aspiration is a minimally invasive and commonly used gynecological procedure (Meckstroth and Paul, 2009; Roblin, 2014).[6] The procedure time is typically less than 10 minutes (Edelman et al., 2001; Goldberg et al., 2004). As noted in the previous chapter, aspiration is currently the most common abortion method used in the United States regardless of gestation, accounting for almost 68 percent of abortions in 2013.[7] The method may be used up to 14 to 16 weeks' gestation. Aspiration is also used in cases of early pregnancy loss (miscarriage) and management of incomplete abortion for medication abortion.

The first steps in the procedure are cervical dilation and priming (when appropriate) so that the contents of the uterus can be evacuated. Cervical dilation is usually done using tapered mechanical dilators and is recommended over routine priming except for adolescents and others for whom cervical dilation may be challenging (Allen and Goldberg, 2016). Cervical priming is accomplished with either osmotic dilators[8] or pharmacological agents (e.g., misoprostol), or both. When placed in the cervix, the osmotic dilator absorbs moisture from the tissues surrounding the cervix and gradually swells to slowly open the cervical orifice (os). The pharmaceutical agents are prostaglandin analogues or progesterone antagonists, such as the drug misoprostol, which is also used in medication abortion.

After cervical dilation and, when indicated, priming, a suction cannula (plastic or metal tube) is inserted through the cervix into the uterus. The cannula is attached to a vacuum source—an electric vacuum pump for electric vacuum aspiration or a handheld, hand-activated aspirator (syringe) for manual vacuum aspiration—to empty the uterine contents. Ultrasound guidance is sometimes used (RCOG, 2011).

See later in this chapter for a discussion of the use of sedation and anesthesia during abortion procedures, including the implications for personnel needs and facility requirements.

---

[6]There is no standard terminology for this type of abortion. As noted in Chapter 1, this report uses the term "aspiration abortion," although others commonly refer to the same procedure as "surgical abortion," "vacuum aspiration," "suction curettage," or "suction evacuation."

[7]Centers for Disease Control and Prevention (CDC) surveillance reports use the catchall category of "curettage" to refer to nonmedical abortion methods. The committee assumed that CDC curettage estimates before 13 weeks' gestation refer to aspiration procedures and that curettage estimates after 13 weeks' gestation are D&E procedures.

[8]Laminaria, small tubes made of dried seaweed, and manmade sterile sponges are common types of osmotic dilators.

2021 ED 000199

Copyright National Academy of Sciences. All rights reserved.

*Effectiveness of Aspiration Abortion*

Recent comparisons of aspiration and medication abortion methods indicate that aspiration may be only slightly more effective than medication abortion in early pregnancy. In Ireland and colleagues' (2015) study of private Los Angeles clinics described in the prior section, the efficacy rate for almost 17,000 aspiration abortions performed up to 9 weeks' gestation was 99.8 percent, compared with 99.6 percent for medication abortions[9] for the same gestational period (Ireland et al., 2015).

*Expected Side Effects*

As in medication abortion, bleeding, uterine pain, and cramping are expected and normal consequences of aspiration abortion.

*Complications*

Aspiration abortions rarely result in complications. In a recent retrospective analysis of California fee-for-service Medicaid claims data, 57 of almost 35,000 women (0.16 percent) were found to have experienced a serious complication (hospital admission, surgery, or blood transfusion) after an aspiration abortion (Upadhyay et al., 2015). A systematic review on aspiration-related complications documents a somewhat higher complication rate (ranging from 0 to 5 percent), but a large proportion of the studies in that review included now outdated procedures, including dilation and sharp curettage (White et al., 2015).

In a historical cohort study, Guiahi and colleagues (2015) analyzed the outpatient medical records of women who had undergone an aspiration abortion between January 2009 and March 2014 in a Colorado clinic. The researchers compared the outcomes of women with (n = 587) and without (n = 1,373) medical comorbidities, including diabetes, hypertension, obesity (weight ≥200 lb or BMI ≥30), HIV, epilepsy, asthma, thyroid disease, and/or bleeding and clotting disorders having aspiration abortions. The researchers found no difference in the rate of complications between the women with at least one comorbidity and those with no comorbidity (odds ratio [OR] = 0.9; 95% CI = 0.5, 1.6).

**Need for repeat aspiration**    Repeat aspiration is most often required for retained products of conception after an abortion. Rates of <0.1 to 8.0 percent have been reported for this complication, related to gestation, experience of the provider, and use of ultrasound guidance (White et al., 2015).

---

[9] $p < .001$.

2021 ED 000200

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 82 of 40
PageID.8260
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*        *61*

Studies showing the highest rates of repeat aspiration included women at ≤6 weeks' gestation and were conducted more than 20 years ago (Bassi et al., 1994). Tissue inspection is recommended after aspiration abortion, regardless of gestation, but products of conception may be difficult to identify prior to 7 weeks' gestation (NAF, 2017a; SFP, 2013). Additional protocols, including magnification of aspirate, follow-up by serum beta-hCG estimation, and flotation of tissue with backlighting may be used to confirm abortion completion (NAF, 2017a; RCOG, 2011; SFP, 2013).

**Hemorrhage**    Hemorrhage requiring transfusion or other treatment (medication administration or repeat aspiration) complicates 0.0 to 4.7 percent of aspiration abortions, with more recent studies reporting a rate of 1.3 percent (Upadhyay et al., 2015; White et al., 2015). In the California Medicaid study, 0.13 percent of aspiration procedures were complicated by hemorrhage (Upadhyay et al., 2015).

**Infection**    Current clinical guidelines recommend routine antibiotic prophylaxis before all aspiration abortions (NAF, 2017a; RCOG, 2015; SFP, 2011b; WHO, 2014). Like any invasive procedure, aspiration abortion carries some risk of infection. If untreated, an upper genital tract infection subsequent to abortion can lead to chronic pelvic pain, dyspareunia, ectopic pregnancy, and infertility (Low et al., 2012). Serious infection after aspiration, however, is rare. In a 2012 systematic review, the Cochrane Collaboration evaluated the effectiveness of perioperative antibiotics in preventing upper genital tract infection (including infection of the uterus and fallopian tubes) (Low et al., 2012). The researchers concluded that universal antibiotic prophylaxis is effective in preventing infection after an aspiration procedure: the incidence of upper genital tract infection among women who received prophylactic antibiotics was 59 percent of that among women who received a placebo. The rate of infection was 5.8 percent among women who received antibiotics (n = 3,525) and 9.4 percent among women in the placebo group (n = 3,500).

In a more recent systematic review of complications following aspiration abortion (up to 14 weeks' gestation), White and colleagues (2015) report that 0.0 to 0.4 percent of 188,395 women undergoing aspiration abortions required intravenous (IV) antibiotics after the procedure in 11 of 12 office-based settings. In Upadhyay and colleagues' (2015) analysis of almost 35,000 aspiration abortions in California, 94 women (0.27 percent) developed an infection after the procedure. Most infections after outpatient aspiration procedures are treated with oral antibiotics, with up to 0.4 percent of patients with infection requiring IV antibiotic administration (White et al., 2015).

2021 ED 000201

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 83 of 40
PageID.8261
*62    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**Uterine perforation**    Uterine perforation involves injury to the uterine wall, as well as potential injury to other abdominal organs. While the risk of uterine perforation in older studies has been reported as ≤0.1 to 2.3 percent, the majority of more recent studies of aspiration abortion report no cases of uterine perforation or note that perforations that occurred were successfully managed conservatively without the need for additional surgery or hospitalization (White et al., 2015). In the study of almost 35,000 California Medicaid-covered aspiration abortions referenced above, 0.01 percent resulted in a perforation (Upadhyay et al., 2015).

**Cervical laceration**    Cervical laceration (injury to the cervix from instrumentation) is also very rare, with most studies reporting none or 1 case (<0.1 to 0.6 percent) (Ohannessian et al., 2016; White et al., 2015). In a study evaluating the risks of aspiration abortion in teens versus adults, an increased risk of cervical laceration was noted for adolescent patients (0.5 versus 0.2 percent), but this study was conducted prior to current approaches to cervical preparation (Cates et al., 1983; White et al., 2015). Use of osmotic dilators was common in older studies, but the more common approach today is medical, using misoprostol 2 to 3 hours prior to the procedure (Allen and Goldberg, 2016; O'Connell et al., 2009). While current recommendations do not include routine use of medical or mechanical cervical preparation because of the delay that would result, misoprostol is commonly used in nulliparous women and young adolescents between 12 and 14 weeks' gestation (Allen and Goldberg, 2016).

### Dilation and Evacuation

Fewer than 9 percent of abortions in the United States occur after 13 weeks' gestation (Jatlaoui et al., 2016). The D&E method, sometimes referred to as a second-trimester surgical abortion, appears to account for the majority of procedures performed between 14 and 20 weeks' gestation. Precise estimates of the rate of abortions by type during these weeks are not available. Reports often cite CDC surveillance statistics as suggesting that D&Es account for up to 96 percent of abortions between 14 and 20 weeks' gestation (ACOG, 2013; Hammond and Chasen, 2009). However, the oft-cited CDC data are actually aggregate estimates that include not only D&E but also other methods (Jatlaoui et al., 2016; Pazol et al., 2009).

D&E techniques have evolved in the decades since the method was first developed (ACOG, 2013; Hammond and Chasen, 2009; Lohr et al., 2008). The procedure is typically performed in two stages, although the specific approaches to cervical preparation, instrumentation, and other aspects may vary (Grossman et al., 2008; Ibis Reproductive Health, 2015; Lohr et al., 2008). The procedure itself generally takes less than 30 minutes

2021 ED 000202

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

(Ben-Ami et al., 2009; Grossman et al., 2008, 2011b). The first step is cervical preparation, dilating the cervix with laminaria (or other type of osmotic dilator) and/or a prostaglandin (e.g., misoprostol). Slow dilation is recommended (e.g., over a few hours, overnight, or sometime repeated over 24 to 48 hours) to minimize the need for supplemental manual or mechanical dilation (Grossman et al., 2008; Lohr et al., 2008). With a greater degree of dilation, the uterus is more easily emptied, instruments are easier to use, and procedure time is shortened (Hern, 2016). Once dilation is adequate and analgesia, sedation, and/or anesthesia have been administered, the amniotic fluid is aspirated (Lohr et al., 2008; WHO, 2014). Before 16 weeks' gestation, suction aspiration may suffice to empty the uterus. At 16 weeks, forceps extraction may also be required. Beyond 16 weeks, suction is not effective, and forceps should be used to remove fetal parts and the placenta. A curette and/or additional suction are also used to remove any remaining tissue or blood clots. Following the procedure, the provider examines the tissue to confirm that the evacuation was complete. Patients should be observed following the procedure to monitor for any postoperative complications (Hammond and Chasen, 2009; Lohr et al., 2008).

Ultrasonography is recommended so the physician can visualize the surgical instruments, locate fetal parts, and confirm an empty uterus (NAF, 2017a). Routine intraoperative ultrasonography has been demonstrated to significantly reduce the risk of uterine perforation and shorten the time required to complete the procedure (Darney and Sweet, 1989).

Performing D&E procedures requires advanced training and/or experience (Cates et al., 1982; Hern, 2016; Lohr et al., 2008; RCOG, 2015; WHO, 2012). Chapter 3 reviews the required clinical skills for performing abortions.

### Complications

Although the risk of complications increases with weeks' gestation (Bartlett et al., 2004; Grossman et al., 2008; Zane et al., 2015), a range of retrospective cohort studies, case series, chart reviews, and a prospective case series have shown D&E to be effective with minimal rates of complications, ranging from 0.05 to 4 percent (ACOG, 2013; Autry et al., 2002; Bryant et al., 2011; Cates et al., 1982; Frick et al., 2010; Grimes et al., 1977; Grossman et al., 2008; Jacot et al., 1993; Mauelshagen et al., 2009; Peterson et al., 1983).

One study, however, suggests that a history of multiple prior cesarean deliveries may significantly increase the risk of a major complication. In a multivariable logistic analysis of 2,973 D&Es performed between 2004 and 2007 at an urban public hospital, Frick and colleagues (2010) found

2021 ED 000203

Copyright National Academy of Sciences. All rights reserved.

an overall rate of major complications (i.e., transfusion required; disseminated intravascular coagulation; or a reoperation involving uterine artery embolization, laparoscopy, or laparotomy) of about 1.0 percent. However, women with two or more prior cesarean sections had a sevenfold increased risk of a major complication (OR = 7.37; 95% CI = 3.35, 15.80) (Frick et al., 2010). A history of one prior cesarean section was not associated with an increased risk of complications, although the authors note that a larger sample might lead to different results.

Obesity has also been studied as a possible risk factor for women undergoing D&E abortions (Benson et al., 2016; Lederle et al., 2015; Murphy et al., 2012). In a retrospective cohort study of 4,968 women undergoing aspiration and D&E abortions at a large outpatient clinic in 2012–2014, obesity was not associated with increased risk of complications[10] (Benson et al., 2016). The same conclusion resulted from a retrospective cohort study of 4,520 D&Es performed in a hospital-based abortion practice in 2009–2013 and a retrospective review of 1,044 women undergoing D&E or dilation and suction (D&S)[11] between 13 and 24 weeks' gestation in 2007–2010 (Lederle et al., 2015; Murphy et al., 2012). Lederle and colleagues (2015) found no association between BMI and D&E complications[12] after adjustment for age, ethnicity, prior vaginal delivery, prior cesarean delivery, and gestational duration. Murphy and colleagues (2012) compared complication rates, operative times, and anesthesia times between obese and nonobese (BMI <30) women and found no significant difference in complication rates. Finally, a retrospective analysis of D&E procedures performed between 2009 and 2014 found an association between obesity and increased risk for complications[13] in abortions performed after 14 weeks' gestation (Mark et al., 2017). Complications increased by BMI category,[14] and the increase in

---

[10]Complications assessed included need for uterine reaspiration (including same-day reaspiration), uterine perforation, cervical laceration, infection, emergency department visit or hospitalization, and excessive blood loss (defined as estimated blood loss greater than or equal to 100 mL).

[11]Dilation and curettage/suction denoted procedures performed when no other instruments besides suction were used; 5.3 percent of procedures in the study were D&S.

[12]Complications assessed included cervical laceration, hemorrhage, uterine atony, anesthesia complications, uterine perforation, disseminated intravascular coagulation, retained products of conception, and major complications (defined as those requiring hospitalization, transfusion, or further surgical intervention).

[13]Complications assessed included hemorrhage, need for repeat evacuation, uterine perforation, cervical laceration, medication reaction, unexpected surgery, or unplanned admission to the hospital.

[14]The cohort was classified into categories based on the WHO classification of underweight (BMI <18.5), normal weight (BMI 18.5–24.9), overweight (BMI 25.0–29.9), obese Class I (BMI 30–34.9), obese Class II (BMI 35–39.9), and obese Class III (BMI 40 or greater).

2021 ED 000204

Copyright National Academy of Sciences. All rights reserved.

complications in women with Class III obesity was significant (OR = 5.04; 95% CI = 1.65–15.39).

**Hemorrhage**   In studies of abortions performed in the year 2000 or later, D&E-related hemorrhage requiring transfusion or other treatment occurred in 0.0 to 1.0 percent of cases (Frick et al., 2010; Grossman et al., 2011a; Mauelshagen et al., 2009).

**Infection**   Routine antibiotic prophylaxis is recommended for all surgical abortions (ACOG, 2013; NAF, 2017a; RCOG, 2015; WHO, 2014). Infection after a D&E is uncommon, with rates ranging from 0.0 to 2.0 percent (Autry et al., 2002; Grossman et al., 2011a; Mauelshagen et al., 2009). In the California Medicaid study described above, Upadhyay and colleagues (2015) found that 0.3 percent or 18 of 8,837 abortions performed after 13 weeks' gestation resulted in an infection, although these procedures included both D&Es and inductions.

**Cervical lacerations**   Injuries to the cervix and uterus have decreased significantly with routine cervical preparation prior to D&E (ACOG, 2013). Recent studies have reported rates of 0.02 to 3.3 percent (Autry et al., 2002; Frick et al., 2010). The risk of cervical laceration is associated with mechanical dilation, nulliparity, advanced gestation, and provider inexperience (ACOG, 2013). Thus, as noted above, performing D&E procedures requires advanced training and/or experience.

**Uterine perforation**   While uterine perforation is more common in D&E than in aspiration procedures, the incidence remains quite low and is likely related to the availability of cervical preparation and ultrasound guidance (Grossman et al., 2008). Limited clinician experience and underestimation of the duration of pregnancy are also factors that have been associated with uterine perforation (Grossman et al., 2008). A 1989 study compared the incidence of perforation during 810 D&E procedures with and without sonography (Darney and Sweet, 1989). Using ultrasound to guide the use of intrauterine forceps clearly improved the safety of the procedure: the rate of perforation declined significantly from 1.4 to 0.2 percent. Studies dating from 2010 to 2015 report perforation rates ranging from 0.2 to 0.8 percent (Frick et al., 2010; Upadhyay et al., 2015).

The facility requirements that are appropriate for D&Es depend on the level of sedation and anesthesia that is used. (See later in this chapter for a review of the use of analgesia, sedation, and anesthesia during abortions.)

2021 ED 000205

Copyright National Academy of Sciences. All rights reserved.

### Induction Abortions

As noted in Chapter 1, abortion terminology can be confusing. All abortion methods are sometimes referred to as "induced," and the term "medical" is often used to describe any nonsurgical method regardless of how early or late in pregnancy it occurs. In this section, the term "induction abortion" refers specifically to nonsurgical abortions that use medications to induce labor and delivery of the fetus. Relevant research and clinical guidelines use varying lower and upper gestation limits. In practice, the gestational parameters for induction vary depending on the facility, patient and provider preference, and state laws and regulations (SFP, 2011a).

Induction abortions are rarely performed in the United States; in 2013, they accounted for approximately 2 percent of all abortions at 14 weeks' gestation or later (Jatlaoui et al., 2016). For many women in the United States, D&E is often the preferred alternative because induction is more painful, its timing is less predictable and slower (sometimes taking more than 24 hours), and it is more expensive (see below) (ACOG, 2013; Ashok et al., 2004; Grimes et al., 2004; Grossman et al., 2008; Kelly et al., 2010; Lohr et al., 2008). In some clinical settings, however, D&E is not an option because the available clinicians lack the necessary experience and/or training in D&E procedures (SFP, 2011a).[15] In addition, D&E abortions are illegal in Mississippi and West Virginia.[16]

#### *Optimal Medication Regimen for Induction Abortions*

The medication regimens for performing an induction abortion have evolved and improved in response to a growing body of research—most notably with respect to the combined use of mifepristone and misoprostol (Gemzell-Danielsson and Lalitkumar, 2008; Wildschut et al., 2011). The safety and efficacy of different medications and medication regimens for inducing abortion has been assessed in RCTs, retrospective analyses, prospective observational studies, and systematic reviews (Ashok et al., 2002, 2004; Constant et al., 2016; Goh and Thong, 2006; Gouk et al., 1999; Hamoda et al., 2003; Kapp et al., 2007; Mauelshagen et al., 2009; Ngoc et al., 2011; Sonalkar et al., 2017; Wildschut et al., 2011).

In a systematic review of the effectiveness and side effects of different induction abortion medication regimens, the Cochrane Collaboration identified 36 RCTs that used various agents and methods of administration. The researchers concluded that a combination of mifepristone and misoprostol

---

[15]See Chapter 3 for a review of factors contributing to the dearth of trained providers.

[16]Both states allow exceptions in cases of life endangerment or severe physical health risk to the woman.

2021 ED 000206

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 88 of 40
PageID.8266
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*        *67*

is the most effective approach and requires the shortest amount of time (Wildschut et al., 2011).

Guidelines developed by the American College of Obstetricians and Gynecologists (ACOG) and endorsed by the Society of Family Planning (SFP) and the Society of Maternal-Fetal Medicine recommend an alternative misoprostol regimen when mifepristone is not available (ACOG, 2013). Although effective, misoprostol-only regimens take longer (Wildschut et al., 2011) and as a result, are likely to be more costly to the patient with respect to time, discomfort, and out-of-pocket expense.

The National Abortion Federation (NAF) guidelines note that, when performed by trained clinicians, induction abortions can be provided in medical offices, clinics, or higher-level health care facilities (NAF, 2017a).

### Complications

The expected side effects of induction abortions are similar to those described above for medication abortions at or before 10 weeks' gestation: cramping, pain, and bleeding, as well as nausea, vomiting, diarrhea, chills, and headache (Borgatta, 2011; Ngoc et al., 2011; Wildschut et al., 2011). The side effects are a result of the medications that are used for induction, the abortion process itself, or the medications used to manage pain (Borgatta, 2011).

The literature on complications resulting from induction abortions is limited by a variety of factors. The available research is a mix of study designs analyzing a variety of treatment protocols and patient populations that differ in important ways, including weeks' gestation, parity, fetal anomaly, and the pharmaceutical regimens and agents used to induce labor (Goyal, 2009; SFP, 2011a). All of these factors may affect patient outcomes. Moreover, while the research on the outcomes of medication and aspiration abortions draws on the outcomes of thousands of patients, the study samples for research on inductions are relatively small and thus have limited statistical power. Nevertheless, the available evidence consistently finds that induction abortion rarely leads to serious complications, although they occur more often than in D&E procedures (Bryant et al., 2011; Grossman, et al., 2008; Mauelshagen et al., 2009; SFP, 2011b).

In addition, among women with a prior cesarean delivery, the use of prostaglandins (particularly misoprostol) to induce labor during a normal vaginal delivery has been associated with an increased risk of uterine rupture—a potentially life-threatening condition (Lydon-Rochelle et al., 2001). Because methods to induce abortion are similar to those used to induce vaginal deliveries, research has assessed whether women with a prior cesarean are at similar risk of uterine rupture when undergoing an induction abortion. The evidence suggests that misoprostol-induced abortions are safe after a cesarean. Uterine rupture has been documented in fewer than

2021 ED 000207

Copyright National Academy of Sciences. All rights reserved.

0.4 percent of induction abortions among women with a prior cesarean (Berghella et al., 2009; Goyal, 2009).

## POSTABORTION CARE

Clinical guidelines suggest that, regardless of abortion method, routine in-person follow-up care is not necessary. However, clinicians may choose to offer an in-person follow-up visit to women 7–14 days after the procedure to confirm the absence of ongoing pregnancy and to assess recovery (NAF, 2017a; WHO, 2014). In the case of medication abortion, which usually occurs in a nonclinical setting, confirmation of termination of the pregnancy is the primary concern after the abortion. The FDA advises that follow-up is needed to confirm complete termination of pregnancy, but that termination can be confirmed by medical history, clinical examination, hCG testing, or ultrasound (FDA, 2016a). Similarly, NAF advises that confirmation can be established by any of these methods in an office, by telephone, or through electronic communication (NAF, 2017a).

Before a woman leaves a facility after an abortion procedure (or after she has taken the appropriate medication in the case of medication abortion), she should receive instructions on what to expect after the procedure, self-care, resuming intercourse, recognizing signs and symptoms of complications, and how and where to seek assistance if needed (NAF, 2017a; RCOG, 2015; WHO, 2014). Fertility goals and future pregnancy should be discussed, and if a woman opts for contraceptive counseling or a method of contraception, it should be provided before she leaves the facility (NAF, 2017a; RCOG, 2016; WHO, 2014). Other treatment (pain medication, medication for RhD-negative patients, emotional support) and referrals for other services (STI/HIV counseling and testing, abuse support services, psychological or social services, and services of other physician specialists) should also be provided before discharge, as needed (RCOG, 2016; WHO, 2014).

As with any other procedure, women who receive minimal, moderate, or deeper sedation should be monitored continuously during a recovery period until they have been evaluated and determined to be no longer at risk for hemodynamic instability or respiratory depression (NAF, 2017a). Prior to discharge, women must be ambulatory with stable blood pressure and pulse, bleeding and pain must be controlled, and these criteria must be documented (NAF, 2017a).

## USE OF ANALGESIA, SEDATION, AND ANESTHESIA IN ABORTION CARE

Patient comfort not only is of critical interest to the patient but also affects the ability of the clinician to perform a procedure safely and

2021 ED 000208

Copyright National Academy of Sciences. All rights reserved.

effectively (Allen et al., 2013). People differ in their experience of and toler-ance for pain. In their review of pain relief for obstetrical and gynecological procedures in outpatient settings, Allen and colleagues (2013) observed that anxiety, depression, and a woman's expectation of pain are strong predic-tors of her actual experience of pain during a procedure.

NAF recommends that providers involve women in the analgesia/sedation/anesthesia decision and that the choice be based on the individual patient's needs and an assessment of the risks and benefits (NAF, 2017a). The pain management approach that is best for women undergoing medica-tion, aspiration, D&E, or induction abortions depends not only on which method is used but also on weeks' gestation, the patient's preferences for pain control, her comorbidities (if any), the availability of equipment and specialized personnel, provider preferences, cost, and facility licensure (Allen et al., 2012, 2013; NAF, 2017a; Nichols et al., 2009; RCOG, 2015). Results of a 2002 survey of NAF administrators and providers offer some insight into providers' preferred methods for pain control during aspira-tion abortions. Almost half (46 percent) of the 110 survey respondents preferred using local and/or oral medication, 33 percent preferred local plus IV sedation, and 21 percent preferred deep sedation or general anesthesia (O'Connell et al., 2009). The survey also elicited information regarding pain control for D&E and induction abortions. Most clinics that offered combined local and IV conscious sedation or general anesthesia used these methods for more than 80 percent of their patients (O'Connell et al., 2008).

The literature on the effectiveness of nonpharmacological approaches to reducing pain during abortion is inconclusive (Tschann et al., 2016). While a variety of methods have been assessed, including relaxation tech-niques (e.g., focused breathing, visualization, vocal coaching, and positive suggestion), hypnosis, aromatherapy, and abortion doulas, more definitive research is needed.

### Pain Management During Aspiration, D&E, and Induction Abortions

The pharmaceutical options for pain management during an abortion range from oral analgesics (e.g., NSAIDs), to local anesthesia (typically a paracervical block), to minimal sedation/anxiolysis, to moderate sedation/analgesia, to deep sedation/analgesia, to general anesthesia (NAF, 2017a). Along this continuum, the physiological effects of sedation have increas-ing clinical implications and, depending on the depth of sedation, may require special equipment and personnel to ensure the patient's safety (see Tables 2-2 and 2-3). The greatest risk of using sedative agents is respiratory depression.

The American Society of Anesthesiologists (ASA) issues clinical stan-dards for the safe use of pain medications and anesthesia in the types

2021 ED 000209

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-2** Levels and Effects of Analgesia, Sedation, and Anesthesia

| Effect on | Minimal Sedation/ Anxiolysis[a] | Moderate Sedation/ Analgesia[b] | Deep Sedation/ Analgesia | General Anesthesia |
|---|---|---|---|---|
| Responsiveness | Normal response to verbal stimulation | Purposeful response to verbal or tactile stimulation | Purposeful response with repeated or painful stimulation | Unarousable by painful stimulus |
| Airway | Unaffected | No intervention required | Intervention may be required | Intervention often required |
| Spontaneous ventilation | Unaffected | Adequate | May be inadequate | Frequently inadequate |
| Cardiovascular function | Unaffected | Usually maintained | Usually maintained | May be impaired |

[a]Minimal sedation includes local anesthesia, e.g., in the form of a paracervical block.
[b]Moderate sedation is sometimes described as "conscious sedation."
SOURCES: ASA, 2015; ASA Task Force, 2002.

of outpatient clinical settings where abortions are provided (ASA, 2013, 2014b, 2015). The standards use a physical health classification system— ASA I through ASA VI—to guide clinicians' decisions about anesthesia options. ASA I patients are healthy, and ASA II patients have mild systemic disease;[17] both are medically eligible for all options up to deep sedation in office-based settings. The vast majority of abortion patients—young women—are in these categories. Women with severe systemic disease (ASA III and IV) require further medical assessment and may be eligible for deep sedation (monitored anesthesia care [MAC]) or general anesthesia in an accredited ambulatory surgery center (ASC) or hospital. Table 2-2 shows the ASA levels of sedation and their effects on cognitive, respiratory, and cardiovascular function.

### Safeguards for Managing Complications and Emergencies During an Abortion

The key safeguards—for abortions and all outpatient procedures— are whether the facility has the appropriate equipment, personnel, and

---

[17]ASA II patients (mild systemic disease) have no functional limitations and well-controlled disease, such as controlled hypertension or diabetes (without systemic effects), mild lung disease, or mild obesity (BMI between 30 and 40) (ASA, 2014a).

2021 ED 000210

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-3** Minimum Facility Requirements Related to Level of Sedation for Medication, Aspiration, and Dilation and Evacuation (D&E) Abortions

| Abortion Method | Minimum Facility Requirements[a] | | | |
|---|---|---|---|---|
| | Equipment to Monitor Oxygen Saturation, Heart Rate, and Blood Pressure | Equipment to Monitor Ventilation (e.g., end-tidal carbon dioxide)[b] | Emergency Resuscitation Equipment | Emergency Transfer Plan |
| Medication | — | — | — | — |
| Aspiration with moderate sedation[a] | √ | — | √ | √ |
| D&E | | | | |
| Deep sedation, or monitored anesthesia care (MAC) | √ | √ | √ | √ |
| General anesthesia | √ | √ | √ | √ |

NOTES: Checkmarks denote American Society of Anesthesiologists (ASA) minimal facility requirements as they relate to the level of sedation used in medication, aspiration, and D&E abortions.

[a]These requirements are for healthy patients or patients with mild systemic disease, i.e., ASA physical health status classifications ASA I and ASA II. Women with severe systemic disease (i.e., ASA III and IV) should be evaluated, and consideration should be given to using deep sedation (MAC) or general anesthesia in an accredited facility such as an ambulatory surgery center or hospital.

[b]End-tidal carbon dioxide monitoring refers to the noninvasive measurement of exhaled carbon dioxide.

SOURCES: Allen et al., 2013; ASA, 2013, 2014a,b, 2015; ASA Task Force, 2002.

emergency transfer plan to address any complications that might occur. While data on the use of specific pain management methods during an abortion are very limited, studies that report outcomes for patients after an abortion find that current pain management methods are safe when appropriate precautions are followed (Dean et al., 2011; Gokhale et al., 2016; Renner et al., 2012).

*Facility Requirements*

Table 2-3 shows the ASA minimal facility requirements as they relate to the level of sedation used in medication, aspiration, and D&E abortions. No special equipment or emergency arrangements are required for medication abortions. If moderate sedation is used during an aspiration

2021 ED 000211

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 93 of 40
PageID.8271
72    *THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

abortion, the facility should have emergency resuscitation equipment and an emergency transfer plan, as well as equipment to monitor oxygen saturation, heart rate, and blood pressure. D&Es that involve deep sedation or general anesthesia should be provided in similarly equipped facilities that also have equipment to monitor ventilation (e.g., end-tidal carbon dioxide) (ASA Task Force, 2002).

New insights into the safe provision of sedation and anesthesia for abortions in outpatient settings are forthcoming. A unique research project, currently ongoing, is comparing the relative safety, cost, and complications of providing abortions in office-based settings and ASCs (ANSIRH, 2017; Roberts, 2017). The investigators are using a national private insurance claims database containing approximately 50 million patient records to compare adverse events, including anesthesia-related outcomes, in the two settings. The study's results were not available when the committee prepared this report. However, analyses of large-scale databases suggest that the risk of hospital admission after outpatient surgery (involving deep sedation) is rare for healthy patients undergoing procedures that last less than 120 minutes (Fleisher et al., 2007). As noted earlier, aspiration abortions typically take 10 minutes, and D&E procedures less than 30 minutes.

### Personnel Requirements

The use of sedation and anesthesia also has important implications for personnel. If moderate sedation is used, it is essential to have a nurse or other qualified clinical staff—in addition to the person performing the abortion—available to monitor the patient (ASA Task Force, 2002; NAF, 2017a). Both deep sedation and general anesthesia require the expertise of an anesthesiologist or certified registered nurse anesthetist (CRNA) to ensure patient safety.

### Evidence on Complications of Analgesia, Sedation, and Anesthesia During Abortions

This section reviews the available evidence on complications related to pain management during aspiration, D&E, and induction abortions. As noted above, NSAIDs reduce the discomfort of pain and cramping safely and effectively during a medication abortion.

### Aspiration Pain Management

Paracervical blocks are used routinely to reduce the pain of cervical dilation during aspiration procedures (Allen et al., 2013; Nichols et al., 2009). Moderate and deep sedation are also options for aspiration

2021 ED 000212

Copyright National Academy of Sciences. All rights reserved.

abortion. The blocks are effective in decreasing pain related to cervical dilation and uterine aspiration, although administration of the block itself is painful (Allen et al., 2013; Renner et al., 2012), and some providers use other medications to reduce the pain of the injection (Allen et al., 2013). Because some women report experiencing moderate to significant procedural pain even with the block, researchers are trying to identify an optimal approach to pain management without sedation during aspiration (Allen et al., 2013; O'Connell et al., 2009; Renner et al., 2012, 2016).

Adverse events related to the use of local anesthesia, regardless of the clinical circumstances, are rare (Nichols et al., 2009). In a recent retrospective cohort study, Horwitz and colleagues (2018) used electronic medical record data to assess whether obesity increased the risk of anesthesia-related complications[18] after an aspiration abortion with moderate IV sedation. The study, based in several Massachusetts outpatient clinics, included 20,381 women. Complications were rare and not associated with BMI[19] (Horwitz et al., 2018).

The White and colleagues (2015) systematic review described above identified 11 studies that report patient outcomes related to the use of local anesthesia, moderate sedation, or general anesthesia for aspiration abortions. Anesthesia-related complications were rare regardless of the clinical setting or level of sedation: ≤0.2 percent of office-based procedures and ≤0.5 percent of procedures in surgical centers and hospital-based clinics.

### D&E Pain Management

A typical D&E regimen includes a paracervical block supplemented with either moderate sedation (using benzodiazepines and/or opiates) or deep sedation with propofol (without intubation) (NAF, 2017a; RCOG, 2015; WHO, 2012, 2014). In office settings, deep sedation should be used only for healthy patients (ASA I) or patients with mild systemic disease (ASA II), and strict fasting guidelines should be followed before the procedure (ASA Task Force, 2002).

Two large-scale, retrospective analyses have demonstrated the safety of using deep sedation for aspiration and D&E abortions in clinic settings (Dean et al., 2011; Gokhale et al., 2016). Dean and colleagues (2011) assessed the experience of 62,125 women who had an aspiration or D&E abortion (up to 24 weeks' gestation) using deep sedation with propofol

---

[18]The primary outcome assessed was supplemental oxygen administration. Secondary outcomes included reversal agent administration, anesthesia-related adverse events, and intraoperative lowest level of consciousness.

[19]Obesity groups (BMI = 30–34.9; BMI = 35–39.9; BMI ≥40) were compared with women with BMI <25.

2021 ED 000213

Copyright National Academy of Sciences. All rights reserved.

(without intubation) in a high-volume licensed clinic in New York State between 2001 and 2008.[20] Deep sedation was provided only to medically eligible patients who followed strict fasting guidelines. The procedures were monitored by an anesthesiologist or CRNA. The researchers reviewed the medical records of all women who were transferred to a hospital (n = 26) because of complications and found that no hospital transfers occurred because of an anesthesia complication.

In a more recent study, Gokhale and colleagues (2016) assessed the outcomes for 5,579 aspiration and D&E abortions using IV sedation (without intubation) at a freestanding abortion clinic in Cleveland from 2012 to 2013. Patients were screened for medical eligibility and followed fasting guidelines. Sedation was administered by registered nurses or by CRNAs if propofol was administered. There were no hospital transfers for anesthesia-related indications. Naloxone was required for opioid reversal in 0.2 percent of patients. The study also compared outcomes for obese and nonobese women; no differences were found.

### Induction Pain Management

There is little research on how best to manage pain during an induction (Jackson and Kapp, 2011). Comparisons of different analgesic regimens are not available, and the optimal approach to effective treatment of pain is not well established (Wiebe and Renner, 2014). The options will depend on the provider's resources and the particular clinical circumstances. Nulliparous women may require more analgesia compared with multiparous women (Ashok et al., 2004). The levels of pain in later-gestation induction abortions are said to be similar to those in normal delivery, but the committee found no studies documenting this (Smith et al., 2016; Viviand et al., 2003).

### MORTALITY

Death associated with a legal abortion in the United States is an exceedingly rare event. As Table 2-4 shows, the risk of death subsequent to a legal abortion[21] (0.7 per 100,000) is a small fraction of that for childbirth (8.8 per 100,000) (Bartlett et al., 2004; Zane et al., 2015).[22] Abortion-related

---

[20]One patient received an endotracheal intubation.

[21]The CDC defines an abortion-related death as "a death resulting from a direct complication of an induced abortion, an indirect complication caused by a chain of events initiated by an abortion procedure, or the aggravation of a pre-existing condition by the physiologic or psychological effects of the abortion" (Jatlaoui et al., 2016, p. 4).

[22]The CDC calculates the rate of abortion mortality using deaths reported to the CDC Abortion Surveillance System and dividing them by the estimated number of abortion procedures in the United States (CDC, 2017; Jones and Jerman, 2014).

2021 ED 000214

Copyright National Academy of Sciences. All rights reserved.

**TABLE 2-4** Comparison of Mortality Rates for Abortion, Childbirth, Colonoscopy, Dental Procedures, Plastic Surgery, and Tonsillectomy, United States

| Procedure (Study Period) | Mortality Rate (number of deaths per 100,000 procedures) |
|---|---|
| Abortion (legal) (1988–2010) | 0.7 |
| Childbirth (1988–2005) | 8.8 |
| Colonoscopy (2001–2015) | 2.9 |
| Dental procedures (1999–2005) | 0.0 to 1.7 |
| Plastic surgery (2000–2012) | 0.8 to 1.7 |
| Tonsillectomy (1968–1972) | 2.9 to 6.3 |

NOTE: Reported tonsillectomy rates were recalculated to reflect the rate per 100,000 procedures.
SOURCES: Baugh et al., 2011; Raymond and Grimes, 2012; Raymond et al., 2014; Reumkens et al., 2016; Zane et al., 2015.

mortality is also lower than that for colonoscopies (2.9 per 100,000), plastic surgery (0.8 to 1.7 per 100,000), dental procedures (0.0 to 1.7 per 100,000), and adult tonsillectomies (2.9 to 6.3 per 100,000). Comparable data for other common medical procedures are difficult to find.

The CDC monitors abortion-related deaths through its Pregnancy Mortality Surveillance System (Jatlaoui et al., 2017). The surveillance data underscore the increased risk of having an abortion later in pregnancy. Zane and colleagues (2015) assessed differences in abortion-related mortality by race, maternal age, and weeks' gestation using data from the CDC surveillance system. Among the 16.1 million legal abortions performed from 1998 to 2010, there were 108 deaths (0.7 per 100,000). Twenty deaths occurred among high-risk women whose pregnancy was life threatening. Infection and anesthesia complications were the most frequent cause of death for procedures performed up to 13 weeks' gestation. After 13 weeks, the deaths reported were due primarily to infection or hemorrhage.

The researchers found that weeks' gestation was the strongest predictor of abortion-related mortality. At 8 weeks' gestation or less, the death rate was 0.3 per 100,000; after 17 weeks, the rate was 6.7 per 100,000. Death rates were approximately three times as high for black women as for white women—similar to the disparities found in pregnancy outcomes overall (Creanga et al., 2012, 2015, 2017; MacDorman et al., 2017). From 2011 to 2013, for example, the overall maternal mortality ratio for non-Hispanic black women was 3.4 times higher than that for non-Hispanic white women (Creanga et al., 2017). A study of maternal mortality in 2013 to 2014 found a 22 percent lower (p = .02) mortality rate for Hispanic women compared with non-Hispanic white women; in 2008–2009, the

2021 ED 000215

Copyright National Academy of Sciences. All rights reserved.

mortality rate for Hispanic women was similar to that for non-Hispanic white women, but the difference was attributed to the 28 percent increase (p <.001) in mortality for non-Hispanic white women (MacDorman et al., 2017). MacDorman and colleagues (2017) note that almost all of the increase in maternal mortality was among woman aged 40 and older and for nonspecific causes of death.

## STATE REGULATION OF ABORTION CARE

States play an essential role in ensuring the safety of health care services, especially through their licensure of clinicians and health care facilities. In every state, clinicians and inpatient facilities (e.g., hospitals, rehabilitation centers) must be licensed by a state board or agency to provide health care services legally (Chaudhry et al., 2013). State licensure may require the facility to be accredited by an independent accrediting organization. Regardless, Medicare and Medicaid, as well as private insurers, require accreditation for inpatient facilities and ASCs to be eligible for reimbursement (CMS, 2012). ASCs provide surgical services to patients not requiring hospitalization when the expected duration of services does not exceed 24 hours (CMS, 2016). In most states, ASCs must also be licensed to provide outpatient surgery, and in many states, ASCs must be accredited (ACFAS, 2017).[23]

Unlike other health care procedures provided in office-based settings, abortions are subject to a wide array of regulations that vary by state. Except for abortion, states typically regulate individual, office-based health services only when the service involves using sedation or general anesthesia (and depending on the level of sedation) (Jones, 2017). Twenty-five states regulate office-based procedures (other than abortion). In 23 of these states,[24] the regulation is triggered by the level of sedation, and in most cases, it requires that the facility be either accredited or licensed by the state in order to offer patients moderate or deep sedation (Jones, 2017; Jones et al., 2018).[25]

State abortion regulations often have a direct impact on the delivery of abortion care. They may stipulate the type of clinician that is allowed to perform an abortion independently of the relevant scope of practice laws

---

[23]According to the American College of Foot and Ankle Surgeons, 46 states require ASCs to be licensed, and 28 states (including the District of Columbia) require accreditation (ACFAS, 2017).

[24]The 23 states are Alabama, Arizona, Arkansas, California, Connecticut, Delaware, Florida, Indiana, Kansas, Louisiana, Mississippi, Nevada, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, and Washington.

[25]Personal communication, B. S. Jones, Advancing New Standards in Reproductive Health (ANSIRH), July 3, 2017.

2021 ED 000216

Copyright National Academy of Sciences. All rights reserved.

(e.g., qualified advanced practice clinicians [APCs] or physicians without hospital privileges may be barred from performing abortions); how the informed consent process is conducted (e.g., providers may be required to misrepresent the risks of the procedure); the abortion method that is used (e.g., D&Es may be banned); the timing and scheduling of procedures (e.g., women may have to wait 18 to 72 hours after a counseling appointment); the physical attributes of the clinical setting (e.g., procedure room size, corridor width); and other basic elements of care. In most states, the regulations apply to all abortion methods regardless of weeks' gestation, use of sedation, or the invasiveness of the procedure.

See Table 1-1 in Chapter 1 for a listing of abortion-specific regulations by states as of September 1, 2017.

## SUMMARY

The clinical evidence presented in this chapter on the provision of safe and high-quality abortion care stands in contrast to the extensive regulatory requirements that state laws impose on the provision of abortion services. These requirements may influence the efficiency of abortion care by requiring medically unnecessary services and multiple visits to the abortion facility, in addition to requiring that care take place in costlier and more sophisticated settings than are clinically necessary. These requirements go beyond the accepted standards of care in the absence of evidence that they improve safety. Some requirements, such as multiple visits and waiting periods, delay abortion services, and by doing so may increase the clinical risks and cost of care. They may also limit women's options for care and impact providers' ability to provide patient-centered care. Furthermore, many of these laws have been documented to reduce the availability of care by imposing unneeded regulations on abortion providers and the settings in which abortion services are delivered. The implications of abortion-specific regulations for the safety and quality of abortion care are described below.

### Delaying the Procedure

The clinical evidence makes clear that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are safe and effective. Serious complications are rare; in the vast majority of studies, they occur in fewer than 1 percent of abortions, and they do not exceed 5 percent in any of the studies the committee identified. However, the risk of a serious complication increases with weeks' gestation. As the number of weeks increases, the invasiveness of the required procedure and the need for

2021 ED 000217

Copyright National Academy of Sciences. All rights reserved.

*78    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

deeper levels of sedation also increase. Thus, delaying the abortion increases the risk of harm to the woman.

State regulations that require women to make multiple in-person visits and wait multiple days delay the abortion. If the waiting period is required *after* an in-person counseling appointment, the delay is exacerbated (Roberts et al., 2016; Sanders et al., 2016; White et al., 2017). Restrictions on the types of providers and on the settings in which abortion services can be provided also delay care by reducing the availability of care (Baum et al., 2016; Fuentes et al., 2016; Gerdts et al., 2016; Grossman et al., 2014, 2017).

Financial burdens and difficulty obtaining insurance are frequently cited by women as reasons for delay in obtaining an abortion (Bessett et al., 2011; Drey et al., 2006; Finer et al. 2006; Foster and Kimport, 2013; Foster et al., 2008; French et al., 2016; Janiak et al., 2014; Kiley et al., 2010; Roberts et al., 2014; Upadhyay et al., 2014). As noted in Chapter 1, 33 states prohibit public payers from paying for abortions, and other states have laws that either prohibit health insurance exchange plans (25 states) or private insurance plans (11 states) sold in the state from covering or paying for abortions, with few exceptions.[26]

### Counseling and Informed Consent

Long-established ethical and legal standards for informed consent in health care appear to have been compromised in the delivery of abortion care in many areas of the country. Thirty-five states have abortion-specific regulations requiring women to receive counseling before an abortion is performed, and abortion patients in many of these states are offered or given inaccurate or misleading information (verbally or in writing) on reversing medication abortions, risks to future fertility, possible breast cancer risk, and/or long-term mental health consequences of abortion (Guttmacher Institute, 2017a) (see Table 1-1 in Chapter 1). As noted earlier in this chapter, the principal objective of the informed consent process is that patients understand the nature and risks of the procedure they are considering (AAAHC, 2016; AMA, 2016; HHS, 2017a; Joint Commission, 2016). However, legally requiring providers to inform women about risks that are not supported and are even invalidated by scientific research violates the accepted standards of informed consent. For example, some states require that providers inform women that abortion puts them at greater risk for breast cancer; mental health disorders; and difficulties in having a healthy, successful pregnancy

---

[26]Exceptions are limited and vary by state. They are often made for pregnancies resulting from rape or incest, pregnancies that endanger the woman's life or severely threaten the health of the woman, and cases of fetal impairment.

2021 ED 000218

Copyright National Academy of Sciences. All rights reserved.

(Guttmacher Institute, 2017a) (see Table 1-1 in Chapter 1 for a detailed list of states' informed consent requirements). Three states require providers to inform women that a medication abortion can be reversed after the woman takes mifepristone (Guttmacher Institute, 2017a). This information is not supported by research that meets scientific standards. See Chapter 4 for an in-depth review of the long-term health effects of abortion.

### Medication Abortion

There is no evidence that the dispensing or taking of mifepristone tablets requires the physical presence of a clinician[27] or a facility with the attributes of an ASC or hospital to ensure safety or quality. The effects of mifepristone occur after women leave the clinic, and extensive research shows that serious complications are rare. The risks of medication abortion are similar in magnitude to the risks of taking commonly prescribed and over-the-counter medications such as antibiotics and NSAIDs. In 35 states, however, only physicians are permitted to give women the mifepristone tablet(s) required to begin the process of medication abortion (RHN, 2017). In 19 states, the clinician (a physician or other provider if allowed) must be physically present to provide the medication, thus prohibiting the use of telemedicine to prescribe the medication remotely for abortion (Guttmacher Institute, 2017b). In 17 states, medication abortions must be performed in a facility that meets the structural standards of ASCs even though the abortion will occur outside the clinical setting, and there is no evidence to suggest that these regulations improve safety or quality.

### Aspiration Abortions

Aspirations are minimally invasive and commonly used for a variety of purposes in gynecology practices, including for early pregnancy loss (miscarriage). Aspiration abortions are performed safely in office-based settings and can be provided by appropriately trained APCs, as well as family practice physicians and OB/GYNs. If moderate sedation is used, the procedure should be performed in a facility that meets the relevant ASA facility standards. There is no evidence that performing aspiration abortions in ASCs increases the safety or efficacy of the procedure. The state regulations described above also affect aspiration abortion procedures: 44 states do not allow APCs to perform aspirations, and 16 states mandate that the procedure be performed in an ASC-like facility.

---

[27]Chapter 3 reviews the clinical competencies needed to provide safe and high-quality abortions, as well as state regulations regarding the role of APCs.

2021 ED 000219

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 101 of 4
PageID.8279
*80    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

### D&E and Induction Abortions

D&E is usually the medically preferred method for abortions at 14 weeks' gestation or later. The alternative—induction—is more painful, slower, and more expensive. D&Es are banned in Mississippi[28] and West Virginia[29] except if the woman's physical health or life is severely threatened.

### REFERENCES

AAAHC (Accreditation Association for Ambulatory Health Care). 2016. *Informed consent.* https://www.aaahc.org/Global/Newsletter_Connection/2016Jul_Connection_FINAL.pdf (accessed September 25, 2017).

AANA (American Association of Nurse Anesthetists). 2016. *Informed consent in anesthesia. Policy and practice considerations.* https://www.aana.com/docs/default-source/practice-aana-com-web-documents-(all)/informed-consent-for-anesthesia-care.pdf (accessed January 23, 2018).

ACFAS (American College of Foot and Ankle Surgeons). 2017. *Ambulatory surgical centers: Regulation and accreditation.* https://www.acfas.org/Physicians/content.aspx?id=628 (accessed November 28, 2017).

ACOG (American College of Obstetricians and Gynecologists). 2013. ACOG practice bulletin 135: Second-trimester abortion. *Obstetrics & Gynecology* 121(6):1394–1406.

ACOG. 2015. *Committee opinion number 439 (reaffirmed). Informed consent.* https://www.acog.org/-/media/Committee-Opinions/Committee-on-Ethics/co439.pdf?dmc=1&ts=20171018T1431178490 (accessed August 1, 2017).

ACOG. 2017a. *About us.* https://www.acog.org/About-ACOG/About-Us (accessed August 23, 2017).

ACOG. 2017b. *Practice bulletin 186: Long-acting reversible contraception: Implants and intrauterine devices.* https://www.acog.org/Resources-And-Publications/Practice-Bulletins/Committee-on-Practice-Bulletins-Gynecology/Long-Acting-Reversible-Contraception-Implants-and-Intrauterine-Devices (accessed October 30, 2017).

ACOG and SFP (Society for Family Planning). 2014. Practice bulletin 143: Medical management of first-trimester abortion. *Obstetrics & Gynecology* 123(3):676–692.

Aiken, A. R. A., K. A. Guthrie, M. Schellekens, J. Trussell, and R. Gomperts. 2018. Barriers to accessing abortion services and perspectives on using mifepristone and misoprostol at home in Great Britain. *Contraception* 97(2):177–183. doi:10.1016/j.contraception.2017.09.003.

Allen, R. H., and A. B. Goldberg. 2016. Cervical dilation before first-trimester surgical abortion (<14 weeks' gestation). *Contraception* 93(4):277–291.

Allen, R. H., J. Fortin, D. Bartz, A. B. Goldberg, and M. A. Clark. 2012. Women's preferences for pain control during first-trimester surgical abortion: A qualitative study. *Contraception* 85(4):413–418.

Allen, R. H., E. Micks, and A. Edelman. 2013. Pain relief for obstetric and gynecologic ambulatory procedures. *Obstetrics & Gynecology Clinics of North America* 40(4):625–645.

---

[28]Mississippi Unborn Child Protection from Dismemberment Abortion Act, Mississippi HB 519, Reg. Sess. 2015–2016 (2016).

[29]Unborn Child Protection from Dismemberment Abortion Act, West Virginia SB 10, Reg. Sess. 2015–2016 (2016).

2021 ED 000220

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 102 of 4
PageID.8280
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*          *81*

AMA (American Medical Association). 2016. *Chapter 2: Opinions on consent, communica-
tion, and decision making. Code of medical ethics*. Washington, DC: American Medical
Association. https://www.ama-assn.org/sites/default/files/media-browser/code-of-medical-
ethics-chapter-2.pdf (accessed February 22, 2018).

Ames, C. M., and W. V. Norman. 2012. Preventing repeat abortion in Canada: Is the immedi-
ate insertion of intrauterine devices postabortion a cost-effective option associated with
fewer repeat abortions? *Contraception* 85(1):1–5.

ANSIRH (Advancing New Standards in Reproductive Health). 2017. *Abortion facility stan-
dards initiative*. https://www.ansirh.org/research/abortion-facility-standards-initiative (ac-
cessed October 24, 2017).

ASA (American Society of Anesthesiologists). 2013. *Statement on nonoperating room anes-
thetizing locations*. http://www.asahq.org/~/media/Sites/ASAHQ/Files/Public/Resources/
standards-guidelines/statement-on-nonoperating-room-anesthetizing-locations.pdf (ac-
cessed October 4, 2017).

ASA. 2014a. *ASA physical status classification system*. https://www.asahq.org/resources/
clinical-information/asa-physical-status-classification-system# (accessed October 5,
2017).

ASA. 2014b. *Guidelines for office-based anesthesia (reaffirmed)*. https://www.asahq.org/~/
media/sites/asahq/files/public/resources/standards-guidelines/guidelines-for-office-based-
anesthesia.pdf (accessed July 2, 2017).

ASA. 2015. *Standards for basic anesthetic monitoring (reaffirmed)*. http://www.asahq.org/
sitecore/shell/~/media/sites/asahq/files/public/resources/publications/epubs/standards-for-
basic-anesthetic-monitoring-epub.epub (accessed July 10, 2017).

ASA Committee on Ethics. 2016. *Frequently asked questions on informed consent for pro-
cedures*. Version 1.5 (draft document). http://www.asahq.org/~/media/sites/asahq/files/
public/resources/faq-anesthesia-consent-ver-1-5.pdf (accessed July 31, 2017).

ASA Task Force on Sedation and Analgesia by Non-Anesthesiologists. 2002. Practice guidelines
for sedation and analgesia by non-anesthesiologists. *Anesthesiology* 96(4):1004–1017.

Ashok, P. W., A. Templeton, P. T. Wagaarachchi, and G. M. Flett. 2002. Factors affecting the
outcome of early medical abortion: A review of 4,132 consecutive cases. *British Journal
of Obstetrics & Gynaecology* 109(11):1281–1289.

Ashok, P. W., A. Templeton, P. T. Wagaarachchi, and G. M. Flett. 2004. Midtrimester
medical termination of pregnancy: A review of 1002 consecutive cases. *Contraception*
69(1):51–58.

Autry, A. M., E. C. Hayes, G. F. Jacobson, and R. S. Kirby. 2002. A comparison of medical
induction and dilation and evacuation for second-trimester abortion. *American Journal
of Obstetrics and Gynecology* 187(2):393–397.

Baker, A., and T. Beresford. 2009. Chapter 5. Informed consent, patient education, and coun-
seling. In *Management of unintended and abnormal pregnancy: Comprehensive abortion
care*, edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield
and M. D. Creinin. Hoboken, NJ: Wiley-Blackwell. Pp. 48–62.

Baron, C., S. Cameron, and A. Johnstone. 2015. Do women seeking termination of pregnancy
need pre-abortion counselling? *Journal of Family Planning and Reproductive Health
Care* 41(3):181–185.

Bartlett, L. A., C. J. Berg, H. B. Shulman, S. B. Zane, C. A. Green, S. Whitehead, and H. K.
Atrash. 2004. Risk factors for legal induced abortion-related mortality in the United
States. *Obstetrics and Gynecology* 103(4):729–737.

Bassi, C., B. Langer, and G. Schlaeder. 1994. Legal abortion by menstrual regulation: A report
of 778 cases. *Journal of Obstetrics and Gynaecology* 14(3):175–179.

2021 ED 000221

Copyright National Academy of Sciences. All rights reserved.

Baugh, R. F., S. M. Archer, R. B. Mitchell, R. M. Rosenfeld, R. Amin, J. J. Burns, D. H. Darrow, T. Giordano, R. S. Litman, K. K. Li, M. E. Mannix, R. H. Schwartz, G. Setzen, E. R. Wald, E. Wall, G. Sandberg, and M. M. Patel. 2011. Clinical practice guideline: Tonsillectomy in children. *Otolaryngology—Head & Neck Surgery* 144(1 Suppl.):S1–S30.

Baum, S. E., K. White, K. Hopkins, J. E. Potter, and D. Grossman. 2016. Women's experience obtaining abortion care in Texas after implementation of restrictive abortion laws: A qualitative study. *PLoS One* 11(10):e0165048.

Ben-Ami, I., D. Schneider, R. Svirsky, N. Smorgick, M. Pansky, and R. Halperin. 2009. Safety of late second-trimester pregnancy termination by laminaria dilatation and evacuation in patients with previous multiple cesarean sections. *American Journal of Obstetrics and Gynecology* 201:154.e1–5.

Benson, L., E. A. Micks, C. Ingalls, and S. W. Prager. 2016. Safety of outpatient surgical abortion for obese patients in the first and second trimesters. *Obstetrics & Gynecology* 128(5):1065–1070.

Berghella, V., J. Airoldi, A. M. O'Neill, K. Einhorn, and M. Hoffman. 2009. Misoprostol for second trimester pregnancy termination in women with prior caesarean: A systematic review. *BJOG: An International Journal of Obstetrics & Gynaecology* 116(9):1151–1157.

Bessett, D., K. Gorski, D. Jinadasa, M. Ostrow, and M. J. Peterson. 2011. Out of time and out of pocket: Experiences of women seeking state-subsidized insurance for abortion care in Massachusetts. *Women's Health Issues* 21(3 Suppl.):S21–S25.

Borgatta, L. 2011. *Labor induction termination of pregnancy.* https://www.glowm.com/section_view/heading/Labor%20Induction%20Termination%20of%20Pregnancy/item/443 (accessed September 13, 2017).

Borkowski, L., J. Strasser, A. Allina, and S. Wood. 2015. *Medication abortion. Overview of research & policy in the United States.* http://publichealth.gwu.edu/sites/default/files/Medication_Abortion_white_paper.pdf (accessed January 25, 2017).

Bourassa, D., and J. Berube. 2007. The prevalence of intimate partner violence among women and teenagers seeking abortion compared with those continuing pregnancy. *Journal of Obstetrics and Gynaecology Canada* 29(5):415–423.

Bracken, H., W. Clark, E. S. Lichtenberg, S. M. Schweikert, J. Tanenhaus, A. Barajas, L. Alpert, and B. Winikoff. 2011. Alternatives to routine ultrasound for eligibility assessment prior to early termination of pregnancy with mifepristone-misoprostol. *BJOG: An International Journal of Obstetrics & Gynaecology* 118(1):17–23.

Brown, S. 2013. Is counselling necessary? Making the decision to have an abortion. A qualitative interview study. *The European Journal of Contraception & Reproductive Health Care* 18(1):44–48.

Bryant, A. G., D. A. Grimes, J. M. Garrett, and G. S. Stuart. 2011. Second-trimester abortion for fetal anomalies or fetal death: Labor induction compared with dilation and evacuation. *Obstetrics & Gynecology* 117(4):788–792.

Cates, Jr., W., K. F. Schulz, D. A. Grimes, A. J. Horowitz, F. A. Lyon, F. H. Kravitz, and M. J. Frisch. 1982. Dilation and evacuation procedures and second-trimester abortions. The role of physician skill and hospital setting. *Journal of the American Medical Association* 248(5):559–563.

Cates, Jr., W., K. F. Schulz, and D. A. Grimes. 1983. The risks associated with teenage abortion. *New England Journal of Medicine* 309(11):621–624.

CDC (Centers for Disease Control and Prevention). 2017. *Pregnancy Mortality Surveillance System.* https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pmss.html (accessed November 1, 2017).

CDER (Center for Drug Evaluation and Review). 2016. *Application number: 020687Orig1s020. Medical review(s).* https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf (accessed April 24, 2017).

2021 ED 000222

Copyright National Academy of Sciences. All rights reserved.

Chai, J., C. Y. Wong, and P. C. Ho. 2013. A randomized clinical trial comparing the short-term side effects of sublingual and buccal routes of misoprostol administration for medical abortions up to 63 days' gestation. *Contraception* 87(4):480–485.

Chaudhry, H. J., F. E. Cain, M. A. Staz, L. A. Talmage, J. A. Rhyne, and J. V. Thomas. 2013. The evidence and rationale for maintenance of licensure. *Journal of Medical Regulation* 99(1):19–26.

Chen, M. J., and M. D. Creinin. 2015. Mifepristone with buccal misoprostol for medical abortion: A systematic review. *Obstetrics & Gynecology* 126(1):12–21.

Chong, E., L. J. Frye, J. Castle, G. Dean, L. Kuehl, and B. Winikoff. 2015. A prospective, non-randomized study of home use of mifepristone for medical abortion in the U.S. *Contraception* 92(3):215–219.

Clark, W. H., D. Hassoun, K. Gemzell-Danielsson, C. Fiala, and B. Winikoff. 2005. Home use of two doses of misoprostol after mifepristone for medical abortion: A pilot study in Sweden and France. *European Journal of Contraception & Reproductive Health Care* 10(3):184–191.

Cleland, K., M. D. Creinin, D. Nucatola, M. Nshom, and J. Trussell. 2013. Significant adverse events and outcomes after medical abortion. *Obstetrics & Gynecology* 121(1):166–171.

CMS (Centers for Medicare & Medicaid Services). 2012. Medicare and Medicaid programs reform of hospital and critical access hospital conditions of participation. *Federal Register* 77(95):29034–29040.

CMS. 2016. *Ambulatory Surgery Centers*. https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/ASCs.html (accessed November 10, 2017).

Conkling, K., C. Karki, H. Tuladhar, H. Bracken, and B. Winikoff. 2015. A prospective open-label study of home use of mifepristone for medical abortion in Nepal. *International Journal of Gynaecology & Obstetrics* 128(3):220–223.

Constant, D., J. Harries, T. Malaba, L. Myer, M. Patel, G. Petro, and D. Grossman. 2016. Clinical outcomes and women's experiences before and after the introduction of mifepristone into second-trimester medical abortion services in South Africa. *PLoS One* 11(9):e0161843.

Creanga, A. A., C. J. Berg, C. Syverson, K. Seed, F. C. Bruce, and W. M. Callaghan. 2012. Race, ethnicity, and nativity differentials in pregnancy-related mortality in the United States: 1993–2006. *Obstetrics & Gynecology* 125(1):5–12.

Creanga, A. A., C. J. Berg, C. Syverson, K. Seed, F. C. Bruce, and W. M. Callaghan. 2015. Pregnancy-related mortality in the United States, 2006–2010. *Obstetrics & Gynecology* 120(2):261–268.

Creanga, A. A., C. Syverson, K. Seed, and W. M. Callaghan. 2017. Pregnancy-related mortality in the United States, 2011–2013. *Obstetrics & Gynecology* 130(2):366–373.

Dabrowska, A. 2017. *FDA Risk Evaluation and Mitigation Strategies (REMS): Description and effect on generic drug development.* Washington, DC: Congressional Research Service.

Darney, P. D., and R. L. Sweet. 1989. Routine intraoperative ultrasonography for second trimester abortion reduces incidence of uterine perforation. *Journal of Ultrasound in Medicine* 8(2):71–75.

Dean, G., A. R. Jacobs, R. C. Goldstein, C. M. Gevirtz, and M. E. Paul. 2011. The safety of deep sedation without intubation for abortion in the outpatient setting. *Journal of Clinical Anesthesia* 23(6):437–442.

Delgado, G., and M. L. Davenport. 2012. Progesterone use to reverse the effects of mifepristone. *Annals of Pharmacotherapy* 46:e36.

Diedrich, J. T., T. Madden, Q. Zhao, and J. F. Peipert. 2015. Long-term utilization and continuation of intrauterine devices. *American Journal of Obstetrics and Gynecology* 213(5):662.e1–662.e8.

2021 ED 000223

Copyright National Academy of Sciences. All rights reserved.

Dragoman, M. V., D. Grossman, N. Kapp, N. M. Huong, N. Habib, D. L. Dung, and A. Tamang. 2016. Two prophylactic medication approaches in addition to a pain control regimen for early medical abortion <63 days' gestation with mifepristone and misoprostol: Study protocol for a randomized, controlled trial. *Reproductive Health* 13(1):132. doi:10.1186/s12978-016-0246-5.

Drey, E. A., D. G. Foster, R. A. Jackson, S. J. Lee, L. H. Cardenas, and P. D. Darney. 2006. Risk factors associated with presenting for abortion in the second trimester. *Obstetrics & Gynecology* 107(1):128–135.

Edelman, A., M. D. Nichols, and J. Jensen. 2001. Comparison of pain and time of procedures with two first-trimester abortion techniques performed by residents and faculty. *American Journal of Obstetrics and Gynecology* 184(7):1564–1567.

Evins, G., and N. Chescheir. 1996. Prevalence of domestic violence among women seeking abortion services. *Women's Health Issues* 6(4):204–210.

Fanslow, J., M. Silva, A. Whitehead, and E. Robinson. 2008. Pregnancy outcomes and intimate partner violence in New Zealand. *Australian and New Zealand Journal of Obstetrics and Gynecology* 48(4):391–397.

FDA (U.S. Food and Drug Administration). 2011. *Mifepristone U.S. postmarketing adverse events summary through 04/30/2011.* http://wayback.archive-it. org/7993/20161024033523/http://www.fda.gov/downloads/Drugs/DrugSafety/ PostmarketDrugSafetyInformationforPatientsandProviders/UCM263353.pdf (accessed February 5, 2018).

FDA. 2016a. *FDA label: Mifeprex.* Reference ID: 3909592. https://www.accessdata.fda.gov/ drugsatfda_docs/label/2016/020687s020lbl.pdf (accessed March 10, 2017).

FDA. 2016b. *Highlights of prescribing information. Mifeprex (revised 3/2016).* https://www. fda.gov/drugs/drugsafety/postmarketdrugsafetyinformationforpatientsandproviders/ ucm111323.htm (accessed May 31, 2017).

FDA. 2016c. *Questions and answers on Mifeprex.* https://www.fda.gov/drugs/drugsafety/ postmarketdrugsafetyinformationforpatientsandproviders/ucm492705.htm (accessed August 10, 2017).

Fiala, C., B. Winikoff, L. Helstrom, M. Hellborg, and K. Gemzell-Danielsson. 2004. Acceptability of home-use of misoprostol in medical abortion. *Contraception* 70(5):387–392.

Finer, L. B., L. F. Frohwirth, L. A. Dauphinee, S. Singh, and A. M. Moore. 2006. Timing of steps and reasons for delays in obtaining abortions in the United States. *Contraception* 74(4):334–344.

Fisher, W. A., S. S. Singh, P. A. Shuper, M. Carey, F. Otchet, D. MacLean-Brine, D. Dal Bello, and J. Gunter. 2005. Characteristics of women undergoing repeat induced abortion. *Canadian Medical Journal* 172(5):637–641.

Fleisher, L. A., L. R. Pasternak, and A. Lyles. 2007. A novel index of elevated risk of inpatient hospital admission immediately following outpatient surgery. *Archives of Surgery* 142(3):263–268.

Foster, D. G., and K. Kimport. 2013. Who seeks abortions at or after 20 weeks? *Perspectives on Sexual and Reproductive Health* 45(4):210–218.

Foster, D. G., R. A. Jackson, K. Cosby, T. A. Weitz, P. D. Darney, and E. A. Drey. 2008. Predictors of delay in each step leading to an abortion. *Contraception* 77(4):289–293.

Fox, M. C., J. Oat-Judge, K. Severson, R. M. Jamshidi, R. H. Singh, R. McDonald-Mosley, and A. E. Burke. 2011. Immediate placement of intrauterine devices after first and second trimester pregnancy termination. *Contraception* 83(1):34–40.

French, V., R. Anthony, C. Souder, C. Geistkemper, E. Drey, and J. Steinauer. 2016. Influence of clinician referral on Nebraska women's decision-to-abortion time. *Contraception* 93(3):236–243.

2021 ED 000224

Copyright National Academy of Sciences. All rights reserved.

Frick, A. C., E. A. Drey, J. T. Diedrich, and J. E. Steinauer. 2010. Effect of prior cesarean delivery on risk of second-trimester surgical abortion complications. *Obstetrics & Gynecology* 115(4):760–764.

Fuentes, L., S. Lebenkoff, K. White, C. Gerdts, K. Hopkins, J. E. Potter, and D. Grossman. 2016. Women's experiences seeking abortion care shortly after the closure of clinics due to a restrictive law in Texas. *Contraception* 93(4):292–297.

Gassman, A. L., C. P. Nguyen, and H. V. Joffe. 2017. FDA regulation of prescription drugs. *New England Journal of Medicine* 376(7):674–682.

Gemzell-Danielsson, K., and S. Lalitkumar. 2008. Second trimester medical abortion with mifepristone-misoprostol and misoprostol alone: A review of methods and management. *Reproductive Health Matters* 16(31 Suppl.):162–172.

Gerdts, C., L. Fuentes, D. Grossman, K. White, B. Keefe-Oates, S. E. Baum, K. Hopkins, C. W. Stolp, and J. E. Potter. 2016. Impact of clinic closures on women obtaining abortion services after implementation of a restrictive law in Texas. *American Journal of Public Health* 106(5):857–864.

Gissler, M., E. Karalis, and V. M. Ulander. 2015. Decreased suicide rate after induced abortion, after the current care guidelines in Finland 1987–2012. *Scandinavian Journal of Public Health* 43(1):99–101.

Glander, S. S., M. L. Moore, R. Michielutte, and L. H. Parsons. 1998. The prevalence of domestic violence among women seeking abortion. *Obstetrics & Gynecology* 91(6):1002–1006.

Goh, S. E., and K. J. Thong. 2006. Induction of second trimester abortion (12–20 weeks) with mifepristone and misoprostol: A review of 386 consecutive cases. *Contraception* 73(5):516–519.

Gokhale, P., J. R. Lappen, J. H. Waters, and L. K. Perriera. 2016. Intravenous sedation without intubation and the risk of anesthesia complications for obese and non-obese women undergoing surgical abortion: A retrospective cohort study. *Anesthesia & Analgesia* 122(6):1957–1962.

Goldberg, A. B., G. Dean, M. S. Kang, S. Youssof, and P. D. Darney. 2004. Manual versus electric vacuum aspiration for early first-trimester abortion: A controlled study of complication rates. *Obstetrics & Gynecology* 103(1):101–107.

Goldstein, S. R., and M. F. Reeves. 2009. Chapter 6. Clinical assessment and ultrasound in early pregnancy. In *Management of unintended and abnormal pregnancy: Comprehensive abortion care*, edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Wiley-Blackwell. Pp. 157–177.

Goodman, S., S. K. Hendlish, M. F. Reeves, and A. Foster-Rosales. 2008. Impact of immediate postabortal insertion of intrauterine contraception on repeat abortion. *Contraception* 78:143–148.

Goodman, S., G. Flaxman, and the TEACH Trainers Collaborative Working Group. 2016. *Early Abortion Training Workbook*, 4th ed. San Francisco, CA: Bixby Center for Global Reproductive Health.

Gouk, E. V., K. Lincoln, A. Khair, J. Haslock, J. Knight, and D. J. Cruickshank. 1999. Medical termination of pregnancy at 63 to 83 days gestation. *British Journal of Obstetrics & Gynaecology* 106(6):535–539.

Goyal, V. 2009. Uterine rupture in second-trimester misoprostol-induced abortion after cesarean delivery: A systematic review. *Obstetrics & Gynecology* 113(5):1117–1123.

Goyal, V., C. Canfield, A. R. A. Aiken, A. Dermish, and J. E. Potter. 2017. Postabortion contraceptive use and continuation when long-acting reversible contraception is free. *Obstetrics & Gynecology* 129(4):655–662.

Graham, R. 2017. A new front in the war over reproductive rights: Abortion-pill reversal. *The New York Times,* July 18.

Copyright National Academy of Sciences. All rights reserved.

Grimes, D. A., K. F. Schulz, W. Cates, Jr., and C. W. Tyler, Jr. 1977. Mid-trimester abortion by dilation and evacuation: A safe and practical alternative. *New England Journal of Medicine* 296(20):1141–1145.

Grimes, D. A., S. M. Smith, and A. D. Witham. 2004. Mifepristone and misoprostol versus dilation and evacuation for midtrimester abortion: A pilot randomised controlled trial. *British Journal of Obstetrics & Gynaecology* 111(2):148–153.

Grimes, D. A., L. M. Lopez, K. F. Schulz, and N. L. Stanwood. 2010. Immediate post-abortal insertion of intrauterine devices. *Cochrane Database of Systematic Reviews* 16(6):CD001777.

Grossman, D., and K. Grindlay. 2017. Safety of medical abortion provided through tele-medicine compared with in person. *Obstetrics & Gynecology* 130(4):778–782.

Grossman, D., K. Blanchard, and P. Blumenthal. 2008. Complications after second trimester surgical and medical abortion. *Reproductive Health Matters* 16(31 Suppl.):173–182.

Grossman, D., K. Grindlay, T. Buchacker, K. Lane, and K. Blanchard. 2011a. Effectiveness and acceptability of medical abortion provided through telemedicine. *Obstetrics & Gynecology* 118(2 Pt. 1):296–303.

Grossman, D., D. Constant, N. Lince, M. Alblas, K. Blanchard, and J. Harries. 2011b. Surgical and medical second trimester abortion in South Africa: A cross-sectional study. *BMC Health Services Research* 11(224):1–9.

Grossman, D. A., K. Grindlay, T. Buchacker, J. E. Potter, and C. P. Schmertmann. 2013. Changes in service delivery patterns after introduction of telemedicine provision of medical abortion in Iowa. *American Journal of Public Health* 103(1):73–78.

Grossman, D., S. Baum, L. Fuentes, K. White, K. Hopkins, A. Stevenson, and J. E. Potter. 2014. Change in abortion services after implementation of a restrictive law in Texas. *Contraception* 90(5):496–501.

Grossman, D., K. White, L. Harris, M. Reeves, P. D. Blumenthal, B. Winikoff, and D. A. Grimes. 2015. Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: A systematic review. *Contraception* 92(3):206–211.

Grossman, D., K. White, K. Hopkins, and J. E. Potter. 2017. Change in distance to nearest facility and abortion in Texas, 2012 to 2014. *Journal of the American Medical Association* 317(4):437–438.

Guengant, J. P., J. Bangou, B. Elul, and C. Ellertson. 1999. Mifepristone-misoprostol medical abortion: Home administration of misoprostol in Guadeloupe. *Contraception* 60(3):167–172.

Guiahi, M., G. Schiller, J. Sheeder, and S. Teal. 2015. Safety of first-trimester uterine evacuation in the outpatient setting for women with common chronic conditions. *Contraception* 92(5):453–457.

Guttmacher Institute. 2017a. *Counseling and waiting periods for abortion*. https://www.guttmacher.org/print/state-policy/explore/counseling-and-waiting-periods-abortion (accessed November 1, 2017).

Guttmacher Institute. 2017b. *Medication abortion*. https://www.guttmacher.org/print/state-policy/explore/medication-abortion (accessed September 12, 2017).

Guyatt, G. H., A. D. Oxman, G. Vist, R. Kunz, J. Brozek, P. Alonso-Coello, V. Montori, E. A. Akl, B. Djulbegovic, Y. Falck-Ytter, S. L. Norris, J. W. Williams, Jr., D. Atkins, J. Meerpohl, and H. J. Schünemann. 2011. GRADE guidelines: 4. Rating the quality of evidence—study limitations (risk of bias). *Journal of Clinical Epidemiology* 64(4):407–415.

Hammond, C., and S. Chasen. 2009. Chapter 11. Dilation and evacuation. In *Management of unintended and abnormal pregnancy: Comprehensive abortion care*, edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Wiley-Blackwell. Pp. 157–177.

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 108 of 4
PageID.8286
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*    *87*

Hamoda, H., P. W. Ashok, G. M. Flett, and A. Templeton. 2003. Medical abortion at 64 to 91 days of gestation: A review of 483 consecutive cases. *American Journal of Obstetrics and Gynecology* 188(5):1315–1319.

Hawkey, C. J., and M. J. Langman. 2003. Non-steroidal anti-inflammatory drugs: Overall risks and management. Complementary roles for COX-2 inhibitors and proton pump inhibitors. *Gut* 52(4):600–608.

Hern, W. M. 2016. *Second-trimester surgical abortion.* https://www.glowm.com/section_view/heading/Second-Trimester%20Surgical%20Abortion/item/441 (accessed October 6, 2017).

HHS (U.S. Department of Health and Human Services). 2017a. Potential inclusion of the quality of informed consent documents for hospital-performed, elective procedures measure. *Federal Register* 82(155):38362–38363.

HHS. 2017b. *Telemedicine.* https://www.medicaid.gov/medicaid/benefits/telemed/index.html (accessed November 10, 2017).

Hirschhorn, L. R., Y. Trnka, A. Onderdonk, M. L. Lee, and R. Platt. 1994. Epidemiology of community-acquired clostridium difficile-associated diarrhea. *Journal of Infectious Disease* 169(1):127–133.

Hognert, H., H. K. Kallner, S. Cameron, C. Nyrelli, I. Jawad, R. Heller, A. Aronsson, I. Lindh, L. Benson, and K. Gemzell-Danielsson. 2016. Immediate versus delayed insertion of an etonogestrel releasing implant at medical abortion—a randomized controlled equivalence trial. *Human Reproduction* 31(11):2484–2490.

Horwitz, G., D. Roncari, K. P. Braaten, R. Maurer, J. Fortin, and A. B. Goldberg. 2018. Moderate intravenous sedation for first trimester surgical abortion: A comparison of adverse outcomes between obese and normal-weight women. *Contraception* 97(1):48–53.

Ibis Reproductive Health. 2015. *Clinical research standards.* http://laterabortion.org/clinical-research-standards (accessed October 6, 2017).

IOM (Institute of Medicine). 2001. *Crossing the quality chasm: A new health system for the 21st century.* Washington, DC: National Academy Press.

Ireland, L. D., M. Gatter, and A. Y. Chen. 2015. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. *Obstetrics & Gynecology* 126(1):22–28.

Jackson, E., and N. Kapp. 2011. Pain control in first-trimester and second-trimester medical termination of pregnancy: A systematic review. *Contraception* 83(2):116–126.

Jacot, F. R. M., C. Poulin, A. P. Bilodeau, M. Morin, S. Moreau, F. Gendron, and D. Mercier. 1993. A five-year experience with second-trimester induced abortions: No increase in complication rate as compared to the first trimester. *American Journal of Obstetrics and Gynecology* 168(2):633–637.

Janiak, E., I. Kawachi, A. Goldberg, and B. Gottlieb. 2014. Abortion barriers and perceptions of gestational age among women seeking abortion care in the latter half of the second trimester. *Contraception* 89(4):322–327.

Janssen, P. A., V. L. Holt, N. K. Sugg, I. Emanuel, C. M. Critchlow, and A. D. Henderson. 2003. Intimate partner violence and adverse pregnancy outcomes: A population-based study. *American Journal of Obstetrics and Gynecology* 188(5):1341–1347.

Jatlaoui, T. C., A. Ewing, M. G. Mandel, K. B. Simmons, D. B. Suchdev, D. J. Jamieson, and K. Pazol. 2016. Abortion surveillance—United States, 2013. *MMWR Surveillance Summaries* 65(12):1–44.

Jatlaoui, T., J. Shah, M. G. Mandel, K. W. Krashin, D. B. Suchdev, D. J. Jamieson, and K. Pazol. 2017. Abortion surveillance—United States, 2014. *Morbidity and Mortality Weekly Reports* 66(SS-24):1–48.

Jerman, J., R. K. Jones, and T. Onda. 2016. *Characteristics of U.S. abortion patients in 2014 and changes since 2008.* https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf (accessed October 17, 2016).

2021 ED 000227

Copyright National Academy of Sciences. All rights reserved.

*88    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

Joint Commission. 2016. Informed consent: More than getting a signature. *QuickSafety. An Advisory on Safety & Quality Issues* 21(1–3).

Joint Commission Resources. 2016. *Resource guide. Centers for Medicare & Medicaid Services (CMS)—Complying with CMS Conditions of Participation (CoP) §482.51: Surgical services.* http://4562.cmssurg.qualityandsafetynetwork.com/downloads/16_JCR6_4562. pdf (accessed September 25, 2017).

Jones, B. S. 2017. *Facility standards for abortions and other outpatient procedures.* Presentation to the Committee on Reproductive Health: Assessing the Safety and Quality of Abortion Care in the U.S. (Health and Medicine Division of the National Academies of Sciences, Engineering, and Medicine). Workshop on Facility Standards and the Safety of Outpatient Procedures, March 24, Washington, DC.

Jones, B. S., S. Daniel, and L. K. Cloud. 2018. State law approaches to facility regulation of abortion and other office interventions. *American Journal of Public Health.* doi: 10.2105/ AJPH.2017.304278.

Jones, R. K., and J. Jerman. 2014. Abortion incidence and service availability in the United States, 2011. *Perspectives on Sexual and Reproductive Health* 46(1):3–14.

Jones, R. K., and J. Jerman. 2017. Abortion incidence and service availability in the United States, 2014. *Perspectives on Sexual and Reproductive Health* 49(1):1–11.

Kaneshiro, B., A. Edelman, R. K. Sneeringer, and R. G. Ponce de Leon. 2011. Expanding medical abortion: Can medical abortion be effectively provided without the routine use of ultrasound? *Contraception* 83(3):194–201.

Kapp, N., L. Borgatta, P. Stubblefield, O. Vragovic, and N. Moreno. 2007. Mifepristone in second-trimester medical abortion: A randomized controlled trial. *Obstetrics & Gynecology* 110(6):1304–1310.

Keeling, J., L. Birch, and P. Green. 2004. Pregnancy counselling clinic: A questionnaire survey of intimate partner abuse. *Journal of Family Planning & Reproductive Health Care* 30(3):156–158.

Kelly, T., J. Suddes, D. Howel, J. Hewison, and S. Robson. 2010. Comparing medical versus surgical termination of pregnancy at 13–20 weeks of gestation: A randomised controlled trial. *British Journal of Obstetrics & Gynaecology* 117(12):1512–1520.

Kilander, H., S. Alehagen, L. Svedlund, K. Westlund, J. Thor, and J. Brynhildsen. 2016. Likelihood of repeat abortion in a Swedish cohort according to the choice of post-abortion contraception: A longitudinal study. *Acta Obstetricia et Gynecologica Scandinavica* 95(5):565–571.

Kiley, J. W., L. M. Yee, C. M. Niemi, J. M. Feinglass, and M. A. Simon. 2010. Delays in request for pregnancy termination: Comparison of patients in the first and second trimesters. *Contraception* 81(5):446–451.

Kinnersley, P., K. Phillips, K. Savage, M. J. Kelly, E. Farrell, B. Morgan, R. Whistance, V. Lewis, M. K. Mann, B. L. Stephens, and J. Blazeby. 2013. Interventions to promote informed consent for patients undergoing surgical and other invasive healthcare procedures. *Cochrane Database of Systematic Reviews* 7:20137CD009445.

Kulier, R., N. Kapp, A. M. Gulmezoglu, G. J. Hofmeyr, L. Cheng, and A. Campana. 2011. Medical methods for first trimester abortion. *Cochrane Database of Systematic Reviews* (11):CD002855.

Lederle, L., J. E. Steinauer, A. Montgomery, S. Aksel, E. A. Drey, and J. L. Kerns. 2015. Obesity as a risk factor for complications after second-trimester abortion by dilation and evacuation. *Obstetrics & Gynecology* 126(3):585–592.

Leung, T. W., W. C. Leung, P. L. Chang, and P. C. Ho. 2002. A comparison of the prevalence of domestic violence between patients seeking termination of pregnancy and other general gynecology patients. *International Journal of Gynaecology & Obstetrics* 77(1):47–54.

2021 ED 000228

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

Case 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 110 of 4
PageID.8288
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*        *89*

Livshits, A., R. Machtinger, L. B. David, M. Spira, A. Moshe-Zahav, and D. S. Seidman. 2009. Ibuprofen and paracetamol for pain relief during medical abortion: A double-blind randomized controlled study. *Fertility and Sterility* 91(5):1877–1880.

Lohr, A. P., J. L. Hayes, and K. Gemzell Danielsson. 2008. Surgical versus medical methods for second trimester induced abortion. *Cochrane Database of Systematic Reviews* (1):CD006714.

Løkeland, M., O. E. Iversen, A. Engeland, I. Okland, and L. Bjorge. 2014. Medical abortion with mifepristone and home administration of misoprostol up to 63 days' gestation. *Acta Obstetricia et Gynecologica Scandinavica* 93(7):647–653.

Low, N., M. Mueller, H. A. Van Vliet, and N. Kapp. 2012. Perioperative antibiotics to prevent infection after first-trimester abortion. *Cochrane Database of Systematic Reviews* (3):CD005217.

Lydon-Rochelle M., V. L. Holt, T. R. Easterling, and D. P. Martin. 2001. Risk of uterine rupture during labor among women with a prior cesarean delivery. *New England Journal of Medicine* 345(1):3–8.

MacDorman, M. F., E. Declercq, and M. E. Thoma. 2017. Trends in maternal mortality by sociodemographic characteristics and cause of death in 27 states and the District of Columbia. *Obstetrics & Gynecology* 129(5):811–818.

Madden, T., J. L. Mullersman, K. J. Omvig, G. M. Secura, and J. F. Peipert. 2013. Structured contraceptive counseling provided by the Contraceptive CHOICE Project. *Contraception* 88(2):243–249.

Mark, K. S., B. Bragg, T. Talaie, K. Chawla, L. Murphy, and M. Terplan. 2017. Risk of complication during surgical abortion in obese women. *American Journal of Obstetrics and Gynecology* S0002-9378(17):31211–31215.

Mauelshagen, A., L. C. Sadler, H. Roberts, M. Harilall, and C. M. Farquhar. 2009. Audit of short term outcomes of surgical and medical second trimester termination of pregnancy. *Reproductive Health* 6(16):1–6.

McFarland, L. V. 1998. Epidemiology, risk factors and treatments for antibiotic-associated diarrhea. *Digestive Diseases* 16(5):292–307.

McNicholas, C., T. Madden, G. Secura, and J. F. Peipert. 2014. The Contraceptive CHOICE Project round up: What we did and what we learned. *Clinical Obstetrics and Gynecology* 57(4):635–643.

Meckstroth, K., and M. Paul. 2009. Chapter 5. First trimester aspiration abortion. In *Management of unintended and abnormal pregnancy: Comprehensive abortion care*, edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Wiley-Blackwell. Pp. 135–156.

Moore, A. M., L. Frohwirth, and N. Blades. 2011. What women want from abortion counseling in the United States: A qualitative study of abortion patients in 2008. *Social Work in Health Care* 50(6):424–442.

Murphy, L. A., L. T. Thornburg, J. C. Glantz, E. C. Wasserman, N. L. Stanwood, and S. J. Betstadt. 2012. Complications of surgical termination of second-trimester pregnancy in obese versus nonobese women. *Contraception* 86(4):402–406.

NAF (National Abortion Federation). 2017a. *2017 Clinical policy guidelines for abortion care*. Washington, DC: NAF.

NAF. 2017b. *History*. https://prochoice.org/about-naf/history (accessed August 23, 2017).

Ngo, T. D., M. H. Park, H. Shakur, and C. Free. 2011. Comparative effectiveness, safety and acceptability of medical abortion at home and in a clinic: A systematic review. *Bulletin of the World Health Organisation* 89(5):360–370.

Ngoc, N. T., V. Q. Nhan, J. Blum, T. T. Mai, J. M. Durocher, and B. Winikoff. 2004. Is home-based administration of prostaglandin safe and feasible for medical abortion? Results from a multisite study in Vietnam. *BJOG: An International Journal of Obstetrics & Gynaecology* 111(8):814–819.

Copyright National Academy of Sciences. All rights reserved.

Ngoc, N. T., T. Shochet, S. Raghavan, J. Blum, N. T. Nga, N. T. Minh, V. Q. Phan, and B. Winikoff. 2011. Mifepristone and misoprostol compared with misoprostol alone for second-trimester abortion: A randomized controlled trial. *Obstetrics & Gynecology* 118(3):601–608.

Nichols, M., B. Halvofrson-Boyd, R. C. Goldstein, C. M. Gevirtz, and D. Healow. 2009. Chapter 8. Pain Management. In *Management of unintended and abnormal pregnancy: Comprehensive abortion care*, edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Wiley-Blackwell. Pp. 90–110.

O'Connell, K., H. E. Jones, E. S. Lichtenberg, and M. Paul. 2008. Second-trimester surgical abortion practices: A survey of National Abortion Federation members. *Contraception* 78(6):492–499.

O'Connell, K., H. E. Jones, M. Simon, V. Saporta, M. Paul, and E. S. Lichtenberg. 2009. First-trimester surgical abortion practices: A survey of National Abortion Federation members. *Contraception* 79(5):385–392.

Ohannessian, A., K. Baumstarck, J. Maruani, E. Cohen-Solal, P. Auquier, and A. Agostini. 2016. Mifepristone and misoprostol for cervical ripening in surgical abortion between 12 and 14 weeks of gestation: A randomized controlled trial. *European Journal of Obstetrics & Gynecology and Reproductive Biology* 201:151–155.

Okusanya, B. O., O. Oduwole, and E. E. Effa. 2014. Immediate postabortal insertion of intrauterine devices. *Cochrane Database of Systematic Reviews* 28(7):CD0017777.

Patil, E., B. Darney, K. Orme-Evans, E. H. Beckley, L. Bergander, M. Nichols, P. H. Bednarek. 2016. Aspiration abortion with immediate intrauterine device insertion: Comparing outcomes of advanced practice clinicians and physicians. *Journal of Midwifery and Women's Health* 31(3):325–330.

Pazol, K., S. B. Gamble, W. Y. Parker, D. A. Cook, S. B. Zane, and S. Hamdan. 2009. Abortion surveillance—United States, 2006. *MMWR Surveillance Summaries* 58(8):1–35.

Peterson, W. F., F. N. Berry, M. R. Grace, and C. L. Gulbranson. 1983. Second-trimester abortion by dilatation and evacuation: An analysis of 11,747 cases. *Obstetrics & Gynecology* 62(2):185–190.

Platais, I., T. Tsereteli, G. Grebennikova, T. Lotarevich, and B. Winikoff. 2016. Prospective study of home use of mifepristone and misoprostol for medical abortion up to 10 weeks of pregnancy in Kazakhstan. *BJOG: An International Journal of Obstetrics & Gynaecology* 134(3):268–271.

Raymond, E. G., and D. A. Grimes. 2012. The comparative safety of legal induced abortion and childbirth in the United States. *Obstetrics and Gynecology* 119(2 Pt. 1):215–219.

Raymond, E. G., C. Shannon, M. A. Weaver, and B. Winikoff. 2013. First-trimester medical abortion with mifepristone 200 mg and misoprostol: A systematic review. *Contraception* 87(1):26–37.

Raymond, E. G., D. Grossman, M. A. Weaver, S. Toti, and B. Winikoff. 2014. Mortality of induced abortion, other outpatient surgical procedures and common activities in the United States. *Contraception* 90(5):476–479.

Raymond, E. G., D. Grossman, E. Wiebe, and B. Winikoff. 2015. Reaching women where they are: Eliminating the initial in-person medical abortion visit. *Contraception* 92(3):190–193.

Raymond, E. G., M. Weaver, K. S. Louie, Y. Tan, M. Bousiéguez, A. G. Aranguré-Peraza, E. M. Lugo-Hernández, P. Sanhueza, A. B. Goldberg, K. R. Culwell, C. Kaplan, L. Memmel, S. Sonalkar, R. Jamshidi, and B. Winikoff. 2016. Effect of depot medroxyprogesterone acetate injection timing on medical abortion efficacy and repeat pregnancy: A randomized controlled trial. *Obstetrics & Gynecology* 128(4):739–745.

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 112 of 4
PageID.8290
*THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS*    91

RCOG (Royal College of Obstetricians and Gynaecologists). 2011. *The care of women re-questing induced abortion* (Evidence-based clinical guideline number 7). https://www.rcog.org.uk/globalassets/documents/guidelines/abortion-guideline_web_1.pdf (accessed July 27, 2017).

RCOG. 2015. *Best practice in comprehensive abortion care* (Best practice paper no. 2). London, UK: RCOG.

RCOG. 2016. *Best practice in comprehensive postabortion care* (Best practice paper no. 3). London, UK: RCOG.

RCOG. 2017. *What we do*. https://www.rcog.org.uk/en/about-us/what-we-do (accessed August 23, 2017).

Renner, R. M., M. D. Nichols, J. T. Jensen, H. Li, and A. B. Edelman. 2012. Paracervical block for pain control in first-trimester surgical abortion: A randomized controlled trial. *Obstetrics and Gynecology* 119(5):1030–1037.

Renner, R. M., A. B. Edelman, M. D. Nichols, J. T. Jensen, J. Y. Lim, and P. H. Bednarek. 2016. Refining paracervical block techniques for pain control in first trimester surgical abortion: A randomized controlled noninferiority trial. *Contraception* 94(5):261–466.

Reumkens, A., E. J. Rondagh, C. M. Bakker, B. Winkens, A. A. Masclee, and S. Sanduleanu. 2016. Post-colonoscopy complications: A systematic review, time trends, and meta-analysis of population-based studies. *American Journal of Gastroenterology* 111(8):1092–1101.

RHN (Reproductive Health in Nursing). 2017. *Providing abortion care: A professional toolkit for nurse-midwives, nurse practitioners, and physician assistants*. https://rhnursing.org/resource/abortion-provider-toolkit-nurses (accessed October 20, 2017).

Roberts, S. C. 2017. *Research on facility-related factors and patient outcomes for non-hospital-based outpatient procedures*. Presentation to the Committee on Reproductive Health: Assessing the Safety and Quality of Abortion Care in the U.S. (Health and Medicine Division of the National Academies of Sciences, Engineering, and Medicine). Workshop on Facility Standards and the Safety of Outpatient Procedures, March 24, Washington, DC.

Roberts, S. C., H. Gould, K. Kimport, T. A. Weitz, and D. G. Foster. 2014. Out-of-pocket costs and insurance coverage for abortion in the United States. *Women's Health Issues* 24(2):e211–e218.

Roberts, S. C., D. K. Turok, E. Belusa, S. Combellick, and U. D. Upadhyay. 2016. Utah's 72-hour waiting period for abortion: Experiences among a clinic-based sample of women. *Perspectives on Sexual and Reproductive Health* 48(4):179–187.

Roblin, P. 2014. Vacuum aspiration. In *Abortion care,* edited by S. Rowlands. Cambridge, UK: Cambridge University Press. Pp. 71–79.

Rose, S. B., and B. A. Lawton. 2012. Impact of long-acting reversible contraception on return for repeat abortion. *American Journal of Obstetrics and Gynecology* 206(37):e1–e6.

Rosenstock, J. R., J. F. Peipert, T. Madden, Q. Zhao, and G. M. Secura. 2012. Continuation of reversible contraception in teenagers and young women. *Obstetrics & Gynecology* 120(6):1298–1305.

Russo, N. F., and J. E. Denious. 2001. Violence in the lives of women having abortions: Implications for practice and public policy. *Professional Psychology: Research and Practice* 32(2):142–150.

Sääv, I., O. Stephansson, and K. Gemzell-Danielsson. 2012. Early versus delayed insertion of intrauterine contraception after medical abortion—A randomized controlled trial. *PLoS One* 7(11):e48948.

Saftlas, A. F., A. B. Wallis, T. Shochet, K. K. Harland, P. Dickey, and C. Peek-Asa. 2010. Prevalence of intimate partner violence among an abortion clinic population. *American Journal of Public Health* 100(8):1412–1415.

Sanders, J. N., H. Conway, J. Jacobson, L. Torres, and D. K. Turok. 2016. The longest wait: Examining the impact of Utah's 72-hour waiting period for abortion. *Women's Health Issues* 26(5):483–487.

2021 ED 000231

Copyright National Academy of Sciences. All rights reserved.

*92    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

Secura, G. M., J. E. Allsworth, T. Madden, J. L. Mullersman, and J. F. Peipert. 2010. The Contraceptive CHOICE Project: Reducing barriers to long-acting reversible contraception. *American Journal of Obstetrics and Gynecology* 203(2):115.e1–115e.7.

SFP (Society for Family Planning). 2011a. Clinical guidelines. Labor induction abortion in the second trimester. *Contraception* 84(1):4–18.

SFP. 2011b. Prevention of infection after induced abortion. *Contraception* 83(4):295–309.

SFP. 2012. First-trimester abortion in women with medical conditions. *Contraception* 86(6):622–630.

SFP. 2013. Surgical abortion prior to 7 weeks of gestation. *Contraception* 88(1):7–17.

SFP. 2017. *Introducing SFP.* https://www.societyfp.org/About-SFP.aspx (accessed August 23, 2017).

Shannon, C. S., B. Winikoff, R. Hausknecht, E. Schaff, P. D. Blumenthal, D. Oyer, H. Sankey, J. Wolff, and R. Goldberg. 2005. Multicenter trial of a simplified mifepristone medical abortion regimen. *Obstetrics & Gynecology* 105(2):345–351.

Shrestha, A., and L. Sedhai. 2014. A randomized trial of hospital vs. home self administration of vaginal misoprostol for medical abortion. *Kathmandu University Medical Journal* 12(47):185–189.

Smalley, W. E., W. A. Ray, J. R. Daugherty, and M. R. Griffin. 1995. Nonsteroidal anti-inflammatory drugs and the incidence of hospitalizations for peptic ulcer disease in elderly persons. *American Journal of Epidemiology* 141(6):539–545.

Smith, R. L., N. Siddiqui, T. Henderson, J. Teresi, K. Downey, and J. C. Carvalho. 2016. Analgesia for medically induced second trimester termination of pregnancy: A randomized trial. *Journal of Obstetrics and Gynaecology Canada* 38(2):147–153.

Sonalkar, S., S. N. Ogden, L. K. Tran, and A. Y. Chen. 2017. Comparison of complications associated with induction by misoprostol versus dilation and evacuation for second-trimester abortion. *International Journal of Gynaecology & Obstetrics* 138(3):272–275.

Steinberg, J. R., and N. F. Russo. 2008. Abortion and anxiety: What's the relationship? *Social Science & Medicine* 67(2):238–252.

Strafford, M. A., J. Mottl-Santiago, A. Savla, N. Soodoo, and L. Borgatta. 2009. Relationship of obesity to outcome of medical abortion. *American Journal of Obstetrics and Gynecology* 200(5):e34–e36.

Swica, Y., E. Chong, T. Middleton, L. Prine, M. Gold, C. A. Schreiber, and B. Winikoff. 2013. Acceptability of home use of mifepristone for medical abortion. *Contraception* 88(1):122–127.

Taft, A. J., and Watson, L. F. 2007. Termination of pregnancy: Associations with partner violence and other factors in a national cohort of young Australian women. *Australian and New Zealand Journal of Public Health* 31(2):135–142.

Taft, A. J., L. F. Watson, and C. Lee. 2004. Violence against young Australian women and association with reproductive events: A cross-sectional analysis of a national population sample. *Australian and New Zealand Journal of Public Health* 28(4):324–329.

Tschann, M., J. Salcedo, and B. Kaneshiro. 2016. Nonpharmaceutical pain control adjuncts during first-trimester aspiration abortion: A review. *Journal of Midwifery & Women's Health* 61(3):331–338.

Upadhyay, U. D., T. A. Weitz, R. K. Jones, R. E. Barar, and D. G. Foster. 2014. Denial of abortion because of provider gestational age limits in the United States. *American Journal of Public Health* 104(9):1687–1694.

Upadhyay, U. D., S. Desai, V. Zlidar, T. A. Weitz, D. Grossman, P. Anderson, and D. Taylor. 2015. Incidence of emergency department visits and complications after abortion. *Obstetrics & Gynecology* 125(1):175–183.

Viviand, X., G. Fabre, D. Ortega, L. Boubli, and C. Martin. 2003. Target-controlled sedation analgesia using propofol and remifentanil in woman undergoing late termination of pregnancy. *International Journal of Obstetric Anesthesia* 12(2):83–88.

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 114 of 4
PageID.8292
THE SAFETY AND QUALITY OF CURRENT ABORTION METHODS          93

Whaley, N. S., and A. E. Burke. 2015. Update on medical abortion: Simplifying the process for women. *Current Opinion in Obstetrics and Gynecology* 27(6):476–481.

White, K., E. Carroll, and D. Grossman. 2015. Complications from first-trimester aspiration abortion: A systematic review of the literature. *Contraception* 92(5):422–438.

White, K., J. Turan, and D. Grossman. 2017. Travel for abortion services in Alabama and delays in obtaining care. *Women's Health Issues* 27(5):523–529.

WHO (World Health Organization). 2012. *Safe abortion: Technical and policy guidance for health systems*, 2nd ed. http://apps.who.int/iris/bitstream/10665/70914/1/9789241548434_eng.pdf (accessed September 12, 2017).

WHO. 2014. *Clinical practice handbook for safe abortion*. http://apps.who.int/iris/bitstream/10665/97415/1/9789241548717_eng.pdf?ua=1&ua=1 (accessed November 15, 2016).

WHO. 2015. *19th WHO model list of essential medicines (April 2015)*. http://www.who.int/medicines/publications/essentialmedicines/EML2015_8-May-15.pdf (accessed March 10, 2017).

WHO. 2017. *About WHO*. http://www.who.int/about/what-we-do/en (accessed August 23, 2017).

Wiebe, E., and R. M. Renner. 2014. Chapter 11. Pain control. In *Abortion care*, edited by S. Rowlands. Cambridge, UK: Cambridge University Press. Pp. 98–105.

Wildschut, H., M. I. Both, S. Medema, E. Thomee, M. F. Wildhagen, and N. Kapp. 2011. Medical methods for mid-trimester termination of pregnancy. *Cochrane Database of Systematic Reviews* (1):CD005216.

Winner, B., J. F. Peipert, Q. Zhao, C. Buckel, T. Madden, J. E. Allsworth, and G. M. Secura. 2012. Effectiveness of long-acting reversible contraception. *New England Journal of Medicine* 366(21):1998–2007.

Woodcock, J. 2016. *Letter from the director of the FDA Center for Drug Evaluation and Research to Donna Harrison, Gene Rudd, and Penny Young Nance. Re: Docket No. FDA-2002-P-0364*. Silver Spring, MD: Food and Drug Administration.

Zane, S., A. A. Creanga, C. J. Berg, K. Pazol, D. B. Suchdev, D. J. Jamieson, and W. M. Callaghan. 2015. Abortion-related mortality in the United States: 1998–2010. *Obstetrics and Gynecology* 126(2):258–265.

Zurek, M., J. O'Donnell, R. Hart, and D. Rogow. 2015. Referral-making in the current landscape of abortion access. *Contraception* 91(1):1–5.

2021 ED 000233

Copyright National Academy of Sciences. All rights reserved.

2021 ED 000234

Copyright National Academy of Sciences. All rights reserved.

3

# Essential Clinical Competencies
for Abortion Providers

Chapters 1 and 2 describe the elements of the continuum of abortion care services, including current abortion methods, relevant side effects and risks for complications, the appropriate clinical settings for the various abortion methods, state regulations affecting the quality of abortion care, and best practices for delivering high-quality, safe abortion care.

As part of its charge (see Box 1-1 in Chapter 1), the committee was tasked with reviewing the evidence on the clinical skills necessary for health care providers to safely perform the various components of abortion care, including pregnancy determination, counseling, gestation assessment, medication dispensing, procedure performance, patient monitoring, and follow-up assessment and care. Provider skills and training—significant factors that influence the safety and quality of abortion care—are the subject of this chapter.

Thus, this chapter identifies the clinical competencies for providing abortion care safely and with the highest degree of quality, the types of providers with the clinical competence to perform abortions, current abortion training of physicians and advanced practice clinicians (APCs), and the availability of appropriately trained clinicians. The chapter also describes the types of clinicians who provide abortion care in the United States; the available literature on the safety and quality of the care they provide; and current opportunities for education and training, including factors that affect the integration of abortion care in clinician education and training. A diverse range of providers can and do provide abortion care, although large-scale studies are generally limited to obstetrician/gynecologists (OB/GYNs), family medicine physicians,

*95*

2021 ED 000235

Copyright National Academy of Sciences. All rights reserved.

and APCs. This chapter focuses on these provider types because of the available data, but the committee recognizes that clinicians in other physician and health care specialties provide abortions and can be trained to provide safe and high-quality abortion care. This chapter also reviews abortion-specific state laws and policies that regulate the level of training and credentialing clinicians must have to be allowed to provide abortion services in different states. Finally, whereas this chapter focuses on provider skills and training, it is assumed the continuum of abortion care is being provided in a safe, well-organized setting/system of care and in an evidence-based manner, as described in Chapter 2.

## REQUIRED CLINICAL COMPETENCIES

To determine the evidence-based, clinical competencies essential to providing high-quality abortion services, the committee reviewed clinical guidelines and training materials published by organizations that provide clinical guidance and continuing education to health professional students and clinicians. These sources include recommendations and standards issued by the American College of Obstetricians and Gynecologists (ACOG), Society of Family Planning (SFP), National Abortion Federation (NAF), Royal College of Obstetricians and Gynaecologists (RCOG), World Health Organization (WHO), University of California, San Francisco (UCSF) Bixby Center for Global Reproductive Health, Kenneth J. Ryan Residency Training Program, Fellowship in Family Planning, Reproductive Health Education in Family Medicine (RHEDI), Reproductive Health Access Project, and others.

For any clinical skill set, competency levels build on basic knowledge, didactic curriculum, clinical training, and continuing education. Key to the safety and quality of abortion services is having appropriate linkages in the continuum of care from preabortion services to postabortion services.

Some components of abortion care are consistent regardless of the particular abortion method; therefore, a number of essential competencies are required for any type of abortion procedure. These competencies have been outlined by several organizations, including the UCSF Bixby Center for Global Reproductive Health, NAF, the Fellowship in Family Planning, and the Ryan Residency Training Program, and include

- patient preparation (education, counseling, and informed consent);
- preprocedure assessment to confirm intrauterine pregnancy and assess gestation;
- pain management during and after the procedure;
- complication assessment and management; and
- provision of postabortion contraception and contraceptive counseling.

2021 ED 000236

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 118 of 4
PageID.8296
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*      *97*

Additionally, the different abortion methods outlined in Chapter 2 (medication, aspiration, dilation and evacuation [D&E], and induction) require procedure-specific competencies. Increased gestation corresponds with increased procedural complexity; therefore, procedures performed later in pregnancy require more complex clinician competencies. See Table 3-1 for a list of all competencies by procedure type.

#### Patient Preparation

As noted in Chapter 2, patient preparation involves providing information to the patient about the available abortion methods (including pain

**TABLE 3-1** Required Competencies by Type of Abortion Procedure

| Competencies | Medication Abortion | Aspiration Abortion | Dilation and Evacuation (D&E) | Induction Abortion |
|---|---|---|---|---|
| Patient preparation (education, counseling, and informed consent) | √ | √ | √ | √ |
| Preprocedure evaluation | √ | √ | √ | √ |
| Complication assessment and management | √ | √ | √ | √ |
| Cervical preparation | | √ | √ | √ |
| Administration of abortion medications | √ | | | √ |
| Use of a manual or power vacuum extractor | | √ | √ | |
| Forceps extraction | | | √ | |
| Identification of products of conception | | √ | √ | |
| Contraception provision | √ | √ | √ | √ |
| Pain management (techniques of analgesia and anesthesia) | √ | √ | √ | √ |

SOURCES: ACOG, 2015; ACOG and SFP, 2014; Allen and Goldberg, 2016; Baird et al., 2007; Baker and Beresford, 2009; Creinin and Danielsson, 2009; Davis and Easterling, 2009; Goldstein and Reeves, 2009; Goodman et al., 2016; Hammond and Chasen, 2009; Kapp and von Hertzen, 2009; Meckstroth and Paul, 2009; NAF, 2017; Newmann et al., 2008, 2010; RCOG, 2015; SFP, 2014.

2021 ED 000237

Copyright National Academy of Sciences. All rights reserved.

management options), the advantages and disadvantages of each method, potential side effects and risks for complications, and contraceptive options (ACOG and SFP, 2014; Goodman et al., 2016; NAF, 2017; Nichols et al., 2009; RCOG, 2015). For patients opting for sedation, a presedation evaluation is recommended (NAF, 2017). The patient's voluntary and informed consent for the procedure must also be obtained (Baker and Beresford, 2009; Goodman et al., 2016; NAF, 2017). During this process, the provider should provide accurate and understandable information and engage in shared decision making with the patient. Shared decision making is a process in which clinicians and patients work together to make decisions and select tests, treatments, and care plans based on clinical evidence that balances risks and expected outcomes with patient preferences and values (Health IT, 2013).

### Preprocedure Assessment

A combination of diagnostic tests and physical examination can be used to confirm intrauterine pregnancy; assess gestation; screen for sexually transmitted infections (STIs) and cervical infections; document Rh status; and evaluate uterine size, position, anomalies, and pain (Goldstein and Reeves, 2009; Goodman et al., 2016; NAF, 2017; RCOG, 2015). Screening for anemia and evaluation for risk of bleeding are typically part of this preprocedure assessment and are often done by hemoglobin or hematocrit testing (NAF, 2017). Appropriate assessment also involves a medical history to determine relevant chronic or acute medical conditions, clinical risks, potential medication contraindications, and necessary modifications to care. Evaluation is necessary for developing a patient-centered clinical plan, determining the appropriate method and setting of abortion care, and knowing when to refer patients in need of more sophisticated clinical settings (Davis and Easterling, 2009; Goodman et al., 2016; RCOG, 2015).

### Pain Management and Patient Support

Pain management varies based on patient preference, method of abortion, gestation, facility type, and availability of patient support from staff or others. Analgesia, anesthesia, and nonpharmacological pain management methods and risks are described in Chapter 2.

A member of the care team should discuss these options and risks with the patient during the patient preparation process, and if the patient opts for sedation, a presedation evaluation should be performed (Goodman et al., 2016; NAF, 2017; Nichols et al., 2009). A presedation evaluation includes relevant history and review of systems; medication

2021 ED 000238

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 120 of 4
PageID.8298
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*   99

review; targeted exam of the heart, lung, and airway; baseline vital signs; and last food intake (NAF, 2017). Providers must be able to administer paracervical blocks and nonsteroidal anti-inflammatory drugs to patients (NAF, 2017). If the patient opts for sedation or anesthesia, a supervising practitioner, appropriately trained to administer anesthesia and appropriately certified according to applicable local and state requirements, must be available (Goodman et al., 2016; NAF, 2017). To administer moderate sedation, NAF requires that a provider have appropriate licensure, basic airway skills, the ability to monitor and effectively rescue patients in an emergency, and the ability to screen patients appropriately (NAF, 2017). As noted above, providers must have the necessary resources and protocols for managing procedural and anesthesia complications and emergencies.

Procedure-related pain is a complex phenomenon influenced by multiple factors, including past history, anxiety, and individual tolerance. Relevant information about anticipated discomfort and options for pain management should be covered by the clinician during the informed consent process (Goodman et al., 2016; Nichols et al., 2009). The clinician should have a thorough understanding of potential side effects and complications from medications used to control pain.

### Complication Assessment and Management

Assessment and management of abortion complications and medical emergencies are a key component of quality abortion care. Chapter 2 describes the types of complications that may require clinical follow-up. Although adverse events are rare, providers must have the ability to recognize conditions and risk factors associated with complications (e.g., accumulation of blood, retained tissue, excessive bleeding, and placental abnormalities) and have the resources or protocols necessary to manage these rare events. NAF and the UCSF Bixby Center recommend that providers have established protocols for medical emergencies, including bleeding and hemorrhage, perforation, respiratory arrest/depression, and anaphylaxis, and for emergency transfer (Goodman et al., 2016; NAF, 2017).

### Contraception Provision and Counseling

Providing evidence-based information on how to prevent a future unintended pregnancy—including the option to obtain contraception contemporaneously with the procedure—is a standard component of abortion care (Goodman et al., 2016; NAF, 2017; RCOG, 2015; WHO, 2014). Contraceptive counseling should be patient-centered and guided by the patient's preferences (Goodman et al., 2016; RCOG, 2015). After the

2021 ED 000239

Copyright National Academy of Sciences. All rights reserved.

abortion, patients should receive the contraceptive method of their choice or be referred elsewhere if the preferred method is unavailable (NAF, 2017; RCOG, 2015; WHO, 2012). The Centers for Disease Control and Prevention and the U.S. Office of Population Affairs recommend the following for providers offering contraceptive services, including contraceptive counseling and education (Gavin et al., 2014):

- Establish and maintain rapport with the client.
- Obtain clinical and social information from the client (medical history, pregnancy intention, and contraceptive experiences and preferences).
- Work with the client interactively to select the most effective and appropriate contraceptive method (providers should ensure that patients understand the various methods' effectiveness, correct use, noncontraceptive benefits, side effects, and potential barriers to their use).
- Conduct a physical assessment related to contraceptive use, when warranted.
- Provide the selected contraceptive method along with instructions for its correct and consistent use, help the client develop a plan for using the selected method and for follow-up, and confirm the client's understanding of this information.

### Competencies Required for Abortion Methods

*Medication Abortion*

Medication abortion is a method commonly used to terminate a pregnancy up to 70 days' (or 10 weeks') gestation with a combination of medications—mifepristone followed by misoprostol. The skill set required for early medication abortion has been outlined by several organizations and is similar to the management of spontaneous loss of a pregnancy with medications (Goodman et al., 2016). The skills include the essential competencies outlined in the section above, plus the knowledge of medication abortion protocols, associated health effects, and contraindications. Prescribing medication abortion is no different from prescribing other medications—providers must be able to recognize who is clinically eligible; counsel the patient regarding medication risks, benefits, and side effects; and instruct the patient on how to take the medication correctly and when to seek follow-up or emergency care.

Chapter 2 describes the U.S. Food and Drug Administration's (FDA's) Risk Evaluation and Mitigation Strategy (REMS) for Mifeprex, the brand name for mifepristone, the first drug administered during a medication

2021 ED 000240

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 122 of 4
PageID.8300
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*      *101*

abortion. Distribution of Mifeprex is restricted to REMS-certified health care providers, but any physician specialty or APC can become certified. In March 2016, the FDA issued revisions to the label and REMS for Mifeprex, changing the language from "physician" to "health care provider" and thereby expanding opportunities for APCs with relevant clinical competencies to obtain and distribute the drug (Simmonds et al., 2017; Woodcock, 2016). A component of the REMS process requires prescribers of Mifeprex to meet the following qualifications (FDA, 2016; Woodcock, 2016):

- ability to assess the duration of pregnancy accurately;
- ability to diagnose ectopic pregnancies; and
- ability to provide surgical intervention in cases of incomplete abortion or severe bleeding or have made plans to provide such care through others, and ability to ensure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

### *Aspiration Abortion*

Aspiration abortion is a minimally invasive procedure that uses suction to empty the uterus. Aspiration abortion is an alternative to medication abortion up to 70 days' (or 10 weeks') gestation and the primary method of abortion through 13 weeks' gestation (Jatlaoui et al., 2016). The procedure and required skills are the same as those for the management of spontaneous loss of a pregnancy with uterine aspiration (Goodman et al., 2016; Nanda et al., 2012). The essential competencies for all abortion procedures form the basis of the skill set required for aspiration abortion. Additional competencies have been defined by the UCSF Bixby Center and NAF (Goodman et al., 2016; NAF, 2017). They include cervical preparation, experience with manual or electric vacuum aspiration, and evaluation of the products of conception for appropriate gestational tissue.

### *Dilation and Evacuation (D&E)*

D&E is usually performed starting at 14 weeks' gestation, and most abortions after 14 weeks' gestation are performed by D&E (ACOG, 2015; Hammond and Chasen, 2009; Jatlaoui et al., 2016; O'Connell et al., 2008; Stubblefield et al., 2004). The procedure and required skills are similar to those for the surgical management of miscarriage after 14 weeks' gestation (Nanda et al., 2012). D&E requires clinicians with advanced training and/or experience, a more complex set of surgical skills relative to those required for aspiration abortion, and an adequate caseload to maintain these surgical skills (Gemzell-Danielsson and Lalitkumar, 2008;

2021 ED 000241

Copyright National Academy of Sciences. All rights reserved.

Grossman et al., 2008; Hammond and Chasen, 2009; Hern, 2016; Kapp and von Hertzen, 2009; Lohr et al., 2008; RCOG, 2015). The additional skills required for D&E include surgical expertise in D&E provision and training in the use of specialized forceps. Cervical preparation, achieved by osmotic dilators or prostaglandin analogues (misoprostol), is standard practice for D&E after 14 weeks' gestation (Newmann et al., 2008, 2010; SFP, 2014).

*Induction Abortion*

Induction abortion is the termination of pregnancy using medications to induce delivery of the fetus. Induction abortion requires a clinician skilled in cervical preparation and delivery (ACOG, 2015; Baird et al., 2007; Hammond and Chasen, 2009; Kapp and von Hertzen, 2009). As with any woman in labor, providing supportive care for women undergoing induction abortion is of utmost importance. Physical as well as emotional support should be offered (Baird et al., 2007). Women should be encouraged to have a support person with them if possible.

## WHICH PROVIDERS HAVE THE CLINICAL SKILLS TO PERFORM ABORTIONS?

While OB/GYNs provide the greatest percentage of abortions (O'Connell et al., 2008, 2009), other types of clinicians (both generalist physicians and APCs) also perform abortions. The committee identified systematic reviews, randomized controlled trials, and a variety of cohort studies assessing the outcomes of abortions provided by family medicine physicians or comparing the outcomes of abortions performed by physicians and nurse practitioners (NPs), certified nurse-midwives (CNMs), and/or physician assistants (PAs) (Bennett et al., 2009; Goldman et al., 2004; Kopp Kallner et al., 2015; Ngo et al., 2013; Paul et al., 2007; Prine et al., 2010; Renner et al., 2013; Weitz et al., 2013). Many of the comparative studies were based in parts of the world where provider shortages are particularly acute, often in developing countries. All the available systematic reviews include this international research and also judge much of the research to be of poor quality (Barnard et al., 2015; Ngo et al., 2013; Renner et al., 2013; Sjöström et al., 2017). The literature is less robust regarding other generalist physicians, yet the same judgment and clinical dexterity necessary to perform first-trimester abortion are possessed by many specialties.

This section reviews the primary research on which providers have the clinical skills to provide abortions that is most relevant to the delivery of abortion care in the United States. It is noteworthy that numerous professional and health care organizations, including ACOG, NAF, the American

2021 ED 000242

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 124 of 4
PageID.8302
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*   *103*

Public Health Association, WHO, and others,[1] endorse APCs providing abortion care (ACOG, 2014a,b; APHA, 2011; Goodman et al., 2016; NAF, 2017; WHO, 2014, 2015).

## Medication and Aspiration Abortion

### *Advanced Practice Clinicians*

The committee identified three primary research studies that assessed APCs' skills in providing either medication or aspiration abortions.

The Health Workforce Pilot Project (HWPP) was a 6-year multisite prospective clinical competency-based training program and study sponsored by the Advancing New Standards in Reproductive Health (ANSIRH) program at the UCSF Bixby Center. The project was designed to train APCs to competence in the provision of aspiration abortion and to evaluate the safety, effectiveness, and acceptability of APCs providing abortion care, in an effort to expand the number of trained providers in California (ANSIRH, 2014; Levi et al., 2012; Weitz et al., 2013). The project received a waiver from the California Office of Statewide Health Planning and Development (OSHPD) to proceed with the study because of an existing statute that limited the provision of aspiration abortion to physicians (Weitz et al., 2013). The project used the Training in Early Abortion for Comprehensive Healthcare model, which combines didactic learning, clinical skill development, and a variety of evaluation methods to ensure clinical competency (Levi et al., 2012).

Weitz and colleagues (2013) evaluated the patient outcomes of aspiration abortions provided between August 2007 and August 2011 by physicians and APCs from five partner organizations, trained to competence through HWPP. The analysis included 11,487 aspiration abortions performed by 40 APCs (n = 5,675) and 96 OB/GYN or family medicine physicians (n = 5,812). The complication rate was 1.8 percent for APCs and 0.9 percent for physicians, with no clinically relevant margin of difference (95% confidence interval [CI] = 1.11, 1.53) (Weitz et al., 2013). The authors concluded that APCs can be trained to competence in early abortion care and provide safe abortion care.

The patients in the study (n = 9,087) completed a survey after their abortions to enable the investigators to assess the women's experience,

---

[1]The American Academy of Physician Assistants, the American College of Nurse-Midwives, the American Medical Women's Association, the Association of Physician Assistants in Obstetrics and Gynecology, the International Confederation of Midwives, the National Association of Nurse Practitioners in Women's Health, and Physicians for Reproductive Choice and Health also support an increased role for appropriately trained APCs (ACNM, 2011b; ICM, 2011b; NAF and CFC, 2018).

2021 ED 000243

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 125 of 4
PageID.8303
*104  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

access to care, and health; regardless of clinician type, the patient experience scores were very high (Taylor et al., 2013). Treatment by staff, timeliness of care, and level of pain were factors that highly impacted women's rating of their experience, but patient experience was not statistically different by clinician type after controlling for other patient- and clinic-level factors.

A qualitative analysis of the women's responses to the survey's open-ended question on their experience (n = 5,214) was conducted to determine themes across the responses (McLemore et al., 2014). The responses were categorized into themes of factors at the patient level (experiences of shame/stigma, pain experience, and interactions with staff) and clinic level (perceptions of clinical environment, adequate pain management, and wait time). Almost 97 percent of respondents reported their patient experience to be what they had expected or better. Major themes identified in the responses by women who reported their experience to have been worse than expected included issues with clinical care (problems with intravenous line insertion and/or preprocedure ultrasound, uncertainty about abortion completion, and needing subsequent follow-up appointments), level of pain experienced, and frustration with wait times for appointments and within the clinic.

In summary, the HWPP studies found that aspiration abortions were performed safely and effectively by both APCs and physicians and with a high degree of patient satisfaction (McLemore et al., 2014; Taylor et al., 2013; Weitz et al., 2013). The project, overseen by OSHPD, was completed in 2013, and the study results supported new legislation[2] in California that expanded the scope of practice for APCs to include early abortion care.

Two smaller studies compared the outcomes of abortions performed by APCs and physicians. In a 2-year prospective cohort study, Goldman and colleagues (2004) analyzed the outcomes of aspiration abortions provided by three PAs in a Vermont clinic (n = 546) and three physicians (n = 817) in a New Hampshire clinic. The authors found no statistically significant difference[3] in the complication rates of the two types of clinicians. Kopp Kallner and colleagues (2015) conducted a nonblinded randomized equivalence trial comparing medication abortions (using the WHO protocol and routine ultrasound) performed by 2 nurse-midwives and 34 physicians in Sweden. The primary outcome was defined as successful completion of the abortion without the need for a follow-up aspiration procedure. Complication rates and women's views on the acceptability of nonphysician providers were also assessed. The results showed superiority for the nurse-midwife group. The risk ratio for the physician group was 2.5 (95% CI =

---

[2]California Assembly Bill No. 154 to amend California Business and Professions Code, Section 2253 and California Health and Safety Code, Section 123468.

[3]The threshold for statistical significance was $p \leq .05$.

2021 ED 000244

Copyright National Academy of Sciences. All rights reserved.

1.4, 4.3). The researchers concluded that using nurse-midwives to provide early medication abortions is highly effective in high-resource areas such as theirs.

### Family Medicine Physicians

Multiple studies have concluded that family medicine physicians provide medication and aspiration abortions safely and effectively (Bennett et al., 2009; Paul et al., 2007; Prine et al., 2003, 2010) with a high degree of patient satisfaction (Paul et al., 2007; Prine et al., 2010; Summit et al., 2016; Wu et al., 2015). In one study of 2,550 women who sought abortions in five clinical settings from family physicians, medication and aspiration procedures had a 96.5 percent and 99.1 percent success rate, respectively (Bennett et al., 2009). All complications were minor and managed effectively at rates similar to those in OB/GYN practices and specialty abortion clinics. Another study of 847 medication abortions in a family medicine setting similarly found that the abortions were as safe and effective as those provided in specialty clinics (Prine et al., 2010).

The literature is less robust regarding other generalist physicians. However, the same judgment and clinical dexterity necessary to perform medication and aspiration abortions are obtained in other specialty training.

### D&E and Induction Abortions

The committee could identify no comparative studies of clinicians who perform D&E and induction abortions. In the United States, D&Es are performed by OB/GYNs, family medicine physicians, or other physicians with advanced training and/or experience (such as the training provided in specialized fellowships) (O'Connell et al., 2008; Steinauer et al., 2012). In general, OB/GYNs have the most experience in the surgical techniques used to perform a D&E abortion. Induction abortion can be provided by a team of providers with the requisite skill set for managing women in labor and during delivery, such as OB/GYNs, family medicine physicians, and CNMs (Gemzell-Danielsson and Lalitkumar, 2008).

### TRAINING OF PHYSICIANS AND ADVANCED PRACTICE CLINICIANS

Although most women's health care providers will interact with patients navigating issues of unintended pregnancy and abortion, abortion training is not universally available to physicians or APCs who intend to provide reproductive health services. Evidence suggests that few education programs incorporate abortion training in didactic curriculum, and only

2021 ED 000245

Copyright National Academy of Sciences. All rights reserved.

a small percentage of residencies, regardless of type or specialty, with the exception of OB/GYN, offer integrated abortion training (Herbitter et al., 2011, 2013; Lesnewski et al., 2003; Steinauer et al., 1997; Talley and Bergus, 1996; Turk et al., 2014).

Many factors influence the availability of training, including geography, institutional policy, and state law. Additionally, training has become more limited as a result of religious hospital mergers, state restrictions on medical schools and hospitals used for training programs, and training inconsistencies (Goodman et al., 2016). Catholic and Catholic-owned health care institutions are the largest group of religiously owned nonprofit hospitals, governing 15 percent of all acute care hospitals and 17 percent of hospital beds in the United States, and in many areas, these institutions function as the sole community hospital.[4] Employees at these institutions are bound by *Ethical and Religious Directives for Catholic Health Care Services*, which prohibits providing and teaching certain reproductive services, including abortion (Freedman and Stulberg, 2013; Freedman et al., 2008; Stulberg et al., 2016). Medical students, residents, and other health professional students are often responsible for seeking out learning opportunities themselves, as almost all abortions are provided outside of the traditional health care trainee learning environment (ACOG, 2014a,b).

### Obstetrics and Gynecology

The organization that accredits allopathic (and by 2020, also osteopathic) residencies in the United States is the Accreditation Council for Graduate Medical Education (ACGME). The ACGME training requirements for OB/GYN state that (1) programs must provide training or access to training in the provision of abortions, and this must be part of a planned curriculum; (2) residents who have religious or moral objections may opt out and must not be required to participate; and (3) residents must have experience in managing complications of abortions and training in all forms of contraception, including reversible methods and sterilization (ACGME, 2017b). Although this requirement has been in place since 1996, a number of OB/GYN residency programs do not provide specific training in abortion, and others provide such training only at the request of the resident (opt-in training). In 1995, Congress passed the Coates Amendment of the Omnibus Consolidated Rescissions and Appropriations Act of 1996,[5] which upholds the legal status and federal funding of institutions that do

---

[4]Designated by the Centers for Medicare & Medicaid Services if the hospital is at least 35 miles from other like hospitals or if travel time between the hospital and the nearest like hospital is at least 45 minutes.

[5]S971, 104th Congress, 1st session (1995).

2021 ED 000246

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 128 of 4
PageID.8306
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*    *107*

not provide abortion training or referrals for residents seeking such training elsewhere (Tocce and Severson, 2012). While the federal funding to these institutions may be preserved, this legislation does not shield institutional residency programs from the need to comply with the accreditation requirements put forth by ACGME.

Although the majority of abortion providers are OB/GYNs (O'Connell et al., 2008, 2009), available data indicate that most OB/GYNs do not provide abortions. Stulberg and colleagues (2011) surveyed practicing OB/GYNs in 2008–2009 using the American Medical Association Physician Masterfile to determine the extent to which OB/GYNs were providing abortions. Of the 1,144 respondents, 14.4 percent provided abortions, whereas 97 percent reported encountering an abortion-seeking patient. OB/GYNs located in the Northeastern or Western United States and those whose zip code was greater than 90 percent urban were most likely to provide abortions (Stulberg et al., 2011). According to the most recent data collected from NAF members, approximately 64 percent of NAF member providers who performed first-trimester surgical abortions in 2001 were OB/GYNs (O'Connell et al., 2009). These are the most recent data available for NAF members, but given the growing percentage of medication abortions before 10 weeks' gestation and expanded opportunities for other types of providers, APCs and family physicians may now represent an increased share of abortion providers.

A 2014 study of OB/GYN fourth-year residents associated with 161 of the 248 total residency programs found that 54 percent of residents reported routine abortion training; 30 percent reported opt-in training, where the training was available but not integrated; and 16 percent reported that training in elective abortion was unavailable in their program (Turk et al., 2014). Previous studies have found training participation rates to be very low among programs with optional training (Almeling et al., 2000; Eastwood et al., 2006).

From their general training, OB/GYN physicians may be more experienced with the surgical techniques of D&E and dilation and sharp curettage (D&C) relative to medication abortion (ACOG, 2015). In a 2007 survey of OB/GYNs who had recently completed their residencies, 65.1 percent reported receiving training in D&C, 62.0 percent in D&E, and 60.2 percent in induction. Residents had received the least training in medication abortion—40.7 percent reported training in mifepristone and misoprostol provision, 43.5 percent in manual vacuum aspiration (MVA), and 45.1 percent in electric vacuum aspiration. Thus, the residents had received more training in abortion procedures that are performed after 13 weeks' gestation. Of the 324 respondents, 62 percent indicated that it was easy to not participate in abortion training (Jackson and Foster, 2012).

2021 ED 000247

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 129 of 4
PageID.8307
*108  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

*Kenneth J. Ryan Residency Training Program*

The Ryan Program, developed by the UCSF Bixby Center in 1999, aims to integrate and enhance family planning training for OB/GYN residents in the United States and Canada (Ryan Residency Training Program, 2017a). The program offers resources and technical expertise to OB/GYN departments that wish to establish a formal, opt-out rotation in family planning (Ryan Residency Training Program, 2017a). Among the total 269 accredited OB/GYN residency programs across the United States during the 2016–2017 academic year, there are 90 Ryan programs[6] (see Figure 3-1), and as of December 2016, 3,963 residents had graduated from Ryan programs (ACGME, 2017c; Ryan Residency Training Program, 2017b).

The Ryan curriculum consists of published comprehensive didactic learning modules and expected milestones for all aspects of abortion care, including contraceptive counseling (Ryan Residency Training Program, 2017c). These milestones distinguish among the necessary clinical competencies for residents-in-training, graduating residents, and area experts. Graduating residents must independently perform procedures (first-trimester aspiration and basic second-trimester D&E) and manage medication abortions and labor induction terminations; manage complications of the different types of abortion procedures; and determine the need for consultation, referral, or transfer of patients with complex conditions, such as those with medical comorbidities or prior uterine surgery.

In annual reviews of the Ryan Program, residents and program directors have reported significant exposure to all methods of abortion and contraception provision, as well as such broader gynecological skills as anesthesia and analgesia, uterine sizing, assessment of gestation, ultrasound, management of fetal demise, and management of abortion-related complications (Steinauer et al., 2013b). In a study by Steinauer and colleagues (2013a), most residents and program directors reported believing that both full and partial program participation improved residents' knowledge and skills in counseling, contraception provision, and uterine evacuation for indications other than elective abortion, such as therapeutic abortion, miscarriage, and suspected ectopic management.

*Fellowship in Family Planning*

Other training opportunities include the Fellowship in Family Planning, a 2-year postresidency fellowship program that offers comprehensive training in research, teaching, and clinical practice in abortion and contraception

---

[6]Personal communication, U. Landy, Ph.D., UCSF Bixby Center for Global Reproductive Health, March 30, 2017.

2021 ED 000248

Copyright National Academy of Sciences. All rights reserved.



**FIGURE 3-1** Selected residencies and fellowships offering abortion training in the United States.
NOTE: RHEDI = Reproductive Health Education in Family Medicine.
SOURCES: FFP, 2017; RHEDI, 2017; Ryan Residency Training Program, 2017b.

at academic medical centers. The fellowship is offered at 30 university locations (see Figure 3-1) and is available to OB/GYNs who have completed residency training (FFP, 2017). Currently, 64 fellows are enrolled in these 2-year programs, and 275 physicians have completed the fellowship training (FFP, 2017).

### Family Medicine

Women's reproductive health care is a fundamental component of family medicine. Family physicians provide routine gynecological, pregnancy counseling, obstetrics, and contraceptive services (Brahmi et al., 2007; Dehlendorf et al., 2007; Goodman et al., 2013; Herbitter et al., 2011; Rubin et al., 2011). ACGME requires that family medicine trainees have 100 hours (or 1 month) or 125 patient encounters in gynecological care, including family planning, miscarriage management, contraceptive services, and options counseling for unintended pregnancy (ACGME, 2017a). The

2021 ED 000249

Copyright National Academy of Sciences. All rights reserved.

Society of Teachers of Family Medicine (STFM) Group on Hospital and Procedural Training recommends that all family medicine residents be exposed to uterine aspirations and D&Cs and have the opportunity to train to independent performance as these procedures are used for a variety of gynecological conditions (Nothnagle et al., 2008). Thus, although there is no specific abortion training requirement in family medicine, residents learn many gynecological skills that are applicable to performing abortions (e.g., counseling, aspirations, endometrial biopsies, and intrauterine device insertion and removal) (AAFP, 2016; Lyus et al., 2009). Indeed, the American Academy of Family Physicians considers medication and aspiration abortions to be within the scope of family medicine (AAFP, 2016).

Available data indicate that most family physicians do not provide abortions. A 2012 survey of 1,198 responding academic family medicine physicians found that only 15.3 percent of respondents had ever provided an abortion (medical or surgical) outside of training, and of those, only 33.8 percent had performed an abortion in the previous year (Herbitter et al., 2013). According to the most recent data collected from NAF members, 21 percent of NAF member providers who performed aspiration abortions in 2001 specialized in family practice (O'Connell et al., 2009). The 2016 National Graduate Survey, conducted by the American Board of Family Medicine and the Association of Family Medicine Residency Directors, was administered to 2013 graduates of residency training. When asked about specific subject areas and procedures, 17 percent of respondents (n = 2,060) reported that residency had prepared them in uterine aspiration/D&C, and 4 percent of respondents (n = 2,034) reported currently practicing these procedures.[7]

Most family medicine programs do not offer specific training in abortion, and only a small proportion of family physicians report having had access to abortion training (Herbitter et al., 2011, 2013; Lesnewski et al., 2003; Steinauer et al., 1997; Talley and Bergus, 1996). In a 2007–2008 survey of family medicine chief residents and program directors, almost two-thirds (63.9 percent) of residents reported that training in medication and aspiration abortions was not available in their programs (Herbitter et al., 2011).

The total number of family medicine residencies offering abortion training is unknown, although it is clear that access to such training varies markedly across the country (Herbitter et al., 2011; Steinauer et al., 1997; Talley et al., 1996). Programs in the West and Northeast are far more likely to provide abortion training relative to programs in the Midwest and South (Herbitter et al., 2011). In 2002, the STFM Group on Abortion Training

---

[7]Personal communication, L. Peterson, M.D., Ph.D., American Board of Family Medicine, January 30, 2018.

Copyright National Academy of Sciences. All rights reserved.

and Access conducted a survey of family medicine residency programs to determine the levels of abortion training offered. They confirmed that only 3.3 percent (11 of 337) of responding programs offered fully integrated abortion training (Lesnewski et al., 2003). In programs where abortion training is available, it appears that curricula are quite variable. A 2004–2005 study of nine programs that required abortion training found that all nine provided training in vacuum aspiration, eight of the nine provided training in medication abortion, and eight of the nine offered ultrasound training (Brahmi et al., 2007). The clinical setting, duration, and content of nonprocedural training were not consistent across the nine programs (Brahmi et al., 2007).

In addition to the RHEDI programs discussed below, seven family medicine residency programs offer integrated and comprehensive abortion training, and two programs offer established local electives in abortion training (RHEDI, 2017) (see Figure 3-1).

## *RHEDI*

The RHEDI program includes 26 family medicine residency programs with fully integrated abortion and family planning training—5.2 percent of the total 498 accredited family medicine residency programs in 2016 (ACGME, 2016; RHEDI, 2017; Summit and Gold, 2017) (see Figure 3-1). RHEDI, established in 2004 at the Montefiore Medical Center, provides grant funding and technical assistance to establish RHEDI programs in family medicine residencies throughout the United States. In a 2012–2014 evaluation of 214 residents in 12 RHEDI programs (representing 90 percent of residents who were part of a RHEDI program during the time period), residents reported increased exposure to provision of contraception (all methods), counseling on pregnancy options, counseling on abortion methods, ultrasound, aspiration and medication abortions, and miscarriage management after their RHEDI rotation. Self-rated competency had also improved (Summit and Gold, 2017). RHEDI is in the process of developing a standardized curriculum.[8]

## *Fellowship in Family Planning*

The previously mentioned Fellowships in Family Planning are available to family physicians that have completed residency training. Three of the 30 fellowship sites (see Figure 3-1) are housed in departments of family

---

[8]Personal communication, M. Gold, M.D., Albert Einstein College of Medicine, June 27, 2017.

2021 ED 000251

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 133 of 4
PageID.8311
*112  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

medicine (FFP, 2017). Additionally, 2 of the 84 Ryan Residency Training programs are available to family physicians.[9]

### Advanced Practice Clinicians

State licensing boards govern the scope of practice for APCs. CNMs and NPs are first credentialed as registered nurses and then as advanced practice nurses in a CNM or NP role. APCs may be educated and also credentialed to practice with a specific population (e.g., primary care, women's health) and/or a specialty area (e.g., abortion care) (Taylor et al., 2009).

Professional regulation and credentialing are based on a set of essential elements that align government authority with regulatory and professional responsibilities. The latter include essential documents developed by the profession that provide a basis for education and practice regulation; formal education from a degree or professional certification program; formal accreditation of educational programs; legal scope of practice by state law and regulations, including licensure; and individual certification formally recognizing the knowledge, skills, and experience of the individual to meet the standards the profession has identified (Taylor et al., 2009).

Foster and colleagues (2006) conducted a survey of all 486 accredited NP, PA, and CNM programs in the United States, with a response rate of 42 percent (n = 202). Overall, 53 percent of responding programs (108 programs) reported didactic instruction in surgical abortion,[10] MVA, and/or medication abortion; 21 percent (43 programs) reported providing clinical instruction in at least one of the three abortion procedures (Foster et al., 2006).

Abortion care competencies are operationalized within individual APC educational programs. In the Foster et al. (2006) study, among all APC educational programs, accredited CNM programs reported the highest rates of didactic instruction in abortion, and accredited NP programs reported the lowest rates of didactic and clinical instruction. Training in abortion care is very difficult for APCs to access. Planned Parenthood Federation of America's Consortium of Abortion Providers offers some training to the federation's members. NAF offers some didactic and practicum training in abortion care, as well as accredited continuing medical education, that is available to APCs (Taylor et al., 2009). Additionally, the Midwest Access Project (MAP) provides connection to training sites for APCs, although MDs receive priority in its placements (MAP, 2017).

---

[9]Personal communication, U. Landy, Ph.D., UCSF Bixby Center for Global Reproductive Health, March 30, 2017.

[10]The authors note a preference for the term "electric vacuum aspiration" to clarify "surgical abortion" in future surveys.

2021 ED 000252

Copyright National Academy of Sciences. All rights reserved.

*Certified Nurse-Midwives (CNMs)*

Midwifery practice encompasses the full range of women's primary care services, including primary care; family planning; STI treatment; gynecological services; care during pregnancy, childbirth, and postpartum; and newborn care (ACNM, 2011a).

CNMs are prepared at the graduate level in educational programs accredited by the Accreditation Commission for Midwifery Education, and must pass a national certification examination administered by the American Midwifery Certification Board. The competencies and standards for the practice of midwifery in the United States are consistent with or exceed the global competencies and standards set forth by the International Confederation of Midwives, including, for example, uterine evacuation via MVA (ICM, 2011a, 2013). These competencies are outlined in *Core Competencies for Basic Midwifery Practice* and must be met by an individual graduating from an accredited midwifery program (ACNM, 2012).

While abortion care is not specifically identified as a core competency for basic midwifery practice, CNMs have the essential skills to be trained to provide medication and aspiration abortions. The scope of midwifery practice may be expanded beyond the core competencies to incorporate additional skills and procedures, such as aspiration abortion, by following the guidelines outlined in Standard VIII of *Standards for the Practice of Midwifery* (ACNM, 2011c).

*Nurse Practitioners (NPs)*

NPs receive advanced education (typically a master's degree or clinical doctorate) and extensive clinical training to enable them to diagnose and manage patient care for a multitude of acute and chronic illnesses. They are independently licensed, have prescriptive authority in some form in all states, and work collaboratively with other health care professionals (Taylor et al., 2009). Their competencies are outlined in *Nurse Practitioner Core Competencies*, issued by the National Organization of Nurse Practitioner Faculties (NONPF, 2017).

The *Consensus Model for APRN Regulation* provides for the expansion of all NP and nurse-midwifery practice roles to advance their practice beyond the core competencies, providing flexibility to meet the emerging and changing needs of patients (APRN and NCSBN, 2008). Competency can be acquired through practical, supervised experience or through additional education and assessed in multiple ways through professional credentialing mechanisms.

2021 ED 000253

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 135 of 4
PageID.8313
*114 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

*Physician Assistants (PAs)*

PA training programs are accredited by the Accreditation Review Commission on Education for the Physician Assistant (ARC-PA). There is no mandated specific curriculum for PA schools, nor is there mandated abortion or family planning training for PAs. The ARC-PA Practice Standards include supervised clinical training in women's health (to include prenatal and gynecological care) (ARC-PA, 2010). The National Commission on Certification of Physician Assistants prepares and administers certifying and recertifying examinations for PAs. The 2015 Content Blueprint includes abortion in its list of reproductive system diseases for the examinations. The Association of Physician Assistants in Obstetrics & Gynecology (APAOG) highlights two OB/GYN residencies, but these residencies do not offer specific abortion training, and most PAs are trained privately in abortion procedures by supervising physicians at their practice sites (APAOG, 2017).

Expansion of the scope of practice for PAs varies slightly from that for advanced practice nurses. Most state laws governing the scope of practice for PAs allow for broad delegatory authority by the supervising physician. The American Academy of Physician Assistants (AAPA) recommends that all PAs consider four parameters when incorporating new skills into their practice: state law, facility policies, delegatory decisions made by the supervising physician, and the PA's education and experience (AAPA, 2017).

## AVAILABILITY OF TRAINED CLINICIANS

The safety and quality of abortion services are contingent on the availability of skilled providers. A number of issues influence the availability of providers skilled in abortion services, including the declining number of facilities offering services (discussed in Chapter 1), the geographic maldistribution of providers, and legal restrictions on training in and provision of services.

### Geographic Distribution

There are marked geographic disparities in a woman's ability to access abortion services in the United States, mirroring the locations of fellowship and residency programs in family planning. Abortion providers tend to be concentrated in urban areas, and a paucity of abortion providers exists in the South and Midwest, creating geographic barriers for women seeking abortion services in these regions (Johns et al., 2017; Jones and Jerman, 2017a; Paul and Norton, 2016). In 2011, 53 percent of women in the Midwest and 49 percent of women in the South lived in a county without an abortion clinic, compared with 24 percent of women in the Northeast and 16 percent in the West (Jones and Jerman, 2014). In 2008, women

Copyright National Academy of Sciences. All rights reserved.

traveled an average of 30 miles for an abortion, with 17 percent traveling more than 50 miles (Jones and Jerman, 2013). Among women living in rural areas, 31 percent traveled more than 100 miles to have an abortion (Jones and Jerman, 2013).

A significant amount of qualitative and quantitative research has been conducted to evaluate the impact of a 2013 law (H.B. 2)[11] that resulted in a reduced number of abortion facilities in Texas. The law went into effect in November 2013, and the number of Texas clinics subsequently declined from 41 in May 2013 to 17 in June 2016 (Grossman et al., 2014, 2017).

Researchers compared the 6-month periods before and after the implementation of the law and found that in the 6 months after implementation, the abortion rate decreased by 13 percent, the proportion of abortions at or after 12 weeks' gestation increased, and medication abortion decreased by 70 percent (Grossman et al., 2014). Furthermore, women had to travel an increased distance for abortion care. The number of women of reproductive age living more than 200 miles from an abortion facility increased from approximately 10,000 in the 6 months prior to the law's implementation to 290,000 6 months after implementation. The number of women living more than 50 and 100 miles from a facility increased from approximately 800,000 to 1.7 million and 400,000 to nearly 1.1 million, respectively (Grossman et al., 2014). Gerdts and colleagues (2016) surveyed women seeking abortion care in 2014 and found that those whose nearest clinic closed in 2013 traveled on average 85 miles to obtain care, compared with 22 miles traveled by women whose nearest clinic remained open. A later study by Grossman and colleagues (2017) found that the decline in abortions increased as the distance to the nearest facility increased between 2012 and 2014. Counties with no change in distance to a facility saw a 1.3 percent decline in abortions, whereas counties with an increase in distance of 100 miles or more saw a 50.3 percent decline (Grossman et al., 2017). Women reported increased informational, cost, and logistical barriers to obtaining abortion services; increased cost and travel time; and a frustrated demand for medication abortion after the law took effect (Baum et al., 2016; Fuentes et al., 2016; Gerdts et al., 2016).

Geographic location figures prominently in equitable access to abortion providers, impacting both the quality and safety of abortion care for women. A 2011–2012 study of claims data on 39,747 abortions covered by California's state Medicaid program (named Medi-Cal) found that

---

[11]Texas House Bill 2 (Tex. Health & Safety Code Ann. § 171.0031[a] [West Cum. Supp. 2015]) banned abortions after 20 weeks postfertilization, required physicians performing abortions to have hospital admitting privileges within 30 miles of the abortion facility, required the provision of medication abortion to follow the labeling approved by the FDA, and required all abortion facilities to be ambulatory surgery centers (Grossman et al., 2014).

2021 ED 000255

Copyright National Academy of Sciences. All rights reserved.

12 percent of the women traveled 50 miles or more for abortion services, and 4 percent traveled more than 100 miles (Upadhyay et al., 2017). For most patients in this study, greater distance traveled was associated with an increased likelihood of seeking follow-up care at a local emergency department, driving up cost and interrupting continuity of care. Women traveling longer distances (25–49 miles, 50–99 miles, or 100 miles or more) were significantly more likely than those traveling 25 miles or less to seek follow-up care in a local emergency department instead of returning to their original provider (Upadhyay et al., 2017). Costs associated with emergency department care were consistently higher than those of follow-up care at the abortion site. In addition to disrupting continuity of care and increasing medical costs, emergency department visits are not the ideal avenue for follow-up abortion care. Evidence suggests that abortion providers are better prepared than emergency department staff to evaluate women post-abortion, avoiding unnecessary use of such interventions as repeat aspiration or antibiotics (Beckman et al., 2002). This finding suggests a disparity in quality of abortion care for women unable to return to their abortion site for follow-up.

As demonstrated in Texas after passage of H.B. 2, geographic disparities contribute to increased travel and logistic challenges for women seeking abortion care, which in turn can result in delays (Bessett et al., 2011; Drey et al., 2006; Finer et al., 2006; Foster and Kimport, 2013; French et al., 2016; Fuentes et al., 2016; Janiak et al., 2014; Kiley et al., 2010; Roberts et al., 2014; Upadhyay et al., 2014; White et al., 2016). Restrictive regulations, including mandatory waiting periods that require a woman to make multiple trips to the abortion facility, impact the timeliness of obtaining abortion care (Grossman et al., 2014; Jones and Jerman, 2016). These challenges are especially burdensome for poor women, women traveling long distances for care, and those with the fewest resources (Baum et al., 2016; Finer et al., 2006; Fuentes et al., 2016; Ostrach and Cheyney, 2014). Delays in obtaining care may result in later abortions, requiring procedures with greater clinical risks and increased costs, in addition to limiting patient options regarding abortion procedures and pain management.

As noted in Chapter 1, most women pay out of pocket for abortions (Jones and Jerman, 2017b). A 2012 survey of nonhospital abortion facilities estimated that at 10 weeks' gestation, the average charge for an aspiration abortion was $480 and for a medication abortion was $504 (Jerman and Jones, 2014). The median charge for an abortion at 20 weeks' gestation was $1,350.

The availability of providers also varies by gestation. Far fewer clinicians offer abortions at later gestation. In 2012, 95 percent of facilities offered abortions at 8 weeks' gestation, 72 percent at 12 weeks', 34 percent at 20 weeks', and 16 percent at 24 weeks' (Jerman and Jones, 2014).

2021 ED 000256

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 138 of 4
PageID.8316
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*   *117*

According to Guttmacher's analysis, there is a sharp decline in abortion provision by nonspecialized clinics and physician's offices after 9 weeks' gestation, suggesting that these facilities are more likely to offer only early abortion services (Jerman and Jones, 2014).

### Regulations That Affect Availability

In many states, abortion-specific regulations address provider education and training and the type of clinician that is permitted to provide abortion services. Many states have regulations limiting the scope of practice for APCs and excluding nonphysician providers from performing abortions (ACOG, 2014a,b; Guttmacher Institute, 2017a; O'Connell et al., 2009). In 15 states plus the District of Columbia (DC), APCs may provide medication abortions, and in 6 of those states plus DC, APCs are also permitted to perform aspiration abortions independently (Guttmacher Institute, 2017a; RHN, 2017). However, 35 states require all abortions (including medication and aspiration abortions) to be performed by a licensed physician (see Figure 3-2).

Twenty states require the involvement of a second physician if an abortion is performed after a specified gestation, typically after 22 weeks since the last menstrual period or later in the pregnancy (Guttmacher Institute, 2017b). No clinical guidelines suggest that D&E and induction abortions require the involvement of a second physician (ACOG, 2015; NAF, 2017; RCOG, 2011, 2015; SFP, 2011, 2013; WHO, 2014). One state requires the provider be either a board-certified OB/GYN or eligible for certification (Guttmacher Institute, 2017c). In one state, only an OB/GYN is permitted



**FIGURE 3-2** Regulations defining the level of provider credentialing required to provide abortions, by state and abortion method.
NOTE: APC = advanced practice clinician.
SOURCE: Adapted from RHN, 2017. Created by Samantha Andrews. Used with permission.

2021 ED 000257

Copyright National Academy of Sciences. All rights reserved.

*118  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

to provide abortions after 14 weeks' gestation (Guttmacher Institute, 2017c). By establishing higher-level credentials than are necessary based on the clinical competencies identified earlier in this chapter, these policies can reduce the availability of providers, resulting in inequitable access to abortion care based on a woman's geography. In addition, these policies can limit patients' preferences, as patient choice is contingent on the availability of trained and experienced providers (ACOG, 2015). Limiting choices impacts patient-centered care, and also negatively affects the efficiency of abortion services by potentially increasing the costs of abortion care as the result of requiring the involvement of a physician to perform a procedure that can be provided safely and effectively by an APC.

Abortion-specific regulations limit training opportunities in many states. Twelve states have laws that specifically prohibit the provision of abortion services in public institutions, such as state-run hospitals or health systems.[12] This type of restriction precludes training in those sites and can make it challenging for educational programs located in those facilities to comply with the abortion-related training requirements stipulated by academic credentialing organizations discussed earlier.

## SUMMARY

This chapter has addressed several questions regarding the competencies and training of the clinical workforce that performs abortions in the United States. The committee found that abortion care, in general, requires providers skilled in patient preparation (education, counseling, and informed consent); clinical assessment (confirming intrauterine pregnancy, determining gestation, taking a relevant medical history, and physical examination); pain management; identification and management of side effects and serious complications; and contraceptive counseling and provision. To provide medication abortions, the clinician should be skilled in all these areas. To provide aspiration abortions, the clinician should also be skilled in the technical aspects of an aspiration procedure. To provide D&E abortions, the clinician needs the relevant surgical expertise and sufficient caseload to maintain the requisite surgical skills. To provide induction abortions, the clinician requires the skills needed for managing labor and delivery.

Both physicians (typically OB/GYNs and family medicine physicians, but other physicians can be trained) and APCs can provide medication

---

[12]Personal communication, O. Cappello, Guttmacher Institute, August 4, 2017: AZ § 15-1630, GA § 20-2-773; KS § 65-6733 and § 76-3308; KY § 311.800; LA RS § 40:1299 and RS § 4 0.1061; MO § 188.210 and § 188.215; MS § 41-41-91; ND § 14-02.3-04; OH § 5101.57; OK 63 § 1-741.1; PA 18 § 3215; TX § 285.202.

2021 ED 000258

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 140 of 4
PageID.8318
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*      *119*

and aspiration abortions safely and effectively. Many states, however, prohibit nonphysicians from performing abortions regardless of the method. OB/GYNs, family medicine physicians, and other physicians with appropriate training and experience can provide D&E abortions. The committee did not find research assessing the ability of APCs, given the appropriate training, to perform D&Es safely and effectively. Induction abortions can be provided by clinicians (OB/GYNs, family medicine physicians, and CNMs) with training in managing labor and delivery.

Access to clinical education and training in abortion care in the United States is highly variable at both the undergraduate and graduate levels. Medical residents and other advanced clinical trainees often have to find abortion training and experience in settings outside of their educational program. Training opportunities are particularly limited in the Southern and Midwestern states, as well as in rural areas throughout the country.

## REFERENCES

AAFP (American Academy of Family Physicians). 2016. *Recommended curriculum guidelines for family medicine residents: Women's health and gynecologic care*. AAFP reprint no. 282. http://www.aafp.org/dam/AAFP/documents/medical_education_residency/program_directors/Reprint282_Women.pdf (accessed October 19, 2017).

AAPA (American Academy of Physician Assistants). 2017. *PA: Scope of practice*. AAPA issue brief. https://www.aapa.org/wp-content/uploads/2017/01/Issue-brief_Scope-of-Practice_0117-1.pdf (accessed October 11, 2017).

ACGME (Accreditation Council for Graduate Medical Education). 2016. *Number of accredited programs academic year 2015–2016, United States*. https://apps.acgme.org/ads/Public/Reports/ReportRun?ReportId=3&CurrentYear=2016&AcademicYearId=2015 (accessed February 12, 2018).

ACGME. 2017a. *ACGME program requirements for graduate medical education in family medicine*. https://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/120_family_medicine_2017-07-01.pdf?ver=2017-06-30-083354-350 (accessed December 7, 2017).

ACGME. 2017b. *ACGME program requirements for graduate medical education in obstetrics and gynecology*. http://www.acgme.org/Portals/0/PFAssets/ProgramRequirements/220_obstetrics_and_gynecology_2017-07-01.pdf (accessed October 19, 2017).

ACGME. 2017c. *Number of accredited programs academic year 2016–2017, United States*. https://apps.acgme.org/ads/Public/Reports/ReportRun?ReportId=3&CurrentYear=2017&AcademicYearId=2016 (accessed January 5, 2018).

ACNM (American College of Nurse-Midwives). 2011a. *Definition of midwifery and scope of practice of certified nurse-midwives and certified midwives*. http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000266/Definition%20of%20Midwifery%20and%20Scope%20of%20Practice%20of%20CNMs%20and%20CMs%20Feb%202012.pdf (accessed October 11, 2017).

ACNM. 2011b. *Position statement: Reproductive health choices*. http://midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000087/Reproductive_Choices.pdf (accessed February 11, 2018).

ACNM. 2011c. *Standards for the practice of midwifery*. http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000051/Standards_for_Practice_of_Midwifery_Sept_2011.pdf (accessed October 11, 2017).

2021 ED 000259

Copyright National Academy of Sciences. All rights reserved.

ACNM. 2012. *Core competencies for basic midwifery practice.* http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000050/Core%20Comptencies%20Dec%202012.pdf (accessed October 11, 2017).

ACOG (American College of Obstetricians and Gynecologists). 2014a. *Committee opinion no. 612: Abortion training and education.* Committee on Health Care for Underserved Women. http://www.acog.org/Resources-And-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Abortion-Training-and-Education (accessed October 16, 2017).

ACOG. 2014b. *Committee opinion no. 613: Increasing access to abortion.* Committee on Health Care for Underserved Women. https://www.acog.org/-/media/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/co613.pdf?dmc=1&ts=20171011T2045552523 (accessed October 16, 2017).

ACOG. 2015. Practice bulletin no. 135: Second-trimester abortion. *Obstetrics & Gynecology* 121(6):1394–1406.

ACOG and SFP (Society for Family Planning). 2014. Practice bulletin no. 143: Medical management of first-trimester abortion. *Obstetrics & Gynecology* 123(3):676–692.

Allen, R. H., and A. B. Goldberg. 2016. Cervical dilation before first-trimester surgical abortion (<14 weeks' gestation). *Contraception* 93(4):277–291.

Almeling, R., L. Tews, and S. Dudley. 2000. Abortion training in U.S. obstetrics and gynecology residency programs, 1998. *Family Planning Perspectives* 32(6):268–271, 320.

ANSIRH (Advancing New Standards in Reproductive Health). 2014. HWPP #171 final data update. *ANSIRH, Health Workforce Pilot Project,* June. https://www.ansirh.org/sites/default/files/documents/hwppupdate-june2014.pdf (accessed February 13, 2018).

APAOG (Association of Physician Assistants in Obstetrics and Gynecology). 2017. *OBGYN residency.* http://www.paobgyn.org/residency (accessed October 20, 2017).

APHA (American Public Health Association). 2011. *Provision of abortion care by advanced practice nurses and physician assistants.* https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants (accessed October 20, 2017).

APRN (Advanced Practice Registered Nurses) and NCSBN (National Council of State Boards of Nursing). 2008. *Consensus model for APRN regulation: Licensure, accreditation, certification and education.* Chicago, IL: National Council of State Boards of Nursing. https://www.ncsbn.org/Consensus_Model_for_APRN_Regulation_July_2008.pdf (accessed October 11, 2017).

ARC-PA (Accreditation Review Commission on Education for the Physician Assistant). 2010. *Accreditation standards for physician assistant education*, 4th ed. Johns Creek, GA: ARC-PA. http://paeaonline.org/wp-content/uploads/2016/07/12b-ARC-PA-Standards.pdf (accessed October 20, 2017).

Baird, T. L., L. D. Castleman, A. G. Hyman, R. E. Gringle, and P. D. Blumenthal. 2007. *Clinician's guide for second-trimester abortion,* 2nd ed. Chapel Hill, NC: Ipas.

Baker, A., and T. Beresford. 2009. Informed consent, patient education, and counseling. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 48–62.

Barnard, S., C. Kim, M. H. Park, and T. D. Ngo. 2015. Doctors or mid-level providers for abortion. *Cochrane Database Systematic Reviews* 27(7):CD011242.

Baum, S. E., K. White, K. Hopkins, J. E. Potter, and D. Grossman. 2016. Women's experience obtaining abortion care in Texas after implementation of restrictive abortion laws: A qualitative study. *PLoS One* 11(10):e0165048.

Beckman, L. J., S. M. Harvey, and S. J. Satre. 2002. The delivery of medical abortion services: The views of experienced providers. *Women's Health Issues* 12(2):103–112.

2021 ED 000260

Copyright National Academy of Sciences. All rights reserved.

Bennett, I. M., M. Baylson, K. Kalkstein, G. Gillespie, S. L. Bellamy, and J. Fleischman. 2009. Early abortion in family medicine: Clinical outcomes. *Annals of Family Medicine* 7(6):527–533.

Bessett, D., K. Gorski, D. Jinadasa, M. Ostrow, and M. J. Peterson. 2011. Out of time and out of pocket: Experiences of women seeking state-subsidized insurance for abortion care in Massachusetts. *Women's Health Issues* 21(3 Suppl.):S21–S25.

Brahmi, D., C. Dehlendorf, D. Engel, K. Grumbach, C. Joffe, and M. Gold. 2007. A descriptive analysis of abortion training in family medicine residency programs. *Family Medicine* 39(6):399–403.

Creinin, M. D., and K. G. Danielsson. 2009. Medical abortion in early pregnancy. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 111–134.

Davis, A., and T. Easterling. 2009. Medical evaluation and management. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 78–79.

Dehlendorf, C., D. Brahmi, D. Engel, K. Grumbach, C. Joffe, and M. Gold. 2007. Integrating abortion training into family medicine residency programs. *Family Medicine* 39(5):337–342.

Drey, E. A., D. G. Foster, R. A. Jackson, S. J. Lee, L. H. Cardenas, and P. D. Darney. 2006. Risk factors associated with presenting for abortion in the second trimester. *Obstetrics & Gynecology* 107(1):128–135.

Eastwood, K. L., J. E. Kacmar, J. Steinauer, S. Weitzen, and L. A. Boardman. 2006. Abortion training in United States obstetrics and gynecology residency programs. *Obstetrics & Gynecology* 108(2):303–308.

FDA (U.S. Food and Drug Administration). 2016. *Highlights of prescribing information: Mifeprex*® (revised 3/2016). https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf (accessed October 20, 2017).

FFP (Fellowship in Family Planning). 2017. *Where are the fellowships located?* https://www.familyplanningfellowship.org/fellowship-programs (accessed October 20, 2017).

Finer, L. B., L. F. Frohwirth, L. A. Dauphinee, S. Singh, and A. M. Moore. 2006. Timing of steps and reasons for delays in obtaining abortions in the United States. *Contraception* 74(4):334–344.

Foster, A. M., P. Chelsea, M. K. Allee, K. Simmonds, M. Zurek, and A. Brown. 2006. Abortion education in nurse practitioner, physician assistant and certified nurse-midwifery programs: A national survey. *Contraception* 73(4):408–414.

Foster, D. G., and K. Kimport. 2013. Who seeks abortions at or after 20 weeks? *Perspectives on Sexual and Reproductive Health* 45(4):210–218.

Freedman, L. R., and D. B. Stulberg. 2013. Conflicts in care for obstetric complications in Catholic hospitals. *AJOB Primary Research* 4(4):1–10.

Freedman, L. R., U. Landy, and J. Steinauer. 2008. When there's a heartbeat: Miscarriage management in Catholic-owned hospitals. *American Journal of Public Health* 98(10):1774–1778.

French, V., R. Anthony, C. Souder, C. Geistkemper, E. Drey, and J. Steinauer. 2016. Influence of clinician referral on Nebraska women's decision-to-abortion time. *Contraception* 93(3):236–243.

Fuentes, L., S. Lebenkoff, K. White, C. Gerdts, K. Hopkins, J. E. Potter, and D. Grossman. 2016. Women's experiences seeking abortion care shortly after the closure of clinics due to a restrictive law in Texas. *Contraception* 93(4):292–297.

2021 ED 000261

Copyright National Academy of Sciences. All rights reserved.

Gavin, L., S. Moskosky, M. Carter, K. Curtis, E. Glass, E. Godfrey, A. Marcell, N. Mautone-Smith, K. Pazol, N. Tepper, and L. Zapata. 2014. Providing quality family planning services: Recommendations of CDC and the U.S. Office of Population Affairs. *Morbidity and Mortality Weekly Reports* 63(RR04):1–29. Atlanta, GA: Centers for Disease Control and Prevention. https://www.cdc.gov/mmwr/preview/mmwrhtml/rr6304a1.htm (accessed September 15, 2017).

Gemzell-Danielsson, K., and S. Lalitkumar. 2008. Second trimester medical abortion with mifepristone-misoprostol and misoprostol alone: A review of methods and management. *Reproductive Health Matters* 16(31 Suppl.):162–172.

Gerdts, C., L. Fuentes, D. Grossman, K. White, B. Keefe-Oates, S. E. Baum, K. Hopkins, C. W. Stolp, and J. E. Potter. 2016. Impact of clinic closures on women obtaining abortion services after implementation of a restrictive law in Texas. *American Journal of Public Health* 106(5):857–864.

Goldman, M. B., J. S. Occhiuto, L. E. Peterson, J. G. Zapka, and R. H. Palmer. 2004. Physician assistants as providers of surgically induced abortion services. *American Journal of Public Health* 94(8):1352–1357.

Goldstein, S. R., and M. F. Reeves. 2009. Clinical assessment and ultrasound in early pregnancy. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 63–77.

Goodman, S., G. Shih, M. Hawkins, S. Feierabend, P. Lossy, N. J. Waxman, M. Gold, and C. Dehlendorf. 2013. A long-term evaluation of a required reproductive health training rotation with opt-out provisions for family medicine residents. *Family Medicine* 45(3):180–186.

Goodman, S., G. Flaxman, and TEACH Trainers Collaborative Working Group. 2016. *Teach early abortion training workbook*, 5th ed. San Francisco, CA: UCSF Bixby Center for Global Reproductive Health. http://www.teachtraining.org/training-tools/early-abortion-training-workbook (accessed October 20, 2017).

Grossman, D., K. Blanchard, and P. Blumenthal. 2008. Complications after second trimester surgical and medical abortion. *Reproductive Health Matters* 16(31 Suppl.):173–182.

Grossman, D., S. Baum, L. Fuentes, K. White, K. Hopkins, A. Stevenson, and J. E. Potter. 2014. Change in abortion services after implementation of a restrictive law in Texas. *Contraception* 90(5):496–501.

Grossman, D., K. White, K. Hopkins, and J. E. Potter. 2017. Change in distance to nearest facility and abortion in Texas, 2012 to 2014. *Journal of the American Medical Association* 317(4):437–438.

Guttmacher Institute. 2017a. *An overview of abortion laws*. Washington, DC: Guttmacher Institute. https://www.guttmacher.org/state-policy/explore/overview-abortion-laws (accessed October 20, 2017).

Guttmacher Institute. 2017b. *State policies on later abortions*. Washington, DC: Guttmacher Institute. https://www.guttmacher.org/state-policy/explore/state-policies-later-abortions (accessed September 21, 2017).

Guttmacher Institute. 2017c. *Targeted regulation of abortion providers*. Washington, DC: Guttmacher Institute. https://www.guttmacher.org/state-policy/explore/targeted-regulation-abortion-providers (accessed June 23, 2017).

Hammond, C., and S. Chasen. 2009. Dilation and evacuation. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 157–177.

Health IT. 2013. *Shared decision making*. https://www.healthit.gov/sites/default/files/nlc_shared_decision_making_fact_sheet.pdf (accessed January 10, 2018).

2021 ED 000262

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 144 of 4
PageID.8322
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*    *123*

Herbitter, C., M. Greenberg, J. Fletcher, C. Query, J. Dalby, and M. Gold. 2011. Family planning training in U.S. family medicine residencies. *Family Medicine* 43(8):574–581.

Herbitter, C., A. Bennett, D. Finn, D. Schubert, I. M. Bennett, and M. Gold. 2013. Management of early pregnancy failure and induced abortion by family medicine educators. *Journal of the American Board of Family Medicine* 26(6):751–758.

Hern, W. M. 2016. *Second-trimester surgical abortion.* https://www.glowm.com/section_view/heading/Second-Trimester%20Surgical%20Abortion/item/441 (accessed October 6, 2017).

ICM (International Confederation of Midwives). 2011a. *Global standards for midwifery regulation.* The Hague, Netherlands: ICM. http://internationalmidwives.org/assets/uploads/documents/Global%20Standards%20Comptencies%20Tools/English/GLOBAL%20STANDARDS%20FOR%20MIDWIFERY%20REGULATION%20ENG.pdf (accessed October 20, 2017).

ICM. 2011b. *Position statement: Midwives' provision of abortion-related services.* https://internationalmidwives.org/assets/uploads/documents/Position%20Statements%20-%20English/Reviewed%20PS%20in%202014/PS2008_011%20V2014%20Midwives'%20provision%20of%20abortion%20related%20services%20ENG.pdf (accessed February 11, 2018).

ICM. 2013. *Essential competencies for basic midwifery practice, 2010 (revised 2013).* The Hague, Netherlands: ICM. https://internationalmidwives.org/assets/uploads/documents/CoreDocuments/ICM%20Essential%20Competencies%20for%20Basic%20Midwifery%20Practice%202010,%20revised%202013.pdf (accessed February 12, 2018).

Jackson, C. B., and A. M. Foster. 2012. OB/GYN training in abortion care: Results from a national survey. *Contraception* 86(4):407–412.

Janiak, E., I. Kawachi, A. Goldberg, and B. Gottlieb. 2014. Abortion barriers and perceptions of gestational age among women seeking abortion care in the latter half of the second trimester. *Contraception* 89(4):322–327.

Jatlaoui, T. C., A. Ewing, M. G. Mandel, K. B. Simmons, D. B. Suchdev, D. J. Jamieson, and K. Pazol. 2016. Abortion surveillance—United States, 2013. *MMWR Surveillance Summaries* 65(SS-12):1–44.

Jerman, J., and R. K. Jones. 2014. Secondary measures of access to abortion services in the United States, 2011 and 2012: Gestational age limits, cost, and harassment. *Women's Health Issues* 24(4):e419–e424.

Johns, N. E., D. G. Foster, and U. D. Upadhyay. 2017. Distance traveled for Medicaid-covered abortion care in California. *BMC Health Services Research* 17(287):1–11.

Jones, R. K., and J. Jerman. 2013. How far did U.S. women travel for abortion services in 2008? *Journal of Women's Health* 22(8):706–713.

Jones, R. K., and J. Jerman. 2014. Abortion incidence and service availability in the United States, 2011. *Perspectives on Sexual and Reproductive Health* 46(1):3–14.

Jones, R. K., and J. Jerman. 2016. *Time to appointment and delays in accessing care among U.S. abortion patients.* Washington, DC: Guttmacher Institute. https://www.guttmacher.org/report/delays-in-accessing-care-among-us-abortion-patients (accessed April 15, 2017).

Jones, R. K., and J. Jerman. 2017a. Abortion incidence and service availability in the United States, 2014. *Perspectives on Sexual and Reproductive Health* 49(1):17–27.

Jones, R. K., and J. Jerman. 2017b. Characteristics and circumstances of U.S. women who obtain very early and second trimester abortions. *PLoS One* 12(1):e0169969.

Kapp, N., and H. von Hertzen. 2009. Medical methods to induce abortion in the second trimester. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 178–192.

Kiley, J. W., L. M. Yee, C. M. Niemi, J. M. Feinglass, and M. A. Simon. 2010. Delays in request for pregnancy termination: Comparison of patients in the first and second trimesters. *Contraception* 81(5):446–451.

2021 ED 000263

Copyright National Academy of Sciences. All rights reserved.

Kopp Kallner, H., R. Gomperts, E. Salomonsson, M. Johansson, L. Marions, and K. Gemzell-Danielsson. 2015. The efficacy, safety, and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse-midwives: A randomised controlled equivalence trial. *British Journal of Obstetricians and Gynaecologists* 122(4):510–517.

Lesnewski, R., L. Prine, and M. Gold. 2003. Abortion training as an integral part of residency training. *Family Medicine* 35(6):469–471.

Levi, A., J. E. Angel, and D. Taylor. 2012. Midwives and abortion care: A model for achieving competency. *Journal of Midwifery & Women's Health* 57(3):285–289.

Lohr, P. A., J. L. Hayes, and K. Gemzell-Danielsson. 2008. Surgical versus medical methods for second trimester induced abortion. *Cochrane Database of Systematic Reviews* (1):CD006714.

Lyus, R. J., P. Gianutsos, and M. Gold. 2009. First trimester procedural abortion in family medicine. *Journal of the American Board of Family Medicine* 22(2):169–174.

MAP (Midwest Access Project). 2017. *What we do.* http://midwestaccessproject.org/what-we-do (accessed October 20, 2017).

McLemore, M. R., S. Desai, L. Freedman, E. A. James, and D. Taylor. 2014. Women know best—findings from a thematic analysis of 5,214 surveys of abortion care experience. *Women's Health Issues* 24(6):594–599.

Meckstroth, K., and M. Paul. 2009. First-trimester aspiration abortion. In *Management of unintended and abnormal pregnancy*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Blackwell Publishing. Pp. 135–156.

NAF (National Abortion Federation). 2017. *Clinical policy guidelines for abortion care.* Washington, DC: NAF.

NAF and CFC (Clinicians for Choice). 2018. *Role of CNMs, NPs, and PAs in abortion care.* https://5aa1b2xfmfh2e2mk03kk8rsx-wpengine.netdna-ssl.com/wp-content/uploads/CNM_NP_PA_org_statements.pdf (accessed February 11, 2018).

Nanda, K., L. M. Lopez, D. A. Grimes, A. Peloggia, and G. Nanda. 2012. Expectant care versus surgical treatment for miscarriage (review). *Cochrane Database of Systemic Reviews* 3:CD003518.

Newmann, S. J., A. Dalve-Endres, and E. A. Drey. 2008. Clinical guidelines: Cervical preparation for surgical abortion from 20 to 24 weeks' gestation. *Society of Family Planning* 77(4):308–314.

Newmann, S. J., A. Dalve-Endres, J. T. Diedrich, J. E. Steinauer, K. Meckstroth, and E. A. Drey. 2010. Cervical preparation for second trimester dilation and evacuation. *Cochrane Database of Systematic Reviews* 8:CD007310.

Ngo, T. D., M. H. Park, and C. Free. 2013. Safety and effectiveness of termination services performed by doctors versus midlevel providers: A systematic review and analysis. *International Journal of Women's Health* 5:9–17.

Nichols, M., B. Halvorfson-Boyd, R. C. Goldstein, C. M. Gevirtz, and D. Healow. 2009. Pain management. In *Management of unintended and abnormal pregnancy: Comprehensive abortion care*, 1st ed., edited by M. Paul, E. S. Lichtenberg, L. Borgatta, D. A. Grimes, P. G. Stubblefield, and M. D. Creinin. Hoboken, NJ: Wiley-Blackwell. Pp. 90–110.

NONPF (Nurse Organization of Nurse Practitioners Faculties). 2017. *Nurse practitioner core competencies content.* http://c.ymcdn.com/sites/www.nonpf.org/resource/resmgr/competencies/2017_NPCoreComps_with_Curric.pdf (accessed October 20, 2017).

Nothnagle, M., J. M. Sicilia, S. Forman, J. Fish, W. Ellert, R. Gebhard, B. F. Kelly, J. L. Pfenninger, M. Tuggy, W. M. Rodney, and STFM Group on Hospital Medicine and Procedural Training. 2008. Required procedural training in family medicine residency: A consensus statement. *Family Medicine* 40(4):248–252.

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 146 of 4
PageID.8324
*ESSENTIAL CLINICAL COMPETENCIES FOR ABORTION PROVIDERS*    *125*

O'Connell, K., H. E. Jones, E. S. Lichtenberg, and M. Paul. 2008. Second-trimester surgical abortion practices: A survey of National Abortion Federation members. *Contraception* 78(6):492–499.

O'Connell, K., H. E. Jones, M. Simon, V. Saporta, M. N. Paul, M. E., and S. Lichtenberg. 2009. First-trimester surgical abortion practices: A survey of National Abortion Federation members. *Contraception* 79(5):385–392.

Ostrach, B., and M. Cheyney. 2014. Navigating social and institutional obstacles: Low-income women seeking abortion. *Quality Health Research* 24(7):1006–1017.

Paul, M., and M. E. Norton. 2016. Ensuring access to safe, legal abortion in an increasingly complex regulatory environment. *Obstetrics & Gynecology* 128(1):171–175.

Paul, M., K. Nobel, S. Goodman, P. Lossy, J. E. Moschella, and H. Hammer. 2007. Abortion training in three family medicine programs: Resident and patient outcomes. *Family Medicine* 39(3):184–189.

Prine, L., R. Lesnewski, N. Berley, and M. Gold. 2003. Medical abortion in family practice: A case series. *Journal of the American Board of Family Medicine* 16(4):290–295.

Prine, L., C. Shannon, G. Gillespie, W. A. Crowden, J. Fortin, M. Howe, and I. Dzuba. 2010. Medical abortion: Outcomes in a family medicine setting. *Journal of the American Board of Family Medicine* 23(4):509–513.

RCOG (Royal College of Obstetricians and Gynaecologists). 2011. *The care of women requesting induced abortion* (Evidence-based clinical guideline number 7). London, UK: RCOG Press.

RCOG. 2015. *Best practice in comprehensive abortion care* (Best practice paper no. 7). London, UK: RCOG Press.

Renner, R.-M., D. Brahmi, and N. Kapp. 2013. Who can provide effective and safe termination of pregnancy care? A systematic review. *British Journal of Obstetrics and Gynecology* 120(1):23–31.

RHEDI (Reproductive Health Education in Family Medicine). 2017. *Family medicine residencies with abortion training*. http://www.rhedi.org/education/residency-training/#rhediprograms (accessed October 20, 2017).

RHN (Reproductive Health in Nursing). 2017. *Providing abortion care: A professional toolkit for nurse-midwives, nurse practitioners, and physician assistants*. https://rhnursing.org/resource/abortion-provider-toolkit-nurses (accessed October 20, 2017).

Roberts, S. C., H. Gould, K. Kimport, T. A. Weitz, and D. G. Foster. 2014. Out-of-pocket costs and insurance coverage for abortion in the United States. *Women's Health Issues* 24(2):e211–e218.

Rubin, S. E., J. Fletcher, T. Stein, P. Segall-Gutierrez, and M. Gold. 2011. Determinants of intrauterine contraception provision among U.S. family physicians: A national survey of knowledge, attitudes, and practice. *Contraception* 83(5):472–478.

Ryan Residency Training Program. 2017a. *About the Ryan Program*. https://www.ryanprogram.org/about-ryan-program (accessed October 20, 2017).

Ryan Residency Training Program. 2017b. *Map and locations of Ryan Program sites*. https://www.ryanprogram.org/map-and-locations (accessed October 20, 2017).

Ryan Residency Training Program. 2017c. *Ryan Program didactics*. https://ryanprogram.org/sites/default/files/Ryan%20Program%20Milestones.pdf (accessed October 20, 2017).

SFP (Society of Family Planning). 2011. Labor induction abortion in the second trimester. *Contraception* 84(1):4–18.

SFP. 2013. Interruption of nonviable pregnancies of 24–28 weeks' gestation using medical methods. *Contraception* 88(3):341–349.

SFP. 2014. Cervical preparation for second-trimester surgical abortion prior to 20 weeks' gestation. *Contraception* 89(2):75–84.

2021 ED 000265

Copyright National Academy of Sciences. All rights reserved.

Simmonds, K. E., M. W. Beal, and M. K. Eagen-Torkko. 2017. Updates to the U.S. Food and Drug Administration regulations for Mifepristone: Implications for clinical practice and access to abortion care. *Journal of Midwifery & Women's Health* 62(3):348–352.

Sjöström, S., M. Dragoman, M. S. Fønhus, B. Ganatra, and K. Gemzell-Danielsson. 2017. Effectiveness, safety, and acceptability of first-trimester medical termination of pregnancy performed by non-doctor providers: A systematic review. *British Journal of Obstetrics and Gynaecology* 124(13):1928–1940.

Steinauer, J., T. DePineres, A. Robert, J. Westfall, and P. Darney. 1997. Training family practice residents in abortion and other reproductive health care: A nationwide survey. *Family Planning Perspectives* 29(5):222–227.

Steinauer, J., C. Dehlendorf, K. Grumbach, U. Landy, and P. Darney. 2012. Multi-specialty family planning training: Collaborating to meet the needs of women. *Contraception* 86(3):188–190.

Steinauer, J. E., M. Hawkins, J. K. Turk, P. Darney, F. Preskill, and U. Landy. 2013a. Opting out of abortion training: Benefits of partial participation in a dedicated family planning rotation for OB-GYN residents. *Contraception* 87(1):88–92.

Steinauer, J. E., J. K. Turk, M. C. Fulton, K. H. Simonson, and U. Landy. 2013b. The benefits of family planning training: A 10-year review of the Ryan Residency Training Program. *Contraception* 88(2):275–280.

Stubblefield, P. G., S. Carr-Ellis, and L. Borgatta. 2004. Methods for induced abortion. *Obstetrics & Gynecology* 104(1):174–185.

Stulberg, D. B., A. M. Dude, I. Dahlquist, and F. A. Curlin. 2011. Abortion provision among practicing obstetrician-gynecologists. *Obstetrics & Gynecology* 118(3):609–614.

Stulberg, D. B., R. A. Jackson, and L. R. Freedman. 2016. Referrals for services prohibited in Catholic health care facilities. *Perspectives on Sexual and Reproductive Health* 48(3):111–117.

Summit, A. K., and M. Gold. 2017. The effects of abortion training on family medicine residents' clinical experience. *Family Medicine* 49(1):22–27.

Summit, A. K., L. M. J. Casey, A. H. Bennett, A. Karasz, and M. Gold. 2016. "I don't want to go anywhere else": Patient experiences of abortion in family medicine. *Family Medicine* 48(1):30–34.

Talley, P., and G. Bergus. 1996. Abortion training in family practice residency programs. *Family Medicine* 28(4):245–248.

Taylor, D., B. Safriet, G. Dempsey, B. Kruse, and C. Jackson. 2009. *Providing abortion care: A professional toolkit for nurse-midwives, nurse practitioners, and physician assistants*. San Francisco, CA: ANSIRH. http://apctoolkit.org/wp-content/themes/apctoolkit/index.html (accessed October 20, 2017).

Taylor, D., D. Postlethwaite, S. Desai, E. A. James, A. W. Calhoun, K. Sheehan, and T. A. Weitz. 2013. Multiple determinants of the abortion care experience: From the patient's perspective. *American Journal of Medical Quality* 28(6):510–518.

Tocce, K., and B. Severson. 2012. Funding for abortion training in OB/GYN residency. *American Medical Association Journal of Ethics* 14(2):112–117.

Turk, J. K., F. Preskill, U. Landy, C. H. Rocca, and J. E. Steinauer. 2014. Availability and characteristics of abortion training in U.S. OB-GYN residency programs: A national survey. *Contraception* 89(4):271–277.

Upadhyay, U. D., T. A. Weitz, R. K. Jones, R. E. Barar, and D. G. Foster. 2014. Denial of abortion because of provider gestational age limits in the United States. *American Journal of Public Health* 104(9):1687–1694.

Upadhyay, U. D., N. E. Johns, K. R. Meckstroth, and J. L. Kerns. 2017. Distance traveled for an abortion and source of care after abortion. *Obstetrics & Gynecology* 130(3):616–624.

Copyright National Academy of Sciences. All rights reserved.

Weitz, T. A., D. Taylor, S. Desai, U. D. Upadhyay, J. Waldman, M. F. Battistelli, and E. A. Drey. 2013. Safety of aspiration abortion performed by nurse practitioners, certified nurse midwives, and physician assistants under a California legal waiver. *American Journal of Public Health* 103(3):454–461.

White, K., V. deMartelly, D. Grossman, and J. M. Turan. 2016. Experiences accessing abortion care in Alabama among women traveling for services. *Women's Health Issues* 26(3):298–304.

WHO (World Health Organization). 2012. *Safe abortion: Technical and policy guidance for health systems*. Geneva, Switzerland: WHO.

WHO. 2014. *Clinical practice handbook for safe abortion*. Geneva, Switzerland: WHO.

WHO. 2015. *Health worker roles in providing safe abortion care and post-abortion contraception*. Geneva, Switzerland: WHO.

Woodcock, J. 2016. Letter from the director of the FDA Center for Drug Evaluation and Research to Donna Harrison, Gene Rudd, and Penny Young Nance. Re: Docket No. FDA-2002-P-0364. Silver Spring, MD: U.S. Food and Drug Administration.

Wu, J. P., E. M. Godfrey, L. Prine, K. L. Anderson, H. MacNaughton, and M. Gold. 2015. Women's satisfaction with abortion care in academic family medicine centers. *Family Medicine* 47(2):98–106.

2021 ED 000267

Copyright National Academy of Sciences. All rights reserved.

2021 ED 000268

Copyright National Academy of Sciences. All rights reserved.

4

# Long-Term Health Effects

When evaluating the safety of any medical intervention, it is important not only to consider the immediate potential complications but also to evaluate the potential for associated long-term health effects. Research on abortion's potential long-term health consequences has focused on reproductive and mental health outcomes, as well as other outcomes including breast cancer risk and premature death. This chapter reviews research on the long-term physical and mental health effects of having an abortion.[1] The focus is on four putative areas of potential harm:

- future childbearing and pregnancy outcomes (e.g., secondary infertility; ectopic pregnancy; spontaneous abortion and stillbirth; complications of pregnancy; and preterm birth, small for gestational age, and low birthweight);
- risk of breast cancer;
- mental health disorders; and
- premature death.

---

[1]This chapter reviews the epidemiological research on abortion's long-term physical and mental health effects. In epidemiology, an odds ratio is the statistic used by researchers to measure the association between an "exposure" (e.g., a prior abortion) and an outcome of interest. Odds ratios compare the relative odds of a particular health outcome, given the exposure, and can indicate whether the exposure is a risk factor, as well as the magnitude of the risk. The confidence interval (CI) indicates the precision of the estimate.

*129*

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 151 of 4
PageID.8329
*130 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

As noted in Chapter 1, some states require that abortion patients be offered or provided information indicating that abortion negatively affects future fertility (Arizona, Kansas, Nebraska, North Carolina, South Dakota, and Texas); risk of breast cancer (Arkansas, Kansas, Mississippi, Oklahoma, and Texas); and/or mental health disorders (Idaho, Kansas, Louisiana, Michigan, Nebraska, North Carolina, North Dakota, Oklahoma, South Dakota, Texas, Utah, and West Virginia).[2] Some observers have also questioned whether abortion may lead to premature death (Reardon et al., 2002).

This chapter first describes the limitations of the abortion literature and the committee's criteria for identifying scientifically valid research on abortion's long-term health consequences. The remainder of the chapter presents the committee's review of what is known about each of the above putative harms of abortion.

## LIMITATIONS OF THE LITERATURE

While randomized controlled trials are the gold standard research design for assessing the health effects of a medical intervention, they are not appropriate for studies assessing the long-term risks of abortion. Women seeking an abortion cannot be randomized to an experimental group that has the abortion or a control group that does not have the abortion. Researchers must use observational study designs (e.g., cohort, case control, and cross-sectional studies) to examine abortion's long-term potential for harm. However, the risk of bias is greater for observational studies than for randomized studies, and it is imperative that published studies be assessed for potential sources of bias that might affect their findings (IOM, 2011). In research, bias refers to systematic error in a study's design or execution that leads to an incorrect result (Cochrane Collaboration, 2018).

### Sources of Bias

Observational studies of abortion's long-term health effects have two important sources of information bias: selective recall bias and selection bias. Each is described below.

#### Selective Recall Bias

Several studies have demonstrated underreporting of past abortions in surveys of American women (Beral et al., 2004; Jones and Kost, 2007; Steinberg et al., 2011). Women who have had an abortion have a tendency

---

[2]See Chapter 1, Table 1-1.

Copyright National Academy of Sciences. All rights reserved.

not to recall—or not to report—having had an abortion when asked (Anderson et al., 1994; Bouyer et al., 2003; Hogue, 1975; Jones and Kost, 2007; Lindefors-Harris et al., 1991). Jones and Kost (2007) pooled data from the 1997 to 2001 annual National Survey of Family Growth to assess the accuracy of women's reports of the number of their past pregnancies and the timing and outcome of each pregnancy. Data were collected from face-to-face interviews and computer-assisted, self-administered questionnaires. Tallies of the survey responses were compared with national estimates of the number of abortions performed during the time period. Overall, the number of self-reported abortions was only 47 percent of the total estimated number of abortions performed in the United States during the study period. Inconsistencies also were seen between women's responses during the interviews and on the self-administered questionnaire.

The committee found that selective recall bias—which occurs when there are systematic differences in study subjects' reporting of a past exposure (e.g., a prior abortion)—affects much of the published research on abortion's long-term health effects.[3] In case control studies, for example, subjects who had a particular negative health outcome may be more likely to report having had the past exposure compared with subjects who also had the exposure but did not have the outcome. As a consequence, healthy subjects with an exposure are more likely than unhealthy subjects to be mistakenly assigned to a nonexposure study group. When this occurs, a study is likely to conclude erroneously that the negative health outcome is associated with the exposure. Many published abortion studies are flawed in this way because women who have had an abortion are less likely to report their prior abortion if they have not experienced a long-term adverse health outcome. Such selective recall bias was first documented in a 1975 study of low-birthweight births among women who had had an abortion (Hogue, 1975) and has been demonstrated in other studies of abortion's long-term effects (Anderson et al., 1994; Bouyer et al., 2003; Lindefors-Harris et al., 1991).

Recall bias is best addressed by using registry or medical record data to document prior abortions and link the abortion histories with reliable records of subsequent patient outcomes.

---

[3]Selective (or differential) recall bias has a different effect on study results relative to general (or nondifferential) recall bias. Nondifferential recall bias occurs when all study subjects are equally likely to misrecall an exposure. When this happens, study results are likely to underreport the association between the exposure and the health outcome (Alexander et al., 2015). In studies of abortion recall and health outcomes, only differential bias has been documented. This suggests that studies that rely on women's reports of abortion and that find no association with the condition under study might be used to conclude that there is evidence of no true association. However, the committee did not utilize this assumption, but rather relied exclusively on studies that document the subjects' abortion history.

2021 ED 000271

Copyright National Academy of Sciences. All rights reserved.

*Selection Bias (Comparability of Study Populations)*

Selection bias occurs when one of the baseline characteristics of the study population is associated with the outcome of interest (e.g., future pregnancy and birth complications after abortion). In such circumstances, the statistical analysis should take into account (or "control for") the differences in the prevalence of the confounding factors in the study and control groups. If the objective of a study is to determine whether having an abortion raises the risk of future mental health problems, for example, the study should control for women's mental health status at baseline (i.e., before they have the abortion). This is particularly important in mental health research because women who have an abortion report higher rates of mental health disorders *before* undergoing the procedure compared with women who give birth (Steinberg et al., 2014). Other confounding variables that may affect future health and pregnancy outcomes include socioeconomic status, race and ethnicity, smoking, and substance use. Much of the research on abortion's long-term effects has been conducted outside the United States, and a substantial volume of literature is based on abortion care in countries where such factors as socioeconomic conditions, culture, population health, health care resources, and/or the health care system are markedly different from those in the United States. In addition to the other selection criteria listed below, the committee determined the applicability of published research based on the likelihood that the abortion interventions examined reflected contemporary abortion care in the United States (e.g., in European countries). Although the committee identified studies of long-term health effects in Africa, China, India, Taiwan, and Vietnam, these studies were excluded.

### The Committee's Selection Criteria

The committee's literature search strategy for this chapter is provided in Appendix D. The bibliographies of retrieved articles were reviewed to find additional relevant research. Each identified article was reviewed to determine whether the study met the criteria listed below. The findings reported in this chapter draw solely on studies that met these criteria:

- for the study population, there was objective medical record or patient registry documentation of a prior induced abortion (excluding spontaneous abortion or miscarriage);
- the study population (women with a documented abortion) was compared with a control group of women with no documented abortion history;
- the analysis controlled for mental health status prior to the abortion (if assessing the mental health effects of abortion);

2021 ED 000272

Copyright National Academy of Sciences. All rights reserved.

- the study was published in 2000 or later and included abortions performed in 1980 or later (to help ensure that reported outcomes reflected contemporary abortion methods); and
- the clinical settings and care delivery were similar to those in the United States.

## FUTURE CHILDBEARING AND PREGNANCY OUTCOMES

Many women are likely to desire and experience a future pregnancy after having had an abortion. Abortion has been investigated for its potential effect on secondary infertility; ectopic pregnancy; spontaneous abortion and stillbirth; pregnancy complications that can lead to adverse maternal or fetal health; and preterm birth, low birthweight, and/or weight that is small for gestational age. This section reviews this research.

### Secondary Infertility

*Does Abortion Increase the Risk of Secondary Infertility?*

Secondary infertility is defined as difficulty conceiving a pregnancy or carrying a pregnancy to term after a previous pregnancy. The committee found one study on abortion and risk of secondary infertility that met its selection criteria. Holmlund and colleagues (2016) examined the pregnancy-related outcomes of 57,406 first-time mothers in Finland who gave birth between 2008 and 2010; 5,167 of the women had had a prior abortion. Using national registry data, the researchers linked the mothers' birth records with records documenting a prior abortion and/or subsequent treatment for infertility. First-time mothers with a prior abortion were significantly *less* likely to be treated for infertility compared with women in their first pregnancy (1.95 versus 5.14 percent, p <.0001), thus suggesting that there is no association between abortion and secondary infertility.

### Ectopic Pregnancy

*Does Abortion Increase the Risk of Ectopic Pregnancy?*

An ectopic pregnancy occurs when a fertilized egg grows outside of the uterus, most commonly in a fallopian tube. As the pregnancy progresses, the fallopian tube may rupture, causing major internal bleeding (ACOG, 2017). In 2013, an estimated 0.68 percent of commercially insured pregnant women and 0.57 percent of Medicaid-insured women in the United States were diagnosed and treated for an ectopic pregnancy (Tao et al., 2017). Women with a history of upper genital tract infection (e.g., in the

2021 ED 000273

Copyright National Academy of Sciences. All rights reserved.

uterus or fallopian tubes) are at increased risk of an ectopic pregnancy (Sivalingam et al., 2011). As noted in Chapter 2, serious infection after an abortion is rare and has become even rarer since antibiotic prophylaxis became standard practice. If untreated, an abortion-related infection may increase the risk of subsequent ectopic pregnancy.

While several literature reviews have concluded that abortion is not associated with increased risk of ectopic pregnancy (Lowit et al., 2010; RCOG, 2011b; Thorp et al., 2003), all the published reviews are methodologically flawed because they include studies based on maternal recall and/or rely heavily on studies of abortions performed before the introduction of contemporary abortion methods. The committee could identify no primary literature without these limitations.

### Spontaneous Abortion (Miscarriage) and Stillbirth

*Does Abortion Increase the Risk of Spontaneous Abortion and Stillbirth?*

Spontaneous abortion, also referred to as miscarriage, is the spontaneous death of a fetus prior to 20 weeks' gestation. Stillbirth refers to spontaneous fetal death after 20 weeks' gestation (ODPHP, 2017). Several literature reviews have concluded that abortion is not associated with increased risk of either spontaneous abortion or stillbirth (Lowit et al., 2010; RCOG, 2011b; Thorp et al., 2003). However, as in the published reviews of abortion and subsequent ectopic pregnancy, these literature reviews include studies of abortions performed with outdated methods and are methodologically flawed by reliance on studies based on maternal recall (rather than objective documentation of an abortion). The committee could identify no relevant primary literature without these limitations, and thus was unable to draw a conclusion regarding the association between abortion and risk of spontaneous abortion and stillbirth.

### Pregnancy Complications

The committee identified three primary research studies[4] that used documented records of receipt of an abortion to assess the effect of abortion

---

[4]The committee identified a fourth study that used Danish registry data to assess the effects of abortions performed from 1980 to 1982 on subsequent pregnancy complications. This study, by Zhou and colleagues (2001), was excluded from the committee's review because it is unlikely to reflect the outcomes of contemporary abortion methods. The authors report that almost all (99.7 percent) of the abortion procedures included in the study were followed by curettage. As noted in Chapter 2, sharp-metal curettage is no longer recommended because it is associated with risk of injury (NAF, 2017; RCOG, 2011b, 2015; Roblin, 2014; SFP, 2013; WHO, 2012).

2021 ED 000274

Copyright National Academy of Sciences. All rights reserved.

on the risk of complications in a future pregnancy. The study findings are summarized below. Study details, including adjusted odds ratios (aORs), sample sizes, and the years in which the abortions occurred, are provided in Table 4-1.

In a retrospective cohort study, Jackson and colleagues (2007) linked medical records and obstetrics databases in two Chicago-area hospitals to compare the pregnancy outcomes of women who had and had not previously received a dilation and evacuation (D&E) abortion. Holmlund and colleagues (2016) linked Finnish birth and abortion registry data to compare the first full-term pregnancies of women with and without a prior abortion. Finally, Woolner and colleagues (2014) used Scottish registry data to compare the risk of preterm delivery and other birth outcomes among women with and without a prior abortion. This latter analysis has a number of strengths not characteristic of most of the available research on abortion and subsequent birth outcomes. The researchers had a large enough sample and sufficient data to control for maternal age, socioeconomic variables, weeks' gestation (≤13 weeks versus >13 weeks), and smoking, as well as to stratify the sample by type of abortion (e.g., medication versus aspiration). The study population groups included 3,186 women with a documented termination of their first pregnancy and 42,446 primigravid women.[5]

## *Does Abortion Increase the Risk of Hypertension of Pregnancy?*

Hypertension of pregnancy includes preeclampsia and chronic and gestational hypertension. It is associated with increased risk of both maternal complications, such as placental abruption and gestational diabetes, and poor birth outcomes, such as preterm birth, having a baby that is small for gestational age, and infant death (CDC, 2016). Hypertension complicates about 5 to 10 percent of pregnancies (Garovic and August, 2013). The Woolner et al. (2014) and Holmlund et al. (2014) studies described above compared the subsequent pregnancies of women who had had prior abortions and women in their first pregnancy (without prior abortions) and found no increased risk of hypertension in pregnancy or preeclampsia among the women with prior abortions. In the Woolner et al. (2014) study, women who had had an abortion had a *lower* risk of hypertensive disease relative to women in their first pregnancy. This finding persisted when the outcomes were analyzed by type of abortion (i.e., medication and aspiration). The authors also found that the timing of abortion had no impact on hypertensive disease. Women who had undergone both early and late abortions had a *lower* risk of hypertension in pregnancy compared with women

---

[5]"Primigravid" refers to women who are pregnant for the first time.

2021 ED 000275

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

**TABLE 4-1** Studies Assessing the Association Between Abortion and Subsequent Pregnancy Complications Using Record-Linkage Methods

| Author (year) | Location (time period) | Abortion Group | Comparison Group |
|---|---|---|---|
| Holmlund et al. (2016) | Finland (1983–2007) | All methods n = 5,167 | Primigravid n = 52,239 |
| Woolner et al. (2014) | Scotland (1986–2010) | All methods n = 3,186 | Primigravid n = 42,446 |
| | | Aspiration n = 1,800 | Primigravid n = 42,446 |
| | | Medication n = 1,385 | Primigravid n = 42,446 |
| | | All methods ≥13 weeks n = 431 | Primigravid n = 42,446 |
| | | All methods <13 weeks n = 2,315 | Primigravid n = 42,446 |
| Jackson et al. (2007) | United States (1995–2003) | D&E 12–24 weeks n = 85 | Women with no history of midtrimester abortion, matched by age n = 170 |

NOTES: The term "primigravid" refers to a first pregnancy.
 [a]All methods n = 2,497; primigravid n = 33,520.
 [b]All methods n = 689; primigravid n = 8,916.
 [c]Aspiration n = 1,421; primigravid n = 33,520.
 [d]Aspiration n = 367; primigravid n = 8,916.
 [e]Medication n = 1,064; primigravid n = 33,520.

2021 ED 000276

Copyright National Academy of Sciences. All rights reserved.

| Adjusted Odds Ratios (Confidence Intervals) | | | |
| Hypertension | Antepartum Hemorrhage | Postpartum Hemorrhage | Notes |
|---|---|---|---|
| 1.07 (0.92–1.24) | n/a | n/a | aOR (95% CI); control variables not reported |
| 0.69 (0.61–0.78) | 1.26 (1.10–1.45) | Vaginal delivery[a] 1.14 (0.97–1.33) Cesarean section[b] 1.01 (0.74–1.36) | aOR (99% CI) adjusted for maternal age at delivery, smoking, and social class |
| 0.73 (0.62–0.85) | 1.33 (1.11–1.59) | Vaginal delivery[c] 0.88 (0.71–1.11) Cesarean section[d] 0.96 (0.64–1.45) | |
| 0.63 (0.52–0.76) | 1.18 (0.95–1.46) | Vaginal delivery[e] 1.49 (1.21–1.85) Cesarean section[f] 1.06 (0.69–1.62) | |
| 0.83 (0.71–0.98) | 1.02 (0.84–1.25) | Vaginal delivery[g] 1.05 (0.85–1.29) Cesarean section[h] 0.94 (0.60–1.45) | |
| 0.64 (0.55–0.75) | 1.29 (1.10–1.51) | Vaginal delivery[i] 1.09 (0.90–1.31) Cesarean section[j] 0.94 (0.66–1.35) | |
| n/a | n/a | n/a | Odds ratios not reported; outcomes reported as percentages (abortion versus control)  Abnormal placentation: 4.8% versus 2.4% (p = .310)  Hemorrhage: 2.3% versus 2.3% (p = 1.0) |

[f]Medication n = 321; primigravid n = 8,916.
[g]All methods ≥13 weeks n = 344; primigravid n = 33,520.
[h]All methods ≥13 weeks n = 87; primigravid n = 8,916.
[i]All methods <13 weeks n = 1,818; primigravid n = 33,520.
[j]All methods <13 weeks n = 497; primigravid n = 8,916.

2021 ED 000277

Copyright National Academy of Sciences. All rights reserved.

in their first pregnancy (aOR = 0.64; 99% CI = 0.55–0.75 and aOR = 0.83; 99% CI = 0.71–0.98, respectively).

### *Does Abortion Increase the Risk of Complications of the Placenta?*

Abnormal placentation, including placenta previa and accreta, is associated with maternal hemorrhage requiring transfusion (Saleh, 2008). The committee identified one study that assessed the risk of placenta complications in a full-term pregnancy following an abortion. As noted earlier, Jackson and colleagues (2007) compared the pregnancy outcomes of women with and without a prior D&E in two Chicago-area hospitals (Jackson et al., 2007). The authors found no association between D&E and abnormal placentation.

### *Does Abortion Increase the Risk of Hemorrhage in Subsequent Pregnancy?*

Two types of hemorrhaging may occur during pregnancy and childbirth: antepartum and postpartum. Antepartum hemorrhage—bleeding from or into the genital tract—affects from 3 to 5 percent of pregnancies globally (Lange and Toledo, 2017). Its causes vary with weeks' gestation. Before 20 weeks, bleeding may be due to abnormal embryo implantation, miscarriage, ectopic pregnancy, gestational trophoblastic disease, and benign and malignant tumors of the reproductive tract. After 20 weeks' gestation (and before birth), the most common causes of antepartum bleeding are cervical change due to preterm labor and disorders of the placenta. Postpartum hemorrhage is usually defined as the loss of 500 ml or more of blood from the genital tract within 24 hours of childbirth (RCOG, 2017); in 2006, it affected an estimated 2.9 percent of pregnancies in the United States (Callaghan et al., 2010). The most common cause (79 percent) is uterine atony, the failure of the uterus to contract following delivery (Bateman et al., 2010).

The Woolner et al. (2014) registry study contains the only analysis the committee could identify on abortion's association with hemorrhage in subsequent pregnancy (Woolner et al., 2014). The study found that prior aspiration abortion was associated with a higher risk of antepartum hemorrhage (aOR = 1.33; 99% CI = 1.11–1.59). However, unlike the other outcomes the researchers investigated (e.g., see the above review of hypertensive disorders and preterm birth), antepartum hemorrhage was not clearly defined, and the finding of higher risk does not appear to be clinically significant as there was no association with preterm birth or hospitalization. In contrast, Woolner and colleagues (2014) clearly defined postpartum hemorrhage as >500 ml blood loss for vaginal delivery or >1,000 ml blood loss for cesarean section. The risk of postpartum hemorrhage during a vaginal

2021 ED 000278

Copyright National Academy of Sciences. All rights reserved.

delivery was higher among women who had had a medication abortion (but not an aspiration abortion) compared with women in their first pregnancy (aOR = 1.49; 99% CI = 1.21–1.85). It is unclear how a medication abortion might lead to postpartum hemorrhage in a later pregnancy. There were no differences for cesarean section.

### Preterm Birth, Small for Gestational Age, and Low Birthweight

Preterm birth (birth at <37 weeks' gestation) and low birthweight are related. Infants born prematurely are more likely than full-term infants to weigh <2,500 g (the definition of low birthweight)—although full-term infants that are small for gestational age may also weigh <2,500 g, and low-birthweight and preterm infants can be the appropriate weight for their gestation. Each of these adverse outcomes may have different underlying causes. The risks to neonatal survival and development vary at different birthweights and weeks' gestation. Thus, investigators often examine both gestation at delivery and fetal growth to determine whether a prior abortion is a risk factor for poor pregnancy outcomes in the future.

First births are at greater risk of preterm delivery than are subsequent births (Ananth et al., 2001). Thus, if the risk of preterm delivery is compared for women who have had an abortion and those who have not, the findings are likely to be biased if they do not take into account the increased risk of preterm delivery for first births (Hogue et al., 1982). To address this source of bias and ensure the comparability of study populations, the committee limited its review to studies of preterm birth that compare the outcomes of a first birth or control for the number of previous births. In the following discussion, the extent to which studies adjust for other confounding variables (e.g., smoking, maternal age, the provision of prophylactic antibiotics at the time of abortion, the type of abortion method, weeks' gestation, and the number of prior abortions) is noted.

The committee identified five studies that met its criteria for assessing the association of abortion with birth outcomes (see Table 4-2). These include the Woolner et al. (2014) and Jackson et al. (2007) studies described above and three studies that used linked Finnish medical records during different but overlapping time periods (KC et al., 2017b; Klemetti et al., 2012; Mannisto et al., 2017). The findings from these studies are presented below. See Table 4-2 for further details on study designs and results.

### *Do Early-Gestation Aspiration or Medication Abortions Increase the Risk of Preterm Birth?*

The Woolner et al. (2014) study is the only available reliable analysis (meeting the committee's criteria) of the association between abortion

2021 ED 000279

Copyright National Academy of Sciences. All rights reserved.

**TABLE 4-2** Studies Assessing the Association Between Abortion and Preterm Birth (PTB), Low Birthweight (LBW), and Small for Gestational Age (SGA) Using Record-Linkage Methods

| Authors (year) | Location (abortion period) | Abortion Group | Comparator | Adjusted Odds Ratios (Confidence Intervals) Very PTB[a] |
|---|---|---|---|---|
| KC et al. (2017b) | Finland (1983–2013) | 1 medication abortion n = 12,183 | No previous abortion n = 365,356 | Very PTB 0.92 (0.70–1.21) Extremely PTB 0.96 (0.68–1.35) |
| | | 1 aspiration abortion n = 33,840 | No previous abortion n = 365,356 | Very PTB 1.01 (0.87–1.18) Extremely PTB 1.11 (0.92–1.33) |
| | | >1 medication abortion n = 1,267 | No previous abortion n = 365,356 | Very PTB 0.50 (0.16–1.55) Extremely PTB 0.82 (0.26–2.58) |
| | | >1 aspiration abortion n = 4,819 | No previous abortion n = 365,356 | Very PTB 1.14 (0.81–1.59) Extremely PTB 1.51 (1.03–2.23) |
| Mannisto et al. (2017) | Finland (2000–2009) | 0 to <6 months interpregnancy interval n = 2,956 | 18 to <24 months interpregnancy interval n = 2,076 | n/a |
| | | 6 to <12 months interpregnancy interval n = 3,203 | 18 to <24 months interpregnancy interval n = 2,076 | n/a |
| | | 12 to <18 months interpregnancy interval n = 2,623 | 18 to <24 months interpregnancy interval n = 2,076 | n/a |
| | | ≥24 months interpregnancy interval n = 9,036 | 18 to <24 months interpregnancy interval n = 2,076 | n/a |

Copyright National Academy of Sciences. All rights reserved.

| | Adjusted Odds Ratios (Confidence Intervals) | | | |
| --- | --- | --- | --- | --- |
| | All PTB <37 Weeks | Spontaneous PTB <37 Weeks | LBW or SGA | Notes |
| | 0.85 (0.77–0.93) | n/a | SGA 1.05 (0.97–1.15) | aOR (95% CI) adjusted for maternal age, marital status, maternal smoking, maternal residence of municipality, and birth year of child. |
| | 0.99 (0.94–1.05) | n/a | SGA 1.07 (1.02–1.13) | |
| | 0.70 (0.51–0.96) | n/a | SGA 1.05 (0.82–1.34) | |
| | 1.00 (0.88–1.14) | n/a | SGA 1.07 (0.95–1.21) | |
| | 1.35 (1.02–1.77) | n/a | LBW 1.22 (0.90–1.66)  SGA 1.15 (0.80–1.66) | aOR (95% CI) adjusted for parity, prepregnancy body mass index (BMI), cohabitation, type of residence, socioeconomic status, maternal age, smoking, type of termination of pregnancy, and gestational age at termination of pregnancy. |
| | 1.14 (0.86–1.50) | n/a | LBW 1.10 (0.82–1.49)  SGA 1.21 (0.85–1.71) | |
| | 0.94 (0.70–1.26) | n/a | LBW 0.87 (0.62–1.20)  SGA 0.86 (0.58–1.26) | |
| | 1.19 (0.93–1.53) | n/a | LBW 1.06 (0.81–1.39)  SGA 0.89 (0.65–1.22) | |

*continued*

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

*142  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**TABLE 4-2**  Continued

| Authors (year) | Location (abortion period) | Abortion Group | Comparator | Adjusted Odds Ratios (Confidence Intervals) Very PTB[a] |
|---|---|---|---|---|
| Woolner et al. (2014) | Scotland (1986–2010) | All methods n = 3,186 | No previous pregnancy n = 42,446 | 0.81 (0.54–1.21) |
| | | Aspiration n = 1,800 | No previous pregnancy n = 42,446 | 0.73 (0.42–1.26) |
| | | Medication n = 1,385 | No previous pregnancy n = 42,446 | 0.91 (0.52–1.60) |
| | | All methods <13 weeks n = 2,315 | No previous pregnancy n = 42,446 | 0.84 (0.53–1.33) |
| | | All methods ≥13 weeks n = 431 | No previous pregnancy n = 42,446 | 1.02 (0.64–1.62) |
| Klemetti et al. (2012) | Finland (1983–2008) | 1 previous abortion n = 31,083 | No previous abortion n = 264,190 | 1.19 (0.98–1.44) |
| | | 2 previous abortions n = 4,417 | No previous abortion n = 264,190 | 1.69 (1.14–2.51) |
| | | 3 or more previous abortions n = 942 | No previous abortion n = 264,190 | 2.78 (1.48–5.24) |
| | | 1 or more previous abortions n = 36,442 | No previous abortion n = 264,190 | 1.27 (1.06–1.52) |

Copyright National Academy of Sciences. All rights reserved.

| | Adjusted Odds Ratios (Confidence Intervals) | | |
| All PTB <37 Weeks | Spontaneous PTB <37 Weeks | LBW or SGA | Notes |
|---|---|---|---|
| 1.05 (0.88–1.26) | 1.05 (0.83–1.32)[b] | LBW 1.14 (0.94–1.39) | aOR (99% CI) adjusted for maternal age at delivery, smoking, and social class. |
| 1.10 (0.88–1.39) | 1.06 (0.78–1.44)[c] | LBW 1.08 (0.84–1.38) | |
| 0.98 (0.75–1.29) | 1.03 (0.72–1.46)[d] | LBW 1.23 (0.92–1.68) | |
| 1.03 (0.83–1.27) | 0.97 (0.73–1.28)[e] | LBW 1.13 (0.90–1.41) | |
| 1.13 (0.91–1.40) | 1.25 (0.97–1.60)[f] | LBW 1.01 (0.79–1.29) | |
| 0.98 (0.93–1.03) | n/a | LBW 0.96 (0.90–1.01) Very LBW 1.03 (0.91–1.18) | aOR (95% CI) adjusted for age, marital status, socioeconomic position, urbanity, smoking, miscarriage, and ectopic pregnancy. |
| 1.01 (0.89–1.15) | n/a | LBW 1.02 (0.89–1.18) Very LBW 1.13 (0.84–1.54) | |
| 1.35 (1.07–1.71) | n/a | LBW 1.43 (1.12–1.84) Very LBW 2.25 (1.43–3.52) | |
| 0.99 (0.94–1.04) | n/a | LBW 0.98 (0.93–1.03) Very LBW 1.06 (0.94–1.19) | |

*continued*

2021 ED 000283

Copyright National Academy of Sciences. All rights reserved.

*144 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**TABLE 4-2** Continued

| Authors (year) | Location (abortion period) | Abortion Group | Comparator | Adjusted Odds Ratios (Confidence Intervals) <br><br> Very PTB[a] |
|---|---|---|---|---|
| Jackson et al. (2007) | United States (1995–2003) | D&E 12–24 weeks n = 85 | Women with no history of midtrimester abortion, matched by age n = 170 | n/a |

NOTES: aOR = adjusted odds radio; CI = confidence interval; LBW = <2,500 g; n/a = not applicable; very LBW = <1,500 g.

[a]Very PTB is defined as the following in these studies: KC et al. (2017b) defines very PTB as a birth before 32 weeks' gestations and extremely PTB as a birth before 28 weeks' gestation; Woolner et al. (2014) defines very PTB as a birth before 33 weeks' gestation; Klemetti et al. (2012) defines very PTB as a birth occurring before 28 weeks' gestation.

[b]All methods n = 2,093; primigravid n = 28,012.

[c]Aspiration n = 1,187; primigravid n = 28,012.

[d]Medication n = 906; primigravid n = 28,012.

[e]All methods <13 weeks n = 1,504; primigravid n = 28,012.

[f]All methods ≥13 weeks n = 304; primigravid n = 28,012.

[g]The authors of this study note that this finding was not likely to be clinically significant and may have been confounded by multiple factors (e.g., an unusually low proportion of PTB in the control group), and that controls were lacking for important variables, including race, socioeconomic status, smoking, and prior uterine surgery (including dilation and curettage) (Jackson et al., 2007, Table 1).

Copyright National Academy of Sciences. All rights reserved.

| | Adjusted Odds Ratios (Confidence Intervals) | | |
| --- | --- | --- | --- |
| All PTB <37 Weeks | Spontaneous PTB <37 Weeks | LBW or SGA | Notes |
| n/a | n/a | n/a | Odds ratios not reported; outcomes reported as percentages (abortion versus control): |
| | | | PTB <37 weeks: 9.5% versus 2.9% (p = .025)[g] |
| | | | PTB <34 weeks: 0.0% versus 0.6% (p = 1.0) |
| | | | Spontaneous PTB <37 weeks: 6.0% versus 2.4% (p = .144) |

2021 ED 000285

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 167 of 4
PageID.8345
*146   THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

*method* at ≤13 weeks' gestation and preterm birth in the next pregnancy. As noted above, the authors controlled for smoking history and other potential confounding variables and also stratified the sample to assess differences in the outcomes of women with a prior medication abortion (n = 1,385), a prior aspiration abortion (n = 1,800), or no prior abortion (n = 42,446) both before and after 13 weeks' gestation. The authors found no statistically significant association between an abortion at <13 weeks' gestation in the first pregnancy and preterm (aOR = 1.03; 99% CI = 0.83–1.27), spontaneous preterm (aOR = 0.97; 99% CI = 0.73–1.28), or very preterm births (aOR = 0.84; 99% CI = 0.53–1.33) in the next pregnancy.

### *Do Later-Gestation Abortions Increase the Risk of Preterm Birth?*

Woolner and colleagues (2014) found no significant association between a medication or aspiration abortion after 13 weeks' gestation and a later preterm birth (aOR = 1.13; 99% CI = 0.91–1.40). The small hospital-based study by Jackson and colleagues (2007) compared the birth outcomes of women undergoing D&Es at 12 to 24 weeks' gestation (n = 85) and women without a history of abortion (n = 170). Controlling for maternal age, multiparity, prior preterm birth, first-trimester dilation and curettage, first-trimester spontaneous delivery, and prior cervical surgery, the researchers found no significant difference in the risk of a later spontaneous preterm birth between the groups of women with a prior D&E abortion and no prior abortion.

### *Does a Short Interval Between Abortion and Subsequent Pregnancy Increase the Risk of Preterm Birth?*

A number of studies indicate that a short interpregnancy interval between live births (conception less than 6 months after the previous pregnancy) may be a risk factor for preterm birth (Smith et al., 2003; Wong et al., 2016). Pregnancies occurring 18 to 23 months after a previous birth have been found to have the lowest risks of preterm births and other adverse events (Ball et al., 2004). The committee identified one study that examined whether a short interpregnancy interval after abortion increases the risk of preterm birth in a subsequent birth. In a Finnish-based study of linked medical records, Mannisto and colleagues (2017) addressed this question by comparing postabortion pregnancies occurring less than 6 months after an abortion with those occurring 18 to 23 months postabortion with respect to risk of preterm birth. They found a slight but significant increase in the estimated risk of preterm birth (aOR = 1.35; 95% CI = 1.02–1.77). This finding is consistent with those from studies focused on other pregnancy outcomes in the index pregnancy (Conde-Agudelo et al., 2012; Shachar et

2021 ED 000286

Copyright National Academy of Sciences. All rights reserved.

al., 2016; Wendt et al., 2012), although some have challenged whether the association is causal or related to maternal factors rather than the interval itself (Ball et al., 2014; Hanley et al., 2017; Klebanoff, 2017). If the association between short interpregnancy interval and preterm birth is causal, extending the interval between pregnancies beyond 6 months should reduce the risk of preterm birth associated with shorter intervals. In the case of abortion, effective postabortion contraceptive counseling and use could reduce this concern.

### *Do Multiple Abortions Increase the Risk of Preterm Birth?*

The committee identified two studies (both based in Finland) that examined whether having multiple abortions is associated with a greater risk of preterm birth (KC et al., 2017b; Klemetti et al., 2012). Using 1983–2008 national registry data, Klemetti and colleagues (2012) compared the outcomes of first-time births among women with two prior abortions of any type or gestation (n = 4,417), three or more prior abortions (n = 942), and no prior abortion (n = 264,190). Their analysis adjusted for maternal age, marital status, socioeconomic status, urban residence, smoking, miscarriage, and ectopic pregnancy. The researchers found a dose-response relationship between the number of prior abortions before a first birth and an increased risk of *very* preterm birth (<28 weeks' gestation)[6] after two abortions (aOR = 1.69; 95% CI = 1.14, 2.51) and after three or more abortions (aOR = 2.78; 95% CI = 1.48, 5.24) compared with first births among women with no abortion history. In addition, three or more abortions were associated with preterm birth at <37 weeks' gestation (aOR = 1.35; 95% CI = 1.07–1.71).

KC and colleagues (2017b)[7] used Finnish registry data that extended into a more recent time period (1983–2013) to examine first-birth outcomes following more than one medication or aspiration abortion. The analysis controlled for maternal age, marital status, smoking, maternal residence (by municipality), and birth year. The researchers found that first births were at an increased risk of very preterm birth[8] after more than one aspiration abortion (n = 4,819) compared with women with no abortions (n = 365,356) (aOR = 1.51; 95% CI = 1.03–2.23). No association was found between multiple medication abortions (n = 1,267) and preterm birth.

---

[6]Incidence of very preterm births (number per 1,000 births): no previous abortions, 3/1,000; one previous abortion, 4/1,000; two previous abortions 6/1,000; three or more previous abortions 11/1,000 (Klemetti et al., 2012).

[7]Another publication by KC and colleagues describes the same study (KC et al., 2017a).

[8]KC and colleagues (2017b) use the term "extremely preterm" to refer to births at <28 weeks. Other than the aORs described, the authors did not report the number of very preterm births in the study groups.

2021 ED 000287

Copyright National Academy of Sciences. All rights reserved.

*148 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

## RISK OF BREAST CANCER

*Does Abortion Increase the Risk of Breast Cancer?*

The association of breast cancer and abortion has been examined in the literature over several decades. Pregnancy has been shown to have a protective effect against breast cancer (NCI, 2016). The original hypotheses suggesting a possible association of abortion with breast cancer drew on animal studies indicating that an *interrupted* pregnancy might reduce the protective effect of full-term pregnancy on future risk of breast cancer (Russo and Russo, 1980). Epidemiological studies have explored this possible association in analyses of women who have had an abortion. However, much of this literature, including systematic reviews, meta-analyses, and primary research, is flawed by recall bias and lack of controls for such clinically important confounding factors as age at first live birth. The risk of hormone receptor-positive breast cancer increases with a woman's age at first full-term pregnancy (NCI, 2016).

The committee identified three case control studies of insured women with abortion coverage that used documented records of a prior abortion (Brewster et al., 2005; Goldacre et al., 2001; Newcomb and Mandelson, 2000). The studies controlled for a variety of confounding variables, such as parity, age at delivery of first child, age at breast cancer diagnosis, family history of breast cancer, race, and socioeconomic status.

In a case control study of Scottish women, Brewster and colleagues (2005) linked National Health Service (NHS) hospital discharge and maternity records with national cancer registry and death records dating from 1981 to 1998. The analysis included 2,833 cases (women with a first-time breast cancer diagnosis before age 55) and 9,888 matched controls (women without cancer who had been admitted to an acute care hospital for a non-obstetric, nongynecological condition). Controls were matched with cases by birth year, year of breast cancer diagnosis, residence, and socioeconomic status. The sample was stratified by the same variables, as well as age at breast cancer diagnosis, parity, and age at delivery of first child. Women who had had a prior abortion were no more likely than other women to develop breast cancer (aOR = 0.80; 95% CI = 0.72–0.89). Age at abortion, number of abortions, weeks of gestation, time since abortion, and temporal sequence of live births and abortions also were not found to increase the risk of breast cancer.

In another case control study using linked NHS records, Goldacre and colleagues (2001) analyzed 28,616 breast cancer cases in the Oxford health region of England from 1968 to 1998. The matched control group included 325,456 women who had been hospitalized for reasons other than cancer. The sample was stratified by age, year of the case or control event, residence, and social class. Women with a prior abortion were found not

2021 ED 000288

Copyright National Academy of Sciences. All rights reserved.

to be at higher risk of breast cancer than women with no abortion history (OR = 0.83; 95% CI = 0.74–0.93).

Newcomb and Mandelson (2000) analyzed the risk of breast cancer among members of the Group Health Cooperative of Puget Sound (Washington State) by linking health plan and local cancer registry data. The analysis included 138 cancer cases and 252 matched controls and adjusted for race, age at first birth, menopause status, family breast cancer history, and body mass index. The control group was matched by age and period of enrollment in the health plan. The analysis found no association between a history of abortion and breast cancer; compared with women with no prior abortion, the adjusted relative risk of breast cancer in women with an abortion was 0.9 (95% CI = 0.5–1.6).

## MENTAL HEALTH DISORDERS

### *Does Abortion Increase the Risk of Long-Term Mental Health Problems?*

The committee identified a wide array of research on mental health outcomes, including systematic reviews (Bellieni and Buonocore, 2013; Charles et al., 2008; Coleman, 2011; Fergusson et al., 2013; Major et al., 2008, 2009; NCCMH, 2011), prospective cohort studies (Biggs et al., 2015, 2016, 2017; Foster et al., 2015; Munk-Olsen et al., 2011), cohort studies (Fergusson et al., 2006; Gomez, 2018; Herd et al., 2016; Pedersen, 2007, 2008; Steinberg and Russo, 2008; Steinberg et al., 2011; Warren et al., 2010), and analyses linking medical record or registry data (Coleman et al., 2002; Gissler et al., 2015; Leppalahti et al., 2016; Munk-Olsen et al., 2011; Reardon et al., 2003). Most of the studies focused on whether abortion increases women's risk of depression, anxiety, and/or posttraumatic stress disorder (PTSD).

The utility of most of the published research on mental health outcomes is limited by selective recall bias, inadequate controls for confounding factors, and inappropriate comparators (Major et al., 2008; NCCMH, 2011). Moreover, systematic reviews and meta-analyses are not reliable if they do not assess the quality of the primary research they include (IOM, 2011). As noted earlier, objective documentation of a prior abortion is essential to assessing whether abortion is associated with any outcomes, including subsequent mental health problems. Yet while self-reported data are not reliable sources of abortion history, self-reports are the basis of much of the available primary research on the association between abortion and mental health (Fergusson et al., 2006; Gomez, 2018; Herd et al., 2016; Nilsen et al., 2012; Pedersen, 2007, 2008; Steinberg and Finer, 2011; Steinberg and Russo, 2008; Steinberg et al., 2011; Sullins, 2016; Warren et al., 2010). In addition, as noted earlier, if a study's objective is to determine whether

2021 ED 000289

Copyright National Academy of Sciences. All rights reserved.

having an abortion raises the risk of future mental health problems, it is important that the study control for women's mental health status at baseline (i.e., before they had the abortion). For example, Steinberg and colleagues (2014) found that women who have abortions report higher rates of mood disorders (depression, bipolar disorder, and dysthymia) (21.0 percent) before undergoing the procedure compared with women with no abortion history who give birth (10.6 percent). Studies by Coleman and colleagues (2002) and Reardon and colleagues (2003) failed to control adequately for preexisting mental disorders. Munk-Olsen and colleagues (2011, 2012) report that their analyses are limited because they were unable to control for a woman's reason for having an abortion and whether the pregnancy was unwanted. Terminations of pregnancies due to fetal abnormalities, for example, may have very different psychological consequences than abortions for unwanted pregnancies.[9]

The committee identified seven systematic reviews on the association between abortion and long-term mental health problems (Bellieni and Buonocore, 2013; Charles et al., 2008; Coleman, 2011; Fergusson et al., 2013; Major et al., 2008, 2009; NCCMH, 2011). The 2011 review conducted by the UK National Collaborating Center for Mental Health (NCCMH)[10] is particularly informative (NCCMH, 2011). Building on the previously published reviews, the NCCMH (2011) used GRADE[11] to analyze the quality of individual studies on several research questions, including the focus of this review, that is, whether women who have an abortion experience more mental health problems than women who deliver an unwanted pregnancy. The two reviews published after the NCCMH report (Bellieni and Buonocore, 2013; Fergusson et al., 2013) identified no additional studies that met the committee's selection criteria. After extensive quality checks of the primary literature, including controlling for previous mental health problems, NCCMH (2011) found that "the rates of mental health problems for women with an unwanted pregnancy were the same whether they had an abortion or gave birth" (p. 8).

The committee identified several more recent studies that met its selection criteria but were published after the NCCMH and other systematic reviews (Biggs et al., 2015, 2016, 2017; Foster et al., 2015; Leppalahti et

---

[9]The committee did not examine the literature on the mental health consequences of terminations of pregnancies due to fetal abnormalities.

[10]The NCCMH was established by the Royal College of Psychiatrists, in partnership with the British Psychological Society, to develop evidence-based mental health reviews and clinical guidelines (NCCMH, 2011).

[11]GRADE refers to the Grading of Recommendations Assessment, Development, and Evaluation. It is a tool, used by the Cochrane Collaboration and many other health care research organizations, for assessing the quality of evidence in health care and the strength of clinical recommendations (GRADE Working Group, 2004, 2018).

2021 ED 000290

Copyright National Academy of Sciences. All rights reserved.

al., 2016). Four recent articles draw on the Turnaway study, a prospective longitudinal cohort study designed to address many of the limitations of other studies (Biggs et al., 2015, 2016, 2017; Foster et al., 2015).

The Turnaway study contributes unique insight into the consequences of receiving a desired abortion versus being denied the procedure and carrying the pregnancy to term. The study sample included 956 English- and Spanish-speaking women aged 15 and over who sought abortions between 2008 and 2010 from 30 abortion facilities in the United States. The sample design was unique because it drew from groups of women who presented up to 3 weeks beyond a facility's gestational age limit and were denied an abortion, women presenting within 2 weeks of the limit who received an abortion, and women who received a first-trimester abortion. The women were followed via semiannual phone interviews for 5 years (Dobkin et al., 2014). The investigators collected baseline data on mental health (history of depression, anxiety, suicidal ideation), as well as data on factors known to be important predictors of mental health problems (e.g., history of trauma and abuse). The study groups were specifically designed to enable comparisons of women who had had abortions and those who had been turned away (wanted an abortion but were denied one).

Results from the Turnaway study suggest that there are few psychiatric consequences of abortion, including risk of depression, anxiety, or PTSD. At 2 years, women who had received an abortion had similar or lower levels of depression and anxiety than women denied an abortion (Foster et al., 2015). The study also examined new self-reports of professional diagnoses of either depression or anxiety at 3 years postabortion. Women who had obtained abortions near facility gestational limits were at no greater mental health risk than women who had sought an abortion and carried an unwanted pregnancy to term (Biggs et al., 2015). At 4 years follow-up, the participants completed a measure of PTSD risk (Biggs et al., 2016). Women who had received an abortion were at no higher risk of PTSD than women who had been denied an abortion. At 5 years follow-up, women completed measures of mental health (depression and anxiety) and well-being (self-esteem and life satisfaction) (Biggs et al., 2017). Compared with having had an abortion, having being denied an abortion may be associated with greater risk of initially experiencing more anxiety symptoms; levels of depression were similar among both groups of women.

Two recent studies used Finnish registry data to analyze mental health outcomes after abortion. Leppalahti and colleagues (2016) conducted a longitudinal retrospective cohort study of girls born in Finland in 1987 to examine the effect of abortion on adolescent girls. The comparison groups were girls who had had an abortion (n = 1,041) or given birth (n = 394) before age 18 and a group with no pregnancies up to age 20 (n = 25,312). The girls were followed until age 25. The researchers found no significant

2021 ED 000291

Copyright National Academy of Sciences. All rights reserved.

differences between the underage abortion group and childbirth group with respect to risk of any psychiatric disorder (including psychoactive substance use disorder, mood disorder, or neurotic or stress-related disorders) after the index pregnancy (aOR = 0.96; 95% CI = 0.67–1.40). Other recent Finnish research provides some evidence that monitoring for mental health status in a follow-up visit after abortion may help reduce the consequences of serious mental health disorders (Gissler et al., 2015).

## PREMATURE DEATH

### *Does Abortion Increase the Risk of Premature Death?*

Mortality following abortion is an important long-term outcome to consider. As noted in Chapter 2 (see Table 2-4), when mortality rates from abortion and childbirth are compared, abortion is associated with fewer maternal deaths than carrying a pregnancy to term (Grimes, 2006; Raymond and Grimes, 2012). However, the follow-up period in these short-term studies may not have been of sufficient length to account for late complications leading to death. The committee identified several studies that examined long-term mortality and abortion. These studies—one U.S. study (Reardon et al., 2002) and four studies using Finnish registries (Gissler et al., 2004, 2005, 2015; Jalanko et al., 2017)—are based on linked records. In comparing groups on mortality, however, it is important to adjust for both individual characteristics and social risk factors, as they are likely to differ between women who give birth and those who have an abortion. Minority women and those who are young, unmarried, or poor are more likely than more advantaged women to have unwanted pregnancies and subsequent abortions (Boonstra et al., 2006). Without robust risk adjustments for these social differences, attributing outcomes to such factors as having an abortion or not, especially when the outcomes are rare, is inappropriate. As a result of the inability to control for the many ways in which women who have unwanted pregnancies differ from those who do not, no clear conclusions regarding the association between abortion and long-term mortality can be drawn from these studies.

## SUMMARY

This chapter has reviewed the epidemiological evidence on abortion's long-term effects on future childbearing and pregnancy outcomes, risk of breast cancer, mental health disorders, and premature death. The committee found that much of the published literature on these topics fails to meet scientific standards for rigorous, unbiased research. Reliable research on these outcomes uses documented records of a prior abortion, analyzes

Copyright National Academy of Sciences. All rights reserved.

comparable study and control groups, and controls for confounding variables shown to affect the outcome of interest. Thus, this chapter has focused on the findings of research that meets these basic standards. The committee did not find well-designed research on abortion's association with future ectopic pregnancy, miscarriage or stillbirth, or long-term mortality. Findings on hemorrhage during a subsequent pregnancy are inconclusive.

The committee identified high-quality research on numerous outcomes of interest and concludes that having an abortion does not increase a woman's risk of secondary infertility, pregnancy-related hypertensive disorders, abnormal placentation (after a D&E abortion), preterm birth, breast cancer, or mental health disorders (depression, anxiety, and PTSD). An increased risk of very preterm birth (<28 weeks' gestation) in a woman's first birth was found to be associated with having two or more prior aspiration abortions compared with first births among women with no abortion history; the risk appears to be associated with the number of prior abortions. Preterm birth is associated with pregnancy spacing after an abortion: it is more likely if the interval between abortion and conception is less than 6 months (the same is also true of pregnancy spacing in general).

## REFERENCES

ACOG (American College of Obstetricians and Gynecologists). 2017. *Ectopic pregnancy*. https://www.acog.org/Patients/FAQs/Ectopic-Pregnancy (accessed November 13, 2017).

Alexander, L. K., B. Lopes, K. Ricchetti-Masterson, and K. B. Yeatts. 2015. *ERIC notebook. sources of systematic error or bias: Information bias*, 2nd ed. https://sph.unc.edu/files/2015/07/nciph_ERIC14.pdf (accessed December 4, 2017).

Ananth, C. V., D. P. Misra, K. Demissie, and J. C. Smulian. 2001. Rates of preterm delivery among black women and white women in the United States over two decades: An age-period-cohort analysis. *American Journal of Epidemiology* 154(7):657–665.

Anderson, B. A., K. Katus, A. Puur, and B. D. Silver. 1994. The validity of survey responses on abortion: Evidence from Estonia. *Demography* 31(1):115–132.

Ball, S. J., G. Pereira, P. Jacoby, N. de Klerk, and F. J. Stanley. 2014. Re-evaluation of link between interpregnancy interval and adverse birth outcomes: Retrospective cohort study matching two intervals per mother. *British Medical Journal* 349:g4333. doi:10.1136/bmj.g4333.

Bateman B. T., M. F. Berman, L. E. Riley, and L. R. Leffert. 2010. The epidemiology of postpartum hemorrhage in a large, nationwide sample of deliveries. *Anesthesia-Analgesia* 110(5):1368–1373.

Bellieni, C. V., and G. Buonocore. 2013. Abortion and subsequent mental health: Review of the literature. *Psychiatry and Clinical Neurosciences* 67(5):301–310.

Beral, V., D. Bull, R. Doll, R. Peto, and G. Reeves. 2004. Breast cancer and abortion: Collaborative reanalysis of data from 53 epidemiological studies, including 83,000 women with breast cancer from 16 countries. *Lancet* 363(9414):1007–1016.

Biggs, M. A., J. M. Neuhaus, and D. G. Foster. 2015. Mental health diagnoses 3 years after receiving or being denied an abortion in the United States. *American Journal of Public Health* 105(12):2557–2563.

2021 ED 000293

Copyright National Academy of Sciences. All rights reserved.

Biggs, M. A., B. Rowland, C. E. McCulloch, and D. G. Foster. 2016. Does abortion increase women's risk for post-traumatic stress? Findings from a prospective longitudinal cohort study. *British Medical Journal Open* 6(2):e009698. doi:10.1136/bmjopen-2015-009698.

Biggs, M. A., U. D. Upadhyay, C. E. McCulloch, and D. G. Foster. 2017. Women's mental health and well-being 5 years after receiving or being denied an abortion: A prospective, longitudinal cohort study. *JAMA Psychiatry* 74(2):169–178.

Boonstra, H. D., R. Gold, C. Richards, and L. Finer. 2006. *Abortion in women's lives.* New York: Guttmacher Institute.

Bouyer, J., J. Coste, T. Shojaei, J. L. Pouly, H. Fernandez, L. Gerbaud, and N. Job-Spira. 2003. Risk factors for ectopic pregnancy: A comprehensive analysis based on a large case-control, population-based study in France. *American Journal of Epidemiology* 157(3):185–194.

Brewster, D., D. Stockton, R. Dobbie, D. Bull, and V. Beral. 2005. Risk of breast cancer after miscarriage or induced abortion: A Scottish record linkage case-control study. *Journal of Epidemiology and Community Health* 59(4):283–287.

Callaghan, W. M., E. V. Kuklina, and C. J. Berg. 2010. Trends in postpartum hemorrhage: United States, 1994–2006. *American Journal of Obstetrics and Gynecology* 202(4):353, e351–e356.

CDC (Centers for Disease Control and Prevention). 2016. *Pregnancy complications.* https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregcomplications.htm (accessed February 2, 2018).

Charles, V. E., C. B. Polis, S. K. Sridhara, and R. W. Blum. 2008. Abortion and long-term mental health outcomes: A systematic review of the evidence. *Contraception* 78(6):436–450.

Cochrane Collaboration. 2018. *Assessing risk of bias in included studies.* http://methods.cochrane.org/bias/assessing-risk-bias-included-studies (accessed January 5, 2018).

Coleman, P. K. 2011. Abortion and mental health: Quantitative synthesis and analysis of research published 1995–2009. *The British Journal of Psychiatry* 199(3):180–186.

Coleman, P. K., D. C. Reardon, V. M. Rue, and J. Cougle. 2002. State-funded abortions versus deliveries: A comparison of outpatient mental health claims over 4 years. *American Journal of Orthopsychiatry* 72(1):141–152.

Conde-Agudelo, A., A. Rosas-Bermudez, F. Castano, and M. H. Norton. 2012. Effects of birth spacing on maternal, perinatal, infant, and child health: A systematic review of causal mechanisms. *Studies in Family Planning* 43(2):93–114.

Dobkin, L. M., H. Gould, R. E. Barar, M. Ferrari, E. I. Weiss, and D. G. Foster. 2014. Implementing a prospective study of women seeking abortion in the United States: Understanding and overcoming barriers to recruitment. *Women's Health Issues* 24(1):e115–e123.

Fergusson, D. M., L. J. Horwood, and E. M. Ridder. 2006. Abortion in young women and subsequent mental health. *Journal of Child Psychology and Psychiatry* 47(1):16–24.

Fergusson, D. M., L. J. Horwood, and J. M. Boden. 2013. Does abortion reduce the mental health risks of unwanted or unintended pregnancy? A re-appraisal of the evidence. *Australian & New Zealand Journal of Psychiatry* 47(9):819–827.

Foster, D. G., J. R. Steinberg, S. C. Roberts, J. Neuhaus, and M. A. Biggs. 2015. A comparison of depression and anxiety symptom trajectories between women who had an abortion and women denied one. *Psychological Medicine* 45(10):2073–2082.

Garovic, V. D., and P. August. 2013. Preeclampsia and the future risk of hypertension: The pregnant evidence. *Current Hypertension Reports* 15(2). doi:10.1007/s11906-013-0329-4.

Gissler, M., C. Berg, M.-H. Bouvier-Colle, and P. Buekens. 2004. Pregnancy-associated mortality after birth, spontaneous abortion, or induced abortion in Finland, 1987–2000. *American Journal of Obstetrics and Gynecology* 190(2):422–427.

Gissler, M., C. Berg, M.-H. Bouvier-Colle, and P. Buekens. 2005. Injury deaths, suicides and homicides associated with pregnancy, Finland 1987–2000. *The European Journal of Public Health* 15(5):459–463.

2021 ED 000294

Copyright National Academy of Sciences. All rights reserved.

Gissler, M., E. Karalis, and V. M. Ulander. 2015. Decreased suicide rate after induced abortion, after the current care guidelines in Finland 1987–2012. *Scandinavian Journal of Public Health* 43(1):99–101.

Goldacre, M., L. Kurina, V. Seagroatt, and D. Yeates. 2001. Abortion and breast cancer: A case-control record linkage study. *Journal of Epidemiology and Community Health* 55(5):336–337.

Gomez, A. M. 2018. Abortion and subsequent depressive symptoms: An analysis of the National Longitudinal Study of Adolescent Health. *Psychology Medicine* 48(2):294–304. doi:10.1017/S0033291717001684.

GRADE (Grading of Recommendations Assessment, Development and Evaluation) Working Group. 2004. Grading quality of evidence and strength of recommendations. *British Medical Journal* 328(7454):1490.

GRADE Working Group. 2018. *GRADE.* http://www.gradeworkinggroup.org (accessed January 19, 2018).

Grimes, D. A. 2006. Estimation of pregnancy-related mortality risk by pregnancy outcome, United States, 1991 to 1999. *American Journal of Obstetrics and Gynecology* 194(1):92–94.

Hanley, G. E., J. A. Hutcheon, B. A. Kinniburgh, and L. Lee. 2017. Interpregnancy interval and adverse pregnancy outcomes: An analysis of successive pregnancies. *Obstetrics & Gynecology* 129(3):408–415.

Herd, P., J. Higgins, K. Sicinski, and I. Merkurieva. 2016. The implications of unintended pregnancies for mental health in later life. *American Journal of Public Health* 106(3):421–429.

Hogue, C. J. 1975. Low birth weight subsequent to induced abortion. A historical prospective study of 948 women in Skopje, Yugoslavia. *American Journal of Obstetrics and Gynecology* 123(7):675–681.

Hogue, C. J., W. Cates, Jr., and C. Tietze. 1982. The effects of induced abortion on subsequent reproduction. *Epidemiologic Reviews* 4(1):66–94.

Holmlund, S., T. Kauko, J. Matomaki, M. Tuominen, J. Makinen, and P. Rautava. 2016. Induced abortion—impact on a subsequent pregnancy in first-time mothers: A registry-based study. *BMC Pregnancy and Childbirth* 16(1):325.

IOM (Institute of Medicine). 2011. *Finding what works in health care: Standards for systematic reviews.* Washington, DC: The National Academies Press.

Jackson, J. E., W. A. Grobman, E. Haney, and H. Casele. 2007. Mid-trimester dilation and evacuation with laminaria does not increase the risk for severe subsequent pregnancy complications. *International Journal of Gynaecology & Obstetrics* 96(1):12–15.

Jalanko, E., S. Leppalahti, O. Heikinheimo, and M. Gissler. 2017. Increased risk of premature death following teenage abortion and childbirth: A longitudinal cohort study. *European Journal of Public Health* 5(1):845–849.

Jones, R. K., and K. Kost. 2007. Underreporting of induced and spontaneous abortion in the United States: An analysis of the 2002 National Survey of Family Growth. *Studies in Family Planning* 38(3):187–197.

KC, S., E. Hemminki, M. Gissler, S. M. Virtanen, and R. Klemetti. 2017a. Perinatal outcomes after induced termination of pregnancy by methods: A nationwide register-based study of first births in Finland 1996–2013. *PLoS One* 12(9):e0184078. doi: 10.1371/journal.pone.0184078.

KC, S., M. Gissler, S. M. Virtanen, and R. Klemetti. 2017b. Risks of adverse perinatal outcomes after repeat terminations of pregnancy by their methods: A nationwide register-based cohort study in Finland 1996–2013. *Paediatrics and Perinatal Epidemiology* 31(6):485–492.

Klebanoff, M. A. 2017. Interpregnancy interval and pregnancy outcomes: Causal or not? *Obstetrics & Gynecology* 129(3):405–407.

2021 ED 000295

Copyright National Academy of Sciences. All rights reserved.

Klemetti, R., M. Gissler, M. Niinimaki, and E. Hemminki. 2012. Birth outcomes after induced abortion: A nationwide register-based study of first births in Finland. *Human Reproduction* 27(11):3315–3320.

Lange, E. M. S., and P. Toledo. 2017. Chapter 33. Antepartum hemorrhage. In *Complications in anesthesia*, 3rd ed., edited by L. A. Fleisher and S. H. Rosenbaum. Philadelphia, PA: W. B. Elsevier.

Leppalahti, S., O. Heikinheimo, I. Kalliala, P. Santalahti, and M. Gissler. 2016. Is underage abortion associated with adverse outcomes in early adulthood? A longitudinal birth cohort study up to 25 years of age. *Human Reproduction* 31(9):2142–2149.

Lindefors-Harris, B. M., G. Eklund, H. O. Adami, and O. Meirik. 1991. Response bias in a case-control study: Analysis utilizing comparative data concerning legal abortions from two independent Swedish studies. *American Journal of Epidemiology* 134(9):1003–1008.

Lowit, A., S. Bhattacharya, and S. Bhattacharya. 2010. Obstetric performance following an induced abortion. *Best Practice & Research in Clinical Obstetrics & Gynaecology* 24(5):667–682.

Major, B., M. Appelbaum, L. Beckman, M. A. Dutton, N. F. Russo, and C. West. 2008. *Report of the APA Task Force on Mental Health and Abortion*. Washington, DC: American Psychological Association.

Major, B., M. Appelbaum, L. Beckman, M. A. Dutton, N. F. Russo, and C. West. 2009. Abortion and mental health: Evaluating the evidence. *American Psychologist* 64(9):863–890.

Mannisto, J., A. Bloigu, M. Mentula, M. Gissler, O. Heikinheimo, and M. Niinimaki. 2017. Interpregnancy interval after termination of pregnancy and the risks of adverse outcomes in subsequent birth. *Obstetrics & Gynecology* 129(2):347–354.

Munk-Olsen, T., T. M. Laursen, C. B. Pedersen, Ø. Lidegaard, and P. B. Mortensen. 2011. Induced first-trimester abortion and risk of mental disorder. *New England Journal of Medicine* 364(4):332–339.

Munk-Olsen, T., T. M. Laursen, C. B. Pedersen, Ø. Lidegaard, and P. B. Mortensen. 2012. First-time first-trimester induced abortion and risk of readmission to a psychiatric hospital in women with a history of treated mental disorder. *Archives of General Psychiatry* 69(2):159–165.

NAF (National Abortion Federation). 2017. *2017 Clinical policy guidelines for abortion care*. Washington, DC: NAF.

NCCMH (National Collaborating Centre for Mental Health). 2011. *Induced abortion and mental health: A systematic review of the mental health outcomes of induced abortion, including their prevalence and associated factors*. London, UK: Academy of Medical Royal Colleges.

NCI (National Cancer Institute). 2016. *Reproductive history and cancer risk*. https://www.cancer.gov/about-cancer/causes-prevention/risk/hormones/reproductive-history-fact-sheet (accessed January 31, 2018).

Newcomb, P. A., and M. T. Mandelson. 2000. A record-based evaluation of induced abortion and breast cancer risk (United States). *Cancer Causes Control* 11(9):777–781.

Nilsen, W., C. A. Olsson, E. Karevold, C. O'Loughlin, M. McKenzie, and G. C. Patton. 2012. Adolescent depressive symptoms and subsequent pregnancy, pregnancy completion and pregnancy termination in young adulthood: Findings from the Victorian Adolescent Health Cohort Study. *Journal of Pediatric and Adolescent Gynecology* 25(1):6–11.

ODPHP (Office of Disease Prevention and Health Promotion). 2017. *National Vital Statistics System—fetal death*. https://www.healthypeople.gov/2020/data-source/national-vital-statistics-system-fetal-death (accessed November 10, 2017).

Pedersen, W. 2007. Childbirth, abortion and subsequent substance use in young women: A population-based longitudinal study. *Addiction* 102(12):1971–1978.

Pedersen, W. 2008. Abortion and depression: A population-based longitudinal study of young women. *Scandinavian Journal of Social Medicine* 36(4):424–428.

2021 ED 000296

Copyright National Academy of Sciences. All rights reserved.

Raymond, E. G., and D. A. Grimes. 2012. The comparative safety of legal induced abortion and childbirth in the United States. *Obstetrics & Gynecology* 119(2 Pt. 1):215–219.

RCOG (Royal College of Obstetricians and Gynaecologists). 2011. *The care of women requesting induced abortion* (Evidence-based clinical guideline number 7). https://www.rcog.org.uk/globalassets/documents/guidelines/abortion-guideline_web_1.pdf (accessed July 27, 2017).

RCOG. 2015. *Best practice in comprehensive abortion care* (Best practice paper no. 2). London, UK: RCOG.

RCOG. 2017. Prevention and management of postpartum haemorrhage. *British Journal of Obstetrics & Gynaecology* 124(5):e106–e149.

Reardon, D., J. Cougle, P. Ney, F. Scheuren, P. Coleman, and T. Strahan. 2002. Deaths associated with delivery and abortion among California Medicaid patients: A record linkage study. *The Southern Medical Journal* 95(8):834–841.

Reardon, D. C., J. R. Cougle, V. M. Rue, M. W. Shuping, P. K. Coleman, and P. G. Ney. 2003. Psychiatric admissions of low-income women following abortion and childbirth. *Canadian Medical Association Journal* 168(10):1253–1256.

Roblin, P. 2014. Vacuum aspiration. In *Abortion care,* edited by S. Rowlands. Cambridge, UK: Cambridge University Press.

Russo, J., and I. H. Russo. 1980. Susceptibility of the mammary gland to carcinogenesis. II. Pregnancy interruption as a risk factor in tumor incidence. *American Journal of Pathology* 100(2):497–512.

Saleh, H. 2008. *Placenta previa and accreta.* https://www.glowm.com/section_view/heading/Placenta%20Previa%20and%20Accreta/item/121 (accessed November 13, 2017).

SFP (Society of Family Planning). 2013. Surgical abortion prior to 7 weeks of gestation. *Contraception* 88(1):7–17.

Shachar, B. Z., J. A. Mayo, D. J. Lyell, R. J. Baer, L. L. Jeliffe-Pawlowski, D. K. Stevenson, and G. M. Shaw. 2016. Interpregnancy interval after live birth or pregnancy termination and estimated risk of preterm birth: A retrospective cohort study. *British Journal of Obstetrics & Gynaecology* 123(12):2009–2017.

Sivalingam, V. N., W. C. Duncan, E. Kirk, L. A. Shephard, and A. W. Horne. 2011. Diagnosis and management of ectopic pregnancy. *The Journal of Family Planning and Reproductive Health Care* 37(4):231–240.

Smith, G. C. S., J. P. Pell, and R. Dobbie. 2003. Interpregnancy interval and risk of preterm birth and neonatal death: Retrospective cohort study. *British Medical Journal* 327(7410):313.

Steinberg, J. R., and L. B. Finer. 2011. Examining the association of abortion history and current mental health: A reanalysis of the national comorbidity survey using a common-risk-factors model. *Social Science and Medicine* 72(1):72–82.

Steinberg, J. R., and N. F. Russo. 2008. Abortion and anxiety: What's the relationship? *Social Science & Medicine* 67(2):238–252.

Steinberg, J. R., D. Becker, and J. T. Henderson. 2011. Does the outcome of a first pregnancy predict depression, suicidal ideation, or lower self-esteem? Data from the National Comorbidity Survey. *American Journal of Orthopsychiatry* 81(2):193–201.

Steinberg, J. R., C. E. McCulloch, and N. E. Adler. 2014. Abortion and mental health: Findings from the National Comorbidity Survey-Replication. *Obstetrics & Gynecology* 123(2 Pt. 1):263–270.

Sullins, D. P. 2016. Abortion, substance abuse and mental health in early adulthood: Thirteen-year longitudinal evidence from the United States. *SAGE Open Medicine* 4:2050312116665997.

Tao, G., C. Patel, and K. W. Hoover. 2017. Updated estimates of ectopic pregnancy among commercially and Medicaid-insured women in the United States, 2002–2013. *Southern Medical Journal* 110(1):18–24. doi:10.14423/SMJ.0000000000000594.

2021 ED 000297

Copyright National Academy of Sciences. All rights reserved.

Thorp, Jr., J. M., K. E. Hartmann, and E. Shadigian. 2003. Long-term physical and psycho-logical health consequences of induced abortion: Review of the evidence. *Obstetrical & Gynecological Survey* 58(1):67–79.

Warren, J. T., S. M. Harvey, and J. T. Henderson. 2010. Do depression and low self-esteem follow abortion among adolescents? Evidence from a national study. *Perspectives on Sexual and Reproductive Health* 42(4):230–235.

Wendt, A., C. M. Gibbs, S. Peters, and C. J. Hogue. 2012. Impact of increasing inter-pregnancy interval on maternal and infant health. *Paediatric and Perinatal Epidemiology* 26(Suppl. 1):239–258.

WHO (World Health Organization). 2012. *Safe abortion: Technical and policy guidance for health systems*, 2nd ed. http://apps.who.int/iris/bitstream/10665/70914/1/9789241548434_eng.pdf (accessed September 12, 2017).

Wong, L. F., J. Wilkes, K. Korgenski, M. W. Varner, and T. A. Manuck. 2016. Risk factors associated with preterm birth after a prior term delivery. *British Journal of Obstetrics & Gynaecology* 123(11):1772–1778.

Woolner, A., S. Bhattacharya, and S. Bhattacharya. 2014. The effect of method and gestational age at termination of pregnancy on future obstetric and perinatal outcomes: A register-based cohort study in Aberdeen, Scotland. *British Journal of Obstetrics & Gynaecology* 121(3):309–318.

Zhou, W., G. L. Nielsen, H. Larsen, and J. Olsen. 2001. Induced abortion and placenta com-plications in the subsequent pregnancy. *Acta Obstetricia et Gynecologica Scandinavica* 80(12):1115–1120.

2021 ED 000298

Copyright National Academy of Sciences. All rights reserved.

5

# Conclusions

This report provides a comprehensive review of the state of the science on the safety and quality of abortion services in the United States. The committee was charged with answering eight specific research questions. This chapter presents the committee's conclusions by responding individually to each question. The research findings that are the basis for these conclusions are presented in the previous chapters. The committee was also asked to offer recommendations regarding the eight questions. However, the committee decided that its conclusions regarding the safety and quality of U.S. abortion care responded comprehensively to the scope of this study. Therefore, the committee does not offer recommendations for specific actions to be taken by policy makers, health care providers, and others.

1. *What types of legal abortion services are available in the United States? What is the evidence regarding which services are appropriate under different clinical circumstances (e.g., based on patient medical conditions such as previous cesarean section, obesity, gestational age)?*

Four legal abortion methods—medication,[1] aspiration, dilation and evacuation (D&E), and induction—are used in the United States. Length of gestation—measured as the amount of time since the first day of the last

---

[1]The terms "medication abortion" and "medical abortion" are used interchangeably in the literature. This report uses "medication abortion" to describe the U.S. Food and Drug Administration (FDA)-approved prescription drug regimen used up to 10 weeks' gestation.

*159*

2021 ED 000299

Copyright National Academy of Sciences. All rights reserved.

*160  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

menstrual period—is the primary factor in deciding what abortion procedure is the most appropriate. Both medication and aspiration abortions are used up to 10 weeks' gestation. Aspiration procedures may be used up to 14 to 16 weeks' gestation.

Mifepristone, sold under the brand name Mifeprex, is the only medication specifically approved by the FDA for use in medication abortion. The drug's distribution has been restricted under the requirements of the FDA Risk Evaluation and Mitigation Strategy program since 2011—it may be dispensed only to patients in clinics, hospitals, or medical offices under the supervision of a certified prescriber. To become a certified prescriber, eligible clinicians must register with the drug's distributor, Danco Laboratories, and meet certain requirements. Retail pharmacies are prohibited from distributing the drug.

When abortion by aspiration is no longer feasible, D&E and induction methods are used. D&E is the superior method; in comparison, inductions are more painful for women, take significantly more time, and are more costly. However, D&Es are not always available to women. The procedure is illegal in Mississippi[2] and West Virginia[3] (both states allow exceptions in cases of life endangerment or severe physical health risk to the woman). Elsewhere, access to the procedure is limited because many obstetrician/gynecologists (OB/GYNs) and other physicians lack the requisite training to perform D&Es. Physicians' access to D&E training is very limited or nonexistent in many areas of the country.

Few women are medically ineligible for abortion. There are, however, specific contraindications to using mifepristone for a medication abortion or induction. The drug should not be used for women with confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass; an intrauterine device in place; chronic adrenal failure; concurrent long-term systemic corticosteroid therapy; hemorrhagic disorders or concurrent anticoagulant therapy; allergy to mifepristone, misoprostol, or other prostaglandins; or inherited porphyrias.

Obesity is not a risk factor for women who undergo medication or aspiration abortions (including with the use of moderate intravenous sedation). Research on the association between obesity and complications during a D&E abortion is less certain—particularly for women with Class III obesity (body mass index ≥40) after 14 weeks' gestation.

A history of a prior cesarean delivery is not a risk factor for women undergoing medication or aspiration abortions, but it may be associated

---

[2]Mississippi Unborn Child Protection from Dismemberment Abortion Act, Mississippi HB 519, Reg. Sess. 2015–2016 (2016).
[3]Unborn Child Protection from Dismemberment Abortion Act, West Virginia SB 10, Reg. Sess. 2015–2016 (2016).

2021 ED 000300

Copyright National Academy of Sciences. All rights reserved.

with an increased risk of complications during D&E abortions, particularly for women with multiple cesarean deliveries. Because induction abortions are so rare, it is difficult to determine definitively whether a prior cesarean delivery increases the risk of complications. The available research suggests no association.

### 2. *What is the evidence on the physical and mental health risks of these different abortion interventions?*

Abortion has been investigated for its potential long-term effects on future childbearing and pregnancy outcomes, risk of breast cancer, mental health disorders, and premature death. The committee found that much of the published literature on these topics does not meet scientific standards for rigorous, unbiased research. Reliable research uses documented records of a prior abortion, analyzes comparable study and control groups, and controls for confounding variables shown to affect the outcome of interest.

**Physical health effects**    The committee identified high-quality research on numerous outcomes of interest and concludes that having an abortion does not increase a woman's risk of secondary infertility, pregnancy-related hypertensive disorders, abnormal placentation (after a D&E abortion), preterm birth, or breast cancer. Although rare, the risk of very preterm birth (<28 weeks' gestation) in a woman's first birth was found to be associated with having two or more prior aspiration abortions compared with first births among women with no abortion history; the risk appears to be associated with the number of prior abortions. Preterm birth is associated with pregnancy spacing after an abortion: it is more likely if the interval between abortion and conception is less than 6 months (this is also true of pregnancy spacing in general). The committee did not find well-designed research on abortion's association with future ectopic pregnancy, miscarriage or stillbirth, or long-term mortality. Findings on hemorrhage during a subsequent pregnancy are inconclusive.

**Mental health effects**    The committee identified a wide array of research on whether abortion increases women's risk of depression, anxiety, and/or posttraumatic stress disorder and concludes that having an abortion does not increase a woman's risk of these mental health disorders.

### 3. *What is the evidence on the safety and quality of medical and surgical abortion care?*

**Safety**    The clinical evidence clearly shows that legal abortions in the United States—whether by medication, aspiration, D&E, or induction—are

2021 ED 000301

Copyright National Academy of Sciences. All rights reserved.

safe and effective. Serious complications are rare. But the risk of a serious complication increases with weeks' gestation. As the number of weeks increases, the invasiveness of the required procedure and the need for deeper levels of sedation also increase.

**Quality**   Health care quality is a multidimensional concept. Six attributes of health care quality—safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity—were central to the committee's review of the quality of abortion care. Table 5-1 details the committee's conclusions regarding each of these quality attributes. Overall, the committee concludes that the quality of abortion care depends to a great extent on where women live. In many parts of the country, state regulations have created barriers to optimizing each dimension of quality care. The quality of care is optimal when the care is based on current evidence and when trained clinicians are available to provide abortion services.

4. *What is the evidence on the minimum characteristics of clinical facilities necessary to effectively and safely provide the different types of abortion interventions?*

Most abortions can be provided safely in office-based settings. No special equipment or emergency arrangements are required for medication abortions. For other abortion methods, the minimum facility characteristics depend on the level of sedation that is used. Aspiration abortions are performed safely in office and clinic settings. If moderate sedation is used, the facility should have emergency resuscitation equipment and an emergency transfer plan, as well as equipment to monitor oxygen saturation, heart rate, and blood pressure. For D&Es that involve deep sedation or general anesthesia, the facility should be similarly equipped and also have equipment to provide general anesthesia and monitor ventilation.

Women with severe systemic disease require special measures if they desire or need deep sedation or general anesthesia. These women require further clinical assessment and should have their abortion in an accredited ambulatory surgery center or hospital.

5. *What is the evidence on what clinical skills are necessary for health care providers to safely perform the various components of abortion care, including pregnancy determination, counseling, gestational age assessment, medication dispensing, procedure performance, patient monitoring, and follow-up assessment and care?*

**Required skills**   All abortion procedures require competent providers skilled in patient preparation (education, counseling, and informed consent);

2021 ED 000302

Copyright National Academy of Sciences. All rights reserved.

**TABLE 5-1** Does Abortion Care in the United States Meet the Six Attributes of Quality Health Care?

| Quality Attribute[a] | Definition | Committee's Conclusions |
|---|---|---|
| Safety | Avoiding injuries to patients from the care that is intended to help them. | Legal abortions—whether by medication, aspiration, D&E, or induction—are safe. Serious complications are rare and occur far less frequently than during childbirth. Safety is enhanced when the abortion is performed as early in pregnancy as possible. |
| Effectiveness[b] | Providing services based on scientific knowledge to all who could benefit and refraining from providing services to those not likely to benefit (avoiding underuse and overuse, respectively). | Legal abortions—whether by medication, aspiration, D&E, or induction—are effective. The likelihood that women will receive the type of abortion services that best meets their needs varies considerably depending on where they live. In many parts of the country, abortion-specific regulations on the site and nature of care, provider type, provider training, and public funding diminish this dimension of quality care. The regulations may limit the number of available providers, misinform women of the risks of the procedures they are considering, overrule women's and clinician's medical decision making, or require medically unnecessary services and delays in care. These include policies that<br>• require office-based settings to meet the structural standards of higher-intensity clinical facilities (e.g., ambulatory surgery centers or hospitals) even for the least invasive abortion methods (medication and aspiration);<br>• prohibit the abortion method that is most effective for a particular clinical circumstance (e.g., D&E);<br>• delay care unnecessarily from a clinical standpoint (e.g., mandatory waiting periods);<br>• prohibit qualified clinicians (family medicine physicians, certified nurse-midwives, nurse practitioners, and physician assistants) from performing abortions;<br>• require the informed consent process to include inaccurate information on abortion's long-term physical and mental health effects;<br>• require individual clinicians to have hospital privileges;<br>• bar publicly funded clinics from providing abortion care to low-income women; or<br>• mandate clinically unnecessary services (e.g., preabortion ultrasound, in-person counseling visit). |

*continued*

2021 ED 000303

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 185 of 4
PageID.8363
*164 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**TABLE 5-1** Continued

| Quality Attribute[a] | Definition | Committee's Conclusions |
|---|---|---|
| Patient-Centeredness | Providing care that is respectful of and responsive to individual patient preferences, needs, and values and ensuring that patient values guide all clinical decisions. | Patients' personal circumstances and individual preferences (including preferred abortion method), needs, and values may be disregarded depending on where they live (as noted above). The high state-to-state variability regarding the specifics of abortion care may be difficult for patients to understand and navigate. Patients' ability to be adequately informed in order to make sound medical decisions is impeded when state regulations require that<br>• women be provided inaccurate or misleading information about abortion's potential harms; and<br>• women's preferences for whether they want individualized counseling not be taken into consideration. |
| Timeliness | Reducing waits and sometimes harmful delays for both those who receive and those who give care. | The timeliness of an abortion depends on a variety of local factors, such as the availability of care, affordability, distance from the provider, and state requirements for an in-person counseling appointment and waiting periods (18 to 72 hours) between counseling and the abortion.<br>• There is some evidence that the logistical challenges of arranging and getting to a second appointment can result in delaying the abortion procedure beyond the mandatory waiting period.<br>• Delays put the patient at greater risk of an adverse event. |
| Efficiency | Avoiding waste, including waste of equipment, supplies, ideas, and energy. | An extensive body of clinical research has led to important refinements and improvements in the procedures, techniques, and methods for performing abortions. The extent to which abortion care is delivered efficiently depends, in part, on the alignment of state regulations with current evidence on best practices. Regulations that require medically unnecessary equipment, services, and/or additional patient visits increase cost, and thus decrease efficiency. |

2021 ED 000304
Copyright National Academy of Sciences. All rights reserved.

**TABLE 5-1** Continued

| Quality Attribute[a] | Definition | Committee's Conclusions |
|---|---|---|
| Equity | Providing care that does not vary in quality because of personal characteristics such as gender, ethnicity, geographic location, and socioeconomic status. | State-level abortion regulations are likely to affect women differently based on their geographic location and socioeconomic status. Barriers (lack of insurance coverage, waiting periods, limits on qualified providers, and requirements for multiple appointments) are more burdensome for women who reside far from providers and/or have limited resources.<br>• Women who undergo abortions are disproportionately lower-income compared with other women of similar age: family incomes of 49 percent of them are below the federal poverty level (FPL), and family incomes of 26 percent are 100 to 200 percent of the FPL; 61 percent are women of color.<br>• Seventeen percent of women travel more than 50 miles to obtain an abortion. |

[a]These attributes of quality health care were first proposed by the Institute of Medicine's Committee on Quality of Health Care in America in the 2001 report *Crossing the Quality Chasm: A New Health System for the 21st Century.*

[b]Elsewhere in this report, effectiveness refers to the successful completion of the abortion without the need for a follow-up aspiration.

clinical assessment (confirming intrauterine pregnancy, determining gestation, taking a relevant medical history, and physical examination); pain management; identification and management of expected side effects and serious complications; and contraceptive counseling and provision. To provide medication abortions, the clinician should be skilled in all these areas. To provide aspiration abortions, the clinician should also be skilled in the technical aspects of an aspiration procedure. To provide D&E abortions, the clinician needs the relevant surgical expertise and sufficient caseload to maintain the requisite surgical skills. To provide induction abortions, the clinician requires the skills needed for managing labor and delivery.

**Clinicians that have the necessary competencies**   Both trained physicians (OB/GYNs, family medicine physicians, and other physicians) and advanced practice clinicians (APCs) (physician assistants, certified nurse-midwives, and nurse practitioners) can provide medication and aspiration abortions safely and effectively. OB/GYNs, family medicine physicians, and other physicians with appropriate training and experience can perform D&E abortions. Induction abortions can be provided by clinicians (OB/GYNs,

2021 ED 000305

Copyright National Academy of Sciences. All rights reserved.

family medicine physicians, and certified nurse-midwives) with training in managing labor and delivery.

The extensive body of research documenting the safety of abortion care in the United States reflects the outcomes of abortions provided by thousands of individual clinicians. The use of sedation and anesthesia may require special expertise. If moderate sedation is used, it is essential to have a nurse or other qualified clinical staff—in addition to the person performing the abortion—available to monitor the patient, as is the case for any other medical procedure. Deep sedation and general anesthesia require the expertise of an anesthesiologist or certified registered nurse anesthetist to ensure patient safety.

### 6.   *What safeguards are necessary to manage medical emergencies arising from abortion interventions?*

The key safeguards—for abortions and all outpatient procedures—are whether the facility has the appropriate equipment, personnel, and emergency transfer plan to address any complications that might occur. No special equipment or emergency arrangements are required for medication abortions; however, clinics should provide a 24-hour clinician-staffed telephone line and have a plan to provide emergency care to patients after hours. If moderate sedation is used during an aspiration abortion, the facility should have emergency resuscitation equipment and an emergency transfer plan, as well as equipment to monitor oxygen saturation, heart rate, and blood pressure. D&Es that involve deep sedation or general anesthesia should be provided in similarly equipped facilities that also have equipment to monitor ventilation.

The committee found no evidence indicating that clinicians that perform abortions require hospital privileges to ensure a safe outcome for the patient. Providers should, however, be able to provide or arrange for patient access or transfer to medical facilities equipped to provide blood transfusions, surgical intervention, and resuscitation, if necessary.

### 7.   *What is the evidence on the safe provision of pain management for abortion care?*

Nonsteroidal anti-inflammatory drugs (NSAIDs) are recommended to reduce the discomfort of pain and cramping during a medication abortion. Some women still report high levels of pain, and researchers are exploring new ways to provide prophylactic pain management for medication abortion. The pharmaceutical options for pain management during aspiration, D&E, and induction abortions range from local anesthesia, to minimal sedation/anxiolysis, to moderate sedation/analgesia, to deep sedation/

2021 ED 000306

Copyright National Academy of Sciences. All rights reserved.

analgesia, to general anesthesia. Along this continuum, the physiological effects of sedation have increasing clinical implications and, depending on the depth of sedation, may require special equipment and personnel to ensure the patient's safety. The greatest risk of using sedative agents is respiratory depression. The vast majority of abortion patients are healthy and medically eligible for all levels of sedation in office-based settings. As noted above (see Questions 4 and 6), if sedation is used, the facility should be appropriately equipped and staffed.

## 8. *What are the research gaps associated with the provision of safe, high-quality care from pre- to postabortion?*

The committee's overarching task was to assess the safety and quality of abortion care in the United States. As noted in the introduction to this chapter, the committee decided that its findings and conclusions fully respond to this charge. The committee concludes that legal abortions are safe and effective. Safety and quality are optimized when the abortion is performed as early in pregnancy as possible. Quality requires that care be respectful of individual patient preferences, needs, and values so that patient values guide all clinical decisions.

The committee did not identify gaps in research that raise concerns about these conclusions and does not offer recommendations for specific actions to be taken by policy makers, health care providers, and others.

The following are the committee's observations about questions that merit further investigation.

**Limitation of Mifepristone distribution**   As noted above, mifepristone, sold under the brand name Mifeprex, is the only medication approved by the FDA for use in medication abortion. Extensive clinical research has demonstrated its safety and effectiveness using the FDA-recommended regimen. Furthermore, few women have contraindications to medication abortion. Nevertheless, as noted earlier, the FDA REMS restricts the distribution of mifepristone. Research is needed on how the limited distribution of mifepristone under the REMS process impacts dimensions of quality, including timeliness, patient-centeredness, and equity. In addition, little is known about pharmacist and patient perspectives on pharmacy dispensing of mifepristone and the potential for direct-to-patient models through telemedicine.

**Pain management**   There is insufficient evidence to identify the optimal approach to minimizing the pain women experience during an aspiration procedure without sedation. Paracervical blocks are effective in decreasing procedural pain, but the administration of the block itself is painful, and

2021 ED 000307

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

even with the block, women report experiencing moderate to significant pain. More research is needed to learn how best to reduce the pain women experience during abortion procedures.

Research on prophylactic pain management for women undergoing medication abortions is also needed. Although NSAIDs reduce the pain of cramping, women still report high levels of pain.

**Availability of providers**    APCs can provide medication and aspiration abortions safely and effectively, but the committee did not find research assessing whether APCs can also be trained to perform D&Es.

**Addressing the needs of women of lower income**    Women who have abortions are disproportionately poor and at risk for interpersonal and other types of violence. Yet little is known about the extent to which they receive needed social and psychological supports when seeking abortion care or how best to meet those needs. More research is needed to assess the need for support services and to define best clinical practice for providing those services.

2021 ED 000308

Copyright National Academy of Sciences. All rights reserved.

# Appendix A

## Biographical Sketches of Committee Members

**B. Ned Calonge, M.D., M.P.H.** (*Co-Chair*), is president and CEO of The Colorado Trust, a private foundation dedicated to achieving health equity for all Coloradans. Prior to joining the Trust, he served as chief medical officer of the Colorado Department of Public Health and Environment. Dr. Calonge also served as chief of the Department of Preventive Medicine for the Colorado Permanente Medical Group (CPMG) and as a CPMG family physician for 10 years. His current academic appointments include associate professor of family medicine, Department of Family Medicine, University of Colorado Denver (UCD) School of Medicine, and associate professor of epidemiology, UCD Colorado School of Public Health. Nationally, Dr. Calonge is past chair of the United States Preventive Services Task Force and a member of the Centers for Disease Control and Prevention's (CDC's) Task Force on Community Preventive Services, as well as the CDC's Breast and Cervical Cancer Early Detection and Control Advisory Committee. He is a past member and chair of the CDC's Evaluating Genomic Applications for Practice and Prevention Workgroup, and is a consultant for and past member of the Advisory Committee on Heritable Disorders in Newborns and Children in the Maternal and Child Health Bureau, Health Resources and Services Administration. Dr. Calonge serves on the Board on Population Health and Public Health Practice and the Roundtable on the Promotion of Health Equity in the Health and Medicine Division of the National Academies of Sciences, Engineering, and Medicine. He has been board-certified in both family medicine and preventive medicine, and was elected to the National Academy of Medicine in 2011. He

*169*

2021 ED 000309

Copyright National Academy of Sciences. All rights reserved.

earned an M.P.H. from the University of Washington and an M.D. from the University of Colorado.

**Helene D. Gayle, M.D., M.P.H.** (*Co-Chair*), is president and CEO of the Chicago Community Trust. Before assuming leadership of the Trust in October 2017, she served as CEO of McKinsey Social Initiative, a non-profit organization that implements programs that bring together varied stakeholders to address complex global social challenges. A member of the National Academy of Medicine, Dr. Gayle was previously president and CEO of CARE USA, a leading international humanitarian organization with approximately 10,000 staff, whose poverty-fighting programs reached more than 97 million people in 87 countries. An expert on global development, humanitarianism, and health issues, she also spent 20 years with the CDC, focused primarily on combating HIV/AIDS. She was appointed as the first director of the National Center for HIV, STD and TB Prevention, and achieved the rank of rear admiral and assistant surgeon general in the U.S. Public Health Service. Dr. Gayle also served as AIDS coordinator and chief of the HIV/AIDS division for the U.S. Agency for International Development. She then directed the HIV, TB and Reproductive Health Program at the Bill & Melinda Gates Foundation, directing programs on HIV/AIDS and other global health issues. She earned her M.D. at the University of Pennsylvania and an M.P.H. at Johns Hopkins University. She is board-certified in pediatrics.

**Wendy R. Brewster, M.D., Ph.D.,** is a professor and gynecologic oncologist in the Department of Obstetrics and Gynecology and an adjunct professor of epidemiology at the University of North Carolina (UNC) at Chapel Hill. She is also director of the UNC Center for Women's Health Research. Dr. Brewster is a co-investigator for several projects designed to identify populations at risk for disparate treatment and poor outcomes in endometrial, colon, ovarian, and cervical cancers. Her recent work has focused on the paradigm for treatment of gynecologic malignancies where obstacles to treatment exist for high-risk groups in limited-resource areas. Prior to her move to UNC, Dr. Brewster was faculty at the University of California, Irvine. She received her M.D. and completed her residency in obstetrics and gynecology at the University of California, Los Angeles. She completed a fellowship in gynecologic oncology and earned a Ph.D. in environmental analysis and design at the University of California, Irvine. She is board-certified in obstetrics and gynecology and gynecologic oncology.

**Lee A. Fleisher, M.D.,** is currently professor and chair of anesthesiology at the University of Pennsylvania Perelman School of Medicine. His research includes perioperative risk assessment, perioperative quality metrics, and

2021 ED 000310

Copyright National Academy of Sciences. All rights reserved.

risk adjustment modeling to assess quality of care. He has been involved as a member and chair of professional society guidelines committees and funded by both the Agency for Healthcare Research and Quality and societies to perform evidence-based reviews. Dr. Fleisher was elected to the National Academy of Medicine in 2007. He has been involved in developing performance metrics for both the American Society of Anesthesiologists and the American College of Cardiology. He was chair and is currently a member of the Consensus Standards Advisory Committee and co-chair of the Surgery Standing Committee of the National Quality Forum, and was a member of the Administrative Board of the Council of Faculty and Academic Specialties of the Association of American Medical Colleges. He is also a member of the Medical Advisory Panel of the Technology Evaluation Center of the Blue Cross/Blue Shield Association. He received his M.D. from the State University of New York at Stony Brook, from which he received the Distinguished Alumni Award.

**Carol J. Rowland Hogue, Ph.D., M.P.H.,** is professor of epidemiology and Jules and Uldeen Terry professor of maternal and child health (MCH) at the Rollins School of Public Health, Emory University. She is also director of the Women's and Children's Center and the Health Resources and Services Administration-sponsored Center of Excellence in MCH Education, Science, and Practice. A former director of the federal CDC's Division of Reproductive Health (1988–1992) and on faculties in biometry at the University of Arkansas for Medical Science (1977–1982) and the UNC School of Public Health's Department of Biostatistics (1974–1977), Dr. Hogue initiated many of the current CDC reproductive health programs, including the Pregnancy Risk Assessment Monitoring System, the National Pregnancy Mortality Surveillance System, and the National Infant Mortality Surveillance project, that launched the national- and state-level development and use of linked birth and death records. In addition, she led the first research on maternal morbidities—the precursor to the current safe motherhood initiative—and the initial innovative research on racial disparities in preterm delivery. She has published broadly in maternal health, including studies of long-term complications of induced abortion, ectopic pregnancy, stillbirth, unintended pregnancy, contraceptive failure, and reproductive cancers. Her current research projects include the Stillbirth Collaborative Research Network's population-based case control study of stillbirth, an implementation fidelity study of elementary school-based health centers, and a CDC-sponsored study of the life-course health of adolescents and adults living with congenital heart defects. Among her many honors, Dr. Hogue served as president of the Society for Epidemiologic Research (1988–1989), served on the Institute of Medicine Committee on Unintended Pregnancy (1993–1995), was chair of the Regional Advisory Panel

2021 ED 000311

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 193 of 4
PageID.8371
*172    THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

for the Americas of the World Health Organization's Human Reproduction Programme (1997–1999), was president of the American College of Epidemiology (2002–2004), was senior fellow of the Emory Center for the Study of Law and Religion (2001–2006), and received the MCH Coalition's National Effective Practice Award in 2002 and Greg Alexander Award for Advancing Knowledge in 2016. In 2017 she received Emory University's Thomas Jefferson Award, the highest honor awarded to a faculty member.

**Jody Rae Lori, Ph.D., R.N., C.N.M.,** is an associate professor and associate dean for Global Affairs at the University of Michigan School of Nursing (UMSN). She also serves as director of the Pan American Health Organization/World Health Organization Collaborating Center for Nursing and Midwifery at UMSN. A fellow in the American College of Nurse Midwives and the American Academy of Nursing, Dr. Lori focuses her research on the development and testing of new models of care to address the high rates of maternal and neonatal mortality in sub-Saharan Africa. With diverse funding sources, including the National Institutes of Health-Fogarty, the U.S. Agency for International Development, and private foundations, she currently has research projects in Liberia and Zambia examining the impact of maternity waiting homes as a system-based intervention to increase access to quality intrapartum care for women living in remote, rural areas far from a skilled provider. She recently completed the first study of group antenatal care for low- and nonliterate women in sub-Saharan Africa. She holds a Ph.D. in nursing from the University of Arizona and an M.S. in midwifery from the University of Michigan.

**Jeanne Miranda, Ph.D., M.S.,** is a professor in the Department of Psychiatry and Biobehavioral Sciences at University of California, Los Angeles (UCLA). She is a mental health services researcher who has focused her work on providing mental health care to low-income and minority communities. Dr. Miranda's major research contributions have been in evaluating the impact of mental health care for ethnic minority communities. She is currently working with two community partners—TIES for Families and the Center for Adoption Support and Education—to evaluate an intervention her team developed to provide care for families adopting older children from foster care. She is also working to develop appropriate depression interventions for young women in Uganda and evaluating a government microfinance program in Uganda. Dr. Miranda is an investigator in two UCLA centers focused on improving disparities in health care for ethnic minorities. She is a member of the National Academy of Medicine and a recipient of the Emily Mumford Award for Contributions to Social Medicine from Columbia University. She holds a Ph.D. in clinical psychology

2021 ED 000312

Copyright National Academy of Sciences. All rights reserved.

from the University of Kansas and completed postdoctoral training at the University of California, San Francisco.

**Ruth Murphey Parker, M.D.,** is professor of medicine at the Emory University School of Medicine. She holds secondary appointments in pediatrics and in epidemiology at the university's Rollins School of Public Health and is a senior fellow of the Center for Ethics. Her primary research interests and activities are in health services of underserved populations, particularly health literacy. She recently completed a position as chair of the Nonprescription Drug Advisory Committee for the U.S. Food and Drug Administration (FDA), and has served as an expert in label comprehension for various FDA advisory committees representing issues related to health literacy and patient/consumer understanding of drug information. She is a member of a Patient-Centered Outcomes Research Institute advisory group and serves on an expert panel for the U.S. Pharmacopeia. Dr. Parker was principal investigator in the Robert Wood Johnson Literacy in Health Study and co-authored the Test of Functional Health Literacy in Adults, a measurement tool for quantifying patients' ability to read and understand health information. She chaired the American Medical Association Foundation steering committee for the national program on health literacy and also chaired the American College of Physicians Foundation Patient Literacy Advisory Board. She consults with various federal and state agencies, professional societies, and members of industry regarding their efforts to advance health literacy. She earned her M.D. at the University of North Carolina at Chapel Hill. She holds board certification in both internal medicine and pediatrics and is an appointed associate of the National Research Council.

**Deborah E. Powell, M.D.,** is dean emerita of the medical school and professor in the Department of Laboratory Medicine and Pathology at the University of Minnesota. She joined the university in 2002 and led the University of Minnesota Medical School until 2009. She was also assistant vice president for clinical sciences, associate vice president for new models of education, and McKnight presidential leadership chairman at the University of Minnesota, Twin Cities. Prior to coming to the University of Minnesota, she served as executive dean and vice chancellor for clinical affairs at the University of Kansas School of Medicine for 5 years. Previously, she served as chairman of the Department of Pathology and Laboratory Medicine and as vice chairman and director of diagnostic pathology at the University of Kentucky in Lexington. She is a medical educator and has more than 30 years of experience in academic medicine. Additionally, she has been president of the United States and Canadian Academy of Pathology and president of the American Board of Pathology. She served as chairman of

2021 ED 000313

Copyright National Academy of Sciences. All rights reserved.

the Council of Deans of the Association of American Medical Colleges and as chair of the Association of American Medical Colleges in 2009–2010. She has served as director of the Accreditation Council for Graduate Medical Education, the Institute for Healthcare Improvement, Fairview Health System, the University of Minnesota Medical Center, the Association of American Medical Colleges, and Hazelden. She is a member of the National Academy of Medicine. Dr. Powell is a board-certified surgical pathologist. She received her medical degree from Tufts University School of Medicine.

**Eva K. Pressman, M.D.,** is Henry A. Thiede Professor and chair of the Department of Obstetrics and Gynecology (OB/GYN) at the University of Rochester. She formerly served as director of maternal fetal medicine (MFM), director of the MFM Fellowship training program, director of reproductive genetics, and director of OB/GYN ultrasound. Before coming to the University of Rochester in 1999, she was an assistant professor at The Johns Hopkins University from 1994 to 1999, where she was also associate director of the OB/GYN Residency Program and director of the Fetal Assessment Center and of the High Risk Obstetrical Clinic. Dr. Pressman is board-certified in OB/GYN and in MFM. Among her current areas of interest are medical complications of pregnancy, including diabetes and psychiatric disorders, and nutrition and metabolism in pregnancy. She received her medical degree at Duke University School of Medicine, where she was elected to Alpha Omega Alpha Honor Society. Dr. Pressman completed her residency training in OB/GYN as well as a fellowship in MFM at Johns Hopkins University.

**Alina Salganicoff, Ph.D.,** is vice president and director of women's health policy at the Kaiser Family Foundation. Widely regarded as an expert on women's health policy, she has written and lectured extensively on health care access and financing for low-income women and their families. Her work focuses on health coverage and access to care for women, with an emphasis on understanding the impact of state and federal policies on underserved women throughout their life span. Dr. Salganicoff was also an associate director of the Kaiser Commission on Medicaid and the Uninsured and worked on the health program staff of The Pew Charitable Trusts. She has served as advisor on women's health issues to numerous federal agencies, including the Department of Veterans Affairs, the Centers for Disease Control and Prevention, the Health Resources and Services Administration, the Agency for Healthcare Research and Quality, and the Department of Health and Human Services' Office of Women's Health. She has also served on many state-level and nonprofit advisory committees. Dr. Salganicoff holds a Ph.D. in health policy from The Johns Hopkins University and a B.S. from The Pennsylvania State University.

2021 ED 000314

Copyright National Academy of Sciences. All rights reserved.

**Paul G. Shekelle, M.D., Ph.D., M.P.H.,** is co-director of the Southern California Evidence-based Practice Center at the RAND Corporation. He is a staff physician in internal medicine at the West Los Angeles Veterans Affairs Medical Center and also a professor of medicine at the UCLA School of Medicine. He earned his M.D. from Duke University and his Ph.D. from UCLA.

**Susan M. Wolf, J.D.,** is McKnight Professor of Law, Medicine & Public Policy; Faegre Baker Daniels Professor of Law; and professor of medicine at the University of Minnesota. She is also chair of the university's Consortium on Law and Values in Health, Environment & the Life Sciences. Professor Wolf teaches in the areas of health law, law and science, and bioethics. She is a member of the National Academy of Medicine, a fellow of the American Association for the Advancement of Science, a fellow of The Hastings Center, and a member of the American Law Institute. She has served on a variety of governmental and institutional panels, including the National Science Advisory Board for Biosecurity, the American Society for Reproductive Medicine's Ethics Committee, and the Memorial Sloan-Kettering Cancer Center's Ethics Committee. Professor Wolf currently serves on the National Academies Committee on Science, Engineering, Medicine, and Public Policy. She is a past chair of the Association of American Law Schools Section on Law, Medicine and Health Care and a past board member of the American Society for Bioethics and Humanities. She received her J.D. from Yale Law School.

2021 ED 000315

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

Copyright National Academy of Sciences. All rights reserved.

# Appendix B

# Acronyms and Glossary

**ACRONYMS**

| | |
|---|---|
| AAAASF | American Association for Accreditation of Ambulatory Surgery Facilities |
| AAAHC | Accreditation Association for Ambulatory Heath Care |
| AAPA | American Academy of Physician Assistants |
| ACGME | Accreditation Council for Graduate Medical Education |
| ACME | Accreditation Commission for Midwifery Education |
| ACNM | American College of Nurse-Midwives |
| ACOG | American College of Obstetricians and Gynecologists |
| AHRQ | Agency for Healthcare Research and Quality |
| AMCB | American Midwifery Certification Board |
| ANSIRH | Advancing New Standards in Reproductive Health |
| APA | American Psychological Association |
| APAOG | Association of Physician Assistants in Obstetrics & Gynecology |
| APC | advanced practice clinician |
| APHA | American Public Health Association |
| ARC-PA | Accreditation Review Commission on Education for the Physician Assistant |
| ASA | American Society of Anesthesiologists |
| ASC | ambulatory surgery center |
| | |
| CAPS | Consortium of Abortion Providers |
| CDC | U.S. Centers for Disease Control and Prevention |
| CI | confidence interval |

*177*

2021 ED 000317

Copyright National Academy of Sciences. All rights reserved.

*178 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

| | |
|---|---|
| CMS | Centers for Medicare & Medicaid Services |
| CNM | certified nurse-midwife |
| CRNA | certified registered nurse anesthetist |
| | |
| D&C | dilation and sharp curettage |
| D&E | dilation and evacuation |
| | |
| EVA | electric vacuum aspiration |
| | |
| FAERS | FDA Adverse Event Reporting System |
| FDA | U.S. Food and Drug Administration |
| FPL | federal poverty level |
| | |
| HWPP | Health Workforce Pilot Project |
| | |
| IOM | Institute of Medicine |
| IUD | intrauterine device |
| | |
| LMP | last menstrual period |
| | |
| MAC | monitored anesthesia care |
| MAP | Midwest Access Project |
| MVA | manual vacuum aspiration |
| | |
| NAF | National Abortion Federation |
| NCCPA | National Commission on Certification of Physician Assistants |
| NCI | National Cancer Institute |
| NONPF | National Organization of Nurse Practitioner Faculties |
| NP | nurse practitioner |
| | |
| OB/GYN | obstetrician/gynecologist |
| OSHPD | Office of Statewide Health Planning and Development |
| | |
| PA | physician assistant |
| PTSD | posttraumatic stress disorder |
| | |
| RCOG | Royal College of Obstetricians and Gynaecologists |
| RCT | randomized controlled trial |
| REMS | Risk Evaluation and Mitigation Strategy |
| RHAP | Reproductive Health Access Project |
| RHEDI | Reproductive Health Education in Family Medicine |

2021 ED 000318

Copyright National Academy of Sciences. All rights reserved.

| SFP | Society of Family Planning |
| STFM | Society of Teachers of Family Medicine |
| STI | sexually transmitted infection |
| | |
| UCSF | University of California, San Francisco |
| | |
| WHO | World Health Organization |

## GLOSSARY

| | |
|---|---|
| abortion rate | The annual number of abortions per 1,000 women aged 15–44 or other specific group within a given population. |
| abortion ratio | The annual number of abortions per 1,000 live births within a given population. |
| abortion-related death | A death resulting from a direct complication of an abortion (legal or illegal), from an indirect complication caused by a chain of events initiated by an abortion, or from an aggravation of a preexisting condition by the physiological or psychological effects of abortion. |
| advanced practice clinicians (APCs) | Include physician assistants (PAs), certified nurse-midwives (CNMs), and nurse practitioners (NPs). |
| aspiration abortion | Also referred to as surgical abortion or suction curettage, this procedure is used up to 14 to 16 weeks' gestation. A hollow curette (tube) is inserted into the uterus. At the other end of the curette, a handheld syringe or an electric device is applied to create suction and empty the uterus. |
| buccal administration | Administering a drug by placing in between the gums and cheek. |
| case control study | An observational study that analyzes one group of persons with a certain disease, chronic condition, or type of injury (case patients) and another group of persons without the health problem (control subjects) and compares differences in their exposures, behaviors, and other characteristics to identify and quantify associations, test hypotheses, and identify causes. |

2021 ED 000319

Copyright National Academy of Sciences. All rights reserved.

*180  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

| | |
|---|---|
| case series | Analyses of a series of people with a disease or health condition (there is no comparison group in case series). |
| certified nurse-midwife (CNM) | An advanced practice registered nurse who has advanced education (master's or doctorate) and training in both midwifery and nursing and is certified by the American Midwifery Certification Board. |
| cohort studies | Observational studies in which groups of exposed individuals (e.g., women with an abortion in their first pregnancy or women whose early-gestation pregnancy was terminated by aspiration) are compared with groups of unexposed individuals (e.g., women whose first pregnancy was a delivery or women whose early-gestation pregnancy was terminated by medication) and monitored over time to observe an outcome of interest (e.g., future fertility). Cohort studies can be either prospective or retrospective. |
| comorbidity | A condition that exists at the same time as the primary condition in the same patient (e.g., hypertension is a comorbidity of many conditions, such as diabetes, ischemic heart disease, and end-stage renal disease). |
| contraception | An agent that prevents ovulation, fertilization of an egg, or implantation of a fertilized egg, thereby preventing a pregnancy from taking place. |
| deep sedation | A drug-induced depression of consciousness during which patients cannot easily be aroused but respond purposefully following repeated or painful stimulation. The ability to maintain ventilatory function independently may be impaired. Patients may require assistance in maintaining a patent airway, and spontaneous ventilation may be inadequate. Cardiovascular function is usually maintained but may be impaired. |
| dilation and sharp curettage (D&C) | A surgical procedure in which the cervix is dilated so that the uterine lining can be scraped with a curette to remove products of conception. |
| dilation and evacuation (D&E) | An abortion procedure that can be performed starting at 14 weeks' gestation. The procedure involves cervical preparation with osmotic dilators and/or medications, followed by suction and/or forceps extraction to empty the uterus. Ultrasound guidance is often used. |

2021 ED 000320

Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| ectopic pregnancy | An abnormal pregnancy that occurs when a fertilized egg grows outside of the uterus, most commonly in a fallopian tube. As the pregnancy progresses, it can cause the tube to rupture (burst), which can cause major internal bleeding. This can be life-threatening and needs to be treated with surgery. |
| effective | Providing services based on scientific knowledge to all who could benefit and refraining from providing services to those not likely to benefit (avoiding underuse and overuse, respectively). |
| efficient | Avoiding waste, including waste of equipment, supplies, ideas, and energy. |
| equitable | Providing care that does not vary in quality because of personal characteristics such as gender, ethnicity, geographic location, and socioeconomic status. |
| general anesthesia | A drug-induced loss of consciousness during which patients are not arousable, even by painful stimulation. The ability to maintain ventilatory function independently is often impaired. Patients often require assistance in maintaining a patent airway, and positive pressure ventilation may be required because of depressed spontaneous ventilation or drug-induced depression of neuromuscular function. Cardiovascular function may be impaired. |
| hemorrhage | Bleeding in excess of 500 mL and/or excessive bleeding that requires a clinical response, such as transfusion or hospital admission. |
| incomplete abortion | Occurs when parts of the products of conception are retained in the uterus. |
| induction abortion | Also referred to as "medical" abortion; involves the use of medications to induce labor and delivery of the fetus. The most effective regimens use a combination of mifepristone and misoprostol. |
| laminaria | A type of osmotic dilator (see definition below). Laminaria tents are made of dried, compressed Japanese seaweed derived from japonica or digitate plants. Laminaria comes in diameters ranging from 2 to 10 mm, and in the standard 60 mm length as well as an extra-long 85 mm model. |

2021 ED 000321

Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| local anesthesia | Elimination or reduction of sensation, especially pain, in one part of the body by topical application or local injection of a drug. In the context of abortion practice, local anesthesia almost always involves a paracervical block. |
| medication abortion | Also referred to as "medical" abortion; involves the use of medications to induce uterine contractions that expel the products of conception. The regimen, approved by the FDA up to 70 days' gestation, uses 200 mg of mifepristone followed by 800 mcg of misoprostol 24 to 48 hours later. |
| meta-analysis | A systematic review that uses statistical methods to combine the results of similar studies quantitatively in an attempt to allow inferences to be drawn from the sample of studies and applied to the population of interest. |
| Mifeprex (mifepristone) | The brand name for mifepristone, a progesterone receptor antagonist that competitively binds to the progesterone receptor, thereby inhibiting the physiological action of progesterone, a hormone needed for a pregnancy to continue. When used together with another medicine called misoprostol (defined below), Mifeprex is used to end a pregnancy. |
| minimal sedation (anxiolysis) | A drug-induced state during which patients respond normally to verbal commands. Although cognitive function and physical coordination may be impaired, airway reflexes and ventilatory and cardiovascular functions are unaffected. |
| miscarriage | Also termed spontaneous abortion (see below); the spontaneous loss of a fetus before 20 weeks' gestation. Spontaneous abortion is a naturally occurring event. |
| misoprostol | A synthetic prostaglandin E1 analogue that is used off-label for a variety of indications in the practice of obstetrics and gynecology, including medication abortion, medical management of miscarriage, induction of labor, cervical ripening before surgical procedures, and the treatment of postpartum hemorrhage. Misoprostol's effects are dose dependent and include cervical softening and dilation, uterine contractions, nausea, vomiting, diarrhea, fever, and chills. |

2021 ED 000322

Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| moderate sedation | Also referred to as conscious sedation; a drug-induced depression of consciousness during which patients respond purposefully to verbal commands, either alone or accompanied by light tactile stimulation. No interventions are required to maintain a patent airway, and spontaneous ventilation is adequate. Cardiovascular function is usually maintained. |
| nurse practitioner (NP) | An advanced practice registered nurse who has advanced education (typically a master's degree) and extensive clinical training in both the NP role (e.g., acute or primary care) and one or more population practice areas (e.g., family, women's health) and specialty practice areas (e.g., high-risk perinatal, infertility, abortion care). NPs diagnose and manage patient care for many acute and chronic illnesses, and they also provide preventive care. |
| osmotic dilator | A device that absorbs moisture from the tissues surrounding the cervix and swells, slowly opening the cervix. There are two common types of osmotic dilators: laminaria, a small tube made of dried seaweed (see above), and synthetic dilators, tubes with varying rigidity and size made of polymer. |
| patient-centered | Defined as "providing care that is respectful of and responsive to individual patient preferences, needs, and values and ensuring that patient values guide all clinical decisions." |
| physician assistant (PA) | An individual certified to practice medicine with physician supervision (indirect). They provide health care services that range from primary care to very specialized surgical services. |
| safety | Avoiding injuries to patients from the care that is intended to help them. |
| spontaneous abortion | The spontaneous loss of a fetus before 20 weeks' gestation. Spontaneous abortion is a naturally occurring event. |
| surgical abortion | A term used to describe aspiration and dilation and evacuation (D&E) procedures. This report uses the specific procedure terms to avoid confusion as to what procedure is being described. |

2021 ED 000323

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

*184 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

| | |
|---|---|
| systematic review | A scientific investigation that focuses on a specific question and that uses explicit, planned scientific methods to identify, select, assess, and summarize the findings of similar but separate studies. It may or may not include a quantitative synthesis of the results from separate studies (meta-analysis, defined above). |
| timely | Reducing waits and sometimes harmful delays for both those who receive and those who give care. |
| unsafe abortion | A procedure for terminating an unintended pregnancy carried out either by persons lacking the necessary skills or in an environment that does not conform to minimal medical standards, or both. |
| uterine perforation | A rupture in the uterus caused by traumatic or patho-logic processes. |

2021 ED 000324

Copyright National Academy of Sciences. All rights reserved.

# Appendix C

# Public Meeting Agenda

Workshop on Facility Standards and the Safety of Outpatient Procedures

March 24, 2017
Keck Center of the National Academies
Room 100
500 Fifth Street NW
Washington, DC

Workshop Objective: To learn about accreditation and other facility standards that relate to delivering abortion services.

**8:30 a.m.**   **Welcome and Introductory Remarks**

*Ned Calonge, M.D., M.P.H., Committee Co-Chair*

**8:40 a.m.**   **Meeting Accreditation and State Licensing Requirements: The Experiences of Provider Organizations**

*Juliet Rogers, Ph.D., M.P.H., Assistant Professor, Health Management and Policy, University of Michigan*

Q&A/Discussion

*185*

2021 ED 000325

Copyright National Academy of Sciences. All rights reserved.

*186 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**9:20 a.m.**   **Differences in Facility Standards: Abortions and Other Outpatient Procedures**

*Bonnie Scott Jones, J.D., Senior Policy Advisor, Advancing New Standards in Reproductive Health (ANSIRH), University of California, San Francisco*

Q&A/Discussion

**10:00 a.m.**   **Research on the Relationship of Facility-Related Factors and Patient Outcomes for Non-Hospital-Based Outpatient Procedures**

*Sarah Roberts, Dr.P.H., Associate Professor, Advancing New Standards in Reproductive Health (ANSIRH), Department of Obstetrics, Gynecology, and Reproductive Sciences, University of California, San Francisco*

Q&A/Discussion

**10:45 a.m.**   **Break**

**11:00 a.m.**   **Public Comments (3–5 minutes each)**

Q&A/Discussion

**12:00 p.m.**   **Closing Remarks**

*Helene Gayle, M.D., M.P.H., Committee Co-Chair*

**12:10 p.m.**   **Adjourn**

Copyright National Academy of Sciences. All rights reserved.

# Appendix D

# Literature Search Strategy

Professional research librarians conducted literature searches for this study based on the statement of task and reference interviews with program staff and the committee to identify relevant research. The databases that were searched included Medline, Embase, PubMed, Scopus, PsycINFO, CINAHL, Web of Science, and Cochrane Database of Systematic Reviews. Titles and abstracts identified in the literature searches were organized into EndNote libraries.

Table D-1 broadly details the scope of each search. The search syntax for each literature search is detailed in the sections below.

2021 ED 000327

Copyright National Academy of Sciences. All rights reserved.

**TABLE D-1** Literature Searches

| Topic | Date | Literature | Date Range | Databases | No. of Citations Yielded |
|---|---|---|---|---|---|
| Mental Health Outcomes | 2/8/2017 | Systematic Reviews, Meta-Analysis | 2000–Present | Medline, Embase, Cochrane, PubMed, PsycINFO | 142 |
| Short-Term Health Effects | 2/8/2017 | Systematic Reviews, Meta-Analysis | 2000–Present | Medline, Embase, Cochrane, PubMed | 248 |
| Mental Health Outcomes | 3/2/2017 | Primary Literature, Editorials | 2000–Present | Medline, Embase, PubMed, PsycINFO | 460 |
| Short-Term Health Effects | 3/2/2017 | Primary Literature, Editorials | 2012–Present | Medline, Embase, PubMed, | 617 |
| Disparities | 3/3/2017 | Systematic Reviews, Meta-Analysis, Primary Literature, Editorials | 2000–Present | Medline, Embase, PubMed, Scopus | 1,381 |
| Long-Term Health Effects | 3/30/2017 | Systematic Reviews, Meta-Analysis, Primary Literature, Editorials | 1970–Present | Medline, Embase, PubMed | 2,072 |
| Delays | 4/19/2017 | Systematic Reviews, Meta-Analysis, Primary Literature, Editorials | 2005–Present | Medline, Embase, PubMed Web of Science | 1,259 |
| Cancer | 6/19/2017 | Systematic Reviews, Meta-Analysis, Primary Literature, Editorials | 2007–Present | Medline, Embase, Cochrane, PubMed | 1,835 |
| Training | 2/20/2017 | Systematic Reviews, Meta-Analysis, Primary Literature, Editorials | 2000–Present | PubMed, CINAHL, Cochrane | 1,378 |

Copyright National Academy of Sciences. All rights reserved.

# MENTAL HEALTH OUTCOMES

## Systematic Reviews

**Search Strategy:** Mental Health Outcomes
**Date:** 2000–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Systematic Reviews, Meta-Analysis
**Databases Searched:** Medline, Embase, Cochrane, PubMed, and PsycINFO

| Search No. | Search Syntax |
|---|---|
| **Medline (Ovid)** | |
| 1 | Abortion Applicants/ or Abortion, Induced/ |
| 2 | Mental Disorders/ or Mental Health/ |
| 3 | Depression/ |
| 4 | Anxiety/ |
| 5 | (mental health or distress or relief or depression or counseling).ti,ab. |
| 6 | or/2–5 |
| 7 | Animals/ |
| 8 | (animal or animals or mice or mouse or rat or rats).ti,ab. |
| 9 | or/7–8 |
| 10 | Abortion, Spontaneous/ |
| 11 | spontaneous abortion.ti,ab. |
| 12 | or/10–11 |
| 13 | Adolescent/ |
| 14 | under 18.ti,ab. |
| 15 | (adolescent or adolescents or teenager or teen).ti,ab. |
| 16 | or/13–15 |
| 17 | 1 and 6 |
| 18 | 17 not 9 |
| 19 | 18 not 12 |
| 20 | 19 |
| 21 | limit 20 to yr="2000–Current" |
| 22 | limit 21 to ("review" or systematic reviews) |
| 23 | 22 and 16 |
| 24 | geographic variation.ti,ab. |
| 25 | Regional Medical Programs/ |
| 26 | Residence Characteristics/ |
| 27 | Health Services Accessibility/ |
| 28 | United States/ |
| 29 | appalachian region/ or great lakes region/ or mid-atlantic region/ or midwestern united states/ or new england/ or northwestern united states/ or pacific states/ or southeastern united states/ or southwestern united states/ |
| 30 | or/24–29 |
| 31 | 22 and 30 |
| 32 | Socioeconomic Factors/ |
| 33 | Poverty/ or Social Class/ |
| 34 | socioeconomic status.ti,ab. |
| 35 | or/32–34 |
| 36 | 22 and 35 |

2021 ED 000329

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

| 37 | Continental Population Groups/ |
| 38 | Ethnic Groups/ |
| 39 | African Americans/ |
| 40 | asian americans/ or hispanic americans/ |
| 41 | (race or ethnicity).ti,ab. |
| 42 | or/37–41 |
| 43 | 22 and 42 |
| 44 | 22 |

## Embase (Ovid)

| 1 | Abortion Applicants/ or Abortion, Induced/ |
| 2 | Mental Disorders/ or Mental Health/ |
| 3 | Depression/ |
| 4 | Anxiety/ |
| 5 | (mental health or distress or relief or depression or counseling).ti,ab. |
| 6 | or/2–5 |
| 7 | Animals/ |
| 8 | (animal or animals or mice or mouse or rat or rats).ti,ab. |
| 9 | or/7–8 |
| 10 | Abortion, Spontaneous/ |
| 11 | spontaneous abortion.ti,ab. |
| 12 | or/10–11 |
| 13 | Adolescent/ |
| 14 | under 18.ti,ab. |
| 15 | (adolescent or adolescents or teenager or teen).ti,ab. |
| 16 | or/13–15 |
| 17 | 1 and 6 |
| 18 | 17 not 9 |
| 19 | 18 not 12 |
| 20 | 19 |
| 21 | limit 20 to yr="2000–Current" |
| 22 | limit 21 to ("review") |
| 23 | 22 and 16 |
| 24 | geographic variation.ti,ab. |
| 25 | Regional Medical Programs/ |
| 26 | Residence Characteristics/ |
| 27 | Health Services Accessibility/ |
| 28 | United States/ |
| 29 | appalachian region/ or great lakes region/ or mid-atlantic region/ or midwestern united states/ or new england/ or northwestern united states/ or pacific states/ or southeastern united states/ or southwestern united states/ |
| 30 | or/24–29 |
| 31 | 22 and 30 |
| 32 | Socioeconomic Factors/ |
| 33 | Poverty/ or Social Class/ |
| 34 | socioeconomic status.ti,ab. |
| 35 | or/32–34 |
| 36 | 22 and 35 |
| 37 | Continental Population Groups/ |
| 38 | Ethnic Groups/ |
| 39 | African Americans/ |
| 40 | asian americans/ or hispanic americans/ |

Copyright National Academy of Sciences. All rights reserved.

| 41 | (race or ethnicity).ti,ab. |
| 42 | or/37–41 |
| 43 | 22 and 42 |
| 44 | 22 |

**Cochrane Database of Systematic Reviews (Ovid)**

| 1 | abortion.ti,ab. |
| 2 | mental health.ti,ab. |
| 3 | (mental disorder or distress or grief or depression or counseling or anxiety).ti,ab. |
| 4 | or/2–3 |
| 5 | 1 and 4 |

**PubMed:**
**Note:** The following search was run to capture e-pub ahead of print, under indexed and recent articles not yet indexed in Medline.
("Abortion, Induced"[Mesh] OR abortion [Title/Abstract])
Filters: Review, Systematic Reviews, Publication date from 206/01/01 to 2017/12/31, Humans

**PsycINFO (ProQuest):**
SU.EXACT("Induced Abortion") AND (SU.EXACT("Anxiety") OR SU.EXACT("Posttraumatic Stress Disorder") OR SU.EXACT("Depression (Emotion)") OR SU.EXACT("Post-Traumatic Stress") OR SU.EXACT("Major Depression") OR SU.EXACT("Anxiety Disorders") OR SU.EXACT("Stress") OR SU.EXACT("Psychological Stress") OR SU.EXACT("Mental Disorders") OR SU.EXACT("Grief") OR anxiety OR stress OR depression OR grief OR "mental disorder" OR "mental health")
Limits:
Date: After January 1, 2000
Document type: Journal, Journal Article, Peer Reviewed Journal, Peer-reviewed Journal
Methodology: Literature Review, Longitudinal Study, Meta-Analysis, Meta Synthesis, Systematic Review
Population: Human

## Primary Literature

**Search Strategy:** Mental Health Outcomes
**Date:** 2000–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Primary Literature, Editorials
**Databases Searched:** Medline, Embase, PubMed, and PsycINFO

| Search No. | Search Syntax |

**Embase (Ovid)**

| 1 | induced abortion/ or (induced adj abortion).ti,kw. |
| 2 | mental disease/ or acute stress/ or physical stress/ or posttraumatic stress disorder/ or stress/ or emotional stress/ or acute stress disorder/ or physiological stress/ |

2021 ED 000331
Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

| 3 | mental health/ |
| 4 | depression/ |
| 5 | anxiety/ |
| 6 | grief/ |
| 7 | (mental health or distress or depression or anxiety or grief or stress or ptsd or post traumatic stress disorder).kw. |
| 8 | or/2–7 |
| 9 | 1 and 8 |
| 10 | spontaneous abortion/ |
| 11 | (spontaneous adj abortion).kw. |
| 12 | or/10–11 |
| 13 | 9 not 12 |
| 14 | animal/ |
| 15 | (animal or animals or mice or mouse or rat or rats).kw. |
| 16 | or/14–15 |
| 17 | 13 not 16 |
| 18 | 17 |
| 19 | limit 18 to yr="2000–Current" |
| 20 | limit 19 to (editorial or letter or note) |
| 21 | limit 19 to (article or conference abstract or conference paper or conference proceeding or "conference review" or journal or report or short survey or trade journal) |
| 22 | 21 not 20 |

**Medline (Ovid)**

| 1 | Abortion, Induced/ or (induced adj abortion).kw,ti. |
| 2 | Mental Disorders/ or Mental Health/ |
| 3 | Depression/ |
| 4 | Anxiety/ or Stress Disorders, Post-Traumatic/ or Stress Disorders, Traumatic/ or Stress Disorders, Traumatic, Acute/ or Stress, Psychological/ or Stress, Physiological/ or Grief/ |
| 5 | (mental health or distress or depression or anxiety or grief or stress or ptsd or post traumatic stress disorder).kw. |
| 6 | or/2–5 |
| 7 | Animals/ |
| 8 | (animal or animals or mice or mouse or rat or rats).kw. |
| 9 | or/7–8 |
| 10 | Abortion, Spontaneous/ |
| 11 | (spontaneous adj abortion).kw. |
| 12 | or/10–11 |
| 13 | 1 and 6 |
| 14 | 13 not 9 |
| 15 | 14 not 12 |
| 16 | 15 |
| 17 | limit 16 to yr="2000–Current" |
| 18 | limit 17 to (comment or editorial or guideline or letter or news) |
| 19 | limit 17 to (case reports or classical article or clinical study or clinical trial, all or clinical trial, phase i or clinical trial, phase ii or clinical trial, phase iii or clinical trial, phase iv or clinical trial or comparative study or controlled clinical trial or evaluation studies or historical article or journal article or meta analysis or multicenter study or observational study or pragmatic |

Copyright National Academy of Sciences. All rights reserved.

|    |                                                                          |
|----|--------------------------------------------------------------------------|
|    | clinical trial or randomized controlled trial or technical report or twin study or validation studies) |
| 20 | 19 not 18                                                                |

**PsycINFO (ProQuest):**
(SU.EXACT("Induced Abortion")) AND (SU.EXACT("Anxiety") OR
SU.EXACT("Posttraumatic Stress Disorder") OR SU.EXACT("Depression
(Emotion)") OR SU.EXACT("Post-Traumatic Stress") OR SU.EXACT("Major
Depression") OR SU.EXACT("Anxiety Disorders") OR SU.EXACT("Stress")
OR SU.EXACT("Psychological Stress") OR SU.EXACT("Mental Disorders") OR
SU.EXACT("Grief"))
Limits:
Date: After January 1, 2000
Record type:  Comment/Reply OR Editorial OR Letter
Record type: Journal OR Peer Reviewed Journal OR Journal Article OR Peer-reviewed
Journal

**PubMed:**
**Note:** The following search was run to capture e-pub ahead of print, under indexed
and recent articles not yet in Medline.
("Abortion, Induced"[Mesh] OR abortion[tw]) AND (mental health[tw] OR"Mental
Health"[Mesh])

## SHORT-TERM HEALTH EFFECTS

### Systematic Reviews

**Search Strategy:** Short-Term Health Effects
**Date:** 2000–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Systematic Reviews, Meta-Analysis
**Databases Searched:** Medline, Embase, Cochrane, and PubMed

| Search No. | Search Syntax |
|------------|---------------|
| **Medline (Ovid)** | |
| 1  | Abortion, Induced/ |
| 2  | abortion.ti,ab. |
| 3  | 1 or 2 |
| 4  | Mortality/ |
| 5  | Hospitalization/ |
| 6  | Emergency Service, Hospital/ |
| 7  | Blood Transfusion/ or Blood Component Transfusion/ |
| 8  | Infection/ |
| 9  | Antibiotic Prophylaxis/ |
| 10 | Postoperative Complications/ |
| 11 | (mortality or hospitalization or emergency room or transfusion or infection or prophylactic antibiotics or surgery or abortion complications or short term effects).ti,ab. |

2021 ED 000333

Copyright National Academy of Sciences. All rights reserved.

| 12 | or/4–11 |
| 13 | 3 and 12 |
| 14 | Animals/ |
| 15 | Mice/ |
| 16 | Rats/ |
| 17 | (animal or animals or mice or mouse or rat or rats).ti,ab. |
| 18 | or/14–17 |
| 19 | 13 not 18 |
| 20 | limit 19 to ("review" or systematic reviews) |
| 21 | Adolescent/ |
| 22 | under 18.ti,ab. |
| 23 | (adolescent or adolescents or teenager or teen).ti,ab. |
| 24 | or/21–23 |
| 25 | 20 and 24 |
| 26 | Abortion, Spontaneous/ |
| 27 | spontaneous abortion.ti,ab. |
| 28 | or/26-27 |
| 29 | 25 not 28 |
| 30 | 29 |
| 31 | limit 29 to yr="2000–Current" |
| 32 | geographic variation.ti,ab. |
| 33 | Regional Medical Programs/ |
| 34 | Residence Characteristics/ |
| 35 | Health Services Accessibility/ |
| 36 | United States/ |
| 37 | appalachian region/ or great lakes region/ or mid-atlantic region/ or midwestern united states/ or new england/ or northwestern united states/ or pacific states/ or southeastern united states/ or southwestern united states/ |
| 38 | or/32–37 |
| 39 | 20 and 38 |
| 40 | 39 not 28 |
| 41 | 40 |
| 42 | limit 41 to yr="2000–Current" |
| 43 | Socioeconomic Factors/ |
| 44 | Poverty/ or Social Class/ |
| 45 | socioeconomic status.ti,ab. |
| 46 | or/43–45 |
| 47 | 20 and 46 |
| 48 | 47 not 28 |
| 49 | 48 |
| 50 | limit 49 to yr="2000–Current" |
| 51 | Continental Population Groups/ |
| 52 | Ethnic Groups/ |
| 53 | African Americans/ |
| 54 | asian americans/ or hispanic americans/ |
| 55 | (race or ethnicity).ti,ab. |
| 56 | or/51–55 |
| 57 | 20 and 56 |
| 58 | 57 not 28 |
| 59 | 58 |
| 60 | limit 59 to yr="2000–Current" |
| 61 | 1 and 12 |

2021 ED 000334

Copyright National Academy of Sciences. All rights reserved.

*APPENDIX D*   *195*

| 62 | 61 |
|----|----|
| 63 | limit 62 to yr="2000–Current" |
| 64 | 63 not 18 |
| 65 | limit 64 to ("review" or systematic reviews) |

**Embase (Ovid)**

| 1 | Abortion, Induced/ |
|----|----|
| 2 | abortion.ti,ab. |
| 3 | 1 or 2 |
| 4 | Mortality/ |
| 5 | Hospitalization/ |
| 6 | Emergency Service, Hospital/ |
| 7 | Blood Transfusion/ or Blood Component Transfusion/ |
| 8 | Infection/ |
| 9 | Antibiotic Prophylaxis/ |
| 10 | Postoperative Complications/ |
| 11 | (mortality or hospitalization or emergency room or transfusion or infection or prophylactic antibiotics or surgery or abortion complications or short term effects).ti,ab. |
| 12 | or/4–11 |
| 13 | 3 and 12 |
| 14 | Animals/ |
| 15 | Mice/ |
| 16 | Rats/ |
| 17 | (animal or animals or mice or mouse or rat or rats).ti,ab. |
| 18 | or/14–17 |
| 19 | 13 not 18 |
| 20 | limit 19 to ("review") |
| 21 | Adolescent/ |
| 22 | under 18.ti,ab. |
| 23 | (adolescent or adolescents or teenager or teen).ti,ab. |
| 24 | or/21–23 |
| 25 | 20 and 24 |
| 26 | Abortion, Spontaneous/ |
| 27 | spontaneous abortion.ti,ab. |
| 28 | or/26–27 |
| 29 | 25 not 28 |
| 30 | 29 |
| 31 | limit 29 to yr="2000–Current" |
| 32 | geographic variation.ti,ab. |
| 33 | Regional Medical Programs/ |
| 34 | Residence Characteristics/ |
| 35 | Health Services Accessibility/ |
| 36 | United States/ |
| 37 | appalachian region/ or great lakes region/ or mid-atlantic region/ or midwestern united states/ or new england/ or northwestern united states/ or pacific states/ or southeastern united states/ or southwestern united states/ |
| 38 | or/32–37 |
| 39 | 20 and 38 |
| 40 | 39 not 28 |
| 41 | 40 |
| 42 | limit 41 to yr="2000–Current" |

2021 ED 000335

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

ase 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 217 of 4
PageID.8395
*196 THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

| 43 | Socioeconomic Factors/ |
| 44 | Poverty/ or Social Class/ |
| 45 | socioeconomic status.ti,ab. |
| 46 | or/43–45 |
| 47 | 20 and 46 |
| 48 | 47 not 28 |
| 49 | 48 |
| 50 | limit 49 to yr="2000–Current" |
| 51 | Continental Population Groups/ |
| 52 | Ethnic Groups/ |
| 53 | African Americans/ |
| 54 | asian americans/ or hispanic americans/ |
| 55 | (race or ethnicity).ti,ab. |
| 56 | or/51–55 |
| 57 | 20 and 56 |
| 58 | 57 not 28 |
| 59 | 58 |
| 60 | limit 59 to yr="2000–Current" |
| 61 | 1 and 12 |
| 62 | 61 |
| 63 | limit 62 to yr="2000–Current" |
| 64 | 63 not 18 |
| 65 | limit 64 to ("review") |

**Cochrane Database of Systematic Reviews (Ovid)**

| 1 | abortion.ti,ab. |
| 2 | short term effects.ti,ab. |
| 3 | (mortality or hospitalization or emergency room or transfusion or infection or prophylactic antibiotics or surgery or complications).ti,ab. |
| 4 | or/2–3 |
| 5 | 1 and 4 |

**PubMed:**
**Note:** The following search was run to capture e-pub ahead of print, under indexed and recent articles not yet in Medline.
("Abortion, Induced"[Mesh] OR abortion [Title/Abstract])
Filters: Review, Systematic Reviews, Publication date from 206/01/01 to 2017/12/31, Humans

## Primary Literature

**Search Strategy:** Short-Term Effects
**Date:** 2012–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Primary Literature, Editorials
**Databases Searched:** Medline, Embase, and PubMed

2021 ED 000336
Copyright National Academy of Sciences. All rights reserved.

| Search No. | Search Syntax |
|---|---|

**Medline (Ovid)**

| | |
|---|---|
| 1 | Abortion, Induced/ or (induced adj abortion).kw,ti. or Abortion, Induced/ co [Complications] |
| 2 | Mortality/ |
| 3 | Hospitalization/ |
| 4 | Emergency Service, Hospital/ |
| 5 | Blood Transfusion/ or Blood Component Transfusion/ |
| 6 | Infection/ |
| 7 | Antibiotic Prophylaxis/ |
| 8 | Postoperative Complications/ or Pain/ |
| 9 | (mortality or hospitalization or emergency room or transfusion or infection or antibiotics or surgery or pain or complications).kw. |
| 10 | or/2–9 |
| 11 | 1 and 10 |
| 12 | Abortion, Spontaneous/ or (spontaneous adj abortion).kw. |
| 13 | 11 not 12 |
| 14 | Animals/ or (animal or animals or mice or mouse or rat or rats).kw. |
| 15 | 13 not 14 |
| 16 | 15 |
| 17 | limit 16 to yr="2012–Current" |
| 18 | limit 17 to (comment or editorial or guideline or letter or news) |
| 19 | limit 17 to (case reports or classical article or clinical study or clinical trial, all or clinical trial, phase i or clinical trial, phase ii or clinical trial, phase iii or clinical trial, phase iv or clinical trial or comparative study or controlled clinical trial or evaluation studies or historical article or journal article or meta analysis or multicenter study or observational study or pragmatic clinical trial or randomized controlled trial or technical report or twin study or validation studies) |
| 20 | 19 not 18 |

**Embase (Ovid)**

| | |
|---|---|
| 1 | induced abortion/ or (induced adj abortion).ti,kw. |
| 2 | mortality/ |
| 3 | hospitalization/ |
| 4 | emergency ward/ |
| 5 | emergency health service/ |
| 6 | blood transfusion/ |
| 7 | intrauterine infection/ or infection/ |
| 8 | pain/ |
| 9 | pain/co [Complication] |
| 10 | antibiotic agent/ |
| 11 | postoperative complication/ |
| 12 | (mortality or hospitalization or emergency room or transfusion or infection or antibiotics or surgery or pain or complications).kw. |
| 13 | or/2–12 |
| 14 | 1 and 13 |
| 15 | spontaneous abortion/ |
| 16 | (spontaneous adj abortion).kw. |
| 17 | or/15–16 |
| 18 | 14 not 17 |

Copyright National Academy of Sciences. All rights reserved.

| 19 | animal/ |
| 20 | (animal or animals or mice or mouse or rat or rats).kw. |
| 21 | or/19–20 |
| 22 | 18 not 21 |
| 23 | 22 |
| 24 | limit 23 to yr="2012–Current" |
| 25 | limit 24 to (editorial or letter or note) |
| 26 | limit 24 to (article or conference abstract or conference paper or conference proceeding or "conference review" or journal or report or short survey or trade journal) |
| 27 | 26 not 25 |

**PubMed:**
("Abortion, Induced/adverse effects"[Mesh] OR "Abortion, Induced/complications"[Mesh])
Limit: 2012–Current
("Abortion, Induced"[Mesh] OR abortion[Title/Textword]) AND (complications [Title/Textword] OR "Postoperative Complications"[Mesh])
Limit: 2015–Current

## DISPARITIES

### Systematic Reviews and Primary Literature

**Search Strategy:** Disparities
**Date:** 2000–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Primary Literature, Editorials, Systematic Reviews, Meta-Analysis
**Databases Searched:** Medline, Embase, PubMed, and Scopus

| Search No. | Search Syntax |
| --- | --- |
| **Medline (Ovid)** | |
| 1 | Abortion, Induced/ or (induced adj abortion).kw,ti. |
| 2 | Abortion, Spontaneous/ |
| 3 | (spontaneous adj abortion).kw. |
| 4 | or/2–3 |
| 5 | 1 not 4 |
| 6 | Health Services Accessibility/ |
| 7 | Health Status Disparities/ or Socioeconomic Factors/ or Healthcare Disparities/ |
| 8 | disparit*.kw,ti. |
| 9 | (geographic adj variation).ti,kw. |
| 10 | Poverty Areas/ or Poverty/ |
| 11 | poverty.ti,kw. |
| 12 | Continental Population Groups/ |
| 13 | Ethnic Groups/ |
| 14 | (race or ethnicity).kw,ti. |
| 15 | Gender Identity/ |
| 16 | gender.kw,ti. |

2021 ED 000338

Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| 17 | disability.ti,kw. |
| 18 | Rural Health/ or Rural Health Services/ |
| 19 | Urban Health/ or Urban Health Services/ |
| 20 | (urban or rural).ti,kw. |
| 21 | or/6–20 |
| 22 | 5 and 21 |
| 23 | 22 |
| 24 | limit 23 to yr="2000–Current" |
| 25 | United States/ |
| 26 | United States.ti,kw. |
| 27 | or/25–26 |
| 28 | 24 and 27 |
| 29 | limit 28 to (comment or editorial or guideline or letter or news) |
| 30 | 28 not 29 |
| 31 | Texas/ |
| 32 | texas.kw,ti. |
| 33 | or/31–32 |
| 34 | 24 and 33 |
| 35 | 24 not (28 or 34) |
| 36 | limit 35 to (comment or editorial or guideline or letter or news) |
| 37 | 35 not 36 |

**Embase (Ovid)**

| | |
|---|---|
| 1 | induced abortion/ or (induced adj abortion).ti,kw. |
| 2 | spontaneous abortion/ |
| 3 | (spontaneous adj abortion).ti,kw. |
| 4 | or/2–3 |
| 5 | 1 not 4 |
| 6 | health disparity/ |
| 7 | health care disparity/ |
| 8 | social status/ |
| 9 | disparit*.kw,ti. |
| 10 | (geographic adj variation).ti,kw. |
| 11 | poverty/ |
| 12 | poverty.ti,kw. |
| 13 | race difference/ or race/ |
| 14 | ethnic group/ or ethnicity/ or "ethnic or racial aspects"/ |
| 15 | (race or ethnicity).kw,ti. |
| 16 | gender identity/ |
| 17 | gender.kw,ti. |
| 18 | disability/ |
| 19 | disability.ti,kw. |
| 20 | rural area/ or urban area/ or urban rural difference/ or urban population/ or rural population/ |
| 21 | (urban or rural).ti,kw. |
| 22 | or/6–21 |
| 23 | 5 and 22 |
| 24 | 23 |
| 25 | limit 24 to yr="2000–Current" |
| 26 | United States/ |
| 27 | united states.ti,kw. |
| 28 | or/26–27 |

2021 ED 000339

Copyright National Academy of Sciences. All rights reserved.

| 29 | 25 and 28 |
| 30 | limit 29 to (editorial or letter or note) |
| 31 | 29 not 30 |
| 32 | limit 25 to (editorial or letter or note) |
| 33 | 32 not 30 |
| 34 | 25 not 31 |

**Scopus:**
Title, Abstract, Keyword searches from 2000–Present:
"abortion disparities"
"induced abortion" AND ("geographic variation" OR "urban" OR "rural")
"induced abortion" AND (inequality OR inequalities)
"induced abortion" AND delay
"induced abortion" AND "socioeconomic status"
"abortion" AND "health disparities"
**PubMed:**
("Abortion, Induced"[Mesh] OR "induced abortion"[tw]) AND ("Health Status
Disparities"[Mesh] AND "Healthcare Disparities"[Mesh] OR "disparity"[tw] OR
"disparities"[tw])

## LONG-TERM HEALTH EFFECTS

### Systematic Reviews and Primary Literature

**Search Strategy:** Long-Term Health Effects
**Date:** 1970–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Primary Literature, Editorials, Systematic Reviews, Meta-Analysis
**Databases Searched:** Medline, Embase, and PubMed

| Search No. | Search Syntax |
| --- | --- |
| **Embase and Medline (Ovid)** | |
| 1 | Birth Weight/ |
| 2 | Breast Neoplasms/ |
| 3 | Fetal Death/ |
| 4 | Fetal Membranes, Premature Rupture/ |
| 5 | Infant, Low Birth Weight/ |
| 6 | Infant, Newborn/co [Complications] |
| 7 | Infant, Premature/ |
| 8 | Infant, Small for Gestational Age/ |
| 9 | Infant, Very Low Birth Weight/ |
| 10 | Infertility, Female/co [Complications] |
| 11 | Obstetric Labor Complications/et [Etiology] |
| 12 | Obstetric Labor, Premature/ |
| 13 | Placenta Previa/et [Etiology] |
| 14 | [Placenta/ab [Abnormalities]] |
| 15 | Pre-Eclampsia/co [Complications] |
| 16 | Pregnancy Complications/ |
| 17 | Pregnancy Outcome/ |

Copyright National Academy of Sciences. All rights reserved.

| | |
|---|---|
| 18 | Pregnancy, Ectopic/ |
| 19 | Pregnancy, High-Risk/ |
| 20 | Pregnancy, Prolonged/ |
| 21 | Premature Birth/ |
| 22 | Uterine Cervical Incompetence/co [Complications] |
| 23 | Uterine Hemorrhage/co [Complications] |
| 24 | *Abortion, Induced/ |
| 25 | (induced adj abortion).ti,kw. |
| 26 | 24 or 25 |
| 27 | Animals/ |
| 28 | (animal or animals or mice or mouse or rat or rats).ti,kw. |
| 29 | or/27–28 |
| 30 | (infertility or "cancer risk" or "intrauterine growth" or "future pregnancy" or "fetal growth" or "preterm birth" or premature or "ectopic pregnancy").ti,kw. |
| 31 | or/1–23 |
| 32 | 30 or 31 |
| 33 | 26 and 32 |
| 34 | 33 not 29 |
| 35 | 34 |
| 36 | limit 35 to yr="1970–Current" |
| 37 | limit 36 to (meta analysis or "systematic review") |
| 38 | limit 36 to (editorial or note) |
| 39 | 36 not (37 or 38) |

**PubMed:**
(("Abortion, Induced/adverse effects"[Majr] OR abortion [title]) NOT spontaneous [title]) AND (Birth Weight [Mesh] OR Breast Neoplasms [Mesh] OR Fetal Death [Mesh] OR Fetal Membranes, Premature Rupture [Mesh] OR Infant, Low Birth Weight [Mesh] OR Infant, Newborn [Mesh] OR Infant, Premature [Mesh] OR Infant, Small for Gestational Age [Mesh] OR Infant, Very Low Birth Weight [Mesh] OR Infertility, Female/complications [Mesh] OR Obstetric Labor Complications/etiology*[Mesh] OR Obstetric Labor, Premature [Mesh] OR Placenta Previa/etiology [Mesh] OR Placenta/abnormalities [Mesh] OR Pre-Eclampsia/complications [Mesh] OR Pregnancy Complications [Mesh] OR Pregnancy Outcome[Mesh] OR Pregnancy, Ectopic[Mesh] OR Pregnancy, High-Risk[Mesh] OR Pregnancy, Prolonged[Mesh] OR Premature Birth[Mesh] OR Uterine Cervical Incompetence/complications[Mesh] OR Uterine Hemorrhage/etiology[Mesh])
Limit: 1970–Present
Limit: Humans

## DELAYS

### Systematic Reviews and Primary Literature

**Search Strategy:** Delays
**Date:** 2005–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Primary Literature, Editorials, Systematic Reviews, Meta-Analysis
**Databases Searched:** Medline, Embase, and PubMed

2021 ED 000341

Copyright National Academy of Sciences. All rights reserved.

| Search No. | Search Syntax |
| --- | --- |
| **Medline (Ovid)** | |
| 1 | Abortion, Induced/ or (induced adj abortion).ab,ti. |
| 2 | Animals/ |
| 3 | (animal or animals or mice or mouse or rat or rats).ti,ab. |
| 4 | or/2–3 |
| 5 | Abortion, Spontaneous/ |
| 6 | (spontaneous adj abortion).ti,ab. |
| 7 | or/5–6 |
| 8 | 1 not 4 |
| 9 | 8 not 7 |
| 10 | Health Services Accessibility/ |
| 11 | Health Facility Closure/ |
| 12 | Time Factors/ |
| 13 | Supreme Court Decisions/ |
| 14 | Texas/ |
| 15 | Waiting Lists/ |
| 16 | "waiting periods".ti,ab. |
| 17 | "financial issues".ti,ab. |
| 18 | "nearest facility".ti,ab. |
| 19 | "clinic closure".ti,ab. |
| 20 | (distance or restriction or delay or barrier).ti,ab. |
| 21 | or/10–20 |
| 22 | 9 and 21 |
| 23 | 22 |
| 24 | limit 23 to yr="2005–Current" |
| 25 | limit 24 to (meta analysis or "review" or systematic reviews) |
| 26 | limit 24 to (comment or editorial or letter) |
| 27 | 24 not (25 or 26) |

| Search No. | Search Syntax |
| --- | --- |
| **Embase (Ovid)** | |
| 1 | *Abortion, Induced/ |
| 2 | (induced adj abortion).ti,ab. |
| 3 | 1 or 2 |
| 4 | Animals/ |
| 5 | (animal or animals or mice or mouse or rat or rats).ti,ab. |
| 6 | or/4–5 |
| 7 | spontaneous abortion/ |
| 8 | (spontaneous adj abortion).ti,ab. |
| 9 | or/7–8 |
| 10 | 3 not 6 |
| 11 | 10 not 9 |
| 12 | health care delivery/ |
| 13 | health care facility/ |
| 14 | time factor/ |
| 15 | Texas/ |
| 16 | hospital admission/ |
| 17 | "waiting list".ti,ab. |
| 18 | "waiting period".ti,ab. |
| 19 | "financial issues".ti,ab. |

Copyright National Academy of Sciences. All rights reserved.

| 20 | "nearest facility".ti,ab. |
|----|---------------------------|
| 21 | "clinic closure".ti,ab. |
| 22 | "supreme court decision".ti,ab. |
| 23 | (distance or restriction or delay or barrier).ti,ab. |
| 24 | or/12–23 |
| 25 | 11 and 24 |
| 26 | 25 |
| 27 | limit 26 to yr="2005–Current" |
| 28 | limit 27 to (meta analysis or "systematic review") |
| 29 | limit 27 to (editorial or letter or note) |
| 30 | 27 not (28 or 29) |

**PubMed:**
("Abortion, Induced"[Mesh] OR "abortion"[tw]) AND ("waiting period" OR
"waiting list" OR "financial issue" OR "nearest facility" OR "clinic closure" OR
"Supreme Court decision" OR distance* OR restriction* OR delay* or barrier*) NOT
(spontaneous)
Limit: 2005–Current

**Database Searched and Time Period Covered:**
PubMed: 1/1/2000–4/5/2017

**Language:**
English

**Search Strategy:**
"Abortion, Induced"[Mesh] OR abortion, legal[mh] OR abortion*[tiab] OR
abortion*[ot]
AND
time factors[mh] OR wait OR waiting OR ban OR bans OR banned OR banning
OR barrier* OR deterrent* OR deter OR deterring OR deters OR deterred OR
requirement* OR restrict* OR consent* OR difficulty OR difficulties OR limitation*
OR confidential* OR privacy OR delay* OR travel* OR distance*
AND
experienc* OR perception* OR perceiv* OR implication* OR impact* OR
perspective* OR influen* OR knowledge OR consequence*
AND
AL[Affiliation] OR AK[Affiliation] OR AZ[Affiliation] OR AR[Affiliation] OR
CA[Affiliation] OR CO[Affiliation] OR CT[Affiliation] OR DE[Affiliation] OR
FL[Affiliation] OR GA[Affiliation] OR HI[Affiliation] OR ID[Affiliation] OR
IL[Affiliation] OR IN[Affiliation] OR IA[Affiliation] OR KS[Affiliation] OR
KY[Affiliation] OR LA[Affiliation] OR ME[Affiliation] OR MD[Affiliation] OR
MA[Affiliation] OR MI[Affiliation] OR MN[Affiliation] OR MS[Affiliation] OR
MO[Affiliation] OR MT[Affiliation] OR NE[Affiliation] OR NV[Affiliation] OR
NH[Affiliation] OR NJ[Affiliation] OR NM[Affiliation] OR NY[Affiliation] OR
NC[Affiliation] OR ND[Affiliation] OR OH[Affiliation] OR OK[Affiliation] OR
OR[Affiliation] OR PA[Affiliation] OR RI[Affiliation] OR SC[Affiliation] OR
SD[Affiliation] OR TN[Affiliation] OR TX[Affiliation] OR UT[Affiliation] OR
VT[Affiliation] OR VA[Affiliation] OR WA[Affiliation] OR WV[Affiliation] OR
WI[Affiliation] OR WY[Affiliation] OR USA[AFFILIATION] OR (Alabama[Affiliation]
OR Alaska[Affiliation] OR Arizona[Affiliation] OR Arkansas[Affiliation] OR
California[Affiliation] OR Colorado[Affiliation] OR Connecticut[Affiliation]

2021 ED 000343
Copyright National Academy of Sciences. All rights reserved.

OR Delaware[Affiliation] OR Florida[Affiliation] OR Georgia[Affiliation]
OR Hawaii[Affiliation] OR Idaho[Affiliation] OR Illinois[Affiliation]
OR Indiana[Affiliation] OR Iowa[Affiliation] OR Kansas[Affiliation] OR
Kentucky[Affiliation] OR Louisiana[Affiliation] OR Maine[Affiliation] OR
Maryland[Affiliation] OR Massachusetts[Affiliation] OR Michigan[Affiliation] OR
Minnesota[Affiliation] OR Mississippi[Affiliation] OR Missouri[Affiliation] OR
Montana[Affiliation] OR Nebraska[Affiliation] OR Nevada[Affiliation] OR New
Hampshire[Affiliation] OR New Jersey[Affiliation] OR New Mexico[Affiliation] OR
New York[Affiliation] OR North Carolina[Affiliation] OR North Dakota[Affiliation]
OR Ohio[Affiliation] OR Oklahoma[Affiliation] OR Oregon[Affiliation] OR
Pennsylvania[Affiliation] OR Rhode Island[Affiliation] OR South Carolina[Affiliation]
OR South Dakota[Affiliation] OR Tennessee[Affiliation] OR Texas[Affiliation]
OR Utah[Affiliation] OR Vermont[Affiliation] OR Virginia[Affiliation] OR
Washington[Affiliation] OR West Virginia[Affiliation] OR Wisconsin[Affiliation] OR
Wyoming[Affiliation] OR united states[Affiliation]

**Database Searched and Time Period Covered:**
Web of Science: 1/1/2000–4/5/2017

**Language:**
English

**Search Strategy: (Note: "TS" = Topic Search)**
ts= (abortion\*)
AND
ts=(time OR times OR wait OR waiting OR ban OR bans OR banned OR banning
OR barrier\* OR deterrent\* OR deter OR deterring OR deters OR deterred OR
requirement\* OR restrict\* OR consent\* OR difficulty OR difficulties OR limitation\*
OR confidential\* OR privacy OR delay\* OR travel\* OR distance\*)
AND
ts=(experienc\* OR perception\* OR perceiv\* OR implication\* OR impact\* OR
perspective\* OR influen\* OR knowledge OR consequence\*)
AND
COUNTRIES/TERRITORIES: ( USA )
NOT
RESEARCH AREAS: ( DEVELOPMENTAL BIOLOGY OR MICROBIOLOGY
OR EVOLUTIONARY BIOLOGY OR CELL BIOLOGY OR MARINE
FRESHWATER BIOLOGY OR FORESTRY OR FOOD SCIENCE TECHNOLOGY
OR ENTOMOLOGY OR ENGINEERING OR ENVIRONMENTAL SCIENCES
ECOLOGY OR ACOUSTICS OR VETERINARY SCIENCES OR WATER
RESOURCES OR TROPICAL MEDICINE OR TRANSPLANTATION OR PLANT
SCIENCES OR BIODIVERSITY CONSERVATION OR SPORT SCIENCES
OR RHEUMATOLOGY OR ZOOLOGY OR PHYSIOLOGY OR MEDICAL
LABORATORY TECHNOLOGY OR AGRICULTURE OR DERMATOLOGY OR
PARASITOLOGY OR ALLERGY )
NOT
WEB OF SCIENCE CATEGORIES: ( ENDOCRINOLOGY METABOLISM OR
GASTROENTEROLOGY HEPATOLOGY OR VIROLOGY OR PERIPHERAL
VASCULAR DISEASE OR ONCOLOGY OR CARDIAC CARDIOVASCULAR
SYSTEMS OR BIOCHEMICAL RESEARCH METHODS OR ANESTHESIOLOGY
OR UROLOGY NEPHROLOGY OR HEMATOLOGY OR RADIOLOGY NUCLEAR
MEDICINE MEDICAL IMAGING OR IMMUNOLOGY OR BIOTECHNOLOGY

Copyright National Academy of Sciences. All rights reserved.

APPLIED MICROBIOLOGY OR GENETICS HEREDITY OR COMPUTER SCIENCE
SOFTWARE ENGINEERING OR COMPUTER SCIENCE INTERDISCIPLINARY
APPLICATIONS OR COMPUTER SCIENCE INFORMATION SYSTEMS OR
BIOCHEMISTRY MOLECULAR BIOLOGY )

**Database Searched and Time Period Covered:**
Embase: 1/1/2000–5/10/2017

**Language:**
English

**Search Strategy:**
"induced abortion"/exp OR abortion*:ab OR abortion*:ti
AND
ban:ti OR bans:ab OR bans:ti OR banned:ab OR banned:ti OR banning:ab OR
banning:ti OR barrier*:ab OR barrier*:ti OR deter*:ab OR deter*:ti OR requir*:ab
OR requir*:ti OR restrict*:ab OR restrict:ti OR consent*:ab OR consent*:ti OR
difficult*:ab OR difficult*:ti OR limitation*:ab OR limitation*:ti OR confidential*:ab
OR confidential*:ti OR privacy:ab OR privacy:ti OR distance*:ab OR distance*:ti OR
travel*:ab OR travel*:ti OR 'time factor'/exp OR time:ab OR time:ti OR delay*:ab
OR delay*:ti OR wait*:ab OR wait*:ti
AND
experienc*:ab OR experience*:ti OR perception*:ab OR perception*:ti OR
perceiv*:ab OR perceiv*:ti OR implication*:ab OR implication*:ti OR impact*:ab OR
impact*:ti OR perspective*:ab OR perspective*:ti OR influen*:ab OR influen*:ti OR
knowledge:ab OR knowledge:ti OR consequence*:ab OR consequence*:ti
AND
[humans]/lim

# CANCER

## Systematic Reviews and Primary Literature

**Search Strategy:** Cancer
**Date:** 2007–Present
**Countries:** United States and International
**Population:** Human
**Document Types:** Primary Literature, Editorials, Systematic Reviews, Meta-Analysis
**Databases Searched:** Medline, Embase, Cochrane, and PubMed

| Search No. | Search Syntax |
|---|---|
| **Medline (Ovid)** | |
| 1 | Abortion, Induced/ or (induced adj abortion).ti,ab,kw. |
| 2 | abortion.ti,ab,kw. |
| 3 | (reproductive adj factors).ti,ab,kw. |
| 4 | (reproductive adj events).ti,ab,kw. |
| 5 | or/1–4 |
| 6 | Neoplasms/ep [Epidemiology] |
| 7 | Neoplasms/ |
| 8 | cancer.ti,ab,kw. |

2021 ED 000345

Copyright National Academy of Sciences. All rights reserved.

| 9  | or/6–8 |
| 10 | 5 and 9 |
| 11 | Animals/ or (animal or animals or mice or mouse or rat or rats).kw. |
| 12 | 10 not 11 |
| 13 | 12 |
| 14 | limit 13 to yr="2007–Current" |
| 15 | limit 14 to (meta analysis or "review" or systematic reviews) |
| 16 | limit 14 to (comment or editorial or letter) |
| 17 | 14 not (15 or 16) |

**Embase (Ovid)**

| 1  | induced abortion/ |
| 2  | (induced adj abortion).ti,ab,kw. |
| 3  | abortion.ti,ab,kw. |
| 4  | (reproductive adj factors).ti,ab,kw. |
| 5  | (reproductive adj events).ti,ab,kw. |
| 6  | or/1–4 |
| 7  | malignant neoplasm/ep [Epidemiology] |
| 8  | malignant neoplasm/ |
| 9  | cancer.ti,ab,kw. |
| 10 | or/7–9 |
| 11 | 6 and 10 |
| 12 | Animals/ or (animal or animals or mice or mouse or rat or rats).kw. |
| 13 | 11 not 12 |
| 14 | 13 |
| 15 | limit 14 to yr="2007–Current" |
| 16 | limit 15 to (meta analysis or "systematic review") |
| 17 | limit 15 to (editorial or erratum or letter or note) |
| 18 | 15 not (16 or 17) |

**Cochrane Database of Systematic Reviews (Ovid)**

| 1 | abortion.ti,ab,kw. |
| 2 | (reproductive adj events).ti,ab,kw. |
| 3 | (reproductive adj factors).ti,ab,kw. |
| 4 | cancer.ti,ab,kw. |
| 5 | 1 and 4 |

**PubMed:**
("Abortion, Induced"[Mesh] OR abortion[Title/Abstract] OR "reproductive
events"[Title/Abstract] OR "reproductive factors"[Title/Abstract] OR abortion[tw] OR
"reproductive events"[tw] OR "reproductive factors"[tw]) AND ("Neoplasms"[Mesh]
OR "Neoplasms/epidemiology"[Mesh] OR cancer[Title/Abstract] OR cancer[tw])
Date: 2007–Present
Limit: Humans

## TRAINING

### Systematic Reviews and Primary Literature

**Database Searched and Time Period Covered:**
PubMed: 1/1/2000–2/20/2017

2021 ED 000346

Copyright National Academy of Sciences. All rights reserved.

**Language:**
English

**Search Strategy:**
"Abortion, Induced"[Mesh] OR abortion*[tiab] OR abortion*[ot]
AND
training OR trained OR competen* OR requirement* OR "Patient Safety"[Mesh] OR
"Professional Competence"[Mesh] OR safe[tiab] OR safety[tiab] OR unsafe
AND
AL[Affiliation] OR AK[Affiliation] OR AZ[Affiliation] OR AR[Affiliation] OR
CA[Affiliation] OR CO[Affiliation] OR CT[Affiliation] OR DE[Affiliation] OR
FL[Affiliation] OR GA[Affiliation] OR HI[Affiliation] OR ID[Affiliation] OR
IL[Affiliation] OR IN[Affiliation] OR IA[Affiliation] OR KS[Affiliation] OR
KY[Affiliation] OR LA[Affiliation] OR ME[Affiliation] OR MD[Affiliation] OR
MA[Affiliation] OR MI[Affiliation] OR MN[Affiliation] OR MS[Affiliation] OR
MO[Affiliation] OR MT[Affiliation] OR NE[Affiliation] OR NV[Affiliation] OR
NH[Affiliation] OR NJ[Affiliation] OR NM[Affiliation] OR NY[Affiliation] OR
NC[Affiliation] OR ND[Affiliation] OR OH[Affiliation] OR OK[Affiliation] OR
OR[Affiliation] OR PA[Affiliation] OR RI[Affiliation] OR SC[Affiliation] OR
SD[Affiliation] OR TN[Affiliation] OR TX[Affiliation] OR UT[Affiliation] OR
VT[Affiliation] OR VA[Affiliation] OR WA[Affiliation] OR WV[Affiliation] OR
WI[Affiliation] OR WY[Affiliation] OR USA[AFFILIATION] OR (Alabama[Affiliation]
OR Alaska[Affiliation] OR Arizona[Affiliation] OR Arkansas[Affiliation] OR
California[Affiliation] OR Colorado[Affiliation] OR Connecticut[Affiliation]
OR Delaware[Affiliation] OR Florida[Affiliation] OR Georgia[Affiliation]
OR Hawaii[Affiliation] OR Idaho[Affiliation] OR Illinois[Affiliation]
OR Indiana[Affiliation] OR Iowa[Affiliation] OR Kansas[Affiliation] OR
Kentucky[Affiliation] OR Louisiana[Affiliation] OR Maine[Affiliation] OR
Maryland[Affiliation] OR Massachusetts[Affiliation] OR Michigan[Affiliation] OR
Minnesota[Affiliation] OR Mississippi[Affiliation] OR Missouri[Affiliation] OR
Montana[Affiliation] OR Nebraska[Affiliation] OR Nevada[Affiliation] OR New
Hampshire[Affiliation] OR New Jersey[Affiliation] OR New Mexico[Affiliation] OR
New York[Affiliation] OR North Carolina[Affiliation] OR North Dakota[Affiliation]
OR Ohio[Affiliation] OR Oklahoma[Affiliation] OR Oregon[Affiliation] OR
Pennsylvania[Affiliation] OR Rhode Island[Affiliation] OR South Carolina[Affiliation]
OR South Dakota[Affiliation] OR Tennessee[Affiliation] OR Texas[Affiliation]
OR Utah[Affiliation] OR Vermont[Affiliation] OR Virginia[Affiliation] OR
Washington[Affiliation] OR West Virginia[Affiliation] OR Wisconsin[Affiliation] OR
Wyoming[Affiliation] OR united states[Affiliation])

**Database Searched and Time Period Covered:**
CINAHL: 1/1/2000–1/30/2017

**Language:**
English

**Search Strategy:**
MH "Abortion, Induced+") OR abortion*
AND
TI ( training OR trained OR competen* OR requirement* ) OR AB ( training
OR trained OR competen* OR requirement*) OR MW ( training OR trained OR
competen* OR requirement*)

Copyright National Academy of Sciences. All rights reserved.

The Safety and Quality of Abortion Care in the United States

*208  THE SAFETY AND QUALITY OF ABORTION CARE IN THE UNITED STATES*

**Database Searched and Time Period Covered:**
Cochrane: 1/1/2000–1/30/2017

**Language:**
English

**Search Strategy:**
MeSH descriptor: [Abortion, Induced] explode all trees OR abortion:ti,ab,kw (Word
variations have been searched)
AND
training or trained or competen* or requirement*:ti,ab,kw (Word variations have been
searched)

2021 ED 000348

Copyright National Academy of Sciences. All rights reserved.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

Food and Drug Administration
Silver Spring, MD 20993

ANDA 091178

**GENERAL ADVICE**

(b)(4)/TS-CI; (b)(6)/PPI

GenBioPro, Inc.

(b)(4)/TS-CI; (b)(6)/PPI

Attention: (b)(4)/TS-CI; (b)(6)/PPI

Dear Sir,

Please refer to your abbreviated new drug application (ANDA) submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) for Mifepristone Tablets, 200 mg.

This letter is to inform you that CDER intends to exercise enforcement discretion during the COVID-19 public health emergency (PHE)[1] regarding the requirement in the Mifepristone REMS Program that your product, Mifepristone Tablets, 200 mg, be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices and hospitals, by or under the supervision of a certified prescriber.[2]

FDA has recognized that during the COVID-19 PHE, certain regulatory requirements may be difficult to comply with because patients may need to avoid public places and patients suspected of having COVID-19 may be self-isolating and/or subject to quarantine. The Agency has received queries concerning products with risk evaluation and mitigation strategies (REMS) that have elements to assure safe use (ETASU), including REMS with ETASUs that restrict distribution, and the impact of such ETASUs on patient access when patients self-isolate or are subject to quarantine.

In summary, provided that all other requirements of the Mifepristone REMS Program are met, and given that the in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare personnel because it may involve a clinic visit solely for this purpose, CDER

---

[1] On January 31, 2020, HHS issued a declaration of a public health emergency related to COVID-19 and mobilized the Operating Divisions of HHS. *See* Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued January 31, 2020, and subsequently renewed), available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.

[2] Under the Mifepristone REMS Program, healthcare providers who prescribe mifepristone must be specially certified.

ANDA 091178
Page 2

intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form. Further, to the extent all of the other requirements of the Mifepristone REMS Program are met, CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

Sincerely,

*{See appended electronic signature page}*

(b)(6)/PPI

Center for Drug Evaluation and Research

Digitally signed by (b)(6)/PPI
Date: 4/12/2021 08:49:29PM
GUID: (b)(6)/PPI

2021 ED 000514



NDA 020687

**GENERAL ADVICE**

Danco Laboratories, LLC
(b)(4)/TS-CI; (b)(6)/PPI

P.O. Box 4816
New York, NY 10185

Dear (b)(4)/TS-CI; (b)(6)/PPI :

Please refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Mifeprex (mifepristone) Tablets.

This letter is to inform you that CDER intends to exercise enforcement discretion during the COVID-19 public health emergency (PHE)[1] regarding the requirement in the Mifepristone REMS Program that your product, Mifeprex, be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices and hospitals, by or under the supervision of a certified prescriber.[2]

FDA has recognized that during the COVID-19 PHE, certain regulatory requirements may be difficult to comply with because patients may need to avoid public places and patients suspected of having COVID-19 may be self-isolating and/or subject to quarantine. The Agency has received queries concerning products with risk evaluation and mitigation strategies (REMS) that have elements to assure safe use (ETASU), including REMS with ETASUs that restrict distribution, and the impact of such ETASUs on patient access when patients self-isolate or are subject to quarantine.

In summary, provided that all other requirements of the Mifepristone REMS Program are met, and given that the in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare personnel because it may involve a clinic visit solely for this purpose, CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form. Further, to the extent all of the other requirements of the Mifepristone REMS Program are met,

---

[1] On January 31, 2020, HHS issued a declaration of a public health emergency related to COVID-19 and mobilized the Operating Divisions of HHS. *See* Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued January 31, 2020, and subsequently renewed), available at https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.
[2] Under the Mifepristone REMS Program, healthcare providers who prescribe mifepristone must be specially certified.

Reference ID: 4777974

2021 ED 000515

NDA 020687
Page 2

CDER intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

If you have any questions, cal [(b)(6)/PPI], at [(b)(6)/PPI].

Sincerely,

*{See appended electronic signature page}*

(b)(6)/PPI

Center for Drug Evaluation and Research

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b)(6)/PPI

04/12/2021 08:31:22 PM

2021 ED 000517

Reference ID: 4777974

Case 1:23-cv-03026-O Document 236-4 Filed 10/05/23 Page 17 of 36 PageID 6786
Case 1:23-cv-03026-O Document 136-4 Filed 10/05/23 Page 17 of 36 PageID 6786
PageID 6414

ISSUE BRIEF, APRIL 2019

## Analysis of Medication Abortion Risk and the FDA report
## "Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018"

### Summary

The FDA report "Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018" includes adverse events associated with the use of mifepristone, regardless of their likelihood of being causally linked to the abortion.[1] Over 3.7 million US women have used medication abortion with mifepristone and misoprostol since Mifeprex (mifepristone 200 mg) was first approved by the US Food and Drug Administration (FDA) in 2000. Since then, the safety of the treatment has been reaffirmed by rigorous research that supplements monitoring data from the FDA.

### Understanding medication abortion complications as published by the FDA

As of December 2018, the FDA reports that 24 women, out of approximately 3.7 million, have died after taking mifepristone for medication abortion. However, as the FDA notes, "The adverse events cannot with certainty be causally attributed to mifepristone because of concurrent use of other drugs, other medical or surgical treatments, co-existing medical conditions, and information gaps about patient health status and clinical management of the patient." Among these 24 deaths:

- 13 cases are probably or possibly related to the abortion, including:
  - 8 cases of Clostridium-related sepsis
  - 1 case of delayed onset toxic shock-like syndrome
  - 1 case of hemorrhage

- 2 cases of ruptured ectopic pregnancy
- 1 case where the cause of death was unclear
- 11 cases appear to be unrelated to the abortion, including:
  - 6 cases of drug or substance use, intoxication and/or overdose
  - 3 cases of confirmed or suspected homicide
  - 1 case of suicide
  - 1 natural death due to severe pulmonary emphysema

Based on this, the overall mortality rate associated with medication abortion is 0.65 deaths per 100,000 medication abortions (24 deaths/3.7 million medication abortion cases). This mortality rate is similar to that reported for abortion overall (0.7 deaths per 100,000 procedures).[2] If only the cases that appear to be related to the abortion are included, the mortality rate is 0.35 deaths per 100,000 medication abortions (13 deaths/3.7 million medication abortion cases).

Because it is mandatory to report any death among someone who used mifepristone and because the US Centers for Disease Control and Prevention has an active surveillance program to monitor abortion-related deaths,[2] these reports capture information about all possible deaths related to medication abortion.

The FDA also published the number of cases of hospitalization and other complications (some already counted in the hospitalization cases) reported to them among women using medication abortion. However, unlike for deaths, there is no active surveillance program, so this report should not be considered as conclusive. We do know that serious complications are rare with medication

PCSF262
2021 REMS 000084

**UCSF** University of California, San Francisco | UCSF Medical Center | Bixby Center for Global Reproductive Health

abortion. The most rigorous study of medication abortion safety included data from 11,319 Medi-Cal patients in California.[3] In this study, only 35 (0.31%) had a major complication, defined as hospitalization, blood transfusion, or surgery.

## Other reports and FDA approvals highlighting the safety of medication abortion

The FDA conducted a rigorous review of research from the United States and other countries to assess the safety profile before it approved mifepristone in 2000. The safety of medication abortion has been highlighted repeatedly since then:

- In 2016, the FDA approved an updated label for mifepristone that allowed for using medication abortion later in pregnancy (up to 10 weeks from last menstrual period) and simplified the drug regimen. It also removed the requirement that all serious adverse events be reported to the agency and now only requires that deaths be reported.[4]

- In 2018, the US Government Accountability Office published a report that evaluated the process that FDA used when it updated the mifepristone label. The report concluded that the agency used its standard review process to incorporate the best available evidence into the updated label.[5]

- In 2018, the National Academies of Sciences, Engineering, and Medicine released a report that highlighted the safety and effectiveness of medication abortion.[6]

- In April 2019, the FDA approved a generic form of mifepristone for medication abortion, which gave the agency another opportunity to review the safety of the treatment.[8]

## Understanding risk

Unfortunately, pregnancy can be risky, and women are also at risk of dying if they choose to continue their pregnancy to term. Nationally, the pregnancy-related mortality ratio is 18 deaths per 100,000 live births, and it is even higher for Black women—

40 deaths per 100,000 live births.[7] The mortality rate for women known to have had a live-born infant is 8.8 per 100,000 live births,[8] which is about 14 times higher than the mortality rate associated with medication abortion.

Other medications that are commonly prescribed or administered in outpatient settings also have risks, including a small risk of death. Penicillin causes a fatal anaphylactic reaction at a rate of 2 deaths per 100,000 patients administered the drug.[9] Phosphodiesterase type-5 inhibitors, which are used for erectile dysfunction and include Viagra, have a fatality rate of 4 deaths per 100,000 users.[10] These risks are several times higher than the risk of death with medication abortion. Acetaminophen (Tylenol) overdose is the most common cause of acute liver failure in the U.S. and accounts for over 600 deaths annually.[11]

## Conclusion

Medication abortion with mifepristone and misoprostol is very safe and effective. The safety profile is similar to that of vacuum aspiration abortion, and medication abortion is safer than continuing a pregnancy to term or using other common medications.

References

1. US Food and Drug Administration. Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018. Available at: https://www.fda.gov/downloads/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/UCM603000.pdf. Accessed April 22, 2019.

2. Zane S, Creanga AA, Berg CJ, Pazol K, Suchdev DB, Jamieson DJ, Callaghan WM. Abortion-Related Mortality in the United States: 1998-2010. Obstet Gynecol 2015;126(2):258-65.

3. Upadhyay UD, Desai S, Zlidar V, Weitz TA, Grossman D, Anderson P, Taylor D. Incidence of emergency department visits and complications after abortion. Obstet Gynecol 2015;125(1):175-83.

4. US Food and Drug Administration. Questions and Answers on Mifeprex. Available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm492705.htm. Accessed April 22, 2019.

5. United States Government Accountability Office Report to Congressional Requesters, Information on Mifeprex Labeling Changes and Ongoing Monitoring Efforts. Available at: https://www.gao.gov/assets/700/691750.pdf. Accessed April 22, 2019.

6. National Academies of Sciences, Engineering, and Medicine. The Safety and Quality of Abortion Care in the United States. Available at: http://www.nationalacademies.org/hmd/Reports/2018/the-safety-and-quality-of-abortion-care-in-the-united-states.aspx. Accessed April 22, 2019.

7. Pregnancy Mortality Surveillance System, US Centers for Disease Control and Prevention. Available at: https://www.cdc.gov/reproductivehealth/maternalinfanthealth/pregnancy-mortality-surveillance-system.htm?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Freproductivehealth%2Fmaternalinfanthealth%2Fpmss.html. Accessed April 22, 2019.

8. Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol 2012;119(2 Pt 1):215-9.

9. Neugut AI, Ghatak AT, Miller RL. Anaphylaxis in the United States: an investigation into its epidemiology. Arch Intern Med 2001;161(1):15-21.

10. Lowe G, Costabile RA. 10-Year analysis of adverse event reports to the Food and Drug Administration for phosphodiesterase type-5 inhibitors. J Sex Med 2012;9(1):265-70.

11. Min J, Osborne V, Kowalski A, Prosperi M. Reported Adverse Events with Painkillers: Data Mining of the US Food and Drug Administration Adverse Events Reporting System. Drug Saf 2018;41(3):313-320.

PCSF263 2021 REMS 000085

## MEMORIAL RESOLUTIONS
## ADOPTED UNANIMOUSLY

### DONALD C. BARTON, MD
### Introduced by Kentucky Medical Association

WHEREAS, Donald C. Barton, MD was born March 23, 1935 and passed away on April 7, 2018; and

WHEREAS, Dr Barton was a tireless supporter of the medical community in Kentucky for more than 47 years; and

WHEREAS, Dr Barton was a life member of the Kentucky Medical Association; and

WHEREAS, Dr Barton served as President of the Kentucky Medical Association (KMA) from 1987-1988, KMA Vice President from 1985-1986, KMA Board Chair from 1983-1984 and Trustee from the 15th District from 1978-1984; and

WHEREAS, Dr Barton utilized his knowledge as a family practice physician to serve as a Delegate followed by service as Senior Delegate to the American Medical Association for more than 20 years; and

WHEREAS, Dr. Barton served as Chair of the Southeastern Delegation to the AMA from 1995-1997; and

WHEREAS, Dr Barton served from 1980-1988 as one of only 10 physicians from across the United States on the Reagan-Bush National Advisory Committee; and

WHEREAS, Dr Barton honorably served his country as a Captain in the United States Airforce from 1966-1968 and was the recipient of the Air Medal and Bronze Star; and

WHEREAS, Dr Barton was the recipient of the Doctor of the Year honors in 1991; and

WHEREAS, Dr Barton was the recipient of the KMA's Distinguished Service Award in 1993; and

WHEREAS, Dr Barton will be remembered as a strong advocate for patients and the body of medicine having been quoted saying "The number one priority remains the same-you have to be the patient's advocate and love the patient and you'll do well. Medicine will continue to survive as the greatest profession there is."; and

WHEREAS, Dr Barton is survived by his wife of 64 years, Joan and their four children: Donna Vance, Becky Myers, Toni Alton and David Barton, numerous grandchildren and great-grandchildren; and

WHEREAS, Dr Barton will be deeply missed by his family and colleagues; be it therefore

RESOLVED, That our American Medical Association do hereby honor the contributions of Dr Barton and his years of service to organized medicine and the countless patients whose lives were touched by his hard work and dedication; and be it further

RESOLVED, That our AMA extend its sympathy to the family of Dr Barton and present them with a copy of this resolution.

© 2018 American Medical Association. All rights reserved.

## RESOLUTIONS

Note: Testimony on each item is summarized in the reference committee reports. Items considered on the reaffirmation calendar do not appear in the reference committee reports and were handled as part of the Committee on Rules and Credentials Supplementary Report on Sunday, June 10. The following resolutions were handled on the reaffirmation calendar: 101, 106, 107, 110, 112, 113, 206, 207, 210, 213, 214, 220, 228, 234, 406, 415, 501, 510, 519, 520, 708 and 709.

### 1. DISCRIMINATORY POLICIES THAT CREATE INEQUITIES IN HEALTH CARE
**Introduced by New York**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED**
        *See Policy H-65.963*

RESOLVED, That our American Medical Association speak against policies that are discriminatory and create even greater health disparities in medicine; and be it further

RESOLVED, That our AMA be a voice for our most vulnerable populations, including sexual, gender, racial and ethnic minorities, who will suffer the most under such policies, further widening the gaps that exist in health and wellness in our nation.

### 2. FMLA EQUIVALENCE
**Introduced by Medical Student Section**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED**
        **TITLE CHANGED**
        *See Policy H-270.951*

RESOLVED, That our American Medical Association advocate that Family and Medical Leave Act policies include any individual related by blood or affinity whose close association with the employee is the equivalent of a family relationship.

### 3. RESEARCH HANDLING OF DE-IDENTIFIED PATIENT INFORMATION
**Introduced by Medical Student Section**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED**
        **TITLE CHANGED**
        *See Policy D-315.975*

RESOLVED, That our American Medical Association study the handling of de-identified patient information and report findings and recommendations back to the AMA House of Delegates.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000087

### 4. PATIENT-REPORTED OUTCOMES IN GENDER CONFIRMATION SURGERY
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy H-460.893*

RESOLVED, That our American Medical Association support initiatives and research developed by specialty societies and other relevant stakeholders to establish standardized protocols for patient selection, surgical management, and preoperative and postoperative care for transgender patients undergoing gender confirmation surgeries; and be it further

RESOLVED, That our AMA support implementation of standardized tools, such as questionnaires developed by specialty societies and other relevant stakeholders to evaluate outcomes of gender confirmation surgeries.

### 5. DECREASING SEX AND GENDER DISPARITIES IN HEALTH OUTCOMES
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy H-410.946*

RESOLVED, That our American Medical Association support the use of decision support tools that aim to mitigate gender bias in diagnosis and treatment; and be it further

RESOLVED, That our AMA encourage the use of guidelines, treatment protocols, and decision support tools specific to biological sex for conditions in which physiologic and pathophysiologic differences exist between sexes.

### 6. LIVING DONOR PROTECTION ACT OF 2017 (HR 1270)
#### Introduced by American Society of Transplant Surgeons

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    POLICY H-370.965 AMENDED AND**
**POLICY H-370.996 REAFFIRMED**
**IN LIEU OF RESOLUTIONS 6 AND 12**

Policy H-370.965 amended by addition and deletion to read as follows:

Removing Financial Barriers to Living Organ Donation
1.  Our AMA supports federal and state laws that remove financial barriers to living organ donation, such as: (a) provisions for expenses involved in the donation incurred by the organ donor; (b) providing access to health care coverage of any medical expense related to the donation and; (c) provisions for expenses incurred after the donation as a consequence of donation; (c) (d) prohibiting employment discrimination on the basis of living donor status; (d) (e) prohibiting the use of living donor status as the sole basis for denying or limiting health, and life, and disability and long-term care insurance coverage; and (e) (f) provisions to encourage paid leave for organ donation.

2.  Our AMA supports legislation expanding paid leave for organ donation.

3.  Our AMA advocates that live organ donation surgery be classified as a serious health condition under the Family and Medical Leave Act.

© 2018 American Medical Association. All rights reserved.

**7. OPPOSE THE CRIMINALIZATION OF SELF-INDUCED ABORTION**
**Introduced by Women Physicians Section**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:   ADOPTED**
                          *See Policy H-5.980*

RESOLVED, That our American Medical Association oppose the criminalization of self-induced abortion as it increases patients' medical risks and deters patients from seeking medically necessary services; and be it further

RESOLVED, That our AMA advocate against any legislative efforts to criminalize self-induced abortion.

**8. HEALTH CARE RIGHTS OF PREGNANT MINORS**
**Introduced by Women Physicians Section**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
                          *See Policy H-60.907*

RESOLVED, That our American Medical Association work with appropriate stakeholders to support legislation allowing pregnant minors to consent to related tests and procedures from the prenatal stage through postpartum care; and be it further

RESOLVED, That our AMA oppose any law or policy that prohibits a pregnant minor from consenting to prenatal and other pregnancy related care, including, but not limited to, prenatal genetic testing, epidural block, pain management, Cesarean section, diagnostic imaging, procedures and emergency care.

**Resolution 9 was withdrawn.**

**10. ADVANCING GENDER EQUITY IN MEDICINE**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:   FOLLOWING ALTERNATIVE RESOLUTION 10 ADOPTED**
                          **IN LIEU OF RESOLUTIONS 10, 11, 20 AND 21**
                          *See Policy D-65.989*

RESOLVED, That our American Medical Association draft and disseminate a report detailing its positions and recommendations for gender equity in medicine, including clarifying principles for state and specialty societies, academic medical centers and other entities that employ physicians, to be submitted to the House for consideration at the 2019 Annual Meeting; and be it further

RESOLVED, That our American Medical Association: (a) advocate for institutional, departmental and practice policies that promote transparency in defining the criteria for initial and subsequent physician compensation; (b) advocate for pay structures based on objective, gender-neutral objective criteria; (c) encourage a specified approach, sufficient to identify gender disparity, to oversight of compensation models, metrics, and actual total compensation for all employed physicians; and (d) advocate for training to identify and mitigate implicit bias in compensation determination for those in positions to determine salary and bonuses, with a focus on how subtle differences in the further evaluation of physicians of different genders may impede compensation and career advancement; and be it further

© 2018 American Medical Association. All rights reserved.     2021 REMS 000089

RESOLVED, That our American Medical Association (AMA) recommend as immediate actions to reduce gender bias (a) elimination of the question of prior salary information from job applications for physician recruitment in academic and private practice; (b) create an awareness campaign to inform physicians about their rights under the Lilly Ledbetter Fair Pay Act and Equal Pay Act; (c) establish educational programs to help empower all genders to negotiate equitable compensation; (d) work with relevant stakeholders to host a workshop on the role of medical societies in advancing women in medicine, with co-development and broad dissemination of a report based on workshop findings; and (e) create guidance for medical schools and health care facilities for institutional transparency of compensation, and regular gender-based pay audits; and be it further

RESOLVED, That our AMA collect and analyze comprehensive demographic data and produce a study on the inclusion of women members including, but not limited to, membership, representation in the House of Delegates, reference committee makeup, and leadership positions within our AMA, including the Board of Trustees, Councils and Section governance, plenary speaker invitations, recognition awards, and grant funding, and disseminate such findings in regular reports to the House of Delegates and making recommendations to support gender equity; and be it further

RESOLVED, That our AMA commit to pay equity across the organization by asking our Board of Trustees to undertake routine assessments of salaries within and across the organization, while making the necessary adjustments to ensure equal pay for equal work.

### 11. WOMEN PHYSICIAN WORKFORCE AND GENDER GAP IN EARNINGS-MEASURES TO IMPROVE EQUALITY
**Introduced by American College of Gastroenterology**

**Resolution 11 was considered with Resolutions 10, 20 and 21. See Resolution 10.**

RESOLVED, That our American Medical Association, together with the assistance of professional medical societies, create an awareness campaign to inform physicians about their rights under the Lilly Ledbetter Fair Pay Act and Equal Pay Act; and be it further

RESOLVED, That our AMA, together with the assistance of professional medical societies, help U.S. public medical schools and facilities create guidance for institutional transparency of compensation, and regular gender-based pay audits, in order to narrow the gender inequity in pay and promotion; and be it further

RESOLVED, That our AMA recommend to eliminate the question of prior salary information from job applications for physician recruitment in academic and private practice.

### 12. COSTS TO KIDNEY DONORS
**Introduced by Illinois**

**Resolution 12 was considered with Resolution 6. See Resolution 6.**

RESOLVED, That our American Medical Association seek legislation to ensure that living kidney donors are reimbursed for expenses associated with donation of their kidney.

© 2018 American Medical Association. All rights reserved.

2021 REMS 000090

### 13. OPPOSING SURGICAL SEX ASSIGNMENT OF INFANTS WITH DIFFERENCES OF SEX DEVELOPMENT
#### Introduced by Michigan

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association oppose the assignment of gender binary sex to infants with differences in sex development through surgical intervention outside of the necessity of physical functioning for an infant and believes children should have meaningful input into any gender assignment surgery.

### 14. PROMOTION OF LGBTQ-FRIENDLY AND GENDER-NEUTRAL INTAKE FORMS
#### Introduced by Michigan

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
            *See Policy D-315.974*

RESOLVED, That our American Medical Association will develop and implement a plan with input from the Advisory Committee on LGBTQ Issues and appropriate medical and community-based organizations to distribute and promote the adoption of the recommendations pertaining to medical documentation and related forms in AMA Policy H-315.967, "Promoting Inclusive Gender, Sex, and Sexual Orientation Options on Medical Documentation," to our membership.

### 15. HUMAN TRAFFICKING/SLAVERY AWARENESS
#### Introduced by Oklahoma

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
            *See Policy D-170.992*

RESOLVED, That our American Medical Association study the awareness and effectiveness of physician education regarding the recognition and reporting of human trafficking and slavery.

### 16. UTILIZATION OF "LGBTQ" IN RELEVANT PAST AND FUTURE AMA POLICIES
#### Introduced by GLMA: Health Professionals Advancing LGBT Equality

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED**
            *See Policy D-65.990*

RESOLVED, That our American Medical Association utilize the terminology "lesbian, gay, bisexual, transgender, and queer" and the abbreviation "LGBTQ" in all future policies and publications when broadly addressing this population; and be it further

RESOLVED, That our AMA revise all relevant and active policies to utilize the abbreviation "LGBTQ" in place of the abbreviations "LGBT" and "GLBT" where such text appears; and be it further

RESOLVED, That our AMA revise all relevant and active policies to utilize the terms "lesbian, gay, bisexual, transgender, and queer" to replace "lesbian, gay, bisexual, and transgender" where such text appears.

© 2018 American Medical Association. All rights reserved.

### 17. REVISED MISSION STATEMENT OF THE AMA
**Introduced by New Jersey**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    NOT ADOPTED**

RESOLVED, That our American Medical Association consider its current mission statement to read: The AMA promotes professionalism, the art and science of medicine, physician wellness and the betterment of public health.

### 18. DISCRIMINATION AGAINST PHYSICIANS BY PATIENTS
**Introduced by Organized Medical Staff Section**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy D-65.991*

RESOLVED, That our American Medical Association study (1) the prevalence, reasons for and impact of physician, resident/fellow and medical student reassignment based upon patients' requests; (2) hospitals' and other health care systems' policies or procedures for handling patient bias; and (3) the legal, ethical, and practical implications of accommodating or refusing such reassignment requests.

### 19. STUDY OF MEDICAL STUDENT, RESIDENT, AND PHYSICIAN SUICIDE
**Introduced by Organized Medical Staff Section**

*Reference committee hearing: see report of Reference Committee on Amendments to Constitution and Bylaws.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy D-345.984*

RESOLVED, That our American Medical Association determine the most efficient and accurate mechanism to study the actual incidence of medical student, resident, and physician suicide, and report back at the 2018 Interim Meeting of the House of Delegates with recommendations for action.

### 20. ADVANCING THE GOAL OF EQUAL PAY FOR WOMEN IN MEDICINE
**Introduced by Young Physicians Section**

**Resolution 20 was considered with Resolutions 10, 11 and 21. See Resolution 10.**

RESOLVED, That our American Medical Association draft and disseminate a report clarifying principles of equal pay in medicine that can form the basis for state and specialty society policy-making, as well as for academic medical centers and other entities that employ physicians, to be submitted to the House for consideration at the 2019 Annual Meeting.

### 21. TAKING STEPS TO ADVANCE GENDER EQUITY IN MEDICINE
**Introduced by Young Physicians Section**

**Resolution 21 was considered with Resolutions 10, 11 and 20. See Resolution 10.**

RESOLVED, That our American Medical Association draft and disseminate a report detailing its positions and recommendations for gender equity in medicine, to be submitted to the House for consideration at the 2019 Annual Meeting; and be it further

© 2018 American Medical Association. All rights reserved.

RESOLVED, That our AMA work with relevant stakeholders to host a workshop on the role of medical societies in advancing women in medicine, with co-development and broad dissemination of a report based on workshop findings.

### 101. MEDICAID REFORM
### Introduced by Louisiana

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-165.855, H-290.972 AND D-165.966 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association support reform of the Medicaid health care delivery model using the principles of expanded individual choice, individual opportunity, individual and governmental responsibility; and be it further

RESOLVED, That our AMA support reform of the Medicaid healthcare delivery model which provides the individual patient the opportunity and responsibility to make wise choices in their own health care delivery model, and to share in the financial savings when using the Medicaid healthcare delivery system wisely; and be it further

RESOLVED, That our AMA encourage pluralism and patient choice in the Medicaid healthcare delivery model by requesting the Centers for Medicare and Medicaid Services develop multiple patient choice healthcare payment options at the Federal level, or by approving waivers at the state level, that include but are not limited to the following:

Option 1: Maintenance of the traditional legacy Medicaid program whereby the recipient is allotted a defined contribution per member per month and is provided a government issued identification card, which upon presentation entitles that recipient to receive healthcare services from any willing provider according to a defined benefit package and prescription formulary. Recipients desiring expanded healthcare services or pharmacy benefits may obtain this by paying the additional cost out-of-pocket.

Option 2: Creation of a Medicaid Advantage program similar to a Medicare Advantage program where the defined Medicaid contribution for the recipient is assigned to a third party which in turn must provide the health care services to the recipient. This third party then utilizes the principles of managed care to generate savings which can then be applied to the recipient in the form of expanded services and pharmacy benefits.

Option 3: Creation of a Medicaid voucher system whereby the recipient could then apply that Medicaid defined contribution toward the purchase of private healthcare coverage of their choice. The recipient could choose a coverage plan similar to the defined benefit package of traditional Medicaid, and if they could find such coverage for a lower premium the recipient could apply the savings toward the purchase of expanded service or pharmacy benefit. The premium for that basic benefit packaged could be required by insurance rule never to be more than the defined contribution amount provided by Medicaid. This protects the recipient from excess personal expense. The recipient could also choose to contribute employer sponsored health care plan premium funds, personal funds, or other funds such as a those provided by a philanthropic organization to expand the premium and thus choose to enhance the healthcare or pharmacy benefit.

Option 4: Creation of a Medicaid Medical Savings Account program in which the Medicaid defined contribution allotted for each recipient is then assigned to an account created for the recipient. The recipient can then choose the health care delivery model best for them, with the cost then assigned to that model. Healthcare coverage is maintained for wellness care, illness care and accident care by participation in in a health system payment model, but the recipient is incentivized to maintain healthy lifestyle and judiciously use the healthcare delivery system by sharing in any savings they help to create. These savings can then be used contemporaneously to acquire expanded healthcare or pharmacy services, or be retained in that recipient account until such time as they reach the age of eligibility for Medicare. Those lifetime accumulated savings could then be used to purchase Medicare supplemental insurance coverage, or the savings could be transferred to the recipient's Social Security or other retirement plan for any use in their retirement years.

© 2018 American Medical Association. All rights reserved.

## 102. EFFECTIVENESS OF RISK ASSESSMENT MODELS IN REPRESENTING HEALTHCARE RESOURCES EXPENDED FOR INFANTS AND CHILDREN
### Introduced by American Academy of Pediatrics

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    ADOPTED**
   *See Policy H-285.903*

RESOLVED, That our American Medical Association support risk modeling that appropriately represents care that is specific to all age groups including infants, children, and adolescents as unique risk strata; and be it further

RESOLVED, That our AMA advocate that health insurance organizations transparently publish their risk adjustment models so that clinicians can more effectively document care that reflects patient risk and so that clinicians can assess whether the risk adjustment model appropriately defines the risk of their patients.

## 103. OPPOSE MEDICAID ELIGIBILITY LOCKOUT
### Introduced by New York

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
   *See Policy H-290.960*

RESOLVED, That our American Medical Association oppose 'lock-out' provisions that exclude Medicaid eligible persons for lengthy periods and support provisions that permit them to reapply immediately for redetermination.

## 104. EMERGENCY OUT OF NETWORK SERVICES
### Introduced by New York

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
   *See Policy* H-285.904

RESOLVED, That our American Medical Association advocate for the principles delineated in HOD Policy H-285.904 for all health plans, including ERISA plans; and be it further

RESOLVED, That Policy H-285.904 be reaffirmed.

## 105. USE OF HIGH MOLECULAR WEIGHT HYALURONIC ACID
### Introduced by New York

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    POLICIES H-165.856, H-185.964, H-385.942, H-410.961 AND H-450.935 REAFFIRMED IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association advocate for reimbursement and national coverage for high molecular weight hyaluronic acid intraarticular injections as appropriate care and treatment for patients with mild to moderate osteoarthritis of the knee.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000094

### 106. PROHIBIT RETROSPECTIVE ER COVERAGE DENIAL
**Introduced by New York**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:**    **POLICIES H-130.970 AND H-285.904 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association actively work toward ensuring strong enforcement of federal and state laws which require health insurance companies to cover emergency room care when a patient reasonably believes they are in need of immediate medical attention, including the imposition of meaningful financial penalties on insurers who do not comply with the law.

### 107. OPPOSITION TO MEDICAID WORK REQUIREMENT
**Introduced by New York**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:**    **POLICY H-290.961 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association reaffirm Policy H-290.961 which opposes work requirements as a criterion for Medicaid eligibility.

### 108. EXPANDING AMA'S POSITION ON HEALTHCARE REFORM OPTIONS
**Introduced by Medical Student Section**

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:**    **REFERRED**

RESOLVED, That our AMA rescind HOD Policy H-165.844; and be it further

RESOLVED, That our AMA rescind HOD Policy H-165.985; and be it further

RESOLVED, That our AMA amend HOD Policy H-165.888 by deletion as follows:

Evaluating Health System Reform Proposals
1. Our AMA will continue its efforts to ensure that health system reform proposals adhere to the following principles:
   A. Physician's maintain primary ethical responsibility to advocate for their patients' interests and needs.
   B. Unfair concentration of market power of payers is detrimental to patients and physicians, if patient freedom of choice or physician ability to select mode of practice is limited or denied. Single payer systems clearly fall within such a definition and, consequently, should continue to be opposed by the AMA. Reform proposals should balance fairly the market power between payers and physicians or be opposed.
   C. All health system reform proposals should include a valid estimate of implementation cost, based on all health care expenditures to be included in the reform; and supports the concept that all health system reform proposals should identify specifically what means of funding (including employer-mandated funding, general taxation, payroll or value-added taxation) will be used to pay for the reform proposal and what the impact will be.
   D. All physicians participating in managed care plans and medical delivery systems must be able without threat of punitive action to comment on and present their positions on the plan's policies and procedures for medical review, quality assurance, grievance procedures, credentialing criteria, and

© 2018 American Medical Association. All rights reserved.

other financial and administrative matters, including physician representation on the governing board and key committees of the plan.

E.   Any national legislation for health system reform should include sufficient and continuing financial support for inner-city and rural hospitals, community health centers, clinics, special programs for special populations and other essential public health facilities that serve underserved populations that otherwise lack the financial means to pay for their health care.

F.   Health system reform proposals and ultimate legislation should result in adequate resources to enable medical schools and residency programs to produce an adequate supply and appropriate generalist/specialist mix of physicians to deliver patient care in a reformed health care system.

G.   All civilian federal government employees, including Congress and the Administration, should be covered by any health care delivery system passed by Congress and signed by the President.

H.   True health reform is impossible without true tort reform.

2.   Our AMA supports health care reform that meets the needs of all Americans including people with injuries, congenital or acquired disabilities, and chronic conditions, and as such values function and its improvement as key outcomes to be specifically included in national health care reform legislation.

3.   Our AMA supports health care reform that meets the needs of all Americans including people with mental illness and substance use / addiction disorders and will advocate for the inclusion of full parity for the treatment of mental illness and substance use / addiction disorders in all national health care reform legislation.

4.   Our AMA supports health system reform alternatives that are consistent with AMA principles of pluralism, freedom of choice, freedom of practice, and universal access for patients; and be it further

RESOLVED, That our AMA amend HOD Policy H-165.838 by deletion as follows:

Health System Reform Legislation

1.   Our American Medical Association is committed to working with Congress, the Administration, and other stakeholders to achieve enactment of health system reforms that include the following seven critical components of AMA policy:
   a.   Health insurance coverage for all Americans
   b.   Insurance market reforms that expand choice of affordable coverage and eliminate denials for pre-existing conditions or due to arbitrary caps
   c.   Assurance that health care decisions will remain in the hands of patients and their physicians, not insurance companies or government officials
   d.   Investments and incentives for quality improvement and prevention and wellness initiatives
   e.   Repeal of the Medicare physician payment formula that triggers steep cuts and threaten seniors' access to care
   f.   Implementation of medical liability reforms to reduce the cost of defensive medicine
   g.   Streamline and standardize insurance claims processing requirements to eliminate unnecessary costs and administrative burdens

2.   Our American Medical Association advocates that elimination of denials due to pre-existing conditions is understood to include rescission of insurance coverage for reasons not related to fraudulent representation.

3.   Our American Medical Association House of Delegates supports AMA leadership in their unwavering and bold efforts to promote AMA policies for health system reform in the United States.

4.   Our American Medical Association supports health system reform alternatives that are consistent with AMA policies concerning pluralism, freedom of choice, freedom of practice, and universal access for patients.

5.   AMA policy is that insurance coverage options offered in a health insurance exchange be self-supporting, have uniform solvency requirements; not receive special advantages from government subsidies; include payment rates established through meaningful negotiations and contracts; not require provider participation; and not restrict enrollees' access to out-of-network physicians.

6.   Our AMA will actively and publicly support the inclusion in health system reform legislation the right of patients and physicians to privately contract, without penalty to patient or physician.

7.   Our AMA will actively and publicly oppose the Independent Medicare Commission (or other similar construct), which would take Medicare payment policy out of the hands of Congress and place it under the control of a group of unelected individuals.

© 2018 American Medical Association. All rights reserved.

8. Our AMA will actively and publicly oppose, in accordance with AMA policy, inclusion of the following provisions in health system reform legislation:
   a. Reduced payments to physicians for failing to report quality data when there is evidence that widespread operational problems still have not been corrected by the Centers for Medicare and Medicaid Services
   b. Medicare payment rate cuts mandated by a commission that would create a double-jeopardy situation for physicians who are already subject to an expenditure target and potential payment reductions under the Medicare physician payment system
   c. Medicare payments cuts for higher utilization with no operational mechanism to assure that the Centers for Medicare and Medicaid Services can report accurate information that is properly attributed and risk-adjusted
   d. Redistributed Medicare payments among providers based on outcomes, quality, and risk-adjustment measurements that are not scientifically valid, verifiable and accurate
   e. Medicare payment cuts for all physician services to partially offset bonuses from one specialty to another
   f. Arbitrary restrictions on physicians who refer Medicare patients to high quality facilities in which they have an ownership interest
9. Our AMA will continue to actively engage grassroots physicians and physicians in training in collaboration with the state medical and national specialty societies to contact their Members of Congress, and that the grassroots message communicate our AMA's position based on AMA policy.
10. Our AMA will use the most effective media event or campaign to outline what physicians and patients need from health system reform.
11. AMA policy is that national health system reform must include replacing the sustainable growth rate (SGR) with a Medicare physician payment system that automatically keeps pace with the cost of running a practice and is backed by a fair, stable funding formula, and that the AMA initiate a "call to action" with the Federation to advance this goal.
12. ~~AMA policy is that creation of a new single-payer, government-run health care system is not in the best interest of the country and must not be part of national health system reform.~~
~~13.~~ AMA policy is that effective medical liability reform that will significantly lower health care costs by reducing defensive medicine and eliminating unnecessary litigation from the system should be part of any national health system reform.

### 109. MEDICAID COVERAGE OF FITNESS FACILITY MEMBERSHIPS
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:  NOT ADOPTED**

RESOLVED, That our American Medical Association support Medicaid coverage of fitness facility memberships as a standard preventive health insurance benefit for patients.

### 110. RETURN TO PRUDENT LAYPERSON STANDARD FOR EMERGENCY SERVICES
### Introduced by Missouri

*Considered on reaffirmation calendar.*

**HOUSE ACTION:  POLICIES H-130.970 AND H-285.904 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association oppose the arbitrary denial of payment for emergency services based on diagnostic coding alone and support the use of the prudent layperson standard.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000097

## 111. MEDICARE COVERAGE FOR DENTAL SERVICES
### Introduced by American College of Cardiology

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association reaffirm appreciation and gratitude for the valuable contributions dental health professionals make to Americans' health and well-being as members of our healthcare team; and be it further

RESOLVED, That our AMA promote and support legislative and administrative action to include preventive and therapeutic dental services as a standard benefit for all Medicare recipients.

## 112. ENABLING ATTENDING PHYSICIANS TO WAIVE THE THREE-MIDNIGHT RULE FOR PATIENTS RECEIVING CARE WITHIN DOWNSIDE RISK SHARING ACCOUNTABLE CARE ORGANIZATIONS AND ADVANCE BUNDLED PAYMENTS CARE IMPROVEMENT PROGRAMS
### Introduced by AMDA - The Society for Post-Acute and Long-Term Care Medicine

*Considered on reaffirmation calendar.*

**HOUSE ACTION:   POLICY H-280.947 REAFFIRMED**
**IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association support provisions that allow attending physicians caring for Medicare recipients in any setting be allowed to waive the three midnight inpatient stay requirement for initiation of skilled nursing care in a facility when the attending physician and the skilled nursing facility are both part of a downside risk sharing arrangement with Medicare--such as a Track 1+ or higher Medicare Accountable Care Organization or an Advanced Bundled Payments for Care Improvement Program.

## 113. SURVIVORSHIP CARE PLANS
### Introduced by American Society of Clinical Oncology

*Considered on reaffirmation calendar.*

**HOUSE ACTION:   POLICIES H-55.969 AND H-70.919 REAFFIRMED**
**IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association study challenges in billing and coding for cancer survivorship care and invite collaboration from internal medicine and specialty societies for guideline development and implementation; and be it further

RESOLVED, That our AMA prioritize assignation of distinct ICD-10 and E&M codes associated with cancer survivorship care, and collaborate with the Centers for Medicare and Medicaid Services implementation in order to provide standards of care and reimbursement for survivorship care plans.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000098

**114. INCLUSION OF BUNDLED PAYMENTS CARE IMPROVEMENT (BPCI)
POST-ACUTE ONLY MODEL 3 IN ADVANCED BPCI
Introduced by AMDA - The Society for Post-Acute and Long-Term Care Medicine**

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
　　　　　　　　*See Policy D-385.954*

RESOLVED, That our American Medical Association work with interested national medical specialty societies to help develop and advocate for one or more Medicare alternative payment models focusing on post-acute and / or long-term care.

**115. EXPANDING ON-SITE PHYSICIAN HOME HEALTH CARE TO LOW-INCOME
FAMILIES AND THE CHRONICALLY ILL
Introduced by Maryland**

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    ADOPTED**
　　　　　　　　*See Policy H-210.981*

RESOLVED, That our American Medical Association amend Policy H-210.981, "On-site Physician Home Health Care," by addition and deletion to read as follows:

The AMA: (1) recognizes that timely access to physician care for the frail, chronically ill, disabled or low-income patient is a goal that can only be met by an increase in physician house calls to this vulnerable, underserved population.

(2) strongly supports the role of interdisciplinary teams in providing direct care in the patient's own home, but recognizes that physician oversight of that care from a distance must sometimes be supplemented by on-site physician care through house calls.

(3) advocates that the physician who collaborates in a patient's plan of care for home health services should see that patient on a periodic basis.

(4) recognizes the value of the house call in establishing and enhancing the physician-patient and physician-family relationship and rapport, in assessing the effects of the social, functional and physical environment on the patient's illness, and in incorporating the knowledge gained into subsequent health care decisions.

(5) believes that physician on-site care through house calls is important when there is a change in condition that cannot be diagnosed over the telephone with the assistance of allied health personnel in the home and assisted transportation to the physician's office is costly, difficult to arrange, or excessively tiring and painful for detrimental to the patient's health.

(6) recognizes the importance of improving communication systems to integrate the activities of the disparate health professionals delivering home care to the same patient. Frequent and comprehensive communication between all team members is crucial to quality care, must be part of every care plan, and can occur via telephone, FAX, e-mail, video telemedicine and in person.

(7) recognizes the importance of removing economic, institutional and regulatory barriers to physician house calls, including the development of programs for low-income families and older adults.

(8) supports the requirement for a medical director for all home health agencies, comparable to the statutory requirements for medical directors for nursing homes and hospice.

(9) recommends that all specialty societies address the effect of dehospitalization on the patients that they care for and examine how their specialty is preparing its residents in-training to provide quality care in the home.

(10) encourages appropriate specialty societies to continue to develop educational programs for practicing physicians interested in expanding their involvement in home care.

(11) urges CMS to clarify and make more accessible to physicians information on standards for utilization of home health services, such as functional status, and severity of illness, and socioeconomic status.

(12) urges CMS, in its efforts to redefine homebound, to consider the adoption of criteria and methods that will strengthen the physician's role in authorizing home health services, as well as how such criteria and methods can be implemented to reduce the paperwork burden on physicians.

© 2018 American Medical Association. All rights reserved.

### 116. BAN ON MEDICARE ADVANTAGE "NO CAUSE" NETWORK TERMINATIONS

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:   FOLLOWING ALTERNATIVE RESOLUTION 116 ADOPTED**
               *See Policies H-285.908, H-285.991, D-285.961 and D-285.988*

RESOLVED, That our AMA develop a set of reform proposals addressing the way that Medicare Advantage plans develop and modify their physician networks with the aim of improving the stability of networks, the ability of patients to obtain needed primary and specialty care from in-network physicians, physician satisfaction, and communication with patients about network access with report back to the House of Delegates at the 2019 Annual Meeting; and be it further

RESOLVED, That our AMA amend Policy D-285.988, by addition to read as follows:
1.  Our AMA will draft model state legislation and amend the AMA's Model Managed Care Contract to reflect AMA policy regarding the marketing of physicians as network participants.
2.  Our AMA will seek legislation or regulation that would prohibit Medicare managed care companies from terminating without cause an enrollee's contracted physician before the enrollee's first subsequent open enrollment period;
and be it further

RESOLVED, That our AMA reaffirm Policy H-285.908, which supports requiring that provider terminations without cause be done prior to the enrollment period, and supports requiring that health insurers that terminate in-network providers: (a) notify providers of pending termination at least 90 days prior to removal from network; (b) give to providers, at least 60 days prior to distribution, a copy of the health insurer's letter notifying patients of the provider's change in network status; and (c) allow the provider 30 days to respond to and contest if necessary the letter prior to its distribution; and be it further

RESOLVED, That our AMA reaffirm Policy H-285.991, which outlines that prior to initiation of actions leading to termination or nonrenewal of a physician's participation contract for any reason the physician shall be given notice specifying the grounds for termination or nonrenewal, a defined process for appeal, and an opportunity to initiate and complete remedial activities except in cases where harm to patients is imminent or an action by a state medical board or other government agency effectively limits the physician's ability to practice medicine.

### 117. SUPPORTING RECLASSIFICATION OF COMPLEX REHABILITATION TECHNOLOGY
**Introduced by Texas**

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association advocate for the Centers for Medicare & Medicaid Services to reclassify complex rehabilitation technology as a separate and distinct payment category to improve access to the most appropriate and necessary equipment to allow individuals with significant disabilities and chronic medical conditions to increase their independence, reduce their overall health care expenses and appropriately manage their medical needs.

© 2018 American Medical Association. All rights reserved.

### 118. PAYMENT FOR ADVANCE CARE PLANNING
#### Introduced by Arizona

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    POLICY H-390.916 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association seek Federal legislation to require Medicare Advantage, Medicaid, and commercial insurance to pay for advance care planning whenever the patient's physician believes that it is appropriate.

### 119. PAYMENT FOR PALLIATIVE CARE
#### Introduced by Arizona

*Reference committee hearing: see report of Reference Committee A.*

**HOUSE ACTION:    POLICIES H-70.915, H-85.951 AND H-85.966 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association seek Federal legislation to require Medicare, Medicare Advantage, Medicaid, and commercial insurance to pay for palliative care, regardless of site of care, whenever the patient's physician believes that it is appropriate and the patient, or surrogate decision maker, agrees.

### 201. REMOVING BARRIERS TO OBESITY TREATMENT
#### Introduced by Obesity Medicine Association, Colorado, Minority Affairs Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
          *See Policy D-440.954*

RESOLVED, That our American Medical Association work with state and specialty societies to identify states in which physicians are restricted from providing the current standard of care with regards to obesity treatment; and be it further

RESOLVED, That our AMA work with interested state medical societies and other stakeholders to remove out-of-date restrictions at the state and federal level prohibiting healthcare providers from providing the current standard of care to patients affected by obesity.

### 202. UNIVERSAL AND STANDARDIZED PROTOCOLS FOR EHR DATA TRANSITION
#### Introduced by Virginia, North Carolina, South Carolina, Mississippi, Maryland, Tennessee, American Urological Association, American Association of Clinical Urologists

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS
ADDITIONAL PROPOSED RESOLVE REFERRED FOR DECISION**
          *See Policy D-478.972*

RESOLVED, That our American Medical Association seek legislation or regulation to require the Office of the National Coordinator for Health Information Technology to establish regulations that require universal and standard interoperability protocols for electronic health record (EHR) vendors to follow during EHR data transition to reduce

© 2018 American Medical Association. All rights reserved.   2021 REMS 000101

common barriers that prevent physicians from changing EHR vendors, including high cost, time, and risk of losing patient data.

PROPOSED RESOLVE CLAUSE REFERRED FOR DECISION:
RESOLVED, That regulations that require universal and standard interoperability protocols be promulgated within twenty-four (24) months of such legislative or regulatory direction to the Office of National Coordinator of Healthcare IT (ONC), with the ONC to establish a compliance deadline for the EHR vendors that is as expedient as practicable and not to exceed thirty-six (36) months from promulgation of the regulations by the ONC.

## 203. UPDATING FEDERAL FOOD POLICY TO IMPROVE NUTRITION AND HEALTH
### Introduced by District of Columbia

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
       *See Policy D-440.978*

RESOLVED, That our American Medical Association amend existing AMA Policy D-440.978, "Culturally Responsive Dietary and Nutritional Guidelines," by addition to read as follows:

D-440.978, Culturally Responsive Dietary and Nutritional Guidelines.
Our AMA and its Minority Affairs Section will: (1) encourage the United States Department of Agriculture (USDA) to include culturally effective guidelines that include listing an array of ethnic staples and use of multicultural symbols to depict serving size in their Dietary Guidelines for Americans and Food Guide; (2) seek ways to assist physicians with applying the USDA Dietary Guidelines for Americans and MyPlate food guide in their practices as appropriate; (3) recognize that lactose intolerance is a common and normal condition among many Americans, especially African Americans, Asian Americans, and Native Americans, with a lower prevalence in whites, often manifesting in childhood; and (34) monitor existing research and identify opportunities where organized medicine can impact issues related to obesity, nutritional and dietary guidelines, racial and ethnic health disparities as well as assist physicians with delivering culturally effective care.

and be it further

RESOLVED, That our AMA propose legislation that modifies the National School Lunch Act, 42 U.S.C. § 1758, so as to eliminate requirements that children produce documentation of a disability or a special medical or dietary need in order to receive an alternative to cow's milk; and be it further

RESOLVED, That our AMA recommend that the U.S. Department of Agriculture and U.S. Department of Health and Human Services clearly indicate in the Dietary Guidelines for Americans and other federal nutrition guidelines that meat and dairy products are optional, based on an individual's dietary needs.

## 204. OPPOSITION TO MANDATED PROFICIENCY IN EHR FOR LICENSURE
### Introduced by Louisiana

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED**
       *See Policy H-478.993*

RESOLVED, That our American Medical Association adopt a policy that provides that no physician should be denied a medical license on the grounds of failure to use an electronic health record or failure to demonstrate proficiency in use of an electronic health record.

© 2018 American Medical Association. All rights reserved.

### 205. AUGMENTED INTELLIGENCE
**Introduced by American Academy of Pediatrics**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    RESOLUTION 205 CONSIDERED WITH BOARD OF TRUSTEES REPORT 41,
WHICH WAS ADOPTED AS AMENDED IN LIEU OF RESOLUTION 205**

RESOLVED, That our American Medical Association develop Augmented Intelligence (AI) policy that reflects the principle that all patients should have 24-7 access to primary care physicians who can see the medical records of the patients; and be it further

RESOLVED, That AI should be funded as an enhancement of the primary care medical home so that patients who really need AI can benefit from the technology and such that AI does not become a requirement that must be incorporated into the care of every patient.

### 206. APPROPRIATE USE OF TELEHEALTH SERVICES
**Introduced by American Academy of Pediatrics**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-480.946 AND H-480.974 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association work with relevant stakeholders to ensure that all telehealth services are provided by and organized within the confines of the medical home, including financial incentives to utilize the telehealth modality outside the medical home; and be it further

RESOLVED, That our AMA advocate at both the state and national level that all telehealth vendors be required to collect and report quality measures in the context of clinical guidelines developed by reputable national specialty organizations; and be it further

RESOLVED, That our AMA work with relevant stake holders to accumulate quality of care, patient satisfaction, and outcome data to compare telehealth with face-to-face care.

### 207. QUALITY IMPROVEMENT REQUIREMENTS
**Introduced by American Academy of Pediatrics**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICY H-450.947 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association develop a quality improvement initiative so that if physicians complete quality improvement requirements of their specialty boards, that payers, hospitals, and licensing agencies will accept the specialty board certification evidence that physicians are practicing good medicine and will not require physicians to meet separate quality improvement requirements of payers, hospitals, and licensing agencies.

© 2018 American Medical Association. All rights reserved.

## 208. PRIOR AUTHORIZATION REQUIREMENTS FOR POST-OPERATIVE OPIOIDS
### Introduced by Pennsylvania

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association strongly oppose prior authorization requirements for postoperative analgesia equivalent to five days or less so as to prevent patient suffering.

## 209. SUBSTANCE USE DISORDERS DURING PREGNANCY
### Introduced by Pennsylvania

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policies H-420.950 and H-420.969*

RESOLVED, That our American Medical Association reaffirm Policy H-420.969 (#4) so as to oppose any legislation that seeks to specifically penalize women who are diagnosed with a substance abuse disorder during pregnancy; and be it further

RESOLVED, That our AMA oppose any efforts to imply that the diagnosis of substance abuse disorder during pregnancy represents child abuse; and be it further

RESOLVED, That our AMA support legislative and other appropriate efforts for the expansion and improved access to evidence-based treatment for substance use disorders during pregnancy.

## 210. BANNING THE SALE OF BUMP STOCKS
### Introduced by New York

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-145.985, H-145.993 AND H-145.997 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association support legislation that blocks the sale of any device or modification, including but not limited to bump stocks, that functionally converts a firearm into a weapon that mimics fully-automatic operation; and be it further

RESOLVED, That our AMA support legislation that would ban the sale and/or ownership of high capacity magazines or clips and high-speed-high-destruction rounds.

© 2018 American Medical Association. All rights reserved.

**211. CLARIFICATION FROM US DEPARTMENT OF JUSTICE REGARDING FEDERAL
ENFORCEMENT OF MEDICAL MARIJUANA LAWS
Introduced by New York**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
             *See Policy D-95.969*

RESOLVED, That our American Medical Association when necessary and prudent seek clarification from the
United States Justice Department (DOJ) about possible federal prosecution of physicians who participate in a state
operated marijuana program for medical use and based on that clarification, ask the DOJ to provide federal guidance
to physicians.

**212. VALUE-BASED PAYMENT SYSTEM
Introduced by New York**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    NOT ADOPTED**

RESOLVED, That our American Medical Association work to repeal the law that conditions a portion of a
physician's Medicare payment on compliance with the Medicare Merit-Based Incentive Payment System (MIPS)
and Alternative Payment Models (APM) programs; and be it further

RESOLVED, That our AMA continue advocating for a reduction in the administrative burdens of compliance with
value-based programs and that these programs comply with evidence-based standards.

**213. UTILIZATION REVIEW
Introduced by New York**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-320.942, H-320.948, H-320.973, H-320.986, H-320.988,
             H-320.995, H-335.999 AND D-320.995 REAFFIRMED
             IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association seek legislation/regulation that requires insurance companies,
peer review organizations and the Centers for Medicare and Medicaid Services to use the review criteria that existed
at the time that services were provided when making their determinations.

**214. STRENGTHENING THE BACKGROUND CHECK SYSTEM FOR FIREARM SALES
Introduced by New York**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-145.991 AND H-145.992 REAFFIRMED
             IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association support legislation that requires a waiting period and
background checks prior to the purchase of all firearms, including the person-to-person transfer, internet sales, and
interstate transactions of all firearms.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000105

## 215. REGULATION OF HOSPITAL ADVERTISING
### Introduced by New York

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    POLICY H-225.994 AMENDED
IN LIEU OF RESOLUTION 215**

Policy H-370.965 amended by addition to read as follows:

> Hospital Advertising in Printed and Broadcast
> In order to prevent medical misinformation, the AMA encourages (1) medical staff participation in hospital administration decisions regarding marketing and advertising, and (2) hospital and medical advertising be consistent with federal regulatory standards and with the *Code of Medical Ethics*.

## 216. FDA CONFLICT OF INTEREST
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association advocate that the Food and Drug Administration place a greater emphasis on a candidate's conflict of interest when selecting members for advisory committees; and be it further

RESOLVED, That our AMA advocate for a reduction in conflict of interest waivers granted to Advisory Committee candidates.

## 217. REFORMING THE ORPHAN DRUG ACT
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association support efforts to reform the Orphan Drug Act by closing loopholes identified by the Food and Drug Administration in order to protect the Act's original intent of promoting therapies targeting rare diseases; and be it further

RESOLVED, That our AMA support increased transparency in development costs, post-approval regulation and overall earnings for pharmaceuticals designated as "Orphan Drugs"; and be it further

RESOLVED, That our AMA support modifications to the exclusivity period of "Orphan Drugs" to increase access to these pharmaceutical drugs for patients with rare diseases.

© 2018 American Medical Association. All rights reserved.          2021 REMS 000106

### 218. CONSIDERING FEMININE HYGIENE PRODUCTS AS MEDICAL NECESSITIES
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:**   **ADOPTED AS FOLLOWS**
             *See Policy H-525.974*

RESOLVED, That our American Medical Association encourage the Internal Revenue Service to classify feminine hygiene products as medical necessities; and be it further

RESOLVED, That our AMA work with federal, state, and specialty medical societies to advocate for the removal of barriers to feminine hygiene products in state and local prisons and correctional institutions to ensure incarcerated women be provided free of charge the appropriate type and quantity of feminine hygiene products, including tampons for their needs.

### 219. IMPROVING MEDICARE PATIENTS' ACCESS TO KIDNEY TRANSPLANTATION
### Introduced by American Society of Transplant Surgeons

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:**   **REFERRED FOR DECISION**

RESOLVED, That our American Medical Association work with professional and patient-centered organizations to advance patient and physician-directed coordinated care for End Stage Renal Disease (ESRD) patients; and be it further

RESOLVED, That our AMA actively oppose the "Dialysis PATIENTS Demonstration Act of 2017" (S. 2065) (HR 4143); and be it further

RESOLVED, That the House of Delegates receive a report back at the 2018 Interim Meeting regarding our AMA actions in opposing the PATIENTS Act

### 220. BAN ON SEMI-AUTOMATIC ASSAULT WEAPONS AND HIGH
### CAPACITY AMMUNITION MAGAZINES
### Introduced by California

*Considered on reaffirmation calendar.*

**HOUSE ACTION:**   **POLICIES H-145.985 AND H-145.993 REAFFIRMED**
             **IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association urge Congress to pass legislation to ban the sale, transfer, manufacture, and importation of assault weapons and high-capacity ammunition magazines to the American public.

© 2018 American Medical Association. All rights reserved.  2021 REMS 000107

### 221. MAINTAINING VALIDITY AND COMPREHENSIVENESS OF U.S. CENSUS DATA
**Introduced by American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, American College of Physicians**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED**
       *See Policy H-350.952*

RESOLVED, That our American Medical Association support adequate funding for the U.S. Census to assure accurate and relevant data is collected and disseminated.

### 222. SUPPORT THE ELIMINATION OF BARRIERS TO MEDICATION-ASSISTED TREATMENT FOR SUBSTANCE USE DISORDER

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    FOLLOWING ALTERNATIVE RESOLUTION 222 ADOPTED
       IN LIEU OF RESOLUTIONS 222 AND 240**
       *See Policy D-95.968*

RESOLVED, That our American Medical Association advocate for legislation that eliminates barriers to, increases funding for, and requires access to all appropriate FDA-approved medications or therapies used by licensed drug treatment clinics or facilities; and be it further

RESOLVED, That our AMA develop a public awareness campaign to increase awareness that medical treatment of substance use disorder with medication-assisted treatment is a first-line treatment for this chronic medical disease.

### 223. TREATING OPIOID USE DISORDER IN HOSPITALS
**Introduced by American Association of Public Health Physicians**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS
       IN LIEU OF RESOLUTION 239**
       *See Policy D-95.967*

RESOLVED, That our American Medical Association's Opioid Task Force work together with the American Hospital Association and other relevant organizations to identify best practices that are being used by hospitals and others to treat opioid use disorder as a chronic disease, including identifying patients with this condition; initiating or providing opioid agonist or partial agonist therapy in inpatient, obstetric and emergency department settings; providing cognitive and behavioral therapy as well as other counseling as appropriate; establishing appropriate discharge plans, including education about opioid use disorder; and participating in community-wide systems of care for patients and families affected by this chronic medical disease; and be it further

RESOLVED, That our AMA advocate for states to evaluate programs that currently exist or have received federal or state funding to assist physicians, hospitals and their communities to coordinate care for patients with the chronic disease of opioid use disorder; and be it further

RESOLVED, That our AMA will take all necessary steps to seek clarification of interpretations of 21 CFR 1306.07 by the DEA and otherwise seek administrative, statutory and regulatory solutions that will allow for (a) prescribers with the waiver permitting the prescribing of buprenorphine for opioid use disorder to be able to do so, when indicated, for hospitalized inpatients, using a physician order rather than an outpatient prescription, and (b) hospital inpatient pharmacies to be able to fill such authorizations by prescribers without this constituting a violation of federal regulations.

© 2018 American Medical Association. All rights reserved.                  2021 REMS 000108

### 224. LEGALIZATION OF INTERPHARMACY TRANSFER OF ELECTRONIC CONTROLLED SUBSTANCE PRESCRIPTIONS
#### Introduced by American Society of Clinical Oncology

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
         *See Policy H-120.923*

RESOLVED, That our American Medical Association advocate for the removal of state, federal and other barriers that impede interpharmacy transfers of valid electronic prescriptions for Schedule II-V medications.

### 225. PHARMACY BENEFIT MANAGERS IMPACT ON PATIENTS
#### Introduced by American Society of Clinical Oncology

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
         *See Policy D-120.933*

RESOLVED, That our American Medical Association gather more data on the erosion of physician-led medication therapy management in order to assess the impact pharmacy benefit manager (PBM) tactics may have on patient's timely access to medications, patient outcomes, and the physician-patient relationship; and be it further

RESOLVED, That our AMA examine issues with PBM-related clawbacks and direct and indirect remuneration (DIR) fees to better inform existing advocacy efforts; and be it further

RESOLVED, That our AMA request from PBMs and compile data on the top twenty-five medication pre-certification requests and the percent of such requests approved after physician challenge.

### 226. MODEL STATE LEGISLATION FOR ROUTINE PREVENTATIVE PROSTATE CANCER SCREENING FOR MEN AGES 55-69
#### Introduced by American Urological Association, American Association of Clinical Urologists, Virginia

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association develop model state legislation for screening of asymptomatic men ages 55-69 for prostate cancer after informed discussion between patients and their physician without annual deductible or co-pay.

### 227. AN OPTIONAL NATIONAL PRESCRIPTION DRUG FORMULARY
#### Introduced by Florida

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association develop a set of principles for a National Prescription Drug Formulary (NPD Formulary) that are designed to lower prescription drug prices to the patient, and be transparent, independent, non-profit, and fee-based, with a report back to the AMA HOD at the 2018 Interim Meeting; and be it further

© 2018 American Medical Association. All rights reserved.

RESOLVED, That our AMA produce model legislation for an NPD Formulary with input from appropriate stakeholders based on a set of principles for such a Formulary that the AMA will develop, and that our AMA join with appropriate stakeholders to advocate that Congress authorize the establishment of this NPD Formulary that will be available to all Americans as an option to their healthcare insurance program in an actuarially appropriate manner.

## 228. MEDICARE QUALITY INCENTIVES
### Introduced by International Medical Graduates Section

*Considered on reaffirmation calendar.*

**HOUSE ACTION:   POLICIES H-390.838 AND D-390.949 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That the American Medical Association work with the Department of Health and Human Services in incentivizing small groups, and more senior physicians, regardless of their volume of patients total billing in dollars, with "small group", and "senior" deferments against penalties and bonuses for continued practice.

## 229. PERMANENT RESIDENCE STATUS FOR PHYSICIANS ON H1-B VISAS

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   FOLLOWING ALTERNATIVE RESOLUTION 229 ADOPTED**
*See Policy D-255.979*

RESOLVED, That our American Medical Association work with all relevant stakeholders to clear the backlog for conversion from H1-B visas for physicians to permanent resident status.

## 230. OPPOSITION TO FUNDING CUTS FOR PROGRAMS THAT IMPACT
## THE HEALTH OF POPULATIONS
### Introduced by Minority Affairs Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
*See Policy H-440.819*

RESOLVED, That our American Medical Association actively advocate that Congress, the White House, and senior cabinet officials ensure that programs designed to meet daily needs, support changes in individual behavior, and improve the health of populations remain funded at least at current levels and remain available without additional restrictions or rules.

## 231. ONLINE CONTROLLED DRUGS
### Introduced by Ohio

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
*See Policy D-120.982*

RESOLVED, That our American Medical Association support efforts that help the Drug Enforcement Administration and the Food and Drug Administration to better regulate and control the illegal online sales and distributions of drugs, dietary supplements and herbal remedies.

© 2018 American Medical Association. All rights reserved.

## 232. RECORDING LAW REFORM
### Introduced by Oklahoma

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:** **ADOPTED**
*See Policy H-315.983*

RESOLVED, That our American Medical Association draft model state legislation requiring consent of all parties to the recording of a physician-patient conversation.

## 233. SUPPORT FOR REAUTHORIZATION OF THE SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM
### Introduced by Oklahoma

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:** **ADOPTED**
*See Policies H-150.937 and D-150.975*

RESOLVED, That our American Medical Association actively lobby Congress to preserve and protect the Supplemental Nutrition Assistance Program through the reauthorization of the 2018 Farm Bill in order for Americans to live healthy and productive lives; and be it further

RESOLVED, That AMA Policy D-150.975, which calls for action to remove sugar-sweetened beverages from the Supplemental Nutrition Assistance Program, be reaffirmed; and be it further

RESOLVED, That AMA Policy H-150.937, which in part aims to replace calorie-rich, nutrient-poor food with nutrient-dense food within the Supplemental Nutrition Assistance Program, be reaffirmed.

## 234. SUPPORT FOR THE PRIMARY CARE ENHANCEMENT ACT
### Introduced by Oklahoma

*Considered on reaffirmation calendar.*

**HOUSE ACTION:** **POLICIES H-380.984 AND H-385.912 REAFFIRMED IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association, pursuant to H-385.912, actively lobby Congress to pass the Primary Care Enhancement Act.

## 235. HOSPITAL CONSOLIDATION
### Introduced by Washington

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:** **REFERRED**

RESOLVED, That our American Medical Association actively oppose future hospital mergers and acquisitions in highly concentrated hospital markets; and be it further

RESOLVED, That our AMA study the benefits and risks of hospital rate setting commissions in states where highly concentrated hospital markets currently exist.

© 2018 American Medical Association. All rights reserved.

## 236. REDUCING MIPS REPORTING BURDEN
### Introduced by Washington

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
*See Policy D-395.999*

RESOLVED, That our American Medical Association work with the Centers for Medicare and Medicaid Services (CMS) to advocate for improvements to Merit-Based Incentive Payment System (MIPS) that have significant input from practicing physicians and reduces regulatory and paperwork burdens on physicians; and be it further

RESOLVED, That, in the interim, our AMA work with CMS to shorten the yearly MIPS data reporting period from one year to a minimum of 90 days (of the physician's choosing) within the calendar year.

## 237. SAFE AND EFFICIENT E-PRESCRIBING
### Introduced by Craig A. Backs, MD, Delegate

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED**
*See Policy D-120.972*

RESOLVED, That our American Medical Association study current e-prescribing processes and make recommendations to improve these processes to make them as safe as possible for patients and as efficient as possible for prescribers.

## 238. REFORM OF PHARMACEUTICAL PRICING: NEGOTIATED PAYMENT SCHEDULES
### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association support federal legislation that modifies the Hatch-Waxman Act and the Biologics Price Competition and Innovation Act (Biosimilars Act) to institute the replacement of time-specific patent protections with negotiated payment schedules and indefinite exclusivity for U.S. Food and Drug Administration-approved drugs in the Medicare Part D Program.

## 239. TREATING OPIOID USE DISORDER IN HOSPITALS
### Introduced by Illinois

**Resolution 239 was considered with Resolution 223. See Resolution 223.**

RESOLVED, That our American Medical Association adopt a policy in favor of hospitals in the United States treating opioid use disorder with medications approved by the U.S. Food and Drug Administration for that purpose (buprenorphine, methadone and naltrexone) along with appropriate counseling; and be it further

RESOLVED, That our AMA advocate for legislation, standards, policies and funding to support hospitals in the United States treating opioid use disorder with medications approved by the FDA for that purpose (buprenorphine, methadone and naltrexone) along with appropriate counseling; and be it further

© 2018 American Medical Association. All rights reserved.          2021 REMS 000112

RESOLVED, That our AMA work together with relevant organizations such as the American Hospital Association, The Joint Commission and the American Society of Addiction Medicine to develop and promote a model hospital policy that would assist hospitals in addressing opioid use disorder as a chronic disease by:

a) ensuring that medical and other clinical staff are educated about evidence-based treatment of opioid use disorder in order to appropriately advise and treat their patients,

b) providing patient education about and access to all three FDA-approved medications (buprenorphine, methadone and naltrexone) in emergency and inpatient settings, and buprenorphine and methadone in obstetric settings,

c) maintaining use of these medications for patients already on them,

d) initiating use of these medications for assenting patients affected by the disease,

e) establishing comprehensive discharge plans for ongoing medical and behavioral treatment in the community, and

f) participating in the development of community-wide systems of care for patients with opioid use disorder to facilitate discharge planning.

## 240. TREATING OPIOID USE DISORDER IN TREATMENT FACILITIES
### Introduced by Illinois

**Resolution 240 was considered with Resolution 222. See Resolution 222.**

RESOLVED, That our American Medical Association adopt a policy that recognizes the use of buprenorphine or methadone as effective treatment for opioid use disorder, and encourages the appropriate use of medication and non-medication-based treatment; and be it further

RESOLVED, That our AMA advocate for legislation to eliminate barriers and require access to all three FDA-approved medications (buprenorphine, methadone and naltrexone) at all legally certified drug treatment facilities, and advocate for standards, policies and funding to support access to these medications at treatment facilities; and be it further

RESOLVED, That our AMA conduct a campaign to increase awareness on the part of providers, treatment programs, and the public that AMA recognizes the use of buprenorphine or methadone as effective treatment for opioid use disorder.

## 241. ACCURACY AND ACCOUNTABILITY OF PHYSICIAN COMPENSATION REPORTING BY DRUG AND DEVICE COMPANIES
### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy H-140.848*

RESOLVED, That our American Medical Association advocate that (1) any payment or transfer of value reported as part of the Physician Payments Sunshine Act should include whether the physician acknowledged receipt of said payment or transfer of value and (2) each payment or transfer of value on the Open Payments website indicates whether the physician verified the payment or transfer of value; and be it further

RESOLVED, That our AMA advocate that a contested reported payment or transfer of value should be removed immediately from the Open Payments website until the reporting company validates the compensation with verifiable documentation.

© 2018 American Medical Association. All rights reserved.

### 242. PHARMACY BENEFIT MANAGERS AND COMPOUNDED MEDICATIONS
#### Introduced by Michigan

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                      *See Policy H-125.986*

RESOLVED, That our American Medical Association amend Policy H-125.986 by addition as follows:

H-125.986, Pharmaceutical Benefits Management Companies
Our AMA: (1) encourages physicians to report to the Food and Drug Administration's (FDA) MedWatch reporting program any instances of adverse consequences (including therapeutic failures and adverse drug reactions) that have resulted from the switching of therapeutic alternates;
(2) encourages the Federal Trade Commission (FTC) and the FDA to continue monitoring the relationships between pharmaceutical manufacturers and PBMs, especially with regard to manufacturers' influences on PBM drug formularies and drug product switching programs, and to take enforcement actions as appropriate;
(3) pursues congressional action to end the inappropriate and unethical use of confidential patient information by pharmacy benefits management companies;
(4) states that certain actions/activities by pharmacy benefit managers and others constitute the practice of medicine without a license and interfere with appropriate medical care to our patients;
(5) encourages physicians to routinely review their patient's treatment regimens for appropriateness to ensure that they are based on sound science and represent safe and cost-effective medical care;
(6) supports efforts to ensure that reimbursement policies established by PBMs are based on medical need; these policies include, but are not limited to, prior authorization, formularies, and tiers for compounded medications, and encourages the FTC and FDA to monitor PBMs' policies for potential conflicts of interests and anti-trust violations, and to take appropriate enforcement actions should those policies advantage pharmacies in which the PBM holds an economic interest; and
(7) encourages the FTC and FDA to monitor PBM's policies for potential conflicts of interest and anti-trust violations, and to take appropriate enforcement actions should those policies advantage pharmacies in which the PBM holds an economic interest.

### 243. ADDRESSING BARRIERS TO REPORTING HEALTH CARE PROVIDER SEX CRIMES

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    FOLLOWING ALTERNATIVE RESOLUTION 243 ADOPTED**
                      *See Policy H-515.954*

RESOLVED, that our American Medical Association support the efforts and work with the Federation of State Medical Boards to examine disciplinary data, barriers that delay or prevent reporting of sex crimes, and the cooperation of state medical boards with law enforcement in order to ensure a comprehensive approach to identifying and addressing sexual crimes within medicine.

© 2018 American Medical Association. All rights reserved.   **2021 REMS 000114**

## 244. INCREASING THE LEGAL AGE OF PURCHASING AMMUNITION
## AND FIREARMS FROM 18 TO 21
### Introduced by Maryland

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    POLICY H-145.985 AMENDED**
**IN LIEU OF RESOLUTIONS 244 AND 248**

Policy H-145.985 amended by addition and deletion to read as follows:

It is the policy of the AMA to:

(1) Support interventions pertaining to firearm control, especially those that occur early in the life of the weapon (e.g., at the time of manufacture or importation, as opposed to those involving possession or use). Such interventions should include but not be limited to:
(a) mandatory inclusion of safety devices on all firearms, whether manufactured or imported into the United States, including built-in locks, loading indicators, safety locks on triggers, and increases in the minimum pressure required to pull triggers;
(b) bans on the possession and use of firearms and ammunition by unsupervised youths under the age of 18 21;
(c) bans of sales of firearms and ammunition from licensed and unlicensed dealers to those under the age of 21 (excluding certain categories of individuals, such as military and law enforcement personnel);
(dc) the imposition of significant licensing fees for firearms dealers;
(ed) the imposition of federal and state surtaxes on manufacturers, dealers and purchasers of handguns and semiautomatic repeating weapons along with the ammunition used in such firearms, with the attending revenue earmarked as additional revenue for health and law enforcement activities that are directly related to the prevention and control of violence in U.S. society; and
(fe) mandatory destruction of any weapons obtained in local buy-back programs.

(2) Support legislation outlawing the Black Talon and other similarly constructed bullets.

(3) Support the right of local jurisdictions to enact firearm regulations that are stricter than those that exist in state statutes and encourage state and local medical societies to evaluate and support local efforts to enact useful controls.

(4) Oppose "concealed carry reciprocity" federal legislation that would require all states to recognize concealed carry firearm permits granted by other states and that would allow citizens with concealed gun carry permits in one state to carry guns across state lines into states that have stricter laws.

## 245. OPPOSING NCOIL ATTEMPTS TO STOP PHYSICIAN DISPENSING
### Introduced by Maryland

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    POLICY H-120.990 AMENDED**
**IN LIEU OF RESOLUTION 245**

Policy H-120.990 amended by addition to read as follows:

Physician Dispensing
Our AMA supports the physician's right to dispense drugs and devices when it is in the best interest of the patient and consistent with AMA's ethical guidelines.

Our AMA oppose legislative and other efforts that are in conflict with AMA policies concerning patient access to physician-dispensed drugs and devices.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000115

### 246. SUPPORT FOR PATIENTS AND PHYSICIANS IN DIRECT PRIMARY CARE

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    FOLLOWING ALTERNATIVE RESOLUTION 246 ADOPTED**
            *See Policy H-385.912*

RESOLVED, That our AMA reaffirm Policy H-385.912, Direct Primary Care; and be it further

RESOLVED, That our AMA support efforts to ensure that patients in Direct Primary Care practices have access to specialty care, including efforts to oppose payer policies that prevent referrals to in-network specialists.

### 247. OPPOSED REPLACEMENT OF THE MERIT-BASED INCENTIVE PAYMENT SYSTEM WITH THE VOLUNTARY VALUE PROGRAM
**Introduced by Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
            *See Policy D-395.998*

RESOLVED, That our American Medical Association oppose the replacement of the Merit-Based Incentive Payment System (MIPS) with the Voluntary Value Program (VVP) as currently defined; and be it further

RESOLVED, That our AMA study the criticisms of the Merit-Based Incentive Payment System (MIPS) program as offered by proponents of the VVP to determine where improvement in the MIPS program need to be made; and be it further

RESOLVED, That our AMA continue its advocacy efforts to improve the MIPS program, specifically requesting:

1. True EHR data transparency, as the free flow of information is vital to the development of meaningful outcome measures,
2. Safe harbor protections for entities providing clinical data for use in the MIPS program,
3. Continued infrastructure support for smaller practices that find participation particularly burdensome,
4. Adequate recognition of and adjustments for socioeconomic and demographic factors that contribute to variation in patient outcomes as well as geographic variation, and
5. Limiting public reporting of physician performance to those measures used for scoring in the MIPS program; and be it further

RESOLVED, That our AMA determine if population measures are appropriate and fair for measuring physician performance.

### 248. OPPOSITION TO FIREARM CONCEALED CARRY RECIPROCITY
**Introduced by Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**

**Resolution 248 was considered with Resolution 244. See Resolution 244.**

RESOLVED, That our American Medical Association, in the interest of safety for all citizens, vigorously oppose "concealed carry reciprocity" federal legislation that would require all states to recognize concealed carry firearm permits granted by other states and that would allow citizens with concealed gun carry permits in one state to carry guns across state lines into states that have stricter laws.

© 2018 American Medical Association. All rights reserved.                2021 REMS 000116

## 249. SUPPORT ANY WILLING PROVIDER LEGISLATION
### Introduced by Florida

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   NOT ADOPTED**

RESOLVED, That our American Medical Association draft and promote model state legislation which:
1. Allows any patient covered by a specific managed care organization to choose to receive medical care from a physician (MD and DO) licensed in that state willing to agree to the terms of that managed care organization's contract, and
2. Allows a physician (MD or DO) licensed in that state willing to agree to the terms of a specific managed care organization's contract to participate in delivering medical services to the patients covered by that managed care organization without being mandated to accept any specific type of insurance or managed care organizations contract.

## 250. CLARIFICATION OF GUIDELINES FOR ONLINE PRESCRIBERS
### Introduced by Texas

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
    *See Policy D-120.972*

RESOLVED, That our American Medical Association support national efforts to amend federal law and federal Drug Enforcement Administration regulations to allow for the e-prescribing of a medication, including a controlled substance, needed by a patient with a mental health or behavioral health diagnosis when a valid patient-physician relationship has been established through telemedicine and in accordance with state law and accepted standards of care.

## 251. SCOPE OF PRACTICE EXPANSION ADVOCACY AND IMPACTS ON PHYSICIANS AND MEDICAL STUDENTS
### Introduced by Arizona

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
    *See Policy D-160.995*

RESOLVED, That our American Medical Association continue to work with relevant stakeholders to recognize physician training and education and patient safety concerns, and produce advocacy tools and materials for state level advocates to use in scope of practice discussions with legislatures, including but not limited to infographics, interactive maps, scientific overviews, geographic comparisons, and educational experience; and be it further

RESOLVED, That our AMA advocate for the inclusion of non-physician scope of practice characteristics in various analyses of practice location attributes and desirability; and be it further

RESOLVED, That our AMA advocate for the inclusion of scope of practice expansion into measurements of physician well-being; and be it further

RESOLVED, That our AMA study the impact of scope of practice expansion on medical student choice of specialty.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000117

### 252. REPEAL OF GROUP PURCHASING ORGANIZATIONS AND PHARMACY
### BENEFIT MANAGER SAFE HARBOR
#### Introduced by Organized Medical Staff Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association collaborate with medical specialty partners, patient advocacy groups, and other stakeholders to seek repeal of the 1987 Safe Harbor exemption to the Medicare Anti-Kickback Statute for Group Purchasing Organizations (GPOs) and Pharmacy Benefit Managers (PBMs); and be it further

RESOLVED, That our AMA educate its members on how safe harbor exemption for GPOs and PBMs affects drug prices and drug shortages; and be it further

RESOLVED, That our AMA reaffirm Policy H-100.956, which states in part that "Our AMA will collaborate with medical specialty partners in identifying and supporting legislative remedies to allow for more reasonable and sustainable payment rates for prescription drugs."

### 253. SEPARATION OF CHILDREN FROM THEIR CAREGIVERS AT BORDER
#### Introduced by Resident and Fellow Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED**
                 **IN LIEU OF RESOLUTION 257**
                 **TITLE CHANGED**
                 *See Policy H-440.818*

RESOLVED, That our American Medical Association oppose the practice of separating migrating children from their caregivers in the absence of immediate physical or emotional threats to the child's well-being; and be it further

RESOLVED, That our AMA urge the federal government to withdraw its policy of requiring separation of migrating children from their caregivers, and instead, give priority to supporting families and protecting the health and well-being of the children within those families.

### 254. OPPOSITION TO REGULATIONS THAT PENALIZE IMMIGRANTS FOR
### ACCESSING HEALTH CARE SERVICES
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
                 *See Policies H-20.901 and D-440.927*

RESOLVED, That our American Medical Association, upon the release of a proposed rule, regulations or policy that would deter immigrants and/or their dependents from utilizing non-cash public benefits including but not limited to Medicaid, CHIP, WIC, and SNAP, issue a formal comment expressing its opposition; and be it further

RESOLVED, That our AMA amend AMA Policy H-20.901 by addition and deletion to read as follows:

Our AMA (1) ~~supports enforcement of the public charge provision of the Immigration Reform Act of 1990 (PL 101-649); (2)~~ recommends that decisions on testing and exclusion of immigrants to the United States be made only by the U.S. Public Health Service, based on the best available medical, scientific, and public health information; (2 ~~3~~) recommends that non-immigrant travel into the United States not be restricted because of

© 2018 American Medical Association. All rights reserved.

2021 REMS 000118

HIV status; and (3 4) recommends that confidential medical information, such as HIV status, not be indicated on a passport or visa document without a valid medical purpose.

**255. 340B DRUG DISCOUNT PROGRAM**
**Introduced by American Society of Clinical Oncology**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
**WITH A RESOLVE REFERRED FOR REPORT AT THE 2018 INTERIM MEETING**
*See Policy H-110.985*

RESOLVED, That our American Medical Association advocate for 340B Drug Discount Program (340B program) transparency, including an accounting of covered entities' 340B savings and the percentage of 340B savings used directly to care for underinsured patients and patients living on low-incomes; and be it further

RESOLVED, That our AMA support recommendations to equip the Health Resources and Services Administration (HRSA) with more authority, resources and staff to conduct needed 340B program oversight; and be it further

RESOLVED, That our AMA recognize the 340B program does not support the extent of care provided by ineligible physician practices to the medically indigent or underserved, and work with HRSA to establish 340B eligibility for all practices demonstrating a commitment to serving low-income and underserved patients.

FOLLOWING RESOLVE REFERRED FOR REPORT AT I-18:

RESOLVED, That our AMA support discontinuing the use of the Disproportionate Share Hospital adjustment as a determining measure for 340B program eligibility.

**256. DEFINING PHYSICIAN FOR THE FEDERAL AVIATION ADMINISTRATION,**
**THE DEPARTMENT OF TRANSPORTATION AND CONGRESS**

*Reference committee hearing: see report of Reference Committee B.*

**HOUSE ACTION:   FOLLOWING ALTERNATIVE RESOLUTION 256 ADOPTED**
*See Policy D-405.989*

RESOLVED, That our American Medical Association advocate for the Federal Aviation Administration, the Department of Transportation and Congress to define a "physician" as an individual possessing degree of either a Doctor of Medicine or Doctor of Osteopathic Medicine.

**257. SEPARATION OF CHILDREN FROM THEIR PARENTS AT BORDER**
**Introduced by American Academy of Pediatrics, American College of Obstetricians and Gynecologists,**
**American College of Physicians**

**Resolution 257 was considered with Resolution 253. See Resolution 253.**

RESOLVED, That our American Medical Association urge the Department of Homeland Security, Attorney General Sessions, and President Trump to withdraw its new policy to require separation of children from their parents, and instead, give priority to supporting families and protecting the health and well-being of the children within those families.

© 2018 American Medical Association. All rights reserved.   2021 REMS 000119

### 301. PROTECTING MEDICAL TRAINEES FROM HAZARDOUS EXPOSURE
#### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association call for the mandatory education of students, residents, physicians and surgeons on the deleterious effects of exposure to hazardous materials; and be it further

RESOLVED, That our AMA encourage the Accreditation Council for Graduate Medical Education and Liaison Committee on Medical Education to create standards that allow students and trainees to voluntarily avoid exposure to hazardous/biohazard materials without negatively impacting their standing in school or training programs; and be it further

RESOLVED, That our AMA support and encourage the specific option for students or trainees to be able to excuse themselves from exposure to Methylmethacrylate if they are or think they may be pregnant without negatively impacting their standing in their school or training programs; and be it further

RESOLVED, That our AMA support and encourage constant updating of the protection of medical trainees, physicians and surgeons from exposure to hazardous materials during the course of their medical school training and practice, using standards published by the Occupational Safety and Health Administration; the National Institute for Occupational Safety and Health and other Centers for Disease Control and Prevention agencies; the College of American Pathologists; and the American College of Radiology, as well as other relevant resources available for health workers.

### 302. FOR-PROFIT MEDICAL SCHOOLS OR COLLEGES
#### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                   *See Policy D-305.954*

RESOLVED, That our American Medical Association study issues related to medical education programs offered at for-profit versus not-for-profit medical schools, to include the (1) attrition rate of students; (2) financial burden of non-graduates versus graduates; (3) success of graduates in obtaining a residency position; and (4) level of support for graduate medical education, and report back at the 2019 Annual Meeting.

### 303. FELLOWSHIP START DATE
#### Introduced by Resident and Fellow Section

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                   *See Policy D-310.958*

RESOLVED, That our American Medical Association work with relevant stakeholders to study the impact of delayed fellowship start dates after July 1 to evaluate the benefits and drawbacks for all interested parties.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000120

**304. PERSONS WITH INTELLECTUAL AND DEVELOPMENTAL DISABILITIES
DESIGNATED AS A MEDICALLY UNDERSERVED POPULATION
Introduced by American Academy of Physical Medicine and Rehabilitation**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy H-90.968*

RESOLVED, That our American Medical Association advocate that the Health Resources and Services Administration include persons with intellectual and developmental disabilities (IDD) as a medically underserved population; and be it further

RESOLVED, That Policy H-90.968 be reaffirmed.

**305. STANDARDIZATION OF MEDICAL LICENSING TIME LIMITS ACROSS STATES
Introduced by Medical Student Section**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association amend Policy H-275.978, "Medical Licensure," by addition to read as follows:

The AMA:(1) urges directors of accredited residency training programs to certify the clinical competence of graduates of foreign medical schools after completion of the first year of residency training; however, program directors must not provide certification until they are satisfied that the resident is clinically competent;
(2) encourages licensing boards to require a certificate of competence for full and unrestricted licensure;
(3) urges licensing boards to review the details of application for initial licensure to assure that procedures are not unnecessarily cumbersome and that inappropriate information is not required. Accurate identification of documents and applicants is critical. It is recommended that boards continue to work cooperatively with the Federation of State Medical Boards to these ends;
(4) will continue to provide information to licensing boards and other health organizations in an effort to prevent the use of fraudulent credentials for entry to medical practice;
(5) urges those licensing boards that have not done so to develop regulations permitting the issuance of special purpose licenses. It is recommended that these regulations permit special purpose licensure with the minimum of educational requirements consistent with protecting the health, safety and welfare of the public;
(6) urges licensing boards, specialty boards, hospitals and their medical staffs, and other organizations that evaluate physician competence to inquire only into conditions which impair a physician's current ability to practice medicine.(BOT Rep. I-93-13; CME Rep. 10 - I-94);
(7) urges licensing boards to maintain strict confidentiality of reported information;
(8) urges that the evaluation of information collected by licensing boards be undertaken only by persons experienced in medical licensure and competent to make judgments about physician competence. It is recommended that decisions concerning medical competence and discipline be made with the participation of physician members of the board;
(9) recommends that if confidential information is improperly released by a licensing board about a physician, the board take appropriate and immediate steps to correct any adverse consequences to the physician;
(10) urges all physicians to participate in continuing medical education as a professional obligation;
(11) urges licensing boards not to require mandatory reporting of continuing medical education as part of the process of reregistering the license to practice medicine;
(12) opposes the use of written cognitive examinations of medical knowledge at the time of reregistration except when there is reason to believe that a physician's knowledge of medicine is deficient;
(13) supports working with the Federation of State Medical Boards to develop mechanisms to evaluate the competence of physicians who do not have hospital privileges and who are not subject to peer review;

© 2018 American Medical Association. All rights reserved.

(14) believes that licensing laws should relate only to requirements for admission to the practice of medicine and to assuring the continuing competence of physicians, and opposes efforts to achieve a variety of socioeconomic objectives through medical licensure regulation;

(15) urges licensing jurisdictions to pass laws and adopt regulations facilitating the movement of licensed physicians between licensing jurisdictions; licensing jurisdictions should limit physician movement only for reasons related to protecting the health, safety and welfare of the public;

(16) encourages the Federation of State Medical Boards and the individual medical licensing boards to continue to pursue the development of uniformity in the acceptance of examination scores on the Federation Licensing Examination and in other requirements for endorsement of medical licenses;

(17) urges licensing boards not to place time limits on the acceptability of National Board certification or on scores on the United State Medical Licensing Examination for endorsement of licenses;

(18) urges licensing boards to base endorsement on an assessment of physician competence and not on passing a written examination of cognitive ability, except in those instances when information collected by a licensing board indicates need for such an examination;

(19) urges licensing boards to accept an initial license provided by another board to a graduate of a US medical school as proof of completion of acceptable medical education;

(20) urges that documentation of graduation from a foreign medical school be maintained by boards providing an initial license, and that the documentation be provided on request to other licensing boards for review in connection with an application for licensure by endorsement;

(21) urges licensing boards to consider the completion of specialty training and evidence of competent and honorable practice of medicine in reviewing applications for licensure by endorsement; and

(22) encourages national specialty boards to reconsider their practice of decertifying physicians who are capable of competently practicing medicine with a limited license.

(23) urges the state medical and osteopathic licensing boards which maintain a time limit on complete licensing examination sequences to adopt a time limit of no less than 10 years for completion of a licensing examination sequence for either USMLE or COMLEX.

### 306. SEX- AND GENDER-BASED MEDICINE
**Introduced by American Medical Women's Association**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
**TITLE CHANGED**
*See Policy D-295.310*

RESOLVED, That our American Medical Association work collaboratively with the Liaison Committee on Medical Education and other interested organizations for the inclusion of sex- and gender-based differences within the curricular content for medical school accreditation.

### 307. HEALTHCARE FINANCE IN THE MEDICAL SCHOOL CURRICULUM
**Introduced by Missouri**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association study the extent to which medical schools and residency programs are teaching topics of healthcare finance and medical economics; and be it further

RESOLVED, That our AMA make a formal suggestion to the Liaison Committee on Medical Education encouraging the addition of a new Element, 7.10, under Standard 7, "Curricular Content," that would specifically address the role of healthcare finance and medical economics in undergraduate medical education.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000122

**RESOLUTION 308 WAS WITHDRAWN**

**309. FOREIGN TRAINED IMGS COMPETENCY-BASED SPECIALTY EXAM
WITHOUT U.S. RESIDENCY
Introduced by International Medical Graduates Section**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:   NOT ADOPTED**

RESOLVED, That our American Medical Association work with other stakeholders including the Accreditation Council of Graduate Medical Education, Association of American Medical Colleges and the American Board of Medical Specialties, to advocate that International Medical Graduates who have completed residency programs in their own countries should be eligible to take the specialties exam without being required to complete additional residency training in the U.S.

**RESOLUTION 310 WAS WITHDRAWN**

**311. OPIOID EDUCATION FOR NEW TRAINEES
Introduced by Illinois**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS
              TITLE CHANGED**
              *See Policy D-120.985*

RESOLVED, That our American Medical Association work in conjunction with the Association of American Medical Colleges, American Osteopathic Association, Commission on Osteopathic College Accreditation, Accreditation Council for Graduate Medical Education, and other interested professional organizations to develop opioid education resources for medical students and physicians in training and practicing physicians.

**312. SUICIDE AWARENESS TRAINING
Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
              *See Policy H-295.858*

RESOLVED, That our American Medical Association engage with the appropriate organizations to facilitate the development of educational resources and training related to suicide risk of patients, medical students, residents/fellows, practicing physicians and other health care professionals, using an evidence-based, multidisciplinary approach.

© 2018 American Medical Association. All rights reserved.

### 313. FINANCIAL LITERACY FOR MEDICAL STUDENTS AND RESIDENTS
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy D-295.316*

RESOLVED, That our American Medical Association amend Policy D-295.316 by addition to read as follows:

D-295.316, Management and Leadership for Physicians
1. Our AMA will study advantages and disadvantages of various educational options on management and leadership for physicians with a report back to the House of Delegates; and develop an online report and guide aimed at physicians interested in management and leadership that would include the advantages and disadvantages of various educational options.
2. Our AMA will work with key stakeholders to advocate for collaborative programs ~~between~~ among medical schools, residency programs, and related schools of business and management to better prepare physicians for administrative, financial and leadership responsibilities in medical management.
3. Our AMA: (a) will advocate for and support the creation of leadership programs and curricula that emphasize experiential and active learning models to include knowledge, skills and management techniques integral to achieving personal and professional financial literacy and leading interprofessional team care, in the spirit of the AMA's Accelerating Change in Medical Education initiative; and (b) will advocate with the Liaison Committee for Medical Education, Association of American Medical Colleges and other governing bodies responsible for the education of future physicians to implement programs early in medical training to promote the development of leadership and personal and professional financial literacy capabilities.

### 314. BOARD CERTIFICATION CHANGES IMPACT ACCESS TO ADDICTION MEDICINE SPECIALISTS
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association work with the American Board of Addiction Medicine (ABAM) and American Board of Medical Specialties (ABMS) to accept ABAM board certification as equivalent to any other ABMS-recognized Member Board specialty as a requirement to enroll in the transitional maintenance of certification program and to qualify for the ABMS Addiction Medicine board certification examination.

### 315 PEER-FACILITATED INTERGROUP DIALOGUE TO PROMOTE CULTURAL COMPETENCE AND HUMILITY
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
**TITLE CHANGED**
*See Policy H-295.897*

RESOLVED, That our American Medical Association encourage the inclusion of peer-facilitated intergroup dialogue in medical education programs nationwide.

© 2018 American Medical Association. All rights reserved.

**316. END "PART 4 IMPROVEMENT IN MEDICAL PRACTICE" REQUIREMENT FOR ABMS MOC®**
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association call for an end to the mandatory American Board of Medical Specialties "Part 4 Improvement in Medical Practice" maintenance of certification requirement.

**317. EMERGING TECHNOLOGIES (ROBOTICS AND AI) IN MEDICAL SCHOOL EDUCATION**
**Introduced by Maryland**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association encourage medical schools to evaluate and update as appropriate their curriculum to increase students' exposure to emerging technologies, in particular those related to robotics and artificial intelligence; and be it further

RESOLVED, That our AMA encourage medical schools to provide student access to computational resources like cloud computing services; and be it further

RESOLVED, That our AMA reaffirm H-480.988 which urges physicians to continue to ensure that, for every patient, technologies will be utilized in the safest and most effective manner by health care professionals; and be it further

RESOLVED, That our AMA reaffirm Section 1.2.11 of the AMA Code of Ethics and H 480.996 that states the guidelines for the ethical development of medical technology and innovation in healthcare.

**318. AMA CONVENE STAKEHOLDERS TO TRANSITION USMLE TO PASS/FAIL SCORING**
**Introduced by Nebraska**

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                *See Policy H-275.953*

RESOLVED, That our American Medical Association amend Policy H-275.953, "The Grading Policy for Medical Licensure Examinations," by addition and deletion to read as follows:

1.  Our AMA's representatives to the ACGME are instructed to promote the principle that selection of residents should be based on a broad variety of evaluative criteria, and to propose that the ACGME General Requirements state clearly that residency program directors must not use NBME or USMLE ranked passing scores as a screening criterion for residency selection.

2.  Our AMA adopts the following policy on NBME or USMLE examination scoring: (a) Students receive "pass/fail" scores as soon as they are available. (If students fail the examinations, they may request their numerical scores immediately.) (b) Numerical scores are reported to the state licensing authorities upon request by the applicant for licensure. At this time, the applicant may request a copy of his or her numerical scores. (c) Scores are reported in pass/fail format for each student to the medical school. The school also receives a frequency distribution of numerical scores for the aggregate of their students.

3.  Our AMA will ~~work with~~ co-convene the appropriate stakeholders to study ~~alternate means of~~ possible mechanisms for transitioning scoring of the USMLE and COMLEX exams to a Pass/Fail system in order to

© 2018 American Medical Association. All rights reserved.

2021 REMS 000125

avoid the inappropriate use of USMLE and COMLEX scores for screening residency applicants while still affording program directors adequate information to meaningfully and efficiently assess medical student applications, and that the recommendations of this study be made available by the 2019 Interim Meeting of the AMA House of Delegates.

### 319. ALL PAYER GRADUATE MEDICAL EDUCATION FUNDING
#### Introduced by Arizona

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED**
            *See Policy D-305.967*

RESOLVED, That our American Medical Association investigate the status of implementation of AMA Policies D-305.973, "Proposed Revisions to AMA Policy on the Financing of Medical Education Programs," and D-305.967, "The Preservation, Stability and Expansion of Full Funding for Graduate Medical Education," and report back to the House of Delegates with proposed measures to resolve the problems of underfunding, inadequate number of residencies and geographic maldistribution of residencies.

### 320. YOUNG PHYSICIAN INVOLVEMENT IN MAINTENANCE OF CERTIFICATION
#### Introduced by Young Physicians Section

*Reference committee hearing: see report of Reference Committee C.*

**HOUSE ACTION:    ADOPTED**
            *See Policy D-275.954*

RESOLVED, That our American Medical Association submit commentary to the American Board of Medical Specialties (ABMS) Continuing Board Certification: Vision for the Future initiative, asking that junior diplomates be given equal opportunity to serve on ABMS and its member boards; and be it further

RESOLVED, That our AMA work with the ABMS and member boards to encourage the inclusion of younger physicians on the ABMS and its member boards.

### 401. ADAPTIVE DRIVING BEAM HEADLIGHTS

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    FOLLOWING ALTERNATIVE RESOLUTION 401 ADOPTED**
            *See Policy H-15.990*

ADAPTIVE DRIVING BEAM HEADLIGHTS

RESOLVED, That our American Medical Association encourage the National Highway Traffic Safety Administration to undertake the necessary rulemaking to integrate automated high-beam to low-beam headlight switching lamps into the Federal Motor Vehicle Safety Standards.

© 2018 American Medical Association. All rights reserved.

**402. SCHOOLS AS GUN-FREE ZONES**
**Introduced by American Academy of Pediatrics**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                        *See Policy H-145.983*

RESOLVED, That our American Medical Association advocate for schools to remain gun-free zones except for school-sanctioned activities and professional law enforcement officers; and be it further

RESOLVED, That our AMA oppose requirements or incentives of teachers to carry weapons.

**403. SCHOOL SAFETY AND MENTAL HEALTH**
**Introduced by American Academy of Pediatrics**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    POLICY H-345.977 REAFFIRMED IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association promote the implementation of school-based mental health screening and therapy programs within its efforts to reduce school-based firearm violence.

**404. EMPHASIZING THE HUMAN PAPILLOMAVIRUS VACCINES AS ANTI-CANCER**
**PROPHYLAXIS FOR A GENDER-NEUTRAL DEMOGRAPHIC**
**Introduced by Medical Student Section**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    POLICY D-170.995 AMENDED IN LIEU OF RESOLUTION 404**

Policy D-170.995 amended by addition and deletion to read as follows:

> Our AMA will: (1) strongly urge existing school health education programs to emphasize the high prevalence of human papillomavirus in ~~both males and females~~ all genders, the causal relationship of HPV to cancer and genital lesions ~~and cancer cervical~~, and the importance of routine pap tests ~~smears~~ in the early detection of ~~cervical~~ cancer; (2) urge that students and parents be educated about HPV and the availability of the HPV vaccine; and (3) support appropriate stakeholders to increase public awareness of HPV vaccine effectiveness for all genders against HPV-related cancers.

**405. RACIAL HOUSING SEGREGATION AS A DETERMINANT OF HEALTH AND PUBLIC**
**ACCESS TO GEOGRAPHIC INFORMATION SYSTEMS (GIS) DATA**
**Introduced by Medical Student Section**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED**
                        *See Policy H-350.953*

RESOLVED, That our American Medical Association oppose policies that enable racial housing segregation; and be it further

RESOLVED, That our AMA advocate for continued federal funding of publicly-accessible geospatial data on community racial and economic disparities and disparities in access to affordable housing, employment, education,

© 2018 American Medical Association. All rights reserved.    2021 REMS 000127

and healthcare, including but not limited to the Department of Housing and Urban Development (HUD) Affirmatively Furthering Fair Housing (AFFH) tool.

### 406. SUPPORT FOR PUBLIC HEALTH VIOLENCE PREVENTION PROGRAMS
#### Introduced by Medical Student Section

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-10.982, H-515.964, H-515.971 AND H-515.979 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association support legislation in addition to other mechanisms that encourage the development and use of evidence-based public health models that prevent violence.

### 407. SUPPORT FOR RESEARCH OF BOXES FOR BABIES' SLEEPING ENVIRONMENT
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
            *See Policy H-245.977*

RESOLVED, That our American Medical Association encourage further research of infant safe sleeping environment programs, including, but not limited to, the study of the safety and efficacy of boxes.

### 408. ENDING MONEY BAIL TO DECREASE BURDEN ON LOWER INCOME COMMUNITIES
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
            *See Policy H-80.993*

RESOLVED, That our American Medical Association (1) recognize the adverse health effects of pretrial detention; and (2) support legislation that promotes the use of non-financial release options for individuals charged with nonviolent crimes.

### 409. FOOD ADVERTISING TARGETED TO YOUTH
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS
            TITLE CHANGED**
            *See Policy H-60.972*

RESOLVED, That our American Medical Association establish a formal position advocating against the use of targeted marketing of nutrient-poor food toward youth from vulnerable populations, including minority and low-income populations; and be it further

© 2018 American Medical Association. All rights reserved.

RESOLVED, That our AMA amend Policy H-60.972 by addition to read as follows:

(1) It is the policy of the our AMA to join with appropriate organizations, including the American Academy of Pediatrics, in educating the public about the adverse effects of food advertising aimed at children; and

(2) Our AMA will support legislation that limits targeted marketing of products that do not meet nutritional standards as defined by the USDA, when such marketing targets youth, especially vulnerable populations.

and be it further

RESOLVED, That our AMA work with the appropriate stakeholders to heighten awareness and regulation of targeted marketing of nutrient-poor food toward youth from vulnerable populations.

### 410. OPPOSITION TO MEASURES THAT CRIMINALIZE HOMELESSNESS
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association oppose measures that criminalize necessary means of living among homeless persons, including but not limited to, sitting or sleeping in public spaces; and be it further

RESOLVED, That our AMA advocate for legislation that requires non-discrimination against homeless persons, such as homeless bills of rights.

### 411. REPORTING CHILD ABUSE IN MILITARY FAMILIES
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED**
                   *See Policy H-515.960*

RESOLVED, That our American Medical Association support state and federal-run child protective services in reporting child abuse and neglect in the military to the Family Advocacy Program within the Department of Defense.

### 412. REDUCING THE USE OF RESTRICTIVE HOUSING IN PRISONERS WITH MENTAL ILLNESS
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                   *See Policy H-430.983*

RESOLVED, That our American Medical Association support limiting the use of solitary confinement of any length, with rare exceptions, for incarcerated persons with mental illness, in adult correctional facilities; and be it further

RESOLVED, that our AMA support efforts to ensure that the mental and physical health of all individuals placed in solitary confinement are regularly monitored by health professionals; and be it further

© 2018 American Medical Association. All rights reserved.    2021 REMS 000129

RESOLVED, That our AMA encourage appropriate stakeholders to develop and implement alternatives to solitary confinement for incarcerated persons in all correctional facilities.

### 413. IMPROVING SAFETY AND HEALTH CODE COMPLIANCE IN SCHOOL FACILITIES
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association support the development and implementation of standardized, comprehensive guidelines for school safety and health code compliance inspections; and be it further

RESOLVED, That our AMA support policies aiding schools in meeting said guidelines, including support for financial and personnel-based aid for schools based in vulnerable neighborhoods; and be it further

RESOLVED, That our AMA support creation of a streamlined reporting system for school facility health data potentially through application of current health infrastructure.

### 414. SEX EDUCATION MATERIALS FOR STUDENTS WITH LIMITED ENGLISH PROFICIENCY
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
                 *See Policy H-170.968*

RESOLVED, That our American Medical Association amend Policy H-170.968 by addition to read as follows:

H-170.968, Sexuality Education, Sexual Violence Prevention, Abstinence, and Distribution of Condoms in Schools
(1) Recognizes that the primary responsibility for family life education is in the home, and additionally supports the concept of a complementary family life and sexuality education program in the schools at all levels, at local option and direction;
(2) Urges schools at all education levels to implement comprehensive, developmentally appropriate sexuality education programs that: (a) are based on rigorous, peer reviewed science; (b) incorporate sexual violence prevention; (c) show promise for delaying the onset of sexual activity and a reduction in sexual behavior that puts adolescents at risk for contracting human immunodeficiency virus (HIV) and other sexually transmitted diseases and for becoming pregnant; (d) include an integrated strategy for making condoms available to students and for providing both factual information and skill-building related to reproductive biology, sexual abstinence, sexual responsibility, contraceptives including condoms, alternatives in birth control, and other issues aimed at prevention of pregnancy and sexual transmission of diseases; (e) utilize classroom teachers and other professionals who have shown an aptitude for working with young people and who have received special training that includes addressing the needs of gay, lesbian, and bisexual youth; (f) include ample involvement of parents, health professionals, and other concerned members of the community in the development of the program; and (g) are part of an overall health education program; and (h) include culturally competent materials that are language-appropriate for Limited English Proficiency (LEP) pupils;
(3) Continues to monitor future research findings related to emerging initiatives that include abstinence-only, school-based sexuality education, and consent communication to prevent dating violence while promoting healthy relationships, and school-based condom availability programs that address sexually transmitted diseases and pregnancy prevention for young people and report back to the House of Delegates as appropriate;
(4) Will work with the United States Surgeon General to design programs that address communities of color and youth in high risk situations within the context of a comprehensive school health education program;
(5) Opposes the sole use of abstinence-only education, as defined by the 1996 Temporary Assistance to Needy Families Act (P.L. 104-193), within school systems;

© 2018 American Medical Association. All rights reserved.

2021 REMS 000130

(6) Endorses comprehensive family life education in lieu of abstinence-only education, unless research shows abstinence-only education to be superior in preventing negative health outcomes;

(7) Supports federal funding of comprehensive sex education programs that stress the importance of abstinence in preventing unwanted teenage pregnancy and sexually transmitted infections, and also teach about contraceptive choices and safer sex, and opposes federal funding of community-based programs that do not show evidence-based benefits; and

(8) Extends its support of comprehensive family-life education to community-based programs promoting abstinence as the best method to prevent teenage pregnancy and sexually-transmitted diseases while also discussing the roles of condoms and birth control, as endorsed for school systems in this policy;

(9) Supports the development of sexual education curriculum that integrates dating violence prevention through lessons on healthy relationships, sexual health, and conversations about consent; and (10) Encourages physicians and all interested parties to develop best-practice, evidence-based, guidelines for sexual education curricula that are developmentally appropriate as well as medically, factually, and technically accurate.

### 415. REDUCING GUN VIOLENCE IN AMERICA
#### Introduced by Colorado

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-145.975, H-145.997, D-145.995 AND D-145.999 REAFFIRMED IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association reaffirm Policies D-145.995, "Gun Violence as a Public Health Crisis," H-145.975, "Firearm Safety and Research, Reduction in Firearm Violence, and Enhancing Access to Mental Health Care," and H-145.997, "Firearms as a Public Health Problem in the United States - Injuries and Death"; and be it further

RESOLVED, That our AMA work with other physician organizations to actively lobby for restoration of funding for gun violence research at the Centers for Disease Control and Prevention and elsewhere; and be it further

RESOLVED, That our AMA review the Rand report on gun violence and other credible sources of research on causes and effective policy to reduce gun violence and report back at the 2018 Interim Meeting with findings and recommendations for further advocacy to reduce gun violence in the US.

### 416. MEDICAL RESPITE CARE FOR HOMELESS ADULTS
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy H-160.903*

RESOLVED, That our American Medical Association encourage the National Health Care for the Homeless Council to study the funding, implementation, and standardized evaluation of Medical Respite Care for homeless persons.

© 2018 American Medical Association. All rights reserved.

2021 REMS 000131

### 417. REDUCING DISPARITIES IN OBSTETRIC OUTCOMES, MATERNAL MORBIDITY, AND PRENATAL CARE
Introduced by Women Physicians Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
             *See Policy D-420.993*

RESOLVED, That our American Medical Association work with stakeholders to encourage research on identifying barriers and developing strategies toward the implementation of evidence-based practices to prevent disease conditions that contribute to poor obstetric outcomes, maternal morbidity and maternal mortality in racial and ethnic minorities.

### 418. A GUIDE FOR BEST HEALTH PRACTICES FOR SENIORS LIVING IN RETIREMENT COMMUNITIES
Introduced by Senior Physicians Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
             *See Policy H-25.987*

RESOLVED, That our American Medical Association, in collaboration with other interested parties, such as the public health community, geriatric specialties, and organizations working to advocate for seniors, create a repository of available resources for physicians to guide healthy practices for seniors who reside in independent living communities.

### 419. VIOLENCE PREVENTION
Introduced by Washington

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    FIRST AND THIRD RESOLVES REFERRED
             FOR REPORT AT THE 2018 INTERIM MEETING
             SECOND RESOLVE NOT ADOPTED**

RESOLVED, That our American Medical Association advocate that a valid permit be required before the sale of all rapidly-firing semi-automatic firearms; and be it further

RESOLVED, That our AMA study options for removing access to firearms for those who may be a threat to themselves or others; and be it further

RESOLVED, That our AMA study options for improving the mental health reporting systems and patient privacy laws at both the state and federal levels and how those can be modified to allow greater information sharing between state and federal government, law enforcement, schools and mental health professionals to identify, track and share information about mentally ill persons with high risk of violence and either report to law enforcement and/or the National Instant Criminal Background Check System, with appropriate protections.

© 2018 American Medical Association. All rights reserved.

## 420. MANDATORY INFLUENZA VACCINATION POLICIES FOR HEALTHCARE WORKERS
### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   NOT ADOPTED**

RESOLVED, That our American Medical Association enact as policy that no health care worker should be terminated from employment due solely to their refusal to be vaccinated for influenza.

## 421. PRODUCT DATE LABELS
### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
             *See Policy H-150.926*

RESOLVED, That our American Medical Association support federal standardization of date labels on food products to ensure that the labels address safety concerns.

## 422. SCHOOL DRINKING WATER QUALITY TESTING, MONITORING, AND MAINTENANCE
### Introduced by Michigan

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   POLICY H-135.928 AMENDED IN LIEU OF RESOLUTION 422**

Policy H-135.928 amended by addition and deletion to read as follows:

Safe Drinking Water
Our AMA supports updates to the U.S. Environmental Protection Agency's Lead and Copper Rule as well as other state and federal laws to eliminate exposure to lead through drinking water by: (1) Removing, in a timely manner, lead service lines and other leaded plumbing materials that come into contact with drinking water; (2) Requiring public water systems to establish a mechanism for consumers to access information on lead service line locations; (3) Informing consumers about the health-risks of partial lead service line replacement; (4) Requiring the inclusion of schools, licensed daycare, and health care settings among the sites routinely tested by municipal water quality assurance systems; (5) Creating and implementing standardized protocols and regulations pertaining to water quality testing, reporting and remediation to ensure the safety of water in schools and child care centers; (56) Improving public access to testing data on water lead levels by requiring testing results from public water systems to be posted on a publicly available website in a reasonable timeframe thereby allowing consumers to take precautions to protect their health; (67) Establishing more robust and frequent public education efforts and outreach to consumers that have lead service lines, including vulnerable populations; (78) Requiring public water systems to notify public health agencies and health care providers when local water samples test above the action level for lead; and (89) Seeking to shorten and streamline the compliance deadline requirements in the Safe Drinking Water Act.; (10) Actively pursuing changes to the federal lead and copper rules consistent with this policy.

© 2018 American Medical Association. All rights reserved.
2021 REMS 000133

## 423. GRILL BRUSH WARNING
### Introduced by Michigan

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:  ADOPTED**
*See Policy D-10.991*

RESOLVED, That our American Medical Association request that the appropriate federal agency require the placement of a warning label on all wire-bristle grill brushes informing consumers about the possibility of wire bristles breaking off and being accidentally ingested.

## 424. RAPE AND SEXUAL ABUSE ON COLLEGE CAMPUSES
### Introduced by Michigan

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:  ADOPTED AS FOLLOWS**
*See Policy H-515.956*

RESOLVED, That our American Medical Association work with relevant stakeholders to address the issues of rape, sexual abuse, and physical abuse on college campuses; and be it further

RESOLVED, That our AMA strongly express our concerns about the problems of rape, sexual abuse, and physical abuse on college campuses.

## 425. HOSPITAL FOOD LABELING
### Introduced by Washington

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:  ADOPTED AS FOLLOWS**
*See Policy H-150.949*

RESOLVED, That our AMA modify Policy H-150.949 by addition and deletion to read as follows:

H-150.949, Healthy Food Options in Hospitals
1. Our AMA encourages healthy food options be available, at reasonable prices and easily accessible, on hospital premises.
2. Our AMA hereby calls on US hospitals to improve the health of patients, staff, and visitors by: (a) providing a variety of healthy ~~healthful~~ food, including plant-based meals, and meals that are low in fat, sodium, and added sugars; (b) eliminating processed meats from menus; and (c) providing and promoting healthy ~~healthful~~ beverages.
3. Our AMA hereby calls for hospital cafeterias and inpatient meal menus to publish nutrition information.

© 2018 American Medical Association. All rights reserved.

2021 REMS 000134

## 426. DECREASE ADOLESCENT MORTALITY THROUGH MORE COMPREHENSIVE GRADUATED DRIVER LICENSING PROGRAMS
### Introduced by Maryland

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
         *See Policy H-15.990*

RESOLVED, That our American Medical Association support more comprehensive Graduated Driver Licensing programs including but not limited to more stringent permit and licensing age requirements, mandatory minimum training hours, and nighttime and teenage passenger restrictions.

## 427. SUPPORT GUN BUYBACK PROGRAMS IN ORDER TO REDUCE THE NUMBER OF CIRCULATING UNWANTED FIREARMS
### Introduced by Maryland

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
         *See Policy H-145.985*

RESOLVED, That our American Medical Association support the concept of gun buyback programs as well as research to determine the effectiveness of the programs in reducing firearm injuries and deaths.

## 428. LGBTQIA+ INCLUSIVE SEX EDUCATION ALONGSIDE HETEROSEXUAL SEX EDUCATION
### Introduced by Maryland

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   POLICY H-170.968 AMENDED IN LIEU OF RESOLUTION 428**

Policy H-170.968 amended by addition and deletion to read as follows:

Sexuality Education, Sexual Violence Prevention, Abstinence, and Distribution of Condoms in Schools
Our AMA:
(1) Recognizes that the primary responsibility for family life education is in the home, and additionally supports the concept of a complementary family life and sexuality education program in the schools at all levels, at local option and direction;
(2) Urges schools at all education levels to implement comprehensive, developmentally appropriate sexuality education programs that: (a) are based on rigorous, peer reviewed science; (b) incorporate sexual violence prevention; (c) show promise for delaying the onset of sexual activity and a reduction in sexual behavior that puts adolescents at risk for contracting human immunodeficiency virus (HIV) and other sexually transmitted diseases and for becoming pregnant; (d) include an integrated strategy for making condoms available to students and for providing both factual information and skill-building related to reproductive biology, sexual abstinence, sexual responsibility, contraceptives including condoms, alternatives in birth control, and other issues aimed at prevention of pregnancy and sexual transmission of diseases; (e) utilize classroom teachers and other professionals who have shown an aptitude for working with young people and who have received special training that includes addressing the needs of gay, lesbian, and bisexual youth; (f) appropriately and comprehensively address the sexual behavior of all people, inclusive of sexual and gender minorities; (g) include ample involvement of parents, health professionals, and other concerned members of the community in the development of the program; and (g h) are part of an overall health education program;
(3) Continues to monitor future research findings related to emerging initiatives that include abstinence-only, school-based sexuality education, and consent communication to prevent dating violence while promoting

© 2018 American Medical Association. All rights reserved.

healthy relationships, and school-based condom availability programs that address sexually transmitted diseases and pregnancy prevention for young people and report back to the House of Delegates as appropriate;

(4) Will work with the United States Surgeon General to design programs that address communities of color and youth in high risk situations within the context of a comprehensive school health education program;

(5) Opposes the sole use of abstinence-only education, as defined by the 1996 Temporary Assistance to Needy Families Act (P.L. 104-193), within school systems;

(6) Endorses comprehensive family life education in lieu of abstinence-only education, unless research shows abstinence-only education to be superior in preventing negative health outcomes;

(7) Supports federal funding of comprehensive sex education programs that stress the importance of abstinence in preventing unwanted teenage pregnancy and sexually transmitted infections, and also teach about contraceptive choices and safer sex, and opposes federal funding of community-based programs that do not show evidence-based benefits;

(8) Extends its support of comprehensive family-life education to community-based programs promoting abstinence as the best method to prevent teenage pregnancy and sexually-transmitted diseases while also discussing the roles of condoms and birth control, as endorsed for school systems in this policy;

(9) Supports the development of sexual education curriculum that integrates dating violence prevention through lessons on healthy relationships, sexual health, and conversations about consent; and

(10) Encourages physicians and all interested parties to develop best-practice, evidence-based, guidelines for sexual education curricula that are developmentally appropriate as well as medically, factually, and technically accurate.


### 429. E-CIGARETTE INGREDIENTS
**Introduced by Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                *See Policy H-495.973*

RESOLVED, That our American Medical Association urge federal officials, including but not limited to the U.S. Food and Drug Administration (FDA), to prohibit the sale of any e-cigarette cartridges and e-liquid refills that do not include a complete list of ingredients on its packaging, in the order of prevalence (similar to food labeling); and be it further

RESOLVED, That our AMA urge federal officials, including but not limited to the FDA, to require that an accurate nicotine content of e-cigarettes, e-cigarette cartridges and e-liquid refills be prominently displayed on the product alongside a warning of the addictive quality of nicotine.


### 430. VECTOR-BORNE DISEASES
**Introduced by American Academy of Dermatology, Florida,**
**American Society for Dermatologic Surgery Association, Society for Investigative Dermatology,**
**American Society of Dermatopathology, California, Arizona, Mississippi, New Jersey, Maryland,**
**South Carolina, Tennessee, Virginia, District of Columbia, New York, Michigan, Delaware,**
**American Academy of Neurology, Georgia, Alabama, North Carolina, Massachusetts, Wisconsin,**
**West Virginia. American College of Mohs Surgery**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    THIRD RESOLVE ADOPTED**
                **FIRST AND SECOND RESOLVES REFERRED**
                *See Policy H-440.820*

RESOLVED, That our American Medical Association study the emerging epidemic of vector-borne diseases including an analysis of currently available testing and treatment standards and their effectiveness; and be it further

© 2018 American Medical Association. All rights reserved.

RESOLVED, That our AMA issue a white paper on vector-borne diseases for the purpose of increasing awareness of the epidemic of vector-borne diseases; and be it further

RESOLVED, That our AMA advocate for local, state and national research, education, reporting and tracking on vector-borne diseases.

### 431. LOW NICOTINE CIGARETTE PRODUCT STANDARD
### Introduced by American Thoracic Society, American College of Chest Physicians

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association develop a report on the individual health and public health implications of a low nicotine standard for cigarettes. Such a report should consider and make recommendations on scientific criteria for selection of a nicotine standard that is non-addictive, regulatory strategies to ensure compliance with an established standard, how a low-nicotine standard should work with other nicotine products in a well-regulated nicotine market.

### 432. LEGAL ACTION TO COMPEL FDA TO REGULATE E-CIGARETTES
### Introduced by American Thoracic Society, American College of Chest Physicians

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED**
                  *See Policy D-495.992*

RESOLVED, That our American Medical Association consider joining other medical organizations in an amicus brief supporting the American Academy of Pediatrics legal action to compel the U.S. Food and Drug Administration to take timely action to establish effective regulation of e-cigarettes, cigars and other nicotine tobacco products.

### 433. FIREARM SAFETY
### Introduced by Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                  *See Policies H-145.993 and H-145.996*

RESOLVED, That our American Medical Association adopt the following firearm safety policies:

1.   Amend Policy H-145.993, "Restriction of Assault Weapons," by addition to read as follows:

     Our AMA supports appropriate legislation that would restrict the sale and private ownership of inexpensive handguns commonly referred to as "Saturday night specials," and large clip, high-rate-of-fire automatic and semi-automatic firearms, or any weapon that is modified or redesigned to operate as a large clip, high-rate-of-fire automatic or semi-automatic weapon <u>and ban the sale and ownership to the public of all assault-type weapons, bump stocks and related devices, high capacity magazines, and armor piercing bullets.</u>

2.   Require the licensing of owners of firearms including completion of a required safety course and registration of all firearms.

3.   Support local law enforcement in the permitting process in such that local police chiefs are empowered to make permitting decisions regarding "concealed carry", by supporting "gun violence restraining orders" for

© 2018 American Medical Association. All rights reserved.    2021 REMS 000137

individuals arrested or convicted of domestic violence or stalking, and by supporting "red-flag" laws for individuals who have demonstrated significant signs of potential violence. In supporting local law enforcement, we support as well as the importance of "due process" so that decisions could be reversible by individuals petitioning in court for their rights to be restored.

## 434. HEALTH CARE WORKPLACE ERGONOMICS
### Introduced by Organized Medical Staff Section

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   ADOPTED**
            *See Policy H-365.977*

RESOLVED, That our American Medical Association: (1) support research on reducing physician and staff ergonomic injuries in the health care workplace, including but not limited to studying medical instrument and work station design and development; and (2) work with resident training programs, hospitals and other interested parties to help integrate evidence-based ergonomics programs with other types of wellness programs for physicians and medical staffs; and be it further

RESOLVED, That our AMA advocate for legislation that would: (1) appropriate an adequate percentage of research dollars to National Institutes of Health (NIH), NIH Institutes, National Science Foundation (NSF), The National Institute for Occupational Safety and Health (NIOSH), and National Academy of Medicine for basic and advanced research of health care workplace ergonomics; and (2) require that such research be focused on practicing physicians, with practicing physicians as Principal Investigators.

## 501. SYNTHETIC CANNABINOIDS
### Introduced by American Society of Addiction Medicine

*Considered on reaffirmation calendar.*

**HOUSE ACTION:   POLICIES H-95.940 AND D-95.970 REAFFIRMED**
              **IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association recognize that synthetic cannabinoids such as JWH-018, JWH-210, and other compounds sold by "street" names such as "Spice" and "K2", are potent agonists in the mammalian endocannabinoid system and are dangerous when smoked or consumed; and be it further

RESOLVED, That our AMA advocate that the Schedule I status of synthetic cannabinoids under the federal Controlled Substances Act should be retained since these compounds are "drugs with no currently accepted medical use and a high potential for abuse"; and be it further

RESOLVED, That our AMA advocate that in any state or other jurisdiction in the U.S. considering changes in the legal status of cannabis, those changes should make explicitly clear that synthetic cannabinoids are unsafe and unfit for human consumption and their possession, use, sale and distribution by persons of all ages should remain illegal.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000138

**502. EXPEDITED PRESCRIPTION CANNABIDIOL (CBD) DRUG RESCHEDULING**
Introduced by Colorado, Mississippi, Oregon

*Reference committee hearing: see report of Reference Committee E.*

HOUSE ACTION:    **ADOPTED IN LIEU OF RESOLUTION 509**
**TITLE CHANGED**
*See Policy H-120.926*

RESOLVED, That our American Medical Association encourage state controlled substance authorities, boards of pharmacy, and legislative bodies to take the necessary steps including regulation and legislation to reschedule U.S. Food and Drug Administration (FDA)-approved cannabidiol products, or make any other necessary regulatory or legislative change, as expeditiously as possible so that they will be available to patients immediately after approval by the FDA and rescheduling by the U.S. Drug Enforcement Administration; and be it further

RESOLVED, That our AMA advocate that an FDA-approved cannabidiol medication should be governed only by the federal and state regulatory provisions that apply to other prescription-only products, such as dispensing through pharmacies, rather than by these various state laws applicable to unapproved cannabis products.

**503. ADVOCATING FOR ANONYMOUS REPORTING OF OVERDOSES BY**
**FIRST RESPONDERS AND EMERGENCY PHYSICIANS**
Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee E.*

HOUSE ACTION:    **POLICY H-95.940 REAFFIRMED**
**IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association support non-fatal and fatal opioid overdose reporting to the appropriate agencies.

**504. ENDING THE RISK EVALUATION AND MITIGATION STRATEGY (REMS)**
**POLICY ON MIFEPRISTONE (MIFEPREX)**
Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee E.*

HOUSE ACTION:    **ADOPTED**
*See Policy H-100.948*

RESOLVED, That our American Medical Association support efforts urging the Food and Drug Administration to lift the Risk Evaluation and Mitigation Strategy on mifepristone.

**505. RESEARCHING DRUG FACILITATED SEXUAL ASSAULT TESTING**
Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee E.*

HOUSE ACTION:    **NOT ADOPTED**

RESOLVED, That our American Medical Association study the feasibility and implications of offering drug testing at point of care for date rape drugs, including rohypnol, ketamine, and gamma-hydroxybutyrate, in cases of suspected non-consensual, drug-facilitated sexual assault.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000139

### 506. NON-THERAPEUTIC GENE THERAPIES
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    REFERRED FOR DECISION FOLLOWING RECONSIDERATION**

RESOLVED, That our American Medical Association partner with relevant institutions to encourage the development of safety guidelines, regulations, and permissible uses of performance enhancing, non-therapeutic gene therapies.

PRIOR TO REFERRAL, THE PROPOSAL HAD BEEN AMENDED TO READ:

RESOLVED, That our American Medical Association encourages the development of safety guidelines and regulations regarding performance enhancing, non-therapeutic gene therapies.

### 507. OPIOID TREATMENT PROGRAMS REPORTING TO PRESCRIPTION MONITORING PROGRAMS
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association amend Policy D-95.980, "Opioid Treatment and Prescription Drug Monitoring Programs," by deletion as follows:

Our AMA will seek changes to ~~allow states the flexibility to~~ require opioid treatment programs to report to prescription monitoring programs.

### 508. MITOCHONDRIAL DONATION
#### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    ADOPTED**
**TITLE CHANGED**
*See Policy H-480.942*

RESOLVED, That our American Medical Association support regulated research to determine the efficacy and safety of mitochondrial donation as a means of preventing the transmission of mitochondrial diseases.

### 509. OPPOSING THE CLASSIFICATION OF CANNABIDIOL AS A SCHEDULE 1 DRUG
#### Introduced by Medical Student Section

**Resolution 509 was considered with Resolution 502. See Resolution 502.**

RESOLVED, That our American Medical Association support the reclassification of Cannabidiol as a non-scheduled drug.

© 2018 American Medical Association. All rights reserved.

2021 REMS 000140

### 510. ALCOHOL USE AND CANCER
#### Introduced by American Society of Clinical Oncology

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-30.937 AND H-30.942 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association recognize alcohol use as a modifiable risk factor for cancer; and be it further

RESOLVED, That our AMA support research and educational efforts about the connection between alcohol use and several types of cancer; and be it further

RESOLVED, That our AMA encourage physicians to counsel patients on the risks of alcohol use and cancer.

### 511. EDUCATION FOR RECOVERING PATIENTS ON OPIATE USE AFTER SOBRIETY
#### Introduced by Oklahoma

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
            *See Policy D-95.987*

RESOLVED, That our AMA amend Policy D-95.987 by addition to read as follows:

D-95.987, Prevention of Opioid Overdose
1. Our AMA: (A) recognizes the great burden that opioid addiction and prescription drug abuse places on patients and society alike and reaffirms its support for the compassionate treatment of such patients; (B) urges that community-based programs offering naloxone and other opioid overdose prevention services continue to be implemented in order to further develop best practices in this area; and (C) encourages the education of health care workers and opioid users about the use of naloxone in preventing opioid overdose fatalities; and (D) will continue to monitor the progress of such initiatives and respond as appropriate.

2. Our AMA will: (A) advocate for the appropriate education of at-risk patients and their caregivers in the signs and symptoms of opioid overdose; and (B) encourage the continued study and implementation of appropriate treatments and risk mitigation methods for patients at risk for opioid overdose.

<u>3. Our AMA supports the development and implementation of appropriate education programs for persons in recovery from opioid addiction and their friends/families that address how a return to opioid use after a period of abstinence can, due to reduced opioid tolerance, result in overdose and death.</u>

### 512. PHYSICIAN AND PATIENT EDUCATION ABOUT THE RISK OF
### SYNTHETIC CANNABINOID USE
#### Introduced by Illinois

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    POLICIES H-95.940 AND D-95.970 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association encourage all physicians to become aware of the adverse psychiatric and medical effects, including coagulopathy with severe bleeding, related to the use of synthetic cannabinoids, which may or may not be contaminated; and be it further

© 2018 American Medical Association. All rights reserved.    2021 REMS 000141

RESOLVED, That our AMA encourage physicians to educate their patients about synthetic cannabinoids and strongly advise them that the use of these drugs carries significant health risks that can produce psychiatric morbidity and hematological mortality.

### 513. HAND SANITIZER EFFECTIVENESS
**Introduced by Illinois**

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:   NOT ADOPTED**

RESOLVED, That our American Medical Association urge the U.S. Food and Drug Administration and the Centers for Disease Control and Prevention to continue to study the use of hand sanitizers in clinical settings, including the risks and benefits to patients and health care professionals.

### 514. EFFECTS OF VIRTUAL REALITY ON HUMAN HEALTH
**Introduced by**

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:   ADOPTED**
            *See Policy H-478.982*

RESOLVED, That our American Medical Association support further study on the impact of virtual reality on human health.

### 515. INFORMATION REGARDING ANIMAL-DERIVED MEDICATIONS
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association support efforts to improve cultural awareness pertaining to the use of animal-derived medications when considering different prescription options; and be it further

RESOLVED, That our AMA encourage the U.S. Food and Drug Administration to make available to the public an easily accessible database that identifies medications containing ingredients derived from animals.

### 516. WASTE INCINERATOR BAN
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:   ADOPTED AS FOLLOWS**
            *See Policy H-135.939*

RESOLVED, That our American Medical Association amend Policy H-135.939 by addition to read as follows:

H-135.939, Green Initiatives and the Health Care Community
Our AMA supports: (1) responsible waste management and clean energy production policies that minimize health risks, including the promotion of appropriate recycling and waste reduction; (2) the use of ecologically sustainable products, foods, and materials when possible; (3) the development of products that are non-toxic,

© 2018 American Medical Association. All rights reserved.

sustainable, and ecologically sound; (4) building practices that help reduce resource utilization and contribute to a healthy environment; and (5) community-wide adoption of 'green' initiatives and activities by organizations, businesses, homes, schools, and government and health care entities.

## 517. IMPACT OF NATURAL DISASTERS ON PHARMACEUTICAL SUPPLY AND PUBLIC HEALTH
### Introduced by Michigan

**Resolution 517 was considered with Council on Science and Public Health Report 2.
See Council on Science and Public Health Report 2.**

RESOLVED, That our American Medical Association study the impact of natural disasters on the pharmaceutical supply chain and downstream effects on patient care, as well as the adequacy of our governmental response to mitigating these recent natural disasters; and be it further

RESOLVED, That our American Medical Association amend policy H-100.956 by addition to read as follows:

H-100.956, National Drug Shortages
1. Our AMA supports recommendations that have been developed by multiple stakeholders to improve manufacturing quality systems, identify efficiencies in regulatory review that can mitigate drug shortages, and explore measures designed to drive greater investment in production capacity for products that experience drug shortages, and will work in a collaborative fashion with these and other stakeholders to implement these recommendations in an urgent fashion.
2. Our AMA supports authorizing the Secretary of Health and Human Services to expedite facility inspections and the review of manufacturing changes, drug applications and supplements that would help mitigate or prevent a drug shortage.
3. Our AMA will advocate that the US Food and Drug Administration (FDA) and/or Congress require drug manufacturers to establish a plan for continuity of supply of vital and life-sustaining medications and vaccines to avoid production shortages whenever possible. This plan should include establishing the necessary resiliency and redundancy in manufacturing capability to minimize disruptions of supplies in foreseeable circumstances including the possibility of a disaster affecting a plant.
4. The Council on Science and Public Health shall continue to evaluate the drug shortage issue, including the impact of group purchasing organizations on drug shortages, and report back at least annually to the House of Delegates on progress made in addressing drug shortages.
5. Our AMA urges the development of a comprehensive independent report on the root causes of drug shortages. Such an analysis should consider federal actions, the number of manufacturers, economic factors including federal reimbursement practices, as well as contracting practices by market participants on competition, access to drugs, and pricing. In particular, further transparent analysis of economic drivers is warranted. The Centers for Medicare & Medicaid Services should review and evaluate its 2003 Medicare reimbursement formula of average sales price plus 6% for unintended consequences including serving as a root cause of drug shortages.
6. Our AMA urges regulatory relief designed to improve the availability of prescription drugs by ensuring that such products are not removed from the market due to compliance issues unless such removal is clearly required for significant and obvious safety reasons.
7. Our AMA supports the view that wholesalers should routinely institute an allocation system that attempts to fairly distribute drugs in short supply based on remaining inventory and considering the customer's purchase history.
8. Our AMA will collaborate with medical specialty partners in identifying and supporting legislative remedies to allow for more reasonable and sustainable payment rates for prescription drugs.
9. Our AMA urges that during the evaluation of potential mergers and acquisitions involving pharmaceutical manufacturers, the Federal Trade Commission consult with the FDA to determine whether such an activity has the potential to worsen drug shortages.

© 2018 American Medical Association. All rights reserved.

### 518. PORTABLE LISTENING DEVICES AND NOISE INDUCED HEARING LOSS
#### Introduced by Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    POLICY H-440.957 AMENDED**
**                 IN LIEU OF RESOLUTION 518**

Policy H-440.957 amended by addition and deletion to read as follows:

> Reporting Potential for Hearing Loss Due to Personal Listening Devices
> It is the policy of the AMA that (1) physicians counsel patients about the potential loss of hearing associated with the misuse of personal listening devices; (2) research be directed at more specific definition of the relationship between acute and chronic use of personal listening devices and the occurrence of short-term and long-term noise-induced hearing loss; and (3) the AMA work with the National Institute on Deafness and Other Communication Disorders to enhance awareness, knowledge and remediation of causes of noise induced hearing loss.; and (4) portable listening devices limit the maximum sound amplitude to safe levels.

### 519. WARNING LABELS FOR CHILDREN'S DIGITAL AND VIDEO GAMES
#### Introduced by Maryland

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-60.911, H-60.915 AND H-515.974 REAFFIRMED**
**                 IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association advocate for putting warning labels on digital and video games, warning parents to monitor children's use and be aware that for some children this can become habit forming, leading to increased time spent on gaming at the cost of more important developmental issues, take precedence over other aspects of their life and escalate despite the occurrence of negative consequences and withdrawal symptoms may occur when attempts are made to reduce or stop it.

### 520. HANDLING OF HAZARDOUS DRUGS
#### Introduced by American Urological Association, American Association of Clinical Urologists, American Academy of Dermatology, American Society for Dermatologic Surgery Association, American Society of Dermatopathology, Society for Investigative Dermatology

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-120.930, H-330.884 AND D-120.941 REAFFIRMED**
**                 IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association work with United States Pharmacopeia to revisit the requirements in General Chapter <800> of the USP Compounding Compendium and review Chapters <795> and <797> to ensure that the requirements included in those chapters are not onerous to physicians and prohibitive to their current ability to provide medications to their patients.

© 2018 American Medical Association. All rights reserved. 2021 REMS 000144

### 521. EPA GILDER TRUCK STANDARD
**Introduced by American Thoracic Society, American College of Chest Physicians**

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:  ADOPTED AS FOLLOWS**
                          **POLICY D-135.996 AMENDED**
                          *See Policy D-135.996*

RESOLVED, That our American Medical Association send a letter to U.S. Environmental Protection Agency (EPA) Administrator opposing the EPA's proposal to roll back the "Glider Kit Rule" which would effectively allow the unlimited sale of reconditioned diesel truck engines that do not meet current EPA new diesel engine emission standards.

Policy D-135.996 amended by addition and deletion to read as follows:

    Reducing Sources of Diesel Exhaust
    Our AMA will:
    (1) encourage the US Environmental Protection Agency to <u>set and enforce</u> ~~finalize~~ the most stringent feasible standards to control pollutant emissions from both large and small non-road engines including construction equipment, farm equipment, boats and trains;
    (2) encourage all states to continue to pursue opportunities to reduce diesel exhaust pollution, including reducing harmful emissions from <u>glider trucks and</u> existing diesel <u>engines</u>; and
    (3) call for all trucks traveling within the United States, regardless of country of origin, to be in compliance with <u>the most stringent and current</u> ~~new~~ diesel emissions standards promulgated by US EPA.

### 522. SILENCE SCIENCE: EPA PROPOSED DATA POLICY
**Introduced by American Thoracic Society, American College of Chest Physicians**

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:  NOT ADOPTED**

RESOLVED, That our American Medical Association submit comments during the public comment period, or join comments written by other medical organizations, to express concern with the U.S. Environmental Protection Agency's (EPA) proposal to limit the use of research studies published in peer reviewed scientific journals that describe the adverse health effects of exposure to air pollution and other environmental exposures; and be it further

RESOLVED, That our AMA reaffirm the value and integrity of the journal peer review process by sending a letter to the EPA stating that studies that have been published in scientific peer reviewed journals should be used by the agency in informing EPA regulatory policy making.

© 2018 American Medical Association. All rights reserved.

## 523. BIOSIMILAR INTERCHANGEABILITY PATHWAY
### Introduced by American College of Rheumatology, American Academy of Allergy, Asthma & Immunology, American Academy of Dermatology, American Academy of Neurology, American Academy of Ophthalmology, American Association of Clinical Endocrinologists, American Gastroenterological Association, American Society of Clinical Oncology, American Society of Hematology, American College of Allergy, Asthma and Immunology

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
             *See Policy H-125.976*

RESOLVED, That our American Medical Association strongly support the pathway for demonstrating biosimilar interchangeability that was proposed in draft guidance by the FDA in 2017, including requiring manufacturers to use studies to determine whether alternating between a reference product and the proposed interchangeable biosimilar multiple times impacts the safety or efficacy of the drug; and be it further

RESOLVED, That our AMA issue a request to the FDA that the agency finalize the biosimilars interchangeability pathway outlined in its draft guidance "Considerations in Demonstrating Interchangeability With a Reference Product" with all due haste, so as to allow development and designation of interchangeable biosimilars to proceed, allowing transition to an era of less expensive biologics that provide safe, effective, and accessible treatment options for patients.

## 524. NALOXONE ON COMMERCIAL AIRLINES
### Introduced by Arizona

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    ADOPTED**
             *See Policy H-45.981*

RESOLVED, That our American Medical Association support the addition of naloxone to the airline medical kit; and be it further

RESOLVED, That our AMA encourage airlines to voluntarily include naloxone in their airline medical kits; and be it further

RESOLVED, That our AMA encourage the addition of naloxone to the emergency medical kits of all US airlines (14CFR Appendix A to Part 121 - First Aid Kits and Emergency Medical Kits).

## 525. TRAMADOL CHANGE FROM DEA SCHEDULE IV TO SCHEDULE III
### Introduced by Arizona

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:    NOT ADOPTED**

RESOLVED, That our American Medical Association petition the United States Drug Enforcement Administration to change tramadol from a Schedule IV to a Schedule III controlled substance.

© 2018 American Medical Association. All rights reserved.    2021 REMS 000146

## 526. DIRECT-TO-CONSUMER LABORATORY TESTING
### Introduced by Organized Medical Staff Section

*Reference committee hearing: see report of Reference Committee E.*

**HOUSE ACTION:**   **ADOPTED**
*See Policy H-480.941*

RESOLVED, That our American Medical Association: (1) advocate for vigilant oversight of direct-to-consumer (DTC) laboratory testing by relevant state and federal agencies; and (2) encourage physicians to educate their patients about the risks and benefits of DTC laboratory tests, as well as the risks associated with interpreting DTC test results without input from a physician or other qualified health care professional.

## 601. CREATION OF LGBTQ HEALTH SPECIALTY SECTION COUNCIL
### Introduced by GLMA: Health Professionals Advancing LGBT Equality

*Reference committee hearing: see report of Reference Committee F*

**HOUSE ACTION:**   **ADOPTED**
*See Policy D-615.978*

RESOLVED, That our American Medical Association House of Delegates establish a Specialty Section Council on LGBTQ Health.

## 602. HEALTH FITNESS PARTNERSHIPS
### Introduced by Resident and Fellow Section

*Reference committee hearing: see report of Reference Committee F.*

**HOUSE ACTION:**   **ADOPTED AS FOLLOWS**
*See Policy H-405.952*

RESOLVED, That our American Medical Association promote evidence-based health and wellness programs among AMA members; and be it further

RESOLVED, That our AMA further investigate and explore relationships with health and fitness companies to promote evidence-based health and wellness programs among AMA members, including arrangements under which attractive discounts are offered to AMA members.

## 603. ELIMINATING FOOD WASTE THROUGH RECOVERY
### Introduced by Medical Student Section

*Reference committee hearing: see report of Reference Committee F.*

**HOUSE ACTION:**   **ADOPTED AS FOLLOWS**
*See Policy G-630.135*

RESOLVED, That our American Medical Association consider sustainability and mitigation of food waste in vendor and venue selection; and be it further

RESOLVED, That our AMA encourage vendors and relevant third parties to practice sustainability and mitigate food waste through donations.

© 2018 American Medical Association. All rights reserved.   2021 REMS 000147

### 604. AMA DELEGATION ENTITLEMENTS
**Introduced by Georgia**

*Reference committee hearing: see report of Reference Committee D.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association continue to provide a count of AMA members for AMA delegation entitlements to the House of Delegates as of December 31 and also provide a second count of AMA members within the first two weeks of the new year and that the higher of the two counts will be used for state and national specialty society delegation entitlements during the current year; and be it further

RESOLVED, That the Council on Constitution and Bylaws prepare appropriate language to add a second period of time to determine AMA delegation entitlements to be considered by the AMA House at its earliest opportunity.

### 605. PRACTICING PHYSICIAN DECLINING MEMBERSHIP ANALYSIS
**Introduced by New Jersey**

*Reference committee hearing: see report of Reference Committee F.*

**HOUSE ACTION:   NOT ADOPTED**

RESOLVED, That our American Medical Association release to its membership annually in its Annual Report any and all aggregate data for that year it has pertaining to reasons physicians are either leaving or not joining the AMA ("Data"), including but not limited to, survey data, focus group data, and exit interview data, giving specific attention to those physicians in the "Young," "Mature," and "Senior" membership categories.

### 606. TRAINING PHYSICIANS IN THE ART OF PUBLIC FORUM
**Introduced by New Jersey**

*Reference committee hearing: see report of Reference Committee F.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association establish a program for training physicians in the art and science of conducting public forums in order to ensure that the public is well informed on the health care system of our country.

### 607. DISCOUNTED / WAIVED CPT FEES AS AN AMA MEMBER BENEFIT AND FOR MEMBERSHIP PROMOTION
**Introduced by Gregory L. Pinto, MD, Delegate**

*Reference committee hearing: see report of Reference Committee F.*

**HOUSE ACTION:   REFERRED FOR REPORT AT THE 2019 ANNUAL MEETING**

RESOLVED, That our American Medical Association investigate mechanisms by which AMA members may receive a discount or waiver on CPT-related fees, including fees associated with using CPT codes within electronic medical billing systems.

© 2018 American Medical Association. All rights reserved.

**608. DIVESTMENT FROM COMPANIES WHOSE PRIMARY BUSINESS IS FOSSIL FUEL**
**Introduced by American Association of Public Health Physicians**

**Resolution 608 was considered with Board of Trustees Report 34. See Board of Trustees Report 34.**

RESOLVED, That our American Medical Association, Foundation, and any affiliated corporations work in a timely, incremental, and fiscally responsible manner, to the extent allowed by their legal and fiduciary duties, to end all financial investments or relationships (divestment) with companies that generate the majority of their income from the exploration for, production of, transportation of, or sale of fossil fuels; and be it further

RESOLVED, That our AMA, when fiscally responsible, choose for its commercial relationships vendors, suppliers, and corporations that have demonstrated environmental sustainability practices that seek to minimize their fossil fuels consumption; and be it further

RESOLVED, That our AMA support efforts of physicians and other health professional associations to proceed with divestment, including to create policy analyses, support continuing medical education, and to inform our patients, the public, legislators, and government policy makers.

**701. EMPLOYED PHYSICIANS BILL OF RIGHTS**
**Introduced by Illinois**

*Reference committee hearing: see report of Reference Committee G*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association adopt an "Employed Physician's Bill of Rights"; and be it further

RESOLVED, That this bill of rights include the principle that compensation should be based on the totality of physician activities for the organization, including but not limited to educational endeavors and preparation, committee participation, student/resident activities and administrative responsibilities; and be it further

RESOLVED, That this bill of rights include the principle that physicians have academic freedom, without censorship in clinical research or academic pursuits; and be it further

RESOLVED, That this bill of rights include the principle that physicians should not be solely responsible for data entry, coding and management of the use of electronic medical record systems; and be it further

RESOLVED, That this bill of rights include the principle that clinical activity should be evaluated only through the peer review process and judged only by clinicians, not corporate executives; and be it further

RESOLVED, That this bill of rights include the principle that physician activities performed outside of defined employed-time boundaries are the sole prerogative of the individual physician and not the employer organization unless it directly conflicts with or increases risk to the organization; and be it further

RESOLVED, That this bill of rights include the principle that conflict-of-interest disclosures should be limited to physician activities that directly affect the organization and should only be disclosed to entities that directly reimburse the physician during their employed time period; and be it further

RESOLVED, That this bill of rights include the principle that restrictive covenants should be limited only to physicians with partnership stakes in the organization and should not apply to salary-based physicians; and be it further

RESOLVED, That this bill of rights include the principle that resources should be appropriately allocated by the organization for continuing medical education as defined by state licensure guidelines; and be it further

© 2018 American Medical Association. All rights reserved.

RESOLVED, That this bill of rights include the principle that employed physicians have the right to the collective bargaining process as outlined in the National Labor Relations Act of 1935 (The Wagner Act); and be it further

RESOLVED, That this bill of rights include the principle that all physicians be empowered to first be the patient's advocate and be allowed to adhere to the spirit of the Hippocratic Oath allowing patient privacy, confidentiality and continuity of a patient's health care and dignity.

### 702. BASIC PRACTICE PROFESSIONAL STANDARDS OF PHYSICIAN EMPLOYMENT
### Introduced by Indiana

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association support best practice for physician employment that will promote improved work-life balance and maximal employment adaptability and professional treatment to maintain physicians in productive medical practice and minimize physician burnout. To achieve these goals, best practice efforts in physician employment contracts would include, among other options:

1.  Establishing the degree of physician medical staff support as well as specifying how different medical staff costs will be covered.
2.  Establishing a specific degree of clerical and administrative support. This would include access to an EMR (electronic medical record) scribe, as well as specifying how different clerical or administrative support costs will be shared/covered.
3.  Providing information regarding current EMR systems and their national ranking, including user ratings and plans to improve these systems.
4.  Providing work flexibility with pay and benefit implications for reduced work hours, reduced call coverage, job sharing, child care support, use of locum tenens coverage, leave of absence for personal reasons or extended duty in the military, medical service organizations or other "greater societal good" organizations.
5.  Establishing an expected workload that does not exceed the mean RVU production of the specialty in that state/county/region.

### 703. ECONOMIC CREDENTIALING
### Introduced by Pennsylvania

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    POLICY H-180.963 REAFFIRMED
                   IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association vigorously oppose clinical credentialing based solely on surgical and non-surgical case volume when there is no other basis for questioning the physician's ability to function with skill and safety.

### 704. NON PAYMENT AND AUDIT TAKEBACKS BY CMS
### Introduced by New York

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association seek through legislation and/or regulation policies opposing claim nonpayment due to minor wording or clinically insignificant documentation inconsistencies; and be it further

© 2018 American Medical Association. All rights reserved.

RESOLVED, That our AMA seek through legislation and/or regulation policies opposing extrapolation of overpayments based on minor inconsistencies; and be it further

RESOLVED, That our AMA seek through legislation and/or regulation policies opposing bundled payment denial based on minor wording or clinically insignificant documentation inconsistencies.

### 705. MODIFY THE CLINICAL LABORATORY IMPROVEMENT AMENDMENT OF 1988
**Introduced by New York**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    REFERRED FOR DECISION**

RESOLVED, That our American Medical Association adopt the position that it is proper to remove the CLIA certification mandate requirement for physicians who only use CLIA-waived tests and physician-performed microscopy.

### 706. ENSURING MEDICARE COVERAGE FOR LONG TERM CARE
**Introduced by New York**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy D-280.985*

RESOLVED, That our AMA work to identify additional mechanisms by which patients' out-of-pocket costs for skilled nursing facility care can be fairly covered.

### 707. HEALTH PLAN PAYMENT OF PATIENT COST-SHARING
**Introduced by California**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    REFERRED**

RESOLVED, That our American Medical Association urge health plans and insurers to bear the responsibility of ensuring physicians promptly receive full payment for patient copayments, coinsurance and deductibles.

### 708. ARBITRARY PAPERWORK AND SIGNATURE DEADLINES FOR HOSPITAL AND REHABILITATION UNIT ADMISSION
**Introduced by Ohio**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES D-160.987 AND D-330.919 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association work to change admission order signature timeframe regulations at the Centers for Medicare and Medicaid Services to be consistent with timeframe regulations for other verbal and telephone orders.

© 2018 American Medical Association. All rights reserved.

### 709. PRIOR AUTHORIZATION FOR DURABLE MEDICAL EQUIPMENT
**Introduced by Ohio**

*Considered on reaffirmation calendar.*

**HOUSE ACTION:    POLICIES H-285.998, H-320.942, H-320.968,
H-320.939 AND H-330.955 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association advocate that denials of prior authorization for durable medical equipment must be based on true medical necessity not arbitrary time limits or other paperwork issues; and be it further

RESOLVED, That our AMA continue to work to improve the prior authorization process for Medicare Managed Care Plans.

### 710. CODE STATUS THROUGH THE CONTINUUM OF CARE
**Introduced by Michigan**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
*See Policy D-140.955*

RESOLVED, That our American Medical Association work with the Centers for Medicare and Medicaid Services to streamline transfer of code status across the continuum of care.

### 711. COMPENSATION FOR PRE-AUTHORIZATION REQUESTS
**Introduced by Ohio**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    POLICY H-320.939 REAFFIRMED
IN LIEU OF FOLLOWING RESOLUTION**

RESOLVED, That our American Medical Association petition the Centers for Medicare and Medicaid Services that CPT code 99080 be reimbursed by Medicare.

### 712. ALTERNATIVE PAYMENT MODELS AND VULNERABLE POPULATIONS
**Introduced by Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    REFERRED**

RESOLVED That our American Medical Association study the impact of current advanced Alternative Payment Models (APMs) and risk adjustment on providers caring for vulnerable populations; and be it further

RESOLVED That our AMA advocate legislatively that advanced APMs examine the evaluation of quality performance (for bonus or incentive payment) of providers caring for vulnerable populations in reference to peer group (similarities in SES status, disability, percentage of dual eligible population).

© 2018 American Medical Association. All rights reserved.

### 713. CORPORATE INVESTORS

**Introduced by American Academy of Dermatology. American Society for Dermatologic Surgery Association, American Society of Dermatopathology, Society for Investigative Dermatology, American Society of Anesthesiologists, American College of Cardiology, American Roentgen Ray Society, American Academy of Ophthalmology, District of Columbia, American College of Mohs Surgery**

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
                              **TITLE CHANGED**
                              *See Policies H-215.981 and D-383.979*

RESOLVED, That our American Medical Association study, with report back at the 2019 Annual Meeting, the effects on the healthcare marketplace of corporate investors (eg, public companies, venture capital / private equity firms, insurance companies and hospital systems) acquiring a majority and / or controlling interest in entities that manage physician practices, such as:

- the degree of corporate investor penetration and investment in the healthcare marketplace;
- the impact on physician practice and independence;
- patient access;
- resultant trends in the use non-physician extenders;
- long term financial viability of purchased practices;
- effects of ownership turnovers and bankruptcies on patients and practice patterns;
- effectiveness of methodologies employed by unpurchased private independent, small group and large group practices to compete for insurance contracts in consolidated marketplaces;
- and the relative impact corporate investor transactions have on the paths and durations of junior, mid-career and senior physicians; and be it further

RESOLVED, That, in order to address the particular concerns of physicians entering into management service organization contracts, our American Medical Association amend the AMA Annotated Model Physician-Group Practice Employment Agreement (H-215.981) to read:

"(2) At the request of state medical associations, our AMA will provide guidance, consultation, and model legislation regarding the corporate practice of medicine, to ensure the autonomy of hospital medical staffs, employed physicians in non-hospital settings, and physicians contracting with corporately-owned management service organizations."

### 714. LABORATORY BENEFIT MANAGERS

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    FOLLOWING ALTERNATIVE RESOLUTION 714 ADOPTED**
                              *See Policy H-260.962*

RESOLVED, That our American Medical Association support efforts to reduce laboratory benefit management policies that result in delays in patient care, reduced patient access, or increased patient costs without clinical justification; and be it further

RESOLVED, That our AMA support that any policies regarding laboratory benefit management arrangements preclude any potential conflict of interest in programs adopted by health insurance payors to provide laboratory benefit management, including prohibition on the use of any laboratory benefit management entity financially affiliated with a clinical laboratory.

© 2018 American Medical Association. All rights reserved.

### 715. THE OBLIGATORY NATURE AND ENDURING PURPOSE OF THE
### SELF-GOVERNED ORGANIZED MEDICAL STAFF
#### Introduced by Organized Medical Staff Section

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:    ADOPTED AS FOLLOWS**
              *See Policy H-225.942*

RESOLVED, That our American Medical Association amend Policy H-225.942 by addition to read as follows:

H-225.942, Physician and Medical Staff Member Bill of Rights

Our AMA adopts and will distribute the following Medical Staff Rights and Responsibilities:

Preamble

The organized medical staff, hospital governing body and administration are all integral to the provision of quality care, providing a safe environment for patients, staff and visitors, and working continuously to improve patient care and outcomes. They operate in distinct, highly expert fields to fulfill common goals, and are each responsible for carrying out primary responsibilities that cannot be delegated.

The organized medical staff consists of practicing physicians who not only have medical expertise but also possess a specialized knowledge that can be acquired only through daily experiences at the frontline of patient care. These personal interactions between medical staff physicians and their patients lead to an accountability distinct from that of other stakeholders in the hospital. This unparalleled accountability requires that physicians remain answerable first and foremost to their patients.

Medical staff self-governance is vital in protecting the ability of physicians to act in their patients' best interest. Only within the confines of the principles and processes of self-governance can physicians ultimately ensure that all treatment decisions remain insulated from interference motivated by commercial or other interests that may threaten high-quality patient care.

From this fundamental understanding flow the following Medical Staff Rights and Responsibilities:

I.   Our AMA recognizes the following fundamental responsibilities of the medical staff:
     a.   The responsibility to provide for the delivery of high-quality and safe patient care, the provision of which relies on mutual accountability and interdependence with the health care organization's governing body.
     b.   The responsibility to provide leadership and work collaboratively with the health care organization's administration and governing body to continuously improve patient care and outcomes.
     c.   The responsibility to participate in the health care organization's operational and strategic planning to safeguard the interest of patients, the community, the health care organization, and the medical staff and its members.
     d.   The responsibility to establish qualifications for membership and fairly evaluate all members and candidates without the use of economic criteria unrelated to quality, and to identify and manage potential conflicts that could result in unfair evaluation.
     e.   The responsibility to establish standards and hold members individually and collectively accountable for quality, safety, and professional conduct.
     f.   The responsibility to make appropriate recommendations to the health care organization's governing body regarding membership, privileging, patient care, and peer review.

II.  Our AMA recognizes that the following fundamental rights of the medical staff are essential to the medical staff's ability to fulfill its responsibilities:
     a.   The right to be self-governed, which includes but is not limited to (i) initiating, developing, and approving or disapproving of medical staff bylaws, rules and regulations, (ii) selecting and removing medical staff leaders, (iii) controlling the use of medical staff funds, (iv) being advised by independent

© 2018 American Medical Association. All rights reserved.    2021 REMS 000154

legal counsel, and (v) establishing and defining, in accordance with applicable law, medical staff membership categories, including categories for non-physician members.

b. The right to advocate for its members and their patients without fear of retaliation by the health care organization's administration or governing body.

c. The right to be provided with the resources necessary to continuously improve patient care and outcomes.

d. The right to be well informed and share in the decision-making of the health care organization's operational and strategic planning, including involvement in decisions to grant exclusive contracts or close medical staff departments.

e. The right to be represented and heard, with or without vote, at all meetings of the health care organization's governing body.

f. The right to engage the health care organization's administration and governing body on professional matters involving their own interests.

III. Our AMA recognizes the following fundamental responsibilities of individual medical staff members, regardless of employment or contractual status:

a. The responsibility to work collaboratively with other members and with the health care organization's administration to improve quality and safety.

b. The responsibility to provide patient care that meets the professional standards established by the medical staff.

c. The responsibility to conduct all professional activities in accordance with the bylaws, rules, and regulations of the medical staff.

d. The responsibility to advocate for the best interest of patients, even when such interest may conflict with the interests of other members, the medical staff, or the health care organization.

e. The responsibility to participate and encourage others to play an active role in the governance and other activities of the medical staff.

f. The responsibility to participate in peer review activities, including submitting to review, contributing as a reviewer, and supporting member improvement.

IV. Our AMA recognizes that the following fundamental rights apply to individual medical staff members, regardless of employment, contractual, or independent status, and are essential to each member's ability to fulfill the responsibilities owed to his or her patients, the medical staff, and the health care organization:

a. The right to exercise fully the prerogatives of medical staff membership afforded by the medical staff bylaws.

b. The right to make treatment decisions, including referrals, based on the best interest of the patient, subject to review only by peers.

c. The right to exercise personal and professional judgment in voting, speaking, and advocating on any matter regarding patient care or medical staff matters, without fear of retaliation by the medical staff or the health care organization's administration or governing body.

d. The right to be evaluated fairly, without the use of economic criteria, by unbiased peers who are actively practicing physicians in the community and in the same specialty.

e. The right to full due process before the medical staff or health care organization takes adverse action affecting membership or privileges, including any attempt to abridge membership or privileges through the granting of exclusive contracts or closing of medical staff departments.

f. The right to immunity from civil damages, injunctive or equitable relief, criminal liability, and protection from any retaliatory actions, when participating in good faith peer review activities.

© 2018 American Medical Association. All rights reserved.

## 716. HOSPITAL CLOSURES AND PHYSICIAN CREDENTIALING
### Introduced by Organized Medical Staff Section

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:   REFERRED**

RESOLVED, That our American Medical Association work with appropriate stakeholders, such as the AMA Organized Medical Staff Section and National Association Medical Staff Services, to produce an AMA credentialing repository that would allow hospitals and other organizations that credential physicians to access verified credentialing information for physicians who were on staff at a hospital, or one of its departments, at the time of closure, and report back at the 2018 Interim Meeting.

## 717. IMPACT OF THE HIGH CAPITAL COST OF HOSPITAL EHRs ON THE MEDICAL STAFF
### Introduced by Organized Medical Staff Section

*Reference committee hearing: see report of Reference Committee G.*

**HOUSE ACTION:   ADOPTED**
     *See Policy D-225.974*

RESOLVED, That our American Medical Association study the long-term economic impact for physicians and hospitals of EHR system procurement, including but not limited to their impact on downsizing of medical staffs and its effect on physician recruitment and retention.

© 2018 American Medical Association. All rights reserved.

Journal of the American Pharmacists Association 58 (2018) 377 381



Contents lists available at ScienceDirect

# Journal of the American Pharmacists Association

journal homepage: www.japha.org



## COMMENTARY

# Medication abortion: Potential for improved patient access through pharmacies

Sarah Raifman\*, Megan Orlando, Sally Rafie, Daniel Grossman

### ARTICLE INFO

Article history:
Received 22 August 2017
Accepted 4 April 2018
Available online 8 May 2018

### ABSTRACT

*Objectives:* To discuss the potential for improving access to early abortion care through pharmacies in the United States.

*Summary:* Despite the growing use of medications to induce termination of early pregnancy, pharmacist involvement in abortion care is currently limited. The Food and Drug Adminis tration's Risk Evaluation and Mitigation Strategy (REMS) for Mifeprex® (mifepristone 200 mg), the principal drug used in early medication abortion, prohibits the dispensing of the drug by prescription at pharmacies. This commentary reviews the pharmacology of medication abortion with the use of mifepristone and misoprostol, as well as aspects of service delivery and data on safety, efficacy, and acceptability. Given its safety record, mifepristone no longer fits the profile of a drug that requires an REMS. The recent implementation of pharmacy dispensing of mifepristone in community pharmacies in Australia and some provinces of Canada has improved access to medication abortion by increasing the number of medication abortion providers, particularly in rural areas.

*Conclusion:* Provision of mifepristone in pharmacies, which involves dispensing and patient counseling, would likely improve access to early abortion in the United States without increasing risks to women.

© 2018 American Pharmacists Association®. Published by Elsevier Inc. This is an open access article under the CC BY NC ND license (http://creativecommons.org/licenses/by nc nd/4.0/).

Pharmacists play an important role in the provision of reproductive health care, including prescribing hormonal contraception and emergency contraception in some states.[1-5] However, pharmacists have limited involvement in abortion care, despite the growing use of medications to induce termi nation of early pregnancy, known as medical or medication abortion (Figure 1). Federal regulations require that mifepris tone, the principal drug used in medication abortion, be dispensed by a certified provider in an outpatient clinic or hospital and not by prescription in a pharmacy.[10] This dispensing restriction is not evidence based and constrains access to medication abortion.[11] There is increasing interest in removing dispensing restrictions in the United States, which would enable pharmacists to dispense mifepristone to patients.

When dispensing medications, pharmacists review the prescription to ensure safety and effectiveness and provide pertinent patient counseling on proper use and adverse effects. Pharmacy dispensing of mifepristone has already been imple mented in Australia and some provinces of Canada.[12,13] As these efforts move forward, it is important for pharmacists to become more familiar with the pharmacotherapy of medication abortion.

Nearly one half of all pregnancies in the United States are unintended (45%, or 2.8 million annually), and approximately 40% of these unintended pregnancies end in abortion.[14] Although the abortion rate has declined in recent years, the proportion of abortions that are done with medication has increased (Figure 1).[6-9] Multiple studies have demonstrated that medication abortion is an acceptable means of pregnancy termination for women who choose this method.[15,16] In a meta analysis of approximately 4500 women who underwent medication abortion, more than 85% were satisfied with the experience.[17] Medication abortion is particularly likely to appeal to patients who desire a more natural experience or prefer to avoid surgical intervention.

**Disclosure:** The authors have no conflicts of interest to disclose.

**Funding:** This work was supported by a grant from Fidelity Charitable.

\* **Correspondence:** Sarah Raifman, 1330 Broadway, Suite 1100 Broadway, Oakland, CA 94612.

*E-mail address:* sarah.raifman@ucsf.edu (S. Raifman).

https://doi.org/10.1016/j.japh.2018.04.011
1544-3191/© 2018 American Pharmacists Association®. Published by Elsevier Inc. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

SCIENCE AND PRACTICE

S. Raifman et al. / Journal of the American Pharmacists Association 58 (2018) 377 381

---

**Key Points**

**Background:**

- Pharmacists play an important role in the provision of reproductive health care, yet they have limited involvement in abortion care.
- Medication abortion (also known as medical abor tion) involves the use of mifepristone and miso prostol to terminate an unwanted pregnancy up to 10 weeks of gestation. This method is safe, effective, and preferred by many women.

**Findings:**

- The U.S. Food and Drug Administration's Risk Eval uation and Mitigation Strategy for Mifeprex® (mife pristone 200 mg) prohibits its dispensing by pharmacists following a prescription.
- Pharmacy dispensing of mifepristone, which has been implemented in Australia and some provinces of Canada, would likely improve access to early abortion in the United States without increasing risks to women.

---

**Medication abortion regimen**

The standard regimen for medication abortion involves two drugs, mifepristone followed by misoprostol, which is approved by the U.S. Food and Drug Administration (FDA) to terminate pregnancies up to 10 weeks of gestation.[18] Mife pristone (Mifeprex®, also known as RU 486) is a progesterone antagonist, which binds without activating the progesterone receptor, thereby leading to decidual necrosis (breakdown of the lining of the uterus), cervical softening, and increased uterine prostaglandin sensitivity. Misoprostol, a prostaglandin E1 analogue, causes cervical dilation and softening and uterine contractions to promote pregnancy expulsion.

The FDA approved labeling for Mifeprex® was updated in March 2016 and describes an evidence based treatment,[19-25] including 200 mg mifepristone orally, followed 24 48 hours later by 800 mcg misoprostol administered buccally. This regimen may be used up to 70 days from the last menstrual period (10 weeks' gestation).[11] The efficacy of this evidence based regimen is 93% to 99%, meaning that 1% to 7% of patients will require a vacuum aspiration procedure to complete the abortion.[18] The U.S. Government Accountability Office recently reviewed the process that the FDA used for updating the Mifeprex® label and found that it was appro priate and based on the best available evidence.[26]

**Providing medication abortion**

Women seeking medication abortion first undergo standard counseling to ensure that they are certain about their decision to terminate the pregnancy, as well as their choice to have a medication abortion instead of a vacuum aspiration procedure. A clinician then screens patients for medical eligi bility for medication abortion. This includes assessing

gestational age with the use of ultrasound or clinical assess ment of uterine size and ruling out ectopic pregnancy, because mifepristone and misoprostol do not effectively terminate or treat an ectopic pregnancy. The clinician also screens for other contraindications, including chronic adrenal failure or long term corticosteroid therapy (because of mifepristone's anti glucocorticoid effect), hemorrhagic disorders or concurrent anticoagulant use, presence of an intrauterine device, inheri ted porphyria (given the possible increased risk of precipi tating an attack), and allergy to mifepristone, misoprostol, or other prostaglandins.[27,28]

Pretreatment laboratory testing commonly includes hemoglobin to assess for anemia and blood type to determine Rhesus (Rh) status.[18] Vaginal bleeding after medication administration (discussed in detail below) is unlikely to be well tolerated by women with severe anemia. In addition, women who are Rh negative are advised to receive RhD immunoglobulin at the time of abortion to prevent the development of anti D antibodies and to reduce the risk of alloimmunization in subsequent pregnancies.[18]

After ensuring eligibility, clinicians provide counseling on medication abortion and dispense the mifepristone directly to the patient, which may be taken in the clinic or at a later time, according to the FDA approved labeling. Misoprostol may be dispensed directly by the clinician, or it may be prescribed and dispensed at a pharmacy; women take the misoprostol dose buccally at home 24 48 hours after mifepristone. Some providers use an off label regimen of 800 mcg misoprostol self administered vaginally as soon as 6 hours after mifepris tone.[29] Although mifepristone is rapidly absorbed, few patients experience bleeding or pregnancy expulsion before taking misoprostol. Bleeding may occur within 1 hour of misoprostol ingestion, and 90% expel the pregnancy within 24 hours.[27,30]

Expected adverse effects of medication abortion include vaginal bleeding and uterine cramping, which almost always occur with successful pregnancy termination. Clinicians often counsel patients to expect a "crescendo decrescendo" bleed whereby the patient's bleeding intensifies and then decreases once the pregnancy tissue is passed. The total duration of vaginal bleeding varies, but it is approximately 8 to 17 days on average.[15] The Mifeprex® medication guide that must be given to patients includes the recommendation that they should call or seek care if they feel lightheaded or are experiencing heavy bleeding, defined as soaking more than two large pads per hour for two consecutive hours.[27] Cramping pain usually peaks shortly after the patient takes misoprostol, and it can often be controlled with the use of nonsteroidal anti inflam matory drugs or, if necessary, oral opioids. Adverse effects can include gastrointestinal complaints such as nausea (34% to 72%), vomiting (12% to 41%), and diarrhea (3% to 26%).[18] Less common adverse effects include headache, dizziness, and thermoregulatory effects such as fever or hot flashes.[21]

Patients are generally encouraged to have follow up after medication abortion within 2 weeks to ensure that the pregnancy has been effectively terminated and is not ongoing, which occurs in 0.5% 3% of cases (a subset of the 1% to 7% who require vacuum aspiration to complete the abortion).[21] Ultra sound can be performed approximately 1 week after mifepris tone administration or sooner if the patient reports pregnancy expulsion. Alternatively, serum human chorionic gonadotropin

PCSF267                    2021 REMS 000169

Case 1:17-cv-00493-JAO-RT   Document 148   Filed 05/07/21   Page 1 of 6     PageID #: 3190
Case 1:17-cv-00493-JAO-RT     Document 240-3     Filed 05/27/25     Page 311 of 407
PageID.8489

ARUN G. RAO
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director

HILARY K. PERKINS
Assistant Director

JONATHAN E. AMGOTT (DCBN 1031947)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 5th Street, N.W.
Washington, D.C. 20530
(202) 532-5025
Jonathan.E.Amgott@usdoj.gov

*Attorneys for Defendants Xavier Becerra,* et al.
*(see signature page for complete list)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al*., <br><br> Defendants. | CIV. NO. 1:17-00493 JAO-RT <br><br> **JOINT MOTION TO STAY CASE PENDING AGENCY REVIEW** <br><br> District Judge: Jill A. Otake <br> Summary Judgment Hearing: July 9, 2021, at 9:00 AM <br> Trial Date: Vacated per Dkt. 82 |

Case 1:17-cv-00493-JAO-RT   Document 148   Filed 05/07/21   Page 2 of 6   PageID #: 3191
Case 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 312 of 407
PageID.8490

The Parties jointly seek a stay of this matter in light of Defendant U.S. Food and Drug Administration's ("FDA") current review of the risk evaluation and mitigation strategy ("REMS") at issue in this case.  The Parties agree that the outcome of FDA's review could have a material impact on the course of this litigation.  Accordingly, to conserve the resources of the Court and the Parties, the Parties seek a stay of this matter until December 1, 2021, with a joint status report, to include an update on the status of FDA's review, due on November 1, 2021.

FDA is reviewing the elements of the REMS for Mifeprex and its approved generic, Mifepristone Tablets, 200 mg, in accordance with the REMS assessment provisions of Section 505-1 of the Federal Food, Drug, and Cosmetic Act.  In conducting this review, FDA is relying on information submitted by the sponsors of the new drug application ("NDA") and the abbreviated new drug application ("ANDA") and information from other sources, including published literature. FDA also commits to review any relevant data and evidence submitted by the Plaintiffs.

FDA recently completed a review of the in-person dispensing requirement (and related provisions) of the REMS in the context of the COVID-19 public health emergency ("PHE").  On April 12, 2021, in response to an April 2020 request from the American College of Obstetricians and Gynecologists ("ACOG"), the Agency decided that it intends to exercise enforcement discretion with respect

2021 REMS 000644

Case 1:17-cv-00493-JAO-RT Document 148 Filed 05/07/21 Page 3 of 6 PageID #: 3192
Case 1:17-cv-00493-JAO-RT Document 240-3 Filed 05/27/25 Page 313 of 407
PageID.8491

to the in-person dispensing requirement (and related provisions) during the

pendency of the PHE.

In a letter announcing its decision, FDA stated that "provided the other

requirements of the Mifepristone REMS Program are met," the Agency "intends to

exercise enforcement discretion during the COVID-19 PHE with respect to the in-

person dispensing requirement of the Mifepristone REMS Program, including any

in-person requirements that may be related to the Patient Agreement Form." Joint

Stips. of Facts, Ex. J, at 2, Dkt. 140-10. FDA also stated that, "to the extent all of

the other requirements of the Mifepristone REMS Program are met," the Agency

"intends to exercise enforcement discretion during the COVID-19 PHE with

respect to the dispensing of mifepristone through the mail either by or under the

supervision of a certified prescriber, or through a mail-order pharmacy when such

dispensing is done under the supervision of a certified prescriber." *Id.* If FDA's

review of the REMS is not completed before the expiration of the PHE, FDA

agrees that it intends to exercise this enforcement discretion for a further 30 days

following the end of the PHE to afford an opportunity for the mifepristone drug

sponsors and mifepristone prescribers to modify their operational protocols.

In light of FDA's decision, the parties in *ACOG v. FDA*, No. 8:20-cv-1320-

TDC (D. Md.), recently filed a joint status report indicating that the plaintiffs

intend to voluntarily dismiss their case challenging the restricted dispensing

2021 REMS 000645

Case 1:17-cv-00493-JAO-RT   Document 148   Filed 05/07/21   Page 4 of 6   PageID #: 3193
Case 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 314 of 407
PageID.8492

requirement (and related provisions) during the PHE.  The parties also stated their

intention to jointly move for dismissal of appeals pending in the U.S. Court of

Appeals for the Fourth Circuit, No. 20-1784.

Similarly, the outcome of FDA's review of the REMS could have a material

effect on the issues before this Court.  Thus, to conserve the resources of the Court

and the Parties, the Parties jointly seek a stay of proceedings until December 1,

2021.  *See, e.g.*, *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863 (9th

Cir. 1979) (recognizing district court authority to stay litigation in the interest of

efficiency and fairness "pending resolution of independent proceedings which bear

upon the case"); EO (Jan. 23, 2020), Dkt. 107.

Previously, the Court stayed this case *sua sponte* pending the Supreme

Court's ruling in *June Medical Services, L. L. C. v. Russo*, 140 S. Ct. 2103 (2020).

*See* EO (Jan. 23, 2020), Dkt. 107; EO (Jan. 13, 2020), Dkt. 102.  Following the

*June Medical* decision and certain proceedings in the *ACOG* litigation, the Court

recently lifted its stay in response to Plaintiffs' unopposed motion.  *See* EO (Mar.

5, 2021), Dkt. 128; Pls.' Unopposed Mot. to Lift Stay & Reactivate Summ. J.

Briefing, Dkt. 127.  Plaintiffs made their request to lift the stay, however, prior to

FDA's April 2021 decision and prior to FDA's current review of the REMS.  In

light of these developments, the stay presently sought by the Parties would once

again enable the Court to handle this case "with economy of time and effort for

Case 1:17-cv-00493-JAO-RT   Document 148   Filed 05/07/21   Page 5 of 6   PageID #: 3194
Case 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 315 of 407
PageID.8493

itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

For the foregoing reasons, the Parties respectfully propose that the Court enter an Order: (1) staying this litigation until December 1, 2021; (2) directing the Parties to submit a joint status report by November 1, 2021; and (3) permitting any Party to move to lift or extend the stay for good cause.

2021 REMS 000647

Case 1:17-cv-00493-JAO-RT Document 148 Filed 05/07/21 Page 6 of 6 PageID #: 3195
Case 1:17-cv-00493-JAO-RT Document 240-3 Filed 05/27/25 Page 316 of 407
PageID.8494

Dated: May 7, 2021

Respectfully submitted,

*/s/ Jonathan E. Amgott*
JONATHAN E. AMGOTT
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice

*Attorney for Defendants Xavier Becerra, J.D., in his official capacity as Secretary, U.S. Department of Health and Human Services; U.S. Food and Drug Administration; and Janet Woodcock, M.D., in her official capacity as Acting Commissioner of Food and Drugs*

*/s/ Julia Kaye*
JULIA KAYE*
RACHEL REEVES*
LORIE CHAITEN*
WHITNEY WHITE*
RUTH HARLOW*
American Civil Liberties Union Foundation

JONGWOOK "WOOKIE" KIM
ACLU of Hawai'i Foundation

JOHN FREEDMAN*
Arnold & Porter Kaye Scholar, LLP

* admitted *pro hac vice*

*Attorneys for Plaintiffs Graham T. Chelius, M.D., Society of Family Planning, and California Academy of Family Physicians*

6

Case 1:17-cv-00493-JAO-RT   Document 149   Filed 05/07/21   Page 1 of 2   PageID #: 3198
Case 1:17-cv-00493-JAO-RT   Document 240-3   Filed 05/27/25   Page 317 of 407
PageID.8495

ARUN G. RAO
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director

HILARY K. PERKINS
Assistant Director

JONATHAN E. AMGOTT (DCBN 1031947)
Trial Attorney
Consumer Protection Branch
Civil Division
U.S. Department of Justice
450 5th Street, N.W.
Washington, D.C. 20530
(202) 532-5025
Jonathan.E.Amgott@usdoj.gov

*Attorneys for Defendants Xavier Becerra, J.D.,*
*in his official capacity as Secretary,*
*U.S. Department of Health and Human Services;*
*U.S. Food and Drug Administration; and*
*Janet Woodcock, M.D., in her official capacity as*
*Acting Commissioner of Food and Drugs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al*., | CIVIL NO. 17-00493 JAO-RT |
| Plaintiffs, | |
| v. | **ORDER GRANTING JOINT MOTION TO STAY CASE PENDING AGENCY REVIEW** |
| XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al*., | |
| Defendants. | |

2021 REMS 000649

Case 1:17-cv-00493-JAO-RT   Document 149   Filed 05/07/21   Page 2 of 2     PageID #: 3199
Case 1:17-cv-00493-JAO-RT    Document 240-3    Filed 05/27/25    Page 318 of 407
PageID.8496

The parties jointly seek a stay of this matter in light of Defendant U.S. Food and Drug Administration's current review of the risk evaluation and mitigation strategy ("REMS") at issue in this case.  After reviewing the parties' Joint Motion to Stay Case Pending Agency Review, ECF No. 148, and for good cause shown, the Court GRANTS  the parties' Joint Motion.  This litigation is stayed until December 1, 2021.  The parties are directed to submit a joint status report every 90 days, starting on August 5, 2021.  Any party may move to lift or extend the stay for good cause.

IT IS SO ORDERED.

DATED:     Honolulu, Hawaiʻi, May 7, 2021.



Jill A. Otake
United States District Judge

CV 17-00493 JAO-RT, *Chelius, et al. v. Becerra, et al.*; ORDER GRANTING JOINT MOTION TO STAY CASE PENDING AGENCY REVIEW

2

2021 REMS 000650

**Planned Parenthood**
Care. No matter what.®

Planned Parenthood Federation of America, Inc.

July 28, 2021



(b)(6)/PPI

Food and Drug Administration



(b)(6)/PPI

Food and Drug Administration

**RE: FDA Review of Mifepristone**

Dear  (b)(6)/PPI  ,

Planned Parenthood Federation of America (PPFA) submits this letter to the  (b)(6)/PPI  (b)(6)/PPI  and the  (b)(6)/PPI  in support of removing mifepristone from the Risk Evaluation and Mitigation Strategy (REMS) program. Requiring mifepristone—one of two pills used in a medication abortion—to be dispensed at a health center, medical office, or hospital by a health care provider who has pre-registered with the drug manufacturer and arranged to stock the medication at their facility is absolutely unnecessary to ensure its safe use. Planned Parenthood takes every opportunity to weigh in on policies and guidelines that harm the communities served by our affiliates across the country, and that is why we are reaching out about this critical issue.

PPFA is the nation's leading organization dedicated to public education and advocacy in the field of reproductive health care. PPFA's core mission is to ensure the provision of comprehensive reproductive health care services, to provide educational programs relating to reproductive and sexual health, and to advocate for public policies to ensure access to health services—including and especially for individuals with low incomes or from underserved communities. Planned Parenthood affiliates provide high-quality, evidence-based sexual and reproductive health care services, as well as primary and preventive care, for 2.4 million people of all genders across the United States. Planned Parenthood health centers have been providing this care for more than 100 years; we follow the science and best practices to provide excellent care to our patients.

The services provided by Planned Parenthood health centers are critical for underserved populations, specifically communities of color, the LGBTQ+ community, individuals with low incomes, and people with multi-marginal identities. Due to systemic barriers and discrimination,

### F. Clinicians can effectively screen for intimate partner violence via telemedicine.

Planned Parenthood providers take reproductive coercion seriously, and they, as health care providers, are in an ideal position to identify intimate partner violence (IPV).[58] Removing the in-person dispensing requirement for mifepristone will not prevent providers from effectively screening for IPV, sexual assault, and reproductive coercion because the screening is nearly identical whether provided via telemedicine or in person. The core elements of such a screening are building trust and rapport with patients[59]—things that can be done successfully during a telemedicine appointment. If there are concerns about a patient's privacy during a telemedicine visit, clinicians can safeguard the patient's privacy through methods such as using the "chat" function that accompanies telemedicine platforms, asking yes-or-no questions, and waiting until a partner who unexpectedly enters the room to leave before proceeding. A clinician may also use written communication, such as self-administered or computerized screenings, to effectively screen patients for IPV.

### III. The REMS restrictions on mifepristone create unnecessary barriers to safe and legal abortion care.

For too many people, especially those living in rural and medically-underserved areas, a major barrier to accessing medication abortion is the REMS in-person dispensing requirement. As of 2017, 89% of U.S. counties lacked an abortion clinic with 38% of women of reproductive age living in said counties.[60] In these medically-isolated communities, if telemedicine is unavailable, patients must go without care or else travel hundreds of miles for high-quality care, resulting in

---

[58] ACOG, Comm. Op. No. 518: *Intimate Partner Violence Intimate Partner Violence*, Comm. on Health Care for Underserved Women (Feb. 2012), *available at* https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2012/02/intimate-partner-violence.

[59] *See* Neha A. Deshpande & Annie Lewis-O'Connor, *Screening for Intimate Partner Violence During Pregnancy*, 63 Obstetrics & Gynecology 141 (2013).

[60] Rachel K. Jones et al., *Abortion Incidence and Service Availability in the United States*, 2017, Guttmacher Inst. (Sept. 2019); *see also* Debra B. Stulberg et al., *Abortion Provision Among Practicing Obstetrician-Gynecologists*, 118 Obstetrics & Gynecology 609, 609, 613–14 (OB/GYNs practicing in urban areas are more likely to provide abortion care than those in non-urban areas); Nat'l Acads., *supra* note 6, at 114–15, 118 (2018); *see also, e.g., id.* ("Among practicing [OB/GYNs], 97% encountered patients seeking abortions, while 14% performed them."); Eve Espey et al., *Abortion Education in Medical Schools: A National Survey*, 192 Am. J. Obstetrics & Gynecology 640, 640–42 (2005) (17% of U.S. medical schools reported no formal education about abortion in the four years of medical school, and in the third-year OB/GYN rotation, 23% reported no formal abortion education); Alison Block et al., *Postgraduate Experiences with an Advanced Reproductive Health and Abortion Training and Leadership Program*, 49 Fam. Med. 706, 707 (2017) (only 6% of family medicine residencies offered opt-out abortion training in 2016).

significant gaps in care and poor health outcomes, including higher rates of unintended pregnancy.

Removing the in-person REMS restriction for mifepristone will reduce significant barriers to accessing medication abortion for patients. Offering medication abortion via telemedicine offers patients access to safe, legal abortion under the supervision of a health care provider from the comfort of their own home. This is a private, patient-centered option for ending a pregnancy, in a setting of their choosing, while still providing necessary support and information from a health care professional. It also reduces or eliminates the number of required health center trips for patients, which can be the difference between obtaining an abortion or not for patients who find it difficult to secure transportation, child care, and time off from work. During the current public health emergency, abortion by telemedicine has reduced unnecessary exposure for both patients and health care staff to COVID-19 without decreasing the safety or efficacy of medication abortion. Burdensome and unnecessary restrictions on medication abortion exacerbate the health inequities already experienced by those who are struggling to make ends meet, particularly individuals living in rural communities; LGBTQ+ patients; and Black, Latinx, AAPI and Indigenous patients, who already face disproportionate economic and health care barriers due to systemic discrimination. These barriers are compounded for those living at the intersections of multi-marginal identities and further push care out of reach.

For the reasons stated above, the REMS restrictions for mifepristone are medically unnecessary, do not enhance abortion safety, and impede abortion access. Mifepristone is safe and effective and can be provided safely without the REMS. Accordingly, Planned Parenthood strongly urges the FDA to remove the REMS requirements for mifepristone.

Respectfully,

Gillian Dean, M.D., M.P.H.
Senior Director of Medical Services
Planned Parenthood Federation of America

PCSF270                                                2021 REMS 000679

# The Comparative Safety of Legal Induced Abortion and Childbirth in the United States

*Elizabeth G. Raymond, MD, MPH, and David A. Grimes, MD*

**OBJECTIVE:** To assess the safety of abortion compared with childbirth.

**METHODS:** We estimated mortality rates associated with live births and legal induced abortions in the United States in 1998–2005. We used data from the Centers for Disease Control and Prevention's Pregnancy Mortality Surveillance System, birth certificates, and Guttmacher Institute surveys. In addition, we searched for population-based data comparing the morbidity of abortion and childbirth.

**RESULTS:** The pregnancy-associated mortality rate among women who delivered live neonates was 8.8 deaths per 100,000 live births. The mortality rate related to induced abortion was 0.6 deaths per 100,000 abortions. In the one recent comparative study of pregnancy morbidity in the United States, pregnancy-related complications were more common with childbirth than with abortion.

**CONCLUSION:** Legal induced abortion is markedly safer than childbirth. The risk of death associated with childbirth is approximately 14 times higher than that with abortion. Similarly, the overall morbidity associated with childbirth exceeds that with abortion.

*(Obstet Gynecol 2012;119:215–9)*

*DOI: 10.1097/AOG.0b013e31823fe923*

**LEVEL OF EVIDENCE: II**

---

See related editorial on page 212.

---

*From Gynuity Health Projects, New York, New York; and the Department of Obstetrics and Gynecology, University of North Carolina School of Medicine, Chapel Hill, North Carolina.*

*The authors thank Rachel K. Jones, PhD and Lawrence B. Finer, PhD of the Guttmacher Institute and Suzanne Zane, DVM, of the Division of Reproductive Health, Centers for Disease Control and Prevention, for providing essential input to develop the manuscript.*

*Corresponding author: Elizabeth G. Raymond, MD, MPH, Gynuity Health Projects, 15 East 26th Street, Suite 801, New York, NY 10010; e-mail: eraymond@gynuity.org.*

**Financial Disclosure**
*The authors did not report any potential conflicts of interest.*

*© 2012 by The American College of Obstetricians and Gynecologists. Published by Lippincott Williams & Wilkins.*
ISSN: 0029-7844/12

Decades of research have demonstrated that legal induced abortion is safe. Mortality and serious acute complications are extremely rare.[1–4] Recently, allegations of later sequelae—breast cancer and mental illness—were refuted.[5,6] However, laws in 22 states in the United States now require that before an abortion is performed, the patient must be given detailed, specific verbal or written information about potential risks. In some cases, this material is misleading or patently wrong.[7]

Health policy and medical practice should be based on the best available evidence. In the past 10 years, the introduction of new abortion methods may have affected the overall safety of the procedure. Notably, mifepristone was approved by the U.S. Food and Drug Administration for medical abortion in 2000; by 2008, approximately 17% of all nonhospital abortions were performed medically rather than surgically.[8] In addition, changes in the risk profile of pregnant women—for example, as a result of growing obesity[9] and an upward shift in the maternal age distribution[10]—as well as the rising cesarean delivery rate[10] may have enhanced the risks of the alternative to abortion, childbirth. The objective of this review is to provide an updated assessment[2] of the safety of abortion relative to delivery.

## MATERIALS AND METHODS

We estimated mortality rates associated with live births and legal induced abortions in the United States in 1998–2005 by combining published data from several national data sets. For mortality related to live birth, we divided the number of pregnancy-related deaths among women delivering live neonates as reported by the Centers for Disease Control and Prevention's (CDC) Pregnancy Mortality Surveillance System[11] by the number of live births as reported on birth certificates.[10] The Pregnancy Mortality Surveillance System collects and reviews death certificates and other information from deceased women who were recorded as pregnant within a

Copyright© American College of Obstetricians and Gynecologists          PCSF271                    2021 REMS 000695

specified time period before death in all 50 states and Washington, DC. To estimate abortion-related mortality, we divided the number of legal abortion-related deaths from the 50 states and Washington, DC, reported by the CDC[12] by the number of legal abortions estimated by the Guttmacher Institute from its annual surveys of all U.S. hospitals, clinics, and physician offices known or suspected to have provided abortion services.[8] We did not calculate confidence intervals around mortality rates because these estimates are derived from the full population.

In addition, we searched PubMed for relevant studies for other population-based comparative data on mortality and morbidity of abortion and childbirth in the United States since 2000. We used the following search strategies: (maternal morbidity [MESH] OR maternal mortality [MESH]) AND pregnancy outcome AND United States [MESH] (73 results); pregnancy outcome AND (maternal morbidity [MESH] OR maternal mortality [MESH]) AND United States [tiab] (49 results); pregnancy outcome AND abortion, induced AND morbidity AND United States [MESH] (94 results). We limited our review to reports that included data on both pregnancy outcomes in a single population with contemporaneous, uniform ascertainment of outcomes.

Because women who choose abortion differ in underlying risk for adverse outcomes from women who opt to continue a pregnancy, we also compared the characteristics of each group. We obtained data about characteristics of U.S. women having abortions and live births in 2008 from the Guttmacher Institute 2008 Abortion Patient survey[13] and from birth certificate data[11] (www.cdc.gov/nchs/data_access/vitalstats/VitalStats_Births.htm. Retrieved 28 May 2011).

## RESULTS

Between 1998 and 2005, the pregnancy-associated mortality rate among women known to have delivered live neonates in the United States was 8.8 deaths per 100,000 live births (Table 1). Of all pregnancy-associated deaths of women with known pregnancy outcome, 71% occurred after live births[11]; if 71% of women with unknown pregnancy outcome who died of pregnancy-associated causes are also assumed to have had live births, the mortality estimate increases to 10.4 deaths per 100,000 live births. The mortality rate related to legal induced abortion during that same interval was 0.6 deaths per 100,000 abortions. Thus, according to federal statistics, the risk of death associated with childbirth was approximately 14 times higher than that with abortion.

**Table 1. Pregnancy-Related Mortality in Women With Live Births or Legal Induced Abortions in the United States, 1998–2005**

| | Deaths* | Pregnancies† | Deaths per 100,000 Pregnancies |
|---|---|---|---|
| Live birth | | 32,347,794 | |
| Known live birth | 2,856 | | 8.8 |
| Known live births+71% of pregnancies with unknown outcome | 3,352 | | 10.4 |
| Legal abortion | 64 | 10,185,100 | 0.6 |

\* Number of deaths related to live births from Berg et al[11]; number of deaths related to abortion from Pazol et al.[12]
† Number of live births from Martin et al[10]; number of abortions from Jones et al.[8]

Only one recent study provided comparative data on morbidity associated with various pregnancy outcomes in the United States.[14] Epidemiologists at the CDC examined all International Classification of Diseases, 9th Revision, Clinical Modification diagnoses reported during or within 8 weeks after all 24,481 pregnancies among members of the Kaiser Permanente Northwest Health Maintenance Organization between 1998 and 2001. Of these pregnancies, 16,824 ended in live birth, 4,192 in induced abortion, and the rest in spontaneous abortions, stillbirths, or other outcomes. Common maternal morbidities were defined as conditions either unique to pregnancy or potentially exacerbated by pregnancy that occurred in at least 5% of all pregnancies.

Every complication was more common among women having live births than among those having abortions (Fig. 1). The relative risks of morbidity with live birth compared with abortion were 1.3 for mental health conditions, 1.8 for urinary tract infection, 4.4 for postpartum hemorrhage, 5.2 for obstetric infections, 24 for hypertensive disorders of pregnancy, 25 for antepartum hemorrhage, and 26 for anemia.

In 2008, the median age of women having abortions was younger than that of women having live births, but the proportion of women age 40 years or older was comparable (Table 2). Nearly half of women in each group had no education beyond high school. Patients undergoing abortion were twice as likely to be unmarried or non-Hispanic African American women. Nulliparity was equally common in the two groups.

Copyright© American College of Obstetricians and Gynecologists



**Fig. 1.** Common maternal morbidities associated with live birth and abortion, 1998–2001. Common maternal morbidities defined as conditions either unique to pregnancy or potentially exacerbated by pregnancy that occurred in at least 5% of all pregnancies. Data from Bruce FC, Berg CJ, Hornbrook MC, Whitlock EP, Callaghan WM, Bachman DJ, et al. Maternal morbidity rates in a managed care population. Obstet Gynecol 2008;111:1089–95.

*Raymond. Safety of Abortion Compared With Childbirth. Obstet Gynecol 2012.*

## DISCUSSION

Legal abortion in the United States remains much safer than childbirth. The difference in risk of death is approximately 14-fold. Abortion also is associated with substantially less pregnancy-related morbidity. These results are consistent with prior analyses of national data.[2] Indeed, the relative safety of abortion has increased substantially since the first decade after nationwide legalization, when child birth-related mortality was approximately seven times the mortality related to abortion.[15] Although we could not find data that allowed comparable calculations of mortality or morbidity associated with surgical and medical abortion, Danco Laboratories, the distributor of mifepristone in the United States, has identified only 11 pregnancy-related deaths among the estimated 1.6 million women who have used the drug in the United States since 2000, which is a mortality rate of 0.7 per 100,000 users (Abigail Long, Danco Laboratories, LLC, personal communication). Clearly, the growing use of medical regimens has not increased relative abortion risk overall.

The disparity between abortion and childbirth safety is not surprising. Pregnancies ending in abortion are substantially shorter than those ending in childbirth and thus entail less time for pregnancy-related problems to occur. Many dangerous pregnancy-related complications such as pregnancy-induced hypertension and placental abnormalities manifest themselves in late pregnancy; early abortion avoids these hazards. Moreover, in the United States in 2008, one third of births occurred by cesarean delivery, an abdominal operation with substantial morbidity.[10,16]

These results may underestimate the relative safety of choosing abortion over continuing a pregnancy for two reasons. First, our comparison was limited to live

**Table 2.** Characteristics of Women Having Live Births and Abortions in the United States, 2008

|  | Live Births* | Abortions† |
|---|---|---|
| Age (y) | | |
| Younger than 15 | 5,764 (0.1) | 4,850 (0.4) |
| 15–19 | 434,758 (10.2) | 208,520 (17.2) |
| 20–24 | 1,052,184 (24.8) | 404,920 (33.4) |
| 25–29 | 1,195,774 (28.2) | 295,810 (24.4) |
| 30–34 | 956,716 (22.5) | 163,670 (13.5) |
| 35–39 | 488,875 (11.5) | 99,410 (8.2) |
| 40 or older | 113,623 (2.7) | 35,160 (2.9) |
| Total | 4,247,694 (100) | 1,212,340 (100) |
| Ethnicity or race | | |
| Hispanic | 1,041,239 (24.7) | 301,880 (24.9) |
| Non-Hispanic white | 2,267,817 (53.8) | 437,660 (36.1) |
| Non-Hispanic African American | 623,029 (14.8) | 358,860 (29.6) |
| Non-Hispanic other | 282,783 (6.7) | 113,960 (9.4) |
| Total | 4,214,868 (100) | 1,212,360 (100) |
| Marital status | | |
| Married | 2,521,128 (59.4) | 179,430 (14.8) |
| Unmarried | 1,726,566 (40.6) | 1,032,930 (85.2) |
| Total | 4,247,694 (100) | 1,212,360 (100) |
| Education among women aged 20 y and older | | |
| Less than high school | 435,462 (18.1) | 122,870 (12.3) |
| High school or GED | 630,970 (26.2) | 282,710 (28.3) |
| Some college | 685,206 (28.4) | 394,590 (39.5) |
| College graduate | 659,044 (27.3) | 198,800 (19.9) |
| Total | 2,410,682 (100) | 998,970 (100) |
| Number of prior births | | |
| 0 | 1,703,921 (40.4) | 474,030 (39.1) |
| 1 | 1,330,540 (31.5) | 321,270 (26.5) |
| 2 or more | 1,186,657 (28.1) | 418,260 (34.5) |
| Total | 4,221,118 (100) | 1,213,560 (100) |

GED, high school equivalency certification.

Data are n (%).

* Data on live births from Martin[10] and the National Center for Health Statistics. Numbers with unknown status are excluded from the table.

† Data on abortion from Jones et al.[13]

Copyright© American College of Obstetricians and Gynecologists

PCSF273

2021 REMS 000697



births; we omitted other pregnancy outcomes: spontaneous abortion, stillbirths, ectopic pregnancies, and gestational trophoblastic disease. The number of pregnancies ending in these outcomes was not available. Stillbirths and ectopic pregnancies are associated with higher risks of death than is live birth.[2] We likely therefore underestimated the mortality associated with opting for pregnancy continuation.

Second, patients undergoing abortion appear to be at higher underlying risk than women who opt for delivery. Women who had abortions were more likely to be African American or unmarried, demographic characteristics strongly associated with increased mortality.[11,17] In addition, because comorbidities are sometimes the motivation for abortion, the underlying medical risk of patients undergoing abortion may be higher than that of other pregnant women. Women in good health may be more likely to choose to continue their pregnancies than those who are ill (selection bias termed the "healthy mother" effect[18]). Thus, mortality among patients undergoing abortion may overestimate the mortality risk of the procedure itself.

This study has both strengths and weaknesses. Strengths include the use of the most recent CDC statistics on pregnancy-related mortality for the entire country. Similarly, the cohort study of morbidity had uniform, contemporaneous ascertainment of outcomes in a large health maintenance organization. We systematically reviewed the past decade of PubMed publications for relevant data. Weaknesses include the likely underreporting of deaths, possibly differential by pregnancy outcome (abortion or childbirth).[19] The analytic rules used by the original researchers to handle incomplete or inconsistent data on women's characteristics may have led to errors. Our assessment of women's underlying risk was necessarily incomplete. Moreover, both abortion and childbirth can cause mortality and morbidity long after the end of the pregnancy; these cases are not included in our analysis. However, these weaknesses are unlikely to account for the large differences in mortality and morbidity found in this analysis.

Pregnant women considering their options deserve accurate information about comparative risks. Currently, some state laws and policies violate this standard. In Texas, for example, the mandatory 23-page pamphlet, "A Woman's Right-to-Know", lists 12 potential complications of medical abortion with mifepristone and misoprostol, 12 of suction curettage, and 11 of dilation and evacuation. In contrast, the pamphlet names only six potential complications of

vaginal delivery and eight of cesarean delivery.[20] To laypersons who have little understanding of medical risk[21] but can count complications, these tallies may imply that abortion has more complications than does childbirth. Similarly, the mortality statistics are presented as fractions with one in the numerator and with large denominators (eg, 8,475). Empiric evidence[22,23] has demonstrated that women with less formal education than a college degree have trouble comparing risks expressed in this manner. Mortality risk should be expressed as number of deaths per 100,000, which is an easier format to understand.[22,23]

Laws that compel exposure of women to such biased material thwart informed choice and contravene the ethical principle of autonomy.[24] Moreover, they put clinicians in the untenable position of having to be complicit in misleading their patients. Since the early 1970s, the public health evidence has been clear and incontrovertible: induced abortion is safer than childbirth.

## REFERENCES

1. Cates W Jr, Rochat RW, Grimes DA, Tyler CW Jr. Legalized abortion: effect on national trends of maternal and abortion-related mortality (1940 through 1976). Am J Obstet Gynecol 1978;132:211–4.

2. Grimes DA. Estimation of pregnancy-related mortality risk by pregnancy outcome, United States, 1991 to 1999. Am J Obstet Gynecol 2006;194:92–4.

3. Hamoda H, Templeton A. Medical and surgical options for induced abortion in first trimester. Best Pract Res Clin Obstet Gynaecol 2010;24:503–16.

4. Grimes DA, Raymond EG. Medical abortion for adolescents. BMJ 2011;342:d2185.

5. Beral V, Bull D, Doll R, Peto R, Reeves G; Collaborative Group on Hormonal Factors in Breast Cancer. Breast cancer and abortion: collaborative reanalysis of data from 53 epidemiological studies, including 83,000 women with breast cancer from 16 countries. Lancet 2004;363:1007–16.

6. Charles VE, Polis CB, Sridhara SK, Blum RW. Abortion and long-term mental health outcomes: a systematic review of the evidence. Contraception 2008;78:436–50.

7. Counseling and waiting periods for abortion. State policies in brief. New York (NY): Guttmacher Institute; 2011.

8. Jones RK, Kooistra K. Abortion incidence and access to services in the United States, 2008. Perspect Sex Reprod Health 2011;43:41–50.

9. Kim SY, Dietz PM, England L, Morrow B, Callaghan WM. Trends in pre-pregnancy obesity in nine states, 1993–2003. Obesity (Silver Spring) 2007;15:986–93.

10. Martin JA, Hamilton BE, Sutton PD, Ventura SJ, Mathews TJ, Osterman MJ. Births: final data for 2008. Hyattsville (MD): National Center for Health Statistics; 2010.

11. Berg CJ, Callaghan WM, Syverson C, Henderson Z. Pregnancy-related mortality in the United States, 1998 to 2005. Obstet Gynecol 2010;116:1302–9.

12. Pazol K, Zane S, Parker WY, Hall LR, Gamble SB, Hamdan S, et al. Abortion surveillance–United States, 2007. MMWR

Copyright© American College of Obstetricians and Gynecologists

PCSF274 2021 REMS 000698



Surveill Summ 2011;60:1–42. Erratum in MMWR Surveill Summ 2011;60:315.

13. Jones RK, Kavanaugh ML. Changes in abortion rates between 2000 and 2008 and lifetime incidence of abortion. Obstet Gynecol 2011;117:1358–66.

14. Bruce FC, Berg CJ, Hornbrook MC, et al. Maternal morbidity rates in a managed care population. Obstet Gynecol 2008;111:1089–95.

15. LeBolt SA, Grimes DA, Cates W Jr. Mortality from abortion and childbirth. Are the populations comparable? JAMA 1982;248:188–91.

16. Liu S, Liston RM, Joseph KS, Heaman M, Sauve R, Kramer MS; Maternal Health Study Group of the Canadian Perinatal Surveillance System. Maternal mortality and severe morbidity associated with low-risk planned cesarean delivery versus planned vaginal delivery at term. CMAJ 2007;176:455–60.

17. Bartlett LA, Berg CJ, Shulman HB, Zane SB, Green CA, Whitehead S, et al. Risk factors for legal induced abortion-related mortality in the United States. Obstet Gynecol 2004;103:729–37.

18. Valachis A, Tsali L, Pesce LL, Polyzos NP, Dimitriadis C, Tsalis K, et al. Safety of pregnancy after primary breast carcinoma in young women: a meta-analysis to overcome bias of healthy mother effect studies. Obstet Gynecol Surv 2010;65:786–93.

19. Horon IL. Underreporting of maternal deaths on death certificates and the magnitude of the problem of maternal mortality. Am J Public Health 2005;95:478–82.

20. A woman's right to know. Austin (TX): Texas Department of Health; 2003.

21. Reyna VF, Nelson WL, Han PK, Dieckmann NF. How numeracy influences risk comprehension and medical decision making. Psychol Bull 2009;135:943–73.

22. Grimes DA, Snively GR. Patients' understanding of medical risks: implications for genetic counseling. Obstet Gynecol 1999;93:910–4.

23. van Vliet HA, Grimes DA, Popkin B, Smith U. Lay persons' understanding of the risk of Down's syndrome in genetic counselling. BJOG 2001;108:649–50.

24. Ethical decision making in obstetrics and gynecology. ACOG Committee Opinion No. 390, December 2007. American College of Obstetricians and Gynecologists. Obstet Gynecol 2007;110:1479–87.



BJOG
An International Journal of Obstetrics and Gynaecology

**VACANCY: EDITOR-IN-CHIEF**
BJOG is inviting applications for the position of Editor-in-Chief as Philip Steer comes to the end of his 7 year term in October 2012.

**OVERVIEW OF ROLE**

The Editor-in-Chief's role is to lead on the strategic direction of the journal. They must also supervise and coach an excellent team of scientific editors with the support of three deputy editors-in-chief and take final responsibility for all published articles. The role requires a high level of expertise to oversee new developments and to provide intellectual input and experience. The role also requires someone who understands the business side to the extent that they can appreciate the publishing business model and how it is developing. Editorial and strategic experience is essential.

The Editor-in-Chief would need to share the values of BJOG: journal quality (selection, validation and improvement), influence and reputation.

This is a professional role with an annual stipend of £40,000.

**Closing date for applications: 17th February 2012**
Shortlisted applicants will be invited for interview in March 2012
Start Date as BJOG Scientific Editor: May 2012
Start Date as Editor-in-Chief: November 2012

For more information on this role, a job description and person specification, please visit BJOG's website at **www.BJOG.org** or contact Elizabeth Hay, Managing Editor by email **ehay@rcog.org.uk** or telephone +44 (0) 20 7772 6440

Copyright© American College of Obstetricians and Gynecologists
PCSF275    2021 REMS 000699






# ACOG PRACTICE BULLETIN

## Clinical Management Guidelines for Obstetrician–Gynecologists

NUMBER 225 *(Replaces Practice Bulletin Number 143, March 2014)*

**Committee on Practice Bulletins—Gynecology and the Society of Family Planning.** This Practice Bulletin was developed jointly by the Committee on Practice Bulletins  Gynecology and the Society of Family Planning in collaboration with Mitchell D. Creinin, MD, and Daniel A. Grossman, MD.

# Medication Abortion Up to 70 Days of Gestation

*Medication abortion, also referred to as medical abortion, is a safe and effective method of providing abortion. Medication abortion involves the use of medicines rather than uterine aspiration to induce an abortion. The U.S. Food and Drug Administration (FDA)-approved medication abortion regimen includes mifepristone and misoprostol. The purpose of this document is to provide updated evidence-based guidance on the provision of medication abortion up to 70 days (or 10 weeks) of gestation. Information about medication abortion after 70 days of gestation is provided in other ACOG publications (1).*

## Background

### Epidemiology

An estimated one in four women in the United States will have an abortion in her lifetime. In 2017, an estimated 60% of abortions in the United States occurred at or before 10 weeks of gestation and medication abortion comprised 39% of all abortions (2). Between 2006 and 2015, there was a shift in the timing of abortion, with abortions taking place at earlier gestational ages; this is likely due, in part, to availability of medication abortion (3). From 2014 to 2017, the number of nonhospital facilities that provided medication abortion increased by 25% (2). A recent survey of American College of Obstetricians and Gynecologists (ACOG) Fellows and Junior Fellows found that 14% had provided medication abortion in the prior year (4).

### Medication Abortion

The medication abortion regimen supported by major medical organizations nationally and internationally includes two medications, mifepristone and misoprostol (5, 6). If mifepristone is unavailable, then a misoprostol-only regimen is an acceptable alternative (5). Mifepristone is a selective progesterone receptor modulator that binds to the progesterone receptor with an affinity greater than progesterone itself but does not activate the receptor, thereby acting as an antiprogestin (7). Mifepristone's known actions on a uterus during pregnancy include decidual necrosis, cervical softening, and increased uterine contractility and prostaglandin sensitivity (8, 9). Misoprostol is a prostaglandin E1 analogue that causes cervical softening and uterine contractions. It is approved by the FDA for oral administration to prevent gastric ulcers in individuals who take anti-inflammatory drugs on a long-term basis, and it is included in the FDA-approved labeling of mifepristone for use in abortion (10).

The FDA currently restricts mifepristone access under the risk evaluation and mitigation strategy (REMS) program, which includes a requirement that the drug be "dispensed to patients only in certain health-care settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber" (10). However, the REMS


© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF276     2021 REMS 000748


restrictions for mifepristone do not make the care safer, are not based on medical evidence or need, and create barriers to clinician and patient access to medication abortion (4, 11, 12). The American College of Obstetricians and Gynecologists advocates the removal of REMS restrictions for mifepristone (12).

# Clinical Considerations and Recommendations

▶ *How should patients be counseled about abortion methods?*

Only when patients have considered their options and decided to have an abortion does the discussion about the different methods become clinically relevant. Patients who choose abortion should be counseled about all methods available as well as the risks, advantages, disadvantages, and the different features of these options (5, 6). Most patients who initially are unsure about the method will have some preference after counseling (13). Generally, patients are satisfied with the method they choose (12, 14, 15). Patients who choose medication abortion tend to do so because of a desire to avoid a procedural intervention; a perception that medication abortion is safer, more natural, and private compared with uterine aspiration; or a combination of these reasons (16). Compared with uterine aspiration, medication abortion takes longer to complete and requires more active patient participation as the pregnancy expels outside of a clinical setting. The uterine aspiration procedure for a first-trimester abortion takes place most commonly in one visit, is slightly more effective, and allows for direct assessment of pregnancy tissue by the clinician.

▶ *What information and counseling should be provided to patients who are considering medication abortion?*

## Eligibility and Contraindications

Most patients at 70 days of gestation or less who desire abortion are eligible for a medication abortion. There are medical conditions for which a medication abortion may be preferable to uterine aspiration. Such examples include uterine fibroids that significantly distort the cervical canal or uterine cavity (17, 18), congenital uterine anomalies (19), or introital scarring related to infibulation (20). Patients with asthma are candidates for medication abortion because misoprostol does not cause bronchoconstriction and actually acts as a weak bronchodilator (21). Multiple gestation

pregnancy is not a contraindication; patients with twin gestations can be treated with the same regimens as those with singleton gestations (22).

Medication abortion is not recommended for patients with any of the following: confirmed or suspected ectopic pregnancy, intrauterine device (IUD) in place (the IUD can be removed before medication abortion), current long-term systemic corticosteroid therapy, chronic adrenal failure, known coagulopathy or anticoagulant therapy, inherited porphyria, or intolerance or allergy to mifepristone or misoprostol (23). Patients with significant comorbidities may still have a medication abortion but may need more monitoring during the process depending on the stability of the conditions. The safety of medication abortion in patients with anemia is unknown because studies have excluded patients with anemia who have hemoglobin levels of less than 9.5 or 10 g/dL. Although the transfusion rates associated with medication abortion are low (less than 0.1%), they exceed those reported for uterine evacuation procedures in early pregnancy (0.01%) (24, 25). Patients may also not be good candidates for medication abortion if they are unable or unwilling to adhere to care instructions, desire quick completion of the abortion process, are not available for follow-up contact or evaluation, or cannot understand the instructions because of comprehension barriers.

## What to Expect

Most patients who have a medication abortion will experience bleeding and cramping, which are necessary for the process to occur. Patient counseling should emphasize that bleeding likely will be much heavier than menses (and potentially with severe cramping).

Adverse effects can occur after mifepristone administration but are more typically experienced after misoprostol administration. Adverse effects commonly associated with misoprostol use include nausea (43 66%), vomiting (23 40%), diarrhea (23 35%), headache (13 40%), dizziness (28 39%), and thermoregulatory effects such as fever, warmth, hot flushes, or chills (32 69%) (26 29). The incidence of each adverse effect varies by regimen used, the dose and route of administration of the prostaglandin analogue, and the gestational age.

Patient counseling before medication abortion should include discussion of when patients should contact their clinician in the case of heavy bleeding (soaking more than two maxi pads per hour for 2 consecutive hours) and when to access urgent intervention (5, 6, 30). In rare cases, patients who undergo medication abortion may need to obtain an additional intervention, such as uterine aspiration. If the prescribing

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF277       2021 REMS 000749



clinician does not perform the intervention, it is medically appropriate to provide a referral. In patients who receive mifepristone and vaginal misoprostol, the need for intervention within the first 24 hours of treatment is rare, occurring in 0.2% of patients (31). The need for intervention is based on how the patient is feeling and whether the bleeding seems to be slowing. For patients with heavy bleeding, a baseline hemoglobin or hematocrit, if known, may also influence when to seek urgent care. Overall, less than 1% of patients will obtain an emergency intervention for excessive bleeding (13 15, 32), and the need for blood transfusion is rare (0.1% of patients or less) (24, 33). Should a rare medical emergency arise, patients should be advised to seek care at the closest emergency facility.

## Teratogenicity and Ongoing Pregnancy

Before undergoing medication abortion, patients should be counseled regarding the teratogenicity of misoprostol in the event of an unsuccessful medication abortion. All patients with a continuing pregnancy after using mifepristone and misoprostol should be provided with all pregnancy options and a thorough discussion of the risks and benefits of each. Most individuals with a continuing pregnancy opt to complete the abortion, but patients should be supported in their choice of how to proceed. No evidence exists to date of a teratogenic effect of mifepristone (34). However, misoprostol can result in congenital anomalies, such as limb defects with or without Möbius' syndrome (ie, facial paralysis), when used during the first trimester (35 39). Because misoprostol is the common agent used with every medication abortion regimen, clinicians should counsel all patients regarding potential teratogenic effects.

In the very rare case that patients change their mind about having an abortion after taking mifepristone and want to continue the pregnancy, they should be monitored expectantly (40). There is no evidence that treatment with progesterone after taking mifepristone increases the likelihood of the pregnancy continuing (41, 42). However, limited available evidence suggests that use of mifepristone alone without subsequent administration of misoprostol may be associated with an increased risk of hemorrhage (43).

▶ **What evaluation and ancillary testing are needed before a medication abortion?**

Before medication abortion is performed, the clinician should confirm pregnancy and estimate gestational age. For patients with regular menstrual cycles, a certain last menstrual period within the prior 56 days, and no signs, symptoms, or risk factors for ectopic pregnancy, a clinical examination or ultrasound examination is not necessary before medication abortion. Rh testing is recommended in patients with unknown Rh status before medication abortion, and Rh D immunoglobulin should be administered if indicated (44). In situations where Rh testing and Rh D immunoglobulin administration are not available or would significantly delay medication abortion, shared decision making is recommended so that patients can make an informed choice about their care. Other laboratory evaluations are not routinely indicated but may be required by local and state laws (2). Preoperative assessment of hemoglobin or hematocrit is indicated only when anemia is suspected.

Most abortion care globally is provided without ultrasound examination. Although most U.S.-based studies have used ultrasonography to confirm gestational age and intrauterine location of the pregnancy, more recent evidence has shown that a patient's certain last menstrual period when within the prior 56 to 63 days is accurate (45 48). In one study, use of certain last menstrual period alone would have resulted in medication abortion being provided to only 26 of 3,041 (0.8%) patients with pregnancies beyond 70 days of gestation (45).

A potential concern when providing early abortion services is the possibility of an undiagnosed ectopic pregnancy. The overall ectopic pregnancy rate in the U.S. general population is low and declining and is approximately 6 per 1,000 pregnancies among insured patients and 14 per 1,000 among patients who receive Medicaid (49, 50). However, in studies of patients who seek abortion, ectopic pregnancy rates generally are lower. A U.S. study of uterine evacuation procedures performed at less than 6 weeks of gestation found the ectopic pregnancy rate to be 5.9 per 1,000 pregnancies (51) at a time when the national rate was three times higher (52). The largest published study of first-trimester medication abortion patients involved 16,369 patients with pregnancies of 49 days of gestation or less and yielded a calculated ectopic pregnancy rate of 1.3 per 1,000 pregnancies (53). Although ectopic pregnancy among individuals who seek early abortion is rare, patients with a medical history of ectopic pregnancy, medical risk factors (prior tubal surgery, pregnancy with progestin-only or IUD contraception use) or symptoms (ie, unilateral pain, vaginal bleeding) suggestive of ectopic pregnancy should have pretreatment clinical evaluation, which may include ultrasonography (5, 6).

Most patients with clinical indications for an ultrasound examination before medication abortion can be initially screened with transabdominal ultrasonography, reserving transvaginal ultrasonography for situations in which further clarification is required (54, 55).

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF278                 2021 REMS 000750



If ultrasonography is medically indicated, transabdominal ultrasonography is sensitive for diagnosing the presence or absence of a gestational sac in patients who are not obese (54). A randomized trial that compared the use of transabdominal ultrasonography with transvaginal ultrasonography for eligibility assessment before medication abortion found that 80% of patients who received initial transabdominal ultrasonography did not require further testing to proceed with medication abortion, thus avoiding use of more invasive and resource-intensive screening with transvaginal ultrasonography (55).

Recommendations on whether Rh D immune globulin should be given to patients before medication abortion in early pregnancy are primarily based on expert opinion because available evidence is limited (6, 56). Rh D alloimmunization that is left undiagnosed and untreated can lead to significant perinatal morbidity and mortality in future pregnancies (57). And, guidelines from ACOG and various other major medical societies include recommendations for Rh D immune globulin prophylaxis for Rh D-negative patients undergoing medication abortion within the first 12 weeks of gestation (44, 58 60). For patients undergoing medication abortion before 10 weeks of gestation, some experts recommend against routine Rh testing and anti-D prophylaxis (6) or advise that forgoing Rh typing and Rh prophylaxis can be considered (61). Research regarding Rh alloimmunization during early pregnancy continues to evolve (62). However, based on currently available indirect evidence and the theoretical risk of Rh D alloimmunization in future pregnancies, ACOG recommends Rh D immune globulin prophylaxis for Rh D-negative patients undergoing medication abortion. In situations where Rh testing and anti-D prophylaxis are not available or would significantly delay medication abortion, shared decision making is recommended so that patients can weigh the benefits and risks of their options and make an informed decision about their care.

▶ *What regimens are used for medication abortion, and how do they compare in effectiveness for treatment?*

Combined mifepristone misoprostol regimens are recommended as the preferred therapy for medication abortion because they are significantly more effective than misoprostol-only regimens. If a combined mifepristone misoprostol regimen is not available, a misoprostol-only regimen is the recommended alternative (5, 63, 64). Mifepristone is approved by the U.S. FDA to be used with misoprostol for medication abortion through 70 days of gestation (23), but evidence also exists to support use with more advanced gestations (1, 5). The recommended medication abortion regimens are listed in Table 1. With all regimens, the mifepristone dose is the same: 200 mg taken orally. The misoprostol portion of the regimen is more variable in terms of dose, route, and timing. Oral use of misoprostol is not recommended because it may result in lower overall efficacy (65). In general, patients prefer a shorter interval between the two medications (66). These regimens have been extensively studied and are similarly safe and effective (5). Offering options provides patients with flexibility in the timing of abortion and the ability to avoid possible adverse effects related to the misoprostol route. Gastrointestinal adverse effects are less common when misoprostol is administered vaginally as compared with regimens that use oral, buccal, or sublingual misoprostol (65, 67). Buccal and sublingual administration cause similar adverse effects, with the sublingual route associated with a higher rate of chills (68).

Complete abortion rates with all regimens are highest at earlier gestational ages (Table 2). *Medication abortion failure* (defined as the need for uterine aspiration because of ongoing pregnancy or retained tissue) increases with advancing gestational age through 70 days of gestation (Table 2), although failure rates remain low even at this point. Clinicians should counsel patients that medication abortion failure rates, especially continuing pregnancy rates, increase as gestational age approaches 10 weeks.

▶ *Who is qualified to provide medication abortion, and in what settings can medication abortion be provided?*

Any clinician with the skills to screen patients for eligibility for medication abortion and to provide appropriate follow-up can provide medication abortion. Clinicians who wish to provide medication abortion services should be trained to perform uterine evacuation procedures or should be able to refer to a clinician who has this training (5, 69).

In addition to physicians, advanced practice clinicians, such as nurse midwives, physician assistants, and nurse practitioners, possess the clinical and counseling skills necessary to provide first-trimester medication abortion (70). Randomized trials in Mexico, Nepal, and Sweden have consistently found that patients randomized to receive medication abortion under the care of a nurse or nurse midwife had a statistically equivalent risk of complete abortion compared with those under the care of a physician, without increased risk of adverse events (71 73). In some U.S. states, advance practice clinicians can provide medication abortion; however, many states require that a physician perform an abortion and prohibit provision of medication abortion by nonphysician clinicians (2).

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF279                    2021 REMS 000751



**Table 1.** Medication Abortion Regimens Up to 70 Days of Gestation

| Regimen | Mifepristone Dose | Misoprostol Dose | Interval Between Drugs |
|---|---|---|---|
| **Preferred** | | | |
| Combination, FDA approved[*] | 200 mg (orally) | 800 micrograms (buccally) | 24  48 h |
| Combination, WHO recommended[†] | 200 mg (orally) | 800 micrograms (vaginally, sublingually, or buccally) | 24  48 h |
| **Alternative** | | | |
| Misoprostol only | N/A | 800 micrograms (vaginally, sublingually, or buccally) | Repeat every 3 h for up to 3 doses[‡] |

Abbreviations: h, hours; FDA, U.S. Food and Drug Administration; N/A, not applicable; WHO, World Health Organization.

[*]U.S. Food and Drug Administration. Mifeprex (mifepristone) information. Postmarket drug safety information for patients and providers. Silver Spring, MD: FDA; 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111323.htm. Retrieved March 3, 2020.

[†]World Health Organization. Medical management of abortion. Geneva: WHO; 2018. Available at: https://apps.who.int/iris/bitstream/handle/10665/278968/9789241550406-eng.pdf?ua 1. Retrieved March 3, 2020.

[‡]Although studies typically use no more than three doses for the initial treatment regimen, the World Health Organization guidelines do not specify a maximum number of misoprostol doses (Raymond EG, Harrison MS, Weaver MA. Efficacy of misoprostol alone for first-trimester medical abortion: a systematic review. Obstet Gynecol 2019;133:137-47 *and* World Health Organization. Medical management of abortion. Geneva: WHO; 2018. Available at: https://apps.who.int/iris/bitstream/handle/10665/278968/9789241550406-eng.pdf?ua 1. Retrieved March 3, 2020).

According to the requirements of the FDA REMS program, clinicians who want to prescribe mifepristone must complete a "prescriber agreement form" before ordering and dispensing mifepristone, and the clinician and patient need to sign a "patient agreement form" before the drug is dispensed (10).

The actual location of where a patient takes the medication abortion drugs has evolved over time. Although the FDA REMS program for mifepristone continues to require dispensing in the clinician's office, the U.S. labeling for mifepristone no longer indicates that the medication should be used only in the clinician's office (10). Patients can safely and effectively use mifepristone at home for medication abortion (74  77). A clinician can prescribe misoprostol and pain medications or can maintain an office supply and directly dispense to the patient. Patients can safely and effectively self-administer misoprostol at home for medication abortion (5, 78  80).

Medication abortion can be provided safely and effectively by telemedicine with a high level of patient satisfaction, and telemedicine improves access to early abortion care, particularly in areas that lack a health care practitioner (81, 82). Telemedicine involves the use of video and information technology to provide a medical service at a distance. Medication abortion through telemedicine has been evaluated in observational studies and found to be equally effective as an in-person visit (33, 83  85). In an analysis of nearly 20,000 medication abortions, adverse events

were rare (0.3% overall) and did not differ between those who choose telemedicine or in-person services (33, 84). Patients who choose telemedicine medication abortion are significantly more likely to say they would recommend the service to a friend compared with those who have an in-person visit (90% versus 83%) (83). Telemedicine also may help reduce the rate of delays to care because of barriers in access to abortion care in remote areas (82). After medication abortion through telemedicine was introduced in Iowa, a significant reduction in second-trimester abortion was reported, and patients in remote parts of the state were more likely to obtain a medication abortion (82). Despite this evidence, some states have passed legislation that bans the use of telemedicine to provide medication abortion (86).

▶ *Should prophylactic antibiotics be used in medication abortion?*

The routine use of prophylactic antibiotics is not recommended for medication abortion (6). Following concern about serious, rare, and deadly infection with clostridial bacteria in patients undergoing medication abortion, it has since become evident that no specific connection exists between clostridial organisms and medication abortion (87, 88). Uterine infection with medication abortion is uncommon, and published data do not support the routine use of prophylactic antibiotics in medication abortion. In a systematic review of 65 studies

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF280          2021 REMS 000752



**Table 2.** Outcome by Gestational Age After Mifepristone 200 mg and Misoprostol for Outpatient Medication Abortion

| | Misoprostol Dose | Interval Between Mifepristone and Misoprostol (h) | Gestational Age | | | |
|---|---|---|---|---|---|---|
| | | | ≤49 days | 50–56 days | 57–63 days | 64–70 days |
| Complete abortion | 800 micrograms buccally[*] | 24  48 | 98.1% | 96.8% | 94.7% | 92.7% |
| | 800 micrograms vaginally[†‡§‖¶‡‡] | 24  72 | 98.3  99.7% | 95.3  98.6% | 95.1  98.3% | 94.9% |
| | 800 micrograms vaginally[§] | 6  8 | 97.1% | 94.2% | 95.2% | N/A |
| | 800 micrograms vaginally[‖¶] | 0  0.25 | 95.5  95.7% | 93.7  94.3% | 91.6  95.3% | N/A |
| | 400 micrograms sublingually[#**] | 24  48 | 95.4% | N/A | 94.8% | 91.9% |
| Ongoing pregnancy | 800 micrograms buccally[*] | 24  48 | 0.3% | 0.8% | 2.0% | 3.1% |
| | 800 micrograms vaginally[†‡§‖¶‡‡] | 24  72 | 0  0.4% | 0  1.2% | 0  2.2% | 3.4% |
| | 800 micrograms vaginally[§] | 6  8 | 0.4% | 0 | 0.8% | N/A |
| | 800 micrograms vaginally[‖¶] | 0  0.25 | 1.4  2.3% | 1.9  2.8% | 1.6  5.0% | N/A |
| | 400 micrograms sublingually[#**††] | 24  48 | N/A | N/A | 1.8  3.5% | 2.2% |

Abbreviations: h, hours; N/A, not available.

[*]U.S. Food and Drug Administration. Mifeprex (mifepristone) information. Postmarket drug safety information for patients and providers. Silver Spring, MD: FDA; 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm111323.htm. Retrieved March 3, 2020.

[†]Schaff EA, Eisinger SH, Stadalius LS, Franks P, Gore BZ, Poppema S. Low-dose mifepristone 200 mg and vaginal misoprostol for abortion. Contraception 1999;59:1–6.

[‡]Schaff EA, Fielding SL, Westhoff C. Randomized trial of oral versus vaginal misoprostol at one day after mifepristone for early medical abortion. Contraception 2001;64:81–5.

[§]Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. A randomized comparison of misoprostol 6 to 8 hours versus 24 hours after mifepristone for abortion. MOD Study Trial Group. Obstet Gynecol 2004;103:851–9.

[‖]Creinin MD, Schreiber CA, Bednarek P, Lintu H, Wagner MS, Meyn LA. Mifepristone and misoprostol administered simultaneously versus 24 hours apart for abortion: a randomized controlled trial. Medical Abortion at the Same Time (MAST) Study Trial Group. Obstet Gynecol 2007;109:885–94.

[¶]Lohr PA, Starling JE, Scott JG, Aiken AR. Simultaneous compared with interval medical abortion regimens where home use is restricted [published erratum appears in Obstet Gynecol 2018;132:219]. Obstet Gynecol 2018;131:635–41.

[#]Raghavan S, Tsereteli T, Kamilov A, Kurbanbekova D, Yusupov D, Kasimova F, et al. Acceptability and feasibility of the use of 400 μg of sublingual misoprostol after mifepristone for medical abortion up to 63 days since the last menstrual period: evidence from Uzbekistan. Eur J Contracept Reprod Health Care 2013;18:104–11.

[**]Bracken H, Dabash R, Tsertsvadze G, Posohova S, Shah M, Hajri S, et al. A two-pill sublingual misoprostol outpatient regimen following mifepristone for medical abortion through 70 days' LMP: a prospective comparative open-label trial. Contraception 2014;89:181–6.

[††]von Hertzen H, Huong NT, Piaggio G, Bayalag M, Cabezas E, Fang AH, et al. Misoprostol dose and route after mifepristone for early medical abortion: a randomised controlled noninferiority trial. WHO Research Group on Postovulatory Methods of Fertility Regulation. BJOG 2010;117:1186–96.

[‡‡]Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception 2019;100:178–81.

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF281    2021 REMS 000753



of heterogeneous design (prospective, retrospective, and randomized), the overall proportion of diagnosed or treated infection after medication abortion was 0.9% in more than 46,000 patients (89). In these studies, as in most studies of abortion by uterine evacuation, the diagnostic criteria for infection were variable, leading to possible overestimation of infection.

Although serious infections occur rarely in patients after medication abortion, clinicians need to be aware of the signs and symptoms. Tachycardia, severe abdominal pain, or general malaise with or without fever that occur more than 24 hours after misoprostol administration should increase suspicion of a serious infection (90). Clostridial toxic shock often resembles a flu-like illness, so clinicians should have a high level of suspicion for infection when symptoms consistent with flu are present (90). Patients with such infections typically have hemoconcentration and significant leukocytosis without fever and can rapidly progress to refractory hypotension and death (91).

▶ *What is the recommended pain management approach for patients undergoing medication abortion?*

Nonsteroidal anti-inflammatory drugs are recommended for pain management in patients who undergo a medication abortion. Pain management during medication abortion is an important consideration because many patients report pain that requires analgesia. Studies of pain control and medication abortion have found that the duration of pain for most patients is no longer than 24 hours after misoprostol administration (92, 93). The most severe pain occurs approximately 2.5–4 hours after misoprostol use and lasts about 1 hour (94). One randomized trial found that ibuprofen taken when needed was more effective than acetaminophen to reduce pain associated with medication abortion (95). Another randomized trial found ibuprofen given prophylactically at the time of misoprostol administration did not significantly reduce pain associated with medication abortion compared with ibuprofen taken when needed (93). Nonsteroidal anti-inflammatory drugs do not appear to counteract misoprostol or affect the success of the medication abortion (96). Opioids have not been found to decrease the amount or duration of maximum pain associated with medication abortion up to 70 days of gestation (94). Other medications, like pregabalin, have been studied for pain control but have not been effective (97).

Patients should be sent home with appropriate instructions for analgesia with over-the-counter medications. If opioids are requested or desired, the Centers for Disease Control and Prevention (CDC) advises that "clinicians should prescribe the lowest effective dose of immediate-release opioids and should prescribe no greater quantity than needed for the expected duration of pain severe enough to require opioids" (98).

▶ *What kind of assessment is recommended after medication abortion?*

Routine in-person follow-up is not necessary after uncomplicated medication abortion. Clinicians should offer patients the choice of self-assessment or clinical follow-up evaluation to assess medication abortion success. If medically indicated or preferred by the patient, follow-up evaluation can be performed by medical history, clinical examination, serum human chorionic gonadotropin (hCG) testing, or ultrasonography (5, 6, 99).

The type of follow-up visit after medication abortion has evolved over time. The mifepristone FDA label includes recommendations for follow up (23). However, some patients choose not to return for follow-up; this likely is due to the high success rates and because patients are able to self-assess abortion completion (100–102).

## Remote Assessment and Self-Assessment

Follow-up can be performed by telephone at 1 week, with subsequent at-home urine pregnancy testing at 4 weeks after treatment, which avoids the need for the patient to go to a facility (103–106). Most studies have used a short series of questions that ask patients whether they have experienced bleeding and cramping (including how much and for how long) and whether they still feel pregnant or if they think the pregnancy has passed (104, 107). When the clinician and the patient think that expulsion has occurred based on symptomatology, they are correct 96–99% of the time (104, 108). Although urine pregnancy testing alone with standard high-sensitivity or low-sensitivity tests has not been shown to be a viable alternative to other forms of follow-up, newer semiquantitative or multilevel at-home urine hCG tests have shown promise in accurately identifying ongoing pregnancies after medication abortion (109–112).

## Clinical Follow-Up

When a patient obtains in-person follow-up after medication abortion, transvaginal ultrasonography is commonly used, although it is not required (5). Incorrect interpretation of ultrasound examination results can lead to unnecessary interventions such as an unneeded uterine aspiration (5). If an ultrasound examination is performed at follow-up after medication abortion, the sole purpose is to determine whether the gestational sac is present or absent. The measurement of endometrial thickness or other findings do not predict the need for subsequent

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF282     2021 REMS 000754



uterine aspiration (113). In research trials, when a transvaginal ultrasound examination shows no evidence of a gestational sac 1 week after mifepristone use, only 1.6% of patients needed subsequent uterine evacuation (113).

Serum hCG testing before treatment and 1 week after treatment is another option for follow-up examination after medication abortion; however, data about use of this approach are lacking for gestations beyond 63 days. This strategy may be more effective than ultrasonography to confirm abortion completion in patients who were below the threshold for visualization of a gestational sac at the time of their medication abortion (114). Patients do not need to return to the same facility; they can obtain serum hCG testing at a convenient location (114, 115). The patient should then be informed of the result. A serum hCG level decrease of at least 80% over 6–7 days after initiating treatment with mifepristone and misoprostol indicates a successful abortion (114). In a randomized trial of in-clinic transvaginal ultrasound examination or serum hCG testing follow-up, 24.5% of patients were lost to follow-up, there were no significant differences reported in unplanned visits and interventions by 2 weeks (6.6% versus 8.2%, respectively) or in uterine evacuation rates by 4 weeks (4.4% and 1.4%, respectively) (116).

▶ *How is incomplete medication abortion or ongoing pregnancy managed?*

Guidelines for intervention vary for patients who have delayed expulsion, an incomplete medication abortion (ie, persistent gestational sac on ultrasonography without evidence of embryonic cardiac activity or retained tissue), or an ongoing pregnancy (ie, continuing development with embryonic cardiac activity).

### Delayed Expulsion

After induced or spontaneous expulsion, the uterus will normally contain sonographically hyperechoic tissue or "thick" endometrial stripe that consists of blood, blood clots, and decidua. Rarely does this ultrasound finding in patients who have undergone medication abortion indicate a need for intervention. In the absence of excessive bleeding or pain by patient report, clinicians can monitor such patients based on symptoms.

### Incomplete Medication Abortion

An incomplete medication abortion can be treated with a repeat dose of misoprostol, uterine aspiration, or expectant management, depending on the clinical circumstances and patient preference (23, 30, 117, 118). Studies indicate that even with a retained sac at 2 weeks after medication abortion, intervention is unnecessary, and that expulsion will typically occur in the ensuing weeks (30). However, some patients with incomplete expulsion will have bothersome symptoms, such as prolonged and irregular bleeding episodes. Patients with incomplete medication abortion 1 week after treatment can safely receive another dose of misoprostol (28, 118) or repeat misoprostol doses (117). Patients who prefer not to wait or do not desire medical management can choose to have a uterine evacuation at any time.

### Ongoing Pregnancy

Ongoing pregnancy after medication abortion can be treated with a repeat dose of misoprostol or uterine aspiration, depending on the clinical circumstances and patient preference. In an analysis of data from two randomized trials with 14 cases of ongoing pregnancy, treatment with a repeat dose of misoprostol, 800 micrograms administered vaginally, resulted in expulsion of the products of pregnancy in five cases (36%); in an additional four cases (29%), gestational cardiac activity was no longer present at the next follow-up visit (118). If gestational cardiac activity persists at follow-up after a second dose of misoprostol, uterine aspiration should be performed.

▶ *What is the recommended timing of contraception initiation after medication abortion?*

Patients undergoing medication abortion who desire contraception should be counseled that

- almost all contraceptive methods, except IUDs and permanent contraception, can be safely initiated immediately on day 1 (mifepristone intake) of medication abortion.
- all contraceptive methods can be safely initiated after successful medication abortion.

Patients who select depot medroxyprogesterone acetate (DMPA) for contraception should be counseled that administration of DMPA on day 1 of the medication abortion regimen may increase the risk of ongoing pregnancy (119).

Providing desired contraception as soon as possible to patients undergoing medication abortion enables the greatest flexibility in care and decreases barriers to initiating contraception. The CDC and World Health Organization (WHO) support the initiation of almost all methods of contraception on day 1 of the medication abortion or on the same day as mifepristone administration (5, 6, 120). Permanent contraception procedures may be performed once abortion is confirmed complete.

Concern has been raised that the immediate use of hormonal contraception that contains progestins could theoretically interfere with medication abortion efficacy. Etonogestrel implant use does not affect medication abortion outcomes (121, 122). However, DMPA injection at the time of mifepristone administration may slightly increase the risk of an ongoing pregnancy

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF283                2021 REMS 000755



(119). In a randomized trial that evaluated the effects of DMPA injection timing on medication abortion outcomes, ongoing pregnancy was more common among those randomized to receive DMPA injection on the day of mifepristone administration compared with those who received DMPA at a follow-up visit (3.6% versus 0.9%; 90% CI, 2.7 [0.4 5.6]), although the proportion undergoing aspiration for any reason did not significantly vary (6.4% versus 5.3%; 90% CI, 1.1 [ 2.8 to 4.9]) (119). Patients should be counseled about this small risk of ongoing pregnancy, which needs to be weighed against the risk of potentially not receiving their desired method of contraception.

Patients do not experience a higher rate of IUD expulsion with placement in the first week after medication abortion as compared with 3 to 6 weeks later (123, 124). However, IUD placement within 6 weeks after medication abortion is associated with a higher expulsion rate compared with IUD placement remote from pregnancy; the time frame after 6 weeks at which this rate decreases is unknown. Placement of a copper or levonorgestrel IUD close to the time of abortion results in improved uptake of a desired IUD compared with placement at an additional follow-up visit several weeks after the abortion (123 125), although overall use rates at 6 months may not differ (126). The IUD expulsion risk should be weighed against the potential for more patients to receive their desired IUD if it is placed sooner rather than later.

### ▶ *How should patients be counseled about the effect of medication abortion on future fertility and pregnancy outcomes?*

Patients can be counseled that medication abortion does not have an adverse effect on future fertility or future pregnancy outcomes (5, 6). Studies consistently demonstrate that medication abortion has no negative result on future fertility or pregnancy outcomes. A study from China found that patients who had a prior mifepristone abortion had lower odds of preterm birth compared with those who had never been pregnant (adjusted OR, 0.77; 95% CI, 0.61 0.98), and the frequencies of low-birth-weight infants and mean lengths of pregnancy were similar in both groups (127). No significant differences were reported in risk of preterm delivery, frequency of low-birth-weight infants, or mean infant birth weight in the comparisons of patients who had previous mifepristone abortion and patients who had uterine evacuation. In a registry-based study from Scotland, no association was found between prior abortion and subsequent preterm birth during the period 2000 2008, when 68% of abortions were medication-induced (128).

# Summary of Recommendations

*The following recommendations are based on good and consistent scientific evidence (Level A):*

▶ Combined mifepristone misoprostol regimens are recommended as the preferred therapy for medication abortion because they are significantly more effective than misoprostol-only regimens. If a combined mifepristone misoprostol regimen is not available, a misoprostol-only regimen is the recommended alternative.

▶ Clinicians should counsel patients that medication abortion failure rates, especially continuing pregnancy rates, increase as gestational age approaches 10 weeks.

▶ Any clinician with the skills to screen patients for eligibility for medication abortion and to provide appropriate follow-up can provide medication abortion.

▶ Patients can safely and effectively use mifepristone at home for medication abortion.

▶ Patients can safely and effectively self-administer misoprostol at home for medication abortion.

▶ Nonsteroidal anti-inflammatory drugs are recommended for pain management in patients who undergo a medication abortion.

▶ Routine in-person follow-up is not necessary after uncomplicated medication abortion. Clinicians should offer patients the choice of self-assessment or clinical follow-up evaluation to assess medication abortion success. If medically indicated or preferred by the patient, follow-up evaluation can be performed by medical history, clinical examination, serum human chorionic gonadotropin (hCG) testing, or ultrasonography.

▶ If an ultrasound examination is performed at follow-up after medication abortion, the sole purpose is to determine whether the gestational sac is present or absent. The measurement of endometrial thickness or other findings do not predict the need for subsequent uterine aspiration.

*The following recommendations are based on limited or inconsistent scientific evidence (Level B):*

▶ Medication abortion is not recommended for patients with any of the following: confirmed or suspected ectopic pregnancy, intrauterine device (IUD) in place (the IUD can be removed before medication abortion), current long-term systemic corticosteroid therapy, chronic adrenal failure,

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF284                    2021 REMS 000756



known coagulopathy or anticoagulant therapy, in-herited porphyria, or intolerance or allergy to mife-pristone or misoprostol.

▶ Before undergoing medication abortion, patients should be counseled regarding the teratogenicity of misoprostol in the event of an unsuccessful medi-cation abortion.

▶ Before medication abortion is performed, the clinician should confirm pregnancy and estimate gestational age. For patients with regular menstrual cycles, a certain last menstrual period within the prior 56 days, and no signs, symptoms, or risk factors for ectopic pregnancy, a clinical examination or ultrasound examination is not necessary before medication abortion.

▶ Most patients with clinical indications for an ultra-sound examination before medication abortion can be initially screened with transabdominal ultraso-nography, reserving transvaginal ultrasonography for situations in which further clarification is required.

▶ Medication abortion can be provided safely and effectively by telemedicine with a high level of patient satisfaction.

▶ The routine use of prophylactic antibiotics is not recommended for medication abortion.

▶ An incomplete medication abortion can be treated with a repeat dose of misoprostol, uterine aspiration, or expectant management, depending on the clinical circumstances and patient preference.

▶ Ongoing pregnancy after medication abortion can be treated with a repeat dose of misoprostol or uterine aspiration, depending on the clinical circumstances and patient preference.

▶ Patients undergoing medication abortion who desire contraception should be counseled that
• almost all contraceptive methods, except IUDs and permanent contraception, can be safely initiated immediately on day 1 (mifepristone intake) of medication abortion.
• all contraceptive methods can be safely initiated after successful medication abortion.

▶ Patients who select depot medroxyprogesterone acetate (DMPA) for contraception should be coun-seled that administration of DMPA on day 1 of the medication abortion regimen may increase the risk of ongoing pregnancy.

▶ Patients can be counseled that medication abortion does not have an adverse effect on future fertility or future pregnancy outcomes.

*The following recommendations are based primarily on consensus and expert opinion (Level C):*

▶ Patients who choose abortion should be counseled about all methods available as well as the risks, advantages, disadvantages, and the different features of these options.

▶ Most patients at 70 days of gestation or less who desire abortion are eligible for a medication abortion.

▶ Patient counseling before medication abortion should include discussion of when patients should contact their clinician in the case of heavy bleeding (soaking more than two maxi pads per hour for 2 consecutive hours) and when to access urgent intervention.

▶ All patients with a continuing pregnancy after using mifepristone and misoprostol should be provided with all pregnancy options and a thorough discus-sion of the risks and benefits of each.

▶ In the very rare case that patients change their mind about having an abortion after taking mifepristone and want to continue the pregnancy, they should be monitored expectantly.

▶ Rh testing is recommended in patients with unknown Rh status before medication abortion, and Rh D immunoglobulin should be administered if indicated. In situations where Rh testing and Rh D immunoglobulin administration are not available or would significantly delay medication abortion, shared decision making is recommended so that patients can make an informed choice about their care.

▶ Clinicians who wish to provide medication abortion services should be trained to perform uterine evac-uation procedures or should be able to refer to a clinician who has this training.

# References

1. Second trimester abortion. Practice Bulletin No. 135. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;121:1394 406. (Level III)

2. Jones RK, Witwer E, Jerman J. Abortion incidence and service availability in the United States, 2017. New York, NY: Guttmacher Institute; 2019. Available at: https://www.guttmacher.org/report/abortion incidence service avail ability us 2017. Retrieved March 4, 2020. (Level II 3)

3. Jatlaoui TC, Boutot ME, Mandel MG, Whiteman MK, Ti A, Petersen E, et al. Abortion surveillance United States, 2015. MMWR Surveill Summ 2018;67:1 45. (Level II 3)

4. Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF285                        2021 REMS 000757

obstetrician gynecologists. Obstet Gynecol 2019;133: 477 83. (Level II 3)

5. World Health Organization. Medical management of abor tion. Geneva: WHO; 2018. Available at: https://apps.who. int/iris/bitstream/handle/10665/278968/9789241550406 eng.pdf?ua=1. Retrieved March 3, 2020. (Level III)

6. National Institute for Health and Care Excellence. Abor tion care. London, UK: NICE; 2019. (Level III)

7. Gravanis A, Schaison G, George M, de Brux J, Satyas waroop PG, Baulieu EE, et al. Endometrial and pituitary responses to the steroidal antiprogestin RU 486 in post menopausal women. J Clin Endocrinol Metab 1985;60: 156 63. (Level III)

8. Swahn ML, Bygdeman M. The effect of the antiprogestin RU 486 on uterine contractility and sensitivity to prosta glandin and oxytocin. Br J Obstet Gynaecol 1988;95:126 34. (Level II 3)

9. Johannison E, Oberholzer M, Swahn ML, Bygdeman M. Vascular changes in the human endometrium following the administration of the progesterone antagonist RU 486. Contraception 1989;39:103 17. (Level III)

10. U.S. Food and Drug Administration. Mifeprex (mifepris tone) information. Postmarket drug safety information for patients and providers. Silver Spring, MD: FDA; 2018. Available at: https://www.fda.gov/Drugs/DrugSafety/ PostmarketDrugSafetyInformationforPatientsandProvid ers/ucm111323.htm. Retrieved March 3, 2020. (Level III)

11. Raymond EG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of overregula tion: time to unburden mifeprex. Mifeprex REMS Study Group. N Engl J Med 2017;376:790 4. (Level III)

12. American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. Position Statement. Washington, DC: Amer ican College of Obstetricians and Gynecologists; 2018. Available at: https://www.acog.org/clinical information/ policy and position statements/position statements/2018/ improving access to mifepristone for reproductive health indications. Retrieved March 4, 2020. (Level III)

13. Creinin MD. Randomized comparison of efficacy, accept ability and cost of medical versus surgical abortion. Con traception 2000;62:117 24. (Level I)

14. Henshaw RC, Naji SA, Russell IT, Templeton AA. Com parison of medical abortion with surgical vacuum aspira tion: women's preferences and acceptability of treatment. BMJ 1993;307:714 7. (Level II 3)

15. Rorbye C, Norgaard M, Nilas L. Medical versus surgical abortion: comparing satisfaction and potential con founders in a partly randomized study. Hum Reprod 2005;20:834 8. (Level II 3)

16. Ho PC. Women's perceptions on medical abortion. Con traception 2006;74:11 5. (Level III)

17. Creinin MD. Medically induced abortion in a woman with a large myomatous uterus. Am J Obstet Gynecol 1996; 175:1379 80. (Level III)

18. Mark K, Bragg B, Chawla K, Hladky K. Medical abortion in women with large uterine fibroids: a case series. Con traception 2016;94:572 4. (Level III)

19. Goldthwaite LM, Teal SB. Controversies in family plan ning: pregnancy termination in women with uterine ana tomic abnormalities. Contraception 2014;90:460 3. (Level III)

20. Mistry H, Jha S. Pregnancy with a pinhole introitus: a report of two cases and a review of the literature. Eur J Contracept Reprod Health Care 2015;20:490 4. (Level III)

21. Rooney Thompson M, Towers CV, Howard BC, Hen nessy MD, Wolfe L, Heitzman C. The use of prostaglan din $E_1$ in peripartum patients with asthma. Am J Obstet Gynecol 2015;212:392.e1 3. (Level II 2)

22. Hayes JL, Achilles SL, Creinin MD, Reeves MF. Out comes of medical abortion through 63 days in women with twin gestations. Contraception 2011;84:505 7. (Level III)

23. GenBioPro, Inc. Mifepristone tablets, 200mg for oral use. Highlights of prescribing information. Las Vegas, NV: GenBioPro, Inc.; 2019. Available at: https://genbiopro. com/wp content/uploads/2019/05/genbiopro prescribing information.pdf. Retrieved June 2, 2020. (Level III)

24. Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. Obstet Gynecol 2013;121:166 71. (Level III)

25. Hakim Elahi E, Tovell HM, Burnhill MS. Complications of first trimester abortion: a report of 170,000 cases. Ob stet Gynecol 1990;76:129 35. (Level II 3)

26. Creinin MD, Schreiber CA, Bednarek P, Lintu H, Wagner MS, Meyn LA. Mifepristone and misoprostol adminis tered simultaneously versus 24 hours apart for abortion: a randomized controlled trial. Medical Abortion at the Same Time (MAST) Study Trial Group. Obstet Gynecol 2007;109:885 94. (Level I)

27. Creinin MD, Fox MC, Teal S, Chen A, Schaff EA, Meyn LA. A randomized comparison of misoprostol 6 to 8 hours versus 24 hours after mifepristone for abortion. MOD Study Trial Group. Obstet Gynecol 2004;103: 851 9. (Level I)

28. Winikoff B, Dzuba IG, Creinin MD, Crowden WA, Gold berg AB, Gonzales J, et al. Two distinct oral routes of misoprostol in mifepristone medical abortion: a random ized controlled trial. Obstet Gynecol 2008;112:1303 10. (Level I)

29. Schaff EA, Eisinger SH, Stadalius LS, Franks P, Gore BZ, Poppema S. Low dose mifepristone 200 mg and vaginal misoprostol for abortion. Contraception 1999;59:1 6. (Level II 3)

30. Creinin MD, Danielsson KG. Medical abortion in early pregnancy. In: Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG and Creinin MD, editors. Management of unintended and abnormal pregnancy: comprehensive abortion care. Hoboken, NJ: Blackwell Publishing Ltd; 2009. p. 111. (Level III)

31. Allen RH, Westhoff C, De Nonno L, Fielding SL, Schaff EA. Curettage after mifepristone induced abortion: fre quency, timing, and indications. Obstet Gynecol 2001; 98:101 6. (Level III)

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF286
2021 REMS 000758



32. Aubeny E, Peyron R, Turpin CL, Renault M, Targosz V, Silvestre L, et al. Termination of early pregnancy (up to 63 days of amenorrhea) with mifepristone and increasing doses of misoprostol [published erratum appears in Int J Fertil Menopausal Stud 1996;41:56]. Int J Fertil Meno pausal Stud 1995;40(suppl 2):85 91. (Level II 3)

33. Grossman D, Grindlay K. Safety of medical abortion pro vided through telemedicine compared with in person. Obstet Gynecol 2017;130:778 82. (Level II 2)

34. Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos Thompson MA, et al. Continuation of pregnancy after first trimester exposure to mifepristone: an observa tional prospective study. BJOG 2013;120:568 74. (Level II 2)

35. Yip SK, Tse AO, Haines CJ, Chung TK. Misoprostol's effect on uterine arterial blood flow and fetal heart rate in early pregnancy. Obstet Gynecol 2000;95:232 5. (Level III)

36. Gonzalez CH, Vargas FR, Perez AB, Kim CA, Brunoni D, Marques Dias MJ, et al. Limb deficiency with or with out Mobius sequence in seven Brazilian children associ ated with misoprostol use in the first trimester of pregnancy. Am J Med Genet 1993;47:59 64. (Level III)

37. Marques Dias MJ, Gonzalez CH, Rosemberg S. Mobius sequence in children exposed in utero to misoprostol: neuropathological study of three cases. Birth Defects Res A Clin Mol Teratol 2003;67:1002 7. (Level III)

38. Pastuszak AL, Schuler L, Speck Martins CE, Coelho KE, Cordello SM, Vargas F, et al. Use of misoprostol during pregnancy and Mobius' syndrome in infants. N Engl J Med 1998;338:1881 5. (Level II 3)

39. Wiebe ER. Abortion induced with methotrexate and mi soprostol: a comparison of various protocols. Contracep tion 1997;55:159 63. (Level II 3)

40. National Abortion Federation. 2020 clinical policy guide lines for abortion care. Washington, DC: NAF; 2020. Available at: https://prochoice.org/resources/clinical pol icy guidelines/. Retrieved June 1, 2020. (Level III)

41. Grossman D, White K. Abortion "reversal" legislating without evidence. N Engl J Med 2018;379:1491 3. (Level III)

42. Grossman D, White K, Harris L, Reeves M, Blumenthal PD, Winikoff B, et al. Continuing pregnancy after mife pristone and "reversal" of first trimester medical abortion: a systematic review. Contraception 2015;92:206 11. (Systematic Review)

43. Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone antagonization with progesterone to prevent medical abortion: a randomized controlled trial. Obstet Gynecol 2020;135:158 65. (Level I)

44. Prevention of Rh D Alloimmunization. Practice Bulletin No. 181. American College of Obstetricians and Gynecol ogists. Obstet Gynecol 2017;130:e57 70. (Level III)

45. Bracken H, Clark W, Lichtenberg ES, Schweikert SM, Tanenhaus J, Barajas A, et al. Alternatives to routine ultrasound for eligibility assessment prior to early termi nation of pregnancy with mifepristone misoprostol. BJOG 2011;118:17 23. (Level II 3)

46. Schonberg D, Wang LF, Bennett AH, Gold M, Jackson E. The accuracy of using last menstrual period to determine gestational age for first trimester medication abortion: a systematic review. Contraception 2014;90:480 7. (Sys tematic Review)

47. Raymond EG, Bracken H. Early medical abortion without prior ultrasound. Contraception 2015;92:212 4. (Meta Analysis)

48. Raymond EG, Tan YL, Comendant R, Sagaidac I, Hodor ogea S, Grant M, et al. Simplified medical abortion screening: a demonstration project. Contraception 2018B;97:292 6. (Level III)

49. Hoover KW, Tao G, Kent CK. Trends in the diagnosis and treatment of ectopic pregnancy in the United States. Obstet Gynecol 2010;115:495 502. (Level II 2)

50. Stulberg DB, Cain LR, Dahlquist I, Lauderdale DS. Ectopic pregnancy rates and racial disparities in the Med icaid population, 2004 2008. Fertil Steril 2014;102:1671 6. (Level II 2)

51. Edwards J, Creinin MD. Surgical abortion for gestations of less than 6 weeks. Curr Probl Obstet Gynecol Fertil 1997;20:11 9. (Level II 2)

52. Centers for Disease Control. Ectopic pregnancy United States, 1988 1989. MMWR Morb Mortal Wkly Rep 1992;41:591 4. (Level II 3)

53. Ulmann A, Silvestre L, Chemama L, Rezvani Y, Renault M, Aguillaume CJ, et al. Medical termination of early pregnancy with mifepristone (RU 486) followed by a prostaglandin analogue. Study in 16,369 women. Acta Obstet Gynecol Scand 1992;71:278 83. (Level II 3)

54. Lohr PA, Reeves MF, Creinin MD. A comparison of transabdominal and transvaginal ultrasonography for determination of gestational age and clinical outcomes in women undergoing early medical abortion. Contracep tion 2010;81:240 4. (Level II 3)

55. Fu A, Weber CE, Gilmore E, Davis AR, Hirsch G, Westh off CL. A noninferiority randomized controlled trial to compare transabdominal and transvaginal sonography for eligibility assessment prior to medical abortion. Con traception 2018;98:199 204. (Level I)

56. Karanth L, Jaafar SH, Kanagasabai S, Nair NS, Barua A. Anti D administration after spontaneous miscarriage for preventing Rhesus alloimmunisation. Cochrane Database of Systematic Reviews 2013, Issue 3. Art. No.: CD009617. DOI: 10.1002/14651858.CD009617.pub2. (Systematic Review)

57. Management of alloimmunization during pregnancy. ACOG Practice Bulletin No. 192. American College of Obstetricians and Gynecologists. Obstet Gynecol 2018; 131:e82 90. (Level III)

58. Fung KF, Eason E. No. 133 Prevention of Rh Alloimmu nization. J Obstet Gynaecol Can 2018;40:e1 10. (Level III)

59. Vayssière C, Gaudineau A, Attali L, Bettahar K, Eyraud S, Faucher P, et al. Elective abortion: clinical practice guidelines from the French College of Gynecologists and Obstetricians (CNGOF). Eur J Obstet Gynecol Re prod Biol 2018;222:95 101. (Level III)

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



PCSF287         2021 REMS 000759



60. World Health Organization. Safe abortion: technical and policy guidance for health systems. 2nd ed. Geneva: WHO; 2012. Available at: https://www.who.int/reproductivehealth/publications/unsafe abortion/9789241548434/en/. Retrieved June 1, 2020. (Level III)

61. Mark A, Grossman D, Foster AM, Prager SW, Winikoff B. When patients change their minds after starting an abortion: guidance from the National Abortion Federation's Clinical Policies Committee. Contraception 2020; 101:283 5. (Level III)

62. Horvath S, Tsao P, Huang ZY, Zhao L, Du Y, Sammel MD, et al. The concentration of fetal red blood cells in first trimester pregnant women undergoing uterine aspiration is below the calculated threshold for Rh sensitization [published online March 2, 2020]. Contraception. DOI: S0010 7824(20)30064 0. (Level III)

63. Kapp N, Baldwin MK, Rodriguez MI. Efficacy of medical abortion prior to 6 gestational weeks: a systematic review. Contraception 2018;97:90 9. (Systematic Review and Meta Analysis)

64. Raymond EG, Harrison MS, Weaver MA. Efficacy of misoprostol alone for first trimester medical abortion: a systematic review. Obstet Gynecol 2019;133:137 47. (Systematic Review and Meta Analysis)

65. Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database of Systematic Reviews 2011, Issue 11. Art. No.: CD002855. DOI: 10.1002/14651858. CD002855.pub4. (Systematic Review and Meta analysis)

66. Schaff EA, Fielding SL, Westhoff C, Ellertson C, Eisinger SH, Stadalius LS, et al. Vaginal misoprostol administered 1, 2, or 3 days after mifepristone for early medical abortion: a randomized trial [published erratum appears in JAMA 2000;284:2597] JAMA 2000;284:1948 53. (Level I)

67. Honkanen H, Piaggio G, Hertzen H, Bartfai G, Erdenetungalag R, Gemzell Danielsson K, et al. WHO multinational study of three misoprostol regimens after mifepristone for early medical abortion. WHO Research Group on Post Ovulatory Methods for Fertility Regulation. BJOG 2004;111:715 25. (Level I)

68. Chai J, Wong CY, Ho PC. A randomized clinical trial comparing the short term side effects of sublingual and buccal routes of misoprostol administration for medical abortions up to 63 days' gestation. Contraception 2013; 87:480 5. (Level I)

69. Abortion training and education. Committee Opinion No. 612. American College of Obstetricians and Gynecologists. Obstet Gynecol 2014;124:1055 9. (Level III)

70. Yarnall J, Swica Y, Winikoff B. Non physician clinicians can safely provide first trimester medical abortion. Reprod Health Matters 2009;17:61 9. (Level III)

71. Warriner IK, Wang D, Huong NT, Thapa K, Tamang A, Shah I, et al. Can midlevel health care providers administer early medical abortion as safely and effectively as doctors? A randomised controlled equivalence trial in Nepal. Lancet 2011;377:1155 61. (Level I)

72. Kopp Kallner H, Gomperts R, Salomonsson E, Johansson M, Marions L, Gemzell Danielsson K. The efficacy, safety and acceptability of medical termination of pregnancy provided by standard care by doctors or by nurse midwives: a randomised controlled equivalence trial. BJOG 2015;122:510 7. (Level 1)

73. Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, et al. Nurse versus physician provision of early medical abortion in Mexico: a randomized controlled non inferiority trial. Bull World Health Organ 2015;93:249 58. (Level I)

74. Tan YL, Singh K, Tan KH, Gosavi A, Koh D, Abbas D, et al. Acceptability and feasibility of outpatient medical abortion with mifepristone and misoprostol up to 70 days gestation in Singapore. Eur J Obstet Gynecol Reprod Biol 2018;229:144 7. (Level II 3)

75. Platais I, Tsereteli T, Grebennikova G, Lotarevich T, Winikoff B. Prospective study of home use of mifepristone and misoprostol for medical abortion up to 10 weeks of pregnancy in Kazakhstan. Int J Gynaecol Obstet 2016; 134:268 71. (Level II 2)

76. Conkling K, Karki C, Tuladhar H, Bracken H, Winikoff B. A prospective open label study of home use of mifepristone for medical abortion in Nepal. Int J Gynaecol Obstet 2015;128:220 3. (Level II 1)

77. Chong E, Frye LJ, Castle J, Dean G, Kuehl L, Winikoff B. A prospective, non randomized study of home use of mifepristone for medical abortion in the U.S. Contraception 2015;92:215 9. (Level II 1)

78. Winikoff B, Dzuba IG, Chong E, Goldberg AB, Lichtenberg ES, Ball C, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol 2012;120:1070 6. (Level II 3)

79. Ngo TD, Park MH, Shakur H, Free C. Comparative effectiveness, safety and acceptability of medical abortion at home and in a clinic: a systematic review. Bull World Health Organ 2011;89:360 70. (Systematic Review and Meta analysis)

80. Raghavan S, Tsereteli T, Kamilov A, Kurbanbekova D, Yusupov D, Kasimova F, et al. Acceptability and feasibility of the use of 400 mug of sublingual misoprostol after mifepristone for medical abortion up to 63 days since the last menstrual period: evidence from Uzbekistan. Eur J Contracept Reprod Health Care 2013;18:104 11. (Level II 3)

81. Hyland P, Raymond EG, Chong E. A direct to patient telemedicine abortion service in Australia: retrospective analysis of the first 18 months. Aust N Z J Obstet Gynaecol 2018;58:335 40. (Level II 3)

82. Grossman DA, Grindlay K, Buchacker T, Potter JE, Schmertmann CP. Changes in service delivery patterns after introduction of telemedicine provision of medical abortion in Iowa. Am J Public Health 2013;103:73 8. (Level II 3)

83. Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectiveness and acceptability of medical abortion provided through telemedicine. Obstet Gynecol 2011; 118:296 303. (Level II 3)

84. Kohn JE, Snow JL, Simons HR, Seymour JW, Thompson TA, Grossman D. Medication abortion provided through

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF288                    2021 REMS 000760

telemedicine in four U.S. States. Obstet Gynecol 2019; 134:343 50. (Level II 2)

85. Endler M, Lavelanet A, Cleeve A, Ganatra B, Gomperts R, Gemzell Danielsson K. Telemedicine for medical abor tion: a systematic review. BJOG 2019;126:1094 102. (Systematic Review)

86. Guttmacher Institute. An overview of abortion laws. New York, NY: Guttmacher Institute; 2020. Available at: https://www.guttmacher.org/state policy/explore/overview abortion laws. Retrieved March 3, 2020. (Level III)

87. Ho CS, Bhatnagar J, Cohen AL, Hacker JK, Zane SB, Reagan S, et al. Undiagnosed cases of fatal clostridium associated toxic shock in Californian women of childbear ing age. Am J Obstet Gynecol 2009;201:459.e1 7. (Level III)

88. Chong E, Winikoff B, Charles D, Agnew K, Prentice JL, Limbago BM, et al. Vaginal and rectal clostridium sor dellii and clostridium perfringens presence among women in the United States. NCT01283828 Study Team. Obstet Gynecol 2016;127:360 8. (Level II 2)

89. Shannon C, Brothers LP, Philip NM, Winikoff B. Infec tion after medical abortion: a review of the literature. Contraception 2004;70:183 90. (Level III)

90. Cohen AL, Bhatnagar J, Reagan S, Zane SB, D'Angeli MA, Fischer M, et al. Toxic shock associated with Clos tridium sordellii and Clostridium perfringens after medi cal and spontaneous abortion. Obstet Gynecol 2007;110: 1027 33. (Level III)

91. Fischer M, Bhatnagar J, Guarner J, Reagan S, Hacker JK, Van Meter SH, et al. Fatal toxic shock syndrome associ ated with Clostridium sordellii after medical abortion. N Engl J Med 2005;353:2352 60. (Level III)

92. Jackson E, Kapp N. Pain control in first trimester and second trimester medical termination of pregnancy: a sys tematic review. Contraception 2011;83:116 26. (System atic Review)

93. Raymond EG, Weaver MA, Louie KS, Dean G, Porsch L, Lichtenberg ES, et al. Prophylactic compared with thera peutic ibuprofen analgesia in first trimester medical abor tion: a randomized controlled trial. Obstet Gynecol 2013; 122:558 64. (Level I)

94. Colwill AC, Bayer LL, Bednarek P, Garg B, Jensen JT, Edelman AB. Opioid analgesia for medical abortion: a randomized controlled trial. Obstet Gynecol 2019;134: 1163 70. (Level I)

95. Livshits A, Machtinger R, David LB, Spira M, Moshe Zahav A, Seidman DS. Ibuprofen and paracetamol for pain relief during medical abortion: a double blind ran domized controlled study. Fertil Steril 2009;91:1877 80. (Level I)

96. Creinin MD, Shulman T. Effect of nonsteroidal anti inflammatory drugs on the action of misoprostol in a reg imen for early abortion. Contraception 1997;56:165 8. (Level III)

97. Friedlander EB, Soon R, Salcedo J, Davis J, Tschann M, Kaneshiro B. Prophylactic pregabalin to decrease pain during medication abortion: a randomized controlled trial. Obstet Gynecol 2018;132:612 8. (Level I)

98. Dowell D, Haegerich TM, Chou R. CDC guideline for prescribing opioids for chronic pain United States, 2016 [published erratum appears in MMWR Recomm Rep 2016;65:295]. MMWR Recomm Rep 2016;65(RR 1):1 49. (Level III)

99. National Academies of Sciences, Engineering, and Med icine. The safety and quality of abortion care in the United States. Washington, DC: National Academy of Sciences; 2018. (Level III)

100. Creinin MD, Potter C, Holovanisin M, Janczukiewicz L, Pymar HC, Schwartz JL, et al. Mifepristone and miso prostol and methotrexate/misoprostol in clinical practice for abortion. Am J Obstet Gynecol 2003;188:664 9. (Level II 3)

101. Prine L, Lesnewski R, Berley N, Gold M. Medical abor tion in family practice: a case series. J Am Board Fam Pract 2003;16:290 5. (Level III)

102. Haimov Kochman R, Arbel R, Sciaky Tamir Y, Brzezin ski A, Laufer N, Yagel S. Risk factors for unsuccessful medical abortion with mifepristone and misoprostol. Acta Obstet Gynecol Scand 2007;86:462 6. (Level II 3)

103. Baiju N, Acharya G, D'Antonio F, Berg RC. Effective ness, safety and acceptability of self assessment of the outcome of first trimester medical abortion: a systematic review and meta analysis. BJOG 2019;126:1536 44. (Systematic Review and Meta Analysis)

104. Perriera LK, Reeves MF, Chen BA, Hohmann HL, Hayes J, Creinin MD. Feasibility of telephone follow up after medical abortion. Contraception 2010;81:143 9. (Level II 3)

105. Cameron ST, Glasier A, Dewart H, Johnstone A, Burn side A. Telephone follow up and self performed urine pregnancy testing after early medical abortion: a service evaluation. Contraception 2012;86:67 73. (Level II 3)

106. Chen MJ, Rounds KM, Creinin MD, Cansino C, Hou MY. Comparing office and telephone follow up after medical abortion. Contraception 2016;94:122 6. (Level II 2)

107. Michie L, Cameron ST. Simplified follow up after early medical abortion: 12 month experience of a telephone call and self performed low sensitivity urine pregnancy test. Contraception 2014;89:440 5. (Level II 3)

108. Rossi B, Creinin MD, Meyn LA. Ability of the clinician and patient to predict the outcome of mifepristone and misoprostol medical abortion. Contraception 2004;70: 313 7. (Level II 3)

109. Godfrey EM, Anderson A, Fielding SL, Meyn L, Creinin MD. Clinical utility of urine pregnancy assays to deter mine medical abortion outcome is limited. Contraception 2007;75:378 82. (Level II 3)

110. Grossman D, Berdichevsky K, Larrea F, Beltran J. Accu racy of a semi quantitative urine pregnancy test compared to serum beta hCG measurement: a possible screening tool for ongoing pregnancy after medication abortion. Contraception 2007;76:101 4. (Level II 3)

111. Raymond EG, Shochet T, Bracken H. Low sensitivity urine pregnancy testing to assess medical abortion out

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



PCSF289          2021 REMS 000761



come: a systematic review. Contraception 2018A;98:30 5. (Systematic Review and Meta Analysis)

112. Raymond EG, Shochet T, Blum J, Sheldon WR, Platais I, Bracken H, et al. Serial multilevel urine pregnancy testing to assess medical abortion outcome: a meta analysis. Contraception 2017;95:442 8. (Meta Analysis)

113. Reeves MF, Fox MC, Lohr PA, Creinin MD. Endometrial thickness following medical abortion is not predictive of subsequent surgical intervention. Ultrasound Obstet Gynecol 2009;34:104 9. (Level III)

114. Fiala C, Safar P, Bygdeman M, Gemzell Danielsson K. Verifying the effectiveness of medical abortion; ultra sound versus hCG testing. Eur J Obstet Gynecol Reprod Biol 2003;109:190 5. (Level III)

115. Pocius KD, Bartz D, Maurer R, Stenquist A, Fortin J, Goldberg AB. Serum human chorionic gonadotropin (hCG) trend within the first few days after medical abor tion: a prospective study. Contraception 2017;95:263 8. (Level II 2)

116. Dayananda I, Maurer R, Fortin J, Goldberg AB. Medical abortion follow up with serum human chorionic gonado tropin compared with ultrasonography: a randomized con trolled trial. Obstet Gynecol 2013;121:607 13. (Level I)

117. Chen MJ, Creinin MD. Mifepristone with buccal miso prostol for medical abortion: a systematic review. Obstet Gynecol 2015;126:12 21. (Systematic Review)

118. Reeves MF, Kudva A, Creinin MD. Medical abortion outcomes after a second dose of misoprostol for persistent gestational sac. Contraception 2008;78:332 5. (Level III)

119. Raymond EG, Weaver MA, Louie KS, Tan YL, Bousie guez M, Arangure Peraza AG, et al. Effects of depot me droxyprogesterone acetate injection timing on medical abortion efficacy and repeat pregnancy: a randomized controlled trial. Obstet Gynecol 2016a;128:739 45. (Level I)

120. Curtis KM, Tepper NK, Jatlaoui TC, Berry Bibee E, Hor ton LG, Zapata LB, et al. U.S. medical eligibility criteria for contraceptive use, 2016. MMWR Recomm Rep 2016; 65(RR 3):1 103. (Level III)

121. Hognert H, Kopp Kallner H, Cameron S, Nyrelli C, Jawad I, Heller R, et al. Immediate versus delayed insertion of an etonogestrel releasing implant at medical abortion a ran domized controlled equivalence trial. Hum Reprod 2016; 31:2484 90. (Level I)

122. Raymond EG, Weaver MA, Tan YL, Louie KS, Bousie guez M, Lugo Hernandez EM, et al. Effect of immediate compared with delayed insertion of etonogestrel implants on medical abortion efficacy and repeat pregnancy: a ran domized controlled trial. Obstet Gynecol 2016;127:306 12. (Level I)

123. Shimoni N, Davis A, Ramos ME, Rosario L, Westhoff C. Timing of copper intrauterine device insertion after med ical abortion: a randomized controlled trial. Obstet Gyne col 2011;118:623 8. (Level I)

124. Saav I, Stephansson O, Gemzell Danielsson K. Early ver sus delayed insertion of intrauterine contraception after medical abortion a randomized controlled trial. PLoS One 2012;7:e48948. (Level I)

125. Pohjoranta E, Suhonen S, Mentula M, Heikinheimo O. Intrauterine contraception after medical abortion: factors affecting success of early insertion. Contraception 2017; 95:257 62. (Level I)

126. Dewan R, Bharti N, Mittal A, Dewan A. Early IUD inser tion after medically induced abortion. Eur J Contracept Reprod Health Care 2018;23:231 6. (Level II 2)

127. Chen A, Yuan W, Meirik O, Wang X, Wu SZ, Zhou L, et al. Mifepristone induced early abortion and outcome of subsequent wanted pregnancy. Am J Epidemiol 2004; 160:110 7. (Level II 2)

128. Oliver Williams C, Fleming M, Monteath K, Wood AM, Smith GC. Changes in association between previous ther apeutic abortion and preterm birth in Scotland, 1980 to 2008: a historical cohort study. PLoS Med 2013;10: e1001481. (Level II 3)

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF290     2021 REMS 000762



The MEDLINE database, the Cochrane Library, and the American College of Obstetricians and Gynecologists' own internal resources and documents were used to conduct a literature search to locate relevant articles published between January 2000 and February 2020. The search was restricted to articles published in the English language. Priority was given to articles reporting results of original research, although review articles and commentaries also were consulted. Abstracts of research presented at symposia and scientific conferences were not considered adequate for inclusion in this document. Guidelines published by organizations or institutions such as the National Institutes of Health and the American College of Obstetricians and Gynecologists were reviewed, and additional studies were located by reviewing bibliographies of identified articles. When reliable research was not available, expert opinions from obstetrician gynecologists were used.

Studies were reviewed and evaluated for quality according to the method outlined by the U.S. Preventive Services Task Force:

I    Evidence obtained from at least one properly de signed randomized controlled trial.
II 1  Evidence obtained from well designed controlled trials without randomization.
II 2  Evidence obtained from well designed cohort or case control analytic studies, preferably from more than one center or research group.
II 3  Evidence obtained from multiple time series with or without the intervention. Dramatic results in uncontrolled experiments also could be regarded as this type of evidence.
III   Opinions of respected authorities, based on clinical experience, descriptive studies, or reports of expert committees.

Based on the highest level of evidence found in the data, recommendations are provided and graded according to the following categories:

Level A   Recommendations are based on good and consistent scientific evidence.

Level B   Recommendations are based on limited or inconsistent scientific evidence.

Level C   Recommendations are based primarily on consensus and expert opinion.

Published online on August 14, 2020.

Published concurrently online on August 14, 2020, in *Contraception*.

Copyright 2020 by the American College of Obstetricians and Gynecologists. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, posted on the internet, or transmitted, in any form or by any means, elec tronic, mechanical, photocopying, recording, or otherwise, without prior written permission from the publisher.

**American College of Obstetricians and Gynecologists**
**409 12th Street SW, Washington, DC 20024-2188**

Medication abortion up to 70 days of gestation. ACOG Practice Bulletin No. 225. American College of Obstetricians and Gynecologists. Obstet Gynecol 2020;136:e31 47.

© 2020 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



*This information is designed as an educational resource to aid clinicians in providing obstetric and gynecologic care, and use of this information is voluntary. This information should not be considered as inclusive of all proper treatments or methods of care or as a statement of the standard of care. It is not intended to substitute for the independent professional judgment of the treating clinician. Variations in practice may be warranted when, in the reasonable judgment of the treating clinician, such course of action is indicated by the condition of the patient, limitations of available resources, or advances in knowledge or technology. The American College of Obstetricians and Gynecologists reviews its publications regularly; however, its publications may not reflect the most recent evidence. Any updates to this document can be found on acog.org or by calling the ACOG Resource Center.*

*While ACOG makes every effort to present accurate and reliable information, this publication is provided "as is" without any warranty of accuracy, reliability, or otherwise, either express or implied. ACOG does not guarantee, warrant, or endorse the products or services of any firm, organization, or person. Neither ACOG nor its officers, directors, members, employees, or agents will be liable for any loss, damage, or claim with respect to any liabilities, including direct, special, indirect, or consequential damages, incurred in connection with this publication or reliance on the information presented.*

*All ACOG committee members and authors have submitted a conflict of interest disclosure statement related to this published product. Any potential conflicts have been considered and managed in accordance with ACOG's Conflict of Interest Disclosure Policy. The ACOG policies can be found on acog.org. For products jointly developed with other organizations, conflict of interest disclosures by representatives of the other organizations are addressed by those organizations. The American College of Obstetricians and Gynecologists has neither solicited nor accepted any commercial involvement in the development of the content of this published product.*

© 2020 by the American College of Obstetricians
and Gynecologists. Published by Wolters Kluwer Health, Inc.
Unauthorized reproduction of this article is prohibited.

PCSF292                    2021 REMS 000764



**2020** CLINICAL POLICY GUIDELINES FOR ABORTION CARE

NATIONAL ABORTION FEDERATION

2021 REMS 000782



# 2020
# Clinical Policy Guidelines
# for Abortion Care

©2020 National Abortion Federation
1090 Vermont Ave, NW, Suite 1000
Washington, DC 20005
www.prochoice.org

The National Abortion Federation is the professional association of abortion providers. Our mission is to unite, represent, serve, and support abortion providers in delivering patient-centered, evidence-based care.

2021 REMS 000783

# TABLE OF CONTENTS

Introduction ............................................................................................................................ i

Notes on Formatting ........................................................................................................... iv

1. Who Can Provide Abortions ........................................................................................ 1

2. Patient Education, Counseling, And Informed Consent ..................................... 3

3. Infection Prevention and Control .............................................................................. 6

4. Laboratory Practice .................................................................................................... 10

5. Limited Sonography in Abortion Care ................................................................... 12

6. Early Medication Abortion ........................................................................................ 15

7. First-Trimester Aspiration Abortion ....................................................................... 23

8. Management of Pregnancy of Uncertain Location ............................................ 26

9. Abortion by Dilation and Evacuation .................................................................... 30

10. Medication Abortion After the First Trimester ................................................. 36

11. Analgesia and Sedation ........................................................................................... 40

12. Post-Procedure Care ................................................................................................. 47

13. Evaluation of Evacuated Uterine Contents ....................................................... 51

14. Emergency Procedures ............................................................................................. 53

2021 REMS 000784

# INTRODUCTION

The National Abortion Federation's (NAF) mission is to unite, represent, serve, and support abortion providers in delivering patient-centered, evidence-based care. An important part of this work is to develop and maintain evidence-based guidelines and standards as well as to educate providers in the latest technologies and techniques.(1) NAF's programs make it possible for women to obtain the highest quality abortion care.

Like its precursors, the 2020 edition of NAF's *Clinical Policy Guidelines for Abortion Care* (CPGs) serve to provide guidance for facilities to use in establishing their clinical policies. The CPGs are developed by consensus, based on rigorous review of the relevant medical literature and patient outcomes.(2-6) These guidelines are intended to provide parameters to ensure that patients have access to the highest quality abortion care.

NAF's *Clinical Policy Guidelines* were first published in 1996 and have been revised annually since then. Since inception, they have been based on the methodology described by David Eddy, MD, in *A Manual for Assessing Health Practices and Designing Practice Policies: The Explicit Approach*.(7) Clinical policy guidelines are defined as a systematically developed series of statements, which assist practitioners and patients in making decisions about appropriate health care. They represent an attempt to distill a large body of medical knowledge into a convenient and readily usable format. Since 2018, we have incorporated the Institute of Medicine's recommendations.(8)

When the outcomes of an intervention are known, practitioner choices are limited. But when the outcomes of an intervention are uncertain or variable, and/or when patients' preferences for those outcomes are uncertain or variable, practitioners must be given flexibility to tailor a policy to individual cases. This is addressed by having three types of policies according to their intended flexibility: standards, recommendations, and options:

1) **STANDARDS** are intended to be applied in virtually all cases. Deviations will be rare and difficult to justify.

2) **RECOMMENDATIONS** are steering in nature. They do not have the force of standards, but when not adhered to, there should be documented, rational clinical justification. They allow some latitude in clinical management.

3) **OPTIONS** are neutral with respect to a treatment choice. They merely note that different interventions are available, and that different people make different choices. They may contribute to the educational process, and they require no justification.

NAF's *Clinical Policy Guidelines for Abortion Care* include a list of references for each section and include discussion material for clarification when appropriate. These guidelines are meant to be living documents, subject to revision as new medical evidence becomes available.

i

Medline was searched monthly on Pubmed. An automated search using the following terms was created and checked monthly:

((((abortion induced [MeSH Major Topic]) OR mifepristone) OR medical abortion) OR (dilation and evacuation)) OR uterine aspiration.

The search was limited to clinical trials, case reports, comparative studies, reviews, meta-analysis, systematic review, and guidelines in humans from January 1, 2018. The search run on December 12, 2019, yielded 374 results. In addition, abstracts from major conferences, references in articles, and related non-abortion searches (for example, in analgesia and sedation) were run.

Studies were included that addressed CPG topics and either changed, updated, or substantially added support to a current recommendation. Studies were excluded that were not relevant, had poor methodology or inconclusive results, or did not substantially add to a current recommendation.

Eighteen new studies were included in the 2020 CPGs because they changed one or more statements or substantially improved the level of evidence supporting a current statement. Changes to each policy statement were drafted by NAF's Medical Director, Alice Mark, MD, MSc, based on the included papers. These papers were reviewed by the NAF Clinical Policy Committee and changes to each policy statement were edited and approved by the entire committee. A synthesis of how the new study altered the existing policy statement will be available in an online module.


NAF 2019 Clinical Policy Committee members:

      Sarah Prager, MD, MAS; Chair
      Sue Carlisle, MD, PhD
      Lorie Chaiten, JD
      Vicki Cowart
      Angel M. Foster, DPhil, MD, AM
      Melissa Grant
      Daniel Grossman, MD
      Suzanne Morris, MD
      Lisa Perriera, MD, MPH
      Rolanda Ryan, RN, MHSA
      Ann Schutt-Ainé, MD
      Elizabeth Talmont, MSN, NP
      Cristina Villarreal Velásquez
      Katie Watson, JD
      Beverly Winikoff, MD, MPH


In 2020, the term "medical abortion" was replaced with "medication abortion" to reflect the fact that all abortions, whether aspiration abortion, dilation and evacuation, or

ii

medication abortion are medical procedures, and the term "medication abortion" more accurately reflects the process of taking medications to induce abortion.(9)

Note: The *Clinical Policy Guidelines for Abortion Care* are not intended to educate members regarding legal and regulatory issues, which may affect abortion practice. It is expected that administrators, staff, and clinicians will be aware of pertinent local, state/provincial/territorial, and national law as well as the requirements and limitations of their individual duties and scope of professional practice. NAF provider members should ensure that all employees have access to appropriate resources for information and support.

**References:**

1. Field M, Lohr KE. Guidelines for Clinical Practice: From Development to Use. Washington, DC: National Academy Press; 1992.

2. Eddy D. Clinical decision making: from theory to practice. Designing a practice policy. Standards, guidelines, and options. JAMA. 1990;263(22):3077, 3081, 3084. (http://www.ncbi.nlm.nih.gov/pubmed/2342221)

3. Hadorn DC, McCormick K, Diokno A. An annotated algorithm approach to clinical guideline development. JAMA. 1992;267(24):3311-4. (https://www.ncbi.nlm.nih.gov/pubmed/1597913)

4. Woolf SH. Practice guidelines: a new reality in medicine. II. Methods of developing guidelines. Arch Intern Med. 1992;152(5):946-52. (http://www.ncbi.nlm.nih.gov/pubmed/1580720)

5. Walker RD, Howard MO, Lambert MD, Suchinsky R. Medical practice guidelines. West J Med. 1994;161(1):39-44. (https://www.ncbi.nlm.nih.gov/pubmed/7941505)

6. James B. Implementing practice guidelines through clinical quality improvement. Front Health Serv Manage. 1993;10(1):3-37; discussion 54-6. (http://www.ncbi.nlm.nih.gov/pubmed/10127902)

7. Eddy D. A Manual for Assessing Health Practice and Designing Practice Policies: The Explicit Approach. Philadelphia: American College of Physicians; 1992.

8. Graham R, Mancher M, Wolman DM, Greenfield S, Steinberg E, Committee on Standards for Developing Trustworthy Clinical Practice Guidelines. Clinical practice guidelines we can trust. Washington, DC: Institute of Medicine, 2011. (http://nap.edu/13058)

9. Weitz TA, Foster A, Ellertson C, Grossman D, Stewart FH. "Medical" and "surgical" abortion: rethinking the modifiers. Contraception. 2004;69(1):77-8. (http://dx.doi.org/10.1016/j.contraception.2003.08.017)

2021 REMS 000787

## NOTES ON FORMATTING

As presented here, standards, recommendations, and options are hierarchical in nature. It is therefore expected that clinical practices will favor the highest level of guidance available on a given point. To clarify the relationships of Recommendations and/or Options that are subordinate to higher level Standards and/or Recommendations, NAF's guidelines are numbered and formatted according to the following scheme:

Within each section, Standards are numbered consecutively starting with the section number with the standard to the right of a decimal. For example, the first standard in Section 1 will be Standard 1.1.

Recommendations are also numbered consecutively within each main subject heading, with numbers that are placed to the right of a second decimal point. Where a recommendation follows a standard, it is indented below the standard and the number of that standard will be found to the left of the decimal point (e.g., Recommendation 1.1.1). Where the recommendation stands alone and is not related to a specific standard, it is not indented in its placement on the page, and there will be a zero in the position to the left of the decimal point (e.g., Recommendation 1.0.1).

The consecutive numbers denoting Options within each main subject heading are placed to the right of the third decimal point. Where an option follows a preceding standard or recommendation, it is indented below that standard or recommendation and the numbers identifying that option will be found to the right of a third decimal point added to the end of the standard or recommendation (e.g., Option 1.1.0.1 or Option 1.1.1.1). Where the option stands alone and is not related to a specific standard or recommendation, it is not indented in its placement on the page, and zeros will be placed in the position for the standard and recommendation (e.g., Option 1.0.0.1).

2021 REMS 000788

# 1. WHO CAN PROVIDE ABORTIONS

**Policy Statement:** Abortion is a safe procedure when provided by qualified practitioners.(1) The vast majority of abortions, including uterine aspiration, dilation and evacuation, and medication abortion after the first trimester, can be safely provided in medical offices or freestanding clinics.(2) Telemedicine can be safely used in abortion care, including medication abortion and informed consent.(3, 4)

Standard 1.1.    Abortion will be provided by licensed[*] practitioners. This category is intended to include physicians from various specialties as well as nurse midwives, nurse practitioners, physician assistants, registered nurses, and other health professionals.(5)

    Recommendation 1.1.1.    Documentation specifying privileges in accordance with each practitioner's scope of practice should be maintained.

    Recommendation 1.1.2.    Hospital admitting privileges are not needed to provide safe abortion care.(2, 6)

Standard 1.2.    All practitioners providing abortions must have received training to competency in abortion care, including the prevention, recognition, and management of complications.

Standard 1.3.    All staff members providing patient services must have appropriate training, for example, in ultrasound, counseling, sedation, laboratory, infection control, and other patient-related services.

Standard 1.4.    Appropriate referrals must be available for patients who cannot be cared for by a practitioner at your facility.[†]

**References:**

1. Zane S, Creanga AA, Berg CJ, Pazol K, Suchdev DB, Jamieson DJ, et al. Abortion-related mortality in the united states: 1998–2010. Obstet Gynecol. 2015;126(2):258-65. (http://dx.doi.org/10.1097/aog.0000000000000945)

2. Roberts SCM, Upadhyay UD, Liu G, Kerns JL, Ba D, Beam N, et al. Association of facility type with procedural-related morbidities and adverse events among patients

---

[*]The term "licensed" is used here to indicate that a person is lawfully entitled to practice their profession in the place in which the practice takes place. The laws are different throughout the United States, Canada, Mexico, and Colombia.
[†]This may include the NAF Referral Line.

2021 REMS 000789

undergoing induced abortions. JAMA. 2018;319(24):2497-506. (http://dx.doi.org/10.1001/jama.2018.7675)

3.  Fok WK, Mark A. Abortion through telemedicine. Curr Opin Obstet Gynecol. 2018;30(6):394-9. (http://dx.doi.org/10.1097/GCO.0000000000000498)

4.  Grossman D, Grindlay K. Safety of medical abortion provided through telemedicine compared with in person. Obstet Gynecol. 2017;130(4):778-82. (http://dx.doi.org/10.1097/AOG.0000000000002212)

5.  Weitz TA, Taylor D, Desai S, Upadhyay UD, Waldman J, Battistelli MF, et al. Safety of aspiration abortion performed by nurse practitioners, certified nurse midwives, and physician assistants under a california legal waiver. Am J Public Health. 2013;103(3):454-61. (http://dx.doi.org/10.2105/ajph.2012.301159)

6.  Jatlaoui TC, Boutot ME, Mandel MG, Whiteman MK, Ti A, Petersen E, et al. Abortion Surveillance - United States, 2015. MMWR Surveill Summ. 2018;67(13):1-45. (http://dx.doi.org/10.15585/mmwr.ss6713a1)

2021 REMS 000790

## 2. PATIENT EDUCATION, COUNSELING, AND INFORMED CONSENT

**Policy Statement:** Obtaining informed consent and assessing that the decision to have an abortion is made freely by the patient are essential parts of the abortion process.

### Informed Consent

Standard 2.1.     The practitioner must ensure that appropriate personnel have a discussion with the patient in which accurate information is provided about the abortion process and its alternatives, and the potential risks and benefits. The patient must have the opportunity to have any questions answered to her satisfaction prior to intervention.

    Option 2.1.0.1.      Information may be provided either on an individual basis or in group sessions.

Standard 2.2.     Documentation must show that the patient affirms that she understands the abortion process and its alternatives, the potential risks and benefits, and that her decision is voluntary. Although other risks may be addressed, at a minimum, the following risks must be included (1-5):

    (1)   Hemorrhage

    (2)   Infection

    (3)   Continuing pregnancy

    (4)   Death.

    For abortion procedures (uterine aspiration or dilation and evacuation), the additional risks must be included:

    (5)   Perforation

    (6)   Damage to organs including hysterectomy.

### Patient Education and Counseling

Standard 2.3.     Each patient must have a private opportunity to discuss the abortion.(6-10)

Standard 2.4.     A patient must undergo the abortion as expeditiously as possible in accordance with good medical practice.

Standard 2.5.     Information about aftercare and contraception must be available to patients at the facility.

    Recommendation 2.5.1.      The importance of contacting the facility for any concerns should be emphasized.

3

Recommendation 2.5.2. | Evidence-based guidelines for contraceptive counseling should be followed.(11)

Standard 2.6. | All reasonable precautions must be taken to ensure the patient's confidentiality.

Recommendation 2.6.1. | The patient should be informed of the communication of information to any third party.

Recommendation 2.6.2. | A discussion should take place about which individuals or agencies may receive communications regarding services. This discussion should include confidentiality implications of using insurance or governmental health care coverage.

**Discussion:** Informed consent and abortion counseling are two different processes. The goal of informed consent is to assure that the patient's decision is voluntary and informed. Patient education and counseling includes a discussion of the feelings and concerns expressed by the patient, which may include help with decision-making and contraceptive choices, values clarification, or referral to other professionals. A referral to community services should be available if that becomes necessary or the needs of the patient are outside the scope of training of clinic staff.

Where abortion is safe and legal, the risk of death overall is less than 1 per 100,000 abortions.(4, 5, 12) Pregnancy-related deaths are significantly higher.(13, 14)

Risks of pregnancy-related death by country (14)

| Country | Maternal mortality ratio* |
|---|---|
| Canada | 7 |
| United States | 17 |
| Mexico | 38 |
| Colombia | 64 |

*deaths per 100,000 live births

**References:**

1. Upadhyay UD, Desai S, Zlidar V, Weitz TA, Grossman D, Anderson P, et al. Incidence of emergency department visits and complications after abortion. Obstet Gynecol. 2015;125(1):175-83. (http://dx.doi.org/10.1097/AOG.0000000000000603)

2. Achilles SL, Reeves MF. Prevention of infection after induced abortion: SFP Guideline 20102. Contraception. 2011;83(4):295-309. (http://dx.doi.org/10.1016/j.contraception.2010.11.006)

4

3.  Ireland LD, Gatter M, Chen AY. Medical compared with surgical abortion for effective pregnancy termination in the first trimester. Obstet Gynecol. 2015;126(1):22-8. (http://dx.doi.org/10.1097/aog.0000000000000910)

4.  Bartlett LA, Berg CJ, Shulman HB, Zane SB, Green CA, Whitehead S, et al. Risk factors for legal induced abortion-related mortality in the United States. Obstet Gynecol. 2004;103(4):729-37. (http://dx.doi.org/10.1097/01.AOG.0000116260.81570.60)

5.  Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol. 2012;119(2, Part 1):215-9. (http://dx.doi.org/10.1097/AOG.0b013e31823fe923)

6.  Perrucci AC. Decision Assessment and Counseling in Abortion Care: Philosophy and Practice. Lanham: Rowman & Littlefield; 2012.

7.  Baker A, Beresford T. Informed consent, patient education, and counseling. In: Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG, Creinin MD, editors. Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. Oxford: Wiley-Blackwell; 2009. p. 48-62.

8.  Needle R, Walker L. Abortion Counseling: A Clinician's Guide to Psychology, Legislation, Politics, and Competency. New York: Springer; 2007.

9.  Gold RB, Nash E. State abortion counseling policies and the fundamental principles of informed consent. Guttmacher Policy Review. 2007;10(4):6-13. (http://www.guttmacher.org/pubs/gpr/10/4/gpr100406.html)

10. Baker A. Abortion and Options Counseling: A Comprehensive Reference. Granite City: Hope Clinic for Women; 1995.

11. Curtis KM, Tepper NK, Jatlaoui TC, Berry-Bibee E, Horton LG, Zapata LB, et al. U.S. Medical eligibility criteria for contraceptive use, 2016. MMWR. 2016;65(3):1-104. (https://www.cdc.gov/mmwr/volumes/65/rr/rr6503a1.htm)

12. Jatlaoui TC, Boutot ME, Mandel MG, Whiteman MK, Ti A, Petersen E, et al. Abortion surveillance - United States, 2015. MMWR Surveill Summ. 2018;67(13):1-45. (http://dx.doi.org/10.15585/mmwr.ss6713a1)

13. Creanga AA, Syverson C, Seed K, Callaghan WM. Pregnancy-related mortality in the United States, 2011-2013. Obstet Gynecol. 2017;130(2):366-73. (http://dx.doi.org/10.1097/AOG.0000000000002114)

14. World Health Organization, World Bank Group, UNICEF, United Nations Population Fund. Trends in Maternal Mortality: 1990 to 2015. Geneva: 2015. (http://www.who.int/reproductivehealth/publications/monitoring/maternal-mortality-2015/en/)

2021 REMS 000793

## 3. INFECTION PREVENTION AND CONTROL

**Policy Statement:** Patients and health care personnel are at risk for exposure to blood borne pathogens and other potentially infectious material. Infectious material may be transmitted to patients when proper engineering[*] and work-practice controls,[†] which reduce exposure, are not followed. Proper handling of chemicals and other materials needed for proper disinfection is important to prevent harm to staff. Prevention and treatment of infection will reduce post-abortion morbidity.

Standard 3.1.      Proper engineering and work practice controls must be in place to reduce exposure of patient and staff to infectious agents. Clinics must protect employees and patients from being exposed to biohazardous material.(1)

Standard 3.2.      Hands must be washed or disinfected before and after patient contact.(2-4)

Standard 3.3.      Personal protective equipment must be provided to all staff.(1, 5-8)

    Recommendation 3.3.1.      New staff with potential exposure should have an initial training as part of orientation.

    Recommendation 3.3.2.      Periodic facility-level training should occur at least every three years.

    Recommendation 3.3.3.      Hepatitis B vaccine should be provided at no cost to the staff.

Standard 3.4.      Exposure control plans must be established and followed.(5, 7, 9)

    Recommendation 3.4.1.      Post-exposure evaluation, prophylaxis, and follow-up should be available to exposed patients or staff for any potentially infectious agent, regardless of source.

Standard 3.5.      All instruments coming into contact with patients must be properly cleaned and disinfected between patients.(10)

Standard 3.6.      All instruments entering the uterus must be sterile.

    Option 3.6.0.1.      The cervix and vagina may be cleansed with a bactericidal agent though randomized trials have failed to show a benefit to this practice.(11)

---

[*] Engineering control—available technology and devices that isolate or remove hazards from the workplace, such as puncture-resistant sharps disposal containers.

[†] Work-practice control—an alteration in the way a task is performed that reduces the likelihood that an employee will be exposed to blood or other potentially infectious materials.

6

Standard 3.7.    Tubing and manual uterine aspirators must be high-level disinfected or sterilized.(10)

Standard 3.8.    All tissue removed in the facility must be considered biohazardous and be handled, stored, and disposed of in a manner that minimizes the risk of exposure. A protocol for tissue handling, storage, and disposal must be in place.

Standard 3.9.    Sharps containers must be readily available.

Standard 3.10.    Routine antibiotic prophylaxis must be used for uterine aspiration and dilation and evacuation.(12, 13)

Recommendation 3.10.1.    All patients having uterine aspiration or dilation and evacuation should receive antibiotics pre-procedure.(11, 14, 15)

Recommendation 3.10.2.    Prophylactic antibiotics should not be continued after the day of the procedure.(11, 14, 15)

Option 3.10.2.1.    Antibiotics may be initiated at the time of insertion of osmotic dilators.

Option 3.10.2.2.    Antibiotics are not required for patients choosing medication abortion.(16) Insufficient evidence exists to support routine antibiotic prophylaxis for medication abortion.

Recommendation 3.10.3.    Additional antibiotics are not recommended for endocarditis prophylaxis in patients with heart murmurs or other cardiac conditions.(13, 17, 18)

Recommendation 3.10.4.    Patients should be offered or referred for testing for chlamydia and gonorrhea according to local guidelines.(19) Testing should not delay the procedure.

Option 3.10.4.1.    Empiric treatment of chlamydia may be considered for patients with history, signs, or symptoms of current infection.

Standard 3.11.    Diagnosed infection must be appropriately treated.

Recommendation 3.11.1.    For documented infections of the reproductive tract, evidence-based regimens should be followed.(19)

2021 REMS 000795

**Discussion:** Regulatory agency policies (see references) may be helpful in developing exposure plans that protect personnel and patients from potentially infectious material. A sample exposure control plan can be found in the online learning resources at https://members.prochoice.org. Techniques for collection, labeling, and disposal of biohazardous material and for the processing of instruments are integral to any complete plan.

Expedited partner treatment may be considered for patients with a known diagnosis of a sexually transmitted infection.(20, 21)

**References:**

1. Centers for Disease Control and Prevention. Infection prevention checklist for outpatient settings: minimal expectations for safe care. 2015. (http://www.cdc.gov/hai/pdfs/guidelines/Ambulatory-Care+Checklist_508_11_2015.pdf)

2. Centers for Disease Control and Prevention. Guideline for hand hygiene in health-care settings: recommendations of the healthcare infection control practices advisory committee and the hicpac/shea/apic/idsa hand hygiene task force. MMWR: 2002. (http://www.cdc.gov/mmwr/pdf/rr/rr5116.pdf)

3. Centers for Disease Control and Prevention. Hand hygiene in healthcare settings [cited 2016]. Available from: http://www.cdc.gov/handhygiene/.

4. World Health Organization. WHO guidelines on hand hygiene in health care. 2009. (http://apps.who.int/iris/bitstream/10665/44102/1/9789241597906_eng.pdf)

5. Canadian Centre for Occupational Health and Safety. Universal precautions and routine practices. 2011. (http://www.ccohs.ca/oshanswers/prevention/universa.html)

6. Centers for Disease Control and Prevention. Bloodborne Infectious Diseases: HIV/AIDS, Hepatitis B, Hepatitis C. 2013. (www.cdc.gov/niosh/topics/bbp/)

7. Occupational Safety and Health Administration. Bloodborne pathogens and needlestick prevention [cited 2015]. Available from: www.osha.gov/SLTC/bloodbornepathogens/index.html.

8. Ontario Hospital Association. Bloodborne diseases surveillance protocol for Ontario hospitals. 2018. (https://www.oha.com/Documents/Blood%20Borne%20Diseases%20Protocol%20(November%202018).pdf)

9. Occupational Safety and Health Administration. Standard 1910.1030: Bloodborne pathogens. 2001. (www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=STANDARDS&p_id=10051)

10. Rutala WA, Weber DJ, Healthcare Infection Control Practices Advisory Committee. Guideline for disinfection and sterilization in healthcare facilities. Center for Disease Control & Prevention, 2008. (http://www.cdc.gov/hicpac/pdf/guidelines/Disinfection_Nov_2008.pdf)

2021 REMS 000796

11. Achilles SL, Reeves MF. Prevention of infection after induced abortion: SFP Guideline 20102. Contraception. 2011;83(4):295-309. (http://dx.doi.org/10.1016/j.contraception.2010.11.006)

12. Sawaya GF, Grady D, Kerlikowske K, Grimes DA. Antibiotics at the time of induced abortion: the case for universal prophylaxis based on a meta-analysis. Obstet Gynecol. 1996;87(5 Pt 2):884-90. (http://www.ncbi.nlm.nih.gov/pubmed/8677129)

13. Van Eyk N, van Schalkwyk J. Antibiotic prophylaxis in gynaecologic procedures. J Obstet Gynaecol Canada. 2012;34(4):382-91. (http://sogc.org/guidelines/antibiotic-prophylaxis-in-gynaecologic-procedures/)

14. Levallois P, Rioux JE. Prophylactic antibiotics for suction curettage abortion: results of a clinical controlled trial. Am J Obstet Gynecol. 1988;158(1):100-5. (http://www.ncbi.nlm.nih.gov/pubmed/3276193)

15. Darj E, Stralin EB, Nilsson S. The prophylactic effect of doxycycline on postoperative infection rate after first-trimester abortion. Obstet Gynecol. 1987;70(5):755-8. (http://www.ncbi.nlm.nih.gov/pubmed/3658286)

16. Fjerstad M, Trussell J, Sivin I, Lichtenberg ES, Cullins V. Rates of serious infection after changes in regimens for medical abortion. N Engl J Med. 2009;361(2):145-51. (http://dx.doi.org/10.1056/NEJMoa0809146)

17. Guiahi M, Davis A. First-trimester abortion in women with medical conditions: SFP Guideline 20122. Contraception. 2012;86(6):622-30. (http://dx.doi.org/10.1016/j.contraception.2012.09.001)

18. Wilson W, Taubert KA, Gewitz M, Lockhart PB, Baddour LM, Levison M, et al. Prevention of infective endocarditis: guidelines from the American Heart Association. Circulation. 2007;116(15):1736-54. (http://dx.doi.org/10.1161/CIRCULATIONAHA.106.183095)

19. Centers for Disease Control and Prevention. Sexually transmitted diseases treatment guidelines, 2015. MMWR. 2015;64(3):1-137. (http://www.cdc.gov/mmwr/preview/mmwrhtml/rr6403a1.htm)

20. Centers for Disease Control and Prevention. Guidance on the use of expedited partner therapy in the treatment of gonorrhea 2016 [cited 2016]. Available from: https://www.cdc.gov/std/ept/gc-guidance.htm.

21. Centers for Disease Control and Prevention. Expedited partner therapy in the management of sexually transmitted diseases. US Department of Health and Human Services. 2006; (https://www.cdc.gov/std/treatment/eptfinalreport2006.pdf)

2021 REMS 000797

## 4. LABORATORY PRACTICE

**Policy Statement:** Rh alloimmunization may jeopardize the health of a subsequent pregnancy.(1)

Standard 4.1.    Rh status testing must be offered to all patients with unknown Rh status over 56 days from the last menstrual period.

  Recommendation 4.1.1.    Below 56 days from the last menstrual period, patients and providers may forego Rh testing and anti-D immune globulin for patients who are Rh negative.(2-5)

Standard 4.2.    Rh status or an informed waiver declining Rh testing must be documented in all patients over 56 days from the last menstrual period.

  Recommendation 4.2.1.    This documentation may be obtained by on-site testing, outside source, or self-report.

  Recommendation 4.2.2.    Additional testing for either sensitization or other antibodies is not required in patients undergoing pregnancy termination, including testing for Du ("weak D").

Standard 4.3.    Rh immune globulin administration must be offered to patients known to be Rh negative (-) who are over 56 days. If Rh immune globulin is not administered in the facility, other arrangements for administration must be documented.

  Recommendation 4.3.1.    A patient who declines Rh immune globulin should sign an informed waiver.

Standard 4.4.    Anemia and the risk of bleeding must be evaluated.(6)

  Recommendation 4.4.1.    Hemoglobin or hematocrit testing should be readily available.

  Recommendation 4.4.2.    Prior to uterine aspiration and medication abortion in the first trimester, hemoglobin/hematocrit and other laboratory evaluation should be done as indicated by medical history and patient symptoms. Routine hemoglobin or hematocrit has not been shown to improve outcomes.

2021 REMS 000798

Recommendation 4.4.3.    Prior to administration of methotrexate, a complete blood count (CBC) should be considered for patients with history of blood dyscrasia.

Recommendation 4.4.4.    Hemoglobin or hematocrit should be checked before all abortions after the first trimester.

**Discussion:** Emerging epidemiologic and clinical evidence indicates that the risk of maternal-fetal hemorrhage caused by early abortion is negligible and Rh testing and provision of Rh immune globulin may not be necessary.(2) It is reasonable to forego Rh testing and anti-D immunoglobulin for women having any type of abortion before 56 days. Foregoing Rh testing and anti-D immunoglobulin for those using medication abortion before 70 days LMP may also be considered.

The use of approved slide/tube/spot methods is acceptable for on-site Rh testing.

Moderate or asymptomatic anemia is rarely a reason to delay abortion care.

**References:**

1. American College of Obstetricians and Gynecologists. Practice Bulletin No. 181: Prevention of Rh D Alloimmunization. Obstet Gynecol;2017;130(2):e57-70. (http://dx.doi.org/10.1097/AOG.0000000000002232)

2. Mark A, Foster AM, Grossman D, Prager SW, Reeves M, Velásquez CV, et al. Foregoing Rh testing and anti-D immunoglobulin for women presenting for early abortion: a recommendation from the National Abortion Federation's Clinical Policies Committee. Contraception. 2019;99(5):265-66. (http://dx.doi.org/10.1016/j.contraception.2019.02.008)

3. Hollenbach SJ, Cochran M, Harrington A. "Provoked" feto-maternal hemorrhage may represent insensible cell exchange in pregnancies from 6 to 22 weeks gestational age. Contraception. 2019;100(2):142-6. (http://dx.doi.org/10.1016/j.contraception.2019.03.051)

4. Wiebe E, Campbell M, Aiken A, Albert A. Can we safely stop testing for rh status and immunizing rh-negative women having early abortions? A comparison of Rh alloimmunization in Canada and the Netherlands. Contraception: X. 2019;100001. (http://dx.doi.org/doi:10.1016.j.conx.100001)

5. Horvath S, Luning Prak ET, Schreiber CA. A highly sensitive flow cytometry protocol shows fetal red blood cell counts in first-trimester maternal circulation well below the threshold for Rh sensitization. Contraception. 2018;98(4):332. (http://dx.doi.org/10.1016/j.contraception.2018.07.011)

6. Kerns J, Steinauer J. Management of postabortion hemorrhage: SFP Guideline 20131. Contraception. 2013;87(3):331-42. (http://dx.doi.org/10.1016/j.contraception.2012.10.024)

2021 REMS 000799

## 5. LIMITED SONOGRAPHY IN ABORTION CARE

**Policy Statement:** The use of ultrasound is not a requirement for the provision of first-trimester abortion care. Proper use of ultrasound may inform clinical decision-making in abortion care.

Standard 5.1.    Staff members who perform ultrasound exams and clinicians who interpret those exams must either show documentation of proficiency or complete a program of training. Training must include a period of supervision. Documentation of this training must be maintained.

Standard 5.2.    A system of proficiency review must be in place for staff members who perform ultrasound exams and clinicians who interpret those exams.

Standard 5.3.    Patients must be informed of the purpose and limitations of the ultrasound exam in the abortion care setting.

Standard 5.4.    Patients must be informed of the sonographic diagnosis, including early pregnancy loss.(1, 2)

Standard 5.5.    The findings of all ultrasound exams and the interpretation of those findings must be documented in the medical record. This documentation must also include the name(s) of staff who performed and interpreted the exam.(3)

    Recommendation 5.5.1.    Ultrasound images should be included as part of the documentation, particularly for the purposes of proficiency review.

    Recommendation 5.5.2.    A standard form for documenting findings and interpretation should be used.

Standard 5.6.    A limited ultrasound exam must include the following:

    (1)    a full scan of the uterus in both the transverse and longitudinal planes to confirm an intrauterine pregnancy;

    (2)    evaluation of embryo/fetal number;

    (3)    measurements to document gestational age;(4, 5)

    (4)    evaluation of pregnancy landmarks, such as yolk sac or the presence or absence of fetal/embryonic cardiac activity; and

    (5)    placental location in second trimester.

2021 REMS 000800

Recommendation 5.6.1.    When clinically indicated, evaluation of other pelvic structures (i.e., adnexal structures and the cul de sac) should be performed and documented or an appropriate referral should be made for further evaluation.

Standard 5.7.    When a patient with a prior uterine scar is found to have placenta previa or a low anterior placenta, or when other placental abnormality is suspected, additional sonographic imaging should be performed on-site or an appropriate referral made.(6-8)

Standard 5.8.    Ultrasound equipment must be properly maintained.

Standard 5.9.    All ultrasound transducers must be disinfected between patients.

**Discussion:** Resources for ultrasound training can be found in NAF's online learning resources on our members-only website at https://members.prochoice.org.

According to the American Institute of Ultrasound in Medicine (AIUM), in collaboration with the American College of Obstetrics and Gynecology and the American College of Radiology, a "limited ultrasound examination" is performed when a specific question requires investigation.(3, 9, 10)

**References:**

1.  Goldstein SR, Reeves MF. Assessing pregnancy status and gestational age. In: Paul M, Lichtenberg S, Borgatta L, Grimes D, Stubblefield P, Creinin M, editors. Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. London: Wiley-Blackwell; 2009.

2.  Perriera L, Reeves MF. Ultrasound criteria for diagnosis of early pregnancy failure and ectopic pregnancy. Semin Reprod Med. 2008;26(5):373-82. (http://dx.doi.org/10.1055/s-0028-1087103)

3.  American Institute of Ultrasound in Medicine. AIUM Practice Parameter for the Performance of Obstetric Ultrasound Examinations. Laurel, MD: American Institute of Ultrasound in Medicine, 2013. (http://www.aium.org/resources/guidelines/obstetric.pdf)

4.  Rossavik IK, Torjusen GO, Gibbons WE. Conceptual age and ultrasound measurements of gestational sac and crown-rump length in in vitro fertilization pregnancies. Fertil Steril. 1988;49(6):1012-7. (http://www.ncbi.nlm.nih.gov/pubmed/3286286)

5.  Hadlock FP, Shah YP, Kanon DJ, Lindsey JV. Fetal crown-rump length: reevaluation of relation to menstrual age (5-18 weeks) with high-resolution real-time US. Radiology. 1992;182(2):501-5. (http://dx.doi.org/10.1148/radiology.182.2.1732970)

13

6. Rac MWF, Dashe JS, Wells CE, Moschos E, McIntire DD, Twickler DM. Ultrasound predictors of placental invasion: the placenta accreta index. Am J Obstet Gynecol. 2015;212(3):343.e1-.e7. (http://dx.doi.org/http://dx.doi.org/10.1016/j.ajog.2014.10.022)

7. Bowman ZS, Eller AG, Kennedy AM, Richards DS, Winter Iii TC, Woodward PJ, et al. Accuracy of ultrasound for the prediction of placenta accreta. Am J Obstet Gynecol. 2014;211(2):177.e1-.e7. (http://dx.doi.org/http://dx.doi.org/10.1016/j.ajog.2014.03.029)

8. Esakoff TF, Sparks TN, Kaimal AJ, Kim LH, Feldstein VA, Goldstein RB, et al. Diagnosis and morbidity of placenta accreta. Ultrasound Obstet Gynecol. 2011;37(3):324-7. (http://dx.doi.org/10.1002/uog.8827)

9. American Institute of Ultrasound in Medicine. AIUM Official Statement: Limited Obstetrical Ultrasound. American Institute of Ultrasound in Medicine, 2009. (http://www.aium.org/officialStatements/19)

10. American College of Obstetricians Gynecologists. Practice Bulletin No. 101: Ultrasonography in pregnancy. Obstet Gynecol. 2009;113(2, Part 1):451-61. (http://dx.doi.org/10.1097/AOG.0b013e31819930b0)

2021 REMS 000802

## 6. EARLY MEDICATION ABORTION

**Policy Statement:** Medication abortion is a safe and effective method for early abortion.(1, 2) Adequate counseling and follow-up care will enhance its safety and acceptability. Providing medication abortion by telemedicine is a safe option.(3, 4)

Standard 6.1.    Initial evaluation must include pertinent medical history.

Standard 6.2.    The patient must be informed about the efficacy, side effects, and risks, including excessive bleeding, infection, and teratogenicity of the medications used.(5)

    Recommendation 6.2.1.    Breastfeeding is not a contraindication to medication abortion with mifepristone and misoprostol. Patients should be informed that breastfeeding can continue uninterrupted without concern for side effects in infants.(6, 7)

        Option 6.2.1.1.    As appropriate, patients may be informed that no evidence-based way to reverse mifepristone exists.(8)

        Option 6.2.1.2.    Not taking an evidence-based regimen of misoprostol after mifepristone may be associated with unusual bleeding, particularly after 49 days.(9)

Standard 6.3.    The patient must be informed that a uterine aspiration may be necessary.

Standard 6.4.    Patient instructions must include written and oral information about use of medications at home and symptoms of abortion complications.

Standard 6.5.    The facility must provide an emergency contact service on a 24-hour basis and must offer or assure referral for uterine aspiration if indicated.

Standard 6.6.    Confirmation of pregnancy must be documented. Gestational age must be verified to be within the limits of the facility medication abortion protocol.

    Recommendation 6.6.1.    If an ultrasound has been performed and an intrauterine gestation has not been confirmed, the medication abortion regimen should be offered concurrently with evaluation for pregnancy of unknown location, as outlined in CPG section 8 Management of Pregnancy of Uncertain Location.

Standard 6.7.    IUDs must be removed prior to proceeding with medication abortion.

2021 REMS 000803

Recommendation 6.7.1.    If an IUD cannot be removed without delaying the medication abortion, the patient should be offered a uterine aspiration.

Standard 6.8.    An evidence-based medication abortion regimen must be used.

Recommendation 6.8.1.    Where legally available and accessible, mifepristone and misoprostol should be used.(10-12)

Recommendation 6.8.2.    A dose of 200 mg of mifepristone is recommended for combined mifepristone-misoprostol regimens.(2)

Option 6.8.2.1.    Mifepristone may be taken outside the clinic setting.(13)

Recommendation 6.8.3.    For medication abortion, oral mifepristone and vaginal, buccal, or sublingual misoprostol are recommended for gestations through 70 days.(14-19)

Recommendation 6.8.4.    For medication abortion at 71 through 77 days, the regimen should include a second dose of misoprostol, 800 mcg, four hours after the first misoprostol dose.(20)

Recommendation 6.8.5.    For medication abortion at 64-70 days, the regimen may include a second dose of misoprostol, 800 mcg, four hours after the first misoprostol dose.(21)

Recommendation 6.8.6.    Where mifepristone is either not legally available or inaccessible, misoprostol-alone regimens may be offered.(22, 23)

Recommendation 6.8.7.    When methotrexate and misoprostol are used, an evidence-based regimen oral or intramuscular methotrexate followed in three to five days with vaginal misoprostol is recommended for gestations up to 63 days.(2, 24)

Standard 6.9.    Patient comfort level during the medication abortion process must be considered. Analgesia or other comfort measures must be discussed and offered as needed.

Recommendation 6.9.1.    Non-steroidal anti-inflammatories such as ibuprofen should be offered over acetaminophen for pain control.(25)

Standard 6.10.    Patients must be offered a follow-up assessment to confirm absence of ongoing pregnancy. Confirmation can be established by

16

ultrasonography, hCG testing, physical exam, or other evaluation in the office, by telephone, or electronic communication.(26-28)

Recommendation 6.10.1.   Follow-up evaluation should be scheduled within 14 days after starting medication abortion.(2)

Recommendation 6.10.2.   High-sensitivity urine hCG testing should not be checked within four weeks of medication abortion.(29-32)

Option 6.10.2.1.   Multi-level or low-sensitivity urine pregnancy tests may be used.(32-36)

Recommendation 6.10.3.   Endometrial thickness should not be used to guide management after medication abortion.(37, 38)

Recommendation 6.10.4.   Prolonged courses of misoprostol should not be given routinely to improve success.(39, 40)

Option 6.10.4.1.   Additional doses of misoprostol with or without mifepristone may be given for persistent gestational sac or continuing pregnancy.(41, 42)

Standard 6.11.   Medications dispensed and prescribed must be documented.


**Discussion:** Medication abortion regimens and follow-up have evolved rapidly over the past decade and are likely to continue to improve.

**The NAF recommended protocol for medication abortion up to 70 days gestation is 200mg mifepristone followed in 24 to 48 hours by 800mcg misoprostol buccally, vaginally, or sublingually.** Vaginal misoprostol may be used if the time interval between mifepristone and misoprostol is shortened. More information on medication abortion regimens and follow-up may be found in NAF's online learning resources on https://members.prochoice.org.

Medication abortion later in pregnancy has increased efficacy rates when repeat doses of misoprostol are given. From 64-70 days, a second dose of misoprostol 800 mcg four hours after the first dose may be used. From 71 to 77 days, a second dose of misoprostol 800 mcg four hours after the first dose should be given (See Table 1).

2021 REMS 000805

**Table 1: Efficacy of mifepristone 200 mg orally and misoprostol regimens by weeks** (16, 20, 21, 43)

|  | Overall efficacy | Ongoing pregnancy |
|---|---|---|
| **57-63 days gestation** | | |
| o  Misoprostol 800 mcg buccal x 1 dose | 93.5% | 3.1% |
| **64-70 days gestation** | | |
| o  Misoprostol 800 mcg buccal x 1 dose | 92.3% | 3.6% |
| o  Misoprostol 800 mcg buccal q 4 hours x 2 doses | 99.6% | 0.4% |
| **71-77 days gestation** | | |
| o  Misoprostol 800 mcg buccal x 1 dose | 86.7% | 8.7% |
| o  Misoprostol 800 mcg buccal q 4 hours x 2 doses | 97.6% | 1.6% |

Mifepristone alone is not as effective as a combined regimen and has a higher risk of ongoing pregnancy. There is no high-quality evidence that progesterone given directly after mifepristone ingestion increases the rate of ongoing pregnancy compared to no intervention.(8) A recent small randomized controlled trial of progesterone vs. placebo after mifepristone was stopped early due to bleeding requiring intervention, especially in patients over 49 days gestation.(9) Laws that require abortion providers to discuss unproven methods to interrupt the abortion process with their patients are a violation of medical ethics in that they require providers to discuss an experimental treatment with no proven benefit.

There is no evidence that mifepristone exposure has a teratogenic effect on an ongoing pregnancy.(44) Misoprostol exposure early in pregnancy doubles the risk of causing major fetal malformations in a continuing pregnancy, from approximately 2% in cases with no exposure to 4% in cases of misoprostol exposure.(45) High-dose methotrexate exposure causes high rates of malformations or pregnancy loss.(46)

High-sensitivity pregnancy tests, such as those found in the pharmacy, typically detect hCG levels under 25-50 mIU/mL. These tests have a high rate of being positive for up to 30 days after a successful medication abortion.(30) Women should not take a high-sensitivity pregnancy test less than four weeks after medication abortion. Multi-level and low-sensitivity pregnancy tests, which detect hCG levels of 1000-2000 mIU/mL may be more accurate for medication abortion follow-up.(32-36)

18

**References:**

1. Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev. 2011;[epub (11):CD002855. (http://dx.doi.org/10.1002/14651858.CD002855.pub4)

2. American College of Obstetricians and Gynecologists. Practice Bulletin No. 143: Medical management of first-trimester abortion. Obstet Gynecol. 2014;123(3):676-92. (http://dx.doi.org/10.1097/01.AOG.0000444454.67279.7d)

3. Fok WK, Mark A. Abortion through telemedicine. Curr Opin Obstet Gynecol. 2018;30(6):394-9. (http://dx.doi.org/10.1097/GCO.0000000000000498)

4. Grossman D, Grindlay K. Safety of medical abortion provided through telemedicine compared with in person. Obstet Gynecol. 2017;130(4):778-82. (http://dx.doi.org/10.1097/AOG.0000000000002212)

5. Gonzalez CH, Vargas FR, Perez AB, Kim CA, Brunoni D, Marques-Dias MJ, et al. Limb deficiency with or without Mobius sequence in seven Brazilian children associated with misoprostol use in the first trimester of pregnancy. American J Med Genetics. 1993;47(1):59-64. (http://www.ncbi.nlm.nih.gov/pubmed/8368254)

6. Sääv I, Fiala C, Hämäläinen JM, Heikinheimo O, Gemzell-Danielsson K. Medical abortion in lactating women--low levels of mifepristone in breast milk. Acta Obstet Gynecol Scand. 2010;89(5):618-22. (http://dx.doi.org/10.3109/00016341003721037)

7. Vogel D, Burkhardt T, Rentsch K, Schweer H, Watzer B, Zimmermann R, et al. Misoprostol versus methylergometrine: pharmacokinetics in human milk. Am J Obstet Gynecol. 2004;191(6):2168-73. (http://dx.doi.org/10.1016/j.ajog.2004.05.008)

8. Grossman D, White K, Harris L, Reeves M, Blumenthal PD, Winikoff B, et al. Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review. Contraception. 2015;92(3):206-11. (http://dx.doi.org/10.1016/j.contraception.2015.06.001)

9. Creinin MD, Hou MY, Dalton L, Steward R, Chen MJ. Mifepristone antagonization with progesterone to prevent medical abortion: a randomized controlled trial. Obstet Gynecol. 2019;[epub 2019/12/07]. (http://dx.doi.org/10.1097/AOG.0000000000003620)

10. Ngoc NTN, Blum J, Raghavan S, Nga NTB, Dabash R, Diop A, et al. Comparing two early medical abortion regimens: mifepristone+misoprostol vs. misoprostol alone. Contraception. 2011;83(5):410-7. (http://dx.doi.org/10.1016/j.contraception.2010.09.002)

11. Blum J, Raghavan S, Dabash R, Ngoc NT, Chelli H, Hajri S, et al. Comparison of misoprostol-only and combined mifepristone-misoprostol regimens for home-based early medical abortion in Tunisia and Vietnam. Int J Gynaecol Obstet. 2012;118(2):166-71. (http://dx.doi.org/10.1016/j.ijgo.2012.03.039)

12. Department of Reproductive Health and Research. Safe Abortion: Technical and Policy Guidance for Health Systems, 2nd ed. Geneva: World Health Organization; 2012.

2021 REMS 000807

(http://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/index.html)

13. Conkling K, Karki C, Tuladhar H, Bracken H, Winikoff B. A prospective open-label study of home use of mifepristone for medical abortion in Nepal. Int J Gynaecol Obstet. 2015;128(3):220-3. (http://dx.doi.org/10.1016/j.ijgo.2014.09.022)

14. Gouk EV, Lincoln K, Khair A, Haslock J, Knight J, Cruickshank DJ. Medical termination of pregnancy at 63 to 83 days gestation. BJOG. 1999;106(6):535-9. (http://www.ncbi.nlm.nih.gov/pubmed/10426609)

15. Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care. 2011;16(2):61-6. (http://dx.doi.org/doi:10.3109/13625187.2011.555568)

16. Winikoff B, Dzuba IG, Chong E, Goldberg AB, Lichtenberg ES, Ball C, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol. 2012;120(5):1070-6. (http://www.ncbi.nlm.nih.gov/pubmed/23090524)

17. Bracken H, Dabash R, Tsertsvadze G, Posohova S, Shah M, Hajri S, et al. A two-pill sublingual misoprostol outpatient regimen following mifepristone for medical abortion through 70 days' LMP: a prospective comparative open-label trial. Contraception. 2014;89(3):181-6. (http://dx.doi.org/10.1016/j.contraception.2013.10.018)

18. Sanhueza Smith P, Pena M, Dzuba IG, Martinez ML, Peraza AG, Bousieguez M, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters. 2015;22(44 Suppl 1):75-82. (http://dx.doi.org/10.1016/S0968-8080(15)43825-X)

19. Abbas D, Chong E, Raymond EG. Outpatient medical abortion is safe and effective through 70 days gestation. Contraception. 2015;92(3):197-9. (http://dx.doi.org/10.1016/j.contraception.2015.06.018)

20. Dzuba IG, Chong E, Hannum C, Kurbanova D, Lichtenberg ES, Lugo-Hernández EM, et al. Outpatient mifepristone-misoprostol medical abortion through 77 days of gestation. Oral presentation at the North American Forum on Family Planning, Denver, CO. 2016.

21. Castillo P, Sanhueza Smith P, Lugo-Hernández EM, Castaneda Vivar JJ, Bousieguez M, Dzuba IG. Does a repeat dose of 800 mcg misoprostol following mifepristone improve outcomes in the later first trimester? A retrospective chart review in mexico city. Poster presented at National Abortion Federation Annual Meeting, Montreal, Canada. 2017.

22. Sheldon WR, Durocher J, Dzuba IG, Sayette H, Martin R, Velasco MC, et al. Early abortion with buccal versus sublingual misoprostol alone: a multicenter, randomized trial. Contraception. 2019;99(5):272-7. (http://dx.doi.org/10.1016/j.contraception.2019.02.002)

23. Raymond EG, Harrison MS, Weaver MA. Efficacy of misoprostol alone for first-trimester medical abortion: a systematic review. Obstet Gynecol. 2019;133(1):137-47. (http://dx.doi.org/10.1097/AOG.0000000000003017)

2021 REMS 000808

24. Costescu D, Guilbert E, Bernardin J, Black A, Dunn S, Fitzsimmons B, et al. Clinical practice guideline: medical abortion. J Obstet Gynaecol Canada. 2016;38(4):366-89. (http://dx.doi.org/10.1016/j.jogc.2016.01.002)

25. Livshits A, Machtinger R, David LB, Spira M, Moshe-Zahav A, Seidman DS. Ibuprofen and paracetamol for pain relief during medical abortion: a double-blind randomized controlled study. Fertil Steril. 2009;91(5):1877-80. (http://dx.doi.org/10.1016/j.fertnstert.2008.01.084)

26. Bracken H, Clark W, Lichtenberg ES, Schweikert SM, Tanenhaus J, Barajas A, et al. Alternatives to routine ultrasound for eligibility assessment prior to early termination of pregnancy with mifepristone–misoprostol. BJOG. 2011;118(1):17-23. (http://dx.doi.org/10.1111/j.1471-0528.2010.02753.x)

27. Cameron ST, Glasier A, Dewart H, Johnstone A, Burnside A. Telephone follow-up and self-performed urine pregnancy testing after early medical abortion: a service evaluation. Contraception. 2012;86(1):67-73. (http://dx.doi.org/10.1016/j.contraception.2011.11.010)

28. Clark W, Bracken H, Tanenhaus J, Schweikert S, Lichtenberg ES, Winikoff B. Alternatives to a routine follow-up visit for early medical abortion. Obstet Gynecol. 2010;115(2 Pt 1):264-72. (http://dx.doi.org/10.1097/AOG.0b013e3181c996f3)

29. Godfrey EM, Anderson A, Fielding SL, Meyn L, Creinin MD. Clinical utility of urine pregnancy assays to determine medical abortion outcome is limited. Contraception. 2007;75(5):378-82. (http://ovidsp.ovid.com/ovidweb.cgi?T=JS&NEWS=N&PAGE=fulltext&AN=17434020&D=medl)

30. Perriera LK, Reeves MF, Chen BA, Hohmann HL, Hayes J, Creinin MD. Feasibility of telephone follow-up after medical abortion. Contraception. 2010;81(2):143-9. (http://linkinghub.elsevier.com/retrieve/pii/S0010782409003874)

31. Parashar P, Iversen OE, Midboe G, Myking O, Bjorge L. Medical abortion in the first trimester: the use of serum hCG and endometrial thickness as markers of completeness. Eur J Contracept Reprod Health Care. 2007;12(4):366-71. (http://dx.doi.org/10.1080/13625180701536300)

32. Blum J, Sheldon WR, Ngoc NTN, Winikoff B, Nga NTB, Martin R, et al. Randomized trial assessing home use of two pregnancy tests for determining early medical abortion outcomes at 3, 7 and 14 days after mifepristone. Contraception. 2016;94(2):115-21. (http://dx.doi.org/10.1016/j.contraception.2016.04.001)

33. Oppegaard KS, Qvigstad E, Fiala C, Heikinheimo O, Benson L, Gemzell-Danielsson K. Clinical follow-up compared with self-assessment of outcome after medical abortion: a multicentre, non-inferiority, randomised, controlled trial. Lancet. 2015;385(9969):698-704. (http://dx.doi.org/10.1016/S0140-6736(14)61054-0)

34. Lynd K, Blum J, Ngoc NT, Shochet T, Blumenthal PD, Winikoff B. Simplified medical abortion using a semi-quantitative pregnancy test for home-based follow-up. Int J Gynaecol Obstet. 2013;121(2):144-8. (http://dx.doi.org/10.1016/j.ijgo.2012.11.022)

35. Blum J, Shochet T, Lynd K, Lichtenberg ES, Fischer D, Arnesen M, et al. Can at-home semi-quantitative pregnancy tests serve as a replacement for clinical follow-up of medical

2021 REMS 000809

abortion? A US study. Contraception. 2012;86(6):757-62.
(http://dx.doi.org/10.1016/j.contraception.2012.06.005)

36. Cameron ST, Glasier A, Johnstone A, Dewart H, Campbell A. Can women determine the success of early medical termination of pregnancy themselves? Contraception. 2015;91(1):6-11. (http://dx.doi.org/10.1016/j.contraception.2014.09.009)

37. Reeves MF, Fox MC, Lohr PA, Creinin MD. Endometrial thickness following medical abortion is not predictive of subsequent surgical intervention. Ultrasound in Obstet Gynecol. 2009;34(1):104-9. (http://dx.doi.org/10.1002/uog.6404)

38. Reeves MF, Lohr PA, Harwood BJ, Creinin MD. Ultrasonographic endometrial thickness after medical and surgical management of early pregnancy failure. Obstet Gynecol. 2008;111(1):106-12. (http://dx.doi.org/10.1097/01.AOG.0000296655.26362.6d)

39. Honkanen H, Ranta S, Ylikorkala O, Heikinheimo O. The kinetics of serum hCG and progesterone in response to oral and vaginal administration of misoprostol during medical termination of early pregnancy. Hum Reprod. 2002;17(9):2315-9. (http://www.ncbi.nlm.nih.gov/pubmed/12202418)

40. von Hertzen H, Honkanen H, Piaggio G, Bartfai G, Erdenetungalag R, Gemzell-Danielsson K, et al. WHO multinational study of three misoprostol regimens after mifepristone for early medical abortion. I: Efficacy. BJOG. 2003;110(9):808-18.

41. Reeves MF, Kudva A, Creinin MD. Medical abortion outcomes after a second dose of misoprostol for persistent gestational sac. Contraception. 2008;78(4):332-5. (http://dx.doi.org/10.1016/j.contraception.2008.06.002)

42. Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med. 2018;378(23):2161-70. (http://dx.doi.org/10.1056/NEJMoa1715726)

43. Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception. 2019;100(3):178-81. (http://dx.doi.org/10.1016/j.contraception.2019.05.006)

44. Bernard N, Elefant E, Carlier P, Tebacher M, Barjhoux CE, Bos-Thompson MA, et al. Continuation of pregnancy after first-trimester exposure to mifepristone: an observational prospective study. BJOG. 2013;120(5):568-74. (http://dx.doi.org/10.1111/1471-0528.12147)

45. Vauzelle C, Beghin D, Cournot MP, Elefant E. Birth defects after exposure to misoprostol in the first trimester of pregnancy: prospective follow-up study. Reprod Toxicol. 2013;36:98-103. (http://dx.doi.org/10.1016/j.reprotox.2012.11.009)

46. Yedlinsky NT, Morgan FC, Whitecar PW. Anomalies associated with failed methotrexate and misoprostol termination. Obstet Gynecol. 2005;105(5 Pt 2):1203-5. (http://dx.doi.org/10.1097/01.AOG.0000154002.26761.41)

2021 REMS 000810

## 7. FIRST-TRIMESTER ASPIRATION ABORTION

**Policy Statement:** Induced abortion is one of the safest procedures in medicine. The following guidelines are intended to outline steps that maximize this safety.

Standard 7.1.    Pertinent medical history must be obtained.

Standard 7.2.    Pregnancy must be confirmed, and gestational age must be assessed.

   Recommendation 7.2.1.    When gestational age cannot be reasonably determined by other means, ultrasonography should be used.

Standard 7.3.    Appropriate initial evaluation must be performed. Baseline blood pressure and pulse must be obtained for all patients.

   Recommendation 7.3.1.    Physical exam should be done as indicated by medical history and patient symptoms.

Standard 7.4.    The cervix should be appropriately dilated for the gestational age.

   Recommendation 7.4.1.    Cervical dilation may be achieved through the use of rigid cervical dilators. Tapered dilators such as Pratt or Denniston dilators are recommended over non-tapered dilators such as Hegar dilators.(1)

   Recommendation 7.4.2.    When cervical preparation with misoprostol is used, an evidence-based regimen should be followed.(2-5)

      Option 7.4.2.1.    The routine use of misoprostol before procedures may reduce rare complications but must be balanced against increased pain and other side effects for all patients.(5)

      Option 7.4.2.2.    Osmotic dilators may be considered when cervical dilation is expected to be difficult.(6)

Standard 7.5.    First-trimester abortion procedures must be performed by aspiration of the uterus, not by sharp curettage.(7-9)

   Recommendation 7.5.1.    Uterine aspiration is effective throughout the first trimester including prior to confirmation of a definitive intrauterine pregnancy on ultrasound.(10)

   Recommendation 7.5.2.    Sharp curettage should not be routinely used after uterine aspiration.

2021 REMS 000811

<u>Recommendation 7.5.3.</u>    Uterotonics should not be used routinely after first-trimester uterine aspiration.(11)

**Discussion:** No evidence supports the routine use of sharp curettage or any uterotonic after first-trimester uterine aspiration.

Cervical preparation has limited effectiveness and is not needed before a routine first-trimester abortion. Its use must be balanced against the prolonged time in the facility, side effects, and patient satisfaction. If misoprostol is used for cervical preparation, an evidence-based regimen is misoprostol 400mcg buccally, vaginally, or sublingually, one to three hours prior to the abortion procedure.(4, 5)

**References:**

1. Hulka JF, Lefler HT, Jr., Anglone A, Lachenbruch PA. A new electronic force monitor to measure factors influencing cervical dilation for vacuum curettage. Am J Obstet Gynecol. 1974;120(2):166-73. (http://www.ncbi.nlm.nih.gov/pubmed/4411687)

2. Singh K, Fong YF, Prasad RN, Dong F. Evacuation interval after vaginal misoprostol for preabortion cervical priming: a randomized trial. Obstet Gynecol. 1999;94(3):431-4.

3. Sharma S, Refaey H, Stafford M, Purkayastha S, Parry M, Axby H. Oral versus vaginal misoprostol administered one hour before surgical termination of pregnancy: a randomised controlled trial. BJOG. 2005;112(4):456-60. (http://dx.doi.org/10.1111/j.1471-0528.2005.00255.x)

4. Sääv I, Kopp Kallner H, Fiala C, Gemzell-Danielsson K. Sublingual versus vaginal misoprostol for cervical dilatation 1 or 3 h prior to surgical abortion: a double-blinded RCT. Human Reproduction. 2015;30(6):1314-22. (http://dx.doi.org/10.1093/humrep/dev071)

5. Meirik O, Huong NTM, Piaggio G, Bergel E, von Hertzen H. Complications of first-trimester abortion by vacuum aspiration after cervical preparation with and without misoprostol: a multicentre randomised trial. The Lancet. 2012;379(9828):1817–24. (http://dx.doi.org/10.1016/S0140-6736(11)61937-5)

6. Allen RH, Goldberg AB. Cervical dilation before first-trimester surgical abortion (<14 weeks' gestation): SFP Guideline 20071. Contraception. 2007;76(2):139-56. (http://dx.doi.org/10.1016/j.contraception.2007.05.001)

7. International Federation of Gynecology and Obstetrics. Consensus statement on uterine evacuation: Uterine evacuation: use vacuum aspiration or medications, not sharp curettage. London: FIGO, 2011. (https://www.figo.org/sites/default/files/FIGO%20DC%20Statement.pdf)

8. Department of Reproductive Health and Research. Safe Abortion: Technical and Policy Guidance for Health Systems, 2nd ed. Geneva: World Health Organization; 2012. (http://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/index.html)

2021 REMS 000812

9.  Paul M, Lichtenberg ES, Borgatta L, Grimes DA, Stubblefield PG, Creinin MD. Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. Oxford: Wiley-Blackwell; 2009.

10. Lichtenberg ES, Paul M. Surgical abortion prior to 7 weeks of gestation: SFP Guideline 20132. Contraception. 2013;88(1):7-17. (http://dx.doi.org/doi:10.1016/j.contraception.2013.02.008)

11. Kerns JL, Pearlson GA, Mengesha BM, Harter K, Jackson RA, Drey EA. The UP trial: a randomized controlled trial of uterotonic prophylaxis with methylergonovine maleate for late dilation and evacuation abortions. Contraception. 2017;96(4):270. (http://dx.doi.org/10.1016/j.contraception.2017.07.036)

25

## 8. MANAGEMENT OF PREGNANCY OF UNCERTAIN LOCATION

**Policy Statement:** Many patients seek care very early in pregnancy before an intrauterine pregnancy can be visualized on ultrasound. When a patient has a positive pregnancy test and pregnancy of uncertain location, the most common diagnosis is an intrauterine pregnancy, but the possibility of ectopic pregnancy must be considered. For these patients, abortion care should be offered, and the patient must be followed to ensure that the pregnancy has ended. If abortion care is delayed allowing for visualization of pregnancy on ultrasound, the patient must be evaluated by a clinician, ectopic precautions must be given, and a plan for follow-up must be made.

Standard 8.1.      The patient must be evaluated by a clinician to assess for the risk of ectopic pregnancy in pregnancy of uncertain location.(1-3)

   Recommendation 8.1.1.   Evaluation should involve assessment of the history in combination with one or more of the following: physical exam, sonography, serial quantitative hCG, and/or uterine aspiration.(4)

   Recommendation 8.1.2.   Abortion care should be offered even if pregnancy location is uncertain.(5-7)

Standard 8.2.      Each facility must have a written protocol to evaluate pregnancy of uncertain location. All relevant staff at the site must be familiar with the protocol.

   Recommendation 8.2.1.   This protocol may include referrals as appropriate.

Standard 8.3.      All patients with a pregnancy of uncertain location must be informed of the options for evaluation and management. The symptoms and dangers associated with ectopic pregnancy, and a plan for when and how to seek emergency medical attention must be reviewed and documented.

   Recommendation 8.3.1.   Each facility should have a patient education handout describing ectopic warning signs and the medical record should reflect that the patient has received this handout.

Standard 8.4.      When a medication or aspiration abortion is initiated for a patient with a pregnancy of uncertain location, resolution of the pregnancy must be verified and documented. This may be demonstrated by either the examination of aspirated tissue or by following serial hCG levels according to evidence-based regimens.

26

Standard 8.5.     When an intrauterine pregnancy cannot be definitively seen on ultrasound, a clinician must review the patient's history, ultrasound images, and signs and symptoms of ectopic pregnancy. A clinician must discuss the risks and warning factors for ectopic pregnancy with the patient.

    Option 8.5.0.1.     hCG levels may be used to determine whether a patient is at elevated risk of ectopic pregnancy and needs immediate evaluation if abortion care is deferred.

Standard 8.6.     Patient follow-up must continue until one of the following:

    (1) the diagnosis of ectopic pregnancy has been excluded;

    (2) clinical resolution of a pregnancy of uncertain location has been ensured; or

    (3) transfer of care to an appropriate provider has been made and documented.

Standard 8.7.     Patients experiencing symptoms suspicious for ectopic pregnancy must be evaluated emergently.

**Discussion:** A combination of clinical assessment, pelvic ultrasound, serum quantitative hCG, and/or examination of uterine aspirate is often needed to distinguish between an intrauterine and an ectopic pregnancy.(1) Although a gestational sac can usually be seen four to five weeks from LMP on transvaginal ultrasound, it may be confused with a pseudo-sac associated with an ectopic pregnancy.(8, 9) Although visualization of a yolk sac or embryo is needed to definitely confirm an intrauterine pregnancy on ultrasound,(10) the lack of visualization of these structures should not delay abortion care.

Although it is an important cause of pregnancy-related morbidity and mortality, ectopic implantation has been reported to occur in less than 1% of pregnancies in patients presenting for induced abortion.(5, 11)

Following aspiration abortion, if sufficient products of conception (POC) are not identified, one option for additional evaluation is the use of quantitative hCG testing. A baseline hCG can be obtained and a second hCG can be done in 24-48 hours. If there is a decrease of 50% or more, no further ectopic follow-up is necessary.(12-14) Otherwise, further evaluation should be initiated including consideration of ectopic pregnancy.

Similarly, following medication abortion, hCG can be used to rule out ectopic pregnancy while simultaneously evaluating success of the medication abortion.(15, 16)

2021 REMS 000815

For more information and protocols for management of pregnancy of uncertain location, please visit NAF's members-only website at https://members.prochoice.org and access the resources section of online learning.

**References:**

1. Kulp JL, Barnhart KT. Ectopic pregnancy. In: Paul M, Lichtenberg S, Borgatta L, Grimes D, Stubblefield P, Creinin M, editors. Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. London: Wiley-Blackwell; 2009.

2. Nama V, Manyonda I. Tubal ectopic pregnancy: diagnosis and management. Arch Gynecol Obstet. 2009;279(4):443-53. (http://dx.doi.org/10.1007/s00404-008-0731-3)

3. Barnhart KT, Sammel MD, Gracia CR, Chittams J, Hummel AC, Shaunik A. Risk factors for ectopic pregnancy in women with symptomatic first-trimester pregnancies. Fertil Steril. 2006;86(1):36-43. (http://dx.doi.org/10.1016/j.fertnstert.2005.12.023)

4. Gracia CR, Barnhart KT. Diagnosing ectopic pregnancy: decision analysis comparing six strategies. Obstet Gynecol. 2001;97(3):464-70. (https://doi.org/10.1016/S0029-7844(00)01159-5)

5. Edwards J, Carson SA. New technologies permit safe abortion at less than six weeks' gestation and provide timely detection of ectopic gestation. Am J Obstet Gynecol. 1997;176(5):1101-6. (http://www.ncbi.nlm.nih.gov/pubmed/9166176)

6. Goldstone P, Michelson J, Williamson E. Effectiveness of early medical abortion using low-dose mifepristone and buccal misoprostol in women with no defined intrauterine gestational sac. Contraception. 2013;87(6):855-8. (http://dx.doi.org/10.1016/j.contraception.2012.10.013)

7. Fjerstad M, Sivin I, Lichtenberg ES, Trussell J, Cleland K, Cullins V. Effectiveness of medical abortion with mifepristone and buccal misoprostol through 59 gestational days. Contraception. 2009;80(3):282-6. (http://dx.doi.org/10.1016/j.contraception.2009.03.010)

8. Barnhart KT. Clinical practice. Ectopic pregnancy. N Engl J Med. 2009;361(4):379-87. (http://dx.doi.org/10.1056/NEJMcp0810384)

9. Perriera L, Reeves MF. Ultrasound criteria for diagnosis of early pregnancy failure and ectopic pregnancy. Semin Reprod Med. 2008;26(5):373-82. (http://dx.doi.org/10.1055/s-0028-1087103)

10. Goldstein SR, Reeves MF. Assessing pregnancy status and gestational age. In: Paul M, Lichtenberg S, Borgatta L, Grimes D, Stubblefield P, Creinin M, editors. Management of Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. London: Wiley-Blackwell; 2009.

11. Hakim-Elahi E, Tovell HM, Burnhill MS. Complications of first-trimester abortion: a report of 170,000 cases. Obstet Gynecol. 1990;76(1):129-35. (http://www.ncbi.nlm.nih.gov/pubmed/2359559)

2021 REMS 000816

12. Midgley AR, Jr., Jaffe RB. Regulation of human gonadotropins. II. Disappearance of human chorionic gonadotropin following delivery. J Clin Endocrinol Metab. 1968;28(12):1712-8. (http://www.ncbi.nlm.nih.gov/pubmed/5749054)

13. Steier JA, Bergsjø P, Myking OL. Human chorionic gonadotropin in maternal plasma after induced abortion, spontaneous abortion, and removed ectopic pregnancy. Obstet Gynecol. 1984;64(3):391-4. (http://www.ncbi.nlm.nih.gov/pubmed/6462569)

14. Rizkallah T, Gurpide E, Vande Wiele RL. Metabolism of hCG in man. J Clin Endocrinol Metab. 1969;29(1):92-100. (http://www.ncbi.nlm.nih.gov/pubmed/5762326)

15. Fiala C, Safar P, Bygdeman M, Gemzell-Danielsson K. Verifying the effectiveness of medical abortion; ultrasound versus hCG testing. European Journal of Obstetrics, Gynecology, & Reproductive Biology. 2003;109(2):190-5. (http://dx.doi.org/10.1016/S0301-2115(03)00012-5)

16. Honkanen H, Ranta S, Ylikorkala O, Heikinheimo O. The kinetics of serum hCG and progesterone in response to oral and vaginal administration of misoprostol during medical termination of early pregnancy. Hum Reprod. 2002;17(9):2315-9. (http://www.ncbi.nlm.nih.gov/pubmed/12202418)

2021 REMS 000817

## 9. ABORTION BY DILATION AND EVACUATION

**Policy Statement:** Abortion by dilation and evacuation (D&E) is a safe outpatient procedure when performed by appropriately trained clinicians in medical offices, freestanding clinics, ambulatory surgery centers, and hospitals.(1-6)

Standard 9.1.    Pertinent medical history must be obtained, and relevant physical examination must be performed.

    Recommendation 9.1.1.    Obesity without comorbidities should not be used to restrict or delay access to D&E.(7-9)

Standard 9.2.    Gestational age must be verified by ultrasonography, using a consistent and published table of fetal measurements, prior to the termination of a pregnancy clinically estimated to be more than 14 weeks from LMP.

Standard 9.3.    The patient must be appropriately evaluated and prepared for the procedure.

    Recommendation 9.3.1.    Intravenous access should be established prior to evacuation.

    Recommendation 9.3.2.    When induced fetal demise is used, it should be provided through an evidence-based protocol.(10-16)

    Recommendation 9.3.3.    In a patient with a prior uterine scar, after appropriate evaluation to exclude placenta accreta spectrum, the patient may have a procedure in the outpatient setting.(17)

Standard 9.4.    When cervical preparation agents are used overnight or outside the facility, a plan for emergency care must be in place and communicated to the patient.

Standard 9.5.    Appropriate dilation of the cervix must be obtained gently and gradually.(18, 19)

    Recommendation 9.5.1.    Osmotic dilators, misoprostol, mifepristone, and/or other cervical preparation agents should be used to facilitate adequate dilation.(20-23)

    Recommendation 9.5.2.    Local anesthesia should be used for pain management with osmotic dilator placement.(24, 25)

    Recommendation 9.5.3.    An evidence-based regimen should be used for dosage, timing, and route of misoprostol.(23, 26-30)

30

       <u>Option 9.5.0.1.</u>    Synthetic osmotic dilators and/or misoprostol may be used for same-day cervical dilation.(26, 28, 29, 31)

<u>Standard 9.6.</u>    All instruments entering uterine cavity must be sterile.

<u>Standard 9.7.</u>    Evidence-based practices must be used to lower the risk of complications.

    <u>Recommendation 9.7.1.</u>    Intra-procedure ultrasonography should be used to aid in visualizing instruments, locating fetal parts, verifying an empty uterus, reducing the risk of uterine perforation, and shortening the procedure.(32-34)

    <u>Recommendation 9.7.2.</u>    Inhaled anesthesia should be avoided if possible due to the increased risk of hemorrhage.(35, 36)

<u>Standard 9.8.</u>    Uterotonics must be available to aid in control of uterine bleeding.(17)

    <u>Option 9.8.0.1.</u> An intra- or paracervical prophylactic vasoconstrictor can be used to reduce blood loss.(37)

**Discussion:** Cervical preparation before dilation and evacuation can be achieved with multiple agents either alone or in combination. Misoprostol is commonly used, with a dose of 400mcg supported by most studies.(38)

Induced fetal demise should be provided using an evidence-based regimen. A sample protocol for digoxin injection is available at https://members.prochoice.org. Intraamniotic or intrafetal digoxin may be used.(39, 40) Intracardiac potassium chloride or lidocaine may also be used.(11, 16, 41) Injections may be done either transabdominally or transvaginally.(42, 43) Cord transection may also be used.(44)

**References:**

1. American College of Obstetrics and Gynecology. Practice Bulletin No. 135: Second-trimester abortion. Obstet Gynecol. 2013;121(6):1394-406. (http://dx.doi.org/10.1097/01.AOG.0000431056.79334.cc)

2. Bryant AG, Grimes DA, Garrett JM, Stuart GS. Second-trimester abortion for fetal anomalies or fetal death: labor induction compared with dilation and evacuation. Obstet Gynecol. 2011;117(4):788-92. (http://dx.doi.org/10.1097/AOG.0b013e31820c3d26)

3. Grimes DA, Schulz KF, Cates W, Jr., Tyler CW, Jr. Mid-trimester abortion by dilatation and evacuation: a safe and practical alternative. N Engl J Med. 1977;296(20):1141-5. (http://dx.doi.org/10.1056/NEJM197705192962004)

2021 REMS 000819

4.  Grimes DA, Cates W, Jr., Tyler CW, Jr. Comparative risk of death from legally induced abortion in hospitals and nonhospital facilities. Obstet Gynecol. 1978;51(3):323-6. (http://www.ncbi.nlm.nih.gov/pubmed/628534)

5.  Cates W, Jr., Schulz KF, Grimes DA, Horowitz AJ, Lyon FA, Kravitz FH, et al. Dilatation and evacuation procedures and second-trimester abortions. The role of physician skill and hospital setting. JAMA. 1982;248(5):559-63. (http://www.ncbi.nlm.nih.gov/pubmed/6285012)

6.  Grimes DA, Schulz KF. Morbidity and mortality from second-trimester abortions. J Reprod Med. 1985;30(7):505-14. (http://www.ncbi.nlm.nih.gov/pubmed/3897528)

7.  Lederle L, Steinauer JE, Montgomery A, Aksel S, Drey EA, Kerns JL. Obesity as a risk factor for complications after second-trimester abortion by dilation and evacuation. Obstet Gynecol. 2015;126(3):585-92. (http://dx.doi.org/10.1097/aog.0000000000001006)

8.  Benson LS, Micks EA, Ingalls C, Prager SW. Safety of outpatient surgical abortion for obese patients in the first and second trimesters. Obstet Gynecol. 2016;128(5):1065-70. (http://dx.doi.org/10.1097/AOG.0000000000001692)

9.  Mark KS, Bragg B, Talaie T, Chawla K, Murphy L, Terplan M. Risk of complication during surgical abortion in obese women. Am J Obstet Gynecol. 2018;218(2):238.e1-238.35. (http://dx.doi.org/10.1016/j.ajog.2017.10.018)

10. Diedrich J, Drey E, for the Society of Family Planning. Induction of fetal demise before abortion: SFP Guideline 20101. Contraception. 2010;81(6):462-73. (http://dx.doi.org/10.1016/j.contraception.2010.01.018)

11. Senat MV, Fischer C, Bernard JP, Ville Y. The use of lidocaine for fetocide in late termination of pregnancy. BJOG. 2003;110(3):296-300. (http://dx.doi.org/10.1046/j.1471-0528.2003.02217.x)

12. Jackson RA, Teplin VL, Drey EA, Thomas LJ, Darney PD. Digoxin to facilitate late second-trimester abortion: a randomized, masked, placebo-controlled trial. Obstet Gynecol. 2001;97(3):471-6. (https://www.ncbi.nlm.nih.gov/pubmed/11239659)

13. Drey EA, Thomas LJ, Benowitz NL, Goldschlager N, Darney PD. Safety of intra-amniotic digoxin administration before late second-trimester abortion by dilation and evacuation. Am J Obstet Gynecol. 2000;182(5):1063-6. (https://www.ncbi.nlm.nih.gov/pubmed/10819828)

14. Nucatola D, Roth N, Gatter M. A randomized pilot study on the effectiveness and side-effect profiles of two doses of digoxin as fetocide when administered intraamniotically or intrafetally prior to second-trimester surgical abortion. Contraception. 2010;81(1):67-74. (http://dx.doi.org/10.1016/j.contraception.2009.08.014)

15. Molaei M, Jones HE, Weiselberg T, McManama M, Bassell J, Westhoff CL. Effectiveness and safety of digoxin to induce fetal demise prior to second-trimester abortion. Contraception. 2008;77(3):223-5. (http://dx.doi.org/10.1016/j.contraception.2007.10.011)

16. Pasquini L, Pontello V, Kumar S. Intracardiac injection of potassium chloride as method for feticide: experience from a single UK tertiary centre. BJOG. 2008;115(4):528-31. (http://dx.doi.org/10.1111/j.1471-0528.2007.01639.x)

2021 REMS 000820

17. Kerns J, Steinauer J. Management of postabortion hemorrhage: SFP Guideline 20131. Contraception. 2013;87(3):331-42. (http://dx.doi.org/10.1016/j.contraception.2012.10.024)

18. Newmann S, Dalve-Endres A, Drey EA. Cervical preparation for surgical abortion from 20 to 24 weeks' gestation: SFP Guideline 20073. Contraception. 2008;77(4):308-14. (http://dx.doi.org/10.1016/j.contraception.2008.01.004)

19. Autry AM, Hayes EC, Jacobson GF, Kirby RS. A comparison of medical induction and dilation and evacuation for second-trimester abortion. Am J Obstet Gynecol. 2002;187(2):393-7. (http://dx.doi.org/10.1067/mob.2002.123887)

20. Borgatta L, Roncari D, Sonalkar S, Mark A, Hou MY, Finneseth M, et al. Mifepristone vs. osmotic dilator insertion for cervical preparation prior to surgical abortion at 14–16 weeks: a randomized trial. Contraception. 2012;86(5):567-71. (http://dx.doi.org/10.1016/j.contraception.2012.05.002)

21. Carbonell JL, Gallego FG, Llorente MP, Bermudez SB, Sala ES, Gonzalez LV, et al. Vaginal vs. sublingual misoprostol with mifepristone for cervical priming in second-trimester abortion by dilation and evacuation: a randomized clinical trial. Contraception. 2007;75(3):230-7. (http://dx.doi.org/10.1016/j.contraception.2006.11.007)

22. Shaw KA, Shaw JG, Hugin M, Velasquez G, Hopkins FW, Blumenthal PD. Adjunct mifepristone for cervical preparation prior to dilation and evacuation: a randomized trial. Contraception. 2015;91(4):313-9. (http://dx.doi.org/10.1016/j.contraception.2014.11.014)

23. Goldberg AB, Fortin JA, Drey EA, Dean G, Lichtenberg ES, Bednarek PH, et al. Cervical preparation before dilation and evacuation using adjunctive misoprostol or mifepristone compared with overnight osmotic dilators alone: a randomized controlled trial. Obstet Gynecol. 2015;126(3):599-609. (http://dx.doi.org/10.1097/aog.0000000000000977)

24. Soon R, Tschann M, Salcedo J, Stevens K, Ahn HJ, Kaneshiro B. Paracervical block for laminaria insertion before second-trimester abortion: a randomized controlled trial. Obstet Gynecol. 2017;130(2):387-92. (http://dx.doi.org/10.1097/AOG.0000000000002149)

25. Schivone GB, Lerma K, Montgomery C, Wright P, Conti JA, Blumenthal PD, et al. Self-administered lidocaine gel for local anesthesia prior to osmotic dilator placement: a randomized trial. Contraception. 2019;99(3):148-51. (http://dx.doi.org/10.1016/j.contraception.2018.11.013)

26. Grossman D, Constant D, Lince-Deroche N, Harries J, Kluge J. A randomized trial of misoprostol versus laminaria before dilation and evacuation in South Africa. Contraception. 2014;90(3):234-41. (http://dx.doi.org/10.1016/j.contraception.2014.05.003)

27. Edelman AB, Buckmaster JG, Goetsch MF, Nichols MD, Jensen JT. Cervical preparation using laminaria with adjunctive buccal misoprostol before second-trimester dilation and evacuation procedures: a randomized clinical trial. American Journal of Obstet Gynecol. 2006;194(2):425-30. (http://dx.doi.org/10.1016/j.ajog.2005.08.016)

28. Lyus R, Lohr PA, Taylor J, Morroni C. Outcomes with same-day cervical preparation with dilapan-s osmotic dilators and vaginal misoprostol before dilatation and evacuation at 18 to

21+6 weeks' gestation. Contraception. 2013;87(1):71-5.
(http://dx.doi.org/10.1016/j.contraception.2012.07.006)

29. Goldberg AB, Drey EA, Whitaker AK, Kang MS, Meckstroth KR, Darney PD. Misoprostol
    compared with laminaria before early second-trimester surgical abortion: a randomized trial.
    Obstet Gynecol. 2005;106(2):234-41. (http://www.ncbi.nlm.nih.gov/pubmed/16055570)

30. Sääv I, Kopp Kallner H, Fiala C, Gemzell-Danielsson K. Sublingual versus vaginal
    misoprostol for cervical dilatation 1 or 3 h prior to surgical abortion: a double-blinded RCT.
    Human Reproduction. 2015;30(6):1314-22. (http://dx.doi.org/10.1093/humrep/dev071)

31. Maurer KA, Jacobson JC, Turok DK. Same-day cervical preparation with misoprostol prior to
    second trimester D&E: a case series. Contraception. 2013;88(1):116-21.
    (http://dx.doi.org/10.1016/j.contraception.2012.12.010)

32. Darney PD, Sweet RL. Routine intraoperative ultrasonography for second trimester abortion
    reduces incidence of uterine perforation. J Ultrasound Med. 1989;8(2):71-5.
    (http://www.ncbi.nlm.nih.gov/pubmed/2651693)

33. Darney PD, Atkinson E, Hirabayashi K. Uterine perforation during second-trimester abortion
    by cervical dilation and instrumental extraction: a review of 15 cases. Obstet Gynecol.
    1990;75(3 Pt 1):441-4. (http://www.ncbi.nlm.nih.gov/pubmed/2304715)

34. World Health Organization. Safe Abortion: Technical and Policy Guidance for Health
    Systems, 2nd ed. Geneva: 2012.
    (http://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/ind
    ex.html)

35. MacKay HT, Schulz KF, Grimes DA. Safety of local versus general anesthesia for second-
    trimester dilatation and evacuation abortion. Obstet Gynecol. 1985;66(5):661-5.
    (http://www.ncbi.nlm.nih.gov/pubmed/4058825)

36. Kumarasinghe N, Harpin R, Stewart AW. Blood loss during suction termination of pregnancy
    with two different anaesthetic techniques. Anaesth Intensive Care. 1997;25(1):48-50.
    (http://www.ncbi.nlm.nih.gov/pubmed/9075514)

37. Schulz KF, Grimes DA, Christensen DD. Vasopressin reduces blood loss from second-
    trimester dilatation and evacuation abortion. Lancet. 1985;2(8451):353-6.
    (http://www.ncbi.nlm.nih.gov/pubmed/2862514)

38. Fox MC, Krajewski CM. Cervical preparation for second-trimester surgical abortion prior to
    20 weeks' gestation: SFP Guideline #2013-4. Contraception. 2014;89(2):75-84.
    (http://dx.doi.org/10.1016/j.contraception.2013.11.001)

39. Dean G, Colarossi L, Lunde B, Jacobs AR, Porsch LM, Paul ME. Safety of digoxin for fetal
    demise before second-trimester abortion by dilation and evacuation. Contraception.
    2012;85(2):144-9. (http://dx.doi.org/10.1016/j.contraception.2011.05.016)

40. White KO, Nucatola DL, Westhoff C. Intra-fetal compared with intra-amniotic digoxin before
    dilation and evacuation: a randomized controlled trial. Obstet Gynecol. 2016;128(5):1071-6.
    (http://dx.doi.org/10.1097/AOG.0000000000001671)

2021 REMS 000822

41. López-Cepero R, Lynch L, de la Vega A. Effectiveness and safety of lidocaine in the induction of fetal cardiac asystole for second trimester pregnany termination. Bol Asoc Med P R. 2013;105(1):14-7. (https://www.ncbi.nlm.nih.gov/pubmed/23767379)

42. Gariepy AM, Chen BA, Hohmann HL, Achilles SL, Russo JA, Creinin MD. Transvaginal administration of intraamniotic digoxin prior to dilation and evacuation. Contraception. 2013;87(1):76-80. (http://dx.doi.org/10.1016/j.contraception.2012.07.019)

43. Tocce K, Sheeder JL, Edwards LJ, Teal SB. Feasibility, effectiveness and safety of transvaginal digoxin administration prior to dilation and evacuation. Contraception. 2013;88(6):706-11. (http://dx.doi.org/10.1016/j.contraception.2013.08.005)

44. Tocce K, Leach KK, Sheeder JL, Nielson K, Teal SB. Umbilical cord transection to induce fetal demise prior to second-trimester D&E abortion. Contraception. 2013;88(6):712-6. (http://dx.doi.org/10.1016/j.contraception.2013.08.001)

2021 REMS 000823

## 10. MEDICATION ABORTION AFTER THE FIRST TRIMESTER

**Policy Statement:** Medication abortion is a safe and effective method for termination of pregnancies beyond the first trimester when performed by trained clinicians in medical offices, freestanding clinics, ambulatory surgery centers, and hospitals. Induced fetal demise may be particularly important at later gestational ages.

Standard 10.1.    Pertinent medical history must be obtained, and relevant physical examination must be performed.

Standard 10.2.    Gestational age must be verified by ultrasonography, using a consistent and published table of fetal measurements, prior to the termination of a pregnancy clinically estimated to be more than 14 weeks from LMP.

Standard 10.3.    The patient must be appropriately evaluated and prepared.

   Recommendation 10.3.1.  Intravenous access should be established.

Standard 10.4.    Facilities must have a policy that addresses whether and when to induce fetal demise.

   Recommendation 10.4.1.  When induced fetal demise is used, it should be provided through a standard protocol.(1-6)

Standard 10.5.    Evidence-based regimens of medication abortion must be used.

   Recommendation 10.5.1.  Mifepristone 200 mg followed by misoprostol should be used, when available and feasible.(7-10)

      Option 10.5.0.1.  Misoprostol may also be used alone.(11)

      Option 10.5.0.2.  The initial dose of misoprostol may be more effective if administered vaginally than sublingually,(11) particularly in nulliparous patients.(12)

      Option 10.5.0.3.  Subsequent doses of 400 mcg misoprostol may be most effective when given every three to four hours and are effective by vaginal, buccal, or sublingual routes.(11)

      Option 10.5.0.4.  Oxytocin may be used according to a protocol.

      Option 10.5.0.5.  Osmotic dilators may be useful at later gestations.

2021 REMS 000824

Recommendation 10.5.2.    Intraamniotic injection or instillation methods should be avoided as they are less effective and result in more complications than mifepristone-misoprostol or misoprostol-alone regimens.(13)

Standard 10.6.    Once regular contractions have been confirmed, patients must be observed by health care staff trained to monitor contractions and expulsion, and who can recognize emergent situations.

Standard 10.7.    A trained clinician must be available from initiation of induction until post-abortion discharge.

Standard 10.8.    Access to surgical management or appropriate referral must be available if surgical intervention is required.

Standard 10.9.    The facility and/or clinician should continue care of the patient until completion of the abortion or transfer of care to an appropriate provider is made.


**Discussion:** An interval of 24-48 hours between mifepristone and misoprostol shortens the time to completion after starting misoprostol.

Caution should be used with osmotic dilators in the second trimester as they may prolong the induction time.(8, 14-16)

Induced fetal demise should be provided using an evidence-based regimen. A sample protocol for digoxin injection is available at https://members.prochoice.org. Intraamniotic or intrafetal digoxin may be used.(17, 18) Intracardiac potassium chloride or lidocaine may also be used.(6, 19, 20) Injections may be done either transabdominally or transvaginally.(21, 22)

Uterine curettage or aspiration should not routinely be performed.

The risk of uterine rupture during later medication abortion with misoprostol may be significantly increased for patients with two or more previous cesarean sections, however, the absolute risk remains low.(23) The risks should be balanced with alternative procedures for later abortion.


**References:**

1.  Diedrich J, Drey E, for the Society of Family Planning. Induction of fetal demise before abortion: SFP Guideline 20101. Contraception. 2010;81(6):462-73. (http://dx.doi.org/10.1016/j.contraception.2010.01.018)

2.  Jackson RA, Teplin VL, Drey EA, Thomas LJ, Darney PD. Digoxin to facilitate late second-trimester abortion: a randomized, masked, placebo-controlled trial. Obstet Gynecol. 2001;97(3):471-6. (https://www.ncbi.nlm.nih.gov/pubmed/11239659)

2021 REMS 000825

3.  Drey EA, Thomas LJ, Benowitz NL, Goldschlager N, Darney PD. Safety of intra-amniotic digoxin administration before late second-trimester abortion by dilation and evacuation. Am J Obstet Gynecol. 2000;182(5):1063-6. (https://www.ncbi.nlm.nih.gov/pubmed/10819828)

4.  Nucatola D, Roth N, Gatter M. A randomized pilot study on the effectiveness and side-effect profiles of two doses of digoxin as fetocide when administered intraamniotically or intrafetally prior to second-trimester surgical abortion. Contraception. 2010;81(1):67-74. (http://dx.doi.org/10.1016/j.contraception.2009.08.014)

5.  Molaei M, Jones HE, Weiselberg T, McManama M, Bassell J, Westhoff CL. Effectiveness and safety of digoxin to induce fetal demise prior to second-trimester abortion. Contraception. 2008;77(3):223-5. (http://dx.doi.org/10.1016/j.contraception.2007.10.011)

6.  Pasquini L, Pontello V, Kumar S. Intracardiac injection of potassium chloride as method for feticide: experience from a single UK tertiary centre. BJOG. 2008;115(4):528-31. (http://dx.doi.org/10.1111/j.1471-0528.2007.01639.x)

7.  Department of Reproductive Health and Research. Safe Abortion: Technical and Policy Guidance for Health Systems, 2nd ed. Geneva: World Health Organization; 2012. (http://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/index.html)

8.  Borgatta L, Kapp N. Labor induction abortion in the second trimester: SFP Guideline 20111. Contraception. 2011;84(1):4-18. (http://dx.doi.org/10.1016/j.contraception.2011.02.005)

9.  Ngoc NT, Shochet T, Raghavan S, Blum J, Nga NT, Minh NT, et al. Mifepristone and misoprostol compared with misoprostol alone for second-trimester abortion: a randomized controlled trial. Obstet Gynecol. 2011;118(3):601-8. (http://dx.doi.org/10.1097/AOG.0b013e318227214e)

10. Nilas L, Glavind-Kristensen M, Vejborg T, Knudsen UB. One or two day mifepristone-misoprostol interval for second trimester abortion. Acta Obstet Gynecol Scand. 2007;86(9):1117-21. (http://dx.doi.org/10.1080/00016340701505002)

11. Wildschut H, Both MI, Medema S, Thomee E, Wildhagen MF, Kapp N. Medical methods for mid-trimester termination of pregnancy. Cochrane Database Syst Rev. 2011;1:CD005216. (http://dx.doi.org/10.1002/14651858.CD005216.pub2)

12. von Hertzen H, Piaggio G, Wojdyla D, Nguyen TM, Marions L, Okoev G, et al. Comparison of vaginal and sublingual misoprostol for second trimester abortion: randomized controlled equivalence trial. Hum Reprod. 2009;24(1):106-12. (http://dx.doi.org/10.1093/humrep/den328)

13. Hou S-P, Fang A-H, Chen Q-F, Huang Y-M, Chen O-j, Cheng L-N. Termination of second-trimester pregnancy by mifepristone combined with misoprostol versus intra-amniotic injection of ethacridine lactate (rivanol®): a systematic review of Chinese trials. Contraception. 2011;84(3):214-23. (http://dx.doi.org/10.1016/j.contraception.2011.01.018)

2021 REMS 000826

14. Borgatta L, Chen AY, Vragovic O, Stubblefield PG, Magloire CA. A randomized clinical trial of the addition of laminaria to misoprostol and hypertonic saline for second-trimester induction abortion. Contraception. 2005;72(5):358-61. (http://dx.doi.org/10.1016/j.contraception.2005.04.016)

15. Jain JK, Mishell JDR. A comparison of misoprostol with and without laminaria tents for induction of second-trimester abortion. American Journal of Obstet Gynecol. 1996;175(1):173-7. (http://dx.doi.org/10.1016/S0002-9378(96)70270-3)

16. Prairie BA, Lauria MR, Kapp N, Mackenzie T, Baker ER, George KE. Mifepristone versus laminaria: a randomized controlled trial of cervical ripening in midtrimester termination. Contraception. 2007;76(5):383-8. (http://dx.doi.org/10.1016/j.contraception.2007.07.008)

17. Dean G, Colarossi L, Lunde B, Jacobs AR, Porsch LM, Paul ME. Safety of digoxin for fetal demise before second-trimester abortion by dilation and evacuation. Contraception. 2012;85(2):144-9. (http://dx.doi.org/10.1016/j.contraception.2011.05.016)

18. White KO, Nucatola DL, Westhoff C. Intra-fetal compared with intra-amniotic digoxin before dilation and evacuation: a randomized controlled trial. Obstet Gynecol. 2016;128(5):1071-6. (http://dx.doi.org/10.1097/AOG.0000000000001671)

19. López-Cepero R, Lynch L, de la Vega A. Effectiveness and safety of lidocaine in the induction of fetal cardiac asystole for second trimester pregnany termination. Bol Asoc Med P R. 2013;105(1):14-7. (https://www.ncbi.nlm.nih.gov/pubmed/23767379)

20. Senat MV, Fischer C, Bernard JP, Ville Y. The use of lidocaine for fetocide in late termination of pregnancy. BJOG. 2003;110(3):296-300. (http://dx.doi.org/10.1046/j.1471-0528.2003.02217.x)

21. Gariepy AM, Chen BA, Hohmann HL, Achilles SL, Russo JA, Creinin MD. Transvaginal administration of intraamniotic digoxin prior to dilation and evacuation. Contraception. 2013;87(1):76-80. (http://dx.doi.org/10.1016/j.contraception.2012.07.019)

22. Tocce K, Sheeder JL, Edwards LJ, Teal SB. Feasibility, effectiveness and safety of transvaginal digoxin administration prior to dilation and evacuation. Contraception. 2013;88(6):706-11. (http://dx.doi.org/10.1016/j.contraception.2013.08.005)

23. Andrikopoulou M, Lavery JA, Ananth CV, Vintzileos AM. Cervical ripening agents in the second trimester of pregnancy in women with a scarred uterus: a systematic review and metaanalysis of observational studies. Am J Obstet Gynecol. 2016;215(2):177-94. (http://dx.doi.org/10.1016/j.ajog.2016.03.037)

2021 REMS 000827

## 11. ANALGESIA AND SEDATION

**Policy Statement:** Anxiolysis, analgesia, or anesthesia should be provided during abortion procedures for any patient for whom the benefits outweigh the risks, with the aim of providing the appropriate level of analgesia and sedation required for each patient's needs. Patients should be involved in a shared decision-making process about pain control and sedation during the procedure.

ON THE USE OF SEDATION IN GENERAL - All medications used in procedural sedation have the potential for serious risk. This risk may be reduced to a minimum by adherence to established practice guidelines. Guidelines developed by other organizations concern themselves with anesthesia and sedation delivered primarily in hospital settings and to patients varying widely in age and general health. Regardless of the drug or route of administration, the degree of central nervous system (CNS) depression is the basis for the NAF guidelines.

These guidelines do not address the use of deep sedation or general anesthesia except to identify basic monitoring practices and appropriate providers of such care, who are expected to follow their professional standards in the delivery of anesthesia services. It is expected that those individuals providing deep sedation or general anesthesia will have appropriate emergency medication and equipment in place to ensure the safe care of a patient in the event of an anesthesia complication.

The promulgation of guidelines for the delivery and monitoring of anesthesia care issued by organizations such as the American Society of Anesthesiologists (ASA), the Canadian Anesthesiologists' Society (CSA), the American Dental Society of Anesthesiologists (ADSA), American Society of Gastrointestinal Endoscopists, and others have clarified many of the issues related to anesthesia care.

Patient comfort and reduced anxiety are significantly affected by patient counseling and by the presence of family, friends, and supportive staff, and are not solely dependent on pharmacologic measures. Alternative modalities (such as relaxation techniques, acupuncture, hypnosis) may be helpful for some patients. The focus of NAF guidelines for analgesia and sedation, however, is on the safe provision of pharmacologic methods generally used in outpatient abortion facilities.

### Definitions (1)

1. Local Anesthesia - Elimination or reduction of sensation, especially pain, in one part of the body by topical application or local injection of a drug. In the context of abortion practice, local anesthesia almost always involves a paracervical block.

2. Minimal Sedation (Anxiolysis) - A drug-induced state during which patients respond normally to verbal commands. Although cognitive function and physical

2021 REMS 000828

coordination may be impaired, airway reflexes, ventilatory, and cardiovascular functions are unaffected.

3. <u>Moderate Sedation/Analgesia</u> - A drug-induced depression of consciousness during which patients respond purposefully[*] to verbal commands, either alone or accompanied by light tactile stimulation. No interventions are required to maintain a patent airway, and spontaneous ventilation is adequate. Cardiovascular function is usually maintained but may be impaired. This level of sedation was previously referred to as "Conscious Sedation." However, this term is no longer recommended.

4. <u>Deep Sedation/Analgesia</u> - A drug-induced depression of consciousness during which patients cannot be easily aroused but respond purposefully following repeated or painful stimulation. The ability to independently maintain ventilatory function may be impaired. Patients may require assistance in maintaining a patent airway, and spontaneous ventilation may be inadequate. Cardiovascular function is usually maintained but may be impaired.

5. <u>General Anesthesia</u> - A drug-induced loss of consciousness during which patients are not arousable, even by painful stimulation. The ability to independently maintain ventilatory function is often impaired. Patients often require assistance in maintaining a patent airway, and positive pressure ventilation may be required because of depressed spontaneous ventilation or drug-induced depression of neuromuscular function. Cardiovascular function may be impaired.

Because sedation is a continuum, it is not always possible to predict how an individual patient will respond. Hence, practitioners intending to produce any level of sedation should be able to rescue patients whose level of sedation becomes deeper than initially intended. *Rescue* corrects adverse physiologic consequences of the deeper-than-intended level of sedation (such as hypoventilation, hypoxia, and hypotension) and returns the patient to the originally intended level of sedation.

<u>Standard 11.1.</u>    Pain control options must be discussed with the patient.

<u>Standard 11.2.</u>    When minimal, moderate, deep sedation, or general anesthesia is to be given, patients must be given information about the risks, benefits, and side effects of the medications to be used.

    <u>Recommendation 11.2.1.</u>  Documentation should include precautions relevant to transient mental impairment.

---

[*]Reflex withdrawal from a painful stimulus is NOT considered a purposeful response.

41

Option 11.2.0.1.  An informed consent form specific for analgesia and sedation may be used.

Standard 11.3.    Prior to moderate sedation, a pre-sedation evaluation of the patient must take place.

Recommendation 11.3.1.    Evaluation should include a relevant history and review of systems; medication review; targeted exam of the heart, lung, and airway as indicated by the patient's history and review of systems; and baseline vital signs.

Recommendation 11.3.2.    For patients receiving moderate sedation who are not at increased risk of aspiration, time from last meal should not limit access to abortion care.(2-4)

Recommendation 11.3.3.    A reduced level of sedation, an alternate abortion procedure, or provision of care by an anesthesia professional should be considered for patients with an atypical airway assessment or ASA Physical Status Classification 3 or greater.(5, 6)

Standard 11.4.    No additional evaluation is needed prior to paracervical block and/or NSAID administration.

Standard 11.5.    The supervising practitioner must be immediately available when sedation is administered.

Standard 11.6.    When local anesthesia or sedation is provided, the practitioner responsible for the treatment of the patient and/or the administration of drugs must be appropriately trained, with approval by the medical director or their designee.(6, 7)

Standard 11.7.    To administer moderate sedation, a provider must have the following: licensure as appropriate, basic airway skills, the ability to monitor and effectively rescue patients in an emergency, and the ability to screen patients appropriately for sedation.

Standard 11.8.    The potential need for intravenous access must be considered prior to administering any level of sedation.

Recommendation 11.8.1.    When more than minimal sedation is intended, intravenous access should be maintained at least until discharge criteria are met (Standard 12.5).

Standard 11.9.    Pulse oximetry, with appropriate alarms, must be employed when moderate or deeper levels of sedation are used.

42

Standard 11.10.    When sedation is provided, monitoring must be adequate to detect the respiratory, cardiovascular, and neurological effects of the drugs being administered, and this monitoring must be documented.

Recommendation 11.10.1. The patient should be checked frequently for verbal responsiveness.

Standard 11.11.    When moderate sedation or deeper is provided, a person other than the clinician performing the procedure, and who is trained to monitor appropriate physiological parameters, must be present. This person must not be performing duties other than monitoring the patient.(6)

**Moderate Sedation**

Standard 11.12.    When moderate sedation is intended, sedation medication must be started at a reasonable low dose and titrated as needed, based on individual circumstances, such as weight and drug tolerance.(8-10)

Recommendation 11.12.1. The following table should be used for guidance for these commonly used drugs when used for moderate sedation. Similar ranges of other opioids and benzodiazepines may be used.

| Drug | Usual initial dose | Max initial dose | Usual incremental Dose | Max incremental Dose |
|------|--------------------|------------------|------------------------|----------------------|
| Fentanyl | 50-100 mcg | 200 mcg | 50-100 mcg | 100 mcg |
| Midazolam | 1-3 mg | 4 mg | 1-2 mg | 2 mg |

Standard 11.13.    When moderate sedation is administered, at least one individual with documented airway skills must be present in the procedure room.

**Deep Sedation or General Anesthesia**

Standard 11.14.    Supplemental oxygen must be used with deep sedation and general anesthesia.

Standard 11.15.    The practitioner administering deep sedation or general anesthesia must not be the practitioner performing the abortion.

Recommendation 11.15.1. For deep sedation and general anesthesia, the following should be monitored: continuous pulse oximetry, intermittent blood pressure, and respiration,

43

either by measuring end-tidal $CO_2$ or clinical observation.

Recommendation 11.15.2. The capability to monitor temperature should be available.

Standard 11.16.  Any individual responsible for administering, supervising, or monitoring a patient receiving any level of sedation must have current, health care provider level basic life support (BLS) certification.

Standard 11.17.  The practitioner administering deep sedation or general anesthesia must adhere to established professional standards of care.(11)


**Nitrous Oxide**

Standard 11.18.  $N_2O$ must be self-administered by the patient or by a qualified anesthesia provider.

Recommendation 11.18.1. $N_2O$ may be an alternative to local or oral sedation but is less effective for pain management than moderate intravenous sedation.(12,13)

Standard 11.19.  If not self-administered, the provision of $N_2O$ must follow guidelines for patient monitoring for moderate sedation.

Standard 11.20.  Equipment for the delivery of $N_2O/O_2$ must:

(1)  provide a concentration of $N_2O$ of no more than 70% inspired;

(2)  provide a minimum of 30% $O_2$; and

(3)  be checked and calibrated regularly.

Recommendation 11.20.1. The concentration of nitrous oxide should not routinely exceed 50% in the absence of qualified anesthesia personnel.

Recommendation 11.20.2. Equipment for the delivery of $N_2O/O_2$ should include an oxygen analyzer.

Recommendation 11.20.3. Due to the potential for occupational exposure, room or personnel monitoring for levels of $N_2O$ should be conducted.

44

## Emergency Equipment

Standard 11.21.    Functioning equipment and current medications must be available on-site to handle medical emergencies and must include: an oxygen delivery system, oral airways, epinephrine, and antihistamines.

Standard 11.22.    In settings where benzodiazepines and opioids are used, appropriate antagonists, bronchodilators, and bag-valve masks capable of delivering supplemental oxygen must be available.

Recommendation 11.22.1. Facilities should have a specified area for emergency equipment, which includes oxygen, medications, and supplies. A protocol and time schedule for checking equipment and removing expired medications must be in place.

Standard 11.23.    In settings where deep sedation and general anesthesia are used, it is expected that providers maintain the appropriate medication and equipment required for an anesthesia emergency.

Recommendation 11.23.1. A defibrillator should be available.

**Discussion:** The time of last food intake does not increase the risk of moderate sedation.(2-4)

ON THE USE OF $N_2O/O_2$ - Nitrous oxide has a long history of use for analgesia and sedation, as well as an excellent safety record in the hands of both anesthesiologists and non-anesthesiologists. Occupational exposure to $N_2O$ has been associated with increased risks of neurologic impairment, spontaneous abortion, subfertility, and hepatic and renal disease. Recommendations for safe use of nitrous oxide can be found in the reference section. In addition to employing adequate ventilation and scavenger systems, it is also recommended to deliver 100% oxygen to the patient for five minutes before removing the mask. This will purge the system, and the patient, of any residual nitrous oxide. Occupational exposure can be monitored by asking staff members to wear personal dosimetry badges or by placing an infrared spectrophotometer in the room. Although there is no OSHA standard for $N_2O$, NIOSH recommends that airborne levels of $N_2O$ be kept below 25 ppm through well-designed scavenger systems and other engineering controls, equipment maintenance, exposure monitoring, and safe work practices.

**References:**

1.  American Society of Anesthesiologists. Continuum of depth of sedation, definitions of general anesthesia and levels of sedation/analgesia. 2019. (https://www.asahq.org/standards-and-guidelines/continuum-of-depth-of-sedation-definition-of-general-anesthesia-and-levels-of-sedationanalgesia)

2. Aksel S, Vargas JE, Drey EA, Simon SG, Steinauer JE, Carlisle AS, et al. Fasting stomach volume in the late second and third trimesters of pregnancy versus nonpregnant controls. Contraception. 2014;90(3):294. (http://dx.doi.org/10.1016/j.contraception.2014.05.209)

3. Wilson LC, Chen BA, Creinin MD. Low-dose fentanyl and midazolam in outpatient surgical abortion up to 18 weeks of gestation. Contraception. 2009;79(2):122-8. (http://dx.doi.org/10.1016/j.contraception.2008.08.005)

4. Wiebe ER, Byczko B, Kaczorowski J, McLane AL. Can we safely avoid fasting before abortions with low-dose procedural sedation? A retrospective cohort chart review of anesthesia-related complications in 47,748 abortions. Contraception. 2012;87(1):51-4. (http://dx.doi.org/10.1016/j.contraception.2012.06.012)

5. American Society of Anesthesiologists. Physical status classification system [cited 2016]. Available from: http://www.asahq.org/resources/clinical-information/asa-physical-status-classification-system.

6. American Society of Anesthesiologists. Practice guidelines for sedation and analgesia by non-anesthesiologists. Anesthesiology. 2002;96(4):1004-17. (http://www.ncbi.nlm.nih.gov/pubmed/11964611)

7. McLemore MR, Aztlan EA. Retrospective evaluation of the procedural sedation practices of expert nurses during abortion care. 2017;46(5):755-63. (http://dx.doi.org/10.1016/j.jogn.2017.06.003)

8. Jackson E, Kapp N. Pain control in first-trimester and second-trimester medical termination of pregnancy: a systematic review. Contraception. 2011;83(2):116-26. (http://dx.doi.org/10.1016/j.contraception.2010.07.014)

9. Renner RM, Jensen JT, Nichols MD, Edelman AB. Pain control in first-trimester surgical abortion: a systematic review of randomized controlled trials. Contraception. 2010;81(5):372-88. (http://dx.doi.org/10.1016/j.contraception.2009.12.008)

10. Allen RH, Fitzmaurice G, Lifford KL, Lasic M, Goldberg AB. Oral compared with intravenous sedation for first-trimester surgical abortion: a randomized controlled trial. Obstet Gynecol. 2009;113(2 Pt 1):276-83. (http://dx.doi.org/10.1097/AOG.0b013e3181938758)

11. Dean G, Jacobs AR, Goldstein RC, Gevirtz CM, Paul ME. The safety of deep sedation without intubation for abortion in the outpatient setting. J Clin Anesth. 2011;23(6):437-42. (http://dx.doi.org/10.1016/j.jclinane.2011.05.001)

12. Thaxton L, Pitotti J, Espey E, Teal S, Sheeder J, Singh RH. Nitrous oxide compared with intravenous sedation for second-trimester abortion: a randomized controlled trial. Obstet Gynecol. 2018;132(5):1192-7. (http://dx.doi.org/10.1097/AOG.0000000000002915)

13. Singh RH, Montoya M, Espey E, Leeman L. Nitrous oxide versus oral sedation for pain management of first-trimester surgical abortion - a randomized study. Contraception. 2017;96(2):118-23. (http://dx.doi.org/10.1016/j.contraception.2017.06.003)

2021 REMS 000834

# 12. POST-PROCEDURE CARE

**Policy Statement:** Appropriate and accessible post-procedure and follow-up care is essential to patients' wellbeing.

Standard 12.1.    Patients who want contraception must receive their chosen method immediately following an abortion or appropriate referral should be made.

    Recommendation 12.1.1.    When desired by the patient, intrauterine contraception or contraceptive implants should be initiated immediately after first-trimester uterine evacuation or second-trimester D&E.(1-3)

    Recommendation 12.1.2.    When desired by the patient after medication abortion, intrauterine contraception should be initiated as soon as expulsion of the pregnancy is confirmed.(4-6)

    Recommendation 12.1.3.    When desired by the patient, contraceptive implants should be initiated on the day of mifepristone administration for medication abortion.(7-10)

        Option 12.1.3.1.    Depot Medroxyprogesterone acetate (Depo-Provera®) may be given at the time of mifepristone with appropriate counseling.(10-12)

Standard 12.2.    All patients receiving more than minimal sedation or in the second trimester must be continuously observed during the recovery period by a health care worker trained in post-procedure care.

Standard 12.3.    Patients who received moderate or deeper sedation must be monitored until determined to be no longer at risk for hemodynamic instability or respiratory depression.

    Recommendation 12.3.1.    A pulse oximeter with alarms should be used until the patient is alert and ambulatory.

Standard 12.4.    A clinician must remain in the facility until all patients are medically stable.

Standard 12.5.    The following criteria must be documented prior to discharge: the patient must be ambulatory with a stable blood pressure and pulse, and bleeding and pain must be controlled.

2021 REMS 000835

<u>Standard 12.6.</u>     The patient must be given oral and written instructions outlining what to expect post-procedure, self-care, and signs and symptoms of complications.

    <u>Recommendation 12.6.1.</u>   Patients who receive sedation should have access to this information prior to the administration of medication.

<u>Standard 12.7.</u>     The facility must provide an emergency contact service on a 24-hour basis, where calls are triaged in accordance with written policies. A recorded message alone is unacceptable.

<u>Standard 12.8.</u>     Any non-clinician involved with first-call triage must be trained to take a post-abortion health history and follow clear written guidelines indicating when immediate consultation with a clinician is indicated.

<u>Standard 12.9.</u>     Any patient who gives a history suggestive of a post-procedure complication must have access to a clinician. The facility must establish a pathway for physician referral if indicated.

    <u>Recommendation 12.9.1.</u>   Uterotonic agents should be given as indicated and not on a routine basis. When used, an evidence-based regimen should be followed.

        <u>Option 12.9.1.1.</u>   Routine post-procedure follow-up is not required. Clinicians may offer a visit for patients who would like one.(13, 14)

**Discussion:** A recent study shows that Depot Medroxyprogesterone acetate (DMPA) (Depo-Provera®) given on the day of mifepristone may increase the risk of continuing pregnancy but does not increase the risk of needing aspiration to complete the abortion compared to when it is given at a follow-up visit.(12) Patient satisfaction is higher with immediate DMPA, but six-month use rates and pregnancy rates are the same due to high rates of discontinuation. If a woman understands the potential risk of ongoing pregnancy, DMPA may be offered and given at the time of mifepristone. DMPA given in the 24-48 hours after mifepristone, on the day of misoprostol, does not affect the rate of continuing pregnancy.(15)

**References**:

1.  Bednarek PH, Creinin MD, Reeves MF, Cwiak C, Espey E, Jensen JT. Immediate versus delayed IUD insertion after uterine aspiration. N Engl J Med. 2011;364(23):2208-17. (http://dx.doi.org/doi:10.1056/NEJMoa1011600)

2021 REMS 000836

2.  Hohmann HL, Reeves MF, Chen BA, Perriera LK, Hayes JL, Creinin MD. Immediate versus delayed insertion of the levonorgestrel-releasing intrauterine device following dilation and evacuation: a randomized controlled trial. Contraception. 2012;85(3):240-5. (http://dx.doi.org/10.1016/j.contraception.2011.08.002)

3.  Cremer M, Bullard KA, Mosley RM, Weiselberg C, Molaei M, Lerner V, et al. Immediate vs. Delayed post-abortal copper T 380A IUD insertion in cases over 12 weeks of gestation. Contraception. 2011;83(6):522-7. (http://dx.doi.org/10.1016/j.contraception.2010.10.005)

4.  Shimoni N, Davis A, Westhoff C. Can ultrasound predict IUD expulsion after medical abortion? Contraception. 2014;89(5):434-9. (http://dx.doi.org/10.1016/j.contraception.2014.01.006)

5.  Shimoni N, Davis A, Ramos ME, Rosario L, Westhoff C. Timing of copper intrauterine device insertion after medical abortion: a randomized controlled trial. Obstet Gynecol. 2011;118(3):623-8. (http://dx.doi.org/10.1097/AOG.0b013e31822ade67)

6.  Sääv I, Stephansson O, Gemzell-Danielsson K. Early versus delayed insertion of intrauterine contraception after medical abortion — a randomized controlled trial. PLoS ONE. 2012;7(11):e48948. (http://dx.doi.org/10.1371/journal.pone.0048948)

7.  Raymond EG, Weaver MA, Tan Y-L, Louie KS, Bousiéguez M, Lugo-Hernández EM, et al. Effect of immediate compared with delayed insertion of etonogestrel implants on medical abortion efficacy and repeat pregnancy: a randomized controlled trial. Obstet Gynecol. 2016;127(2):306-12. (http://dx.doi.org/10.1097/aog.0000000000001274)

8.  Park J, Robinson N, Wessels U, Turner J, Geller S. Progestin-based contraceptive on the same day as medical abortion. Int J Gynecol Obstet. 2016;133(2):217-20. (http://dx.doi.org/http://dx.doi.org/10.1016/j.ijgo.2015.08.025)

9.  Sonalkar S, Hou M, Borgatta L. Administration of the etonogestrel contraceptive implant on the day of mifepristone for medical abortion: a pilot study. Contraception. 2013;88(5):671-3. (http://dx.doi.org/10.1016/j.contraception.2013.07.008)

10.  Douthwaite M, Candelas JA, Reichwein B, Eckhardt C, Ngo TD, Domínguez A. Efficacy of early induced medical abortion with mifepristone when beginning progestin-only contraception on the same day. Int J Gynecol Obstet. 2016;133(3):329-33. (http://dx.doi.org/10.1016/j.ijgo.2015.11.009)

11.  Sonalkar S, McClusky J, Hou MY, Borgatta L. Administration of depot medroxyprogesterone acetate on the day of mifepristone for medical abortion: a pilot study. Contraception. 2015;91(2):174-7. (http://dx.doi.org/10.1016/j.contraception.2014.10.010)

12.  Raymond EG, Weaver MA, Louie KS, Tan Y-L, Bousiéguez M, Aranguré-Peraza AG, et al. Effects of depot medroxyprogesterone acetate injection timing on medical abortion efficacy and repeat pregnancy: a randomized controlled trial. Obstet Gynecol. 2016;128(4):739-45. (http://dx.doi.org/10.1097/aog.0000000000001627)

2021 REMS 000837

13. Gatter M, Roth N, Safarian C, Nucatola D. Eliminating the routine postoperative surgical abortion visit. Contraception. 2012;86(4):397-401. (http://dx.doi.org/10.1016/j.contraception.2012.02.016)

14. Grossman D, Ellertson C, Grimes DA, Walker D. Routine follow-up visits after first-trimester induced abortion. Obstet Gynecol. 2004;103(4):738-45. (http://dx.doi.org/10.1097/01.AOG.0000115511.14004.19)

15. Lang C, Chen ZE, Johnstone A, Cameron S. Initiating intramuscular depot medroxyprogesterone acetate 24-48 hours after mifepristone administration does not affect success of early medical abortion. BMJ Sex Reprod Health. 2018;[epub 2018/07/28]. (http://dx.doi.org/10.1136/bmjsrh-2017-101928)

2021 REMS 000838

## 13. EVALUATION OF EVACUATED UTERINE CONTENTS

**Policy Statement:** Identification of appropriate products of conception (POC) following evacuation abortion procedures confirms termination of an intrauterine pregnancy.

Standard 13.1.    Termination of pregnancy must be confirmed prior to the patient leaving the facility or further evaluation must be initiated.

Recommendation 13.1.1.    Evacuated uterine contents should be examined before the patient leaves the facility.

Recommendation 13.1.2.    In first-trimester terminations, flotation of tissue should be used to identify products of conception, including gestational sac.

Option 13.1.2.1.    Backlighting of tissue may be useful.

Option 13.1.2.2.    Sending the evacuated uterine contents for additional pathological examination is not required.(1, 2)

Standard 13.2.    In the first trimester, when insufficient tissue or incomplete products of conception are obtained, the patient must be reevaluated.

Recommendation 13.2.1.    Re-aspiration, serial quantitative hCG, and/or ultrasonographic examination should be considered.(3-5)

Recommendation 13.2.2.    Ectopic pregnancy should be considered.

Standard 13.3.    After the first trimester, examination of the uterine contents must be performed to identify the placenta and all major fetal parts.

Recommendation 13.3.1.    If the above are not identified, ultrasonographic evaluation and uterine exploration under ultrasound guidance should be considered.

Recommendation 13.3.2.    The facility and/or clinician should continue care of the patient until completion of the abortion or transfer of care to an appropriate provider is made.

**Discussion:** One option for additional evaluation if sufficient POC are not identified is the use of serum quantitative hCG tests. A baseline hCG can be drawn and a second hCG can be done in 24-48 hours. If there is a decrease of 50% or more, no further ectopic follow-up is necessary. Otherwise, further evaluation should be initiated including consideration of ectopic pregnancy. In this situation, Section 8 (Management of Pregnancy of Uncertain Location) may be useful.

2021 REMS 000839

**References:**

1. Paul M, Lackie E, Mitchell C, Rogers A, Fox M. Is pathology examination useful after early surgical abortion? Obstet Gynecol. 2002;99(4):567-71. (http://www.ncbi.nlm.nih.gov/pubmed/12039112)

2. Heath V, Chadwick V, Cooke I, Manek S, MacKenzie IZ. Should tissue from pregnancy termination and uterine evacuation routinely be examined histologically? BJOG. 2000;107(6):727-30. (http://dx.doi.org/10.1111/j.1471-0528.2000.tb13332.x)

3. Barnhart K, Sammel MD, Chung K, Zhou L, Hummel AC, Guo W. Decline of serum human chorionic gonadotropin and spontaneous complete abortion: defining the normal curve. Obstet Gynecol. 2004;104(5 Pt 1):975-81. (http://dx.doi.org/10.1097/01.AOG.0000142712.80407.fd)

4. van der Lugt B, Drogendijk A. The disappearance of human chorionic gonadotropin from plasma and urine following induced abortion. Acta Obstet Gynecol Scand. 1985;64(7):547-52. (http://www.ncbi.nlm.nih.gov/pubmed/2417443)

5. Steier JA, Bergsjø P, Myking OL. Human chorionic gonadotropin in maternal plasma after induced abortion, spontaneous abortion, and removed ectopic pregnancy. Obstet Gynecol. 1984;64(3):391-4. (http://www.ncbi.nlm.nih.gov/pubmed/6462569)

2021 REMS 000840

## 14. EMERGENCY PROCEDURES

**Policy Statement:** Appropriate management of abortion emergencies reduces morbidity and mortality. Hemorrhage can be one of the most serious immediate complications of an abortion procedure. Early recognition of the source of bleeding can reduce morbidity and mortality. Uterine perforation is a complication of abortion that can lead to significant morbidity. Morbidity is related to site of perforation, instrumentation, and gestational age.

Standard 14.1.    Protocols for the management of medical emergencies must be in place. These protocols must include indications for emergency transport and written, readily available directions for contacting external emergency assistance (e.g., an ambulance).

    Recommendation 14.1.1.    Protocols for the following topics should be in place: bleeding, perforation, respiratory arrest/depression, anaphylaxis, and emergency transfer.

    Recommendation 14.1.2.    Staff should review protocols annually.

        Option 14.1.2.1.    Annual drills of the emergency protocols are encouraged.

    Recommendation 14.1.3.    Clinics should consider developing a transfer agreement with a hospital outlining the means of communication and transport and the protocol for emergent transfer of care.

Standard 14.2.    All staff must know their appropriate roles in the management of medical emergencies.

Standard 14.3.    Emergency supplies must be in known, appropriate locations and regularly updated.

Standard 14.4.    When abortion procedures are being performed, at least one medical staff member with health care provider level basic life support (BLS) training must be present.

    Recommendation 14.4.1.    All medical staff providing direct patient care should have current health care provider level BLS certification.

<u>Standard 14.5.</u>    All facilities must have a protocol for the management of acute hemorrhage.(1) This protocol must address the following items:

    (1) establishment of intravenous access;

    (2) administration of uterotonics;

    (3) evaluation of the cause and/or source of bleeding; and

    (4) criteria for hospital transfer.

<u>Standard 14.6.</u>    The facility must have at least two uterotonics and/or mechanical methods of controlling bleeding.

<u>Standard 14.7.</u>    If a perforation occurs or is suspected, even if the patient is asymptomatic, a protocol must address the following items:

    (1) establishment of intravenous access;

    (2) additional observation;

    (3) plan for follow-up including plans for completing the abortion if needed; and

    (4) criteria for transfer to a hospital such as the following:

        (i) intra-abdominal viscera are detected in the uterine cavity, cervix, vagina, suction tubing, or on tissue examination;

        (ii) fetal parts are detected in the abdominal cavity;

        (iii) expanding intra-abdominal or retroperitoneal hematoma is detected; or

        (iv) hemodynamic instability is present.

    <u>Recommendation 14.7.1.</u>    If the procedure is completed after a suspected perforation, uterine evacuation should be performed under direct ultrasound guidance or laparoscopic visualization.(2, 3)

**Discussion:** Excessive bleeding during the procedure and in the post-procedure period is almost always due to uterine atony, often caused by incomplete emptying of the uterus. Therefore, the most important initial efforts should be directed at assuring complete evacuation of the uterus and at increasing uterine tone through uterotonics or uterine massage. Problems arise when bleeding is ignored or its severity underestimated. Clinicians must always remember to do the simple things when confronted with a developing bleeding problem: continue assessment of the blood loss, measure and record vital signs frequently, and assure intravenous access.

2021 REMS 000842

The following measures may be used for treatment of post-abortion hemorrhage:

a. uterine massage;

b. methylergonovine (Methergine);

c. oxytocin (Pitocin);

d. vasopressin (Vasostrict);

e. misoprostol (Cytotec);

f. carboprost tromethamine (Hemabate);

g. intrauterine pressure using a Foley or Bakri balloon or vaginal pack; or

h. uterine re-aspiration.

When bleeding continues after assurance of complete uterine emptying and when there are no visible cervical or vaginal lacerations, the clinician must consider other complications such as perforation, coagulopathy, or placenta accreta. The patient may need immediate transfer to manage these conditions.

Perforations are often occult and may be difficult to identify.(4-6) If a perforation is suspected, it is safest to proceed as if there has been a perforation.

*In the first trimester,* perforations are often asymptomatic and self-healing.(7, 8) Most perforations are midline and/or fundal in location.(9) If they occur before suction, these usually can be managed with observation and close follow-up.(8) A lateral perforation may involve uterine blood vessels and, if so, will be more significant.

*In the second trimester,* even an asymptomatic perforation may warrant transfer to a hospital for evaluation depending on the instrumentation involved.(10, 11) There may be more significant morbidity due to increased uterine blood flow and the use of larger grasping instruments.

**References:**

1. Kerns J, Steinauer J. Management of postabortion hemorrhage: SFP Guideline 20131. Contraception. 2013;87(3):331-42. (http://dx.doi.org/10.1016/j.contraception.2012.10.024)

2. Kohlenberg CF, Casper GR. The use of intraoperative ultrasound in the management of a perforated uterus with retained products of conception. Aust N Z J Obstet Gynaecol. 1996;36(4):482-4. (http://www.ncbi.nlm.nih.gov/pubmed/9006840)

3. Lauersen NH, Birnbaum S. Laparoscopy as a diagnostic and therapeutic technique in uterine perforations during first-trimester abortions. Am J Obstet Gynecol. 1973;117(4):522-6. (http://www.ncbi.nlm.nih.gov/pubmed/4270312)

2021 REMS 000843

4.  Amarin ZO, Badria LF. A survey of uterine perforation following dilatation and curettage or evacuation of retained products of conception. Arch Gynecol Obstet. 2005;271(3):203-6. (http://dx.doi.org/10.1007/s00404-003-0592-8)

5.  Berek JS, Stubblefield PG. Anatomic and clinical correlates of uterine perforation. Am J Obstet Gynecol. 1979;135(2):181-4. (http://www.ncbi.nlm.nih.gov/pubmed/474668)

6.  Grimes DA, Schulz KF, Cates WJ, Jr. Prevention of uterine perforation during curettage abortion. JAMA. 1984;251(16):2108-11. (http://www.ncbi.nlm.nih.gov/pubmed/6708260)

7.  Kaali SG, Szigetvari IA, Bartfai GS. The frequency and management of uterine perforations during first-trimester abortions. Am J Obstet Gynecol. 1989;161(2):406-8. (http://dx.doi.org/10.1016/0002-9378(89)90532-2)

8.  Lindell G, Flam F. Management of uterine perforations in connection with legal abortions. Acta Obstet Gynecol Scand. 1995;74(5):373-5. (http://www.ncbi.nlm.nih.gov/pubmed/7778431)

9.  Mittal S, Misra SL. Uterine perforation following medical termination of pregnancy by vacuum aspiration. Int J Gynaecol Obstet. 1985;23(1):45-50. (http://www.ncbi.nlm.nih.gov/pubmed/2860032)

10. Darney PD, Atkinson E, Hirabayashi K. Uterine perforation during second-trimester abortion by cervical dilation and instrumental extraction: A review of 15 cases. Obstet Gynecol. 1990;75(3 Pt 1):441-4. (http://www.ncbi.nlm.nih.gov/pubmed/2304715)

11. Pridmore BR, Chambers DG. Uterine perforation during surgical abortion: A review of diagnosis, management and prevention. Aust N Z J Obstet Gynaecol. 1999;39(3):349-53. (http://www.ncbi.nlm.nih.gov/pubmed/10554950)

2021 REMS 000844



2021 REMS 000845