**Index of Joint Appendix Documents**
*Purcell, et al. v. Kennedy, et al.,*
**No. 1:17-cv-00493-JAO-RT (D. Haw.)**

| VOLUME D | | | |
|---|---|---|---|
| **Administrative Record** | | | |
| **AR Range** | **Document Name** | **Date** | **Location in Pls.' Exhibits** |
| 2021REMS950-55 | Letter from SFP Bd. of Dirs., to FDA | Aug. 11, 2021 | Doc. 222-4, Ex. Vol. C at PCSF305 |
| 2021REMS956-57 | Laura Schummers et al., *Do Medication Abortion Complications Increase When Mifepristone Is Available Without Regulations Restricting Practice? A Population-based Study Using Linked Health Administrative Data from Canada*, 47 BMJ Sex. Reprod. Health. 2-3 | Jan. 12, 2021 | Doc. 222-4, Ex. Vol. C at PCSF311 |
| 2021REMS958, 963 | Nathalie Kapp & Patricia A. Lohr, *Modern Methods to Induce Abortion: Safety, Efficacy and Choice*, 63 Best Pract. Res. Clin. Obstetrics & Gynaecology 37-44 | 2020 | Doc. 222-4, Ex. Vol. C at PCSF313 |

| 2021REMS966-72 | Daniel Grossman et al., *Induced Abortion Provision Among a National Sample of Obstetrician-Gynecologists*, 133 Obstetrics & Gynecology 477-83 | Mar. 2019 | Doc. 222-4, Ex. Vol. C at PCSF315 |
|---|---|---|---|
| 2021REMS973-78 | Silpa Srinivasulu et al., *US clinicians' Perspectives on How Mifepristone Regulations Affect Access to Medication Abortion and Early Pregnancy Loss Care in Primary Care*, 104 Contraception 92-97 | 2021 | Doc. 222-4, Ex. Vol. C at PCSF322 |
| 2021REMS979-80 | Danielle Calloway et al., *Mifepristone Restrictions and Primary Care: Breaking the Cycle of Stigma Through a Learning Collaborative Model in the U.S.*, 104 Contraception 24-28 | 2021 | Doc. 222-4, Ex. Vol. C at PCSF328 |
| 2021REMS984-92 | Sarah Munro et al., *Perspectives Among Canadian Physicians on Factors Influencing* | Sept./Oct. 2020 | Doc. 222-4, Ex. Vol. C at PCSF330 |

| | | | |
|---|---|---|---|
| | *Implementation of Mifepristone Medical Abortion: A National Qualitative Study*, 18 Annals Family Med. 413-21 | | |
| 2021REMS993-98 | Kayla N. Rasmussen et al., *Expanding Access to Medication Abortion Through Pharmacy Dispensing of Mifepristone: Primary Care Perspectives from Illinois*, 104 Contraception 98-103 | 2021 | Doc. 222-4, Ex. Vol. C at PCSF339 |
| 2021REMS1159-67 | Letter from Dr. Graham Chelius, SFP & Cal. Acad. of Family Physicians, to FDA | Sept. 29, 2021 | Doc. 222-4, Ex. Vol. C at PCSF345 |
| 2021REMS1168-71 | Cong. of Delegates, Am. Acad. of Fam. Physicians, *Resolution No. 506 (Cosponsored C) - Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization of Mifepristone* | May 24, 2018 | Doc. 222-4, Ex. Vol. C at PCSF354 |

| 2021REMS1177-84 | Jonathan M. Bearak et al., *Disparities and Change Over Time in Distance Women Would Need to Travel to Have an Abortion in the USA: a Spatial Analysis*, 2 Lancet Pub. Health e493-e500 | Nov. 2017 | Doc. 222-4, Ex. Vol. C at PCSF358 |
| --- | --- | --- | --- |
| 2021REMS1390-1401 | Memorandum: Mifepristone and All Adverse Events, NDA 020687 and ANDA 091178 | Dec. 16, 2021 | N/A |
| 2021REMS1505-08 | REMS Memorandum | Dec. 16, 2021 | N/A |
| 2021REMS1509-32 | Review of the one-year REMS assessment report for the Mifepristone REMS Program | Dec. 16, 2021 | N/A |
| 2021REMS1561-1609 | REMS Modification Rationale Review (Mifepristone) | Dec. 16, 2021 | Doc. 222-4, Ex. Vol. C at PCSF366 |
| 2021REMS1803-07 | Letter from FDA to Danco Laboratories, LLC re: REMS Modification Notification | Dec. 16, 2021 | N/A |

| 2021REMS1808-11 | Letter from FDA to GenBioPro, Inc. re: REMS Modification Notification | Dec. 16, 2021 | N/A |
|---|---|---|---|
| 2021REMS1813-16 | FDA, *Opioid Medications* | Mar. 29, 2021 | Doc. 222-4, Ex. Vol. C at PCSF415 |
| 2021REMS1818 | FDA, *Labeling (Jeuveau)* | Feb. 2019 | Doc. 222-4, Ex. Vol. C at PCSF419 |
| 2021REMS1945-58 | Exhibit 2, Declaration of Julie Amaon, M.D. | Apr. 14, 2021 | Doc. 222-4, Ex. Vol. C at PCSF454 |
| 2021REMS1959-64 | Exhibit 3, Declaration of Joey Banks, M.D. | Apr. 12, 2021 | Doc. 222-4, Ex. Vol. C at PCSF468 |
| 2021REMS1965-73 | Exhibit 4, Declaration of Jared Garrison-Jakel, M.D. | Apr. 14, 2021 | Doc. 222-4, Ex. Vol. C at PCSF474 |
| 2021REMS1974-81 | Exhibit 5, Declaration of Erin King, M.D. | Apr. 14, 2021 | Doc. 222-4, Ex. Vol. C at PCSF483 |
| 2021REMS1982-95 | Exhibit 6, Declaration of Charisse M. Loder, M.D., M.SC. | Apr. 14, 2021 | Doc. 222-4, Ex. Vol. C at PCSF491 |

| 2021REMS1996-2009 | Exhibit 7, Declaration of Jane Roe, M.D. | 2021 | Doc. 222-4, Ex. Vol. C at PCSF505 |
|---|---|---|---|
| 2021REMS2010-50 | Exhibit 8, Declaration of Diana M. Pearce, Ph.D. & Pearce Declaration Appendix | Apr. 12, 2021 | Doc. 222-4, Ex. Vol. C at PCSF519 |
| 2021REMS2051-52 | Letter from ACOG to FDA | Oct. 6, 2021 | Doc. 222-4, Ex. Vol. C at PCSF560 |



**Society of Family Planning**
**& SFP RESEARCH FUND**

August 11, 2021

Food and Drug Administration
Center for Drug Evaluation and Research
(b)(6)/PPI
5901-B Ammendale Road
Beltsville, MD 20705-1266

**Re: US Food and Drug Administration's review of the risk evaluation and mitigation strategy for mifepristone**

Dear (b)(6)/PPI :

On May 7, 2021, the US Food and Drug Administration (FDA) announced a review of the risk evaluation and mitigation strategy for the drug mifepristone (hereafter, the mifepristone REMS). On behalf of the Society of Family Planning, the academic society for Complex Family Planning subspecialists and over 1,000 academicians, scientists, and partners focused on abortion and contraception research and clinical care, we write to share relevant evidence to support your review of the mifepristone REMS. We appreciate the opportunity to lend the expertise of the Society and its members to this process and applaud your efforts, as a science-based agency, to center sound medical evidence in the decision-making process related to mifepristone and its distribution and use.

As the organization representing Complex Family Planning Fellowship-trained obstetrician-gynecologists—the leaders in clinical care and medical education related to complex abortion and contraception—we conclude the additional controls provided by the REMS are not medically necessary to ensure patient safety. Our 30 years of experience within the Fellowship providing abortion and pregnancy loss care in complex cases, as well as the existing evidence on this topic described in detail below, does not support requiring provider certification and registration to prescribe mifepristone or restricting the healthcare professionals that can prescribe mifepristone. Mifepristone is extremely safe and highly effective when provided via a health center, pharmacy, or home delivery, and does not require a clinician to oversee dispensing.

On behalf of our expert membership, we offer the following summary of peer-reviewed scientific evidence related to the mifepristone REMS, with a focus on research published since the most recent FDA-approved labeling change in 2016. **We conclude that the current REMS, specifically the provisions that require provider certification and registration and restrict where mifepristone may be dispensed, confers no benefit in terms of safety, efficacy, or acceptability of the drug mifepristone and instead creates barriers to use that negatively impact public health and equity in access to care.**

2021 REMS 000950

**Requiring provider certification and registration to prescribe mifepristone is unnecessary because it does not increase patient safety and constrains abortion provision.**

- **The mifepristone REMS currently requires that providers are specially certified to prescribe the drug and must register as prescribers directly with the manufacturer(s); however, there is no evidence this requirement increases abortion safety**. In Canada, mifepristone-specific requirements for provider certification were lifted in November 2017. According to a comprehensive analysis of linked medical and financial records in Ontario, medication abortion remained extremely safe after deregulation, with a major complication rate of 0.33% compared to a rate of 0.31% in an analysis of a similar administrative dataset from California under the REMS, and consistent with a clinical review finding major complication rates <1% across multiple studies of mifepristone use for early abortion.[1–3]

- **Requiring provider certification and registration prevents many providers from incorporating mifepristone into their scope of practice**. In a representative national population-based survey of obstetrician-gynecologists, Grossman and colleagues found that 28% of obstetrician-gynecologists who did not currently provide care using mifepristone would do so if they could prescribe it similarly to other drugs.[4] Several recent, rigorous qualitative studies with diverse groups of clinicians have also demonstrated how the REMS creates barriers to incorporation of mifepristone into practice by creating administrative burdens that clinical champions are unable to overcome.[5,6]

**The current restrictions on where mifepristone may be dispensed are unnecessary because mifepristone dispensing in clinical care settings is not associated with higher efficacy, greater safety, or greater acceptability compared to dispensing in brick-and-mortar pharmacies or via postal mail or delivery service.**

- **The requirement for in-person dispensing of mifepristone in certain health care settings confers no safety benefit**. Through the mifepristone labeling change approved in 2016, the FDA recognized that requiring misoprostol be administered in clinical settings as part of early abortion care is unnecessary. As the summary of the peer-reviewed literature below suggests, patient self-administration of mifepristone at home is effective, safe, and acceptable. However, the current mifepristone REMS further require that mifepristone be distributed "only in…clinics, medical offices, and hospitals."

- **Mifepristone can be safely dispensed in brick-and-mortar pharmacies**. Pharmacists are well qualified to assure safe dispensing of medications with a comparable safety profile to the 200 mg mifepristone tablet, including the 300 mg formulation of mifepristone for Cushing's syndrome, which is not subject to a REMS. Evidence from high-income countries with health care infrastructure comparable to the US has demonstrated the acceptability of pharmacy dispensing of mifepristone. For example, mifepristone is currently distributed by pharmacists in Canada, a practice that Canadian physicians report facilitates the provision of medication abortion with mifepristone.[7] In the

US, physicians support pharmacy dispensing of mifepristone. In a qualitative study of primary care providers' perceptions of and experiences with mifepristone, Rasmussen and colleagues found that primary care providers in Illinois support pharmacy dispensing of mifepristone, describing it as a more patient-centered approach to administration of this drug.[8] Further, a recent US study demonstrated that pharmacy dispensing of mifepristone is safe and effective. In a study that included eight pharmacies in California and Washington state, Grossman and colleagues demonstrated that mifepristone dispensing by pharmacists in the pharmacy setting after the patient received counseling from a clinician is as effective (93.5% abortion completion with medication alone) as in-clinic dispensing efficacy reported by Winikoff and colleagues in a large multi-site national trial.[9,10] In Grossman and colleagues' study, only three (1.3%) participants visited an emergency department during the study follow up period, a lower proportion than most clinical trials of medication abortion using in-clinic mifepristone administration (range 2.9-4.1%).[10,11]

- **Mifepristone can also be safely dispensed by mail**. In a large (N=1,157 abortions) national US-based clinical trial of mifepristone dispensing by mail (the Teleabortion study), Chong and colleagues also found that mifepristone dispensing by direct mail to consumers is effective (95% abortion completion with medication alone), with only 0.9% experiencing any serious adverse event compared to an adverse event rate of 0.65% in a large (N=233,805 medication abortions) retrospective cohort study of in-clinic mifepristone administration.[12,13]

- **Retrospective analyses of rapid practice adaptations in the context of the COVID-19 pandemic further demonstrate the safety, efficacy, and acceptability of mifepristone dispensing by mail**. In a large (N=52,218) retrospective cohort study, Aiken and colleagues reported on the safety, efficacy, and acceptability of telemedicine abortion at Britain's largest abortion providers, which rapidly adapted to provide medication abortion using telemedicine during the spring and summer of 2020.[14] Following a telehealth consultation, individuals with a last menstrual period dating the pregnancy up to 69 days and without symptoms of ectopic pregnancy were able to receive both mifepristone and misoprostol for home administration. Investigators found that while medication abortion was equally effective in the telemedicine model (98.8%) vs the traditional in-clinic mifepristone administration model (98.2%, p=1.0), individuals using telemedicine had a shorter wait time between first contact and initiating the medication abortion (6.5 days vs. 10.7 days, p<0.001).

- **Whether patients receive mifepristone at a pharmacy or by mail, they report high acceptability**. In their pharmacy dispensing study, Grossman and colleagues report that 74.3% of patients would recommend pharmacy dispensing of mifepristone to a friend in a similar situation, and 65.4% were highly satisfied with their abortion experience.[9] Hyland and colleagues report that 97% of women cared for by an Australian telemedicine medication abortion service report high satisfaction, and Chong and colleagues report that 85% of participants in the Teleabortion study found their abortion experience "very satisfactory".[12,15]

2021 REMS 000952

**Requiring provider certification and registration to prescribe mifepristone and mifepristone dispensing restrictions may lead to abortions happening later in pregnancy.** Unfortunately, abortions become more socially and clinically complicated the further along in a pregnancy the abortion occurs.[2,16–18] Thus, restrictions such as the mifepristone REMS that limit people's ability to access abortion as soon as they discover they are pregnant negatively impact public health. Delays are particularly problematic for people with low incomes as abortions after the first trimester are more expensive and often result in even further delays in obtaining a desired abortion.[19–21] In Canada, where abortions are covered as part of universal health care, the proportion of abortions in the second trimester decreased by approximately 12% after mifepristone deregulation.[1] In the US, where limited access and cost are major contributors to delays in abortion, lifting the REMS may result in an even greater shift in abortions to earlier gestational ages.

The National Academies of Science, Engineering, and Medicine defines quality abortion care as safe, effective, patient-centered, timely, efficient, and equitable.[16] **By unnecessarily limiting the number of mifepristone providers in the US, the mifepristone REMS adversely impacts timeliness and equity in access to care.** As the academic society representing Complex Family Planning subspecialists, scientists, and partners focused on abortion and contraception research and clinical care, we hope this sound medical evidence is held central in your review of the mifepristone REMS. We appreciate your commitment to centering science and ensuring that policy decisions are based on the latest evidence.


Sincerely,

The Society of Family Planning Board of Directors

2021 REMS 000953

References:

1.  Schummers L, Darling E, Gavowsky A, et al. Do medication abortion complications increase when mifepristone is available without regulations restricting practice? A population-based study using linked health administrative data from Canada. *BMJ Sex Reprod Heal*. 2021;47(e1). 10.1136/bmjsrh-2020-bsacp.4.

2.  Upadhyay UD, Desai S, Zlidar V, et al. Incidence of emergency department visits and complications after abortion. *Obstet Gynecol*. 2015;125(1):175-183. doi:10.1097/AOG.0000000000000603

3.  Kapp N, Lohr PA. Modern methods to induce abortion: Safety, efficacy and choice. *Best Pract Res Clin Obstet Gynaecol*. 2020;63:37-44. doi:10.1016/j.bpobgyn.2019.11.008

4.  Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. *Obstet Gynecol*. 2019;133(3):477-483. doi:10.1097/AOG.0000000000003110

5.  Srinivasulu S, Yavari R, Brubaker L, Riker L, Prine L, Rubin SE. US clinicians' perspectives on how mifepristone regulations affect access to medication abortion and early pregnancy loss care in primary care. *Contraception*. 2021;104(1):92-97. doi:10.1016/j.contraception.2021.04.017

6.  Calloway D, Stulberg DB, Janiak E. Mifepristone restrictions and primary care: Breaking the cycle of stigma through a learning collaborative model in the United States. *Contraception*. 2021;104(1):24-28. doi:10.1016/j.contraception.2021.04.002

7.  Munro S, Guilbert E, Wagner MS, et al. Perspectives among Canadian physicians on factors influencing implementation of mifepristone medical abortion: A national qualitative study. *Ann Fam Med*. 2020;18(5):413-421. doi:10.1370/afm.2562

8.  Rasmussen KN, Janiak E, Cottrill AA, Stulberg DB. Expanding access to medication abortion through pharmacy dispensing of mifepristone: Primary care perspectives from Illinois. *Contraception*. 2021;104(1):98-103. doi:10.1016/j.contraception.2021.03.022

9.  Grossman D, Baba CF, Kaller S, et al. Medication abortion with pharmacist dispensing of mifepristone. *Obstet Gynecol*. 2021;137(4):613-622. doi:10.1097/AOG.0000000000004312

10. Winikoff B, Dzuba IG, Chong E, et al. Extending outpatient medical abortion services through 70 days of gestational age. *Obstet Gynecol*. 2012;120(5):1070-1076. doi:10.1097/AOG.0b013e31826c315f

11. Chen MJ, Creinin MD. Mifepristone With buccal misoprostol for medical abortion. *Obstet Gynecol*. 2015;126(1):12-21. doi:10.1097/AOG.0000000000000897

12. Chong E, Shochet T, Raymond E, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. *Contraception*. 2021;104(1):43-48. doi:10.1016/j.contraception.2021.03.019

13. Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. *Obstet Gynecol*. 2013;121(1):166-171. doi:10.1097/AOG.0b013e3182755763

14. Aiken A, Lohr P, Lord J, Ghosh N, Starling J. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. *BJOG An Int J Obstet Gynaecol*. 2021;128(9):1464-1474. doi:10.1111/1471-0528.16668

15.  Hyland P, Raymond EG, Chong E. A direct-to-patient telemedicine abortion service in Australia: Retrospective analysis of the first 18 months. *Aust New Zeal J Obstet Gynaecol*. 2018;58(3):335-340. doi:10.1111/ajo.12800

16.  National Academies of Sciences, Engineering, and Medicine. *The Safety and Quality of Abortion Care in the United States*. National Academies Press (US); 2018. doi:10.17226/24950

17.  Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. *Obstet Gynecol*. 2012;119(2):215-219. doi:10.1097/AOG.0b013e31823fe923

18.  Bartlett LA, Berg CJ, Shulman HB, et al. Risk factors for legal induced abortion-related mortality in the United States. *Obstet Gynecol*. 2004;103(4):729-737. doi:10.1097/01.AOG.0000116260.81570.60

19.  Jones RK, Jerman J. Time to appointment and delays in accessing care among U.S. abortion patients. 2016. www.guttmacher.org. Accessed August 6, 2021.

20.  Foster DG, Kimport K. Who seeks abortions at or after 20 weeks? *Perspect Sex Reprod Health*. 2013;45(4):210-218. doi:10.1363/4521013

21.  Ely G, Polmanteer RSR, Caron A. Access to abortion services in Tennessee: Does distance traveled and geographic location influence return for a second appointment as required by the mandatory waiting period policy? *Heal Soc Work*. 2019;44(1):13-21. doi:10.1093/hsw/hly039

Case 5:24-cv-10049-JWB-APP Document 22-4 filed 10/06/25 PageID.6611 Page 12
PageID.8598

remaining 6, 3 were PUL treated with methotrexate and 3 were ectopic (salpingectomy=2, methotrexate=1). However, in 2 of these 6 cases, ultrasound falsely indicated an intrauterine pregnancy.

**Conclusions** Ectopic pregnancies are uncommon amongst women presenting for abortion. The value of routine ultra sound in excluding ectopic pregnancy in symptom free women without significant risk factors is questionable as it may aid detection of some cases but may give false reassurance that a pregnancy is intrauterine.

---

## 3 ACCEPTABILITY OF EARLY MEDICAL ABORTION DELIVERED BY TELEMEDICINE – PRELIMINARY DATA FROM AN NHS COMMUNITY ABORTION SERVICE

[1]John Reynolds Wright*, [2]Anne Johnstone, [3]Karen McCabe, [4]Claire Nicol, [5]Sharon Cameron. [1]Clinical Research Fellow, MRC Centre for Reproductive Health, University of Edinburgh, Edinburgh, UK; [2]Clinical Research Nurse, University of Edinburgh, Edinburgh, UK; [3]Clinical Research Midwife, University of Edinburgh, Edinburgh, UK; [4]Advanced Sexual and Reproductive Health Practitioner, NHS Lothian, Edinburgh, UK; [5]Consultant Gynaecologist, NHS Lothian and Honorary Professor of Sexual and Reproductive Health, University of Edinburgh, Edinburgh, UK

10.1136/bmjsrh 2020 bsacp.3

**Introduction** In response to the COVID 19 outbreak, the NHS Lothian abortion service (based at the Chalmers Centre for Sexual and Reproductive Health, Edinburgh) transferred wholly to telemedicine delivery of abortion care. The need for ultrasound scan was assessed as per Royal College of Obstetricians and Gynaecologists (RCOG) guidance based on symptoms and/or significant risk factors for ectopic, uncertain gestation or last menstrual period (LMP) of more than 12 weeks ago. Those with a gestation of less than 12 weeks, and medically eligible could choose early medical abortion (EMA) at home with collection of medication or delivery by courier. We sought to evaluate the experience of these women.

**Methods** Between 1 April and 9 July 2020, an interviewer administered survey was conducted of women who had received EMA, at 4 days and 14 days following their teleme dicine consultation. Questions included preparedness for the EMA, acceptability of telemedicine and preferred future type of consultation, importance of ultrasound and result of the day 14 low sensitivity pregnancy test (LSPT).

**Results** Our preliminary analysis includes 322 women with complete follow up at day 4 and day 14. 281 (87%) of women rated their telephone abortion care as 'very accept able' or 'somewhat acceptable', and 275 (85%) rated them selves as 'very prepared' or 'somewhat prepared for the procedure'. 236 (73%) had a negative LSPT at day 14. Of the remaining women, less than 1% had an ongoing preg nancy after further investigation. 231 (72%) of respondents would select a telephone consultation again if they needed a further abortion. Only 70 (22%) women considered ultra sound as being 'very important' or 'somewhat important' to them.

**Conclusions** The move to telemedicine has been positively received by the majority of women in our cohort. Continu ing to provide the majority of EMA care via telemedicine would appear to be an effective approach, appreciated by patients.

---

## 4 DO MEDICATION ABORTION COMPLICATIONS INCREASE WHEN MIFEPRISTONE IS AVAILABLE WITHOUT REGULATIONS RESTRICTING PRACTICE? A POPULATION-BASED STUDY USING LINKED HEALTH ADMINISTRATIVE DATA FROM CANADA

[1,2]Laura Schummers*, [2,3]Elizabeth K Darling, [2]Anastasia Gayowsky, [4]Sheila Dunn, [5]Kimberlyn McGrai, [3]Michael Law, [6]Tracey Lea Laba, [1,7]Wendy V Norman. [1]Department of Family Practice, University of British Columbia, Vancouver, Canada; [2]ICES McMaster, Hamilton, Ontario, Canada; [3]Department of Obstetrics and Gynecology, McMaster University, Hamilton, Ontario, Canada; [4]Department of Family and Community Medicine, University of Toronto, Toronto, Canada; [5]School of Population and Public Health, University of British Columbia, Vancouver, Canada; [6]Centre for Health Economics Research and Evaluation, University of Technology Sydney, Sydney, Australia; [7]Faculty of Public Health and Policy, London School of Hygiene and Tropical Medicine, London, UK

10.1136/bmjsrh 2020 bsacp.4

**Objective** In January 2017, mifepristone became available in Canada, where abortion has been fully decriminalised since 1988. By November 2017, all drug label restrictions on pre scribing and dispensing were removed. Canada's globally unique policies allow any physician or nurse practitioner to prescribe mifepristone physically or via telemedicine, any phar macist to directly dispense mifepristone to patients, and patients to swallow their mifepristone when and where they choose. In this study, we examined the association of this deregulated medication abortion approach with abortion uti lisation and complications including ongoing pregnancy.

**Methods** We used linked administrative data (billing, hospital, ambulatory care, and prescription records) from Ontario, Can ada to examine the 308 344 surgical and medication abortions from January 2012 to December 2019. We examined abortion utilisation, abortion after 14 weeks' gestation, abortion related complications (infection, haemorrhage, embolism, shock, renal failure, damage to pelvic organs, other venous complications) and severe adverse events (overnight hospitalisation, blood transfusion, or death), surgical follow up (laparotomy, laparo scopy, hysterectomy), aspiration/re aspiration, and ongoing pregnancy (ectopic, intrauterine) within 6 weeks of the abor tion. We compared incidences before and after mifepristone deregulation (2012 2016 vs 2018 2019).

**Results** Medication abortion utilisation increased substantially from 2.9% of all abortions from 2012 2016 to 31.0% in 2018 2019. Abortion after 14 weeks' gestation decreased from 5.8% (95% CI 5.7 5.9) before to 5.3% (95% CI 5.2 5.5) after mifepristone deregulation. Among the 255 642 first trimester abortions, complications were similar before and after deregulation: abortion related complication inci dence was 0.66% (95% CI 0.62 0.69) before and 0.61% (95% CI 0.55 0.67) after, while severe adverse event inci dence was 0.26% (95% CI 0.24 0.28) before and 0.33% (95% CI 0.28 0.37) after (Figure 1). Surgical follow up was similar in both periods, occurring in 0.05% (95% CI 0.04 0.06) before and 0.06% (95% CI 0.04 0.08) after deregula tion. Aspiration/re aspiration increased modestly from 0.05% (95% CI 0.04 0.06) to 0.13% (95% CI 0.10 0.16), as did ectopic pregnancy diagnosed after the abortion, from 0.15% (95% CI 0.14 0.17) to 0.22% (95% CI 0.19 0.26). Ongoing intrauterine pregnancy continuing to delivery increased from 0.07% (95% CI 0.06 0.08) to 0.31% (95% CI 0.27 0.35) after, while ongoing pregnancy leading to subsequent abor tion increased from 0.54% (95% CI 0.50 0.57) to 0.96% (95% CI 0.89 1.03).

PCSF311                    2021 REMS 000956

BMJ Sex Reprod Health: first published as 10.1136/bmjsrh-2020-bsacp on 12 January 2021. Downloaded from http://jfprhc.bmj.com/ on July 25, 2023 at FDA Library. Protected by copyright.

Case 1:17-cv-07045-RA-OTW Document 222-4 Filed 10/26/23 Page 14 of 312
Case 1:07-cv-07045-RAO-DC Document 222-4 Filed 10/16/23/2567 Page 4 of 8 PageID.6836
PageID.8599

BMJ Sex Reprod Health: first published as 10.1136/bmjsrh-2020-bsacp on 12 January 2021. Downloaded from http://jfprhc.bmj.com/ on July 25, 2023 at FDA Library. Protected by copyright.



**Abstract 4 Figure 1** Incidence of adverse events, abortion-related complications, and ongoing pregnancy outcomes before (2012–2016) and after (2018–2019) mifepristone deregulation in Ontario, Canada among all first-trimester abortions.

**Impact** Canada's globally unique deregulation of mifepristone medication abortion, which enabled patients to self manage their care with their primary care provider's support available, substantially increased medication abortion utilisation and was not associated with a clinically significant increase in abortion complications, ongoing pregnancy, or adverse events.

---

| 5 | DEMAND FOR SELF-MANAGED ONLINE TELEMEDICINE ABORTION IN EUROPE DURING THE COVID-19 PANDEMIC |

[1,2]Abigail RA Aiken, [3,4]Jennifer E Starling, [5]Rebecca Gomperts, [3,6]James G Scott, [7]Catherine E Aiken*. [1]LBJ School of Public Policy, University of Texas at Austin, Austin, Texas, USA; [2]Population Research Center, University of Texas at Austin, Texas, USA; [3]Department of Statistics and Data Sciences, University of Texas at Austin, Austin, USA; [4]Mathematica Policy Research, Cambridge, Massachusetts, USA; [5]Women on Web, Amsterdam, The Netherlands; [6]McCombs School of Business, University of Texas at Austin, Austin, USA; [7]University Department of Obstetrics and Gynaecology, University of Cambridge; NIHR Cambridge Biomedical Research Centre, Cambridge, UK

10.1136/bmjsrh 2020 bsacp.5

**Objectives** In most European countries, patients seeking medication abortion during the COVID 19 pandemic are still required to attend healthcare settings in person. We assessed whether demand for self managed medication abortion provided by a fully remote online telemedicine service increased following the emergence of COVID 19.

**Methods** We examined 3915 requests for self managed abortion to Women on Web (WoW), an online telemedicine abortion service, between 1 January 2019 and 1 June 2020. We used regression discontinuity to compare request rates in 10 European countries before and after they implemented lockdown measures to slow COVID 19 transmission. We examined the prevalence of COVID 19 infection, the degree of government provided economic support, the severity of lockdown travel restrictions, and the medication abortion service provision model in countries with and without significant changes in requests.

**Results** Five countries showed significant increases in requests to WoW, ranging from 28% in Northern Ireland (p=0.001) to 139% in Portugal (p<0.001) (Table 1). Two countries showed no significant change in requests, and one country, Great Britain, showed an 88% decrease in requests (p<0.001). Countries with significant increases in requests were either countries where abortion services are mainly provided in hospitals or where no abortion services are available and international travel was prohibited during lockdown. By contrast, Great Britain authorised teleconsultation for medication abortion during the pandemic, and remote provision of medications.

**Abstract 5 Table 1** Actual versus expected numbers of self-managed abortion requests in the 'after' period for each country included in the study.

| Country | Actual requests (n) | Expected requests (n) | Percentage (%) change over baseline trend (95% CI) | P value |
|---|---|---|---|---|
| Portugal | 34 | 14.2 | 139.0 (54.5, 385.7) | <0.001 |
| Italy | 53 | 31.6 | 67.9 (23.3, 152.4) | <0.001 |
| Hungary | 113 | 83.2 | 35.8 (11.9, 71.2) | <0.001 |
| Malta | 69 | 52.3 | 31.9 (3.0, 76.9) | <0.001 |
| Northern Ireland (UK) | 97 | 75.8 | 28.0 (4.3, 64.4) | 0.001 |
| Germany | 465 | 467.1 | 0.5 ( 9.0, 9.2) | 0.798 |
| Netherlands | 47 | 50.9 | 7.7 ( 28.8, 27.0) | 0.458 |
| Great Britain | 1 | 8.1 | 87.6 ( 92.9, 66.7) | <0.001 |

**Conclusion** These marked changes in requests for self managed medication abortion during COVID 19 demonstrate demand for remote models of care, and an urgent need to expand access to medication abortion by telemedicine.

Best Practice & Research Clinical Obstetrics and Gynaecology 63 (2020) 37–44



Contents lists available at ScienceDirect

# Best Practice & Research Clinical Obstetrics and Gynaecology

journal homepage: www.elsevier.com/locate/bpobgyn



4

# Modern methods to induce abortion: Safety, efficacy and choice



Nathalie Kapp [a, *], Patricia A. Lohr [b]

[a] *Ipas, Chapel Hill, NC, USA*
[b] *British Pregnancy Advisory Service, Stratford Upon Avon, UK*

### A B S T R A C T

Abortion care is a fundamental part of women's reproductive health care. Surgical and medical abortion methods are safe and effective throughout the gestational age range wherein abortions are performed. Although risks increase with the gestational age of the pregnancy being terminated, rates of complications remain low and comparable between surgical and medical techniques. A high quality abortion service should offer women a choice be tween abortion methods and provide the one they prefer.

© 2020 Elsevier Ltd. All rights reserved.

## Introduction

Abortion is a common event in women's reproductive lives, affecting approximately 25% of all pregnancies [1]. Globally, 56 million induced abortions are estimated to occur each year for a rate of 35 abortions per 1000 women aged 15–44 years [1]. Safe services to terminate a pregnancy are, therefore, an essential aspect of women's health care.

Induced abortion using modern methods is very safe [2]. The chance of a woman dying from an induced abortion, when performed by a trained clinician, is manyfold lower than dying from a preg nancy carried to term [3]. However, abortions performed by unskilled providers or in environments lacking minimal medical standards, have high rates of maternal death and injury [4,5]. The informal use of misoprostol, which has become widespread, has decreased risks historically associated with unsafe methods of abortion [6]. Ensuring the safe provision of abortion — whether by training in

---

\* Corresponding author.
*E-mail address:* kappn@ipas.org (N. Kapp).

https://doi.org/10.1016/j.bpobgyn.2019.11.008
1521-6934/© 2020 Elsevier Ltd. All rights reserved.

PCSF313        2021 REMS 000958

countries, and found a fetal expulsion rate of 85% at 24 h and 94% at 48 h among those who had vaginally administered misoprostol [49]. The median time to fetal expulsion was 12 h (4.1–61.8 h) and parous women had significantly shorter abortion intervals. Other randomized trials with smaller sample sizes report abortion intervals between 10 and 15 h, and no difference in efficacy between vaginal and sublingual administration [50,51]. With a dosing interval of 6 h, compared with 3 h, the time to abortion is increased [52]. Major complications occurred in about 1% of women; in the largest trial of 681 women, 10 (1.5%) required a blood transfusion [49].

### The value of choice between abortion methods

Contraindications to either medical or surgical abortion are few; therefore, most women will be eligible for either method throughout the first and second trimesters. Both methods can be provided in an outpatient setting, which further facilitates offering a choice. For medical abortion, as the gesta tional age progresses, some women may require an overnight stay but a recent study estimated its occurrence among only 11% of those undergoing abortion up to 18 weeks [53]. D&E can be safely provided as a day case, even when general anesthesia or deep sedation is used [22,54]. As the char acteristics of the methods are markedly different, a woman's informed choice is the best decision maker between surgical and medical abortion. Acceptability and satisfaction with the abortion pro cess is greatest when women can choose between methods and receive their preferred method [2,55–58].

Characteristics of surgical abortion that are attractive to some are the short duration of the pro cedure, completion within an expected timeframe, low complication rate, and comfort with options for pain management during the procedure ranging from local anesthesia and oral analgesia to general anesthesia. Women who prefer medical abortion appreciate the characteristics of privacy – particu larly in early gestations when women administer misoprostol and abort at home  the more natural seeming process, which is akin to having a miscarriage, and avoiding an invasive procedure or administration of anesthesia [55,56,58]. In later gestations, medical abortion techniques allow seeing or holding the fetus after it is expelled, a wish some women have when the pregnancy is terminated for fetal indications [57,59].

Randomizing women between medical and surgical methods has been difficult given many women's strong preference for one method over the other; therefore, comparative trials are few and at least one was prematurely stopped because of slow enrolment [20,60]. The stronger preference in these studies has been for a surgical procedure, which women perceive as less painful, less psycho logically traumatic, and faster [60,61]. In studies where women agreed to be randomized and acceptability assessed, higher satisfaction was reported with surgical abortion techniques over med ical, primarily because of the length or volume of bleeding and pain associated with medical abortion [20,61–63]. In the most recent of such studies, 100% of those who were randomized to the D&E pro cedure reported they would choose it again when compared with 53% of those who were randomized to a medical abortion [61]. Additionally, significantly fewer women who had a D&E compared with medical abortion found the experience to be worse than expected. Given the strong preferences women may have regarding the characteristics of abortion techniques and the generally more positive experience women attribute to uterine aspiration and D&E when randomized to it, services should aim to provide both methods. Where trained providers or facility characteristics impede this ideal, referral mechanisms should be in place to best meet women's needs and preferences.

### Conclusion

Abortion care is a fundamental part of women's reproductive health care. Surgical and medical abortion methods are safe and effective throughout the gestational age range wherein abortions are performed. Although risks increase with the gestational age of the pregnancy, rates of complications remain low and comparable between surgical and medical techniques. Women should be offered a choice between methods and receive the one they prefer.

Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0h CywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abggQ2Xdg3jZfMwJ2LeIs on 07/21/2023

Abortion: *Original Research*

# Induced Abortion Provision Among a National Sample of Obstetrician–Gynecologists

*Daniel Grossman, MD, Kate Grindlay, MSPH, Anna L. Altshuler, MD, MPH, and Jay Schulkin, PhD*

**OBJECTIVE:** To estimate the proportion of obstetrician–gynecologists (ob-gyns) who provided induced abortion in the prior year, disaggregated by surgical and medication methods, and document barriers to provision of medication abortion.

**METHODS:** In 2016–2017, we conducted a cross-sectional survey of a national sample of American College of Obstetricians and Gynecologists Fellows and Junior Fellows who were part of the Collaborative Ambulatory Research Network. We sent the survey by email, and mailed nonresponders paper surveys. We performed descriptive statistics, $\chi^2$ tests, and logistic regression analyses.

**RESULTS:** Sixty-seven percent (655/980) of Collaborative Ambulatory Research Network members responded. Ninety-nine percent reported seeing patients of reproductive age, and 72% reported having a patient in the prior year who needed or wanted an abortion. Among those seeing patients of reproductive age, 23.8% (95% CI 20.5%–27.4%) reported performing an induced abortion in the prior year; 10.4% provided surgical and medication abortion, 9.4% surgical only, and 4.0% medication only. In multivariable analysis, physicians practicing in the Midwest (adjusted odds ratio [AOR] 0.31, 95% CI 0.16–0.60) or South (AOR 0.22, 95% CI 0.11–0.42) had lower odds of provision compared with those practicing in the Northeast, whereas those practicing in an urban inner city (AOR 2.71, 95% CI 1.31–5.60) or urban non–inner-city area (AOR 2.89, 95% CI 1.48–5.64 vs midsize towns, rural areas, or military settings) had higher odds of provision. The most common reasons for not providing medication abortion were personal beliefs (34%) and practice restrictions (19%). Among those not providing medication abortion, 28% said they would if they could write a prescription for mifepristone.

**CONCLUSION:** Compared with the previous national survey in 2008–2009, abortion provision may be increasing among practicing ob-gyns, although important geographic disparities persist. Few provide medication abortion, but uptake might increase if mifepristone could be prescribed.

*(Obstet Gynecol 2019;133:477 83)*
*DOI: 10.1097/AOG.0000000000003110*

*From Advancing New Standards in Reproductive Health (ANSIRH), Bixby Center for Global Reproductive Health, Department of Obstetrics, Gynecology and Reproductive Sciences, University of California, San Francisco, Oakland, California; Ibis Reproductive Health, Cambridge, Massachusetts; California Pacific Medical Center, San Francisco, California; the University of Washington, Seattle, Washington; and the American College of Obstetricians and Gynecologists, Washington, DC.*

*Supported by the Society of Family Planning Research Fund (SFPRF). The views and opinions expressed are those of the authors and do not necessarily represent the views and opinions of SFPRF. Additional support was provided by the Maternal and Child Health Bureau (Title V, Social Security Act, Health Resources and Services Administration, and Department of Health and Human Services), Grant UA6MC19010. The funding sources had no role in the study design; the collection, analysis, and interpretation of the data; nor the preparation, writing, or submission of this manuscript.*

*Presented as a poster at the North American Forum on Family Planning, October 14 16, 2017, Atlanta, Georgia.*

*The authors thank Neko M. Castleberry and Lauren M. Stark for their assistance with data collection and cleaning.*

*Each author has confirmed compliance with the journal's requirements for authorship.*

*Corresponding author: Daniel Grossman, MD, ANSIRH, 1330 Broadway, Suite 1100, Oakland, CA 94612; email: Daniel.Grossman@UCSF.edu.*

***Financial Disclosure***
*The authors did not report any potential conflicts of interest.*

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. All rights reserved.
ISSN: 0029 7844/19

I n a 2018 analysis of induced abortion care in the United States, the National Academies of Sciences, Engineering, and Medicine concluded that legal induced abortion care is safe and effective, yet the quality of care varies geographically owing to state-level regulations.[1] Timeliness and equity, two dimensions of quality, greatly depend on the distribution of services, requiring care to be readily available locally to all women when needed. Obstetrician–gynecologists

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF315                    2021 REMS 000966



Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cl3VCYJabggQZXdgQj2RMxl2Lsit+ on 07/21/2023

(ob-gyns) play an important role in ensuring timely access to abortion care because they may be the first clinicians a patient with an unintended pregnancy encounters.

The most recent representative survey of U.S. ob-gyns performed in 2008–2009 found that 14% reported providing abortion care.[2] Female physicians and physicians living in an urban area or reporting they were Jewish were significantly more likely to provide abortions, whereas those older than 35 years of age, living in the South and Midwest (compared with the Northeast), or reporting high religious motivation were less likely to provide. The survey did not ask about the abortion methods provided. Medication abortion has become increasingly popular in recent years, accounting for 31% of nonhospital abortions in 2014.[3] However, a study from 2007 suggested that uptake of medication abortion among those not already providing surgical abortion was limited.[4]

The objective of this study was to provide an updated estimate of the proportion of ob-gyns who provide induced abortion, disaggregated by method, as well as physician and practice characteristics associated with provision. We also aimed to explore the barriers to provision of medication abortion, including the requirement to stock mifepristone in one's office.

## METHODS

This cross-sectional survey included Fellows and Junior Fellows of the American College of Obstetricians and Gynecologists (ACOG) who were currently in practice. The American College of Obstetricians and Gynecologists is a professional society that represents approximately 90% of practicing U.S. ob-gyns and has more than 58,000 members. The study population included 1,000 members of ACOG's Collaborative Ambulatory Research Network, which is a demographically representative group of practicing ACOG members who voluntarily participate in surveys conducted by the ACOG Research Department.[5] We randomly selected 1,000 participants from a list of more than 1,400 current members of the Collaborative Ambulatory Research Network. With a minimum response rate of 60%, the maximum margin of error in the estimation of proportions with a 95% CI in a random sample of 600 participants is ±4.0%.

Data collection took place between August 2016 and March 2017. We initially invited participants via email with a link to access the survey, which was administered using Qualtrics software. The email invited participants to complete a survey on "selected ob-gyn practices" and said the survey included "questions about how you manage patients with early pregnancy loss and unintended pregnancy and those seeking contraception." Those who were retired or did not wish to participate were given a link to opt out. We sent email reminders weekly for 5 weeks to those who had not completed the survey, and we mailed one postcard reminder. Participants who had not completed the electronic survey after these reminders were mailed a paper version of the questionnaire and a prepaid return envelope. We sent a second mailing containing a shortened version of the questionnaire to those who completed neither the electronic nor the first mailed survey.

We pretested the survey among practicing ob-gyns for meaning and respondent interest. The final version included 14 demographic questions and 19 questions about induced abortion provision (the shortened version contained eight abortion questions), in addition to questions on other family planning topics. Participants who reported that at least some of their patients were of reproductive age (15–49 years old) were asked whether they "had any patients in the last 12 months who wanted or needed an abortion or termination of pregnancy." If they answered affirmatively, we then asked whether, in the prior 12 months, they had provided a surgical abortion (dilation and sharp curettage, electric or manual vacuum aspiration) or a medical (medication) abortion. If they did provide any abortion care, we asked them to estimate the number of procedures and the locations where the procedures took place (ambulatory surgical center, hospital operating room, outpatient office setting of primary practice, Planned Parenthood or other specialized clinic, or other location).

Because medication abortion may be easier to provide in one's office than surgical abortion, we specifically explored the barriers to providing the former. We asked those who did not provide medication abortion in the prior year their reason. Participants could select from a list of 10 responses or write in a response, and multiple responses were allowed.

The U.S. Food and Drug Administration requires Mifeprex (mifepristone 200 mg) to be dispensed by the clinician in an office, clinic, or hospital; it may not be dispensed by prescription at a pharmacy.[6] To determine whether this is a barrier to provision, we asked participants who reported not providing medication abortion the following: "Currently, if you want to provide medical abortion, you must stock the medications in your office. Would you offer medical abortion to your patients if you could write a prescription for mifepristone and misoprostol, and your patient

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF316
2021 REMS 000967

Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSfl4Cl3VCYJabqgpGZXdgqGj2fMwUZLeIs on 07/21/2023

could obtain both medications at a pharmacy?" Participants could select yes, no, or not sure.

To ensure data entry accuracy, 5% of all mailed questionnaires were randomly selected for review. We found only one consistent data entry error (a coding error on the shortened paper surveys), prompting all shortened surveys to be reviewed.

We conducted data analyses with Stata 15.1. Respondents who answered the primary outcome questions on whether they provided medication or surgical abortion in the past 12 months were included in the analysis. Responses that were incorrectly given (eg, anyone who did not follow the skip logic correctly on the paper survey) were removed, and any respondents who stated they were retired in the open responses were removed and recategorized as ineligible.

We categorized the state where respondents practiced into U.S. regions based on U.S. Census Bureau definitions (Northeast, Midwest, South, and West), and Puerto Rico was categorized as "South." We coded participants' practice setting in the following hierarchy if more than one response was selected: university faculty practice, partnership or group, health maintenance organization or staff model, solo or private practice, other. We coded the community type where participants' practice was located in the following hierarchy if more than one response was selected: urban inner city; urban non–inner-city; suburban; midsize town, rural, or military.

If more than one response was provided for the location where induced abortions were performed, we coded abortion location in the following manner: abortion provided only in an ambulatory surgical center or hospital setting, any abortion provided in an outpatient office but not at a Planned Parenthood or specialized clinic, and any abortion in a Planned Parenthood or specialized clinic. We calculated the median number of abortions for each site where abortion was performed among those who provided any abortion.

Statistical tests assumed significance at $P$ value less than .05. Descriptive statistics were calculated separately for respondents who did and did not report providing abortion in the prior year and among participants overall. Comparisons of categorical variables were analyzed using $\chi^2$ tests. Univariable and multivariable logistic regression analyses were performed to estimate odds of providing abortion in the prior 12 months (1 means provided medication or surgical abortion, 0 means did not provide induced abortion) by background characteristics. All variables were used as binary or categorical predictors, with reference

groups based on sample size or meaningful comparison. We excluded missing data. We included all independent variables from Table 1 in an initial multivariable regression model. Sequentially, we removed from the model extraneous variables with a $P$ value greater than .2. Age and gender were forced into the model a priori because they were found to be significant predictors of abortion provision in the representative survey of U.S. ob-gyns performed in 2008–2009.[2] The Allendale Investigational Review Board approved this study.

## RESULTS

Of the original sample of 1,000 members of the Collaborative Ambulatory Research Network, 18 were found to be no longer an ACOG member or not in practice, and two were unreachable by mail, resulting in a sample of 980 members. Among this sample, 655 respondents provided data (response rate 67%). Nonresponders were similar to respondents in terms of age and geographic region of practice, but slightly more women responded to the survey (61% of respondents vs 55% of nonresponders, $P$=.06). Of the 655 respondents, 99% reported seeing patients of reproductive age, and of these, 72% reported having a patient in the prior year who needed or wanted an induced abortion. Participants who reported seeing patients of reproductive age who answered the questions on whether they provided medication or surgical abortion (N=597) were included in this analysis. Overall, 515 (86%) took the long version of the survey, and this proportion was similar across geographic regions.

Table 1 shows the demographic characteristics of participants, separated by those who did and did not provide abortion in the prior year. Overall, 23.8% (95% CI 20.5%–27.4%) reported providing any type of induced abortion in the prior year. In univariable analyses, male physicians and physicians residing in the Midwest and South had lower odds of provision compared with female physicians and physicians residing in the Northeast, respectively. Physicians in a university faculty practice had higher odds of provision compared with those in a partnership or group practice, as did physicians practicing in urban or suburban communities compared with those practicing in midsize towns, rural areas, or military settings.

In multivariable regression analysis, controlling for age and gender, those practicing in the Midwest (adjusted odds ratio [AOR] 0.31, 95% CI 0.16–0.60) and the South (AOR 0.22, 95% CI 0.11–0.42) compared with participants living in the Northeast had lower odds of providing induced abortion. Those

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF317     2021 REMS 000968



Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cl3VCYub/agpQ2Xdg3jZfMwlZLel+ on 07/21/2023

**Table 1.** Background Characteristics of Obstetrician–Gynecologists by Provision of Any Induced Abortion Services in the Prior Year

| Characteristic | Total (N=597) | Provided Abortion in Prior Year (n=142) | Did Not Provide Abortion in Prior Year (n=455) | Regression OR | Regression AOR* |
|---|---|---|---|---|---|
| All | 597 (100) | 142 (23.8) | 455 (76.2) | | |
| Age (y) | | | | | |
| 30–45 | 153 (25.7) | 39 (27.5) | 114 (25.2) | 1.10 (0.70–1.75) | 1.05 (0.64–1.73) |
| 46–60 | 266 (44.7) | 63 (44.4) | 203 (44.8) | 1.00 | 1.00 |
| 61 or older | 176 (29.6) | 40 (28.2) | 136 (30.0) | 0.95 (0.60–1.49) | 0.99 (0.59–1.64) |
| Gender | | | | | |
| Male | 234 (39.6) | 44 (31.7) | 190 (42.0) | 0.64 (0.43–0.96)† | 0.81 (0.51–1.28) |
| Female | 357 (60.4) | 95 (68.4) | 262 (58.0) | 1.00 | 1.00 |
| Race and ethnicity | | | | | |
| Asian-Pacific Islander, non-Hispanic | 42 (7.1) | 15 (10.6) | 27 (6.0) | 1.87 (0.96–3.65) | NA |
| Black, non-Hispanic | 27 (4.6) | 5 (3.6) | 22 (4.9) | 0.77 (0.28–2.07) | NA |
| Hispanic | 27 (4.6) | 5 (3.6) | 22 (4.9) | 0.77 (0.28–2.07) | NA |
| White, non-Hispanic | 468 (78.8) | 107 (75.9) | 361 (79.7) | 1.00 | NA |
| Other, non-Hispanic | 30 (5.1) | 9 (6.4) | 21 (4.6) | 1.45 (0.64–3.25) | NA |
| Region | | | | | |
| Northeast | 68 (11.5) | 28 (20.3) | 40 (8.9) | 1.00 | 1.00 |
| Midwest | 157 (26.6) | 27 (19.6) | 130 (28.8) | 0.30 (0.16–0.56)† | 0.31 (0.16–0.60)† |
| South | 198 (33.6) | 26 (18.8) | 172 (38.1) | 0.22 (0.11–0.41)† | 0.22 (0.11–0.42)† |
| West | 167 (28.3) | 57 (41.3) | 110 (24.3) | 0.74 (0.41–1.32) | 0.71 (0.39–1.29) |
| Practice setting | | | | | |
| Solo private practice | 73 (12.3) | 18 (12.8) | 55 (12.2) | 1.18 (0.65–2.14) | NA |
| Partnership or group | 318 (53.6) | 69 (48.9) | 249 (55.1) | 1.00 | NA |
| HMO or staff model | 51 (8.6) | 11 (7.8) | 40 (8.9) | 0.99 (0.48–2.04) | NA |
| University faculty practice | 131 (22.1) | 40 (28.4) | 91 (20.1) | 1.59 (1.00–2.51)† | NA |
| Other | 20 (3.4) | 3 (2.1) | 17 (3.8) | 0.64 (0.18–2.24) | NA |
| Years in practice | | | | | |
| 1–10 | 91 (16.4) | 24 (18.1) | 67 (15.9) | 1.15 (0.65–2.03) | NA |
| 11–20 | 189 (34.1) | 45 (33.8) | 144 (34.2) | 1.00 | NA |
| 21 or more | 274 (49.5) | 64 (48.1) | 210 (49.9) | 0.98 (0.63–1.51) | NA |
| Practice location | | | | | |
| Urban inner city | 107 (18.0) | 30 (21.3) | 77 (17.0) | 2.75 (1.39–5.47)† | 2.71 (1.31–5.60)† |
| Urban non–inner-city | 182 (30.6) | 55 (39.0) | 127 (28.0) | 3.06 (1.64–5.73)† | 2.89 (1.48–5.64)† |
| Suburban | 185 (31.1) | 41 (29.1) | 144 (31.7) | 2.01 (1.06–3.83)† | 1.94 (0.99–3.83) |
| Midsize town, rural, or military | 121 (20.3) | 15 (10.6) | 106 (23.4) | 1.00 | 1.00 |

OR, odds ratio; AOR, adjusted odds ratio; NA, not applicable (blank cells owing to model inclusion criteria); HMO, health maintenance organization.

Data are n (%) unless otherwise specified.

Columns may not tally to 100% owing to missing values.

* Final adjusted model included age, gender, region, and practice location, n 581.

† Significantly different from reference category at P<.05.

practicing in an urban inner city (AOR 2.71, 95% CI 1.31–5.60) or urban non–inner-city area (AOR 2.89, 95% CI 1.48–5.64) had higher odds of providing abortion compared with those in a midsize town, rural area, or who practiced exclusively in the military.

Table 2 shows details of participants' abortion practice in the prior year. Overall, 9.4% provided only surgically induced abortion, 4.0% provided only medication abortion, and 10.4% provided both surgical and medication abortion. Approximately 20% provided surgical abortion in the prior year, with about half of these performing electrical vacuum aspiration,

one quarter using manual vacuum aspiration, and one quarter using sharp curettage. Fourteen percent provided medication abortion in the prior year; among these providers, 58.1% used the combined mifepristone–misoprostol regimen, 41.9% used misoprostol alone, and 10.5% used methotrexate and misoprostol. Participants were not specifically asked the gestational age range of patients provided medication abortion.

Participants who completed the long version of the survey and who provided abortion in the prior year gave information about where they provided

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF318    2021 REMS 000969



Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abgpGZXdgGjZfMnZ1eLisi on 07/21/2023

**Table 2.** Abortion Methods Provided by Obstetrician–Gynecologists in the Prior Year (N=597)

| Method | n (%) |
|---|---|
| Provided any induced abortion | 142 (23.8) |
|   Provided only surgical induced abortion | 56 (9.4) |
|   Provided only medication abortion | 24 (4.0) |
|   Provided surgical and medication abortion | 62 (10.4) |
| Provided any surgical induced abortion | 118 (19.8) |
|   Dilation and sharp curettage | 31 (5.2) |
|   Electrical vacuum aspiration | 57 (9.5) |
|   Manual vacuum aspiration | 31 (5.2) |
| Provided any medication abortion | 86 (14.4) |
|   Treatment with misoprostol alone | 36 (6.0) |
|   Treatment with mifepristone and misoprostol | 50 (8.4) |
|   Treatment with methotrexate and misoprostol | 9 (1.5) |

abortion (n=120). A total of 32.5% reported providing abortion only in an ambulatory surgical center or hospital setting, 47.5% reported providing in an outpatient office but not at a specialized clinic or Planned Parenthood, and 10.8% reported providing at least some abortions at a specialized clinic or Planned Parenthood. However, the number of abortions performed by participants varied by site. The median number of abortions performed in the past year by those who only provided at an ambulatory surgical center or hospital was 5.5, and the median was 8.0 for those who provided in their office but not at a specialized clinic. Among those who provided any abortion at a specialized clinic, the median number of procedures was 112.0 in the prior year (Table 3).

Respondents who reported having patients seeking abortion but did not provide medication abortion in the prior year were asked about reasons why they did not provide (n=368). About one third (34%) cited personal, religious, or moral beliefs against abortion, 19% pointed to practice setting restrictions against abortion provision, and 16% mentioned office staff attitudes. Ten percent said there was no perceived need, and 8% said their patients had access to another provider or they referred out (Table 4). Eleven percent cited a lack of training as the reason for not providing medication abortion, and a similar proportion cited the requirement to stock the medications in their clinic. Nine percent cited the requirement to sign the provider agreement with the manufacturer of mifepristone. Some of the responses in the "other" category, each of which was cited by less than 4% of participants, included community attitudes, not having an ultrasound scanner in the office, lack of surgical backup, and laws and regulations.

When those who did not provide medication abortion but reported having patients seeking abortion were asked whether they would offer the service if they could write prescriptions for the medications, 28% said they would offer medication abortion, 47% said they would not, and 22% said they were not sure (Table 4). The number of respondents who said they would offer medication abortion by prescription (n=102) is more than the number in the survey who reported providing medication abortion in the prior year (n=86). This suggests that the proportion of ob-gyns offering induced medication abortion might increase from 14% currently to as much as 31% if it were not required to stock the medication in one's office.

## DISCUSSION

This study aimed to describe induced abortion provision among practicing ob-gyns in the United States and found that 24% of them had performed abortion in the prior year. Factors associated with provision included practicing in the Northeast or West rather than the South or Midwest and practicing in an urban setting. This inequitable geographic distribution is similar to findings in previous research, which may be related to more restrictions on abortion provision in Southern and Midwestern states.[2,7,8]

The proportion of ob-gyns who reported providing induced abortion in our survey was higher than the 14% reported in a national survey conducted in 2008–2009.[2] Our results were similar to a survey of ob-gyns who became board certified between 1998 and 2001, which found that 22% performed an induced abortion in the prior year.[9] The Accreditation Council for Graduate Medical Education has required training in induced abortion in obstetrics and gynecology residency programs since 1996, which may have contributed to an increase in provision.

Among those providing induced abortion in the prior year, approximately one third reported providing the service only in an ambulatory surgical center or hospital setting. Given the safety of providing abortion in an outpatient setting,[10] more research is needed to understand the reasons why ob-gyns choose to provide the service in a hospital. These physicians provided a small number of procedures in the prior year (median of 5.5), which is consistent with national data.[3]

Desai et al recently reported on a survey of ob-gyns in private practice, which found that 7% reported performing an induced abortion in 2013 or 2014.[7] That survey focused on provision of abortions at the physician's office and excluded specialized clinics

Grossman et al *Induced Abortion Provision Among Ob Gyns* **481**

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF319      2021 REMS 000970



Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abqgQZXdgGj2fMwtZLeI+ on 07/21/2023

**Table 3. Site Where Induced Abortion was Provided and Annual Number of Abortions Performed Among Obstetrician–Gynecologists Providing Any Abortions (n=120)***

| Site | n (%) | Annual No. of Abortions Performed | |
|---|---|---|---|
| | | Median | IQR |
| Induced abortion provided only in ambulatory surgical center or hospital setting | 39 (32.5) | 5.5 | 3 12 |
| Any abortion provided in outpatient office but not at a Planned Parenthood or specialized clinic | 57 (47.5) | 8.0 | 3 15 |
| Any abortion provided at a Planned Parenthood or specialized clinic | 13 (10.8) | 112.0 | 75 251 |

IQR, interquartile range.
Columns may not tally to 100% owing to missing values.
* Among respondents who answered long survey.

providing abortion care. About half of the ob-gyns in our survey who provided abortion reported doing so in an outpatient setting, which makes our findings comparable with those of Desai.

Among ob-gyns who reported seeing patients who needed or requested an abortion, the most commonly cited reasons for not providing medication abortion were personal reasons or practice restrictions. These results are similar to a survey of ob-gyns in New Mexico in 2008.[11] Qualitative research has also highlighted how practice restrictions prevent trained physicians from providing the service.[12]

Beyond these personal and practice explanations, some of the reasons for not providing medication abortion could be addressed through training and policy changes. Eleven percent cited a lack of training, suggesting medication abortion teaching in residencies and continuing education might increase uptake of the method. A similar proportion reported that the requirement to stock mifepristone in their clinics was a reason they did not provide the method, and our findings suggest that the number of ob-gyns providing medication abortion might at least double if they could write a prescription for mifepristone. Pharmacy dispensing of Mifeprex by prescription is currently prohibited by the drug's Risk Evaluation and Mitigation Strategy imposed by the U.S. Food and Drug Administration.[6] A recent analysis found that the mifepristone Risk Evaluation and Mitigation Strategy is not justified given the positive safety record of the drug, and the authors argued for its withdrawal.[13] Our survey suggests that the Risk Evaluation and Mitigation Strategy is a barrier to provision of medication abortion, which should add new urgency to the push to remove this medically unnecessary restriction.

**Table 4. Perspectives of Obstetrician–Gynecologists Who Do Not Provide Medication Abortion, Among Those Who Had Patients Seeking Abortion (n=368)**

| | n (%) |
|---|---|
| Reasons for not providing medication abortion (multiple responses allowed) | |
| Personal, religious, or moral beliefs against abortion | 126 (34.2) |
| Practice setting restrictions against abortion provision | 69 (18.8) |
| Office staff attitudes | 58 (15.8) |
| Lack of training | 41 (11.1) |
| Requirement to stock medications in clinic | 40 (10.9) |
| No perceived need | 36 (9.8) |
| Requirement to sign agreement with manufacturer of Mifeprex | 33 (9.0) |
| Patients have access to someone else or provider refers out | 28 (7.6) |
| Other | 64 (17.4) |
| Would offer medication abortion to patients if they could write a prescription for mifepristone and misoprostol and patients could obtain both medications at a pharmacy, among those who had not provided induced medication abortion in past year and who had patients seeking abortion | |
| Would offer medication abortion | 102 (27.7) |
| No | 173 (47.0) |
| Not sure | 79 (21.5) |

Columns may not tally to 100% owing to missing values.

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF320 2021 REMS 000971



Case 1:17-cv-10949-RAO Document 222-4 Filed 10/02/23 Page 23 of 312 PageID.8608

This study has several limitations. Although the response rate for this survey was 67% and non-responders were similar to respondents, there is a risk of nonparticipation bias. Of note, participants did not know the survey focused on induced abortion practice when they were invited to participate. Still, it is likely that nonparticipation bias results in an overestimation of abortion provision in this survey. Our survey asked about abortion provision in the prior year, whereas the 2008–2009 survey asked "do you provide abortion services." Although our wording is more precise, it may overestimate provision for physicians who recently stopped offering abortion. The hypothetical question about prescribing mifepristone may overestimate the effect of allowing pharmacy dispensing of the drug, because other barriers, such as practice restrictions and pharmacist refusals, may still limit expansion of medication abortion. In addition, Collaborative Ambulatory Research Network members may represent a subset of more engaged ACOG Fellows who might be more likely to change their practice if the policy regarding mifepristone dispensing were changed.

Quality of induced abortion care depends on all women seeking the service being able to do so in a timely fashion in a safe and effective way. State-based abortion regulations, federal laws restricting provision of medication abortion, individual providers' personal, religious, or moral beliefs, and practice and community factors affect the availability of abortion services and pose barriers to abortion quality. Expanding opportunities for professional development and reversing restrictive state and federal policies may help to improve the quality of abortion care.

## REFERENCES

1. National Academies of Sciences, Engineering, and Medicine. The safety and quality of abortion care in the United States. Washington, DC: The National Academies Press; 2018.

2. Stulberg DB, Dude AM, Dahlquist I, Curlin FA. Abortion pro vision among practicing obstetrician gynecologists. Obstet Gynecol 2011;118:609 14.

3. Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2014. Perspect Sex Reprod Health 2017; 49:17 27.

4. Finer LB, Wei J. Effect of mifepristone on abortion access in the United States. Obstet Gynecol 2009;114:623 30.

5. Leddy MA, Lawrence H, Schulkin J. Obstetrician gynecologists and women's mental health: findings of the Collaborative Ambulatory Research Network 2005 2009. Obstet Gynecol Surv 2011;66:316 23.

6. U.S. Food and Drug Administration. Risk evaluation and mit igation strategy for Mifeprex (mifepristone) tablets, 200 mg. Available at: https://www.accessdata.fda.gov/drugsatfda docs/ rems/Mifeprex 2016 03 29 REMS full.pdf. Retrieved July 4, 2018.

7. Guttmacher Institute. An overview of abortion laws. Available at: https://www.guttmacher.org/state policy/explore/overview abortion laws. Retrieved July 6, 2018.

8. Desai S, Jones RK, Castle K. Estimating abortion provision and abortion referrals among United States obstetrician gynecologists in private practice. Contraception 2018;97:297 302.

9. Steinauer J, Landy U, Filippone H, Laube D, Darney PD, Jack son RA. Predictors of abortion provision among practicing obstetrician gynecologists: a national survey. Am J Obstet Gy necol 2008;198:39.e1 6.

10. White K, Carroll E, Grossman D. Complications from first trimester aspiration abortion: a systematic review of the litera ture. Contraception 2015;92:422 38.

11. Espey E, Leeman L, Ogburn T, Skipper B, Eyman C, North M. Has mifepristone medical abortion expanded abortion access in New Mexico? A survey of OB GYN and family medicine physicians. Contraception 2011;84:178 83.

12. Freedman L, Landy U, Darney P, Steinauer J. Obstacles to the integration of abortion into obstetrics and gynecology practice. Perspect Sex Reprod Health 2010;42:146 51.

13. Mifeprex REMS Study Group, Raymond EG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, et al. Sixteen years of overregulation: time to unburden Mifeprex. N Engl J Med 2017;376:790 4.

## PEER REVIEW HISTORY

Received September 8, 2018. Received in revised form November 18, 2018. Accepted November 29, 2018. Peer reviews and author correspondence are available at http://links.lww.com/AOG/B277.

© 2019 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

Downloaded from http://journals.lww.com/greenjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abggQZXdgGj2MWZLdI+ on 07/21/2023

PCSF321          2021 REMS 000972



Case 1:17-cv-00493-RTO-RT Document 240e4 10File 05/27/2577 Page 24 of 312
Case 1:17-cv-00493-RTO-RT Document 222t 240e4 10Filed 05/27/2577 Page 24 of 3126846
Contraception 2021.04.012-97
Page ID.8609



Contents lists available at ScienceDirect

# Contraception

journal homepage: www.elsevier.com/locate/contraception

ELSEVIER

Original Research Article

# US clinicians' perspectives on how mifepristone regulations affect access to medication abortion and early pregnancy loss care in primary care



Silpa Srinivasulu [a,*], Roya Yavari [b], Libby Brubaker [b], Laura Riker [a], Linda Prine [a,b], Susan E. Rubin [b]

[a] Reproductive Health Access Project, New York, NY, United States
[b] Icahn School of Medicine at Mount Sinai, New York, NY, United States

ARTICLE INFO

Article history:
Received 23 November 2020
Received in revised form 15 April 2021
Accepted 19 April 2021

Keywords:
Mifepristone
Medication abortion
Miscarriage
Early pregnancy loss
Primary care
Access

ABSTRACT

Objective: Protocols including mifepristone are the most effective medication regimens for medication abortion and early pregnancy loss (EPL) management. Both can be safely and effectively offered in primary care settings. Despite mifepristone's excellent safety record, the United States (US) Food and Drug Administration (FDA) heavily regulates provision. This exploratory study examines US primary care clinicians' perspectives on the effects of mifepristone restrictions, including FDA regulations, on access to medication abortion and EPL management in primary care.
Study Design: In 2019, we conducted an online qualitative survey of US primary care clinicians recruited from six reproductive health-focused listservs. Open-ended questions queried about barriers to providing mifepristone and effects on patients when unable to access mifepristone in primary care. We iteratively coded and analyzed qualitative data using inductive thematic analysis.
Results: Of our analytic sample of 113 respondents, one-third had mifepristone available in their current primary practice setting. Key barriers to provision stemmed from the FDA rule to stock and dispense mifepristone onsite, including logistical difficulties and resistance from health center leadership. Clinicians believed that lack of mifepristone in primary care resulted in negative patient experiences, including disrupted continuity of care, medically-unnecessary appointments, and undesired aspiration procedures.
Conclusions: FDA regulations that inhibit mifepristone provision in primary care create structural barriers to provision. This may result in physical, emotional, and financial burdens for patients.
Implications: When mifepristone is unavailable in primary care, some patients in need of abortion or EPL care may experience physical, emotional, and financial harms. Removing FDA restrictions is a critical step in reducing primary care barriers to mifepristone provision and improving access to timely, patient-centered medication abortion and EPL care.

© 2021 The Authors. Published by Elsevier Inc.
This is an open access article under the CC BY-NC-ND license
(http://creativecommons.org/licenses/by-nc-nd/4.0/)

## 1. Introduction

Abortion and early pregnancy loss (EPL) are very common. In the United States (US), one in four women will have an abortion in their lifetime; one in five will have a clinically-recognized EPL [1-2]. Using mifepristone with misoprostol for medication abortion is safe and effective [3-5]. Mifepristone with misoprostol is recommended by professional medical organizations to treat EPL off-label, as it is the most effective medication regimen (83.8% vs 67.1%

misoprostol-only) [5-7]. To date, abortion is the only US Food and Drug Administration (FDA)-approved indication for mifepristone.

The FDA has long restricted mifepristone under a Risk Evaluation and Mitigation Strategy (REMS), a drug safety program designed to regulate medications suspected to cause serious adverse effects [8]. Yet, among 3.7 million US people who have taken mifepristone since 2000, the FDA reported 24 deaths, of which several were unrelated to the drug. Between 2012 and 2018, the FDA reported 1,455 adverse events, including 274 people requiring hospitalization and 12 severe infections [9]. The mifepristone REMS includes three Elements to Assure Safe Use (ETASU): (1) mifepristone cannot be mailed or dispensed in pharmacies, only stocked

* Corresponding author.
E-mail address: silpa@reproductiveaccess.org (S. Srinivasulu).

https://doi.org/10.1016/j.contraception.2021.04.017
0010-7824/© 2021 The Authors. Published by Elsevier Inc. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/)

Case 1:17-cv-00493-RA-RWL Document 222-4 10 Filed 05/27/25 Page 25 of 312
Case 1:17-cv-00493-RA-RWL Document 240-1 Filed 05/27/25 Page 25 of 126847
PageID.8610

S. Srinivasulu et al. Contraception 104 (2021) 92–97

and provided to patients in medical offices; (2) a clinician with prescriptive authority must become certified through a prescriber agreement; and (3) patients must sign an FDA-approved agreement. All elements apply even for off-label indications, like EPL [10].

Providing abortion and EPL care in primary care settings is feasible and acceptable to patients, and enhances continuity of care [4,11]. Some patients report a preference for getting this care from their primary care practice, while others prefer receiving abortion care at freestanding clinics [12,13]. Providing mifepristone in primary care may also increase access to abortion care [14]. Despite feasibility, acceptability, and need, only about 25% of primary care physicians trained in reproductive health provide medication abortion and/or comprehensive EPL care. Of these, about half offer medication abortion and medication management of EPL in specialized settings, respectively, rather than in primary care [15-18].

Barriers to integrating mifepristone into primary care include staffing, limited time, training, stigma, malpractice insurance, and federal and state laws [15-19]. The Hyde Amendment, for example, prohibits using federal funds for abortion except in cases of rape, incest, and serious health consequences for or life endangerment of the pregnant person [20]. Additionally, states continue to enact laws imposing non-evidence-based conditions on patients and clinicians, like mandatory ultrasounds, waiting periods, and "physician-only" care, which contribute to delays, stigma, and medically-unnecessary visits and procedures [21,22]. While research has explored the effects of these laws on abortion access and outcomes, none to date have studied the effect of mifepristone ETASU on the delivery of medication abortion and EPL management in primary care. This exploratory study examines primary care clinicians' perspectives on the ways that regulations, specifically the REMS, affect access to medication abortion and EPL care in primary care settings.

## 2. Material and methods

From September to December 2019, we conducted a qualitative survey with open- and closed-ended questions with a convenience sample of US primary care clinicians. To recruit participants, we identified primary care reproductive health-focused listservs managed by professional medical and/or reproductive health organizations. From an initial list of 10 listservs, we selected 6 based on the following criteria: supports abortion care, moderator accepts postings for research, and represents a predominantly primary care clinician audience. The 6 listservs represented family medicine (n = 1), advanced practice nurses (APRNs) [nurse practitioners (NPs) and midwives, n = 3], adolescent medicine (n = 1), and internal medicine (n = 1). Five listservs ranged from 180 to 275 members; one had 3,200 members. Listserv membership was not mutually exclusive.

The Institutional Review Board of the Institute for Family Health deemed the study exempt from full board review.

### 2.1. Data collection

Moderators (n = 5) or the study team (n = 1) shared survey invitations and reminders to listservs. We invited primary care clinicians to share thoughts about whether and how restrictions on mifepristone affected their abilities to provide medication abortion and/or EPL care. We sent up to 3 reminders every 2 to 3 weeks. Each listserv received a unique URL for response tracking. As an incentive, respondents could enter a raffle for one free registration to a conference on family planning and abortion care.

Additionally, we employed early participant referral. Within each invitation and reminder, and upon survey completion, respondents could share a unique link to colleagues they felt would be interested in participating. We closed the survey 2 weeks after the last reminder.

### 2.2. Survey instrument and sample

Prior studies and discussions with experts informed survey development [23]. We pretested the survey with family physicians and NPs. The final version included closed-ended questions on demographic and practice characteristics, and knowledge and perceptions of mifepristone and hypothetical pharmacy dispensing. We paired the latter with open-ended questions asking for respondents to elaborate on their perceptions of effects of mifepristone stocking and dispensing ETASU; attitudes toward mifepristone pharmacy-dispensing; and willingness to complete the prescriber agreement. We also asked participants the following: "tell us about the challenges you have perceived, observed, or faced when thinking about or actually trying to provide mifepristone in clinical practice." We prompted respondents to share how challenges affected patients. This question did not explicitly mention the REMS to allow respondents to share any challenges that arose.

The survey included two screener questions to assess eligibility: respondents had to identify as primary care clinicians and have seen reproductive-aged female patients within the last 5 years in the US. We included participants who answered at least one open-ended question. We excluded those who primarily provided in abortion clinics and those with missing data. We de-identified and stored data in a password-protected Dropbox folder.

### 2.3. Analysis

We used summary statistics to describe the sample and perceptions of mifepristone regulations. We employed inductive thematic analysis to analyze barriers to providing mifepristone in primary care and respondents' perspectives of patient experiences [24]. The analysis team consisted of five women with expertise in qualitative data analysis: a public health researcher (SS), a family physician and reproductive health services researcher (SR), a family physician receiving advanced training in reproductive healthcare and advocacy (JM), and 2 family medicine residents (RY, LB).

Initially, the team independently read responses and used open coding to identify emerging themes and constructs. After discussion, we adapted Bronfenbrenner's socioecological model to develop codes based on emerging barriers and patient experiences [25]. SS and SR developed an initial codebook with 14 codes and definitions. After re-reading 20 respondents' survey text, we reviewed coding for concordance and refined the codebook accordingly. Then, 2 team members independently read every respondents' survey text and applied the final codebook, which contained 19 codes. SS coded all text; one of four clinicians each employed axial coding to 25 to 32 respondents' text to make connections between constructs and to begin developing an integrated theory. We reconciled discordance through discussion. The analysis team then discussed the coded excerpts and their intersections to identify themes and organized them into matrices for in-depth analysis. Throughout, we wrote memos to practice reflexivity, acknowledging our biases as reproductive health professionals and/or clinicians [26]. We utilized Dedoose version 8.3.10 (Los Angeles, CA: SocioCultural Research Consultants, LLC) to manage data.

## 3. Results

Of the 172 people who took the survey, 16 screened ineligible, 12 left the survey incomplete, 5 primarily practiced in abortion

S. Srinivasulu et al.                                                                                                 Contraception 104 (2021) 92–97

**Table 1**
Primary care clinician respondents' demographic and practice characteristics, and knowledge and perceptions around mifepristone regulations (N = 113).

| Demographic characteristics | n (%) |
| --- | --- |
| Professional background | |
|   Family physician | 67 (59%) |
|   Midwife | 17 (15%) |
|   Nurse practitioner or physician assistant | 12 (11%) |
|   Other physician type* | 9 (8%) |
|   No response | 8 (7%) |
| Gender | |
|   Female | 95 (84%) |
|   Male | 8 (7%) |
|   Non-binary | 1 (0.9%) |
|   No rresponse | 9 (8%) |
| Abortion rights hostility of respondent's state** | |
|   Very supportive | 15 (13%) |
|   Supportive | 24 (21%) |
|   Leans supportive | 19 (17%) |
|   Middle ground | 20 (18%) |
|   Leans hostile | 6 (5%) |
|   Hostile or very hostile | 19 (17%) |
|   No response | 10 (9%) |
| **Practice characteristics** | |
| Ever provided... | |
|   Medication abortion | 75 (66%) |
|   EPL with misoprostol | 82 (73%) |
|   EPL with mifepristone & misoprostol | 40 (35%) |
|   Never provided abortion or medication management of EPL | 13 (12%) |
| Self-reported competence to provide | |
|   Medication abortion | 101 (89%) |
|   EPL with misoprostol | 104 (92%) |
|   EPL with mifepristone & misoprostol | 95 (84%) |
| **Practice setting characteristics** | |
| Mifepristone available onsite at current main practice setting | 36 (32%) |
| Main practice setting | |
|   Federally qualified health center | 36 (32%) |
|   Hospital-affiliated outpatient clinic | 23 (20%) |
|   University faculty practice | 17 (15%) |
|   Community health center | 7 (6%) |
|   Group private practice | 8 (7%) |
|   Other practice settings*** | 11 (10%) |
|   No response | 11 (10%) |
| Urbanicity of main practice setting | |
|   Urban | 65 (58%) |
|   Midsize town/suburb | 24 (21%) |
|   Rural | 14 (12%) |
|   No response | 10 (9%) |
| **Knowledge and perceptions around mifepristone regulations** | |
| Knew prior to survey that mifepristone and misoprostol for EPL is more effective than misoprostol alone | 101 (89%) |
| If allowed to prescribe mifepristone, would prescribe for... | |
|   Medication abortion | 85 (75%) |
|   Medication management of EPL | 103 (91%) |
| Strongly agree patients would be able to fill a mifepristone prescription at their pharmacy | 106 (94%) |
| Believes rule to stock and dispense in-clinic interferes with mifepristone provision | 83 (74%) |

*Other physician types include adolescent medicine pediatricians, internal medicine physicians, obstetrician-gynecologists who work in primary care settings.

**Abortion rights hostility level of respondents' primary practice state refers to the 2019 data presented by the Alan Guttmacher Institute that categorizes states on a scale of very supportive to very hostile based on the number of state-level abortion restrictions in place (very hostile, hostile, leans hostile, middle-ground, leans supportive, supportive, very supportive). [27] Few respondent states were considered "very hostile" so we collapsed them with "hostile." We selected 2019 data to convey the abortion rights hostility of respondents' states at the time data were collected.

***Respondents classified into "other" primary practice settings provided care in health maintenance organizations, solo private practices, urgent care, public health departments, and the Indian Health Service.

clinics, and 26 did not complete any open-ended questions, leaving an analytic sample of 113 respondents (66%). Table 1 illustrates participants' demographic characteristics and knowledge and perceptions around mifepristone regulations. Most respondents were family physicians, women, practiced in federally qualified health centers (FQHCs) and urban areas, and supported pharmacy dispensing of prescription mifepristone.

### 3.1. Barriers to provide mifepristone in primary care

Obstacles to providing mifepristone centered on the REMS-related organizational barriers to stock and dispense and the intersection of the REMS with other abortion policy issues.

For organizational barriers, two REMS-related obstacles emerged regarding stocking and dispensing mifepristone: bu-

S. Srinivasulu et al.                                                                                    Contraception 104 (2021) 92–97

reaucratic hurdles and leadership resistance. Bureaucratic hurdles involved logistical challenges, like "upfront cost[s]... training staff... [and] extra time," to establish supply, clinic, and patient care systems (NP, hospital-affiliated outpatient clinic). Some found the process more complicated than obtaining equipment for uterine aspiration. They remarked that often primary care settings "do not have the infrastructure or space" to routinely stock and dispense prescription medications (Physician, FQHC).

Additionally, various clinic and department managers, administrators, and others in positions of power demonstrated misperceptions, resistance, and discomfort to integrate medication abortion and/or mifepristone for EPL management. This administrative resistance inhibited respondents from pursuing efforts to change practice and provide mifepristone. One respondent described:

> We have tried to get mifepristone available at all of our clinic sites, and the pharmacy department has been very resistant and difficult to work with on this due to the REMS classification. They state that they are scared about being out of compliance and risking shutting down the entire institution. They demonstrate many false ideas about what the REMS classification does and does not mean, but are unwilling to change their opinions or practices about this. (Physician, FQHC).

Overall, respondents believed that bureaucratic barriers would be minimized if mifepristone was available by prescription, rather than stocked onsite.

Some shared how the REMS intersects with federal and state abortion restrictions, like the Hyde Amendment and physician-only laws. Many FQHC respondents said their organizations barred abortion care, including stocking and dispensing mifepristone, due to administrators' risk aversion and misinterpretation of the law. One explained:

> Our directors and managers believe that it's illegal for us to provide pregnancy terminations. The reality is we would have to separate out federal funding from other funding sources. Our financial department is not that savvy, nor are they interested in setting up a parallel system of funds. (Physician, FQHC).

Even for EPL care, FQHC leadership prevented clinicians from using mifepristone due to its association with abortion and perceived similarities between abortion and EPL care: "They [administration] feel it could jeopardize funding even though we would only use it for EPL" (Physician, FQHC).

In many states, physician-only laws prohibit APRNs and physician assistants from providing abortion care. One respondent described:

> I was able to provide mifepristone in my practice...until the state laws changed and restricted provision of abortion services to physicians only... We had to wait for a physician to travel 3.5 hours to our clinic twice a month. So, all patients who needed abortion services had to come on specific days, when they were previously able to come any day. (Midwife, community health center).

Though these laws were designed to impact abortion, respondents shared that they affected EPL care too.

### 3.2. Effects of restricted mifepristone access on patients

Respondents perceived three kinds of patient harms when mifepristone was inaccessible in primary care: disrupted continuity of care, additional medically-unnecessary appointments, and undesired aspiration procedures for EPL.

Respondents felt that not having mifepristone accessible in primary care disrupted patients' continuity of care. They described having close relationships with patients who preferred not to go to unfamiliar providers for abortion or EPL, as this may increase anxiety. One explained:

> Patients have come to me wanting medical management of miscarriage or medical abortion, and I have had to turn them away and send them to other practices... stigmatizing their experience, and sending the message that management of their pregnancy and fertility is not part of primary care... I remember a patient sitting in my office, wanting a medical abortion from her trusted midwives and saying, *how is it possible you can't provide me with this service?* (Midwife, hospital-affiliated outpatient clinic).

Additionally, patients referred to outside facilities experienced added wait times and logistical issues, leading to delays in care and disproportionate financial burdens. A respondent said:

> My patient was Spanish-speaking only and lived...45 minutes [from] the closest [abortion clinic]. I am a Spanish-speaking provider in her neighborhood. The patient had to pay for a second visit with [the abortion clinic] for a service I could have provided myself, and had to wait an additional two weeks for this appointment... It is anxiety-provoking for patients to go to an unfamiliar clinic at a distance from their home to see an unfamiliar provider who may not speak their native language. (Physician, FQHC).

Respondents also felt the ETASU to dispense mifepristone in-office created medically-unnecessary appointment-related obstacles for patients to navigate, delaying care and/or influencing decision-making. One shared:

> Sometimes, I diagnose miscarriage when a patient is not in the office. If she wants to be treated with the mifepristone/misoprostol combination, then she must come into the clinic and wait until I (or another provider who feels comfortable dispensing mife[pristone]) is in session at the clinic. (Physician, FQHC).

In some cases, patients wanted medication management for their EPL but ultimately had undesired aspiration procedures due to lack of mifepristone in primary care:

> I had a recent patient who chose aspiration due to greater effectiveness compared to misoprostol alone, but I think otherwise would have chosen medication management. She ultimately had a traumatic and painful procedure due to difficult anatomy...and I think would have been much better served with evidence-based medication management. (Physician, university practice).

In other situations, patients took the misoprostol-only regimen and needed follow-up aspirations, which may have been avoided had mifepristone been accessible in primary care:

> I had two patients with EPL who wanted to pass the pregnancy at home, in private. Both felt this would help them process the [miscarriage] in a way that was best for them. Both failed protocols with misoprostol alone, and both required referral out to another clinic for manual vacuum aspiration. This took more time, was more expensive, and involved...meeting a provider with whom they were less comfortable. (Physician, FQHC).

Overall, respondents felt that primary care access to mifepristone could have prevented negative patient experiences.

### 4. Discussion

Even for clinicians committed to reproductive healthcare access, the FDA REMS rule mandating in-office mifepristone stocking

and dispensing inhibited many from integrating medication abortion and/or EPL management into primary care. Respondents reported concerns that this resulted in negative physical, emotional, and financial experiences for patients. Studies exploring abortion restrictions find similar consequences: delays in care leading to large expenses, appointment and travel logistics to navigate, and emotional frustrations [22,28]. For EPL, respondents cited an inability to honor patients' preferences for treatment, which minimized decision-making autonomy and exacerbated potential harms to health and wellbeing. This is a significant public health concern, as evidence shows quality of life outcomes improve when patients have comprehensive EPL options available and they actively participate in treatment decisions [29].

These barriers to primary care access and negative patient experiences underscore the importance of removing mifepristone from the REMS. Delays due to the REMS do not enhance safety, timely care does. In fact, Canada has made pharmacy dispensing of mifepristone available, with positive experiences and improved access to care [30]. Expert opinion and safety data demonstrate that mifepristone no longer meets requirements to be regulated under a REMS [4,8]. Our findings suggest that amending the stocking and dispensing ETASU may ameliorate barriers to providing mifepristone in primary care.

However, expanding primary care provision of mifepristone is complex. Even if the mifepristone REMS were removed, policies like the Hyde Amendment and physician-only laws will continue to restrict funding for and access to medication abortion. Some healthcare organizations may continue inhibiting mifepristone for EPL, due to associations with abortion [19]. Though mifepristone may not be fully accessible to all without repealing harmful federal and state laws, removing the mifepristone REMS is a crucial evidence-based step to increase access [31]. While the mifepristone REMS persists, reproductive health and rights organizations should support interested primary care clinicians and health centers to obtain and provide mifepristone. Technical assistance and interprofessional training have shown to be effective in supporting committed primary care clinicians engage with leaders and colleagues to overcome logistical barriers and leadership resistance to offer abortion and EPL care [15,18,19,32,33].

Our study has several limitations. While we approximated potential respondents from the chosen listservs, the true size and representativeness of the eligible source population is unknown due to lack of non-respondent eligibility information, possibility that emails were never opened, and potential overlap of membership across listservs. Additionally, this sample was not representative of the US primary care clinician workforce as most respondents have provided medication abortion at some point, are knowledgeable about medication abortion and EPL care, and have demonstrated interest in providing this care. As such, barriers may be different for clinicians less actively involved. As an exploratory qualitative study, we cannot make claims about representativeness or generalizability. We hoped early participant referral would increase our reach, but few respondents were sourced this way (n = 3). Patient experiences are described from clinicians' perspectives, rather than patients themselves. We chose to collect qualitative data through open-ended survey questions, rather than in-depth interviews or focus group discussions. This allowed for a larger sample, which increased geographic, practice setting, and clinician diversity, though interviews and focus group discussions may have given us more insight and context. Finally, the study predated the COVID-19 pandemic, so we did not document practice changes or additional barriers.

Our exploratory study suggests that amending the mifepristone REMS may reduce barriers for clinicians interested in offering medication abortion and EPL management in primary care. Decades of prior research demonstrating mifepristone's safety combined with further studies on primary care barriers to access and patient outcomes can inform evidence-based FDA policy changes. The mifepristone REMS, intended to promote safety, should not concurrently inhibit patients from accessing standard of care treatment and must be reevaluated.

## Declaration of Competing Interest

None.

## Funding

This research did not receive any specific grant from funding agencies in the public, commercial, or not-for-profit sector.

## Acknowledgments

The authors have no financial conflicts of interest to report. We are grateful for the willingness of listserv moderators to share our survey to their membership. We deeply appreciate Dr. Jiana Menendez's support with data analysis and the generous guidance from Kelly Cleland, Dr. Daniel Davis, Dr. Samantha Garbers, and Lisa Maldonado.

## References

[1] Jones RK, Jerman J. Population group abortion rates and lifetime incidence of abortion: United States, 2008-2014. Am J Public Health 2017;107:1904–9.

[2] Rossen LM, Ahrens KA, Branum AM. Trends in risk of pregnancy loss among US women, 1990-2011. Paediatr Perinat Epidemiol 2018;32:19–29.

[3] Raymond EG, Shannon C, Weaver MA, Winikoff B. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. Contraception 2013;87:26–37.

[4] National Academies of Sciences, Engineering, and Medicine The safety and quality of abortion care in the United States. Washington, DC: The National Academies Press; 2018.

[5] Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161–70.

[6] American College of Obstetricians and Gynecologists (ACOG). ACOG practice bulletin no. 200: early pregnancy loss. Obstet Gynecol 2018;132:e197–207.

[7] Hendriks E, MacNaughton H, MacKenzie MC. First trimester bleeding: evaluation and management. Am Fam Physician 2019;99:166–74.

[8] Henney JE, Gayle HD. Time to reevaluate US mifepristone restrictions. N Engl J Med 2019;381:597–8.

[9] United States Food and Drug Administration. Mifepristone US post-marketing adverse events summary through 12/31/2018, https://www.fda.gov/media/112118/download; 2019 [accessed 20 November 2020].

[10] United States Food and Drug Administration. Risk Evaluation and Mitigation Strategy (REMS) single shared system for Mifepristone 200mg. https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf; 2019. [accessed 20 November 2020].

[11] Dennis A, Fuentes L, Durham-Douglas E, Grossman D. Barriers to and facilitators of moving miscarriage management out of the operating room. Perspect Sex Reprod Health 2015;47:141–9.

[12] Summit AK, Casey LMJ, Bennett AH, Karasz A, Gold M. I don't want a go anywhere else": patient experiences of abortion in family medicine. Fam Med 2016;48:30–4.

[13] Miller CA, Roe AH, McAllister A, Meisel ZF, Koelper N, Schreiber CA. Patient experiences with miscarriage management in the emergency and ambulatory settings. Obstet Gynecol 2019;134:1285–92.

[14] Jones RK, Witwer E, Jerman J. Abortion incidence and service availability in the United States, 2017. New York: Guttmacher Institute; 2019.

[15] Block A, Dehlendorf C, Biggs A, McNeil S, Goodman S. Postgraduate experiences with an advanced reproductive health and abortion training and leadership program. Fam Med 2017;49:706–13.

[16] Srinivasulu S, Maldonado L, Prine L, Rubin SE. Intention to provide abortion upon completing family medicine residency and subsequent abortion provision: a 5-year follow-up survey. Contraception 2019;100:188–92.

[17] Wallace R, Dehlendorf C, Vittinghoff E, Gold KJ, Dalton VK. Early pregnancy failure management among family physicians. Fam Med 2013;45:173–9.

[18] deFiebre G, Srinivasulu S, Maldonado L, Romero D, Prine L, Rubin SE. Barriers and enablers to family physicians' provision of early pregnancy loss management in the United States. Womens Health Issues 2021;31:57–64.

[19] Darney BG, VanDerhei D, Weaver MR, Stevens NG, Prager SW. We have to what?": lessons learned about engaging support staff in an interprofessional intervention to implement MVA for management of spontaneous abortion. Contraception 2013;88:221–5.

S. Srinivasulu et al.                                                                 Contraception 104 (2021) 92–97

[20] American Civil Liberties Union. Access denied: origins of the Hyde Amendment and other restrictions on public funding for abortion, https://www.aclu.org/other/access-denied-origins-hyde-amendment-and-other-restrictions-public-funding-abortion. [accessed 20 November 2020].

[21] Nash E, Mohammed L, Cappello O, Naide S. State policy trends 2019: a wave of abortion bans, but some states are fighting back, https://www.guttmacher.org/article/2019/12/state-policy-trends-2019-wave-abortion-bans-some-states-are-fighting-back; 2019. [accessed 20 November 2020].

[22] Jerman J, Frohwirth L, Kavanaugh ML, Blades N. Barriers to abortion care and their consequences for patients traveling for services: qualitative findings from two states. Perspect Sex Reprod Health 2017;49:95–102.

[23] Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. Obstet Gynecol 2019;133:477–83.

[24] Braun V, Clarke V. Using thematic analysis in psychology. Qual Res Psychol 2006;3:77–101.

[25] Bronfenbrenner U. The ecology of human development. Cambridge, MA: Harvard University Press; 1979.

[26] Engward H, Davis G. Being reflexive in qualitative grounded theory: discussion and application of a model of reflexivity. J Adv Nurs 2015;71:1530–8.

[27] Nash E. State abortion policy landscape: from hostile to supportive, New York: Guttmacher Institute; 2020. https://www.guttmacher.org/article/2019/08/state-abortion-policy-landscape-hostile-supportive [accessed 20 November 2020].

[28] Gerdts C, Fuentes L, Grossman D, White K, Keefe-Oates B, Baum SE. Impact of clinic closures on women obtaining abortion services after implementation of a restrictive law in Texas. Am J Public Health 2016;106:857–64.

[29] Wieringa-de Waard M, Hartman EE, Ankum WM, Reitsma JB, Bindels PJE, Bonsel GJ. Expectant management versus surgical evacuation in first trimester miscarriage: health-related quality of life in randomized and non-randomized patients. Hum Reprod 2002;17:1638–42.

[30] LaRoche KL, Foster AM. It gives you autonomy over your own choices": a qualitative study of Canadian abortion patients' experiences with mifepristone and misoprostol. Contraception 2020;102:61–5.

[31] Dehlendorf C, Harris LH, Weitz T. Disparities in abortion rates: a public health approach. Am J Public Health 2013;103:1772–9.

[32] Srinivasulu S, Riker L, Maldonado L, Breitbart V. Evaluation of the miscarriage care initiative: a program to integrate comprehensive early pregnancy loss management in primary care settings. Fam Med 2020;52:707–15.

[33] Calloway Danielle, Stulberg Debra B, Janiak Elizabeth. Mifepristone restrictions and primary care: breaking the cycle of stigma through a learning collaborative model in the United States. Contraception 2021 In this issue. doi:10.1016/j.contraception.2021.04.002.

Contraception 108 (2022) 24–28

Contents lists available at ScienceDirect

# Contraception

journal homepage: www.elsevier.com/locate/contraception



# Mifepristone restrictions and primary care: Breaking the cycle of stigma through a learning collaborative model in the United States



Danielle Calloway[a], Debra B. Stulberg[a], Elizabeth Janiak[b,c,d,*]

[a] Department of Family Medicine, University of Chicago, Chicago, IL, United States
[b] Department of Obstetrics and Gynecology, Brigham and Women's Hospital, Boston, MA, United States
[c] Department of Obstetrics, Gynecology, and Reproductive Biology, Harvard Medical School, Boston, MA, United States
[d] Planned Parenthood League of Massachusetts, Boston, MA, United States

ARTICLE INFO

Article history:
Received 5 February 2021
Received in revised form 31 March 2021
Accepted 4 April 2021

Keywords:
Abortion access
Abortion stigma
Mifepristone
Primary care

ABSTRACT

Despite its safety record, mifepristone is subject to a highly restrictive set of regulatory measures through the Risk Evaluation and Mitigation Strategy (REMS) by the US Food and Drug Administration. We argue that these restrictions both reflect and perpetuate a cycle of abortion stigma, creating particular barriers to mifepristone use in primary care settings where communities that historically experience barriers to care can most easily access reproductive health services. Through qualitative interviews with Illinois primary care clinicians, we discovered how the REMS heightens institutional anxiety over implementation of mifepristone use. To address this, we created ExPAND Mifepristone, a learning collaborative targeting institutional anxiety and logistical barriers to mifepristone use. The learning collaborative model holds high potential to mitigate institutional barriers to mifepristone use by increasing providers' self-efficacy to identify, address, and overcome institutional fears. Until the REMS is fully repealed, learning collaboratives constitute a promising tool to combat the practical and psychological barriers to mifepristone use that these restrictions currently pose.

© 2021 Elsevier Inc. All rights reserved.

## Introduction

Abortion with mifepristone is safe and effective [1–4]. This treatment falls well within the scope of primary care in the United States, as it involves patient assessment and health education for which primary care providers are extensively trained [5–8]. Nonetheless, many clinicians trained to provide medication abortion do not currently do so, and only an estimated 1% of medication abortions occur in primary care offices [9,10]. The potential for primary care providers to help improve abortion access is particularly high in the Midwest, which experienced the largest regional decline in abortion clinics over the past decade [11]. Given this context, our team set out to develop an evidence-based intervention to support mifepristone use in primary care in Illinois, resulting in the learning collaborative *Excellence in Providing Access to New Directions in Mifepristone Use (ExPAND Mifepristone)*. This commentary describes how ExPAND Mifepristone seeks to disrupt a cycle of abortion stigmatization in primary care that is anchored by the US Food and Drug Administration's inclusion of mifepristone in the Risk Evaluation and Mitigation Strategy (REMS) program. We

argue that the REMS serves as the linchpin of a cycle of medication abortion stigmatization in primary care, encouraging institutional anxiety over abortion provision which leads to logistical barriers to mifepristone use. This cycle successfully excludes mifepristone from many primary care settings, reinforcing the perception that abortion is a tainted and undesirable service that should remain marginalized in specialty settings. The learning collaborative model serves as a potentially valuable framework for primary care physicians to address, understand, and overcome the institutional fears that the REMS program encourages.

## 1. The mifepristone REMS and the ripple effect of logistical barriers

*The fascinating thing is, there are a lot of other things I've managed to implement [since joining this primary care practice], and when the perception is that your organization does not care, or prioritize providing abortion care, the barriers can be great, and other [services] the organization does prioritize, the resources, the people, the organization gets behind them. So it's very frustrating to me that abortion care again occupies this separate space. – Illinois primary care provider*

The REMS for mifepristone requires that (1) the drug be dispensed in healthcare settings by or under the supervision of a cer-

* Corresponding author.
E-mail address: ejaniak@bwh.harvard.edu (E. Janiak).

https://doi.org/10.1016/j.contraception.2021.04.002
0010-7824/© 2021 Elsevier Inc. All rights reserved.

2021 REMS 000979

D. Calloway, D.B. Stulberg and E. Janiak                   Contraception 104 (2021) 24–28



**Fig. 1.** Taxonomy of barriers to medication abortion care in primary care settings.

tified prescriber; (2) dispensing clinicians register with the drug manufacturer; and (3) patients sign a specific form stating the drug will be used for a medication abortion, despite the evidence base that it is also effective for both early pregnancy loss treatment and cervical ripening for dilation and evacuation procedures [12–14]. While the REMS program aims to reduce risks from drugs with high potential of serious adverse health effects [15], mifepristone has been shown to have an excellent safety profile [16]. As a result, mifepristone access has expanded globally through evidence-based deregulation. Mifepristone is fully incorporated in abortion services in Canada, as the federal regulatory system permits dispensing through a pharmacy with a prescription from a clinician and no longer requires an ultrasound prior to prescribing [17,18]. Mifepristone distribution via postal mail following a telemedicine appointment is also approved in the United Kingdom [19]. In light of these regulatory frameworks, the REMS stands out as exceptionally restrictive.

To gain a more comprehensive understanding of the institutional barriers primary care providers face to evidence-based mifepristone use, we conducted a qualitative study of providers in Illinois and assessed their opinions of the REMS restrictions and other barriers to medication abortion provision. As part of this larger study on barriers to abortion provision in primary care, 19 primary care providers and clinical administrators participated in semi-structured interviews exploring barriers to and facilitators of mifepristone use at the individual, institutional, and policy levels. We sampled clinicians based on their current abortion provision status (providing in primary care or not), type of health care facility (community health center, hospital, group or private practice), and geographic location (within vs. outside of Chicago). For full study methodology, see Rasmussen and colleagues, this issue.

Overall, interviewees expressed widespread support of removal of the mifepristone REMS and reported that removing the REMS would help them or their colleagues integrate medication abortion into primary care. We noted that providers named two types of barriers posed by the REMS: direct infrastructure requirements for dispensing mifepristone; and requirements self-imposed in response to the REMS (Fig. 1). On a practical level, some clinicians expressed that if the REMS was eliminated and they could prescribe mifepristone through a pharmacy, that would remove logistical barriers around medication stocking [20]. Participants also expressed that the REMS impedes mifepristone use in primary care by perpetuating fear and mystery around the drug that is not supported by clinical evidence of its risks, resulting in the desire for excessive clinical training, unnecessary bureaucratic infrastructure-building, and fear of extremely rare complications with mifepristone use. The resulting institutional anxiety around abortion provision drives a process of stigmatization of which the REMS forms an integral part.

## 2. Logistical barriers within a cycle of stigmatization

*Interviewer: Your practice has implemented quite a few new services. How do you feel implementing these services is analogous or different to implementing abortion?*

*Clinician: I want to say it's just the stigma that surrounds it is the only real difference. When there's money…and operations stand behind it, it's much easier, but then we are also now faced with the…stigma of it.* – Illinois primary care provider

The REMS program imposes medically unnecessary restrictions on mifepristone access, and these restrictions create specific logistical hurdles, as well as generating an impression that provision of mifepristone is difficult and requires extensive training, ultimately creating a hesitancy among primary care clinicians to administer it. As illustrated in Figure 2, the REMS are the linchpin of a cycle of stigmatization that continues to keep mifepristone out of primary care practice and other non-specialty settings over time. Similarly to stigma among abortion patients and providers, institutional stigma around abortion care functions as a cycle [21,22]. Because regulations such as the REMS are imposed, institutions perceive abortion care to be excessively complex, and fear abortion provision. Out of fear, leadership blocks qualified clinicians from integrating abortion into their primary care practice. Thus, abortion remains siloed from mainstream medicine, reinforcing the perception that it is a tainted medical practice [23].

We heard this hesitancy in our interviews, as clinicians expressed concern over their own competency to administer mifepristone to their patients. When asked about their personal barriers to administering medication abortion, one clinician responded: "I totally believe that it can be done, but I also feel like I didn't have that preparation… But I've heard that some people do it in primary care settings…I'm like, 'How do I do this? Can I do it?'" Other clinicians expressed feeling a sense of hypervigilance when it came to providing medication abortion services because of the seemingly specialized nature of mifepristone protocols. One clinician noted their heightened sense of alertness stems from their desire to distribute mifepristone perfectly. They commented: "I think there's a piece of perfectionism…it may lead us to stumble across smaller roadblocks, because we're looking for a perfect outcome, rather than a safe and acceptable outcome." As a result of the perceived need for extensive training in medication abortion provision, primary care institutions lean towards not administering mifepristone in fear of incorrectly distributing the medication or not knowing how to proceed with potential adverse side effects. While primary care institutions see training as necessary to overcome institutional anxiety about abortion provision, this anxiety can also prevent individuals from accessing additional training: "Even just talking about wanting abortion training or having that be a conversation that felt normal was a barrier because of the stigma around abortions."

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 32 of 312
PageID.8617
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 85 of 366    PageID.6854

# Perspectives Among Canadian Physicians on Factors Influencing Implementation of Mifepristone Medical Abortion: A National Qualitative Study

Sarah Munro, PhD[1,2]

Edith Guilbert, MD, MSc[3]

Marie-Soleil Wagner, MD, MS[4]

Elizabeth S. Wilcox, MA[2,5]

Courtney Devane, MSN[6]

Sheila Dunn, MD, MSc[7,8]

Melissa Brooks, MD[9]

Judith A. Soon, RPh[10]

Megan Mills, MD[11]

Genevieve Leduc-Robert, MSc[11]

Kate Wahl[6]

Erik Zannier, MD[11]

Wendy V. Norman, MD, MHSc[12,13]



MORE ONLINE
www.annfammed.org

Conflicts of interest: authors report none.

**CORRESPONDING AUTHOR**

Wendy V. Norman
Department of Family Practice
University of British Columbia
320-5950 University Boulevard
Vancouver, BC, Canada, V6T 1Z3
wendy.norman@ubc.ca

## ABSTRACT

**PURPOSE** Access to family planning health services in Canada has been historically inadequate and inequitable. A potential solution appeared when Health Canada approved mifepristone, the gold standard for medical abortion, in July 2015. We sought to investigate the factors that influence successful initiation and ongoing provision of medical abortion services among Canadian health professionals and how these factors relate to abortion policies, systems, and service access throughout Canada.

**METHODS** We conducted 1-on-1 semistructured interviews with a national sample of abortion-providing and nonproviding physicians and health system stakeholders in Canadian health care settings. Our data collection, thematic analysis, and interpretation were guided by Diffusion of Innovation theory.

**RESULTS** We conducted interviews with 90 participants including rural practitioners and those with no previous abortion experience. In the course of our study, Health Canada removed mifepristone restrictions. Our results suggest that Health Canada's initial restrictions discouraged physicians from providing mifepristone and were inconsistent with provincial licensing standards, thereby limiting patient access. Once deregulated, remaining factors were primarily related to local and regional implementation processes. Participants held strong perceptions that mifepristone was the new standard of care for medical abortion in Canada and within the scope of primary care practice.

**CONCLUSION** Health Canada's removal of mifepristone restrictions facilitated the implementation of abortion care in the primary care setting. Our results are unique because Canada is the first country to facilitate provision of medical abortion in primary care via evidence-based deregulation of mifepristone.

*Ann Fam Med* 2020;18:413-421. https://doi.org/10.1370/afm.2562.

## INTRODUCTION

Approximately 40% of pregnancies in Canada are unplanned, and 1 in 3 Canadian women will have at least 1 abortion in their lifetime.[1-4] Access to health services in Canada that enable patients to plan and space their pregnancies has been historically inadequate and inequitable.[5] Before 2017 in Canada, abortion services were surgical and provided by fewer than 300 doctors at roughly 100 facilities in urban cities close to the Canada-US border.[4] In this context, patients who lived outside large cities had to travel significant distances to access abortion care.[6,7] Concern about these inequities was expressed in the November 2016 report of the Committee on Elimination of Discrimination Against Women, in which the United Nations Human Rights Commissioner called on the government of Canada to improve access.[5]

The approval of mifepristone medical abortion in July 2015 by Health Canada (the equivalent of the US Food and Drug Administration) appeared to be a potential solution to improve abortion access in the primary care setting.[8-10] Mifepristone became available for prescription

PCSF230                                    2021 REMS 000984

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 33 of 312
PageID.8618
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 86 of 366    PageID.6855

IMPLEMENTATION OF MIFEPRISTONE

by physicians in January 2017. Mifepristone is on the World Health Organization's list of essential medicines[11] and is considered the gold standard for medical abortion.[8] Mifepristone 200 mg oral and misoprostol 800 mg buccal/vaginal/sublingual is the regimen of choice for medical abortion up to 70 days after the last menstrual period among eligible women.[1] Data on use of mifepristone in other nations since 1988 suggests that the drug is associated with an increased proportion of medical abortion compared with surgical abortion but not with an increase in overall abortion rates.[12] Health Canada's approval of mifepristone[9] included restrictions, such as mandated physician dispensing and registration with the manufacturer, that have contributed to a low uptake of mifepristone in primary care in similar high-income nations including the United States.[10,12-15]

We hypothesized that Health Canada's restrictions would impede implementation of mifepristone in primary care.[16] We also anticipated that stakeholder-reported barriers and facilitators to implementation could inform improvements to Canadian abortion policy and practice. The present study was part of a larger mixed-methods investigation.[17] In the main study, we asked the following questions: What are the factors that influence successful initiation and ongoing provision of medical abortion services among health professionals, and how do these relate to health policies, systems, and services, and to abortion service access throughout Canada? The present study focused on the first question involving the identification of factors that influence the initiation and provision of medical abortion from the perspectives of Canadian physicians and stakeholders. This research is a particularly novel contribution

to the literature given that Health Canada repealed its initial restrictions on mifepristone in real time over the course the study–in October 2016, May 2017, November 2017, and April 2019 (Table 1). These changes made it possible to prescribe and dispense mifepristone in the same way as most other drugs in Canada. This study will be relevant to other nations experiencing challenges with access to family planning services given that Canada is the first to use evidence-based deregulation of mifepristone to facilitate provision of medical abortion in the primary care setting.

## METHODS

### Study Design

This national interview study aimed to explore factors that influence implementation of mifepristone medical abortion in Canadian health service delivery and health systems. Our approach was guided by Rogers' theory of the Diffusion of Innovations,[18] as articulated by Greenhalgh and colleagues[19] and Cook and colleagues.[20] Our qualitative study was a component of a national, 4-year, prospective, mixed-methods, observational program of research on factors that influence the implementation of mifepristone use in primary care, the Contraception and Abortion Research Team-Mifepristone (CART-Mife) Study. A fulsome account of our methods and integrated knowledge translation[21] approach for the entire study can be found in our research protocol.[17] Our survey data collection is ongoing and not reported in the present study. Our approach was guided by the Standards for Reporting Implementation Studies statement.[22] Ethical approval was provided by the Behavioral Research Ethics Board of the University of British Columbia and BC Women's and Children's Hospital.

### Setting

Our study took place in the context of Canadian health care settings, which we defined as any service delivery environment where a prescriber could provide primary care, including hospitals, abortion facilities, health centers, and private physician offices, as well as via telemedicine.

### Participants

Following Greenhalgh's guidance,[19] we sought to interview potential adopters and representatives of organizations that had an interest or concern in implementation of mifepristone use. Individuals eligible to participate in interviews

| Table 1. Changes to Health Canada Regulations for Mifepristone-Misoprostol Medical Abortion, as of January 2020 | | |
|---|---|---|
| **Topic** | **Change** | **Date Changed** |
| Observed ingestion | Removed requirement for observation of mifepristone ingestion. The patient can take the drug where and when they choose. | October 2016 |
| Training | Removed requirement for training for pharmacists. | May 2017 |
| Training | Removed requirement for training for prescribers. | November 2017 |
| Consent form | Removed requirement for a manufacturer consent form to be signed by the patient. | November 2017 |
| Registration | Removed requirement for registration of prescribers or pharmacists with the manufacturer. | November 2017 |
| Dispensing | Mifepristone can be dispensed directly to patients by a pharmacist or prescribing health professional, rather than the original requirement that a physician must dispense directly to the patient. | November 2017 |
| Gestational age | Mifepristone-misoprostol may be used up to 9 weeks (63 days) from the last menstrual period, rather than the original 7 weeks (49 days). | November 2017 |
| Ultrasound | Removed requirement for mandatory ultrasound before prescribing. | April 2019 |

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 34 of 312
PageID.8619
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 87 of 366    PageID.6856

IMPLEMENTATION OF MIFEPRISTONE

included physicians who intended to begin practice with mifepristone within the first year of availability; health care professionals, such as family physicians, who were eligible to become mifepristone prescribers but did not pursue this practice; and stakeholders (eg, representatives of Health Canada, health care professional colleges, and advocacy groups) who had the potential to affect health policy, system, and service factors that influence implementation of mifepristone. Participants had to be English or French speaking and reside in Canada at the time of the interview to participate.

## Recruitment

For physicians who intended to begin practice with mifepristone within the first year of availability, we invited those who completed a CART-Mife Study national online survey during the period January to December 2017 and responded that they would like to participate in a interview. All interview invitations and a copy of the consent form were sent by e-mail to potential participants. We invited non-providing health care professionals and stakeholders via third-party recruitment with the assistance of the study's knowledge user partners (eg, health professional organizations). We also asked each nonproviding physician if they would refer potential participants to the study (snowball recruitment). The potential study population was purposefully sampled to represent diversity of demographic characteristics (eg, sex, age, profession, region) and factors related to the implementation of mifepristone (eg, previous abortion practice).

Sampling, data collection, and analysis were iterative rather than linear steps to collect sufficient data to illustrate the phenomenon of mifepristone implementation in Canada. As categories emerged from analysis of transcripts, we engaged in theoretical sampling that guided our invitation of physicians to participate in a repeat interview 12 months later. Sampling for repeat interviews was guided by the following question: Given our emerging understanding of the factors that influence implementation, which participants would provide the most useful data to further develop those concepts? We invited physicians who were likely to have information-rich cases of adoption or nonadoption to repeat interviews. We also used stratified, purposeful sampling (per above) to ensure that repeat interview participants remained diverse and had varying experiences of abortion practice in the year following mifepristone availability.[23]

## Data Collection

We developed and pilot-tested our interview guide with a panel of researchers and clinicians before data collection (Supplemental Appendix 1, https://www.AnnFamMed.org/content/18/5/413/suppl/DC1/). One-on-one semistructured interviews were conducted by telephone in the first year of mifepristone availability at least 3 months after participants had completed training (April to December 2017). Repeat interviews were conducted 1 year later (October to December 2018). Three health services researchers (S.M., E.G., M-S.W.) conducted the interviews with support from a team of trainees from nursing, medicine, and population and public health (C.D., M.M., G.L-R., K.W., E.S.W., E.Z.). The trainees completed a full-day training workshop on the study procedures before engaging in data collection. During interviews, we sought to be attuned to the participants' comfort level and differences in power and status. Data collection and analysis were concurrent. We conducted interviews until we achieved saturation; when new data repeated what was in previous data (in our data collection), themes were well exemplified in participant data (in our sampling), and no new themes emerged (in our analysis).[24,25] We also sought to recruit participants until the data sufficiently represented a range of the preidentified factors from the purposeful sampling strategies. To ensure transparency and rigor, we engaged in verification strategies throughout, including constant comparison, keeping an audit trail, and sampling to theoretical sufficiency. All interviews were audio-recorded.

## Data Analysis

Interviews were transcribed and French interviews were translated to English before 2 qualitative researchers (S.M., E.S.W.) subjected the data to thematic analysis, informed by Braun and Clarke's flexible approach.[26] Each participant was assigned a unique identifier (eg, 011_Phys – family physician, rural British Columbia, previous medical and surgical abortion experience). We deidentified and coded a sample of transcripts independently and compared results. Discrepancies were resolved via discussion with a third team member (W.V.N. or E.G.). We developed a codebook inductively by identifying codes (themes) from the transcripts that were related to the research objectives and then mapped the themes to constructs in Diffusion of Innovation theory. We then explored individual, organizational, and system patterns, the presence of conflicting themes, and interactions between the codes. To explain physicians' implementation behavior, we considered the prevalence of themes across the data, the presence of conflicting themes, and the perceived relevance of the themes. Finally, we wrote the analysis into a descriptive, explanatory narrative that illuminated the factors influencing implementation of mifepristone abortion practice.

PCSF232

2021 REMS 000986

Case 1:17-cv-00493-JAO-RT   Document 240-4   Filed 05/27/25   Page 35 of 312
PageID.8620
Case 1:17-cv-00493-JAO-RT   Document 222-4   Filed 10/02/24   Page 88 of 366   PageID.6857
IMPLEMENTATION OF MIFEPRISTONE

## RESULTS

We conducted 1-on-1 interviews with health care professionals (n = 55) and stakeholders (n = 35) involved in the planning and provision of abortion services in Canada (Table 2). We conducted repeat interviews with 27 of the 55 health care professionals at least 12 months after their initial interview to explore experiences of mifepristone provision. All 90 participants were volunteers, and all who consented to participate completed their interview. Among those who had provided abortions before mifepristone's availability, their experiences were diverse and ranged from writing 1 prescription for methotrexate-misoprostol to full-time surgical abortion practice.

Participants' perceptions of barriers and facilitators to implementation of mifepristone in routine primary care involved 4 overarching themes informed by Diffusion of Innovation theory as follows: (1) federal restrictions made mifepristone more complicated than it needs to be; (2) navigating the huge bureaucratic process of organizational implementation; (3) challenges with diffusion and dissemination of policy information; and (4) adoption by individuals was a process rather than an event. Themes and representative quotations are provided in Supplemental Appendix 2, https://www.AnnFamMed.org/content/18/5/413/suppl/DC1/.

### 1. Health Canada Made Mifepristone More Complicated Than it Needs to Be

Participants' interviews illuminated how Health Canada's initial restrictions influenced their ability to implement mifepristone in routine care. In the first year of mifepristone availability (2017), all of Health Canada's regulations for the distribution of mifepristone were perceived to create unfeasible task issues that limited adoption of mifepristone abortion and in turn limited equitable access. Whereas participants valued the knowledge from the online training modules, they also perceived training to be time-consuming and the registration with the manufacturer to be a breach of their privacy. Participants hypothesized that these factors would discourage other physicians from practice and thereby limit women's access to medical abortion (006_Phys – family physician, Territories, previous medical and surgical abortion experience).

New prescribers with limited abortion experience emphasized that the initial requirement for physician-only dispensing of mifepristone was inconsistent with their scope of practice and that in their experience dispensing was the responsibility of pharmacists. One noted, "I would definitely not have done this had they stuck to the original rules where we had to purchase, store all the products" (011_Phys – family physician, rural British Columbia, previous medical and surgical abortion experience). The requirement for ultrasound to be used for gestational age dating and to rule out ectopic pregnancy limited the ability of clinicians to provide mifepristone in areas where they felt their local access to timely ultrasound was challenging. In

### Table 2. Participant Characteristics

| Characteristic | No. |
| --- | --- |
| Profession | |
| Family physician/general practice | 45 |
| Gynecologist | 8 |
| Other primary health care professional[a] | 2 |
| Stakeholder | |
| College or regulatory body | 13 |
| Advocate or advocacy group | 9 |
| Government | 7 |
| Abortion facility | 6 |
| Total of profession and stakeholder | 90 |
| Region[b] | |
| National | 9 |
| British Columbia | 19 |
| Prairies (Alberta, Saskatchewan, Manitoba) | 14 |
| Ontario | 14 |
| Quebec | 20 |
| Atlantic (New Brunswick, Nova Scotia, Newfoundland) | 9 |
| Territories (Yukon, Northwest Territories, Nunavut) | 5 |
| Total | 90 |
| Sex (self-reported) | |
| Female | 68 |
| Male | 20 |
| Other/did not respond | 2 |
| Total | 90 |
| Health care professional age, y | |
| 20-29 | 5 |
| 30-39 | 25 |
| 40-49 | 11 |
| 50-59 | 10 |
| 60-69 | 4 |
| Total | 55 |
| Health care professional practice location | |
| Urban | 33 |
| Rural | 22 |
| Total | 55 |
| Health care professional abortion experience at time of study enrollment | |
| Surgical only | 9 |
| Medical only | 5 |
| Surgical and medical | 24 |
| None | 17 |
| Total | 55 |

[a] Other primary health care professional (eg, nurse practitioner, emergency medicine).
[b] Participants reported collectively from some provinces and territories to protect anonymity due to small numbers.

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 36 of 312
PageID.8621
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 89 of 366    PageID.6858
IMPLEMENTATION OF MIFEPRISTONE

contrast, those working in established abortion facilities perceived it to be an easy transition to prescribe mifepristone, owing to existing infrastructure, billing mechanisms, and skilled counselors.

Participants were unanimous in their criticism of an initial requirement that mifepristone be a directly observed dosing, as one participant clarified, "I can't think of a safety reason that is more significant for that medication than it is for tons of other things that are prescribed and taken at or from a pharmacy" (013_Phys – family physician, urban British Columbia, no previous abortion experience). This restriction was perceived as a paternalistic barrier to patient access rather than a factor directly influencing clinician uptake. Although it remained in the product monograph initially, Health Canada removed this restriction before mifepristone became available in January 2017.[27] Despite this early policy change before the start of the present study, a number of participants misbelieved that they had to observe their patients take the drug.

## 2. Navigating the Huge Bureaucratic Process of Organizational Implementation

The majority of Health Canada's federal restrictions were removed within the first year of availability (January-November 2017). Participants perceived that the deregulated mifepristone regimen was simple and compatible with their primary care practice. However, participants described persistent organizational barriers to implementing mifepristone in their local setting. Funding was a key challenge and included provincial variation in patient subsidies for the cost of the drug and in physician billing codes. Unequal costs and compensation across Canada created what participants described as a 2-tiered system, in which patients had financial access to surgical and medical options in one province, but in another they could face out-of-pocket charges only for medical abortion. Physicians described encountering a huge bureaucratic process, such as adding the billing code for medical abortion to their payment system, before they could begin to prescribe mifepristone (003_Phys – family physician, urban Ontario, previous medical and surgical abortion experience).

Conscientious objection and antichoice attitudes in organizations actively prevented physicians from implementing mifepristone abortion. Participants described hospital staff who refused to clean clinic rooms where abortion care was provided, hospital administrators who ignored requests to implement a medical abortion protocol, and community pharmacists who refused to dispense mifepristone. These attitudes contributed to geographic variation in the implementation of mifepristone.

Experiences of stigma and harassment from the general public were uncommon: "It's not like we have people demonstrating outside the hospital or clinic about abortions. It's not to that degree. It's more just the obstruction caused by people's personal views" (040_Phys – family physician, rural British Columbia, previous medical abortion experience). Whereas this did not affect participants' willingness to implement mifepristone, it did influence how much they were willing to communicate or advertise their services as an abortion provider. To avoid scrutiny, some physicians chose to "do it kind of in the dark" and not to disclose their practice to family, friends, or colleagues (004_Phys – family physician, urban Ontario, no previous abortion experience).

Whereas universal coverage for mifepristone was established in Quebec during the first year of mifepristone's availability in Canada, a separate policy process contributed an additional year of delay in making it available in that province. In addition, the Quebec College of Physicians added its own restriction requiring accredited training in surgical abortion for any mifepristone provider. Some participants felt that Quebec professional colleges were being unnecessarily restrictive (022_Stakeholder – national advocate), and others reflected that Quebec's challenges might have been mitigated if Health Canada had collaborated early on with provincial colleges to understand how regulations differed across provinces and territories (E8_Stakeholder and E9_Stakeholder – Quebec college/regulatory body decision makers).

Participants reflected positively on the examples set by British Columbia and Ontario, provinces where professional colleges of pharmacy and medicine chose to overrule Health Canada's restrictions soon after mifepristone's approval and to allow pharmacists to dispense directly to patients. Participants perceived that the actions in British Columbia and Ontario increased access and safety by supporting "doctors [to] do what they want using their own best medical discretion" (022_Stakeholder – national advocate). Participants described how such actions emboldened health professional regulators in other provinces to follow suit and ease restrictions on mifepristone dispensing.

In rural communities, prescribers spoke about the realities of caring for patients who were distributed across vast geographic catchments and faced overwhelming barriers to access all primary care services, not just abortion. Some participants felt that it would be more feasible and private for many rural patients to access a single surgical abortion appointment compared with the multiple visits required for mifepristone medical abortion. Concerns about loss to follow-up for postabortion care were strong for some

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 37 of 312
PageID.8622
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 90 of 366    PageID.6859

IMPLEMENTATION OF MIFEPRISTONE

participants. As one participant reflected, surgical abortion "is more certain. They make one trip to the city. It's a done deal. They go home. They don't have to follow up" (002_Stakeholder – advocate, Prairie province). Participants who were not concerned about potential complications said that having a sounding board of support from expert colleagues helped to assuage their fears.

Despite these implementation barriers at the organizational level, prescribers felt that the tasks involved in providing mifepristone were relatively simple, compatible with their practice, and easy to learn through self-study. For example, one prescriber who had never provided abortion was surprised at how straightforward it was and recalled thinking, "That was so crazy easy" (034_Phys – rural family physician, Atlantic province, no previous abortion experience).

### 3. Challenges With Diffusion and Dissemination of Policy Information

During the first year of availability, as Health Canada removed restrictions, participants struggled to make sense of rapidly changing and inconsistent information about the shifting regulations:

"It seems almost every week there's a new announcement about some kind of change in funding or regulation or all this sort of stuff that makes it very difficult as a provider to know what you can and can't do. I actually think I don't know why it has been rolled out this way, but I think it's been made way more complicated than it needs to be." (017_Phys – family physician, urban Ontario, previous medical and surgical abortion experience)

Participants described how a regulatory change would be reported in the news media, but the product monograph would remain unchanged on existing stock. As one physician from urban Ontario reflected in the summer of the first year of mifepristone availability, "Is the pharmacist supposed to observe them taking the medication? Am I supposed to have the medication delivered to my office and then the patient come back? I don't actually, really, understand what the rule is there" (022_Phys – family physician, urban Ontario, previous medical abortion experience). Having peers on hand to act as a sounding board was critical, particularly for rural prescribers (040_Phys – family physician, rural British Columbia, previous medical abortion experience). This confusion was still present in repeat interviews conducted with participants in the year after mifepristone was deregulated.

Participants who were members of the community of practice component of our main study, the Canadian Abortion Providers Support (CAPS) platform,[28] consistently cited the platform's biweekly emails as a

reliable source of information on changing regulations. Nonetheless, participants expressed a need for more public communication about mifepristone as a new standard of care for family physicians to raise awareness among both practitioners and the public. These attitudes often were intertwined with the belief that these practitioners had a responsibility to support access to reproductive care (012_Stakeholder – advocate, Prairies).

### 4. Adoption by Individuals: A Process Rather Than an Event

According to Diffusion of Innovation theory, "adoption is a process rather than an event, with different concerns being dominant at different stages."[19] Factors related to individual physician behavior, such as ability, skills, and motivation, influenced implementation of mifepristone in routine care. Preadoption, physicians first had to be aware of mifepristone, have up-to-date information about Health Canada's changes, and have a clear perspective of how it would benefit their practice and patient population. During early use, participants' confidence in prescribing mifepristone increased as they honed their skills and knowledge with each successful abortion. One described how this in turn led to increasing the percentage of medical vs surgical abortions at their clinic:

"Well, [the benefit] is already apparent to us. We have seen it on 250 patients thus far. That is more than we would see in an entire year when we were using methotrexate… Just seeing that, for those of us who have been around for as long as I have, it is a bit jaw dropping how well it works. It makes me even angrier that it took this long to get, that women were denied this for so long." (003_Stakeholder – facility leader, Prairie province)

One key facilitator was participants' perceptions of the relative advantage of mifepristone in comparison to methotrexate medical abortion. They perceived that mifepristone was a more effective, reliable, and safe treatment. It also was seen to enhance access by allowing patients to manage an abortion in their own home at their convenience (019_Stakeholder – advocate, British Columbia) and via primary care: "I think it puts access into family doctors' hands because it's a lot more within our realm than going on and doing training in surgical abortions" (004_Phys– family physician, urban Ontario, no previous abortion experience). Our repeat interviews with participants suggested providing even 1 medical abortion strengthened these attitudes.

Participants viewed mifepristone as the new best practice for medical abortion in Canada, which was a motivator to start providing it. As one family physician reflected, "Like I said, it's the standard of care for the

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 38 of 312
PageID.8623
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 91 of 366    PageID.6860

IMPLEMENTATION OF MIFEPRISTONE

physicians" (038_Phys – family physician, rural British Columbia, no previous abortion experience). Our repeat interviews indicated that many family physicians in the sample became motivated to provide mifepristone after getting a well-timed nudge, such as counseling a patient with an unplanned pregnancy or hearing a colleague's experience of prescribing it. A sample of urban physicians who did not yet prescribe mifepristone, however, expressed that they were experiencing "inertia" (042_Phys – family physician, urban British Columbia, previous medical abortion experience) and would prefer the convenience of continuing to refer their patients to nearby abortion clinics. For these non-prescribers, the key preadoption barrier was a perception that abortion was already accessible in their urban community.

## DISCUSSION

### Main Findings

We undertook a national qualitative investigation of physicians' and stakeholders' perceptions of the factors influencing implementation of mifepristone medical abortion during its first 2 years of availability in Canada. Our results indicate that uptake was initially challenging, owing to restrictions contained in the federal approval of mifepristone; however, within the first year of availability (January-November 2017) these restrictions were removed, and mifepristone could be prescribed in primary care settings and dispensed in pharmacies (Table 1). Despite the deregulation of mifepristone at the federal level, a number of barriers persisted throughout the study period at the organizational and individual levels, which made it difficult to implement mifepristone in primary care. These barriers included provincial variation in patient subsidies and physician billing codes, provincial restrictions from the Quebec College of Physicians, and lack of motivation to provide mifepristone among some family physicians who assumed that abortion was already accessible in their communities. Ongoing implementation of mifepristone will require Canadian organizations to create tailored solutions to these local barriers, which might include creating new billing codes, provincial policy advocacy efforts in Quebec, and conducting physician engagement to increase awareness of access barriers. Reflecting the variation in regulations between provinces, perceptions of barriers were lower in British Columbia, Ontario, and Alberta, and higher in Quebec, where availability was further delayed. Despite these barriers, participants held strong perceptions that mifepristone was the new standard of care for medical abortion in Canada and within the scope of primary care practice.

## Interpretation

Our results are consistent with research in high-income nations, which documents that federal regulations are barriers to the uptake of mifepristone.[12,29,30] Participants in our study who did not intend to engage in medical abortion expressed a sense of inertia similar to that reported by Australian general practitioners who perceived that abortion is a service provided in specialist clinics and that abortion will draw unwanted stigma.[31] Our results suggest that providers might incorrectly perceive medical abortion risks to be greater than those related to continued pregnancy, despite strong evidence to the contrary.[1,32-34] Loss to follow-up might occur for 10% to 20% of medical abortion cases.[35] International studies, however, have shown that severe complications are rare.[1,36]

Our research might have important implications for the United States, where a number of the restrictions that Health Canada repealed are still mandated nationwide. The US Risk Evaluation and Mitigation Strategy for mifepristone includes elements to ensure safe use of the drug as follows: pharmacists cannot dispense directly to patients, prescribers must be registered with the drug distributor, and patients must sign a mandated agreement form.[14] Our results indicate that Canadian physicians perceived that these elements would not enhance safety, would discourage other physicians from practice, and would limit access to abortion. The experience of implementing mifepristone in the absence of regulations will be relevant for jurisdictions such as the United States and might be useful in efforts to bring the drug label in line with current international practice and evidence.[37,38]

## Strengths and Limitations

Our results will have relevance for other high-income nations where medical abortion is provided in the primary care setting. Canada's experience illustrates how evidence-based deregulation of mifepristone might facilitate its provision and increase access. Strengths of our study are the national sample, interviews conducted at 2 time points, and inclusion of new and experienced abortion providers, physicians not involved in abortion services, and stakeholders responsible for rural and urban family planning services. These stakeholders are ideally positioned to reflect on the factors that influence uptake of medical abortion at the individual, organizational, and system levels. An additional strength of this national sample is the inclusion of experiences of practitioners from regions with historically limited abortion access including the Territories and Atlantic provinces. Our results might be limited by including only 1 nurse practitioner in the sample, who became eligible to provide medical abortion during the

IMPLEMENTATION OF MIFEPRISTONE

study. In future research, our team will explore their perspectives, as well as those of midwives, patients, and pharmacists. We investigated mifepristone implementation in its early phase, during which Health Canada made significant changes to the regulation of this drug. As use and familiarity with mifepristone increase, the barriers and facilitators will likely change.

## Conclusion

In the first 2 years since mifepristone has been made available in Canada, rapid regulatory revisions greatly assisted primary care practitioners to implement abortion care, particularly in rural communities. These changes have led to health care professional perceptions that there are minimal regulatory barriers to medical abortion practice. Our results are unique internationally given that Canada is the first nation to facilitate provision of medical abortion in the primary care setting via evidence-based deregulation of mifepristone.

To read or post commentaries in response to this article, see it online at https://www.AnnFamMed.org/content/18/5/413.

Key words: abortion; family planning; health policy; health services accessibility; implementation; qualitative research; interview

Submitted August 30, 2019; submitted, revised, January 21, 2020; accepted February 11, 2020.

Author affiliations: Department of Obstetrics and Gynaecology, University of British Columbia, Vancouver, British Columbia, Canada (S.M., K.W.); Centre for Health Evaluation and Outcome Sciences, Providence Health Care Research Institute, Vancouver, British Columbia, Canada (S.M., E.S.W.); Department of Obstetrics and Gynaecology, Laval University, Quebec City, Quebec, Canada (E.G.); Department of Obstetrics and Gynaecology, University of Montreal, Montreal, Quebec, Canada (M.W.); School of Population and Public Health, University of British Columbia, Vancouver, British Columbia, Canada (E.S.W.); School of Nursing, University of British Columbia, Vancouver, British Columbia, Canada (C.D.); Department of Family and Community Medicine, University of Toronto, Toronto, Ontario, Canada (S.D.); Women's College Research Institute, Toronto, Ontario, Canada (S.D.); Department of Obstetrics and Gynaecology, Dalhousie University, Halifax, Nova Scotia, Canada (M.B.); Faculty of Pharmaceutical Sciences, University of British Columbia, Vancouver, British Columbia, Canada (J.A.S.); Faculty of Medicine, University of British Columbia, Vancouver, British Columbia, Canada (M.M., G.L., E.Z); Department of Family Practice, University of British Columbia, Vancouver, British Columbia, Canada (W.V.N.); Faculty of Public Health and Policy, London School of Hygiene & Tropical Medicine, London, United Kingdom (W.V.N.).

Funding support: Canadian Institutes of Health Research (PHE148161, CPP-329455-107837); Michael Smith Foundation for Health Research (Award 16743, 16603, 2012-5139 [HSR]); Society of Family Planning (SFPRF11-19). S.M. was supported as a Trainee and a Scholar of the Michael Smith Foundation for Health Research (16603, 18270). W.V.N. was supported as a Scholar of the Michael Smith Foundation for Health Research (2012-5139 [HSR]) and as an Applied Public Health Research Chair by the Canadian Institutes of Health Research (CPP-329455-107837). In-kind support was contributed by the Society of Obstetricians and Gynaecologists of Canada (SOGC), the College of Family Physicians of Canada, the Canadian Pharmacists Association, and the Women's Health Research Institute of British Columbia Women's Hospital and Health Centre of the Provincial Health Services Authority of British Columbia. The SOGC supported development and design of the Community of Practice Platform that contributed to participant recruitment and retention via a contract with the last author's institution. All grants underwent external peer review for scientific quality, and the funders played no role in conducting the research or writing the paper.

Acknowledgments: Thank you to past and present members of the CART-Mife Implementation Study team for providing expert and professional feedback in preparing this study: Stirling Bryan, Janusz Kaczorowski, Tamil Kendall, Eleni Stroulia, Flora Teng, Ashley Waddington, Glenys Webster. Our thanks to Marianne Manuge for translation of interviews from French to English.

Supplementary materials: Available at https://www.AnnFamMed.org/content/18/5/413/suppl/DC1/.

## References

1. Costescu D, Guilbert E, Bernardin J, et al; Society of Obstetricians and Gynecologists of Canada. Medical abortion. J Obstet Gynaecol Can. 2016;38(4):366-389.

2. Black A, Guilbert E, Costescu D, et al; Society of Obstetricians and Gynaecologists of Canada. Canadian Contraception Consensus (Part 1 of 4). J Obstet Gynaecol Can. 2015;37(10):936-942.

3. Norman WV. Induced abortion in Canada 1974-2005: trends over the first generation with legal access. Contraception. 2012;85(2):185-191.

4. Norman WV, Guilbert ER, Okpaleke C, et al. Abortion health services in Canada: results of a 2012 national survey. Can Fam Physician. 2016;62(4):e209-e217.

5. United Nations Convention on the Elimination of All Forms of Discrimination Against Women. Concluding observations on the combined 8th and 9th periodic reports of Canada: Committee on the Elimination of Discrimination against Women. https://digitallibrary.un.org/record/3802136?ln=en. Published Nov 25, 2016. Accessed Jul 27, 2020.

6. Sethna C, Doull M. Spatial disparities and travel to freestanding abortion clinics in Canada. Womens Studies International Forum. 2013;38:52-62.

7. Sethna C, Doull M. Far from home? A pilot study tracking women's journeys to a Canadian abortion clinic. J Obstet Gynaecol Can. 2007; 29(8):640-647.

8. Dunn S, Cook R. Medical abortion in Canada: behind the times. CMAJ. 2014;186(1):13-14.

9. Government of Canada. Regulatory Decision Summary – Mifegymiso – Health Canada. https://www.hc-sc.gc.ca/. Published 2015. Accessed Jul 27, 2020.

10. Newton D, Bayly C, McNamee K, et al. '...a one stop shop in their own community': medical abortion and the role of general practice. Aust N Z J Obstet Gynaecol. 2016;56(6):648-654.

11. World Health Organization. WHO model lists of essential medicines. https://www.who.int/medicines/publications/essentialmedicines/en/. Published 2005. Accessed Jul 27, 2020.

12. Jones RK, Henshaw SK. Mifepristone for early medical abortion: experiences in France, Great Britain and Sweden. Perspect Sex Reprod Health. 2002;34(3):154-161.

13. Templeton A, Grimes DA. Clinical practice. A request for abortion. N Engl J Med. 2011;365(23):2198-2204.

14. Raymond EG, Blanchard K, Blumenthal PD, et al; Mifeprex REMS Study Group. Sixteen years of overregulation: time to unburden mifeprex. N Engl J Med. 2017;376(8):790-794.

15. Baird B. Medical abortion in Australia: a short history. Reprod Health Matters. 2015;23(46):169-176.

Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 40 of 312
PageID.8625
Case 1:17-cv-00493-JAO-RT    Document 222-4    Filed 10/02/24    Page 93 of 366    PageID.6862

IMPLEMENTATION OF MIFEPRISTONE

16. Norman WV, Soon JA. Requiring physicians to dispense mifepristone: an unnecessary limit on safety and access to medical abortion. *CMAJ*. 2016;188(17-18):E429-E430.

17. Norman WV, Munro S, Brooks M, et al. Could implementation of mifepristone address Canada's urban-rural abortion access disparity: a mixed-methods implementation study protocol. *BMJ Open*. 2019;9(4):e028443.

18. Rogers EM. *Diffusion of Innovations*. 5th ed. New York, NY: Simon & Schuster; 2003.

19. Greenhalgh T, Robert G, Macfarlane F, Bate P, Kyriakidou O. Diffusion of innovations in service organizations: systematic review and recommendations. *Milbank Q*. 2004;82(4):581-629.

20. Cook JM, O'Donnell C, Dinnen S, Coyne JC, Ruzek JI, Schnurr PP. Measurement of a model of implementation for health care: toward a testable theory. *Implement Sci*. 2012;7:59.

21. Canadian Institutes of Health Research. Guide to knowledge translation planning at CIHR: integrated and end-of-grant approaches. https://cihr-irsc.gc.ca/e/documents/kt_lm_ktplan-en.pdf. Published 2012. Accessed Jul 27, 2020.

22. Pinnock H, Barwick M, Carpenter CR, et al; StaRI Group. Standards for Reporting Implementation Studies (StaRI) statement. *BMJ*. 2017; 356:i6795.

23. Patton MQ. *Qualitative Research & Evaluation Methods*. 4th ed. London, UK: Sage Publications; 2014.

24. Saunders B, Sim J, Kingstone T, et al. Saturation in qualitative research: exploring its conceptualization and operationalization. *Qual Quant*. 2018;52(4):1893-1907.

25. Sandelowski M. Sample size in qualitative research. *Res Nurs Health*. 1995;18(2):179-183.

26. Braun V, Clarke V. Using thematic analysis in psychology. *Qual Res Psychol*. 2006;3(2):77-101.

27. Health Canada. MIFEGYMISO (mifepristone and misoprostol tablets) - Updates to Product Monograph and Risk Management Plan. https://healthycanadians.gc.ca/recall-alert-rappel-avis/hc-sc/2017/65030a-eng.php. Published Nov 7, 2017. Accessed Jul 27, 2020.

28. Contraception and Abortion Research Team (CART-GRAC). Canadian Abortion Providers Support (CAPS CPCA). Community of Practice. https://www.caps-cpca.ubc.ca/index.php?title=Main_Page. Accessed Jun 12, 2019.

29. Yanow S. It is time to integrate abortion into primary care. *Am J Public Health*. 2013;103(1):14-16.

30. Grossman D, Goldstone P. Mifepristone by prescription: a dream in the United States but reality in Australia. *Contraception*. 2015;92(3): 186-189.

31. Dawson AJ, Nicolls R, Bateson D, et al. Medical termination of pregnancy in general practice in Australia: a descriptive-interpretive qualitative study. *Reprod Health*. 2017;14(1):39.

32. Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. *Obstet Gynecol*. 2012; 119(2 Pt 1):215-219.

33. Joseph KS, Liu S, Rouleau J, et al. Severe maternal morbidity in Canada, 2003 to 2007: surveillance using routine hospitalization data and ICD-10CA codes. *J Obstet Gynaecol Can*. 2010;32(9):837-846.

34. Schummers L, Norman WV. Abortion services in Canada: access and safety. *CMAJ*. 2019;191(9):E517-E518.

35. Warden S, Genkin I, Hum S, Dunn S. Outcomes during early implementation of mifepristone-buccal misoprostol abortions up to 63 days of gestation in a Canadian clinical setting. *J Obstet Gynaecol Can*. 2019;41(5):647-652.

36. Raymond EG, Shannon C, Weaver MA, Winikoff B. First-trimester medical abortion with mifepristone 200 mg and misoprostol: a systematic review. *Contraception*. 2013;87(1):26-37.

37. Gold M, Chong E. If we can do it for misoprostol, why not for mifepristone? The case for taking mifepristone out of the office in medical abortion. *Contraception*. 2015;92(3):194-196.

38. Foster AM, Jackson CB, LaRoche KJ, Simmonds K, Taylor D. From qualified physician to licensed health care professional: the time has come to change mifepristone's label. *Contraception*. 2015;92(3): 200-202.

PCSF228                                                   2021 REMS 000992

Contents lists available at ScienceDirect

# Contraception

journal homepage: www.elsevier.com/locate/contraception



Original Research Article

# Expanding access to medication abortion through pharmacy dispensing of mifepristone: Primary care perspectives from Illinois



Kayla N. Rasmussen[a], Elizabeth Janiak[b], Alischer A. Cottrill[b,1], Debra B. Stulberg[c,*]

[a] Pritzker School of Medicine, University of Chicago, Chicago, IL, United States
[b] Planned Parenthood League of Massachusetts, Boston, MA, United States
[c] Department of Family Medicine, University of Chicago, Chicago, IL, United States

## ARTICLE INFO

Article history:
Received 1 September 2020
Received in revised form 14 March 2021
Accepted 21 March 2021

Keywords:
Medication abortion
Mifepristone
Pharmacy dispensing
Primary care

## ABSTRACT

Objective: Medication abortion is safe and effective, yet access is limited by a strict Risk Evaluation and Mitigation Strategy (REMS) that prohibits pharmacy dispensing of mifepristone. Given the ability of primary care providers (PCPs) to expand medication abortion access, we assessed PCP perspectives on how lifting the mifepristone REMS would affect the provision of medication abortion in primary care.
Study design: We conducted a qualitative study of PCPs and administrators in Illinois with experience or interest in providing medication abortion care at their practice. The final sample (N=19) consisted of seven family medicine physicians, three nurse practitioners, four certified nurse midwives, and five administrators. We queried participants on how removing the REMS to allow pharmacy dispensing of mifepristone would affect their ability to provide medication abortion. We conducted interviews via telephone and used ATLAS.ti to manage our transcripts; we analyzed these data for major themes regarding pharmacy dispensing.
Results: Primary care providers expressed support for pharmacy dispensing due to its ability to help normalize medication abortion, reduce implementation barriers in primary care, and expand abortion access. Further challenges to address if the REMS restrictions are lifted include federal funding restrictions on abortion, concerns about unsupervised mifepristone use, and pharmacy cooperation.
Conclusion: Removing the mifepristone REMS to allow pharmacy dispensing could help normalize medication abortion care, facilitate provision in primary care, and address disparities in abortion access.
Implications: Our findings illuminate novel benefits of removing the mifepristone REMS and highlight methods to promote successful implementation of pharmacy dispensing. Combined with prior literature, these results support prompt reevaluation and removal of the REMS to align medication abortion care with evidence-based practices.

© 2021 Elsevier Inc. All rights reserved.

## 1. Introduction

The number of abortion facilities in the US is declining, further exacerbating disparities in abortion access. Between 2011–2014, the number of abortion clinics nationwide declined 6%, with the greatest decline occurring in the Midwest at 22% [1]. As the number of abortion clinics in the Midwest and South continues to decline [2], healthcare providers need strategies to overcome these geographic barriers and expand equitable access to care. Medication abortion offers several potential strategies to address these needs.

Medication abortion, using mifepristone and misoprostol, has become increasingly popular, making up 39% of all abortions in 2017 [2]. Patients report high rates of satisfaction [3], citing the ability to choose an alternative to procedural abortion that they perceive as safer and more natural [4]. The combination of mifepristone and misoprostol is also used to manage early pregnancy loss, yielding superior efficacy than misoprostol alone [5]. Importantly, medication abortion can be safely provided in primary care by family medicine physicians (FMPs), nurse practitioners (NPs), physician assistants (PAs), and certified nurse midwives (CNMs) [6,7]. These primary care providers (PCPs) have the potential to greatly expand access to abortion services, especially in rural and medically underserved areas. Combined with the ability to offer safe, convenient abortion care via telemedicine [8–10], medication abortion has immense potential to improve reproductive health equity in the US.

* Corresponding author.
E-mail address: stulberg@uchicago.edu (D.B. Stulberg).
1 Present address: Harvard T.H. Chan School of Public Health, 677 Huntington Ave, Boston, MA 02115, United States.

https://doi.org/10.1016/j.contraception.2021.03.022
0010-7824/© 2021 Elsevier Inc. All rights reserved.

K.N. Rasmussen et al.                                                    Contraception 104 (2021) 98–103

However, current laws and policies place medically unnecessary restrictions on medication abortion care, effectively limiting this potential. Since the approval of mifepristone in 2000, the Food and Drug Administration (FDA) has imposed a set of restrictions on the medication, later deemed a Risk Evaluation and Mitigation Strategy (REMS). The purpose of the REMS is to help ensure the benefits of a medication outweigh its risks. Mifepristone has one of the most restrictive REMS: providers must be certified with the manufacturer and complete a Prescriber Agreement Form, patients must sign a Patient Agreement Form, and the medication can only be dispensed in a clinic, medical office, or hospital [11]. Thus, in contrast to most other medications, pharmacists cannot dispense mifepristone.

While there is no evidence that the mifepristone REMS protects patient safety, it does impede the availability and accessibility of mifepristone [12]. Rather than access the medication from their pharmacy via pick-up or mail-order, patients must travel to a clinic that stocks mifepristone. Likewise, the burden of stocking the drug can be a barrier to providers. A national survey of obstetrician-gynecologists found that 28% of those not providing medication abortion said they would if they could write a prescription for it [13]. In Australia, pharmacist dispensing drastically increased the number of providers and availability of abortion, especially in rural areas [14]. In Canada, pharmacy dispensing of mifepristone has contributed to its successful incorporation into abortion services [15,16].

In the US, medical and drug experts continue to call upon the FDA to lift the REMS given mifepristone's excellent safety profile and its ability to expand access to reproductive healthcare [12,17,18]. The American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and American Medical Association support the removal of the mifepristone REMS [19–21], noting how these restrictions are inappropriately unique to abortion provision [19].

Given the ability of primary care providers to expand access to abortion, especially in underserved areas, it is important to understand how the REMS affects their ability to provide. We conducted a qualitative study of Illinois PCPs and assessed their perspectives on how lifting the REMS to allow pharmacy dispensing of mifepristone would affect the provision of medication abortion in primary care.

## 2. Methods

### 2.1. Recruitment

As part of a larger exploration of medication abortion in primary care, we interviewed 19 PCPs and clinical administrators in Illinois (Table 1). We obtained ethical approval from the University of Chicago Institutional Review Board. After recruiting known professional contacts with experience or interest in providing medication abortion, we used snowball sampling to recruit additional clinicians and administrators. We classified interviewees as administrators if their primary perspective for the purpose of the interview was their administrative role, even if they also had clinical training or experience. We sampled for maximum diversity on provider type, current ability to provide medication abortion, practice setting, and practice location [22]. To gain insight from NPs and CNMs who provide medication abortion, we included a few clinicians who practice at specialty clinics. Our final interview sample represented eight different healthcare organizations in Illinois. Study participants received $50 in remuneration.

**Table 1**
Characteristics of Illinois primary care clinicians and administrators interviewed regarding abortion provision in primary care (N=19)

| Characteristic | Number of participants |
| --- | --- |
| Participant type | |
|   Family medicine physician | 7 |
|   Nurse practitioner | 3 |
|   Certified nurse midwife | 4 |
|   Administrator[a] | 5 |
| Medication abortion provision | |
|   Site currently providing | 6 |
|   Site not currently providing | 13 |
| Practice setting | |
|   Hospital-based | 4 |
|   Community-based | 12 |
|   Specialty clinic | 3 |
| Practice location | |
|   Chicago | 15 |
|   Other location in Illinois | 4 |

[a] Types of administrators interviewed include Administrative Director, Clinical Director, and Chief Operating Officer.

### 2.2. Interviews

We conducted in-depth telephone interviews in March 2019 – Jan 2020. Interviews lasted approximately an hour and were done by a qualitative researcher with doctoral training in sociology and public health (EJ) or one of two trained members of the research team (KR and AC). Interviewers used a semi-structured interview guide with open-ended questions, allowing participants to partially guide the conversation. Interviewees could mention pharmacy dispensing any time throughout the interview as they found relevant. In addition, toward the conclusion of each interview we asked, "If the law allowed clinicians to prescribe mifepristone for pick up at a pharmacy, how would that affect your ability to provide medication abortion, if at all?" We probed interviewees for thoughts on potential benefits or challenges of this model. We used a third party to transcribe the interviews from our audio recordings. The research team verified transcripts for accuracy.

### 2.3. Analysis

Analysis followed an exploratory approach grounded in a multilevel conceptual framework informed by the prior literature on factors affecting clinicians' decisions surrounding abortion provision [13,23,24]. The three researchers serving as primary coders (EJ, KR, AC) developed and validated the preliminary codebook using a combination of a priori and emergent codes with the assistance of a fourth researcher with clinical experience with abortion provision in primary care (DS). Two of the three primary coders analyzed each transcript. We used ATLAS.ti for coding and performed manual reconciliation of coding discrepancies through iterative discussions among the study team. We analyzed discussions of pharmacy dispensing to identify major and minor themes. Because this was a subtopic of a larger analysis, we did not prospectively assess for thematic saturation on pharmacy dispensing during data collection.

## 3. Results

Overall, participants expressed wide support for removing the REMS to allow pharmacy dispensing of mifepristone. We identified four major themes regarding the benefits and challenges of removing the mifepristone REMS: reducing abortion stigma by normalizing mifepristone; decreasing implementation barriers in primary

K.N. Rasmussen et al.                                                                                                    Contraception 104 (2021) 98–103

care; increasing access to safe, legal abortion; and addressing further challenges to medication abortion care.

### 3.1. Reducing abortion stigma by normalizing mifepristone

Participants described how stigma around abortion can be a barrier to provision. While explicit opposition to abortion from colleagues was referenced occasionally, the more common manifestation of stigma was the perception that abortion is risky and requires specialization distinct from other healthcare. Participants described how allowing pharmacists to dispense mifepristone, like any other medication, would help reduce abortion stigma, normalize its integration into primary care, and align with evidence-based practice.

Providers described how prohibiting pharmacy dispensing of mifepristone leads to heightened concern about the risks of the medication. This in turn contributes to the specialization of abortion and perpetuates the perceived need for regulations. As one provider explained: "So I feel like if it was something that could be prescribed, I think that more people would feel it was easier to do. It wouldn't feel so restricted and specialized…But I mean, if you have this drug that only you can prescribe if you are a special someone, then it makes it seem like it's this mysterious thing" (CNM, not currently providing abortion care, Chicago).

Overcoming this perception that abortion is a specialty service can be challenging for PCPs who wish to offer comprehensive sexual and reproductive health services. Removal of the REMS would align with current evidence that supports the provision of medication abortion in primary care rather than as a specialty referral. As one participant said: "There's that primary care model which people see their PCP, but then for certain services they have to go to other people. Our model historically has been that your PCP is your PCP and we're trying to have them do as many things as possible…I think [pharmacy dispensing] would help with that for sure" (administrator, site not currently providing abortion care, Chicago).

Participants expressed frustration with non-evidence-based abortion restrictions that prohibit healthcare professionals from working at their full scope of practice. Regarding pharmacist ability to dispense mifepristone, one participant said: "One, I absolutely think it should be available at pharmacies so that people can get it. I think pharmacists are well qualified to give people [mifepristone and misoprostol]. I think that would be great." They went on to express hope that lifting the REMS would shift perceptions of abortion risk and lead policymakers to reevaluate the basis of "physician-only" laws that prohibit other clinicians from prescribing mifepristone on the grounds of safety concerns: "But if the conversation gets to the point where pharmacists can hand it out, then absolutely nurse practitioners, nurse midwives and PAs should be able to also" (CNM, not currently providing abortion care, Chicago).

### 3.2. Decreasing implementation barriers in primary care

Not only would lifting the REMS help normalize abortion, many participants described how removing these restrictions would make it more feasible for them to provide medication abortion care in their practice. Removing the REMS would address implementation barriers including unsupportive peers, stocking mifepristone, and disruptions in clinic flow.

Treating mifepristone like any other medication would help address discomfort peers have about providing abortion in primary care. However, some providers still expressed concern about peers who object to abortion on moral grounds. In these cases, allowing providers to prescribe mifepristone for pick-up at a pharmacy would help providers work around unsupportive peers. As

one participant explained: "Let's say you work in a small practice, and your one nurse or staff member does not support abortion care, then certainly as a physician you can do it yourself, but you need the staff to check the meds, and do a count and make sure things are expiring. [Pharmacy dispensing] removes that potential barrier" (FMP, not currently providing abortion care, Chicago).

Even for clinics where providers and staff all share similar values regarding abortion, the hassle of purchasing and stocking mifepristone in the clinic can be a barrier. A NP currently providing abortion care outside of Chicago said: "I think for other places that can't financially carry a large stock of it, it could be very helpful because it's very expensive. So of course, you have to balance carrying the amount that you need with what you're using."

Although the FDA approved a generic version of mifepristone during our study, thereby reducing the cost per pill, this interviewee's concern about clinics purchasing and stocking mifepristone remains valid. Addressing this barrier is particularly important in primary care settings that expect to see a low volume of patients seeking abortion, especially when first implementing the service. As a Chicago FMP currently providing abortion care explained: "[Pharmacy dispensing] would be more helpful for a clinic that has trouble keeping mifepristone in stock or that it's expiring because they're so low volume."

While participants believed pharmacy dispensing would reduce financial barriers of providing mifepristone in clinic, one participant questioned whether this would transfer more financial burden to patients: "Or it might get just a lot harder for patients to access if it's no longer in the office. As an FQHC, we might be able to provide that $50 tablet and eat the cost, right? We do that all the time. You can't pay today? All right, well, we're never going to take you to collections. So I can see it being possibly more damaging to patients, but I don't know" (CNM, not currently providing abortion care, Chicago).

Multiple participants noted that there is existing infrastructure at their clinics for dispensing medications through on-site pharmacies. Participants explained how routing mifepristone through their pharmacy, like all other medications, would be more efficient for both the clinic and their patients. As one said: "I would imagine that if it would just help ease the flow, and it would make it a much easier thing to implement if that was the case. We have pharmacies within most of our clinics, and so to be able just to have that at the pharmacy would help reduce patient wait times, and help increase flow and all of that" (administrator, site not currently providing abortion care, Chicago).

### 3.3. Increasing access to safe, legal abortion

In addition to facilitating implementation in primary care, participants described other ways in which removing the REMS to allow pharmacy dispensing would help address disparities in abortion access. These delivery models, including pharmacy pick-up and telemedicine provision, would increase patient access while maintaining the safety and efficacy of mifepristone.

Many participants believed that having access to mifepristone via pharmacies would expand medication abortion accessibility for patients. As a Chicago administrator whose site is not currently providing abortion care stated: "From just like a state policy, that would be magical. Again, it would also just help reduce stigma. It would help reduce, or help increase accessibility. So I think that it would be amazing. Huge shift."

While it would be beneficial for most patients, one Chicago FMP who is not currently providing abortion care expressed concern over how pharmacy pick-up may affect patient privacy, specifically in small towns: "And then certainly if you're in a small town, really uncomfortable potentially for patients to pick up that medication

K.N. Rasmussen et al.                                                                    Contraception 104 (2021) 98–103

at a pharmacy, and so I'm not entirely sure that from a patient perspective it makes the most sense." Other participants noted a solution to privacy concerns via direct-to-patient telemedicine provision of medication abortion.

Many participants supported the use of telemedicine for medication abortion care and noted how pharmacy dispensing of mifepristone would synergistically expand access to abortion. The REMS constrains providers to the site-to-site model of telemedicine provision, which requires patients to visit a clinic to pick up mifepristone. Without this requirement, providers in Illinois could utilize the direct-to-patient model in which the medication is mailed directly to the patient. When asked about the use of telemedicine to expand medication access, one participant replied: "I mean that kind of crossed my mind when you talked about the shift in mife and if it could be prescribed by a pharmacist, because it would help increase access, and help potentially with the ability to offer telemedicine. So I think that yes, it would absolutely help benefit everybody if that can happen" (administrator, site not currently providing abortion care, Chicago).

While pharmacy dispensing has the potential to expand abortion access via multiple delivery models, participants emphasized that these innovations in care would not affect the safety or efficacy of mifepristone. When asked if they saw any disadvantages of pharmacy dispensing, one Chicago administrator whose site is not currently providing abortion care explained: "You know, it'll still allow the provider to provide the education surrounding the medication, what to expect and symptoms, side effects, all that kind of stuff, so I don't perceive any issues with that." Thus, participants did not perceive a correlation between dispensing location and risk of adverse effects.

### 3.4. Further challenges to address

While participants expressed strong support for removing the REMS to allow pharmacy dispensing of mifepristone, they also illuminated some challenges that would remain to be addressed. These include federal funding restrictions on abortion, lingering concerns about unsupervised mifepristone use, and pharmacy cooperation.

Providers who receive federal funding expressed uncertainty over whether legal restrictions would allow them to write a prescription for mifepristone. One clinician working in an FQHC said of writing a mifepristone prescription for pharmacy pick-up: "I'd sure love to put that. My gut reaction is like, Ooh, yeah, yeah, yeah, yeah. And then I'm like, oh, am I going to be allowed to do that? Oh, shoot, maybe I won't. I'd have to backtrack and really figure it out. But, if that barrier was gone then sure that would help a lot, but I'm not entirely sure if I would still be able to do that. I don't know. I could find out. I know people will know, but I don't know" (CNM, not currently providing abortion care, Chicago).

Since these federal restrictions apply specifically to abortion provision, providers also questioned whether they would be able to prescribe mifepristone for its other uses, such as the management of early pregnancy loss. As one Chicago FMP not currently providing abortion care said: "I think the challenge we have here with the federal funding though wouldn't allow us to write those prescriptions for abortion…I think we could write it for miscarriage management potentially, but not for abortion."

A couple participants expressed concern about patients misusing the medication if they are allowed to take it at home. One participant, whose experience involved patients taking mifepristone in the clinic, said: "It concerns me about who they [are] actually going to give it to. But, with any change, then you always think of stuff like that. Like, 'Oh, wait. We've always done it this way. What if they do this, or what if they do that?' Yeah, that would be my concern, is are they actually going to take it, or

are they giving it to someone else? And, I don't know anything about that other person…Or, just ending up deciding, 'You know what? I don't want to take this,' and then deciding to take it two weeks later because they changed their mind again. Just not taking it appropriately" (NP, currently providing abortion care, outside Chicago).

Finally, many participants cautioned that pharmacy dispensing may introduce a new barrier to abortion access: pharmacist refusal to dispense mifepristone. As one Chicago CNM not currently providing abortion care explained: "Pharmacists still have the right of conscience to decline it, because they decline things like EC still. I can't imagine them agreeing to hand out mife if we have pharmacists that won't prescribe emergency contraception." While many participants raised this concern over pharmacist cooperation, most of them still expressed strong support for pharmacy dispensing of mifepristone. As one Chicago administrator whose site is not currently providing abortion care explained: "I could see it potentially being an issue, but I think it would be…It's like worth it in the end. I mean, it's not a big enough issue to not do it."

## 4. Discussion

Primary care providers interviewed in this study supported the removal of the REMS to allow pharmacy dispensing of mifepristone. Participants described how this policy change would help normalize the inclusion of abortion in primary care, reduce implementation barriers, and increase abortion access. Further challenges to address include perceived or possible federal funding restrictions, concerns about unsupervised medication handling and use, and potential pharmacist refusal to dispense mifepristone.

The use of a qualitative approach in this study allowed us to explore complex themes regarding pharmacy dispensing and its potential impacts on abortion. Additional strengths include the diverse expertise of our research team and our iterative methods for coding and analysis. We designed this study to capture perspectives from PCPs and administrators with experience or interest in providing abortion services at their practice. The themes presented here do not reflect the attitudes of all primary care providers in Illinois, as it was not our goal to query a representative sample of all PCPs. Additionally, these findings may not be transferrable outside of Illinois due to variations in the political and legal abortion landscape between states. While Illinois has expanded protections for abortion in recent years [25], other states continue to restrict abortion access. Currently 32 states, including most of the Midwest, have "physician-only" laws and 18 states prevent the use of telemedicine for abortion [26]. Thus, while our findings suggest that pharmacy dispensing of mifepristone would synergistically expand abortion access via primary care integration and telemedicine provision, different state policies would continue to impose limitations.

Our findings provide new insight into the burdens the REMS imposes on abortion access and availability. Prior literature supports removal of the REMS based on the safety of mifepristone, the potential for improved patient access, and the efficacy of direct-to-patient telemedicine abortion [8,12,17,18]. The perspectives of primary care providers and administrators presented in this study provide further support for these arguments and illuminate additional benefits of pharmacy dispensing. These novel insights include the potential for pharmacy dispensing to normalize abortion and facilitate the integration of medication abortion in primary care.

These findings have important implications for the future of abortion care. Expanding provision of medication abortion in primary care, combined with the ability to offer direct-to-patient telemedicine abortion, could reduce geographic disparities in abortion access and increase patient autonomy over where and how

Case 1:17-cv-30493-RTO Document 240-4 10 Filed 05/27/25 Page 45 of 312

K.N. Rasmussen et al.
Contraception 104 (2021) 98–103

to receive care. The COVID-19 pandemic has stressed the need for these innovations in abortion care. Evidence-based protocols support provision of medication abortion without in-person contact [27], yet the REMS unnecessarily requires patients to visit a clinic to pick up the medication. The American College of Obstetricians and Gynecologists and individual medical providers sued the FDA over its imposition of the REMS during the pandemic, resulting in a temporary suspension of the in-person requirements due to the "substantial obstacle" they present to people seeking a medication abortion during the pandemic [28]. Issued in July 2020, this injunction temporarily allows providers to mail mifepristone to patients, yet pharmacy dispensing is still prohibited. The current crisis has highlighted the need to reevaluate the REMS restrictions and the barriers they impose on abortion access.

For patients to gain the full benefit of pharmacy dispensing, the remaining challenges highlighted in this study must be addressed. Providers raised the concern that some pharmacists may refuse to dispense mifepristone on moral grounds. States have varying laws regarding healthcare refusal and the requirement for health professionals to refer patients elsewhere if they refuse to provide a service [29]. It is essential to raise awareness of these conscience clauses and include discussions of the professional, legal, and ethical dilemmas in pharmacy education [30]. Additional strategies to address pharmacist refusal include public education and community organizing, pharmacist outreach and training, and working with state pharmacy boards to shape policies on medication access [31]. These approaches have successfully expanded access to contraception in pharmacies and can apply to mifepristone as well.

Additionally, since 2016 the FDA label has allowed home use of mifepristone based on numerous studies detailing the efficacy, safety, and benefits for patients [32–34]. Given that this update aligns with the common practice in our medical system – to dispense medications to patients and entrust them with the responsibility and autonomy to self-administer their medications at home – we expected all providers to express support for this protocol. Instead, we found a handful of providers expressed the perception that mifepristone requires greater supervision and regulation than other medications. This finding highlights the need to address lingering concerns about abortion risk by increasing awareness of evidence-based guidelines.

This study found that primary care providers expressed support for pharmacy dispensing of mifepristone and its ability to expand access and availability of abortion. Further research is ongoing regarding the feasibility, effectiveness, and acceptability of pharmacy dispensing among patients and pharmacists [35]. If the FDA removes the REMS restrictions and the landscape of abortion care expands to include pharmacy dispensing, this will align mifepristone with other equally safe medications and help normalize abortion in clinical practice.

### Declaration of competing interest

None.

### Funding

This work was funded by the Irving Harris Foundation with support from the University of Chicago Pritzker School of Medicine.

### Acknowledgments

We would like to acknowledge Irma Hasham Dalquist, Ashley McHugh, and Alexis Cacioppo for their contributions to this study.

### Supplementary materials

Supplementary material associated with this article can be found, in the online version, at doi:10.1016/j.contraception.2021.03.022.

### References

[1] Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2014. Perspect Sex Reprod Health 2017;49:17–27.

[2] Jones RK, Witwer E, Jerman J. Abortion incidence and service availability in the United States, 2017. Guttmacher Institute 2019. https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017 (Accessed April 29, 2020).

[3] Jensen JT, Harvey SM, Beckman LJ. Acceptability of suction curettage and mifepristone abortion in the United States: a prospective comparison study. Am J Obstet Gynecol 2000;182:1292–9.

[4] Ho PC. Women's perceptions on medical abortion. Contraception 2006;74:11–15.

[5] Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161–70.

[6] Prine L, Shannon C, Gillespie G, Crowden WA, Fortin J, Howe M, et al. Medical abortion: outcomes in a family medicine setting. J Am Board Fam Med 2010;23:509–13.

[7] Porsch L, Dragoman M, Jones H, Steinle K, Dayananda I. Advanced practice clinicians and medication abortion safety: a 10-year retrospective review. Contraception 2020;101:357.

[8] Raymond E, Chong E, Winikoff B, Platais I, Mary M, Lotarevich T, et al. TelAbortion: evaluation of a direct to patient telemedicine abortion service in the United States. Contraception 2019;100:173–7.

[9] Grossman DA, Grindlay K, Buchacker T, Potter JE, Schmertmann CP. Changes in service delivery patterns after introduction of telemedicine provision of medical abortion in Iowa. Am J Public Health 2012;103:73–8.

[10] Grossman D, Grindlay K, Buchacker T, Lane K, Blanchard K. Effectiveness and acceptability of medical abortion provided through telemedicine. Obstetr Gynecol 2011;118:296–303.

[11] United States Food & Drug Administration. Approved Risk Evaluation and Mitigation Strategies (REMS). https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390 (Accessed May 11, 2020).

[12] Mifeprex REMS Study Group, Raymond EG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of overregulation: time to unburden Mifeprex. N Engl J Med 2017;376:790–4.

[13] Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician–gynecologists. Obstetr Gynecol 2019;133:477–83.

[14] Grossman D, Goldstone P. Mifepristone by prescription: a dream in the United States but reality in Australia. Contraception 2015;92:186–9.

[15] Yalahow A, Doctoroff J, Mark A, Foster AM. Trends in medication abortion provision before and after the introduction of mifepristone: a study of the National Abortion Federation's Canadian member services. Contraception 2020;102:119–21.

[16] LaRoche KJ, Foster AM. It gives you autonomy over your own choices": a qualitative study of Canadian abortion patients' experiences with mifepristone and misoprostol. Contraception 2020;102:61–5.

[17] Henney JE, Gayle HD. Time to reevaluate U.S. mifepristone restrictions. N Engl J Med 2019;381:597–8.

[18] Raifman S, Orlando M, Rafie S, Grossman D. Medication abortion: potential for improved patient access through pharmacies. J Am Pharm Assoc 2018;58:377–81.

[19] American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. https://www.acog.org/en/Clinical Information/Policy and Position Statements/Position Statements/2018/Improving Access to Mifepristone for Reproductive Health Indications (Accessed July 23, 2020).

[20] Munger ML, Letter to FDA on REMS requirements for mifepristone. https://www.aafp.org/dam/AAFP/documents/advocacy/prevention/women/LT-FDA-MifepristoneREMS-062019.pdf (Accessed July 23, 2020).

[21] American Medical Association. H-100.948 Ending the Risk Evaluation and Mitigation Strategy (REMS) policy on mifepristone (Mifeprex). AMA. https://policysearch.ama-assn.org/policyfinder/detail/mifepristone?uri=%2FAMADoc%2FHOD.xml-H-100.948.xml (Accessed July 23, 2020).

[22] Miles MB, Huberman AM. Qualitative data analysis: an expanded sourcebook. 2nd ed. Thousand Oaks, CA, US: Sage Publications, Inc; 1994.

[23] Freedman L. Willing and unable: doctors' constraints in abortion care. Nashville, TN: Vanderbilt University Press; 2010.

[24] Harris LH, Debbink M, Martin L, Hassinger J. Dynamics of stigma in abortion work: findings from a pilot study of the Providers Share Workshop. Soc Sci Med 2011;73(7):1062–70.

[25] Nash E, Mohammed L, Cappello O. Illinois steps up as other states decimate abortion rights. Guttmacher Institute 2019. https://www.guttmacher.org/article/2019/06/illinois-steps-other-states-decimate-abortion-rights (Accessed May 7, 2020).

K.N. Rasmussen et al.

Contraception 104 (2021) 98–103

[26] Guttmacher Institute, Medication abortion. Guttmacher Institute 2016. https://www.guttmacher.org/state-policy/explore/medication-abortion (Accessed April 20, 2020).

[27] Raymond EG, Grossman D, Mark A, Upadhyay UD, Dean G, Creinin MD, et al. No-test medication abortion: a sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361–6.

[28] Kunzelman M. Judge: Women can get abortion pill without doctor visits. AP News. https://apnews.com/article/819bdff2b93b4b305bc6d1037aa8c5de (Accessed April 5, 2021).

[29] Guttmacher Institute. Refusing to provide health services. Guttmacher Institute 2016. https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services (Accessed April 21, 2020).

[30] Erstad BL. The conscience of a pharmacist. AJPE 2019;83.

[31] Reynertson S, Singh R, Uttley L. Pharmacy refusal toolkit protesting women's rights at the pharmacy counter: advocacy strategies from states and localities. Merger Watch; 2006.

[32] Swica Y, Chong E, Middleton T, Prine L, Gold M, Schreiber CA, et al. Acceptability of home use of mifepristone for medical abortion. Contraception 2013;88:122–7.

[33] Chong E, Frye LJ, Castle J, Dean G, Kuehl L, Winikoff B. A prospective, non-randomized study of home use of mifepristone for medical abortion in the U.S.. Contraception 2015;92:215–19.

[34] Gold M, Chong E. If we can do it for misoprostol, why not for mifepristone? The case for taking mifepristone out of the office in medical abortion. Contraception 2015;92:194–6.

[35] Grossman D. Medication abortion via pharmacy dispensing - Full Text View - ClinicalTrials.gov. https://clinicaltrials.gov/ct2/show/NCT03320057 (Accessed August 29, 2020).

Sept. 29, 2021

**BY ELECTRONIC MAIL**

Janet Woodcock, M.D.
Acting Commissioner
United States Food and Drug Administration
10903 New Hampshire Ave.
Silver Spring, MD 20993-0002

Re:    Evidence Supporting Elimination of the Mifepristone REMS

Dear Dr. Woodcock:

We are the health care providers and researchers engaged in litigation challenging the Risk Evaluation and Mitigation Strategy ("REMS") for mifepristone 200 mg for termination of early pregnancy. We are pleased that the U.S. Food and Drug Administration ("FDA") has initiated a comprehensive evaluation of the mifepristone REMS and its three elements to assure safe use ("ETASU"), and appreciate the opportunity to submit data and evidence for FDA's review.[1]

As you know, it is our position that a REMS is not medically necessary to ensure that the benefits of mifepristone outweigh its risks.[2] We note that one of the signatories to this letter (the Society of Family Planning) is the organization that represents Complex Family Planning Fellowship-trained obstetrician-gynecologists, who are the leaders in clinical care, medical education, and research relating to abortion and contraception. Other leading medical authorities—including the American Medical Association, the American College of Obstetricians and Gynecologists, and the American Academy of Family Physicians—likewise support eliminating these restrictions.[3] We hope that, following a comprehensive evaluation incorporating new data and evidence from the past five years, FDA will reach the same conclusion.

### The Mifepristone REMS with ETASU Does Not Enhance Safety

As extensively detailed in the letter submitted by the Society of Family Planning on August 11, 2021, peer-reviewed scientific evidence, including research published since the most recent FDA-approved labeling change in 2016, confirms that mifepristone is extremely safe and highly effective whether dispensed at a health center, pharmacy, or by home delivery, and does not require a clinician to oversee dispensing or specially certify their ability to provide appropriate care. The evidence is clear that the mifepristone REMS and its three ETASU confer no benefit in terms of safety, efficacy, or acceptability of the medication, are not "commensurate with" the risks of mifepristone,[4] and create barriers to use that reduce patient access and negatively impact public health, causing particular harm to communities of color, people with fewer resources, and people living in rural areas.

Mifepristone's strong safety and efficacy findings hold true across a range of regulatory contexts, including international and domestic studies operating outside of the ETASU C dispensing framework. For instance, as you are aware,[5] a recent large (N=52,218) retrospective cohort study reported on the safety, efficacy, and acceptability of telemedicine abortion at Britain's

1

largest abortion providers, which rapidly adapted to provide medication abortion using telemedicine during the spring and summer of 2020 in response to the COVID-19 pandemic.[6] Following a telehealth consultation, individuals with a last menstrual period dating the pregnancy up to 69 days and without symptoms of ectopic pregnancy were able to receive both mifepristone and misoprostol by mail for home administration. Aiken and colleagues found that medication abortion was equally effective in this telemedicine model (98.8%) versus the traditional in-clinic mifepristone administration model (98.2%, p=1.0); that 99.98% of patients using the telemedicine model experienced no serious adverse events compared to 99.96% of abortions with an in-person assessment; and that patients obtaining their medications by mail following a telemedicine consultation were able to initiate treatment *earlier* in pregnancy than patients utilizing the traditional in-clinic model. Similarly, in a large (N=1,157 abortions) national U.S.-based clinical trial of mifepristone dispensing by mail (the TelAbortion study), Chong and colleagues found that mifepristone dispensing by direct mail to consumers is effective (95% abortion completion with medication alone), with only 0.9% experiencing any serious adverse event, compared to a serious adverse event rate of 0.65% in a large (N=233,805 medication abortions) retrospective cohort study of in-clinic mifepristone administration.[7]

There is likewise no evidence that the ETASU A requirement that mifepristone prescribers attest to their ability to prescribe mifepristone mitigates any safety risks of the medication. Indeed, the evidence refutes this. For instance, in Canada, mifepristone-specific requirements for provider certification were lifted in November 2017. According to a comprehensive analysis of linked medical and financial records in Ontario, medication abortion remained extremely safe after deregulation, with a major complication rate of 0.33% compared to a rate of 0.31% in an analysis of a similar administrative dataset from California under the REMS, and consistent with a clinical review finding major complication rates below 1% across multiple studies of mifepristone use for early abortion.[8]

Finally, we agree with the recommendation of FDA's scientific review team in 2016 to eliminate ETASU D, after finding that this ETASU "does not add to safe use conditions" because the Patient Agreement is "generally duplicative of information contained in the Medication Guide and of information and counseling provided to patients under standard informed consent practices for medical care and under professional practice guidelines."[9]

### The Mifepristone REMS Is an Outlier and Unwarranted by Mifepristone's Strong Safety Record

Consistent with strict statutory criteria,[10] FDA imposes REMS programs rarely: fewer than 3% of FDA-regulated drugs are subject to a REMS,[11] and the overwhelming majority of drugs subject to a REMS are opioids—which, in FDA's words, are "claiming lives at [such] a staggering rate" that they are "reducing life expectancy in the United States."[12] FDA subjects only 17 drugs (0.09%), including Mifeprex® and its generic, to a REMS requiring the patient to obtain the medication in a clinic, office, or hospital.[13] And for all such drugs *except* mifepristone, FDA also requires that the medication be taken under clinical supervision, either because of the administration form (e.g., intravenous) or because it can be safely administered only in certain settings (e.g., with monitoring for immediate reactions such as "life-threatening respiratory depression"). In short, mifepristone is the only drug in the nation that FDA requires patients to

2

pick up in a clinical setting yet permits patients to self-administer elsewhere without direct clinical supervision, based on data confirming the safety of home administration.[14]

While we recognize that there are multiple factors informing the determination of whether a REMS is necessary for any individual drug,[15] we note that FDA has determined that many other drugs posing risks of serious adverse events can be successfully regulated through labeling without a REMS. For example:

- Jeuveau® is an FDA-approved acetylcholine release inhibitor and a neuromuscular blocking agent "indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients"—i.e., it is indicated for a purely cosmetic purpose among a healthy population. Jeuveau carries a black-box warning for "[s]wallowing and breathing difficulties" that "can be life threatening" if this botulinum toxin product spreads beyond the area of injection, and the labeling notes that "there have been reports of death."[16]

- Propecia®, a drug "indicated for the treatment of male pattern hair loss," had its labeling updated in 2011 to reflect that this cosmetic medication may cause an "increased risk of high-grade prostate cancer."[17]

- NuvaRing® is an estrogen/progestin combination hormonal contraceptive ("CHC") inserted as a vaginal ring, which carries a black-box warning for "serious cardiovascular events" with increased risk among cigarette smokers.[18]  Its labeling warns patients that CHCs pose a risk of "death from heart attack, blood clots or stroke."[19] Other serious risks associated with NuvaRing include Toxic Shock Syndrome and liver tumors.[20]

- Coumadin®, a common anticoagulant, carries a black box warning for "major or fatal bleeding," with risk ranging from 0.6 to 4.6% for patients with certain comorbidities.[21]

For all of these drugs, FDA has determined that the benefits outweigh the risks even in the absence of a REMS. Now, with the benefit of additional safety and efficacy data on mifepristone reported over the past five years, we urge you to find that mifepristone's risks likewise can be appropriately managed through labeling without a REMS.

## The Mifepristone ETASU Are Unduly Burdensome

The REMS statute prohibits ETASU that are "unduly burdensome on patient access to the drug, considering in particular . . . patients who have difficulty accessing health care (such as patients in rural or medically underserved areas)."[22] The statute further requires that any ETASU be crafted to "minimize the burden on the health care delivery system," "[t]o the extent practicable."[23] Accordingly, FDA has emphasized that a "REMS should be designed to meet the relevant goals, not unduly impede patient access to the drug, and minimize the burden on the health care delivery system to the extent practicable."[24]  While a drug sponsor may request changes to a REMS program, it is FDA that is responsible for ensuring that any REMS comports with all statutory and regulatory requirements and limitations, regardless of what the sponsor has proposed or requested.[25]

3

The mifepristone ETASU do not comply with these requirements. Extensive evidence shows that these ETASU significantly impede patient access, and do so in part by burdening health care providers. And, whereas FDA has long acknowledged that mifepristone is "important to the health of women,"[26] has underscored the need to prevent treatment delays for mifepristone patients,[27] and has stressed that unwanted pregnancy can be a "serious medical condition,"[28] substantial evidence shows that the mifepristone ETASU *cause* treatment delays and prevent some pregnant patients from obtaining a desired abortion at all.

Attached as appendices are several declarations that were submitted as part of the *Chelius v. Becerra* litigation, which provide first-hand physician narratives, research, and statistical analysis detailing how the mifepristone ETASU unduly burden the health care delivery system and patients' access to this medication. We appreciate your consideration of all of this relevant evidence, which we briefly summarize below:

*First*, the mifepristone ETASU reduce the pool of qualified clinicians providing medication abortion, including in the geographic areas most lacking in abortion access. For instance, in a nationally representative survey of currently practicing board-certified obstetrician-gynecologists, fewer than one in five respondents who see patients seeking abortion care reported having provided a medication abortion during the previous year—but the proportion of medication abortion providers would likely *double* if clinicians were permitted to prescribe mifepristone through a pharmacy.[29] Notably, the number of respondents in the South and Midwest who said they would begin providing medication abortion if not for the REMS was higher than the number who were currently providing such care.[30] This finding is of particular significance given the increasing efforts by states in the South and Midwest to ban abortion at all but the earliest weeks of pregnancy.[31] Put plainly, if there are more medication abortion providers in those states, more patients will be able to obtain abortions before confronting those (unconstitutional) gestational age limits. Moreover, while the overwhelming majority of current abortion providers practice in urban areas, 40% of OB-GYNs who responded that they would provide medication abortion care if not for the REMS identified their practices as "suburban" or "midsize town, rural, or military."[32]

Specifically, ETASU C burdens the health care delivery system and severely reduces patient access because of the challenges of obtaining institutional approval to dispense mifepristone onsite, and the complicated logistics necessary to do so. It is extremely unusual for health care providers to have to serve as, in effect, both prescribers and pharmacists; as noted above, fewer than 0.1% of FDA-approved drugs must be dispensed in a hospital, medical office, or clinic. Thus, health care institutions typically must develop unique protocols around the dispensing of mifepristone onsite, which can significantly delay clinicians' ability to prescribe this medication or prevent them from doing so at all. As just one example, it took five years and hundreds of hours of individual clinician and stakeholder advocacy before mifepristone was available to patients at the University of Michigan's Women's Clinic. After years of clinician lobbying to add mifepristone to the institution's formulary, personnel across the organization then had to develop protocols for ordering, storing, and dispensing the medication (including "opt-out" protocols for staff opposed to any involvement in such activities), as well as establish insurance and billing practices. Many clinicians would face none of these burdens if their patients could simply fill their mifepristone prescription through a retail or mail-order pharmacy.

2021 REMS 001162

Additionally, ETASU C exacerbates these logistical burdens by enabling interference by individuals opposed to abortion. Instead of being able to simply issue a mifepristone prescription for an eligible patient to fill at a pharmacy, clinicians seeking to prescribe mifepristone must—as a direct result of ETASU C—involve numerous other health care staff in the process of procuring, stocking, dispensing, and billing for mifepristone onsite. As a practical matter, this means that even a single colleague who objects to abortion can substantially delay, or altogether derail, a clinician's ability to prescribe a safe and effective medication that their patients urgently need.

ETASU A also deters many qualified clinicians from becoming mifepristone prescribers. In light of the long history of anti-abortion violence and harassment in this country, some physicians are unwilling to register with the mifepristone sponsors—fearful of what they and their families might face if abortion opponents were ever able to access their certification agreements. While the drug manufacturers and distributors are required to maintain that information strictly confidentially, these clinician fears are not unfounded; indeed, in our litigation, FDA was unwilling to provide Plaintiffs with the names or offices of agency staff who had been involved in any Mifeprex reviews, *even subject to a protective order* requiring strict confidentiality of Plaintiffs and their counsel.[33] Prescriber certification presents a real barrier to patient access, and, as discussed above, there is no evidence showing that this ETASU advances any countervailing safety interest sufficient to outweigh these burdens.

*Second*, ETASU C forces patients to travel unnecessarily to a mifepristone provider for no medical reason, and in sharp contrast with the expansion of telemedicine nationwide. Across virtually all other areas of medicine, a telemedicine revolution is increasing health care access in medically under-resourced communities and reducing the need for patients to travel long distances for care. But, while medically eligible mifepristone patients already can and do obtain all evaluation and counseling via telemedicine, the REMS prohibits patients from filling their prescription by mail or at a local pharmacy. Instead, FDA requires that mifepristone patients travel to a health center for the sole purpose of picking up the pill and signing a form.

It is important to understand that abortion access is very limited in the United States—in part due to the burdens of ETASU C and A, which reduce the number of clinicians able to provide this essential health care. A nationally representative sample of 8,000 abortion patients found that patients traveled, on average, 68 miles round-trip to receive an abortion.[34] In a majority of states, at least 20% of reproductive-age women live more than 100 miles round-trip from the nearest abortion clinic.[35] And while rural areas are particularly lacking, patients in urban areas also struggle. A 2018 study found that 27 major cities have no publicly advertised abortion provider within 100 miles.[36] Requiring patients to pick up their mifepristone pill in person at a health center thus in many cases requires significant travel.

Given the mifepristone patient population, such travel can be incredibly difficult and in some cases impossible. According to a nationally representative survey, in 2014 (the most recent year for which such data are available), 75 percent of abortion patients had incomes at or below the U.S. Official Poverty Measure.[37] Sixty percent of abortion patients identify as people of color, including 53 percent of patients who identify as Black or Hispanic.[38] And 60 percent of abortion patients have at least one child.[39] Forcing patients to travel in person to pick up the mifepristone tablet at one of the (few) abortion providers in the country imposes costs and burdens relating to

transportation, childcare, and lost wages for missed work that many in this patient population simply cannot afford. Indeed, a robust body of research, spanning multiple states and decades, confirms that forcing patients to travel even slightly farther (e.g., 10 miles) delays or blocks patients from accessing desired abortions.[40] In short, these ETASU specifically burden "patients who have difficulty accessing health care," in violation of the REMS statute.[41]

*** 

We welcomed FDA's April 2021 announcement that it intends to exercise enforcement discretion during the COVID-19 Public Health Emergency with respect to the dispensing of mifepristone through the mail or through a mail-order pharmacy when such dispensing is done by or under the supervision of a certified prescriber. We note that this enforcement discretion has mitigated some (though not all) of the burdens on patients and the health care delivery system described in the physician narratives attached as Appendices. Most significantly, enabling patients to obtain their mifepristone prescription through telemedicine and mail-order pharmacies where medically appropriate has prevented many patients from having to needlessly travel for health care during the pandemic, reducing treatment delays and COVID-19 risks and enabling some patients to access mifepristone who otherwise would not have been able to do so at all.

In addition, having the option to submit a prescription to a pharmacy and then have the pharmacy directly bill and dispense the mifepristone to their patient has enabled some qualified physicians—who previously had been impeded by the complex logistics and controversy around procuring, stocking, dispensing, and billing for mifepristone onsite at their health centers—to begin prescribing this medication for the first time. This is consistent with the nationally representative OB-GYN survey discussed above, which showed that eliminating the REMS would increase the pool of qualified mifepristone prescribers.[42] If the other barriers imposed by the mifepristone ETASU are lifted, even more qualified clinicians will be able to begin prescribing this safe and effective medication.

We appreciate FDA's careful consideration of the extensive evidence showing that the mifepristone REMS does not advance patient safety; causes treatment delays that undermine patients' health; subjects some patients who are unable to obtain mifepristone because of the REMS to the serious medical risks of ongoing pregnancy and childbirth; and unduly burdens both patients and the health care delivery system, with disproportionate harm to people living in rural and medically underserved areas, people with fewer financial resources, and people of color. Consistent with this sound evidence, we urge you to eliminate the mifepristone REMS.

Sincerely,

Dr. Graham Chelius
The Society of Family Planning
The California Academy of Family Physicians

Plaintiffs in *Chelius v. Becerra*, No. 1:17-cv-00493-JAO-RT (D. Haw.)

CC:    Dr. Patrizia Cavazzoni, Center for Drug Evaluation and Research
       Dr. Catherine Sewell, Center for Drug Evaluation and Research

6

[1] *Chelius v. Becerra*, No. 1:17-cv-00493-JAO-RT (D. Haw.) [hereinafter *Chelius v. Becerra*], Joint Motion to Stay Case Pending Agency Review 2, Dkt. 148.

[2] 21 U.S.C. § 355-1(g)(4)(B)(i).

[3] *See, e.g.*, House of Delegates, Am. Med. Ass'n, *Memorial Resolutions Adopted Unanimously* No. 504 (2018), https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a18-resolutions.pdf; Am. Coll. of Obstetricians & Gynecologists, *Position Statement: Improving Access to Mifepristone for Reproductive Health Indications* (June 2018), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications; Cong. of Delegates, Am. Acad. of Fam. Physicians, *Resolution No. 506 (CoSponsored C) Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone* (May 24, 2018), https://www.reproductiveaccess.org/wp-content/uploads/2019/02/Resolution-No.-506-REMS.pdf.

[4] 21 U.S.C. § 355-1(f)(2)(A).

[5] *See* Letter from Janet Woodcock, M.D., Acting Commissioner of Food & Drug Admin., to Maureen G. Phipps, M.D., M.P.H., FACOG, and William Grobman, M.D., M.B.A. (Apr. 12, 2021), https://www.aclu.org/letter/fda-response-acog-april-2021.

[6] Abigail Aiken et al., *Effectiveness, Safety and Acceptability of No-Test Medical Abortion (Termination of Pregnancy) Provided Via Telemedicine: A National Cohort Study*, 128(9) BJOG 1464 (Aug. 2021), https://obgyn.onlinelibrary.wiley.com/doi/10.1111/1471-0528.16668.

[7] Erica Chong et al., *Expansion of a Direct-to-Patient Telemedicine Abortion Service in the United States and Experience during the COVID-19 Pandemic*, 104(1) Contraception 43 (July 2021), https://www.contraceptionjournal.org/article/S0010-7824(21)00091-3/fulltext; Kelly Cleland et al., *Significant Adverse Events and Outcomes after Medical Abortion*, 121(1) Obstetrics & Gynecology 166 (Jan. 2013), https://pubmed ncbi nlm nih.gov/23262942/.

[8] Laura Schummers et al, *Do Medication Abortion Complications Increase When Restrictive Risk Evaluation and Mitigation Strategy Regulations are Removed? A Population-Based Study Using Single-Payer Linked Health Administrative Data*, 102(4) Contraception 273 (Oct. 2020), https://www.contraceptionjournal.org/article/S0010-7824(20)30214-6/fulltext; Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications after Abortion*, 125(1) Obstetrics & Gynecology 175 (Jan. 2015), https://pubmed ncbi.nlm.nih.gov/25560122/; Nathalie Kapp & Patricia A. Lohr, *Modern Methods to Induce Abortion: Safety, Efficacy and Choice*, 63 Best Prac. & Res. Clinical Obstetrics & Gynecology 37 (Feb. 2020), https://www.sciencedirect.com/science/article/pii/S1521693419301762?via%3Dihub.

[9] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Application Number 020687Orig1s020: Summary Review(s)* 25 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020SumR.pdf; U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Application Number 020687Orig1s020: Risk Assessment and Risk Mitigation Review(s)* Ref ID: 3909589 at 2 (Mar. 29, 2016), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020RiskR.pdf.

[10] 21 U.S.C. § 355-1(a)(1).

[11] *Chelius v. Becerra*, Joint Stips. of Facts, Dkt. 140, ¶¶ 59–60.

[12] *Id.* at ¶¶ 59–60; U.S. Food & Drug Admin., *Opioid Medications* (Mar. 29, 2021), https://www.fda.gov/drugs/information-drug-class/opioid-medications.

[13] *Chelius v. Becerra*, Joint Stips. of Facts, Dkt. 140, ¶¶ 59, 61.

[14] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Application Number 020687Orig1s020: Medical Review(s)* 39 (Mar. 29, 2016) https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/020687Orig1s020MedR.pdf.

[15] 21 U.S.C. § 355-1(a)(1).

7

[16] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Application Number 761085Orig1s000: Labeling* (Jeuveau) (Feb. 2019), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2019/761085Orig1s000Lbl.pdf.

[17] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Labeling* (Propecia) (Apr. 2012), https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/020788s020s021s023lbl.pdf.

[18] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Labeling* (NuvaRing) (Oct. 2013), https://www.accessdata.fda.gov/drugsatfda_docs/label/2013/021187s022lbl.pdf.

[19] *Id.*

[20] *Id.*

[21] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Labeling* (Coumadin) (Oct. 2011), https://www.accessdata.fda.gov/drugsatfda_docs/label/2011/009218s107lbl.pdf.

[22] 21 U.S.C. § 355-1(f)(2)(C).

[23] 21 U.S.C. § 355-1(f)(2)(D).

[24] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., Ctr. for Bio. Eval. & Res., *REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary* 5 (April 2019), https://www.fda.gov/media/100307/download.

[25] 21 U.S.C. § 355-1(a), (d), (f).

[26] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Mifeprex (mifepristone) NDA Approval Letter* 4 (Sept. 2000), *Chelius v. Becerra*, Dkt. 142-2, Ex. B.

[27] U.S. Food & Drug Admin., Ctr. for Drug Eval. & Res., *Final Risk Evaluation and Mitigation Strategy (REMS) Review: Mifeprex* (Oct. 2013), *Chelius v. Becerra*, Dkt. 85-8.

[28] Letter from Janet Woodcock, M.D., Director, Ctr. for Drug Eval. & Res., to Donna Harrison, M.D. et al., Denying Citizen Petition Asking the FDA to Revoke Approval of Mifeprex 4-5 (Mar. 29, 2016) (emphasis added), https://www.regulations.gov/document?D=FDA-2002-P-0364-0002.

[29] Sara Daniel et al., *Obstetrician-Gynecologist Willingness to Provide Medication Abortion with Removal of the In-Person Dispensing Requirement for Mifepristone*, 104(1) Contraception 73 (July 2021), https://www.contraceptionjournal.org/article/S0010-7824(21)00098-6/fulltext.

[30] *Id.*

[31] *See, e.g.*, *Whole Woman's Health v. Jackson*, No. 21A24, 2021 WL3910722 (U.S. Sept. 2, 2021) (denying request to block Texas's six-week abortion ban from taking effect); *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-24 00508-MGL, 2021 WL 672406, at *2 (D.S.C. Feb. 29, 2021) (preliminary injunction of South Carolina six-week ban), *appeal filed*, No. 21-1369 (4th Cir. Apr. 5, 2021); *SisterSong Women of Color Reprod. Justice Collective v. Kemp*, 472 F. Supp. 3d 1297, 1312 (N.D. Ga. 2020) (preliminary injunction of Georgia six-week ban), *appeal filed*, No. 20-13024 (11th Cir. Aug. 11, 2020); *Memphis Ctr. for Reprod. Health v. Slatery*, No. 3:20-CV-00501, 2020 WL 4274198, at *2 (M.D. Tenn. July 24, 2020) (preliminary injunction of Tennessee six-week ban), *appeal filed*, No. 20-5969 (6th Cir. Aug. 24, 2020); *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 804 (S.D. Ohio 2019) (preliminary injunction of Ohio six-week ban); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178-DJH, 2019 WL 1233575, at *2 (W.D. Ky. Mar. 15, 2019) (temporary restraining order of Kentucky six-week ban).

[32] Daniel et al., *supra* n.29.

[33] *Chelius v. Becerra*, Joint Stips. of Facts, Dkt. 140, ¶ 47 ("In light of the violence and harassment surrounding the provision of abortion, FDA withheld FDA employee names and other identifying information from documents related to Mifeprex in the administrative record . . . . Because releasing this information would constitute an unwarranted invasion of personal privacy and could expose those employees to threats, intimidation, harassment and/or violence, FDA believes it is necessary not to disclose information that could be used to identify these employees to any person outside of FDA, including Plaintiffs' counsel subject to a protective order.").

[34] Liza Fuentes & Jenna Jerman, *Distance Traveled to Obtain Clinical Abortion Care in the United States and Reasons for Clinic Choice*, 28 J. Women's Health 1623, 1625 (2019), https://pubmed.ncbi.nlm.nih.gov/31282804/.

2021 REMS 001166

[35] Jonathan M. Bearak et al., *Disparities and Change Over Time in Distance Women Would Need to Travel to Have an Abortion in the USA: A Spatial Analysis*, Lancet Pub. Health e493, e495–96 (2017), https://www.thelancet.come/action/showPDF?pii=S2468-2667%2817%2930158-5 (in six states, a majority of women of reproductive age live more than 50 miles away from the nearest abortion provider, including two states where a majority live more than 150 miles from the nearest provider).

[36] Alice Cartwright et al., *Identifying National Availability of Abortion Care and Distance from Major US Cities: Systematic Online Search*, 20 J. Med. Internet Res. 7 (2018), https://www.jmir.org/2018/5/e186/.

[37] Jenna Jerman et al., Guttmacher Inst., *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* 1, 7 (May 2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.

[38] *Id.* at 1, 5; *Abortion Surveillance — United States, 2018*, Ctrs. for Disease Control & Prevention [hereinafter *CDC Abortion Surveillance*], at Table 5, https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T5_down (last updated Nov. 7, 2020).

[39] Jerman et al., *supra* n.37, at 1, 7; *CDC Abortion Surveillance* at Table 7, https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T7_down.

[40] Jill Barr-Walker et al., *Experience of Women Who Travel for Abortion: A Mixed Methods Systematic Review*, PLOS ONE 14(4), at 2 (2019), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0209991; Daniel Grossman et al., *Change in Distance to Nearest Facility and Abortion in Texas, 2012 to 2014*, 317 JAMA Network 437, 437–38 (2017), http://sites.utexas.edu/txpep/files/2017/10/Grossman-et-al-HB2-Change-in-Distance-Abortion-JAMA-2017.pdf (in Texas, when the distance to the nearest abortion clinic increased by 25–49 miles, abortions decreased 25.3%; when the change was 50–99 miles, abortions decreased by 35.7%; and when the change was 100 miles or more, abortions decreased by 50.3%); Sharon A. Dobie et al., *Abortion Services in Rural Washington State, 1983–1984 to 1993–1994: Availability and Outcomes*, 31 Fam. Plan. Persp. 241, 241–44 (1999), https://www.guttmacher.org/sites/default/files/article_files/3124199.pdf (in Washington, when a decline in the number of abortion providers led to a 12 mile increase in travel distance for rural women, the abortion rate among that population decreased by 27%); Robert W. Brown et al., *Provider Availability, Race, and Abortion Demand*, 67 Southern Eco. J. 656, 658 (2001) (in Texas, an increase of 10% in the travel distance from a woman's county to the nearest city with an abortion provider was associated with a 2.3% decline in the abortion rate for white women, 2.7% for African-American women, and 5.0% for Hispanic women); James D. Shelton et al., *Abortion Utilization: Does Travel Distance Matter?*, 8 Fam. Plan. Persp. 260, 260–62 (1976), https://jstor.org/stable/pdf/2134397.pdf?seq=1#page_scan_tab_contents (in Georgia, for every 10 miles of distance from the major abortion providers in Atlanta, the number of abortions declined by 6.7 per 1,000 live births); Alison H. Norris et al., *Abortion Access in Ohio's Changing Legislative Context, 2010–2018*, 110 Am. J. Pub Health 1228, 1232 (2020), https://pubmed.ncbi.nlm.nih.gov/32437269/ (abortion rate in rural counties disproportionately affected by clinic closures decreased more than 30% over study period); Ushma D. Upadhyay et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, Am. J. Pub. Health 1687, 1689 (2014), https://doi.org/10.2105/AJPH.2013.301378 (finding that 58.3% of patients turned away because they were beyond the abortion clinic's limit and 67% arriving just before the limit attributed their delay to "travel and procedure costs" and 29.8% cited "not knowing how to get to a provider"; for first trimester patients, travel and procedure cost was the second-most cited reason for delay).

[41] 21 U.S.C. 355-1(f)(2)(C)(ii).

[42] Daniels et al., *supra* n.29.

9

2021 REMS 001167

Resolution No. 506 (Co-Sponsored C) - Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone -- Congress of Dele...
Case 1:17-cv-00493-JAO-RT     Document 240-4     Filed 05/27/25     Page 56 of 312
PageID.8641



# Resolution No. 506 (Co-Sponsored C) - Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone

## ACTION TAKEN BY THE 2018 CONGRESS OF DELEGATES: ADOPTED



The Board of Directors referred this resolution to the Commission on Governmental Advocacy. Please address questions regarding the resolution to Robert Hall at rhall@aafp.org (mailto:rhall@aafp.org).

**RESOLUTION NO. 506 (Co-Sponsored C)**

**Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone**

Introduced by the Oregon, New York State, and Washington Chapters

Referred to the Reference Committee on Advocacy

WHEREAS, The U.S. Food and Drug Administration (FDA) uses the Risk Evaluation and Mitigation Strategies (REMS) classification to impose restrictions on only the most dangerous drugs with known or suspected serious complications or contraindications, and

WHEREAS, although the current FDA label for mifepri tone wa modified in 2016 to reflect more evidenced ba ed do ing and ge tational limit , the label till include a REMS cla ification requiring three provi ion to "a ure afe u e," including that

- mifepri tone be di pen ed in a health care etting under upervi ion, and
- from a provider who i regi tered and ha igned a provider agreement with the pharmaceutical di tributor, and
- the patient ign an FDA approved patient agreement form, and

2021 REMS 001168

Resolution No. 506 (Co-Sponsored C) - Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone -- Congress of Dele…
Case 1:17-cv-00493-JAO-RT    Document 240-4    Filed 05/27/25    Page 57 of 312
PageID.8642

WHEREAS, the American Academy of Family Physicians (AAFP) "supports a woman's access to reproductive health services and opposes non-evidence-based restrictions on medical care and the provision of such services," and

WHEREAS, the REMS re triction  on mifepri tone are not ba ed on   cientific evidence and cau e  ignificant barrier to acce  ing abortion care,  uch a  landlord  who e lea e  don't allow  abortion  to be done on  ite, manager  who won't allow   tocking of mifepri tone, colleague  who object to provi ion, and

WHEREAS, stocking Mifepristone in the office causes an upfront expense and financial burden which can be difficult for small practitioners to bear, further decreasing access for patients who might prefer to go to their own physician and for rural patients who have no other access points beyond their local physician, and

WHEREAS, there are 16 years of data proving an outstanding safety record of mifepristone, including an 0.05% risk of major complications, and

WHEREAS, other drugs with higher complication rates, such as acetaminophen, aspirin, loratadine, and sildenafil, do not have REMS restrictions, and

WHEREAS, the REMS cla  ification contribute  to delay  in care, thereby increa ing  econd trime ter and  urgical abortion , both of which have increa ed complication rate , and

WHEREAS, the REMS classification creates a barrier to safe and effective off-label uses of mifepristone, such as for anti-corticoid treatment of Cushing's disease, term labor induction, and miscarriage management, and

WHEREAS, the American College of Obstetricians and Gynecologists (ACOG) "believes that a Risk Evaluation and Mitigation Strategy (REMS) is no longer necessary for mifepristone, given its history of safe use. The REMS requirement is inconsistent with requirements for other drugs with similar or greater risks, especially in light of the significant benefit that mifepristone provides to patients", now, therefore be it

RESOLVED, That the American Academy of Family Physicians engage in efforts to overturn the Risk Evaluation and Mitigation Strategies (REMS) classification on mifepristone.

(Received 5/24/18)

**Fiscal Impact:** None

**Background**

Medication abortion, also known as, RU-486 or Mifepristone, is a family planning method that can be used during the first 10 weeks of pregnancy. According to a Kaiser Family Foundation repor (https://www.kff.org/womens-health-policy/fact-sheet/medication-abortion/)t, since the U.S. Food and Drug Administration (FDA) approved the drug in 2000, its use has quickly grown and now almo t one third of all abortion  at 8 week  ge tation or le   are medication abortion  In 2000, the FDA approved regimen required three office vi it  by the patient  one to di pen e mi opro tol, one to di pen e Mifepre , and a follow up vi it to confirm the termination had occurred  Thi  now outdated practice u ed a higher do e of Mifepre , which wa  a  ociated with more  ide effect   However, after exten ive re earch and with the  upport of profe  ional organization , the agency approved a new evidence ba ed regimen and drug label in 2016 that allow  u e for up to 10 week  ge tation and permit  home admini tration

FDA's REMS
Despite the FDA's updates, the drug's administration remains restricted under the agency's Risk Evaluation and Management Strategy (REMS). Under the FDA's requirements, mifepristone may only be accessed under three conditions: (1) Mifeprex can only be administered in a clinic, hospital, or under the direct supervision of a certified

2021 REMS 001169

Resolution No. 506 (Co-Sponsored C) - Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone -- Congress of Dele...
Case 1:17-cv-00493-JAO-RT     Document 240-4     Filed 05/27/25     Page 58 of 312
PageID.8643

medical provider; (2) a provider must be certified by submitting a Prescriber Agreement Form to the drug distributer, confirming their ability to assess ectopic pregnancies and to provide a surgical abortion, in the event of an incomplete abortion; and (3) the certified prescriber must obtain a signed Patient Agreement Form from the woman before dispensing the drug.

Support for Amending FDA' REMS
The American College of Ob tetrician and Gynecologi t upport the elimination of REMS regulation for Mifepre , which they maintain are medically unnece ary and impede acce to medical abortion They cite the low rate of complication a ociated with medical abortion and a ert that other drug with imilar or more eriou ri k do not have REMS re triction In re pon e to the e concern , the American Civil Libertie Union (ACLU) filed a 2017 lawsuit on behalf of a group of provider again t the FDA challenging the REMS requirement for mifepri tone The ACLU argued that the current re triction on acce to medicated abortion violate the 2016 Supreme Court Deci ion *Whole Woman's Health v Hellerstedt,* which empha ized that no "undue burden" can be placed upon women' acce to abortion The uit wa filed in the U S Di trict Court for the Di trict of Hawaii The phy ician complainant argued that in place with no abortion clinic , like Kauai, the rule often make it impo ible for women to obtain the medication

Advocates also claim that the REMS certification program delays care for women seeking the medication from uncertified providers, and restricts the use of telemedicine in abortion care. The REMS program also requires the manufacturer to establish a costly distribution infrastructure instead of allowing sale of the drug through retail or mail order pharmacies, potentially preventing a less expensive generic from being developed. Finally, some advocates suggest that the certification process may limit the pool of providers, as a provider may be reluctant to register with the distributer due to the potential harassment faced by clinicians who provide abortions.

A five-year study of 13,000 women published last year (https://rewire.news/article/2015/01/28/study-evidence-based-protocols-medication-abortion-safe-effective/) in the journal *Contraception* found that evidence-based alternatives to the FDA-approved regimen for medication abortion are afe and effective The tudy found that the evidence ba ed protocol were more than 98% effective for pregnancie of up to 42 day ' ge tation, and more than 95% effective up to 63 day

Federal FDA Mifeprex REMS Bills
Currently, there is no federal legislation to amend the FDA's REMS process for Mifeprex.

State Abortion Drug Restrictions
In addition to the FDA's restrictions, states also have implemented their own policies to restrict how the abortion drug is administered. According to the Guttmacher Institute's report (https://www.guttmacher.org/state-policy/explore/medication-abortion), 34 states require clinicians who perform medication abortion procedures to be licensed physicians. The FDA's protocols allow nurse practitioners to administer the drug. Nineteen states require that the clinician providing a medication abortion be physically present during the procedure, thereby prohibiting the use of telemedicine to prescribe medication for abortion remotely.

**Current Policy**

**Reproductive Decisions** (https://www.aafp.org/about/policies/all/reproductive-decisions.html)

**Reproductive and Maternity Health Services** (https://www.aafp.org/about/policies/all/reproductivehealth-services.html)

**Prior Congress Action**
None

Resolution No. 506 (Co-Sponsored C) - Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization on Mifepristone -- Congress of Dele…

Case 1:17-cv-00493-JAO-RT     Document 240-4     Filed 05/27/25     Page 59 of 312
PageID.8644

**Prior Board Action**

None

 ADD TO FAVORITES

---

Resolution No. 506 (Co-Sponsored C) - Removing Risk Evaluation and
Mitigation Strategy (REMS) Categorization on Mifepristone -- Congress of
Delegates

https://www.aafp.org/about/governance/congress-delegates/2018/resolutions2/cosponsored-
c.mem.html



Copyright © 2019 American Academy of Family Physicians. All rights reserved.

11400 Tomahawk Creek Parkway • Leawood, KS 66211-2680

800.274.2237 • 913.906.6000 • Fax: 913.906.6075 • aafp@aafp.org

# Disparities and change over time in distance women would need to travel to have an abortion in the USA: a spatial analysis



Jonathan M Bearak, Kristen Lagasse Burke, Rachel K Jones



## Summary

**Background** Abortion can help women to control their fertility and is an important component of health care for women. Although women in the USA who live further from an abortion clinic are less likely to obtain an abortion than women who live closer to an abortion clinic, no national study has examined inequality in access to abortion and whether inequality has increased as the number of abortion clinics has declined.

**Methods** For this analysis, we obtained data on abortion clinics for 2000, 2011, and 2014 from the Guttmacher Institute's Abortion Provider Census. Block groups and the percentage of women aged 15–44 years by census tract were obtained from the US Census Bureau. Distance to the nearest clinic was calculated for the population-weighted centroid of every block group. We calculated the median distance to an abortion clinic for women in each county and the median and 80th percentile distances for each state by weighting block groups by the number of women of reproductive age (15–44 years).

**Findings** In 2014, women in the USA would have had to travel a median distance of 10·79 miles (17·36 km) to reach the nearest abortion clinic, although 20% of women would have had to travel 42·54 miles (68·46 km) or more. We found substantially greater variation within than between states because, even in mostly rural states, women and clinics were concentrated in urban areas. We identified spatial disparities in abortion access, which were broadly unchanged, at least as far back as 2000.

**Interpretation** We showed substantial and persistent spatial disparities in access to abortion in the USA. These results contribute to an emerging literature documenting similar disparities in other high-income countries.

**Funding** An anonymous grant to the Guttmacher Institute.

**Copyright** © The Author(s). Published by Elsevier Ltd. This is an Open Access article under the CC BY-NC-ND 4.0 license.

*Lancet Public Health* 2017; 2: e493–500

Published Online October 3, 2017 http://dx.doi.org/10.1016/ S2468-2667(17)30158-5

See Comment page e484

Guttmacher Institute, New York, NY, USA (J M Bearak PhD, K L Burke BA, R K Jones PhD)

Correspondence to: Dr Jonathan M Bearak, Guttmacher Institute, New York, NY 10038, USA jbearak@guttmacher.org

## Introduction

Induced abortion allows women to control their fertility, and ensuring that all women in the USA have access to abortion is a public health goal.[1,2] In 2011, 2·8 million (45%) of the 6·1 million pregnancies in the USA were unintended, and 42% of unintended pregnancies ended in abortion.[3] However, abortion is not always easy to access in the USA, and issues such as stigma, restrictive laws, and financial constraints can pose barriers to access. One key measure of access is how far women have to travel to reach an abortion clinic. Previous research[4–7] found that the further a woman lives from a provider, the less likely she is to obtain an abortion. Most patients seeking an abortion have limited financial resources, so having to cover the cost of travel (which can include overnight stays and time off work) might prevent them from having an abortion.[8]

Spatial inequality—unequal access to resources and services based on location—affects access to abortion in many countries where it is legal.[9] Studies[10–13] in Australia, New Zealand, Canada, and the USA have found that, among women who have abortions, those who live in rural areas typically travel greater distances than those who live in urban areas, at least in part because of subnational variation in restrictive laws.[13]

At least 20 US states have adopted one or more abortion restrictions since 2011 (appendix), making analysis of spatial inequality in that country particularly timely and relevant.[14] In 2008, patients in the USA travelled a median distance of 15 miles (24 km) to have an abortion.[15] Although the median distance travelled was reasonably low, a substantial minority of women (17%) travelled 50 miles (80 km) or more, and 31% of women living in rural areas travelled 100 miles (161 km) or more to have an abortion. A 2016 study[16] examined the change in how far women travelled for an abortion in the state of Texas after implementation of a restrictive law, which resulted in the closure of 22 (54%) of 41 abortion providers in the state. Similar to women nationally, patients in Texas in 2013 travelled a mean distance of 15 miles (24 km) to reach an abortion facility. The mean distance increased by 20 miles (32 km), to 35 miles (56 km), in 2014 after the law came into effect,

PCSF358                                   2021 REMS 001177                e493

### Research in context

**Evidence before this study**
Between Feb 1, 2017, and April 1, 2017, we searched Google Scholar for studies about spatial inequality in abortion access using the search terms "abortion and distance", "abortion access", and "spatial inequality". We reviewed the reference lists and reverse citations of relevant articles. Studies of high-income countries in which abortion is legal have identified spatial disparities in access to abortion facilities. Within the USA, studies using data from individual states have shown an inverse association between distance to nearest abortion provider and county abortion incidence. Meanwhile, many areas of the USA are implementing restrictive policies aimed at curtailing abortion. However, no national study has examined spatial inequality in access to abortion in the USA.

**Added value of this study**
We present the first national estimates of spatial disparities in distance to the nearest abortion provider in the USA. This study is also the first to take into account the geographical distribution of women. This approach allowed estimation of the median distance that a woman would have to travel to an abortion provider in each county and state and the 80th percentile distance that 20% of women in each state live from the nearest clinic. We characterised spatial disparities within and across states, and the stability of these disparities over a 15 year period, from 2000 to 2014.

**Implications of all the available evidence**
We showed persistant spatial disparities in women's access to abortion in the USA that might be applicable to women in other high-income countries.

and the number of patients who travelled more than 50 miles (80 km) increased from 10% to 44%.[16]

A limitation of those analyses was that they examined users of abortion services and did not capture women who wanted abortions but did not make it to the clinic because of distance; thus, they did not fully capture spatial inequality in access to abortions.[4–7] Two studies[4,7] found that the number of abortions in a county in Texas decreased as the distance to the nearest abortion facility increased between 2012 and 2014. Previous studies[5,6] that used abortion data for the states of New York and Georgia in the 1970s also found that the further women lived from a county or state where abortion care was provided, the lower the abortion incidence. These studies suggest that distance has been a persistent barrier to abortion.

Between 2011 and 2014, abortion incidence in the USA decreased by 14% to 14·6 abortions per 1000 women (15–44 years) each year.[17] During the same period, the number of clinics providing abortions decreased by 6%, from 839 to 788, compared with a 1% decline across the preceding 3 year period.[17] The decline in clinics was greatest in the midwest (22%) and southern (13%) regions, which also had the highest number of abortion restrictions enacted over this period.[17] As abortion clinics closed and service availability shifted, women might have had to travel further to have an abortion.

Using abortion-clinic data for 2014, 2011, and 2000, we examined spatial disparities in distance to the nearest abortion clinic by state and county. Because a decline in the number of abortion clinics might have increased the distance women had to travel to reach a provider,[17] we also examined state-specific and county-specific changes in distance to abortion clinics between 2011 and 2014. In a supplementary analysis to assess the long-term stability of access to abortion, we also analysed change since 2000.

## Methods

### Study design

We obtained the location of all abortion clinics in the USA from the Guttmacher Institute's Abortion Provider Census (APC). Since 1973, the Guttmacher Institute has regularly surveyed all known abortion-providing facilities to collect information about number of abortions and other aspects of service provision. The APC provides the most accurate counts of abortion available in the USA.[18] In the most recent APC, information was collected for 2014.[17] We also used data for 2011 and 2000 in this analysis. Approval for the study was obtained through expedited review by the Guttmacher Institute's federally registered institutional review board.

To identify clinics providing abortion services to the public, we limited the analysis to facilities that had caseloads of 400 abortions or more per year and those affiliated with Planned Parenthood that did at least one abortion in the period of interest. We included Planned Parenthood facilities that provided fewer than 400 abortions in a year because of name recognition and because their websites indicated whether they provided abortion services. These providers did 95% of all abortions in 2014; of the remainder, 2·1% occurred in hospitals, 1·4% in private physicians' offices, and 1·5% in health clinics.

Not all locations where abortions are done are accessible and discoverable to a woman seeking abortion care. Abortion providers in the USA have been targets of domestic terrorism, and doctors might be unable to maintain a practice if they are known to be willing to do abortions. Our data collection efforts showed that facilities doing small numbers of abortions seldom advertise their services. Thus, it is possible for a woman to live near to an abortion provider without knowing of that physician or that the physician provides abortions. Such a provider would not constitute a public point of access, and these were excluded from our analysis.

**Articles**

Moreover, confidentiality concerns did not allow us to reveal the locations of low-volume providers because doing so would threaten their safety.

### Statistical analysis

To measure the distance between women and abortion providers, we first needed to specify the location of both. For women, we used the smallest publicly available geographical units, census block groups, which are geographical subdivisions of census tracts.[19] For their coordinates, we used population-weighted centroids.[20] For abortion providers, we geocoded (ie, determined the latitude and longitude of) each provider using Maptitude 2016, and linked each census block group to the nearest provider. Some women obtain abortions outside their state of residence; as such, in our analysis the nearest provider could be in another county or state. We used Open Source Routing Machine 4.9 to compute driving distance.[21]

| | 2011 | | 2014 | | Change in distance, 2011–14 | |
|---|---|---|---|---|---|---|
| | Median | 80th percentile | Median | 80th percentile | Median | 80th percentile |
| USA | 10·59 (17·04) | 40·26 (64·80) | 10·79 (17·36) | 42·54 (68·46) | 0·20 (0·32) | 2·28 (3·66) |
| **Northeast** | | | | | | |
| Connecticut | 5·74 (9·24) | 10·65 (17·13) | 5·17 (8·32) | 9·70 (15·60) | −0·57 (−0·92) | −0·95 (−1·53) |
| Maine | 46·12 (74·22) | 129·73 (208·77) | 25·31 (40·73) | 40·36 (64·95) | −20·81 (−33·49) | −89·37 (−143·82) |
| Massachusetts | 9·67 (15·56) | 21·64 (34·82) | 9·77 (15·72) | 21·52 (34·63) | 0·10 (0·16) | −0·12 (−0·19) |
| New Hampshire | 15·08 (24·27) | 24·28 (39·07) | 14·98 (24·10) | 24·14 (38·84) | −0·10 (−0·16) | −0·14 (−0·23) |
| New Jersey | 6·70 (10·78) | 14·37 (23·12) | 5·43 (8·74) | 11·65 (18·75) | −1·27 (−2·04) | −2·72 (−4·37) |
| New York | 3·19 (5·14) | 9·66 (15·55) | 3·17 (5·10) | 9·12 (14·67) | 0·03 (−0·04) | −0·54 (−0·87) |
| Pennsylvania | 12·96 (20·86) | 51·92 (83·55) | 13·00 (20·91) | 50·92 (81·95) | 0·04 (0·06) | −0·99 (−1·60) |
| Rhode Island | 7·07 (11·38) | 18·90 (30·41) | 7·07 (11·38) | 18·83 (30·31) | 0·00 (0·00) | −0·07 (−0·11) |
| Vermont | 18·86 (30·36) | 34·98 (56·29) | 15·78 (25·40) | 34·08 (54·84) | −3·08 (−4·96) | −0·90 (−1·45) |
| **Midwest** | | | | | | |
| Illinois | 9·96 (16·03) | 29·56 (47·57) | 10·41 (16·75) | 32·67 (52·58) | 0·45 (0·72) | 3·11 (5·01) |
| Indiana | 21·34 (34·34) | 60·51 (97·37) | 21·32 (34·31) | 60·30 (97·04) | −0·02 (−0·03) | −0·21 (−0·34) |
| Iowa | 17·61 (28·33) | 47·76 (76·87) | 12·16 (19·57) | 47·92 (77·12) | −5·45 (−8·77) | 0·16 (0·25) |
| Kansas | 105·58 (169·92) | 188·93 (304·05) | 32·04 (51·57) | 100·50 (161·74) | −73·54 (−118·35) | −88·43 (−142·31) |
| Michigan | 10·92 (17·57) | 35·35 (56·89) | 12·63 (20·33) | 42·85 (68·96) | 1·71 (2·76) | 7·50 (12·07) |
| Minnesota | 16·47 (26·50) | 60·43 (97·25) | 17·77 (28·59) | 60·55 (97·44) | 1·30 (2·09) | 0·12 (0·20) |
| Missouri | 29·54 (47·54) | 97·62 (157·10) | 36·99 (59·53) | 124·38 (200·17) | 7·45 (11·99) | 26·76 (43·07) |
| Nebraska | 9·21 (14·82) | 97·16 (156·36) | 9·36 (15·06) | 98·13 (157·92) | 0·15 (0·24) | 0·97 (1·56) |
| North Dakota | 137·13 (220·68) | 284·23 (457·42) | 151·58 (243·94) | 286·78 (461·52) | 14·46 (23·27) | 2·55 (4·11) |
| Ohio | 16·43 (26·44) | 45·26 (72·83) | 15·41 (24·80) | 45·58 (73·36) | −1·02 (−1·64) | 0·33 (0·53) |
| South Dakota | 95·87 (154·29) | 327·33 (526·79) | 92·06 (148·16) | 329·85 (530·83) | −3·81 (−6·14) | 2·51 (4·04) |
| Wisconsin | 29·18 (46·96) | 66·82 (107·53) | 29·53 (47·53) | 64·78 (104·25) | 0·35 (0·56) | −2·04 (−3·28) |
| **South** | | | | | | |
| Alabama | 26·59 (42·80) | 60·91 (98·03) | 26·20 (42·16) | 60·01 (96·58) | −0·40 (−0·64) | −0·90 (−1·45) |
| Arkansas | 49·29 (79·32) | 82·10 (132·13) | 48·35 (77·81) | 81·63 (131·36) | −0·94 (−1·51) | −0·47 (−0·76) |
| Delaware | 6·65 (10·71) | 19·36 (31·15) | 6·68 (10·75) | 19·39 (31·20) | 0·03 (0·04) | 0·03 (0·05) |
| Florida | 8·34 (13·42) | 22·58 (36·33) | 7·84 (12·62) | 20·74 (33·38) | −0·50 (−0·80) | −1·84 (−2·95) |
| Georgia | 20·11 (32·37) | 63·05 (101·47) | 17·95 (28·89) | 59·94 (96·46) | −2·16 (−3·48) | −3·11 (−5·01) |
| Kentucky | 38·88 (62·57) | 91·24 (146·83) | 38·18 (61·45) | 90·51 (145·66) | −0·70 (−1·13) | −0·73 (−1·17) |
| Louisiana | 34·39 (55·34) | 75·34 (121·24) | 35·06 (56·42) | 84·81 (136·48) | 0·67 (1·07) | 9·47 (15·24) |
| Maryland | 5·86 (9·42) | 15·53 (24·99) | 6·20 (9·97) | 16·61 (26·73) | 0·34 (0·55) | 1·08 (1·74) |
| Mississippi | 68·31 (109·94) | 95·30 (153·37) | 68·80 (110·72) | 94·92 (152·76) | 0·49 (0·78) | −0·38 (−0·61) |
| North Carolina | 19·07 (30·69) | 46·41 (74·68) | 18·34 (29·52) | 45·68 (73·52) | −0·73 (−1·17) | −0·72 (−1·16) |
| Oklahoma | 21·47 (34·55) | 75·59 (121·65) | 20·79 (33·46) | 75·09 (120·84) | −0·68 (−1·09) | −0·50 (−0·81) |
| South Carolina | 24·24 (39·01) | 52·05 (83·76) | 23·98 (38·59) | 51·71 (83·23) | −0·26 (−0·42) | −0·33 (−0·54) |
| Tennessee | 26·99 (43·43) | 68·50 (110·23) | 26·91 (43·31) | 68·54 (110·30) | −0·08 (−0·13) | 0·04 (0·06) |
| Texas | 14·01 (22·55) | 32·86 (52·88) | 17·23 (27·72) | 89·36 (143·81) | 3·22 (5·18) | 56·50 (90·93) |
| Virginia | 10·91 (17·56) | 40·22 (64·73) | 11·25 (18·10) | 39·67 (63·85) | 0·34 (0·54) | −0·55 (−0·88) |
| West Virginia | 59·94 (96·46) | 91·46 (147·18) | 59·81 (96·25) | 91·44 (147·15) | −0·13 (−0·21) | −0·02 (0·04) |

*(Table continues on next page)*

PCSF360

2021 REMS 001179

| | 2011 | | 2014 | | Change in distance, 2011–14 | |
|---|---|---|---|---|---|---|
| | Median | 80th percentile | Median | 80th percentile | Median | 80th percentile |
| (Continued from previous page) | | | | | | |
| **West** | | | | | | |
| Alaska | 9·31 (14·99) | 156·24 (251·45) | 9·31 (14·98) | 154·26 (248·26) | 0·00 (0·00) | −1·99 (−3·20) |
| Arizona | 8·13 (13·08) | 20·94 (33·69) | 11·71 (18·84) | 31·80 (51·18) | 3·58 (5·76) | 10·87 (17·49) |
| California | 4·51 (7·26) | 10·85 (17·47) | 4·50 (7·24) | 10·95 (17·63) | −0·01 (−0·02) | 0·10 (0·16) |
| Colorado | 10·26 (16·51) | 25·73 (41·41) | 9·73 (15·66) | 20·08 (32·32) | −0·53 (−0·85) | −5·65 (−9·09) |
| Hawaii | 14·00 (22·54) | 29·97 (48·24) | 14·00 (22·54) | 30·20 (48·61) | 0·00 (0·00) | 0·23 (0·37) |
| Idaho | 26·79 (43·12) | 118·29 (190·37) | 24·65 (39·67) | 115·81 (186·37) | −2·14 (−3·45) | −2·48 (−4·00) |
| Montana | 27·82 (44·76) | 113·39 (182·48) | 74·02 (119·13) | 123·83 (199·29) | 46·21 (74·37) | 10·45 (16·81) |
| Nevada | 7·22 (11·62) | 13·26 (21·33) | 7·10 (11·43) | 12·06 (19·41) | −0·12 (−0·19) | −1·19 (−1·92) |
| New Mexico | 27·27 (43·89) | 102·09 (164·29) | 26·52 (42·67) | 112·45 (180·96) | −0·75 (−1·21) | 10·36 (16·67) |
| Oregon | 8·07 (12·99) | 36·05 (58·02) | 8·16 (13·12) | 35·77 (57·56) | 0·08 (0·13) | −0·29 (−0·46) |
| Utah | 29·51 (47·49) | 53·62 (86·29) | 29·35 (47·23) | 50·97 (82·03) | −0·16 (−0·26) | −2·65 (−4·26) |
| Washington | 6·11 (9·84) | 16·53 (26·61) | 6·36 (10·24) | 15·25 (24·55) | 0·25 (0·40) | −1·28 (−2·06) |
| Wyoming | 168·36 (270·95) | 273·04 (439·42) | 168·49 (271·16) | 275·01 (442·59) | 0·13 (0·21) | 1·97 (3·17) |

Data are miles (km).

*Table:* Median and 80th percentile distances to nearest abortion clinic for women aged 15–44 years in 2011–14, by state

To estimate mean and percentile distances for each state and county, we weighted each block group by the approximate number of women of reproductive age (15–44 years). We obtained population data for 2000 and 2010 from the Decennial Census.[22,23] The smallest geographical area for which age and sex distributions were available was census tract; therefore, we multiplied each block group's population by the proportion of the census tract that was made up of women aged 15–44 years. To account for population growth after 2010, the last year a census was done, we scaled each block group's population using the Census Bureau's 2011 and 2014 county population estimates.[24]

Mean distances were right skewed by the small proportion of women who lived several 100 miles from the nearest provider. For this reason, we used median distance or the value for which half of women in a county lived from the nearest provider. In our state-level analyses, we also examined 80th percentile distances.

We analysed whether distance to provider varied by the National Center for Health Statistics' urban-rural classification scheme, an extension of the Office of Management and Budget metropolitan statistical area (MSA) classification.[25]

No smooth gradient was seen in the number of abortions done by providers; of the providers excluded from the analysis in 2014, 631 (62%) did fewer than 25 abortions, whereas 38 (4%) did 300–399 abortions. A concern was that a small number of abortions might have placed a provider above or below 400 abortions so as to substantively affect our results. To address this possibility, we did a sensitivity analysis that included all providers who did at least 200 abortions.

Another concern was that rural areas might have been served by providers who did very few abortions. However, although 43% of counties were rural, less than 1% of the excluded providers were in rural areas. All of these were either hospitals or physicians' offices, except for one clinic, which did not advertise abortion services on its website.

We excluded the District of Columbia from the tables and discussion of the findings (but not from the overall analysis) because it is not a state. In both 2011 and 2014, the District of Columbia had four or more abortion clinics,[17,26] and residents would have had to travel a median distance of 2 miles to reach the nearest clinic (shorter than the median distance in any state).

### Role of the funding source
The funding source did not have any role in the study design, data collection, data analysis, writing of the manuscript, or in the decision to submit the paper for publication. The corresponding author had full access to all the data in the study and had final responsibility for the decision to submit for publication.

## Results
Nationally, half of all women of reproductive age in 2014 lived within 10·79 miles (17·36 km) of an abortion clinic (table). The median distance a woman would have had to travel to reach the nearest abortion clinic in 2014 was less than 15 miles (24 km) in 23 (46%) states (figure 1 and table). These states were located in all four geographical regions. Because we considered the concentration of residents in census block groups, many women in states with large rural populations would not have had to travel far to reach a clinic. For example, although a third of residents in Alaska live in rural areas,[27] we found that half

of all women in this state lived within 9·31 miles
(14·98 km) of the nearest abortion clinic.

The median distance to the nearest clinic providing
abortion services in 2014 was 15–29 miles (24–47 km) in
16 (32%) states and 30–89 miles (48–143 km) in eight
(16%) states. At least half of all women in three (6%)
states, including Wyoming (168·49 miles [271·16 km]),
North Dakota (151·58 miles [243·94 km]), and South
Dakota (92·06 miles [148·16 km]), would have had to
travel more than 90 miles (145 km) to reach the nearest
clinic.

The median state distances concealed sizable
minorities of women who would have had to travel
substantial distances to reach an abortion provider. For
example, compared with the median distance of
9·31 miles (14·98 km) in Alaska, the 80th percentile
distance showed that 20% of women in Alaska would
have had to travel at least 154·26 miles (248·26 km) to
reach the nearest abortion clinic in 2014 (table). In
26 (52%) states, at least 20% of women would have had to
travel more than 50 miles (80 km) to reach the nearest
facility providing abortion care.

Examining distance to the nearest clinic by county
provided a more complex picture (figure 2). Substantially
more variation was seen between counties than between
states, and women in many counties had to travel
considerably further than their state median distance.
However, even in states such as Texas, in which most of
the landmass was far from an abortion clinic, most
women lived reasonably close to an abortion clinic
because of the concentration of both women and clinics
in urban areas (appendix).

Counties where women would have had to travel
180 miles (290 km) or more to reach the nearest clinic
were concentrated in the middle of the country, covering
large portions of Montana, Wyoming, North Dakota,
South Dakota, Nebraska, Kansas, and Texas. There
were also areas with large travel distances in some
states bordering Canada (Minnesota and Michigan), as
well as pockets in California, Nevada, Utah, Idaho,
and Missouri. Although geographically sizable, most
of these areas were not densely populated and
were generally rural (appendix). However, several of them
were located in or near to medium or small metropolitan
areas, the largest of which were located in Texas:
Corpus Christi (324000 residents), Lubbock (246000),
Amarillo (199000), and Brownsville (183000).

Between 2011 and 2014, the median distance a woman
would have had to travel to reach an abortion clinic
decreased in nine [18%] states; remained stable, changing
no more than 1 mile (1·6 km) in 34 (68%) states; and
increased in seven [14%] states (table). Most of the
changes in distance to the nearest clinic were 5 miles
(8 km) or less. The exceptions were Kansas (73·54 miles
[118·35 km]) and Maine (20·81 miles [33·49 km]), where
the median distance decreased, and Montana (46·21 miles
[74·37 km]), North Dakota (14·46 miles [23·27 km]), and



**Figure 1: Median distance to the nearest abortion provider by state, 2014**
Alaska and Hawaii are inset in the bottom-left corner.



**Figure 2: Median distance to the nearest abortion provider by county, 2014**
Alaska and Hawaii are inset in the bottom-left corner.

Missouri (7·45 miles [11·99 km]), where the median
distance increased.

Similarly, little to no change was seen in the median
distance to the nearest clinic in most counties (figure 3).
Counties where the median distance to the nearest
provider increased by 30 miles (48 km) or more were
especially prominent in Texas, Iowa, Montana, and
Missouri, and were present only outside large
metropolitan areas (appendix). Texas and Missouri also
had the largest increases in the 80th percentile distance
that 20% of women would have had to travel to reach a
clinic (56·50 miles [90·93 km] for Texas and 26·76 miles

See Online for appendix

PCSF362    2021 REMS 001181    e497



*Figure 3*: Change in median distance to the nearest abortion provider by county, 2011–14
Alaska and Hawaii are inset in the bottom-left corner.

[43·07 km] for Missouri). Conversely, the 80th percentile distance increased by less than 1 mile in Iowa, and the median distance actually decreased by 5·45 miles (8·77 km) in this state (table). Although counties where the median distance to the nearest provider increased by 30 miles (48 km) or more were located in all four geographical regions, New Jersey was the only state in the northeast to show this degree of change. Counties where the median distance to a clinic increased by 15–29 miles (24–47 km) were more sparse than those where the median distance to the nearest provider increased by 30 miles (48 km) or more, although they too were not found in large metropolitan areas (appendix). These counties were also scattered across all four regions, although only one state in the northeast, Virginia, experienced this level of decline in access.

Counties where the median distance to the nearest clinic decreased by more than 30 miles (48 km) were most commonly in the midwest, occurring in Illinois, Iowa, Kansas, Missouri, Nebraska, and Wisconsin. Distance to the nearest clinic also decreased by 30 miles (48 km) or more in counties in California and Colorado (in the west) and in Maine and upstate New York (in the northeast).

Our findings showed spatial disparities that were broadly unchanged in the period of 2011–14, despite several abortion restrictions being enacted during this period. We confirmed the consistency of the spatial disparities in our supplemental analysis of data from 2000. These spatial disparities have persisted for at least 15 years (appendix).

To assess the robustness of our results, we did a sensitivity analysis with inclusion of providers who did

200–399 abortions each year. State distances in 2014 were almost identical to those from the original primary analysis, with one exception: in Texas, the 80th percentile distance increased by 30 miles (48 km) because of a restrictive law that forced clinic closures (appendix).

## Discussion

To our knowledge, this study is the first to provide national estimates of spatial disparity in distance to the nearest abortion clinic for all women aged 15–44 years in the USA. Research has shown that living far from a provider can make abortion inaccessible.[4–6] Travelling long distances can impose a substantial burden on women with respect to transportation costs, travel duration, time off work, and arrangement of childcare, particularly for women who are economically disadvantaged. However, distance can be contextualised within several factors that can affect access to abortion care. The presence of one nearby clinic does not necessarily show that the clinic meets the needs of all prospective patients, that it is open daily, or that it has the capacity to meet demand.[28] Numerous barriers to access can have compounding effects on a woman's ability to access care. For example, in 2014, 11 US states (an increase from nine states in 2011) required that a woman have in-person counselling, followed by waiting for 24–72 h, before obtaining an abortion (appendix). For these women, even seemingly short distances of 30 miles (48 km) can pose a substantial barrier to care because they would have to travel to and from the clinic twice (120 miles [193 km] in total).

Almost all patients who have an abortion in the USA are economically disadvantaged, and many either do not have health insurance or are unable to use insurance to pay for the procedure.[8] These women might be able to travel to an abortion clinic, but they will be unable to access the service if they cannot afford to pay for the procedure. Distance might compound these cost barriers.

Most women would not have to travel considerable distances to reach an abortion clinic because almost all women and providers in the USA are in metropolitan areas. However, a sizable minority of women would have to travel 90 miles or more, and variation between counties is greater than between states. For example, in Alaska in 2014, half of all women lived 9·31 miles (14·98 km) or less from an abortion clinic, but a fifth of women lived 154·26 miles (248·26 km) or even further from a clinic; similar examples included Idaho, Montana, Nebraska, New Mexico, and Texas. Although half of all woman in the USA would have had to travel no more than 10·79 miles (17·36 km) to reach the nearest abortion clinic, 20% of women would have had to travel 42·54 miles (68·46 km) or more. Although policies are implemented at the state level, the consequences of restrictive legislation might not be felt equally across counties within a state; women in rural counties are likely to be most adversely affected by clinic closures.

PCSF363

2021 REMS 001182

Increases in distance in excess of 30 miles (48 km) between 2011 and 2014 were particularly evident in numerous counties in Texas, Missouri, Iowa, and Montana. All of these states, except for Iowa, adopted abortion restrictions during this period (appendix). These states were among those that had the largest proportionate decline in clinics.[17] A hostile environment might have contributed to clinic closures, meaning that more women would have had to travel further to access care in 2014 than in 2011. By contrast, Iowa enacted no major restrictions during the study period and was not considered hostile to abortion rights, although it had five fewer clinics in 2014 than in 2011 (appendix). Research has suggested that efforts to increase access to long-acting contraceptive methods in Iowa might have contributed to reductions in the number of abortions.[29] Reduced need for abortion services might have contributed to the decline in clinics and, in turn, the increase in distance that some women in some counties would have to travel for an abortion. The median distance to a clinic decreased by about 5 miles (8 km) for Iowa during the study period, suggesting that abortion services were redistributed and that women, particularly those living in metropolitan areas, would not have had to travel quite as far.

Texas was an outlier in that the distance that 20% of women would have had to travel increased by about 56 miles (90 km). This finding was probably due to an abortion restriction enacted in 2013 requiring that physicians who provide abortion care have admitting privileges at nearby hospitals. This law resulted in the closure of more than half of the abortion care facilities in the state between 2013 and 2014.[30] Our estimates of distance to nearest provider for women in Texas in 2014 are probably too low because they were calculated with inclusion of facilities that provided at least 400 abortions in 2014, several of which were closed at some point that year.[31] Although some of the more onerous restrictions were struck down by the Supreme Court in June, 2016,[4] most clinics have not yet reopened,[4] and the distance to the nearest provider has probably not improved.

The median distance to the nearest provider decreased by more than 20 miles (32 km) in Kansas and Maine. A new clinic opened in Kansas, and two clinics in Maine had increased caseloads so that they provided 400 or more abortions in 2014. These findings suggested that abortion might have become more accessible for women in these states.

This study had several limitations. First, there are numerous barriers to abortion access in the USA, and distance is not the only obstacle. Abortion restrictions, stigma, and financial constraints could prevent a woman from having an abortion, regardless of distance. Second, our estimates might be conservative because they do not capture the effect of mandated counselling and waiting periods, which might force women to make multiple trips to an abortion clinic. Third, a woman might not visit the closest abortion provider to her home; for example, the closest provider might not offer the necessary or desired services. Fourth, our analysis did not capture women's qualitative experiences. Fifth, the inclusion criteria might have affected the measured distances, but modifying these criteria would have led to inclusion of locations that were not public points of access. Finally, although we documented spatial disparities, it was beyond the scope of our analysis to fully address their causal determinants (eg, reduced demand for services might have affected a clinic's ability to support itself).

In conclusion, abortion is an important component of reproductive health, and restricting access to abortions can lead to them being done later or under potentially unsafe conditions. Our analysis showed substantial and persistent spatial disparities in access to abortion. Enacting restrictions at the state level is a stated priority of many policy makers.[32] Such efforts, if successful, could not only reduce access to abortion, especially for economically disadvantaged women who might not have the resources to overcome obstacles posed by travel, but could potentially exacerbate existing spatial inequality.

### Contributors
JMB led the conceptualisation of the research and analysis of data. RKJ led the Abortion Provider Censuses and contributed to conceptualisation of the research. KLB contributed to data collection, geocoded the data, and co-led the analysis, under the supervision of JMB and RKJ. All authors contributed to interpretation of the results and writing of this report.

### Declaration of interests
We declare no competing interests.

### Acknowledgments
This study was funded by an anonymous grant to the Guttmacher Institute. We thank Lawrence Finer, Kathryn Kost, Rachel Gold, Elizabeth Nash, Megan Donovan, and Adam Sonfield for reviewing drafts of this report and Liza Fuentes for her insight during peer review.

### References
1    Committee on Health Care for Underserved Women. ACOG Committee opinion no. 613: increasing access to abortion. *Obstet Gynecol* 2014; **124:** 1060–65.
2    American Public Health Association. Restricted access to abortion violates human rights, precludes reproductive justice, and demands public health intervention. Policy number 20152. 2015. https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2016/01/04/11/24/restricted-access-to-abortion-violates-human-rights (accessed Dec 13, 2016).
3    Finer LB, Zolna MR. Declines in unintended pregnancy in the United States, 2008–2011. *N Engl J Med* 2016; **374:** 843–52.
4    Grossman D, White K, Hopkins K, Potter JE. Change in distance to nearest facility and abortion in Texas, 2012 to 2014. *JAMA* 2017; **317:** 437–39.
5    Shelton JD, Brann EA, Schulz KF. Abortion utilization: does travel distance matter? *Fam Plann Perspect* 1976; **8:** 260–62.
6    Joyce TJ, Tan R, Zhang Y. Back to the future? Abortion before & after Roe. Cambridge, MA: National Bureau of Economic Research, 2012.
7    Cunningham S, Lindo JM, Myers C, Schlosser A. How far is too far? New evidence on abortion clinic closures, access, and abortions. Cambridge, MA: National Bureau of Economic Research, 2017.
8    Jerman J, Jones RK, Onda T. Characteristics of US abortion patients in 2014 and changes since 2008. New York, NY: Guttmacher Institute, 2016.

9   Doran F, Nancarrow S. Barriers and facilitators of access to first-trimester abortion services for women in the developed world: a systematic review. *J Fam Plann Reprod Health Care* 2015; **41:** 170–80.

10  Sethna C, Doull M. Spatial disparities and travel to freestanding abortion clinics in Canada. *Womens Stud Int Forum* 2013; **38:** 52–62.

11  Silva M, McNeill R. Geographical access to termination of pregnancy services in New Zealand. *Aust NZ J Public Health* 2008; **32:** 519–21.

12  Nickson C, Smith AMA, Shelley JM. Travel undertaken by women accessing private Victorian pregnancy termination services. *Aust NZ J Public Health* 2006; **30:** 329–33.

13  Nickson C, Shelley J, Smith A. Use of interstate services for the termination of pregnancy in Australia. *Aust NZ J Public Health* 2002; **26:** 421–25.

14  Nash E, Gold RB, Ansari-Thomas Z, Cappello O, Mohammed L. Policy trends in the states: 2016. New York, NY: Guttmacher Institute, 2017.

15  Jones RK, Jerman J. How far did US women travel for abortion services in 2008? *J Womens Health* 2013; **22:** 706–13.

16  Gerdts C, Fuentes L, Grossman D, et al. Impact of clinic closures on women obtaining abortion services after implementation of a restrictive law in Texas. *Am J Public Health* 2016; **106:** 857–64.

17  Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2014. *Perspect Sex Reprod Health* 2017; **49:** 17–27.

18  Jatlaoui TC, Ewing A, Mandel MG, et al. Abortion surveillance—United States, 2013. *MMWR Surveill Summ* 2016; **65:** 1–44.

19  US Census Bureau. Geographic terms and concepts—block groups. 2010. https://www.census.gov/geo/reference/gtc/gtc_bg.html (accessed June 15, 2017).

20  US Census Bureau. Centers of population. http://www.census.gov/geo/reference/centersofpop.html (accessed June 14, 2017).

21  Huber S, Rust C. Calculate travel time and distance with OpenStreetMap data using the Open Source Routing Machine (OSRM). *Stata J* 2016; **16:** 416–23.

22  US Census Bureau/American FactFinder. P12: sex by age. 2000 Census. US Census Bureau, 2000.

23  US Census Bureau/American FactFinder. P12: sex by age. 2010 Census. US Census Bureau, 2010.

24  US Census Bureau. County population totals tables: 2010–2016. https://www.census.gov/data/tables/2016/demo/popest/counties-total.html (accessed June 26, 2017).

25  Ingram DD, Franco SJ. 2013 NCHS urban-rural classification scheme for counties. Hyattsville, MD: National Center for Health Statistics, 2014.

26  Jones RK, Jerman J. Abortion incidence and service availability in the United States, 2011. *Perspect Sex Reprod Health* 2014; **46:** 3–14.

27  Iowa Community Indicators Program. Urban percentage of the population for states, historical. http://www.icip.iastate.edu/tables/population/urban-pct-states (accessed Feb 21, 2017)

28  Texas Policy Evaluation Project. Abortion wait times in Texas: the shrinking capacity of facilities and the potential impact of closing non-ASC clinics. 2015. http://sites.utexas.edu/txpep/files/2016/01/Abortion_Wait_Time_Brief.pdf (accessed July 25, 2017)

29  Biggs MA, Rocca CH, Brindis CD, Hirsch H, Grossman D. Did increasing use of highly effective contraception contribute to declining abortions in Iowa? *Contraception* 2015; **91:** 167–73.

30  Grossman D, Baum S, Fuentes L, et al. Change in abortion services after implementation of a restrictive law in Texas. *Contraception* 2014; **90:** 496–501.

31  Fuentes L, Lebenkoff S, White K, et al. Women's experiences seeking abortion care shortly after the closure of clinics due to a restrictive law in Texas. *Contraception* 2016; **93:** 292–97.

32  Gold RB, Starrs AM. US reproductive health and rights: beyond the global gag rule. *Lancet Public Health* 2017; **2:** e122–23.

PCSF365

2021 REMS 001184

**Department of Health and Human Services**
**Public Health Service**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b)(6)/PPI

(b)(6)/PPI

(b)(6)/PPI     **Memorandum**

| | |
|---|---|
| **Date:** | December 16, 2021 |
| **Reviewer:** | (b)(6)/PPI |
| | (b)(6)/PPI |
| (b)(6)/PPI | (b)(6)/PPI |
| | (b)(6)/PPI |
| (b)(6)/PPI  : | (b)(6)/PPI |
| | (b)(6)/PPI |
| (b)(6)/PPI | (b)(6)/PPI |
| | (b)(6)/PPI |
| **Product Name:** | Mifepristone 200 mg |
| **Subject:** | All Adverse Events |
| **Application Type/Number:** | NDA 020687; ANDA 091178 |
| **Applicant/Sponsor:** | Danco Laboratories, LLC; GenBioPro, Inc. |
| (b)(6)/PPI  **#:** | 2007-525 |

1

# 1    INTRODUCTION

This [(b)(6)/PPI] [(b)(6)/PPI] [(b)(6)/PPI] [(b)(6)/PPI] memorandum provides a summary of United States (U.S.) postmarketing adverse events that reportedly occurred from January 13, 2021 - September 30, 2021 with mifepristone use for medical termination of pregnancy. This memorandum is in response to a request from [(b)(6)/PP] [(b)(6)/PPI] ( [(b)(6)/PPI] ) and will be used to assist in the Agency's review of the single, shared system Risk Evaluation and Mitigation Strategy (SSS REMS) for mifepristone, in a regimen with misoprostol, for medical termination of intrauterine pregnancy through 70 days gestation.

For the purposes of this memorandum, we reviewed both the FDA Adverse Event Reporting System (FAERS) database and the published medical literature to identify adverse events that reportedly occurred during the following specified time periods of interest: January 13, 2021 - April 12, 2021 and April 13, 2021 - September 30, 2021.[a, 1, 2]

## 1.1    PREVIOUS [(b)(6)/PPI] MEMORANDUM

On April 12, 2021, we completed a memorandum which provided a summary of U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 - January 12, 2021 with mifepristone use for medical termination of pregnancy.[3] This previously completed memorandum was also in response to a request from [(b)(6)/PP] [(b)(6)/PPI] and used to assist in the Agency's review of a communication from the American College of Obstetricians and Gynecologists (ACOG) regarding the in-person dispensing requirements in the SSS REMS for mifepristone during the Coronavirus Disease 2019 (COVID-19) public health emergency (PHE). Both FAERS and the published medical literature were reviewed to identify adverse events that reportedly occurred during the following specified time periods of interest: January 27, 2020 - July 12, 2020 and July 13, 2020 - January 12, 2021.[b, 1, 4]

Four cases were identified from FAERS in which an adverse event reportedly occurred from January 27, 2020 - January 12, 2021 with mifepristone use for medical termination of pregnancy in the U.S. Of these four cases, one reported the occurrence of an adverse event (bleeding) during the period of January 27, 2020 - July 12, 2020, and two cases reported the occurrence of an adverse event (in one case, ongoing pregnancy and in the other, drug intoxication and death approximately 5 months after ingestion of mifepristone) during the period of July 13, 2020 - January 12, 2021. The remaining case only noted the occurrence of the adverse event (oral

---

[a] These specific time periods of interest correlate with the Supreme Court stay of the preliminary injunction that had temporarily stopped enforcement of the in-person requirements in the SSS REMS for mifepristone (i.e., January 12, 2021) and the start date (i.e., April 12, 2021) of the Agency's intention to exercise enforcement discretion with respect to the in-person dispensing requirements in the SSS REMS for mifepristone during the Coronavirus Disease 2019 (COVID-19) public health emergency (PHE), beginning with the first full day after each event.[1, 2]
[b] These specific time periods of interest correlate with the start date of the PHE as declared by the Secretary of Health and Human Services (HHS) through the day prior to a district court's order granting a preliminary injunction to temporarily stop enforcement of the in-person requirements in the SSS REMS for mifepristone (i.e., January 27, 2020 - July 12, 2020) and the time period the injunction was in effect (i.e., July 13, 2020 - January 12, 2021).[1, 4]

2021 REMS 001391

Reference ID: 4905703

pain/soreness) in July 2020 (exact date not specified). No additional case reports were identified from the published medical literature.

Based on the U.S. postmarketing data from FAERS reviewed at that time, we concluded that no new safety concerns had been identified with the use of mifepristone for medical termination of pregnancy.

## 2    METHODS AND MATERIALS

### 2.1    CASE DEFINITION

*Inclusion Criterion:* Cases were included if an adverse event reportedly occurred from January 13, 2021 - September 30, 2021 with mifepristone use for medical termination of pregnancy in the U.S.

*Exclusion Criteria:* Cases were excluded if they did not meet the inclusion criterion specified above OR for any of the following reasons:

- Mifepristone was used for a reason other than medical termination of pregnancy
- The case occurred outside of the U.S.
- The adverse event(s) did not occur during the specified time period of interest
- No adverse event was reported

### 2.2    FAERS SEARCH STRATEGY

(b)(6) PPI searched the FAERS database with the strategy described in **Table 1**.

| Table 1. FAERS Search Strategy* | |
|---|---|
| Date of search | October 16, 2021 |
| Time period of search | January 13, 2021[†] - October 15, 2021[‡] |
| Search type | FBIS Quick Query |
| Product terms | Active Ingredient: Mifepristone |
| MedDRA search terms (Version 24.0) | All adverse events |
| * See **Appendix A** for a description of the FAERS database. † January 13, 2021 was the day after the Supreme Court stay of the preliminary injunction that had temporarily stopped enforcement of the in-person requirements in the SSS REMS for mifepristone, and the previously completed (b)(6) PPI memorandum included adverse events that had reportedly occurred prior to that date.[1, 3] ‡ To account for reports that may have been submitted to FAERS after the adverse event reportedly occurred, the search end date was extended beyond the September 30, 2021 data cut-off date to the day prior to search completion. **Abbreviations:** FBIS=FAERS Business Intelligence Solution, MedDRA=Medical Dictionary for Regulatory Activities | |

Reference ID: 4905703

2021 REMS 001392

## 2.3    LITERATURE SEARCH

[(b)(6)/PPI] searched the medical literature with the strategy described in **Table 2**.

| Table 2. Literature Search Strategy | |
|---|---|
| Date of search | October 16, 2021 |
| Database | Embase and PubMed |
| Search terms | Embase: ('mifepristone'/exp OR mifepristone) AND (2021:py) AND 'case report'/de<br><br>PubMed: (("mifepriston"[MeSH Terms] OR "mifepristone"[All Fields] OR "mifepriston"[All Fields]) AND ("case reports"[Publication Type] OR "case report"[All Fields])) AND (2021[pdat]) |
| Years included in search | 2021 |

## 3    RESULTS

## 3.1    FAERS CASE SELECTION

The FAERS search retrieved 235 reports. After applying the case definition in **Section 2.1** and accounting for duplicate reports, four cases were identified in which an adverse event reportedly occurred from January 13, 2021 - September 30, 2021 with mifepristone use for medical termination of pregnancy in the U.S. (see **Figure 1**).

**Figure 1. FAERS Case Selection**



\* 207 reports documented the use of mifepristone for Cushing's syndrome (or related conditions) or specified the use of Korlym®, 1 report documented the use of mifepristone for breast cancer, and 1 report documented the use of mifepristone for expulsion of an incomplete abortion.

We summarized the pertinent information from all four cases, grouped by the specified time periods of interest, below. **Appendix B** contains a line listing of these four cases.

2021 REMS 001393

Reference ID: 4905703

### 3.1.1   January 13, 2021 - April 12, 2021 (n=1)

**FAERS Case #19069360 (Duplicate Case #19119341), Reported Adverse Event Date - March 27, 2021**

An 18-year-old female at 8 weeks 3 days gestation ingested mifepristone 200 milligrams (mg), followed by misoprostol 800 micrograms (mcg) the next day for medical termination of pregnancy. It was noted that the patient had no follow-up scheduled with her abortion provider and that she was directed to go the emergency department (ED) if any problems arose. Approximately 14 days later, she presented to the hospital with vaginal bleeding which had started the day of mifepristone ingestion; a fever of 103.4°F; abdominal pain and cramping; and leukocytosis. Her hemoglobin was checked and found to be 8.6 gm/dL (reference range: 12.0 - 15.5 gm/dL). She was diagnosed as being septic with endometritis and retained products of conception and required urgent surgical intervention (suction dilation and curettage). During her hospital admission, she received intravenous (IV) antibiotics (ampicillin, clindamycin, and gentamicin), which were continued until she was afebrile for 24 hours, and oral azithromycin for chlamydia. She was discharged home on hospital day 3 in good condition after the above treatment.

*Reviewer Comments: Uterine and vaginal bleeding and the risk of infection and sepsis are known and labeled adverse events with the use of mifepristone for medical termination of pregnancy. Language regarding the risk of bleeding, in addition to monitoring parameters and treatment options, can be found in various sections of the prescribing information (e.g., BOXED WARNING, WARNINGS AND PRECAUTIONS) for the mifepristone products approved for medical termination of pregnancy. Language regarding the risk of infection and sepsis, in addition to specific clinical considerations (e.g., laboratory parameters that may be affected, signs and symptoms that may be present), can be found in various sections of the prescribing information (e.g., BOXED WARNING, WARNINGS AND PRECAUTIONS) for the mifepristone products approved for medical termination of pregnancy. Language regarding the importance of a post-treatment follow-up assessment (to confirm complete termination of pregnancy and to evaluate the degree of bleeding) with a healthcare provider approximately 7 - 14 days after mifepristone administration can be found in various sections of the prescribing information (e.g., DOSAGE AND ADMINISTRATION, PATIENT COUNSELING INFORMATION) for the mifepristone products approved for medical termination of pregnancy.* [5, 6]

### 3.1.2   April 13, 2021 - September 30, 2021 (n=3)

**FAERS Case #19522257, Reported Adverse Event Date - June 4, 2021[c]**

A 22-year-old female at 7 weeks 3 days gestation ingested mifepristone 200 mg (specifically noted to be "administered in-person by physician") and was given misoprostol 800 mcg to ingest 24 - 48 hours later for medical termination of pregnancy. The clinic was later informed by the patient's mother that post-misoprostol ingestion (the exact time was not specified; however, it was the day after mifepristone ingestion), her daughter had contacted her and stated that she felt like she couldn't breathe. The mother then went to the patient's home and found her deceased.

---

[c] This death case is not accounted for in the *Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2021* (which was completed by (b)(6) and finalized on September 24, 2021) as this case was not received by FDA until 7/12/2021.

2021 REMS 001394

Reference ID: 4905703

The patient's medical history was notable for asthma, with the use of an albuterol inhaler as needed. She had no other contributory medical history or concomitant medications.

*Reviewer Comments: The lack of information provided at this time precludes our assessment of this case; however, it was confirmed that an investigation into this patient's death is being conducted by the office of the coroner/medical examiner in the applicable jurisdiction. We have requested the reports related to the investigation (i.e., investigative report, autopsy report, toxicology report) and our request will be fulfilled once all the reports are finalized. Of note, we have not yet received the requested information.*

**FAERS Case #19484255 (Duplicate Case #19519688 [** (b)(6) PPI **follow-up #1], Case #19609302 [** (b)(6) PPI **follow-up #2], and Case #19684468 [** (b)(6) PPI **follow-up #3]), Reported Adverse Event Date - June 22, 2021**[d]

A 24-year-old female at 7 weeks gestation ingested mifepristone 200 mg (specifically noted to be given by the physician), followed by vaginal administration of misoprostol 800 mcg the next day for medical termination of pregnancy. She then called the clinic 3 days post-mifepristone ingestion (2 days post-misoprostol administration) with complaints of feeling weak, along with pain during urination and bowel movements. The clinic advised her to increase fluid intake, to take acetaminophen and/or ibuprofen as needed, and to come to the clinic the following day or to go to the ED sooner if needed. Approximately 12 hours later, she presented to the hospital with abdominal pain, vomiting, leukocytosis (initial white blood cell count upon ED arrival was markedly elevated and found to be 63.2 x $10^3/mm^3$; it was then repeated and found to be 71.8 x $10^3/mm^3$ [reference range: 4.5 - 10.3 x $10^3/mm^3$]), and probable endometritis. Abdominal/pelvic imaging was concerning for gas in the uterus and treatment with IV antibiotics was initiated (piperacillin/tazobactam and clindamycin) as sepsis was suspected. The patient quickly decompensated (e.g., blood pressure was unable to be obtained, became increasingly tachycardic), and emergent surgical intervention was required (exploratory laparotomy, hysterectomy, bilateral salpingectomy); however, while in the operating room (OR), she "coded on the OR table and required chest compressions multiple times." After the OR, she was transferred to the intensive care unit, where she required ventilatory support and remained hypotensive despite treatment with multiple medications. Ultimately, the patient expired 4 days post-mifepristone ingestion (3 days post-misoprostol administration). The final diagnosis documented in her medical records was sepsis. Uterine tissue cultures were completed and *Clostridium sordellii* was detected. Of note, an autopsy was not performed per parental request in (b)(6)/PPI

*Reviewer Comments: The risk of infection and sepsis are known and labeled adverse events with the use of mifepristone for medical termination of pregnancy. Language regarding the risk of infection and sepsis, in addition to specific clinical considerations (e.g., laboratory parameters that may be affected, signs and symptoms that may be present) and notation of the "very rare cases of fatal septic shock", can be found in various sections of the prescribing information (e.g., BOXED WARNING, WARNINGS AND PRECAUTIONS) for the mifepristone products approved for medical termination of pregnancy.[5, 6]*

---

[d] This death case is not accounted for in the *Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2021* (which was completed by (b)(6) PPI and finalized on September 24, 2021) as this case was not received by FDA until 7/1/2021.

6

Reference ID: 4905703

*Since the U.S. approval of mifepristone for medical termination of pregnancy, there have been a total of nine cases of death associated with sepsis (inclusive of this case) identified in the U.S. post-marketing setting (eight cases tested positive for Clostridium sordellii, and one case tested positive for Clostridium perfringens). Eight of the nine fatal sepsis cases reported vaginal misoprostol use; one case reported buccal misoprostol use. [7] The estimated number of women who have used mifepristone in the U.S. for medical termination of pregnancy through the end of June 2021 is approximately* (b)(4)/TS-CI *women. [7] In the approved indication for mifepristone, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation, misoprostol is administered by the buccal route and the prescribing information for the mifepristone products approved for medical termination of pregnancy only reference the use of misoprostol via the buccal route; however, in clinical practice, vaginal administration is also used. [8, 9]*

**FAERS Case #19605602, Reported Adverse Event Date - June 28, 2021**
A 29-year-old female at 9 weeks 4 days gestation ingested mifepristone 200 mg (specifically noted to be "given in the clinic" by the physician), followed by misoprostol 800 mcg the next day for medical termination of pregnancy. Approximately 14 days later at the patient's follow-up appointment, she reported that she had gone to the hospital secondary to chest pain and shortness of breath 4 days post-mifepristone ingestion (3 days post-misoprostol ingestion). She was found to have a pulmonary embolism and was started on anticoagulation. No additional information regarding the patient's medical history or other concomitant medications was provided. She was noted to be 75.46 kg; however, her height was not provided.

*Reviewer Comments: Women who are pregnant or in the postpartum period are known to have a four-fold to five-fold increased risk of thromboembolism compared to non-pregnant women. Approximately 80% of all thromboembolic events in pregnancy are venous and include deep vein thrombosis and pulmonary embolism (collectively referred to as venous thromboembolism or VTE). VTE is one of the leading causes of maternal mortality in the U.S., accounting for 9.3% of all maternal deaths. Although the risk of VTE may be higher in the third trimester compared to the first and second trimesters, it is important to note that the increased risk of VTE is present from the first trimester, often before many of the anatomic changes of pregnancy occur. [10] There is currently no language related to VTE in the prescribing information for the mifepristone products approved for medical termination of pregnancy. [5, 6]*

## 3.2    LITERATURE CASE SELECTION

The literature search retrieved 32 publications. After applying the case definition in **Section 2.1**, no relevant case reports of adverse events that reportedly occurred from January 13, 2021 - September 30, 2021 with mifepristone use for medical termination of pregnancy in the U.S. were identified in the published medical literature (see **Figure 2**).

7

Reference ID: 4905703

**Figure 2. Literature Case Selection**



Publications Meeting Literature Search Criteria (n=32)

Excluded Publications (n=32)

- Did not meet the case definition (n=32)
  - *The case occurred outside of the U.S. (n=25)*
  - *Mifepristone was used for a reason other than medical termination of pregnancy (n=6)\**
  - *No adverse event was reported (n=1)*

\*    2 publications documented the use of mifepristone for Cushing's syndrome (or related conditions), 1 publication documented the use of mifepristone for meningioma, 1 publication documented the use of mifepristone for osteosarcoma, 1 publication documented the use of mifepristone for pituitary adenoma, and 1 publication documented the use of mifepristone for an unspecified type of cancer.

## 4    SUMMARY AND CONCLUSION

In summary, we identified four cases from FAERS in which an adverse event reportedly occurred from January 13, 2021 - September 30, 2021 with mifepristone use for medical termination of pregnancy in the U.S. Of these four cases, one reported the occurrence of an adverse event (bleeding and sepsis) during the period of January 13, 2021 - April 12, 2021, and three cases reported the occurrence of an adverse event (one case of death [the cause of death is unknown at this time]; one case of sepsis and death; and one case of pulmonary embolism) during the period of April 13, 2021 - September 30, 2021. We did not identify any additional case reports in the published medical literature.

Based on the U.S. postmarketing data from FAERS reviewed in this memorandum, we have not identified any new safety concerns with the use of mifepristone for medical termination of pregnancy. This is consistent with our previous conclusion from the April 2021 (b)(6)/ PPI memorandum.[3, e]

---

[e] Of note, the eight total FAERS cases identified by (b)(6)/PPI (four from this memorandum and four from the April 2021 memorandum) are all accounted for in the Applicants' responses to the information requests (IRs) sent by (b)(6)/PPI    (b)(6)/PPI    in April 2021 and June 2021 related to the SSS REMS for mifepristone. The relevant IRs were sent to the NDA Applicant on April 1, 2021 and June 30, 2021 and to the ANDA Applicant on April 7, 2021 and June 30, 2021. The relevant Applicants' IR responses were submitted by the NDA Applicant on April 7, 2021 (eCTD Sequence Number 0004, Supporting Document Number 752) and October 8, 2021 (eCTD Sequence Number 0012, Supporting Document Number 761) and by the ANDA Applicant on April 12, 2021 (eCTD Sequence Number 0058, Supporting Document Number 71), April 14, 2021 (eCTD Sequence Number 0059, Supporting Document Number 72), and October 12, 2021 (eCTD Sequence Number 0069, Supporting Document Number 82).

2021 REMS 001397

Reference ID: 4905703

# 5   REFERENCES

[1] *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. July 13, 2020), order clarified, 2020 WL 8167535 (D. Md. Aug. 19, 2020) (preliminarily enjoining FDA from enforcing the in-person dispensing requirement of the Mifepristone SSS REMS); *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (Jan. 12, 2021) (staying the preliminary injunction imposed by the District Court).

[2] U.S. Food & Drug Administration. Postmarket Drug Safety Information for Patients and Providers - Questions and Answers on Mifeprex; Question and Answer #14. Content current as of date: April 13, 2021. Available at: https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/questions-and-answers-mifeprex

[3] (b)(6)/PPI  Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. (b)(6)/PPI # 2007-525. Finalized April 12, 2021.

[4] Becerra X, Secretary of Health and Human Services. Renewal of Determination That a Public Health Emergency Exists. October 15, 2021, effective January 27, 2020. Available at: https://www.phe.gov/emergency/news/healthactions/phe/Pages/COVDI-15Oct21.aspx

[5] Mifeprex (mifepristone) [package insert]. New York, NY: Danco Laboratories, LLC; April 2019. Available at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf

[6] Mifepristone [package insert]. Las Vegas, NV: GenBioPro, Inc.; February 2019. Available at: https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=b63fad9b-7f12-4400-9019-b0586054e534

[7] (b)(6)/PPI  Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2021. NDA 020687 and ANDA 091178. (b)(6)/PPI # 2007-525. Finalized September 24, 2021.

[8] American College of Obstetricians and Gynecologists' Committee on Practice Bulletins - Gynecology, Society of Family Planning. Medication Abortion Up to 70 Days of Gestation: ACOG Practice Bulletin, Number 225. Obstet Gynecol. 2020 Oct;136(4):e31-e47. doi: 10.1097/AOG.0000000000004082

[9] National Abortion Federation - 2020 Clinical Policy Guidelines for Abortion Care. Available at: https://5aa1b2xfmfh2e2mk03kk8rsx-wpengine.netdna-ssl.com/wp-content/uploads/2020_CPGs.pdf

[10] American College of Obstetricians and Gynecologists' Committee on Practice Bulletins - Obstetrics. ACOG Practice Bulletin No. 196: Thromboembolism in Pregnancy. Obstet Gynecol. 2018 Jul;132(1):e1-e17. doi: 10.1097/AOG.0000000000002706

Reference ID: 4905703

2021 REMS 001398

# 6    APPENDICES

## 6.1    APPENDIX A. FDA ADVERSE EVENT REPORTING SYSTEM (FAERS)

**FDA Adverse Event Reporting System (FAERS)**

The FDA Adverse Event Reporting System (FAERS) is a database that contains information on adverse event and medication error reports submitted to FDA. The database is designed to support FDA's postmarketing safety surveillance program for drug and therapeutic biological products. The informatic structure of the database adheres to the international safety reporting guidance issued by the International Council on Harmonisation. Adverse events and medication errors are coded to terms in the Medical Dictionary for Regulatory Activities (MedDRA) terminology. The suspect products are coded to valid tradenames or active ingredients in the FAERS Product Dictionary (FPD).

FAERS data have limitations. First, there is no certainty that the reported event was actually due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Further, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether or not an event will be reported, such as the time a product has been marketed and publicity about an event. Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population.

2021 REMS 001399

Reference ID: 4905703

6.2   APPENDIX B. FAERS LINE LISTING OF ADVERSE EVENTS THAT REPORTEDLY OCCURRED FROM JANUARY 13, 2021–
SEPTEMBER 30, 2021 WITH MIFEPRISTONE USE FOR MEDICAL TERMINATION OF PREGNANCY IN THE U.S.

| # | Initial FDA Received Date | FAERS Case # | Version # | Manufacturer Control # | Case Type | Age (years) | Sex | Country Derived | Serious Outcome(s)* |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 3/29/2021 | 19069360 | 1 | - | Direct | 18 | F | USA | HO,LT |
| 2 | 4/6/2021 | 19119341 | 1 | DL2021-02 | Expedited (15-Day) | 18 | F | USA | HO |
| 2 | 7/12/2021 | 19522257 | 1 | US-GENBIOPRO-2113725 | Expedited (15-Day) | 22 | F | USA | DE |
|   | 7/1/2021 | 19484255 | 3 | US-GENBIOPRO-2113386 | Expedited (15-Day) | 24 | F | USA | DE |
| 3 | 7/12/2021 | 19519688 | 1 | - | Direct | 24 | F | USA | DE |
|   | 7/23/2021 | 19609302 | 1 | - | Direct | 24 | F | USA | DE |
|   | 8/10/2021 | 19684468 | 1 | - | Direct | 24 | F | USA | DE |
| 4 | 7/24/2021 | 19605602 | 1 | US-GENBIOPRO-2114244 | Expedited (15-Day) | 29 | F | USA | LT |

*As per 21 CFR 314.80, the regulatory definition of serious is any adverse drug experience occurring at any dose that results in any of the following outcomes: death, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, a congenital anomaly/birth defect, or other serious important medical events. Those which are blank were not marked as serious (per the previous definition) by the reporter, and are coded as non-serious. A case can have more than one serious outcome.

Abbreviations: DE=Death, F=Female, LT=Life-Threatening, HO=Hospitalization, USA=United States of America

11

Reference ID: 4905703

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b)(6)/PPI

12/16/2021 05:37:01 AM

(b)(6)/PPI

12/16/2021 06:21:58 AM

(b)(6)/PPI

12/16/2021 06:25:40 AM

(b)(6)/PPI

12/16/2021 08:47:51 AM

**Risk Evaluation and Mitigation Strategy (REMS) Memorandum**
**REMS Modification: Removal of a Requirement and Addition of a Requirement**
**U.S. FOOD AND DRUG ADMINISTRATION**
**CENTER FOR DRUG EVALUATION AND RESEARCH**

(b)(6)/PPI
(b)(6)/PPI
(b)(6)/PPI

| | |
|---|---|
| **NDA/ANDA #s:** | NDA 20687, ANDA 91178 |
| **Products:** | Mifeprex, mifepristone, 200 mg tablets |
| **APPLICANTS:** | Danco, GenBioPro |
| **FROM:** | (b)(6)/PPI (b)(6)/PPI |
| **DATE:** | December 16, 2021 |

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifeprex was approved on September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (subpart H) and subsequently was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007. The Mifeprex REMS with elements to assure safe use (ETASU) was approved on June 8, 2011 and a supplemental efficacy application and REMS modification was approved on March 29, 2016. The Mifepristone REMS Program (a single, shared system REMS that currently includes NDA 020687 and ANDA 91178) was approved on April 11, 2019.

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone. The current Mifepristone REMS Program includes elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments. Elements to assure safe use include requirements for prescriber certification (ETASU A), that mifepristone be dispensed only in certain healthcare settings by or under the supervision of a certified prescriber (ETASU C), and that mifepristone be dispensed only with documentation of safe use conditions (ETASU D). Documentation of safe use conditions consists of a Patient Agreement Form between the prescriber and the patient, indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with mifepristone.

The requirement under ETASU C that mifepristone be dispensed only in certain health care settings, specifically clinics, medical offices, and hospitals, is referred to as the "in-person dispensing requirement."

On January 31, 2020 the Secretary of Health and Human Services (HHS) declared COVID-19 a public health emergency (PHE) as of January 27, 2020. During the COVID-19 pandemic, there have been periods when the in-person dispensing requirement has not been enforced. From July

1

Reference ID: 4906018

13, 2020 until January 12, 2021, enforcement was barred by an injunction issued in the *ACOG v. FDA* litigation. More recently, on April 12, 2021, the Agency stated its intent to exercise enforcement discretion with respect to the in-person dispensing requirement during the COVID-19 PHE, which is still ongoing as of the date of this review.   These circumstances have provided additional information regarding the in-person dispensing requirement as there have been periods when the in-person dispensing requirement was not enforced.

As part of the May 7, 2021, joint motion to stay the *Chelius v. Becerra* litigation, the Agency agreed to undertake a full review the Mifepristone REMS Program, in accordance with the REMS assessment provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act).[1]

After consultations between the ⬛⬛⬛(b)(6)/PPI (⬛⬛⬛(b)(6)/PPI and the ⬛⬛⬛(b)(6)/PPI ⬛⬛⬛(b)(6)/PPI (⬛⬛⬛(b)(6)/PPI analyzing several different sources of information, including published literature, safety information collected during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals,  the Applicants, and the plaintiffs in the *Chelius* litigation, we determined that the approved REMS for mifepristone could be modified without adversely impacting patient safety. Importantly, our review did not identify any differences in adverse events between periods when the in-person dispensing requirement was being enforced and periods when that requirement was not being enforced. The data suggested that the requirements for prescriber certification (ETASU A) and the Patient Agreement Form (ETASU D) should be maintained, while the in-person dispensing requirement (under ETASU C) could be removed, to reduce the burden imposed by the REMS. In determining that the in-person dispensing requirement could be removed, we concluded that a new requirement for pharmacy certification (ETASU B) is necessary to ensure the benefits of the product outweigh the risks.

⬛(b)(6)/PPI and ⬛(b)(6)/PPI ⬛(b)(6)/PPI (⬛(b)(6)/PPI assessment and recommendations were presented to the ⬛⬛⬛(b)(6)/PPI on November 2, 2021. The ⬛(b)(6)/PPI unanimously agreed with our recommendations.

For more detailed information on the review and assessments of the information, refer to the REMS Modification Rationale Review, jointly completed by ⬛(b)(6)/PPI and ⬛(b)(6)/PPI on December 16, 2021.

In conclusion, provided all other conditions of the Mifepristone REMS Program are met and that the other elements of the REMS are maintained (ETASU A and D), the following are required:

1. Modification of the Mifepristone REMS Program to remove the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.  This would allow, for example, dispensing of mifepristone by mail, via certified prescribers or pharmacies, in addition to in-person

---

[1] Section 505-1(g)(2) of the FD&C Act (21 U.S.C. § 355-1(g)(2)).

Reference ID: 4906018

dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C .
We find that this provision is no longer necessary to ensure that the benefits of the drug
outweigh the risks and that removing it will help minimize the burden of complying with
the REMS on the healthcare delivery system.

2. Modification of the Mifepristone REMS Program to add a requirement under ETASU B
   that pharmacies that dispense the drug be specially certified.

Based on the (b)(6)/PPI and (b)(6)/PPI determination that a modified REMS with the components
described above is necessary to reduce the burden imposed by the REMS and ensure the benefits
of mifepristone outweigh the risks, FDA is requiring submission of the proposed REMS
modification within 120 days of the date of the notification letter.

3

2021 REMS 001507

----------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

----------------------------------------------------------------------------------------------

/s/

--------------------------------------------------------------

(b)(6)/PPI

12/16/2021 11:49:15 AM

Reference ID: 4906018

(b)(6)/PPI

**Center for Drug Evaluation and Research (CDER)**

---

| | |
|---|---|
| **Application Type/Number** | NDA 20687; ANDA 091178 |
| **Submission Type/Number** | NDA: Original-1/741 |
| | ANDA: Original-1/57 |
| (b)(6)/PPI **#** | 2020-815 |

(b)(6)/PPI

(b)(6)/PPI

| | |
|---|---|
| **Review Completion Date** | December 16, 2021 |
| **Subject** | Review of the One-Year (1st) Risk Evaluation and Mitigation Strategy (REMS) Assessment Report |
| **Established Name** | Mifepristone REMS Program |
| **Name of Applicant(s)** | Danco Laboratories, LLC (RLD); GenBioPro, Inc. (ANDA) |
| **Therapeutic Class** | Anti-progestational Synthetic Steroid |
| **Formulation(s)** | 200 mg oral tablet |
| **Submission Dates** | NDA 020687: April 10, 2020 |
| | ANDA 91178: April 15, 2020 |

1

2021 REMS 001509

## Table of Contents

**Executive Summary** ................................................................................................................4

**1.   Introduction** ....................................................................................................................6

**2.   Background** ......................................................................................................................6

2.1   REMS Elements ............................................................................................................7

**3.   Materials Reviewed** .........................................................................................................8

**4.   Review of The One-Year (1ˢᵗ) Mifepristone REMS Program Assessment Report**............9

4.1   Metric 1 and Metric 2: Healthcare Provider Certification .........................................9

4.2   Metric 3 and Metric 4: Healthcare Providers Ordering/Attempting to Order Mifepristone........9

4.3   Metric 5: Number of Patients Exposed to Mifepristone (during the reporting period and cumulative) based on the number of units dispensed. ................................................10

4.4   Metric 6: Program Deviations and Corrective Actions .............................................10

4.4.1    Information on Program Deviations, Non-compliance and Adverse Events During the Public Health Emergency (PHE) ................................................................12

4.5   Metric 7: Informing Patients .....................................................................................15

4.6   Applicant's Overall Conclusion of Whether the REMS Is Meeting Its Goals During the Review Period  15

**5.   Other Data That Informs Review of the REMS Assessment** ...........................................15

5.1    (b)(6)/PPI .................................................................................15

**6.   Discussion** ......................................................................................................................16

6.1   Analysis of Assessment Findings ..............................................................................16

**7.   Conclusions** ...................................................................................................................17

7.1   Achievement of The Goals of The REMS During the Review Period..........................17

7.1.1    Reviewer Conclusion ......................................................................................17

7.1.2    Review Team Conclusion ................................................................................18

7.2   Next Steps .................................................................................................................18

7.2.1    Need for REMS Modification ..........................................................................18

7.2.2    Need for Assessment Plan Revision ...............................................................18

7.2.3    Additional Actions ..........................................................................................18

**8.   Recommendations**..........................................................................................................18

**9.   Comments For The Applicants** ......................................................................................19

**10.  References** ....................................................................................................................20

2021 REMS 001510

Reference ID: 4905773

**11.  Appendices**................................................................................................................**21**

Appendix A:   Mifepristone REMS Program Assessment Plan [Current] (as outlined in the April 11, 2019 Supplement Approval Letter)..............................................................................21

Appendix B:   Mifepristone REMS Program Assessment Plan [Revised]...............................................22

3

2021 REMS 001511

# Executive Summary

This review evaluates the one-year (1st) risk evaluation and mitigation strategy (REMS) assessment report for the single, shared system REMS for mifepristone 200 mg, hereafter referred to as the Mifepristone REMS Program[a], to determine if the goal of the REMS is being met. Mifepristone is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. The approved dosing regimen is 200 mg oral mifepristone on Day 1, followed 24 to 48 hours after mifepristone dosing by 800 mcg buccal misoprostol. The Mifepristone REMS Program was approved in April 2019 to ensure the benefits of mifepristone outweigh the risk of serious complications associated with mifepristone for the medical termination of intrauterine pregnancy. Under the Mifepristone REMS Program, healthcare providers who prescribe mifepristone must be specially certified, mifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber, and mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (i.e., the patient must sign a Patient Agreement Form). The REMS also includes an implementation system, and a timetable for assessments (one-year from the date of the initial approval of the REMS (4/11/2019) and every three years thereafter).

The one-year assessment reports for the Mifepristone REMS Program were received on April 10, 2020 and April 15, 2020 and are the subject of this review.  These reports include information collected during the reporting period of April 11, 2019 through February 29, 2020. The one-year (1st) assessment for the Mifepristone REMS Program includes certification data, REMS program utilization and compliance data, audit results, and patient exposure data. This review also analyzes data from the time period of January 27, 2020 through September 30, 2021 in response to information requests from FDA; this time period coincides with the COVID-19 public health emergency (PHE) that has existed since January 27, 2020 and continues.[b] FDA requested these data to facilitate its review of the REMS assessment reports.

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone.

The first objective, *requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program,* was met during the period covered by this review. The second objective, *ensuring that mifepristone is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber,* was met during the assessment reporting period.  We note that from July 13, 2020 through January 11, 2021 and beginning on April 12, 2021 the in-person dispensing requirement was not being enforced. Data used to inform our review of these objectives included certification and distributor audit data.

---

[a] The Mifepristone REMS Program includes the following products and application holders: Mifeprex, NDA 020687, Danco Laboratories, LLC; Mifepristone 200 mg Tablets, ANDA 091178, GenBioPro, Inc.

[b] Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued Jan. 31, 2020, and subsequently renewed), *available at* https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx.

2021 REMS 001512

Reference ID: 4905773

Between January 27, 2020 and September 30, 2021, the NDA Applicant reported that there were (b)(4)/TS-CI tablets shipped to (b)(4) non-certified healthcare providers out of the (b)(4)/TS-CI total tablets distributed. (b)(4)/TS-CI healthcare providers were subsequently certified and (b)(4)/TS-CI were not.  Product was recovered from (b)(4)/TS-CI of the (b)(4)/TS-CI non-certified healthcare providers. (b)(4)/TS-CI dispensed (b)(4)/TS-CI by the (b)(4)/TS-CI non-certified healthcare provider. The NDA Applicant reported that they received no adverse event reports associated with this dispensing.  The ANDA Applicant reported one shipment of (b)(4) tablets out of (b)(4)/TS-CI total tablets distributed was lost and not recovered. While a small number of deviations were noted for both Applicants, the deviations did not appear to be associated with adverse events.  Both Applicants conducted root cause analyses to determine the cause of the deviations and the NDA Applicant implemented corrective actions to address the deviations. The ANDA Applicant determined that the error was on the part of a third-party, therefore no changes were made to ANDA Applicant's distribution procedures.

The reports of noncompliance by both Applicants were infrequent and involved a limited number of occurrences. The Applicants performed root cause analysis to determine the cause. The NDA Applicant implemented a corrective and preventive action to address the issue from recurring which we found to be acceptable.

The third objective, *informing patients about the risk of serious complications associated with mifepristone*, was met. Data used to inform this objective included certification data.  Informing patients of the risk was indirectly assessed based on the certification of healthcare providers who prescribe mifepristone. As a condition of certification under the Mifepristone REMS Program, healthcare providers agree to review the Patient Agreement Form with each patient and counsel them about the risks associated with the use of mifepristone. Both healthcare providers and patients sign the Patient Agreement Form*,* the REMS requires that Patient Agreement Form is placed in the patients' medical records, and a copy of the signed Patient Agreement Form and the Medication Guide are given to patients.

Additional key observations of this review include:

- During the assessment reporting period, the NDA Applicant reported (b)(4)/TS-CI newly certified healthcare providers and the ANDA Applicant reported (b)(4)/TS-CI newly certified healthcare providers.
- The NDA Applicant reported a total of (b)(4)/TS-CI certified healthcare providers (includes new and previously certified) ordered mifepristone during the assessment reporting period. The ANDA Applicant reported a total of (b)(4)/TS-CI certified healthcare providers ordered mifepristone during the assessment reporting period.
- The NDA Applicant estimated that a total of (b)(4)/TS-CI patients were exposed to mifepristone during the assessment reporting period. The ANDA Applicant reported an estimated total of (b)(4)/TS-CI patients were exposed to mifepristone.
- No new safety concerns have been identified by the (b)(6)/PPI

We found that the REMS was meeting its goal for the period covered by this review.

Next steps: The Applicants will be sent a REMS Assessment Acknowledgment/REMS Assessment Plan Revision letter stating our conclusion that the REMS met its goal for the period covered by this review;

5

Reference ID: 4905773

however, we have determined that the REMS Assessment Plan requires revision to add additional compliance metrics to better inform if the REMS is meeting its goal in the future.

The ███████████████ (b)(6)/PPI ███████████████ performed a separate comprehensive review of the REMS and determined that in order to reduce the burden on the healthcare system, the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, should be removed; and a requirement under ETASU B that pharmacies that dispense the drug be specially certified should be added to ensure the benefits outweigh the risks.

# 1. Introduction

This review evaluates the one-year risk evaluation and mitigation strategy (REMS) assessment report for the Mifepristone REMS Program to determine if the goal of the Mifepristone REMS Program is being met. The assessment period covers April 11, 2019 through February 29, 2020.  This is the first REMS assessment for the Mifepristone REMS Program. The reports were received on April 10, 2020 from the NDA Applicant and on April 15, 2020 from the ANDA Applicant.  This review also analyzes data from responses to information requests (IRs) that were submitted by both Applicants between April and November of 2021 and coincides with the COVID-19 public health emergency (PHE), which has existed since January 27, 2020 and is ongoing.

# 2. Background

Mifeprex (mifepristone 200 mg) is a synthetic steroid with antiprogestational effects. It is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. The approved dosing regimen is 200 mg oral mifepristone on Day 1, followed 24 to 48 hours after mifepristone dosing by 800 mcg buccal misoprostol. Mifeprex was initially approved September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (Subpart H). Mifeprex was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007. The REMS for Mifeprex was approved on June 8, 2011 to ensure that the benefits of the drug outweigh the risk of serious complications associated with mifepristone for the medical termination of intrauterine pregnancy. GenBioPro's abbreviated new drug application (ANDA 091178) for mifepristone and the single, shared system REMS for mifepristone products for the medical termination of intrauterine pregnancy (hereafter referred to as the Mifepristone REMS Program) were approved on April 11, 2019.  The Mifepristone REMS Program consists of elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments of the REMS. For the period covered by the review, healthcare providers who prescribe mifepristone must be specially certified (ETASU A); mifepristone must be dispensed to patients only in certified healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber (ETASU C) ; and mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (ETASU D).

For the period covered by this review, the goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

> a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.
> b) Ensuring that mifepristone is only dispensed in certain healthcare settings by or under the

2021 REMS 001514

Reference ID: 4905773

supervision of a certified prescriber.
c) Informing patients about the risk of serious complications associated with mifepristone

On April 1, 2021, we requested that, as part of the one-year REMS assessment for the Mifepristone REMS Program, the Applicants provide certain information regarding the use of Mifeprex and the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, during the period from January 27, 2020 through March 31, 2021 (See section 4.4.1 for additional details of the request and the analysis).

(b)(6)/PPI                                                    conducted a careful scientific review of the in-person dispensing requirement of the Mifepristone REMS Program, including information submitted in response to the April 1, 2021 IR, and concluded that provided all other requirements of the Mifepristone REMS Program are met, it would be appropriate during the COVID-19 PHE to exercise enforcement discretion with respect to the dispensing of mifepristone through the mail either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.  On April 12, 2021, FDA stated that it had conducted a careful scientific review of the in-person dispensing requirement of the single, shared system REMS, known as the Mifepristone REMS Program and, provided all other requirements of the Mifepristone REMS Program are met, the Agency intends to exercise enforcement discretion with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form, during the COVID-19 public health emergency (PHE). This determination, which FDA made on April 12, 2021, was effective immediately. Further, to the extent all of the other requirements of the Mifepristone REMS Program are met, the FDA stated that it intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of Mifeprex or the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

On April 12, 2021, the FDA also issued a General Advice letter to the Applicants of the Mifepristone REMS Program, stating that CDER intends to exercise enforcement discretion during the COVID-19 PHE regarding the requirement in the Mifepristone REMS Program that mifepristone be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices and hospitals, by or under the supervision of a certified prescriber.

## 2.1   REMS Elements

For the period covered by the review, the REMS elements include:

Elements to Assure Safe Use

- Healthcare providers who prescribe mifepristone must be specially certified
- Mifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber.
- Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions.

Implementation System

7

Reference ID: 4905773

The Applicants must:

- Ensure that mifepristone is only distributed to clinics, medical offices, and hospitals by or under the supervision of a certified prescriber
- Monitor distribution data
- Audit new distributors within 90 calendar days after the distributor is authorized
- Take reasonable steps to improve implementation of and compliances with the requirements of the REMS program
- Report any death associated with mifepristone as soon as possible to the FDA, but no later than 15 calendar days from the initial receipt of information.

The timetable for submission of assessments for the Mifepristone REMS Program is one year from the date of the initial approval of the REMS (4/11/2019) and every three years thereafter.  The Mifepristone REMS Program Assessment Plan (as outlined in the April 11, 2019 Supplement Approval letter) is in Appendix A.

## 3.  Materials Reviewed[c]

- April 11, 2019, Mifepristone SS REMS Supplement (22) Approval letter
- April 10, 2020, the Applicants submitted a Joint REMS Assessment Report for the one-year Mifepristone REMS Program
- April 10, 2020, the NDA Applicant submitted proprietary information as part of the one-year assessment report for the Mifepristone REMS Program
- April 15, 2020, the ANDA Applicant submitted proprietary information as part of the year-one assessment report for the Mifepristone REMS Program
- November 15, 2020, [(b)(6)/PPI] Review of the 7-Year (3rd) Mifeprex REMS Assessment Report
- December 17, 2020, the FDA sent an IR to ANDA Applicant
- December 18, 2020, the FDA sent an IR to NDA Applicant
- February 2, 2021, the NDA Applicant responded to an IR dated December 18, 2020
- February 4, 2021, the ANDA Applicant responded to an IR request dated December 17, 2020
- April 1, 2021, the FDA sent an IR to NDA Applicant
- April 5, 2021, the FDA sent an IR to NDA Applicant
- April 7, 2021, the FDA sent and IR to ANDA Applicant
- April 7, 2021, the NDA Applicant responded to FDA IR dated April 1 and April 5, 2020
- April 12, 2021, the ANDA Applicant responded to FDA IR dated April 7, 2021
- April 14, 2021, ANDA Applicant provided a correction to the response to FDA IR dated April 7, 2021
- April 29, 2021, [(b)(6)/PPI] Interim review of the REMS minor modification to use gender neutral language.
- May 14, 2021, [(b)(6)/PPI] Final REMS review of the minor modification to use gender neutral language.

---

[c] An additional information request was sent by FDA to the Applicants on August 5, 2021. The Applicants' responses to that information request were reviewed by the [(b)(6)/PPI] as part of the December 16, 2021 REMS Modification Rationale Review.

2021 REMS 001516

- June 30, 2021, the FDA sent an IR to both Applicants
- July 15, 2021, the FDA clarified and amended the June 30, 2021 IR to the Applicants
- September 2, 2021, the FDA sent an IR to both NDA Applicant
- September 9, 2021, the NDA Applicant responded to IR dated September 2, 2021.
- October 8, 2021, the NDA Applicant responded to IR dated June 30, 2021.
- October 16, 2021, the ANDA Applicant responded to IR dated June 30, 2021.
- November 6, 2021, the FDA sent an IR to the NDA Applicant.
- November 6, 2021, the FDA sent an IR to the NDA Applicant.
- November 9, 2021, the NDA Applicant responded to IR dated November 6, 2021
- November 9, 2021, the ANDA Applicant responded to IR dated November 6, 2021

# 4. Review of The One-Year (1st) Mifepristone REMS Program Assessment Report

The assessment report includes information on all of the metrics outlined in the REMS Assessment Plan.

## 4.1 Metric 1 and Metric 2: Healthcare Provider Certification

During the assessment reporting period (time period between April 11, 2019 to February 29, 2020), the NDA Applicant reported that they newly certified (b)(4)/TS-CI healthcare providers and the ANDA Applicant reported that they newly certified (b)(4)/TS-CI healthcare providers.

**Reviewer's Comment:**

- *It is not known if there is overlap between the healthcare providers who are certified by the NDA and ANDA Applicants; therefore, we are not combining these numbers as it may not reflect the unique number of healthcare providers who are certified, since some healthcare providers may be certified by both Applicants.*

## 4.2 Metric 3 and Metric 4: Healthcare Providers Ordering/Attempting to Order Mifepristone

During the assessment reporting period, (b)(4)/TS-CI certified prescribers ordered mifepristone from the NDA Applicant and (b)(4)/TS-CI from the ANDA Applicant. The assessment plan also asked for the number of healthcare providers who attempted to order but were not enrolled. The NDA Applicant stated that "It is our understanding that the distributor does not keep records of any healthcare providers who sought to order mifepristone who were not enrolled, but the distributor does offer to provide the Prescriber Agreement Form and Prescribing Information to all who express interest in purchasing mifepristone." The ANDA Applicant reported that (b)(4)/TS-CI attempted to order mifepristone (b)(4)/TS-CI not certified. The ANDA Applicant reported that a clinic which had an active account with the distributor logged into the distributor's online ordering system and attempted to place an order without having a Prescriber Agreement on file. The (b)(4)/TS-CI did have a signed Prescriber Agreement Form with the NDA Applicant, but not with the ANDA Applicant. The distributor's automated system did not accept the order, generated an error notification, and no mifepristone was shipped. The ANDA Applicant reached out to the clinic to inform them that the drug would not be shipped. No additional actions were necessary.

9

Reference ID: 4905773

### 4.3   Metric 5: Number of Patients Exposed to Mifepristone (during the reporting period and cumulative) based on the number of units dispensed.

During the assessment reporting period, the NDA Applicant reported there were approximately (b)(4)/TS-CI patients exposed to mifepristone and the ANDA Applicant reported an estimated (b)(4)/TS-CI patients exposed to mifepristone.

**Reviewer's Comment:**

- *One requirement of the Mifepristone REMS Program is that healthcare providers who prescribe mifepristone for the medical termination of pregnancy must be certified. The metrics provide the number of healthcare providers certified and the number of patients exposed. The NDA Applicant stated they were unable to provide a metric to assess the number of healthcare providers who were not certified who attempted to order mifepristone because they do not track this metric. We recommend that two metrics be added to the assessment plan to capture 1) if healthcare providers tried to order mifepristone without being certified and 2) if non-certified healthcare providers successfully ordered mifepristone. These metrics can be captured as part of the program audits since audits may be able to detect if mifepristone has been distributed to non-certified prescribers. Distributor audits could be conducted via questionnaire, telephone, or in-person.*
- *The number of healthcare providers who were decertified from the program, for any reason, including non-compliance, is currently not included in the assessment plan. We recommend that a metric is added to capture this number and the reason for decertification.*

### 4.4   Metric 6: Program Deviations and Corrective Actions

The NDA Applicant uses one authorized distributor for the distribution of mifepristone. On February 10, 2020, the NDA Applicant conducted an audit of the distributor responsible for all product volume (using "an appropriate sample of distributor records"). The NDA Applicant reported that the audit was conducted through a random selection process; (b)(4)/TS-CI

. The NDA Applicant

---

[d] Random Selection Process: (b)(4)/TS-CI

2021 REMS 001518

Reference ID: 4905773

concluded that the distributor was in compliance with its obligations for implementing the REMS and that:

—  Mifepristone is shipped only to certified healthcare providers who signed a Prescriber Agreement Form, which are stored at the authorized distributor; to the clinics, medical offices, and hospitals identified in signed Prescriber Agreement Forms; and not distributed to retail pharmacies.

—  Shipping records are maintained in a secure and confidential manner.

—  The distributor is following the requirements included in the Mifepristone REMS Program as well as its own standard operating procedures (SOPs) of scanning barcodes to track product by serial number, completing the healthcare provider certification process when receiving the Prescriber Agreement Form, providing Patient Agreement Forms to each certified healthcare provider, obtaining proof of delivery, and periodically matching computer records against physical inventory.

The authorized distributor reported to the NDA Applicant that they experienced deviations with scanning of product serial numbers, which were confirmed during the February 2020 audit. During July 29, 2019 through October 6, 2019, there was a failure of the primary scanning system and a failure of the backup serial number system. As a result,  shipments ( tablets) did not have a serial number associated with them. The authorized distributor conducted a root cause analysis and developed a corrective and preventive action (CAPA) on February 12, 2020.  For the primary scanning system, the root cause analysis found a

. The CAPA was validated and deployed with monitoring of the system through April 10, 2020.  The NDA Applicant stated the authorized distributor has undertaken to install

. Based on the February 2, 2021 response to IR, the authorized distributor began implementing an interim reconciliation process on January 15, 2020, while the root cause of the interface failure was being investigated.  On March 27, 2020, the authorized distributor completed implementation of a

In December 17 and 18, 2020 IRs, the Agency requested that both Applicants provide their sampling strategy, including the number and percentage of distributors' shipment records that were audited, the audit plan, the non-compliance plan, and a summary of the audit report. The Agency also requested additional information on distributor deviations noted in the assessment report.

In their February 2, 2021 response to the December 18, 2020 IR, the NDA Applicant stated that the audit covered a period of        months, in which there were        sales days and        distributor sales records, for an average of        sales records per day. A sales record was selected for each month. The        audited records account for        % (        ) of the sales days,        % (        ) of sales records on a given day, and

2021 REMS 001519

Reference ID: 4905773

[(b)(4)/TS] % of the total number of sales records over the period. The NDA Applicant stated that their methodology was based on a random probability sampling approach that gives all units in the population an equal opportunity of being selected for audit, ensuring that all samples randomly selected are representative of the population audited.

In the February 4, 2021 response to the December 17, 2020 IR, the ANDA Applicant described their audit process. The audit of their distributor was conducted on October 3, 2019 within [(b)(4)] days of the date the distributor was authorized to distribute mifepristone.  Areas reviewed included staff training, the healthcare provider certification process, prescriber agreements, and validation and verification of the automated and manual systems controlling product and distribution controls.  The ANDA Applicant reported that all were verified to be functional and in compliance with the REMS requirements.  There were [(b)(4)/TS] certified accounts reviewed which represented approximately [(b)(4)/TS] % of the certified healthcare providers at the time of the audit ([(b)(4)/TS] out of [(b)(4)] certified healthcare providers) and [(b)(4)] shipments ([(b)(4)] out of [(b)(4)] total shipments) and the ANDA Applicant reported that all were found in compliance with the REMS requirements.  The ANDA Applicant reported one violation in shipping procedures on February 10, 2020 that was reported by the authorized distributor when the receiving healthcare provider contacted them about non-delivery. One order o [(b)(4)] cartons (each 'carton' contains [(b)(4)/TS-CI] [          ]) was lost by the courier [(b)(4)/TS-CI] in shipment. An investigation was initiated by the courier and the distributor, and the distributor filed a Drug Notification Form FDA 3911 to the Agency on March 2, 2020 regarding the loss. The ANDA Applicant reported that all mifepristone shipments are made by [(b)(4)/TS-CI] in unmarked boxes with tracking numbers. Each shipment is required to be physically presented to a receiving employee with name and timestamp documented by the courier. This process was not followed in this instance and the product was left at the address. The shipment was not recovered. The serial numbers for the product were decommissioned. The investigation determined the error was on the part of [(b)(4)/TS-CI] and did not require modifications to the ANDA or distributor shipping procedures. The ANDA Applicant communicated to us that they had followed up with [(b)(4)/TS-CI] and was provided "assurance" that [(b)(4)/TS-CI] was implementing corrective actions.

**Reviewer's Comments:**

- *While shipping deviations were noted for both Applicants, the deviations did not appear to be associated with adverse events.  The NDA Applicant implemented corrective actions to address the deviations.  The ANDA Applicant determined that the error was on the part of the third-party, so did not make changes to its current shipping procedures; however, they did follow-up with the carrier [(b)(4)/TS-CI] ) and the carrier was implementing corrective actions.*
- *We recommend aligning the assessment plan with the assessment plans for other currently approved REMS to add additional compliance metrics to better inform if the REMS is meeting its goal.*


## 4.4.1    Information on Program Deviations, Non-compliance and Adverse Events During the Public Health Emergency (PHE)

Between April 2021 and November 2021, the FDA sent several IRs to both Applicants to obtain additional information on any program deviations, adverse events, or noncompliance with the Mifepristone REMS Program that have occurred from the effective date of the COVID-19 Public Health Emergency (PHE) on January 27, 2020, to September 30, 2021.

The NDA Applicant reported, in the September 9, 2021 and October 8, 2021 IR Responses, that that there were [(b)(4)] shipments representing [(b)(4)/TS-CI] tablets made to [(b)(4)] non-certified healthcare providers during the January 27, 2020 to September 30, 2021 time period. Of the [(b)(4)] non-certified healthcare providers, [(b)(4)/TS-CI] were subsequently certified and [(b)(4)] were not subsequently certified. Of the shipments made ([(b)(4)] total tablets) to the [(b)(4)] non-certified healthcare providers who were not subsequently certified, [(b)(4)/TS-CI] returned a total of [(b)(4)] tablets. [(b)(4)/TS-CI] was not subsequently certified dispensed [(b)(4)/TS-CI] that they received from the distributor. The total number of shipments during the time period of January 27, 2020 to September 30, 2021 was [(b)(4)/TS-CI] representing [(b)(4)/TS-CI] tablets. The reason for the deviations was explained to be the authorized distributor transition to the [(b)(4)/TS-CI] The NDA Applicant reported that [(b)(4)/TS-CI] ” The authorized distributor reported conducting the following corrective actions to address the program deviation: [(b)(4)/TS-CI]

”.

The NDA Applicant reported that during the period of July 13, 2020 to January 12, 2021, they arranged for [(b)(4)/TS-CI] to receive and hold mifepristone on behalf of certified healthcare providers who had purchased the product from the authorized distributor but wished the product to be mailed to their patients.[e,f] The [(b)(4)/TS-CI] shipped from the healthcare provider's inventory to the designated patients and provided shipping, lot, and serial number information to the healthcare provider for the patient records. During this period, orders of [(b)(4)/TS-CI] each were shipped to patients and no adverse events were reported in those patients.

The ANDA Applicant reported, in the October 16, 2021 and November 9, 2021 IR responses, that the distributor made [(b)(4)/TS-CI] shipments containing a total of [(b)(4)/TS-CI] tablets during the January 27, 2020 to September 30, 2021 time period.

The ANDA Applicant provided the following response:

> "GenBioPro does not consider any product shipped in a manner consistent with the American College of Obstetricians & Gynecologists (ACOG) Court Order, during the period of the court-ordered stay, to constitute a deviation or noncompliance event from the REMS program. We nonetheless provide FDA with the data we believe the Agency is requesting.

---

[e] NDA 020687: September 20, 2021 response to the September 15, 2021 information request; October 26, 2021 response to October 22 information request.

[f] On July 13, 2020, the United States (US) District Court for the District of Maryland granted a preliminary injunction in the *ACOG v. FDA* litigation to temporarily bar enforcement of the Mifepristone REMS Program in-person dispensing requirement during the COVID-19 PHE. The US Supreme Court granted a stay of that injunction on January 12, 2021.

13

2021 REMS 001521

Reference ID: 4905773

*GenBioPro is not aware of any program deviation or noncompliance event that occurred after January 27, 2020 until April 9, 2021. Nonetheless, during the period the ACOG Order was in effect (from July 13, 2020 to January 12, 2021),* (b)(4) *shipments, totaling* (b)(4) TS-Ci *tablets were made to one of* (b)(4) TS-Ci *mail order service providers which had been designated by one of* (b)(4) TS-Ci *Certified Prescribers. Each of these shipments was purchased by a Certified Prescriber and the shipment was made on the request of the Certified Prescriber to a mail service site that had been appropriately added to their Certified Prescriber agreement. As stated above, we do not believe these to be a deviation or non-compliance event, but rather made pursuant to and in compliance with the judicial order.*

*No corrective actions were required as we do not consider these shipments as deviation or noncompliance events. However, all shipments of GenBioPro mifepristone under the ACOG order ceased on January 12, 2021 when the order was no longer in effect."*

The NDA and the ANDA Applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021. These eight cases were also identified in the FDA Adverse Event Reporting System (FAERS)[g] database (See Section 5.1 for the (b)(6)/PPI reviews).

**Reviewer's Comments:**

- *The small number of adverse events reported to FDA for the time period of January 27, 2020 to September 30, 2021 (which took place during the COVID-19 PHE) with mifepristone use for medical termination of pregnancy provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to the reported adverse events.*
- *The* (b)(6)/PPI *reviewed both the FDA Adverse Event Reporting System (FAERS) database and the published medical literature to identify adverse events that reportedly occurred from January 27, 2020 – September 30,2021 with mifepristone use for medical termination of pregnancy. Based on the U.S. post-marketing data reviewed, no new safety concerns were identified with the use of mifepristone for medical termination of pregnancy.[1]*
- *The reports of noncompliance by both Applicants were infrequent and involved a limited number of occurrences. The Applicants performed root cause analysis to determine the cause. The NDA Applicant implemented a corrective and preventive action to address the issue from recurring which we found to be acceptable.*

---

[g] The FDA Adverse Event Reporting System (FAERS) is a database that contains information on adverse event and medication error reports submitted to FDA. The database is designed to support FDA's post-marketing safety surveillance program for drug and therapeutic biological products. FAERS data have limitations. First, there is no certainty that the reported event was actually due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Further, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether or not an event will be reported, such as the time a product has been marketed and publicity about an event. Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population.

2021 REMS 001522

Reference ID: 4905773

### 4.5  Metric 7: Informing Patients

The third objective of the Mifepristone REMS is to inform patients about the risk of serious complications associated with mifepristone. The Applicants reported that the Mifepristone REMS Program indirectly assessed if patients were informed by requiring healthcare providers to be certified in order to prescribe the drug.  As part of the certification process, healthcare providers who prescribe agree to:

- Review the Patient Agreement Form with the patient and explain the risks of the mifepristone treatment regimen
- Sign the Patient Agreement Form and obtain the patient's signature on the form
- Provide the patient with a copy of the form and the Medication Guide
- Place the signed form in the patient's medical record

**Reviewer's Comment:**

- *One of the objectives of the Mifepristone REMS Program is to inform patients about the risk of serious complications associated with mifepristone.  The Applicants used the indirect measure of healthcare provider certification to address this objective due to unique concerns with patient and prescriber confidentiality with the use of this product for the medical termination of pregnancy. This approach adequately addresses the Mifepristone REMS Program objective while avoiding compromising patient and prescriber confidentiality.*

### 4.6  Applicant's Overall Conclusion of Whether the REMS Is Meeting Its Goals During the Review Period

The Applicants reported, "Danco and GenBioPro are in agreement that the goal of the SSS REMS for mifepristone is being met.  Mifepristone has been on the market for almost 20 years with essentially the same restrictions to ensure safe use in place. Prescribers are well-versed in the safe use of the product. The Applicants propose no modifications to the REMS at this point as the available data reflected in the assessment documents, as well as the long history of safe use of this product, do not warrant the imposition of additional requirements."

## 5.  Other Data That Informs Review of the REMS Assessment

### 5.1  ⬛⬛⬛ (b)(6)/PPI ⬛⬛⬛

During the REMS assessment period of April 11, 2019 through February 29, 2020, (b)(6)/PPI completed the following post-marketing adverse event summaries:

- Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2019 (Completed on November 19, 2019)[4]
- Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2019 (Completed on March 19, 2020)[5]
- Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2020 (Completed on October 6, 2020)[6]

The aforementioned adverse event summaries contain information from U.S. post-marketing reports received by FDA of adverse events that occurred among patients who had taken mifepristone for

Reference ID: 4905773

2021 REMS 001523

medical termination of pregnancy. Two additional Mifepristone U.S. Post-Marketing Adverse Event Summaries have since been completed (one containing data through December 31, 2020 and the other containing data through June 30, 2021).[7,8]

Additionally, on April 12, 2021, and December 16, 2021, (b)(6)/PPI finalized two additional pharmacovigilance memoranda, in which both the FDA Adverse Event Reporting System (FAERS) database and the published medical literature were reviewed to identify adverse events that reportedly occurred from January 27, 2020 – September 30, 2021 with mifepristone use for medical termination of pregnancy.[9,10]

No new safety concerns were identified by (b)(6)/PPI .

# 6. Discussion

## 6.1    Analysis of Assessment Findings

This is the first REMS assessment for the Mifepristone REMS Program. The Applicants provided data to address the currently required assessment plan metrics. One objective of the Mifepristone REMS Program requires healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program. It is recommended that noncompliance metrics be added to the Mifepristone REMS Program assessment plan to capture: 1) if healthcare providers tried to order mifepristone without being certified, and 2) if non-certified healthcare providers successfully ordered mifepristone. These metrics can be captured as part of the program audits of the distributors since audits should be able to detect if mifepristone has been distributed to non-certified prescribers. Audits of the distributors could be conducted via questionnaire, telephone, or in person. In addition, a metric should be added to capture the number of healthcare providers who were decertified from the program, for any reasons, including non-compliance.

The Applicants used the indirect measure of healthcare provider certification to address the objective of informing patients of the risk of serious complications of mifepristone, due to concerns with prescriber and patient confidentiality. Although we typically assess whether patients are informed of the risks identified in a REMS through patient surveys and/or focus groups, we agree that the Applicants' use of the indirect measure of healthcare provider certification adequately addresses the Mifepristone REMS Program objective of informing patients. In addition, because of these prescriber and patient confidentiality concerns, we believe it is unlikely that the Agency would obtain better information using the typical methods of assessment of patient knowledge.  As previously noted in the 2019 (b)(6)/PPI assessment review of the Mifeprex REMS Program, a systematic review of abortion stigma indicates that stigma is a serious concern for patients who terminate a pregnancy.[7] The majority of studies reviewed by the authors found that a large proportion of patients perceived stigma from multiple sources (society, the community, significant others, and medical institutions). The systematic review found that patients frequently concealed their abortion history to manage stigma. We believe that patient concerns regarding stigma also could adversely impact recruitment of patients who have terminated a pregnancy for patient surveys and/or focus groups[11]. Taking all of the available information into account, we will continue to use the indirect measure of healthcare provider certification in the Mifepristone REMS Program, in order to avoid compromising patient and prescriber confidentiality and due to potential patient concerns with stigma.

16

2021 REMS 001524

# 7. Conclusions

## 7.1    Achievement of The Goals of The REMS During the Review Period

### 7.1.1    Reviewer Conclusion

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone.

The first objective, *requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program was met during the period covered by this review.* The second objective, *ensuring that mifepristone is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber was* met during the assessment reporting period.  We note that from July 13, 2020 through January 11, 2021 and beginning on April 12, 2021 the in-person dispensing requirement was not being enforced.[h] Data used to inform our review of these objectives include certification and distributor audit data.

Between January 27, 2020 and March 31, 2021, the NDA Applicant reported that there were (b)(4)/TS-CI tablets shipped to (b)(4) non-certified healthcare providers out of the (b)(4)/TS-CI total tablets distributed. (b)(4)/TS-CI healthcare providers were subsequently certified and (b)(4)/TS-CI were not.  Product was recovered from (b)(4)/TS-CI of the (b)(4) non-certified healthcare providers. (b)(4)/TS-CI dispensed to a patient by the (b)(4) non-certified healthcare provider. The NDA Applicant reported that they received no adverse event reports associated with this dispensing.  The ANDA Applicant reported one shipment of (b)(4) tablets out of (b)(4)/TS-CI total tablets distributed was lost and not recovered. While a small number of deviations were noted for both Applicants, the deviations did not appear to be associated with adverse events.  Both Applicants conducted root cause analyses to determine the cause of the deviations and the NDA Applicant implemented corrective actions to address the deviations. The ANDA Applicant determined that the error was on the part of a third-party, therefore no changes were made to ANDA Applicant's distribution procedures.

The reports of noncompliance by both Applicants were infrequent and involved a limited number of occurrences. The Applicants performed root cause analysis to determine the cause. The NDA Applicant implemented a corrective and preventive action to address the issue from recurring which we found to be acceptable.

The third objective, *informing patients about the risk of serious complications associated with mifepristone*, was met. Data used to inform this objective included certification data.  Informing patients of the risk was indirectly assessed based on the certification of healthcare providers who prescribe mifepristone. As a condition of certification under the Mifepristone REMS Program, healthcare providers

---

[h] Between July 13, 2020 and January 12, 2021, enforcement of the in-person dispensing requirement was subject to a court injunction.  On April 12, 2021, FDA stated that, provided all other requirements of the Mifepristone REMS Program are met, the Agency intends to exercise enforcement discretion with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form, during the COVID-19 public health emergency (PHE). Further, to the extent all of the other requirements of the Mifepristone REMS Program are met, the Agency has stated that it intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of Mifeprex or the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

2021 REMS 001525

Reference ID: 4905773

agree to review the Patient Agreement Form with each patient and counsel them about the risks associated with the use of mifepristone. Both healthcare providers and patients sign the Patient Agreement Form, the REMS requires that Patient Agreement Form is placed in the patients' medical records, and a copy of the signed Patient Agreement Form and the Medication Guide are given to patients.

The REMS met its goal during the period covered by this review.

### 7.1.2    Review Team Conclusion
The review team met to discuss this conclusion and agreed with the reviewer's conclusions that the goal of the REMS was met during the period covered by this review.

## 7.2    Next Steps
### 7.2.1    Need for REMS Modification
The ⬚⬚⬚⬚⬚⬚⬚⬚⬚(b)(6)/PPI⬚⬚⬚⬚⬚⬚⬚⬚⬚ performed a comprehensive review of the REMS that was separate from the review of the 1st year assessment for the Mifepristone REMS and that included more recent information through September 30, 2021. The purpose of that separate review was to determine whether modifications to the REMS were warranted. Based on that separate review, we have determined that in order to reduce the burden on the healthcare system, the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, should be removed, and a requirement under ETASU B that pharmacies that dispense the drug be specially certified should be added to ensure the benefits outweigh the risks.

### 7.2.2    Need for Assessment Plan Revision
The April 11, 2019 Supplemental Approval letter described the REMS Assessment Plan; however, we have determined that the REMS Assessment Plan requires revision to capture additional compliance metrics.

### 7.2.3    Additional Actions
The Applicants will be asked to revise the Assessment Plan to capture additional compliance metrics.

## 8.  Recommendations

We recommend the Applicants be sent a REMS Assessment Acknowledgment letter that includes General Comments and an Assessment Plan revision.

Refer to **Section 7 – Conclusions** for the following information to include to the letter:
- Determination on the achievement of the goals (Section 7.1.2: Review Team Conclusion)
- Determination on the need to modify the REMS (Section 7.2.1: Need for REMS Modification)
- Determination on the need for assessment plan revision (Section 7.2.2: Need for Assessment Plan Revision)

Refer to **Section 9 – Comments for the Applicant** for additional comments to convey to the applicant.

Reference ID: 4905773

## 9. Comments For The Applicants

Include the following comments for the Applicants in the REMS Assessment Acknowledgment/REMS Assessment Plan Revision letter.

1. The first objective of the REMS is to require healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program. We require the addition of compliance metrics to the Assessment Plan to capture: 1) if non-certified healthcare providers attempted to order mifepristone, and 2) if non-certified healthcare providers successfully ordered mifepristone. These metrics can be captured as part of the program audits of the distributor since audits are able to detect if mifepristone has been distributed to non-certified healthcare provider. Audits could be conducted via questionnaire, telephone, in person.

Our April 11, 2019 Supplemental Approval letter describes your REMS Assessment Plan. We have determined that your REMS Assessment Plan requires revision to capture additional compliance metrics. Within 60 days of receipt of this letter, submit an updated Supporting Document that incorporates the revised Assessment Plan.

The REMS Assessment Plan must include but is not limited to the following items. Additions are noted by <u>underline</u> and deletions are noted by ~~strikethrough~~.

Provide each metric for the current reporting period and cumulative for the ~~RLD~~ <u>NDA</u> and ANDA(s):

**<u>Program Implementation and Operations</u>**

1. <u>REMS Utilization Data</u>
   i. Number of ~~prescribers~~ <u>healthcare providers</u> ~~enrolled~~ <u>certified</u>
   ii. Number of ~~prescribers~~ <u>healthcare providers</u> ordering mifepristone
   iii. Number of ~~women~~ <u>patients</u> exposed to mifepristone

2. <u>REMS Compliance</u>
   a. <u>Audits: Summary of audit activities including but not limited to:</u>
      i. <u>A copy of the audit plan.</u>
      ii. <u>The number of audits expected, and the number of audits performed</u>
      iii. <u>The number and type of deficiencies noted</u>
      iv. <u>For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required to address the deficiencies, including the status (e.g., completed, not completed, in progress).</u>
      v. <u>For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken</u>
      vi. <u>A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements</u>

   b. <u>A summary report of non-compliance, associated CAPAs, and the status of CAPAs including but not limited to:</u>

2021 REMS 001527

Reference ID: 4905773

      i. <u>A copy of the Non-Compliance Plan which addresses the criteria for noncompliance, actions taken to address noncompliance for each event, and under what circumstances a stakeholder would be suspended or de-certified from the REMS</u>

      ii. <u>The number of instances of noncompliance accompanied by a description of each instance and the reason for the occurrence (if provided). For each instance of noncompliance, report the following information:</u>

           1. <u>The unique ID(s) of the stakeholder(s) associated with the noncompliance event or deviation to enable tracking over time</u>

           2. <u>The source of the noncompliance data</u>

           3. <u>The results of root cause analysis</u>

           4. <u>What action(s) were taken in response.</u>

c. <u>Healthcare provider compliance</u>

      i. Number of healthcare providers who attempted to order mifepristone who were not ~~enrolled~~ <u>certified</u>; describe actions taken

      ii. <u>Number of healthcare providers who successfully ordered mifepristone who were not certified; describe actions taken</u>

      iii. <u>Number of healthcare providers who became decertified as a result of non-compliance, accompanied by a summary of reasons for decertification</u>

      iv. Summary and analysis of any program deviations and corrective actions taken

3. ~~Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed~~

4. The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

## 10.   References

1. [(b)(6)/PPI] Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. [(b)(6)/PPI] # 2007-525. Finalized April 12, 2021.
2. [(b)(6)/PPI] Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2018. NDA 020687. [(b)(6)/PPI] # 2007-525. Finalized October 30, 2018.
3. [(b)(6)/PPI] Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2018. NDA 020687. [(b)(6)/PPI] # 2007-525. Finalized March 8, 2019.
4. [(b)(6)/PPI] Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2019. NDA 020687. [(b)(6)/PPI] # 2007-525. Finalized November 19, 2019.
5. [(b)(6)/PPI] Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2019. NDA 020687 and ANDA 091178 [(b)(6)/PPI] # 2007-525. Finalized March 19, 2020

6.  [(b)(6)/PPI] . Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2020. NDA 020687 and ANDA 091178. [(b)(6)/PPI] # 2007-525. Finalized October 6, 2020.
7.  [(b)(6)/PPI] . Mifepristone U.S. Post-Marketing Adverse Events Summary through 12/31/2020. NDA 020687 and ANDA 091178 [(b)(6)/PPI] # 2007-525. Finalized March 16, 2021
8.  [(b)(6)/PPI] . Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2021. NDA 020687 and ANDA 091178. [(b)(6)/PPI] # 2007-525. Finalized September 24, 2021.
9.  [(b)(6)/PPI] Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. [(b)(6)/PPI] # 2007-525. Finalized April 12, 2021.
10. [(b)(6)/PPI] Memorandum:  Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178 [(b)(6)/PPI] # 2007-525. Finalized December 16, 2021.
11. Hanschmidt, F., Linde, K., Hilbert, A., Riedel-Heller, S.G., and Kersting, A. Abortion Stigma: A Systematic Review. Perspectives on Sexual and Reproductive Health, 2016, 48(4):169-177, doi:10.1363/48e8516

# 11.  Appendices

## Appendix A:  Mifepristone REMS Program Assessment Plan [Current] (as outlined in the April 11, 2019 Supplement Approval Letter)

Provide each metric for the current reporting period and cumulative for the RLD and ANDA(s):

1.  Number of prescribers enrolled
2.  Number of prescribers ordering mifepristone
3.  Number of healthcare providers who attempted to order mifepristone who were not enrolled; describe actions taken
4.  Number of women exposed to mifepristone
5.  Summary and analysis of any program deviations and corrective action taken
6.  Based on the information reported, an assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed
7.  The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

2021 REMS 001529

Reference ID: 4905773

## Appendix B:  Mifepristone REMS Program Assessment Plan [Revised]

The REMS Assessment Plan must include but is not limited to the following items.

Provide each metric for the current reporting period and cumulative for the NDA and ANDA(s):

**Program Implementation and Operations**

1. REMS Utilization Data
   a. Number of healthcare providers certified
   b. Number of healthcare providers ordering mifepristone
   c. Number of patients exposed to mifepristone

2. REMS Compliance
   a. Audits: Summary of audit activities including but not limited to:
      i. A copy of the audit plan.
      ii. The number of audits expected, and the number of audits performed
      iii. The number and type of deficiencies noted
      iv. For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required to address the deficiencies, including the status (e.g., completed, not completed, in progress).
      v. For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken
      vi. A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements

   b. A summary report of non-compliance, associated CAPAs, and the status of CAPAs including but not limited to:
      i. A copy of the Non-Compliance Plan which addresses the criteria for noncompliance, actions taken to address noncompliance for each event, and under what circumstances a stakeholder would be suspended or de-certified from the REMS
      ii. The number of instances of noncompliance accompanied by a description of each instance and the reason for the occurrence (if provided). For each instance of noncompliance, report the following information:

         1. The unique ID(s) of the stakeholder(s) associated with the noncompliance event or deviation to enable tracking over time
         2. The source of the noncompliance data
         3. The results of root cause analysis
         4. What action(s) were taken in response.

   c. Healthcare provider compliance
      i. Number of healthcare providers who attempted to order mifepristone who were not certified; describe actions taken
      ii. Number of healthcare providers who successfully ordered mifepristone who were not certified; describe actions taken

2021 REMS 001530

Reference ID: 4905773

    iii.   Number of healthcare providers who became decertified as a result of non-compliance, accompanied by a summary of reasons for decertification

    iv.   Summary and analysis of any program deviations and corrective actions taken

3.   The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

2021 REMS 001531

Reference ID: 4905773

---------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

---------------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b)(6)/PPI

12/16/2021 09:02:51 AM

(b)(6)/PPI

12/16/2021 09:11:55 AM

2021 REMS 001532



**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | 020687 and 91178 |
| **Reviewer Names** | |

**Review Completion Date**    December 16, 2021

1

2021 REMS 001561

| | |
|---|---|
| **Subject** | REMS Modification Rationale Review |
| **Established Name** | Mifepristone REMS |
| **Name of Applicants** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablets |

2

Reference ID: 4905882

## Table of Contents

EXECUTIVE SUMMARY ........................................................................................................... 4

1.   Introduction ................................................................................................................. 5

2.   Background .................................................................................................................. 5

   2.1.   PRODUCT AND REMS INFORMATION ................................................................. 5

   2.2.   REGULATORY HISTORY AND EVENTS RELEVANT TO THIS REMS MODIFICATION RATIONALE
   REVIEW........................................................................................................................ 7

3.   Rationale for Proposed REMS Modification ................................................................. 9

   3.1.   CURRENT REQUIREMENTS FOR THE APPROVED REMS ....................................... 10

   3.2.   EVALUATION OF THE EVIDENCE ....................................................................... 10

   3.2.1.   Evaluation of the requirement for healthcare providers who prescribe the drug to be
   specially certified (ETASU A) ....................................................................................... 12

   3.2.2.   Evaluation of the requirement for the drug to be dispensed with evidence or other
   documentation of safe-use conditions (ETASU D) ........................................................ 14

   3.2.3.   Evaluation of the requirement for drug to be dispensed only in certain healthcare settings
   (ETASU C) ................................................................................................................... 19

4.   Discussion.................................................................................................................. 36

5.   Conclusions and Recommendations ........................................................................... 41

6.   References ................................................................................................................. 42

7.    Appendix.................................................................................................................. 45

3

Reference ID: 4905882

## EXECUTIVE SUMMARY

This review provides the ▮▮▮▮▮▮▮▮▮▮▮▮▮ (b) (6) (▮ (b) (6) and ▮▮▮▮▮▮ (b) (6)
▮▮▮ (▮ (b) (6) rationale and conclusions regarding modifications to the single, shared system
Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (Mifepristone REMS
Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA)
91178.

ANDA 91178 was approved with the approval of the Mifepristone REMS Program on April 11,
2019 to mitigate the risk of serious complications associated with mifepristone 200 mg. The
most recent REMS modification was approved on May 14, 2021. The REMS consists of elements
to assure safe use (ETASU) under ETASU A, C and D, an implementation system, and a timetable
for submission of assessments. To determine whether a modification to the REMS was
warranted, FDA undertook a comprehensive review of the published literature; safety
information collected during the COVID-19 public health emergency (PHE); the one-year REMS
assessment report of the Mifepristone REMS Program; adverse event data; and information
provided by advocacy groups, individuals and the Applicants. Our review also included an
examination of literature references provided by plaintiffs in the *Chelius v. Becerra* litigation
discussed below.

The modifications to the REMS will consist of:

- Removing the requirement under ETASU C that mifepristone be dispensed only in
  certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to
  here as the "in-person dispensing requirement" for brevity)

- Adding a requirement under ETASU B that pharmacies that dispense the drug be
  specially certified

A REMS Modification Notification letter will be sent to both Applicants in the Single Shared
System.

4

Reference ID: 4905882

## 1. Introduction

In connection with the *Chelius v. Becerra* litigation, FDA agreed to undertake a full review of the Mifepristone REMS Program, in accordance with the REMS assessment provisions of the Federal Food, Drug, and Cosmetic Act (FD&C Act).[a] This review provides the analysis of the ( (b) (6) ( (b) (6) and the (b) (6) ( (b) (6) regarding whether any changes are warranted to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone (hereafter referred to as the Mifepristone REMS Program) for new drug application (NDA) 20687 and abbreviated new drug application (ANDA) 91178. The Mifeprex REMS was initially approved in 2011; the single, shared system REMS for mifepristone 200 mg, known as the Mifepristone REMS Program, was approved in 2019.

The last time the existing REMS elements to assure safe use (under ETASU A, C and D) were reviewed was in the context of our review of supplement S-020 to NDA 20687; these ETASU were updated following review and approval of supplement S-020 on March 29, 2016. The key changes approved in 2016 are summarized below.

Changes to labeling included:
- Changing the dosing of Mifeprex to 200 mg orally x 1
- Extension of maximum gestational age through 70 days
- Inclusion of misoprostol in the indication statement
- Replacing the term "physician" with "licensed healthcare provider"
- Removal of the phrase "Under Federal Law"

The Mifeprex REMS and REMS materials were updated to reflect the changes above, and additional changes were made including:
- Removing the Medication Guide as part of the REMS but retaining it as part of labeling.

## 2. Background

### 2.1. PRODUCT AND REMS INFORMATION

---

[a] Section 505-1(g)(2) of the FD&C Act (21 U.S.C. § 355-1(g)(2)).

2021 REMS 001565

Reference ID: 4905882

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifepristone is available as 200 mg tablets for oral use.

Mifeprex (mifepristone) was approved on September 28, 2000 with a restricted distribution program under 21 CFR 314.520 (subpart H)[b] to ensure that the benefits of the drug outweighed the risk of serious complications associated with mifepristone when used for medical abortion. Mifeprex was deemed to have a REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act (FDAAA) of 2007, and the Mifeprex REMS was approved on June 8, 2011. On March 29, 2016, as noted above, a supplemental application and REMS modification was approved for Mifeprex. On April 11, 2019, ANDA 091178 was approved, and the Mifepristone REMS Program was approved. The Mifepristone REMS Program is a single, shared system REMS that includes NDA 020687 and ANDA 91178.

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a. Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program (under ETASU A).
b. Ensuring that mifepristone is only dispensed in certain healthcare settings,  by or under the supervision of a certified prescriber (under ETASU C).
c. Informing patients about the risk of serious complications associated with mifepristone (under ETASU D).

Under ETASU A, to become specially certified to prescribe mifepristone, a healthcare provider must review the prescribing information, complete and sign the *Prescriber Agreement Form,* and follow the guidelines for use of mifepristone. Under ETASU C, mifepristone must be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. Under ETASU D, mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (i.e., the patient must sign a *Patient Agreement Form*). The Mifepristone REMS Program also includes an implementation system, and a timetable for assessments (one year from the date of the initial approval of the REMS on April 11, 2019, and every three years thereafter).

---

[b] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

6

Reference ID: 4905882

## 2.2. REGULATORY HISTORY AND EVENTS RELEVANT TO THIS REMS MODIFICATION RATIONALE REVIEW

The following is a summary of significant regulatory history since approval of the REMS modification on March 29, 2016:

- 03/29/2016: FDA approved an efficacy supplement (S-020) that, among other things, provided a new dosing regimen (200 mg mifepristone, followed in 24 to 48 hours by 800 mcg buccal misoprostol), increased the gestational age (GA) to which mifepristone may be used (through 70 days gestation), and modified the REMS.

- 03/29/2019: A Citizen Petition was received requesting that FDA revise the product labeling to reflect pre-2016 provisions (including limiting GA to 49 days and requiring patients to make 3 office visits) and that FDA maintain the REMS.

- 04/11/2019: ANDA 91178 was approved along with the Single Shared System REMS for Mifepristone 200 mg (Mifepristone REMS Program) for NDA 20687 and ANDA 91178.

- 01/31/2020: the COVID-19 public health emergency (PHE) was declared by the Secretary of Health and Human Services (HHS) as having existed since January 27, 2020.[c]

- 7/13/2020: The United States (US) District Court of Maryland granted a preliminary injunction in the *ACOG v. FDA* litigation to temporarily bar enforcement of the Mifepristone REMS Program in-person dispensing requirement during the COVID-19 PHE.

- 1/12/2021: US Supreme Court granted a stay of that injunction.

- 04/12/2021: FDA issued a General Advice Letter to both the NDA and ANDA Applicants, stating that provided that all other requirements of the Mifepristone REMS Program are met, and given that in-person dispensing of mifepristone for medical termination of early pregnancy may present additional COVID-related risks to patients and healthcare

---

[c] *See* Secretary of Health and Human Services, Determination that a Public Health Emergency Exists (originally issued January 31, 2020, and subsequently renewed), available at
https://www.phe.gov/emergency/news/healthactions/phe/Pages/default.aspx

2021 REMS 001567

Reference ID: 4905882

personnel because it may involve a clinical visit solely for this purpose, FDA intends to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement in the Mifepristone REMS Program, including any in-person requirements that may be related to the *Patient Agreement Form.* FDA further stated that to the extent all of the other requirements of the Mifepristone REMS Program are met, FDA intends to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of mifepristone through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

- 05/07/2021: FDA stated that it would be reviewing the elements of the Mifepristone REMS Program in accordance with the REMS assessment provisions of section 505-1 of the FD&C Act.

- 05/14/2021: A modification was approved for the Mifepristone REMS Program. This modification was to revise the *Patient Agreement Form* to include gender-neutral language.

- 06/30/2021: An Information Request (IR) was sent to the Applicants for additional information on shipments and any program deviations, adverse events, or noncompliance with the REMS that occurred during the period from April 1, 2021 through September 30, 2021.

- 7/15/2021: An IR was sent to the Applicants to provide the total number of shipments during the period from April 1, 2021 to September 30, 2021 and details on whether any of those shipments were involved in any program deviation or non-compliance.

- 8/5/2021: An IR was sent to the Applicants for additional clinical and other information (e.g., adverse events and units of mifepristone shipped) for the period of March 29, 2016 through June 30, 2021, to be provided by August 31, 2021. This IR also requested information covering the period of July 1, 2021 through September 30, 2021 and an

8

2021 REMS 001568

aggregate summary (for the period of March 29, 2016 through September 30, 2021), to be provided by October 12, 2021.[d]

- 8/26/2021: The ANDA Applicant submitted a response to the IR issued on 8/5/2021.

- 08/27/2021: The NDA Applicant submitted a response to the IR issued on 8/5/2021.

- 10/08/2021: The NDA Applicant submitted a response to the June 30 and July 15, 2021 IRs as well as an aggregate summary for the period March 29, 2016 through September 30, 2021 in response to the August 5, 2021 IR. The NDA Applicant also included a follow-up to their initial response provided on August 27, 2021 to the August 5, 2021 IR.

- 10/12/2021: The ANDA Applicant submitted a response to the June 30 and July 15, 2021 IRs as well as an aggregate summary for the period March 29, 2016 through September 30, 2021 in response to the August 5, 2021 IR.

- 10/16/2021: The ANDA Applicant revised their Oct 12, 2012 response to provide a correction to the number of mifepristone tablets.

-                                                                                                          (b) (4)
                                                            .

- 11/02/2021: A                        (b) (6)        (b) (6)  meeting was convened to obtain CDER concurrence on the removal of the in-person dispensing requirement and the addition of a certification requirement for pharmacies. The   (b) (6)       (b) (6)  and senior CDER leadership concurred with removing the in-person dispensing and adding pharmacy certification.

## 3. Rationale for Proposed REMS Modification

---

[d] Multiple Information Requests were issued to obtain additional information on drug shipments, any program deviations or noncompliance, and use of alternative methods for drug distribution during the COVID-19 PHE. These IRs are referenced as appropriate in this document and the one-year REMS Assessment Review of the Mifepristone REMS Program, December 16, 2021.

9

Reference ID: 4905882

## 3.1. CURRENT REQUIREMENTS FOR THE APPROVED REMS

The Mifepristone REMS Program includes elements to assure safe use (ETASU), an implementation system, and a timetable for submission of assessments. Elements to assure safe use in the current REMS include a prescriber certification requirement (ETASU A), a requirement that mifepristone be dispensed only in certain healthcare settings by or under the supervision of a certified prescriber (ETASU C), and a requirement that mifepristone be dispensed only with documentation of safe use conditions (ETASU D). Documentation of safe use conditions under ETASU D consists of a *Patient Agreement Form* between the prescriber and the patient indicating that the patient has received counseling from the prescriber regarding the risk of serious complications associated with mifepristone 200 mg for medical termination of early pregnancy.

## 3.2. EVALUATION OF THE EVIDENCE

We reviewed multiple different sources of information, including published literature, safety information submitted to the Agency during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, the first REMS assessment report for the Mifepristone REMS Program, and information provided by advocacy groups, individuals, and the Applicants. Our review also included an examination of literature references provided by plaintiffs in the *Chelius v. Becerra* litigation. Below is an overview of how information relevant to the current Mifepristone REMS Program was retrieved, analyzed, and applied to each of the individual ETASUs to determine if further changes should be considered.

Methods for the literature search

(b) (6) conducted a literature search in PubMed and Embase to retrieve publications relevant to this review. The time period used for this literature search was between March 29, 2016 (when the Mifeprex labeling and REMS were last substantially revised) through July 26, 2021. The search terms used were "medical abortion" and "mifepristone" and "pregnancy termination and mifepristone."

The search retrieved 306 publications from PubMed and 613 from Embase, respectively; the search yielded 646 unique publications after eliminating duplications between the two databases. The result of our literature search was also supplemented by an examination of literature references provided by advocacy groups, individuals, plaintiffs in the *Chelius* litigation, and the Applicants, as well as letters from healthcare providers and researchers.

10

Reference ID: 4905882

References included in these letters were considered for inclusion in this review using identical selection criteria to the [(b) (6)] literature search (outlined below).

For this review of the REMS, [(b) (6)] focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS ETASUs. We excluded systematic reviews and meta-analyses because these publications did not include original safety data related to the outcomes of medical abortion. The following are examples of materials that were excluded from our literature search:

- Information from survey studies or qualitative studies that evaluated perspectives on and/or satisfaction with medical abortion procedures from patients, pharmacists, clinic staff, or providers, even if the study assessed REMS ETASUs. These surveys or qualitative studies did not include objective safety data related to outcomes of medical abortion.

- Opinions, commentaries, or policy/advocacy statements. These publications did not include objective safety data related to outcomes of medical abortion.

- Safety data related to mifepristone use for second trimester medical abortion. These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data related to mifepristone use for spontaneous first trimester abortion (i.e., miscarriages). These publications reported data not applicable to the approved indication for medical abortion up to 70 days gestation.

- Safety data that pertained only to surgical abortion or did not separate out medical abortion from surgical abortion.

- Other safety information unrelated to the REMS elements (e.g., articles limited to case reports or those discussing unrelated gynecologic or medical issues)

- Publications for which it was not possible to conduct a full review of the methods or results, i.e., the references were limited to an abstract of the study methods and results.

- Publications that provided only general statistics on abortion care in the United States.

11

Reference ID: 4905882

- Information pertinent to molecular or other basic science aspects of mifepristone.

- Data on the logistics of accessing abortion care in general, such as time to appointment or the distance traveled to obtain care.

- Publications that provided data not related specifically to abortion care or the REMS (e.g., references focused on federal poverty guidelines, poverty data, or the financial impact of the COVID-19 pandemic).

One exception to the above literature search criteria was the inclusion in Section 3.2.2 of this review, which discusses the *Patient Agreement Form*, of publications that discussed changes in provider volume. The data discussed in relation to provider volume was obtained from surveys. This data was included because changes in provider volume could only be obtained from well-conducted survey studies.

Regarding medical/scientific references submitted with letters from the plaintiffs in the *Chelius* litigation, we applied the same criteria as for the literature search, as described above.

Letters from the plaintiffs in the *Chelius* litigation included several references that preceded our 2016 review of the REMS. Two of those pre-2016 studies were not captured in our 2016 literature search. These two studies were assessed as part of our current review; their results are consistent with the existing safety profile of the approved medical abortion regimen, and therefore, support our current conclusions regarding the REMS. See Appendix A.

### 3.2.1.  Evaluation of the requirement for healthcare providers who prescribe the drug to be specially certified (ETASU A)

In order to become specially certified, prescribers must: 1) review the prescribing information for mifepristone and 2) complete the *Prescriber Agreement Form*. In signing the *Prescriber Agreement Form*, prescribers agree they meet the qualifications listed below:

- Ability to assess the duration of pregnancy accurately
- Ability to diagnose ectopic pregnancies
- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to

12

2021 REMS 001572

Reference ID: 4905882

ensure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information of mifepristone (which the provider can access by phone or online).

In addition to meeting these qualifications, as a condition of certification the healthcare provider also agrees to follow the guidelines for use below:

- Review the *Patient Agreement Form* with the patient and fully explain the risks of the mifepristone treatment regimen. Answer any questions the patient may have prior to receiving mifepristone.
- Sign and obtain the patient's signature on the *Patient Agreement Form*.
- Provide the patient with a copy of the *Patient Agreement Form* and the Medication Guide.
- Place the signed *Patient Agreement Form* in the patient's medical record.
- Record the serial number from each package of mifepristone in each patient's record.
- Report deaths to the Applicant, identifying the patient by a non-identifiable patient reference and the serial number from each package of mifepristone.

The literature review was the primary source of information that contributed to our reassessment of ETASU A.

We continue to be concerned that absent these provider qualifications, serious and potentially fatal complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed. Our review of the literature did not identify any studies comparing providers who met these qualifications with providers who did not. In the absence of such studies, there is no evidence to contradict our previous finding that prescribers' ability to accurately date pregnancies, diagnose ectopic pregnancies, and provide surgical intervention or arrange for such care through others if needed, is necessary to mitigate the serious risks associated with the use of mifepristone in a regimen with misoprostol. Therefore, our review continues to support the conclusion that a healthcare provider who prescribes mifepristone should meet the above qualifications.   We conclude it is reasonable to maintain the requirement for a one-time prescriber certification where prescribers attest to having the ability to diagnose an intrauterine

13

Reference ID: 4905882

pregnancy, to diagnose an ectopic pregnancy,[e] and to either manage serious complications themselves or arrange for other providers to provide the needed care in a timely manner.

In addition, in signing the *Prescriber Agreement Form* and placing it in the patient's medical record, the prescribers acknowledge the requirement to report patient deaths associated with mifepristone to the manufacturer. Such a requirement ensures that the manufacturer receives all reports of patient deaths and, in turn, fulfills its regulatory obligations to report those deaths to the FDA.

As discussed in Section 3.2.2 below, there is a potential for doubling of the number of prescribers of mifepristone if the in-person dispensing requirement in ETASU C is removed from the Mifepristone REMS Program. Given the potential addition of new prescribers, in addition to the considerations described above, we conclude that we should maintain the requirement for prescriber certification, to ensure that providers meet the necessary qualifications and adhere to the guidelines for use.  Our literature review supports that these requirements are still necessary, and the potential increase in new prescribers under the REMS is a further reason to maintain prescriber certification.  Healthcare provider certification continues to be a necessary component of the REMS to ensure the benefits of mifepristone for medical abortion outweigh the risks. The burden of prescriber certification has been minimized to the extent possible by requiring prescribers to certify only one time for each applicant.

### 3.2.2.   Evaluation of the requirement for the drug to be dispensed with evidence or other documentation of safe-use conditions (ETASU D)

In order to receive mifepristone for medical termination of pregnancy through 70 days gestation, the patient must sign a *Patient Agreement Form* indicating that the patient has received, read, and been provided a copy of the *Patient Agreement Form* and received counseling from the prescriber regarding the risk of serious complications associated with mifepristone for this indication. The *Patient Agreement Form* ensures that patients are informed of the risks of serious complications associated with mifepristone for this indication.

---

[e] American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin Number 191, February 2018. Tubal Ectopic Pregnancy. https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2018/03/tubal-ectopic-pregnancy. Mifepristone is not effective for terminating ectopic pregnancy. Some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. A missed ectopic pregnancy that ruptures is a medical emergency that requires immediate surgical intervention.

14

2021 REMS 001574

Reference ID: 4905882

In a number of approved REMS, *Patient Agreement Forms* or *Patient Enrollment Forms* ensure that patients are counseled about the risks of the product and/or informed of appropriate safe use conditions.[f]

As a condition of certification under the Mifepristone REMS Program, healthcare providers must follow the guidelines for use of mifepristone, including reviewing the *Patient Agreement Form* with the patient, fully explaining the risks of the treatment regimen, and answering any questions the patient may have before receiving the medication. With this form, the patient acknowledges that they have received and read the form, and that they have received the counseling regarding when to take mifepristone, the risk of serious complications associated with mifepristone and what to do if they experience adverse events (e.g., fever, heavy bleeding). Both the healthcare provider and patient must sign the document and the patient must receive a copy of the signed form. In addition to the counseling described in the *Patient Agreement Form*, patients also receive a copy of the Medication Guide for mifepristone. Ultimately, the *Patient Agreement Form* serves as an important counseling component, and documentation that the safe use conditions of the Mifepristone REMS Program have been satisfied, as the prescriber is required to place the signed *Patient Agreement Form* in the patient's medical record.

Prior to the March 29, 2016 approval of the S-020 efficacy supplement for Mifeprex, FDA undertook a review of all elements of the REMS. At that time, the ▓▓▓▓▓▓ (b) (6) ▓▓▓▓▓▓ (                    (b) (6)            ), along with the ▓▓▓▓▓▓ (b) (6) (          (b) (6)          ), recommended removal of the *Patient Agreement Form* (ETASU D). This recommendation received concurrence from the ▓▓▓▓▓▓ (b) (6) on February 23, 2016. The rationale for this recommendation in the 2016 review[g] ▓▓▓▓ (b) (6) is summarized here as follows:

- The safety profile of Mifeprex is well-characterized over 15 years of experience, with known risks occurring rarely; the safety profile has not changed over the period of surveillance.
- Established clinical practice includes patient counseling and documentation of informed consent and evidence shows that practitioners are providing appropriate patient

---

[f] REMS@FDA, https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm, Accessed November 15, 2021.
[g] ▓▓▓▓▓▓ (b) (6) Clinical Review, NDA 020687/S20, dated March 29, 2016. https://darrts.fda.gov/darrts/faces/ViewDocument?documentId=090140af803dc7bd&_afrRedirect=38617557320374 5

Reference ID: 4905882

counseling and education; the *Patient Agreement Form* is duplicative of these established practices.

- Medical abortion with Mifeprex is provided by a small group of organizations and their associated providers. Their documents and guidelines are duplicated in the *Patient Agreement Form*.

- ETASUs A and C remain in place: The *Prescriber Agreement Form* and the requirement that Mifeprex be dispensed to patients only in certain healthcare settings, specifically, clinics, medical offices, and hospitals under the supervision of a certified prescriber, remain in place.

In light of a memorandum from the Director of the Center for Drug Evaluation and Research, an addendum to the [redacted] (b) (6) March 29, 2016 review and a memorandum from the signatory authority in [redacted] (b) (6) indicated that the *Patient Agreement Form* would be retained in the REMS.[h,i]

The current review of literature from March 29, 2016 to July 26, 2021, is relevant to our assessment of the necessity of the *Patient Agreement Form* as part of the REMS. While our literature search yielded no publications which directly addressed this element of the REMS, we identified the following literature that focused on the informed consent process. These studies were reviewed for their potential relevance on this topic, though the articles do not directly assess the need for the *Patient Agreement Form* as a condition necessary to assure safe use of Mifepristone under ETASU D.

- Two studies[1,2] (both authored by Dr. Grossman in 2021) used the *Patient Agreement Form* and additional clinic-specific written informed consent forms as part of the study methodology. One study evaluated medical abortion with pharmacist dispensing of mifepristone and another evaluated mail-order pharmacy dispensing. Safety and efficacy outcomes were not assessed regarding the element of consent in isolation or the *Patient Agreement Form*.

- Several studies included use of electronic or verbal consent. Two studies were conducted using signed electronic consent (Chong[3], Kerestes[4]). Aiken[5] reported that patients had the option of providing consent verbally and the discussion had to be recorded in the notes. Rocca[6] described obtaining verbal informed consent from patients seeking medical abortion provided in pharmacies or government-certified

---

Reference ID: 4905882

h [redacted] (b) (6) Review of proposed REMS modifications to Mifeprex. March 29, 2106.
i [redacted] (b) (6) Summary of Regulatory Action for Mifeprex. March 29, 2016.

2021 REMS 001576

public health facilities by auxiliary nurse midwives (ANMs) in Nepal. Outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

- A retrospective chart review (Wiebe[7]) was conducted in Canada. This study included telemedicine abortions between January 31, 2017 and January 31, 2019 and a similar group of controls seen in the clinic during the same time frame, matched by date of initial appointment. As part of the telemedicine process, patients read a consent form (not specified whether they could view an electronic version) and gave verbal consent "witnessed by the counselor". Again, outcomes were not assessed regarding the single element of consent and its role in the efficacy of medical abortion.

After review, we conclude that there are no outcome data from these studies that address the need for the *Patient Agreement Form* as a condition necessary to assure safe use of mifepristone. Nor do any of these studies provide evidence of whether the patient's informed consent has been adequately documented under the process set out in the study protocol. Therefore, these studies do not provide evidence that would support removing ETASU D.

Although _____ (b) (6) agrees that informed consent in medicine is an established practice, the National Abortion Federation's 2020 Clinical Policy Guidelines for Abortion Care[8] continue to include a detailed section on patient education, counseling, and informed consent. The guidelines state that these steps are essential parts of the abortion process; that they should be conducted by appropriate personnel, with accurate information, including about alternatives and potential risks and benefits; and that the patients must have an opportunity to have any questions answered to their satisfaction prior to any intervention. Under these guidelines, documentation must show that the patient affirms that they understand all the information provided and that the decision to undergo an abortion is voluntary. The guidelines specifically list the risks that must be addressed at a minimum, including those pertinent to medical abortion: hemorrhage, infection, continuing pregnancy, and death. Additionally, Practice Bulletins from ACOG[9] and the Society of Family Planning also support detailed patient counseling.

In addition, trends in US clinical practice are developing which could negatively impact adequate patient counseling about the risks of medical abortion. One survey by Jones 2017[10] of abortion providers in the United States and Canada prior to the COVID-19 pandemic did reveal strong adherence to evidence-based guidelines. However, this same survey noted continued increasing uptake of medical abortion by US providers. Grossman[11] conducted a US survey in

17

Reference ID: 4905882

2019 which suggested that the number of obstetrician/gynecologists providing medical abortion care may be increasing and that uptake might increase if mifepristone were dispensed by pharmacies instead of being dispensed in-person. A subsequent survey of US obstetricians/gynecologists by Daniel in 2021[12] evaluated a subsample (n = 868) from a prior national survey of providers and found that 164 (19%) reported providing medical abortion in the previous year. Of those obstetrician/gynecologists not providing medical abortion, 171 (24%) said they would offer the method to their patients if the in-person dispensing requirement for mifepristone were removed. This indicates a potential doubling of providers (+ 104%, 95% confidence interval (CI): 97% −112%). There were geographical variations, with the largest potential increases being in the Midwest (+ 189%, 95% CI: 172% −207%) and the South (+ 118%, 95% CI: 103% −134%).

Based on the articles discussed above, removal of the in-person dispensing requirement from the Mifepristone REMS Program (as discussed below in section 3.2.3) could significantly increase the number of providers to a larger group of practitioners. The *Patient Agreement Form* is an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients, and also provides the information in a brief and understandable format for patients. The requirement to counsel the patient, to provide the patient with the *Patient Agreement Form*, and to have the healthcare provider and patient sign the *Patient Agreement Form*, ensures that each provider, including new providers, informs each patient of the appropriate use of mifepristone, risks associated with treatment, and what to do if the patient experiences symptoms that may require emergency care. The single-page *Patient Agreement Form* is in line with other elements of this REMS, in that it supports the requirement that certified prescribers be able to accurately assess a patient, counsel a patient appropriately and recognize and manage potential complications. The form is placed in the patient's medical record to document the patient's acknowledgment of receiving the information from the prescriber and a copy is provided to the patient. We determined, consistent with section 505-1(f)(2) of the FD&C Act, that this does not impose an unreasonable burden on providers or patients, and that the *Patient Agreement Form* remains necessary to assure the safe use of Mifepristone.

After considering potential burden on healthcare providers and patients and considering the available data discussed above, including the potential for increased prescribing of mifepristone if in-patient dispensing is removed from the REMS, we conclude that the *Patient Agreement Form* should remain a safe use condition in the REMS.

2021 REMS 001578

Reference ID: 4905882

### 3.2.3.  Evaluation of the requirement for drug to be dispensed only in certain healthcare settings (ETASU C)

Mifepristone applicants must ensure that mifepristone is available to be dispensed to patients only in clinics, medical offices, and hospitals by or under the supervision of a certified prescriber. This creates what we refer to in this document as an in-person dispensing requirement under the REMS; i.e., the patient must be present in person in the clinic, medical office or hospital when the drug is dispensed.  The mifepristone REMS document states that mifepristone may not be distributed to or dispensed through retail pharmacies or settings other than these.

The following information contributed to our analysis of this requirement: Mifepristone REMS Program year-one assessment data, postmarketing safety information and literature review.

**REMS Assessment Data**
_Reporting period for the Mifepristone REMS Program - April 11, 2019 through February 29, 2020_

We evaluated information included in the one-year (1st)[j] REMS assessment reports for the Mifepristone REMS Program, which included healthcare provider certification data, program utilization data, compliance data, audit results and patient exposure data.[13] The assessment reports were submitted on April 10, 2020 by the NDA Applicant and April 15, 2020 by the ANDA Applicant and cover a reporting period from April 11, 2019 through February 29, 2020. During this reporting period, the NDA Applicant reported (b) (4) newly certified healthcare providers, and the ANDA Applicant reported (b) (4) newly certified healthcare providers in the Mifepristone REMS Program. The NDA Applicant reported a total of (b) (4) certified healthcare providers (includes new and previously certified) ordered mifepristone during the assessment reporting period, and the ANDA Applicant reported a total of (b) (4) certified healthcare providers ordered mifepristone during the assessment reporting period. The NDA Applicant estimated that a total of (b) (4) patients were exposed to mifepristone during the assessment reporting period. The ANDA Applicant reported an estimated total of (b) (4) patients were exposed to mifepristone during the reporting period.

During the reporting period, a small number of non-compliance events were reported. The authorized distributor for the NDA applicant reported to the NDA Applicant that they experienced deviations with scanning of the product serial numbers which were confirmed during the February 2020 audit. The authorized distributor conducted a root cause analysis and developed a corrective and preventive action (CAPA) on February 12, 2020. The CAPA was

---

[j] This REMS assessment report was the first to be submitted following the approval of the single, shared system REMS for mifepristone.

2021 REMS 001579

Reference ID: 4905882

validated and deployed with monitoring of the system through April 10, 2020. The corrective action will prevent similar events from occurring in the future.

*January 27, 2020 through September 30, 2021*

During the timeframe from January 27, 2020 through September 30, 2021, there were periods when the in-person dispensing requirement was not being enforced.

- On July 13, 2020, the United States District Court for the District of Maryland granted a preliminary injunction in the *ACOG* case to temporarily bar enforcement of the in-person dispensing requirement during the COVID-19 PHE.
- On January 12, 2021, the United States Supreme Court issued a stay of the injunction.
- On April 12, 2021, the FDA issued a General Advice Letter informing the applicants of the Agency's intent to exercise enforcement discretion during the COVID-19 public health emergency regarding the in-person dispensing requirement in the Mifepristone REMS Program.[k,l]

To better understand whether there was any impact on safety or noncompliance during the periods when the in-person dispensing requirement was not being enforced, we requested additional information from the Applicants to provide for more comprehensive assessment of the REMS for the time period from January 27, 2020 (the effective date of the COVID-19 PHE) to September 30, 2021. We requested the Applicants provide a summary and analysis of any program deviation or noncompliance events from the REMS requirements and any adverse events that occurred during this time period that had not already been submitted to FDA. As part of an additional request for information for the REMS assessment report, the Applicants were also asked to submit the adverse events to FAERS and to notify FDA that the reports were submitted.

Between January 27, 2020 and September 30, 2021, the NDA Applicant distributed (b) (4) shipments representing (b) (4) tablets. The NDA Applicant reported that there were (b) (4) shipments representing a total of (b) (4) tablets sent to (b) (4) non-certified healthcare providers.[m,n] (b) (4) of these healthcare providers subsequently became certified while (b) (4) did not. Of the (b) (4) healthcare providers who were not subsequently certified, (b) (4) returned a total of (b) (4)

---

[k] FDA General Advice Letter for NDA 20687, April 12, 2021.
[l] FDA General Advice Letter for ANDA 091178, April 12, 2021.

[m] NDA 020687 September 9, 2021 response to the FDA's September 2, 2021 Information Request.
[n] NDA 020687 October 8, 2021 response to the FDA's June 30, 2021 Information Request.

20

Reference ID: 4905882

Mifeprex tablets to the distributor. ▓▓ (b) (4) non-certified healthcare provider dispensed ▓▓ (b) (4) to a patient; no adverse events were reported. The NDA Applicant attributed the non-compliance observed to the authorized distributor's transition to a new platform. The NDA Applicant implemented a corrective and preventative action to address this issue, which we found to be acceptable.

The ANDA Applicant distributed ▓▓ (b) (4) shipments representing ▓▓ (b) (4) tablets of mifepristone from January 27, 2020 to September 30, 2021 and reported no instances of shipments to non-certified healthcare providers during this timeframe.

The NDA and the ANDA applicants reported a total of eight cases reporting adverse events between January 27, 2020 and September 30, 2021. These eight cases were also identified in the FAERS database and are described in the section below.

The number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use for medical termination of pregnancy is small, and the data provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these reported adverse events. Further analysis of the adverse events is included below in the section on Pharmacovigilance Data.

**Pharmacovigilance Data**

The ▓▓▓▓▓▓▓▓▓▓ (b) (6) ( (b) (6) conducted a search of the FAERS database and the published medical literature to identify U.S. postmarketing adverse events that reportedly occurred from January 27, 2020 through September 30, 2021 with mifepristone use for medical termination of pregnancy.[o,p]

The data for this time period were then further divided into date ranges when the in-person dispensing requirement was being enforced per the REMS (January 27, 2020 - July 12, 2020 & January 13, 2021 - April 12, 2021) versus when the in-person dispensing requirement was not being enforced (July 13, 2020 - January 12, 2021 (in-person dispensing requirement was temporarily enjoined) & April 13, 2021 - September 30, 2021 (in-person dispensing requirement was not being enforced because of the COVID-19 PHE)).

---

[o] ▓▓▓▓▓▓ (b) (6). Pharmacovigilance Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. ▓ (b) (6) # 2007-525. Finalized April 12, 2021.

[p] ▓▓▓▓▓▓ (b) (6) Pharmacovigilance Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. ▓ (b) (6) # 2007-525. Finalized December 16, 2021.

A total of eight cases that met the search criteria were identified in FAERS and no additional case reports were identified in the medical literature. Two of the eight cases reported adverse events that occurred when the in-person dispensing requirement in the REMS was being enforced (i.e., January 27, 2020 - July 12, 2020 & January 13, 2021 - April 12, 2021). These two cases reported the occurrence of uterine/vaginal bleeding (case 1) and uterine/vaginal bleeding and sepsis (case 2). Of note, uterine/vaginal bleeding and sepsis are labeled adverse events. Five of the eight cases reported adverse events that occurred when the in-person dispensing requirement was not being enforced (i.e., July 13, 2020 - January 12, 2021 & April 13, 2021 - September 30, 2021). These five cases reported the occurrence of ongoing pregnancy (case 3), drug intoxication and death approximately 5 months after ingestion of mifepristone (case 4), death [cause of death is currently unknown] (case 5), sepsis and death (case 6), and pulmonary embolism (case 7). Although these adverse events occurred during the period when the in-person dispensing requirement was not being enforced, the narratives provided in the FAERS reports for cases 5, 6, and 7 explicitly stated that mifepristone was dispensed in-person. Of note, ongoing pregnancy, and sepsis, including the possibility of fatal septic shock, are labeled adverse events. The remaining case from July 2021 reported the occurrence of oral pain/soreness (case 8) but did not provide sufficient information to determine the exact date of the adverse event. Based upon the U.S. postmarketing data reviewed, no new safety concerns were identified by (b) (6)

In addition to the FAERS data provided above, (b) (6) routinely monitors adverse events reported to FAERS and published in the medical literature for mifepristone for medical termination of pregnancy. (b) (6) has not identified any new safety concerns with the use of mifepristone for medical termination of pregnancy.

To enable additional review of adverse events, the Applicants were requested[q] to provide a summary and analysis of adverse events reported with incomplete medical abortion requiring surgical intervention to complete abortion, blood transfusion following heavy bleeding or hemorrhage, ectopic pregnancies, sepsis, infection without sepsis, hospitalization related to medical abortion, and emergency department (ED)/urgent care encounter related to medical abortion. The Applicant for Mifeprex provided a summary of postmarketing safety information from March 29, 2016, when S-020 was approved, through September 30, 2021, on August 27 and October 8, 2021. During the time period in question, (b) (4) tablets were shipped, and

---

[q] On August 5, 2021, an IR was sent to the Applicants requesting a summary and analysis of adverse events from March 29, 2016 through June 30, 2021 and from July 1, 2021 through September 30, 2021.

22

2021 REMS 001582

Reference ID: 4905882

48 adverse events were received. The 48 adverse events included 4 deaths (one of which occurred in 2010 but was reported in 2017), 25 incomplete abortions requiring surgical intervention, 17 blood transfusions following heavy vaginal bleeding, 2 ectopic pregnancies, 7 infections (1 sepsis and 6 infection without sepsis), 13 hospitalizations, and 43 ED or urgent care visits related to medical abortion. For the period between January 27, 2020 and September 30, 2021, a time frame that includes the entire period when the COVID-19 public health emergency (PHE) has been in effect, there were three adverse events reported corresponding to the above cases from FAERS identified by <sup>(b) (6)</sup> case 1 (uterine/vaginal bleeding), case 2 (uterine/vaginal bleeding and sepsis), and case 4 (drug intoxication and death).

The ANDA Applicant provided a summary of postmarketing safety information from April 11, 2019 (date of ANDA approval) through September 30, 2021. On August 26, 2021, the Applicant provided distribution and adverse event information from April 11, 2019 through June 30, 2021. During this time period, a total of <sup>(b) (4)</sup> tablets were shipped. There were 7 adverse events including 3 deaths (1 from sepsis, 1 from bilateral pulmonary artery thromboemboli, 1 in a patient who complained of not being able to breathe), 1 ongoing pregnancy treated with uterine aspiration, 2 blood transfusions, 1 sepsis (with death), 1 hospitalization, and 3 ED or urgent care visits related to medical abortion. On October 12, 2021 the Applicant provided information from July 1, 2021 to September 30, 2021; there were no additional adverse events. For the period between January 27, 2020 and September 30, 2021, there were four adverse events reported corresponding to the above cases from FAERS identified by <sup>(b) (6)</sup> case 3 (ongoing pregnancy), case 5 (death unknown cause), case 6 (sepsis and death), and case 7 (pulmonary embolism).[r]

The postmarketing data from FAERS were analyzed by <sup>(b) (6)</sup> to determine if there was a difference in adverse events between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced. Based on this review, we conclude that there does not appear to be a difference in adverse events between periods when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced. This suggests that mifepristone may be safely used without an in-person dispensing requirement.

---

[r] The eighth FAERS case, oral pain/soreness, was not within the scope of the August 5, 2021 IR and was not considered for this review of postmarketing safety information submitted by the Applicants in response to the IRs.

23

Reference ID: 4905882

[b) (6) review of the Applicants' IR responses, which included the same cases identified by (b) (6) from FAERS, did not change our conclusion.[5]

**Literature Review**

Published studies have described alternatives in location and method for dispensing mifepristone by a certified prescriber (or an equivalent healthcare provider in countries other than the US). Some studies have examined replacing in-person dispensing in certain health care settings with dispensing at retail pharmacies (Grossman[2], Wiebe[7], Rocca[6]) and dispensing mifepristone from pharmacies by mail (Grossman[1], Upadhyay[14], Hyland[15]). Other studies have evaluated two modes of dispensing by prescribers: (1) prescribers mailing the medications to women (Gynuity study [Raymond[16], Chong[3], Anger[17]], Kerestes[4], Aiken[5] (2021)) and (2) prescribers using couriered delivery of medications (Reynolds-Wright[18]). Other studies have evaluated dispensing mifepristone by mail by an entity described as "a partner organization" (Aiken[19] (2017), Norton[20], Endler[21]). For ease of review, in the sections below that describe these studies, we have separated relevant references by the methodology used to dispense mifepristone.

<u>Retail pharmacy dispensing</u>

Three studies report medical abortion outcomes for retail pharmacy dispensing of mifepristone after clinical evaluation. Grossman[2] conducted a US-based study in which mifepristone and misoprostol were dispensed from a pharmacy partnered with the clinic where the participant had an evaluation by ultrasound and counseling. Of the 266 participants enrolled, 260 had known abortion outcomes. Complete abortion without additional procedure occurred in 243 participants (93.5% of those with known outcomes). Seventeen participants (6.5% of those with known outcomes) were diagnosed with incomplete abortion and underwent uterine aspiration. The reported proportion of complete abortion is within the range described in the approved mifepristone labeling. However, the finding represents a lower-than-expected efficacy based on the cohort's GA (84% of participants were at ≤ 56 days GA, a cohort for which the labeled success rate is 96.8%). No participants experienced a serious adverse event, were hospitalized, or required transfusion. Three participants had ED visits with treatment (intravenous hydration, pain medication, pelvic infection after uterine aspiration for incomplete abortion). The study's

---

[5] The reporting period of [b) (6)] assessment of the adverse events in FAERS is not identical to the time period for summaries of adverse events in the IRs to the Applicants. Therefore, the numbers of cases and adverse events summarized in [b) (6)] assessment may differ from the numbers of cases and adverse events summarized by the Applicants in their responses to IRs (note that each case report may include more than one adverse event).

24

Reference ID: 4905882

safety and efficacy outcomes are consistent with labeled frequencies. The majority of participants (65%) were very satisfied with the experience. There were some complaints from participants about not receiving all prescribed medications at the initial pharmacy visit, privacy not being adequately maintained, and perceived negative pharmacist attitude.

Overall, we conclude that this study has limited generalizability because it was conducted in two US states and involved partnered pharmacies, some of which were in the same building as the clinic. Additionally, all participating pharmacies in this study were required to have a pharmacist on duty during clinic hours who had been trained in the study protocol and was willing to dispense mifepristone. The study conditions may not be generalizable to US retail pharmacies; there is insufficient information to assess this. Rocca[6] conducted an observational study evaluating 605 participants at ≤63 days GA who obtained medical abortions in Nepal by comparing the provision of medical abortion service by newly trained nurse midwives in pharmacies to medical abortion provided in government-certified clinics. Participants who presented to pharmacy study sites underwent clinical screening including a pelvic exam by trained nurse midwives at the pharmacy (which was equipped with an examination room) and if eligible for medical abortion, were dispensed mifepristone and misoprostol in the pharmacy at the time of their visit. Participants who presented to public health facilities underwent clinical screening including pelvic examination by abortion providers including trained nurse midwives and if eligible for medical abortion were dispensed mifepristone and misoprostol in the clinic at the time of their visit. The authors reported that, with respect to complete abortion (>97%) and complications (no hospitalizations or transfusions), evaluation and dispensing in pharmacy was non-inferior to in-clinic evaluation and dispensing.

Wiebe,[7] in a retrospective, chart review study conducted in Canada, compared abortion outcomes of 182 women at ≤ 70 days GA who underwent medical abortion with telemedicine consult, and either received medications by courier or picked them up at a local pharmacy, with outcomes of a matched control cohort of 199 women who received the medications at a pharmacy after an in-clinic visit. The groups had similar documented complete medical abortion outcomes (90%, calculated maintaining subjects with unknown outcomes in the denominator; ≥ 95% calculated with known outcomes only). The telemedicine group had one case of hemorrhage (0.5%) and one case of infection requiring antibiotics (0.5%) compared with no cases of hemorrhage or infection requiring antibiotics in the in-clinic cohort. The telemedicine group had more ED visits (3.3% compared to 1.5% in-clinic cohort). Both models of dispensing mifepristone resulted in efficacy and safety outcomes within labeled frequency.

25

Reference ID: 4905882

None of the three studies described above allow a determination regarding differences in safety between in-person dispensing by a certified prescriber in a health care setting and dispensing through a retail pharmacy, due to limitations on the generalizability of the studies to the current retail pharmacy environment in the US. The outcome findings from the one US study (Grossman[2]), in which the pharmacies were partnered with prescribers, may not be generalizable to much of the US as they do not reflect typical prescription medication availability with use of retail pharmacy dispensing. Although retail pharmacy dispensing of mifepristone and misoprostol in Canada has been described in the literature, there are important differences in healthcare systems between Canada and the US that render the findings from studies in Canada (Wiebe[7]) not generalizable to the US. In the Wiebe study, timely provision of medication from the retail pharmacy was accomplished by either courier to the woman or faxed prescription to the woman's pharmacy. It is unknown whether conditions that allow timely access to medications for medical abortion would occur in retail pharmacies throughout the US. Canada's federal government has reaffirmed that abortion is an essential health service[t] which may have implications affecting access to medical abortion from retail pharmacies in Canada. The Rocca[6] study evaluated medical abortion provided in Nepali pharmacies and essentially moved the abortion provider and clinical examination into the pharmacy, a scenario that is not, at this time, applicable to the US retail setting.

Mail order pharmacy

Grossman[1] published an interim analysis of an ongoing prospective cohort study evaluating medical abortion with mifepristone and misoprostol dispensed by mail-order pharmacy after in-person clinical assessment. All participants were evaluated for eligibility during a clinic visit with GA up to 63 days confirmed with either an ultrasound or examination; instead of receiving medication at the clinic visit, participants received medications from a mail-order pharmacy. A total of 240 participants have been enrolled; three participants did not take either medication. A total of 227 (94.6%) provided some outcome information, of whom 224 provided abortion outcome information. Complete abortion without additional procedures occurred in 217 participants (96.9 of those with known outcomes). Two (0.9%) participants experienced serious adverse events (SAE); one received a blood transfusion, and one was hospitalized overnight. Nine (4%) participants attended 10 ED visits. In this interim analysis, the outcomes are consistent with labeled frequencies. With respect to the time interval between a

---

[t] As noted in Mark[23] and Martin[24], most provincial and federal health insurance programs in Canada cover medical abortion, and covered services are free at the point of care.

26

Reference ID: 4905882

participant's clinic visit and receipt of medications, of the 224 participants with known abortion outcomes, 184 (82.1%) received medication within 3 days. However, 17% received between 4-7 days and one participant waited over 7 days for receipt. Seven of 216 (3.2%) participants who completed the day-3 survey reported compromised confidentiality (e.g., someone found their medication, privacy concerns).

Upadhyay[14] reports findings from a retrospective cohort study of 141 women undergoing medical abortion in the US without a consultation or visit. Eligibility was assessed based on a participant-completed online form collecting pregnancy and medical history. Participants who were considered eligible received medication delivered by a mail-order pharmacy. Three interactions via text, messaging or telephone occurred to confirm medication administration, assessment of expulsion and pregnancy symptoms, and results of a 4-week home pregnancy test. Abortion outcome was determined by either the day 3 assessment or the 4-week pregnancy test. The investigators reported a complete abortion rate without additional procedures of 95% (105 participants out of 110 for whom outcomes were known) and stated that no participants had any major adverse events. The proportion of abortion outcomes assessed at 3 days versus 4 weeks is not reported. Regardless, determining outcomes at 3 days is insufficient to determine outcome rates or safety findings because a 3-day follow-up period is too short. Additionally, a substantial number of participants (31) provided no outcomes information. Among the 141 participants enrolled, 128 had any follow-up contact with the study staff, and 110 provided outcomes information. Excluding outcomes of 22% of the cohort is a limitation of this study. This study used a model with numerous deviations from standard provision of medical abortion in the US, such as no synchronous interaction with the prescriber during informed consent or prior to prescribing medication, no confirmation of self-reported medical, surgical, and menstrual history. Further, follow-up information based on a 3-day period is insufficient to determine outcome rates or safety findings. These deviations, limited follow-up information, and small sample size limit the usefulness of this study.

Hyland[15] describes findings from a cohort study in Australia evaluating medical abortion outcomes utilizing telemedicine and a central mail order pharmacy. All participants obtained screening tests including ultrasound confirmation of GA. A total of 1010 participants completed the screening process and were provided mifepristone and misoprostol. Abortion outcomes were determined for 754 (75%) of the 1010. Outcomes for the remaining 256 participants (25%) were not included because 31 provided no relevant information after shipment, 14 reported not taking misoprostol, and 211 did not have "full follow up" (i.e., known outcome of either complete medical abortion, uterine evacuation, or ongoing pregnancy with plan to continue).

27

Reference ID: 4905882

Complete abortions without additional procedures occurred in 727 participants (96% of those with definitively documented outcomes) and is consistent with labeled efficacy. Of the 754 participants included in the analysis 717 (95%) had no face-to-face clinical encounters after medications were mailed while 21 (3%) were admitted to the hospital and 16 (2%) had an outpatient encounter. One participant who was hospitalized and underwent a surgical uterine evacuation received a transfusion. Not included in the findings are 7 hospitalizations occurring in 7 participants who did not have "full follow up". The authors do not report any other adverse events and conclude use of the telemedicine medical abortion service is safe. The reasons for hospitalization are not discussed by the authors; therefore, it is unknown why the patients were hospitalized. Although the reported number of hospitalizations (3%) is higher than the less than 1% in the FDA-approved mifepristone labeling,  conclusions regarding the safety findings in this study cannot be made in the absence of information about the reasons for hospitalization. Other limitations of this study include incomplete information about outcomes with face-to-face encounters, and not reporting outcomes of 25% of the enrolled cohort.

Overall, the three studies evaluating mail order pharmacy dispensing suggest that the efficacy of medical abortion is maintained with mail order pharmacy dispensing. In the Grossman[1] study, the interim analysis, although small, does not raise serious safety concerns. We note that 18% of participants did not receive medications within 3 days; the potential for delay in receiving medication by mail could limit the GA eligible for medical abortion through mail order pharmacy dispensing, because women at GA closer to 70 days might not receive medication in time. A small proportion (3%) of participants raised concerns regarding the issues of confidentiality and privacy. Safety findings from the Hyland[15] study are difficult to interpret. Although only one transfusion is reported, and the authors state the findings demonstrate safety, the higher hospitalization rates, and lack of information on the reasons for hospitalization do not allow any conclusions about safety findings. Lastly, the Upadhyay[14] study had no reported adverse events, but the findings are less useful because of the limited follow-up, and because medical abortions were provided using a model with numerous deviations from standard provision of medical abortion in the US.

<u>Clinic dispensing by mail</u>

A total of five studies evaluated clinic dispensing by mail.[3,4,5,16, 17] Gynuity Health Projects conducted a prospective cohort study (the "TelAbortion" study) evaluating use of telemedicine for remote visits and mifepristone being dispensed from clinics via overnight or regular tracked mail. Three publications reviewed have reported outcomes for the Gynuity population

Reference ID: 4905882

exclusively: Raymond[16] from May 2016 to December 2018, Chong[3] from May 2016 to September 2020 and Anger[17] from March 2020 to September 2020. Due to the pandemic, the Gynuity study deviated from the protocol requirement of confirmation of GA by examination or ultrasound for many participants treated from March 2020 onward (although none of the three publications reported on the single element of dispensing mifepristone from the healthcare setting by mail). A fourth study, Kerestes,[4] reports outcomes of medical abortion at the University of Hawai'i from April 2020 to November 2020: seventy-five (of whom 71 were enrolled in the Gynuity study) of the 334 participants in Kerestes were dispensed mifepristone by mail after a telemedicine consult. The section below discusses these four studies from the US as well as a large UK study by Aiken[5] (2021).

Raymond [16] (2019) reported outcomes from the Gynuity study prior to the pandemic. In the TelAbortion study, participants were not required to have an in-person clinic visit; rather, they obtained screening tests at laboratories and radiology offices and then communicated with the abortion provider by videoconference. If the participant was eligible for treatment, the provider dispensed the medications by mail. Of 433 women screened, 165 (38%) either declined to schedule the videoconference or did not keep the videoconference appointment. Among the 268 participants evaluated via videoconference, medication packages were sent to 248. Abortion outcomes were determined for 190 (77%) of the 248; outcomes for 58 (23%) participants were unknown. Complete abortion without additional procedures occurred in 177 participants (93% of those with known outcomes). The investigators obtained follow-up information from 217 participants after package shipment; there were two hospitalizations (one received a transfusion for severe anemia despite having had a complete abortion), and 16 other participants (7%) had clinical encounters in ED and urgent care centers. The reported outcomes in Raymond[16] (2019) are similar to outcomes described in approved labeling except the combined ED/urgent care center encounters (7%) exceeded the ED visits in approved labeling (2.9-4.6%). The authors note that half of the ED/urgent care visits did not entail any medical treatment and opine that the increased number of visits may have been due to the study participants living farther from the abortion providers.[16] All participants received medications within 8 days.

Chong[3] updated the findings from the Gynuity study described in Raymond[16] and reported on 1157 medical abortion outcomes, of which approximately 50% occurred during the period of the COVID-19 PHE. Although a screening ultrasound was required per the protocol, sites determined in 52% (346/669) of abortions that occurred during the period of the COVID-19 PHE that, in order to avoid potential exposure to COVID-19 at a health care facility, those

29

Reference ID: 4905882

participants were not required to obtain a screening ultrasound. Use of urine pregnancy test to confirm abortion completion also increased from 67% (144/214) in the 6 months prior to the pandemic to 90% (602/669) in the 6 months during the pandemic. Of the 1390 participants to whom medicine packages (containing both mifepristone and misoprostol) were mailed, 1157 (83.2%) had known abortion outcomes. Complete abortion without a procedure occurred in 1103 participants (95% of the those with a known outcome). Ten women experienced an SAE (5 transfusions (0.4%) and 7 hospitalizations (0.7%)) and 70 (6%) participants had unplanned clinical encounters in ED/urgent care. Surgical interventions were required in 47 participants (4.1% of 1390) to complete abortion. The reported outcomes in this study are similar to outcomes described in approved labeling, except that the combined ED/urgent care center encounters (6%) exceeded the ED visits in approved labeling (2.9-4.6%).

Anger[17] compared outcomes among participants enrolled in the Gynuity study who did versus did not have confirmation of GA/intrauterine location with an examination or ultrasound from 10 jurisdictions across the US. These participants were screened for enrollment from March 25 through September 15, 2020. All participants had a telemedicine consultation and received mifepristone and misoprostol by mail from the healthcare facility. Determination of which participants did not require confirmation of GA by examination or ultrasound to be eligible depended on the study clinician's assessment of eligibility for "no-test medication abortion"[u] based on a sample protocol published by Raymond[22] (2020). There were two key differences between the two groups. Participants for whom the study clinician determined a pre-abortion ultrasound was required were more likely than the participants who had no ultrasound or examination to live further than 150 miles from the clinic (51.2% vs. 31.7%) and were more likely to have a GA above 63 days (12.0% vs. 1.7%). The study sites shipped 503 medication packages during the analysis period; 344 packages went to the "no test" group while 159 went to the "test" medical abortion cohort (see figure below). However, because the two cohorts were not randomized in this study, they had different baseline characteristics. Consequently, findings based on the comparisons between the two cohorts should be interpreted carefully.

---

[u] "No-test medication abortion" refers to medical abortion provided without a pretreatment ultrasound, pelvic examination, or laboratory tests when, in the judgment of the provider, doing so is medically appropriate (appropriateness based on history and symptoms); "no-test medication abortion" does include post-abortion follow up. A sample protocol is described by Raymond et al.[22]

2021 REMS 001590

Reference ID: 4905882



Source: Figure 1 in this publication. MA= medical abortion.

The investigators' analyses excluded 91 (18% of 503; 57 in the no-test group and 34 in the test group) participants because they did not provide a date of the last menstrual period (LMP), did not take mifepristone, or did not have a recorded abortion outcome. Overall, 410 participants (81.5% of 503) provided outcomes data. There were no reported ectopic pregnancies in either group. The number of ED/urgent care visits and the proportion of unplanned clinical encounters that led to medical treatment were not reported. In the no-test group, complete medical abortion was confirmed in 271 participants who took medications (94% among those with known outcome). In the no-test cohort, two participants were "hospitalized and/or blood transfusion," and 36 (12.5%) had an unplanned clinical encounter (participant sought in-person medical care related to abortion and the visit was not planned prior to abortion).

In the test medical abortion group, complete abortion was confirmed in 123 participants (of 125 with known outcomes); the completion rate was 98% among those with known outcomes. In the test medical abortion group, one participant was "hospitalized and/or blood transfusion," and 10 (8.0%) had an unplanned clinical encounter. The authors concluded that, compared to participants who had an ultrasound prior to medical abortion, those without an examination prior to medical abortion were more likely to require procedural interventions and had more unplanned clinical encounters.

Kerestes[4] was the only publication that linked outcomes of medical abortion with different delivery models. Participants included in the report had GA up to 77 days and received

31

Reference ID: 4905882

medications in Hawaii between April 2020 and January 2020. A total of 334 medication packages (to 330 unique participants) were dispensed containing mifepristone and misoprostol; three different delivery models were used concurrently: 110 (32.9%) had traditional in-person visits, 149 (44.6%) had telemedicine consultation with in-person pick-up of medications, and 75 (22.5%) were sent medications by mail (71 of these were enrolled through Gynuity's TelAbortion study). Seven participants of the 330 participants who received 334 medication packages reported that they did not take them and were excluded from analysis of the outcomes. Among participants with follow-up data, the rates of successful medical abortion without surgery were 93.6%, 96.8%, and 97.1% in the in-clinic group, telemedicine + in-person pickup group, and telemedicine + mail group, respectively; these were consistent with outcomes in approved labeling. Blood transfusion was given to two participants (both in the telemedicine + in-person pickup group). Eleven participants went to an ED. Although ED visits occurred the most frequently in the telemedicine + mail group (four participants or 5.8%) and the least in the in-person group (two participants or 2.1%), the study reported no increases in other serious adverse events.

Taken together, the three Gynuity study reports[3,16,17] and Kerestes[4] support dispensing mifepristone and misoprostol by mail after a telemedicine visit. Efficacy was maintained in all four studies. All of the studies reported SAEs frequencies comparable to labeled rates, except two of the Gynuity study reports (Raymond[16], Chong[3]) and Kerestes[4] report a higher frequency of ED/urgent care visits than the labeled frequency of ED visits. We do not know whether the reporting of combined ED and urgent care visits represents an increased rate of ED visits compared to the labeled rate of ED visits (2.9-4.6%). Other labeled SAEs (e.g., transfusion) occur infrequently (< 1%).

Aiken[5] (2021) reports outcomes of medical abortion up to 70 days GA in the UK before and during the pandemic in a retrospective cohort study. In the UK, prior to the COVID-19 pandemic, all patients attended an in-clinic visit where they received an ultrasound, were administered mifepristone in the clinic, and given misoprostol in-clinic for use at home (traditional model). During the pandemic, medical abortion consultations were performed remotely by telephone or video. Based on the consultation and questionnaire (including date of last menstrual period; menstrual, contraceptive and medical history; symptoms; risk for ectopic pregnancy), an assessment of eligibility for treatment via telemedicine was made. If eligible, medications were delivered to participants via mail or were made available for collection from the clinic for use at home. If the participant was assessed to be ineligible for treatment via

Reference ID: 4905882

telemedicine, an in-person assessment with ultrasound was performed and medications were provided from the clinic for home use (hybrid model).

The study compared the two cohorts: 22,158 obtained medical abortion before the pandemic and had in-person visits and dispensing (traditional model) and 29,984 obtained medical abortion during the pandemic with either in-person visit and in-person dispensing, or a telemedicine visit and dispensing by mail or picked up from the clinic (hybrid model). Outcomes were obtained from electronic records and incident databases. Outcomes of all hospitalizations related to abortion, ED visits, infection without sepsis, and hemorrhage without transfusion were not reported. The investigators' analysis for non-inferiority determined the efficacy and safety were comparable between both cohorts. Complete abortion occurred in > 98% in both cohorts. Hemorrhage requiring transfusion was reported in 0.04% and 0.02% of the traditional and hybrid cohorts, respectively; this is lower than the labeled 0.5% transfusion rate. There were no severe infections requiring hospitalization, major surgery or deaths reported.

A secondary analysis of the hybrid cohort was reported. Within the 29,984-person hybrid model cohort, 11,549 (39%) abortions were conducted in-person (in-person assessment with ultrasound was performed and medications provided from the clinic for home use) and 18,435 (61%) abortions were provided by telemedicine visit, without tests or confirmation of GA/intrauterine position by ultrasound, and medications either mailed or picked up from the clinic. Outcomes stratified by type of mifepristone dispensing were not reported. The rate of complete abortion was slightly higher in the telemedicine group (99.2%) than that in the in-person group (98.1%). There were no significant differences in the rates of reported SAEs. Adjustments for clinical and demographic characteristics were made because the two groups differed in baseline characteristics, including a higher proportion of pregnancies with GA over 6 weeks in the in-person group (68.2% compared with 55.1%). The authors conclude a hybrid model for medical abortion that includes no-test medical abortion[u] (no ultrasound, no pelvic exam, no pregnancy test) is effective and safe.

We conclude that although the Aiken[5] (2021) study has a large sample size and includes 85% of all medical abortions performed in England and Wales during the study period, the study has limitations. The authors acknowledge the main limitation of their study was that analysis was based on deidentified information in the NHS database and the investigators were unable to verify the outcomes extracted. Other limitations included that their search only captured

33

Reference ID: 4905882

outcomes in electronic records and incident databases that met the authors' defined threshold for SAE reporting, and that the labeled abortion outcomes considered serious, such as hospitalizations related to abortion, infection without sepsis, hemorrhage without transfusion, or ED/urgent care visits, were not all included in the authors' definition of serious adverse event.

Data from the mail order dispensing studies with telemedicine visits from Gynuity (Raymond, Chong and Anger),[3,16,17] Kerestes[4], and Aiken[5] (2021) support that efficacy of medical abortion was maintained. The Aiken[5] study appears to be of sufficient sample size to determine whether safety outcomes with mail dispensing differ from in-person dispensing; however, the study's design did not capture all serious safety outcomes, thus limiting the certainty of the findings. Study reports of Raymond[16] Chong[3], and Kerestes[4] all suggest there may be an increase in ED/urgent care visits with telemedicine visits and dispensing by mail without increases in other adverse events. Anger's[17] comparative analysis suggests a pre-abortion examination may decrease the occurrence of procedural intervention and decrease the number of unplanned visits for postabortion care. Overall, despite the limitations noted, these studies support that dispensing by mail is safe and effective. Although the literature suggests there may be more frequent ED/urgent care visits related to the use of mifepristone when dispensed by mail from the clinic, there are no apparent increases in other SAEs related to mifepristone use. One reason for the increase in frequent ED/urgent care visits in the Raymond[16] publication, according to its authors, may have been that a substantial proportion of participants lived significant distances from their providers and increased distances have been associated with higher use of ED following treatment. Raymond[16] reported that half of the participants who had an ED/urgent care visit did not require medical treatment.

Clinic dispensing by courier

Reynolds-Wright[18] reported findings from a prospective cohort study of 663 women at less than 12 weeks' GA in Scotland undergoing medical abortion at home with use of telemedicine during the pandemic (from April 1 to July 9, 2020). The majority of medical abortions (78.7%) used telemedicine visits, eliminated pre-abortion ultrasound, and provided mifepristone for pick up at the service or by couriered delivery to woman's home. The number of couriered deliveries was not reported; thus, this study does not provide abortion outcomes separately for couriered delivery of mifepristone and misoprostol. With access to NHS regional hospital databases, the investigators were able to verify pregnancy outcomes and complications. Of the 663 participants, 642 (98.2%) were under 10 weeks GA, 21 (1.8%) were between 10 and 12 weeks

34

Reference ID: 4905882

GA, and one participant was never pregnant. A total of 650 participants had complete abortion without requiring surgical intervention (98%), 5 (0.8%) an ongoing pregnancy and 4 (0.6%) an incomplete abortion. The outcomes from this study in Scotland are consistent with labeled mifepristone outcomes. The study shares the same limitations as the Aiken[5] (2021) study.

<u>Partner organization dispensing by mail</u>

Women on Web (WoW), an internet group, connects patients and providers outside of the US and provides medical abortion globally, dispensing mifepristone through "a partner organization" by mail.[v] Medical abortion eligibility is determined using an online questionnaire with asynchronous physician review. If eligible, medications are mailed to the women. WoW provides help and support by email or instant messaging.

Aiken[19] (2017) conducted a population-based study analyzing findings from 1,636 women in the Republic of Ireland and Northern Ireland who were sent medications between 2010 and 2012. Receipt of medications was confirmed for 1,181 women, among whom 1,023 confirmed use of mifepristone and misoprostol; outcome information was available for 1,000 (61% of women sent medications). Of the 1,000 women, the majority (781, 78%) were less than 7 weeks GA and 219 (22%) were at 7-9 weeks. Complete abortion without surgical intervention occurred in 947 (94.7% of 1,000 with known outcome); 7 (0.7%) women received a blood transfusion, 26 (2.6%) received antibiotics (route of administration undetermined) and 87 (8.7%) sought medical care at a hospital or clinic for symptoms related to medical abortion. Hospitalizations related to abortion were not reported. The reported proportion of complete abortion is within the range labeled for medical abortion up to 70 days (92.7-98.1%). However, the finding of 94.7% complete abortion represents a lower-than-expected efficacy based on the cohort's GA (almost 80% less than 7 weeks, labeled success for medical abortion ≤ 49 days is 98.1%). This study has limitations, including outcomes based on self-report without validation of completed abortion by examination or laboratory testing, and no known outcomes for 39% of study cohort. Additionally, the authors noted medical abortion was provided in a legally-restrictive setting, where the law provided a maximum penalty of life imprisonment for the woman undergoing the abortion, which may affect participants' self-reporting.

---

[v] In March 2019, FDA sent a WL to Aidaccess.org, a group affiliated with WoW. Aidaccess.org received this WL because it was introducing misbranded and unapproved new drugs into the U.S. In the context of this REMS review, studies involving WoW are included solely for purposes of evaluating of data regarding the methods of dispensing mifepristone.

Reference ID: 4905882

Endler[21] and Norten[20] have reported outcomes from WoW cohorts but do not provide relevant information on mifepristone dispensing by mail, because neither provide meaningful outcomes data for consideration. Endler[21] compared the outcomes of self-reported heavy bleeding and clinical visits occurring during the "first or second day of abortion" that occurred in women undergoing medical abortion at 9 weeks GA or less, with outcomes from women at more than 9 weeks GA. Outcome data from day 1 or 2 is of limited usefulness. Norten[20] describes findings from a survey of women who were sent medical abortion medication through WoW and provided self-reported outcomes. Results were based on surveys returned from only 37% of participants, a return rate that is too low for the study to be considered valid.

WoW uses a model with numerous deviations from the standard provision of medical abortion in the US. For example, this model has no synchronous interaction with the prescriber during informed consent or prior to prescribing medication and no confirmation of self-reported medical, surgical, and menstrual history or confirmed pregnancy testing. Further, although Aiken[19] (2017) is a large cohort study, the outcomes are self-reported with no verification of complete abortion by laboratory or clinical evaluation and 39% of outcomes are unaccounted for. These limitations in the Aiken study result in the data being insufficient to determine the safety of dispensing mifepristone by mail through a partner organization.

## 4. Discussion

After review of the published literature, safety information collected during the COVID-19 PHE, postmarketing data, information from the first Mifepristone REMS Program assessment report, responses to information requests to the Applicants, and information provided by advocacy groups, individuals and the plaintiffs in the *Chelius v. Becerra* litigation, we conclude that the REMS can be modified to reduce burden without compromising patient safety.

**Prescriber Certification**

None of the publications we reviewed would support a conclusion that a healthcare provider who prescribes mifepristone does not need to meet the qualifications included in the Mifepristone REMS Program as described above in section 3.2.1. Absent these provider qualifications, serious complications associated with medical abortion, including missed ectopic pregnancy and heavy bleeding from incomplete abortion, would not be detected or appropriately managed.

36

Reference ID: 4905882

We conclude that prescriber certification (ETASU A) should be maintained. The current process requires the prescriber to agree to the requirements of the Mifepristone REMS Program and to attest that they meet the qualifications described in section 3.2.1 above. The REMS has been structured to minimize burden to prescribers by requiring only a one-time certification by the prescriber for each Applicant. We have determined that healthcare provider certification continues to be necessary to ensure the benefits outweigh the risks, especially considering that, if the in-person dispensing requirement is removed from the Mifepristone REMS Program, the number of new providers may increase (see discussion in section 3.2.2 above).

**Drug to be dispensed with evidence or other documentation of safe use conditions**

The requirement to counsel the patient and provide them with the *Patient Agreement Form* ensures that each patient is informed of the appropriate use of mifepristone, the risks associated with treatment, and what to do if they experience symptoms that may require emergency care.

In 2016, we initially recommended eliminating the *Patient Agreement Form* (see section 3.2.2), though the form was ultimately maintained as part of the REMS. As discussed above, our current literature review has indicated that there is no basis to remove the *Patient Agreement Form* from the REMS. In addition, surveys we reviewed suggest that if the in-person dispensing requirement for mifepristone is removed, there could be a potential doubling of medical abortion providers. This potential doubling of medical abortion providers supports the continued need to ensure that patients are consistently provided patient education under the Mifepristone REMS Program regarding the use and risks of mifepristone. The *Patient Agreement Form* is an important part of standardizing the medication information that prescribers communicate to their patients, including new prescribers, and also provides the information in a brief and understandable format to patients. We determined, in accordance with section 505-1(f)(2) of the FD&C Act, that this does not impose an unreasonable burden on providers or patients.[w]

Given the likelihood of a potential increase in new prescribers if the in-person dispensing requirement is removed from the Mifepristone REMS Program, we conclude that maintaining the *Patient Agreement Form* remains necessary to assure safe use at this time.

---

[w] *The Patient Agreement Form* can be signed in person or through other means.

Reference ID: 4905882

**Drug to be dispensed only in certain healthcare settings**

As discussed above in section 3.2.3, our evaluation of information submitted by the applicants in the one-year (1st) REMS assessment report for the Mifepristone REMS Program and in response to follow-up requests from the Agency indicates that the number of adverse events reported to FDA during the COVID-19 PHE with mifepristone use is small, and the data provide no indication that any program deviation or noncompliance with the Mifepristone REMS Program contributed to these adverse events. We further conclude, based our review of the postmarketing safety data from FAERS during the COVID-19 PHE and information submitted by the applicants for the timeframe of January 27, 2020 through September 30, 2021, that there does not appear to be a difference in adverse events between periods during the COVID-19 PHE when the in-person dispensing requirement was being enforced and periods when the in-person dispensing requirement was not being enforced; nor have we identified any new safety concerns with the use of mifepristone for medical termination of early pregnancy.

Alternatives to in-person dispensing of mifepristone have been investigated in several studies and countries. The literature review identified 15 publications[x] that assessed safety outcomes from various medication delivery models (US, UK, Canada, Ireland, Australia, Nepal), including dispensing by retail and mail order pharmacies, prescribers mailing medications or using couriered service to deliver medications, and dispensing by "partner organizations". The ability to generalize the results of these studies to the US population is hampered by differences in pre-abortion care (e.g., telemedicine versus in-person, testing), and the usefulness of the studies is limited in some instances by small sample sizes and lack of follow-up information on outcomes with regard to both safety and efficacy.

In addition, there are factors which complicate the analysis of the dispensing element alone. Some of these factors are: (1) only a few studies have evaluated alternatives for in-person dispensing of mifepristone in isolation; for example, most studies on mail dispensing of mifepristone also include telemedicine consultation, and (2) because most SAEs with medical abortion are infrequent, though they can be life threatening, further evaluation of changes in dispensing would require studies with larger numbers of participants. We did not find any large clinical studies that were designed to collect safety outcomes in healthcare systems similar to the US.

---

[x] The 15 publications correspond to endnote numbers: 1-7, 14-21.

Reference ID: 4905882

Based on the literature identified by our review, dispensing mifepristone by mail from the clinic or from a mail order pharmacy does not appear to jeopardize the efficacy of medical abortion. The studies we reviewed are not adequate on their own to establish the safety of the model of dispensing mifepristone by mail, although the safety and efficacy outcomes reported in these studies remain within the ranges described in mifepristone labeling except for increased numbers of ED/urgent care visits and hospitalizations.

Four publications (Raymond[16], Chong[3], Anger[17] and Kerestes[4]), describe a relevant US cohort where dispensing mifepristone from the clinic by mail was paired with telemedicine visits. These studies showed that efficacy was maintained and there was no increased frequency of SAEs except for higher ED/urgent care visits. The increased ED/urgent care visits were not associated with increases of other SAEs, and in the view of one study's authors (Raymond[16]), may be associated with participants being located significant distances from their providers. The Aiken[5] (2021) study of a large UK cohort where the clinics mailed mifepristone report small (lower than labeled) occurrences of transfusion and no significant infections requiring hospitalization. In Grossman[1] and Hyland[15], where the pharmacies mailed mifepristone after prescribers confirmed GA, efficacy is maintained. Grossman's[1] interim analysis found no increases in SAEs. Hyland[15] reported higher numbers of hospitalizations but did not report increases of other SAEs. Overall, while the studies assessing mifepristone dispensing by mail suggest more frequent encounters with healthcare providers, they generally support a conclusion that dispensing by mail is safe. Despite the limitations of the studies we reviewed, we conclude that overall, the outcomes of these studies are not inconsistent with our conclusion that, based on the 1st year REMS assessment report and postmarketing safety data, mifepristone will remain safe, and efficacy will be maintained if the in-person dispensing requirement is removed from the Mifepristone REMS Program.

Based on the REMS assessment data, FAERS data from the time period when the in-person dispensing requirement was not being enforced, our review of the literature, and information provided by advocacy groups, individuals, the Applicants, and the plaintiffs in the *Chelius v. Becerra* litigation, we conclude that mifepristone will remain safe and effective for medical abortion if the in-person dispensing requirement is removed, provided all the other requirements of the REMS are met, and pharmacy certification is added as described below.

Removing the in-person dispensing requirement will render the REMS less burdensome to healthcare providers and patients and provided all other requirements of the REMS are met, including the additional requirement for pharmacy certification, the REMS will continue to

39

Reference ID: 4905882

ensure that the benefits of mifepristone for medical abortion outweigh the risks. Therefore, to reduce the burden imposed by the REMS, the Mifepristone REMS Program should be modified to  remove the in-person dispensing requirement, which would allow, for example, dispensing of mifepristone by mail via certified prescribers or pharmacies, in addition to in-person dispensing in clinics, medical offices and hospitals as currently outlined in ETASU C.

**New requirement to be added for pharmacy certification**

The current distribution model requires the certified prescriber to dispense mifepristone directly to the patient in a clinic, medical office, or hospital. During the periods when the in-person dispensing requirement was not being enforced, both applicants used mail order pharmacies to receive and hold mifepristone on behalf of the certified healthcare providers who had purchased the product.[j,y,z]  Pursuant to a prescription for mifepristone, the mail order pharmacy would ship the product to a named patient.

The Mifepristone REMS Program continues to require that mifepristone be prescribed only by certified prescribers. With the removal of the in-person dispensing requirement, however, the drug is no longer required to be dispensed only in a clinic, medical office or hospital. Under the REMS as modified, mifepristone can be dispensed through a pharmacy, provided the product is prescribed by a certified prescriber and all other requirements of the REMS are met. Given this modification to the dispensing requirements in the REMS, it is necessary to add a requirement for certification of pharmacies under ETASU B. Adding the pharmacy certification requirement incorporates pharmacies into the REMS, ensures that pharmacies are aware of and agree to follow applicable REMS requirements, and ensures that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers. Without pharmacy certification, a pharmacy might dispense product that was not prescribed by a certified prescriber. Adding pharmacy certification ensures that ETASU A is met prior to dispensing the product to a patient; certified prescribers, in turn, have agreed to meet all the conditions of the REMS, including ensuring that the *Patient Agreement Form* (ETASU D) is completed. In addition, wholesalers and distributors can only ship to certified pharmacies. Based on our review of the safety data and our consideration of the distribution model implemented by the Applicants during the periods

---

y ANDA 091178: September 23, 2021 response to the September 15, 2021 information request;  October 11 and 16, 2021  responses to the June 30, 2021 and July 15, 2021 information requests; October 26, 2021 response to  the October 22, 2021 information request; October 29, 2021 response to the October 27 information request.
z NDA 020687: September 20, 2021 response to the September 15, 2021 information request; October 26, 2021 response to the October 22 information request.

40

Reference ID: 4905882

when the in-person dispensing requirement was not being enforced, as well as REMS assessment data and published literature, we conclude that provided all other requirements of the REMS are met, the REMS program, with the removal of the in-person dispensing requirement and the addition of a requirement for pharmacy certification, will continue to ensure the benefits of mifepristone for medical abortion outweigh the risks while minimizing the burden imposed by the REMS on healthcare providers and patients. As modified, the REMS would allow, for example, dispensing by mail order or specialty pharmacies, similar to the distribution model used by applicants during the periods when the in-person dispensing requirement was not being enforced.[aa]

The above recommendations were discussed with the ___(b) (6)___ (___(b) (6)___ and senior leadership from CDER on November 2, 2021. The ___(b) (6)___ ___(b) (4)___ along with senior CDER leadership, concurred with removing the in-person dispensing requirement provided that all of the remaining REMS requirements are met, including but not limited to prescriber certification where prescribers need to attest to having certain qualifications, and maintaining the *Patient Agreement Form*. The ___(b) (6)___ ___(b) (4)___ and senior leadership from CDER were also in favor of adding pharmacy certification to assure the safe use of mifepristone.

## 5. Conclusions and Recommendations

Based on the results of REMS assessments; our review of safety data collected during the PHE as well as data from FAERS; our literature search; and information provided by advocacy groups, individuals, the Applicants, and the plaintiffs in the *Chelius v. Becerra* litigation, ___(b) (6)___ and ___(b) (6)___ have concluded that a REMS modification is necessary and should include the following changes:

- Removing the requirement under ETASU C that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals.
- Adding a requirement under ETASU B that pharmacies that dispense the drug be specially certified.

---

[aa] Our current conclusion that the REMS would allow dispensing by mail order or specialty pharmacies is based on data received from Applicants relating to the periods when the in-person dispensing requirement was not enforced and mail-order pharmacies were used to dispense the product, as well as our analysis of postmarketing safety data and available literature. At this time we do not have data (from the Applicants or from other sources) to assess the certification of retail pharmacies under the REMS. We have not yet determined the details of pharmacy certification requirements, including whether any limitations on the types of pharmacies that may dispense the product are necessary.

41

2021 REMS 001601

Reference ID: 4905882

(b) (6)  and  (b) (6)  recommend the Applicants be issued a REMS Modification Notification Letter that requests submission within 120 days from the date of the letter.

## 6. References

[1] Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2021; In press. doi:https://doi.org/10.1016/j.contraception.2021.09.008

[2] Grossman D, Baba CF, Kaller S, et al. Medication Abortion With Pharmacist Dispensing of Mifepristone. Obstet Gynecol 2021;137:613–22.

[3] Chong E, Shochet T, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-48.

[4] Kerestes C, Murayama S, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021 Jul;104(1):49-53. doi:10.1016/j.contraception.2021.03.025. Epub 2021 Mar 28.

[5] Aiken ARA, Lohr PA, et al. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464–1474.

[6] Rocca CH, Puri M, et al. Effectiveness and safety of early medication abortion provided in pharmacies by auxiliary nurse-midwives: A non-inferiority study in Nepal. PLoS ONE 2018 13(1): e0191174. https://doi.org/10.1371/journal.pone.019117

[7] Wiebe ER, Campbell M, et al. Comparing telemedicine to in-clinic medication abortions induced with mifepristone and misoprostol. Contracept X. 2020; 2: 100023.

[8] National Abortion Federation 2020 Clinical Policy Guidelines for Abortion Care, available at https://5aa1b2xfmfh2e2mk03kk8rsx-wpengine.netdna-ssl.com/wp-content/uploads/2020_CPGs.pdf

[9] American College of Obstetricians and Gynecologists Committee on Practice Bulletins—Gynecology and the Society of Family Planning. Simultaneously published as ACOG Bulletin

2021 REMS 001602

Reference ID: 4905882

[19] Aiken AR, Digon I, Trussell J, et al. Self reported outcomes and adverse events after medical abortion through online telemedicine: population based study in the Republic of Ireland and Northern Ireland. BMJ 2017;357:j2011.

[20] Norten H, Ilozumba O, Wilkinson J, et.al. 10-year evaluation of the use of medical abortion through telemedicine: a retrospective cohort study. BJOG 2021; https://doi.org/10.1111/1471-0528.16765.

[21] Endler M, Beets L, Gemzell Danielsson K, Gomperts R. Safety and acceptability of medical abortion through telemedicine after 9 weeks of gestation: a population-based cohort study. BJOG 2019;126:609–618.

[22] Raymond EG, Grossman D, Mark A, et.al. Commentary: No-test medication abortion: A sample protocol for increasing access during a pandemic and beyond. Contraception 2020;101:361-366

[23] Mark A, Foster A, Perritt J. The future of abortion is now: Mifepristone by mail and in-clinic abortion access in the United States. Contraception 2021;104:38-42

[24] Martin D, Miller A, Quesnel-Vallee, A, et al. Canada's global leadership on health 1. Canada's universal health care system: achieving its potential. Lancet 2018; 391:1718-35

44

Reference ID: 4905882

# 7. Appendix A

## References Cited in Letters from Plaintiffs

| References cited in letter from *Chelius v. Becerra* Plaintiffs (September 29, 2021) | |
|---|---|
| **References included in the REMS review** | |
| Aiken A et al. BJOG 2021: 128 (9): 1464-1474 | |
| Chong, et al. Contraception 2021; 104(1) 43-48 | |
| Daniel S. et al. Contraception 2021; 104(1): 73-76 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Am. Coll. of Obstetricians & Gynecologists, *Position Statement: Improving Access to Mifepristone for Reproductive Health Indications* (June 2018), https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications | Policy/advocacy statement |
| House of Delegates, Am. Med. Ass'n., *Memorial Resolutions Adopted Unanimously No. 504 (2018)* https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a18-resolutions.pdf | Policy/advocacy statement |
| Cong. Of Delegates, Am. Acad. Of Fam. Physicians,  *Resolution No. 506 (CoSponsored C) Removing Risk Evaluation and Mitigation Strategy (REMS) Categorization of Mifepristone* (May 24, 2018) https://www.reproductiveaccess.org/wp-content/uploads/2019/02/Resolution-No.-506-REMS.pdf | Policy/advocacy statement |
| Schummers L et al, Contraception 2020; 102(4): 273 | Abstract |
| Upadhyay UD et al.) Obstet & Gynecol 2015; 125: 175 | Published prior to March 29, 2016-July 26, 2021 timeframe for current literature review. We note that the extensive literature review conducted as part of the 2016 review, which was consistent with the division's standard approach for reviewing an efficacy supplement |

45

Reference ID: 4905882

| | and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
|---|---|
| Kapp N et al. Best Pract Clin Obstet Gynaecol. 2020;63:37-44 | Abstract. Also outside the scope of first trimester medical abortion. |
| Fuentes L et al. J Women's Health 2019; 28 (12): 1623, 1625<br><br>Bearak JM, Lancet Pub Health 2017 Nov;2(11): e493, e495-96<br><br>Cartwright A et al 20 J Med Internet Res 2018  20(5):e10235<br><br>Barr-Walker J, et al PLoS One 2019;14(4): e0209991<br><br>Grossman et al  JAMA Network 2017;317(4):437, 437-438<br><br>Dobie S et al 31 Fam Plan Persp 1999; 31(5): 241-244<br><br>Shelton JD 8 Fam Plan Persp 1976; 8(6):260, 260-262<br><br>Norris AH et al Am J Pub Health 2020; 110 (8): 1228,1232<br><br>Upadhyay UD et al Am J Pub Health 2014; 104(9):1687, 1689 | Focused on the logistics of accessing abortion care. |
| CDC MMWR Abortion Surveillance – United States, 2018<br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T5_down | Contains primarily general statistics on abortion care  by state. |

| References cited in appendix from *Chelius v. Becerra* Plaintiffs (September 29, 2021) |
|---|
| References included in the REMS review |
| None |

46

Reference ID: 4905882

| References excluded from the REMS review | Rationale for Exclusion |
|---|---|
| Jones RK et al Guttmacher Institute Abortion Incidence and Service Availability in the United States, 2017 (2019)<br><br>Guttmacher Inst, Induced Abortion in the United States (2019) | Contains primarily general statistics on abortion care and logistics of accessing abortion care. |
| University of Minnesota Healthy Youth Dev. Prevention Rsch Ctr, 2019 Minnesota Adolescent Sexual Health Report 3 (2019) | Not related specifically to abortion care. |
| Jerman J et al Guttmacher Inst, Characteristics of U.S. Abortion Patients in 2014 and Changes since 2008 (2016) | Contains figures on patient characteristics from 2008-2014. |
| Roberts CM et al  Women's Health Issues 2014; 24:e211, e215 | Focused on cost of abortion. |
| CDC MMWR Abortion Surveillance 2018<br><br>https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T7 down (last updated Nov. 7, 2020) | Contains primarily statistics on number of abortions in the US. |
| Jones RK  Persp on Sexual & Reprod Health 2017; 49:17, 20 | Focused on abortion incidence and service availability. |
| Fuentes L et al (as above)<br><br>Bearak JM et al (as above)<br><br>Cartwright A et al (as above)<br><br>Johns NE et al. BMC Health Serv Res 2017; 17: 287, 294 | Focused on logistics of accessing abortion care. |

| References cited in letter from Society of Family Planning (August 11, 2021) |
|---|
| References included in the REMS review |
| Grossman D. Obstet Gynecol 2019;133 (3): 477-483 |

Reference ID: 4905882

| Grossman D et al. Obstet Gynecol 2021; 137 (4): 613-622. | |
| Winikoff B et al. Obstet Gynecol 2012; 120: 1070-1076 reviewed in 2016 clinical memo | |
| Chen MJ et al. Obstet Gynecol 2015;126(1):12-21 reviewed in 2016 memo | |
| Chong et al. Contraception 2021;104(1): 43-48 | |
| Aiken A et al. BJOG 2021; 128 (9): 1464 -1474 | |
| Hyland 2018 et al. Aust New Zeal J Obstet Gynaecol 2018; 58 (3): 335-340 | |
| **References excluded from the REMS review** | **Rationale for Exclusion** |
| Schummers L et al. BMJ Sex Reprod Heal 2021;47(e1) | Abstract |
| Kapp et al. 2020 (as above) | Abstract |
| Upadhyay et al. 2015 (as above) | (See rationale above) |
| Srinivasulu et al. Contraception 2021; 104(1):92-97 | Survey on clinician perspectives on access to mifepristone. |
| Calloway D et al. Contraception 2021; 104(1): 24-28 | Primarily addresses provider stigma around abortion care. |
| Rasmussen et al. Contraception; 104(1): 98-103 | Opinion/commentary |
| Cleland et al. Obstet Gynecol 2013;121(1):166-171 | Published prior to March 29, 2016 - July 26, 2021 timeframe for current literature review. We note that the extensive literature search conducted as part of the 2016 clinical review, which was consistent with the division's standard approach for reviewing an efficacy supplement and encompassed 90 references, did not capture this publication. However, the authors' conclusion in this publication is consistent with our review of the safety data in 2016. |
| National Academy of Sciences, Engineering, and Medicine. Safety and Quality of Abortion Care in the US 2018 | General information about abortion care in the US. Did not provide safety data relevant to the elements of the REMS |
| Raymond EG. Obstet Gynecol 2012: 119(2): 215-219 | Does not separate out medical and surgical abortion. |

48

2021 REMS 001607

| Bartlett LA et al. Obstet Gynecol 2004; 103(4): 729-737 | Focused on surgical abortion. |
|---|---|
| Jones RK, Jerman J. Time to appointment and delays in accessing care among U.S. abortion patients, Guttmacher 2016 | Focused on logistics of accessing abortion care. |
| Foster DG et al. Perspect Sex Reprod Health 2013; 45(4):210-218 | Focused on second trimester abortion. |
| Ely G et al. Heal Soc Work 2019;44(1):13-21 | Focused on logistics of accessing abortion care. |
| Munro S et al. Ann Fam Med 2020; 18(5):413-421. | Survey on physician perspectives on implementing medical abortion with mifepristone. |

2021 REMS 001608

Reference ID: 4905882

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

(b) (6)

12/16/2021 10:22:50 AM

(b) (6)

12/16/2021 10:25:34 AM

(b) (6)

12/16/2021 10:30:08 AM

(b) (6)

12/16/2021 10:35:53 AM

(b) (6)

12/16/2021 10:49:46 AM

(b) (6)

12/16/2021 10:59:01 AM

(b) (6)

12/16/2021 11:08:07 AM

2021 REMS 001609

**FDA** **U.S. FOOD & DRUG**
ADMINISTRATION

NDA 020687

**REMS MODIFICATION NOTIFICATION**

Danco Laboratories, LLC
(b) (4), (b) (6)

P.O. Box 4816
New York, NY 10185

Dear ___(b) (4), (b) (6)___ :

We refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Mifeprex (mifepristone) Tablets.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

The REMS for mifepristone was originally approved on June 8, 2011, and your single shared system REMS (SSS REMS) was approved on April 11, 2019. Your last SSS REMS modification was approved May 14, 2021. The SSS REMS consists of elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

In accordance with section 505-1(g)(4)(B) of the Federal Food, Drug, and Cosmetic Act (FDCA), we have determined that your approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks.

This determination is based on a review of published literature, safety information collected during the COVID 19 PHE, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

Your approved REMS must be modified as follows:

**Elements to Assure Safe Use:** We have determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in person dispensing will also minimize the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), we have also determined that an additional element to assure safe use is necessary to mitigate the risk of serious

2021 REMS 001803

Reference ID: 4906335

NDA 020687

Page 2

complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

Your REMS must include elements to mitigate this risk, including at least the following:

- Healthcare providers have particular experience or training, or are specially certified

- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified

- The drug is dispensed to patients with evidence or other documentation of safe use conditions.

  The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the elements to assure safe use (outlined above).  Include an intervention plan to address any findings of non-compliance with the ETASU.

The proposed REMS must include a timetable for submission of assessments. The proposed REMS modification submission should include a new proposed REMS document and appended REMS materials, as appropriate, that show the complete previously approved REMS with all proposed modifications highlighted and revised REMS materials.

In addition, the submission should also include an update to the REMS supporting document that includes a description of all proposed modifications and their potential impact on other REMS elements. Revisions to the REMS supporting document should be submitted with all changes marked and highlighted.

Because we have determined that a REMS modification as described above is necessary to minimize the burden on the health care delivery system of complying with the REMS, and to ensure that the benefits of the drug outweigh the risks, you must submit a proposed REMS modification within 120 days of the date of this letter.

Submit the proposed modified REMS as a Prior Approval supplement (PAS) to your NDA.

NDA 020687
Page 3

Because FDA is requiring the REMS modifications in accordance with section 505-1(g)(4)(B), you are not required to submit an adequate rationale to support the proposed modifications, as long as the proposals are consistent with the modifications described in this letter. If the proposed REMS modification supplement includes changes that differ from the modifications described in this letter, an adequate rationale is required for those additional proposed changes in accordance with section 505-1(g)(4)(A).

Prominently identify the submission with the following wording in bold capital letters at the top of the first page of the submission:

**NEW SUPPLEMENT FOR NDA 020687/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

Prominently identify subsequent submissions related to the proposed REMS modification with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687/S-000**
**PROPOSED REMS MODIFICATION-AMENDMENT**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

## SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

In addition to submitting the proposed modified REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS modification submission.

For more information on submitting REMS in SPL format, please email FDAREMSwebsite@fda.hhs.gov.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

NDA 020687
Page 4

If you have any questions, call [redacted] (b) (6), at [redacted] (b) (6).

Sincerely,

*{See appended electronic signature page}*

[redacted] (b) (6)

Center for Drug Evaluation and Research

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

2021 REMS 001806

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------

/s/

------------------------------------------------------------

(b) (6)

12/16/2021 03:09:07 PM

2021 REMS 001807

Reference ID: 4906335

**FDA U.S. FOOD & DRUG**
ADMINISTRATION

ANDA 091178

**REMS MODIFICATION NOTIFICATION**

GenBioPro, Inc.
c/o      (b)(4)/TS-CI; (b)(6)/PPI

Attention:    (b)(4)/TS-CI; (b)(6)/PPI

Dear  (b)(4)/TS-CI; (b)(6)/PPI :

Please refer to your Abbreviated New Drug Application (ANDA) submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) for mifepristone tablets.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

The Shared System (SS) REMS for mifepristone consists of elements to assure safe use, and an implementation system.

In accordance with section 505-1(g)(4)(B) of the FD&C Act, we have determined that your approved REMS for mifepristone must be modified to minimize the burden on the health care delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks.

This determination is based on a review of published literature, safety information collected during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

Your approved REMS must be modified as follows:

**Elements to Assure Safe Use:** We have determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will reduce the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), we have also determined that an additional element to assure safe use is necessary to mitigate the risk of

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2021 REMS 001808

ANDA 091178
Page 2

serious complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

Your REMS must include elements to mitigate this risk, including at least the following:

- Healthcare providers who prescribe the drugs have particular experience or training, or are specially certified
- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified
- The drug is dispensed to patients with evidence or other documentation of safe use conditions

The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the ETASU (as outlined above). Include an intervention plan to address any findings of non-compliance with the ETASU.

The proposed REMS modification submission should include a new proposed REMS document and appended REMS materials, as appropriate, that show the complete previously approved REMS with all proposed modifications highlighted and revised REMS materials.

In addition, the submission should also include an update to the REMS supporting document that includes a description of all proposed modifications and their potential impact on other REMS elements. Revisions to the REMS supporting document should be submitted with all changes marked and highlighted.

Because we have determined that a REMS modification as described above is necessary to minimize the burden on the health care delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks, you must submit a proposed REMS modification within 120 days of the date of this letter.

Submit the proposed modified REMS as a Prior Approval supplement (PAS) to your ANDA.

Because FDA is requiring the REMS modifications in accordance with section 505-1(g)(4)(B) of the FD&C Act, you are not required to submit an adequate rationale to support the proposed modifications, as long as the proposals are consistent with the modifications described in this letter.  If the proposed REMS modification supplement includes changes that differ from the modifications described in this letter, an adequate rationale is required for those additional proposed changes in accordance with section 505-1(g)(4)(A) of the FD&C Act.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2021 REMS 001809

Reference ID: 4906129

Prominently identify the submission with the following wording in bold capital letters at the top of the first page of the submission:

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

Prominently identify subsequent submissions related to the proposed REMS modification with the following wording in bold capital letters at the top of the first page of the submission:

**ANDA 091178/S-000**
**PROPOSED REMS MODIFICATION-AMENDMENT**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

**SUBMISSION OF REMS DOCUMENT IN SPL FORMAT**

In addition to submitting the proposed modified REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS modification submission.

For more information on submitting REMS in SPL format, please email REMS_Website@fda.hhs.gov.

If you have any questions, call ⟨(b)(6)/PPI⟩ .

Sincerely,

*{See appended electronic signature page}*

⟨(b)(6)/PPI⟩

Center for Drug Evaluation and Research

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2021 REMS 001810

-------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-------------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

12/16/2021 03:21:22 PM

☐ Search    ☐ Menu

**IN THIS SECTION: Information By Drug Class**    ☐

☐ Information by Drug Class

# Opioid Medications

☐ Share  |  Post  |  ☐ Linkedin  |  ☐ Email  |  ☐ Print

Prescription opioids are powerful pain-reducing medications that include oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. However, too many Americans have been impacted by the serious harms associated with these medications, and despite ongoing efforts, the scope of the opioid crisis continues to grow.

One of the highest priorities of the FDA is advancing efforts to address the crisis of misuse and abuse of opioid drugs harming families. Opioids are claiming lives at a staggering rate, and overdoses from prescription opioids are reducing life expectancy in the United States.

At FDA, we're working across the full scope of our regulatory obligations to impact this crisis. Our approach to reducing the misuse and abuse of opioids is outlined in FDA's 2018 Strategic Policy Roadmap, which addresses various facets of this complex issue, as there are no simple answers to reverse this epidemic.

## Decrease Exposure & Prevent New Addiction

Reducing the number of Americans who are addicted to opioids and cutting the rate of new addiction is one of the FDA's highest priorities. This may be achieved by ensuring that only appropriately indicated patients are prescribed opioids and that the prescriptions are for durations and doses that properly match the clinical reason for which the drug is being prescribed in the first place.

- SUPPORT Act Section 3002: Report on Evidence-Based Opioid Analgesic Prescribing Guidelines (PDF - 225 KB)
- SUPPORT Act Section 7024: Report to Congress on Opioid Prescribing Limits (PDF - 871 KB)
- Opioid Policy Steering Committee (OPSC)

- [Opioid Analgesic Risk Evaluation and Mitigation Strategy (REMS)](#)

- [FDA Opioid Systems Modeling Effort](#)

- [Disposal of Unused Medicines: What You Should Know](#)

## Support Treatment of Those with Opioid Use Disorder

Given the scale of the opioid crisis, with millions of Americans already affected, prevention is not enough. We must do everything possible to address the human toll caused by opioid use disorder and help those suffering from addiction by expanding access to lifesaving treatment.

- [Medication-Assisted Treatment (MAT)](#)

- [Naloxone](#)

- [FDA Innovation Challenge: Devices to Prevent and Treat Opioid Use Disorder](#)

## Foster Development of Novel Pain Treatment Therapies

As we continue to confront opioid abuse and addiction, we must also take steps to help those with acute and chronic pain who need access to medicines, including opioids, get improved treatment alternatives. Transitioning from the current market, dominated by conventional opioids, to one in which most opioids have abuse-deterrent properties, holds significant promise for a meaningful public health benefit. While these innovative formulations are designed to make it harder for people to manipulate the opioid drug so they can't be abused, it's important that prescribers and patients understand that these drugs are not "abuse-proof," and they do not prevent addiction, overdose, or death.

- [SUPPORT Act Section 6012: Report on Abuse-Deterrent Opioid Formulations and Access Barriers Under Medicare](#) (PDF - 698 KB)

- [Abuse-Deterrent Formulations](#)

- [Patient-Focused Drug Development for Chronic Pain](#)

## Improve Enforcement & Assess Benefit/Risk

The FDA plays an enforcement role when it comes to the illicit market for diverted opioids and illegal drugs. One of those roles is collaborating with Customs and Border Protection on interdiction work on drugs being shipped through the mail. The agency has received new funding for processing drugs and other articles imported or offered for import through International Mail Facilities. A lot of the illicit drugs brought into the U.S., including products laced with lethal doses of fentanyl, are being purchased online and shipped in the mail. Although the sale of prescription opioids without a valid prescription is illegal, the FDA continues to see these products in the packages we inspect.

FDA takes action against websites marketing unapproved opioids

- Online Opioid Summit

In addition, part of our ongoing work is ensuring that drug approval and removal decisions are made within a benefit/risk framework that evaluates not only the outcomes of opioids when used a prescribed, but also the public health effects of inappropriate use of these drugs. We are continually re-evaluating the safety of approved opioid products based on both post-market data the FDA has required from sponsors and additional sources of information as part of our safety surveillance.

- Opioid Analgesic Drugs: Considerations for Benefit/Risk Assessment Framwork (draft guidance)

- Standards for Future Opioid Analgesic Approach and Incentives for New Therapeutics to Treat Pain and Addiction (public meeting)

- Pain Management and the Opioid Epidemic: Balancing Societal and Individual Benefits and Risks of Prescription Opioid Use☐

- Oxymorphone (marketed as Opana ER) Information

## Timeline

The FDA has compiled a timeline to provide chronological information about agency activities and significant events related to opioids. Included on this page is a summary timeline of key events, followed by tabbed years that provide selected additional actions and more detail about the items listed in the summary.

## Related Resources

- Safe Opioid Disposal - Remove the Risk Outreach Toolkit

- Safety Measures for Immediate Release (IR) Opioids

- Safety Measures for Extended-release and Long-acting (ER/LA) Opioids

- Safety Measures for Opioid Analgesics, Prescription Opioid Cough Products, and Benzodiazepines

- Search and Rescue: Connecting prescribers to resources to help prevent drug misuse and abuse in their practices

## Resources For You

- HHS Opioids

- CDC: Injury Prevention and Control: Prescription Drug Overdose

- Substance Abuse and Mental Health Services Administration: Opioids

- National Institute on Drug Abuse: Opioids

**Content current as of:**
03/29/2021

FDA Archive

About FDA

Accessibility

Visitor Information

Website Policies / Privacy

No FEAR Act

Vulnerability Disclosure
Policy

FOIA

HHS.gov

USA.gov

Contact FDA

☐ 1-888-INFO-FDA (1-888-463-6332)

**HIGHLIGHTS OF PRESCRIBING INFORMATION**

**These highlights do not include all the information needed to use JEUVEAU™ safely and effectively. See full prescribing information for JEUVEAU.**

**JEUVEAU (prabotulinumtoxinA-xvfs) for injection, for intramuscular use**
**Initial U.S. Approval: 2019**

---

| WARNING: DISTANT SPREAD OF TOXIN EFFECT |
|---|
| *See full prescribing information for complete boxed warning* |
| **The effects of all botulinum toxin products, including JEUVEAU, may spread from the area of injection to produce symptoms consistent with botulinum toxin effects. These symptoms have been reported hours to weeks after injection.  Swallowing and breathing difficulties can be life threatening and there have been reports of death. JEUVEAU is not approved for the treatment of spasticity or any conditions other than glabellar lines.  [*See Warnings and Precautions (5.1)*]** |

---

**---------------INDICATIONS AND USAGE------------**
JEUVEAU is an acetylcholine release inhibitor and a neuromuscular blocking agent indicated for the temporary improvement in the appearance of moderate to severe glabellar lines associated with corrugator and/or procerus muscle activity in adult patients (1)

**----------DOSAGE AND ADMINISTRATION--------**
Glabellar Lines Administration: 0.1 mL (4 Units) by intramuscular injection into each of five sites, for a total dose of 20 Units (2.2, 2.3)

**-------DOSAGE FORMS AND STRENGTHS-------**
For Injection: 100 Units vacuum-dried powder in a single- dose vial (3)

**---------------CONTRAINDICATIONS------------------**
• Hypersensitivity to any botulinum toxin preparation or to any of the components in the formulation (4.1)
• Infection at the injection site (4.2)

**-----------WARNINGS AND PRECAUTIONS--------**
•Potency Units of JEUVEAU are not interchangeable with other preparations of botulinum toxin products (5.2, 11)
• Spread of toxin effects; swallowing and breathing difficulties can lead to death. Seek immediate medical attention if respiratory, speech or swallowing difficulties occur (5.2, 5.7)
• Potential serious adverse reactions after JEUVEAU injections for unapproved uses (5.3)
• Adverse event reports have been received involving the cardiovascular system, some with fatal outcomes. Use caution when administering to patients with pre-existing cardiovascular disease. (5.5)
• Concomitant neuromuscular disorder may exacerbate clinical effects of treatment (5.6)
• Use with caution in patients with compromised respiratory function or dysphagia (5.7)

**-----------------ADVERSE REACTIONS---------------**
The most common adverse reactions are (6.1):
• Headache (9.3%)
• Eyelid Ptosis (2%)
• Upper Respiratory Tract Infection (3%)
• Increase White Blood Cell count (1%)

**To report SUSPECTED ADVERSE REACTIONS, contact Evolus at [1-877-386-5871] or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch.***

**-----------------DRUG INTERACTIONS----------------**
Patients receiving concomitant treatment of JEUVEAU and aminoglycosides or other agents interfering with neuromuscular transmission (e.g. curare-like agents), or muscle relaxants, should be observed closely because the effect of JEUVEAU may be potentiated (7)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 02/2019**

Reference ID: 4384428

Merck Sharp & Dohme Corp., a subsidiary of
**MERCK & CO., INC.**
Whitehouse Station, NJ 08889, USA

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use
PROPECIA safely and effectively. See full prescribing information for
PROPECIA.**

**PROPECIA® (finasteride) tablets for oral use**
**Initial U.S. Approval: 1992**

**------------------------- RECENT MAJOR CHANGES -------------------------**
Warnings and Precautions, Increased Risk of High-Grade Prostate Cancer
with 5α-Reductase Inhibitors (5.3)                                    06/2011

**------------------------- INDICATIONS AND USAGE -------------------------**
- PROPECIA is a 5α-reductase inhibitor indicated for the treatment of
  male pattern hair loss (androgenetic alopecia) in **MEN ONLY** (1).
- PROPECIA is not indicated for use in women (1, 4, 5.1).

**--------------------- DOSAGE AND ADMINISTRATION ---------------------**
- PROPECIA may be administered with or without meals (2).
- One tablet (1 mg) taken once daily (2.1).
- In general, daily use for three months or more is necessary before benefit
  is observed (2.2).

**--------------------- DOSAGE FORMS AND STRENGTHS ---------------------**
1 mg tablets (3).

**----------------------- CONTRAINDICATIONS -----------------------**
- Pregnancy (4, 5.1, 8.1, 16).
- Hypersensitivity to any components of this product (4).

**----------------------- WARNINGS AND PRECAUTIONS -----------------------**
- PROPECIA is not indicated for use in women or pediatric patients (5.1,
  5.4).
- Women should not handle crushed or broken PROPECIA tablets when
  they are pregnant or may potentially be pregnant due to potential risk to
  a male fetus (5.1, 8.1, 16).
- PROPECIA causes a decrease in serum PSA levels. Any confirmed
  increase in PSA while on PROPECIA may signal the presence of
  prostate cancer and should be evaluated, even if those values are still
  within the normal range for men not taking a 5α-reductase inhibitor
  (5.2).
- 5α-reductase inhibitors may increase the risk of high-grade prostate
  cancer (5.3, 6.1).

**----------------------- ADVERSE REACTIONS -----------------------**
The most common adverse reactions, reported in ≥1% of patients treated with
PROPECIA and greater than in patients treated with placebo are: decreased
libido, erectile dysfunction and ejaculation disorder (6.1).

**To report SUSPECTED ADVERSE REACTIONS, contact Merck Sharp
& Dohme Corp., a subsidiary of Merck & Co., Inc., at 1-877-888-4231 or
FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**See 17 for PATIENT COUNSELING INFORMATION and
FDA-approved patient labeling.**

**Revised: 04/2012**

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
   5.1   Exposure of Women — Risk to Male Fetus
   5.2   Effects on Prostate Specific Antigen (PSA)
   5.3   Increased Risk of High-Grade Prostate Cancer with 5α-Reductase
         Inhibitors
   5.4   Pediatric Patients
**6   ADVERSE REACTIONS**
   6.1   Clinical Trials Experience
   6.2   Postmarketing Experience
**7   DRUG INTERACTIONS**
   7.1   Cytochrome P450-Linked Drug Metabolizing Enzyme System
   7.2   Other Concomitant Therapy
**8   USE IN SPECIFIC POPULATIONS**
   8.1   Pregnancy
   8.3   Nursing Mothers
   8.4   Pediatric Use
   8.5   Geriatric Use
   8.6   Hepatic Impairment
   8.7   Renal Impairment

**10   OVERDOSAGE**
**11   DESCRIPTION**
**12   CLINICAL PHARMACOLOGY**
   12.1   Mechanism of Action
   12.2   Pharmacodynamics
   12.3   Pharmacokinetics
**13   NONCLINICAL TOXICOLOGY**
   13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
**14   CLINICAL STUDIES**
   14.1   Studies in Men
   14.2   Study in Women
**16   HOW SUPPLIED/STORAGE AND HANDLING**
**17   PATIENT COUNSELING INFORMATION**
   17.1   Exposure of Women—Risk to Male Fetus
   17.2   Increased Risk of High-Grade Prostate Cancer
   17.3   Additional Instructions

*Sections or subsections omitted from the full prescribing information are not
listed

—

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use NuvaRing safely and effectively. See full prescribing information for NuvaRing.**

**NuvaRing® (etonogestrel/ethinyl estradiol vaginal ring)**
Initial U.S. Approval: 2001

---

**WARNING: CIGARETTE SMOKING AND**
**SERIOUS CARDIOVASCULAR EVENTS**
*See full prescribing information for complete boxed warning.*

- **Women over 35 years old who smoke should not use NuvaRing. (4)**
- **Cigarette smoking increases the risk of serious cardiovascular events from combination hormonal contraceptive (CHC) use. (4)**

---

--------------------------- RECENT MAJOR CHANGES ---------------------------
Warnings and Precautions (5.1)                                    10/2013

----------------------------- INDICATIONS AND USAGE -----------------------------
NuvaRing is an estrogen/progestin combination hormonal contraceptive (CHC) indicated for use by women to prevent pregnancy. (1)

----------------------- DOSAGE AND ADMINISTRATION -----------------------
One NuvaRing is inserted in the vagina. The ring must remain in place continuously for three weeks, followed by a one-week ring-free interval. (2)

--------------------- DOSAGE FORMS AND STRENGTHS ---------------------
NuvaRing is a polymeric vaginal ring containing 11.7 mg etonogestrel and 2.7 mg ethinyl estradiol, which releases on average 0.12 mg/day of etonogestrel and 0.015 mg/day of ethinyl estradiol. (3)

------------------------------- CONTRAINDICATIONS -------------------------------
- A high risk of arterial or venous thrombotic diseases (4)
- Breast cancer or other estrogen- or progestin-sensitive cancer (4)
- Liver tumors or liver disease (4)
- Undiagnosed abnormal uterine bleeding (4)
- Pregnancy (4)
- Hypersensitivity to any of the components of NuvaRing (4)

----------------------- WARNINGS AND PRECAUTIONS -----------------------
- Vascular risks: Stop NuvaRing use if a thrombotic event occurs. Stop NuvaRing use at least 4 weeks before and through 2 weeks after major surgery. Start no earlier than 4 weeks after delivery, in women who are not breastfeeding. (5.1)
- Toxic Shock Syndrome (TSS): If patient exhibits signs or symptoms of TSS, consider the possibility of this diagnosis and initiate appropriate medical evaluation and treatment. (5.2)
- Liver disease: Discontinue NuvaRing use if jaundice develops.(5.3)
- High blood pressure: If used in women with well-controlled hypertension, monitor blood pressure and stop NuvaRing use if blood pressure rises significantly. (5.4)
- Carbohydrate and lipid metabolic effects: Monitor prediabetic and diabetic women. Consider an alternate contraceptive method for women with uncontrolled dyslipidemia. (5.7)
- Headache: Evaluate significant change in headaches and discontinue NuvaRing use if indicated. (5.8)
- Uterine bleeding: Evaluate irregular bleeding or amenorrhea. (5.9)

------------------------------- ADVERSE REACTIONS -------------------------------
The most common adverse reactions (≥2%) in clinical trials were: vaginitis, headache (including migraine), mood changes (e.g., depression, mood swings, mood altered, depressed mood, affect lability), device-related events (e.g., expulsion/discomfort/foreign body sensation), nausea/vomiting, vaginal discharge, increased weight, vaginal discomfort, breast pain/discomfort/tenderness, dysmenorrhea, abdominal pain, acne, and decreased libido. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Merck, Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., at 1-877-888-4231 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

------------------------------- DRUG INTERACTIONS -------------------------------
Drugs or herbal products that induce certain enzymes, such as CYP3A4, may decrease the effectiveness of CHCs or increase breakthrough bleeding. Counsel patients to use a back-up or alternative method of contraception when enzyme inducers are used with CHCs. (7)

----------------------- USE IN SPECIFIC POPULATIONS -----------------------
- Nursing mothers: Not recommended; can decrease milk production. (8.3)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 10/2013**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**WARNING: CIGARETTE SMOKING AND SERIOUS CARDIOVASCULAR EVENTS**
**1  INDICATIONS AND USAGE**
**2  DOSAGE AND ADMINISTRATION**
2.1  How to Use NuvaRing
2.2  How to Start Using NuvaRing
2.3  Deviations from the Recommended Regimen
2.4  In the Event of a Missed Menstrual Period
2.5  Use with Other Vaginal Products
**3  DOSAGE FORMS AND STRENGTHS**
**4  CONTRAINDICATIONS**
**5  WARNINGS AND PRECAUTIONS**
5.1  Thromboembolic Disorders and Other Vascular Problems
5.2  Toxic Shock Syndrome (TSS)
5.3  Liver Disease
5.4  High Blood Pressure
5.5  Vaginal Use
5.6  Gallbladder Disease
5.7  Carbohydrate and Lipid Metabolic Effects
5.8  Headache
5.9  Bleeding Irregularities and Amenorrhea
5.10  Inadvertent Urinary Bladder Insertion
5.11  CHC Use Before or During Early Pregnancy
5.12  Depression
5.13  Carcinoma of the Breasts and Cervix
5.14  Effect on Binding Globulins
5.15  Monitoring
5.16  Hereditary Angioedema
5.17  Chloasma
**6  ADVERSE REACTIONS**
6.1  Clinical Trials Experience
6.2  Postmarketing Experience
**7  DRUG INTERACTIONS**
7.1  Effects of Other Drugs on CHCs
7.2  Effects of Combined CHCs on Other Drugs
7.3  Interference with Laboratory Tests
**8  USE IN SPECIFIC POPULATIONS**
8.1  Pregnancy
8.3  Nursing Mothers
8.4  Pediatric Use
8.5  Geriatric Use
8.6  Hepatic Impairment
8.7  Renal Impairment
**10  OVERDOSAGE**
**11  DESCRIPTION**

## Patient Information

## NuvaRing® (NEW-vah-ring)
## (etonogestrel/ethinyl estradiol vaginal ring)

---

**What is the most important information I should know about NuvaRing?**

**Do not use NuvaRing if you smoke cigarettes and are over 35 years old. Smoking increases your risk of serious cardiovascular side effects (heart and blood vessel problems) from combination hormonal contraceptives (CHCs), including death from heart attack, blood clots or stroke. This risk increases with age and the number of cigarettes you smoke.**

---

Hormonal birth control methods help to lower the chances of becoming pregnant. They do not protect against HIV infection (AIDS) and other sexually transmitted infections.

### What is NuvaRing?

NuvaRing (NEW-vah-ring) is a flexible birth control vaginal ring used to prevent pregnancy.

NuvaRing contains a combination of a progestin and estrogen, 2 kinds of female hormones. Birth control methods that contain both an estrogen and a progestin are called combination hormonal contraceptives (CHCs).

### How well does NuvaRing work?

Your chance of getting pregnant depends on how well you follow the directions for using NuvaRing. The better you follow the directions, the less chance you have of getting pregnant.

Based on the results of a US clinical study, approximately 1 to 3 women out of 100 women may get pregnant during the first year they use NuvaRing.

The following chart shows the chance of getting pregnant for women who use different methods of birth control. Each box on the chart contains a list of birth control methods that are similar in effectiveness. The most effective methods are at the top of the chart. The box on the bottom of the chart shows the chance of getting pregnant for women who do not use birth control and are trying to get pregnant.

1

Reference ID: 3385075

- While using NuvaRing, you should not use a vaginal diaphragm as your back-up method of birth control because NuvaRing may interfere with the correct placement and position of a diaphragm.

- Use of spermicides or vaginal yeast products will not make NuvaRing less effective at preventing pregnancy.

- Use of tampons will not make NuvaRing less effective or stop NuvaRing from working.

- If NuvaRing has been left inside your vagina for more than 4 weeks (28 days), you may not be protected from pregnancy and you should see your healthcare provider to be sure you are not pregnant. Until you know the results of your pregnancy test, you should use an extra method of birth control, such as male condoms with spermicide, until the new NuvaRing has been in place for 7 days in a row.

- Do not use more than 1 NuvaRing at a time. Too much hormonal birth control medicine in your body may cause nausea, vomiting, or vaginal bleeding.

Your healthcare provider should examine you at least 1 time a year to see if you have any signs of side effects from using NuvaRing.

**What are the possible side effects of using NuvaRing?**

**See "What is the most important information I should know about NuvaRing?"**

**NuvaRing may cause serious side effects, including:**

**blood clots.** Like pregnancy, combination hormonal birth control methods increase the risk of serious blood clots (see following graph), especially in women who have other risk factors, such as smoking, obesity, or age greater than 35. This increased risk is highest when you first start using a combination hormonal birth control method or when you restart the same or different combination hormonal birth control method after not using it for a month or more. Talk with your healthcare provider about your risk of getting a blood clot before using NuvaRing or before deciding which type of birth control is right for you.

In some studies of women who used NuvaRing, the risk of getting a blood clot was similar to the risk in women who used combination birth control pills.

Other studies have reported that the risk of blood clots was higher for women who use combination birth control pills containing desogestrel (a progestin similar to the progestin in NuvaRing) than for women who use combination birth control pills that do not contain desogestrel.

**It is possible to die or be permanently disabled from a problem caused by a blood clot, such as heart attack or stroke.** Some examples of serious blood clots are blood clots in the:

- o legs (deep vein thrombosis)
- o lungs (pulmonary embolus)

6

Reference ID: 3385075

- ○ eyes (loss of eyesight)
- ○ heart (heart attack)
- ○ brain (stroke)

To put the risk of developing a blood clot into perspective: If 10,000 women who are not pregnant and do not use hormonal birth control are followed for one year, between 1 and 5 of these women will develop a blood clot. The figure below shows the likelihood of developing a serious blood clot for women who are not pregnant and do not use hormonal birth control, for women who use hormonal birth control, for pregnant women, and for women in the first 12 weeks after delivering a baby.

**Likelihood of Developing a Serious Blood Clot (Venous Thromboembolism [VTE])**



*CHC=combination hormonal contraception

**Pregnancy data based on actual duration of pregnancy in the reference studies. Based on a model assumption that pregnancy duration is nine months, the rate is 7 to 27 per 10,000 WY.

**Call your healthcare provider right away if you have:**

- ○ leg pain that does not go away
- ○ sudden shortness of breath
- ○ sudden blindness, partial or complete
- ○ severe pain or pressure in your chest
- ○ sudden, severe headache unlike your usual headaches

7

Reference ID: 3385075

- weakness or numbness in an arm or leg, or trouble speaking
- yellowing of the skin or eyeballs

**Other serious risks include:**

- Toxic Shock Syndrome (TSS). Some of the symptoms are much the same as the flu, but they can become serious very quickly. Call your healthcare provider or get emergency treatment right away if you have the following symptoms:
  - sudden high fever
  - vomiting
  - diarrhea
  - a sunburn-like rash
  - muscle aches
  - dizziness
  - fainting or feeling faint when standing up
- liver problems, including liver tumors
- high blood pressure
- gallbladder problems
- accidental insertion into bladder
- symptoms of a problem called angioedema if you already have a family history of angioedema

The most common side effects of NuvaRing are:

- tissue irritation inside your vagina or on your cervix
- headache (including migraine)
- mood changes (including depression, especially if you had depression in the past). Call your healthcare provider immediately if you have any thoughts of harming yourself.
- NuvaRing problems, including the ring slipping out or causing discomfort
- nausea and vomiting
- vaginal discharge
- weight gain
- vaginal discomfort
- breast pain, discomfort, or tenderness
- painful menstrual periods
- abdominal pain
- acne
- less sexual desire

Some women have spotting or light bleeding during NuvaRing use.  If these symptoms occur, do not stop using NuvaRing.  The problem will usually go away.  If it doesn't go away, check with your healthcare provider.

8

Reference ID: 3385075

Other side effects seen with NuvaRing include allergic reaction, hives, and penis discomfort of the partner (such as irritation, rash, itching).

Less common side effects seen with combination hormonal birth control include:

- Blotchy darkening of your skin, especially on your face

- High blood sugar, especially in women who already have diabetes

- High fat (cholesterol, triglycerides) levels in the blood

Tell your healthcare provider about any side effect that bothers you or that does not go away.  These are not all the possible side effects of NuvaRing. For more information, ask your healthcare provider or pharmacist.  Call your healthcare provider for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**How should I store NuvaRing and throw away used NuvaRings?**

- Store NuvaRing at room temperature between 68°F to 77°F (20°C to 25°C).

- Store NuvaRing at room temperature for up to 4 months after you receive it. Throw NuvaRing away if the expiration date on the label has passed.

- Do not store NuvaRing above 86°F (30°C).

- Avoid direct sunlight

- Place the used NuvaRing in the re-closable foil pouch and properly throw it away in your household trash out of the reach of children and pets. Do not flush your used NuvaRing down the toilet.

**Keep NuvaRing and all medicines out of the reach of children.**

**General information about the safe and effective use of NuvaRing**

Medicines are sometimes prescribed for purposes other than those listed in the Patient Information. Do not use NuvaRing for a condition for which it was not prescribed. Do not give NuvaRing to other people. It may harm them.

This leaflet summarizes the most important information about NuvaRing. If you would like more information, talk with your healthcare provider. You can ask your pharmacist or healthcare provider for information about NuvaRing that is written for health professionals.

For more information, go to www.nuvaring.com or call 1-877-NUVARING (1-877-688-2746).

**What are the ingredients in NuvaRing?**

**Active ingredients:** etonogestrel and ethinyl estradiol

Reference ID: 3385075

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use COUMADIN safely and effectively. See full prescribing information for COUMADIN.

**COUMADIN (warfarin sodium) tablets, for oral use**
**COUMADIN (warfarin sodium) for injection, for intravenous use**
**Initial U.S. Approval: 1954**

---

**WARNING: BLEEDING RISK**
*See full prescribing information for complete boxed warning.*
- **COUMADIN can cause major or fatal bleeding. (5.1)**
- **Perform regular monitoring of INR in all treated patients. (2.1)**
- **Drugs, dietary changes, and other factors affect INR levels achieved with COUMADIN therapy. (7)**
- **Instruct patients about prevention measures to minimize risk of bleeding and to report signs and symptoms of bleeding. (17)**

---

------------------------------RECENT MAJOR CHANGES-------------------------
Contraindications (4)                                                10/2011
Warnings and Precautions, Use in Pregnant Women with Mechanical
    Heart Valves (5.5)                                               10/2011

---------------------------INDICATIONS AND USAGE---------------------------
COUMADIN is a vitamin K antagonist indicated for:
- Prophylaxis and treatment of venous thrombosis and its extension, pulmonary embolism (1)
- Prophylaxis and treatment of thromboembolic complications associated with atrial fibrillation and/or cardiac valve replacement (1)
- Reduction in the risk of death, recurrent myocardial infarction, and thromboembolic events such as stroke or systemic embolization after myocardial infarction (1)

**Limitation of Use**
COUMADIN has no direct effect on an established thrombus, nor does it reverse ischemic tissue damage. (1)

----------------------DOSAGE AND ADMINISTRATION----------------------
- Individualize dosing regimen for each patient, and adjust based on INR response. (2.1, 2.2)
- Knowledge of genotype can inform initial dose selection. (2.3)
- Monitoring: Obtain daily INR determinations upon initiation until stable in the therapeutic range. Obtain subsequent INR determinations every 1 to 4 weeks. (2.1)
- Review conversion instructions from other anticoagulants. (2.8)

---------------------DOSAGE FORMS AND STRENGTHS---------------------
- Scored tablets: 1, 2, 2-1/2, 3, 4, 5, 6, 7-1/2, or 10 mg (3)
- For injection: Vial containing 5 mg lyophilized powder (3)

-----------------------------CONTRAINDICATIONS-----------------------------
- Pregnancy, except in women with mechanical heart valves (4)
- Hemorrhagic tendencies or blood dyscrasias (4)

- Recent or contemplated surgery of the central nervous system (CNS) or eye, or traumatic surgery resulting in large open surfaces (4, 5.7)
- Bleeding tendencies associated with certain conditions (4)
- Threatened abortion, eclampsia, and preeclampsia (4)
- Unsupervised patients with potential high levels of non-compliance (4)
- Spinal puncture and other diagnostic or therapeutic procedures with potential for uncontrollable bleeding (4)
- Hypersensitivity to warfarin or any component of the product (4)
- Major regional or lumbar block anesthesia (4)
- Malignant hypertension (4)

----------------------WARNINGS AND PRECAUTIONS-----------------------
- Tissue necrosis: Necrosis or gangrene of skin or other tissues can occur, with severe cases requiring debridement or amputation. Discontinue COUMADIN and consider alternative anticoagulants if necessary. (5.2)
- Systemic atheroemboli and cholesterol microemboli: Some cases have progressed to necrosis or death. Discontinue COUMADIN if such emboli occur. (5.3)
- Heparin-induced thrombocytopenia (HIT): Initial therapy with COUMADIN in HIT has resulted in cases of amputation and death. COUMADIN may be considered after platelet count has normalized. (5.4)
- Pregnant women with mechanical heart valves: COUMADIN may cause fetal harm; however, the benefits may outweigh the risks. (5.5)

-------------------------------ADVERSE REACTIONS-----------------------------
Most common adverse reactions to COUMADIN are fatal and nonfatal hemorrhage from any tissue or organ. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Bristol-Myers Squibb at 1-800-721-5072 or FDA at 1-800-FDA-1088 or**
*www.fda.gov/medwatch.*

--------------------------------DRUG INTERACTIONS-----------------------------
- Consult labeling of all concurrently used drugs for complete information about interactions with COUMADIN or increased risks for bleeding. (7)
- Inhibitors and inducers of CYP2C9, 1A2, or 3A4: May alter warfarin exposure. Monitor INR closely when any such drug is used with COUMADIN. (7.1)
- Drugs that increase bleeding risk: Closely monitor patients receiving any such drug (e.g., other anticoagulants, antiplatelet agents, nonsteroidal anti-inflammatory drugs, serotonin reuptake inhibitors). (7.2)
- Antibiotics and antifungals: Closely monitor INR when initiating or stopping an antibiotic or antifungal course of therapy. (7.3)
- Botanical (herbal) products: Some may influence patient response to COUMADIN necessitating close INR monitoring. (7.4)

-----------------------USE IN SPECIFIC POPULATIONS-----------------------
- Nursing mothers: Use with caution in a nursing woman. Monitor breast-feeding infants for bruising or bleeding. (8.3)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide**

**Revised: 10/2011**

---

PCSF427                                                  2021 REMS 001885

Reference ID: 3022954

# 14 CLINICAL STUDIES

## 14.1 Atrial Fibrillation

In five prospective, randomized, controlled clinical trials involving 3711 patients with non-rheumatic AF, warfarin significantly reduced the risk of systemic thromboembolism including stroke (see Table 4). The risk reduction ranged from 60% to 86% in all except one trial (CAFA: 45%), which was stopped early due to published positive results from two of these trials. The incidence of major bleeding in these trials ranged from 0.6% to 2.7% (see Table 4).

**Table 4:**         **Clinical Studies of Warfarin in Non-Rheumatic AF Patients\***

| | N | | | | Thromboembolism | | % Major Bleeding | |
| Study | Warfarin-Treated Patients | Control Patients | PT Ratio | INR | % Risk Reduction | *p*-value | Warfarin-Treated Patients | Control Patients |
|---|---|---|---|---|---|---|---|---|
| AFASAK | 335 | 336 | 1.5-2.0 | 2.8-4.2 | 60 | 0.027 | 0.6 | 0.0 |
| SPAF | 210 | 211 | 1.3-1.8 | 2.0-4.5 | 67 | 0.01 | 1.9 | 1.9 |
| BAATAF | 212 | 208 | 1.2-1.5 | 1.5-2.7 | 86 | <0.05 | 0.9 | 0.5 |
| CAFA | 187 | 191 | 1.3-1.6 | 2.0-3.0 | 45 | 0.25 | 2.7 | 0.5 |
| SPINAF | 260 | 265 | 1.2-1.5 | 1.4-2.8 | 79 | 0.001 | 2.3 | 1.5 |

\*All study results of warfarin vs. control are based on intention-to-treat analysis and include ischemic stroke and systemic thromboembolism, excluding hemorrhagic stroke and transient ischemic attacks.

Trials in patients with both AF and mitral stenosis suggest a benefit from anticoagulation with COUMADIN [see *Dosage and Administration (2.2)*].

## 14.2 Mechanical and Bioprosthetic Heart Valves

In a prospective, randomized, open-label, positive-controlled study in 254 patients with mechanical prosthetic heart valves, the thromboembolic-free interval was found to be significantly greater in patients treated with warfarin alone compared with dipyridamole/aspirin-treated patients (p<0.005) and pentoxifylline/aspirin-treated patients (p<0.05). The results of this study are presented in Table 5.

**Table 5:**         **Prospective, Randomized, Open-Label, Positive-Controlled Clinical Study of Warfarin in Patients with Mechanical Prosthetic Heart Valves**

| Patients Treated With |
|---|

24

Reference ID: 3022954

| Event | Warfarin | Dipyridamole/Aspirin | Pentoxifylline/Aspirin |
|---|---|---|---|
| Thromboembolism | 2.2/100 py | 8.6/100 py | 7.9/100 py |
| Major Bleeding | 2.5/100 py | 0.0/100 py | 0.9/100 py |

py=patient years

In a prospective, open-label, clinical study comparing moderate (INR 2.65) vs. high intensity (INR 9.0) warfarin therapies in 258 patients with mechanical prosthetic heart valves, thromboembolism occurred with similar frequency in the two groups (4.0 and 3.7 events per 100 patient years, respectively). Major bleeding was more common in the high intensity group. The results of this study are presented in Table 6.

**Table 6:** **Prospective, Open-Label Clinical Study of Warfarin in Patients with Mechanical Prosthetic Heart Valves**

| Event | Moderate Warfarin Therapy INR 2.65 | High Intensity Warfarin Therapy INR 9.0 |
|---|---|---|
| Thromboembolism | 4.0/100 py | 3.7/100 py |
| Major Bleeding | 0.95/100 py | 2.1/100 py |

py=patient years

In a randomized trial in 210 patients comparing two intensities of warfarin therapy (INR 2.0-2.25 vs. INR 2.5-4.0) for a three-month period following tissue heart valve replacement, thromboembolism occurred with similar frequency in the two groups (major embolic events 2.0% vs. 1.9%, respectively, and minor embolic events 10.8% vs. 10.2%, respectively). Major hemorrhages occurred in 4.6% of patients in the higher intensity INR group compared to zero in the lower intensity INR group.

## 14.3 Myocardial Infarction

WARIS (The Warfarin Re-Infarction Study) was a double-blind, randomized study of 1214 patients 2 to 4 weeks post-infarction treated with warfarin to a target INR of 2.8 to 4.8. The primary endpoint was a composite of total mortality and recurrent infarction. A secondary endpoint of cerebrovascular events was assessed. Mean follow-up of the patients was 37 months. The results for each endpoint separately, including an analysis of vascular death, are provided in Table 7:

**Table 7:** **WARIS – Endpoint Analysis of Separate Events**

Reference ID: 3022954

# APPENDIX

# TABLE OF CONTENTS

Exhibit 1, Declaration of Graham T. Chelius, M.D............................ App.001

Exhibit 2, Declaration of Julie Amaon, M.D..................................... App.023

Exhibit 3, Declaration of Joey Banks, M.D....................................... App.037

Exhibit 4, Declaration of Jared Garrison-Jakel, M.D. ........................ App.043

Exhibit 5, Declaration of Erin King, M.D. ........................................ App.052

Exhibit 6, Declaration of Charisse M. Loder, M.D., M.SC............... App.060

Exhibit 7, Declaration of Jane Roe, M.D.......................................... App.074

Exhibit 8, Declaration of Diana M. Pearce, Ph.D.
   & Pearce Decl. Appendix ............................................................ App.088

# EXHIBIT 1

Declaration of Graham T. Chelius, M.D.

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org

*admitted pro hac vice*
**admission for pro hac vice pending*

*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*,<br><br>Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT<br><br>[CIVIL RIGHTS ACTION]<br><br>**DECLARATION OF GRAHAM T. CHELIUS, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Jill A. Otake<br>Hearing Date: Vacated per Dkt. 107<br>Trial Date: Vacated per Dkt. 82 |

Graham T. Chelius, M.D., declares and states as follows:

1.     I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows.

2.     I am a plaintiff in the above-captioned litigation, which challenges the U.S. Food and Drug Administration's Risk Evaluation and Mitigation Strategy ("REMS") for Mifeprex. I provide this declaration in support of that litigation. I do so in my individual capacity, and not on behalf of any entity with which I am associated or where I practice, including my employer, Hawaii Health Systems Corporation.

3.     I am a board-certified Family Medicine physician based on the island of Kauaʻi in Hawaiʻi. I practice medicine at Kauai Veterans Memorial Hospital ("Kauai Veterans") and its associated clinics, West Kauai Clinics. Kauai Veterans is located on the western side of the island in the town of Waimea, Kauaʻi. Kauai Veterans currently employs about 275 people.

4.     I am currently the Chief of Staff at Kauai Veterans, a position I have held since February 2018. Immediately before that, and after serving for several years as a board member, I served as the Chief Medical Officer for the Hawaii Health Systems Corporation's Kauaʻi Region (which, in addition to Kauai Veterans, included Samuel Mahelona Memorial Hospital, on the eastern side of the

island in Kapaʻa, Kauaʻi), but resigned from that position in December 2017 in favor of this new opportunity as Chief of Staff. In my role as Chief Medical Officer, I was primarily responsible for managing the relationship between Hawaii Health Systems Corporation and the physicians who serve the Kauaʻi region, including participating in contract negotiations, overseeing physician staffing assignments, and responding to any complaints brought against physicians by both patients and staff. As Chief of Staff, I have very similar responsibilities, but rather than acting as a representative of the administration I am an elected representative of the physicians who form the medical staff. Both my current and former positions require that I be involved in resolving most conflicts that arise among the small clinical team at Kauai Veterans.

5.      I received my medical degree from the University of Wisconsin in 2001, and completed my residency in Family Medicine at North Colorado Medical Center. Since January 2009, I have been practicing medicine in Hawaiʻi at Kauai Veterans.

6.      In my current role as Chief of Staff, I continue to treat patients. Within my specialty of Family Medicine, I focus in particular on women's health, including obstetrics, and on chemical dependency treatment.

7.      During the twelve years that I have been practicing medicine in Hawaiʻi, I would estimate that I have cared for more than 2,750 pregnant patients

and delivered over 1,100 babies on the island of Kaua'i. While many of my

patients have much-wanted pregnancies, a substantial percentage choose to end

their pregnancies, and come to me seeking abortion care. Most of these patients are

medically eligible for the FDA-approved medication abortion regimen: Mifeprex

followed by the drug misoprostol.

8.      However, I am unable to prescribe Mifeprex to patients who need this

medication because, as detailed below, complying with the requirements in the

REMS that I procure, stock, and dispense Mifeprex at my health care facility—

rather than issuing a prescription, from the privacy of my office, for my patient to

fill at a pharmacy—would damage my professional standing locally, disrupt the

workplace dynamics I am responsible for maintaining, interfere with my ability to

continue to serve the many patients I now serve, and jeopardize my patients'

confidentiality. The Mifeprex REMS deters clinicians and harms patients by

imposing unique, unnecessary, and onerous requirements on their care. Put plainly,

the REMS impedes my and other clinicians' ability to safely and appropriately care

for our abortion and miscarriage patients as we would patients seeking any other

service.

9.      The distribution restriction substantially interferes with my ability to

practice medicine in accordance with my professional judgment. Because of the

Mifeprex REMS, I am unable to provide medication abortions to my patients, even

in situations when my best medical judgment would strongly counsel in favor of providing this care.

10. There is only a narrow window in which a patient can take the Mifeprex-misoprostol regimen for early pregnancy termination: this method has been approved by FDA only for the first ten weeks of pregnancy, and that is the period during which clinicians generally prescribe it. But patients cannot know they are pregnant until four weeks, and many patients do not realize they are pregnant until their sixth to eighth week. By the time a patient sees me, they typically have only a few weeks—indeed, often only a few days—in which to take the medications. If they cannot access Mifeprex within the window of availability, the only option is a surgical abortion. Nevertheless, because of the REMS, I am unable to provide medication abortion care in these time-sensitive situations.

11. There are no abortion providers on Kaua'i, a federally designated "medically underserved area." The closest provider of abortion services is on O'ahu, which can be reached only by airplane. I have seen the anxiety and confusion in my patients' eyes when I tell them that they have to fly to O'ahu to obtain an abortion. I have heard them describe their frustration, anger, and heartbreak. For some patients—many of whom are already experiencing significant anxiety as a result of the unwanted pregnancy, and some of whom are also struggling with the challenges and trauma of poverty, drug addiction,

joblessness, and/or domestic violence—this news is simply devastating.

12.     Traveling to Oʻahu for a surgical abortion costs my patients money and time, and causes them stress. Many are forced to make significant personal and financial sacrifices in order to get the health care they need. They must find the money to pay, or if possible make arrangements for insurance to pay, for the costs of transportation to and from the airports on both islands, and for the flights themselves. They must arrange to take time off from work or school, and arrange for child care if they have children, which most do. If a loved one is accompanying them to Oʻahu for support, that person must bear these costs as well. This travel and related logistics also impose significant psychological and emotional strain on many of my patients, and in my experience can be especially hard on young women, women struggling with substance abuse, women for whom English is not their first language, and women who are homeless.

13.     Raising the money and making arrangements to travel is often time-consuming. Given the circumstances of my patients' lives, it is not uncommon for it to take several weeks, a month, or longer. Indeed, even for those of my patients fortunate enough to have insurance coverage for the abortion procedure and the travel to obtain it (though, of course, still not for child care, missed work, or food away from home), it typically takes one to two weeks just for the paperwork to be approved. As previously noted, delays often mean that patients are no longer

eligible for medication abortion at all, and instead must have a surgical procedure. Moreover, while abortion is very safe, the risks increase as pregnancy advances. And, on top of that, patients whose abortions are delayed also face health risks associated with continuing a pregnancy for additional days, weeks, or months. For such patients, delaying their abortion means they are sicker, longer.

14.    I recall one patient whose experience powerfully illustrates many of the harms caused and burdens created by the REMS. She is a woman whom I had been treating for substance use disorder and who had previously seen us for obstetrical care for her first child. She came to my office seeking an abortion prior to 10 weeks of pregnancy. After evaluating her, I concurred that a medication abortion was an appropriate treatment, that she could utilize the Mifeprex-misoprostol regimen, and that she should do so without delay. I wanted to—and would have—provided her with the medication abortion she desired if I could have written a prescription for Mifeprex for her to fill at a pharmacy. But, because of the REMS, I could not provide that care to my patient. Instead, she was forced to travel to Oʻahu.

15.    Because of the complications in this woman's life, by the time she was finally able to make the journey to Oʻahu, more than six weeks had passed. At that point, she had to have a two-day dilation and evacuation ("D&E") abortion instead of the medication abortion she had wanted. Not only is D&E a significantly

6

more complex and invasive procedure, but it also required her to bear the costs of

staying on Oʻahu—in a hotel, away from her home and her family—overnight.

This was utterly unaffordable for her. Indeed, I understand that she called her sister

on the day of her first appointment to tell her that she was on Oʻahu for an abortion

and had only $20 in her pocket. Her sister jumped on the plane to help my patient

find lodging and provide her with emotional support during the procedure—which

of course meant that my patient's sister also had to bear the costs of a round-trip

flight, hotel, and food during her stay. Fortunately, her sister managed to drop

everything and come to her aid, but otherwise I don't know how she would have

managed to get to and from her appointments or where she would have stayed

overnight.

     16.    I still feel frustrated and upset that my patient and her family had to

bear the emotional trauma, financial burdens, and medical risks of this experience.

And she is far from the only patient I have had who was eligible for medication

abortion at the time I saw her, but ultimately had to not only fly to Oʻahu to get the

care they needed, but by the time they did so were too late for a medication

abortion and had to have a procedure instead. Again, none of this would be

necessary if I could have simply written this patient, and other patients like her, a

prescription for Mifeprex when she was in my office early in her pregnancy.

     

17.     While that patient *was* ultimately able to get an abortion—not all of my patients are. In some cases, the travel burdens created by the Mifeprex REMS are simply untenable, and my patients end up carrying pregnancies to term and having children against their will. For instance, one patient who struggles with chemical dependency never was able to get to Oʻahu, despite her expressed desire for an abortion and despite extensive assistance with the travel arrangements. As a result, she was forced to carry the pregnancy to term (and her child was exposed to drugs throughout the entire pregnancy). I have continued to care for such patients through the course of their pregnancies and beyond, and have seen firsthand the emotional, physical, and financial burdens that an unwanted pregnancy can cause.

18.     Sadly, the situation is even worse for women who live on Niʻihau, which is a sparsely populated island just west of Kauaʻi. There are no paved roads, and no cell coverage—let alone health care—on Niʻihau. Because of the lack of access to reproductive health care on-island, women on Niʻihau have to schedule transportation by boat to Kauaʻi just to see a doctor. My hospital delivers virtually all the babies for pregnant women on Niʻihau. If a woman on Niʻihau wants to terminate her pregnancy, the obstacles are even greater for her than for a woman on Kauaʻi. But if the REMS did not exist, she could simply go to Kauaʻi to obtain Mifeprex the same day, instead of going to Kauaʻi only to then get referred to an Oʻahu-based abortion provider and facing all the associated obstacles. I mention

Niʻihau just to show how burdens can aggregate and compound into an entirely insurmountable barrier to accessing safe abortion care.

19.     I became a doctor to make my patients' lives easier, less painful, and more fulfilling. But, because of the REMS, I must watch them suffer medical, emotional, and financial burdens when I cannot provide them with the abortion care that they desire. In addition, as a physician, I am concerned about continuity of care—yet the restrictions imposed by the Mifeprex REMS mean that I must needlessly hand off my patients to someone else for care, breaking that continuity for absolutely no medical reason. While I am confident that the providers to whom I refer my patients in Oʻahu provide high-quality care, it pains me to have to turn my patients away and send them off island to get care they need and that I am perfectly competent to provide. The Mifeprex REMS thus prevents me from providing uninterrupted, comprehensive primary health care to my patients, as I strive to do whenever possible. It violates my fundamental beliefs as a health care provider to have to deny a patient's request for time-sensitive, medically indicated care only because of medically unjustified restrictions like the Mifeprex REMS.

20.     For the past several years, some of my patients have been able to avoid most of these burdens by participating in the Telemedicine Abortion Study ("TelAbortion"), which is run through the University of Hawaiʻi. This study— which I understand operates as a temporary waiver of the REMS—allows certain

9

qualifying patients to receive Mifeprex by overnight mail from the study's

principal investigators on Oʻahu without having to fly to that island for care.

Recognizing how difficult the journey to Oʻahu is for many of my patients,

wherever possible, I have assisted them in participating in the study. I believe this

model of care delivery—mailing Mifeprex following a telemedicine visit—is safe

and effective and a valuable option for my patients.

21.     But the TelAbortion study's process carries its own burdens and

complexities, and therefore excludes the most vulnerable, highest-risk patients.

The cost of participation in TelAbortion presents the first hurdle. While the State

of Hawaiʻi generally covers the cost of abortion services through its Medicaid

program, it does not cover the cost of Mifeprex obtained through the TelAbortion

study. Thus, Medicaid enrollees must pay out-of-pocket for Mifeprex provided

through the study. This effectively excludes or deters many lower-income patients

from participating.

22.     The logistics are another hurdle. In most cases, the study protocols

require that a participating patient first have a blood test and ultrasound performed,

and then mail, fax, or email the results to a physician at the University of Hawaiʻi.

Then, that physician must connect with the patient by secure videoconference at a

set appointment time. Some of my patients—including some who are homeless,

poor, or live in extremely remote parts of Kauaʻi—do not have reliable internet or

10

cell phone service, access to technology with secure videoconferencing capability, or the ability to use this technology in a private space where they can speak confidentially. In such cases, I often have to step in to help them. On several occasions, I have stayed late at my office to let a patient use my computer to participate in the study, but this is not always possible: my patients' schedule, my schedule, and the schedule of the physicians on Oʻahu do not always align, and certainly do not always align before the patient's window for a medication abortion closes. Helping my patients participate in the TelAbortion study has taken, and continues to take, many hours of my time—and even so, some of my patients still cannot successfully use it.

23.    A third hurdle is that participating patients must have a physical address to which a package can be securely and confidentially mailed. But my patients who are homeless do not have such a safe address. So the study also cannot provide relief to such patients.

24.    For all patients, even if they can gather the resources to participate in TelAbortion, the processes and requirements of participating in a research study delay care. I have on numerous occasions seen patients who were still within the window for a medication abortion, but did not have enough time to access it through the study.

25.     Critically, I understand that the TelAbortion study is only temporary. When it ends, it will no longer exist as an option for me and my patients.

26.     The harms and burdens I have described that both my patients and I are experiencing flow directly from my inability to issue a prescription for Mifeprex to be filled at a pharmacy or by mail order as I can do with countless other equally or less safe drugs. Most of these harms and burdens would be entirely eliminated, or substantially reduced, if the REMS were eliminated.

27.     In addition, the REMS imposes a broader set of harms by deterring and blocking qualified clinicians from becoming medication abortion providers through its unique and unnecessary barriers. First, in order to comply with the requirement in the REMS that I procure, stock, and dispense Mifeprex at my medical facility, I would have to risk serious damage to my professional standing in my workplace and to my respected role in the local community. Abortion is an issue about which people hold very strong views, and some of my colleagues and staff members strongly oppose it. In my tight-knit workplace, attempting to establish a policy for procuring, stocking, and dispensing Mifeprex at our facility would create internal conflict, undermining the team cohesion that I am responsible for developing and maintaining as Chief of Staff. It would also jeopardize my ability to continue in that elected position, threaten initiatives I am undertaking to improve care within our hospital system, and reduce the time I have

12

to treat patients. I cannot afford these personal and professional risks.

28.     To be clear, many of my colleagues and staff already know that I provide abortion referrals. I know that some staff oppose even this; some have directly expressed such views to me. But if I were to comply with the Mifeprex REMS, I would be doing more than just supporting access to abortion in my *individual* professional capacity—I would also have to involve, and win the approval of, multiple colleagues and staff members in the process of procuring, stocking, dispensing, and billing for Mifeprex within our health care facility. Asking or demanding that my colleagues who have deeply held views against abortion participate or assist in providing abortions would cause significant conflict among my staff—conflict that, as Chief of Staff, I would also be required to manage, if possible. The negative consequences for my professional standing and for carefully nurtured workplace dynamics, which benefit all of our patients, deter me from attempting to comply with the Mifeprex REMS.

29.     Relatedly, I also have had serious personal safety concerns about the requirement in the REMS that I register with the drug manufacturer and drug distribution company as an abortion provider. I understand that they must keep confidential the list of clinicians registered to prescribe Mifeprex. But particularly in light of the many recent health care hacking incidents, I have been concerned about being inadvertently or maliciously exposed as an abortion provider, and the

resulting likelihood of public backlash to me and my family.

30.     Of course, my name is now public in the context of this litigation, and my experience since filing this lawsuit has validated my earlier concerns. Since the lawsuit was filed, I have received numerous phone calls and letters from strangers relating to this litigation. Many of those communications were positive and supportive. But a few were negative and concerning. Based on security consultations, I now carefully examine envelopes for toxic material, and have tried to remember to only open packages that I have been expecting. We also installed a security system at our house. In a country where abortion clinic shootings are commonplace and abortion providers have been assassinated, I have feared risking my and my family's safety by following through with what the Mifeprex REMS requires.

31.     I ultimately made the difficult choice to publicize my desire to provide abortion care through this lawsuit, because I believe this case has the potential to expand access to medication abortion for patients all across the country. My family and I felt that this goal was worth the risk to our safety and privacy. But we did not make that choice lightly, and I expect that I am not the only physician who has found the REMS requirement that I add my name to a list of all medication abortion providers in the country a serious deterrent to providing this care.

32.     I am also concerned that compliance with the Mifeprex REMS would jeopardize my patients' privacy. By requiring that my facility be responsible for the purchasing, stocking, dispensing, and billing of Mifeprex—discrete responsibilities held by discrete members of our staff—the REMS injects many more people into the abortion care process. This raises real confidentiality concerns in the small-town community in which I practice. Everybody knows you and you know everybody in Waimea, a town of fewer than 2,000 people on an island of just over 65,000. In fact, it is not uncommon for members of my staff to bump into my patients at the grocery store, gym, or on the street. For myself, going to either of the two grocery stores in Waimea is a social event due to the fact that I will certainly know someone either working or shopping at the store.

33.     Additionally, many members of the community have a family member, friend, or neighbor employed at Kauai Veterans, and, as a result, members of our community are sometimes nervous about seeking intimate medical care from us out of fear for their confidentiality. Certain elements of a person's medical history (history of abortion, sexually transmitted diseases such as HIV or gonorrhea, a history of rape, struggles with substance use disorder) are closely guarded by patients due to real or perceived stigma from those in the general population and medical providers.

34.     For instance, I have a patient who, while pregnant, asked that a specific doctor not be involved in her care because she was afraid that the provider might divulge her medical history to family members of the doctor whom the patient also knew. Fortunately, I was able to sufficiently reassure this patient that I trust this physician to respect her confidentiality, which resulted in this patient continuing to receive care from us. But there is no doubt that, in our community, patients struggle with the decision of whether to get adequate medical care due to concerns about their confidentiality. And, indeed, it would be entirely reasonable for a patient to fear for the privacy of her abortion decision if she happens to know, for instance, some of the numerous people who may be involved with the billing, ordering, recording, and physical dispensing of medication at our facility (which, again, is a perfectly plausible scenario in our small town).

35.     By contrast, if the Mifeprex REMS did not exist, I would be able to write a prescription for Mifeprex for my patient without needing to let anyone else know about the prescription except, at most, the patient's nurse, a medical records clerk, and the patient's trusted pharmacist (or a pharmacy on the other side of the island, or a mail-order pharmacy, if that is the patient's preference). The risk to my patients' confidentiality is thus substantially higher under the Mifeprex REMS.

16

36.     The Mifeprex REMS also presents significant logistical hurdles. In order to stock and dispense Mifeprex onsite, I would need to first get a policy created for storing and dispensing the drug in the clinic, and then secure approval from the Pharmacy and Therapeutics committee at Kauai Veterans. I would also need to complete and submit all of the paperwork associated with becoming a certified prescriber under the Mifeprex REMS and setting up an account with the drug distribution company—a process that would take even more time and effort because the purchasing agreement would need to go through our contracting office, which has to follow burdensome state contracting guidelines and rules.

37.     Of course, I am not now a certified prescriber (though I could easily satisfy the stated criteria for prescribing clinicians), because the certification requires me to provide a billing address and a shipping address where the Mifeprex can be sent to and then dispensed from—which, for the reasons I have stated, I am unable to do. And regardless of any certification requirement, I now provide and will always provide only medical care within the scope of practice for which I'm qualified. That is a well-recognized, basic standard of the medical profession.

38.     As I have already noted, this approval process would be extremely challenging in the tense political climate surrounding abortion at my hospital, and it would almost certainly be subject to interference by colleagues and others who vehemently oppose abortion and therefore would object to a decision to stock

17

Mifeprex in our hospital system. As Chief of Staff tasked with maintaining good working relationships in my hospital, I find these risks unacceptable. They would not only interfere with my supervisory role, and the long-term positive changes for overall patient care that I am attempting to accomplish in that role, but also take valuable time away from my own practice.

39.     In addition, I understand that the Mifeprex REMS would also require me to provide my patients with, and discuss and sign, a "Patient Agreement Form" describing the proper usage of, and risks associated with, Mifeprex as of March 2016. This special form requirement is unnecessary and singles out abortion in a manner that other medications, even much less safe medications, are not.

40.     Informed consent counseling is a bedrock of medical care, taught as a core skill in medical school and reinforced by the American Medical Association's Code of Medical Ethics. I do not need any special requirement or form to ensure that I provide every patient with informed consent counseling, including discussion of proper usage and risks and what to do in the event that they need follow-up or emergency care. In fact, much less safe medications that I use in my chemical dependency practice, such as Sublocade®, which are controlled substances and are very high risk for patients, do not require any such "patient agreement form." Nor do the many other medications that I prescribe, that patients fill at a pharmacy, and that they take at home.

2021 RCSFS 001942

41.     The bottom line is that, because of the REMS, I have been unable to provide my patients with essential health care that they need and that I am fully capable of providing. The REMS delays care, and forces patients to jump through hoops that are unnecessary, stigmatizing, and confusing. For some patients, the Mifeprex REMS makes abortion beyond reach. I greatly hope that Plaintiffs' motion for summary judgment once and for all lifts the unjustified REMS requirements from this safe, important drug, so that many other clinicians and I can provide it via prescription to our patients who need it.

42.     I learned on April 13, 2021, that FDA has suspended the in-person dispensing requirement and authorized use of a mail-order pharmacy for providing patients with Mifeprex during the COVID-19 Public Health Emergency. I am exploring whether it will be possible for me to prescribe through a mail-order pharmacy under the special "supervision" requirement still imposed by FDA, and what kinds of contracts and/or billing practices may be necessary under FDA's non-enforcement guidance (which, of course, continues to treat Mifeprex differently than virtually all other drugs). I understand further that, even if I am able to take advantage of this in the short-term, this temporary allowance expires when the public health emergency ends. In short, there is an urgent need for

19

permanent relief through this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___4 / 14___, 2021

Graham T. Chelius, M.D.

2021 REMS 001944
PCSF453

App. 022

# EXHIBIT 2

Declaration of Julie Amaon, M.D.

App.023

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org


*admitted pro hac vice*
**admission for pro hac vice pending*

*Attorneys for Plaintiffs*

**American Civil Liberties Union Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*, <br><br> Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT <br><br> [CIVIL RIGHTS ACTION] <br><br> **DECLARATION OF JULIE AMAON, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Judge: Hon. Jill A. Otake <br> Hearing Date: Vacated per Dkt. 107 <br> Trial Date: Vacated per Dkt. 82 |

Julie Amaon, M.D., declares and states as follows:

1.  I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.  I am a board-certified family physician, licensed to practice in Minnesota, Texas, and Montana. I am trained to provide the full scope of family medicine with a focus on reproductive health care, including abortion.

3.  Since July 1, 2020, I have been the Medical Director of Just The Pill, an organization founded in April of 2020 to improve access to sexual and reproductive health care for patients in rural Minnesota. To my knowledge, Just the Pill is the only mobile health center offering abortion care in the United States.

4.  As a part of my practice, I prescribe mifepristone (brand name Mifeprex®) to patients seeking medication abortion. Because of restrictions imposed under the Food and Drug Administration ("FDA") Risk Evaluation and Mitigation Strategy ("REMS") for mifepristone, I cannot simply write a prescription for mifepristone for my patients to fill at a local or mail-order pharmacy, as they would for any other medication.

5.  I can and do provide all counseling and assessment for eligible medication abortion patients in a telehealth visit, which FDA permits. FDA also permits my patients to take the medication at a location of their choice. But under the REMS, my patients have to travel in person to pick up their medication—a trip

that, for patients in rural Minnesota, can mean hours of travel each way and time away from family, and jobs. The challenge of arranging for lengthy travel and time away is often hugely burdensome for my patients, and, for some, means a delay of care beyond the point at which medication abortion is available to them or denial of access to abortion care altogether. In addition to these burdens, during the COVID-19 pandemic, the mifepristone REMS has subjected my patients and their families to needless risk of exposure to a deadly virus as they travel to pick up their medication.

6.      I submit this declaration in support of the Plaintiffs' Motion for Summary Judgement in my individual capacity and not on behalf of Just The Pill or any other institution.

### *Limited Access to Abortion in Rural Minnesota*

7.      Minnesota's bricks-and-mortar abortion clinics are all located in three urban population centers: the Twin Cities, Duluth, and Rochester. According to the Guttmacher Institute in 2017, 61% of Minnesota women lived in a county lacking an abortion clinic.[1] Indeed, nearly half of the rural counties in Minnesota have no sexual or reproductive health clinics at all.[2]

---

[1] Jones RK, Witwer E & Jerman J, Guttmacher Inst. Abortion Incidence and Service Availability in the United States, 2017, at 17 (2019), https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017.

[2] Univ. of Minn. Healthy Youth Dev. Prevention Rsch. Ctr., 2019 Minnesota Adolescent Sexual

2

8.     As a result, patients who reside in rural areas often must drive 3 or 4 hours *each* way to access abortion care, and sometimes longer in inclement weather during Minnesota's long winters. This travel requires patients to pay and arrange for transportation, time away from work, and child care, all of which can be costly and difficult. The expenses necessitated by this travel creates particularly weighty burdens for patients living with low incomes, which is the case for 75% of abortion patients.[3] As described below, for some patients the challenges they face in raising funds and arranging for travel and time away results in significant delays in their ability to access care and can prevent them from obtaining the abortion they seek.

### COVID-19 and the Expansion of Telehealth Services

9.     Just The Pill was established in the Spring of 2020, as the SARS-CoV-2 virus that causes COVID-19 spread through the United States, and access to abortion care in Minnesota became increasingly limited because of pandemic-related clinic closures and drastically reduced in-person care. At that time, the provision of health care in the United States was changing dramatically. Federal and state governments urged health care providers to use telemedicine to provide

---

Health Report 3 (2019), https://kstp.com/kstpImages/repository/cs/files/2019_ashr_final.pdf.

[3] Guttmacher Inst., Induced Abortion in the United States (2019), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states#.

care whenever possible to maximize patient access to health care while minimizing the risk of viral transmission associated with travel to health care facilities during the pandemic.

10.    At that time, I was working in a family medicine clinic, and like other physicians throughout the country, my practice transformed from an almost entirely in-person practice to one in which a broad range of primary care was offered by telehealth. However, because of the REMS, medication abortion patients were still required to travel in person to a health care facility to pick up their mifepristone. For patients in rural Minnesota, this meant continuing to travel long distances to access care. Just The Pill was created with the goal of helping such patients reduce the burdens and risks of travel by offering care from a mobile health clinic that could bring services closer to the patients.

11.    In the summer of 2020, as Just The Pill was raising the funds to pay for its mobile health clinic, a federal district court in Maryland entered an injunction suspending the mifepristone REMS in-person requirements for the duration of the COVID-19 Public Health Emergency ("PHE").[4] This meant that mifepristone prescribers could mail or deliver mifepristone to patients or arrange to have the medication sent from a mail-order pharmacy.[5] As a result, Just The Pill

---

[4] *Am. Coll. of Obstetricians & Gynecologists v. FDA* [hereinafter "*ACOG v. FDA*"], 472 F.Supp.3d 183 (D. Md. 2020).

[5] *Id.*; *ACOG v. FDA*, Civ. No. TDA-20-1320, 2020 WL 8167535 (D. Md. Aug. 19, 2020).

4

pivoted from its plan to treat patients from a mobile health clinic and, in October of

2020, began offering medication abortion care via telehealth to eligible patients

throughout Minnesota and delivering their medication directly to them through a

mail-order pharmacy. However, in January of this year, the U.S. Supreme Court

issued a stay of the injunction, reinstating the mifepristone REMS in-person

requirements.[6]

      12.    From October of 2020 until the Supreme Court reinstated the

mifepristone REMS in-person requirements, Just The Pill provided medication

abortion by telemedicine with delivery from a mail-order pharmacy to nearly 100

patients in Minnesota. During this period, patients would schedule a telehealth

appointment with me, where we would discuss the patient's medical history and

symptoms to permit me to assess whether they were eligible for a fully remote

medication abortion. If their medical history and symptoms were consistent with a

fully remote medication abortion, I would provide comprehensive counseling, just

as I would at an in-person visit. This included discussing the medication abortion

process and the risks, benefits and alternatives to a medication abortion; reviewing

FDA's Patient Agreement for mifepristone; informing the patient about our 24-

hour-a-day phone line in the event that they had any questions after the

appointment; reading the Minnesota state-mandated information about abortion;

---

[6] *ACOG v. FDA*, 141 S. Ct. 578 (2021).

5

and answering any questions they might have, ensuring that they had all the
information they needed to make an informed decision about their care. After
answering any additional questions, I would ask if they consented to a medication
abortion, and if so, document that consent in their medical record. I would then
*again* review the instructions for how and when to take their medication, what the
follow-up process was, and what they should do if they experienced any of the
(very rare) complications associated with mifepristone.

13. Following the telehealth visit, I would direct the mail-order pharmacy
with which I have a contract for shipping and dispensing mifepristone to send the
patient a package containing the medications (mifepristone, misoprostol, and, if
requested, anti-nausea medication and ibuprofen for their comfort), written
instructions, the mifepristone medication guide, and our 24-hour telephone
number. We tracked shipments and confirmed delivery to patients from the mail-
order pharmacy; the process was efficient and effective. As with the medication
abortion itself, the medical follow-up for the vast majority of patients was also
completed remotely, using telephone or audio-video communications and an at-
home pregnancy test. None of the nearly 100 patients we treated through this
process experienced a serious complication.

14. Being able to obtain their abortion medications from a mail-order
pharmacy, without an unnecessary in-person trip to a health clinic, was a huge

relief for my patients. It enabled them to end their pregnancies earlier and more safely, without the need to travel long distances, arrange for child care, and take time away and lose pay from much needed jobs—and without the risk of viral exposure that jeopardized their health and lives and that of their families for no medical purpose. In a survey during part of this time in which 45 patients participated, 16 told us that, without the ability to have a telehealth visit and have their medication delivered directly to them, they would have had to delay care for "significantly more than 2 weeks," and 2 already knew they would not have been able to access abortion care at all and would have been forced to carry their unwanted pregnancies to term.

### *Burdens and Risk for Patients Following Supreme Court Stay*

15.     After the Supreme Court reinstated the mifepristone REMS in-person requirements, Just The Pill began providing care from a mobile health clinic at locations throughout the State to help patients access care. We did all evaluation and counseling with our patients via telemedicine, but we could no longer have their medication shipped to them; instead, they had to travel to where our mobile clinic was located on a given day.

16.     We attempted to drive our mobile health clinic to locations that would be most helpful for our patients. These are largely places with communities facing the greatest barriers to traveling for care—such as communities with high

7

concentrations of migrant farm workers; areas with high poverty rates; and communities hardest hit by the COVID-19 pandemic, including those with large concentrations of Black, Indigenous, and people of color, and one particular community with a widespread outbreak of COVID-19 among workers at a meat-processing plant. However, we are a small operation, able to travel only a few days a week to a few different places in a very large state. Even with our atypical (and highly labor intensive) care delivery model, our patients continued to suffer significant burdens and risks as a result of the travel necessitated by the REMS.

17.     For example, I recently treated a patient who lived in far northern Minnesota—on the Canadian border. Based on her medical history and symptoms, she was eligible for a fully remote medication abortion. I had conducted a telehealth visit with her, but, because of the REMS, she had to travel in person to pick up her medication. She scheduled her appointment on a day when we would be driving the mobile health clinic to our farthest north destination—approximately 4 hours northwest of Minneapolis. Even so, this meant that the patient had to travel 2 hours each way to us. She did not have a car and the only way for her to get to us was by cab, which cost approximately $300. When she arrived, she quickly got out of the cab, ran to the mobile clinic, and then immediately turned around to go home with her medication. Fortunately, we were able to raise private funds for this patient to get the care she needed.  She told me that had assistance not been

available to pay for her to take a cab to our mobile clinic (or had Just The Pill's mobile clinic not been available), there is no way she could have afforded to get to clinic and she would have had to carry her pregnancy to term. But for the REMS, this patient could have received her medication without ever leaving her home.

18.    We recently treated a patient who had 3 children, no car, and would have had to travel 3 hours round-trip to get to the nearest bricks-and-mortar clinic offering abortion care. We were able to treat her by telemedicine, but she had no one to care for her children and was unable to arrange for transportation to pick up her medication even from our mobile health center. In order to help this patient, we drove the mobile health clinic and parked it a block from her home so that she could walk to our mobile clinic. This was an extremely unusual situation; we simply could not do that for every patient. However, if we had not done so for this patient, she would not have been able to have the abortion she sought. But for the REMS in-person requirement, we could have had the medication sent directly to her following her telehealth visit.

19.    Another patient with 4 or 5 children at home was trying to arrange to travel to our mobile health clinic to pick up her medication. This patient lived a 5-hour round-trip car ride from the nearest bricks-and-mortar clinic offering abortion care. She had a car, but it was not reliable, even for the 1-hour drive to our mobile clinic. We offered financial assistance for a cab, but this patient could not take

advantage of it, because she could not fit all of her children in the cab. Her spouse was a long-distance truck driver who was on the road most of the time, and, since the patient was new to the area, she did not have anyone she could turn to for child care assistance. To help this patient, we were able to drive the mobile health clinic to her town; however, this meant a delay of more than a week before she could obtain care. But for the REMS, we could have had her medication delivered directly to her home without such delay.

20.     I have had numerous patients who have had to cancel appointments at the last minute because they can't get time off work, find child care, or forgo other obligations with which this travel interferes, or because their travel arrangements have fallen through. For some of these patients, when they tried to reschedule, we had to tell them that they were no longer eligible for a medication abortion because they were beyond 10 weeks in pregnancy. When that happens, we refer them to other abortion providers who offer in-clinic procedures, but, since there are so few abortion clinics in the state, this generally means even lengthier and more costly travel, and therefore more delay. Given the challenges that prevent such patients from accessing even our mobile clinic, I feel certain that some were never able to make the journey to a brick-and-mortar clinic in one of Minnesota's urban centers and therefore were forced to continue their pregnancies and have a child.  But for

the REMS, these patients could obtain care without delay by telemedicine and home delivery of medication.

### *Barriers to Prescribing Mifepristone*

21.     Even though medication abortion could be safely provided in primary care and other health care settings throughout the state, the REMS requires health care providers to register as certified prescribers with the REMS program and stock mifepristone onsite for in-person dispensing. I have seen how these requirements prevent would-be mifepristone prescribers from providing this essential care to their patients. I know clinicians who would have prescribed mifepristone but were prevented from stocking and dispensing it onsite by others at the facilities in which they practice. For example, the family medicine clinic where I did my residency training was not permitted to stock mifepristone onsite because of opposition from someone at the institution.  If it were not for the REMS, however, clinicians would have been able to send in mifepristone prescriptions to a pharmacy, as they do for virtually all other medications. Instead, because of the REMS, clinicians who practiced at the clinic could not provide mifepristone to their patients. The mifepristone REMS creates unnecessary barriers to the provision of care.

22.     Earlier this week, FDA announced that it would suspend enforcement of the REMS in-person requirements during the COVID-19 PHE. This is

extremely good news for my patients, who now again have the opportunity to receive care by telehealth and have their medication delivered directly to them from a mail-order pharmacy. However, this non-enforcement policy is limited to the PHE: when the PHE ends, the REMS in-person requirements will again harm my patients as they have in the past.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on April 14, 2021.

Julie Amaon, M.D.

# EXHIBIT 3

Declaration of Joey Banks, M.D.

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org

*admitted pro hac vice
**admission for pro hac vice pending

*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAIʻI

GRAHAM T. CHELIUS, M.D., *et al.*,

    Plaintiffs,

vs.

XAVIER BECERRA, J.D., *in his
official capacity as* SECRETARY,
U.S. D.H.H.S., *et al.*,

    Defendants.

CIV. NO. 1:17-cv-00493-JAO-RT

[CIVIL RIGHTS ACTION]

**DECLARATION OF JOEY
BANKS, M.D., IN SUPPORT OF
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Judge: Hon. Jill A. Otake
Hearing Date: Vacated per Dkt. 107
Trial Date: Vacated per Dkt. 82

Case 1:17-cv-00493-BAO-RT Document 240-4 10 Filed 05/27/25 Page 2 of 12
Case 1:07-cv-04493-BAO-RT Document 240-4 10 Filed 05/27/25 Page 622 of 312 6994
PageID.8806

Joey Banks, M.D. declares and states as follows:

1.    I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.    I am a family medicine physician. I work at Blue Mountain Clinic in Missoula, Montana, where I have been providing care since 2011. I currently provide and train residents in reproductive health care, including abortion, at the Blue Mountain Clinic and also provide such care at a clinic in Tulsa, Oklahoma.

3.    In addition, I serve as the Chief Medical Officer for Planned Parenthood of Montana, a position I have held since 2019. In this capacity, I supervise the medical staff at all Planned Parenthood sites statewide and also provide reproductive health care to patients.

4.    In my practice I prescribe mifepristone (brand name Mifeprex®) to my patients both for pregnancy termination and in cases of pregnancy loss (where mifepristone assists in safely and efficiently completing the miscarriage). I have provided abortion and miscarriage care to patients for 20 years and, over the years, have provided such care to many people who lived in areas where care is difficult to obtain—including in Alaska, Maine, Montana, and, most recently, in Oklahoma.

5.    I am a member of the National Abortion Federation, the American Academy of Family Physicians, and the Montana Academy of Family Physicians. I am also a member of the Society of Family Planning ("SFP"). I understand that SFP is a plaintiff in litigation challenging FDA's imposition of a Risk Evaluation and Mitigation Strategy ("REMS") for mifepristone, and write this declaration in support of SFP's Motion for Summary Judgment. I do so in my individual capacity and as an SFP member, and do not speak on behalf of Blue Mountain Clinic, Planned Parenthood, or any other institution.

1

6.      Until a couple of years ago, Blue Mountain Clinic was the only clinic in Missoula where patients could access abortion care. The Blue Mountain Clinic is located near a perinatologist's office. A perinatologist is an obstetrician who specializes in maternal-fetal medicine and has special training in high-risk pregnancy care. Perinatologists sometimes use mifepristone to induce labor in late pregnancy.

7.      The perinatologist near my clinic did not stock mifepristone, but occasionally wanted to administer it to his patients to induce labor in late pregnancy. Knowing that I stocked and provided mifepristone to my patients, in 2018 the perinatologist approached me about whether I would be amenable to his sending his patients to see me just to obtain the mifepristone, and then he would re-assume care after the patient left my clinic.

8.      When I asked the perinatologist why he didn't stock mifepristone himself, he said it was because he was worried that by stocking mifepristone he would unwittingly be placed on a list of abortion providers. The perinatologist was aware of the history of violence and harassment by anti-abortion activists and was concerned that if the list of mifepristone prescribers required by the REMS were somehow made public, it would put him in danger.

9.      The perinatologist was affiliated with and provides services at a local hospital in Missoula, Montana. When I asked why he didn't just ask the hospital to stock mifepristone in its formulary, he said that he did not want anyone in the hospital to presume he was pro-choice.

10.     This is not the only instance in which I have encountered clinicians who are unwilling to stock mifepristone even though it would benefit their patients. For instance, since 2013, I have been providing reproductive health care training to family medicine residents at Blue Mountain Clinic. My training includes, among other things, medication abortion, procedural (sometimes called "surgical") abortion, and miscarriage management. For many

2

years, I have taught residents to treat patients seeking medication abortion with a regimen of

200mg of mifepristone followed by 800mg of misoprostol; and, since 2018, based on new, high-

quality medical research, I also began teaching them this two-drug regimen for the medical

management of miscarriages. Although both can be accomplished with misoprostol alone,

evidence supports the two-drug regimen as the superior regimen.

  11. On numerous occasions, I have been contacted by physicians I previously trained,

telling me that the health care facility where they work does not stock mifepristone, and that they

felt uncomfortable asking leadership at their health care facility to begin stocking mifepristone,

or that they knew their clinic simply would not stock mifepristone. They all wanted to know

whether they could still care for patients who sought a medication abortion or suffered a

miscarriage, even without mifepristone. In light of these conversations, I now explain to the

residents I train that if their health care facility does not stock mifepristone, they can consider

prescribing misoprostol alone for either early abortion or miscarriage treatment, but that it is less

effective and that the two-drug regimen, including mifepristone, is the superior regimen

  12. In my experience, the mifepristone REMS is interfering with practitioners'

provision of evidence-based medicine. Some clinicians fear professional repercussions if they try

to persuade their colleagues to stock and dispense mifepristone onsite. And some are so

concerned about the stigma and threat of violence surrounding the provision of abortion that they

are unwilling to register their names and addresses with the mifepristone distributer, as required

by the REMS. The prospect of this "abortion provider list" being leaked to the public is enough

to prevent clinicians from providing what they deem the best medicine for their patients.

  13. In sum, the mifepristone REMS prevents clinicians from providing solid

evidence-based medicine due to the stigma and fear associated with having to register with the

drug manufacturer and stock the medication onsite.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct. Executed on April 12, 2021.

Joey Banks, M.D.

4

# EXHIBIT 4

Declaration of Jared Garrison-Jakel, M.D.

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org


*admitted pro hac vice
**admission for pro hac vice pending

*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*, <br><br> Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT <br><br> [CIVIL RIGHTS ACTION] <br><br> **DECLARATION OF JARED GARRISON-JAKEL, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Judge: Hon. Jill A. Otake <br> Hearing Date: Vacated per Dkt. 107 <br> Trial Date: Vacated per Dkt. 82 |

Jared Garrison-Jakel, M.D., declares and states as follows:

1.    I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.    I am a board-certified family medicine and addiction medicine doctor in Guerneville, California, and a member of the California Academy of Family Physicians ("CAFP"). I understand that CAFP is a plaintiff in this litigation challenging the U.S. Food and Drug Administration's imposition of a Risk Evaluation and Mitigation Strategy ("REMS") for Mifeprex, and write in support of that litigation. The Mifeprex REMS causes injury to me and my patients. But for the REMS, I could and would provide Mifeprex to my patients.

3.    I received my undergraduate degree from Pomona College in 2005, a Master's in Public Health from the University of California Berkeley in 2009, and my medical degree from the University of California Irvine School of Medicine in 2010. I subsequently completed an internship and residency in family medicine at Sutter Medical Center of Santa Rosa in California.

4.    I am trained in both medication and surgical abortion and provided those services while in my residency at Sutter Medical Center of Santa Rosa.

5.    Since 2013, I have practiced at Russian River Health Center in Guerneville, California ("Russian River"). I submit this declaration in my individual capacity and— besides CAFP—not on behalf of any institution with

which I am associated, including the health center.

6.      Russian River is a federally qualified health center ("FQHC"). FQHCs offer primary health care services to low-income populations in medically underserved areas. Guerneville, where Russian River is located, is an economically depressed city with virtually no other health care facilities. Our health center is located about 30 minutes away from any other doctor's office.

7.      Many of my patients have little access to transportation outside of the community where Russian River is located. This lack of transportation makes it difficult to access even urgent health care services. For example, I treated one patient who had a terrible cut in her hand—the laceration reached the tendon. I told this patient that she needed to see a hand surgeon due to the severity of the laceration, but the patient explained that such travel would be impossible for her. She told me, "Doc, either you fix it now or no one's fixing it."

8.      As explained below, because of the REMS, medication abortion is not available in the health center where I work. As a result, I have had to turn away patients who need abortion care. The closest clinic that offers abortion services is a one-hour round-trip from our health center. Traveling such a distance is a significant impediment for the populations I serve, who generally struggle to afford and arrange for things like transportation and child care. And, making this journey may very well also require my patients to miss work, and therefore lose wages—

2

that is, if they can get time off work at all; at the low-wage jobs where my patients

typically work, there is often no paid leave. The reality is that it can be difficult or

impossible for my patients to overcome all of these barriers.

9.      I am medically qualified to provide Mifeprex to my patients who

request a medication abortion. The only reason why I am not able to do so is

because of the requirement that I stock and dispense Mifeprex on site.

10.      I am aware that at least one of my colleagues, who holds a position of

authority at our institution, is opposed to abortion and would not consent to

Mifeprex being stocked and dispensed in our health center. (For the same reason,

we cannot provide surgical abortion services here.) However, I am also aware that

this colleague would not interfere with my writing a prescription for Mifeprex in

the privacy of my office for a patient to fill at a pharmacy—and there are two

pharmacies very close to the health center where I work; one is only a block away.

But for the REMS, I could and would provide medication abortion care to my

patients (and would do so in compliance with all federal segregation guidelines for

FQHCs that provide abortion services).

11.      Because of the REMS, I have been unable to treat my patients in

accordance with my medical judgment. Multiple patients have come to me with

unwanted pregnancies at less than ten weeks, who requested—and were eligible

for—medication abortions. However, because of the REMS, I had to deny them

this care—delaying their abortion, to the extent that they could obtain the abortion at all. Indeed, I am always reluctant to refer a patient to another health care facility, whether for abortion or any other medical service; given the financial challenges that my patients almost uniformly face, which are often compounded by other barriers and stressors (such as mental health disorders, substance use disorders, or homelessness), such a referral usually means that they will be significantly delayed in accessing medical care, or not obtain it at all.

12.      There are three central concerns with delaying abortion care. First, if a patient is delayed past ten weeks of pregnancy, she typically will no longer be able to obtain a medication abortion and will instead need to have an in-office clinical procedure, which may be an inferior option given her circumstances. Second, while abortion is extremely safe, and far safer than remaining pregnant and carrying to term, the risk of complications increases as the pregnancy progresses. I can recall at least one patient who came to me at a point in pregnancy when she was still eligible for a medication abortion but, because I could not write her a prescription for Mifeprex, ended up having a more invasive and time-consuming second-trimester dilation and evacuation abortion procedure over a month later. Third, delaying a patient's abortion means that the patient stays pregnant longer, and thus must incur the serious risks and discomforts associated with pregnancy for longer.

4

13.     Moreover, because of the REMS, at least one of my patients was

prevented from having a desired abortion at all. This patient had a history of sexual

trauma and struggled with substance use disorders. She was extremely distressed to

learn that she was pregnant, and presented to me seeking a medication abortion. To

add to the complications of her situation, she did not feel that she could disclose

her desire for an abortion to her partner. I initially referred her to the nearest clinic

providing first-trimester abortion services, but she was unable to make the journey

to that clinic for her appointment. I saw her again in her second trimester, when she

reiterated that she did not want to carry the pregnancy to term. At that point, I

referred her to the nearest provider of second-trimester abortions, which is

approximately three hours round-trip from Guerneville. I know that the care team

at that facility worked diligently to support her in accessing abortion care,

including trying to arrange transportation for her. Nevertheless, because of the

many challenges in her life, she missed multiple appointments there as well. This

patient ultimately ended up carrying the pregnancy to term. I have grave concerns

about how this unintended pregnancy has affected her life; when I'd seen her, she

communicated that the pregnancy had worsened her suffering around her sexual

trauma history and medication dependency. Moreover, this patient did not obtain

adequate prenatal care during her first or second trimesters because this was not a

pregnancy she had intended to carry to term. Needless to say, denying this patient

the care she so desperately wanted and needed was not in accordance with my best medical judgment.

14.     In short, the Mifeprex REMS has prevented me from fulfilling my personal, professional, and ethical obligations to provide my patients with the medical care they need, which I am qualified to and would otherwise provide.

15.     I am aware that the FDA just announced that, for the remainder of the COVID-19 Public Health Emergency, it is suspending enforcement of the requirement that patients obtain Mifeprex in person at a health center and instead allowing patients to obtain their medication by mail or from a mail-order pharmacy acting under the supervision of a certified REMS prescriber. Although this is an important step in the right direction, even under this short-term policy, the FDA continues to treat Mifeprex differently than any other drug I prescribe. I am working to understand what this "supervision" requirement entails (such as with regard to billing) and determine whether or not I will be able to take advantage of this temporary policy shift. Regardless, a permanent fix is essential to ensure that my patients can access medication abortion care without facing needless, and sometimes insurmountable, hurdles.

6

App.050

I declare under penalty of perjury that the foregoing is true and correct and

that this declaration was executed on __April 14th__, 2021, in Guerneville,

California.

Jared Garrison-Jakel, M.D.

7

App.051

# EXHIBIT 5

Declaration of Erin King, M.D.

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org


*admitted pro hac vice*
**admission for pro hac vice pending*

*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

|  |  |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*, <br><br> Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT <br><br> [CIVIL RIGHTS ACTION] <br><br> **DECLARATION OF ERIN KING, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Judge: Hon. Jill A. Otake <br> Hearing Date: Vacated per Dkt. 107 <br> Trial Date: Vacated per Dkt. 82 |

Erin King, M.D. declares and states as follows:

1.  I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.  I am a board-certified Obstetrician Gynecologist ("Ob-Gyn") licensed to practice in Illinois and Missouri. I treat patients principally at a general Ob-Gyn practice in St. Louis, Missouri, and at the Hope Clinic for Women ("Hope Clinic") in Granite City, Illinois, where I also serve as the Executive Director. I provide patients with the full scope of obstetric and gynecological care, including abortion care.

3.  I am a member of the American College of Obstetricians and Gynecologists, the National Abortion Federation, and the Society of Family Planning ("SFP"). I understand that SFP is a plaintiff in this litigation challenging the Risk Evaluation and Mitigation Strategy ("REMS") that the Food and Drug Administration ("FDA") imposes for mifepristone (brand name Mifeprex®). I write this declaration in support of Plaintiffs' Motion for Summary Judgment, on my own behalf, and not on behalf of Hope Clinic or any other institution.

4.  I am a certified prescriber under FDA's mifepristone REMS. I prescribe mifepristone as part of a medication abortion regimen and for patients seeking medical management of miscarriage. I also provide training in medication abortion and other abortion and reproductive health care.

5.     I am aware of clinicians who would prescribe mifepristone for medication abortion and miscarriage care for their patients if they could send in a prescription to a local or mail-order pharmacy as they do with nearly all other medication. However, the mifepristone REMS—which requires clinicians to register as certified prescribers and to stock and dispense mifepristone in their offices—has prevented them from using mifepristone in their patient care. Physicians I have trained have often told me that they are unable to find employment with practices that are willing to stock mifepristone and, as a result, were not able to provide medication abortion or miscarriage care using mifepristone to their patients, though they would have been able to provide this care if they could simply write a prescription.

6.     The mifepristone REMS also imposes significant burdens on my patients. Because of the REMS, my patients whom I can evaluate and counsel via telemedicine have had to travel unnecessarily to my clinic for their medication. They have had to find and pay for transportation and child care and take time away from jobs that pay by the hour or day. This is particularly burdensome for my many patients who live with low incomes and have to travel long distances, from rural parts of southern Illinois, to get to my clinic. In addition, during the COVID-19 pandemic, the REMS has put them and their families at needless risk for contracting a deadly virus as they travel in person to pick up medication that they

2

could otherwise safely receive by mail at home.

7.      Last year, a federal district court in Maryland issued an injunction suspending the mifepristone REMS in-person requirements for medication abortion for the duration of the COVID-19 federal Public Health Emergency ("PHE").[1] The injunction permitted me to contract with a mail-order pharmacy to ship mifepristone to my eligible patients. That meant that, for my medication abortion patients who did not require in-person assessment, I could provide all counseling and assessment in a telehealth visit and then have the medication delivered directly to them from the mail-order pharmacy.

8.      On the day we began offering patients the option to receive their prescription through the mail-order pharmacy, I treated a patient who had had an appointment to come to the clinic for a medication abortion but had had to cancel because she could not get time away from work and could not find anyone to stay with her children. She told me that she would have had to forgo an abortion altogether if we had not been able to offer her a telemedicine visit and delivery of her medication, because she did not think she would ever be able to make the arrangements necessary to get to the clinic in person. But, because the REMS in-person requirements were enjoined, she was able to have a safe abortion from the

---

[1] *Am. Coll. of Obstetricians & Gynecologists v. FDA* [hereinafter "*ACOG v. FDA*"], 472 F.Supp.3d 183 (D.Md. 2020); *ACOG v. FDA*, Civ. No. TDA-20-1320, 2020 WL 8167535 (D.Md., Aug. 19, 2020).

3

safety and privacy of her own home.

9. Unfortunately, however, the U.S. Supreme Court entered a stay of the injunction, reinstating the in-person requirements.[2] As a result, for the past three months I have again been forced to require patients seeking medication abortion care to travel to the clinic to pick up their medication.

10. This requirement imposes substantial burdens on my patients. Since the Supreme Court reinstated the REMS in-person requirements, I have seen numerous patients who needed no in-person assessment but nevertheless had to travel multiple hours, each way, to come to my clinic to pick up their medication. These patients have had to bear the costs and burdens of arranging travel, time away from work, and child care, when they could just as safely have obtained their prescription by mail and avoided all of these burdens.

11. Needing to make these arrangements and raise funds for this travel has often delayed my patients' care—sometimes beyond the point when they can have a medication abortion. I recently saw a patient who wanted a medication abortion but was 13 weeks pregnant and therefore had to have an in-clinic procedure. She was very upset, explaining that she had rescheduled her appointment numerous times because she could not arrange for travel or find someone to take care of her children—and during the pandemic, she could not

---

[2] *ACOG v. FDA*, 141 S. Ct. 578 (2021).

2021 REMS 001979     App.057

bring her children with her to our clinic, because we do not allow anyone other than the patient to enter in order to mitigate viral spread. But for the mifepristone REMS, I could have treated this patient in a telemedicine visit and had her medication delivered to her at home while she was still eligible for a medication abortion. This patient is not alone; I see patients every week with one variation or another of this story.

12.     I am able to provide care entirely by telehealth for a wide array of other medical needs. For instance, I regularly use telehealth to diagnose, treat, and counsel patients regarding urinary tract infections, vaginitis, rashes, and contraception needs. In my practice, we also conduct prenatal and post-partum visits remotely. We can even examine a patient's sutures and evaluate how well the patient is healing after surgery in a telehealth visit. I can just as safely and effectively evaluate and comprehensively counsel eligible medication abortion patients in a telehealth visit. However, because of the REMS, my patients who require mifepristone have had to suffer needless burdens and risks that my patients who can obtain care entirely by telehealth are able to avoid.

13.     Earlier this week, FDA announced that it would suspend enforcement of the REMS in-person requirements during the COVID-19 PHE. I am very pleased that my patients receiving care by telehealth can now have their medication delivered directly to them from a mail-order pharmacy without the

App.058

costs, risks, and burdens of a needless in-person trip. However, when the PHE ends and this non-enforcement policy expires, the REMS in-person requirements will again impose substantial burdens on my patients.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on April ___14___, 2021.


_____
Erin King, M.D.

6

# EXHIBIT 6

Declaration of
Charisse M. Loder, M.D., M.SC.

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM 11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org


*admitted pro hac vice
**admission for pro hac vice pending

*Attorneys for Plaintiffs*

**American Civil Liberties Union Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

GRAHAM T. CHELIUS, M.D., *et al.*,

Plaintiffs,

vs.

XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*,

Defendants.

CIV. NO. 1:17-cv-00493-JAO-RT

[CIVIL RIGHTS ACTION]
**DECLARATION OF CHARISSE M. LODER, M.D., M.SC., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Judge: Hon. Jill A. Otake
Hearing Date: Vacated per Dkt. 107
Trial Date: Vacated per Dkt. 82

Charisse M. Loder, M.D., M.Sc., declares and states as follows:

1.      I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.      I am an obstetrician-gynecologist trained in abortion care and a member of the Society of Family Planning ("SFP"). I am a Clinical Assistant Professor of Obstetrics and Gynecology at the University of Michigan Medical School. My practice is located at the Women's Clinic at Von Voigtlander Women's Hospital in Ann Arbor, Michigan. I have also practiced as an obstetrician-gynecologist at Planned Parenthood in Ann Arbor.

3.      I received my undergraduate degree from Cornell University in 2003, and my medical degree from Pennsylvania State University in 2011. I did my residency in Obstetrics and Gynecology at the University of Rochester, where I served as Chief Resident, and then completed a fellowship in Family Planning and received a Master of Science degree in Health and Health Care Research at the University of Michigan.

4.      In my current practice, I provide a range of obstetrics and gynecology care, and specialize in miscarriage management, complex contraception and sterilization, and abortion care.

5.      I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. I do so only in my individual capacity and as a member of SFP, not on behalf of any institution with which I am affiliated.

6.      Mifeprex is an important drug for the provision of abortion and miscarriage care. I advocated to make this medication available within the Women's Clinic in order to offer our patients the best possible care at our own institution, without having to refer them elsewhere.

7.      While I am currently able to prescribe mifepristone to my patients, attempting to bring the Women's Clinic at the University of Michigan into compliance with the mifepristone (brand name Mifeprex®) Risk Evaluation and Mitigation Strategy ("REMS") was an extremely complicated process that took five years (and a substantial investment of time, resources, and professional capital by me and other colleagues). During these five years, my colleagues and I were forced to refer patients who needed medication abortion care to other institutions. When patients are referred elsewhere for abortion care, many experience delays or are even prevented from accessing this time-sensitive care. We were also unable to offer Mifeprex for miscarriage and second-trimester abortion care, even though Mifeprex enhances the efficacy of those treatments.  There is absolutely no medical reason for FDA to impose these barriers to patients obtaining this safe and effective medication.

8.      My involvement in the process of trying to make Mifeprex available

at the University of Michigan began when I arrived at the University six years ago,

in 2015. But conversations surrounding Mifeprex at the University of Michigan

began seven years ago, in 2014. As of 2014, the only patients who could access

mifepristone through the University of Michigan were those seeking treatment for

Cushing's syndrome: University clinicians were able to prescribe mifepristone

under the brand name Korlym, and the patients filled those prescriptions through a

mail-order pharmacy. However, patients in need of mifepristone under the brand

name Mifeprex, for reproductive health care, could not access the medication

through any University provider.

9.      As a first step, I had to get approval to add Mifeprex to the

University's drug formulary from the University's Pharmacy and Therapeutics

Committee ("the Committee"), which is composed of pharmacists and physicians

from a variety of clinical specialties. As discussed above, I was not the first

physician to attempt to do so; in 2014, other physicians had participated in multiple

meetings with the Committee during which they advocated for adding Mifeprex to

the formulary. Ultimately, these conversations stalled because those physicians

were unable to invest the immense amounts of time required to move this process

forward.

10.     Between 2015 and 2016, I participated in approximately four Committee meetings relating to Mifeprex. To assist in the Committee's evaluation of Mifeprex, the Committee asked me and my colleagues to provide literature on Mifeprex's safety and indications for use, which we did. These meetings were each about an hour long, and I individually spent at least 20 additional hours researching and preparing presentations about Mifeprex's safety and efficacy, as well as writing guidelines for its use.

11.     Finally, in 2016, the Committee approved Mifeprex for the University formulary. None of this would have been necessary—the Committee would not have been involved at all—if we could simply issue our patients a prescription to fill at a pharmacy instead of having to stock and dispense Mifeprex onsite.

12.     But getting Mifeprex on our hospital's formulary still did not mean that University of Michigan clinicians could start prescribing Mifeprex to patients. Placing a drug "on formulary" means that the drug is approved for safe use by the hospital. But, in order to make Mifeprex available "in clinic" for patients, the University of Michigan first had to order and stock this medication. And it took me *three* more years of advocacy to achieve this second step.

13.     In 2018, a pharmacist in the gynecology department suggested that I form a task force to develop protocols for Mifeprex use in-clinic because the process had stalled out. I believe that my colleague suggested that I create such a

task force in order to alleviate concerns throughout the University about how to comply with the Mifeprex REMS and to accelerate the process of actually stocking and dispensing Mifeprex. I have never heard of such a task force being formed for the introduction of other drugs or devices into University practice. For example, we frequently integrate new intrauterine contraceptive devices (IUDs) into our practice, and have never had to develop protocols about how to prescribe them. But I believed that without a physician champion and a committee specifically focused on this issue, Mifeprex would never be made available in our clinic.

14.     Accordingly, I organized and created a multidisciplinary task force to develop various protocols for ordering, stocking, prescribing, and dispensing Mifeprex at the Women's Clinic.  This task force is made up of gynecology and family medicine physicians, nurses, clinic managers, pharmacists, and electronic medical record (EMR) specialists. The task force was charged with finalizing protocols to address how Mifeprex is ordered, administered, and stored, as well as addressing safety and reimbursement concerns surrounding the storage and dispensing of Mifeprex at our clinic. In a large health care institution like ours, where every organizational decision requires approval from multiple stakeholders, none of these decisions were simple.

15.     I first convened this task force in October 2018, and the task force met every six weeks until Mifeprex was available in clinic.  The task force met for

6

about an hour each time—and that is only the tip of the iceberg. Since October 2018, I have spent at least 80 hours of my time preparing for and/or completing follow-up work relating to task force meetings (such as preparing education materials for clinical staff), as well as participating in numerous *non*-task force meetings with stakeholders to discuss protocols to ensure compliance with the REMS as we integrate Mifeprex into clinical practice. For instance, I met with EMR representatives to propose edits to our electronic medical records in order to track Mifeprex administration in patient records. I attended separate meetings with the Women's Clinic manager, insurance verification team, and billing team related to the University's financial and reimbursement concerns around the dispensing of Mifeprex onsite. And I consulted on strategies to communicate guidelines for Mifeprex administration with staff, including developing REMS-compliant protocols for nurses who may want to "opt-out" of any involvement in the dispensing of Mifeprex. If not for the REMS, I would not have had to involve all of these other clinicians and stakeholders within the University and invest so many hours of my time and professional resources into developing system-wide protocols to integrate Mifeprex into hospital practice. I would simply have written my patients a prescription.

16.     The Mifeprex REMS also requires that clinicians register with the drug's distributor in order to become a certified prescriber. As an initial matter, this

7

requirement is medically unnecessary: Mifeprex is a safe and straightforward medication; the clinical competencies necessary to safely prescribe it are very common; and in general, and as a legal and ethical matter, my colleagues and I do not prescribe any treatment unless it is within our competency to do so. But the prescriber certification requirement also posed numerous obstacles to the provision of Mifeprex at the University of Michigan.

17.     First, task force members raised concerns that the University would face legal liability if clinicians who were not acting pursuant to a REMS prescriber agreement prescribed this drug. We spent many meetings discussing protocols to prevent violations of the REMS.

18.     Second, members of the task force were concerned about how to store Mifeprex to ensure that only certified prescribers can access it. As a result, the task force spent numerous meetings discussing how to properly secure the Mifeprex stock with locks, and how to determine which clinicians have access to the locked area.

19.     Third, because of the prescriber certification requirement, the University of Michigan must update its EMR system and pharmacy database each time a physician registers as a certified provider. These updates are costly and require staff time. These systems must be updated constantly to alleviate a concern that someone will prescribe Mifeprex in violation of the REMS.

8

20.     These organizational concerns related to prescriber certification stem not from any mistrust of physicians, but from concerns about compliance with the REMS.

21.     I would never have been able to provide mifepristone to my patients if it were not for the tenacious advocacy and time commitment my colleagues and I invested into this effort. As it was, for more than five years, the REMS prevented me and all of my colleagues from providing that care to our patients and necessitated that we refer patients outside of the University of Michigan system. I know that many of my colleagues have had the same experience, because over the years, I have frequently been contacted by colleagues inquiring whether they were permitted to prescribe Mifeprex to their patients, and I had to tell them that—because of the REMS—the answer was no.

22.     And my situation at the University of Michigan is by no means unique. I am regularly contacted by clinicians at other academic medical centers who are seeking advice on how to navigate the REMS in order to stock and dispense Mifeprex at their institutions.

23.     Clinicians outside the University of Michigan have also shared with me that they have not integrated Mifeprex into their practice because they fear that completing the REMS prescriber certification requirement would place them on a registry of abortion providers and thus make them targets of anti-abortion

9

harassment or violence. If clinicians could simply write a prescription for Mifeprex without this obstacle and the other obstacles the REMS imposes, I believe that many more clinicians, in a wider swath of our state, would do so.

24.    While abortion care is extremely safe, the risks associated with abortion increase as pregnancy advances. Therefore, delaying a patient's abortion care increases the risks she faces.

25.    This delay also pushes patients past the point at which a medication abortion, or any abortion care, is available to them at all. When I worked at Planned Parenthood, I often saw patients who had been referred there by their primary provider because their provider does not provide medication abortion care. But, because of the delay caused by this referral, by the time these patients got to Planned Parenthood, they were frequently too far along in their pregnancies to be eligible for a medication abortion—even though they preferred that option and that option would have been most clinically suitable for them. Because of this delay, these patients were only eligible for aspiration or dilation and evacuation ("D&E") abortion, in-clinic procedures that are significantly more expensive than medication abortion.  And some of these patients could not afford these more expensive in-clinic procedures and ultimately were unable to get an abortion at all.

26.    My patients at Planned Parenthood frequently told me about the burdens they faced traveling to us for care: paying for transportation, arranging

child care, taking time (often unpaid) off from work, and more. Some of these patients traveled great distances: there are very few abortion providers in Northern Michigan or in Michigan's Upper Peninsula, and many of our patients traveled more than one and a half hours, and up to 10 hours, to obtain abortion care. Many of these patients shared that they could not access abortion care in their local community.

27.     In addition to being an important part of safe, effective early abortion care, Mifeprex has other clinical indications, such as in medical management of pregnancy loss (miscarriage) and labor induction abortions during the second trimester. In both of these clinical circumstances, pretreatment with mifepristone reduces the length of the treatment and, as a result, reduces the risk of complications.

28.     At the University of Michigan, my colleagues and I care for patients undergoing second-trimester labor induction in cases of pregnancy loss, or where the patient seeks abortion because of a diagnosis of fetal anomalies or due to significant risk to maternal health or life. During this process the patient experiences all the pain and physical consequences of labor. Clinicians often prescribe Mifeprex to patients going through this process, in order to make it easier and faster. When clinicians are unable to add Mifeprex to their treatment regimen,

many patients and their families suffer both emotional and physical tolls from longer labor inductions.

29.     After five years of advocacy and hundreds of hours of advocacy by a few dedicated clinicians and stakeholders, Mifeprex finally became available onsite at the University of Michigan in late September 2019. But even now, the work continues: although Mifeprex is available at the Von Voigtlander Women's Hospital (where the Women's Clinic is located), I am still expending hours of effort to work to make Mifeprex available at our six OB/GYN outpatient sites, where clinicians continue to struggle to develop systems to stock and store Mifeprex consistent with the REMS. As a result, patients in those communities must travel longer distances (up to 40 miles round-trip) to get to our hospital for care, rather than being able to obtain a prescription for Mifeprex at their local outpatient site to then fill through a retail or mail-order pharmacy.

30.     The Mifeprex REMS made this process extremely burdensome, requiring both an institutional champion (myself) willing to expend more than 80 hours of work and significant professional capital, and more institutional resources than I have seen for any other medication that has ever been made available in clinic at the University of Michigan. The five-year delay in Mifeprex's availability in clinic harmed patients.

hours of work and significant professional capital, and more institutional resources than I have seen for any other medication that has ever been made available in clinic at the University of Michigan. The five-year delay in Mifeprex's availability in clinic harmed patients.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, 2021.



Charisse M. Loder, M.D., M.Sc.

13

# EXHIBIT 7

Declaration of Jane Roe, M.D.

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN*
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org

*admitted pro hac vice*

*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE*
RUTH HARLOW*
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN*
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

|  |  |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*, <br><br> Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT <br><br> [CIVIL RIGHTS ACTION] <br><br> **DECLARATION OF ▮▮▮▮▮▮▮▮▮, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Judge: Hon. Jill A. Otake <br> Hearing Date: Vacated per Dkt. 107 <br> Trial Date: Vacated per Dkt. 82 |

████████████, M.D., a/k/a/ Jane Roe, M.D., declares and states as follows:

1.      I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.      I am a Family Medicine doctor trained in abortion care. I live and practice in a rural area in the western United States, approximately 100 miles away from the nearest abortion clinic. I am seeking to proceed pseudonymously out of fear of being exposed—nationally and in my small, rural town—as an abortion provider. In light of the extreme harassment and violence, including murder, that has been perpetrated against abortion providers in the United States, I attempt to keep my provision of abortion care as private as possible; I am painfully aware that my primary practice does not have the safeguards in place that exist at the abortion clinics (several hours away) where I work part-time—bulletproof glass, violent intruder protocols, alarm button, separate entrance for providers, and so on. Moreover, given the significant abortion stigma in my community, I expect that I would lose many of my non-abortion patients at my primary practice if the fact of my abortion provision were widely known.

3.      I am a member of Plaintiff Society of Family Planning, and I submit this declaration in support of Plaintiffs' Motion for Summary Judgment. I do so only in my individual capacity and not on behalf of any institution with which I am affiliated.

1

4.      Attempting to comply with the Mifeprex REMS has been time-consuming, stressful, and professionally compromising. Because of the REMS, my ability to care for my patients in accordance with their needs and with my medical judgment has been conditioned on my seeking (and gaining) approval and assistance from countless individuals and committees within my health care institution. If not for the REMS, I could have simply written a prescription for Mifeprex for my patients to fill at a local or mail-order pharmacy, rather than having to mount a workplace lobbying campaign, and jeopardize my professional standing, in order to provide this safe medication onsite to my patients who need it.

5.      I am a full-spectrum Family Medicine physician. In addition to my three years of residency, I completed a Family Medicine fellowship in obstetrics. I often care for three or four generations within a family—delivering a baby one day and caring for her grandmother the next. I perform a range of obstetric and gynecological services, such as cesarean sections, tubal ligations, leeps (which entails removing pre-cancerous lesions from the cervix), endometrial biopsies, and insertion and removal of intrauterine contraceptive devices.

6.      I also provide miscarriage management, including by prescribing medications to evacuate the contents of a patient's uterus. When using medications to manage a miscarriage, it is the standard of care to use both Mifeprex and misoprostol, the same two drugs used in the FDA-approved medication abortion

2

regimen. Thus, as discussed further below, the restrictions on Mifeprex impact my ability to provide both abortion and miscarriage care.

7.  I work at a hospital and affiliated clinic within a large health care system that includes multiple hospitals, each of which has one or more affiliated clinics. Many of my patients are low-income; virtually all are rural; and many travel to us from medically underserved areas in our state. Indeed, some of my patients live in areas where there are no roads—only snowmobile access in the winters.

8.  Over the years, my colleagues and I have had multiple patients ask if we could provide a medication abortion, but—because we could not write them a prescription for Mifeprex to fill at a pharmacy—we had to refer all of these patients elsewhere for care. The nearest abortion clinic is a 200-mile round-trip, and some of these patients never made the journey, instead returning later for prenatal care. I recall one adolescent patient who told my colleague that she had repeatedly scheduled appointments at the abortion clinic, only to have to cancel multiple times because she simply could not make it there.

9.  So, in February 2017, along with a few colleagues, I began the process of trying to get Mifeprex added to our hospital's formulary. The formulary is the list of medications approved for use by the pharmacy committees for our hospital and for our health care system, and then made available at our hospital for

3

dispensing or administering to patients. Based on conversations I had with colleagues about attitudes towards abortion at our institution, I concluded that there was a greater likelihood of my gaining approval to add Mifeprex to our formulary and dispense it in my office, rather than gaining approval to perform surgical abortion services in our operating room. That is because the latter would require the involvement of many clinicians, including nursing staff, certified scrub technicians, and anesthesia providers, and would thus require (at a minimum) approval from the CEO of the hospital and the departments overseeing each of those categories of clinicians, as well as the development of opt-out procedures for the supporting clinical staff.

10.     Attempting to add Mifeprex to our formulary was a major undertaking. First, we had to obtain approval from the pharmacy committee at our hospital. Once that committee agreed to move forward with the process, we could elevate the request to the pharmacy committee for the entire health care system.

11.     Over the next six months, we were delayed time and again in trying to get a decision from that system-level pharmacy committee—including being advised by a representative of the committee to delay raising the issue of Mifeprex until our request could undergo further "informal vetting," and then being bumped from the agenda for the committee's once-a-month meeting at least three times. In addition, the pharmacy committee representative insisted that *we* complete the

4

"new drug review" analysis for Mifeprex—a time-consuming assignment that, to my knowledge, is always completed by the system-level pharmacy committee, not by the hospital-level pharmacy committee or the individual physicians or pharmacists making the request. I believe this was demanded of us only because of the controversy and stigma surrounding abortion in our community, as in many places in this country.

12.     Throughout the six months that we were slogging through this process—which would not have been necessary if not for the REMS—I was forced to turn away patients who needed my care. I know with certainty that, as a result, at least one of my patients was delayed past the point in pregnancy when she could obtain a medication abortion at all—which is available only up to 10 weeks of pregnancy—and had to travel 200 miles round-trip to have a surgical abortion instead. While abortion is one of the safest procedures in modern American medicine, and far safer for a woman than remaining pregnant and carrying to term, the risks associated with abortion increase as pregnancy advances. Thus, delaying a woman's abortion care increases the risks she faces.

13.     It is inconsistent with both my medical judgment and my deeply held values to deny a patient's urgent request for time-sensitive medical care that I am qualified to provide—but that is exactly what the REMS required of me.

14.     In September 2017, I was contacted by the Chief Medical Officer of

our health care system, who had apparently been informed of my request. To my knowledge, it is very unusual for the CMO to be involved in a formulary request, and I assume that my request was only elevated to this very high level because of the controversy surrounding abortion. He proposed a possible strategy to enable me to provide Mifeprex to my patients while avoiding the conflict that he expected would result from a system-wide debate on this question: namely, that I would prescribe and dispense Mifeprex as a "non-formulary drug," which the policy defines as "[a]n agent, which has not been reviewed by the [pharmacy committee] or has been reviewed and denied admission to the formulary."

15.     This was a highly unusual application of our policy on non-formulary drugs, which to my knowledge is typically invoked in situations where patients admitted to our hospital need to continue a pre-established medication regimen for the short period of time that they are admitted. The policy on non-formulary drugs also expressly provides that usage of such medications will be "tracked and routinely reviewed . . . to evaluate appropriateness" by the system-level pharmacy committee—the very same committee that this strategy was designed to avoid, given the expectation of conflict over the abortion issue. Classifying Mifeprex as a non-formulary drug to be "tracked and routinely reviewed" meant that I had to continue to expend time, and put my professional reputation on the line, having discussions with leadership at my institution regarding my Mifeprex use. And, of

course, this designation meant that I could suddenly lose the ability to provide this care to my patients.

16.     After gaining this temporary, precarious approval to stock and dispense Mifeprex on-site as a non-formulary drug, I next had to sign up with Danco (the manufacturer of Mifeprex) as a certified prescriber and set up an account with the drug distribution company. This was a significant ordeal in and of itself, further delaying my ability to care for my patients by approximately two months. I completed as much of the paperwork myself as I could, but setting up an account requires information (including on billing and shipping) that, as a doctor within a large health care institution, I do not have. This meant that I had to involve yet another colleague in the process—my Practice Administrator, who oversees finances, staffing, and other significant matters in our practice—and then repeatedly bother that person, who I know to be personally opposed to abortion, until it got done. If not for the REMS, I would not have had to compromise this important professional relationship in this manner.

17.     I believe that the REMS has harmed my reputation among some of my colleagues by necessitating that I engage in an internal lobbying campaign to try to make Mifeprex available onsite, and necessitating the involvement of additional members of our staff in this care. For instance, I was informed about a senior leadership meeting at which a colleague raised as a "concern" that I was working

7

to make Mifeprex available at our facility (mentioning me by name).

18.     *None* of this would have been necessary if I could simply write a prescription for Mifeprex for my patient to fill at a retail pharmacy, as I can do for virtually every other prescription drug. My colleagues do not have to expend such time and resources, or jeopardize their professional reputations, in order to prescribe other medications that are equally or less safe than Mifeprex.

19.     Earlier in 2019, our health care system finally approved Mifeprex as a formulary drug. But this was no quick fix: ordering, stocking, and dispensing the medication remains a complicated, multi-stage process involving numerous staff members across our health care system. To begin, one provider from each individual clinic or hospital wishing to prescribe Mifeprex must register with the "buyer" for our health care system's central pharmacy. This entails attesting that they will oversee the prescription and dispensing of Mifeprex at their clinic or hospital site; completing the necessary materials for Danco; determining how many doses to order; and all of the correspondence and paperwork this necessitates. The central pharmacy then orders the medication to be stocked at the specific clinic or hospital.

20.     In the Family Medicine clinic where I work, Mifeprex is stored under lock in our medication stock room, where we keep vaccines and other medications administered in the clinic (typically drugs administered by injection, or basic

8

painkillers like ibuprofen). When one of the medical assistants who works in my clinic sees that I have entered an order for Mifeprex, she goes into the medication stock room to obtain the pill and complete the special Mifeprex log, noting the serial number of the package (as required by the REMS) as well as the two-part patient ID (typically, the patient's medical records number and date of birth).

21. Having to comply with the REMS thus dramatically increases the number of people in our health care system who must be involved in the provision of Mifeprex. In addition to posing logistical complications, this heightens the risk of a violation of patient confidentiality—and perpetually threatens that a single individual who opposes abortion could delay or derail the process. By contrast, if not for the REMS, I could just electronically submit the prescription order to a pharmacy of my patient's choice and no one else would have to be involved.

22. Notably, formulary drugs are still subject to "annual" review by the system-level pharmacy committee (as compared to the "routine" review for non-formulary drugs)—which means that availability at our hospital is still subject to debate every year by a committee, the members of which change on a regular basis. My ability to include Mifeprex within my practice, and my patients' access to this vital care, remains precarious.

23. The Mifeprex REMS also requires me to provide my patients with and discuss, and for us each to sign, a "Patient Agreement Form" containing medical

information about Mifeprex dated to March 2016. This is not merely unnecessary from an informed consent perspective—it actively *undermines* my informed consent process by forcing me to discuss with my patients information that is inconsistent with my clinical approach and increasingly out-of-step with the research on Mifeprex as science moves forward. For instance, the form requires the patient's signature that, "[i]f my pregnancy continues after treatment with Mifeprex and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy." However, I (like many clinicians) treat the small percentage of patients whose pregnancies continue following use of the Mifeprex and misoprostol regimen with additional medication doses in the first instance, not surgery. This is well within the standard of care, yet not reflected in the form—to the contrary, the form suggests to patients that surgery is the *only* option in such a case. Moreover, the statement that "the treatment will not work . . . . in about 2 to 7 out of 100 women" is misleading and not how I counsel my patients about the expected efficacy of the treatment: while in some small number of cases, the regimen listed on the label will not fully complete the abortion, the treatment may very well still work – after, for instance, an additional dosage of misoprostol.

24.     The Form is particularly ill-suited for my patients to whom I am prescribing Mifeprex as part of miscarriage management, as has become the standard of care. The Form does not describe the clinical circumstances of patients

10

experiencing pregnancy loss, and can be confusing and distressing for them. Nevertheless, because of the REMS, I still must have these patients sign the Form before I can prescribe them Mifeprex. For all of these reasons, the Patient Agreement Form interferes with my ability to practice my profession in accordance with my medical judgment.

25.     I hope that more clinicians within our health care system will begin providing Mifeprex at their own hospitals and clinics as well, and thus continue to expand access to this safe and effective medication. I have had numerous conversations with like-minded colleagues to that end, including giving them advice about navigating the multi-step, time-consuming process I described above to register with both our health care system and with Danco as a prescriber and then to actually get the medication onsite. Unfortunately, these logistical hurdles caused by the REMS have proven to be a significant deterrent, and there are still only a handful of us in the health care system who prescribe Mifeprex, either for abortion care or for miscarriage management.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in ▮▮▮▮▮▮▮▮▮, on ▮▮▮▮▮▮▮▮▮▮▮, 2021.



▮▮▮▮▮▮▮▮▮, M.D., a/k/a Jane Roe, M.D.

12

App.087

# EXHIBIT 8

Declaration of Diana M. Pearce, Ph.D.
& Pearce Decl. Appendix

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union
Foundation**
LORIE CHAITEN**
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org

*admitted pro hac vice
**admission for pro hac vice pending

*Attorneys for Plaintiffs*

**American Civil Liberties Union
Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE**
RUTH HARLOW**
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN**
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*,<br><br>Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT<br><br>[CIVIL RIGHTS ACTION]<br><br>**DECLARATION OF DIANA M. PEARCE, PH.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Jill A. Otake<br>Hearing Date: Vacated per Dkt. 107<br>Trial Date: Vacated per Dkt. 82 |

Diana M. Pearce, Ph.D., declares and states as follows:

## I.    BACKGROUND AND QUALIFICATIONS

1.    I make this declaration based on my own personal knowledge. If called to testify, I could and would do so competently as follows.

2.    I provide the following facts and opinions as an expert in the field of Sociology, specifically specializing in poverty, women's welfare, and women studies in the United States. I hold an M.S.W. and a joint Ph.D. in Social Work and Social Science (Sociology) from the University of Michigan. I am currently the Scholar in Residence at the Center for Women's Welfare at the School of Social Work at the University of Washington, after serving as the Founder and Director of the Center for 18 years. For more than two decades, I have been on the faculty of the School of Social Work as a Senior Lecturer (now Senior Lecturer Emerita), as well as an affiliate of the Gender, Women and Sexuality Studies department and the West Coast Poverty Center, all at the University of Washington. For over 40 years, I have conducted research and published on the topics of poverty and women's welfare in peer-reviewed sociology and poverty journals. Most famously, I coined the term "the feminization of poverty,"[1] which became one of the ten themes of the Beijing Conference on Women in 1995, as well as the subject of countless articles and books.

---

[1] Diana M. Pearce, *The Feminization of Poverty: Women, Work and Welfare*, 11 Urb. & Soc. Change Rev. 28 (1978).

I have also authored numerous reports, including for the U.S. Department of Labor and the U.S. Civil Rights Commission.

3.      Since 1996, I have been the creator and principal investigator of the Self-Sufficiency Standard (the "Standard"), which measures the amount of income necessary for different family types to meet basic needs without public subsidies or private/informal assistance. Since then the Standard has been calculated for 41 states.[2]

4.      I have presented my research on poverty at numerous professional conferences and governmental briefings, including presentations to the U.S. Department of Health and Human Services and the U.S. House of Representatives. I also testified twelve times before the U.S. Congress. I have received various awards for my work and research, including:

- National Association of Social Workers, Presidential Award for Leadership in Research (presented at NASW Conference, The Feminization of Poverty Revisited) (2013)

- Wider Opportunities for Women, Setting the Standard (Lifetime Achievement) Award (2003)

- Workforce Development Council of Seattle-King County, for Visionary Research on Family Self-Sufficiency (2003)

- Society for Applied Sociology, Sociological Practice Award (2003)

---

[2] For all data and reports relating to and a general explanation of the Standard, see generally Self-Sufficiency Standard, http://www.selfsufficiencystandard.org/ (last visited Apr. 7, 2021).

5.      A true and correct copy of my curriculum vitae is attached as Exhibit H-1 to this declaration.

## II.    THE IMPACT OF THE RISK EVALUATION AND MITIGATION STRATEGY (REMS) FOR MIFEPREX ON WOMEN SEEKING ABORTION CARE

6.      I have been asked to evaluate the impact of the Mifeprex REMS on women in the United States seeking abortion care.[3] I understand that under the Mifeprex REMS, a patient cannot obtain the medication by prescription at a retail pharmacy or by mail; they must receive it at a clinic, medical office, or hospital from a clinician who has prearranged to stock and dispense Mifeprex. I understand that these requirements deter or prevent a significant number of health care providers, such as Dr. Graham Chelius on Kaua'i, from prescribing medication abortion, and, as a result, some patients have to travel further distances or make an entirely unnecessary trip in order to access time-sensitive abortion care. I understand further that the REMS prevents medication abortion patients who have been evaluated and counseled via telemedicine from picking up their prescription at their local pharmacy or obtaining their mifepristone prescription by mail without even having to leave home, forcing such patients instead to make a trip to a REMS-certified provider just to pick up the pill and sign a form.

---

[3] I use "women" here as a shorthand for patients who need abortion care, but note that patients who are gender non-binary or transgender also utilize these services.

7.     Data demonstrate that the overwhelming majority of abortion patients are low-income and struggle to make ends meet. As an expert in poverty and women's welfare who has studied the barriers that affect low-income women's access to health care, I know that low-income people find it extremely difficult just to afford their basic household needs, let alone unplanned emergency expenses like abortion. In my expert opinion, by requiring patients to make additional and/or lengthier trips to get a medication abortion, the Mifeprex REMS increases the costs and logistical burdens of accessing care—including missed work, transportation and child care costs—to such a degree that they significantly delay or entirely prevent women from accessing abortion care. Even for those who are ultimately able to access care, the resources and other hurdles that the REMS force women to navigate often require significant sacrifices for patients and their families that threaten patients' privacy and economic stability, including by jeopardizing their employment or housing, forcing patients to forgo other necessary expenses like food or other medical care, and increasing the risk of domestic violence.

**A. Many Abortion Patients Cannot Afford to Meet Their Basic Needs.**

8.     The vast majority of women seeking abortion care have low incomes. In 2014, the most recent year for which data are available, half (49%) of women seeking abortions in the United States had incomes at or below the U.S. Official Poverty Measure (OPM), which for 2014 was $11,670 annually for a single person

4

or $19,790 for a family of three (in the contiguous U.S.).[4] Another quarter (26%) of U.S. abortion patients had incomes between 100 and 200% of the OPM in 2014.[5] In other words, based on the OPM, three out of four abortion patients are poor or very low-income.[6]

9.      But it is likely that this statistic actually undercounts the percentage of abortion patients with inadequate income to meet their basic needs, because the OPM is based on a flawed and outdated methodology and set of assumptions. The OPM was developed decades ago and assumes that a family's total budget is three times what they spend on food—reflecting average American family expenditure patterns of the mid-1950s. However, household expenditure patterns have changed significantly since then. For instance, the cost of food has increased much less over

---

[4] Jenna Jerman, Rachel K. Jones & Tsuyoshi Onda, Guttmacher Inst., Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008 1, 7 (2016), https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014; *Prior HHS Poverty Guidelines and Federal Register References*, U.S. Dep't of Health & Hum. Servs., https://aspe.hhs.gov/prior-hhs-poverty-guidelines-and-federal-register-references (last visited April 7, 2021). For 2021, the amounts are $12,880 for a single person and $21,960 for a family of three. *2021 Poverty Guidelines*, U.S. Dep't of Health & Hum. Servs.: ASPE (last updated Jan. 26, 2021), https://aspe.hhs.gov/2021-poverty-guidelines.

[5] Jerman, Jones & Onda, *supra* note 4, at 1, 7.

[6] *Id.* Because these statistics are drawn from surveys of patients who received an abortion, they do not account for poor or low-income patients who wanted to have an abortion but were prevented from accessing one because of financial or other barriers to access. *Cf., e.g.*, Sarah C.M. Roberts et al., *Out-of-Pocket Costs and Insurance Coverage for Abortion in the United States*, 24 Women's Health Issues e211, e215 (2014), https://www.sciencedirect.com/science/article/abs/pii/S1049386714000048 (in longitudinal study of abortion patients at 30 facilities across the country, more than half reported that the need to raise money delayed access to care).

the past decades than almost all other basic expenses, while other costs have increased substantially (housing, health care, taxes). Moreover, the OPM does not account for geographic variation in costs or for variations in family type (such as by children's ages), and it does not explicitly reflect basic needs like child care, taxes, health care, and transportation.[7]

10.     A more accurate measure of income inadequacy is the Self-Sufficiency Standard, which my colleagues and I first developed two decades ago to address gaps and deficiencies in the federal poverty measures. The Self-Sufficiency Standard describes the minimally adequate income that a family of a certain composition in a given place needs to meet their basic needs, without public or private assistance. It is tailored to reflect the minimum actual costs of housing, child care, food, transportation, health care, miscellaneous expenses, taxes, and tax credits for 719 family types in every county in a given state. The Standard additionally reflects cost

---

[7] Increasing recognition of the OPM's shortcomings led Congress in the 1990s to direct the National Academies of Sciences, Engineering and Medicine to undertake a wide-ranging study of the measure. *See* Nat'l Rsch. Council, Measuring Poverty: A New Approach xv, 2–3 (Constance F. Citro & Robert T. Michael, eds. 1995), https://www.nap.edu/download/4759#. The study and resulting report spurred a number of experimental measures piloted by the U.S. Census Bureau, and, in 2010, the Bureau adopted the Supplemental Poverty Measure (SPM). *See* Liana Fox, U.S. Census Bureau, The Supplemental Poverty Measure: 2019 (2020), https://www.census.gov/library/publications/2020/demo/p60-272.html. Although the SPM addresses some of the problems with the OPM, such as varying housing costs by Census region, it does not consider the substantial variation in housing costs within the four Census regions, and it either fails to or inadequately addresses the other flaws discussed above. In particular, the SPM methodology does not address the most serious shortcoming of the OPM— that it seriously underestimates the total cost of basic needs—and thus like the OPM, the SPM is likewise much too low, everywhere and for every family type.

differentials due to the age of children; thus, families with children below school age requiring full-time child care will have a higher Standard than those with older or no children. Whenever possible, the amount for a given need is based on the amount of financial assistance that the government (federal or state) has deemed minimally adequate for that basic need (such as housing, child care, or food expenses).[8]

11. We have found that a substantial percentage of people across the country—and far more than are captured by the OPM—do not have incomes sufficient to meet their basic needs.[9] (This is true even though the vast majority of households with incomes below the Standard have at least one worker in them.[10]) The Standard is higher than the OPM in every jurisdiction for which we have

---

[8] For housing, the Standard uses the U.S. Department of Housing and Urban Development Fair Market Rents, which set the maximum rent allowed for Section 8 voucher (housing assistance) recipients; for child care costs, the Standard uses the maximum amount set by the state for reimbursement for those receiving child care assistance (minus child care copayments); and for food costs, the Standard uses the U.S. Department of Agriculture's "Low-Cost" Food Plan, which only covers the cost of basic groceries, with no allowance for any take-out or restaurant food. L. Manzer & A. Kucklick, Ctr. for Women's Welfare, Technical Brief: The Self-Sufficiency Standard 2021 Update (2021) (available upon request from the Center for Women's Welfare, University of Washington School of Social Work, www.selfsufficiencystandard.org).

[9] When calculating income inadequacy compared to the Standard, we consider all cash resources available to a household, including cash assistance, such as Temporary Assistance for Needy Families (TANF) or Supplemental Security Income (SSI). It should be noted, however, that the income limits for means-tested cash assistance are very low (often near or even below the OPM), and thus are never sufficient to bring a family up to their Self-Sufficiency Standard.

[10] See, e.g., Diana M. Pearce, Ctr. for Women's Welfare, Overlooked and Undercounted 2018: Struggling to Make Ends Meet in Colorado, at vi (2018), http://www.selfsufficiencystandard.org/sites/default/files/selfsuff/docs/CO18_Demo_Web.pdf.

calculated it—sometimes significantly higher.[11] This is especially true for families—which is notable here since, nationwide, about 60% of women seeking an abortion have at least one child.[12]

12.    In fact, the Self-Sufficiency Standard for a family consisting of one adult and one infant exceeds *200% of the OPM* in 92% of counties in the 31 states for which we have current Standard data and in every single county in 20 states. And the gaps are similarly stark for other family types.[13] In other words, given that the Standard is a bare-bones budget, it is clear that in the vast majority of counties in most states, abortion patients with incomes living up to 200% of OPM still lack the minimum income necessary to afford even their basic household needs.

13.    My research in numerous states to determine the characteristics of households most likely to have income below the Self-Sufficiency Standard further reinforces the existing data showing that most abortion patients struggle to make ends meet. As noted, a majority of abortion patients are mothers,[14] and

---

[11] The states with current Standard data included in this analysis are: AL, AZ, CA, CO, CT, FL, GA, HI, IL, IN, KS, MA, MD, MI, MN, MO, NC, NJ, NV, NY, OK, OR, PA, SC, TN, TX, UT, VA, WA, WI, and WY. Data on file with the author.

[12] *Abortion Surveillance — United States, 2018*, Ctrs. for Disease Control & Prevention, at Table 7 [hereinafter "*CDC Abortion Surveillance*"], https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T7_down (last updated Nov. 7, 2020).

[13] For a family of one adult and one preschooler, the Standard exceeds 200% of the OPM in 88% of counties; for a family with one adult, one preschooler, and one school-aged child, in 83% of counties; and, for a family with two adults, one preschooler, and one school-aged child, in 84% of counties.

[14] *CDC Abortion Surveillance*, *supra* note 12, Table 7.

8

approximately 85% are unmarried.[15] Moreover, 60% identify as people of color, including 53% identifying as Black or Hispanic.[16] My colleagues and I have uniformly found that these are the very populations that are statistically more likely than other demographic groups to live below the Standard.

14.     For example, the percentage of Black households with incomes below the Standard is on average double the percentage of white households with incomes below the Standard; the percentage of Latinx households is 2.5 times the percentage of white households; and the percentage of single-mother families with incomes below the Standard is 2.2 times that of married couples with children.[17] This is particularly true for single mothers of color: on average, almost three out of four (74%) Black single mothers, and almost four out of five (79%) Latina single mothers, have incomes below the Standard.[18]

---

[15] *Id.* at Table 6, https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T6_down.

[16] *Id.* at Table 5, https://www.cdc.gov/mmwr/volumes/69/ss/ss6907a1.htm#T5_down; *see also* Jerman, Jones & Onda, *supra* note 4, at 1, 5.

[17] Based on an analysis of Standard data and demographic reports for California (2019), Colorado (2016), Connecticut (2017), Maryland (2015), New York City (2019), New York State (2019), Pennsylvania (2017), Washington (2013), and Wyoming (2010–2014). Data on file with the author and/or available on the Standard website, in individual reports. *See Self-Sufficiency Standard by State*, Self Sufficiency Standard, http://www.selfsufficiencystandard.org/self-sufficiency-standard-state (last visited Apr. 8, 2021); *Research and Resources: Demographic Reports*, Self Sufficiency Standard, http://www.selfsufficiencystandard.org/node/30 (last visited Apr. 8, 2021).

[18] In every state for which we have performed these demographic analyses, at least 65% of Black single mothers and 74% of Latina single mothers had incomes below the Standard, compared to an average of 52% of white single mothers. See resources listed above, *supra* note 17.

9

15.　To further illustrate this concept, consider Kaua‘i. On that island, where Dr. Chelius's patients live, the 2020 Self-Sufficiency Standard—the *minimum* income necessary for basic subsistence, based largely on government reimbursement rates—for a single adult caring for one school-aged child and one preschooler was nearly 1.75 times the median household income for single-mother households in Kaua‘i, and more than triple the 2020 OPM for a family of three.[19] For a single adult caring for one infant, the Standard was 1.8 times higher than the median income for single mothers in Kaua‘i, and more than four times the 2020 OPM for a family of two.[20] Thus, many single-mother households in Kaua‘i that would not be classified as poor or low-income according to the OPM are in fact struggling to afford basic household needs.

16.　Kaua‘i is not an outlier. I analyzed the monthly basic needs budget for families with one adult and one preschooler in the least expensive county, median county, and county with the largest city in eight representative states across the

---

[19] *Compare Hawaii Self-Sufficiency Standard Table, 2020*, at By County tab, Table 3, cell L71 (2020) [hereinafter "*Hawaii Standard 2020*"], http://www.selfsufficiencystandard.org/node/50 (Self-Sufficiency Standard of $69,224), *with* U.S. Census Bureau, *Table S1903: Median Income in the Last 12 Months*, https://data.census.gov/cedsci/table?q=S1903&tid=ACSST1Y2019.S1903 (filter by "Browse Filters: Geography," "Geography: County," "Within (State): Hawaii," and select "Kauai County, Hawaii") (last visited April 7, 2021) (median income of $39,422 for "Female householder, no spouse present" and "With own children under 18 years"), *and 2020 Poverty Guidelines*, U.S. Dep't of Health & Hum. Servs.: ASPE (last updated Jan. 21, 2020), https://aspe.hhs.gov/2020-poverty-guidelines (2020 OPM of $21,720).

[20] *Compare Hawaii Standard 2020*, *supra* note 19, at By County tab, Table 3, cell C71 (Self-Sufficiency Standard of $70,788), *with* U.S. Census Bureau, *Table S1903*, *supra* note 19 (median income of $39,422), *and 2020 Poverty Guidelines*, *supra* note 19 (2020 OPM of $17,240).

country, all of which have statewide poverty rates (according to the OPM) similar to either the national average or the average for their geographic region.[21] In every county in every state considered in this analysis, a full-time minimum wage worker[22] is unable to afford the minimum needs for their family. In all eight states, one adult with a preschool-aged child in the least expensive county in the state (*i.e.*, the county with the *lowest* Standard) needs at least 36% more than a full-time minimum wage income (Santa Cruz County, AZ) and as much as two or more times the minimum wage (Uvalde County, TX, and Person County, NC), just to afford their family's basic needs. For those living in the largest city in each of these states, the deficit is even more substantial: in Chicago (Cook County, IL), a single mother with a preschooler needs to earn almost twice the minimum wage, while in Charlotte, NC (Mecklenburg County), she needs to earn at least 3.6 times the minimum wage, just to meet her basic needs. These families are already forced to make sacrifices or economic trade-offs just to scrape by; *any* added expense, no matter how small, can be destabilizing, potentially forcing them to forgo basic needs like food, rent, or

---

[21] States used in this analysis are those (a) with statewide poverty rates closest to the national rate or to the average rate for states in their Census region, based on data from the U.S. Census Bureau, and (b) for which current Self-Sufficiency Standard data (2021) was available. *See* Exhibit H-2 (summarizing Standard data for all 8 states).

[22] The Standard assumes full-time work (40 hours per week). Thus, I am evaluating whether full-time work at the state (or local) minimum wage will be enough to meet the cost of basic needs in the Standard for this family type in each place.

medical care.[23]

17.     Key economic trends indicate that American families may be facing
even more challenges in the future. For example, in every state in which my
colleagues and I have tracked the Standard over the last two decades, the cost of
basic needs has been rising faster than income, even during the Great Recession and
the subsequent Recovery.[24] In addition, the economic precarity of many working
families across the country has only been amplified by the current economic
recession relating to the COVID pandemic. While the data showing the full extent
of the economic impact of the pandemic is not yet available, and uncertainty remains
due to new surges in COVID cases, the widespread job losses and staggeringly high
rates of unemployment experienced so far already have taken their toll, with large

---

[23] For many families, public assistance will be inadequate to fill these gaps. For example, as its
name suggests, the Temporary Assistance for Needy Families Program (TANF) is not designed
to be an ongoing source of income for working families; although work is required to maintain
eligibility, even working part-time is likely to result in an income too high to maintain eligibility
for TANF. And while in-kind benefits such as SNAP (food stamps), child care assistance, and
housing assistance are meant to help low-wage workers, only a minority of eligible families
actually receive those benefits. *See, e.g.*, Gov't Accountability Office, Child Care: Subsidy
Eligibility and Receipt, and Wait Lists – Briefing to Senate Comm. on Health, Educ., Labor &
Pensions and House Comm. on Educ. & Labor, GAO-21-245R, at 12 (2020),
https://www.gao.gov/assets/gao-21-245r.pdf (only 14% of children eligible for child care
assistance under federal standards, and only 22% of those eligible under state rules, actually
receive such assistance in an average month); G.T. Kingsley, Urban Institute, Trends in Housing
Problems and Federal Housing Assistance3 (2017),
https://www.urban.org/sites/default/files/publication/94146/trends-in-housing-problems-and-
federal-housing-assistance.pdf (only about one in five low-income renters with housing needs
received assistance in 2015).

[24] For example, see Standard Reports for Colorado, Connecticut, Indiana, Maryland, Michigan,
New York, New York City, North Carolina, Ohio, Oregon, South Carolina, Washington,
Wisconsin, and Wyoming, all available at *Self-Sufficiency Standard by State*, *supra* note 17.

numbers of families citing serious economic impacts and concerns for the future.[25]

These losses have disproportionately affected single mothers, particularly women of

color, and other households that had inadequate income to meet their basic needs

even before the recession.[26]

18.    In sum, in considering the impact of the Mifeprex REMS on access to

abortion nationwide, it is important to recognize that the vast majority of abortion

patients—likely even *more* than the 75% of patients with incomes at or below 200%

OPM—are already unable to afford their and their families' basic needs. For these

patients, the unexpected, emergency expenses associated with traveling for abortion

care—whether to another county, city, or state, or even to a second local health care

facility—presents a serious hardship or is entirely impossible.

## B. The Mifeprex REMS Imposes Significant Costs and Burdens on Medication Abortion Patients.

19.    Abortion access is very limited in the United States. Approximately 90

---

[25] J. Horowitz et al., *A Year Into the Pandemic, Long-Term Financial Impact Weighs Heavily on Many Americans*, Pew Rsch. (Mar. 5, 2021), https://www.pewresearch.org/social-trends/2021/03/05/a-year-into-the-pandemic-long-term-financial-impact-weighs-heavily-on-many-americans/ (finding that 40% of adults say they or someone in their household lost a job or wages during the pandemic, and half of those who did so are still earning less than before the pandemic).

[26] *See id.* (finding that, during the pandemic, Black and low-income workers are more likely to have incurred debt or put off paying household bills due to lost income); A. Barroso & R. Kochhar, *In the pandemic, the share of unpartnered moms at work fell more sharply than among other parents*, Pew Rsch. (Nov. 4, 2020), https://www.pewresearch.org/fact-tank/2020/11/24/in-the-pandemic-the-share-of-unpartnered-moms-at-work-fell-more-sharply-than-among-other-parents/ (finding steepest declines among Black and Hispanic single mothers and single mothers with young children).

percent of U.S. counties lack an abortion clinic, and, nationwide, 38% of women of reproductive age live in those counties.[27] A survey of a nationally representative sample of more than 8,000 abortion patients found that the average distance traveled to reach the clinic was 68 miles round-trip.[28] In a majority of states, at least one in five women of reproductive age lives more than 50 miles from the nearest clinic.[29] While rural women are most likely to face significant travel distances,[30] women in many cities must also travel significant distances to obtain abortion care: for instance, a 2018 study characterized 27 major U.S. cities as "abortion deserts" because they did not have a publicly advertised facility that provides abortions within 100 miles.[31]

---

[27] Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Persp. on Sexual & Reprod. Health 17, 20 (2017), https://onlinelibrary.wiley.com/doi/epdf/10.1363/psrh.12015. Today, 95% of abortions are performed in clinics (rather than doctors' offices or hospitals). *Id.* at 17.

[28] Liza Fuentes & Jenna Jerman, *Distance Traveled to Obtain Clinical Abortion Care in the United States and Reasons for Clinic Choice*, 28 J. Women's Health 1623, 1625 (2019), https://pubmed.ncbi.nlm.nih.gov/31282804/.

[29] Jonathan M. Bearak et al., *Disparities and Change Over Time in Distance Women Would Need to Travel to Have an Abortion in the USA: A Spatial Analysis*, Lancet Pub. Health e493, e495–96 (2017), https://www.thelancet.com/action/showPDF?pii=S2468-2667%2817%2930158-5 (in six states, a majority live more than 50 miles away, including two where a majority live more than 150 miles from the nearest provider).

[30] *See, e.g.*, Nicole E. Johns et al., *Distance Traveled for Medicaid-Covered Abortion Care in California*, 17 BMC Health Serv. Res. 287, 294 (2017), https://doi.org/10.1186/s12913-017-2241-0 (more than half of rural women in California traveled more than 50 miles to obtain an abortion); Bearak et al., *supra* note 29, at e497 (identifying swath of rural counties in the middle of the United States with travel distances of more than 180 miles to nearest abortion clinic).

[31] Alice Cartwright et al., *Identifying National Availability of Abortion Care and Distance from Major US Cities: Systematic Online Search*, 20 J. Med. Internet Res. 7 (2018), https://www.jmir.org/2018/5/e186/.

20.     I understand that the Mifeprex REMS increases the distance that many women must travel to obtain a medication abortion, both by diminishing the number of medication abortion providers across the country (thus increasing the distance or number of trips patients must make to access care), and by preventing medication abortion providers from delivering mifepristone care to their eligible patients using telemedicine and mail (*i.e.*, but for the REMS, those patients would not have to travel at all to get the care they need).

21.     As detailed below, the costs and burdens associated with increased travel and/or multiple trips to obtain an abortion typically include transportation, child care, and missed work, and may also include lodging, increased food costs (while traveling), and other unexpected expenses. There are also nonfinancial costs, as the logistics and time associated with travel, and the need to raise money for travel and associated costs, will often require the patient to share the fact of her abortion with people, such as household members and employers, whom she otherwise would not wish to tell—which may put her at risk for domestic violence or jeopardize her employment.

22.     In my expert opinion, the overwhelming majority of people seeking abortions nationwide who have incomes too low to meet their basic needs—at *minimum*, three out of four abortion patients—suffer significant harm as a result of these added costs and burdens. Many are delayed in accessing this time-sensitive

15

care while they raise funds and make travel and logistical arrangements; some are blocked from obtaining an abortion at all because they cannot afford and navigate these costs and complications, or because they cannot safely share their abortion decision with household members or employers. Even those who are able to obtain an abortion despite these hurdles will have to make harmful trade-offs to do so—such as forgoing groceries or other medical care for themselves or their families, failing to pay bills including those for heat or rent, which puts the family at risk of losing their utilities or housing, or otherwise incurring debts that could have long-term consequences for household stability—or be forced to compromise their privacy and safety to access care.

### *Travel and Transportation*

23.     The additional travel costs necessitated by the REMS in order to access a medication abortion impose substantial burdens for low-income women. Even local trips of relatively short distances can present significant financial and logistical challenges for low-income women, who—as discussed above—are typically already struggling to afford basic household needs. And those costs and burdens are compounded for patients who live a considerable distance from the nearest medication abortion provider and who may have to incur significant financial costs for transportation, time off from work, child care, and potentially meals away from home, and lodging in order to access care.

16

24.    For people with incomes below the minimum basic needs budget for their area, *any* added expenses—like refilling a gas tank, or taking a relatively short taxi ride—can stretch already strained and overextended budgets. The logistical burdens of arranging a trip to a REMS-certified provider can be especially challenging for those living in the majority of places in the United States with limited or essentially no public transportation options, particularly given that 9% of all households in the U.S. and 24% of households with incomes below the OPM do not have a vehicle, or have access to a vehicle.[32] Even if a low-income woman has access to a car, it may be shared among multiple people, which can limit access in practice, thus delaying care or forcing patients to disclose their abortion to others.

25.    These burdens are compounded for those women who live farther from a REMS-certified provider and who may have to travel outside their county or state to access care. Cars owned by low-income households are older on average[33] and therefore less dependable for long journeys. And, for those without access to a

---

[32] *See* N. McGuckin & A. Fucci, U.S. Dept. of Transp., Summary of Travel Trends 2017 National Household Travel Survey 60, at Table 17, (2018) [hereinafter "NHTS 2017 Summary"], https://nhts.ornl.gov/assets/2017_nhts_summary_travel_trends.pdf; U.S. Dep't of Transp., Fed. Highway Admin., FHWA NHTS BRIEF 2014: Mobility Challenges for Households in Poverty 2. (2014), https://nhts.ornl.gov/briefs/PovertyBrief.pdf.

[33] NHTS 2017 Summary, *supra* note 32, at 8, 20; *see also* Jenna Jerman et al., *Barriers to Abortion Care and Their Consequences For Patients Traveling for Services: Qualitative Findings from Two States*, 49 Perspectives on Sexual & Reprod. Health 95, 98 (2017) (in qualitative study of abortion patients in New Mexico and Michigan who crossed state lines or traveled long distances, factors including "limited access to safe and reliable transportation, or the need to use multiple means of transport[] significantly increased the time it took women to travel even relatively short distances" to access abortion care).

17

private car, bus or other transportation options between cities may be limited or inaccessible. For example, for a patient in Phillipston, MA,[34] there are abortion providers approximately 30 miles away in Worcester, MA,[35] and Keene, NH. But given limited public transportation options, traveling to Worcester would take at minimum 4 hours and three bus transfers, at an estimated round-trip cost of $42.50[36]; traveling to Keene, NH, would require five transfers and more than a day of travel.[37] For a patient in Cullowhee (Jackson County), NC, there are no public transportation options available to the nearest provider approximately 50 miles away in Asheville;

---

[34] With the exception of Kauaʻi, Hawaiʻi, all other locations used to provide examples of travel distances, routes, and costs in this section are drawn from the same subset of counties in states with poverty rates similar to regional and national averages listed in Exhibit H-2.

[35] All distances to nearest providers are based on a search of publicly listed abortion clinics via Planned Parenthood, https://www.plannedparenthood.org/ (last visited Apr. 8, 2021), and *Find a Provider*, National Abortion Fed'n, https://prochoice.org/patients/find-a-provider/ (last visited Apr. 8, 2021). Driving distances in this section are estimated using Google Maps, assuming uncongested travel times. Bus, train, and flight fares assumed travel within two weeks of search.

[36] *See MART Trip Planner*, Montachusetts Reg'l Trans. Auth., http://www.mrta.us/trip-planner (search start: "Phillipston, MA," and finish: "Worcester, MA"). The Athol Link bus service departs Phillipston approximately every 90 minutes between 5:45 a.m. and 6:00 p.m., Monday through Friday. Patients would need to transfer at the Gardner City Hall stop to the Wachusett Shuttle line, which, at the time of search, was operating on a limited schedule of only four departures per day (6:05 a.m., 8:20 a.m., 1:05 p.m., and 6:05 p.m.). Patients would then need to transfer again at the MART Intermodal Transportation Center to the Clinton-Worcester Commuter Shuttle (commuter line, only running in morning hours) or the Worcester Shuttle (only three departures per day) for service to downtown Worcester. For full route schedules and fares, see *Routes and Schedules*, Montachusetts Reg'l Trans. Auth., http://www.mrta.us/routes-schedules (last visited Apr. 9, 2021), and *Fares and Passes*, Montachusetts Reg'l Trans. Auth, http://www.mrta.us/farespasses (last visited Apr. 9, 2021). Patients would also need to arrange transportation from home to the departure station and from the arrival station to the clinic.

[37] *See MART Trip Planner*, *supra* note 36. Although my search identified other clinics within 50 miles of Phillipston, travel by public transportation was similarly complicated for all options, involving multiple transfers and multiple-hour trips.

she would have to take a taxi all the way to the outskirts of the city to reach the closest bus stop, at a cost of $140–170.[38] For the families living below the Self-Sufficiency Standards for those states, these added expenses and lengthy travel time—not to mention the time and effort necessary to navigate multiple bus schedules and transfers in potentially unfamiliar locations—may be insurmountable.

26.     Furthermore, routes and departure times are often very limited—even more so now, as some services reduced routes during the pandemic and have not yet resumed full service. If available arrival times do not align with available appointment times, even trips of only moderate distance may turn into more expensive cab rides,[39] or require overnight stays, requiring lodging and increasing child care costs and time away from work.

27.     The burdens continue to increase for the sizeable percentage of women traveling especially long distances of 100 miles or more each way to access abortion care,[40] such as those in Quartzsite, AZ (La Paz County), who must travel

---

[38] *See* Rome2Rio, https://www.rome2rio.com/map/Asheville/Cullowhee (last visited Apr. 9, 2021).

[39] For example, a taxi between Phillipston and Worcester could cost approximately $110 one way, or $220 round-trip. *See* Taxi Fare Finder, https://www.taxifarefinder.com/ (last visited Apr. 12, 2021) (searching for "Phillipston, Massachusetts," to "Worcester, Massachusetts," and selecting "Cheapest" filter).

[40] *See, e.g.*, Bearak et al., *supra* note 29 (majority of women of reproductive age in North Dakota and Wyoming and one in five women in Alaska, Idaho, Kansas, Missouri, Montana, New Mexico, and South Dakota lived more than 100 miles from the nearest provider).

approximately 125 miles each way to reach a provider in Phoenix, AZ,[41] or Dalhart (Dallam County), TX, who must travel 200 miles each way to Lubbock, TX.[42] In extreme cases, such as for patients living in Hawaiʻi or in other states with island populations (such as Alaska, Maine, North Carolina, and Florida), air travel may be required to access in-person abortion care. For example, in Hawaiʻi, I understand that there are no clinics offering abortion care on the islands of Kauaʻi, Hawaiʻi, Lanaʻi, Molokaʻi, and Niʻihau, necessitating inter-island travel to Oʻahu to reach the nearest abortion provider. Since these arrangements are often made within a short timeframe, the costs tend to be higher than for long-planned travel. For example, the lowest round-trip ticket to Oʻahu (bought for travel within two weeks of purchase) was $178 for Kona, Lihuʻe, or Hilo, according to Kayak.com.[43] On top of flight costs, abortion patients would also need to pay for ground transportation to and from the airport and/or overnight parking. For those living on Hawaiʻi, the price of a taxi to or from the Hilo airport can run from $12 for people living in Hilo to $104 for

---

[41] Approximately 2 hours by car or bus ($56–62 round-trip, depending on how many days in advance of travel reservation is made, with only 4:00 a.m. departures and 10:30 p.m. returns available). *See Book A Trip*, Greyhound, https://www.greyhound.com/en (last visited Apr. 11, 2021). Clinics in El Centro, CA, and Coachella, CA, are similar distances by car, but options by bus take much longer and are more expensive.

[42] Approximately 3 hours by car. There is no bus service directly from Dalhart. Patients would have to arrange transportation to Dumas, TX (approximately 35 miles away), for bus service to Lubbock (at least 3.5–5 hours, depending on schedule), at a total round-trip cost of $200–280, including a taxi from Dalhart to Dumas. *See* Greyhound, *supra* note 41; Rome2Rio, https://www.rome2rio.com/map/Dalhart/Lubbock (last visited Apr. 11, 2021).

[43] Kayak.com, http://www.kayak.com (last visited April 7, 2021).

people living in Honokaʻa.[44] Additionally, the cost of public transportation once on Oʻahu is $5.50 per day. Thus, for a woman from Honokaʻa traveling to Honolulu for abortion care, the cost of ground transportation alone (in both places) can exceed $219.[45] In addition, for many low-income women, particularly those for whom English is a second language and/or non-citizens, air travel may pose psychological and emotional hurdles, as it requires security checks, identification that may not be regularly needed, and simply the unfamiliarity of airplane travel.

28.     Finally, for those who have to travel long distances or inter-island—such as patients in Hawaiʻi, Buffalo (Dallas County), MO (320 miles round-trip to Kansas City, KS), or  Dalhart, TX (400 miles round trip to Lubbock)—travel for abortion may require overnight lodging,[46] for example, because of limited bus

---

[44] *Taxicab*, Hawaii.gov: Hilo Int'l Airport, http://airports.hawaii.gov/ito/getting-to-from/ground-transportation/taxicab (last visited April 7, 2021). For patients with cars, the cost of parking at the Hilo airport is $15 per day. *Parking*, Hawaii.gov: Hilo Int'l Airport, http://airports.hawaii.gov/ito/getting-to-from/parking/ (last visited April 7, 2021). Like many other places in the United States, Hawaiʻi has poor public transportation options, especially outside of Oʻahu, and visitors to the counties of Hawaiʻi and Kauaʻi, for example, are strongly urged to rent a car or use taxis for local transportation. *See* Sheila Beal, *What are the public transportation options in Hawaii*, Go Visit Hawaii (Oct. 23, 2017), https://www.govisithawaii.com/2017/10/10/what-are-the-public-transportation-options-in-hawaii/; *Transportation Rankings*, U.S. News, https://www.usnews.com/news/best-states/rankings/infrastructure/transportation (last visited April 7, 2021) (ranking the state of Hawaii 40th in terms of transportation infrastructure).

[45] *Adult Fare*, The Bus: City and County of Honolulu, http://www.thebus.org/Fare/Adultfare.asp (last visited April 7, 2021).

[46] *See, e.g.*, Caitlin Gerdts et al., *Impact of Clinic Closures on Women Obtaining Abortion Services After Implementation of a Restrictive Law in Texas*, 106 Am. J. Pub. Health 857, 861–63 (2016) (in study of Texas abortion patients whose nearest abortion clinic had closed as a result of a 2013 law, 16% reported having to stay overnight to access abortion care).

schedules, to accommodate early morning appointments, to obtain the least expensive bus or flight ticket, or if the round-trip distance is too far to travel in a single day.[47] Such costs are typically higher if reservations must be made just a few days or weeks ahead of time. According to a discount website, the cost of lodging starts around $83 in Honolulu, $43 in Lubbock TX, and $49 in Kansas City, KS.[48]

29.    Especially for women already struggling to make ends meet, the added costs and logistical burdens of arranging transportation to a REMS-certified provider can be onerous, if not insurmountable.

### *Missed Work*

30.    Traveling to pick up a pill in person at a hospital, clinic, or medical office instead of receiving it by mail at home, or traveling to a second health care facility because the provider who diagnosed a patient's pregnancy cannot write them a prescription for Mifeprex, also may interfere with patients' work schedules. Women who have to travel long distances to reach a REMS-certified prescriber may

---

[47] For example, there is no direct bus service out of Buffalo, MO. To reach Kansas City, KS, a patient would first need to figure out how to get to Springfield, MO, 30 miles away. From there, she could take a Greyhound bus to Kansas City, MO, and then a shuttle to Kansas City, KS, at a cost of $62–104 round-trip (depending on how many days in advance she makes the reservation), not including the cost of getting to Springfield and back. In addition, there is only one bus per day between Springfield and Kansas City, departing at 2:15 p.m., and arriving at approximately 6:00 p.m. Accordingly, she would also likely need to travel the day before her appointment and stay overnight. *See* Greyhound, *supra* note 41 (no results for "Buffalo, MO"; results for travel to Kansas City, MO, from Springfield). Alternative options from Springfield include, *e.g.*, a 4.5-hour bus at a cost of $130 round-trip to St. Louis, MO, or a 3.5-hour bus ride each way at a cost of approximately $72–96 round trip to Tulsa, OK, which would also likely require an overnight stay. *Id.*

[48] *See* Hotels.com, https://www.hotels.com/ (last visited Apr. 11, 2021).

miss multiple days of work. Especially for low-income workers, the burdens associated with arranging time off work can result in delayed care, lost income, and even threats to job security.

31.    About 40% of women workers in the United States have no paid time off.[49] Among low-wage workers (the bottom 25%), 93% lack paid family leave and 49% lack paid sick leave[50]; and almost two-thirds of workers in jobs that do not require a college degree lack paid personal days.[51] For part-time workers,[52] 92% lack paid family leave, three-quarters have no paid sick leave, and two-thirds lack any paid vacation or holidays.[53] For those without paid time off, any time away from work in order to access abortion care translates into lost wages. According to one study, the mean wages lost as a result of traveling for abortion care because of missed

---

[49] Cynthia Hess et al, Inst. for Women's Pol'y Res., The Status of Women in the States: 2015, at 88 (2015), https://iwpr.org/wp-content/uploads/2020/08/R400-FINAL-8.25.2015.pdf.

[50] Pronita Gupta et al., Paid Family and Medical Leave is Critical for Low-wage Workers and Their Families 1 (Dec. 2018), https://www.clasp.org/publications/fact-sheet/paid-family-and-medical-leave-critical-low-wage-workers-and-their-families.

[51] Gregory Acs & Pamela Loprest, Urb. Inst., Employers in the Low-Skill Labor Market, Brief No. 2: Low-Skill Jobs, Work Hours, and Paid Time Off 4 (2008), https://www.urban.org/sites/default/files/publication/32211/411802-Low-Skill-Jobs-Work-Hours-and-Paid-Time-Off.PDF.

[52] Twenty-five percent of women workers are employed in a part-time position. *Economics Daily: Percentage of Employed Women Working Full Time Little Changed Over Past 5 Decades*, U.S. Bureau of Lab. Statistics (Dec. 1, 2017), https://www.bls.gov/opub/ted/2017/percentage-of-employed-women-working-full-time-little-changed-over-past-5-decades.htm?view_full.

[53] Gupta, *supra* note 50, at 1; Hess et al, *supra* note 49, at 89.

work was $198 nationally.[54]

32.    Missing one or more days from work not only means lost wages, but may also put the job itself at risk, leading to economic instability. In many cases, low-wage workers have unpredictable hours or are required as a condition of employment to regularly work overtime, both of which make it difficult to reliably plan appointments and related travel during non-work hours. It can be extremely difficult for low-wage workers to get a particular day off, particularly on short notice. And taking unapproved time off to keep an appointment or travel for abortion care can cost a patient her job.

33.    Furthermore, some jobs that provide sick leave or paid leave may nonetheless require documentation of the reason for the leave. Women reluctant to disclose their abortions to their employers may therefore be unable to use paid or unpaid leave, even if their employer technically provides it; and those who do disclose their reason may have the request denied by a hostile employer or be vulnerable to retaliation as a result of their abortion.

### *Child Care*

34.    As noted, approximately 60% of women seeking an abortion have at least one child.[55] Consequently, traveling for an abortion, or making an unnecessary

---

[54] Rachel K. Jones et al., *At What Cost? Payment for Abortion Care by U.S. Women*, 23 Women's Health Issues e173, e174 (2013), https://www.ncbi.nlm.nih.gov/pubmed/23660430.

[55] *CDC Abortion Surveillance*, *supra* note 12, at Table 7.

or additional trip to a health care facility in order to obtain an abortion, may require child care arrangements, including when the abortion patient is the child's primary caregiver, or when the time needed for the appointment and travel to and from does not align with the child or children's regular childcare or school hours.

35.    Child care costs can take up a significant proportion of a low-wage worker's income. In Hawai'i, costs range from $372 per month for part-time child care for a school-aged child to $589 per month for full-time infant care. Among the largest cities in the eight representative states analyzed above, full-time monthly child care for a preschooler ranges from $973 in Kansas City, MO (Jackson County), to $2,509 in Boston, MA. In rural counties across these states, a preschooler's full-time child care ranges in cost from $471 in Dallas County, MO, to $1,047 in Sandisfield, MA. Altogether, child care for just one preschooler ranges from 17% to 28% of the monthly needs budget across these eight states, averaging 21% of the budget.

36.    But the daily rate for emergency short-term child care is often even greater than the daily rate for a month- or year-long slot. In addition, because many child care options, such as at a center or family home, are only available during regular daytime work hours, if a patient must be away overnight, the costs of child care are considerably higher. And if a woman cannot find or afford paid child care that aligns with her appointment and travel time, she may need to turn to a friend,

family member, or neighbor—which may require disclosing the reason she will be away, impinging on her privacy.

### *The Consequences of Attempting to Pay for Abortion-Related Travel*

37.    As detailed above, the total out-of-pocket costs involved in accessing abortion care can be substantial compared to income. For more than half of women attaining an abortion in a multi-state 2014 study, out-of-pocket costs (not including lost wages) averaged more than one-third of their personal monthly income.[56] In order to pay for these costs, low-income patients often end up making economic trade-offs that, as noted above, can carry serious consequences for their health, safety, and long-term economic stability.[57]

38.    Indeed, a 2016 study concluded that two-thirds of women find it difficult or very difficult to pay for an abortion, and that doing so prevented or delayed nearly half of abortion patients from paying for at least one other basic need, including bills, food, rent, child care, and medical care.[58] Diverting funds from other basic needs in order to access an abortion can lead to additional costs and serious consequences. For instance, if a patient diverts any amount of rent funds and

---

[56] Roberts et al., *supra* note 6, at e211, e214.

[57] *Id.* at e216.

[58] Deborah Karasek & Sarah C.M. Roberts, *Abortion Patients' Experience and Perceptions of Waiting Periods: Survey Evidence before Arizona's Two-visit 24-hour Mandatory Waiting Period Law*, 26 Women's Health Issues 60, 63 (2016), https://www.whijournal.com/article/S1049-3867(15)00161-9/fulltext.

26

therefore cannot pay her full rent, she and her family risk eviction. Other consequences of having to divert funds include utility cut-offs, having to rely on food pantries or food banks, skipping meals, missing car payments, forgoing needed medical or dental care, or losing a scarce spot in a child care program.[59] Each of these in turn can lead to major long-term harms such as job loss, food insecurity, and medical harm.[60]

39.     The most common source of money for an abortion is from the man involved in the pregnancy.[61] But borrowing from a partner can be problematic for some women, particularly where the relationship itself is unhealthy. The disclosure that results from the need for resources to cover travel and other costs (as well as

---

[59] Sandra S. Butler & Luisa S. Deprez, *The Parents as Scholars Program: A Maine Success Story*, 17 Me. Pol'y Rev. 40 (2008), http://digitalcommons.library.umaine.edu/mpr/vol17/iss1/7.

[60] Insurance does not change this calculus. Approximately two-thirds of the states restrict Medicaid coverage for abortion. Alina Salganicoff et al., *Coverage for Abortion Services and the ACA*, Kaiser Family Found. (Sept. 19, 2014), https://www.kff.org/womens-health-policy/issue-brief/coverage-for-abortion-services-and-the-aca/. Even in the states that do provide such coverage, many low-income women cannot access it because, for example, the income-eligibility threshold is too low, they are undocumented, or the time necessary to enroll will delay their abortion care beyond the time when they can access a medication abortion. *See* Kaiser Family Found., Health Care Coverage for Immigrants (2020), https://www.kff.org/racial-equity-and-health-policy/fact-sheet/health-coverage-of-immigrants/. A multi-state 2014 study found that nearly one-third of patients who appeared eligible for Medicaid coverage based on income and state of residency did not use Medicaid to pay for their abortions. Roberts et al., *supra* note 6, at e216. Many private or marketplace plans do not cover abortion either. Salganicoff et al., *supra*. Given this and other barriers, the same 2014 study found that only one in four patients with private insurance had their abortion covered by insurance. Roberts et al., *supra* note 6, at e216. And, the pandemic has increased the number of households that have lost health insurance coverage due to job loss and the associated loss of employer-provided health insurance. Furthermore, even for those who have coverage, Medicaid and private insurance do not cover other travel-related costs, such as meals, child care, and lost wages.

[61] Jones et al. (2013), *supra* note 54, at e177.

assistance with the travel itself) may increase the risk of domestic violence,[62] a widespread problem across the country.[63]

40.    Other tactics to raise funds carry their own risks and consequences. Borrowing money from a payday lender or credit card company can help pay for an emergency expense, but repaying such loans may result in a cycle of refinancing, with additional fees and compounding interest leading to increasing debt.

41.    Monetary costs alone do not fully capture how disruptive having to travel for abortion care can be. At each step, from arranging care for children, to informing supervisors or coworkers, to securing transportation and lodging, to obtaining resources (whether borrowed or diverted from other needs), the psychological harm increases and the circle of people aware of the reason for travel widens, breaching patient privacy, putting relationships or employment at risk, and increasing the risk of domestic violence.[64]

---

[62] Sarah CM Roberts, *Risk of Violence from The Man Involved In Pregnancy After Receiving or Being Denied An Abortion*, BMC Med. 12:144 (2014), at 1 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4182793/.

[63] *See id.*; Ctrs. for Disease Control & Prevention, The National Intimate Partner and Sexual Violence Survey: 2015 Data Brief – Updated Release 2, 8 (2018) https://www.cdc.gov/violenceprevention/pdf/2015data-brief508.pdf (reporting that 43% of U.S. women had experienced some form of sexual violence in their lifetime, one in four experienced contact sexual violence, physical violence, or stalking by an intimate partner, and one in five experienced rape or attempted rape).

[64] Jill Barr-Walker et al., *Experience of Women Who Travel for Abortion: A Mixed Methods Systematic Review*, PLOS ONE 14(4), at 18 (2019), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0209991 ("Participants discussed how the need to secure time off of work, arrange childcare, or borrow money for travel

### C. Research Confirms That Increased Travel to Obtain an Abortion Delays or Blocks Care

42.    An extensive body of research supports the analysis above, documenting that the burdens and costs associated with traveling for abortion care delay or prevent patients from accessing care, decrease confidentiality, and increase the likelihood of anti-abortion stigma from employers, families, and/or friends.[65]

43.    Research confirms that the greater the distance a patient must travel to access abortion, the less likely that the abortion will occur. For instance, a 2017 study evaluating the impact of a 2013 law that closed 24 of 41 abortion clinics in Texas— and thus increased the distance to the nearest clinic for many Texas women—found that the number of abortions declined 17% across the state between 2012 and 2014.[66] The magnitude of the decline in abortion rates increased more substantially as the distance from a patient's county of residence to the nearest abortion clinic increased: when the change in distance to an abortion clinic was 25–49 miles, abortions decreased 25.3%; when the change was 50–99 miles, abortions decreased by 35.7%; and when the change was 100 miles or more, abortions decreased by 50.3%.[67]

---

or the procedure necessitated disclosing their decision to have an abortion to people at work and in their personal lives.").

[65] *Id.* at 2 (summarizing findings of multiple studies).

[66] Daniel Grossman et al., *Change in Distance to Nearest Facility and Abortion in Texas, 2012 to 2014*, 317 JAMA Network 437, 437–38 (2017), http://sites.utexas.edu/txpep/files/2017/10/Grossman-et-al-HB2-Change-in-Distance-Abortion-JAMA-2017.pdf.

[67] *Id.* at 438.

44.     Other studies have documented this same inverse relationship between travel distance and abortion rates even for relatively short increases in distance. In Washington state, when a decline in the number of abortion providers led to a 12 mile increase in travel distance for rural women, the abortion rate among that population decreased by 27%.[68] In Georgia, for every 10 miles of distance from the major abortion providers in Atlanta, the number of abortions declined by 6.7 per 1,000 live births.[69] And in Ohio, when clinics in Toledo and Lima closed, necessitating greater travel distances to reach an abortion provider, abortions rates in those counties and surrounding areas dropped by 25% or more the following year.[70]

45.     The research literature also shows a complex interrelationship between travel costs, distance, and delay that in turn impacts access to abortion. Travel

---

[68] Sharon A. Dobie et al., *Abortion Services in Rural Washington State, 1983–1984 to 1993–1994: Availability and Outcomes*, 31 Fam. Plan. Persp. 241, 241–44 (1999), https://www.guttmacher.org/sites/default/files/article_files/3124199.pdf; *see also* Robert W. Brown et al., *Provider Availability, Race, and Abortion Demand*, 67 Southern Eco. J. 656, 658 (2001) (in Texas, an increase of 10% in the travel distance from a woman's county to the nearest city with an abortion provider was associated with a 2.3% decline in the abortion rate for white women, 2.7% for African-American women, and 5.0% for Hispanic women).

[69] James D. Shelton et al., *Abortion Utilization: Does Travel Distance Matter?*, 8 Fam. Plan. Persp. 260, 260–62 (1976), https://jstor.org/stable/pdf/2134397.pdf?seq=1#page_scan_tab_contents (also finding a significantly greater increase in abortions in two counties distant from Atlanta after new abortion providers opened there, as compared to other counties in the state).

[70] Alison H. Norris et al., *Abortion Access in Ohio's Changing Legislative Context, 2010–2018*, 110 Am. J. Pub Health 1228, 1232 (2020) (abortion rate in rural counties disproportionately affected by clinic closures decreased more than 30% over study period).

burdens and costs can lead to delays in obtaining an abortion, which in turn can result in a patient being unable to access medication abortion or being turned away from the abortion clinic because by the time the patient is able to obtain the funds and make the necessary arrangements to get there, her pregnancy has advanced beyond the window for medication abortion care or the latest point in pregnancy at which the clinic provides services.[71] At the same time, delays can increase both the cost of the procedure (which typically increases as pregnancy advances and is greater for procedural abortion than medication abortion) and the cost of travel (for instance, if a patient must pay for lodging for a two-day procedure during the second trimester), thus causing further delay.[72] A nationwide 2014 study found that, for patients who were near a clinic's limit or were turned away because they exceeded that limit, the most cited reason for the delay was costs, for both travel and the procedure.[73] A 2010

---

[71] *See* Jerman et al., *supra* note 33, at 95, 98 (in qualitative study of 29 women traveling across state lines or long distances to access abortion in New Mexico and Michigan, most common consequence of travel and related barriers was "obtain[ing] abortions at later gestations than desired because of delays"); *see also* Norris et al., *supra* note 70, at 1233 (finding that patients in Ohio have abortions later in pregnancy than the national average and that this disparity increased as the number of facilities offering care in the state diminished).

[72] Jerman et al., *supra* note 33, at 100 (describing the "negative feedback loop," in which delay caused by difficulty raising money can lead to higher procedure costs and further delay); Diane Greene Foster & Katrina Kimport, *Who Seeks Abortions at or After 20 Weeks?*, 45 Persp. on Sexual & Reprod. Health 210, 214–15 (2013), https://doi.org/10.1363/4521013 (women who were 20 weeks or more pregnant reported difficulty getting to an abortion facility, spent more on travel, and experienced more delay); Norris et al., *supra* note 70, at 1233 (period of legislative and regulatory changes in Ohio that reduced access and resulted in clinic closures coincided with Ohioans being increasingly more likely to access abortion at later gestational ages).

[73] Ushma D. Upadhyay et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, Am. J. Pub. Health 1687, 1689 (2014), https://doi.org/10.2105/AJPH.2013.301378 (finding that 58.3% of patients turned away and 67%

31

study in Illinois found that "[m]any women reported substantial difficulty locating a clinic, traveling long distances and finding transportation," and that such obstacles were associated with seeking abortion care in the second rather than the first trimester.[74]

## III. CONCLUSION

46.    At *least* three out of four abortion patients have income that is insufficient to meet their basic needs. The costs and burdens of traveling to obtain an abortion, arranging child care, and lost wages entirely prevent some women from obtaining abortion care. Even for those able to access care, these burdens force many patients to forgo other necessary expenses for themselves and their families and put them at risk of longer-term economic insecurity. In addition, these burdens force women to disclose their abortions to a wider circle of people than would otherwise be necessary, thus exposing some women and their families to domestic violence and/or longer-term economic insecurity.

---

arriving just before the limit attributed their delay to "travel and procedure costs," while 29.8% cited "not knowing how to get to a provider"; for first trimester patients, travel and procedure cost was the second-most cited reason, after "not recognizing pregnancy").

[74] Jessica W. Kiley et al., *Delays in Request for Pregnancy Termination: Comparison of Patients in the First and Second Trimesters*, 81 Contraception J. 446, 449 (2010), https://doi.org/10.1016/j.contraception.2009.12.021.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct. Executed in _Friday Harbor, WA_ on _April 12_, 2021.

_Diana M. Pearce_

Diana M. Pearce, Ph.D.

# Pearce Decl.

### Appendix

**APPENDIX: Comparison of Basic Needs Budgets in Eight States With Poverty Rates Close to National and Regional Averages**

**State Selection Methodology:** To select states for this analysis, I used states that had poverty rates closest to the national and regional averages, according to U.S. Census Bureau data, and for which current Self-Sufficiency Standard data was available. State poverty rates and the national poverty rate refers to the latest two-year average (2018–19) provided by the Census Bureau.[1] To calculate regional averages, states were grouped by Census region: Northeast, Midwest, South, and West. The average regional percentage was then calculated using the state poverty rates for all states within that region. Finally, each state's percentage below-poverty was compared to the national average and the regional average, respectively, to determine the state or states closest to each average. If 2021 Self-Sufficiency Standard data was not available for the state with the closest rate to the national or regional average, the second-closest was used instead.

**State Needs Budgets:** For each state, I compared the Standard (*i.e.*, needs budget) for a family with one adult and one preschooler to the local or state minimum wage for (a) the county with the largest city; (b) the county with the median Standard in the state; and (c) the county with the lowest Standard in the state. The Standard was then compared to the minimum wage for each locality, assuming full-time work. Wherever possible, the cost of a given need in the Standard is based on the amount of financial assistance that the government (federal or state) has deemed minimally adequate for that basic need (such as housing, child care, or food expenses):

- Housing: maximum rent allowed for Section 8 voucher (housing assistance) recipients as set by the U.S. Department of Housing and Urban Development

- Child care: maximum amount set by the state for reimbursement for those receiving child care assistance (minus copayments)

- Food: the U.S. Department of Agriculture's "Low-Cost" Food Plan, which covers *only* the cost of basic groceries, without any take-out or restaurant food

- Transportation: cost of a monthly pass for local public transportation, or (if no adequate option) average cost of a private car, assuming use to/from work and one weekly shopping trip, based on national data such as U.S. Highway Administration's National Household Travel Survey, and U.S. Bureau of Labor Statistics' Consumer Expenditure Survey

- Health care: assuming employer-sponsored insurance and out-of-pocket costs based on the Medical Panel Survey, the most complete national source for health and insurance costs

- Miscellaneous: 10% of all other costs, and accounting only for essentials such as clothing, nonprescription medicines, and personal hygiene items, and not including any recreation, entertainment, savings, or debt repayment

- Taxes: federal and state income tax, payroll taxes, and state and local taxes (if applicable), and accounting for federal and applicable state tax credits

---

[1] *Income and Poverty in the United States*, U.S. Census Bureau, at Table: Percentage of People in Poverty by State Using 2- and 3-Year Averages: 2016–17 and 2018–19, https://www.census.gov/data/tables/2020/demo/income-poverty/p60-270.html (last visited Apr. 9, 2021).

1

**National Average Poverty Rate (2018–19):** 11.1%

**Northeast**
**Average Poverty Rate (2018–19):** 9.0%

| | Closest to National Average | | | Closest to Regional Average | | |
| | New York[2] | | | Massachusetts[3] | | |
| | Largest city (Queens County)[4] | Median (Schoharie County) | Least expensive (Cattaraugus County) | Largest city (Boston) | Median (Phillipston) | Least expensive (Sandisfield) |
|---|---|---|---|---|---|---|
| Housing | $2,091 | $938 | $734 | $2,509 | $976 | $1,175 |
| Child care | $1,285 | $840 | $840 | $1,502 | $1,047 | $1,047 |
| Food | $471 | $415 | $371 | $559 | $470 | $476 |
| Transp'n | $127 | $328 | $315 | $90 | $308 | $320 |
| Health care | $535 | $485 | $451 | $542 | $534 | $534 |
| Misc. | $451 | $301 | $271 | $520 | $333 | $355 |
| Taxes | $1,469 | $588 | $434 | $1,615 | $789 | $869 |
| Earned Income Tax Credit | $0 | $0 | -$75 | $0 | $0 | $0 |
| Child Care Tax Credit | -$50 | -$50 | -$58 | -$50 | -$50 | -$50 |
| Child Tax Credit | -$167 | -$167 | -$167 | -$167 | -$167 | -$167 |
| **Monthly Self-Sufficiency Standard** | $6,212 | $3,678 | $3,116 | $7,120 | $4,240 | $4,559 |
| **Minimum Wage** | $15.00 | $12.50 | $12.50 | $13.50 | $13.50 | $13.50 |
| **Ratio (Self-Suff. to Min. Wage)** | **2.4** | **1.7** | **1.4** | **3.0** | **1.8** | **1.9** |

[2] The Northeastern state closest to the national average was Maine (11.0%), but current Standard data for Maine is not available. The second-closest to the national average was New York (11.8%).

[3] The Northeastern state closest to the national average was Rhode Island (9.0%), but current Standard data for Rhode Island is not available. The second-closest to the regional average was Massachusetts (8.1%). Standard data in Massachusetts is grouped by town, not county, because towns are the more meaningful local geographic unit under Massachusetts's government structure.

[4] The largest city in New York (New York City) spans multiple counties; of those, Kings County is the most populous, but its Standard data is divided into two sub-regions to capture cost variations within the county. Queens County, the second-largest, has county-wide Standard data and is used instead for ease of comparison.

2

App. 126

**Midwest**
**Average Poverty Rate (2018–19)**: 9.7%

| | Closest to National Average | | | losest to Regional Average | | |
|---|---|---|---|---|---|---|
| | **Missouri**[5] | | | **Illinois**[6] | | |
| | Largest city (Jackson County) | Median (Adair County) | Least expensive (Dallas County) | Largest city (Cook County) | Median (Jersey County) | Least expensive (Pike County) |
| Housing | $973 | $662 | $662 | $1,197 | $791 | $700 |
| Child care | $782 | $486 | $471 | $1,179 | $647 | $547 |
| Food | $388 | $347 | $378 | $384 | $380 | $358 |
| Transp'n | $352 | $331 | $337 | $100 | $275 | $266 |
| Health care | $603 | $720 | $646 | $446 | $594 | $565 |
| Misc. | $310 | $255 | $249 | $331 | $269 | $244 |
| Taxes | $739 | $443 | $418 | $857 | $600 | $473 |
| Earned Income Tax Credit | $0 | -$95 | -$110 | $0 | -$41 | -$137 |
| Child Care Tax Credit | -$50 | -$60 | -$63 | -$50 | -$55 | -$63 |
| Child Tax Credit | -$167 | -$167 | -$167 | -$167 | -$167 | -$167 |
| **Monthly Self-Sufficiency Standard** | $3,929 | $2,922 | $2,823 | $4,277 | $3,293 | $2,787 |
| **Minimum Wage** | $10.30 | $10.30 | $10.30 | $13.00 | $11.00 | $11.00 |
| **Ratio (Self-Suff. to Min. Wage)** | 2.2 | 1.6 | 1.6 | 1.9 | 1.7 | 1.5 |

---

[5] Missouri's 2018–19 average poverty rate was 10.8%, the closest to the national average among Midwestern states.

[6] Illinois's 2018–19 average poverty rate was 9.8%, the closest to the regional average for Midwestern states.

3

## South
**Average Poverty Rate (2018–19)**: 13.2%

| | Closest to National Average | | | Closest to Regional Average | | |
| | Texas[7] | | | North Carolina[8] | | |
| | Largest city (Harris County) | Median (Dallam County) | Least expensive (Uvalde County) | Largest city (Mecklenburg County) | Median (Jackson County) | Least expensive (Person County) |
|---|---|---|---|---|---|---|
| Housing | $1,129 | $762 | $734 | $1,237 | $718 | $757 |
| Child care | $788 | $665 | $509 | $1,053 | $688 | $521 |
| Food | $376 | $374 | $296 | $435 | $397 | $375 |
| Transp'n | $355 | $311 | $318 | $301 | $270 | $276 |
| Health care | $637 | $683 | $682 | $495 | $607 | $454 |
| Misc. | $329 | $279 | $254 | $352 | $268 | $238 |
| Taxes | $606 | $458 | $367 | $880 | $543 | $405 |
| Earned Income Tax Credit | $0 | -$39 | -$111 | $0 | -$47 | -$136 |
| Child Care Tax Credit | -$50 | -$55 | -$63 | -$50 | -$58 | -$65 |
| Child Tax Credit | -$167 | -$167 | -$167 | -$167 | -$167 | -$161 |
| **Monthly Self-Sufficiency Standard** | $4,004 | $3,272 | $2,820 | $4,536 | $3,219 | $2,664 |
| **Minimum Wage** | $7.25 | $7.25 | $7.25 | $7.25 | $7.25 | $7.25 |
| **Ratio (Self-Suff. to Min. Wage)** | 3.2 | 2.6 | 2.2 | 3.6 | 2.6 | 2.1 |

[7] The Southern state closest to the national average was Oklahoma (12.1%), but current Standard data for Oklahoma is not available. The second-closest to the national average was Texas (12.4%).

[8] North Carolina's 2018–19 average poverty rate was 12.9%, the closest to the regional average for Southern states.

4

## West
**Average Poverty Rate (2018–19)**: 10.2%

| | Closest to National Average | | | Closest to Regional Average | | |
| | California[9] | | | Arizona[10] | | |
| | Largest city (Los Angeles County) | Median (Riverside County) | Least expensive (Modoc County) | Largest city (Maricopa County) | Median (La Paz County) | Least expensive (Santa Cruz County) |
|---|---|---|---|---|---|---|
| Housing | $2,058 | $1,417 | $807 | $1,259 | $952 | $788 |
| Child care | $1,447 | $1,054 | $757 | $879 | $630 | $700 |
| Food | $448 | $408 | $435 | $408 | $396 | $334 |
| Transp'n | $342 | $340 | $323 | $269 | $241 | $241 |
| Health care | $507 | $511 | $849 | $518 | $624 | $484 |
| Misc. | $480 | $373 | $317 | $333 | $284 | $255 |
| Taxes | $1,145 | $727 | $571 | $688 | $524 | $399 |
| Earned Income Tax Credit | $0 | $0 | $0 | $0 | -$15 | -$103 |
| Child Care Tax Credit | -$50 | -$50 | -$50 | -$50 | -$53 | -$63 |
| Child Tax Credit | -$167 | -$167 | -$167 | -$167 | -$167 | -$167 |
| **Monthly Self-Sufficiency Standard** | $6,210 | $4,613 | $3,842 | $4,138 | $3,417 | $2,868 |
| **Minimum Wage** | $15.00 | $14.00 | $14.00 | $12.15 | $12.15 | $12.15 |
| **Ratio (Self-Suff. to Min. Wage)** | 2.4 | 1.9 | 1.6 | 2.0 | 1.6 | 1.4 |

[9] California's 2018–19 average poverty rate was 11.0%, the closest to the national average among Western states.

[10] The Western state closest to the regional average was also California (11.0%). The second-closest was Arizona (11.4%).

5

**The American College of
Obstetricians and Gynecologists**

WOMEN'S HEALTH CARE PHYSICIANS

October 6, 2021

Janet Woodcock, MD
Acting Commissioner
U.S. Food and Drug Administration
10903 New Hampshire Ave
Silver Spring, MD 20993-0002

**Re: U.S. Food and Drug Administration's review of the risk evaluation and mitigation strategy for mifepristone**

Dear Acting Commissioner Woodcock:

On behalf of the American College of Obstetricians and Gynecologists (ACOG), representing more than 60,000 physicians and partners dedicated to advancing women's health, we write to express our strong support for the review of the risk evaluation and mitigation strategy (REMS) for mifepristone currently underway at the U.S. Food and Drug Administration (FDA). ACOG supports efforts to improve access to quality women's health care and, given the decades of research and data reinforcing the safety of this medication, urges the FDA to remove the REMS and Elements to Assure Safe Use (ETASU) requirements for mifepristone.

Mifepristone has been used by over 3 million women in the United States since FDA approval in 2000 and robust evidence exists regarding the safety of mifepristone for medication-induced abortion.[1,2,3,4*] The REMS and ETASU requirements for mifepristone are inconsistent with those for other medications with similar safety profiles, and create barriers to access without demonstrated improvements to patient safety or outcomes. These medically unnecessary requirements restricting access to mifepristone interfere with the ability of obstetrician–gynecologists and other health care professionals to deliver the highest quality care for their patients. In addition to being supported by researchers, clinicians, and more than twenty years of data, removing the REMS and ETASU requirements for mifepristone is consistent with FDA's mission to ensure the safety and efficacy of medications and help "…the public get the accurate and science-based information they need to use medical products…"[5]

ACOG is the premier professional membership organization for obstetrician-gynecologists and produces practice guidelines for women's health clinicians based on the best available science and evidence. As referenced in ACOG Practice Bulletin 225, *Medication Abortion Up to 70 Days of Gestation*, medication abortion is a safe and effective method of providing abortion. The REMS restrictions for mifepristone do not make care safer, are not based on medical evidence or need, and create barriers to patient access to medication abortion.[6,7,8] Abortion is an essential component of comprehensive health care and is a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks or

---

[*] Recent evidence also supports the use of mifepristone to improve the safe and effective medical management of early pregnancy loss.
*See* Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161-70. Available at: https://www.nejm.org/doi/full/10.1056/NEJMoa1715726. Retrieved July 9, 2018; and
Westhoff CL. A Better medical regimen for the management of miscarriage. N Engl J Med 2018;378:2232-3. Available at: https://www.nejm.org/doi/full/10.1056/NEJMe1803491. Retrieved July 9, 2018.

2021 REMS 002051

potentially make it completely inaccessible.[9] Furthermore, research conducted during the COVID-19 pandemic, when enforcement of the in-person dispensing requirement for mifepristone was suspended, demonstrates the safety of providing abortion through telehealth contact and mailed medications.[10,11] Additionally, recent data suggests that patients offered telemedicine with mailed medications had abortions earlier than those without this option.[12] Removing the REMS and ETASU on mifepristone will improve access to medication-induced abortion and enhance patient care.

ACOG is pleased that the FDA is conducting a thorough review of the REMS restrictions for mifepristone and urges the FDA to remove the medically unnecessary REMS and ETASU restrictions that hinder access to medication abortion. Thank you for your attention to this critical issue. We are available to answer any questions.

Sincerely,

*Maureen G. Phipps, MD*

Maureen G. Phipps, MD, MPH, FACOG
Chief Executive Officer
American College of Obstetricians and Gynecologists

---

[1] Improving Access to Mifepristone for Reproductive Health Indications. Position Statement. American College of Obstetricians and Gynecologists. June 2018. Available at https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications.

[2] Cleland K, Smith N. Aligning mifepristone regulation with evidence: Driving policy change using 15 years of excellent safety data. *Contraception*. 2015;92(3):179-181. doi:10.1016/j.contraception.2015.06.016.

[3] Sixteen Years of Overregulation: Time to Unburden Mifeprex. *N Engl J Med*. 2017;376(8):790-794.

[4] Song LP, Tang SY, Li CL, Zhou LJGYK, Mo XT. Early medical abortion with self-administered low-dose mifepristone in combination with misoprostol. *J Obstet Gynaecol Res*. 2018;44(9):1705-1711. doi:10.1111/jog.13716.

[5] U.S. Food and Drug Administration. FDA Mission. Available at https://www.fda.gov/about-fda/what-we-do. Retrieved September 20, 2021.

[6] Medication abortion up to 70 days of gestation. ACOG Practice Bulletin No. 225. American College of Obstetricians and Gynecologists. Obstet Gynecol 2020;136:e31–47.

[7] Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. Obstet Gynecol 2019;133:477–83.Raymond EG, Blanchard K, Blumenthal PD, Cleland

[8] Raymond EG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of overregulation: time to unburden mifeprex. Mifeprex REMS Study Group. N Engl J Med 2017;376:790–4.

[9] Joint Statement on Abortion Access During the COVID-19 Outbreak. March 18, 2020. Available at https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

[10] Chong E, Shochet T, Raymond E, Platais I, Anger H, Raidoo S, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021.

[11] Kerestes C, Murayama S, Tyson J, Natavio M, Seamon E, Raidoo S, et al. Provision of medication abortion in Hawai'i during COVID-19: Practical experience with multiple care delivery models. Contraception 2021.

[12] Aiken A, Lohr P, Lord J, Ghosh N, Starling J. Effectiveness, safety and acceptability of no-test medical abortion provided via telemedicine. British J Obstet Gynecol 2021.

2021 REMS 002052