# Index of Joint Appendix Documents
## *Purcell, et al. v. Kennedy, et al.,*
## No. 1:17-cv-00493-JAO-RT (D. Haw.)

| VOLUME E | | | |
|---|---|---|---|
| **Administrative Record** | | | |
| **AR Range** | **Document Name** | **Date** | **Location in Pls.' Exhibits** |
| 2022CP71-98 | Citizen Petition from ACOG et al. to FDA | Oct. 4, 2022 | Doc. 222-4, Ex. Vol. C at PCSF562 |
| 2022CP99-109 | Laura Schummers et al., *Abortion Safety and Use with Normally Prescribed Mifepristone in Canada*, 386 New Eng. J. Med. 57-67 | Jan. 6, 2022 | Doc. 222-4, Ex. Vol. C at PCSF590 |
| 2022CP110-13 | Citizen Petition Response Letter from FDA to ACOG | Jan. 3, 2023 | Doc. 231-3, Ex. C at 57 |
| 2022CP530-37 | Jessica Beaman et al., *Medication to Manage Abortion and Miscarriage*, 35(8) J. Gen. Intern. Med. 2398-405 | 2020 | Doc. 222-4, Ex. Vol. C at PCSF601 |
| 2022CP776 | Sam Neill et al., *Medication Management of Early* | May 2022 | Doc. 222-4, Ex. Vol. C at PCSF605 |

| | | | |
|---|---|---|---|
| | *Pregnancy Loss: The Impact of the US Food and Drug Administration Risk Evaluation and Mitigation Strategy*, 139 Obstetrics & Gynecology 83S | | |
| 2022CP1120-25 | Na'amah Razon et al., *Exploring the Impact of Mifepristone's Risk Evaluation and Mitigation Strategy (REMS) on the Integration of Medication Abortion into US Family Medicine Primary Care Clinics*, 109 Contraception 19-24 | 2022 | Doc. 222-4, Ex. Vol. C at PCSF606 |
| 2023SUPP32-37 | Letter from Maureen G. Phipps, ACOG & James L. Madara, Am. Med. Assoc., to FDA re: actions related to mifepristone | June 21, 2022 | Doc. 222-5, Ex. Vol. D at PCSF612 |
| 2023SUPP88-159 | World Health Org., Medical Management of Abortion | 2018 | Doc. 222-5, Ex. Vol. D at PCSF618 |

| 2023SUPP229, 2023SUPP237 | M. Antonia Biggs et al., *Women's Mental Health and Well-being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study*, 74 JAMA Psychiatry 169-78 | 2017 | Doc. 222-5, Ex. Vol. D at PCSF620 |
|---|---|---|---|
| 2023SUPP257-350 | NDA - supplemental application submission | June 22, 2022 | N/A |
| 2023SUPP351-439 | ANDA - supplemental application submission | June 22, 2022 | N/A |
| 2023SUPP446-50 | Information request sent to NDA mifepristone applicant | July 22, 2022 | N/A |
| 2023SUPP460, 2023SUPP477 | Sponsors' Resp. to FDA's Information Request (Mifepristone REMS) | Aug. 26, 2022 | Doc. 222-5, Ex. Vol. D at PCSF622 |
| 2023SUPP479, 2023SUPP496 | GenBioPro Resp. to FDA's Information Request (Mifepristone REMS) | Aug. 26, 2022 | Doc. 222-5, Ex. Vol. D at PCSF624 |
| 2023SUPP539-60 | Sponsors' Resp. to Agency Corresp. Following | Oct. 19, 2022 | Doc. 222-5, Ex. Vol. D at PCSF626 |

| | 9/19/2022 Meeting (Mifepristone REMS) | | |
|---|---|---|---|
| 2023SUPP852-945 | Single Shared System REMS Supporting Document (Mifepristone REMS) | Dec. 16, 2022 | Doc. 222-5, Ex. Vol. D at PCSF630 |
| 2023SUPP1040-51 | FDA Integrated Memorandum re All Adverse Events (Mifepristone REMS) | Dec. 22, 2022 | Doc. 222-5, Ex. Vol. D at PCSF635 |
| 2023SUPP1054-55 | Review of Supplemental Drug Applications Proposing Modifications to the Mifepristone REMS Program | Dec. 23, 2022 | N/A |
| 2023SUPP1077-80 | Memorandum to File: Referenced Publications | Dec. 30, 2022 | Doc. 231-3, Ex. C at 63 |
| 2023SUPP1112-50 | Joint Summary Review (Mifepristone REMS) | Jan. 3, 2023 | Doc. 222-5, Ex. Vol. D at PCSF637; Doc. 231-3, Ex. C at 67 |
| 2023SUPP1151-59 | NAF, 2020 Violence and Disruption Statistics | 2020 | Doc. 222-5, Ex. Vol. D at PCSF676 |

| | | | |
|---|---|---|---|
| 2023SUPP1259-61 | Memorandum to File: Referenced Publication | Jan. 3, 2023 | Doc. 231-3, Ex. C at 68 |
| 2023SUPP1448-60 | Letter from FDA to Danco Laboratories, LLC re: Supplement Approval NDA 020687/S-025 | Jan. 3, 2023 | N/A |
| 2023SUPP1461-65 | Letter from FDA to GenBioPro, Inc. re: Supplemental Approval ANDA 091178-S004 | Jan. 3, 2023 | N/A |
| 2023SUPP1466-70 | Mifepristone Tablets, 200mg, Single Shared System REMS | Jan. 2023 | Doc. 222-5, Ex. Vol. D at PCSF676; Doc. 231-3, Ex. C at 71-74 |
| 2023SUPP1471-89 | Mifeprex 2023 Labeling and Medication Guide | Jan. 2023 | Doc. 222-5, Ex. Vol. D at PCSF690 |
| 2023SUPP1490-1509 | Mifepristone 2023 Labeling and Medication Guide | Jan. 2023 | Doc. 222-5, Ex. Vol. D at PCSF709 |

| 2023SUPP1510 | Patient Agreement Form (Mifeprex) | Jan. 2023 | Doc. 222-5, Ex. Vol. D at PCSF729 |
| 2023SUPP1511-12 | Pharmacy Agreement Form (Mifeprex) | Jan. 2023 | Doc. 222-5, Ex. Vol. D at PCSF730 |
| 2023SUPP1513 | Pharmacy Agreement Form (GenBioPro) | Jan. 2023 | N/A |
| 2023SUPP1514-15 | Prescriber Agreement Form (Mifeprex) | Jan. 2023 | Doc. 222-5, Ex. Vol. D at PCSF732 |
| 2023SUPP1516-17 | Prescriber Agreement Form (GenBioPro) | Jan. 2023 | N/A |

October 4, 2022

TO:

Lauren Roth
Associate Commissioner for Policy
The US Food & Drug Administration
10903 New Hampshire Ave
Silver Spring, MD 20903

<u>CITIZEN PETITION</u>

The American College of Obstetricians and Gynecologists submits this petition on behalf of itself and 48 other organizations listed below pursuant to 21 C.F.R. § 10.30 to request that the Food & Drug Administration (FDA) ask Danco Laboratories, LLC ("Danco") – the holder of the approved new drug application for Mifeprex (mifepristone)—to submit a Supplemental New Drug Application (sNDA) that seeks to add miscarriage management as an indication to the drug's label and to eliminate or modify mifepristone's Risk Evaluation and Mitigation Strategy (REMS) so that it is not unduly burdensome for that use.[1] In the meantime, Petitioners also request that FDA immediately exercise enforcement discretion with respect to the use and distribution of mifepristone for miscarriage management without complying with the REMS.[2]

---

[1] There is precedent for such a request. In 1997, the FDA issued a notice encouraging the manufacturers of certain contraceptives to submit a New Drug Application that would modify the dose and use of its product for postcoital emergency contraception (1). The FDA found that this use was safe and effective, that postcoital emergency contraception was important for public health, and that manufacturers should make this product available. In this case, we are asking the FDA to request the manufacturer to submit an sNDA, as opposed to an NDA, because it is more efficient and the medication abortion drug dosages are identical to the miscarriage management protocol, which was not true in the emergency contraception example.

[2] There also is precedent for FDA to exercise enforcement discretion with respect to REMS requirements when they are seriously affecting patient access to important drugs, as it did last year, for example, with respect to the Clozapine REMS (2). Of course, FDA also exercised enforcement discretion with respect to part of the mifepristone REMS itself in order to facilitate patient access during the COVID-19 public health emergency (3).

1

Mifepristone, in combination with misoprostol, is the most effective regimen for medical management of miscarriage,[3] but patient access to this regimen is currently limited both because the drug lacks FDA approval for this indication and because the REMS limits clinicians' ability to use the drug for miscarriage management. We urge the FDA to request Danco to seek FDA approval of a miscarriage management indication for mifepristone because it is a safe and essential part of the most effective regimen for miscarriage management. With this new indication on the labeling, the REMS must be eliminated or modified so that it does not unduly burden access to the drug for this use and so that it accurately reflects the approved indications for mifepristone.

## ACTION REQUESTED

Petitioners request that the FDA ask Danco to submit an sNDA to add miscarriage management as an indication to the mifepristone label and to modify the REMS so that it does not unduly burden its use for miscarriage management. While the FDA is considering these changes, Petitioners request that FDA state that it will exercise enforcement discretion with respect to the use and distribution of mifepristone consistent with the requested indication and REMS modifications.

## STATEMENT OF GROUNDS

Miscarriage is common, has significant physical, psychological, and social sequelae, and is a contributor to—and result of— racial health inequities. Miscarriage describes the spontaneous

---

[3] HHS Secretary Becerra called mifepristone the "gold standard for care when someone who's pregnant experiences a miscarriage" (4). Indeed, the American College of Obstetricians and Gynecologists recommends using mifepristone in combination with misoprostol whenever available, citing studies we discuss below (5). Nevertheless, the REMS's restrictions have made it difficult for this best practice for miscarriage care to become the standard of care as it ought to be, for reasons we explore in more depth below.

2

loss of a pregnancy prior to 20 weeks' gestation (6). Miscarriage is most common early in pregnancy (7,8). While 1 in 6 recognized pregnancies ends in miscarriage worldwide (7), it is likely that miscarriage also occurs in some early, unrecognized pregnancies. When accounting for unrecognized pregnancies, the miscarriage rate is estimated to be around 25% (8). Miscarriage affects people of every age, race/ethnicity, and socioeconomic status, but is more common among groups negatively impacted by societal dynamics of power and oppression, such as pregnant people[4] who are Black, poor, or exposed to environmental pollutants (7). These risk factors have compounding effects when it comes to health equity, as people of color are both more likely to be exposed to pollution and more likely to live in poverty (9,10).

Miscarriage can also levy a heavy psychological toll, and the burdens of these negative mental health sequelae further exacerbate health inequities. In a recent prospective study in the United States, 1 in 4 people who experienced miscarriage were at risk for major depression 30 days after their loss, according to their scores on a widely used and validated screener (11). Among participants in this study, people who identified as Black had significantly higher odds than people who identified as non-Black of being at risk for major depression following miscarriage, after adjusting for potential confounding medical and demographic differences (aOR 2.48; 95% CI 1.28-4.81) (11). Miscarriage is also stigmatized in many societies and social groups, meaning people who experience pregnancy loss are socially marked as inferior and may be treated poorly or suffer lower self-esteem (12).

The risks and negative outcomes associated with miscarriage are mitigated when health care teams support patient autonomy in selecting a management strategy when appropriate (13).

---

[4] Women are not the only people capable of becoming pregnant and not all women are capable of pregnancy. To be inclusive of the diversity of pregnancy-capable individuals, including girls, non-binary people, and trans men, we use gender neutral language in this petition whenever appropriate. However, when referring to studies that only included (presumably cisgender) women or when discussing the gendered impact of regulations, we use gendered language.

3

Miscarriage management options are particularly important for patients who experience missed or incomplete miscarriage, where the body has not expelled all of the pregnancy tissue on its own. Without proper care and intervention when needed, miscarriage carries risks of hemorrhage, sepsis, and death (14). Second trimester miscarriage (14 weeks 0 days through 19 weeks 6 days gestation) can carry significant medical risks, and expectant management is not routinely recommended (5). However, for the estimated greater than 80% of miscarriages occurring in the first trimester (8), several management strategies may be appropriate. In general, there are three options for miscarriage management: expectant management, where no interventions are initiated immediately but patients are actively monitored for symptoms indicating that intervention could be needed (e.g., infection); medical management, where medications are used to help the body start or complete the miscarriage process; and surgical management, where a procedure is used to empty the uterus. (5,14) Each option has its own unique risks and benefits, and patients often have strong preferences on which option they prefer.  Widely accepted and used clinical guidelines support engaging uncomplicated patients who are experiencing miscarriage in a shared decision-making process, wherein clinicians educate patients on available treatment options so they may make informed choices aligned with their values and preferences (5).

Some patients prefer active intervention because both medical and surgical management on average lead to a faster completion of the pregnancy loss and involve fewer unplanned procedural interventions compared to expectant management. While expectant management can take up to 8 weeks to result in complete miscarriage, many observational studies and randomized trials affirm that medical management of miscarriage results in markedly faster resolution of the pregnancy, often within a few hours and usually not more than a few days after initiating treatment (15, 16, 17, 18). People who start medication treatment are also less likely to require a subsequent

4

uterine evacuation to complete their miscarriage compared to those who pursue expectant management. For example, in a randomized controlled trial of 1,200 pregnant patients, individuals who were randomized to expectant management were more likely to need unplanned surgical intervention to complete their miscarriage (44%) compared to those randomized to medical treatment of miscarriage (13%) (15). Some patients might also prefer active miscarriage management for psychosocial reasons, including an ability to have some control over an unexpected, and often disheartening, bodily process (7,13). In a randomized controlled trial of people experiencing miscarriages, pregnant individuals who were allocated to expectant management were significantly less likely to state they would choose this method again, compared to those allocated to intervention (18). This trial suggests that the experience of expectant management is on average less acceptable compared to intervention to empty the uterus.

Qualitative research also suggests that choice of management strategy is paramount in driving patient satisfaction with miscarriage care. In a 2017 qualitative study, Wallace and colleagues found that women who had recently experienced miscarriage expressed a strong preference for informed choice among multiple options rather than being prescribed a single option by their health care team (19). The induced abortion patient population, though not perfectly analogous, also provides additional context, with similar findings about the value of method choice across multiple studies. Abortion patients hold strong preferences for method of termination. A 2006 review of the global literature on abortion method preference found that in most settings and across multiple studies, the predominant reasons patients provide for choosing medication abortion are to avoid surgery and anesthesia, the (incorrect) perception that it is safer than procedural abortion, and the perception that is more natural compared to procedural abortion (20).

5

Importantly, surgical options are not always available to all patients. Rural patients in particular can struggle to access surgical management of miscarriage due to the lack of trained clinicians in rural communities, meaning that medical management is their only alternative to expectant management (21, 22). The literature is therefore clear that patients value and deserve a choice between expectant management, medical management, and surgical management in the context of miscarriage.

**To ensure access to the safest and most effective treatments for miscarriage, and to preserve patient choice in miscarriage management and equitably confer the benefits of that choice irrespective of geographic location, race/ethnicity, and socioeconomic status, it is imperative to promote access to evidence-based medical management of miscarriage, which includes access to mifepristone. To achieve this goal, Danco should request, and FDA should approve, a miscarriage management indication for mifepristone, and the REMS should be revised accordingly. Because the public health needs are urgent, FDA should immediately state that it will exercise enforcement discretion until this process is completed.**

## I.     Miscarriage Management Should be Approved as an Indication for Mifepristone Through the First Trimester of Pregnancy

Miscarriage management should be added to the mifepristone label because it is the most effective regimen for medical management of miscarriage. Published research demonstrates that mifepristone is safe and effective for this use throughout the first trimester (13 weeks and 6 days of pregnancy) (23,24). Indeed, it is as safe or safer than alternatives for miscarriage management and the most effective medical option to manage miscarriage. Patients choosing medical

6

management of miscarriage should have access to the most effective protocol, which is mifepristone in combination with misoprostol.

      A.     *A Combination of Mifepristone and Misoprostol for Miscarriage is the Most Effective Protocol for Medical Management of Miscarriage*

Because of the onerous restrictions currently in place on mifepristone in the United States, the most commonly used medical protocol for miscarriage management today is misoprostol alone. However, leading professional organizations encourage the use of adjunctive mifepristone whenever possible.[5] For example, based on a systematic review of the literature on miscarriage management with misoprostol, and on a large, randomized trial of a misoprostol-only regimen, the American College of Obstetricians and Gynecologists (ACOG) recommends an initial dose of 800 micrograms of misoprostol administered vaginally, with a repeat dose administered in the same quantity and route as needed, when utilizing misoprostol alone for miscarriage management (5,17,25,26). However, ACOG further advises that "[t]he addition of a dose of mifepristone (200 mg orally) 24 hours before misoprostol administration may significantly improve treatment efficacy" (5). Clinical experts in internal medicine also endorse mifepristone use for miscarriage management (27). These recommendations stem from the growing evidence that the mifepristone-misoprostol regimen has superior efficacy for the treatment of miscarriage, compared to misoprostol alone.

In the past decade, two large, randomized trials have augmented the observational literature to definitively prove that misoprostol with adjunctive mifepristone is superior to misoprostol alone

---

[5] ACOG's practice bulletin notes that "the availability of mifepristone is limited by U.S. Food and Drug Administration Risk Evaluation and Mitigation Strategy restrictions," which makes it inaccessible for miscarriage management in many places (5).

7

to treat miscarriage (23,24,27). Schreiber and colleagues found that 200 milligrams of oral mifepristone followed by 800 micrograms of vaginal misoprostol is more effective (complete expulsion of pregnancy after the initially prescribed regimen = 83.8%; 95% CI 76.8 to 89.3) compared to 800 micrograms of vaginal misoprostol alone (complete expulsion = (67.1%; 95% CI, 59.0 to 74.6) (23). Moreover, the need for uterine aspiration was much lower in the mifepristone-misoprostol group in this trial compared to misoprostol alone (8.8% vs. 23.5%; relative risk, 0.37; 95% CI, 0.21 to 0.68). A separately conducted randomized controlled trial through 14w0d of pregnancy replicated these results, with patients who received mifepristone and misoprostol having a lower risk of not passing their pregnancy within 7 days ([RR] 0.73, 95% CI 0.54-0.99) and a lower risk of needing surgical intervention to empty the uterus ([RR] 0.71, 95% CI 0.53-0.95), compared to misoprostol alone (24).[6] Having enrolled a diverse combined sample of over 1,000 participants across 30 hospitals in the United States and the United Kingdom, together these trials provide excellent evidence of the superiority of the mifepristone-misoprostol regimen compared to misoprostol alone.

### B.  A Combination of Mifepristone and Misoprostol for Miscarriage is Safe

Medical management of miscarriage has a comparable or superior safety profile than alternatives for miscarriage management. For the context of this discussion, we compare interventions based on the prevalence of (1) transfusion, (2) sepsis, (3) hospitalization, (4)

---

[6] Chu and colleagues did not directly compare the efficacy of the two originally administered regimens in their trial. Instead, they compared complete miscarriage at 7 days regardless of how many additional doses of misoprostol individuals received on top of the original 800 microgram dose. The difference in completion by 7 days between mifepristone plus a single dose of misoprostol, vs a single dose of misoprostol alone, would likely be larger in magnitude (24).

2022 CP 000078

infection without sepsis, and (5) hemorrhage. These serious adverse events are substantially similar to the "serious adverse events" on the mifepristone label for abortion.[7]

When mifepristone and misoprostol was compared to misoprostol alone for first trimester miscarriage, there were no differences in safety outcomes. In two randomized trials that assigned pregnant people to misoprostol alone vs mifepristone with adjunctive misoprostol, there was no difference in the rate of blood transfusions or any other safety outcome (23,24). In a randomized trial including 300 individuals, Schreiber et al reported a serious adverse event (defined as bleeding resulting in transfusion or pelvic infection) rate of 3.4% for mifepristone and misoprostol combined vs 2.0% for misoprostol alone (p=0.47) (23). In a subsequent placebo-controlled trial that enrolled 711 individuals, Chu and colleagues found no difference in bleeding patterns between groups, and a rate of inpatient treatment for infection of 1% among both the misoprostol alone and mifepristone and misoprostol combined groups (24).

### C. Abortion Bills are Targeting Mifepristone, Potentially Limiting Access to the Drug for Miscarriage Management and Harming Public Health

Based on the evidence and clinical guidance cited above, clinicians with the political freedom to make evidence-based choices regarding miscarriage treatment are increasingly using mifepristone. For example, in a survey of Massachusetts obstetrician-gynecologists, Neill and colleagues found that 63% use mifepristone to treat miscarriages (29). However, clinicians in areas where abortion is highly stigmatized and legally scrutinized face many more barriers to this evidence-based best practice. Now that the Supreme Court has overturned *Roe v. Wade*, some

---

[7] The only serious adverse event on the mifepristone label that we did not include is Emergency Room (ER) visits. ER visits are not a good indicator of safety in the miscarriage population because these patients often first seek care in the ER.

states are moving quickly to limit access to drugs that can induce abortion. These efforts have collateral consequences that harm all aspects of reproductive health, including miscarriage management.

The fact that mifepristone is only approved to terminate a pregnancy—even though it is used and is recommended for use off-label for miscarriage management—has made it vulnerable to wholesale bans on the drug. For instance, in the last legislative session, Alabama legislators introduced Alabama H261, which made it "unlawful for any person or entity to manufacture, distribute, prescribe, dispense, sell, or transfer the 'abortion pill,' otherwise known as RU-486, Mifepristone, Mifegyne, or Mifeprex, or any substantially similar generic or non-generic abortifacient drug in Alabama" (30). A nearly identical bill was also introduced in Arizona (H2811) and other states (31). These are wholesale bans on mifepristone for any use and, if enacted, will prevent clinicians from providing the gold standard miscarriage care in their communities of practice, harming public health. Even without a wholesale ban on mifepristone, clinicians in states that ban abortion may be hesitant to prescribe a drug that has only been approved for abortion even for a legal, off-label use, like miscarriage management (32). Adding miscarriage management to the label would legitimize this important use and potentially hamper legislative efforts to ban the drug so patients have greater access to the most effective medical tool for miscarriage care.

Media reports affirm that out of an abundance of caution, in the wake of *Dobbs v. Jackson Women's Health Organization,* some pharmacies are creating barriers to accessing drugs that can cause or treat pregnancy loss but are prescribed for other uses, such as methotrexate for rheumatic diseases or mifepristone or misoprostol for miscarriage (33,34,35). Moving forward, regulators and the pharmacy community must work to clarify and educate the field on professional

10

responsibility of pharmacists—by law and by oath—to serve their patients' medical needs and comply with federal law.[8] In this context, including the indication of miscarriage management on the mifepristone label may help to clear up confusion or anxiety about legal compliance in a rapidly evolving legal landscape.

## II.     The Mifepristone REMS Must Be Eliminated Because it is Not Necessary for the Drug's Benefits to Outweigh its Risks and is Unduly Burdensome for this New Use

If miscarriage management is added as an indication to the mifepristone label, then changes to the mifepristone REMS would also be needed to ensure that it is not unduly burdensome for this new use. Section 505-1(f)(2) of the Federal Food, Drug, and Cosmetic Act states that an Element to Assure Safe Use (ETASU) may "not be unduly burdensome on patient access to the drug, considering in particular . . . patients who have difficulty accessing health care (such as patients in rural or medically underserved areas)." 21 U.S.C. § § 355–1(f)(2). The statute also only permits the imposition of a REMS where it is "necessary to ensure that the benefits of the drug outweigh the risks of the drug." 21 U.S.C. § 355-1(a)(1). And finally, each ETASU must "conform with elements to assure safe use for other drugs with similar, serious risks." 21 U.S.C. § § 355–1(f)(2)

Each element of the mifepristone REMS imposes unique burdens on accessing mifepristone for miscarriage management and is unnecessary to ensure mifepristone's benefits for miscarriage management outweigh its risks. Furthermore, as described below, the misoprostol-only alternative has lower efficacy and similar risks but is not subject to an ETASU (or any REMS at all). As a result, the REMS burdens the equally safe and more effective

---

[8] HHS Secretary Becerra recently issued a guidance document stating that a pharmacy's refusal to dispense mifepristone for miscarriage management due to its concern for abortion laws constituted unlawful sex discrimination (36).

11

miscarriage management protocol, making it harder for patients, especially poor and rural patients, to access it. Accordingly, a REMS with ETASU is inappropriate for a miscarriage management indication for mifepristone and should therefore be eliminated.

A. *The Patient Agreement Form is Not Necessary for the Benefits of Mifepristone to Outweigh the Risks and Unduly Burdens Access to the Drug*

We recommend that the Patient Agreement Form be removed entirely because it is medically unnecessary and repetitive of informed consent, as a previous review conducted by CDER determined in 2016.[9] As a result, the Form does nothing to ensure the benefits of the drug outweigh the risks. Moreover, for miscarriage management, there is an additional concern: the medical alternative (misoprostol alone) does not require patients to sign any form, and therefore the mandated Patient Agreement Form adds an administrative and logistical burden that disincentivizes the most effective protocol for medically managing miscarriage at the health systems level. It should therefore be removed for that reason.

If the Patient Agreement Form is retained, however, it at least minimally needs to be amended to reflect the new indication or separate forms should be used for the separate indications. The current Form makes people attest that they are ending a pregnancy, which is not accurate for the indication of miscarriage, in which the loss of the pregnancy has already occurred or is already in process. Asking a miscarriage patient to attest to having an abortion will confuse patients at best, but due to the prevalence of abortion stigma, it might also add emotional harm to their miscarriage experience (38).

---

[9] These recommendations were ultimately rejected by Dr. Janet Woodcock, who decided to retain this element of the REMS (37).

12

*B. The Provider Self-Certification Process for Mifepristone is Not Necessary for the Benefits of Mifepristone to Outweigh the Risks and Unduly Burdens Access to the Drug*

Second, the Certified Provider Requirement serves no benefit to patient safety, especially in the miscarriage population. In this population, the pregnancy has already been confirmed and diagnosed as a miscarriage. Moreover, clinicians prescribing mifepristone for miscarriage know how to date a pregnancy, diagnose an ectopic pregnancy, and treat complications that arise (or refer to someone who could). Clinicians who commonly provide early pregnancy loss care, such as emergency medicine specialists, obstetrician-gynecologists, family physicians, women's health nurse practitioners, and certified nurse midwives, receive training in pregnancy dating, ectopic risk factors,[10] and care coordination (40,41). As a result, the certification is redundant and unnecessary to prove that mifepristone's benefits outweigh its risks for this indication.

The negligible or non-existent benefits of provider self-certification are vastly outweighed by the impediments to accessing mifepristone that result from this requirement. This requirement creates an administrative burden that discourages clinicians from using the drug. First, social science research demonstrates in other contexts that an opt-in requirement generally disincentivizes participation (42). The certification process therefore presents an administrative burden that busy clinicians may be unable or unwilling to fulfill without institutional support or technical assistance.

In addition to the administrative burden, clinicians might also be particularly wary about undergoing the certification process for mifepristone given its relationship to abortion. Even before

---

[10] Recent studies have suggested that mifepristone use is safe even for pregnancies of unknown location (PUL). In a 2022 retrospective cohort study of 432 abortion patients with a PUL and no ectopic risk factors, Goldberg and colleagues report that individuals had a faster time to rule out ectopic pregnancy when they were treated with mifepristone immediately, rather than delaying initiation of mifepristone until after pregnancy location was diagnosed (39).

13

*Roe v. Wade* was overturned, abortion providers have consistently faced risks of violence and harassment unlike any other field of medicine (43). For that reason, clinicians might have reasonable reservations about opting into a prescription system that could, if their certification were leaked, suggest they were an abortion provider and open them up to violence and harassment (42). In recent qualitative studies in Illinois and Massachusetts, researchers found this fear was present even among physicians who personally only plan to prescribe mifepristone for miscarriage care (29,44). It is likely that clinicians' reservations will increase in states that have moved to ban abortion care since the *Dobbs* decision, further compounding the effects of abortion stigma (45). Research has shown that without certification, more clinicians would prescribe mifepristone. In qualitative studies in Massachusetts, Illinois, Alabama, and with a national sample, both generalist obstetrician-gynecologists and primary care providers described the REMS as a barrier to integration of mifepristone use in their practice (29,44,45,46).

The result is that only the limited number of clinicians who have already navigated mifepristone REMS compliance to provide abortion care are prepared to prescribe mifepristone for miscarriage. And those clinicians are almost always located in cities (47,48), meaning that rural residents will disproportionately lack access to certified providers who can prescribe mifepristone as part of a medical miscarriage protocol. Moreover, rural residents are more likely to lack access to OBGYNs (21), meaning that surgical management is also less likely to be an option. Thus, rural residents will only have access to a less effective medical protocol for managing miscarriage or may be forced to complete their miscarriage without active measures.

This certification barrier has devastating effects for the miscarriage population, who may only be able to access the most effective medical miscarriage management protocol if their hospital or provider group has an abortion provider on staff. And these burdens fall disproportionately on

14

poor and rural women, contrary to goals of the REMS statute. Because the misoprostol-only alternative does not require certification despite being less effective and having a similar risk and safety profile, the certified provider requirement again burdens the more effective protocol and makes it much harder to access the best medical treatment for miscarriage.

### C. The Certified Pharmacy Requirement is Not Necessary for the Benefits of Mifepristone to Outweigh the Risks and Unduly Burdens Access to the Drug

Though the details of the new pharmacy certification requirement have yet to be finalized, research also suggests that the pharmacy requirement is unnecessary to ensure that mifepristone's benefits outweigh its risks and unduly burden access. A preliminary trial of pharmacy dispensing of mifepristone conducted by Grossman and colleagues in California and Washington state suggests that pharmacies are already equipped to dispense the drug without special certification. In this trial of 266 individuals, which was halted early due to the COVID-19 pandemic, rates of non-serious adverse events following pharmacy dispensing were extremely low (1.5%) and no higher than rates from studies of in-clinic dispensing, and satisfaction was high, with 65.4% of patients very and 19% somewhat satisfied. Though the pharmacies in this study partnered with prescribers, there is no reason to think the results would be different with retail pharmacies, especially in light of the Canadian data discussed in the next section (49).

The pharmacy certification requirement is also expected to create similar barriers to care for the miscarriage population as the provider certification. The extra administrative burden will disincentivize participation and the fact that pharmacies are businesses, not people, exacerbates this concern. Unlike clinicians, who may endure the obstacles of certification out of a moral

15

conviction or professional obligation to provide the best reproductive healthcare, pharmacies will engage in a business decision where they will evaluate whether the financial gain in distributing the drug is worth the costs and risks (42). Moreover, given that the antiabortion movement is known for boycotts, pharmacies will also likely weigh the risks associated with their status as a certified pharmacy becoming public. Walgreens already indicated that it will not seek certification, and many large retail pharmacies may follow suit (42). People will therefore be dependent on online pharmacies to access mifepristone—even for miscarriage management.

As with the certified provider requirement, the burdens associated with the certified pharmacy requirement will also fall disproportionately on poor and rural women, contrary to the REMS statute. Most Americans rely on neighborhood retail pharmacies to obtain their prescription drugs, and retail pharmacy distribution of drugs can increase access for rural residents (42). For instance, when the government in Australia started allowing retail pharmacies to dispense mifepristone, access to the drug increased, especially in rural areas (43). If only online pharmacies become certified to dispense mifepristone, then it might harm those with less digital literacy, who may have more difficulty interfacing with online pharmacies after their clinicians prescribe mifepristone for miscarriage. This might be especially true for patients struggling to process their loss, who have little emotional capacity to set up an account and learn a new pharmacy's online interface. Moreover, adults who are not digitally literate are disproportionately less educated and more likely to be Black, Hispanic, or foreign born, meaning that these groups would likely be the most adversely impacted if mifepristone is available solely through online pharmacies (50). Given that the misoprostol-only alternative can be accessed at any pharmacy, the pharmacy certification requirement therefore incentivizes the less effective protocol for medical miscarriage management and will limit access to the most effective protocol.

16

D. *Existing Data Demonstrate that a Removal of All REMS Requirements Will Not Harm Patient Safety*

After Canada removed all restrictions on prescribing mifepristone for abortion, thereby allowing it to be prescribed and dispensed like any other drug ("normal prescribing"), there was no increase in complications from mifepristone use (51). In a 2022 study, Schummers and colleagues used multiple sources of medical and administrative data to create a linked dataset containing information on Ontario residents receiving abortion care through Canada's universal, single-payer health system from 2012 through 2020 (total n=314,859 abortions). They found no difference in the rate of any complication (0.67% vs. 0.69%) or in the rate of serious adverse events (0.03% vs. 0.04%) between the ten-month period when mifepristone was distributed with REMS-like restrictions and the twenty-eight-month period of normal prescribing after all such restrictions were lifted and mifepristone was prescribed with no special self-certification and dispensed routinely from pharmacies (52). We expect the same results in the miscarriage population given the similarity in regimens when using mifepristone for abortion and miscarriage.

III. **FDA Should Immediately State That it Will Exercise Enforcement Discretion Until This Process is Completed**

As just discussed, clinicians who treat miscarriage and their patients have an urgent need to address increasing barriers to accessing mifepristone. While we urge both FDA and Danco to act expeditiously on our requests, we recognize that submission and review of an sNDA and corresponding REMS changes will take time. Thousands of patients suffering miscarriages will be adversely affected during this period. We therefore request that FDA immediately announce that it will exercise enforcement discretion to permit the use and distribution of mifepristone consistent

17

with the requested miscarriage indication and changes in the REMS for this indication. The public health needs for this safe and effective treatment are substantial. Just last year, FDA exercised enforcement discretion with respect to certain pharmacy and wholesale distribution requirements under the Clozapine REMS because they had frustrated patients' ability to access a needed drug. FDA explained that its "highest priorities" are "[c]ontinuity of care, patient access . . ., and patient safety" (2). Patient access to the gold standard of miscarriage care, which is being significantly restricted due to the mifepristone REMS, and patient safety weigh heavily in favor of exercising enforcement discretion here as well. There is, of course, precedent for FDA to exercise enforcement discretion specifically with respect to the mifepristone REMS as well, as it did last year during the COVID-19 public health emergency (3). Enforcement discretion will ensure patients have access to the most effective regimen for miscarriage management while Danco submits, and FDA reviews, the sNDA.

## ENVIRONMENTAL IMPACT

The proposed action is exempt from the requirement of an environmental impact statement under 21 C.F.R. § 25.24(c)(2).

## ECONOMIC IMPACT

No information required at this time.

## CERTIFICATION

18

The petitioners certify that, to the best of our knowledge and belief, this petition includes all information and views on which the petition relies. The petitioners know of no data unfavorable to the opinion.

Signed:

*Maureen S. Phipps, MD*

Maureen G. Phipps, MD, MPH, FACOG
Chief Executive Officer
American College of Obstetricians and Gynecologists
409 12th Street SW
Washington, DC 20024
202-863-2534


Together with:

Advancing New Standards in Reproductive Health
All Families Healthcare
American Academy of Family Physicians
American Civil Liberties Union
American College of Nurse-Midwives
American Humanist Association
American Medical Association
American Medical Women's Association
American Society for Reproductive Medicine
Association of Women's Health, Obstetric and Neonatal Nurses
Black Mamas Matter Alliance
Centering Equity, Race, and Cultural Literacy in Family Planning
Center for Reproductive Rights
Collective Energy for Nurturing Training in Reproductive and Sexual Health
Community Catalyst
Doctors for America FDA Task Force
EMAA Project
ExPAND Mifepristone
Guttmacher Institute
Gynuity Health Projects
Ibis Reproductive Health
Ipas
Jacobs Institute of Women's Health
Jefferson Health
Just The Pill/Abortion Delivered
NARAL Pro-Choice America

19

National Abortion Federation
National Association of Nurse Practitioners in Women's Health
National Birth Equity Collaborative
National Consumers League
National Family Planning & Reproductive Health Association
National Health Law Program
National Latina Institute for Reproductive Justice
National Partnership for Women & Families
National Women's Health Network
Nurses for Sexual and Reproductive Health
Partners in Abortion Care
Pegasus Health Justice Center
Physicians for Reproductive Health
Planned Parenthood Federation of America
Power to Decide
Reproductive Health Access Project
Reproductive Health Education in Family Medicine
SisterReach
Society for Academic Specialists in General Obstetrics and Gynecology
Society for Maternal-Fetal Medicine
Society of Family Planning
UCSF Bixby Center for Global Reproductive Health

References

1. Department of Health and Human Services. Prescription drug products; certain combined oral contraceptives for use as postcoital emergency contraception. Notice. 62 Fed. Regis. 1997 February 25; 8610.

2. U.S. Food and Drug Administration. FDA is temporarily exercising enforcement discretion with respect to certain Clozapine REMS program requirements to ensure continuity of care for patients taking clozapine [Internet]. 2021 December 2. Available from: https://www.fda.gov/drugs/drug-safety-and-availability/fda-

2022 CP 000090

temporarily-exercising-enforcement-discretion-respect-certain-clozapine-rems-program

3.  Woodcock J. (Acting Commissioner, U.S. Food and Drug Administration, Silver Spring, MD). Letter to: Phipps M. (Chief Executive Officer, American College of Obstetricians and Gynecologists, Washington, D.C.). Grobman W. (President, Society for Maternal-Fetal Medicine, Washington, D.C.). 2021 April 12. Available from: https://www.aclu.org/letter/fda-response-acog-april-2021

4.  Becerra J. Remarks by Secretary Xavier Becerra at the press conference in response to President Biden's directive following overturning of Roe v. Wade [Speech video recording]. 2022 June 28. U.S. Department of Health and Human Services. Available from: https://www.hhs.gov/about/news/2022/06/28/remarks-by-secretary-xavier-becerra-at-the-press-conference-in-response-to-president-bidens-directive-following-overturning-of-roe-v-wade.html

5.  American College of Obstetricians and Gynecology. Committee on Practice Bulletins–Gynecology. Early pregnancy loss: interim update. Obstetrics and Gynecology, 2018 Nov;132(5):e197-207.

6.  Centers for Disease Control and Prevention. Pregnancy and infant loss [Internet.] 2020 August 13 [cited 2022 July 20]. Available from: https://www.cdc.gov/ncbddd/stillbirth/features/pregnancy-infant-loss.html

7.  Quenby S, Gallos ID, Dhillon-Smith RK, Podesek M, Stephenson MD, et al. Miscarriage matters: the epidemiological, physical, psychological, and economic costs of early pregnancy loss. Lancet. 2021; 397: 1658–67.

21

8.  Wang X, Chen C, Wang L, Chen D, Guang W, French J. Conception, early pregnancy loss, and time to clinical pregnancy: a population-based prospective study. Fertil Steril. 2003;79(3):577-84.

9.  Tessum CW, Paolella DA, Chambliss S, Apte JS, Hill JD, Marshall, JD. PM2. 5 polluters disproportionately and systemically affect people of color in the United States. Science Advances. 2021; 7(18):eabf4491.

10. Kaiser Family Foundation. State health facts: poverty rate by race/ethnicity, 2019. [Internet.]  2022 [cited 2022 August 7]. Available from: https://www.kff.org/other/state-indicator/poverty-rate-by-raceethnicity/?currentTimeframe=0&sortModel=%7B%22 colId%22:%22Location%22,%22sort%22:%22asc%22%7D

11. Shorter JM, Koelper N, Sonalkar S, Oquendo MA, Sammel MD, Schreiber CA. Racial disparities in mental health outcomes among women with early pregnancy loss. Obstet Gynecol. 2021;137(1):156-163.

12. Layne L. "True gifts from God": paradoxes of motherhood, sacrifice, and enrichment in motherhood lost: a feminist account of pregnancy loss in America. Routledge, 2002:145-172.

13. Wallace RR, Goodman S, Freedman LR, Dalton VK, Harris LH. Counseling women with early pregnancy failure: utilizing evidence, preserving preference. Patient Educ Couns. 2010;81(3):454-61.

14. Goldberg AB, Carusi D, Westhoff C. "Pregnancy Loss."  In Paul M, Lichtenberg PES, Borgotta L, Grimes DA, Stubblefield PG, Creinin MD, eds. Management of

2022 CP 000092

Unintended and Abnormal Pregnancy: Comprehensive Abortion Care. Wiley, 2009, pp. 264-279.

15. Trinder J, Brocklehurst P, Porter R, Read M, Vyas S, Smith L. Management of miscarriage: expectant, medical, or surgical? Results of randomised controlled trial (miscarriage treatment (MIST) trial). BMJ. 2006 May 27; 332(7552):1235-40.

16. Blohm F, Fridén BE, Milsom I, Platz-Christensen JJ, Nielsen S. A randomised double blind trial comparing misoprostol or placebo in the management of early miscarriage. BJOG. 2005 Aug;112(8):1090-1095.

17. Zhang J, Gilles JM, Barnhart K, Creinin MD, Westhoff C, Frederick MM. A comparison of medical management with misoprostol and surgical management for early pregnancy failure. N Engl J Med. 2005 Aug 25;353:761-769

18. Wieringa-de Waard M, Bindels PJE, JVos J, Bonsel GJ, Stalmeier PFM, Ankum WM. Patient preferences for expectant management vs. surgical evacuation in first-trimester uncomplicated miscarriage. J Clin Epidemiol. 2004 Feb;57(2):167-73.

19. Wallace R, DiLaura A, Dehlendorf C. "Every person's just different": women's experiences with counseling for early pregnancy loss management. Womens Health Issues. 2017;27(4):456-462.

20. Ho PC. Women's perceptions on Medical Abortion. Contraception. 2006 Jul;74(1):11-5.

21. Rayburn WF, Klagholz JC, Murray-Krezan C, Dowell LE, Strunk AL. Distribution of American Congress of Obstetricians and Gynecologists fellows

2022 CP 000093

and junior fellows in practice in the United States. Obstet Gynecol. 2012;119(5):1017-1022.

22. Agency for Healthcare Research and Quality. Primary care workforce facts and stats number 3: Pub. No. 12-P001-4-EF [Internet.]. 2021 Jan [cited 2022 Aug 7]. Available from: https://www.ahrq.gov/sites/default/files/publications/files/pcwork3.pdf

23. Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161-70.

24. Chu JJ, Devall AJ, Beeson LE, Hardy P, Cheed V, et al. Mifepristone and misoprostol versus misoprostol alone for the management of missed miscarriage (MifeMiso): a randomised, double-blind, placebo-controlled trial. Lancet. 2020; 396(10253): 770–778.

25. Neilson JP, Hickey M, Vazquez JC. Medical treatment for early fetal death (less than 24 weeks). Cochrane Database Syst Rev. 2006 Jul 19;2006(3):CD002253.

26. Kim C, Barnard S, Neilson JP, Hickey M, Vazquez JC, Dou L. Medical treatments for incomplete miscarriage. Cochrane Database Syst Rev. 2017 Jan 31;1(1):CD007223.

27. Beaman J, Prifti C, Schwarz EB, Sobota M. Medication to manage abortion and miscarriage. J Gen Intern Med. 2020;35(8):2398–405

28. Ghosh J, Papadopoulou A, Devall AJ, Jeffery HC, Beeson LE, et al. Methods for managing miscarriage: a network meta-analysis. Cochrane Database Syst Rev. 2021 Jun 1;6(6):CD012602.

24

29. Neill S, Goldberg AB, Janiak E. Medication management of early pregnancy loss: the impact of the US Food and Drug Administration Risk Evaluation and Mitigation Strategy [A289]. Obstet Gynecol. 2022 May;139: 83S.

30. Alabama Chemical Abortion Prohibition Act, H.B. 261, Reg. Sess. (Alabama 2022).

31. Unlawful Abortion Medication, HB 2811, Reg. Sess. (Arizona 2022). https://apps.azleg.gov/BillStatus/BillOverview/77880

32. Belluck, P. They had miscarriages, and new abortion laws obstructed treatment [Internet]. The New York Times. 2022 July 17 [cited 2022 July 20]. Available from: https://www.nytimes.com/2022/07/17/health/abortion-miscarriage-treatment.html

33. Murphy T. CVS seeks verification on drugs with possible abortion use [Internet]. AP News. 2022 July 21 [cited 2022 July 21]. Available from: https://apnews.com/article/abortion-us-supreme-court-health-medication-1f2e8da6ac0ff43e0128c683f40689db

34. Sellers F, Nirappil F. Confusion post-Roe spurs delays, denials for some lifesaving pregnancy care [Internet]. The Washington Post. 2022 July 16 [cited 2022 July 20]. Available from: https://www.washingtonpost.com/health/2022/07/16/abortion-miscarriage-ectopic-pregnancy-care/

35. Christensen J. Women with chronic conditions struggle to find medications after abortion laws limit access [Internet]. CNN. 2022 July 22 [cited 2022 July 22].

2022 CP 000095

Available from: https://www.cnn.com/2022/07/22/health/abortion-law-

medications-methotrexate/index.html

36. U.S. Department of Health and Human Services. Office for Civil Rights.

Guidance to Nation's Retail Pharmacies: Obligations under Federal Civil Rights

Laws to Ensure Access to Comprehensive Reproductive Health Care Services.

2022 July 13. Available from: https://www.hhs.gov/sites/default/files/pharmacies-

guidance.pdf

37. U.S. Food and Drug Administration. Center for Drug Evaluation and Research.

Risk Assessment and Risk Mitigation Review(s); Application Number

020687Orig1s020. 2016 March 29. Available from:

https://www.accessdata.fda.gov/drugsatfda_docs/ da/2016/0

20687Orig1s020RiskR.pdf

38. Norris A, Bessett D, Steinberg JR, Kavanaugh ML, De Zodro S, Becker D.

Abortion stigma: a reconceptualization of constituents, causes, and consequences.

Women's Health Issues. 2011; 21(3 Suppl):S49-54.

39. Goldberg AB, Fulcher IR, Fortin J, Hofer RK, Cottrill A, Dthier D, et al.

Mifepristone and misoprostol for undesired pregnancy of unknown location.

Obstet Gynecol 2022;139(5):771-780.

40. Society of Teachers of Family Medicine. [Internet.] EPAs, competencies,

subcompetencies, and milestones. Accessed June 17, 2022. Available from:

https://www.stfm.org/teachingresources/resources/epascompetenciesmilestones/o

verview/#7136

26

41. Accreditation Council for Graduate Medical Education. Obstetrics and Gynecology Milestones. 2021. [cited 2022 September 13.] Available from: https://www.acgme.org/globalassets/pdfs/milestones/obstetricsandgynecologymilestones.pdf

42. Donley G. Medication abortion exceptionalism. Cornell Law Review. 2022;107. U. of Pittsburgh Legal Studies Research Paper No. 2021-09. Posted: 5 Mar 2021 Last revised: 7 Jul 2022.

43. Cohen DS, Connon K. Living in the crosshairs: The untold stories of anti-abortion terrorism. Oxford University Press; 2015.

44. Calloway D, Stulberg DB, Janiak E. Mifepristone restrictions and primary care: Breaking the cycle of stigma through a learning collaborative model in the United States. Contraception. 2021 July; 104(1):24-28.

45. Mokashi M, Boulineaux C, Janiak E, Boozer M, Neill S. "There's only one use for it": stigma as a barrier to mifepristone use for early pregnancy loss in Alabama. [A31]. Obstet Gynecol. 2022 May:139:9S-10S.

46. Razon N, Wulf S, Perez C, McNeil S, Maldonado L, et al. Exploring the impact of mifepristone's risk evaluation and mitigation strategy (REMS) on the integration of medication abortion into US family medicine primary care clinics. Contraception 2022;109(5):19-24.

47. Bearak JM, Burke KL, Jones RK. Disparities and change over time in distance women would need to travel to have an abortion in the USA: a spatial analysis. Lancet Public Health. 2017; 2:e493–500.

27

48. Committee on Health Care for Underserved Women. Health Disparities in Rural Women. American College of Obstetricians and Gynecologists. Obstet Gynecol. 2014;123:384-388.

49. Grossman D, Baba CF, Kaller S, Biggs MA, Raifman S, et al. Medication abortion with pharmacist dispensing of mifepristone. Obstet Gynecol 2021;137(4):613-622

50. Mamedova S, Pawlowksi E. A Description of U.S. adults who are not digitally literate. National Center for Education Statistics. 2018 May 29. Available from: https://nces.ed.gov/pubsearch/pubsinfo.asp?pubid=2018161

51. Health Canada. Regulatory decision summary — Mifegymiso — Health Canada [Internet]. 2017 November 7. Available from: https://hprrps.hres.ca/reg-content/regulatory-decision-summary-detail.php?lang= en&linkID=RDS00294

52. Schummers L, Darling EK, Dunn S, McGrail K, Gayowsky A, et al. Abortion Safety and Use with Normally Prescribed Mifepristone in Canada. N Engl J Med. 2022 Jan 6;386(1):57-67.

2022 CP 000098

*The* N E W E N G L A N D J O U R N A L *of* M E D I C I N E

---

## SPECIAL ARTICLE

# Abortion Safety and Use with Normally Prescribed Mifepristone in Canada

Laura Schummers, Sc.D., Elizabeth K. Darling, Ph.D., Sheila Dunn, M.D.,
Kimberlyn McGrail, Ph.D., Anastasia Gayowsky, M.Sc., Michael R. Law, Ph.D.,
Tracey-Lea Laba, Ph.D., Janusz Kaczorowski, Ph.D.,
and Wendy V. Norman, M.D., M.H.Sc.

---

### ABSTRACT

**BACKGROUND**

In the United States, mifepristone is available for medical abortion (for use with misoprostol) only with Risk Evaluation and Mitigation Strategy (REMS) restrictions, despite an absence of evidence to support such restrictions. Mifepristone has been available in Canada with a normal prescription since November 2017.

**METHODS**

Using population-based administrative data from Ontario, Canada, we examined abortion use, safety, and effectiveness using an interrupted time-series analysis comparing trends in incidence before mifepristone was available (January 2012 through December 2016) with trends after its availability without restrictions (November 7, 2017, through March 15, 2020).

**RESULTS**

A total of 195,183 abortions were performed before mifepristone was available and 84,032 after its availability without restrictions. After the availability of mifepristone with a normal prescription, the abortion rate continued to decline, although more slowly than was expected on the basis of trends before mifepristone had been available (adjusted risk difference in time-series analysis, 1.2 per 1000 female residents between 15 and 49 years of age; 95% confidence interval [CI], 1.1 to 1.4), whereas the percentage of abortions provided as medical procedures increased from 2.2% to 31.4% (adjusted risk difference, 28.8 percentage points; 95% CI, 28.0 to 29.7). There were no material changes between the period before mifepristone was available and the nonrestricted period in the incidence of severe adverse events (0.03% vs. 0.04%; adjusted risk difference, 0.01 percentage points; 95% CI, −0.06 to 0.03), complications (0.74% vs. 0.69%; adjusted risk difference, 0.06 percentage points; 95% CI, −0.07 to 0.18), or ectopic pregnancy detected after abortion (0.15% vs. 0.22%; adjusted risk difference, −0.03 percentage points; 95% CI, −0.19 to 0.09). There was a small increase in ongoing intrauterine pregnancy continuing to delivery (adjusted risk difference, 0.08 percentage points; 95% CI, 0.04 to 0.10).

**CONCLUSIONS**

After mifepristone became available as a normal prescription, the abortion rate remained relatively stable, the proportion of abortions provided by medication increased rapidly, and adverse events and complications remained stable, as compared with the period when mifepristone was unavailable. (Funded by the Canadian Institutes of Health Research and the Women's Health Research Institute.)

From the Department of Family Practice (L.S., W.V.N.) and the Centre for Health Services and Policy Research, School of Population and Public Health (K.M., M.R.L.), University of British Columbia, Vancouver, ICES (L.S., E.K.D., A.G.) and the Department of Obstetrics and Gynecology (E.K.D.), McMaster University, Hamilton, ON, the Department of Family and Community Medicine, University of Toronto, and the Women's College Research Institute, Women's College Hospital, Toronto (S.D.), and the Department of Family and Emergency Medicine, University of Montreal, Montreal (J.K.) — all in Canada; the Centre for Health Economics Research and Evaluation, University of Technology, Sydney (T.-L.L.); and the Department of Public Health, Environments, and Society, Faculty of Public Health and Policy, London School of Hygiene and Tropical Medicine, London (W.V.N.). Dr. Norman can be contacted at wendy.norman@ubc.ca or at the Department of Family Practice, University of British Columbia, 5950 University Blvd., Vancouver, BC, V6T 1Z3, Canada.

This article was published on December 8, 2021, and updated on January 6, 2022, at NEJM.org.

N Engl J Med 2022;386:57-67.
DOI: 10.1056/NEJMsa2109779
*Copyright © 2021 Massachusetts Medical Society.*

57

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000099

*The* NEW ENGLAND JOURNAL *of* MEDICINE

ACCESS TO SAFE ABORTION IS A HUMAN right and a key component of reproductive health, yet inadequate access remains a global concern.[1] A medical abortion regimen of mifepristone and misoprostol has been shown to be safe.[2-4] Mifepristone is approved for use in the United States with Risk Evaluation and Mitigation Strategy (REMS) restrictions[5] (including mandatory prescriber certification, observed dosing, dispensing by the prescriber or medical facility with the exclusion of pharmacies, and submission of a prespecified patient consent form) and elsewhere with similar restricted approvals.[6,7] Professional organizations have called for the removal of REMS restrictions because they impede access to abortion services without improving safety.[8] However, high-quality data with respect to abortion safety and effectiveness when mifepristone is available without REMS-like restrictions are lacking.[9]

Mifepristone was first marketed in Canada in January 2017 as a 200-mg tablet combined with 800 $\mu$g of misoprostol.[10] Approval came more than 15 years after approval in the United States and more than 25 years after similar rulings in France, Sweden, and the United Kingdom.[11] Initially, regulatory restrictions in Canada were similar to REMS restrictions.[12] By November 7, 2017, Canadian regulators had removed these restrictions so that mifepristone could be prescribed and dispensed as a normal prescription medication and had expanded approved use from 49 to 63 days after the patient's last menstrual period.[13] This action resulted in a globally unprecedented practice of permitting any physician or nurse practitioner to prescribe, any pharmacist to dispense, and patients to independently administer mifepristone when, where, and if they chose.[14] Before 2017, medically induced abortions made up only 4% of all abortions in Canada and used off-label regimens of misoprostol with or without methotrexate. These regimens have reduced effectiveness (84 to 97%) and a high risk of teratogenicity if the abortion fails.[4,15]

We compared abortion use, safety, and effectiveness during the period after mifepristone had become available without REMS-like restrictions with the period before mifepristone had been available in Ontario, Canada (representing nearly 40% of the Canadian population).

## METHODS

### DATA SET

In Canada, universal single-payer health care — including coverage for abortion services and management of its complications — is provided by each province or territory. We used linked administrative health data[16] to create a population-based cohort of all female Ontario residents between the ages of 12 and 49 years who had received abortion services from January 1, 2012, to March 15, 2020. We linked records from practitioner visits, all hospital visits, and outpatient prescriptions using a secure data platform at ICES (formerly known as the Institute for Clinical Evaluative Sciences) at McMaster University.[16,17] We excluded events that had occurred within 6 weeks before or after a missed abortion (pregnancy loss without expulsion) or spontaneous abortion (pregnancy loss with expulsion) and those occurring within 6 weeks after delivery at 25 weeks or more of gestation to avoid including procedures that could have been misclassified as abortions. Details regarding the data set are provided in Figure S1 and Table S1 in the Supplementary Appendix, available with the full text of this article at NEJM.org. Ethics approval for the study was granted by the University of British Columbia.

### EXPOSURE AND OUTCOMES

The exposure we examined was the regulatory change that made mifepristone available as a normal prescription. Outcomes included measures of abortion use, safety, and effectiveness.

We evaluated outcomes regarding abortion use that included the abortion rate, which was calculated according to the international standard as the annual number of abortions among female residents between 15 and 49 years of age per 1000 female residents in that age group,[18] the percentage of all abortions that were medically induced, and the percentage of all abortions that were provided at 14 weeks or more of gestation (second-trimester abortion). (In the calculation of the abortion rate, the lower age for female residents was 15 years, as compared with a lower age of 12 years that was used for all other calculations in our study cohort.) Abortion safety outcomes within 6 weeks after abortion were severe adverse

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000100

events, including any blood transfusion, abdominal surgery (laparotomy, laparoscopy, or hysterectomy), admission to an intensive care unit, or sepsis that occurred during a hospitalization associated with an abortion-complication code. Complications of abortion included genital tract or pelvic infection, hemorrhage (delayed or excessive bleeding that complicated complete or incomplete abortion), embolism, shock, renal failure, damage to pelvic organs or tissues (including uterine perforation), venous complications, and other or unspecified complications. Outcomes regarding abortion effectiveness were the incidence of subsequent uterine evacuation (aspiration after medical abortion, reaspiration after surgical abortion, or subsequent abortion procedure), ongoing intrauterine pregnancy continuing until delivery, and ectopic pregnancy diagnosed within 6 weeks after the abortion date. Detailed outcome definitions are provided in Table S1.

### STATISTICAL ANALYSIS

We tabulated the incidence of each outcome according to the mifepristone regulatory period. We then conducted interrupted time-series analysis using segmented generalized mixed-effects regression to compare the expected incidence and trend for each outcome based on the period before mifepristone had become available with the observed level and trend after the availability of mifepristone with a normal prescription. We used log binomial regression to model incidence outcomes and Poisson regression with population offset to calculate the abortion rate; models were adjusted for outcome trends before the approval of mifepristone and accounted for autocorrelation and correlated residuals (File 1 in the Supplementary Appendix).[19,20] We used 6-month moving averages to smooth the resulting estimates. We examined the period from January 1, 2017, through November 6, 2017, descriptively but excluded this period from our models because it included rapid, incremental regulatory changes.[13]

We graphed the observed and expected monthly outcome incidence (quarterly for outcomes with <6 events in any month) following best practices.[21] We estimated risk differences and risk ratios for each outcome by comparing the observed with expected values for September 2019, a time

point selected a priori to balance model stability (greatest in the middle of the study period) and integration of mifepristone into practice (greatest at the end of the study period). We used bootstrapping with 200 samples drawn with replacement to estimate 95% confidence intervals[22] without adjustment for multiple comparisons. All analyses were conducted with the use of SAS software, version 7.51, and R software (code in File 2 in the Supplementary Appendix).

To examine the robustness of our findings to modeling specification, we conducted sensitivity analyses using segmented generalized least-squares regression, with autocorrelation terms selected on the basis of the Durbin–Watson test[23-25] and visual examination of autocorrelation function and partial autocorrelation function residuals.[25] We conducted subgroup analyses that were restricted to first-trimester abortions and then further restricted to first-trimester medical abortions.

## RESULTS

### CHARACTERISTICS OF THE STUDY POPULATION

Of the 314,859 induced abortions in Ontario, Canada, from January 1, 2012, through March 15, 2020, the majority (89.3%) were surgical (with 94.6% performed by means of suction aspiration), approximately 10% were medical abortions, and less than 0.1% were unclassified. Table 1 shows cohort characteristics according to the regulatory period for mifepristone.

### DESCRIPTIVE ANALYSES OF ABORTION OUTCOMES

The abortion rate per 1000 female residents of reproductive age and the incidence of all other outcomes are presented descriptively according to the regulatory period in Table 2. (Components of the composite outcomes are shown in Table S2.) The abortion rate decreased from 11.9 abortions per 1000 female residents between the ages of 15 and 49 years of age before mifepristone had become available to 11.3 per 1000 female residents after mifepristone had become available with a normal prescription. The percentage of all abortions that were provided medically increased from 2.2% before mifepristone had become available to 8.3% while mifepristone was restricted and then to 31.4% after mifepristone had become avail-

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000101

*The* NEW ENGLAND JOURNAL *of* MEDICINE

**Table 1.** Characteristics of Patients Undergoing Medical or Surgical Abortion, According to Period of Availability of Mifepristone.

| Characteristic | Mifepristone Not Available (N = 195,183) | Mifepristone Available with Restrictions (N = 35,644) | Mifepristone Available without Restrictions (N = 84,032) |
|---|---|---|---|
| | January 2012– December 2016 | January 1, 2017– November 6, 2017 | November 7, 2017– March 15, 2020 |
| | *number of patients (percent)* | | |
| Age — yr* | | | |
| <20 | 20,034 (10.3) | 2,969 (8.3) | 6,643 (7.9) |
| 20–24 | 54,346 (27.8) | 9,208 (25.8) | 20,247 (24.1) |
| 25–29 | 47,598 (24.4) | 8,909 (25.0) | 21,717 (25.8) |
| 30–34 | 36,640 (18.8) | 7,369 (20.7) | 17,838 (21.2) |
| ≥35 | 36,565 (18.7) | 7,189 (20.2) | 17,587 (20.9) |
| Nulliparous | 104,824 (53.7) | 19,030 (53.4) | 45,902 (54.6) |
| Neighborhood income† | | | |
| Lowest quintile | 55,076 (28.2) | 9,737 (27.3) | 22,360 (26.6) |
| Highest quintile | 24,852 (12.7) | 4,603 (12.9) | 11,075 (13.2) |
| Neighborhood ethnic concentration‡ | | | |
| Highest quintile | 82,143 (42.1) | 14,627 (41.0) | 33,600 (40.0) |
| Lowest quintile | 19,424 (10.0) | 3,552 (10.0) | 8,451 (10.1) |
| Rural residence§ | 11,709 (6.0) | 2,174 (6.1) | 5,195 (6.2) |

* Trends regarding the patient's age at which abortion was performed in Ontario continued a historic gradual and steady increase over the study period, which was consistent with an increase in age in the population-based trends during this period.
† The neighborhood income quintile was drawn from the Registered Persons Database file from the Institute for Clinical Evaluative Sciences and was defined on the basis of the Nearest Census-Based Neighborhood Income Quintile from Census Canada.
‡ The neighborhood ethnic concentration, which is part of the Ontario Marginalization Index,[26] refers to high area-level percentages of recent immigrants and persons belonging to a "visible minority" group, which was defined by Statistics Canada as "persons, other than aboriginal peoples, who are non-Caucasian in race or non-white in color." The highest concentration of such residents is the top quintile, and the lowest concentration is the lowest quintile.
§ Rural residence is defined as all territory lying outside population centers.

able with a normal prescription. The rate of second-trimester abortions declined from 5.5% of all abortions to 5.1% after the availability of mifepristone with a normal prescription.

Abortion safety outcomes remained stable during the period before mifepristone had become available and during the period after its availability with a normal prescription (severe adverse events, 0.03% and 0.04%, respectively; and abortion complications, 0.67% and 0.74%, respectively). Subsequent uterine evacuation increased from 1.0% to 2.2%, and ongoing intrauterine pregnancy continuing until delivery increased from 0.03% to 0.08%. Ectopic pregnancy that was detected after abortion increased from 0.15% to 0.22%.

**TIME-SERIES ANALYSES OF ABORTION OUTCOMES**

Interrupted time-series graphs of abortion-use outcomes are presented in Figure 1, abortion safety outcomes in Figure 2, and abortion-effectiveness outcomes in Figure 3. Adjusted risk differences and risk ratios from these models comparing the period before mifepristone had become available with the nonrestricted period are presented in Table 2.

During the study period, the abortion rate continued an absolute decline, although as compared with the trend before the approval of mifepristone, we noted an increase of 1.2 abortions per 1000 female residents (95% confidence interval [CI], 1.1 to 1.4) over the predicted rate.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000102

**Table 2. Safety and Effectiveness of 314,859 Abortions Provided during the Study Period.***

| Outcome | Mifepristone Not Available (N=195,183) January 2012–December 2016 | Mifepristone Available with Restrictions (N=35,644) January 1, 2017–November 6, 2017 | Mifepristone Available without Restrictions (N=84,032) November 7, 2017–March 15, 2020 | Adjusted Risk Difference (95% CI)† | Adjusted Risk Ratio (95% CI) |
|---|---|---|---|---|---|
| Abortions provided | | | | | |
| No. of female residents in age cohort | 3,268,428 | 3,272,448 | 3,312,061 | | |
| Annual rate of abortion per 1000 female residents in age cohort‡ | 11.9 | 10.9 | 11.3 | 1.2 (1.1 to 1.4) | 1.1 (1.1 to 1.2) |
| Type of abortion — no. (%) | | | | | |
| Medical abortion | 4,307 (2.2) | 2,962 (8.3) | 26,434 (31.4) | 28.8 (28.0 to 29.7) | 5.3 (4.7 to 5.9) |
| Second-trimester abortion at ≥14 wk of gestation | 10,830 (5.5) | 2,072 (5.8) | 4,300 (5.1) | −0.22 (−0.63 to 0.19) | 0.96 (0.88 to 1.04) |
| Abortion safety — no. (%) | | | | | |
| Severe adverse events§ | 53 (0.03) | 9 (0.03) | 29 (0.04) | 0.01 (−0.06 to 0.03) | 1.2 (0.4 to 3.4) |
| Complications¶ | 1,434 (0.74) | 239 (0.67) | 578 (0.69) | 0.06 (−0.07 to 0.18) | 1.1 (0.9 to 1.3) |
| Ongoing pregnancy — no. (%) | | | | | |
| Subsequent uterine evacuation‖ | 2,029 (1.0) | 518 (1.5) | 1,882 (2.2) | 1.1 (0.9 to 1.3) | 2.0 (1.7 to 2.3) |
| Ongoing pregnancy continuing until delivery | 51 (0.03) | 15 (0.04) | 70 (0.08) | 0.08 (0.04 to 0.10) | 7.8 (2.2 to 33.6) |
| Ectopic pregnancy detected after abortion | 289 (0.15) | 57 (0.16) | 182 (0.22) | −0.03 (−0.19 to 0.09) | 0.88 (0.54 to 1.40) |

\* Adjusted risk differences and risk ratios are for the period after mifepristone was available without restrictions as compared with the period before mifepristone was available. The calculations were performed by means of interrupted time-series segmented regression analyses among all surgical and medical abortions after adjustment for outcome trends during the period before mifepristone had been available. CI denotes confidence interval.

† The adjusted risk difference is shown in percentage points for all categories except for the abortion rate per 1000 female residents.

‡ The annual abortion rate was calculated as the number of abortions provided among female residents between the ages of 15 and 49 years per 1000 female residents in the same age cohort in the population per year.

§ Severe adverse events included blood transfusion, abdominal surgery (laparotomy, laparoscopy, and hysterectomy), admission to an intensive care unit, or sepsis, all concurrent with an abortion complication. A detailed definition is provided in Table S1 in the Supplementary Appendix.

¶ Abortion complications included incomplete or complete abortion complicated by infection, hemorrhage, embolism, damage to pelvic organs, venous complications, or other complications after an induced abortion.

‖ Subsequent uterine evacuation included aspiration, reaspiration, or subsequent abortion procedure in the same pregnancy.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000103

The NEW ENGLAND JOURNAL of MEDICINE



**Figure 1. Changes in the Percentages of Medical and Second-Trimester Abortions among All Abortions and in Abortion Rates.**

Shown are the results of interrupted time-series analyses of the level and trend of abortion outcomes in Ontario, Canada, among all surgical and medical abortions that were provided before the introduction of mifepristone in the province (2012 through 2016), after the introduction but with Risk Evaluation and Mitigation Strategy (REMS)–like restrictions (January 1, 2017, through November 6, 2017), and after a regulatory change to remove restrictions, which made mifepristone available by normal prescription (November 7, 2017, through March 15, 2020). Panel A shows the percentage of all abortions that were performed medically at any gestational age. Panel B shows the annual abortion rate among female residents between the ages of 15 and 49 years per 1000 female residents in the same age group in the population. Panel C shows the percentage of second-trimester abortions (≥14 weeks of gestation) among all abortions. In Panels B and C, the insets show the same data on an expanded y axis; shading indicates 95% confidence intervals. The expected outcomes if mifepristone had not been available were estimated from segmented mixed-effects models (log binomial regression in Panels A and C and Poisson regression with population offset in Panel B) and smoothed with the use of a 6-month moving-average function.

The proportion of all abortions that were medical increased by an adjusted risk difference of 28.8 percentage points (95% CI, 28.0 to 29.7). The rate of second-trimester abortions showed a stable, continuous decline (adjusted risk difference, −0.22 percentage points; 95% CI, −0.63 to 0.19). Abortion safety outcomes were materially stable, with an adjusted risk difference of 0.01 percentage points (95% CI, −0.06 to 0.03) for severe adverse events and 0.06 percentage points (95% CI, −0.07 to 0.18) for complications. The rate of subsequent uterine evacuation increased modestly, with an adjusted risk difference of 1.1 percentage points (95% CI, 0.91 to 1.3), and the rate of ongoing intrauterine pregnancy that continued until delivery increased by 0.08 percentage points (95% CI, 0.04 to 0.10). The rate of ectopic pregnancy that was detected after abortion was materially stable, with an adjusted risk difference of −0.03 percentage points (95% CI, −0.19 to 0.09).

Interrupted time-series graphs from generalized least-squares regression with the use of

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000104

aggregated monthly data showed the robustness of the findings to modeling specification (Figs. S2, S3, and S4). Changes in outcome incidences and trends after mifepristone availability with a normal prescription were consistent for all outcomes except for the percentage of second-trimester abortions, for which aggregated models indicated a slight reduction (−0.92 percentage points; 95% CI, −1.40 to −0.48).

### OUTCOMES AFTER FIRST-TRIMESTER ABORTION

Outcome incidences among all first-trimester abortions are presented in Tables S3 and S4 and Figures S5, S6, and S7; outcomes among first-trimester medical abortions are provided in Tables S5 and S6. The percentage of first-trimester abortions that were performed medically increased from 1.6% before mifepristone was available to 32.4% after mifepristone was available without restrictions. Severe adverse events were rare among first-trimester medical abortions (<6 events per 25,744 abortions [too infrequent to report exact incidence]), the incidence of abortion complications was 0.76%, and the incidence of subsequent uterine evacuation was 4.5%. Similarly, ongoing intrauterine pregnancy was uncommon, with 0.13% continuing to delivery. Ectopic pregnancy detected after abortion that occurred with any severe adverse event was also rare (<6 per 314,859 abortions).

### DISCUSSION

We comprehensively examined changes in abortion use, safety, and effectiveness during the period when mifepristone had become available without REMS-like restrictions in a population-based cohort of abortion service users in Ontario, Canada. We found that after mifepristone had become available with a normal prescription dispensed by pharmacists and taken at user discretion, abortion rates were materially stable, medical abortion uptake was rapid, and abortion-related adverse events and ectopic pregnancy remained rare, as compared with before mifepristone had been available.

The modestly slower decline in the abortion rate, relative to the expected decline based on the trend before mifepristone had become available, may be due in part to the provision of abortion earlier in pregnancy. Since 4 to 7% of pregnancies per week in the first trimester[27] end in



**A** Severe Adverse Event



**B** Abortion Complication

**Figure 2. Changes in Abortion Safety Outcomes.**
Shown are the results of interrupted time-series analyses of the level and trend of abortion safety in Ontario, Canada, among all surgical and medical abortions provided during the study period. Panel A shows the incidence of severe adverse events, which included any blood transfusion, abdominal surgery (laparotomy, laparoscopy, or hysterectomy), admission to an intensive care unit, or sepsis that occurred during a hospitalization associated with an abortion-complication code. Panel B shows abortion complications, which included genital tract or pelvic infection, hemorrhage, embolism, shock, renal failure, damage to pelvic organs or tissues, venous complications, and other or unspecified abortion complications. In Panel A, the inset shows the same data on an expanded y axis; shading indicates 95% confidence intervals.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000105

The NEW ENGLAND JOURNAL of MEDICINE



— Observed model   ---- Expected trend before mifepristone approval

**Figure 3. Abortion Effectiveness and Ongoing Pregnancy Outcomes.**

Shown are the results of interrupted time-series analyses of the level and trend of ongoing pregnancy outcomes among all surgical and medical abortions provided during the study period. These outcomes include the incidences of uterine evacuation after abortion (Panel A), ongoing intrauterine pregnancy continuing until delivery (Panel B), and ectopic pregnancy detected after abortion (Panel C). Shading indicates 95% confidence intervals.

spontaneous abortion, the availability of abortion at earlier gestational ages would increase the abortion rate by enabling termination of pregnancy before the occurrence of miscarriage, even in the absence of a true increase in demand for abortion. The availability of mifepristone without restrictions may have slowed the decline in the abortion rate through improved abortion access, a hypothesis that is consistent with findings that restrictive policies regarding the prescription of mifepristone worsen access to abortion[28] and that abortion rates increase when access improves.[29] Because we did not measure pregnancy intention in our study, we cannot differentiate trend changes in unintended pregnancy from changes in the fraction of pregnancies that were terminated. Our findings indicate that improved abortion access was not associated with a material increase in the abortion rate.

The uptake of mifepristone for medical abortion under Canada's unrestricted regulations was faster than reported in settings with restrictive regulations. Although more than one third of abortions in Ontario were medically induced 2 years after mifepristone had been available as a normal prescription, 5.2% of abortions in the United States were medically induced 2 years after mifepristone availability, with the percentage slowly increasing to 39.0% 17 years after availability.[2] Similarly slower uptake has been reported in European settings that have mifepristone restrictions, even among those where mifepristone had been introduced long after best practice guidelines had been established.[30]

Our findings indicate that abortion remained safe and ongoing pregnancy remained infrequent after unrestricted access to mifepristone.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000106

Without observed administration, some patients with a prescription for mifepristone may have never used it.[9] However, the infrequent occurrence of ongoing intrauterine pregnancy indicates that patients who received mifepristone most often correctly used the medication without supervision.[31] Our abortion safety and effectiveness findings are consistent with the results of recent studies examining patient-reported outcomes during the coronavirus disease 2019 pandemic, when REMS-like restrictions were temporarily removed in some settings.[9,32,33] A study involving 52,142 patients in the United Kingdom showed no material differences in success rates or serious adverse events between abortions provided under REMS-like restrictions and a telemedicine-hybrid model with investigations such as ultrasonography performed only when indicated.[33]

The small increase in the incidence of ectopic pregnancy that was detected after unrestricted access to mifepristone was consistent with the increasing trend before the availability of mifepristone, which indicated no increase over the expected incidence. A 2012 cross-sectional survey of abortion providers in the United States and Canada showed that more than 90% of providers routinely performed ultrasonography before abortion,[34] even though the value of such imaging in the absence of known ectopic risks or symptoms had not been shown.[2,35] Ectopic pregnancy is more likely to be detected after abortion that is provided at earlier stages of gestation before a clinical or ultrasonographic diagnosis. Because undiagnosed ectopic pregnancy can lead to tubal rupture and death,[36] identifying ectopic pregnancy before the onset of complications with the use of clear clinical protocols[2,4] is essential, although such procedures do not need to be performed before the initiation of medical abortion.[33]

Our safety and ongoing pregnancy findings among first-trimester medical abortions during the period after unrestricted access to mifepristone were consistent with reports from other settings with restricted access.[2,4] In settings with REMS-like restrictions, first-trimester medical abortions resulted in major adverse events in 0.3 to 0.5% of women[2,4,31] and blood transfusion in 0.04 to 0.10%.[4,31] Among medical abortions performed up to 63 days after the last menstrual period, subsequent uterine evacuation occurred in 2.0 to 4.8% of patients and ongoing intrauterine pregnancy in 0.5 to 2.0%.[2,4] In our study among first-trimester abortions, severe adverse events were too infrequent to report an incidence value, 0.04% of the patients underwent blood transfusion, 4.5% underwent uterine evacuation, and 0.13% had an ongoing pregnancy continuing to delivery. Although the incidence of uterine evacuation was increasing before mifepristone had become available, the expected incidence trend after the availability of mifepristone leveled off because of the more rapid increase in the number of abortions (the denominator). Because subsequent uterine evacuation is substantially more frequent after medical abortion than after surgical procedures (<3.0%),[4,37] a practice shift to more medical abortions is expected to increase the incidence of this outcome.

Our study has several potential limitations. The fundamental assumption underlying the validity of interrupted time-series analysis is that outcome trends before the exposure of interest would have continued if the exposure had not occurred. This assumption does not hold if other policy, practice, or contextual changes that may have an effect on outcome incidence occur concurrent to the exposure of interest.[20] However, this analytic approach is robust with respect to changes in the individual-level characteristics of patients or provider practices that accrue gradually over the study period, since such changes are accounted for in trend regression terms during the period before mifepristone had become available. Careful review of policies, academic literature, practice guidelines, and media output that are related to abortion during the study period identified no concurrent changes that would have invalidated our analytic approach. Practitioner fees, training programs, administrative data codes, and cost coverage for the drug were stable during the study period. Surveys and interviews among practitioners indicate that initial mifepristone restrictions were barriers to broad adoption of this practice.[13,38] The short period during which mifepristone was available in Canada with REMS-like restrictions (January 1 to November 6, 2017) precludes a formal analysis of mifepristone

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000107

*The* NEW ENGLAND JOURNAL *of* MEDICINE

availability with restrictions as compared with such availability without restrictions. The unrestricted availability of mifepristone appears to be the fundamental factor associated with changes in our study outcomes.

Our prescription database universally captured mifepristone prescriptions that were dispensed after August 10, 2017 (when a universal no-cost subsidy was introduced) but only captured mifepristone prescriptions from January to August 9, 2017, among patients with income-based prescription subsidies and those under 25 years of age. These factors may have contributed to an underestimation of early mifepristone uptake. However, this limitation was mitigated by our identification of medical abortions using data regarding practitioner payments, procedures, and prescriptions, along with our exclusion of these months from our time-series analysis. Our population-based data comprehensively captured all abortions among Ontario residents, as well as all subsequent hospital or health service events, even if such services were not provided by the same provider or facility that provided the initial care. Therefore, loss to follow-up was minimal since it involved only patients who had moved out of the province within 6 weeks after the abortion or during the current pregnancy. However, since linkages across databases are possible only for residents who are eligible for provincial health insurance, we excluded the 397 abortions (0.1%) that were provided to nonresidents. Because of lags in availability of cause-of-death data, we could not report the incidence of abortion-related deaths. However, surveillance by the U.S. Centers for Disease Control and Prevention indicates that death is a very rare outcome (2 deaths among 609,095 abortions in 2018).[39] Although minimal data were missing for gestational trimester, we did not have data regarding specific gestational ages in weeks, which prevented an evaluation of changes to abortion timing within trimesters.

When mifepristone became available as a normally prescribed medication in Canada, the frequency of medical abortion rose substantially as compared with the frequency during the period before mifepristone became available, even though the rate of abortion remained materially stable. The incidences of serious adverse events and complications remained materially unchanged, and uterine evacuation and ongoing pregnancy remained infrequent.

Parts of this material are based on data and information compiled and provided by the Ontario Ministry of Health and the Canadian Institute for Health Information. The analyses, conclusions, opinions, and statements expressed in this article are solely those of the authors and do not reflect those of the funding or data sources.

Supported by a grant (PJT-168964) from the Canadian Institutes of Health Research and by a grant from the Women's Health Research Institute of the Provincial Health Services Authority of British Columbia.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

We thank staff members at ICES, which is supported by the Government of Ontario Ministry of Health and the Ministry of Long-Term Care, for their assistance with data management; staff members at IQVIA Solutions Canada for use of their Drug Information File; and our fellow members of the Canadian Contraception and Abortion Research Team for their contributions to the study.

**REFERENCES**

**1.** United Nations High Commissioner for Human Rights. Information series on sexual and reproductive health and rights: abortion. 2020 (https://www.ohchr.org/Documents/Issues/Women/WRGS/SexualHealth/INFO_Abortion_WEB.pdf).
**2.** Creinin MD, Grossman DA. Medication abortion up to 70 days of gestation: ACOG practice bulletin, number 225. Obstet Gynecol 2020;136(4):e31-e47.
**3.** Kulier R, Kapp N, Gülmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev 2011;11: CD002855.
**4.** Costescu D, Guilbert E, Bernardin J, et al. Medical abortion. J Obstet Gynaecol Can 2016;38:366-89.
**5.** Mifeprex REMS Study Group. Sixteen years of overregulation: time to unburden mifeprex. N Engl J Med 2017;376:790-4.
**6.** Gissler M, Fronteira I, Jahn A, et al. Terminations of pregnancy in the European Union. BJOG 2012;119:324-32.
**7.** Baird B. Medical abortion in Australia: a short history. Reprod Health Matters 2015;23:169-76.
**8.** American College of Obstetricians and Gynecologists. Improving access to mifepristone for reproductive health indications. June 2018 (https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications).
**9.** Gambir K, Garnsey C, Necastro KA, Ngo TD. Effectiveness, safety and acceptability of medical abortion at home versus in the clinic: a systematic review and meta-analysis in response to COVID-19. BMJ Glob Health 2020;5(12):e003934.
**10.** Grant K. Long-awaited abortion pill Mifegymiso makes Canadian debut. Globe and Mail. January 20, 2017 (https://beta.theglobeandmail.com/news/national/long-awaited-abortion-pill-mifegymiso-rolls-out-in-canada/article33695167/?ref=http://www.theglobeandmail.com&).
**11.** Gynuity Health Projects. Map of mifepristone approvals. June 2017 (http://gynuity.org/resources/info/map-of-mifepristone-approvals/).
**12.** Health Canada. Regulatory decision summary: Mifegymiso. 2015 (https://cart-grac.ubc.ca/np-mifepristone-study/regulatory-decision-summary-sbd_-mifegymiso-2015-health-canada/?login).
**13.** Munro S, Guilbert E, Wagner M-S, et al. Perspectives among Canadian physicians on factors influencing implementation of mifepristone medical abortion: a national qualitative study. Ann Fam Med 2020;18: 413-21.

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000108

ABORTION USE WITH MIFEPRISTONE IN CANADA

**14.** Health Canada. Regulatory decision summary — Mifegumiso — Health Canada. November 7, 2017 (https://hpr-rps .hres.ca/reg-content/regulatory-decision -summary-detail.php?lang=en&linkID= RDS00294).

**15.** Guilbert ER, Hayden AS, Jones HE, et al. First-trimester medical abortion practices in Canada: National survey. Can Fam Physician 2016;62(4):e201-e208.

**16.** ICES. Mission, vision & values (https:// www.ices.on.ca/About-ICES/Mission-vision -and-values).

**17.** Samiedaluie S, Peterson S, Brant R, Kaczorowski J, Norman WV. Validating abortion procedure coding in Canadian administrative databases. BMC Health Serv Res 2016;16:255.

**18.** World Health Organization. Women of reproductive age (15-49) population (thousands). April 12, 2021 (https://www .who.int/data/maternal-newborn-child -adolescent-ageing/indicator-explorer -new/mca/women-of-reproductive-age -(15-49-years)-population-(thousands)).

**19.** Saeed S, Moodie EEM, Strumpf EC, Klein MB. Segmented generalized mixed effect models to evaluate health outcomes. Int J Public Health 2018;63:547-51.

**20.** Bernal JL, Cummins S, Gasparrini A. Interrupted time series regression for the evaluation of public health interventions: a tutorial. Int J Epidemiol 2017;46:348-55.

**21.** Turner SL, Karahalios A, Forbes AB, et al. Creating effective interrupted time series graphs: review and recommendations. Res Synth Methods 2021;12:106-17.

**22.** Haukoos JSLR, Lewis RJ. Advanced statistics: bootstrapping confidence intervals for statistics with "difficult" distributions. Acad Emerg Med 2005;12:360-5.

**23.** Hategeka C, Ruton H, Karamouzian M, Lynd LD, Law MR. Use of interrupted time series methods in the evaluation of health system quality improvement interventions: a methodological systematic review. BMJ Glob Health 2020;5(10):e003567.

**24.** Nelson BK. Statistical methodology. V. Time series analysis using autoregressive integrated moving average (ARIMA) models. Acad Emerg Med 1998;5:739-44.

**25.** Wagner AK, Soumerai SB, Zhang F, Ross-Degnan D. Segmented regression analysis of interrupted time series studies in medication use research. J Clin Pharm Ther 2002;27:299-309.

**26.** Matheson FI, van Ingen T. 2011 Ontario marginalization index: technical document. Toronto: St. Michael's Hospital, November 2017 (https://www .publichealthontario.ca/-/media/ documents/on-marg-technical.pdf?la=en).

**27.** Ammon Avalos L, Galindo C, Li D-K. A systematic review to calculate background miscarriage rates using life table analysis. Birth Defects Res A Clin Mol Teratol 2012;94:417-23.

**28.** Brown BP, Hebert LE, Gilliam M, Kaestner R. Association of highly restrictive state abortion policies with abortion rates, 2000–2014. JAMA Netw Open 2020; 3(11):e2024610.

**29.** Ferris LE, McMain-Klein M. Small-area variations in utilization of abortion services in Ontario from 1985 to 1992. CMAJ 1995;152:1801-7.

**30.** Berard V, Fiala C, Cameron S, Bombas T, Parachini M, Gemzell-Danielsson K. Instability of misoprostol tablets stored outside the blister: a potential serious concern for clinical outcome in medical abortion. PLoS One 2014;9(12):e112401.

**31.** Cleland K, Creinin MD, Nucatola D, Nshom M, Trussell J. Significant adverse events and outcomes after medical abortion. Obstet Gynecol 2013;121:166-71.

**32.** Chong E, Shochet T, Raymond E, et al. Expansion of a direct-to-patient telemedicine abortion service in the United States and experience during the COVID-19 pandemic. Contraception 2021;104:43-8.

**33.** Aiken A, Lohr PA, Lord J, Ghosh N, Starling J. Effectiveness, safety and acceptability of no-test medical abortion (termination of pregnancy) provided via telemedicine: a national cohort study. BJOG 2021;128:1464-74.

**34.** Jones HE, O'Connell White K, Norman WV, Guilbert E, Lichtenberg ES, Paul M. First trimester medication abortion practice in the United States and Canada. PLoS One 2017;12(10):e0186487.

**35.** Kulier R, Kapp N. Comprehensive analysis of the use of pre-procedure ultrasound for first- and second-trimester abortion. Contraception 2011;83:30-3.

**36.** Grimes DA. Estimation of pregnancy-related mortality risk by pregnancy outcome, United States, 1991 to 1999. Am J Obstet Gynecol 2006;194:92-4.

**37.** Costescu D, Guilbert É. No. 360 — induced abortion: surgical abortion and second trimester medical methods. J Obstet Gynaecol Can 2018;40:750-83.

**38.** Devane C, Renner RM, Munro S, et al. Implementation of mifepristone medical abortion in Canada: pilot and feasibility testing of a survey to assess facilitators and barriers. Pilot Feasibility Stud 2019;5: 126.

**39.** Kortsmit K, Jatlaoui TC, Mandel MG, et al. Abortion surveillance — United States, 2018. MMWR Surveill Summ 2020; 69(7):1-29.

*Copyright © 2021 Massachusetts Medical Society.*

The New England Journal of Medicine
Downloaded from nejm.org at FDA Library on January 6, 2024. For personal use only. No other uses without permission.
Copyright © 2022 Massachusetts Medical Society. All rights reserved.

2022 CP 000109



Maureen G. Phipps, MD, MPH, FACOG
American College of Obstetricians and Gynecologists
409 12th Street SW
Washington, DC 20024

January 3, 2023

Re: Docket No. FDA-2022-P-2425

Dear Dr. Phipps:

This letter responds to your citizen petition submitted to the Food and Drug Administration (FDA or Agency) on October 4, 2022, on behalf of the American College of Obstetricians and Gynecologists and 48 other organizations (Petition). In the Petition, you request that FDA:

(1) Ask Danco Laboratories, LLC, the holder of the approved new drug application (NDA) for Mifeprex (mifepristone) (NDA holder), to submit a supplemental new drug application (sNDA) that seeks to add miscarriage management as an indication to the drug's labeling, and to eliminate or modify mifepristone's risk evaluation and mitigation strategy (REMS) so that it is not unduly burdensome for that use

(2) Immediately exercise enforcement discretion with respect to the use and distribution of mifepristone for miscarriage management without complying with the REMS

We have carefully considered the Petition and other information available to us. For the reasons stated below, the Petition is denied.

## I.      BACKGROUND

On September 28, 2000, FDA approved Mifeprex for the medical termination of intrauterine pregnancy through 49 days' pregnancy (NDA 020687). The application was approved under part 314, subpart H (21 CFR part 314, subpart H); specifically, § 314.520 of subpart H provides for approval with restrictions that are needed to assure the safe use of the drug product. In accordance with § 314.520, FDA restricted the distribution of Mifeprex as specified in the September 2000 approval letter.[1]

Subsequently, Mifeprex was identified as one of the products that was deemed to have in effect an approved REMS under the Food and Drug Administration Amendments Act of 2007 (FDAAA) because on the effective date of Title IX, subtitle A of FDAAA (March 28, 2008), Mifeprex had in effect

---

[1] See https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2000/20687appltr.pdf.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20993
www.fda.gov

elements to assure safe use.[2]  Accordingly, in June 2011, we approved a REMS for Mifeprex, consisting of a Medication Guide, elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

On March 29, 2016, we approved an efficacy supplement (S-020) to NDA 020687 for Mifeprex submitted by the NDA holder. The approval included changes in the dose of Mifeprex and the dosing regimen for taking Mifeprex and misoprostol (including the dose of misoprostol and a change in the route of misoprostol administration from oral to buccal (in the cheek pouch); the interval between taking Mifeprex and misoprostol; and the location at which the patient may take misoprostol).  The approval also modified the gestational age up to which Mifeprex has been shown to be safe and effective (through 70 days gestation), as well as the process for follow-up after administration of the drug.

On April 11, 2019, we approved GenBioPro, Inc.'s generic version of Mifeprex, Mifepristone Tablets, 200 milligrams (mg) (abbreviated new drug application 091178). As required by 21 CFR 314.94(a)(8), the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, has the same labeling (with certain permissible differences) as the brand product it references, Mifeprex.[3]

At the same time that FDA approved the generic version of Mifeprex in 2019, FDA approved a supplemental new drug application for Mifeprex, approving modifications to the existing, approved REMS for Mifeprex to establish a single, shared system REMS for mifepristone products for the medical termination of intrauterine pregnancy through 70 days gestation (referred to as the Mifepristone REMS Program).  In January 2023, FDA approved another supplemental new drug application, approving modifications to the Mifepristone REMS Program to remove the requirement that mifepristone be dispensed to patients by or under the supervision of a certified prescriber only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to as the in-person dispensing requirement) and to add a pharmacy certification requirement.

## II.    DISCUSSION

### A.  Adding a New Indication to Mifeprex

In your Petition, you request that the Agency ask the NDA holder for Mifeprex to submit an sNDA that seeks to add miscarriage management as an indication to the drug's labeling (Petition at 1).[4]

---

[2] 73 FR 16313 (Mar. 27, 2008).

[3] We note that Korlym and the generic version of Korlym (Mifepristone Tablets, 300 mg) contain the same active ingredient – mifepristone – as Mifeprex and the generic version of Mifeprex (Mifepristone Tablets, 200 mg). Although these drug products contain the same active ingredient, their intended uses target different receptors, and the products have different strengths and use different dosing regimens.  Korlym and the generic version of Korlym are approved for the control of hyperglycemia (high blood sugar levels) due to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes or glucose intolerance, and have failed surgery or are not candidates for surgery.  References to mifepristone in this response refer to the use of mifepristone for the medical termination of intrauterine pregnancy through 70 days gestation, unless otherwise noted.

[4] Your reference to FDA's request for submissions of NDAs to add an emergency contraception indication to certain combined oral contraceptives as precedent for FDA requesting that the NDA holder for Mifeprex add a management of miscarriage indication to its labeling is not on point (Petition at 1, footnote 1).  The circumstances under which FDA made this request to manufacturers of oral contraceptives – which included unanimous backing by the

2022 CP 000111

Docket No. FDA-2022-P-2425

The Federal Food, Drug, and Cosmetic Act (FD&C Act) and FDA regulations require that a person seeking to market a new drug, including a new indication for an approved drug, submit an application to FDA for review.[5] To support the addition of a new indication to a drug product's FDA-approved labeling, the holder of the NDA for the drug product would submit a supplemental application requesting a new indication.[6] FDA would approve a supplemental application only if the Agency finds that the drug product is safe and effective for the proposed indication.[7]

Only the holder of an approved application may submit a supplement to an application.[8] Therefore, if the person seeking a new indication for an approved drug product is not the application holder for the drug, that person would need to submit a separate, original application for approval of a new drug with the new indication.[9]

To support a finding of safety and effectiveness for a new indication, FDA would require, among other information, that an applicant provide adequate data and information to support the new indication. The applicant must establish effectiveness of the drug for the proposed indication and the application (whether an original application or a supplemental application) generally would contain data and information adequate to support a determination that the drug is safe and effective under the conditions of use specified in the labeling.

If the NDA holder for Mifeprex chooses to submit an sNDA to add an indication for miscarriage management to the Mifeprex labeling, the Agency will review such application consistent with the FD&C Act, FDA regulations, and our standard process for sNDAs. In addition, any person may submit an original new drug application requesting approval of mifepristone for miscarriage management.[10] As with all products, FDA is open to meeting with interested parties to discuss the potential submission of an application. In addition, it is our understanding that the NDA holder for Mifeprex is aware of your Petition, including the request to add miscarriage management as an indication to the drug's labeling.[11]

For these reasons, we deny your request that we ask the NDA holder for Mifeprex to submit an sNDA that seeks to add miscarriage management as an indication to the drug's labeling.

---

Advisory Committee for Reproductive Health Drugs in addition to specific findings by FDA based on literature and experience with approved combined oral contraceptive products – do not exist here.

[5] Section 505(a) of the FD&C Act (21 U.S.C. 355(a)) and 21 CFR part 314.

[6] §§ 314.71(b) and 314.50(d)(5). See also FDA final guidance, *Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees* (Dec. 2004), at 6. We update guidances periodically. For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/regulatory-information/search-fda-guidance-documents.

[7] See section 505(d) of the FD&C Act.

[8] § 314.71(a).

[9] An application submitted under section 505(b)(1) of the FD&C Act, also called a "stand-alone NDA," requires that the application contain, among other information, "full reports of investigations" to show that the drug is safe and effective for its intended use.

[10] See section 505(b)(1) and (2) of the FD&C Act.

[11] See https://www.reuters.com/business/healthcare-pharmaceuticals/doctors-urge-us-fda-add-miscarriage-management-abortion-pill-label-2022-10-04/.

2022 CP 000112

Docket No. FDA-2022-P-2425

B.    Mifepristone REMS Program

In your Petition, you ask that FDA eliminate or modify the Mifepristone REMS Program so that it is not unduly burdensome for a miscarriage management indication (Petition at 1).  Because the management of miscarriage is not a currently approved indication for mifepristone, it would be premature for FDA to consider the impact that the addition of this indication would have, if any, on the Mifepristone REMS Program so that it is not unduly burdensome for that use.

For these reasons, we deny your request that we eliminate or modify the Mifepristone REMS Program so that it is not unduly burdensome for a miscarriage management indication.

In your Petition, you also request that FDA immediately exercise enforcement discretion with respect to the use and distribution of mifepristone for miscarriage management without complying with the REMS (Petition at 1).

The action you seek may not properly be the subject of a citizen petition under FDA's regulations. Under 21 CFR 10.30, a person may petition the Agency to issue, amend, or revoke a regulation or order or to take or refrain from taking any other form of administrative action. FDA regulations in 21 CFR 10.3 define "administrative action" as "every act, including the refusal or failure to act, involved in the administration of any law by the Commissioner, except that it does not include the referral of apparent violations to U.S. attorneys for the institution of civil or criminal proceedings or an act in preparation of a referral." Similarly, under 21 CFR 10.30(k), citizen petitions may not be used with respect to "referral of a matter to a United States attorney for the initiation of court enforcement action and related correspondence." Agency decisions to take, or to refrain from taking, enforcement action are decisions related to the "referral of apparent violations to U.S. attorneys for the institution of civil or criminal proceedings, or acts in preparation of such referrals" and therefore are not properly the subject of a citizen petition.

For these reasons, your request that FDA immediately exercise enforcement discretion with respect to the use and distribution of mifepristone for miscarriage management without complying with the Mifepristone REMS Program is denied.

## III.    CONCLUSION

For the reasons explained above, we deny your Petition.

Sincerely,

Patrizia A.
Cavazzoni -S

Digitally signed by
Patrizia A. Cavazzoni -S
Date: 2023.01.03
18:47:23 -05'00'

Patrizia Cavazzoni, M.D.
Director
Center for Drug Evaluation and Research

4

2022 CP 000113

JGIM

## REVIEWS

# Medication to Manage Abortion and Miscarriage



Check for updates

*Jessica Beaman, MD MPH[1], Christine Prifti, MD[2], Eleanor Bimla Schwarz, MD MS[3], and Mindy Sobota, MD MS MPhil[4]*

[1]Department of Medicine, University of California San Francisco, CA, USA; [2]Department of Medicine, Boston Medical CenterBoston, MA, USA; [3]Department of Medicine, University of California, DavisDavis, CA, USA; [4]Department of Medicine, Brown UniversityProvidence, RI, USA.

Abortion and miscarriage are common, affecting millions of US women each year. By age 45, one in four women in the USA will have had an abortion, and at least as many will have had a miscarriage. Most individuals seeking abortion services do so before 10 weeks' gestation when medication abortions are a safe and effective option, using a regimen of oral mifepristone followed by misoprostol tablets. When a pregnancy is non-viable before 13 weeks' gestation, it is referred to as an early pregnancy loss or miscarriage and can be managed using the same mifepristone and misoprostol regimen. Given their safety and efficacy, mifepristone and misoprostol can be offered in ambulatory settings without special equipment or on-site emergency services. As more patients find it difficult to access clinical care when faced with an undesired pregnancy or a miscarriage, it is important for general internists and primary care providers to become familiar with how to use medications to manage these common conditions. We summarize the most recent evidence regarding the use of mifepristone with misoprostol for early abortion and miscarriage. We discuss clinical considerations and resources for integrating mifepristone and misoprostol into clinical practice. By learning to prescribe mifepristone and misoprostol, clinicians can expand access to time-sensitive health services for vulnerable populations.

*KEY WORDS:* family planning; medication abortion; miscarriage; women's health; primary care.

J Gen Intern Med 35(8):2398–405
DOI: 10.1007/s11606-020-05836-9
© Society of General Internal Medicine 2020

## INTRODUCTION

Internists provide primary care for many reproductive-age women, and the American College of Physicians has called for enhanced reproductive health education and training.[1] Abortion and miscarriage affect one-third of women in the USA who become pregnant annually.[2] By age 45, one in four US women will have had an abortion, and at least as many will have had a miscarriage.[3, 4] Abortions are most commonly

*Electronic supplementary material* The online version of this article (https://doi.org/10.1007/s11606-020-05836-9) contains supplementary material, which is available to authorized users.

*Received October 8, 2019*
*Accepted April 2, 2020*
*Published online May 14, 2020*

performed in the first trimester, with 91% of US abortions occurring before 13 weeks.[5] Until 10 weeks' gestation, abortion can be induced safely and effectively with medications (mifepristone followed by misoprostol).[6] Currently, 80% of abortions occur before 10 weeks' gestation.[5, 7] Thus, the majority of US women seeking abortion care are eligible for a medication abortion.

As pill-based protocols for medication abortion and miscarriage are safe and effective, internists should become familiar with these options for managing such time-sensitive clinical conditions. Historically, obstetrician–gynecologists and family medicine physicians have provided nearly all of the abortion care in the USA. However, a recent survey found that only 7% of obstetrician–gynecologists provided any abortions in the preceding year, and 35% said they would not refer patients for abortion services.[8] In fact, there are only slightly more than 1500 abortion providers nationwide.[9, 10] Many women seeking clinical services related to abortion and miscarriage must travel considerable distances to obtain care—a particular burden for rural and low-income women.[11, 12] Moreover, many patients prefer to receive family planning services from a familiar primary care provider rather than a clinician whom they have never met.[13–16] With nearly 100,000 currently practicing in the USA, general internists are in a unique position to close the gap in access to medication management of abortion and miscarriage.[10]

Since the US Food and Drug Administration (FDA) first approved its use in 2000 for medication abortion, more than 3.7 million US women have used mifepristone in combination with misoprostol for medication abortion.[17] Although misoprostol alone can be used to expel pregnancy tissue, combining it with mifepristone increases its efficacy for both abortion and miscarriage.[18, 19] Thus, for both medication abortion and medical management of early miscarriage, the standard of care is to provide oral mifepristone followed by misoprostol tablets.[4, 18] The use of medication for abortion and miscarriage has evolved since the last review of abortion for generalists in 2004.[20]

We summarize the most recent evidence supporting mifepristone's use with misoprostol for abortion and miscarriage. We discuss the drug's safety profile and common side effects, resources for integration into clinical practice, and legal considerations. By learning how to prescribe mifepristone and misoprostol for abortion and miscarriage, internists can meet

2022 CP 000530

Case 1:17-cv-00493-JAO-RT    Document 240-5    Filed 05/27/25    Page 51 of 591
PageID.8948
JGIM                J Beaman et al.: Medication for Abortion and Miscarriage                2399

the needs of reproductive-age patients and improve access to timely care.

## TERMINOLOGY

This review uses the term *abortion* to indicate an induced abortion, meaning a medication or procedure to end a pregnancy. We use the term *miscarriage* to refer to early pregnancy loss, defined as a non-viable, intrauterine pregnancy diagnosed by ultrasound before 13 weeks' gestation.[4]

## SEARCH STRATEGY

We reviewed the medical literature published in the English language using PubMed and detailed search terms for medication abortion and miscarriage. The full list of terms used in the search is included in the supplementary appendix. A landmark National Academies of Science, Engineering, and Medicine (NASEM) report on abortion published in 2018 reviewed more than 9000 peer-reviewed articles published over 30 years.[6] Our manuscript includes key articles from that comprehensive report as well as studies published more recently (January 2017–December 2019), which had not been included. Our search yielded 373 studies published during that time period; of these, 59 studies were relevant to US practice of general internal medicine.

## MEDICAL MANAGEMENT OF ABORTION

First developed in France in 1982 and known as RU-486, mifepristone has been extensively studied in the USA and worldwide.[21] An anti-progestin that competitively binds to progesterone receptors, mifepristone can be used to detach pregnancy tissue from the endometrium. Mifepristone alone has limited effectiveness for medication abortion, but it is highly effective when combined with misoprostol, a prostaglandin analogue, that induces uterine contractions and cervical dilation to aid in the expulsion of pregnancy tissue.

**Table 1** Comparison of the US Food and Drug Administration (FDA) Labeling for Mifepristone Followed by Misoprostol 2000 vs. 2016

|  | Original FDA-approved regimen (2000) | Updated FDA-approved regimen (2016) |
|---|---|---|
| Gestational age limits | 49 days' gestation | 70 days' gestation |
| Mifepristone dose and administration | 600 mg on day 1 in clinic | 200 mg on day 1 in clinic |
| Misoprostol dose and administration | 400 mcg orally in clinic on day 3 post-mifepristone | 800 mcg buccally at home 24–48 h post-mifepristone |
| Timing of follow-up assessment | 7–14 days post-mifepristone | 7–14 days post-mifepristone |
| Location of follow-up assessment | In clinic required | In clinic not required |

The US FDA first approved a regimen of mifepristone followed by misoprostol in 2000 for medication abortion prior to 49 days' gestation. The original protocol required three in-clinic visits and used a high dose of mifepristone (600 mg).[22, 23] The details of this regimen are outlined in Table 1. Subsequent clinical trials indicated that a lower dose of mifepristone (200 mg) followed by a high dose of misoprostol (800 mcg) was as effective as the original regimen.[21, 24, 25] Although mifepristone followed by misoprostol is more effective the earlier it is given in pregnancy and highest at < 42 days (6 weeks), it remains 93% effective for abortions ≤ 70 days (10 weeks) with 2.9% risk of continuing pregnancy.[26–28]

Consequently, in 2016, the FDA updated the mifepristone label for termination of pregnancies up to 70 days (10 weeks) gestation and reduced the number of mandatory in-person visits to one (Table 1). Direct clinical observation of ingestion of mifepristone and misoprostol is no longer necessary, allowing for successful telemedicine programs.[24, 26, 29] Although many patients are eager to complete the medication regimen as soon as possible, taking misoprostol the same day as the mifepristone is less effective than waiting 24–48 h.[30, 31]

Despite the new clinical protocol in 2016, the FDA made no changes to the Risk Evaluation and Mitigation Strategy (REMS) that has been in place for mifepristone since it was originally approved in 2000.[32] The REMS requires that (1) clinicians register in the drug manufacturer's central database and (2) registered clinicians must order, store, and dispense mifepristone instead of writing a prescription to be filled at a retail pharmacy. These FDA requirements were placed to ensure patient safety and that registered clinicians could only dispense the medication if they could accurately determine gestational age, diagnose ectopic pregnancy, and provide or refer to emergency care if necessary.[32] Clinical experts have called for the FDA to remove the REMS from mifepristone to allow pharmacy dispensing, as mifepristone's safety profile is superior to that of many over-the-counter medications.[33, 34]

Internationally, studies have shown that multiple doses of misoprostol alone can be used off-label (800 mcg vaginally or sublingually every 3 h for a total of 3 doses) to induce abortions in the first trimester.[35] However, with this misoprostol-only regimen, 7% of women had ongoing pregnancies, and 22% required a uterine aspiration procedure to complete the abortion.[35, 36] Given the lower efficacy rates and greater need for follow-up procedures, a regimen of mifepristone followed by misoprostol remains the standard of care for providing medication abortion. However, in settings where access to mifepristone has been restricted, a misoprostol-only regimen may be needed or preferred given its relative ease of access (e.g., misoprostol does not require REMS protocol) and lower cost (misoprostol costs $10–$15 whereas mifepristone costs $50–100).[37, 38]

Overall, the use of mifepristone and misoprostol for medication abortion has been slowly rising in the USA. In 2017, 39% of all abortions before 10 weeks' gestation were medication abortions.[9] However, the vast majority of these occurred

in free-standing abortion clinics (95%) rather than in primary care settings.[9] General internists who provide mifepristone and misoprostol for their patients reduce practical barriers and burdens for patients seeking time-sensitive care.

## MEDICAL MANAGEMENT OF MISCARRIAGE

Up to one-third of all pregnancies end in miscarriage.[39-41] When a pregnant patient presents with an early pregnancy loss (often with bleeding and/or cramping), an ultrasound should be used to confirm miscarriage and rule out other pregnancy complications. Once the diagnosis of a miscarriage is confirmed and found to be < 13 weeks' gestation, patients can be offered expectant management, medical management, or a uterine aspiration procedure.[25] All are effective and result in similar long-term outcomes.[4] For patients who prefer to expedite the passage of their miscarriage but wish to avoid a uterine aspiration, medical management is a reasonable approach.

Historically, clinicians have treated women experiencing miscarriage with misoprostol 800 mcg (vaginally, orally, or buccally) alone to stimulate uterine contractions and facilitate passage of pregnancy tissue. However, up to 30% of women treated with this misoprostol-only regimen required additional doses of misoprostol or a uterine aspiration procedure, prolonging physical and emotional recovery.[42, 43] A 2019 Cochrane Systematic Review found vaginal misoprostol accelerated time to completion of miscarriage compared with placebo or expectant management.[43] Notably, it did not lead to increased satisfaction or decreased physical symptoms (e.g., nausea, bleeding).[43]

Subsequent studies attempted to increase the effectiveness of medical management of miscarriage by adding mifepristone as a "pre-treatment" before misoprostol, in a regimen identical to the combined regimen used for medication abortion.[44, 45] A 2018 randomized, controlled trial compared pre-treatment with mifepristone 200 mg followed by misoprostol 800 mcg (intervention group) to misoprostol 800 mcg alone (control group) and found that women pre-treated with mifepristone were less likely to require subsequent uterine aspiration (8.8% vs. 23.5%, RR 0.37, 95% CI 0.21–0.68).[18] The intervention group was more likely to complete passage of the gestational sac within 4 days (83.8% vs. 67.1%, RR 1.25, 95% CI 1.09–1.43). The number needed to treat with mifepristone to avoid an intrauterine procedure was 6. Rates of adverse events were low and similar in both groups.

A subsequent systematic review on miscarriage comparing expectant management, medical management with misoprostol alone, medical management with mifepristone and misoprostol, and aspiration procedures found that medical treatments had similar effectiveness to surgical interventions and that mifepristone with misoprostol is more effective than misoprostol alone (RR 1.49, 95% CI 1.09–2.03).[46] This finding has also been validated in international trials, and mifepristone pre-treatment has consistently led to improved efficacy

compared with misoprostol alone.[47, 48] As a result, mifepristone pre-treatment is becoming the new standard of care for medical management of miscarriage.

Recently, ACOG updated their practice bulletin on early pregnancy loss to recommend a 200-mg oral dose of mifepristone be given 24 h before misoprostol administration "when mifepristone is available"—recognizing ongoing obstacles to accessing mifepristone in some communities.[4] Clinically, use of mifepristone followed by misoprostol for management of abortion and miscarriage is nearly identical (Table 2). However, the use of mifepristone for miscarriage remains off-label.

## INTEGRATION OF MIFEPRISTONE INTO PRIMARY CARE PRACTICE

### Ordering and Dispensing Medications

Although mifepristone is available in pharmacies in Canada and many countries worldwide, this is not yet the case in the USA. The US FDA currently requires that mifepristone be ordered, stored, and dispensed by a registered clinician.[23] Online resources outlining the steps needed to order mifepristone are readily available.[51] Under federal guidelines, no formal medical board certification or privileging is required. Clinics that dispense mifepristone do not need to have an ultrasound on site or the ability to perform a uterine aspiration procedure.

### Clinical Protocol and Resources for Implementation

Any licensed physician (and in many states advanced practice clinicians) can provide mifepristone and misoprostol.[52] The key steps in providing mifepristone followed by misoprostol for either early abortion or miscarriage are nearly identical (Fig. 1). The first step is to assess gestational age via history of last menstrual period. Ultrasound is used to formally diagnose miscarriage but is not required for abortion unless (1) the gestational age is uncertain or (2) there is concern for ectopic pregnancy.[53, 54] Pelvic examination is indicated only for those with an uncertain gestational age (especially if there is concern it is greater than 10 weeks) or concern for ectopic pregnancy.[54] There are few contraindications to use of mifepristone and misoprostol (Box 1, 2).[22] A history of cesarean section does not preclude use of mifepristone followed by misoprostol for either medication abortion or management of miscarriage.[55]

Box 1 Contraindications to Mifepristone[56]

- Adrenal insufficiency or chronic adrenal failure
- Concurrent use of long-term corticosteroid therapy
- Ectopic pregnancy
- Bleeding disorder or use of anticoagulant therapy
- Inherited porphyria
- Allergy to mifepristone or misoprostol
- Intrauterine device in place

2022 CP 000532

**Table 2  Comparison of Mifepristone Followed by Misoprostol for Management of Medication Abortion Versus Early Miscarriage**

|  | Medication abortion | Miscarriage |
|---|---|---|
| **Day 1 (in office)** | | |
| History | • Confirm last menstrual period correlates to GA less than 70 days (ultrasound only needed if concern for ectopic pregnancy or uncertain GA)<br>• Counseling about pregnancy options<br>• Exclude contraindications (Box 1) | • Ultrasound to confirm diagnosis<br>• Counseling about miscarriage management options |
| Exam | • Pelvic examination only considered if concern for ectopic pregnancy or uncertain GA | |
| Lab | • ± Baseline quantitative serum hCG for comparison at follow-up visit<br>• ± Hemoglobin if concern for anemia<br>• ± STI testing if risk factors identified | |
| Informed consent | • Ensure patient understands the process, alternatives, risks, and benefits<br>• Required: sign manufacturer's Patient Agreement Form (available at earlyoptionpill.com)<br>• Dispense mifepristone 200 mg PO × 1 | |
| **Day 2+ (at home)** | | |
| Patient initiates | Take 800 mcg misoprostol buccally or vaginally 24–72 h after taking mifepristone<br>• Ibuprofen 600 mg every 6 h as needed for cramping and pain<br>• Counsel patient on concerning symptoms and return precautions that would require urgent evaluation (Box 2) | Take 800 mcg misoprostol vaginally 24–72 h after taking mifepristone |
| **Days 5–14** | | |
| History | • Assess bleeding and symptoms consistent with passed pregnancy and resolution of pregnancy symptoms<br>• Identify if any concerning symptoms are present (Box 2) | |
| Lab | • Quantitative serum hCG should decline 50% by 3 days after medication abortion and 80% by 7 days[49, 50]<br>• Ultrasound rarely indicated (e.g., concern for ectopic, ongoing pregnancy) | |

*GA gestational age, hCG human chorionic gonadotropin, STI sexually transmitted infection*

Box 2 Concerning Symptoms and Return Precautions[22, 50, 54, 57, 58]

---

• Excessive bleeding: soaking through 2 sanitary napkins per hour for 2 consecutive hours
• Lack of bleeding: no bleeding 24 h after taking misoprostol
• Infectious symptoms: flu-like symptoms that start 24 h after taking misoprostol or fevers, chills, severe abdominal pain, and/or malodorous discharge
• Pain: severe abdominal pain, cramping, and/or bloating
• Ongoing pregnancy symptoms: feeling pregnant (e.g., breast tenderness, nausea) at the follow-up visit

---

Although, historically, Rh-negative women who sought abortion in the USA were given Rhogam, current guidelines state that Rh testing and Rhogam are not required if the gestational age is less than 8 weeks.[59] Moreover, a recent study suggests Rhogam is likely unnecessary for medication abortion and early miscarriage less than 10 weeks.[60] Testing for sexually transmitted infections is not required for low-risk women seeking abortion or miscarriage management but should be offered to those with risk factors. When treatment is needed for a sexually transmitted infection, antibiotics can be provided at the same time as mifepristone.

Patients should be educated about how to use misoprostol at home. A free 1-h video-based online training (https://abortionpillcme.teachtraining.org/) provides examples of primary care counseling about medication abortion and highlights key steps in providing mifepristone and misoprostol.



**Figure 1  Combining mifepristone and misoprostol to treat undesired pregnancy or miscarriage.** hCG, human chorionic gonadotropin

To reduce nausea, the patient medication guide from the manufacturer has a useful illustration to show patients how to use misoprostol buccally by placing two 200-mcg tablets in each cheek pouch (the area between the cheek and gums) for 30 min, after which any pill remnants can be swallowed with water.[56] If the tablets are in place for less time (e.g., vomited), patients may need to re-dose the misoprostol.[54, 61] Other common off-label but evidence-based regimens for patients prone to nausea include placing misoprostol vaginally; tablets placed in the vagina do not have to be removed after 30 min.[62]

For managing cramps with medication abortion, ibuprofen is superior to acetaminophen.[63] Ibuprofen taken as needed, rather than scheduled, results in equal pain control with less medication use.[64] Although non-steroidal anti-inflammatory drugs are first-line therapy and typically sufficient, oral narcotics are occasionally used as adjuvant therapy for pain management.[65] However, oral narcotics have not been shown to reduce maximum pain scores or duration of maximum pain, and they have not led to improved satisfaction among women undergoing medical abortion; thus, narcotics should be used with caution.[66]

After medication abortion or medical management of miscarriage, follow-up should be scheduled for 5–14 days after taking mifepristone and can occur either in person, by telephone, or via electronic messaging (i.e., use of a patient portal).[54, 67 70] Follow-up involves assessing symptoms to rule out ongoing pregnancy, such as breast tenderness and nausea, as well as symptoms that could warrant further evaluation to rule out a complication (Box 2). If pregnancy continues after an attempted medication abortion, one must counsel patients about the teratogenicity of misoprostol.[71]

A number of approaches can be used to confirm a successful medication abortion, including patient self-assessment of symptoms, repeated pregnancy testing, and ultrasound. Measuring serum human chorionic gonadotropin (hCG), a hormone produced in early pregnancy, before and after use of mifepristone and misoprostol is more reliable than ultrasound.[54, 72] Compared with baseline, serum hCG should decline 50% by 3 days after medication abortion and 80% by 7 days.[49, 72] Although some clinicians opt to use ultrasound to confirm complete passage of tissue, residual echogenic material in the uterus and endometrial thickening may be normal and requires no intervention unless accompanied by cramping, excessive bleeding, or concern for infection.[54] Clinicians should be aware that most over-the-counter urine pregnancy tests utilize a cutoff level of hCG for pregnancy detection instead of a range. Thus, standard pregnancy tests may remain positive more than a month after a pregnancy ends and are not helpful in detecting downward trends in hCG levels that would indicate a successful abortion.[54]

Resources for integrating mifepristone and misoprostol into clinical practice—including electronic health record templates, patient aftercare instructions, and an electronic listserv that offers prompt responses to real-world questions—are available from the Reproductive Health Access Project

(RHAP) with additional resources from the Training in Early Abortion for Comprehensive Healthcare (TEACH) program, the National Abortion Federation (NAF), and primary care practice summaries.[50, 54, 57] Although primary care is typically team-based, given the rarity of adverse events following use of mifepristone and misoprostol, some general internists (e.g., one author) offer these medications without asking colleagues to take phone calls from their patients who have taken mifepristone. In rare cases when concern for ectopic pregnancy or excessive bleeding arises, referral to a local gynecologist, family physician, or emergency department is warranted.

## Safety, Side Effects, and Adverse Events

The 2018 NASEM review concluded that primary care clinicians can safely provide medication abortion in ambulatory settings without on-site ultrasound or emergency services.[6] Clinical experience has shown mifepristone to be far safer than antibiotics, antihypertensive agents, insulin, and many other common primary care medications.[6, 29, 50, 73] The use of mifepristone followed by misoprostol to end a pregnancy is 14 times safer than continuing a pregnancy to term.[74] Medication abortion has no long-term adverse effects on health or fertility.[75] In a prospective cohort study of nearly 1000 women comparing those who received an abortion and those who were turned away due to gestational age limits, women who were turned away reported worse anxiety and mental health, as well as worse self-reported physical health outcomes, which persisted 5 years later.[75, 76]

Patients do not typically experience side effects after taking mifepristone. In contrast, side effects generally occur after taking misoprostol. Common side effects include 4–6 h of severe cramping and vaginal bleeding that is heavier than a typical menstrual period and often includes passage of clots. After the initial 4–6 h, bleeding should gradually decrease and spotting is common for up to 1–2 weeks[77] Bleeding that requires urgent evaluation or transfusion is very rare (0.05%).[26, 73] Given that bleeding is expected, the risk of anemia should be considered prior to administration of mifepristone and misoprostol, and patients with a hemoglobin < 9.5 g/dl are generally advised to consider a uterine aspiration procedure instead of a medication abortion.[50, 78]

Flu-like symptoms such as nausea, fever and chills, vomiting, diarrhea, and malaise may occur and should last less than 24 h. Patients should be advised to take non-steroidal anti-inflammatory medication for pain management and call if they experience concerning symptoms that could warrant urgent evaluation (Box 2). Patients who experience no or little bleeding within 24 h of taking misoprostol should be advised to call their clinician, as it could indicate a risk for ongoing or ectopic pregnancy (< 0.6%).[79] If a patient requires urgent evaluation (Box 2), the first step is often an ultrasound to identify whether pregnancy tissue remains in the uterus. If a patient has retained pregnancy tissue on ultrasound, they can generally be managed with a repeat dose of misoprostol;

Case 1:17-cv-00493-JAO-RT    Document 240-5    Filed 05/27/25    Page 55 of 591
PageID.8952
JGIM    J Beaman et al.: Medication for Abortion and Miscarriage    2403

however, some individuals may opt for a uterine aspiration procedure.[54]

Pelvic infections, such as endometritis and sepsis, are exceedingly rare, and prophylactic antibiotics are not routinely recommended.[80] Overall, only 0.5–0.9% of patients will need treatment for infection and 0.04–0.9% require hospitalization.[73] The need for IV antibiotics is extremely rare (0.006% to 0.093%).[73, 81] However, mifepristone has a black box warning reminding providers that if a patient presents with afebrile malaise, *Clostridium sordellii* should be considered. *C. sordellii* can lead to toxic shock syndrome, and patients may present with tachycardia, hypotension, and lab abnormalities (e.g., leukocytosis, hemoconcentration).[82, 84] Case reports of fatal *C. sordellii* infections have been noted in patients following medication abortion as well as live birth, stillbirth, miscarriage, and procedures for cervical dysplasia. Therefore, it remains unclear whether mifepristone or misoprostol truly plays a causal role in clostridial infections though must be considered given the associated morbidity and mortality.[84]

## Legal Considerations

Although provision of mifepristone and misoprostol is clinically safe, medication abortion is increasingly regulated by laws and policies at the federal and state level.[52] In some communities, restrictions may include gestational age limits, physician-only prescribing, requiring the prescriber to be physically on-site (e.g., precluding telemedicine), mandatory waiting periods, mandatory counseling that may be inaccurate and dangerous (e.g., reversal of medication abortions with progesterone), and requirements for the physical characteristics of buildings in which abortions are allowed to occur.[85, 86] An up-to-date, state-by-state resource is available online from the Guttmacher Institute.[52]

## Moving Forward

Given that patients in a growing number of communities experience barriers to accessing clinical services, an increasing number of individuals seek to self-manage their abortion.[87, 88] Unfortunately, this has resulted in the incarceration of some women for "practicing medicine without a license" and provides a stark reminder of the need to integrate mifepristone into primary care.[89] The landscape of abortion is ever-changing, and we are likely to see new models for abortion care emerge, along with further integration into primary care.

## SUMMARY

Mifepristone followed by misoprostol can be safely and effectively used to manage early abortion and miscarriage. Recent evidence supports the provision of mifepristone followed by misoprostol in primary care without need for special equipment or emergency services. Primary care providers in many

states can easily integrate mifepristone with misoprostol into their practice, thereby dramatically reducing stigma and other barriers their patients may face in accessing time-sensitive reproductive healthcare.

---

Take-Home Points
• Mifepristone and misoprostol are highly effective for medical management of early abortion and miscarriage.
• Mifepristone and misoprostol can be safely integrated into primary care settings and improve access to time-sensitive clinical services.
• Resources are readily available to support the provision of these medications in clinical practice.

---

***Acknowledgments:*** *We gratefully acknowledge the assistance of Amy Studer, RN, MSN, MSLIS, AHIP, Health Science Librarian, UC Davis Blaisdell Medical Library, in structuring a search of the relevant literature and Erin Hartman, MS, UCSF Department of Medicine, for her review and editorial guidance.*

***Corresponding Author:*** *Jessica Beaman, MD MPH; Department of Medicine, University of California San Francisco, CA, USA (e-mail: Jessica.beaman@ucsf.edu).*

***Compliance with Ethical Standards:***

***Conflict of Interest:*** *The authors declare that they do not have a conflict of interest.*

## REFERENCES

1. **Daniel H, Erickson SM, Bornstein SS**. Women's health policy in the United States: an American College of Physicians position paper. Ann Intern Med. 2018;168(12):874-5.
2. **Curtin SC, Abma JC, Kost K**. Pregnancy rates among U.S. women. 2010. Available at: https://www.cdc.gov/nchs/data/hestat/pregnancy/2010_pregnancy_rates.htm#table 1. Accessed July 3, 2019.
3. **Jones RK, Jerman J**. Population group abortion rates and lifetime incidence of abortion: United States, 2008-2014. Am J Public Health. 2017;107(12):1904-9.
4. The American College of Obstetricians and Gynecologists. Early pregnancy loss. Available at: https://www.acog.org/Patients/FAQs/Early-Pregnancy-Loss?IsMobileSet=false. Accessed July 3, 2019.
5. **Jatlaoui TC, Eckhaus L, Mandel MG, et al.** Abortion Surveillance – United States, 2016. MMWR Surveill Summ. 2019;68(11):1-41.
6. National Academies of Sciences, Engineering, and Medicine. The safety and quality of abortion care in the United States. Available at: https://doi.org/10.17226/24950. Accessed July 3, 2019.
7. Guttmacher Institute: https://www.guttmacher.org/state-policy/explore/medication-abortion. Accessed on December 17, 2019.
8. **Desai S, Jones RK, Castle K**. Estimating abortion provision and abortion referrals among United States obstetrician-gynecologists in private practice. Contraception. 2018;97(4):297-302.
9. **Jones R, Witwer E, Jerman J**. Abortion incidence and service availability in the United States. 2017. Available at: https://www.guttmacher.org/report/abortion-incidence-service-availability-us-2017. Accessed December 12, 2019.
10. Agency for Healthcare Research and Quality. The Number of Practicing Primary Care Physicians in the United States: Primary Care Workforce Facts and Stats No. 1. Available at: https://www.ahrq.gov/research/findings/factsheets/primary/pcwork1/index.html. Accessed December 12, 2019.
11. **Bearak JM, Burke KL, Jones RK**. Disparities and change over time in distance women need to travel to have an abortion in the USA: a spatial analysis. Lancet. 2017;2(11):e492-500.
12. **Barr-Walker, J, Jayawera RT, Ramirez AM, Gerdts C**. Experiences of women who travel for abortion: A mixed methods systematic review. PloS One. 2019;14(4):e0209991.
13. **Godfrey EM, Rubin SE, Khare MM, Gold M**. Women's preference for receiving abortion in primary care settings. J Womens Health. 2010;19(3):547-53.

14. Page C, Stumbar S, Gold M. Attitudes and preferences toward the provision of medication abortion in an urban academic internal medicine practice. J Gen Intern Med. 2012;27(6):647-52.

15. Summit AK, Casey LM, Bennett AH, Karasz A, Gold M. "I don't want to go anywhere else": patient experiences of abortion in family medicine. Fam Med. 2015;48(1):30-4.

16. Wu JP, Godfrey EM, Prine L, Andersen KL, MacNaughton H, Gold M. Women's satisfaction with abortion care in academic family medicine centers. Fam Med. 2015;47(2):98-106.

17. U.S. Food and Drug Administration. Mifepristone U.S. post-marketing adverse events summary through 12/31/2018. Available at: https://www.fda.gov/media/112118/download. Accessed July 3, 2019.

18. Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med. 2018;378:2161-70.

19. Avrech OM, Golan A, Weinraub Z, Bukovsky I, Caspi E. Mifepristone (RU486) alone or in combination with a prostaglandin analogue for termination of early pregnancy: a review. Fertil Steril. 1991;56(3):385-93.

20. Grimes DA, Creinin MD. Induced Abortion: An Overview for Internists. Ann Intern Med. 2004;140(8):620-6.

21. Kulier R, Kapp N, Gulmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev. 2011;(11):CD002855.

22. U.S. Food and Drug Administration. MIFEPREX (mifepristone) tablets. 200mg for oral administration only. Available online at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2000/20687lbl.htm. Accessed July 3, 2019.

23. Government Accountability Office. Approval and oversight of the drug mifeprex. 2008 Available at: https://www.gao.gov/new.items/d08751.pdf. Accessed July 3, 2019.

24. Schaff EA, Eisinger SH, Stadalius LS, Franks B, Gore BZ, Poppema S. Low-dose mifepristone 200mg and vaginal misoprostol for abortion. Contraception. 1999;59:1-6.

25. Neilson JP, Hickey M, Vazquez JC. Medical treatment for early fetal death (less than 24 months). Cochrane Database Syst Rev. 2006;(3):CD002253.

26. Cleland K, Creinin MD, Nucatola D, Nshom M, Trussel J. Significant adverse events and outcomes after medical abortion. Obstet Gynecol. 2013;121(1):166-71.

27. Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol. 2015;126(1):12-21.

28. Kapp N, Baldwin MK, Rodriguez MI. Efficacy of medical abortion prior to 6 gestational weeks: a systematic review. Contraception. 2018;97(2):90-9.

29. Abbas D, Chong E, Raymond EG. Outpatient medical abortion is safe and effective through 70 days gestation. Contraception. 2015;92(3):197-9.

30. Guest J, Chien PF, Thomson MA, Kosseim ML. Randomized controlled trial comparing the efficacy of same-day administration of mifepristone and misoprostol for termination of pregnancy with the standard 36 to 48-hour protocol. BJOG. 2007;114(2):207-15.

31. Lohr PA, Starling JE, Scott JG, Aiken ARA. Simultaneous Compared With Interval Medical Abortion Regimens Where Home Use Is Restricted. Obstet Gynecol. 2018;131(4):635-41.

32. U.S. Food and Drug Administration. Risk evaluation and mitigation strategies (REMS). Available at: https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems. Accessed July 3, 2019.

33. Mifeprex REMS Study Group. Sixteen years of overregulation: time to unburden Mifeprex. N Engl J Med. 2017;376:790-4.

34. Henney JE, Gayle HD. Time to reevaluate U.S. mifepristone restrictions. N Engl J Med. 2019. https://doi.org/10.1056/NEJMp1908305.

35. Sheldon, WR, Durocher J, Dzuba IG, et al. Early abortion with buccal versus sublingual misoprostol alone: a multicenter, randomized trial. Contraception. 2019;99(5):272-7.

36. Raymond EG, Harrison MS, Weaver MA. Efficacy of misoprostol alone for first-trimester medical abortion: a systematic review. Obstet Gynecol. 2019;133(1):137-47.

37. NeedyMeds. Mifeprex. [cited 2020 Jan 24];Available from: https://www.needymeds.org/generic-drug/DrugSearch/mifepristone

38. GoodRx. Misoprostol. [cited 2020 Jan 24];Available from: https://www.goodrx.com/misoprostol

39. Wilcox AJ, Weinberg CR, O'Connor JF, et al. Incidence of early loss of pregnancy. N Engl J Med. 1988;319(4):189-94.

40. Zinaman MJ, Clegg ED, Brown CC, O'Connor J, Selevan SG. Estimates of human fertility and pregnancy loss. Fertil Steril. 1996;65(3):503-9.

41. Zhang J, Gilles JM, Barnhart K, et al. A comparison of medical management with misoprostol and surgical management for early pregnancy failure. N Engl J Med. 2005;353(8):761-9.

42. Chen BA and Creinin MD. Contemporary management of early pregnancy failure. Clin Obstet Gynecol. 2007;50(1):67-88.

43. Lemmers M, Verschoor MA, Kim BV, et al. Medical treatment for early fetal death (less than 24 weeks). Cochrane Database Syst Rev. 2019;(6):CD002253.

44. Ehrnstén L, Altman D, Ljungblad A, Kallner HK. Efficacy of mifepristone and misoprostol for medical treatment for missed miscarriage in clinical practice- a cohort study. Acta Obstet Gynecol Scand. 2019.

45. Marret H, Simon E, Beucher G, et al. Overview and expert management of off-label use of misoprostol in obstetrics and gynaecology: review and report by the Collège national des gynécologues obstétriciens français. Eur K Obstet Gynecol Reprod Biol. 2015;187:80-4.

46. Haw B, Murugesu N, Tobias A, Zamora J, Khan KS. Management of first-trimester miscarriage: a systematic review and network meta-analysis. Hum Reprod Update. 2019;25(3):362-74.

47. Dunford A, Fyfe R. Combination therapy with mifepristone and misoprostol for the management of first trimester miscarriage: Improved success. Aust N Z J Obstet Gynaecol. 2018;58(4):438-42.

48. Sinha P, Suneja A, Guleria K, Aggarwal R, Vaid NB. Comparison of Mifepristone Followed by Misoprostol with Misoprostol Alone for Treatment of Early Pregnancy Failure: A Randomized Double-Blind Placebo-Controlled Trial. J Obstet Gynaecol India. 2018;68(1):39-44.

49. Stenquist A, Fortin J, Goldberg AB. Serum human chorionic gonado-tropin (hCG) trend within the first few days after medical abortion: a prospective study. Contraception. 2017;95(3):263-8.

50. Amico JR, Cheng TL, Godfrey EM. Providing Abortion Services in the Primary Care Setting. Prim Care. 2018;45(4):599-613.

51. Reproductive Health Access Project. Mifepristone (Mifeprex) ordering information. Available at: https://www.reproductiveaccess.org/wp-content/uploads/2013/12/mifepristone_ordering.pdf. Accessed July 3, 2019.

52. Guttmacher Institute. An overview of abortion laws. Available at: https://www.guttmacher.org/state-policy/explore/overview-abortion-laws. Accessed July 3, 2019.

53. Raymond EG, Tan YL, Comendant R, et al. Simplified medical abortion screening: a demonstration project. Contraception. 2018;97(4):292-6.

54. National Abortion Federation. 2018 clinical policy guidelines. Available at: https://prochoice.org/resources/clinical-policy-guidelines/. Accessed July 3, 2019.

55. Mazouni C, Provensal M, Porcu G, et al. Termination of pregnancy in patients with previous cesarean section. Contraception. 2006;73(3):244-8.

56. Danco Laboratories. Mifeprex medication guide. Available at: http://www.earlyoptionpill.com/wp-content/uploads/2016/01/DAN_MedGuideEng_FINAL.pdf. Accessed July 3, 2019.

57. Training in Early Abortion for Comprehensive Healthcare (TEACH). Early abortion training workbook. Available at: https://www.teachtraining.org/training-tools/early-abortion-training-workbook/. Accessed July 3, 2019.

58. World Health Organization. Medical Management of Abortion. Available at: https://apps.who.int/iris/bitstream/handle/10665/278968/9789241550406-eng.pdf?ua=1. Accessed January 24,2020.

59. Mark A, Foster AM, Grossman D, et al. Foregoing Rh testing and anti-D immunoglobulin for women presenting for early abortion: a recommendation from National Abortion Federation's Clinical Policies Committee. Contraception 2019;99(5):265-6.

60. Hollenback SJ, Cochran M, Harrington A. "Provoked" feto-maternal hemorrhage may represent insensible cell exchange in pregnancies from 6 to 22 weeks gestational age. Contraception. 2019;S0010-7824(19):30129-5.

61. Planned Parenthood. Client information: how to take the pills for your abortion and what to expect. Available at: https://www.plannedparenthood.org/files/1314/2308/5667/CI_Buccal_NEW.pdf. Accessed July 3, 2019.

62. Hsia JK, Lohr PA, Taylor J, Creinin MD. Medical abortion with mifepristone and vaginal misoprostol between 64 and 70 days' gestation. Contraception. 2019;S0010-7824(19):30169-6.

63. Livshits A, Machtinger R, David LB, Spira M, Moshe-Zahav A, Seidman DS. Ibuprofen and paracetamol for pain relief during medical abortion: a double-blind randomized controlled study. Fertil Steril. 2009;91(5):1877-80.

64. Raymond EG, Weaver MA, Louie KS, et al. Prophylactic compared with therapeutic ibuprofen analgesia in first-trimester medical abortion: A randomized controlled trial. Obstet Gynecol. 2013;122(3):558-64.

65. **Friedlander EB**, **Soon R**, **Salcedo J**, **et al.** Prophylactic pregabalin to decrease pain during medication abortion: A randomized controlled trial. Obstet Gynecol. 2018;132(3):612-8.

66. **Colwill AC**, **Bayer LL**, **Bednarek P**, **Garg B**, **Jensen JT**, **Edelman AB**. Opioid Analgesia for Medical Abortion: A Randomized Controlled Trial. Obstet Gynecol. 2019;134(6):1163-70.

67. **Clark W**, **Bracken H**, **Tanenhaus J**, **Schweikert S**, **Lichtenberg ES**, **Winikoff B**. Alternatives to a routine follow-up visit for early medical abortion. Obstet Gynecol. 2010;115(2 Pt 1):264-72.

68. **Cameron ST**, **Glasier A**, **Dewart H**, **Johnstone A**, **Burnside A**. Telephone follow-up and self-performed urine pregnancy testing after early medical abortion: A service evaluation. Contraception. 2012;86(1):67-73.

69. **Oppegaard KS**, **Qvigstad E**, **Fiala C**, **Heikinheimo O**, **Benson L**, **Gemzell-Danielsson K**. Clinical follow-up compared with self-assessment of outcome after medical abortion: a multicentre, non-inferiority, randomised, controlled trial. Lancet. 2015;385(9969):698-704.

70. **Cameron ST**, **Glasier A**, **Johnstone A**, **Dewart H**, **Campbell A**. Can women determine the success of early medical termination of pregnancy themselves?. Contraception. 2015;91(1):6-11.

71. **Coelho KE**, **Sarmento MF**, **Veiga CM**, **et al.** Misoprostol embryotoxicity: clinical evaluation of fifteen patients with arthrogryposis. Am J Med Genet. 2000;95(4):297-301.

72. **Fiala C**, **Safar P**, **Bygdeman M**, **Gemzell-Danielsson K**. Verifying the effectiveness of medical abortion; ultrasound versus hCG testing. Eur J Obstet Gynecol Reprod Biol. 2003;109(2):190-5.

73. **Upadhyay UD**, **Desai S**, **Zlidar V**, **et al.** Incidence of emergency department visits and complications after abortion. Obstet Gynecol. 2015;125(1):175-83.

74. **Raymond EG**, **Grimes DA**. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol. 2012;119(2 Pt 1):215-9.

75. **Biggs MA**, **Upadhyay UD**, **McCulloch CE**, **Foster DG**. Women's mental health and well-bring 5 years after receiving or being denied an abortion: a prospective, longitudinal cohort study. JAMA Psychiatry. 2017;74(2):169-78.

76. **Ralph LJ**, **Schwarz EB**, **Grossman D**, **Foster DG**. Self-reported physical health of women who did and did not terminate pregnancy after seeking abortion services: a cohort study. Ann Intern Med. 2019. https://doi.org/10.7326/M18-1666.

77. **Davis A**, **Westhoff C**, **De Nonno L**. Bleeding patterns after early abortion with mifepristone and misoprostol or manual vacuum aspiration. J AM Med Womens Assoc. 2000:55(3 Suppl):141-4.

78. The American College of Obstetricians and Gynecologists. Practice Bulletin No. 143: medical management of first-trimester abortion. Obstet Gynecol. 2014;123(3):676-92.

79. **Raymond EG**, **Shannon C**, **Weaver MA**. **Winikoff B**. First-trimester medical abortion with mifepristone 200mg and misoprostol: a systematic review. Contraception. 2013;87(1):26-37.

80. **Achilles SL**, **Reeves MF**. Prevention of infection after induced abortion: SFP guideline 20102. Contraception. 2011;83(4):295-309.

81. **Fjerstad M**, **Trussel J**, **Sivin I**, **Lichtenberg ES**, **Cullins V**. Rates of serious infection after changes in regimens for medical abortion. N Engl J Med. 2009;361(2):145-51.

82. **Fischer M**, **Bhatnagar J**, **Guarner J**, **et al.** Fatal toxic shock syndrome associated with Clostridium sordellii after medical abortion. N Engl J Med. 2005;353(22):2352-60.

83. **Winikoff, B**. Clostridium sordellii infection in medical abortion. Clin Infect Dis. 2006;43(11):1447-8.

84. **Ho CS**, **Bhatnagar J**, **Cohen AL**, **et al.** Undiagnosed cases of fatal Clostridium-associated toxic shock in Californian women of childbearing age. Am J Obstet Gynecol. 2009;201:459.e1-7.

85. **Grossman D**, **White K**, **Harris L**, **et al.** Continuing pregnancy after mifepristone and "reversal" of first-trimester medical abortion: a systematic review. Contraception. 2015;92(3):206-11.

86. **Creinin MD**, **Hou MY**, **Dalton L**, **Steward R**, **Chen MJ**. Mifepristone antagonization with progesterone to prevent medical abortion: a randomized controlled trial. Obstet Gynecol 2020;135(1):158-65.

87. **Aiken ARA**, **Broussard K**, **Johnson DM**, **Padron E**. Motivations and Experiences of People Seeking Medication Abortion Online in the United States. Perspect Sex Reprod Health. 2018;50(4):157-63.

88. **Biggs MA**, **Ralph L**, **Raifman S**, **Foster DG**, **Grossman D**. Support for and interest in alternative models of medication abortion provision among a national probability sample of U.S. women. Contraception. 2019;99(2):118-24.

89. **Bazelon E**. A Mother in Jail for Helping Her Daughter Have an Abortion. New York Times. Available at: https://www.nytimes.com/2014/09/22/magazine/a-mother-in-jail-for-helping-her-daughter-have-an-abortion.html. Accessed January 24, 2020.

**Publisher's Note:** *Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.*

examination when patients had a known history of trauma, only 88 (24.3%) thought it was extremely important to use a trauma informed approach when no trauma history was known. Ninety seven clinicians (26.8%) endorsed using trauma informed practices during pelvic examinations "often" or "always."

**CONCLUSION:** Clinicians reported a lack of training in TIC. They did not see the need for universal application of TIC, and they reported inconsistent usage of trauma informed practices during pelvic examinations. These data demonstrate a pressing need to improve training for clinicians and appropriate care for patients.

*Financial Disclosure: The authors did not report any potential conflicts of interest.*

## Implementation and Evaluation of A Gynecology eConsult Service Within A Large Health System [A287]

*Katherine Buddemeyer, MD*
 Atrium Wake Forest Baptist, Winston Salem, NC
*Sean Hernandez, MD, Ajay Dharod, MD, and David Shalowitz, MD*

**INTRODUCTION:** Electronic consultations (eConsults) between primary care providers (PCPs) and specialty clinicians offer specialists' input into patient care without in person consultation. However, limited data exist on process outcomes associated with implementing systemwide eConsult services for gynecologic care.

**METHODS:** We reviewed all gynecology eConsults at our institution from program start in February 2020 to September 2021. Analyzed variables included content, completion time, and provider satisfaction. The eConsult data were contextualized within systemwide data regarding in person consultation processes.

**RESULTS:** Implementation required identification of gynecologists willing to answer eConsults through the electronic medical record and development of consult template text to ensure adequate information was presented. Educational outreach was provided to PCP practices on workflow. A total of 71 gynecology eConsults were analyzed. Mean time from submission to completion was 0.73 days; 85% required less than 15 minutes of specialists' time. Most common eConsults involved cervical cancer screening (32%), abnormal uterine bleeding (14%), contraception (14%), imaging (13%), and menopause (10%). Systemwide, 85% of eConsults were perceived as appropriate by specialists; 93% of PCPs reported being satisfied or extremely satisfied. Of the PCPs, 30% reported they would have initiated in person consultations if eConsults were unavailable; systemwide, time from referral to in person consultation was 32.8 days.

**CONCLUSION:** Implementation of a gynecology eConsult program is feasible, minimally burdensome to specialists, and associated with high satisfaction among PCPs. In our system, successful eConsults improved timeliness of access to gynecologists' recommendations by several weeks. Future work is in progress to determine whether and how expansion of eConsult utilization can further improve access to gynecologic care.

*Financial Disclosure: The authors did not report any potential conflicts of interest.*

## Pelvic Pain Disorders and Associated Acceptability of Office Hysteroscopy [A288]

*Amanda C. Brant, MD*
 Mayo Clinic, Rochester, MN
*Nneanata Echetebu, MHS, Kristin Mara, MS, Shannon Laughlin-Tommaso, MD, M. Hopkins, MD, and Isabel Green, MD*

**INTRODUCTION:** Despite the benefits, convenience, and acceptability of office hysteroscopy (OH), 20% of patients find OH unacceptable. In this study we defined acceptability as willingness to undergo office hysteroscopy in the future and investigated whether patients with co existing pelvic pain disorders were more likely to find OH unacceptable.

**METHODS:** Patients who underwent OH from 12/2016 to 6/2018 were included. Patients were asked to rate acceptability at the time of their procedure. Retrospective chart review was used to identify patients with pelvic pain disorders defined as chronic pelvic pain (CPP), dysmenorrhea, vulvodynia, dyspareunia, or high tone pelvic floor dysfunction (PFD). Patients rating OH as acceptable (Likert scale 4 5) were compared to those rating it as unacceptable (Likert scale 1 2). Comparisons between groups were made using a t test or Wilcoxon rank sum test for continuous data, and a Chi square test for categorical data. This study was determined to be exempt from the requirement for IRB approval (IRB #20 009387).

**RESULTS:** Compared to patients in the "acceptable" group (n=929), patients who rated OH as "unacceptable" (n=55) reported higher during and post procedure pain scores and lower satisfaction rates (*P*<.001). Prior diagnosis of PFD (*P*<.001) and dyspareunia (*P*=.003) were both associated with finding OH unacceptable. Dysmenorrhea, CPP, and vulvodynia were associated with unacceptability but did not achieve significance.

**CONCLUSION:** A preexisting diagnosis of a pelvic pain disorder, specifically PFD and dyspareunia, was associated with unacceptability of OH. Implementing triage criteria for patients to pursue hysteroscopy with sedation or anesthesia could help improve patient satisfaction and warrants additional study.

*Financial Disclosure: M. Hopkins: Rejoni (Consultant). The other authors did not report any potential conflicts of interest.*

## Medication Management of Early Pregnancy Loss: The Impact of the U.S. Food and Drug Administration Risk Evaluation and Mitigation Strategy [A289]

*Sara Neill, MD*
 Beth Israel Deaconess Medical Center, Boston, MA
*Alisa Goldberg, MD, and Elizabeth Janiak, ScD*

**INTRODUCTION:** Early pregnancy loss (EPL) occurs in 1 million U.S. patients annually. Mifepristone pretreatment for medication management increases efficacy but requires compliance with the U.S. Food and Drug Administration Risk Evaluation and Mitigation Strategy (REMS) program. This study examined how REMS influences mifepristone use for EPL among obstetrician gynecologists (ob gyns) in Massachusetts.

**METHODS:** This mixed methods study included in depth qualitative interviews focused on EPL management analyzed under a thematic analysis framework using multiple coders and a consensus method. Qualitative data informed development of a survey fielded among all ob gyns in Massachusetts identified through the American Medical Association Physician Masterfile. The Partners IRB deemed this study exempt.

**RESULTS:** Nearly all interviewees (17 of 19, 89%) listed the REMS as a barrier to mifepristone use. Barriers included belief that the REMS indicated mifepristone was not available to general ob gyns, lack of pharmacy dispensing, and concerns about signing the required prescriber agreement. The REMS sometimes gave hospital or pharmacy leadership the impression that mifepristone is dangerous, prolonging protocol development and implementation. A total of 197 physicians responded to a subsequent survey. Of those, 37% did not offer mifepristone for EPL, and 40% were not or only somewhat familiar with mifepristone's REMS program. Among those who reported on barriers to mifepristone use (n=57), the most common was uncertainty with how to comply with the REMS (53%); 73% reported that removing these regulations would help them use mifepristone for EPL.

**CONCLUSION:** The FDA REMS program for mifepristone impedes evidence based medication management of EPL. Removing the REMS would improve access to this best practice.

*Financial Disclosure: The authors did not report any potential conflicts of interest.*

© 2022 by the American College of Obstetricians and Gynecologists. Published by Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

PCSF605

2022 CP 000776





Contents lists available at ScienceDirect

# Contraception

journal homepage: www.elsevier.com/locate/contraception



# Exploring the impact of mifepristone's risk evaluation and mitigation strategy (REMS) on the integration of medication abortion into US family medicine primary care clinics ☆,☆☆☆⋆,☆☆



Na'amah Razon [a,⁎], Sarah Wulf [b], Citlali Perez [b], Sarah McNeil [c], Lisa Maldonado [d], Alison Byrne Fields [e], Diana Carvajal [f], Rachel Logan [b], Christine Dehlendorf [b]

[a] Department of Family and Community Medicine, University of California, Davis, CA, United States
[b] Person-Centered Reproductive Health Program, Department of Family and Community Medicine, University of California, San Francisco, CA, United States
[c] Departments of Family Medicine and Ob/Gyn, Contra Costa Regional Medical Center, Medical Director, Training in Early Abortion for Comprehensive Healthcare, Martinez, CA, United States
[d] Reproductive Health Access Project, New York, NY, United States
[e] Aggregate, Seattle, WA, United States
[f] Department of Family and Community Medicine, University of Maryland, Director of DEIA and Strategic Planning, National RHEDI Program, Baltimore, MD, United States

## ARTICLE INFO

Article history:
Received 2 February 2021
Received in revised form 20 January 2022
Accepted 21 January 2022

Keywords:
Family medicine
Medication abortion
Mifepristone
Primary care
REMS

## ABSTRACT

Objectives: In 2000, the United States' Food and Drug Administration (FDA) approved mifepristone for medication abortion. In this article, we explore how the Risk Evaluation and Mitigation Strategy (REMS) criteria for mifepristone specifically impede family physicians' ability to provide medication abortion in primary care settings.

Study design: We conducted 56 qualitative interviews with a national sample of family physicians across the US who were not opposed to abortion. We examined how the REMS criteria for mifepristone impact family physicians' ability to provide medication abortion.

Results: Of the 56 interviews conducted, 23 participants (41%) raised the REMS criteria as a barrier to providing medication abortion in primary care. These participants reported the REMS added a layer of bureaucratic complexity that made it difficult for family physicians to navigate, even when trained, to provide abortion care. These family physicians described 2 predominant ways the REMS impede their ability to provide medication abortion: (1) The REMS require substantial involvement of clinic administration, who can be unsupportive; (2) The complexity of navigating the REMS results in physicians and clinic administration in primary care viewing medication abortion as not worth the effort, since it is only a small component of services offered in primary care.

Conclusion: Removing the REMS could simplify integration of medication abortion into primary care, which could meet patient preferences, improve access, and reduce abortion stigma. The FDA's revised REMS criteria may ease administrative burden but will likely maintain key barriers to integrating medication abortion into family physicians' practice.

Implications: Our study highlights that the REMS criteria are barriers to family physicians' ability to integrate medication abortion into their primary care practices. The FDA's removal of in person dispensing criteria may provide some impetus for trained family physicians to integrate medication abortion into their scope of practice but the revised REMS criteria maintain key barriers to broader adoption.

© 2022 The Authors. Published by Elsevier Inc.
This is an open access article under the CC BY-NC-ND license
(http://creativecommons.org/licenses/by-nc-nd/4.0/)

Abbreviations: REMS, Risk Evaluation and Mitigation Strategies; FDA, Food and Drug Administration.
⁎ ☆Declaration of competing interest: The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

⁎⁎ ☆☆Funding: The research reported in this publication was funded through the Society of Family Planning Research Fund (grant award number SFPRF12-MA9).
⁎ Corresponding author.
E-mail address: nrazon@ucdavis.edu (N. Razon).

https://doi.org/10.1016/j.contraception.2022.01.017
0010-7824/© 2022 The Authors. Published by Elsevier Inc. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/)

PCSF606      2022 CP 001120

Downloaded for Anonymous User (n/a) at The George Washington University from ClinicalKey.com by Elsevier on April 20, 2024. For personal use only. No other uses without permission. Copyright ©2024. Elsevier Inc. All rights reserved.

N. Razon et al.                                                                                    Contraception 109 (2022) 19–24

## 1. Introduction

In 2000, the United States Food and Drug Administration (FDA) approved mifepristone for medication abortion. A growing proportion of patients in the United States choose medication abortion instead of an in-office instrumentation procedure: in 2018, medication abortion made up 39% of abortions, up from 23% in 2014 [1–3]. Since only 11% of counties in the United States have a clinician who provides abortion care, many advocates hoped that the availability of mifepristone would allow primary care clinicians to integrate abortion services into their practices [4,5]. Unfortunately, this expansion into primary care has not occurred: more than twenty years later most abortions still take place in specialized abortion clinics, with only 1% of abortions taking place in a physician's office [5].

Family physicians are primary care physicians who provide broad scope of care across the life course, including reproductive health services. Provision of medication abortions by family physicians presents a unique opportunity to enhance access to patient-centered medication abortion care [6]. Further, having family physicians integrate medication abortion into their practice has the potential to destigmatize abortion for patients and providers by normalizing it as a routine part of full-spectrum care [4,7]. Family physicians make up the majority of primary care physicians in the United States and provide care in many counties where there is no access to other health care services [8,9]. Medication abortion care aligns with family medicine values related to meeting patients' needs for comprehensive care [4,6,10,11]. Prior research demonstrates that family physicians who provide abortion services have low complication rates and that some patients prefer to have an abortion with their primary care provider [12–16].

While substantial efforts to expand abortion training for family physicians have been implemented, this has not resulted in substantial numbers of abortions being provided in primary care settings [17–19]. Several studies have outlined barriers that limit the integration of abortion into primary care, even among trained clinicians. These include state laws, health system restrictions, and liability insurance [10,17,18,20,21]. An additional consideration for family physicians wishing to provide mifepristone to their patients is the FDA's stringent Risk Evaluation and Mitigation Strategies (REMS) [22,23]. The REMS criteria for mifepristone includes a formal certification process, which determines that a provider can accurately date a pregnancy, diagnose an ectopic pregnancy, and provide surgical intervention or referral for any complication. Furthermore, the REMS require that each patient sign a Patient Agreement Form. While in December 2021, the FDA announced a critical decision to remove the REMS in person dispensing requirement, the FDA maintained 2 key provisions of the REMS: (1) Providers (and now pharmacies) must receive certification from the manufacturer of mifepristone to prescribe and dispense mifepristone, and (2) patients still must sign a Patient Agreement Form for mifepristone use [24].

Drawing on a national set of qualitative interviews with family physicians, in this article we examine how the REMS for mifepristone specifically impede family physicians' ability to provide medication abortion in primary care settings.

## 2. Methods

This study draws on interviews with family physicians performed with the primary goal of exploring how family medicine values can be leveraged to encourage family physicians to integrate medication abortion into primary care settings to improve abortion access. Given the geographic variation in abortion access across the United States, we focused on recruiting participants from diverse geographies and with a broad range of experiences. We used a multipronged recruitment approach that included recruiting participants from national conferences and from national listservs. In addition, we (CD, SM, LM, SR) used professional networks to purposively sample family physicians from states with more hostile abortion policies, as well as to identify family physicians who had successfully integrated abortion services into primary care or had experience in leadership in family medicine.

Inclusion criteria for this study included being either a new career family physician or a family medicine thought leader. These criteria were based on the desire to focus on the perspectives of those with insights into the ongoing evolution of family medicine practice patterns. We defined new career family physicians as those who completed a family medicine residency in the United States within the previous 10 years. Thought leaders included experts in the field of family medicine with experience motivating other family physicians to expand their scope, or family physicians specifically with experience related to abortion integration into family medicine. The study team directly asked thought leaders to participate in the study.

The study team screened participants in the primary study for eligibility over the phone or in person with an initial eligibility survey, and excluded individuals who self-identified as opposing abortion, based on their responses to: "Are you personally opposed to people getting abortions?" The research team met regularly to review transcripts and discuss findings. During the recruitment process, we also used purposive sampling to speak to individuals who successfully integrated medication abortion into primary care. Once the team established that the themes related to the initial research question and aims reached saturation, by noting similar themes and responses during interviews, recruitment for the primary study ended.

### 2.1. Data collection

We developed an interview guide for the primary study with input from the research team including family physicians, educators, advocates, a social and behavioral scientist, and a communications specialist. Interview questions covered key components of the Theory of Planned Behavior, a well-described and frequently used approach to understanding influences on behavior change with attention to social norms, attitudes, perceived control, and intentions [25]. The research team iterated the interview guide based on participant feedback and themes that arose from interviews. Data for this analysis primarily came from responses to the following interview questions: "What factors do you think most contribute to you not providing medication abortion?" (asked only of those not providing medication abortion in a primary care setting) and, "What do you think are the main reasons why more family physicians don't provide medication abortion?"

Research staff (CD, EF, SW) obtained oral informed consent and participants completed surveys with questions about demographics, training, and clinical experience ahead of the interviews. Three team members (CD, EF, SW), trained in qualitative interview methods and with experience working in reproductive health, conducted the interviews. Two UCSF research staff (EF, SW) conducted most of the interviews with new career family physicians and all interviews with thought leaders. Both self-identify as white women who led projects within the Person-Centered Reproductive Health Program. They are not family physicians or clinicians and therefore studying up in this setting based on clinical hierarchy. CD, a UCSF faculty member and practicing family physician, conducted 4 new career family physician interviews. CD identifies as a white woman. While CD brings extensive research expertise on reproductive health and family medicine, she did not know any of the providers interviewed and related to them as a peer.

Downloaded for Anonymous User (n/a) at The George Washington University from ClinicalKey.com by Elsevier on April 20,
2024. For personal use only. No other uses without permission. Copyright ©2024. Elsevier Inc. All rights reserved.

N. Razon et al.                                                                                          Contraception 109 (2022) 19–24

Interviews took place either in person or virtually over video conferencing software and lasted 60 to 75 minutes. We audio-recorded all interviews. We compensated participants for their time with $100 gift cards. The UCSF Institutional Review Board approved this study.

### 2.2. Analysis

We used a HIPAA-compliant professional transcription service to transcribe verbatim and de-identify all transcripts. A team member (RK, CP, IS, SW) reviewed transcripts to ensure accuracy. Research team members (KH, IS, SW) read transcripts, discussed impressions with the entire study team, and developed a preliminary codebook based on components of the Theory of Planned Behavior.

Two researchers (IS, SW) double coded an initial set of transcripts using NVivo 12 to assess inter-coder agreement, clarify codes, and resolve disagreements. Through this iterative process the research team revised the codebook. Three members of the study team (CP, NR, SW) coded approximately equal number of transcripts and met regularly to achieve consensus on coding and resolve any discrepancies.

We took a deductive-inductive content analysis approach and used memos to identify broad themes [26]. After coding a transcript, the study team drafted a memo to document and describe impressions of the interview. Over the course of the coding process, memos became more structured to highlight key domains. The team regularly met to discuss memos and major themes derived from the transcripts. Based on these analyses, researchers clarified the central attitudes and factors shaping family physicians' perspectives on providing medication abortion. Participants independently raised REMS as a topic that influenced their ability to provide medication abortion or integrate medication abortion into primary care. This paper focuses on a secondary analysis of family physicians' experience and knowledge of the REMS.

### 3. Results

We interviewed 56 family physicians (see Table 1). A plurality of participants received abortion training ($n = 37$, 66%) but most did not currently provide medication abortions ($n = 39$, 70%). Sixteen interviewees (29%) did not receive abortion training and did not provide abortions. Of the physicians that provided abortions 7 offered abortions in the primary care setting where they have a continuity practice with patients, with the remaining providing abortions in specialized reproductive health settings.

Of the 56 family physicians interviewed, 23 (41%) either named or described the REMS criteria as a barrier to providing medication abortion. Participants who mentioned the REMS represented all regions of the country and worked in states with abortion policies that ranged from supportive to hostile. Both thought leaders and new career family physicians raised the REMS criteria as a barrier. Most family physicians who mentioned the REMS criteria received abortion training ($n = 20$, 87%).

Family physicians who raised the REMS criteria described 2 predominant ways the REMS impede their ability to provide medication abortion within primary care: (1) The REMS require substantial involvement of clinic administration, who can be unsupportive; (2) The complexity of navigating the REMS results in physicians and clinic administration in primary care viewing medication abortion as not worth the effort, since it is only a small component of services offered in primary care.

### 3.1. Administrative interference

Participants discussed the REMS criteria as transforming the decision to provide mifepristone from being one between a physician and patient, to involving multiple levels of administration. Participants described to us how dispensing mifepristone requires that their clinics register, install a lockbox on site to stock medication, and have specific systems in place for ordering. These requirements meant that clinic administration must approve the process. As 1 participant who provided medication abortion only at a reproductive health clinic explained, "The only other huge hurdle, which would be wonderful if it could get overturned, it would be the REMS... You just have to sign some papers and have it on-site, but it does, you know, add another level of bureaucracy that we need to overcome to be able to stock the pill in our office" (Early career, northeast, abortion provider). As this participant went on to explain, the REMS criteria not only require providers' training but specifically their clinic's backing.

You really do need [the] support of your administration before you could do it, especially with all the regulations that are required. It's the fact that mifepristone has the REMS criteria, and it's not easy to - you can't just prescribe it. Um, it has to be given to the person in person, so you have to stock it in your clinic, and there's just - those hurdles kind of keep a lot of providers from doing it (Early career, northeast, abortion provider).

The need to navigate regulations and logistics as a result of the REMs meant participants with unsupportive clinic leadership were unable to provide, even if there were no religious or other formal limitations on abortion provision. As another participant explained to us, "You're at the whim of the place that you practice and if the person in charge of your clinic doesn't feel like providing or purchasing mifepristone is important or profitable, then you just don't do it" (Early career, west, abortion provider). Another participant echoed this sentiment: "If you don't have a local champion, you don't have someone who's willing to put the time and effort into it, it's hard to do, right. It's easy for me to prescribe like antibiotics, but it's not so easy for me to prescribe mifepristone 'cause of all the stuff around it" (Early career, northeast, abortion provider).

Because of the restrictions around mifepristone, some participants characterized the REMS criteria as "a stop sign" (Early career, south, not abortion provider) and "the absolute biggest barrier" (Early career, south, not abortion provider) to providing medication abortion. One family physician trained in medication abortion felt unable to provide specifically because of the REMS. "Unfortunately, there's just so much more red tape... I would be doing it in a heartbeat if I could prescribe mifepristone, and my patient could pick it up at a commercial pharmacy, but she can't because of the way it's regulated by the FDA" (Early career, south, not abortion provider).

Even among family physicians who do provide abortions, several felt that the complexity required to implement medication abortion steered their colleagues away from adopting it into their scope of practice.

I think number 1 is the restrictions on mifepristone. That's a huge 1 because - because there are so many restrictions, it scares people into thinking that they can't do medication abortions. So even though you may - there may be a lot of physicians out there who agree with medication abortion and would, you know, in theory would do it, there's so many restrictions and barriers to doing it, I think it really turns people off (Early career, midwest, abortion provider).

One of the thought leaders we interviewed who provides medication abortion emphasized the barrier the REMS criteria pose for most family physicians.

I think the REMS is a huge factor. It's because the access to the medication is restricted and you have to order it and stock it in your health center. You have to get a lot of other people's approval before - you know, you can't just write a prescription... So, you know, you have to go to a pharmacy and therapeutics committee or the Director of Nursing has to approve it or the CEO has to ap-

Downloaded for Anonymous User (n/a) at The George Washington University from ClinicalKey.com by Elsevier on April 20,
2024. For personal use only. No other uses without permission. Copyright ©2024. Elsevier Inc. All rights reserved.

Case Case1:07-cv-00493-RJO-RTm Document 240-510/Pled405/27/2364Page62 of591
N. Razon et al.                                                                    Contraception 109 (2022) 19–24
PageID.8959

**Table 1**

Participants' demographics and abortion training and provision in six US states in 2020

| Gender | Total participants N = 56 (%) | Mentioned REMS N = 23 (%) |
|---|---|---|
| Female | 43 (77) | 19 (83) |
| Male | 12 (21) | 4 (17) |
| Non-binary/third gender | 1 (2) | 0 |
| Race | | |
| American Indian/Alaska Native | 0 | 0 |
| Asian | 9 (16) | 2 (9) |
| Black or African American | 5 (9) | 1 (4) |
| Native Hawaiian/Pacific Islander | 1 (2) | 0 |
| White | 35 (63) | 18 (78) |
| Other | 6 (11) | 2 (9) |
| Ethnicity | | |
| Hispanic or Latino/a/x | 3 (5) | 0 |
| Non-Hispanic or Latino/a/x | 53 (95) | 23 (100) |
| Age (years) | | |
| ≤30 | 1 (2) | 0 |
| 31–40 | 45 (80) | 18 (78) |
| 41–50 | 5 (9) | 1 (4) |
| 51–60 | 4 (7) | 3 (13) |
| >60 | 1 (2) | 1 (4) |
| Regions of the U.S.[a] | | |
| West | 23 (41) | 8 (35) |
| South | 13 (23) | 5 (22) |
| Midwest | 6 (11) | 2 (9) |
| Northeast | 14 (25) | 8 (35) |
| State Abortion Policy Landscape[b] | | |
| Hostile | 20 (36) | 7 (30) |
| Neutral | 4 (7) | 3 (13) |
| Supportive | 30 (54) | 11 (48) |
| N/A | 2 (4) | 2 (9) |
| Approximate distance between provider's clinical setting and nearest abortion clinic[c] (miles) | | |
| <5 | 32 (57) | 19 (83) |
| 5–25 | 15 (27) | 2 (9) |
| 26–50 | 4 (7) | 1 (4) |
| >50 | 4 (7) | 1 (4) |
| Unknown | 1 (2) | 0 |
| Abortion Training | | |
| Aspiration and medication abortion | 35 (63) | 19 (83) |
| Only aspiration abortion | 3 (5) | 1 (4) |
| Only medication abortion | 2 (4) | 0 |
| Neither aspiration or medication abortion | 16 (29) | 3 (13) |
| Abortion services provided since graduating residency | | |
| Aspiration and medication abortion | 16 (29) | 12 (52) |
| Only aspiration abortion | 0 | 0 |
| Only medication abortion | 5 (9) | 3 (13) |
| Neither aspiration or medication abortion | 35 (63) | 8 (35) |
| Current medication abortion provision | | |
| Currently provides medication abortion | 17 (30) | 14 (61) |
| Does not currently provide medication abortion | 39 (70) | 9 (39) |
| Setting of current abortion provision | | |
| Primary care | 5 (9) | 3 (13) |
| Reproductive health clinic | 10 (18) | 9 (39) |
| Primary care and reproductive health clinic | 2 (4) | 2 (9) |
| N/A (Does not provide abortion care) | 39 (70) | 9 (39) |

[a] U.S. Census Bureau, Census Regions and Divisions of the United States, 2013.

[b] Nash E, State Abortion Policy Landscape: From Hostile to Supportive, Guttmacher Institute, 2019. *State categories were based on laws in effect as of July 1, 2020. N/A refers to areas where a state policy landscape was not available.* https://www.guttmacher.org/article/2019/08/state-abortion-policy-landscape-hostile-supportive

[c] ANSIRH, Abortion Facility Database, University of California, San Francisco, 2019. *Distance was calculated using the zip code of the clinic where the provider works and the address of the closest clinic that offers abortion care in the ANSIRH Facility Database. If a provider works at multiple sites, the zip code of the furthest clinic from an abortion clinic was used.* https://www.ansirh.org/abortion-facility-database

prove it or the Medical Director has to approve it, or all of those people have to approve it. And there's bound to be somebody in there who doesn't like the idea (Though leader, northeast, abortion provider).

### 3.2. Medication abortion as only a small part of primary healthcare

The REMS criteria impose the same restrictions on all clinical practices and prescribers, regardless of abortion volume. A number of participants mentioned that because a family medicine clinic might only care for patients choosing a medication abortion a few times a month (or even year), this low volume served as justifi-

cation for leadership as to why they should not pursue approval to dispense mifepristone. In short, clinic leadership, and at times participants themselves, felt that the effort required to stock and dispense mifepristone outweigh the benefits of providing the service. As 1 participant explained, "Many primary care clinics think, oh, if our volume is low, like why bother going through all of this headache to be able to provide the service when, you know, we have maybe like 4 a week or something like that" (Early career south, not abortion provider).

Multiple participants highlighted how the REMS' disproportionately impacts clinics with low abortion volume. One participant we spoke with received training in medication abortion during resi-

PCSF609                                                          2022 CP 001123

Downloaded for Anonymous User (n/a) at The George Washington University from ClinicalKey.com by Elsevier on April 20,
2024. For personal use only. No other uses without permission. Copyright ©2024. Elsevier Inc. All rights reserved.

N. Razon et al.                                                                                                    Contraception 109 (2022) 19–24

dency, but she did not provide in her current practice. The REMS criteria determined where medication abortion took place in her organization as a mifepristone lockbox was only provided to the ob/gyn department. She explained,

[F] or Mifeprex specifically, there's a multitude of restrictions that make it logistically incredibly challenging, depending on how many patients actually need it… The really irritating thing about it is they got exactly what they wanted by passing that, right? Which is that… you make a logistical barrier so high that providers who completely support it ideologically just don't feel that it's worth the time… While I wholly support it [mifepristone] being available, I can also see how, in terms of the use of time, like me like training and signing off every provider. And like making sure this med is stocked. And making sure there's lockboxes. And like all of this stuff. Uh, is an enormous burden relative to the number of patients whose lives it would improve (Early career, west, not abortion provider).

## 4. Discussion

In a United States sample of family physicians, we found that the REMS on mifepristone creates a barrier to some family physicians' ability to provide medication abortion in their primary care clinics, with many interviewees sharing without prompting that the REMS prevented them from providing medication abortion. While these criteria are not the only barriers family physicians hoping to provide medication abortion encounter [27], the REMS do pose specific challenges for family physicians. Furthermore, given mifepristone's safety record, the need for the REMS (even in its revised form) has been questioned [22,28,29]. Our findings add to growing research documenting the negative impact of the REMS on primary care practitioners' ability to provide medication abortions [23,30]. In their study of primary care physicians and administrators in Illinois, Calloway and colleagues characterize the REMS as the "linchpin of a cycle of stigmatization that continues to keep mifepristone out of primary care practice" [30]. As family physicians make up the majority of primary care physicians in the United States, our study adds to this literature by characterizing how this key group of physicians experience the REMS criteria and suggests that fully removing the REMS from mifepristone would be an important facilitator of efforts to broaden medication abortion access.

While our study took place prior to the FDA's decision to partially revise the REMS, our research provides insights into how this decision may impact United States family physicians' ability to provide medication abortion. The FDA's removal of the in person dispensing provision may encourage family physicians whose clinical site previously did not support the provision of medication abortion to provide medication abortion. This group of family physicians, who made up the majority of our sample, could now prescribe mifepristone directly to a certified pharmacy. The removal of the in person dispensing means that much of the administrative and clinic barriers and complexity that study participants described may be more easily overcome.

Nonetheless, the physicians we interviewed still encountered a range of barriers to provide medication abortions that the revised REMS will not alleviate. For example, the certification requirement for providers, and now pharmacies, may continue to serve as a gatekeeper for some providers. The ongoing requirement for patients to sign a Patient Agreement Form may also limit the ability of family physicians to provide medication abortion, especially since having this form on site and incorporating it into medical records requires the involvement of clinical administrators. To our knowledge, there is no existing evidence that supports maintaining this requirement or how this form impacts clinicians' ability to integrate or provide medication abortion. Beyond the REMS re-

strictions, family physicians will continue to experience additional barriers, including the restriction on provision of abortion in Federally Qualified Health Centers because of the Hyde Amendment and state-level restrictions on telemedicine for abortion care.

The experience of the Canadian health care system with mifepristone expansion into primary care provides useful insights into the potential impact of fully removing the REMS criteria [33]. In 2015, mifepristone was approved by Health Canada for medication abortion. The initial Risk Management Plan, similar to the FDA's REMS, instituted by Health Canada limited the availability and accessibility to medication abortion by limiting gestational age at the time of abortion to 7 weeks, requiring an ultrasound prior to dispensing, requiring providers to register with the manufacturer, and only allowing providers to dispense medications [34]. However, through the efforts of advocacy groups and regional professional organizations, Canada decreased regulations, including eliminating the ultrasound requirement and allowing pharmacists to directly dispense to patients. A study in Ottawa documented that after these changes, participants experienced shorter wait times and an increase in medication abortion access [35]. It is important to note, however, that these decreased regulations occurred alongside other influences on medication abortion access and provision, including government financing of abortion care and trainings conducted by the Canadian Academy of Family Physicians and the National Abortion Federation Canada.

In the United States, models such as *ExPAND Mifepristone* demonstrate that learning collaborations that provide evidence-based knowledge on the clinical use of mifepristone and expertise on best practices to navigate the administrative logistics are important aspects of reducing logistical and psychological barriers to abortion provision in primary settings [30]. In addition, recent models of online provision of medication abortion by family physicians provide encouraging direction for expanding care [31,32]. These broad efforts will likely be necessary, alongside the full elimination of the REMS, to reduce stigma and optimize provision of medication abortion in primary care settings.

Because abortion restrictions vary across the United States, 1 of the strengths of our study is our geographically diverse sample of family physicians working in different practice settings. Our interview methodology allowed physicians to share in depth experiences with abortion provision that may not be captured in survey data. Nonetheless, our study does have limitations that are important for consideration when interpreting our findings. First, as with all qualitative studies, the small and not inherently representative sample limits the generalizability of our findings. While we did not necessarily seek to recruit abortion trained physicians who are not providing abortion care, our sample did have more individuals who received abortion training, which does not reflect the broader family medicine community. In addition, our study design was not aimed to explore REMS specifically or the role of REMS in relationship to other barriers. As a result, we may not have fully elucidated experiences related to REMs from our participants, and our ability to compare barriers or explore the role of REMS for participants who did not bring up this topic is limited. Nonetheless we believe that the emphasis many participants placed on the impacts of the REMS criteria on their practice highlights its role in shaping abortion provision.

Mifepristone's approval in 2000 did not significantly improve abortion access through integration into primary care, and our interviews demonstrate the role that the REMS criteria played in this failure. The FDA's decision to revise the REMS on mifepristone has been long overdue, yet it does not go far enough. By keeping key components of the REMS in place, the FDA maintains an exceptionality to abortion services and may continue to keep abortion outside the scope of routine medical care. By permanently, and fully, removing the REMS on mifepristone family physicians and

Downloaded for Anonymous User (n/a) at The George Washington University from ClinicalKey.com by Elsevier on April 20,
2024. For personal use only. No other uses without permission. Copyright ©2024. Elsevier Inc. All rights reserved.

other primary care providers could more easily incorporate medication abortion into their scope of practice and integrate medication abortion into primary care settings. Such changes can better honor patient preferences for where abortion services are offered, reduce abortion stigma for providers and patients, and finally improve abortion access for millions across the United States.

## Acknowledgments

The authors would like to thank Shelly Rodrigues, Edith Fox, Ilana Silverstein, Kelsey Holt, and Rassidatou Konate for their input into the parent study on which the data for this analysis was drawn. Also, would like to thanks to the many physicians who spoke with us and shared their time, insights, and persistence.

## References

[1] Newhall EP, Winikoff B. Abortion with mifepristone and misoprostol: Regimens, efficacy, acceptability and future directions. Am J Obstetr Gynecol 2000;183:S44–53. doi:10.1067/mob.2000.107950.

[2] Pazol K, Creanga AA, Burley KD, Jamieson DJ. Abortion surveillance - United States, 2011. MMWR Surveill Summ 2014;63:1–41. doi:10.15585/mmwr.ss6811a1.

[3] Kortsmit K, Jatlaoui TC, Mandel MG, Reeves JA, Oduyebo T, Petersen E, et al. Abortion surveillance — United States, 2018. MMWR Surveill Summ 2020;69:1–30. doi:10.15585/MMWR.SS6907A1.

[4] Yanow S. It is time to integrate abortion into primary care. Am J Public Health 2013;103:14–16. doi:10.2105/AJPH.2012.301119.

[5] Jones RK, Witwer E, Jerman J. Abortion Incidence and Service Availability the United States, 2017. New York: 2019. https://doi.org/Abortion Incidence and Service Availability in the United States, 2017.

[6] Amico JR, Godfrey EM. Providing abortion services in the primary care setting. Prim Care 2018;45:599–613. doi:10.1016/j.pop.2018.07.010.

[7] Dianat S, Silverstein IA, Holt K, Steinauer J, Dehlendorf C. Breaking the silence in the primary care office: patients' attitudes toward discussing abortion during contraceptive counseling. Contraception X 2020;16(2):100049. doi:10.1016/j.conx.2020.100029.

[8] Petterson S, McNellis R, Klink K, Meyers D, Bazemore A. The state of primary care in the United States: a chartbook of facts and statistics. Washington, DC: Robert Graham Center; 2018.

[9] The United States relies on family physicians unlike any other specialty. Am Fam Physician 2001;63:1669.

[10] Block A, Dehlendorf C, Biggs MA, McNeil S, Goodman S. Postgraduate experiences with an advanced reproductive health and abortion training and leadership program. Fam Med 2017;49:706–13.

[11] Nothnagle M, Prine L, Goodman S. Benefits of comprehensive reproductive health education in family medicine residency. Fam Med 2008;40:204–7.

[12] Herbitter C, Bennett A, Schubert FD, Bennett IM, Gold M. Management of early pregnancy failure and induced abortion by family medicine educators. J Am Board Fam Med 2013;26:751–8. doi:10.3122/jabfm.2013.06.120248.

[13] Rubin SE, Godfrey E, Gold M. Patient attitudes toward early abortion services in the family medicine clinic. J Am Board Fam Med 2008;21:162–4. doi:10.3122/jabfm.2008.02.070158.

[14] Paul M, Nobel K, Goodman S, Lossy P, Moschella JE, Hammer H. Abortion training in three family medicine programs: resident and patient outcomes. Fam Med 2007;39:184–9.

[15] Bennett I, Baylson M, Kalkstein K, Gillespie G, Bellamy S, Fleischman J. Early abortion in family medicine: clinical outcomes. Ann Fam Med 2009;527–33. doi:10.1370/afm.1051.

[16] Logsdon MB, Handler A, Godfrey EM. Women's preferences for the location of abortion services: a pilot study in two Chicago clinics. Matern Child Health J 2012;16:212–16. doi:10.1007/s10995-010-0722-4.

[17] Greenberg M. Barriers and enablers to becoming abortion providers. Fam Med 2017;44:493–500.

[18] Goodman S, Shih G, Hawkins M, Feierabend S, Lossy P, Waxman NJ, et al. A long-term evaluation of a required reproductive health training rotation with opt-out provisions for family medicine residents. Fam Med 2013;45:180–6.

[19] Srinivasulu S, Maldonado L, Prine L, Rubin S. Intention to provide abortion upon completing family medicine residency and subsequent abortion provision: a 5-year follow-up survey. Contraception 2019;100:188–92.

[20] Dehlendorf C, Brahmi D, Engel D, Grumbach K, Joffe C, Gold M. Integrating abortion training into family medicine residency programs. Fam Med 2007;39:337–42.

[21] Dehlendorf CE, Grumbach K. Medical liability insurance as a barrier to the provision of abortion services in family medicine. Am J Public Health 2008;98:1770–4. doi:10.2105/AJPH.2008.136325.

[22] EIG Raymond, K Blanchard, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of overregulation: time to unburden mifeprex. N Engl J Med 2017;376:790–4. doi:10.1056/NEJMsb1612526.

[23] Srinivasulu S, Yavari R, Brubaker L, Prine L, Riker L, Prine L, et al. US clinicians' perspectives on how mifepristone regulations affect access to medication abortion and early pregnancy loss care in primary care. Contraception 2021;104:92–7.

[24] U.S. Food and Drug Administration. "Mifeprex (mifepristone) Information." Accessed: December 17, 2021. Available: https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/mifeprex-mifepristone-information.

[25] Ajzen I. The theory of planned behavior. Organ Behav Hum Decis Process 1991;50:179–211. doi:10.1016/0749-5978(91)90020-T.

[26] Hsieh H-F, Shannon SE. Three approaches to qualitative content analysis. 2005. https://doi.org/10.1177/1049732305276687.

[27] Razon N, Wulf S, Perez C, McNeil S, Maldonado S, Byrne Fields A, et al. A qualitative analysis of family physicians' barriers and facilitators to incorporating medication abortion into primary care Na'amah Razona, Sarah Wulf, Citlali Perez, Sarah McNeil, Lisa Maldonado, Alison Byrne Fields, Kelsey Holt, Edith Fox, Ilana Silverstein, Christine Dehlendorf. J Am Board Fam Med 2022 In Press.

[28] Cleland K, Smith N. Aligning mifepristone regulation with evidence: Driving policy change using 15 years of excellent safety data. Contraception 2015;92:179–81. doi:10.1016/j.contraception.2015.06.016.

[29] Kaye J, Reeves R, Chaiten L. The mifepristone REMS: a needless and unlawful barrier to care. Contraception 2021;104:12–15.

[30] Calloway D, Stulberg D, Janiak E. Mifepristone restrictions and primary care: breaking the cycle of stigma through a learning collaborative model in the United States. Contraception 2021;104:24–8.

[31] Godfrey E, Thayer E, Fiastro A, Aiken A, Gomperts R. Family medicine provision of online medication abortion in three US states during COVID-19. Contraception 2021;104:54–60.

[32] Upadhyay UD, Koenig LR, Meckstroth KR. Safety and efficacy of telehealth medication abortions in the US during the COVID-19 pandemic. JAMA Netw Open 2021;4(8):e2122320. doi:10.1001/jamanetworkopen.2021.22320.

[33] Munro S, Guilbert E, Wagner MS, Wilcox ES, Devane C, Dunn S, et al. Perspectives among Canadian physicians on factors influencing implementation of mifepristone medical abortion: a national qualitative study. Ann Fam Med 2020;18:413–21. doi:10.1370/afm.2562.

[34] Yalahow A, Doctoroff J, Mark A, Foster AM. Trends in medication abortion provision before and after the introduction of mifepristone: a study of the National Abortion Federation's Canadian member services. Contraception 2020;102:119–21. doi:10.1016/j.contraception.2020.04.012.

[35] LaRoche KJ, Labeca-Gordon IN, Foster AM. How did the introduction of mifepristone impact the availability of abortion care in Ottawa? a qualitative study with abortion patients. Facets 2020;5:559–70. doi:10.1139/FACETS-2020-0019.

Downloaded for Anonymous User (n/a) at The George Washington University from ClinicalKey.com by Elsevier on April 20, 2024. For personal use only. No other uses without permission. Copyright ©2024. Elsevier Inc. All rights reserved.

 

June 21, 2022

Robert Califf, MD
Commissioner
U.S. Food and Drug Administration
5630 Fishers Lane, Rm. 1061
Rockville, MD 20852

*Re: U.S. Food and Drug Administration actions related to mifepristone*

Dear Dr. Califf:

On behalf of the American College of Obstetricians and Gynecologists (ACOG), representing more than 60,000 physicians and partners dedicated to advancing women's health and individuals seeking obstetric and gynecologic care, and the American Medical Association, we write to express our appreciation for the support demonstrated by the U.S. Food and Drug Administration (FDA) in response to the needs of individuals seeking reproductive care. Respectfully, we request that additional actions are taken to improve access to quality women's health care. In anticipation of the crisis to abortion access that is expected to follow the United States Supreme Court's decision in the *Dobbs v. Jackson Women's Health Organization* case, we strongly urge you to prioritize the following evidence-based decisions that will increase access to mifepristone:

- Reconsider the implementation of the Risk Evaluation and Mitigation Strategies (REMS) and Elements to Assure Safe Use (ETASU) requirements for mifepristone and ensure the process does not add unnecessary and unmitigated burdens for physicians, patients, and pharmacies; and
- Explicitly preempt state laws relating to mifepristone that are not evidence-based, that interfere with the medically necessary and appropriate use of a safe and effective drug, and that frustrate the FDA's regulatory decisions relating to mifepristone, and that have inconsistent policies and laws restricting access to mifepristone.

**Mifepristone is Safe and Effective**

Mifepristone is a safe, effective, and important component of treatment and management for early pregnancy loss (i.e., spontaneous abortion, miscarriage, missed abortion) and induced abortion. Mifepristone has been used by over 3 million women in the United States since FDA approval in 2000, and robust evidence exists regarding the safety of mifepristone for medication-induced abortion.[1,2,3,4]

Early pregnancy loss is common, occurring in 10% of all clinically recognized pregnancies and affects approximately 1 million women in the U.S. annually.[5,6] Recent evidence demonstrates that mifepristone significantly improves the safe and effective medical management of early pregnancy loss when taken as part of a two-medication regimen.[7,8] A 2018 randomized controlled trial demonstrated that people who received mifepristone in addition to misoprostol experienced increased rates of complete expulsion and required fewer procedures compared to those who received misoprostol alone.[9] Therefore, we ask that the FDA modify the mifepristone label indicating that mifepristone is approved for the use of miscarriage management.

As referenced in ACOG clinical guidance, the evidence supports medication abortion as a safe and effective method of providing abortion care.[10] Barriers to accessing mifepristone do not make care safer, are not based on medical evidence, and create barriers to patient access to essential reproductive health care.[11,12] Abortion care is time-sensitive: delays in care increase risk to patients and potentially results in an abortion being completely inaccessible.[13] Research conducted during the COVID-19 pandemic demonstrates that when enforcement of the in-person dispensing requirement for mifepristone was suspended, abortion through telehealth contact and mailed medications was safe.[14]

According to reaffirmed ACOG guidance, second-trimester abortion is safely accomplished through medical induction or medical abortion, especially when compared with other methods.[15] Mifepristone followed in 24–48 hours by misoprostol is the most effective regimen for second-trimester medical abortion.[16] In fact, that regimen is up to 91% successful within 24 hours of initiation of misoprostol, and outcomes include a significantly shorter induction interval and fewer adverse effects than misoprostol alone.[17]

**FDA Preemption of State Laws that Restrict Access to Mifepristone**

There are currently nineteen states that require a physician to be present upon delivery of mifepristone; two states have made it illegal to use mifepristone at earlier gestation ages than the label allows.[18] Neither of these state restrictions are evidence-based.

Mifepristone is approved by the FDA to be used with misoprostol for medication abortion through 70 days of gestation.[19,20] In 2016, the FDA expanded the gestational age limit from 49 to 70 days (10 weeks) to better correspond with recently published evidence.[21,22] The 2015 systematic review reported average effectiveness rates of 96.7% in the 8th week, 95.2% in the 9th week, and 93.1% in the 10th week. Subsequently, evidence-based guidelines concluded that mifepristone followed in 24–48 hours by misoprostol is the most effective regimen for second-

trimester medical abortion.[23] Currently, strong evidence supports the use of the mifepristone regimen through 77 days gestation, and multi-center study published in 2022 found that many physicians offer mifepristone up to 77 days.[24,25]

Experts, including ACOG, and the growing body of scientific evidence, demonstrate that the FDA regulations should preempt those state laws and prevent state lawmakers from imposing restrictions that are not evidence-based, that interfere with the medically necessary and appropriate use of a safe and effective drug, that frustrate access to necessary care and are inconsistent with the FDA's regulatory decisions relating to mifepristone.

**Revisit or Remove the Risk Evaluation and Mitigation Strategies (REMS) and Elements to Assure Safe Use (ETASU) Requirements for Mifepristone**

Recognizing the accomplishments of the FDA in modifying the REMS for mifepristone, we continue to urge the FDA to remove or make further changes to the REMS and ETASU requirements to allow obstetrician–gynecologists and other physicians to deliver the highest quality care for their patients. While the FDA updated the REMS for mifepristone in December 2021, the REMS for mifepristone still requires use of a provider agreement form, a patient agreement form and dispensing from a pharmacy certified by the drug distributors. The agency and manufacturers have not yet defined the pharmacy certification process; however, we are concerned that this unnecessary hurdle could serve as a deterrent to pharmacies' decisions to stock and dispense mifepristone. To increase access to mifepristone, we ask that, at a minimum, the FDA simplify the pharmacy certification process, eliminate the requirement for patients to sign a form to get the drug, lift the requirement that prescribers acquire a certification from the manufacturer, and evaluate adding protections for availability of mifepristone via telehealth.

**Failure to Improve Access to Mifepristone Will Threaten to Exacerbate the Maternal Mortality Crisis**

The United States leads the developed world in rates of maternal mortality. In 2020, the most recent year for which data is available, there were 23.8 deaths per 100,000 live births, up from 20.1 in 2019.[26] Alarmingly, the maternal mortality rate for Black women was 55.3 deaths per 100,000 live births, 2.9 times the rate for White women, and rates significantly increased for both Black and Hispanic women.[27] The rising maternal mortality rates and persistent racial disparities in maternal outcomes are unacceptable. However, without sufficient access to abortion care, including mifepristone, these figures are certain to climb.

Current data support an association between restricted access to safe and legal abortion and higher rates of maternal morbidity and mortality, with already vulnerable populations experiencing the greatest burden.[28,29,30] At just 0.3 deaths per 100,000 abortions performed at or before 8 weeks, the mortality rate associated with abortion is significantly lower than the mortality rate associated with childbirth.[31] A lack of access to mifepristone will result in more pregnancies, including high-risk pregnancies, which is associated with the much higher maternal mortality rates described above. A recent study estimated a total, nationwide abortion ban would increase pregnancy-related deaths by 7% in the first year and 21% in subsequent years, including a 33% increase for Black people.[32]

Furthermore, research suggests that a lack of abortion access carries the risk of adverse physical outcomes. The harm of mifepristone restrictions is also more pronounced for patients with medical conditions for which a medication abortion may be preferable to uterine aspiration. Such examples include uterine fibroids that significantly distort the cervical canal or uterine cavity, congenital uterine anomalies, or introital scarring related to infibulation.[33] Patients with asthma are candidates for medication abortion because misoprostol does not cause bronchoconstriction and actually acts as a weak bronchodilator.[34] Carrying a pregnancy to term is also associated with mental health conditions. A 2017 study found women who were denied abortions experienced more symptoms of anxiety, lower self-esteem, and lower life satisfaction after one week than their counterparts who obtained abortions.[35] Perinatal depression, which includes major and minor depressive episodes that occur during pregnancy or in the first 12 months after delivery, is one of the most common medical complications during pregnancy and the postpartum period, affecting one in seven.[36] Finally, restrictions on the use of telemedicine have a disproportionate effect on rural people's access to abortion, who are forced to travel substantially greater distances outside of their communities than nonrural women for care.[37]

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

Thank you for your attention to this critical issue and your continued partnership with us. Your commitment and dedication to advancing women's health and individuals receiving obstetric and gynecologic care is recognized and appreciated. Should you have any questions, please contact Rebecca Lauer, Manager, Federal Affairs, at rlauer@acog.org.

Sincerely,

*Maureen S. Phipps, MD*

Maureen G. Phipps, MD, MPH, FACOG
Chief Executive Officer
American College of Obstetricians and Gynecologists

*James L. Madara*

James L. Madara, MD
CEO, Executive Vice President
American Medical Association

cc:    The Honorable Joseph R. Biden, Jr.
        The Honorable Kamala D. Harris

[1] Improving Access to Mifepristone for Reproductive Health Indications. Position Statement. American College of Obstetricians and Gynecologists. June 2018. Available at https://www.acog.org/clinical-information/policy-and-position-statements/position-statements/2018/improving-access-to-mifepristone-for-reproductive-health-indications.

[2] Cleland K, Smith N. Aligning mifepristone regulation with evidence: Driving policy change using 15 years of excellent safety data. *Contraception*. 2015;92(3):179-181. doi:10.1016/j.contraception.2015.06.016.

[3] Sixteen Years of Overregulation: Time to Unburden Mifeprex. *N Engl J Med*. 2017;376(8):790-794.

[4] Song LP, Tang SY, Li CL, Zhou LJGYK, Mo XT. Early medical abortion with self-administered low-dose mifepristone in combination with misoprostol. *J Obstet Gynaecol Res*. 2018;44(9):1705-1711. doi:10.1111/jog.13716.

[5] Early pregnancy loss. Practice Bulletin No. 150. American College of Obstetricians and Gynecologists. Obstet Gynecol 2015;125:1258-67.

[6] Ventura SJ, Curtin SC, Abma JC, Henshaw SK. Estimated pregnancy rates and rates of pregnancy outcomes for the United States, 1990-2008. Natl Vital Stat Rep 2012;60(7):1-21.

[7] Schreiber CA, Creinin MD, Atrio J, Sonalkar S, Ratcliffe SJ, Barnhart KT. Mifepristone pretreatment for the medical management of early pregnancy loss. N Engl J Med 2018;378:2161-70.

[8] Westhoff CL. A Better medical regimen for the management of miscarriage. N Engl J Med 2018;378:2232-3.

[9] Schreiber CA , Creinin MD , Atrio J , Sonalkar S , Ratcliffe SJ , Barnhart KT . Mifepristone pretreatment for the medical management of early pregnancy loss . N Engl J Med 2018; 378:2161-70.

[10] Medication abortion up to 70 days of gestation. ACOG Practice Bulletin No. 225. American College of Obstetricians and Gynecologists. Obstet Gynecol 2020;136:e31–47.

[11] Grossman D, Grindlay K, Altshuler AL, Schulkin J. Induced abortion provision among a national sample of obstetrician-gynecologists. Obstet Gynecol 2019;133:477–83.

[12] Raymond EG, Blanchard K, Blumenthal PD, Cleland K, Foster AM, Gold M, et al. Sixteen years of overregulation: time to unburden mifeprex. Mifeprex REMS Study Group. N Engl J Med 2017;376:790–4.

[13] Joint Statement on Abortion Access During the COVID-19 Outbreak. March 18, 2020. Available at: https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion-access-during-the-covid-19-outbreak.

[14] Kerestes C, Murayama S, Tyson J, Natavio M, Seamon E, Raidoo S, et al. Provision of medication abortion in Hawaiʻi during COVID-19: Practical experience with multiple care delivery models. Contraception 2021.

[15] Second-trimester abortion. Practice Bulletin No. 135. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;121:1394–1406.

[16] Ibid.

[17] Ibid.

[18] Guttmacher Institute. Medication Abortion. Available at: https://www.guttmacher.org/state-policy/explore/medication-abortion. Retrieved June 16, 2022.

[19] Second-trimester abortion. Practice Bulletin No. 135. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;121:1394–406.

[20] World Health Organization. Medical management of abortion . Geneva: WHO; 2018. Available at: https://apps.who.int/iris/bitstream/handle/10665/278968/9789241550406-eng.pdf?ua=1. Retrieved June 16, 2022.

[21] Abbas D, Chong E, Raymond EG. Outpatient medical abortion is safe and effective through 70 days gestation. Contraception 2015;92:197–9.

[22] Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol 2015;126:12–21.

[23] Second-trimester abortion. Practice Bulletin No. 135. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;121:1394–406.

[24] 3. Dzuba IG, Chong E, Hannum C, et al. A non-inferiority study of outpatient mifepristone-misoprostol medical abortion at 64-70 days and 71-77 days of gestation. Contraception. 2020;101(5):302-308.

[25] Upadhyay UD, Raymond EG, Koenig LR, et al. Outcomes and Safety of History-Based Screening for Medication Abortion: A Retrospective Multicenter Cohort Study. JAMA Intern Med. 2022;182(5):482–491.

[26] Hoyert DL. Maternal mortality rates in the United States, 2020. National Center for Health Statistics Health E-Stats. February 23, 2022. doi: https://dx.doi.org/10.15620/cdc:113967

[27] Ibid.

[28] Addante, A.N., et al., *The association between state-level abortion restrictions and maternal mortality in the United States, 1995-2017.* Contraception, 2021. 104(5): p. 496-501.

[29] Hawkins, S.S., et al., *Impact of State-Level Changes on Maternal Mortality: A Population-Based, Quasi-Experimental Study.* Am J Prev Med, 2020. 58(2): p. 165-174.

[3030] Verma, N. and S.A. Shainker, *Maternal mortality, abortion access, and optimizing care in an increasingly restrictive United States: A review of the current climate.* Semin Perinatol, 2020. 44(5): p. 151269.

[31] Medicaid Coverage of Abortion. Guttmacher Institute. Medicaid Coverage of Abortion. Available at: https://www.guttmacher.org/evidence-you-can-use/medicaid-coverage-abortion. Retrieved June 16, 2022.

[32] Stevenson, AJ. The Pregnancy-Related Mortality Impact of a Total Abortion Ban in the United States: A Research Note on Increased Deaths Due to Remaining Pregnant. *Demography.* December 1, 2021; 58 (6):2019–2028. doi: https://doi.org/10.1215/00703370-9585908.

[33] Second-trimester abortion. Practice Bulletin No. 135. American College of Obstetricians and Gynecologists. Obstet Gynecol 2013;121:1394–406.

[34] Ibid.

[35] Biggs MA, Upadhyay UD, McCulloch CE, Foster DG. Women's Mental Health and Well-being 5 Years After Receiving or Being Denied an Abortion: A Prospective, Longitudinal Cohort Study. *JAMA Psychiatry.* 2017;74(2):169–178. https://doi:10.1001/jamapsychiatry.2016.3478.

[36] Gavin NI, Gaynes BN, Lohr KN, Meltzer-Brody S, Gartlehner G, Swinson T. Perinatal depression: a systematic review of prevalence and incidence. *Obstet Gynecol.* 2005;106:1071–83.

[37] Health disparities in rural women. Committee Opinion No. 586. American College of Obstetricians and Gynecologists. Obstet Gynecol 2014;123:384–8.


**World Health Organization**

# Medical management of abortion

**Medical management of abortion, 2018**
ISBN 978-92-4-155040-6

© **World Health Organization 2018**

**Some rights reserved.** This work is available under the Creative Commons
Attribution-NonCommercial-ShareAlike 3.0 IGO licence (CC BY-NC-SA 3.0 IGO;
https://creativecommons.org/licenses/by-nc-sa/3.0/igo).

Under the terms of this licence, you may copy, redistribute and adapt the work for
non-commercial purposes, provided the work is appropriately cited, as indicated below.
In any use of this work, there should be no suggestion that WHO endorses any specific
organization, products or services. The use of the WHO logo is not permitted. If you
adapt the work, then you must license your work under the same or equivalent Creative
Commons licence. If you create a translation of this work, you should add the following
disclaimer along with the suggested citation: "This translation was not created by the
World Health Organization (WHO). WHO is not responsible for the content or accuracy of
this translation. The original English edition shall be the binding and authentic edition".

Any mediation relating to disputes arising under the licence shall be conducted in
accordance with the mediation rules of the World Intellectual Property Organization.

**Suggested citation.** Medical management of abortion. Geneva: World Health
Organization; 2018. Licence: CC BY-NC-SA 3.0 IGO.

**Cataloguing-in-Publication (CIP) data.** CIP data are available at http://apps.who.int/iris.

**Sales, rights and licensing.** To purchase WHO publications, see http://apps.who.int/
bookorders. To submit requests for commercial use and queries on rights and licensing,
see http://www.who.int/about/licensing.

**Third-party materials**. If you wish to reuse material from this work that is attributed
to a third party, such as tables, figures or images, it is your responsibility to determine
whether permission is needed for that reuse and to obtain permission from the
copyright holder. The risk of claims resulting from infringement of any third-party-owned
component in the work rests solely with the user.

**General disclaimers.** The designations employed and the presentation of the material
in this publication do not imply the expression of any opinion whatsoever on the part of
WHO concerning the legal status of any country, territory, city or area or of its authorities,
or concerning the delimitation of its frontiers or boundaries. Dotted and dashed lines on
maps represent approximate border lines for which there may not yet be full agreement.

The mention of specific companies or of certain manufacturers' products does not imply
that they are endorsed or recommended by WHO in preference to others of a similar
nature that are not mentioned. Errors and omissions excepted, the names of proprietary
products are distinguished by initial capital letters.

All reasonable precautions have been taken by WHO to verify the information contained
in this publication. However, the published material is being distributed without warranty
of any kind, either expressed or implied. The responsibility for the interpretation and use
of the material lies with the reader. In no event shall WHO be liable for damages arising
from its use.

Printed in Switzerland.



# Medical management of abortion

2023 SUPP 000090

# Contents



2023 SUPP 000091

**Acknowledgements** ...................................................................... iv

**Acronyms and abbreviations** ...................................................... iv

**Glossary** ....................................................................................... v

**Executive summary** ................................................................... vi

Rationale for this guideline                                                    viii
Guideline development process                                                   viii
Overview of recommendations                                                        x
Notable differences between this guideline and previous guidance     xii
Estimation of duration of pregnancy (gestation)                            xiii

**1. Introduction** ......................................................................... xiv

1.1  Background                                                                     1
1.2  Goal and objectives                                                            4
1.3  Target audience and relevance                                                  5

**2. Guideline development process** ............................................. 6

2.1  Contributors and their roles                                                   7
2.2  Declarations of interests                                                      8
2.3  Scoping and formulation of the guideline questions                             9
2.4  Evidence retrieval and synthesis                                              10
2.5  Use of the frameworks for decision-making                                     11
2.6  Document preparation, revision and peer review                                11

**3. Recommendations, rationale and evidence summary** .......... 12

3.1  Guiding principles                                                            14
3.2  Incomplete abortion                                                           16
3.3  Intrauterine fetal demise                                                     22
3.4  Induced abortion                                                              26
3.5  Post-abortion contraception                                                   31

**4. General implementation considerations** .............................. 38

**5. Dissemination and adaptation** ............................................. 44

**6. Guideline impact evaluation and future updates** ................ 44

**References** ................................................................................ 46

**Annex 1: WHO staff and external experts involved
in the guideline development process** ....................................... 50

Web annexes: Medical management of abortion: evidence base (available at http://www.who.int/
reproductivehealth/publications/medical-management-abortion/en/).

# Acknowledgements

The guideline was developed by the Department of Reproductive Health and Research, World Health Organization.

WHO is grateful for the contributions of staff and consultants to the Department, members of the Guideline Development Group and the external peer reviewers who participated in initial online consultations, subsequent technical consultations and the review of this guideline.

A complete list of contributors and their specific roles can be found in Annex 1.

The development of these guidelines was supported by the UNDP-UNFPA-UNICEF-WHO-World Bank Special Programme of Research, Development and Research Training in Human Reproduction (HRP), a cosponsored programme executed by the World Health Organization (WHO).

Editing and proofreading: Green Ink, United Kingdom (greenink.co.uk).

Design and layout: Little Unicorns (https://littleunicorns.com).

# Acronyms and abbreviations

| | | | | |
|---|---|---|---|---|
| **B** | buccal (in the cheek) (*route of administration of medication*) | | **IM** | intramuscular |
| **CDC** | Centers for Disease Control and Prevention | | **IUD** | intrauterine device |
| | | | **IUFD** | intrauterine fetal demise |
| **CRE** | Office of Compliance, Risk Management and Ethics | | **LMP** | last menstrual period |
| **COI** | conflict of interest | | **NGO** | nongovernmental organization |
| **DMPA** | depot medroxyprogesterone acetate | | **PAHO** | Pan American Health Organization |
| **DOI** | declaration of interest | | **PICO** | population, intervention, comparator, outcome |
| **ERG** | External Review Group | | **PO** | oral (*route of administration of medication*) |
| **EST** | Evidence Synthesis Team | | | |
| **EtD** | Evidence to Decision | | **PV** | vaginal (*route of administration of medication*) |
| **GDG** | Guideline Development Group | | **RCT** | randomized controlled trial |
| **GRADE** | Grading of Recommendations Assessment, Development and Evaluation | | **SL** | sublingual (under the tongue) (*route of administration of medication*) |
| **hCG** | human chorionic gonadotrophin | | **WHO** | World Health Organization |

2023 SUPP 000093

# Glossary

**Duration of pregnancy (gestation):** Size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP).

**Medical methods of abortion (medical abortion):** Use of pharmacological drugs to terminate pregnancy. Sometimes the terms "non-surgical abortion" or "medication abortion" are also used.

**Routes of misoprostol administration:**

| | |
|---|---|
| **oral** | pills are swallowed; |
| **buccal** | pills are placed between the cheek and gums and swallowed after 30 minutes; |
| **sublingual** | pills are placed under the tongue and swallowed after 30 minutes; |
| **vaginal** | pills are placed in the vaginal fornices (deepest portions of the vagina) and the individual is instructed to lie down for 30 minutes. |

**Surgical methods of abortion (surgical abortion):** use of transcervical procedures for terminating pregnancy, including vacuum aspiration and dilatation and evacuation (D&E). See Chapter 2, section 2.2.4 in the WHO *Safe abortion* guideline (2012)[1] for a more detailed description of methods of surgical abortion.

**Human rights terminology**

**International human rights treaty/covenant/convention:** adopted by the international community of States, normally at the United Nations General Assembly. Each treaty sets out a range of human rights, and corresponding obligations which are legally binding on States that have ratified the treaty. Annex 7 in the 2012 *Safe abortion* guideline includes a list of these treaties.

**Regional human rights treaties:** States adopted human rights treaties in Africa, the Americas, Europe and the Middle East. Regional human rights bodies, such as the African Union, the Organization of American States, the Council of Europe, the European Union, and the League of Arab States monitor States' compliance with the treaties. To date, there are no regional human rights treaties in South-East Asia or the Western Pacific. Annex 7 in the 2012 *Safe abortion* guideline includes a list of regional human rights treaties.

**Human rights standards:** the meaning and scope of human rights as interpreted and applied by the human rights bodies tasked with this work, e.g. international, regional and national courts, and human rights committees.

---

[1]  Safe abortion: technical and policy guidance for health systems, second edition. Geneva: World Health Organization; 2012 (http://apps.who.int/iris/bitstream/handle/10665/70914/9789241548434_eng.pdf).



# Executive summary

Medical abortion care encompasses the management of various clinical conditions including spontaneous and induced abortion (both viable and non-viable pregnancies), incomplete abortion and intrauterine fetal demise, as well as post-abortion contraception.

Medical management of abortion generally involves either a combination regimen of mifepristone and misoprostol or a misoprostol-only regimen. Medical abortion care plays a crucial role in providing access to safe, effective and acceptable abortion care. In both high- and low-resource settings, the use of medical methods of abortion have contributed to task shifting and sharing and more efficient use of resources. Moreover, many interventions in medical abortion care, particularly those in early pregnancy, can now be provided at the primary-care level and on an outpatient basis, which further increases access to care. Medical abortion care reduces the need for skilled surgical abortion providers and offers a non-invasive and highly acceptable option to pregnant individuals.

### Rationale for this guideline

Recommendations for the use of mifepristone and misoprostol for inducing abortion and for managing incomplete abortion are contained within the 2012 WHO guideline *Safe abortion: technical and policy guidance for health systems*. Evidence related to home use of medication and self-assessment is included in the 2015 WHO guideline *Health worker roles in providing safe abortion and post-abortion contraception*. However, a number of new studies have been published in more recent years providing evidence related to the timing, dosage, dosing intervals and routes of administration of medications to manage abortion, and also the timing of contraception initiation following a medical abortion. Hence it was critical for WHO to review the evidence and update its own recommendations.

### Guideline development process

The guideline was developed according to the principles set out in the *WHO handbook for guideline development* and under the oversight of the WHO Guidelines Review Committee. The core team at WHO (the Steering Group) was complemented by an Evidence Synthesis Team (EST) of experts (including two guideline methodologists) and by a multidisciplinary group of external technical experts who constituted the Guideline Development Group (GDG).

The WHO 2012 *Safe abortion* guidance will be updated during 2019–2020. The contents of this 2018 guideline represent prioritized thematic areas that need to be updated more urgently, based on input from a pre-scoping online survey, conducted in mid-2016 among a group of experts in the field, and from a technical consultation and scoping meeting held in February 2017. Based on input received, the WHO Steering Group drafted an initial list of thematic issues and associated questions in PICO (population, intervention, comparator, outcome) format. These thematic issues included surgical management of abortion; however, the focus of this clinical guideline is medical management of abortion. A systematic literature search was conducted followed by review of the evidence; eight separate systematic reviews were undertaken. Data that informed the recommendations in this guideline came from a total of 140 studies carried out in a wide variety of settings ranging from high- to low-income economies. Figure 1 shows the geographical spread and number of studies per indication for medical management of abortion that served as the evidence base. The certainty of the evidence on safety, effectiveness and user satisfaction was assessed using the Grading of Recommendations Assessment, Development and Evaluation (GRADE) approach.[2]

---

[2]  Further information is available at: http://www.gradeworkinggroup.org/

Recommendations were finalized in consultation with the GDG and using Evidence to Decision (EtD) frameworks that considered benefits, harms, values, equity, feasibility and acceptability, as well as implications for resource use, where available. Where there was limited evidence, supplemental programmatic information provided by experts from the field was considered. The guideline was prepared by the WHO Steering Group with input from the GDG. In addition to the GDG, several external peer reviewers who were unconnected to the guideline development process also reviewed and critically appraised the draft guideline prior to its finalization. Declarations of interest (DOIs) were managed according to standard procedures.

**FIGURE 1** — **Evidence base informing the recommendations**

| | | |
|---|---|---|
| RESOLUTION OF INCOMPLETE ABORTION | 24 studies | Australia, Burkina Faso, China, Denmark, Egypt, Finland, Ghana, India, Madagascar, Mauritania, Mozambique, Niger, Nigeria, Republic of Maldova, Senegal, South Africa, Sweden, Thailand, Turkey, Uganda, United Kingdom, United Republic of Tanzania, United States of America (USA), Viet Nam |
| INDUCED ABORTION FOR FETAL DEMISE | 16 studies | Australia, India, Iran, Netherlands, Pakistan, Sudan, Thailand, Turkey, USA, Viet Nam |
| INDUCED ABORTION < 12 WEEKS | 49 studies | Armenia, Canada, China, Cuba, Georgia, Hong Kong SAR, Hungary, India, Iran, Kazakhstan, Mongolia, Mozambique, Nepal, Republic of Moldova, Romania, Scotland, Serbia, Slovenia, South Africa, Sweden, Thailand, Tunisia, Ukraine, United Kingdom, USA, Viet Nam |
| INDUCED ABORTION ≥ 12 WEEKS | 44 studies | Australia, Armenia, Canada, China, Cuba, Finland, Georgia, Hungary, Hong Kong SAR, India, Nepal, New Zealand, Singapore, Slovenia, South Africa, Sweden, Thailand, Tunisia, Turkey, United Kingdom, USA, Uzbekistan, Viet Nam |
| TIMING OF POST-ABORTION CONTRACEPTION | 7 studies | Finland, Mexico, Portugal, Sweden, United Kingdom, USA |

**Executive summary**

## Overview of recommendations

This guideline focuses exclusively on medical management of abortion. It provides *new* recommendations related to the following indications: medical management of incomplete abortion at ≥ 13 weeks of gestation[3] (Recommendation 1b), medical management of intrauterine fetal demise at ≥ 14 to ≤ 28 weeks of gestation (Recommendation 2), timing of post-abortion hormonal contraception initiation (Recommendation 4a) and timing of post-abortion IUD placement (Recommendation 4b).

In addition, this guideline includes *updated* recommendations related to the following indications: medical management of incomplete abortion at < 13 weeks of gestation (Recommendation 1a), and medical management of induced abortion at < 12 weeks (Recommendation 3a) and at ≥ 12 weeks (Recommendation 3b).

---

[3] Duration of pregnancy (gestation): Size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP).

2023 SUPP 000099

**TABLE 1** — Summary chart of recommendations on medical management of abortion

| RECOMMENDATIONS | COMBINATION REGIMEN (RECOMMENDED[a]) | | MISOPROSTOL-ONLY (ALTERNATE) |
|---|---|---|---|
| | MIFEPRISTONE ⟩⟩ 1–2 DAYS ⟩⟩ MISOPROSTOL | | MISOPROSTOL |
| **1A.** INCOMPLETE ABORTION < 13 WEEKS | None | Use misoprostol-only regimen | 600 µg PO[b] or 400 µg SL[b] |
| **1B.** INCOMPLETE ABORTION ≥ 13 WEEKS | None | Use misoprostol-only regimen | 400 µg B, PV or SL every 3 hours[b] |
| **2.** INTRAUTERINE FETAL DEMISE ≥ 14–28 WEEKS | 200 mg PO once | 400 µg PV or SL every 4–6 hours[b] | 400 µg SL (preferred) or PV every 4–6 hours[b] |
| **3A.** INDUCED ABORTION < 12 WEEKS | 200 mg PO once | 800 µg B, PV or SL[b] | 800 µg B, PV or SL[b] |
| **3B.** INDUCED ABORTION ≥ 12 WEEKS | 200 mg PO once | 400 µg B, PV or SL every 3 hours[b] | 400 µg B, PV or SL every 3 hours[b] |

| | TIMING OF POST-ABORTION CONTRACEPTION | |
|---|---|---|
| | IMMEDIATE INITIATION | |
| **4A.** HORMONAL CONTRACEPTION | Immediately after the first pill of the medical abortion | |
| **4B.** IUD | With assessment of successful abortion | |

B: buccal; PO: oral; PV: vaginal; SL: sublingual

[a] Combination regimen is recommended because it is more effective.

[b] Repeat doses of misoprostol can be considered when needed to achieve success of the abortion process. In this guideline we do not provide a maximum number of doses of misoprostol. Health-care providers should use caution and clinical judgement to decide the maximum number of doses of misoprostol in pregnant individuals with prior uterine incision. Uterine rupture is a rare complication; clinical judgement and health system preparedness for emergency management of uterine rupture must be considered with advanced gestational age.

**Executive summary**

## Notable differences between this guideline and previous guidance

There are several notable differences between this guideline and previous (2012) WHO guidance, including the time period between mifepristone and misoprostol dosing, the use of a loading dose, and the maximum number of doses of misoprostol.

| **TABLE 2** | **Notable differences between information in this guideline and previous guidance** |

| TOPIC | THIS GUIDELINE (2018) | SAFE ABORTION GUIDELINE (2012)[4] |
|---|---|---|
| TIME PERIOD BETWEEN MIFEPRISTONE AND MISOPROSTOL DOSING | Time period is in days rather than hours | Time was provided in hours (i.e. 36–48) for induced abortion regimens with pregnancies beyond nine weeks |
| LOADING DOSE | The use of a loading dose of misoprostol is not necessary | Previous guidance recommended a loading dose that differed from subsequent doses of misoprostol for induced abortion regimens with pregnancies beyond nine weeks |
| MAXIMUM NUMBER OF DOSES OF MISOPROSTOL | In this guideline we do not provide a maximum number of doses of misoprostol | Previous guidance recommended a maximum number of five doses |

---

4   Safe abortion: technical and policy guidance for health systems, second edition. Geneva: World Health Organization; 2012 (http://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/).

2023 SUPP 000101

## Estimation of duration of pregnancy (gestation)

In this guideline, duration of pregnancy (gestation) is the size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP). Where it is difficult to determine uterine size based on clinical examination, alternate methods of pregnancy dating can be used (i.e. LMP or ultrasound).



**FIGURE 2**

**Pregnancy dating by physical examination (bimanual pelvic and abdominal examination)**

AFTER 4 WEEKS OF GESTATION THE UTERUS INCREASES IN SIZE BY APPROXIMATELY 1 CM PER WEEK

AFTER 12 WEEKS OF GESTATION THE UTERUS RISES OUT OF THE PELVIS

AFTER 15–16 WEEKS OF GESTATION THE UTERUS REACHES THE MIDPOINT BETWEEN THE SYMPHYSIS PUBIS AND THE UMBILICUS

UTERINE SIZE (IN WEEKS): 2  4  8  12  16  20  30  40

AT 20 WEEKS OF GESTATION THE UTERUS REACHES THE UMBILICUS

AFTER 20 WEEKS OF GESTATION FUNDAL HEIGHT IN CENTIMETRES MEASURED FROM THE SYMPHYSIS PUBIS APPROXIMATES THE WEEKS OF GESTATION

**LIMITATIONS TO DATING BY UTERINE SIZE ON PHYSICAL EXAMINATION**

- uterine malformations/fibroids
- multiple gestation
- marked uterine retroversion
- obesity
- molar pregnancy

**KEY CONSIDERATIONS**

**A UTERUS THAT IS SMALLER THAN EXPECTED MAY INDICATE:**

- the woman is not pregnant
- inaccurate menstrual dating
- ectopic pregnancy or abnormal intrauterine pregnancy, e.g. spontaneous or missed abortion

**A UTERUS THAT IS LARGER THAN EXPECTED MAY INDICATE:**

- inaccurate menstrual dating
- multiple gestation
- uterine abnormalities, such as fibroids
- molar pregnancy

Source: Clinical practice handbook for safe abortion. Geneva: World Health Organization; 2014, p. 17 (http://www.who.int/reproductivehealth/publications/unsafe_abortion/clinical-practice-safe-abortion/en/); adapted from Goodman S, Wolfe M; TEACH Trainers Collaborative Working Group. Early abortion training workbook, third edition. San Francisco (CA): UCSF Bixby Center for Reproductive Health Research and Policy; 2007 (http://www.teachtraining.org/trainingworkbook/earlyabortiontrainingworkbook.pdf).

# 1. Introduction



## 1.1 Background

Mifepristone and misoprostol in combination or misoprostol alone are the medications generally used to induce abortion and to manage incomplete abortion or intrauterine fetal demise (IUFD).

These medications are increasingly available globally, and they are on the World Health Organization (WHO) List of Essential Medicines *(1)*. Mifepristone is an anti-progestin which binds to progesterone receptors, inhibiting the action of progesterone and hence interfering with the continuation of pregnancy. Treatment regimens entail an initial dose of mifepristone followed by administration of a synthetic prostaglandin analogue, misoprostol, which induces cervical softening and dilation and enhances uterine contractions, which aids in expelling the products of conception *(2,3)*.

Misoprostol is a prostaglandin E1 analogue that can be used either in combination with mifepristone or on its own *(4–6)*. Misoprostol has a wide range of reproductive health applications, including induction of labour, management of spontaneous and induced abortion, and prevention and treatment of postpartum haemorrhage *(7)*. Due to the ease of handling and storing it, as well as its non-invasiveness and proven cost-effectiveness, the use of misoprostol within abortion care – either in combination with mifepristone or alone – offers several advantages. It reduces the need for skilled surgical abortion providers, equipment, sterilization and anaesthesia, while offering a non-invasive and highly acceptable option to pregnant individuals *(8)*. For these reasons, and because it is stable at room temperature within its packaging, misoprostol is particularly useful in low-resource settings *(7)*.

Medical abortion plays a crucial role in providing access to safe, effective and acceptable abortion care. Previous guidance published by WHO, including *Safe abortion: technical and policy guidance for health systems* (2012), provided recommendations for the use of mifepristone and misoprostol in combination or misoprostol alone for the management of medical abortion *(6)*. The 2012 guidance stated that many interventions in medical abortion care, particularly those

**Introduction**

in early pregnancy, can be provided at the primary care level and on an outpatient basis, which further increases access to care *(6)*. In both high- and low-resource settings, the use of medical methods of abortion have contributed to task shifting and sharing and more efficient use of resources *(9)*. Given the nature of the medical abortion process, it is also possible for individuals to play a role in managing some of the components by themselves, outside of a health-care facility. Another existing WHO guideline, *Health worker roles in providing safe abortion and post-abortion contraception* (2015), recommends that in specific circumstances, individuals may self-manage their mifepristone and/or misoprostol medication without direct supervision of a health-care provider, as well as self-assess the success of the abortion process using pregnancy tests and checklists *(10)* (see Box 1). It should be noted that pregnancy tests used to self-assess the success of the abortion process are low-sensitivity urine pregnancy tests, which are different from those tests commonly used to diagnose pregnancy. Such self-assessment and self-management approaches can be empowering for individuals and help to triage care, leading to a more optimal use of health-care resources.

All individuals who can become pregnant, including women, girls and those with varying gender identities, and who seek medical abortion care should be provided with all of the necessary information to make an informed decision to ensure the promotion of their health and human rights, including sex and gender equality and non-discrimination. With this information, individuals can decide freely and responsibly the number, spacing and timing of their children *(11)*. It is the right of every person, regardless of marital status, to enjoy the benefits of scientific progress and its applications *(11)*.

Depending upon the context, unmarried individuals, adolescents, those living in extreme poverty, individuals from ethnic minorities, refugees and other displaced persons, people with disabilities, and those facing violence in the home may be vulnerable to inequitable access to safe abortion services. Adolescents, in particular, are less likely than adults to be able to obtain legal and safe abortions to terminate their pregnancies. Some of the barriers adolescents face include requirements for third party authorizations (including parental consent) and financial constraints (inability to pay the required fees) *(6,12)*. Additional considerations related to the care of adolescents can be found in section 4 (General implementation considerations), and in the WHO adolescent job aid *(13)*.

Where geographic inequities exist, people must travel greater distances for care, thereby raising costs and delaying access *(14)*. Financing mechanisms should ensure equitable access to good-quality services *(15)*. Where individuals are charged fees for abortion, such fees should be matched to their ability to pay,

> *All individuals who can become pregnant, including women, girls and those with varying gender identities, and who seek medical abortion care should be provided with all of the necessary information to make an informed decision to ensure the promotion of their health and human rights, including sex and gender equality and non-discrimination.*

2023 SUPP 000105

and procedures should be developed for exempting the poor and adolescents from paying for services. As far as possible, abortion services should be mandated for coverage under insurance plans. Abortion should never be denied or delayed because of inability to pay. Providers of abortion services should ensure that all individuals are treated with respect and without discrimination.

Health-care providers, health managers, policy-makers and other stakeholders need up-to-date, evidence-based recommendations to inform clinical policies and practices, to enable improved health-care outcomes and to provide information that is complete, accurate and easy to understand. Expansion of medical abortion and new studies related to the timing, interval and routes of administration of medical abortion medications, necessitated a review of the evidence and the development of new recommendations as well as updates to the WHO recommendations issued in 2012 *(6)*.

**BOX 1    Other relevant WHO guidance on safe abortion**

PREVIOUS WHO RECOMMENDATIONS RELATED TO MEDICAL ABORTION CARE WERE PRESENTED IN TWO WHO GUIDELINES, WHICH REMAIN CURRENT AND APPLICABLE:

> *Safe abortion: technical and policy guidance for health systems*

This guideline was first issued in 2003 and the second edition was released in 2012 (updated based on evidence available for review in 2010). It provides recommendations for clinical care while addressing policy, programmatic and health systems considerations in the provision of safe abortion *(6)*. Specific thematic areas related to medical abortion regimens contained within the 2012 edition have been updated in this 2018 guideline on the medical management of abortion; however, guidance on aspects of care provision (such as the service location and determination of success of medical abortion regimens) still apply, as presented in the 2012 guideline. These considerations have been placed in this 2018 guideline either in the "Additional considerations" subsections for each recommendation or in the "General implementation considerations" section, which follows the "Recommendations" section.

> *Health worker roles in providing safe abortion and post-abortion contraception*

This guideline was issued in 2015 (with evidence up until 2015). It contains recommendations on the roles of various health workers involved in abortion care, as well as on self-management of medical abortion *(10)*. These 2015 recommendations remain applicable, since this 2018 guideline on the medical management of abortion focuses solely on the medication regimens.

**Introduction**

## 1.2 Goal and objectives

**Goal:** To provide evidence-based recommendations on the safety and effectiveness of abortion medications for the clinical management of abortion, as well as the satisfaction of users.

**Objectives:** To review the evidence and develop (or update) recommendations related to the following focus areas:

1. Medical management of incomplete abortion at <13 weeks and at ≥13 weeks of gestation (updating the recommendations in the 2012 WHO *Safe abortion* guideline *(6)* based on new evidence);

2. Medical management of intrauterine fetal demise (IUFD) at ≥14 to ≤28 weeks of gestation (new recommendation as no previous recommendations existed);

3. Medical management of induced abortion at <12 weeks and at ≥12 weeks of gestation (updating the recommendations in the 2012 WHO *Safe abortion* guideline *(6)* based on new evidence);

4. Timing of initiation of contraception after medical abortion (new recommendation as no previous recommendations existed).

In this guideline, duration of pregnancy (gestation) is the size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP). Where it is difficult to determine uterine size based on clinical examination, alternate methods of pregnancy dating can be used (i.e. LMP or ultrasound). See also Figure 2 in the Executive summary.

4

2023 SUPP 000107

## 1.3 Target audience and relevance

The guideline is expected to be useful for:

- ▶ health-care providers;

- ▶ national and subnational policy-makers;

- ▶ implementers and managers of national and subnational reproductive health programmes; and

- ▶ nongovernmental and other organizations and professional bodies involved in the planning and management of medical abortion services.

While legal, policy and regulatory contexts vary, abortion is legal at least to save the life of the pregnant individual in most countries and more than two thirds of countries have one or more additional grounds for legal abortion *(16)*. The provision of post-abortion care is always legal *(10)*. These recommendations will be relevant across a diverse range of settings as the need to make care more accessible and rationalize the use of available health resources exists in both high- and low-resource settings.

# 2. Guideline development process

2023 SUPP 000109

This guideline was developed by the WHO Department of Reproductive Health and Research in accordance with procedures outlined in the *WHO handbook for guideline development, second edition*, 2014 *(17)* and under the oversight of the WHO Guidelines Review Committee.

Individuals from other organizations who contributed to this guideline did so in their capacity as individual experts. Donors to the Department who fund work on abortion issues were not included among the members of the Guideline Development Group (GDG) and were not present at any of the GDG meetings. Commercial entities were not involved in developing the guideline, nor was funding from such sources used.

## 2.1 Contributors and their roles

The guideline was produced by the WHO Department of Reproductive Health and Research and the work of developing the guideline was coordinated by the WHO Steering Group, comprising WHO staff and consultants. The Secretariat was formed of members of the Steering Group from the Department of Reproductive Health and Research. The Secretariat developed the guideline questions, oversaw and participated in the evidence retrieval and synthesis, developed the Evidence to Decision (EtD) frameworks and drafted the recommendations, while also managing the day-to-day activities of developing the guideline.

The Evidence Synthesis Team (EST) consisted of several researchers, who conducted the systematic reviews, and guideline methodologists, who were responsible for evidence retrieval, synthesis and appraisal, including assisting the Steering Group to develop the EtD frameworks. The guideline methodologists were experts from the Global Health Unit, Norwegian Institute of Public Health, Oslo, Norway, and

**Process**

Cochrane, Portland, United States of America (USA). They worked closely with the WHO Steering Group and researchers from the EST to appraise the evidence from the systematic reviews using Grading of Recommendations Assessment, Development and Evaluation (GRADE) methodology.[5]

The Guideline Development Group (GDG) was composed of 11 members (5 women, 6 men) from various regions who possessed expertise on a diverse range of relevant issues. GDG members were selected on the basis of their particular knowledge of clinical care for abortion, service delivery and health systems and their work in regions of the world where the need for medical guidance on abortion care is a high priority. The GDG members provided input into the development of the scope of the guideline, the formulation of the population-intervention-comparator-outcome (PICO) questions, the review of the evidence and the development of the recommendations. They also reviewed and approved the final guideline.

A technical consultation and scoping meeting for this guideline was held in Geneva, Switzerland, in February 2017. Further consultation was conducted via email, and four subsequent GDG webinar meetings were held, in December 2017, March 2018, June 2018 and August 2018.

Eight individuals, external to the guideline development process and chosen to reflect the views of end-users who will be impacted by these recommendations, served as an External Review Group (ERG) for the draft guidelines.

A complete list of all contributors, their affiliations and roles is provided in Annex 1.

## 2.2 Declarations of interests

In accordance with the *WHO handbook for guideline development (17)*, all members of the GDG, EST and ERG were required to complete the standard WHO Declaration of Interests (DOI) form. GDG members completed the form prior to each meeting they attended and were also instructed to let the Secretariat know of any changes to their declared interests over time. In addition, experts were requested to submit an electronic copy of their curriculum vitae and their biographies (which were posted online for a minimum of two weeks) along with the completed DOI form prior to each meeting. The WHO Steering Group evaluated the responses and discussed them with the Director of the WHO Department of Reproductive Health and Research. At the GDG meetings, the Chair presented a summary of the DOIs and all participants had the opportunity to confirm, append or amend any interests already declared.

---

[5]  Further information is available at: http://www.gradeworkinggroup.org/

2023 SUPP 000111

One individual being considered for the GDG declared an interest that was perceived to be a potential conflict of interest for the purpose of this guideline. This was discussed with the WHO Office of Compliance, Risk Management and Ethics (CRE). Based on the advice of the CRE, this individual was allowed to participate in the meetings as a technical resource person but did not participate in the development of the recommendations. No additional conflicts of financial interests or involvement with commercial entities were declared. The DOI forms and curriculum vitae have been electronically archived to ensure that confidentiality is maintained.

## 2.3 Scoping and formulation of the guideline questions

The issues to be addressed by this guideline were carefully scoped and refined. The initial list of concepts to be considered was developed on the basis of the results of a pre-scoping online survey conducted in mid-2016, which over 60 experts from all regions of the world were invited to participate in. This survey aimed to identify relevant research gaps and possible interventions. A total of 40 responses were received. Further discussions were held via telephone or videoconference with the respondents. Based on input received, the WHO Steering Group drafted an initial list of thematic issues and associated questions in PICO format. The draft list of PICO questions was presented at the technical consultation and scoping meeting in February 2017. Most of those who contributed to the development of the guideline, as listed in Annex 1, also attended this meeting.

Preliminary PICO questions were identified, discussed, reviewed, modified and finalized during the scoping meeting. The final PICO questions for this guideline represent prioritized thematic areas that needed to be updated most urgently, based on input during the technical consultation and scoping meeting. The finalized priority PICO questions covered the following thematic areas:

- ▸ medical management of incomplete abortion at ≥ 13 weeks of gestation;
- ▸ medical management of intrauterine fetal demise (IUFD) at ≥ 14 to ≤ 28 weeks of gestation;
- ▸ medical management of induced abortion at 9–12 weeks of gestation;
- ▸ medical management of induced abortion at ≥ 12 weeks of gestation;
- ▸ timing of initiation of contraception after a medical abortion.

Several other thematic areas were noted as important, two of which were re-addressed in an effort to provide a more comprehensive set of

**Process**

recommendations:

▶ medical management of incomplete abortion at <13 weeks of gestation; and

▶ medical management of induced abortion at <9 weeks of gestation.

The primary outcomes of interest were:

▶ benefits and harms

- effectiveness (specific to the task) and
- safety, i.e. serious adverse events and complications (specific to the task).

The secondary outcomes of interest were:

▶ side-effects (specific to the intervention) and

▶ satisfaction of users (specific to the intervention).

## 2.4 Evidence retrieval and synthesis

Evidence of safety, effectiveness and satisfaction related to the interventions of interest included relevant randomized controlled trials (RCTs) as well as non-randomized controlled trials, controlled before-and-after studies, interrupted time-series and cohort studies. The following databases were searched from inception to June 2017, without language filters.

▶ **International databases:** ClinicalTrials.gov, Cochrane database, Cumulative Index to Nursing and Allied Health Literature (CINAHL), Embase, Global Index Medicus (GIM), Population Information Online (POPLINE), PubMed.

▶ **Regional databases:** African Index Medicus (AIM), Chinese Biomedical Literature Database, Index Medicus for the South-East Asian Region (IMSEAR), Index Medicus for the Eastern Mediterranean Region (IMEMR), Latin American and Caribbean Health Sciences Literature (LILACS), Western Pacific Regional Index Medicus (WPRIM).

In addition, a search of trial registry sites and organizational websites, as well as information from experts in the field, were used to identify any major ongoing or completed but unpublished trials that could be relevant to the guideline and the recommendations.

### 2.4.1 Assessment of confidence in the evidence

The certainty (i.e. the extent to which one can be confident that an estimate of the effect or association is correct) of the evidence on the benefits and harms outcomes was assessed using the GRADE approach; two GRADE methodologists were responsible for different thematic issues. Five criteria – study limitations, consistency of effect, imprecision, indirectness and publication bias – were used to assess the certainty for each outcome. The level of certainty in the evidence was downgraded by one level for serious limitations and by two levels for

2023 SUPP 000113

very serious limitations. Information about the certainty of evidence can be found in the justification section for each recommendation.

### 2.4.2  Moving from evidence to recommendations

Various factors that inform decisions on recommendations were assessed using the Evidence to Decision (EtD) framework method developed by the DECIDE collaboration *(18)*. Developing an EtD framework requires explicit and systematic consideration of evidence on interventions in terms of specified domains: effects (benefits/ harms), values, equity, resources required, acceptability (as distinct from the secondary outcome of satisfaction) and feasibility.

Additional evidence of potential harms or unintended consequences is described in the "Additional considerations" subsection of each evidence summary. Such considerations include programmatic data that did not directly address the priority PICO question but provided pertinent information in the absence of direct evidence, and additional data extracted from other relevant sources including qualitative studies.

## 2.5 Use of the frameworks for decision-making

Draft EtD frameworks were prepared by the WHO Steering Group and the EST. These were reviewed by the GDG and recommendations were subsequently drafted and then were finalized during the four GDG webinar meetings. In addition to the EtD frameworks, the GDG also had access to all the supporting materials.

Decision-making (formulation of recommendations) was based on the EtD frameworks and discussion of the synthesized evidence. The final adoption of each recommendation was consensus-driven, defined as full agreement among all GDG members, where possible. The final decision was based on majority opinion, provided the GDG members with opposing views were willing to agree to this outcome; voting to reach a final decision was unnecessary. An option for noting dissenting opinions was available, but at no time was it necessary to exercise this option.

## 2.6 Document preparation, revision and peer review

Responsible officers at WHO wrote the draft guideline. The GDG reviewed the draft and their feedback was incorporated. The guideline was also reviewed by the members of the ERG who were unconnected with the process of guideline development. They provided structured feedback on accuracy, presentation, implementation considerations and the overall usefulness of the guideline.

# 3. Recommendations, rationale and evidence summary



Recommendations in this guideline focus on four thematic areas and are presented here accordingly in subsections, as follows.



Recommendations on medical regimens for the management of:

1. incomplete abortion
2. intrauterine fetal demise (IUFD)
3. induced abortion.

Recommendations on the timing of:

4. initiation of contraception after medical abortion.

Following each recommendation, the rationale and evidence summary are provided, followed by additional considerations and research gaps. The research gaps were identified using a survey that was circulated among the members of the Guideline Development Group (GDG) to indicate topics requiring further research.

Considerations relating to care provision, including location of services, provider type, assessment of success of the medical abortion regimen, and the role of ultrasound, are derived from the 2012 WHO publication, *Safe abortion: technical and policy guidance for health systems (6)*. Information on these considerations has been included in this guideline under the "Additional considerations" subsections for each recommendation and in the "General implementation considerations" section, which follows this section on recommendations.

Recommendations in this guideline are presented using one of the following phrases:

▶ *We recommend* the intervention (strong recommendation in favour of the intervention)

▶ *We suggest* the intervention (weak, conditional, discretionary or qualified recommendation in favour of the intervention)

Justifications for each recommendation are provided. The certainty of the underlying body of evidence (high, moderate, low or very low) is also specified.

**Recommendations**

## 3.1 Guiding principles

Principles underlying the process of improving the access to and quality of abortion care include the right of access to relevant evidence-based health information, so that individuals who can become pregnant can have control over and decide freely and responsibly on matters related to their sexuality and reproduction (including their sexual and reproductive health) free of coercion, discrimination and violence *(11)*. These principles also include the provision of additional services, for the holistic care of the patient.

### 3.1.1  Provide information

Information is a necessary component of any medical care and should always be provided to individuals considering abortion. At a minimum, this should include *(6)*:

▶ the available options for abortion methods and pain management;

▶ what will be done before, during and after the procedure, including any tests that may be performed;

▶ what they are likely to experience (e.g. pain and bleeding) and how long the procedure and the recovery are likely to take (vaginal bleeding for two weeks is normal after medical abortion – such bleeding can last up to 45 days in rare cases);

▶ how to recognize potential complications, and how and where to seek help, if required (individuals should return to the hospital or clinic if they experience increased intensity of cramping or abdominal pain, heavy vaginal bleeding and/or fever);

▶ when normal activities can be resumed, including sexual intercourse (the return of fertility can occur within two weeks following abortion);

▶ where and how to access additional services and follow-up care (see section 3.1.4 on the right).

### 3.1.2  Offer counselling

Counselling is a focused, interactive process through which one voluntarily receives support, additional information and guidance from a trained person, in an environment that is conducive to openly sharing thoughts, feelings and perceptions. When providing counselling, it is essential to:

▶ communicate information in simple language;

▶ maintain privacy;

▶ support the individual and ensure they receive adequate responses to their questions and needs; and

▶ avoid imposing personal values and beliefs *(6)*.

2023 SUPP 000117

### 3.1.3    Additional services

Additional services may need to be provided to individuals seeking medical abortion *(19)*.

▶ Provide iron tablets for anaemia, if needed.

▶ Provide any necessary pain medications.

▶ Provide emotional support, if needed.

▶ Refer the individual to other services as determined by an assessment of their needs; these services may include: counselling and testing for sexually transmitted infections (STIs, including HIV), abuse support services, psychological or social services, or other specialist health or medical services.

### 3.1.4    Follow-up care

Routine follow-up is not necessary following an uncomplicated surgical or medical abortion using mifepristone and misoprostol. However, an optional follow-up visit 7–14 days after their procedure may be offered to provide further contraceptive counselling and services, further emotional support, or to address any medical concerns.

A routine follow-up visit is recommended only in the case of medical abortion using misoprostol alone, to assess success of the abortion.

At the follow-up appointment:

▶ assess the individual's recovery and inquire about any signs or symptoms of ongoing pregnancy;

▶ review any available medical records and referral documents;

▶ ask about any symptoms experienced since the procedure;

▶ perform a focused physical examination in response to any complaints; and

▶ assess the individual's fertility goals and need for contraceptive services.

- If no method was started prior to discharge from the facility, provide information and offer counselling and the appropriate contraceptive method, if desired by the client.

- If a contraceptive method was already started, assess the method used and note any concerns – where there are no concerns, resupply as needed; where there are concerns, help with selection of another appropriate method *(19)*.

**Recommendations**

## 3.2 Incomplete abortion

### 3.2.1 Diagnosis of incomplete abortion

Incomplete abortion is defined by clinical presence of open cervical os and bleeding, whereby all products of conception have not been expelled from the uterus. Common symptoms include vaginal bleeding and abdominal pain. Incomplete abortion should also be suspected if, upon visual examination, the expulsed tissue is not consistent with the estimated duration of pregnancy.

### 3.2.2 Medical management of incomplete abortion: Recommendations 1a and 1b

Incomplete abortion may be managed expectantly, or treated surgically or medically. The mode of management to be used should be selected based on the individual's clinical condition and preference for treatment.

**RECOMMENDATION 1A** — **Medical management of incomplete abortion at < 13 weeks of gestation[6]**

| RECOMMENDATIONS | COMBINATION REGIMEN | | MISOPROSTOL-ONLY |
|---|---|---|---|
| | MIFEPRISTONE ⟫ 1–2 DAYS ⟫ MISOPROSTOL | | MISOPROSTOL |
| INCOMPLETE ABORTION < 13 WEEKS | None | Use misoprostol-only regimen | 600 µg PO[a] or 400 µg SL[a] |

PO: oral; SL: sublingual

**For the treatment of incomplete abortion at < 13 weeks uterine size, we suggest the use of 600 µg misoprostol administered orally or 400 µg misoprostol administered sublingually.[a]**



RECOMMENDATION TYPE: NEW OR UPDATED

Recommendation 1a is an updated recommendation from the WHO 2012 *Safe abortion* guidance *(6)*. The option of 400–800 µg vaginal misoprostol has been removed from this updated recommendation.

[a] Repeat doses of misoprostol can be considered when needed to achieve success of the abortion process. In this guideline we do not provide a maximum number of doses of misoprostol. Health-care providers should use caution and clinical judgement to decide the maximum number of doses of misoprostol in pregnant individuals with prior uterine incision. Uterine rupture is a rare complication; clinical judgement and health system preparedness for emergency management of uterine rupture must be considered with advanced gestational age.

[6] In this guideline, duration of pregnancy (gestation) is the size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP).

2023 SUPP 000119

### 3.2.3 Evidence summary and rationale for Recommendations 1a and 1b

A Cochrane review served as the evidence base for the medical management of incomplete abortion; the review assessed the effectiveness, safety and acceptability of various management options (20). There were 24 studies included in the review that focused on incomplete abortion at < 13 weeks of gestation. Of those 24 studies, 22 compared different doses and routes of misoprostol in misoprostol-only regimens and options of expectant, medical or surgical management.

**Effects (benefits and harms)**

Two studies focused on misoprostol dosage regimens; these studies found higher rates of successful abortion and fewer unplanned surgical interventions with 600 µg repeat oral dosing. In the studies that compared misoprostol routes, there was no clear evidence of one route being superior to another. In the studies that compared medical management with surgical or expectant management, the incidence

---

**RECOMMENDATION 1B** — Medical management of incomplete abortion at ≥ 13 weeks of gestation

| RECOMMENDATIONS | COMBINATION REGIMEN | | MISOPROSTOL-ONLY |
|---|---|---|---|
| | MIFEPRISTONE ⟩⟩ 1–2 DAYS ⟩⟩ MISOPROSTOL | | MISOPROSTOL |
| INCOMPLETE ABORTION ≥ 13 WEEKS | None | Use misoprostol-only regimen | 400 µg B, PV or SL every 3 hours[a] |

B: buccal; PV: vaginal; SL: sublingual

For the treatment of incomplete abortion at ≥ 13 weeks uterine size, we suggest the use of repeat doses of 400 µg misoprostol administered sublingually, vaginally or buccally every 3 hours.[a]

**RECOMMENDATION TYPE: NEW OR UPDATED**
Recommendation 1b is a new recommendation.

[a] Repeat doses of misoprostol can be considered when needed to achieve success of the abortion process. In this guideline we do not provide a maximum number of doses of misoprostol. Health-care providers should use caution and clinical judgement to decide the maximum number of doses of misoprostol in pregnant individuals with prior uterine incision. Uterine rupture is a rare complication; clinical judgement and health system preparedness for emergency management of uterine rupture must be considered with advanced gestational age.

of successful abortion was found to be slightly lower with medical and expectant management, but all methods achieved high success rates. In all 22 studies that looked at the relevant regimens, there were few data on serious adverse events.

There were no studies that focused exclusively on incomplete abortion at ≥ 13 weeks. One study set in Finland evaluated the management of incomplete abortion in pregnancies up to 24 weeks of gestation, but it included only three women whose pregnancies fell within the gestational age between 13 and 24 weeks by menstrual dating *(21)*. Of these three women, one received medical treatment and the other two received surgical intervention.

**Values**  There was no evidence identified in the Cochrane review that looked directly at how women value medical abortion procedures. However, generally, women describe avoidance of surgery as a positive feature of medical management, while some women value the shorter abortion process and minimal bleeding associated with surgical management *(22,23)*. Some women dislike the side-effects associated with medical management, including bleeding, fevers and chills *(22,23)*.

**Equity**  We were unable to identify research on aspects of equity relating to the relative effectiveness of the intervention in different subgroups; no assumptions were made.

**Resources**  We attempted to collect programmatic data from organizations involved in service delivery in order to inform the decision on how resources factor into the recommendation. However, we were only able to collect limited information, and the available data varied considerably in its reporting (e.g. definition of terms), thus these data were not used in the decision-making. In cases where additional hospital resources are required, such as blood transfusion, inpatient management or analgesic measures, we assume that the costs associated with this care will be higher.

**Acceptability**  Women generally find medical management of incomplete abortion with misoprostol alone acceptable and would recommend the procedure to a friend *(24–27)*.

**Feasibility**  We were unable to identify research on the feasibility of implementing the use of misoprostol alone or in combination with mifepristone for the management of incomplete abortion. However, the Cochrane review included 22 studies conducted across 24 countries, providing information related to the varying country contexts in which such services may be provided. Of these 24 countries, seven were in low-income economies, seven were in lower-middle-income economies, four were in upper-middle-income economies and six were in high-income economies *(20)*.

2023 SUPP 000121

**Rationale for Recommendation 1a (on incomplete abortion at <13 weeks):** Women treated with 600 µg oral misoprostol had higher rates of successful abortion and lower occurrence of additional surgical interventions; this is based on low-certainty evidence. Low-certainty evidence also suggests that the use of 400 µg sublingual misoprostol leads to high rates of successful abortion. Acceptability of these regimens also appears high.

**Rationale for Recommendation 1b (on incomplete abortion at ≥ 13 weeks):** Due to the lack of direct evidence on medical management of incomplete abortion at ≥ 13 weeks of gestation, this recommendation is based on information extrapolated from data related to the medical management of abortion at >12 weeks using misoprostol alone. Individuals presenting with incomplete abortion at ≥ 13 weeks may present with varying amounts of residual tissue or products of conception. Thus, the GDG members took the view that since the regimen utilized for medical abortion at >12 weeks is safe, effective and acceptable, then this regimen can also be applied to those being treated for incomplete abortion where expulsion of uterine contents has begun, as evidenced by bleeding, cramping or contractions.

### 3.2.4   Additional considerations

Ultrasound scanning is not routinely required for the provision of abortion *(4,28,29)*. Ultrasound is useful to detect ongoing pregnancy; measuring endometrial thickness, however, is not generally useful for diagnosing incomplete abortion and may lead to inappropriate surgical interventions *(30)*.

The following health worker cadres can provide medical management of uncomplicated incomplete abortion, given task-specific training and functioning systems for monitoring and supportive supervision: auxiliary nurses, auxiliary nurse midwives, nurses, midwives, associate/advanced associate clinicians, and non-specialist and specialist doctors *(10)*.

### 3.2.5   Research gaps

*General:*

▶ Identification of the most effective medical abortion regimen for incomplete abortion at ≥ 13 weeks of gestation (including the use of mifepristone in combination with misoprostol versus misoprostol alone) is still needed. Recommendations have been made for this regimen using indirect evidence. Results from the survey on research gaps (completed by GDG members) noted the lack of evidence for effective regimens in this clinical scenario and, therefore, further research on this topic should be pursued.

**Recommendations**

## 3.3 Intrauterine fetal demise

### 3.3.1 Diagnosis of intrauterine fetal demise (IUFD)

Fetal demise refers to situations in which the fetus is no longer alive, but the uterus has not yet started to expel its contents and the cervical os remains closed *(31)*. The diagnosis is made by ultrasound scan following the clinical findings, which can include vaginal bleeding, absent fetal heart sounds on electronic auscultation, a failure to feel fetal movements or a uterus that is significantly smaller than the expected size *(31)*.

### 3.3.2 Medical management of IUFD at ≥ 14 to ≤ 28 weeks of gestation: Recommendation 2

IUFD may be managed expectantly, or treated surgically or medically. The decision about the mode of management of IUFD should be based upon the individual's clinical condition and preference for treatment.

Medical management of IUFD includes the use of mifepristone in combination with misoprostol (recommended) or misoprostol alone (alternate).

### 3.3.3 Evidence summary and rationale for Recommendation 2

A systematic review assessed the effectiveness, safety and acceptability of misoprostol treatment of IUFD at ≥ 14 to ≤ 28 weeks of gestation *(32)*. A total of 16 RCTs were identified for inclusion in the review. Studies were included in the review if they included cases of IUFD at ≥ 14 to ≤ 28 weeks and if these cases were evenly distributed between the study arms. Studies that included IUFD at < 14 weeks or > 28 weeks of gestation were considered only if the mean gestational age of participants was within the range of ≥ 14 to ≤ 28 weeks.

The review included studies that compared regimens of mifepristone used in combination with misoprostol versus misoprostol alone, as well as those that compared different doses of misoprostol after administration of mifepristone, different doses of misoprostol with or without a loading dose, different routes of administration of misoprostol and different preparations of misoprostol (i.e. moistened or dry).

*Effects (benefits and harms)*  The reviewed studies showed that women treated with a combination of mifepristone and misoprostol had higher rates of complete abortion within 24 hours and a shorter expulsion time than those treated with misoprostol alone. For both combination regimens and misoprostol-only regimens, women treated with 400 µg misoprostol had higher rates of complete abortion within 24 hours and lower rates of serious adverse events than women treated with alternative dosages of misoprostol. In the studies that compared routes of

20

| RECOMMENDATION 2 | Medical management for intrauterine fetal demise at ≥ 14 to ≤ 28 weeks of gestation[7] | |
|---|---|---|

| RECOMMENDATIONS | COMBINATION REGIMEN (RECOMMENDED[a]) | | MISOPROSTOL-ONLY (ALTERNATE) |
|---|---|---|---|
| | MIFEPRISTONE ⟩⟩ 1–2 DAYS ⟩⟩ MISOPROSTOL | | MISOPROSTOL |
| INTRAUTERINE FETAL DEMISE ≥ 14–28 WEEKS | 200 mg PO once | 400 µg PV or SL every 4–6 hours[b] | 400 µg SL (preferred) or PV every 4–6 hours[b] |

PO: oral; PV: vaginal; SL: sublingual

We suggest the use of 200 mg mifepristone administered orally, followed 1–2 days later by repeat doses of 400 µg misoprostol administered sublingually or vaginally every 4–6 hours.[b] The minimum recommended interval between use of mifepristone and misoprostol is 24 hours.

For the misoprostol-only regimen, we suggest the use of repeat doses of 400 µg misoprostol administered sublingually every 4–6 hours.[b]

Where sublingual misoprostol is not used, we suggest the use of repeat doses of 400 µg misoprostol administered vaginally every 4–6 hours.[b]

Notes:
- Data related to gestational ages over 24 weeks of gestation were more limited.
- The use of a loading dose of misoprostol is not necessary. There is no advantage to the use of moistened over dry misoprostol.

 RECOMMENDATION TYPE: NEW OR UPDATED
Recommendation 2 is new.

[a] Combination regimen is recommended because it is more effective.

[b] Repeat doses of misoprostol can be considered when needed to achieve success of the abortion process. In this guideline we do not provide a maximum number of doses of misoprostol. Health-care providers should use caution and clinical judgement to decide the maximum number of doses of misoprostol in pregnant individuals with prior uterine incision. Uterine rupture is a rare complication; clinical judgement and health system preparedness for emergency management of uterine rupture must be considered with advanced gestational age.

administration for misoprostol, there was no strong evidence of one route being superior to another.

**Values** We were not able to identify research addressing the value placed on management of IUFD. Generally, we made the assumption that individuals would value shorter induction to expulsion times, and would value avoiding additional surgical intervention, serious adverse events and minor side-effects. However, there may be important variability in how much individuals value these outcomes, particularly in relation to each other. For example, a person may choose a longer induction to expulsion time if it is associated with a lower risk of serious adverse events and minor side-effects.

[7] In this guideline, duration of pregnancy (gestation) is the size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP).

2023 SUPP 000124
21

**Recommendations**

**Equity**

We were unable to identify research on aspects of equity related to the relative effectiveness of the intervention in different subgroups; no assumptions were made.

**Resources**

We were unable to identify research that explored the costs involved or the cost-effectiveness of the intervention among the studies included in the systematic review. However, serious adverse events related to medical management of IUFD are rare. In cases where additional hospital resources are required, such as blood transfusion, inpatient management or analgesic measures, we assume that the costs associated with this care will be higher. We were unable to determine the impact that the use of mifepristone has on costs. While there may be an increased upfront cost in the delivery of a combination regimen (mifepristone and misoprostol), the overall resource use (and cost) may be decreased due to a shorter abortion process and higher success rates.

**Acceptability**

Several factors impacting acceptability were considered in the development of this recommendation, including tolerability of medication. Overall, women were satisfied with their treatment *(33–35)* and found the pain associated with the induction less than or the same as they expected *(35)*.

**Feasibility**

We were unable to identify research on the feasibility of implementing the use of misoprostol alone or in combination with mifepristone for the management of IUFD at ≥ 14 to ≤ 28 weeks specifically. However, the 16 studies were conducted across 17 countries (one study was conducted across sites in two countries) providing information on the varying country contexts in which such services may be provided. Of these 17 countries, six were lower-middle-income economies, seven were upper-middle-income economies and four were high-income economies *(32)*.

**Rationale for Recommendation 2:** Women treated with a combination of mifepristone and misoprostol had higher rates of successful abortion within 24 hours and a shorter expulsion time than those treated with misoprostol alone. The certainty of the evidence ranged from low to very low. Evidence suggests that in both combination regimens and misoprostol-only regimens, the use of 400 µg misoprostol leads to higher rates of successful abortion within 24 hours and lower rates of serious adverse events compared with other doses.

### 3.3.4 Additional considerations

For the health-care providers managing IUFD at ≥ 14 to ≤ 28 weeks of gestation, the recommendations for cadres who can manage medical abortion at > 12 weeks can be followed. Alongside non-specialist and specialist doctors, additional cadres – including nurses, midwives and associate/advanced associate clinicians – can provide care

where there is access to appropriate surgical backup and the proper infrastructure is available to address incomplete abortion or other complications *(10)*. Patient preference should be considered when determining the route of misoprostol administration in medical management.

### 3.3.5 Research gaps

*General:*

▶ Identification of the most effective medical regimen for IUFD management is needed. In particular, future research can investigate the efficacy of lower doses of misoprostol, such as 200 µg, when used with mifepristone.

▶ Misoprostol dosage for management of IUFD at < 20 weeks versus 20–28 weeks of gestation should be investigated.

**Recommendations**

## 3.4 Induced abortion

### 3.4.1 Indication for induced abortion

People with an unplanned, mistimed or unwanted pregnancy may choose to have a medical abortion. Medical abortion refers to the sequential use of mifepristone followed by misoprostol or, in settings where mifepristone is not available, the use of misoprostol alone, to induce abortion, as an alternative to surgical management of abortion. An enabling regulatory and policy environment is needed to ensure that every individual who can become pregnant and who is legally eligible has ready access to safe abortion care. Laws and policies on abortion should protect health and human rights *(6)*.

**RECOMMENDATION 3A**

**Medical management of induced abortion at < 12 weeks of gestation[8]**

| RECOMMENDATIONS | COMBINATION REGIMEN (RECOMMENDED[a]) | | MISOPROSTOL-ONLY (ALTERNATE) |
|---|---|---|---|
| | MIFEPRISTONE ⟩⟩ 1–2 DAYS ⟩⟩ MISOPROSTOL | | MISOPROSTOL |
| INDUCED ABORTION < 12 WEEKS | 200 mg PO once | 800 µg B, PV or SL[b,c] | 800 µg B, PV or SL[b,c] |

B: buccal; PO: oral; PV: vaginal; SL: sublingual

We recommend the use of 200 mg mifepristone administered orally, followed 1–2 days later by 800 µg misoprostol administered vaginally, sublingually or buccally.[b,c] The minimum recommended interval between use of mifepristone and misoprostol is 24 hours.

For the misoprostol-only regimen, we recommend the use of 800 µg misoprostol administered vaginally, sublingually or buccally.[b,c]

Notes:
- There is limited evidence to suggest that simultaneous dosing of mifepristone and misoprostol is efficacious *(39,40)*.



**RECOMMENDATION TYPE: NEW OR UPDATED**

Recommendation 3a has been updated from the WHO 2012 *Safe abortion* guidance *(6)*. This updated recommendation applies to pregnancies up to 12 weeks of gestation, whereas in the prior guidance, different regimens were recommended for pregnancies up to 7 weeks, 9 weeks and 12 weeks. For the recommended misoprostol-only regimen, buccal route of administration has been added and the maximum number of doses has been removed. Interval dosing has been removed and a note has been added that repeat doses of misoprostol can be considered to achieve success of the abortion process.

[a] Combination regimen is recommended because it is more effective.

[b] Consideration for patient and provider preference suggests the inclusion of all routes, including buccal administration.

[c] See note on next page (for Recommendation 3b).

[8] In this guideline, duration of pregnancy (gestation) is the size of the uterus, estimated in weeks, based on clinical examination, that corresponds to a pregnant uterus of the same gestational age dated by last menstrual period (LMP).

2023 SUPP 000127

### 3.4.2   Medical management of induced abortion: Recommendations 3a and 3b

The decision about abortion management should be based on the individual's preference for treatment. The WHO guideline, *Safe abortion: technical and policy guidance for health systems* (2012), recommends manual or electric vacuum aspiration, dilation and evacuation, or medical management, either using a combination regimen (mifepristone followed by misoprostol) or misoprostol alone *(6)*. Mifepristone followed by a prostaglandin analogue has been shown to be safe and effective *(36)*. Limited evidence also suggests that a regimen with repeated doses of misoprostol between 9 and 12 weeks of gestation is safe and effective *(4,28,37,38)*; however, use of misoprostol alone is less effective than its use in combination with mifepristone.

**RECOMMENDATION 3B** — **Medical management of induced abortion at ≥ 12 weeks of gestation**

| RECOMMENDATIONS | COMBINATION REGIMEN (RECOMMENDED[a]) | | MISOPROSTOL-ONLY (ALTERNATE) |
|---|---|---|---|
| | MIFEPRISTONE ⟩⟩ 1–2 DAYS ⟩⟩ MISOPROSTOL | | MISOPROSTOL |
| **INDUCED ABORTION ≥ 12 WEEKS** | 200 mg PO once | 400 µg B, PV or SL every 3 hours[b,c] | 400 µg B, PV or SL every 3 hours[b,c] |

B: buccal; PO: oral; PV: vaginal; SL: sublingual

**We suggest the use of 200 mg mifepristone administered orally, followed 1–2 days later by repeat doses of 400 µg misoprostol administered vaginally, sublingually or buccally every 3 hours.[b,c] The minimum recommended interval between use of mifepristone and misoprostol is 24 hours.**

**For the misoprostol-only regimen, we suggest the use of repeat doses of 400 µg misoprostol administered vaginally, sublingually or buccally every 3 hours.[b,c]**

Notes:
• The use of a loading dose of misoprostol is not necessary. There is no advantage to the use of moistened over dry misoprostol.



**RECOMMENDATION TYPE: NEW OR UPDATED**

Recommendation 3b has been updated from the WHO 2012 *Safe abortion* guidance *(6)*. For this recommendation, the combination regimen (mifepristone and misoprostol) does not have the loading dose of 800 µg misoprostol as in the prior guidance. For both the combination regimen and the misoprostol-only regimen, the buccal route has been added as an option. Maximum number of doses has been removed and the time period between mifepristone and misoprostol dosing is given in days.

[a]   Combination regimen is recommended because it is more effective.

[b]   Evidence suggests that vaginal route is the most effective. Consideration for patient and provider preference suggests the inclusion of all routes, including buccal administration.

[c]   Repeat doses of misoprostol can be considered when needed to achieve success of the abortion process. In this guideline we do not provide a maximum number of doses of misoprostol. Health-care providers should use caution and clinical judgement to decide the maximum number of doses of misoprostol in pregnant individuals with prior uterine incision. Uterine rupture is a rare complication; clinical judgement and health system preparedness for emergency management of uterine rupture must be considered with advanced gestational age.

**Recommendations**

This guideline provides updated information related to specific dosages, routes and regimens for medical abortion, which differ for pregnancies of different gestational ages.

### 3.4.3 Evidence summary and rationale for Recommendations 3a and 3b

Three systematic reviews served as the evidence base for the effectiveness, safety and acceptability of medical management of induced abortion regimens using mifepristone plus misoprostol (the combination regimen) or misoprostol alone: the first was for induced abortions at ≤ 63 days of gestation *(41)*; the second was for induced abortions at > 63 days and up to 84 days *(42)*; and the third was for induced abortions at ≥ 12 weeks of gestation *(43)*.

In the first systematic review, 41 studies were included towards the development of this recommendation comparing the combination regimen to the use of misoprostol alone, and comparing different routes, doses and dosing intervals for misoprostol after administration of mifepristone, and different doses of misoprostol in misoprostol-only regimens *(41)*.

In the second systematic review, five studies were included towards the development of these recommendations comparing different routes of misoprostol administration after use of mifepristone, different doses of misoprostol administration in misoprostol-only regimens, and comparing the management of induced abortion in a health-care facility to self-management by the pregnant individual *(42)*.

In the third systematic review, a total of 44 RCTs were identified for inclusion. The review included studies that compared the combination regimen with misoprostol alone. Studies also compared different doses of misoprostol after administration of mifepristone, different doses of misoprostol with or without a loading dose, different routes of administration of misoprostol, and different preparations of misoprostol (i.e. moistened or dry) *(43)*.

**Effects (benefits and harms)**  The first review, on induced abortions at ≤ 63 days of gestation *(41)*, revealed that the combination regimen had higher rates of successful abortion and lower rates of ongoing pregnancy than the misoprostol-only regimen. In the studies comparing misoprostol doses and interval of misoprostol administration in the combination regimen, there were higher rates of successful abortion and lower rates of ongoing pregnancy with 800 µg of misoprostol and an interval of at least 24 hours between use of mifepristone and misoprostol. Studies comparing the different routes of misoprostol administration revealed the vaginal and sublingual routes to be more effective. In the few studies that compared misoprostol dosages in misoprostol-only regimen, 800 µg of misoprostol had lower rates of ongoing pregnancy and higher rates of successful abortion.

2023 SUPP 000129

The second systematic review revealed that medical abortion is effective in the late first trimester (>63 days and up to 84 days of gestation) *(42)*. A combination regimen is significantly more effective than a misoprostol-only regimen. Success rates were higher with repeat dosing of misoprostol both in combination regimens and when misoprostol was used alone, and they were also higher with vaginal rather than oral administration for repeat dosing. Two studies addressed outpatient medical abortion, showing no significant difference in effectiveness, safety or acceptability between the two groups.

*An enabling regulatory and policy environment is needed to ensure that every individual who can become pregnant and who is legally eligible has ready access to safe abortion care.*

The third systematic review, on induced abortion at ≥12 weeks, showed that combination regimens had lower rates of ongoing pregnancy at 24 and 48 hours when compared with misoprostol-only regimens. Dosing of mifepristone 24 hours before misoprostol had lower rates of ongoing pregnancy when compared to simultaneous dosing of both medications. In misoprostol-only regimens, dosing intervals of 3 hours had lower rates of ongoing pregnancy at 24 and 48 hours compared to other dosing intervals. For both combination and misoprostol-only regimens, sublingual and vaginal misoprostol routes of administration had better efficacy and lower rates of side-effects than the oral route *(43)*.

**Values**    We were unable to identify research on values relating to the management of medical abortion. We made the assumption that individuals value outcomes of effectiveness and safety, but it is unclear how they would value those outcomes when weighed against side-effects and markers of acceptability.

Women may also strongly value certain interventions over others, with preferences for route and timing of medication administration, and type of intervention (medical or surgical) differing significantly between one woman and another, or one region of the world and another *(44–46)*. Consideration should also be given to the value women place on the timing and cost of abortion services as well as opportunities to take part in managing their own abortion care in situations where at-home dosing or abortion self-management are available *(47–49)*.

**Equity**    We were unable to identify research on aspects of equity around relative effectiveness of the interventions in different subgroups. However, in 4 studies, participants ranged in age from 16 to 44 years, demonstrating inclusion of people across age groups *(50–53)*.

**Resources**    In the studies included in the three systematic reviews, we were unable to identify research that explored the costs involved or the cost-effectiveness. Studies on medical abortion include analgesic options ranging from oral to parenteral administration, including opiates, depending on gestational age. In cases where additional

hospital resources are required, such as blood transfusion, inpatient management, analgesic measures or foeticide, we assume that the costs associated with these services will be higher. We were unable to determine the impact that the use of mifepristone has on costs. While there may be an increased upfront cost with the use of a combination regimen, the overall resources used may be decreased due to a shorter abortion process and a higher success rate.

**Feasibility**

We were unable to identify research on the feasibility of implementing the use of misoprostol alone or in combination with mifepristone for the management of medical abortion. However, four studies conducted in women with pregnancies 9–12 weeks of gestation reported that the medical abortion service was provided as outpatient care indicating feasibility of offering the service through outpatient health-care facilities *(33,50,51,53)*. Additionally, studies related to management of medical abortion at < 12 weeks of gestation were conducted across 10 countries: two high-income, three upper-middle-income, four lower-middle-income and one low-income economy *(41)*. Studies related to management of medical abortion at ≥ 12 weeks of gestation were conducted across 23 countries (four studies were conducted across sites in multiple countries): one was a low-income economy, six were lower-middle-income economies, five were upper-middle-income economies, and 11 were high-income economies *(43)*.

**Acceptability**

Generally, women find various routes of misoprostol administration acceptable *(48,49,54–59)*. Additionally, women found the side-effects to be acceptable *(47,49)*. Women receiving care for management of medical abortion at < 12 weeks of gestation reported that the ability to predict timing of the bleeding was the best feature of taking the medicines at home *(51)*. Home use of medical abortion at < 12 weeks gestation following an interaction with a health-care provider enabled women to keep working or reduced opportunity costs *(51)*.

> Women receiving care for management of medical abortion at < 12 weeks of gestation reported that the ability to predict timing of the bleeding was the best feature of taking the medicines at home *(51)*.

**Rationale for Recommendation 3a (on medical abortion at < 12 weeks of gestation):** The combination mifepristone and misoprostol regimen is based on moderate certainty of evidence for induced abortion at < 12 weeks. In combination regimens, misoprostol dosage of 800 μg administered vaginally, sublingually or buccally is recommended based on moderate certainty of evidence. Evidence is limited regarding the use of misoprostol-only regimens, especially between 9 and 12 weeks of gestation. Thus, the GDG members took the view that when using misoprostol-only regimens, the dose of 800 μg administered vaginally, sublingually or buccally is safe, effective and acceptable.

**Rationale for Recommendation 3b (on medical abortion at ≥ 12 weeks of gestation):** The combination mifepristone and misoprostol regimen is based on moderate certainty of evidence for induced

2023 SUPP 000131

abortion at ≥ 12 weeks. Mifepristone 200 mg is suggested based on success, women's values and cost (given the higher price of 600 mg of mifepristone) based on low to very low certainty of evidence. Misoprostol dosage of 400 μg administered every 3 hours is suggested based on overall very low certainty of evidence and is conditional upon resources available in different settings. Evidence on use of the buccal route was inconclusive, but it should be considered as an acceptable option if an individual prefers this route of administration. This is based on low to very low certainty of evidence.

### 3.4.4 Additional considerations

Given the nature of the medical abortion process when using the combination regimen, it is possible for individuals to play a role in managing some of the components by themselves outside of a health-care facility. Where there is access to a source of accurate information and to a health-care provider (should one be needed or wanted at any stage of the process), the abortion process can be self-managed with pregnancies < 12 weeks of gestation without the direct supervision of a health-care provider *(10)* (evidence is limited for pregnancies > 10 weeks *[53,60–64]*).

For provision of medical abortion of pregnancies < 12 weeks, the following cadres have been recommended: auxiliary nurses, auxiliary nurse midwives, nurses, midwives, associate/advanced associate clinicians, and non-specialist and specialist doctors. Doctors of complementary systems of medicine can be providers of this service in health system contexts with an established mechanism for the participation of such doctors in other tasks related to maternal and reproductive health *(10)*.

Alongside non-specialist and specialist doctors, the following cadres can provide medical abortion for pregnancies ≥ 12 weeks in contexts where appropriate surgical backup and proper infrastructure is established and easily accessible to address incomplete abortion or other complications: nurses, midwives, associate/advanced associate clinicians *(10)*.

### 3.4.5 Research gaps

*General:*

▶ The various next steps that individuals can take, if needed, after medical abortion should be further evaluated. This includes self-assessment of the success of medical abortion, in particular for misoprostol-only regimens, which tend to be used in more restrictive settings and which are less effective.

▶ For those with uterine scars, the safety and efficacy of medical abortion regimens is an area requiring more research. In particular, the misoprostol dosage when used in combination with mifepristone and when used in misoprostol-only regimens for pregnancies 13–20 weeks versus 20–28 weeks of gestation can be investigated.

**Recommendations**

▶ Additional evidence is needed on the cost-effectiveness of all medical abortion interventions.

▶ Qualitative research is needed on individuals' values and preferences relating to all medical abortion interventions.

*Medical abortion at <12 weeks of gestation:*

▶ Studies are needed on the efficacy, safety and acceptability of medical abortion (combination mifepristone and misoprostol regimens and misoprostol-only regimens) in the outpatient setting for pregnancies 9–12 weeks of gestation. This includes the follow-up care for medical abortion when self-assessment is used to determine eligibility for and success of the medical abortion.

*Medical abortion at ≥ 12 weeks of gestation:*

▶ Studies are needed to determine the gestational age limit within which it is safe to carry out medical abortion without hospital admission.

▶ In connection to the research gap noted above, qualitative research will also be needed on the acceptability of outpatient medical abortion.

30

# 3.5 Post-abortion contraception

### 3.5.1 Provision of post-abortion contraception

Contraception can be initiated at the time of administration of the first pill of the medical abortion regimen or after assessment of successful medical abortion. All contraceptive options may be used. Criteria laid out in the WHO publications *Medical eligibility criteria for contraceptive use* and *Ensuring human rights in the provision of contraceptive information and services* should be adhered to *(65,66)*.

**TABLE 3**

**Post-abortion medical eligibility recommendations for contraceptive methods**

| CONTRACEPTIVE METHOD | POST-ABORTION CONDITION | | |
|---|---|---|---|
| | FIRST TRIMESTER | SECOND TRIMESTER | IMMEDIATE POST-SEPTIC ABORTION |
| COMBINED ORAL CONTRACEPTIVES (COCs) | 1 | 1 | 1 |
| COMBINED INJECTABLE CONTRACEPTIVES (CICs) | 1 | 1 | 1 |
| PATCH & VAGINAL RING | 1 | 1 | 1 |
| PROGESTERONE-ONLY PILLS (POPs) | 1 | 1 | 1 |
| PROGESTOGEN-ONLY INJECTABLES: DMPA, NET-EN (depot medroxyprogesterone acetate, norethisterone enanthate) | 1 | 1 | 1 |
| PROGESTOGEN-ONLY IMPLANTS: LNG, ETG (levonorgestrel, etonogestrel) | 1 | 1 | 1 |
| COPPER-BEARING INTRAUTERINE DEVICE (IUD) | 1 | 2 | 4 |
| LNG-RELEASING IUD | 1 | 2 | 4 |
| CONDOMS | 1 | 1 | 1 |
| SPERMICIDE | 1 | 1 | 1 |
| DIAPHRAGM | 1 | 1 | 1 |

**DEFINITION OF CATEGORIES**

1. A condition for which there is no restriction for the use of the contraceptive method.
2. A condition where the advantages of using the method generally outweigh the theoretical or proven risks.
3. A condition where the theoretical or proven risks usually outweigh the advantages of using the method.
4. A condition that represents an unacceptable health risk if the contraceptive method is used.

*Source: WHO (2015) (65)*

**Recommendations**

### 3.5.2 Timing of post-abortion contraception: Recommendations 4a and 4b

The following recommendations provide further clarification on the timing of initiating contraception after a medical abortion.

### 3.5.3 Evidence summary and rationale for Recommendations 4a and 4b

Three systematic reviews served as the evidence base for the timing of post-abortion contraception. The first systematic review assessed the efficacy and safety of non-IUD hormonal contraception initiation after abortion (including medical abortion) *(68)*. Three RCTs *(67,69,70)* and one cohort study *(71)* compared immediate versus delayed initiation of implants or DMPA after medical abortion with mifepristone and misoprostol. No studies assessed hormonal contraception initiation after medical abortion with a misoprostol-only regimen.

---

**RECOMMENDATION 4A**

**Timing of post-abortion hormonal contraception initiation, except for intrauterine device (IUD)**

| | TIMING OF POST-ABORTION CONTRACEPTION |
|---|---|
| | IMMEDIATE INITIATION |
| HORMONAL CONTRACEPTION | Immediately after the first pill of the medical abortion |

**For individuals undergoing medical abortion with the combination mifepristone and misoprostol regimen or the misoprostol-only regimen who desire hormonal contraception (oral contraceptive pills, contraceptive patch, contraceptive ring, contraceptive implant or contraceptive injections), we suggest that they be given the option of starting hormonal contraception immediately after the first pill of the medical abortion regimen.**

Notes:

- All individuals who can become pregnant should be provided with all of the necessary information to make an informed decision regarding the use of contraception. Immediate initiation of intramuscular (IM) depot medroxyprogesterone acetate (DMPA) is associated with a slight decrease in the effectiveness of medical abortion regimens *(67)*. However, immediate initiation of DMPA should still be offered as an available contraceptive method after an abortion.

- Indirect evidence was used as a basis for decision-making on initiation of hormonal contraception as an option for individuals undergoing medical abortion with misoprostol alone.

- No data were available on the use of combined hormonal contraception (pills or injections) by those undergoing medical abortion.



**RECOMMENDATION TYPE: NEW OR UPDATED**
Recommendation 4a is a new recommendation.

The second systematic review assessed contraceptive continuation at six months (implants, DMPA and IUD) and unintended pregnancies after the index abortion *(72)*. This review included the same three RCTs *(67,69,70)* and one cohort study *(71)* that were included in the first review.

The third systematic review assessed the effectiveness and safety of initiation of IUD after abortion *(73)*. In this review, three studies compared immediate versus delayed IUD insertion after medical abortion with mifepristone and misoprostol *(74–76)*. The included studies assessed copper-bearing and levonorgestrel-releasing IUDs. No studies assessed IUD initiation after medical abortion with a misoprostol-only regimen.

**Effects (benefits and harms)** The findings of the three RCTs and one cohort study in the first systematic review *(68)* showed that there was little difference in the rates of successful abortion between the two groups (immediate versus delayed initiation of implants or DMPA after medical abortion) and satisfaction regarding the timing of their contraception initiation was high. Findings from the same studies, which were also reviewed in the second systematic review *(72)*, showed that continuation rates at six months were higher for the women in the immediate initiation group. Contraceptive failure rates were lower among women who initiated the implant, DMPA or the IUD immediately. The studies on immediate versus delayed IUD insertion after medical abortion in the third systematic review *(73)* showed that there was no difference between the immediate and delayed insertion groups with regard to adverse events or the need for further intervention after IUD

---

**RECOMMENDATION 4B**  **Timing of post-abortion intrauterine device (IUD) placement**

| | TIMING OF POST-ABORTION CONTRACEPTION |
| --- | --- |
| | IMMEDIATE INITIATION |
| IUD | With assessment of successful abortion |

**For individuals undergoing medical abortion with the combination mifepristone and misoprostol regimen or the misoprostol-only regimen who wish to have an IUD inserted, we suggest IUD placement at the time that success of the abortion procedure is determined. The use of clinical signs with bimanual examination, serum human chorionic gonadotrophin (hCG) levels or ultrasonography (if available), and an assessment of the individual's current symptoms can be used to determine whether or not there is an ongoing pregnancy.**

**RECOMMENDATION TYPE: NEW OR UPDATED**
Recommendation 4b is a new recommendation.

**Recommendations**

placement. There were fewer expulsions of the IUD at 12 months among women who had undergone immediate IUD placement.

**Values**

Women placed high value on accepting a contraceptive method to prevent a future pregnancy. Two studies looking at DMPA and implants reported that women undergoing an abortion placed high importance on preventing a pregnancy in the next six months *(67,70)*.

**Resources**

In regard to resource requirements and cost-effectiveness, there was no direct research evidence that explored these domains. The cost of the IUD and implant versus pills and injections in various country contexts could not be determined. While there may be increased upfront costs of the IUD and implant, related to the cost of the devices, provider training and additional placement and removal visits, costs may decrease over time compared with the repeated need for pills and injections *(77)*.

**Equity**

There was no research evidence identified on aspects of equity around the relative effectiveness of the intervention in different subgroups. However, three studies included adolescents *(67,70,71)* and three studies included nulliparous women *(74–76)*.

**Acceptability**

Women reported high satisfaction with immediate initiation of their implant or DMPA administration *(67,70)*. Acceptability and satisfaction were also reported by women in the immediate-start group based on fewer visits made to the health-care provider compared with the delayed-start group *(70)*. Immediate initiators of implants had higher attendance at follow-up appointments *(69,71)*.

For the IUD studies, similar considerations were taken into account. None of the included studies specifically addressed acceptability of the service to women. However, timing of insertion can be used as a proxy indicator for acceptability; more women had the IUD placed at the time that successful abortion was determined compared with the number of women who opted for delayed insertion *(74,76)*. The rate of loss to follow-up at six months was reportedly lower for the early-insertion group as compared with the delayed insertion group *(75)*.

**Feasibility**

Initiation of post-abortion contraception appears feasible to implement. The included studies for both IUD and hormonal contraception were conducted through outpatient clinics, indicating feasibility of offering the service through outpatient health-care facilities.

34

**Rationale for Recommendation 4a (on post-abortion hormonal contraception initiation, except for IUD):** There was little difference in the successful abortion rates between women who started non-IUD hormonal contraception after receiving mifepristone versus those who started after receiving both mifepristone and misoprostol. This difference was based on low certainty of evidence. Women placed value on accepting a contraceptive method and they placed value on preventing future pregnancies. Satisfaction with and acceptability of immediate initiation of a contraceptive method was high. Continuation rates for the implant at six months were higher for the women in the immediate-initiation group. The certainty of the evidence was very low.

**Rationale for Recommendation 4b (on post-abortion IUD placement):** Placement of an IUD at the time the abortion process has been deemed successful leads to lower rates of contraceptive failure and higher continuation rates at 6 and 12 months. The 6-month continuation rates are based on moderate certainty of evidence while the contraceptive failure rates are based on low certainty of evidence and the continuation rates at 12 months are based on very low certainty of evidence. There is no difference in the number of women requiring further intervention post-IUD placement due to retained tissue or bleeding, but the certainty of the evidence was low. There is no difference in the side-effect of pain at IUD insertion between the two groups, based on moderate certainty of evidence. Serious adverse events are rare and there was no difference between the two groups for uterine perforation or death, but this was based on very low certainty of evidence. Acceptability and feasibility of immediate placement of the IUD was high.

### 3.5.4  Additional considerations

All individuals who can become pregnant should be informed that ovulation can return within two weeks following abortion, putting them at risk of pregnancy unless an effective contraceptive method is used. Those who are interested in contraception should be provided with accurate information to assist them with choosing the most appropriate contraceptive method to meet their needs. Some prefer to discuss options for contraception after the abortion is completed. For those seeking an abortion following a reported contraceptive failure, it is important to discuss whether the method may have been used incorrectly and how to use it correctly, or whether it may be appropriate to change to a different method. Ultimately, the final decision about whether to use contraception, and which method to use, is up to the individual alone *(19)*.



**IMPORTANT NOTE:** Acceptance of a contraceptive method must never be a precondition for providing an abortion.

For the health workforce, task sharing guidelines have offered options for various cadres to conduct different aspects of the provision of contraception counselling and services *(10,78)*.

For injectable contraception administration, the following cadres have been recommended: auxiliary nurses, auxiliary nurse midwives, nurses, midwives, pharmacists, associate/advanced associate clinicians, and non-specialist and specialist doctors. Doctors of complementary systems of medicine can be providers of this service in health system contexts with an established mechanism for the participation of such doctors in other tasks related to maternal and reproductive health. Pharmacy workers can administer the injectable contraceptive under direct supervision of a pharmacist. Lay health works as administrators of injectable contraception can be an option if conducted under targeted monitoring and evaluation *(10)*.

For implant insertion and removal, the following cadres have been recommended: nurses, midwives, pharmacists, associate/advanced associate clinicians, and non-specialist and specialist doctors. Auxiliary nurses and auxiliary nurse midwives may perform implant insertion/removal within the context of targeted monitoring and evaluation. Doctors of complementary systems of medicine can be providers of this service in health system contexts with an established mechanism for the participation of such doctors in other tasks related to maternal and reproductive health and where training in implant removal is given along with training in insertion *(10)*.

For IUD placement, the following cadres have been recommended: auxiliary nurse midwives, nurses, midwives, associate and advanced associate clinicians, non-specialist and specialist doctors. Doctors of complementary systems of medicine can be providers of this service in health system contexts with an established mechanism for the participation of such doctors in other tasks related to maternal and reproductive health *(10)*.

Self-administration of injectable contraception is an option in contexts where mechanisms to provide appropriate information and training exist, referral linkages to health-care providers are strong, and monitoring and follow-up can be ensured *(10)*.

2023 SUPP 000139

### 3.5.5  Research gaps

*General:*

▶ Studies are needed on the efficacy, safety and acceptability of immediate initiation of contraception with misoprostol-only regimens.

▶ Studies on the efficacy, safety and acceptability of the initiation of combined hormonal contraception at the time of mifepristone administration are also lacking.

▶ Recommendations on the timing of post-abortion contraception are inclusive of combined hormonal contraception and misoprostol-only regimens, based on indirect evidence. Results from the survey on research gaps (completed by GDG members) noted the lack of direct evidence for these clinical scenarios and, therefore, further research on this topic should be pursued.

# 4. General implementation considerations



General implementation considerations for the recommendations in this guideline are outlined below through a question-and-answer format.



**IMPORTANT NOTE:** The quality of medicines used is an important factor that can influence the process and overall success of a medical abortion. Substandard mifepristone and/or misoprostol products that do not contain the right active ingredients in the right dosages, and those that are not manufactured, transported or stored under the specified conditions, can affect the outcomes of a medical abortion. It is critical that mifepristone and misoprostol used for medical abortion are properly manufactured in line with specifications and are handled appropriately through the supply chain until use at the point of care. Ensuring use of quality-assured mifepristone and misoprostol that has been transported and stored correctly according to the specified conditions can contribute to the overall quality of a medical abortion process.

**Q: Where should medical abortion services be available?**
A: Services should be available at the primary-care level, with referral systems in place for all required higher-level care.

**Q: Who can provide these medical abortion services?**
A: In addition to non-specialist doctors and specialist doctors, with task-specific training and functioning systems for monitoring and supportive supervision, a wide range of health worker cadres – such as auxiliary nurses, auxiliary nurse midwives, nurses, midwives, associate/advanced associate clinicians, pharmacists and

**Implementation**

doctors of complementary medicine – can provide various aspects of medical abortion services. In addition, indirect evidence from a qualitative systematic review on factors affecting implementation of task sharing in abortion identified that some providers in a middle-income setting where abortion is legal saw medical abortion as having a number of benefits for health services *(9)*. These reported benefits included that it was safe and effective; it would reduce the burden on health services; and it may make it easier for people involved to act in accordance with their conscience. A discussion of general considerations for task shifting in maternal health and family planning can be found in the 2012 OptimizeMNH guideline: *WHO recommendations: optimizing health worker roles to improve access to key maternal and newborn health interventions through task shifting (78)*.

The specific cadres able to provide medical abortion services have been outlined in the additional considerations section for each recommendation.

**Q: Can medical abortion processes be self-managed?**

A: When using the combination mifepristone and misoprostol regimen, the medical abortion process can be self-managed for pregnancies up to 12 weeks of gestation, including the ability to take the medications at home, without direct supervision of a health-care provider *(10)*; it should be noted that there was limited evidence for pregnancies beyond 10 weeks *(53,60–64)*. This is an option in circumstances where individuals have a source of accurate information and access to a health-care provider should they need or want it at any stage during the process *(10)*.

**Q: What general considerations should be taken into account when providing care to adolescents/youth?**

A: Ensure that you are fully aware of the national and local laws and policies. In your work with adolescents, you may find that in some situations, prevailing laws and policies may not permit you to do what is in the best interests of your adolescent patient (e.g. in some places, the provision of contraceptives to unmarried adolescents is illegal). In such situations, you may need to draw upon your experience and the support of caring and knowledgeable people to find the best way to balance your legal obligations with your ethical obligations *(13)*.

Provide information on the implications of each treatment option and help the adolescent choose the one best suited to his/her needs. While doing this:

▶ present all the relevant information;

▶ respond to questions as fully and honestly as you can;

40

2023 SUPP 000143

▶ help them choose; and

▶ respect their choice, even if it is not the one you would have wanted them to make.

Adolescents may be reluctant to disclose information on sensitive matters if their parents, guardians or spouses are also present.

Reduce the stigma around the issue by normalising it: an adolescent who has an unwanted pregnancy or a sexually transmitted infection may feel embarrassed or even ashamed. You can reduce the stigma around the issue by saying to the adolescent, "I have treated a number of young people with the same problem you have."

**Q:  What considerations should be taken into account when conducting a clinical interview and examination with adolescents/youth?**

A:  Following is list of considerations and steps.

▶ Respect local sensitivities regarding gender norms (e.g. whether it is appropriate for a male health worker to examine a female patient). If needed, ensure the presence of a female colleague during the examination *(13)*.

▶ Ensure privacy (e.g. make sure that curtains are drawn, doors are shut and that no unauthorized person enters the room during the examination).

▶ Start the clinical interview with issues that are the least sensitive and least threatening; it is often best to ask first about the activities of their peers and friends rather than directly about their own activities.

▶ If the adolescent is with an accompanying person, reach an agreement as to whether they want this person to be present during the examination.

▶ Inform the adolescent about what examination you want to carry out and the purpose of the examination.

▶ Explain the nature of the examination.

▶ Obtain the consent of the adolescent.

Implementation

**Q: How does one determine duration of pregnancy (gestation)?**

A: Physical examination to assess uterine size (i.e. bimanual pelvic and abdominal examination), assessment of last menstrual period (LMP) and recognition of symptoms of pregnancy are usually adequate. Laboratory or ultrasound testing may also be used, if needed. Laboratory testing is needed when typical signs of pregnancy are not clearly present and the provider is unsure whether there is an ongoing pregnancy. Obtaining tests should not hinder or delay uterine evacuation. Ultrasound scanning is not routinely required. Where it is available, it can help identify an intrauterine pregnancy and exclude an ectopic pregnancy *(6,19)*.

**Q: How can success of the medical abortion be determined?**

A: Success of medical abortion is determined by signs and symptoms as experienced by the individual. These may include heavy bleeding with clots, passage of the products of conception, and pain that may be significantly stronger than normal menstrual cramps. If ongoing symptoms of pregnancy are reported and/or there has only been minimal or no bleeding after taking the medications as directed, ongoing pregnancy should be suspected and further evaluation could include pelvic examination (demonstrating a growing uterus) or an ultrasound scan (demonstrating an ongoing pregnancy) *(19)*.

**Q: What is the role of ultrasound in these recommendations?**

A: Ultrasound scanning is not routinely required for the provision of abortion *(6)*. Successful abortion may be confirmed by pelvic examination, pelvic ultrasound or a repeat hCG measurement. If serum hCG measurements are used, it should be remembered that in some cases low hCG levels can be detectable for up to four weeks after successful expulsion. Ultrasound is useful to detect ongoing pregnancy by measuring endometrial thickness; it should be noted, however, that endometrial thickness is not useful for diagnosing incomplete abortion and its use as an indicator for this purpose may lead to inappropriate surgical interventions *(6)*.

For initiation of contraception, an ultrasound is not needed. Non-IUD methods can be started immediately. IUDs can be inserted whenever the medical abortion has been deemed successful *(19)*.

**Q: Is there a maximum number of doses of misoprostol that can be used in the medical management of abortion?**

A: Repeat doses of misoprostol can be considered when needed to achieve success of the abortion process. In this guideline we do not provide a maximum number of doses of misoprostol. Health-care providers should use caution and clinical judgement to decide the maximum number of doses of misoprostol in pregnant individuals with prior uterine incision. Uterine rupture is a rare

complication; clinical judgement and health system preparedness for emergency management of uterine rupture must be considered with advanced gestational age.

**Q: What is the best way to store misoprostol?**

A: Aluminium blister packs are the best way to store misoprostol *(79)*. Cutting the blister pack and storing misoprostol outside the aluminium blister may increase the risk of damage to the packaging (i.e. the inner seal), leading to exposure to environmental conditions *(80)*.

Store misoprostol in dry conditions at temperatures at or below 25 °C (77 °F) *(79,81)*.

Exposure to heat and humidity during manufacturing, packaging and storage may compromise the quality of misoprostol *(81)*.

**Q: What is the best way to store mifepristone?**

A: Store at 25 °C (77 °F); excursions permitted between 15 ° and 30 °C (59 ° and 86 °F) *(82)*.

**Q: When does return to ovulation occur after a medical abortion?**

A: Ovulation can occur as few as eight days after a medical abortion *(83)*.

# 5. Dissemination and adaptation

# 6. Guideline impact evaluation and future updates

# Dissemination and adaptation

Translation of this guideline into Spanish (in collaboration with PAHO), French and Portuguese is planned. Versions in other United Nations languages will be developed as needed. Third-party translations into additional non-United Nations languages will be encouraged, provided they comply with WHO guidance on such translations.

The digital versions of the guideline in all languages will be available via the WHO website[9] and through the WHO Reproductive Health Library (RHL) website.[10] Print versions of this guideline will be distributed to WHO regional and country offices, nongovernmental organization (NGO) partners, professional associations and other networks and partners.

WHO regional offices are expected to be active partners in the dissemination and adaptation of these guidelines. A number of other interested agencies and NGOs are encouraged to partner with WHO in the dissemination and local adaptation of the guidelines and in developing derivative informational materials.

The guideline will be launched in WHO regions through regional dissemination meetings and specific knowledge transfer and adaptation activities and implementation research will take place in select countries based on need and interest to move ahead with implementation of the recommendations. Derivative products will be developed, such as simple pocket-sized charts.

# Guideline impact evaluation and future updates

Two years after publication of the guideline, an online survey will be conducted through WHO regional and country offices and selected respondents representing other user groups (e.g. professional societies, NGOs). The purpose of the survey will be to gauge in-country progress in utilization of the guideline, implementation of the recommendations and any influence on policy decisions. It will also help in gathering feedback relevant to future modifications of the guidance.

Evidence will be reviewed and the guideline updated in four years, or earlier if new evidence warrants an update.

---

9    The webpage for this guideline, all language versions and related products is: http://www.who.int/reproductivehealth/publications/medical-management-abortion/en/
10    Available at: www.who.int/rhl

# References

1.  WHO model list of essential medicines (20th List). March 2017 (Amended August 2017). Geneva: World Health Organization; 2017 (http://apps.who.int/iris/bitstream/handle/10665/273826/EML-20-eng.pdf, accessed 5 November 2018).

2.  Bygdeman MSM. Progesterone receptor blockage. Effect on uterine contractility and early pregnancy. Contraception. 1985;32:45-51.

3.  Swahn ML, Bygdeman M. The effect of the anitprogestin RU 486 on uterine contractility and sensitivity to prostaglandin and oxytocin. BJOG. 1988;95(2):126-34.

4.  Kulier R, Kapp N, Gulmezoglu AM, Hofmeyr GJ, Cheng L, Campana A. Medical methods for first trimester abortion. Cochrane Database Syst Rev. 2011;(11):CD002855.

5.  Wildschut H, Both MI, Medema S, Thomee E, Wildhagen MF, Kapp N. Medical methods for mid-trimester termination of pregnancy. Cochrane Database Syst Rev. 2011;(1):CD005216.

6.  Safe abortion: technical and policy guidance for health systems, second edition. Geneva: World Health Organization; 2012 (http://www.who.int/reproductivehealth/publications/unsafe_abortion/9789241548434/en/, accessed 17 October 2018).

7.  Tang J, Kapp N, Dragoman M, de Souza JP. WHO recommendations for misoprostol use for obstetric and gynecologic indications. Int J Gynaecol Obstet. 2013;121(2):186-9.

8.  Blum J, Winikoff B, Gemzell-Danielsson K, Ho PC, Schiavon R, Weeks A. Treatment of incomplete abortion and miscarriage with misoprostol. Int J Gynaecol Obstet. 2007;99(Suppl 2):S186-9.

9.  Dawson AJ, Buchan J, Duffield C, Homer CS, Wijewardena K. Task shifting and sharing in maternal and reproductive health in low-income countries: a narrative synthesis of current evidence. Health Policy Plan. 2014;29(3):396-408.

10. Health worker roles in providing safe abortion care and post-abortion contraception. Geneva: World Health Organization; 2015 (http://www.who.int/reproductivehealth/publications/unsafe_abortion/abortion-task-shifting/en/, accessed 17 October 2018).

11. The WHO strategic approach to strengthening sexual and reproductive health policies and programmes. Geneva: World Health Organization; 2007 (https://www.k4health.org/sites/default/files/WHO%20Strategic%20approach.pdf, accessed 17 October 2018).

12. Chandra-Mouli V, Camacho AV, Michaud PA. WHO guidelines on preventing early pregnancy and poor reproductive outcomes among adolescents in developing countries. J Adolescent Health. 2013;52(5):517-22.

13. Adolescent job aid: a handy desk reference tool for primary level health workers. Geneva: World Health Organization; 2010 (http://apps.who.int/iris/bitstream/handle/10665/44387/9789241599962_eng.pdf, accessed 17 October 2018).

14. Jones BS, Weitz TA. Legal barriers to second-trimester abortion provision and public health consequences. Am J Public Health. 2009;99(4):623-30.

15. Mundigo AI, Indriso C, World Health Organization. Abortion in the developing world. New Delhi: Vistaar; 1999 (http://apps.who.int/iris/handle/10665/42174, accessed 16 October 2018).

16. Global abortion policies database. Geneva: World Health Organization; 2018 (http://srhr.org/abortion-policies/, accessed 17 October 2018).

17. WHO handbook for guideline development, second edition. Geneva: World Health Organization; 2014 (http://www.who.int/iris/handle/10665/145714).

18. Evidence to Decision (EtD) framework. In: DECIDE (2011–2015) [website] (https://www.decide-collaboration.eu/evidence-decision-etd-framework, accessed 16 October 2018).

19. Clinical practice handbook for safe abortion. Geneva: World Health Organization; 2014 (http://www.who.int/reproductivehealth/publications/unsafe_abortion/clinical-practice-safe-abortion/en/, accessed 16 October 2018).

20. Kim C, Barnard S, Neilson JP, Hickey M, Vazquez JC, Dou L. Medical treatments for incomplete miscarriage. Cochrane Database Syst Rev. 2017;(1):CD007223.

21. Niinimaki M, Jouppila P, Martikainen H, Talvensaari-Mattila A. A randomized study comparing efficacy and patient satisfaction in medical or surgical treatment of miscarriage. Fertil Steril. 2006;86(2):367-72.

22. Bique C, Usta M, Debora B, Chong E, Westheimer E, Winikoff B. Comparison of misoprostol and manual vacuum aspiration for the treatment of incomplete abortion. Int J Gynaecol Obstet. 2007;98(3):222-6.

2023 SUPP 000149

23. Dabash R, Ramadan MC, Darwish E, Hassanein N, Blum J, Winikoff B. A randomized controlled trial of 400-μg sublingual misoprostol versus manual vacuum aspiration for the treatment of incomplete abortion in two Egyptian hospitals. Int J Gynaecol Obstet. 2010;111(2):131-5.

24. Diop A, Raghavan S, Rakotovao JP, Comendant R, Blumenthal PD, Winikoff B. Two routes of administration for misoprostol in the treatment of incomplete abortion: a randomized clinical trial. Contraception. 2009;79(6):456-62.

25. Blanchard K, Taneepanichskul S, Kiriwat O, Sirimai K, Svirirojana N, Mavimbela N, et al. Two regimens of misoprostol for treatment of incomplete abortion. Obstet Gynecol. 2004;103(5 Pt 1):860-5.

26. Nguyen TN, Blum J, Durocher J, Quan TT, Winikoff B. A randomized controlled study comparing 600 versus 1,200 microg oral misoprostol for medical management of incomplete abortion. Contraception. 2005;72(6):438-42.

27. Chigbu B, Onwere S, Aluka C, Kamanu C, Ezenobi O. Is misoprostol a suitable alternative to the surgical evacuation of incomplete abortion in rural south-eastern Nigeria? East African Med J. 2012;89(5):172-7.

28. The care of women requesting induced abortion: evidence-based clinical guideline No. 7, third edition. London: The Royal College of Obstetricians and Gynaecologists – RCOG Press; 2011 (https://www.rcog.org.uk/globalassets/documents/guidelines/abortion-guideline_web_1.pdf, accessed 29 November 2018).

29. Kulier R, Kapp N. Comprehensive analysis of the use of pre-procedure ultrasound for first- and second-trimester abortion. Contraception. 2011;83(1):30-3.

30. Reeves MF, Fox MC, Lohr PA, Creinin MD. Endometrial thickness following medical abortion is not predictive of subsequent surgical intervention. Ultrasound Obstet Gynecol. 2009;34(1):104-9.

31. Neilson JP, Gyte GM, Hickey M, Vazquez JC, Dou L. Medical treatments for incomplete miscarriage (less than 24 weeks). Cochrane Database Syst Rev. 2010;(1):CD007223.

32. Cleeve A, Fønhus MS, Lavelanet AF. Effectiveness, safety and acceptability of medical management of intrauterine foetal death 14 to 28 weeks: a systematic review. [Evidence synthesis for WHO Guidelines]. 2018 (unpublished).

33. Bracken H, Ngoc NT, Banks E, Blumenthal PD, Derman RJ, Patel A, et al. Buccal misoprostol for treatment of fetal death at 14–28 weeks of pregnancy: a double-blind randomized controlled trial. Contraception. 2014;89(3):187-92.

34. Rahimi-Sharbaf F, Adabi K, Valadan M, Shirazi M, Nekuie S, Ghaffari P, et al. The combination route versus sublingual and vaginal misoprostol for the termination of 13 to 24 week pregnancies: a randomized clinical trial. Taiwan J Obstet Gynecol. 2015;54(6):660-5.

35. Usmani I. A randomized clinicla trial of 200 patients of oral vs vaginal misoprostol in second trimester pregnancy termination. Med Forum. 2013;24(2):55-7.

36. Lalitkumar S, Bygdeman M, Gemzell-Danielsson K. Mid-trimester induced abortion: a review. Hum Reprod Update. 2007;13(1):37-52.

37. Hamoda H, Ashok PW, Flett GM, Templeton A. A randomized trial of mifepristone in combination with misoprostol administered sublingually or vaginally for medical abortion at 13–20 weeks gestation. Hum Reprod. 2005;20(8):2348-54.

38. Tang OS, Miao BY, Lee SW, Ho PC. Pilot study on the use of repeated doses of sublingual misoprostol in termination of pregnancy up to 12 weeks gestation: efficacy and acceptability. Hum Reprod. 2002;17(3):654-8.

39. Verma ML, Singh U, Singh N, Sankhwar PL, Qureshi S. Efficacy of concurrent administration of mifepristone and misoprostol for termination of pregnancy. Hum Fertil. 2017;20(1):43-7.

40. Goel A, Mittal S, Taneja BK, Singal N, Attri S. Simultaneous administration of mifepristone and misoprostol for early termination of pregnancy: a randomized controlled trial. Arch Gynecol Obstet. 2011;283(6):1409-13.

41. Abubeker FK, Kim CR, Lavelanet A. Medical termination of pregnancy in early first trimester(≤ 63 days): a systematic review. [Evidence synthesis for a WHO guideline]. 2018 (unpublished).

42. Kapp NE, Eckersberger E, Lavelanet A, Rodriguez MI. Medical abortion in the late first trimester: a systematic review. Contraception. 2018 (in press). doi:10.1016/j.contraception.2018.11.002.

43. Whitehouse KB, Sporstol Fonhus M, Lavelanet A, Ganatra B. Medical regimens for abortion at 12 weeks and above: a systematic review and meta-analysis. [Evidence synthesis for a WHO guideline]. 2018 (unpublished).

44. Ho PC, Ngai SW, Liu KL, Wong GC, Lee SW. Vaginal misoprostol compared with oral misoprostol in termination of second-trimester pregnancy. Obstet Gynecol. 1997;90(5):735-8.

45. Ngai SW, Tang OS, Chan YM, Ho PC. Vaginal misoprostol alone for medical abortion up to 9 weeks of gestation: efficacy and acceptability. Hum Reprod. 2000;15(5):1159-62.

46. Tang OS, Chan CC, Kan AS, Ho PC. A prospective randomized comparison of sublingual and oral misoprostol when combined with mifepristone for medical abortion at 12–20 weeks gestation. Hum Reprod. 2005;20(11):3062-6.

47. Ngoc NT, Blum J, Raghavan S, Nga NT, Dabash R, Diop A, et al. Comparing two early medical abortion regimens: mifepristone+misoprostol vs. misoprostol alone. Contraception. 2011;83(5):410-7.

48. Akoury HA, Hannah ME, Chitayat D, Thomas M, Winsor E, Ferris LE, et al. Randomized controlled trial of misoprostol for second-trimester pregnancy termination associated with fetal malformation. Am J Obstet Gynecol. 2004;190(3):755-62.

49. von Hertzen H, Piaggio G, Wojdyla D, Huong NTM, Marions L, Okoev G, et al. Comparison of vaginal and sublingual misoprostol for second trimester abortion: randomized controlled equivalence trial. Hum Reprod. 2009;24(1):106-12.

50. Bugalho A, Faundes A, Jamisse L, Usfa M, Maria E, Bique C. Evaluation of the effectiveness of vaginal misoprostol to induce first trimester abortion. Contraception. 1996;53(4):244-6.

51. Platais I, Tsereteli T, Grebennikova G, Lotarevich T, Winikoff B. Prospective study of home use of mifepristone and misoprostol for medical abortion up to 10 weeks of pregnancy in Kazakhstan. Int J Gynaecol Obstet. 2016;134(3):268-71.

52. van Bogaert LJ, Misra A. Anthropometric characteristics and success rates of oral or vaginal misoprostol for pregnancy termination in the first and second trimesters. Int J Gynaecol Obstet. 2010;109(3):213-5.

53. Winikoff B, Dzuba IG, Chong E, Goldberg AB, Lichtenberg ES, Ball C, et al. Extending outpatient medical abortion services through 70 days of gestational age. Obstet Gynecol. 2012;120(5):1070-6.

54. Bhattacharjee N, Saha SP, Ghoshroy SC, Bhowmik S, Barui G. A randomised comparative study on sublingual versus vaginal administration of misoprostol for termination of pregnancy between 13 to 20 weeks. Aust NZ J Obstet Gynaecol. 2008;48(2):165-71.

55. Dickinson JE, Evans SF. A comparison of oral misoprostol with vaginal misoprostol administration in second-trimester pregnancy termination for fetal abnormality. Obstet Gynecol. 2003;101(6):1294-9.

56. Ellis SC, Kapp N, Vragpvoc O, Borgata L. Randomized trial of buccal versus vaginal misoprostol for induction of second trimester abortion. Contraception. 2010;81(5):441-5.

57. Modak RB, Biswas DK, Ghosh A, Pal A, Mandal TK. Comparative study of sublingual and vaginal misoprostol in second trimester induced abortion. Open J Obstet Gynecol. 2014;4:751-6.

58. Nautiyal D, Mukherjee K, Perhar I, Banerjee N. Comparative study of misoprostol in first and second trimester abortions by oral, sublingual, and vaginal routes. J Obstet Gynaecol India. 2015;65(4):246-50.

59. Tang OS, Lau WN, Chan CC, Ho PC. A prospective randomised comparison of sublingual and vaginal misoprostol in second trimester termination of pregnancy. BJOG. 2004;111(9):1001-5.

60. Boersma AA, Meyboom-de Jong B, Kleiverda G. Mifepristone followed by home administration of buccal misoprostol for medical abortion up to 70 days of amenorrhoea in a general practice in Curacao. Eur J Contracept Reprod Health Care. 2011;16(2):61-6.

61. Sanhueza Smith P, Pena M, Dzuba IG, Garcia Martinez ML, Arangure Peraza AG, Bousieguez M, et al. Safety, efficacy and acceptability of outpatient mifepristone-misoprostol medical abortion through 70 days since last menstrual period in public sector facilities in Mexico City. Reprod Health Matters. 2015;22(44 Suppl 1):75-82.

62. Olavarrieta CD, Ganatra B, Sorhaindo A, Karver TS, Seuc A, Villalobos A, et al. Nurse versus physician-provision of early medical abortion in Mexico: a randomized controlled non-inferiority trial. Bull World Health Organ. 2015;93(4):249-58.

63. Chen MJ, Creinin MD. Mifepristone with buccal misoprostol for medical abortion: a systematic review. Obstet Gynecol. 2015;126(1):12-21.

64. Raymond EG, Grimes DA. The comparative safety of legal induced abortion and childbirth in the United States. Obstet Gynecol. 2012;119(2 Pt 1):215-9.

65. Medical eligibility criteria for contraceptive use, fifth edition. Geneva: World Health Organization; 2015 (http://www.who.int/reproductivehealth/publications/family_planning/MEC-5/en/, accessed 16 October 2018).

66. Ensuring human rights in the provision of contraceptive information and services: guidance and recommendations. Geneva: World Health Organization; 2014 (http://apps.who.int/iris/bitstream/10665/102539/1/9789241506748_eng.pdf, accessed 16 October 2018).

2023 SUPP 000151

67.  Raymond EG, Weaver MA, Louie KS, Tan YL, Bousieguez M, Arangure-Peraza AG, et al. Effects of depot medroxyprogesterone acetate injection timing on medical abortion efficacy and repeat pregnancy: a randomized controlled trial. Obstet Gynecol. 2016;128(4):739-45.

68.  Kim CR, Berry-Bibee E, Yokabed E, Jatloui T, Curtis K. Post-abortion hormonal contraception: a systematic review. 2018 (unpublished).

69.  Hognert H, Kopp Kallner H, Cameron S, Nyrelli C, Jawad I, Heller R, et al. Immediate versus delayed insertion of an etonogestrel releasing implant at medical abortion-a randomized controlled equivalence trial. Hum Reprod. 2016;31(11):2484-90.

70.  Raymond EG, Weaver MA, Tan YL, Louie KS, Bousieguez M, Lugo-Hernandez EM, et al. Effect of immediate compared with delayed insertion of etonogestrel implants on medical abortion efficacy and repeat pregnancy: a randomized controlled trial. Obstet Gynecol. 2016;127(2):306-12.

71.  Barros Pereira I, Carvalho RM, Graca LM. Intra-abortion contraception with etonogestrel subdermal implant. Eur J Obstet Gynecol Reprod Biol. 2015;185:33-5.

72.  Krashin J, Kim CR, Morgan IA, Tepper NK, Jatlaoui T, Curtis K. Immediate compared with delayed provision of contraception after abortion and long-term outcomes: a systematic review with meta-analysis. 2018 (unpublished).

73.  Yokabed E, Horton L, Berry-Bibee E, Kim CR, Curtis K. Safety and effectiveness of post-abortion IUDs: a systematic review. 2018 (unpublished).

74.  Korjamo R, Mentula M, Heikinheimo O. Fast-track vs. delayed insertion of the levonorgestrel-releasing intrauterine system after early medical abortion – a randomized trial. Contraception. 2017;96(5):344-51.

75.  Saav I, Stephansson O, Gemzell-Danielsson K. Early versus delayed insertion of intrauterine contraception after medical abortion – a randomized controlled trial. PLoS One. 2012;7(11):e48948.

76.  Shimoni N, Davis A, Ramos ME, Rosario L, Westhoff C. Timing of copper intrauterine device insertion after medical abortion: a randomized controlled trial. Obstet Gynecol. 2011;118(3):623-8.

77.  Trussell J, Lalla AM, Doan QV, Reyes E, Pinto L, Gricar J. Cost effectiveness of contraceptives in the United States. Contraception. 2009;79(1):5-14.

78.  WHO recommendations: optimizing health worker roles to improve access to key maternal and newborn health interventions through task shifting. Geneva: World Health Organization; 2012 (http://www.who.int/iris/handle/10665/77764, accessed 17 October 2018).

79.  Hall PE. Quality of medicines: quality of misoprostol products. In: WHO Drug Information Vol. 30(1). Geneva: World Health Organization; 2016: 35-39 (http://apps.who.int/medicinedocs/documents/s22361en/s22361en.pdf, accessed 17 October 2018).

80.  Berard V, Fiala C, Cameron S, Bombas T, Parachini M, Gemzell-Danielsson K. Instability of misoprostol tablets stored outside the blister: a potential serious concern for clinical outcome in medical abortion. PLoS One. 2014;9(12):e112401.

81.  Product Information: Misoprostol Item No. 13820. Ann Arbor (MI): Cayman Chemical; 2012 (https://www.caymanchem.com/pdfs/13820.pdf, accessed 17 October 2018).

82.  MIFEPREX (mifepristone) tablets, for oral use [Prescribing information]. New York (NY): Danco Laboratories, LLC; 2016 (https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf, accessed 17 October 2018).

83.  Schreiber CA, Sober S, Ratcliffe S, Creinin MD. Ovulation resumption after medical abortion with mifepristone and misoprostol. Contraception. 2011;84(3):230-3.

**ANNEX 1:**

# WHO staff and external experts involved in the guideline development process

2023 SUPP 000153

## MEMBERS  WHO Steering Group

**NAME & AFFILIATION**

**Ferid Abubeker**
Medical Officer, WHO Department of Reproductive Health and Research (WHO/RHR)*

**Mavjuda Babamuradova**
Former Regional Acting Programme Manager, Sexual and Reproductive Health, WHO European Region

**Bela Ganatra**
Scientist, WHO/RHR

**Rodolfo Gomez**
Regional Advisor, WHO Region of the Americas (Pan American Health Organization [PAHO])

**A. Metin Gülmezoglu**
Coordinator, WHO/RHR

**Caron Kim**
Medical Officer, WHO/RHR
Responsible Officer

**Antonella Lavelanet**
Medical Officer, WHO/RHR
Responsible Officer

**Petrus Steyn**
Scientist, WHO/RHR

\*  WHO/RHR is based at WHO headquarters, Geneva, Switzerland.
Note: The Secretariat includes all members of the Steering Group who are affiliated with WHO/RHR (or were at the time of guideline development).

 **MEMBERS**   **Guideline Development Group (GDG)**

| NAME & AFFILIATION | | COUNTRY (WHO REGION) | EXPERTISE | COI* |
|---|---|---|---|---|
| | GENDER | | | |
| **Josaphat K. Byamugisha** <br> Associate Professor, Makerere University, Department of Obstetrics and Gynecology, Mulago National Referral Hospital | M | Uganda <br> *(African Region)* | Clinical and reproductive health research | None |
| **Laura Castleman** <br> Medical Director, Ipas, Adjunct Clinical Assistant Professor, Department of Obstetrics and Gynecology, University of Michigan | F | United States of America <br> *(Region of the Americas)* | Reproductive health research and clinical care | None |
| **Munir Kassa Eshetu** <br> Director for Reproductive Health Service Quality, Center for International Reproductive Health Training (CIRHT) | M | Ethiopia <br> *(African Region)* | Reproductive health | None |
| **Anibal Faúndes** <br> General Coordinator, International Federation of Gynecology and Obstetrics (FIGO) Initiative on Prevention of Unsafe Abortion | M | Brazil <br> *(Region of the Americas)* | Clinical care, obstetrics and gynaecology | None |
| **Selma Hajri** <br> Coordinator, African Network for Medical Abortion | F | Tunisia <br> *(Eastern Mediterranean Region)* | Women's health, clinical and reproductive health research | None |
| **Kirti Iyengar** <br> Founder, Action Research & Training for Health (ARTH) | F | India <br> *(South-East Asia Region)* | Public health | None |
| **Hiromi Obara** <br> Health Policy Advisor, Japan International Cooperation Agency (JICA) | F | Lao People's Democratic Republic <br> *(Western Pacific Region)* | Clinical care, women's health | None |
| **Patricio Sanhueza** <br> Head of Reproductive Health, Mexico City Secretariat of Health | M | Mexico <br> *(Region of the Americas)* | Public health, women's health | None |
| **Paul Van Look** (CHAIR) <br> Independent consultant | M | Geneva <br> *(European Region)* | Sexual and reproductive health | None |
| **Beverly Winikoff** <br> President, Gynuity Health Projects | F | United States of America <br> *(Region of the Americas)* | Clinical research, women's health | None |
| **Ann Yates** <br> Midwifery Advisor, International Confederation of Midwives | F | The Netherlands <br> *(European Region)* | Clinical care, women's health | None |

## GDG meeting observers

| | | | | |
|---|---|---|---|---|
| **Jennifer Blum** <br> Vice President, Programs and Strategic Initiatives, Gynuity Health Projects | F | United States of America <br> *(Region of the Americas)* | Clinical research on post-abortion care, medical abortion and postpartum haemorrhage | None |
| **Kristina Gemzell-Danielsson** <br> Professor and Chair, Division of Obstetrics and Gynecology, Department of Women's and Children's Health, Karolinska Institutet | F | Sweden <br> *(European Region)* | Clinical research on contraception and abortion, guideline development | Declared |

\*   Conflict of interest (COI)

2023 SUPP 000155

 **MEMBERS** | **Evidence Synthesis Team (EST)**

| NAME & AFFILIATION | | EXPERTISE | COI* |
|---|---|---|---|
| | GENDER | | |
| **Katie Alton**<br>Oregon Health & Science University | F | Abortion, family planning | None |
| **Ashley Brant**<br>Medstar Washington Hospital Center | F | Abortion, family planning | None |
| **Amanda Cleeve**<br>Karolinska Institute | F | Abortion, family planning | None |
| **Kate Curtis**<br>United States Centers for Disease Control and Prevention (CDC) | F | Public health, family planning | None |
| **Yokabed Ermias**<br>United States Centers for Disease Control and Prevention (CDC) | F | Public health, family planning | None |
| **Roopan Gill**<br>University of British Columbia | F | Abortion, family planning | None |
| **Natalie Kapp**<br>Ipas | F | Abortion, family planning | None |
| **Caron Kim**<br>WHO Department of Reproductive Health and Research (WHO/RHR) | F | Abortion, family planning | None |
| **Jamie Krashin**<br>CDC | F | Abortion, family planning | None |
| **Laura Laursen**<br>University of Chicago Medical Center | F | Abortion, family planning | None |
| **Antonella Lavelanet**<br>WHO/RHR | F | Abortion, family planning, policy | None |
| **Karthik Srinivasan**<br>Independent consultant | M | Abortion, family planning | None |
| **Katherine Whitehouse**<br>Independent consultant (former Medical Officer at WHO/RHR) | F | Abortion, family planning | None |

## Guideline methodologists

| | | | |
|---|---|---|---|
| **Maria Rodriguez**<br>Cochrane Fertility Regulation Group at Oregon Health & Science University | F | Quality appraisal using GRADE[1] methodology, and translation of evidence into recommendations | None |
| **Marita Sporstøl Fønhus**<br>Norwegian Knowledge Centre | F | Quality appraisal using GRADE[1] methodology, and translation of evidence into recommendations | None |

\*   Conflict of interest (COI)
[1]   GRADE: Grading of Recommendations Assessment, Development and Evaluation. Further information is available at: http://www.gradeworkinggroup.org/

 **MEMBERS**   **External Review Group (ERG)**

| NAME & AFFILIATION | GENDER | COUNTRY (WHO REGION) | EXPERTISE | COI* |
|---|---|---|---|---|
| **Sharon Cameron**<br>National Health Service (NHS)<br>Lothian and Edinburgh University | F | United Kingdom<br>*(European Region)* | Medical abortion care | None |
| **Manju Chugani**<br>Rufaida College of Nursing | F | India<br>*(South-East Asia Region)* | Women's health | None |
| **Guyo Jaldesa**<br>International Federation of Gynecology and Obstetrics (FIGO)<br>Working Group for Unsafe Abortion – East, Central and South African Region | M | Kenya<br>*(African Region)* | Abortion care | None |
| **Helena Kopp Kallner**<br>Karolinska Institutet | F | Sweden<br>*(European Region)* | Medical abortion care | None |
| **Alongkone Phengsavanh**<br>Faculty of Medicine,<br>University of Health Sciences, Ministry of Health | M | Lao People's Democratic Republic<br>*(Western Pacific Region)* | Women's health | None |
| **Mariana Romero**<br>Center for the Study of State and Society | F | Argentina<br>*(Region of the Americas)* | Women's health | None |
| **Stephen Rulisa**<br>University of Rwanda | M | Rwanda<br>*(African Region)* | Women's health | None |
| **Shahida Zaidi**<br>National Committee for Maternal and Neonatal Health | F | Pakistan<br>*(Eastern Mediterranean Region)* | Abortion care | None |

\*   Conflict of interest (COI)

2023 SUPP 000157





For more information, please contact:

**Department of Reproductive Health and Research**
**World Health Organization**

Avenue Appia 20, CH-1211 Geneva 27, Switzerland
Fax:      +41 22 791 4171
Email:    reproductivehealth@who.int
Web:      www.who.int/reproductivehealth

ISBN 978-92-4-155040-6

2023 SUPP0001

**JAMA Psychiatry** | Original Investigation

# Women's Mental Health and Well-being 5 Years After Receiving or Being Denied an Abortion
## A Prospective, Longitudinal Cohort Study

M. Antonia Biggs, PhD; Ushma D. Upadhyay, PhD, MPH; Charles E. McCulloch, PhD; Diana G. Foster, PhD

+ Supplemental content

**IMPORTANCE** The idea that abortion leads to adverse psychological outcomes has been the basis for legislation mandating counseling before obtaining an abortion and other policies to restrict access to abortion.

**OBJECTIVE** To assess women's psychological well-being 5 years after receiving or being denied an abortion.

**DESIGN, SETTING, AND PARTICIPANTS** This study presents data from the Turnaway Study, a prospective longitudinal study with a quasi-experimental design. Women were recruited from January 1, 2008, to December 31, 2010, from 30 abortion facilities in 21 states throughout the United States, interviewed via telephone 1 week after seeking an abortion, and then interviewed semiannually for 5 years, totaling 11 interview waves. Interviews were completed January 31, 2016. We examined the psychological trajectories of women who received abortions just under the facility's gestational limit (near-limit group) and compared them with women who sought but were denied an abortion because they were just beyond the facility gestational limit (turnaway group, which includes the turnaway-birth and turnaway-no-birth groups). We used mixed effects linear and logistic regression analyses to assess whether psychological trajectories differed by study group.

**MAIN OUTCOMES AND MEASURES** We included 6 measures of mental health and well-being: 2 measures of depression and 2 measures of anxiety assessed using the Brief Symptom Inventory, as well as self-esteem, and life satisfaction.

**RESULTS** Of the 956 women (mean [SD] age, 24.9 [5.8] years) in the study, at 1 week after seeking an abortion, compared with the near-limit group, women denied an abortion reported more anxiety symptoms (turnaway-births, 0.57; 95% CI, 0.01 to 1.13; turnaway-no-births, 2.29; 95% CI, 1.39 to 3.18), lower self-esteem (turnaway-births, –0.33; 95% CI, –0.56 to –0.09; turnaway-no-births, –0.40; 95% CI, –0.78 to –0.02), lower life satisfaction (turnaway-births, –0.16; 95% CI, –0.38 to 0.06; turnaway-no-births, –0.41; 95% CI, –0.77 to –0.06), and similar levels of depression (turnaway-births, 0.13; 95% CI, –0.46 to 0.72; turnaway-no-births, 0.44; 95% CI, –0.50 to 1.39).

**CONCLUSIONS AND RELEVANCE** In this study, compared with having an abortion, being denied an abortion may be associated with greater risk of initially experiencing adverse psychological outcomes. Psychological well-being improved over time so that both groups of women eventually converged. These findings do not support policies that restrict women's access to abortion on the basis that abortion harms women's mental health.

**Author Affiliations:** Advancing New Standards in Reproductive Health, Bixby Center for Global Reproductive Health, University of California, San Francisco, Oakland (Biggs, Upadhyay, Foster); Department of Epidemiology and Biostatistics, University of California, San Francisco (McCulloch).

**Corresponding Author:** M. Antonia Biggs, PhD, Advancing New Standards in Reproductive Health, Bixby Center for Global Reproductive Health, University of California, San Francisco, 1330 Broadway, Ste 1100, Oakland, CA 94612 (antonia.biggs@ucsf.edu).

*JAMA Psychiatry*. 2017;74(2):169-178. doi:10.1001/jamapsychiatry.2016.3478
Published online December 14, 2016. Corrected on January 18, 2017.

Copyright 2017 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a FDA Library User on 08/16/2023

PCSF620

2023 SUPP 000229

women with adverse mental health outcomes may have been less likely to participate and/or to be retained. Mitigating concerns of bias include the lack of differential loss to follow-up based on mental health history, as well as our ability to control for history of mental health conditions, child abuse and neglect, and substance use. Furthermore, our use of mixed model regression protects against bias owing to loss to follow up that is predictable from previously measured covariates or outcomes. Concern about bias introduced by low study participation is further lessened by the consistent findings in our sensitivity analyses restricted to sites with more than 50% participation. The lack of change from wave 10 to wave 11 on any of our outcomes lessens our concerns that differential loss by study group at the last interview wave affected our findings.

Another limitation is that because this is an observational study, confounding is a possibility and causal inference can be problematic. By choosing 2 similar groups of women, both of whom were seeking abortion, and adjusting for known confounders and observed differences at baseline we have addressed the threats to the validity of our findings on the effects of abortion on mental health outcomes. Nevertheless, there may have been confounders we did not measure, and our baseline measurement occurred 1 week after the women sought an abortion and thus may not adequately account for unobserved factors.

Although the authors of the Brief Symptom Inventory scales advise that an individual should score 9 or more on at least 2 of their 3 subscales,[22] our measure is broader, with cases defined solely on scores from 1 subscale. We excluded the third subscale—somatization—from our analysis, as somatization is normally higher among pregnant women.[32] This slightly altered use of the scale is likely to result in a higher proportion of women falling within the range of clinically relevant symptoms. Thus, a case does not necessarily indicate mental illness but a need for further screening.

## Conclusions

Our study demonstrates that, during a 5-year period, women receiving wanted abortions had similar or better mental health outcomes than those who were denied a wanted abortion. The convergence of most outcomes between groups by 6 months to 1 year suggests that future divergence is unlikely. Given the large number and range of recruitment facilities representing geographically diverse regions in the United States (30 clinics from 21 states), and that our sample demographics are consistent with those of nationally representative samples of women seeking abortion, we believe these results are generalizable.[33,34] Thus, there is no evidence to justify laws that require women seeking abortion to be forewarned about negative psychological responses. Women considering abortion are best served by being provided with the most accurate, scientific information available to help them make their pregnancy decisions. These findings suggest that the effects of being denied an abortion may be more detrimental to women's psychological well-being than allowing women to obtain their wanted procedures.

**ARTICLE INFORMATION**

**Accepted for Publication:** October 21, 2016.

**Correction:** This article was corrected on January 18, 2017, to fix a sentence in the Results section.

**Published Online:** December 14, 2016.
doi:10.1001/jamapsychiatry.2016.3478

**Author Contributions:** Dr Biggs had full access to all the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Foster.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Biggs.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Biggs, McCulloch.
*Obtained funding:* Foster.
*Administrative, technical, or material support:* Foster.
*Study supervision:* Foster.

**Conflict of Interest Disclosures:** None reported.

**Funding/Support:** This study was supported by research and institutional grants from the Wallace Alexander Gerbode Foundation, the David and Lucile Packard Foundation, grant A117053 from The William and Flora Hewlett Foundation, and an anonymous foundation.

**Role of the Funder/Sponsor:** The funding sources had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**Additional Contributions:** Rana Barar, MPH, University of California, San Francisco; Heather Gould, MPH, University of California, San Francisco; and Sandy Stonesifer, MA, SSquared Consulting, provided study coordination and management. Mattie Boehler-Tatman; Janine Carpenter, MPH, OLE Health; Ivette Gomez, Kaiser Family Foundation; Selena Phipps, Access Reproductive Care-Southeast Inc; Brenly Rowland, University of California, San Francisco; Claire Schreiber, MPP, Center for Medicare and Medicaid Innovation; and Danielle Sinkford, MS, RN, FNP-C, St. Johns Well Child and Family Center, conducted interviews. Michaela Ferrari, MPH, Dignity Health; Debbie Nguyen, Upstream USA; and Elisette Weiss, Sea Change Program, provided project support. Jay Fraser, MA, Judicial Council of California; and John Neuhaus, PhD, University of California, San Francisco, provided statistical and database assistance. All individuals listed were compensated for their contributions. We also thank all the participating health care professionals for their assistance with recruitment.

**REFERENCES**

1. Koop CE. A measured response: Koop on abortion. *Fam Plann Perspect*. 1989;21(1):31-32.

2. Major B, Appelbaum M, Beckman L, Dutton MA, Russo NF, West C. Abortion and mental health: evaluating the evidence. *Am Psychol*. 2009;64(9):863-890.

3. Robinson GE, Stotland NL, Russo NF, Lang JA, Occhiogrosso M. Is there an "abortion trauma syndrome"? critiquing the evidence. *Harv Rev Psychiatry*. 2009;17(4):268-290.

4. Charles VE, Polis CB, Sridhara SK, Blum RW. Abortion and long-term mental health outcomes: a systematic review of the evidence. *Contraception*. 2008;78(6):436-450.

5. National Collaborating Centre for Mental Health at the Royal College of Psychiatrists. *Induced Abortion and Mental Health: A Systematic Review of the Mental Health Outcomes of Induced Abortion, Including Their Prevalence and Associated Factors*. London, England: Royal College of Psychiatrists; 2011.

6. Stotland NL. Induced abortion and adolescent mental health. *Curr Opin Obstet Gynecol*. 2011;23 (5):340-343.

7. Bellieni CV, Buonocore G. Abortion and subsequent mental health: review of the literature. *Psychiatry Clin Neurosci*. 2013;67(5):301-310.

8. Coleman PK. Abortion and mental health: quantitative synthesis and analysis of research published 1995-2009. *Br J Psychiatry*. 2011;199(3): 180-186.

9. Steinberg JR, Trussell J, Hall KS, Guthrie K. Fatal flaws in a recent meta-analysis on abortion and mental health. *Contraception*. 2012;86(5):430-437.

10. Steinberg JR, Finer LB. Coleman, Coyle, Shuping, and Rue make false statements and draw erroneous conclusions in analyses of abortion and mental health using the National Comorbidity Survey. *J Psychiatr Res*. 2012;46(3):407-408.

11. Robinson GE, Stotland NL, Nadelson CC. Abortion and mental health: guidelines for proper

Copyright 2017 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a FDA Library User on 08/16/2023

| Next Page | Export Data | Import Data | Reset Form |

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Food and Drug Administration

## APPLICATION TO MARKET A NEW OR ABBREVIATED NEW DRUG OR BIOLOGIC FOR HUMAN USE
*(Title 21, Code of Federal Regulations, Parts 314 & 601)*

Form Approved: OMB No. 0910-0338
Expiration Date: March 31, 2020
*See PRA Statement on page 3.*

**1. Date of Submission** *(mm/dd/yyyy)*
06/22/2022

---

| **APPLICANT INFORMATION** | **2. Name of Applicant** |
|---|---|
| | Danco Laboratories, LLC |

**3. Telephone Number** *(Include country code if applicable and area code)*
877-432-7596

**4. Facsimile (FAX) Number** *(Include country code if applicable and area code)* (b)(4)TS-CI; (b)(6)PPI

**5. Applicant Address**

Address 1 *(Street address, P.O. box, company name c/o)*
P.O. Box 4816

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

| City | State/Province/Region |
|---|---|
| New York | NY |
| Country | ZIP or Postal Code |
| USA | 10185 |

Email Address
(b)(4)TS-CI; (b)(6)PPI

Applicant DUNS
005078048

U.S. License Number if previously issued

**6. Authorized U.S. Agent** *(Required for non-U.S. applicants)*

Authorized U.S. Agent Name

Address 1 *(Street address, P.O. box, company name c/o)*

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

| City | State |
|---|---|
| | |
| ZIP Code | |

Telephone Number *(Include area code)*

FAX Number *(Include area code)*

Email Address

U.S. Agent DUNS

---

| **PRODUCT DESCRIPTION** | **7. NDA, ANDA, or BLA Application Number** | **8. Supplement Number** *(If applicable)* |
|---|---|---|
| | 020687 | 025 |

**9. Established Name** *(e.g., proper name, USP/USAN name)*
Mifepristone

**10. Proprietary Name (Trade Name)** *(If any)*
Mifeprex

**11. Chemical/Biochemical/Blood Product Name** *(If any)*
11β-[p-(dimethylamino)phenyl]-17β-hydroxy-17-(1-propynyl)estra-4, 9-dien-3-one

| **12. Dosage Form** | **13. Strengths** | **14. Route of Administration** |
|---|---|---|
| Tablet | 200 mg | Oral |

**15A. Proposed Indication for Use**

Medical Termination of Intrauterine Pregnancy

Is this indication for a rare disease (prevalence <200,000 in U.S.)?  ☐ Yes  ☑ No

Does this product have an FDA Orphan Designation for this indication?  ☐ Yes  ☑ No

If yes, provide the Orphan Designation number for this indication:

**Continuation Page for #15**

**15B. SNOMED CT Indication Disease Term** *(Use continuation page for each additional indication and respective coded disease term)*
386639001 |Termination of pregnancy (procedure)|

---

| **APPLICATION INFORMATION** | **16. Application Type** *(Select one)* | ☑ New Drug Application (NDA)   ☐ Biologics License Application (BLA) |
|---|---|---|
| | | ☐ Abbreviated New Drug Application (ANDA) |

**17. If an NDA, identify the type**  ☑ 505(b)(1)  ☐ 505(b)(2)

**18. If a BLA, identify the type**  ☐ 351(a)  ☐ 351(k)

**19. If a 351(k), identify the biological reference product that is the basis for the submission.**
Name of Biologic: _____    Holder of Licensed Application: _____

**20. If an ANDA, or 505(b)(2), identify the listed drug product that is/are the basis for the submission.**
Name of Drug: _____    Application Number of Relied Upon Product: _____

Indicate Patent Certification:  ☐ P1  ☐ P2  ☐ P3  ☐ P4  ☐ Section viii - MOU  ☐ Statement of no relevant patents

---

**FORM FDA 356h (08/18 - PREVIOUS EDITIONS OBSOLETE)**     **Page 1 of 3**     2023 SUPP 000257

**21. Submission** *(See instructions)* ☐ Original ☐ Labeling Supplement ☐ PageID.9048 Supplement ☐ Efficacy Supplement ☐ Annual Report

☐ Product Correspondence ☑ REMS Supplement ☐ Postmarketing Requirements or Commitments ☐ Periodic Safety Report

☐ Request for Proprietary Name Review ☐ Other *(Specify):* _____

| 22. Submission Sub-Type | ☐ Presubmission ☐ Amendment | ☑ Initial Submission ☐ Resubmission | 23. If a supplement, identify the appropriate category. | ☐ CBE ☐ CBE-30 | ☑ Prior Approval (PA) |
|---|---|---|---|---|---|

| 24. For Originals and all Supplements, is the product a combination product (21 CFR 3.2(e))? ☐ Yes ☑ No | Combination Product Type *(See instructions)* | Request for Designation (RFD) Number |
|---|---|---|

**25. Does the submission contain:** Only Pediatric data? ☐ Yes ☑ No | Human factors information? ☐ Yes ☑ No | **26. Proposed Marketing Status** *(Select one)* ☑ Prescription Product (Rx) ☐ Over-The-Counter Product (OTC)

**27. Reasons for Submission**

Proposed Major SSS REMS Program Modification

**28. Establishment Information** *(Full establishment information should be provided in the body of the application.)*

| Establishment Name | |
|---|---|
| Address 1 *(Street address, P.O. box, company name c/o)* | Registration (FEI) Number |
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | MF Number |
| City / State/Province/Region | |
| Country / ZIP or Postal Code | Establishment DUNS Number |

Is the establishment new to the application? ☐ Yes ☐ No | What is the status of the establishment? ☐ Pending ☐ Active ☐ Inactive ☐ Withdrawn

*Establishment Contact Information at the site/facility*

| Name of Contact for the Establishment | Telephone Number *(Include area code)* |
|---|---|
| Address 1 *(Street address, P.O. box, company name c/o)* | |
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | FAX Number *(Include area code)* |
| City / State/Province/Region | |
| Country / ZIP or Postal Code | Email Address |

| Manufacturing Steps and/or Type of Testing | Is the site ready for inspection? ☐ Yes ☐ No ☐ N/A If No, when will site be ready? *(mm/dd/yyyy)* _____ |
|---|---|

**Continuation Page for #28**

**29. Cross References** (List related BLAs, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, MAFs, and DMFs referenced in the current application.)

N/A

**Contin. Page for #29**

**30. This application contains the following items** *(Select all that apply)*

☐ 1. Index ☑ 2. Labeling *(Select one):* ☑ Draft Labeling ☐ Final Printed Labeling ☐ 3. Summary *(21 CFR 314.50 (c))*

☐ 4. Chemistry Section
  ☐ A. Chemistry, manufacturing, and controls information *(e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2)*
  ☐ B. Samples *(21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request)*
  ☐ C. Methods validation package *(e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2)*

☐ 5. Nonclinical pharmacology and toxicology section *(e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2)* | ☐ 6. Human pharmacokinetics and bioavailability section *(e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2)*

☐ 7. Clinical microbiology section *(e.g., 21 CFR 314.50(d)(4))* | ☐ 8. Clinical data section *(e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2)*

*Item 30 continued on page 3*

2023 SUPP 000258

30. This application contains the following items *(Continued; select all that apply)*

| | |
|---|---|
| ☐ 9. Safety update report *(e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2)* | ☐ 10. Statistical section *(e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2)* |
| ☐ 11. Case report tabulations *(e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2)* | ☐ 12. Case report forms *(e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2)* |
| ☐ 13. Patent information on any patent that claims the drug/ biologic *(21 U.S.C. 355(b) or (c))* | ☐ 14. A patent certification with respect to any patent that claims the drug/biologic *(21 U.S.C. 355 (b)(2) or (j)(2)(A))* |
| ☐ 15. Establishment description *(21 CFR Part 600, if applicable)* | ☐ 16. Debarment certification *(FD&C Act 306 (k)(1))* |
| ☐ 17. Field copy certification *(21 CFR 314.50 (l)(3))* | ☐ 18. User Fee Cover Sheet *(PDUFA Form FDA 3397, GDUFA Form FDA 3794, BsUFA Form FDA 3792, or MDUFA Form FDA 3601)* |
| ☐ 19. Financial Disclosure Information *(21 CFR Part 54)* | |
| ☑ 20. Other *(Specify):* Proposed Major SSS REMS Program Modification | |

## CERTIFICATION

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to, the following:

1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state, and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.

The data and information in this submission have been reviewed and, to the best of my knowledge, are certified to be true and accurate.

**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| 31. Typed Name and Title of Applicant's Responsible Official | | 32. Date *(mm/dd/yyyy)* |
|---|---|---|
| (b)(4)/TS-CI; (b)(6)/PPI | | 06/22/2022 |

| 33. Telephone Number *(Include country code if applicable and area code)* | 34. FAX Number *(Include country code if applicable and area code)* | 35. Email Address |
|---|---|---|
| 877-432-7596 | (b)(4)/TS-CI; (b)(6)/PPI | (b)(4)/TS-CI; (b)(6)/PPI |

36. Address of Applicant's Responsible Official

Address 1 *(Street address, P.O. box, company name c/o)*
P.O. Box 4816

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

| City | State/Province/Region |
|---|---|
| New York | NY |
| Country | ZIP or Postal Code |
| USA | 10185 |

| 37. Signature of Applicant's Responsible Official or Other Authorized Official | Sign | 38. Countersignature of Authorized U.S. Agent | Sign |
|---|---|---|---|
| (b)(4)/TS-CI; (b)(6)/PPI | | | |

### The information below applies only to requirements of the Paperwork Reduction Act of 1995.

The burden time for this collection of information is estimated to average 24 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the address to the right:

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

Department of Health and Human Services
Food and Drug Administration
Office of Operations
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

**DO NOT SEND YOUR COMPLETED FORM TO THIS PRA STAFF EMAIL ADDRESS.**

FORM FDA 356h (08/18 - PREVIOUS EDITIONS OBSOLETE)    Page 3 of 3

2023 SUPP 000259

CONFIDENTIAL *

# Danco Laboratories, LLC

P.O. Box 4816, New York,
New York 10185
Tel: (b)(4)TS-CI; (b)(6)/PPI
Facsimile: (b)(4)/TS-CI; (b)(6)/PPI

**NEW SUPPLEMENT FOR NDA 020687/S-025**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

June 22, 2022



Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD 20705

Re:    NDA 020687, eCTD Sequence No.18
       MIFEPREX® (mifepristone) tablets, 200 mg

**PRIOR APPROVAL SUPPLEMENT S-025**

**PROPOSED MAJOR SSS REMS PROGRAM MODIFICATION**
**INCLUDING CHANGES TO LABELING AND MEDICATION GUIDE**

Dear (b)(6)/PPI

This prior approval supplement S-025 is being submitted by Danco Laboratories, LLC in response to FDA's REMS Modification Notification dated December 16, 2021. This supplement addresses FDA's determination that the approved Mifepristone Single Shared System Risk Evaluation and Mitigation Strategy ("SSS REMS") must be modified to minimize the burden on the health care delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks.

Danco and GenBioPro have worked collaboratively to modify the SSS REMS to include the necessary elements to assure safe use of mifepristone. GenBioPro, Inc. will be submitting identical documents to their ANDA 091178, adjusted for company name and other proprietary information.

The proposed major modifications to the SSS REMS were developed based on the recommendations provided by FDA in the REMS Modification Notification as well as feedback received in the Type A Meeting Written Response communication dated April 08, 2022 ("Written Response"). Additionally, the Full Prescribing Information and the Medication Guide have been

---

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Applicant requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.**

revised to align with the modifications to the SSS REMS. All revised documents include gender neutral adjustments where indicated.

The below list of documents are included in this submission.

| Documents Provided in this Submission | eCTD Location |
|---|---|
| Summary of Modifications | |
|     Summary of Modifications to Mifepristone SSS REMS – PDF | 1.16.2.2 |
|     Summary of Modifications to Mifepristone SSS REMS – MS Word | 1.16.2.2 |
| Mifepristone SSS REMS Proposed Modification | |
|     Mifepristone SSS REMS Modification – TRACK CHANGES MS Word Version | 1.16.2.2 |
|     Mifepristone SSS REMS Modification – CLEAN MS Word Version | 1.16.2.2 |
|     Side-by-Side Comparison of the SSS REMS Modification and REMS Materials with the Current SSS REMS and REMS Materials | 1.16.2.2 |
| Revised Patient Agreement | |
|     Revised Patient Agreement –TRACK CHANGES MS Word version | 1.16.2.2 |
|     Revised Patient Agreement – CLEAN MS Word version | 1.16.2.2 |
| Revised Prescriber Agreement | |
|     Revised Danco Prescriber Agreement –TRACK CHANGES MS Word version | 1.16.2.2 |
|     Revised Danco Prescriber Agreement –CLEAN MS Word version | 1.16.2.2 |
| New Proposed Pharmacy Agreement | |
|     New Proposed Danco Pharmacy Agreement – MS Word | 1.16.2.2 |

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Applicant requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.**

| Documents Provided in this Submission | eCTD Location |
|---|---|
| Revised REMS Supporting Document | |
| REMS Supporting Document –TRACK CHANGES MS Word version | 1.16.2.2 |
| REMS Supporting Document – CLEAN MS Word version | 1.16.2.2 |
| Revised Full Prescribing Information and Medication Guide | |
| Revised Danco Full Prescribing Information and Medication Guide– Redline Annotated MS Word version | 1.14.1.2 |
| Revised Danco Full Prescribing Information and Medication Guide– Clean MS Word version | 1.14.1.2 |

Please contact me with any questions or if you need additional information.

Sincerely,

(b)(4)/TS-CI; (b)(6)/PPI

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Applicant requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.**

## ELECTRONIC SUBMISSION SPECIFICATIONS

| | |
|---|---|
| **Root Folder Name:** | nda020687 |
| **eCTD Sequence Number:** | 0018 |
| **Size of Submission:** | Approximately 6 MB |
| **No. Files:** | 24 |
| **No. Folders:** | 12 |
| **Virus Protection Statement:** | This submission is virus free |
| **Anti-Virus Software Information:** | Microsoft Antimalware for Azure (eCTD Server) |

**FDA U.S. FOOD & DRUG**
**ADMINISTRATION**

NDA 020687

**MEETING REQUEST-**
**WRITTEN RESPONSES**

Danco Laboratories, LLC

P.O. Box 4816
New York, NY 10185

Dear

Please refer to your new drug application (NDA) submitted under section 505(b) of the
Federal Food, Drug, and Cosmetic Act for Mifeprex (mifepristone) Tablets.

We also refer to your submission dated March 11, 2022, containing a meeting request.
The purpose of the requested meeting was to discuss the proposed modifications to the
single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone
200 mg, the REMS materials, and other supporting documents to facilitate a submission
by April 15, 2022.

Further reference is made to our Meeting Granted letter dated March 16, 2022, wherein
we agreed that written responses to your questions would be provided in lieu of a
meeting.

The enclosed document constitutes our written responses to the questions contained in
your March 11, 2022, background package.

If you have any questions,

Sincerely,

*{See appended electronic signature page}*

Center for Drug Evaluation and Research

Enclosure:
- Written Responses

2023 SUPP 000264

NDA 020687
Page 2

## WRITTEN RESPONSES

| | |
|---|---|
| **Meeting Type:** | **Type A** |
| **Meeting Category:** | **Post-Action Meeting, REMS** |
| **Application Number:** | **020687** |
| **Product Name:** | **Mifeprex (mifepristone) Tablets** |
| **Indication:** | **Mifepristone, in a regimen with misoprostol, is indicated for the medical termination of intrauterine pregnancy through 70 days gestation** |
| **Applicant Name:** | **Danco Laboratories, LLC** |

## BACKGROUND

On December 16, 2021, FDA issued a letter to notify the applicants of mifepristone for medical termination of early pregnancy that the single, shared system REMS must be modified as follows:

**Elements to Assure Safe Use:** FDA determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will also minimize the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), FDA also determined that an additional element to assure safe use is necessary to mitigate the risk of serious complications associated with mifepristone listed in the labeling of the drug. Modification of the REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

2023 SUPP 000265

NDA 020687
Page 3

## QUESTIONS AND RESPONSES

**Question 1:  For pharmacies that will dispense mifepristone:**

<u>**Question 1 a):**</u> Will the Agency accept a certification process and requirements that are the same for pharmacies dispensing by mail or local courier and pharmacies dispensing in-person to the patient?

*<u>FDA Response:</u> You may propose the same certification for different pharmacy dispensing models. However, we may need additional information on your proposal depending on your dispensing model. A review of your proposed REMS modifications will be necessary to determine if your overall proposal for pharmacy certification assures the safe use of mifepristone, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.*

<u>**Question 1 b):**</u> Is certification of an authorized representative of the pharmacy on behalf of all of its multiple locations and personnel acceptable to the Agency for the revised mifepristone REMS?

*<u>**FDA Response:**</u> Yes, a pharmacy can designate an authorized representative to carry out the certification process regardless of whether that pharmacy has one location or multiple locations. Note that the authorized representative is responsible for and must agree to oversee implementation of and compliance with the Mifepristone REMS Program.  In addition, as part of your proposed implementation system, you must have a process to ensure that the pharmacies distributing mifepristone comply with the Mifepristone REMS Program requirements for certified pharmacies.  In your submission, describe how you would implement and monitor compliance by certified pharmacies with the Mifepristone REMS Program requirements.*

**Question 1 c):** Would FDA consider approving Pharmacy Certification with the following requirements and advise on other elements that also need to be addressed?

Requirements: The pharmacy, through its authorized representative, certifies that it will implement necessary actions to ensure the following:

(i) Dispense mifepristone only under prescriptions issued by ☐ (b)(4)/TS-CI ☐ a certified prescriber (see below for contemplated verification and questions on certified prescribers);

(ii) No transfer of mifepristone other than to a patient per above, a certified prescriber, another certified pharmacy, or for returns or destruction;

(iii) Communicate any reported deaths of mifepristone users to the prescriber;

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

2023 SUPP 000266

NDA 020687

Page 4

(iv) The Medication Guide is available to patients;

(v) Maintain records of the above and accept audits; and

(vi) Protect the confidentiality and privacy of providers and patients.

***FDA Response:*** *Specifics on pharmacy requirements will be a matter of FDA review. At this time, we have insufficient information regarding permitting mifepristone to be transferred from one certified pharmacy to another certified pharmacy or from a certified pharmacy to a certified prescriber. In your submission, provide your rationale and examples of when and how such a transfer would occur. We encourage you to review the Format and Content of a REMS Document Guidance for Industry which can be found at Format and Content of a REMS Document Guidance for Industry | FDA.*

*In general, we agree with your proposal for (iii), (iv), (v), and (vi) but specific details will be a review issue. See our response to question 1 d) for (i).*

**Question 1 d):** As the Agency understands, providing medical abortion with mifepristone may expose prescribers to extreme risks to their safety that are different from any other drug product. The ever-present risk of anti-abortion violence creates material security and confidentiality risks for mifepristone prescribers, distributers, pharmacies, and patients. Accordingly, care must be taken to ensure that any modification to the Mifepristone REMS Program does not create a risk of unauthorized disclosure of identifying information about any of these stakeholders. (b)(4)/TS-CI

. Any apparent or potential risk would cause many prescribers—including existing prescribers—to refrain from becoming or remaining mifepristone prescribers.

Nonetheless, the Sponsors assume that, if mifepristone is to be dispensed by pharmacies, the REMS must include a process by which a pharmacy first confirms that the prescriber is specially certified. Currently the prescriber verification process is handled by the distributors for each product, each of which receives a Prescriber Agreement and distributes product only on the basis of a valid order from a certified prescriber. The number of distributors and prescribers is quite small; however, the nature and size of a prescriber certification system for dispensing pharmacies present potential disclosure risk of an entirely different magnitude. (b)(4)/TS-CI

In short, the critical elements of an effective system must reconcile prescriber security and confidentiality, while providing reasonable

NDA 020687
Page 5

assurance that pharmacies dispense only in response to a valid prescription from a specially certified prescriber.

With that in mind, would the Agency consider or comment on a verification system that includes the following elements:

(i) 

(ii) The pharmacy must keep prescription records.

**_FDA Response:_** *The verification process for safe use conditions by the pharmacy is a matter of FDA review.* (b)(4)/TS-CI

*In your submission, specify how you would implement and monitor compliance with this requirement.*

**Question 2:**  In accordance with the Mifepristone REMS Program, medical assessment, counseling, and follow-up are carried out by healthcare professionals and qualified persons acting under the supervision of the certified prescriber responsible for assuring compliance with required procedures. To eliminate confusion for healthcare providers, this should be expressly recognized as an acceptable approach for mifepristone prescribing under the REMS.

Accordingly, would FDA consider or accept an explicit clarification to the REMS that prescriber certification establishes the certification of the prescriber and the healthcare providers who are working by or under their supervision?

**_FDA Response:_** *Yes. The Prescriber Agreement Form could be revised for the certified prescriber to stipulate that assessment, counseling, prescribing, and follow-up may be conducted by the certified prescriber and health care providers who are working under the supervision of the certified prescriber.  Propose specific edits to the Prescriber Agreement Form to address this issue.*

**Question 3:**                                       (b)(4)/TS-CI

NDA 020687
Page 6

(b)(4)/TS-CI

**FDA Response:**                    (b)(4)/TS-CI

**Question 4:**                    (b)(4)/TS-CI

**FDA Response:**                    (b)(4)/TS-CI

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

2023 SUPP 000269

--------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

04/08/2022 02:38:35 PM

2023 SUPP 000270

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-Cl

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

**MEDICATION GUIDE**
(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

PATIENT AGREEMENT FORM                          Mifepristone Tablets, 200mg

(b)(4)/TS-CI





(b)(4)/TS-CI

2023 SUPP 000291

MIFEPREX®
(Mifepristone) Tablets, 200 mg

**Prescriber Agreement Form**

(b)(4)/TS-CI



(b)(4)/TS-CI





(b)(4)/TS-CI

2023 SUPP 000294

(b)(4)/TS-C[



APPEARS THIS WAY ON ORIGINAL

2023 SUPP 000296

MIFEPREX<sup>®</sup>
(Mifepristone) Tablets, 200 mg

PHARMACY AGREEMENT FORM

(b)(4)/TS-CI

(b)(4)/TS-CI

2023 SUPP 000298



**U.S. FOOD & DRUG** ADMINISTRATION

NDA 020687

**REMS MODIFICATION NOTIFICATION**

Danco Laboratories, LLC
(b)(4)/TS-CI; (b)(6)/PPI

P.O. Box 4816
New York, NY 10185

Dear (b)(4)/TS-CI; (b)(6)/PPI

We refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Mifeprex (mifepristone) Tablets.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

The REMS for mifepristone was originally approved on June 8, 2011, and your single shared system REMS (SSS REMS) was approved on April 11, 2019. Your last SSS REMS modification was approved May 14, 2021.  The SSS REMS consists of elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

In accordance with section 505-1(g)(4)(B) of the Federal Food, Drug, and Cosmetic Act (FDCA), we have determined that your approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks.

This determination is based on a review of published literature, safety information collected during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

Your approved REMS must be modified as follows:

**Elements to Assure Safe Use:** We have determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will also minimize the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), we have also determined that an additional element to assure safe use is necessary to mitigate the risk of serious

2023 SUPP 000299

NDA 020687
Page 2

complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

Your REMS must include elements to mitigate this risk, including at least the following:

- Healthcare providers have particular experience or training, or are specially certified

- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified

- The drug is dispensed to patients with evidence or other documentation of safe use conditions.

  The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the elements to assure safe use (outlined above). Include an intervention plan to address any findings of non-compliance with the ETASU.

The proposed REMS must include a timetable for submission of assessments. The proposed REMS modification submission should include a new proposed REMS document and appended REMS materials, as appropriate, that show the complete previously approved REMS with all proposed modifications highlighted and revised REMS materials.

In addition, the submission should also include an update to the REMS supporting document that includes a description of all proposed modifications and their potential impact on other REMS elements. Revisions to the REMS supporting document should be submitted with all changes marked and highlighted.

Because we have determined that a REMS modification as described above is necessary to minimize the burden on the health care delivery system of complying with the REMS, and to ensure that the benefits of the drug outweigh the risks, you must submit a proposed REMS modification within 120 days of the date of this letter.

Submit the proposed modified REMS as a Prior Approval supplement (PAS) to your NDA.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

2023 SUPP 000300

NDA 020687
Page 3

Because FDA is requiring the REMS modifications in accordance with section 505-1(g)(4)(B), you are not required to submit an adequate rationale to support the proposed modifications, as long as the proposals are consistent with the modifications described in this letter. If the proposed REMS modification supplement includes changes that differ from the modifications described in this letter, an adequate rationale is required for those additional proposed changes in accordance with section 505-1(g)(4)(A).

Prominently identify the submission with the following wording in bold capital letters at the top of the first page of the submission:

**NEW SUPPLEMENT FOR NDA 020687/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

Prominently identify subsequent submissions related to the proposed REMS modification with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687/S-000**
**PROPOSED REMS MODIFICATION-AMENDMENT**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

**<u>SUBMISSION OF REMS DOCUMENT IN SPL FORMAT</u>**

In addition to submitting the proposed modified REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS modification submission.

For more information on submitting REMS in SPL format, please email <u>FDAREMSwebsite@fda.hhs.gov</u>.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

2023 SUPP 000301

NDA 020687
Page 4

If you have any questions, call [(b)(6)/PPI]

Sincerely,

*{See appended electronic signature page}*

[(b)(6)/PPI]

Center for Drug Evaluation and Research

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

Reference ID: 4906335

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-------------------------------------------------------------------------------------

/s/

-------------------------------------------------------------

(b)(6)/PPI

12/16/2021 03:09:07 PM

2023 SUPP 000303

Reference ID: 4906335

(b)(4)/TS-CI

Mifepristone Tablets, 200 mg

Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

**SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200MG**

(b)(4)/TS-CI



Reference ID: 4499499

(b)(4)/TS-CI



Reference D: 4499499

2023 SUPP 000305

(b)(4)/TS-Cl



Reference D 4499499



(b)(4)/TS-CI

Reference ID: 4499499

**Mifepristone Tablets, 200 mg**[1]

# SINGLE SHARED SYSTEM RISK EVALUATION AND MITIGATION STRATEGY (REMS) SUPPORTING DOCUMENT



(b)(4)/TS-CI

---

[1] This document constitutes trade secret and confidential information exempt from public disclosure under 21 C.F.R. § 20.61.  Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, the Sponsors request immediate notification and an opportunity for consultation in accordance with 21 C.F.R. § 20.45.

Confidential

(b)(4)/TS-CI

(b)(4)/TS-CI

Confidential

(b)(4)/TS-CI

2023 SUPP 000311

(b)(4)/TS-CI

2023 SUPP 000312

Confidential

(b)(4)/TS-CI

REMS Modification Comparison

The Mifepristone REMS Program PROPOSED MODIFICATIONS – ANNOTATED SIDE BY SIDE COMPARISON

**Legend**
Insert    ~~Delete~~    Sponsor Specific Information    DELETED NOT SHOWN/SEE NOTE

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |



JUNE 18 FINAL - FINAL

2023 SUPP 000314

REMS Modification Comparison

2

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUNE 18 FINAL - FINAL



REMS Modification Comparison

3

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUN18 FINAL - FINAL

2023 SUPP 000316

REMS Modification Comparison

4

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUNE18 FINAL - FINAL

2023 SUPP 000317

REMS Modification Comparison

5

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-Cl | | |

JUN18 FINAL - FINAL

REMS Modification Comparison

6

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUNE18 FINAL - FINAL

2023 SUPP 000319

REMS Modification Comparison

7

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

REMS Modification Comparison

8

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUN18 FINAL - FINAL

2023 SUPP 000321

REMS Modification Comparison

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUN18 FINAL - FINAL

2023 SUPP 000322

9

REMS Modification Comparison

10

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUN18 FINAL - FINAL

11

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

12

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

13

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

14

REMS Modification Comparison

(b)(4)/TS-CI

JUNE18 FINAL - FINAL

15

REMS Modification Comparison

(b)(4)/TS-CI

JUNI8 FINAL - FINAL

16

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

17

(b)(4)/TS-CI

REMS Modification Comparison

JUNE18 FINAL - FINAL



JUN18 FINAL - FINAL

19

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

20

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

2023 SUPP 000333

21

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

2023 SUPP 000334

22

(b)(4)/TS-CI

REMS Modification Comparison

JUNE FINAL - FINAL

23

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

2023 SUPP 000336

24

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

25

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

26

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

2023 SUPP 000339

# Table of Contents

1.16.2   Summary of the Proposed REMS Modifications .......................................................... 2

1.   Introduction ................................................................................................................. 2

2.   Background ................................................................................................................... 3

3.   Proposed Modifications to the REMS and REMS Materials ........................................ 4

　3.1.   Modified Mifepristone SSS REMS Document ...................................................... 4

　　3.1.1.   Goals ............................................................................................................. 5

　　3.1.2.   A — ETASUs ................................................................................................ 5

　　3.1.3.   B — Implementation System ....................................................................... 8

　　3.1.4.   C — Timetable for Submission of Assessments ......................................... 9

　3.2.   Proposed Modified Prescriber Agreement ............................................................ 9

　3.3.   Proposed Modified Patient Agreement .................................................................. 9

　3.4.   New Proposed Pharmacy Agreement ................................................................... 10

　3.5.   Modified Proposed REMS Supporting Document ............................................... 10

4.   Proposed Modifications to the Full Prescribing Information and Medication Guide ........... 10

## 1.16.2     Summary of the Proposed REMS Modifications

## 1. Introduction

On December 16, 2021, the Agency directed Danco Laboratories, LLC ("Danco") and GenBioPro, Inc. ("GenBioPro") (collectively, the "Sponsors") in a REMS Modification Notification dated December 16, 2021 to modify the Mifepristone SSS REMS (the "REMS") as follows:

> **Elements to Assure Safe Use:** We have determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will reduce the burden on the healthcare delivery system of complying with the REMS.

> **Elements to Assure Safe Use:** Pursuant to §505-1(f)(1) [of the Food, Drug, and Cosmetic Act], we have also determined that an additional element to assure safe use is necessary to mitigate the risk of serious complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

> Your REMS must include elements to mitigate this risk, including at least the following:

> - Healthcare providers who prescribe the drugs have particular experience or training, or are specially certified[.]
> - Pharmacies, practitioners, or health care settings that dispense the drug are specially certified[.]
> - The drug is dispensed to patients with evidence or other documentation of safe use conditions.

> The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the elements to assure safe use (outlined above). Include an intervention plan to address any findings of non-compliance with the ETASU.

On March 11, 2022, the Sponsors submitted a Type A Meeting Request including questions regarding the REMS Modification to which the Agency provided Written Responses on April 8, 2022.

GenBioPro and Danco have worked collaboratively to modify the REMS for mifepristone as directed by FDA.

This document summarizes and provides further explanation for the proposed Modifications to the mifepristone REMS and serves as the adequate rationale for the REMS Modifications to the extent required by § 505-1(g)(4)(A) of the Food, Drug, and Cosmetic Act (FDCA). Additionally, a detailed side-by-side annotated comparison of the proposed modified REMS versus the approved REMS is provided in Section 1.16.2.2.

## 2. Background

Based on FDA's review of published literature, safety information collected during the ongoing COVID-19 public health emergency, FDA Adverse Event Reporting Systems (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, and parties in ongoing litigation, FDA determined that the in-person dispensing requirement is no longer necessary to ensure the benefit of the drug outweigh the risk and that modification of the REMS to add pharmacy certification is necessary to allow dispensing by pharmacies.

The proposed Modifications to the REMS and REMS materials were developed to allow for mifepristone to be prescribed by certified prescribers , without imposing in-person assessment, counseling, consenting, prescribing or follow-up requirements. In addition, the proposed Modifications provide for mifepristone to be dispensed by mail/courier (as well as in person) by or under the supervision of certified prescribers or by certified pharmacies, while meeting the statutory requirement under §505-1(f)(2)(B) of the FDCA to minimize the burden on the health care system and not be unduly burdensome on patient access to the drug (especially to patients who have difficulty accessing health care, such as patients in rural or medically underserved areas or who have other limitations).

In developing the modified REMS, the Sponsors considered both the FDA's responses (in its Written Response) to the Sponsors' questions and their extensive experience with the use and distribution of mifepristone, including the experience gained over the last two years with the provision of mifepristone through telemedicine and mail delivery by healthcare providers and mail-order pharmacies. They have also consulted with a broad range of stakeholders, including current and potential prescribers, mail and retail pharmacies, distributors, and other experts to develop REMS Modifications that would best meet the FDA directive to improve access and maintain safe use without imposing undue burdens on patients and stakeholders.

The Sponsors' proposed REMS includes several interrelated elements to implement the REMS to meet the Agency's objectives and mandate under §505-1(f)(2)(B) while avoiding the unintended effect of limiting access, increasing burdens, and introducing risks to healthcare provider and patient confidentiality. In that regard, the proposed modified REMS is intended to meet the applicable legal standards and reflect FDA's considered view of what conditions are necessary for the safe use of mifepristone for the intended use, such that additional restrictions would be

inconsistent with the conditions of use (including its labeling, distribution, prescribing, dispensing and use) established by the Agency under its unique and exclusive statutory authority, mandates and recognized expertise.  We ask FDA to carefully evaluate our proposed Modifications, as a suitable approach to assure that patient access to mifepristone under such restrictions as necessary to safe use.

The proposed Modified REMS includes the following:

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

NDA 020687 Mifeprex® (Mifepristone) Tablets, 200 mg
REMS Modification
eCTD Sequence 18

Confidential

(b)(4)/TS-CI

NDA 020687 Mifeprex® (Mifepristone) Tablets, 200 mg
REMS Modification
eCTD Sequence 18

2023 SUPP 000349

(b)(4)/TS-CI

NDA 020687 Mifeprex® (Mifepristone) Tablets, 200 mg
REMS Modification
eCTD Sequence 18





GenBioPro, Inc.
P.O. Box 32011
Las Vegas, NV 89103

**NEW SUPPLEMENT FOR ANDA 091178/S-004**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

June 22, 2022

(b)(6)/PPI

Center for Drug Evaluation and Research
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**Re:** **ANDA 091178, Sequence No. 0087**
**Mifepristone tablets, 200 mg**

**PRIOR APPROVAL SUPPLEMENT S-004**

**PROPOSED MAJOR SSS REMS MODIFICATION**
**PROPOSED CHANGES TO LABELING AND MEDICATION GUIDE**

Dear (b)(6)/PPI

This prior approval ANDA supplement 004 is being submitted by GenBioPro, Inc. in response to
FDA's REMS Modification Notification dated December 16, 2021. This supplement addresses
FDA's determination that the approved Mifepristone Single Shared System Risk Evaluation and
Mitigation Strategy ("SSS REMS") must be modified to minimize the burden on the health care
delivery system of complying with the REMS and to ensure that the benefits of the drug
outweigh the risks.

Danco and GenBioPro have worked collaboratively to modify the SSS REMS to include the
necessary elements to assure safe use of mifepristone. Danco will be submitting identical
documents to their NDA 020687, adjusted for company name and other proprietary information.

The proposed major modifications to the SSS REMS were developed based on the
recommendations provided by FDA in the REMS Modification Notification as well as feedback
received in the Type A Meeting Written Response communication dated April 08, 2022
("Written Response"). Additionally, the Full Prescribing Information, and the Medication Guide
have been revised to align with the modifications to the SSS REMS. All revised documents
include gender neutral adjustments where indicated.

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under
**21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request
under the Freedom of Information Act, Applicant requests immediate notification and an opportunity for consultation in
accordance with **21 C.F.R. 20.45.**

The below list of documents are included in this submission.

| Documents Provided in this Submission | eCTD Location |
|---|---|
| Summary of Changes<br><br>Summary of Modifications to Mifepristone SSS REMS | 1.16.2.2 |
| Mifepristone SSS REMS Proposed Modification<br><br>Mifepristone SSS REMS Modification – TRACK CHANGES MS Word version | 1.16.2.2 |
| Mifepristone SSS REMS Modification – CLEAN MS Word version | 1.16.2.2 |
| Side-by-Side Comparison of the SSS REMS Modification and REMS Materials with the Current SSS REMS and REMS Materials | 1.16.2.2 |
| Revised Patient Agreement<br><br>Revised Patient Agreement –TRACK CHANGES MS Word version | 1.16.2.2 |
| Revised Patient Agreement – CLEAN MS Word version | 1.16.2.2 |
| Revised Prescriber Agreement<br><br>Revised Prescriber Agreement – (GenBioPro) TRACK CHANGES MS Word version | 1.16.2.2 |
| Revised Prescriber Agreement – (GenBioPro) CLEAN MS Word version | 1.16.2.2 |
| New Proposed Pharmacy Agreement<br><br>New Proposed Pharmacy Agreement (GenBioPro) – MS Word | 1.16.2.2 |

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under
**21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request
under the Freedom of Information Act, Applicant requests immediate notification and an opportunity for consultation in
accordance with **21 C.F.R. 20.45.**

| Documents Provided in this Submission | eCTD Location |
|---|---|
| **Revised REMS Supporting Document** | |
| REMS Supporting Document – TRACK CHANGES MS Word version | 1.16.2.2 |
| REMS Supporting Document – CLEAN MS Word version | 1.16.2.2 |
| **Revised Full Prescribing Information and Medication Guide** | |
| Revised Full Prescribing Information and Medication Guide – (GenBioPro) Redline Annotated MS Word version | 1.14.1.2 |
| Revised Full Prescribing Information and Medication Guide – (GenBioPro) Clean MS Word version | 1.14.1.2 |

If there are any questions regarding this submission, please do not hesitate to contact me directly.

Sincerely,

(b)(4)/TS-CI; (b)(6)/PPI

GenBioPro, Inc.
(b)(4)/TS-CI; (b)(6)/PPI         (mobile)
(b)(4)/TS-CI; (b)(6)/PPI

\* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Applicant requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.**

Table of Contents

MEETING REQUEST WRITTEN RESPONSES ................................................................. 2

  Question 1: For pharmacies that will dispense mifepristone: ........................................... 4

    Question 1a ........................................................................................................... 4

      FDA Response .................................................................................................... 4

    Question 1b ........................................................................................................... 4

      FDA Response .................................................................................................... 4

    Question 1c ........................................................................................................... 4

      FDA Response .................................................................................................... 5

    Question 1d ........................................................................................................... 5

      FDA Response .................................................................................................... 6

  Question 2 ............................................................................................................... 6

    FDA Response .......................................................................................................... 6

  Question 3 ............................................................................................................... 7

    FDA Response .......................................................................................................... 7

  Question 4 ............................................................................................................... 7

    FDA Response .......................................................................................................... 7


**U.S. FOOD & DRUG**
ADMINISTRATION

NDA 020687

**MEETING REQUEST-
WRITTEN RESPONSES**

Danco Laboratories, LLC
<span>(b)(4)/TS-CI; (b)(6)/PPI</span>

P.O. Box 4816
New York, NY 10185

Dear <span>(b)(4)/TS-CI; (b)(6)/PPI</span>

Please refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Mifeprex (mifepristone) Tablets.

We also refer to your submission dated March 11, 2022, containing a meeting request. The purpose of the requested meeting was to discuss the proposed modifications to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg, the REMS materials, and other supporting documents to facilitate a submission by April 15, 2022.

Further reference is made to our Meeting Granted letter dated March 16, 2022, wherein we agreed that written responses to your questions would be provided in lieu of a meeting.

The enclosed document constitutes our written responses to the questions contained in your March 11, 2022, background package.

If you have any questions, <span>(b)(6)/PPI</span>

Sincerely,

*{See appended electronic signature page}*

<span>(b)(6)/PPI</span>

Center for Drug Evaluation and Research

Enclosure:
- Written Responses

2023 SUPP 000355

NDA 020687
Page 2

# WRITTEN RESPONSES

| | |
|---|---|
| **Meeting Type:** | **Type A** |
| **Meeting Category:** | **Post-Action Meeting, REMS** |
| **Application Number:** | **020687** |
| **Product Name:** | **Mifeprex (mifepristone) Tablets** |
| **Indication:** | **Mifepristone, in a regimen with misoprostol, is indicated for the medical termination of intrauterine pregnancy through 70 days gestation** |
| **Applicant Name:** | **Danco Laboratories, LLC** |

## BACKGROUND

On December 16, 2021, FDA issued a letter to notify the applicants of mifepristone for medical termination of early pregnancy that the single, shared system REMS must be modified as follows:

**Elements to Assure Safe Use:** FDA determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will also minimize the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), FDA also determined that an additional element to assure safe use is necessary to mitigate the risk of serious complications associated with mifepristone listed in the labeling of the drug. Modification of the REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

2023 SUPP 000356

NDA 020687

Page 3

## QUESTIONS AND RESPONSES

**Question 1:  For pharmacies that will dispense mifepristone:**

**Question 1 a):** Will the Agency accept a certification process and requirements that are the same for pharmacies dispensing by mail or local courier and pharmacies dispensing in-person to the patient?

*FDA Response: You may propose the same certification for different pharmacy dispensing models. However, we may need additional information on your proposal depending on your dispensing model. A review of your proposed REMS modifications will be necessary to determine if your overall proposal for pharmacy certification assures the safe use of mifepristone, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.*

**Question 1 b):** Is certification of an authorized representative of the pharmacy on behalf of all of its multiple locations and personnel acceptable to the Agency for the revised mifepristone REMS?

*FDA Response: Yes, a pharmacy can designate an authorized representative to carry out the certification process regardless of whether that pharmacy has one location or multiple locations. Note that the authorized representative is responsible for and must agree to oversee implementation of and compliance with the Mifepristone REMS Program.  In addition, as part of your proposed implementation system, you must have a process to ensure that the pharmacies distributing mifepristone comply with the Mifepristone REMS Program requirements for certified pharmacies.  In your submission, describe how you would implement and monitor compliance by certified pharmacies with the Mifepristone REMS Program requirements.*

**Question 1 c):** Would FDA consider approving Pharmacy Certification with the following requirements and advise on other elements that also need to be addressed?

Requirements: The pharmacy, through its authorized representative, certifies that it will implement necessary actions to ensure the following:

(i) Dispense mifepristone only under prescriptions issued by [(b)(4)/TS-CI] a certified prescriber (see below for contemplated verification and questions on certified prescribers);

(ii) No transfer of mifepristone other than to a patient per above, a certified prescriber, another certified pharmacy, or for returns or destruction;

(iii) Communicate any reported deaths of mifepristone users to the prescriber;

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

NDA 020687
Page 4

(iv) The Medication Guide is available to patients;

(v) Maintain records of the above and accept audits; and

(vi) Protect the confidentiality and privacy of providers and patients.

*__FDA Response:__ Specifics on pharmacy requirements will be a matter of FDA review. At this time, we have insufficient information regarding permitting mifepristone to be transferred from one certified pharmacy to another certified pharmacy or from a certified pharmacy to a certified prescriber. In your submission, provide your rationale and examples of when and how such a transfer would occur. We encourage you to review the Format and Content of a REMS Document Guidance for Industry which can be found at Format and Content of a REMS Document Guidance for Industry | FDA.*

*In general, we agree with your proposal for (iii), (iv), (v), and (vi) but specific details will be a review issue. See our response to question 1 d) for (i).*

**Question 1 d):** As the Agency understands, providing medical abortion with mifepristone may expose prescribers to extreme risks to their safety that are different from any other drug product. The ever-present risk of anti-abortion violence creates material security and confidentiality risks for mifepristone prescribers, distributers, pharmacies, and patients. Accordingly, care must be taken to ensure that any modification to the Mifepristone REMS Program does not create a risk of unauthorized disclosure of identifying information about any of these stakeholders. (b)(4)/TS-CI

. Any apparent or potential risk would cause many prescribers—including existing prescribers—to refrain from becoming or remaining mifepristone prescribers.

Nonetheless, the Sponsors assume that, if mifepristone is to be dispensed by pharmacies, the REMS must include a process by which a pharmacy first confirms that the prescriber is specially certified. Currently the prescriber verification process is handled by the distributors for each product, each of which receives a Prescriber Agreement and distributes product only on the basis of a valid order from a certified prescriber. The number of distributors and prescribers is quite small; however, the nature and size of a prescriber certification system for dispensing pharmacies present potential disclosure risk of an entirely different magnitude. (b)(4)/TS-CI

. In short, the critical elements of an effective system must reconcile prescriber security and confidentiality, while providing reasonable

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

NDA 020687
Page 5

assurance that pharmacies dispense only in response to a valid prescription from a specially certified prescriber.

With that in mind, would the Agency consider or comment on a verification system that includes the following elements:

(i) 

(ii) The pharmacy must keep prescription records.

*__FDA Response:__ The verification process for safe use conditions by the pharmacy is a matter of FDA review.*

*In your submission, specify how you would implement and monitor compliance with this requirement.*

__Question 2:__  In accordance with the Mifepristone REMS Program, medical assessment, counseling, and follow-up are carried out by healthcare professionals and qualified persons acting under the supervision of the certified prescriber responsible for assuring compliance with required procedures. To eliminate confusion for healthcare providers, this should be expressly recognized as an acceptable approach for mifepristone prescribing under the REMS.

Accordingly, would FDA consider or accept an explicit clarification to the REMS that prescriber certification establishes the certification of the prescriber and the healthcare providers who are working by or under their supervision?

*__FDA Response:__ Yes. The Prescriber Agreement Form could be revised for the certified prescriber to stipulate that assessment, counseling, prescribing, and follow-up may be conducted by the certified prescriber and health care providers who are working under the supervision of the certified prescriber.  Propose specific edits to the Prescriber Agreement Form to address this issue.*

__Question 3:__

NDA 020687
Page 6

(b)(4)/TS-Cl

**FDA Response:**    (b)(4)/TS-Cl

**Question 4:**    (b)(4)/TS-Cl

**FDA Response:**    (b)(4)/TS-Cl

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

/s/

---------------------------------------------------------

(b)(6)/PPI

04/08/2022 02:38:35 PM

Reference ID: 4966319

**FDA U.S. FOOD & DRUG**
ADMINISTRATION

ANDA 091178

**REMS MODIFICATION NOTIFICATION**

GenBioPro  Inc    (b)(4)/TS-CI; (b)(6)/PPI

US Agent for GenBioPro, Inc.

Dear (b)(4)/TS-CI; (b)(6)/PPI

Please refer to your Abbreviated New Drug Application (ANDA) submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) for mifepristone tablets.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

The Shared System (SS) REMS for mifepristone consists of elements to assure safe use, and an implementation system.

In accordance with section 505-1(g)(4)(B) of the FD&C Act, we have determined that your approved REMS for mifepristone must be modified to minimize the burden on the health care delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks.

This determination is based on a review of published literature, safety information collected during the COVID-19 PHE, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

Your approved REMS must be modified as follows:

**Elements to Assure Safe Use:** We have determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will reduce the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to 505-1(f)(1), we have also determined that an additional element to assure safe use is necessary to mitigate the risk of

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2023 SUPP 000362

Reference ID: 4906129

serious complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

Your REMS must include elements to mitigate this risk, including at least the following:
- Healthcare providers who prescribe the drugs have particular experience or training, or are specially certified
- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified
- The drug is dispensed to patients with evidence or other documentation of safe use conditions

The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the ETASU (as outlined above). Include an intervention plan to address any findings of non-compliance with the ETASU.

The proposed REMS modification submission should include a new proposed REMS document and appended REMS materials, as appropriate, that show the complete previously approved REMS with all proposed modifications highlighted and revised REMS materials.

In addition, the submission should also include an update to the REMS supporting document that includes a description of all proposed modifications and their potential impact on other REMS elements. Revisions to the REMS supporting document should be submitted with all changes marked and highlighted.

Because we have determined that a REMS modification as described above is necessary to minimize the burden on the health care delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks, you must submit a proposed REMS modification within 120 days of the date of this letter.

Submit the proposed modified REMS as a Prior Approval supplement (PAS) to your ANDA.

Because FDA is requiring the REMS modifications in accordance with section 505-1(g)(4)(B) of the FD&C Act, you are not required to submit an adequate rationale to support the proposed modifications, as long as the proposals are consistent with the modifications described in this letter.  If the proposed REMS modification supplement includes changes that differ from the modifications described in this letter, an adequate rationale is required for those additional proposed changes in accordance with section 505-1(g)(4)(A) of the FD&C Act.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2023 SUPP 000363

Prominently identify the submission with the following wording in bold capital letters at the top of the first page of the submission:

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

Prominently identify subsequent submissions related to the proposed REMS modification with the following wording in bold capital letters at the top of the first page of the submission:

**ANDA 091178/S-000**
**PROPOSED REMS MODIFICATION-AMENDMENT**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

## SUBMISSION OF REMS DOCUMENT IN SPL FORMAT

In addition to submitting the proposed modified REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format.  If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS modification submission.

For more information on submitting REMS in SPL format, please email REMS_Website@fda.hhs.gov.

If you have any questions, call ███████████ (b)(6)/PPI ███████████

Sincerely,

*{See appended electronic signature page}*

(b)(6)/PPI

Center for Drug Evaluation and Research

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2023 SUPP 000364

Reference ID: 4906129

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

12/16/2021 03:21:22 PM

2023 SUPP 000366

**FULL PRESCRIBING INFORMATION**

(b)(4)/TS-CI

2

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

**MEDICATION GUIDE**

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

Mifepristone Tablets, 200 mg

Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

**SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200MG**

(b)(4)/TS-CI

2023 SUPP 000386

2023 SUPP 000387

Reference ID: 4499499

(b)(4)/TS-CI

Reference ID: 4499499

(b)(4)/TS-CI

Reference ID: 4499499

PHARMACY AGREEMENT FORM                    Mifepristone Tablets, 200 mg

(b)(4)/TS-CI

PRESCRIBER AGREEMENT FORM

Mifepristone Tablets, 200 mg

(b)(4)/TS-CI

2023 SUPP 000393

**Mifepristone Tablets, 200 mg**[1]

# SINGLE SHARED SYSTEM RISK EVALUATION AND MITIGATION STRATEGY (REMS) SUPPORTING DOCUMENT



(b)(4)/TS-CI

---

[1] This document constitutes trade secret and confidential information exempt from public disclosure under 21 C.F.R. § 20.61. Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, the Sponsors request immediate notification and an opportunity for consultation in accordance with 21 C.F.R. § 20.45.

{00212682}

Confidential

(b)(4)/TS-CI

Confidential

(b)(4)/TS-CI

Confidential

(b)(4)/TS-CI

2023 SUPP 000397

(b)(4)/TS-CI

2023 SUPP 000398

Confidential

(b)(4)/TS-CI

2023 SUPP 000399

Table of Contents

THE MIFEPRISTONE REMS PROGRAM PROPOSED MODIFICATIONS – ANNOTATED SIDE BY SIDE COMPARISON ........ 1

I. Goal ........................................................................................................................................................................ 1

II. REMS Elements ...................................................................................................................................................... 2

    A. Elements to Assure Safe Use ........................................................................................................................... 2

    B. Implementation System ................................................................................................................................... 10

    C. Timetable for Submission of Assessments ...................................................................................................... 14

Prescriber Agreement Form ........................................................................................................................................ 15

Patient Agreement Form .............................................................................................................................................. 20

Pharmacy Agreement Form ......................................................................................................................................... 24

REMS Modification Comparison

The Mifepristone REMS Program PROPOSED MODIFICATIONS – ANNOTATED SIDE BY SIDE COMPARISON

**Legend**
Insert    Delete    Sponsor Specific Information    DELETED NOT SHOWN/SEE NOTE

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUN18 FINAL - FINAL

2023 SUPP 000403

REMS Modification Comparison

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUNI8 FINAL - FINAL

2023 SUPP 000404

REMS Modification Comparison

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|

(b)(4)/TS-CI

JUN18 FINAL - FINAL

2023 SUPP 000405

3

REMS Modification Comparison

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

2023 SUPP 000406

JUNE 18 FINAL - FINAL

4

REMS Modification Comparison

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUNE 18 FINAL - FINAL

2023 SUPP 000407

5

REMS Modification Comparison

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUNE 2018 FINAL - FINAL

2023 SUPP 000408

6

REMS Modification Comparison

7

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUN18 FINAL - FINAL

2023 SUPP 000409

REMS Modification Comparison

8

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUN18 FINAL - FINAL

2023 SUPP 000410

REMS Modification Comparison

9

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | (b)(4)/TS-CI | | |

JUN18 FINAL - FINAL

2023 SUPP 000411

REMS Modification Comparison

10

| CURRENT REMS | PROPOSED REVISIONS (Redline) | PROPOSED REVISIONS (Clean) | REASON FOR MODIFICATION |
|---|---|---|---|
| | | (b)(4)/TS-CI | |

JUN18 FINAL - FINAL

2023 SUPP 000412

2023 SUPP 000413

11

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

REMS Modification Comparison

(b)(4)/TS-CI

12

JUN18 FINAL - FINAL

2023 SUPP 000414

13

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

2023 SUPP 000415

14

REMS Modification Comparison

(b)(4)/TS-CI

JUNE18 FINAL - FINAL

2023 SUPP 000416

REMS Modification Comparison

(b)(4)/TS-CI

15

2023 SUPP 000417

JUN18 FINAL - FINAL

16

2023 SUPP 000418

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

17

REMS Modification Comparison

(b)(4)/TS-CI

2023 SUPP 000419

JUN18 FINAL - FINAL

18

2023 SUPP 000420

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

2023 SUPP 000421

19

(b)(4)/TS-Ci

REMS Modification Comparison

JUN18 FINAL - FINAL

20

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

2023 SUPP 000422

21

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

2023 SUPP 000423

REMS Modification Comparison

22

(b)(4)/TS-CI

JUN18 FINAL - FINAL

2023 SUPP 000424

REMS Modification Comparison

(b)(4)/TS-CI

23

JUN18 FINAL - FINAL

2023 SUPP 000425

24

2023 SUPP 000426

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

2023 SUPP 000427

25

(b)(4)/TS-CI

REMS Modification Comparison

JUN18 FINAL - FINAL

REMS Modification Comparison

(b)(4)/TS-CI

JUN18 FINAL - FINAL

26

2023 SUPP 000428

# Table of Contents

1.16.2   Summary of the Proposed REMS Modifications ............................................................ 2

1.   Introduction ............................................................................................................................ 2

2.   Background ............................................................................................................................. 3

3.   Proposed Modifications to the REMS and REMS Materials ................................................. 4

   3.1.   Modified Mifepristone SSS REMS Document ............................................................. 4

      3.1.1.   Goals ...................................................................................................................... 5

      3.1.2.   A — ETASUs ........................................................................................................ 5

      3.1.3.   B — Implementation System ................................................................................ 8

      3.1.4.   C — Timetable for Submission of Assessments ................................................... 9

   3.2.   Proposed Modified Prescriber Agreement ..................................................................... 9

   3.3.   Proposed Modified Patient Agreement .......................................................................... 9

   3.4.   New Proposed Pharmacy Agreement ........................................................................... 10

   3.5.   Modified Proposed REMS Supporting Document ........................................................ 10

4.   Proposed Modifications to the Full Prescribing Information and Medication Guide ........... 10

## 1.16.2        Summary of the Proposed REMS Modifications

## 1. Introduction

On December 16, 2021, the Agency directed Danco Laboratories, LLC ("Danco") and GenBioPro, Inc. ("GenBioPro") (collectively, the "Sponsors") in a REMS Modification Notification dated December 16, 2021 to modify the Mifepristone SSS REMS (the "REMS") as follows:

**Elements to Assure Safe Use:** We have determined that the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") is no longer necessary to ensure the benefits of mifepristone outweigh the risks of serious complications associated with mifepristone that are listed in the labeling of the drug. Removal of the requirement for in-person dispensing will reduce the burden on the healthcare delivery system of complying with the REMS.

**Elements to Assure Safe Use:** Pursuant to §505-1(f)(1) [of the Food, Drug, and Cosmetic Act], we have also determined that an additional element to assure safe use is necessary to mitigate the risk of serious complications associated with mifepristone listed in the labeling of the drug. Modification of the Mifepristone REMS to allow dispensing of mifepristone by pharmacies requires the addition of certification of pharmacies that dispense the drug.

Your REMS must include elements to mitigate this risk, including at least the following:

- Healthcare providers who prescribe the drugs have particular experience or training, or are specially certified[.]
- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified[.]
- The drug is dispensed to patients with evidence or other documentation of safe use conditions.

The REMS must include an implementation system to monitor, evaluate, and work to improve the implementation of the elements to assure safe use (outlined above). Include an intervention plan to address any findings of non-compliance with the ETASU.

On March 11, 2022, the Sponsors submitted a Type A Meeting Request including questions regarding the REMS Modification to which the Agency provided Written Responses on April 8, 2022.

GenBioPro and Danco have worked collaboratively to modify the REMS for mifepristone as directed by FDA.

This document summarizes and provides further explanation for the proposed Modifications to the mifepristone REMS and serves as the adequate rationale for the REMS Modifications to the extent required by § 505-1(g)(4)(A) of the Food, Drug, and Cosmetic Act (FDCA). Additionally, a detailed side-by-side annotated comparison of the proposed modified REMS versus the approved REMS is provided in Section 1.16.2.2.

## 2. Background

Based on FDA's review of published literature, safety information collected during the ongoing COVID-19 public health emergency, FDA Adverse Event Reporting Systems (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, and parties in ongoing litigation, FDA determined that the in-person dispensing requirement is no longer necessary to ensure the benefit of the drug outweigh the risk and that modification of the REMS to add pharmacy certification is necessary to allow dispensing by pharmacies.

The proposed Modifications to the REMS and REMS materials were developed to allow for mifepristone to be prescribed by certified prescribers  without imposing in-person assessment, counseling, consenting, prescribing or follow-up requirements. In addition, the proposed Modifications provide for mifepristone to be dispensed by mail/courier (as well as in person) by or under the supervision of certified prescribers or by certified pharmacies, while meeting the statutory requirement under §505-1(f)(2)(B) of the FDCA to minimize the burden on the health care system and not be unduly burdensome on patient access to the drug (especially to patients who have difficulty accessing health care, such as patients in rural or medically underserved areas or who have other limitations).

In developing the modified REMS, the Sponsors considered both the FDA's responses (in its Written Response) to the Sponsors' questions and their extensive experience with the use and distribution of mifepristone, including the experience gained over the last two years with the provision of mifepristone through telemedicine and mail delivery by healthcare providers and mail-order pharmacies. They have also consulted with a broad range of stakeholders, including current and potential prescribers, mail and retail pharmacies, distributors, and other experts to develop REMS Modifications that would best meet the FDA directive to improve access and maintain safe use without imposing undue burdens on patients and stakeholders.

The Sponsors' proposed REMS includes several interrelated elements to implement the REMS to meet the Agency's objectives and mandate under §505-1(f)(2)(B) while avoiding the unintended effect of limiting access, increasing burdens, and introducing risks to healthcare provider and patient confidentiality. In that regard, the proposed modified REMS is intended to meet the applicable legal standards and reflect FDA's considered view of what conditions are necessary for the safe use of mifepristone for the intended use, such that additional restrictions would be

inconsistent with the conditions of use (including its labeling, distribution, prescribing, dispensing and use) established by the Agency under its unique and exclusive statutory authority, mandates and recognized expertise. We ask FDA to carefully evaluate our proposed Modifications, as a suitable approach to assure that patient access to mifepristone under such restrictions as necessary to safe use.

The proposed Modified REMS includes the following:

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

Confidential

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

2023 SUPP 000433

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

Confidential

(b)(4)/TS-CI

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

Confidential

(b)(4)/TS-CI

ANDA 091178 Mifepristone Tablets, 200 mg
REMS Modification
eCTD Sequence 004

2023 SUPP 000439

From:          (b)(6)/PPI
To:            (b)(4)/TS-CI; (b)(6)/PPI
Cc:            (b)(6)/PPI
Subject:       Information Request: NDA 020687
Date:          Friday, July 22, 2022 2:36:00 PM
Importance:    High

Hello (b)(4)/TS-CI; (b)(6)/PPI

Refer to your proposed modification to the single, shared system (SSS) REMS, the Mifepristone
REMS Program, submitted on June 22, 2022. To support our review of your proposed modification,
we request you provide responses to the following questions and comments. We also request you
confirm receipt of our requests below and agree that you will respond by July 29, 2022. Submit your
responses no later than July 29, 2022, as a REMS Correspondence.

General

    1.   Provide any feedback (e.g., pros and cons) obtained from stakeholders (e.g.,
patients, prescribers, retail pharmacies, specialty pharmacies and distributors) on any
aspects of your proposed REMS modification. Specify which comments came from which
stakeholders.

    2.   Provide schematics of all envisioned drug movement through the healthcare system
from distributor to healthcare provider (HCP) to pharmacy and/or patient. The
schematics should focus on how adherence to the REMS is ensured. If the model differs
for a mail order pharmacy or a retail pharmacy, ensure you provide a separate
schematic.

For the REMS element that addresses prescriber requirements

    3.   Your proposed modified REMS Document states [(b)(4)/TS-CI]

[(b)(4)/TS-CI]

    e.   Provide the criteria for decertification of a prescriber. Describe how:

2023 SUPP 000446

i. prescribers are notified that they are no longer certified

ii. [REDACTED (b)(4)/TS-CI]

[REDACTED], and

iii. distributors are notified that a prescriber has been decertified.

4. Your proposed modified REMS Document (and modified Prescriber Agreement Form (PAF)) states that prescribers must have " [REDACTED (b)(4)/TS-CI]

[REDACTED]

[REDACTED] ." We have two concerns with this provision:

[REDACTED (b)(4)/TS-CI]

5. You propose [REDACTED (b)(4)/TS-CI]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] .

<u>For the REMS element that addresses dispenser requirements</u>

6. Refer to the April 8, 2022, written responses in which we stated, " [REDACTED (b)(4)/TS-CI]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

a. Explain your plan to monitor the REMS to ensure that pharmacies are dispensing mifepristone only upon a prescription written by, [REDACTED (b)(4)/TS-CI] [REDACTED] a certified prescriber. Specifically, provide your audit and noncompliance plans and how you would address pharmacies found to not

2023 SUPP 000447

comply with the REMS.

    b.   In your proposal, the responsibility falls on the pharmacist to verify that the HCP is certified. Propose [(b)(4)/TS-CI]

7.   Your proposed [(b)(4)/TS-CI]

8.   Describe the types of pharmacies (e.g., mail order, specialty, retail chain, retail independent) that you anticipate would seek to certify in the Mifepristone REMS Program and, if certified, which types you would expect to conduct the majority of dispensing. Provide any data that you have that supports your assumptions.

9.   Do you intend to allow any pharmacy that meets the requirements of the REMS to become certified or will you also require that pharmacies have a contractual relationship with you?

10.  Your proposal implies that retail pharmacies can become certified pharmacies. Your proposal for pharmacy certification does not adequately describe a system through which retail pharmacies would be able to confirm that an HCP is certified in the REMS. We note that this presents challenges in light of our understanding that there are approximately 60,000 retail pharmacies in the United States[1]. In addition, your proposal fails to describe how stakeholders (HCPs and patients) would know which retail pharmacies are certified.

    a.   Provide the process through which pharmacies would be able to confirm that a HCP is certified in the REMS.

    b.   Provide a process through which stakeholders (HCPs and patients) would be able to identify which pharmacies are certified and with which Applicant.

11.  How will you ensure that pharmacies are able to dispense in a timely manner? Delays in use of this product could adversely impact patient safety as the risk of serious adverse events such as bleeding that requires transfusion, although rare, increase with increasing gestation. Further,  the approved indication reflects a window of use up to 70 days gestation. Explain whether there will be differences between the types of certified pharmacies in ensuring compliance with certification and decertification and how you will ensure patients receive the product within this window.

12.  Describe the criteria for pharmacy decertification and how this would be communicated to other stakeholders, such as distributors, prescribers, and patients.

<u>Communication</u>

13.  Describe how the new processes in this REMS modification, if approved, will be communicated to current certified prescribers.

2023 SUPP 000448

Finally, we remind you that the information provided in your response will need to be incorporated into your REMS supporting document.

Thank you,

(b)(6)/PPI

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

---

/s/

---

(b)(6)/PPI

07/22/2022 03:26:25 PM

2023 SUPP 000450

Reference ID: 5017978

**Mifepristone SSS REMS**

**Sponsors' August 26, 2022 Response to FDA's Information Request**

**Dated July 22, 2022**

Mifepristone Shared REMS
NDA 20687, Information Request
Received: July 22, 2022
Submitted: August 26, 2022

17

The Sponsors anticipate that certified pharmacies will either publicize their certification status or reveal their status upon inquiry from a HCP or have an existing relationship with that certified HCP or their patient based on routinely filling their other prescriptions (e.g., pharmacies that fill prescriptions of misoprostol and other drugs for a clinic that does not dispense those drugs to their medical abortion patients). HCPs and their patients will be able to readily identify the former pharmacies from public sources and confirm certification status of the latter pharmacies directly with such pharmacies. Over time, we expect that HCPs will gain institutional knowledge about which pharmacies maintain certification. Based on input from stakeholders, if the REMS mandates disclosure of certified pharmacies that do not want to be publicly identified they will not enter into a pharmacy certification agreement to purchase and dispense mifepristone.

11. *How will you ensure that pharmacies are able to dispense in a timely manner? Delays in use of this product could adversely impact patient safety as the risk of serious adverse events such as bleeding that requires transfusion, although rare, increase with increasing gestation. Further, the approved indication reflects a window of use up to 70 days gestation. Explain whether there will be differences between the types of certified pharmacies in ensuring compliance with certification and decertification and how you will ensure patients receive the product within this window.*

**Response:**

(b)(4)/TS-CI

First, the professional practice of pharmacy requires that pharmacies promptly dispense products to patients upon receiving the prescription or swiftly communicate with the patient and prescriber if that is not possible within the appropriate clinical window. Second, pharmacies and individual pharmacists are accustomed to complying with substantial product-specific requirements and prescriber instructions when dispensing products to patients (either in person or by mail) to ensure safe and effective use., As noted in response to Questions 2 and 12 , we do not anticipate differences in certification or decertification based on pharmacy type.

12. *Describe the criteria for pharmacy decertification and how this would be communicated to other stakeholders, such as distributors, prescribers, and patients.*

**Response:** The standard for pharmacy decertification is intentional and/or repeated failure to comply with the REMS after efforts to ensure compliance. This same standard applies to decertification of HCPs. If a Sponsor determines



**REMS CORRESPONDENCE
RESPONSE TO INFORMATION REQUEST**

August 26, 2022

(b)(6)/PPI

Center for Drug Evaluation and Research
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, Maryland 20993-0002

**Re:     ANDA 091178 – Mifepristone Oral Tablets, 200 mg
            Sequence 0089**

**REMS Correspondence:
Response to FDA's Information Request Dated July 22, 2022 re Proposed Modification to
Mifepristone SSS REMS Program submitted under S-004**

Dear (b)(6)/PPI ,

This submission is GenBioPro, Inc.'s response to FDA's Information Request dated July 22, 2022("IR"). Reference is made to FDA's REMS Modification Notification dated December 16, 2021 and the prior approval supplement submitted on June 22, 2022 by GenBioPro (S-004) and Danco (S-025) ("The Sponsors") proposing modifications to the Mifepristone Single Shared System Risk Evaluation and Mitigation Strategy ("SSS REMS").

The FDA's IR questions are included in the submission and the Sponsors' collaborative responses are provided for each question.

The Sponsors note that we intend to incorporate the proposed changes to the SSS REMS and the Prescriber Agreement Form described in our attached response and any other necessary changes to the SSS REMS and REMS materials (including the REMS Supporting Document) in one updated submission prior to approval.

Please let me know if you require any additional information.

Sincerely,

(b)(4)/TS-CI; (b)(6)/PPI

GenBioPro, Inc.

Attachment: Sponsors' Response to IR

---

\* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, GenBioPro, Inc. requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.** Contact telephone number is (b)(4)/TS-CI; (b)(6)/PPI .

Mifepristone Shared REMS
ANDA 091178, Information Request
Received: July 22, 2022
Submitted: August 26, 2022



(b)(4)/TS-CI

5.  *You propose*  (b)(4)/TS-CI

(b)(4)/TS-CI

---

[6] See *Emergency Medical Treatment and Active Labor Act*  42 USC §1395dd and 42 CFR §489.24(b) Emergency room care necessarily includes access to resuscitation, transfusions and other critical care needed to address to adverse events where transfusions or resuscitation might be needed (e.g., services needed to stabilize patients with acute serious conditions or impairment of bodily function).  Under the EMTALA law, patients presenting to "emergency medical services" cannot be denied care needed to stabilize their condition.

| Next Page | Export Data | Import Data | Reset Form |
|---|---|---|---|

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Food and Drug Administration

**APPLICATION TO MARKET A NEW OR ABBREVIATED NEW DRUG OR BIOLOGIC FOR HUMAN USE**

*(Title 21, Code of Federal Regulations, Parts 314 & 601)*

Form Approved: OMB No. 0910-0338
Expiration Date: February 28, 2023
*See PRA Statement on page 3.*

1. Date of Submission *(mm/dd/yyyy)*
10/19/2022

---

**APPLICANT INFORMATION**

2. Name of Applicant
Danco Laboratories, LLC

3. Telephone Number *(Include country code if applicable and area code)*
877-432-7596

4. Facsimile (FAX) Number *(Include country code if applicable and area code)* (b)(4)/TS-CI; (b)(6)/PPI

5. Applicant Address

Address 1 *(Street address, P.O. box, company name c/o)*
P.O. Box 4816

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

City
New York

State/Province/Region
NY

Country
USA

ZIP or Postal Code
10185

Email Address
(b)(4)/TS-CI; (b)(6)/PPI

Applicant DUNS
005078048

U.S. License Number if previously issued

6. Authorized U.S. Agent *(Required for non-U.S. applicants)*

Authorized U.S. Agent Name

Address 1 *(Street address, P.O. box, company name c/o)*

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

City

State

ZIP Code

Telephone Number *(Include area code)*

FAX Number *(Include area code)*

Email Address

U.S. Agent DUNS

---

**PRODUCT DESCRIPTION**

7. NDA, ANDA, or BLA Application Number
020687

8. Supplement Number *(If applicable)*
025

9. Established Name *(e.g., proper name, USP/USAN name)*
Mifepristone

10. Proprietary Name *(Trade Name) (If any)*
Mifeprex

11. Chemical/Biochemical/Blood Product Name *(If any)*
11β-[p-(dimethylamino)phenyl]-17β-hydroxy-17-(1-propynyl)estra-4, 9-dien-3-one

12. Dosage Form
Tablet

13. Strengths
200 mg

14. Route of Administration
Oral

15A. Proposed Indication for Use
Medical Termination of Intrauterine Pregnancy

Is this indication for a rare disease (prevalence <200,000 in U.S.)?  ☐ Yes  ☑ No

Does this product have an FDA Orphan Designation for this indication?  ☐ Yes  ☑ No

If yes, provide the Orphan Designation number for this indication:

**Continuation Page for #15**

15B. SNOMED CT Indication Disease Term *(Use continuation page for each additional indication and respective coded disease term)*
386639001 |Termination of pregnancy (procedure)|

---

**APPLICATION INFORMATION**

16. Application Type *(Select one)*
☑ New Drug Application (NDA)  ☐ Biologics License Application (BLA)
☐ Abbreviated New Drug Application (ANDA)

17. If an NDA, identify the type  ☑ 505(b)(1)  ☐ 505(b)(2)

18. If a BLA, identify the type  ☐ 351(a)  ☐ 351(k)

19. If a 351(k), identify the biological reference product that is the basis for the submission.
Name of Biologic: _____  Holder of Licensed Application: _____

20. If an ANDA, or 505(b)(2), identify the listed drug product that is/are the basis for the submission.
Name of Drug: _____  Application Number of Relied Upon Product: _____

Indicate Patent Certification:  ☐ P1  ☐ P2  ☐ P3  ☐ P4  ☐ Section viii - MOU  ☐ Statement of no relevant patents

---

FORM FDA 356h (03/22 - PREVIOUS EDITIONS OBSOLETE)    Page 1 of 3    (301) 443-6740    EF

2023 SUPP 000539

**21. Submission** *(See instructions)*
☐ Original ☐ Labeling Supplement ☐ CMC Supplement ☐ Efficacy Supplement ☐ Annual Report
☐ Product Correspondence ☑ REMS Supplement ☐ Postmarketing Requirements or Commitments ☐ Periodic Safety Report
☐ Request for Proprietary Name Review ☐ Other *(Specify):* ___

**22. Submission Sub-Type**
☐ Presubmission ☑ Amendment
☐ Initial Submission ☐ Resubmission

**23. If a supplement, identify the appropriate category.**
☐ CBE ☑ Prior Approval (PA)
☐ CBE-30

**24. For Originals and all Supplements, is the product a combination product (21 CFR 3.2(e))?** ☐ Yes ☑ No
Combination Product Type *(See instructions)*
Request for Designation (RFD) Number

**25. Does the submission contain:**
Only Pediatric data? ☐ Yes ☑ No
Human factors information? ☐ Yes ☑ No
**26. Proposed Marketing Status** *(Select one)*
☑ Prescription Product (Rx) ☐ Over-The-Counter Product (OTC)

**27. Reasons for Submission**

REMS Correspondence: REMS Supplement Amendment – Response to FDA Meetings 09/16/2022 and 10/06/2022 Mifepristone SSS REMS

**28. Establishment Information** *(Full establishment information should be provided in the body of the application.)*

| Establishment Name | | |
|---|---|---|
| Address 1 *(Street address, P.O. box, company name c/o)* | | Registration (FEI) Number |
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | | MF Number |
| City | State/Province/Region | Establishment DUNS Number |
| Country | ZIP or Postal Code | |

Is the establishment new to the application? ☐ Yes ☐ No
What is the status of the establishment? ☐ Pending ☐ Active ☐ Inactive ☐ Withdrawn

*Establishment Contact Information at the site/facility*

| Name of Contact for the Establishment | Telephone Number *(Include area code)* |
|---|---|
| Address 1 *(Street address, P.O. box, company name c/o)* | FAX Number *(Include area code)* |
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | |
| City — State/Province/Region | Email Address |
| Country — ZIP or Postal Code | |

Manufacturing Steps and/or Type of Testing

Is the site ready for inspection? ☐ Yes ☐ No ☐ N/A
If No, when will site be ready? *(mm/dd/yyyy)* ___

**Continuation Page for #28**

**29. Cross References** (List related BLAs, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, MAFs, and DMFs referenced in the current application.)

N/A

**Contin. Page for #29**

**30. This application contains the following items** *(Select all that apply)*

☐ 1. Index ☐ 2. Labeling *(Select one):* ☐ Draft Labeling ☐ Final Printed Labeling ☐ 3. Summary *(21 CFR 314.50 (c))*

☐ 4. Chemistry Section
☐ A. Chemistry, manufacturing, and controls information *(e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2)*
☐ B. Samples *(21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request)*
☐ C. Methods validation package *(e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2)*

☐ 5. Nonclinical pharmacology and toxicology section *(e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2)*
☐ 6. Human pharmacokinetics and bioavailability section *(e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2)*

☐ 7. Clinical microbiology section *(e.g., 21 CFR 314.50(d)(4))*
☐ 8. Clinical data section *(e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2)*

*Item 30 continued on page 3*

30. This application contains the following items *(Continued; select all that apply)*

| | |
|---|---|
| ☐ 9. Safety update report *(e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2)* | ☐ 10. Statistical section *(e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2)* |
| ☐ 11. Case report tabulations *(e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2)* | ☐ 12. Case report forms *(e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2)* |
| ☐ 13. Patent information on any patent that claims the drug/ biologic *(21 U.S.C. 355(b)(2) or (c))* | ☐ 14. A patent certification with respect to any patent that claims the drug/biologic *(21 U.S.C. 355 (b)(2) or (j)(2)(A))* |
| ☐ 15. Establishment description *(21 CFR Part 600, if applicable)* | ☐ 16. Debarment certification *(FD&C Act 306 (k)(1))* |
| ☐ 17. Field copy certification *(21 CFR 314.50 (l)(3))* | ☐ 18. User Fee Cover Sheet *(PDUFA Form FDA 3397, GDUFA Form FDA 3794, BsUFA Form FDA 3792, or MDUFA Form FDA 3601)* |
| ☐ 19. Financial Disclosure Information *(21 CFR Part 54)* | |
| ☑ 20. Other *(Specify):* REMS Supplement Amendment - Response to FDA Meetings 09/16/2022 and 10/06/2022 Mifepristone SSS REMS | |

## CERTIFICATION

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to, the following:

1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
2. Biological establishment standards in 21 CFR Part 600.
3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
7. Local, state, and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.

The data and information in this submission have been reviewed and, to the best of my knowledge, are certified to be true and accurate.

**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| 31. Typed Name and Title of Applicant's Responsible Official | | 32. Date *(mm/dd/yyyy)* |
|---|---|---|
| (b)(4)/TS-CI; (b)(6)/PPI | | 10/19/2022 |

| 33. Telephone Number *(Include country code if applicable and area code)* | 34. FAX Number *(Include country code if applicable and area code)* | 35. Email Address |
|---|---|---|
| 877-432-7596 | (b)(4)/TS-CI; (b)(6)/PPI | (b)(4)/TS-CI; (b)(6)/PPI |

36. Address of Applicant's Responsible Official

Address 1 *(Street address, P.O. box, company name c/o)*
PO Box 4816

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

| City | State/Province/Region | |
|---|---|---|
| New York | NY | |
| Country | ZIP or Postal Code | |
| USA | 10185 | |

| 37. Signature of Applicant's Responsible Official or Other Authorized Official | Sign | 38. Countersignature of Authorized U.S. Agent | Sign |
|---|---|---|---|
| (b)(4)/TS-CI; (b)(6)/PPI | | | |

### The information below applies only to requirements of the Paperwork Reduction Act of 1995.

The burden time for this collection of information is estimated to average 24 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the address to the right:

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

Department of Health and Human Services
Food and Drug Administration
Office of Operations
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

**DO NOT SEND YOUR COMPLETED FORM TO THIS PRA STAFF EMAIL ADDRESS.**

# Danco Laboratories, LLC

P.O. Box 4816, New York, New York  10185
Tel: [(b)(4)/TS-CI; (b)(6)/PPI]    Facsimile: [(b)(4)/TS-CI; (b)(6)/PPI]

October 19, 2022

[(b)(6)/PPI]

Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD  20705

Re:    NDA 20-687, eCTD Sequence No.22
       MIFEPREX® (mifepristone) tablets, 200 mg

       **REMS Correspondence: REMS Modification Amendment Following FDA Meetings
       September 19 and October 6, 2022 re Proposed Modification to Mifepristone SSS REMS
       Program**

Dear [(b)(6)/PPI]

This REMS Modification Amendment being submitted by Danco Laboratories, LLC ("Danco") has been
jointly prepared by Danco and GenBioPro to address FDA's recommendations and questions discussed
in the meetings with FDA on September 19, 2022 and October 6, 2022.  Reference is made to FDA's
REMS Modification Notification dated December 16, 2021 and the prior approval supplement submitted
on June 22, 2022 by Danco (S-025) and GenBioPro (S-004) ("The Sponsors") proposing modifications to
the Mifepristone Single Shared System Risk Evaluation and Mitigation Strategy ("SSS REMS") and the
Sponsors August 26, 2022 response to FDA's Information Request dated July 22, 2022("IR").

During the October 6, 2022 meeting the Sponsors and FDA agreed on a rolling submission of the revised
SSS REMS, REMS documents and associated documents.  This submission includes the Sponsors
Response to Agency Correspondence, revisions to the REMS, the Prescriber Agreement, the Patient
Agreement and the Pharmacy Agreement based on feedback from the meetings described above and
subsequent post meeting agency correspondence. Subsequent submissions will include the revised
REMS Supporting document, Prescribing Information, Medication Guide, Assessment, Communication
and Audit Plans after receiving feedback on this submission.

Danco and GenBioPro have worked collaboratively to revise the documents in this submission.
GenBioPro will be submitting identical documents to their ANDA 091178, adjusted for company name and
other proprietary information.

The documents listed below are included in this submission.

_____

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under
**21 C.F.R.  20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request
under the Freedom of Information Act, Danco Laboratories, LLC requests immediate notification and an opportunity for
consultation in accordance with **21 C.F.R.  20.45.** Contact telephone number is [(b)(4)/TS-CI; (b)(6)/PPI]

| Documents Provided in this Submission | eCTD Location |
|---|---|
| Sponsors Response<br><br>Sponsors Response to Agency Correspondence Following 9/19/2022 Meeting | <br><br>1.16.2.2 |
| Mifepristone SSS REMS Proposed Modification<br><br>Mifepristone SSS REMS Modification – TRACK CHANGES MS Word Version versus CLEAN June 22 Submission<br><br>Mifepristone SSS REMS Modification – CLEAN MS Word Version | <br><br>1.16.2.2<br><br><br>1.16.2.2 |
| Revised Patient Agreement<br><br>Revised Patient Agreement –TRACK CHANGES MS Word version versus CLEAN June 22 Submission<br><br>Revised Patient Agreement – CLEAN MS Word version | <br><br>1.16.2.2<br><br>1.16.2.2 |
| Revised Prescriber Agreement<br><br>Revised Danco Prescriber Agreement –TRACK CHANGES MS Word version versus CLEAN June 22 Submission<br><br>Revised Danco Prescriber Agreement –CLEAN MS Word version | <br><br>1.16.2.2<br><br><br>1.16.2.2 |
| New Proposed Pharmacy Agreement<br><br>Revised Danco Pharmacy Agreement – TRACK CHANGES MS Word version versus CLEAN June 22 Submission<br><br>Revised Danco Pharmacy Agreement – CLEAN MS Word version | <br><br>1.16.2.2<br><br>1.16.2.2 |

Please let me know if you require any additional information.
Sincerely,

(b)(4)/TS-CI; (b)(6)/PPI

Attachment: Sponsors Response, Revised REMS, Patient, Prescriber and Pharmacy Agreements

_____

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Danco Laboratories, LLC requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.** Contact telephone number is (b)(4)/TS-CI; (b)(6)/PPI

## ELECTRONIC SUBMISSION SPECIFICATIONS

| | |
|---|---|
| **Root Folder Name:** | nda020687 |
| **eCTD Sequence Number:** | 0022 |
| **Size of Submission:** | Approximately 6 MB |
| **No. Files:** | 18 |
| **No. Folders:** | 9 |
| **Virus Protection Statement:** | This submission is virus free |
| **Anti-Virus Software Information:** | Microsoft Antimalware for Azure (eCTD Server) |

2023 SUPP 000544

REVISED Patient Agreement MARKED v CLEAN for FDA Re-Submission

PATIENT AGREEMENT FORM                    Mifepristone Tablets, 200mg

(b)(4)/TS-CI

DANCO Prescriber Agreement Form MARKED v CLEAN June 22

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

(b)(4)/TS-CI

2023 SUPP 000546

DANCO Prescriber Agreement Form MARKED VCEAN June-22

(b)(4)/TS-CI

2023 SUPP 000547

DANCO-NEW PROPOSED PHARMACY AGREEMENT MARKED v CLEAN June 22

MIFEPREX®(Mifepristone) Tablets, 200mg

(b)(4)/TS-CI

DANCO-NEW PROPOSED PHARMACY AGREEMENT MARKED v CLEAN June 22

APPEARS THIS WAY ON ORIGINAL

(b)(4)/TS-CI

2023 SUPP 000549

Mifepristone SSS REMS Modification Marked-Up Clean June 22

(b)(4)/TS-CI

Mifepristone Tablets,

200 mg Progestin

Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**

**SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200MG**

(b)(4)/TS-CI

Mifepristone SSS REMS Modification Marked-up Clean June 2022

(b)(4)/TS-CI

Mifepristone SSS REMS Modification Marked-up/Clean Rule 22

(b)(4)/TS-Cl

2023 SUPP 000552

Mifepristone SSS REMS Modification Marked-up/Clean Page 22

(b)(4)/TS-CI

Reference ID: 4499499#######

Mifepristone SSS REMS Modification Marked & Clean June 22

(b)(4)/TS-CI



## Sponsors Response to Agency Correspondence Following 9/19/2022 Meeting

FDA comments for a distribution in person at clinics, medical offices, and hospitals, and by mail/courier from clinics, medical offices, hospitals and mail-order or specialty pharmacies.

We acknowledge your agreement to work towards a distribution system that includes both in-person dispensing at clinics, medical offices, and hospitals, and dispensing by mail/courier from clinics, medical offices, hospitals and mail-order or specialty pharmacies.  See the following concerns that we outlined during the September 19, 2022, teleconference and additional comments from the Agency.

**REMS Sponsor Response:**  The REMS Sponsors appreciate the acknowledgement and believe we have addressed the Agency's comments below and those expressed in the meeting with a workable proposal that assures safe use without imposing undue burdens on patients or stakeholders or disrupting patient access to this important drug.

### 1.  Prescriber Certification Requirements

There are two key requirements that are necessary to ensure safe use: 1) that each individual prescriber writing prescriptions for pharmacies must be certified in the REMS, and (2) the pharmacy must be able to verify the prescriber is certified.

**REMS Sponsor Response:**

a.  Each individual prescriber writing prescriptions must be certified in the REMS

(b)(4)/TS-CI

. Dispensing directly from clinics, medical offices, and hospitals by individuals under the supervision of a certified prescriber will continue to be an option and can continue to fall under the Prescriber Agreement Form executed by the certified prescriber.

**REMS Sponsor Response:**  The REMS Sponsors have revised the proposed REMS to permit mail order/specialty pharmacy dispensing only in response to a prescription from a certified prescriber.  As reflected in the REMS, Prescriber Agreement Form and Mail-Order/Specialty Pharmacy Agreement Form, this is accomplished by requiring each provider who wants to submit prescriptions to a mail-order/specialty pharmacy to send a signed Prescriber Agreement Form to the mail-order/specialty pharmacy, which must verify before each dispensing that it has a signed Prescriber Agreement Form from the provider submitting the prescription.

b.  Pharmacies must be able to verify the prescriber certification.

Your proposal to include                    (b)(4)/TS-CI

Sponsors Response to Agency Correspondence Following 1985-2022 Meeting



2.  **Additional Pharmacy Requirements**

In addition to pharmacies verifying certification of prescribers prior to dispensing, pharmacies must meet the following additional requirements:

- Each pharmacy that dispenses the drug must be specially certified under the REMS in order to receive shipments of the drug and dispense the drug.

- Since it is important for this drug to be dispensed to patients in a timely manner, the REMS must include assurances that pharmacies are able to dispense the drug to patients within a certain timeframe to avoid delays from such factors as inadequate stocking of the drug or pharmacists refusing to fill prescriptions. Your proposal must include additional pharmacy requirements to ensure dispensing of the drug in a timely manner which entails that, at a minimum, a filled prescription must be received by the patient within (b)(4)/TS-CI of the pharmacy's receipt of the prescription. The pharmacy must also agree to notify the patient and prescriber within (b)(4)/TS-CI of the pharmacy's receipt of the prescription if the pharmacy cannot get the prescription to the patient within (b)(4)/TS-CI.

- Your proposal must also include that pharmacy inventory records are maintained.

**REMS Sponsor Response:** We agree with the Agency's expressed goals, but are proposing a few modifications to how those goals are achieved; our proposals are included in the proposed REMS and proposed Mail-Order/Specialty Pharmacy Agreement Form.

- We agree that each mail-order/specialty pharmacy must be specially certified in order to receive shipments of the drug and dispense the drug. This is accomplished by the Mail-Order/Specialty Pharmacy Agreement Form, which must be completed to obtain certification, and by which the mail-order/specialty pharmacy obligates itself to obtain and maintain Prescriber Agreement Forms, and to fill prescriptions only after verifying that it has a signed Prescriber Agreement Form from the provider submitting the prescription.

- We agree that timely dispensing of mifepristone is very important but recognize that any effort to ensure that patients timely receive the drug must reflect practical realities, including patient-specific clinical urgency, location, various conditions of shipping and/or receipt, including the day of the week (weekday/weekend/holiday), the weather, scheduling, availability for patient to accept delivery and affordability of shipping services. We have reviewed this issue with mail-order specialty pharmacies currently dispensing mifepristone and with providers and believe a clinically appropriate and operationally viable approach is to (b)(4)/TS-CI

(b)(4)/TS-CI

Our discussions with mail-order/specialty pharmacies tell us that requiring (b)(4)/TS-CI delivery is not feasible, as a practical matter. As a starting point, managing from time of receipt rather than day of receipt is logistically unworkable, taking into account such considerations as pharmacy workflows, time zones, hours of operations, the impact of holidays and weekends, and the potential need to verify payment adjudication and confirm/correct shipping address, among other things.

- We have revised the proposal to state that inventory records must be maintained, which is consistent with existing legal requirements to maintain records of prescription drug receipt and handling.

### 3. Implementation

If you use the processes currently in place that support specialty/mail order dispensing to inform your pharmacy dispensing model, provide details on whether prescribers certified with a specific Sponsor will be able to send a prescription to the other Sponsor's certified specialty or mail order pharmacy. If you use a different process for distribution and dispensing, please provide those details. Describe how prescribers will stay abreast of which pharmacies they can send their prescriptions to as more pharmacies certify or if pharmacies later decline participation in the REMS.

**REMS Sponsor Response:** The Sponsors have revised their respective Prescriber Agreement Forms to make clear that receipt from a provider of a signed Prescriber Agreement Form associated with any Sponsor under the REMS would permit a mail-order/specialty pharmacy to dispense mifepristone from any Sponsor, not just the Sponsor whose form was used. The communication to stakeholders about the REMS Modification will expressly address this issue.

With respect to patient and provider awareness of pharmacies that agree to publicize their REMS participation, Sponsors will take steps to make such information available, and anticipate the broader stakeholder community and participating mail-order/specialty pharmacies will be disseminating information about the mail-order/specialty pharmacies that choose to be publicly identified. We are confident there will be mail-order/specialty pharmacies serving all states that allow mail-order shipment of mifepristone, and information about those pharmacies will be available and accessible. We anticipate that even participating mail-order/specialty pharmacies that eschew broadly publicizing their role will communicate directly with prescribers or prescribing organizations.

Additionally, your 8/26/22 response to our information request included your communication activities proposed to let stakeholders know about REMS changes. You indicated that you plan to communicate changes to existing certified prescribers through email and mail, based on the contact information on file. Your proposal must include your plan and any materials for providing updated REMS information to inquiring stakeholders.

**REMS Sponsor Response:** The Sponsors will provide this information but ask to defer submission until we and the Agency have agreed on the specifics of the REMS to be communicated.

### 4. Patient Agreement Form

(b)(4)/TS-CI



**REMS Sponsor Response:** (b)(4)/TS-CI

**REMS Sponsors Request:** (b)(4)/TS-CI

### 5. Assessment of the REMS

Please include an updated REMS assessment plan in your next submission.

> **REMS Sponsor Response:** The Sponsors intend to provide an updated REMS assessment plan with the REMS Supporting Document. We have modified the provision in the REMS on the Periodic Assessment Plan, which will be more fully detailed in the REMS Supporting Document.

Additionally, your proposal to not                           (b)(4)/TS-CI

We recommend that you submit your audit methodology and noncompliance plan to the Agency for review within 60 days after the approval of the modification.

> **REMS Sponsor Response:** We will provide this as requested and address it in the REMS Supporting Document. We have modified the provision in the REMS and the Mail-Order/Specialty Pharmacy Agreement to make it clear that certified pharmacies will be subject to audit and must accept compliance assessments by Sponsors and FDA.

Sponsors Response to Agency Correspondence Following PreNDA (b)(4) 18554 2022 Meeting

<u>Resubmission Instructions</u>
Review of the proposed REMS modification is ongoing; these comments should not be considered final. Submit a REMS amendment by **October 14, 2022** that addresses these comments.

> **REMS Sponsor Response:** As discussed in the call, this will be prepared and submitted when the REMS modifications are established. Because of urgent need to obtain approval of the proposed REMS modifications, we ask FDA to consider making this a post-approval action.

Include the REMS document, and the REMS supporting document in a Word clean version; include a Word tracked changes version of any other documents that you modify, and .pdf version of the REMS Document, supporting document and all REMS materials in their final format.

> **REMS Sponsor Response:** The below items have been addressed as discussed above.

- REMS Document that uses the new format and includes
    - a proposal that each prescriber writing prescriptions will be certified
    - a proposal that addresses how pharmacies can verify prescriber certification
    - a proposal of updated certified pharmacy requirements that include
        - that a pharmacy must dispense mifepristone in a timely manner which entails that, at a minimum, a filled prescription must be received by the patient from the mail order pharmacy within (b)(4)/TS-CI from receipt of prescription by the pharmacy
        - what must be done if a prescription cannot be filled in a timely manner, including that the patient and prescriber are notified within (b)(4)/TS-CI of the pharmacy's receipt of prescription if it will not reach the patient within the (b)(4)/TS-CI timeframe.
        - the pharmacy must maintain inventory records of drug received and drug dispensed
- REMS Materials
    - a confirmation on the Prescriber Agreement Form that the prescriber will capture a patient's agreement in the medical record, either by the patient signing or via other captured methods
    - additional pharmacy requirements must be included in the Pharmacy Agreement Form in addition to the REMS document

- REMS Supporting Document

> **REMS Sponsor Response:** As discussed above, we will finalize and submit a revised REMS Supporting Document if the proposed revisions to the REMS are acceptable.

    - any contractual obligations certified pharmacies will enter into that also support the REMS requirements
    - communication activities and materials for current certified prescribers
    - any additional details regarding how the program will work with pharmacy dispensers, including
        - details on whether prescribers certified with a specific Sponsor will be able to send a prescription to the other Sponsor's certified specialty or mail order pharmacy
        - details on how prescribers will continually know where to send prescriptions as pharmacies certify or later if pharmacies decline participation in the REMS.
    - an updated assessment plan

(b)(4)/TS-CI

**REMS Sponsor Response:**

(b)(4)/TS-CI

| | |
|---|---|
| **DEPARTMENT OF HEALTH AND HUMAN SERVICES**<br>Food and Drug Administration<br>**APPLICATION TO MARKET A NEW OR ABBREVIATED NEW<br>DRUG OR BIOLOGIC FOR HUMAN USE**<br>*(Title 21, Code of Federal Regulations, Parts 314 & 601)* | Form Approved: OMB No. 0910-0338<br>Expiration Date: February 28, 2023<br>*See PRA Statement on page 3.*<br>1. Date of Submission *(mm/dd/yyyy)*<br>12/16/2022 |

**Next Page**  **Export Data**  **Import Data**  **Reset Form**

| **APPLICANT INFORMATION** | 2. Name of Applicant<br>Danco Laboratories, LLC |
|---|---|

| 3. Telephone Number *(Include country code if applicable and area code)*<br>877-432-7596 | 4. Facsimile (FAX) Number *(Include country code if applicable and area code)*  (b)(4)/TS-CI; (b)(6)/PPI |
|---|---|

**5. Applicant Address**

| Address 1 *(Street address, P.O. box, company name c/o)*<br>P.O. Box 4816 | Email Address  (b)(4)/TS-CI; (b)(6)/PPI |
|---|---|
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | Applicant DUNS<br>005078048 |
| City<br>New York | State/Province/Region<br>NY | |
| Country<br>USA | ZIP or Postal Code<br>10185 | U.S. License Number if previously issued |

**6. Authorized U.S. Agent** *(Required for non-U.S. applicants)*

| Authorized U.S. Agent Name | Telephone Number *(Include area code)* |
|---|---|
| Address 1 *(Street address, P.O. box, company name c/o)* | FAX Number *(Include area code)* |
| Address 2 *(Apartment, suite, unit, building, floor, etc.)* | Email Address |
| City | State | |
| ZIP Code | | U.S. Agent DUNS |

| **PRODUCT DESCRIPTION** | 7. NDA, ANDA, or BLA Application Number<br>020687 | 8. Supplement Number *(If applicable)*<br>025 |
|---|---|---|

9. Established Name *(e.g., proper name, USP/USAN name)*
Mifepristone

10. Proprietary Name *(Trade Name) (If any)*
Mifeprex

11. Chemical/Biochemical/Blood Product Name *(If any)*
11β-[p-(dimethylamino)phenyl]-17β-hydroxy-17-(1-propynyl)estra-4, 9-dien-3-one

| 12. Dosage Form<br>Tablet | 13. Strengths<br>200 mg | 14. Route of Administration<br>Oral |
|---|---|---|

| 15A. Proposed Indication for Use<br>Medical Termination of Intrauterine Pregnancy | Is this indication for a rare disease (prevalence <200,000 in U.S.)?  ☐ Yes  ☑ No |
|---|---|
| | Does this product have an FDA Orphan Designation for this indication?  ☐ Yes  ☑ No | If yes, provide the Orphan Designation number for this indication: | **Continuation Page for #15** |

15B. SNOMED CT Indication Disease Term *(Use continuation page for each additional indication and respective coded disease term)*
386639001 |Termination of pregnancy (procedure)|

| **APPLICATION INFORMATION** | 16. Application Type<br>*(Select one)* | ☑ New Drug Application (NDA)  ☐ Biologics License Application (BLA)<br>☐ Abbreviated New Drug Application (ANDA) |
|---|---|---|

| 17. If an NDA, identify the type  ☑ 505(b)(1)  ☐ 505(b)(2) | 18. If a BLA, identify the type  ☐ 351(a)  ☐ 351(k) |
|---|---|

19. If a 351(k), identify the biological reference product that is the basis for the submission.
Name of Biologic: _____    Holder of Licensed Application: _____

20. If an ANDA, or 505(b)(2), identify the listed drug product that is/are the basis for the submission.
Name of Drug: _____    Application Number of Relied Upon Product: _____

Indicate Patent Certification:  ☐ P1  ☐ P2  ☐ P3  ☐ P4  ☐ Section viii - MOU  ☐ Statement of no relevant patents

2023 SUPP 000852

21. Submission *(See instructions)*
☐ Original  ☐ Labeling Supplement  ☐ CMC Supplement  ☐ Efficacy Supplement  ☐ Annual Report
☐ Product Correspondence  ☐ REMS Supplement  ☐ Postmarketing Requirements or Commitments  ☐ Periodic Safety Report
☐ Request for Proprietary Name Review  ☑ Other *(Specify):* REMS Correspond: Respse to Info Req 12/8/22 & 12/14/22 Mifepristone SSS REMS

22. Submission Sub-Type
☐ Presubmission  ☑ Amendment
☐ Initial Submission  ☐ Resubmission

23. If a supplement, identify the appropriate category.
☐ CBE  ☐ Prior Approval (PA)
☐ CBE-30

24. For Originals and all Supplements, is the product a combination product (21 CFR 3.2(e))?  ☐ Yes  ☐ No
Combination Product Type *(See instructions)*
Request for Designation (RFD) Number

25. Does the submission contain:
*Only* Pediatric data? ☐ Yes ☑ No
Human factors information? ☐ Yes ☑ No

26. Proposed Marketing Status *(Select one)*
☑ Prescription Product (Rx)  ☐ Over-The-Counter Product (OTC)

27. Reasons for Submission

REMS Correspondence: Response to Information Requests Dated 12/8/2022 &12/14/2022 Mifepristone SSS REMS

28. Establishment Information *(Full establishment information should be provided in the body of the application.)*

Establishment Name

Address 1 *(Street address, P.O. box, company name c/o)*

Registration (FEI) Number

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

MF Number

City | State/Province/Region

Country | ZIP or Postal Code

Establishment DUNS Number

Is the establishment new to the application?  ☐ Yes  ☐ No
What is the status of the establishment?  ☐ Pending  ☐ Active  ☐ Inactive  ☐ Withdrawn

*Establishment Contact Information at the site/facility*

Name of Contact for the Establishment

Telephone Number *(Include area code)*

Address 1 *(Street address, P.O. box, company name c/o)*

Address 2 *(Apartment, suite, unit, building, floor, etc.)*

FAX Number *(Include area code)*

City | State/Province/Region

Country | ZIP or Postal Code

Email Address

Manufacturing Steps and/or Type of Testing

Is the site ready for inspection? ☐ Yes ☐ No ☐ N/A
If No, when will site be ready? *(mm/dd/yyyy)*

**Continuation Page for #28**

29. Cross References (List related BLAs, INDs, NDAs, PMAs, 510(k)s, IDEs, BMFs, MAFs, and DMFs referenced in the current application.)

N/A

**Contin. Page for #29**

30. This application contains the following items *(Select all that apply)*

☐ 1. Index  ☐ 2. Labeling *(Select one):*  ☐ Draft Labeling  ☐ Final Printed Labeling  ☐ 3. Summary *(21 CFR 314.50 (c))*

☐ 4. Chemistry Section  ☐ A. Chemistry, manufacturing, and controls information *(e.g., 21 CFR 314.50(d)(1); 21 CFR 601.2)*
☐ B. Samples *(21 CFR 314.50 (e)(1); 21 CFR 601.2 (a)) (Submit only upon FDA's request)*
☐ C. Methods validation package *(e.g., 21 CFR 314.50(e)(2)(i); 21 CFR 601.2)*

☐ 5. Nonclinical pharmacology and toxicology section *(e.g., 21 CFR 314.50(d)(2); 21 CFR 601.2)*
☐ 6. Human pharmacokinetics and bioavailability section *(e.g., 21 CFR 314.50(d)(3); 21 CFR 601.2)*

☐ 7. Clinical microbiology section *(e.g., 21 CFR 314.50(d)(4))*  ☐ 8. Clinical data section *(e.g., 21 CFR 314.50(d)(5); 21 CFR 601.2)*

*Item 30 continued on page 3*

2023 SUPP 000853

30. This application contains the following items (Continued; select all that apply):

| | |
|---|---|
| ☐ 9. Safety update report *(e.g., 21 CFR 314.50(d)(5)(vi)(b); 21 CFR 601.2)* | ☐ 10. Statistical section *(e.g., 21 CFR 314.50(d)(6); 21 CFR 601.2)* |
| ☐ 11. Case report tabulations *(e.g., 21 CFR 314.50(f)(1); 21 CFR 601.2)* | ☐ 12. Case report forms *(e.g., 21 CFR 314.50 (f)(2); 21 CFR 601.2)* |
| ☐ 13. Patent information on any patent that claims the drug/biologic *(21 U.S.C. 355(b) or (c))* | ☐ 14. A patent certification with respect to any patent that claims the drug/biologic *(21 U.S.C. 355 (b)(2) or (j)(2)(A))* |
| ☐ 15. Establishment description *(21 CFR Part 600, if applicable)* | ☐ 16. Debarment certification *(FD&C Act 306 (k)(1))* |
| ☐ 17. Field copy certification *(21 CFR 314.50 (l)(3))* | ☐ 18. User Fee Cover Sheet *(PDUFA Form FDA 3397, GDUFA Form FDA 3794, BsUFA Form FDA 3792, or MDUFA Form FDA 3601)* |
| ☐ 19. Financial Disclosure Information *(21 CFR Part 54)* | |
| ☑ 20. Other *(Specify):* REMS Correspondence: Response to Information Requests Dated 12/8/2022 &12/14/2022 Mifepristone SSS REMS | |

**CERTIFICATION**

I agree to update this application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling. I agree to submit safety update reports as provided for by regulation or as requested by FDA. If this application is approved, I agree to comply with all applicable laws and regulations that apply to approved applications, including, but not limited to, the following:

    1. Good manufacturing practice regulations in 21 CFR Parts 210, 211 or applicable regulations, Parts 606, and/or 820.
    2. Biological establishment standards in 21 CFR Part 600.
    3. Labeling regulations in 21 CFR Parts 201, 606, 610, 660, and/or 809.
    4. In the case of a prescription drug or biological product, prescription drug advertising regulations in 21 CFR Part 202.
    5. Regulations on making changes in application in FD&C Act section 506A, 21 CFR 314.71, 314.72, 314.97, 314.99, and 601.12.
    6. Regulations on Reports in 21 CFR 314.80, 314.81, 600.80, and 600.81.
    7. Local, state, and Federal environmental impact laws.

If this application applies to a drug product that FDA has proposed for scheduling under the Controlled Substances Act, I agree not to market the product until the Drug Enforcement Administration makes a final scheduling decision.

The data and information in this submission have been reviewed and, to the best of my knowledge, are certified to be true and accurate.

**Warning:** A willfully false statement is a criminal offense, U.S. Code, title 18, section 1001.

| 31. Typed Name and Title of Applicant's Responsible Official | 32. Date *(mm/dd/yyyy)* |
|---|---|
| (b)(4)-CI; (b)(6)/PPI | 12/16/2022 |

| 33. Telephone Number *(Include country code if applicable and area code)* | 34. FAX Number *(Include country code if applicable and area code)* | 35. Email Address |
|---|---|---|
| 877-432-7596 | (b)(4)/TS-CI; (b)(6)/PPI | (b)(4)/TS-CI; (b)(6)/PPI |

36. Address of Applicant's Responsible Official

| Address 1 *(Street address, P.O. box, company name c/o)* |
|---|
| PO Box 4816 |

| Address 2 *(Apartment, suite, unit, building, floor, etc.)* |
|---|

| City | State/Province/Region |
|---|---|
| New York | NY |

| Country | ZIP or Postal Code |
|---|---|
| USA | 10185 |

| 37. Signature of Applicant's Responsible Official or Other Authorized Official | Sign | 38. Countersignature of Authorized U.S. Agent | Sign |
|---|---|---|---|
| (b)(4)/TS-CI; (b)(6)/PPI | | | |

---

**The information below applies only to requirements of the Paperwork Reduction Act of 1995.**

The burden time for this collection of information is estimated to average 24 hours per response, including the time to review instructions, search existing data sources, gather and maintain the data needed and complete and review the collection of information. Send comments regarding this burden estimate or any other aspect of this information collection, including suggestions for reducing this burden to the address to the right:

Department of Health and Human Services
Food and Drug Administration
Office of Operations
Paperwork Reduction Act (PRA) Staff
*PRAStaff@fda.hhs.gov*

*"An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB number."*

**DO NOT SEND YOUR COMPLETED FORM TO THIS PRA STAFF EMAIL ADDRESS.**

CONFIDENTIAL*

# Danco Laboratories, LLC

P.O. Box 4816, New York, New York  10185
Tel: [(b)(4)/TS-CI; (b)(6)/PPI]   Facsimile: [(b)(4)/TS-CI; (b)(6)/PPI]

December 16, 2022

[(b)(6)/PPI]

Center for Drug Evaluation and Research
Food and Drug Administration
5901-B Ammendale Road
Beltsville, MD  20705

Re:    NDA 20-687, eCTD Sequence No.26
        MIFEPREX® (mifepristone) tablets, 200 mg

        **REMS Correspondence: Sponsor Response to Agency Information Request and
        Comments Dated December 8 and 14, 2022 re Proposed Modification to Mifepristone SSS
        REMS Program submitted as S-025.**

Dear [(b)(6)/PPI]

This response to Agency Information Request and Comments dated December 5, 2022 regarding the
Single Shared System Risk Evaluation and Mitigation Strategy ("SSS REMS") is being submitted by
Danco Laboratories, LLC ("Danco") and has been jointly prepared by Danco and GenBioPro,
Inc.("GenBioPro").  Reference is made to FDA's REMS Modification Notification dated December 16,
2021 and the prior approval supplement submitted on June 22, 2022 by Danco (S-025) and GenBioPro
(S-004) ("The Sponsors") proposing modifications to the Mifepristone SSS REMS, the Sponsors August
26, 2022 response to FDA's Information Request dated July 22, 2022("IR"), the Sponsor's November 30,
2022 response to FDA's Information Request dated November 23, 2022, the Sponsor's December 8
response to the FDA's Information Request dated December 5, 2022, the meetings with the Agency on
September 19, 2022, October 6, 2022, October 25, 2022, December 1, 7and 15 (2), 2022 and the REMS
Modification Amendment dated October 19, 2022.

After review and discussion during the December 15 meetings with FDA, the Mifepristone REMS Program
documents received from the Agency on December 14, 2022 have been collaboratively revised by the
Sponsors and explanatory comments for the changes have been included to facilitate the Agency's
review.

GenBioPro will be submitting identical documents to their ANDA 091178.

The documents listed below are included in this submission:

Please see next pages.

_____

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under
**21 C.F.R.  20.61**. Should FDA tentatively determine that any portion of this document is disclosable in response to a request
under the Freedom of Information Act, Danco Laboratories, LLC requests immediate notification and an opportunity for
consultation in accordance with **21 C.F.R.  20.45**. Contact telephone number is [(b)(4)/TS-CI; (b)(6)/PPI]

| Documents Provided in this Submission | eCTD Location |
|---|---|
| **REMS and REMS Materials Combined** | |
| Mifepristone SSS REMS and REMS Materials Combined – CLEAN PDF version | 1.16.2.2 |
| **Mifepristone SSS REMS Modification** | |
| Mifepristone SSS REMS Modification – TRACK CHANGES MS Word version | 1.16.2.2 |
| Mifepristone SSS REMS Modification – CLEAN MS Word version | 1.16.2.2 |
| Mifepristone SSS REMS Modification – CLEAN PDF version | 1.16.2.2 |
| **Revised Prescriber Agreement** | |
| Revised Danco Prescriber Agreement –CLEAN MS Word version | 1.16.2.2 |
| Revised Danco Prescriber Agreement –CLEAN PDF version | 1.16.2.2 |
| **Proposed Pharmacy Agreement** | |
| Revised Danco Pharmacy Agreement – CLEAN MS Word version | 1.16.2.2 |
| Revised Danco Pharmacy Agreement – CLEAN PDF version | 1.16.2.2 |
| **Revised Patient Agreement** | |
| Revised Patient Agreement – CLEAN MS Word version | 1.16.2.2 |
| Revised Patient Agreement – CLEAN PDF version | 1.16.2.2 |

_____

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Danco Laboratories, LLC requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.** Contact telephone number is (b)(4)/TS-CI; (b)(6)/ PPI .

| Documents Provided in this Submission | eCTD Location |
|---|---|
| **Revised REMS Supporting Document** | |
| REMS Supporting Document – TRACK CHANGES MS Word version | 1.16.2.2 |
| REMS Supporting Document – CLEAN MS Word version | 1.16.2.2 |
| REMS Supporting Document –CLEAN PDF version | 1.16.2.2 |
| **Revised Full Prescribing Information and Medication Guide** | |
| Revised Danco Full Prescribing Information and Medication Guide– CLEAN MS Word version | 1.14.1.2 |
| Revised Danco Full Prescribing Information and Medication Guide– CLEAN PDF version | 1.14.1.2 |

Please let me know if you require any additional information.

Sincerely,

(b)(4)/TS-CI; (b)(6)/PPI

---

* This document constitutes trade secret and confidential commercial information exempt from public disclosure under **21 C.F.R. 20.61.** Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, Danco Laboratories, LLC requests immediate notification and an opportunity for consultation in accordance with **21 C.F.R. 20.45.** Contact telephone number is (b)(4)/TS-CI; (b)(6)/PPI

## ELECTRONIC SUBMISSION SPECIFICATIONS

| | |
|---|---|
| **Root Folder Name:** | nda020687 |
| **eCTD Sequence Number:** | 0026 |
| **Size of Submission:** | Approximately 7 MB |
| **No. Files:** | 23 |
| **No. Folders:** | 11 |
| **Virus Protection Statement:** | This submission is virus free |
| **Anti-Virus Software Information:** | Microsoft Antimalware for Azure (eCTD Server) |

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use MIFEPREX safely and effectively. See full prescribing information for MIFEPREX.

MIFEPREX® (mifepristone) tablets, for oral use
Initial U.S. Approval: 2000

---

| WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING |
|---|
| *See full prescribing information for complete boxed warning.*<br>Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.<br>• **Atypical Presentation of Infection.** Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)<br>• **Bleeding.** Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)<br>MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).<br>Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol. |

---

**----------------INDICATIONS AND USAGE----------------**
MIFEPREX is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

**----------------DOSAGE AND ADMINISTRATION----------------**
• 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
• Instruct the patient what to do if significant adverse reactions occur. (2.2)
• Follow-up is needed to confirm complete termination of pregnancy. (2.3)

**----------------DOSAGE FORMS AND STRENGTHS----------------**
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

**----------------CONTRAINDICATIONS----------------**
• Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
• Chronic adrenal failure (4)
• Concurrent long-term corticosteroid therapy (4)
• History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
• Hemorrhagic disorders or concurrent anticoagulant therapy (4)
• Inherited porphyria (4)
• Intrauterine device (IUD) in place (4)

**----------------WARNINGS AND PRECAUTIONS----------------**
• Ectopic pregnancy: Exclude before treatment. (5.4)
• Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

**----------------ADVERSE REACTIONS----------------**
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Danco Laboratories, LLC at 1-877-432-7596 or medicaldirector@earlyoptionpill.com or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

**----------------DRUG INTERACTIONS----------------**
• CYP3A4 inducers can lower mifepristone concentrations. (7.1)
• CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
• CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

**----------------USE IN SPECIFIC POPULATIONS----------------**
• Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.**

**Revised: XX/2022**

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
**1    INDICATIONS AND USAGE**
**2    DOSAGE AND ADMINISTRATION**
    2.1    Dosing Regimen
    2.2    Patient Management Following Misoprostol Administration
    2.3    Post-treatment Assessment: Day 7 to 14
    2.4    Contact for Consultation
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
**5    WARNINGS AND PRECAUTIONS**
    5.1    Infections and Sepsis
    5.2    Uterine Bleeding
    5.3    Mifepristone REMS Program
    5.4    Ectopic Pregnancy
    5.5    Rhesus Immunization
**6    ADVERSE REACTIONS**
    6.1    Clinical Trials Experience
    6.2    Postmarketing Experience
**7    DRUG INTERACTIONS**
    7.1    Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)
    7.2    Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)
    7.3    Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)
**8    USE IN SPECIFIC POPULATIONS**
    8.1    Pregnancy
    8.2    Lactation
    8.4    Pediatric Use
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
    12.1    Mechanism of Action
    12.2    Pharmacodynamics
    12.3    Pharmacokinetics
**13    NONCLINICAL TOXICOLOGY**
    13.1    Carcinogenesis, Mutagenesis, Impairment of Fertility
**14    CLINICAL STUDIES**
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

---

## 1   INDICATIONS AND USAGE

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

## 2   DOSAGE AND ADMINISTRATION

### 2.1  Dosing Regimen

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

Remove any intrauterine device ("IUD") before treatment with MIFEPREX begins [*see Contraindications (4)*].

The dosing regimen for MIFEPREX and misoprostol is:

2

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* MIFEPREX Administration
    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (<u>minimum</u> 24-hour interval between
    MIFEPREX and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

  Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area
  between the cheek and gums) for 30 minutes and then swallow any remnants with water
  or another liquid (see Figure 1).

  **Figure 1**



  **2 pills between cheek and gum on left side + 2 pills between cheek and gum on
  right side**

Patients taking MIFEPREX must take misoprostol within 24 to 48 hours after taking MIFEPREX.
The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours
or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see
Clinical Studies (14)]*, discuss with the patient an appropriate location for them to be when
taking the misoprostol, taking into account that expulsion could begin within 2 hours of
administration.

### 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need
medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)]*.

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other
  adverse reactions occur
- A phone number to call if the patient has questions following the administration of the
  misoprostol
- The name and phone number of the healthcare provider who will be handling
  emergencies.

**2.3   Post-treatment Assessment: Day 7 to 14**

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of MIFEPREX. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding.  Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Patients should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, patients may be treated with another dose of misoprostol 800 mcg buccally.  There have been rare reports of uterine rupture in women who took MIFEPREX and misoprostol, including women with prior uterine rupture or uterine scar and women who received multiple doses of misoprostol within 24 hours.   Patients who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*.  Advise the patient whether you will provide such care or will refer them to another provider as part of counseling prior to prescribing MIFEPREX.

**2.4   Contact for Consultation**

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

**3     DOSAGE FORMS AND STRENGTHS**

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. MIFEPREX tablets are light yellow, cylindrical, and bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "MF."

**4     CONTRAINDICATIONS**

- Administration of MIFEPREX and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

    - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

    - Chronic adrenal failure (risk of acute adrenal insufficiency)

    - Concurrent long-term corticosteroid therapy (risk of acute adrenal insufficiency)

    - History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

    - Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

• Use of MIFEPREX and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination). If the IUD is removed, MIFEPREX may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in patients who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects. Because heavy bleeding requiring surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

### 5.3 Mifepristone REMS Program

MIFEPREX is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)]*.

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- MIFEPREX must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers.

Further information is available at 1-877-4 Early Option (1-877-432-7596).

### 5.4 Ectopic Pregnancy

MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies *[see Contraindications (4)]*. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

Patients who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

### 5.5 Rhesus Immunization

The use of MIFEPREX is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

## 6   ADVERSE REACTIONS

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*

- Uterine bleeding *[see Warnings and Precautions (5.2)]*

### 6.1 Clinical Trials Experience

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without contraindications to mifepristone or misoprostol use according to the MIFEPREX product label. Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

About 85% of patients report at least one adverse reaction following administration of MIFEPREX and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with MIFEPREX and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy. Uterine bleeding and cramping are expected consequences of the action of MIFEPREX and misoprostol as used in the treatment procedure. Most patients can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| **Nausea** | 3 | 1,248 | 51-75% | 70 days |
| **Weakness** | 2 | 630 | 55-58% | 63 days |
| **Fever/chills** | 1 | 414 | 48% | 63 days |
| **Vomiting** | 3 | 1,248 | 37-48% | 70 days |
| **Headache** | 2 | 630 | 41-44% | 63 days |
| **Diarrhea** | 3 | 1,248 | 18-43% | 70 days |
| **Dizziness** | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally. Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented. In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation. Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2.

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
* This outcome represents a single patient who experienced death related to sepsis.

## 6.2    Postmarketing Experience

The following adverse reactions have been identified during postapproval use of MIFEPREX and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7    DRUG INTERACTIONS

## 7.1  Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone).  Whether this action has an impact on the efficacy of the dose

regimen is unknown.   Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

### 7.2 Drugs that May Increase MIFEPREX Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). MIFEPREX should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

### 7.3 Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

Risk Summary

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant patients are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant patients with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects.  Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol. In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

### 8.2 Lactation

MIFEPREX is present in human milk.  Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of MIFEPREX in a regimen with

misoprostol in a breastfed infant or on milk production.  Refer to misoprostol labeling for lactation information with the use of misoprostol.  The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from MIFEPREX in a regimen with misoprostol.

### 8.4  Pediatric Use

Safety and efficacy of MIFEPREX have been established in pregnant females. Data from a clinical study of MIFEPREX that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

## 10   OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, the patient should be observed closely for signs of adrenal failure.

## 11   DESCRIPTION

MIFEPREX tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical, and bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[*p*-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:

The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

## 12   CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity

of prostaglandins.

## 12.2 Pharmacodynamics

Use of MIFEPREX in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity: Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity. The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

Absorption

The absolute bioavailability of a 20 mg mifepristone oral dose in females of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 ± 1.0 mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was 1.77 ± 0.7 mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was 25.8 ± 6.2 mg*hr/L.

Distribution

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

Elimination

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

Specific Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.

## 13  NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed.

Mutagenesis

Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

Impairment of Fertility

In rats, administration of 0.3 mg/kg mifepristone per day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effects on reproductive performance were observed.

## 14  CLINICAL STUDIES

Safety and efficacy data from clinical studies of mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation are reported below. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure based on 22 worldwide clinical studies (including 7 U.S. studies) appear in Table 3.

The demographics of women who participated in the U.S. clinical studies varied depending on study location and represent the racial and ethnic variety of American females.  Females of all reproductive ages were represented, including females less than 18 and more than 40 years of age; most were 27 years or younger.

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| **N** | 16,794 | 18,425 |
| **Complete Medical Abortion** | 97.4% | 96.2% |
| **Surgical Intervention\*** | 2.6% | 3.8% |
| **Ongoing Pregnancy\*\*** | 0.7% | 0.9% |

\* Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.
\*\* Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy.

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment  with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| **Complete medical abortion** | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| **Surgical intervention for ongoing pregnancy** | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data.  Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

is only available through a restricted program called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

MIFEPREX is supplied as light yellow, cylindrical, and bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 64875-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

## 17  PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of MIFEPREX. Additional copies of the Medication Guide are available by contacting Danco Laboratories at 1-877-4 Early Option (1-877-432-7596) or from www.earlyoptionpill.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- MIFEPREX is only available through a restricted program called the mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

  o  Patients must sign the Patient Agreement Form.

  o  MIFEPREX is only dispensed by or under the supervision of certified prescribers or by certified pharmacies on prescriptions issued by certified prescribers.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

- 

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking MIFEPREX *[see Dosage and Administration (2.3)]*.

- Explain that

  o  prolonged heavy vaginal bleeding is not proof of a complete abortion,

  o  if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

  o  it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer them to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before resuming sexual intercourse.

MIFEPREX is a registered trademark of Danco Laboratories, LLC.

Manufactured for:
*Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

XX/2022

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone tablets, for oral use

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

**What is Mifeprex?**

**Mifeprex is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifeprex is not approved for ending pregnancies that are further along. Mifeprex blocks a hormone needed for your pregnancy to continue. When you use Mifeprex on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifeprex, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifeprex and misoprostol. When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifeprex will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

**Who should not take Mifeprex?**

Some patients should not take Mifeprex. Do not take Mifeprex if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifeprex.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifeprex.

**What should I tell my healthcare provider before taking Mifeprex?**

**Before you take Mifeprex, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifeprex can pass into your breast milk. The effect of the Mifeprex and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifeprex and certain other medicines may affect each other if they are used together. This can cause side effects.

**How should I take Mifeprex?**

- Mifeprex will be given to you by a healthcare provider or pharmacy.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifeprex and misoprostol:**

**Mifeprex (1 tablet) orally + misoprostol (4 tablets) buccally**

**Day 1:**

- Take 1 Mifeprex tablet by mouth.

**24 to 48 hours after taking Mifeprex:**

- Take 4 misoprostol tablets by placing 2 tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifeprex or later than 48 hours after Mifeprex.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important.  You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifeprex to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

**When should I begin birth control?**

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

**What should I avoid while taking Mifeprex and misoprostol?**

Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects.

**What are the possible side effects of Mifeprex and misoprostol?**

**Mifeprex may cause serious side effects. See "What is the most important information I should know about Mifeprex?"**

**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifeprex. See "How should I take Mifeprex?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifeprex. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy.

The most common side effects of Mifeprex treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects. These are not all the possible side effects of Mifeprex.

Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Mifeprex.**

**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifeprex. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifeprex that is written for healthcare professionals.**

**For more information about Mifeprex, go to www.earlyoptionpill.com or call 1-877-4 Early Option (1-877-432-7596).**

Manufactured for: *Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com

This Medication Guide has been approved by the U.S. Food and Drug Administration.    ==Approval XX/2022==

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - Track and verify receipt of each shipment of Mifeprex.
  - Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 000878

Signature: _____    Date: _____

Email: _____    Phone: _____    Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to <u>Mifeprex@dancodistributor.com</u> or fax to 1-866-227-3343**.**



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 000879

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:
  - o Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**
  - o Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - o Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 000880

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:

  o   Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.

  o   Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.

- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:

  o   Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____     Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved XX/2022 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 000881

## PATIENT AGREEMENT FORM                     Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

**1.** I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

**2.** I understand:
    **a.** I will take mifepristone on Day 1.
    **b.** I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

**3.** My healthcare provider has talked with me about the risks, including:
- heavy bleeding
- infection

**4.** I will contact the clinic/office/provider right away if in the days after treatment I have:
- a fever of 100.4°F or higher that lasts for more than four hours
- heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
- severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
— these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

**5.** I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

**6.** I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**7.** If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**8.** I have the MEDICATION GUIDE for mifepristone.

**9.** My healthcare provider has answered all my questions.


**Patient Signature:** _____ **Patient Name** (print): _____ **Date**: _____


**Provider Signature:** _____ **Provider Name** (print): _____ **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

   **XX/2022**

Initial Shared System REMS approval:  04/2019
Most Recent Modification:  ##/202#

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

### I.   GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

   a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

   b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

   c) Informing patients about the risk of serious complications associated with mifepristone.

### II.  REMS ELEMENTS

### A. Elements to Assure Safe Use

1.  Healthcare providers who prescribe mifepristone must be specially certified.

   a. To become specially certified to prescribe mifepristone, healthcare providers must:

      i.  Review the Prescribing Information for mifepristone.

      ii. Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

         1)  They have the following qualifications:

            a) Ability to assess the duration of pregnancy accurately

            b) Ability to diagnose ectopic pregnancies

            c) Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

         2)  They will follow the guidelines for use of mifepristone (see b.i-vii below).

   b. As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

      i.  Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

      ii. Ensure that the healthcare provider and patient sign the *Patient Agreement Form*.

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

vi. If mifepristone will be dispensed by a certified pharmacy:

    1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

    2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

    3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

    1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

    2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

    3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

    1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

    2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

2. Pharmacies that dispense mifepristone must be specially certified

   a. To become specially certified to dispense mifepristone, pharmacies must:

      i. Be able to receive *Prescriber Agreement Forms* by email and fax.

      ii. Be able to ship mifepristone using a shipping service that provides tracking information.

      iii. Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

      iv. Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

         1) Review the Prescribing Information for mifepristone.

         2) Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

            a) Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

            b) Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

            c) Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

            d) Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

            e) Track and verify receipt of each shipment of mifepristone.

            f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

            g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

            h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

            i) Maintain records of *Prescriber Agreement Forms*.

            j) Maintain records of dispensing and shipping.

            k) Maintain records of all processes and procedures including compliance with those processes and procedures.

            l) Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes..

            m) Train all relevant staff on the Mifepristone REMS Program requirements.

    n) Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b. Mifepristone Sponsors must:

    i. Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

    ii. Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

    i. Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3. Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

a. The patient must sign a *Patient Agreement Form* indicating that the patient has:

    i. Received, read and been provided a copy of the *Patient Agreement Form*.

    ii. Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

**B. Implementation System**

1. Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

a. Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

    i. The distributors must put processes and procedures in place to:

        1) Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

        2) Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

        3) Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

        4) Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

        5) Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

    ii. Put processes and procedures in place to maintain a distribution system that is secure,

       confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

    iii. Train all relevant staff on the Mifepristone REMS Program requirements.

    iv. Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

  b. Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2. Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4. Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5. Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6. Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7. Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (XX/XX/XXXX) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

Initial Shared System REMS approval:  04/2019
Most Recent Modification:  ==##==/202==#==

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

## I.  GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

    a)  Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

    b)  Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

    c)  Informing patients about the risk of serious complications associated with mifepristone.

## II.  REMS ELEMENTS

### A.  Elements to Assure Safe Use

1.  Healthcare providers who prescribe mifepristone must be specially certified.

    a.  To become specially certified to prescribe mifepristone, healthcare providers must:

        i.  Review the Prescribing Information for mifepristone.

        ii.  Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

            1)  They have the following qualifications:

                a)  Ability to assess the duration of pregnancy accurately

                b)  Ability to diagnose ectopic pregnancies

                c)  Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

            2)  They will follow the guidelines for use of mifepristone (see b.i-vii below).

    b.  As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

        i.  Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

        ii.  Ensure that the healthcare provider and patient sign the *Patient Agreement Form*.

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

vi. If mifepristone will be dispensed by a certified pharmacy:

  1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

  2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

  3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

  1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

  2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

  3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

  1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

  2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

2. Pharmacies that dispense mifepristone must be specially certified

   a. To become specially certified to dispense mifepristone, pharmacies must:

      i. Be able to receive *Prescriber Agreement Forms* by email and fax.

      ii. Be able to ship mifepristone using a shipping service that provides tracking information.

      iii. Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

      iv. Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

        1) Review the Prescribing Information for mifepristone.

        2) Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

          a) Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

          b) Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

          c) Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

          d) Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

          e) Track and verify receipt of each shipment of mifepristone.

          f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

          g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

          h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

          i) Maintain records of *Prescriber Agreement Forms*.

          j) Maintain records of dispensing and shipping.

          k) Maintain records of all processes and procedures including compliance with those processes and procedures.

          l) Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes..

          m) Train all relevant staff on the Mifepristone REMS Program requirements.

n)  Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b.  Mifepristone Sponsors must:

i.  Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

ii.  Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

i.  Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.  Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

a.  The patient must sign a *Patient Agreement Form* indicating that the patient has:

i.  Received, read and been provided a copy of the *Patient Agreement Form*.

ii.  Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

**B. Implementation System**

1.  Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

a.  Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

i.  The distributors must put processes and procedures in place to:

1)  Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

2)  Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

3)  Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

4)  Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

5)  Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

ii.  Put processes and procedures in place to maintain a distribution system that is secure,

confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

 iii. Train all relevant staff on the Mifepristone REMS Program requirements.

 iv. Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

 b. Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2. Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4. Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5. Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6. Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7. Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (XX/XX/XXXX) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:
  - o Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**
  - o Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.
  - o Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:
  - o  Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.
  - o  Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.
- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:
  - o  Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____     Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved XX/2022 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 000894

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - Track and verify receipt of each shipment of Mifeprex.
  - Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

Signature: _____    Date: _____

Email: _____    Phone: _____    Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

# PATIENT AGREEMENT FORM                    Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

**1.**   I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

**2.**   I understand:
    **a.**   I will take mifepristone on Day 1.
    **b.**   I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

**3.**   My healthcare provider has talked with me about the risks, including:
- heavy bleeding
- infection

**4.**   I will contact the clinic/office/provider right away if in the days after treatment I have:
- a fever of 100.4°F or higher that lasts for more than four hours
- heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
- severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
  — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

**5.**   I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

**6.**   I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**7.**   If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**8.**   I have the MEDICATION GUIDE for mifepristone.

**9.**   My healthcare provider has answered all my questions.


**Patient Signature:** _____     **Patient Name** (print): _____     **Date**: _____


**Provider Signature:** _____     **Provider Name** (print): _____     **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

**XX/2022**

Mifepristone Tablets, 200 mg[1]

## SINGLE SHARED SYSTEM RISK EVALUATION AND MITIGATION STRATEGY (REMS) SUPPORTING DOCUMENT

## I.    BACKGROUND

The New Drug Application (NDA) for Mifeprex Tablets, 200 mg submitted by Danco Laboratories, LLC was approved in September 2000 for the medical termination of intrauterine pregnancy through 49 days' gestation with a Restricted Distribution system under 21 C.F.R. § 314.520 (restrictions to assure safe use). Mifeprex was deemed to have in effect an approved Risk Evaluation and Mitigation System (REMS) under section 505-1 of the Federal Food, Drug, and Cosmetic Act (FDCA) with the passage of the Food and Drug Administration Amendments Act of 2007 (FDAAA). The Mifeprex REMS was approved in June 2011.  A supplemental new drug application was approved on March 29, 2016, which, among other things, modified the gestational age up to which Mifeprex has been shown to be safe and effective, and the dose of Mifeprex, and the dosing regimen for taking Mifeprex and misoprostol. Other aspects of the labeling and REMS were also modified, with REMS changes including removal of the Medication Guide as an element of the REMS and modifications to the REMS Document, *Prescriber Agreement Form*, and *Patient Agreement Form*.  The Abbreviated New Drug Application (ANDA) for Mifepristone Tablets, 200 mg submitted by GenBioPro, Inc. was approved on April 11, 2019, along with a Single Shared System REMS ("SSS REMS") called the Mifepristone REMS Program.  On May 14, 2021 FDA approved a modification to the REMS that revised the *Patient Agreement Form* to include gender-neutral language.

On December 16, 2021 FDA advised that, in accordance with section 505-1(g)(4)(B) of the FDCA, they have determined that the approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. This determination was based on a review of published literature, safety information collected during the COVID-19 Public Health Emergency, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Sponsors, and plaintiffs in ongoing litigation with FDA.

The December 16, 2021 letter, directed that the REMS be modified by:

1) Removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices and hospitals (i.e., the "in-person dispensing requirement"), and

2) Adding a requirement of certification of pharmacies that dispense the drug.

---

[1] This document constitutes trade secret and confidential information exempt from public disclosure under 21 C.F.R. § 20.61.  Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, the Sponsors request immediate notification and an opportunity for consultation in accordance with 21 C.F.R. § 20.45.

1

The changes made to the SSS REMS in response to the December 16th letter are those necessary to ensure the benefits of the drug outweigh the risks and minimize the burden on the healthcare delivery system. To that end, the Sponsors designed the REMS to be compatible with established distribution, procurement, and dispensing systems for drugs and to avoid unduly burdensome requirements that may limit patient access to this drug (especially to patients who have difficulty accessing health care).

This SSS REMS Supporting Document provides the supporting details of the shared elements in the Mifepristone Tablets, 200 mg SSS REMS.

## II.    GOALS

The goal of the mifepristone SSS REMS is to mitigate the risk of serious complications associated with mifepristone by:

### A.    Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

In order to prescribe mifepristone under the Mifepristone REMS Program, a healthcare provider must be certified.

Prescriber Certification requires reviewing the mifepristone Prescribing Information and signing a *Prescriber Agreement Form.* By signing, the healthcare provider agrees that they (1) meet identified qualifications for the safe use of mifepristone, and (2) will ensure specified guidelines for using mifepristone are followed, which include steps to ensure that patients understand the potential risks associated with the use of mifepristone, appropriate records are maintained, and deaths are reported to sponsors.

Certification ensures that (1) patients are informed of the potential risks associated with the use of mifepristone, and therefore can make informed decisions about using the product, (2) certified prescribers have the necessary knowledge, skills, and ability to assure patient access to medical facilities to mitigate those risks, and (3) any deaths are reported to the Sponsors.

### B.    Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

Mifepristone distribution is restricted to ensure that it is only dispensed by or under the supervision of a certified prescriber or by certified pharmacies under prescriptions issued by certified prescribers. Certain certified prescribers supervise dispensing to patients at locations that also have a pharmacy or pharmacy license in order to receive or dispense medications (e.g., hospitals, clinics, medical offices). For clarity, the REMS does not require certification of pharmacies that are affiliated with such locations (e.g., locations where a certified prescriber or healthcare providers operating under the certified prescriber's supervision dispense mifepristone to patients). Rather, the REMS requires certification of independent/unaffiliated pharmacies accepting prescriptions from certified prescribers. This is reflected by the statement in the

2

Pharmacy Agreement, "Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification."

Distribution to healthcare settings and pharmacies is implemented with the receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form* by the distributors. Sponsors enter into contractual relationships with the distributors. The REMS also imposes requirements on distributors and any contractual relationships between the Sponsors and the distributors must be consistent with the REMS requirements. These requirements mitigate risk by limiting the facilities to which mifepristone is distributed and from which it is dispensed. Dispensing of mifepristone to patients may be carried out in-person, by mail, or courier permitted for prescription medications as determined by the dispenser in their judgement.

Prescribers submitting a mifepristone prescription to a certified pharmacy must submit a copy of their signed *Prescriber Agreement Form*, before the pharmacy may dispense mifepristone. Prescribing healthcare providers will submit a copy of their signed *Prescriber Agreement Form* to the pharmacy by electronic or fax transmission.  If a prescriber does not provide the required copy of their signed *Prescriber Agreement Form*, the pharmacy shall direct the prescriber to obtain and submit a completed and signed copy before the pharmacy can accept the prescription and dispense mifepristone on their prescription.

**C.  Informing patients about the risk of serious complications associated with mifepristone.**

Patients are given detailed information about the risks of mifepristone before they decide whether to take the drug.  The SSS REMS ensures that patients are informed of the risks by receiving a copy of the *Patient Agreement Form* and reviewing it with the provider.  The patient acknowledgment of the *Patient Agreement Form* is to be documented in the patient's medical record by obtaining the patient's and provider's signature on the *Patient Agreement Form*.

**III.  DISCUSSION OF REMS ELEMENTS**

A.  <u>Elements to Assure Safe Use</u>

The REMS includes the following Elements to Assure Safe Use:

1.  Healthcare providers who prescribe mifepristone must be specially certified.

By signing the *Prescriber Agreement Form*, healthcare providers agree that they have the below qualifications to prescribe mifepristone and to manage the risk of complications that may occur following use of the drug.

- Ability to assess the duration of pregnancy accurately

- Ability to diagnose ectopic pregnancies

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others,

3

and ability to assure patients access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone.

As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

- Ensure that the Patient Agreement Form is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure that the healthcare provider and patient sign the Patient Agreement Form.

- Ensure that the patient is provided with a copy of the Patient Agreement Form and Medication Guide.

- Ensure that the signed Patient Agreement Form is placed in the patient's medical record.

- Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

- If mifepristone will be dispensed by a certified pharmacy:
  - Provide the certified pharmacy a signed Prescriber Agreement Form.
  - Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.
  - Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

- The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:
  - Provide an authorized distributor with a signed Prescriber Agreement Form.
  - Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.
  - Ensure that healthcare providers under their supervision follow guidelines above.

As noted in the Prescribing Information, the assessment of pregnancy duration and diagnosis of ectopic pregnancies as described in the Full Prescribing Information.

4

The Certified Prescriber's obligations to assure safe use include ensuring that they have the qualifications and follow the guidelines for the use of mifepristone as provided under the REMS. The qualifications include that they have the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary. If the patient is unable to reach the provider, the plans for providing care through others and assurance of access to such facilities include ensuring that the patient knows whom to call and what to do, including going to an emergency room if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever and other symptoms and instructions raised as described in the Prescribing Information and Medication Guide.

Certified Prescribers may also supervise other healthcare providers. Consistent with the *Prescriber Agreement Form*, the Certified Prescriber is responsible for overseeing implementation and compliance with the Mifepristone REMS Program and for ensuring that the healthcare providers under their supervision follow the REMS guidelines, including patient assessment, counseling, consenting, signing of *Patient Agreement Forms*, dispensing, and follow-up. Healthcare providers under the supervision of the Certified Prescriber, who are able to issue prescriptions, may authorize the dispensing of mifepristone from the healthcare organization under the Certified Prescriber's supervision so long as all the Mifepristone REMS guidelines are followed. ***However, a healthcare provider may not submit a prescription to a Certified Pharmacy unless they have signed a Prescriber Agreement Form and submitted it to the Certified Pharmacy.*** As further provided below, every healthcare provider who submits a prescription to a Certified Pharmacy must submit a signed[2] *Prescriber Agreement Form* to the Certified Pharmacy prior to or concurrent with the submission of a first mifepristone prescription. Subsequent prescriptions from that prescriber can be filled by the pharmacy after it verifies it has previously received their signed *Prescriber Agreement Form.*

The Certified Prescriber must ensure that prior to dispensing, the *Patient Agreement Form* is reviewed with the patient by the Certified Prescriber or by a supervised healthcare provider and the risks of the mifepristone treatment regimen are fully explained and any questions the patient may have are answered. The patient must also sign the *Patient Agreement Form.* The patient acknowledgment of the *Patient Agreement Form* is to be documented in the patient's medical record by obtaining the patient and provider signature on the *Patient Agreement Form* and placing a copy of the completed form in the patient's medical record. In unusual situations, and as with other medical consent procedures, where a patient is not able to sign the Patient Agreement Form (e.g., physical disability) the healthcare provider must document that the patient's agreement has been effectively and properly obtained (e.g., recorded or witnessed verbal agreement).

The patient must be provided a copy of the *Medication Guide* and the *Patient Agreement Form* (a signed copy must be included with the patient's medical record).

---

[2] In all cases, the use of "signed" in the REMS means hand or electronically signed documents.

5

As a condition of certification, the *Prescriber Agreement Form* also requires that the certified prescriber ensure any patient deaths are reported to the appropriate Sponsor, using a non-identifiable reference and the NDC and lot number from the package of mifepristone that was dispensed to the patient. This reporting obligation includes any deaths reported to the Certified Prescriber by the Certified Pharmacy that dispensed mifepristone on the prescription they submitted. The Sponsors are separately obligated by the REMS to report such information to FDA.

For all prescriptions submitted to a Certified Pharmacy, the prescriber must provide a copy of a *Prescriber Agreement Form* that they have signed or already have one on file at the Certified Pharmacy. This can be submitted by methods acceptable by the pharmacy but which will include email or fax submission. The certified pharmacy <u>must</u> receive the prescriber's signed *Prescriber Agreement Form* before it can dispense mifepristone based on their submitted prescription (the pharmacy can keep it on file for future prescriptions). The pharmacy is required to dispense mifepristone for delivery to the patient within four calendar days of receiving the prescription. When delivery within four days will not be possible, the Pharmacy is required to confirm that the prescriber deems dispensing to still be appropriate and document the prescriber's decision.

If mifepristone will be ***dispensed*** from a healthcare setting by the certified prescriber or under their supervision, the distributor must receive a signed copy of the certified prescriber's *Prescriber Agreement Form* before any mifepristone can be shipped to the locations specified for receiving mifepristone. Instructions for submitting the signed *Prescriber Agreement Form* are provided on the form. Annually, certified prescribers will be contacted by the Sponsor or its distributor to verify their receiving locations.

Each Sponsor must ensure that healthcare providers who prescribe their mifepristone are certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements. They will communicate prescriber decertification as provided later in this document. Sponsors must also ensure that healthcare providers can complete the certification process by email[3] or fax to an authorized distributor and/or certified pharmacy. They must provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified. They must ensure annually with each certified prescriber that the locations for receiving mifepristone are up to date.

    2.   Pharmacies that dispense mifepristone must be specially certified.

Mifepristone may be dispensed from Certified Pharmacies upon prescriptions submitted by a Certified Prescriber.[4] To become a Certified Pharmacy the pharmacy must submit a Sponsor's *Pharmacy Agreement Form* signed by the pharmacy's authorized representative, who is

---

[3] In this REMS "email" includes secure electronic transmissions, such as submission portals.

[4] As noted above dispensing from healthcare settings, such as medical offices, clinics and hospitals, is considered as dispensing under the supervision of a certified healthcare provider. Those health care settings are not required to become "certified pharmacies" to receive and dispense mifepristone on the orders of a certified prescriber or supervised healthcare provider.

6

authorized to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy and its locations. By signing the *Pharmacy Agreement Form*, the authorized representative is agreeing to all the requirements spelled out in the *Pharmacy Agreement Form* including those that address privacy and confidentiality. To become a Certified Pharmacy, the pharmacy must be able to ship mifepristone using a shipping service that provides tracking information to assure that the mifepristone has been delivered to the address provided for the patient.

The authorized representative is responsible for reviewing the mifepristone prescribing information, completing and submitting the Pharmacy Agreement Form and oversees implementation and compliance with the Mifepristone REMS Program, including ensuring that each location of their pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed:

a) Verify that the prescriber is certified by confirming a completed Prescriber Agreement Form was received with the prescription or is on file from that prescriber. If a prescriber does not have a signed Prescriber Agreement Form on file, the Certified Pharmacy must promptly communicate with the prescriber that they must provide a signed form before any mifepristone can be dispensed. It is not required that the *Prescriber Agreement Form* be the form provided by the manufacturer of the mifepristone that the Certified Pharmacy dispenses.

b) Dispense mifepristone such that it will be delivered to the patient within four calendar days of the date the pharmacy receives the prescription, except as provided in c) below. This means that the delivery method used is expected to complete patient delivery on or before the fourth day from receiving the prescription (e.g., two-day or next day shipping).

c) Confirm with the prescriber that dispensing mifepristone for patients who will not receive the drug within 4 calendar days of the date the pharmacy receives the prescription is appropriate and document that confirmation. This is required when at time of dispensing delivery within the 4 day period would not be possible.

d) Record the NDC and lot number from each package of mifepristone dispensed in the patient's record.

e) Track and verify receipt of each shipment of mifepristone. This means that the shipper has provided the pharmacy with notification that the mifepristone was delivered to the indicated address.

f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone. The Pharmacy must also notify the manufacturer of the dispensed mifepristone that it submitted a report of death to the prescriber and the name and contact information for the prescriber, including the NDC and lot number of the dispensed product.

7

h)   Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of that pharmacy.  Transfers customary in pharmacy operations, such as transfer to the distributor or a processor for stock returns or destruction is also acceptable.  Stock ownership arising from the sale or closing of the pharmacy or a pharmacy location are acceptable so long as any changes to the authorized representative and Pharmacy Agreement are updated if applicable and prior written approvals of the Sponsor that manufactured the mifepristone to be transferred are obtained and any necessary new certifications are completed. As stated in the Pharmacy Agreement, "Any new authorized representative must complete and submit the *Pharmacy Agreement Form*." In addition, a change in authorized representative and pharmacy name would also be identified during the annual verification/audit/assessment.

i)   Maintain records of Prescriber Agreement Forms, of dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.

j)   Maintain the identity of the patient and provider as confidential, including limiting access to patient and provider identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

k)   Train all relevant staff on the Mifepristone REMS Program requirements.

l)   Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Threats of violence and intimidation directed to those providing or receiving abortion care are well-documented and continue to rise.  FDA's rationale for requiring modification to the REMS was to minimize  the burden on  the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The currently approved REMS requires sponsors and distributors to maintain secure and confidential records (See approved REMS, Implementation System (II.B. 1. a. ii and b).  Accordingly, in order to avoid unduly burdening patient access, a change to the REMS to allow certification of pharmacies must maintain the protection of patient and prescriber identities, to ensure that neither patients nor certified prescribers are deterred from using the pharmacy dispensing option out of concern that their identity will not be protected.  For this reason, the modified REMS retains the obligation on distributors to maintain secure and confidential records and, in order to avoid unduly burdening patient access, requires that certified pharmacies put policies and procedures in place to ensure that each pharmacy location will maintain the confidentiality of the identity of mifepristone patients and certified prescribers and will not disclose that information except as necessary to dispense under the REMS or for payment or insurance purposes.

Mifepristone Sponsors also must ensure that their pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements. They are to communicate decertification to their distributors as further described in the decertification section of this document. Sponsors must ensure that pharmacies can complete the certification process by email or fax to an

8

authorized distributor.  They also must ensure annual verification that the authorized representative's name and contact information corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.  Sponsors will ensure that a Medication Guide is included in each unit of mifepristone to ensure that patients receive FDA-approved labeling information that is necessary to the safe use of the drug product.

3. Mifepristone must be  dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the Prescriber Agreement Form.

As discussed above under Certified Prescriber obligations the patient must sign a Patient Agreement Form indicating that the patient has received, read and been provided a copy of the *Patient Agreement Form* and has received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.  By reviewing the *Patient Agreement Form*, the patient is made aware of the risks of heavy bleeding and infection and instructed to contact their provider if they experience certain symptoms that could require emergency care and to follow up with their provider.

B.  Implementation System

1. Each Sponsor is responsible for ensuring that mifepristone is distributed to the mifepristone receiving locations (i) for the healthcare settings where it will be dispensed by or under the supervision of the certified prescribers, and (ii) for the certified pharmacies for dispensing under a Certified Prescriber's prescription.  Shipping is carried out in accordance with the REMS obligations and the terms of the contractual relationships between the purchasing entity and the Sponsor and/or their distributor.

2. Each Sponsor must ensure that its mifepristone distributors comply with the program requirements for distributors, including completion of the prescriber and pharmacy certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form* by notifying the providing prescriber or pharmacy that it has been certified.

3. Sponsors will ensure that they or their distributor provide(s) the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

4. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that Mifepristone REMS requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.  Each Sponsor must monitor distribution data to ensure compliance with the REMS and take steps to address any noncompliance that is identified.

5. Each Sponsor is responsible for ensuring that its distributor(s) maintain(s) secure and confidential distribution records of all mifepristone shipments, in accordance with the Mifepristone REMS requirements.  Each Sponsor is also responsible for ensuring that its

9

distributor does not ship mifepristone to pharmacies or healthcare providers who become de-certified from the Mifepristone REMS Program.

6.     Following approval of the REMS Modification, each Sponsor must audit any new distributors within 90 calendar days of shipping mifepristone to that new distributor, and annually thereafter audit each of its authorized distributors to ensure that all processes, procedures and training are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

7.     Mifepristone Sponsors must audit their Certified Pharmacies to ensure compliance with the REMS Program.  Initial audits will be conducted within 180 days after the pharmacy places its first order of mifepristone and annually thereafter for Certified Pharmacies that have ordered mifepristone in the previous 12 months.

Each Sponsor will submit its audit plan and non-compliance plan within 60 days of the REMS Modification approval.  The audit plan will address the method and processes for the audit of certified pharmacies and the incorporation of audit findings into the REMS assessments.

8.     Based on monitoring and assessment of the REMS, each Sponsor must take reasonable steps to improve implementation of, and compliance with, the REMS.

9.     The Sponsors must report to FDA any death associated with mifepristone, whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the Sponsor's initial receipt of the information.  This requirement does not affect the Sponsor's other reporting and follow-up requirements under FDA regulations.

10.     Upon approval of the REMS modification, each sponsor will notify all of its certified prescribers that the REMS has been modified, provide an overview of the key changes and a link to the modified REMS, including all REMS materials.  The notification to certified prescribers will inform them that they will be subject to the revised *Prescriber Agreement* Form.

11.     Upon approval of the REMS modification, each sponsor will ensure prescribers previously certified in the Mifepristone REMS Program complete the new Prescriber Agreement Form:

    a.   Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

    b.   Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

C.   Enrollment of Certified Pharmacies.

The Sponsors will enroll pharmacies as certified pharmacies as provided below.

**Certification of pharmacies in use _prior_ to approval of the REMS modification.**
Within 120 days of the approval of the REMS Modification, the Sponsors will ensure that the pharmacies in use **_prior_** to the approval of the REMS modification (i.e., during the

10

PHE enforcement discretion period) and that will continue dispensing mifepristone have executed the approved *Pharmacy Agreement Form*, and that such pharmacies have confirmed that they have implemented the procedures and training necessary for pharmacy dispensing as set forth under the Mifepristone REMS Program.

**Certification of new pharmacies.** Following approval of the REMS Modification, each Sponsor also may begin accepting *Pharmacy Agreement Forms* from additional pharmacies. Pharmacies will not be certified unless they agree to fully comply with all requirements under the Mifepristone REMS Program and execute the *Pharmacy Agreement Form*.

D. <u>Communication of Mifepristone REMS Program Modifications to Stakeholders</u>

Sponsors will implement the following activities to communicate to stakeholders the changes to the Mifepristone REMS within 120 days of the approval of the REMS modification.

1. The Sponsors will transmit information regarding the modified REMS to their certified distributors and certified prescribers that have purchased mifepristone from their distributor within the 12 months prior to the REMS Modification approval date, including a link to the modified Mifepristone REMS Program and REMS materials and provide such information on their product websites.

2. The Sponsors will provide similar information to healthcare and other stakeholder organizations for those organizations to prepare and disseminate a communication to their members and stakeholders, including at least the following organizations:

- (b)(4)/TS-CI
-
-
-
-
-

E. <u>Identification of Certified Pharmacies</u>

Each Sponsor will ask each pharmacy seeking to become a Certified Pharmacy whether it is willing to be publicly identified by the Sponsor on the Sponsor's website as a certified pharmacy under the Mifepristone REMS Program. Because of the substantial potential safety and other risks to pharmacies and their personnel and operations from being identified as a mifepristone dispensing pharmacy, agreeing to public identification on the Sponsor's website is not required as a condition of becoming a Certified Pharmacy.

For the Certified Pharmacies agreeing to public identification on the Sponsor's website, each Sponsor will maintain on their product website a means for HCPs and patients to identify and contact the Sponsor's certified pharmacies. For Certified Pharmacies not agreeing to public

11

identification on the Sponsor's website, the Sponsors expect that a Certified Pharmacy will communicate with the Certified Prescribers it chooses to work with.  If a pharmacy is decertified, or otherwise ceases its willingness to dispense mifepristone, Sponsors shall promptly remove it from their list of Certified Pharmacies.

      F.   Timetable for Submission of Assessments

The Sponsors will submit a Joint Mifepristone SSS REMS Assessment Report to the FDA by ____ __, 202_, and annually thereafter. Sponsors will implement appropriate procedures to ensure they carry out the preparation and submission of the Joint Assessment Report as provided below and as agreed to in the Memorandum of Understanding between the Sponsors. The assessment reporting interval covered by each assessment will conclude no earlier than 90 days before the submission date for that assessment report.

## IV.  INFORMATION NEEDED FOR ASSESSMENT

The Joint Mifepristone SSS REMS Assessment Report will include available data for each metric for the current and cumulative reporting periods (if applicable) for the NDA and ANDA(s) unless otherwise noted in the REMS Assessment Plan.

Each Sponsor may submit the below data separately to FDA and are not required to provide this data to each other.

Based on the information reported, the assessment will also include a joint assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed.  To the extent that any summary and analysis of any program deviations or goals assessment relate to an individual Sponsor's authorized distributor, that summary and assessment also will be separately provided by the individual Sponsor at the same time as the submission of the Joint Mifepristone SSS REMS Assessment Report.

The REMS Assessment Plan must include but is not limited to the following items.

**Program Implementation and Operations**
1. REMS Certification Statistics
    a. Prescribers
        i.   Number of certified prescribers who have certified with the Sponsor's distributor(s) and number who have submitted *Prescriber Agreement Forms* to Certified Pharmacies
        ii.  Number and percentage of newly certified prescribers
        iii. Number and percentage of active certified prescribers (i.e., who ordered mifepristone or submitted a prescription during the reporting period)

    b. Pharmacies
        i.   Number of certified pharmacies
        ii.  Number and percentage of newly certified pharmacies

2023 SUPP 000909

      iii.   Number and percentage of active certified pharmacies (i.e., that dispensed mifepristone during the reporting period)

  c.  Wholesalers/Distributors

      i.   Number of authorized wholesalers/distributors

      ii.   Number and percentage of newly authorized wholesalers/distributors

      iii.   Number and percentage of active authorized wholesalers/distributors (i.e. that shipped mifepristone during the reporting period)

2. Utilization Data

  a.  Total number of tablets shipped by wholesalers/distributors, stratified by Certified Prescriber or Certified Pharmacy location

  b.  Number of prescriptions dispensed from pharmacies

3. REMS Compliance Data

  a.  Audits: Summary of audit activities for each stakeholder (i.e., certified pharmacies and wholesalers/distributors) including but not limited to:

      i.   A copy of the final audit plan for each stakeholder type (provide for the current reporting period)

      ii.   The number of audits expected, and the number of audits performed

      iii.   The number and type of deficiencies noted

      iv.   For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required, if any, to address the deficiencies, including the status (e.g., completed, not completed, in progress) (provide for the current reporting period)

      v.   For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken (provide for the current reporting period)

      vi.   A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements (provide for the current reporting period)

  b.  A summary report of non-compliance, associated corrective action plans (CAPAs), and the status of CAPAs including but not limited to:

      i.   A copy of the final non-compliance plans for Pharmacies and Distributors (provide for the current reporting period)

      ii.   For each instance of noncompliance below (iii-v), report the following information (provide for the current reporting period):

         1.   A unique, anonymized ID for the stakeholder(s) associated with the non-compliance event to enable tracking over time

         2.   The source of the non-compliance data (e.g., self-reported, audit, other)

         3.   A root cause analysis of the non-compliance

         4.   Actions to prevent future occurrences and outcomes of such actions

      iii.   Prescriber compliance

         1.   Number and percentage of certified prescribers who became decertified as a result of non- compliance

13

- Provide a summary of reasons for decertification (provide for the current reporting period)

2. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

iv. Pharmacy compliance

1. Number and percentage of prescriptions dispensed that were written by prescriber(s) who did not submit a Prescriber Agreement to the dispensing Certified Pharmacy

2. Number and percentage of mifepristone tablets dispensed by non-certified pharmacies

3. Number and percentage of pharmacies that became decertified as a result of non-compliance

- Provide a summary of reasons for decertification (provide for the current reporting period)

4. An assessment of prescription delivery timelines, including percentage delivered more than four days after receipt of the prescription, duration and causes for delay. A proposal for this assessment will be submitted within 60 days of the approval of the REMS Modification.

5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

v. Wholesaler/distributor compliance

1. Number of healthcare providers who successfully ordered mifepristone who were not certified

2. Number of non-certified pharmacies that successfully ordered mifepristone

3. Number of shipments sent to non-certified prescriber receiving locations

4. Number of shipments sent to non-certified pharmacy receiving locations

5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

**Overall Assessment of REMS Effectiveness**

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

Mifepristone Tablets, 200 mg[1]

**SINGLE SHARED SYSTEM RISK EVALUATION AND MITIGATION STRATEGY (REMS) SUPPORTING DOCUMENT**

## I.    BACKGROUND

The New Drug Application (NDA) for Mifeprex Tablets, 200 mg submitted by Danco Laboratories, LLC was approved in September 2000 for the medical termination of intrauterine pregnancy through 49 days' gestation with a Restricted Distribution system under 21 C.F.R. § 314.520 (restrictions to assure safe use). Mifeprex was deemed to have in effect an approved Risk Evaluation and Mitigation System (REMS) under section 505-1 of the Federal Food, Drug, and Cosmetic Act (FDCA) with the passage of the Food and Drug Administration Amendments Act of 2007 (FDAAA). The Mifeprex REMS was approved in June 2011.  A supplemental new drug application was approved on March 29, 2016, which, among other things, modified the gestational age up to which Mifeprex has been shown to be safe and effective, and the dose of Mifeprex, and the dosing regimen for taking Mifeprex and misoprostol. Other aspects of the labeling and REMS were also modified, with REMS changes including removal of the Medication Guide as an element of the REMS and modifications to the REMS Document, *Prescriber Agreement Form*, and *Patient Agreement Form*.  The Abbreviated New Drug Application (ANDA) for Mifepristone Tablets, 200 mg submitted by GenBioPro, Inc. was approved on April 11, 2019, along with a Single Shared System REMS ("SSS REMS") called the Mifepristone REMS Program.  On May 14, 2021 FDA approved a modification to the REMS that revised the *Patient Agreement Form* to include gender-neutral language.

On December 16, 2021 FDA advised that, in accordance with section 505-1(g)(4)(B) of the FDCA, they have determined that the approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. This determination was based on a review of published literature, safety information collected during the COVID-19 Public Health Emergency, FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Sponsors, and plaintiffs in ongoing litigation with FDA.

The December 16, 2021 letter, directed that the REMS be modified by:

1) Removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices and hospitals (i.e., the "in-person dispensing requirement"), and

2) Adding a requirement of certification of pharmacies that dispense the drug.

---

[1] This document constitutes trade secret and confidential information exempt from public disclosure under 21 C.F.R. § 20.61.  Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, the Sponsors request immediate notification and an opportunity for consultation in accordance with 21 C.F.R. § 20.45.

1

The changes made to the SSS REMS in response to the December 16th letter are those necessary to ensure the benefits of the drug outweigh the risks and minimize the burden on the healthcare delivery system. To that end, the Sponsors designed the REMS to be compatible with established distribution, procurement, and dispensing systems for drugs and to avoid unduly burdensome requirements that may limit patient access to this drug (especially to patients who have difficulty accessing health care).

This SSS REMS Supporting Document provides the supporting details of the shared elements in the Mifepristone Tablets, 200 mg SSS REMS.

## II.  GOALS

The goal of the mifepristone SSS REMS is to mitigate the risk of serious complications associated with mifepristone by:

**A.  Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.**

In order to prescribe mifepristone under the Mifepristone REMS Program, a healthcare provider must be certified.

Prescriber Certification requires reviewing the mifepristone Prescribing Information and signing a *Prescriber Agreement Form.* By signing, the healthcare provider agrees that they (1) meet identified qualifications for the safe use of mifepristone, and (2) will ensure specified guidelines for using mifepristone are followed, which include steps to ensure that patients understand the potential risks associated with the use of mifepristone, appropriate records are maintained, and deaths are reported to sponsors.

Certification ensures that (1) patients are informed of the potential risks associated with the use of mifepristone, and therefore can make informed decisions about using the product, (2) certified prescribers have the necessary knowledge, skills, and ability to assure patient access to medical facilities to mitigate those risks, and (3) any deaths are reported to the Sponsors.

**B.  Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.**

Mifepristone distribution is restricted to ensure that it is only dispensed by or under the supervision of a certified prescriber or by certified pharmacies under prescriptions issued by certified prescribers.  Certain certified prescribers supervise dispensing to patients at locations that also have a pharmacy or pharmacy license in order to receive or dispense medications (e.g., hospitals, clinics, medical offices). For clarity, the REMS does not require certification of pharmacies that are affiliated with such locations (e.g., locations where a certified prescriber or healthcare providers operating under the certified prescriber's supervision dispense mifepristone to patients).  Rather, the REMS requires certification of independent/unaffiliated pharmacies accepting prescriptions from certified prescribers. This is reflected by the statement in the

2

Pharmacy Agreement, "Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification."

Distribution to healthcare settings and pharmacies is implemented with the receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form* by the distributors. Sponsors enter into contractual relationships with the distributors. The REMS also imposes requirements on distributors and any contractual relationships between the Sponsors and the distributors must be consistent with the REMS requirements. These requirements mitigate risk by limiting the facilities to which mifepristone is distributed and from which it is dispensed. Dispensing of mifepristone to patients may be carried out in-person, by mail, or courier permitted for prescription medications as determined by the dispenser in their judgement.

Prescribers submitting a mifepristone prescription to a certified pharmacy must submit a copy of their signed *Prescriber Agreement Form*, before the pharmacy may dispense mifepristone. Prescribing healthcare providers will submit a copy of their signed *Prescriber Agreement Form* to the pharmacy by electronic or fax transmission.  If a prescriber does not provide the required copy of their signed *Prescriber Agreement Form*, the pharmacy shall direct the prescriber to obtain and submit a completed and signed copy before the pharmacy can accept the prescription and dispense mifepristone on their prescription.

### C. Informing patients about the risk of serious complications associated with mifepristone.

Patients are given detailed information about the risks of mifepristone before they decide whether to take the drug.  The SSS REMS ensures that patients are informed of the risks by receiving a copy of the *Patient Agreement Form* and reviewing it with the provider.  The patient acknowledgment of the *Patient Agreement Form* is to be documented in the patient's medical record by obtaining the patient's and provider's signature on the *Patient Agreement Form*.

## III.   DISCUSSION OF REMS ELEMENTS

### A.  Elements to Assure Safe Use

The REMS includes the following Elements to Assure Safe Use:

1.   Healthcare providers who prescribe mifepristone must be specially certified.

By signing the *Prescriber Agreement Form*, healthcare providers agree that they have the below qualifications to prescribe mifepristone and to manage the risk of complications that may occur following use of the drug.

- Ability to assess the duration of pregnancy accurately

- Ability to diagnose ectopic pregnancies

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others,

3

and ability to assure patients access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone.

As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

- Ensure that the Patient Agreement Form is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.
- Ensure that the healthcare provider and patient sign the Patient Agreement Form.
- Ensure that the patient is provided with a copy of the Patient Agreement Form and Medication Guide.
- Ensure that the signed Patient Agreement Form is placed in the patient's medical record.
- Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.
- If mifepristone will be dispensed by a certified pharmacy:
    - Provide the certified pharmacy a signed Prescriber Agreement Form.
    - Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.
    - Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.
- The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:
    - Provide an authorized distributor with a signed Prescriber Agreement Form.
    - Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.
    - Ensure that healthcare providers under their supervision follow guidelines above.

As noted in the Prescribing Information, the assessment of pregnancy duration and diagnosis of ectopic pregnancies as described in the Full Prescribing Information.

4

The Certified Prescriber's obligations to assure safe use include ensuring that they have the qualifications and follow the guidelines for the use of mifepristone as provided under the REMS. The qualifications include that they have the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.  If the patient is unable to reach the provider, the plans for providing care through others and assurance of access to such facilities include ensuring that the patient knows whom to call and what to do, including going to an emergency room if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever and other symptoms and instructions raised as described in the Prescribing Information and Medication Guide.

Certified Prescribers may also supervise other healthcare providers.  Consistent with the *Prescriber Agreement Form*, the Certified Prescriber is responsible for overseeing implementation and compliance with the Mifepristone REMS Program and for ensuring that the healthcare providers under their supervision follow the REMS guidelines, including patient assessment, counseling, consenting, signing of *Patient Agreement Forms*, dispensing, and follow-up.  Healthcare providers under the supervision of the Certified Prescriber, who are able to issue prescriptions, may authorize the dispensing of mifepristone from the healthcare organization under the Certified Prescriber's supervision so long as all the Mifepristone REMS guidelines are followed.  ***However, a healthcare provider may not submit a prescription to a Certified Pharmacy unless they have signed a Prescriber Agreement Form and submitted it to the Certified Pharmacy***.  As further provided below, every healthcare provider who submits a prescription to a Certified Pharmacy must submit a signed[2] *Prescriber Agreement Form* to the Certified Pharmacy prior to or concurrent with the submission of a first mifepristone prescription.  Subsequent prescriptions from that prescriber can be filled by the pharmacy after it verifies it has previously received their signed *Prescriber Agreement Form.*

The Certified Prescriber must ensure that prior to dispensing, the *Patient Agreement Form* is reviewed with the patient by the Certified Prescriber or by a supervised healthcare provider and the risks of the mifepristone treatment regimen are fully explained and any questions the patient may have are answered.  The patient must also sign the *Patient Agreement Form.*  The patient acknowledgment of the *Patient Agreement Form* is to be documented in the patient's medical record by obtaining the patient and provider signature on the *Patient Agreement Form* and placing a copy of the completed form in the patient's medical record. In unusual situations, and as with other medical consent procedures, where a patient is not able to sign the Patient Agreement Form (e.g., physical disability) the healthcare provider must document that the patient's agreement has been effectively and properly obtained (e.g., recorded or witnessed verbal agreement).

The patient must be provided a copy of the *Medication Guide* and the *Patient Agreement Form* (a signed copy must be included with the patient's medical record).

---

[2] In all cases, the use of "signed" in the REMS means hand or electronically signed documents.

5

As a condition of certification, the *Prescriber Agreement Form* also requires that the certified prescriber ensure any patient deaths are reported to the appropriate Sponsor, using a non-identifiable reference and the NDC and lot number from the package of mifepristone that was dispensed to the patient. This reporting obligation includes any deaths reported to the Certified Prescriber by the Certified Pharmacy that dispensed mifepristone on the prescription they submitted. The Sponsors are separately obligated by the REMS to report such information to FDA.

For all prescriptions submitted to a Certified Pharmacy, the prescriber must provide a copy of a *Prescriber Agreement Form* that they have signed or already have one on file at the Certified Pharmacy.  This can be submitted by methods acceptable by the pharmacy but which will include email or fax submission.  The certified pharmacy <u>must</u> receive the prescriber's signed *Prescriber Agreement Form* before it can dispense mifepristone based on their submitted prescription (the pharmacy can keep it on file for future prescriptions).  The pharmacy is required to dispense mifepristone for delivery to the patient within four calendar days of receiving the prescription.  When delivery within four days will not be possible, the Pharmacy is required to confirm that the prescriber deems dispensing to still be appropriate and document the prescriber's decision.

If mifepristone will be ***<u>dispensed</u>*** from a healthcare setting by the certified prescriber or under their supervision, the distributor must receive a signed copy of the certified prescriber's *Prescriber Agreement Form* before any mifepristone can be shipped to the locations specified for receiving mifepristone.  Instructions for submitting the signed *Prescriber Agreement Form* are provided on the form.  Annually, certified prescribers will be contacted by the Sponsor or its distributor to verify their receiving locations.

Each Sponsor must ensure that healthcare providers who prescribe their mifepristone are certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.  They will communicate prescriber decertification as provided later in this document.  Sponsors must also ensure that healthcare providers can complete the certification process by email[3] or fax to an authorized distributor and/or certified pharmacy.  They must provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.  They must ensure annually with each certified prescriber that the locations for receiving mifepristone are up to date.

> 2. Pharmacies that dispense mifepristone must be specially certified.

Mifepristone may be dispensed from Certified Pharmacies upon prescriptions submitted by a Certified Prescriber.[4]  To become a Certified Pharmacy the pharmacy must submit a Sponsor's *Pharmacy Agreement Form* signed by the pharmacy's authorized representative, who is

---

[3] In this REMS "email" includes secure electronic transmissions, such as submission portals.

[4] As noted above dispensing from healthcare settings, such as medical offices, clinics and hospitals, is considered as dispensing under the supervision of a certified healthcare provider. Those health care settings are not required to become "certified pharmacies" to receive and dispense mifepristone on the orders of a certified prescriber or supervised healthcare provider.

6

authorized to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy and its locations. By signing the *Pharmacy Agreement Form*, the authorized representative is agreeing to all the requirements spelled out in the *Pharmacy Agreement Form* including those that address privacy and confidentiality. To become a Certified Pharmacy, the pharmacy must be able to ship mifepristone using a shipping service that provides tracking information to assure that the mifepristone has been delivered to the address provided for the patient.

The authorized representative is responsible for reviewing the mifepristone prescribing information, completing and submitting the Pharmacy Agreement Form and oversees implementation and compliance with the Mifepristone REMS Program, including ensuring that each location of their pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed:

a) Verify that the prescriber is certified by confirming a completed Prescriber Agreement Form was received with the prescription or is on file from that prescriber. If a prescriber does not have a signed Prescriber Agreement Form on file, the Certified Pharmacy must promptly communicate with the prescriber that they must provide a signed form before any mifepristone can be dispensed. It is not required that the *Prescriber Agreement Form* be the form provided by the manufacturer of the mifepristone that the Certified Pharmacy dispenses.

b) Dispense mifepristone such that it will be delivered to the patient within four calendar days of the date the pharmacy receives the prescription, except as provided in c) below. This means that the delivery method used is expected to complete patient delivery on or before the fourth day from receiving the prescription (e.g., two-day or next day shipping).

c) Confirm with the prescriber that dispensing mifepristone for patients who will not receive the drug within 4 calendar days of the date the pharmacy receives the prescription is appropriate and document that confirmation. This is required when at time of dispensing delivery within the 4 day period would not be possible.

d) Record the NDC and lot number from each package of mifepristone dispensed in the patient's record.

e) Track and verify receipt of each shipment of mifepristone. This means that the shipper has provided the pharmacy with notification that the mifepristone was delivered to the indicated address.

f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone. The Pharmacy must also notify the manufacturer of the dispensed mifepristone that it submitted a report of death to the prescriber and the name and contact information for the prescriber, including the NDC and lot number of the dispensed product.

2023 SUPP 000918

h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of that pharmacy. Transfers customary in pharmacy operations, such as transfer to the distributor or a processor for stock returns or destruction is also acceptable. Stock ownership arising from the sale or closing of the pharmacy or a pharmacy location are acceptable so long as any changes to the authorized representative and Pharmacy Agreement are updated if applicable and prior written approvals of the Sponsor that manufactured the mifepristone to be transferred are obtained and any necessary new certifications are completed. As stated in the Pharmacy Agreement, "Any new authorized representative must complete and submit the *Pharmacy Agreement Form*." In addition, a change in authorized representative and pharmacy name would also be identified during the annual verification/audit/assessment.

i) Maintain records of Prescriber Agreement Forms, of dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.

j) Maintain the identity of the patient and provider as confidential, including limiting access to patient and provider identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

k) Train all relevant staff on the Mifepristone REMS Program requirements.

l) Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Threats of violence and intimidation directed to those providing or receiving abortion care are well-documented and continue to rise. FDA's rationale for requiring modification to the REMS was to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The currently approved REMS requires sponsors and distributors to maintain secure and confidential records (See approved REMS, Implementation System (II.B. 1. a. ii and b). Accordingly, in order to avoid unduly burdening patient access, a change to the REMS to allow certification of pharmacies must maintain the protection of patient and prescriber identities, to ensure that neither patients nor certified prescribers are deterred from using the pharmacy dispensing option out of concern that their identity will not be protected. For this reason, the modified REMS retains the obligation on distributors to maintain secure and confidential records and, in order to avoid unduly burdening patient access, requires that certified pharmacies put policies and procedures in place to ensure that each pharmacy location will maintain the confidentiality of the identity of mifepristone patients and certified prescribers and will not disclose that information except as necessary to dispense under the REMS or for payment or insurance purposes.

Mifepristone Sponsors also must ensure that their pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements. They are to communicate decertification to their distributors as further described in the decertification section of this document. Sponsors must ensure that pharmacies can complete the certification process by email or fax to an

8

authorized distributor.  They also must ensure annual verification that the authorized representative's name and contact information corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.  Sponsors will ensure that a Medication Guide is included in each unit of mifepristone to ensure that patients receive FDA-approved labeling information that is necessary to the safe use of the drug product.

3.  Mifepristone must be  dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the Prescriber Agreement Form.

As discussed above under Certified Prescriber obligations the patient must sign a Patient Agreement Form indicating that the patient has received, read and been provided a copy of the *Patient Agreement Form* and has received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.  By reviewing the *Patient Agreement Form*, the patient is made aware of the risks of heavy bleeding and infection and instructed to contact their provider if they experience certain symptoms that could require emergency care and to follow up with their provider.

B.  Implementation System

1.  Each Sponsor is responsible for ensuring that mifepristone is distributed to the mifepristone receiving locations (i) for the healthcare settings where it will be dispensed by or under the supervision of the certified prescribers, and (ii) for the certified pharmacies for dispensing under a Certified Prescriber's prescription.  Shipping is carried out in accordance with the REMS obligations and the terms of the contractual relationships between the purchasing entity and the Sponsor and/or their distributor.

2.  Each Sponsor must ensure that its mifepristone distributors comply with the program requirements for distributors, including completion of the prescriber and pharmacy certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form* by notifying the providing prescriber or pharmacy that it has been certified.

3.  Sponsors will ensure that they or their distributor provide(s) the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

4.  Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that Mifepristone REMS requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.  Each Sponsor must monitor distribution data to ensure compliance with the REMS and take steps to address any noncompliance that is identified.

5.  Each Sponsor is responsible for ensuring that its distributor(s) maintain(s) secure and confidential distribution records of all mifepristone shipments, in accordance with the Mifepristone REMS requirements.  Each Sponsor is also responsible for ensuring that its

9

distributor does not ship mifepristone to pharmacies or healthcare providers who become de-certified from the Mifepristone REMS Program.

6.    Following approval of the REMS Modification, each Sponsor must audit any new distributors within 90 calendar days of shipping mifepristone to that new distributor, and annually thereafter audit each of its authorized distributors to ensure that all processes, procedures and training are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

7.    Mifepristone Sponsors must audit their Certified Pharmacies to ensure compliance with the REMS Program.  Initial audits will be conducted within 180 days after the pharmacy places its first order of mifepristone and annually thereafter for Certified Pharmacies that have ordered mifepristone in the previous 12 months.

Each Sponsor will submit its audit plan and non-compliance plan within 60 days of the REMS Modification approval.  The audit plan will address the method and processes for the audit of certified pharmacies and the incorporation of audit findings into the REMS assessments.

8.    Based on monitoring and assessment of the REMS, each Sponsor must take reasonable steps to improve implementation of, and compliance with, the REMS.

9.    The Sponsors must report to FDA any death associated with mifepristone, whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the Sponsor's initial receipt of the information.  This requirement does not affect the Sponsor's other reporting and follow-up requirements under FDA regulations.

10.    Upon approval of the REMS modification, each sponsor will notify all of its certified prescribers that the REMS has been modified, provide an overview of the key changes and a link to the modified REMS, including all REMS materials.  The notification to certified prescribers will inform them that they will be subject to the revised *Prescriber Agreement* Form.

11.    Upon approval of the REMS modification, each sponsor will ensure prescribers previously certified in the Mifepristone REMS Program complete the new Prescriber Agreement Form:

    a.    Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

    b.    Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

C.    Enrollment of Certified Pharmacies.

The Sponsors will enroll pharmacies as certified pharmacies as provided below.

**Certification of pharmacies in use *prior* to approval of the REMS modification.**
Within 120 days of the approval of the REMS Modification, the Sponsors will ensure that the pharmacies in use ***prior*** to the approval of the REMS modification (i.e., during the

10

PHE enforcement discretion period) and that will continue dispensing mifepristone have executed the approved *Pharmacy Agreement Form*, and that such pharmacies have confirmed that they have implemented the procedures and training necessary for pharmacy dispensing as set forth under the Mifepristone REMS Program.

**Certification of new pharmacies.** Following approval of the REMS Modification, each Sponsor also may begin accepting *Pharmacy Agreement Forms* from additional pharmacies. Pharmacies will not be certified unless they agree to fully comply with all requirements under the Mifepristone REMS Program and execute the *Pharmacy Agreement Form*.

D.   Communication of Mifepristone REMS Program Modifications to Stakeholders

Sponsors will implement the following activities to communicate to stakeholders the changes to the Mifepristone REMS within 120 days of the approval of the REMS modification.

1. The Sponsors will transmit information regarding the modified REMS to their certified distributors and certified prescribers that have purchased mifepristone from their distributor within the 12 months prior to the REMS Modification approval date, including a link to the modified Mifepristone REMS Program and REMS materials and provide such information on their product websites.

2. The Sponsors will provide similar information to healthcare and other stakeholder organizations for those organizations to prepare and disseminate a communication to their members and stakeholders, including at least the following organizations:

- (b)(4)/TS-CI
-
-
-
-
-

E.   Identification of Certified Pharmacies

Each Sponsor will ask each pharmacy seeking to become a Certified Pharmacy whether it is willing to be publicly identified by the Sponsor on the Sponsor's website as a certified pharmacy under the Mifepristone REMS Program. Because of the substantial potential safety and other risks to pharmacies and their personnel and operations from being identified as a mifepristone dispensing pharmacy, agreeing to public identification on the Sponsor's website is not required as a condition of becoming a Certified Pharmacy.

For the Certified Pharmacies agreeing to public identification on the Sponsor's website, each Sponsor will maintain on their product website a means for HCPs and patients to identify and contact the Sponsor's certified pharmacies. For Certified Pharmacies not agreeing to public

11

identification on the Sponsor's website, the Sponsors expect that a Certified Pharmacy will communicate with the Certified Prescribers it chooses to work with.  If a pharmacy is decertified, or otherwise ceases its willingness to dispense mifepristone, Sponsors shall promptly remove it from their list of Certified Pharmacies.

     F.   Timetable for Submission of Assessments

The Sponsors will submit a Joint Mifepristone SSS REMS Assessment Report to the FDA by ____ __, 202_, and annually thereafter. Sponsors will implement appropriate procedures to ensure they carry out the preparation and submission of the Joint Assessment Report as provided below and as agreed to in the Memorandum of Understanding between the Sponsors. The assessment reporting interval covered by each assessment will conclude no earlier than 90 days before the submission date for that assessment report.

## IV.  INFORMATION NEEDED FOR ASSESSMENT

The Joint Mifepristone SSS REMS Assessment Report will include available data for each metric for the current and cumulative reporting periods (if applicable) for the NDA and ANDA(s) unless otherwise noted in the REMS Assessment Plan.

Each Sponsor may submit the below data separately to FDA and are not required to provide this data to each other.

Based on the information reported, the assessment will also include a joint assessment and analysis of whether the REMS is meeting its goals and whether modifications to the REMS are needed.  To the extent that any summary and analysis of any program deviations or goals assessment relate to an individual Sponsor's authorized distributor, that summary and assessment also will be separately provided by the individual Sponsor at the same time as the submission of the Joint Mifepristone SSS REMS Assessment Report.

The REMS Assessment Plan must include but is not limited to the following items.

**Program Implementation and Operations**

1. REMS Certification Statistics
   a. Prescribers
      i. Number of certified prescribers who have certified with the Sponsor's distributor(s) and number who have submitted *Prescriber Agreement Forms* to Certified Pharmacies
      ii. Number and percentage of newly certified prescribers
      iii. Number and percentage of active certified prescribers (i.e., who ordered mifepristone or submitted a prescription during the reporting period)

   b. Pharmacies
      i. Number of certified pharmacies
      ii. Number and percentage of newly certified pharmacies

12

    iii.   Number and percentage of active certified pharmacies (i.e., that dispensed mifepristone during the reporting period)

  c.  Wholesalers/Distributors

    i.   Number of authorized wholesalers/distributors

    ii.   Number and percentage of newly authorized wholesalers/distributors

    iii.   Number and percentage of active authorized wholesalers/distributors (i.e. that shipped mifepristone during the reporting period)

2. Utilization Data

  a.  Total number of tablets shipped by wholesalers/distributors, stratified by Certified Prescriber or Certified Pharmacy location

  b.  Number of prescriptions dispensed from pharmacies

3. REMS Compliance Data

  a.  Audits: Summary of audit activities for each stakeholder (i.e., certified pharmacies and wholesalers/distributors) including but not limited to:

    i.   A copy of the final audit plan for each stakeholder type (provide for the current reporting period)

    ii.   The number of audits expected, and the number of audits performed

    iii.   The number and type of deficiencies noted

    iv.   For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required, if any, to address the deficiencies, including the status (e.g., completed, not completed, in progress) (provide for the current reporting period)

    v.   For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken (provide for the current reporting period)

    vi.   A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements (provide for the current reporting period)

  b.  A summary report of non-compliance, associated corrective action plans (CAPAs), and the status of CAPAs including but not limited to:

    i.   A copy of the final non-compliance plans for Pharmacies and Distributors (provide for the current reporting period)

    ii.   For each instance of noncompliance below (iii-v), report the following information (provide for the current reporting period):

      1.   A unique, anonymized ID for the stakeholder(s) associated with the non-compliance event to enable tracking over time

      2.   The source of the non-compliance data (e.g., self-reported, audit, other)

      3.   A root cause analysis of the non-compliance

      4.   Actions to prevent future occurrences and outcomes of such actions

    iii.   Prescriber compliance

      1.   Number and percentage of certified prescribers who became decertified as a result of non- compliance

13

- Provide a summary of reasons for decertification (provide for the current reporting period)

2. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

iv. Pharmacy compliance

1. Number and percentage of prescriptions dispensed that were written by prescriber(s) who did not submit a Prescriber Agreement to the dispensing Certified Pharmacy

2. Number and percentage of mifepristone tablets dispensed by non-certified pharmacies

3. Number and percentage of pharmacies that became decertified as a result of non-compliance

- Provide a summary of reasons for decertification (provide for the current reporting period)

4. An assessment of prescription delivery timelines, including percentage delivered more than four days after receipt of the prescription, duration and causes for delay. A proposal for this assessment will be submitted within 60 days of the approval of the REMS Modification.

5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

v. Wholesaler/distributor compliance

1. Number of healthcare providers who successfully ordered mifepristone who were not certified

2. Number of non-certified pharmacies that successfully ordered mifepristone

3. Number of shipments sent to non-certified prescriber receiving locations

4. Number of shipments sent to non-certified pharmacy receiving locations

5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

**Overall Assessment of REMS Effectiveness**

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

14

**Mifepristone Tablets, 200 mg[1]**

## SINGLE SHARED SYSTEM RISK EVALUATION AND MITIGATION STRATEGY (REMS) SUPPORTING DOCUMENT

(b)(4)/TS-CI



---

[1] This document constitutes trade secret and confidential information exempt from public disclosure under 21 C.F.R. § 20.61. Should FDA tentatively determine that any portion of this document is disclosable in response to a request under the Freedom of Information Act, the Sponsors request immediate notification and an opportunity for consultation in accordance with 21 C.F.R. § 20.45.

1

(b)(4)/TS-CI



2

2023 SUPP 000927

(b)(4)/TS-CI



3

2023 SUPP 000928

(b)(4)/TS-CI



4

(b)(4)/TS-CI



5

2023 SUPP 000930



(b)(4)/TS-CI

6

2023 SUPP 000931

(b)(4)/TS-CI



7

2023 SUPP 000932

(b)(4)/TS-CI



8

2023 SUPP 000933



(b)(4)/TS-CI

9

2023 SUPP 000934

(b)(4)/TS-CI



10

2023 SUPP 000935

(b)(4)/TS-CI



11

(b)(4)/TS-CI



12

(b)(4)/TS-CI



13

2023 SUPP 000938

(b)(4)/TS-CI



14

(b)(4)/TS-CI



15

2023 SUPP 000940

(b)(4)/TS-CI

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)**
**SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

(b)(4)/TS-CI

2023 SUPP 000945

**Department of Health and Human Services**
**Public Health Service**
**Food and Drug Administration**
**Center for Drug Evaluation and Research**

(b)(6)/PPI

**Integrated** (b)(6)/PPI **Memorandum**

**Date:**                December 22, 2022

**Reviewers:**

(b)(6)/PPI

(b)(6)/PPI

(b)(6)/PPI

(b)(6)/PPI

(b)(6)/PPI

(b)(6)/PPI

(b)(6)/PPI

**Product Name:**        Mifepristone 200 mg

**Subject:**             All Adverse Events

**Application Type/Number:**   NDA 020687; ANDA 091178

**Applicants:**          Danco Laboratories, LLC; GenBioPro, Inc.

(b)(6)/PPI **#:**        2022-2987

2023 SUPP 001040

Reference ID: 5099635

# 1    INTRODUCTION

This integrated ▮▮▮▮ (b)(6)/PPI ▮▮▮▮ memorandum provides a summary of United States (U.S.) postmarketing adverse events that reportedly occurred from October 1, 2021 - December 3, 2022, with mifepristone use for medical termination of pregnancy.

For the purposes of this memorandum, we reviewed both the FDA Adverse Event Reporting System (FAERS) database and the published medical literature to identify adverse events that reportedly occurred from October 1, 2021 - December 3, 2022.

# 2    METHODS AND MATERIALS

## 2.1    CASE DEFINITION

**Inclusion Criteria:** Cases were included if an adverse event reportedly occurred from October 1, 2021 - December 3, 2022, with mifepristone use for medical termination of pregnancy in the U.S.

**Exclusion Criteria:** Cases were excluded if they did not meet the inclusion criteria specified above OR for any of the following reasons:

- Mifepristone was used for a reason other than medical termination of pregnancy
- The case occurred outside of the U.S.
- The adverse event(s) did not occur during the specified time period of interest
- Insufficient information provided for case assessment
- No adverse event was reported

## 2.2    FAERS SEARCH STRATEGY

We searched the FAERS database with the strategy described in **Table 1**.

| Table 1. FAERS Search Strategy* | |
| --- | --- |
| Date of search | December 4, 2022 |
| Time period of search | October 1, 2021 - December 3, 2022† |
| Search types | RxLogix PV Reports Quick Query, RxLogix PV Reports Case Form Report |
| Product terms | Active Ingredient: Mifepristone |
| MedDRA search terms (Version 25.1) | All adverse events |
| * See **Appendix A** for a description of the FAERS database. † Follow-up information obtained by (b)(6)/PPI after December 3, 2022, was included in this memorandum if the case was initially reported to FAERS between October 1, 2021 - December 3, 2022. **Abbreviations:** MedDRA=Medical Dictionary for Regulatory Activities | |

Reference ID: 5099635

2023 SUPP 001041

## 2.3  LITERATURE SEARCH

We searched the medical literature with the strategy described in **Table 2**.

| Table 2. Literature Search Strategy | |
|---|---|
| Date of search | December 4, 2022 |
| Databases | Embase and PubMed |
| Search terms | Embase: ('mifepristone'/exp OR mifepristone) AND (2021:py OR 2022:py) AND 'case report'/de <br><br> PubMed: (("mifepristone"[MeSH Terms] OR "mifepristone"[All Fields] OR "mifepriston"[All Fields]) AND ("case reports"[Publication Type] OR "case report"[All Fields])) AND (2021:2022/12/3[pdat]) |
| Years included in search | 2021 and 2022 |

## 3  RESULTS

## 3.1  FAERS CASE SELECTION

The FAERS search retrieved 343 reports. After applying the case definition in **Section 2.1** and accounting for duplicate reports, five cases were identified in which an adverse event reportedly occurred from October 1, 2021 - December 3, 2022, with mifepristone use for medical termination of pregnancy in the U.S. (see **Figure 1**).

**Figure 1. FAERS Case Selection**



\* 295 reports documented the use of mifepristone for Cushing's syndrome (or related conditions) or specified the use of Korlym® and 2 reports documented the use of mifepristone for the management of early pregnancy loss.

We summarized the pertinent information from all five cases below. **Appendix B** contains a line listing of these five cases.

3

2023 SUPP 001042

**FAERS Case # 21055005 (Duplicate Case # 21177969), Reported Adverse Event Date - May 18, 2022[a]**

A 26-year-old female at 7 weeks gestation per ultrasound ingested mifepristone 200 milligrams (mg) and was given misoprostol 800 micrograms (mcg) to administer, either via the buccal or vaginal route, 24 - 48 hours later for medical termination of pregnancy. It was specifically noted that the patient ingested the mifepristone at the clinic during her in-person appointment. The exact day/time of the misoprostol administration was unknown; however, it was known that it was administered vaginally. Approximately 12 days post-mifepristone ingestion (unknown number of days post-misoprostol), the patient committed suicide. The autopsy documented the cause of death to be the result of a "gunshot wound of head." Of note, all psychiatric screenings completed during the patient's clinic visit were reportedly negative for any psychiatric-related concerns. Additionally, the patient did not report any psychiatric history or history of depression.

**FAERS Case # 21073590 (Duplicate Case # 21252634), Reported Adverse Event Date - June 5, 2022[b]**

A 37-year-old female at 8 weeks 3 days gestation per ultrasound ingested mifepristone 200 mg followed by misoprostol 800 mcg buccally the next day for medical termination of pregnancy. It was specifically noted that the patient ingested the mifepristone at the clinic during her in-person appointment. No antibiotics or other medications were administered prior to her medical abortion. Approximately 8 days later, the patient presented to the hospital with complaints of significant abdominal pain and vaginal bleeding. She had not contacted the clinic about any of her symptoms prior to going to the hospital. Her white blood cell (WBC) count was found to be elevated at 29.3 K/uL (reference range: 4.0 - 11.0 K/uL) and the presence of copious, malodorous discharge was noted upon gynecologic examination; therefore, sepsis was suspected. Blood cultures were obtained, and intravenous (IV) antibiotics were initiated. The patient's leukocytosis worsened despite being on antibiotics, and multiple interventions were documented over the course of her hospitalization, including additional antibiotics, hysterectomy, salpingectomy, and laparotomy. Her blood cultures were found to be positive for *Clostridium sordellii*. Ultimately, the patient expired 11 days post-mifepristone ingestion (10 days post-misoprostol). The death certificate documented the cause of death to be the result of sepsis/toxic shock syndrome secondary to *Clostridium sordellii*.

**FAERS Case # 21124769, Reported Adverse Event Date - July 8, 2022**

A 20-year-old female at 10 weeks gestation was believed to have ingested mifepristone 200 mg followed by misoprostol 800 mcg "under her tongue" (split into two 400 mcg doses) for medical termination of pregnancy. It was specifically noted that the patient "was given 1 pill by mouth at ▓▓▓▓▓▓▓ (b)(6)/PPI ▓▓▓▓▓▓▓ then instructed to go home and take 2 pills under her tongue, followed by 2 more pills under her tongue 4 hours later." It was unknown if the patient had an ultrasound prior to mifepristone ingestion, the exact day/time of misoprostol administration was unknown, and the patient was unable to identify the medications she ingested as part of her medication abortion

---

[a] This death case was not accounted for in the *Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2022* (which was completed by ▓(b)(6) PPI▓ and finalized on November 9, 2022) as this case was not received by FDA until 7/7/2022.

[b] This death case was not accounted for in the *Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2022* (which was completed by ▓(b)(6) PPI▓ and finalized on November 9, 2022) as this case was not received by FDA until 7/13/2022.

2023 SUPP 001043

regimen; the reporting healthcare provider in (b)(6)/PPI suspected that the medications ingested were mifepristone and misoprostol based on information found on the (b)(6)/PPI clinic's website regarding their medication abortion protocol. Approximately 24 days later, the patient presented to the hospital (in (b)(6)/PPI ), was found to have a high normal WBC at 15.23 (units were not specified; reference range: 4.5 - 15.3), elevated band neutrophils at 14 (units were not specified; reference range: 0 - 6), cervical tenderness, and a positive quantitative beta human chorionic gonadotropin level of 21.16 (units were not specified; reference range: < 4.83 non-pregnant). She was diagnosed as having a uterine infection and IV antibiotics were initiated. A dilation and curettage was also completed which "showed trophoblastic implantation site consistent with intrauterine conception and chronic endometritis." It is unknown if the patient had contacted the clinic prior to going to the hospital.

**FAERS Case # 21458187 (Duplicate Case # 21668113), Reported Adverse Event Date - September 7, 2022**

A 36-year-old female at 9 weeks gestation per ultrasound ingested mifepristone 200 mg followed by misoprostol 800 mcg vaginally later the same day for medical termination of pregnancy. It was specifically noted that the patient ingested the mifepristone at the clinic during her in-person appointment. No antibiotics or other medications were administered prior to her medical abortion. Telephone follow-up was completed approximately 7 days later, and no concerns were reported by the patient to the clinic. Approximately 26 days later (post-mifepristone ingestion), the patient presented to the hospital with complaints of abdominal pain and shortness of breath. She had not contacted the clinic about any of her symptoms prior to going to the hospital. She was found to be hypotensive and tachycardic; persistent vaginal bleeding and acute onset kidney injury were also noted. A potential pulmonary embolism was identified, and sepsis was suspected given the patient's clinical presentation and her initial elevated lactic acid of 6.1 mmol/L (reference range: 0.4 - 2.0 mmol/L). IV antibiotics were initiated; however, there was no documentation of blood culture results prior to initial antibiotic administration. The patient quickly decompensated despite multiple interventions, which included intensive care, intubation, and additional antibiotics. A bedside exploratory laparotomy was also deemed to be necessary and "necrosis of the uterus, liver, spleen, patchy necrosis of the small bowel and stomach, and complete necrotizing soft tissue infection of the retroperitoneum" was found. It could not be determined if the uterus was the source of the infection, but it was noted to be a possibility. Body fluid cultures ("abdominal purulence") initially identified gram-positive cocci in pairs and gram-negative rods but were then documented as "no growth after 5 days incubation." Blood cultures (post-antibiotic initiation) were negative. Ultimately, the patient expired 27 days post-mifepristone ingestion (27 days post-misoprostol). The preliminary cause of death was documented to be the result of "septic shock secondary to necrotizing fasciitis infection" ("septic shock with multi-organ failure with unknown definitive cause"). The patient's death certificate has been requested.

**FAERS Case # 21544690 (Duplicate Cases # 21643590, # 21682753, # 21706995), Reported Adverse Event Date - September 28, 2022**

A 24-year-old female at 8 weeks 5 days gestation per ultrasound ingested mifepristone 200 mg followed by misoprostol 800 mcg vaginally (exact day of misoprostol administration was unknown) for medical termination of pregnancy. It was specifically noted that the patient ingested the mifepristone at the clinic during her in-person appointment. No antibiotics or other

medications were administered prior to her medical abortion. Approximately 5 days later, the patient presented to the hospital with a 4-day history of nausea/vomiting, diarrhea, and abdominal pain. The patient reported a "normal amount" of vaginal bleeding. She had not contacted the clinic about any of her symptoms prior to going to the hospital. The patient was found to be dehydrated, and laboratory data showed hemoconcentration with acute renal failure; this was documented as being likely due to dehydration and IV fluids were administered. Sepsis was also suspected given her elevated lactic acid of 9.1 mmol/L (reference range: 0.4 - 2.0 mmol/L) and IV antibiotics were administered. Blood cultures were documented as being obtained per the healthcare provider's notes; however, no blood culture order or results were found in the patient's medical records. While awaiting transfer to a hospital with a higher level of care, the patient quickly decompensated despite multiple interventions, which included multiple fluid boluses, intubation, and cardiopulmonary resuscitation. Ultimately, the patient expired 6 days post-mifepristone ingestion (unknown number of days post-misoprostol). An autopsy was completed, and the cause of death was reported to be the result of "complications of septic abortion." Postmortem blood cultures were reported to be negative for bacteria.

*Reviewers' Comments: We identified a total of five FAERS cases in which an adverse event reportedly occurred from October 1, 2021 - December 3, 2022, with mifepristone use for medical termination of pregnancy in the U.S. Of note, all five cases reported that mifepristone was dispensed to and ingested by the patient while they were physically (i.e., in-person) at the clinic.*

*Of these five cases, one case reported suicide via a gunshot wound to the head, one case reported sepsis, and three cases reported both sepsis and death (i.e., death associated with sepsis). Of note, our review of the three cases reporting death associated with sepsis did not identify any new aspect of this known and labeled adverse event.*

*The risks of infection and sepsis are known and labeled adverse events with the use of mifepristone for medical termination of pregnancy. Language regarding the risk of infection and sepsis, in addition to specific clinical considerations (e.g., laboratory parameters that may be affected, signs and symptoms that may be present) and notation of the "sometimes fatal infections" or "very rare cases of fatal septic shock", can be found in various sections of the prescribing information (e.g., BOXED WARNING, WARNINGS AND PRECAUTIONS) for the mifepristone products approved for medical termination of pregnancy.* [1, 2]

*The estimated number of women who have used mifepristone in the U.S. for medical termination of pregnancy since its approval on September 28, 2000, through the end of June 2022 is approximately 5.6 million women.* [3] *Since the U.S. approval of mifepristone for medical termination of pregnancy on September 28, 2000, there have been a total of eleven cases of death associated with sepsis (inclusive of two of the three cases summarized above reporting both sepsis and death) identified in the U.S. post-marketing setting (nine cases tested positive for Clostridium sordellii, one case tested positive for Clostridium perfringens, and one case had negative blood cultures).* [3] *Nine of the eleven fatal sepsis cases reported vaginal misoprostol use; two cases reported buccal misoprostol use. In the approved regimen for mifepristone for the medical termination of intrauterine pregnancy through 70 days gestation, misoprostol is administered by the buccal route and the prescribing information for the mifepristone products*

6

Reference ID: 5099635

*approved for medical termination of pregnancy only reference the use of misoprostol via the buccal route; however, in clinical practice, vaginal administration is also used.[4, 5]*

*Of note, the aforementioned numerical analysis regarding the eleven cases of death associated with sepsis does not include the case in which the preliminary cause of death was reported to be the result of "septic shock secondary to necrotizing fasciitis infection" ("septic shock with multi-organ failure with unknown definitive cause") as we have not yet received the requested death certificate. This death certificate is necessary to complete our analysis of this specific case given the uncertainty regarding the cause of infection.*

### 3.2    LITERATURE CASE SELECTION

The literature search retrieved 79 publications. After applying the case definition in **Section 2.1**, no relevant case reports of adverse events that reportedly occurred from October 1, 2021 - December 3, 2022, with mifepristone use for medical termination of pregnancy in the U.S. were identified in the published medical literature (see **Figure 2**).

**Figure 2. Literature Case Selection**



\* 7 publications documented the use of mifepristone for Cushing's syndrome (or related conditions) and 1 publication documented the use of mifepristone for adrenal incidentalomas.

† These 32 publications were identified and accounted for in a [(b)(6)/PPI] memorandum completed in December 2021.[6]

## 4    SUMMARY AND CONCLUSION

In summary, we identified five cases from FAERS in which an adverse event reportedly occurred from October 1, 2021 - December 3, 2022, with mifepristone use for medical termination of pregnancy in the U.S. Of these five cases, one case reported suicide, one case reported sepsis, and three cases reported both sepsis and death (i.e., death associated with sepsis). We did not identify any additional case reports in the published medical literature.

Reference ID: 5099635

2023 SUPP 001046

Based on the U.S. postmarketing data from FAERS reviewed in this memorandum, we have not identified any new safety concerns with the use of mifepristone for medical termination of pregnancy.

2023 SUPP 001047

Reference ID: 5099635

# 5   REFERENCES

[1] Mifeprex (mifepristone) [package insert]. New York, NY: Danco Laboratories, LLC; April 2019. Available at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/020687s022lbl.pdf

[2] Mifepristone [package insert]. Las Vegas, NV: GenBioPro, Inc.; February 2019. Available at: https://dailymed.nlm.nih.gov/dailymed/getFile.cfm?setid=b63fad9b-7f12-4400-9019-b0586054e534&type=pdf

[3] (b)(6)/PPI          Mifepristone U.S. Post-Marketing Adverse Events Summary through 06/30/2022. NDA 020687 and ANDA 091178. (b)(6)/PPI # 2022-2468. Finalized November 9, 2022.

[4] American College of Obstetricians and Gynecologists' Committee on Practice Bulletins - Gynecology, Society of Family Planning. Medication Abortion Up to 70 Days of Gestation: ACOG Practice Bulletin, Number 225. Obstet Gynecol. 2020 Oct;136(4):e31-e47. doi: 10.1097/AOG.0000000000004082

[5] National Abortion Federation - 2020 Clinical Policy Guidelines for Abortion Care. Available at: https://prochoice.org/wp-content/uploads/2020_CPGs.pdf

[6] (b)(6)/PPI          Memorandum: Mifepristone and All Adverse Events. NDA 020687 and ANDA 091178. (b)(6)/PPI # 2007-525. Finalized December 16, 2021.

Reference ID: 5099635

2023 SUPP 001048

# 6   APPENDICES

## 6.1   APPENDIX A. FDA ADVERSE EVENT REPORTING SYSTEM (FAERS)

### FDA Adverse Event Reporting System (FAERS)

The FDA Adverse Event Reporting System (FAERS) is a database that contains information on adverse event and medication error reports submitted to FDA. The database is designed to support FDA's postmarketing safety surveillance program for drug and therapeutic biological products. The informatic structure of the database adheres to the international safety reporting guidance issued by the International Council on Harmonisation. Adverse events and medication errors are coded to terms in the Medical Dictionary for Regulatory Activities (MedDRA) terminology. The suspect products are coded to valid tradenames or active ingredients in the FAERS Product Dictionary (FPD).

FAERS data have limitations. First, there is no certainty that the reported event was actually due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Further, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether or not an event will be reported, such as the time a product has been marketed and publicity about an event. Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population.

2023 SUPP 001049

6.2   APPENDIX B. FAERS LINE LISTING OF ADVERSE EVENTS THAT REPORTEDLY OCCURRED FROM OCTOBER 1, 2021 – DECEMBER 3, 2022, WITH MIFEPRISTONE USE FOR MEDICAL TERMINATION OF PREGNANCY IN THE U.S.

| Case # | Initial FDA Received Date | FAERS Case # | Version # | Manufacturer Control # | Case Type | Age (years) | Sex | Country Derived | Serious Outcome(s)* |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 7/7/2022 | 21055005 | 1 | US-GenBioPro-2130636 | Expedited (15-Day) | 26 | F | USA | DE |
| | 8/4/2022 | 21177969 | 1 | FDA-CDER-CTU-2022-62282 | Direct | 26 | F | USA | DE |
| 2 | 7/13/2022 | 21073590 | 1 | US-GenBioPro-2130806 | Expedited (15-Day) | 37 | F | USA | DE |
| | 8/24/2022 | 21252634 | 1 | FDA-CDER-CTU-2022-68089 | Direct | 37 | F | USA | DE |
| 3 | 7/23/2022 | 21124769 | 1 | FDA-CDER-CTU-2022-58337 | Direct | 20 | F | USA | HO, OT, RI† |
| 4 | 10/13/2022 | 21458187 | 1 | DI2022-02 | Expedited (15-Day) | 36 | F | USA | HO, DE |
| | 11/30/2022 | 21668113 | 1 | FDA-CDER-CTU-2022-95327 | Direct | 36 | F | USA | DE |
| | 11/2/2022 | 21544690 | 1 | US-GenBioPro-2134440 | Expedited (15-Day) | 24 | F | USA | DE |
| 5 | 11/25/2022 | 21643590 | 1 | FDA-CDER-CTU-2022-93742 | Direct | 24 | F | USA | DE |
| | 12/5/2022‡ | 21682753 | 1 | FDA-CDER-CTU-2022-96330 | Direct | 24 | F | USA | DE |
| | 12/9/2022‡ | 21706995 | 1 | FDA-CDER-CTU-2022-98223 | Direct | 24 | F | USA | DE |

*As per 21 CFR 314.80, the regulatory definition of serious is any adverse drug experience occurring at any dose that results in any of the following outcomes: death, a life-threatening adverse drug experience, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant disability/incapacity, a congenital anomaly/birth defect, or other serious important medical events. Those which are blank were not marked as serious (per the previous definition) by the reporter, and are coded as non-serious. A case can have more than one serious outcome.

† Although *Required Intervention* (RI) does not meet the regulatory serious definition per 21 CFR 314.80, this outcome is considered to be serious for the purposes of this memorandum.

‡ This FAERS case contains follow-up information obtained by (b)(6)/PPI for a case that was initially reported to FAERS between October 1, 2021 – December 3, 2022 (see **Table 1**).

**Abbreviations:** DE = Death, F = Female, HO = Hospitalization, OT = Other Medically Significant, RI = Required Intervention, USA = United States of America

2023 SUPP 001050

Reference ID: 5099635

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

12/22/2022 12:50:46 PM

(b)(6)/PPI

12/22/2022 12:53:03 PM

(b)(6)/PPI

12/22/2022 12:57:50 PM

(b)(6)/PPI

12/22/2022 12:59:06 PM

(b)(6)/PPI

12/22/2022 01:00:55 PM

(b)(6)/PPI

(b)(6)/PPI

12/22/2022 01:06:08 PM

(b)(6)/PPI

12/22/2022 01:33:02 PM

2023 SUPP 001051

MEMORANDUM          DEPARTMENT OF HEALTH AND HUMAN SERVICES
                    PUBLIC HEALTH SERVICE
                    FOOD AND DRUG ADMINISTRATION
                    CENTER FOR DRUG EVALUATION AND RESEARCH

TO:        FILE

FROM:      (b) (6)                    (b) (6)        Digitally signed by    (b) (6)
                                                     Date: 2022.12.23 13:11:43 -05'00'

DATE:      December 23, 2022

SUBJECT:   Review of Supplemental Drug Applications Proposing Modifications to the
           Mifepristone REMS Program

FDA is currently reviewing a supplemental new drug application from Danco Laboratories, LLC
(Danco) and a supplemental abbreviated new drug application from GenBioPro, Inc. (GBP) that
propose to modify the Mifepristone Risk Evaluation and Mitigation Strategy (REMS) Program
as approved under Danco's new drug application for Mifeprex (mifepristone) (NDA 020867) and
GBP's abbreviated new drug application for Mifepristone Tablets 200 mg (ANDA 091178).
Citing the Comstock Act, 18 U.S.C. §§ 1461, 1462, Plaintiffs in *Alliance for Hippocratic
Medicine v. U.S. Food and Drug Administration*, No. 2:22-cv-00223-Z (N.D. Tex.), have alleged
that FDA's actions regarding mifepristone do not comply with "federal laws that expressly
prohibit the mailing or delivery by any letter carrier, express company, or other common carrier
of any substance or drug intended for producing abortion" and also that FDA "failed to
acknowledge and address" those laws. Complaint ¶¶ 22, 392 (Nov. 18, 2022).  This
memorandum notes that the Office of Legal Counsel of the United States Department of Justice,
which provides controlling advice to Executive Branch officials on questions of law, has
concluded that the Comstock Act provisions cited by Plaintiffs "[do] not prohibit the mailing of
mifepristone or misoprostol where the sender lacks the intent that the recipient will use them
unlawfully. And in light of the many lawful uses of mifepristone and misoprostol, the fact that
these drugs are being mailed to a jurisdiction that significantly restricts abortion is not a
sufficient basis for concluding that the mailing violates [these provisions]."  Memorandum for
Thomas J. Marshall, General Counsel, United States Postal Service, from Christopher H.
Schroeder, Assistant Attorney General, Office of Legal Counsel, *Re: Application of the
Comstock Act to the Mailing of Prescription Drugs That Can Be Used for Abortions*, at 15
(December 23, 2022).[1]  Thus, even if the Comstock Act provisions bear on FDA's analysis of
the pending supplemental drug applications, in light of the conclusions set forth by the Office of
Legal Counsel, they pose no issue for FDA's approval of the applications.

---

[1] The Office of Legal Counsel's analysis applies to 18 U.S.C. § 1461 and § 1462. *See id.* at 1 n.3.

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------

/s/

------------------------------------------------------------

(b) (6)

12/23/2022 03:02:29 PM

I am placing this document in for                                                    (b) (6)    .
This is for archiving purposes.

Reference ID: 5100604

## Center for Drug Evaluation and Research (CDER)

(b)(6)/PPI

### Memorandum to File

| NDA | 020687 |
|---|---|
| Reviewer Names | (b)(6)/PPI |
| | |
| | |
| | |
| | |
| Date of Memorandum | December 30, 2022 |
| Subject | Referenced Publications |

On December 16, 2021, FDA sent REMS Modification Notification letters to Danco Laboratories, LLC (Danco) and GenBioPro, Inc. (GBP) (collectively the Applicants) regarding the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program), which was approved on April 11, 2019 and last modified on May 14, 2021. The December 16, 2021 letters explained that, in accordance with section 505-1(g)(4)(8) of the Federal Food, Drug, and Cosmetic Act (FDCA), FDA had determined that the approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The letters also noted that the determination was based on a review of published literature, safety information collected during the COVID-19 Public Health Emergency (PHE), FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

FDA is reviewing Danco's supplemental new drug application (sNDA) and GBP's supplemental abbreviated new drug application (sANDA), which were submitted on June 22, 2022, in response to the December 16, 2021 letters. The REMS modification supplemental applications propose revisions to the Mifepristone REMS Program that, consistent with the December 16, 2021 REMS Modification Notification letters, 1) remove the REMS requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber (known as the "in-person dispensing requirement") and 2) add a new REMS requirement for pharmacy certification. The supplemental applications also include proposed changes

1

2023 SUPP 001077

to, among other things, the REMS document and REMS materials, to align with the removal of the in-person dispensing requirement and the addition of pharmacy certification.

[(b)(6)/PPI] was notified that the publications listed below were attached to the Complaint recently filed in a lawsuit (Alliance for Hippocratic Medicine v. U.S. Food and Drug Administration, No. 2:22-cv-00223-Z (N.D. Tex.)):

1. Studnicki et al., 2021: "A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015"[1]

2. Studnicki et al., 2022: "A Post Hoc Exploratory Analysis: Induced Abortion Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization"[2]

3. Rafferty et al., 2020: "#AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives"[3]

4. Aultman et al., 2019: "Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019"[4]

5. Cirucci et al., 2021: "Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act"[5]

[(b)(6)/PPI] has reviewed these five publications for the limited purpose of determining whether they contain information relevant to our review of the REMS modifications proposed in the pending sNDA and sANDA, applying the same approach described on pages 11-12 of the December 16, 2021 REMS Modification Rationale Review prepared jointly by [(b)(6)/PPI]. As described on pages 11-12 of the REMS Modification Rationale Review, [(b)(6)/PPI] approach to the literature review for the Agency's December 16, 2021 REMS modification determination focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS elements to assure safe use (ETASUs). We excluded systematic reviews and meta-analyses because these publications did not include original safety data related to the outcomes of medical abortion.

We applied the same approach that was used for the literature search for the December 16, 2021 review to these five articles, which were not studies focused on in-person dispensing or pharmacy certification. We conclude that the five publications listed above do not include safety data relevant to

---

[1] Studnicki J, Harrison DJ, Longbons T, et al. A Longitudinal Cohort Study of Emergency Room Utilization Following Mifepristone Chemical and Surgical Abortions, 1999–2015. Health Services Research and Managerial Epidemiology. 2021;8. doi:10.1177/23333928211053965.

[2] Studnicki J, Longbons T, Harrison DJ, et al. A Post Hoc Exploratory Analysis: Induced Abortion Complications Mistaken for Miscarriage in the Emergency Room are a Risk Factor for Hospitalization. Health Services Research and Managerial Epidemiology. 2022;9. doi:10.1177/23333928221103107.

[3] KA Rafferty and T Longbons. #AbortionChangesYou: A Case Study to Understand the Communicative Tensions in Women's Medication Abortion Narratives. Health Communication 2020; 36:12, 1485-1494.

[4] Aultman K, Cirucci CA, Harrison DJ, et al. Deaths and Severe Adverse Events after the use of Mifepristone as an Abortifacient from September 2000 to February 2019. Issues Law Med. 2021;36(1):3-26.

[5] Mifepristone Adverse Events Identified by Planned Parenthood in 2009 and 2010 Compared to Those in the FDA Adverse Event Reporting System and Those Obtained Through the Freedom of Information Act. Health Serv Res Manag Epidemiol. 2021 Dec 21;8:23333928211068919. doi: 10.1177/23333928211068919. eCollection 2021 Jan-Dec.

2023 SUPP 001078

the Applicants' proposed modifications to the REMS ETASUs (i.e., removal of the "in-person dispensing requirement" or the addition of a new requirement for pharmacy certification).

2023 SUPP 001079

Reference ID: 5102531

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

12/30/2022 09:21:40 AM

(b)(6)/PPI

12/30/2022 09:23:55 AM

(b)(6)/PPI

12/30/2022 09:26:21 AM

(b)(6)/PPI

12/30/2022 09:27:53 AM

(b)(6)/PPI

12/30/2022 10:14:26 AM

(b)(6)/PPI

(b)(6)/PPI

12/30/2022 10:49:21 AM

2023 SUPP 001080



(b) (6) **and**
(b) (6)
(b) (6)
(b) (6)

**Center for Drug Evaluation and Research (CDER)**

| | |
|---|---|
| **Application Type** | NDA and ANDA |
| **Application Number** | NDA 020687 and ANDA 091178 |
| **Supplement Number, Date Received** | NDA Supplement-025 and ANDA Supplement-004 received June 22, 2022 (sequences 18 and 87 respectively) and amended October 19, 2022 (sequences 22 and 91 respectively), November 30, 2022 (sequences 24 and 92 respectively), December 9, 2022 (sequences 25 and 93 respectively) and December 16, 2022 (sequences 26 and 95 respectively). This supplement is on a 180-Day clock. |
| **Targeted Action Date** | December 19, 2022 |
| (b) (6) # | 2022-1169 |
| **Reviewer Names** | |
| **Review Completion Date** | January 3, 2023 |
| **Subject** | Review of proposed Major REMS Modification |
| **Established Name** | Mifepristone REMS |
| **Name of Sponsor** | Danco Laboratories, LLC and GenBioPro, Inc. |
| **Therapeutic Class** | Progestin antagonist |
| **Formulation** | Oral tablet |

1

Reference ID: 5103819

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................ 3

1.    Introduction ................................................................................................... 4

2.    Background ..................................................................................................... 4

   2.1.    Product Information and REMS Information ........................................... 4

   2.2.    Regulatory History ................................................................................. 6

3.    Review of Proposed REMS Modification ........................................................ 8

   3.1.    REMS Goal ............................................................................................. 8

   3.2.    REMS Document .................................................................................... 8

   3.3.    REMS Requirements .............................................................................. 9

      3.3.1.    Addition and Removal of ETASU ..................................................... 9

      3.3.2.    REMS Participant Requirements and Materials ............................... 9

         3.3.2.1.    Prescriber Requirements ........................................................... 9

         3.3.2.2.    Patient Requirements ............................................................... 11

         3.3.2.3.    Pharmacy Requirements ........................................................... 12

         3.3.2.4.    Distributor Requirements ......................................................... 15

      3.3.3.    REMS Sponsor Requirements ....................................................... 15

         3.3.3.1.    Sponsor Requirements to Support Prescriber Certification ....... 15

         3.3.3.2.    Sponsor Requirements to Support Pharmacy Certification ....... 16

         3.3.3.3.    Sponsor Implementation Requirements .................................... 16

   3.4.    REMS Assessment Timetable ............................................................... 16

4.    Supporting Document .................................................................................. 17

5.    REMS Assessment Plan ................................................................................ 17

6.    Discussion ................................................................................................... 19

7.    Conclusions and Recommendations ............................................................. 21

8.    References ................................................................................................... 21

9.    Appendices .................................................................................................. 22

2023 SUPP 001113

Reference ID: 5103819

## EXECUTIVE SUMMARY

This is a review of the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and by GenBioPro, Inc. (GBP) for abbreviated new drug application (ANDA) 091178. The Sponsors submitted proposed modification to the Mifepristone REMS Program on June 22, 2022, and amended their submissions on October 19, 2022 (Danco), October 20, 2022 (GBP), November 30, 2022 (both), December 9, 2022 (both) and December 16, 2022 (both).

The Mifepristone REMS Program was originally approved on April 11, 2019, to mitigate the risk of serious complications associated with mifepristone 200 mg. The most recent REMS modification was approved on May 14, 2021.[a] The Mifepristone REMS Program consists of elements to assure safe use (ETASU) A, C and D, an implementation system, and a timetable for submission of assessments of the REMS.

The Sponsors submitted the proposed modification to the REMS in response to the Agency's REMS Modification Notification letters dated December 16, 2021, which required removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement") and the addition of certification of pharmacies that dispense the drug.

In addition, the following were addressed during the course of the review:
- revisions to the REMS goal to align with the updated REMS requirements.
- replacing serial number with recording of NDC and lot number of mifepristone dispensed.
- additional edits for clarification and consistency in the REMS Document and REMS materials (*Prescriber Agreement Forms*, *Patient Agreement Form*, and *Pharmacy Agreement Forms*).

The review team finds the proposed modification to the Mifepristone REMS Program last submitted on December 16, 2022, to be acceptable and recommends approval of the REMS modification. The proposed REMS modification includes changes to the REMS goal, additional REMS requirements for prescribers to incorporate dispensing from certified pharmacies and new REMS requirements for pharmacy certification.

The proposed goal of the modified REMS for mifepristone 200 mg is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c) Informing patients about the risk of serious complications associated with mifepristone.

---

[a] The May 14, 2021 REMS modification approved the inclusion of gender neutral language in the Patient Agreement Form as well as corresponding minor changes to the REMS document to be consistent with the changes made to the Patient Agreement Form.

3

Reference ID: 5103819

The timetable for submission of assessments of the REMS was modified to one year from the date of the approval of the modified REMS and annually thereafter. The assessment plan was revised to align with the changes to the REMS and capture additional metrics for drug utilization and REMS operations.

The modified REMS includes ETASU A, B and D, an implementation system, and a timetable for submission of assessments of the REMS. Mifepristone will no longer be required to be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (referred to as the "in-person dispensing requirement" for brevity) and will be able to be dispensed from certified pharmacies.

# 1. Introduction

This review evaluates the proposed modification to the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program) submitted by Danco Laboratories, LLC (Danco) for new drug application (NDA) 020687 and by GenBioPro, Inc. (GBP) for abbreviated new drug application (ANDA) 091178.

The Sponsors initially submitted proposed modification to the Mifepristone REMS Program on June 22, 2022, in response to the Agency's REMS Modification Notification letters issued on December 16, 2021, to Danco and GBP, requiring the following modification to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks:

- removal of the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals (i.e., the "in-person dispensing requirement")

- addition of certification of pharmacies that dispense the drug

Per the Agency's December 16, 2021, REMS Modification Notification letters, the proposed REMS was required to include the following ETASU to mitigate the risk of serious complications associated with mifepristone, including at least the following:

- healthcare providers have particular experience or training, or are specially certified

- pharmacies, practitioners, or health care settings that dispense the drug are specially certified

- the drug is dispensed to patients with evidence or other documentation of safe use conditions

The REMS was also required to include an implementation system and timetable for submission of assessments.

# 2. Background

## 2.1. Product Information and REMS Information

Mifepristone is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy (IUP) through 70 days gestation. Mifepristone is available as 200 mg tablets for oral use.

Mifeprex (mifepristone) was approved on September 28, 2000, with a restricted distribution program under 21 CFR 314.520 (subpart H)[b] to ensure that the benefits of the drug outweighed

---

[b] NDA approval letter Mifeprex (NDA 020687) dated September 28, 2000.

4

Reference ID: 5103819

the risk of serious complications associated with mifepristone when used for medical abortion.[c] Mifeprex was deemed to have in effect an approved REMS under section 505-1 of the Federal Food, Drug, and Cosmetic Act with the passage of the Food and Drug Administration Amendments Act of 2007 (FDAAA), and the Mifeprex REMS was approved on June 8, 2011.

On March 29, 2016, FDA approved an efficacy supplement for Mifeprex, which included changes in the dose of Mifeprex and the dosing regimen for taking Mifeprex and misoprostol, as well as a modification of the gestational age up to which Mifeprex has been shown to be safe and effective and a modification to the process for follow-up after administration of the drug.  FDA also approved modification to the Mifeprex REMS that reflected the changes approved in the efficacy supplement.[1-5] On April 11, 2019, FDA approved ANDA 091178 and the Mifepristone REMS Program.[6-7] The Mifepristone REMS Program is a single, shared system REMS that includes NDA 020687 and ANDA 091178. The goal of the approved Mifepristone REMS Program is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program (under ETASU A).
b) Ensuring that mifepristone is only dispensed in certain healthcare settings by or under the supervision of a certified prescriber (under ETASU C).
c) Informing patients about the risk of serious complications associated with mifepristone (under ETASU D).

The Mifepristone REMS Program was last modified and approved in 2021 to revise the *Patient Agreement Form* to include gender-neutral language; however, the goal of the Mifepristone REMS Program has not changed since the initial approval in 2019.

Under ETASU A, to become specially certified to prescribe mifepristone, a healthcare provider must review the prescribing information, complete and sign the *Prescriber Agreement Form,* and agree to follow the guidelines for use of mifepristone. Under ETASU C, in the Mifepristone REMS Program as approved prior to today's action, mifepristone was required to be dispensed to patients only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber. Under ETASU D, mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions (i.e., the patient must sign a *Patient Agreement Form*). The approved Mifepristone REMS Program includes an implementation system, and a timetable for assessments (one year from the date of the initial approval of the REMS on April 11, 2019, and every three years thereafter).

In April 2021, FDA communicated its intent to exercise enforcement discretion during the COVID-19 public health emergency (PHE) regarding the in-person dispensing requirement in the Mifepristone REMS Program.  Specifically, FDA communicated that provided all other requirements of the Mifepristone REMS Program are met, the Agency intended to exercise enforcement discretion with respect to the in-person dispensing requirement of the Mifepristone REMS Program, including any in-person requirements that may be related to the *Patient Agreement Form*, during the COVID-19 PHE. This determination, which FDA made on April 12, 2021, was effective immediately.  We also note that from July 13, 2020, to January 12, 2021, per a court order, FDA was enjoined from enforcing the in-person dispensing requirement of the Mifepristone REMS Program.[8]

---

[c] Mifepristone is also approved in approximately 80 other countries.
https://gynuity.org/assets/resources/biblio_ref_lst_mife_en.pdf

5

Reference ID: 5103819

Further, and as we also communicated on April 12, 2021, to the extent all of the other requirements of the Mifepristone REMS Program are met, the Agency intended to exercise enforcement discretion during the COVID-19 PHE with respect to the dispensing of Mifeprex or the approved generic version of Mifeprex, Mifepristone Tablets, 200 mg, through the mail, either by or under the supervision of a certified prescriber, or through a mail-order pharmacy when such dispensing is done under the supervision of a certified prescriber.

## 2.2. Regulatory History

The following is a summary of the regulatory history relevant to this review:

- 04/11/2019: Approval of the Mifepristone REMS Program, a single, shared system REMS that includes NDA 020687 and ANDA 091178.

- 04/12/2021: The Agency issued a General Advice letter to both the NDA and ANDA Applicants, explaining that FDA intended to exercise enforcement discretion during the COVID-19 PHE with respect to the in-person dispensing requirement in the Mifepristone REMS Program, including any in-person requirements that may be related to the Patient Agreement Form.

- 05/07/2021: The Agency stated that it would be reviewing the elements of the Mifepristone REMS Program in accordance with section 505-1 of the FD&C Act.

- 12/16/2021: The Agency completed its review of the Mifepristone REMS Program and determined, among other things, that the REMS must be modified to remove the in-person dispensing requirement and add pharmacy certification.[9]

- 12/16/2021: REMS Modification Notification letters were sent to both Sponsors stating that the approved Mifepristone REMS Program must be modified to minimize the burden on the healthcare system of complying with the REMS and ensure that the benefits of the drug outweigh the risks.

- 04/08/2022: Final written responses to a Type A meeting request were provided to Danco, the point of contact for the Mifepristone REMS Program. The questions pertained to the 12/16/2021 REMS Modification Notification letter requirements.

- 04/13/2022: The Sponsors requested an extension to 6/30/2022, to submit a proposed REMS modification in response to the Agency's 12/16/2021 REMS Modification Notification letters.

- 04/15/2022: The Agency granted the Sponsors' request for an extension to submit a proposed REMS modification and conveyed that the modification must be submitted no later than 06/30/2022.[10]

- 06/22/2022: Danco and GBP submitted a proposed REMS modification to their respective applications in response to the 12/16/2021 REMS Modification Notification letters.

- 07/22/2022: An Information Request was sent to the Sponsors requesting clarification of the proposed prescriber and dispenser requirements and additional rationale to support their proposal.

- 08/26/2022: Sponsors submitted responses to 07/22/2022 Information Request.

- 09/19/2022: Teleconference was held between Agency and Sponsors where the Agency communicated the REMS requirements that are necessary to support the addition of pharmacy

6

Reference ID: 5103819

certification. The Agency proposed focusing on the pharmacy settings where a closed system[d] REMS could be implemented using the existing email and facsimile based system, ▬▬▬▬▬ (b) (4) ▬▬▬▬▬, as the best strategy for an approvable modification by the goal date.

- 09/22/2022: An Information Request was sent to Sponsors requesting confirmation that the Sponsors agree with the pharmacy distribution approach outlined in the 09/19/2022 teleconference so that the Agency's feedback could be appropriately tailored.

- 09/23/2022: The Sponsors confirmed via email that they were willing to pursue ▬▬▬▬ (b) (4) ▬▬▬▬, as discussed in the 09/19/2022 teleconference. The Sponsors also requested a teleconference to discuss the current modification ▬▬▬▬ (b) (4) ▬▬▬▬.

- 09/27/2022: Comments from the 09/19/2022 teleconference sent to Sponsors with additional comments and requests regarding what will be necessary for pharmacy certification.

- 09/29/2022: An Information request was sent to the Sponsors asking for agenda items, questions, and a request to walk through their proposed system for pharmacy certification, including dispensing through mail-order or specialty pharmacies, at the 10/06/2022 scheduled teleconference.

- 10/04/2022: Sponsors emailed that they will focus the 10/06/2022 teleconference on the 09/27/2022 Agency comments and their mail order and specialty pharmacy distribution model.

- 10/06/2022: Teleconference was held between Agency and Sponsors where Sponsors outlined their proposal for pharmacy certification, including dispensing through mail order and specialty pharmacies, as well as their concerns with certain requirements and general timelines.

- 10/19/2022: Danco submitted a REMS amendment to their pending sNDA, which included a REMS document and REMS materials. They did not submit a REMS Supporting Document.

- 10/20/2022: GBP submitted a REMS amendment to their pending sANDA, which included a REMS document and REMS materials. They did not submit a REMS Supporting Document.

- 10/25/2022: Teleconference was held between Agency and Sponsors to discuss the *Patient Agreement Form* and timing related to shipping a mifepristone prescription from a certified pharmacy to the patient.

- 11/23/2022: An Information Request was sent to Sponsors with comments on their proposed REMS Document, submitted on 10/19/2022 (Danco) and 10/20/2022 (GBP).

- 11/30/2022: Danco and GBP submitted REMS amendments, which included the REMS Document, to their respective pending supplemental applications.

- 12/01/2022: Teleconference was held between Agency and Sponsors to discuss the REMS Document.

- 12/05/2022: An Information Request was sent to Sponsors with comments on their proposed REMS Document submitted on 11/30/2022 and discussed at the teleconference on 12/01/2022, and REMS materials submitted to their applications on 10/19/2022 and 10/20/2022.

---

[d] "Closed system" in this case refers to a system where prescribers, pharmacies, and distributors are certified or authorized in the REMS and the certification of the stakeholder must be verified prior to distribution or dispensing, as per the REMS.

7

2023 SUPP 001118

- 12/07/2022: Teleconference was held between Agency and Sponsors to discuss the REMS Document and REMS materials the Agency sent to the Sponsors on 12/05/22.

- 12/08/2022: Danco and GBP submitted REMS amendments, including the REMS Document, *Prescriber Agreement Form, Pharmacy Agreement Form, Patient Agreement Form* and REMS Supporting Document, to their respective pending applications.

- 12/09/2022: An Information Request was sent to Sponsors with the Agency's comments on the REMS assessment plan.

- 12/14/2022: An Information Request was sent to Sponsors with the Agency's comments on the REMS Document, *Prescriber Agreement Form, Pharmacy Agreement Form*, and REMS Supporting Document.

- 12/15/2022: Two teleconferences were held between Agency and Sponsors to discuss the proposed REMS Document and REMS materials the Agency sent to the Sponsors on 12/14/22.

- 12/16/2022: Sponsors submitted a REMS amendment to their respective applications.

## 3. Review of Proposed REMS Modification

[(b) (6)] has discussed the Sponsors' proposed modification with the review team, which includes members of the [(b) (6)] and the [(b) (6)] ; hereafter referred to as the review team. This review includes their input and concurrence with the analysis and proposed changes to the Mifepristone REMS Program.

### 3.1. REMS Goal

The Sponsors proposed modification to the goal for the Mifepristone REMS Program to add that mifepristone can also be dispensed from certified pharmacies on prescriptions issued by certified prescribers. The proposed REMS goal is:

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a) Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b) Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c) Informing patients about the risk of serious complications associated with mifepristone.

*Reviewer Comment: We agree with the Sponsors' proposal.*

### 3.2. REMS Document

The proposed REMS Document is not in the format as outlined in the 2017 Draft Guidance for Industry, Format and Content of a REMS Document.[11]

2023 SUPP 001119

Reference ID: 5103819

*Reviewer Comment:* *To avoid the misperception that this REMS modification is making major changes to the REMS document that go beyond our December 16, 2021, determination that the REMS must be modified to remove the in-person dispensing requirement and add pharmacy certification, CDER staff and management discussed whether to change the format of the REMS document to that described in the 2017 draft guidance.[11]* *After internal discussion, CDER staff and management aligned not to transition the REMS document at this time to the format described in the 2017 draft guidance.*

### 3.3. REMS Requirements

#### 3.3.1. Addition and Removal of ETASU

The December 16, 2021, REMS Modification Notification letters specified that the ETASU must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure the benefits of the drug outweigh the risks by:

- Removing the requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices and hospitals (i.e., the "in-person dispensing requirement"), and;
- Adding a requirement that pharmacies that dispense the drug be specially certified.

The Sponsors proposed changes to the REMS as reflected in the subsections below.

#### 3.3.2. REMS Participant Requirements and Materials
#### 3.3.2.1. Prescriber Requirements

Consistent with the approved Mifepristone REMS Program prescribers must be specially certified. To become specially certified to prescribe mifepristone, healthcare providers who prescribe must review the Prescribing Information for mifepristone and complete the *Prescriber Agreement Form*. In signing the *Prescriber Agreement Form*, prescribers agree they meet certain qualifications and will follow the guidelines for use of mifepristone.  The guidelines for use include ensuring i) that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained; ii) that the healthcare provider (HCP) and the patient sign the *Patient Agreement Form*, iii) the patient receives a copy of the *Patient Agreement Form* and Medication Guide, iv) the *Patient Agreement Form* is placed in the patient's medical record; v) that any patient deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient. The language on the guidelines for use was revised from the Mifepristone REMS Program approved in 2021 to clarify that, if the certified prescriber supervises the dispensing of mifepristone, they must ensure the guidelines for use of mifepristone are followed by those under their supervision.  This clarification reflects the ongoing implementation of the approved Mifepristone REMS Program.  For example, consistent with the approved REMS, the *Patient Agreement Form* does not require the certified prescriber's signature, but rather the signature of the healthcare provider counseling the patient on the risks of mifepristone.  Additional changes were made globally to provide consistency and clarity of the requirements for certified prescribers and healthcare providers who complete tasks under the supervision of certified prescribers.

A certified prescriber may submit the *Prescriber Agreement Form* to an authorized distributor if the certified prescriber wishes to dispense or supervise the dispensing of mifepristone; this is consistent with the current requirements of the Mifepristone REMS Program. Additional requirements were

9

Reference ID: 5103819

added to incorporate mifepristone dispensing by a certified pharmacy. If a healthcare provider wishes to prescribe mifepristone by sending a prescription to a certified pharmacy for dispensing, the healthcare provider must become certified by providing the pharmacy a *Prescriber Agreement Form* signed by the provider. A certified prescriber must also assess the appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than four calendar days after the prescription was received by the certified pharmacy.

The NDC and lot number of the dispensed drug will be recorded in the patient's record when mifepristone is dispensed by or under the supervision of a certified prescriber, replacing the requirement that serial numbers from each package of mifepristone be recorded in the patient's record. If prescribers become aware of the death of a patient for whom the mifepristone was dispensed from a certified pharmacy, the prescribers will be required to obtain the NDC and lot number of the package of mifepristone the patient received from the pharmacy.

The following materials support prescriber requirements:
- *Prescriber Agreement Form* for Danco Laboratories, LLC
- *Prescriber Agreement Form* for GenBioPro, Inc.
- *Patient Agreement Form*

**Reviewer Comment:**  *We agree with the Sponsors' proposal.*

*Although certain activities (review of the Patient Agreement Form with patients and answering any questions about treatment, signing, providing a copy to the patient and retaining the Patient Agreement Form, providing a copy of the Medication Guide, and ensuring any deaths are reported to the Mifepristone Sponsor, recording the NDC and lot number from drug dispensed from the certified prescriber or those under their supervision) may be conducted by healthcare providers under the supervision of a certified prescriber, the certified prescriber remains responsible for ensuring compliance with the requirements of the Mifepristone REMS Program. We agree with the additional language to further clarify that the certified prescriber must ensure the guidelines for use of mifepristone are followed.*

*As proposed, certified prescribers may either, 1) continue to submit the Prescriber Agreement Form to an authorized distributor if the certified prescriber is dispensing or supervising the dispensing of the drug (as already required in the REMS), or 2) if the drug will be dispensed from a certified pharmacy, submit the Prescriber Agreement Form to the certified pharmacy that will dispense the drug (as proposed in the modification). Regarding #2, the pharmacy can only fill prescriptions written by a certified prescriber.*

*Based on our review of the proposed changes, the review team finds it acceptable for prescribers to submit their Prescriber Agreement Form directly to the certified pharmacy. Although certified prescribers still have the option of in-person dispensing of the drug, not all prescribers may want to stock mifepristone. Typically due to the number of drugs that are available and the expense associated with stocking prescription medications intended for outpatient use, most prescribers do not stock many medications, if they stock medications at all.*

*The proposal to submit a Prescriber Agreement Form to a certified pharmacy provides another option for dispensing mifepristone. The burden of providing the Prescriber Agreement Form prior to or when the prescription is provided to a certified pharmacy does not create unreasonable burden for prescribers. The burden of prescriber certification has been minimized to the extent possible. The Prescriber Agreement Form is designed to require minimal time to complete and requires that the prescriber submit it to the authorized distributor once, and if the prescriber chooses to use a certified pharmacy to dispense mifepristone, they will need to submit the form to the certified pharmacy.*

Reference ID: 5103819

*There is an additional requirement added for certified pharmacies and certified prescribers in the event that a patient will not receive their medication from the certified pharmacy within four calendar days of the pharmacy's receipt of the prescription (for example, if the medication is not in stock). In this circumstance, the pharmacy will be required to contact the certified prescriber to make them aware of the delay and will be required to obtain from the prescriber confirmation that it is appropriate to dispense mifepristone to the patient even though they will receive mifepristone more than four calendar days after the prescription was received by the certified pharmacy. This confirmation is intended to ensure timeliness of delivery in light of the labeled indication and gestational age. Additional details and rationale on the pharmacy requirements to dispense and ship drug in a timely manner are described in section 3.3.2.3.*

*If a certified prescriber becomes aware of a patient death that occurs subsequent to the use of mifepristone dispensed from a pharmacy, the certified prescriber must obtain the NDC and lot number of the package of mifepristone the patient received from the pharmacy. This information will be reported to the appropriate Mifepristone Sponsor in the same manner prescribers have done previously. This additional requirement to obtain the NDC and lot number from the pharmacy is needed to ensure consistent adverse event reporting when mifepristone is dispensed from a certified pharmacy.*

Prescriber Agreement Form

The Sponsors' proposed changes to the *Prescriber Agreement Form* aligned with those described above. The proposed *Prescriber Agreement Form* explains the two methods of certification which are: 1) submitting the form to the authorized distributor and 2) submitting the form to the dispensing certified pharmacy. Further clarification was added that healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification. The statement that certified prescribers are responsible for overseeing implementation and compliance with the REMS Program was also added. The following statement was added to the form: "I understand that the pharmacy may dispense mifepristone made by a different manufacturer than that stated on the Prescriber Agreement Form." The account set up information was removed and replaced with prescriber information response fields.

**Reviewer Comment**: *We agree with the Sponsors' proposal. Changes in the above prescriber requirements were incorporated in the Prescriber Agreement Form.*

### 3.3.2.2.    Patient Requirements

The *Patient Agreement Form* was updated to clarify that the signatures may be written or electronic, to reorganize the risk information about ectopic pregnancy, and to remove the statement that the Medication Guide will be taken to an emergency room or provided to a healthcare provider who did not prescribe mifepristone so that it is known that the patient had a medical abortion with mifepristone.

The following materials support patient requirements:

- *Patient Agreement Form*

**Reviewer Comment**: *We agree with the Sponsors' proposal.*

*The Patient Agreement Form continues to be an important part of standardizing the medication information on the use of mifepristone that prescribers communicate to their patients, and also provides the information in a brief and understandable format for patients. The requirement to counsel the*

11

Reference ID: 5103819

*patient, to provide the patient with the Patient Agreement Form, and to have the healthcare provider and patient sign the Patient Agreement Form, ensures that each provider, including new providers, informs each patient of the appropriate use of mifepristone, risks associated with treatment, and what to do if the patient experiences symptoms that may require emergency care. The form is signed by the patient and the provider and placed in the patient's medical record, and a copy is provided to the patient, to document the patient's acknowledgment of receiving the information from the prescriber. The Agency agrees that the further clarification that signatures can be written or electronic is appropriate for the continued use of the form.*

*The reference to ectopic pregnancy has been reorganized in the document since it is not a risk of the drug. The signs and symptoms of an untreated ectopic pregnancy that may persist after mifepristone use have been clarified in the section of the form that explains the signs and symptoms of potential problems that may occur after mifepristone use.*

*The review team agrees with removing the patient's agreement to take the Medication Guide with them if they visit an emergency room or HCP who did not give them mifepristone so the emergency room or HCP will understand that the patient is having a medical abortion. Although this statement has been in the Medication Guide for a number of years, upon further consideration, the Agency has concluded that patients seeking emergency medical care are not likely to carry a Medication Guide with them, the Medication Guide is readily available online, and information about medical conditions and previous treatments can be obtained at the point of care.*

### 3.3.2.3.    Pharmacy Requirements

The Sponsors proposed that certified pharmacies, in addition to certified prescribers and HCPs under the supervision of certified prescribers, can dispense mifepristone. In order for a pharmacy to become certified, the pharmacy must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy. The Authorized Representative must certify that they have read and understood the Prescribing Information for mifepristone. Each location of the pharmacy must be able to receive *Prescriber Agreement Forms* by email and fax and be able to ship mifepristone using a shipping service that provides tracking information.

Additionally, each dispensing pharmacy location must put processes and procedures in place to fulfill the REMS requirements. Certified pharmacies must verify prescriber certification by confirming they have obtained a copy of the prescriber's signed *Prescriber Agreement Form* before dispensing. Certified pharmacies must dispense mifepristone such that it is received by the patient within four days from the day of prescription receipt by the pharmacy. If the pharmacy will not be able to deliver mifepristone to the patient within four days of receipt of the prescription, the pharmacy must contact the prescriber to confirm the appropriateness of dispensing mifepristone and document the certified prescriber's decision. The pharmacy must also record the NDC and lot number from each package of mifepristone dispensed in the patient's record, track and verify receipt of each shipment of mifepristone, dispense mifepristone in its original package, and only distribute, transfer, loan, or sell mifepristone to certified prescribers or between locations of the certified pharmacy. The pharmacy must also report any patient deaths to the prescriber, including the NDC and lot number from the package dispensed to the patient, and remind the prescriber of their obligation under the REMS to report patient deaths to the Sponsor that supplied the mifepristone; the certified pharmacy also must notify the Sponsor that supplied the mifepristone that the pharmacy submitted a report of a patient death to the prescriber and include the name and contact information for the prescriber as well as the NDC and lot number of the dispensed

12

product. Record-keeping requirements of the pharmacy include records of *Prescriber Agreement Forms*, mifepristone dispensing and shipping, and all processes and procedures and compliance with those processes and procedures. Pharmacies must train all relevant staff and participate in compliance audits. Pharmacies must also maintain the identity of patients and providers as confidential, including limiting access to patient and provider identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes. The requirement that mifepristone not be dispensed from retail pharmacies was removed.

The following materials support pharmacy requirements:

- *Pharmacy Agreement Form* for Danco Laboratories, LLC

- *Pharmacy Agreement Form* for GenBioPro, Inc.

**Reviewer Comment:**  *We agree with the Sponsors' proposal. The Mifepristone REMS Program continues to require that mifepristone be prescribed only by certified prescribers. With the removal of the in-person dispensing requirement, however, mifepristone can be dispensed from a pharmacy, provided the product is prescribed by a certified prescriber and all other requirements of the REMS are met. Given this modification to the dispensing requirements in the REMS, it is necessary to add a requirement for certification of pharmacies. Adding the pharmacy certification requirement incorporates pharmacies into the REMS, ensures that pharmacies are aware of and agree to follow applicable REMS requirements, and ensures that mifepristone is only dispensed pursuant to prescriptions that are written by certified prescribers. Without pharmacy certification, a pharmacy might dispense product that was not prescribed by a certified prescriber. Adding pharmacy certification ensures that the prescriber is certified prior to dispensing the product to a patient; certified prescribers, in turn, have agreed to meet all the conditions of the REMS, including ensuring that the Patient Agreement Form is completed. In addition, wholesalers and distributors can only ship to certified pharmacies. Based on our review and our consideration of the distribution model implemented by the Sponsors during the periods when the in-person dispensing requirement was not being enforced, as well as REMS assessment data and published literature, we conclude that provided all other requirements of the REMS are met, the REMS program, with the removal of the in-person dispensing requirement and the addition of a requirement for pharmacy certification, will continue to ensure the benefits of mifepristone for medical abortion outweigh the risks while minimizing the burden imposed by the REMS on healthcare providers and patients.*

*The requirement to maintain confidentiality, including limiting access to patient and provider identity only to those personnel necessary for dispensing under the Mifepristone REMS Program or as necessary for payment and/or insurance purposes, is included to avoid unduly burdening patient access.*

*The Sponsors proposed inclusion of this requirement because of concerns that patients may be reluctant or unwilling to seek to obtain mifepristone from pharmacies if they are concerned that confidentiality of their medical information could be compromised, potentially exposing them to intimidation, threats, or acts of violence by individuals opposed to the use of mifepristone for medical abortion.[e] Further, unwillingness on the part of prescribers to participate in the Mifepristone REMS Program on the basis of*

---

[e] See e.g., *2020 Violence and Disruption Statistics,* National Abortion Federation (Dec. 16, 2021), https://prochoice.org/national-abortion-federation-releases-2020-violence-disruption-statistics/;
 Amanda Musa, CNN, *Wyoming Authorities Search for a Suspect Believed to Have Set an Abortion Clinic on Fire*, CNN WIRE (June 10, 2022), https://abc17news.com/news/2022/06/10/wyoming-authorities-search-for-a-suspect-believed-to-have-set-an-abortion-clinic-on-fire/.

13

Reference ID: 5103819

*similar confidentiality concerns may unduly burden patient access by limiting the number of prescribers who are willing to send prescriptions to certified pharmacies. Addition of this requirement protects patient access by requiring the pharmacy to put processes and procedures in place to limit access to confidential information to only those individuals who are essential for dispensing mifepristone under the Mifepristone REMS Program or as necessary for payment or insurance purposes. Inclusion of this requirement for certified pharmacies is consistent with the requirement in the current Mifepristone REMS Program, that distributors maintain secure and confidential records.*

*Reference to mifepristone not being available in retail pharmacies was removed from the REMS. There is no single definition of the term "retail pharmacy" and therefore the scope of the exclusion in the REMS was not well defined. Including a restriction in the Mifepristone REMS Program that retail pharmacies cannot participate in the REMS may unintentionally prohibit the participation of mail order and specialty pharmacies that could, under one or more definitions, also be considered a "retail pharmacy."*

*After reconsideration of the term, "retail," the Agency concluded that a more appropriate approach was to articulate the specific requirements that would be necessary for pharmacy certification. As modified, the REMS will not preclude the participation of any pharmacy that meets the certification requirements. However, we acknowledge that the provision in the REMS related to pharmacies' verification of prescriber enrollment will likely limit the types of pharmacies that will choose to certify in the REMS. The REMS requires that pharmacies dispense mifepristone only after verifying that the prescriber is certified. The REMS further requires that pharmacies be able to receive the Prescriber Agreement Forms by email and fax.*

(b) (4)

*The pharmacy certification requirements include that the drug reach patients within four days of the certified pharmacy receiving the prescription. During the course of the review, the review team concluded that requiring medication delivery to the patient within four days of the pharmacy's receipt of a prescription is acceptable based on the labeled indication and literature,[13] while taking into account practical shipping considerations (e.g., shipping over weekends and holidays). For patients who will not receive the drug within four calendar days of the date the pharmacy receives the prescription, the pharmacy must notify the certified prescriber and the certified prescriber must determine if it is still appropriate for the certified pharmacy to dispense the drug. The pharmacy must document the certified prescriber's decision. A prescriber's confirmation that it is appropriate to dispense mifepristone when it will not be delivered to the patient within the allotted four days is intended to ensure timeliness of delivery in light of the labeled indication and gestational age.*

14

Pharmacy Agreement Form

The proposed *Pharmacy Agreement Form* is a new form and is the means by which a pharmacy becomes certified to dispense mifepristone. The form, which is submitted by an authorized representative on behalf of a pharmacy seeking certification, outlines all requirements proposed above. Clarification is included in the form that healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program, do not require pharmacy certification. Any new authorized representative must complete and submit the *Pharmacy Agreement Form*. Spaces for specific authorized representative information and pharmacy name and address are included.  The completed form can be submitted by email or fax to the authorized distributor.

*Reviewer Comment: We agree with the Sponsors' proposal. The Pharmacy Agreement Form aligns with the pharmacy requirements discussed above.*

### 3.3.2.4. Distributor Requirements

The Sponsors proposed that the distributors' processes and procedures in the approved Mifepristone REMS Program be updated to ensure that mifepristone is only shipped to clinics, medical offices and hospitals identified by certified prescribers and to certified pharmacies. Distributors will continue to complete the certification process for any *Prescriber Agreement Forms* they receive and also will complete the certification process for pharmacies upon receipt of a *Pharmacy Agreement Form*, including notifying pharmacies when they become certified. FDA was removed as a potential auditor for distributors.

*Reviewer Comment:  We agree with the Sponsors' proposal. At this time, FDA does not audit distributors directly, it carries out inspections of Sponsors to monitor industry compliance with REMS requirements.*

### 3.3.3. REMS Sponsor Requirements
### 3.3.3.1. Sponsor Requirements to Support Prescriber Certification

The Sponsors proposed additions to this section of the REMS document, including that Sponsors will ensure prescribers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy, and that Sponsors will ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date. Sponsors will also ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*: (1) within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies, or (2) within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

*Reviewer Comment: We agree with the Sponsors' proposal. The requirement to confirm that the locations associated with the certified prescriber are current is parallel to the pharmacy requirement that the authorized representative's contact information is up to date. In determining the pharmacy requirement, which is necessary to ensure program compliance and is consistent with other approved REMS that include pharmacy certification, the Agency also concluded that a parallel requirement for certified prescribers should be added.*

*With respect to recertification, it is important that active certified prescribers are informed of and agree to new REMS requirements to ensure the continued safe use of mifepristone. There is minimal burden to recertification and the timelines allow sufficient time to accomplish recertification.*

15

Reference ID: 5103819

### 3.3.3.2.    Sponsor Requirements to Support Pharmacy Certification

The Sponsors proposed the addition of Sponsor requirements to support pharmacy certification and compliance, including ensuring that pharmacies are certified in accordance with the requirements in the Mifepristone REMS Program, de-certifying pharmacies that do not maintain compliance with the certification requirements, and ensuring that pharmacy certification can be completed by email and fax to an authorized distributor. Annually, the authorized representative's name and contact information will be verified to ensure it corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, a new authorized representative must certify for the pharmacy. All reference to the requirement in the 2021 Mifepristone REMS Program that mifepristone to be dispensed to patients only in clinics, medical offices and hospitals by or under the supervision of a certified prescriber, and not from retail pharmacies, was removed.

*Reviewer Comment: We agree with the Sponsors' proposal. Changes are in line with the REMS Modification Notification letters sent December 16, 2021. Refer to section 3.3.2.3 Reviewer Comments on Pharmacy Certification for rationale for removing the statement that mifepristone is not distributed to or dispensed from retail pharmacies. Ensuring that the authorized representative's contact information is up to date is necessary to ensure that there is always a point person who is responsible for implementing the Mifepristone REMS Program in their pharmacy and can address any changes that are needed if pharmacy audits identify a need for improvement.*

### 3.3.3.3.    Sponsor Implementation Requirements

The Sponsors proposed that they will ensure that adequate records are maintained to demonstrate that REMS requirements have been met (including but not limited to records of mifepristone distribution, certification of prescribers and pharmacies, and audits of pharmacies and distributors), and that the records must be readily available for FDA inspections. The distributor audit requirement was updated to audit new distributors within 90 calendar days of becoming authorized and annually thereafter (a one-time audit requirement was previously required). The Sponsors also proposed a pharmacy audit requirement whereby certified pharmacies that order mifepristone are audited within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter for pharmacies that ordered in the previous 12 months.

*Reviewer's Comment: We agree with the Sponsors' proposal.*

*The number of pharmacies that will certify in the REMS is uncertain; therefore, to obtain a reliable sample size for the audits, the Sponsors will need to audit all certified pharmacies within 180 calendar days after the pharmacy places its first order and annually thereafter for pharmacies that have ordered mifepristone in the previous 12 months. Audits performed at 180 days should allow time for establishment and implementation of audit protocols and for the Sponsors to perform the audits. With the addition of more stakeholders (i.e., certified pharmacies), it is also necessary to audit distributors annually to ensure the REMS requirements are followed. The requirement to conduct audits annually may be revisited if assessment data shows that the REMS is meeting its goal.*

### 3.4. REMS Assessment Timetable

The Sponsors proposed that assessments must be submitted one year from the approval of the modified REMS and annually thereafter, instead of every three years as per the previous requirement.

16

Reference ID: 5103819

*Reviewer's Comment: We agree with the Sponsors' proposal. With the addition of new pharmacy stakeholders and removal of the in-person dispensing requirement, more frequent assessment after this REMS modification is needed to ensure REMS processes are being followed and that the REMS is meeting its goal. The requirement can be revisited at a later date if assessment data shows that the modified REMS is meeting its goal. The NDA applicant is required to submit assessment reports as outlined in the timetable for submission of assessments. These reports address requirements for the Mifepristone REMS Program. The Sponsors have indicated that some data will be submitted as separate reports when Sponsor-specific information is needed to address the assessment metrics.*

## 4.  Supporting Document

The Sponsors' REMS Supporting Document was substantially updated to include information regarding the proposed modification under review. Background and rationale from the 12/16/21 REMS Modification Notification letters was included. An updated description of the REMS goal and the ETASU was also included to align with the changes in the REMS Document and provide further clarification. Further explanation of prescriber requirements and rationale for various pharmacy requirements was also included.

Regarding implementation of the modified REMS, the Sponsors additionally proposed that pharmacies that received and shipped mifepristone during the Agency's exercise of enforcement discretion during the COVID-19 PHE, that wish to continue to dispense mifepristone, will be required to comply with the pharmacy certification requirements within 120 days of approval of the modified REMS.

The communication strategy to alert current and future prescriber and pharmacy stakeholders was outlined. Distributors, certified prescribers that purchased mifepristone in the last twelve months, and various professional organizations will receive information about REMS changes within 120 days of modification approval. The Sponsors proposed to list pharmacies that agree to be publicly disclosed on their respective product websites but disclosure of this nature is not a requirement of the REMS. The Sponsors indicated that they anticipate certified pharmacies that do not agree to public disclosure will communicate with the certified prescribers they wish to work with.

The REMS Assessment Plan is discussed in the following section.

*Reviewer's Comment: We agree with the Sponsors' proposal. The Supporting Document addresses all REMS requirements and provides sufficient clarification of implementation and maintenance of the REMS. The implementation requirements for pharmacies currently dispensing mifepristone under FDA's exercise of enforcement discretion during the COVID-19 PHE provide for continued use of these pharmacies without breaks in service. The communication strategy is also adequate given the efforts to reach both established certified prescribers and potentially new prescribers through professional organizations.*

*The Sponsors' plan to communicate which pharmacies are certified to certified prescribers is adequate. For the reasons listed in section 3.3.2.3, confidentiality is a concern for REMS stakeholders. Disclosure of pharmacy certification status should be a choice made by individual certified pharmacies. The Sponsors have indicated that there will be some certified pharmacies that have agreed to publicly disclose their status, making this information available to certified prescribers who wish to use a pharmacy to dispense mifepristone.*

## 5.  REMS Assessment Plan

Reference ID: 5103819

The REMS Assessment Plan is summarized in the REMS Supporting Document and will be included in the REMS Modification Approval letter.

The REMS Assessment Plan was revised to align with the modified REMS goal and objectives.

The goal of the Mifepristone REMS Program is to mitigate the risk of serious complications associated with mifepristone by:

a. Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

- This objective will be assessed using REMS Certification Statistics and REMS Compliance metrics.

b. Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

- This objective will be assessed using REMS Certification Statistics and REMS Compliance metrics.

c. Informing patients about the risk of serious complications associated with mifepristone.
- This objective will be indirectly assessed using REMS Certification Statistics to avoid compromising patient and prescriber confidentiality.  As part of the certification process, healthcare providers agree to:
  - Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained
  - Ensure that the *Patient Agreement Form* is signed by the healthcare provider and the patient
  - Ensure that the patient is provided with a copy of the *Patient Agreement Form* and the Medication Guide
  - Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record

The following revisions were made from the Mifepristone REMS Assessment Plan in the April 11, 2019, Supplement Approval letter:

The Assessment Plan Categories of 1) Program Implementation and Operations and 2) Overall Assessment of REMS Effectiveness were added.

REMS Certification Statistics metrics were added to capture certification numbers for program stakeholders to assess the first objective of requiring healthcare providers who prescribe mifepristone to be certified and the second objective of ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.  The total number of certified prescribers who certified with the wholesaler/distributor and the total number of certified prescribers who submitted a *Prescriber Agreement Form* to certified pharmacies were added to capture the additional method of prescriber certification. The number of newly certified prescribers and the number of active certified prescribers (i.e., those who ordered mifepristone or submitted a prescription during the reporting period) were added. Metrics were also added to capture the total number of certified, newly certified, and active certified pharmacies as well as the total number of authorized, newly authorized, and active authorized wholesaler/distributors.

18

2023 SUPP 001129

Drug Utilization Data metrics were added to obtain information on shipment and dispensing of mifepristone.  Metrics were added to capture the total number of tablets shipped by the wholesaler/distributor and the number of prescriptions dispensed.

REMS Compliance Data metrics were added to assess the first objective of requiring healthcare providers who prescribe mifepristone to be certified and the second objective of ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.  These metrics capture program deviations and evaluate overall if the REMS is operating as intended.  Metrics include certified pharmacies and wholesaler/distributor audit results and a summary of instances of non-compliance and actions taken to address non-compliance. Prescriber compliance metrics were added to assess if prescribers are decertified along with reasons why. Pharmacy compliance metrics were added to assess if prescriptions were dispensed that were written by non-certified prescribers or if mifepristone tablets were dispensed by non-certified pharmacies as well as the number of pharmacies that were decertified along with reasons why.  Wholesaler/distributor metrics were added to assess if shipments were sent to non-certified prescribers and non-certified pharmacies and corrective actions taken. The audit plan and non-compliance plans will be submitted for FDA review within 60 days after the REMS modification approval.

The Sponsors were asked to develop an assessment of prescription delivery timelines to determine what percentage of prescriptions were delivered on time (within four calendar days) and what percentage were delivered late (more than four calendar days) along with the length of the delay and reasons for the delay (e.g., mifepristone is out of stock shipment issues, other).  The protocol for this assessment will be submitted for FDA review within 60 days after the REMS modification approval.

The revised REMS Assessment Plan is in the Appendix.

***Reviewer's Comment***: *We agree with the Sponsors' proposed REMS Assessment Plan.*

## 6.  Discussion

The Sponsors submitted changes to the REMS to remove the requirement that mifepristone be dispensed only in certain healthcare settings (i.e., the "in-person dispensing requirement") and to add that certified pharmacies can dispense the drug in order to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The REMS goal was updated to this effect. Changes were required for prescriber requirements and Sponsors to support the change in ETASU, and new pharmacy requirements were introduced.

The qualifications to become a certified prescriber have not changed as a result of the modification to the Mifepristone REMS Program; however, clarification has been provided for certain prescriber requirements and new prescriber requirements have been added to support pharmacy dispensing. Although certain responsibilities may be conducted by staff under the supervision of a certified prescriber, the certified prescriber remains responsible for ensuring compliance with the requirements of the Mifepristone REMS Program. In order to clarify this, revisions were made throughout the prescriber requirements and REMS materials to reflect that the certified prescriber is responsible for ensuring that the prescriber requirements are met. Additionally, the review team finds it acceptable that certified prescribers who wish to use a certified pharmacy to dispense mifepristone submit their *Prescriber Agreement Form* to the dispensing certified pharmacy (b) (4)

. The burden to prescriber and

19

Reference ID: 5103819

pharmacy stakeholders of having certified prescribers submit the form directly to the certified pharmacy that will be dispensing the mifepristone is not unreasonable and has been minimized to the extent possible; it does not impact the safe use of the product. Prescriber requirements necessitated by the addition of some pharmacy requirements were added as well and include prescriber responsibilities in deciding whether or not mifepristone should be dispensed if the patient will receive the drug from the certified pharmacy more than four days after the pharmacy receives the prescription, and prescriber adverse event reporting requirements if a prescriber becomes aware of a patient death and the mifepristone was dispensed from a certified pharmacy. The addition of the latter requirements will ensure consistent adverse event data is relayed to the relevant Mifepristone Sponsor.

Changes were made to the *Patient Agreement Form.* Changes to the form were added to improve clarity of the safety messages. After further consideration, the patient's agreement to take the Medication Guide with them if they visit an emergency room or HCP who did not give them mifepristone so the emergency room or HCP will understand that the patient is having a medical abortion has been removed from the *Patient Agreement Form*. The Medication Guide is not typically carried by patients and this information can be obtained at the point of care. Changes align with updates to labeling submitted with this modification.[13, 14]

The Agency and Sponsors agreed during this modification to focus on certification of pharmacies that can receive *Prescriber Agreement Forms* via email or fax to complete the prescriber certification process. The proposed pharmacy certification requirements also support timely dispensing of mifepristone. If the mifepristone is shipped to the patient, the REMS requires that it must be delivered within four calendar days from the receipt of the prescription by the pharmacy; if the patient will receive the mifepristone more than four calendar days from pharmacy receipt of prescription, the REMS requires the pharmacist to confirm with the certified prescriber that it is still appropriate to dispense the drug to the patient. This allows prescribers to make treatment decisions based on individual patient situations. A requirement to maintain confidentiality was also added to avoid unduly burdening patient access since patients and prescribers may not utilize pharmacy dispensing if they believe their personal information is at risk. Ultimately, the addition of pharmacy distribution with the proposed requirements will offer another option for dispensing mifepristone, alleviating burden associated with the REMS.



(b) (4)

.

The Agency reviewed the REMS in 2021, and per the review team's conclusions, a REMS modification was necessary to remove the in-person dispensing requirement and add a requirement that pharmacies that dispense the drug be specially certified; the review team concluded that these changes could occur without compromising patient safety. There have been no new safety concerns identified relevant to the REMS ETASUs that the applicants proposed modifying in their June 22, 2022 submissions since the REMS Modification Notification letters dated 12/16/2021. It is still the position of the review team that the proposed modification is acceptable.

Because the modification proposed include changes to the ETASU of the Mifepristone REMS Program, the assessment plan and timetable of assessments were changed. The assessment plan will capture information on pharmacy dispensing and provide valuable insight as to whether the program is operating as intended Annual assessments are consistent with other approved REMS modifications for major modifications necessitating extensive assessment plan changes.

20

Reference ID: 5103819

As part of the REMS Assessment Plan, the REMS goal and objectives are assessed using Program Implementation and Operations Metrics, including REMS Certification Statistics and REMS Compliance Data. The metrics will provide information on the number of certified prescribers, certified pharmacies, and authorized wholesalers/distributors as well as if mifepristone is dispensed by non-certified prescribers or pharmacies. The Sponsors will use the indirect measure of healthcare provider certification to address the objective of informing patients of the risk of serious complications of mifepristone, due to concerns with prescriber and patient confidentiality. Although we typically assess whether patients are informed of the risks identified in a REMS through patient surveys and/or focus groups, we agree that the Sponsors' continued use of the indirect measure of healthcare provider certification adequately addresses the Mifepristone REMS Program objective of informing patients. In addition, because of these prescriber and patient confidentiality concerns, we believe it is unlikely that the Agency would be able to use the typical methods of assessment of patient knowledge and understanding of the risks and safe use of mifepristone.

## 7. Conclusions and Recommendations

The review team finds the proposed REMS modification for the Mifepristone REMS Program, as submitted on June 22, 2022, and amended on October 19, 2022 (Danco) and October 20, 2022 (GBP), November 30, 2022 (both), December 9 (both), and December 16 (both) acceptable. The REMS materials were amended to be consistent with the revised REMS document. The review team recommends approval of the Mifepristone REMS Program, received on June 22, 2022, and last amended on December 16, 2022, and appended to this review.

## 8. References

1.                (b) (6)   Clinical Review of SE-2 Efficacy Supplement for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909590.

2.          (b) (6)   Summary Review for Regulatory Action for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909594.

3.          (b) (6)   REMS Review for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909588.

4.          (b) (6)   REMS Review for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909587.

5.      Approval Letter for SE-2 Efficacy Supplement for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 3909592.

6.      (b) (6)   REMS Review for mifepristone, NDA 020687. February 22, 2018. DARRTS Reference ID: 4224674.

7.      Approval Letter for SE-20 REMS Supplement for mifepristone, NDA 020687. March 29, 2016. DARRTS Reference ID: 4418041.

8.      *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 233 (D. Md. July 13, 2020), order clarified, 2020 WL 8167535 (D. Md. Aug. 19, 2020) (preliminarily enjoining FDA from enforcing the in-person dispensing requirement and any other in-person requirements of the

2023 SUPP 001132

Mifepristone SSS REMS); *FDA v. Am. Coll. of Obstetricians & Gynecologists*, 141 S. Ct. 578 (Jan. 12, 2021) (staying the preliminary injunction imposed by the District Court).

9.    ⬚⬚⬚⬚⬚⬚ (b) (6) REMS Modification Rationale Review for mifepristone, NDA 020687. December 16, 2021. DARRTS Reference ID: 4905882.

10.    General Advice Letter for the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone, NDA 020687, April 15, 2022.  DARRTS ID 4969358.

11.    Format and Content of a REMS Document Guidance for Industry https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM184128.pdf.  Accessed on December 18, 2022.

12.    Grossman D, Raifman S, Morris N, et.al. Mail-order pharmacy dispensing of mifepristone for medication abortion after in-person clinical assessment. Contraception 2022; 107:36-41. https://doi.org/10.1016/j.contraception.2021.09.008. This article was included in the literature review for the December 16, 2021 REMS Modification Rationale Review, while the article was still in press.

# 9.  Appendices

REMS Document

Prescriber Agreement Form for Danco Laboratories, LLC

Prescriber Agreement Form for GenBioPro, Inc.

Patient Agreement Form

Pharmacy Agreement Form for Danco Laboratories, LLC

Pharmacy Agreement Form for GenBioPro, Inc.

Mifepristone REMS Assessment Plan

2023 SUPP 001133

Reference ID: 5103819

Initial Shared System REMS approval:  04/2019
Most Recent Modification: 01/2023

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

## I.   GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

   a)   Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

   b)   Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

   c)   Informing patients about the risk of serious complications associated with mifepristone.

## II.  REMS ELEMENTS

### A. Elements to Assure Safe Use

1.   Healthcare providers who prescribe mifepristone must be specially certified.

   a.   To become specially certified to prescribe mifepristone, healthcare providers must:

      i.   Review the Prescribing Information for mifepristone.

      ii.  Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

         1)   They have the following qualifications:

            a)   Ability to assess the duration of pregnancy accurately

            b)   Ability to diagnose ectopic pregnancies

            c)   Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

         2)   They will follow the guidelines for use of mifepristone (see b.i-vii below).

   b.   As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

      i.   Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

      ii.  Ensure that the healthcare provider and patient sign the *Patient Agreement Form.*

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

Reference ID: 5103819

iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

vi. If mifepristone will be dispensed by a certified pharmacy:

   1) Provide the certified pharmacy a signed *Prescriber Agreement Form.*

   2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

   3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

   1) Provide an authorized distributor with a signed *Prescriber Agreement Form.*

   2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

   3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

   1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

   2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

Reference ID: 5103819

2. Pharmacies that dispense mifepristone must be specially certified

   a. To become specially certified to dispense mifepristone, pharmacies must:

      i. Be able to receive *Prescriber Agreement Forms* by email and fax.

      ii. Be able to ship mifepristone using a shipping service that provides tracking information.

      iii. Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

      iv. Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

         1) Review the Prescribing Information for mifepristone.

         2) Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

           a) Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

           b) Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

           c) Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

           d) Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

           e) Track and verify receipt of each shipment of mifepristone.

           f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

           g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone.  Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

           h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

           i) Maintain records of *Prescriber Agreement Forms*.

           j) Maintain records of dispensing and shipping.

           k) Maintain records of all processes and procedures including compliance with those processes and procedures.

           l) Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

           m) Train all relevant staff on the Mifepristone REMS Program requirements.

      n)  Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

b.  Mifepristone Sponsors must:

    i.  Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

    ii.  Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

    i.  Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.  Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form.*

a.  The patient must sign a *Patient Agreement Form* indicating that the patient has:

    i.  Received, read and been provided a copy of the *Patient Agreement Form.*

    ii.  Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

## B. Implementation System

1.  Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

a.  Ensuring that distributors who distribute their mifepristone comply with the program requirements for distributors.

    i.  The distributors must put processes and procedures in place to:

      1)  Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form.*

      2)  Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

      3)  Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

      4)  Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

      5)  Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

    ii.  Put processes and procedures in place to maintain a distribution system that is secure,

      confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

   iii. Train all relevant staff on the Mifepristone REMS Program requirements.

   iv. Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

  b. Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2. Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4. Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5. Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6. Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7. Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

**C. Timetable for Submission of Assessments**

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (1/3/2023) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:

  o   Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**

  o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.

  o   Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 001139

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:

  o  Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.

  o  Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.

- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:

  o  Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____    Title: _____

Signature: _____    Date: _____

Medical License # _____    State _____

NPI # _____

Practice Setting Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved 01/2023 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 001140

Reference ID: 5103819

PRESCRIBER AGREEMENT FORM                                    Mifepristone Tablets, 200 mg

Mifepristone Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit mifepristone prescriptions for dispensing from certified pharmacies**:

  o   Submit this form to each certified pharmacy to which you intend to submit mifepristone prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order mifepristone for dispensing by you or healthcare providers under your supervision:**

  o   Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.

  o   Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855—643-3463 toll-free), or by visiting www.MifeInfo.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received mifepristone are reported to GenBioPro, Inc. that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

Ensure that healthcare providers under your supervision follow the guidelines listed above.



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

2023 SUPP 001141

Reference ID: 5103819

- If mifepristone will be dispensed through a certified pharmacy:

  o Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

  o Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of a patient.

- If mifepristone will be dispensed by you or by healthcare providers under your supervision:

  o Ensure the NDC and lot number from each package of mifepristone are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____     Title: _____

Signature: _____     Date: _____

Medical License # _____     State _____

NPI # _____

Practice Setting Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to 1-877-239-8036

Approved 01/2023 [Doc control ID]



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

2023 SUPP 001142

## PATIENT AGREEMENT FORM                    Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

**1.** I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

**2.** I understand:
   **a.** I will take mifepristone on Day 1.
   **b.** I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

**3.** My healthcare provider has talked with me about the risks, including:
- heavy bleeding
- infection

**4.** I will contact the clinic/office/provider right away if in the days after treatment I have:
- a fever of 100.4°F or higher that lasts for more than four hours
- heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
- severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
— these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

**5.** I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

**6.** I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

**7.** If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

**8.** I have the MEDICATION GUIDE for mifepristone.

**9.** My healthcare provider has answered all my questions.


**Patient Signature:** _____  **Patient Name** (print): _____  **Date**: _____


**Provider Signature:** _____  **Provider Name** (print): _____  **Date**: _____


*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

**01/2023**

2023 SUPP 001143

Reference ID: 5103819

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - Track and verify receipt of each shipment of Mifeprex.
  - Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 001144

Reference ID: 5103819

Signature: _____     Date: _____

Email: _____     Phone: _____     Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC

P.O. Box 4816-New York, NY 10185

1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 001145

**PHARMACY AGREEMENT FORM**                                    **Mifepristone Tablets, 200 mg**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense mifepristone is able to receive *Prescriber Agreement Forms* by email and fax.

- Each location of my pharmacy that will dispense mifepristone is able to ship mifepristone using a shipping service that provides tracking information.

- I have read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855-643-3463 toll-free) or online at www.MifeInfo.com; and

- Each location of my pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting mifepristone orders.

  o Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.

  o Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.

  o Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

  o Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

  o Track and verify receipt of each shipment of mifepristone.

  o Dispense mifepristone in its package as supplied by GenBioPro, Inc.

  o Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to GenBioPro, Inc. Notify GenBioPro that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

  o Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

  o Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, all processes and procedures including compliance with those processes and procedures.

  o Maintain the identity of mifepristone patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance purposes.

  o Train all relevant staff on the Mifepristone REMS Program requirements.

  o Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____

Signature: _____    Date: _____

Email: _____    Phone: _____    Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to **1-877-239-8036.**



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.GenBioPro.com
2023-SUPP-001-146

Reference ID: 5103819

The REMS Assessment Plan must include but is not limited to the following items.

**Program Implementation and Operations**

1. REMS Certification Statistics
   a. Prescribers
      i. Number of certified prescribers who have certified with the Sponsor's distributor(s) and number who have submitted *Prescriber Agreement Forms* to Certified Pharmacies
      ii. Number and percentage of newly certified prescribers
      iii. Number and percentage of active certified prescribers (i.e., who ordered mifepristone or submitted a prescription during the reporting period)

   b. Pharmacies
      i. Number of certified pharmacies
      ii. Number and percentage of newly certified pharmacies
      iii. Number and percentage of active certified pharmacies (i.e., that dispensed mifepristone during the reporting period)
   c. Wholesalers/Distributors
      i. Number of authorized wholesalers/distributors
      ii. Number and percentage of newly authorized wholesalers/distributors
      iii. Number and percentage of active authorized wholesalers/distributors (i.e. that shipped mifepristone during the reporting period)

2. Utilization Data
   a. Total number of tablets shipped by wholesalers/distributors, stratified by Certified Prescriber or Certified Pharmacy location
   b. Number of prescriptions dispensed from pharmacies

3. REMS Compliance Data
   a. Audits: Summary of audit activities for each stakeholder (i.e., certified pharmacies and wholesalers/distributors) including but not limited to:
      i. A copy of the final audit plan for each stakeholder type (provide for the current reporting period)
      ii. The number of audits expected, and the number of audits performed
      iii. The number and type of deficiencies noted
      iv. For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required, if any, to address the deficiencies, including the status (e.g., completed, not completed, in progress) (provide for the current reporting period)
      v. For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken (provide for the current reporting period)

1

2023 SUPP 001147

vi.  A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements (provide for the current reporting period)

b.  A summary report of non-compliance, associated corrective action plans (CAPAs), and the status of CAPAs including but not limited to:

i.  A copy of the final non-compliance plans for Pharmacies and Distributors (provide for the current reporting period)

ii.  For each instance of noncompliance below (iii-v), report the following information (provide for the current reporting period):

1.  A unique, anonymized ID for the stakeholder(s) associated with the non-compliance event to enable tracking over time

2.  The source of the non-compliance data (e.g., self-reported, audit, other)

3.  A root cause analysis of the non-compliance

4.  Actions to prevent future occurrences and outcomes of such actions

iii.  Prescriber compliance

1.  Number and percentage of certified prescribers who became decertified as a result of non- compliance

- Provide a summary of reasons for decertification (provide for the current reporting period)

2.  Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

iv.  Pharmacy compliance

1.  Number and percentage of prescriptions dispensed that were written by prescriber(s) who did not submit a Prescriber Agreement to the dispensing Certified Pharmacy

2.  Number and percentage of mifepristone tablets dispensed by non-certified pharmacies

3.  Number and percentage of pharmacies that became decertified as a result of non-compliance

- Provide a summary of reasons for decertification (provide for the current reporting period)

4.  An assessment of prescription delivery timelines, including percentage delivered more than four days after receipt of the prescription, duration and causes for delay.  A proposal for this assessment will be submitted within 60 days of the approval of the REMS Modification.

5.  Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

v.  Wholesaler/distributor compliance

1.  Number of healthcare providers who successfully ordered mifepristone who were not certified

2.  Number of non-certified pharmacies that successfully ordered mifepristone

3.  Number of shipments sent to non-certified prescriber receiving locations

4.  Number of shipments sent to non-certified pharmacy receiving locations

2

Reference ID: 5103819

5.   Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

3

Reference ID: 5103819

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b) (6)

01/03/2023 05:18:27 PM

(b) (6)

01/03/2023 05:19:15 PM

(b) (6)

01/03/2023 05:24:28 PM

(b) (6)

01/03/2023 05:27:04 PM

(b) (6)

01/03/2023 05:27:58 PM

(b) (6)

01/03/2023 05:29:45 PM

(b) (6)

01/03/2023 05:33:47 PM

2023 SUPP 001150



# 2020 VIOLENCE AND DISRUPTION STATISTICS

Despite a global pandemic, abortion providers continued to experience an escalation in targeted violence and disruption in 2020. Abortion providers reported an increase in vandalism, assault and battery, death threats/threats of harm, stalking, and hoax devices/suspicious packages from 2019.

Throughout 2020, anti-abortion individuals and groups exploited the COVID-19 pandemic, racial justice uprisings, and 2020 elections as opportunities to harass abortion providers.

Anti-abortion protesters congregated outside abortion clinics despite stay-at-home orders and public health guidance to avoid group gatherings, and we observed an alarming trend of armed, white supremacist individuals meeting outside NAF member facilities and protesters co-opting the language of the movement for Black lives in their attempts to intimidate providers and patients.

Emboldened by the passage and enforcement of abortion restrictions in several states, anti-abortion individuals and groups continued to harass abortion providers this year. A January 2020 unclassified report from the FBI outlined an ongoing increase in anti-abortion threats, disruption, and violence, stating, "The FBI assesses the increase in abortion-related violent extremist threats and criminal activity, including violations of the Freedom of Access to Clinic Entrances (FACE) Act, against targets including reproductive healthcare facilities (RHCFs) likely is driven in part by the recent rise in state legislative activities related to abortion services and access."

Abortion providers reported an increase in vandalism, assault and battery, death threats/threats of harm, stalking, and hoax devices/suspicious packages from 2019.

PCSF677

2023 SUPP 001152

ANTI-SEMITIC VIOLENCE AND DISRUPTION STATISTICS



Case 1:17-cv-00493-JAO-RT Document 232-5 Filed 10/02/25 Page 68 of 95 PageID.9410

# ASSAULT & BATTERY

## REPORTS OF ASSAULT & BATTERY INCREASED 125% FROM 2019

NAF members reported an increase in assault and battery outside of clinics, with the majority of incidents involving anti-abortion protesters having altercations with clinic escorts, patient companions, and patients. We received reports of anti-abortion individuals shoving, pushing, tripping, and spitting on clinic escorts, staff, and others outside of clinics. These reports were particularly disturbing given the public health concerns around COVID-19 and the guidance to practice social distancing.



PCSF679

2023 SUPP 001154

# INTERNET HARASSMENT & DEATH THREATS

Internet harassment, hate mail and harassing phone calls, and death threats all rose once again this year. During the pandemic, some anti-abortion individuals and groups encouraged their followers who were staying at home to target abortion care providers online.

Providers reported:

## 3,413 targeted incidents of hate mail and harassing phone calls, rising from 3,123 in 2019.

Abortion care providers continued to receive focused threats through phone calls and text messages as well as postal mail and flyers sent to health care facilities and the homes of clinic staff. This hate speech often escalates and turns into death threats and threats of harm.

## In 2020, abortion providers reported an increase in death threats and threats of harm, rising from 92 in 2019 to 200 in 2020.

Case 1:1-70-4939493-JAO-PT Document 232-5 Filed 10/02/25/27/35 70 Page 515 age 517205 PageID.9412

# PROTESTS AMID A PANDEMIC

Although reports of picketing were slightly lower in 2020, this is likely due to a decrease in anti-abortion protester activity in some locations at the very beginning of the COVID-19 pandemic. However, after the onset of the pandemic, anti-abortion individuals and groups went back to targeting clinics and we received anecdotal accounts of increased threats and disruptions at member clinics specifically linked to COVID-19, with anti-abortion protesters threatening to sneeze and cough on patients and surrounding patients' cars as they waited to enter clinic buildings. Many anti-abortion protesters were unmasked and defied stay-at-home orders and restrictions on gatherings:



123,228
115,517
■ 2019
■ 2020

- In March 2020, four men were charged —and three of them arrested—while protesting outside a clinic in Greensboro, NC, even though there was a local stay-at-home order in place. The following week, eight people were arrested for violating North Carolina's stay-at-home order by participating in a protest of approximately 50 people outside an abortion clinic in Charlotte.

- The first citation for violating San Francisco's COVID-19 stay-at-home order was issued to an anti-abortion protester outside a clinic.

- In Michigan, the Governor issued a stay-at-home order that prohibited

public and private gatherings but did not apply to churches and other houses of worship. Anti-abortion protesters exploited this and gathered in large groups outside Detroit clinics during the pandemic claiming that they were having a religious gathering.

- More than 700 anti-abortion individuals held a march in Charlotte, NC, in November with no social distancing and few people wearing masks during a record-breaking spike in COVID-19 cases.

NAF members also reported an escalation in aggressive behavior from protesters during 2020 so although there was a slight decrease in picketing, the activities were often more intense and disruptive.

PCSF681

2023 SUPP 001156

Case 1:17-cv-00493-JAO-RT   Document 225-5   Filed 10/02/25   Page 71 of 151   PageID.9413

# METHODOLOGY

NAF has been tracking incidents of violence and disruption against reproductive health care providers since 1977. NAF asks our member facilities and allied organizations to submit monthly reports on the anti-abortion incidents that they experience. We conduct telephone and email follow up to our member clinics to acquire completed reports and to gather additional information about reported incidents as needed. If we are not able to validate an incident, it is not included in our statistics, which suggests that actual incidents are higher than reported. In the 2020 statistics, we suspect underreporting in picketing, blockades, obstructions, robbery, stalking, suspicious packages, trespass, and vandalism.

NAF continues to work with an outside security firm to monitor threats, track scheduled anti-abortion events, and develop comprehensive profiles of anti-abortion extremists. NAF collects and compiles this data to detect patterns in anti-abortion criminal activities and appropriately report these trends to law enforcement.

Numbers prior to 2013 represent the United States and Canada only. Numbers from 2013-2020 represent the United States, Canada, and Colombia.

## ABOUT NAF

*The National Abortion Federation (NAF) is the professional association of abortion providers in North America. We represent all types of abortion providers. Our members include private and non-profit clinics, Planned Parenthood affiliates, women's health centers, physicians' offices, and hospitals who together care for more than half the women who choose abortion in the U.S. and Canada each year. Our members also include public hospitals and both public and private clinics in Mexico City and private clinics in Colombia.*



www.prochoice.org

PCSF682                                                        2023 SUPP 001157

| naf NATIONAL ABORTION FEDERATION | NAF VIOLENCE AND DISRUPTION STATISTICS (2010 - 2020) INCIDENTS OF VIOLENCE & DISRUPTION AGAINST ABORTION PROVIDERS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Totals 2010 2020 |
| **Violence** | | | | | | | | | | | | |
| Murder | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 3 |
| Attempted Murder | 0 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 9 |
| Bombing | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Arson | 0 | 1 | 5 | 0 | 1 | 4 | 1 | 1 | 1 | 1 | 5 | 20 |
| Attempted Bombing / Arson | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 4 | 8 |
| Invasion | 0 | 0 | 0 | 8 | 1 | 6 | 7 | 11 | 8 | 19 | 7 | 67 |
| Vandalism | 22 | 27 | 12 | 5 | 12 | 67 | 109 | 92 | 125 | 70 | 80 | 621 |
| Trespassing[1] | 45 | 69 | 47 | 264 | 78 | 118 | 247 | 823 | 1,135 | 1,507 | 1,265 | 5,598 |
| Butyric Acid Attacks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Anthrax / Bioterrorism Threats | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| Assault & Battery | 4 | 3 | 7 | 0 | 1 | 6 | 36 | 36 | 15 | 24 | 54 | 186 |
| Death Threats / Threats of Harm[2] | 2 | 2 | 6 | 2 | 1 | 94 | 33 | 62 | 57 | 92 | 200 | 551 |
| Kidnapping | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Burglary[3] | 13 | 8 | 5 | 0 | 1 | 9 | 66 | 34 | 13 | 9 | 8 | 166 |
| Stalking[4] | 7 | 1 | 6 | 20 | 4 | 9 | 22 | 21 | 14 | 2 | 4 | 110 |
| **Totals** | 95 | 114 | 88 | 299 | 99 | 325 | 521 | 1,081 | 1,369 | 1,724 | 1,627 | 7,342 |
| **Disruption** | | | | | | | | | | | | |
| Hate Mail / Harassing Calls | 404 | 365 | 452 | 420 | 367 | 373 | 869 | 1,156 | 1,388 | 3,123 | 3,413 | 12,330 |
| Hate Email / Internet Harassment[5] | 44 | 17 | 41 | 88 | 91 | 25,839 | 42,726 | 15,773 | 21,252 | 22,366 | 24,646 | 152,883 |
| Hoax Devices / Suspicious Packages[6] | 8 | 2 | 7 | 2 | 9 | 35 | 29 | 30 | 4 | 2 | 27 | 155 |
| Bomb Threats | 12 | 1 | 1 | 4 | 1 | 4 | 9 | 8 | 3 | 8 | 5 | 56 |
| Picketing[7] | 6,347 | 4,780 | 5,706 | 5,574 | 5,402 | 21,715 | 61,562 | 78,114 | 99,409 | 123,228 | 115,517 | 527,354 |
| Obstruction[8] | | | 79 | 396 | 251 | 242 | 580 | 1,704 | 3,038 | 3,387 | 2,712 | 12,389 |
| **Totals** | 6,815 | 5,165 | 6,286 | 6,484 | 6,121 | 48,208 | 105,775 | 96,785 | 125,094 | 152,114 | 146,320 | 705,167 |
| **Clinic Blockades** | | | | | | | | | | | | |
| Number of Incidents | 1 | 5 | 6 | 3 | 23 | 45 | 51 | 104 | 43 | 9 | 2 | 292 |
| Number of Arrests[9] | 0 | 0 | 4 | 1 | 0 | 0 | 1 | 10 | 2 | 0 | 18 | 36 |

[1] Tabulation of trespassing began in 1999.

[2] Death Threats, as of 2015, include any reported or discovered "Threats of Harm."

[3] This category includes incidents of Burglary, Robbery, and Theft that occurred at a reproductive health facility.

[4] Stalking is defined as the persistent following, threatening, and harassing of an abortion provider, staff member, or patient away from the clinic. Tabulation of stalking incidents began in 1993.

[5] Tabulation of email harassment began in 2002. As of mid-November 2015, enhanced technology allowed for an increased ability to document internet harassment.

[6] Tabulation of hoax devices began in 2002.

[7] NAF changed its method of collecting picketing data in 2012. Obstruction was separated into its own category.

[8] Tabulation of obstructions began in 2012. Obstruction is defined as the act of causing a delay or an attempt to cause a delay in the conduct of business or prevent persons from entering or exiting an area. This would apply to violations of the FACE Act.

[9] The "number of arrests" represents the total number of arrests, not the total number of persons arrested. Many individuals were arrested multiple times

| | NAF VIOLENCE AND DISRUPTION STATISTICS (Summary by Decade) INCIDENTS OF VIOLENCE & DISRUPTION AGAINST ABORTION PROVIDERS | | | | | |
|---|---|---|---|---|---|---|
| | 1977 to 89 | 1990 to 99 | 2000 to 09 | 2010 to 19 | 2020 | Totals |
| **Violence** | | | | | | |
| Murder | 0 | 7 | 1 | 3 | 0 | 11 |
| Attempted Murder | 0 | 16 | 1 | 9 | 0 | 26 |
| Bombing | 25 | 15 | 1 | 1 | 0 | 42 |
| Arson | 64 | 96 | 14 | 15 | 5 | 194 |
| Attempted Bombing / Arson | 37 | 39 | 20 | 4 | 4 | 104 |
| Invasion | 247 | 117 | 25 | 60 | 7 | 456 |
| Vandalism | 244 | 575 | 570 | 541 | 80 | 2,010 |
| Trespassing[1] | | 193 | 1,864 | 4,333 | 1,265 | 7,655 |
| Butyric Acid Attacks | 0 | 100 | 0 | 0 | 0 | 100 |
| Anthrax / Bioterrorism Threats | 0 | 47 | 614 | 2 | 0 | 663 |
| Assault & Battery | 58 | 53 | 71 | 132 | 54 | 368 |
| Death Threats / Threats of Harm[2] | 70 | 247 | 88 | 351 | 200 | 956 |
| Kidnapping | 2 | 1 | 1 | 0 | 0 | 4 |
| Burglary[3] | 20 | 35 | 98 | 158 | 8 | 319 |
| Stalking[4] | | 404 | 110 | 106 | 4 | 624 |
| **Totals** | **767** | **1,945** | **3,478** | **5,715** | **1,627** | **13,532** |
| **Disruption** | | | | | | |
| Hate Mail / Harassing Calls | 192 | 6,327 | 6,210 | 8,917 | 3,413 | 25,059 |
| Hate Email / Internet Harassment[5] | | | 345 | 128,237 | 24,646 | 153,228 |
| Hoax Devices / Suspicious Packages[6] | | | 160 | 128 | 27 | 315 |
| Bomb Threats | 237 | 245 | 129 | 51 | 5 | 667 |
| Picketing[7] | 847 | 29,937 | 110,600 | 411,837 | 115,517 | 668,738 |
| Obstruction[8] | | | | 9,677 | 2,712 | 12,389 |
| **Totals** | **1,276** | **36,509** | **117,444** | **558,847** | **146,320** | **860,396** |
| **Clinic Blockades** | | | | | | |
| Number of Incidents | 385 | 289 | 87 | 290 | 2 | 1,051 |
| Number of Arrests[9] | 24,380 | 9,447 | 4 | 18 | 18 | 33,867 |

[1] Tabulation of trespassing began in 1999.

[2] Death Threats, as of 2015, include any reported or discovered "Threats of Harm."

[3] This category includes incidents of Burglary, Robbery, and Theft that occurred at a reproductive health facility.

[4] Stalking is defined as the persistent following, threatening, and harassing of an abortion provider, staff member, or patient away from the clinic. Tabulation of stalking incidents began in 1993.

[5] Tabulation of email harassment began in 2002. As of mid-November 2015, enhanced technology allowed for an increased ability to document internet harassment.

[6] Tabulation of hoax devices began in 2002.

[7] NAF changed its method of collecting picketing data in 2012. Obstruction was separated into its own category.

[8] Tabulation of obstructions began in 2012. Obstruction is defined as the act of causing a delay or an attempt to cause a delay in the conduct of business or prevent persons from entering or exiting an area. This would apply to violations of the FACE Act.

[9] The "number of arrests" represents the total number of arrests, not the total number of persons arrested. Many individuals were arrested multiple times.

## Center for Drug Evaluation and Research (CDER)

(b)(6)/PPI

### Memorandum to File

| NDA | 020687 |
|---|---|
| Reviewer, (b)(6)/PPI | (b)(6)/PPI |
| Date of Memorandum | January 3, 2023 |
| Subject | Referenced Publication |

On December 16, 2021, FDA sent REMS Modification Notification letters to Danco Laboratories, LLC (Danco) and GenBioPro, Inc. (GBP) (collectively the Applicants) regarding the single, shared system Risk Evaluation and Mitigation Strategy (REMS) for mifepristone 200 mg (hereafter referred to as the Mifepristone REMS Program), which was approved on April 11, 2019 and last modified on May 14, 2021. The December 16, 2021 letters explained that, in accordance with section 505-1(g)(4)(B) of the Federal Food, Drug, and Cosmetic Act (FDCA), FDA had determined that the approved REMS for mifepristone must be modified to minimize the burden on the healthcare delivery system of complying with the REMS and to ensure that the benefits of the drug outweigh the risks. The letters also noted that the determination was based on a review of published literature, safety information collected during the COVID-19 Public Health Emergency (PHE), FDA Adverse Event Reporting System (FAERS) reports, REMS assessment reports, and information provided by advocacy groups, individuals, the Applicants, and plaintiffs in ongoing litigation.

FDA is reviewing Danco's supplemental new drug application (sNDA) and GBP's supplemental abbreviated new drug application (sANDA), which were submitted on June 22, 2022, in response to the December 16, 2021 letters. The REMS modification supplemental applications propose revisions to the Mifepristone REMS Program that, consistent with the December 16, 2021 REMS Modification Notification letters, 1) remove the REMS requirement that mifepristone be dispensed only in certain healthcare settings, specifically clinics, medical offices, and hospitals, by or under the supervision of a certified prescriber (known as the "in-person dispensing requirement") and 2) add a new REMS requirement for pharmacy certification. The supplemental applications also include proposed changes to, among other things, the REMS document and REMS materials, to align with the removal of the in-person dispensing requirement and the addition of pharmacy certification.

(b)(6)/PPI received notification through a weekly email listing the table of contents for the Annals of Internal Medicine that a large clinical study, Liu N, Ray JG., 2023 "Short-term Adverse Outcomes After

2023 SUPP 001259

Mifepristone–Misoprostol Versus Procedural Induced Abortion," was published in *Annals of Internal Medicine* on January 3, 2023.[1]

[(b)(6)/PPI] have reviewed this publication for the limited purpose of determining whether it contains information relevant to our review of the REMS modifications proposed in the pending sNDA and sANDA, applying the same approach described on pages 11-12 of the December 16, 2021 REMS Modification Rationale Review prepared jointly by [(b)(6)/PPI] As described on pages 11-12 of the REMS Modification Rationale Review, [(b)(6)/PPI] approach to the literature review for the Agency's December 16, 2021 REMS modification determination focused on publications containing safety data related to outcomes of medical abortion (objective safety data) obtained from our literature search and from the references provided to us relevant to the REMS elements to assure safe use (ETASUs).

We applied the same approach that was used for the literature search for the December 16, 2021 review to this article. We conclude that the findings are not relevant to the Applicants' proposal to remove the "in-person dispensing requirement" or to add a new requirement for pharmacy certification because the study did not evaluate and compare outcomes when the drug is dispensed in person versus a manner other than in person.

---

[1] Liu N, Ray JG. Short-term Adverse Outcomes After Mifepristone–Misoprostol Versus Procedural Induced Abortion. A population-based propensity-weighted study. Ann Intern Med. 3 January 2023. [Epub ahead of print]. doi:10.7326/M22-2568.

Reference ID: 5103795

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

(b)(6)/PPI

01/03/2023 04:51:52 PM

(b)(6)/PPI

01/03/2023 04:53:44 PM

(b)(6)/PPI

01/03/2023 04:57:10 PM

(b)(6)/PPI

01/03/2023 04:58:21 PM

(b)(6)/PPI

01/03/2023 04:59:37 PM

2023 SUPP 001261

# CENTER FOR DRUG EVALUATION AND RESEARCH

## Approval Package for:

### *APPLICATION NUMBER:*

### 020687Orig1s025

| | |
|---|---|
| *Trade Name:* | Mifeprex Tablets 200 mg |
| *Generic or Proper Name:* | Mifepristone |
| *Sponsor:* | Danco Laboratories, LLC |
| *Approval Date:* | January 3, 2023 |
| *Indication:* | For modification to the approved single, shared system (SSS) risk evaluation and mitigation strategy (REMS) for mifepristone 200 mg tablets, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation, as well as corresponding labeling revisions to the prescribing information and the Medication Guide to align with the modification to the Mifepristone REMS Program. |

# CENTER FOR DRUG EVALUATION AND RESEARCH

# 020687Orig1s025

## CONTENTS

## Reviews / Information Included in this NDA Review.

| | |
|---|---|
| **Approval Letter** | **X** |
| **Other Action Letters** | |
| **Labeling** | **X** |
| **REMS** | **X** |
| **Summary Review** | **X** |
| **Officer/Employee List** | |
| **Office Director Memo** | |
| **Cross Discipline Team Leader Review** | |
| **Clinical Review(s)** | |
| **Product Quality Review(s)** | |
| **Non-Clinical Review(s)** | |
| **Statistical Review(s)** | |
| **Clinical Microbiology / Virology Review(s)** | |
| **Clinical Pharmacology Review(s)** | |
| **Other Reviews** | **X** |
| **Risk Assessment and Risk Mitigation Review(s)** | **X** |
| **Proprietary Name Review(s)** | |
| **Administrative/Correspondence Document(s)** | **X** |

# CENTER FOR DRUG EVALUATION AND RESEARCH

*APPLICATION NUMBER:*

**020687Orig1s025**

# <u>APPROVAL LETTER</u>

2023 SUPP 001450

**FDA U.S. FOOD & DRUG**
ADMINISTRATION

NDA 020687/S-025

**SUPPLEMENT APPROVAL**

Danco Laboratories, LLC

(b) (4), (b) (6)

P.O. Box 4816
New York, NY 10185

Dear ⬛⬛⬛ (b) (4), (b) (6) :

Please refer to your supplemental new drug application (sNDA) dated and received
June 22, 2022, and your amendments, submitted under section 505(b) of the Federal
Food, Drug, and Cosmetic Act (FDCA) for Mifeprex (mifepristone) Tablets, 200 mg.

This Prior Approval sNDA provides for modification to the approved single, shared
system (SSS) risk evaluation and mitigation strategy (REMS) for mifepristone 200 mg
tablets, in a regimen with misoprostol, for the medical termination of intrauterine
pregnancy through 70 days gestation, as well as corresponding labeling revisions to the
prescribing information and the Medication Guide to align with the modification to the
Mifepristone REMS Program. This SSS REMS is known as the Mifepristone REMS
Program.

## APPROVAL & LABELING

We have completed our review of the supplemental application, as amended. It is
approved effective the date of this letter.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit the
content of labeling [21 CFR 314.50(l)] in structured product labeling (SPL) format using
the FDA automated drug registration and listing system (eLIST), as described at
FDA.gov.[1] Content of labeling must be identical to the enclosed labeling (text for the
Prescribing Information and Medication Guide), with the addition of any labeling
changes in pending "Changes Being Effected" (CBE) supplements, as well as annual
reportable changes not included in the enclosed labeling.

---

[1] http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm

2023 SUPP 001451

NDA 020687/S-025
Page 2

Information on submitting SPL files using eList may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As.*[2]

The SPL will be accessible from publicly available labeling repositories.

Also within 14 days, amend all pending supplemental applications that include labeling changes for this NDA, including CBE supplements for which FDA has not yet issued an action letter, with the content of labeling [21 CFR 314.50(l)(1)(i)] in Microsoft Word format, that includes the changes approved in this supplemental application, as well as annual reportable changes. To facilitate review of your submission(s), provide a highlighted or marked-up copy that shows all changes, as well as a clean Microsoft Word version. The marked-up copy should provide appropriate annotations, including supplement number(s) and annual report date(s).

We request that the labeling approved today be available on your website within 10 days of receipt of this letter.


**REQUIRED PEDIATRIC ASSESSMENTS**

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication in pediatric patients unless this requirement is waived, deferred, or inapplicable.

Because none of these criteria apply to your application, you are exempt from this requirement.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

The Mifepristone REMS Program, of which Mifeprex is a member, was originally approved on April 11, 2019, and the most recent REMS modification was approved on May 14, 2021. The Mifepristone REMS Program consists of elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

In order to ensure the benefits of Mifeprex outweigh its risks and to minimize burden on the healthcare delivery system of complying with the REMS, we determined that you were required to make the REMS modifications outlined in our REMS Modification

---

[2] We update guidances periodically. For the most recent version of a guidance, check the FDA Guidance Documents Database https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

2023 SUPP 001452

NDA 020687/S-025
Page 3

Notification letter dated December 16, 2021. In addition the following modifications were communicated during the course of the review:

- Revisions to the REMS goal to align with the updated REMS requirements.

- Replacing serial number with recording of NDC and lot number of mifepristone dispensed.

- Additional edits for clarification and consistency in the REMS Document and REMS materials (*Prescriber Agreement Forms, Patient Agreement Form,* and *Pharmacy Agreement Forms*).

Your proposed modified REMS, received on June 22, 2022, amended and appended to this letter, is approved. The modified REMS consists of the elements to assure safe use, implementation system, and a timetable for submission of assessments of the REMS.

The modification of the approved REMS must be fully implemented within 120 calendar days of this letter.

This shared system REMS, known as the Mifepristone REMS Program, currently includes those products listed on the FDA REMS website[3].

Other products may be added in the future if additional NDAs or ANDAs are approved.

The timetable for submission of assessments of the REMS must be revised to one year from the date of the approval of the modified SSS REMS (1/3/2023) and annually thereafter.

The revised REMS assessment plan must include, but is not limited to, the following:

**Program Implementation and Operations**

1. REMS Certification Statistics
   a. Prescribers
      i. Number of certified prescribers who have certified with the Sponsor's distributor(s) and number who have submitted *Prescriber Agreement Forms* to Certified Pharmacies
      ii. Number and percentage of newly certified prescribers
      iii. Number and percentage of active certified prescribers (i.e., who ordered mifepristone or submitted a prescription during the reporting period)

   b. Pharmacies

---

[3] https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

2023 SUPP 001453

Reference ID: 5103833

NDA 020687/S-025
Page 4

      i.   Number of certified pharmacies
      ii.   Number and percentage of newly certified pharmacies
      iii.   Number and percentage of active certified pharmacies (i.e.,  that dispensed mifepristone during the reporting period)

   c.  Wholesalers/Distributors
      i.   Number of authorized wholesalers/distributors
      ii.   Number and percentage of newly authorized wholesalers/distributors
      iii.   Number and percentage of active authorized wholesalers/distributors (i.e. that shipped mifepristone during the reporting period)

2. Utilization Data
   a.  Total number of tablets shipped by wholesalers/distributors, stratified by Certified Prescriber or Certified Pharmacy location
   b.  Number of prescriptions dispensed from pharmacies

3. REMS Compliance Data
   a.  Audits: Summary of audit activities for each stakeholder (i.e., certified pharmacies and wholesalers/distributors) including but not limited to:
      i.   A copy of the final audit plan for each stakeholder type (provide for the current reporting period)
      ii.   The number of audits expected, and the number of audits performed
      iii.   The number and type of deficiencies noted
      iv.   For those with deficiencies noted, report the corrective and preventive actions (CAPAs) required, if any, to address the deficiencies, including the status (e.g., completed, not completed, in progress) (provide for the current reporting period)
      v.   For any stakeholders that did not complete the CAPA within the timeframe specified in the audit plan, describe actions taken (provide for the current reporting period)
      vi.   A summary report of all resulting changes to processes and procedures necessary to ensure compliance with the REMS requirements (provide for the current reporting period)

   b.  A summary report of non-compliance, associated corrective action plans (CAPAs), and the status of CAPAs including but not limited to:
      i.   A copy of the final non-compliance plans for Pharmacies and Distributors (provide for the current reporting period)
      ii.   For each instance of noncompliance below (iii-v), report the following information (provide for the current reporting period):
         1.  A unique, anonymized ID for the stakeholder(s) associated with the non-compliance event to enable tracking over time
         2.  The source of the non-compliance data (e.g., self-reported, audit, other)
         3.  A root cause analysis of the non-compliance

NDA 020687/S-025

Page 5

    4. Actions to prevent future occurrences and outcomes of such actions

  iii. Prescriber compliance

    1. Number and percentage of certified prescribers who became decertified as a result of non- compliance

      • Provide a summary of reasons for decertification (provide for the current reporting period)

    2. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

  iv. Pharmacy compliance

    1. Number and percentage of prescriptions dispensed that were written by prescriber(s) who did not submit a Prescriber Agreement to the dispensing Certified Pharmacy

    2. Number and percentage of mifepristone tablets dispensed by non-certified pharmacies

    3. Number and percentage of pharmacies that became decertified as a result of non- compliance

      • Provide a summary of reasons for decertification (provide for the current reporting period)

    4. An assessment of prescription delivery timelines, including percentage delivered more than four days after receipt of the prescription, duration and causes for delay. A proposal for this assessment will be submitted within 60 days of the approval of the REMS Modification.

    5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

  v. Wholesaler/distributor compliance

    1. Number of healthcare providers who successfully ordered mifepristone who were not certified

    2. Number of non-certified pharmacies that successfully ordered mifepristone

    3. Number of shipments sent to non-certified prescriber receiving locations

    4. Number of shipments sent to non-certified pharmacy receiving locations

    5. Summary and analysis of any program deviations and corrective actions taken (provide for the current reporting period)

**Overall Assessment of REMS Effectiveness**

The requirements for assessments of an approved REMS under section 505-1(g)(3) include with respect to each goal included in the strategy, an assessment of the extent to which the approved strategy, including each element of the strategy, is meeting the goal or whether one or more such goals or such elements should be modified.

We remind you that in addition to the REMS assessments submitted according to the timetable in the approved REMS, you must include an adequate rationale to support a

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

Reference ID: 5103833

NDA 020687/S-025
Page 6

proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FDCA.

We also remind you that you must submit a REMS assessment when you submit a supplemental application for a new indication for use, as described in section 505-1(g)(2)(A) of the FDCA. This assessment should include:

a) An evaluation of how the benefit-risk profile will or will not change with the new indication;

b) A determination of the implications of a change in the benefit-risk profile for the current REMS;

c) *If the new indication for use introduces unexpected risks*: A description of those risks and an evaluation of whether those risks can be appropriately managed with the currently approved REMS.

d) *If a REMS assessment was submitted in the 18 months prior to submission of the supplemental application for a new indication for use*: A statement about whether the REMS was meeting its goals at the time of that last assessment and if any modifications of the REMS have been proposed since that assessment.

e) *If a REMS assessment has not been submitted in the 18 months prior to submission of the supplemental application for a new indication for use:* Provision of as many of the currently listed assessment plan items as is feasible.

f) *If you propose a REMS modification based on a change in the benefit-risk profile or because of the new indication of use, submit an adequate rationale to support the modification, including*: Provision of the reason(s) why the proposed REMS modification is necessary, the potential effect on the serious risk(s) for which the REMS was required, on patient access to the drug, and/or on the burden on the health care delivery system; and other appropriate evidence or data to support the proposed change. Additionally, include any changes to the assessment plan necessary to assess the proposed modified REMS. *If you are not proposing REMS modifications*, provide a rationale for why the REMS does not need to be modified.

If the assessment instruments and methodology for your REMS assessments are not included in the REMS supporting document, or if you propose changes to the submitted assessment instruments or methodology, you should update the REMS supporting document to include specific assessment instrument and methodology information at least 90 days before the assessments will be conducted. Updates to the REMS supporting document may be included in a new document that references previous REMS supporting document submission(s) for unchanged portions. Alternatively,

NDA 020687/S-025
Page 7

updates may be made by modifying the complete previous REMS supporting document, with all changes marked and highlighted.

Prominently identify the submission containing the assessment instruments and methodology with the following wording in bold capital letters at the top of the first page of the submission:

**NDA 020687 REMS ASSESSMENT METHODOLOGY (insert concise description of content in bold capital letters, e.g., ASSESSMENT METHODOLOGY, PROTOCOL, SURVEY METHODOLOGIES, AUDIT PLAN, DRUG USE STUDY)**

An authorized generic drug under this NDA must have an approved REMS prior to marketing. Should you decide to market, sell, or distribute an authorized generic drug under this NDA, contact us to discuss what will be required in the authorized generic drug REMS submission.

We remind you that section 505-1(f)(8) of FDCA prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j). A violation of this provision in 505-1(f) could result in enforcement action.

Prominently identify any submission containing the REMS assessments or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**NDA 020687 REMS ASSESSMENT**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000 CHANGES BEING EFFECTED IN 30 DAYS PROPOSED MINOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000 PRIOR APPROVAL SUPPLEMENT PROPOSED MAJOR REMS MODIFICATION**

*or*

**NEW SUPPLEMENT FOR NDA 020687/S-000/ PRIOR APPROVAL SUPPLEMENT**

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

2023 SUPP 001457

NDA 020687/S-025
Page 8

**PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABELING CHANGES SUBMITTED IN SUPPLEMENT XXX**

*or*

**NEW SUPPLEMENT (NEW INDICATION FOR USE)
FOR NDA 020687/S-000
    REMS ASSESSMENT
    PROPOSED REMS MODIFICATION (if included)**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

**REMS REVISIONS FOR NDA 020687**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, or website screenshots are only in PDF format, they may be submitted as such, but Word format is preferred.

**<u>SUBMISSION OF REMS DOCUMENT IN SPL FORMAT</u>**

FDA can accept the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, as soon as possible, but no later than 14 days from the date of this letter, submit the REMS document in SPL format using the FDA automated drug registration and listing system (eLIST).

For more information on submitting REMS in SPL format, please email FDAREMSwebsite@fda.hhs.gov
.
**<u>PATENT LISTING REQUIREMENTS</u>**

Pursuant to 21 CFR 314.53(d)(2) and 314.70(f), certain changes to an approved NDA submitted in a supplement require you to submit patent information for listing in the Orange Book upon approval of the supplement.  You must submit the patent information required by 21 CFR 314.53(d)(2)(i)(A) through (C) and 314.53(d)(2)(ii)(A) and (C), as applicable, to FDA on Form FDA 3542 within 30 days after the date of approval of the supplement for the patent information to be timely filed (see 21 CFR 314.53(c)(2)(ii)).  You also must ensure that any changes to your approved NDA that require the submission of a request to remove patent information from the Orange Book are submitted to FDA at the time of approval of the supplement pursuant to 21 CFR 314.53(d)(2)(ii)(B) and 314.53(f)(2)(iv).

Reference ID: 5103833

NDA 020687/S-025
Page 9

## REPORTING REQUIREMENTS

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call                                    (b) (6)

Sincerely,

*{See appended electronic signature page}*

                                                                      (b) (6)

Center for Drug Evaluation and Research

ENCLOSURE(S):
- Content of Labeling
    - Prescribing Information
    - Medication Guide
    - REMS Document
    - Prescriber Agreement
    - Patient Agreement Form
    - Pharmacy Agreement Form

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

-------------------------------------------------------------

(b) (6)

01/03/2023 05:35:41 PM

**FDA U.S. FOOD & DRUG**
ADMINISTRATION

ANDA 091178/S-004

**PRIOR APPROVAL SUPPLEMENT**
**APPROVAL**

GenBioPro, Inc.

(b) (6), (b) (4)

Attention: (b) (6), (b) (4)

Dear Sir or Madam:

This is in reference to your supplemental abbreviated new drug application (sANDA) received for review on June 22, 2022, submitted pursuant to section 505(j) of the Federal Food, Drug, and Cosmetic Act (FD&C Act), for Mifepristone Tablets, 200 mg.

Reference is also made to any amendments submitted prior to the issuance of this letter.

The sANDA, submitted as "Prior Approval Supplement," provides for modification to the approved single, shared system (SSS) risk evaluation and mitigation strategy (REMS) for mifepristone 200 mg tablets in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation, as well as corresponding labeling revisions to the prescribing information and the Medication Guide to align with the modification to the Mifepristone REMS Program. This SSS REMS is known as the Mifepristone REMS Program.

**APPROVAL & LABELING**

We have completed the review of this sANDA, as amended, and it is **approved**.

**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**

In order to ensure the benefits of Mifepristone Tablets, 200 mg. outweigh its risks and to minimize burden on the healthcare delivery system of complying with the REMS, we determined that you were required to make the REMS modifications outlined in our REMS Modification Notification letter dated December 16, 2021. In addition the following modifications were communicated during the course of the review:

- Revisions to the REMS goal to align with the updated REMS requirements.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2023 SUPP 001461

- Replacing serial number with recording of NDC and lot number of mifepristone dispensed.

- Additional edits for clarification and consistency in the REMS Document and REMS materials (*Prescriber Agreement Forms, Patient Agreement Form,* and *Pharmacy Agreement Forms*).

Your proposed modified REMS, received on June 22, 2022, and amended is approved and will be posted on the FDA REMS website: http://www.fda.gov/rems.

The modified REMS consists of elements to assure safe use and an implementation system.

The modification of the approved REMS must be fully implemented within 120 calendar days of this letter.

Other products may be added in the future if additional NDAs or ANDAs are approved.

Under section 505-1(g)(2)(C) of the FD&C Act, FDA can require the submission of a REMS assessment if FDA determines an assessment is needed to evaluate whether the REMS should be modified to ensure the benefits of the drug outweigh the risks or to minimize the burden on the healthcare delivery system of complying with the REMS.

We remind you that you must include an adequate rationale to support a proposed REMS modification for the addition, modification, or removal of any goal or element of the REMS, as described in section 505-1(g)(4) of the FD&C Act.

We remind you that section 505-1(f)(8) of the FD&C Act prohibits holders of an approved covered application with elements to assure safe use from using any element to block or delay approval of an application under section 505(b)(2) or (j) of the FD&C Act.  A violation of this provision in 505-1(f) of the FD&C Act could result in enforcement action.

Prominently identify any submission containing the REMS assessments or proposed modifications of the REMS with the following wording in bold capital letters at the top of the first page of the submission as appropriate:

**ANDA 091178 REMS ASSESSMENT**

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**CHANGES BEING EFFECTED IN 30 DAYS**
**PROPOSED MINOR REMS MODIFICATION**

*or*

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD  20903
www.fda.gov

2023 SUPP 001462

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED MAJOR REMS MODIFICATION**

> *or*

**NEW SUPPLEMENT FOR ANDA 091178/S-000**
**PRIOR APPROVAL SUPPLEMENT**
**PROPOSED REMS MODIFICATIONS DUE TO SAFETY LABELING CHANGES**
**SUBMITTED IN SUPPLEMENT XXX**

Should you choose to submit a REMS revision, prominently identify the submission containing the REMS revisions with the following wording in bold capital letters at the top of the first page of the submission:

**REMS REVISIONS FOR ANDA 091178**

To facilitate review of your submission, we request that you submit your proposed modified REMS and other REMS-related materials in Microsoft Word format. If certain documents, such as enrollment forms, are only in PDF format, they may be submitted as such, but the preference is to include as many as possible in Word format.

**SUBMISSION OF REMS DOCUMENT IN SPL FORMAT**

In addition to submitting the proposed REMS as described above, you can also submit the REMS document in Structured Product Labeling (SPL) format. If you intend to submit the REMS document in SPL format, include the SPL file with your proposed REMS submission.

For more information on submitting REMS in SPL format, please email REMSWebsite@fda.hhs.gov.

**REPORTING REQUIREMENTS**

Postmarketing reporting requirements for this ANDA are set forth in 21 CFR 314.80-81 and 314.98 and at section 506I of the FD&C Act. The Agency should be advised of any change in the marketing status of this drug or if this drug will not be available for sale after approval. In particular, under section 506I(b) of the FD&C Act, you are required to notify the Agency in writing within 180 days from the date of this letter if this drug will not be available for sale within 180 days from the date of approval. As part of such written notification, you must include (1) the identity of the drug by established name and proprietary name (if any); (2) the ANDA number; (3) the strength of the drug; (4) the date on which the drug will be available for sale, if known; and (5) the reason for not marketing the drug after approval.

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20903
www.fda.gov

2023 SUPP 001463

Reference ID: 5103841

If your product is a combination product as defined by 21 CFR 3.2(e) and is comprised of drug and device constituent parts, we remind you that you must comply with the postmarking safety reporting requirements for an approved combination product (21 CFR Part 4, Subpart B).  Additional information on combination product postmarketing safety reporting is available at https://www.fda.gov/combination-products/guidance-regulatory-information/postmarketing-safety-reporting-combination-products.

## ANNUAL FACILITY FEES

The Generic Drug User Fee Amendments of 2012 (GDUFA) (Public Law 112-144, Title III) established certain provisions[1] with respect to self-identification of facilities and payment of annual facility fees.  Your ANDA identifies at least one facility that is subject to the self-identification requirement and payment of an annual facility fee.  Self-identification must occur by June 1 of each year for the next fiscal year.  Facility fees must be paid each year by the date specified in the Federal Register notice announcing facility fee amounts.

All finished dosage forms (FDFs) or active pharmaceutical ingredients (APIs) manufactured in a facility that has not met its obligations to self-identify or to pay fees when they are due will be deemed misbranded. This means that it will be a violation of federal law to ship these products in interstate commerce or to import them into the United States.  Such violations can result in prosecution of those responsible, injunctions, or seizures of misbranded products.  Products misbranded because of failure to self-identify or pay facility fees are subject to being denied entry into the United States.

If you have any questions, call                                                                    (b) (6)

Sincerely,

*{See appended electronic signature page}*

(b) (6)

Center for Drug Evaluation and Research

---

[1] Some of these provisions were amended by the Generic Drug User Fee Amendments of 2017 (GDUFA II) (Public Law 115-52, Title III).

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

-----------------------------------------------------------------------------------------

/s/

---------------------------------------------------------

(b) (6)

01/03/2023 05:42:43 PM

Reference ID: 5103841

Initial Shared System REMS approval:  04/2019
Most Recent Modification: 01/2023

Mifepristone Tablets, 200 mg
Progestin Antagonist

**RISK EVALUATION AND MITIGATION STRATEGY (REMS)
SINGLE SHARED SYSTEM FOR MIFEPRISTONE 200 MG**

## I.   GOAL

The goal of the REMS for mifepristone is to mitigate the risk of serious complications associated with mifepristone by:

a)   Requiring healthcare providers who prescribe mifepristone to be certified in the Mifepristone REMS Program.

b)   Ensuring that mifepristone is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

c)   Informing patients about the risk of serious complications associated with mifepristone.

## II.  REMS ELEMENTS

### A.  Elements to Assure Safe Use

1.   Healthcare providers who prescribe mifepristone must be specially certified.

   a.   To become specially certified to prescribe mifepristone, healthcare providers must:

      i.   Review the Prescribing Information for mifepristone.

      ii.   Complete a *Prescriber Agreement Form*. By signing[1] a *Prescriber Agreement Form*, prescribers agree that:

        1)   They have the following qualifications:

          a)   Ability to assess the duration of pregnancy accurately

          b)   Ability to diagnose ectopic pregnancies

          c)   Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary

        2)   They will follow the guidelines for use of mifepristone (see b.i-vii below).

   b.   As a condition of certification, prescribers must follow the guidelines for use of mifepristone described below:

      i.   Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained.  Ensure any questions the patient may have prior to receiving mifepristone are answered.

      ii.   Ensure that the healthcare provider and patient sign the *Patient Agreement Form.*

---

[1] In this REMS, the terms "sign" and "signature" include electronic signatures.

Reference ID: 5103833

    iii. Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

    iv. Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

    v. Ensure that any deaths are reported to the Mifepristone Sponsor that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

    vi. If mifepristone will be dispensed by a certified pharmacy:

       1) Provide the certified pharmacy a signed *Prescriber Agreement Form*.

       2) Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.

       3) Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of the patient.

    vii. The certified prescriber who dispenses mifepristone or who supervises the dispensing of mifepristone must:

       1) Provide an authorized distributor with a signed *Prescriber Agreement Form*.

       2) Ensure that the NDC and lot number from each package of mifepristone dispensed are recorded in the patient's record.

       3) Ensure that healthcare providers under their supervision follow guidelines i.-v.

c. Mifepristone Sponsors must:

    i. Ensure that healthcare providers who prescribe their mifepristone are specially certified in accordance with the requirements described above and de-certify healthcare providers who do not maintain compliance with certification requirements.

    ii. Ensure prescribers previously certified in the Mifepristone REMS Program complete the new *Prescriber Agreement Form*:

       1) Within 120 days after approval of this modification, for those previously certified prescribers submitting prescriptions to certified pharmacies.

       2) Within one year after approval of this modification, if previously certified and ordering from an authorized distributor.

    iii. Ensure that healthcare providers can complete the certification process by email or fax to an authorized distributor and/or certified pharmacy.

    iv. Provide the Prescribing Information and their *Prescriber Agreement Form* to healthcare providers who inquire about how to become certified.

    v. Ensure annually with each certified prescriber that their locations for receiving mifepristone are up to date.

The following materials are part of the Mifepristone REMS Program:

- *Prescriber Agreement Form for Danco Laboratories, LLC*

- *Prescriber Agreement Form for GenBioPro, Inc.*

- *Patient Agreement Form*

Reference ID: 5103833

2. Pharmacies that dispense mifepristone must be specially certified

   a. To become specially certified to dispense mifepristone, pharmacies must:

      i. Be able to receive *Prescriber Agreement Forms* by email and fax.

      ii. Be able to ship mifepristone using a shipping service that provides tracking information.

      iii. Designate an authorized representative to carry out the certification process on behalf of the pharmacy.

      iv. Ensure the authorized representative oversees implementation and compliance with the Mifepristone REMS Program by doing the following:

         1) Review the Prescribing Information for mifepristone.

         2) Complete a *Pharmacy Agreement Form*. By signing a *Pharmacy Agreement Form*, the authorized representative agrees that the pharmacy will put processes and procedures in place to ensure the following requirements are completed:

            a) Verify that the prescriber is certified by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with the pharmacy.

            b) Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in c) below.

            c) Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.

            d) Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.

            e) Track and verify receipt of each shipment of mifepristone.

            f) Dispense mifepristone in its package as supplied by the Mifepristone Sponsor.

            g) Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to the Mifepristone Sponsor that provided the mifepristone. Notify the Mifepristone Sponsor that provided the dispensed mifepristone that the pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.

            h) Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.

            i) Maintain records of *Prescriber Agreement Forms*.

            j) Maintain records of dispensing and shipping.

            k) Maintain records of all processes and procedures including compliance with those processes and procedures.

            l) Maintain the identity of the patient and prescriber as confidential, including limiting access to patient and prescriber identity only to those personnel necessary to dispense mifepristone in accordance with the Mifepristone REMS Program requirements, or as necessary for payment and/or insurance purposes.

            m) Train all relevant staff on the Mifepristone REMS Program requirements.

Reference ID: 5103833

    n)  Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

  b.  Mifepristone Sponsors must:

    i.  Ensure that pharmacies are specially certified in accordance with the requirements described above and de-certify pharmacies that do not maintain compliance with certification requirements.

    ii.  Ensure that pharmacies can complete the certification process by email and fax to an authorized distributor.

    i.  Verify annually that the name and contact information for the pharmacy's authorized representative corresponds to that of the current designated authorized representative for the certified pharmacy, and if different, require the pharmacy to recertify with the new authorized representative.

The following materials are part of the Mifepristone REMS Program:

- *Pharmacy Agreement Form for Danco Laboratories, LLC*
- *Pharmacy Agreement Form for GenBioPro, Inc.*

3.  Mifepristone must be dispensed to patients with evidence or other documentation of safe use conditions as ensured by the certified prescriber in signing the *Prescriber Agreement Form*.

  a.  The patient must sign a *Patient Agreement Form* indicating that the patient has:

    i.  Received, read and been provided a copy of the *Patient Agreement Form*.

    ii.  Received counseling from the healthcare provider regarding the risk of serious complications associated with mifepristone.

## B. Implementation System

1.  Mifepristone Sponsors must ensure that their mifepristone is only distributed to certified prescribers and certified pharmacies by:

  a.  Ensuring that distributors who distribute  their mifepristone comply with the program requirements for distributors.

    i.  The distributors must put processes and procedures in place to:

      1)  Complete the certification process upon receipt of a *Prescriber Agreement Form* or *Pharmacy Agreement Form*.

      2)  Notify healthcare providers and pharmacies when they have been certified by the Mifepristone REMS Program.

      3)  Ship mifepristone only to certified pharmacies or locations identified by certified prescribers.

      4)  Not ship mifepristone to pharmacies or prescribers who become de-certified from the Mifepristone REMS Program.

      5)  Provide the Prescribing Information and their Prescriber Agreement Form to healthcare providers who (1) attempt to order mifepristone and are not yet certified, or (2) inquire about how to become certified.

    ii.  Put processes and procedures in place to maintain a distribution system that is secure,

       confidential and follows all processes and procedures, including those for storage, handling, shipping, tracking package serial numbers, NDC and lot numbers, proof of delivery and controlled returns of mifepristone.

   iii. Train all relevant staff on the Mifepristone REMS Program requirements.

   iv. Comply with audits by Mifepristone Sponsors or a third party acting on behalf of Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed for the Mifepristone REMS Program. In addition, distributors must maintain appropriate documentation and make it available for audits.

  b. Ensuring that distributors maintain secure and confidential distribution records of all shipments of mifepristone.

2. Mifepristone Sponsors must monitor their distribution data to ensure compliance with the Mifepristone REMS Program.

3. Mifepristone Sponsors must ensure that adequate records are maintained to demonstrate that the Mifepristone REMS Program requirements have been met, including, but not limited to records of mifepristone distribution; certification of prescribers and pharmacies; and audits of pharmacies and distributors. These records must be readily available for FDA inspections.

4. Mifepristone Sponsors must audit their new distributors within 90 calendar days and annually thereafter after the distributor is authorized to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their distributor compliance if noncompliance is identified.

5. Mifepristone Sponsors must audit their certified pharmacies within 180 calendar days after the pharmacy places its first order of mifepristone, and annually thereafter audit certified pharmacies that have ordered mifepristone in the previous 12 months, to ensure that all processes and procedures are in place and functioning to support the requirements of the Mifepristone REMS Program. Mifepristone Sponsors will take steps to address their pharmacy compliance if noncompliance is identified.

6. Mifepristone Sponsors must take reasonable steps to improve implementation of and compliance with the requirements of the Mifepristone REMS Program based on monitoring and assessment of the Mifepristone REMS Program.

7. Mifepristone Sponsors must report to FDA any death associated with mifepristone whether or not considered drug-related, as soon as possible but no later than 15 calendar days from the initial receipt of the information by the Mifepristone Sponsor. This requirement does not affect the sponsors' other reporting and follow-up requirements under FDA regulations.

## C. Timetable for Submission of Assessments

The NDA Sponsor must submit REMS assessments to FDA one year from the date of the approval of the modified REMS (1/3/2023) and annually thereafter. To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 90 calendar days before the submission date for that assessment. The NDA Sponsor must submit each assessment so that it will be received by the FDA on or before the due date.

Reference ID: 5103833

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use
MIFEPREX safely and effectively. See full prescribing information for
MIFEPREX.

MIFEPREX® (mifepristone) tablets, for oral use
Initial U.S. Approval: 2000

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

*See full prescribing information for complete boxed warning.*

Serious and sometimes fatal infections and bleeding occur very rarely
following spontaneous, surgical, and medical abortions, including
following MIFEPREX use.

- **Atypical Presentation of Infection. Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)**
- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)**

MIFEPREX is only available through a restricted program called the
mifepristone REMS Program (5.3).

Before prescribing MIFEPREX, inform the patient about these risks.
Ensure the patient knows whom to call and what to do if they experience
sustained fever, severe abdominal pain, prolonged heavy bleeding, or
syncope, or if they experience abdominal pain or discomfort or general
malaise for more than 24 hours after taking misoprostol.

---

**------------------INDICATIONS AND USAGE------------------**

MIFEPREX is a progestin antagonist indicated, in a regimen with
misoprostol, for the medical termination of intrauterine pregnancy through 70
days gestation. (1)

**----------------DOSAGE AND ADMINISTRATION----------------**

- 200 mg MIFEPREX on Day 1, followed 24-48 hours after MIFEPREX dosing by 800 mcg buccal misoprostol. (2.1)
- Instruct the patient what to do if significant adverse reactions occur. (2.2)
- Follow-up is needed to confirm complete termination of pregnancy. (2.3)

**--------------DOSAGE FORMS AND STRENGTHS--------------**

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one
blister card (3)

**------------------CONTRAINDICATIONS------------------**

- Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
- Chronic adrenal failure (4)
- Concurrent long-term corticosteroid therapy (4)
- History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
- Hemorrhagic disorders or concurrent anticoagulant therapy (4)
- Inherited porphyria (4)
- Intrauterine device (IUD) in place (4)

**----------------WARNINGS AND PRECAUTIONS----------------**

- Ectopic pregnancy: Exclude before treatment. (5.4)
- Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

**--------------------ADVERSE REACTIONS--------------------**

Most common adverse reactions (>15%) are nausea, weakness, fever/chills,
vomiting, headache, diarrhea, and dizziness. (6)

To report SUSPECTED ADVERSE REACTIONS, contact Danco
Laboratories, LLC at 1-877-432-7596 or
medicaldirector@earlyoptionpill.com or FDA at 1-800-FDA-1088 or
*www.fda.gov/medwatch*.

**------------------DRUG INTERACTIONS------------------**

- CYP3A4 inducers can lower mifepristone concentrations. (7.1)
- CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
- CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

**----------------USE IN SPECIFIC POPULATIONS----------------**

- Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

See 17 for PATIENT COUNSELING INFORMATION, Medication
Guide.

Revised: 01/2023

---

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
1 **INDICATIONS AND USAGE**
2 **DOSAGE AND ADMINISTRATION**
  2.1 Dosing Regimen
  2.2 Patient Management Following Misoprostol Administration
  2.3 Post-treatment Assessment: Day 7 to 14
  2.4 Contact for Consultation
3 **DOSAGE FORMS AND STRENGTHS**
4 **CONTRAINDICATIONS**
5 **WARNINGS AND PRECAUTIONS**
  5.1 Infections and Sepsis
  5.2 Uterine Bleeding
  5.3 Mifepristone REMS Program
  5.4 Ectopic Pregnancy
  5.5 Rhesus Immunization
6 **ADVERSE REACTIONS**
  6.1 Clinical Trials Experience
  6.2 Postmarketing Experience
7 **DRUG INTERACTIONS**
  7.1 Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)
  7.2 Drugs that May Increase Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)
  7.3 Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)
8 **USE IN SPECIFIC POPULATIONS**
  8.1 Pregnancy
  8.2 Lactation
  8.4 Pediatric Use
10 **OVERDOSAGE**
11 **DESCRIPTION**
12 **CLINICAL PHARMACOLOGY**
  12.1 Mechanism of Action
  12.2 Pharmacodynamics
  12.3 Pharmacokinetics
13 **NONCLINICAL TOXICOLOGY**
  13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
14 **CLINICAL STUDIES**
16 **HOW SUPPLIED/STORAGE AND HANDLING**
17 **PATIENT COUNSELING INFORMATION**

\*Sections or subsections omitted from the full prescribing information are not
listed.

Reference ID: 5103833

**FULL PRESCRIBING INFORMATION**

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use. No causal relationship between the use of MIFEPREX and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

---

# 1    INDICATIONS AND USAGE

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

# 2    DOSAGE AND ADMINISTRATION

## 2.1  Dosing Regimen

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

Remove any intrauterine device ("IUD") before treatment with MIFEPREX begins [*see Contraindications (4)*].

The dosing regimen for MIFEPREX and misoprostol is:

2

Reference ID: 5103833

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* MIFEPREX Administration
    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (<u>minimum</u> 24-hour interval between MIFEPREX and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

    Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area between the cheek and gums) for 30 minutes and then swallow any remnants with water or another liquid (see Figure 1).

    **Figure 1**

    

    **2 pills between cheek and gum on left side + 2 pills between cheek and gum on right side**

Patients taking MIFEPREX must take misoprostol within 24 to 48 hours after taking MIFEPREX. The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see Clinical Studies (14)]*, discuss with the patient an appropriate location for them to be when taking the misoprostol, taking into account that expulsion could begin within 2 hours of administration.

## 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)].*

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other adverse reactions occur
- A phone number to call if the patient has questions following the administration of the misoprostol
- The name and phone number of the healthcare provider who will be handling emergencies.

### 2.3  Post-treatment Assessment: Day 7 to 14

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of MIFEPREX. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding.  Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Patients should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, patients may be treated with another dose of misoprostol 800 mcg buccally.  There have been rare reports of uterine rupture in women who took MIFEPREX and misoprostol, including women with prior uterine rupture or uterine scar and women who received multiple doses of misoprostol within 24 hours.   Patients who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*.  Advise the patient whether you will provide such care or will refer them to another provider as part of counseling prior to prescribing MIFEPREX.

### 2.4  Contact for Consultation

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call Danco Laboratories at 1-877-4 Early Option (1-877-432-7596).**

### 3    DOSAGE FORMS AND STRENGTHS

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. MIFEPREX tablets are light yellow, cylindrical, and bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "MF."

### 4    CONTRAINDICATIONS

- Administration of MIFEPREX and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

  - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

  - Chronic adrenal failure (risk of acute adrenal insufficiency)

  - Concurrent long-term corticosteroid therapy (risk of acute adrenal insufficiency)

  - History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

  - Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

Reference ID: 5103833

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

- Use of MIFEPREX and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination).  If the IUD is removed, MIFEPREX may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of MIFEPREX *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise.  No causal relationship between MIFEPREX and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days.  Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in patients who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects.  Because heavy bleeding requiring surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

Reference ID: 5103833

### 5.3 Mifepristone REMS Program

MIFEPREX is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)]*.

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- MIFEPREX must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers.

Further information is available at 1-877-4 Early Option (1-877-432-7596).

### 5.4 Ectopic Pregnancy

MIFEPREX is contraindicated in patients with a confirmed or suspected ectopic pregnancy because MIFEPREX is not effective for terminating ectopic pregnancies *[see Contraindications (4)]*. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed MIFEPREX.

Patients who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

### 5.5 Rhesus Immunization

The use of MIFEPREX is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

## 6  ADVERSE REACTIONS

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*
- Uterine bleeding *[see Warnings and Precautions (5.2)]*

### 6.1 Clinical Trials Experience

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without contraindications to mifepristone or misoprostol use according to the MIFEPREX product label. Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

Reference ID: 5103833

About 85% of patients report at least one adverse reaction following administration of MIFEPREX and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with MIFEPREX and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy. Uterine bleeding and cramping are expected consequences of the action of MIFEPREX and misoprostol as used in the treatment procedure. Most patients can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| **Nausea** | 3 | 1,248 | 51-75% | 70 days |
| **Weakness** | 2 | 630 | 55-58% | 63 days |
| **Fever/chills** | 1 | 414 | 48% | 63 days |
| **Vomiting** | 3 | 1,248 | 37-48% | 70 days |
| **Headache** | 2 | 630 | 41-44% | 63 days |
| **Diarrhea** | 3 | 1,248 | 18-43% | 70 days |
| **Dizziness** | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally. Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented. In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation. Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2.

Reference ID: 5103833

2023 SUPP 001477

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
* This outcome represents a single patient who experienced death related to sepsis.

## 6.2    Postmarketing Experience

The following adverse reactions have been identified during postapproval use of MIFEPREX and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7    DRUG INTERACTIONS

### 7.1    Drugs that May Reduce MIFEPREX Exposure (Effect of CYP 3A4 Inducers on MIFEPREX)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone). Whether this action has an impact on the efficacy of the dose

Reference ID: 5103833

regimen is unknown.   Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

### 7.2  Drugs that May Increase MIFEPREX Exposure (Effect of CYP 3A4 Inhibitors on MIFEPREX)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). MIFEPREX should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

### 7.3  Effects of MIFEPREX on Other Drugs (Effect of MIFEPREX on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1  Pregnancy

Risk Summary

MIFEPREX is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant patients are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant patients with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects.  Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with MIFEPREX in a regimen with misoprostol. In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

### 8.2  Lactation

MIFEPREX is present in human milk.  Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of MIFEPREX in a regimen with

Reference ID: 5103833

misoprostol in a breastfed infant or on milk production. Refer to misoprostol labeling for lactation information with the use of misoprostol. The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from MIFEPREX in a regimen with misoprostol.

### 8.4 Pediatric Use

Safety and efficacy of MIFEPREX have been established in pregnant females. Data from a clinical study of MIFEPREX that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

## 10    OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, the patient should be observed closely for signs of adrenal failure.

## 11    DESCRIPTION

MIFEPREX tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, cylindrical, and bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silica anhydrous, corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[*p*-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:

The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

## 12    CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity

Reference ID: 5103833

of prostaglandins.

## 12.2 Pharmacodynamics

Use of MIFEPREX in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity:  Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity.  The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

Absorption

The absolute bioavailability of a 20 mg mifepristone oral dose in females of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 ± 1.0 mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was 1.77 ± 0.7 mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was 25.8 ± 6.2 mg*hr/L.

Distribution

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

Elimination

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

Reference ID: 5103833

Specific Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.

## 13    NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed.

Mutagenesis

Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

Impairment of Fertility

In rats, administration of 0.3 mg/kg mifepristone per day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effects on reproductive performance were observed.

## 14    CLINICAL STUDIES

Safety and efficacy data from clinical studies of mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation are reported below. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure based on 22 worldwide clinical studies (including 7 U.S. studies) appear in Table 3.

The demographics of women who participated in the U.S. clinical studies varied depending on study location and represent the racial and ethnic variety of American females.  Females of all reproductive ages were represented, including females less than 18 and more than 40 years of age; most were 27 years or younger.

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| **N** | 16,794 | 18,425 |
| **Complete Medical Abortion** | 97.4% | 96.2% |
| **Surgical Intervention\*** | 2.6% | 3.8% |
| **Ongoing Pregnancy\*\*** | 0.7% | 0.9% |

\*   Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.
\*\*  Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy.

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment  with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| Complete medical abortion | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| Surgical intervention for ongoing pregnancy | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data.  Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

is only available through a restricted program called the Mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

MIFEPREX is supplied as light yellow, cylindrical, and bi-convex tablets imprinted on one side with "MF." Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 64875-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

Reference ID: 5103833

## 17   PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of MIFEPREX. Additional copies of the Medication Guide are available by contacting Danco Laboratories at 1-877-4 Early Option (1-877-432-7596) or from www.earlyoptionpill.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- MIFEPREX is only available through a restricted program called the Mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

  - Patients must sign a Patient Agreement Form.

  - MIFEPREX is only dispensed by or under the supervision of certified prescribers or by certified pharmacies on prescriptions issued by certified prescribers.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

- 

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking MIFEPREX *[see Dosage and Administration (2.3)]*.

- Explain that

  - prolonged heavy vaginal bleeding is not proof of a complete abortion,

  - if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

  - it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer them to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before resuming sexual intercourse.

MIFEPREX is a registered trademark of Danco Laboratories, LLC.

Reference ID: 5103833

Manufactured for:
*Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596)
www.earlyoptionpill.com

01/2023

Reference ID: 5103833

---

**MEDICATION GUIDE**

**Mifeprex** (MIF-eh-prex) (mifepristone tablets, for oral use

---

Read this information carefully before taking Mifeprex and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

---

**What is the most important information I should know about Mifeprex?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifeprex and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifeprex with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifeprex, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifeprex.

Reference ID: 5103833

**What is Mifeprex?**

**Mifeprex is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifeprex is not approved for ending pregnancies that are further along. Mifeprex blocks a hormone needed for your pregnancy to continue. When you use Mifeprex on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifeprex, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifeprex and misoprostol.  When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifeprex will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

**Who should not take Mifeprex?**

Some patients should not take Mifeprex. Do not take Mifeprex if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifeprex.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifeprex.

**What should I tell my healthcare provider before taking Mifeprex?**

**Before you take Mifeprex, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifeprex can pass into your breast milk.  The effect of the Mifeprex and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifeprex and certain other medicines may affect each other if they are used together.  This can cause side effects.

Reference ID: 5103833

**How should I take Mifeprex?**

- Mifeprex will be given to you by a healthcare provider or pharmacy.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifeprex and misoprostol:**

**Mifeprex (1 tablet) orally + misoprostol (4 tablets) buccally**

**Day 1:**

- Take 1 Mifeprex tablet by mouth.

**24 to 48 hours after taking Mifeprex:**

- Take 4 misoprostol tablets by placing 2 tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifeprex or later than 48 hours after Mifeprex.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important.  You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifeprex to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

Reference ID: 5103833

**When should I begin birth control?**

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

**What should I avoid while taking Mifeprex and misoprostol?**

Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects.

**What are the possible side effects of Mifeprex and misoprostol?**

**Mifeprex may cause serious side effects. See "What is the most important information I should know about Mifeprex?"**

**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifeprex. See "How should I take Mifeprex?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifeprex, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifeprex. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy.

The most common side effects of Mifeprex treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects. These are not all the possible side effects of Mifeprex.

Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Mifeprex.**

**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifeprex. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifeprex that is written for healthcare professionals.**

**For more information about Mifeprex, go to www.earlyoptionpill.com or call 1-877-4 Early Option (1-877-432-7596).**

Manufactured for: *Danco Laboratories, LLC*
P.O. Box 4816
New York, NY 10185
1-877-4 Early Option (1-877-432-7596) www.earlyoptionpill.com

This Medication Guide has been approved by the U.S. Food and Drug Administration.    Approval 01/2023

Reference ID: 5103833

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use **MIFEPRISTONE TABLETS, 200 mg** safely and effectively. See full prescribing information for Mifepristone tablets, 200 mg.

**MIFEPRISTONE tablets, 200 mg** for oral use
Initial U.S. Approval: 2000

---

> **WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
>
> *See full prescribing information for complete boxed warning.*
> Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following Mifepristone tablets, 200 mg use.
> - **Atypical Presentation of Infection.** Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)
> - **Bleeding.** Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)
> Mifepristone tablets, 200 mg is only available through a restricted program called the mifepristone REMS Program (5.3).
> Before prescribing Mifepristone tablets, 200 mg, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.

---

**---------------------------INDICATIONS AND USAGE---------------------------**
Mifepristone tablets, 200 mg is a progestin antagonist indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. (1)

**---------------------DOSAGE AND ADMINISTRATION----------------------**
- 200 mg Mifepristone on Day 1, followed 24-48 hours after Mifepristone dosing by 800 mcg buccal misoprostol. (2.1)
- Instruct the patient what to do if significant adverse reactions occur. (2.2)
- Follow-up is needed to confirm complete termination of pregnancy. (2.3)

**-------------DOSAGE FORMS AND STRENGTHS-------------**
Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card (3)

**-----------------------CONTRAINDICATIONS-----------------------**
- Confirmed/suspected ectopic pregnancy or undiagnosed adnexal mass (4)
- Chronic adrenal failure (4)
- Concurrent long-term corticosteroid therapy (4)
- History of allergy to mifepristone, misoprostol, or other prostaglandins (4)
- Hemorrhagic disorders or concurrent anticoagulant therapy (4)
- Inherited porphyria (4)
- Intrauterine device (IUD) in place (4)

**---------------------WARNINGS AND PRECAUTIONS---------------------**
- Ectopic pregnancy: Exclude before treatment. (5.4)
- Rhesus immunization: Prevention needed as for surgical abortion. (5.5)

**-----------------------ADVERSE REACTIONS-----------------------**
Most common adverse reactions (>15%) are nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact GenBioPro, Inc. at 1-855-643-3463 or** medical@genbiopro.com **or MIFEINFO.com or FDA at 1-800-FDA-1088 or** *www.fda.gov/medwatch.*

**-----------------------DRUG INTERACTIONS-----------------------**
- CYP3A4 inducers can lower mifepristone concentrations. (7.1)
- CYP3A4 inhibitors can increase mifepristone concentrations. Use with caution. (7.2)
- CYP3A4 substrate concentrations can be increased. Caution with coadministration of substrates with narrow therapeutic margin. (7.3)

**-----------------------USE IN SPECIFIC POPULATIONS-----------------------**
- Pregnancy: Risk of fetal malformations in ongoing pregnancy if not terminated is unknown. (8.1)

**See 17 for PATIENT COUNSELING INFORMATION, Medication Guide.**

**Revised: 01/2023**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**
1 **INDICATIONS AND USAGE**
2 **DOSAGE AND ADMINISTRATION**
    2.1 Dosing Regimen
    2.2 Patient Management Following Misoprostol Administration
    2.3 Post-treatment Assessment: Day 7 to 14
    2.4 Contact for Consultation
3 **DOSAGE FORMS AND STRENGTHS**
4 **CONTRAINDICATIONS**
5 **WARNINGS AND PRECAUTIONS**
    5.1 Infections and Sepsis
    5.2 Uterine Bleeding
    5.3 Mifepristone REMS Program
    5.4 Ectopic Pregnancy
    5.5 Rhesus Immunization
6 **ADVERSE REACTIONS**
    6.1 Clinical Trials Experience
    6.2 Postmarketing Experience
7 **DRUG INTERACTIONS**
    7.1 Drugs that May Reduce Mifepristone tablets, 200 mg Exposure (Effect of CYP 3A4 Inducers on Mifepristone tablets, 200 mg)
    7.2 Drugs that May Increase Mifepristone tablets, 200 mg Exposure (Effect of CYP 3A4 Inhibitors on Mifepristone tablets, 200 mg)
    7.3 Effects of Mifepristone tablets, 200 mg on Other Drugs (Effect of Mifepristone tablets, 200 mg on CYP 3A4 Substrates)
8 **USE IN SPECIFIC POPULATIONS**
    8.1 Pregnancy
    8.2 Lactation
    8.4 Pediatric Use
10 **OVERDOSAGE**
11 **DESCRIPTION**
12 **CLINICAL PHARMACOLOGY**
    12.1 Mechanism of Action
    12.2 Pharmacodynamics
    12.3 Pharmacokinetics
13 **NONCLINICAL TOXICOLOGY**
    13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
14 **CLINICAL STUDIES**
16 **HOW SUPPLIED/STORAGE AND HANDLING**
17 **PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

**FULL PRESCRIBING INFORMATION**

---

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following Mifepristone tablets, 200 mg use. No causal relationship between the use of Mifepristone tablets, 200 mg and misoprostol and these events has been established.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections (e.g., *Clostridium sordellii*) and sepsis can present without fever, bacteremia, or significant findings on pelvic examination following an abortion. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis *[see Warnings and Precautions (5.1)]*.**

- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding *[see Warnings and Precautions (5.2)]*.**

**Because of the risks of serious complications described above, Mifepristone tablets, 200 mg is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.**

**Before prescribing mifepristone, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting, or diarrhea) for more than 24 hours after taking misoprostol.**

---

## 1    INDICATIONS AND USAGE

Mifepristone tablets, 200 mg is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.

## 2    DOSAGE AND ADMINISTRATION

### 2.1  Dosing Regimen

For purposes of this treatment, pregnancy is dated from the first day of the last menstrual period. The duration of pregnancy may be determined from menstrual history and clinical examination. Assess the pregnancy by ultrasonographic scan if the duration of pregnancy is uncertain or if ectopic pregnancy is suspected.

Remove any intrauterine device ("IUD") before treatment with Mifepristone tablets, 200 mg begins [*see Contraindications (4)*].

The dosing regimen for Mifepristone tablets, 200 mg and misoprostol is:

2

- Mifepristone 200 mg orally + misoprostol 800 mcg buccally

  - *Day One:* Mifepristone 200 mg Administration
    One 200 mg tablet of Mifepristone is taken in a single oral dose.

  - *Day Two or Three:* Misoprostol Administration (<u>minimum</u> 24-hour interval between Mifepristone and misoprostol)
    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken by the buccal route.

    Tell the patient to place two 200 mcg misoprostol tablets in each cheek pouch (the area between the cheek and gums) for 30 minutes and then swallow any remnants with water or another liquid (see Figure 1).

**Figure 1**



**2 pills between cheek and gum on left side + 2 pills between cheek and gum on right side**

Patients taking Mifepristone tablets, 200 mg must take misoprostol within 24 to 48 hours after taking Mifepristone. The effectiveness of the regimen may be lower if misoprostol is administered less than 24 hours or more than 48 hours after mifepristone administration.

Because most women will expel the pregnancy within 2 to 24 hours of taking misoprostol *[see Clinical Studies (14)]*, discuss with the patient an appropriate location for them to be when taking the misoprostol, taking into account that expulsion could begin within 2 hours of administration.

## 2.2  Patient Management Following Misoprostol Administration

During the period immediately following the administration of misoprostol, the patient may need medication for cramps or gastrointestinal symptoms *[see Adverse Reactions (6)].*

Give the patient:

- Instructions on what to do if significant discomfort, excessive vaginal bleeding or other adverse reactions occur
- A phone number to call if the patient has questions following the administration of the misoprostol
- The name and phone number of the healthcare provider who will be handling emergencies.

### 2.3  Post-treatment Assessment: Day 7 to 14

Patients should follow-up with their healthcare provider approximately 7 to 14 days after the administration of Mifepristone. This assessment is very important to confirm that complete termination of pregnancy has occurred and to evaluate the degree of bleeding.  Termination can be confirmed by medical history, clinical examination, human Chorionic Gonadotropin (hCG) testing, or ultrasonographic scan. Lack of bleeding following treatment usually indicates failure; however, prolonged or heavy bleeding is not proof of a complete abortion.

The existence of debris in the uterus (e.g., if seen on ultrasonography) following the treatment procedure will not necessarily require surgery for its removal.

Patients should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of women may experience some type of bleeding for more than 30 days. Persistence of heavy or moderate vaginal bleeding at the time of follow-up, however, could indicate an incomplete abortion.

If complete expulsion has not occurred, but the pregnancy is not ongoing, patients may be treated with another dose of misoprostol 800 mcg buccally.  There have been rare reports of uterine rupture in women who took mifepristone tablets, 200 mg and misoprostol, including women with prior uterine rupture or uterine scar and patients who received multiple doses of misoprostol within 24 hours.   Patients who choose to use a repeat dose of misoprostol should have a follow-up visit with their healthcare provider in approximately 7 days to assess for complete termination.

Surgical evacuation is recommended to manage ongoing pregnancies after medical abortion *[see Use in Specific Populations (8.1)]*.  Advise the patient whether you will provide such care or will refer them to another provider as part of counseling prior to prescribing Mifepristone tablets, 200 mg.

### 2.4  Contact for Consultation

**For consultation 24 hours a day, 7 days a week with an expert in mifepristone, call GenBioPro, Inc. at 1-855-MIFEINFO (1-855-643-3463).**

### 3    DOSAGE FORMS AND STRENGTHS

Tablets containing 200 mg of mifepristone each, supplied as 1 tablet on one blister card. Mifepristone tablets are light yellow, circular, bi-convex tablets, approximately 11 mm in diameter and imprinted on one side with "S."

### 4    CONTRAINDICATIONS

- Administration of Mifepristone tablets, 200 mg and misoprostol for the termination of pregnancy (the "treatment procedure") is contraindicated in patients with any of the following conditions:

   - Confirmed or suspected ectopic pregnancy or undiagnosed adnexal mass (the treatment procedure will not be effective to terminate an ectopic pregnancy) *[see Warnings and Precautions (5.4)]*

   - Chronic adrenal failure (risk of acute adrenal insufficiency)

   - Concurrent long-term corticosteroid therapy (risk of acute adrenal insufficiency)

- History of allergy to mifepristone, misoprostol, or other prostaglandins (allergic reactions including anaphylaxis, angioedema, rash, hives, and itching have been reported *[see Adverse Reactions (6.2)]*)

- Hemorrhagic disorders or concurrent anticoagulant therapy (risk of heavy bleeding)

- Inherited porphyrias (risk of worsening or of precipitation of attacks)

• Use of Mifepristone tablets, 200 mg and misoprostol for termination of intrauterine pregnancy is contraindicated in patients with an intrauterine device ("IUD") in place (the IUD might interfere with pregnancy termination). If the IUD is removed, Mifepristone tablets, 200 mg may be used.

## 5    WARNINGS AND PRECAUTIONS

### 5.1  Infection and Sepsis

As with other types of abortion, cases of serious bacterial infection, including very rare cases of fatal septic shock, have been reported following the use of Mifepristone tablets, 200 mg *[see Boxed Warning]*. Healthcare providers evaluating a patient who is undergoing a medical abortion should be alert to the possibility of this rare event. A sustained (> 4 hours) fever of 100.4°F or higher, severe abdominal pain, or pelvic tenderness in the days after a medical abortion may be an indication of infection.

A high index of suspicion is needed to rule out sepsis (e.g., from *Clostridium sordellii*) if a patient reports abdominal pain or discomfort or general malaise (including weakness, nausea, vomiting, or diarrhea) more than 24 hours after taking misoprostol. Very rarely, deaths have been reported in patients who presented without fever, with or without abdominal pain, but with leukocytosis with a marked left shift, tachycardia, hemoconcentration, and general malaise. No causal relationship between Mifepristone tablets, 200 mg and misoprostol use and an increased risk of infection or death has been established. *Clostridium sordellii* infections have also been reported very rarely following childbirth (vaginal delivery and caesarian section), and in other gynecologic and non-gynecologic conditions.

### 5.2  Uterine Bleeding

Uterine bleeding occurs in almost all patients during a medical abortion. Prolonged heavy bleeding (soaking through two thick full-size sanitary pads per hour for two consecutive hours) may be a sign of incomplete abortion or other complications, and prompt medical or surgical intervention may be needed to prevent the development of hypovolemic shock. Counsel patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding following a medical abortion *[see Boxed Warning]*.

Women should expect to experience vaginal bleeding or spotting for an average of 9 to 16 days. Women report experiencing heavy bleeding for a median duration of 2 days. Up to 8% of all subjects may experience some type of bleeding for 30 days or more. In general, the duration of bleeding and spotting increased as the duration of the pregnancy increased.

Decreases in hemoglobin concentration, hematocrit, and red blood cell count may occur in patients who bleed heavily.

Excessive uterine bleeding usually requires treatment by uterotonics, vasoconstrictor drugs, surgical uterine evacuation, administration of saline infusions, and/or blood transfusions. Based on data from several large clinical trials, vasoconstrictor drugs were used in 4.3% of all subjects, there was a decrease in hemoglobin of more than 2 g/dL in 5.5% of subjects, and blood transfusions were administered to ≤ 0.1% of subjects. Because heavy bleeding requiring

surgical uterine evacuation occurs in about 1% of patients, special care should be given to patients with hemostatic disorders, hypocoagulability, or severe anemia.

**5.3 Mifepristone REMS Program**

Mifepristone tablets, 200 mg is available only through a restricted program under a REMS called the mifepristone REMS Program, because of the risks of serious complications *[see Warnings and Precautions (5.1, 5.2)]*.

Notable requirements of the mifepristone REMS Program include the following:

- Prescribers must be certified with the program by completing the Prescriber Agreement Form.
- Patients must sign a Patient Agreement Form.
- Mifepristone tablets, 200 mg must only be dispensed to patients by or under the supervision of a certified prescriber, or by certified pharmacies on prescriptions issued by certified prescribers.

Further information is available at 1-855-MIFEINFO (1-855-643-3463).

**5.4 Ectopic Pregnancy**

Mifepristone tablets, 200 mg is contraindicated in patients with a confirmed or suspected ectopic pregnancy because mifepristone is not effective for terminating ectopic pregnancies *[see Contraindications (4)]*. Healthcare providers should remain alert to the possibility that a patient who is undergoing a medical abortion could have an undiagnosed ectopic pregnancy because some of the expected symptoms experienced with a medical abortion (abdominal pain, uterine bleeding) may be similar to those of a ruptured ectopic pregnancy. The presence of an ectopic pregnancy may have been missed even if the patient underwent ultrasonography prior to being prescribed Mifepristone tablets, 200 mg.

Patients who became pregnant with an IUD in place should be assessed for ectopic pregnancy.

**5.5 Rhesus Immunization**

The use of Mifepristone tablets, 200 mg is assumed to require the same preventive measures as those taken prior to and during surgical abortion to prevent rhesus immunization.

**6    ADVERSE REACTIONS**

The following adverse reactions are described in greater detail in other sections:

- Infection and sepsis *[see Warnings and Precautions (5.1)]*
- Uterine bleeding *[see Warnings and Precautions (5.2)]*

**6.1 Clinical Trials Experience**

Because clinical studies are conducted under widely varying conditions, adverse reaction rates observed in the clinical studies of a drug cannot be directly compared to rates in the clinical studies of another drug and may not reflect the rates observed in practice.

Information presented on common adverse reactions relies solely on data from U.S. studies, because rates reported in non-U.S. studies were markedly lower and are not likely generalizable to the U.S. population.  In three U.S. clinical studies totaling 1,248 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally, women reported adverse reactions in diaries and in interviews at the follow-up visit. These studies enrolled generally healthy women of reproductive age without

contraindications to mifepristone or misoprostol use according to the Mifepristone tablets, 200 mg product label. Gestational age was assessed prior to study enrollment using the date of the woman's last menstrual period, clinical evaluation, and/or ultrasound examination.

About 85% of patients report at least one adverse reaction following administration of Mifepristone tablets, 200 mg and misoprostol, and many can be expected to report more than one such reaction. The most commonly reported adverse reactions (>15%) were nausea, weakness, fever/chills, vomiting, headache, diarrhea, and dizziness (see Table 1). The frequency of adverse reactions varies between studies and may be dependent on many factors, including the patient population and gestational age.

Abdominal pain/cramping is expected in all medical abortion patients and its incidence is not reported in clinical studies. Treatment with Mifepristone tablets, 200 mg and misoprostol is designed to induce uterine bleeding and cramping to cause termination of an intrauterine pregnancy. Uterine bleeding and cramping are expected consequences of the action of Mifepristone tablets, 200 mg and misoprostol as used in the treatment procedure. Most patients can expect bleeding more heavily than they do during a heavy menstrual period *[see Warnings and Precautions (5.2)]*.

Table 1 lists the adverse reactions reported in U.S. clinical studies with incidence >15% of women.

**Table 1**
**Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. Clinical Studies**

| Adverse Reaction | # U.S. studies | Number of Evaluable Women | Range of frequency (%) | Upper Gestational Age of Studies Reporting Outcome |
|---|---|---|---|---|
| Nausea | 3 | 1,248 | 51-75% | 70 days |
| Weakness | 2 | 630 | 55-58% | 63 days |
| Fever/chills | 1 | 414 | 48% | 63 days |
| Vomiting | 3 | 1,248 | 37-48% | 70 days |
| Headache | 2 | 630 | 41-44% | 63 days |
| Diarrhea | 3 | 1,248 | 18-43% | 70 days |
| Dizziness | 2 | 630 | 39-41% | 63 days |

One study provided gestational-age stratified adverse reaction rates for women who were 57-63 and 64-70 days; there was little difference in frequency of the reported common adverse reactions by gestational age.

Information on serious adverse reactions was reported in six U.S. and four non-U.S. clinical studies, totaling 30,966 women through 70 days gestation who used mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally. Serious adverse reaction rates were similar between U.S. and non-U.S. studies, so rates from both U.S. and non-U.S. studies are presented. In the U.S. studies, one studied women through 56 days gestation, four through 63 days gestation, and one through 70 days gestation, while in the non-U.S. studies, two studied women through 63 days gestation, and two through 70 days gestation. Serious adverse reactions were reported in <0.5% of women. Information from the U.S. and non-U.S. studies is presented in Table 2.

**Table 2**
**Serious Adverse Reactions Reported in Women Following Administration of Mifepristone (oral) and Misoprostol (buccal) in U.S. and Non-U.S. Clinical Studies**

| Adverse Reaction | U.S. | | | Non-U.S. | | |
|---|---|---|---|---|---|---|
| | # of studies | Number of Evaluable Women | Range of frequency (%) | # of studies | Number of Evaluable Women | Range of frequency (%) |
| Transfusion | 4 | 17,774 | 0.03-0.5% | 3 | 12,134 | 0-0.1% |
| Sepsis | 1 | 629 | 0.2% | 1 | 11,155 | <0.01%* |
| ER visit | 2 | 1,043 | 2.9-4.6% | 1 | 95 | 0 |
| Hospitalization Related to Medical Abortion | 3 | 14,339 | 0.04-0.6% | 3 | 1,286 | 0-0.7% |
| Infection without sepsis | 1 | 216 | 0 | 1 | 11,155 | 0.2% |
| Hemorrhage | NR | NR | NR | 1 | 11,155 | 0.1% |

NR= Not reported
* This outcome represents a single patient who experienced death related to sepsis.

## 6.2    Postmarketing Experience

The following adverse reactions have been identified during postapproval use of Mifepristone tablets, 200 mg and misoprostol. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

*Infections and infestations:* post-abortal infection (including endometritis, endomyometritis, parametritis, pelvic infection, pelvic inflammatory disease, salpingitis)
*Blood and the lymphatic system disorders:* anemia
*Immune system disorders:* allergic reaction (including anaphylaxis, angioedema, hives, rash, itching)
*Psychiatric disorders:* anxiety
*Cardiac disorders:* tachycardia (including racing pulse, heart palpitations, heart pounding)
*Vascular disorders:* syncope, fainting, loss of consciousness, hypotension (including orthostatic), light-headedness
*Respiratory, thoracic and mediastinal disorders:* shortness of breath
*Gastrointestinal disorders:* dyspepsia
*Musculoskeletal, connective tissue and bone disorders:* back pain, leg pain
*Reproductive system and breast disorders:* uterine rupture, ruptured ectopic pregnancy, hematometra, leukorrhea
*General disorders and administration site conditions:* pain

## 7    DRUG INTERACTIONS

## 7.1  Drugs that May Reduce Mifepristone tablets, 200 mg Exposure (Effect of CYP 3A4 Inducers on Mifepristone tablets, 200 mg)

CYP450 3A4 is primarily responsible for the metabolism of mifepristone. CYP3A4 inducers such as rifampin, dexamethasone, St. John's Wort, and certain anticonvulsants (such as phenytoin, phenobarbital, carbamazepine) may induce mifepristone metabolism (lowering serum concentrations of mifepristone).  Whether this action has an impact on the efficacy of the dose

regimen is unknown.   Refer to the follow-up assessment *[see Dosage and Administration (2.3 )]* to verify that treatment has been successful.

### 7.2  Drugs that May Increase Mifepristone tablets, 200 mg Exposure (Effect of CYP 3A4 Inhibitors on Mifepristone tablets, 200 mg)

Although specific drug or food interactions with mifepristone have not been studied, on the basis of this drug's metabolism by CYP 3A4, it is possible that ketoconazole, itraconazole, erythromycin, and grapefruit juice may inhibit its metabolism (increasing serum concentrations of mifepristone). Mifepristone tablets, 200 mg should be used with caution in patients currently or recently treated with CYP 3A4 inhibitors.

### 7.3  Effects of Mifepristone tablets, 200 mg on Other Drugs (Effect of Mifepristone tablets, 200 mg on CYP 3A4 Substrates)

Based on *in vitro* inhibition information, coadministration of mifepristone may lead to an increase in serum concentrations of drugs that are CYP 3A4 substrates. Due to the slow elimination of mifepristone from the body, such interaction may be observed for a prolonged period after its administration. Therefore, caution should be exercised when mifepristone is administered with drugs that are CYP 3A4 substrates and have narrow therapeutic range.

## 8    USE IN SPECIFIC POPULATIONS

### 8.1  Pregnancy

Risk Summary

Mifepristone is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation.  Risks to pregnant patients are discussed throughout the labeling.

Refer to misoprostol labeling for risks to pregnant patients with the use of misoprostol.

The risk of adverse developmental outcomes with a continued pregnancy after a failed pregnancy termination with Mifepristone tablets, 200 mg in a regimen with misoprostol is unknown; however, the process of a failed pregnancy termination could disrupt normal embryo-fetal development and result in adverse developmental effects.  Birth defects have been reported with a continued pregnancy after a failed pregnancy termination with Mifepristone tablets, 200 mg in a regimen with misoprostol.  In animal reproduction studies, increased fetal losses were observed in mice, rats, and rabbits and skull deformities were observed in rabbits with administration of mifepristone at doses lower than the human exposure level based on body surface area.

Data

*Animal Data*

In teratology studies in mice, rats and rabbits at doses of 0.25 to 4.0 mg/kg (less than 1/100 to approximately 1/3 the human exposure based on body surface area), because of the antiprogestational activity of mifepristone,fetal losses were much higher than in control animals. Skull deformities were detected in rabbit studies at approximately 1/6 the human exposure, although no teratogenic effects of mifepristone have been observed to date in rats or mice. These deformities were most likely due to the mechanical effects of uterine contractions resulting from inhibition of progesterone action.

## 8.2 Lactation

Mifepristone tablets, 200 mg is present in human milk. Limited data demonstrate undetectable to low levels of the drug in human milk with the relative (weight-adjusted) infant dose 0.5% or less as compared to maternal dosing. There is no information on the effects of Mifepristone tablets, 200 mg in a regimen with misoprostol in a breastfed infant or on milk production. Refer to misoprostol labeling for lactation information with the use of misoprostol. The developmental and health benefits of breast-feeding should be considered along with any potential adverse effects on the breast-fed child from Mifepristone tablets, 200 mg in a regimen with misoprostol.

## 8.4 Pediatric Use

Safety and efficacy of Mifepristone tablets, 200 mg have been established in pregnant females. Data from a clinical study of Mifepristone tablets, 200 mg that included a subset of 322 females under age 17 demonstrated a safety and efficacy profile similar to that observed in adults.

## 10   OVERDOSAGE

No serious adverse reactions were reported in tolerance studies in healthy non-pregnant female and healthy male subjects where mifepristone was administered in single doses greater than 1800 mg (ninefold the recommended dose for medical abortion). If a patient ingests a massive overdose, the patient should be observed closely for signs of adrenal failure.

## 11   DESCRIPTION

Mifepristone tablets each contain 200 mg of mifepristone, a synthetic steroid with antiprogestational effects. The tablets are light yellow in color, circular, bi-convex, and are intended for oral administration only. The tablets include the inactive ingredients colloidal silicon dioxide , corn starch, povidone, microcrystalline cellulose, and magnesium stearate.

Mifepristone is a substituted 19-nor steroid compound chemically designated as 11ß-[*p*-(Dimethylamino)phenyl]-17ß-hydroxy-17-(1-propynyl)estra-4,9-dien-3-one. Its empirical formula is $C_{29}H_{35}NO_2$. Its structural formula is:

The compound is a yellow powder with a molecular weight of 429.6 and a melting point of 192-196°C. It is very soluble in methanol, chloroform and acetone and poorly soluble in water, hexane and isopropyl ether.

## 12   CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

The anti-progestational activity of mifepristone results from competitive interaction with progesterone at progesterone-receptor sites. Based on studies with various oral doses in

several animal species (mouse, rat, rabbit, and monkey), the compound inhibits the activity of endogenous or exogenous progesterone, resulting in effects on the uterus and cervix that, when combined with misoprostol, result in termination of an intrauterine pregnancy.

During pregnancy, the compound sensitizes the myometrium to the contraction-inducing activity of prostaglandins.

## 12.2 Pharmacodynamics

Use of Mifepristone tablets, 200 mg in a regimen with misoprostol disrupts pregnancy by causing decidual necrosis, myometrial contractions, and cervical softening, leading to the expulsion of the products of conception.

Doses of 1 mg/kg or greater of mifepristone have been shown to antagonize the endometrial and myometrial effects of progesterone in women.

Antiglucocorticoid and antiandrogenic activity:  Mifepristone also exhibits antiglucocorticoid and weak antiandrogenic activity.  The activity of the glucocorticoid dexamethasone in rats was inhibited following doses of 10 to 25 mg/kg of mifepristone. Doses of 4.5 mg/kg or greater in human beings resulted in a compensatory elevation of adrenocorticotropic hormone (ACTH) and cortisol. Antiandrogenic activity was observed in rats following repeated administration of doses from 10 to 100 mg/kg.

## 12.3 Pharmacokinetics

Mifepristone is rapidly absorbed after oral ingestion with non-linear pharmacokinetics for Cmax after single oral doses of 200 mg and 600 mg in healthy subjects.

Absorption

The absolute bioavailability of a 20 mg mifepristone oral dose in females of childbearing age is 69%. Following oral administration of a single dose of 600 mg, mifepristone is rapidly absorbed, with a peak plasma concentration of 1.98 ± 1.0 mg/L occurring approximately 90 minutes after ingestion.

Following oral administration of a single dose of 200 mg in healthy men (n=8), mean Cmax was 1.77 ± 0.7 mg/L occurring approximately 45 minutes after ingestion. Mean $AUC_{0-\infty}$ was 25.8 ± 6.2 mg*hr/L.

Distribution

Mifepristone is 98% bound to plasma proteins, albumin, and $\alpha_1$-acid glycoprotein. Binding to the latter protein is saturable, and the drug displays nonlinear kinetics with respect to plasma concentration and clearance.

Elimination

Following a distribution phase, elimination of mifepristone is slow at first (50% eliminated between 12 and 72 hours) and then becomes more rapid with a terminal elimination half-life of 18 hours.

*Metabolism*

Metabolism of mifepristone is primarily via pathways involving N-demethylation and terminal hydroxylation of the 17-propynyl chain. *In vitro* studies have shown that CYP450 3A4 is primarily responsible for the metabolism. The three major metabolites identified in humans are: (1) RU 42 633, the most widely found in plasma, is the N-monodemethylated metabolite; (2) RU 42 848, which results from the loss of two methyl groups from the 4-dimethylaminophenyl in position 11ß; and (3) RU 42 698, which results from terminal hydroxylation of the 17-propynyl chain.

*Excretion*

By 11 days after a 600 mg dose of tritiated compound, 83% of the drug has been accounted for by the feces and 9% by the urine. Serum concentrations are undetectable by 11 days.

Specific Populations

The effects of age, hepatic disease and renal disease on the safety, efficacy and pharmacokinetics of mifepristone have not been investigated.


**13   NONCLINICAL TOXICOLOGY**

**13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility**

Carcinogenesis

No long-term studies to evaluate the carcinogenic potential of mifepristone have been performed.

Mutagenesis

Results from studies conducted *in vitro* and in animals have revealed no genotoxic potential for mifepristone. Among the tests carried out were: Ames test with and without metabolic activation; gene conversion test in *Saccharomyces cerevisiae* D4 cells; forward mutation in *Schizosaccharomyces pompe* P1 cells; induction of unscheduled DNA synthesis in cultured HeLa cells; induction of chromosome aberrations in CHO cells; *in vitro* test for gene mutation in V79 Chinese hamster lung cells; and micronucleus test in mice.

Impairment of Fertility

In rats, administration of 0.3 mg/kg mifepristone per day caused severe disruption of the estrus cycles for the three weeks of the treatment period. Following resumption of the estrus cycle, animals were mated and no effects on reproductive performance were observed.


**14   CLINICAL STUDIES**

Safety and efficacy data from clinical studies of mifepristone 200 mg orally followed 24-48 hours later by misoprostol 800 mcg buccally through 70 days gestation are reported below. Success was defined as the complete expulsion of the products of conception without the need for surgical intervention. The overall rates of success and failure, shown by reason for failure based on 22 worldwide clinical studies (including 7 U.S. studies) appear in Table 3.

The demographics of women who participated in the U.S. clinical studies varied depending on study location and represent the racial and ethnic variety of American females.  Females of all reproductive ages were represented, including females less than 18 and more than 40 years of age; most were 27 years or younger.

**Table 3**
**Outcome Following Treatment with Mifepristone (oral) and Misoprostol (buccal)**
**Through 70 Days Gestation**

|  | U.S. Trials | Non-U.S. Trials |
|---|---|---|
| **N** | 16,794 | 18,425 |
| **Complete Medical Abortion** | 97.4% | 96.2% |
| **Surgical Intervention\*** | 2.6% | 3.8% |
| **Ongoing Pregnancy\*\*** | 0.7% | 0.9% |

\*   Reasons for surgical intervention include ongoing pregnancy, medical necessity, persistent or heavy bleeding after treatment, patient request, or incomplete expulsion.
\*\*  Ongoing pregnancy is a subcategory of surgical intervention, indicating the percent of women who have surgical intervention due to an ongoing pregnancy.

The results for clinical studies that reported outcomes, including failure rates for ongoing pregnancy, by gestational age are presented in Table 4.

**Table 4**
**Outcome by Gestational Age Following Treatment  with Mifepristone and**
**Misoprostol (buccal) for U.S. and Non-U.S. Clinical Studies**

|  | ≤49 days | | | 50-56 days | | | 57-63 days | | | 64-70 days | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies | N | % | Number of Evaluable Studies |
| **Complete medical abortion** | 12,046 | 98.1 | 10 | 3,941 | 96.8 | 7 | 2,294 | 94.7 | 9 | 479 | 92.7 | 4 |
| **Surgical intervention for ongoing pregnancy** | 10,272 | 0.3 | 6 | 3,788 | 0.8 | 6 | 2,211 | 2 | 8 | 453 | 3.1 | 3 |

One clinical study asked subjects through 70 days gestation to estimate when they expelled the pregnancy, with 70% providing data.  Of these, 23-38% reported expulsion within 3 hours and over 90% within 24 hours of using misoprostol.

## 16   HOW SUPPLIED/STORAGE AND HANDLING

Mifepristone tablets, 200 mg is only available through a restricted program called the mifepristone REMS Program *[see Warnings and Precautions (5.3)]*.

Mifepristone tablets, 200 mg is supplied as light yellow, circular, bi-convex tablets debossed with "S" on one side and plain on the other side. Each tablet contains 200 mg of mifepristone. One tablet is individually blistered on one blister card that is packaged in an individual package (National Drug Code 43393-001-01).

Store at 25°C (77°F); excursions permitted to 15 to 30°C (59 to 86°F) [see USP Controlled Room Temperature].

**17    PATIENT COUNSELING INFORMATION**

Advise the patient to read the FDA-approved patient labeling (Medication Guide), included with each package of Mifepristone tablets, 200 mg. Additional copies of the Medication Guide are available by contacting GenBioPro, Inc. at 1-855-MIFEINFO (1-855-643-3463) or from www.MIFEINFO.com.

Serious Infections and Bleeding

- Inform the patient that uterine bleeding and uterine cramping will occur [*see Warnings and Precautions (5.2)*].

- Advise the patient that serious and sometimes fatal infections and bleeding can occur very rarely [*see Warnings and Precautions (5.1, 5.2)*].

- Mifepristone tablets, 200 mg are only available through a restricted program called the mifepristone REMS Program [*see Warnings and Precautions (5.3)*].  Under the mifepristone REMS Program:

  o  Patients must sign a Patient Agreement Form.

  o  Mifepristone tablets, 200 mg is only dispensed by or under the supervision of certified prescribers, or by certified pharmacies on prescriptions issued by certified prescribers.

Provider Contacts and Actions in Case of Complications

- Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, or if the patient experiences complications including prolonged heavy bleeding, severe abdominal pain, or sustained fever *[see Boxed Warning]*.

Compliance with Treatment Schedule and Follow-up Assessment

- Advise the patient that it is necessary to complete the treatment schedule, including a follow-up assessment approximately 7 to14 days after taking Mifepristone tablets, 200 mg *[see Dosage and Administration (2.3)]*.

- Explain that

  o  prolonged heavy vaginal bleeding is not proof of a complete abortion,

  o  if the treatment fails and the pregnancy continues, the risk of fetal malformation is unknown,

  o  it is recommended that ongoing pregnancy be managed by surgical termination *[see Dosage and Administration (2.3)]*.  Advise the patient whether you will provide such care or will refer them to another provider.

Subsequent Fertility

- Inform the patient that another pregnancy can occur following medical abortion and before resumption of normal menses.

- Inform the patient that contraception can be initiated as soon as pregnancy expulsion has been confirmed, or before resuming sexual intercourse.

Manufactured for:
GenBioPro, Inc.
P.O. Box 32011
Las Vegas, NV 89103
1-855-MIFEINFO (1-855-643-3463)
www.MIFEINFO.com

01/2023

---

**MEDICATION GUIDE**

Mifepristone (MIF-eh-pris-tone) tablets, 200 mg for oral use

---

Read this information carefully before taking Mifepristone tablets, 200 mg and misoprostol. It will help you understand how the treatment works. This Medication Guide does not take the place of talking with your healthcare provider.

---

**What is the most important information I should know about Mifepristone tablets, 200 mg?**

**What symptoms should I be concerned with?** Although cramping and bleeding are an expected part of ending a pregnancy, rarely, serious and potentially life-threatening bleeding, infections, or other problems can occur following a miscarriage, surgical abortion, medical abortion, or childbirth. Seeking medical attention as soon as possible is needed in these circumstances. Serious infection has resulted in death in a very small number of cases. There is no information that use of Mifepristone tablets, 200 mg and misoprostol caused these deaths. If you have any questions, concerns, or problems, or if you are worried about any side effects or symptoms, you should contact your healthcare provider. You can write down your healthcare provider's telephone number here _____.

**Be sure to contact your healthcare provider promptly if you have any of the following:**

- **Heavy Bleeding.** Contact your healthcare provider right away if you bleed enough to soak through two thick full-size sanitary pads per hour for two consecutive hours or if you are concerned about heavy bleeding. In about 1 out of 100 women, bleeding can be so heavy that it requires a surgical procedure (surgical aspiration or D&C).

- **Abdominal Pain or "Feeling Sick."** If you have abdominal pain or discomfort, or you are "feeling sick," including weakness, nausea, vomiting, or diarrhea, with or without fever, more than 24 hours after taking misoprostol, you should contact your healthcare provider without delay. These symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

- **Fever.** In the days after treatment, if you have a fever of 100.4°F or higher that lasts for more than 4 hours, you should contact your healthcare provider right away. Fever may be a symptom of a serious infection or another problem.

**If you cannot reach your healthcare provider, go to the nearest hospital emergency room.**

**What to do if you are still pregnant after Mifepristone tablets, 200 mg with misoprostol treatment.** If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy. In many cases, this surgical procedure can be done in the office/clinic. The chance of birth defects if the pregnancy is not ended is unknown.

**Talk with your healthcare provider.** Before you take Mifepristone tablets, 200 mg, you should read this Medication Guide and you and your healthcare provider should discuss the benefits and risks of your using Mifepristone tablets, 200 mg.

**What is Mifepristone tablets, 200 mg?**

**Mifepristone tablets, 200 mg is used in a regimen with another prescription medicine called misoprostol, to end an early pregnancy.** Early pregnancy means it is 70 days (10 weeks) or less since your last menstrual period began. Mifepristone tablets, 200 mg is not approved for ending pregnancies that are further along. Mifepristone tablets, 200 mg blocks a hormone needed for your pregnancy to continue. When you use Mifepristone tablets, 200 mg on Day 1, you also need to take another medicine called misoprostol 24 to 48 hours after you take Mifepristone tablets, 200 mg, to cause the pregnancy to be passed from your uterus.

The pregnancy is likely to be passed from your uterus within 2 to 24 hours after taking Mifepristone tablets, 200 mg and misoprostol.  When the pregnancy is passed from the uterus, you will have bleeding and cramping that will likely be heavier than your usual period. About 2 to 7 out of 100 women taking Mifepristone tablets, 200 mg will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding.

**Who should not take Mifepristone tablets, 200 mg?**

Some patients should not take Mifepristone tablets, 200 mg. Do not take Mifepristone tablets, 200 mg if you:

- Have a pregnancy that is more than 70 days (10 weeks). Your healthcare provider may do a clinical examination, an ultrasound examination, or other testing to determine how far along you are in pregnancy.

- Are using an IUD (intrauterine device or system). It must be taken out before you take Mifepristone tablets, 200 mg.

- Have been told by your healthcare provider that you have a pregnancy outside the uterus (ectopic pregnancy).

- Have problems with your adrenal glands (chronic adrenal failure).

- Take a medicine to thin your blood.

- Have a bleeding problem.

- Have porphyria.

- Take certain steroid medicines.

- Are allergic to mifepristone, misoprostol, or medicines that contain misoprostol, such as Cytotec or Arthrotec.

Ask your healthcare provider if you are not sure about all your medical conditions before taking this medicine to find out if you can take Mifepristone tablets, 200 mg.

**What should I tell my healthcare provider before taking Mifepristone tablets, 200 mg?**

**Before you take Mifepristone tablets, 200 mg, tell your healthcare provider if you:**

- cannot follow-up within approximately 7 to 14 days of your first visit

- are breastfeeding. Mifepristone tablets, 200 mg can pass into your breast milk.  The effect of the Mifepristone, tablets, 200 mg and misoprostol regimen on the breastfed infant or on milk production is unknown.

- are taking medicines, including prescription and over-the-counter medicines, vitamins, and herbal supplements.
  Mifepristone tablets, 200 mg and certain other medicines may affect each other if they are used together.  This can cause side effects.

**How should I take Mifepristone tablets, 200 mg?**

- Mifepristone tablets, 200 mg will be given to you by a healthcare provider or pharmacy.

- You and your healthcare provider will plan the most appropriate location for you to take the misoprostol, because it may cause bleeding, cramps, nausea, diarrhea, and other symptoms that usually begin within 2 to 24 hours after taking it.

- Most women will pass the pregnancy within 2 to 24 hours after taking the misoprostol tablets.

**Follow the instruction below on how to take Mifepristone tablets, 200 mg and misoprostol:**

**<u>Mifepristone tablets, 200 mg (1 tablet) orally + misoprostol (4 tablets) buccally</u>**

**Day 1:**

- Take 1 Mifepristone 200 mg tablet by mouth.

**24 to 48 hours after taking Mifepristone tablets, 200 mg:**

- Take 4 misoprostol tablets by placing 2 tablets in each cheek pouch (the area between your teeth and cheek - see Figure A) for 30 minutes and then swallow anything left over with a drink of water or another liquid.

- The medicines may not work as well if you take misoprostol sooner than 24 hours after Mifepristone tablets, 200 mg or later than 48 hours after Mifepristone tablets, 200 mg.

- Misoprostol often causes cramps, nausea, diarrhea, and other symptoms. Your healthcare provider may send you home with medicines for these symptoms.



**Figure A** (2 tablets between your left cheek and gum and 2 tablets between your right cheek and gum).

**Follow-up Assessment at Day 7 to 14:**

- This follow-up assessment is very important. You must follow-up with your healthcare provider about 7 to 14 days after you have taken Mifepristone tablets, 200 mg to be sure you are well and that you have had bleeding and the pregnancy has passed from your uterus.

- Your healthcare provider will assess whether your pregnancy has passed from your uterus. If your pregnancy continues, the chance that there may be birth defects is unknown. If you are still pregnant, your healthcare provider will talk with you about a surgical procedure to end your pregnancy.

- If your pregnancy has ended, but has not yet completely passed from your uterus, your provider will talk with you about other choices you have, including waiting, taking another dose of misoprostol, or having a surgical procedure to empty your uterus.

**When should I begin birth control?**

You can become pregnant again right after your pregnancy ends. If you do not want to become pregnant again, start using birth control as soon as your pregnancy ends or before you start having sexual intercourse again.

**What should I avoid while taking Mifepristone tablets, 200 mg and misoprostol?**

Do not take any other prescription or over-the-counter medicines (including herbal medicines or supplements) at any time during the treatment period without first asking your healthcare provider about them because they may interfere with the treatment. Ask your healthcare provider about what medicines you can take for pain and other side effects.

**What are the possible side effects of Mifepristone tablets, 200 mg and misoprostol?**

**Mifepristone tablets, 200 mg may cause serious side effects. See "What is the most important information I should know about Mifepristone tablets, 200 mg?"**

**Cramping and bleeding.** Cramping and vaginal bleeding are expected with this treatment. Usually, these symptoms mean that the treatment is working. But sometimes you can get cramping and bleeding and still be pregnant. This is why you must follow-up with your healthcare provider approximately 7 to 14 days after taking Mifepristone tablets, 200 mg. See "How should I take Mifepristone tablets, 200 mg?" for more information on your follow-up assessment. If you are not already bleeding after taking Mifepristone tablets, 200 mg, you probably will begin to bleed once you take misoprostol, the medicine you take 24 to 48 hours after Mifepristone tablets, 200 mg. Bleeding or spotting can be expected for an average of 9 to16 days and may last for up to 30 days. Your bleeding may be similar to, or greater than, a normal heavy period. You may see blood clots and tissue. This is an expected part of passing the pregnancy.

The most common side effects of Mifepristone tablets, 200 mg treatment include: nausea, weakness, fever/chills, vomiting, headache, diarrhea and dizziness. Your provider will tell you how to manage any pain or other side effects.These are not all the possible side effects of Mifepristone tablets, 200 mg.

Call your healthcare provider for medical advice about any side effects that bother you or do not go away. You may report side effects to FDA at 1-800-FDA-1088.

**General information about the safe and effective use of Mifepristone tablets, 200 mg.**

**Medicines are sometimes prescribed for purposes other than those listed in a Medication Guide. This Medication Guide summarizes the most important information about Mifepristone tablets, 200 mg. If you would like more information, talk with your healthcare provider. You may ask your healthcare provider for information about Mifepristone tablets, 200 mg that is written for healthcare professionals.**

**For more information about Mifepristone tablets, 200 mg, go to www.MIFEINFO.com or call 1-855-MIFEINFO (1-855-643-3463).**

Manufactured for:
GenBioPro, Inc.
P.O. Box 32011
Las Vegas, NV 89103
1-855-MIFEINFO (1-855-643-3463)
www.MIFEINFO.com

This Medication Guide has been approved by the U.S. Food and Drug Administration.
Approval 01/2023

## PATIENT AGREEMENT FORM          Mifepristone Tablets, 200 mg

**Healthcare Providers:** *Counsel the patient on the risks of mifepristone. Both you and the patient must provide a written or electronic signature on this form.*

**Patient Agreement:**

1. I have decided to take mifepristone and misoprostol to end my pregnancy and will follow my healthcare provider's advice about when to take each drug and what to do in an emergency.

2. I understand:
   a. I will take mifepristone on Day 1.
   b. I will take the misoprostol tablets 24 to 48 hours after I take mifepristone.

3. My healthcare provider has talked with me about the risks, including:
   - heavy bleeding
   - infection

4. I will contact the clinic/office/provider right away if in the days after treatment I have:
   - a fever of 100.4°F or higher that lasts for more than four hours
   - heavy bleeding (soaking through two thick full-size sanitary pads per hour for two hours in a row)
   - severe stomach area (abdominal) pain or discomfort, or I am "feeling sick," including weakness, nausea, vomiting, or diarrhea, more than 24 hours after taking misoprostol
     — these symptoms may be a sign of a serious infection or another problem (including an ectopic pregnancy, a pregnancy outside the womb).

   My healthcare provider has told me that these symptoms listed above could require emergency care. If I cannot reach the clinic/office/provider right away, my healthcare provider has told me who to call and what to do.

5. I should follow up with my healthcare provider about 7 to 14 days after I take mifepristone to be sure that my pregnancy has ended and that I am well.

6. I know that, in some cases, the treatment will not work. This happens in about 2 to 7 out of 100 women who use this treatment. If my pregnancy continues after treatment with mifepristone and misoprostol, I will talk with my provider about a surgical procedure to end my pregnancy.

7. If I need a surgical procedure because the medicines did not end my pregnancy or to stop heavy bleeding, my healthcare provider has told me whether they will do the procedure or refer me to another healthcare provider who will.

8. I have the MEDICATION GUIDE for mifepristone.

9. My healthcare provider has answered all my questions.


**Patient Signature:** _____    **Patient Name** (print): _____    **Date**: _____


**Provider Signature:** _____    **Provider Name** (print): _____    **Date**: _____

*Patient Agreement Forms may be provided, completed, signed, and transmitted in paper or electronically.*

**01/2023**

Reference ID: 5103833

**MIFEPREX®(Mifepristone) Tablets, 200mg**

**PHARMACY AGREEMENT FORM**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense Mifeprex is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense Mifeprex is able to ship Mifeprex using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for Mifeprex. The Prescribing Information is available by calling 1-877-4 EARLY OPTION (1-877-432-7596 toll-free) or online at www.earlyoptionpill.com; and
- Each location of my pharmacy that will dispense Mifeprex will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting Mifeprex orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense Mifeprex such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing Mifeprex for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of Mifeprex dispensed.
  - Track and verify receipt of each shipment of Mifeprex.
  - Dispense mifepristone in its package as supplied by Danco Laboratories, LLC.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of Mifeprex dispensed to the patient, and remind the prescriber of their obligation to report the deaths to Danco Laboratories, LLC. Notify Danco that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, and all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of Mifeprex patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____    Title: _____



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com
2023 SUPP 001511

Reference ID: 5103833

Signature: _____ Date: _____

Email: _____ Phone: _____ Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com
2023 SUPP 001512

Reference ID: 5103833

**PHARMACY AGREEMENT FORM**                                    **Mifepristone Tablets, 200 mg**

Pharmacies must designate an authorized representative to carry out the certification process and oversee implementation and compliance with the Mifepristone REMS Program on behalf of the pharmacy.

Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**By signing this form, as the Authorized Representative I certify that:**

- Each location of my pharmacy that will dispense mifepristone is able to receive *Prescriber Agreement Forms* by email and fax.
- Each location of my pharmacy that will dispense mifepristone is able to ship mifepristone using a shipping service that provides tracking information.
- I have read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855-643-3463 toll-free) or online at www.MifeInfo.com; and
- Each location of my pharmacy that will dispense mifepristone will put processes and procedures in place to ensure the following requirements are completed. I also understand that if my pharmacy does not complete these requirements, the distributor may stop accepting mifepristone orders.
  - Verify that the prescriber is certified in the Mifepristone REMS Program by confirming their completed *Prescriber Agreement Form* was received with the prescription or is on file with your pharmacy.
  - Dispense mifepristone such that it is delivered to the patient within 4 calendar days of the date the pharmacy receives the prescription, except as provided in the following bullet.
  - Confirm with the prescriber the appropriateness of dispensing mifepristone for patients who will receive the drug more than 4 calendar days after the date the pharmacy receives the prescription and document the prescriber's decision.
  - Record in the patient's record the NDC and lot number from each package of mifepristone dispensed.
  - Track and verify receipt of each shipment of mifepristone.
  - Dispense mifepristone in its package as supplied by GenBioPro, Inc.
  - Report any patient deaths to the prescriber, including the NDC and lot number from the package of mifepristone dispensed to the patient, and remind the prescriber of their obligation to report the deaths to GenBioPro, Inc. Notify GenBioPro that your pharmacy submitted a report of death to the prescriber, including the name and contact information for the prescriber and the NDC and lot number of the dispensed product.
  - Not distribute, transfer, loan or sell mifepristone except to certified prescribers or other locations of the pharmacy.
  - Maintain records of *Prescriber Agreement Forms*, dispensing and shipping, all processes and procedures including compliance with those processes and procedures.
  - Maintain the identity of mifepristone patients and prescribers as confidential and protected from disclosure except to the extent necessary for dispensing under this REMS or as necessary for payment and/or insurance purposes.
  - Train all relevant staff on the Mifepristone REMS Program requirements.
  - Comply with audits carried out by the Mifepristone Sponsors or a third party acting on behalf of the Mifepristone Sponsors to ensure that all processes and procedures are in place and are being followed.

Any new authorized representative must complete and submit the *Pharmacy Agreement Form*.

Authorized Representative Name: _____  Title: _____

Signature: _____  Date: _____

Email: _____  Phone: _____  Preferred __ email __ phone

Pharmacy Name: _____

Pharmacy Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to **1-877-239-8036.**



Reference ID: 5103833

**MIFEPREX® (Mifepristone) Tablets, 200 mg**

**PRESCRIBER AGREEMENT FORM**

Mifeprex* (Mifepristone) Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit Mifeprex prescriptions for dispensing from certified pharmacies**:

  o  Submit this form to each certified pharmacy to which you intend to submit Mifeprex prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order Mifeprex for dispensing by you or healthcare providers under your supervision:**

  o  Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.

  o  Healthcare settings, such as medical offices, clinics, and hospitals, where Mifeprex will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

*Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:*

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling  1-877-4 EARLY OPTION (1-877-432-7596 toll-free), or by visiting www.earlyoptionpill.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received Mifeprex are reported to Danco Laboratories, LLC, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of Mifeprex that was dispensed to the patient.



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com

2023 SUPP 001514

Ensure that healthcare providers under your supervision follow the guidelines listed above.

- If Mifeprex will be dispensed through a certified pharmacy:
  - o  Assess appropriateness of dispensing Mifeprex when contacted by a certified pharmacy about patients who will receive Mifeprex more than 4 calendar days after the prescription was received by the certified pharmacy.
  - o  Obtain the NDC and lot number of the package of Mifeprex the patient received in the event the prescriber becomes aware of the death of a patient.
- If Mifeprex will be dispensed by you or by healthcare providers under your supervision:
  - o  Ensure the NDC and lot number from each package of Mifeprex are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____    Title: _____

Signature: _____    Date: _____

Medical License # _____    State _____

NPI # _____

Practice Setting Address: _____    _____

Return completed form to Mifeprex@dancodistributor.com or fax to 1-866-227-3343.

Approved 01/2023 [Doc control ID]



*MIFEPREX is a registered trademark of Danco Laboratories, LLC
P.O. Box 4816-New York, NY 10185
1-877-4-EARLY-OPTION (1-877-432-7596) www.earlyoptionpill.com
2023 SUPP 001515

Reference ID: 5103833

PRESCRIBER AGREEMENT FORM                                    Mifepristone Tablets, 200 mg

Mifepristone Tablets, 200 mg, is indicated, in a regimen with misoprostol, for the medical termination of intrauterine pregnancy through 70 days gestation. Please see Prescribing Information and Medication Guide for complete safety information.

To **become a certified prescriber**, you must:

- **If you submit mifepristone prescriptions for dispensing from certified pharmacies**:

  o  Submit this form to each certified pharmacy to which you intend to submit mifepristone prescriptions. The form must be received by the certified pharmacy before any prescriptions are dispensed by that pharmacy.

- **If you order mifepristone for dispensing by you or healthcare providers under your supervision:**

  o  Submit this form to the distributor. This form must be received by the distributor before the first order will be shipped to the healthcare setting.

  o  Healthcare settings, such as medical offices, clinics, and hospitals, where mifepristone will be dispensed by or under the supervision of a certified prescriber in the Mifepristone REMS Program do not require pharmacy certification.

**Prescriber Agreement:** By signing this form, you agree that you meet the qualifications below and will follow the guidelines for use. You are responsible for overseeing implementation and compliance with the Mifepristone REMS Program. You also understand that if the guidelines below are not followed, the distributor may stop shipping mifepristone to the locations that you identify and certified pharmacies may stop accepting your mifepristone prescriptions.

***Mifepristone must be provided by or under the supervision of a certified prescriber who meets the following qualifications:***

- Ability to assess the duration of pregnancy accurately.

- Ability to diagnose ectopic pregnancies.

- Ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or have made plans to provide such care through others, and be able to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary.

- Has read and understood the Prescribing Information for mifepristone. The Prescribing Information is available by calling 1-855-MIFE-INFO (1-855—643-3463 toll-free), or by visiting www.MifeInfo.com.

**In addition to meeting these qualifications, you also agree to follow these guidelines for use:**

- Ensure that the *Patient Agreement Form* is reviewed with the patient and the risks of the mifepristone treatment regimen are fully explained. Ensure any questions the patient may have prior to receiving mifepristone are answered.

- Ensure the healthcare provider and patient sign the *Patient Agreement Form*.

- Ensure that the patient is provided with a copy of the *Patient Agreement Form* and Medication Guide.

- Ensure that the signed *Patient Agreement Form* is placed in the patient's medical record.

- Ensure that any deaths of patients who received mifepristone are reported to GenBioPro, Inc. that provided the mifepristone, identifying the patient by a non-identifiable reference and including the NDC and lot number from the package of mifepristone that was dispensed to the patient.

Ensure that healthcare providers under your supervision follow the guidelines listed above.



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

2023 SUPP 001516

Reference ID: 5103833

- If mifepristone will be dispensed through a certified pharmacy:
  - o Assess appropriateness of dispensing mifepristone when contacted by a certified pharmacy about patients who will receive mifepristone more than 4 calendar days after the prescription was received by the certified pharmacy.
  - o Obtain the NDC and lot number of the package of mifepristone the patient received in the event the prescriber becomes aware of the death of a patient.
- If mifepristone will be dispensed by you or by healthcare providers under your supervision:
  - o Ensure the NDC and lot number from each package of mifepristone are recorded in the patient's record.

I understand that a certified pharmacy may dispense mifepristone made by a different manufacturer than that stated on this Prescriber Agreement Form.

Print Name: _____   Title: _____

Signature:  _____   Date: _____

Medical License # _____   State _____

NPI # _____

Practice Setting Address: _____

Return completed form to **RxAgreements@GenBioPro.com** or fax to 1-877-239-8036

Approved 01/2023 [Doc control ID]



GenBioPro Inc. - PO Box 32011 - Las Vegas, NV 89103
1-855-MIFE-INFO (1-855-643-3463) - www.MifeInfo.com

2023 SUPP 001517

Reference ID: 5103833