# Index of Joint Appendix Documents
## *Purcell, et al. v. Kennedy, et al.,*
## No. 1:17-cv-00493-JAO-RT (D. Haw.)

| VOLUME F | | |
|---|---|---|
| **Materials Available on FDA Webpages** | | |
| **Webpage or Document Name** | **Date** | **Location in Pls.' Exhibits** |
| Excerpt from FDA, *REMS Modification Notification (Isotretinoin)* | no date | Doc. 222-5, Ex. Vol. D at PCSF734 |
| FDA, *REMS Document: Opioid Analgesic REMS Program* | Apr. 2021 | Doc. 222-5, Ex. Vol. D at PCSF735 |
| Excerpts from FDA, *Opioid Analgesic REMS (Products tab)* | Apr. 9, 2021 | Doc. 222-5, Ex. Vol. D at PCSF741 |
| Excerpts from FDA, *REMS Assessment: Planning and Reporting Guidance, Guidance for Industry* | Jan. 2019 | Doc. 222-5, Ex. Vol. D at PCSF744 |
| REMS Homepage | accessed Sept. 30, 2024 | Doc. 222-5, Ex. Vol. D at PCSF751 |
| FDA, *REMS: FDA's Application of Statutory Factors in* | Apr. 2019 | Doc. 222-5, Ex. Vol. D at PCSF757 |

| | | |
|---|---|---|
| *Determining When a REMS is Necessary: Guidance for Industry* | | |
| Excerpts from FDA, *Labeling* (Viagra) | Mar. 2014 | Doc. 222-5, Ex. Vol. D at PCSF770 |
| Excerpts from FDA, *Supplemental Approval (Zydelig)* | July 6, 2022 | Doc. 222-5, Ex. Vol. D at PCSF775 |

| Litigation Documents | | | |
|---|---|---|---|
| **Doc. Name** | **Date** | **ECF No.** | **Location in Pls.' Exhibits** |
| Excerpt from Defs.' Concise Statement in Resp. to Pls.' Concise Statement of Facts | Jan. 10, 2020 | ECF 101 | Doc. 222-5, Ex. Vol. D at PCSF777 |
| Joint Stipulations of Facts | Apr. 15, 2021 | ECF 140 | Doc. 222-5, Ex. Vol. D at PCSF779 |
| Excerpts from Defs.' Answer to Corrected Second Amended & Suppl. Complaint | Aug. 16, 2024 | ECF 213 | Doc. 222-5, Ex. Vol. D at PCSF808 |



NDA ######

**REMS MODIFICATION NOTIFICATION**

APPLICANT NAME
ADDRESS

Dear CONTACT:[1]

We refer to your new drug application (NDA) submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for PROPRIETARY NAME (ESTABLISHED NAME).

## <u>RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENT</u>

The REMS for isotretinoin was originally approved on October 22, 2010, and the most recent REMS modification was approved on March 24, 2023. The REMS consists of elements to assure safe use, an implementation system, and a timetable for submission of assessments of the REMS.

In accordance with section 505-1(g)(4)(B) of the FDCA, we have determined that your approved REMS for isotretinoin must be modified to minimize the burden on the healthcare delivery system of complying with the REMS.

This determination is based on an analysis of potential changes to the current REMS requirements that could reduce burden on the healthcare delivery system while maintaining a comparable level of safe use. This analysis considered the advice, presentations, and discussion from the Joint Meeting of the Drug Safety and Risk Management Advisory Committee and the Dermatologic and Ophthalmic Drugs Advisory Committee held on March 28-29, 2023; stakeholder feedback from prescribers, pharmacists, and patients; review of the literature; experience during the COVID-19 Public Health Emergency; review of postmarketing data and REMS assessment reports covering years 12 through 16 of the REMS along with additional supplemental REMS data provided by the applicants.

Your approved REMS must be modified as follows:
- Remove the requirement that pregnancy tests must be performed in a CLIA-certified laboratory; however, all pregnancy testing before isotretinoin treatment

---

[1] We update guidances periodically. For the most recent version of a guidance, check the FDA Guidance Documents Database https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

# Risk Evaluation and Mitigation Strategy (REMS) Document

## Opioid Analgesic REMS Program

*The Opioid Analgesic REMS Program includes all opioid analgesics used in the outpatient setting and not covered by other REMS programs.*

## I. Administrative Information

Initial Shared System REMS Approval: 07/2012
Most Recent REMS Update: 04/2021

## II. REMS Goal

The Opioid Analgesic REMS is an educational effort and one of a number of national efforts that are designed to address the epidemic of prescription opioid abuse.

The goal of the Opioid Analgesic REMS is to educate prescribers and other healthcare providers (including pharmacists and nurses) on the treatment and monitoring of patients with pain. The education provided through the REMS program is based on the Opioid Analgesic REMS Education Blueprint for Health Care Providers Involved in the Treatment and Monitoring of Patients with Pain ("FDA Blueprint"). Through better education, the healthcare team will have an improved understanding of how to manage pain and the role of opioid analgesics along with nonpharmacologic and non-opioid analgesics in pain management. The education will also provide information about the risks of opioids and use of other therapies which is intended to assist healthcare providers in reducing adverse outcomes of addiction, unintentional overdose, and death resulting from inappropriate prescribing, abuse, and misuse. The REMS will accomplish this goal by:

1. Ensuring that training based on the FDA Blueprint is effective in educating prescribers and other healthcare providers involved in the treatment and monitoring of patients in pain (including pharmacists and nurses) about recommended pain management practices and appropriate use of opioid analgesics.

2. Informing patients about their roles and responsibilities regarding their pain treatment plan, including the risks of opioid analgesics and how to use and store them safely, as outlined in the Medication Guides and Patient Counseling Guide for opioid analgesics.

## III. REMS Requirements

**Opioid Analgesic Applicants must make training available to healthcare providers who prescribe and healthcare providers involved in the treatment and monitoring of patients who receive opioid analgesics.**

The training must include all the elements of the FDA Blueprint. The training must be made available to healthcare providers who prescribe or are involved in the treatment and monitoring (including pharmacists and nurses) of patients who receive opioid analgesics.

Training is compliant with the REMS if it: 1) for training provided by Continuing Education (CE) Providers, is offered by an accredited CE Provider and supported by unrestricted educational grants from the opioid analgesic applicants; 2) includes all elements of the FDA Blueprint; 3) includes a knowledge assessment of

1

all sections of the FDA Blueprint; and 4) is subject to independent audit to confirm that conditions of the REMS training have been met.

**To inform healthcare providers about the REMS Program and the risks and safe use of opioid analgesics, Opioid Analgesic Applicants must disseminate REMS communication materials according to the table below:**

| Target Audience | Communication Materials & Dissemination Plans |
|---|---|
| All DEA-registered prescribers, pharmacies, hospitals, and teaching institutions registered to prescribe or dispense Schedule II, III, and IV drugs | REMS Letter: Healthcare Provider Letter 1 or Professional Society/Licensing Board Letter 1 with attachment Patient Counseling Guide<br><br>1. Email within 60 calendar days of the approval (09/18/2018) of the REMS.<br><br>   a. Send by mail within 30 calendar days of the date the first email was sent if a healthcare provider's email address is not available or the email is undeliverable.<br><br>   b. Send a second email within 30 calendar days of the date the first email was sent if the first email is marked as unopened.<br><br>   c. Send by mail within 30 calendar days of the date the second email was sent if the second email is marked as unopened.<br><br>2. Disseminate through the following professional societies and request the letter or content be provided to their members:<br><br>   a. The professional societies identified in Appendix A.<br><br>3. Disseminate through all dental, medical (allopathic and osteopathic), nursing, and pharmacy licensing boards and request the letter or content be provided to their licensed practitioners.<br><br>REMS Letter: Healthcare Provider Letter 2 or Professional Society/Licensing Board Letter 2 with attachment Patient Counseling Guide<br><br>4. Email within 30 calendar days of 03/31/2019.<br><br>   a. Send by mail within 30 calendar days of the date the first email was sent if a healthcare provider's email address is not available or the email is undeliverable.<br><br>   b. Send a second email within 30 calendar days of the date the first email was sent if the first email is marked as unopened.<br><br>   c. Send by mail within 30 calendar days of the date the second email was sent if the second email is marked as unopened.<br><br>5. Disseminate through the following professional societies and request the letter or content be provided to their members.<br><br>   a. The professional societies identified in Appendix A.<br><br>6. Disseminate through all dental, medical (allopathic and osteopathic), nursing, and pharmacy licensing boards and request the letter or content be provided to their licensed practitioners. |

2

| Target Audience | Communication Materials & Dissemination Plans |
|---|---|
| All newly DEA-registered prescribers, pharmacies, hospitals, and teaching institutions registered to prescribe or dispense Schedule II, III, and IV drugs since the last dissemination | REMS Letter: Healthcare Provider Letter 2 with attachment Patient Counseling Guide<br><br>1. Email annually from the date of the approval (09/18/2018) of the REMS.<br><br>  a. Send by mail within 30 calendar days of the date the first email was sent if a healthcare provider's email address is not available or the email is undeliverable.<br><br>  b. Send a second email within 30 calendar days of the date the first email was sent if the first email is marked as unopened.<br><br>  c. Send by mail within 30 calendar days of the date the second email was sent if the second email is marked as unopened. |

**To support REMS Program operations, Opioid Analgesic Applicants must:**

1. Establish and maintain a REMS Program website, www.opioidanalgesicrems.com. The REMS Program website must include a current list of training funded by the Opioid Analgesic Applicants that is REMS-compliant and the option to print the PI, Medication Guide, and REMS materials. All product websites for consumers and healthcare providers must include prominent REMS-specific links to the REMS Program website. The REMS Program website must not link back to the promotional product websites.

2. Direct CE Providers to the FDA Blueprint on www.fda.gov/OpioidAnalgesicREMSBlueprint.

3. Make the REMS Program website fully operational and all REMS materials available through the website and call center within 60 calendar days of REMS approval (09/18/2018).

4. Establish and maintain a REMS Program call center for healthcare providers at 1-800-503-0784.

5. Ensure healthcare providers who prescribe or are involved in the treatment and monitoring of patients who receive opioid analgesics are able to access training by 3/31/2019

6. Notify accredited CE Providers of REMS-compliant training regarding changes to the FDA Blueprint within 10 calendar days of such changes.

7. Use independent auditors (accreditation bodies of CE Providers are considered independent and eligible to conduct the audits) to audit the educational materials used by the accredited CE Providers of REMS-compliant training of a random sample of at least 10% of the training funded by the Opioid Analgesic Applicants to evaluate (1) whether the content of the training covers all the components of the FDA Blueprint, (2) whether the knowledge assessment measures knowledge of all sections of the FDA Blueprint, (3) whether the training was conducted in accordance with the standards for CE of the Accreditation Council for Continuing Medication Education or of another CE accrediting body appropriate to the prescribers, dental, pharmacy, nursing, or healthcare profession.

# IV.   REMS Assessment Timetable

Opioid Analgesic NDA Applicants must submit REMS Assessments at 6 months, 12 months, and annually thereafter from the date of the approval of the REMS (09/18/2018). To facilitate inclusion of as much information as possible while allowing reasonable time to prepare the submission, the reporting interval covered by each assessment should conclude no earlier than 60 calendar days before the submission date

3

for that assessment. Opioid Analgesic NDA Applicants must submit each assessment so that it will be received by the FDA on or before the due date.


# V.   REMS Materials

The following materials are part of the Opioid Analgesic REMS**:**

**Training and Educational Materials**

   Healthcare Provider:

   1.   Healthcare Provider training available at www.opioidanalgesicrems.com

   Patient:

   2.   Medication Guide (available at www.opioidanalgesicrems.com)
   3.   Patient Counseling Guide

**Communication Materials**

   4.   Healthcare Provider Letter 1
   5.   Healthcare Provider Letter 2
   6.   Professional Society/Licensing Board Letter 1
   7.   Professional Society/Licensing Board Letter 2

**Other Materials**

   8.   Opioid Analgesic REMS Education Blueprint for Health Care Providers Involved in the Treatment and Monitoring of Patients with Pain (FDA Blueprint)
   9.   Opioid Analgesic REMS Program website (www.opioidanalgesicrems.com)

4

# Appendix A: List of Professional Societies

1. American Academy of Addiction Psychiatry
2. Council of Medical Specialty Societies
3. Academy of Integrative Pain Management
4. Academy of Managed Care Pharmacists
5. American Academy of Family Physicians
6. American Academy of Hospice and Palliative Medicine
7. American Academy of Neurology
8. American Academy of Nurse Practitioners
9. American Academy of Nursing
10. American Academy of Orofacial Pain
11. American Academy of Pain Medicine
12. American Academy of Physical Medicine and Rehabilitation
13. American Academy of Physician Assistants
14. American Association of Colleges of Nursing
15. American Association of Colleges of Osteopathic Medicine
16. American Association of Poison Control Centers
17. American Board of Medical Specialties
18. American Board of Orofacial Pain
19. American College of Clinical Pharmacy
20. American College of Nurse Midwives
21. American College of Nurse Practitioners
22. American College of Osteopathic Family Physicians
23. American College of Physicians
24. American College of Rheumatology
25. American Dental Association
26. American Dental Education Association
27. American Medical Association
28. American Medical Directors Association
29. American Nurses Association
30. American Nurses Credentialing Center
31. American Osteopathic Association

5

32. American Osteopathic Association of Addiction Medicine

33. American Pain Society

34. American Pediatric Association

35. American Pharmacists Association

36. American Psychiatric Nursing Association

37. American Society for Pain Management Nursing

38. American Society of Addiction Medicine

39. American Society of Anesthesiologists

40. American Society of Consultant Pharmacists

41. American Society of Pain Educators

42. Association of American Medical Colleges

43. Doctors of Nursing Practice

44. Gerontological Nursing Association

45. Hospice and Palliative Nurses Association

46. National Association of Managed Care Professionals

47. National Association of Pediatric Nurse Practitioners

48. National Conference of Nurse Practitioners

49. National League of Nursing

50. National Organization of Nurse Practitioner Faculties

51. Nurse Practitioners in Women's Health

52. Oncology Nursing Society

53. Society of Emergency Medicine Physician Assistants

6

<u>Drug Databases (https://www.fda.gov/Drugs/InformationOnDrugs/default.htm)</u>

# Approved Risk Evaluation and Mitigation Strategies (REMS)

## Opioid Analgesic REMS
### Shared System REMS

REMS last update: 04/09/2021

| Products | Goals | Summary | REMS Materials |
| Assessment Plan | Update history |

## What medicines are included in the REMS?

**<u>ExcelCSVPrint</u>**

| Product Name | Application Number | Application Holder | Added to REMS |
|---|---|---|---|
| acetaminophen and codeine phosphate (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=040779)**) | ANDA 040779 | AMNEAL PHARMS NY | 09/18/2018 |
| acetaminophen and codeine phosphate (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=081249)**) | ANDA 081249 | FOSUN PHARMA | 09/18/2018 |
| acetaminophen and codeine phosphate (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=081250)**) | ANDA 081250 | FOSUN PHARMA | 09/18/2018 |
| acetaminophen and codeine phosphate (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=202800)**) | ANDA 202800 | AUROLIFE PHARMA LLC | 09/18/2018 |
| acetaminophen and codeine phosphate (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=91238)**) | ANDA 91238 | CHARTWELL MOLECULAR | 09/18/2018 |

| Product Name | Application Number | Application Holder | Added to REMS |
|---|---|---|---|
| fentanyl (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=202097)**) | ANDA 202097 | KINDEVA | 09/18/2018 |
| fentanyl transdermal system (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=209655)**) | ANDA 209655 | ZYDUS PHARMS | 01/25/2023 |
| fentanyl transdermal system ( **PI and MG at DailyMed (https://dailymed.nlm.nih.gov/dailymed/lookup.cfm? setid=67cb9ea4-5adb-4a3a-9568-266b6f472078)** , **Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=077154)** ) | ANDA 077154 | SPECGX LLC | 07/09/2012 |
| fentanyl transdermal system ( **PI and MG at DailyMed (https://dailymed.nlm.nih.gov/dailymed/lookup.cfm? setid=51ed4fe8-61fd-499d-abf3-d363f4c096e4)** , **Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=077449)** ) | ANDA 077449 | AVEVA | 02/14/2013 |
| fentanyl transdermal system ( **PI and MG at DailyMed (https://dailymed.nlm.nih.gov/dailymed/lookup.cfm? setid=2a2238e9-4b5d-c56d-8663-dd354ff9ae0c)** , **Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=076258)** ) | ANDA 076258 | MYLAN TECHNOLOGIES | 07/09/2012 |
| Fioricet with Codeine (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=75929)**) | ANDA 75929 | NOSTRUM LABS INC | 09/18/2018 |
| Fioricet with Codeine (butalbital, acetaminophen, caffeine, and codeine phosphate) (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=20232)**) | NDA 20232 | ACTAVIS LABS UT INC | 09/18/2018 |
| Hydrocodone bitartrate (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm? event=overview.process&ApplNo=206986)**) | ANDA 206986 | ALVOGEN | 01/21/2020 |

| Product Name | Application Number | Application Holder | Added to REMS |
|---|---|---|---|
| oxycodone hydrochloride and acetaminophen (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=211499**)) | ANDA 211499 | ABHAI LLC | 12/31/2018 |
| oxycodone hydrochloride and acetaminophen (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=201448**)) | ANDA 201448 | NOSTRUM LABS INC | 08/26/2021 |
| OxyContin (oxycodone hydrochloride) ( **PI and MG at DailyMed (https://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=bfdfe235-d717-4855-a3c8-a13d26dadede)** , **Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=022272)** ) | NDA 022272 | PURDUE PHARMA LP | 07/09/2012 |
| oxymorphone hydrochloride (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=90964**)) | ANDA 90964 | HIKMA | 09/18/2018 |
| oxymorphone hydrochloride (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=201187**)) | ANDA 201187 | EPIC PHARMA LLC | 09/18/2018 |
| oxymorphone hydrochloride (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=203601**)) | ANDA 203601 | AVANTHI INC | 09/18/2018 |
| oxymorphone hydrochloride (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=210175**)) | ANDA 210175 | ASCENT PHARMS INC | 09/18/2018 |
| oxymorphone hydrochloride (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=204459**)) | ANDA 204459 | AUROLIFE PHARMA LLC | 09/18/2018 |
| oxymorphone hydrochloride (**Info at Drugs@FDA (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=91443**)) | ANDA 91443 | TEVA | 09/18/2018 |

# REMS Assessment:
# Planning and Reporting
## Guidance for Industry

***DRAFT GUIDANCE***

For questions regarding this draft document contact (CDER) Doris Auth 301-796-0487, or
(CBER) Office of Communication, Outreach and Development, 800-835-4709 or 240-402-8010

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**January 2019**
**Procedural**

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

196  categories described above in section IV.A. More than one metric may be selected for each
197  assessment category. Example metrics for the above assessment categories are provided below.
198
199  • Metrics in the *Program Outreach and Communication* assessment category may include
200     numbers of specific REMS materials that were distributed to, and the proportion of these
201     that were subsequently opened or read by, the targeted audiences.
202
203  • Metrics in the *Program Implementation and Operations* assessment category may include
204     the number of prescribers, health care settings, and/or pharmacies that have certified or
205     undergone training in the REMS program; the number of contacts to the call center and a
206     summary of the reason for the contact; number and results of audits of certified health
207     care settings; and the number of shipments of the drug to non-certified settings.
208
209  • Metrics in the *Knowledge* assessment category may include stakeholder understanding of
210     the risks and safe use of the drug. The draft guidance for industry *Survey Methodologies*
211     *to Assess REMS Goals that Relate to Knowledge* provides further recommendations on
212     using surveys to evaluate knowledge of REMS risks and safe use conditions.[23]
213
214  • Metrics in the *Safe Use Behaviors* assessment category can include an evaluation of
215     prescribing patterns and the proportion of patients who were counseled prior to initiating
216     a drug, as evidenced by the use of a REMS material such as a patient counseling tool or
217     patient-provider agreement form.
218
219  • Metrics in the *Health Outcomes and/or Surrogates of Health Outcomes* assessment
220     category can include numbers and/or rates of a specific adverse event of interest such as
221     rates of serious bleeds or severe neutropenia. Surrogate metrics could include the number
222     of inadvertent fetal exposures or the number of prevented fetal exposures to the
223     teratogenic drug.
224
225  The metrics that are selected within each assessment category will depend on the goals and
226  objectives of the program, the REMS requirements (e.g., education, dispensing requirements)
227  and REMS material (e.g., prescriber-patient agreement), and the feasibility of the measurement.
228
229  See Appendix 1 for additional examples of some potential metrics for the different assessment
230  categories and Appendix 2 for an example of how the development of a REMS Assessment Plan
231  may be linked to the REMS goals, objectives, and requirements. Applicants may also consider
232  other healthcare program assessment frameworks to help identify and organize REMS metrics.
233
234  **C.    Selecting Sources of Assessment Data**
235
236  Applicants are encouraged to identify complementary data sources that provide a combination of
237  qualitative and quantitative information about the REMS and should select sources that provide
238  data supporting the REMS assessment starting from the initial REMS implementation.
239
240  In selecting the sources of data, applicants should take into consideration how accurately and
      completely each data source can capture the relevant population and important components

*Contains Nonbinding Recommendations*

Draft — Not for Implementation

241　necessary for the assessment. Some data sources may be used to assess multiple identified
242　metrics. For example, drug utilization data may be used to assess changes in prescribing
243　behaviors as well as to inform potential barriers to patient access that would require additional
244　analyses. In other cases, multiple data sources may be needed to assess a single metric.
245
246　A detailed description of the data sources and methodological approaches, as well as the
247　applicant's evaluation of the adequacy of these in assessing the specific REMS requirement or
248　REMS materials, should be provided in the REMS Supporting Document. For all studies, a
249　protocol and statistical analysis plan should be submitted to FDA for review and comment prior
250　to study initiation. If applicable, timelines for the submission of study protocol and interim and
251　final reports should be provided by the applicant and agreed upon by FDA.
252
253　Described below are examples of data sources that may be used to inform REMS assessments.
254　This list is not meant to be comprehensive, and additional sources or approaches may be
255　appropriate.
256
257　　　*1. Applicant's REMS Data*
258
259　REMS with ETASU may include a requirement that the applicant maintain a database of
260　certified/enrolled prescribers, dispensers, healthcare settings, distributors, or patients. This
261　database can be a rich source of data for metrics that apply to several assessment categories.
262　Applicants should carefully consider what data need to be collected for REMS assessment
263　purposes when they design and develop REMS databases.
264
265　As an example, an applicant's REMS database can collect program participation metrics,
266　including the number of stakeholders or healthcare settings enrolled or certified in the program
267　when an ETASU requires such enrollment or certification. Depending on what data are captured,
268　the database might help to provide information about patient access to the drug, geographic
269　location of prescribers, numbers of prescriptions dispensed, and prescriber specialties. The
270　database can also include data that inform program operations and safe use conditions, such as
271　the number of prescriptions dispensed with and without the proper authorization when the
272　ETASU require such authorization. It may provide information about burden to the healthcare
273　system through categorizing data from general complaints received through a call center or
274　instances of delays in patient access that may be associated with the REMS. For REMS that
275　require a post-training knowledge assessment, the database can capture poor performance on
276　knowledge assessment questions, which can prompt a revision of the training program content to
277　address knowledge gaps. The database may also collect information related to health outcomes
278　of interest or results of laboratory monitoring (e.g., absolute neutrophil counts, pregnancy test
279　results).
280
281　Many applicants also collect other REMS operations data, such as the results of audit findings.
282　Applicants are encouraged to collect data across a wide range of program processes and
283　functions to the extent it facilitates their assessment of their REMS.
284

PCSF746

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

285         *2. Surveys*
286
287    When a REMS includes an objective to inform or educate patients or health care professionals
288    about a serious risk associated with a drug, or about the safe use of a drug, the assessment plan
289    should include an assessment of these stakeholders' knowledge. The key messages for each
290    targeted stakeholder should be defined prior to REMS approval (and documented in the REMS
291    Supporting Document), should be consistent with the key messages in the counseling, education,
292    or communication materials, and should relate to the REMS objective. Surveys are often used to
293    assess knowledge of these key messages and the related safe use actions to be taken by various
294    stakeholders.
295
296    Assessment of stakeholder understanding of REMS requirements may also be useful to
297    determine whether safe use behaviors are being adopted and whether stakeholders adhere to
298    certain REMS requirements. For example, if a REMS requires prescribers to counsel patients
299    before prescribing the drug, prescribers may be surveyed on whether they did so with the initial
300    and any subsequent prescriptions. Patients, in turn, may be surveyed on whether they received
301    counseling from their provider before they were prescribed the drug.
302
303    In addition to the use of surveys to assess self-reported adherence with program requirements,
304    surveys may also be designed to assess attitudes and beliefs and the potential burden associated
305    with REMS program requirements. FDA's draft guidance, *Survey Methodologies to Assess*
306    *REMS Goals That Relate to Knowledge,* provides recommendations to industry on conducting
307    REMS assessment surveys to assess respondent knowledge of REMS-related information.[23]
308
309         *3. Drug Utilization Data*
310
311    Drug utilization data not only provide descriptive information on the patterns of drug use but can
312    also provide useful information on overall disease treatment patterns and healthcare market
313    dynamics. Studies incorporating drug utilization data may be able to measure patient and
314    provider characteristics; reasons for use; rates of drug uptake; concomitant drug use; and, in
315    some cases, more detailed information such as duration of use and drug switching patterns.
316    Finally, drug utilization studies may, in combination with other studies, inform barriers to patient
317    access to the drug (see section V.B.).
318
319    If a REMS Assessment Plan includes a drug utilization study, it should describe the drug
320    utilization data source, the rationale for the data source, and the data collection methodology,
321    design and analytical approaches, and any limitations. The drug utilization study protocol should
322    also describe the national representativeness of the utilization data analyzed, as well as the
323    representativeness of the population evaluated in the drug utilization study relative to the overall
324    patient population receiving the drug product, comprehensiveness of the capture of drug
325    utilization across all settings of care, any linkages to other data sources as relevant/appropriate,
326    and any relevant data projection methodologies employed.
327

PCSF747

*Contains Nonbinding Recommendations*

Draft — Not for Implementation

328    For all drug utilization studies, a study protocol should be submitted to FDA for review and
329    comment prior to study initiation. In some cases, a statistical analysis plan may also be
330    necessary.
331
332        *4.   Postmarketing Adverse Event Data*
333
334    Adverse event data can provide qualitative information on adverse events and outcomes related
335    to the risk that the REMS is intended to mitigate. A number of factors affect spontaneous adverse
336    event reporting, including the nature and severity of the adverse event and length of time the
337    product has been on the market.
338
339    The quality of the adverse event reports is critical for appropriate assessment of the REMS;
340    therefore, we recommend collection of targeted information about specific adverse events of
341    interest. The information collected should focus on further characterizing the risk, and capturing
342    patient outcomes, as well as determining whether safe use conditions were met. The type of data
343    the applicant plans to collect to further characterize the adverse event should be included in the
344    REMS Assessment Plan. If feasible, it is helpful to link patient information in the applicant's
345    REMS database, when one exists, to adverse event reports in the applicant's adverse event
346    database.
347
348    A well-recognized limitation of spontaneous adverse event reporting is underreporting. It is
349    possible that the extent of underreporting for products with REMS with ETASU is not as
350    extensive as products without REMS, particularly when there is a mechanism to monitor patients
351    for adverse events as part of a REMS requirement. However, because spontaneous adverse event
352    reporting systems do not capture all adverse events, even adverse events for drugs with an
353    approved REMS, the data from those reporting systems cannot be used to calculate the incidence
354    of a particular adverse event.
355
356    Postmarketing adverse event data can be used to compare reporting rates of an adverse event
357    before and after a REMS have been implemented. In certain circumstances, however, it may not
358    be appropriate to do so because there may be differences in the way the adverse event
359    information was obtained. For example, prior to the implementation of a REMS, adverse event
360    information may be collected solely from spontaneous reports. If the REMS includes a prescriber
361    attestation to report adverse events experienced by patients taking the drug, the number of
362    reported events may be higher after REMS implementation (stimulated reporting).
363
364    To the extent possible, several sources should be employed to obtain information on adverse
365    events and outcomes related to the risk that the REMS was intended to mitigate. Adverse event
366    reports received or identified through REMS are still required to be evaluated and must be
367    submitted to FDA per the regulations for postmarketing adverse event reporting.[24]
368

---

[24] 21 CFR 314.80, 314.98, and 600.80.

PCSF748

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

369        *5. Observational/Epidemiology Data*
370
371    Studies analyzing observational data to evaluate outcomes associated with use of drug products
372    (i.e., pharmacoepidemiology studies) can be considered to evaluate various aspects of REMS
373    including safe use behaviors, prescribing patterns, barriers to patient access, and safety-related
374    health outcomes or surrogates of those outcomes.
375
376    When designing epidemiology studies to assess a REMS, applicants may consider various
377    population data sources and study designs. FDA has published best practices for conducting and
378    reporting pharmacoepidemiology safety studies using electronic health care data.[25] Additionally,
379    the published literature contains guidelines for planning, conduct, analysis, and reporting of
380    epidemiologic studies of drug safety, which could be used to assess the performance of
381    REMS.[26,27]
382
383    There may be unique challenges in using pharmacoepidemiology data to assess the effectiveness
384    of a REMS. In most instances, existing databases may not adequately capture important data
385    elements, such as the outcome of interest and covariates, therefore limiting the adequacy of a
386    pharmacoepidemiology study to evaluate the metrics of interest. In those instances, studies
387    employing prospective data collection will need to be considered. Additionally, the utility of
388    pharmacoepidemiology data is limited when a REMS is implemented at the time of approval and
389    therefore no data are available on the use of the drug without a REMS. Nevertheless, the optimal
390    design and methodology of studies using observational/epidemiologic data to assess the impact
391    of REMS or specific REMS requirements on certain outcomes are evolving. FDA intends to
392    exercise a flexible approach with regard to such studies.
393
394    This guidance does not recommend a specific pharmacoepidemiology study design or type for
395    REMS assessments, nor does it address the specific population or data sources to be considered.
396    The decision to use a pharmacoepidemiology study should be guided by the questions of interest,
397    and the feasibility of the selected data to adequately evaluate the question of interest. A
398    discussion of the challenges of conducting a proposed assessment and limitations of the data
399    used should be included in the study proposal.
400

---

[25] FDA guidance for industry *Best Practices for Conducting and Reporting Pharmacoepidemiologic Safety Studies Using Electronic Healthcare Data Sets*. Available from:
https://www.fda.gov/downloads/drugs/guidances/ucm243537.pdf.

[26] Von Elm E, Altman DG, Pocock SJ, et al. Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for reporting observational studies. BMJ. 2007; 335:806-808.

[27] European Network of Centres for Pharmacoepidemiology and Pharmacovigilance (ENCePP) Guide on Methodological Standards in Pharmacoepidemiology (Revision 1) [Internet]. London (UK): European Medicines Agency. EMA/95098/2010. Available at
http://www.encepp.eu/standards_and_guidances/documents/ENCePPGuideofMethStandardsinPE_2.pdf

PCSF749

Case 1:17-cv-00493-RJA-RT Document 24-10 Filed 05/23/25 Page 19 of 79
PageID.7274
Case 1:17-cv-00493-RJA-RT Document 22 Filed 05/27/25 Page 19 of 79 PageID.9507

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

401       *6. Data from Root Cause Analysis*
402
403 A root cause analysis (RCA) is a structured method used to analyze adverse events or root causes
404 of program deficiencies and focuses on improving systems and processes to enhance patient
405 safety.[28] An RCA may need to be conducted to better understand the observed findings from a
406 specific REMS assessment. RCAs may be conducted after a REMS assessment has been
407 completed if it is unclear whether certain aspects of the program are performing as intended.
408 RCAs can help identify determinants and underlying causes of REMS failure to meet its goals.
409 RCAs can also help identify the factors responsible for a particular type of failure of the REMS,
410 as well as burden of the program on the healthcare delivery system, and barriers to patient access
411 to the drug. This analysis may help inform any necessary modifications to the REMS program
412 goals and requirements.
413
414 RCA best practices include the development and use of a predefined protocol and a team-based
415 reconstruction of each issue via retrospective review and interviews. The applicant should then
416 assess the sequence of steps that led to each type of program failure (e.g., inadequate prescriber
417 knowledge, lack of compliance) or unintended effect and determine how and why that event
418 occurred. RCAs can also help assess other adverse events or unfavorable effects that may occur
419 as an unintended consequence of the REMS requirements.
420
421       *7. Data from Stakeholder Outreach*
422
423 Applicants should consider seeking input from the key stakeholders affected by the REMS,
424 including prescribers, pharmacists, other healthcare professionals, and patients. Input from
425 marketing research surveys, focus groups, and interviews could also inform the applicant and the
426 Agency about the impact of the program on the healthcare delivery system and on patient access
427 to the drug, as well as opportunities for program improvement.
428
429     **D.    Specifying Thresholds for REMS Effectiveness**
430
431 An additional consideration in REMS assessment planning is specifying performance thresholds
432 for determining the effectiveness of the REMS. The specification of performance thresholds or
433 performance levels over time provides criteria to help determine if REMS program performance
434 is acceptable or if modifications to the REMS are needed. For example, a proposal and
435 justification for a performance threshold should be provided in study protocols for knowledge
436 surveys. In this case, the threshold would be the minimum knowledge rate that, if achieved,
437 demonstrates that the REMS has met its goals of communicating the REMS key messages.[23]
438
439 The REMS Assessment Plan should specify a performance threshold for a health outcome of
440 interest, if feasible. If the health outcomes of interest for the REMS are difficult to measure
441 directly, performance thresholds should be specified for surrogate metrics.

---

[28] Patient safety primers: root cause analysis [Internet]. Rockville (MD): Department of Health and Human Services (US). Agency for Healthcare Research and Quality. Available from: http://psnet.ahrq.gov/primer.aspx?primerID=10. See also Root Cause Analysis [Internet]. Washington (DC): Department of Veterans Affairs (US). National Center for Patient Safety. Available from: https://www.patientsafety.va.gov/professionals/onthejob/rca.asp

PCSF750

Drug Databases (https://www.fda.gov/Drugs/InformationOnDrugs/default.htm)

# Approved Risk Evaluation and Mitigation Strategies (REMS)

## REMS@FDA (index.cfm)

**Contact Us (https://www.accessdata.fda.gov/scripts/email/cder/comment-rems.cfm)** | **REMS Resources (https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems)** | **(https://public.govdelivery.com/accounts/USFDA/subscriber/new?topic_id=USFDA_342)** **Get REMS Email Alerts (https://public.govdelivery.com/accounts/USFDA/subscriber/new?topic_id=USFDA_342)** | **Reports & Data Files (/scripts/cder/rems/index.cfm?event=RemsData.page)** | **REMS Public Dashboard (https://fis.fda.gov/sense/app/ca606d81-3f9b-4480-9e47-8a8649da6470/sheet/6840df68-c772-45f1-bc4f-39d8b04cbfc1/state/analysis)**

Persons with disabilities having problems accessing the PDF file(s) below may call (301) 796-3634 for assistance.

The Food and Drug Administration Amendments Act of 2007 gave FDA the authority to require a Risk Evaluation and Mitigation Strategy (REMS) from manufacturers to ensure that the benefits of a drug or biological product outweigh its risks.

The table below provides links to currently approved individual and shared system REMS.

Information on historical and released REMS is available in downloadable: **data files (https://www.accessdata.fda.gov/scripts/cder/rems/index.cfm?event=RemsData.page)**.

**ExcelCSVPrint**

Filter by Keyword (e.g. REMS name, active ingredient, eleme

| Name | REMS Approved | Last Updated | MedGuide (MG)* | Comm. Plan (CP) | ETASU | Imp. System (IS) |
|---|---|---|---|---|---|---|
| **Abecma (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=406)** *(Idecabtagene vicleucel)*, suspension, for intravenous infusion BLA #125736 | 03/26/2021 | 04/04/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=406#tabs-2)** | IS |
| **Adasuve (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=2)** *(loxapine)*, aerosol, powder NDA #022549 | 12/21/2012 | 01/27/2022 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=2#tabs-2)** | IS |
| **Addyi (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=350)** *(flibanserin)*, tablet NDA #022526 | 08/18/2015 | 10/09/2019 | MG | | | |
| **Alvimopan Shared System REMS (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=397)** Shared System REMS | 12/19/2019 | 06/12/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=397#tabs-3)** | IS |
| **Ambrisentan Shared System (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=396)** Shared System REMS | 03/28/2019 | 08/19/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=396#tabs-3)** | IS |
| **Aveed (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=313)** *(testosterone undecanoate)*, injection NDA #022219 | 03/05/2014 | 05/26/2022 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=313#tabs-2)** | IS |
| **BKEMV (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=431)** *(eculizumab-aeeb)*, injection BLA #761333 | 05/28/2024 | 05/28/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=431#tabs-2)** | IS |
| **Bosentan (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=395)** Shared System REMS | 04/26/2019 | 09/17/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=395#tabs-3)** | IS |

| Name | REMS Approved | Last Updated | MedGuide (MG)* | Comm. Plan (CP) | ETASU | Imp. System (IS) |
|---|---|---|---|---|---|---|
| **Breyanzi (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=405)** (*lisocabtagene maraleucel*), suspension, for intravenous infusion BLA #125714 | 02/05/2021 | 05/30/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=405#tabs-2)** | IS |
| **Brixadi (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=418)** (*buprenorphine*), injection NDA #210136 | 05/23/2023 | 05/23/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=418#tabs-2)** | IS |
| **Buprenorphine Transmucosal Products for Opioid Dependence (BTOD) (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=9)** Shared System REMS | | 03/20/2024 | MG | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=9#tabs-3)** | IS |
| **Camzyos (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=413)** (*mavacamten*), capsule NDA #214998 | 04/28/2022 | 12/19/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=413#tabs-2)** | IS |
| **Caprelsa (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=11)** (*vandetanib*), tablet NDA #022405 | 04/06/2011 | 01/05/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=11#tabs-2)** | IS |
| **Carvykti (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=412)** (*ciltacabtagene autoleucel*), suspension, for intravenous infusion BLA #125746 | 02/28/2022 | 04/05/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=412#tabs-2)** | IS |
| **Clozapine (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=351)** Shared System REMS | | 09/29/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=351#tabs-3)** | IS |
| **Copiktra (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=382)** (*duvelisib*), capsule NDA #211155 | 09/24/2018 | 02/02/2022 | | **CP (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=382#tabs-2)** | | |
| **Dsuvia (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=384)** (*sufentanil*), tablet, sublingual NDA #209128 | 11/02/2018 | 12/19/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=384#tabs-2)** | IS |
| **Elrexfio (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=421)** (*elranatamab-bcmm*), injection BLA #761345 | 08/14/2023 | 09/10/2024 | | **CP (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=421#tabs-2)** | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=421#tabs-2)** | IS |
| **Empaveli (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=409)** (*Pegcetacoplan*), injection NDA #215014 | 05/14/2021 | 05/14/2021 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=409#tabs-2)** | IS |
| **Epysqli (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=434)** (*eculizumab-aagh*), injection BLA #761340 | 07/19/2024 | 07/19/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=434#tabs-2)** | IS |
| **Fabhalta (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=425)** (*iptacopan*), capsule NDA #218276 | 12/05/2023 | 08/07/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=425#tabs-2)** | IS |
| **Filspari (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=416)** (*sparsentan*), tablet NDA #216403 | 02/17/2023 | 12/20/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=416#tabs-2)** | IS |
| **Fintepla (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=400)** (*fenfluramine hydrochloride*), solution NDA #212102 | 06/25/2020 | 05/24/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=400#tabs-2)** | IS |

Case 1:24-cv-00493-RJA-DB Document 240-10/1/Filed 05/27/2542 Page 22 of 79 .7277
Case 1:24-cv-00493-RJA-DB Document 240-10 Filed 05/27/25 Page 22 of 79
PageID.9510

| Name | REMS Approved | Last Updated | MedGuide (MG)* | Comm. Plan (CP) | ETASU | Imp. System (IS) |
|---|---|---|---|---|---|---|
| **Gattex (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=21)** (*teduglutide [rDNA origin]*), injection, powder, for solution NDA #203441 | 12/21/2012 | 10/21/2022 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=21#tabs-2)** | |
| **Hepzato (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=422)** (*melphalan*), injection NDA #201848 | 08/14/2023 | 01/22/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=422#tabs-2)** | IS |
| **Isotretinoin iPLEDGE ((/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=24)** Shared System REMS | 10/22/2010 | 10/03/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=24#tabs-3)** | IS |
| **Jubbonti (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=426)** (*denosumab-bbdz*), injection BLA #761362 | 03/05/2024 | 08/14/2024 | | **CP (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=426#tabs-2)** | | |
| **Juxtapid (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=25)** (*lomitapide*), capsule NDA #203858 | 12/21/2012 | 04/26/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=25#tabs-2)** | IS |
| **Jynarque (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=380)** (*tolvaptan*), tablet NDA #204441 | 04/23/2018 | 09/29/2023 | | **CP (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=380#tabs-2)** | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=380#tabs-2)** | IS |
| **Kymriah (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=368)** (*tisagenlecleucel*), suspension, for intravenous infusion BLA #125646 | 08/30/2017 | 08/16/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=368#tabs-2)** | IS |
| **Lemtrada (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=340)** (*alemtuzumab*), injection, solution, concentrate BLA #103948 | 11/14/2014 | 03/04/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=340#tabs-2)** | IS |
| **Lenalidomide ((/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=410)** Shared System REMS | 05/21/2021 | 03/24/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=410#tabs-3)** | IS |
| **Lumryz (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=401)** (*sodium oxybate extended-release*), solution NDA #214755 | 05/01/2023 | 10/31/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=401#tabs-2)** | IS |
| **Macitentan-Containing Products ((/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=407)** Shared System REMS | 04/06/2021 | 05/17/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=407#tabs-3)** | IS |
| **Mifepristone ((/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390)** Shared System REMS | 04/11/2019 | 03/23/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=390#tabs-3)** | IS |
| **Myalept (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=314)** (*metreleptin*), injection, powder, lyophilized, for solution BLA #125390 | 02/24/2014 | 03/06/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=314#tabs-2)** | IS |
| **Mycophenolate ((/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=37)** Shared System REMS | 09/25/2012 | 08/13/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=37#tabs-3)** | |

| Name | REMS Approved | Last Updated | MedGuide (MG)* | Comm. Plan (CP) | ETASU | Imp. System (IS) |
|---|---|---|---|---|---|---|
| **Natpara (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=343)** (*parathyroid hormone*), injection, powder, lyophilized, for solution BLA #125511 | 01/23/2015 | 09/14/2023 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=343#tabs-2)** | IS |
| **Opioid Analgesic REMS (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=17)** Shared System REMS | 07/09/2012 | 04/09/2021 | MG | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=17#tabs-3)** | |
| **Palforzia (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=398)** (*Peanut (Arachis hypogaea) Allergen Powder-dnfp*), powder BLA #125696 | 01/31/2020 | 07/26/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=398#tabs-2)** | IS |
| **Palynziq (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=381)** (*pegvaliase-pqpz*), injection, solution BLA #761079 | 05/24/2018 | 12/09/2023 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=381#tabs-2)** | IS |
| **Phentermine and Topiramate Extended-Release Capsules (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=433)** Shared System REMS | 06/25/2024 | 06/25/2024 | MG | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=433#tabs-3)** | IS |
| **Piasky (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=432)** (*Crovalimab-akkz*), injection BLA #761388 | 06/20/2024 | 06/20/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=432#tabs-2)** | IS |
| **Pomalidomide (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=404)** Shared System REMS | 10/30/2020 | 10/30/2020 | | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=404#tabs-3)** | IS |
| **Pomalyst (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=41)** (*pomalidomide*), capsule NDA #204026 | 02/08/2013 | 03/24/2023 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=41#tabs-2)** | IS |
| **Probuphine (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=356)** (*buprenorphine hydrochloride*), implant NDA #204442 | 05/26/2016 | 11/01/2018 | MG | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=356#tabs-2)** | IS |
| **Prolia (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=43)** (*denosumab*), injection BLA #125320 | 06/01/2010 | 04/09/2024 | | **CP (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=43#tabs-2)** | | |
| **PS-Mycophenolate (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=419)** Shared System REMS | 06/01/2023 | 06/01/2023 | | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=419#tabs-3)** | IS |
| **Qsymia (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=45)** (*phentermine and topiramate*), capsule, extended release NDA #022580 | 07/17/2012 | 02/06/2024 | MG | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=45#tabs-2)** | IS |
| **Riociguat Shared System REMS (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=414)** Shared System REMS | 10/08/2013 | 09/01/2022 | | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=414#tabs-3)** | IS |
| **Siliq (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=362)** (*brodalumab*), injection BLA #761032 | 02/15/2017 | 07/19/2023 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=362#tabs-2)** | IS |
| **Sodium Oxybate (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=361)** Shared System REMS | 01/17/2017 | 01/17/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=361#tabs-3)** | IS |

| Name | REMS Approved | Last Updated | MedGuide (MG)* | Comm. Plan (CP) | ETASU | Imp. System (IS) |
|---|---|---|---|---|---|---|
| **Spravato (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=386)** (*esketamine*), spray NDA #211243 | 03/05/2019 | 01/03/2022 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=386#tabs-2)** | IS |
| **Sublocade (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=376)** (*buprenorphine extended-release*), injection NDA #209819 | 11/30/2017 | 04/19/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=376#tabs-2)** | IS |
| **Tecvayli and Talvey (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=415)** (*talquetamab-tgvs*), injection; injection, solution BLA #761291 BLA #761342 BLA #761291 BLA #761342 | 10/25/2022 | 07/02/2024 | | **CP (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=415#tabs-2)** | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=415#tabs-2)** | IS |
| **Tegsedi (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=383)** (*Inotersen*), injection NDA #211172 | 10/05/2018 | 08/24/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=383#tabs-2)** | IS |
| **Thalidomide (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=417)** Shared System REMS | 04/27/2023 | 04/27/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=417#tabs-3)** | IS |
| **Thalomid (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=58)** (*thalidomide*), capsule NDA #020785 | 08/03/2010 | 03/24/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=58#tabs-2)** | IS |
| **Transmucosal Immediate-Release Fentanyl (TIRF) Products (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=60)** Shared System REMS | 12/28/2011 | 08/28/2024 | MG | | **ETASU (/scripts/cder/rems/index.cfm?event=RemsDetails.page&REMS=60#tabs-3)** | IS |
| **Tryvio (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=427)** (*aprocitentan*), tablet NDA #217686 | 03/19/2024 | 08/23/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=427#tabs-2)** | IS |
| **Turalio (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=389)** (*pexidartinib*), capsule NDA #211810 | 08/02/2019 | 04/17/2023 | | **CP (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=389#tabs-2)** | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=389#tabs-2)** | IS |
| **Tyruko (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=423)** (*natalizumab-sztn*), injection BLA #761322 | 08/24/2023 | 08/24/2023 | MG | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=423#tabs-2)** | IS |
| **Tysabri (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=63)** (*natalizumab*), injection BLA #125104 | 10/07/2011 | 09/01/2023 | MG | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=63#tabs-2)** | IS |
| **Ultomiris and Soliris (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=429)** (*eculizumab*), injection; injection, solution, concentrate BLA #125166 BLA #761108 BLA #125166 BLA #761108 | 06/04/2010 | 09/03/2024 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=429#tabs-2)** | IS |
| **Vanflyta (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=420)** (*quizartinib*), tablet NDA #216993 | 07/20/2023 | 07/20/2023 | | | **ETASU (/scripts/cder/rems/index.cfm?event=IndvRemsDetails.page&REMS=420#tabs-2)** | IS |

| Name | REMS Approved | Last Updated | MedGuide (MG)* | Comm. Plan (CP) | ETASU | Imp. System (IS) |
|---|---|---|---|---|---|---|
| **Vigabatrin (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=364)** Shared System REMS | 04/27/2017 | 09/12/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=RemsDetails.page&REMS=364#tabs-3)** | IS |
| **Voydeya (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=430)** (*danicopan*), tablet NDA #218037 | 03/29/2024 | 08/28/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=430#tabs-2)** | IS |
| **Xiaflex (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=71)** (*collagenase clostridium histolyticum*), kit BLA #125338 | 02/02/2010 | 11/02/2022 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=71#tabs-2)** | IS |
| **Xywav and Xyrem (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=345)** (*calcium, magnesium, potassium, and sodium oxybates*), solution NDA #021196 NDA #212690 NDA #021196 NDA #212690 | 02/27/2015 | 05/22/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=345#tabs-2)** | IS |
| **Yescarta and Tecartus (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=375)** (*axicabtagene ciloleucel*), suspension, for intravenous infusion BLA #125643 BLA #125703 BLA #125643 BLA #125703 | 10/18/2017 | 06/12/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=375#tabs-2)** | IS |
| **Zilbrysq (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=424)** (*zilucoplan*), injection NDA #216834 | 10/17/2023 | 01/16/2024 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=424#tabs-2)** | IS |
| **Zulresso (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=387)** (*brexanolone*), injection NDA #211371 | 03/19/2019 | 10/17/2023 | | | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=387#tabs-2)** | IS |
| **Zyprexa Relprevv (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=74)** (*olanzapine*), kit NDA #022173 | 12/11/2009 | 04/28/2021 | MG | **CP (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=74#tabs-2)** | **ETASU (/scripts/cder/rems/index.cfm? event=IndvRemsDetails.page&REMS=74#tabs-2)** | IS |

Showing 1 to 73 of 73 entries

*Many products within these REMS programs have Medication Guides not part of the REMS program. For a full list of Medication Guides **click here (http://www.fda.gov/Drugs/DrugSafety/ucm085729.htm)**.

# REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary

## Guidance for Industry

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2019**
**Drug Safety**

# REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary

## Guidance for Industry

*Additional copies are available from:*

*Office of Communications, Division of Drug Information*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*10001 New Hampshire Ave., Hillandale Bldg., 4th Floor*
*Silver Spring, MD 20993-0002*
*Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353*
*Email: druginfo@fda.hhs.gov*
*http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm*

*and/or*

*Office of Communication, Outreach and Development*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*10903 New Hampshire Ave, Bldg. 71, Room 3128*
*Silver Spring, MD 20993-0002*
*Phone: 800-835-4709 or 240-402-8010*
*Email: ocod@fda.hhs.gov*
*http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/default.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2019**
**Drug Safety**

*Contains Nonbinding Recommendations*

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ........................................................................................... 1

II.    **BACKGROUND** ............................................................................................ 2

III.   **MANAGING DRUG RISKS** ...................................................................... 4

IV.   **THE USE OF REMS IN MANAGING DRUG RISKS** ............................ 4

V.    **APPLICATION OF STATUTORY FACTORS IN REMS DECISION-MAKING** ... 5

     A.     **Seriousness of Known or Potential Adverse Events That May Be Related to the Drug and the Background Incidence of Such Events in the Population Likely To Use the Drug** ................................................................................. 6

     B.     **Expected Benefit of the Drug With Respect to the Disease or Condition** ................... 7

     C.     **Seriousness of the Disease or Condition To Be Treated** ............................... 8

     D.     **Whether the Drug Is a New Molecular Entity** ................................................. 8

     E.     **Expected or Actual Duration of Treatment With the Drug** ......................... 9

     F.     **Estimated Size of Population Likely To Use the Drug** ................................. 9

VI.   **ADDITIONAL CONSIDERATIONS: POTENTIAL BURDEN ON THE HEALTH CARE DELIVERY SYSTEM AND PATIENT ACCESS** ........................................... 9

# REMS: FDA's Application of Statutory Factors in Determining When a REMS Is Necessary

## Guidance for Industry[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page.

## I.    INTRODUCTION

This guidance is intended to clarify how the Food and Drug Administration (FDA or Agency) applies the factors set forth in section 505-1 of the Federal Food, Drug, and Cosmetic Act (FD&C Act) (21 U.S.C. 355-1) in determining whether a risk evaluation and mitigation strategy (REMS) is necessary to ensure that the benefits of a drug outweigh its risks.[2] This guidance fulfills one of the performance goals that FDA agreed to satisfy in the reauthorization of the Prescription Drug User Fee Act (PDUFA) V.[3]

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word *should* in agency guidances means that something is suggested or recommended, but not required.

---

[1] This guidance has been prepared by the Office of New Drugs, Office of Surveillance and Epidemiology, Office of Medical Policy, and Office of Regulatory Policy in the Center for Drug Evaluation and Research (CDER), in cooperation with the Center for Biologics Evaluation and Research (CBER), at the Food and Drug Administration.

[2] Section 505-1 of the FD&C Act applies to applications for prescription drugs submitted or approved under subsections 505(b) (i.e., new drug applications) or (j) (i.e., abbreviated new drug applications) of the FD&C Act and to applications submitted or licensed under section 351 (i.e., biologics license applications) of the Public Health Service Act (PHS Act) (42 U.S.C. 262). For the purposes of this document, unless otherwise specified, the term *drug* refers to human prescription drugs, including those that are licensed as biological products (biologics).

[3] Section XI.A.1 of "PDUFA Reauthorization Performance Goals and Procedures Fiscal Years 2013 Through 2017" (PDUFA V), available at http://www.fda.gov/downloads/ForIndustry/UserFees/PrescriptionDrugUserFee/UCM270412.pdf.

1

PCSF760

## II. BACKGROUND

The Food and Drug Administration Amendments Act of 2007 (FDAAA)[4] created section 505-1 of the FD&C Act, which establishes FDA's REMS authority. A REMS is a required risk management plan that can include one or more elements to ensure that the benefits of a drug outweigh its risks.[5]

If FDA determines that a REMS is necessary, the Agency may require one or more REMS elements, which could include a Medication Guide,[6] a patient package insert,[7] and/or a communication plan.[8] FDA may also require elements to assure safe use (ETASU) as part of a REMS.[9] ETASU may be required if the drug has been shown to be effective, but is associated with a specific serious risk and can be approved only if, or would be withdrawn unless, such elements are required as part of a strategy to mitigate a specific serious risk(s) listed in the labeling of the drug. ETASU may be required for approved drug products that were initially approved without ETASU when other elements are not sufficient to mitigate a serious risk.

Specifically, ETASU may include one or any combination of the following requirements[10]:

- Health care providers who prescribe the drug have particular training or experience, or are specially certified;
- Pharmacies, practitioners, or health care settings that dispense the drug are specially certified;
- The drug be dispensed to patients only in certain health care settings, such as hospitals;
- The drug be dispensed to patients with evidence or other documentation of safe use conditions, such as laboratory test results;
- Each patient using the drug be subject to monitoring; or
- Each patient using the drug be enrolled in a registry.

If a REMS includes certain ETASU, the REMS may also include an implementation system to enable the applicant to monitor, evaluate, and improve the implementation of the elements (e.g., development of a REMS specific Web site or call center to facilitate enrollment; establishment of electronic databases of certified health care settings).[11]

---

[4] Public Law 110-85.

[5] See section 505-1(e) of the FD&C Act and section 505-1(f) of the FD&C Act.

[6] See Section 505-1(e)(2) of the FD&C Act.

[7] Id.

[8] See Section 505-1(e)(3) of the FD&C Act.

[9] See Section 505-1(f) of the FD&C Act.

[10] See Section 505-1(f)(3) of the FD&C Act.

[11] See Section 505-1(f)(4) of the FD&C Act.

PCSF761

*Contains Nonbinding Recommendations*

All REMS should include one or more overall goals, and if the REMS has ETASU, the REMS must include one or more goals to mitigate a specific serious risk listed in the labeling of the drug and for which the ETASU are required.[12]

Finally, REMS generally must include a timetable for submission of assessments of the REMS.[13] The timetable for submission of assessments of the REMS must include an assessment by the dates that are 18 months and 3 years after the REMS is initially approved, and an assessment in the 7th year after the REMS is approved, or at another frequency specified in the REMS.[14]

FDA can require a REMS before initial approval of a new drug application or, should FDA become aware of new safety information[15] about a drug and determine that a REMS is necessary to ensure that the benefits of the drug outweigh its risks, after the drug has been approved.[16]

Before FDAAA was enacted, FDA approved a small number of drugs and biologics with risk minimization action plans (RiskMAPs).[17] A RiskMAP is a strategic safety program designed to meet specific goals and objectives in minimizing the known risks of a drug while preserving the drug's benefits. RiskMAPs were developed for products that had risks that required additional risk management strategies that went beyond the provision of FDA-approved labeling, including the prescribing information.[18] In 2005, FDA issued a guidance for industry, *Development and Use of Risk Minimization Action Plans* (RiskMAP Guidance).[19] Many of the principles described in the RiskMAP Guidance are reflected in the REMS provisions set forth in FDAAA[20] and have been incorporated into FDA's REMS decision-making process. The purpose of this new guidance is to explain FDA's current application of previously articulated risk management principles and considerations under the REMS regulatory paradigm.

---

[12] See Section 505-1(f)(3) of the FD& C Act.

[13] New Drug Applications (NDAs) and Biologics License Applications (BLAs) must include a timetable for submission of assessments. ANDAs are not subject to the requirement for a timetable for submission of assessments (Section 505-1(i)), but FDA can require any application holder, including ANDA applicants, to submit REMS assessments under Section 505-1(g)(2)(C).

[14] See Section 505-1(d); see also 505-1(g)(2) of the FD&C Act.

[15] Section 505-1(b)(3) of the FD&C Act.

[16] See section 505-1(a)(2) of the FD&C Act.

[17] Some of these drugs were approved pursuant to either subpart H (21 CFR 314.520) or subpart E (21 CFR 601.42) with restrictions on their use or distribution to assure safe use.

[18] A drug's *prescribing information* (PI) contains a summary of the essential scientific information needed for the safe and effective use of the drug. 21 CFR 201.56(a)(1). The PI is updated from time to time to incorporate information from postmarketing surveillance or studies, for example, revealing new benefits or risk concerns.

[19] The RiskMAP Guidance is available at https://www.fda.gov/ucm/groups/fdagov-public/@fdagov-drugs-gen/documents/document/ucm071616.pdf.

[20] See section 505-1(a)(1) of the FD&C Act.

PCSF762

## III.    MANAGING DRUG RISKS

The statutory standard for FDA approval of a drug is that the drug is safe and effective for its labeled indications under its labeled conditions of use.[21]  FDA's determination that a drug is safe, however, does not suggest an absence of risk.  Rather, a drug is considered to be safe if the clinical significance and probability of its beneficial effects outweigh the likelihood and medical importance of its harmful or undesirable effects.  In other words, a drug is considered safe if it has an appropriate benefit-risk balance.

Risk management is a key factor in FDA's risk-benefit assessment.[22]  As described in previous guidances, risk management consists of both risk assessment and risk minimization: it is an iterative process involving (1) assessing a drug's benefit-risk balance, (2) developing and implementing tools to minimize the drug's risks while preserving its benefits, (3) evaluating tool effectiveness and reassessing the benefit-risk balance, and (4) making adjustments, as appropriate, to risk minimization tools to further improve the benefit-risk balance.  This four-part process should be continuous throughout a drug's life cycle, with the results of risk assessment informing the sponsor's decisions regarding risk minimization.[23]

## IV.    THE USE OF REMS IN MANAGING DRUG RISKS

The goal of risk mitigation is to preserve a drug's benefits while reducing its risks to the extent possible.  For the majority of drugs, routine risk mitigation measures, such as providing health care providers with risk information through FDA-approved prescribing information, are sufficient to preserve benefits while minimizing risks.  In some cases, however, FDA may consider whether a REMS would help ensure that the benefits of the drug outweigh its risks.

FDA's determination as to whether a REMS is necessary for a particular drug is a complex, drug-specific inquiry, reflecting an analysis of multiple, interrelated factors and of how those factors apply in a particular case.  In conducting this analysis, FDA considers whether (based on premarketing or postmarketing risk assessments) there is a particular risk or risks associated with the use of the drug that, on balance, outweigh its benefits and whether additional interventions beyond FDA-approved labeling are necessary to ensure that the drug's benefits outweigh its risks.

In making these determinations, FDA may take into consideration information from a variety of sources, including FDA's internal and external experts with specialized expertise relevant to a particular risk, input on relevant issues from other centers within FDA, other government

---

[21] See section 505(d) of the FD&C Act (21 U.S.C. 355(d)).

[22] Information about FDA's Benefit-Risk Assessment Framework is available at
https://www.fda.gov/ForIndustry/UserFees/PrescriptionDrugUserFee/ucm326192.htm

[23] See the following FDA guidances for industry: *Premarketing Risk Assessment,* available at
https://www.fda.gov/ucm/groups/fdagov-public//@fdagov-drugs-gen/documents/document/ucm072002.pdf;
RiskMAP Guidance; and *Good Pharmacovigilance Practices and Pharmacoepidemiologic Assessment,* available at
http://www.fda.gov/ucm/groups/fdagov-public//@fdagov-drugs-gen/documents/document/ucm071696.pdf.

PCSF763

agencies, advisory committee meetings, the Drug Safety Oversight Board, literature, and professional societies. For approved drugs, FDA may also gather information from post-approval adverse event reports and active surveillance, as well as from post-approval clinical trials and other post-approval studies, including epidemiological studies, when evaluating whether a REMS is necessary.

If FDA determines that a REMS is necessary, the Agency considers what the goals of a proposed REMS to address these risks would be and what specific REMS elements, as described above, could help meet those goals. The REMS should be designed to meet the relevant goals, not unduly impede patient access to the drug, and minimize the burden on the health care delivery system to the extent practicable. If FDA believes that the drug's risks would exceed its benefits even if FDA were to require a REMS for the drug, FDA will not approve the drug or may consider seeking withdrawal of the drug if it is already being marketed.


## V.  APPLICATION OF STATUTORY FACTORS IN REMS DECISION-MAKING

Section 505-1(a)(1) of the FD&C Act, as added by FDAAA, requires FDA to consider the following six factors[24] in making a decision about whether to require a REMS:

- The seriousness of any known or potential adverse events that may be related to the drug and the background incidence of such events in the population likely to use the drug;

- The expected benefit of the drug with respect to the disease or condition;

- The seriousness of the disease or condition that is to be treated with the drug;

- Whether the drug is a new molecular entity;

- The expected or actual duration of treatment with the drug; and

- The estimated size of the population likely to use the drug.

These six factors influence FDA's decisions with respect to whether a REMS is required for a particular drug and what type of REMS might be necessary (i.e., what specific elements or tools should be included as part of the REMS). FDA makes decisions about requiring a REMS as part of a benefit-risk determination for a drug after an evaluation that includes integrated consideration of each of the statutory factors. All six factors are considered together to inform FDA's REMS decision making process and no single factor is determinative as to whether a REMS is necessary. The relative importance or weight of each factor is a case specific inquiry. The application of these factors is discussed in the sections below.

---

[24] The FD&C Act requires that FDA consider these factors in determining whether a REMS is necessary for a new drug. FDA also generally considers these factors in determining whether (based on new safety information) a REMS is necessary for a drug that is the subject of an approved application.

### A. Seriousness of Known or Potential Adverse Events That May Be Related to the Drug and the Background Incidence of Such Events in the Population Likely To Use the Drug

The more serious[25] a drug's known or potential associated risks relative to its benefits, the more likely it is that a REMS will be necessary to ensure that the benefits of the drug outweigh its risks. In determining whether to require a REMS, FDA considers the source, nature and reliability of available scientific evidence about the adverse events as well as the characteristics of the risks, including the reversibility, preventability, temporality, frequency, severity, background incidence, and likelihood of occurrence.

For drugs associated with adverse events that are reversible or preventable if particular measures are taken promptly, FDA may consider requiring a REMS to help ensure that such measures are undertaken in a timely manner to minimize or prevent a serious adverse event. For example, for a drug that is associated with hepatotoxicity that is reversible with drug discontinuation, the REMS may require that the patient be monitored through laboratory studies so that the drug can be discontinued if and when hepatic enzyme elevations are observed.

A drug that is associated with a risk of a serious adverse event that is irreversible, such as one that causes a permanent disability or persistent incapacity, may be particularly likely to have a favorable benefit-risk profile only in the presence of a REMS that helps minimize drug exposure and the associated occurrence of the adverse event. In such cases, a REMS may include, for example, a prescriber certification requirement that includes prescriber training and patient counseling on the nature of the associated risk and on the drug's benefit-risk balance to facilitate informed patient and prescriber decisions about treatment with the drug. Such REMS are designed to ensure that patients are fully informed of the serious risk before beginning therapy and may involve patient acknowledgment forms or other methods of documenting that such patient-provider discussions have taken place. This kind of REMS is particularly important for drugs with limited available methods of preventing the actual occurrence of drug-associated adverse events.

The frequency and severity of adverse events associated with the use of a drug may also affect FDA's determination of whether a REMS is necessary. While a high frequency of adverse events may necessitate a REMS to mitigate this risk, FDA may also require a REMS for an infrequent adverse event, if the adverse event is particularly severe.

As part of its assessment of whether a particular adverse event is drug-associated, FDA examines the rate of the adverse event in individuals exposed to the drug relative to the background incidence of the adverse event in the population likely to use the drug. If an adverse event is determined to be drug-associated, FDA may determine that treatment with the drug unacceptably

---

[25] Section 505-1(b)(4) of the FD&C Act defines an adverse drug experience as serious if it results in death, immediate risk of death, inpatient hospitalization or prolongation of existing hospitalization, a persistent or significant incapacity or substantial disruption of the ability to conduct normal life functions, or a congenital anomaly/birth defect (or, based on appropriate medical judgment, may jeopardize the patient and may require a medical or surgical intervention to prevent the above-described outcomes).

PCSF765

*Contains Nonbinding Recommendations*

increases the frequency and/or severity of the adverse event in the patient population and that this risk needs to be mitigated through a REMS.

As part of its evaluation of the risks associated with the use of a drug, FDA also takes into consideration whether information about managing the particular risk is widely available and whether risk management measures are being widely implemented. FDA may also consider factors such as the specialties of the healthcare providers who may prescribe, dispense or administer the drug and whether approaches to mitigate the risk are standard and well-known by the health care professional or are less familiar to the health care professional when determining whether a REMS is needed. The Agency also takes into account the health care setting(s) in which the drug is used or is likely to be used. For drugs intended for use in an outpatient setting, FDA considers the degree to which patients can be expected to reliably recognize symptoms as being associated with a drug and to take necessary actions to address adverse events. If, for example, FDA expects that a drug will likely be used in a setting where patient monitoring and certain medical equipment are not available, and believes that such measures are needed to mitigate the risks associated with the use of the drug, FDA may require a REMS with ETASU to limit use of the drug to settings in which these measures are available.

### B. Expected Benefit of the Drug With Respect to the Disease or Condition

When assessing a drug's expected benefits with respect to a specific disease or condition, FDA may evaluate information about the drug's effectiveness, whether the drug treats a serious disease or condition, whether it fills an unmet medical need, and whether it can cure the disease or alleviate its symptoms. FDA may also consider the extent to which new dosage forms enhance convenience of administration and/or improve adherence to prescribed regimens, and whether new formulations or delivery mechanisms may extend treatment to patient populations who were formerly unable to use the drug.

A drug's expected benefits, however, are not considered in isolation. In determining whether a REMS is necessary, FDA's assessment of a drug's benefit is balanced against consideration of the risks associated with its use. For example, a once-a-month oral dosage form of a drug that was previously only available as a daily oral dosage form may offer a meaningful benefit in terms of convenience to the patient and adherence to medication therapy, but may have a different risk profile (e.g., a new risk associated with the new formulation, or with the longer half-life of the drug) that makes it more likely that FDA would determine that a REMS is necessary to ensure that the benefits of the drug outweigh its risks.

PCSF766

*Contains Nonbinding Recommendations*

### C. Seriousness of the Disease or Condition To Be Treated

The seriousness of the disease or condition[26] to be treated is a part of FDA's overall analysis of the benefits of a drug: the more serious the disease or condition to be treated, the greater the potential benefit of the drug's measured effect in the benefit-risk assessment. Nevertheless, even for drugs intended to treat serious or life-threatening diseases or conditions, the severity, irreversibility, or duration of an associated risk may weigh in favor of a REMS. For example, if a drug indicated for long-term treatment of an indolent, asymptomatic, or slowly progressing cancer also has a more immediate risk of serious and potentially fatal cardiac arrhythmias, FDA may conclude that, without a REMS, the risk of serious cardiac arrhythmias outweighs the potential benefits of this kind of cancer treatment. In this example, a REMS may be required to educate prescribers about the risk, appropriate monitoring, and management of cardiac arrhythmias to help minimize the occurrence of the adverse event associated with the drug.

### D. Whether the Drug Is a New Molecular Entity

For new molecular entities (NMEs)[27] and certain Biologics License Applications (BLAs) licensed under section 351(a) of the PHS Act, available information about the drug can be limited and, as a result, there may be greater uncertainty about risks associated with the use of the drug that might emerge in the post-approval setting. When available safety information about a NME or BLA indicates a serious risk, there may be uncertainties about the nature of the serious risk (e.g., the strength of the association of the adverse event with drug treatment, the likelihood of occurrence of the adverse event, or the accuracy and/or reliability of the data). Depending on the nature of the uncertainties about the risks associated with the use of the drug, FDA may require a REMS to help ensure that the benefits of the drug outweigh its risks.

---

[26] FDA has defined *serious disease or condition* as

> "a disease or condition associated with morbidity that has substantial impact on day-to-day functioning. Short-lived and self-limiting morbidity will usually not be sufficient, but the morbidity need not be irreversible, provided it is persistent or recurrent. Whether a disease or condition is serious is a matter of clinical judgment, based on its impact on such factors as survival, day-to-day functioning, or the likelihood that the disease, if left untreated, will progress from a less severe condition to a more serious one."

(21 CFR 312.300(b)); see also FDA's guidance for industry on *Expedited Programs for Serious Conditions – Drugs and Biologics*, available at
http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM358301.pdf.

[27] FDA has defined the term "new molecular entity" as an active ingredient that contains no active moiety that has been previously approved by the Agency in an application submitted under section 505 of the Act (in any application approved or deemed approved from 1938 to the present), or has been previously marketed as a drug in the United States. See Manual of Policies and Procedures (MAPP) 5018.2 NDA Classification Codes, available at http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ManualofPoliciesProcedures/default.htm

PCSF767

Case 1:07-cv-00493-RJA-RT Document 24-10 Filed 05/27/25 Page 37 of 79
Case 1:07-cv-00493-RJA-RT Document 24-10 Filed 05/27/2557 Page 37 of 79.7292
PageID. 9525

*Contains Nonbinding Recommendations*

E.  **Expected or Actual Duration of Treatment With the Drug**

The duration of treatment with a drug and the impact of treatment length on the likelihood and severity of adverse events also affect FDA's decision-making with regard to the need for a REMS.  If long-term therapy with a drug appears to increase the likelihood of a serious adverse event, FDA may require a REMS either to limit the duration of treatment or to ensure that patients on long term treatment are monitored, e.g., for liver function if the drug is associated with liver toxicity.

A REMS may also be required for a drug with a relatively short duration of treatment, depending on the nature of the associated risk if, for example, the drug is associated with a serious adverse event that occurs immediately after administration.  Such a REMS may require that the drug only be administered in a setting in which monitoring is available to ensure that the adverse event can be appropriately managed or in a setting in which, for example, providers have received particular risk management training.  Similarly, a REMS may be required for a drug that is only intended to be administered once or twice if FDA determines that specialized training is necessary to prevent the occurrence of an adverse event associated with improper drug administration.  In some cases, serious adverse events may occur even after treatment with a drug has ended.  In such cases, FDA may determine that a REMS is required to ensure proper monitoring of patients for a period of time following completion of treatment.

F.  **Estimated Size of Population Likely To Use the Drug**

In considering the estimated size of the population likely to use the drug, FDA considers, among other things, the extent to which that population includes patients expected to use the drug for unapproved uses and the risks associated with those uses. In certain cases, FDA may consider whether a REMS designed to help ensure that a drug's use is limited to its approved indications is appropriate.

VI.  **ADDITIONAL CONSIDERATIONS: POTENTIAL BURDEN ON THE HEALTH CARE DELIVERY SYSTEM AND PATIENT ACCESS**

FDA understands that REMS, particularly those with ETASU, may impose some measure of burden on patients and/or health care providers.  When considering this burden on patient access and the health care delivery system, FDA takes into account existing REMS elements for other drugs with similar risks and whether the REMS under consideration can be designed to be compatible with established medical drug distribution, procurement, and dispensing systems.  FDA also considers how patients for whom the drug is indicated currently access health care (such as whether patients are in rural or medically underserved areas) and whether the REMS may impose additional access difficulties.  FDA also takes into account the consequences of potential treatment interruption or delays, particularly where patients have serious or life-threatening conditions and/or have difficulty accessing health care.  In such circumstances, FDA takes steps, to ensure that REMS are designed to minimize delays or interruptions in drug therapy that may have untoward clinical impact. Particularly for a REMS that requires additional procedures and controls in the patient care process, FDA also considers  the characteristics,

PCSF768

*Contains Nonbinding Recommendations*

experience, and size of the likely prescriber population; how the drug will likely be dispensed in the setting in which it will likely be used; and the patient population likely to use the drug.

The selection of REMS elements and tools may be influenced by the extent to which they have already been used in the clinical trials to evaluate the drug's safety and efficacy, and by what is known about the effectiveness of the elements and tools more generally.  Selection of risk management elements and tools is also informed by any regulatory precedent for addressing similar risks.[28]  For example, if a serious risk is common to all members of a drug class, FDA will consider, as appropriate, how the Agency has previously managed the riskand seek opportunities to standardize the approach to managing that risk.  FDA also encourages sponsors to submit REMS proposals that are compatible with established distribution, procurement, and dispensing systems.  Following approval of a REMS, FDA continues to evaluate the impact of the REMS on patient access and the health care delivery system.

---

[28] In addition, the elements and tools may be driven by results of previous REMS assessments for REMS designed to address a similar risk, a similar patient population, or a similar drug distribution or dispensing system to the product under review.

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use VIAGRA safely and effectively. See full prescribing information for VIAGRA.**

**VIAGRA® (sildenafil citrate) tablets, for oral use**
**Initial U.S. Approval: 1998**

---------------------------**INDICATIONS AND USAGE**---------------------------
VIAGRA is a phosphodiesterase-5 (PDE5) inhibitor indicated for the treatment of erectile dysfunction (ED) (1)

----------------------**DOSAGE AND ADMINISTRATION**--------------------
- For most patients, the recommended dose is 50 mg taken, as needed, approximately 1 hour before sexual activity. However, VIAGRA may be taken anywhere from 30 minutes to 4 hours before sexual activity (2.1)
- Based on effectiveness and toleration, may increase to a maximum of 100 mg or decrease to 25 mg (2.1)
- Maximum recommended dosing frequency is once per day (2.1)

------------------------**DOSAGE FORMS AND STRENGTHS**------------------------
Tablets: 25 mg, 50 mg, 100 mg (3)

----------------------------**CONTRAINDICATIONS**----------------------------
- Administration of VIAGRA to patients using nitric oxide donors, such as organic nitrates or organic nitrites in any form. VIAGRA was shown to potentiate the hypotensive effect of nitrates (4.1, 7.1, 12.2)
- Known hypersensitivity to sildenafil or any component of tablet (4.2)

----------------------**WARNINGS AND PRECAUTIONS**--------------------
- Patients should use VIAGRA if sexual activity is inadvisable due to cardiovascular status (5.1)
- Patients should seek emergency treatment if an erection lasts >4 hours. Use VIAGRA with caution in patients predisposed to priapism (5.2)
- Patients should stop VIAGRA and seek medical care if a sudden loss of vision occurs in one or both eyes, which could be a sign of non arteritic anterior ischemic optic neuropathy (NAION). VIAGRA should be used with caution, and only when the anticipated benefits outweigh the risks, in patients with a history of NAION. Patients with a "crowded" optic disc may also be at an increased risk of NAION. (5.3)

- Patients should stop VIAGRA and seek prompt medical attention in the event of sudden decrease or loss of hearing (5.4)
- Caution is advised when VIAGRA is co-administered with alpha-blockers or anti-hypertensives. Concomitant use may lead to hypotension (5.5)
- Decreased blood pressure, syncope, and prolonged erection may occur at higher sildenafil exposures. In patients taking strong CYP inhibitors, such as ritonavir, sildenafil exposure is increased. Decrease in VIAGRA dosage is recommended (2.4, 5.6)

----------------------------**ADVERSE REACTIONS**----------------------------
Most common adverse reactions (≥ 2%) include headache, flushing, dyspepsia, abnormal vision, nasal congestion, back pain, myalgia, nausea, dizziness and rash (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Pfizer at 1-800-438-1985 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

----------------------------**DRUG INTERACTIONS**----------------------------
- VIAGRA can potentiate the hypotensive effects of nitrates, alpha blockers, and anti-hypertensives (4.1, 5.5, 7.1, 7.2, 7.3, 12.2)
- With concomitant use of alpha blockers, initiate VIAGRA at 25 mg dose (2.3)
- CYP3A4 inhibitors (e.g., ritonavir, ketoconazole, itraconazole, erythromycin): Increase VIAGRA exposure (2.4, 7.4, 12.3)
  - Ritonavir: Do not exceed a maximum single dose of 25 mg in a 48 hour period (2.4, 5.6)
  - Erythromycin or strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, saquinavir): Consider a starting dose of 25 mg (2.4, 7.4)

----------------------**USE IN SPECIFIC POPULATIONS**----------------------
- Geriatric use: Consider a starting dose of 25 mg (2.5, 8.5)
- Severe renal impairment: Consider a starting dose of 25 mg (2.5, 8.6)
- Hepatic impairment: Consider a starting dose of 25 mg (2.5, 8.7)

**See 17 for PATIENT COUNSELING INFORMATION and FDA-approved patient labeling.**

**Revised: 03/2014**

---

**FULL PRESCRIBING INFORMATION: CONTENTS***

**1 INDICATIONS AND USAGE**
**2 DOSAGE AND ADMINISTRATION**
2.1 Dosage Information
2.2 Use with Food
2.3 Dosage Adjustments in Specific Situations
2.4 Dosage Adjustments Due to Drug Interactions
2.5 Dosage Adjustments in Special Populations
**3 DOSAGE FORMS AND STRENGTHS**
**4 CONTRAINDICATIONS**
4.1 Nitrates
4.2 Hypersensitivity Reactions
**5 WARNINGS AND PRECAUTIONS**
5.1 Cardiovascular
5.2 Prolonged Erection and Priapism
5.3 Effects on the Eye
5.4 Hearing Loss
5.5 Hypotension when Co-administered with Alpha-blockers or Anti-hypertensives
5.6 Adverse Reactions with the Concomitant Use of Ritonavir
5.7 Combination with other PDE5 Inhibitors or Other Erectile Dysfunction Therapies
5.8 Effects on Bleeding
5.9 Counseling Patients About Sexually Transmitted Diseases
**6 ADVERSE REACTIONS**
6.1 Clinical Trials Experience
6.2 Postmarketing Experience

**7 DRUG INTERACTIONS**
7.1 Nitrates
7.2 Alpha-blockers
7.3 Amlodipine
7.4 Ritonavir and Other CYP3A4 Inhibitors
7.5 Alcohol
**8 USE IN SPECIFIC POPULATIONS**
8.1 Pregnancy
8.4 Pediatric Use
8.5 Geriatric Use
8.6 Renal Impairment
8.7 Hepatic Impairment
**10 OVERDOSAGE**
**11 DESCRIPTION**
**12 CLINICAL PHARMACOLOGY**
12.1 Mechanism of Action
12.2 Pharmacodynamics
12.3 Pharmacokinetics
**13 NONCLINICAL TOXICOLOGY**
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
**14 CLINICAL STUDIES**
**16 HOW SUPPLIED/STORAGE AND HANDLING**
**17 PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed

---

PCSF770

Reference ID: 3466301

**Patient Information**

**VIAGRA® (vi-AG-rah)**

**(sildenafil citrate)**

**Tablets**

## What is the most important information I should know about VIAGRA?

**VIAGRA can cause your blood pressure to drop suddenly to an unsafe level if it is taken with certain other medicines.** Do not take VIAGRA if you take any other medicines called "nitrates." Nitrates are used to treat chest pain (angina).  A sudden drop in blood pressure can cause you to feel dizzy, faint, or have a heart attack or stroke.

**Tell all your healthcare providers that you take VIAGRA.** If you need emergency medical care for a heart problem, it will be important for your healthcare provider to know when you last took VIAGRA.

Stop sexual activity and get medical help right away if you get symptoms such as chest pain, dizziness, or nausea during sex.

Sexual activity can put an extra strain on your heart, especially if your heart is already weak from a heart attack or heart disease.  Ask your doctor if your heart is healthy enough to handle the extra strain of having sex.

VIAGRA does not protect you or your partner from getting sexually transmitted diseases, including HIV—the virus that causes AIDS.

## What is VIAGRA?

VIAGRA is a prescription medicine used to treat erectile dysfunction (ED). You will not get an erection just by taking this medicine.  VIAGRA helps a man with erectile dysfunction get and keep an erection only when he is sexually excited (stimulated).

VIAGRA is not for use in women or children.

It is not known if VIAGRA is safe and effective in women or children under 18 years of age.

## Who should not take VIAGRA?

**Do not take VIAGRA if you:**

- take medicines called "nitrates" (such as nitroglycerin)
- use street drugs called "poppers" such as amyl nitrate or amyl nitrite, and butyl nitrate
- are allergic to sildenafil, as contained in VIAGRA and REVATIO,  or any of the ingredients in VIAGRA.  See the end of this leaflet for a complete list of ingredients in VIAGRA.

## What should I tell my healthcare provider before taking VIAGRA?

**Before you take VIAGRA, tell your healthcare provider if you:**

- have or have had heart problems such as a heart attack, irregular heartbeat, angina, chest pain, narrowing of the aortic valve or heart failure
- have had heart surgery within the last 6 months

PCSF771

- have had a stroke
- have low blood pressure, or high blood pressure that is not controlled
- have a deformed penis shape
- have had an erection that lasted for more than 4 hours
- have problems with your blood cells such as sickle cell anemia, multiple myeloma, or leukemia
- have retinitis pigmentosa, a rare genetic (runs in families) eye disease
- have ever had severe vision loss, including an eye problem called non-arteritic anterior ischemic optic neuropathy (NAION)
- have bleeding problems
- have or have had stomach ulcers
- have liver problems
- have kidney problems or are having kidney dialysis
- have any other medical conditions

**Tell your healthcare provider about all the medicines you take\*,** including prescription and over-the-counter medicines, vitamins, and herbal supplements.

VIAGRA may affect the way other medicines work, and other medicines may affect the way VIAGRA works causing side effects.  Especially tell your healthcare provider if you take any of the following:

- medicines called nitrates (see "**What is the most important information I should know about VIAGRA?"**)
- medicines called alpha blockers such as Hytrin (terazosin HCl), Flomax (tamsulosin HCl), Cardura (doxazosin mesylate), Minipress (prazosin HCl), Uroxatral (alfuzosin HCl), Jalyn (dutasteride and tamsulosin HCl), or Rapaflo (silodosin).  Alpha-blockers are sometimes prescribed for prostate problems or high blood pressure.  In some patients, the use of VIAGRA with alpha-blockers can lead to a drop in blood pressure or to fainting.
- medicines called HIV protease inhibitors, such as ritonavir (Norvir), indinavir sulfate (Crixivan), saquinavir (Fortovase or Invirase) or atazanavir sulfate (Reyataz)
- some types of oral antifungal medicines, such as ketoconazole (Nizoral), and itraconozale (Sporanox)
- some types of antibiotics, such as clarithromycin (Biaxin), telithromycin (Ketek), or erythromycin
- other medicines that treat high blood pressure
- other medicines or treatments for ED
- VIAGRA contains sildenafil, which is the same medicine found in another drug called REVATIO.  REVATIO is used to treat a rare disease called pulmonary arterial hypertension (PAH).  VIAGRA should not be used with REVATIO or with other PAH treatments containing sildenafil or any other PDE5 inhibitors (such as Adcirca [tadalafil]).

Ask your healthcare provider or pharmacist for a list of these medicines, if you are not sure.

Know the medicines you take.  Keep a list of them to show to your healthcare provider and pharmacist when you get a new medicine.

PCSF772

**How should I take VIAGRA?**

- Take VIAGRA exactly as your healthcare provider tells you to take it.

- Your healthcare provider will tell you how much VIAGRA to take and when to take it.

- Your healthcare provider may change your dose if needed.

- Take VIAGRA about 1 hour before sexual activity.  You may take VIAGRA between 30 minutes to 4 hours before sexual activity if needed.

- VIAGRA can be taken with or without food. If you take VIAGRA after a high fat meal (such as a cheeseburger and french fries), VIAGRA may take a little longer to start working

- **Do not** take VIAGRA more than 1 time a day.

- If you accidentally take too much VIAGRA, call your doctor or go to the nearest hospital emergency room right away.


**What are the possible side effects of VIAGRA?**

**VIAGRA can cause serious side effects**. Rarely reported side effects include:

- **an erection that will not go away (priapism).**  If you have an erection that lasts more than 4 hours, get medical help right away.  If it is not treated right away, priapism can permanently damage your penis.

- **sudden vision loss in one or both eyes.**  Sudden vision loss in one or both eyes can be a sign of a serious eye problem called non-arteritic anterior ischemic optic neuropathy (NAION).  Stop taking VIAGRA and call your healthcare provider right away if you have sudden vision loss in one or both eyes.

- **sudden hearing decrease or hearing loss.**  Some people may also have ringing in their ears (tinnitus) or dizziness.  If you have these symptoms, stop taking VIAGRA and contact a doctor right away.

**The most common side effects of VIAGRA are:**

- headache
- flushing
- upset stomach
- abnormal vision, such as changes in color vision (such as having a blue color tinge) and blurred vision
- stuffy or runny nose
- back pain
- muscle pain
- nausea
- dizziness
- rash

In addition, heart attack, stroke, irregular heartbeats and death have happened rarely in men taking VIAGRA.  Most, but not all, of these men had heart problems before taking VIAGRA. It is not known if VIAGRA caused these problems.

Tell your healthcare provider if you have any side effect that bothers you or does not go away.

Case 1:17-cv-00493-RJA-JJM Document 240-10 Filed 05/27/25 Page 43 of 79
Case 1:07-cv-00493-RJA-RT Document 240-10 Filed 05/27/2563 Page 943 of 79.7298
Page 0.9531

These are not all the possible side effects of VIAGRA. For more information, ask your healthcare provider or pharmacist.

Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.


**How should I store VIAGRA?**

• Store VIAGRA at room temperature between 68°F to 77°F (20°C to 25°C).

**Keep VIAGRA and all medicines out of the reach of children.**


**General information about the safe and effective use of VIAGRA.**

Medicines are sometimes prescribed for purposes other than those listed in a Patient Information leaflet. Do not use VIAGRA for a condition for which it was not prescribed. Do not give VIAGRA to other people, even if they have the same symptoms that you have. It may harm them.

This Patient Information leaflet summarizes the most important information about VIAGRA. If you would like more information, talk with your healthcare provider. You can ask your healthcare provider or pharmacist for information about VIAGRA that is written for health professionals.

For more information, go to www.viagra.com, or call 1-888-4VIAGRA


**What are the ingredients in VIAGRA?**

**Active ingredient:** sildenafil citrate

**Inactive ingredients:** microcrystalline cellulose, anhydrous dibasic calcium phosphate, croscarmellose sodium, magnesium stearate, hypromellose, titanium dioxide, lactose, triacetin, and FD & C Blue #2 aluminum lake


This Patient Information has been approved by the U.S. Food and Drug Administration.


Distributed by
**Pfizer Labs**
Division of Pfizer Inc, NY, NY 10017


Revised: 03/2014


This product's label may have been updated. For current full prescribing information, please visit www.pfizer.com.


Viagra (sildenafil citrate), Revatio (sildenafil), Cardura (doxazosin mesylate), and Minipress (prazosin HCl) are registered trademarks of Pfizer Inc.
*The other brands listed are trademarks of their respective owners and are not trademarks of Pfizer Inc. The makers of these brands are not affiliated with and do not endorse Pfizer Inc or its products.


LAB-0220-7.2

Reference ID: 3466301



NDA 205858/S-018

**SUPPLEMENT APPROVAL**

Gilead Sciences, Inc.
Attention: Nate Schmidt, MS, MBA
Manager, Regulatory Affairs
199 East Blaine Street
Seattle, WA 98102

Dear Mr. Schmidt:

Please refer to your supplemental new drug application (sNDA) dated January 10, 2022, received January 10, 2022, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (FDCA) for Zydelig (idelalisib) tablets.

This Prior Approval sNDA provides for proposed modifications to the approved Risk Evaluation and Mitigation Strategy (REMS) for Zydelig.

We have completed our review of this supplement application. It is approved effective on the date of this letter.

<u>**RISK EVALUATION AND MITIGATION STRATEGY (REMS) REQUIREMENTS**</u>

The REMS for Zydelig was originally approved on July 23, 2014, and the most recent REMS modification was approved on March 10, 2022. The REMS consists of a communication plan and a timetable for submission of assessments of the REMS.

Your proposed modification to the REMS consists of eliminating the communication plan from the REMS, and for release from the requirement for the REMS.

In accordance with section 505-1 of the FDCA, we have determined that the following REMS modifications are necessary to minimize burden on the healthcare delivery system of complying with the REMS:

- Removal of the communication plan

We have determined that the communication plan is no longer necessary to ensure the benefits of Zydelig (idelalisib) outweigh its risks because the communication plan has been completed and the most recent assessment demonstrates that the communication plan has met its goal based on knowledge surveys of healthcare providers that demonstrate acceptable understanding of the risks. No further assessments are necessary to assess the current communication plan.

PCSF775

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

--------------------------------------------------------------------------------------------

/s/

----------------------------------------------------------

SHAN PRADHAN
07/06/2022 03:30:17 PM

Reference ID: 5008633

Case 1:17-cv-00493-JAO-RT   Document 101   Filed 01/10/20   Page 1 of 29    PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/25   Page 46 of 79   PageID.7301
PageID.9534

JOSEPH H. HUNT
Assistant Attorney General

GUSTAV W. EYLER
Director

ANDREW E. CLARK
Assistant Director

ROGER J. GURAL
GA Bar No. 300800
HILARY K. PERKINS
Bar No. 1017593
Trial Attorneys
Consumer Protection Branch
United States Department of Justice
450 Fifth St., N.W., Suite 6400 South
Washington, DC 20530
Tele: 202-307-0174/Fax: 202-514-8742
Roger.Gural@usdoj.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ALEX M. AZAR, II, M.D., M.P.H., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*,<br><br>Defendants. | CIV. NO. 1:17-00493 JAO-RT<br><br>**DEFENDANTS' CONCISE STATEMENT IN RESPONSE TO PLAINTIFFS' CONCISE STATEMENT OF FACTS (DKT. NO. 87)** |

| | | |
|---|---|---|
| | except that Mifeprex is "well-understood after more than 15 years of marketing" and "[s]erious adverse events are rare." JSF Ex. I, at 0681. | the drug outweigh the risks of the drug," pursuant to 21 U.S.C. § 355-1(a)(1).  JSF Ex. I at 0680; *see also id.* at 0679, 0681, 0688-89, 0702, 0707. Not disputed that the cited quotes are accurate quotes for JSF Ex. I at 0681. |
| 17 | The 2016 REMS Review for Mifeprex did not list the 2013 REMS Review among the "Materials Informing Our Review." JSF Ex. I, at 0701. | Not disputed that the "Material Reviewed" list at JSF Ex. I at 0701 does not expressly contain the 2013 REMS Review.<br><br>Disputed in that the fact is not material to this case. |
| 18 | Numerous laws and ethical standards require clinicians to prescribe only medications they are qualified to provide, and to obtain informed consent. Schreiber ¶¶58, 67, 76. | Not disputed that the practice of medicine is regulated by the states. Disputed in that the cited Declaration paragraphs provide no support for its assertions of requirements of "[n]umerous laws and ethical standards," Schreiber ¶¶ 58, 67, 76, and disputed in that the fact is not material to this case. |
| 19 | In an emergency, all clinicians can refer patients to the nearest Emergency Department, ensuring access to surgery, blood transfusions, and resuscitation. Schreiber ¶64. | Accuracy of fact not disputed, but disputed in that the fact is not material to this case. |
| 20 | All clinicians with prescriptive authority are qualified to understand Mifeprex's prescribing information. Schreiber ¶65. | Not disputed that clinicians with state-licensed prescribing authority are qualified to understand any prescribing information sufficiently to discern whether they are qualified to prescribe or administer a particular drug. Disputed otherwise, and disputed in that the fact is not material to this case. |

8

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 1 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-10/Filed 05/27/2568 Page 48 of 79.7303
PageID.9536

**ACLU of Hawaii Foundation**
JONGWOOK "WOOKIE" KIM
11020
P.O. Box 3410
Honolulu, HI 96801
T: (808) 522-5905
F: (808) 522-5909
wkim@acluhawaii.org

**American Civil Liberties Union Foundation**
LORIE CHAITEN*
1640 North Sedgwick Street
Chicago, IL 60614
T: (212) 549-2633
F: (212) 549-2650
rfp_lc@aclu.org

*admitted pro hac vice*

*Attorneys for Plaintiffs*

**American Civil Liberties Union Foundation**
JULIA KAYE*
RACHEL REEVES*
WHITNEY WHITE*
RUTH HARLOW*
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2633
F: (212) 549-2650
jkaye@aclu.org
rreeves@aclu.org
wwhite@aclu.org
rharlow@aclu.org

**Arnold & Porter Kaye Scholer LLP**
JOHN A. FREEDMAN*
601 Massachusetts Ave., NW
Washington, DC 20001
T: (202) 942-5000
F: (202) 942-5999
john.freedman@arnoldporter.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| GRAHAM T. CHELIUS, M.D., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>XAVIER BECERRA, J.D., *in his official capacity as* SECRETARY, U.S. D.H.H.S., *et al.*,<br><br>Defendants. | CIV. NO. 1:17-cv-00493-JAO-RT<br><br>**JOINT STIPULATIONS OF FACTS** |

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 2 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/25   Page 49 of 79   PageID.7304
PageID.9537

## JOINT STIPULATIONS OF FACTS

Solely for purposes of resolution of the Cross-Motions for Summary

Judgment, the Parties stipulate to each of the following facts:

### *FDA Regulatory Background*

1. Before a new drug can be marketed in the United States, the drug sponsor

   must submit a new drug application ("NDA") to the U.S. Food and Drug

   Administration ("FDA").

2. According to the FDA website, "FDA approval of a drug means that data on

   the drug's effects have been reviewed by the [FDA's Center for Drug

   Evaluation and Research], and the drug is determined to provide benefits

   that outweigh its known and potential risks for the intended population. The

   drug approval process takes place within a structured framework that

   includes:

   - *Analysis of the target condition and available treatments*—FDA

     reviewers analyze the condition or illness for which the drug is

     intended and evaluate the current treatment landscape, which provide

     the context for weighing the drug's risks and benefits. For example, a

     drug intended to treat patients with a life-threatening disease for

     which no other therapy exists may be considered to have benefits that

1

Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/2570   Page 50 of 79.7305
PageID.9538

outweigh the risks even if those risks would be considered

unacceptable for a condition that is not life threatening.

- ***Assessment of benefits and risks from clinical data***—FDA reviewers

  evaluate clinical benefit and risk information submitted by the drug

  maker, taking into account any uncertainties that may result from

  imperfect or incomplete data. Generally, the agency expects that the

  drug maker will submit results from two well-designed clinical trials,

  to be sure that the findings from the first trial are not the result of

  chance or bias. In certain cases, especially if the disease is rare and

  multiple trials may not be feasible, convincing evidence from one

  clinical trial may be enough. Evidence that the drug will benefit the

  target population should outweigh any risks and uncertainties.

- ***Strategies for managing risks***—All drugs have risks. Risk

  management strategies include an FDA-approved drug label, which

  clearly describes the drug's benefits and risks, and how the risks can

  be detected and managed. Sometimes, more effort is needed to

  manage risks. In these cases, a drug maker may need to implement a

  Risk [Evaluation] and Mitigation Strategy (REMS)."

3.  A drug sponsor may request changes to a previously approved NDA by

    submitting to FDA a supplemental NDA ("sNDA").

PCSF781

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 4 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-10   Filed 05/27/21   Page 51 of 79   PageID.7306
PageID.9539

4. FDA follows a similar process in evaluating an sNDA as it does in evaluating an NDA.

5. Every NDA holder is required to report serious, unexpected adverse events as 15-day safety reports, and to submit non-expedited individual case safety reports, and periodic adverse drug experience reports.

6. FDA routinely monitors post-marketing safety data (including 15-day safety reports, individual case safety reports, and periodic adverse drug experience reports) for all approved drugs.

### *Mifeprex Regulatory Background*

7. Mifepristone was approved for the medical termination of early pregnancy in France and China in 1988; in the United Kingdom in 1991; and in other European countries throughout the 1990s.

8. In March 1996, the Population Council, a nonprofit organization based in the United States, sponsored an NDA for Mifeprex® (mifepristone) for use in combination with misoprostol for the medical termination of early pregnancy.

9. In 1999, the Population Council contracted with Danco Laboratories, L.L.C. ("Danco") for the manufacturing and marketing of Mifeprex.

3

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 5 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/2572   Page 52 of 79 PageID.7307
PageID.9540

10. On September 28, 2000, FDA approved mifepristone under the brand name Mifeprex® for use, in a regimen with the drug misoprostol, as a medical option for terminating an early pregnancy.

11. Danco began distribution of Mifeprex in November 2000.

12. The Population Council subsequently transferred ownership of the Mifeprex NDA to Danco.

13. Mifeprex is a single tablet that is only prescribed for a single use.

14. FDA originally authorized Mifeprex for use in a 600-mg dose, in a regimen with misoprostol, to terminate an intrauterine pregnancy through 49 days of pregnancy.

15. Since 2016, Mifeprex has been approved for use in a 200-mg dose, in a regimen with misoprostol, to terminate an intrauterine pregnancy through 70 days of pregnancy.

16. Prior to 2016, the Mifeprex *Patient Agreement Form* included the following statements: "I understand that I will take Mifeprex in my provider's office (Day 1)." and "I understand that I will take misoprostol in my provider's office two days after I take Mifeprex (Day 3)."

17. A true and correct copy of the current Mifeprex labeling is attached as **Exhibit A**.

PCSF783

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 6 of 29   PageID #:
Case 1:23-cv-01740-JAO-RT   Document 240-10   Filed 05/27/25   Page 53 of 79   PageID.7308
PageID.9541

18. Since 2016, the Mifeprex labeling has provided the following dosing

regimen:

- MIFEPREX 200 mg orally + misoprostol 800 mcg buccally

  o Day One: MIFEPREX Administration

    One 200 mg tablet of MIFEPREX is taken in a single oral dose.

  o Day Two or Three: Misoprostol Administration (minimum 24-hour

    interval between MIFEPREX and misoprostol)

    Four 200 mcg tablets (total dose 800 mcg) of misoprostol are taken

    by the buccal route.

19. The Black Box warning on the current Mifeprex labeling states in full:

    "WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR

    BLEEDING Serious and sometimes fatal infections and bleeding occur very

    rarely following spontaneous, surgical, and medical abortions, including

    following MIFEPREX use. No causal relationship between the use of

    MIFEPREX and misoprostol and these events has been established. Atypical

    Presentation of Infection. Patients with serious bacterial infections (e.g.,

    Clostridium sordellii) and sepsis can present without fever, bacteremia, or

    significant findings on pelvic examination following an abortion. Very

    rarely, deaths have been reported in patients who presented without fever,

    with or without abdominal pain, but with leukocytosis with a marked left

PCSF784

shift, tachycardia, hemoconcentration, and general malaise. A high index of suspicion is needed to rule out serious infection and sepsis [see Warnings and Precautions (5.1)]. Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. Advise patients to seek immediate medical attention if they experience prolonged heavy vaginal bleeding [see Warnings and Precautions (5.2)]. Because of the risks of serious complications described above, MIFEPREX is available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the MIFEPREX REMS Program [see Warnings and Precautions (5.3)]. Before prescribing MIFEPREX, inform the patient about the risk of these serious events. Ensure that the patient knows whom to call and what to do, including going to an Emergency Room if none of the provided contacts are reachable, if she experiences sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if she experiences abdominal pain or discomfort, or general malaise (including weakness, nausea, vomiting or diarrhea) for more than 24 hours after taking misoprostol. Advise the patient to take the Medication Guide with her if she visits an emergency room or a healthcare provider who did not prescribe MIFEPREX, so that the provider knows that she is undergoing a medical abortion."

6

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 8 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10/Filed 05/27/2575 Page 55 of 79 .7310
PageID.9543

20. There is no known risk of a patient developing a dependency on Mifeprex.

21. As of March 2016, approximately 2.5 million women in the U.S. had used Mifeprex. As of December 2017, more than 3 million women in the U.S. had used Mifeprex.

22. FDA originally approved Mifeprex under its "Subpart H" regulations (21 C.F.R. §§ 314.500-560) and subject to certain restrictions.

23. In 2007, pursuant to Section 909(b)(1) of the newly enacted Food and Drug Administration Amendments Act of 2007, Mifeprex was "deemed to have in effect an approved risk evaluation and mitigation strategy" (*i.e.*, REMS) because FDA previously had approved it with certain restrictions under its "Subpart H" regulations.

24. In 2011, FDA affirmatively approved Mifeprex's REMS, maintaining the same requirements initially imposed in 2000 and subsequently deemed a REMS in 2007. A true and correct copy of the Mifeprex REMS approved in 2011 is attached as **Exhibit B**.

25. In 2015, Danco submitted an sNDA seeking approval to alter the Mifeprex indication, labeling, and REMS to reflect an updated, evidence-based prescription regimen.

26. FDA reviewed both the Mifeprex labeling and REMS in 2015-2016.

PCSF786

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 9 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-10   Filed 05/27/2576   Page 56 of 79   PageID.7311
PageID.9544

27. In 2016, FDA reauthorized the Mifeprex REMS. A true and correct copy of the Mifeprex REMS approved in March 2016 is attached as **Exhibit C**.

28. The Mifeprex REMS includes three Elements to Assure Safe Usage ("ETASU"):

- **The Prescriber Certification Requirement** (ETASU A) provides that health care providers who prescribe Mifeprex must be specially certified. To become specially certified, a health care provider must review the Prescribing Information for Mifeprex; complete the *Prescriber Agreement Form*; and follow certain guidelines for use of Mifeprex. By signing the *Prescriber Agreement Form*, prescribers agree that they have the ability to assess the duration of pregnancy accurately, the ability to diagnose ectopic pregnancies, and the ability to provide surgical intervention in cases of incomplete abortion or severe bleeding or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to provide blood transfusions and resuscitation, if necessary; prescribers also agree that they will follow the guidelines for use of Mifeprex. The guidelines for use of Mifeprex require prescribers to review the *Patient Agreement Form* with the patient; fully explain the risks of the Mifeprex treatment regimen; answer any questions the patient may have prior to receiving Mifeprex;

8

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 10 of 29     PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-610/04/21   Filed 05/27/25   Page 57 of 79   ID.7312
PageID.9545

sign the *Patient Agreement Form* and obtain the Patient's signature on

the *Form*; provide the patient with a copy of the *Patient Agreement Form*

and the Mifeprex Medication Guide; place the signed *Patient Agreement

Form* in the patient's medical record; record the serial number from each

package of Mifeprex in each patient's record; and report any deaths to

Danco, identifying the patient by a non-identifiable reference and the

serial number from each package of Mifeprex. Danco is responsible for

ensuring that healthcare providers who prescribe Mifeprex are specially

certified in accordance with these requirements and de-certifying health

care providers who do not maintain compliance with certification

requirements. Danco is also required to provide the prescribing

information and *Prescriber Agreement Form* to healthcare providers who

inquire about how to become certified.

- **The Restricted Distribution Requirement** (ETASU C), provides that

  Mifeprex must be dispensed to patients only in certain health care

  settings, specifically clinics, medical offices, and hospitals, by or under

  the supervision of a certified prescriber; and that Danco must ensure that

  Mifeprex is not distributed to or dispensed through retail pharmacies,

  mail-order pharmacies, or any other setting not described above.

PCSF788

- **The Patient Agreement Requirement** (ETASU D), provides that a patient must sign a *Patient Agreement Form* indicating that she has received, read, and been provided a copy of the *Patient Agreement Form*, and received counseling from the prescriber regarding the risk of serious complications associated with Mifeprex.

29. The REMS does not require that the patient take Mifeprex in certain health care settings, only that it be dispensed to her in certain health care settings. The patient may self-administer the medication in a location of her choosing, outside a supervised setting.

30. The *Patient Agreement Form* approved in 2016 includes the following statement: "I understand:

    a. I will take Mifeprex on Day 1.

    b. My provider will either give me or prescribe for me the misoprostol tablets which I will take 24 to 48 hours after I take Mifeprex."

31. Between November 2015 and February 2016, FDA received three letters from representatives of academia and various professional organizations relating to the Mifeprex sNDA and REMS ("the Letters").

32. The first letter was dated November 3, 2015, and signed by the American Public Health Association (Population, Reproductive, and Sexual Health

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 12 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/2579   Page 59 of 79   PageID.7314
PageID.9547

Section); Gynuity Health Projects; Ibis Reproductive Health; the National

Abortion Federation; and clinicians from the Albert Einstein College of

Medicine, Columbia University, Princeton University, Stanford University,

the University of California San Francisco, the University of North Carolina,

the University of New Mexico, and the University of Ottawa, among others.

A true and correct copy is attached as **Exhibit D**.

33. The second letter was dated November 4, 2015, and signed by Hal C.

Lawrence, III, MD, FACOG, the Executive Vice President and CEO of the

American College of Obstetricians and Gynecologists. A true and correct

copy is attached as **Exhibit E**.

34. The third letter was dated February 4, 2016, and signed by the Association

of Reproductive Health Professionals, Ibis Reproductive Health, Gynuity

Health Projects, the National Abortion Federation, Planned Parenthood

Federation of America, and Plaintiff Society of Family Planning ("SFP"),

among others. A true and correct copy is attached as **Exhibit F**.

35. The Letters requested certain changes to the Mifeprex labeling, and that the

REMS be modified or eliminated, to remove the Patient Agreement and

eliminate the prescriber certification, while allowing Mifeprex to be

dispensed through retail pharmacies.

PCSF790

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 13 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-10   Filed 05/27/2580   Page 60 of 79.7315
PageID.9548

36.In a February 25, 2016, letter addressed to the principal signatory of the

Letter signed by Plaintiff SFP, Janet Woodcock, Director of FDA's Center

for Drug Evaluation and Research ("CDER"), wrote: "Thank you for your

letter dated February 4, 2016, to [then-Acting FDA Commissioner] Dr.

Ostroff, Dr. Califf, and me with recommendations to lift the Risk Evaluation

and Mitigation Strategy (REMS) for Mifeprex (mifepristone), and to extend

the indicated use of Mifeprex through a gestational age of 70 days. Dr.

Ostroff has asked me to respond on behalf of the FDA because the Center

for Drug Evaluation and Research is responsible for regulating all drugs,

including mifepristone. Please share this response with your cosigners. In

your letter, you strongly encouraged FDA to revise the mifepristone label

and eliminate the REMS restrictions, especially the Elements to Assure Safe

Use, which includes the prescriber and patient agreements. You requested

that the dose regimen be changed to mifepristone 200 mg followed 24-48

hours later by misoprostol 800 mcg. You also recommended not restricting

the location where the patient should take these drugs and stated that an in-

person visit is not always necessary for a follow-up assessment. Moreover,

you proposed that any licensed health care provider should be able to

prescribe mifepristone, and that it be available through pharmacies as well as

provider offices. Your letter has been shared with the appropriate FDA staff

PCSF791

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 14 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/21   Page 61 of 79   PageID.7316
PageID.9549

and will be carefully reviewed." A true and correct copy of that letter is attached as **Exhibit G**.

37. As part of their consideration of whether each element of the Mifeprex REMS continued to be necessary to ensure that the benefits of Mifeprex outweigh its risks for the approved indication, 11 FDA employees (eight managers and three reviewers/analysts) recommended that the Patient Agreement Form be removed from the Mifeprex REMS.

38. Dr. Robert M. Califf, the former Commissioner of Food and Drugs ("Commissioner"), was briefed orally on March 2 and/or 18, 2016, about the Mifeprex sNDA, including the conclusion of FDA's CDER that a REMS remained necessary to ensure that the benefits of Mifeprex outweigh its risks, but that the REMS should be modified, including by removing one component of the REMS, the Patient Agreement Form.

39. The Commissioner is a political appointee.

40. Subsequent to being briefed, the Commissioner requested that the Patient Agreement Form remain a component of the Mifeprex REMS.

41. In a March 28, 2016, memorandum documenting the Commissioner's request and related action, Dr. Woodcock wrote: "The currently approved REMS for Mifeprex contains a Patient Agreement Form required to be signed by both the patient and the prescriber. During the review of the

13

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 15 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-10   Filed 05/27/2582   Page 62 of 79 PageID.7317
PageID.9550

REMS in connection with [the sNDA submitted by Danco], [**redacted**] found that the information contained in the Patient Agreement Form is generally duplicative of information in the Medication Guide and of information and counseling provided to patients under standard informed consent practices for medical care and under professional practice guidelines. For the reasons further described in their reviews, the reviewers recommended that the Patient Agreement Form be removed from the REMS. After being briefed on the planned changes to the NDA that the Center [for Drug Evaluation and Research] was considering, the Commissioner concluded that continuing the REMS requirement for a signed Patient Agreement Form would not interfere with access and would provide additional assurance that the patient is aware of the nature of the procedure, its risks, and the need for appropriate follow-up care.  He requested that the Patient Agreement Form be retained as an element of the REMS.  Therefore, I have asked [**redacted**] and [**redacted**] to continue to include a Patient Agreement Form in the REMS for Mifeprex."

42. The Mifeprex REMS approved in 2016 contains the same restrictions that were originally imposed in 2000 pursuant to FDA's Subpart H regulations; then deemed a REMS in 2007; and then affirmatively approved in 2011, with three changes: (1) Revisions to the Prescriber Agreement Form; (2)

PCSF793

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 16 of 29     PageID #:
Case 1:23-cv-03026-TOR   Document 140-610   Filed 05/27/2583   Page 63 of 79   D.7318
PageID.9551

Removal of the Medication Guide as a REMS Element; and (3) Updating of
the REMS Goals to reflect the above changes.

43. The 2016 REMS also removed the requirement that Danco report to the
FDA certain specifically enumerated adverse events, such as all
hospitalizations due to complications or blood transfusions, but retained the
reporting requirement as to deaths.

44. In addition to Dr. Califf, other politically-appointed FDA employees in the
Office of the Commissioner were involved in the 2016 Mifeprex REMS
decision.

45. The following materials were presented to politically-appointed FDA
employees in relation to the 2016 decision that a REMS remained necessary
to ensure the safe use of Mifeprex: A high-level summary of the history of
Mifeprex and the pending sNDA, including potential modifications to the
REMS; the Letters; drafts of potential responses to press inquiries; drafts of
material to be posted on FDA's website regarding Mifeprex; and a draft of
the sNDA approval.

46. In April 2019, the FDA approved a generic version of mifepristone for use
as a medical option of terminating an early pregnancy. It has the same
labeling as Mifeprex and is required to use the single, shared system
"Mifepristone REMS" with Mifeprex.

15

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 17 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/25   Page 64 of 79   PageID.7319
PageID.9552

47. In a declaration dated October 8, 2019, Janet Woodcock, the Director of the

FDA's CDER, stated: "In light of the violence and harassment surrounding

the provision of abortion, FDA withheld FDA employee names and other

identifying information from documents related to Mifeprex in the

administrative record produced in this case due to the risk to the health

and/or safety of those employees if their names and/or identifying

information were made public. Since 2000, FDA has withheld this

information from agency records related to Mifeprex because of these risks.

Because releasing this information would constitute an unwarranted invasion

of personal privacy and could expose those employees to threats,

intimidation, harassment and/or violence, FDA believes it is necessary not to

disclose information that could be used to identify these employees to any

person outside of FDA, including Plaintiffs' counsel subject to a protective

order."

*Mifeprex REMS Goals and Rationales*

48. Prior to March 2016, the official Mifeprex REMS Goals were:

- "To provide information to patients about the benefits and risks of

    Mifeprex before they make a decision whether to take the drug.

- To minimize the risk of serious complications by requiring prescribers

    to certify that they are qualified to prescribe Mifeprex and are able to

16

assure patient access to appropriate medical facilities to manage any

complications."

49. As of March 2016, the official Mifeprex REMS Goal is: "To mitigate the

risk of serious complications associated with Mifeprex by:

> a) Requiring healthcare providers who prescribe Mifeprex to be
>
> certified in the Mifeprex REMS Program.
>
> b) Ensuring that Mifeprex is only dispensed in certain
>
> healthcare settings by or under the supervision of a certified
>
> prescriber.
>
> c) Informing patients about the risk of serious complications
>
> associated with Mifeprex."

50. There are two documents in the Administrative Record that set out FDA's

rationale for maintaining the Mifeprex REMS: First, an October 2013

memorandum entitled *Final Risk Evaluation and Mitigation Strategy*

*(REMS) Review* for Mifeprex (the "2013 REMS Review"), a true and correct

copy of which is attached as **Exhibit H**. Second, a March 2016

memorandum entitled *Risk Assessment and Risk Mitigation Review(s)* for

Mifeprex ("2016 REMS Review"), a true and correct copy of which is

attached as **Exhibit I**.

51. The 2013 REMS Review includes a section entitled "Impact of REMS Elements and Their Removal," with subsections on "Prescriber Certification" (*i.e.*, ETASU A); "Restricted to Certain Healthcare Settings" (*i.e.*, ETASU C); and "Documentation of Safe Use Conditions," (*i.e.*, ETASU D).

52. The "Prescriber Certification"/ETASU A subsection of the 2013 REMS Review states in full: "This Prescriber Agreement is a one-time event with limited burden. Prescriber certification probably has the most influence of the three ETASUs in addressing safe use and limiting access to Mifeprex because this element requires physicians to attest to having certain skills, agree to abide by the program requirements including reporting of serious adverse events, and complete an additional step (e.g., the enrollment form) in the usual drug procurement process. Eliminating this element opens access to any prescriber. Therefore, it is possible that physicians and advanced practice healthcare providers (e.g., physician assistants, nurse practitioners) who are not familiar with Mifeprex and/or practice outside of facilities with established protocols may prescribe Mifeprex; a factor that could contribute to an increase in serious complications."

53. The "Restricted to Certain Healthcare Settings"/ETASU C subsection of the 2013 REMS Review states in full: "This element limits distribution by

PCSF797

preventing the distribution of Mifeprex through retail (including mail order

and internet) pharmacies. If this restriction was removed, any pharmacy

could stock the drug and prescribers would no longer have to stock

Mifeprex. In a 'worst case' scenario, the following *could* occur:

- patients are not properly counseled about the serious complications and what to do in the event that they experience an adverse event,
- patients may not pick-up the prescription – failing to initiate the abortion in a timely manner resulting in ineffective or inappropriate use of the drug or potentially an increased incidence of complications,
- patients have difficulty finding a pharmacy that stocks the drug because not all pharmacies may choose to stock the drug, resulting in treatment delay.

Although not safety concerns, confidentiality and personal safety are

significant concerns with Mifeprex. Distribution through retail pharmacies

could compromise patient and prescriber confidentiality with adding a new

stakeholder to the treatment process, and pharmacies could be targeted by

individuals or groups opposed to abortions. Restriction of mifepristone to

certain healthcare settings is probably the most critical element for

maintaining confidentiality and privacy for both patients and prescribers.

This element also contributes to the patient's safe use of Mifeprex by

making the prescriber responsible for giving the drug directly to the patient

and counseling the patient at the time of dispensing. It is safer for the patient

- providing the opportunity for direct observed therapy (although this is not a

REMS program requirement) to initiate the time-sensitive abortion process,

19

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 21 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 140-610/Filed 05/27/2588 Page 68 of 79.7323
PageID.9556

and ensures the patient leaves the healthcare facility with the medications that are necessary for completing a medical abortion to maximize efficacy and minimize risk."

54. The "Documentation of Safe Use Conditions"/ ETASU D subsection of the 2013 REMS Review states in full: "The REMS requires that prescribers review and complete a Patient Agreement with each patient before treatment is initiated. The signed Agreement is placed in the patient's medical record; however it is not collected by Danco. There is no data available on how often the Agreement is utilized. Family planning clinics generally utilize consent forms and in this type of practice setting the Patient Agreement may be redundant. Therefore, it is not known if removing this element would increase the risk that a patient is not properly informed and counseled about complications and what to do when a complication occurs."

55. The 2013 REMS Review includes a section entitled "Discussion," which states in full: "[**redacted**] and [**redacted**] considered two options – maintain the REMS or eliminate the REMS with the following possible rationale for each option:

- Eliminate the REMS: No new safety concerns have been identified in 6-7 years. The serious complications being reported now have been consistent with labeling and the reporting rate has been stable over the

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 22 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/25   Page 69 of 79   PageID.7324
PageID.9557

last several years. These complications are consistent with what one

would expect with a surgical abortion and are not necessarily unique

to a medical abortion with Mifeprex. Use of Mifeprex has been

primarily in Planned Parenthood and other family planning clinics

where there are protocols and familiarity with assessing the duration

of pregnancy, diagnosing an ectopic pregnancy, performing surgical

interventions in cases of incomplete abortion, and caring for patients

that experience serious complications. Some of the safe use practices

surrounding Mifeprex may therefore already be embedded in these

practice sites that already [sic] dispensing Mifeprex and would likely

be maintained even if the REMS were eliminated.

- Maintain the REMS: There have been a small number of reported

  serious complications associated with Mifeprex and this is likely

  reflective of the use of Mifeprex within a system of knowledgeable

  healthcare providers, safe use protocols, proper patient counseling,

  and follow-up procedures. Medical abortion accounts for the minority

  of abortions in the U.S. Similarly, training opportunities in medical

  abortion appear limited and are less available than surgical abortion

  experience. Given this relative lack of familiarity and experience with

  medical abortion, a restricted distribution program that reinforces the

PCSF800

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 23 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/2590   Page 70 of 79.7325
PageID.9558

necessary skills and appropriate care (i.e., counseling and follow-up)

is necessary to assure safe use of Mifeprex. The Mifeprex REMS

provides the foundation to ensure the implementation of safe use

conditions with Mifeprex use. Accurate gestation date, patient

education, dispensing Mifeprex directly to the patient during the

office visit, and timely access to medical care remain important to

maintaining the current safety profile of Mifeprex. It is not likely that

the essential safe use conditions will be maintained to a similar extent

if a REMS is no longer required and, as a consequence, we would

expect a negative impact on the types, incidence, and severity of

adverse events."

56. The 2013 REMS Review includes a section entitled "Recommendation and

Conclusion," which states in full: "[**Redacted**] recommends that the existing

elements of the REMS should be maintained.  Specifically, prescriber

certification and dispensing limited to certain healthcare setting provide a

framework to ensure that the benefits of Mifeprex outweigh its risks in an

appropriate patient population.  On January 30, 2013, [redacted] and

[redacted] presented this recommendation to the Center Director and senior

level management from [redacted].  There was general consensus that a

REMS is necessary to ensure that the benefits outweigh its risks."

PCSF801

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 24 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/21   Page 71 of 79   PageID.7326
PageID.9559

57. The 2016 REMS Review states in part: "The safety profile of Mifeprex is
well-characterized and its risks well-understood after more than 15 years of
marketing. Serious adverse events are rare and the safety profile of Mifeprex
has not substantially changed. The removal of the Medication Guide as a
REMS element and of the Patient Agreement form is not expected to
adversely impact the ability of the REMS to ensure that the drug benefits
outweigh its risks. The benefit risk balance of Mifeprex remains favorable in
the presence of the following:

- Retention of ETASUs A and C in the Mifeprex REMS: The
  Prescriber's Agreement form required for prescriber certification
  under ETASU A will continue to require that providers 'explain
  the procedure, follow-up, and risks to each patient and give her an
  opportunity to discuss them.' The REMS will continue to require
  that Mifeprex be dispensed to patients only in certain healthcare
  settings, specifically, clinics, medical offices, and hospitals by or
  under the supervision of a certified prescriber. This ensures that
  Mifeprex can only be dispensed by or under the direct supervision
  of a certified prescriber.

- Communication of risks through patient labeling: The Medication
  Guide, which will be retained as part of labeling, contains the same

23

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 25 of 29     PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/2592 Page 72 of 79.7327
PageID.9560

risk information covered under the Patient Agreement form. Under

21CFR 208.24, prescribers who dispense Mifeprex are required to

provide the Medication Guide to patients. The Prescriber's

Agreement form also reminds the prescriber to provide the

Medication Guide to the patient.

- <u>Information from published articles on established clinical practices:</u> This information, including clinical guidelines and publications, indicates that comprehensive patient counseling and informed consent prior to medical or surgical abortion treatment is standard of care when using Mifeprex."

58. On April 12, 2021, FDA announced that, "provided the other requirements

of the Mifepristone REMS Program are met," it "intends to exercise

enforcement discretion during the COVID-19 [Public Health Emergency

("PHE")] with respect to the in-person dispensing requirement of the

Mifepristone REMS Program, including any in-person requirements that

may be related to the Patient Agreement Form." FDA also stated that, "to the

extent all of the other requirements of the Mifepristone REMS Program are

met," it "intends to exercise enforcement discretion during the COVID-19

PHE with respect to the dispensing of mifepristone through the mail either

by or under the supervision of a certified prescriber, or through a mail-order

PCSF803

Case 1:17-cv-00493-JAO-RT   Document 140   Filed 04/15/21   Page 26 of 29   PageID #:
Case 1:17-cv-00493-JAO-RT   Document 240-10   Filed 05/27/25   Page 73 of 79   PageID.7328
PageID.9561

pharmacy when such dispensing is done under the supervision of a certified

prescriber." A true and correct copy of FDA's letter is attached as **Exhibit J.**

### *Other Stipulations*

59. There are over 20,000 prescription drug products that are FDA-approved for

marketing.

60. As of November 2019, FDA subjected 530 drug applications to a REMS,

75% of which were opioids.

61. As of June 2020, 17 drug products, including Mifeprex and its generic, were

subject to a REMS with an in-person dispensing and/or administration

requirement.

62. Misoprostol is not subject to a REMS and may be obtained by prescription

from a pharmacy.

63. Korlym® (mifepristone) tablets, 300 mg., is FDA-approved for the control

of hyperglycemia secondary to hypercortisolism in adult patients with

endogenous Cushing's syndrome who have type 2 diabetes mellitus or

glucose intolerance and in whom surgery has not been successful or who are

not candidates for surgery.

64. Korlym was initially approved on February 17, 2012.

65. Korlym is approved for chronic, daily use in doses ranging from 300 to 1200

mg.

PCSF804

66. Korlym is not subject to a REMS. It is available through a specialty

pharmacy pursuant to a voluntary restricted distribution system.

67. At least eight FDA managers and two reviewers/analysts were involved in

both the 2016 determination that a REMS continues to be necessary to

ensure the safe use of Mifeprex, and the decision not to impose a REMS for

Korlym.

68. Any provider who is not comfortable using patient medical history or a

clinical examination to assess the duration and location of a pregnancy can

obtain that information by ordering an ultrasound.

PCSF805

Dated:  April 15, 2021

Respectfully submitted,

/s/ Julia Kaye
JULIA KAYE
RACHEL REEVES
LORIE CHAITEN
WHITNEY WHITE
RUTH HARLOW
American Civil Liberties Union Foundation

/s/ Jongwook "Wookie" Kim
JONGWOOK "WOOKIE" KIM
ACLU of Hawai'i Foundation

JOHN FREEDMAN
Arnold & Porter Kaye Scholer LLP

*Attorneys for Plaintiffs*

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

MICHAEL D. GRANSTON
Deputy Assistant Attorney General
Civil Division

GUSTAV W. EYLER
Director
Consumer Protection Branch

HILARY K. PERKINS
Assistant Director

/s/ Jonathan E. Amgott
JONATHAN E. AMGOTT
Trial Attorney
Consumer Protection Branch

27

Civil Division
U.S. Department of Justice
450 5th Street, N.W.
Washington, D.C. 20530
(202) 532-5025
Jonathan.E.Amgott@usdoj.gov

*Attorneys for Defendants*

PCSF807

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ARUN G. RAO
Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director, Civil Litigation

HILARY K. PERKINS
Assistant Director

NOAH T. KATZEN (D.C. Bar No. 1006053)
ISAAC C. BELFER (D.C. Bar No. 1014909)
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
450 Fifth St., N.W.
Washington, DC 20530
Tele: 202-305-2428 (Katzen)/202-305-7134 (Belfer)
Fax: 202-514-8742
Noah.T.Katzen@usdoj.gov
Isaac.C.Belfer@usdoj.gov

*Attorneys for Defendants (see signature page for complete list)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| HEIDI PURCELL, M.D., FACOG, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, *et al.*,<br><br>Defendants. | CIV. NO. 1:17-00493-JAO-RT<br><br>**ANSWER TO CORRECTED SECOND AMENDED AND SUPPLEMENTAL COMPLAINT** |

1

speaks for itself, and respectfully refer the Court to the Mifepristone REMS Program for a full and complete statement of its contents.

147.   Defendants admit that the cited document contains the quoted text. Defendants deny any characterization of that document, which speaks for itself, and respectfully refer the Court to that document for a full and complete statement of its contents. Defendants further deny that FDA's rationale for maintaining ETASU A was "a pure tautology."

148.   This paragraph characterizes the cited documents. Defendants admit that on January 3, 2023, FDA approved supplemental applications that modified the Mifepristone REMS Program. Defendants further admit that the cited documents contain the quoted text. Defendants deny any characterization of those documents, which speak for themselves, and respectfully refer the Court to those documents for a full and complete statement of their contents.

149.   Deny.

150.   Deny.

151.   Defendants deny the allegations in the first sentence for lack of knowledge or information sufficient to form a belief as to their truth. Defendants deny the allegations in the second sentence.

152.   Deny, except Defendants admit there are other drugs for which patient screening is the standard of care but that are not subject to ETASU.

38

allegations characterize the Mifepristone REMS Program. Defendants deny any characterization of the Mifepristone REMS Program, which speaks for itself, and respectfully refer the Court to the Mifepristone REMS Program for a full and complete statement of its contents. Defendants further deny that the Pharmacy Certification ETASU imposes burdens beyond what is permitted by statute.

158.   As to the first sentence, Defendants admit that the cited document contains the quoted text. Defendants deny any characterization of that document, which speaks for itself, and respectfully refer the Court to that document for a full and complete statement of its contents. Defendants specifically deny that "the Pharmacy Certification ETASU is burdensome." Defendants deny the allegations in the second sentence.

159.   Defendants admit that the cited document contains the quoted text. Defendants deny any characterization of that document, which speaks for itself, and respectfully refer the Court to that document for a full and complete statement of its contents.

160.   Defendants deny the allegations in the first sentence. As to the second sentence, Defendants admit that by January 3, 2023, a limited number of pharmacies had been dispensing mifepristone without certification for a period of time. Defendants deny any remaining allegations in the second sentence.